**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PERRY CAPITAL LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1025-RLW |
| | ) | |
| **JACOB J. LEW**, in his official capacity as | ) | |
| Secretary of the Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |
| **FAIRHOLME FUNDS, INC.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1053-RLW |
| | ) | |
| **FEDERAL HOUSING FINANCE AGENCY**, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |
| **ARROWOOD INDEMNITY COMPANY**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1439-RLW |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | |
| **ASSOCIATION**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |
| **In re Fannie Mae/Freddie Mac Senior** | ) | |
| **Preferred Stock Purchase Agreement Class** | ) | |
| **Action Litigations** | ) | Misc. Action No. 13-mc-1288-RBW |
| ———————————— | ) | |
| This document relates to: | ) | |
| ALL CASES | ) | |
| ——————————————————— | ) | |

**ADMINISTRATIVE RECORD
OF THE DEPARTMENT OF TREASURY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PERRY CAPITAL LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1025-RLW |
| | ) | |
| **JACOB J. LEW**, in his official capacity as | ) | |
| Secretary of the Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **FAIRHOLME FUNDS, INC.,** *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1053-RLW |
| | ) | |
| **FEDERAL HOUSING FINANCE AGENCY,** | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **ARROWOOD INDEMNITY COMPANY**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1439-RLW |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | |
| **ASSOCIATION**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| **In re Fannie Mae/Freddie Mac Senior** | ) | |
| **Preferred Stock Purchase Agreement Class** | ) | |
| **Action Litigations** | ) | Misc. Action No. 13-mc-1288-RBW |
| _____ | ) | |
| This document relates to: | ) | |
| ALL CASES | ) | |
| _____ | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Timothy Bowler, declare as follows:

1.      I am currently Deputy Assistant Secretary, Capital Markets, in the U.S. Department of the Treasury (Treasury).   I have held this position since August 1, 2011.

2.      As Deputy Assistant Secretary, Capital Markets, I advised and assisted the Secretary of the Treasury, the Under Secretary for Domestic Finance, and other senior officials on entering into the Third Amendment to the Senior Preferred Stock Purchase Agreement with the Federal National Mortgage Association and Third Amendment to the Senior Preferred Stock Purchase Agreement with the Federal Home Loan Mortgage Corporation.

3.      The documents annexed hereto reflect, to the best of my knowledge, the nonprivileged information considered by Treasury in entering into the August 17, 2012, Third Amendment to the Senior Preferred Stock Purchase Agreement with the Federal National Mortgage Association and the August 17, 2012, Third Amendment to the Senior Preferred Stock Purchase Agreement with the Federal Home Loan Mortgage Corporation.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 17th day of December, 2013, in Washington, D.C.

Timothy Bowler
Deputy Assistant Secretary, Capital Markets

**INDEX**

| Tab | Document | Bates Range |
|-----|----------|-------------|
| 1 | HERA Determination for Senior Preferred Stock Purchase Agreements (September 7, 2008) | 0001-0016 |
| 2 | Fannie Mae Senior Preferred Stock Purchase Agreement (September 7, 2008) | 0017-0031 |
| 3 | Fannie Mae Senior Preferred Stock Certificate (September 7, 2008) | 0032-0040 |
| 4 | Fannie Mae Warrant to Purchase Common Stock (September 7, 2008) | 0041-0050 |
| 5 | Freddie Mac Senior Preferred Stock Purchase Agreement (September 7, 2008) | 0051-0065 |
| 6 | Freddie Mac Senior Preferred Stock Certificate (September 7, 2008) | 0066-0074 |
| 7 | Freddie Mac Warrant to Purchase Common Stock (September 7, 2008) | 0075-0084 |
| 8 | Statement of FHFA Director James B. Lockhart (September 7, 2008) | 0085-0094 |
| 9 | Fannie Mae Amended and Restated Senior Preferred Stock Purchase Agreement (September 26, 2008) | 0095-0108 |
| 10 | Fannie Mae Senior Preferred Stock Certificate Form (September 26, 2008) | 0109-0117 |
| 11 | Fannie Mae Warrant to Purchase Common Stock (September 26, 2008) | 0118-0127 |
| 12 | Freddie Mac Amended and Restated Senior Preferred Stock Purchase Agreement (September 26, 2008) | 0128-0141 |
| 13 | Freddie Mac Senior Preferred Stock Certificate Form (September 26, 2008) | 0142-0150 |

| 14 | Freddie Mac Warrant to Purchase Common Stock (September 26, 2008) | 0151-0160 |
|----|----|----|
| 15 | Action Memorandum – Amendments to the Senior Preferred Stock Purchase Agreement with Fannie Mae and Freddie Mac, and Related Determination (May 6, 2009) | 0161-0162 |
| 16 | HERA Determination for Amendments to Senior Preferred Stock Purchase Agreements (May 6, 2009) | 0163-0164 |
| 17 | Fannie Mae Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (May 6, 2009) | 0165-0169 |
| 18 | Freddie Mac Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (May 6, 2009) | 0170-0174 |
| 20 | Action Memorandum – Expiration of HERA Authority and Amendments to the Preferred Stock Purchase Agreements (PSPAs) between Treasury and Fannie Mae and Freddie Mac (December 22, 2009) | 0175-0180 |
| 21 | Action Memorandum – Determination under Section 1117 of the Housing and Economic Recovery Act of 2008 for Purchase of Obligations and Securities of Regulated Entities (December 24, 2009) | 0181-0186 |
| 22 | HERA Determination for Second Amendment to Senior Preferred Stock Purchase Agreements (December 24, 2009) | 0187-0188 |
| 23 | Fannie Mae Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (December 24, 2009) | 0189-0194 |
| 24 | Freddie Mac Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (December 24, 2009) | 0195-0200 |

| 25 | Action Memorandum – Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (PSPAs) (December 20, 2010) | 0201-0203 |
|----|----|----|
| 26 | Periodic Commitment Fee Waiver Letter (December 29, 2010) | 0204 |
| 27 | Reforming America's Housing Finance Market: A Report to Congress, February 2011 | 0205-0236 |
| 28 | Fannie Mae 2010 Form 10-K | 0237-0639 |
| 29 | Freddie Mac 2010 Form 10-K | 0640-1063 |
| 30 | Periodic Commitment Fee Waiver Letter (March 31, 2011) | 1064 |
| 31 | Fannie Mae First Quarter 2011 Form 10-Q | 1065-1230 |
| 32 | Freddie Mac First Quarter 2011 Form 10-Q | 1231-1461 |
| 33 | Periodic Commitment Fee Waiver Letter (June 30, 2011) | 1462 |
| 34 | Fannie Mae Second Quarter 2011 Form 10-Q | 1463-1646 |
| 35 | Freddie Mac Second Quarter 2011 Form 10-Q | 1647-1892 |
| 36 | Moody's: Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support (September 26, 2011) | 1893-1895 |
| 37 | Periodic Commitment Fee Waiver Letter (September 30, 2011) | 1896 |
| 38 | FHFA Press Release: FHFA Updates Projections of Potential Draws for Fannie Mae and Freddie Mac (October 27, 2011) (attaching FHFA's "Projections of the Enterprises' Financial Performance") | 1897-1912 |
| 39 | Fannie Mae Third Quarter 2011 Form 10-Q | 1913-2113 |
| 40 | Freddie Mac Third Quarter 2011 Form 10-Q | 2114-2357 |

| 41 | Action Memorandum – 2012 Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (December 21, 2011) | 2358-2365 |
|----|----|----|
| 42 | Periodic Commitment Fee Waiver Letter (December 21, 2011) | 2366 |
| 43 | FHFA Press Release: FHFA Sends Congress Strategic Plan for Fannie Mae and Freddie Mac Conservatorships (February 21, 2012) (attaching transmittal letter and "Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending") | 2367-2390 |
| 44 | Fannie Mae 2011 Form 10-K | 2391-2764 |
| 45 | Freddie Mac 2011 Form 10-K | 2765-3247 |
| 46 | Deutsche Bank: The Outlook In MBS and Securities Products (March 14, 2012) | 3248-3273 |
| 47 | Action Memorandum – Periodic Commitment Fee Waiver Letter for Q2 2012 (March 30, 2012) | 3274-3283 |
| 48 | Periodic Commitment Fee Waiver Letter (March 30, 2012) | 3284 |
| 49 | Moody's Presentation to Treasury: Fannie Mae and Freddie Mac Capital Positions (April 4, 2012) | 3285-3294 |
| 50 | Information Memorandum – GSE Budgeting and Cost Estimates (April 13, 2012) | 3295-3343 |
| 51 | Fannie Mae First Quarter 2012 Form 10-Q | 3344-3531 |
| 52 | Freddie Mac First Quarter 2012 Form 10-Q | 3532-3774 |
| 53 | GSE Preferred Stock Purchase Agreements Summary Review and Key Considerations, Presentation to the Office of Management and Budget, May 23, 2012 | 3775-3802 |
| 54 | Federal Housing Finance Agency, Office of Inspector General: Fannie Mae and Freddie Mac: Where the Taxpayers' Money Went (May 24, 2012) | 3803-3832 |

| 55 | GSE Preferred Stock Purchase Agreements (PSPA) Overview and Key Considerations, June 13, 2012 | 3833-3862 |
|----|-----|-----|
| 56 | Conservator's Report on the Enterprises' Financial Performance, First Quarter 2012 | 3863-3880 |
| 57 | Action Memorandum – Periodic Commitment Fee Waiver Letter for Q3 2012 (June 25, 2012) | 3881 |
| 58 | Periodic Commitment Fee Waiver Letter (June 25, 2012) | 3882 |
| 59 | Email dated July 6, 2012 attaching Illustrative Financial Forecasts – Fannie Mae Base Case & Stress Scenarios, July 2012 | 3883-3894 |
| 60 | Email dated August 7, 2012 attaching Treasury's Capital Support for The GSEs, Summary Review and Key Consideration, August 8, 2012 | 3895-3903 |
| 61 | Fannie Mae Second Quarter 2012 Form 10-Q | 3904-4082 |
| 62 | Freddie Mac Second Quarter 2012 Form 10-Q | 4083-4329 |
| 63 | Action Memorandum – Third Amendments to the Senior Preferred Stock Purchase Agreements with Fannie Mae and Freddie Mac (August 15, 2012) | 4330-4333 |
| 64 | Fannie Mae Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (August 17, 2012) | 4334-4341 |
| 65 | Freddie Mac Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (August 17, 2012) | 4342-4349 |
| 66 | Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities | 4350-4357 |

## DETERMINATION

**WHEREAS,** Section 1117 of the Housing and Economic Recovery Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to purchase any obligations and other securities ("purchase authority") issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and any Federal Home Loan Bank (collectively, the "regulated entities"), on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine;

**WHEREAS,** Section 1117 of the Act provides that in connection with the Secretary's use of his purchase authority, the Secretary must determine that such actions are necessary to: (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer;

**WHEREAS,** Section 1117 of the Act also provides that in making the determination that such actions are necessary to protect the taxpayer, the Secretary shall take into consideration: (i) the need for preferences or priorities regarding payments to the Government; (ii) limits on maturity or disposition of obligations or securities to be purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any such obligation or other security, including repayment; (v) the need to maintain the regulated entities' status as private-shareholder owned companies; and (vi) restrictions on the use of regulated entity resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes;

**NOW, THEREFORE, I HEREBY DETERMINE,** based on the three criteria described above and after taking into consideration the six factors described above and such other information available to me, that (1) the United States Department of the Treasury's (the "Treasury") execution of the Senior Preferred Stock Purchase Agreement (the "Agreement") and, pursuant to such Agreement, the purchase of senior preferred stock and common stock warrants of Fannie Mae and Freddie Mac; (2) the Treasury's purchase in the secondary market of mortgage backed securities issued by Fannie Mae and Freddie Mac; and (3) a Treasury secured lending agreement with each of the regulated entities, are necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

Henry M. Paulson, Jr.
September 7, 2008



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

ASSISTANT SECRETARY

September 7, 2008

## ACTION MEMORANDUM FOR SECRETARY PAULSON

**FROM:**      Anthony W. Ryan
              Acting Under Secretary for Domestic Finance

**SUBJECT:**   Emergency Determination under Section 1117 of the Housing and
              Economic Recovery Act of 2008 for Purchase of Obligations and
              Securities of Regulated Entities

### Recommendation

That you approve and sign the proposed Determination relating to the purchase of
obligations and securities from the regulated entities.

_____ Approve          _____ Disapprove          _____ Let's Discuss

### Background

Section 1117 of the Housing and Economic Recovery Act of 2008 ("the Act") authorizes the
Treasury to purchase any obligations and other securities issued by the Federal National
Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation
("Freddie Mac") (collectively the Government Sponsored Enterprises or "Housing GSEs") and
the twelve Federal Home Loan Banks ("FHLBs"), on such terms and conditions and in such
amounts as you may determine.

In connection with exercising this authority, the Act requires you to make a determination that
such exercise is necessary to: (1) provide stability to the financial markets; (2) prevent
disruptions in the availability of mortgage finance; and (3) protect the taxpayer.  The Act also
provides that in making the determination that the actions are necessary to protect the taxpayer,
you must take into consideration: (i) the need for preferences or priorities regarding payments to
the Government; (ii) limits on maturity or disposition of obligations or securities to be
purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding
or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any
such obligation or other security, including repayment; (v) the need to maintain the regulated
entities' status as private-shareholder owned companies; and (vi) restrictions on the use of
regulated entity resources, including limitations on the payment of dividends and executive
compensation and any such other terms and conditions as appropriate for those purposes.

The overall conditions in the mortgage and housing markets have been, and remain, challenging for many market participants. Both Fannie Mae and Freddie Mac are exposed to these markets through their guarantees of mortgage backed securities and mortgage investments in their portfolios. As the assets supporting Fannie Mae's and Freddie Mac's guarantee and investment portfolios have deteriorated, the costs of raising additional capital and funding themselves have risen. Both Housing GSEs have experienced challenges in raising capital given current conditions. Given these concerns as well as other findings related to unsafe and unsound practices and conditions at both Housing GSEs, the Director of the Federal Housing Finance Agency ("FHFA") has made the determination to place Fannie Mae and Freddie Mac in conservatorship. In addition to the challenges experienced by the Housing GSEs, the FHLBs borrowing costs have also been impacted which also affect the availability of mortgage credit in the overall economy.

**Exercise of Emergency Authority**

In order to provide stability to the financial markets, prevent disruptions in mortgage finance availability, and protect the taxpayers, we recommend that you exercise the authority granted to Treasury in three ways. First, the Treasury will establish a backstop government sponsored enterprise credit facility (GSECF), which will be made available to Fannie Mae, Freddie Mac, and the FHLBs. Second, the Treasury will acquire in the secondary market investment grade agency mortgage backed securities issued by Fannie Mae and Freddie Mac through Financial Agency Agreements with two or three selected financial agents (the "GSE MBS Security Purchase Program"). Third, the Treasury will enter into a Senior Preferred Stock Purchase Agreement ("Purchase Agreement") with both Fannie Mae and Freddie Mac.

The GSECF will provide Fannie Mae, Freddie Mac, and the FHLBs with an ultimate liquidity backstop. As noted, in the months preceding Fannie Mae's and Freddie Mac's entry into conservatorship, the cost of the Housing GSEs' borrowing had become increasingly expensive and volatile, creating uncertainty in the financial markets and concerns regarding the future availability of mortgage financing. The GSECF is intended to help address uncertainty in the markets regarding the Housing GSEs and the FHLBs.

Treasury's purchase of Fannie Mae and Freddie Mac mortgage backed securities through the GSE MBS Purchase Program will help support the availability of mortgage credit by temporarily providing additional capital to the mortgage market.

Finally, to further promote stability in the markets, the Treasury's Senior Preferred Stock Purchase Agreements provides for the purchase of up to $100 billion in Senior Preferred Stock from each Housing GSE to help ensure that they each maintain a positive net worth. This action will improve market stability by providing additional security to Housing GSE debt holders, senior and subordinated, and improve mortgage availability by providing additional confidence to investors in Housing GSE mortgage backed securities. The terms underlying the Purchase Agreement also include the provision of warrants, which will provide potential future upside to the taxpayers.

In designing these three initiatives, specific steps were taken to protect the taxpayer. In particular, consideration was given to the six factors set forth in the Act.

*The need for preferences or priorities* – The Purchase Agreement will protect the taxpayer by providing the Treasury with Senior Preferred Stock that has a liquidation preference over all other classes of equity, including existing preferred stock. The Purchase Agreement also protects the taxpayer by: (i) prohibiting Fannie Mae and Freddie Mac from issuing any additional subordinated debt; and (ii) restricting Fannie Mae and Freddie Mac from increasing the aggregate amount of their indebtedness to more than 110% of the amount of their aggregate indebtedness as of June 30, 2008. In addition, the terms of the Senior Preferred Stock Agreement require Fannie Mae and Freddie Mac to remit to Treasury the net proceeds from the issuance of any equity which is to be applied to redeem amounts outstanding under the liquidation preference (and which shall be applied first against any accrued and unpaid dividends). The GSE MBS Purchase Program will also protect the taxpayer by purchasing mortgage backed securities guaranteed by the Housing GSEs.

*Limits on maturity or disposition of obligations or securities* – The loans made under the GSECF will have a short-term duration and will be fully collateralized. The eligible collateral also will be limited to GSE MBS collateral. There will be adequate haircuts on the collateral to provide additional protection to the taxpayer as well as discretion to change if necessary. In considering the appropriate limits on the duration of the Purchase Agreement, it was determined in order to facilitate market stability that the Purchase Agreement should continue until the earlier of the $100 billion cap having been reached or until all liabilities of Fannie Mae and Freddie Mac have been satisfied. In addition, beginning in 2010 the Treasury will begin to charge the Housing GSEs a periodic commitment fee that will be payable quarterly to compensate the taxpayers for the ongoing support provided to the Housing GSEs under the terms of the Purchase Agreement. Moreover, because the Treasury can hold to maturity securities purchased under the GSE MBS Purchase Program and because of the spreads between Treasury issuances and GSE mortgage backed securities, we do not expect taxpayer losses from this GSE MBS program.

*Housing GSEs plans for orderly resumption of private market funding or capital market access* – Under conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns, and the issuance of the Senior Preferred Stock and Treasury's corresponding commitment of up to $100 billion so that each Housing GSE maintains a positive net worth should strengthen their ability to secure financing in the capital markets.

*Probability of the Housing GSEs and the FHLBs fulfilling the terms of their obligations* – The terms of the GSECF with regard to the short-term duration, eligible collateral, and haircuts make it likely that the Housing GSEs will be able to fulfill their obligations. With regard to the Purchase Agreement, we believe that the structure of the Purchase Agreement and the terms of the Senior Preferred Stock with its liquidation preference over all other equity, including preferred equity, combined with the Purchase Agreement's restrictions on debt issuance, enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed.

*Need to maintain the Housing GSEs' and the FHLBs' status as private shareholder-owned companies* – Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations, or they may emerge in some other form determined by Congress. Conservatorship preserves the status and claims of the preferred and common shareholders. The value of the warrants issued to the government under the terms of the Purchase Agreement could potentially increase in value, thereby providing enhanced value to the taxpayers. Upon the government's exercise of the warrants, the Housing GSEs would be required under the terms of the Purchase Agreement to apply the net cash proceeds to pay-down the liquidation preference of the Senior Preferred Stock. Moreover, the terms of the collateralized short term loans made under the GSECF to the FHLBs are consistent with the need to maintain their status as private shareholder-owned companies.

*Restrictions on the use of corporation resources* – The terms of the Purchase Agreement prohibit Fannie Mae and Freddie Mac from declaring any dividends on outstanding preferred or common stock until the Senior Preferred Stock has been fully redeemed. The Purchase Agreement also prohibits the redemption of any outstanding preferred or common stock without the prior consent of the Treasury until the Senior Preferred Stock has been fully redeemed. The Purchase Agreement requires that the Director of FHFA consult with the Treasury before entering into new compensation arrangements or increasing amounts or benefits payable under existing compensation agreements with certain executive officers.


Attachments:

Tab 1: Determination
Tab 2: Summary of Government Sponsored Enterprise Credit Facility
Tab 3: Summary of the GSE Mortgage Backed Security Purchase Program
Tab 4: Summary of the Senior Preferred Stock Purchase Agreement

TAB 1

## DETERMINATION

**WHEREAS**, Section 1117 of the Housing and Economic Recovery Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to purchase any obligations and other securities ("purchase authority") issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and any Federal Home Loan Bank (collectively, the "regulated entities"), on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine;

**WHEREAS**, Section 1117 of the Act provides that in connection with the Secretary's use of his purchase authority, the Secretary must determine that such actions are necessary to: (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer;

**WHEREAS**, Section 1117 of the Act also provides that in making the determination that such actions are necessary to protect the taxpayer, the Secretary shall take into consideration: (i) the need for preferences or priorities regarding payments to the Government; (ii) limits on maturity or disposition of obligations or securities to be purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any such obligation or other security, including repayment; (v) the need to maintain the regulated entities' status as private-shareholder owned companies; and (vi) restrictions on the use of regulated entity resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes;

**NOW, THEREFORE, I HEREBY DETERMINE**, based on the three criteria described above and after taking into consideration the six factors described above and such other information available to me, that (1) the United States Department of the Treasury's (the "Treasury") execution of the Senior Preferred Stock Purchase Agreement (the "Agreement") and, pursuant to such Agreement, the purchase of senior preferred stock and common stock warrants of Fannie Mae and Freddie Mac; (2) the Treasury's purchase in the secondary market of mortgage backed securities issued by Fannie Mae and Freddie Mac; and (3) a Treasury secured lending agreement with each of the regulated entities, are necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

_____
Henry M. Paulson, Jr.
September ____, 2008

**TAB 2**

## SUMMARY
## Government Sponsored Enterprise Credit Facility

Treasury will established the Government Sponsored Enterprise Credit Facility (GSECF) to ensure credit availability to the housing GSEs. The GSECF is a lending facility that will provide secured funding on an as needed basis under terms and conditions established by the Secretary to protect taxpayers. Fannie Mae, Freddie Mac, and the Federal Home Loan Banks are eligible to borrow under this program if needed.

The facility will offer liquidity if needed until December 31, 2009. The Housing and Economic Recovery Act of 2008 provided Treasury with the authority to establish this facility.

**Funding.** Funding will be provided directly by Treasury from its general fund held at the Federal Reserve Bank of New York (FRBNY) in exchange for eligible collateral from the GSEs, which will be limited to guaranteed mortgage backed securities issued by Freddie Mac and Fannie Mae as well as advances made by the Federal Home Loan Banks. All such assets pledged against loans will be accepted with appropriate collateral margins as determined by Treasury.

- The FRBNY will act as Treasury's fiscal agent to advance funds to the GSEs and to administer collateral arrangements.
- Any lending through the GSECF will be directly debited from Treasury's general account and credited to the borrowing GSE's account, both held at the FRBNY.
- Loan requests will require approval from Treasury and verification by the FRBNY that adequate collateral has been pledged.
- Similar to other borrowing done by Treasury, information on any borrowing will be publicly reported at the end of the following day in the Daily Treasury Statement.
- Any additional borrowing by Treasury necessitated by this program would be subject to the debt limit.

**Loan Duration and Size.** Loans will be for short-term durations and would in general be expected to be for less than one month but no shorter than one week.
- Specific maturities will be determined based on individual loan requests.
- The term of a loan may not be extended, but a maturing loan may be replaced with a new loan under the same borrowing procedures as the initial loan.
- Loans may be pre-paid with two days notice, and loans may be called before their scheduled maturity date.
- Loan amounts will be based on available collateral.
- Loans will not be made with a maturity date beyond December 31, 2009.

**Rate.** The rate on a loan request ordinarily will be based on the daily LIBOR fix for a similar term of the loan plus 50 basis points (LIBOR +50 bp). The rate is set at the discretion of the Secretary with the objective of protecting the taxpayer, and is subject to change.

**Collateral.** All loans will be collateralized and collateral is limited to agency mortgage backed securities issued by Freddie Mac and Fannie Mae and advances made by the Federal Home Loan Banks.

- The collateral will be valued and managed by Treasury's fiscal agent, the FRBNY, based on a range of pricing services.

**TAB 3**

## SUMMARY
## GSE Mortgage Backed Securities Purchase Program

To promote the stability of the mortgage market, Treasury will purchase Government Sponsored Enterprise (GSE) mortgage-backed securities (MBS) in the open market. By purchasing these guaranteed securities, Treasury seeks to broaden access to mortgage funding for current and prospective homeowners, promote market stability, and mitigate pressures on mortgage rates.

**Scope of Program.** Treasury will invest in agency MBS with the size and timing subject to the discretion of the Secretary. The scale of the program will be based on developments in the capital markets and housing markets.

- Congress granted Treasury authority to purchases MBS in the Housing and Economic Recovery Act of 2008. The authority expires on December 31, 2009.
- Treasury will begin later this month with an initial investment of $5 billion in GSE MBS, which are credit-guaranteed by the GSEs. Additional purchases will be made as deemed appropriate.
- Treasury can hold this portfolio of MBS to maturity and, based on mortgage market conditions, Treasury may make adjustments to the portfolio.

**Management.** Treasury will designate independent asset managers as financial agents to undertake the purchase and management of a portfolio of GSE MBS on behalf of Treasury.

- The portfolios will be managed with clear investment guidelines and investment objectives.
- The primary objectives of this portfolio will be to promote market stability, ensure mortgage availability, and protect the taxpayer.

**Risk.** Treasury is committed to protecting taxpayers and will ensure that measures are in place to reduce the potential for investment loss.

- Under most likely scenarios, taxpayers will benefit from this program - both indirectly through the increased availability and lower cost of mortgage financing, and directly through potential returns on Treasury's portfolio of MBS.

**Budget Implications.** Given that Treasury can hold these securities to maturity, the spreads between Treasury's cost of borrowing and GSE MBS indicate that there is no reason to expect taxpayer losses from this program, and it could produce gains.

- Treasury financing of purchases of GSE MBS will be deemed as outlays and are subject to the statutory debt limit.

- However, Treasury will be receiving an income producing asset (a portfolio of GSE MBS) in return for its invested funds.
- Treasury will make available information on purchases through this program in the Monthly Treasury Statement.

**TAB 4**

## SUMMARY
## Treasury Senior Preferred Stock Purchase Agreement

Fannie Mae and Freddie Mac (collectively, GSEs) debt and mortgage backed securities (MBS) outstanding today amount to about $5 trillion, and are held by central banks and investors around the world. Investors have purchased GSE securities in part because the ambiguities in their Congressional charters created a perception of government backing. These ambiguities fostered enormous growth in GSE debt outstanding, and the breadth of these holdings pose a systemic risk to our financial system. Because the U.S. government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

To address our responsibility to support GSE debt holders, Treasury will establish a Senior Preferred Stock Purchase Agreement (Agreement) with each GSE which will ensure that each enterprise does not have a negative net worth. This measure will add to market stability by providing additional security to GSE debt holders – senior and subordinated-- and will add to mortgage affordability by providing additional confidence to investors in GSE MBS. This commitment will eliminate any mandatory triggering of receivership.

These Agreements are the most effective means of averting systemic risk and protecting the taxpayer. They are more efficient than a one-time equity injection, in that Treasury will use them only as needed and on terms that the Department deems appropriate.

These Agreements will provide maximum protection for the taxpayer, in the form of senior preferred stock with a liquidation preference; an upfront $1 billion issuance of senior preferred stock from each GSE, quarterly dividend payments, warrants representing an ownership stake of 79.9% in each GSE going forward, and a quarterly fee starting in 2010.

**Terms of the Agreements:**

- The Agreements will be contracts between the Department of the Treasury and each GSE. They will be indefinite in length and have a capacity of $100 billion each, an amount chosen to demonstrate a strong commitment to the GSEs' creditors and MBS holders. This number is unrelated to the Department's analysis of the current financial conditions of the GSEs.

- If the Federal Housing Finance Agency determines that a GSE's liabilities have exceeded its assets under generally accepted accounting principles, Treasury will contribute cash capital to the GSE in an amount equal to the difference between liabilities and assets and receive in return senior preferred stock, which will be senior to all other preferred stock, common stock or other capital stock to be issued by the GSE. These Agreements will protect the senior and subordinated debt and the mortgage-backed securities of the GSEs. The GSE's common stock and existing preferred shareholders will bear any losses ahead of the government.

- In exchange for entering into these Agreements with the GSEs, Treasury will immediately receive the following compensation:
    - o $1 billion of senior preferred stock in each GSE
    - o Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully-diluted basis at a nominal price.

- The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.

- The senior preferred stock shall not be entitled to voting rights. In a conservatorship, voting rights of all stockholders are vested in the Conservator.

- Beginning March 31, 2010, the GSEs shall pay the Department of Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the Agreement. The Secretary of the Treasury and the Conservator shall determine the periodic commitment fee in consultation with the Chairman of the Federal Reserve.

- The following covenants apply to the GSEs as part of the Agreements.
    - o Without the prior consent of the Treasury, the GSEs shall not:
        - ▪ Make any payment to purchase or redeem its capital stock (other than senior preferred stock), or pay any dividends, including preferred dividends (other than dividends on senior preferred stock).
        - ▪ Issue capital stock of any kind
        - ▪ Enter into any new or adjust any existing compensation agreements with "named executive officers" without consulting with Treasury
        - ▪ Terminate conservatorship other than in connection with receivership
        - ▪ Sell, convey or transfer any of its assets outside the ordinary course of business except as necessary to meet their obligation under the Agreements to reduce their portfolio of retained mortgages and MBS

- Increase its funded senior debt to more than 110% of its funded senior debt as of June 30, 2008
- Consolidate, merge or sell substantially all of its assets

- Each GSE's retained mortgage and MBS portfolio shall not exceed $850 billion as of December 31, 2009, and shall decline by 10% per year until the retained mortgage and MBS portfolio reaches $250 billion.

## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

SENIOR PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") dated as of September 7, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser") and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").  Reference is made to Article 1 below for the meaning of capitalized terms used herein without definition.

### Background

A.  The Agency has been duly appointed as Conservator for Seller pursuant to Section 1367(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as amended, the "FHE Act").  Conservator has determined that entry into this Agreement is (i) necessary to put Seller in a sound and solvent condition; (ii) appropriate to carry on the business of Seller and preserve and conserve the assets and property of Seller; and (iii) otherwise consistent with its powers, authorities and responsibilities.

B.  Purchaser is authorized to purchase obligations and other securities issued by Seller pursuant to Section 304(g) of the Federal National Mortgage Association Charter Act, as amended (the "Charter Act").  The Secretary of the Treasury has determined, after taking into consideration the matters set forth in Section 304(g)(1)(C) of the Charter Act, that the purchases contemplated herein are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer.

THEREFORE, the parties hereto agree as follows:

### Terms and Conditions

## 1. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" means, when used with respect to a specified Person (i) any direct or indirect holder or group (as defined in Sections 13(d) and 14(d) of the Exchange Act) of holders of 10.0% or more of any class of capital stock of such Person and (ii) any current or former director or officer of such Person, or any other current or former employee of such Person that currently exercises or formerly exercised a material degree of Control over such Person, including without limitation each current or former Named Executive Officer of such Person.

"*Available Amount*" means, as of any date of determination, the lesser of (a) the Deficiency Amount as of such date and (b) the Maximum Amount as of such date.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under United States federal law and the law of the State of New York.

"*Capital Lease Obligations*" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Deficiency Amount*" means, as of any date of determination, the amount, if any, by which (a) the total liabilities of Seller exceed (b) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof), in each case as reflected on the balance sheet of Seller as of the applicable date set forth in this Agreement, prepared in accordance with GAAP; provided, however, that:

(i)  for the avoidance of doubt, in measuring the Deficiency Amount liabilities shall exclude any obligation in respect of any capital stock of Seller, including the Senior Preferred Stock contemplated herein;

(ii)  in the event that Seller becomes subject to receivership or other liquidation process or proceeding, "Deficiency Amount" shall mean, as of any date of determination, the amount, if any, by which (a) the total allowed claims against the receivership or other applicable estate (excluding any liabilities of or transferred to any LLRE (as defined in Section 5.4(a)) created by a receiver) exceed (b) the total assets of such receivership or other estate (excluding the Commitment, any unfunded amounts thereof and any assets of or transferred to any LLRE, but including the value of the receiver's interest in any LLRE);

(iii)  to the extent Conservator or a receiver of Seller, or any statute, rule, regulation or court of competent jurisdiction, specifies or determines that a liability of Seller (including without limitation a claim against Seller arising from rescission of a purchase or sale of a security issued by Seller (or guaranteed by Seller or with respect to which Seller is otherwise liable) or for damages arising from the purchase, sale or retention of such a security) shall be subordinated (other than pursuant to a contract providing for such subordination) to all other liabilities of Seller or shall be treated on par with any class of equity of Seller, then such liability shall be excluded in the calculation of Deficiency Amount; and

(iv)  the Deficiency Amount may be increased above the otherwise applicable amount by the mutual written agreement of Purchaser and Seller, each acting in its sole discretion.

"*Designated Representative*" means Conservator or (a) if Conservator has been superseded by a receiver pursuant to Section 1367(a) of the FHE Act, such receiver, or (b) if Seller is not in con-

servatorship or receivership pursuant to Section 1367(a) of the FHE Act, Seller's chief financial officer.

"*Director*" shall mean the Director of the Agency.

"*Effective Date*" means the date on which this Agreement shall have been executed and delivered by both of the parties hereto.

"*Equity Interests*" of any Person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity, ownership or profits of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time.

"*Indebtedness*" of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' acceptances and similar instruments and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing any Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations.

"*Liquidation End Date*" means the date of completion of the liquidation of Seller's assets.

"*Maximum Amount*" means, as of any date of determination, $100,000,000,000 (one hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

"*Mortgage Assets*" of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any

- 3 -

change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

"*Mortgage Guarantee Obligations*" means guarantees, standby commitments, credit enhancements and other similar obligations of Seller, in each case in respect of Mortgage Assets.

"*Named Executive Officer*" has the meaning given to such term in Item 402(a)(3) of Regulation S-K under the Exchange Act, as in effect on the date hereof.

"*Person*" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof, or any other entity whatsoever.

"*SEC*" means the Securities and Exchange Commission.

"*Senior Preferred Stock*" means the Variable Liquidation Preference Senior Preferred Stock of Seller, substantially in the form of Exhibit A hereto.

"*Warrant*" means a warrant for the purchase of common stock of Seller representing 79.9% of the common stock of Seller on a fully-diluted basis, substantially in the form of Exhibit B hereto.

## 2. COMMITMENT

2.1. *Commitment.* Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed $100,000,000,000 (one hundred billion dollars). The liquidation preference of the Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

2.2. *Quarterly Draws on Commitment.* Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the end of each fiscal quarter of Seller which ends on or before the Liquidation End Date, the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the end of such quarter. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount as of the end of the applicable quarter. Purchaser shall provide such funds within sixty (60) days of its receipt of such request or, following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller if such funds are not received sooner, such shorter period as may be necessary to avoid such mandatory appointment of a receiver if reasonably practicable taking into consideration Purchaser's access to funds.

2.3. *Accelerated Draws on Commitment.* Immediately following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller prior to the Liquidation End Date unless Seller's capital is increased by an amount (the "Special Amount")

up to but not in excess of the then current Available Amount (computed based on a balance sheet of Seller prepared in accordance with GAAP that differs from the most recent balance sheet of Seller delivered in accordance with Section 5.9(a) or (b)) on a date that is prior to the date that funds will be available to Seller pursuant to Section 2.2, Conservator may, on behalf of Seller, request that Purchaser provide to Seller the Special Amount in immediately available funds. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains certifications of Conservator that (i) the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the then existing Deficiency Amount) and (ii) the requested amount is required to avoid the imminent mandatory appointment of a receiver for Seller. Purchaser shall provide such funds within thirty (30) days of its receipt of such request or, if reasonably practicable taking into consideration Purchaser's access to funds, any shorter period as may be necessary to avoid mandatory appointment of a receiver.

2.4. *Final Draw on Commitment.* Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the Liquidation End Date (computed based on a balance sheet of Seller as of the Liquidation End Date prepared in accordance with GAAP), the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the Liquidation End Date. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the Deficiency Amount as of the Liquidation End Date). Purchaser shall provide such funds within sixty (60) days of its receipt of such request.

2.5. *Termination of Purchaser's Obligations.* Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of: (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $100,000,000,000 (one hundred billion dollars). For the avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

## 3. PURCHASE OF SENIOR PREFERRED STOCK AND WARRANT; FEES

3.1. *Initial Commitment Fee.* In consideration of the Commitment, and for no additional consideration, on the Effective Date (or as soon thereafter as is practicable) Seller shall sell and issue to Purchaser, and Purchaser shall purchase from Seller, (a) one million (1,000,000) shares of Senior Preferred Stock, with an initial liquidation preference equal to $1,000 per share

($1,000,000,000 (one billion dollars) liquidation preference in the aggregate), and (b) the Warrant.

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2010, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2010.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

3.3. *Increases of Senior Preferred Stock Liquidation Preference as a Result of Funding under the Commitment.* The aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall be automatically increased by an amount equal to the amount of each draw on the Commitment pursuant to Article 2 that is funded by Purchaser to Seller, such increase to occur simultaneously with such funding and ratably with respect to each share of Senior Preferred Stock.

3.4. *Notation of Increase in Liquidation Preference.* Seller shall duly mark its records to reflect each increase in the liquidation preference of the Senior Preferred Stock contemplated herein (but, for the avoidance of doubt, such increase shall be effective regardless of whether Seller has properly marked its records).

## 4. REPRESENTATIONS

Seller represents and warrants as of the Effective Date, and shall be deemed to have represented and warranted as of the date of each request for and funding of an advance under the Commitment pursuant to Article 2, as follows:

4.1. *Organization and Good Standing.* Seller is a corporation, chartered by the Congress of the United States, duly organized, validly existing and in good standing under the laws of the United States and has all corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

4.2. *Organizational Documents.* Seller has made available to Purchaser a complete and correct copy of its charter and bylaws, each as amended to date (the "Organizational Documents"). The Organizational Documents are in full force and effect. Seller is not in violation of any provision of its Organizational Documents.

4.3. *Authorization and Enforceability.* All corporate or other action on the part of Seller or Conservator necessary for the authorization, execution, delivery and performance of this Agreement by Seller and for the authorization, issuance and delivery of the Senior Preferred Stock and the Warrant being purchased under this Agreement, has been taken. This Agreement has been duly and validly executed and delivered by Seller and (assuming due authorization, execution and delivery by the Purchaser) shall constitute the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent the enforceability thereof may be limited by bankruptcy laws, insolvency laws, reorganization laws, moratorium laws or other laws of general applicability affecting creditors' rights generally or by general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law). The Agency is acting as conservator for Seller under Section 1367 of the FHE Act. The Board of Directors of Seller, by valid action at a duly called meeting of the Board of Directors on September 6, 2008, consented to the appointment of the Agency as conservator for purposes of Section 1367(a)(3)(I) of the FHE Act, and the Director of the Agency has appointed the Agency as Conservator for Seller pursuant to Section 1367(a)(1) of the FHE Act, and each such action has not been rescinded, revoked or modified in any respect.

4.4. *Valid Issuance.* When issued in accordance with the terms of this Agreement, the Senior Preferred Stock and the Warrant will be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens and preemptive rights. The shares of common stock to which the holder of the Warrant is entitled have been duly and validly reserved for issuance. When issued and delivered in accordance with the terms of this Agreement and the Warrant, such shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights.

4.5. *Non-Contravention.*

(a) The execution, delivery or performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (i) conflict with or violate any provision of the Organizational Documents of Seller; (ii) conflict with or violate

TREASURY-0023

any law, decree or regulation applicable to Seller or by which any property or asset of Seller is bound or affected, or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien upon any of the properties or assets of Seller, pursuant to any note, bond, mortgage, indenture or credit agreement, or any other contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Seller is a party or by which Seller is bound or affected, other than, in the case of clause (iii), any such breach, default, termination, amendment, acceleration, cancellation or lien that would not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, property, operations or condition of the Seller, the authority of the Conservator or the validity or enforceability of this Agreement (a "Material Adverse Effect").

(b) The execution and delivery of this Agreement by Seller does not, and the consummation by Seller of the transactions contemplated by this Agreement will not, require any consent, approval, authorization, waiver or permit of, or filing with or notification to, any governmental authority or any other person, except for such as have already been obtained.

## 5. COVENANTS

From the Effective Date until such time as the Senior Preferred Stock shall have been repaid or redeemed in full in accordance with its terms:

5.1. *Restricted Payments.* Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, declare or pay any dividend (preferred or otherwise) or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of Seller's Equity Interests (other than with respect to the Senior Preferred Stock or the Warrant) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of Seller's Equity Interests (other than the Senior Preferred Stock or the Warrant), or set aside any amount for any such purpose.

5.2. *Issuance of Capital Stock.* Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell or issue Equity Interests of Seller or any of its subsidiaries of any kind or nature, in any amount, other than the sale and issuance of the Senior Preferred Stock and Warrant on the Effective Date and the common stock subject to the Warrant upon exercise thereof, and other than as required by (and pursuant to) the terms of any binding agreement as in effect on the date hereof.

5.3. *Conservatorship.* Seller shall not (and Conservator, by its signature below, agrees that it shall not), without the prior written consent of Purchaser, terminate, seek termination of or permit to be terminated the conservatorship of Seller pursuant to Section 1367 of the FHE Act, other than in connection with a receivership pursuant to Section 1367 of the FHE Act.

5.4. *Transfer of Assets.* Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including

- 8 -

Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a)  to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b)  of assets and properties in the ordinary course of business, consistent with past practice;

(c)  in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(d)  of cash or cash equivalents for cash or cash equivalents; or

(e)  to the extent necessary to comply with the covenant set forth in Section 5.7 below.

5.5. *Indebtedness.* Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed 110.0% of the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis as of June 30, 2008 or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

5.6. *Fundamental Changes.* Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, (i) merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, (ii) effect a reorganization or recapitalization involving the common stock of Seller, a reclassification of the common stock of Seller or similar corporate transaction or event or (iii) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or any division, unit or business of any Person.

5.7. *Mortgage Assets.* Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $850 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

5.8. *Transactions with Affiliates.* Seller shall not, and shall not permit any of its subsidiaries to, without the prior written consent of Purchaser, engage in any transaction of any kind or nature with an Affiliate of Seller unless such transaction is (i) pursuant to this Agreement, the Senior Preferred Stock or the Warrant, (ii) upon terms no less favorable to Seller than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of Seller or

- 9 -

(iii) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence as of the date hereof.

5.9. *Reporting*. Seller shall provide to Purchaser:

(a) not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(b) not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(c) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form);

(d) concurrently with any delivery of financial statements under paragraphs (a) or (b) above, a certificate of the Designated Representative, (i) certifying that Seller is (and since the last such certificate has at all times been) in compliance with each of the covenants contained herein and that no representation made by Seller herein or in any document delivered pursuant hereto or in connection herewith was false or misleading in any material respect when made, or, if the foregoing is not true, specifying the nature and extent of the breach of covenant and/or representation and any corrective action taken or proposed to be taken with respect thereto, and (ii) setting forth computations in reasonable detail and satisfactory to the Purchaser of the Deficiency Amount, if any;

(e) promptly, from time to time, such other information regarding the operations, business affairs, plans, projections and financial condition of Seller, or compliance with the terms of this Agreement, as Purchaser may reasonably request; and

(f) as promptly as reasonably practicable, written notice of the following:

(i) the occurrence of the Liquidation End Date;

(ii) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any governmental authority or in arbitration, against Conservator, Seller or any other Person which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(iii) any other development that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect.

5.10. *Executive Compensation*. Seller shall not, without the consent of the Director, in con-sultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer of Seller.

## 6. MISCELLANEOUS

6.1. *No Third-Party Beneficiaries*. Until the termination of the Commitment, at any time during the existence and continuance of a payment default with respect to debt securities issued by Seller and/or a default by Seller with respect to any Mortgage Guarantee Obligations, any holder of such defaulted debt securities or beneficiary of such Mortgage Guarantee Obligations (collectively, the "Holders") may (a) deliver notice to the Seller and the Designated Representa-tive requesting exercise of all rights available to them under this Agreement to draw on the Commitment up to the lesser of the amount necessary to cure the outstanding payment defaults and the Available Amount as of the last day of the immediately preceding fiscal quarter, and (b) if Seller and the Designated Representative fail to act as requested within thirty (30) days of such notice, or if Purchaser shall fail to perform its obligations in respect of any draw on the Com-mitment and Seller and/or the Designated Representative shall not be diligently pursuing reme-dies in respect of such failure, seek judicial relief requiring Seller to draw on the Commitment or Purchaser to fund the Commitment, as applicable. The Holders shall have no other rights under or in respect of this Agreement, and the Commitment shall not otherwise be enforceable by any creditor of Seller or by any other Person other than the parties hereto, and no such creditor or other Person is intended to be, or shall be, a third party beneficiary of any provision of this Agreement.

6.2. *Non-Transferable; Successors*. The Commitment is solely for the benefit of Seller and shall not inure to the benefit of any other Person (other than the Holders to the extent set forth in Section 6.1), including any entity to which the charter of Seller may be transferred, to any LLRE or to any other successor to the assets, liabilities or operations of Seller. The Commitment may not be assigned or otherwise transferred, in whole or in part, to any Person (including, for the avoidance of doubt, any LLRE to which a receiver has assigned all or a portion of Seller's assets) without the prior written consent of Purchaser (which may be withheld in its sole discretion). In no event shall any successor to Seller (including such an LLRE) be entitled to the benefit of the Commitment without the prior written consent of Purchaser. Seller and Conservator, for them-selves and on behalf of their permitted successors, covenant and agree not to transfer or purport to transfer the Commitment in contravention of the terms hereof, and any such attempted transfer shall be null and void *ab initio*. It is the expectation of the parties that, in the event Seller were placed into receivership and an LLRE formed to purchase certain of its assets and assume certain of its liabilities, the Commitment would remain with Seller for the benefit of the holders of the debt of Seller not assumed by the LLRE.

6.3. *Amendments; Waivers*. This Agreement may be waived or amended solely by a writing executed by both of the parties hereto, and, with respect to amendments to or waivers of the pro-visions of Sections 5.3, 6.2 and 6.11, the Conservator; provided, however, that no such waiver or amendment shall decrease the aggregate Commitment or add conditions to funding the amounts required to be funded by Purchaser under the Commitment if such waiver or amendment would,

- 11 -

in the reasonable opinion of Seller, adversely affect in any material respect the holders of debt securities of Seller and/or the beneficiaries of Mortgage Guarantee Obligations, in each case in their capacities as such, after taking into account any alternative arrangements that may be implemented concurrently with such waiver or amendment. In no event shall any rights granted hereunder prevent the parties hereto from waiving or amending in any manner whatsoever the covenants of Seller hereunder.

6.4. *Governing Law; Jurisdiction; Venue.* This Agreement and the Warrant shall be governed by, and construed in accordance with, the federal law of the United States of America if and to the extent such federal law is applicable, and otherwise in accordance with the laws of the State of New York. The Senior Preferred Stock shall be governed as set forth in the terms thereof. The United States District Court for the District of Columbia shall have exclusive jurisdiction over all civil actions arising out of this Agreement, the Commitment, the Senior Preferred Stock and the Warrant, and venue for any such civil action shall lie exclusively in the United States District Court for the District of Columbia.

6.5. *Notices.* Any notices delivered pursuant to or in connection with this Agreement shall be delivered to the applicable parties at the addresses set forth below:

If to Seller:

Federal National Mortgage Association
c/o Federal Housing Finance Authority
1700 G Street, NW
4th Floor
Washington, DC 20552
Attention:  General Counsel

If to Purchaser:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC   20220
Attention:  Under Secretary for Domestic Finance

with a copy to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC   20220
Attention:  General Counsel

If to Conservator:

Federal Housing Finance Authority
1700 G Street, NW

TREASURY-0028

4th Floor
Washington, DC 20552
Attention: General Counsel

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail. All notices hereunder shall be effective upon receipt.

6.6. *Disclaimer of Guarantee.* This Agreement and the Commitment are not intended to and shall not be deemed to constitute a guarantee by Purchaser or any other agency or instrumentality of the United States of the payment or performance of any debt security or any other obligation, indebtedness or liability of Seller of any kind or character whatsoever.

6.7. *Effect of Order; Injunction; Decree.* If any order, injunction or decree is issued by any court of competent jurisdiction that vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of Conservator as conservator of Seller or otherwise curtails Conservator's powers as such conservator (except in each case any order converting the conservatorship to a receivership under Section 1367(a) of the FHE Act), Purchaser may by written notice to Conservator and Seller declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

6.8. *Business Day.* To the extent that any deadline or date of performance of any right or obligation set forth herein shall fall on a day other than a Business Day, then such deadline or date of performance shall automatically be extended to the next succeeding Business Day.

6.9. *Entire Agreement.* This Agreement, together with the Senior Preferred Stock and Warrant, contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, term sheets, statements, letters of intent or representations, written or oral, with respect thereto.

6.10. *Remedies.* In the event of a breach by Seller of any covenant or representation of Seller set forth herein, Purchaser shall be entitled to specific performance (in the case of a breach of covenant), damages and such other remedies as may be available at law or in equity; provided, that Purchaser shall not have the right to terminate the Commitment solely as a result of any such breach, and compliance with the covenants and the accuracy of the representations set forth in this Agreement shall not be conditions to funding the Commitment.

6.11. *Tax Reporting.* Neither Seller nor Conservator shall take, or shall permit any of their respective successors or assigns to take, a position for any tax, accounting or other purpose that is inconsistent with Internal Revenue Service Notice 2008-76 (or the regulations to be issued pursuant to such Notice) regarding the application of Section 382 of the Internal Revenue Code of 1986, as amended, a copy of which Notice has been provided to Seller in connection with the execution of this Agreement.

- 13 -

6.12. *Non-Severability.* Each of the provisions of this Agreement is integrated with and integral to the whole and shall not be severable from the remainder of the Agreement. In the event that any provision of this Agreement, the Senior Preferred Stock or the Warrant is determined to be illegal or unenforceable, then Purchaser may, in its sole discretion, by written notice to Conservator and Seller, declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

[Signature Page Follows]

TREASURY-0030

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator

James B. Lockhart III
Director


UNITED STATES DEPARTMENT
OF THE TREASURY

Henry M. Paulson, Jr.
Secretary of the Treasury


Acknowledged and, solely as
to Sections 5.3, 6.2 and 6.11,
agreed:

FEDERAL HOUSING
FINANCE AGENCY,
as Conservator

James B. Lockhart III
Director

*Signature Page to Senior Preferred Stock Purchase Agreement*

## CERTIFICATE OF DESIGNATION OF TERMS OF VARIABLE LIQUIDATION PREFERENCE SENIOR PREFERRED STOCK, SERIES 2008-2

### 1.    Designation, Par Value, Number of Shares and Priority

The designation of the series of preferred stock of the Federal National Mortgage Association (the "Company") created by this resolution shall be "Variable Liquidation Preference Senior Preferred Stock, Series 2008-2" (the "Senior Preferred Stock"), and the number of shares initially constituting the Senior Preferred Stock is 1,000,000. Shares of Senior Preferred Stock will have no par value and a stated value and initial liquidation preference per share equal to $1,000 per share, subject to adjustment as set forth herein. The Board of Directors of the Company, or a duly authorized committee thereof, in its sole discretion, may reduce the number of shares of Senior Preferred Stock, provided such reduction is not below the number of shares of Senior Preferred Stock then outstanding.

The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon dissolution, liquidation or winding up of the Company, prior to (a) the shares of preferred stock of the Company designated "5.25% Non-Cumulative Preferred Stock, Series D", "5.10% Non-Cumulative Preferred Stock, Series E", "Variable Rate Non-Cumulative Preferred Stock, Series F", "Variable Rate Non-Cumulative Preferred Stock, Series G", "5.81% Non-Cumulative Preferred Stock, Series H", "5.375% Non-Cumulative Preferred Stock, Series I", "5.125% Non-Cumulative Preferred Stock, Series L", "4.75% Non-Cumulative Preferred Stock, Series M", "5.50% Non-Cumulative Preferred Stock, Series N", "Non-Cumulative Preferred Stock, Series O", "Non-Cumulative Convertible Series 2004-1 Preferred Stock", "Variable Rate Non-Cumulative Preferred Stock, Series P", "6.75% Non-Cumulative Preferred Stock, Series Q", "7.625% Non-Cumulative Preferred Stock, Series R", "Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S", and "8.75% Non-Cumulative Mandatory Convertible Preferred Stock", Series 2008-1", (b) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock and (c) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

### 2.    Dividends

(a)    For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference. Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008. If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to

account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date. The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month. For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b)    To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c)    "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d)    Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date. The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e)    Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time

2

TREASURY-0033

to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f)     If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

## 3.     Optional Pay Down of Liquidation Preference

(a)     Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b)     In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c)     If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be

3

outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

## 4.   Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock

(a)     If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

(b)     If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally. The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c)     If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

4

**5.     No Voting Rights**

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

**6.     No Conversion or Exchange Rights**

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

**7.     No Preemptive Rights**

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

**8.     Liquidation Rights and Preference**

(a)     Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b)     "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i)     increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii)     increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

5

(iii)     increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv)     decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c)     "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement, dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d)     Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

## 9.     Additional Classes or Series of Stock

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

## 10.     Miscellaneous

(a)     The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary. All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b)     The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c)     The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

6

(d)     For purposes of this Certificate, the term "the Company" means the Federal National Mortgage Association and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e)     This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the State of Delaware shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f)     Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Fannie Mae, 3900 Wisconsin Avenue NW, Washington, DC 20016, Attn: Executive Vice President and General Counsel. Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company. Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time. Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g)     The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i)     Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

(ii)     The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g). The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

7

(iii)     Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g).  In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

(h)     **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE.  NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

TREASURY-0039