

**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.  20220**

December 20, 2010

## ACTION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**     Jeffrey A. Goldstein
              Under Secretary for Domestic Finance

**SUBJECT:**  Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (PSPAs)

### Recommendation

That you waive the Periodic Commitment Fee (PCF) for 2011 and reconsider next year.

_____ Approve        _____ Disapprove        _____ Let's Discuss

### Background:

- The amended PSPA agreements between Treasury and GSEs specify that a Periodic Commitment Fee (PCF) be set by December 31, 2010.
- The date for setting the PCF was previously moved from December 31, 2009 to December 31, 2010 as part of the broader amendments to the PSPAs on December 24, 2009.  Therefore, no PCF has been set or paid to date.
- Treasury may waive the PCF for one year at a time in its sole discretion based on adverse conditions in the mortgage market.
- The PCF is to be mutually agreed to by Treasury and FHFA, in consultation with the Federal Reserve.  The PCF was designed to fully compensate Treasury for providing its ongoing financial commitment.

### Considerations:

#### Reasons to Waive the PCF for 2011

*Housing markets remain fragile*

- Private capital has yet to return to the market
  - Fannie Mae, Freddie Mac, and FHA/GNMA currently account for over 95% of mortgage originations – the historic average is around 40%
  - The spread between prime jumbos and conforming mortgages is still elevated and is currently around 100 basis points – the historic average is closer to 20 basis points
  - Since September 2008, there has only been one private label new issue securitization to come to the market (Redwood Sequoia deal)
- Nearly 11 million borrowers are underwater on their mortgages
- Mortgage delinquency rates remain elevated (5.2% for prime, 36.5% for subprime, and 11.9% for FHA)
- Foreclosure starts and completions remain elevated

1

*Given the size of current GSE draws, imposing a PCF would only lead to increased Treasury draws and not generate increased return for the taxpayer*
- According to the FHFA stress tests in the base case, both GSEs are expected to require additional draws through the end of 2011 to cover net income losses and required dividend payments (although projected draws are < $1 billion for Freddie Mac in Q3 and Q4) (see appendix)

*Other than timing, no real additional taxpayer value is created*
- Even if the GSEs generated positive surplus of net income after dividends, that surplus can be used to offset potential draws in future quarters

*Potentially confusing message to the market*
- Last year we stated that the fragility of the housing market was one of the rationales for postponing setting the commitment fee; by setting the fee this year (at any level), we could be viewed as implicitly making an affirmative statement on the health of the housing market

*Waiving the PCF for 2011 preserves full optionality to set the PCF next year if housing markets are more stable and if the GSEs are generating positive net income in excess of their dividend commitments*

### Reasons to Set the PCF
- Makes clear the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future
- Illustrates further commitment to recouping taxpayer support

### If you decided to set the PCF, there are two potential options:
Option 1 – Set the PCF as a percentage of the liquidation preference of the outstanding preferred stock
Option 2 – Set the PCF equal to any generated positive net income (subject to further legal review)
*These would have to be mutually agreed by FHFA in consultation with the Federal Reserve*

2

**Appendix:**

**FHFA "Base Case" (Scenario 2) Projections - FNMA**
**($ in billions)**

|      | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|------|-----------|----------|-----------|-----------------|----------------------|
| 4Q10 |           |          |           |                 | $104.6               |
| 1Q11 | $9.6      | $2.3     | -$7.6     | $0.3            | 114.2                |
| 2Q11 | 8.8       | 2.6      | -6.4      | 0.3             | 122.9                |
| 3Q11 | 7.9       | 2.9      | -5.4      | 0.3             | 130.9                |
| 4Q11 | 8.7       | 3.1      | -5.8      | 0.3             | 139.6                |

**FHFA "Base Case" (Scenario 2) Projections - FHLMC**
**($ in billions)**

|      | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|------|-----------|----------|-----------|-----------------|----------------------|
| 4Q10 |           |          |           |                 | $72.6                |
| 1Q11 | $1.2      | $1.8     | -$0.4     | $0.9            | 73.8                 |
| 2Q11 | 1.3       | 1.8      | -0.4      | 0.9             | 75.1                 |
| 3Q11 | 0.6       | 1.9      | 0.4       | 0.9             | 75.7                 |
| 4Q11 | 0.2       | 1.9      | 0.7       | 0.9             | 75.9                 |

(1) AOCI = Accumulated Other Comprehensive Income
Retained earnings changes from changes in the value of certain AFS assets

3



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

UNDER SECRETARY

December 29, 2010

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises), provides, in section 3.2 of each Agreement, that each Enterprise shall pay to Treasury quarterly a "Periodic Commitment Fee" (PCF) beginning on March 31, 2011. The amount of the PCF is intended to fully compensate Treasury for the support provided by the ongoing funding commitment under the Agreement with each Enterprise following December 31, 2010. The amount of the PCF is to be set no later than December 31, 2010, but Treasury may waive the PCF for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

By this letter, please be advised that Treasury waives, for the first quarter of Calendar Year (CY) 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer. As currently structured, the Enterprises' required dividend payments to Treasury through the end of CY 2011 are forecast to be larger than the earnings that the Enterprises are forecast to produce. Therefore, any net income from the Enterprises through the end of CY 2011 is forecast to be returned to taxpayers already. Accordingly, Treasury believes that the imposition of the PCF at this time would not provide additional net proceeds for the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein




# REFORMING AMERICA'S HOUSING FINANCE MARKET
## A REPORT TO CONGRESS

February 2011

# INTRODUCTION

This paper lays out the Administration's plan to reform America's housing finance market to better serve families and function more safely in a world that has changed dramatically since its original pillars were put in place nearly eighty years ago.

Our plan champions the belief that Americans should have choices in housing that make sense for them and for their families. This means rental options near good schools and good jobs. It means access to credit for those Americans who want to own their own home, which has helped millions of middle class families build wealth and achieve the American Dream. And it means a helping hand for lower-income Americans, who are burdened by the strain of high housing costs.

But our plan also dramatically transforms the role of government in the housing market. In the past, the government's financial and tax policies encouraged housing purchases and real estate investment over other sectors of our economy, and ultimately left taxpayers responsible for much of the risk incurred by a poorly supervised housing finance market.

Going forward, the government's primary role should be limited to robust oversight and consumer protection, targeted assistance for low- and moderate-income homeowners and renters, and carefully designed support for market stability and crisis response. Our plan helps ensure that our nation's economic health will not be jeopardized again by the fundamental flaws in the housing market that existed before the financial crisis. At the same time, this plan recognizes the fragile state of our housing market and is designed to ensure that reforms are implemented at a stable and measured pace to support economic recovery over the next several years.

Under our plan, private markets – subject to strong oversight and standards for consumer and investor protection – will be the primary source of mortgage credit and bear the burden for losses. Banks and other financial institutions will be required to hold more capital to withstand future recessions or significant declines in home prices, and adhere to more conservative underwriting standards that require homeowners to hold more equity in their homes. Securitization, alongside credit from the banking system, should continue to play a major role in housing finance subject to greater risk retention, disclosure, and other key reforms. Our plan is also designed to eliminate unfair capital, oversight, and accounting advantages and promote a level playing field for all participants in the housing market.

The Administration will work with the Federal Housing Finance Agency ("FHFA") to develop a plan to responsibly reduce the role of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") in the mortgage market and, ultimately, wind down both institutions.  We recommend FHFA employ a number of policy levers – including increased guarantee fee pricing, increased down payment requirements, and other measures – to bring private capital back into the mortgage market and reduce taxpayer risk.  As the market improves and Fannie Mae and Freddie Mac are wound down, it should be clear that the government is committed to ensuring that Fannie Mae and Freddie Mac have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations.  We believe that under our current Preferred Stock Purchase Agreements (PSPAs), there is sufficient funding to ensure the orderly and deliberate wind down of Fannie Mae and Freddie Mac, as described in our plan.

Successful reform will require more than just winding down Fannie Mae and Freddie Mac and reducing other government support to the housing market.  In addition to fully implementing the reforms in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") (Pub. L. 111-203), the Administration will mobilize all tools available to address the nation's broken system of mortgage servicing and foreclosure processing.  Taken together, these steps will help restore trust in the underlying foundation of the mortgage market so borrowers, lenders, and investors have the confidence to purchase a home, issue a loan, or make an investment.

The government must also help ensure that all Americans have access to quality housing that they can afford.  This does not mean our goal is for all Americans to be homeowners.  We should continue to provide targeted and effective support to families with the financial capacity and desire to own a home, but who are underserved by the private market, as well as a range of options for Americans who rent their homes.

Finally, our plan presents several proposals for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit.  We evaluate these proposals according to their effects on four key criteria: access to mortgage credit; incentives for investment in the housing sector; taxpayer protection; and financial and economic stability.  We ask Congress to work with us to determine the right balance of priorities for a new, predominantly private housing finance market as soon as possible.

Reform will not come overnight.  Some reforms can take place immediately, like improvements to consumer protection and government oversight, while others will be implemented more gradually as the housing market heals.

We welcome the opportunity to work with Congress, independent regulators and agencies, and a wide range of stakeholders and partners to meet the goals laid out in the pages below.

# HOUSING FINANCE FROM THE GREAT DEPRESSION TO THE GREAT RECESSION

Nearly eighty years ago, in the midst of the Great Depression, the federal government began implementing sweeping reforms to the American financial system. These reforms – deposit insurance, limits on the risks banks can take, better transparency and investor protections in securities markets, a stronger Federal Reserve – helped build a financial system that provided a solid foundation for America's unprecedented prosperity.

Improving how housing was financed was an important part of these broader Depression-era reforms. In the 1930s, following severe mortgage market disruptions, widespread foreclosures, and sinking homeownership rates, the government created the Federal Housing Administration ("FHA"), Fannie Mae, the Federal Home Loan Banks ("FHLBs") and, several decades later, Freddie Mac to help promote secure and sustainable homeownership for future generations of Americans.

Fannie Mae and Freddie Mac held true to their original mission for many years. They established appropriate benchmarks for conforming loans that drove improved standards within the broader mortgage industry. They helped reduce rates for borrowers by bringing transparency and standardization to the housing finance market. They played a central role in the development of securitization of conventional mortgages, which expanded access to homeownership for responsible borrowers, providing a much-needed link between places with established banking services and growing parts of the country without local funding sources for mortgages. For decades, borrowers, lenders, and investors benefited from the deep, liquid markets these institutions helped establish. This same marketplace gave American families access to simple, straightforward products, protecting them from sudden financial shocks and helping them build savings in their homes.

But in the years leading up to the recent financial crisis, trillions of dollars worth of financial decisions were made across the U.S. economy and around the world on the faulty expectation that national house prices would only rise. Twenty years of economic stability had desensitized every player in the housing market to the possibility that home prices could fall.

Indeed, despite occasional regional price declines, national home values in America had not declined on a consistent basis since the Depression. But in the years leading up to the recent crisis, a robust expansion in credit, fueled by processes and financial instruments designed to

shift risk away from originators, combined with other factors, fed a rising demand for housing that lifted prices well above sustainable values.  Average home values in many parts of the country skyrocketed.  Mortgages became tools for speculative, short-term investments and a means to access easy cash.  Lulled into a false sense of an ever-rising real estate market, some homebuyers took on more debt than they could afford to purchase homes beyond their means, and existing homeowners used their homes like ATM machines by converting home equity to cash.

By mid-2006, however, housing prices across a broad range of markets began to turn, eventually declining consistently for the first time since the 1930s.  Almost no one in the housing finance market was prepared.  Homeowners, investors, and financial institutions – including Fannie Mae and Freddie Mac – did not have enough capital supporting their investments to absorb the resulting losses.  In 2008, credit markets froze.  Our nation's financial system – which had outgrown and outmaneuvered a regulatory framework largely designed in the 1930s – was driven to the brink of collapse.  Millions of Americans lost their jobs, families lost their homes, and small businesses shut down.  Fannie Mae and Freddie Mac experienced catastrophic losses and were placed into conservatorship, where they remain today.

## Fundamental Flaws in the Housing Finance Market

No single cause can fully explain the crisis. Misbehavior, misjudgments, and missed opportunities – on Wall Street, on Main Street, and in Washington – all came together to push the economy to the brink of collapse.  Several fundamental flaws in our housing finance system contributed to the crisis and must be corrected to protect American families from the instabilities and excesses that helped bring us to a crisis point.

- *Poor consumer protections allowed risky, low-quality mortgage products and predatory lending to proliferate:* Unregulated brokers and originators promoted complex mortgage products that "reset" to sharply higher rates after a few years, or required no income documentation or down payment.  Some allowed borrowers to defer principal and interest payments, increasing their indebtedness over time.  Often, brokers and originators had incentives to steer borrowers into these higher-cost loans, even if they qualified for more affordable options.  Some speculators knowingly took on loans they could not afford, betting that future housing price increases would bail them out.  Millions of borrowers who

purchased these products proved unable to make required payments, resulting in widespread defaults and foreclosures once housing prices started to fall.

- *An inadequate and outdated regulatory regime failed to keep the system in check:* Regulatory boundaries largely unchanged from the 1930s allowed large parts of the financial system that were deeply involved in housing finance to operate with virtually no oversight. To be sure, there were some problems that arose from violations of the law.  In many cases, however, weak and fragmented regulation and enforcement also allowed lenders to "shop" for weaker oversight and drove deteriorating standards in lending practices.  Securitizers and investors could essentially opt-out of the parts of the system with heavier regulation and use whatever underwriting practices they saw fit.  Other actors in the system were allowed to avoid consistent regulation and choose favorable jurisdictions.

- *A complex securitization chain lacked transparency, standardization, and accountability:* The market increasingly relied on an opaque and complex securitization chain – comprised of mortgage brokers, originators, securitizers, ratings agencies, and investors – to provide the money that helped fuel the rapid rise in home prices.  Brokers and originators could profit from selling poorly underwritten mortgages to securitizers without regard to those loans' future performance.  Ratings agencies and investors failed to recognize that the deterioration in underwriting standards had undermined the quality of complex mortgage-backed securities.  An overall lack of transparency and clear rules made it difficult for regulators and investors to track and recognize risk as it moved through the securitization chain.

- *Inadequate capital in the system left financial institutions unprepared to absorb losses.* Systemically-significant financial institutions were not required to hold adequate capital against the true mortgage risk on their balance sheets because these institutions were allowed to hold less capital against securities backed by mortgages than if they kept the same mortgages themselves.  When home prices started to fall and these institutions experienced substantial losses, they had inadequate capital to weather the storm, putting the health of the entire financial system and broader economy at risk.

- *The servicing industry was ill-equipped to serve the needs of borrowers, lenders, and investors once housing prices fell.*   The servicing industry, which processes borrower payments and forwards the proceeds to investors who own the pool of mortgages, was unprepared and poorly structured to address the higher levels of default and foreclosure that occurred after the housing market collapse.  Servicing contracts did a poor job defining the

obligations of servicers to minimize losses on defaulting loans.   Servicers' flat fee compensation structure also failed to provide appropriate incentives for servicers to invest the time, effort, and resources necessary to prevent foreclosure, even when doing so would have been in both the homeowner and mortgage investors' interests.

## The Failure of Fannie Mae and Freddie Mac

Initially, Fannie Mae and Freddie Mac were largely on the sidelines while private markets generated increasingly risky mortgages.  Between 2001 and 2005, private-label securitizations of Alt-A and subprime mortgages grew fivefold, yet Fannie Mae and Freddie Mac continued to primarily guarantee fully documented, high-quality mortgages.

But as their combined market share declined – from nearly 70 percent of new originations in 2003 to 40 percent in 2006 – Fannie Mae and Freddie Mac pursued riskier business to raise their market share and increase profits.  Not only did they expand their guarantees to new and riskier products, but they also increased their holdings of some of these riskier mortgages on their own balance sheets.

Fannie Mae and Freddie Mac strayed farthest from their core business in 2006 and 2007 – the very moment the housing market was extending credit to the riskiest borrowers and home prices were peaking.  When home prices began to fall and adjustable-rate mortgages with low teaser rates reset to higher rates, the Alt-A mortgages that Fannie Mae and Freddie Mac had accumulated started to default at alarming rates.

By 2008, mortgages across the product spectrum, including high-credit, well-documented prime mortgages, were defaulting at historically high rates.  Fannie Mae and Freddie Mac's losses had become far too substantial for their thin capital buffers to absorb, and it became clear they would be unable to fully honor their debts and guarantees.  In September of 2008, in consultation with the Bush Administration, FHFA placed Fannie Mae and Freddie Mac in conservatorship under the authority provided by the Housing and Economic Recovery Act of 2008 ("HERA") (Pub. L. 110-289), which Congress had passed to support the housing market two months earlier.  The Treasury Department agreed to exercise its authority under HERA to provide financial support – to date, over $130 billion – so both Fannie Mae and Freddie Mac could honor their debt and guarantees.  These measures, though unfortunate, were necessary to prevent a more severe disruption in the mortgage market and broader economy.

Fannie Mae and Freddie Mac's structural design flaws, combined with failures in management, were the primary cause of their collapse. Although some have suggested affordability goals played a major role, the mistakes that led to the failure of Fannie Mae and Freddie Mac – poor underwriting standards, under pricing risk, and insufficient capital with inadequate regulatory or investor oversight – closely mirrored mistakes in the private-label securities (PLS) market where affordability goals were not a factor. In fact, delinquency rates on many PLS securities and other loans held by banks and other private market institutions were far higher than on the loans held by Fannie Mae and Freddie Mac, including loans qualifying for the affordability goals. While Fannie Mae and Freddie Mac's affordability goals were poorly designed and did not effectively serve their purposes (as detailed below), fundamental structural flaws and poor decision-making are the principal reasons these institutions failed.

- *Fannie Mae and Freddie Mac's profit-maximizing structure undermined their public mission.* Fannie Mae and Freddie Mac's congressional charters require them to promote market stability and access to mortgage credit. But their private shareholder structure, coupled with a weak oversight regime, encouraged management to take on excessive risk in order to retain market share and maximize profits, jeopardizing their ability to support the mortgage market and leaving taxpayers to bear major losses. Their pursuit of profit leading up to the financial crisis caused them to fail when their broader public mandate to support the market was needed most.

- *Fannie Mae and Freddie Mac's perceived government backing conferred unfair advantages.* Fannie Mae and Freddie Mac benefited from preferential tax treatment, far lower capital requirements, and a widely perceived government guarantee – the commonly held assumption that large losses would be backstopped by the taxpayer. These advantages gave them substantial pricing power that helped them dominate segments of the market in which they participated, build up large investment portfolios at a cost far lower than their competitors, and take on irresponsible risks through their guarantee business that ultimately resulted in their failure.

- *Fannie Mae and Freddie Mac's capital standards were unfair and inadequate.* Fannie Mae and Freddie Mac were required to hold far less capital than other regulated private institutions. Since they did not have to maintain higher levels of capital, they could set the fee that they charged to guarantee mortgage-backed securities at artificially low levels. It also left them with an inadequate cushion to absorb losses once the housing crisis hit.

- *Fannie Mae and Freddie Mac's regulator was structurally weak and ineffective.* The Office of Federal Housing Enterprise Oversight ("OFHEO"), Fannie Mae and Freddie Mac's previous regulator, did not have adequate enforcement mechanisms or authority to set capital standards to constrain risky behavior. Over the years, Fannie Mae and Freddie Mac's aggressive lobbying efforts had successfully defeated efforts to bring them under closer supervision.

The financial crisis also exacerbated fundamental flaws in the FHLBs, which help mostly insured depository institutions access liquidity and capital to compete in an increasingly competitive marketplace. Prior to the crisis, the FHLBs suffered from inadequate regulatory oversight, and were allowed to build large investment portfolios that subjected them to excess risk, while providing concentrated funding to banks engaging in unsound business practices. Today, eight of the twelve banks are under regulatory orders with respect to their capital or have voluntarily suspended dividends or the repurchase of excess stock.

Because each of the twelve FHLBs is also liable for the losses of other FHLBs, additional losses could adversely affect the entire FHLB system, damaging the mortgage finance market and potentially constraining access to capital for financial institutions. Reforms to the FHLB system are necessary to restore its important primary role of providing a stable source of mortgage credit for financial institutions of all sizes.

## The Current State of the Housing Market

Since taking office in January 2009, the Obama Administration has acted to help stabilize the housing market and provide critical support for struggling homeowners. The Administration worked with Congress to put in place expanded tax credits for first-time homebuyers, additional support for state and local housing agencies, neighborhood stabilization and community development programs, mortgage modification and refinancing initiatives, housing counseling programs, expanded support for mortgage credit through FHA, and strengthened consumer protections. The Administration has also provided ongoing financial support for Fannie Mae and Freddie Mac through the PSPAs following the Bush Administration's decision to put that support in place and FHFA's decision to place them into conservatorship.

These policies helped avert a deeper economic collapse and a more severe housing crisis. However, the housing market remains fragile and will take years to fully recover. An elevated

unemployment rate, lower household wealth, and higher credit standards are constraining demand for housing.  Sales of new and existing homes are well below their recent peaks.  At the same time, the large inventory of unsold homes, including a backlog of foreclosed homes that have yet to appear on the market, will take an extended period to work through the system.  As a result of both supply and demand factors, housing construction is at historically low levels, and home prices remain weak.

# TOWARDS A NEW SYSTEM OF HOUSING FINANCE

The Obama Administration has already begun the critical process of reforming our nation's housing finance market. The Dodd-Frank Act, enacted in July 2010, provides vital protections for consumers and investors that will help end abusive practices in the mortgage market and improve the stability of the overall housing finance system.

Since Fannie Mae and Freddie Mac were placed into conservatorship, the FHFA has monitored their business operations closely and strengthened underwriting standards, reducing risk to the American taxpayers. Since 2008, FICO scores and loan-to-value ratios – both key measures of how likely a borrower will be to make mortgage payments – are meaningfully better on new mortgages. Fannie Mae and Freddie Mac have also increased their guarantee fees and adjusted their pricing to better reflect risk. The FHA has also implemented important changes and reforms over the last two years, including strengthening underwriting standards, improving processes and operations, and raising premiums to improve its financial condition.

But these measures are only first steps. We must move forward with additional reforms to better protect taxpayers and improve the long-term health of the housing market.

The Obama Administration's reform plan is designed to:

1.  Pave the way for a robust private mortgage market by reducing government support for housing finance and winding down Fannie Mae and Freddie Mac on a responsible timeline.

2.  Address fundamental flaws in the mortgage market to protect borrowers, help ensure transparency for investors, and increase the role of private capital.

3.  Target the government's vital support for affordable housing in a more effective and transparent manner.

Any responsible reform effort that addresses the flaws in the pre-crisis housing market will make credit less easily available than before the crisis. Any such changes should occur at a measured pace that allows borrowers to adjust to the new market, that preserves widespread access to affordable mortgages for creditworthy borrowers, including lower-income Americans, and that supports, rather than threatens, the nation's economic recovery.

## I.  Paving the Way for a Robust Private Mortgage Market

In the wake of the financial crisis, private capital has not sufficiently returned to the mortgage market, leaving Fannie Mae, Freddie Mac, FHA, and the Government National Mortgage Association ("Ginnie Mae") to insure or guarantee more than nine out of every ten new mortgages.

Under normal market conditions, the essential components of housing finance – buying houses, lending money, determining how best to invest capital, and bearing credit risk – are fundamentally private sector activities.  Although the government still has an important role to play in housing finance, private markets – subject to strong oversight and standards for consumer and investor protection – should be the primary source of mortgage credit and bear the burden for losses.  The Obama Administration, in consultation with FHFA and Congress, will work to restrict the areas of mortgage finance in which Fannie Mae, Freddie Mac, and the FHLBs operate, so that overall government support is substantially reduced.

Our commitment to ensuring Fannie Mae and Freddie Mac have sufficient capital to honor any guarantees issued now or in the future and meet any of their debt obligations remains unchanged.  Ensuring these institutions have the financial capacity to meet their obligations is essential to continued stability, and the Administration will not waver from its commitment.  Given Fannie Mae and Freddie Mac's current role in the mortgage market, we must proceed carefully with reform to ensure government support is withdrawn at a pace that does not undermine economic recovery.  We believe that under the PSPAs, there is sufficient funding to ensure the orderly and deliberate wind down of Fannie Mae and Freddie Mac, as described in our plan.

### *Winding Down Fannie Mae and Freddie Mac on a responsible timeline*

The Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae and Freddie Mac's role in the market and ultimately wind down both institutions, creating the conditions for private capital to play the predominant role in housing finance.  These efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

- *Increasing guarantee fees to bring in more private capital.*  We support ending the unfair capital advantages that Fannie Mae and Freddie Mac previously enjoyed and recommend FHFA require that they price their guarantees as if they were held to the same capital

standards as private banks or financial institutions.  This will mean that the price of the guarantee offered by Fannie Mae and Freddie Mac explicitly reflects its risk, and will help the private market compete on a level playing field, reducing Fannie Mae and Freddie Mac's market share over time.  Although the pace of these price changes will depend significantly on market conditions, such changes should be phased in over the next several years.

- *Increasing private capital ahead of Fannie Mae and Freddie Mac guarantees.*  In addition to increasing guarantee pricing, we will encourage Fannie Mae and Freddie Mac to pursue additional credit-loss protection from private insurers and other capital providers.  We also support increasing the level of private capital ahead of Fannie Mae and Freddie Mac's guarantees by requiring larger down payments by borrowers.  Going forward, we support gradually increasing the level of required down payment so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a ten percent down payment.

- *Reducing conforming loan limits.*  The conforming loan limit is the maximum size of a loan that Fannie Mae and Freddie Mac are allowed to guarantee.  In order to further scale back the enterprises' share of the mortgage market, the Administration recommends that Congress allow the temporary increase in limits that was approved in 2008 to expire as scheduled on October 1, 2011 and revert to the limits established under HERA.  We will work with Congress to determine appropriate conforming loan limits in the future, taking into account cost-of-living differences across the country.  As a result of these reforms, larger loans for more expensive homes will once again be funded only through the private market.

- *Winding down Fannie Mae and Freddie Mac's investment portfolio.* Fannie Mae and Freddie Mac were allowed to behave like government-backed hedge funds, managing large investment portfolios for the profit of their shareholders with the risk ultimately falling largely on taxpayers.  The PSPAs require a reduction in this risk-taking by winding down their investment portfolios at an annual pace of no less than 10 percent.

Implementing a wind down of Fannie Mae and Freddie Mac's future participation in the housing market requires recognition of both the fragile state of that market today and the private sector's need for clarity about the speed with which that transition will take place.  As the market begins to heal and private investors return, we will seek opportunities, wherever possible, to accelerate Fannie Mae and Freddie Mac's withdrawal.

***Returning FHA to its traditional role as targeted lender of affordable mortgages***

In addition to winding down Fannie Mae and Freddie Mac, FHA should return to its pre-crisis role as a targeted provider of mortgage credit access for low- and moderate-income Americans and first-time homebuyers.  (Today, FHA's market share is nearly 30 percent, compared to its historic role of between 10-15 percent.)  As Fannie Mae and Freddie Mac's presence in the market shrinks, the Administration will coordinate program changes at FHA to ensure that the private market – not FHA – picks up that new market share.

To accomplish this objective, we recommend decreasing the maximum loan size that can qualify for FHA insurance – first by allowing the present increase in those limits to expire as scheduled on October 1, 2011, and then by reviewing whether those limits should be further decreased moving forward.  As we begin to pursue increased pricing for guarantees at Fannie Mae and Freddie Mac, we will also increase the price of FHA mortgage insurance.  We have already acted on this front, raising premiums two times since the beginning of this Administration.  And we will put in place another 25 basis point increase in the annual mortgage insurance premium that is detailed in the President's 2012 Budget.  This will continue the ongoing effort to strengthen the capital reserve account of FHA, and put it in a better position to gradually shrink its market share.  Going forward we will coordinate reforms of Fannie Mae and Freddie Mac with changes at FHA to help ensure the private market, not FHA, fills the market opportunities created by reform.

***Ensuring FHLB support for small- and medium-sized financial institutions***

The Administration believes the FHLBs have played a vital role in our housing finance system by helping smaller financial institutions effectively access liquidity to compete in an increasingly competitive marketplace.  But these institutions also developed significant weaknesses as the housing market evolved that should be addressed as part of housing finance reform.  HERA has already placed the FHLBs under stricter regulatory oversight, but further reform is required.  We will also work with Congress to consider additional means of advance funding for mortgage credit, including potentially the development of a covered bond market.

- *Focusing on small- and medium-sized financial institutions*.  The Administration supports allowing each financial institution to be an active member in only a single FHLB Bank.  We also support limiting the level of advances, which would only have an impact on large financial institutions that can access capital markets already.

- *Reducing portfolio investments.* Similar to Fannie Mae and Freddie Mac, several of the FHLBs were allowed to build up large investment portfolios. These portfolios should be reduced and their composition altered to better serve the FHLB's mission of providing liquidity and access to capital for insured depository institutions. We support FHFA's efforts to address this issue, and we will work with Congress to provide clarity to the FHLB's investment authority.

***Improving coordination among existing government housing finance programs***

In addition to changing the level of government support for the housing market, we also must reform the way government support is delivered. The Department of Housing and Urban Development, the Department of Agriculture, and the Department of Veterans Affairs will set up a task force to explore ways in which their housing finance programs can be better coordinated, or even consolidated, to serve the public more effectively. Though they serve different targeted groups of Americans, their programs and borrowers will benefit from greater coordination of systems, information, and market standards.

## II.  Restoring Trust and Integrity in the Broader Housing Market

Addressing Fannie Mae, Freddie Mac, FHA, and the FHLBs alone will not give rise to a housing finance market that meets the needs of families, lenders, and investors. Nor will it guarantee that private markets can effectively play a more dominant role in the mortgage market. Fundamental flaws occurred at almost every link in the housing finance chain.

The Administration supports the vigorous implementation of reforms to help address pre-crisis flaws and rebuild trust and integrity in the mortgage market. Taken together, these reforms will improve consumer protection, support the creation of safe, high-quality mortgage products with strong underwriting standards, restore the integrity of the securitization market, restructure the servicing industry, and establish clear and consolidated regulatory oversight.

The Dodd-Frank Act laid the groundwork for many of these reforms. We will implement its provisions in a thoughtful manner to protect borrowers and promote stability across the housing finance markets. Together, these reforms will form the foundation of a market in which borrowers, lenders, investors – along with the broader economy – will all be better off.

*Empowering consumers to avoid unfair practices and make fully informed decisions*

The Administration is committed to full implementation of the Dodd-Frank Act's consumer protection provisions, including the following:

- *Curbing abusive practices.*  Under rules to be developed by the Bureau of Consumer Financial Protection ("CFPB"), which was created by the Dodd-Frank Act, lenders will be prohibited from originating high-cost loans with certain abusive features, and mortgage brokers and other originators will be prohibited from accepting financial rewards for steering borrowers into more expensive products than those for which they are qualified.

- *Promoting choice and clarity.*  The CFPB also will have the authority to set clear, consistent rules that allow financial services providers to compete on a level playing field and let consumers clearly see the costs and features of consumer financial products and services. The CFPB will take steps to improve and simplify the required disclosures for mortgage loan transactions to promote fairness, transparency, and competition in the mortgage market.

- *Stronger underwriting standards, including requiring lenders to verify ability to pay.*  Under rules to be prescribed by the CFPB, lenders will be required to make a reasonable and good-faith determination that all borrowers have a reasonable ability to repay their mortgage, including by verifying a borrower's income.

*Increasing transparency, standardization, and accountability in the securitization chain*

The Administration believes the securitization market should continue to play a key role in housing finance.  That market, however, requires meaningful reform so private investors can confidently participate in the housing market and provide an alternative funding source for mortgages outside of the traditional banking system and government-supported institutions.

- *Requiring originators and securitizers to retain risk.*  The Administration is working with federal regulators to set rules requiring securitizers or originators to retain five percent of a security's credit risk when sold to investors.  Combined with an exemption for mortgages that meet high underwriting standards (Qualified Residential Mortgages, or "QRM"), this requirement will improve alignment of interests between mortgage originators, securitizers, and investors.  Rules will be finalized in 2011 and become effective in 2012.

- *Improving access to information among all market participants.*  The SEC will implement Dodd-Frank Act provisions that set stricter disclosure and reporting requirements so that regulators and investors can more easily understand the underlying collateral and risks of securities.

- *Strengthen transparency and disclosure in credit ratings agencies' analysis.*  The Securities and Exchange Commission ("SEC") will establish an Office of Credit Ratings.  This new office will have dedicated compliance resources with the ability to improve disclosure for ratings methodologies, set new requirements to prohibit conflicts of interest, and authorize the SEC to deregister ratings agencies that perform poorly.

### Increasing capital standards to improve the safety and stability of the financial system

The Basel III Capital Accords will substantially increase the overall amount of capital that banks are required to hold on their balance sheets.  These measures will improve the ability of banks to withstand future downturns, declines in home prices, and other sudden economic shocks, which will help improve the safety and stability of the financial system and broader economy.  These new standards will also require banks to hold larger capital buffers against higher-risk mortgages that have a greater risk of default, providing strong incentives to originate higher-quality mortgages.

### Strengthening regulatory oversight

The Dodd-Frank Act provides a comprehensive approach to monitor and constrain excessive risk in the financial system, and to strengthen the transparency and resilience of financial markets.

- *Closing regulatory gaps.*  The newly created Financial Stability Oversight Council ("FSOC") has the authority to require consolidated supervision of any financial firm – regardless of legal form – whose failure could pose a threat to financial stability.  The Act also eliminates regulatory arbitrage for nationally chartered depository institutions by eliminating the Office of Thrift Supervision and moving that authority into the Office of the Comptroller of the Currency.

- *Monitoring systemic risk.*  The Dodd-Frank Act creates accountability in the FSOC for taking a comprehensive approach to monitoring the nation's financial system.  The FSOC is charged with identifying threats to the financial stability of the United States, promoting market

discipline, and responding to emerging risks to the stability of the United States financial system, including mortgage markets.

### Improving mortgage servicing and foreclosure processing

The Administration supports several immediate and near-term reforms to correct problems in mortgage servicing and foreclosure processing and help prevent their recurrence.

- *Establishing national standards for mortgage servicing.* Servicers should manage each loan that they service promptly and appropriately. The Administration supports national servicing standards that better align incentives and provide clarity and consistency to borrowers and investors regarding their treatment by servicers, especially in the event of delinquency.

- *Reforming servicing compensation to align industry incentives.* The Administration is working with FHFA, in coordination with HUD, to explore alternative servicing compensation structures to align industry incentives. Currently, servicers collect a flat fee that does not adjust to reflect the amount of work they are required to perform, resulting in overpayment for servicing current loans and underpayment for servicing delinquent loans. A compensation structure that corrects for the current structure's shortcomings could help ensure servicers are appropriately incentivized to invest the time and effort to work with troubled borrowers to avoid default or foreclosure.

- *Improving treatment of lien priority.* We should reduce conflicts of interests between holders of first and second mortgages and improve transparency for lenders and borrowers regarding the total debt secured by a given piece of property. Mortgage documents should require disclosure of second liens. In addition, mortgage documents should define the process for modifying a second lien in the event that the first lien becomes delinquent. This will prevent a second lien from standing in the way of a first lien modification and help prevent avoidable foreclosures. Finally, we should consider options for allowing primary mortgage holders to restrict, in certain circumstances, additional debt secured by the same property.

## III.  A System with Transparent and Targeted Support for Access and Affordability

The Administration believes that we must continue to take the necessary steps to ensure that Americans have access to an adequate range of affordable housing options. This does not mean

all Americans should become homeowners. Instead, we should make sure that all Americans who have the credit history, financial capacity, and desire to own a home have the opportunity to take that step. At the same time, we should ensure that there are a range of affordable options for the 100 million Americans who rent, whether they do so by choice or necessity.

In the past, broader government efforts to support affordability through Fannie Mae and Freddie Mac's affordable housing goals proved inefficient and ineffective. Their affordability goals were inadequately responsive to the unique needs of underserved families and communities. They were misaligned with lending in the primary market. And most egregiously, they did not exclude high-cost, predatory loans. As we establish new ways to ensure access and affordability, we must learn from these failed efforts and design policies that are better targeted, more transparent, and focused on providing support that is financially sustainable for families and communities.

We recommend focusing initially on four primary areas of reform:

- A reformed and strengthened FHA.

- A commitment to affordable rental housing.

- Measures to ensure that capital is available to creditworthy borrowers in *all* communities, including rural areas, economically distressed regions, and low-income communities.

- A flexible and transparent funding source to support targeted access and affordability initiatives.

### *A reformed and strengthened FHA*

The Administration is committed to ensuring creditworthy first-time homebuyers and families with modest incomes can access a mortgage. The Administration will make sure that creditworthy borrowers that have incomes up to the median level for their area have access to these mortgages, but we will do so in a way that does not allow FHA to expand during normal economic times to a share of the market that is unhealthy or unsustainable.

To make sure that FHA is financially strong enough to provide this key support, and that those taking out FHA-insured single-family loans are taking on sustainable mortgages, the Administration will explore ways to further reduce the risk exposure of FHA. While FHA has already changed its policy to require that borrowers with lower FICO scores put down larger

down payments, FHA will consider other options, such as lowering the maximum loan-to-value ratio for qualifying mortgages more broadly.  In considering how to apply such options, FHA will continue to balance the need to manage prudently the risk to FHA and the borrower with its efforts to ensure access to affordable loans for lower- and middle-income Americans.

We will work with Congress to give FHA more flexibility to respond to stress in the housing market and manage its risk more effectively.  This will mean giving FHA flexibility to adjust fees and programmatic parameters more nimbly than it can today.   FHA should also have the technology and talent needed to run what should be a world-class financial institution.

### A renewed commitment to affordable rental housing

As we move forward to address the challenges of affordability and access, we must address how those issues impact renters.  Today, renters often face significant affordability challenges.  Half of all renters spend more than a third of their income on housing, and a quarter spend more than half.  And for low-income renters, adequate and affordable homes are increasingly scarce. For every 100 extremely low-income American families, for example, only 32 adequate rental homes are affordable.

Promoting a housing finance market that provides liquidity and capital to support affordable rental options can alleviate the high rental burdens that many low-income households face.  It can also expand rental options for low-income households in urban, suburban, and rural communities of opportunity, with good jobs for parents and quality schools for children.

Private credit markets have generally underserved multifamily rental properties that offer affordable rents, preferring to invest in high-end developments. By contrast, Fannie Mae and Freddie Mac developed expertise in profitably providing financing to the middle of the rental market, where housing is generally affordable to moderate-income families.  As we wind down Fannie Mae and Freddie Mac, it will be critical to find ways to maintain funding to this segment of the market.

The Administration will explore ways to provide greater support for rental housing.  One option would be to do so by expanding FHA's capacity to support lending to the multifamily market.  Key to this would be utilizing existing multifamily expertise so that FHA and other entities continue the industry's current best practices and retain valuable human capital.   We will consider a range of reforms, such as risk-sharing with private lenders, to reduce the risk to FHA

and the taxpayer, and the development of programs dedicated to hard-to-reach property segments, including the smaller properties that contain one-third of all rental apartments.

### *Ensuring that capital is available to creditworthy borrowers in all communities*

We will work to ensure that all mortgage market participants are complying with laws that prohibit discrimination in providing capital to borrowers and communities.  To support that effort, we will work with Congress to require greater transparency in the mortgage market, requiring securitizers to disclose information on the credit, geographic, and demographic characteristics of the underlying loans they package into securities.  This will make it easier to determine whether market participants are complying with their legal obligations, and also make clear to the public what communities these institutions are and are not serving.

We will work with Congress to ensure that *all* communities and families – including those in rural and economically distressed areas, as well as those that are low- and moderate-income – have the access to capital needed for sustainable homeownership and a range of rental options.  We will consider measures to make sure that secondary market participants are providing capital to all communities in ways that reflect activity in primary markets, consistent with their obligations of safety and soundness.

### *Dedicated funds for targeted homeownership and rental affordability*

Although FHA and other federal affordable housing policies do a great deal to provide access and affordability, we recognize that a more balanced system will require additional resources to address clear gaps.  The Administration will thus advocate for a dedicated, budget-neutral financing mechanism to support homeownership and rental housing objectives that current policies cannot adequately address.  This funding stream would support the development and preservation of more affordable rental housing for the lowest-income families to address serious supply shortages, similar to the Housing Trust Fund that the President has proposed to be capitalized.  It would support down-payment assistance and counseling to help qualified low- and moderate-income homebuyers, in a form that does not expose them or financial institutions to excessive risk or cost.  We would scale up support for proven nonprofit partnerships for affordable housing production and preservation that can attract much larger amounts of private capital.  And funding would help to overcome market failures that make it hard to develop a secondary market for targeted affordable housing mortgages, such as that for small rental properties.

These components target specific needs in flexible ways that can engage a range of partners and respond to local priorities and opportunities.  We will work with Congress to ensure that funding will be budget neutral, transparent, and targeted to clearly defined objectives and programs.

# A RESPONSIBLE PATH FORWARD FOR REFORM

The reform measures outlined in this report will help reshape the housing finance market by putting private capital back at the center of a healthier system, reducing taxpayer risk, and increasing protections for consumers and investors. However, given the still-fragile state of the housing market, implementing these reforms fully will take time. The Administration will proceed deliberately so that the mortgage-finance chain and the broader capital markets are not disrupted during this transition.

### The importance of a responsible transition

Proceeding with a prudent transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during that period is essential to protecting the health of the economic recovery and is in the best interests of taxpayers.

A careful transition path offers the best prospects for maximizing recovery on the investments we have made in these institutions and minimizing future losses. Prematurely constraining Fannie Mae and Freddie Mac's ability to guarantee loans or precipitously winding them down could limit the availability of mortgage credit, shock the housing market, and expose taxpayers to additional losses on the loans Fannie Mae and Freddie Mac already guarantee.

The losses that the federal government has covered at Fannie Mae and Freddie Mac under HERA authority are virtually all attributable to bad loans that those firms took on during the height of the housing bubble. Over the last two years, Fannie Mae and Freddie Mac have implemented stricter underwriting standards and increased their pricing. As a result, the new loans being guaranteed by Fannie Mae and Freddie Mac today are of much higher quality than in the past and are unlikely to pose a significant risk of loss to taxpayers.

As Fannie Mae and Freddie Mac are wound down, we must design a transition that allows for continued support of the housing market, so that Americans continue to have the ability to take out a mortgage to buy a home or refinance their existing mortgage. We will continue to work with FHFA to ensure that talent is retained so that mortgage credit continues to flow and risk is contained during the transition, and that the wind down is as successful as possible and supports taxpayers' interests.

The government is committed to ensuring that Fannie Mae and Freddie Mac have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations. The Administration will not pursue policies or reforms in a way that would impair the ability of Fannie Mae and Freddie Mac to honor their obligations.

### *A path forward*

Determining the appropriate path for how to responsibly wind down Fannie Mae and Freddie Mac and reduce the size of FHA will be challenging and will require great care. As members of the Federal Housing Finance Oversight Board ("FHFOB"), the Advisory Board to FHFA, the Secretaries of Treasury and HUD will make recommendations on the appropriate mix of incentives and deadlines for FHFA to pursue to wind down these institutions at a pace that recognizes the fragile state of the housing market.

We support the creation of a joint FHFA and FHA working group to consider changes to pricing and other standards. We recommend that FHFA and FHA seek comment from the public on the most appropriate pace of the transition and issue a timeline for tightening standards and raising pricing. This working group should provide regular updates to the FHFOB and FSOC, as reforms are implemented. Throughout the transition, FHFA and FHA should continue to seek comment and revise timelines as necessary to account for changing market conditions and accelerate the transition where possible.

As the reforms outlined in the Administration's plan are implemented and new standards at Fannie Mae, Freddie Mac, FHA, and the FHLBs are established, we will ultimately need to complete the transition to a more privatized market. We face a consequential choice about how to structure the government's ultimate role within that market. This report outlines three proposals for Congress and the Administration to consider together. Each of these proposals has unique advantages and disadvantages that deserve thorough evaluation through a robust public dialogue.

## Options for the Long-Term Structure of Housing Finance

There has been robust discussion about the long-term future of the American mortgage market and a wide range of options proposed for its reform that differ both in the structure and scale of the government's future role.

As part of this discussion, we considered the range of ways other countries support housing finance. Though there are lessons to be drawn from the diversity of systems, they are complex. In most countries lacking a widely available guarantee or other means of direct government support, mortgages are financed through the banking system, which often enjoys indirect government backing. Some countries utilize their regulatory framework, or establish firm underwriting standards, to promote liquid mortgage markets. And some countries, particularly in Europe, use so-called covered bonds to channel credit to housing.

Like the U.S., several countries have government-supported entities that guarantee or hold mortgages, though in none are they as large as they have historically been in the United States. The U.S. is also the only high-income country in which securitization plays a major role in housing finance. In countries where securitization is present, it generally plays a smaller role and takes different forms than those we are familiar with in this country. The U.S. system, however, is one of the only countries in the world where the majority of mortgages are pre-payable, 30-year fixed-rate mortgages.

Although international comparisons offer useful lessons and new ideas, we believe that Americans' housing needs can best be met by a system that takes four key factors into consideration:

*Access to Mortgage Credit.* Government support for housing finance can expand access to mortgage credit for creditworthy American families. By attracting additional capital into the housing finance system, it can lower the cost of mortgages and increase the availability of certain kinds of mortgage products, such as the 30-year, fixed-rate mortgage. The government can also help standardize the national mortgage market by setting specific criteria for the types of mortgages that it will support. Government support can also increase access to secondary markets for smaller lenders and community banks, promoting a more competitive market and minimizing consolidation.

*Incentive for Investment in Housing.* Government support makes investment in housing more attractive. While this can broaden access and lower costs for borrowers and communities, it can also draw investment away from other areas that may lead to greater long-term growth or job creation and it can inflate the value of housing assets, possibly leading to larger boom and bust cycles. Without government support, however, some of the capital invested in the housing market today may simply move to investments outside the United States that offer better risk-weighted returns. Other government policies, such as tax incentives like the mortgage interest

deduction and other tax credits can also encourage investment towards housing over other sectors in the economy.

*Taxpayer Protection*.  Any time the government stands behind a loan, even indirectly, it takes on some degree of risk.  While the government can charge market participants an insurance premium for accepting that risk, pricing risk properly can be difficult.  If the government does not charge a fair price, it may encourage excessive risk-taking and increase the likelihood that the taxpayer will be forced to bear the cost of the government's losses.  Political pressure to lower the price of government support increases the odds that the government will misprice risk and put taxpayers at risk.  Requiring private capital to come ahead of government guarantees or providing a way to ensure taxpayer losses are repaid through future assessments, such as higher fees, may mitigate these risks.

*Financial and Economic Stability*.  Government support can help promote financial stability by ensuring the flow of credit through periods of economic stress.  However, if not properly structured, it can also encourage the private market to take on excessive risk and potentially destabilize the system.

While the options that have been proposed vary widely, each can be viewed as posing trade-offs between the four factors mentioned above.

Some advocates and experts have proposed approaches to our housing finance system that starkly illustrate this trade-off: one advocates a near complete privatization of the mortgage market, while others advocate for its near complete nationalization.  Under the former, the government would restrict support for the mortgage market to narrowly targeted subsidies for lower-income Americans.  Under the latter, the government would provide an explicit guarantee and directly bear most of the credit risk for almost the entire mortgage market.

While each of these approaches has positive attributes, the Administration does not believe that either represents a viable long-term strategy for the nation's housing market.  Complete privatization would limit access to, and increase the cost of, mortgages for most Americans too dramatically and leave the government with very little it can do to ensure liquidity during a crisis.  Near-complete nationalization runs too high a risk of crowding out private capital, distorting investment decisions, and putting too much taxpayer money at risk.

The Administration believes that the right course falls between these two extremes, with the government's role in the future mortgage market striking a balance between the factors outlined

above: creditworthy Americans should have broad access to credit, but not at a cost of excessive taxpayer risk, distorted markets, or financial instability.

With that in mind, we should consider three possible courses for long-term reform.

***Option 1: Privatized system of housing finance with the government insurance role limited to FHA, USDA and Department of Veterans' Affairs' assistance for narrowly targeted groups of borrowers***

This option would dramatically reduce the government's role in insuring or guaranteeing mortgages, limiting it to FHA and other programs targeted to creditworthy lower- and moderate-income borrowers. While the government would continue to provide access for this targeted segment of borrowers, it would leave the vast majority of the mortgage market to the private sector.

The strength of this option is that it would minimize distortions in capital allocation across sectors, reduce moral hazard in mortgage lending and drastically reduce direct taxpayer exposure to private lenders' losses. With less incentive to invest in housing, more capital will flow into other areas of the economy, potentially leading to more long-run economic growth and reducing the inflationary pressure on housing assets. Risk throughout the system may also be reduced, as private actors will not be as inclined to take on excessive risk without the assurance of a government guarantee behind them. And finally, direct taxpayer risk exposure to private losses in the mortgage market would be limited to the loans guaranteed by FHA and other narrowly-targeted government loan programs: no longer would taxpayers be at direct risk for guarantees covering most of the nation's mortgages.

Though these are indeed significant benefits, this option has particularly acute costs in its potential impact on access to credit for many Americans. While FHA would continue to provide access to mortgage credit for low- and moderate-income Americans, the cost of mortgage credit for those who do not qualify for an FHA-insured loan – the majority of borrowers – would likely increase. While mortgage rates are likely to rise somewhat under any responsible reform proposal, including the three outlined here, the effect could be larger under this option. In particular, it may be more difficult for many Americans to afford the traditional pre-payable, 30-year fixed-rate mortgage. Additionally, smaller lenders and community banks could have a difficult time competing for business outside of the FHA segment of the market, which may in

turn impact access to lending in the communities they have traditionally served more effectively than larger institutions.

Another concern with this option is the ability of the government to effectively step in to ensure access to capital during a crisis.  Congress, FHA, the Federal Reserve, and other regulators would be able to play the countercyclical role that they have played in the recent downturn, but it is unlikely that they could play a still more robust role as might be needed in the absence of broader government support in the market.  And absent sufficient government support to mitigate a credit crisis, there would be greater risk of a more severe downturn, and thus the risk of greater cost to the taxpayer.  A related risk would exist if investors believe that the government would inevitably step in to save whatever private financial institutions or banks have become necessary to maintain the flow of mortgage credit.  If so, this option will potentially fail to eliminate the risk of moral hazard.

### Option 2: Privatized system of housing finance with assistance from FHA, USDA and Department of Veterans' Affairs for narrowly targeted groups of borrowers and a guarantee mechanism to scale up during times of crisis

As in the option above, FHA and other narrowly targeted programs would provide access to mortgage credit for low- and moderate-income borrowers, but the government's overall role in the housing finance system would be dramatically reduced.   In this option, however, the government would also develop a backstop mechanism to ensure access to credit during a housing crisis.

This backstop would maintain a minimal presence in the market during normal times, but would be ready to scale up to a larger share of the market as private capital withdraws in times of financial stress.  One approach would be to price the guarantee fee at a sufficiently high level that it would only be competitive in the absence of private capital.  It would thus only expand when needed, and that need would be dictated by the market.  An alternative approach would restrict the amount of public insurance sold to the private market in normal times, but allow the amount of insurance offered to ramp up to stabilize the market in times of stress.

The strength of this proposal is that it would be designed to address one of the primary concerns associated with the prior model – the inability of the government to soften a contraction of credit during a crisis – without necessarily taking on all the costs associated with a broad government guarantee during normal times.   During normal times it would avoid the distortions in the

housing market associated with a broad-based guarantee and thus reduce both moral hazard and taxpayer risk.  Again, private capital would be more likely to flow to the most productive assets in the economy, private actors would be on the hook for their own risky decisions and the government would not be putting taxpayers at direct risk in backing the nation's mortgage market.

In addition to these benefits, the government would be in a better position than under Option One to manage another downturn in the housing market.  As private capital pulls back, the government could better step in to ensure the availability of credit and thus help to stabilize a declining market.  Though this would likely be more effective than relying only on Congress, FHA, and the Federal Reserve, there remains a significant operational challenge in designing and managing an organization that can remain small during normal economic times, yet has the capacity to take on much more business quickly during these times of need.

There are other costs to this model as well.  Aside from the uncertainty around how well it would be able to scale up in times of crisis, there is the same concern with the access issues that we face with the prior option.  Access to credit, particularly the pre-payable, 30-year fixed-rate mortgage, would likely be more expensive under this option than under the following one.

***Option 3: Privatized system of housing finance with FHA, USDA and Department of Veterans' Affairs assistance for low- and moderate-income borrowers and catastrophic reinsurance behind significant private capital***

Under this option, as in the previous options, the mortgage market outside of the FHA and other federal agency guarantee programs would be driven by private investment decisions with private capital taking the primary credit risk.  However, to increase the liquidity in the mortgage market and access to mortgages for creditworthy Americans – as well as to ensure the government's ability to respond to future crises – the government would offer reinsurance for the securities of a targeted range of mortgages.

In one approach to such a system, a group of private mortgage guarantor companies that meet stringent capital and oversight requirements would provide guarantees for securities backed by mortgages that meet strict underwriting standards.  A government reinsurer would then provide reinsurance to the holders of these securities, which would be paid out only if shareholders of the private mortgage guarantors have been entirely wiped out.  The government reinsurer would

charge a premium for this reinsurance, which would be used to cover future claims and recoup losses to protect taxpayers.

The strength of this option is that it likely provides the lowest-cost access to mortgage credit of the three options.  While mortgage rates would be increased by the cost of the premium and the first-loss position of private capital, this reinsurance will likely attract a larger pool of investors to the mortgage market, increasing liquidity.  This, in turn, could help to lower the prices and pricing volatility of mortgages and increase the availability of the pre-payable, 30-year fixed-rate mortgage.   It will also provide a more competitive playing field for smaller lenders and community banks, which, in turn, could improve access in communities where those institutions have a good record of service.  And finally, the government reinsurer's broad presence in the market could put it in a position to scale up to provide credit during a time of stress in the market more effectively.

However, this option, too, comes with costs.  The increased flow of capital into the mortgage market could draw capital away from potentially more productive sectors of the economy and could artificially inflate the value of housing assets.   And while the capital requirements, oversight of the private mortgage guarantors, and premiums collected to cover future losses will together help to reduce the risk to the taxpayer, the reinsurance of private-lending activity, by its nature, exposes the government to risk and moral hazard.   If the oversight of the private mortgage guarantors is inadequate or the pricing of the reinsurance too low or recoupment of costs too politically difficult, then private actors in the market may take on excessive risk and the taxpayer could again bear the cost.

# THE CHOICE AHEAD

In choosing among these options, care must be given to designing a system that maximizes the benefits we are seeking from government involvement in the mortgage market, while minimizing the costs. We must also consider how to utilize the existing systems and assets in our housing finance system, including those at Fannie Mae and Freddie Mac, as best as possible for the benefit of the taxpayer and the American people. But design choices alone will not tell us what the best path is for the future of our mortgage system, for we are faced with difficult trade-offs. We must decide what we take to be the right balance between providing broad access to mortgages for American families, managing the risk to taxpayers, and maintaining a stable and healthy mortgage market. As we see above, these priorities are not always well aligned, so we will have to make difficult decisions as we choose the path for long-term reform.

There will of course be significant debate about how to strike this difficult balance. But we must be careful not to let that debate keep us from the immediate task at hand: we need to scale back the role of government in the mortgage market, and promote the return of private capital to a healthier, more robust mortgage market.

We will continue to seek input and consult with a wide variety of constituents, market participants, academic experts, and consumer and community organizations on our plan for reform. Given the importance of the long-term stability of the housing market and the critical role the government continues to play in the current financial circumstances, this approach to housing finance reform, built upon significant input from various stakeholders, should form the basis for a strong bi-partisan solution that results in a stronger housing finance market for all Americans.

The housing finance system *must* be reformed. It is the vital link to sustainable homeownership and rental options for millions of Americans, and it is central to our nation's economy. We allowed its flaws to go unchecked for too long, contributing to a financial collapse that has strained families, decimated communities, and pushed the economy into the worst recession since the Great Depression. The Obama Administration here provides a path of reform, which will lead to a future system with more private capital, better-aligned incentives, more oversight, and less risk to the taxpayer – in short, to a healthier, more stable system of housing finance.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2010
Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:
**(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **None** | |

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, without par value**
*(Title of class)*

**8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share**
*(Title of class)*

**8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, stated value $50 per share**
*(Title of class)*

**Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share**
*(Title of class)*

**7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share**
*(Title of class)*

**6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share**
*(Title of class)*

**Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share**
*(Title of class)*

**Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share**
*(Title of class)*

**5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share**
*(Title of class)*

**5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share**
*(Title of class)*

**4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share**
*(Title of class)*

**5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share**
*(Title of class)*

**5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share**
*(Title of class)*

**5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share**
*(Title of class)*

**Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share**
*(Title of class)*

**Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share**
*(Title of class)*

**5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share**
*(Title of class)*

**5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☑          Smaller Reporting company ☐
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the last reported sale price of the common stock quoted on the New York Stock Exchange on June 30, 2010 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $383 million.

As of January 31, 2011, there were 1,119,639,748 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**   None

TREASURY-0289

## TABLE OF CONTENTS

PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Item 1.    Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
           Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
           Residential Mortgage Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
           Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           Mortgage Securitizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
           Business Segments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           Conservatorship and Treasury Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
           Legislation and GSE Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
           Our Charter and Regulation of Our Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           Making Home Affordable Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
           Our Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
           Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
           Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
           Where You Can Find Additional Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
           Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Item 1A.   Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Item 1B.   Unresolved Staff Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
Item 2.    Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
Item 3.    Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Item 4.    [Removed and Reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

PART II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases
           of Equity Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
Item 6.    Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations . . . 76
           Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
           Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
           Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
           Consolidated Balance Sheet Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
           Supplemental Non-GAAP Information — Fair Value Balance Sheets . . . . . . . . . . . . . . . . . . 126
           Liquidity and Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
           Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
           Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
           Glossary of Terms Used in This Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
Item 7A.   Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . . 192
Item 8.    Financial Statements and Supplementary Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure . . . 192
Item 9A.   Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
Item 9B.   Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

i

**PART III** ............................................................................................ 199

Item 10.   Directors, Executive Officers and Corporate Governance ............................ 199

           Directors ................................................................... 199

           Corporate Governance ..................................................... 202

           Executive Officers ........................................................ 206

Item 11.   Executive Compensation .............................................................. 208

           Compensation Discussion and Analysis ....................................... 208

           Compensation Committee Report ........................................... 219

           Compensation Risk Assessment ............................................ 219

           Compensation Tables ...................................................... 220

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters ................................................................................ 233

Item 13.   Certain Relationships and Related Transactions, and Director Independence .............. 235

           Policies and Procedures Relating to Transactions with Related Persons ................. 235

           Transactions with Related Persons .......................................... 237

           Director Independence ..................................................... 241

Item 14.   Principal Accounting Fees and Services ........................................... 244

**PART IV** ........................................................................................... 246

Item 15.   Exhibits, Financial Statement Schedules ......................................... 246

INDEX TO EXHIBITS ............................................................................ E-1

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS ................................. F-1

TREASURY-0239

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 73 |
| 1 | Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through 2010 | 10 |
| 2 | Single-Family Serious Delinquency Rates by Year of Acquisition | 12 |
| 3 | Credit Profile of Single-Family Conventional Loans Acquired | 13 |
| 4 | Credit Statistics, Single-Family Guaranty Book of Business | 17 |
| 5 | Level 3 Recurring Financial Assets at Fair Value | 77 |
| 6 | Summary of Consolidated Results of Operations | 83 |
| 7 | Analysis of Net Interest Income and Yield | 85 |
| 8 | Rate/Volume Analysis of Changes in Net Interest Income | 86 |
| 9 | Fair Value Losses, Net | 89 |
| 10 | Credit-Related Expenses | 92 |
| 11 | Total Loss Reserves | 93 |
| 12 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 94 |
| 13 | Nonperforming Single-Family and Multifamily Loans | 98 |
| 14 | Credit Loss Performance Metrics | 100 |
| 15 | Credit Loss Concentration Analysis | 101 |
| 16 | Single-Family Credit Loss Sensitivity | 102 |
| 17 | Impairments and Fair Value Losses on Loans in HAMP | 104 |
| 18 | Business Segment Summary | 107 |
| 19 | Business Segment Results | 108 |
| 20 | Single-Family Business Results | 109 |
| 21 | Multifamily Business Results | 113 |
| 22 | Capital Markets Group Results | 116 |
| 23 | Capital Markets Group's Mortgage Portfolio Activity | 119 |
| 24 | Capital Markets Group's Mortgage Portfolio Composition | 120 |
| 25 | Summary of Consolidated Balance Sheets | 122 |
| 26 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities | 123 |
| 27 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) | 124 |
| 28 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net | 126 |
| 29 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 127 |
| 30 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 130 |
| 31 | Activity in Debt of Fannie Mae | 133 |
| 32 | Outstanding Short-Term Borrowings and Long-Term Debt | 136 |
| 33 | Outstanding Short-Term Borrowings | 137 |
| 34 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 139 |

TREASURY-0240

| Table | Description | Page |
|---|---|---|
| 35 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year . . . . . . . . | 139 |
| 36 | Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
| 37 | Cash and Other Investments Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 141 |
| 38 | Fannie Mae Credit Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 143 |
| 39 | Composition of Mortgage Credit Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 150 |
| 40 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 155 |
| 41 | Delinquency Status of Single-Family Conventional Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 |
| 42 | Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 161 |
| 43 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis . . . . . . . . . . . . . . | 162 |
| 44 | Statistics on Single-Family Loan Workouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 164 |
| 45 | Loan Modification Profile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 165 |
| 46 | Single-Family Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 166 |
| 47 | Single-Family Acquired Property Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 167 |
| 48 | Multifamily Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
| 49 | Multifamily Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
| 50 | Multifamily Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
| 51 | Mortgage Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 174 |
| 52 | Activity and Maturity Data for Risk Management Derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . | 185 |
| 53 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187 |
| 54 | Derivative Impact on Interest Rate Risk (50 Basis Points) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187 |
| 55 | Interest Rate Sensitivity of Financial Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188 |

TREASURY-0241

## PART I

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in "Conservatorship and Treasury Agreements."*

*This report contains forward-looking statements, which are statements about matters that are not historical facts. Forward-looking statements often include words like "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "would," "should," "could," "may," or similar words. Actual results could differ materially from those projected in the forward-looking statements as a result of a number of factors including those discussed in "Risk Factors" and elsewhere in this report. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report.*

*We provide a glossary of terms in "Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Glossary of Terms Used in This Report."*

## Item 1.   Business

## OVERVIEW

Fannie Mae is a government-sponsored enterprise that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activities include providing market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae mortgage-backed securities, which we refer to as Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for our mortgage portfolio. We acquire funds to purchase mortgage-related assets for our mortgage portfolio by issuing a variety of debt securities in the domestic and international capital markets. We also make other investments that increase the supply of affordable housing. During 2010, we concentrated much of our efforts on minimizing our credit losses by using home retention solutions and foreclosure alternatives to address delinquent mortgages, starting with solutions, such as modifications, that permit people to stay in their homes. When there is no lower-cost alternative, our goal is to move to foreclosure expeditiously. We describe our business activities below.

As a federally chartered corporation, we are subject to extensive regulation, supervision and examination by FHFA, and regulation by other federal agencies, including Treasury, the Department of Housing and Urban Development ("HUD"), and the Securities and Exchange Commission ("SEC").

Although we are a corporation chartered by the U.S. Congress, our conservator is a U.S. government agency, Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth, the U.S. government does not guarantee our securities or other obligations. Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

The conservatorship we have been under since September 2008, with FHFA acting as conservator, has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what changes to our business structure will be made during or following the conservatorship.

TREASURY-0242

Since our entry into conservatorship, we have entered into agreements with Treasury that include covenants that significantly restrict our business activities and provide for substantial U.S. government financial support. We provide additional information on the conservatorship, the provisions of our agreements with the Treasury, and its impact on our business below under "Conservatorship and Treasury Agreements" and "Risk Factors."

## RESIDENTIAL MORTGAGE MARKET

### The U.S. Residential Mortgage Market

We conduct business in the U.S. residential mortgage market and the global securities market. In response to the financial crisis and severe economic recession that began in December 2007, the U.S. government took a number of extraordinary measures designed to provide fiscal stimulus, improve liquidity and protect and support the housing and financial markets. Examples of these measures include: (1) the Federal Reserve's temporary programs to purchase up to $1.25 trillion of GSE mortgage-backed securities and approximately $175 billion of GSE debt by March 31, 2010, which were intended to provide support to mortgage lending and the housing market and to improve overall conditions in private credit markets; (2) the Administration's Making Home Affordable Program, which was intended to stabilize the housing market by providing assistance to homeowners and preventing foreclosures; and (3) the first-time and move-up homebuyer tax credits, enacted to help increase home sales and stabilize home prices. The homebuyer tax credits were available for qualifying home purchases by buyers who entered into binding contracts by April 30, 2010.

Total U.S. residential mortgage debt outstanding, which includes $10.6 trillion of single-family mortgage debt outstanding, was estimated to be approximately $11.5 trillion as of September 30, 2010, the latest date for which information was available, according to the Federal Reserve. After increasing every quarter since record keeping began in 1952 until the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining since then. We owned or guaranteed mortgage assets representing approximately 27.4% of total U.S. residential mortgage debt outstanding as of September 30, 2010.

We operate our business solely in the United States and its territories, and accordingly, we generate no revenue from and have no assets in geographic locations other than the United States and its territories.

### Housing and Mortgage Market and Economic Conditions

During the fourth quarter of 2010, the United States economic recovery continued. The U.S. gross domestic product, or GDP, rose by 3.2% on an annualized basis during the quarter after adjusting for inflation, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 128,000 jobs in the fourth quarter, with the private sector continuing its recent trend of moderate employment growth throughout the quarter and into January 2011. The unemployment rate was 9.0% in January 2011, compared with 9.6% in September 2010, based on data from the U.S. Bureau of Labor Statistics.

Housing activity rebounded modestly in the fourth quarter of 2010 after experiencing a pullback in the third quarter. For all of 2010, home sales declined for the fourth time in the past five years, despite low mortgage rates, reduced home prices and the first-time and move-up homebuyer tax credits that increased existing home sales earlier in the year. Weak demand for homes, a weak labor market, strengthened lending standards in the industry and elevated vacancy and foreclosure rates are the main obstacles to the housing recovery. Total existing home sales fell by 4.8% in 2010 from 2009, according to data available through January 2011. Faced with fierce competition from distressed sales, new home sales fared significantly worse, dropping by 14.2% in 2010, according to data available through January 2011, and accounting for just 5.5% of total home sales in the fourth quarter of 2010, down from a peak of more than 19% at the beginning of 2005. After four consecutive years of double-digit declines to an annual record low, total housing starts rose a modest 5.9% in 2010.

2

The table below presents several key indicators related to the total U.S. residential mortgage market.

**Housing and Mortgage Market Indicators**[1]

|  | 2010 | 2009 | 2008 | % Change 2010 | 2009 |
|---|---|---|---|---|---|
| Home sales (units in thousands) | 5,229 | 5,530 | 5,398 | (5.4)% | 2.4% |
| New home sales | 321 | 374 | 485 | (14.2) | (22.9) |
| Existing home sales | 4,908 | 5,156 | 4,913 | (4.8) | 4.9 |
| Home price depreciation based on Fannie Mae Home Price Index ("HPI")[2] | (3.1)% | (3.7)% | (10.3)% | — | — |
| Annual average fixed-rate mortgage interest rate[3] | 4.7% | 5.0% | 6.0% | — | — |
| Single-family mortgage originations (in billions) | $ 1,530 | $ 1,917 | $ 1,580 | (20.2) | 21.3 |
| Type of single-family mortgage origination: |  |  |  |  |  |
| Refinance share | 65% | 69% | 52% | — | — |
| Adjustable-rate mortgage share | 5% | 4% | 7% | — | — |
| Total U.S. residential mortgage debt outstanding (in billions)[4] | $11,459 | $11,712 | $11,915 | (2.2) | (1.7) |

[1] The sources of the housing and mortgage market data in this table are the Federal Reserve Board, the Bureau of the Census, HUD, the National Association of Realtors, the Mortgage Bankers Association and FHFA. Homes sales data are based on information available through January 2011. Single-family mortgage originations, as well as refinance shares, are based on February 2011 estimates from Fannie Mae's Economics & Mortgage Market Analysis Group. The adjustable-rate mortgage share is based on mortgage applications data reported by the Mortgage Bankers Association. Certain previously reported data may have been changed to reflect revised historical data from any or all of these organizations.

[2] Calculated internally using property data information on loans purchased by Fannie Mae, Freddie Mac and other third-party home sales data. Fannie Mae's HPI is a weighted repeat transactions index, meaning that it measures average price changes in repeat sales on the same properties. Fannie Mae's HPI excludes prices on properties sold in foreclosure. The reported home price depreciation reflects the percentage change in Fannie Mae's HPI from the fourth quarter of the prior year to the fourth quarter of the reported year.

[3] Based on the annual average 30-year fixed-rate mortgage interest rate reported by Freddie Mac.

[4] Information for 2010 is through September 30, 2010 and has been obtained from the Federal Reserve's September 2010 mortgage debt outstanding release.

Home prices, which rose in the second quarter of 2010 when the home buyer tax credits were available, have fallen since the tax credits' expiration. We estimate that home prices on a national basis declined by approximately 3.1% in both the second half of 2010 and in 2010 overall. We estimate that home prices have declined by 20.5% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available.

As a result of the increase in existing home sales in the fourth quarter of 2010 and the pause in foreclosures triggered by the discovery of deficiencies in servicers' foreclosure processes, the supply of unsold single-family homes dropped during the quarter. According to the National Association of Realtors' December 2010 Existing Home Sales Report, there was an 8.1 month average supply of existing unsold homes as of December 31, 2010, compared with a 10.6 month average supply as of September 30, 2010 and a 7.2 month average supply as of December 31, 2009. Although the supply of unsold homes dropped in the fourth quarter, the inventory of unsold homes remains above long-term average levels. The national average inventory/sales ratio masks significant regional variation as some regions, such as Florida, struggle with large inventory overhang while others, such as California, are experiencing nearly depleted inventories in some market segments.

An additional factor weighing on the market is the elevated level of vacant properties, as reported by the Census Bureau. While the inventory of vacant homes for sale and for rent appears to be stabilizing, according to the Bureau of the Census Housing Vacancy Survey, vacancy rates remain significantly above their normal levels and will continue to weigh down the market. The serious delinquency rate has trended down since

TREASURY-0244

peaking in the fourth quarter of 2009 but has remained historically high, with an estimated four million loans seriously delinquent (90 days or more past due or in the foreclosure process), based on the Mortgage Bankers Association National Delinquency Survey. The shadow supply from these mortgages will also negatively affect the market. According to the minutes of the December Federal Reserve Open Market Committee, members expressed concern that the elevated supply of homes available for sale and the overhang of foreclosed homes will contribute to further drops in home prices, reducing household wealth and thus restraining growth in consumer spending. We provide information about Fannie Mae's serious delinquency rate, which also decreased during 2010, in "Executive Summary—Credit Performance."

We estimate that total single-family mortgage originations decreased by 20.2% in 2010 to $1.5 trillion, with a purchase share of 35% and a refinance share of 65%. For 2011, we expect an increase in mortgage rates will likely reduce the share of refinance loans to approximately 35% and total single-family originations are expected to decline to about $1.0 trillion.

Since the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining due to several factors including rising foreclosures, declining house prices, increased cash sales, reduced household formation, and reduced home equity extraction. We anticipate another approximately 2% decline in single-family mortgage debt outstanding in 2011. Total U.S. residential mortgage debt outstanding fell on an annualized basis by approximately 2.4% in both the second and third quarters of 2010.

Despite signs of stabilization and improvement, one out of seven borrowers was delinquent or in foreclosure during the fourth quarter of 2010, according to the Mortgage Bankers Association National Delinquency Survey. The housing market remains under pressure due to the high level of unemployment, which was a primary driver of the significant number of mortgage delinquencies and defaults in 2010. At the start of the recession in December 2007, the unemployment rate was 5.0%, based on data from the U.S. Bureau of Labor Statistics. The unemployment rate peaked at a 26-year high of 10.1% in October 2009, and remained as high as 9.0% in January 2011. We expect the unemployment rate to decline modestly throughout 2011.

The most comprehensive measure of the unemployment rate, which includes those working part-time who would rather work full-time (part-time workers for economic reasons) and those not looking for work but who want to work and are available for work (discouraged workers), was 16.7% in December 2010, close to the record high of 17.4% in October 2009.

The decline in house prices both nationally and regionally has left many homeowners with "negative equity" in their homes, which means the principal balances on their mortgages exceed the current market value of their homes. This provides an incentive for borrowers to walk away from their mortgage obligations and for the loans to become delinquent and proceed to foreclosure. According to First American CoreLogic, Inc. approximately 11 million, or 23%, of all residential properties with mortgages were in negative equity in the third quarter of 2010. This potential supply also weighs on the supply/demand balance putting downward pressure on both house prices and rents. See "Risk Factors" for a description of risks to our business associated with the weak economy and housing market.

The multifamily sector improved during 2010 despite slow job growth. Multifamily fundamentals strengthened, driven primarily by increases in non-farm payrolls and tenants renting rather than purchasing homes due to uncertainty surrounding home values. Vacancy rates, which had climbed to record levels in 2009, have improved, and asking rents increased on a national basis. Preliminary third-party data suggest that the rate of apartment vacancies held steady in the fourth quarter of 2010. Rents appear to have risen during most of 2010, with overall rent growth up by an estimated 3%.

Vacancy rates and rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property. Improvements in these fundamentals helped to stabilize property values during 2010 in a number of metropolitan areas.

Prolonged periods of high vacancies and negative or flat rent growth will adversely affect multifamily properties' net operating incomes and related cash flows, which can strain the ability of borrowers to make loan payments and thereby potentially increase delinquency rates and credit expenses.

4

TREASURY-0245

While national multifamily market fundamentals improved during 2010, certain local markets and properties continue to exhibit weak fundamentals. As a result, we expect that our multifamily nonperforming assets will increase in certain areas and we may continue to experience an increase in delinquencies and credit losses despite generally improving market fundamentals. We expect the multifamily sector to continue to improve modestly in 2011, even though unemployment levels remain elevated.

## EXECUTIVE SUMMARY

*Please read this Executive Summary together with our Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") and our consolidated financial statements as of December 31, 2010 and related notes. This discussion contains forward-looking statements that are based upon management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report and "Risk Factors" for a discussion of factors that could cause our actual results to differ, perhaps materially, from our forward-looking statements. Please also see "MD&A—Glossary of Terms Used in This Report."*

### Our Mission

Our public mission is to support liquidity and stability in the secondary mortgage market and increase the supply of affordable housing. In connection with our public mission, FHFA, as our conservator, and the Obama Administration have given us an important role in addressing housing and mortgage market conditions. As we discuss below and elsewhere in "Business," we are concentrating our efforts on supporting liquidity, stability and affordability in the secondary mortgage market and minimizing our credit losses from delinquent loans.

### Our Business Objectives and Strategy

Our Board of Directors and management consult with our conservator in establishing our strategic direction, taking into consideration our role in addressing housing and mortgage market conditions. FHFA has approved our business objectives. We face a variety of different, and potentially conflicting, objectives including:

- minimizing our credit losses from delinquent mortgages;

- providing liquidity, stability and affordability in the mortgage market;

- providing assistance to the mortgage market and to the struggling housing market;

- limiting the amount of the investment Treasury must make under our senior preferred stock purchase agreement;

- returning to long-term profitability; and

- protecting the interests of the taxpayers.

We therefore regularly consult with and receive direction from our conservator on how to balance these objectives. Our pursuit of our mission creates conflicts in strategic and day-to-day decision-making that could hamper achievement of some or all of these objectives.

We currently are concentrating our efforts on minimizing our credit losses. We use home retention solutions and foreclosure alternatives to address delinquent mortgages, starting with solutions, such as modifications, that permit people to stay in their homes. When there is no lower-cost alternative, our goal is to move to foreclosure expeditiously. We also seek to minimize credit losses by actively managing our real estate owned ("REO") inventory and by pursuing contractual remedies where third parties such as lenders or providers of credit enhancement are obligated to compensate us for losses.

Along with our efforts to minimize credit losses, we continue our significant role of providing support for liquidity and affordability in the mortgage market through our guaranty and capital markets businesses. In

TREASURY-0246

2010, we continued our work to strengthen our book of business, acquiring loans with a strong overall credit profile. We discuss the performance of single-family loans we acquired in 2009 and 2010 later in this executive summary.

We will continue to need funds from Treasury as a result of ongoing adverse conditions in the housing and mortgage markets, the deteriorated credit performance of loans in our mortgage credit book of business that we acquired prior to 2009, the costs associated with our efforts pursuant to our mission, and the dividends we are required to pay Treasury on the senior preferred stock. As a result of these factors, we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. Further, there is significant uncertainty regarding the future of our company, as the Administration, Congress and our regulators consider options for the future state of Fannie Mae, Freddie Mac and the U.S. government's role in residential mortgage finance.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We discuss the report's recommendations for a new long-term structure for the housing finance system in more detail in "Legislation and GSE Reform—GSE Reform."

In the final quarter of 2010 we initiated a comprehensive review of our business processes, infrastructure and organizational structure to assess the company's readiness to operate effectively in the secondary mortgage market of the future. We expect to implement the plan in phases with goals of providing value to our customers, simplifying and standardizing our operating model, and reducing our costs.

To provide context for analyzing our consolidated financial statements and understanding our MD&A, we discuss the following topics in this executive summary:

- Our 2010 financial performance;

- Actions we take to provide liquidity to the mortgage market;

- Our expectations regarding profitability, the book of business we have acquired since the beginning of 2009 and credit losses;

- Our strategies and actions to reduce credit losses;

- Our 2009 and 2010 credit performance;

- The servicer foreclosure process deficiencies discovered in 2010 and the related foreclosure pause;

- Our liquidity position; and

- Our outlook.

**Summary of Our Financial Performance for 2010**

Our financial results for 2010 reflect the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment and underemployment, and the impact of the adoption of new accounting standards and the consolidation of the majority of our MBS trusts.

Effective January 1, 2010, we prospectively adopted new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. We refer to these accounting standards together as the "new accounting standards." In this report, we also refer to January 1, 2010 as the "transition date."

Our adoption of the new accounting standards had a major impact on the presentation of our consolidated financial statements. The new standards require that we consolidate the substantial majority of Fannie Mae MBS trusts we guarantee and recognize the underlying assets (typically mortgage loans) and debt (typically

TREASURY-0247

bonds issued by the trusts in the form of Fannie Mae MBS certificates) of these trusts as assets and liabilities in our consolidated balance sheets.

Although the new accounting standards did not change the economic risk to our business, we recorded a decrease of $3.3 billion in our total deficit as of January 1, 2010 to reflect the cumulative effect of adopting these new standards. We provide a detailed discussion of the impact of the new accounting standards on our accounting and financial statements in "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities." Upon adopting the new accounting standards, we changed the presentation of segment financial information that is currently evaluated by management, as we discuss in "Business Segment Results — Changes to Segment Reporting."

We recognized a net loss of $14.0 billion for 2010, a net loss attributable to common stockholders of $21.7 billion, which includes $7.7 billion in dividends on senior preferred stock paid to Treasury, and a diluted loss per share of $3.81. In comparison, we recognized a net loss of $72.0 billion, a net loss attributable to common stockholders of $74.4 billion, including $2.5 billion in dividends on senior preferred stock, and a diluted loss per share of $13.11 in 2009.

The $58.0 billion decrease in our net loss for 2010 compared with 2009 was due primarily to:

- a $46.9 billion decrease in credit-related expenses, which consist of the provision for loan losses, the provision for guaranty losses (collectively referred to as the "provision for credit losses") plus foreclosed property expense, due to the factors described below;

- a $9.1 billion decrease in net other-than-temporary impairments due to slower deterioration of the estimated credit component of the fair value losses of Alt-A and subprime securities. In addition, net-other-than temporary impairment decreased in 2010 compared with 2009 because, effective beginning in the second quarter of 2009, we recognize only the credit portion of other-than-temporary impairment in our consolidated statements of operations due to the adoption of a new other-than-temporary impairment accounting standard;

- a $6.7 billion decrease in losses from partnership investments resulting primarily from the recognition, in the fourth quarter of 2009, of $5.0 billion in other-than-temporary impairment losses on our federal low-income housing tax credit ("LIHTC") investments; and

- a $2.3 billion decrease in net fair value losses primarily due to lower fair value losses on risk management derivatives.

Our credit-related expenses were $26.6 billion for 2010 compared with $73.5 billion for 2009. Our provision for credit losses was substantially lower in 2010, primarily because there was neither a significant increase in the number of seriously delinquent loans, nor a sharp decline in home prices. Therefore, we did not need to substantially increase our total loss reserves in 2010. Another contributing factor was the insignificant amount of fair value losses on acquired credit-impaired loans recognized in 2010, because only purchases of credit-deteriorated loans from unconsolidated MBS trusts or as a result of other credit guarantees generate fair value losses upon acquisition, due to our adoption of the new accounting standards. Additionally, on December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, to address outstanding repurchase requests for residential mortgage loans. Bank of America agreed, among other things, to a cash payment of $1.3 billion, $930 million of which was recognized as a recovery of charge-offs, resulting in a reduction to our provision for loan losses and allowance for loan losses, and $266 million as a reduction to foreclosed property expense. For additional information on the terms of this agreement, see "Risk Management — Credit Risk Management — Institutional Counterparty Credit Risk Management."

We had a net worth deficit of $2.5 billion as of December 31, 2010 and $2.4 billion as of September 30, 2010, compared with $15.3 billion as of December 31, 2009. Our net worth as of December 31, 2010 was negatively impacted by the recognition of our net loss of $14.0 billion and the senior preferred stock dividends of $7.7 billion. These reductions in our net worth were offset by our receipt of $27.7 billion in funds from Treasury under our senior preferred stock purchase agreement with Treasury, a $3.3 billion cumulative effect from the adoption of new accounting standards as of January 1, 2010, and a $3.1 billion reduction in

7

unrealized losses in our holdings of available-for-sale securities. Our net worth, which is the basis for determining the amount that Treasury has committed to provide us under the senior preferred stock purchase agreement, equals the "Total deficit" reported in our consolidated balance sheets. In February 2011, the Acting Director of FHFA submitted a request to Treasury on our behalf for $2.6 billion to eliminate our net worth deficit as of December 31, 2010. When Treasury provides the requested funds, the aggregate liquidation preference on the senior preferred stock will be $91.2 billion, which will require an annualized dividend payment of $9.1 billion. This amount exceeds our reported annual net income for each of the last nine years, in most cases by a significant margin. Through December 31, 2010, we have paid an aggregate of $10.2 billion to Treasury in dividends on the senior preferred stock.

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $66.3 billion as of December 31, 2010 from $64.7 billion as of September 30, 2010, $61.4 billion as of January 1, 2010 and $64.9 billion as of December 31, 2009. Our total loss reserve coverage to total nonperforming loans was 30.85% as of December 31, 2010, compared with 30.34% as of September 30, 2010 and 29.98% as of December 31, 2009.

We recognized net income of $73 million for the fourth quarter of 2010, driven primarily by net interest income of $4.6 billion and fair value gains of $366 million, which were partially offset by credit-related expenses of $4.3 billion and administrative expenses of $592 million. Our fourth quarter results were favorably impacted by the cash payment received from Bank of America, because it reduced our credit-related expenses for the period. The net loss attributable to common stockholders, which includes $2.2 billion in dividends on senior preferred stock, was $2.1 billion and our diluted loss per share was $0.37. In comparison, we recognized a net loss of $1.3 billion, a net loss attributable to common stockholders of $3.5 billion and a diluted loss per share of $0.61 for the third quarter of 2010. We recognized a net loss of $15.2 billion, a net loss attributable to common stockholders of $16.3 billion and a diluted loss per share of $2.87 for the fourth quarter of 2009.

**Providing Mortgage Market Liquidity**

We support liquidity and stability in the secondary mortgage market, serving as a stable source of funds for purchases of homes and multifamily rental housing and for refinancing existing mortgages. We provide this financing through the activities of our three complementary businesses: our Single-Family business ("Single-Family"), our Multifamily Mortgage Business ("Multifamily," formerly "Housing and Community Development," or "HCD") and our Capital Markets group. Our Single-Family and Multifamily businesses work with our lender customers to purchase and securitize mortgage loans customers deliver to us into Fannie Mae MBS. Our Capital Markets group manages our investment activity in mortgage-related assets, funding investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. The Capital Markets group works with lender customers to provide funds to the mortgage market through short-term financing and other activities, making short-term use of our balance sheet. These financing activities include whole loan conduit transactions, early funding transactions, Real Estate Mortgage Investment Conduit ("REMIC") and other structured securitization activities, and dollar rolls, which we describe in more detail in "Business Segments — Capital Markets Group."

In 2010, we purchased or guaranteed approximately $856 billion in loans, measured by unpaid principal balance, which includes approximately $217 billion in delinquent loans we purchased from our single-family MBS trusts. Our purchases and guarantees financed approximately 2,712,000 single-family conventional loans, excluding delinquent loans purchased from our MBS trusts, and approximately 306,000 units in multifamily properties.

Our mortgage credit book of business — which consists of the mortgage loans and mortgage-related securities we hold in our investment portfolio, Fannie Mae MBS held by third parties and other credit enhancements that we provide on mortgage assets — totaled $3.1 trillion as of September 30, 2010, which represented approximately 27.4% of U.S. residential mortgage debt outstanding on September 30, 2010, the latest date for which the Federal Reserve has estimated U.S. residential mortgage debt outstanding. We remained the largest single issuer of mortgage-related securities in the secondary market, with an estimated market share of new

8

single-family mortgage-related securities of 49.0% during the fourth quarter of 2010 and 44.0% for the full year. In comparison, our estimated market share of new single-family mortgage-related securities issuances was 44.5% in the third quarter of 2010 and 38.9% in the fourth quarter of 2009. If the Federal Housing Administration ("FHA") continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher loan-to-value ("LTV") ratios, our market share could be adversely impacted if the market shifts away from refinance activity, which is likely to occur when interest rates rise. In the multifamily market, we remain a constant source of liquidity, guaranteeing an estimated 20.1% of multifamily mortgage debt outstanding as of September 30, 2010, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences.

### Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses

In this section we discuss our expectations regarding the profitability, performance and credit profile of the single-family loans we have purchased or guaranteed since the beginning of 2009, shortly after entering into conservatorship in late 2008, and our expected single-family credit losses. We refer to loans that we have purchased or guaranteed as loans that we have "acquired."

- Since the beginning of 2009, we have acquired single-family loans that have a strong overall credit profile and are performing well. We expect these loans will be profitable, by which we mean they will generate more fee income than credit losses and administrative costs, as we discuss in "Expected Profitability of Our Single-Family Acquisitions" below. For further information, see "Table 2: Single-Family Serious Delinquency Rates by Year of Acquisition" and "Table 3: Credit Profile of Single-Family Conventional Loans Acquired."

- The vast majority of our realized credit losses in 2009 and 2010 on single-family loans are attributable to single-family loans that we purchased or guaranteed from 2005 through 2008. While these loans will give rise to additional credit losses that we have not yet realized, we estimate that we have reserved for the substantial majority of the remaining losses.

### *Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations*

In this discussion, we present a number of estimates and expectations regarding the profitability of single-family loans we have acquired, our single-family credit losses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of these amounts, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of home price changes, changes in interest rates, unemployment, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, other macro-economic variables, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our REO inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, or many other factors, including those discussed in "Risk Factors" and "MD&A — Forward-Looking Statements." For example, if the economy were to enter a deep recession during this time period, we would expect actual outcomes to differ substantially from our current expectations.

### *Expected Profitability of Our Single-Family Acquisitions*

While it is too early to know how loans we have acquired since January 1, 2009 will ultimately perform, given their strong credit risk profile, low levels of payment delinquencies shortly after their acquisition, and low serious delinquency rate, we expect that, over their lifecycle, these loans will be profitable. Table 1 provides information about whether we expect loans we acquired in 1991 through 2010 to be profitable, and the percentage of our single-family guaranty book of business represented by these loans as of December 31, 2010. The expectations reflected in Table 1 are based on the credit risk profile of the loans we have acquired,

TREASURY-0250

which we discuss in more detail in "Table 3: Credit Profile of Single-Family Conventional Loans Acquired" and in "Table 40: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business." These expectations are also based on numerous other assumptions, including our expectations regarding home price declines set forth below in "Outlook." As shown in Table 1, we expect loans we have acquired in 2009 and 2010 to be profitable. If future macroeconomic conditions turn out to be significantly more adverse than our expectations, these loans could become unprofitable. For example, we believe that these loans would become unprofitable if home prices declined more than 20% from their December 2010 levels over the next five years based on our home price index, which would be an approximately 36% decline from their peak in the third quarter of 2006.

**Table 1:   Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through 2010**



As Table 1 shows, the key years in which we acquired loans that we expect will be unprofitable are 2005 through 2008, and the vast majority of our realized credit losses in 2009 and 2010 to date are attributable to these loans. Loans we acquired in 2004 were originated under more conservative acquisition policies than loans we acquired from 2005 through 2008; however, we expect them to perform close to break-even because these loans were made as home prices were rapidly increasing and therefore suffered from the subsequent decline in home prices.

Loans we have acquired since the beginning of 2009 comprised over 40% of our single-family guaranty book of business as of December 31, 2010. Our 2005 to 2008 acquisitions are becoming a smaller percentage of our guaranty book of business, having decreased from 50% of our guaranty book of business as of December 31, 2009 to 39% as of December 31, 2010.

TREASURY-0251

*Performance of Our Single-Family Acquisitions*

In our experience, an early predictor of the ultimate performance of loans is the rate at which the loans become seriously delinquent within a short period of time after acquisition. Loans we acquired in 2009 have experienced historically low levels of delinquencies shortly after their acquisition. Table 2 shows, for single-family loans we acquired in each year from 2001 to 2009, the percentage that were seriously delinquent (three or more months past due or in the foreclosure process) as of the end of the fourth quarter following the acquisition year. Loans we acquired in 2010 are not included in this table because a substantial portion of them were originated so recently that they could not yet have become seriously delinquent. As Table 2 shows, the percentage of our 2009 acquisitions that were seriously delinquent as of the end of the fourth quarter following their acquisition year was more than nine times lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. Table 2 also shows serious delinquency rates for each year's acquisitions as of December 31, 2010. Except for the most recent acquisition years, whose serious delinquency rates are likely lower than they will be after the loans have aged, Table 2 shows that the serious delinquency rate as of December 31, 2010 generally tracks the trend of the serious delinquency rate as of the end of the fourth quarter following the year of acquisition. Below the table we provide information about the economic environment in which the loans were acquired, specifically home price appreciation and unemployment levels.

TREASURY-0252

Table 2:   Single-Family Serious Delinquency Rates by Year of Acquisition



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| Home Price Appreciation[1] | 6.3 % | 7.5 % | 7.6 % | 10.7 % | 11.5 % | 2.7 % | (4.1)% | (10.3)% | (3.7)% | (3.1)% |
| Unemployment rate[2] | 4.7 % | 5.8 % | 6.0 % | 5.5 % | 5.1 % | 4.6 % | 4.6 % | 5.8 % | 9.3 % | 9.6 % |

---

  * For 2009, the serious delinquency rate as of December 31, 2010 is the same as the serious delinquency rate as of the end of the fourth quarter following the acquisition year.

  [1] Based on Fannie Mae's HPI, which measures average price changes based on repeat sales on the same properties. For 2010, the data show an initial estimate based on purchase transactions in Fannie-Freddie acquisition and public deed data available through the end of January 2011. Previously reported data has been revised to reflect additional available historical data. Including subsequently available data may lead to materially different results.

  [2] Based on the average national unemployment rates for each month reported in the labor force statistics current population survey (CPS), Bureau of Labor Statistics.

*Credit Profile of Our Single-Family Acquisitions*

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized, on average and as discussed below, by higher LTV ratios and lower FICO credit scores than loans we have acquired since January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only payment features. As a result of the sharp declines in home prices, 29% of the loans that we acquired from

TREASURY-0253

2005 through 2008 had mark-to-market LTV ratios that were greater than 100% as of December 31, 2010, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. This percentage is higher when second lien loans secured by the same properties that secure our loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. We are taking a number of actions to reduce our credit losses. We discuss these actions and our strategy below in "Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" and in "MD&A — Risk Management — Credit Risk Management — Single-Family Mortgage Credit Risk Management."

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market conditions, we reduced our acquisitions of loans with higher-risk loan attributes. The loans we have purchased or guaranteed since January 1, 2009 have had a better credit risk profile overall than loans we acquired in 2005 through 2008, and their early performance has been strong. Our experience has been that loans with stronger credit risk profiles perform better than loans without stronger credit risk profiles. For example, one measure of a loan's credit risk profile that we believe is a strong predictor of performance is LTV ratio, which indicates the amount of equity a borrower has in the underlying property. As Table 3 demonstrates, the loans we have acquired since January 1, 2009 have a strong credit risk profile, with lower original LTV ratios, higher FICO credit scores, and a product mix with a greater percentage of fully amortizing fixed-rate mortgage loans than loans we acquired from 2005 through 2008.

**Table 3:   Credit Profile of Single-Family Conventional Loans Acquired[1]**

|  | Acquisitions from 2009 through 2010 | Acquisitions from 2005 through 2008 |
| --- | --- | --- |
| Weighted average loan-to-value ratio at origination . . . . . . . . . . . . . . . . | 68% | 73% |
| Weighted average FICO credit score at origination. . . . . . . . . . . . . . . . . | 762 | 722 |
| Fully amortizing, fixed-rate loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95% | 86% |
| Alt-A loans[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 14% |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 12% |
| Original loan-to-value ratio > 90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5% | 11% |
| FICO credit score < 620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | * | 5% |

\*   Represent less than 0.5% of the total acquisitions.

[1]   Loans that meet more than one category are included in each applicable category.

[2]   Newly originated Alt-A loans acquired in 2009 and 2010 consist of the refinance of existing Alt-A loans.

Improvements in the credit risk profile of our 2009 and 2010 acquisitions over acquisitions in prior years reflect changes that we made to our pricing and eligibility standards, as well as changes that mortgage insurers made to their eligibility standards. In addition, FHA's role as the lower-cost option for some consumers for loans with higher LTV ratios has also reduced our acquisitions of these types of loans. The credit risk profile of our 2009 and 2010 acquisitions has been influenced further by a significant percentage of refinanced loans, which generally perform well as they demonstrate a borrower's desire to maintain homeownership. In 2010 our acquisitions of refinanced loans included a significant number of loans under the Refi Plus™ initiative, which involves refinancing existing, performing Fannie Mae loans with current LTV ratios up to 125%, and possibly lower FICO credit scores, into loans that reduce the borrowers' monthly payments or are otherwise more sustainable. A substantial portion of the refinances with higher LTV ratios were done as part of the Home Affordable Refinance Program ("HARP"), which is for loans on primary residences with current LTV ratios in excess of 80% and up to 125%. Due to the volume of HARP loans, the LTV ratios at origination for our 2010 acquisitions are higher than for our 2009 acquisitions. However, the overall credit profile of our 2010 acquisitions remained significantly stronger than the credit profile of our 2005 through 2008 acquisitions.

TREASURY-0254

Whether the loans we acquire in the future exhibit an overall credit profile similar to our acquisitions since January 1, 2009 will depend on a number of factors, including our future eligibility standards and those of mortgage insurers, the percentage of loan originations representing refinancings, our future objectives, and market and competitive conditions.

Beginning in 2008, we made changes to our pricing and eligibility standards and underwriting that were intended to more accurately reflect the risk in the housing market and to significantly reduce our acquisitions of loans with higher-risk attributes. These changes included the following:

- Established a minimum FICO credit score and reduced maximum debt-to-income ratio for most loans;

- Limited or eliminated certain loan products with higher-risk characteristics, including discontinuing the acquisition of newly originated Alt-A loans, except for those that represent the refinancing of an existing Alt-A Fannie Mae loan (we may also continue to selectively acquire seasoned Alt-A loans that meet acceptable eligibility and underwriting criteria; however, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods);

- Updated our comprehensive risk assessment model in Desktop Underwriter®, our proprietary automated underwriting system, and implemented a comprehensive risk assessment worksheet to assist lenders in the manual underwriting of loans;

- Increased our guaranty fee pricing to better align risk and pricing;

- Updated our policies regarding appraisals of properties backing loans; and

- Established a national down payment policy requiring borrowers to have a minimum down payment (or minimum equity, for refinances) of 3%, in most cases.

If we had applied our current pricing and eligibility standards and underwriting to loans we acquired in 2005 through 2008, our losses on loans acquired in those years would have been lower, although we would still have experienced losses due to the rise and subsequent sharp decline in home prices and increased unemployment.

### Expectations Regarding Credit Losses

The single-family credit losses we realized in 2009 and 2010, combined with the amounts we have reserved for single-family credit losses as of December 31, 2010, total approximately $110 billion. The vast majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we estimate that we have reserved for the substantial majority of the remaining losses. While we believe our results of operations have already reflected a substantial majority of the credit losses we have yet to realize on these loans, we expect that defaults on these loans and the resulting charge-offs will occur over a period of years. In addition, given the large current and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory approaches pre-2008 levels.

We show how we calculate our realized credit losses in "Table 14: Credit Loss Performance Metrics." Our reserves for credit losses consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of MBS trusts reflected in our consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, please see "Table 11: Total Loss Reserves."

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." The majority of the fair value losses were recorded prior to our adoption of the new accounting standards in 2010. Upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses to the extent that the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in

14

the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our consolidated balance sheets and have effectively been recognized in our consolidated statements of operations through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize them as credit losses in the future.

As a result of the substantial reserving for and realizing of our credit losses to date, we have drawn a significant amount of funds from Treasury through December 31, 2010. As our draws from Treasury for credit losses abate, we expect our draws instead to be driven increasingly by dividend payments to Treasury.

### Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business

To reduce the credit losses we ultimately incur on our single-family guaranty book of business, we are focusing our efforts on the following strategies:

- Reducing defaults to avoid losses that otherwise would occur;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Pursuing foreclosure alternatives to reduce the severity of the losses we incur;

- Managing our REO inventory to reduce costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders and providers of credit enhancement, including mortgage insurers.

We refer to actions taken by our servicers with borrowers to resolve the problem of existing or potential delinquent loan payments as "workouts," which include our home retention solutions and foreclosure alternatives discussed below. As "Table 4: Credit Statistics, Single-Family Guaranty Book of Business" illustrates, our single-family serious delinquency rate decreased to 4.48% as of December 31, 2010 from 5.38% as of December 31, 2009. This decrease is primarily the result of workouts and foreclosed property acquisitions completed during the year and reflects our work with servicers to reduce delays in determining and executing the appropriate approach for a given loan. During 2010, we completed approximately 772,000 workouts and foreclosed property acquisitions. The decrease is also attributable to our acquisition of loans with stronger credit profiles in 2010. Serious delinquency rates declined in 2010 and, as of September 30, 2010, we experienced the first year-over-year decline in our serious delinquency rate since 2007. This year-over-year decline continued as of December 31, 2010. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, and the extent to which borrowers with modified loans again become delinquent in their payments.

*Reducing Defaults.*   We are working to reduce defaults through improved servicing, refinancing initiatives and solutions that help borrowers retain their homes, such as modifications.

- *Improved Servicing*.   Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. We seek to improve the servicing of our delinquent loans through a variety of means, including increasing our resources for managing the oversight of servicers, increasing our communications with servicers, and holding servicers accountable for following our requirements. We are also working with some of our servicers to test and implement high-touch protocols for servicing our higher risk loans, including lowering the ratio of loans per servicer employee, prescribing borrower outreach strategies to be used at earlier stages of delinquency, and providing distressed borrowers a single point of contact to resolve issues.

- *Refinancing Initiatives*.   Through our Refi Plus™ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers, we acquired or guaranteed approximately 659,000 loans in 2010 that helped borrowers obtain more affordable monthly payments now and in the future or a more stable mortgage product (for example, by moving from an adjustable-rate mortgage to a fixed-rate mortgage). These refinancing activities may help prevent future delinquencies and defaults. Loans

15

refinanced through the Refi Plus initiative in 2010 reduced our borrowers' monthly mortgage payments by an average of $149.

- *Home Retention Solutions*.   Our home retention solutions are intended to help borrowers stay in their homes and include loan modifications, repayment plans and forbearances. We provide information on our home retention solutions completed during 2010 in Table 4. Please also see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Management of Problem Loans and Loan Workout Metrics" for a discussion of our home retention strategies.

*Managing Timelines.*   We believe that repayment plans, short-term forbearances and loan modifications can be most effective in preventing defaults when completed at an early stage of delinquency. Similarly, we believe that our foreclosure alternatives are more likely to be successful in reducing our loss severity if they are executed expeditiously. Accordingly, it is important for servicers to work with delinquent borrowers early in the delinquency to determine whether home retention solutions or foreclosure alternatives will be viable and, where no workout is viable, to reduce delays in proceeding to foreclosure.

*Pursuing Foreclosure Alternatives.*   If we are unable to provide a viable home retention solution for a problem loan, we seek to offer foreclosure alternatives and complete them in a timely manner. These foreclosure alternatives are primarily preforeclosure sales, which are sometimes referred to as "short sales," as well as deeds-in-lieu of foreclosure. These alternatives are intended to reduce the severity of our loss resulting from a borrower's default while permitting the borrower to avoid going through a foreclosure. We provide information about the volume of foreclosure alternatives we completed during 2010 in Table 4.

*Managing Our REO Inventory.*   Since January 2009, we have strengthened our REO sales capabilities by significantly increasing the number of resources in this area, and we are working to manage our REO inventory to reduce costs and maximize sales proceeds. As Table 4 shows, in 2010 we increased our dispositions of foreclosed single-family properties by 51% as compared with 2009, while our acquisition of properties increased by 80%. Given the large number of seriously delinquent loans in our single-family guaranty book of business and the large current and anticipated supply of single-family homes in the market, we expect it will take years before our REO inventory approaches pre-2008 levels.

*Pursuing Contractual Remedies.*   We conduct reviews of delinquent loans and, when we discover loans that do not meet our underwriting and eligibility requirements, we make demands for lenders to repurchase these loans or compensate us for losses sustained on the loans. We also make demands for lenders to repurchase or compensate us for loans for which the mortgage insurer rescinds coverage. We increased the volume of our repurchase requests in 2010 as compared with 2009, and we expect the number of repurchase requests we make in 2011 to remain high. During 2010, lenders repurchased from us or reimbursed us for losses on approximately $8.8 billion in loans, measured by unpaid principal balance, pursuant to their contractual obligations. In addition, as of December 31, 2010, we had outstanding requests for lenders to repurchase from us or reimburse us for losses on $5.0 billion in loans, of which 30% had been outstanding for more than 120 days.

These dollar amounts represent the unpaid principal balance of the loans underlying the repurchase requests, not the actual amounts we have received or requested from the lenders. When lenders pay us for these requests, they pay us either to repurchase the loans or else to make us whole for our losses in cases where we have acquired and disposed of the property underlying the loans. Make-whole payments are typically for less than the unpaid principal balance because we have already recovered some of the balance through the sale of the REO. As a result, our actual cash receipts relating to these outstanding repurchase requests are significantly lower than the unpaid principal balance of the loans.

We entered into an agreement on December 31, 2010, with Bank of America, N.A., BAC Home Loans Servicing LP, and Countrywide Home Loans, Inc., each of which is an affiliate of Bank of America Corporation. The agreement addresses outstanding repurchase requests on loans with an unpaid principal balance of approximately $3.9 billion delivered to Fannie Mae by affiliates of Countrywide Financial Corporation (collectively, "Countrywide"), with which Bank of America Corporation merged in 2008. For

16

more information regarding this agreement, please see "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We are also pursuing contractual remedies from providers of credit enhancement on our loans, including mortgage insurers. We received proceeds under our mortgage insurance policies for single-family loans of $1.9 billion for the fourth quarter of 2010. Please see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for a discussion of our repurchase and reimbursement requests and outstanding receivables from mortgage insurers, as well as the risk that one or more of these counterparties fails to fulfill its obligations to us.

While the actions we have taken to stabilize the housing market and minimize our credit losses have been undertaken with the goal of reducing our future credit losses below what they otherwise would have been, it is difficult to predict how effective these actions ultimately will be in reducing our credit losses and, in the future, it may be difficult to measure the impact our actions ultimately have on our credit losses.

**Credit Performance**

Table 4 presents information for each quarter of 2010 and for 2009 about the credit performance of mortgage loans in our single-family guaranty book of business and our loan workouts. The workout information in Table 4 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

**Table 4:   Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2010 | | | | | 2009 |
|---|---|---|---|---|---|---|
| | Full Year | Q4 | Q3 | Q2 | Q1 | Full Year |
| | | | (Dollars in millions) | | | |
| As of the end of each period: | | | | | | |
| Serious delinquency rate[2] . . . . . . . . . . . | 4.48% | 4.48% | 4.56% | 4.99% | 5.47% | 5.38% |
| Nonperforming loans[3] . . . . . . . . . . . . . | $ 212,858 | $212,858 | $212,305 | $217,216 | $222,892 | $ 215,505 |
| Foreclosed property inventory: | | | | | | |
| Number of properties . . . . . . . . . . . . . | 162,489 | 162,489 | 166,787 | 129,310 | 109,989 | 86,155 |
| Carrying value . . . . . . . . . . . . . . . . . . . | $  14,955 | $ 14,955 | $ 16,394 | $ 13,043 | $ 11,423 | $   8,466 |
| Combined loss reserves[4] . . . . . . . . . . . | $  60,163 | $ 60,163 | $ 58,451 | $ 59,087 | $ 58,900 | $  62,312 |
| Total loss reserves[5] . . . . . . . . . . . . . . . | $  64,469 | $ 64,469 | $ 63,105 | $ 64,877 | $ 66,479 | $  62,848 |
| During the period: | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions[6] . . . . . . . . . . . . . . . . . . . | 262,078 | 45,962 | 85,349 | 68,838 | 61,929 | 145,617 |
| Dispositions . . . . . . . . . . . . . . . . . . . . . | (185,744) | (50,260) | (47,872) | (49,517) | (38,095) | (123,000) |
| Credit-related expenses[7] . . . . . . . . . . . . | $  26,420 | $  4,064 | $  5,559 | $  4,871 | $ 11,926 | $  71,320 |
| Credit losses[8] . . . . . . . . . . . . . . . . . . . | $  23,133 | $  3,111 | $  8,037 | $  6,923 | $  5,062 | $  13,362 |
| Loan workout activity (number of loans): | | | | | | |
| Home retention loan workouts[9] . . . . . . . . | 440,276 | 89,691 | 113,367 | 132,192 | 105,026 | 160,722 |
| Preforeclosure sales and deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . . . . . . . | 75,391 | 15,632 | 20,918 | 21,515 | 17,326 | 39,617 |
| Total loan workouts . . . . . . . . . . . . . . . . | 515,667 | 105,323 | 134,285 | 153,707 | 122,352 | 200,339 |
| Loan workouts as a percentage of our delinquent loans in our guaranty book of business[10] . . . . . . . . . . . . . . . . . . . . | 37.30% | 30.47% | 37.86% | 41.18% | 31.59% | 12.24% |

[1]  Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

17

[2] Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

[3] Represents the total amount of nonperforming loans, including troubled debt restructurings and HomeSaver Advance first-lien loans, which are unsecured personal loans in the amount of past due payments used to bring mortgage loans current, that are on accrual status. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

[4] Consists of the allowance for loan losses for loans recognized in our consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. Prior period amounts have been restated to conform to the current period presentation. The amounts shown as of March 31, 2010, June 30, 2010, September 30, 2010 and December 31, 2010 reflect a decrease from the amount shown as of December 31, 2009 as a result of the adoption of the new accounting standards. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

[5] Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[6] Includes acquisitions through deeds-in-lieu of foreclosure.

[7] Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense.

[8] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans.

[9] Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 44: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

[10] Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Servicer Foreclosure Process Deficiencies and Foreclosure Pause**

In the fall of 2010, a number of our single-family mortgage servicers temporarily halted foreclosures in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process. Deficiencies include improperly notarized affidavits and affidavits signed without appropriate knowledge and review of the documents. These foreclosure process deficiencies have generated significant concern and are currently being investigated by various government agencies and by the attorneys general of all fifty states. This has resulted in new foreclosure laws and court rules in several states that we anticipate will increase costs and may lengthen the time to foreclose.

We have directed our servicers and certain of the law firms that handle foreclosure processes for our mortgage servicers to review their policies and procedures relating to the execution of affidavits, verifications and other legal documents in connection with the foreclosure process. We are also addressing concerns that have been raised regarding the practices of some law firms that handle the foreclosure process for our mortgage servicers in Florida. In the case of one firm under investigation by the Florida attorney general's office, we terminated the firm's handling of Fannie Mae matters and moved all Fannie Mae matters pending with the firm to other firms. We have also served a termination notice on a second Florida law firm handling foreclosure related matters for us. We have expanded the list of law firms that our servicers may use to process foreclosures in Florida.

18

The Acting Director of FHFA issued statements on October 1 and October 13, 2010 regarding servicers' foreclosure processing issues. We are currently coordinating with FHFA regarding appropriate corrective actions consistent with the four-point policy framework issued by FHFA on October 13, 2010. Under this framework, servicers are required to: (1) review their processes and verify that all documents are in compliance with legal requirements; (2) remediate problems identified through this review in an appropriate, timely and sustainable manner; (3) report suspected fraudulent activity; and (4) without delay, proceed to foreclose on mortgage loans that have no problems relating to process, on which the borrower has stopped payment, and for which home retention solutions and foreclosure alternatives have been unsuccessful.

Due to the servicer affidavit issues, we temporarily suspended certain eviction proceedings and the closing of some REO sales. On November 24, 2010, we authorized the scheduling and closing of REO sale transactions to resume. Effective January 18, 2011, we issued instructions to counsel to proceed with scheduling and completing the eviction actions previously placed on hold.

Although the foreclosure pause has negatively affected our serious delinquency rates, credit-related expenses and foreclosure timelines, we cannot yet predict the full extent of its impact. The foreclosure pause also could negatively affect housing market conditions and delay the recovery of the housing market. Some servicers have lifted the foreclosure pause in certain jurisdictions, while continuing the pause in others. At this time, we cannot predict how long the pause on foreclosures will last, how many of our loans will be affected by it or its ultimate impact on our business or the housing market. See "Risk Factors" for further information about the potential impact of the servicer foreclosure process deficiencies and the foreclosure pause on our business, results of operations, financial condition and liquidity position.

### Liquidity

In response to the strong demand that we experienced for our debt securities during 2010, we issued a variety of non-callable and callable debt securities in a wide range of maturities to achieve cost-efficient funding and to extend our debt maturity profile. In particular, we issued a significant amount of long-term debt during this period, which we then used to repay maturing debt and prepay more expensive callable long-term debt.

We believe that our ready access to long-term debt funding during 2009 and 2010 has been primarily due to the actions taken by the federal government to support us and the financial markets. Accordingly, we believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially and adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition, results of operations and ability to continue as a going concern. Demand for our debt securities could decline in the future, as the Administration, Congress and our regulators debate our future. Despite the conclusion of the Federal Reserve's program to purchase agency debt and MBS during the first quarter of 2010, as of the date of this filing, demand for our long-term debt securities continues to be strong. See "MD&A—Liquidity and Capital Management—Liquidity Management" for more information on our debt funding activities and "Risk Factors" for a discussion of the risks to our business posed by our reliance on the issuance of debt securities to fund our operations.

### Outlook

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in 2011. The high level of delinquent mortgage loans will result in the foreclosure of troubled loans, which is likely to add to the excess housing inventory. Home sales are unlikely to rise before the unemployment rate improves. In addition, the servicer foreclosure process deficiencies described above create uncertainty for potential home buyers, because foreclosed homes account for a substantial part of the existing home market. Thus, widespread concerns about foreclosure process deficiencies could suppress home sales in the near term and interfere with the housing recovery.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011. Despite the initial signs of multifamily sector improvement, we expect multifamily

charge-offs to remain commensurate with 2010 levels throughout 2011. All of these conditions as well as our single-family serious delinquency rate may worsen if the unemployment rate increases on either a national or regional basis. We expect our overall business volume in 2011 will be lower than in 2010 as a result of our expectations that, in 2011 (1) residential mortgage debt outstanding will continue to decline, (2) total originations will decline, and (3) the portion of originations represented by refinancings will decline. Approximately 78% of our single-family business in 2010 consisted of refinancings.

*Home Price Declines.*   We expect that home prices on a national basis will decline slightly, with greater declines in some geographic areas than others, before stabilizing later in 2011, and that the peak-to-trough home price decline on a national basis will range between 21% and 26%. These estimates are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. These estimates also contain significant inherent uncertainty in the current market environment regarding a variety of critical assumptions we make when formulating these estimates, including the effect of actions the federal government has taken and may take with respect to the national economic recovery; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our 21% to 26% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas we believe the S&P/Case-Shiller index weights expectations based on property value, causing home price declines on higher priced homes to have a greater effect on the overall result; and (2) our estimates attempt to exclude sales of foreclosed homes because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values, whereas we believe the S&P/Case-Shiller index includes foreclosed homes sales. The S&P/Case-Shiller comparison numbers are calculated using our models and assumptions, but modified to account for weighting based on property value and the impact of foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not modified to account for this data pool difference. We are working on enhancing our home price estimates to identify and exclude a greater portion of foreclosed home sales. When we begin reporting these enhanced home price estimates, we expect that some period to period comparisons of home prices may differ from those determined using our current estimates.

*Credit-Related Expenses and Credit Losses.*   We expect that our credit-related expenses will remain high in 2011 and that our credit losses will increase in 2011 as compared to 2010. We describe our credit loss outlook above under "Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. Given our expectations regarding future losses, which we describe above under "Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses," we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. As a result of these factors, there is significant uncertainty as to our long-term financial sustainability.

In addition, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. In December 2009, while announcing amendments to the senior preferred stock purchase agreement and to Treasury's preferred stock purchase agreement with Freddie Mac, Treasury noted that the amendments "should leave no uncertainty about the Treasury's commitment to support [Fannie Mae and Freddie Mac] as they continue to play a vital role in the housing market during this current crisis." Treasury and HUD's February 11, 2011 report to Congress on reforming America's housing finance market provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. Please see "Legislation and GSE Reform" for a discussion of recent legislative reform of the financial services industry, and proposals for GSE reform, that could affect our business and "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

## MORTGAGE SECURITIZATIONS

We support market liquidity by securitizing mortgage loans, which means we place loans in a trust and Fannie Mae MBS backed by the mortgage loans are then issued. We guarantee to the MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the trust certificates. In return for this guaranty, we receive guaranty fees.

Below we discuss (1) two broad categories of securitization transactions: lender swaps and portfolio securitizations; (2) features of our MBS trusts; (3) circumstances under which we purchase loans from MBS trusts; and (4) single-class and multi-class Fannie Mae MBS.

### Lender Swaps and Portfolio Securitizations

We currently securitize a majority of the single-family and multifamily mortgage loans we acquire. Our securitization transactions primarily fall within two broad categories: lender swap transactions and portfolio securitizations.

Our most common type of securitization transaction is our "lender swap transaction." Mortgage lenders that operate in the primary mortgage market generally deliver pools of mortgage loans to us in exchange for Fannie Mae MBS backed by these mortgage loans. A pool of mortgage loans is a group of mortgage loans with similar characteristics. After receiving the mortgage loans in a lender swap transaction, we place them in a trust that is established for the sole purpose of holding the mortgage loans separate and apart from our assets. We deliver to the lender (or its designee) Fannie Mae MBS that are backed by the pool of mortgage loans in the trust and that represent an undivided beneficial ownership interest in each of the mortgage loans. We guarantee to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the related Fannie Mae MBS. We retain a portion of the interest payment as the fee for providing our guaranty. Then, on behalf of the trust, we make monthly distributions to the Fannie Mae MBS certificateholders from the principal and interest payments and other collections on the underlying mortgage loans. The structured securitization transactions we describe below in "Business Segments—Capital Markets—Securitization Activities" involve a process that is very similar to the process involved in our lender swap securitizations.

In contrast to our lender swap securitizations, in which lenders deliver pools of mortgage loans to us that we immediately place in a trust for securitization, our "portfolio securitization transactions" involve creating and issuing Fannie Mae MBS using mortgage loans and mortgage-related securities that we hold in our mortgage portfolio.

TREASURY-0262

## Features of Our MBS Trusts

We serve as trustee for our MBS trusts, each of which is established for the sole purpose of holding mortgage loans separate and apart from our assets. Our MBS trusts hold either single-family or multifamily mortgage loans or mortgage-related securities. Each trust operates in accordance with a trust agreement or a trust indenture. Each MBS trust is also governed by an issue supplement documenting the formation of that MBS trust, the identification of its related assets and the issuance of the related Fannie Mae MBS. The trust agreement or the trust indenture, together with the issue supplement and any amendments, are considered the "trust documents" that govern an individual MBS trust.

In 2010 we established a new multifamily master trust agreement that governs our multifamily MBS trusts formed on or after October 1, 2010. The new master trust agreement provides greater flexibility in certain servicing activities related to multifamily mortgage loans held in an MBS trust formed on or after that date.

## Purchases of Loans from our MBS Trusts

Under the terms of our MBS trust documents, we have the option or, in some instances, the obligation, to purchase mortgage loans that meet specific criteria from an MBS trust. In particular, we have the option to purchase a loan from an MBS trust if the loan is delinquent as to four or more consecutive monthly payments. Our acquisition cost for these loans is the unpaid principal balance of the loan plus accrued interest.

In deciding whether and when to purchase a loan from a single-family MBS trust, we consider a variety of factors, including: our legal ability or obligation to purchase loans under the terms of the trust documents; our mission and public policy; our loss mitigation strategies and the exposure to credit losses we face under our guaranty; our cost of funds; the impact on our results of operations; relevant market yields; the accounting impact; the administrative costs associated with purchasing and holding the loans; counterparty exposure to lenders that have agreed to cover losses associated with delinquent loans; general market conditions; our statutory obligations under our Charter Act; and other legal obligations such as those established by consumer finance laws. The weight we give to these factors changes depending on market circumstances and other factors.

With the adoption of new accounting standards on January 1, 2010, we no longer recognize the acquisition of loans from the MBS trusts that we have consolidated as a purchase with an associated fair value loss for the difference between the fair value of the acquired loan and its acquisition cost, as these loans are already reflected on our consolidated balance sheet. Currently, the cost of purchasing most delinquent loans from Fannie Mae MBS trusts and holding them in our portfolio is less than the cost of advancing delinquent payments to security holders. In light of these factors, in the first half of 2010 we significantly increased these purchases, purchasing the substantial majority of our previously outstanding delinquent loan population in our single-family MBS trusts. As a result, during 2010 we reduced the total unpaid principal balance of loans in single-family MBS trusts that were delinquent for four or more consecutive months to approximately $8 billion as of December 31, 2010 from approximately $127 billion as of December 31, 2009. We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other constraints, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We continue to review the economics of purchasing loans that are four or more months delinquent in the future and may reevaluate our delinquent loan purchase practices and alter them if circumstances warrant.

For our multifamily MBS trusts, we typically exercise our option to purchase a loan from the trust if the loan is delinquent, in whole or in part, as to four or more consecutive monthly payments.

## Single-Class and Multi-Class Fannie Mae MBS

Fannie Mae MBS trusts may be single-class or multi-class. Single-class MBS are MBS in which the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. Multi-class MBS are MBS, including REMICs, in which the cash flows on the underlying mortgage assets are divided, creating several classes of securities, each of which represents an undivided beneficial ownership

TREASURY-0263

interest in the assets of the related MBS trust and entitles the related holder to a specific portion of cash flows. Terms to maturity of some multi-class Fannie Mae MBS, particularly REMIC classes, may match or be shorter than the maturity of the underlying mortgage loans and/or mortgage-related securities. After these classes expire, cash flows received on the underlying mortgage assets are allocated to the remaining classes in accordance with the terms of the securities' structures. As a result, each of the classes in a multi-class MBS may have a different coupon rate, average life, repayment sensitivity or final maturity. Structured Fannie Mae MBS are either multi-class MBS or single-class MBS that are typically resecuritizations of other single-class Fannie Mae MBS. In a resecuritization, pools of MBS are collected and securitized.

## BUSINESS SEGMENTS

We have three business segments for management reporting purposes: Single-Family Credit Guaranty, Multifamily, and Capital Markets. We refer to our business groups that run these segments as our "Single-Family business," our "Multifamily business" and our "Capital Markets group." These groups engage in complementary business activities in pursuing our mission of providing liquidity, stability and affordability to the U.S. housing market. These activities are summarized in the table below and described in more detail following this table. We also summarize in the table below the key sources of revenue for each of our segments and the primary expenses.

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Single-Family Credit Guaranty, or Single-Family | • *Mortgage securitizations:* Works with our lender customers to securitize single-family mortgage loans delivered to us by lenders into Fannie Mae MBS, which we refer to as "lender swap" transactions<br><br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of single-family mortgage loans for our mortgage portfolio<br><br>• *Credit risk management:* Prices and manages the credit risk on loans in our single-family guaranty book of business<br><br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of REO we acquire upon foreclosure or through a deed-in-lieu of foreclosure, and through lender repurchases | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our single-family guaranty book of business<br><br>• *Fee and other income:* Compensation received for providing lender services | • *Credit-related expenses.* Consists of provision for single-family loan losses, provision for single-family guaranty losses and foreclosed property expense on loans underlying our single-family guaranty book of business<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with the Single-Family business operations |

23

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Multifamily | • *Mortgage securitizations:* Works with our lender customers to securitize multifamily mortgage loans delivered to us by lenders into Fannie Mae MBS in lender swap transactions<br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of multifamily mortgage loans for our mortgage portfolio<br>• *Affordable housing investments*:  Provides funding for investments in affordable multifamily rental housing projects<br>• *Credit risk management:* Prices and manages the credit risk on loans in our multifamily guaranty book of business<br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of REO we acquire upon foreclosure or through a deed-in-lieu of foreclosure, and through lender repurchases | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our multifamily guaranty book of business<br>• *Fee and other income*: Compensation received for engaging in multifamily transactions and bond credit enhancements | • *Credit-related expenses:* Consists of provision for multifamily loan losses, provision for multifamily guaranty losses and foreclosed property expense on loans underlying our multifamily guaranty book of business<br>• *Net operating losses:* Generated by our affordable housing investments, net of any tax benefits generated by these investments that we are able to utilize<br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Multifamily business operations |

24

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Capital Markets | • *Mortgage and other investments:* Purchases mortgage assets and makes investments in other non-mortgage interest-earning assets<br><br>• *Mortgage securitizations:* Purchases loans from a large group of lenders, securitizes them, and may sell the securities to dealers and investors<br><br>• *Structured mortgage securitizations and other customer services:* Issues structured Fannie Mae MBS for customers in exchange for a transaction fee and provides other fee-related services to our lender customers<br><br>• *Interest rate risk management:* Manages the interest rate risk on our portfolio by issuing a variety of debt securities in a wide range of maturities and by using derivatives | • *Net interest income*: Generated from the difference between the interest income earned on our interest-earning assets and the interest expense associated with the debt funding those assets<br><br>• *Fee and other income:* Compensation received for providing structured transactions and other lender services | • *Fair value gains and losses:* Primarily consists of fair value gains and losses on derivatives and trading securities<br><br>• *Investment gains and losses:* Primarily consists of gains and losses on the sale or securitization of mortgage assets<br><br>• *Other-than-temporary impairment:* Consists of impairment recognized on our investments<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Capital Markets business operations |

## Revenues from our Business Segments

The following table shows the percentage of our total net revenues accounted for by our business segments for each of the last three years. Our prospective adoption of the new accounting standards had a significant impact on our financial statements. Also, effective in 2010 we changed the presentation of segment financial information that is currently evaluated by management. As a result of the new accounting standards and changes to our segment presentation, our 2010 segment results are not comparable to prior years' segment results. We have not restated prior years' results, nor have we presented 2010 results under the old presentation, because we determined that it was impracticable to do so. For more information about changes in our segment reporting and the financial results and performance of each of our segments, please see "MD&A—Business Segment Results" and "Note 15, Segment Reporting."

## Business Segment Revenues[1]

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010[2] | 2009 | 2008 |
| Single-Family Credit Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12% | 39% | 54% |
| Multifamily[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 3 | 3 |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77 | 58 | 43 |

[1] Amounts presented represent the percentage of our total net revenues accounted for by each of our business segments.

[2] Segment results for 2010 are not comparable with prior years' results. In addition, under our current segment reporting structure, the sum of net revenues for our three business segments does not equal our consolidated total net revenues because we separate the activity related to our consolidated trusts from the results generated by our three segments.

[3] These amounts do not include the net interest income we earn on our multifamily investments in our mortgage portfolio, which is reflected in the revenues of our Capital Markets segment.

TREASURY-0266

Under the terms of our intracompany guaranty arrangement, Capital Markets receives reimbursements primarily from Single-Family for the contractual interest due on mortgage loans held in our portfolio when interest income on the loans is no longer recognized in accordance with our nonaccrual accounting policy. As a result, the substantial increase in the number of nonaccrual loans purchased from our consolidated MBS trusts in 2010 significantly increased Capital Markets' net revenue in 2010, while reducing the net revenues of Single-Family.

**Single-Family Business**

Our Single-Family business works with our lender customers to provide funds to the mortgage market by securitizing single-family mortgage loans into Fannie Mae MBS. Our Single-Family business also works with our Capital Markets group to facilitate the purchase of single-family mortgage loans for our mortgage portfolio. Our Single-Family business has primary responsibility for pricing and managing the credit risk on our single-family guaranty book of business, which consists of single-family mortgage loans underlying Fannie Mae MBS and single-family loans held in our mortgage portfolio.

A single-family loan is secured by a property with four or fewer residential units. Our Single-Family business and Capital Markets group securitize and purchase primarily conventional (not federally insured or guaranteed) single-family fixed-rate or adjustable-rate, first lien mortgage loans, or mortgage-related securities backed by these types of loans. We also securitize or purchase loans insured by FHA, loans guaranteed by the Department of Veterans Affairs ("VA"), and loans guaranteed by the Rural Development Housing and Community Facilities Program of the Department of Agriculture, manufactured housing loans, reverse mortgage loans, multifamily mortgage loans, subordinate lien mortgage loans (for example, loans secured by second liens) and other mortgage-related securities.

Revenues for our Single-Family business are derived primarily from guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS. We also allocate guaranty fee revenues to the Single-Family business for assuming and managing the credit risk on the single-family mortgage loans held in our portfolio. The aggregate amount of single-family guaranty fees we receive or that are allocated to our Single-Family business in any period depends on the amount of single-family Fannie Mae MBS outstanding and loans held in our mortgage portfolio during the period and the applicable guaranty fee rates. The amount of Fannie Mae MBS outstanding at any time is primarily determined by the rate at which we issue new Fannie Mae MBS and by the repayment rate for the loans underlying our outstanding Fannie Mae MBS. Other factors affecting the amount of Fannie Mae MBS outstanding are the extent to which (1) we purchase loans from our MBS trusts because of borrower defaults (with the amount of these purchases affected by the rate of borrower defaults on the loans and the extent of loan modification programs in which we engage) and (2) sellers and servicers repurchase loans from us upon our demand based on a breach in the selling representations and warranties provided upon delivery of the loans.

We describe the credit risk management process employed by our Single-Family business, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our single-family credit risk in "MD&A—Risk Management—Credit Risk Management."

*Single-Family Mortgage Securitizations and Acquisitions*

Our Single-Family business securitizes single-family mortgage loans and issues single-class Fannie Mae MBS, which are described above in "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS," for our lender customers. Unlike our Capital Markets group, which securitizes loans from our portfolio, our Single-Family business securitizes loans solely in lender swap transactions, in which lenders deliver pools of mortgage loans to us, which are placed immediately in a trust, in exchange for Fannie Mae MBS backed by these loans. We describe lender swap transactions, and how they differ from portfolio securitizations, in "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

Loans from our lender customers are delivered to us through either our "flow" or "bulk" transaction channels. In our flow business, we enter into agreements that generally set agreed-upon guaranty fee prices for a

26

lender's future delivery of individual loans to us over a specified time period. Our bulk business generally consists of transactions in which a set of loans is delivered to us in bulk, typically with guaranty fees and other contract terms negotiated individually for each transaction.

### Single-Family Mortgage Servicing

#### Servicing

Generally, the servicing of the mortgage loans held in our mortgage portfolio or that back our Fannie Mae MBS is performed by mortgage servicers on our behalf. Typically, lenders who sell single-family mortgage loans to us service these loans for us. For loans we own or guarantee, the lender or servicer must obtain our approval before selling servicing rights to another servicer.

Our mortgage servicers typically collect and deliver principal and interest payments, administer escrow accounts, monitor and report delinquencies, perform default prevention activities, evaluate transfers of ownership interests, respond to requests for partial releases of security, and handle proceeds from casualty and condemnation losses. Our mortgage servicers are the primary point of contact for borrowers and perform a key role in the effective implementation of our homeownership assistance initiatives, negotiation of workouts of troubled loans, and loss mitigation activities. If necessary, mortgage servicers inspect and preserve properties and process foreclosures and bankruptcies. Because we generally delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, our ability to actively manage troubled loans that we own or guarantee may be limited. For more information on the risks of our reliance on servicers, refer to "Risk Factors" and "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We compensate servicers primarily by permitting them to retain a specified portion of each interest payment on a serviced mortgage loan as a servicing fee. Servicers also generally retain prepayment premiums, assumption fees, late payment charges and other similar charges, to the extent they are collected from borrowers, as additional servicing compensation. We also compensate servicers for negotiating workouts on problem loans.

In January 2011, FHFA announced that it directed Fannie Mae and Freddie Mac to work on a joint initiative, in coordination with FHFA and HUD, to consider alternatives for future mortgage servicing structures and servicing compensation for their single-family mortgage loans. Alternatives that may be considered include a fee for service compensation structure for nonperforming loans, as well as the possibility of reducing or eliminating the minimum mortgage servicing fee for performing loans, or other structures. In its announcement, FHFA stated that any implementation of a new servicing compensation structure would not be expected to occur before summer 2012.

#### REO Management and Lender Repurchase Evaluations

In the event a loan defaults and we acquire a home through foreclosure or a deed-in-lieu of foreclosure, we focus on selling the home through a national network of real estate agents. Our primary objectives are both to minimize the severity of loss to Fannie Mae by maximizing sales prices and also to stabilize neighborhoods—to prevent empty homes from depressing home values. We also continue to seek non-traditional ways to sell properties, including by selling homes to cities, municipalities and other public entities, and by selling properties in bulk or through public auctions.

We also conduct post-purchase quality control file reviews to ensure that loans sold to and serviced for us meet our guidelines. If we discover violations through reviews, we issue repurchase demands to the seller and seek to collect on our repurchase claims.

### Multifamily Business

A core part of Fannie Mae's mission is to support the U.S. multifamily housing market to help serve the nation's rental housing needs, focusing on low- to middle-income households and communities. Multifamily mortgage loans relate to properties with five or more residential units, which may be apartment communities,

TREASURY-0268

cooperative properties or manufactured housing communities. During 2010, we changed the name of our multifamily business division from Housing and Community Development to Multifamily Mortgage Business. The new name better reflects the division's realignment to focus on our core multifamily activities and the discontinuation of some of our non-mortgage secured debt and equity investment activities as instructed by FHFA.

Our Multifamily business works with our lender customers to provide funds to the mortgage market by securitizing multifamily mortgage loans into Fannie Mae MBS. Through our Multifamily business, we provide liquidity and support to the U.S. multifamily housing market principally by purchasing or securitizing loans that finance multifamily rental housing properties. We also provide some limited debt financing for other acquisition, development, construction and rehabilitation activity related to projects that complement this business. Our Multifamily business also works with our Capital Markets group to facilitate the purchase and securitization of multifamily mortgage loans and securities for Fannie Mae's portfolio, as well as to facilitate portfolio securitization and resecuritization activities. Our multifamily guaranty book of business consists of multifamily mortgage loans underlying Fannie Mae MBS and multifamily loans and securities held in our mortgage portfolio. Our Multifamily business has primary responsibility for pricing the credit risk on our multifamily guaranty book of business and for managing the credit risk on multifamily loans and Fannie Mae MBS backed by multifamily loans that are held in our mortgage portfolio.

Revenues for our Multifamily business are derived from a variety of sources, including: (1) guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS and on the multifamily mortgage loans held in our portfolio and on other mortgage-related securities; (2) transaction fees associated with the multifamily business and (3) other bond credit enhancement related fees.

We describe the credit risk management process employed by our Multifamily business, along with our Multifamily Enterprise Risk Management group, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our multifamily credit risk, in "MD&A—Risk Management—Credit Risk Management—Multifamily Mortgage Credit Risk Management."

### Key Characteristics of the Multifamily Mortgage Market and Multifamily Transactions

The multifamily mortgage market and our transactions in that market have a number of key characteristics that affect our multifamily activities and distinguish them from our activities in the single-family residential mortgage market.

- *Funding sources:*   Unlike the single-family residential mortgage market in which the GSEs' predominance makes us a driver of market standards and rates, the multifamily market is made up of a wide variety of lending sources, including commercial banks, life insurance companies, investment banks, small community banks, FHA, state and local housing finance agencies and the GSEs.

- *Number of lenders; lender relationships:*   In 2010, we executed multifamily transactions with 32 lenders. Of these, 24 lenders delivered loans to us under our Delegated Underwriting and Servicing, or DUS®, product line. In determining whether to do business with a multifamily lender, we consider the lender's financial strength, multifamily underwriting and servicing experience, portfolio performance and willingness and ability to share in the risk of loss associated with the multifamily loans they originate.

- *Loan size:*   On average, loans in our multifamily guaranty book of business are several million dollars in size. A significant number of our multifamily loans are under $5 million, and some of our multifamily loans are greater than $25 million.

- *Collateral:*   Multifamily loans are collateralized by properties that generate cash flows, such as garden and high-rise apartment complexes, seniors housing communities, cooperatives, dedicated student housing and manufactured housing communities. These rental properties are operated as businesses.

- *Borrower profile:*   Most multifamily borrowers are for-profit corporations, limited liability companies, partnerships, real estate investment trusts and individuals who invest in real estate for cash flow and

28

equity returns in exchange for their original investment in the asset. Multifamily loans are generally non-recourse to the borrower. When considering a multifamily borrower, creditworthiness is evaluated through a combination of quantitative and qualitative data including liquid assets, net worth, number of units owned, experience in a market and/or property type, multifamily portfolio performance, access to additional liquidity, debt maturities, asset/property management platform, senior management experience, reputation and lender exposure.

- *Borrower and lender investment*:   Borrowers are required to contribute cash equity into multifamily properties on which they borrow, while lenders generally share in any losses realized from the loans that we purchase.

- *Underwriting process*:   Some multifamily loans require a detailed underwriting process due to the size of the loan or the complexity of the collateral or transaction.

- *Term and lifecycle*:   In contrast to the standard 30-year single-family residential loan, multifamily loans typically have terms of 5, 7 or 10 years, with balloon payments due at maturity.

- *Prepayment terms*:   Multifamily Fannie Mae loans and MBS trade in a market in which investors expect commercial investment terms, particularly limitations on prepayments of loans and the imposition of prepayment premiums.

### *Multifamily Mortgage Securitizations and Acquisitions*

Our Multifamily business generally creates multifamily Fannie Mae MBS and acquires multifamily mortgage assets in the same manner as our Single-Family business, as described above in "Single-Family Business— Mortgage Securitizations and Acquisitions."

### Delegated Underwriting and Servicing (DUS)

In an effort to promote product standardization in the multifamily marketplace, in 1988 Fannie Mae initiated the DUS product line for acquiring individual multifamily loans.

DUS is a unique business model in the commercial mortgage industry. The standard industry practice for a multifamily loan requires the purchaser or guarantor to underwrite or re-underwrite each loan prior to deciding whether to purchase or guaranty the loan. Under our model, DUS lenders are pre-approved and delegated the authority to underwrite and service loans on behalf of Fannie Mae. In exchange for this authority, DUS lenders are required to share with us the risk of loss over the life of the loan, generally retaining one-third of the underlying credit risk on each loan sold to Fannie Mae. Since DUS lenders share in the credit risk, the servicing fee to the lenders includes compensation for credit risk. Delegation permits lenders to respond to customers more rapidly, as the lender generally has the authority to approve a loan within prescribed parameters, which provides an important competitive advantage.

We believe our DUS model aligns the interests of the borrower, lender and Fannie Mae. Our current 25-member DUS lender network, which is comprised of large financial institutions and independent mortgage lenders, continues to be our principal source of multifamily loan deliveries.

Fannie Mae MBS secured by DUS loans are typically backed by a single mortgage loan, which is often a fixed-rate loan. We believe this structure increases the liquidity of the securities in the market. Structuring MBS to be backed by a single multifamily loan also facilitates securitizations by our smaller lenders.

### *Multifamily Mortgage Servicing*

As with the servicing of single-family mortgages, multifamily mortgage servicing is typically performed by the lenders who sell the mortgages to us. Many of our multifamily mortgage servicers have agreed, as part of the DUS relationship, to accept loss sharing, which we believe increases the alignment of interests between us and our multifamily loan servicers. Because of our loss-sharing arrangements with our multifamily lenders, transfers of multifamily servicing rights are infrequent, and we carefully monitor all our servicing relationships and enforce our right to approve all servicing transfers. As a seller-servicer, the lender is responsible for

TREASURY-0270

evaluating the financial condition of properties and property owners, administering various types of agreements (including agreements regarding replacement reserves, completion or repair, and operations and maintenance), as well as conducting routine property inspections.

### The Multifamily Markets in which We Operate

In the multifamily mortgage market, we aim to address the rental housing needs of a wide range of the population, from those at the lower end of the income range up through middle-income households. Our mission requires us to serve the market steadily, rather than moving in and out depending on market conditions. Through the secondary mortgage market, we support rental housing for the workforce, for senior citizens and students, and for families with the greatest economic need. Our Multifamily business is organized and operated as an integrated commercial real estate finance business, with dedicated teams that address the spectrum of multifamily housing finance needs, including the teams described below.

- To meet the growing need for affordable financing, we have a team that focuses on the purchase and guarantee of multifamily loans under $3 million ($5 million in high income areas), which finance affordable housing. We purchase these loans from DUS lenders as well as small community banks and nonprofits or similar entities. Over the years, we have been an active purchaser of these loans from both DUS and non-DUS lenders and, as of December 31, 2010, they represented 70% of our multifamily guaranty book of business by loan count and 18% based on unpaid principal balance.

- To serve low- and very low-income households, we also have a team that focuses exclusively on relationships with lenders financing privately-owned multifamily properties that receive public subsidies in exchange for maintaining long-term affordable rents. We enable borrowers to leverage housing programs and subsidies provided by local, state and federal agencies. These public subsidy programs are largely targeted to providing housing to families earning less than 60% of area median income (as defined by HUD) and are structured to ensure that the low and very low-income households who benefit from the subsidies pay no more than 30% of their gross monthly income for rent and utilities. As of December 31, 2010, this type of financing represented approximately 14% of our multifamily guaranty book of business, based on unpaid principal balance, including $16.5 billion in bond credit enhancements.

### Capital Markets

Our Capital Markets group manages our investment activity in mortgage-related assets and other interest-earning non-mortgage investments. We fund our investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. Our Capital Markets group has primary responsibility for managing the interest rate risk associated with our investments in mortgage assets.

The business model for our Capital Markets group has evolved in recent years. Our business activity is now focused on making short-term use of our balance sheet rather than long-term investments. As a result, our Capital Markets group works with lender customers to provide funds to the mortgage market through short-term financing and investing activities. Activities we are undertaking to provide liquidity to the mortgage market include the following:

- *Whole Loan Conduit.*   Whole loan conduit activities involve our purchase of both single-family and multifamily loans principally for the purpose of securitizing them. We purchase loans from a large group of lenders and then securitize them as Fannie Mae MBS, which may then be sold to dealers and investors.

- *Early Funding.*   Lenders who deliver whole loans or pools of whole loans to us in exchange for MBS typically must wait between 30 and 45 days from the closing and settlement of the loans or pools and the issuance of the MBS. This delay may limit lenders' ability to originate new loans. Under our early lender funding programs, we purchase whole loans or pools of loans on an accelerated basis, allowing lenders to receive quicker payment for the whole loans and pools, which replenishes their funds and allows them to originate more mortgage loans.

30

- *REMICs and Other Structured Securitizations.*   We issue structured Fannie Mae MBS (including REMICs), typically for our lender customers or securities dealer customers, in exchange for a transaction fee.

- *Dollar Roll Transactions.*   We engaged in dollar roll activity in 2010, but the transaction volume was lower than in 2009 and 2008 due to lower market demand for short-term financing. A dollar roll transaction is a commitment to purchase a mortgage-related security with a concurrent agreement to re-sell a substantially similar security at a later date or vice versa.

In 2010, our Capital Markets group substantially increased the amount of loans purchased out of our single-family MBS trusts because, as a result of the adoption of the new accounting standards, the cost of purchasing most delinquent loans from Fannie Mae MBS trusts and holding them in our portfolio is less than the cost of advancing delinquent payments to security holders.

### Securitization Activities

Our Capital Markets group is engaged in issuing both single-class and multi-class Fannie Mae MBS through both portfolio securitizations and structured securitizations involving third party assets.

- *Portfolio securitizations.*   Our Capital Markets group creates single-class and multi-class Fannie Mae MBS from mortgage-related assets held in our mortgage portfolio. Our Capital Markets group may sell these Fannie Mae MBS into the secondary market or may retain the Fannie Mae MBS in our investment portfolio.

- *Structured securitizations:*   Our Capital Markets group creates single-class and multi-class structured Fannie Mae MBS, typically for our lender customers or securities dealer customers, in exchange for a transaction fee. In these transactions, the customer "swaps" a mortgage-related asset that it owns (typically a mortgage security) in exchange for a structured Fannie Mae MBS we issue. Our Capital Markets group earns transaction fees for creating structured Fannie Mae MBS for third parties. The process for issuing Fannie Mae MBS in a structured securitization is similar to the process involved in our lender swap securitizations. For more information about that process and how it differs from portfolio securitizations, please see "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

For a description of single-class Fannie Mae MBS, please see "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS."

### Other Customer Services

Our Capital Markets group provides our lender customers and their affiliates with services that include offering to purchase a wide variety of mortgage assets, including non-standard mortgage loan products; segregating customer portfolios to obtain optimal pricing for their mortgage loans; and assisting customers with hedging their mortgage business. These activities provide a significant flow of assets for our mortgage portfolio, help to create a broader market for our customers and enhance liquidity in the secondary mortgage market.

### Mortgage Asset Portfolio

Although our Capital Markets group's business activities are focused on short-term financing and investing, revenue from our Capital Markets group is derived primarily from the difference, or spread, between the interest we earn on our mortgage and non-mortgage investments and the interest we incur on the debt we issue to fund these assets. Our Capital Markets revenues are primarily derived from our mortgage asset portfolio. Over time, we expect these revenues to decrease as the maximum allowable size of our mortgage asset portfolio decreases by 10% annually under our senior preferred stock purchase agreement with Treasury. See "Conservatorship and Treasury Agreements—Treasury Agreements—Covenants under Treasury Agreements" for more information on the decreasing limits on the amount of mortgage assets we are permitted to hold.

TREASURY-0272

We describe the interest rate risk management process employed by our Capital Markets group, including its key strategies in managing interest rate risk and key metrics used in measuring and evaluating our interest rate risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk."

### Investment and Financing Activities

Our Capital Markets group seeks to increase the liquidity of the mortgage market by maintaining a presence as an active investor in mortgage loans and mortgage-related securities and, in particular, supports the liquidity and value of Fannie Mae MBS in a variety of market conditions.

Our Capital Markets group funds its investments primarily through the issuance of a variety of debt securities in a wide range of maturities in the domestic and international capital markets. The most active investors in our debt securities include commercial bank portfolios and trust departments, investment fund managers, insurance companies, pension funds, state and local governments, and central banks. The approved dealers for underwriting various types of Fannie Mae debt securities may differ by funding program. See "MD&A—Liquidity and Capital Management—Liquidity Management" for information on the composition of our outstanding debt and a discussion of our liquidity.

Our Capital Markets group's investment and financing activities are affected by market conditions and the target rates of return that we expect to earn on the equity capital underlying our investments. When we estimate that we can earn returns in excess of our targets, we generally will be an active purchaser of mortgage loans and mortgage-related securities. When potential returns are below our investment targets, we generally will be a less active purchaser, and may be a net seller, of mortgage assets. Our investment activities also are subject to contractual limitations, the provisions of the senior preferred stock agreement with Treasury, capital requirements (although our regulator has announced that these are not binding on us during conservatorship) and other regulatory constraints, to the extent described below under "Conservatorship and Treasury Agreements" and "Our Charter and Regulation of Our Activities."

## CONSERVATORSHIP AND TREASURY AGREEMENTS

### Conservatorship

On September 6, 2008, the Director of FHFA appointed FHFA as our conservator, pursuant to its authority under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, or 2008 Reform Act (together, the "GSE Act"). The conservatorship is a statutory process designed to preserve and conserve our assets and property, and put the company in a sound and solvent condition.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. For more information on the risks to our business relating to the conservatorship and uncertainties regarding the future of our company and business, as well as the adverse effects of the conservatorship on the rights of holders of our common stock, please see "Risk Factors."

### Management of the Company during Conservatorship

Upon its appointment, the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

TREASURY-0273

Our directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in specified areas, as described in "Directors, Executive Officers and Corporate Governance—Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

Because we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters. The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship, and we are no longer managed with a strategy to maximize shareholder returns. In a letter to Congress dated February 2, 2010, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director also stated that FHFA does not expect that we will be a substantial buyer or seller of mortgages for our retained portfolio, except for purchases of delinquent mortgages out of our guaranteed MBS pools. For additional information about our business strategy, please see "Executive Summary—Our Business Objectives and Strategy."

### Powers of the Conservator under the GSE Act

FHFA has broad powers when acting as our conservator. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf. Further, FHFA may transfer or sell any of our assets or liabilities (subject to limitations and post-transfer notice provisions for transfers of certain types of financial contracts), without any approval, assignment of rights or consent of any party. The GSE Act provides, however, that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of February 24, 2011, FHFA has not exercised its power to transfer or sell our assets or liabilities.

In addition, FHFA has the power to disaffirm or repudiate most contracts that we entered into prior to its appointment as conservator, provided that it exercises this power within a "reasonable period" following such appointment. FHFA's proposed rule on conservatorship and receivership operations, published on July 9, 2010, defines a "reasonable period" as a period of 18 months following the appointment of a conservator or receiver. This proposed rule has not been finalized. As of February 24, 2011, FHFA has not disaffirmed or repudiated any contracts we entered into prior to its appointment as conservator.

Neither the conservatorship nor the terms of our agreements with Treasury changes our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. For more information on the risks to our business relating to conservatorship and uncertainties regarding the future of our business, see "Risk Factors."

### Treasury Agreements

On September 7, 2008, we, through FHFA, in its capacity as conservator, and Treasury entered into a senior preferred stock purchase agreement, which was subsequently amended on September 26, 2008, May 6, 2009

TREASURY-0274

and December 24, 2009. Unless the context indicates otherwise, references in this report to the senior preferred stock purchase agreement refer to the agreement as amended through December 24, 2009. The terms of the senior preferred stock purchase agreement, senior preferred stock and the warrant discussed below will continue to apply to us even if we are released from the conservatorship. Please see "Risk Factors" for a description of the risks to our business relating to the Treasury agreements, as well as the adverse effects of the senior preferred stock and the warrant on the rights of holders of our common stock and other series of preferred stock.

### *Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant*

#### *Senior Preferred Stock Purchase Agreement*

Under the senior preferred stock purchase agreement, we issued to Treasury (a) one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, which we refer to as the "senior preferred stock," and (b) a warrant to purchase, for a nominal price, shares of common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the "warrant."

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the commitment from Treasury to provide funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. The senior preferred stock purchase agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter (referred to as the "deficiency amount").

On December 24, 2009, the maximum amount of Treasury's funding commitment to us under the senior preferred stock purchase agreement was increased pursuant to an amendment to the agreement. The amendment provides that the maximum amount under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits after December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion, ($200 billion less the $75.2 billion cumulatively drawn through March 31, 2010), less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

In announcing the December 24, 2009 amendments to the senior preferred stock purchase agreement and to Treasury's preferred stock purchase agreement with Freddie Mac, Treasury noted that the amendments "should leave no uncertainty about the Treasury's commitment to support [Fannie Mae and Freddie Mac] as they continue to play a vital role in the housing market during this current crisis." The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. We discuss our net worth deficits and FHFA's requests on our behalf for funds from Treasury in "Executive Summary—Summary of our Financial Performance for 2010."

Under the senior preferred stock purchase agreement, beginning on March 31, 2011, we were scheduled to begin paying a quarterly commitment fee to Treasury. On December 29, 2010, Treasury notified FHFA that Treasury was waiving the commitment fee for the first quarter of 2011 due to adverse conditions in the U.S. mortgage market and because it believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate matters in the next calendar quarter to determine whether to set the quarterly commitment fee under the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount that may be funded under the agreement. In addition,

34

Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment under the agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

In the event of our default on payments with respect to our debt securities or guaranteed Fannie Mae MBS, if Treasury fails to perform its obligations under its funding commitment and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of our debt securities or Fannie Mae MBS may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount that may be funded under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the senior preferred stock purchase agreement that will increase the liquidation preference of the senior preferred stock.

*Senior Preferred Stock*

Pursuant to the senior preferred stock purchase agreement, we issued one million shares of senior preferred stock to Treasury on September 8, 2008 with an aggregate initial liquidation preference of $1.0 billion. The stock's liquidation preference is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the senior preferred stock purchase agreement and any quarterly commitment fees that are either not paid in cash to Treasury or not waived by Treasury will be added to the liquidation preference. Accordingly, the aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010.

Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless (1) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (2) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

35

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part.

<u>Common Stock Warrant</u>

Pursuant to the senior preferred stock purchase agreement, on September 7, 2008, we, through FHFA, in its capacity as conservator, issued a warrant to purchase common stock to Treasury. The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise, for an exercise price of $0.00001 per share. The warrant may be exercised in whole or in part at any time on or before September 7, 2028.

**Covenants under Treasury Agreements**

The senior preferred stock purchase agreement and warrant contain covenants that significantly restrict our business activities and require the prior written consent of Treasury before we can take certain actions. These covenants prohibit us from:

- paying dividends or other distributions on or repurchasing our equity securities (other than the senior preferred stock or warrant);

- issuing additional equity securities (except in limited instances);

- selling, transferring, leasing or otherwise disposing of any assets, other than dispositions for fair market value, except in limited circumstances including if the transaction is in the ordinary course of business and consistent with past practice;

- issuing subordinated debt; and

- entering into any new compensation arrangements or increasing amounts or benefits payable under existing compensation arrangements for any of our executive officers (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

In November 2009, Treasury withheld its consent under these covenants to our proposed transfer of LIHTC investments. Please see "MD&A—Consolidated Results of Operations—Losses from Partnership Investments" for information on the resulting other-than-temporary impairment losses we recognized during the fourth quarter of 2009.

We also are subject to limits, which are described below, on the amount of mortgage assets that we may own and the total amount of our indebtedness. As a result, we can no longer obtain additional equity financing (other than pursuant to the senior preferred stock purchase agreement) and we are limited in the amount and type of debt financing we may obtain.

- *Mortgage Asset Limit.*   We are restricted in the amount of mortgage assets that we may own. The maximum allowable amount was reduced by $90 billion to $810 billion on December 31, 2010. On each December 31 thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. Accordingly, the maximum allowable amount of mortgage assets we may own on December 31, 2011 is $729 billion. The definition of mortgage asset is based on the unpaid principal balance of such assets and does not reflect market

<div align="center">36</div>

valuation adjustments, allowance for loan losses, impairments, unamortized premiums and discounts and the impact of consolidation of variable interest entities. Under this definition, our mortgage assets on December 31, 2010 were $788.8 billion. We disclose the amount of our mortgage assets on a monthly basis under the caption "Gross Mortgage Portfolio" in our Monthly Summaries, which are available on our Web site and announced in a press release.

- *Debt Limit.* We are subject to a limit on the amount of our indebtedness. Our debt limit in 2010 was $1,080 billion and in 2011 is $972 billion. For every year thereafter, our debt cap will equal 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. The definition of indebtedness is based on the par value of each applicable loan for purposes of our debt cap. Under this definition, our indebtedness as of December 31, 2010 was $793.9 billion. We disclose the amount of our indebtedness on a monthly basis under the caption "Total Debt Outstanding" in our Monthly Summaries, which are available on our Web site and announced in a press release.

Under the terms of the senior preferred stock purchase agreement, "mortgage assets" and "indebtedness" are calculated without giving effect to changes made after May 2009 to the accounting rules governing the transfer and servicing of financial assets and the extinguishment of liabilities or similar accounting standards. Accordingly, our adoption in 2010 of new accounting policies regarding consolidation and transfers of financial assets did not affect these calculations.

## LEGISLATION AND GSE REFORM

### Financial Regulatory Reform Legislation: The Dodd-Frank Act

On July 21, 2010, President Obama signed into law financial regulatory reform legislation known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). The Dodd-Frank Act will significantly change the regulation of the financial services industry, including by its creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. The Dodd-Frank Act will directly affect our business because new and additional regulatory oversight and standards will apply to us. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that impact the activities of our customers and counterparties in the financial services industry. Extensive regulatory guidance is needed to implement and clarify many of the provisions of the Dodd-Frank Act and regulators have not completed the required administrative processes. It is therefore difficult to assess fully the impact of this legislation on our business and industry at this time. We discuss the potential risks to our business resulting from the Dodd-Frank Act in "Risk Factors." Below we summarize some key provisions of the legislation.

The Dodd-Frank Act established the Financial Stability Oversight Council (the "FSOC"), chaired by the Secretary of the Treasury, to ensure that all financial companies whose failure could pose a threat to the financial stability of the United States—not just banks—will be subject to strong oversight. The FSOC has held meetings and issued a proposed rule describing the criteria that will inform the FSOC's designation of systemically important nonbank financial companies. Under the proposed rule, the FSOC will make such a designation if it determines that material financial distress at the nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the company, could pose a threat to the financial stability of the United States. FSOC action on the final designation criteria and process is expected later this year. If we are so designated, we may be subject to stricter prudential standards to be established by the Federal Reserve, including standards related to risk-based capital, leverage limits, liquidity, credit concentrations, resolution plans, reporting credit exposures and other risk management measures. The Federal Reserve may also impose other standards related to contingent capital, enhanced public disclosure, short-term debt limits and other requirements as appropriate.

The Dodd-Frank Act requires certain institutions meeting the definition of "swap dealer" or "major swap participant" to register with the Commodity Futures Trading Commission (the "CFTC"). The CFTC and SEC have issued a joint proposed rule regarding certain definitions in the Dodd-Frank Act, including the definition of "major swap participant." If we are determined to be a major swap participant, minimum capital and

margin requirements would apply to our swap transactions, including transactions that are not subject to clearing. Even if we are not deemed to be a major swap participant, the Dodd-Frank Act includes provisions that may require us to submit new swap transactions for clearing to a derivatives clearing organization.

The Dodd-Frank Act requires creditors to determine that borrowers have a "reasonable ability to repay" mortgage loans prior to making such loans. The act provides a presumption of compliance for mortgage loans that meet certain terms and characteristics (so-called "qualified mortgages"); however, the presumption is rebuttable by a borrower bringing a claim. If a creditor fails to comply, a borrower may be able to offset amounts owed as part of a foreclosure or recoup monetary damages. The new Bureau of Consumer Financial Protection, created by the Dodd-Frank Act, is responsible for prescribing the criteria that define a qualified mortgage.

The Dodd-Frank Act requires financial regulators to jointly prescribe regulations requiring securitizers and/or originators to maintain a portion of the credit risk in assets transferred, sold or conveyed through the issuance of asset-backed securities, with certain exceptions. This risk retention requirement does not appear to apply to us and, in any event, we already retain the credit risk on mortgages we own or guarantee. How this requirement will affect our customers and counterparties on loans sold to and guaranteed by us will depend on how the regulations are implemented.

In accordance with the Dodd-Frank Act's requirements, the SEC recently adopted a rule requiring securitizers to disclose certain information regarding fulfilled and unfulfilled repurchase requests, to allow investors to identify asset originators with clear underwriting deficiencies. As adopted, the rule will require us to file quarterly reports on our repurchase activity, with our initial report to cover a three-year period and be filed in February 2012. We anticipate that providing the required disclosure will involve a significant operational burden.

## GSE Reform

The Dodd-Frank Act does not contain substantive GSE reform provisions, but does state that it is the sense of Congress that efforts to regulate the terms and practices related to residential mortgage credit would be incomplete without enactment of meaningful structural reforms of Fannie Mae and Freddie Mac. The Dodd-Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac.

On February 11, 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Freddie Mac and Fannie Mae, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payment so that any mortgages insured by Freddie Mac or Fannie Mae eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the 2008 Reform Act, (4) encouraging Freddie Mac and Fannie Mae to pursue additional credit loss protection and (5) reducing Freddie Mac and Fannie Mae's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the VA to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful

transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this annual report on Form 10-K.

During 2010, Congress held hearings on the future status of Fannie Mae and Freddie Mac, the Congressional Budget Office released a study examining various alternatives for the future of the secondary mortgage market, and members of Congress offered legislative proposals relating to the future status of the GSEs. We expect hearings on GSE reform to continue in 2011 and additional proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

On January 27, 2011, the Financial Crisis Inquiry Commission released its Final Report on the Causes of the Financial and Economic Crisis in the United States, which consists of a majority report and two dissenting views. The report addresses, among other things, the roles that the GSEs played in the financial crisis, and may be considered by policymakers as they assess legislative proposals related to the future status of the GSEs. We cannot predict how the report may impact such deliberations.

In sum, there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Please see "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

**Energy Loan Tax Assessment Legislation**

A number of states have enacted or are considering legislation allowing localities to create energy loan assessment programs for the purpose of financing energy efficient home improvements. These programs are typically named Property Assessed Clean Energy, or PACE, programs. While the specific terms may vary, these laws generally grant lenders of energy efficient loans the equivalent of a tax lien, giving them priority over all other liens on the property, including previously recorded first lien mortgage loans.

On July 6, 2010, FHFA announced that it had determined that certain of these programs present significant safety and soundness concerns that must be addressed by the GSEs. FHFA directed Fannie Mae and Freddie Mac to waive the uniform mortgage document prohibitions against senior liens for any homeowner who obtained a PACE or PACE-like loan with a first priority lien before July 6, 2010 and to undertake actions to protect the safe and sound operation of the companies as it relates to loans originated under PACE programs.

On August 31, 2010, we released a new directive to our seller-servicers in which we reinforced our long-standing requirement that mortgages sold to us must be and remain in the first-lien position, while also providing guidance on our requirements for refinancing loans that were originated with PACE obligations before July 6, 2010.

During 2010, legislation was introduced in Congress that would require us to adopt standards to support PACE programs. We and FHFA are also subject to a number of lawsuits relating to PACE programs. We cannot predict the outcome of the litigation, or the prospects for enactment, timing or content of federal or state legislative proposals relating to PACE or PACE-like programs.

## OUR CHARTER AND REGULATION OF OUR ACTIVITIES

**Charter Act**

We are a shareholder-owned corporation, originally established in 1938, organized and existing under the Federal National Mortgage Association Charter Act, as amended, which we refer to as the Charter Act or our

TREASURY-0280

charter. The Charter Act sets forth the activities that we are permitted to conduct, authorizes us to issue debt and equity securities, and describes our general corporate powers. The Charter Act states that our purposes are to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- promote access to mortgage credit throughout the nation (including central cities, rural areas and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

It is from these sections of the Charter Act that we derive our mission of providing liquidity, increasing stability and promoting affordability in the residential mortgage market. In addition to the alignment of our overall strategy with these purposes, all of our business activities must be permissible under the Charter Act. Our charter authorizes us to: purchase, service, sell, lend on the security of, and otherwise deal in certain mortgage loans; issue debt obligations and mortgage-related securities; and "do all things as are necessary or incidental to the proper management of [our] affairs and the proper conduct of [our] business."

### Loan Standards

Mortgage loans we purchase or securitize must meet the following standards required by the Charter Act.

- *Principal Balance Limitations.* Our charter permits us to purchase and securitize mortgage loans secured by either a single-family or multifamily property. Single-family conventional mortgage loans are subject to maximum original principal balance limits, known as "conforming loan limits." The conforming loan limits are established each year based on the average prices of one-family residences.

  In 2010, the national conforming loan limit for mortgages that finance one-family residences was $417,000, with higher limits for mortgages secured by two- to four-family residences and in four statutorily-designated states and territories (Alaska, Hawaii, Guam and the U.S. Virgin Islands). Higher loan limits also apply in high-cost areas (counties or county-equivalent areas) that are designated by FHFA annually. Our charter sets permanent loan limits for high-cost areas up to 150% of the national loan limit ($625,500 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). Since early 2008, however, a series of legislative acts have increased our loan limits for loans originated during a designated time period in high-cost areas, to up to 175% of the national loan limit ($729,750 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). These loan limits are currently in effect for mortgages originated through September 30, 2011.

  No statutory limits apply to the maximum original principal balance of multifamily mortgage loans that we purchase or securitize. In addition, the Charter Act imposes no maximum original principal balance limits on loans we purchase or securitize that are insured by FHA or guaranteed by the VA.

- *Loan-to-Value and Credit Enhancement Requirements.* The Charter Act generally requires credit enhancement on any conventional single-family mortgage loan that we purchase or securitize if it has a loan-to-value ratio over 80% at the time of purchase. We also do not purchase or securitize second lien single-family mortgage loans when the combined loan-to-value ratio exceeds 80%, unless the second lien mortgage loan has credit enhancement in accordance with the requirements of the Charter Act. The credit enhancement required by our charter may take the form of one or more of the following: (1) insurance or a guaranty by a qualified insurer of the over-80% portion of the unpaid principal balance of the mortgage; (2) a seller's agreement to repurchase or replace the mortgage in the event of default (for such period and

40

under such circumstances as we may require); or (3) retention by the seller of at least a 10% participation interest in the mortgage. Regardless of loan-to-value ratio, the Charter Act does not require us to obtain credit enhancement to purchase or securitize loans insured by FHA or guaranteed by the VA.

### Authority of U.S. Treasury to Purchase GSE Securities

Pursuant to our charter, at the discretion of the Secretary of the Treasury, Treasury may purchase our obligations up to a maximum of $2.25 billion outstanding at any one time. While the 2008 Reform Act gave Treasury expanded temporary authority to purchase our obligations and other securities in unlimited amounts (up to the national debt limit), this authority expired on December 31, 2009. We describe Treasury's investment in our senior preferred stock and a common stock warrant pursuant to this expanded temporary authority under "Conservatorship and Treasury Agreements—Treasury Agreements."

### Other Charter Act Provisions

The Charter Act has the following additional provisions.

- *Issuances of Our Securities.*   We are authorized, upon the approval of the Secretary of the Treasury, to issue debt obligations and mortgage-related securities. Neither the U.S. government nor any of its agencies guarantees, directly or indirectly, our debt or mortgage-related securities.

- *Exemptions for Our Securities.*   The Charter Act generally provides that our securities are exempt under the federal securities laws administered by the SEC. As a result, we are not required to file registration statements with the SEC under the Securities Act of 1933 with respect to offerings of any of our securities. Our non-equity securities are also exempt securities under the Securities Exchange Act of 1934 (the "Exchange Act"). However, our equity securities are not treated as exempted securities for purposes of Sections 12, 13, 14 or 16 of the Exchange Act. Consequently, we are required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

- *Exemption from Specified Taxes.*   We are exempt from taxation by states, territories, counties, municipalities and local taxing authorities, except for taxation by those authorities on our real property. We are not exempt from the payment of federal corporate income taxes.

- *Other Limitations and Requirements.*   We may not originate mortgage loans or advance funds to a mortgage seller on an interim basis, using mortgage loans as collateral, pending the sale of the mortgages in the secondary market. In addition, we may only purchase or securitize mortgages on properties located in the United States and its territories.

### Regulation and Oversight of Our Activities

As a federally chartered corporation, we are subject to government regulation and oversight. FHFA is an independent agency of the federal government with general supervisory and regulatory authority over Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. FHFA was established in July 2008, assuming the duties of our former safety and soundness regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), and our former mission regulator, HUD. HUD remains our regulator with respect to fair lending matters. Our regulators also include the SEC and Treasury.

The GSE Act provides FHFA with safety and soundness authority that is comparable to and in some respects broader than that of the federal banking agencies. Even if we were not in conservatorship, the GSE Act gives FHFA the authority to raise capital levels above statutory minimum levels, regulate the size and content of our portfolio and approve new mortgage products, among other things.

FHFA is responsible for implementing the various provisions of the GSE Act. In general, we remain subject to existing regulations, orders and determinations until new ones are issued or made.

*Capital.*   The GSE Act provides FHFA with broad authority to increase the level of our required minimum capital and to establish capital or reserve requirements for specific products and activities. FHFA also has

41

broad authority to establish risk-based capital requirements, to ensure that we operate in a safe and sound manner and maintain sufficient capital and reserves. During the conservatorship, FHFA has suspended our capital classifications. We continue to submit capital reports to FHFA during the conservatorship, and FHFA continues to monitor our capital levels. We describe our capital requirements below under "Capital Adequacy Requirements."

*Portfolio.*   The GSE Act requires FHFA to establish standards governing our portfolio holdings, to ensure that they are backed by sufficient capital and consistent with our mission and safe and sound operations. FHFA is also required to monitor our portfolio and, in some circumstances, may require us to dispose of or acquire assets. On December 28, 2010, FHFA published a final rule adopting, as the standard for our portfolio holdings, the portfolio limits specified in the senior preferred stock purchase agreement described under "Treasury Agreements—Covenants under Treasury Agreements," as it may be amended from time to time. The rule is effective for as long as we remain subject to the terms and obligations of the senior preferred stock purchase agreement.

*New Products.*   The GSE Act requires us to obtain FHFA's approval before initially offering any product, subject to certain exceptions. The GSE Act also requires us to provide FHFA with written notice before commencing any new activity. On July 2, 2009, FHFA published an interim final rule implementing these provisions of the GSE Act. Subsequently, the Acting Director of FHFA concluded that permitting us to offer new products at this time is inconsistent with the goals of the conservatorship. He therefore instructed us not to submit requests for approval of new products under the interim final rule. We cannot predict when or if FHFA will permit us to submit new product requests under the rule.

*Receivership.*   Under the GSE Act, FHFA must place us into receivership if it determines that our assets are less than our obligations for 60 days, or we have not been paying our debts as they become due for 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and liabilities would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days thereafter. FHFA has advised us that if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the senior preferred stock purchase agreement, the Director of FHFA will not make a mandatory receivership determination.

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then-Director of FHFA placed us into conservatorship. The statutory grounds for discretionary appointment of a receiver include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent.

On July 9, 2010, FHFA published a proposed rule to establish a framework for conservatorship and receivership operations for the GSEs. The proposed rule would, among other things, clarify that: (1) all claims arising from an equity interest in a regulated entity in receivership would be given the same treatment as the interests of shareholders; and (2) claims by shareholders would receive the lowest priority in a receivership, behind administrative expenses of the receiver, general liabilities of the regulated entity and liabilities subordinated to those of general creditors. The proposed rule would also provide that payment of certain securities litigation claims would be held in abeyance during conservatorship, except as otherwise ordered by FHFA. The proposed rule is part of FHFA's implementation of the powers provided by the 2008 Reform Act, and does not seek to anticipate or predict future conservatorships or receiverships. In announcing the publication of this proposed rule for comment, the Acting Director of FHFA said it had "no impact" on current conservatorship operations. This rule has not been finalized.

*Prudential Management and Operational Standards.*   The GSE Act requires FHFA to establish prudential standards for a broad range of our operations. These standards must address internal controls, independence and adequacy of internal audit systems, management of interest rate risk exposure, management of market risk, adequacy and maintenance of liquidity and reserves, management of asset and investment portfolio

growth, investments and asset acquisitions, overall risk management processes, management of credit and counterparty risk and recordkeeping. FHFA may also establish any additional operational and management standards the Director of FHFA deems appropriate.

*Affordable Housing Goals and Duty to Serve.*   We discuss our affordable housing goals and our duty to serve underserved markets below under "Housing Goals and Duty to Serve Underserved Markets."

*Affordable Housing Allocations.*   The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the unpaid principal balance of our total new business acquisitions, and to allocate such amount to certain government funds. The GSE Act also allows FHFA to suspend allocations on a temporary basis. In November 2008, FHFA advised us that it was suspending our allocations until further notice.

*Executive Compensation.*   The GSE Act directs FHFA to prohibit us from providing unreasonable or non-comparable compensation to our executive officers. FHFA may at any time review the reasonableness and comparability of an executive officer's compensation and may require us to withhold any payment to the officer during such review. FHFA is also authorized to prohibit or limit certain golden parachute and indemnification payments to directors, officers and certain other parties. FHFA has issued rules relating to golden parachute payments, setting forth factors to be considered by the Director of FHFA in acting upon his authority to limit such payments.

*Fair Lending.*   The GSE Act requires the Secretary of HUD to assure that the GSEs meet their fair lending obligations. Among other things, HUD is required to periodically review and comment on the underwriting and appraisal guidelines of each company to ensure consistency with the Fair Housing Act. HUD is currently conducting such a review.

### Capital Adequacy Requirements

The GSE Act establishes capital adequacy requirements. The statutory capital framework incorporates two different quantitative assessments of capital—a minimum capital requirement and a risk-based capital requirement. The minimum capital requirement is ratio-based, while the risk-based capital requirement is based on simulated stress test performance. The GSE Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." However, during the conservatorship, FHFA has suspended capital classification of us and announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding. FHFA has advised us that, because we are under conservatorship, we will not be subject to corrective action requirements that would ordinarily result from our receiving a capital classification of "undercapitalized."

*Minimum Capital Requirement.*   Under the GSE Act, we must maintain an amount of core capital that equals or exceeds our minimum capital requirement. The GSE Act defines core capital as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of outstanding non-cumulative perpetual preferred stock, paid-in capital, and retained earnings, as determined in accordance with GAAP. Our minimum capital requirement is generally equal to the sum of 2.50% of on-balance sheet assets and 0.45% of off-balance sheet obligations.

Effective January 1, 2010, we adopted new accounting standards that resulted in our recording on our consolidated balance sheet substantially all of the loans backing our Fannie Mae MBS. However, FHFA has directed us, for purposes of minimum capital, to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.45% of the unpaid principal balance. FHFA retains authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities.

*Risk-Based Capital Requirement.*   The GSE Act requires FHFA to establish risk-based capital requirements for Fannie Mae and Freddie Mac, to ensure that we operate in a safe and sound manner. Existing risk-based capital regulation ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. FHFA has stated that it does not intend to publish our risk-based capital level during the conservatorship and has

43

discontinued stress test simulations under the existing rule. We continue to submit detailed profiles of our books of business to FHFA to support FHFA's monitoring of our business activity and their research into future risk-based capital rules.

*Critical Capital Requirement.*   The GSE Act also establishes a critical capital requirement, which is the amount of core capital below which we would be classified as "critically undercapitalized." Under the GSE Act, such classification is a discretionary ground for appointing a conservator or receiver. Our critical capital requirement is generally equal to the sum of 1.25% of on-balance sheet assets and 0.25% of off-balance sheet obligations. FHFA has directed us, for purposes of critical capital, to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.25% of the unpaid principal balance, notwithstanding our consolidation of substantially all of the loans backing these securities. FHFA has stated that it does not intend to publish our critical capital level during the conservatorship.

*Bank Capital Requirements.*   In the wake of the financial crisis and as a result of the Dodd-Frank Act and of actions by international bank regulators, the capital regime for the banking industry is undergoing major changes. The Basel Committee on Banking Supervision finalized a set of revisions (known as Basel III) to the international capital requirements in December 2010. Basel III generally narrows the definition of capital that can be used to meet risk-based standards and raises the amount of capital that must be held. U.S. bank regulators are expected to issue detailed implementing regulations for U.S. banks in the coming months.

Although the GSEs are not currently subject to bank capital requirements, any revised framework for GSE capital standards may be based on bank requirements, particularly if the GSEs are deemed to be systemically important financial companies subject to Federal Reserve oversight.

### Housing Goals and Duty to Serve Underserved Markets

Since 1993, we have been subject to housing goals. For 2010, the structure of our housing goals changed as a result of the 2008 Reform Act. The 2008 Reform Act also created a new duty for us to serve three underserved markets, which we discuss below.

#### Housing Goals

FHFA published a final rule establishing our 2010 and 2011 housing goals on September 14, 2010. FHFA's final rule and subsequent notices dated October 29, 2010 and January 28, 2011 established the following single-family home purchase and refinance housing goal benchmarks for 2010 and 2011. A home purchase mortgage may be counted toward more than one home purchase benchmark.

- *Low-Income Families Home Purchase Benchmark:*   At least 27% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to low-income families (defined as families with income no higher than 80% of area median income).

- *Very Low-Income Families Home Purchase Benchmark:*   At least 8% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to very low-income families (defined as families with income no higher than 50% of area median income).

- *Low-Income Areas Home Purchase Benchmarks:*   At least 24% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be for families in low-income census tracts, for moderate-income families (defined as families with income no higher than 100% of area median income) in designated disaster areas or for moderate-income families in minority census tracts. In addition, at least 13% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be for families in low-income census tracts or for moderate-income families in minority census tracts.

- *Low-Income Families Refinancing Benchmark:*   At least 21% of our acquisitions of single-family owner-occupied refinance mortgage loans must be affordable to low-income families, which may include qualifying permanent modifications of mortgages under HAMP completed during the year.

If we do not meet these benchmarks, we may still meet our goals. The final rule specifies that our single-family housing goals performance will be measured against these benchmarks and against goals-qualifying

TREASURY-0285

originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures.

The final rule also established a new multifamily goal and subgoal. For each of 2010 and 2011, our multifamily mortgage acquisitions must finance at least 177,750 units affordable to low-income families, and at least 42,750 units affordable to very low-income families. There is no market-based alternative measurement for the multifamily goals.

FHFA's final rule made significant changes to prior housing goals regulations regarding the types of products that count towards the housing goals. Private-label mortgage-related securities, second liens and single-family government loans do not count towards the housing goals. In addition, only permanent modifications of mortgages under HAMP completed during the year will count towards the housing goals; trial modifications will not be counted. Moreover, these modifications will count only towards the single-family low-income families refinance goal, not any of the home purchase goals.

The final rule notes that "FHFA does not intend for [Fannie Mae] to undertake uneconomic or high-risk activities in support of the [housing] goals. However, the fact that [Fannie Mae is] in conservatorship should not be a justification for withdrawing support from these market segments." If our efforts to meet our goals prove to be insufficient, FHFA will determine whether the goals were feasible. If FHFA finds that our goals were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our results of operations and financial condition. The housing plan must describe the actions we would take to meet the goal in the next calendar year and be approved by FHFA. The potential penalties for failure to comply with housing plan requirements include a cease-and-desist order and civil money penalties. See "Risk Factors" for a description of how we may be unable to meet our housing goals and how actions we may take to meet these goals and other regulatory requirements could adversely affect our business, results of operations and financial condition.

The following table presents our performance against our 2010 single-family housing benchmarks and multifamily housing goals. These performance results have not yet been validated by FHFA.

## 2010 Housing Goals Performance

| | Result[1] | Benchmark[2] |
|---|---|---|
| **Single-family housing goals:[3]** | | |
| Low-income families home purchases | 25.1% | 27.0% |
| Very low-income families home purchases | 7.2 | 8.0 |
| Low-income areas home purchases | 24.0 | 24.0 |
| Low-income and high-minority areas home purchases | 12.4 | 13.0 |
| Low-income families refinancing | 20.9 | 21.0 |

| | Result[1] | Goal |
|---|---|---|
| **Multifamily housing goals:** | | |
| Affordable to families with incomes no higher than 80% of area median income | 212,768 units | 177,750 units |
| Affordable to families with incomes no higher than 50% of area median income | 53,184 units | 42,750 units |

[1] Our 2010 results have not been validated by FHFA, and after validation they may differ from the results reported above.

[2] Even if our results do not meet the benchmarks, we may still meet our goals. The final rule specifies that our single-family housing goals performance will be measured not only against these benchmarks, but also against the share of goals-qualifying originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures. The amount of goals-qualifying originations in the market during 2010 will not be available until the release of data reported by primary market originators under the Home Mortgage Disclosure Act in the fall of 2011.

[3] Our single-family results and benchmarks are expressed as a percentage of the total number of eligible mortgages acquired during the period.

TREASURY-0286

We believe we met our single-family low-income areas home purchase benchmark for 2010, as well as our 2010 multifamily goals. To determine whether we met our other 2010 single-family goals, we and FHFA will have to compare our performance with that of the market after the release of data reported by primary market originators under the Home Mortgage Disclosure Act in the fall of 2011, because we believe we did not meet the benchmarks for these goals. As noted in FHFA's final rule establishing our 2010 housing goals, FHFA has indicated that we should not undertake uneconomic or high-risk activities in support of our housing goals.

We will file our assessment of our performance with FHFA in mid-March. FHFA will then determine our final performance numbers and whether we met our goals.

*Duty to Serve*

The 2008 Reform Act created the duty to serve underserved markets in order for us and Freddie Mac to "provide leadership to the market in developing loan products and flexible underwriting guidelines to facilitate a secondary market for very low-, low-, and moderate-income families" with respect to three underserved markets: manufactured housing, affordable housing preservation, and rural areas.

The duty to serve is a new oversight responsibility for FHFA. The Director of FHFA is required to establish by regulation a method for evaluating and rating the performance by us and Freddie Mac of the duty to serve underserved markets. On June 7, 2010, FHFA published its proposed rule to implement this new duty, although the final rule has not been issued.

Under the proposed rule, we would be required to submit an underserved markets plan at least 90 days before the plan's effective date of January 1st of a particular year establishing benchmarks and objectives against which FHFA would evaluate and rate our performance. The plan term is two years. We will likely need to submit a plan as soon as practicable after the publication of the final rule that will be effective for the first plan period.

The 2008 Reform Act requires FHFA to separately evaluate the following four assessment factors:

- The loan product assessment factor requires evaluation of our "development of loan products, more flexible underwriting guidelines, and other innovative approaches to providing financing to each" underserved market.

- The outreach assessment factor requires evaluation of "the extent of outreach to qualified loan sellers and other market participants." We are expected to engage market participants and pursue relationships with qualified sellers that serve each underserved market.

- The loan purchase assessment factor requires FHFA to consider the volume of loans acquired in each underserved market relative to the market opportunities available to us. The 2008 Reform Act prohibits the establishment of specific quantitative targets by FHFA. However, in its evaluation FHFA could consider the volume of loans acquired in past years.

- The investment and grants assessment factor requires evaluation of the amount of investment and grants in projects that assist in meeting the needs of underserved markets.

Under the proposed rule, FHFA would give the loan purchase and outreach assessment factors significant weight. Because we are in conservatorship, the investment and grants assessment factor would receive little or no weight. In addition, FHFA would consider the loan product assessment factor, even though we are currently prohibited from entering into new lines of business and developing new products. The proposed rule states that acquisitions and activities pursuant to the duty to serve should be profitable, even if less profitable than other activities.

FHFA would evaluate our performance on each assessment factor annually, and assign a rating of "satisfactory" or "unsatisfactory" to each factor in each underserved market. The evaluation would be based on whether we have substantially met our benchmarks and objectives as outlined in our underserved markets plan. FHFA would also consider the impact of overall market conditions and other factors outside our control that could impact our ability to meet our benchmarks and objectives. Based on the assessment factor findings,

TREASURY-0287

FHFA would assign a rating of "in compliance" or "noncompliance" with the duty to serve each underserved market.

With some exceptions, the counting rules and other requirements would be similar to those established for the housing goals. For the loan purchase assessment factor, FHFA proposes to measure performance in terms of units rather than mortgages or unpaid principal balance. All single-family loans we acquire must meet the standards in the Interagency Statement on Subprime Mortgage Lending and the Interagency Guidance on Nontraditional Mortgage Product Risks. We are expected to review the operations of loan sellers to ensure compliance with these standards.

If we fail to comply with, or there is a substantial probability that we will not comply with, our duty to serve a particular underserved market in a given year, FHFA would determine whether the benchmarks and objectives in our underserved markets plan are or were feasible. If we fail to meet our duty to serve, and FHFA determines that the benchmarks and objectives in our underserved markets plan are or were feasible, then, in the Director's discretion, we may be required to submit a housing plan. Under the proposed rule, the housing plan must describe the activities that we will take to comply with the duty to serve a particular underserved market for the next calendar year, or improvements and changes in operations that we will make during the remainder of the current year.

Under the proposed rule, we would be required to provide quarterly and annual reports on our performance and progress towards meeting our duty to serve.

See "Risk Factors" for a description of how changes we may make in our business strategies in order to meet our housing goals and duty to serve requirement may increase our credit losses and adversely affect our results of operations.

## MAKING HOME AFFORDABLE PROGRAM

The Obama Administration's Making Home Affordable Program, which was introduced in February 2009, is intended to provide assistance to homeowners and prevent foreclosures. Working with our conservator, we have devoted significant effort and resources to help distressed homeowners through initiatives that support the Making Home Affordable Program. Below we describe key aspects of the Making Home Affordable Program and our role in the program. For additional information about our activities under the program, please see "Business—Making Home Affordable Program" in our Annual Report on Form 10-K for the year ended December 31, 2009. For information about the program's financial impact on us, please see "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae."

The Making Home Affordable Program is comprised primarily of a Home Affordable Refinance Program ("HARP"), under which we acquire or guarantee loans that are refinancings of mortgage loans we own or guarantee, and Freddie Mac does the same, and a Home Affordable Modification Program ("HAMP"), which provides for the modification of mortgage loans owned or guaranteed by us or Freddie Mac, as well as other mortgage loans. These two programs were designed to expand the number of borrowers who can refinance or modify their mortgages to achieve a monthly payment that is more affordable now and into the future or to obtain a more stable loan product, such as a fixed-rate mortgage loan in lieu of an adjustable-rate mortgage loan. We participate in the Making Home Affordable Program, and our sellers and servicers offer HARP and HAMP to Fannie Mae borrowers. We also serve as Treasury's program administrator for HAMP and other initiatives under the Making Home Affordable Program.

### Our Role as Program Administrator

Treasury has engaged us to serve as program administrator for HAMP and other initiatives under the Making Home Affordable Program. Our principal activities as program administrator include the following:

- Implementing the guidelines and policies of the Treasury program;

- Preparing the requisite forms, tools and training to facilitate efficient loan modifications by servicers;

- Creating, making available and managing the process for servicers to report modification activity and program performance;

- Calculating incentive compensation consistent with program guidelines;

- Acting as record-keeper for executed loan modifications and program administration;

- Coordinating with Treasury and other parties toward achievement of the program's goals, including assisting with development and implementation of updates to the program and initiatives expanding the program's reach; and

- Performing other tasks as directed by Treasury from time to time.

In our capacity as program administrator for the program, we support over 100 servicers that have signed up to participate with respect to non-agency loans under the program. To help servicers implement the program, we have provided information and resources through a Web site dedicated to servicers under the program. We have also communicated information about the program to servicers and helped servicers implement and integrate the program with new systems and processes. As program administrator, we have taken the following steps to help servicers implement the program:

- dedicated Fannie Mae personnel to work closely with participating servicers;

- established a servicer support call center;

- conducted ongoing conference calls with the leadership of participating servicers;

- provided training through live Web seminars and recorded tutorials; and

- made checklists and job aids available on the program Web site.

## OUR CUSTOMERS

Our principal customers are lenders that operate within the primary mortgage market where mortgage loans are originated and funds are loaned to borrowers. Our customers include mortgage banking companies, savings and loan associations, savings banks, commercial banks, credit unions, community banks, insurance companies, and state and local housing finance agencies. Lenders originating mortgages in the primary mortgage market often sell them in the secondary mortgage market in the form of whole loans or in the form of mortgage-related securities.

During 2010, approximately 1,100 lenders delivered single-family mortgage loans to us, either for securitization or for purchase. We acquire a significant portion of our single-family mortgage loans from several large mortgage lenders. During both 2010 and 2009, our top five lender customers, in the aggregate, accounted for approximately 62% of our single-family business volume. Three lender customers, Wells Fargo & Company, Bank of America Corporation, and JPMorgan Chase & Co., including their respective affiliates, in the aggregate accounted for more than 52% of our single-family business volume for 2010.

Due to ongoing consolidation within the mortgage industry, as well as the number of mortgage lenders that have gone out of business since late 2006, we, as well as our competitors, seek business from a decreasing number of large mortgage lenders. To the extent we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products and services optimally. In addition, many of our lender customers are experiencing financial and liquidity problems that may affect the volume of business they are able to generate. We discuss these and other risks that this customer concentration poses to our business in "Risk Factors."

## COMPETITION

Historically, our competitors have included Freddie Mac, FHA, Ginnie Mae (which primarily guarantees securities backed by FHA-insured loans), the 12 Federal Home Loan Banks ("FHLBs"), financial institutions,

TREASURY-0289

securities dealers, insurance companies, pension funds, investment funds and other investors. During 2008, almost all of our competitors, other than Freddie Mac, FHA, Ginnie Mae and the FHLBs, ceased their activities in the residential mortgage finance business, and we remained the largest single issuer of mortgage-related securities in the secondary market in 2010.

We compete to acquire mortgage assets in the secondary market both for securitization into Fannie Mae MBS and, to a significantly lesser extent, for our investment portfolio. We also compete for the issuance of mortgage-related securities to investors. Competition in these areas is affected by many factors, including the amount of residential mortgage loans offered for sale in the secondary market by loan originators and other market participants, the nature of the residential mortgage loans offered for sale (for example, whether the loans represent refinancings), the current demand for mortgage assets from mortgage investors, the interest rate risk investors are willing to assume and the yields they will require as a result, and the credit risk and prices associated with available mortgage investments.

Competition to acquire mortgage assets is significantly affected by pricing and eligibility standards. Changes in our pricing and eligibility standards and in the eligibility standards of the mortgage insurance companies in 2008 and 2009 have reduced our acquisition of loans with higher LTV ratios and other high-risk features. In addition, FHA has become the lower-cost option, or in some cases the only option, for loans with higher LTV ratios.

During 2010, our primary competitors for the issuance of mortgage-related securities were Ginnie Mae and Freddie Mac. Prior to the severe market downturn, there was a significant increase in the issuance of mortgage-related securities by non-agency issuers, which caused a decrease in our share of the market for new issuances of single-family mortgage-related securities from 2003 to 2006. Non-agency issuers, also referred to as private-label issuers, are those issuers of mortgage-related securities other than agency issuers Fannie Mae, Freddie Mac and Ginnie Mae. The subsequent mortgage and credit market disruption led to a significant decline in the issuance of private-label mortgage-related securities. Accordingly, our market share significantly increased during 2008 and has remained high since then. Our estimated market share of new single-family mortgage-related securities issuances was 44.0% in 2010, compared with 46.3% in 2009, 45.4% in 2008, and 33.9% in 2007. Our estimated market share of 46.3% in 2009 includes $94.6 billion of whole loans held for investment in our mortgage portfolio that were securitized into Fannie Mae MBS in the second quarter, but retained in our mortgage portfolio and consolidated on our consolidated balance sheets. Excluding these Fannie Mae MBS from the estimate of our market share, our estimated 2009 market share of new single-family mortgage-related securities issuances was 43.2%.

We also compete for low-cost debt funding with institutions that hold mortgage portfolios, including Freddie Mac and the FHLBs.

Although we do not know the structure that long-term GSE reform will ultimately take, we expect that, if our company continues, we will face more competition in the future. Please see "Business—Legislation and GSE Reform" for a discussion of proposals for GSE reform, as well as recent legislative reform of the financial services industry that could affect our business.

## EMPLOYEES

As of January 31, 2011, we employed approximately 7,300 personnel, including full-time and part-time employees, term employees and employees on leave.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We make available free of charge through our Web site our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. Our Web site address is www.fanniemae.com. Materials that we file with the SEC are also available from the SEC's Web site, www.sec.gov. You may also request copies of any filing from us, at no cost, by calling the Fannie Mae

TREASURY-0290

Fixed-Income Securities Helpline at (800) 237-8627 or (202) 752-7115 or by writing to Fannie Mae, Attention: Fixed-Income Securities, 3900 Wisconsin Avenue, NW, Area 2H-3S, Washington, DC 20016.

We are providing our Web site addresses and the Web site address of the SEC solely for your information. Information appearing on our Web site or on the SEC's Web site is not incorporated into this annual report on Form 10-K.

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Exchange Act. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "may," "prospects," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that mortgage interest rates will increase in 2011, which will likely reduce the share of refinance loans;

- The size of the declines nationwide in total single-family originations and mortgage debt outstanding that we expect in 2011;

- Our expectation that the unemployment rate will decline modestly throughout 2011;

- Our expectations that our multifamily nonperforming assets will increase in certain geographic areas and that we may continue to experience an increase in delinquencies and credit losses despite improving market fundamentals;

- Our expectation that the multifamily sector will continue to improve modestly in 2011, even though unemployment levels remain elevated;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that, if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted if the market shifts away from refinance activity;

- Our expectation that the single-family loans we have acquired since 2009 will be profitable;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we have reserved for the substantial majority of the remaining losses;

- Our expectation that our draws from Treasury for credit losses will abate and our draws will increasingly be driven by dividend payments;

- Our belief that loans we have acquired since 2009 would become unprofitable if home prices declined by more than 20% from their December 2010 levels over the next five years based on our home price index;

- Our expectations regarding whether loans we acquired in specific years prior to 2009 will be profitable or unprofitable;

- Our expectation that defaults on loans we acquired from 2005 through 2008 and the resulting charge-offs will occur over a period of years;

- Our expectation that it will take years before our REO inventory approaches pre-2008 levels;

- Our expectation that the number of our repurchase requests to seller/servicers will remain high in 2011;

50

- Our expectation that we will realize as credit losses an estimated two-thirds of the fair value losses on loans purchased out of MBS trusts that are reflected in our consolidated balance sheets, and recover the remaining third through our consolidated statements of operations;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that weakness in the housing and mortgage markets will continue in 2011;

- Our expectation that home sales are unlikely to increase until the unemployment rate improves;

- Our expectation that single-family default and severity rates and the level of single-family foreclosures will remain high in 2011;

- Our expectation that multifamily charge-offs will remain commensurate with 2010 levels throughout 2011;

- Our expectation that our overall business volume in 2011 will be lower than in 2010;

- Our expectation that home prices on a national basis will decline slightly, with greater declines in some geographic areas than others, before stabilizing later in 2011, and that the peak-to-trough home price decline on a national basis will range between 21% and 26%;

- Our expectation that our credit-related expenses will remain high in 2011 and that our credit losses will increase in 2011 as compared to 2010;

- Our expectation that we will continue to purchase loans from MBS trusts as they become delinquent for four or more consecutive monthly payments subject to market conditions, servicer capacity, and other constraints, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that revenues from our mortgage asset portfolio will decrease over time;

- Whether during conservatorship we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship;

- Our not being a substantial buyer or seller of mortgages for our retained portfolio, except for purchases of delinquent mortgages out of our guaranteed MBS pools;

- Our expectations that FHFA will request additional funds from Treasury on our behalf to ensure we maintain a positive net worth and avoid mandatory receivership, that Treasury will provide such funds, and that the dividends on Treasury's investments in us will therefore increase;

- Our expectation that the Dodd-Frank Act will significantly change the regulation of the financial services industry, directly affect our business, and may involve a significant operational burden;

- Our expectation that some or all of the conditions that negatively affected our ability to meet our 2010 single-family housing goals are likely to continue in 2011;

- Our expectation that the pause in foreclosures as a result of servicer foreclosure process deficiencies will likely result in higher serious delinquency rates, longer foreclosure timelines and higher foreclosed property expenses;

- Our expectation that we may continue to experience substantial changes in management, employees and our business structure and practices;

- Our intention to maximize the value of nonperforming loans over time, utilizing loan modification, foreclosure, repurchases and other preferable loss mitigation actions;

- Our estimation of the amount that we could realize over the fair value of our nonperforming loans reported in our non-GAAP consolidated fair value balance sheet;

51

- Our expectation that the current market premium portion of our current estimate of fair value will not impact future Treasury draws, which is based on our intention not to have another party assume the credit risk inherent in our book of business;

- Our expectation that our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirements of the senior preferred stock purchase agreement;

- Our expectation that, due to the large size of our portfolio of mortgage-related securities, current market conditions and the significant amount of distressed assets in our mortgage portfolio, it is unlikely that there would be sufficient market demand for large amounts of these securities over a prolonged period of time, particularly during a liquidity crisis;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will decrease over time;

- Our belief that we have limited exposure to losses on home equity conversion mortgages, a type of reverse mortgage insured by the federal government;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions and the extent to which borrowers with modified loans again become delinquent in their payments;

- Our expectation that we will increase our use of foreclosure alternatives;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and home prices;

- Our belief that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future;

- Our assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments; and

- Our anticipated 2011 contributions to our benefit plans.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; deficiencies in servicer and law firm foreclosure processes and the consequences of those deficiencies; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in this report, including those factors described in "Risk Factors."

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors." These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

TREASURY-0293

## Item 1A.   Risk Factors

This section identifies specific risks that should be considered carefully in evaluating our business. The risks described in "Risks Relating to Our Business" are specific to us and our business, while those described in "Risks Relating to Our Industry" relate to the industry in which we operate. Refer to "MD&A—Risk Management" for a more detailed description of the primary risks to our business and how we seek to manage those risks.

In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently deem to be immaterial. The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth and could cause our actual results to differ materially from our past results or the results contemplated by the forward-looking statements contained in this report.

## RISKS RELATING TO OUR BUSINESS

### *The future of our company is uncertain.*

There is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

During 2010, Congress held hearings on the future status of Fannie Mae and Freddie Mac, the Congressional Budget Office released a study examining various alternatives for the future of the secondary mortgage market, and legislative proposals were introduced that would substantially change our business structure and the operation of our business. We expect hearings on GSE reform to continue in 2011 and additional proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "Business—Legislation and GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

### *We expect FHFA to request additional funds from Treasury on our behalf to ensure we maintain a positive net worth and avoid mandatory receivership. The dividends we must pay or that accrue on Treasury's investments are substantial and are expected to increase, and we likely will not be able to fund them through net income.*

FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (which we refer to as a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days after the filing deadline for our Form 10-K or Form-Q with the SEC. We have had a net worth deficit as of the end of each of the last nine fiscal quarters, including as of December 31, 2010. Treasury provided us with funds under the senior preferred stock purchase agreement to cure the net worth deficits in prior periods before the end of the 60-day period, and we expect Treasury to do the same with respect to the December 31, 2010 deficit. When Treasury provides the additional $2.6 billion FHFA has requested on our behalf, the aggregate liquidation preference on the senior preferred stock will be $91.2 billion, and will require an annualized dividend of $9.1 billion. The prospective $9.1 billion annual dividend obligation exceeds our reported annual net income for each of the last nine years, in most cases by a significant margin. Our ability to maintain a positive net worth has been and continues to be adversely affected by market conditions. To the extent we have a negative net worth as of the end of future fiscal

TREASURY-0294

quarters, we expect that FHFA will request on our behalf additional funds from Treasury under the senior preferred stock purchase agreement. Further funds from Treasury under the senior preferred stock purchase agreement will increase the liquidation preference of and the dividends we owe on the senior preferred stock and, therefore, we will need additional funds from Treasury in order to meet our dividend obligation to Treasury.

In addition, beginning in 2011, the senior preferred stock purchase agreement requires that we pay a quarterly commitment fee to Treasury. Although Treasury has waived this fee for the first quarter of 2011 due to adverse conditions in the mortgage market and its belief that imposing the commitment fee would not generate increased compensation for taxpayers, Treasury indicated that it would reevaluate whether to set the fee next quarter. The aggregate liquidation preference and dividend obligations relating to the preferred stock also will increase by the amount of any required dividend on the senior preferred stock that we fail to pay in cash and by the amount of any required quarterly commitment fee on the senior preferred stock that we fail to pay. The substantial dividend obligations and potentially substantial quarterly commitment fees on the senior preferred stock, coupled with our effective inability to pay down draws under the senior preferred stock purchase agreement, will continue to strain our financial resources and have an adverse impact on our results of operations, financial condition, liquidity and net worth, both in the short and long term.

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation may be insufficient to cover our obligations or aggregate liquidation preference on our preferred stock, or provide any proceeds to common shareholders.***

Because of the weak economy, conditions in the housing market and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid a trigger of mandatory receivership under the GSE Act. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the GSE Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, only after payment of the secured and unsecured claims against the company (including repaying all outstanding debt obligations), the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock. To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees. The uncertainty of our future and the public policy debate surrounding GSE reform, as well as limitations on employee compensation, our inability to offer equity compensation and our conservatorship, have adversely affected and may in the future adversely affect our ability to retain and recruit well-qualified employees. We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees. An improving economy is likely to put additional pressures on turnover, as

54

attractive opportunities become available to our employees. If we lose a significant number of employees and are not able to quickly recruit and train new employees, it could negatively affect customer relationships and goodwill, and could have a material adverse effect on our ability to do business and our results of operations. In addition, management turnover may impair our ability to manage our business effectively. Since August 2008, we have had significant departures by various members of senior management, including two Chief Executive Officers and two Chief Financial Officers. Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance.

***Since 2008, we have experienced substantial deterioration in the credit performance of mortgage loans that we own or that back our guaranteed Fannie Mae MBS, which we expect to continue and result in additional credit-related expenses.***

We are exposed to mortgage credit risk relating to the mortgage loans that we hold in our investment portfolio and the mortgage loans that back our guaranteed Fannie Mae MBS. When borrowers fail to make required payments of principal and interest on their mortgage loans, we are exposed to the risk of credit losses and credit-related expenses.

While serious delinquency rates improved in recent months, conditions in the housing market contributed to a deterioration in the credit performance of our book of business, negatively impacting serious delinquency rates, default rates and average loan loss severity on the mortgage loans we hold or that back our guaranteed Fannie Mae MBS, as well as increasing our inventory of foreclosed properties. Increases in delinquencies, default rates and loss severity cause us to experience higher credit-related expenses. The credit performance of our book of business has also been negatively affected by the extent and duration of the decline in home prices and high unemployment. These credit performance trends have been notable in certain of our higher risk loan categories, states and vintages. Home price declines, adverse market conditions and continuing high levels of unemployment also have affected the credit performance of our broader book of business. Further, home price declines have resulted in a large number of borrowers with "negative equity" in their properties (that is, they owe more on their mortgage loans than their houses are worth), which increases the likelihood that either these borrowers will strategically default on their mortgage loans even if they have the ability to continue to pay the loans or that their homes will be sold in a "short sale" for significantly less than the unpaid amount of the loans. We present detailed information about the risk characteristics of our conventional single-family guaranty book of business in "MD&A—Risk Management—Credit Risk Management— Mortgage Credit Risk Management," and we present detailed information on our 2010 credit-related expenses, credit losses and results of operations in "MD&A—Consolidated Results of Operations."

Adverse credit performance trends may resume, particularly if we experience further national and regional declines in home prices, weak economic conditions and high unemployment.

***We expect further losses and write-downs relating to our investment securities.***

We experienced significant fair value losses and other-than-temporary impairment write-downs relating to our investment securities in 2008 and recorded significant other-than-temporary impairment write-downs of some of our available-for-sale securities in 2009. A substantial portion of these fair value losses and write-downs related to our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans and, in the case of fair value losses, our investments in commercial mortgage-backed securities ("CMBS") due to the decline in home prices and the weak economy. We expect to experience additional other-than-temporary impairment write-downs of our investments in private-label mortgage-related securities, including those that continue to be AAA-rated. See "MD&A—Consolidated Balance Sheet Analysis— Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for detailed information on our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans.

If the market for securities we hold in our investment portfolio is not liquid, we must use a greater amount of management judgment to value these securities. Later valuations and any price we ultimately would realize if

TREASURY-0296

we were to sell these securities could be materially lower than the estimated fair value at which we carry them on our balance sheet.

Any of the above factors could require us to record additional write-downs in the value of our investment portfolio, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Our business activities are significantly affected by the conservatorship and the senior preferred stock purchase agreement.***

We are currently under the control of our conservator, FHFA, and we do not know when or how the conservatorship will be terminated. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf, and generally has the power to transfer or sell any of our assets or liabilities. In addition, our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS in making or approving a decision unless specifically directed to do so by the conservator.

The conservator has determined that while we are in conservatorship, we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. In view of the conservatorship and the reasons stated for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non-financial objectives. Among other things, we could experience significant changes in the size, growth and characteristics of our guarantor and investment activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guaranty business. Accordingly, our strategic and operational focus going forward may not be consistent with the investment objectives of our investors. In addition, we may be directed to engage in activities that are operationally difficult, costly to implement or unprofitable.

The senior preferred stock purchase agreement with Treasury includes a number of covenants that significantly restrict our business activities. We cannot, without the prior written consent of Treasury: pay dividends (except on the senior preferred stock); sell, issue, purchase or redeem Fannie Mae equity securities; sell, transfer, lease or otherwise dispose of assets in specified situations; engage in transactions with affiliates other than on arm's-length terms or in the ordinary course of business; issue subordinated debt; or incur indebtedness that would result in our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own. In deciding whether to consent to any request for approval it receives from us under the agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. Pursuant to the senior preferred stock purchase agreement, the maximum allowable amount of mortgage assets we may own on December 31, 2010 is $810 billion. (Our mortgage assets were approximately $788.8 billion as of that date.) On December 31, 2011, and each December 31 thereafter, our mortgage assets may not exceed 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year. The maximum allowable amount is reduced annually until it reaches $250 billion. This limit on the amount of mortgage assets we are permitted to hold could constrain the amount of delinquent loans we purchase from single-family MBS trusts, which could increase our costs.

We discuss the powers of the conservator, the terms of the senior preferred stock purchase agreement, and their impact on us and shareholders in "Business—Conservatorship and Treasury Agreements." These factors may adversely affect our business, results of operations, financial condition, liquidity and net worth.

***The conservatorship and investment by Treasury have had, and will continue to have, a material adverse effect on our common and preferred shareholders.***

We do not know when or how the conservatorship will be terminated. Moreover, even if the conservatorship is terminated, we remain subject to the terms of the senior preferred stock purchase agreement, senior preferred stock and warrant, which can only be cancelled or modified by mutual consent of Treasury and the

TREASURY-0297

conservator. The conservatorship and investment by Treasury have had, and will continue to have, material adverse effects on our common and preferred shareholders, including the following:

*No voting rights during conservatorship.*   The rights and powers of our shareholders are suspended during the conservatorship. The conservatorship has no specified termination date. During the conservatorship, our common shareholders do not have the ability to elect directors or to vote on other matters unless the conservator delegates this authority to them.

*Dividends to common and preferred shareholders, other than to Treasury, have been eliminated.*   Under the terms of the senior preferred stock purchase agreement, dividends may not be paid to common or preferred shareholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether we are in conservatorship.

*Liquidation preference of senior preferred stock will increase, likely substantially.*   The senior preferred stock ranks prior to our common stock and all other series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and distributions upon liquidation. Accordingly, if we are liquidated, the senior preferred stock is entitled to its then-current liquidation preference, plus any accrued but unpaid dividends, before any distribution is made to the holders of our common stock or other preferred stock. As of December 31, 2010, the liquidation preference on the senior preferred stock was $88.6 billion; however, it will increase to $91.2 billion when Treasury provides the additional $2.6 billion FHFA has already requested on our behalf. The liquidation preference could increase substantially as we draw on Treasury's funding commitment, if we do not pay dividends owed on the senior preferred stock or if we do not pay the quarterly commitment fee under the senior preferred stock purchase agreement. If we are liquidated, it is unlikely that there would be sufficient funds remaining after payment of amounts to our creditors and to Treasury as holder of the senior preferred stock to make any distribution to holders of our common stock and other preferred stock.

*Exercise of the Treasury warrant would substantially dilute investment of current shareholders.*   If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common shareholders will be substantially diluted, and we would thereafter have a controlling shareholder.

*No longer managed for the benefit of shareholders.*   Because we are in conservatorship, we are no longer managed with a strategy to maximize shareholder returns.

For additional description of the restrictions on us and the risks to our shareholders, see "Business— Conservatorship and Treasury Agreements."

**Efforts we are required or asked to undertake by FHFA, other government agencies or Congress in pursuit of providing liquidity, stability and affordability to the mortgage market and providing assistance to struggling homeowners, or in pursuit of other goals, may adversely affect our business, results of operations, financial condition, liquidity and net worth.**

Prior to the conservatorship, our business was managed with a strategy to maximize shareholder returns, while fulfilling our mission. Our conservator has directed us to focus primarily on minimizing our credit losses from delinquent mortgages and providing assistance to struggling homeowners to help them remain in their homes. As a result, we may continue to take a variety of actions designed to address this focus that could adversely affect our economic returns, possibly significantly, such as: reducing our guaranty fees and modifying loans to extend the maturity, lower the interest rate or defer or forgive principal owed by the borrower. These activities may have short- and long-term adverse effects on our business, results of operations, financial condition, liquidity and net worth. Other agencies of the U.S. government or Congress also may ask us to undertake significant efforts to support the housing and mortgage markets, as well as struggling homeowners. For example, under the Administration's Making Home Affordable Program, we are offering HAMP. We have incurred substantial costs in connection with the program, as we discuss in "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae."

TREASURY-0298

*We may be unable to meet our housing goals and duty to serve requirements, and actions we take to meet those requirements may adversely affect our business, results of operations, financial condition, liquidity and net worth.*

To meet our housing goals obligations, a portion of the mortgage loans we acquire must be for low- and very-low income families, families in low-income census tracts and moderate-income families in minority census tracts or designated disaster areas. In addition, when a final duty-to-serve rule is issued, we will have a duty to serve three underserved markets: manufactured housing, affordable housing preservation and rural areas. We may take actions to meet these obligations that could increase our credit losses and credit-related expenses. If we fail to meet our housing goals in a given year and FHFA finds that they were feasible, or if we fail to comply with our duty to serve requirements, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our financial condition. The housing plan must describe the actions we would take to meet the goals and/or duty to serve in the next calendar year and be approved by FHFA. With respect to our housing goals, the potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties.

Mortgage market conditions during 2010 negatively affected our ability to meet our goals. These conditions included a reduction in single-family borrowing by low-income purchasers following the expiration of the home buyer tax credits, an increase in the share of mortgages made to moderate-income borrowers due to low interest rates, continuing high unemployment, strengthened underwriting and eligibility standards, increased standards of private mortgage insurers and the increased role of FHA in acquiring goals-qualifying mortgage loans. Some or all of these conditions are likely to continue in 2011. We cannot predict the impact that market conditions during 2011 will have on our ability to meet our 2011 housing goals and duty to serve requirements.

For more information about our housing goals and duty to serve requirements, as well as our 2010 housing goals performance, please see "Business—Our Charter and Regulation of Our Activities—Housing Goals and Duty to Serve Underserved Markets."

*Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.*

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business and the future of our business (including future profitability, future structure, regulatory actions and GSE status) could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets, including the Federal Reserve's purchases of our debt and MBS. As a result, we believe that our status as a GSE and continued federal government support of our business is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. Please see "MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding—Fannie Mae Debt Funding Activity" for a more complete discussion of actions taken by the federal government to support us and the financial markets. However, there can be no assurance that the government will continue to support us or that our current level of access to debt funding will continue.

In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our

TREASURY-0299

obligations, it likely would interfere with the operation of our business and have a material adverse effect on our liquidity, results of operations, financial condition and net worth.

***Our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis.***

We believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis. As a result if we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be significantly impaired. If adverse market conditions resulted in our being unable to access the unsecured debt markets, our alternative sources of liquidity consist of our cash and other investments portfolio and the unencumbered mortgage assets in our mortgage portfolio.

We believe that the amount of mortgage-related assets that we could successfully borrow against or sell in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Due to the large size of our portfolio of mortgage assets, current market conditions and the significant amount of distressed assets in our mortgage portfolio, it is unlikely that there would be sufficient market demand for large amounts of these assets over a prolonged period of time, particularly during a liquidity crisis, which could limit our ability to borrow against or sell these assets.

To the extent that we would be able to obtain funding by pledging or selling mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount would result in proceeds significantly lower than the current market value of these securities and would thereby reduce the amount of financing we would obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

***A decrease in the credit ratings on our senior unsecured debt would likely have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements.***

Our borrowing costs and our access to the debt capital markets depend in large part on the high credit ratings on our senior unsecured debt. Credit ratings on our debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt. The reduction in our credit ratings would likely increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. It may also reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

***Deterioration in the credit quality of, or defaults by, one or more of our institutional counterparties could result in financial losses, business disruption and decreased ability to manage risk.***

We face the risk that one or more of our institutional counterparties may fail to fulfill their contractual obligations to us. Unfavorable market conditions since 2008 have adversely affected the liquidity and financial condition of our institutional counterparties. Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS; seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances; third-party providers of credit enhancement on the mortgage assets that we hold in our mortgage portfolio or that back our Fannie Mae MBS, including mortgage insurers, lenders with risk sharing arrangements and financial guarantors; issuers of securities held in our cash and other investments portfolio; and derivatives counterparties.

We may have multiple exposures to one counterparty as many of our counterparties provide several types of services to us. For example, our lender customers or their affiliates also act as derivatives counterparties, mortgage servicers, custodial depository institutions or document custodians. Accordingly, if one of these

59

counterparties were to become insolvent or otherwise default on its obligations to us, it could harm our business and financial results in a variety of ways.

An institutional counterparty may default in its obligations to us for a number of reasons, such as changes in financial condition that affect its credit rating, a reduction in liquidity, operational failures or insolvency. A number of our institutional counterparties are currently experiencing financial difficulties that may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. Counterparty defaults or limitations on their ability to do business with us could result in significant financial losses or hamper our ability to do business, which would adversely affect our business, results of operations, financial condition, liquidity and net worth.

We routinely execute a high volume of transactions with counterparties in the financial services industry. Many of the transactions we engage in with these counterparties expose us to credit risk relating to the possibility of a default by our counterparties. In addition, to the extent these transactions are secured, our credit risk may be exacerbated to the extent that the collateral we hold cannot be realized or can be liquidated only at prices too low to recover the full amount of the loan or derivative exposure. We have exposure to these financial institutions in the form of unsecured debt instruments and derivatives transactions. As a result, we could incur losses relating to defaults under these instruments or relating to impairments to the carrying value of our assets represented by these instruments. These losses could materially and adversely affect our business, results of operations, financial condition, liquidity and net worth.

We depend on our ability to enter into derivatives transactions in order to manage the duration and prepayment risk of our mortgage portfolio. If we lose access to our derivatives counterparties, it could adversely affect our ability to manage these risks, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Deterioration in the credit quality of, or defaults by, one or more of our mortgage insurer counterparties could result in nonpayment of claims under mortgage insurance policies, business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on conventional single-family mortgage loans with LTV ratios over 80% at the time of acquisition. The current weakened financial condition of our mortgage insurer counterparties creates a significant risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. Since January 1, 2009, the insurer financial strength ratings of all of our major mortgage insurer counterparties have been downgraded to reflect their weakened financial condition, in some cases more than once. One of our mortgage insurer counterparties ceased issuing commitments for new mortgage insurance in 2008, and, under an order received from its regulator, is now paying all valid claims 60% in cash and 40% by the creation of a deferred payment obligation, which may be paid in the future.

A number of our mortgage insurers publicly disclosed that they have exceeded or might exceed the state-imposed risk-to-capital limits under which they operate and they might not have access to sufficient capital to continue to write new business in accordance with state regulatory requirements. In addition, a number of our mortgage insurers have received waivers from their regulators regarding state-imposed risk-to-capital limits. However, these waivers are temporary. Some mortgage insurers have been exploring corporate restructurings, intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

If mortgage insurers are not able to raise capital and exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure a waiver from their state regulator. This would increase the risk that they will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate. If our assessment of one or more of our mortgage insurer counterparty's ability to fulfill its obligations to us worsens and our internal credit rating for the insurer is

TREASURY-0301

further downgraded, it could result in a significant increase in our loss reserves and a significant increase in the fair value of our guaranty obligations.

Many mortgage insurers stopped insuring new mortgages with higher loan-to-value ratios or with lower borrower credit scores or on select property types, which has contributed to the reduction in our business volumes for high loan-to-value ratio loans. As our charter generally requires us to obtain credit enhancement on conventional single-family mortgage loans with loan-to-value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans. In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry.

***The loss of business volume from any one of our key lender customers could adversely affect our business and result in a decrease in our revenues.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire most of our mortgage loans through mortgage purchase volume commitments that are negotiated annually or semiannually with lender customers and that establish a minimum level of mortgage volume that these customers will deliver to us. We acquire a significant portion of our mortgage loans from several large mortgage lenders. During 2010, our top five lender customers, in the aggregate, accounted for approximately 62% of our single-family business volume, with three of our customers accounting for greater than 52% of our single-family business volume. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is critical to our business.

The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our major lender customers could adversely affect our revenues and the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value. In addition, as we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products optimally.

In addition, many of our lender customers are experiencing, or may experience in the future, financial and liquidity problems that may affect the volume of business they are able to generate. Many of our lender customers also strengthened their lending criteria, which reduced their loan volume. If any of our key lender customers significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our revenues. Our demands that our lender customers repurchase or compensate us for losses on loans that do not meet our underwriting and eligibility standards may strain our relationships with our lender customers and may also result in our customers reducing the volume of loans they provide us. A significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

***Our reliance on third parties to service our mortgage loans may impede our efforts to keep people in their homes, as well as the re-performance rate of loans we modify.***

Mortgage servicers, or their agents and contractors, typically are the primary point of contact for borrowers as we delegate servicing responsibilities to them. We rely on these mortgage servicers to identify and contact troubled borrowers as early as possible, to assess the situation and offer appropriate options for resolving the problem and to successfully implement a solution. The demands placed on experienced mortgage loan servicers to service delinquent loans have increased significantly across the industry, straining servicer capacity. The Making Home Affordable Program is also impacting servicer resources. To the extent that mortgage servicers are hampered by limited resources or other factors, they may not be successful in conducting their servicing activities in a manner that fully accomplishes our objectives within the timeframe we desire. Further, our servicers have advised us that they have not been able to reach many of the borrowers

TREASURY-0302

who may need help with their mortgage loans even when repeated efforts have been made to contact the borrower.

For these reasons, our ability to actively manage the troubled loans that we own or guarantee, and to implement our homeownership assistance and foreclosure prevention efforts quickly and effectively, may be limited by our reliance on our mortgage servicers. Our inability to effectively manage these loans and implement these efforts could have a material adverse effect on our business, results of operations and financial condition.

***Deficiencies in servicer and law firm foreclosure processes and the resulting foreclosure pause may cause higher credit losses and credit-related expenses.***

A number of our single-family mortgage servicers temporarily halted foreclosures in the fall of 2010 in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process. This foreclosure pause could expand to additional servicers and states, and possibly to all or substantially all of our loans in the foreclosure process. Some servicers have lifted the foreclosure pause in some jurisdictions, while continuing the pause in others.

Although we cannot predict the ultimate impact of this foreclosure pause on our business at this time, we expect the pause will likely result in higher serious delinquency rates, longer foreclosure timelines and higher foreclosed property expenses. This foreclosure pause could also negatively affect the value of our REO inventory and the severity of our losses on foreclosed properties. In addition, this foreclosure pause could negatively affect housing market conditions and delay the recovery of the housing market. As a result, we expect this foreclosure pause will likely result in higher credit losses and credit-related expenses. This foreclosure pause may also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities.

The foreclosure process deficiencies have generated significant concern and are currently being investigated by various government agencies and the attorneys general of all fifty states. These foreclosure process deficiencies could lead to expensive or time-consuming new regulation, such as new rules applicable to the foreclosure process recently issued by courts in some states. In addition, the failure of our servicers or a law firm to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us. As a result, depending on the duration and extent of the foreclosure pause and the foreclosure process deficiencies, these matters could have a material adverse effect on our business.

***Challenges to the MERS® System could pose counterparty, operational, reputational and legal risks for us.***

MERSCORP, Inc. is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc., can serve as a nominee for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP, Inc.

Several legal challenges have been made disputing MERS's legal standing to initiate foreclosures and/or act as nominee in local land records. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions. In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational,

TREASURY-0303

reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to MERS or the impact on our business, results of operations and financial condition.

***Changes in accounting standards can be difficult to predict and can materially impact how we record and report our financial results.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. From time to time, FASB changes the financial accounting and reporting standards that govern the preparation of our financial statements. In addition, those who set or interpret accounting standards may amend or even reverse their previous interpretations or positions on how these standards should be applied. These changes can be difficult to predict and expensive to implement, can divert management's attention from other matters, and can materially impact how we record and report our financial condition and results of operations.

***Material weaknesses in our internal control over financial reporting could result in errors in our reported results or disclosures that are not complete or accurate.***

Management has determined that, as of the date of this filing, we have ineffective disclosure controls and procedures and a material weakness in our internal control over financial reporting. In addition, our independent registered public accounting firm, Deloitte & Touche LLP, has expressed an adverse opinion on our internal control over financial reporting because of the material weakness. Our ineffective disclosure controls and procedures and material weakness could result in errors in our reported results or disclosures that are not complete or accurate, which could have a material adverse effect on our business and operations.

Our material weakness relates specifically to the impact of the conservatorship on our disclosure controls and procedures. Because we are under the control of FHFA, some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Because FHFA currently functions as both our regulator and our conservator, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures relating to information within FHFA's knowledge. As a result, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our financial statements. Given the structural nature of this material weakness, it is likely that we will not remediate this weakness while we are under conservatorship. See "Controls and Procedures" for further discussion of management's conclusions on our disclosure controls and procedures and internal control over financial reporting.

***Operational control weaknesses could materially adversely affect our business, cause financial losses and harm our reputation.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial statement reliability, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, liability to customers and financial losses or damage to our reputation, including as a result of our inadvertent dissemination of confidential or inaccurate information. For example, our business is dependent on our ability to manage and process, on a daily basis, an extremely large number of transactions across numerous and diverse markets and in an environment in which we must make frequent changes to our core processes in response to changing external conditions. These transactions are subject to various legal and regulatory standards.

We rely upon business processes that are highly dependent on people, legacy technology and the use of numerous complex systems and models to manage our business and produce books and records upon which our financial statements are prepared. This reliance increases the risk that we may be exposed to financial,

TREASURY-0304

reputational or other losses as a result of inadequately designed internal processes or systems, or failed execution of our systems. Our operational risk management efforts are aimed at reducing this risk.

We continue to implement our operational risk management framework, which consists of a set of integrated processes, tools and strategies designed to support the identification, assessment, mitigation and control, and reporting and monitoring of operational risk. We also have made a number of changes in our structure, business focus and operations during the past two years, as well as changes to our risk management processes, to keep pace with changing external conditions. These changes, in turn, have necessitated modifications to or development of new business models, processes, systems, policies, standards and controls. While we believe that the steps we have taken and are taking to enhance our technology and operational controls and organizational structure will help identify, assess, mitigate, control and monitor operational risk, our implementation of our operational risk management framework may not be effective to manage these risks and may create additional operational risk as we execute these enhancements.

In addition, we have experienced, and expect we may continue to experience, substantial changes in management, employees and our business structure and practices since the conservatorship began. These changes could increase our operational risk and result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, employees or third parties could engage in improper or unauthorized actions, or our systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions and reputational damage.

***In many cases, our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations, require management to make judgments and estimates about matters that are inherently uncertain. Management also relies on models in making these estimates.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with GAAP and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. In some cases, management must select the appropriate accounting policy or method from two or more alternatives, any of which might be reasonable under the circumstances but might affect the amounts of assets, liabilities, revenues and expenses that we report. See "Note 1, Summary of Significant Accounting Policies" for a description of our significant accounting policies.

We have identified three accounting policies as critical to the presentation of our financial condition and results of operations. These accounting policies are described in "MD&A—Critical Accounting Policies and Estimates." We believe these policies are critical because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions. Due to the complexity of these critical accounting policies, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result of the above factors, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, potentially significantly.

***Failure of our models to produce reliable results may adversely affect our ability to manage risk and make effective business decisions.***

We make significant use of business and financial models to measure and monitor our risk exposures and to manage our business. For example, we use models to measure and monitor our exposures to interest rate, credit and market risks, and to forecast credit losses. The information provided by these models is used in making business decisions relating to strategies, initiatives, transactions, pricing and products.

Models are inherently imperfect predictors of actual results because they are based on historical data available to us and our assumptions about factors such as future loan demand, borrower behavior, creditworthiness,

64

home price trends and other factors that may overstate or understate future experience. Models can produce unreliable results for a number of reasons, including invalid or incorrect assumptions, incorrect computer coding, flaws in data or data use, inappropriate application of a model to products or events outside the model's intended use and, fundamentally, the inherent limitations of relying on historical data to predict future results, especially in the face of unprecedented events. Adjustments to models or model results are sometimes required to align the results with management's best judgment.

We continually receive new economic and mortgage market data, such as housing starts and sales and home price changes. Our critical accounting estimates, such as our loss reserves and other-than-temporary impairments, are subject to change, sometimes significantly, due to the nature and magnitude of changes in market conditions. However, there is generally a lag between the availability of this market information and the preparation of our financial statements. When market conditions change quickly and in unforeseen ways, there is an increased risk that the assumptions and inputs reflected in our models are not representative of the most recent market conditions.

In addition, we may take actions that require us to rely on management judgment and adjustments to our models if circumstances preclude effective execution of our standard control processes required for a formal model update. These control processes include model research, testing, independent validation and implementation. In a rapidly changing environment, it may not be possible to update existing models quickly enough to ensure they properly account for the most recently available data and events. Model adjustments are a means of mitigating circumstances where models cannot be updated quickly enough, but the resulting model output is only as reliable as the underlying management judgment.

If our models fail to produce reliable results on an ongoing basis, we may not make appropriate risk management decisions, including decisions affecting loan purchases, management of credit losses, guaranty fee pricing, asset and liability management and the management of our net worth. Any of these decisions could adversely affect our businesses, results of operations, liquidity, net worth and financial condition. Furthermore, strategies we employ to manage the risks associated with our use of models may not be effective or fully reliable.

***Changes in interest rates or our loss of the ability to manage interest rate risk successfully, could adversely affect our net interest income and increase interest rate risk.***

We fund our operations primarily through the issuance of debt and invest our funds primarily in mortgage-related assets that permit mortgage borrowers to prepay their mortgages at any time. These business activities expose us to market risk, which is the risk of adverse changes in the fair value of financial instruments resulting from changes in market conditions. Our most significant market risks are interest rate risk and prepayment risk. We describe these risks in more detail in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management." Changes in interest rates affect both the value of our mortgage assets and prepayment rates on our mortgage loans.

Changes in interest rates could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Our ability to manage interest rate risk depends on our ability to issue debt instruments with a range of maturities and other features, including call provisions, at attractive rates and to engage in derivatives transactions. We must exercise judgment in selecting the amount, type and mix of debt and derivatives instruments that will most effectively manage our interest rate risk. The amount, type and mix of financial instruments that are available to us may not offset possible future changes in the spread between our borrowing costs and the interest we earn on our mortgage assets.

***Our business is subject to laws and regulations that restrict our activities and operations, which may prohibit us from undertaking activities that management believes would benefit our business and limit our ability to diversify our business.***

As a federally chartered corporation, we are subject to the limitations imposed by the Charter Act, extensive regulation, supervision and examination by FHFA and regulation by other federal agencies, including Treasury, HUD and the SEC. As a company under conservatorship, our primary regulator has management authority

over us in its role as our conservator. We are also subject to other laws and regulations that affect our business, including those regarding taxation and privacy.

The Charter Act defines our permissible business activities. For example, we may not originate mortgage loans or purchase single-family loans in excess of the conforming loan limits, and our business is limited to the U.S. housing finance sector. In addition, our conservator has determined that, while in conservatorship, we will not be permitted to engage in new products and will be limited to continuing our existing business activities and taking actions necessary to advance the goals of the conservatorship. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. The weak and unstable condition of the U.S. housing market over the past approximately three to four years has therefore had a significant adverse effect on our results of operations, financial condition and net worth, which is likely to continue.

***We could be required to pay substantial judgments, settlements or other penalties as a result of pending government investigations and civil litigation.***

We are subject to investigations by the Department of Justice and the SEC, and are a party to a number of lawsuits. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these investigations and lawsuits, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In addition, responding to requests for information in these investigations and lawsuits may divert significant internal resources away from managing our business. More information regarding these investigations and lawsuits is included in "Legal Proceedings" and "Note 20, Commitments and Contingencies."

***Our common and preferred stock have been delisted from the NYSE and the Chicago Stock Exchange, which could adversely affect the market price and liquidity of our delisted securities.***

Our common stock and previously-listed series of our preferred stock were delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and are now traded exclusively in the over-the-counter market. The market price of our common stock has declined significantly since June 16, 2010, the date we announced our intention to delist these securities, and may decline further.

There can be no assurance that an active trading market in our equity securities will continue to exist. Our quoted securities are likely to experience price and volume fluctuations which may be more significant than when our securities were listed on a national securities exchange, which could adversely affect the market price of these securities. We cannot predict the actions of market makers, investors or other market participants, and can offer no assurances that the market for our securities will be stable.

***Mortgage fraud could result in significant financial losses and harm to our reputation.***

We use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the single-family mortgage loans we purchase and securitize. As a result, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. We have experienced financial losses resulting from mortgage fraud, including institutional fraud perpetrated by counterparties. In the future, we may experience additional financial losses or reputational damage as a result of mortgage fraud.

## RISKS RELATING TO OUR INDUSTRY

***A further decline in U.S. home prices or activity in the U.S. housing market would likely cause higher credit losses and credit-related expenses, and lower business volumes.***

We expect weakness in the real estate financial markets to continue in 2011. The deterioration in the credit condition of outstanding mortgages will result in the foreclosure of some troubled loans, which is likely to add

to excess inventory of unsold homes. We also expect heightened default and severity rates to continue during this period, and home prices, particularly in some geographic areas, may decline further. Any resulting increase in delinquencies or defaults, or in severity, will likely result in a higher level of credit losses and credit-related expenses, which in turn will reduce our earnings and adversely affect our net worth and financial condition.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. The rate of growth in total U.S. residential mortgage debt outstanding has declined substantially in response to the reduced activity in the housing market and declines in home prices, and we expect single-family mortgage debt outstanding to decrease by approximately 2% in 2011. A decline in the rate of growth in mortgage debt outstanding reduces the unpaid principal balance of mortgage loans available for us to purchase or securitize, which in turn could reduce our net interest income and guaranty fee income. Even if we are able to increase our share of the secondary mortgage market, it may not be sufficient to make up for the decline in the rate of growth in mortgage originations, which could adversely affect our results of operations and financial condition.

***The Dodd-Frank Act and regulatory changes in the financial services industry may negatively impact our business.***

The Dodd-Frank Act will significantly change the regulation of the financial services industry, including by the creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. This legislation will directly and indirectly affect many aspects of our business and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. The Dodd-Frank Act and related future regulatory changes could require us to change certain business practices, cause us to incur significant additional costs, limit the products we offer, require us to increase our regulatory capital or otherwise adversely affect our business. Additionally, implementation of this legislation will result in increased supervision and more comprehensive regulation of our customers and counterparties in the financial services industry, which may have a significant impact on the business practices of our customers and counterparties, as well as on our counterparty credit risk.

Examples of aspects of the Dodd-Frank Act and related future regulatory changes that, if applicable, may significantly affect us include mandatory clearing of certain derivatives transactions, which could impose significant additional costs on us; minimum standards for residential mortgage loans, which could subject us to increased legal risk for loans we purchase or guarantee; and the development of credit risk retention regulations applicable to residential mortgage loan securitizations, which could impact the types and volume of loans sold to us. We could also be designated as a systemically important nonbank financial company subject to supervision and regulation by the Federal Reserve. If this were to occur, the Federal Reserve would have the authority to examine us and could impose stricter prudential standards on us, including risk-based capital requirements, leverage limits, liquidity requirements, credit concentration limits, resolution plan and credit exposure reporting requirements, overall risk management requirements, contingent capital requirements, enhanced public disclosures and short-term debt limits. Regulators have been seeking public comment regarding the criteria for designating nonbank financial companies for heightened supervision.

Because federal agencies have not completed the extensive rulemaking processes needed to implement and clarify many of the provisions of the Dodd-Frank Act, it is difficult to assess fully the impact of this legislation on our business and industry at this time, nor can we predict what similar changes to statutes or regulations will occur in the future.

Recent revisions by the Basel Committee on Banking Supervision to international capital requirements, referred to as Basel III, may also have a significant impact on us or on the business practices of our customers and counterparties. Depending on how they are implemented by regulators, the Basel III rules could be the basis for a revised framework for GSE capital standards that could increase our capital requirements. The Basel III rules could also affect investor demand for our debt and MBS securities, and could limit some lenders' ability to count their rights to service mortgage loans toward meeting their regulatory capital

TREASURY-0308

requirements, which may reduce the economic value of mortgage servicing rights. As a result, a number of our customers and counterparties may change their business practices.

In addition, the actions of Treasury, the CFTC, the SEC, the Federal Deposit Insurance Corporation, the Federal Reserve and international central banking authorities directly or indirectly impact financial institutions' cost of funds for lending, capital raising and investment activities, which could increase our borrowing costs or make borrowing more difficult for us. Changes in monetary policy are beyond our control and difficult to anticipate.

Legislative and regulatory changes could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In particular, these changes could affect our ability to issue debt and may reduce our customer base.

***Structural changes in the financial services industry may negatively impact our business.***

The financial market crisis has resulted in mergers of some of our most significant institutional counterparties. Consolidation of the financial services industry has increased and may continue to increase our concentration risk to counterparties in this industry, and we are and may become more reliant on a smaller number of institutional counterparties. This both increases our risk exposure to any individual counterparty and decreases our negotiating leverage with these counterparties. The structural changes in the financial services industry could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***The occurrence of a major natural or other disaster in the United States could negatively impact our credit losses and credit-related expenses or disrupt our business operations in the affected geographic area.***

We conduct our business in the residential mortgage market and own or guarantee the performance of mortgage loans throughout the United States. The occurrence of a major natural or environmental disaster, terrorist attack, pandemic, or similar event (a "major disruptive event") in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a major disruptive event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A major disruptive event that either damaged or destroyed residential real estate underlying mortgage loans in our book of business or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans in our book of business could increase our delinquency rates, default rates and average loan loss severity of our book of business in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. While we attempt to create a geographically diverse mortgage credit book of business, there can be no assurance that a major disruptive event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses.

Additionally, the contingency plans and facilities that we have in place may be insufficient to prevent an adverse effect on our ability to conduct business, which could lead to financial losses. Substantially all of our senior management and investment personnel work out of our offices in the Washington, DC metropolitan area. If a disruption occurs and our senior management or other employees are unable to occupy our offices, communicate with other personnel or travel to other locations, our ability to interact with each other and with our customers may suffer, and we may not be successful in implementing contingency plans that depend on communication or travel.

### Item 1B.   Unresolved Staff Comments

None.

### Item 2.   Properties

We own our principal office, which is located at 3900 Wisconsin Avenue, NW, Washington, DC, as well as additional Washington, DC facilities at 3939 Wisconsin Avenue, NW and 4250 Connecticut Avenue, NW. We also own two office facilities in Herndon, Virginia, as well as two additional facilities located in Reston,

TREASURY-0309

Virginia; and Urbana, Maryland. These owned facilities contain a total of approximately 1,459,000 square feet of space. We lease the land underlying the 4250 Connecticut Avenue building pursuant to a ground lease that automatically renews on July 1, 2029 for an additional 49 years unless we elect to terminate the lease by providing notice to the landlord of our decision to terminate at least one year prior to the automatic renewal date. In addition, we lease approximately 429,000 square feet of office space, including a conference center, at 4000 Wisconsin Avenue, NW, which is adjacent to our principal office. The present lease term for the office space at 4000 Wisconsin Avenue expires in April 2013 and we have one additional 5-year renewal option remaining under the original lease. The lease term for the conference center at 4000 Wisconsin Avenue expires in April 2018. We also lease an additional approximately 317,000 square feet of office space at three other locations in Washington, DC and Virginia. We maintain approximately 723,000 square feet of office space in leased premises in Pasadena, California; Irvine, California; Atlanta, Georgia; Chicago, Illinois; Philadelphia, Pennsylvania; and three facilities in Dallas, Texas.

## Item 3.   Legal Proceedings

This item describes our material legal proceedings. We describe additional material legal proceedings in "Note 20, Commitments and Contingencies" in the section titled "Litigation and Regulatory Matters," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can reasonably be estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described or incorporated by reference below. We have recorded a reserve for legal claims related to those matters for which we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

### *Shareholder Derivative Litigation*

Four shareholder derivative cases, filed at various times between June 2007 and June 2008, naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant, are currently pending in the U.S. District Court for the District of Columbia: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); *Arthur v. Mudd, et al.* (filed November 26, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). Three of the cases (*Kellmer*, *Middleton*, and *Agnes*) rely on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. Two of the cases (*Arthur* and *Agnes*) rely on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated. Plaintiffs seek, on behalf of Fannie Mae, various forms of monetary and non-monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets. Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Arthur* and *Agnes* without prejudice. FHFA filed motions to reconsider the decisions dismissing *Kellmer and Middleton* with prejudice, and those motions were denied on October 22, 2010. FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the Court of Appeals for the District of Columbia issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek

and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals for the District of Columbia issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff.

### Inquiry by the Financial Crisis Inquiry Commission

Over the course of 2010, we received numerous requests for documents and information from the Financial Crisis Inquiry Commission (the "FCIC") in connection with its statutory mandate to examine the causes of the financial crisis. The FCIC released its final report on January 27, 2011. The report is described in "Business—Legislation and GSE Reform—GSE Reform."

**Item 4.   [Removed and Reserved]**

## PART II

**Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the ticker symbol "FNMA." The transfer agent and registrar for our common stock is Computershare, P.O. Box 43078, Providence, Rhode Island 02940.

### Common Stock Data

The following table shows, for the periods indicated, the high and low prices per share of our common stock as reported in the Bloomberg Financial Markets service. For periods prior to our stock's delisting from the NYSE on July 8, 2010, these are high and low sales prices reported in the consolidated transaction reporting system. For periods on or after July 8, 2010, these prices represent high and low trade prices. No dividends were declared on shares of our common stock during the periods indicated.

| Quarter | High | Low |
|---|---|---|
| **2009** | | |
| First Quarter | $1.43 | $0.35 |
| Second Quarter | 1.05 | 0.51 |
| Third Quarter | 2.13 | 0.51 |
| Fourth Quarter | 1.55 | 0.88 |
| **2010** | | |
| First Quarter | $1.23 | $0.91 |
| Second Quarter | 1.36 | 0.34 |
| Third Quarter | 0.42 | 0.19 |
| Fourth Quarter | 0.47 | 0.27 |

## Dividends

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock.

*Restrictions Under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly

TREASURY-0311

undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

See "MD&A—Liquidity and Capital Management" for information on dividends declared and paid to Treasury on the senior preferred stock.

## Holders

As of January 31, 2011, we had approximately 18,000 registered holders of record of our common stock, including holders of our restricted stock. In addition, as of January 31, 2011, Treasury held a warrant giving it the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise.

## Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Stock Compensation Plans"). Information about sales and issuances of our unregistered securities during the first three quarters of 2010, some of which were made pursuant to these Stock Compensation Plans, was provided in our quarterly reports on Form 10-Q for the quarters ended March 31, 2010, June 30, 2010 and September 30, 2010 filed with the SEC on May 10, 2010, August 5, 2010 and November 5, 2010, respectively.

During the quarter ended December 31, 2010, 520,589 shares of common stock were issued upon conversion of 337,871 shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, at the option of the holders pursuant to the terms of the preferred stock. All series of preferred stock, other than the senior preferred stock, were issued prior to September 7, 2008.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act with respect to our securities offerings.

## Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03

71

or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K that we file with the SEC, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this annual report on Form 10-K.

### Purchases of Equity Securities by the Issuer

The following table shows shares of our common stock we repurchased during the fourth quarter of 2010.

| | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2010** | | | | |
| October 1-31 . . . . . . . . . . . . . . . . . . . . . . . | 1 | $0.37 | — | — |
| November 1-30 . . . . . . . . . . . . . . . . . . . . . | 1 | 0.38 | — | — |
| December 1-31 . . . . . . . . . . . . . . . . . . . . . | 1 | 0.32 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | | | |

---

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of approximately $930 in withholding taxes due upon the vesting of previously issued restricted stock. Does not include 337,871 shares of 8.75% Non-Cumulative Mandatory Convertible Series 2008-1 Preferred Stock received from holders upon conversion of those shares into 520,589 shares of common stock.

[2] On January 21, 2003, we publicly announced that the Board of Directors had approved an open market share repurchase program under which we could purchase in open market transactions the sum of (a) up to 5% of the shares of common stock outstanding as of December 31, 2002 (49.4 million shares) and (b) additional shares to offset stock issued or expected to be issued under our employee benefit plans. Since August 2004, no shares have been repurchased pursuant to this program. The Board of Directors terminated this share repurchase program on October 14, 2010.

TREASURY-0313

**Item 6.    Selected Financial Data**

The selected consolidated financial data presented below is summarized from our results of operations for the five-year period ended December 31, 2010, as well as selected consolidated balance sheet data as of the end of each year within this five-year period. Certain prior period amounts have been reclassified to conform to the current period presentation. This data should be reviewed in conjunction with the audited consolidated financial statements and related notes and with the MD&A included in this annual report on Form 10-K.

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010[1] | 2009 | 2008 | 2007 | 2006 |
| | (Dollars and shares in millions, except per share amounts) | | | | |
| **Statement of operations data:[2]** | | | | | |
| Net interest income | $ 16,409 | $ 14,510 | $ 8,782 | $ 4,581 | $ 6,752 |
| Guaranty fee income | 202 | 7,211 | 7,621 | 5,071 | 4,250 |
| Net other-than-temporary impairments | (722) | (9,861) | (6,974) | (814) | (853) |
| Investment gains (losses), net | 346 | 1,458 | (246) | (53) | 162 |
| Fair value losses, net[3] | (511) | (2,811) | (20,129) | (4,668) | (1,744) |
| Administrative expenses | (2,597) | (2,207) | (1,979) | (2,669) | (3,076) |
| Credit-related expenses[4] | (26,614) | (73,536) | (29,809) | (5,012) | (783) |
| Other income (expenses), net[5] | 240 | (6,287) | (743) | (923) | (84) |
| (Provision) benefit for federal income taxes | 82 | 985 | (13,749) | 3,091 | (166) |
| Net (loss) income attributable to Fannie Mae | (14,014) | (71,969) | (58,707) | (2,050) | 4,059 |
| Preferred stock dividends and issuance costs at redemption | (7,704) | (2,474) | (1,069) | (513) | (511) |
| Net (loss) income attributable to common stockholders | (21,718) | (74,443) | (59,776) | (2,563) | 3,548 |
| **Per common share data:** | | | | | |
| Earnings (loss) per share: | | | | | |
| Basic | $ (3.81) | $ (13.11) | $ (24.04) | $ (2.63) | $ 3.65 |
| Diluted | (3.81) | (13.11) | (24.04) | (2.63) | 3.65 |
| Weighted-average common shares outstanding:[6] | | | | | |
| Basic | 5,694 | 5,680 | 2,487 | 973 | 971 |
| Diluted | 5,694 | 5,680 | 2,487 | 973 | 972 |
| Cash dividends declared per share | $ — | $ — | $ 0.75 | $ 1.90 | $ 1.18 |
| **New business acquisition data:** | | | | | |
| Fannie Mae MBS issues acquired by third parties[7] | $497,975 | $496,067 | $434,711 | $563,648 | $417,471 |
| Mortgage portfolio purchases[8] | 357,573 | 327,578 | 196,645 | 182,471 | 185,507 |
| New business acquisitions | $855,548 | $823,645 | $631,356 | $746,119 | $602,978 |

TREASURY-0314

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2010**[1] | **2009** | **2008** | **2007** | **2006** |
| | (Dollars in millions) | | | | |
| **Balance sheet data:**[2] | | | | | |
| Investments in securities: | | | | | |
| Fannie Mae MBS . . . . . . . . . . . . . . . . . . . . . . . . . | $ 30,226 | $ 229,169 | $ 234,250 | $ 179,401 | $ 196,678 |
| Other agency MBS . . . . . . . . . . . . . . . . . . . . . . . | 19,951 | 43,905 | 35,440 | 32,957 | 31,484 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . | 11,650 | 13,446 | 13,183 | 16,213 | 17,221 |
| Other mortgage-related securities . . . . . . . . . . . . . . | 56,668 | 54,265 | 56,781 | 90,827 | 97,156 |
| Non-mortgage-related securities . . . . . . . . . . . . . . . | 32,753 | 8,882 | 17,640 | 38,115 | 47,573 |
| Mortgage loans:[9] | | | | | |
| Loans held for sale . . . . . . . . . . . . . . . . . . . . . . | 915 | 18,462 | 13,270 | 7,008 | 4,868 |
| Loans held for investment, net of allowance . . . . . . . . . | 2,922,805 | 376,099 | 412,142 | 396,516 | 378,687 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,221,972 | 869,141 | 912,404 | 879,389 | 841,469 |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . | 157,243 | 200,437 | 330,991 | 234,160 | 165,810 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . | 3,039,757 | 574,117 | 539,402 | 562,139 | 601,236 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . | 3,224,489 | 884,422 | 927,561 | 835,271 | 799,827 |
| Senior preferred stock . . . . . . . . . . . . . . . . . . . . . | 88,600 | 60,900 | 1,000 | — | — |
| Preferred stock . . . . . . . . . . . . . . . . . . . . . . . . . | 20,204 | 20,348 | 21,222 | 16,913 | 9,108 |
| Total Fannie Mae stockholders' equity (deficit) . . . . . . . . | (2,599) | (15,372) | (15,314) | 44,011 | 41,506 |
| Net worth surplus (deficit)[10] . . . . . . . . . . . . . . . . . . | $ (2,517) | $ (15,281) | $ (15,157) | $ 44,118 | $ 41,642 |
| **Book of business data:** | | | | | |
| Total mortgage assets[11] . . . . . . . . . . . . . . . . . . . . | $3,099,250 | $ 769,252 | $ 792,196 | $ 727,903 | $ 728,932 |
| Unconsolidated Fannie Mae MBS, held by third parties[12] . . | 21,323 | 2,432,789 | 2,289,459 | 2,118,909 | 1,777,550 |
| Other guarantees[13] . . . . . . . . . . . . . . . . . . . . . . . . | 35,619 | 27,624 | 27,809 | 41,588 | 19,747 |
| Mortgage credit book of business . . . . . . . . . . . . . . . | $3,156,192 | $3,229,665 | $3,109,464 | $2,888,400 | $2,526,229 |
| Guaranty book of business[14] . . . . . . . . . . . . . . . . . . | $3,054,488 | $3,097,201 | $2,975,710 | $2,744,237 | $2,379,986 |
| **Credit quality:** | | | | | |
| Nonperforming loans[15] . . . . . . . . . . . . . . . . . . . . . | $ 214,752 | $ 216,455 | $ 119,232 | $ 27,156 | $ 13,846 |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . | 66,251 | 64,891 | 24,753 | 3,391 | 859 |
| Total loss reserves as a percentage of total guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.17% | 2.10% | 0.83% | 0.12% | 0.04% |
| Total loss reserves as a percentage of total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30.85 | 29.98 | 20.76 | 12.49 | 6.20 |

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2010**[1] | **2009** | **2008** | **2007** | **2006** |
| **Performance ratios:** | | | | | |
| Net interest yield[16] . . . . . . . . . . . . . . . . . . . | 0.51% | 1.65% | 1.03% | 0.57% | 0.85% |
| Average effective guaranty fee rate (in basis points)[17] . . . . . . . . . . . . . . . . . . . . . . . . . . | N/A | 27.6 bp | 31.0 bp | 23.7 bp | 22.2 bp |
| Credit loss ratio (in basis points)[18] . . . . . . . . | 77.4 bp | 44.6 bp | 22.7 bp | 5.3 bp | 2.2 bp |
| Return on assets[19]* . . . . . . . . . . . . . . . . . . | (0.67)% | (8.27)% | (6.77)% | (0.30)% | 0.42% |

[1] As discussed in "Business—Executive Summary," prospectively adopting the new accounting standards had a significant impact on the presentation and comparability of our consolidated financial statements due to the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. While some line items in our consolidated statements of operations and balance sheet were not impacted, others were impacted significantly, which reduces the comparability of our results for 2010 with the results for prior years. See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impact of the new accounting standards on our consolidated financial statements.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

TREASURY-0315

[3] Consists of the following: (a) derivatives fair value gains (losses), net; (b) trading securities gains (losses), net; (c) hedged mortgage assets gains (losses), net; (d) debt foreign exchange gains (losses), net; (e) debt fair value gains (losses), net; and (f) mortgage loans fair value losses, net.

[4] Consists of provision for loan losses, provision for guaranty losses and foreclosed property expense.

[5] Consists of the following: (a) debt extinguishment gains (losses), net; (b) losses from partnership investments; (c) losses on certain guaranty contracts; and (d) fee and other income.

[6] Includes the weighted-average shares of common stock that would be issuable upon the full exercise of the warrant issued to Treasury from the date of conservatorship through the end of the period for 2008 and for the full year for 2009 and 2010. Because the warrant's exercise price of $0.00001 per share is considered non-substantive (compared to the market price of our common stock), the warrant was evaluated based on its substance over form. It was determined to have characteristics of non-voting common stock, and thus included in the computation of basic earnings (loss) per share.

[7] Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by us during the reporting period less: (a) securitizations of mortgage loans held in our mortgage portfolio during the reporting period and (b) Fannie Mae MBS purchased for our mortgage portfolio during the reporting period.

[8] Reflects unpaid principal balance of mortgage loans and mortgage-related securities we purchased for our mortgage portfolio during the reporting period. Includes acquisition of mortgage-related securities accounted for as the extinguishment of debt because the entity underlying the mortgage-related securities has been consolidated in our consolidated balance sheet. For 2010, includes unpaid principal balance of approximately $217 billion of delinquent loans purchased from our single-family MBS trusts. Under our MBS trust documents, we have the option to purchase from MBS trusts loans that are delinquent as to four or more consecutive monthly payments.

[9] Mortgage loans consist solely of domestic residential real-estate mortgages.

[10] Total assets less total liabilities.

[11] Reflects unpaid principal balance of mortgage loans and mortgage-related securities reported in our consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount. As a result of our adoption of the new accounting standards as of January 1, 2010, we reflect a substantial majority of our Fannie Mae MBS as mortgage assets and the balance as unconsolidated Fannie Mae MBS.

[12] Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[13] Primarily includes long-term standby commitments we have issued and single-family and multifamily credit enhancements we have provided and that are not otherwise reflected in the table.

[14] Reflects mortgage credit book of business less non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[15] Consists of on-balance sheet nonperforming loans held in our mortgage assets and off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts held by third parties. Includes all nonaccrual loans, as well as troubled debt restructurings ("TDRs") and HomeSaver Advance first-lien loans on accrual status. We generally classify single-family and multifamily loans as nonperforming when the payment of principal or interest on the loan is equal to or greater than two and three months past due, respectively. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. Prior to 2008, the nonperforming loans that we reported consisted of on-balance sheet nonperforming loans held in our mortgage portfolio and did not include off-balance sheet nonperforming loans in Fannie Mae MBS held by third parties.

[16] Calculated based on net interest income for the reporting period divided by the average balance of total interest-earning assets during the period, expressed as a percentage.

[17] Calculated based on guaranty fee income for the reporting period divided by average outstanding Fannie Mae MBS and other guarantees during the period, expressed in basis points.

[18] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense for the reporting period (adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans) divided by the average guaranty book of business during the period, expressed in basis points.

[19] Calculated based on net income (loss) available to common stockholders for the reporting period divided by average total assets during the period, expressed as a percentage.

**Note:**

* Average balances for purposes of ratio calculations are based on balances at the beginning of the year and at the end of each respective quarter for 2010, 2009, 2008 and 2007. Average balances for purposes of ratio calculations for 2006 are based on beginning and end of year balances. Beginning of the year balance for 2010 is as of January 1, 2010, post transition adjustment. See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impacts of the new accounting standards on our consolidated financial statements.

75

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our consolidated financial statements as of December 31, 2010 and related notes, and with "Business—Executive Summary."*

*This report contains forward-looking statements that are based upon management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Business—Forward-Looking Statements" for more information on the forward-looking statements in this report and "Risk Factors" for a discussion of factors that could cause our actual results to differ, perhaps materially, from our forward-looking statements. Please also see "MD&A—Glossary of Terms Used in This Report."*

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies."

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. See "Risk Factors" for a discussion of the risk associated with the use of models. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Total Loss Reserves

- Other-Than-Temporary Impairment of Investment Securities

Effective January 1, 2010, we adopted the new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. Refer to "Note 1, Summary of Significant Accounting Policies" and "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for additional information.

In this section, we discuss significant changes in the judgments and assumptions we made during 2010 in applying our critical accounting policies, significant changes to critical estimates and the impact of the new accounting standards on our total loss reserves.

### Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 19, Fair Value."

The fair value accounting rules provide a three-level fair value hierarchy for classifying financial instruments. This hierarchy is based on whether the inputs to the valuation techniques used to measure fair value are observable or unobservable. Each asset or liability is assigned to a level based on the lowest level of any input that is significant to the fair value measurement. The three levels of the fair value hierarchy are described below:

Level 1: Quoted prices (unadjusted) in active markets for identical assets or liabilities.

TREASURY-0317

Level 2:  Observable market-based inputs, other than quoted prices in active markets for identical assets or liabilities.

Level 3:  Unobservable inputs.

The majority of the financial instruments that we report at fair value in our consolidated financial statements fall within the Level 2 category and are valued primarily utilizing inputs and assumptions that are observable in the marketplace, that can be derived from observable market data or that can be corroborated by recent trading activity of similar instruments with similar characteristics. For example, we generally request non-binding prices from at least four independent pricing services to estimate the fair value of our trading and available-for-sale securities at an individual security level. We use the average of these prices to determine the fair value.

In the absence of such information or if we are not able to corroborate these prices by other available, relevant market information, we estimate their fair values based on single source quotations from brokers or dealers or by using internal calculations or discounted cash flow techniques that incorporate inputs, such as prepayment rates, discount rates and delinquency, default and cumulative loss expectations, that are implied by market prices for similar securities and collateral structure types. Because this valuation technique relies on significant unobservable inputs, the fair value estimation is classified as Level 3. The process for determining fair value using unobservable inputs is generally more subjective and involves a high degree of management judgment and assumptions. These assumptions may have a significant effect on our estimates of fair value, and the use of different assumptions as well as changes in market conditions could have a material effect on our results of operations or financial condition.

### Fair Value Hierarchy—Level 3 Assets and Liabilities

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage- and asset-backed securities and residual interests, certain mortgage loans, acquired property, partnership investments, our guaranty assets and buy-ups, our master servicing assets, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 5 presents a comparison, by balance sheet category, of the amount of financial assets carried in our consolidated balance sheets at fair value on a recurring basis ( "recurring asset") that were classified as Level 3 as of December 31, 2010 and 2009. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

**Table 5:   Level 3 Recurring Financial Assets at Fair Value**

| Balance Sheet Category | As of December 31, | |
|---|---|---|
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    4,576 | $   8,861 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,934 | 36,154 |
| Mortgage loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,207 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 247 | 2,727 |
| Level 3 recurring assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  38,964 | $ 47,742 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $869,141 |
| Total recurring assets measured at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 161,696 | $353,718 |
| Level 3 recurring assets as a percentage of total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 5% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value . . . . . . . | 24% | 13% |
| Total recurring assets measured at fair value as a percentage of total assets . . . . . . . . . . . . . . | 5% | 41% |

77

The decrease in assets classified as Level 3 during 2010 includes a $2.6 billion decrease due to derecognition of guaranty assets and buy-ups at the transition date as well as net transfers of approximately $6.0 billion in assets to Level 2 from Level 3. The assets transferred from Level 3 consist primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities.

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include held-for-sale loans, held-for-investment loans, acquired property and partnership investments. The fair value of Level 3 nonrecurring assets totaled $63.0 billion during the year ended December 31, 2010, and $21.2 billion during the year ended December 31, 2009.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.0 billion as of December 31, 2010 and $601 million as of December 31, 2009, and derivatives liabilities with a fair value of $143 million as of December 31, 2010 and $27 million as of December 31, 2009.

### Fair Value Control Processes

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable. Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations and validation procedures.

Our Valuation Oversight Committee, which includes senior representation from our three business segments, our Enterprise Risk Office and our Finance Division, is responsible for reviewing the valuation methodologies used in our fair value measurements and any significant valuation adjustments, judgments, controls and results. Actual valuations are performed by personnel independent of our business units. Our Price Verification Group, which is an independent control group separate from the group responsible for obtaining prices, is responsible for performing monthly independent price verification. The Price Verification Group also performs independent reviews of the assumptions used in determining the fair value of products we hold that have material estimation risk because observable market-based inputs do not exist.

Our validation procedures are intended to ensure that the individual prices we receive are consistent with our observations of the marketplace and prices that are provided to us by pricing services or dealers. We verify selected prices using a variety of methods, including comparing the prices to secondary pricing services, corroborating the prices by reference to other independent market data, such as non-binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally calculated expected prices and conducting relative value comparisons based on specific characteristics of securities. In addition, we compare our derivatives valuations to counterparty valuations as part of the collateral exchange process. We have formal discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the models and related assumptions and inputs that these vendors use in developing prices. The prices provided to us by independent pricing services reflect the existence of credit enhancements, including monoline insurance coverage, and the current lack of liquidity in the marketplace. If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow-up discussions with the pricing service or dealer. If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid-ask spreads and credit considerations. These adjustments are generally based on available market evidence. In the absence of such evidence, management's best estimate is used. All of these processes are executed before we use the prices in preparing our financial statements.

We continually refine our valuation methodologies as markets and products develop and the pricing for certain products becomes more or less transparent. While we believe our valuation methods are appropriate and consistent with those of other market participants, using different methodologies or assumptions to determine fair value could result in a materially different estimate of the fair value of some of our financial instruments.

TREASURY-0319

The dislocation of historical pricing relationships between certain financial instruments persisted during 2010 due to the housing and financial market crisis. These conditions, which have resulted in greater market volatility, wider credit spreads and a lack of price transparency, made the measurement of fair value more difficult and complex for some financial instruments, particularly for financial instruments for which there is no active market, such as our guaranty contracts and loans purchased with evidence of credit deterioration.

**Other-Than-Temporary Impairment of Investment Securities**

We evaluate available-for-sale securities in an unrealized loss position as of the end of each quarter for other-than-temporary impairment. A debt security is evaluated for other-than-temporary impairment if its fair value is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (1) our intent is to sell the security; (2) it is more likely than not that we will be required to sell the security before the impairment is recovered; or (3) we do not expect to recover our amortized cost basis. If, by contrast, we do not intend to sell the security and will not be required to sell prior to recovery of the amortized cost basis, we recognize only the credit component of other-than-temporary impairment in earnings. We record the noncredit component in other comprehensive income. The credit component is the difference between the security's amortized cost basis and the present value of its expected future cash flows, while the noncredit component is the remaining difference between the security's fair value and the present value of expected future cash flows. If, subsequent to recognizing other-than-temporary impairment, our estimates of future cash flows improve, we recognize the change in estimate prospectively over the remaining life of securities as a component of interest income.

Our evaluation requires significant management judgment and consideration of various factors to determine if we will receive the amortized cost basis of our investment securities. We evaluate a debt security for other-than-temporary impairment using an econometric model that estimates the present value of cash flows given multiple factors. These factors include: the severity and duration of the impairment; recent events specific to the issuer and/or industry to which the issuer belongs; the payment structure of the security; external credit ratings and the failure of the issuer to make scheduled interest or principal payments. We rely on expected future cash flow projections to determine if we will recover the amortized cost basis of our available-for-sale securities. To reduce costs associated with maintaining our internal model and decrease the operational risk, in the fourth quarter of 2010, we ceased to use our internally developed model and began using a third-party model to project cash flow estimates on our private-label securities. This model change resulted in more favorable cash flow estimates that, based on estimates as of December 31, 2010, increased the amount that we will recognize prospectively as interest income over the remaining life of the securities by $2.5 billion.

We provide more detailed information on our accounting for other-than-temporary impairment in "Note 1, Summary of Significant Accounting Policies" and "Note 6, Investments in Securities." Also refer to "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of other-than-temporary impairment recognized on our investments in Alt-A and subprime private-label securities. See "Risk Factors" for a discussion of the risks associated with possible future write-downs of our investment securities.

**Total Loss Reserves**

Our total loss reserves consist of the following components:

- Allowance for loan losses;
- Allowance for accrued interest receivable;
- Reserve for guaranty losses; and
- Allowance for preforeclosure property tax and insurance receivable.

These components can be further divided into single-family portions, which collectively make up our single-family loss reserves, and multifamily portions, which collectively make up our multifamily loss reserves.

We maintain an allowance for loan losses and an allowance for accrued interest receivable for loans classified as held for investment, including both loans we hold in our portfolio and loans held in consolidated Fannie

Mae MBS trusts. We maintain a reserve for guaranty losses for loans held in unconsolidated Fannie Mae MBS trusts we guarantee and loans we have guaranteed under long-term standby commitments and other credit enhancements we have provided. We also maintain an allowance for preforeclosure property tax and insurance receivable on delinquent loans that is included in "Other assets" in our consolidated balance sheets. These amounts, which we collectively refer to as our total loss reserves, represent probable losses related to loans in our guaranty book of business as of the balance sheet date.

The allowance for loan losses, allowance for accrued interest receivable and allowance for preforeclosure property tax and insurance receivable are valuation allowances that reflect an estimate of incurred credit losses related to our recorded investment in loans held for investment. The reserve for guaranty losses is a liability account in our consolidated balance sheets that reflects an estimate of incurred credit losses related to our guaranty to each unconsolidated Fannie Mae MBS trust that we will supplement amounts received by the Fannie Mae MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. As a result, the guaranty reserve considers not only the principal and interest due on the loan at the current balance sheet date, but also an estimate of any additional interest payments due to the trust from the current balance sheet date until the point of loan acquisition or foreclosure. Our loss reserves consist of a specific loss reserve for individually impaired loans and a collective loss reserve for all other loans.

We have an established process, using analytical tools, benchmarks and management judgment, to determine our loss reserves. Although our loss reserve process benefits from extensive historical loan performance data, this process is subject to risks and uncertainties, including a reliance on historical loss information that may not be representative of current conditions. We continually monitor delinquency and default trends and make changes in our historically developed assumptions and estimates as necessary to better reflect present conditions, including current trends in borrower risk and/or general economic trends, changes in risk management practices, and changes in public policy and the regulatory environment. We also consider the recoveries that we expect to receive on mortgage insurance and other loan-specific credit enhancements entered into contemporaneously with and in contemplation of a guaranty or loan purchase transaction, as such recoveries reduce the severity of the loss associated with defaulted loans. Due to the stress in the housing and credit markets, and the speed and extent of deterioration in these markets, our process for determining our loss reserves has become significantly more complex and involves a greater degree of management judgment than prior to this period of housing and mortgage market stress.

### Single-Family Loss Reserves

We establish a specific single-family loss reserve for individually impaired loans, which includes loans we restructure in troubled debt restructurings, certain nonperforming loans in MBS trusts and acquired credit-impaired loans that have been further impaired subsequent to acquisition. The single-family loss reserve for individually impaired loans has grown as a proportion of the total single-family loss reserves in recent periods due to increases in the population of restructured loans. We typically measure impairment based on the difference between our recorded investment in the loan and the present value of the estimated cash flows we expect to receive, which we calculate using the effective interest rate of the original loan or the effective interest rate at acquisition for an acquired credit-impaired loan. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, adjusted for the estimated discounted costs to sell the property and estimated insurance or other proceeds we expect to receive. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

We establish a collective single-family loss reserve for all other single-family loans in our single-family guaranty book of business using a model that estimates the probability of default of loans to derive an overall loss reserve estimate given multiple factors such as: origination year, mark-to-market LTV ratio, delinquency status and loan product type. We believe that the loss severity estimates we use in determining our loss reserves reflect current available information on actual events and conditions as of each balance sheet date, including current home prices. Our loss severity estimates do not incorporate assumptions about future changes in home prices. We do, however, use a look back period to develop our loss severity estimates for all loan categories. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

80

Our allowance for loan losses includes an estimate for the benefit of payments from lenders and servicers to make us whole for losses on loans due to a breach of selling or servicing representations and warranties. Historically, this estimate was based significantly on historical cash collections. In the fourth quarter of 2010, the following factors impacted this estimate:

- we revised our methodology to take into account trends in management actions taken before cash collections, which resulted in our allowance for loan losses being $1.1 billion higher than it would have been under the previous methodology; and

- agreements with seller/servicers that addressed their loan repurchase and other obligations to us impacted our expectation of future make-whole payments, resulting in a decrease in our allowance for loan losses of approximately $700 million.

In the fourth quarter of 2010, we updated our allowance for loan loss models to incorporate more recent data on prepayments and modified loan performance which reduced the allowance on individually impaired loans by $670 million, driven primarily by more favorable default expectations for modified loans that withstood successful trial periods. In the second quarter of 2010, we updated our allowance for loan loss model to reflect a change in our severity calculations to use mark-to-market LTV ratios rather than LTV ratios at origination, which we believe better reflects the current values of the loans. This model change resulted in a change in estimate and a decrease to our allowance for loan losses of approximately $1.6 billion.

*Multifamily Loss Reserves*

We establish a specific multifamily loss reserve for multifamily loans that we determine are individually impaired. We use an internal credit-risk rating system, delinquency status and management judgment to evaluate the credit quality of our multifamily loans and to determine which loans we believe are impaired. Our risk-rating system assigns an internal rating through an assessment of the credit risk profile and repayment prospects of each loan, taking into consideration available operating statements and expected cash flows from the underlying property, the estimated value of the property, the historical loan payment experience and current relevant market conditions that may impact credit quality. If we conclude that a multifamily loan is impaired, we measure the impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property less the estimated discounted costs to sell the property. When a modified loan is deemed individually impaired, we measure the impairment based on the difference between our recorded investment in the loan and the present value of expected cash flows discounted at the loan's original interest rate. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, adjusted for the estimated discounted costs to sell the property and estimated insurance or other proceeds we expect to receive. We generally obtain property appraisals from independent third-parties to determine the fair value of multifamily loans that we consider to be individually impaired. We also obtain property appraisals when we foreclose on a multifamily property. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

The collective multifamily loss reserve for all other loans in our multifamily guaranty book of business is established using an internal model that applies loss factors to loans with similar risk ratings. Our loss factors are developed based on our historical default and loss severity experience. Management may also apply judgment to adjust the loss factors derived from our models, taking into consideration model imprecision and specifically known events, such as current credit conditions, that may affect the credit quality of our multifamily loan portfolio but are not yet reflected in our model-generated loss factors. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

*Transition Impact*

Upon recognition of the mortgage loans held by newly consolidated trusts and the associated accrued interest receivable at the transition date of our adoption of the new accounting standards, we increased our "Allowance for loan losses" by $43.6 billion, increased our "Allowance for accrued interest receivable" by $7.0 billion and decreased our "Reserve for guaranty losses" by $54.1 billion. The net decrease of $3.5 billion reflects the

81

difference in the methodology used to estimate incurred losses for our allowances for loans losses and accrued interest receivable versus our reserve for guaranty losses.

Upon adoption of the new accounting standards, we derecognized the substantial majority of the "Reserve for guaranty losses" relating to loans in previously unconsolidated trusts that were consolidated in our consolidated balance sheet. We continue to record a reserve for guaranty losses related to loans in unconsolidated trusts and to loans that we have guaranteed under long-term standby commitments.

## CONSOLIDATED RESULTS OF OPERATIONS

The section below provides a discussion of our consolidated results of operations for the periods indicated. You should read this section together with our consolidated financial statements including the accompanying notes.

As discussed in "Business—Executive Summary," on January 1, 2010 we prospectively adopted new accounting standards, which had a significant impact on the presentation and comparability of our consolidated financial statements. The new standards resulted in the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. While some line items in our consolidated statements of operations were not impacted, others were impacted significantly, which reduces the comparability of our results for 2010 with the results for prior years. The following table describes the impact to our 2010 results for those line items that were impacted significantly as a result of our adoption of the new accounting standards.

| Item | Consolidation Impact |
|------|---------------------|
| Net interest income | • We now recognize the underlying assets and liabilities of the substantial majority of our MBS trusts in our consolidated balance sheets, which increases both our interest-earning assets and interest-bearing liabilities and related interest income and interest expense.<br>• Contractual guaranty fees and the amortization of deferred cash fees received after December 31, 2009 are recognized into interest income.<br>• We now include nonaccrual loans from the majority of our MBS trusts in our consolidated financial statements, which decreases our net interest income as we do not recognize interest income on these loans while we continue to recognize interest expense for amounts owed to MBS certificateholders.<br>• Trust management income and certain fee income from consolidated trusts are now recognized as interest income. |
| Guaranty fee income | • Upon adoption of the new accounting standards, we eliminated substantially all of our guaranty-related assets and liabilities in our consolidated balance sheets.  As a result, consolidated trusts' deferred cash fees and non-cash fees through December 31, 2009 were recognized into our total deficit through the transition adjustment effective January 1, 2010, and we no longer recognize income or loss from amortizing these assets and liabilities nor do we recognize changes in their fair value. As noted above, we now recognize both contractual guaranty fees and the amortization of deferred cash fees received after December 31, 2009 through interest income, thereby reducing guaranty fee income to only those amounts related to unconsolidated trusts and other credit enhancement arrangements, such as our long-term standby commitments. |
| Credit-related expenses | • As the majority of our trusts are consolidated, we no longer record fair value losses on credit-impaired loans acquired from the substantial majority of our trusts.<br>• The substantial majority of our combined loss reserves are now recognized in our allowance for loan losses to reflect the loss allowance against the consolidated mortgage loans. We use a different methodology to estimate incurred losses for our allowance for loan losses as compared with our reserve for guaranty losses, which reduces our credit-related expenses. |
| Investment gains (losses), net | • Our portfolio securitization transactions that reflect transfers of assets to consolidated trusts do not qualify as sales, thereby reducing the amount we recognize as portfolio securitization gains and losses.<br>• We no longer designate the substantial majority of our loans held for securitization as held-for-sale because the substantial majority of related MBS trusts will be consolidated, thereby reducing lower of cost or fair value adjustments.<br>• We no longer record gains or losses on the sale from our portfolio of the substantial majority of our available-for-sale MBS because these securities were eliminated in consolidation. |

TREASURY-0323

| Item | Consolidation Impact |
|------|---------------------|
| Fair value gains (losses), net | • We no longer record fair value gains or losses on the majority of our trading MBS, thereby reducing the amount of securities subject to recognition of changes in fair value in our consolidated statement of operations. |
| Other non-interest expenses | • Upon purchase of MBS securities issued by consolidated trusts where the purchase price of the MBS does not equal the carrying value of the related consolidated debt, we recognize a gain or loss on debt extinguishment. |

See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impacts of the new accounting standards on our consolidated financial statements.

Additionally, we expect high levels of period-to-period volatility in our results of operations and financial condition, principally due to changes in market conditions that result in periodic fluctuations in the estimated fair value of financial instruments that we mark to market through our earnings. These instruments include trading securities and derivatives. The estimated fair value of our trading securities and derivatives may fluctuate substantially from period to period because of changes in interest rates, credit spreads and interest rate volatility, as well as activity related to these financial instruments.

Table 6 summarizes our consolidated results of operations for the periods indicated.

**Table 6:   Summary of Consolidated Results of Operations**

| | For the Year Ended December 31, | | | Variance | |
|------|------|------|------|------|------|
| | 2010 | 2009 | 2008 | 2010 vs. 2009 | 2009 vs. 2008 |
| | | | (Dollars in millions) | | |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . | $ 16,409 | $ 14,510 | $  8,782 | $  1,899 | $   5,728 |
| Guaranty fee income . . . . . . . . . . . . . . . . . . . . . . . | 202 | 7,211 | 7,621 | (7,009) | (410) |
| Fee and other income[1] . . . . . . . . . . . . . . . . . . . . | 882 | 773 | 1,033 | 109 | (260) |
| **Net revenues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **$ 17,493** | **$ 22,494** | **$ 17,436** | **$(5,001)** | **$   5,058** |
| Investment gains (losses), net[2] . . . . . . . . . . . . . . . | 346 | 1,458 | (246) | (1,112) | 1,704 |
| Net other-than-temporary impairments[2] . . . . . . . . . | (722) | (9,861) | (6,974) | 9,139 | (2,887) |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . | (511) | (2,811) | (20,129) | 2,300 | 17,318 |
| Losses from partnership investments . . . . . . . . . . . . | (74) | (6,735) | (1,554) | 6,661 | (5,181) |
| Administrative expenses . . . . . . . . . . . . . . . . . . . . . . | (2,597) | (2,207) | (1,979) | (390) | (228) |
| Credit-related expenses[3] . . . . . . . . . . . . . . . . . . . . | (26,614) | (73,536) | (29,809) | 46,922 | (43,727) |
| Other non-interest expenses[4] . . . . . . . . . . . . . . . . . | (1,421) | (1,809) | (1,315) | 388 | (494) |
| Loss before federal income taxes and extraordinary losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (14,100) | (73,007) | (44,570) | 58,907 | (28,437) |
| Benefit (provision) for federal income taxes . . . . . . . . | 82 | 985 | (13,749) | (903) | 14,734 |
| Extraordinary losses, net of tax effect . . . . . . . . . . . . | — | — | (409) | — | 409 |
| **Net loss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **(14,018)** | **(72,022)** | **(58,728)** | **58,004** | **(13,294)** |
| Less: Net loss attributable to the noncontrolling interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 53 | 21 | (49) | 32 |
| **Net loss attributable to Fannie Mae** . . . . . . . . . . . . | **$(14,014)** | **$(71,969)** | **$(58,707)** | **$57,955** | **$(13,262)** |

[1]   Certain prior period amounts have been reclassified to conform to the current period presentation. Trust management income is included in fee and other income.

[2]   Prior to an April 2009 change in accounting for impairments, net other-than-temporary impairments also included the non-credit portion, which in subsequent periods is recorded in other comprehensive income.

[3]   Consists of provision for loan losses, provision for guaranty losses and foreclosed property expense.

[4]   Consists of debt extinguishment losses, net and other expenses.

83

**Net Interest Income**

Net interest income represents the difference between interest income and interest expense and is a primary source of our revenue. The amount of interest income and interest expense we recognize in the consolidated statements of operations is affected by our investment activity, our debt activity, asset yields and our funding costs.

Table 7 presents an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we used a daily weighted average of amortized cost. When daily average balance information was not available, such as for mortgage loans, we used monthly averages. Table 8 presents the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities; or (2) changes in the interest rates of these assets and liabilities. In 2010, we changed the presentation to distinguish the change in net interest income of Fannie Mae from the change in net interest income of consolidated trusts. Prior period results have been revised to conform to the current period presentation.

TREASURY-0325

**Table 7:   Analysis of Net Interest Income and Yield**

| | For the Year Ended December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2010** | | | **2009** | | | **2008** | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | (Dollars in millions) | | | | | | | | |
| Interest-earning assets: | | | | | | | | | |
| Mortgage loans of Fannie Mae[1] . . . | $ 362,785 | $ 14,992 | 4.13% | $321,394 | $15,378 | 4.78% | $344,922 | $18,547 | 5.38% |
| Mortgage loans of consolidated trusts[1] . . . . . . . . . . . . . . . . . | 2,619,258 | 132,591 | 5.06 | 104,385 | 6,143 | 5.88 | 71,694 | 4,145 | 5.78 |
| Total mortgage loans . . . . . . . . . | 2,982,043 | 147,583 | 4.95 | 425,779 | 21,521 | 5.05 | 416,616 | 22,692 | 5.45 |
| Mortgage-related securities . . . . . . . | 387,798 | 19,552 | 5.04 | | | | | | |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . | (250,748) | (13,232) | 5.28 | | | | | | |
| Total mortgage-related securities, net . . . . . . . . . . . . . . . . . . . | 137,050 | 6,320 | 4.61 | 347,467 | 17,230 | 4.96 | 332,442 | 17,344 | 5.22 |
| Non-mortgage securities[2] . . . . . . . | 91,613 | 221 | 0.24 | 53,724 | 247 | 0.46 | 60,230 | 1,748 | 2.90 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . | 28,685 | 62 | 0.22 | 46,073 | 260 | 0.56 | 41,991 | 1,158 | 2.76 |
| Advances to lenders . . . . . . . . . . . | 3,523 | 84 | 2.38 | 4,580 | 97 | 2.12 | 3,521 | 181 | 5.14 |
| Total interest-earning assets . . . . . . . | $3,242,914 | $154,270 | 4.76% | $877,623 | $39,355 | 4.48% | $854,800 | $43,123 | 5.04% |
| Interest-bearing liabilities: | | | | | | | | | |
| Short-term debt . . . . . . . . . . . . . . | $ 212,741 | $ 619 | 0.29% | $280,215 | $ 2,305 | 0.82% | $277,503 | $ 7,806 | 2.81% |
| Long-term debt . . . . . . . . . . . . . . | 583,369 | 18,857 | 3.23 | 561,907 | 22,195 | 3.95 | 543,358 | 26,145 | 4.81 |
| Total short-term and long-term funding debt . . . . . . . . . . . . . | 796,110 | 19,476 | 2.45 | 842,122 | 24,500 | 2.91 | 820,861 | 33,951 | 4.14 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . | 43 | — | 0.14 | 45 | 1 | 1.44 | 428 | 9 | 2.10 |
| Debt securities of consolidated trusts . . . . . . . . . . . . . . . . . | 2,682,434 | 131,617 | 4.91 | | | | | | |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . | (250,748) | (13,232) | 5.28 | | | | | | |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . | 2,431,686 | 118,385 | 4.87 | 6,033 | 344 | 5.70 | 6,475 | 381 | 5.88 |
| Total interest-bearing liabilities . . . . . . | $3,227,839 | $137,861 | 4.27% | $848,200 | $24,845 | 2.93% | $827,764 | $34,341 | 4.15% |
| Impact of net non-interest bearing funding . . . . . . . . . . . . . . . . . . . | $ 15,075 | | 0.02% | $ 29,423 | | 0.10% | $ 27,036 | | 0.14% |
| Net interest income/net interest yield . . | | $ 16,409 | 0.51% | | $14,510 | 1.65% | | $ 8,782 | 1.03% |
| Net interest income/net interest yield of consolidated trusts . . . . . . . . . . . | | $ 974 | 0.04% | | | | | | |
| **Selected benchmark interest rates at end of period:**[3] | | | | | | | | | |
| 3-month LIBOR . . . . . . . . . . . . . | | | 0.30% | | | 0.25% | | | 1.43% |
| 2-year swap interest rate . . . . . . . . | | | 0.80 | | | 1.42 | | | 1.47 |
| 5-year swap interest rate . . . . . . . . | | | 2.17 | | | 2.98 | | | 2.13 |
| 30-year Fannie Mae MBS par coupon rate . . . . . . . . . . . . . . . . . . . | | | 4.13 | | | 4.56 | | | 3.89 |

[1]   Interest income includes interest income on acquired credit-impaired loans of $2.2 billion, $619 million and $634 million for 2010, 2009 and 2008, respectively. These amounts include accretion income of $1.0 billion, $405 million and $158 million for 2010, 2009 and 2008, respectively, relating to a portion of the fair value losses recorded upon the acquisition of the loans. Average balance includes loans on nonaccrual status, for which interest income is recognized when collected.

[2]   Includes cash equivalents.

[3]   Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg.

TREASURY-0326

**Table 8:   Rate/Volume Analysis of Changes in Net Interest Income**

| | 2010 vs. 2009 | | | 2009 vs. 2008 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Total Variance | Variance Due to:[1] | | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate | | Volume | Rate |
| | | | (Dollars in millions) | | | |
| **Interest income:** | | | | | | |
| Mortgage loans of Fannie Mae . . . . . . . . . . . . . | $   (386) | $   1,849 | $(2,235) | $(3,169) | $(1,212) | $  (1,957) |
| Mortgage loans of consolidated trusts . . . . . . . . . | 126,448 | 127,426 | (978) | 1,998 | 1,923 | 75 |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . | 126,062 | 129,275 | (3,213) | (1,171) | 711 | (1,882) |
| Total mortgage-related securities, net . . . . . . . . . . | (10,910) | (9,779) | (1,131) | (114) | 765 | (879) |
| Non-mortgage securities[2] . . . . . . . . . . . . . . | (26) | 125 | (151) | (1,501) | (171) | (1,330) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . | (198) | (75) | (123) | (898) | 103 | (1,001) |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . | (13) | (24) | 11 | (84) | 44 | (128) |
| Total interest income . . . . . . . . . . . . . . . . . . . . . . | 114,915 | 119,522 | (4,607) | (3,768) | 1,452 | (5,220) |
| **Interest expense:** | | | | | | |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,686) | (458) | (1,228) | (5,501) | 76 | (5,577) |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,338) | 821 | (4,159) | (3,950) | 867 | (4,817) |
| Total short-term and long-term funding debt . . . . . | (5,024) | 363 | (5,387) | (9,451) | 943 | (10,394) |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | (1) | — | (1) | (8) | (6) | (2) |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . . . . . | 118,041 | 118,099 | (58) | (37) | (25) | (12) |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . | 113,016 | 118,462 | (5,446) | (9,496) | 912 | (10,408) |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . | $  1,899 | $  1,060 | $   839 | $ 5,728 | $   540 | $  5,188 |

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

[2]   Includes cash equivalents.

Net interest income increased during 2010 compared with 2009 primarily as a result of an increase in interest income due to the recognition of contractual guaranty fees in interest income upon adoption of the new accounting standards and a reduction in the interest expense on debt that we have issued as lower borrowing rates allowed us to replace higher-cost debt with lower-cost debt. Partially offsetting these positive effects for 2010 was lower interest income from the interest earning assets that we own due to lower yields on our mortgage and non-mortgage assets. The increase in net interest income was further offset by a significant increase in the number of loans on nonaccrual status in our consolidated balance sheets, because we do not recognize interest income on loans that have been placed on nonaccrual status, except when cash payments are received. The increase in loans on nonaccrual status in 2010 was due to our adoption of the new accounting standards.

For 2010, interest income that we did not recognize for nonaccrual mortgage loans, net of recoveries, was $8.4 billion, which resulted in a 26 basis point reduction in net interest yield, compared with $1.2 billion for 2009, which resulted in a 14 basis point reduction in net interest yield and $381 million for 2008, which resulted in a 4 basis point reduction in net interest yield. Of the $8.4 billion of interest income that we did not recognize for nonaccrual mortgage loans for 2010, $4.7 billion was related to the unsecuritized mortgage loans that we own.

Net interest yield significantly decreased for 2010 compared with 2009. We recognize the contractual guaranty fee and the amortization of deferred cash fees received after December 31, 2009 on the underlying mortgage loans of consolidated trusts as interest income, which represents the spread between the net interest yield on the underlying mortgage assets and the rate on the debt of the consolidated trusts. Upon adoption of the new accounting standards, our interest-earning assets and interest-bearing liabilities both increased by

86

TREASURY-0327

approximately $2.4 trillion. The lower spread on these interest-earning assets and liabilities reduced our net interest yield for 2010 as compared with 2009.

Net interest income and net interest yield increased during 2009 compared with 2008, driven by lower funding costs and by growth in the average size of our mortgage portfolio. The significant reduction in the average cost of our debt was primarily attributable to a decline in borrowing rates as we replaced higher cost debt with lower cost debt.

During 2008, we increased our portfolio balance as mortgage-to-debt spreads reached historic highs, and liquidations were reduced due to the disruption of the housing and credit markets. As a result, we began 2009 with a substantially higher balance of interest-earning assets compared with the beginning of 2008. Although portfolio actions and high liquidation levels reduced our balance of interest-earning assets during the course of 2009, the higher beginning balance resulted in a higher average balance of interest-earning assets for the full year of 2009 compared with 2008.

The net interest income for our Capital Markets group reflects interest income from the assets we have purchased and the interest expense from the debt we have issued. See "Business Segment Results" for a detailed discussion of our Capital Markets group's net interest income.

**Guaranty Fee Income**

Guaranty fee income primarily consists of contractual guaranty fees related to unconsolidated Fannie Mae MBS trusts and other credit enhancement arrangements. Guaranty fee income also includes adjustments for the amortization of deferred cash and non-cash fees and fair value adjustments related to our guaranty to the trusts. Beginning January 1, 2010, the vast majority of guaranty fees related to Fannie Mae trusts are reflected in interest income on a consolidated basis due to our adoption of new accounting standards that require us to consolidate the substantial majority of our MBS trusts. At adoption of the new accounting standards, our guaranty-related assets and liabilities pertaining to previously unconsolidated trusts were eliminated; therefore, we no longer recognize amortization of previously recorded deferred cash and non-cash fees or fair value adjustments related to our guaranty to these trusts.

Guaranty fee income decreased in 2010 compared with 2009 because, as noted above, we now recognize both contractual guaranty fees and the amortization of deferred cash fees received after December 31, 2009 through interest income, thereby reducing guaranty fee income to only those amounts related to unconsolidated trusts and other credit enhancement arrangements, such as our long-term standby commitments.

The decrease in guaranty fee income in 2009 compared with 2008 resulted primarily from a decrease in the average effective guaranty fee rate as a sharp decline in interest rates generated an acceleration of deferred amounts into income during 2008. In addition, the effective guaranty fee rate declined due to a lower average charged fee on new acquisitions due to a reduction in our acquisition of loans with higher risk characteristics. This decline was partially offset by higher fair value adjustments on buy-ups and certain guaranty assets recorded in 2009 and an increase in average outstanding Fannie Mae MBS and other guarantees.

**Fee and Other Income**

Fee and other income includes transaction fees, technology fees and multifamily fees. Beginning in 2010, fee and other income also includes trust management income we earn as master servicer, issuer, and trustee for Fannie Mae MBS relating only to unconsolidated trusts. Upon adoption of the new accounting standards, we report trust management income earned by consolidated trusts as a component of net interest income in our consolidated statement of operations. We derive trust management income from the interest earned on cash flows between the date of remittance of mortgage and other payments to us by servicers and the date of the distribution of these payments to MBS certificateholders.

The increase in fee and other income in 2010 compared with 2009 was primarily attributable to an increase in transaction fees due to a higher volume of structured Fannie Mae MBS created for third parties.

87

The decrease in fee and other income in 2009 as compared with 2008 was primarily attributable to lower trust management income due to a significant decline in short-term interest rates.

**Investment Gains (Losses), Net**

Investment gains and losses, net consist of: gains and losses recognized on the securitization of loans and securities from our portfolio; gains and losses recognized from the sale of available-for-sale securities; gains and losses on the consolidation and deconsolidation of securities; lower of cost or fair value adjustments on held-for-sale loans; and other investment gains and losses. Investment gains and losses may fluctuate significantly from period to period depending upon our portfolio investment and securitization activities. Investment gains declined in 2010 compared with 2009 due to a decline in gains from securitizations and in gains from sales of available-for-sale securities as a result of adopting the new accounting standards. Under these standards, our portfolio securitization transactions that reflect transfers of assets to consolidated trusts no longer qualify for sale treatment, which reduced our portfolio securitization gains and losses. We no longer record gains and losses on the sale from our portfolio of the substantial majority of available-for-sale Fannie Mae MBS because these securities were eliminated in consolidation. The decline in investment gains in 2010 was partially offset by a decrease in lower of cost or fair value adjustments on held-for-sale loans due to the reclassification of most of our held-for-sale loans to held for investment upon adoption of the new accounting standards.

The shift to gains in 2009 compared with losses in 2008 was primarily attributable to increased securitization gains due to MBS issuances and sales related to whole loan conduit activity and increased gains on available-for-sale securities due to tightening of investment spreads on agency MBS, which led to higher sale prices. These gains were partially offset by an increase in lower of cost or fair value adjustments on loans primarily driven by a decline in the credit quality of these loans and an increase in interest rates.

**Net Other-Than-Temporary Impairment**

The net other-than-temporary impairment charges recorded in 2010 were primarily driven by a net decline in forecasted home prices for certain geographic regions, which resulted in a decrease in the present value of our cash flow projections on Alt-A and subprime securities. Net other-than-temporary impairment decreased in 2010 compared with 2009 due to slower deterioration of the estimated credit component of the fair value losses of these securities. In addition, net other-than-temporary impairment decreased in 2010 compared with 2009 because, effective beginning in the second quarter of 2009, we recognize only the credit portion of other-than-temporary impairment in our consolidated statements of operations due to the adoption of a new other-than-temporary impairment accounting standard. The net other-than-temporary impairment charge recorded prior to April 1, 2009 included both the credit and non-credit components of the loss in fair value. Approximately 57% of the impairment recorded in 2009 was recorded in the first quarter of 2009 prior to the change in accounting standards. See "Note 6, Investments in Securities" for additional information regarding the net other-than-temporary impairment recognized in 2010. The increase in net other-than-temporary impairment in 2009 compared with 2008 was principally related to an increase in the expected losses on our private-label securities.

**Fair Value Losses, Net**

Table 9 presents the components of fair value gains and losses.

TREASURY-0329

**Table 9:   Fair Value Losses, Net**

| | For the Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
|---|---|---|---|
| Risk management derivatives fair value losses attributable to: | | | |
| Net contractual interest expense accruals on interest rate swaps | $(2,895) | $(3,359) | $ (1,576) |
| Net change in fair value during the period | 1,088 | (1,337) | (13,387) |
| Total risk management derivatives fair value losses, net | (1,807) | (4,696) | (14,963) |
| Mortgage commitment derivatives fair value losses, net | (1,193) | (1,654) | (453) |
| Total derivatives fair value losses, net | (3,000) | (6,350) | (15,416) |
| Trading securities gains (losses), net | 2,692 | 3,744 | (7,040) |
| Hedged mortgage assets gains, net[1] | — | — | 2,154 |
| Debt foreign exchange gains (losses), net | (77) | (173) | 230 |
| Debt fair value gains (losses), net | 5 | (32) | (57) |
| Mortgage loans fair value losses, net | (131) | — | — |
| Fair value losses, net | $  (511) | $(2,811) | $(20,129) |

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| 5-year swap interest rate: | | | |
| As of March 31 | 2.73% | 2.22% | 3.31% |
| As of June 30 | 2.06 | 2.97 | 4.26 |
| As of September 30 | 1.51 | 2.65 | 4.11 |
| As of December 31 | 2.18 | 2.98 | 2.13 |

[1]   Represents adjustments to the carrying value of mortgage assets designated for hedge accounting that are attributable to changes in interest rates.

### Risk Management Derivatives Fair Value Losses, Net

Risk management derivative instruments are an integral part of our management of interest rate risk. We supplement our issuance of debt securities with derivative instruments to further reduce duration and prepayment risks. We generally are the purchaser of risk management derivatives. In cases where options obtained through callable debt issuances are not needed for risk management derivative purposes, we may sell options in the over-the-counter derivatives market in order to offset the options obtained in the callable debt. Our principal purpose in using derivatives is to manage our aggregate interest rate risk profile within prescribed risk parameters. We generally use only derivatives that are relatively liquid and straightforward to value. We consider the cost of derivatives used in our management of interest rate risk to be an inherent part of the cost of funding and hedging our mortgage investments and economically similar to the interest expense that we recognize on the debt we issue to fund our mortgage investments.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the years ended December 31, 2010, 2009 and 2008 in "Note 10, Derivative Instruments and Hedging Activities."

The primary factors affecting the fair value of our risk management derivatives include the following.

- *Changes in interest rates:*   Our derivatives, in combination with our issuances of debt securities, are intended to offset changes in the fair value of our mortgage assets, which tend to increase in value when interest rates decrease and, conversely, decrease in value when interest rates rise. Pay-fixed swaps decrease in value and receive-fixed swaps increase in value as swap interest rates decrease (with the opposite being true when swap interest rates increase). Because the composition of our pay-fixed and receive-fixed derivatives varies across the yield curve, the overall fair value gains and losses of our derivatives are sensitive to flattening and steepening of the yield curve.

89

- *Implied interest rate volatility:*   Our derivatives portfolio includes option-based derivatives, which we use to economically hedge the prepayment option embedded in our mortgage investments. A key variable in estimating the fair value of option-based derivatives is implied volatility, which reflects the market's expectation of the magnitude of future changes in interest rates. Assuming all other factors are held equal, including interest rates, a decrease in implied volatility would reduce the fair value of our purchased options and an increase in implied volatility would increase the fair value of our purchased options.

- *Changes in our derivative activity:*   As interest rates change, we are likely to take actions to rebalance our portfolio to manage our interest rate exposure. As interest rates decrease, expected mortgage prepayments are likely to increase, which reduces the duration of our mortgage investments. In this scenario, we generally will rebalance our existing portfolio to manage this risk by terminating pay-fixed swaps or adding receive-fixed swaps, which shortens the duration of our liabilities. Conversely, when interest rates increase and the duration of our mortgage assets increases, we are likely to rebalance our existing portfolio by adding pay-fixed swaps that have the effect of extending the duration of our liabilities. We use foreign-currency swaps to manage the foreign exchange impact of our foreign currency denominated debt issuances. We also use derivatives in various interest rate environments to hedge the risk of incremental mortgage purchases that we are not able to accomplish solely through our issuance of debt securities.

- *Time value of purchased options:*   Intrinsic value and time value are the two primary components of an option's price. The intrinsic value is the amount that can be immediately realized by exercising the option—the amount by which the market rate exceeds or is below the exercise, or strike rate, such that the option is in-the-money. The time value of an option is the amount by which the price of an option exceeds its intrinsic value. Time decay refers to the diminishing value of an option over time as less time remains to exercise the option. We have a significant amount of purchased options where the time value of the upfront premium we pay decreases due to the passage of time.

We recorded risk management derivative fair value losses in 2010 primarily as a result of: (1) time decay on our purchased options; (2) a decrease in the fair value of our pay-fixed derivatives due to a decline in swap interest rates during the first quarter of 2010; and (3) a decrease in implied interest rate volatility, which reduced the fair value of our purchased options.

Risk management derivative losses in 2009 were driven by losses on our receive-fixed swaps and receive-fixed option-based derivatives due to an increase in swap interest rates and by time decay on our purchased options, partially offset by gains on our net-pay fixed book due to higher swap interest rates.

We recorded risk management derivative losses in 2008 primarily attributable to the decline in swap interest rates, which resulted in substantial fair value losses on our pay-fixed swaps that exceeded our fair value gains on our receive-fixed swaps.

Because risk management derivatives are an important part of our interest rate risk management strategy, it is important to evaluate the impact of our derivatives in the context of our overall interest rate risk profile and in conjunction with the other offsetting mark-to-market gains and losses presented in Table 9. For additional information on our use of derivatives to manage interest rate risk, including the economic objective of our use of various types of derivative instruments, changes in our derivatives activity and the outstanding notional amounts, see "Risk Management—Market Risk Management, Including Interest Rate Risk Management— Interest Rate Risk Management." See "Consolidated Balance Sheet Analysis—Derivative Instruments" for a discussion of the effect of derivatives on our consolidated balance sheets.

### Mortgage Commitment Derivatives Fair Value Losses, Net

Commitments to purchase or sell some mortgage-related securities and to purchase single-family mortgage loans are generally accounted for as derivatives. For open mortgage commitment derivatives, we include changes in their fair value in our consolidated statements of operations. When derivative purchase commitments settle, we include the fair value of the commitment on the settlement date in the cost basis of the loan or security we purchase. When derivative commitments to sell securities settle, we include the fair

TREASURY-0331

value of the commitment on the settlement date in the cost basis of the security we sell. Purchases and sales of securities issued by our consolidated MBS trusts are treated as extinguishment or issuance of debt, respectively. For commitments to purchase and sell securities issued by our consolidated MBS trusts, we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses or in the cost basis of the debt issued, respectively. In 2010 and 2009, the majority of our mortgage commitments were commitments to sell mortgage-related securities and we recognized losses due to their increased prices during the commitment period. Additionally, mortgage commitment losses in 2009 were associated with a large volume of dollar roll transactions. Mortgage commitment derivative losses in 2008 were primarily driven by losses on our securities purchase commitments as mortgage-related securities prices decreased during the commitment period.

### Trading Securities Gains (Losses), Net

Gains from trading securities in 2010 were primarily driven by a decrease in interest rates and narrowing of credit spreads, primarily on CMBS. The decline in gains from trading securities in 2010 compared with 2009 was primarily due to lower gains on non-mortgage securities because credit spreads were relatively flat in 2010 compared with significant narrowing of credit spreads in 2009. Gains from trading securities in 2009 were primarily attributable to the narrowing of spreads on CMBS, agency MBS and non-mortgage related securities, partially offset by an increase in interest rates. The losses from trading securities in 2008 were primarily attributable to widening of spreads, particularly on private-label mortgage-related securities backed by Alt-A and subprime loans and CMBS, as well as losses on non-mortgage securities in our cash and other investments portfolio.

We provide additional information on our trading and available-for-sale securities in "Consolidated Balance Sheet Analysis—Trading and Available-for-Sale Investment Securities" and disclose the sensitivity of changes in the fair value of our trading securities to changes in interest rates in "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk."

### Hedged Mortgage Assets Gains, Net

We applied hedge accounting during a period of time in 2008. We did not have any derivatives designated as hedges during 2010 or 2009.

Our hedge accounting relationships during 2008 consisted of pay-fixed interest rate swaps designated as fair value hedges of changes in the fair value, attributable to changes in the LIBOR benchmark interest rate, of specified mortgage assets. These fair value accounting hedges resulted in gains on the hedged mortgage assets of $2.2 billion for 2008, which were offset by losses of $2.2 billion on the pay-fixed swaps designated as hedging instruments. The losses on these pay-fixed swaps are included as a component of derivatives fair value losses, net.

### Losses from Partnership Investments

We are a limited liability investor in LIHTC and non-LIHTC investments formed for the purpose of providing equity funding for affordable multifamily rental properties. Historically, we generally received tax benefits (tax credits and tax deductions for net operating losses) on our LIHTC investments that we used to reduce our income tax expense. Given our current tax position, it is unlikely that we will be able to use the tax benefits that we expect to receive this year and in the future from these LIHTC investments.

Losses from partnership investments declined significantly during 2010 because we no longer recognize net operating losses or impairment on our LIHTC investments. During 2009, we explored options to sell or otherwise transfer our LIHTC investments for value consistent with our mission. On February 18, 2010, FHFA informed us by letter that, after consultation with Treasury, we may not sell or transfer our LIHTC partnership interests and that FHFA sees no disposition options. Therefore, we no longer have the intent and ability to sell or otherwise transfer our LIHTC investments for value. As a result, we recognized a loss of $5.0 billion during the fourth quarter of 2009 to reduce the carrying value of our LIHTC partnership investments to zero in our

91

consolidated financial statements, and we no longer recognize net operating losses or impairment on our LIHTC investments.

As of December 31, 2010, we had an obligation to fund $280 million in capital contributions on our LIHTC investments, which has been recorded as a component of "Other liabilities" in our consolidated balance sheet.

Losses from partnership investments increased in 2009 compared with 2008 due to the recognition of the $5.0 billion loss during the fourth quarter of 2009, as discussed above.

### Administrative Expenses

Administrative expenses increased in 2010 compared with 2009 due to an increase in employees and third-party services primarily related to our foreclosure prevention and credit loss mitigation efforts. The increase in administrative expenses was partially offset by a $167 million reduction in expenses in the fourth quarter of 2010 for the accrual and receipt of reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for HAMP and other initiatives under the Making Home Affordable Program.

Administrative expenses increased in 2009 compared with 2008 due to an increase in employees and third-party services primarily related to our foreclosure prevention and credit loss mitigation efforts. The increase in these costs was partially offset by lower staffing levels throughout the year in other areas of the company.

### Credit-Related Expenses

Credit-related expenses consist of the provision for loan losses, provision for guaranty losses and foreclosed property expense. We detail the components of our credit-related expenses in Table 10.

**Table 10:   Credit-Related Expenses**

|  | For the Year Ended December 31, | | |
|  | 2010 | 2009 | 2008 |
| --- | --- | --- | --- |
|  | (Dollars in millions) | | |
| Provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $24,702 | $ 9,569 | $ 4,022 |
| Provision for guaranty losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 194 | 63,057 | 23,929 |
| Total provision for credit losses[(1)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,896 | 72,626 | 27,951 |
| Foreclosed property expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,718 | 910 | 1,858 |
| Credit-related expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $26,614 | $73,536 | $29,809 |

---

[(1)]  Includes charge-offs attributable to acquired credit-impaired loans and HomeSaver Advance fair value losses of $180 million, $20.6 billion and $2.4 billion for the years ended December 31, 2010, 2009 and 2008, respectively.

#### *Provision for Credit Losses*

Our total loss reserves provide for probable credit losses inherent in our guaranty book of business as of each balance sheet date. We establish our loss reserves through the provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record the charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a credit to our loss reserves.

Table 11 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of MBS trusts reflected in our consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower "total loss reserves." For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize them as credit losses in the future. We estimate that approximately two-thirds of this amount, as of December 31, 2010, represents credit losses we expect to realize in the future and approximately one-third will eventually be recovered through our consolidated statements of operations, primarily as net interest income if the loan cures or as foreclosed property income if the sale of the collateral exceeds the recorded investment in the credit-

TREASURY-0333

impaired loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

**Table 11:   Total Loss Reserves**

|  | As of December 31, | |
|---|---|---|
|  | **2010** | **2009** |
|  | **(Dollars in millions)** | |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $61,556 | $ 9,925 |
| Reserve for guaranty losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 323 | 54,430 |
| Combined loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61,879 | 64,355 |
| Allowance for accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,414 | 536 |
| Allowance for preforeclosure property taxes and insurance receivable[1] . . . . . . . . . . . . . . . . . . . . | 958 | — |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66,251 | 64,891 |
| Fair value losses previously recognized on acquired credit impaired loans[2] . . . . . . . . . . . . . . . . . . | 19,171 | 22,295 |
| Total loss reserves and fair value losses previously recognized on acquired credit impaired loans . . | $85,422 | $87,186 |

_____

[1]   Amount included in "Other assets" in our consolidated balance sheets.

[2]   Represents the fair value losses on loans purchased out of MBS trusts reflected in our consolidated balance sheets.

We summarize the changes in our combined loss reserves in Table 12. Upon recognition of the mortgage loans held by newly consolidated trusts on January 1, 2010, we increased our "Allowance for loan losses" and decreased our "Reserve for guaranty losses." The impact at transition is reported as "Adoption of new accounting standards" in Table 12. The decrease in the combined loss reserves from transition represents a difference in the methodology used to estimate incurred losses for our allowance for loan losses as compared with our reserve for guaranty losses and our separate presentation of the portion of the allowance related to accrued interest as our "Allowance for accrued interest receivable." These changes are discussed in "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities."

TREASURY-0334

**Table 12:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

|  | As of December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2010 | | | | | | |
|  | Of Fannie Mae | Of Consolidated Trusts | Total | 2009 | 2008 | 2007 | 2006 |
|  | | | (Dollars in millions) | | | | |
| **Changes in combined loss reserves:** | | | | | | | |
| Allowance for loan losses: | | | | | | | |
| Beginning balance[1] . . . . . . . . . . . . . . . . . . . . | $ 8,078 | $ 1,847 | $ 9,925 | $ 2,772 | $ 629 | $ 284 | $ 246 |
| Adoption of new accounting standards . . . . . . . . | — | 43,576 | 43,576 | — | — | — | — |
| Provision for loan losses . . . . . . . . . . . . . . . . . | 13,067 | 11,635 | 24,702 | 9,569 | 4,022 | 658 | 174 |
| Charge-offs[2] . . . . . . . . . . . . . . . . . . . . . . . | (15,852) | (7,026) | (22,878) | (2,245) | (1,987) | (407) | (206) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,913 | 1,164 | 3,077 | 214 | 190 | 107 | 70 |
| Transfers[3] . . . . . . . . . . . . . . . . . . . . . . . . . | 44,714 | (44,714) | — | — | — | — | — |
| Net reclassifications[1][4] . . . . . . . . . . . . . . . . | (3,390) | 6,544 | 3,154 | (385) | (82) | (13) | — |
| Ending balance[1][5] . . . . . . . . . . . . . . . . . . . . | $ 48,530 | $ 13,026 | $ 61,556 | $ 9,925 | $ 2,772 | $ 629 | $ 284 |
| Reserve for guaranty losses: | | | | | | | |
| Beginning balance. . . . . . . . . . . . . . . . . . . . . . | $ 54,430 | $ — | $ 54,430 | $ 21,830 | $ 2,693 | $ 519 | $ 422 |
| Adoption of new accounting standards . . . . . . . . | (54,103) | — | (54,103) | — | — | — | — |
| Provision for guaranty losses . . . . . . . . . . . . . . | 194 | — | 194 | 63,057 | 23,929 | 3,906 | 415 |
| Charge-offs . . . . . . . . . . . . . . . . . . . . . . . . . . | (203) | — | (203) | (31,142) | (4,986) | (1,782) | (336) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | — | 5 | 685 | 194 | 50 | 18 |
| Ending balance. . . . . . . . . . . . . . . . . . . . . . . . | $ 323 | $ — | $ 323 | $ 54,430 | $ 21,830 | $ 2,693 | $ 519 |
| Combined loss reserves: | | | | | | | |
| Beginning balance[1] . . . . . . . . . . . . . . . . . . . . | $ 62,508 | $ 1,847 | $ 64,355 | $ 24,602 | $ 3,322 | $ 803 | $ 668 |
| Adoption of new accounting standards . . . . . . . . | (54,103) | 43,576 | (10,527) | — | — | — | — |
| Total provision for credit losses . . . . . . . . . . . | 13,261 | 11,635 | 24,896 | 72,626 | 27,951 | 4,564 | 589 |
| Charge-offs[2] . . . . . . . . . . . . . . . . . . . . . . . | (16,055) | (7,026) | (23,081) | (33,387) | (6,973) | (2,189) | (542) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,918 | 1,164 | 3,082 | 899 | 384 | 157 | 88 |
| Transfers[3] . . . . . . . . . . . . . . . . . . . . . . . . . | 44,714 | (44,714) | — | — | — | — | — |
| Net reclassifications[1][4] . . . . . . . . . . . . . . . . | (3,390) | 6,544 | 3,154 | (385) | (82) | (13) | — |
| Ending balance[1][5] . . . . . . . . . . . . . . . . . . . . | $ 48,853 | $ 13,026 | $ 61,879 | $ 64,355 | $ 24,602 | $ 3,322 | $ 803 |
| **Attribution of charge-offs:** | | | | | | | |
| Charge-offs attributable to guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . | | | $(22,901) | $(12,832) | $(4,544) | $ (825) | $(338) |
| Charge-offs attributable to fair value losses on: | | | | | | | |
| Acquired credit-impaired loans . . . . . . . . . . . . | | | (180) | (20,327) | (2,096) | (1,364) | (204) |
| HomeSaver Advance loans . . . . . . . . . . . . . . | | | — | (228) | (333) | — | — |
| Total charge-offs. . . . . . . . . . . . . . . . . . . . . . | | | $(23,081) | $(33,387) | $(6,973) | $(2,189) | $(542) |
| **Allocation of combined loss reserves:** | | | | | | | |
| Balance at end of each period attributable to: | | | | | | | |
| Single-family[1] . . . . . . . . . . . . . . . . . . . . . . | | | $ 60,163 | $ 62,312 | $24,498 | $ 3,249 | $ 729 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1,716 | 2,043 | 104 | 73 | 74 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | $ 61,879 | $ 64,355 | $24,602 | $ 3,322 | $ 803 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | | | | | | |
| Single-family[1] . . . . . . . . . . . . . . . . . . . . . . | | | 2.10% | 2.14% | 0.87% | 0.13% | 0.03% |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . | | | 0.91 | 1.10 | 0.06 | 0.05 | 0.06 |
| **Combined loss reserves as a percentage of:** | | | | | | | |
| Total guaranty book of business[1] . . . . . . . . . . | | | 2.03% | 2.08% | 0.83% | 0.12% | 0.03% |
| Total nonperforming loans[1] . . . . . . . . . . . . . . | | | 28.81 | 29.73 | 20.63 | 12.23 | 5.80 |

94

<hr>

(1) Prior period amounts have been reclassified and respective percentages have been recalculated to conform to the current period presentation.

(2) Includes accrued interest of $2.4 billion, $1.5 billion, $642 million, $128 million and $39 million for the years ended December 31, 2010, 2009, 2008, 2007 and 2006, respectively.

(3) Includes transfers from trusts for delinquent loan purchases.

(4) Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

(5) Includes $385 million, $726 million, $150 million, $39 million and $28 million as of December 31, 2010, 2009, 2008, 2007 and 2006, respectively, for acquired credit-impaired loans.

Our provision for credit losses decreased in 2010 compared with 2009, primarily due to the moderate change in our total loss reserves during 2010 compared with the substantial increase in our total loss reserves during 2009. The substantial increase in our total loss reserves during 2009 reflected the significant growth in the number of loans that were seriously delinquent during that period, which was partly the result of the economic deterioration during 2009. Another impact of economic deterioration during 2009 was sharply falling home prices, which resulted in higher losses on defaulted loans, further increasing the loss reserves. Our provision for credit losses was substantially lower in 2010 because there was neither an increase in the number of seriously delinquent loans, nor a sharp decline in home prices; therefore we did not need to substantially increase our reserves in 2010. Although lower for 2010 than in 2009, our provision for credit losses, level of delinquencies and defaults, and our total loss reserves remained high and were primarily affected by the following factors:

- Continued stress on a broader segment of borrowers due to continued high levels of unemployment and underemployment and the prolonged decline in home prices has resulted in elevated delinquency rates on loans in our single-family guaranty book of business that do not have characteristics typically associated with higher-risk loans.

- Certain loan categories continued to contribute disproportionately to the increase in our nonperforming loans and credit losses. These categories include: loans on properties in California, Florida, Arizona and Nevada and certain Midwest states; loans originated in 2006 and 2007; and loans related to higher-risk product types, such as Alt-A loans. Although we have identified each year of our 2005 through 2008 vintages as unprofitable, the largest and most disproportionate contributors to credit losses have been the 2006 and 2007 vintages. Accordingly, our concentration statistics throughout the MD&A focus on only these two vintages.

- The prolonged decline in home prices has also resulted in negative home equity for some borrowers, especially when the impact of existing second mortgage liens is taken into account, which has affected their ability to refinance or willingness to make their mortgage payments, and caused loans to remain delinquent for an extended period of time as shown in "Table 41: Delinquency Status of Single-Family Conventional Loans."

- The number of loans that are seriously delinquent remained high due to delays in foreclosures because: (1) legislation or judicial changes in the foreclosure process in a number of states have lengthened the foreclosure timeline; (2) some jurisdictions are experiencing foreclosure processing backlogs due to high foreclosure case volumes; and (3) as discussed in "Executive Summary—Servicer Foreclosure Process Deficiencies and Foreclosure Pause," a number of our single-family mortgage servicers temporarily halted foreclosures in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process, which has lengthened the time to foreclose. However, during 2010, the number of loans that transitioned out of seriously delinquent status exceeded the number of loans that became seriously delinquent, primarily due to an increase in loan modifications and foreclosure alternatives and a higher volume of foreclosures.

- A greater proportion of our total loss reserves is attributable to individual impairment rather than the collective reserve for loan losses. We consider a loan to be individually impaired when, based on current information, it is probable that we will not receive all amounts due, including interest, in accordance with

the contractual terms of the loan agreement. Individually impaired loans currently include, among others, those restructured in a TDR, which is a form of restructuring a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. Any impairment recognized on these loans is part of our provision for loan losses and allowance for loan losses. The higher level of workouts initiated as a result of our home retention and foreclosure prevention efforts during 2010, increased our total number of individually impaired loans, especially those considered to be TDRs, compared with 2009. Individual impairment for TDRs is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The model includes forward-looking assumptions using multiple scenarios of the future economic environment, including interest rates and home prices. Based on the structure of the modifications, in particular the size of the concession granted, and performance of loans modified during 2010 combined with the forward looking assumptions used in our model, the allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve.

- We recorded an out-of-period adjustment of $1.1 billion to our provision for loan losses in the second quarter of 2010, related to an additional provision for losses on preforeclosure property taxes and insurance receivables. For additional information about this adjustment, see "Note 5, Allowance for Loan Losses and Reserve for Guaranty Losses."

- On December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, to address outstanding repurchase requests for residential mortgage loans. Bank of America agreed, among other things, to a cash payment of $1.3 billion, $930 million of which was recognized as a recovery of charge-offs resulting in a reduction to our provision for loan losses and allowance for loan losses.

- Additionally, as discussed in "Critical Account Policies and Estimates—Total Loss Reserves—Single-Family Loss Reserves," the impact on our expectations of future payments from servicers due to this collection resulted in a decrease of approximately $700 million in our allowance for loan losses and we revised our methodology for estimating the benefit of payments from servicers, which resulted in our allowance for loan losses being $1.1 billion higher than it would have been under the previous methodology. For additional information on the terms of this agreement, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

The decline in our fair value losses on acquired credit-impaired loans was another significant factor contributing to the decline in our provision for credit losses in 2010 compared with 2009. In our capacity as guarantor of our MBS trusts, we have the option under the trust agreements to purchase mortgage loans that meet specific criteria from our MBS trusts. We generally are not permitted to complete a modification of a loan while the loan is held in the MBS trust. As a result, we generally exercise our option to purchase any delinquent loan that we intend to modify from an MBS trust prior to the time that the modification becomes effective. See "Mortgage Securitizations—Purchases of Loans from our MBS Trusts" for additional information on the provisions in our MBS trust agreements that govern the purchase of loans from our MBS trusts and the factors that we consider in determining whether to purchase delinquent loans from our MBS trusts. While we acquired significantly more credit-impaired loans from MBS trusts in 2010, we experienced a significant decline in fair value losses on acquired credit-impaired loans because of our adoption of the new accounting standards. Only purchases of credit-deteriorated loans from unconsolidated MBS trusts or as a result of other credit guarantees generate fair value losses upon acquisition. In 2010, we acquired approximately 1,118,000 loans from MBS trusts.

In 2009, we generally recorded our net investment in acquired credit-impaired loans at the lower of the acquisition cost of the loan or the estimated fair value at the date of purchase or consolidation. To the extent that the acquisition cost of these loans exceeded the estimated fair value, we recorded a fair value loss charge-off against the "Reserve for guaranty losses" at the time we acquired the loan. We expect to realize a portion of these fair value losses as credit losses in the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our consolidated balance sheets and have effectively been recognized in our consolidated statements of operations

TREASURY-0337

through our provision for guaranty losses. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower "total loss reserves." However, any incremental impairment recognized on these loans after the date of acquisition becomes a component of our total loss reserves.

Loans in certain states, certain higher-risk categories and our 2006 and 2007 vintages continue to contribute disproportionately to our credit losses, as displayed in Table 15. Our combined single-family loss reserves are also disproportionately higher for certain states, Alt-A loans and our 2006 and 2007 vintages. The Midwest accounted for approximately 14% of our combined single-family loss reserves as of December 31, 2010, compared with approximately 13% as of December 31, 2009. Our mortgage loans in California, Florida, Arizona and Nevada together accounted for approximately 52% of our combined single-family loss reserves as of December 31, 2010, compared with approximately 53% as of December 31, 2009. Our Alt-A loans represented approximately 30% of our combined single-family loss reserves as of December 31, 2010, compared with approximately 35% as of December 31, 2009, and our 2006 and 2007 loan vintages together accounted for approximately 67% of our combined single-family loss reserves as of December 31, 2010, compared with approximately 69% as of December 31, 2009.

For additional discussion of our loan workout activities, delinquent loans and concentrations, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Problem Loan Management." For a discussion of our charge-offs, see "Consolidated Results of Operations—Credit-Related Expenses—Credit Loss Performance Metrics." We provide additional information on credit-impaired loans acquired from MBS trusts in "Note 4, Mortgage Loans."

Our balance of nonperforming single-family loans remained high as of December 31, 2010 due to both high levels of delinquencies and an increase in TDRs. When a TDR is executed, the loan status becomes current, but the loan will continue to be classified as a nonperforming loan as the loan is not performing per the original terms. The composition of our nonperforming loans is shown in Table 13. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 4, Mortgage Loans."

TREASURY-0338

**Table 13:   Nonperforming Single-Family and Multifamily Loans**

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
|  | **2010** | **2009** | **2008** | **2007** | **2006** |
|  | **(Dollars in millions)** | | | | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | | | | |
| Nonaccrual loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $152,756 | $ 34,079 | $ 17,634 | $ 8,343 | $ 5,961 |
| Troubled debt restructurings on accrual status . . . . . . . . . . . . . . . . . . . | 58,078 | 6,922 | 1,931 | 1,765 | 1,086 |
| HomeSaver Advance first-lien loans on accrual status . . . . . . . . . . . . . . | 3,829 | 866 | 1,121 | — | — |
| Total on-balance sheet nonperforming loans . . . . . . . . . . . . . . . . . . . | 214,663 | 41,867 | 20,686 | 10,108 | 7,047 |
| Off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts: | | | | | |
| Nonperforming loans, excluding HomeSaver Advance first-lien loans[1] . . | 89 | 161,406 | 89,617 | 17,048 | 6,799 |
| HomeSaver Advance first-lien loans[2] . . . . . . . . . . . . . . . . . . . . . . . . | — | 13,182 | 8,929 | — | — |
| Total off-balance sheet nonperforming loans . . . . . . . . . . . . . . . . . . | 89 | 174,588 | 98,546 | 17,048 | 6,799 |
| Total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $214,752 | $216,455 | $119,232 | $27,156 | $13,846 |
| Accruing on-balance sheet loans past due 90 days or more[3] . . . . . . . . . . | $    896 | $    612 | $    317 | $    204 | $    147 |

|  | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2010** | **2009** | **2008** | **2007** | **2006** |
|  | **(Dollars in millions)** | | | | |
| Interest related to on-balance sheet nonperforming loans: | | | | | |
| Interest income forgone[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  8,185 | $  1,341 | $    401 | $    215 | $    163 |
| Interest income recognized for the period[5] . . . . . . . . . . . . . . . . . . . . . | 7,995 | 1,206 | 771 | 328 | 295 |

[1]  Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

[2]  Represents all off-balance sheet first-lien loans associated with unsecured HomeSaver Advance loans, including first-lien loans that are not seriously delinquent.

[3]  Recorded investment in loans as of the end of each period that are 90 days or more past due and continuing to accrue interest, the majority includes loans insured or guaranteed by the U.S. government and loans where we have recourse against the seller in the event of a default.

[4]  Represents the amount of interest income that would have been recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[5]  Represents interest income recognized during the period based on stated coupon rate for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while loan was performing and cash payments received on nonaccrual loans.

### *Foreclosed Property Expense*

Foreclosed property expense increased during 2010 compared with 2009 primarily due to the substantial increase in our REO inventory and an increase in valuation adjustments that reduced the value of our REO inventory. The increase in foreclosed property expense was partially offset by the recognition of $796 million in 2010 from the cancellation and restructuring of some of our mortgage insurance coverage compared with a recognition of $668 million from restructurings in 2009. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce our future exposure to our mortgage insurers. Further, under our December 31, 2010 agreement with Bank of America, N.A., and its affiliates, Bank of America agreed, among other things, to a cash payment of $1.3 billion, $266 million of which was recognized as a reduction to foreclosed property expense. For additional information on the terms of this agreement, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management." In addition, during the second quarter of 2010, we began recording expenses related to preforeclosure property taxes and insurance to the provision for loan losses.

TREASURY-0339

While we experienced an increase in foreclosure activity in 2009 compared with 2008 due to higher foreclosed property acquisitions, foreclosed property expense decreased in 2009 compared with 2008 primarily driven by $668 million in cash fees received from the cancellation and restructuring of some of our mortgage insurance coverage.

As described in "Business—Executive Summary," although the current servicer foreclosure pause has negatively affected our serious delinquency rates, credit-related expenses and foreclosure timelines, we cannot yet predict the full extent of its impact.

### Credit Loss Performance Metrics

Our credit-related expenses should be considered in conjunction with our credit loss performance metrics. These credit loss performance metrics are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with HomeSaver Advance loans and the acquisition of credit-impaired loans as follows:

- We include the impact of any credit losses that ultimately result from foreclosure.

- We exclude the impact of fair value losses recorded upon acquisition.

- We add back to our credit losses the amount of charge-offs and foreclosed property expense that we would have recorded if we had calculated these amounts based on the acquisition cost. Because the fair value amount at acquisition was lower than the acquisition cost, any loss recorded at foreclosure is less than it would have been if we had recorded the loan at its acquisition cost.

Interest forgone on nonperforming loans in our mortgage portfolio reduces our net interest income but is not reflected in our credit losses total. In addition, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans are excluded from credit losses.

Historically, management viewed our credit loss performance metrics, which include our historical credit losses and our credit loss ratio, as indicators of the effectiveness of our credit risk management strategies. As our credit losses are now at such high levels, management has shifted focus to our loss mitigation strategies and the reduction of our total credit losses and away from the credit loss ratio to measure performance. However, we believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. They also provide a consistent treatment of credit losses for on- and off-balance sheet loans. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans and HomeSaver Advance loans, investors are able to evaluate our credit performance on a more consistent basis among periods. Table 14 details the components of our credit loss performance metrics as well as our average single-family default rate and average single-family loss severity rate.

TREASURY-0340

**Table 14:   Credit Loss Performance Metrics**

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | **Amount** | **Ratio[1]** | **Amount** | **Ratio[1]** | **Amount** | **Ratio[1]** |
| | | | (Dollars in millions) | | | |
| Charge-offs, net of recoveries [2][3] . . . . . . . . . . . . . . . | $19,999 | 65.6 bp | $ 32,488 | 106.7 bp | $ 6,589 | 22.9 bp |
| Foreclosed property expense[2][3] . . . . . . . . . . . . . . . . . | 1,718 | 5.6 | 910 | 3.0 | 1,858 | 6.5 |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans and HomeSaver Advance loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,717 | 71.2 | 33,398 | 109.7 | 8,447 | 29.4 |
| Less: Fair value losses resulting from acquired credit-impaired loans and HomeSaver Advance loans . . . . . | (180) | (0.6) | (20,555) | (67.5) | (2,429) | (8.4) |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense . . . . . . . | 2,094 | 6.8 | 739 | 2.4 | 501 | 1.7 |
| Credit losses and credit loss ratio . . . . . . . . . . . . . . . | $23,631 | 77.4 bp | $ 13,582 | 44.6 bp | $ 6,519 | 22.7 bp |
| Credit losses attributable to: | | | | | | |
| Single-family. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $23,133 | | $ 13,362 | | $ 6,467 | |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 498 | | 220 | | 52 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $23,631 | | $ 13,582 | | $ 6,519 | |
| Average single-family default rate . . . . . . . . . . . . . . . . | | 1.99% | | 1.07% | | 0.59% |
| Average single-family initial charge-off severity rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 34.07% | | 37.21% | | 25.65% |

[1] Basis points are based on the amount for each line item presented divided by the average guaranty book of business during the period.

[2] Beginning in the second quarter of 2010, expenses relating to preforeclosure taxes and insurance, previously recorded as foreclosed property expense, were recorded as charge-offs. The impact of including these costs was 4.7 basis points for the year ended December 31, 2010.

[3] Includes cash received pursuant to our December 31, 2010 agreement with Bank of America. The impact of this cash receipt was a reduction in charge-offs, net of recoveries, of $930 million or 3.0 basis points and a reduction in foreclosed property expense of $266 million or 0.9 basis points for the year ended December 31, 2010.

[4] Excludes fair value losses on credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans and charge-offs from preforeclosure sales and any costs, gains or losses associated with REO after initial acquisition through final disposition.

The increase in our credit losses in 2010 reflects the increase in the number of defaults, particularly due to our acquisition of loans in 2005 through 2008 with higher-risk attributes compared with current underwriting standards, the prolonged period of high unemployment and the decline in home prices. In addition, defaults in 2009 were lower than they could have been due to the foreclosure moratoria during the end of 2008 and first quarter of 2009. The increase in defaults during 2010 was partially offset by a slight reduction in average loss severity as home prices improved in some geographic regions.

Table 15 provides an analysis of our credit losses in certain higher-risk loan categories, loan vintages and loans within certain states that continue to account for a disproportionate share of our credit losses as compared with our other loans.

TREASURY-0341

**Table 15:   Credit Loss Concentration Analysis**

| | Percentage of Single-Family Conventional Guaranty Book of Business Outstanding[1] | | | Percentage of Single-Family Credit Losses | | |
| | As of December 31, | | | For the Year Ended December 31, | | |
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|---|
| **Geographical distribution:** | | | | | | |
| Arizona, California, Florida and Nevada . . . . . . . . . . . . . . . . . . . . . . . . | 28% | 28% | 27% | 56% | 57% | 49% |
| Illinois, Indiana, Michigan and Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 11 | 11 | 14 | 15 | 21 |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 | 61 | 62 | 30 | 28 | 30 |
| Select higher-risk product features[2] . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 24 | 28 | 61 | 69 | 75 |
| **Vintages:** | | | | | | |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 11 | 14 | 29 | 31 | 35 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 15 | 20 | 36 | 36 | 28 |
| All other vintages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 | 74 | 66 | 35 | 33 | 37 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Includes Alt-A loans, subprime loans, interest-only loans, loans with original LTV ratios greater than 90% and loans with FICO credit scores less than 620.

Our 2009 and 2010 vintages accounted for less than 1% of our single-family credit losses for 2010. Typically, credit losses on mortgage loans do not peak until the third through fifth years following origination. We provide more detailed credit performance information, including serious delinquency rates by geographic region, statistics on nonperforming loans and foreclosure activity in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with OFHEO, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Although other provisions of the September 2005 agreement were suspended in March 2009 by FHFA until further notice, this disclosure requirement was not suspended. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 16 compares the credit loss sensitivities for the periods indicated for first lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancement.

TREASURY-0342

**Table 16:   Single-Family Credit Loss Sensitivity[1]**

| | As of December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Gross single-family credit loss sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  25,937 | $  18,311 |
| Less: Projected credit risk sharing proceeds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,771) | (2,533) |
| Net single-family credit loss sensitivity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  23,166 | $  15,778 |
| Outstanding single-family whole loans and Fannie Mae MBS[2]. . . . . . . . . . . . . . . . . . . . . . | $2,782,512 | $2,830,004 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.83% | 0.56% |

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of both December 31, 2010 and 2009. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

[2]   As a result of our adoption of the new accounting standards, the balance reflects a reduction as of December 31, 2010 from 2009 due to unscheduled principal payments.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

## Other Non-Interest Expenses

Other non-interest expenses consist of credit enhancement expenses, which reflect the amortization of the credit enhancement asset we record at the inception of guaranty contracts; costs associated with the purchase of additional mortgage insurance to protect against credit losses; net gains and losses on the extinguishment of debt; servicer incentive fees in connection with loans modified under HAMP; and other miscellaneous expenses. Other non-interest expenses decreased in 2010 compared with 2009 due primarily to a decrease in master servicing costs related to our master servicing assets and liabilities as a result of derecognizing the portion of our master servicing asset and liability relating to consolidated trusts upon adoption of the new accounting standards; lower expenses for legal claim reserves; and lower interest expense associated with unrecognized tax benefits related to certain unresolved tax positions. The decrease in 2010 was partially offset by an increase in HAMP incentive payments and net losses recorded on the extinguishment of debt, because our borrowing costs declined and it became advantageous for us to redeem higher cost debt and replace it with lower cost debt.

Other non-interest expenses increased in 2009 compared with 2008 primarily due to an increase in our master servicing costs, recording reserves for legal claims, and an increase in net losses recorded on the extinguishment of debt. The increased expenses were partially offset by a reduction in interest expense associated with unrecognized tax benefits related to certain unresolved tax positions.

## Federal Income Taxes

We recorded a tax benefit for federal income taxes of $82 million for 2010 primarily due to the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS for our unrecognized tax benefits for the tax years 1999 through 2004. We were not able to recognize an income tax benefit for our pre-tax loss in 2010 as there has been no change to our conclusion that it is more likely than not that we will not generate sufficient taxable income in the foreseeable future to realize our

TREASURY-0343

net deferred tax assets. As a result, we recorded an increase in our valuation allowance in 2010 that resulted in the recognition of $5.9 billion in our provision for income taxes. This amount represented the tax effect associated with a portion of the pre-tax loss. The change in our 2010 valuation allowance also includes a $2.4 billion reduction primarily due to our adoption of the new accounting standards for amounts originally recognized in "Accumulated deficit." The valuation allowance recorded against our deferred tax assets totaled $56.3 billion as of December 31, 2010, resulting in a net deferred tax asset of $754 million. Our tax benefit for the year resulted in an effective income tax rate of less than 1%. Our effective tax rate was different from the statutory rate of 35% primarily due to an increase in our valuation allowance. The difference in rates was also the result of the settlement agreement with the IRS.

We recorded a tax benefit for federal income taxes of $985 million for 2009, due primarily to the benefit of carrying back a portion of our 2009 loss, net of the reversal of the use of certain tax credits, to prior years. In comparison, we recorded a provision for federal income taxes of $13.7 billion in 2008, due primarily to the valuation allowance recorded against our deferred tax assets that totaled $30.8 billion as of December 31, 2008, resulting in a net deferred tax asset of $3.9 billion.

We discuss the factors that led us to record a partial valuation allowance against our net deferred tax assets in "Note 11, Income Taxes." The amount of deferred tax assets considered realizable is subject to adjustment in future periods. We will continue to monitor all available evidence related to our ability to utilize our remaining deferred tax assets. If we determine that recovery is not likely, we will record an additional valuation allowance against the deferred tax assets that we estimate may not be recoverable. Our income tax expense in future periods will be reduced or increased to the extent of offsetting decreases or increases to our valuation allowance.

**Financial Impact of the Making Home Affordable Program on Fannie Mae**

*Home Affordable Refinance Program*

Because we already own or guarantee the original mortgages that we refinance under HARP, our expenses under that program consist mostly of limited administrative costs.

*Home Affordable Modification Program*

Modifying loans we own or guarantee under HAMP, pursuant to our mission, directly affects our financial results in the following ways:

*Key elements affecting our financial results*

Loans in trial modification plans are treated as individually impaired. Under HAMP, a borrower must satisfy the terms of a trial modification plan, typically for a period of at least three months, before the modification of the loan can become effective. A trial modification period begins when the borrower and Fannie Mae agree to the terms of the trial modification plan. If the loan is recorded on our consolidated balance sheet, we account for the loan as a TDR, because it is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial hardship. As a result, we consider the loan to be individually impaired when it enters a trial modification period, and we calculate our allowance for loan losses for the restructured loan on an individual basis. Once a permanent loan modification becomes effective, the loan will continue to be considered individually impaired.

We continually reassess our loss reserves to determine if the amount of impairment recorded is appropriate and make adjustments as required. Consequently, after a loan has entered into a trial modification under HAMP, we continue to adjust the amount of impairment.

When we begin to individually assess a loan for impairment, we exclude the loan from the population of loans on which we calculate our collective loss reserves. Amounts in the table below do not reflect the impact of removing these individually impaired loans from this population. The collective loss reserves are reduced by the fact that these loans are no longer included in the population for which the collective reserves are calculated.

103

The following table provides information about the impairments and fair value losses associated with these activities for Fannie Mae loans entering trial modifications under HAMP. These amounts have been included in the calculation of our provision for credit losses in our consolidated results of operations for the years ended December 31, 2010 and 2009.

**Table 17:   Impairments and Fair Value Losses on Loans in HAMP[1]**

|  | For the Year Ended December 31, | |
| --- | --- | --- |
|  | **2010** | **2009** |
|  | (Dollars in millions) | |
| Impairments[2] | $ 14,120 | $ 15,777 |
| Fair value losses on credit-impaired loans acquired from MBS trusts[3] | 6 | 10,637 |
| Total | $ 14,126 | $ 26,414 |
| Loans entered into a trial modification under the program | 163,000 | 333,300 |
| Credit-impaired loans acquired from MBS trusts in trial modifications under the program[4] | 65 | 83,700 |

[1]   Includes amounts for loans that entered into a trial modification under the program but that have not yet received, or that have been determined to be ineligible for, a permanent modification under the program. Some of these ineligible loans have since been modified outside of the program.

[2]   Impairments consist of (a) impairments recognized on loans accounted for as loans restructured in a troubled debt restructuring and (b) credit losses on loans in MBS trusts that have entered into a trial modification and been individually assessed for incurred credit losses. Amount includes impairments recognized subsequent to the date of loan acquisition.

[3]   These fair value losses are recorded as charge-offs against the "Reserve for guaranty losses" and have the effect of increasing the provision for guaranty losses in our consolidated statements of operations.

[4]   Excludes loans purchased from consolidated trusts for the year ended December 31, 2010, for which no fair value losses were recognized.

The decline in fair value losses on credit-impaired loans in trial modifications under the program acquired from MBS trusts in 2010 compared with 2009 was due to the adoption of the new accounting standards. Under the new standards, only purchases of credit-deteriorated loans from unconsolidated MBS trusts or as a result of other credit guarantees generate fair value losses upon acquisition.

### *Servicer and Borrower Incentives*

We incurred $339 million during 2010 and $17 million during 2009 in paid and accrued incentive fees for servicers in connection with loans modified under HAMP, which we recorded as part of "Other expenses." Borrower incentive payments are included in the calculation of our allowance for loan losses for individually impaired loans.

### *Overall Impact of the Making Home Affordable Program*

Because of the unprecedented nature of the circumstances that led to the Making Home Affordable Program, we cannot quantify what the impact would have been on Fannie Mae if the Making Home Affordable Program had not been introduced. We do not know how many loans we would have modified under alternative programs, what the terms or costs of those modifications would have been, how many foreclosures would have resulted nationwide, and at what pace, or the impact on housing prices if the program had not been put in place. As a result, the amounts we discuss above are not intended to measure how much the program is costing us in comparison to what it would have cost us if we did not have the program at all.

## BUSINESS SEGMENT RESULTS

We provide a more complete description of our business segments in "Business—Business Segments." Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. We describe the management reporting and allocation process used to generate our segment results in "Note 15,

TREASURY-0345

Segment Reporting." In this section, we discuss changes to our presentation for reporting results for our three business segments, Single-Family, Multifamily and Capital Markets, which have been revised due to our prospective adoption of the new accounting standards. We then discuss our business segment results. This section should be read together with our consolidated results of operations in "Consolidated Results of Operations."

## Changes to Segment Reporting

Our prospective adoption of the new accounting standards had a significant impact on the presentation and comparability of our consolidated financial statements because we consolidated the substantial majority of our single-class securitization trusts and eliminated previously recorded deferred revenue from our guaranty arrangements. We continue to manage Fannie Mae based on the same three business segments; however, effective in 2010 we changed the presentation of segment financial information that is currently evaluated by management.

While some line items in our segment results were not impacted by either the change from the new accounting standards or changes to our segment presentation, others were impacted materially, which reduces the comparability of our segment results with prior years. We have not restated prior years' results nor have we presented current year results under the old presentation because we determined that it was impracticable to do so; therefore, our segment results reported in the current period are not comparable with prior years. In the table below, we compare our current segment reporting for our three business segments with our segment reporting in prior years.

## Segment Reporting in Current Periods Compared with Prior Years

| Single-Family and Multifamily | | |
|---|---|---|
| **Line Item** | **Current Segment Reporting** | **Prior Year Segment Reporting** |
| Guaranty fee income | • At adoption of the new accounting standards, we eliminated a substantial majority of our guaranty-related assets and liabilities in our consolidated balance sheet. We re-established an asset and a liability related to the deferred cash fees on Single-Family's balance sheet and we amortize these fees as guaranty fee income with our contractual guaranty fees. | • At the inception of a guaranty to an unconsolidated entity, we established a guaranty asset and guaranty obligation, which included deferred cash fees. These guaranty-related assets and liabilities were then amortized and recognized in guaranty fee income with our contractual guaranty fees over the life of the guaranty. |
| | • We use a static yield method to amortize deferred cash fees to better align with the recognition of contractual guaranty fee income. | • We used a prospective level yield method to amortize our guaranty-related assets and liabilities, which created significant fluctuations in our guaranty fee income as the interest rate environment shifted. |
| | • We eliminated substantially all of our guaranty assets that were previously recorded at fair value upon adoption of the new accounting standards. As such, the recognition of fair value adjustments as a component of Single-Family guaranty fee income has been essentially eliminated. | • We recorded fair value adjustments on our buy-up assets and certain guaranty assets as a component of Single-Family guaranty fee income. |

TREASURY-0346

| Single-Family and Multifamily | | |
|---|---|---|
| **Line Item** | **Current Segment Reporting** | **Prior Year Segment Reporting** |
| Net interest income (expense) | • Because we now recognize loans underlying the substantial majority of our MBS trusts in our consolidated balance sheets, the amount of interest expense Single-Family and Multifamily recognize related to interest not recorded on nonperforming loans underlying MBS trusts has significantly increased. | • Interest payments expected to be delinquent on off-balance sheet nonperforming loans were considered in the reserve for guaranty losses. |
| Credit-related expenses | • Because we now recognize loans underlying the substantial majority of our MBS trusts in our consolidated balance sheets, we no longer recognize fair value losses upon acquiring credit-impaired loans from these trusts.<br><br>• Upon recognition of mortgage loans held by newly consolidated trusts, we increased our allowance for loan losses and decreased our reserve for guaranty losses. We use a different methodology in estimating incurred losses under our allowance for loan losses versus under our reserve for guaranty losses which will result in lower credit-related expenses. | • We recorded a fair value loss on credit-impaired loans acquired from MBS trusts.<br><br>• The majority of our combined loss reserves were recorded in the reserve for guaranty losses, which used a different methodology for estimating incurred losses versus the methodology used for the allowance for loan losses. |

| Multifamily only | | |
|---|---|---|
| **Line Item** | **Current Segment Reporting** | **Prior Year Segment Reporting** |
| Income (losses) from partnership investments | • We report income or losses from partnership investments on an equity basis in the Multifamily balance sheet. As a result, net income or loss attributable to noncontrolling interests is not included in income (losses) from partnership investments. | • Income (losses) from partnership investments included net income or loss attributable to noncontrolling interests for the Multifamily segment. |

| Capital Markets | | |
|---|---|---|
| **Line Item** | **Current Segment Reporting** | **Prior Year Segment Reporting** |
| Net interest income | • We recognize interest income on interest-earning assets that we own and interest expense on debt that we have issued. | • In addition to the assets we own and the debt we issue, we also included interest income on mortgage-related assets underlying MBS trusts that we consolidated under the prior consolidation accounting standards and the interest expense on the corresponding debt of such trusts. |

106

| Capital Markets | | |
|---|---|---|
| Line Item | Current Segment Reporting | Prior Year Segment Reporting |
| Investment gains (losses), net | • We no longer designate the substantial majority of our loans held for securitization as held for sale as the substantial majority of related MBS trusts will be consolidated, thereby reducing lower of cost or fair value adjustments. | • We designated loans held for securitization as held for sale resulting in recognition of lower of cost or fair value adjustments on our held-for-sale loans. |
| | • We include the securities that we own, regardless of whether the trust has been consolidated, in reporting gains and losses on securitizations and sales of available-for-sale securities. | • We excluded the securities of consolidated trusts that we owned in reporting of gains and losses on securitizations and sales of available-for-sale securities. |
| Fair value gains (losses), net | • We include the trading securities that we own, regardless of whether the trust has been consolidated, in recognizing fair value gains and losses on trading securities. | • MBS trusts that were consolidated were reported as loans and thus any securities we owned issued by these trusts did not have fair value adjustments. |

Under the current segment reporting structure, the sum of the results for our three business segments does not equal our consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our consolidated results of operations.

**Summary**

Table 18 displays a summary of our segment results under our current segment reporting presentation for 2010 and our prior segment presentation for 2009 and 2008.

**Table 18:  Business Segment Summary**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| Net revenues:[1] | | | |
| Single-Family | $ 2,126 | $ 8,784 | $ 9,434 |
| Multifamily | 940 | 582 | 476 |
| Capital Markets | 13,400 | 13,128 | 7,526 |
| Consolidated trusts | 460 | — | — |
| Eliminations/adjustments | 567 | — | — |
| Total | $ 17,493 | $ 22,494 | $ 17,436 |
| Net income (loss) attributable to Fannie Mae: | | | |
| Single-Family | $(26,680) | $(63,798) | $(27,101) |
| Multifamily | 216 | (9,028) | (2,189) |
| Capital Markets | 16,074 | 857 | (29,417) |
| Consolidated trusts | (224) | — | — |
| Eliminations/adjustments | (3,400) | — | — |
| Total | $(14,014) | $(71,969) | $(58,707) |

TREASURY-0348

| | As of December 31, | | |
| --- | ---: | ---: | ---: |
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| **Total assets:** | | | |
| Single-Family[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 14,843 | $ 19,991 | $ 24,115 |
| Multifamily[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,881 | 5,698 | 10,994 |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 873,052 | 843,452 | 877,295 |
| Consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,673,937 | — | — |
| Eliminations/adjustments[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (344,741) | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $869,141 | $912,404 |

[1] Includes net interest income, guaranty fee income, and fee and other income (expense).

[2] Beginning in 2010, the allowance for loan losses, allowance for accrued interest receivable and fair value losses previously recognized on acquired credit impaired loans are not treated as assets for Single-Family and Multifamily segment reporting purposes because these allowances and losses relate to loan assets that are held by the Capital Markets segment and consolidated trusts.

## Segment Results

Table 19 displays our segment results under our current segment reporting presentation for 2010.

**Table 19: Business Segment Results**

| | For the Year Ended December 31, 2010 | | | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | **Single-Family** | **Multifamily** | **Capital Markets** | **Consolidated Trusts[1]** | **Eliminations/ Adjustments[2]** | **Total Results** |
| | (Dollars in millions) | | | | | |
| Net interest income (expense) . . . . . . . . | $ (5,386) | $    3 | $14,321 | $ 5,073 | $ 2,398[3] | $ 16,409 |
| Provision for loan losses . . . . . . . . . . . | (24,503) | (199) | — | — | — | (24,702) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . . | (29,889) | (196) | 14,321 | 5,073 | 2,398 | (8,293) |
| Guaranty fee income (expense) . . . . . . . | 7,206 | 791 | (1,440) | (4,525)[4] | (1,830)[4] | 202 |
| Investment gains (losses), net . . . . . . . . | 9 | 6 | 4,047 | (418) | (3,298)[5] | 346 |
| Net other-than-temporary impairments . . | — | — | (720) | (2) | — | (722) |
| Fair value gains (losses), net . . . . . . . . | — | — | 239 | (155) | (595)[6] | (511) |
| Debt extinguishment losses, net . . . . . . | — | — | (459) | (109) | — | (568) |
| Losses from partnership investments . . . | — | (70) | — | — | (4) | (74) |
| Fee and other income (expense) . . . . . . | 306 | 146 | 519 | (88) | (1) | 882 |
| Administrative expenses . . . . . . . . . . . | (1,628) | (384) | (585) | — | — | (2,597) |
| Benefit (provision) for guaranty losses . . | (237) | 43 | — | — | — | (194) |
| Foreclosed property expense . . . . . . . . | (1,680) | (38) | — | — | — | (1,718) |
| Other income (expenses) . . . . . . . . . . | (836) | (68) | 125 | — | (74)[7] | (853) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . | (26,749) | 230 | 16,047 | (224) | (3,404) | (14,100) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . | 69 | (14) | 27 | — | — | 82 |
| Net income (loss) . . . . . . . . . . . . . . | (26,680) | 216 | 16,074 | (224) | (3,404) | (14,018) |
| Less: Net income attributable to noncontrolling interests . . . . . . . . . | — | — | — | — | 4[8] | 4 |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . . | $(26,680) | $ 216 | $16,074 | $  (224) | $(3,400) | $(14,014) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our balance sheet under the new accounting standards.

TREASURY-0349

[2]   Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our consolidated results.

[3]   Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4]   Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting.

[5]   Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6]   Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7]   Represents the removal of amortization of deferred revenue on certain credit enhancements from the Single-Family and Multifamily segment balance sheets that are eliminated upon reconciliation to our consolidated balance sheets.

[8]   Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our consolidated balance sheets.

### Single-Family Business Results

Table 20 summarizes the financial results of our Single-Family business for 2010 under the current segment reporting presentation and for 2009 and 2008 under the prior segment reporting presentation. The primary sources of revenue for our Single-Family business are guaranty fee income and fee and other income. Expenses primarily include credit-related expenses and administrative expenses.

**Table 20:   Single-Family Business Results**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| **Statement of operations data:**[1] | | | |
| Net interest income (expense) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (5,386) | $ 428 | $ 461 |
| Guaranty fee income[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,206 | 8,002 | 8,390 |
| Credit-related expenses[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (26,420) | (71,320) | (29,725) |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,149) | (2,283) | (1,439) |
| Loss before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (26,749) | (65,173) | (22,313) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . | 69 | 1,375 | (4,788) |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (26,680) | $ (63,798) | $ (27,101) |
| **Other key performance data:** | | | |
| Single-family effective guaranty fee rate (in basis points)[1][5] . . . . . . . . . . . . . | 25.1 | 27.9 | 30.9 |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.7 | 23.8 | 28.0 |
| Average single-family guaranty book of business[7] . . . . . . . . . . . . . . . . . . . . | $2,873,779 | $2,864,759 | $2,715,606 |
| Single-family Fannie Mae MBS issues[8] . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 603,247 | $ 791,418 | $ 536,951 |

[1]   Segment statement of operations data reported under the current segment reporting basis is not comparable to the segment statement of operations data reported in prior periods.

[2]   In 2010, guaranty fee income related to consolidated MBS trusts consisted of contractual guaranty fees and the amortization of deferred cash fees using a static yield method. In 2009 and 2008, guaranty fee income consisted of contractual guaranty fees and amortization of our guaranty-related assets and liabilities using a prospective level yield method and fair value adjustments of buys-ups and certain guaranty assets.

[3]   Consists of the provision for loan losses, provision for guaranty losses and foreclosed property expense.

[4]   Consists of investment gains and losses, fee and other income, other expenses, and administrative expenses.

[5]   Calculated based on Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

TREASURY-0350

[6] Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[7] Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[8] Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period. In 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac in which we agreed to provide assistance to state and local housing finance agencies ("HFAs") through three separate assistance programs: a temporary credit and liquidity facilities program, a new issue bond program and a multifamily credit enhancement program. Includes HFA new issue bond program issuances of $3.1 billion for the year ended December 31, 2010.

<u>2010 compared with 2009</u>

Key factors affecting the results of our Single-Family business for 2010 compared with 2009 included the following:

*Net Interest Income (Expense)*

Net interest income (expense) for the Single-Family business segment includes the fee paid to the Capital Markets group for the contractual interest due on the nonaccrual loans held in our portfolio under the terms of our intracompany guarantee arrangement and in consolidated trusts. It also includes an allocated cost of capital charge among our three business segments. The shift from net interest income in 2009 to net interest expense in 2010 was primarily driven by an increase in interest not recorded on nonaccrual loans, which increased to $8.4 billion in 2010 from $1.2 billion in 2009. The number of nonaccrual loans in our consolidated balance sheets increased as a result of our adoption of the new accounting standards.

*Guaranty Fee Income*

Guaranty fee income decreased in 2010, compared with 2009, primarily because: (1) we now amortize our single-family deferred cash fees under the static yield method, which resulted in lower amortization income compared with 2009 when we amortized these fees under the prospective level yield method; (2) guaranty fee income in 2009 included the amortization of certain non-cash deferred items, the balance of which was eliminated upon adoption of the new accounting standards and was not re-established on Single-Family's balance sheet at the transition date; and (3) guaranty fee income in 2009 reflected an increase in the fair value of buy-ups and certain guaranty assets which are no longer adjusted to fair value under the new segment reporting.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. There were fewer new mortgage originations due to weakness in the housing market and an increase in liquidations due to the high level of foreclosures. Our estimated market share of new single-family mortgage-related securities issuances, which is based on publicly available data and excludes previously securitized mortgages, remained high at 44.0% for 2010.

The single-family average charged guaranty fee on new acquisitions increased in 2010 compared with 2009 primarily due to an increase in acquisitions of loans with characteristics that receive risk-based pricing adjustments.

*Credit-Related Expenses*

Single-family credit-related expenses decreased in 2010 compared with 2009 primarily due to the moderate change in our total single-family loss reserves during 2010 compared with the substantial increase in our total single-family loss reserves during 2009. The substantial increase in our single-family total loss reserves during 2009 reflected the significant growth in the number of loans that were seriously delinquent during that period,

which was partly the result of the economic deterioration during 2009. Another impact of the economic deterioration during 2009 was sharply falling home prices, which resulted in higher losses on defaulted loans, further increasing the loss reserves. Our single-family provision for credit losses was substantially lower in 2010 because there has not been an increase in seriously delinquent loans, nor a sharp decline in house prices. Therefore, we did not need to substantially increase our reserves in 2010. Additionally, because we now recognize loans underlying the substantial majority of our MBS trusts in our consolidated balance sheets, we no longer recognize fair value losses upon acquiring credit-impaired loans from these trusts. Although our credit-related expenses declined in 2010, our credit losses were higher in 2010 compared with 2009 due to an increase in the number of defaults.

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide additional information on our credit-related expenses in "Consolidated Results of Operations — Credit-Related Expenses."

*Federal Income Taxes*

We recognized an income tax benefit in 2010 due to the reversal of a portion of the valuation allowance for deferred tax assets primarily due to a settlement agreement reached with the IRS in 2010 for our unrecognized tax benefits for the tax years 1999 through 2004. The tax benefit recognized for 2009 was primarily due to the benefit of carrying back to prior years a portion of our 2009 tax loss, net of the reversal of the use of certain tax credits.

2009 compared with 2008

Key factors affecting the results of our Single-Family business for 2009 compared with 2008 included the following:

*Guaranty Fee Income*

Our guaranty fee income decreased due to a decrease in our average effective guaranty fee rate partially offset by growth in the average single-family guaranty book of business. The decrease in our average effective guaranty fee rate was primarily attributable to lower amortization of deferred revenue in 2009 as the sharp decline in interest rates in 2008 generated an acceleration of deferred amounts. This decline was partially offset by a higher fair value adjustment on our buy-ups and certain guaranty assets recorded during 2009 due to increased market prices on interest only-strips.

Our average single-family guaranty book of business increased by 5.5% in 2009 over 2008. We experienced an increase in our average outstanding Fannie Mae MBS and other guarantees as our market share of new single-family mortgage-related securities issuances remained high and new MBS issuances outpaced liquidations. Our estimated market share of new single-family mortgage-related securities issuances, which is based on publicly available data and excludes previously securitized mortgages, increased to 46.3% for 2009 from 45.4% for 2008.

The average charged guaranty fee on our new single-family business decreased in 2009 compared with 2008. The decrease in the average charged fee was primarily the result of a reduction in our acquisition of loans with higher risk, higher fee categories such as higher LTV and lower FICO scores due to (1) changes in our underwriting and eligibility standards; (2) changes in the eligibility standards of the mortgage insurance companies; and (3) the increased presence of FHA in the higher-LTV market.

*Credit-Related Expenses*

The increase in credit-related expenses was due to worsening credit performance trends, including significant increases in delinquencies, defaults and loss severities, throughout our guaranty book of business, reflecting the adverse impact of the decline in home prices, the weak economy and high unemployment. Certain higher risk loan categories, loan vintages and loans within certain states that have had the greatest home price depreciation from their peaks continue to account for a disproportionate share of our credit losses, but we are also experiencing deterioration in the credit performance of loans with fewer risk layers. In addition, the

111

increased level of troubled debt restructurings, particularly through workouts initiated as part of our foreclosure prevention efforts, increased the number of loans that were individually impaired, contributing to the increase in the provision for credit losses.

We also experienced a significant increase in fair value losses on credit-impaired loans acquired from MBS trusts for the purpose of modifying them during 2009, reflecting the increase in the number of delinquent loans acquired from MBS trusts, and the decrease in the estimated fair value of these loans compared with 2008.

Credit-related expenses in the Single-Family business represent the substantial majority of the company's total credit-related expenses. We provide additional information on total credit-related expenses in "Consolidated Results of Operations — Credit-Related Expenses."

*Federal Income Taxes*

The net tax benefit recognized in 2009 was attributable to our ability to carry back current year tax losses to previous tax years. We recorded a valuation allowance for the majority of the tax benefits associated with the pre-tax losses recognized in 2009 that we were unable to carry back to previous tax years as there has been no change in the conclusion we reached in 2008 that it was more likely than not that we would not generate sufficient taxable income in the foreseeable future to realize all of the tax benefits generated from these losses. We recorded a non-cash charge in 2008 to establish a partial deferred tax asset valuation allowance against our net deferred tax assets.

***Multifamily Business Results***

Table 21 summarizes the financial results of our Multifamily business for 2010 under the current segment reporting presentation and for 2009 and 2008 under the prior segment reporting presentation. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses primarily include credit-related expenses, net operating losses associated with our partnership investments, and administrative expenses.

112

**Table 21:   Multifamily Business Results**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| **Statement of operations data:**[1] | | | |
| Guaranty fee income[2] | $ 791 | $ 675 | $ 633 |
| Fee and other income | 146 | 100 | 186 |
| Losses from partnership investments[3] | (70) | (6,735) | (1,554) |
| Credit-related expenses[4] | (194) | (2,216) | (84) |
| Other expenses[5] | (443) | (594) | (880) |
| Income (loss) before federal income taxes | 230 | (8,770) | (1,699) |
| Provision for federal income taxes | (14) | (311) | (511) |
| Net income (loss) | 216 | (9,081) | (2,210) |
| Less: Net loss attributable to the noncontrolling interests[3] | — | 53 | 21 |
| Net income (loss) attributable to Fannie Mae | $ 216 | $ (9,028) | $ (2,189) |
| **Other key performance data:** | | | |
| Multifamily effective guaranty fee rate (in basis points)[1][6] | 42.3 | 37.6 | 39.1 |
| Credit loss performance ratio (in basis points)[7] | 26.6 | 12.3 | 3.2 |
| Average Multifamily guaranty book of business[8] | $186,867 | $179,315 | $161,722 |
| Multifamily new business volumes[9] | $ 17,919 | $ 20,183 | $ 35,025 |
| Multifamily units financed from new business volumes[10] | 306,000 | 372,000 | 577,000 |
| Fannie Mae Multifamily MBS issuances[11] | $ 26,499 | $ 16,435 | $ 5,862 |
| Fannie Mae Multifamily structured securities issuances (issued by Capital Markets group)[12] | $ 4,808 | $ 1,648 | $ — |
| Additional net interest income earned on Fannie Mae Multifamily mortgage loans and MBS (included in Capital Markets Group's results)[13] | $ 865 | $ 785 | $ 565 |
| Average Fannie Mae Multifamily mortgage loans and MBS in Capital Markets Group's portfolio[14] | $115,839 | $117,417 | $102,422 |

| | As of December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate | 0.71% | 0.63% |
| Percentage of guaranty book of business with credit enhancement | 89% | 89% |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[15] | 20.1% | 19.8% |
| Fannie Mae Multifamily MBS outstanding[16] | $77,251 | $59,852 |

[1]   Segment statement of operations data reported under the current segment reporting basis is not comparable to the segment statement of operations data reported in prior periods.

[2]   In 2010, guaranty fee income related to consolidated MBS trusts consisted of contractual guaranty fees. In 2009 and 2008, guaranty fee income also consisted of contractual guaranty fees and amortization of our guaranty-related assets and liabilities using a prospective level yield method.

[3]   In 2010, income or losses from partnership investments is reported using the equity method of accounting. As a result, net income or losses attributable to noncontrolling interests from partnership investments is not included in income or losses for the Multifamily segment. In 2009 and 2008, income or losses from partnership investments is reported using either the equity method or consolidation, in accordance with GAAP, with net income or losses attributable to noncontrolling interests included in partnership investments income or losses.

[4]   Consists of the provision for loan losses, provision or benefit for guaranty losses and foreclosed property expense.

[5]   Consists of net interest income or expense, investment gains, other expenses, and administrative expenses.

(6)   Calculated based on Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

(7)   Calculated based on credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

(8)   Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

(9)   Reflects unpaid principal balance of Fannie Mae MBS issued (excluding portfolio securitizations) and loans purchased during the period. Includes $1.0 billion and $391 million from the HFA new issue bond program for the years ended December 31, 2010 and December 31, 2009, respectively.

(10)  Excludes HFA new issue bond program.

(11)  Reflects unpaid principal balance of Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS volumes, (b) $8.7 billion of Fannie Mae portfolio securitization transactions for the year ended December 31, 2010 and (c) $389 million of conversion of adjustable rate loans to fixed rate loans and DMBS securities to MBS securities for the year ended December 31, 2010.

(12)  Reflects original face value of out-of-portfolio structured securities issuances by our Capital Markets Group.

(13)  Interest expense estimate based on allocated duration matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

(14)  Based on unpaid principal balance.

(15)  Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information for 2010 is through September 30, 2010 and has been obtained from the Federal Reserve's September 2010 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences.

(16)  Includes $19.9 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our consolidated balance sheet, and $1.4 billion of bonds issued by HFAs as of December 31, 2010.

2010 compared with 2009

Key factors affecting the results of our Multifamily business for 2010 compared with 2009 included the following:

*Guaranty Fee Income*

Multifamily guaranty fee income increased in 2010 compared with 2009 primarily due to higher fees charged on new acquisitions in recent years. New acquisitions with higher guaranty fees have become an increasingly large part of our book of business.

*Losses from Partnership Investments*

In 2009, we reduced the carrying value of our LIHTC investments to zero. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments, which resulted in a decrease in losses from partnership investments in 2010 compared with 2009.

*Credit-Related Expenses*

Multifamily credit-related expenses decreased in 2010 compared with 2009 primarily due to a modest decrease in the allowance for loan losses in 2010, as multifamily credit trends stabilized, compared with the increase in the allowance for 2009. The provision for credit losses for 2010 was $156 million compared with $2.2 billion for 2009.

Although our allowance and provision for multifamily credit losses decreased, our multifamily charge-offs and foreclosed property expense remained elevated. Our multifamily net charge-offs and foreclosed property expense increased from $220 million in 2009 to $498 million in 2010. The increase in net charge-offs and

114

foreclosed property expense was driven by increased volumes of multifamily REO acquisitions in 2010. Our expectation is that multifamily charge-offs will remain commensurate with 2010 levels throughout 2011 as we continue through the current economic cycle.

*Federal Income Taxes*

We recognized a provision for income taxes in 2010 resulting from a settlement agreement reached with the IRS with respect to our unrecognized tax benefits for tax years 1999 through 2004. The tax provision recognized in 2009 was attributable to the reversal of previously utilized tax credits because of our ability to carry back net operating losses to recover taxes from prior years.

2009 compared with 2008

Key factors affecting the results of our Multifamily business for 2009 compared with 2008 included the following:

*Guaranty Fee Income*

The increase in guaranty fee income in 2009 compared with 2008 was primarily attributable to growth in the average multifamily guaranty book of business. The increase in the average multifamily guaranty book of business reflected the investment and liquidity we have been providing to the multifamily mortgage market. Compared with 2008, during 2009 there was also an increase in the average charged guaranty fee rate, which was offset by lower guaranty-related amortization income.

*Losses from Partnership Investments*

We recorded $5.0 billion of other-than-temporary impairment on our LIHTC investments during the fourth quarter of 2009. We provide further discussion of losses from partnership investments, including details regarding other-than-temporary impairments of these assets, in "Consolidated Results of Operations—Losses from Partnership Investments."

*Credit-Related Income (Expenses)*

The increase in credit-related expenses in 2009 compared with 2008 largely reflected the increase in our multifamily combined loss reserves to $2.0 billion, or 1.10% of our multifamily guaranty book of business, as of December 31, 2009 from $104 million, or 0.06% of our multifamily guaranty book of business as of December 31, 2008. The increase in the multifamily reserve was driven by several factors including higher severity, deterioration in some large loans, lower property values, and weaker financial results from borrowers, all of which are a reflection of the weak economy. Net charge-offs and foreclosed property expenses totaled $220 million in 2009 compared with $52 million in 2008.

*Federal Income Taxes*

The net tax provision recognized in 2009 was attributable to the reversal of the use of certain tax credits, net of our ability to carryback current tax losses. In addition, we recorded a valuation allowance for all of the tax benefits associated with the tax credits generated by our partnership investments in 2009. We recorded a non-cash charge in 2008 to establish a partial deferred tax asset valuation allowance against our net deferred tax assets.

### Capital Markets Group Results

Table 22 summarizes the financial results of our Capital Markets group for 2010 under the current segment reporting presentation and for 2009 and 2008 under the prior segment reporting presentation. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion on the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion on the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments,"

115

"Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments," and "Note 10, Derivative Instruments and Hedging Activities." The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, other-than-temporary impairment, and administrative expenses.

**Table 22:   Capital Markets Group Results**

| | For the Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | (Dollars in millions) | | |
| **Statement of operations data:**[1] | | | |
| Net interest income[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $14,321 | $14,275 | $  8,664 |
| Investment gains (losses), net[3] . . . . . . . . . . . . . . . . . . . . . . . . | 4,047 | 1,460 | (174) |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . . | (720) | (9,861) | (6,974) |
| Fair value gains (losses), net[4] . . . . . . . . . . . . . . . . . . . . . . . . | 239 | (2,811) | (20,129) |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 519 | 319 | 264 |
| Other expenses[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,359) | (2,446) | (2,209) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . | 16,047 | 936 | (20,558) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . | 27 | (79) | (8,450) |
| Extraordinary losses, net of tax effect . . . . . . . . . . . . . . . . . . . . . | — | — | (409) |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . . . | $16,074 | $    857 | $(29,417) |

[1] Segment statement of operations data reported under the current segment reporting basis is not comparable to the segment statement of operations data reported in prior periods.

[2] Includes contractual interest on nonaccrual loans received from Single-Family and Multifamily segments. In 2010, Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts. In 2009 and 2008, the Capital Markets group's net interest income included interest income on mortgage-related assets underlying MBS trusts that we consolidated under the prior consolidation accounting standards and the interest expense on the corresponding debt of such trusts.

[3] In 2010, we include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities. In 2009 and 2008, we excluded the securities of consolidated trusts that we own in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[4] In 2010, fair value gains or losses on trading securities include the trading securities that we own, regardless of whether the trust has been consolidated. In 2009 and 2008, MBS trusts that were consolidated were reported as loans and thus any securities we owned issued by these trusts did not have fair value adjustments.

[5] Includes allocated guaranty fee expense, debt extinguishment losses, net, administrative expenses, and other expenses. In 2010, gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group because purchases of securities are recognized as such. In 2009 and 2008, gains or losses related to the extinguishment of debt issued by consolidated trusts were included in the Capital Markets group's results as debt extinguishment gain or loss.

2010 compared with 2009

Key factors affecting the results of our Capital Markets group for 2010 compared with 2009 included the following:

*Net Interest Income*

The Capital Markets group's interest income consists of interest on the segment's interest-earning assets, which differs from interest-earning assets in our consolidated balance sheets. We exclude loans and securities that underlie the consolidated trusts from our Capital Markets group's balance sheets. The net interest income

116

reported by the Capital Markets group excludes the interest income earned on assets held by consolidated trusts. As a result, the Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes as interest income reimbursements the group receives primarily from Single-Family for the contractual interest due.

Capital Markets group's interest expense consists of contractual interest on the Capital Markets group's interest-bearing liabilities, including the accretion and amortization of any cost basis adjustments. It excludes interest expense on debt issued by consolidated trusts. Therefore, the interest expense recognized on the Capital Markets group's statement of operations is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our consolidated balance sheets. Net interest expense also includes an allocated cost of capital charge among the three business segments.

The Capital Markets group's net interest income increased in 2010 compared with 2009 primarily due to a decline in funding costs as we replaced higher cost debt with lower cost debt. Also, Capital Markets' net interest income and net interest yield benefited from funds we received from Treasury under the senior preferred stock purchase agreement as the cash received was used to reduce our debt and the cost of these funds is included in dividends rather than interest expense.

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value losses, net" and is shown in "Table 9: Fair Value Losses, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $2.9 billion in 2010 compared with a $3.4 billion decrease in 2009.

*Investment Gains (Losses), Net*

The increase in investment gains in 2010 compared with 2009 was primarily driven by an increase in gains on securitizations as well as a significant decline in lower of cost or fair value adjustments on held-for-sale loans.

*Net Other-Than-Temporary Impairment*

The net other-than-temporary impairment recognized by the Capital Markets group is generally consistent with the net other-than-temporary impairment reported in our consolidated results of operations. We discuss details on net other-than-temporary impairment in "Consolidated Results of Operations—Net Other-Than-Temporary Impairment."

*Fair Value Gains (Losses), Net*

The derivative gains and losses and foreign exchange gains and losses that are reported for the Capital Markets group are consistent with these same losses reported in our consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations— Fair Value Gains (Losses), Net."

The gains on our trading securities for the segment during 2010 were driven by a decrease in interest rates and narrowing of credit spreads on CMBS.

The gains on our trading securities during 2009 were primarily attributable to the narrowing of credit spreads on CMBS, asset-backed securities, corporate debt securities and agency MBS, partially offset by an increase in interest rates in 2009.

117

*Federal Income Taxes*

We recognized an income tax benefit in 2010 primarily due to the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS in the first quarter of 2010 for our unrecognized tax benefits for the tax years 1999 through 2004. We recorded a valuation allowance for the majority of the tax benefits associated with the pre-tax losses recognized in 2009.

<u>2009 compared with 2008</u>

Key factors affecting the results of our Capital Markets group for 2009 compared with 2008 included the following:

*Net Interest Income*

The increase in net interest income in 2009 compared with 2008 was primarily attributable to an expansion of our net interest yield driven by a reduction in the average cost of our debt that more than offset a decline in the average yield on our interest-earning assets. The significant reduction in the average cost of our debt during 2009 compared with 2008 was primarily attributable to a decline in borrowing rates as we replaced higher cost debt with lower cost debt. Our net interest income does not include the effect of the periodic net contractual interest accruals on our interest rate swaps which totaled $3.4 billion in 2009, compared with $1.6 billion in 2008.

*Investment Gains (Losses), Net*

The shift to investment gains in 2009 compared with investment losses in 2008 was primarily attributable to: (1) an increase in gains on portfolio securitizations as we increased our MBS issuance volumes and sales related to whole loan conduit activity and (2) an increase in realized gains on sales of available-for-sale securities as tightening of investment spreads on agency MBS led to higher sale prices. These gains were partially offset by an increase in lower of cost or fair value adjustments on loans, primarily driven by a decline in the credit quality of these loans and an increase in interest rates.

*Net Other-Than-Temporary Impairment*

Net other-than-temporary impairment increased during 2009. We discuss net-other-than-temporary impairment in "Consolidated Results of Operations—Net Other-Than-Temporary Impairment."

*Fair Value Gains (Losses), Net*

Fair value losses substantially decreased in 2009. We discuss our fair value losses in "Consolidated Results of Operations—Fair Value Gains (Losses), Net."

*Federal Income Taxes*

Federal income tax provision substantially declined in 2009 compared with 2008 as we recorded a non-cash charge in 2008 to establish a partial deferred tax asset valuation allowance against our net deferred tax assets.

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage-related securities and mortgage loans that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheets. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

We are restricted in the amount of mortgage assets that we may own. Please see "Conservatorship and Treasury Agreements—Treasury Agreements—Covenants under Treasury Agreement."

118

Table 23 summarizes our Capital Markets group's mortgage portfolio activity based on unpaid principal balance for 2010.

**Table 23:   Capital Markets Group's Mortgage Portfolio Activity**

|  | 2010 |
|---|---|
|  | (Dollars in millions) |
| **Total Capital Markets mortgage portfolio, beginning balance as of January 1, 2010** . . . . . . . . . | $ 772,728 |
| **Mortgage loans:** |  |
| Beginning balance as of January 1, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 281,162 |
| Purchases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 313,075 |
| Securitizations[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (95,783) |
| Liquidations[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (71,380) |
| Mortgage loans, ending balance as of December 31, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . | 427,074 |
| **Mortgage securities:** |  |
| Beginning balance as of January 1, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 491,566 |
| Purchases[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44,495 |
| Securitizations[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95,783 |
| Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (179,620) |
| Liquidations[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (90,527) |
| Mortgage securities, ending balance as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . | 361,697 |
| **Total Capital Markets mortgage portfolio, ending balance as of December 31, 2010** . . . . . . . . . | $ 788,771 |

[1]   Includes portfolio securitization transactions that do not qualify for sale treatment under the new accounting standards on the transfers of financial assets.

[2]   Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[3]   Includes purchases of Fannie Mae MBS issued by consolidated trusts.

The Capital Markets group's mortgage portfolio activity for 2010 has been impacted by an increase in purchases of delinquent loans from single-family MBS trusts. We purchased approximately 1,118,000 delinquent loans with an unpaid principal balance of approximately $217 billion from our single-family MBS trusts in 2010. The substantial majority of these delinquent loan purchases were completed in the first half of 2010.

Table 24 shows the composition of the Capital Markets group's mortgage portfolio based on unpaid principal balance as of December 31, 2010 and as of January 1, 2010, immediately after we adopted the new accounting standards.

TREASURY-0360

**Table 24:   Capital Markets Group's Mortgage Portfolio Composition**

| | As of | |
|---|---|---|
| | December 31, 2010 | January 1, 2010 |
| | (Dollars in millions) | |
| **Capital Markets Group's mortgage loans:** | | |
| Single-family loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 51,783 | $ 51,395 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 237,096 | 94,236 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,446 | 8,418 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,526 | 18,493 |
| Total single-family conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 280,068 | 121,147 |
| **Total single-family loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 331,851 | 172,542 |
| Multifamily loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 431 | 521 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,413 | 4,941 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71,010 | 81,610 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,369 | 21,548 |
| Total multifamily conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94,792 | 108,099 |
| **Total multifamily loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95,223 | 108,620 |
| **Total Capital Markets Group's mortgage loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . | 427,074 | 281,162 |
| **Capital Markets Group's mortgage-related securities:** | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 260,429 | 358,495 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,332 | 41,390 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,425 | 1,255 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,283 | 25,133 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,038 | 20,001 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,052 | 25,703 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,525 | 14,448 |
| Other mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,613 | 5,141 |
| **Total Capital Markets Group's mortgage-related securities**[1] . . . . . . . . . . . . . . . . . . | 361,697 | 491,566 |
| **Total Capital Markets Group's mortgage portfolio** . . . . . . . . . . . . . . . . . . . . . . . . . . | $788,771 | $772,728 |

---

[1]   The fair value of these mortgage-related securities was $365.8 billion as of December 31, 2010.

The increase in our portfolio balance from January 1, 2010 to December 31, 2010 was driven by the increase in purchases of delinquent loans from single-family MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets Group's mortgage portfolio was $228.0 billion as of December 31, 2010. This population includes loans that have been modified and have been classified as TDRs as well as unmodified delinquent loans that are on nonaccrual status in our consolidated financial statements.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other constraints including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. As of December 31, 2010, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was approximately $8 billion. In January 2011, we purchased approximately 39,000 delinquent loans with an unpaid principal balance of $6.9 billion from our single-family MBS trusts.

TREASURY-0361

**CONSOLIDATED BALANCE SHEET ANALYSIS**

We seek to structure the composition of our balance sheet and manage its size to comply with our regulatory requirements, to provide adequate liquidity to meet our needs, and to mitigate our interest rate risk and credit risk exposure. The major asset components of our consolidated balance sheet include our mortgage investments and our cash and other investments portfolio. We fund and manage the interest rate risk on these investments through the issuance of debt securities and the use of derivatives. Our debt securities and derivatives represent the major liability components of our consolidated balance sheet.

As discussed in "Business—Executive Summary," on January 1, 2010 we prospectively adopted new accounting standards, which had a significant impact on the presentation and comparability of our consolidated financial statements. The new standards resulted in the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. In the table below, we summarize the primary impacts of the new accounting standards to our consolidated balance sheet for 2010.

| Item | Consolidation Impact |
|------|---------------------|
| Restricted cash | We recognize unscheduled cash payments that have been either received by the servicer or that are held by consolidated trusts and have not yet been remitted to MBS certificateholders. |
| Investments in securities | Fannie Mae MBS that we own were consolidated resulting in a decrease in our investments in securities. |
| Mortgage loans<br><br>Accrued interest receivable | We now record the underlying assets of the majority of our MBS trusts in our consolidated balance sheets, which significantly increases mortgage loans and related accrued interest receivable. |
| Allowance for loan losses<br><br>Reserve for guaranty losses | The substantial majority of our combined loss reserves are now recognized in our allowance for loan losses to reflect the loss allowance against the consolidated mortgage loans. We use a different methodology to estimate incurred losses for our allowance for loan losses as compared with our reserve for guaranty losses. |
| Guaranty assets<br><br>Guaranty obligations | We eliminated our guaranty accounting for the newly consolidated trusts, which resulted in derecognizing previously recorded guaranty-related assets and liabilities associated with the newly consolidated trusts from our consolidated balance sheets. We continue to have guaranty assets and obligations on unconsolidated trusts and other credit enhancements arrangements, such as our long-term standby commitments. |
| Debt<br><br>Accrued interest payable | We recognize the MBS certificates issued by the consolidated trusts and that are held by third-party certificateholders as debt, which significantly increases our debt outstanding and related accrued interest payable. |

We recognized a decrease of $3.3 billion in our stockholders' deficit to reflect the cumulative effect of adopting the new accounting standards. See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impacts of the new accounting standards on our consolidated financial statements.

Table 25 presents a summary of our consolidated balance sheets as of December 31, 2010 and 2009, as well as the impact of the transition to the new accounting standards on January 1, 2010. Following the table is a discussion of material changes in the major components of our assets, liabilities and deficit from January 1, 2010 to December 31, 2010.

TREASURY-0362

**Table 25:   Summary of Consolidated Balance Sheets**

| | As of | | | Variance | |
|---|---|---|---|---|---|
| | December 31, 2010 | January 1, 2010 | December 31, 2009 | January 1 to December 31, 2010 | December 31, 2009 to January 1, 2010 |
| | (Dollars in millions) | | | | |
| **Assets** | | | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . | $  29,048 | $   60,161 | $ 60,496 | $(31,113) | $      (335) |
| Restricted cash . . . . . . . . . . . . . . . . . . . . | 63,678 | 48,653 | 3,070 | 15,025 | 45,583 |
| Investments in securities[1] . . . . . . . . . . . | 151,248 | 161,088 | 349,667 | (9,840) | (188,579) |
| Mortgage loans . . . . . . . . . . . . . . . . . . . . | 2,985,276 | 2,985,445 | 404,486 | (169) | 2,580,959 |
| Allowance for loan losses . . . . . . . . . . . . | (61,556) | (53,501) | (9,925) | (8,055) | (43,576) |
| Mortgage loans, net of allowance for loan losses | 2,923,720 | 2,931,944 | 394,561 | (8,224) | 2,537,383 |
| Other assets[2] . . . . . . . . . . . . . . . . . . . | 54,278 | 44,389 | 61,347 | 9,889 | (16,958) |
| Total assets . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $3,246,235 | $869,141 | $(24,263) | $2,377,094 |
| **Liabilities and equity (deficit)** | | | | | |
| Debt[3] . . . . . . . . . . . . . . . . . . . . . . . . . | $3,197,052 | $3,223,054 | $774,554 | $(26,002) | $2,448,500 |
| Other liabilities[4] . . . . . . . . . . . . . . . . . | 27,437 | 35,164 | 109,868 | (7,727) | (74,704) |
| Total liabilities . . . . . . . . . . . . . . . . . | 3,224,489 | 3,258,218 | 884,422 | (33,729) | 2,373,796 |
| Senior preferred stock . . . . . . . . . . . . . . | 88,600 | 60,900 | 60,900 | 27,700 | — |
| Other equity (deficit)[5] . . . . . . . . . . . . . | (91,117) | (72,883) | (76,181) | (18,234) | 3,298 |
| Total stockholders' equity (deficit) . . . . | (2,517) | (11,983) | (15,281) | 9,466 | 3,298 |
| **Total liabilities and stockholders' deficit** . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $3,246,235 | $869,141 | $(24,263) | $2,377,094 |

[1]   Includes $32.8 billion as of December 31, 2010 and $8.9 billion as of both January 1, 2010 and December 31, 2009 of non-mortgage-related securities that are included in our other investments portfolio in "Table 37: Cash and Other Investments Portfolio."

[2]   Consists of: accrued interest receivable, net; acquired property, net; servicer and MBS trust receivable and other assets.

[3]   Consists of: federal funds purchased and securities sold under agreements to repurchase; short-term debt; and long-term debt.

[4]   Consists of: accrued interest payable; reserve for guaranty losses; servicer and MBS trust payable; and other liabilities.

[5]   Consists of: preferred stock; common stock; additional paid-in capital; retained earnings (accumulated deficit); accumulated other comprehensive loss; treasury stock; and noncontrolling interest.

## Cash and Cash Equivalents and Federal Funds Sold and Securities Purchased under Agreements to Resell or Similar Arrangements

Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements are included in our cash and other investments portfolio. See "Liquidity and Capital Management—Liquidity Management— Liquidity Risk Management Practices and Contingency Planning— Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

## Investments in Mortgage-Related Securities

Our investments in mortgage-related securities are classified in our consolidated balance sheets as either trading or available-for-sale and are reported at fair value. Gains and losses on trading securities are recognized in earnings, while unrealized gains and losses on available-for-sale securities are recorded in stockholders' equity (deficit) as a component of "Accumulated other comprehensive loss" ("AOCI"). See

TREASURY-0363

"Note 6, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of December 31, 2010.

### Investments in Agency Mortgage-Related Securities

Our investments in agency mortgage-related securities consist of securities issued by Fannie Mae, Freddie Mac and Ginnie Mae. Investments in agency mortgage securities declined to $50.2 billion as of December 31, 2010 compared with $83.7 billion as of January 1, 2010. The decline was primarily due to settlement of sales commitments related to dollar roll transactions.

### Investments in Private-Label Mortgage-Related Securities

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $40.7 billion as of December 31, 2010, of which $30.8 billion was rated below investment grade. Table 26 presents the fair value of our investments in Alt-A and subprime private-label securities and an analysis of the cumulative losses on these investments as of December 31, 2010. As of December 31, 2010, we had realized actual cumulative principal shortfalls of approximately 2% of the total cumulative credit losses reported in this table and reflected in our consolidated financial statements.

**Table 26: Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component [3] |
| | | | (Dollars in millions) | | |
| Trading securities:[4] | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . | $ 3,082 | $ 1,683 | $ (1,351) | $ (188) | $(1,163) |
| Subprime private-label securities . . . . . . . . . . | 2,767 | 1,581 | (1,186) | (278) | (908) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,849 | $ 3,264 | $ (2,537) | $ (466) | $(2,071) |
| Available-for-sale securities: | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . | $19,201 | $13,890 | $ (5,410) | $(1,899) | $(3,511) |
| Subprime private-label securities[5] . . . . . . . . | 15,643 | 9,932 | (5,751) | (1,391) | (4,360) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $34,844 | $23,822 | $(11,161) | $(3,290) | $(7,871) |
| Grand Total . . . . . . . . . . . . . . . . . . . . . . . . . | $40,693 | $27,086 | $(13,698) | $(3,756) | $(9,942) |

[1] Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2] Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3] For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the portion of other-than-temporary impairment losses net of accretion that are recognized in earnings in accordance with the accounting standards for other-than-temporary impairments.

TREASURY-0364

[4] Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

[5] Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

Table 27 presents the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and First American CoreLogic, LoanPerformance ("First American CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of December 31, 2010. Based on the stressed condition of some of our financial guarantors, we believe some of these counterparties will not fully meet their obligation to us in the future. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

**Table 27:   Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | As of December 31, 2010 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | | | Monoline Financial Guaranteed Amount[6] |
| | Trading | Available-for-Sale | Wraps[1] | ≥ 60 Days Delinquent[2)(3] | Average Loss Severity[3)(4] | Average Credit Enhancement[3)(5] | |
| | (Dollars in millions) | | | | | | |
| **Private-label mortgage-related securities backed by:**[7] | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | $    — | $    521 | $    — | 33.5% | 48.8% | 19.5% | $    — |
| 2005 . . . . . . . . . . . . . . | — | 1,401 | — | 44.3 | 54.1 | 43.8 | 272 |
| 2006 . . . . . . . . . . . . . . | — | 1,379 | — | 46.6 | 58.9 | 33.9 | 155 |
| 2007 . . . . . . . . . . . . . . | 2,145 | — | — | 45.8 | 60.0 | 60.2 | 781 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | — | 6,927 | — | 10.1 | 56.8 | 12.3 | 14 |
| 2005 . . . . . . . . . . . . . . | 93 | 4,460 | 136 | 24.6 | 54.8 | 7.2 | — |
| 2006 . . . . . . . . . . . . . . | 68 | 4,384 | — | 30.6 | 56.0 | 2.3 | — |
| 2007 . . . . . . . . . . . . . . | 776 | — | 200 | 44.8 | 65.2 | 33.3 | 322 |
| 2008[8] . . . . . . . . . . . . . | — | 129 | — | — | — | — | — |
| Total Alt-A mortgage loans: . . . . . . . . . . . . . . | 3,082 | 19,201 | 336 | | | | 1,544 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior[9] . . . . . . | — | 2,216 | 679 | 24.6 | 87.2 | 60.0 | 688 |
| 2005[8] . . . . . . . . . . . . . | — | 206 | 1,504 | 45.0 | 78.4 | 58.1 | 229 |
| 2006 . . . . . . . . . . . . . . | — | 12,565 | — | 50.2 | 76.7 | 20.7 | 52 |
| 2007 . . . . . . . . . . . . . . | 2,767 | 656 | 5,833 | 49.5 | 73.2 | 24.2 | 183 |
| Total subprime mortgage loans: . . . . . . . . . . . . . . | 2,767 | 15,643 | 8,016 | | | | 1,152 |
| Total Alt-A and subprime mortgage loans: . . . . . . . | $5,849 | $34,844 | $8,352 | | | | $2,696 |

[1] Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

124

[2] Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflects information from December 2010 remittances for November 2010 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3] The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4] Severity data obtained from First American CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The First American CoreLogic severity data reflects information from December 2010 remittances for November 2010 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5] Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee.

[6] Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

[7] Vintages are based on series date and not loan origination date.

[8] The unpaid principal balance includes private-label REMIC securities that have been resecuritized totaling $129 million for the 2008 vintage of other Alt-A loans and $23 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

[9] Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

## Mortgage Loans

The mortgage loans reported in our consolidated balance sheets include loans owned by Fannie Mae and loans held in consolidated trusts and are classified as either held for sale or held for investment. Mortgage loans remained relatively flat from January 1, 2010 to December 31, 2010 as the principal balance of the loans securitized through our lender swap and portfolio securitization programs was offset by scheduled principal paydowns and prepayments. For additional information on our mortgage loans, see "Note 4, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Segment Results—Capital Markets Group Results."

## Debt Instruments

The debt reported in our consolidated balance sheets consists of two categories of debt, which we refer to as "debt of Fannie Mae" and "debt of consolidated trusts." Debt of Fannie Mae, which consists of short-term debt, long-term debt and federal funds purchased and securities sold under agreements to repurchase, is the primary means of funding our mortgage investments. Debt of consolidated trusts represents our liability to third-party beneficial interest holders when we have included the assets of a corresponding trust in our consolidated balance sheets. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt as of December 31, 2010 and 2009 in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 9, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

The decrease in debt of consolidated trusts from January 1, 2010 to December 31, 2010 was primarily driven by the purchase of delinquent loans from MBS trusts as purchasing these loans from MBS trusts for our portfolio results in the extinguishment of the associated consolidated trust debt.

## Derivative Instruments

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. We aggregate, by derivative counterparty, the net fair value

TREASURY-0366

gain or loss, less any cash collateral paid or received, and report these amounts in our consolidated balance sheets as either assets or liabilities.

Our derivative assets and liabilities consist of these risk management derivatives and our mortgage commitments. We refer to the difference between the derivative assets and derivative liabilities recorded in our consolidated balance sheets as our net derivative asset or liability. We present, by derivative instrument type, the estimated fair value of derivatives recorded in our consolidated balance sheets and the related outstanding notional amounts as of December 31, 2010 and 2009 in "Note 10, Derivative Instruments and Hedging Activities." Table 28 provides an analysis of the factors driving the change during 2010 in the estimated fair value of our net derivative liability related to our risk management derivatives recorded in our consolidated balance sheets.

**Table 28:   Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net**

|  | 2010 |
| --- | --- |
|  | (Dollars in millions) |
| Net risk management derivative liability as of December 31, 2009 . . . . . . . . . . . . . . . . . . . . . . | $ (340) |
| Effect of cash payments: |  |
| Fair value at inception of contracts entered into during the period[1] . . . . . . . . . . . . . . . . . . | (2,107) |
| Fair value at date of termination of contracts settled during the period[2] . . . . . . . . . . . . . . | 2,451 |
| Net collateral received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,595) |
| Periodic net cash contractual interest payments[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,609 |
| Total cash payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,358 |
| Statement of operations impact of recognized amounts: |  |
| Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . . . . | (2,895) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,088 |
| Risk management derivatives fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,807) |
| Net risk management derivative liability as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . | $ (789) |

[1]  Cash receipts from sale of derivative option contracts increase the derivative liability recorded in our consolidated balance sheets. Cash payments made to purchase derivative option contracts (purchased option premiums) increase the derivative asset recorded in our consolidated balance sheets.

[2]  Cash payments made to terminate derivative contracts reduce the derivative liability recorded in our consolidated balance sheets. Primarily represents cash paid (received) upon termination of derivative contracts.

[3]  Interest is accrued on interest rate swap contracts based on the contractual terms. Accrued interest income increases our derivative asset and accrued interest expense increases our derivative liability. The offsetting interest income and expense are included as components of derivatives fair value gains (losses), net in our consolidated statements of operations. Net periodic interest receipts reduce the derivative asset and net periodic interest payments reduce the derivative liability.

For additional information on our derivative instruments, see "Consolidated Results of Operations—Fair Value Losses, Net," "Risk Management—Market Risk Management, Including Interest Rate Risk Management" and "Note 10, Derivative Instruments and Hedging Activities."

## SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 29 summarizes changes in our stockholders' deficit reported in our GAAP consolidated balance sheets and in the fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the year ended December 31, 2010. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests.

126

We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 19, Fair Value."

**Table 29:   Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

| | 2010 |
|---|---|
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (15,372) |
| Impact of new accounting standards on Fannie Mae stockholders' deficit as of January 1, 2010[1] . . . . | 3,312 |
| Fannie Mae stockholders' deficit as of January 1, 2010[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12,060) |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (14,014) |
| Changes in net unrealized losses on available-for-sale securities, net of tax. . . . . . . . . . . . . . . . . . . | 3,054 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss, net of tax  . . | 469 |
| Capital transactions:[3] | |
| Funds received from Treasury under the senior preferred stock purchase agreement . . . . . . . . . . . | 27,700 |
| Senior preferred stock dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,706) |
| Capital transactions, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,994 |
| Other equity transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (42) |
| Fannie Mae stockholders' deficit as of December 31, 2010[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (2,599) |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (98,792) |
| Impact of new accounting standards on Fannie Mae estimated fair value of net assets as of January 1, 2010[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (52,302) |
| Estimated fair value of net assets as of January 1, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (151,094) |
| Capital transactions, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,994 |
| Change in estimated fair value of net assets[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,806 |
| Increase in estimated fair value of net assets, net. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,800 |
| Estimated fair value of net assets as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(120,294) |

[1] Reflects our adoption of the new accounting standards for transfers of financial assets and consolidation of variable interest entities.

[2] Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total deficit" amount reported in our consolidated balance sheets. Our net worth, or total deficit, is comprised of "Total Fannie Mae's stockholders' equity (deficit)" and "Noncontrolling interests" reported in our consolidated balance sheets.

[3] Represents capital transactions, which are reflected in our consolidated statements of changes in equity (deficit).

[4] Excludes cumulative effect of our adoption of the new accounting standards and capital transactions.

The $10.8 billion increase in the fair value of our net assets during 2010, excluding the cumulative effect of our January 1, 2010 adoption of the new accounting standards and capital transactions, was attributable to:

- An increase in the fair value of the net portfolio attributable to the positive impact of changes in the spread between mortgage assets and associated debt and derivatives partially offset by,

- A net decrease in the fair value due to credit-related items principally related to declining actual and expected home prices as well as an increase in estimated severity rates based on recent experience, particularly for loans with a high mark-to-market LTV ratio.

127

The decline in the fair value of net assets due to the new accounting standards was primarily associated with recording delinquent loans underlying consolidated MBS trusts and eliminating our net guaranty obligations related to MBS trusts that were consolidated on January 1, 2010. The fair value of our guaranty obligations is a measure of the credit risk related to mortgage loans underlying Fannie Mae MBS that we assume through our guaranty. With consolidation of MBS trusts and the elimination of our guaranty obligation, we ceased valuing our credit risk associated with delinquent loans in consolidated MBS trusts using our guaranty obligation models and began valuing those delinquent loans based on nonperforming loan prices.

Since market participants' assumptions inherent in the pricing for nonperforming loans differ from assumptions we use in estimating the fair value of our guaranty obligations, most significantly expected returns and liquidity discounts, consolidation of MBS trusts directly impacted the fair value of our net assets. Market prices for nonperforming loans are reflective of highly negotiated transactions in a principal-to-principal market that often involve loan-level due diligence prior to completion of a transaction. Many of these transactions involve sellers who previously acquired the loans in distressed transactions and buyers who demand significant return opportunities.

We intend to maximize the value of nonperforming loans over time, utilizing loan modifications, foreclosures, repurchases and other preferable loss mitigation actions (for example, preforeclosure sales) that to date have resulted in per loan net recoveries materially higher than those that would have been available had they been sold in the nonperforming loan market. By following our loss mitigation strategies, rather than selling our nonperforming loans at the current estimated market price, we estimate, based on our proprietary credit valuation models, that we could realize approximately $45 billion more than the fair value of our nonperforming loans reported in our non-GAAP consolidated fair value balance sheet as of December 31, 2010. Nonperforming loans in this fair value balance sheet disclosure include loans that are delinquent by one or more payments. Key inputs and assumptions used in our credit valuation models included the amount of estimated default costs, including estimated unrecoverable principal and interest that we expected to incur over the life of the underlying mortgage loans backing our Fannie Mae MBS, estimated foreclosure-related costs and estimated administrative and other costs related to our guaranty.

**Cautionary Language Relating to Supplemental Non-GAAP Financial Measures**

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not intend to have another party assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

TREASURY-0369

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We present our non-GAAP fair value balance sheets in Table 30. Credit risk is managed by our guaranty business and is computed for intracompany allocation purposes. By computing this intracompany allocation, we reflect the value associated with credit risk, which is managed by our guaranty business, versus the interest rate risk, which is measured by our Capital Markets group. As a result of our adoption of the new accounting standards, we shifted from presenting the fair value of mortgage loans separately from the fair value of net guaranty obligations of MBS trusts as of December 31, 2009 to presenting consolidated mortgage loans, net of the fair value of guaranty assets and obligations as of December 31, 2010. We have not changed our fair value methodologies or our methodology of computing our credit risk for intracompany allocation purposes.

129

**Table 30:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of December 31, 2010 | | | As of December 31, 2009[1] | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[2] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[2] | Estimated Fair Value |
| | | | (Dollars in millions) | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $ 80,975 | $ — | $ 80,975 | $ 9,882 | $ — | $ 9,882 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . | 11,751 | — | 11,751 | 53,684 | (28) | 53,656 |
| Trading securities. . . . . . . . . . . . . . . . . . . . . | 56,856 | — | 56,856 | 111,939 | — | 111,939 |
| Available-for-sale securities . . . . . . . . . . . . . . | 94,392 | — | 94,392 | 237,728 | — | 237,728 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale . . . . . . . . . . . | 915 | — | 915 | 18,462 | 153 | 18,615 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . | 358,698 | (39,331) | 319,367 | 246,509 | (5,209) | 241,300 |
| Of consolidated trusts . . . . . . . . . . . . . . | 2,564,107 | 46,038[3] | 2,610,145[4] | 129,590 | (45) | 129,545[4] |
| Total mortgage loans . . . . . . . . . . . . . . . . . . | 2,923,720 | 6,707 | 2,930,427[5] | 394,561 | (5,101) | 389,460[5] |
| Advances to lenders . . . . . . . . . . . . . . . . . . . | 7,215 | (225) | 6,990[6][7] | 5,449 | (305) | 5,144[6][7] |
| Derivative assets at fair value . . . . . . . . . . . . . | 1,137 | — | 1,137[6][7] | 1,474 | — | 1,474[6][7] |
| Guaranty assets and buy-ups, net. . . . . . . . . . . | 458 | 356 | 814[6][7] | 9,520 | 5,104 | 14,624[6][7] |
| Total financial assets . . . . . . . . . . . . . . . . | 3,176,504 | 6,838 | 3,183,342[8] | 824,237 | (330) | 823,907[8] |
| Master servicing assets and credit enhancements . . . . . . . . . . . . . . . . . . . . . | 479 | 3,286 | 3,765[6][7] | 651 | 5,917 | 6,568[6][7] |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . | 44,989 | (261) | 44,728[6][7] | 44,253 | 373 | 44,626[6][7] |
| Total assets . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $ 9,863 | $3,231,835 | $869,141 | $ 5,960 | $ 875,101 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . | $ 52 | $ (1) | $ 51 | $ — | $ — | $ — |
| Short-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | 151,884 | 90 | 151,974 | 200,437 | 56 | 200,493 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 5,359 | — | 5,359 | — | — | — |
| Long-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | 628,160[9] | 21,524 | 649,684 | 567,950[9] | 19,473 | 587,423 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 2,411,597[9] | 103,332[3] | 2,514,929 | 6,167[9] | 143 | 6,310 |
| Derivative liabilities at fair value. . . . . . . . . . . | 1,715 | — | 1,715[10][11] | 1,029 | — | 1,029[10][11] |
| Guaranty obligations. . . . . . . . . . . . . . . . . . . | 769 | 3,085 | 3,854[10][11] | 13,996 | 124,586 | 138,582[10][11] |
| Total financial liabilities . . . . . . . . . . . . . | 3,199,536 | 128,030 | 3,327,566[8] | 789,579 | 144,258 | 933,837[8] |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . | 24,953 | (472) | 24,481[10][11] | 94,843 | (54,878) | 39,965[10][11] |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . | 3,224,489 | 127,558 | 3,352,047 | 884,422 | 89,380 | 973,802 |
| **Equity (deficit)** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[12] . . . . . . . . . . . . . . . . . . . | 88,600 | — | 88,600 | 60,900 | — | 60,900 |
| Preferred . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,204 | (19,829) | 375 | 20,348 | (19,629) | 719 |
| Common . . . . . . . . . . . . . . . . . . . . . . . . . . | (111,403) | (97,866) | (209,269) | (96,620) | (63,791) | (160,411) |
| **Total Fannie Mae stockholders' deficit/non-GAAP fair value of net assets** . . . . . . . | $ (2,599) | $(117,695) | $ (120,294) | $(15,372) | $ (83,420) | $ (98,792) |
| Noncontrolling interests . . . . . . . . . . . . . . . | 82 | — | 82 | 91 | — | 91 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . | (2,517) | (117,695) | (120,212) | (15,281) | (83,420) | (98,701) |
| Total liabilities and equity (deficit) . . . . . . . . | $3,221,972 | $ 9,863 | $3,231,835 | $869,141 | $ 5,960 | $ 875,101 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]   Certain prior period amounts have been reclassified to conform to the current period presentation.

[2]   Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[3]   Fair value exceeds the carrying value of consolidated loans and debt of consolidated trusts due to the fact that the loans and debt were consolidated in our GAAP consolidated balance sheet at unpaid principal balance at transition. Also impacting the difference

TREASURY-0371

between fair value and carrying value of the consolidated loans is the credit component of the loan. This credit component is reflected in the net guaranty obligation, which is included in the consolidated loan fair value, but was presented as a separate line item in our fair value balance sheet in prior periods.

[4] Includes certain mortgage loans that we elected to report at fair value in our GAAP consolidated balance sheet of $3.0 billion as of December 31, 2010. We did not elect to report any mortgage loans at fair value in our consolidated balance sheet as of December 31, 2009.

[5] Performing loans had a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2010 compared to a fair value of $345.5 billion and an unpaid principal balance of $348.2 billion as of December 31, 2009. Nonperforming loans, which include loans that are delinquent by one or more payments, had a fair value of $168.5 billion and an unpaid principal balance of $287.4 billion as of December 31, 2010 compared to a fair value of $43.9 billion and an unpaid principal balance of $79.8 billion as of December 31, 2009. See "Note 19, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[6] The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Master servicing assets and credit enhancements and (e) Other assets, together consist of the following assets presented in our GAAP consolidated balance sheets: (a) Total accrued interest receivable, net of allowance; (b) Acquired property, net; (c) Servicer and MBS trust receivable; and (d) Other assets.

[7] "Other assets" include the following GAAP consolidated balance sheets line items: (a) Total accrued interest receivable, net of allowance; (b) Acquired property, net; (c) Servicer and MBS trust receivable. The carrying value of these items in our GAAP consolidated balance sheets totaled $28.4 billion and $31.2 billion as of December 31, 2010 and 2009, respectively. "Other assets" in our GAAP consolidated balance sheets includes the following: (a) Advances to Lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Master servicing assets and credit enhancements. The carrying value of these items totaled $9.3 billion and $17.1 billion as of December 31, 2010 and 2009, respectively.

[8] We determined the estimated fair value of these financial instruments in accordance with the fair value accounting standard as described in "Note 19, Fair Value."

[9] Includes certain long-term debt instruments that we elected to report at fair value in our GAAP consolidated balance sheets of $3.2 billion and $3.3 billion as of December 31, 2010 and 2009, respectively.

[10] The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP consolidated balance sheets: (a) Accrued interest payable of Fannie Mae; (b) Accrued interest payable of consolidated trusts; (c) Reserve for guaranty losses; (d) Servicer and MBS trust payable; and (e) Other liabilities.

[11] "Other liabilities" include the following GAAP consolidated balance sheets line items: (a) Accrued interest payable of Fannie Mae; (b) Accrued interest payable of consolidated trusts; (c) Reserve for guaranty losses; and (d) Servicer and MBS trust payable. The carrying value of these items in our GAAP consolidated balance sheets totaled $17.0 billion and $85.3 billion as of December 31, 2010 and 2009, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as a separate line item in our consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $2.5 billion and $15.0 billion as of December 31, 2010 and 2009, respectively.

[12] The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity management involves forecasting funding requirements and maintaining sufficient capacity to meet these needs. Our Treasury group is responsible for our liquidity and contingency planning strategies.

### *Primary Sources and Uses of Funds*

Our primary source of funds is proceeds from the issuance of short-term and long-term debt securities. Accordingly, our liquidity depends largely on our ability to issue unsecured debt in the capital markets. Our status as a GSE and federal government support of our business continue to be essential to maintaining our access to the unsecured debt markets. Our senior unsecured debt obligations are rated AAA, or its equivalent, by the major rating agencies.

TREASURY-0372

In addition to funding we obtain from the issuance of debt securities, our other sources of cash include:

- principal and interest payments received on mortgage loans, mortgage-related securities and non-mortgage investments we own;

- proceeds from the sale of mortgage-related securities, mortgage loans and non-mortgage assets, including proceeds from the sales of foreclosed real estate assets;

- funds from Treasury pursuant to the senior preferred stock purchase agreement;

- borrowings under secured and unsecured intraday funding lines of credit we have established with several large financial institutions;

- guaranty fees received on Fannie Mae MBS;

- borrowings against mortgage-related securities and other investment securities we hold pursuant to repurchase agreements and loan agreements;

- payments received from mortgage insurance counterparties; and

- net receipts on derivative instruments.

Our primary funding needs include:

- the repayment of matured, redeemed and repurchased debt;

- the purchase of mortgage loans (including delinquent loans from MBS trusts), mortgage-related securities and other investments;

- interest payments on outstanding debt;

- dividend payments made to Treasury pursuant to the senior preferred stock purchase agreement;

- net payments on derivative instruments;

- the pledging of collateral under derivative instruments;

- administrative expenses; and

- losses incurred in connection with our Fannie Mae MBS guaranty obligations.

An increased proportion of our funding needs during 2010, compared with 2009, came from: (1) purchasing delinquent loans from MBS trusts; (2) an increase in the redemption of callable debt; and (3) increased dividend payments to Treasury under the senior preferred stock purchase agreement. As we draw more funds pursuant to the senior preferred stock purchase agreement, we expect our cash dividend payments to Treasury will continue to increase in future periods if we continue to pay the dividend on a quarterly basis, rather than allowing the dividend to accrue at an increased rate of 12% and be added to the liquidation preference of the senior preferred stock.

### Debt Funding

Effective January 1, 2010, we adopted new accounting standards that resulted in the consolidation of the substantial majority of our MBS trusts and recognized the underlying assets and debt of these trusts in our consolidated balance sheet. Debt from consolidations represents our liability to third-party beneficial interest holders of MBS that we guarantee when we have included the assets of a corresponding trust in our consolidated balance sheets. Despite the increase in debt recognized in our consolidated balance sheets due to consolidations, the adoption of the new accounting standards did not change our exposure to liquidity risk. We separately present the debt from consolidations ("debt of consolidated trusts") and the debt issued by us ("debt of Fannie Mae") in our consolidated balance sheets and in the debt tables below. Our discussion regarding debt funding in this section focuses on the debt of Fannie Mae.

132

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities. Purchasers of our debt securities are also geographically diversified, with a significant portion of our investors located in North America, South America, Europe and Asia.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

### Fannie Mae Debt Funding Activity

Table 31 summarizes the activity in the debt of Fannie Mae for the periods indicated. This activity includes federal funds purchased and securities sold under agreements to repurchase but excludes the debt of consolidated trusts as well as intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

**Table 31:   Activity in Debt of Fannie Mae**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009[3] | 2008 |
| | (Dollars in millions) | | |
| Issued during the period: [1] | | | |
| Short-term: [1] | | | |
|    Amount | $451,289 | $1,381,640 | $1,624,868 |
|    Weighted-average interest rate | 0.25% | 0.18% | 2.11% |
| Long-term: | | | |
|    Amount | $463,157 | $  295,147 | $  248,168 |
|    Weighted-average interest rate | 1.88% | 2.52% | 3.76% |
| Total issued: | | | |
|    Amount | $914,446 | $1,676,787 | $1,873,036 |
|    Weighted-average interest rate | 1.08% | 0.59% | 2.33% |
| Paid off during the period: [2] | | | |
| Short-term:[1] | | | |
|    Amount | $499,828 | $1,513,683 | $1,529,368 |
|    Weighted-average interest rate | 0.23% | 0.51% | 2.54% |
| Long-term: | | | |
|    Amount | $406,267 | $  260,578 | $  266,764 |
|    Weighted-average interest rate | 3.16% | 4.09% | 4.89% |
| Total paid off: | | | |
|    Amount | $906,095 | $1,774,261 | $1,796,132 |
|    Weighted-average interest rate | 1.54% | 1.04% | 2.89% |

[1]   The amount of short-term debt issued and paid off included $766.8 billion and $482.5 billion for the years ended December 31, 2009 and 2008, respectively, of debt issued and repaid to Fannie Mae MBS trusts.

TREASURY-0374

[2]   Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases.

[3]   For the year ended December 31, 2009, we revised the weighted-average interest rate on short-term issued, total issued, short-term paid-off and total paid-off debt primarily to reflect weighting based on transaction level data.

Due to the adoption of the new accounting standards, we no longer include debt issued and repaid to Fannie Mae MBS trusts in our short-term debt activity, as the substantial majority of our MBS trusts were consolidated and the underlying assets and debt of these trusts were recognized in our consolidated balance sheets. In 2009, short-term debt activity of Fannie Mae, excluding debt issued and repaid to Fannie Mae MBS trusts, consisted of issuances of $614.6 billion with a weighted-average interest rate of 0.27% and repayments of $746.6 billion with a weighted-average interest rate of 0.93%. In 2008, short-term debt activity of Fannie Mae, excluding debt issued and repaid to Fannie Mae MBS trusts, consisted of issuances of $1.1 trillion with a weighted-average interest rate of 2.20% and repayments of $1.0 trillion with a weighted-average interest rate of 2.84%.

Excluding debt issued and repaid to Fannie Mae MBS trusts, debt funding activity in 2010 was relatively flat compared with 2009 because the increase in our issuances of long-term debt offset a decrease in our issuances of short-term debt. Our issuances of long-term debt increased primarily because we: (1) increased our redemption of debt with higher interest rates and replaced it with issuances of debt with lower interest rates; (2) issued additional debt to fund purchases of delinquent loans from MBS trusts; and (3) issued additional long-term debt in lieu of short-term debt to meet our liquidity risk management requirements.

During 2010, we purchased from MBS trusts the substantial majority of delinquent loans that were four or more consecutive monthly payments delinquent. We purchased approximately $217 billion of delinquent loans from single-family MBS trusts during 2010. The substantial majority of these delinquent loan purchases were completed in the first half of 2010. We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other constraints including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement.

Our ability to issue long-term debt has been strong in recent quarters primarily due to actions taken by the federal government to support us and the financial markets. Many of these programs initiated by the federal government have expired. The Treasury credit facility and Treasury MBS purchase program terminated on December 31, 2009 and the Federal Reserve's agency debt and MBS purchase programs expired on March 31, 2010. Despite the expiration of these programs, demand for our long-term debt securities continues to be strong as of the date of this filing.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" for a discussion of the risks to our business related to our ability to obtain funds for our operations through the issuance of debt securities, the relative cost at which we are able to obtain these funds and our liquidity contingency plans. Also see "Risk Factors" in this report for discussions of the risks to our business relating to the uncertain future of our company and to our reliance on access to the debt capital markets, as well as the possibility that legislative proposals regarding our business could have a material impact on our ability to issue debt or refinance existing debt as it becomes due.

*Outstanding Debt*

Table 32 provides information as of December 31, 2010 and 2009 on our outstanding short-term and long-term debt based on its original contractual terms. Our total outstanding debt of Fannie Mae, which consists of federal funds purchased and securities sold under agreements to repurchase and short-term and long-term debt, excluding debt of consolidated trusts, increased to $780.1 billion as of December 31, 2010, from $768.4 billion as of December 31, 2009.

As of December 31, 2010, our outstanding short-term debt, based on its original contractual maturity, decreased as a percentage of our total outstanding debt to 19% from 26% as of December 31, 2009. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.77% as of December 31, 2010 from 3.71% as of December 31, 2009.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Our debt cap under the senior preferred stock purchase agreement was $1,080 billion in 2010 and is $972 billion in 2011. As of December 31, 2010, our aggregate indebtedness totaled $793.9 billion, which was $286.1 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt cap reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

135

**Table 32:   Outstanding Short-Term Borrowings and Long-Term Debt[1]**

| | | As of December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2010** | | | **2009** | |
| | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate** | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate** |
| | | | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . | — | $      52 | 2.20% | — | $      — | —% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . | — | $ 151,500 | 0.32% | — | $199,987 | 0.27% |
| Foreign exchange discount notes . . . . . . | — | 384 | 2.43 | — | 300 | 1.50 |
| Other short-term debt . . . . . . . . . . . . . | — | — | — | — | 100 | 0.53 |
| Total fixed-rate . . . . . . . . . . . . . . . | — | 151,884 | 0.32 | — | 200,387 | 0.27 |
| Floating-rate[2] . . . . . . . . . . . . . . . . . . . | — | — | — | — | 50 | 0.02 |
| Total short-term debt of Fannie Mae[3] . . . . . | | 151,884 | 0.32 | | 200,437 | 0.27 |
| Debt of consolidated trusts . . . . . . . . . . . | — | 5,359 | 0.23 | — | — | — |
| Total short-term debt . . . . . . . . . . . . . . . . | | $ 157,243 | 0.32% | | $200,437 | 0.27% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . | 2011 - 2030 | $ 300,344 | 3.20% | 2010 - 2030 | $279,945 | 4.10% |
| Medium-term notes . . . . . . . . . . . . . . | 2011 - 2020 | 199,266 | 2.13 | 2010 - 2019 | 171,207 | 2.97 |
| Foreign exchange notes and bonds . . . . . | 2017 - 2028 | 1,177 | 6.21 | 2010 - 2028 | 1,239 | 5.64 |
| Other long-term debt[2] . . . . . . . . . . . . | 2011 - 2040 | 44,893 | 5.64 | 2010 - 2039 | 62,783 | 5.80 |
| Total senior fixed . . . . . . . . . . . . . | | 545,680 | 3.02 | | 515,174 | 3.94 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . . . . | 2011 - 2015 | 72,039 | 0.31 | 2010 - 2014 | 41,911 | 0.26 |
| Other long-term debt[2] . . . . . . . . . . . . | 2020 - 2037 | 386 | 4.92 | 2020 - 2037 | 1,041 | 4.12 |
| Total senior floating . . . . . . . . . . . . | | 72,425 | 0.34 | | 42,952 | 0.34 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[4] . . . . . . . . . | 2011 - 2014 | 7,392 | 5.47 | 2011 - 2014 | 7,391 | 5.47 |
| Subordinated debentures . . . . . . . . . . . | 2019 | 2,663 | 9.91 | 2019 | 2,433 | 9.89 |
| Total subordinated fixed-rate . . . . . . . | | 10,055 | 6.65 | | 9,824 | 6.57 |
| Total long-term debt of Fannie Mae[5] . . . . . | | 628,160 | 2.77 | | 567,950 | 3.71 |
| Debt of consolidated trusts[2] . . . . . . . . . | 2011 - 2051 | 2,411,597 | 4.59 | 2010 - 2039 | 6,167 | 5.63 |
| Total long-term debt . . . . . . . . . . . . . . . | | $3,039,757 | 4.22% | | $574,117 | 3.73% |
| Outstanding callable debt of Fannie Mae[6] . . | | $ 219,804 | 2.53% | | $210,181 | 3.48% |

[1] Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt, which excludes unamortized discounts, premiums and other cost basis adjustments and debt of consolidated trusts, totaled $792.6 billion and $784.0 billion as of December 31, 2010 and 2009, respectively.

[2] Includes a portion of structured debt instruments that is reported at fair value.

[3] Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $128 million and $129 million as of December 31, 2010 and 2009, respectively.

[4] Consists of subordinated debt with an interest deferral feature.

136

(5) Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $95.4 billion and $106.5 billion as of December 31, 2010 and 2009, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $12.4 billion and $15.6 billion as of December 31, 2010 and 2009, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $640.5 billion and $583.4 billion as of December 31, 2010 and 2009, respectively.

(6) Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

Table 33 below presents additional information for each category of our short-term borrowings.

**Table 33:   Outstanding Short-Term Borrowings[1]**

|  | 2010 | | | | |
|  | As of December 31 | | Average During the Year | | |
|  | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| --- | --- | --- | --- | --- | --- |
|  | | | (Dollars in millions) | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | $    52 | 2.20% | $    72 | 0.16% | $   200 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . . . . . . . | $151,500 | 0.32% | $210,986 | 0.29% | $260,377 |
| Foreign exchange discount notes . . . . . . . . . . . | 384 | 2.43 | 299 | 1.86 | 384 |
| Other fixed-rate short-term debt . . . . . . . . . . . | — | — | 15 | 0.53 | 100 |
| Floating-rate short-term debt . . . . . . . . . . . . . . . | — | — | 8 | 0.02 | 50 |
| Total short-term debt . . . . . . . . . . . . . . . . . . . | $151,884 | 0.32% | | | |

|  | 2009 | | | | |
|  | As of December 31 | | Average During the Year | | |
|  | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| --- | --- | --- | --- | --- | --- |
|  | | | (Dollars in millions) | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | $    — | —% | $    42 | 1.55% | $   189 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . . . . . . . | $199,987 | 0.27% | $253,884 | 0.92% | $325,239 |
| Foreign exchange discount notes . . . . . . . . . . . | 300 | 1.50 | 222 | 1.41 | 300 |
| Other fixed-rate short-term debt . . . . . . . . . . . | 100 | 0.53 | 199 | 1.30 | 334 |
| Floating-rate short-term debt . . . . . . . . . . . . . . . | 50 | 0.02 | 2,744 | 1.20 | 3,136 |
| Total short-term debt . . . . . . . . . . . . . . . . . . . | $200,437 | 0.27% | | | |

TREASURY-0378

| | 2008 | | | | |
| | As of December 31 | | Average During the Year | | |
| | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| | | | (Dollars in millions) | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | $    77 | 0.01% | $    294 | 1.93% | $    725 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . . . . . . | $322,932 | 1.75% | $257,845 | 2.51% | $326,374 |
| Foreign exchange discount notes . . . . . . . . . . . | 141 | 2.50 | 276 | 3.73 | 363 |
| Other fixed-rate short-term debt . . . . . . . . . . . | 333 | 2.80 | 714 | 2.83 | 1,886 |
| Floating-rate short-term debt[4] . . . . . . . . . . . . . | 7,585 | 1.66 | 4,858 | 2.26 | 7,586 |
| Total short-term debt . . . . . . . . . . . . . . . . . . . | $330,991 | 1.75% | | | |

---

[1]  Includes unamortized discounts, premiums and other cost basis adjustments.

[2]  Average amount outstanding during the year has been calculated using month-end balances.

[3]  Maximum outstanding represents the highest month-end outstanding balance during the year.

[4]  Includes a portion of structured debt instruments that is reported at fair value.

### Subordinated Debt

We had $7.4 billion in outstanding qualifying subordinated debt as of December 31, 2010. Of this amount, $2.5 billion will mature during 2011. The terms of these securities state that, if our core capital is below 125% of our critical capital requirement (which it was as of December 31, 2010), we will defer interest payments on these securities. FHFA has directed us, however, to continue paying principal and interest on our outstanding qualifying subordinated debt during the conservatorship and thereafter until directed otherwise, regardless of our existing capital levels.

Under the senior preferred stock purchase agreement, we are prohibited from issuing additional subordinated debt without the written consent of Treasury. We did not issue any subordinated debt in 2010.

### Maturity Profile of Outstanding Debt of Fannie Mae

Table 34 presents the maturity profile, as of December 31, 2010, of our outstanding debt maturing within one year, by month, including amounts we have announced that we are calling for redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, decreased as a percentage of our total outstanding debt, excluding debt of consolidated trusts and federal funds purchased and securities sold under agreements to repurchase, to 32% as of December 31, 2010, compared with 41% as of December 31, 2009. The weighted-average maturity of our outstanding debt that is maturing within one year was 116 days as of December 31, 2010, compared with 103 days as of December 31, 2009.

TREASURY-0379

**Table 34:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year**[1]



[1]   Includes unamortized discounts, premiums and other cost basis adjustments of $176 million as of December 31, 2010.
      Excludes debt of consolidated trusts maturing within one year of $9.8 billion and federal funds purchased and
      securities sold under agreements to repurchase of $52 million as of December 31, 2010.

Table 35 presents the maturity profile, as of December 31, 2010, of the portion of our long-term debt that
matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding
amounts we have announced that we are calling for redemption within one year. The weighted-average
maturity of our outstanding debt maturing in more than one year was approximately 58 months as of
December 31, 2010, compared with approximately 72 months as of December 31, 2009.

**Table 35:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year**[1]

[1]   Includes unamortized discounts, premiums and other cost basis adjustments of $12.4 billion as of December 31, 2010.
      Excludes debt of consolidated trusts of $2.4 trillion as of December 31, 2010.

We intend to repay our short-term and long-term debt obligations as they become due primarily through
proceeds from the issuance of additional debt securities. We also intend to use funds we receive from Treasury
under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the
senior preferred stock.

*Contractual Obligations*

Table 36 summarizes, by remaining maturity, our future cash obligations related to our long-term debt,
announced calls, operating leases, purchase obligations and other material noncancelable contractual
obligations as of December 31, 2010.

TREASURY-0380

**Table 36:   Contractual Obligations**

| | Total | Less than 1 Year | 1 to < 3 Years | 3 to 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| | | **Payment Due by Period as of December 31, 2010** | | | |
| | | **(Dollars in millions)** | | | |
| Long-term debt obligations[1] . . . . . . . . . . . . . . . . . . . . . . | $628,160 | $ 97,245 | $273,191 | $138,446 | $119,278 |
| Contractual interest on long-term debt obligations[2] . . . . . . | 95,358 | 14,718 | 23,769 | 15,622 | 41,249 |
| Operating lease obligations[3] . . . . . . . . . . . . . . . . . . . . . | 158 | 40 | 61 | 31 | 26 |
| Purchase obligations: | | | | | |
| Mortgage commitments[4] . . . . . . . . . . . . . . . . . . . . . | 54,858 | 54,837 | 21 | — | — |
| Other purchase obligations[5] . . . . . . . . . . . . . . . . . . . | 274 | 106 | 163 | 5 | — |
| Other long-term liabilities reflected in the consolidated balance sheet[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,087 | 862 | 156 | 37 | 32 |
| Total contractual obligations . . . . . . . . . . . . . . . . . . . . . . | $779,895 | $167,808 | $297,361 | $154,141 | $160,585 |

[1] Represents the carrying amount of our long-term debt assuming payments are made in full at maturity. Amounts exclude $2.4 trillion in long-term debt from consolidations. Amounts include unamortized net discount and other cost basis adjustments of $12.4 billion.

[2] Excludes contractual interest on long-term debt from consolidations.

[3] Includes certain premises and equipment leases.

[4] Includes on- and off-balance sheet commitments to purchase mortgage loans and mortgage-related securities.

[5] Includes only unconditional purchase obligations that are subject to a cancellation penalty for certain telecom services, software and computer services, and other agreements. Excludes arrangements that may be cancelled without penalty. Amounts also include off-balance sheet commitments for the unutilized portion of lending agreements entered into with multifamily borrowers.

[6] Excludes risk management derivative transactions that may require cash settlement in future periods and our obligations to stand ready to perform under our guarantees relating to Fannie Mae MBS and other financial guarantees, because the amount and timing of payments under these arrangements are generally contingent upon the occurrence of future events. For a description of the amount of our on- and off-balance sheet Fannie Mae MBS and other financial guarantees as of December 31, 2010, see "Off-Balance Sheet Arrangements." Includes future cash payments due under our contractual obligations to fund LIHTC and other partnerships that are unconditional and legally binding and cash received as collateral from derivative counterparties, which are included in our consolidated balance sheets under "Other liabilities."

## Equity Funding

As a result of the covenants under the senior preferred stock purchase agreement and Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding, we no longer have access to equity funding except through draws under the senior preferred stock purchase agreement. For a description of the covenants under the senior preferred stock purchase agreement, see "Business— Conservatorship and Treasury Agreements—Treasury Agreements—Covenants Under Treasury Agreements." We discuss our funding under the senior preferred stock purchase agreement below in "Liquidity and Capital Management—Capital Management—Capital Activity—Senior Preferred Stock Purchase Agreement."

## Liquidity Risk Management Practices and Contingency Planning

Our liquidity position could be adversely affected by many causes, both internal and external to our business, including: actions taken by the conservator, the Federal Reserve, Treasury or other government agencies; legislation relating to us or our business; an unexpected systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a downgrade of our or the U.S. government's credit ratings from the major ratings organizations; a significant further decline in our net worth; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden

catastrophic operational failure in the financial sector due to a terrorist attack or other event; or elimination of our GSE status. See "Risk Factors" for a description of factors that could adversely affect our liquidity.

We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt.

In 2010, under direction from FHFA, we revised our liquidity management policies and practices. FHFA requires that we:

- maintain a portfolio of highly liquid securities to cover 30 calendar days of net cash needs, assuming no access to the short- and long-term unsecured debt markets and other assumptions required by FHFA;

- maintain within our cash and other investments portfolio a daily balance of U.S. Treasury securities that has a redemption amount greater than or equal to 50% of the average of the previous three month-end balances of our cash and other investments portfolio (as adjusted in agreement with FHFA); and

- maintain a portfolio of unencumbered agency mortgage securities and U.S. Treasury securities with more than one year remaining to maturity with a market value (less a discount and expected prepayments during the year) that meets or exceeds our projected 365-day net cash needs.

As of December 31, 2010, we were in compliance with each of the liquidity risk management policies and practices set forth above.

In addition to these FHFA requirements, we run routine operational testing of our ability to rely upon identified sources of liquidity, such as mortgage repurchase arrangements with counterparties. One method we use to conduct these tests involves entering into a relatively small mortgage repurchase agreement (approximately $100 million) with a counterparty in order to confirm that we have the operational and systems capability to enter into repurchase arrangements. In addition, we have provided collateral in advance to a number of clearing banks in the event we seek to enter into mortgage repurchase arrangements in the future. We do not, however, have committed repurchase arrangements with specific counterparties, as historically we have not relied on this form of funding. As a result, our use of such facilities and our ability to enter into them in significant dollar amounts may be challenging in a stressed market environment.

Below we describe in detail our alternative sources of liquidity if our access to the debt markets became limited.

*Cash and Other Investments Portfolio*

Table 37 provides information on the composition of our cash and other investments portfolio for the periods indicated.

**Table 37:   Cash and Other Investments Portfolio**

| | As of December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Cash and cash equivalents[1] | $17,297 | $ 6,812 | $17,933 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 11,751 | 53,684 | 57,418 |
| Non-mortgage-related securities: | | | |
| U.S. Treasury securities | 27,432 | — | — |
| Asset-backed securities[2] | 5,321 | 8,515 | 10,598 |
| Corporate debt securities | — | 364 | 6,037 |
| Other | — | 3 | 1,005 |
| Total non-mortgage-related securities | 32,753 | 8,882 | 17,640 |
| Total cash and other investments | $61,801 | $69,378 | $92,991 |

TREASURY-0382

---

(1)   Includes $4.0 billion of U.S. Treasury securities and $2.3 billion of money market fund as of December 31, 2010, with a maturity at the date of acquisition of three months or less.

(2)   Includes securities primarily backed by credit cards loans, student loans and automobile loans.

Our total cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements and non-mortgage investment securities. Our cash and other investments portfolio decreased in 2010 compared with 2009 primarily due to the reduction in our short-term debt balances, which reduced the amount of cash we needed on hand as of December 31, 2010.

See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Issuers of Investments Held in our Cash and Other Investments Portfolio" for additional information on the risks associated with the assets in our cash and other investments portfolio.

*Unencumbered Mortgage Portfolio*

Another source of liquidity in the event our access to the unsecured debt market becomes impaired is the unencumbered mortgage assets in our mortgage portfolio, which could be sold or used as collateral for secured borrowing.

We continue to make enhancements to our systems to facilitate the securitization of a significant portion of the performing whole loans in our mortgage portfolio into Fannie Mae MBS. We have securitized the majority of the performing single-family whole loans in our retained portfolio and, in October 2010, we developed the capability to securitize the multifamily loans in our mortgage portfolio. These mortgage-related securities could be used as collateral in repurchase agreements or other lending arrangements to the extent they have not been sold or encumbered. Despite these enhancements to our systems, we do not have the capability to securitize all of the whole loans in our unencumbered mortgage portfolio.

We believe that the amount of mortgage-related securities that we could successfully sell or borrow against in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related securities we hold. Due to the large size of our portfolio of mortgage-related assets, current market conditions, and the significant amount of distressed assets in our mortgage portfolio, it is unlikely that there would be sufficient market demand for large amounts of these assets over a prolonged period of time, particularly during a liquidity crisis, which could limit our ability to sell or borrow against these assets. To the extent that we would be able to obtain funding by selling or pledging mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount would result in proceeds significantly lower than the current market value of these assets and would thereby reduce the amount of financing we could obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury arrangements, we believe that our liquidity contingency plans may be difficult or impossible to execute for a company of our size in our circumstances. See "Risk Factors" for a description of the risks associated with our liquidity contingency planning.

**Credit Ratings**

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, are highly dependent on our credit ratings from the major ratings organizations. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions. Factors that may influence our credit ratings include our status as a GSE, Treasury's funding commitment under the senior preferred stock purchase agreement, the rating agencies' assessment of the general operating and regulatory environment, the credit ratings of the U.S. government, our relative position in the market, our

142

financial condition, our reputation, our liquidity position, the level and volatility of our earnings, and our corporate governance and risk management policies. Our senior unsecured debt (both long-term and short-term), qualifying subordinated debt and preferred stock are rated and monitored by Standard & Poor's, Moody's and Fitch. There have been no changes in our credit ratings from December 31, 2009 to February 21, 2011. Table 38 presents the credit ratings issued by each of these rating agencies as of February 21, 2011.

**Table 38:   Fannie Mae Credit Ratings**

| | As of February 21, 2011 | | |
| --- | --- | --- | --- |
| | Standard & Poor's | Moody's | Fitch |
| Long-term senior debt . . . . . . . . . . | AAA | Aaa | AAA |
| Short-term senior debt . . . . . . . . . . | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt . . . . . | A | Aa2 | AA- |
| Preferred stock . . . . . . . . . . . . . . . | C | Ca | C/RR6 |
| Bank financial strength rating . . . . . | — | E+ | — |
| Outlook . . . . . . . . . . . . . . . . . . . . . | Stable (for Long Term Senior Debt and Qualifying Subordinated Debt) | Stable (for all ratings) | Stable (for AAA rated Long Term Issuer Default Rating) |

We have no covenants in our existing debt agreements that would be violated by a downgrade in our credit ratings. However, in connection with certain derivatives counterparties, we could be required to provide additional collateral to or terminate transactions with certain counterparties in the event that our senior unsecured debt ratings are downgraded. The amount of additional collateral required depends on the contract and is usually a fixed incremental amount, the market value of the exposure, or both. See "Note 10, Derivative Instruments and Hedging Activities" for additional information on collateral we are required to provide to our derivatives counterparties in the event of downgrades in our credit ratings.

### Cash Flows

*Year Ended December 31, 2010*.   Cash and cash equivalents of $17.3 billion as of December 31, 2010 increased by $10.5 billion from December 31, 2009. Net cash generated from investing activities totaled $540.2 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were partially offset by net cash outflows used in operating activities of $27.4 billion resulting primarily from purchases of trading securities. The net cash used in financing activities of $502.3 billion was primarily attributable to a significant amount of short-term and long-term debt redemptions in excess of proceeds received from the issuance of short-term and long-term debt.

*Year Ended December 31, 2009*.   Cash and cash equivalents of $6.8 billion as of December 31, 2009 decreased by $11.1 billion from December 31, 2008. Net cash generated from investing activities totaled $117.7 billion, resulting primarily from proceeds received from the sale of available-for-sale securities. These net cash inflows were partially offset by net cash outflows used in operating activities of $85.9 billion, largely attributable to our purchases of loans held-for-sale due to a significant increase in whole loan conduit activity, and net cash outflows used in financing activities of $42.9 billion. The net cash used in financing activities was attributable to the redemption of a significant amount of short-term debt, which was partially offset by the issuance of long-term debt in excess of amounts redeemed and the funds received from Treasury under the senior preferred stock purchase agreement.

### Capital Management

#### Regulatory Capital

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and FHFA will not issue quarterly capital classifications. We submit minimum capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. We report our minimum capital requirement, core capital and GAAP net worth in our periodic reports on Form 10-Q and Form 10-K, and FHFA also reports them on its website. FHFA is not reporting on our critical capital, risk-

based capital or subordinated debt levels during the conservatorship. For information on our minimum capital requirements see "Note 17, Regulatory Capital Requirements."

### *Capital Activity*

Following our entry into conservatorship, FHFA advised us to manage to a positive net worth, which is represented as the "total deficit" line item in our consolidated balance sheet. Our ability to manage our net worth continues to be very limited. We are effectively unable to raise equity capital from private sources at this time and, therefore, are reliant on the senior preferred stock purchase agreement to address any net worth deficit.

### Senior Preferred Stock Purchase Agreement

We have received a total of $87.6 billion from Treasury pursuant to the senior preferred stock purchase agreement as of December 31, 2010. These funds allowed us to eliminate our net worth deficits as of the end of each of the eight prior quarters. In February 2011, the Acting Director of FHFA submitted a request for $2.6 billion from Treasury under the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2010, and requested receipt of those funds on or prior to March 31, 2011. Upon receipt of the requested funds, the aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, will equal $91.2 billion. We continue to expect to have a net worth deficit in future periods and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement. Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

### Dividends

The conservator announced in September, 2008 that we would not pay any dividends on the common stock or on any series of outstanding preferred stock. In addition, the senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury. Dividends on our outstanding preferred stock (other than the senior preferred stock) are non-cumulative; therefore, holders of this preferred stock are not entitled to receive any forgone dividends in the future.

Holders of the senior preferred stock are entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Treasury is the current holder of our senior preferred stock. As conservator and under our charter, FHFA has authority to declare and approve dividends on the senior preferred stock. If at any time we do not pay cash dividends on the senior preferred stock when they are due, then immediately following the period we did not pay dividends and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends on the senior preferred stock that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock.

Our fourth quarter dividend of $2.2 billion was declared by the conservator and paid by us on December 31, 2010. Upon receipt of additional funds from Treasury in March 2011, which FHFA requested on our behalf in February 2011, the annualized dividend on the senior preferred stock will be $9.1 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we

TREASURY-0385

expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements to facilitate our statutory purpose of providing liquidity to the secondary mortgage market and to reduce our exposure to interest rate fluctuations. Some of these arrangements are not recorded in our consolidated balance sheets or may be recorded in amounts different from the full contract or notional amount of the transaction, depending on the nature or structure of, and accounting required to be applied to, the arrangement. These arrangements are commonly referred to as "off-balance sheet arrangements" and expose us to potential losses in excess of the amounts recorded in our consolidated balance sheets.

Our off-balance sheet arrangements result primarily from the following:

- our guaranty of mortgage loan securitization and resecuritization transactions over which we do not have control;

- other guaranty transactions;

- liquidity support transactions; and

- partnership interests.

In 2009 and prior, most MBS trusts created as part of our guaranteed securitizations were not consolidated by the company for financial reporting purposes because the trusts were considered to be qualifying special purpose entities under the accounting rules governing the transfer and servicing of financial assets and the extinguishment of liabilities. Effective January 1, 2010, we prospectively adopted the new accounting standards, which resulted in the majority of our single-class securitization trusts being consolidated by us upon adoption.

Our Fannie Mae MBS and other credit guarantees outstanding totaled $2.7 trillion as of December 31, 2010 and $2.8 trillion as of December 31, 2009. These totals include $2.6 trillion of consolidated Fannie Mae MBS and $7.5 billion of Fannie Mae MBS held in portfolio as of December 31, 2010 and $147.9 billion of consolidated Fannie Mae MBS and $220.2 billion of Fannie Mae MBS held in portfolio as of December 31, 2009.

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $56.9 billion as of December 31, 2010 and $2.5 trillion as of December 31, 2009.

For information on the mortgage loans underlying both our on- and off-balance sheet Fannie Mae MBS, as well as whole mortgage loans that we own, see "Risk Management—Credit Risk Management."

### Partnership Investment Interests

For partnership investments where we have determined that we are the primary beneficiary, we have consolidated these investments and recorded all of the partnership assets and liabilities in our consolidated balance sheets. The carrying value of our partnership investments, which primarily include investments in affordable rental and for-sale housing partnerships, totaled $1.8 billion as of December 31, 2010, compared with $2.4 billion as of December 31, 2009.

*LIHTC Partnership Interests*

In most instances, we are not the primary beneficiary of our LIHTC partnership investments, and therefore our consolidated balance sheets reflect only our investment in the LIHTC partnership, rather than the full amount of the LIHTC partnership's assets and liabilities. During 2009, we explored options to sell or otherwise

145

transfer our LIHTC investments for value consistent with our mission. On February 18, 2010, FHFA informed us that after consultation with Treasury, we were not authorized to sell or transfer our LIHTC partnership interests.

In the fourth quarter of 2009, we reduced the carrying value of our LIHTC partnership investments to zero, recognizing a loss of $5.0 billion, as we no longer had both the intent and ability to sell or otherwise transfer our LIHTC investments for value. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments. However, we still have an obligation to fund our LIHTC partnership investments and have recorded such obligation as a liability in our financial statements. Our obligation to fund consolidated LIHTC partnerships was $139 million as of December 31, 2010 and $282 million as of December 31, 2009. Our obligation to fund unconsolidated LIHTC partnerships was $141 million as of December 31, 2010 and $259 million as of December 31, 2009. Our contributions to consolidated LIHTC partnerships were $114 million for the year ended December 31, 2010 and $341 million for the year ended December 31, 2009. Our contribution to unconsolidated LIHTC partnerships was $158 million for the year ended December 31, 2010 and $293 million for the year ended December 31, 2009. As a result of our current tax position, we currently are not making any new LIHTC investments, other than pursuant to commitments existing prior to 2008, and are not recognizing any tax benefits in our consolidated statements of operations associated with the tax credits and net operating losses. For additional information regarding our holdings in off-balance sheet limited partnerships and other off-balance sheet transactions, refer to "Note 3, Consolidations and Transfers of Financial Assets" and "Note 18, Concentrations of Credit Risk."

**Treasury Housing Finance Agency Initiative**

During the fourth quarter of 2009, we entered into agreements with Treasury, FHFA and Freddie Mac under which we provided assistance to state and local housing finance agencies ("HFAs") through two primary programs, which together comprise what we refer to as the HFA initiative. See "Certain Relationships and Related Transactions, and Director Independence—Transactions with Related Persons—Transactions with Treasury—Treasury Housing Finance Agency Initiative" for a discussion of the HFA initiative.

Through assistance to state and local HFAs and pursuant to the temporary credit and liquidity facilities programs that we describe in "Related Parties" in "Note 1, Summary of Significant Accounting Policies," Treasury has purchased participation interests in temporary credit and liquidity facilities provided by us and Freddie Mac to the HFAs. These facilities create a credit and liquidity backstop for the HFAs. Our outstanding commitments under the temporary credit and liquidity facilities program totaled $3.7 billion as of December 31, 2010 and $870 million as of December 31, 2009.

Our total outstanding liquidity commitments to advance funds for securities backed by multifamily housing revenue bonds totaled $17.8 billion as of December 31, 2010 and $15.5 billion as of December 31, 2009. These commitments require us to advance funds to third parties that enable them to repurchase tendered bonds or securities that are unable to be remarketed. Any repurchased securities are pledged to us to secure funding until the securities are remarketed. We hold cash and cash equivalents in our cash and other investments portfolio in excess of these commitments to advance funds (exclusive of $3.7 billion as of December 31, 2010 and $870 million as of December 31, 2009, of our outstanding commitments under the HFA temporary credit and liquidity facilities program, for which we are not required to hold excess cash).

As of both December 31, 2010 and 2009, there were no liquidity guarantee advances outstanding.

---

**RISK MANAGEMENT**

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to manage these risks and mitigate our losses by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities.

- *Credit Risk.* Credit risk is the potential for financial loss resulting from the failure of a borrower or institutional counterparty to honor its financial or contractual obligations, resulting in a potential loss of

TREASURY-0387

earnings or cash flows. In regards to financial securities or instruments, credit risk is the risk of not receiving principal, interest or any other financial obligation on a timely basis, for any reason. Credit risk exists primarily in our mortgage credit book of business and derivatives portfolio.

- *Market Risk.*   Market risk is the exposure generated by adverse changes in the value of financial instruments caused by a change in market prices or interest rates. Two significant market risks we face and actively manage are interest rate risk and liquidity risk. Interest rate risk is the risk of changes in our long-term earnings or in the value of our net assets due to fluctuations in interest rates. Liquidity risk is our potential inability to meet our funding obligations in a timely manner.

- *Operational Risk.*   Operational risk is the loss resulting from inadequate or failed internal processes, people, systems, or from external events.

We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions. Another risk that can impact our financial condition, earnings and cash flow is model risk, which is defined as the potential for model errors to adversely affect the company. See "Risk Factors" for a discussion of the risks associated with our reliance on models.

Our risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks inherent in our business activities. Our ability to identify, assess, mitigate and control, and report and monitor risk is crucial to our safety and soundness.

- *Risk Identification.*   Risk identification is the process of finding, recognizing and describing risk. The identification of risk facilitates effective risk management by achieving awareness of the sources, impact and magnitude of risk.

- *Risk Assessment.*   We assess risk using a variety of methodologies, such as calculation of potential losses from loans and stress tests relating to interest rate sensitivity. When we assess risk we look at metrics such as frequency, severity, concentration, correlation, volatility and loss. Information obtained from these assessments is reviewed on a regular basis to ensure that our risk assumptions are reasonable and reflect our current positions.

- *Risk Mitigation & Control.*   We proactively develop appropriate mitigation strategies to prevent excessive risk exposure, address risks that exceed established tolerances, and address risks that create unanticipated business impact. Mitigation strategies and controls can be in the form of reduction, transference, acceptance or avoidance of the identified risk. We also manage risk through four control elements that are designed to work in conjunction with each other: (1) risk policies; (2) risk limits; (3) delegations of authority; and (4) risk committees.

- *Risk Reporting & Monitoring.*   Our business units actively monitor emerging and identified risks that are taken when executing our strategies. Risks and concerns are reported to the appropriate level of management to ensure that the necessary action is taken to mitigate the risk.

## Enterprise Risk Governance

Our enterprise risk management structure is designed to balance a strong corporate risk management philosophy, appetite and culture with a well-defined independent risk management function. Our objective is to ensure that people and processes are organized in a way to promote a cross-functional approach to risk management and that controls are in place to better manage our risks and comply with legal and regulatory requirements.

Our enterprise risk governance structure consists of the Board of Directors, executive leadership, including the Chief Risk Officer, the Enterprise Risk Management division, designated officers responsible for managing our financial risks, business unit chief risk officers, and risk management committees. This structure is designed to encourage a culture of accountability within the divisions and promote effective risk management throughout the company.

147

Our organizational structure and risk management framework work in conjunction with each other to identify risk-related trends with respect to customers, products or portfolios and external events to develop appropriate strategies to mitigate emerging and identified risks.

### Board of Directors

The Board of Directors is responsible for the oversight of risk management primarily through the Board's Risk Policy and Capital Committee. This board committee oversees risk-related policies, including: review of the corporate-level risk policies and limits; performance against these policies and limits; and the sufficiency of risk management capabilities. In addition, the Audit Committee reviews the system of internal controls that we rely upon to provide reasonable assurance of compliance with our enterprise risk management processes.

### Enterprise Risk Management Division

Our Enterprise Risk Management division is headed by the Chief Risk Officer. The Chief Risk Officer reports directly to the Chief Executive Officer and independently to the Board of Directors, primarily through the Board's Risk Policy and Capital Committee. Enterprise Risk Management is responsible for providing our risk management directives and functions as well as for establishing effective controls, including policy development, risk management methodologies and risk reporting.

Our Enterprise Risk Management division has designated chief risk officers for each of our business segments in addition to risk officers who are responsible for the management of our financial risks. These chief risk officers are responsible for oversight and approval of key risks within their respective business unit and for developing the appropriate risk policies and reporting requirements for their business unit.

### Risk Committees

We use our risk committees as a forum for discussing emerging risks, risk mitigation strategies, and communication across business lines. Risk committees enhance the risk management framework by reinforcing our risk management culture and providing accountability for the resolution of key risk issues and decisions. Each business risk committee is co-chaired by the business unit chief risk officer and the business unit executive vice president and includes key business and risk leaders.

Our current committee structure includes four Business Risk Committees (Capital Markets Risk, Credit Portfolio Management Risk, Multifamily Risk and Single-Family Risk) and five Enterprise Risk Committees (Asset and Liability, Credit Risk, Credit Expense Forecast and Allowance, Model Risk Oversight and Change Management, and Operational Risk).

### Internal Audit

Our Internal Audit group, under the direction of the Chief Audit Executive, provides an objective assessment of the design and execution of our internal control system, including our management systems, risk governance, and policies and procedures. The Chief Audit Executive reports directly and independently to the Audit Committee of the Board of Directors, and audit personnel are compensated on objectives set for the group by the Audit Committee rather than corporate financial results or goals. The Chief Audit Executive reports administratively to the Chief Executive Officer and may be removed only upon approval by the Board's Audit Committee. Internal audit activities are designed to provide reasonable assurance that resources are safeguarded; that significant financial, managerial and operating information is complete, accurate and reliable; and that employee actions comply with our policies and applicable laws and regulations.

### Compliance and Ethics

The Compliance and Ethics division, under the direction of the Chief Compliance Officer, is dedicated to developing policies and procedures to help ensure that Fannie Mae and its employees comply with the law, our Code of Conduct, and all regulatory obligations. The Chief Compliance Officer reports directly to our Chief Executive Officer and independently to the Audit Committee of the Board of Directors, and Compliance

148

and Ethics personnel are compensated on objectives set for the group by the Audit Committee of the Board of Directors rather than corporate financial results or goals. The Chief Compliance Officer may be removed only upon Board approval. The Chief Compliance Officer is responsible for overseeing our compliance activities; developing and promoting a code of ethical conduct; evaluating and investigating any allegations of misconduct; and overseeing and coordinating regulatory reporting and examinations.

**Credit Risk Management**

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Continuing adverse market conditions have resulted in significant exposure to mortgage and institutional counterparty credit risk. The metrics used to measure credit risk are generated using internal models. Our internal models require numerous assumptions and there are inherent limitations in any methodology used to estimate macro-economic factors such as home prices, unemployment and interest rates and their impact on borrower behavior. When market conditions change rapidly and dramatically the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models. See "Risk Factors" for a discussion of the risks associated with our use of models.

*Mortgage Credit Risk Management*

Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty.

<u>*Mortgage Credit Book of Business*</u>

Table 39 displays the composition of our entire mortgage credit book of business as of the periods indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of both December 31, 2010 and 2009. As a result of our adoption of the new accounting standards, we reflect a substantial majority of our Fannie Mae MBS as mortgage loans, which are reported on an actual unpaid principal balance basis and include the recognition of unscheduled payments made by borrowers in the month received. Previously, we recorded these Fannie Mae MBS in our mortgage credit book of business on a scheduled basis and recognized these payments when we remitted payment to the MBS trusts one month after the unscheduled payments were received. As a result of this timing difference, our mortgage credit book of business decreased upon adoption of the new accounting standards.

The total mortgage credit book of business is not impacted by our repurchase of delinquent loans as this activity is a reclassification from loans of consolidated trusts to loans of Fannie Mae.

149

**Table 39:   Composition of Mortgage Credit Book of Business[1]**

| | As of December 31, 2010 | | | | | |
| | Single-Family | | Multifamily | | Total | |
| | Conventional[2] | Government[3] | Conventional[2] | Government[3] | Conventional[2] | Government[3] |
| | (Dollars in millions) | | | | | |
| **Mortgage assets:** | | | | | | |
| Mortgage loans[4] . . . . . . | $2,766,870 | $52,577 | $170,074 | $ 476 | $2,936,944 | $53,053 |
| Fannie Mae MBS[5][7] . . . | 5,961 | 1,586 | — | 2 | 5,961 | 1,588 |
| Agency mortgage-related securities[5][6] . . . . . . . | 17,291 | 1,506 | — | 24 | 17,291 | 1,530 |
| Mortgage revenue bonds[5] . . . . . . . . . . | 2,197 | 1,190 | 7,449 | 1,689 | 9,646 | 2,879 |
| Other mortgage-related securities[5] . . . . . . . . | 43,634 | 1,657 | 25,052 | 15 | 68,686 | 1,672 |
| Total mortgage assets . . . . . | 2,835,953 | 58,516 | 202,575 | 2,206 | 3,038,528 | 60,722 |
| Unconsolidated Fannie Mae MBS[5][7] . . . . . . . . . . . . | 2,230 | 17,238 | 37 | 1,818 | 2,267 | 19,056 |
| Other credit guarantees[8] . . . | 15,529 | 3,096 | 16,601 | 393 | 32,130 | 3,489 |
| Mortgage credit book of business . . . . . . . . . . | $2,853,712 | $78,850 | $219,213 | $4,417 | $3,072,925 | $83,267 |
| Guaranty book of business . . . . . . . . . . | $2,790,590 | $74,497 | $186,712 | $2,689 | $2,977,302 | $77,186 |

| | As of December 31, 2009 | | | | | |
| | Single-Family | | Multifamily | | Total | |
| | Conventional[2] | Government[3] | Conventional[2] | Government[3] | Conventional[2] | Government[3] |
| | (Dollars in millions) | | | | | |
| **Mortgage portfolio:** | | | | | | |
| Mortgage loans[4] . . . . . . | $ 243,730 | $52,399 | $119,829 | $ 585 | $ 363,559 | $52,984 |
| Fannie Mae MBS[5] . . . . . | 218,033 | 1,816 | 314 | 82 | 218,347 | 1,898 |
| Agency mortgage-related securities[5][6] . . . . . . . | 41,337 | 1,309 | — | 21 | 41,337 | 1,330 |
| Mortgage revenue bonds[5] . . . . . . . . . . | 2,709 | 2,056 | 7,734 | 1,954 | 10,443 | 4,010 |
| Other mortgage-related securities[5] . . . . . . . . | 47,825 | 1,796 | 25,703 | 20 | 73,528 | 1,816 |
| Total mortgage portfolio . . . | 553,634 | 59,376 | 153,580 | 2,662 | 707,214 | 62,038 |
| Fannie Mae MBS held by third parties[5][7] . . . . . . | 2,370,037 | 15,197 | 46,628 | 927 | 2,416,665 | 16,124 |
| Other credit guarantees[8] . . . | 9,873 | 802 | 16,909 | 40 | 26,782 | 842 |
| Mortgage credit book of business . . . . . . . . . . | $2,933,544 | $75,375 | $217,117 | $3,629 | $3,150,661 | $79,004 |
| Guaranty book of business . . . . . . . . . . | $2,841,673 | $70,214 | $183,680 | $1,634 | $3,025,353 | $71,848 |

[1]  Based on unpaid principal balance.

[2]  Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured by the U.S. government or any of its agencies.

[3]  Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[4]  Includes unscheduled borrower principal payments.

TREASURY-0391

(5)  Excludes unscheduled borrower principal payments.

(6)  Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

(7)  The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(8)  Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies and underwriting standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies, which we discuss in detail below, may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions. The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus our efforts more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, including Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our single-family guaranty book of business for which we have access to detailed loan-level information, which constituted over 99% of our single-family conventional guaranty book of business as of December 31, 2010 and 98% as of December 31, 2009. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information. See "Risk Factors" for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

### Single-Family Acquisition and Servicing Policies and Underwriting Standards

Our Single-Family business, in conjunction with our Enterprise Risk Management division, is responsible for pricing and managing credit risk relating to the portion of our single-family mortgage credit book of business consisting of single-family mortgage loans and Fannie Mae MBS backed by single-family mortgage loans (whether held in our portfolio or held by third parties). Desktop Underwriter™, our proprietary automated underwriting system which measures default risk by assessing the primary risk factors of a mortgage, is used to evaluate the majority of the loans we purchase or securitize. As part of our regular evaluation of Desktop Underwriter, we conduct periodic examinations of the underlying risk assessment models to improve Desktop

Underwriter's ability to effectively analyze risk by recalibrating the models based on actual loan performance and market assumptions. Subject to our prior approval, we also may purchase and securitize mortgage loans that have been underwritten using other automated underwriting systems, as well as mortgage loans underwritten to agreed-upon standards that differ from our standard underwriting and eligibility criteria. Additionally, as the number of our delinquent and defaulted loans has increased, so has the corresponding number of these loans reviewed for compliance with our requirements. We use the information obtained from these loan quality reviews to provide more timely feedback to lenders on possible areas for correction in their origination practices.

We initiated underwriting and eligibility changes that became effective in 2009 such as establishing a minimum FICO credit score and a maximum debt-to-income cap, updating Desktop Underwriter's credit risk assessment model by implementing Desktop Underwriter 8.0, and we provided updates to our property-related policies. All of the changes focused on strengthening the underwriting and eligibility standards to promote sustainable homeownership. The result of many of these changes is reflected in the substantially improved risk profile of the single-family acquisitions in 2010 and 2009.

Our charter requires that single-family conventional mortgage loans with LTV ratios above 80% at acquisition that we purchase or that back Fannie Mae MBS generally be covered by one or more of the following: (1) insurance or a guaranty by a qualified insurer; (2) a seller's agreement to repurchase or replace any mortgage loan in default (for such period and under such circumstances as we may require); or (3) retention by the seller of at least a 10% participation interest in the mortgage loans. However, under our Refi Plus initiative, which includes HARP, we allow our borrowers who have mortgage loans with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. We have worked with FHFA to provide us with the flexibility to implement this element of RefiPlus. FHFA granted our request for an extension of this flexibility for loans originated through June 2011. We have submitted a request to FHFA for an additional extension.

Borrower-paid primary mortgage insurance is the most common type of credit enhancement in our single-family mortgage credit book of business. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage loan to a third-party insurer. In order for us to receive a payment in settlement of a claim under a primary mortgage insurance policy, the insured loan must be in default and the borrower's interest in the property that secured the loan must have been extinguished, generally in a foreclosure action. The claims process for primary mortgage insurance typically takes three to six months after title to the property has been transferred.

Mortgage insurers may also provide pool mortgage insurance, which is insurance that applies to a defined group of loans. Pool mortgage insurance benefits typically are based on actual loss incurred and are subject to an aggregate loss limit. Under some of our pool mortgage insurance policies, we are required to meet specified loss deductibles before we can recover under the policy. We typically collect claims under pool mortgage insurance three to six months after disposition of the property that secured the loan.

For a discussion of our aggregate mortgage insurance coverage as of December 31, 2010 and 2009, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Insurers."

We monitor both housing and economic market conditions as well as loan performance, to manage and evaluate our credit risks. During 2010, we announced several changes to our single-family acquisition and servicing policies and underwriting standards that were intended to improve the credit quality of mortgage loans delivered to us, strengthen our servicing policies, continue our corporate focus on sustainable homeownership and further reduce our acquisition of higher-risk conventional loan categories. Some of these changes include:

- Implementation of a Loan Quality Initiative ("LQI") which is a longer-term strategy that will help mortgage loans meet our credit, eligibility, and pricing standards by capturing critical loan data earlier in the loan delivery process. This initiative is intended to reduce lender repurchase requests in the future through improved data integrity and early feedback on some aspects of policy compliance, thereby

152

reducing investor and lender risks. As part of the LQI, we have implemented or announced certain initiatives designed to validate certain borrower and property information and collect additional property and appraisal data prior to or at the time of delivery of the mortgage loan:

- Implementation of FHFA's Uniform Mortgage Data Program that provides a common approach to collection of the appraisal and loan delivery data required on the loans that lenders sell to Fannie Mae;

- Development of the Uniform Loan Delivery Dataset definition of single-family loan delivery data requirements for all mortgages delivered to either GSE on or after March 19, 2012;

- Launch of EarlyCheck™, a new service that provides lenders access to loan delivery data checks that are designed to help them identify potential data problems at any point prior to loan delivery;

- Adjustments to pricing of flow business for mortgage loans with certain risk characteristics to ensure that Fannie Mae is positioned to provide a stable source of liquidity to its lender partners;

- On October 18, 2010, the Federal Reserve Board released an interim final rule on appraiser independence. Under the Dodd-Frank Act, promulgation of the interim final rule resulted in the termination of the Home Valuation Code of Conduct ("HVCC"). In October 2010, we announced the Appraiser Independence Requirements that we, FHFA and key industry participants developed to replace the HVCC. The Appraiser Independence Requirements maintain the spirit and intent of the HVCC and continue to provide important protections for mortgage investors, home buyers, and the housing market;

- Updating of our existing quality control standards to require that lenders follow our revised requirements for their quality control plans, reviews and processes, as well as updated requirements for the approval and management of third-party originators. We have also increased our enforcement and monitoring resources to increase lender compliance with these revised standards;

- Changes to interest-only mortgage loans, including minimum reserve and FICO credit score requirements, lower LTV ratios, and the elimination of interest-only eligibility for certain products, including cash-out refinances, 2- to 4- unit properties and investment properties;

- Adjustments to the qualifying interest rate requirements for adjustable-rate mortgage loans with an initial term of five years or less to help increase the probability that borrowers are able to absorb future payment increases;

- Elimination of balloon mortgage loans as an eligible product under our standard business;

- Continuation of our providing guidance to assist servicers in implementing the eligibility, underwriting and servicing requirements of HAMP. For example, we implemented changes to require full verification of borrower eligibility prior to offering a trial period plan and issued guidance around income verification options;

- Enhancements to loss mitigation options to provide payment relief for homeowners who have lost their jobs by offering eligible unemployed borrowers a forbearance plan to temporarily reduce or suspend their mortgage payments;

- Introduction of the Home Affordable Foreclosure Alternatives program which is designed to mitigate the impact of foreclosures on borrowers who were eligible for a loan modification under HAMP but ultimately were unsuccessful in obtaining one;

- Introduction of servicer requirements for staffing, training and performance monitoring of default-related activities as well as enhanced guidance for call coverage and borrower contact;

- Adjustment to the minimum waiting period that must elapse after a foreclosure before a borrower without extenuating circumstances is eligible for a new mortgage loan. The adjustment is designed to increase disincentives for borrowers to walk away from their mortgages without working with servicers to pursue alternatives to foreclosure. Borrowers with extenuating circumstances or those who agree to foreclosure alternatives may qualify for new mortgage loans eligible for sale to Fannie Mae in as little as two to three years;

153

- Addition of new requirements for financial information verification before borrowers can be offered a loan modification outside of HAMP;

- Introduction of a Unique Hardship policy to allow servicers to grant forbearance, and a provision for credit bureau reporting relief, to borrowers who face difficulty maintaining timely payments due to an event or temporary financial hardship that has been classified by us as a unique hardship;

- Adjustments to foreclosure time frames and notice of compensatory fees for breach of servicing obligations, which are designed to hold servicers accountable for their servicing requirements and aim to improve servicer performance and costly delays in foreclosure proceedings; and

- Introduction of the Second Lien Modification Program (2MP), which is designed to work in tandem with HAMP for first liens to create a comprehensive solution to help borrowers achieve greater affordability by lowering payments on both first and second lien mortgage loans for borrowers whose second lien loan is owned by Fannie Mae.

On September 29, 2010, Congress passed a continuing resolution that, among other things, extended the current GSE loan limits for high cost areas through September 30, 2011. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" for additional information on our loan limits.

*Single-Family Portfolio Diversification and Monitoring*

Diversification within our single-family mortgage credit book of business by product type, loan characteristics and geography is an important factor that influences credit quality and performance and may reduce our credit risk. We also review the payment performance of loans in order to help identify potential problem loans early in the delinquency cycle and to guide the development of our loss mitigation strategies.

The profile of our guaranty book of business is comprised of the following key loan attributes:

- *LTV ratio.* LTV ratio is a strong predictor of credit performance. The likelihood of default and the gross severity of a loss in the event of default are typically lower as the LTV ratio decreases. This also applies to the estimated mark-to-market LTV ratios, particularly those over 100%, as this indicates that the borrower's mortgage balance exceeds the property value.

- *Product type.* Certain loan product types have features that may result in increased risk. Generally, intermediate-term, fixed-rate mortgages exhibit the lowest default rates, followed by long-term, fixed-rate mortgages. ARMs and balloon/reset mortgages typically exhibit higher default rates than fixed-rate mortgages, partly because the borrower's future payments may rise, within limits, as interest rates change. Negative-amortizing and interest-only loans also default more often than traditional fixed-rate mortgage loans.

- *Number of units.* Mortgages on one-unit properties tend to have lower credit risk than mortgages on two-, three- or four-unit properties.

- *Property type.* Certain property types have a higher risk of default. For example, condominiums generally are considered to have higher credit risk than single-family detached properties.

- *Occupancy type.* Mortgages on properties occupied by the borrower as a primary or secondary residence tend to have lower credit risk than mortgages on investment properties.

- *Credit score.* Credit score is a measure often used by the financial services industry, including our company, to assess borrower credit quality and the likelihood that a borrower will repay future obligations as expected. A higher credit score typically indicates lower credit risk.

- *Loan purpose.* Loan purpose indicates how the borrower intends to use the funds from a mortgage loan. Cash-out refinancings have a higher risk of default than either mortgage loans used for the purchase of a property or other refinancings that restrict the amount of cash returned to the borrower.

- *Geographic concentration.* Local economic conditions affect borrowers' ability to repay loans and the value of collateral underlying loans. Geographic diversification reduces mortgage credit risk.

154

— *Loan age.* We monitor year of origination and loan age, which is defined as the number of years since origination. Statistically, the peak ages for default are currently from two to six years after origination. However, we have seen higher early default rates for loans originated in 2006 and 2007, due to a higher number of loans originated during these years with risk layering. Risk layering means permitting a loan to have several features that compound risk, such as loans with reduced documentation and higher risk loan product types.

Table 40 presents our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

**Table 40:** **Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business[1]**

| | Percent of Single-Family Conventional Business Volume[2] For the Year Ended December 31, | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of December 31, | | |
|---|---|---|---|---|---|---|
| | **2010** | **2009** | **2008** | **2010** | **2009** | **2008** |
| | | | (Dollars in millions) | | | |
| **Original LTV ratio:[5]** | | | | | | |
| <= 60% . . . . . . . . . . . . . . . . . . . . | 30% | 33% | 23% | 24% | 24% | 22% |
| 60.01% to 70% . . . . . . . . . . . . . . . . | 16 | 17 | 16 | 16 | 16 | 16 |
| 70.01% to 80% . . . . . . . . . . . . . . . . | 38 | 40 | 39 | 41 | 42 | 43 |
| 80.01% to 90%[6] . . . . . . . . . . . . . | 9 | 7 | 12 | 9 | 9 | 9 |
| 90.01% to 100%[6] . . . . . . . . . . . . | 5 | 3 | 10 | 9 | 9 | 10 |
| Greater than 100%[6] . . . . . . . . . . . | 2 | * | * | 1 | * | * |
| Total . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average. . . . . . . . . . . . . | 68% | 67% | 72% | 71% | 71% | 72% |
| Average loan amount | $219,431 | $219,118 | $208,652 | $155,531 | $153,302 | $148,824 |
| **Estimated mark-to-market LTV ratio:[7]** | | | | | | |
| <= 60% . . . . . . . . . . . . . . . . . . . . | | | | 28% | 31% | 36% |
| 60.01% to 70% . . . . . . . . . . . . . . . . | | | | 13 | 13 | 13 |
| 70.01% to 80% . . . . . . . . . . . . . . . . | | | | 19 | 19 | 17 |
| 80.01% to 90% . . . . . . . . . . . . . . . . | | | | 15 | 14 | 14 |
| 90.01% to 100% . . . . . . . . . . . . . . . | | | | 9 | 9 | 8 |
| Greater than 100% . . . . . . . . . . . . . | | | | 16 | 14 | 12 |
| Total . . . . . . . . . . . . . . . . . . . . . . | | | | 100% | 100% | 100% |
| Weighted average. . . . . . . . . . . . . | | | | 77% | 75% | 70% |
| **Product type:** | | | | | | |
| **Fixed-rate:[8]** | | | | | | |
| Long-term. . . . . . . . . . . . . . . . . . . | 72% | 82% | 78% | 74% | 75% | 74% |
| Intermediate-term. . . . . . . . . . . . . . | 22 | 15 | 12 | 14 | 13 | 13 |
| Interest-only . . . . . . . . . . . . . . . . . | * | * | 2 | 2 | 3 | 3 |
| Total fixed-rate. . . . . . . . . . . . . | 94 | 97 | 92 | 90 | 91 | 90 |
| **Adjustable-rate:** | | | | | | |
| Interest-only . . . . . . . . . . . . . . . . . | 1 | 1 | 4 | 4 | 4 | 5 |
| Negative-amortizing . . . . . . . . . . . . | — | * | — | * | 1 | 1 |
| Other ARMs . . . . . . . . . . . . . . . . . | 5 | 2 | 4 | 6 | 4 | 4 |
| Total adjustable-rate . . . . . . . . | 6 | 3 | 8 | 10 | 9 | 10 |
| Total . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Number of property units:** | | | | | | |
| 1 unit. . . . . . . . . . . . . . . . . . . . . . | 98% | 98% | 97% | 97% | 96% | 96% |
| 2-4 units. . . . . . . . . . . . . . . . . . . . | 2 | 2 | 3 | 3 | 4 | 4 |
| Total . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |

155

| | Percent of Single-Family Conventional Business Volume[2] For the Year Ended December 31, | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of December 31, | | |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | | | | |
| **Property type:** | | | | | | |
| Single-family homes . . . . . . . . . . . . . | 91% | 92% | 89% | 91% | 91% | 91% |
| Condo/Co-op . . . . . . . . . . . . . . . . . | 9 | 8 | 11 | 9 | 9 | 9 |
| Total . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy type:** | | | | | | |
| Primary residence . . . . . . . . . . . . . . | 91% | 93% | 89% | 90% | 90% | 90% |
| Second/vacation home . . . . . . . . . . . . | 4 | 5 | 5 | 4 | 4 | 4 |
| Investor . . . . . . . . . . . . . . . . . . . . | 5 | 2 | 6 | 6 | 6 | 6 |
| Total . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **FICO credit score:** | | | | | | |
| < 620 . . . . . . . . . . . . . . . . . . . . . | *% | * % | 3% | 4% | 4% | 5% |
| 620 to < 660 . . . . . . . . . . . . . . . . . | 2 | 2 | 6 | 7 | 8 | 9 |
| 660 to < 700 . . . . . . . . . . . . . . . . . | 7 | 7 | 14 | 15 | 16 | 17 |
| 700 to < 740 . . . . . . . . . . . . . . . . . | 16 | 17 | 22 | 21 | 22 | 23 |
| >= 740 . . . . . . . . . . . . . . . . . . . . . | 75 | 74 | 55 | 53 | 50 | 45 |
| Not available . . . . . . . . . . . . . . . . . | * | * | — | — | * | 1 |
| Total . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average. . . . . . . . . . . . . . | 762 | 761 | 738 | 735 | 730 | 724 |
| **Loan purpose:** | | | | | | |
| Purchase . . . . . . . . . . . . . . . . . . . | 22% | 20% | 41% | 33% | 36% | 41% |
| Cash-out refinance. . . . . . . . . . . . . . | 20 | 27 | 31 | 29 | 31 | 32 |
| Other refinance . . . . . . . . . . . . . . . . | 58 | 53 | 28 | 38 | 33 | 27 |
| Total . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Geographic concentration:[9]** | | | | | | |
| Midwest. . . . . . . . . . . . . . . . . . . . . | 16% | 16% | 15% | 15% | 16% | 16% |
| Northeast . . . . . . . . . . . . . . . . . . . | 20 | 19 | 18 | 19 | 19 | 19 |
| Southeast . . . . . . . . . . . . . . . . . . . | 18 | 20 | 23 | 24 | 24 | 25 |
| Southwest. . . . . . . . . . . . . . . . . . . | 15 | 15 | 16 | 15 | 15 | 16 |
| West . . . . . . . . . . . . . . . . . . . . . . | 31 | 30 | 28 | 27 | 26 | 24 |
| Total . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Origination year:** | | | | | | |
| <=2000 . . . . . . . . . . . . . . . . . . . . . | | | | 1% | 2% | 2% |
| 2001 . . . . . . . . . . . . . . . . . . . . . . | | | | 1 | 1 | 2 |
| 2002 . . . . . . . . . . . . . . . . . . . . . . | | | | 3 | 4 | 5 |
| 2003 . . . . . . . . . . . . . . . . . . . . . . | | | | 11 | 14 | 18 |
| 2004 . . . . . . . . . . . . . . . . . . . . . . | | | | 7 | 7 | 10 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . | | | | 9 | 10 | 13 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . | | | | 8 | 11 | 14 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . | | | | 12 | 15 | 20 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . | | | | 9 | 13 | 16 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . | | | | 21 | 23 | — |
| 2010 . . . . . . . . . . . . . . . . . . . . . . | | | | 18 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . | | | | 100% | 100% | 100% |

---

\*   Represents less than 0.5% of single-family conventional business volume or book of business.

[1]   We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.6% of our single-

156

TREASURY-0397

family conventional guaranty book of business as of December 31, 2010, 2009 and 2008. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

(2) Percentages calculated based on unpaid principal balance of loans at time of acquisition. Single-family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we securitize into Fannie Mae MBS.

(3) Percentages calculated based on unpaid principal balance of loans as of the end of each period.

(4) Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented approximately 3.9% of our single-family conventional guaranty book of business as of December 31, 2010 and 2.4% as of December 31, 2009. See "Business—Our Charter and Regulation of Our Activities—Charter Act-Loan Standards" for additional information on loan limits.

(5) The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

(6) We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have a LTV ratio over 80%.

(7) The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

(8) Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

(9) Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

## Credit Profile Summary

In 2009, we began to see the positive effects of actions we took, beginning in 2008, to significantly restrict our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market conditions, we reduced our acquisition of loans with higher-risk loan attributes. The single-family loans we purchased or guaranteed in 2010 have had a strong credit profile with a weighted average original LTV ratio of 68%, a weighted average FICO credit score of 762, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to the relatively high volume of Refi Plus loans (including HARP), the LTV ratios at origination for our 2010 acquisitions to date are higher than for our 2009 acquisitions.

Improvements in the credit profile of our acquisitions since January 1, 2009 reflect changes we made in our pricing and eligibility standards, as well as changes our mortgage insurers made in their eligibility standards. Whether our acquisitions in 2011 will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. In addition, FHA's role as the lower-cost option for some consumers, or in some cases the only option, for loans with higher LTV ratios further reduced our acquisition of these types of loans. However, in October 2010, changes to FHA's pricing structure became effective, which may reduce its cost advantage to some consumers. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

The credit profile of our acquisitions in 2010 was further influenced by a significant percentage of our acquisitions representing refinanced loans, which generally have a strong credit profile because refinancing indicates the borrower's ability to make their mortgage payment and desire to maintain homeownership. Refinancings represented 78% of our single-family acquisitions in 2010. While refinanced loans have historically tended to perform better than loans used for initial home purchase, Refi Plus loans may not ultimately perform as strongly as traditional refinanced loans because these loans, which relate to non-delinquent Fannie Mae mortgages that were refinanced, may have original LTV ratios as high as 125% and lower FICO credit scores than traditional refinanced loans. Our regulator granted our request for an extension of these flexibilities for loans originated through June 2011. Approximately 10% of our single-family

157

conventional business volume for 2009 consisted of loans with a LTV ratio higher than 80% at the time of purchase. For the year ended December 31, 2010, these loans accounted for 16% of our single-family business volume.

The prolonged and severe decline in home prices has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 77% as of December 31, 2010, and 75% as of 2009. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 16% as of December 31, 2010, and 14% as of December 31, 2009. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

Our exposure, as discussed in this paragraph, to Alt-A and subprime loans included in our single-family conventional guaranty book of business does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae Alt-A loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A to decrease over time. We are also not currently acquiring newly originated subprime loans. We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender. We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A and subprime loans included in our single-family conventional guaranty book of business of $218.3 billion as of December 31, 2010, represented approximately 7.8% of our single-family conventional guaranty book of business. See "Note 18, Concentration of Credit Risk" for additional information on our total exposure to Alt-A and subprime loans and mortgage-related securities and "Table 40: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for information on our single-family book of business.

We also provide information on our jumbo-conforming, high-balance loans and reverse mortgages. The outstanding unpaid principal balance of our jumbo-conforming and high-balance loans was $109.7 billion, or 3.9% of our single-family conventional guaranty book of business, as of December 31, 2010 and $66.6 billion, or 2.4% of our single-family conventional guaranty book of business, as of December 31, 2009. Jumbo-conforming and high-balance loans refer to high-balance loans we acquired pursuant to the Economic Stimulus Act of 2008, the 2008 Reform Act and the American Recovery and Reinvestment Act of 2009, which increased our conforming loan limits in certain high-cost areas above our standard conforming loan limit. The standard conforming loan limit for a one-unit property was $417,000 in 2010 and 2009. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" for additional information on our loan limits.

The outstanding unpaid principal balance of reverse mortgage whole loans included in our mortgage portfolio was $50.8 billion as of December 31, 2010 and $50.2 billion as of December 31, 2009. The majority of these loans are home equity conversion mortgages insured by the federal government through the FHA. Because home equity conversion mortgages are insured by the federal government, we believe that we have limited exposure to losses on these loans. Our market share of new reverse mortgage acquisitions was 2% in 2010 and 50% in 2009. The decrease in our market share was a result of changes in our pricing strategy and market

TREASURY-0399

conditions. In December 2010 we communicated to our lenders that we are exiting the reverse mortgage business and will no longer acquire newly originated home equity conversion mortgages.

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to reduce the severity of the losses we incur. If a borrower does not make required payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. We refer to actions taken by servicers with borrowers to resolve the problem of existing or potential delinquent loan payments as "workouts." Our loan workouts reflect our various types of home retention strategies and foreclosure alternatives.

Our home retention solutions are intended to help borrowers stay in their homes and include loan modifications, repayment plans and forbearances. Because we believe that reducing delays and implementing solutions that can be executed in a timely manner and early in the delinquency increases the likelihood that our problem loan management strategies will be successful in avoiding a default or minimizing severity, it is important for our servicers to work with borrowers to complete these solutions as early in their delinquency as feasible. If the servicer cannot provide a viable home retention solution for a problem loan, the servicer will seek to offer foreclosure alternatives, primarily preforeclosure sales and deeds-in-lieu of foreclosure. These alternatives reduce the severity of our loss resulting from a borrower's default while permitting the borrower to avoid going through a foreclosure. However, the existence of a second lien may limit our ability to provide borrowers with loan workout options, including those that are part of our foreclosure prevention efforts. We occasionally execute third-party sales, where we sell the property to a third party immediately prior to entering the foreclosure process. When appropriate, we seek to move to foreclosure expeditiously.

Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. We seek to improve the servicing of our delinquent loans through a variety of means, including improving our communications with and training of our servicers, increasing the number of our personnel who manage our servicers, directing servicers to contact borrowers at an earlier stage of delinquency and improve their telephone communications with borrowers, and holding our servicers accountable for following our requirements. We continue to work with some of our servicers to test and implement "high-touch" servicing protocols designed for managing higher-risk loans, which include lower ratios of loans per servicer employee, beginning borrower outreach strategies earlier in the delinquency cycle and establishing a single point of resolution for distressed borrowers. Additionally, partnering with our servicers, civic and community leaders and housing industry partners, we have launched a series of nationwide Mortgage Help Centers that will accelerate the response time for struggling borrowers with loans owned by us. During 2010, we established six Mortgage Help Centers and completed approximately 900 home retention plans that kept borrowers in their homes. We plan to open additional Mortgage Help Centers in 2011.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. We generally define single-family problem loans as loans that have been identified as being at imminent risk of payment default; early stage delinquent loans that are either 30 days or 60 days past due; and seriously delinquent loans, which are loans that are three or more monthly payments past due or in the foreclosure process. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

TREASURY-0400

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the periods indicated.

**Table 41:   Delinquency Status of Single-Family Conventional Loans**

|  | As of December 31, | | |
|---|---|---|---|
|  | **2010** | **2009** | **2008** |
| As of period end: | | | |
| Delinquency status: | | | |
| 30 to 59 days delinquent | 2.32% | 2.46% | 2.52% |
| 60 to 89 days delinquent | 0.87 | 1.07 | 1.00 |
| Seriously delinquent | 4.48 | 5.38 | 2.42 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days | 67.30% | 57.22% | 40.00% |

## Early Stage Delinquency

The prolonged and severe decline in home prices, coupled with continued high unemployment, caused an overall increase in the number of early stage delinquencies—loans that are less than three monthly payments past due—over the past several years. The number of early stage delinquencies has decreased as of December 31, 2010 compared with 2009; however, the potential number of loans at imminent risk of payment default remains elevated.

## Serious Delinquency

The potential number of loans at risk of becoming seriously delinquent has diminished in 2010. As of December 31, 2010, the percentage and number of our single-family conventional loans that were seriously delinquent decreased, as compared to December 31, 2009 and has decreased every month since February 2010. The decrease in our serious delinquency rate in 2010 is primarily the result of:

- Home retention workouts and foreclosure alternatives we completed.

- Higher volume of foreclosures during 2010.

- Higher percentage of our single-family guaranty book of business from 2009 and later vintages, which have strong credit characteristics.

We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, and the extent to which borrowers with modified loans again become delinquent in their payments.

We continue to work with our servicers to reduce delays in determining and executing the appropriate workout solution. However, the continued negative trends in the current economic environment, such as the sustained weakness in the housing market and high unemployment, have continued to adversely affect the serious delinquency rates across our single-family conventional guaranty book of business and the serious delinquency rate remains elevated. Additionally, the period of time that loans are seriously delinquent continues to remain extended as the factors present during 2009 were relatively unchanged during 2010. During 2009, the number of loans that transitioned to seriously delinquent and the aging of our seriously delinquent loans increased substantially from 2008 due to the following factors:

- Declines in home prices lengthen the period of time that loans are seriously delinquent because a delinquent borrower may not have sufficient equity in the home to refinance or sell the property and recover enough proceeds to pay off the loan and avoid foreclosure.

- High levels of unemployment are hampering the ability of many delinquent borrowers to cure delinquencies and return their loans to current status.

160

TREASURY-0401

- Loans in a trial-payment period under HAMP typically remain delinquent until the trial period is successfully completed and a final loan modification has been executed.

- Loan servicers are operating under our directive to delay foreclosure sales until they verify that borrowers are not eligible for HAMP modifications and other home retention and foreclosure-prevention alternatives have been exhausted.

- A number of states have enacted laws to lengthen or impose other requirements that result in slowdowns in the legal processes for completing foreclosures.

Further, as described in "Business—Executive Summary," we believe the current servicer foreclosure pause has negatively affected our serious delinquency rates.

Table 42 provides a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the periods indicated for single-family conventional loans in our single-family guaranty book of business.

**Table 42:   Serious Delinquency Rates**

| | As of December 31, | | | | | |
| | 2010 | | 2009 | | 2008 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest. . . . . . . . . . . . . . . . . | 15% | 4.16% | 16% | 4.97% | 16% | 2.44% |
| Northeast . . . . . . . . . . . . . . . . | 19 | 4.38 | 19 | 4.53 | 19 | 1.97 |
| Southeast . . . . . . . . . . . . . . . . | 24 | 6.15 | 24 | 7.06 | 25 | 3.27 |
| Southwest . . . . . . . . . . . . . . . | 15 | 3.05 | 15 | 4.19 | 16 | 1.98 |
| West . . . . . . . . . . . . . . . . . . . | 27 | 4.06 | 26 | 5.45 | 24 | 2.10 |
| Total single-family conventional loans . . . . . . . . . . . . . . . . . | 100% | 4.48% | 100% | 5.38% | 100% | 2.42% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . . | 15% | 10.60% | 18% | 13.51% | 21% | 6.42% |
| Non-credit enhanced . . . . . . . . . | 85 | 3.40 | 82 | 3.67 | 79 | 1.40 |
| Total single-family conventional loans . . . . . . . | 100% | 4.48% | 100% | 5.38% | 100% | 2.42% |

[1]   See footnote 9 to "Table 40: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans and loans with higher mark-to-market LTVs, and our 2006 and 2007 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. States in the Midwest have experienced prolonged economic weakness and California, Florida, Arizona and Nevada have experienced the most significant declines in home prices coupled with unemployment rates that remain high.

Table 43 presents the conventional serious delinquency rates and other financial information for our single-family loans with some of these higher-risk characteristics as of the periods indicated. The reported categories are not mutually exclusive. See "Consolidated Results of Operations—Credit-Related Expenses—Credit Loss Performance Metrics" for information on the portion of our credit losses attributable to Alt-A loans and certain other higher-risk loan categories.

TREASURY-0402

**Table 43:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | As of | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | December 31, 2010 | | | | December 31, 2009 | | | | December 31, 2008 | | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
| | | | | | (Dollars in millions) | | | | | | | |
| States: | | | | | | | | | | | | |
| Arizona . . . . . . . $ | 71,052 | 2% | 6.23% | 105% $ | 76,073 | 3% | 8.80% | 100% $ | 77,728 | 3% | 3.41% | 86% |
| California . . . . . | 507,598 | 18 | 3.89 | 76 | 484,923 | 17 | 5.73 | 77 | 436,117 | 16 | 2.30 | 71 |
| Florida . . . . . . . | 184,101 | 7 | 12.31 | 107 | 195,309 | 7 | 12.82 | 100 | 199,871 | 7 | 6.14 | 87 |
| Nevada . . . . . . . | 31,661 | 1 | 10.66 | 128 | 34,657 | 1 | 13.00 | 123 | 35,787 | 1 | 4.74 | 98 |
| Select Midwest states[2] . . . . . | 292,734 | 11 | 4.80 | 80 | 304,147 | 11 | 5.62 | 77 | 308,463 | 11 | 2.70 | 72 |
| All other states . . | 1,695,615 | 61 | 3.46 | 71 | 1,701,379 | 61 | 4.11 | 69 | 1,653,426 | 62 | 1.86 | 66 |
| Product type: | | | | | | | | | | | | |
| Alt-A[3] . . . . . . | 211,770 | 8 | 13.87 | 96 | 248,311 | 9 | 15.63 | 92 | 290,778 | 11 | 7.03 | 81 |
| Subprime . . . . . | 6,499 | * | 28.20 | 103 | 7,364 | * | 30.68 | 97 | 8,417 | * | 14.29 | 87 |
| Vintages: | | | | | | | | | | | | |
| 2006 . . . . . . . . | 232,009 | 8 | 12.19 | 104 | 292,184 | 11 | 12.87 | 97 | 372,254 | 14 | 5.11 | 85 |
| 2007 . . . . . . . . | 334,110 | 12 | 13.24 | 104 | 422,956 | 15 | 14.06 | 96 | 536,459 | 20 | 4.70 | 87 |
| All other vintages . . . . . | 2,216,642 | 80 | 2.62 | 70 | 2,081,348 | 74 | 3.08 | 67 | 1,802,679 | 66 | 1.51 | 62 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | | |
| Greater than 100%[1] . . . . . | 435,991 | 16 | 17.70 | 130 | 403,443 | 14 | 22.09 | 128 | 314,674 | 12 | 10.98 | 119 |
| Select combined risk characteristics: | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 . . | 21,205 | 1 | 21.41 | 109 | 23,966 | 1 | 27.96 | 104 | 27,159 | 1 | 15.97 | 98 |

* Percentage is less than 0.5%.

[1] Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2] Consists of Illinois, Indiana, Michigan and Ohio.

[3] For 2009, data for Alt-A loans does not reflect loans we acquired in 2009 upon the refinance of existing Alt-A loans.

*Management of Problem Loans and Loan Workout Metrics*

The efforts of our mortgage servicers are critical in keeping people in their homes, preventing foreclosures and providing homeowner assistance. We have substantially increased the number of personnel designated to work with our servicers. In addition, we have employees working on-site with our largest servicers. Three key areas where our servicers play a critical role in implementing our home retention and foreclosure prevention initiatives are: (1) establishing contact with the borrower; (2) reviewing the borrower's financial profile in identifying potential home retention strategies to reduce the likelihood that the borrower will re-default; and (3) in the event that there is not a suitable home retention strategy available, offering a viable foreclosure alternative to the borrower.

We require our single-family servicers to evaluate all problem loans under HAMP first before considering other workout alternatives, unless the borrower is unemployed, in which case the borrower should be considered for forbearance. If it is determined that a borrower is not eligible for a modification under HAMP, our servicers are required to exhaust all other workout alternatives before proceeding to foreclosure. We

TREASURY-0403

continue to work with our servicers to implement our foreclosure prevention initiatives effectively and to find ways to enhance our workout protocols and their workflow processes.

Loan modifications involve changes to the original mortgage terms such as product type, interest rate, amortization term, maturity date and/or unpaid principal balance. Modifications include TDRs, which is the only form of modification in which we do not expect to collect the full original contractual principal and interest due under the loan. Other resolutions and modifications may result in our receiving the full amount due, or certain installments due, under the loan over a period of time that is longer than the period of time originally provided for under the terms of the loan.

During 2009 and 2010, we experienced a significant shift in our approach to workouts to address the increasing number of borrowers facing long-term, rather than short-term, financial hardships. While it has always been our objective to help borrowers retain their homes, prior to 2009, our workout solutions focused on borrowers after the hardship that caused them to be delinquent on their mortgage obligation had been resolved. These solutions included (1) loan modifications that capitalized the delinquent principal and interest payments and/or extended the term of the loan, or (2) a personal loan, called a HomeSaver Advance, used to cover the delinquent principal and interest. When a home retention solution was not available, the borrower would sell the property as a means of paying off the entire mortgage obligation as the value of the property was generally in excess of their mortgage obligation.

During 2009 and 2010, the prolonged economic stress and high levels of unemployment hindered the efforts of many delinquent borrowers to bring their loans current. Accordingly, borrowers have become increasingly in need of a workout solution prior to the resolution of the hardships that are causing their mortgage delinquency. As a result, we completed more loan modifications during 2010 that are concentrated on lowering or deferring the borrowers' monthly mortgage payments for a predetermined period of time to allow borrowers to work through their hardships. The vast majority of our loan modifications during 2010 and 2009 were designed to help distressed borrowers by reducing the borrower's monthly principal and interest payment through an extension of the loan term, a reduction in the interest rate, or a combination of both.

In March 2009, we implemented HAMP, a modification initiative under the Making Home Affordable Program. Intended to be uniform across servicers, HAMP is aimed at helping borrowers whose loan is either currently delinquent or is at imminent risk of default. HAMP modifications can include reduced interest rates, term extensions, and/or principal forbearance to bring the monthly payment down to 31% of the borrower's gross (pre-tax) income. We require that servicers first evaluate borrowers for eligibility under HAMP before considering other workout options or foreclosure. By design, not all borrowers facing foreclosure will be eligible for a HAMP modification. As a result, we are working with servicers to ensure that borrowers who do not qualify for HAMP or who fail to successfully complete the HAMP required trial period are provided with alternative home retention options or a foreclosure avoidance alternative.

In addition, there has been greater focus on alternatives to foreclosure for borrowers who are unable to retain their homes. Foreclosure alternatives may be more appropriate if the borrower has experienced a significant adverse change in financial condition due to events such as unemployment or reduced income, divorce, or unexpected issues like medical bills and is therefore no longer able to make the required mortgage payments. Since the cost of foreclosure can be significant to both the borrower and Fannie Mae, to avoid foreclosure and satisfy the first lien mortgage obligation, our servicers work with a borrower to sell their home prior to foreclosure in a preforeclosure sale or accept the deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid the pressure and stigma associated with a foreclosure.

Table 44 provides statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications under HAMP or repayment and forbearance plans that have been initiated but not completed.

163

**Table 44:   Statistics on Single-Family Loan Workouts**

| | For the Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | | | (Dollars in millions) | | | |
| Home retention strategies: | | | | | | |
| Modifications . . . . . . . . . . . . . . . . . . . . . . . | $ 82,826 | 403,506 | $18,702 | 98,575 | $ 5,119 | 33,388 |
| Repayment plans and forbearances completed[1] . . | 4,385 | 31,579 | 2,930 | 22,948 | 936 | 7,892 |
| HomeSaver Advance first-lien loans. . . . . . . . . . | 688 | 5,191 | 6,057 | 39,199 | 11,196 | 70,967 |
| | $ 87,899 | 440,276 | $27,689 | 160,722 | $17,251 | 112,247 |
| Foreclosure alternatives: | | | | | | |
| Preforeclosure sales . . . . . . . . . . . . . . . . . . . . . | $ 15,899 | 69,634 | $ 8,457 | 36,968 | $ 2,212 | 10,355 |
| Deeds-in-lieu of foreclosure . . . . . . . . . . . . . . | 1,053 | 5,757 | 491 | 2,649 | 252 | 1,341 |
| | $ 16,952 | 75,391 | $ 8,948 | 39,617 | $ 2,464 | 11,696 |
| Total loan workouts. . . . . . . . . . . . . . . . . . . . . . | $104,851 | 515,667 | $36,637 | 200,339 | $19,715 | 123,943 |
| Loan workouts as a percentage of single-family guaranty book of business[2] . . . . . . . . . . . . . . | 3.66% | 2.87% | 1.26% | 1.10% | 0.70% | 0.68% |

[1]   For the years ended December 31, 2010 and 2009, repayment plans reflected those plans associated with loans that were 60 days or more delinquent. For the year ended December 31, 2008, repayment plans reflected those plans associated with loans that were 90 days or more delinquent. If we had included repayment plans associated with loans that were 60 days or more delinquent for the year ended December 31, 2008, the unpaid principal balance that had repayment plans and forbearances completed would have been $2.8 billion and the number of loans that had repayment plans and forbearances completed would have been 22,337.

[2]   Represents total loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of each year.

We increased the volume of workouts during 2010 compared with 2009, through our home retention and foreclosure prevention efforts. Loan modification volume was more than four times larger in 2010 than in 2009, as the number of borrowers who were experiencing financial difficulty increased and a significant number of HAMP trial modifications were completed and became permanent HAMP modifications. HomeSaver Advance workout volume substantially declined and this workout option was ultimately retired in 2010. HomeSaver Advances were only used in limited circumstances as a result of more borrowers facing permanent, instead of short-term, hardships as well as our requirement that all potential loan workouts first be evaluated under HAMP before being considered for other alternatives. We also agreed to an increasing number of preforeclosure sales and accepted a higher number of deeds-in-lieu of foreclosure during 2010 as these are favorable solutions for a growing number of borrowers. The volume of our foreclosure alternatives remained high throughout 2010.

Because we did not begin implementing HAMP until March 2009, the vast majority of loan modifications performed during 2009 were not made under HAMP; during 2010, slightly less than half of our loan modifications were completed under HAMP. During 2010, we initiated approximately 163,000 trial modifications under HAMP, along with other types of loan modifications, repayment plans and forbearance compared with 333,000 during 2009. It is difficult to predict how many of these trial modifications and initiated plans will be completed. During 2009, there were only a limited number of permanent HAMP modifications because the program entails at least a three month trial period. During this trial period, the loan servicer evaluates the borrower's ability to make the required modified loan payment and collects all required documentation before making the modification effective. The inability to obtain proper documentation from borrowers who had entered into a trial modification was a significant factor in the low number of modifications that became permanent under HAMP in 2009. In a February 2010 announcement, as directed by Treasury, servicers are required to conduct a full verification of a borrower's eligibility prior to offering a

164

HAMP trial period plan. This is effective for all HAMP trial period plans with effective dates on or after June 1, 2010.

We remain focused on our goals to minimize our credit losses and continue to look for additional solutions to help borrowers stay in their homes and avoid foreclosure. However, in those instances where borrowers are unable to stay in their homes, we expect to increase the use of foreclosure alternatives. Also during 2010, we began offering an Alternative Modification™ option for Fannie Mae borrowers who were believed to be eligible for and accepted a HAMP trial modification plan, made their required payments during their trial period, but were subsequently denied a permanent modification because they were unable to demonstrate compliance with the eligibility requirements for a permanent modification under HAMP. In many cases, these borrowers initially qualified for a HAMP trial modification based on verbal information and, upon verification of their income, it was discovered that their income was either too high or too low relative to their monthly mortgage payment for them to meet the program's requirements. Alternative Modifications are available only for borrowers who were in a HAMP trial modification that was initiated by March 1, 2010. Alternative Modifications were not available after August 31, 2010.

Table 45 displays the profile of loan modifications (HAMP and non-HAMP) provided to borrowers during 2010, 2009 and 2008.

**Table 45:   Loan Modification Profile**

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| Term extension, interest rate reduction, or combination of both[1] | 93% | 93% | 57% |
| Initial reduction in monthly payment[2] | 91 | 87 | 38 |
| Estimated mark-to-market LTV ratio > 100% | 53 | 47 | 22 |
| Troubled debt restructurings | 94 | 92 | 60 |

[1] Reported statistics for term extension, interest rate reduction or the combination include subprime adjustable-rate mortgage loans that have been modified to a fixed-rate loan.

[2] These modification statistics do not include subprime adjustable-rate mortgage loans that were modified to a fixed-rate loan and were current at the time of the modification.

A significant portion of our modifications pertain to loans with a mark-to-market LTV ratio greater than 100% because these borrowers are typically unable to refinance their mortgages or sell their homes for a price that allows them to pay off their mortgage obligation as their mortgages are greater than the value of their homes. Additionally, the serious delinquency rate for these loans tends to be significantly higher than the overall average serious delinquency rate. As of December 31, 2010, the serious delinquency rate for loans with a mark-to-market LTV ratio greater than 100% was 18%, compared with our overall average single-family serious delinquency rate of 4.48%.

Approximately 50% of loans modified during 2009 were current or had paid off as of one year following loan modification date. In comparison, 36% of loans modified during 2008 were current or had paid off as of one year following the loan modification date. There is significant uncertainty regarding the ultimate long term success of our current modification efforts because of the economic and financial pressures on borrowers. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations. FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets.

As we have focused our efforts on distressed borrowers who are experiencing current economic hardship, the short-term performance of our workouts may not be indicative of long-term performance. We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and home prices.

TREASURY-0406

*REO Management*

Foreclosure and REO activity affect the level of credit losses. Table 46 compares our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

**Table 46:   Single-Family Foreclosed Properties**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| Single-family foreclosed properties (number of properties): | | | |
| Beginning of period inventory of single-family foreclosed properties (REO)[1] . . . . | 86,155 | 63,538 | 33,729 |
| Acquisitions by geographic area:[2] | | | |
| Midwest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 57,761 | 36,072 | 30,026 |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,049 | 7,934 | 5,984 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79,453 | 39,302 | 24,925 |
| Southwest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55,276 | 31,197 | 18,340 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55,539 | 31,112 | 15,377 |
| Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . | 262,078 | 145,617 | 94,652 |
| Dispositions of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (185,744) | (123,000) | (64,843) |
| End of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . | 162,489 | 86,155 | 63,538 |
| Carrying value of single-family foreclosed properties (dollars in millions)[3] . . . . . | $ 14,955 | $ 8,466 | $ 6,531 |
| Single-family foreclosure rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.46% | 0.80% | 0.52% |

[1]   Includes acquisitions through deeds-in-lieu of foreclosure.

[2]   See footnote 9 to "Table 40: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]   Excludes foreclosed property claims receivables, which are reported in our consolidated balance sheets as a component of "Acquired property, net."

[4]   Estimated based on the total number of properties acquired through foreclosure as a percentage of the total number of loans in our single-family conventional guaranty book of business as of the end of each respective period.

The continued weak economy, as well as high unemployment rates, continues to result in an increase in the percentage of our mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Additionally, the prolonged decline in home prices on a national basis has significantly reduced the values of our single-family REO. Despite the increase in our foreclosure rate during 2010, foreclosure levels were lower than what they otherwise would have been due to our directive to servicers to delay foreclosure sales until the loan servicer verifies that the borrower is ineligible for a HAMP modification and that all other home retention and foreclosure prevention alternatives have been exhausted and the delay due to the foreclosure pause. Additionally, foreclosure levels during 2009 were affected by the foreclosure moratoria. To increase the effectiveness of our loss mitigation efforts, it is important that our servicers work with delinquent borrowers early in the delinquency to determine whether a home retention or foreclosure alternative will be viable and, where no alternative is viable, to reduce delays in proceeding to foreclosure. Accordingly, we are working to manage our foreclosure timelines more efficiently.

Further, we have seen an increase in the percentage of our properties that we are unable to market for sale in 2010 compared with 2009. The most common reasons for our inability to market properties for sale are: (1) properties are within the period during which state law allows the former mortgagor and second lien holders to redeem the property (states which allow this are known as "redemption states"); (2) properties are still occupied by the person or personal property and the eviction process is not yet complete ("occupied status"); or (3) properties are being repaired. As we are unable to market a higher portion of our inventory, it slows the pace at which we can dispose of our properties and increases our foreclosed property expense related to costs associated with ensuring that the property is vacant and maintaining the property. For example,

TREASURY-0407

as of December 31, 2010, approximately 27% of our properties that we were unable to market for sale were in redemption status, which lengthens the time a property is in our REO inventory by an average of two to six months. Additionally, as of December 31, 2010, approximately 40% of our properties that we were unable to market for sale were in occupied status, which lengthens the time a property is in our REO inventory by an average of one to two months.

As shown in Table 47 we have experienced a disproportionate share of foreclosures in certain states as compared to their share of our guaranty book of business. This is primarily because these states have had significant home price depreciation or weak economies, and in the case of California and Florida specifically, a significant number of Alt-A loans.

**Table 47:   Single-Family Acquired Property Concentration Analysis**

| | As of | For The Year Ended | As of | For The Year Ended | As of | For The Year Ended |
|---|---|---|---|---|---|---|
| | December 31, 2010 | | December 31, 2009 | | December 31, 2008 | |
| | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] |
| States: | | | | | | |
| Arizona, California, Florida and Nevada . . . . . . . . . | 28% | 36% | 28% | 36% | 27% | 27% |
| Illinois, Indiana, Michigan and Ohio . . . . . . . . . . . | 11 | 17 | 11 | 20 | 11 | 25 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Calculated based on the number of properties acquired through foreclosure during the period divided by the total number of properties acquired through foreclosure.

Although we have expanded our loan workout initiatives to help borrowers stay in their homes, our foreclosure levels for 2010 were higher than 2009 as a result of the continued adverse impact that the weak economy and high unemployment have had on the financial condition of borrowers. As described in "Executive Summary," a number of our single-family mortgage servicers have recently halted foreclosures in some or all states after discovering deficiencies in their processes relating to the execution of affidavits in connection with the foreclosure process. Although the foreclosure pause has negatively affected our foreclosure timelines and increased the number of our REO properties that we are unable to market for sale, we cannot yet predict the full impact on our REO inventory and our credit-related expenses.

### Multifamily Mortgage Credit Risk Management

The credit risk profile of our multifamily mortgage credit book of business is influenced by: the structure of the financing; the type and location of the property; the condition and value of the property; the financial strength of the borrower and lender; market and sub-market trends and growth; and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

While our multifamily mortgage credit book of business includes all of our multifamily mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae multifamily mortgage-related securities held in our portfolio for which we do not provide a guaranty. Our multifamily guaranty book of business consists of: multifamily mortgage loans held in our mortgage portfolio; Fannie Mae MBS held in our portfolio or by third parties; and other credit enhancements that we provide on mortgage assets.

The credit statistics reported below, unless otherwise noted, pertain only to a specific portion of our multifamily guaranty book of business for which we have access to detailed loan-level information. We

TREASURY-0408

typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information. The portion of our multifamily guaranty book of business for which we have detailed loan level-information, excluding loans that have been defeased, constituted 99% of our total multifamily guaranty book as of both December 31, 2010 and 2009. See "Risk Factors" for a discussion of the risk due to our reliance on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business.

*Multifamily Acquisition Policy and Underwriting Standards*

Our Multifamily business, in conjunction with our Enterprise Risk Management division, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the DUS program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented 84% of our multifamily guaranty book of business as of December 31, 2010 compared with 81% as of December 31, 2009.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing. Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Other lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration and credit enhancement arrangements is an important factor that influences credit quality and performance and helps reduce our credit risk.

The weighted average original LTV ratio for our multifamily guaranty book of business was 67% as of each of the three years ended December 31, 2010, 2009, and 2008. The percentage of our multifamily guaranty book of business with an original LTV ratio greater than 80% was 5% as of each of the three years ended December 31, 2010, 2009, and 2008. We present the current risk profile of our multifamily guaranty book of business in "Note 7, Financial Guarantees and Master Servicing."

We monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the investment at the loan, property and portfolio level. We closely track the physical condition of the property, the relevant local market and economic conditions that may signal changing risk or return profiles and other risk factors. For example, we closely monitor the rental payment trends and vacancy levels in local markets to identify loans that merit closer attention or loss mitigation actions. We are managing our exposure to refinancing risk for multifamily loans maturing in the next several years. We recently formed a team to proactively manage upcoming loan maturities and minimize losses on maturing loans. This team assists lenders and borrowers with timely and appropriate refinancing of maturing loans with the goal of reducing defaults and foreclosures related to loans maturing in the near term. For our investments in multifamily loans, the primary asset management responsibilities are performed by our DUS and other multifamily lenders. We periodically evaluate the performance of our third-party service providers for compliance with our asset management criteria.

TREASURY-0409

*Problem Loan Management and Foreclosure Prevention*

Unfavorable economic conditions have caused continued increases in our multifamily serious delinquency rate and the level of defaults. Since delinquency rates are a lagging indicator, even if the market shows some improvement, we expect to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

*Problem Loan Statistics*

Table 48 provides a comparison of our multifamily serious delinquency rates for loans with and without credit enhancement in our multifamily guaranty book of business. We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

**Table 48:   Multifamily Serious Delinquency Rates**

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Multifamily loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . | 89% | 0.67% | 89% | 0.54% | 86% | 0.26% |
| Non-credit enhanced . . . . . . . . | 11 | 1.01 | 11 | 1.33 | 14 | 0.54 |
| Total multifamily loans . . . . . | 100% | 0.71% | 100% | 0.63% | 100% | 0.30% |

Table 49 provides a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders and loans acquired through non-DUS lenders.

**Table 49:   Multifamily Concentration Analysis**

| | As of December 31, | | | | | | Percentage of Multifamily Credit Losses For the Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2010 | 2009 | 2008 |
| DUS small balance loans[1] . . . . . . . | 8% | 0.55% | 7% | 0.47% | 7% | 0.24% | 7% | 9% | 15% |
| DUS non small balance loans[2] . . . . | 70 | 0.56 | 69 | 0.38 | 66 | 0.24 | 61 | 77 | 66 |
| Non-DUS small balance loans[1] . . . | 10 | 1.47 | 11 | 1.16 | 13 | 0.52 | 10 | 11 | 10 |
| Non-DUS non small balance loans[2] . . . . . . . . . . . . . . . . . . | 12 | 0.97 | 13 | 1.54 | 14 | 0.37 | 22 | 3 | 9 |

[1] Loans with unpaid principal balances less than or equal to $3 million except in high cost markets where they are loans with unpaid principal balances less than or equal to $5 million.

[2] Loans with unpaid principal balances greater than $3 million except in high cost markets where they are loans with unpaid principal balances greater than $5 million.

The weak economic environment negatively affected serious delinquency rates across our multifamily guaranty book of business, with all loan sizes experiencing higher delinquencies. The multifamily serious delinquency rate increased as of December 31, 2010 compared with December 31, 2009, even as market conditions began to stabilize throughout the year, as delinquency rates are a lagging indicator. The DUS loans in our guaranty book of business have a lower rate of delinquencies when compared with the total book of business while the non-DUS loans are experiencing a higher rate of delinquencies.

TREASURY-0410

Multifamily loans with an original balance of less than $3 million nationwide or $5 million in high cost markets, which we refer to as small balance loans, acquired through non-DUS lenders continue to exhibit higher delinquencies than small balance loans acquired through DUS lenders. These small balance non-DUS loans account for 21% of our multifamily serious delinquency rate while representing approximately 10% of our multifamily guaranty book of business as of December 31, 2010. These small balance non-DUS loan acquisitions were most common in 2007 and 2008 and have not been a significant portion of our total multifamily acquisitions since 2008. Although our 2007 and early 2008 acquisitions were underwritten to our then-current credit standards and required borrower cash equity, they were acquired near the peak of multifamily housing values. During the second half of 2008, our underwriting standards were adjusted to reflect the evolving market trends at that time. While these non-DUS small balance loans represent a higher proportionate share of delinquencies, they generally are covered by loss sharing arrangements, which limits the credit losses incurred.

In addition, Arizona, Florida, Georgia, and Ohio, have a disproportionate share of seriously delinquent loans compared to their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for 39% of multifamily serious delinquencies but only 10% of the multifamily guaranty book of business.

### REO Management

Foreclosure and REO activity affect the level of credit losses. Table 50 compares our multifamily REO balances for the periods indicated.

**Table 50:   Multifamily Foreclosed Properties**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| Multifamily foreclosed properties (number of properties): | | | |
| Beginning of period inventory of multifamily foreclosed properties (REO)................. | 73 | 29 | 9 |
|    Total properties acquired through foreclosure.................................... | 232 | 105 | 33 |
|    Disposition of REO ...................................................... | (83) | (61) | (13) |
| End of period inventory of multifamily foreclosed properties (REO) ....................... | 222 | 73 | 29 |
| Carrying value of multifamily foreclosed properties (dollars in millions) ................... | $596 | $265 | $105 |

Our multifamily foreclosed property inventory increase reflects the continuing stress on our multifamily guaranty book of business as weak economic conditions have caused new foreclosures to outpace dispositions.

### Institutional Counterparty Credit Risk Management

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

Several of our institutional counterparties may now be subject to provisions of the Dodd-Frank Act, which was signed into law in July 2010. However, we cannot predict its potential impact on our company or our industry at this time. For additional discussion on key provisions and additional information about this legislation please see "Legislation and GSE Reform—Financial Regulatory Reform Legislation: The Dodd-Frank Act" and "Risk Factors" in this report.

TREASURY-0411

We have exposure primarily to the following types of institutional counterparties:

- mortgage seller/servicers that service the loans we hold in our investment portfolio or that back our Fannie Mae MBS;

- third-party providers of credit enhancement on the mortgage assets that we hold in our investment portfolio or that back our Fannie Mae MBS, including mortgage insurers, financial guarantors and lenders with risk sharing arrangements;

- custodial depository institutions that hold principal and interest payments for Fannie Mae portfolio loans and MBS certificateholders, as well as collateral posted by derivatives counterparties, repurchase transaction counterparties and mortgage originators or servicers;

- issuers of securities held in our cash and other investments portfolio;

- derivatives counterparties;

- mortgage originators and investors;

- debt security and mortgage dealers; and

- document custodians.

We routinely enter into a high volume of transactions with counterparties in the financial services industry, including brokers and dealers, mortgage lenders and commercial banks, and mortgage insurers, resulting in a significant credit concentration with respect to this industry. We also have significant concentrations of credit risk with particular counterparties. Many of our institutional counterparties provide several types of services for us. For example, many of our lender customers or their affiliates act as mortgage seller/servicers, derivatives counterparties, custodial depository institutions and document custodians on our behalf.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of many of our institutional counterparties, which has significantly increased the risk to our business of defaults by these counterparties due to bankruptcy or receivership, lack of liquidity, insufficient capital, operational failure or other reasons. Although we believe that government actions to provide liquidity and other support to specified financial market participants has initially helped and may continue to help improve the financial condition and liquidity position of a number of our institutional counterparties, there can be no assurance that these actions will continue to be effective or will be sufficient. As described in "Risk Factors," the financial difficulties that our institutional counterparties are experiencing may negatively affect their ability to meet their obligations to us and the amount or quality of the products or services they provide to us.

In the event of a bankruptcy or receivership of one of our counterparties, we may be required to establish our ownership rights to the assets these counterparties hold on our behalf to the satisfaction of the bankruptcy court or receiver, which could result in a delay in accessing these assets causing a decline in their value. In addition, if we are unable to replace a defaulting counterparty that performs services that are critical to our business with another counterparty, it could materially adversely affect our ability to conduct our operations.

On September 22, 2009, we filed a proof of claim as a creditor in the bankruptcy case of Lehman Brothers Holdings, Inc., which filed for bankruptcy in September 2008. The claim of $8.9 billion included losses we incurred in connection with the termination of our outstanding derivatives contracts with a subsidiary of Lehman Brothers, federal securities law claims related to Lehman Brothers private-label securities and notes held in our cash and other investments portfolio, losses arising under certain REMIC and grantor trust transactions, and mortgage loan repurchase obligations. A contingent claim of $6.9 billion was also included, primarily relating to a large multifamily transaction. However, based on Lehman Brothers' financial condition, we believe we will receive only a portion of these claims.

TREASURY-0412

*Mortgage Seller/Servicers*

Mortgage seller/servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. We have minimum standards and financial requirements for mortgage seller/servicers. For example, we require servicers to collect and retain a sufficient level of servicing fees to reasonably compensate a replacement servicer in the event of a servicing contract breach. In addition, we perform periodic on-site and financial reviews of our servicers and monitor their financial and portfolio performance as compared to peers and internal benchmarks. We work with our largest servicers to establish performance goals and monitor performance against the goals, and our servicing consultants work with servicers to improve servicing results and compliance with our servicing guide.

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 77% of our single-family guaranty book of business as of December 31, 2010, compared to 80% as of December 31, 2009. Our largest mortgage servicer is Bank of America, which, together with its affiliates, serviced approximately 26% of our single-family guaranty book of business as of December 31, 2010, compared to 27% as of December 31, 2009. In addition, we had two other mortgage servicers, JP Morgan and Wells Fargo, that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of December 31, 2010 and 2009. In addition, Wells Fargo, with its affiliates, serviced over 10% of our multifamily guaranty book of business as of both December 31, 2010 and 2009. Also, PNC Financial Services Group, Inc., together with its affiliates, serviced over 10% of our multifamily guaranty book of business as of December 31, 2009. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition and performance of many of our mortgage seller/servicers. Several mortgage seller/servicers have experienced ratings downgrades and liquidity constraints. However, our primary mortgage servicer counterparties have generally continued to meet their obligations to us during 2009 and 2010. The growth in the number of delinquent loans on their books of business may negatively affect the ability of these counterparties to continue to meet their obligations to us in the future. We are also relying on our mortgage seller/servicers to play a significant role in our homeownership assistance programs; the broad scope of some of these programs, as well as the recent economic challenges in the market, may limit their capacity to support these programs.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to these collectively as "repurchase requests." In 2010 and 2009, the number of our repurchase requests remained high. During 2010, the aggregate unpaid principal balance of loans repurchased by our seller/servicers pursuant to their contractual obligations was approximately $8.8 billion, compared to $4.6 billion during 2009. As of December 31, 2010, we had $5.0 billion in outstanding repurchase requests related to loans that had been reviewed for potential breaches of contractual obligations. Approximately 41% of our total outstanding repurchase requests had been made to one of our seller/servicers. As of December 31, 2010, 30% of our outstanding repurchase requests had been outstanding for more than 120 days from either the original loan repurchase request date or, for lenders remitting after the REO is disposed, the date of our final loss determination.

The amount of our outstanding repurchase requests provided above is based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. Lenders have the option to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than this amount. In addition, amounts relating to repurchase requests originating from missing documentation or loan

172

files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

On December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, BAC Home Loans Servicing, LP, and Countrywide Home Loans, Inc., to address outstanding repurchase requests for residential mortgage loans with an unpaid principal balance of $3.9 billion delivered to us by affiliates of Countrywide Financial Corporation. Bank of America agreed, among other things, to a resolution amount of $1.5 billion, consisting of a cash payment of $1.3 billion made by Bank of America on December 31, 2010, and other payments recently made or to be made by them.

The agreement substantially resolves or addresses outstanding repurchase requests on loans sold to us by Countrywide and permits us to bring claims for any additional breaches of our representations and warranties that are identified with respect to those loans. We continue to work with Bank of America to resolve repurchase requests that remain outstanding, including requests relating to loans delivered to us by Bank of America, N.A.

In December 2010, we entered into an agreement with certain wholly-owned subsidiaries of Ally Financial, Inc. ("Ally"). Under the agreement, we received a cash payment of $462 million in exchange for our release of specified Ally affiliates from potential liability relating to certain private-label securities sponsored by the subsidiaries and for certain selling representation and warranty liability related to mortgage loans sold and/or serviced by one of the subsidiaries as of or prior to June 30, 2010.

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests; however, as the volume of repurchase requests increases, the risk increases that affected seller/servicers will not be willing or able to meet the terms of their repurchase obligations and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. If a significant seller/servicer counterparty, or a number of seller/servicer counterparties, fails to fulfill its repurchase obligations to us, it could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. We expect that the amount of our outstanding repurchase requests could remain high in 2011.

We likely would incur costs and potential increases in servicing fees and could also face operational risks if we decide to replace a mortgage seller/servicer due to its default, our assessment of its financial condition or for other reasons. If a significant mortgage servicer counterparty fails, and its mortgage servicing obligations are not transferred to a company with the ability and intent to fulfill all of these obligations, we could incur penalties for late payment of taxes and insurance on the properties that secure the mortgage loans serviced by that mortgage seller/servicer. We could also be required to absorb losses on defaulted loans that a failed servicer is obligated to repurchase from us if we determine there was an underwriting or eligibility breach.

We are exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" for additional discussion on risks of mortgage fraud we are exposed to.

Risk management steps we have taken to mitigate our risk to servicers with whom we have material counterparty exposure include guaranty of obligations by a higher-rated entity, reduction or elimination of exposures, reduction or elimination of certain business activities, transfer of exposures to third parties, receipt of additional collateral and suspension or termination of the servicing relationship.

### *Mortgage Insurers*

We use several types of credit enhancement to manage our single-family mortgage credit risk, including primary and pool mortgage insurance coverage. Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $95.9 billion on the single-family mortgage loans in our guaranty book of business as of December 31, 2010, which represented approximately 3% of our single-family guaranty book of business as

173

of December 31, 2010. Primary mortgage insurance represented $91.2 billion of this total, and pool mortgage insurance was $4.7 billion. We had total mortgage insurance coverage risk in force of $106.5 billion on the single-family mortgage loans in our guaranty book of business as of December 31, 2009, which represented approximately 4% of our single-family guaranty book of business as of December 31, 2009. Primary mortgage insurance represented $99.6 billion of this total, and pool mortgage insurance was $6.9 billion of this total.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and condition of mortgage insurers. Since January 1, 2009, Standard & Poor's, Fitch and Moody's have downgraded, in some cases more than once, the insurer financial strength ratings of each of our top seven mortgage insurer counterparties that continue to be rated. As a result of the downgrades, these mortgage insurer counterparties' current insurer financial strength ratings are below the "AA-" level that we require under our qualified mortgage insurer approval requirements to be considered qualified as a "Type 1" mortgage insurer. Due to these downgrades, we have begun to primarily rely on our internal credit ratings when assessing our exposure to a counterparty.

Our rating structure is based on a scale of 1 to 8. A rating of 1 represents a counterparty that we view as having excellent credit quality. We consider the credit quality of an 8 to be poor. These internal ratings, which reflect our views of a mortgage insurer's claims paying ability, are based primarily on an assessment of the mortgage insurer's capital adequacy and liquidity. These assessments conducted in making our credit quality determinations involve in-depth credit reviews of each mortgage insurer, a comprehensive analysis of the mortgage insurance sector, stress analyses of the insurer's portfolio, discussions with the insurer's management, the insurer's plans to maintain capital within the insuring entity and our views on macroeconomic variables which impact a mortgage insurer's estimated future paid losses, such as changes in home prices and changes in interest rates. From time to time, we may also discuss its situation with the rating agencies.

Table 51 presents our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business by mortgage insurer for our top eight mortgage insurer counterparties as of December 31, 2010. These mortgage insurers provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of December 31, 2010.

**Table 51:   Mortgage Insurance Coverage**

| Counterparty:[1] | As of December 31, 2010 | | |
|---|---|---|---|
| | Maximum Coverage[2] | | |
| | Primary | Pool | Total |
| | (Dollars in millions) | | |
| Mortgage Guaranty Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $21,334 | $1,943 | $23,277 |
| Radian Guaranty, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,002 | 368 | 15,370 |
| Genworth Mortgage Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,250 | 81 | 14,331 |
| United Guaranty Residential Insurance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,831 | 213 | 14,044 |
| PMI Mortgage Insurance Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,065 | 294 | 12,359 |
| Republic Mortgage Insurance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,573 | 993 | 10,566 |
| Triad Guaranty Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,986 | 823 | 3,809 |
| CMG Mortgage Insurance Company[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,938 | — | 1,938 |

[1]   Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[2]   Maximum coverage refers to the aggregate dollar amount of insurance coverage (*i.e.*, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[3]   CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

TREASURY-0415

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. A number of our mortgage insurers have received waivers from their regulators regarding state-imposed risk-to-capital limits. Without these waivers, these mortgage insurers would not be able to continue to write new business in accordance with state regulatory requirements, should they fall below their regulatory capital requirements. In 2010, the parent companies of several of our largest mortgage insurer counterparties raised capital, which may improve their ability to meet state-imposed risk-to-capital limits and their ability to continue paying our claims in full as they come due, to the extent that the capital raised by the parent companies is contributed to their respective mortgage insurance entities. It is uncertain as to how long our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits. Additionally, mortgage insurers continue to approach us with various proposed corporate restructurings that would require our approval of affiliated mortgage insurance writing entities. In 2010, we approved PMI Mortgage Assurance Co., a wholly-owned subsidiary of PMI Mortgage Insurance Co., to provide mortgage insurance in a limited number of states, subject to certain conditions.

If mortgage insurers are not able to raise capital and exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure a waiver from their state regulator. A mortgage insurer that is in run-off continues to collect premiums and pay claims on its existing insurance business, but no longer writes new insurance. This would increase the risk that the mortgage insurer will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate. In addition, if we are no longer willing or able to conduct business with one or more of our mortgage insurer counterparties, and we are unable to replace them with another mortgage insurer, it is likely we would further increase our concentration risk with the remaining mortgage insurers in the industry.

Triad Guaranty Insurance Corporation ceased issuing commitments for new mortgage insurance and began to run-off its existing business in July 2008. In April 2009, Triad received an order from its regulator that changes the way it will pay all policyholder claims. Under the order, all valid claims under Triad's mortgage guaranty insurance policies will be paid 60% in cash and 40% by the creation of a deferred payment obligation. Triad began paying claims through this combination of cash and deferred payment obligations in June 2009. When, and if, Triad's financial position permits, Triad's regulator will allow Triad to begin paying its deferred payment obligations and/or increase the amount of cash Triad pays on claims.

When we estimate the credit losses that are inherent in our mortgage loan portfolio and under the terms of our guaranty obligations we also consider the recoveries that we will receive on primary mortgage insurance, as mortgage insurance recoveries would reduce the severity of the loss associated with defaulted loans. We adjust the contractually due recovery amount to ensure that only amounts which are probable of collection as of the balance sheet date are included in our loss reserve estimate. As a result, if our assessment of one or more of our mortgage insurer counterparty's ability to fulfill their respective obligations to us worsens, it could result in an increase in our loss reserves.

As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are measured collectively for impairment. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of approximately $1.2 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. As of December 31, 2009, our allowance for loan losses of $9.9 billion, allowance for accrued interest receivable of $536 million and reserve for guaranty losses of $54.4 billion incorporated an estimated recovery amount of approximately $16.3 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are measured collectively for impairment. This amount is comprised of the contractual recovery of approximately $18.5 billion as of December 31, 2009 and an adjustment of approximately $2.2 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

TREASURY-0416

For loans that are collectively evaluated for impairment, we estimate the portion of our incurred loss that we expect to recover from each of our mortgage insurance counterparties based on the losses that have been incurred, the contractual mortgage insurance coverage, and an estimate of each counterparty's resources available to pay claims to Fannie Mae. An analysis by our Counterparty Risk division determines whether, based on all the information available to us, any counterparty is considered probable to fail to meet their obligations in the next 30 months. This period is consistent with the amount of time over which claims related to losses incurred today are expected to be paid. If that separate analysis finds a counterparty is probable to fail, we then reserve for the shortfall between incurred claims and estimated resources available to pay claims to Fannie Mae.

For loans that have been determined to be individually impaired, we calculate a net present value of the expected cash flows for each loan to determine the level of impairment, which is included in our allowance for loan losses or reserve for guaranty losses. These expected cash flow projections include proceeds from mortgage insurance, that are based, in part, on the internal credit ratings for each of our mortgage insurance counterparties. Specifically, for loans insured by a mortgage insurer with a poorer credit rating, our cash flow projections include fewer proceeds from the insurer. Also, as our internal credit ratings of our mortgage insurer counterparties decrease, we reduce the amount of benefits we expect to receive from the insurance they provide, which in turn increases the fair value of our guaranty obligation.

As described above, our methodologies for individually and collectively impaired loans differ as required by GAAP, but both consider the ability of our counterparties to pay their obligations in a manner that is consistent with each methodology. As the loans individually assessed for impairment consider the life of the loan, we use the noted risk ratings to adjust the loss severity in our best estimates of future cash flows. As the loans collectively assessed for impairment only look to the probable payments we would receive associated with our loss emergence period, we use the noted shortfall to adjust the loss severity.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds their insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $4.4 billion as of December 31, 2010 and $2.5 billion as of December 31, 2009 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $648 million as of December 31, 2010 and $301 million as of December 31, 2009 was due from our mortgage seller/servicers. We assessed the receivables for collectibility, and they are recorded net of a valuation allowance of $317 million as of December 31, 2010 and $51 million as of December 31, 2009 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $6.4 billion for the year ended December 31, 2010 and $3.6 billion for the year ended December 31, 2009. During the years ended December 31, 2010 and 2009, we negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million for the year ended December 31, 2010 and $668 million for the year ended December 31, 2009 are included in our total insurance proceeds amount.

Our mortgage insurer counterparties have generally continued to pay claims owed to us, except where deferred payment terms have been established. Our mortgage insurer counterparties have increased the number of mortgage loans for which they have rescinded coverage. In those cases where the mortgage insurance was obtained to meet our charter requirements or where we independently agree with the materiality of the finding that was the basis for the rescission, we generally require the seller/servicer to repurchase the loan or indemnify us against loss. We also independently review the origination loan files based upon internal protocols, and seek repurchase of those loans where we discover material underwriting defects, misrepresentation, or fraud.

In the second quarter of 2010, some mortgage insurers disclosed agreements with certain lenders whereby they agree to waive certain rights to investigate claims for significant product segments of the insured loans for that

particular lender, and in return receive some compensation. This means that these mortgage insurers will require fewer mortgage insurance rescissions for origination defects for the impacted loans. For loans covered by these agreements, to the extent we do not uncover loan defects independently for loans that otherwise would have resulted in mortgage insurance rescission, we may be at risk of additional loss. It is unclear how prevalent this type of agreement between mortgage insurers and lenders may become or how many loans it may impact. We have required our top mortgage insurer counterparties to notify us promptly of any such agreements to waive rights either to investigate claims or to rescind mortgage insurance coverage. Because loans covered by such agreements will be subject to fewer mortgage insurance rescissions, we expect that our own independent review process will lead to loan repurchases that otherwise would have been subject to a rescission of mortgage insurance coverage. We examine these arrangements to determine if other actions are necessary.

Besides evaluating their condition to assess whether we have incurred probable losses in connection with our coverage, we also evaluate these counterparties individually to determine whether or under what conditions they will remain eligible to insure new mortgages sold to us. Except for Triad Guaranty Insurance Corporation, as of February 24, 2011, our private mortgage insurer counterparties remain qualified to conduct business with us. However, based on our evaluation of them, we may impose additional terms and conditions of approval on some of our mortgage insurers, including: limiting the volume and types of loans they may insure for us; requiring them to obtain our consent prior to providing risk sharing arrangements with mortgage lenders; and requiring them to meet certain financial conditions, such as maintaining a minimum level of policyholders' surplus, a maximum risk-to-capital ratio, a maximum combined ratio, parental or other capital support agreements and limitations on the types and volumes of certain assets that may be considered as liquid assets.

From time to time, we may enter into negotiated transactions with mortgage insurer counterparties pursuant to which we agree to cancel or restructure insurance coverage, in excess of charter requirements, in exchange for a fee. These insurance cancellations and restructurings may provide our counterparties with capital relief and provide us with cash in lieu of future claims that the counterparty may not be able to pay, thereby reducing our future counterparty credit exposure. We may negotiate additional insurance coverage restructurings in 2011, though fewer than prior years.

We generally are required pursuant to our charter to obtain credit enhancement on single-family conventional mortgage loans that we purchase or securitize with LTV ratios over 80% at the time of purchase. In connection with Refi Plus, we are generally able to purchase an eligible loan if the loan has mortgage insurance in an amount at least equal to the amount of mortgage insurance that existed on the loan that was refinanced. As a result, these refinanced loans with updated LTV ratios above 80% and up to 125% may have no mortgage insurance or less insurance than we would otherwise require for a loan not originated under this program. In the current environment, many mortgage insurers have stopped insuring new mortgages with higher LTV ratios or with lower borrower credit scores or on select property types, which has contributed to the reduction in our business volumes for high LTV ratio loans. In addition, FHA's role as the lower-cost option for loans with higher LTV ratios has also reduced our acquisitions of these types of loans. If our mortgage insurer counterparties further restrict their eligibility requirements or new business volumes for high LTV ratio loans, or if we are no longer willing or able to obtain mortgage insurance from these counterparties, and we are not able to find suitable alternative methods of obtaining credit enhancement for these loans, or if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, we may be further restricted in our ability to purchase or securitize loans with LTV ratios over 80% at the time of purchase.

*Financial Guarantors*

We were the beneficiary of financial guarantees totaling $8.8 billion as of December 31, 2010 and $9.6 billion as of December 31, 2009 on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal

177

government and its agencies that totaled $25.7 billion as of December 31, 2010 and $51.3 billion as of December 31, 2009.

Most of the financial guarantors that provided bond insurance coverage to us as of December 31, 2010 experienced material adverse changes to their investment grade ratings and their financial condition during 2010 and 2009 because of significantly higher claim losses that have impaired their claims paying ability. From time to time, we may enter into negotiated transactions with financial guarantor counterparties pursuant to which we agree to cancellation of their guaranty in exchange for a cancellation fee. With the exception of Ambac Assurance Corporation ("Ambac"), as described below, none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. However, based on the stressed financial condition of our financial guarantor counterparties, we believe that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future. We model our securities assuming the benefit of those external financial guarantees that are deemed creditworthy. For additional discussions of our model methodology and key inputs used to estimate other-than-temporary impairment see "Note 6, Investments in Securities."

In March 2010, Ambac and its insurance regulator, the Wisconsin Office of the Commissioner of Insurance, imposed a court-ordered moratorium on certain claim payments under Ambac's bond insurance coverage, including claims arising under coverage on $1.2 billion of our private-label securities insured by Ambac as of December 31, 2010. Prior to March 2010, we received payments from Ambac for our claims on Ambac insured private-label securities. As a result of the moratorium, we have not received payments for the additional claims filed with Ambac in 2010. On January 24, 2011, the Wisconsin Circuit Court of Dane County confirmed Ambac's rehabilitation plan; however, the plan is subject to stay and appeal. The outcome of legal proceedings regarding the moratorium and the proposed company rehabilitation each remain uncertain at this time. We assumed no benefit for Ambac's financial guaranty when estimating other-than-temporary impairment. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities" for more information on our investments in private-label mortgage-related securities.

*Lenders with Risk Sharing*

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $15.6 billion as of December 31, 2010 and $18.3 billion as of December 31, 2009. As of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2009, 53% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $30.3 billion as of December 31, 2010 and $28.7 billion as of December 31, 2009. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three lenders. As of December 31, 2009, 51% of our maximum potential loss recovery on multifamily loans was from three lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of Standard & Poor's, Moody's and Fitch ratings) was 46% as of December 31, 2010, compared with 45% as of December 31, 2009. The percentage of these recourse obligations to lender counterparties rated below investment grade was 23% as of December 31, 2010, compared to 22% as of December 31, 2009. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 31% as of December 31, 2010, compared with 33% as of December 31, 2009. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent

178

non-bank financial institutions. As of December 31, 2010, loans representing approximately 55% of the unpaid principal balance of loans in our guaranty book of business acquired from our DUS lenders are serviced by institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to backstop a portion of the lenders' future obligations. To ensure the level of risk associated with these lenders remains within our standards, we actively monitor their financial condition. Due to the current credit trends within the multifamily market, effective January 2011, we increased the collateral requirements for DUS lenders to better align with more recent actual and modeled loss projections. Lenders delivering loans with higher-risk characteristics will be required to maintain increased levels of collateral with our designated custodian. Although the current capital requirements have withstood significant testing, we believe these changes will more closely align the DUS program with current levels of risk in the market and better protect our assets.

Several of our DUS lenders and their parent companies, including Capmark Finance Inc. ("Capmark"), have experienced financial stress during the recent market downturn. Capmark, along with its parent and various other affiliates, filed for Chapter 11 bankruptcy protection on October 25, 2009. On December 11, 2009, Berkadia Commercial Mortgage LLC ("Berkadia") acquired Capmark's mortgage origination and servicing business, including its Fannie Mae portfolio, through the Section 363 bankruptcy auction process. While Berkadia subsequently became an active DUS lender and servicer of the former Capmark Fannie Mae portfolio, our contractual and investment relationships continue with other Capmark affiliates that remain subject to bankruptcy court jurisdiction. At this time, we cannot determine what, if any, impact the bankruptcy might have on us. Any action taken by Capmark, including an entity or asset sale, likely would affect only our investments in LIHTC funds, which have a carrying value of zero in our consolidated financial statements.

*Custodial Depository Institutions*

A total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010 and a total of $51.0 billion in deposits for single-family payments were received and held by 284 institutions in the month of December 2009. Of these total deposits, 92% as of December 31, 2010 and 95% as of December 31, 2009 were held by institutions rated as investment grade by Standard & Poor's, Moody's and Fitch. Our ten largest custodial depository institutions held 93% of these deposits as of both December 31, 2010 and 2009.

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts. If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificateholders. Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us.

Due to the challenging market conditions, several of our custodial depository counterparties experienced ratings downgrades and liquidity constraints. In response, we reduced the aggregate amount of our funds permitted to be held with these counterparties and required more frequent remittances of funds. These rules are effective through December 2013.

The Dodd-Frank Act, signed into law July 21, 2010, permanently increased the amount of federal deposit insurance available to $250,000 per depositor, which substantially lowered our counterparty exposure relating to principal and interest payments held on our behalf. Prior to this legislation, this increase was set to expire in December 2013.

*Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio primarily consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and

asset-backed securities. See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio. Our counterparty risk is primarily with financial institutions and U.S. Treasury.

Our cash and other investments portfolio, which totaled $61.8 billion as of December 31, 2010, included $31.5 billion of U.S. Treasury securities and $10.3 billion of unsecured positions all of which were short-term deposits with financial institutions which had short-term credit ratings of A-1, P-1, F1 (or equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively. As of December 31, 2009, our cash and other investments portfolio totaled $69.4 billion and included $45.8 billion of unsecured positions with issuers of corporate debt securities or short-term deposits with financial institutions, of which approximately 92% were with issuers which had short-term credit ratings of A-1, P-1, F1 (or its equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively.

We monitor the credit risk position of our cash and other investments portfolio by duration and rating level. In addition, we monitor the financial position and any downgrades of these counterparties. The outcome of our monitoring could result in a range of events, including selling some of these investments. If one of our primary cash and other investments portfolio counterparties fails to meet its obligations to us under the terms of the investments, it could result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth. During 2010, we evaluated the growing uncertainty of the stability of various European economies and financial institutions and as a result of this evaluation, reduced the number of counterparties in our cash and other investments portfolio in those markets and began to lend to remaining counterparties on a secured basis.

### Derivatives Counterparties

Our derivative credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. Derivatives in a gain position are included in our consolidated balance sheets in "Other assets."

We expect our credit exposure on derivative contracts to fluctuate with changes in interest rates, implied volatility and the collateral thresholds of the counterparties. Typically, we seek to manage this exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better. These counterparties consist of large banks, broker-dealers and other financial institutions that have a significant presence in the derivatives market.

We also manage our exposure to derivatives counterparties by requiring collateral in specified instances. We have a collateral management policy with provisions for requiring collateral on interest rate and foreign currency derivative contracts in net gain positions based upon the counterparty's credit rating. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities. We analyze credit exposure on our derivative instruments daily and make collateral calls as appropriate based on the results of internal pricing models and dealer quotes. In the case of a bankruptcy filing by an interest rate or foreign currency derivative counterparty or other default by the counterparty under the derivative contract, we would have the right to terminate all outstanding derivative contracts with that counterparty and may retain collateral previously posted by that counterparty to the extent that we are in a net gain position on the termination date.

Our net credit exposure on derivatives contracts decreased to $152 million as of December 31, 2010, from $238 million as of December 31, 2009. We had outstanding interest rate and foreign currency derivative transactions with 15 counterparties as of December 31, 2010 and 16 counterparties as of December 31, 2009. Derivatives transactions with nine of our counterparties accounted for approximately 90% of our total outstanding notional amount as of December 31, 2010, with each of these counterparties accounting for between approximately 5% and 19% of the total outstanding notional amount. In addition to the 15 counterparties with whom we had outstanding notional amounts as of December 31, 2010, we had master

TREASURY-0421

netting agreements with three counterparties with whom we may enter into interest rate derivative or foreign currency derivative transactions in the future.

The Dodd-Frank Act includes additional regulation of the over-the-counter derivatives market that will likely directly and indirectly affect many aspects of our business and our business partners. Under the Dodd-Frank Act, if a swap is required by the CFTC to be cleared, it will be unlawful to enter into such a swap unless it is submitted for clearing to a derivatives clearing organization. In anticipation of those requirements, we cleared a small number of new interest rate swap transactions with a derivatives clearing organization. The Dodd-Frank Act also requires certain institutions meeting the definition of "swap dealer" or "major swap participant" to register with the CFTC. The CFTC and SEC issued joint proposed rules regarding certain definitions in the Dodd-Frank Act, including the definition of "major swap participant." See "Legislation and GSE Reform—Financial Regulatory Reform Legislation: The Dodd-Frank Act" and "Risk Factors" for additional details regarding the Dodd-Frank Act and risks to our business posed by the Act.

See "Note 10, Derivative Instruments and Hedging Activities" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of December 31, 2010 and 2009. See "Risk Factors" for a discussion of the risks to our business posed by interest rate risk and a discussion of the risks to our business as a result of the increasing concentration of our derivatives counterparties.

### Mortgage Originators and Investors

We are routinely exposed to pre-settlement risk through the purchase or sale of closed mortgage loans and mortgage-related securities with mortgage originators and mortgage investors. The risk is the possibility that the counterparty will be unable or unwilling to either deliver closed mortgage assets or compensate us for the cost to cancel or replace the transaction. We manage this risk by determining position limits with these counterparties, based upon our assessment of their creditworthiness, and monitoring and managing these exposures.

### Debt Security and Mortgage Dealers

The credit risk associated with dealers that commit to place our debt securities is that they will fail to honor their contracts to take delivery of the debt, which could result in delayed issuance of the debt through another dealer. The primary credit risk associated with dealers who make forward commitments to deliver mortgage pools to us is that they may fail to deliver the agreed-upon loans to us on the agreed-upon date, which could result in our having to replace the mortgage pools at higher cost to meet a forward commitment to sell the MBS. We manage these risks by establishing approval standards and limits on exposure and monitoring both our exposure positions and changes in the credit quality of dealers.

### Document Custodians

We use third-party document custodians to provide loan document certification and custody services for some of the loans that we purchase and securitize. In many cases, our lender customers or their affiliates also serve as document custodians for us. Our ownership rights to the mortgage loans that we own or that back our Fannie Mae MBS could be challenged if a lender intentionally or negligently pledges or sells the loans that we purchased or fails to obtain a release of prior liens on the loans that we purchased, which could result in financial losses to us. When a lender or one of its affiliates acts as a document custodian for us, the risk that our ownership interest in the loans may be adversely affected is increased, particularly in the event the lender were to become insolvent. We mitigate these risks through legal and contractual arrangements with these custodians that identify our ownership interest, as well as by establishing qualifying standards for document custodians and requiring removal of the documents to our possession or to an independent third-party document custodian if we have concerns about the solvency or competency of the document custodian.

TREASURY-0422

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner.

*Interest Rate Risk Management*

Our goal is to manage market risk to be neutral to the movements in interest rates and volatility, subject to model constraints and prevailing market conditions. We employ an integrated interest rate risk management strategy that allows for informed risk taking within pre-defined corporate risk limits. Decisions regarding our strategy in managing interest rate risk are based upon our corporate market risk policy and limits that are established by our Chief Market Risk Officer and our Chief Risk Officer and are subject to review and approval by our Board of Directors. Our Capital Markets Group has primary responsibility for executing our interest rate risk management strategy.

We have actively managed the interest rate risk of our "net portfolio," which is defined below, through the following techniques: (1) asset selection and structuring (that is, by identifying or structuring mortgage assets with attractive prepayment and other risk characteristics); (2) issuing a broad range of both callable and non-callable debt instruments; and (3) using LIBOR-based interest-rate derivatives. We have not actively managed or hedged our spread risk, or the impact of changes in the spread between our mortgage assets and debt (referred to as mortgage-to-debt spreads) after we purchase mortgage assets, other than through asset monitoring and disposition. For mortgage assets in our portfolio that we intend to hold to maturity to realize the contractual cash flows, we accept period-to-period volatility in our financial performance attributable to changes in mortgage-to-debt spreads that occur after our purchase of mortgage assets. For more information on the impact that changes in spreads have on the value of the fair value of our net assets, see "Supplemental Non-GAAP Information—Fair Value Balance Sheets."

We monitor current market conditions, including the interest rate environment, to assess the impact of these conditions on individual positions and our overall interest rate risk profile. In addition to qualitative factors, we use various quantitative risk metrics in determining the appropriate composition of our consolidated balance sheet and relative mix of debt and derivatives positions in order to remain within pre-defined risk tolerance levels that we consider acceptable. We regularly disclose two interest rate risk metrics that estimate our overall interest rate exposure: (1) fair value sensitivity to changes in interest rate levels and the slope of the yield curve and (2) duration gap.

The metrics used to measure our interest rate exposure are generated using internal models. Our internal models, consistent with standard practice for models used in our industry, require numerous assumptions. There are inherent limitations in any methodology used to estimate the exposure to changes in market interest rates. The reliability of our prepayment estimates and interest rate risk metrics depends on the availability and quality of historical data for each of the types of securities in our net portfolio. When market conditions change rapidly and dramatically, as they did during the financial market crisis of late 2008, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models.

*Sources of Interest Rate Risk Exposure*

The primary source of our interest rate risk is the composition of our net portfolio. Our net portfolio consists of our existing investments in mortgage assets, investments in non-mortgage securities, our outstanding debt used to fund those assets and the derivatives used to supplement our debt instruments and manage interest rate risk, and any fixed-price asset, liability or derivative commitments.

Our mortgage assets consist mainly of single-family fixed-rate mortgage loans that give borrowers the option to prepay at any time before the scheduled maturity date or continue paying until the stated maturity. Given

this prepayment option held by the borrower, we are exposed to uncertainty as to when or at what rate prepayments will occur, which affects the length of time our mortgage assets will remain outstanding and the timing of the cash flows related to these assets. This prepayment uncertainty results in a potential mismatch between the timing of receipt of cash flows related to our assets and the timing of payment of cash flows related to our liabilities.

Changes in interest rates, as well as other factors, influence mortgage prepayment rates and duration and also affect the value of our mortgage assets. When interest rates decrease, prepayment rates on fixed-rate mortgages generally accelerate because borrowers usually can pay off their existing mortgages and refinance at lower rates. Accelerated prepayment rates have the effect of shortening the duration and average life of the fixed-rate mortgage assets we hold in our portfolio. In a declining interest rate environment, existing mortgage assets held in our portfolio tend to increase in value or price because these mortgages are likely to have higher interest rates than new mortgages, which are being originated at the then-current lower interest rates. Conversely, when interest rates increase, prepayment rates generally slow, which extends the duration and average life of our mortgage assets and results in a decrease in value.

Although the fair value of our guaranty assets and our guaranty obligations is highly sensitive to changes in interest rates and the market's perception of future credit performance, we do not actively manage the change in the fair value of our guaranty business that is attributable to changes in interest rates. We do not believe that periodic changes in fair value due to movements in interest rates are the best indication of the long-term value of our guaranty business because these changes do not take into account future guaranty business activity.

### Interest Rate Risk Management Strategy

Our strategy for managing the interest rate risk of our net portfolio involves asset selection and structuring of our liabilities to match and offset the interest rate characteristics of our balance sheet assets and liabilities as much as possible. Our strategy consists of the following principal elements:

- *Debt Instruments.*   We issue a broad range of both callable and non-callable debt instruments to manage the duration and prepayment risk of expected cash flows of the mortgage assets we own.

- *Derivative Instruments.*   We supplement our issuance of debt with derivative instruments to further reduce duration and prepayment risks.

- *Monitoring and Active Portfolio Rebalancing.*   We continually monitor our risk positions and actively rebalance our portfolio of interest rate-sensitive financial instruments to maintain a close match between the duration of our assets and liabilities.

### Debt Instruments

Historically, the primary tool we have used to fund the purchase of mortgage assets and manage the interest rate risk implicit in our mortgage assets is the variety of debt instruments we issue. The debt we issue is a mix that typically consists of short- and long-term, non-callable debt and callable debt. The varied maturities and flexibility of these debt combinations help us in reducing the mismatch of cash flows between assets and liabilities in order to manage the duration risk associated with an investment in long-term fixed-rate assets. Callable debt helps us manage the prepayment risk associated with fixed-rate mortgage assets because the duration of callable debt changes when interest rates change in a manner similar to changes in the duration of mortgage assets. See "Liquidity and Capital Management—Liquidity Management—Debt Funding" for additional information on our debt activity.

### Derivative Instruments

Derivative instruments also are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. When deciding whether to use derivatives, we consider a

TREASURY-0424

number of factors, such as cost, efficiency, the effect on our liquidity, results of operations, and our overall interest rate risk management strategy.

The derivatives we use for interest rate risk management purposes fall into four broad categories:

- *Interest rate swap contracts.*   An interest rate swap is a transaction between two parties in which each agrees to exchange, or swap, interest payments. The interest payment amounts are tied to different interest rates or indices for a specified period of time and are generally based on a notional amount of principal. The types of interest rate swaps we use include pay-fixed swaps, receive-fixed swaps and basis swaps.

- *Interest rate option contracts.*   These contracts primarily include pay-fixed swaptions, receive-fixed swaptions, cancelable swaps and interest rate caps. A swaption is an option contract that allows us or a counterparty to enter into a pay-fixed or receive-fixed swap at some point in the future.

- *Foreign currency swaps.*   These swaps convert debt that we issue in foreign-denominated currencies into U.S. dollars. We enter into foreign currency swaps only to the extent that we issue foreign currency debt.

- *Futures.*   These are standardized exchange-traded contracts that either obligate a buyer to buy an asset at a predetermined date and price or a seller to sell an asset at a predetermined date and price. The types of futures contracts we enter into include Eurodollar, U.S. Treasury and swaps.

We use interest rate swaps, interest rate options and futures, in combination with our issuance of debt securities, to better match the prepayment risk and duration of our assets with the duration of our liabilities. We are generally an end user of derivatives; our principal purpose in using derivatives is to manage our aggregate interest rate risk profile within prescribed risk parameters. We generally only use derivatives that are relatively liquid and straightforward to value. We use derivatives for four primary purposes:

(1) As a substitute for notes and bonds that we issue in the debt markets;

(2) To achieve risk management objectives not obtainable with debt market securities;

(3) To quickly and efficiently rebalance our portfolio and

(4) To hedge foreign currency exposure.

Decisions regarding the repositioning of our derivatives portfolio are based upon current assessments of our interest rate risk profile and economic conditions, including the composition of our consolidated balance sheets and relative mix of our debt and derivative positions, the interest rate environment and expected trends.

Table 52 presents, by derivative instrument type, our risk management derivative activity, excluding mortgage commitments, for the years ended December 31, 2010 and 2009 along with the stated maturities of derivatives outstanding as of December 31, 2010.

184

**Table 52:  Activity and Maturity Data for Risk Management Derivatives[1]**

| | Interest Rate Swaps | | | | Interest Rate Swaptions | | | | | |
| | Pay-Fixed | Receive-Fixed[2] | Basis[3] | Foreign Currency[4] | Pay-Fixed | Receive-Fixed | Interest Rate Caps | Futures | Other[5] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | | | | | |
| Notional balance as of December 31, 2008 . . . . . | $ 546,916 | $ 451,081 | $ 24,560 | $1,652 | $ 79,500 | $ 93,560 | $ 500 | $ — | $827 | $1,198,596 |
| Additions . . . . . . . . . . . . | 297,379 | 279,854 | 2,765 | 577 | 32,825 | 19,175 | 6,500 | — | 13 | 639,088 |
| Terminations[6] . . . . . . . | (461,695) | (455,518) | (24,100) | (692) | (13,025) | (37,355) | — | — | (92) | (992,477) |
| Notional balance as of December 31, 2009 . . . . . | $ 382,600 | $ 275,417 | $ 3,225 | $1,537 | $ 99,300 | $ 75,380 | $7,000 | $ — | $748 | $ 845,207 |
| Additions . . . . . . . . . . . . | 212,214 | 250,417 | 55 | 636 | 51,700 | 51,025 | — | 598 | — | 566,645 |
| Terminations[6] . . . . . . . . | (317,587) | (301,657) | (2,795) | (613) | (53,850) | (47,790) | — | (353) | (59) | (724,704) |
| Notional balance as of December 31, 2010 . . . . . | $ 277,227 | $ 224,177 | $ 485 | $1,560 | $ 97,150 | $ 78,615 | $7,000 | $ 245 | $689 | $ 687,148 |
| Future maturities of notional amounts:[7] | | | | | | | | | | |
| Less than 1 year . . . . . . . | $ 70,656 | $ 14,200 | $ 50 | $ 386 | $ 20,750 | $ — | $ — | $ 125 | $ 75 | $ 106,242 |
| 1 to less than 5 years . . . . | 90,788 | 168,000 | 35 | — | 35,300 | 4,500 | 7,000 | 120 | 593 | 306,336 |
| 5 to less than 10 years. . . . | 96,400 | 29,632 | 100 | 511 | 10,200 | 20,970 | — | — | 21 | 157,834 |
| 10 years and over . . . . . . | 19,383 | 12,345 | 300 | 663 | 30,900 | 53,145 | — | — | — | 116,736 |
| Total . . . . . . . . . . . . | $ 277,227 | $ 224,177 | $ 485 | $1,560 | $ 97,150 | $ 78,615 | $7,000 | $ 245 | $689 | $ 687,148 |
| Weighted-average interest rate as of December 31, 2010: | | | | | | | | | | |
| Pay rate . . . . . . . . . . . . | 2.84% | 0.29% | 0.09% | — | 5.14% | — | — | — | — | |
| Receive rate . . . . . . . . . | 0.28% | 2.27% | 4.61% | — | — | 4.15% | 3.58% | — | — | |
| Weighted-average interest rate as of December 31, 2009: | | | | | | | | | | |
| Pay rate . . . . . . . . . . . . | 3.46% | 0.26% | 0.05% | — | 5.46% | — | — | — | — | |
| Receive rate . . . . . . . . . | 0.26% | 3.47% | 1.59% | — | — | 4.45% | 3.58% | — | — | |

[1]  Dollars represent notional amounts that indicate only the amount on which payments are being calculated and do not represent the amount at risk of loss.

[2]  Notional amounts include swaps callable by Fannie Mae of $394 million, $406 million and $418 million as of December 31, 2010, 2009 and 2008, respectively. The notional amounts of swaps callable by derivatives counterparties were $3.2 billion and $10.4 billion as of December 31, 2010 and 2008, respectively. There were no swaps callable by derivatives counterparties as of December 31, 2009.

[3]  Notional amounts include swaps callable by derivatives counterparties of $50 million, $610 million and $925 million as of December 31, 2010, 2009 and 2008, respectively.

[4]  Exchange rate adjustments to foreign currency swaps existing at both the beginning and the end of the period are included in terminations. Exchange rate adjustments to foreign currency swaps that are added or terminated during the period are reflected in the respective categories.

[5]  Includes swap credit enhancements and mortgage insurance contracts.

[6]  Includes matured, called, exercised, assigned and terminated amounts.

[7]  Amounts reported are based on contractual maturities. Some of these amounts represent swaps that are callable by Fannie Mae or by a derivative counterparty, in which case the notional amount would cease to be outstanding prior to maturity if the call option were exercised. See notes (2) and (3) for information on notional amounts that are callable.

*Measurement of Interest Rate Risk*

Our interest rate risk measurement framework is based on the fair value of our assets, liabilities and derivative instruments, and the sensitivity of these values to changes in market factors. Estimating the impact of prepayment risk is critical in managing interest rate risk. We use prepayment models to determine the estimated duration and convexity of our mortgage assets and various quantitative methods for measuring our interest rate exposure. Because no single method can reflect all aspects of the interest rate risk inherent in our

185

mortgage portfolio, we utilize various risk measurements that together provide a more complete assessment of our aggregate interest rate risk profile.

We measure and monitor the fair value sensitivity to both small and large changes in the level of interest rates, changes in the shape of the yield curve, and changes in interest rate volatility. In addition, we perform a range of stress test analyses that measure the sensitivity of the portfolio to severe hypothetical changes in market conditions.

Our fair value sensitivity and duration gap metric, which are based on our net portfolio defined above, are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as appropriate to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. We also provide additional information that may be useful in evaluating our interest rate exposure. Our overall interest rate exposure, as reflected in the fair value sensitivity to changes in interest rate levels and the slope of the yield curve and duration gap, was within acceptable, pre-defined corporate limits as of December 31, 2010.

_Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve_

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift in the 1-year and 30-year rates of 16.7 basis points and 8.3 basis points, respectively. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

_Duration Gap_

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summaries, which are available on our website and announced in a press release.

The sensitivity measures presented in Table 53, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure

reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

In addition, Table 53 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended December 31, 2010.

**Table 53:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve[1]**

| | As of December 31, | |
|---|---|---|
| | **2010** | **2009** |
| | **(Dollars in billions)** | |
| Rate level shock: | | |
| -100 basis points | $(0.8) | $(0.1) |
| -50 basis points | (0.2) | 0.1 |
| +50 basis points | (0.2) | (0.4) |
| +100 basis points | (0.5) | (0.9) |
| Rate slope shock: | | |
| -25 basis points (flattening) | (0.1) | (0.2) |
| +25 basis points (steepening) | 0.1 | 0.1 |

| | For the Three Months Ended December 31, 2010 | | |
|---|---|---|---|
| | **Duration Gap** | **Rate Slope Shock 25 Bps** | **Rate Level Shock 50 Bps** |
| | | Exposure | |
| | **(In months)** | **(Dollars in billions)** | |
| Average | 0.3 | $0.1 | $0.3 |
| Minimum | (0.7) | — | — |
| Maximum | 0.9 | 0.1 | 0.4 |
| Standard deviation | 0.3 | — | 0.1 |

[1] Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuance, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 54 shows an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

**Table 54:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

| | **Before Derivatives** | **After Derivatives** | **Effect of Derivatives** |
|---|---|---|---|
| | **(Dollars in billions)** | | |
| As of December 31, 2010 | $(0.9) | $(0.2) | $0.7 |
| As of December 31, 2009 | $(2.1) | $(0.4) | $1.7 |

*Other Interest Rate Risk Information*

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

TREASURY-0428

We provide additional interest rate sensitivities below in Table 55, including separate disclosure of the potential impact on the fair value of our trading assets and our other financial instruments for the periods indicated, from the same hypothetical changes in the level of interest rates as presented above in Table 53. We also assume a parallel shift in all maturities along the interest rate swap curve in calculating these sensitivities. We believe these interest rate changes represent reasonably possible near-term changes in interest rates over the next twelve months.

**Table 55:   Interest Rate Sensitivity of Financial Instruments**

| | | As of December 31, 2010 | | | |
| | | Pre-tax Effect on Estimated Fair Value | | | |
| | | Change in Interest Rates (in basis points) | | | |
| | Estimated Fair Value | -100 | -50 | +50 | +100 |
| | | (Dollars in billions) | | | |
| Trading financial instruments | $ 56.9 | $ 0.9 | $0.4 | $(0.4) | $(0.8) |
| Other financial instruments, net[(1)(2)] | (201.1) | 10.8 | 4.1 | (3.9) | (6.1) |

| | | As of December 31, 2009 | | | |
| | | Pre-tax Effect on Estimated Fair Value | | | |
| | | Change in Interest Rates (in basis points) | | | |
| | Estimated Fair Value | -100 | -50 | +50 | +100 |
| | | (Dollars in billions) | | | |
| Trading financial instruments | $ 111.9 | $ 2.7 | $ 1.6 | $(1.9) | $(4.0) |
| Guaranty assets and guaranty obligations, net[(1)] | (149.3) | 11.3 | 5.7 | (6.0) | (4.3) |
| Other financial instruments, net[(2)] | (72.5) | (2.2) | (1.1) | 1.2 | 2.7 |

---

[(1)]   Consists of the net of "Guaranty assets" and "Guaranty obligations" reported in our consolidated balance sheets. In addition, includes certain amounts that have been reclassified from "Mortgage loans held for investment, net of allowance for loan losses" reported in our consolidated balance sheets to reflect how the risk of the interest rate and credit risk components of these loans are managed by our business segments.

[(2)]   Also consists of the net of all other financial instruments reported in "Note 19, Fair Value."

## Liquidity Risk Management

See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning" for a discussion on how we manage liquidity risk.

## Operational Risk Management

Our corporate operational risk framework is based on the OFHEO Enterprise Guidance on Operational Risk Management, published September 23, 2008. Our framework is intended to provide a methodology to identify, assess, mitigate, control and monitor operational risks across the company. Included in this framework is a requirement and plan for the development of a new system for tracking and reporting of operational risk incidents. The framework also includes a methodology for business owners to conduct risk and control self assessments to self identify potential operational risks and points of execution failure, the effectiveness of associated controls, and document corrective action plans to close identified deficiencies. This methodology is in its early stage of execution and the success of our operational risk effort will depend on the consistent execution of the operational risk programs and the timely remediation of high operational risk issues.

We have made a number of enhancements to our operational risk management efforts in 2010 including our business process focus, policies and framework. To quantify our operational risk exposure, we rely on the Basel Standardized approach, which is based on a percentage of revenue. As our operational risk management program matures, it is our goal to measure our operational risk exposure using quantitative models that will leverage data from our various operational risk programs.

TREASURY-0429

***Management of Business Resiliency***

Our business resiliency program is designed to provide reasonable assurance for continuity of critical business operations in the event of disruptions caused by the loss of facilities, technology or personnel. Despite proactive planning, testing and continuous preparation of back up venues, these measures may not prevent a significant business disruption from an improbable but highly catastrophic event.

***Non-Mortgage Related Fraud Risk***

Our anti-fraud program provides a framework for managing non-mortgage related fraud risk. The program is designed to provide reasonable assurance for the prevention and detection of non-mortgage related fraudulent activity. However, because fraudulent activity requires the intentional circumvention of the internal control structure, the efforts of the program may not always prevent, or immediately detect, instances of such activity.

See "Risk Factors" for a discussion on our operational risk.

189

## GLOSSARY OF TERMS USED IN THIS REPORT

Terms used in this report have the following meanings, unless the context indicates otherwise.

An *"Acquired credit-impaired loan"* refers to a loan we have acquired for which there is evidence of credit deterioration since origination and for which it is probable we will not be able to collect all of the contractually due cash flows. We record our net investment in such loans at the lower of the acquisition cost of the loan or the estimated fair value of the loan at the date of acquisition. Typically, loans we acquire from our MBS trusts pursuant to our option to purchase upon default meet these criteria. Because we acquire these loans from our MBS trusts at par value plus accrued interest, to the extent the par value of a loan exceeds the estimated fair value at the time we acquire the loan, we record the related fair value loss as a charge against the "Reserve for guaranty losses."

*"Alt-A mortgage loan"* or *"Alt-A loan"* generally refers to a mortgage loan originated under a lender's program offering reduced or alternative documentation than that required for a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans have a higher risk of default than non-Alt-A mortgage loans. In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that delivered the mortgage loans to us classified the loans as Alt-A based on documentation or other product features. We have classified private-label mortgage-related securities held in our investment portfolio as Alt-A if the securities were labeled as such when issued.

*"Business volume"* or *"new business acquisitions"* refers to the sum in any given period of the unpaid principal balance of: (1) the mortgage loans and mortgage-related securities we purchase for our investment portfolio; (2) the mortgage loans we securitize into Fannie Mae MBS that are acquired by third parties; and (3) credit enhancements that we provide on our mortgage assets. It excludes mortgage loans we securitize from our portfolio and the purchase of Fannie Mae MBS for our investment portfolio.

*"Buy-ups"* refer to upfront payments we make to lenders to adjust the monthly contractual guaranty fee rate on a Fannie Mae MBS so that the pass-through coupon rate on the MBS is in a more easily tradable increment of a whole or half percent.

*"Buy-downs"* refer to upfront payments we receive from lenders to adjust the monthly contractual guaranty fee rate on a Fannie Mae MBS so that the pass-through coupon rate on the MBS is in a more easily tradable increment of a whole or half percent.

*"Charge-off"* refers to loan amounts written off as uncollectible bad debts. When repayment is considered unlikely, these loan amounts are removed from our consolidated balance sheet and charged against our loss reserves.

*"Conventional mortgage"* refers to a mortgage loan that is not guaranteed or insured by the U.S. government or its agencies, such as the VA, the FHA or the Rural Development Housing and Community Facilities Program of the Department of Agriculture.

*"Credit enhancement"* refers to an agreement used to reduce credit risk by requiring collateral, letters of credit, mortgage insurance, corporate guarantees, or other agreements to provide an entity with some assurance that it will be compensated to some degree in the event of a financial loss.

*"Duration"* refers to the sensitivity of the value of a security to changes in interest rates. The duration of a financial instrument is the expected percentage change in its value in the event of a change in interest rates of 100 basis points.

*"Guaranty book of business"* refers to the sum of the unpaid principal balance of: (1) mortgage loans held in our mortgage portfolio; (2) Fannie Mae MBS held in our mortgage portfolio; (3) Fannie Mae MBS held by third parties; and (4) other credit enhancements that we provide on mortgage assets. It excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

*"HomeSaver Advance"* refers to a 15-year unsecured personal loan in an amount equal to all past due payments relating to a borrower's first lien mortgage loan, generally up to the lesser of $15,000 or 15% of the

190

unpaid principal balance of the delinquent first lien loan. The advance is used to bring the first lien mortgage loan current.

*"HomeSaver Advance fair value losses"* refer to losses recorded at the time we make a HomeSaver Advance loan to a borrower, which result from our recording HomeSaver Advance loans at their estimated fair value at the date of purchase from the servicers.

*"Implied volatility"* refers to the market's expectation of the magnitude of future changes in interest rates.

*"Interest rate swap"* refers to a transaction between two parties in which each agrees to exchange payments tied to different interest rates or indices for a specified period of time, generally based on a notional principal amount. An interest rate swap is a type of derivative.

*"LIHTC partnerships"* refer to low-income housing tax credit limited partnerships or limited liability companies.

*"Loans," "mortgage loans"* and *"mortgages"* refer to both whole loans and loan participations, secured by residential real estate, cooperative shares or by manufactured housing units.

*"Mortgage assets,"* when referring to our assets, refers to both mortgage loans and mortgage-related securities we hold in our investment portfolio.

*"Mortgage credit book of business"* refers to the sum of the unpaid principal balance of: (1) mortgage loans held in our mortgage portfolio; (2) Fannie Mae MBS held in our mortgage portfolio; (3) non-Fannie Mae mortgage-related securities held in our investment portfolio; (4) Fannie Mae MBS held by third parties; and (5) other credit enhancements that we provide on mortgage assets.

*"Multifamily mortgage loan"* refers to a mortgage loan secured by a property containing five or more residential dwelling units.

*"Notional amount"* refers to the hypothetical dollar amount in an interest rate swap transaction on which exchanged payments are based. The notional amount in an interest rate swap transaction generally is not paid or received by either party to the transaction and is typically significantly greater than the potential market or credit loss that could result from such transaction.

*"Option-adjusted spread"* or *"OAS"* refers to the incremental expected return between a security, loan or derivative contract and a benchmark yield curve (typically, U.S. Treasury securities, LIBOR and swaps, or agency debt securities). The OAS provides explicit consideration of the variability in the security's cash flows across multiple interest rate scenarios resulting from any options embedded in the security, such as prepayment options. For example, the OAS of a mortgage that can be prepaid by the homeowner without penalty is typically lower than a nominal yield spread to the same benchmark because the OAS reflects the exercise of the prepayment option by the homeowner, which lowers the expected return of the mortgage investor. In other words, OAS for mortgage loans is a risk-adjusted spread after consideration of the prepayment risk in mortgage loans. The market convention for mortgages is typically to quote their OAS to swaps. The OAS of our debt and derivative instruments are also frequently quoted to swaps. The OAS of our net mortgage assets is therefore the combination of these two spreads to swaps and is the option-adjusted spread between our assets and our funding and hedging instruments.

*"Outstanding Fannie Mae MBS"* refers to the total unpaid principal balance of Fannie Mae MBS that is held by third-party investors and held in our mortgage portfolio.

*"Pay-fixed swap"* refers to an agreement under which we pay a predetermined fixed rate of interest based upon a set notional principal amount and receive a variable interest payment based upon a stated index, with the index resetting at regular intervals over a specified period of time. These contracts generally increase in value as interest rates rise and decrease in value as interest rates fall.

*"Private-label securities"* refers to mortgage-related securities issued by entities other than agency issuers Fannie Mae, Freddie Mac or Ginnie Mae.

191

*"Receive-fixed swap"* refers to an agreement under which we make a variable interest payment based upon a stated index, with the index resetting at regular intervals, and receive a predetermined fixed rate of interest based upon a set notional amount and over a specified period of time. These contracts generally increase in value as interest rates fall and decrease in value as interest rates rise.

*"REMIC"* or *"Real Estate Mortgage Investment Conduit"* refers to a type of mortgage-related security in which interest and principal payments from mortgages or mortgage-related securities are structured into separately traded securities.

*"REO"* refers to real-estate owned by Fannie Mae because we have foreclosed on the property or obtained the property through a deed-in-lieu of foreclosure.

*"Severity rate"* or *"loss severity rate"* refers to the percentage of our total loss, which includes the unpaid principal balance of a loan, purchased interest, and selling costs if applicable, that we believe will not be recovered in the event of default.

*"Single-class Fannie Mae MBS"* refers to Fannie Mae MBS where the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issue.

*"Single-family mortgage loan"* refers to a mortgage loan secured by a property containing four or fewer residential dwelling units.

*"Small balance loans"* refers to multifamily loans with an original balance of less than $3 million nationwide or $5 million in high cost markets.

*"Subprime mortgage loan"* generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans were typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans were originated by one of these specialty lenders or a subprime division of a large lender. We exclude loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We have classified private-label mortgage-related securities held in our investment portfolio as subprime if the securities were labeled as such when issued.

*"Structured Fannie Mae MBS"* refers to Fannie Mae MBS that are resecuritizations of other Fannie Mae MBS.

*"Swaptions"* refers to options on interest rate swaps in the form of contracts granting an option to one party and creating a corresponding commitment from the counterparty to enter into specified interest rate swaps in the future. Swaptions are traded in the over-the-counter market and not through an exchange.

## Item 7A.   Quantitative and Qualitative Disclosures About Market Risk

Quantitative and qualitative disclosure about market risk is set forth in "MD&A—Risk Management—Market Risk Management, including Interest Rate Risk Management."

## Item 8.   Financial Statements and Supplementary Data

Our consolidated financial statements and notes thereto are included elsewhere in this annual report on Form 10-K as described below in "Exhibits and Financial Statement Schedules."

## Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

192

**Item 9A.   Controls and Procedures**

## OVERVIEW

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

## EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Deputy Chief Financial Officer, who is acting as our chief financial officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

### Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Deputy Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of December 31, 2010, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Deputy Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2010 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of December 31, 2010 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws.

As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of December 31, 2010 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness."

Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate the weakness in our disclosure controls and procedures relating to information known to FHFA while we are under conservatorship.

## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

### Overview

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting, as defined in rules promulgated under the Exchange Act, is a process designed by, or under the supervision of, our Chief Executive Officer and Deputy Chief Financial Officer and effected by our Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

TREASURY-0434

purposes in accordance with GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and our Board of Directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations. Internal control over financial reporting is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. Internal control over financial reporting also can be circumvented by collusion or improper override. Because of such limitations, there is a risk that material misstatements may not be prevented or detected on a timely basis by internal control over financial reporting. However, these inherent limitations are known features of the financial reporting process, and it is possible to design into the process safeguards to reduce, though not eliminate, this risk.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2010. In making its assessment, management used the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Management's assessment of our internal control over financial reporting as of December 31, 2010 identified a material weakness, which is described below. Because of this material weakness, management has concluded that our internal control over financial reporting was not effective as of December 31, 2010 or as of the date of filing this report.

Our independent registered public accounting firm, Deloitte & Touche LLP, has issued an audit report on our internal control over financial reporting, expressing an adverse opinion on the effectiveness of our internal control over financial reporting as of December 31, 2010. This report is included below.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management has determined that we had the following material weakness as of December 31, 2010:

- *Disclosure Controls and Procedures.*   We have been under the conservatorship of FHFA since September 6, 2008. Under the Regulatory Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the Regulatory Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the Regulatory Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly

194

with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of December 31, 2010 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

## MITIGATING ACTIONS RELATING TO MATERIAL WEAKNESS

**Disclosure Controls and Procedures**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this annual report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our 2010 Form 10-K, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the 2010 Form 10-K, and it was not aware of any material misstatements or omissions in the 2010 Form 10-K and had no objection to our filing the Form 10-K.

- The Director of FHFA or, after August 2009, the Acting Director of FHFA, and our Chief Executive Officer have been in frequent communication, typically meeting on a weekly basis.

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, liquidity, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

195

## CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

**Overview**

Management has evaluated, with the participation of our Chief Executive Officer and Deputy Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe changes in our internal control over financial reporting since September 30, 2010 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

- *Change in Management.*   During the fourth quarter of 2010, our Chief Financial Officer resigned from the company and our Deputy Chief Financial Officer assumed his responsibilities as chief financial officer.

- *Model Change.*   In the fourth quarter of 2010, we transitioned from using an internal model to a third-party vendor as the source for determining cash flows used to assess other-than-temporary impairment on Alt-A and subprime private-label securities. The implementation of the third-party vendor model required operational and system changes to enable the processing of the cash flows and analytical data that include certain internal controls. Accordingly, the implementation has required revisions to our internal control over financial reporting. We reviewed the implementation of the third-party vendor model, as well as the controls impacted, and made appropriate changes to affected internal controls.

TREASURY-0437

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To Fannie Mae:

We have audited Fannie Mae and consolidated entities' (in conservatorship) (the "Company") internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on that risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment:

- Disclosure Controls and Procedures—The Company's disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to the Federal Housing Finance Agency that is needed to meet its disclosure obligations under the federal securities laws as they relate to financial reporting.

This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2010, of the Company and this report does not affect our report on such financial statements.

In our opinion, because of the effect of the material weakness identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial

197

reporting as of December 31, 2010, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2010, of the Company and our report dated February 24, 2011 expressed an unqualified opinion on those financial statements and included explanatory paragraphs regarding the Company's adoption of new accounting standards and the Company's dependence upon the continued support of the United States Government, various United States Government agencies and the Company's conservator and regulator, the Federal Housing Finance Agency.


/s/   DELOITTE & TOUCHE LLP


Washington, DC
February 24, 2011

198

**Item 9B.   Other Information**

None.

<div align="center">

**PART III**

</div>

**Item 10.   Directors, Executive Officers and Corporate Governance**

## DIRECTORS

Our current directors are listed below. They have provided the following information about their principal occupation, business experience and other matters. Upon FHFA's appointment as our conservator on September 6, 2008, FHFA succeeded to all rights, titles, powers and privileges of any director of Fannie Mae with respect to Fannie Mae and its assets. More information about FHFA's September 6, 2008 appointment as our conservator and its subsequent reconstitution of our Board and direction regarding the Board's function and authorities can be found below in "Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

As discussed in more detail below under "Corporate Governance—Composition of Board of Directors," FHFA, as conservator, appointed an initial group of directors to our Board following our entry into conservatorship, delegated to the Board the authority to appoint directors to subsequent vacancies subject to conservator review, and defined the term of service of directors during conservatorship. The Nominating and Corporate Governance Committee evaluates the qualifications of individual directors on an annual basis. In its assessment of current directors and evaluation of potential candidates for director, the Nominating and Corporate Governance Committee considers, among other things, whether the Board as a whole possesses meaningful experience, qualifications and skills in the following subject areas:

- business;
- finance;
- capital markets;
- accounting;
- risk management;
- public policy;
- mortgage lending, real estate, low-income housing and/or homebuilding; and
- the regulation of financial institutions.

See "Corporate Governance—Composition of Board of Directors" below for further information on the factors the Nominating and Corporate Governance Committee considers in evaluating and selecting board members.

*Dennis R. Beresford*, 72, has served as Ernst & Young Executive Professor of Accounting at the J.M. Tull School of Accounting, Terry College of Business, University of Georgia since 1997. From 1987 to 1997, Mr. Beresford served as Chairman of the Financial Accounting Standards Board, or FASB, the designated organization in the private sector for establishing standards of financial accounting and reporting in the U.S. From 1961 to 1986, Mr. Beresford was with Ernst & Young LLP, including ten years as a Senior Partner and National Director of Accounting. In addition, Mr. Beresford served on the SEC Advisory Committee on Improvements to Financial Reporting. Mr. Beresford is currently a member of the Board of Directors and Chairman of the Audit Committee of Kimberly-Clark Corporation and of Legg Mason, Inc. He also serves as a member of the Risk Committee of Legg Mason, Inc. He previously was a member of the Board of Directors of MCI, Inc. from July 2002 to January 2006, where he served as Chairman of the Audit Committee. Mr. Beresford is a certified public accountant. Mr. Beresford initially became a Fannie Mae director in May 2006, before we were put into conservatorship, and FHFA appointed Mr. Beresford to Fannie Mae's Board in

<div align="center">199</div>

December 2008. Mr. Beresford serves as Chair of the Audit Committee and is also a member of the Compensation Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Beresford should continue to serve as a director due to his extensive experience in accounting, finance, business and risk management, which he gained in the positions described above.

*William Thomas Forrester*, 62, served as Chief Financial Officer of The Progressive Corporation from 1999 until his retirement in March 2007, and served in a variety of senior financial and operating positions with Progressive prior to that time. Prior to joining The Progressive Corporation in 1984, Mr. Forrester was with Price Waterhouse LLP, a major public accounting firm, from 1976 to 1984. Mr. Forrester is currently a member of the Board of Directors and Chairman of the Audit Committee of The Navigators Group, Inc. He also serves on the Finance Committee and Compensation Committee of The Navigators Group, Inc. Mr. Forrester is also currently a member of the Board of Directors of Alterra Capital Holdings Limited, where he serves on the Audit and Risk Management Committee. He previously was a member of the Board of Directors of Axis Capital Holdings Limited from December 2003 to May 2006, where he served as Chairman of the Audit Committee. Mr. Forrester has been a Fannie Mae director since December 2008. Mr. Forrester serves as a member of both the Audit Committee and the Nominating and Corporate Governance Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Forrester should continue to serve as a director due to his extensive experience in business, finance, accounting and risk management, which he gained in the positions described above.

*Brenda J. Gaines*, 61, served as President and Chief Executive Officer of Diners Club North America, a subsidiary of Citigroup, from October 2002 until her retirement in April 2004. She served as President, Diners Club North America, from February 1999 to September 2002. From 1988 until her appointment as President, she held various positions within Diners Club North America, Citigroup and Citigroup's predecessor corporations. She also served as Deputy Chief of Staff for the Mayor of the City of Chicago from 1985 to 1987 and as Chicago Commissioner of Housing from 1983 to 1985. Ms. Gaines also has over 12 years of experience with the Department of Housing and Urban Development, including serving as Deputy Regional Administrator from 1980 to 1981. Ms. Gaines is currently a member of the Board of Directors of Office Depot, Inc., where she serves as Chair of the Audit Committee and a member of the Corporate Governance and Nominating Committee. Ms. Gaines is also a member of the Board of Directors of NICOR, Inc., where she serves as a member of the Corporate Governance Committee, and Tenet Healthcare Corporation, where she serves as a member of both the Audit Committee and Compensation Committee. She previously was a member of the Board of Directors of CNA Financial Corporation from October 2004 to May 2007, where she served as Chair of the Audit Committee. Ms. Gaines initially became a Fannie Mae director in September 2006, before we were put into conservatorship, and FHFA appointed Ms. Gaines to Fannie Mae's Board in December 2008. Ms. Gaines serves as Chair of the Compensation Committee and is also a member of the Audit Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Ms. Gaines should continue to serve as a director due to her extensive experience in business, finance, accounting, risk management, public policy matters, mortgage lending, low-income housing, and the regulation of financial institutions, which she gained in the positions described above.

*Charlynn Goins*, 68, served as Chairperson of the Board of Directors of New York City Health and Hospitals Corporation from June 2004 to October 2008. She also served on the Board of Trustees of The Mainstay Funds, New York Life Insurance Company's retail family of funds, from June 2001 through July 2006 and on the Board of Directors of The Community's Bank from February 2001 through June 2004. Ms. Goins also was a Senior Vice President of Prudential Financial, Inc. (formerly, Prudential Securities, Inc.) from 1990 to 1997. Ms. Goins serves as the Chairperson of the New York Community Trust. She also serves as a director and a member of the Organization and Compensation Committee of AXA Financial Inc. She is also a director of AXA Equitable, MONY Life and MONY Life of America, which are subsidiaries of AXA Financial Inc. Ms. Goins is an attorney. Ms. Goins has been a Fannie Mae director since December 2008. Ms. Goins serves

200

as Chair of the Nominating and Corporate Governance Committee and is also a member of the Compensation Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Ms. Goins should continue to serve as a director due to her extensive experience in business, finance, public policy matters, and the regulation of financial institutions, which she gained in the positions described above.

*Frederick B. "Bart" Harvey III*, 61, retired in March 2008 from his role as chairman of the Board of Trustees of Enterprise Community Partners and Enterprise Community Investment, providers of development capital and technical expertise to create affordable housing and rebuild communities. Enterprise is a national non-profit that raises funds from the private sector to finance homes primarily for low and very low income people. Enterprise has also pioneered "green" affordable housing with its EnterpriseGreen Communities initiative. Mr. Harvey was Enterprise's chief executive officer from 1993 to 2007. He joined Enterprise in 1984, and a year later became vice chairman. Before joining Enterprise, Mr. Harvey served for 10 years in various domestic and international positions with Dean Witter Reynolds (now Morgan Stanley), leaving as Managing Director of Corporate Finance. Mr. Harvey was a member of the Board of Directors of the Federal Home Loan Bank of Atlanta from 1996 to 1999, a director of the National Housing Trust from 1990 to 2008, and also served as an executive committee member of the National Housing Conference from 1999 to 2008. Mr. Harvey initially became a Fannie Mae director in August 2008, before we were put into conservatorship, and FHFA appointed Mr. Harvey to Fannie Mae's Board in December 2008. Mr. Harvey serves as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Risk Policy and Capital Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Harvey should continue to serve as a director due to his extensive experience in business, finance, capital markets, risk management, public policy matters, mortgage lending, low-income housing and homebuilding, which he gained in the positions described above.

*Philip A. Laskawy*, 69, retired from Ernst & Young in September 2001, after having held several positions during his employment there from 1961 to 2001, including serving as Chairman and Chief Executive Officer from 1994 until his retirement in September 2001. Mr. Laskawy currently serves on the Boards of Directors of General Motors Corporation, Henry Schein, Inc., Lazard Ltd. and Loews Corporation. He is a member of the Audit Committee of each of these companies, including Chairman of the Audit Committee of General Motors Corporation. He is also Chair of the Nominating and Governance Committee and a member of the Strategic Advisory Committee at Henry Schein, Inc. Mr. Laskawy previously was a member of the Board of Directors of The Progressive Corporation (from 2001 through December 2007) and Discover Financial Services (from June 2007 through September 2008). He served as Chairman of the Audit Committee at each of these companies. Mr. Laskawy initially became a director and Chairman of Fannie Mae's Board in September 2008. Mr. Laskawy is Chair of the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Laskawy should continue to serve as a director due to his extensive experience in business, finance, accounting and risk management, which he gained in the positions described above.

*Egbert L. J. Perry*, 55, is the Chairman and Chief Executive Officer of The Integral Group LLC. Founded in 1993 by Mr. Perry, Integral is a real estate advisory, investment management and development company based in Atlanta. Mr. Perry has over 29 years experience as a real estate professional, including work in urban development, developing and investing in mixed-income, mixed-use communities, affordable/work force housing and commercial real estate projects in markets across the country. Mr. Perry currently serves as Chair of the Board of Directors of Atlanta Life Financial Group, where he serves as a member of the Audit Committee, as Chair of the Advisory Board of the Penn Institute for Urban Research and as a trustee of the University of Pennsylvania and Children's Healthcare of Atlanta. Mr. Perry served from 2002 through 2008 as a director of the Federal Reserve Bank of Atlanta. Mr. Perry has been a Fannie Mae director since December 2008. Mr. Perry is a member of both the Nominating and Corporate Governance Committee and the Risk Policy and Capital Committee.

TREASURY-0442

The Nominating and Corporate Governance Committee concluded that Mr. Perry should continue to serve as a director due to his extensive experience in business, finance, accounting, mortgage lending, real estate, low-income housing and homebuilding, which he gained in the positions described above.

*Jonathan Plutzik,* 56, has served as Chairman of Betsy Ross Investors, LLC since August 2005. He also has served as President of the Jonathan Plutzik and Lesley Goldwasser Family Foundation Inc. and as Chairman of the Coro New York Leadership Center since January 2003. Mr. Plutzik served as Non-Executive Chairman of the Board of Directors at Firaxis Games from June 2002 to December 2005. Before that, he served from 1978 to June 2002 in various positions with Credit Suisse First Boston, retiring in June 2002 from his role as Vice Chairman. Mr. Plutzik has been a Fannie Mae director since November 2009. Mr. Plutzik is a member of both the Compensation Committee and the Risk Policy and Capital Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Plutzik should continue to serve as a director due to his extensive experience in business, finance, capital markets, risk management and the regulation of financial institutions, which he gained in the positions described above.

*David H. Sidwell,* 57, served as Executive Vice President and Chief Financial Officer of Morgan Stanley from March 2004 to October 2007, when he retired. From 1984 to March 2004, Mr. Sidwell worked for JPMorgan Chase & Co. in a variety of financial and operating positions, most recently as Chief Financial Officer of JPMorgan Chase's investment bank from January 2000 to March 2004. Prior to joining JP Morgan in 1984, Mr. Sidwell was with Price Waterhouse LLP, a major public accounting firm, from 1975 to 1984. Mr. Sidwell serves as a Trustee of the International Accounting Standards Committee Foundation. Mr. Sidwell is currently a member of the Board of Directors, Senior Independent Director, and Chair of the Risk Committee of UBS AG. He previously was a member of the Board of Directors of MSCI Inc. from November 2007 through September 2008, where he served as Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee. Mr. Sidwell has been a Fannie Mae director since December 2008. Mr. Sidwell is Chair of the Risk Policy and Capital Committee and a member of the Compensation Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Sidwell should continue to serve as a director due to his extensive experience in business, finance, capital markets, accounting, risk management and the regulation of financial institutions, which he gained in the positions described above.

*Michael J. Williams,* 53, has been President and Chief Executive Officer of Fannie Mae since April 2009. He previously served as Fannie Mae's Executive Vice President and Chief Operating Officer from November 2005 to April 2009. Mr. Williams also served as Fannie Mae's Executive Vice President for Regulatory Agreements and Restatement from February 2005 to November 2005, as President—Fannie Mae eBusiness from July 2000 to February 2005 and as Senior Vice President—e-commerce from July 1999 to July 2000. Prior to this, Mr. Williams served in various roles in the Single-Family and Corporate Information Systems divisions of Fannie Mae. Mr. Williams joined Fannie Mae in 1991. Mr. Williams has been a Fannie Mae director since April 2009. He is a member of the Executive Committee.

Mr. Williams serves as a member of our Board of Directors pursuant to a FHFA order that specifies that our Chief Executive Officer will serve as a member of the Board. In addition, the Nominating and Corporate Governance Committee concluded that Mr. Williams should continue to serve as a director due to his extensive experience in business, finance, accounting, mortgage lending, real estate, low-income housing and the regulation of financial institutions, which he gained in the positions described above.

## CORPORATE GOVERNANCE

### Conservatorship and Delegation of Authority to Board of Directors

On September 6, 2008, the Director of FHFA appointed FHFA as our conservator in accordance with the GSE Act. Upon its appointment, the conservator immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to the books, records and assets of any other legal custodian of Fannie Mae.

TREASURY-0443

As a result, our Board of Directors no longer had the power or duty to manage, direct or oversee our business and affairs.

On November 24, 2008, FHFA, as conservator, reconstituted our Board of Directors and directed us regarding the function and authorities of the Board of Directors. FHFA has delegated to our Board of Directors and management the authority to conduct our day-to-day operations, subject to the direction of the conservator. FHFA's delegation of authority to the Board became effective on December 19, 2008 when FHFA appointed nine Board members to serve in addition to the Board Chairman, who was appointed by FHFA on September 16, 2008. Pursuant to FHFA's delegation of authority to the Board, the Board is responsible for carrying out normal Board functions, but is required to obtain the review and approval of FHFA as conservator before taking action in the specified areas described below. The delegation of authority will remain in effect until modified or rescinded by the conservator. The conservatorship has no specified termination date. The directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors have no duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator.

The conservator instructed that in taking actions the Board should ensure that appropriate regulatory approvals have been received. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in the following areas:

(1) actions involving capital stock, dividends, the senior preferred stock purchase agreement, increases in risk limits, material changes in accounting policy and reasonably foreseeable material increases in operational risk;

(2) the creation of any subsidiary or affiliate or any substantial non-ordinary course transactions with any subsidiary or affiliate;

(3) matters that relate to conservatorship;

(4) actions involving hiring, compensation and termination benefits of directors and officers at the executive vice president level and above and other specified executives;

(5) actions involving retention and termination of external auditors and law firms serving as consultants to the Board;

(6) settlements of litigation, claims, regulatory proceedings or tax-related matters in excess of a specified threshold;

(7) any merger with or acquisition of a business for consideration in excess of $50 million; and

(8) any action that in the reasonable business judgment of the Board at the time that the action is taken is likely to cause significant reputational risk.

For more information on the conservatorship, refer to "Business—Conservatorship and Treasury Agreements— Conservatorship."

**Composition of Board of Directors**

In November 2008, FHFA directed that our Board will have a minimum of nine and not more than thirteen directors. There will be a non-executive Chairman of the Board, and our Chief Executive Officer will be the only corporate officer serving as a director. Our initial directors were appointed by the conservator and subsequent vacancies have been and may continue to be filled by the Board, subject to review by the conservator. Each director will serve on the Board until the earlier of (1) resignation or removal by the conservator or (2) the election of a successor director at an annual meeting of shareholders.

Fannie Mae's bylaws provide that each director holds office for the term to which he or she was elected or appointed and until his or her successor is chosen and qualified or until he or she dies, resigns, retires or is

removed from office in accordance with the law, whichever occurs first. Under the Charter Act, each director is elected or appointed for a term ending on the date of our next shareholders' meeting. As noted above, however, the conservator appointed the initial directors to our Board, delegated to the Board the authority to appoint directors to subsequent vacancies subject to conservator review, and defined the term of service of directors during conservatorship.

Under the Charter Act, our Board shall at all times have as members at least one person from each of the homebuilding, mortgage lending and real estate industries, and at least one person from an organization that has represented consumer or community interests for not less than two years or one person who has demonstrated a career commitment to the provision of housing for low-income households. It is the policy of the Board that a substantial majority of Fannie Mae's directors will be independent, in accordance with the standards adopted by the Board. In addition, the Board, as a group, must be knowledgeable in business, finance, capital markets, accounting, risk management, public policy, mortgage lending, real estate, low-income housing, homebuilding, regulation of financial institutions and any other areas that may be relevant to the safe and sound operation of Fannie Mae.

In addition to knowledge in the areas noted above, the Nominating and Corporate Governance Committee considers the personal attributes and diversity of backgrounds offered by candidates, but does not have a formal policy on the consideration of diversity in identifying Board members. The Nominating and Corporate Governance Committee seeks out Board members who possess the highest personal values, judgment and integrity, diverse ideas and perspectives, and an understanding of the regulatory environment in which Fannie Mae does business. The Committee also considers whether a prospective candidate for the Board has the ability to attend meetings and fully participate in the activities of the Board.

The Nominating and Corporate Governance Committee evaluates the qualifications of current directors on an annual basis. Factors taken into consideration by the Committee in making this evaluation include:

- a director's contribution to the effective functioning of the corporation;

- any change in the director's principal area of responsibility with his or her company or his or her retirement from the company;

- whether the director continues to bring relevant experience to the Board;

- whether the director has the ability to attend meetings and fully participate in the activities of the Board;

- whether the director has developed any relationships with Fannie Mae or another organization, or other circumstances have arisen, that might make it inappropriate for the director to continue serving on the Board;

- the director's age and length of service on the Board; and

- the director's particular experience, qualifications, attributes and skills.

Information regarding the particular experience, qualifications, attributes or skills of each of our current directors is provided above under "Directors."

### Board Leadership Structure

We have had a non-executive Chairman of the Board since 2004. FHFA examination guidance requires separate Chairman of the Board and Chief Executive Officer positions and requires that the Chairman of the Board be an independent director. Our Board is also structured so that all but one of our directors, our Chief Executive Officer, are independent. A non-executive Chairman structure enables non-management directors to raise issues and concerns for Board consideration without immediately involving management and is consistent with the Board's emphasis on independent oversight, as well as our conservator's directives.

Our Board has five standing committees: the Audit Committee, the Compensation Committee, the Executive Committee, the Nominating and Corporate Governance Committee, and the Risk Policy and Capital Committee. The Board and the standing Board committees function in accordance with their designated duties

and with the authorities as set forth in federal statutes, regulations and FHFA examination and policy guidance, Delaware law (for corporate governance purposes) and in Fannie Mae's bylaws and applicable charters of Fannie Mae's Board committees. Such duties or authorities may be modified by the conservator at any time. In January 2011, the Board dissolved the Strategic Planning Committee and determined that its strategic planning oversight roles and responsibilities would be discharged by the full Board of Directors.

The Board oversees risk management primarily through the Risk Policy and Capital Committee. This Committee oversees management's risk-related policies, including receiving, reviewing and discussing with management presentations and analyses on corporate level risk policies and limits, performance against these policies and limits, and the sufficiency of risk management capabilities. For more information on the Board's role in risk oversight, see "MD&A—Risk Management—Enterprise Risk Governance—Board of Directors."

### Corporate Governance Information, Committee Charters and Codes of Conduct

Our Corporate Governance Guidelines, as well as the charters for our Board's Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Risk Policy and Capital Committee, are posted on our Web site, www.fanniemae.com, under "Corporate Governance" in the "About Us" section of our Web site. Our Executive Committee does not have a written charter. The responsibilities, duties and authorities of the Executive Committee are set forth in our Bylaws, which are also posted on our Web site, www.fanniemae.com, under "Corporate Governance" in the "About Us" section of our Web site.

We have a Code of Conduct that is applicable to all officers and employees and a Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors. Our Code of Conduct also serves as the code of ethics for our Chief Executive Officer and senior financial officers required by the Sarbanes-Oxley Act of 2002 and implementing regulations of the SEC. We have posted these codes on our Web site, www.fanniemae.com, under "Corporate Governance" in the "About Us" section of our Web site. We intend to disclose any changes to or waivers from these codes that apply to any of our executive officers or directors by posting this information on our Web site.

Although our equity securities are no longer listed on the New York Stock Exchange ("NYSE"), we are required by FHFA's corporate governance regulations and examination guidance for corporate governance, compensation practices and accounting practices to follow specified NYSE corporate governance requirements relating to, among other things, the independence of our Board members and the charters, independence, composition, expertise, duties and other requirements of our Board Committees.

### Audit Committee Membership

Our Board has a standing Audit Committee consisting of Mr. Beresford, who is the Chair, Mr. Forrester, Ms. Gaines and Mr. Harvey, all of whom are independent under the requirements of independence set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE), Fannie Mae's Corporate Governance Guidelines and other SEC rules and regulations applicable to audit committees. The Board has determined that Mr. Beresford, Mr. Forrester, Ms. Gaines and Mr. Harvey each have the requisite experience to qualify as an "audit committee financial expert" under the rules and regulations of the SEC and has designated each of them as such.

### Executive Sessions

Our non-management directors meet regularly in executive sessions without management present. Our Board of Directors reserves time for executive sessions at every regularly scheduled Board meeting. The non-executive Chairman of the Board, Mr. Laskawy, presides over these sessions.

### Communications with Directors

Interested parties wishing to communicate any concerns or questions about Fannie Mae to the non-executive Chairman of the Board or to our non-management directors individually or as a group may do so by electronic mail addressed to "board@fanniemae.com," or by U.S. mail addressed to Fannie Mae Board of Directors,

c/o Office of the Corporate Secretary, Fannie Mae, Mail Stop 1H-2S/05, 3900 Wisconsin Avenue NW, Washington, DC 20016-2892. Communications may be addressed to a specific director or directors, including Mr. Laskawy, the Chairman of the Board, or to groups of directors, such as the independent or non-management directors.

The Office of the Corporate Secretary is responsible for processing all communications to a director or directors. Communications that are deemed by the Office of the Corporate Secretary to be commercial solicitations, ordinary course customer inquiries, incoherent or obscene are not forwarded to directors.

**Director Nominations; Shareholder Proposals**

During the conservatorship, FHFA, as conservator, has all powers of the shareholders and Board of Directors of Fannie Mae. As a result, under the GSE Act, Fannie Mae's common shareholders no longer have the ability to recommend director nominees or elect the directors of Fannie Mae or bring business before any meeting of shareholders pursuant to the procedures in our bylaws. In consultation with the conservator, we currently do not plan to hold an annual meeting of shareholders in 2011. For more information on the conservatorship, refer to "Business—Conservatorship and Treasury Agreements—Conservatorship."

## EXECUTIVE OFFICERS

Our current executive officers who are not also members of the Board of Directors are listed below. They have provided the following information about their principal occupation, business experience and other matters.

*Kenneth J. Bacon*, 56, has been Executive Vice President—Multifamily (formerly, Housing and Community Development) since July 2005 and was interim head of Housing and Community Development from January 2005 to July 2005. He was Senior Vice President—Multifamily Lending and Investment from May 2000 to January 2005, and Senior Vice President—American Communities Fund from October 1999 to May 2000. From August 1998 to October 1999 he was Senior Vice President of the Community Development Capital Corporation. He was Senior Vice President of Fannie Mae's Northeastern Regional Office in Philadelphia from May 1993 to August 1998. Mr. Bacon was a director of the Fannie Mae Foundation from January 1995 until it was dissolved in June 2009. He was Vice Chairman of the Fannie Mae Foundation from January 2005 to September 2008 and was Chairman from September 2008 to June 2009. Mr. Bacon is a director of Comcast Corporation and the Corporation for Supportive Housing. He is a member of the Executive Leadership Council.

*David C. Benson*, 51, has been Executive Vice President—Capital Markets since April 2009 and has also served as Treasurer since June 2010. Mr. Benson previously served as Fannie Mae's Executive Vice President—Capital Markets and Treasury from August 2008 to April 2009, as Fannie Mae's Senior Vice President and Treasurer from March 2006 to August 2008, and as Fannie Mae's Vice President and Assistant Treasurer from June 2002 to February 2006. Prior to joining Fannie Mae in 2002, Mr. Benson was Managing Director in the fixed income division of Merrill Lynch & Co. From 1988 through 2002, he served in several capacities at Merrill Lynch in the areas of risk management, trading, debt syndication and e-commerce based in New York and London.

*Terence W. Edwards,* 55, has been Executive Vice President—Credit Portfolio Management since September 2009, when he joined Fannie Mae. Prior to joining Fannie Mae, Mr. Edwards served as the President and Chief Executive Officer of PHH Corporation, a leading outsource provider of mortgage and fleet management services, from January 2005 to June 2009. Mr. Edwards was also a member of the Board of Directors of PHH Corporation from January 2005 through June 2009. Prior to PHH Corporation's spin-off from Cendant Corporation (now known as Avis Budget Group, Inc.) in January 2005, Mr. Edwards served as President and Chief Executive Officer of Cendant Mortgage Corporation (now known as PHH Mortgage Corporation), a subsidiary of Cendant Corporation, beginning in February 1996. Mr. Edwards had previously served in other executive roles at PHH Corporation, which he joined in 1980.

*David C. Hisey*, 50, has been Executive Vice President and Deputy Chief Financial Officer since November 2008 and also assumed the responsibilities of Chief Financial Officer in December 2010. Mr. Hisey previously

served as Executive Vice President and Chief Financial Officer from August to November 2008, as Senior Vice President and Controller from February 2005 to August 2008 and as Senior Vice President, Financial Controls and Operations from January to February 2005. Prior to joining Fannie Mae, Mr. Hisey was Corporate Vice President of Financial Services Consulting, Managing Director and practice leader of the Lending and Leasing Group of BearingPoint, Inc., a management consulting and systems integration company. Prior to joining BearingPoint in 2000, Mr. Hisey was an audit partner with KPMG, LLP. Mr. Hisey serves as our principal accounting officer and is a certified public accountant.

*Linda K. Knight,* 60, has served as the Executive Vice President leading Fannie Mae's operating plan since September 2010. Since January 2011, Ms. Knight has also led the Financial Planning & Analysis business unit and the Strategy, Execution & Transformation business unit. Ms. Knight served as Executive Vice President—Mortgage-Backed Securities and Pricing from June 2010 to September 2010, and she served as Executive Vice President and Treasurer from April 2009 to June 2010. Ms. Knight previously served as Executive Vice President—Enterprise Operations & Securities from November 2008 to April 2009. Ms. Knight was responsible for securities operations from August 2008 to September 2010. She was responsible for enterprise operations from April 2007 to April 2009, except for a period from August 2008 to September 2008. Ms. Knight served under the title Executive Vice President—Securities from August to November 2008 and as Executive Vice President—Enterprise Operations from April 2007 until August 2008. Previously, Ms. Knight served as Executive Vice President—Capital Markets from March 2006 to April 2007. Before that, she served as Senior Vice President and Treasurer from February 1993 to March 2006, and Vice President and Assistant Treasurer from November 1986 to February 1993. Ms. Knight held the position of Director, Treasurer's Office from November 1984 to November 1986. Ms. Knight joined Fannie Mae in August 1982 as a senior market analyst.

*Timothy J. Mayopoulos,* 51, has been Executive Vice President, Chief Administrative Officer, General Counsel and Corporate Secretary since September 2010. Mr. Mayopoulos was Executive Vice President, General Counsel and Corporate Secretary from April 2009 to September 2010. Before joining Fannie Mae, Mr. Mayopoulos was Executive Vice President and General Counsel of Bank of America Corporation from January 2004 to December 2008. He was Managing Director and General Counsel, Americas of Deutsche Bank AG's Corporate and Investment Bank from January 2002 to January 2004. He was Managing Director and Senior Deputy General Counsel, Americas of Credit Suisse First Boston from November 2000 to May 2001, and Managing Director and Associate General Counsel of Donaldson, Lufkin & Jenrette, Inc. from May 1996 to November 2000. Mr. Mayopoulos was previously in private law practice at Davis Polk & Wardwell and served in the Office of the Independent Counsel during the Whitewater investigation.

*Karen R. Pallotta,* 47, has been Executive Vice President—Single-Family Mortgage Business since June 2009. Ms. Pallotta served as Senior Vice President—Product Acquisition Strategy and Support from September 2005 to May 2009. She previously served as Vice President—Marketing and Lender Strategies from November 2001 to September 2005. Ms. Pallotta held the positions of Director—Marketing from December 1999 to November 2001 and Director—Transactions and Account Management from July 1997 to December 1999. From July 1990, when she joined Fannie Mae, to July 1997, Ms. Pallotta held various analyst, manager and specialist positions with Fannie Mae.

*Kenneth J. Phelan,* 51, has been Executive Vice President—Chief Risk Officer, from April 2009 through February 2011. Prior to joining Fannie Mae, Mr. Phelan served as Chief Risk Officer of Wachovia Corporation, a financial holding company and bank holding company, from October 2008 to January 2009. Prior to Wachovia, Mr. Phelan served as Head of Risk Management Services at JPMorgan Chase & Co., a financial holding company, from August 2004 to September 2008. He also served as Head of Risk Strategy Development for Bank One Corporation, which was acquired by JPMorgan Chase & Co. in 2004, from September 2001 to August 2004.

*Michael A. Shaw,* 63, has been Executive Vice President and Chief Credit Officer since April 2009. Mr. Shaw previously served as Executive Vice President and Enterprise Risk Officer from November 2008 to April 2009, and as Executive Vice President and Chief Risk Officer from August 2008 to November 2008. Prior to that time, Mr. Shaw served as Senior Vice President—Credit Risk Oversight beginning in April 2006, when he

joined Fannie Mae. Prior to that time, Mr. Shaw was employed at JPMorgan Chase & Co., where he served as Senior Credit Executive from 2004 to 2006, as Senior Risk Executive, Policy, Reporting, Analytics and Finance during 2004 and as Senior Credit Executive—Consumer, Chase Financial Services from 2003 to 2004. Prior to joining JP Morgan, Mr. Shaw held senior risk positions at GE Capital and a subsidiary from 1997 to 2003. Mr. Shaw previously served in several senior risk positions at Citigroup Inc., which he joined in 1972.

*Edward G. Watson*, 49, has been Executive Vice President—Operations and Technology, since April 2009, when he joined Fannie Mae. Prior to joining Fannie Mae, Mr. Watson held a variety of positions with Citigroup Inc., a global diversified financial services holding company. From April 2004 to April 2008, he was Global Head, Capital Markets Operations and Institutional Clients Group Business Services. Before that, he served in a series of senior finance positions, including as Chief Financial Officer of Citigroup International, the European Investment Bank, and of Global Investment Management. Upon joining Citigroup in 1994, Mr. Watson led the effort to build the infrastructure for a start-up interest rate and equity over-the-counter derivatives business, which he ran until 1998.

Under our bylaws, each executive officer holds office until his or her successor is chosen and qualified or until he or she dies, resigns, retires or is removed from office.

### Section 16(a) Beneficial Ownership Reporting Compliance

Our directors and officers file with the SEC reports on their ownership of our stock and on changes in their stock ownership. Based on a review of forms filed during 2010 or with respect to 2010 and on written representations from our directors and officers, we believe that all of our directors and officers timely filed all required reports and reported all transactions reportable during 2010.

### Item 11.   Executive Compensation

---

### COMPENSATION DISCUSSION AND ANALYSIS

---

### Executive Summary

Our Board of Directors approved an executive compensation program in December 2009, which we used for 2009 and 2010 compensation actions. The program was approved by FHFA in consultation with the Department of the Treasury.

As described in more detail below, our executive compensation structure consists of three principal elements: base salary, deferred pay and a long-term incentive award. A key objective of our compensation program is to tie pay to performance. Accordingly, half of the deferred pay award is based on achievement of corporate goals and the entire long-term incentive award is based on performance against individual and corporate goals. Another key objective of our compensation program is to attract and retain the executive talent needed to continue to fulfill the company's important role in providing liquidity to the mortgage market and supporting the housing market, as well as to prudently manage our $3.2 trillion book of business and be an effective steward of the government's support. Our executive compensation program is also designed to follow the same general structure of compensation arrangements approved by Treasury's Special Master for TARP Executive Compensation for top executives at financial institutions that have received exceptional assistance under the Troubled Asset Relief Program ("TARP").

As compared to 2009, our executive compensation program for 2010 includes the following changes designed to further the objectives of the program:

- We increased the amount of the named executives' pay that is subject to performance: half of deferred pay is now based on corporate performance, whereas in 2009 all of deferred pay was service-based;

- We lengthened the performance period for the second installment of the 2010 long-term incentive award to two years, whereas the performance period for the 2009 long-term incentive award was only one year;

TREASURY-0449

- We implemented a policy to limit perquisites for our named executives to no more than $25,000 per person per year (with any exceptions to this limit requiring FHFA approval), and perquisites made available to our named executives in 2010 were substantially lower than this limit. We also eliminated tax reimbursements on perquisites for the named executives, as well as our executive life insurance program; and

- We froze benefit accruals in the Executive Pension Plan for all participants, including our Chief Executive Officer, for compensation years after 2009.

In addition, the Board of Directors did not increase the named executives' 2010 target total direct compensation from 2009 levels.

Our 2010 corporate performance goals were designed to support our current business objectives, which include providing support to the housing and mortgage markets during this critical time while minimizing our credit losses from delinquent mortgages. As such, our goals for 2010 were to achieve our mission of providing liquidity, stability and affordability to the U.S. housing and mortgage markets, build a more streamlined and higher-performing company, and build a stronger service and delivery model. The Compensation Committee determined that our performance against these goals was strong in many areas in 2010. For example, we provided significant liquidity to the market while maintaining the credit quality and expected economic returns of our new business. The Compensation Committee also determined, however, that we did not fully meet our subgoals relating to the management of our credit book and our risk and control environment. Based on its review of our corporate performance for 2010, the Compensation Committee determined that, subject to FHFA approval, the performance-based portion of 2010 deferred pay would be paid at 90% of target and the pool for the first installment of the 2010 long-term incentive awards for executive officers would be funded at 90% of target. Payment of the first installment of the 2010 long-term incentive awards was also subject to individual performance. FHFA reviewed and approved the Compensation Committee's determinations. See "Determination of 2010 Compensation" for more information about how corporate and individual performance were used to determine compensation of our named executives.

### Named Executives for 2010

This Compensation Discussion and Analysis focuses on compensation decisions relating to our Chief Executive Officer, our former Chief Financial Officer, our Deputy Chief Financial Officer (who assumed the responsibilities of our former Chief Financial Officer on December 30, 2010), and our next three most highly compensated executive officers during 2010. We refer to these individuals as our named executives. For 2010, our named executives were:

- Michael J. Williams, President and Chief Executive Officer;

- David C. Hisey, Executive Vice President and Deputy Chief Financial Officer (assumed responsibilities of the former Chief Financial Officer on December 30, 2010);

- David M. Johnson, Executive Vice President and Chief Financial Officer (through December 29, 2010);

- David C. Benson, Executive Vice President—Capital Markets;

- Terence W. Edwards, Executive Vice President—Credit Portfolio Management; and

- Timothy J. Mayopoulos, Executive Vice President, Chief Administrative Officer, General Counsel and Corporate Secretary.

### Impact of Conservatorship

As discussed above under "Business—Conservatorship and Treasury Agreements—Conservatorship," we have been under the conservatorship of FHFA since September 2008. The conservatorship has had a significant impact on the compensation received by our named executives in 2010, as well as the process by which

executive compensation for 2010 was determined. Regulatory requirements affecting our executive compensation include:

- Our directors serve on behalf of FHFA and exercise their authority subject to the direction of FHFA. More information about the role of our directors is described above in "Directors, Executive Officers and Corporate Governance—Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

- While we are in conservatorship, FHFA, as our conservator, retains the authority to approve and to modify both the terms and amount of any compensation to any of our executive officers. FHFA, as our conservator, has directed that our Board consult with and obtain FHFA's consent before taking any actions involving hiring, compensation or termination benefits of any officer at the executive vice president level and above and including, regardless of title, executives who hold positions with the functions of the chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer and chief/general/internal auditor.

- FHFA, as our regulator, must approve any termination benefits we offer to our named executives and certain other officers identified by FHFA.

- Under the terms of the senior preferred stock purchase agreement with Treasury, we may not enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any named executives or executive officers without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

- Under the terms of the senior preferred stock purchase agreement, we may not sell or issue any equity securities without the prior written consent of Treasury, other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement. This effectively eliminates our ability to offer stock-based compensation.

- Under the Housing and Economic Recovery Act of 2008 and related regulations issued by FHFA, the Director of FHFA has the authority to prohibit or limit us from making any "golden parachute payment" to specified categories of persons, including our named executives.

As a result of these requirements, the 2010 compensation determinations for our named executives discussed in this Compensation Discussion and Analysis were approved by the Acting Director of FHFA.

### 2010 Executive Compensation Program

#### *Overview of Program Objectives and Structure*

Our executive compensation program is designed to fulfill two primary objectives:

- *Pay for Performance.*   Our executive compensation program is intended to drive a pay for performance environment through the use of performance-based long-term incentive awards and deferred pay.

- *Attract and Retain Executive Talent.*   Our executive compensation program is also intended to attract and retain the executive talent needed to continue to fulfill the company's important role in providing liquidity to the mortgage market and supporting the housing market, as well as to prudently manage our book of business and be an effective steward of the government's support.

As described in our 2009 Form 10-K, in 2009, FHFA worked with our management and Board of Directors, and sought the guidance of Treasury's Special Master for TARP Executive Compensation, to develop an executive compensation program that meets these objectives and also reflects evolving standards regarding executive compensation and, to the extent appropriate, is generally consistent with the structural standards created for firms that received exceptional TARP assistance. The views of management and the Board of Directors in the development of this executive compensation program reflected input from management's and the Compensation Committee's compensation consultants.

TREASURY-0451

As a result of these efforts, in December 2009, we adopted a compensation program based on FHFA's guidance consisting of three primary elements: base salary, deferred pay and a long-term incentive award. With regard to the relative distribution of total compensation among these elements, based on guidance from FHFA, we targeted the long-term incentive award component at one-third of total direct compensation, with base salary and deferred pay together constituting the remaining two-thirds of total direct compensation. In addition, based on guidance from FHFA, we limited annual base salary rates to no more than $500,000, except in the case of our Chief Executive Officer and Chief Financial Officer, which is similar to the pay structure created for firms that received exceptional TARP assistance. FHFA, in consultation with Treasury, approved our compensation program and the level of salary, deferred pay target and long-term incentive target for each of our named executives.

The Board and the Compensation Committee reviewed compensation arrangements for the named executives in March 2010 and did not make any changes to the named executives' salaries, deferred pay targets or long-term incentive targets for 2010.

### Elements of 2010 Compensation Program

*Direct Compensation*

- *Base Salary.*   Base salary is paid in cash throughout the year on a bi-weekly basis and provides a minimum, fixed level of cash compensation for the named executives. Base salary reflects the named executive's level of responsibility and experience, as well as individual performance over time. Base salary is capped at $500,000 for all of our executive officers, including the named executives, other than our Chief Executive Officer and Chief Financial Officer.

- *Deferred Pay.*   Deferred pay is paid to the named executives in cash in quarterly installments in the year following the performance year. We will pay 2010 deferred pay to the named executives in four equal quarterly installments in March, June, September and December of 2011. Deferred pay is designed to replicate the "stock salary" element of the compensation program applicable to financial institutions that received exceptional TARP assistance and is also intended to serve as a retention incentive for the named executives; however, deferred pay is paid in cash, not stock. Given the low market value of our common stock since our entry into conservatorship, we and FHFA believe that stock-based compensation would not provide appropriate retention incentives for our named executives. Further, large grants of low-priced stock could provide substantial incentives for the named executives to seek and take large risks. In addition, we are prohibited from paying new stock-based compensation under the senior preferred stock purchase agreement without Treasury's consent. Except in the limited circumstances described under "Compensation Tables—Potential Payments Upon Termination or Change-in-Control" below, we will pay installments of deferred pay only if the named executive is employed by Fannie Mae on the scheduled payment dates.

  Half of 2010 deferred pay is based on the Board of Directors' determination of corporate performance in 2010, as approved by FHFA; the remaining half of 2010 deferred pay is service based. Accordingly, the performance-based portion of deferred pay that a named executive actually receives may be more or less than the named executive's target.

- *Long-term Incentive Award.*   A long-term incentive award is a performance-based cash award that is paid over two calendar years. Long-term incentive awards are designed to provide incentives to the named executives to achieve corporate and individual performance goals, and to serve as a retention incentive. A named executive's target for a long-term incentive award is one-third of the executive's target total direct compensation. Except in the limited circumstances described under "Compensation Tables—Potential Payments Upon Termination or Change-in-Control" below, we will pay installments of a long-term incentive award only if the named executive is employed by Fannie Mae on the scheduled payment dates.

  Half of the 2010 long-term incentive award is based on corporate and individual performance for 2010, and is paid in February 2011. The remaining half of the award will be determined and paid in early 2012 based on corporate and individual performance for both 2010 and 2011. Because the award is

211

performance based, the long-term incentive award that a named executive actually receives may be more or less than the named executive's target; however, the sum of the individual long-term incentive awards to all executive officers cannot exceed the overall amount of the long-term incentive pool for our executive officers. In addition, each long-term incentive award paid to an executive officer must be approved by FHFA.

*Employee Benefits*

Our employee benefits are a fundamental part of our executive compensation program, and serve as an important tool in attracting and retaining senior executives. We describe these employee benefits below.

- *Retirement Plans.*   Eligibility for our retirement plans is dependent on the named executive's date of hire, as we have made significant changes to our retirement programs over the last several years.

  - *Mr. Williams.*   Mr. Williams has a frozen benefit under the Executive Pension Plan. Mr. Williams also participates in our tax-qualified defined benefit pension plan and supplemental defined benefit pension plans. See "Compensation Tables—Pension Benefits—Defined Benefit Pension Plans" for more information about Mr. Williams' retirement benefits and changes made to those benefits during 2010.

  - *Messrs. Hisey and Benson.*   Messrs. Hisey and Benson participate in our tax-qualified defined benefit pension plan and supplemental defined benefit pension plans.

  - *Messrs. Johnson, Edwards and Mayopoulos.*   Messrs. Johnson, Edwards and Mayopoulos do not participate in any of our defined benefit pension plans because they were hired after we froze participation in these plans. They participate instead in our Supplemental Retirement Savings Plan, which is an unfunded, non-tax-qualified defined contribution plan.

  All of the named executives are also eligible to participate in our Retirement Savings Plan, which is a 401(k) plan that is available to our employee population as a whole. We provide more detail on our retirement plans under "Compensation Tables—Pension Benefits" and "Compensation Tables—Nonqualified Deferred Compensation."

- *Other Employee Benefits and Plans.*   In general, the named executives are eligible for employee benefits available to our employee population as a whole, including our medical insurance plans, life insurance program and matching charitable gifts program. The named executives are also eligible to participate in our voluntary supplemental long-term disability plan, which is available to many of our employees.

- *Perquisites.*   Our policy is to limit perquisites for our named executives to no more than $25,000 per person per year. Any exceptions to this limit would require the approval of FHFA in consultation with Treasury. No named executive received more than $2,400 in perquisites in 2010.

- *Severance Benefits.*   We have not entered into employment agreements with any of our named executives that would entitle the executive to severance benefits. Information on compensation that we may pay to a named executive in certain circumstances in the event the executive's employment is terminated is provided below in "Compensation Tables—Potential Payments Upon Termination or Change-in-Control." FHFA must approve any termination benefits we offer our named executives.

## Determination of 2010 Compensation

### Summary of 2010 Compensation Actions

The table below displays the named executives' 2010 compensation targets compared to the actual awards or payments to be received by the named executives. Only the first installment of the 2010 long-term incentive award, which is paid in February 2011, is included in this chart. The target amount for the second installment of the 2010 long-term incentive award is the same as the target for the first installment of the award. The second installment of the 2010 long-term incentive award will be determined and paid in 2012 based on 2010 and 2011 corporate and individual performance, and therefore is excluded from the chart. This table is not intended to replace the summary compensation table, required under applicable SEC rules, which is included below under "Compensation Tables—Summary Compensation Table for 2010, 2009 and 2008."

TREASURY-0453

| Named Executive | 2010 Base Salary Rate | 2010 Deferred Pay | | 2010 Long-Term Incentive Award (First Installment Only)[2] | | |
|---|---|---|---|---|---|---|
| | | Target | Actual Amount Approved to be Paid in 2011[1] | Target | Actual Amount Approved to be Paid in 2011 | Percentage of Target |
| Michael Williams . . . . . . . . . . . . . . . . . . . . | $900,000 | $3,100,000 | $2,945,000 | $1,000,000 | $900,000 | 90% |
| David Hisey. . . . . . . . . . . . . . . . . . . . . . . . | 425,000 | 1,045,000 | 992,750 | 365,000 | 325,000 | 89 |
| David Johnson[3] . . . . . . . . . . . . . . . . . . . | 650,000 | 1,700,000 | — | 575,000 | — | — |
| David Benson . . . . . . . . . . . . . . . . . . . . . | 500,000 | 1,369,667 | 1,301,184 | 465,167 | 440,000 | 95 |
| Terence Edwards . . . . . . . . . . . . . . . . . . . | 500,000 | 1,369,667 | 1,301,184 | 465,167 | 420,000 | 90 |
| Timothy Mayopoulos. . . . . . . . . . . . . . . . . | 500,000 | 1,469,667 | 1,396,184 | 490,167 | 485,000 | 99 |

[1] Target 2010 deferred pay is 50% service-based and 50% corporate performance-based. The Compensation Committee determined that the corporate performance-based portion of 2010 deferred pay would be paid at 90% of target.

[2] Amounts do not include the second installment of each named executive's 2010 long-term incentive award. For each named executive, the target amount for the second installment of the award is the same as the target for the first installment of the award. The amount of the second installment that will actually be paid to each named executive will be determined and paid in 2012 based on an assessment of 2010 and 2011 corporate and individual performance.

[3] Mr. Johnson left the company in December 2010 and therefore will not receive 2010 deferred pay or payment of a 2010 long-term incentive award.

### 2010 Corporate Performance Goals and Assessment of 2010 Corporate Performance

In May 2010, the Board established, and FHFA approved, 2010 corporate performance goals for the performance-based portion of deferred pay and for the first installment of the 2010 long-term incentive award, as well as continuing two-year (2010 and 2011) corporate performance goals for the second installment of the 2010 long-term incentive award. The Board did not assign any relative weight to the goals and the Compensation Committee may consider other factors in addition to the goals in assessing corporate performance.

In December 2010 and January 2011, the Compensation Committee reviewed our performance against each of our 2010 performance goals and related subgoals to determine the funding of the pool for the first installment of the 2010 long-term incentive awards for the named executives and the amounts of the performance-based portion of 2010 deferred pay for the named executives. In conducting its review, the Compensation Committee took into consideration the views of the Committee members and its objective to correlate compensation with performance, the views of FHFA, management's assessment of the company's performance against the goals, and the discussion and review of corporate performance with the Chief Executive Officer. The results of the Compensation Committee's review are summarized below.

- *Goal 1:* Our first 2010 performance goal was to achieve our mission of providing liquidity, stability and affordability to the U.S. housing and mortgage markets. Our subgoals under this goal consisted of: providing liquidity to the market while maintaining the credit quality and expected economic returns of our new business; managing our credit book of business; administering Treasury's Making Home Affordable Program; and addressing our duty to serve and housing goals. Key achievements during 2010 pursuant to this goal were as follows:

  - Our Single-Family business provided liquidity to the market by achieving a market share of new single-family mortgage-related securities issuances of 44.0% for 2010, significantly exceeding its target of 33% while actively balancing this market position with prudent lending and pricing.

  - Our Multifamily business provided liquidity to the market by achieving a multifamily GSE market share of 53% for 2010, exceeding its target of 50% while actively balancing this market position with prudent lending and pricing. Multifamily GSE market share refers to the percentage of multifamily credit guaranty acquisitions by Fannie Mae versus Freddie Mac.

  - Our Capital Markets business provided liquidity to the market through securities structuring, early funding, whole loan conduit and related activities that generated revenues well in excess of its target of $320 million.

TREASURY-0454

- We incurred single-family credit-related expenses of $26.4 billion for 2010, significantly lower than our target of $45.4 billion.

- We significantly increased our default prevention and loss mitigation activities in 2010 as compared to 2009, completing over 400,000 modifications, disposing of more than 185,000 REO properties and providing over 75,000 foreclosure alternatives in 2010. In addition, our serious delinquency rate declined by more than 100 basis points from its peak in February 2010.

- We made improvements to the HAMP system of record, supported Treasury-hosted borrower outreach events and conducted training of industry stakeholders and participating servicers.

- We made significant progress in meeting our new 2010 housing goals despite difficult market conditions. We also prepared for implementation of the final duty to serve rule.

The Compensation Committee concluded that the company had substantially met this goal. The Compensation Committee recognized the company's 2010 achievements described above, particularly the company's strong performance with respect to its liquidity subgoal. The company provided substantial liquidity to the market in 2010, while also acquiring new business with a high credit quality that is expected to be profitable. The Compensation Committee concluded, however, that the company only partially met its subgoal relating to the management of its credit book of business. While the company's credit losses were lower than expected in 2010, it was partially due to the temporary halt to foreclosures by some of our servicers during the fourth quarter of 2010. In addition, the Committee took into account the foreclosure process deficiencies of servicers, lawyers and other service providers that were discovered in 2010.

- _**Goal 2:**_  Our second 2010 performance goal was to build a more streamlined, higher-performing company. Our subgoals under this goal consisted of: enhancing our financial metrics; improving our business processes and technology infrastructure; developing and retaining employees; and achieving and maintaining a strong risk and control environment. Key achievements during 2010 pursuant to this goal were as follows:

  - We operated within our 2010 corporate forecast of revenues and expenses, developed a three-year cost reduction plan and developed new reporting and tracking methodologies for key business metrics.

  - We implemented a corporate project quality office, documented the current state architecture, created a baseline future state and made a number of organizational changes to optimize the technology and operations areas.

  - We enhanced our talent development and review processes, and retained high-performing employees at a higher rate than lower performers.

  - We resolved specified risk and control matters identified by internal audit and FHFA, and remediated our material weakness in internal control over financial reporting relating to change management by September 30, 2010.

  - We conducted risk control self-assessments for all high risk and a majority of medium risk processes and developed remediation plans for identified high exposure items.

The Compensation Committee concluded that the company had substantially met this goal. In making its determination, the Committee took into account the company's 2010 achievements described above. In addition, while the Committee acknowledged the significant progress the company had made in addressing risk and control issues in 2010, it concluded that the company only partially met its subgoal relating to its risk and control environment, and that the company must continue to work toward operational excellence and better manage its internal controls. For example, the company initially produced information for Treasury's June MHA report that contained an error.

- _**Goal 3:**_  Our third 2010 performance goal was to build a stronger service and delivery model. The Compensation Committee concluded that we met this goal for 2010 by successfully developing a three-year operating plan to improve organizational efficiency and reduce costs.

214

The Compensation Committee considered other factors in evaluating our 2010 performance in addition to performance against the 2010 corporate goals. These factors included: the company's implementation of consolidation accounting; its launch of an initiative to improve the quality of loan data and underwriting in the primary market; its participation in FHFA's initiative to review and evaluate servicing compensation for single-family loans; its development and implementation of a strategy to move high-risk servicing portfolios; and its resolution of a significant portion of its outstanding repurchase requests. The Compensation Committee also considered the company's continued substantial financial losses in 2010.

Based on its evaluation of the company's performance against its goals and these additional factors, the Compensation Committee determined that, subject to FHFA approval, the performance-based portion of 2010 deferred pay would be paid at 90% of target and the pool for the first installment of the 2010 long-term incentive awards for executive officers would be funded at 90% of target. In making this determination, the Compensation Committee did not give more weight to one goal or subgoal than any other goal or subgoal. The Board and FHFA have reviewed and approved this determination.

### Assessment of 2010 Individual Performance

*Overview.*   The amounts of the first installment of the 2010 long-term incentive awards for the named executives took into account not only the company's performance against the 2010 corporate goals and subgoals described above, but also an assessment by the Board of Directors of each named executive's performance during the year. The Board assessed the Chief Executive Officer's performance with input from the Compensation Committee and assessed each other named executive's performance with input from both the Compensation Committee and the Chief Executive Officer. Based on these assessments, the Board used its judgment and discretion to determine the amount of compensation it deemed appropriate for each named executive. The Board did not evaluate the performance of Mr. Johnson, who left the company in December 2010 and therefore did not receive a 2010 long-term incentive award.

We describe the Board's determination with respect to the first installment of each named executive's 2010 long-term incentive award, as well as the elements of each named executive's performance the Board considered in making this determination, below. FHFA has reviewed and approved these determinations. More information on the compensation arrangements for each of our named executives is set forth below in the "Summary Compensation Table for 2010, 2009 and 2008."

*Michael Williams, President and Chief Executive Officer.*   The Board determined that the first installment of Mr. Williams' 2010 long-term incentive award would be $900,000, which was 90% of his target. Mr. Williams' individual 2010 performance was evaluated based on the company's performance against the corporate performance goals for 2010, reflecting the fact that he is accountable for the success of the entire organization. In addition, other achievements not reflected in the corporate performance goals were considered. The Board determined that, under Mr. Williams' leadership in 2010, the company substantially met its corporate goals and subgoals, made solid progress in managing credit losses on its pre-2009 book of business, acquired a 2010 book of business with a strong credit profile that is expected to be profitable, and achieved substantial progress in making the company more operationally disciplined and efficient. The Board also determined that, during his tenure as Chief Executive Officer, Mr. Williams has provided strong and steady leadership in an extraordinarily challenging period for the company and a difficult market environment. He has built and maintained good relationships with FHFA and Treasury. In addition, he has built an effective executive management team and has also been instrumental in attracting and retaining strong employees at the senior vice president level.

*David Hisey, Executive Vice President—Deputy Chief Financial Officer.*   The Chief Executive Officer recommended to the Board that the first installment of Mr. Hisey's 2010 long-term incentive award be $325,000, which was approximately 89% of his target. The Board approved this recommendation. In recommending the amount of Mr. Hisey's long-term incentive award, the Chief Executive Officer considered Mr. Hisey's leadership of the company's implementation of the new consolidation accounting standards, which was completed in the first quarter of 2010. Implementation of these new accounting standards required the company to make major, complex operational and system changes in a very short time. The implementation

TREASURY-0456

effort involved the work of hundreds of people, and had a substantial impact on our overall internal control environment. Mr. Hisey's leadership of this project was critical in ensuring that it was completed successfully and on time. The Chief Executive Officer also considered Mr. Hisey's key partnership role in supporting the Credit Portfolio Management team, particularly with respect to special servicing efforts. In addition, the Chief Executive Officer considered Mr. Hisey's leadership of the company's participation in FHFA's ongoing initiative to review and evaluate servicing compensation for single-family loans, which includes not only managing a large internal team but also coordinating with FHFA.

*David Benson, Executive Vice President—Capital Markets.*   The Chief Executive Officer recommended to the Board that the first installment of Mr. Benson's 2010 long-term incentive award be $440,000, which was approximately 95% of his target. The Board approved this recommendation. In recommending the amount of Mr. Benson's long-term incentive award, the Chief Executive Officer considered that, under Mr. Benson's leadership, the Capital Markets group provided significant liquidity support to the market through securities structuring, early funding, whole loan conduit and related activities. The Chief Executive Officer also considered the additional responsibilities Mr. Benson took on as the company's Treasurer in 2010, and his key role in refinancing and restructuring a significant portion of our outstanding debt. Mr. Benson also had a significant role in obtaining funding for the company's purchase of over $200 billion in delinquent loans from our single-family MBS trusts in 2010, which had a beneficial impact on our financial results. The Chief Executive Officer also considered Mr. Benson's integral role in communicating with the company's regulators and his significant work in the company's efforts to improve its culture.

*Terence Edwards, Executive Vice President—Credit Portfolio Management.*   The Chief Executive Officer recommended to the Board that the first installment of Mr. Edwards' 2010 long-term incentive award be $420,000, which was approximately 90% of his target. The Board approved this recommendation. In recommending the amount of Mr. Edwards' long-term incentive award, the Chief Executive Officer considered Mr. Edwards' outstanding leadership in transforming the credit portfolio management team, which was one of the company's most critical leadership challenges in 2010. Mr. Edwards built a strong credit portfolio management team, adding over 600 people to his division through both internal and external resources. Under Mr. Edwards' effective leadership, his division handled an extraordinarily large volume of default prevention and loss mitigation activities in 2010, which had a positive impact on both homeowners and Fannie Mae's credit losses. In addition, the Chief Executive Officer determined that Mr. Edwards' leadership made it possible for the credit portfolio management team to make significant progress in addressing and remediating control issues.

*Timothy Mayopoulos, Executive Vice President, Chief Administrative Officer, General Counsel and Corporate Secretary.*   The Chief Executive Officer recommended to the Board that the first installment of Mr. Mayopoulos' 2010 long-term incentive award be $485,000, which was approximately 99% of his target. The Board approved this recommendation. In recommending the amount of Mr. Mayopoulos' long-term incentive award, the Chief Executive Officer considered the additional responsibilities Mr. Mayopoulos took on in 2010 as the company's new Chief Administrative Officer, with responsibility for the Human Resources, Communications and Marketing Services, and Government and Industry Relations divisions. The Chief Executive Officer also considered Mr. Mayopoulos' many significant accomplishments in 2010, which included his effective leadership relating to the settlement and ongoing handling of the company's litigation matters and his critical leadership role relating to the company's participation in Congressional hearings and in the Financial Crisis Inquiry Commission hearings. In addition, the Chief Executive Officer considered Mr. Mayopoulos' significant role in developing the company's operating plan as part of the company's goal of building a stronger service and delivery model, particularly in the early stages of this effort. He also considered that Mr. Mayopoulos continues to play a key advisory role in connection with the company's operating plan.

### Compensation Arrangements with our Former Chief Financial Officer

Mr. Johnson, the company's former Chief Financial Officer, received base salary in 2010 through his departure date of December 29, 2010. Mr. Johnson was not eligible to receive the fourth quarterly installment of his 2009 deferred pay because he was not employed by us on the payment date for that installment. In addition,

Mr. Johnson is not eligible to receive payments of the second installment of his 2009 long-term incentive award, the first or second installment of his 2010 long-term incentive award or any of the quarterly installments of his 2010 deferred pay because he will not be employed by us on the respective payment dates for these installments. In addition to base salary, Mr. Johnson received company contributions to his Retirement Savings Plan and company credits to a Supplemental Retirement Savings Plan in 2010; however, due to his resignation, he forfeited the 2% company contributions to the Retirement Savings Plan and the 2% company credits to the Supplemental Retirement Savings Plan for 2008, 2009 and 2010, which have a three-year vesting period. Mr. Johnson did not receive any severance payments as a result of his resignation from Fannie Mae. For more detailed information regarding Mr. Johnson's 2010, 2009 and 2008 compensation, refer to the "Summary Compensation Table for 2010, 2009 and 2008" below.

## Other Executive Compensation Considerations

### Role of Compensation Consultants

Our current executive compensation program was developed in 2009 with assistance from the company's outside compensation consultant, McLagan, and the Compensation Committee's independent compensation consultant, Frederic W. Cook & Co., Inc. ("FW Cook").

McLagan advised management on various compensation and human resources matters during 2010, including the company's risk assessment of its 2010 compensation program and the performance metrics under our compensation plans. McLagan also advised management on competitive pay levels, organization structure and headcount, and various compensation proposals for new hires and promotions. In addition, McLagan provided market compensation data for senior management positions for purposes of determining 2011 compensation targets, including the named executives' positions.

FW Cook advised the Compensation Committee and the Board on various executive compensation matters during 2010, including the company's risk assessment of its 2010 compensation program, changes to the Chief Executive Officer's retirement benefits and various compensation proposals for new hires and promotions. FW Cook also evaluated the company's 2010 corporate performance goals and assisted the Compensation Committee in its assessment of the company's performance against these goals. In addition, FW Cook informed the Compensation Committee of market trends in compensation and assisted the Committee in its evaluation of our executive compensation program, including reviewing the market compensation data prepared by McLagan for senior management positions for purposes of determining 2011 compensation targets, including the named executives' positions. FW Cook did not provide any services to management in 2010.

### Compensation Recoupment Policy

Beginning with compensation for the 2009 performance year, our executive officers' compensation is subject to the following forfeiture and repayment provisions, also known as "clawback" provisions:

- *Materially Inaccurate Information.* If an executive officer has been granted deferred pay or incentive payments (including long-term incentive awards) based on materially inaccurate financial statements or any other materially inaccurate performance metric criteria, he or she will forfeit or must repay amounts granted in excess of the amounts the Board of Directors determines would likely have been granted using accurate metrics.

- *Termination for Cause.* If we terminate an executive officer's employment for cause, he or she will immediately forfeit all deferred pay, long-term incentive awards and any other incentive payments that have not yet been paid. We may terminate an executive officer's employment for cause if we determine that the officer has: (a) materially harmed the company by, in connection with the officer's performance of his or her duties for the company, engaging in gross misconduct or performing his or her duties in a grossly negligent manner, or (b) been convicted of, or pleaded *nolo contendere* with respect to, a felony.

- *Subsequent Determination of Cause.* If an executive officer's employment was not terminated for cause, but the Board of Directors later determines, within a specified period of time, that he or she could have

TREASURY-0458

been terminated for cause and that the officer's actions materially harmed the business or reputation of the company, the officer will forfeit or must repay, as the case may be, deferred pay, long-term incentive awards and any other incentive payments received by the officer to the extent the Board of Directors deems appropriate under the circumstances. The Board of Directors may require the forfeiture or repayment of all deferred pay, long-term incentive awards and any other incentive payments so that the officer is in the same economic position as if he or she had been terminated for cause as of the date of termination of his or her employment.

- *Effect of Willful Misconduct.*   If an executive officer's employment: (a) is terminated for cause (or the Board of Directors later determines that cause for termination existed) due to either (i) willful misconduct by the officer in connection with his or her performance of his or her duties for the company or (ii) the officer has been convicted of, or pleaded *nolo contendere* with respect to, a felony consisting of an act of willful misconduct in the performance of his or her duties for the company and (b) in the determination of the Board of Directors, this has materially harmed the business or reputation of the company, then, to the extent the Board of Directors deems it appropriate under the circumstances, in addition to the forfeiture or repayment of deferred pay, long-term incentive awards and any other incentive payments described above, the executive officer will also forfeit or must repay, as the case may be, deferred pay and annual incentives or long-term awards paid to him or her in the two-year period prior to the date of termination of his or her employment or payable to him or her in the future. Misconduct is not considered willful unless it is done or omitted to be done by the officer in bad faith or without reasonable belief that his or her action or omission was in the best interest of the company.

Certain of the bonus or other incentive-based or equity-based compensation for our Chief Executive Officer and Chief Financial Officer also may be subject to a requirement that they be reimbursed to the company in the event that Section 304 of the Sarbanes-Oxley Act of 2002 applies to that compensation.

Our complete compensation repayment provisions are attached as Exhibit 99.1 to our Form 8-K filed on December 24, 2009.

The Compensation Committee plans to review our compensation recoupment policy and revise it as necessary to comply with the Dodd-Frank Act once rules implementing the Act's clawback requirements have been finalized by the SEC.

### Stock Ownership and Hedging Policies

In January 2009, our Board eliminated our stock ownership requirements because of the difficulty of meeting the requirements at current market prices and because we had ceased paying our executives stock-based compensation. All employees, including our named executives, are prohibited from transacting in derivative securities related to our securities, including options, puts and calls, other than pursuant to our stock-based benefit plans.

### Tax Deductibility of our Compensation Expenses

Subject to certain exceptions, section 162(m) of the Internal Revenue Code imposes a $1 million limit on the amount that a company may annually deduct for compensation to its CEO and certain other named executives, unless, among other things, the compensation is "performance-based," as defined in section 162(m), and provided under a plan that has been approved by the shareholders. We have not adopted a policy requiring all compensation to be deductible under section 162(m). The impact of a potential lost deduction because of Section 162(m) is substantially mitigated by our current and projected tax losses, and this approach allows us flexibility in light of the conservatorship. Awards under the 2008 Retention Program, 2009 deferred pay and long-term incentive awards for 2009 performance received by the named executives in 2010 do not qualify as performance-based compensation under section 162(m). In addition, 2010 deferred pay and long-term incentive awards for 2010 performance are not structured to qualify as performance-based compensation under section 162(m).

**2011 Compensation**

The Board and the Compensation Committee reviewed the current compensation arrangements for our named executives in January 2011 and determined that the named executives' base salary, deferred pay targets and long-term incentive targets will not change in 2011. As of February 24, 2011, the Board of Directors had not established 2011 corporate performance goals for purposes of determining the first installment of the 2011 long-term incentive awards.

The continuing two-year (2010 and 2011) performance goals against which the company's performance will be measured for purposes of the second installment of the 2010 long-term incentive awards (which are payable in the first quarter of 2012) are to: reduce fixed general and administrative expenses; achieve our target relating to the reduction of credit-related expenses; achieve risk-adjusted return on economic capital targets; meet deliverables on business process and technology improvements; address all matters requiring attention identified by our regulator; and make progress on certain strategic projects.

## COMPENSATION COMMITTEE REPORT

The Compensation Committee of the Board of Directors of Fannie Mae has reviewed and discussed the Compensation Discussion and Analysis included in this Form 10-K with management. Based on such review and discussions, the Compensation Committee has recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Form 10-K.

Compensation Committee:

Brenda J. Gaines, Chair
Dennis R. Beresford
Charlynn Goins (member since January 2011)
Jonathan Plutzik
David H. Sidwell

## COMPENSATION RISK ASSESSMENT

We conducted a risk assessment of our employee compensation policies and practices. In conducting this risk assessment, we reviewed, among other things, our compensation plans, pay profiles, performance goals and performance appraisal management process. We also assessed whether policies, procedures or other mitigating controls existed that would reduce the opportunity for excessive or inappropriate risk-taking within our compensation policies and practices.

Based on the results of our risk assessment, we concluded that our employee compensation policies and practices do not create risks that are reasonably likely to have a material adverse effect on the company. Several factors contributed to our conclusion, including:

- Payment of incentive compensation is based on the achievement of performance metrics that we have concluded do not encourage unnecessary or excessive risk-taking. Our mix of multiple qualitative and quantitative performance metrics without undue emphasis on any one metric provides an appropriate balance of incentives.

- Our extensive performance appraisal process ensures achievement of goals without encouraging executives or employees to take inappropriate risks.

- Although we have an all cash compensation program while under conservatorship, FHFA approval of our executive compensation arrangements and our payment of most incentive payments over time, with a portion based on future performance, encourages appropriate decision-making.

TREASURY-0460

- Our Board and Compensation Committee have an active and significant oversight role in compensation-related decisions, including approving the company's overall compensation structure, determining whether corporate goals have been achieved and determining the overall funding level of the pool for incentive awards, with final approval from FHFA. The Compensation Committee regularly reviews compensation data and consults with its independent compensation consultant on compensation matters.

- Deferred pay and incentive compensation for our senior executive officers is subject to the terms of a clawback policy.

- We have no severance arrangements for our executive officers that would pay additional compensation when an executive leaves and there is no guarantee that an executive would receive payments of previously awarded deferred pay or long-term incentive compensation if an executive's employment were terminated.

## COMPENSATION TABLES

### Summary Compensation Table for 2010, 2009 and 2008

The following table shows summary compensation information for 2010, 2009 and 2008 for the named executives.

| Name and Principal Position | Year | Salary ($)[1] | Bonus ($)[2] | Stock Awards ($)[3] | Non-Equity Incentive Plan Compensation ($)[4] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)[5] | All Other Compensation ($)[6] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Michael Williams[7] . . . . . . . . . . . . . . . . . . | 2010 | 900,000 | 1,550,000 | — | 2,295,000 | 833,156 | 16,300 | 5,594,456 |
| President and Chief Executive | 2009 | 860,523 | 2,867,200 | — | 2,051,100 | 790,803 | 111,180 | 6,680,806 |
| Officer | 2008 | 676,000 | 871,000 | 4,783,993 | — | 724,874 | 43,034 | 7,098,901 |
| David Hisey[8] . . . . . . . . . . . . . . . . . . | 2010 | 408,654 | 522,500 | — | 795,250 | 130,600 | 15,950 | 1,872,954 |
| Executive Vice President and | 2009 | 441,347 | 1,045,000 | — | 983,700 | 70,894 | 44,600 | 2,585,541 |
| Deputy Chief Financial Officer | 2008 | 382,904 | 737,000 | 940,487 | 160,000 | 62,450 | 43,209 | 2,326,050 |
| David Johnson[9] . . . . . . . . . . . . . . . . . . | 2010 | 645,000 | — | — | — | — | 79,200 | 724,200 |
| Executive Vice President and | 2009 | 675,000 | 1,275,000 | — | 517,500 | — | 178,865 | 2,646,365 |
| Chief Financial Officer | 2008 | 48,077 | — | — | — | — | — | 48,077 |
| David Benson. . . . . . . . . . . . . . . . . . . . . . | 2010 | 500,000 | 684,834 | — | 1,056,350 | 218,844 | 22,250 | 2,482,278 |
| Executive Vice President—Capital | 2009 | 519,231 | 1,369,667 | — | 1,282,800 | 125,157 | 47,815 | 3,344,670 |
| Markets | | | | | | | | |
| Terence Edwards. . . . . . . . . . . . . . . . . . . . | 2010 | 500,000 | 684,834 | — | 1,036,350 | — | 54,439 | 2,275,623 |
| Executive Vice President—Credit Portfolio | | | | | | | | |
| Management | | | | | | | | |
| Timothy Mayopoulos[10] . . . . . . . . . . . . . . | 2010 | 500,000 | 734,834 | — | 1,146,350 | — | 88,308 | 2,469,492 |
| Executive Vice President, | 2009 | 439,346 | 1,278,610 | — | 842,601 | — | 87,138 | 2,647,695 |
| Chief Administrative Officer, General | | | | | | | | |
| Counsel and Corporate Secretary | | | | | | | | |

[1] Calendar year 2009 contained 27 biweekly pay periods, rather than the usual 26 biweekly pay periods. As a result, salary amounts for 2009 reflect an additional biweekly pay period.

[2] Amounts shown for 2010 in the "Bonus" column consist of the service-based portion of 2010 deferred pay, which is 50% of the total 2010 deferred pay target. As described in footnote 4 below, the performance-based portion of 2010 deferred pay is included in the "Non-Equity Incentive Plan Compensation" column. Deferred pay for 2010 will be paid in four equal installments in March, June, September and December 2011. These amounts generally will be paid only if the named executive remains employed by us on the payment date. More information about deferred pay is presented in "Compensation Discussion and Analysis—2010 Executive Compensation Program—Elements of 2010 Compensation Program."

Amounts shown for 2009 in the "Bonus" column consist of the entire amount of 2009 deferred pay, all of which was service-based. As noted in footnote 9 below, the amount of 2009 deferred pay originally awarded to Mr. Johnson was $1,700,000; however, Mr. Johnson did not receive the fourth $425,000 installment of this award because he left the company prior to the payment date for the installment. Accordingly, the 2009 amount shown in this column for Mr. Johnson consists of only the $1,275,000 in 2009 deferred pay actually paid to him.

TREASURY-0461

(3) Amounts shown in the "Stock Awards" column represent the aggregate grant date fair value of restricted stock granted during the applicable year computed in accordance with the accounting standards for stock compensation. The amounts shown exclude the impact of estimated forfeitures related to service-based vesting conditions. The grant date fair value of restricted stock for each year is the average of the high and low trading price of our common stock on the date of grant.

(4) Amounts shown for 2010 in the "Non-Equity Incentive Plan Compensation" column include the first installment of the 2010 long-term incentive award, which was based on corporate and individual performance for 2010. The amount of the first installment of the 2010 long-term incentive award awarded to each named executive was as follows: $900,000 for Mr. Williams, $325,000 for Mr. Hisey, $440,000 for Mr. Benson, $420,000 for Mr. Edwards and $485,000 for Mr. Mayopoulos. This first installment of the 2010 long-term incentive award is paid in February 2011. The second installment of the 2010 long-term incentive award will be determined and paid in the first quarter of 2012 based on corporate and individual performance for both 2010 and 2011, and therefore is not included as 2010 compensation in this table. As noted in footnote 9 below, Mr. Johnson will not receive payment of a 2010 long-term incentive award because he left the company prior to the payment dates for the award.

Amounts shown for 2010 in the "Non-Equity Incentive Plan Compensation" column also include the performance-based portion of 2010 deferred pay, which was based on corporate performance for 2010. The amount of the performance-based portion of 2010 deferred pay awarded to each named executive was as follows: $1,395,000 for Mr. Williams, $470,250 for Mr. Hisey, $616,350 for Mr. Benson, $616,350 for Mr. Edwards and $661,350 for Mr. Mayopoulos. These amounts represent 90% of the target amount of the performance-based portion of 2010 deferred pay for each named executive. As noted in footnote 2, 2010 deferred pay will be paid in four equal installments in March, June, September and December 2011. These amounts generally will be paid only if the named executive remains employed by us on the payment date. As noted in footnote 9 below, Mr. Johnson will not receive payment of 2010 deferred pay because he left the company prior to the payment dates.

More information about deferred pay and long-term incentive awards is presented in "Compensation Discussion and Analysis—2010 Executive Compensation Program—Elements of 2010 Compensation Program."

Amounts shown for 2009 in the "Non-Equity Incentive Plan Compensation" column include long-term incentive awards awarded based on 2009 corporate and individual performance. The amount of this award was $1,665,000 for Mr. Williams, $657,000 for Mr. Hisey, $837,300 for Mr. Benson and $842,601 for Mr. Mayopoulos. These long-term incentive awards were payable in two equal installments. The first installment was paid in February 2010 and the second installment is paid in February 2011. As described in footnote 9 below, the amount of the 2009 long-term incentive award originally awarded to Mr. Johnson was $1,035,000; however, Mr. Johnson did not receive the second $517,500 installment of this award because he left the company prior to the payment date for the installment. Accordingly, the 2009 amount shown in this column for Mr. Johnson consists of only the first $517,500 installment paid to him in February 2010.

Amounts shown for 2009 in the "Non-Equity Incentive Plan Compensation" column for Messrs. Williams, Hisey and Benson also include the performance-based portion of their 2008 Retention Program award, which was based on 2009 corporate performance. The amount of this award was $386,100 for Mr. Williams, $326,700 for Mr. Hisey and $445,500 for Mr. Benson. This portion of the 2008 Retention Program award was paid in February 2010. Messrs. Johnson and Mayopoulos did not receive 2008 Retention Program awards.

(5) The reported amounts represent change in pension value. We calculated these amounts using the same assumptions we use for financial reporting under GAAP, using a discount rate of 5.65% at December 31, 2010. None of our named executives received above-market or preferential earnings on nonqualified deferred compensation.

(6) The table below shows more information about the amounts reported for 2010 in the "All Other Compensation" column, which include (1) company contributions under our Retirement Savings Plan (401(k) Plan); (2) company credits to our Supplemental Retirement Savings Plan; and (3) matching charitable contributions under our matching charitable gifts program.

| Name | Company Contributions to Retirement Savings (401(k)) Plan | Company Credits to Supplemental Retirement Savings Plan | Charitable Award Programs |
|---|---|---|---|
| Michael Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,350 | — | $ 8,950 |
| David Hisey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,250 | — | 3,700 |
| David Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,700 | $ 64,500 | — |
| David Benson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,250 | — | 10,000 |
| Terence Edwards . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,600 | 30,339 | 4,500 |
| Timothy Mayopoulos . . . . . . . . . . . . . . . . . . . . . . . . | 19,600 | 48,708 | 20,000 |

221

In accordance with SEC rules, amounts shown under "All Other Compensation" for 2010 do not include perquisites or personal benefits for any named executives, because aggregate perquisites for each named executive in 2010 were substantially less than $10,000.

Amounts shown in the "Charitable Award Programs" column reflect gifts we made under our matching charitable gifts program, under which gifts made by our employees and directors to Section 501(c)(3) charities are matched, up to an aggregate total of $10,000 in any calendar year. Effective January 1, 2011, we changed our matching charitable gifts program to reduce the maximum amount of matching gifts to $5,000 in any calendar year. Amounts included in this column for Mr. Mayopoulos consist of a $10,000 matching contribution submitted in March 2010 relating to charitable contributions he made in 2009 and a $10,000 matching contribution submitted in January 2011 relating to charitable contributions he made in 2010.

Mr. Johnson left the company before completing the three-year vesting period for the company's 2% contribution to the Retirement Savings Plan for 2010 and 2% credit to the Supplemental Retirement Savings Plan for 2010. Accordingly, he forfeited the 2% company contribution to the Retirement Savings Plan for 2010 and the 2% company credit to the Supplemental Retirement Savings Plan for 2010. Amounts included in this table for Mr. Johnson include only the 6% company contribution to the Retirement Savings Plan for 2010 and the 6% company credit to the Supplemental Retirement Savings Plan for 2010 that immediately vested, and do not include these forfeited amounts.

[7] Mr. Williams became our President and Chief Executive Officer on April 21, 2009. He previously served as Fannie Mae's Executive Vice President and Chief Operating Officer from November 2005 through April 20, 2009.

[8] Mr. Hisey joined Fannie Mae in January 2005. He has been Executive Vice President and Deputy Chief Financial Officer since November 2008 and also assumed the responsibilities of Chief Financial Officer on December 30, 2010, following the departure of Mr. Johnson. Mr. Hisey previously served as Executive Vice President and Chief Financial Officer from August to November 2008, and as Senior Vice President and Controller from February 2005 to August 2008.

[9] Mr. Johnson joined Fannie Mae in November 2008 and left the company on December 29, 2010. Mr. Johnson was not eligible to receive 2010 deferred pay or payment of his 2010 long-term incentive award because he left the company prior to the payment dates for the awards. In addition, he did not receive the fourth installment of his 2009 deferred pay ($425,000) or the second installment of his 2009 long-term incentive award ($517,500) because he was not employed by Fannie Mae on the respective payment dates for these installments. Mr. Johnson also forfeited the 2% company contributions to the Retirement Savings Plan and the 2% company credits to the Supplemental Retirement Savings Plan for 2008, 2009 and 2010, which have a three-year vesting period. The amounts reported as Mr. Johnson's 2008, 2009 and 2010 compensation in this table exclude these forfeited payments and represent the amounts he actually received, rather than the original amounts awarded to him.

[10] Mr. Mayopoulos has been an employee of Fannie Mae since April 21, 2009 and was engaged as a consultant for Fannie Mae from February 17, 2009 through April 20, 2009. Amounts reported as Mr. Mayopoulos' 2009 compensation in the "Salary" column consist of (a) $353,846 in base salary paid to him from April 21, 2009 (the date he became an employee of Fannie Mae) through December 31, 2009; and (b) $85,500 in fees paid to him from February 17, 2009 through April 20, 2009 for his services as a consultant.

TREASURY-0463

**Grants of Plan-Based Awards in 2010**

The following table shows grants of awards made to the named executives during 2010 under our long-term incentive plan and deferred pay plan. The terms of these long-term incentive and deferred pay awards are described above in "Compensation Discussion and Analysis—2010 Executive Compensation Program—Elements of 2010 Compensation Program." Deferred pay amounts shown represent only the performance-based portion (50%) of the named executives' 2010 deferred pay award.

| Name | Award Type[1] | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[2] | | |
|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) |
| Michael Williams | LTI | — | 2,000,000 | — |
| | DP | — | 1,550,000 | — |
| David Hisey | LTI | — | 730,000 | — |
| | DP | — | 522,500 | — |
| David Johnson[3] | LTI | — | 1,150,000 | — |
| | DP | — | 850,000 | — |
| David Benson | LTI | — | 930,333 | — |
| | DP | — | 684,834 | — |
| Terence Edwards | LTI | — | 930,333 | — |
| | DP | — | 684,834 | — |
| Timothy Mayopoulos | LTI | — | 980,333 | — |
| | DP | — | 734,834 | — |

[1] LTI indicates an award under our long-term incentive plan. DP indicates the corporate performance-based portion (50%) of the named executives' 2010 deferred pay award.

[2] For awards under our long-term incentive plan, the amounts shown are the target amounts of the named executives' 2010 long-term incentive awards established by our Board in 2010. Except for Mr. Johnson, the actual amount of the first installment (50%) of each named executive's 2010 long-term incentive award was determined in 2011 based on 2010 performance against pre-established corporate and individual performance goals. The second installment (50%) of each named executive's 2010 long-term incentive award will be determined in 2012 based on performance in 2010 and 2011 against pre-established corporate and individual performance goals. No amounts are shown in the "Threshold" and "Maximum" columns because our long-term incentive plan does not specify threshold or maximum payout amounts. Our Board has the discretion to pay awards in amounts below or above these target amounts, subject to the approval of FHFA. The actual amounts of the first installment of the 2010 long-term incentive award awarded by the Board and approved by FHFA for 2010 performance are included in the "Non-Equity Incentive Plan Compensation" column of the "Summary Compensation Table for 2010, 2009 and 2008" and explained in footnote 4 to that table. The first installment of the long-term incentive award is paid to the named executives in February 2011. The second installment of the long-term incentive award will be determined and paid in 2012.

For deferred pay awards, the amounts shown are the target amounts of the performance-based portion (50%) of the named executives' 2010 deferred pay award. Except for Mr. Johnson, the actual amount of the performance-based portion of 2010 deferred pay was determined in 2011 based on 2010 performance against pre-established corporate performance goals. No amounts are shown in the "Threshold" and "Maximum" columns because our deferred pay plan does not specify threshold or maximum payout amounts. Our Board has the discretion to pay awards in amounts below or above these target amounts, subject to the approval of FHFA. The actual amounts of the performance-based portion of 2010 deferred pay awarded by the Board and approved by FHFA for 2010 performance are included in the "Non-Equity Incentive Plan Compensation" column of the "Summary Compensation Table for 2010, 2009 and 2008" and explained in footnote 4 to that table. The performance-based portion of 2010 deferred pay will paid to the named executives in four equal quarterly installments in March, June, September and December 2011.

[3] Because Mr. Johnson left the company before the payment dates for the awards, he did not receive any payment of his 2010 long-term incentive award or 2010 deferred pay. See "Compensation Discussion and Analysis—Determination of 2010 Compensation—Assessment of 2010 Individual Performance" for further information.

**Outstanding Equity Awards at 2010 Fiscal Year-End**

The following table shows outstanding stock option awards and unvested restricted stock held by the named executives as of December 31, 2010. The market value of stock awards shown in the table below is based on a per share price of $0.30, which was the closing market price of our common stock on December 31, 2010. As

TREASURY-0464

of December 31, 2010, the exercise prices of all of the outstanding options referenced in the table below were substantially higher than the market price of our common stock.

| Name | Award Type[1] | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|
| | | | Option Awards[2] | | | Stock Awards[2] | |
| Michael Williams . . . . . . . . . . . . . . | O | 11/20/2001 | 44,735 | 80.95 | 11/20/2011 | | |
| | O | 1/21/2003 | 63,836 | 69.43 | 1/21/2013 | | |
| | O | 1/23/2004 | 73,880 | 78.32 | 1/23/2014 | | |
| | RS | 1/25/2007 | | | | 23,156 | 6,947 |
| | RS | 1/28/2008 | | | | 74,378 | 22,313 |
| David Hisey . . . . . . . . . . . . . . . . . | O | 1/3/2005 | 10,000 | 71.31 | 1/3/2015 | | |
| | RS | 1/25/2007 | | | | 4,022 | 1,207 |
| | RS | 1/28/2008 | | | | 14,622 | 4,387 |
| David Johnson . . . . . . . . . . . . . . . . | N/A | | | | | | |
| David Benson . . . . . . . . . . . . . . . . . | O | 6/3/2002 | 12,000 | 79.33 | 6/3/2012 | | |
| | O | 6/3/2002 | 20,080[3] | 79.33 | 6/3/2012 | | |
| | O | 1/21/2003 | 9,624 | 69.43 | 1/21/2013 | | |
| | O | 1/23/2004 | 12,223 | 78.32 | 1/23/2014 | | |
| | RS | 1/25/2007 | | | | 2,983 | 895 |
| | RS | 1/28/2008 | | | | 11,971 | 3,591 |
| Terence Edwards. . . . . . . . . . . . . . . | N/A | | | | | | |
| Timothy Mayopoulos. . . . . . . . . . . . | N/A | | | | | | |

[1] O indicates stock options and RS indicates restricted stock.

[2] Except as otherwise indicated, all awards of options and restricted stock listed in this table vest in four equal annual installments beginning on the first anniversary of the date of grant. Amounts reported in this table for restricted stock represent only the unvested portion of awards. Amounts reported in this table for options represent only the unexercised portions of awards.

[3] This option award had special vesting provisions: 3,860 options vested immediately upon grant, 9,080 vested on August 31, 2002, 4,370 vested on January 31, 2003, 1,610 vested on January 31, 2004 and 1,160 vested on January 31, 2005.

## Option Exercises and Stock Vested in 2010

The following table shows information regarding vesting of restricted stock held by the named executives during 2010. We have calculated the value realized on vesting by multiplying the number of shares of stock by the fair market value (based on the closing market price) of our common stock on the vesting date. We have provided no information regarding stock option exercises because no named executives exercised stock options during 2010.

| Name | Stock Awards | |
|---|---|---|
| | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Michael Williams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,747 | 74,698 |
| David Hisey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,246 | 19,403 |
| David Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| David Benson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,383 | 10,261 |
| Terence Edwards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Timothy Mayopoulos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |

TREASURY-0465

**Pension Benefits**

*Defined Benefit Pension Plans*

*Executive Pension Plan.*   The Executive Pension Plan was designed to supplement the benefits payable under our tax-qualified defined benefit retirement plan (the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law or "Retirement Plan"). Mr. Williams is the only named executive with a benefit under the Executive Pension Plan, and his benefit under the plan was frozen as of December 31, 2009. Because the Executive Pension Plan is frozen, Mr. Williams' compensation, years of service and Retirement Plan benefits earned for years after 2009 are not taken into account in determining his benefit under the Executive Pension Plan.

Executive Pension Plan benefits vested after ten years of participation in the plan, and Mr. Williams was 90% vested at the time the plan was frozen. Mr. Williams' maximum annual pension benefit under the Executive Pension Plan, based on his status as 90% vested and a pension goal formula of 40%, is 36% of his average annual covered compensation earned for the years 2007, 2008 and 2009. Covered compensation is Mr. Williams' average annual base salary, including deferred compensation, plus eligible incentive compensation. For this purpose, eligible incentive compensation is limited in the aggregate to 50% of Mr. Williams' base salary, and consists of his Annual Incentive Plan cash bonus for 2007 and his 2008 Retention Program awards earned for 2008 and 2009. His payments under the Executive Pension Plan are reduced by his Retirement Plan benefit determined as of December 31, 2009.

Early retirement is available under the plan at age 55, with a reduction in the plan benefit of 2% for each year between the year in which benefit payments begin and the year in which the participant turns 60. The benefit payment for Mr. Williams is a monthly amount equal to 1/12th of his annual retirement benefit payable during the lives of Mr. Williams and his surviving spouse. If he dies before receiving benefits under the Executive Pension Plan, his surviving spouse will be entitled to a death benefit that begins when Mr. Williams would have reached age 55, based on his pension benefit at the date of death.

*Supplemental Pension Plan and 2003 Supplemental Pension Plan.*   The purpose of the Supplemental Pension Plan is to provide supplemental retirement benefits to employees whose salary exceeds the statutory compensation cap applicable to the Retirement Plan or whose benefit under the Retirement Plan is limited by the statutory benefit cap applicable to the Retirement Plan. The purpose of the Supplemental Pension Plan of 2003 (the "2003 Supplemental Pension Plan") is to provide additional benefits based on eligible incentive compensation not taken into account under the Retirement Plan or the Supplemental Pension Plan. For executive officers, eligible incentive compensation includes Annual Incentive Plan bonuses, and awards under the 2008 Retention Program for 2008 and 2009. Beginning with awards for 2009 performance, eligible incentive compensation for executive officers also includes deferred pay awards. For purposes of determining benefits under the 2003 Supplemental Pension Plan, the amount of an officer's eligible incentive compensation taken into account is limited in the aggregate to 50% of the officer's base salary. Benefits under these plans vest at the same time as benefits under the Retirement Plan, and benefits under these plans typically commence at the later of age 55 or separation from service.

Messrs. Williams, Hisey and Benson are the only named executives who participate in the Supplemental Pension Plan and the 2003 Supplemental Pension Plan. In general, officers who are eligible to participate in the Executive Pension Plan receive the greater of their Executive Pension Plan benefits or combined Supplemental Pension Plan and 2003 Supplemental Pension Plan benefits. However, for 2010 and 2011, Mr. Williams will accrue benefits under the Supplemental Pension Plan and the 2003 Supplemental Pension Plan that will not be offset by his Executive Pension Plan benefit. In light of its decision to freeze Mr. Williams' benefit under the Executive Pension Plan, the Board adopted this change, with the approval of FHFA, to provide Mr. Williams a pension benefit for 2010 and 2011.

*Retirement Plan.*   Participation in the Retirement Plan has been frozen, and employees hired after December 31, 2007 and employees who did not satisfy the age and service requirements to be grandfathered participants under the Retirement Plan do not earn benefits under the Retirement Plan. Prior to 2007, participation in the Retirement Plan was generally available to employees. Participants are fully vested in the

Retirement Plan when they complete five years of credited service. Messrs. Williams, Hisey and Benson are the only named executives who participate in the Retirement Plan.

Under the Retirement Plan, normal retirement benefits are computed on a single life basis using a formula based on final average annual earnings and years of credited service. For years of service after 1988, the pension formula is:

- 1½% multiplied by final average annual earnings, plus

- 1/2% multiplied by final average annual earnings over Social Security-covered compensation multiplied by years of credited service.

A different formula applies for years of service after 35 years. Final average annual earnings are average annual earnings in the participant's highest paid 36 consecutive calendar months during his last 120 calendar months of employment. Earnings are base salary. Provisions of the Internal Revenue Code of 1986, as amended, limit the amount of annual compensation that may be used for calculating pension benefits and the annual benefit that may be paid. For 2010, the statutory compensation and benefit caps were $245,000 and $195,000, respectively. Early retirement under the Retirement Plan is generally available at age 55. For employees who retire before age 65, benefits are reduced by stated percentages for each year that they are younger than 65.

The table below shows the years of credited service and the present value of accumulated benefits for each named executive under our defined benefit pension plans as of December 31, 2010.

## Pension Benefits for 2010

| Name | Plan Name | Number of Years Credited Service (#)[1] | Present Value of Accumulated Benefit ($)[2] |
|------|-----------|:---:|---:|
| Michael Williams . . . . . | Retirement Plan | 20 | 496,799 |
| | Supplemental Pension Plan[3] | 20 | 212,562 |
| | 2003 Supplemental Pension Plan[3] | 20 | 127,318 |
| | Executive Pension Plan | 9 | 3,267,952 |
| David Hisey . . . . . . . . | Retirement Plan | 6 | 134,035 |
| | Supplemental Pension Plan | 6 | 106,003 |
| | 2003 Supplemental Pension Plan | 6 | 127,263 |
| David Johnson . . . . . . . | Not applicable | | |
| David Benson . . . . . . . | Retirement Plan | 9 | 194,507 |
| | Supplemental Pension Plan | 9 | 191,149 |
| | 2003 Supplemental Pension Plan | 9 | 203,159 |
| Terence Edwards . . . . . . | Not applicable | | |
| Timothy Mayopoulos . . . | Not applicable | | |

[1] Mr. Williams has fewer years of credited service under the Executive Pension Plan than under the Retirement Plan because he worked at Fannie Mae prior to becoming a participant in the Executive Pension Plan. In addition, because benefit accruals under the Executive Pension Plan for years after 2009 were frozen, Mr. Williams' credited service under the Executive Pension Plan was frozen in 2009 at 9 years.

[2] The present value for the Executive Pension Plan assumes that Mr. Williams will remain in service until age 60, the normal retirement age under the Executive Pension Plan. The present value for the Retirement Plan, Supplemental Pension Plan and 2003 Supplemental Pension Plan assumes that the named executives will remain in service until age 65, the normal retirement age under those plans. The values also assume that benefits under the Executive Pension Plan will be paid in the form of a monthly annuity for Mr. Williams' life and that Mr. Williams' surviving spouse and benefits under the Retirement Plan will be paid in the form of a single life monthly annuity for Mr. Williams' life. The postretirement mortality assumption is based on the IRS prescribed mortality table for 2011 funding purposes. Under the terms of the 2003 Supplemental Pension Plan, the deferred pay award for 2010 has been taken into account for the purpose of determining present value as of December 31, 2010. For additional information regarding the calculation of present value and the assumptions underlying these amounts, see "Note 14, Employee Retirement Benefits" in this report.

(3)   The present value of accumulated benefit for Mr. Williams for the Supplemental Pension Plan and 2003 Supplemental Pension Plan shown in this table reflects only the amounts accrued under these plans in 2010. Although Mr. Williams has 20 years of credited service under the Supplemental Pension Plan and 2003 Supplemental Pension Plan, as of December 31, 2010, his benefit for years prior to 2010 under these plans is offset by the benefit that he would receive upon his retirement under the Executive Pension Plan.

### Retirement Savings Plan

The Retirement Savings Plan is a defined contribution plan that includes a 401(k) before-tax feature, a regular after-tax feature and a Roth after-tax feature. Under the plan, eligible employees may allocate investment balances to a variety of investment options. Subject to IRS limits for 401(k) plans, we match in cash employee contributions up to 3% of base salary for employees who are grandfathered participants in our Retirement Plan and up to 6% of base salary and eligible incentive compensation (which for the applicable named executives includes annual bonuses and deferred pay) for employees who are not grandfathered participants in our Retirement Plan. All non-grandfathered employees are 100% vested in our matching contributions. Grandfathered employees receive benefits under the 3% of base salary matching program and are fully vested in our matching contributions after five years of service. Messrs. Williams, Hisey and Benson are grandfathered employees under our Retirement Plan and therefore receive benefits under the 3% matching program, while Messrs. Johnson, Edwards and Mayopoulos are non-grandfathered employees and therefore receive benefits under the 6% matching program.

All regular employees, with the exception of those who participated in the Executive Pension Plan (which includes Mr. Williams), receive an additional 2% contribution (based on base salary for grandfathered employees and on base salary and eligible incentive compensation for non-grandfathered employees) from the company regardless of employee contributions to this plan. Participants are fully vested in this 2% contribution after three years of service.

### Nonqualified Deferred Compensation

Our Supplemental Retirement Savings Plan is an unfunded, non-tax-qualified defined contribution plan for non-grandfathered employees. The Supplemental Retirement Savings Plan is intended to supplement our Retirement Savings Plan, or 401(k) plan, by providing benefits to participants whose annual eligible earnings exceed the IRS annual limit on eligible compensation for 401(k) plans (for 2010, the limit was $245,000). Messrs. Johnson, Edwards and Mayopoulos are the named executives who participated in the Supplemental Retirement Savings Plan in 2010.

For 2010, we credited 8% of the eligible compensation for Messrs. Johnson, Edwards and Mayopoulos that exceeded the IRS annual limit for 2010. Eligible compensation for Messrs. Johnson, Edwards and Mayopoulos consists of base salary plus any eligible incentive compensation (which includes annual bonuses and deferred pay) earned for that year, plus any awards earned for that year under the 2008 Retention Program, up to a combined maximum of two times base salary. The 8% credit consists of two parts: (1) a 2% credit that will vest after the participant has completed three years of service with us; and (2) a 6% credit that is immediately vested.

While the Supplemental Retirement Savings Plan is not funded, amounts credited on behalf of a participant under the Supplemental Retirement Savings Plan are deemed to be invested in mutual fund investments similar to the investments offered under our 401(k) plan. Participants may change their investment elections on a daily basis.

Amounts deferred under the Supplemental Retirement Savings Plan are payable to participants in the January or July following separation from service with us, subject to a six month delay in payment for the 50 most highly-compensated officers. Participants may not withdraw amounts from the Supplemental Retirement Savings Plan while they are employed by us.

The table below provides information on the nonqualified deferred compensation of the named executives for 2010.

227

**Nonqualified Deferred Compensation for 2010**

| Name | Executive Contributions in Last Fiscal Year ($) | Company Contributions in Last Fiscal Year ($)[1] | Aggregate Earnings in Last Fiscal Year ($)[2] | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year-End ($)[3] |
|---|---|---|---|---|---|
| Michael Williams | | | | | |
| 2001 Special Stock Award[4] . . . . . . . . . | — | — | (1,208) | — | 412 |
| David Hisey . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — |
| David Johnson | | | | | |
| Supplemental Retirement Savings Plan . . . | — | 64,500 | 14,027 | — | 106,909 |
| David Benson . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — |
| Terence Edwards | | | | | |
| Supplemental Retirement Savings Plan . . . | — | 30,339 | 1,409 | — | 31,748 |
| Timothy Mayopoulos | | | | | |
| Supplemental Retirement Savings Plan . . . | — | 48,708 | 7,118 | — | 64,708 |

[1] All amounts reported in this column for Messrs. Johnson, Edwards and Mayopoulos as company contributions in the last fiscal year pursuant to the Supplemental Retirement Savings Plan are also reported as 2010 compensation in the "All Other Compensation" column of the "Summary Compensation Table for 2010, 2009 and 2008." Company contributions for Mr. Johnson in this column do not include $21,500 in company credits made under the Supplemental Retirement Savings Plan in 2010 that he forfeited by leaving the company before completing the three-year vesting period.

[2] None of the earnings reported in this column are reported as 2010 compensation in the "Summary Compensation Table for 2010, 2009 and 2008" because the earnings are neither above-market nor preferential.

[3] Amounts reported in this column for Mr. Johnson include company contributions in 2009 to the Supplemental Retirement Savings Plan of $25,800 that are also reported as 2009 compensation in the "All Other Compensation" column of the "Summary Compensation Table for 2010, 2009 and 2008." Amounts reported in this column for Mr. Mayopoulos include company contributions in 2009 to the Supplemental Retirement Savings Plan of $8,708 that are also reported as 2009 compensation in the "All Other Compensation" column of the "Summary Compensation Table for 2010, 2009 and 2008."

[4] The Board previously approved a special stock award to officers for 2001 performance. On January 15, 2002, Mr. Williams deferred until retirement 1,142 shares he received in connection with this award. Aggregate earnings on these shares reflect changes in stock price. Mr. Williams' number of shares has grown through the reinvestment of dividends to 1,373 shares as of December 31, 2010.

## Potential Payments upon Termination or Change-in-Control

The information below describes and quantifies certain compensation and benefits that may have become payable to each of our named executives under our existing plans and arrangements if our named executive's employment had terminated on December 31, 2010, taking into account the named executive's compensation and service levels as of that date and based on a per share price of $0.30, which was the closing price of our common stock on December 31, 2010. The discussion below does not reflect retirement or deferred compensation benefits to which our named executives may be entitled, as these benefits are described above under "Pension Benefits" and "Nonqualified Deferred Compensation." The information below also does not generally reflect compensation and benefits available to all salaried employees upon termination of employment with us under similar circumstances. We are not obligated to provide any additional compensation to our named executives in connection with a change-in-control.

### FHFA Must Approve Any Termination Benefits We Provide Named Executives

FHFA, as our regulator, must approve any termination benefits we offer our named executives. Moreover, as our conservator, FHFA has directed that our Board consult with and obtain FHFA's consent before taking any action involving termination benefits for any officer at the executive vice president level and above and including, regardless of title, executives who hold positions with the functions of the chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer and chief/general/internal auditor. In addition, as described below under "Potential Payments to Named Executives," in the event Fannie Mae terminates a named executive's

TREASURY-0469

employment other than for cause, any determination by the Board to pay unpaid deferred pay or long-term incentive awards to the named executive is subject to the approval of FHFA in consultation with Treasury.

*Potential Payments to Named Executives*

We have not entered into employment agreements with any of our named executives that would entitle our executives to severance benefits. Below we discuss various elements of compensation that may become payable in the event a named executive dies or retires, or that may be paid in the event his employment is terminated by Fannie Mae. We then quantify the amounts that might have been paid to our named executives in these circumstances, in each case as of December 31, 2010.

- *Deferred Pay and Long-Term Incentive Awards.*   In general, an executive officer, including our named executives, must continue to be employed to receive payments of deferred pay or the long-term incentive award, and will forfeit any unpaid amounts upon termination of his or her employment. Exceptions to this general rule apply in the case of an executive officer's death or retirement, and may apply in the event an executive officer's employment is terminated by Fannie Mae other than for cause, as follows:

  - *Death.*   In the event an executive officer's employment is terminated due to his or her death, his or her estate will receive the remaining installment payments of deferred pay for the prior year, as well as a pro rata portion of deferred pay for the current year, based on time worked during the year. In addition, his or her estate will receive any remaining installment payment of a long-term incentive award for a completed performance year and a pro rata portion of a long-term incentive award for the current performance year, based on time worked during the year; provided that the executive officer was employed at least one complete calendar quarter during the current performance year.

  - *Retirement.*   If an executive officer retires from Fannie Mae at or after age 65 with at least 5 years of service, he or she will receive the remaining installment payments of deferred pay for the prior year. In addition, he or she will receive any remaining installment payment of a long-term incentive award for a completed performance year.

  - *Termination by Fannie Mae.*   If Fannie Mae terminates an executive officer's employment other than for cause, the Board of Directors may determine, subject to the approval of FHFA in consultation with Treasury, that he or she may receive certain unpaid deferred pay or long-term incentive awards. The determination to pay amounts of unpaid deferred pay or long-term incentive awards is in the discretion of the Board of Directors and FHFA; the named executives do not have any contractual right or right under the terms of the deferred pay plan or the long-term incentive plan to receive any unpaid deferred pay or long-term incentive awards in the event of a termination by Fannie Mae.

  In each case, for any portion of a long-term incentive award or any performance-based portion of a deferred pay award that has not been finally determined, the award will be adjusted based on performance relative to the applicable performance goals and, in the case of a termination by Fannie Mae, cannot exceed 100% of the target award. In addition, installment payments of the awards will be made on the original payment schedule, rather than being provided in a lump sum. In the case of a termination by Fannie Mae, an executive officer must agree to the terms of a standard termination agreement with the company in order to receive these post-termination of employment payments. More information about deferred pay and the long-term incentive awards is provided above in "Compensation Discussion and Analysis—2010 Executive Compensation Program—Elements of 2010 Compensation Program."

- *Stock Compensation Plans.*   Under the Fannie Mae Stock Compensation Plan of 2003, stock options, restricted stock and restricted stock units held by our employees, including our named executives, fully vest upon the employee's death, total disability or retirement. Under both the Fannie Mae Stock Compensation Plan of 2003 and the Fannie Mae Stock Compensation Plan of 1993, upon the occurrence of these events, or if an option holder leaves our employment after age 55 with at least 5 years of service, the option holder, or the holder's estate in the case of death, can exercise any stock options until the initial expiration date of the stock option, which is generally 10 years after the date of grant. For these purposes, "retirement" generally

229

means that the executive retires at or after age 60 with 5 years of service or age 65 (with no service requirement).

- *Retiree Medical Benefits.* We currently make certain retiree medical benefits available to our full-time employees who retire and meet certain age and service requirements.

The table below shows the amounts that would have become payable if a named executive's employment had terminated on December 31, 2010 as a result of his death. The table below does not show any amounts that would have become payable if a named executive had retired on December 31, 2010 since as of that date none of the named executives had reached the minimum age required to receive any of these amounts upon his retirement.

### Potential Payments Upon Death as of December 31, 2010[1]

| Name | Restricted Stock[2] | 2010 Deferred Pay[3] | 2009 Long-Term Incentive Award[4] | 2010 Long-Term Incentive Award[5] | Total |
|---|---|---|---|---|---|
| Michael Williams | $29,260 | $2,945,000 | $832,500 | $900,000 | $4,706,760 |
| David Hisey | 5,594 | 992,750 | 328,500 | 325,000 | 1,651,844 |
| David Johnson[6] | — | — | — | — | — |
| David Benson | 4,486 | 1,301,184 | 418,650 | 440,000 | 2,164,320 |
| Terence Edwards | — | 1,301,184 | 163,095 | 420,000 | 1,884,279 |
| Timothy Mayopoulos | — | 1,396,184 | 421,301 | 485,000 | 2,302,485 |

[1] The named executives would also have received the applicable amounts shown in the "Restricted Stock" column of this table in the event of their total disability, but not the amounts shown under any other column.

[2] These values are based on a per share price of $0.30, which was the closing price of our common stock on December 31, 2010.

[3] Assumes that each named executive (other than Mr. Johnson) would have received the 2010 deferred pay awarded to him, which is payable in March, June, September and December 2011. Each named executive was awarded 95% of his target 2010 deferred pay (50% of deferred pay was based on corporate performance, which the Compensation Committee determined would be paid at 90% of target, and the remaining 50% of deferred pay was service based and therefore the named executives will receive 100% of this portion of the award).

[4] Assumes that each named executive (other than Mr. Johnson) would have received the second installment of his 2009 long-term incentive award, which was determined in February 2010 and is paid in February 2011.

[5] Assumes that each named executive (other than Mr. Johnson) would have received the first installment of his 2010 long-term incentive award, which was determined in January 2011 and is paid in February 2011. The named executives would not have received the second installment of the 2010 long-term incentive award in the event of their death on December 31, 2010, because that installment will be determined in the first quarter of 2012 based on corporate and individual performance for both 2010 and 2011.

[6] Mr. Johnson left the company on December 29, 2010 and therefore would not be entitled to any payments upon death as of December 31, 2010.

The table below shows the maximum amount of deferred pay and long-term incentive award that could have become payable to the named executive if his employment was terminated other than for cause on December 31, 2010. The named executives do not have any contractual right or right under the terms of the deferred pay plan or the long-term incentive plan to receive any unpaid deferred pay or long-term incentive awards in the event of a termination by Fannie Mae. Any amounts of unpaid deferred pay or long-term incentive awards paid to executive officers if they are terminated other than for cause will be determined on a case-by-case basis in the discretion of our Board of Directors and also subject to the approval of FHFA in consultation with Treasury. We therefore cannot make a reasonable estimate of the amounts that would become payable in such cases.

TREASURY-0471

**Maximum Potential Payments Upon Termination Other Than For Cause as of December 31, 2010**

| Name | 2010 Deferred Pay[1] | 2009 Long-Term Incentive Award[2] | 2010 Long-Term Incentive Award[3] | Total |
|---|---|---|---|---|
| Michael Williams . . . . . . . . . . . . . . . . . . . . . . . . . | $2,945,000 | $832,500 | $900,000 | $4,677,500 |
| David Hisey . . . . . . . . . . . . . . . . . . . . . . . . . . . | 992,750 | 328,500 | 325,000 | 1,646,250 |
| David Johnson[4] . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — |
| David Benson . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,301,184 | 418,650 | 440,000 | 2,159,834 |
| Terence Edwards . . . . . . . . . . . . . . . . . . . . . . . . | 1,301,184 | 163,095 | 420,000 | 1,884,279 |
| Timothy Mayopoulos . . . . . . . . . . . . . . . . . . . . . . | 1,396,184 | 421,301 | 485,000 | 2,302,485 |

[1] Assumes that each named executive (other than Mr. Johnson) would have received 100% of the 2010 deferred pay awarded to him, which is payable in March, June, September and December 2011. Each named executive was awarded 95% of his target 2010 deferred pay (50% of deferred pay was based on corporate performance, which the Compensation Committee determined would be paid at 90% of target, and the remaining 50% of deferred pay was service based and therefore the named executives will receive 100% of this portion of the award). The actual amount of unpaid deferred pay a named executive would receive in the event his employment is terminated would be in the discretion of our Board of Directors and also subject to the approval of FHFA in consultation with Treasury, and could range from 0% to 100% of the amount shown in this column.

[2] Assumes that each named executive (other than Mr. Johnson) would have received 100% of the second installment of his 2009 long-term incentive award, which was determined in February 2010 and is paid in February 2011. The actual amount of the unpaid 2009 long-term incentive award a named executive would receive in the event his employment is terminated would be in the discretion of our Board of Directors and also subject to the approval of FHFA in consultation with Treasury, and could range from 0% to 100% of the amount shown in this column.

[3] Assumes that each named executive (other than Mr. Johnson) would have received 100% of the first installment of his 2010 long-term incentive award, which was determined in January 2011 and is paid in February 2011. We have not included the second installment of the 2010 long-term incentive award because that installment will not be determined until the first quarter of 2012 based on corporate and individual performance for both 2010 and 2011. The actual amount of the unpaid 2010 long-term incentive award a named executive would receive in the event his employment is terminated would be in the discretion of our Board of Directors and also subject to the approval of FHFA in consultation with Treasury, and could range from 0% to 100% of the amount shown in this column.

[4] Mr. Johnson left the company on December 29, 2010 and therefore would not be entitled to any payments upon termination as of December 31, 2010.

*Payments to Former Chief Financial Officer*

Mr. Johnson, who served as our Chief Financial Officer from November 2008 to December 2010, received no severance payments from us as a result of his resignation from Fannie Mae.

**Director Compensation**

In November 2008, FHFA approved a new program under which our non-management directors receive all compensation in cash, as described below. This compensation for the directors was designed to be reasonable, appropriate and commensurate with the duties and responsibilities of their Board service.

The total 2010 compensation for our non-management directors is shown in the table below. Mr. Williams, our only director who also served as an employee of Fannie Mae during 2010, was not entitled to receive any of the benefits provided to our non-management directors other than those provided under the matching charitable gifts program, which is available to all of our employees.

TREASURY-0472

**2010 Non-Employee Director Compensation Table**

| Name | Fees Earned or Paid in Cash ($) | All Other Compensation ($)[1] | Total ($) |
|---|---|---|---|
| Dennis R. Beresford | 185,000 | — | 185,000 |
| William Thomas Forrester | 170,000 | — | 170,000 |
| Brenda J. Gaines | 180,000 | — | 180,000 |
| Charlynn Goins | 170,000 | — | 170,000 |
| Frederick B. "Bart" Harvey III | 170,000 | 10,000 | 180,000 |
| Philip A. Laskawy | 290,000 | 10,000 | 300,000 |
| Egbert L. J. Perry | 160,000 | — | 160,000 |
| Jonathan Plutzik | 160,000 | 10,000 | 170,000 |
| David H. Sidwell | 160,000 | 10,000 | 170,000 |

[1] "All Other Compensation" consists of gifts we made or will make under our matching charitable gifts program. Our matching charitable gifts program is discussed in greater detail following this table.

### Compensation Arrangements for our Non-Management Directors

Our non-management directors receive a retainer at an annual rate of $160,000, with no meeting fees. Committee chairs and Audit Committee members receive an additional retainer at an annual rate of $25,000 for the Audit Committee chair, $15,000 for the Risk Policy and Capital Committee chair and $10,000 for all other committee chairs and each member of the Audit Committee. In recognition of the substantial amount of time and effort necessary to fulfill the duties of non-executive Chairman of the Board, the annual retainer for our non-executive Chairman, Mr. Laskawy, is $290,000. Our directors receive no equity compensation.

### Additional Arrangements with our Non-Management Directors

*Matching Charitable Gifts Program.*   To further our support for charitable giving, non-employee directors are able to participate in our corporate matching gifts program on the same terms as our employees. Under this program, gifts made by employees and directors to Section 501(c)(3) charities are matched, up to an aggregate total of $10,000 in any calendar year, including up to $500 that may be matched on a 2-for-1 basis. Effective January 1, 2011, we changed our matching charitable gifts program to reduce the maximum amount of matching gifts to $5,000 in any calendar year and to eliminate the ability to match up to $500 on a 2-for-1 basis.

*Stock Ownership Guidelines for Directors.*   In January 2009, our Board eliminated our stock ownership requirements for directors and for senior officers in light of the difficulty of meeting the requirements at current market prices and because we have ceased paying stock-based compensation.

*Other Expenses.*   We also pay for or reimburse directors for out-of-pocket expenses incurred in connection with their service on the Board, including travel to and from our meetings, accommodations, meals and training.

TREASURY-0473

**Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table provides information as of December 31, 2010 with respect to shares of common stock that may be issued under our existing equity compensation plans. At this time, we are prohibited from issuing new stock without the prior written consent of Treasury under the terms of the senior preferred stock purchase agreement, other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement, including as required by the terms of outstanding stock options and restricted stock units.

**Equity Compensation Plan Information**

| | As of December 31, 2010 | | |
|---|---|---|---|
| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (#) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (Excluding Securities Reflected in First Column) (#) |
| Equity compensation plans approved by stockholders . . . . . | 4,942,332[1] | $75.07[2] | 40,989,913[3] |
| Equity compensation plans not approved by stockholders . . | N/A | N/A | N/A |
| Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,942,332 | $75.07 | 40,989,913 |

[1] This amount includes outstanding stock options; restricted stock units; deferred stock units; and shares issuable upon the payout of deferred stock balances. Outstanding awards, options and rights include grants under the Fannie Mae Stock Compensation Plan of 1993, the Stock Compensation Plan of 2003 and the payout of shares deferred upon the settlement of awards made under the 1993 plan and a prior plan.

[2] The weighted average exercise price is calculated for the outstanding options and does not take into account restricted stock units or deferred shares.

[3] This number of shares consists of 11,960,258 shares available under the 1985 Employee Stock Purchase Plan and 29,029,655 shares available under the Stock Compensation Plan of 2003 that may be issued as restricted stock, stock bonuses, stock options or in settlement of restricted stock units, performance share program awards, stock appreciation rights or other stock-based awards. No more than 1,433,784 of the shares issuable under the Stock Compensation Plan of 2003 may be issued as restricted stock or restricted stock units vesting in full in fewer than three years, performance shares with a performance period of less than one year or bonus shares subject to similar vesting provisions or performance periods.

TREASURY-0474

## Beneficial Ownership

The following table shows the beneficial ownership of our common stock by each of our current directors and the named executives, and all current directors and executive officers as a group, as of February 15, 2011, unless otherwise indicated. As of that date, no director or named executive, nor all directors and current executive officers as a group, owned as much as 1% of our outstanding common stock.

| Name and Position | Common Stock Beneficially Owned Excluding Stock Options | Stock Options Exercisable or Other Shares Obtainable Within 60 Days of February 15, 2011[2] | Total Common Stock Beneficially Owned |
|---|---|---|---|
| | | Amount and Nature of Beneficial Ownership[1] | |
| David C. Benson[3]. . . . . . . . . . . . . . . . . . . . . . .<br>Executive Vice President—Capital Markets | 17,367 | 53,927 | 71,294 |
| Dennis R. Beresford . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 4,719 | 0 | 4,719 |
| Terence W. Edwards. . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Executive Vice President—Credit Portfolio Management | 0 | 0 | 0 |
| W. Thomas Forrester . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| Brenda J. Gaines . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 487 | 0 | 487 |
| Charlynn Goins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| Frederick Barton Harvey, III . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| David C. Hisey[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Executive Vice President and Deputy Chief Financial Officer | 14,517 | 10,000 | 24,517 |
| David M. Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Executive Vice President and Chief Financial Officer | 0 | 0 | 0 |
| Philip A. Laskawy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Chairman of the Board | 0 | 0 | 0 |
| Timothy J. Mayopoulos . . . . . . . . . . . . . . . . . . . . . . . . .<br>Executive Vice President, Chief Administrative Officer,<br>General Counsel and Corporate Secretary | 0 | 0 | 0 |
| Egbert L. J. Perry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| Jonathan Plutzik. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| David H. Sidwell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Director | 0 | 0 | 0 |
| Michael J. Williams[5] . . . . . . . . . . . . . . . . . . . . . . . . . .<br>President and Chief Executive Officer | 254,657 | 183,824 | 438,481 |
| All directors and current executive officers as a group<br>(20 persons)[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 457,286 | 403,965 | 861,251 |

[1] Beneficial ownership is determined in accordance with the rules of the SEC for computing the number of shares of common stock beneficially owned by each person and the percentage owned. Holders of restricted stock have no investment power but have sole voting power over the shares and, accordingly, these shares are included in this table. Holders of stock options have no investment or voting power over the shares issuable upon the exercise of the options until the options are exercised. Shares issuable upon the vesting of restricted stock units are not considered to be beneficially owned under applicable SEC rules and, accordingly, restricted stock units are not included in the amounts shown.

[2] These shares are issuable upon the exercise of outstanding stock options, except for 1,373 shares of deferred stock held by Mr. Williams, which he could obtain within 60 days in certain circumstances.

[3] Mr. Benson's shares include 5,986 shares of restricted stock.

TREASURY-0475

[4] Mr. Hisey's shares include 7,311 shares of restricted stock.

[5] Mr. Williams' shares include 81,541 shares held jointly with his spouse, 700 shares held by his daughter, and 37,189 shares of restricted stock.

[6] The amount of shares held by all directors and current executive officers as a group includes 70,073 shares of restricted stock held by our directors and current executive officers and 748 shares of stock held by their family members. The beneficially owned total includes 1,373 shares of deferred stock. The shares in this table do not include 21,184 shares of restricted stock units over which the holders will not obtain voting rights or investment power until the restrictions lapse.

The following table shows the beneficial ownership of our common stock by each holder of more than 5% of our common stock as of February 15, 2011.

| 5% Holders | Common Stock Beneficially Owned | Percent of Class |
|---|---|---|
| Department of the Treasury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Variable[1] | 79.9% |
| 1500 Pennsylvania Avenue, NW., Room 3000 Washington, DC 20220 | | |

[1] In September 2008, we issued to Treasury a warrant to purchase, for one one-thousandth of a cent ($0.00001) per share, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised. The warrant may be exercised in whole or in part at any time until September 7, 2028. As of February 24, 2011, Treasury has not exercised the warrant. The information above assumes Treasury beneficially owns no other shares of our common stock.

## Item 13.   Certain Relationships and Related Transactions, and Director Independence

## POLICIES AND PROCEDURES RELATING TO TRANSACTIONS WITH RELATED PERSONS

We review relationships and transactions in which Fannie Mae is a participant and in which any of our directors and executive officers or their immediate family members has an interest to determine whether any of those persons has a material interest in the relationship or transaction. Our current written policies and procedures for the review, approval or ratification of relationships or transactions with related persons are set forth in our:

- Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors;

- Nominating and Corporate Governance Committee Charter;

- Board of Directors' delegation of authorities and reservation of powers;

- Code of Conduct for employees;

- Conflict of Interest Policy and Conflict of Interest Procedure for employees; and

- Employment of Relatives Practice.

In addition, depending on the circumstances, relationships and transactions with related persons may require approval of the conservator pursuant to the delegation of authority issued to us by the conservator on November 24, 2008 or may require the approval of Treasury pursuant to the senior preferred stock purchase agreement.

Our Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors prohibits our directors from engaging in any conduct or activity that is inconsistent with our best interests, as defined by the conservator's express directions. The Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors requires each of our directors to excuse himself or herself from voting on any issue before the Board that could result in a conflict, self-dealing or other circumstance where the director's position as a director would be detrimental to us or result in a noncompetitive, favored or unfair advantage to either the director or the director's associates. In addition, our directors must disclose to the Chair of the Nominating and Corporate Governance Committee, or another member of the committee, any situation that involves or appears to involve a conflict of interest. This includes, for example, any financial interest of a director, an immediate family member of a director or a business associate of a director in any transaction being

235

considered by the Board, as well as any financial interest a director may have in an organization doing business with us. Each of our directors also must annually certify compliance with the Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors.

The Nominating and Corporate Governance Committee Charter and our Board's delegation of authorities and reservation of powers require the Nominating and Corporate Governance Committee to approve any transaction that Fannie Mae engages in with any director, nominee for director or executive officer, or any immediate family member of a director, nominee for director or executive officer, that is required to be disclosed pursuant to Item 404 of Regulation S-K. In addition, the Board's delegation of authorities and reservation of powers requires the Board and the conservator to approve any action, including a related party transaction, that in the reasonable business judgment of the Board at the time the action is taken is likely to cause significant reputational risk.

Our Code of Conduct for employees requires that we and our employees seek to avoid any actual or apparent conflict between our business interests and the personal interests of our employees or their relatives or associates. An employee who knows or suspects a violation of our Code of Conduct must raise the issue with the employee's manager, another appropriate member of management, a member of our Human Resources division or our Compliance and Ethics division.

Under our Conflict of Interest Policy and Conflict of Interest Procedure for employees, an employee who has a potential or actual conflict of interest must request review and approval of the conflict. Conflicts requiring review and approval include situations where the employee or a close relative of the employee has (1) a financial interest worth more than $100,000 in an entity that does business with or seeks to do business with or competes with Fannie Mae, (2) a financial interest worth more than $10,000 in such an entity combined with the ability to control or influence Fannie Mae's relationship with the entity, or (3) for senior vice presidents and above, any financial interest in specified significant Fannie Mae counterparties and other entities. In accordance with its charter, our Nominating and Corporate Governance Committee must review activities engaged in by our Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Enterprise Risk Officer, General Counsel, Chief Audit Executive or Chief Compliance Officer that may result in an actual or potential conflict of interest under the Employee Code of Conduct or Conflict of Interest Policy and Conflict of Interest Procedure. Our Chief Executive Officer is responsible for reviewing and approving conflicts involving other executive officers. If any conflicts are determined to involve significant reputational risk, they must be raised to the conservator.

Our Employment of Relatives Practice prohibits, among other things, situations where an employee would exercise influence, control or authority over the employee's relative's areas of responsibility or terms of employment, including but not limited to job responsibilities, performance ratings or compensation. Employees have an obligation to disclose the existence of any relation to another current employee prior to applying for any position or engaging in any other work situation that may give rise to prohibited influence, control or authority.

We are required by the conservator to obtain its approval for various matters, some of which may involve relationships or transactions with related persons. These matters include actions involving the senior preferred stock purchase agreement, the creation of any subsidiary or affiliate or any substantial non-ordinary course transactions with any subsidiary or affiliate, actions involving hiring, compensation and termination benefits of directors and officers at the executive vice president level and above and other specified executives, and any action that in the reasonable business judgment of the Board at the time that the action is taken is likely to cause significant reputational risk. The senior preferred stock purchase agreement requires us to obtain written Treasury approval of transactions with affiliates unless, among other things, the transaction is upon terms no less favorable to us than would be obtained in a comparable arm's-length transaction with a non-affiliate or the transaction is undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence at the time the senior preferred stock purchase agreement was entered into.

We require our directors and executive officers, not less than annually, to describe to us any situation involving a transaction with us in which a director or executive officer could potentially have a personal interest that would require disclosure under Item 404 of Regulation S-K. In addition, our Conflict of Interest

TREASURY-0477

Policy and Conflict of Interest Procedure for employees require our executive officers to request review and approval of any existing or proposed transaction with us, whether or not in the ordinary course of business, in which that officer or a member of his or her immediate family has a direct or indirect interest.

## TRANSACTIONS WITH RELATED PERSONS

**Transactions with Treasury**

Treasury beneficially owns more than 5% of the outstanding shares of our common stock by virtue of the warrant we issued to Treasury on September 7, 2008. The warrant entitles Treasury to purchase shares of our common stock equal to 79.9% of our outstanding common stock on a fully diluted basis on the date of exercise, for an exercise price of $0.00001 per share, and is exercisable in whole or in part at any time on or before September 7, 2028. We describe below our current agreements with Treasury.

### *Treasury Senior Preferred Stock Purchase Agreement*

We issued the warrant to Treasury pursuant to the terms of the senior preferred stock purchase agreement we entered into with Treasury on September 7, 2008. Under the senior preferred stock purchase agreement, we also issued to Treasury one million shares of senior preferred stock. We issued the warrant and the senior preferred stock as an initial commitment fee in consideration of Treasury's commitment to provide up to $100 billion in funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. On May 6, 2009, Treasury amended the senior preferred stock purchase agreement to increase its funding commitment to $200 billion and to revise some of the covenants in the agreement. Treasury further amended the senior preferred stock purchase agreement on December 24, 2009 in order to further increase its funding commitment to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits after December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion, ($200 billion less the $75.2 billion cumulatively drawn through March 31, 2010), less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012. The amendment also made some other revisions to the agreement. The senior preferred stock purchase agreement also requires that we pay a quarterly commitment fee, beginning on March 31, 2011, in an amount to be determined by Treasury no later than December 31, 2010. In December 2010, Treasury notified FHFA that Treasury was waiving the quarterly commitment fee for the first quarter of 2011 due to adverse conditions in the U.S. mortgage market and because it believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate matters in the next calendar quarter to determine whether to set the quarterly commitment fee.

We have received an aggregate of $87.6 billion from Treasury under the senior preferred stock purchase agreement, and in February 2011, the Acting Director of FHFA submitted a request on behalf of Fannie Mae to Treasury for an additional $2.6 billion from Treasury under the senior preferred purchase stock agreement. Through December 31, 2010, we have paid an aggregate of $10.2 billion to Treasury in dividends on the senior preferred stock. See "Business—Conservatorship and Treasury Agreements—Treasury Agreements" for more information about the senior preferred stock purchase agreement.

### *Treasury Making Home Affordable Program*

On February 18, 2009, the Obama Administration announced its Homeowner Affordability and Stability Plan, a plan to provide stability and affordability to the U.S. housing market. Pursuant to this plan, in March 2009, the Administration announced the details of its Making Home Affordable Program, a program intended to provide assistance to homeowners and prevent foreclosures. One of the primary initiatives under the Making Home Affordable Program is the Home Affordable Modification Program, or HAMP, which is aimed at helping borrowers whose loan is either currently delinquent or at imminent risk of default by modifying their mortgage loan to make their monthly payments more affordable. In addition to our participation in the Administration's initiatives under the Making Home Affordable Program, Treasury engaged us to serve as program administrator for loans modified under HAMP pursuant to the financial agency agreement between

TREASURY-0478

Treasury and us, dated February 18, 2009. See "Business—Making Home Affordable Program—Our Role as Program Administrator" for a description of our principal activities as program administrator for HAMP and other initiatives under the Making Home Affordable Program.

Under our arrangement with Treasury, Treasury has agreed to compensate us for a significant portion of the work we have performed in our role as program administrator for HAMP and other initiatives under the Making Home Affordable Program. In December 2009, Treasury established an initial budget for services provided by us in our role as program administrator. This initial budget covered U.S. government fiscal years 2009, 2010 and 2011, and has since been updated to reflect changes in program scope. We expect to receive an aggregate of approximately $200.5 million from Treasury for our work as program administrator for U.S. government fiscal years 2009, 2010 and 2011, as well as receive from Treasury an additional amount of approximately $45.3 million to be passed through to third-party vendors engaged by us for HAMP and other initiatives under the Making Home Affordable Program. These amounts are based on current workload estimates and program scope, and will be updated to reflect any changes in policy, workload and program scope.

### Treasury Housing Finance Agency Initiative

On October 19, 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac that established terms under which we, Freddie Mac and Treasury would provide assistance to state and local housing finance agencies ("HFAs") so that the HFAs could continue to meet their mission of providing affordable financing for both single-family and multifamily housing. Pursuant to this HFA initiative, we, Freddie Mac and Treasury are providing assistance to the HFAs through two primary programs: a temporary credit and liquidity facilities ("TCLF") program, which is intended to improve the HFAs' access to liquidity for outstanding HFA bonds, and a new issue bond ("NIB") program, which is intended to support new lending by the HFAs. We entered into various agreements in November and December 2009 to implement these HFA assistance programs, including several to which Treasury is a party. Pursuant to the TCLF program, Treasury has purchased participation interests in temporary credit and liquidity facilities provided by us and Freddie Mac to the HFAs, which facilities create a credit and liquidity backstop for the HFAs. Pursuant to the NIB program, Treasury has purchased new securities issued by us and Freddie Mac backed by new housing bonds issued by the HFAs. Freddie Mac is also providing assistance to the HFAs through a multifamily credit enhancement program. We did not participate in this program.

The total amount originally established by Treasury for the TCLF program and the NIB program was $23.4 billion: an aggregate of $8.2 billion for the TCLF program (of which $7.7 billion consisted of principal and approximately $500 million consisted of accrued interest) and an aggregate of $15.2 billion for the NIB program (of which $12.4 billion related to single-family bonds and $2.8 billion related to multifamily bonds). The amounts outstanding under these programs have been reduced since the programs were established and will continue to be reduced over time as principal payments are received on the mortgage loans financed by the NIB program and as liquidity facilities under the TCLF program are replaced by the HFAs. As of December 31, 2010, the total outstanding principal balance under the TCLF program was $6.9 billion and the total unpaid principal amount outstanding under the NIB program was $15.2 billion.

We and Freddie Mac administer these programs on a coordinated basis. We provide temporary credit and liquidity facility support and issued securities backed by HFA bonds on a 50-50 pro rata basis with Freddie Mac under these programs. Treasury will bear the initial losses of principal under the TCLF program and the NIB program up to 35% of total principal on a combined program-wide basis, and thereafter we and Freddie Mac each will bear the losses of principal that are attributable to our own portion of the temporary credit and liquidity facilities and the securities that we have issued. Treasury will bear all losses of unpaid interest under the two programs. Accordingly, as of December 31, 2010, Fannie Mae's maximum potential risk of loss under these programs, assuming a 100% loss of principal, was approximately $7.2 billion.

FHFA, as conservator, approved the senior preferred stock purchase agreement and the amendments to the agreement, our role as program administrator for HAMP and other initiatives under the Making Home Affordable Program, and the HFA transactions described above.

TREASURY-0479

**Transactions with PHH Corporation**

Terence W. Edwards has been Executive Vice President—Credit Portfolio Management of Fannie Mae since September 14, 2009, when he joined Fannie Mae. Prior to joining Fannie Mae, Mr. Edwards served as the President and Chief Executive Officer, as well as a member of the Board of Directors, of PHH Corporation, until June 17, 2009. Mr. Edwards continued to be employed by PHH Corporation until September 11, 2009.

PHH Mortgage Corporation ("PHH"), a subsidiary of PHH Corporation, is a single-family seller-servicer customer of Fannie Mae. We regularly enter into transactions with PHH in the ordinary course of this business relationship. In 2010, PHH delivered approximately $15 billion in mortgage loans to us, which included the delivery of loans for direct payment and the delivery of pools of mortgage loans in exchange for Fannie Mae MBS. We acquired most of these mortgage loans pursuant to our early funding programs. This represented approximately 2.5% of our single-family business volume in 2010 and made PHH our eighth-largest single-family customer. In addition, as of December 31, 2010, PHH serviced approximately $66 billion of single-family mortgage loans either owned directly by Fannie Mae or backing Fannie Mae MBS, which represented approximately 2.4% of our single-family servicing book, making PHH our seventh-largest servicer. PHH also entered into transactions with us to purchase or sell approximately $16 billion in Fannie Mae, Freddie Mac and Ginnie Mae mortgage-related securities in 2010. As a single-family seller-servicer customer, PHH also pays us fees for its use of certain Fannie Mae technology, enters into risk-sharing arrangements with us, and provides us with collateral to secure some of its obligations. PHH renewed its delivery commitment to us in November 2010 for a 17-month term.

In December 2010, we entered into a committed purchase facility with PHH, pursuant to which PHH may have, at any given time during the term of the facility, up to $1.0 billion in outstanding early funding transactions with us. This agreement is in addition to our existing uncommitted transaction limits with PHH under our early funding programs. We have also provided PHH with an early reimbursement facility to fund certain of PHH's servicing advances. The maximum amount outstanding under this early reimbursement facility during 2010 was approximately $68 million. PHH is also a participating lender in our HomePath® Mortgage financing initiative relating to our REO properties.

We believe that Fannie Mae is one of PHH's largest business partners and that transactions with Fannie Mae are material to PHH's business. According to PHH Corporation's quarterly report on Form 10-Q for the quarter ended September 30, 2010, 96% of its mortgage loan sales during the first nine months of 2010 were to Fannie Mae, Freddie Mac or Ginnie Mae, and its business is highly dependent on programs administered by the GSEs.

Pursuant to a separation agreement with PHH Corporation, Mr. Edwards is entitled to receive additional compensation from PHH Corporation for his prior services to the company. Some of this additional compensation is dependent on the performance of PHH Corporation. According to Forms 8-K filed by PHH Corporation on August 5, 2009 and September 16, 2009, Mr. Edwards' separation agreement with PHH Corporation provided that he would receive the following additional compensation from PHH Corporation: (a) an amount equal to his base salary for a 24-month period beginning on PHH Corporation's first regular pay date after March 11, 2010; (b) annual cash bonuses for calendar years 2009, 2010 and 2011 in an amount equal to the bonus he would have received based on actual performance of the company (except that the 2011 bonus will be prorated to reflect the actual number of months covered by the severance period in 2011), which bonuses will be paid to Mr. Edwards at the same time bonuses are payable to corporate employees, but no later than March 15 after the end of the applicable performance year; and (c) a cash transition payment of $50,000 on PHH Corporation's first regular pay date after March 11, 2010. In addition, the outstanding options and restricted stock units that have been previously awarded to him will continue to vest and, on the last day of the severance period, all remaining unvested options and restricted stock units will become fully vested, except for the 2009 performance-based restricted stock units which will become vested only to the extent that performance goals have been satisfied.

Our policies and procedures for the review and approval of related party transactions described above under "Policies and Procedures Relating to Transactions with Related Persons" did not require the review, approval or ratification of the above-described transactions with PHH. Our Nominating and Corporate Governance

239

Committee Charter and our Board's delegation of authorities did not require the Nominating and Corporate Governance Committee to review and approve these transactions because Fannie Mae did not engage in any such transactions directly with Mr. Edwards. As required under our Conflict of Interest Policy and Conflict of Interest Procedure for employees, Mr. Edwards reported his ongoing financial interest in PHH Corporation at the time of his employment and requested review and approval of the conflict. Our Chief Executive Officer reviewed and approved of the conflict, and to address the conflict has required that Mr. Edwards be recused from all matters relating to PHH.

**Transactions with Phelan Firms**

Kenneth J. Phelan has been Executive Vice President—Chief Risk Officer from April 2009 through February 2011. Mr. Phelan's brother, Lawrence T. Phelan, is an equity partner with ownership interests in two law firms that perform services for Fannie Mae, as well as a minority owner in a company that performs services for these law firms on Fannie Mae matters. The services performed by these firms for Fannie Mae include loss mitigation, foreclosures, bankruptcies, REO matters, evictions and related services.

*Phelan Hallinan and Schmieg.*   Lawrence Phelan has an approximately 49% ownership interest in Phelan Hallinan and Schmieg, LLP ("PHS"), a law firm representing lenders and servicers in Pennsylvania. PHS or its predecessor (Federman and Phelan) has provided legal services to Fannie Mae for over 25 years, and is currently part of Fannie Mae's retained attorney network. In 2010, PHS invoiced approximately $8.5 million in legal fees relating to work performed for Fannie Mae, which represented a significant portion of the firm's overall legal fees invoiced in 2010. PHS also invoiced approximately $17.9 million in third-party costs relating to Fannie Mae matters in 2010. In 2009, PHS invoiced approximately $6.8 million in legal fees relating to work performed for Fannie Mae, which represented a significant portion of the firm's overall legal fees invoiced in 2009. PHS also invoiced approximately $15.3 million in third-party costs relating to Fannie Mae matters in 2009.

*Phelan Hallinan Schmieg and Diamond.*   Lawrence Phelan also has an approximately 41% ownership interest in Phelan Hallinan Schmieg and Diamond, PC ("PHSD"), a law firm representing lenders and servicers in New Jersey. PHSD has provided legal services to Fannie Mae for over 10 years, and is currently part of Fannie Mae's retained attorney network. PHSD invoiced approximately $6.8 million in legal fees in 2010 relating to work performed for Fannie Mae, which represented a significant portion of the firm's overall legal fees invoiced in 2010. PHSD also invoiced approximately $11.2 million in third-party costs relating to Fannie Mae matters in 2010. PHSD invoiced approximately $4.7 million in legal fees in 2009 relating to work performed for Fannie Mae, which represented a significant portion of the firm's overall legal fees invoiced in 2009. PHSD also invoiced approximately $6.7 million in third-party costs relating to Fannie Mae matters in 2009.

*Full Spectrum Holdings.*   Lawrence Phelan also has an approximately 31% interest in Full Spectrum Holdings LCC, a company that provides support services for PHS, PHSD and other firms. Full Spectrum Holdings performs services such as title searches, investigations and service of process for PHSD and PHS on Fannie Mae-related matters. Full Spectrum Holdings billed PHS and PHSD approximately $12.9 million for work performed on Fannie Mae matters in 2010, which represented a significant portion of their 2010 revenues. This amount represents approximately 44% of the third-party costs invoiced by PHS and PHSD in 2010 described above. Full Spectrum Holdings billed PHS and PHSD approximately $8.3 million for work performed on Fannie Mae matters in 2009, which represented a significant portion of their 2009 revenues. This amount represents approximately 38% of the third-party costs invoiced by PHS and PHSD in 2009 described above.

Kenneth Phelan has no affiliation with PHS, PHSD or Full Spectrum Holdings and receives no compensation or other financial benefits from these firms. In exercising his duties, Kenneth Phelan is required to recuse himself from any decisions specifically relating to Fannie Mae's relationship or transactions with PHS, PHSD or Full Spectrum Holdings. In accordance with the requirements of our Nominating and Corporate Governance Committee Charter and our Board's delegation of authorities, the Nominating and Corporate Governance Committee has approved Fannie Mae's transactions with these firms.

TREASURY-0481

**Transactions involving The Integral Group LLC**

Mr. Perry, who joined our Board in December 2008, is the Chairman, Chief Executive Officer and controlling shareholder of The Integral Group LLC, referred to as Integral. Over the past nine years, our Multifamily (formerly, Housing and Community Development) business has invested indirectly in certain limited partnerships or limited liability companies that are controlled and managed by entities affiliated with Integral, in the capacity of general partner or managing member, as the case may be. These limited partnerships or limited liability companies are referred to as the Integral Property Partnerships. The Integral Property Partnerships own and manage LIHTC properties. We also hold multifamily mortgage loans made to borrowing entities sponsored by Integral. We believe that Mr. Perry has no material direct or indirect interest in these transactions. Mr. Perry has informed us that Integral accepted no further equity investments from us relating to Integral Property Partnerships beginning in December 2008, when he joined our Board. Mr. Perry has also informed us that Integral does not intend to seek debt financing intended specifically to be purchased by us, although, as a secondary market participant, in the ordinary course of our business we may purchase multifamily mortgage loans made to borrowing entities sponsored by Integral. See "Director Independence— Our Board of Directors" below for further information.

## DIRECTOR INDEPENDENCE

Our Board of Directors, with the assistance of the Nominating and Corporate Governance Committee, has reviewed the independence of all current Board members under the requirements set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE) and under the standards of independence adopted by the Board, as set forth in our Corporate Governance Guidelines and outlined below. It is the policy of our Board of Directors that a substantial majority of our seated directors will be independent in accordance with these standards. Our Board is currently structured so that all but one of our directors, our Chief Executive Officer, is independent. Based on its review, the Board has determined that all of our non-employee directors meet the director independence requirements set forth in FHFA's corporate governance regulations and in our Corporate Governance Guidelines.

### Independence Standards

Under the standards of independence adopted by our Board, which meet and in some respects exceed the definition of independence required by FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE), an "independent director" must be determined to have no material relationship with us, either directly or through an organization that has a material relationship with us. A relationship is "material" if, in the judgment of the Board, it would interfere with the director's independent judgment. The Board did not consider the Board's duties to the conservator, together with the federal government's controlling beneficial ownership of Fannie Mae, in determining independence of the Board members.

In addition, under FHFA's corporate governance regulations, our Audit Committee is required to be in compliance with the NYSE's listing requirements for audit committees, under which members of a company's audit committee must meet additional, heightened independence criteria. Our own independence standards require all independent directors to meet these criteria.

To assist it in determining whether a director is independent, our Board has adopted the standards set forth below, which are posted on our Web site, www.fanniemae.com, under "Corporate Governance" in the "About Us" section of our Web site:

- A director will not be considered independent if, within the preceding five years:

  - the director was our employee; or

  - an immediate family member of the director was employed by us as an executive officer.

241

- A director will not be considered independent if:

  - the director is a current partner or employee of our external auditor, or within the preceding five years, was (but is no longer) a partner or employee of our external auditor and personally worked on our audit within that time; or

  - an immediate family member of the director is a current partner of our external auditor, or is a current employee of our external auditor and personally works on Fannie Mae's audit, or, within the preceding five years, was (but is no longer) a partner or employee of our external auditor and personally worked on our audit within that time.

- A director will not be considered independent if, within the preceding five years:

  - the director was employed by a company at a time when one of our current executive officers sat on that company's compensation committee; or

  - an immediate family member of the director was employed as an officer by a company at a time when one of our current executive officers sat on that company's compensation committee.

- A director will not be considered independent if, within the preceding five years:

  - the director received any compensation from us, directly or indirectly, other than fees for service as a director; or

  - an immediate family member of the director received any compensation from us, directly or indirectly, other than compensation received for service as our employee (other than an executive officer).

- A director will not be considered independent if:

  - the director is a current executive officer, employee, controlling stockholder or partner of a company or other entity that does or did business with us and to which we made, or from which we received, payments within the preceding five years that, in any single fiscal year, were in excess of $1 million or 2% of the entity's consolidated gross annual revenues, whichever is greater; or

  - an immediate family member of the director is a current executive officer of a company or other entity that does or did business with us and to which we made, or from which we received, payments within the preceding five years that, in any single fiscal year, were in excess of $1 million or 2% of the entity's consolidated gross annual revenues, whichever is greater.

- A director will not be considered independent if the director or the director's spouse is an executive officer, employee, director or trustee of a nonprofit organization to which we make or have made contributions within the preceding three years (including contributions made by the Fannie Mae Foundation prior to December 31, 2008) that in any year were in excess of 5% of the organization's consolidated gross annual revenues, or $120,000, whichever is less (amounts contributed under our Matching Gifts Program are not included in the contributions calculated for purposes of this standard). The Nominating and Corporate Governance Committee also will receive periodic reports regarding charitable contributions to organizations otherwise associated with a director or any spouse of a director.

After considering all the facts and circumstances, our Board may determine in its judgment that a director is independent (in other words, the director has no relationship with us that would interfere with the director's independent judgment), even though the director does not meet the standards listed above, so long as the determination of independence is consistent with the NYSE definition of "independence." Where the guidelines above and the NYSE independence requirements do not address a particular relationship, the determination of whether the relationship is material, and whether a director is independent, will be made by our Board, based upon the recommendation of the Nominating and Corporate Governance Committee.

**Our Board of Directors**

Our Board of Directors, with the assistance of the Nominating and Corporate Governance Committee, has reviewed the independence of all current Board members under the requirements set forth in FHFA's corporate

TREASURY-0483

governance regulations (which requires the standard of independence adopted by the NYSE) and under the standards of independence adopted by the Board contained in our Corporate Governance Guidelines, as outlined above. Based on its review, the Board has affirmatively determined that all of our non-employee directors meet the director independence standards of our Guidelines and the NYSE, and that each of the following nine directors is independent: Philip A. Laskawy, Dennis R. Beresford, William Thomas Forrester, Brenda J. Gaines, Charlynn Goins, Frederick B. Harvey III, Egbert L. J. Perry, Jonathan Plutzik and David H. Sidwell.

In determining the independence of each of these Board members, the Board of Directors considered the following relationships in addition to those addressed by the standards contained in our Guidelines as set forth above:

- Certain of these Board members also serve as directors or advisory Board members of other companies that engage in business with Fannie Mae. In each of these cases, the Board members are only directors or advisory Board members of these other companies. In addition, in most instances, the payments made by or to Fannie Mae pursuant to these relationships during the past five years fell below our Guidelines' thresholds of materiality for a Board member that is a current executive officer, employee, controlling shareholder or partner of a company engaged in business with Fannie Mae. In light of these facts, the Board of Directors has concluded that these business relationships are not material to the independence of these Board members.

- Certain of these Board members also serve as trustees or board members for charitable organizations that have received donations from Fannie Mae. In each case, the amounts of these charitable donations fell substantially below our Guidelines' thresholds of materiality for a Board member who is a current trustee or board member of a charitable organization that receives donations from Fannie Mae. In light of this fact, the Board of Directors has concluded that these relationships with charitable organizations are not material to the independence of these Board members.

- Certain of these Board members serve as directors of other companies that hold Fannie Mae fixed income securities or control entities that direct investments in such securities. It is not possible for Fannie Mae to determine the extent of the holdings of these companies in Fannie Mae fixed income securities as all payments to holders are made through the Federal Reserve, and most of these securities are held in turn by financial intermediaries. Each director has confirmed that the transactions by these other companies in Fannie Mae fixed income securities are entered into in the ordinary course of business of these companies and are not entered into at the direction of, or upon approval by, him or her in his or her capacity as a director of these companies. In light of these facts, the Board of Directors has concluded that these business relationships are not material to the independence of these Board members.

- Mr. Perry is an executive officer and majority shareholder of The Integral Group LLC, which indirectly does business with Fannie Mae. This business includes the following:

  - Fannie Mae purchased a 50% participation in a mortgage loan made in 2001 to a limited partnership borrower sponsored by Integral. This mortgage loan was paid off in 2006.

  - Since 2006, Fannie Mae has held six multifamily mortgage loans made to six borrowing entities sponsored by Integral. In each case, Integral participates in the borrowing entity as a general partner of the limited partnership, or as a managing member of the limited liability company, as the case may be, and holds a 0.01% economic interest in such entity. The aggregate unpaid principal balance of these loans as of December 31, 2010 constituted approximately 5% of Integral's total debt outstanding. The borrowing entities have made interest payments on these loans. The total amount of Integral's pro rata share of the interest payments made to Fannie Mae on these loans since 2006 is less than $1 million.

  - Fannie Mae has invested as a limited partner or member in certain LIHTC funds that in turn have invested indirectly as a limited partner or member in various Integral Property Partnerships, which are lower-tier project partnerships or limited liability companies that own LIHTC properties. Integral participates indirectly as a member or the general partner of the Integral Property Partnerships (each a "Project General Partner"). The Integral Property Partnerships construct, develop and manage housing

243

projects, a portion of which includes affordable housing units. Each Project General Partner and its affiliates earn certain fees each year in connection with those project activities, and such fees are paid from income generated by the project (other than certain developer fees paid from development sources). Fannie Mae's indirect investments in the Integral Property Partnerships, through the LIHTC funds, have not resulted in any direct payments by Fannie Mae to any Project General Partner or its affiliates, including Integral. Fannie Mae's indirect equity investment in the Integral Property Partnerships as of December 31, 2010 constituted approximately 3% of the total capitalization and approximately 10% of the total equity in all of the Integral Property Partnerships.

The aggregate debt service and other required payments made, directly and indirectly, to or on behalf of Fannie Mae pursuant to these relationships with Integral fall below our Guidelines' thresholds of materiality for a Board member who is a current executive officer, employee, controlling shareholder or partner of a company that engages in business with Fannie Mae. In addition, as a limited partner or member in the LIHTC funds, which in turn are limited partners in the Integral Property Partnerships, Fannie Mae has no direct dealings with Integral or Mr. Perry and has not been involved in the management of the Integral Property Partnerships. Mr. Perry also was not generally aware of the identity of the limited partners or members of the LIHTC funds, as Integral sells the partnership or LLC interests to syndicators who, in turn, syndicate these interests to limited partners or members of their choosing. Further, Integral has not accepted additional equity investments from Fannie Mae since Mr. Perry joined the Board and Mr. Perry has informed Fannie Mae that Integral does not intend to seek debt financing specifically to be purchased by Fannie Mae. Based on the foregoing, the Board of Directors has concluded that these business relationships are not material to Mr. Perry's independence.

- Mr. Plutzik's wife, Leslie Goldwasser, is a Managing Director with Credit Suisse. She is not an executive officer of Credit Suisse. Fannie Mae has multiple business relationships with Credit Suisse in the ordinary course of its business. We believe that payments made by or to Fannie Mae pursuant to its relationships with Credit Suisse during the past five years likely fell below our Guidelines' thresholds of materiality for when an immediate family member of a director is a current executive officer, employee, controlling shareholder or partner of a company engaged in business with Fannie Mae. Ms. Goldwasser has confirmed that she has no direct or indirect interest or involvement in any transactions between Fannie Mae and Credit Suisse and that her compensation is not affected directly or indirectly by any such transactions. In light of these facts, the Board of Directors has concluded that these business relationships are not material to Mr. Plutzik's independence.

The Board determined that none of these relationships would interfere with the director's independent judgment.

Mr. Williams is not considered an independent director under the Guidelines because of his position as Chief Executive Officer.

## Item 14.   Principal Accounting Fees and Services

The Audit Committee of our Board of Directors is directly responsible for the appointment, oversight and evaluation of our independent registered public accounting firm, subject to conservator approval of matters relating to retention and termination. In accordance with the Audit Committee's charter, it must approve, in advance of the service, all audit and permissible non-audit services to be provided by our independent registered public accounting firm and establish policies and procedures for the engagement of the external auditor to provide audit and permissible non-audit services. Our independent registered public accounting firm may not be retained to perform non-audit services specified in Section 10A(g) of the Exchange Act.

Deloitte & Touche LLP was our independent registered public accounting firm for the years ended December 31, 2010 and 2009. Deloitte & Touche LLP has advised the Audit Committee that they are independent accountants with respect to the company, within the meaning of standards established by the PCAOB and federal securities laws administered by the SEC.

TREASURY-0485

The following table sets forth the aggregate estimated or actual fees for professional services provided by Deloitte & Touche LLP in 2010 and 2009, including fees for the 2010 and 2009 audits.

| Description of Fees | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Audit fees[1] | $37,000,000 | $42,600,000 |
| Audit-related fees[2] | 2,500,000 | 2,800,000 |
| Total fees | $39,500,000 | $45,400,000 |

---

[1] 2009 amounts include costs associated with the audit of our adoption of the new accounting standard on consolidation.

[2] Mainly consists of: (1) fees billed for attest-related services on securitization transactions and (2) in 2009, reimbursement of costs associated with responding to subpoenas relating to Fannie Mae's securities litigation.

**Pre-Approval Policy**

The Audit Committee's policy is to pre-approve all audit and permissible non-audit services to be provided by the independent registered public accounting firm. The independent registered public accounting firm and management are required to present reports on the nature of the services provided by the independent registered public accounting firm for the past year and the fees for such services, categorized into audit services, audit-related services, tax services and other services.

In connection with its approval of Deloitte & Touche as Fannie Mae's independent registered public accounting firm for Fannie Mae's 2010 integrated audit, the Audit Committee delegated the authority to pre-approve any additional audit and audit-related services to its Chairman, Mr. Beresford, who was required to report any such pre-approvals at the next scheduled meeting of the Audit Committee. Additionally, any services provided by Deloitte & Touche outside of the scope of this engagement must be approved by the Conservator.

In 2010, we paid no fees to the independent registered public accounting firm pursuant to the de minimis exception established by the SEC, and all services were pre-approved.

245

**PART IV**

**Item 15.   Exhibits, Financial Statement Schedules**

**(a)   Documents filed as part of this report**

**1.   Consolidated Financial Statements**

Report of Independent Registered Public Accounting Firm............................... F-2

Financial Statements................................................................ F-3

Consolidated Balance Sheets as of December 31, 2010 and 2009.......................... F-3

Consolidated Statements of Operations for the years ended December 31, 2010, 2009, and 2008.. F-4

Consolidated Statements of Cash Flows for the years ended December 31, 2010, 2009, and 2008.................................................................. F-5

Consolidated Statements of Changes in Equity (Deficit) for the years ended December 31, 2010, 2009, and 2008.................................................................. F-6

Notes to Consolidated Financial Statements......................................... F-8

    Note 1—   Summary of Significant Accounting Policies ............................. F-8

    Note 2—   Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities ................................. F-36

    Note 3—   Consolidations and Transfers of Financial Assets .......................... F-45

    Note 4—   Mortgage Loans ................................................ F-50

    Note 5—   Allowance for Loan Losses and Reserve for Guaranty Losses ................. F-55

    Note 6—   Investments in Securities .......................................... F-60

    Note 7—   Financial Guarantees and Master Servicing............................. F-68

    Note 8—   Acquired Property, Net ........................................... F-73

    Note 9—   Short-term Borrowings and Long-term Debt ............................ F-74

    Note 10—   Derivative Instruments and Hedging Activities .......................... F-77

    Note 11—   Income Taxes .................................................. F-83

    Note 12—   Loss Per Share ................................................. F-86

    Note 13—   Stock-Based Compensation ........................................ F-87

    Note 14—   Employee Retirement Benefits ..................................... F-89

    Note 15—   Segment Reporting .............................................. F-96

    Note 16—   Equity (Deficit) ................................................ F-103

    Note 17—   Regulatory Capital Requirements ................................... F-110

    Note 18—   Concentrations of Credit Risk ..................................... F-112

    Note 19—   Fair Value .................................................... F-117

    Note 20—   Commitments and Contingencies .................................... F-134

    Note 21—   Selected Quarterly Financial Information (Unaudited)...................... F-138

**2.   Financial Statement Schedules**

None.

**3.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

TREASURY-0487

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Federal National Mortgage Association

/s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: February 24, 2011

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Michael J. Williams and David C. Hisey, and each of them severally, his or her true and lawful attorney-in-fact with power of substitution and resubstitution to sign in his or her name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U.S. Securities and Exchange Commission in connection with the Annual Report on Form 10-K and any and all amendments hereto, as fully for all intents and purposes as he or she might or could do in person, and hereby ratifies and confirms all said attorneys-in-fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   Philip A. Laskawy<br>Philip A. Laskawy | Chairman of the Board of Directors | February 24, 2011 |
| /s/   Michael J. Williams<br>Michael J. Williams | President and Chief Executive Officer and Director | February 24, 2011 |
| /s/   David C. Hisey<br>David C. Hisey | Executive Vice President and Deputy Chief Financial Officer | February 24, 2011 |
| /s/   Dennis R. Beresford<br>Dennis R. Beresford | Director | February 24, 2011 |
| /s/   William Thomas Forrester<br>William Thomas Forrester | Director | February 24, 2011 |

247

| Signature | Title | Date |
|---|---|---|
| /s/   Brenda J. Gaines<br>Brenda J. Gaines | Director | February 24, 2011 |
| /s/   Charlynn Goins<br>Charlynn Goins | Director | February 24, 2011 |
| /s/   Frederick B. Harvey III<br>Frederick B. Harvey III | Director | February 24, 2011 |
| /s/   Egbert L. J. Perry<br>Egbert L. J. Perry | Director | February 24, 2011 |
| /s/   Jonathan Plutzik<br>Jonathan Plutzik | Director | February 24, 2011 |
| /s/   David H. Sidwell<br>David H. Sidwell | Director | February 24, 2011 |

TREASURY-0489

## INDEX TO EXHIBITS

| Item | Description |
| --- | --- |
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 4.1 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series D (Incorporated by reference to Exhibit 4.1 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.2 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series E (Incorporated by reference to Exhibit 4.2 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.3 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series F (Incorporated by reference to Exhibit 4.3 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.4 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series G (Incorporated by reference to Exhibit 4.4 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.5 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series H (Incorporated by reference to Exhibit 4.5 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.6 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series I (Incorporated by reference to Exhibit 4.6 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.7 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series L (Incorporated by reference to Exhibit 4.7 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.8 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series M (Incorporated by reference to Exhibit 4.8 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.9 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series N (Incorporated by reference to Exhibit 4.9 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.10 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Convertible Preferred Stock, Series 2004-1(Incorporated by reference to Exhibit 4.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.11 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series O (Incorporated by reference to Exhibit 4.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.12 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series P (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed September 28, 2007.) |
| 4.13 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series Q (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 5, 2007.) |
| 4.14 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series R (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed November 21, 2007.) |
| 4.15 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series S (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 11, 2007.) |
| 4.16 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 14, 2008.) |
| 4.17 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series T (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 19, 2008.) |
| 4.18 | Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Incorporated by reference to Exhibit 4.2 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.) |

E-1

| Item | Description |
|------|-------------|

4.19    Warrant to Purchase Common Stock, dated September 7, 2008 conservator (Incorporated by reference to Exhibit 4.3 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.)

4.20    Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 2008.)

4.21    Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.)

4.22    Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.)

10.1    Fannie Mae's Elective Deferred Compensation Plan, as amended effective November 15, 2004† (Incorporated by reference to Exhibit 10.21 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.2    Amendment to Fannie Mae Elective Deferred Compensation Plan I, effective October 27, 2008† (Incorporated by reference to Exhibit 10.7 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.3    Fannie Mae Elective Deferred Compensation Plan II† (Incorporated by reference to Exhibit 10.7 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.4    Amendment to Fannie Mae Elective Deferred Compensation Plan II, effective April 29, 2008† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.)

10.5    Amendment to Fannie Mae Elective Deferred Compensation Plan II, effective October 27, 2008† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.6    Compensation Repayment Provisions† (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed December 24, 2009.)

10.7    Long-Term Incentive Plan, effective December 16, 2009† (Incorporated by reference to Exhibit 10.9 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.8    Deferred Pay Plan, effective December 16, 2009† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.9    Fannie Mae Form of Indemnification Agreement for directors and officers of Fannie Mae (Incorporated by reference to Exhibit 10.15 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.10    Federal National Mortgage Association Supplemental Pension Plan, as amended November 20, 2007† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.11    Amendment to Fannie Mae Supplemental Pension Plan for Internal Revenue Code Section 409A, effective January 1, 2009† (Incorporated by reference to Exhibit 10.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.12    Amendment to Fannie Mae Supplemental Pension Plan, executed December 22, 2008† (Incorporated by reference to Exhibit 10.18 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

E-2

| Item | Description |
|------|-------------|
| 10.13 | Fannie Mae Supplemental Pension Plan of 2003, as amended November 20, 2007† (Incorporated by reference to Exhibit 10.12 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.14 | Amendment to Fannie Mae Supplemental Pension Plan of 2003 for Internal Revenue Code Section 409A, effective January 1, 2009† (Incorporated by reference to Exhibit 10.13 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.15 | Amendment to Fannie Mae Supplemental Pension Plan of 2003 for Internal Revenue Code Section 409A, adopted December 22, 2008† (Incorporated by reference to Exhibit 10.21 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.16 | Amendment to Fannie Mae Supplement Pension Plan of 2003, effective May 14, 2010† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 5, 2010.) |
| 10.17 | Executive Pension Plan of the Federal National Mortgage Association as amended and restated† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's registration statement on Form 10, filed March 31, 2003) |
| 10.18 | Amendment to the Executive Pension Plan of the Federal National Mortgage Association, as amended and restated, effective March 1, 2007† (Incorporated by reference to Exhibit 10.20 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2005, filed May 2, 2007.) |
| 10.19 | Amendment to Fannie Mae Executive Pension Plan, effective November 20, 2007† (Incorporated by reference to Exhibit 10.16 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.20 | Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective January 1, 2008† (Incorporated by reference to Exhibit 10.25 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.21 | Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective December 16, 2009† (Incorporated by reference to Exhibit 10.23 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 10.22 | Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective January 1, 2010† |
| 10.23 | Fannie Mae Annual Incentive Plan, as amended December 10, 2007† (Incorporated by reference to Exhibit 10.17 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.24 | Fannie Mae Stock Compensation Plan of 2003, as amended through December 14, 2007† (Incorporated by reference to Exhibit 10.18 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.25 | Amendment to Fannie Mae Stock Compensation Plan of 2003, as amended, for Internal Revenue Code Section 409A, adopted December 22, 2008† (Incorporated by reference to Exhibit 10.28 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.26 | Fannie Mae Stock Compensation Plan of 1993† (Incorporated by reference to Exhibit 10.18 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2004, filed December 6, 2006.) |
| 10.27 | 2009 Amendment to Fannie Mae Stock Compensation Plans of 1993 and 2003† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed November 5, 2009.) |
| 10.28 | Fannie Mae Procedures for Deferral and Diversification of Awards, as amended effective December 10, 2007† (Incorporated by reference to Exhibit 10.30 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |

E-3

| Item | Description |
|------|-------------|
| 10.29 | Fannie Mae Supplemental Retirement Savings Plan, as amended through April 29, 2008† (Incorporated by reference to Exhibit 10.2 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 10.30 | Amendment to Fannie Mae Supplemental Retirement Savings Plan, effective October 8, 2008† (Incorporated by reference to Exhibit 10.32 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.31 | Amendment to Fannie Mae Supplemental Retirement Savings Plan, effective May 14, 2010† (Incorporated by reference to Exhibit 10.2 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 5, 2010.) |
| 10.32 | Form of Nonqualified Stock Option Grant Award Document† (Incorporated by reference to Exhibit 10.33 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 10.33 | Form of Restricted Stock Award Document† (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed January 26, 2007.) |
| 10.34 | Form of Restricted Stock Units Award Document adopted January 23, 2008† (Incorporated by reference to Exhibit 10.27 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.) |
| 10.35 | Form of Restricted Stock Units Award Document† (Incorporated by reference to Exhibit 99.2 to Fannie Mae's Current Report on Form 8-K, filed January 26, 2007.) |
| 10.36 | Lending Agreement, dated September 19, 2008, between the U.S. Treasury and Fannie Mae† (Incorporated by reference to Exhibit 10.4 to Fannie Mae's Quarterly Report on Form 10-Q, filed November 10, 2008.) |
| 10.37 | Senior Preferred Stock Purchase Agreement dated as of September 7, 2008, as amended and restated on September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association (Incorporated by reference Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 3008.) |
| 10.38 | Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.) |
| 10.39 | Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.) |
| 10.40 | Letters, dated September 1, 2005, setting forth an agreement between Fannie Mae and OFHEO (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Current Report on Form 8-K, filed September 8, 2005.) |
| 10.41 | Consent of Defendant Fannie Mae with Securities and Exchange Commission, dated May 23, 2006 (Incorporated by reference to Exhibit 10.2 to Fannie Mae's Current Report on Form 8-K, filed May 30, 2006.) |
| 10.42 | Letter Agreement between Fannie Mae and Timothy J. Mayopoulos, dated March 9, 2009† (Incorporated by reference to Exhibit 10.44 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 10.43 | Memorandum of Understanding among the Department of the Treasury, the Federal Housing Finance Agency, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation, dated October 19, 2009 (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed October 23, 2009.) |
| 12.1 | Statement re: computation of ratios to earnings to fixed charges |
| 12.2 | Statement re: computation of ratios of earnings to combined fixed charges and preferred stock dividends |

E-4

| Item | Description |
|------|-------------|
| 31.1 | Certification of Deputy Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Deputy Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |

\* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

† This Exhibit is a management contract or compensatory plan or arrangement.

TREASURY-0494

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-2

Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-3

Consolidated Balance Sheets as of December 31, 2010 and 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-3

Consolidated Statements of Operations for the years ended December 31, 2010, 2009, and 2008 . . . . . F-4

Consolidated Statements of Cash Flows for the years ended December 31, 2010, 2009, and 2008 . . . . . F-5

Consolidated Statements of Changes in Equity (Deficit) for the years ended December 31, 2010, 2009, and 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-6

Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-8

   Note 1—   Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-8

   Note 2—   Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-36

   Note 3—   Consolidations and Transfers of Financial Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-45

   Note 4—   Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-50

   Note 5—   Allowance for Loan Losses and Reserve for Guaranty Losses . . . . . . . . . . . . . . . . . . . . F-55

   Note 6—   Investments in Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-60

   Note 7—   Financial Guarantees and Master Servicing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-68

   Note 8—   Acquired Property, Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-73

   Note 9—   Short-term Borrowings and Long-term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-74

   Note 10—  Derivative Instruments and Hedging Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-77

   Note 11—  Income Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-83

   Note 12—  Loss Per Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-86

   Note 13—  Stock-Based Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-87

   Note 14—  Employee Retirement Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-89

   Note 15—  Segment Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-96

   Note 16—  Equity (Deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-103

   Note 17—  Regulatory Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-110

   Note 18—  Concentrations of Credit Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-112

   Note 19—  Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-117

   Note 20—  Commitments and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-134

   Note 21—  Selected Quarterly Financial Information (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . F-138

TREASURY-0495

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To Fannie Mae:

We have audited the accompanying consolidated balance sheets of Fannie Mae and consolidated entities (in conservatorship) (the "Company") as of December 31, 2010 and 2009, and the related consolidated statements of operations, cash flows, and changes in equity (deficit) for each of the three years in the period ended December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Fannie Mae and consolidated entities (in conservatorship) as of December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Notes 1 and 2 to the consolidated financial statements, on January 1, 2010, the Company prospectively adopted the Financial Accounting Standards Board (FASB) new accounting standards on the transfers of financial assets and the consolidation of variable interest entities.

As discussed in Note 1 to the consolidated financial statements, on April 1, 2009, the Company adopted the FASB modified standard on the model for assessing other-than-temporary impairments, applicable to existing and new debt securities.

As also discussed in Note 1 to the consolidated financial statements, the Company is currently under the control of its conservator and regulator, the Federal Housing Finance Agency ("FHFA"). Further, the Company directly and indirectly receives substantial support from various agencies of the United States Government, including the United States Department of Treasury and FHFA. The Company is dependent upon the continued support of the United States Government, various United States Government agencies and the Company's conservator and regulator, FHFA.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2010, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 24, 2011 expressed an adverse opinion on the Company's internal control over financial reporting because of a material weakness.

/s/   Deloitte & Touche LLP

Washington, DC
February 24, 2011

TREASURY-0496

**FANNIE MAE**
**(In conservatorship)**

**Consolidated Balance Sheets**
**(Dollars in millions, except share amounts)**

| | As of December 31, | |
|---|---|---|
| | **2010** | **2009** |
| **ASSETS** | | |
| Cash and cash equivalents (includes cash of consolidated trusts of $348 and $2,092, respectively) . . . . . . . . . | $ 17,297 | $ 6,812 |
| Restricted cash (includes restricted cash of consolidated trusts of $59,619 and $-, respectively) . . . . . . . . . . . | 63,678 | 3,070 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . | 11,751 | 53,684 |
| Investments in securities: | | |
| Trading, at fair value (includes securities of consolidated trusts of $21 and $5,599, respectively) . . . . . . . . | 56,856 | 111,939 |
| Available-for-sale, at fair value (includes securities of consolidated trusts of $1,055 and $10,513, respectively, and securities pledged as collateral that may be sold or repledged of $- and $1,148, respectively) . . . . . . . . . | 94,392 | 237,728 |
| Total investments in securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 151,248 | 349,667 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 915 | 18,462 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 407,228 | 256,434 |
| Of consolidated trusts (includes loans at fair value of $2,962 and $-, respectively, and loans pledged as collateral that may be sold or repledged of $2,522 and $1,947, respectively) . . . . . . . . . . . . . . . . . . . | 2,577,133 | 129,590 |
| Total loans held for investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,984,361 | 386,024 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (61,556) | (9,925) |
| Total loans held for investment, net of allowance . . . . . . . . . . . . . . . . . . . . . . . | 2,922,805 | 376,099 |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,923,720 | 394,561 |
| Accrued interest receivable: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,344 | 3,774 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,349 | 519 |
| Allowance for accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,414) | (536) |
| Total accrued interest receivable, net of allowance . . . . . . . . . . . . . . . . . . . | 11,279 | 3,757 |
| Acquired property, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,173 | 9,142 |
| Servicer and MBS trust receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 951 | 18,329 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,875 | 30,119 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $869,141 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| Liabilities: | | |
| Accrued interest payable: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,052 | $ 4,951 |
| Of consolidated trusts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,712 | 29 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . | 52 | — |
| Short-term debt: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 151,884 | 200,437 |
| Of consolidated trusts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,359 | — |
| Long-term debt: | | |
| Of Fannie Mae (includes debt at fair value of $893 and $3,274, respectively) . . . . . . . . . . . . . . . . . . . . | 628,160 | 567,950 |
| Of consolidated trusts (includes debt at fair value of $2,271 and $-, respectively) . . . . . . . . . . . . . . . . . | 2,411,597 | 6,167 |
| Reserve for guaranty losses (includes $54 and $4,772, respectively, related to Fannie Mae MBS included in Investments in securities) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 323 | 54,430 |
| Servicer and MBS trust payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,950 | 25,872 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,400 | 24,586 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,224,489 | 884,422 |
| Commitments and contingencies (Note 20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 88,600 | 60,900 |
| Preferred stock, 700,000,000 shares are authorized—576,868,139 and 579,735,457 shares issued and outstanding, respectively . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,204 | 20,348 |
| Common stock, no par value, no maximum authorization—1,270,092,708 and 1,265,674,761 shares issued, respectively; 1,118,504,194 and 1,113,358,051 shares outstanding, respectively . . . . . . . . . . . . . . . . . . | 667 | 664 |
| Additional paid-in capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,083 |
| Accumulated deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (102,986) | (90,237) |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,682) | (1,732) |
| Treasury stock, at cost, 151,588,514 and 152,316,710 shares, respectively . . . . . . . . . . . . . . . . . . . . . . | (7,402) | (7,398) |
| Total Fannie Mae stockholders' deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,599) | (15,372) |
| Noncontrolling interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 | 91 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,517) | (15,281) |
| Total liabilities and equity (deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $869,141 |

See Notes to Consolidated Financial Statements

F-3

**FANNIE MAE**

**(In conservatorship)**

**Consolidated Statements of Operations**

(Dollars and shares in millions, except per share amounts)

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| Interest income: | | | |
| Trading securities | $ 1,251 | $ 3,859 | $ 5,878 |
| Available-for-sale securities | 5,290 | 13,618 | 13,214 |
| Mortgage loans: | | | |
| Of Fannie Mae | 14,992 | 15,378 | 18,547 |
| Of consolidated trusts | 132,591 | 6,143 | 4,145 |
| Other | 146 | 357 | 1,339 |
| Total interest income | 154,270 | 39,355 | 43,123 |
| Interest expense: | | | |
| Short-term debt: | | | |
| Of Fannie Mae | 619 | 2,306 | 7,815 |
| Of consolidated trusts | 12 | — | — |
| Long-term debt: | | | |
| Of Fannie Mae | 18,857 | 22,195 | 26,145 |
| Of consolidated trusts | 118,373 | 344 | 381 |
| Total interest expense | 137,861 | 24,845 | 34,341 |
| Net interest income | 16,409 | 14,510 | 8,782 |
| Provision for loan losses | (24,702) | (9,569) | (4,022) |
| Net interest income (loss) after provision for loan losses | (8,293) | 4,941 | 4,760 |
| Guaranty fee income (includes imputed interest of $111, $1,333 and $1,423, respectively) | 202 | 7,211 | 7,621 |
| Investment gains (losses), net | 346 | 1,458 | (246) |
| Other-than-temporary impairments | (694) | (9,057) | (6,974) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive loss | (28) | (804) | — |
| Net other-than-temporary impairments | (722) | (9,861) | (6,974) |
| Fair value losses, net | (511) | (2,811) | (20,129) |
| Debt extinguishment losses, net (includes debt extinguishment losses related to consolidated trusts of $109, $- and $-, respectively) | (568) | (325) | (222) |
| Losses from partnership investments | (74) | (6,735) | (1,554) |
| Fee and other income | 882 | 773 | 1,033 |
| Non-interest loss | (445) | (10,290) | (20,471) |
| Administrative expenses: | | | |
| Salaries and employee benefits | 1,277 | 1,133 | 1,032 |
| Professional services | 942 | 684 | 529 |
| Occupancy expenses | 170 | 205 | 227 |
| Other administrative expenses | 208 | 185 | 191 |
| Total administrative expenses | 2,597 | 2,207 | 1,979 |
| Provision for guaranty losses | 194 | 63,057 | 23,929 |
| Foreclosed property expense | 1,718 | 910 | 1,858 |
| Other expenses | 853 | 1,484 | 1,093 |
| Total expenses | 5,362 | 67,658 | 28,859 |
| Loss before federal income taxes and extraordinary losses | (14,100) | (73,007) | (44,570) |
| Provision (benefit) for federal income taxes | (82) | (985) | 13,749 |
| Loss before extraordinary losses | (14,018) | (72,022) | (58,319) |
| Extraordinary losses, net of tax effect | — | — | (409) |
| Net loss | (14,018) | (72,022) | (58,728) |
| Less: Net loss attributable to the noncontrolling interest | 4 | 53 | 21 |
| Net loss attributable to Fannie Mae | (14,014) | (71,969) | (58,707) |
| Preferred stock dividends | (7,704) | (2,474) | (1,069) |
| Net loss attributable to common stockholders | $(21,718) | $(74,443) | $(59,776) |
| Loss per share — Basic and Diluted | $ (3.81) | $ (13.11) | $ (24.04) |
| Cash dividends per common share | $ — | $ — | $ 0.75 |
| Weighted-average common shares outstanding — Basic and Diluted | 5,694 | 5,680 | 2,487 |

See Notes to Consolidated Financial Statements

F-4

## FANNIE MAE
### (In conservatorship)

### Consolidated Statements of Cash Flows
**(Dollars in millions)**

| | For the Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2010 | 2009 | 2008 |
| **Cash flows (used in) provided by operating activities:** | | | |
| Net loss | $ (14,018) | $ (72,022) | $ (58,728) |
| Reconciliation of net loss to net cash (used in) provided by operating activities: | | | |
| Amortization of cost basis adjustments | 126 | 2,568 | 8,189 |
| Provisions for loan and guaranty losses | 24,896 | 72,626 | 27,951 |
| Valuation (gains) losses | (1,289) | 3,425 | 12,725 |
| Losses from partnership investments | 74 | 6,735 | 1,554 |
| Current and deferred federal income taxes | 258 | (1,919) | 12,904 |
| Extraordinary losses, net of tax effect | — | — | 409 |
| Purchases of loans held for sale | (81) | (109,684) | (56,768) |
| Proceeds from repayments of loans held for sale | 88 | 2,413 | 617 |
| Net change in trading securities, excluding non-cash transfers | (23,612) | 11,976 | 72,689 |
| Other, net | (13,837) | (2,027) | (5,689) |
| Net cash (used in) provided by operating activities | (27,395) | (85,909) | 15,853 |
| **Cash flows provided by (used in) investing activities:** | | | |
| Purchases of trading securities held for investment | (8,547) | (48,659) | (7,635) |
| Proceeds from maturities of trading securities held for investment | 2,638 | 12,918 | 9,530 |
| Proceeds from sales of trading securities held for investment | 21,556 | 39,261 | 2,823 |
| Purchases of available-for-sale securities | (413) | (165,103) | (147,337) |
| Proceeds from maturities of available-for-sale securities | 17,102 | 48,096 | 33,369 |
| Proceeds from sales of available-for-sale securities | 7,867 | 306,598 | 146,630 |
| Purchases of loans held for investment | (86,724) | (52,148) | (63,097) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 20,715 | 30,958 | 39,098 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 574,740 | 26,184 | 10,230 |
| Net change in restricted cash | (15,025) | — | — |
| Advances to lenders | (74,130) | (79,163) | (81,483) |
| Proceeds from disposition of acquired property and preforeclosure sales | 39,682 | 22,667 | 10,905 |
| Contributions to partnership investments | (351) | (688) | (1,507) |
| Proceeds from partnership investments | 129 | 87 | 1,042 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | 41,471 | 4,230 | (9,793) |
| Other, net | (531) | (27,503) | (15,282) |
| Net cash provided by (used in) investing activities | 540,179 | 117,735 | (72,507) |
| **Cash flows (used in) provided by financing activities:** | | | |
| Proceeds from issuance of short-term debt of Fannie Mae | 699,346 | 1,641,119 | 1,913,685 |
| Payments to redeem short-term debt of Fannie Mae | (748,550) | (1,773,977) | (1,824,511) |
| Proceeds from issuance of long-term debt of Fannie Mae | 456,602 | 289,806 | 243,180 |
| Payments to redeem long-term debt of Fannie Mae | (397,813) | (256,728) | (266,758) |
| Proceeds from issuance of short-term debt of consolidated trusts | 12,613 | — | — |
| Payments to redeem short-term debt of consolidated trusts | (37,210) | — | — |
| Proceeds from issuance of long-term debt of consolidated trusts | 263,962 | 58 | 377 |
| Payments to redeem long-term debt of consolidated trusts | (771,292) | (601) | (467) |
| Payments of cash dividends on senior preferred stock to Treasury | (7,706) | (2,470) | (31) |
| Payments of cash dividends on common and preferred stock | — | — | (1,774) |
| Proceeds from issuance of common and preferred stock | — | — | 7,211 |
| Proceeds from senior preferred stock purchase agreement with Treasury | 27,700 | 59,900 | — |
| Net change in federal funds purchased and securities sold under agreements to repurchase | 49 | (54) | (266) |
| Net cash (used in) provided by financing activities | (502,299) | (42,947) | 70,646 |
| **Net increase (decrease) in cash and cash equivalents** | 10,485 | (11,121) | 13,992 |
| Cash and cash equivalents at beginning of period | 6,812 | 17,933 | 3,941 |
| Cash and cash equivalents at end of period | $ 17,297 | $ 6,812 | $ 17,933 |
| **Cash paid during the period for:** | | | |
| Interest | $ 140,651 | $ 26,344 | $ 35,959 |
| Income taxes | — | 876 | 845 |
| **Non-cash activities (excluding transition-related impacts — see Note 2):** | | | |
| Mortgage loans acquired by assuming debt | $ 484,699 | $ — | $ 167 |
| Net transfers from mortgage loans held for investment of consolidated trusts to mortgage loans held for investment of Fannie Mae | 121,852 | — | — |
| Transfers from advances to lenders to investments in securities | — | 77,191 | 83,534 |
| Transfers from advances to lenders to loans held for investment of consolidated trusts | 68,385 | — | — |
| Net transfers from mortgage loans to acquired property | 66,081 | 5,707 | 4,272 |

See Notes to Consolidated Financial Statements

F-5

### FANNIE MAE
### (In conservatorship)

## Consolidated Statements of Changes in Equity (Deficit)
**(Dollars and shares in millions, except per share amounts)**

Fannie Mae Stockholders' Equity (Deficit)

| | Shares Outstanding | | | Senior Preferred | Preferred Stock | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Treasury Stock | Non Controlling Interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred | Preferred | Common | | | | | | | | | |
| **Balance as of December 31, 2007** | — | 466 | 974 | $ — | $16,913 | $593 | $ 1,831 | $ 33,548 | $ (1,362) | $(7,512) | $107 | $ 44,118 |
| Cumulative effect from the adoption of the accounting standards on the fair value option for financial instruments and fair value measurement, net of tax | — | — | — | — | — | — | — | 148 | (93) | — | — | 55 |
| **Balances as of January 1, 2008 adjusted** | — | 466 | 974 | — | 16,913 | 593 | 1,831 | 33,696 | (1,455) | (7,512) | 107 | 44,173 |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | 71 | 71 |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (58,707) | — | — | (21) | (58,728) |
| Other comprehensive loss, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $5,395) | — | — | — | — | — | — | — | — | (10,020) | — | — | (10,020) |
| Reclassification adjustment for other-than- temporary impairments recognized in net loss (net of tax of $2,441) | — | — | — | — | — | — | — | — | 4,533 | — | — | 4,533 |
| Reclassification adjustment for gains included in net loss (net of tax of $36) | — | — | — | — | — | — | — | — | (67) | — | — | (67) |
| Unrealized losses on guaranty assets and guaranty fee buy-ups | — | — | — | — | — | — | — | — | (342) | — | — | (342) |
| Amortization of net cash flow hedging gains | — | — | — | — | — | — | — | — | 1 | — | — | 1 |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | (323) | — | — | (323) |
| Total comprehensive loss | | | | | | | | | | | | (64,946) |
| Common stock dividends ($0.75 per share) | — | — | — | — | — | — | — | (741) | — | — | — | (741) |
| Senior preferred stock dividends | — | — | — | — | — | — | (31) | — | — | — | — | (31) |
| Common stock issued | — | — | 94 | — | — | 49 | 2,477 | — | — | — | — | 2,526 |
| Common stock warrant issued | — | — | — | — | — | — | 3,518 | — | — | — | — | 3,518 |
| Preferred stock dividends declared | — | — | — | — | — | — | — | (1,038) | — | — | — | (1,038) |
| Senior preferred stock issued | 1 | — | — | 1,000 | — | — | — | — | — | — | — | 1,000 |
| Preferred stock issued | — | 141 | — | — | 4,812 | — | (127) | — | — | — | — | 4,685 |
| Conversion of convertible preferred stock into common stock | — | (10) | 16 | — | (503) | 8 | 495 | — | — | — | — | — |
| Treasury commitment | — | — | — | — | — | — | (4,518) | — | — | — | 168 | (4,518) |
| Other | — | — | 1 | — | — | — | (24) | — | — | — | — | 144 |
| **Balance as of December 31, 2008** | 1 | 597 | 1,085 | 1,000 | 21,222 | 650 | 3,621 | (26,790) | (7,673) | (7,344) | 157 | (15,157) |
| Cumulative effect from the adoption of a new accounting standard on other-than-temporary impairments, net of tax | — | — | — | — | — | — | — | 8,520 | (5,556) | — | — | 2,964 |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (13) | (13) |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (71,969) | — | — | (53) | (72,022) |
| Other comprehensive loss, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $2,658) | — | — | — | — | — | — | — | — | 4,936 | — | — | 4,936 |
| Reclassification adjustment for other-than- temporary impairments recognized in net loss (net of tax of $3,441) | — | — | — | — | — | — | — | — | 6,420 | — | — | 6,420 |
| Reclassification adjustment for gains included in net loss (net of tax of $119) | — | — | — | — | — | — | — | — | (220) | — | — | (220) |
| Unrealized gains on guaranty assets and guaranty fee buy-ups | — | — | — | — | — | — | — | — | 245 | — | — | 245 |
| Amortization of net cash flow hedging gains | — | — | — | — | — | — | — | — | 9 | — | — | 9 |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | 107 | — | — | 107 |
| Total comprehensive loss | | | | | | | | | | | | (60,525) |
| Senior preferred stock dividends | — | — | — | — | — | — | (2,470) | — | — | — | — | (2,470) |
| Increase to senior preferred liquidation preference | — | — | — | 59,900 | — | — | — | — | — | — | — | 59,900 |
| Conversion of convertible preferred stock into common stock | — | (17) | 27 | — | (874) | 14 | 860 | — | — | — | — | — |
| Other | — | — | 1 | — | — | — | 72 | 2 | — | (54) | — | 20 |

See Notes to Consolidated Financial Statements

F-6

**Fannie Mae Stockholders' Equity (Deficit)**

| | Shares Outstanding | | | Senior Preferred | Preferred Stock | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Treasury Stock | Non Controlling Interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred | Preferred | Common | | | | | | | | | |
| **Balance as of December 31, 2009** | 1 | 580 | 1,113 | $60,900 | $20,348 | $664 | $ 2,083 | $ (90,237) | $ (1,732) | $(7,398) | $ 91 | $(15,281) |
| Cumulative effect from the adoption of the accounting standards on transfers of financial assets and consolidation | — | — | — | — | — | — | — | 6,706 | (3,394) | — | (14) | 3,298 |
| **Balance as of January 1, 2010, adjusted** | 1 | 580 | 1,113 | 60,900 | 20,348 | 664 | 2,083 | (83,531) | (5,126) | (7,398) | 77 | (11,983) |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | 9 | 9 |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (14,014) | — | — | (4) | (14,018) |
| Other comprehensive loss, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities, (net of tax of $1,644) | — | — | — | — | — | — | — | — | 3,054 | — | — | 3,054 |
| Reclassification adjustment for other-than- temporary impairments recognized in net loss (net of tax of $253) | — | — | — | — | — | — | — | — | 469 | — | — | 469 |
| Reclassification adjustment for gains included in net loss (net of tax of $10) | — | — | — | — | — | — | — | — | (19) | — | — | (19) |
| Unrealized gains on guaranty assets and guaranty fee buy-ups | — | — | — | — | — | — | — | — | 1 | — | — | 1 |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | (61) | — | — | (61) |
| Total comprehensive loss | — | — | — | — | — | — | — | — | — | — | — | (10,574) |
| Senior preferred stock dividends | — | — | — | — | — | — | (2,265) | (5,441) | — | — | — | (7,706) |
| Increase to senior preferred liquidation preference | — | — | — | 27,700 | — | — | — | — | — | — | — | 27,700 |
| Conversion of convertible preferred stock into common stock | — | (3) | 5 | — | (144) | 3 | 141 | — | — | — | — | — |
| Other | — | — | 1 | — | — | — | 41 | — | — | (4) | — | 37 |
| **Balance as of December 31, 2010** | 1 | 577 | 1,119 | $88,600 | $20,204 | $667 | $ — | $(102,986) | $ (1,682) | $(7,402) | $ 82 | $ (2,517) |

See Notes to Consolidated Financial Statements

F-7

TREASURY-0501

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.   Summary of Significant Accounting Policies**

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE"), and we are subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

We operate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities, including mortgage-related securities guaranteed by us, from primary mortgage market institutions, such as commercial banks, savings and loan associations, mortgage banking companies, securities dealers and other investors. We do not lend money directly to consumers in the primary mortgage market. We provide additional liquidity in the secondary mortgage market by issuing guaranteed mortgage-related securities.

We operate under three business segments: Single-Family Credit Guaranty ("Single-Family"), Multifamily ("Multifamily"—formerly "Housing and Community Development") and Capital Markets. Our Single-Family segment generates revenue primarily from the guaranty fees on the mortgage loans underlying guaranteed single-family Fannie Mae mortgage-backed securities ("Fannie Mae MBS"). Our Multifamily segment generates revenue from a variety of sources, including guaranty fees on the mortgage loans underlying multifamily Fannie Mae MBS and on the multifamily mortgage loans held in our portfolio, transaction fees associated with the multifamily business and bond credit enhancement fees. Our Capital Markets segment invests in mortgage loans, mortgage-related securities and other investments, and generates income primarily from the difference, or spread, between the yield on the mortgage assets we own and the interest we pay on the debt we issue in the global capital markets to fund the purchases of these mortgage assets.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship; (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock; and (3) Treasury's agreement to establish a temporary secured lending credit facility that was available to us and the other GSEs regulated by FHFA under identical terms until December 31, 2009.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

We were directed by FHFA to voluntarily delist our common stock and each listed series of our preferred stock from the New York Stock Exchange and the Chicago Stock Exchange. The last trading day for the listed securities on the New York Stock Exchange and the Chicago Stock Exchange was July 7, 2010, and since July 8, 2010, the securities have been quoted on the over-the-counter market.

As of February 24, 2011, the conservator has advised us that it has not disaffirmed or repudiated any contracts we entered into prior to its appointment as conservator. The GSE Act requires FHFA to exercise its right to

F-8

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

disaffirm or repudiate most contracts within a reasonable period of time after its appointment as conservator. FHFA's proposed rule on conservatorship and receivership operations, published on July 9, 2010, defines "reasonable period" as a period of 18 months following the appointment of a conservator or receiver. This proposed rule has not been finalized.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of February 24, 2011, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results.

### Senior Preferred Stock and Warrant Issued to Treasury

On September 7, 2008, we, through FHFA in its capacity as conservator, entered into a senior preferred stock purchase agreement with Treasury. The agreement was amended on September 26, 2008, May 6, 2009 and December 24, 2009. Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. Treasury's maximum funding commitment to us under the agreement is the greater of (a) $200 billion or (b) $200 billion plus the cumulative amount of our net worth deficit (the amount by which our total liabilities exceed our total assets) as of the end of any and each calendar quarter in 2010, 2011 and 2012, less any positive net worth as of December 31, 2012. As consideration for Treasury's funding commitment, we issued one million shares of senior preferred stock and a warrant to purchase shares of our common stock to Treasury. We were scheduled to begin paying Treasury a quarterly commitment fee beginning on March 31, 2011. On December 29, 2010, FHFA was notified by Treasury that Treasury was waiving the commitment fee for the first quarter of 2011 due to adverse conditions in the U.S. mortgage market and because Treasury believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate whether to set the fee the next quarter. Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if directed by our conservator, cumulative quarterly cash dividends at the annual rate of 10% per year on the current liquidation preference of the senior preferred stock. If at any time we do not pay cash dividends in a timely manner, then all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends, the dividend rate will be 12% per year. We have received a total of $87.6 billion to date under Treasury's funding commitment and the Acting Director of FHFA has submitted

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

a request for an additional $2.6 billion from Treasury to eliminate our net worth deficit as of December 31, 2010. The aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010.

On September 7, 2008, we issued a warrant to Treasury giving it the right to purchase, at a nominal price, shares of our common stock equal to 79.9% of the total common stock outstanding on a fully diluted basis on the date Treasury exercises the warrant. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028. We recorded the warrant at fair value in our stockholders' equity as a component of additional paid-in-capital. The fair value of the warrant was calculated using the Black-Scholes Option Pricing Model. Since the warrant has an exercise price of $0.00001 per share, the model is insensitive to the risk-free rate and volatility assumptions used in the calculation and the share value of the warrant is equal to the price of the underlying common stock. We estimated that the fair value of the warrant at issuance was $3.5 billion based on the price of our common stock on September 8, 2008, which was after the dilutive effect of the warrant had been reflected in the market price. Subsequent changes in the fair value of the warrant are not recognized in the financial statements. If the warrant is exercised, the stated value of the common stock issued will be reclassified as "Common stock" in our consolidated balance sheets. Because the warrant's exercise price per share is considered non-substantive (compared to the market price of our common stock), the warrant was determined to have characteristics of non-voting common stock, and thus is included in the computation of basic and diluted loss per share. The weighted-average shares of common stock outstanding for the years ended December 31, 2010, 2009 and 2008, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

*Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. Government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong in 2009 and 2010 primarily due to actions taken by the federal government to support us and the financial markets. Demand for our long-term debt securities continues to be strong.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The accompanying consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated.

*Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and the Treasury are deemed related parties. As of December 31, 2010, Treasury held an investment in our senior preferred stock with a liquidation preference of $88.6 billion. Beginning in 2009, Treasury engaged us to serve as program administrator for the Home Affordable Modification Program ("HAMP") and other initiatives under the Making Home Affordable Program. Our administrative expenses were reduced by $167 million in the fourth quarter 2010 due to accrual and receipt of reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator.

In January 2011, we received a refund of $1.1 billion from the IRS, a bureau of Treasury, related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years.

In December 2010, we entered into an agreement with certain wholly-owned subsidiaries of Ally Financial, Inc. ("Ally"). Under the agreement, we received $462 million in exchange for our release of specified Ally affiliates from potential liability relating to certain private-label securities sponsored by the affiliates and for certain selling representation and warranty liability related to mortgage loans sold and/or serviced by one of the subsidiaries as of or prior to June 30, 2010. Treasury has majority ownership of Ally.

In addition, in 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac in which we agreed to provide assistance to state and local housing finance agencies ("HFAs") through three separate assistance programs: a temporary credit and liquidity facilities ("TCLF") program, a new issue bond ("NIB") program and a multifamily credit enhancement program.

Under the TCLF program, we had $3.7 billion and $870 million outstanding, which includes principal and interest, of three-year standby credit and liquidity support as of December 31, 2010 and 2009, respectively. Treasury has purchased participating interests in these temporary credit and liquidity facilities. Under the NIB program, we had $7.6 billion and $3.5 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by HFAs as of December 31, 2010 and 2009, respectively. Treasury bears the initial loss of principal under the TCLF program and the NIB program up to 35% of the total principal on a combined program-wide basis. We are not participating in the multifamily credit enhancement program.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of December 31, 2010 and 2009, we held Freddie Mac mortgage-related securities with a fair value of $18.3 billion and $42.6 billion, respectively, and accrued interest receivable of $93 million and $230 million, respectively. We recognized interest income on Freddie Mac mortgage-related securities held by us of $1.1 billion, $2.0 billion and $1.6 billion for the years ended December 31, 2010, 2009 and 2008, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

TREASURY-0505

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Use of Estimates*

Preparing consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

Our allowance for loan losses includes an estimate for the benefit of payments from lenders and servicers to make us whole for losses on loans due to a breach of selling or servicing representations and warranties. Historically, this estimate was based significantly on historical cash collections. In the fourth quarter of 2010, the following factors impacted this estimate:

- we revised our methodology to take into account trends in management actions taken before cash collections, which resulted in our allowance for loan losses being $1.1 billion higher than it would have been under the previous methodology; and

- agreements with seller/servicers that addressed their loan repurchase and other obligations to us impacted our expectation of future make-whole payments, resulting in a decrease in our allowance for loan losses of approximately $700 million.

In the fourth quarter of 2010, we updated our allowance for loan loss models to incorporate more recent data on prepayments and modified loan performance which reduced the allowance on individually impaired loans by $670 million, driven primarily by more favorable default expectations for modified loans that withstood successful trial periods. In the second quarter of 2010, we updated our allowance for loan loss model to reflect a change in our cohort structure for our severity calculations which resulted in a change in estimate and a decrease in our allowance for loan losses of approximately $1.6 billion.

*Principles of Consolidation*

Our consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. The typical condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. A controlling financial interest may also exist in entities through arrangements that do not involve voting interests, such as a variable interest entity ("VIE").

VIE Assessment

We have interests in various entities that are considered VIEs. A VIE is an entity (1) that has total equity at risk that is not sufficient to finance its activities without additional subordinated financial support from other entities, (2) where the group of equity holders does not have the power to direct the activities of the entity that most significantly impact the entity's economic performance, or the obligation to absorb the entity's expected losses or the right to receive the entity's expected residual returns, or both, or (3) where the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity, their rights to receive the expected residual returns of the entity, or both, and substantially all of the entity's activities either involve or are conducted on behalf of an investor that has disproportionately few voting rights.

In order to determine if an entity is considered a VIE, we first perform a qualitative analysis, which requires certain subjective decisions including, but not limited to, the design of the entity, the variability that the entity was designed to create and pass along to its interest holders, the rights of the parties, and the purpose of the

F-12

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

arrangement. If we cannot conclude after a qualitative analysis whether an entity is a VIE, we perform a quantitative analysis.

The primary types of VIE entities with which we are involved are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, limited partnership investments in low-income housing tax credit ("LIHTC") and other housing partnerships, as well as mortgage and asset-backed trusts that were not created by us.

In June 2009, the Financial Accounting Standards Board ("FASB") revised the accounting standard on the consolidation of VIEs (the "new accounting standard"), and we adopted the new accounting standard prospectively for all existing VIEs effective January 1, 2010.

Prior to the adoption of the new accounting standard on January 1, 2010, we were exempt from evaluating certain securitization entities for consolidation if the entities met the criteria of a qualifying special purpose entity ("QSPE"), and if we did not have the unilateral ability to cause the entity to liquidate or change the entity's QSPE status. The QSPE requirements significantly limited the activities in which a QSPE could engage and the types of assets and liabilities it could hold. To the extent any entity failed to meet those criteria, we were required to consolidate its assets and liabilities if we were determined to be the primary beneficiary of the entity. The new accounting standard removed the concept of a QSPE and replaced the previous primarily quantitative consolidation model with a qualitative model for determining the primary beneficiary of a VIE.

<u>Primary Beneficiary Determination</u>

Upon the adoption of the new accounting standard on January 1, 2010, if an entity is a VIE, we consider whether our variable interest in that entity causes us to be the primary beneficiary. Under the new accounting standard, an enterprise is deemed to be the primary beneficiary of a VIE when the enterprise has both (1) the power to direct the activities of the VIE that most significantly impact the entity's economic performance, and (2) exposure to benefits and/or losses that could potentially be significant to the entity. The primary beneficiary of the VIE is required to consolidate and account for the assets, liabilities, and noncontrolling interests of the VIE in its consolidated financial statements. The assessment of the party that has the power to direct the activities of the VIE may require significant management judgment when (1) more than one party has power or (2) more than one party is involved in the design of the VIE but no party has the power to direct the ongoing activities that could be significant.

We are required to continually assess whether we are the primary beneficiary and therefore may consolidate a VIE through the duration of our involvement. Examples of certain events that may change whether or not we consolidate the VIE include a change in the design of the entity or a change in our ownership such that we no longer hold substantially all of the certificates issued by a multi-class resecuritization trust.

Prior to January 1, 2010, we determined whether our variable interest caused us to be considered the primary beneficiary through a combination of qualitative and quantitative analyses. The qualitative analysis considered the design of the entity, the risks that cause variability, the purpose for which the entity was created, and the variability that the entity was designed to pass along to its variable interest holders. When the primary beneficiary could not be identified through a qualitative analysis, we used internal cash flow models, which in certain cases included Monte Carlo simulations, to compute and allocate expected losses or expected residual returns to each variable interest holder based upon the relative contractual rights and preferences of each interest holder in the VIE's capital structure. We were the primary beneficiary and were required to consolidate the entity if we absorbed the majority of expected losses or expected residual returns, or both.

TREASURY-0507

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

<u>Measurement of Consolidated Assets and Liabilities</u>

In accordance with the new accounting standard, on the transition date, January 1, 2010, we initially measured the assets and liabilities of the newly consolidated securitization trusts at their unpaid principal balances and established a corresponding valuation allowance and accrued interest, as it was not practicable to determine the carrying amount of such assets and liabilities. The securitization assets and liabilities that did not qualify for the use of this practical expedient were initially measured at fair value. As such, we recognized in our consolidated balance sheet the mortgage loans underlying our consolidated trusts as "Mortgage loans held for investment of consolidated trusts." We also recognized securities issued by these trusts that are held by third parties in our consolidated balance sheet as either "Short-term debt of consolidated trusts" or "Long-term debt of consolidated trusts."

Except for securitization trusts consolidated on the transition date, when we transfer assets into a VIE that we consolidate at the time of transfer, we recognize the assets and liabilities of the VIE at the amounts that they would have been recognized if they had not been transferred, and no gain or loss is recognized on the transfer. For all other VIEs that we consolidate subsequent to transition, we recognize the assets and liabilities of the VIE in our consolidated financial statements at fair value, and we recognize a gain or loss for the difference between (1) the fair value of the consideration paid, fair value of noncontrolling interests and the reported amount of any previously held interests, and (2) the net amount of the fair value of the assets and liabilities consolidated. However, for the securitization trusts established under our lender swap program, no gain or loss is recognized if the trust is consolidated at formation as there is no difference in the respective fair value of (1) and (2) above.

If we cease to be deemed the primary beneficiary of a VIE, we deconsolidate the VIE. We use fair value to measure the initial cost basis for any retained interests that are recorded upon the deconsolidation of a VIE. Any difference between the fair value and the previous carrying amount of our investment in the VIE is recorded as "Investment gains (losses), net" in our consolidated statements of operations. We also record gains or losses that are associated with the consolidation of a VIE as "Investment gains (losses), net" in our consolidated statements of operations.

<u>Purchase/Sale of Fannie Mae Securities</u>

We actively purchase and may subsequently sell guaranteed MBS that have been issued through our lender swap and portfolio securitization transaction programs. The accounting for the purchase and sale of our guaranteed MBS issued by the trusts differs based on the characteristics of the securitization trusts and whether the trusts are consolidated.

*Single-Class Securitization Trusts*

Our single-class securitization trusts are trusts we create to issue single-class Fannie Mae MBS that evidence an undivided interest in the mortgage loans held in the trust. Investors in single-class Fannie Mae MBS receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. We guarantee to each single-class securitization trust that we will supplement amounts received by the single-class securitization trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. This guaranty exposes us to credit losses on the loans underlying Fannie Mae MBS.

We create single-class securitization trusts through both our lender swap and portfolio securitization transaction programs. A lender swap transaction occurs when a mortgage lender delivers a pool of single-family mortgage loans to us, which we immediately deposit into an MBS trust. The MBS are then issued to the lender in exchange for the mortgage loans. A portfolio securitization transaction occurs when we purchase mortgage loans from third-party sellers for cash and later deposit these loans into an MBS trust. The securities issued through a portfolio securitization are then sold to investors for cash. We consolidate most of the single-

F-14

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

class securitization trusts that are issued under these programs because our role as guarantor and master servicer provides us with the power to direct matters that impact the credit risk to which we are exposed.

When we purchase single-class Fannie Mae MBS issued from a consolidated trust, we account for the transaction as an extinguishment of the related debt in our consolidated financial statements. We record a gain or loss on the extinguishment of such debt to the extent that the purchase price of the MBS does not equal the carrying value of the related consolidated debt reported in our consolidated balance sheet (including unamortized premiums, discounts or the other cost basis adjustments) at the time of purchase. We account for the sale of an MBS from Fannie Mae's portfolio to a third party that was issued from a consolidated trust as the issuance of debt in our consolidated financial statements. We amortize the related premiums, discounts and other cost basis adjustments into income over time.

To determine the order in which consolidated debt is extinguished, we have elected to use a daily convention in the application of the last-issued first-extinguished method. Under this method, we record the net daily change in each MBS holding as either the issuance of debt if there has been an increase in the position that is held by third parties, or the extinguishment of the most recently issued related debt if there has been a decrease in the position held by third parties. The impact of this method is that we record the net daily activity for an MBS as if it were a single buy or sell trade, which results in a change in our beginning debt balance if the total unpaid principal balance purchased does not match the total unpaid principal balance sold.

If a single-class securitization trust is not consolidated, we account for the purchase and subsequent sale of such securities as the transfer of an investment security in accordance with the new accounting standard for the transfers of financial assets.

*Single-Class Resecuritization Trusts*

Single-class resecuritization trusts are created by depositing Fannie Mae MBS into a new securitization trust for the purpose of aggregating multiple MBS into a single larger security. The cash flows from the new security represent an aggregation of the cash flows from the underlying MBS. We guarantee to each single-class resecuritization trust that we will supplement amounts received by the trust as required to permit timely payments of principal and interest on the related Fannie Mae securities. However, we assume no additional credit risk in such a resecuritization transaction, because the underlying assets are MBS for which we have already provided a guaranty. Additionally, our involvement with these trusts does not provide any incremental rights or power that would enable Fannie Mae to direct any activities of the trusts. As a result, we are not the primary beneficiaries of, and therefore do not consolidate, our single-class resecuritization trusts.

As our single-class resecuritization securities pass through all of the cash flows of the underlying MBS directly to the holders of the securities, they are deemed to be substantially the same as the underlying MBS. Therefore, we account for purchases of our single-class resecuritization securities as an extinguishment of the underlying MBS debt and the sale of these securities as an issuance of the underlying MBS debt.

*Multi-Class Resecuritization Trusts*

Multi-class resecuritization trusts are trusts we create to issue multi-class Fannie Mae securities, including Real Estate Mortgage Investment Conduits ("REMICs") and strip securities, in which the cash flows of the underlying mortgage assets are divided, creating several classes of securities, each of which represents a beneficial ownership interest in a separate portion of cash flows. We guarantee to each multi-class resecuritization trust that we will supplement amounts received by the trusts as required to permit timely payments of principal and interest, as applicable, on the related Fannie Mae securities. However, we assume no additional credit risk in such a resecuritization transaction because the underlying assets are Fannie Mae MBS for which we have already provided a guaranty. Although we may be exposed to prepayment risk via

TREASURY-0509

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

our ownership of the securities issued by these trusts, we do not have the ability via our involvement with a multi-class resecuritization trust to impact the economic risk to which we are exposed. Therefore, we do not consolidate such a multi-class resecuritization trust until we hold a substantial portion of the outstanding beneficial interests that have been issued by the trust and are therefore considered the primary beneficiary of the trust.

We account for the purchase of the securities issued by consolidated multi-class resecuritization trusts as an extinguishment of the debt issued by these trusts and the subsequent sale of such securities as the issuance of multi-class debt. In contrast to our single-class resecuritization trust, the cash flows from the underlying mortgage assets are divided between the debt securities issued by the multi-class resecuritization trust, and therefore, the debt issued by a multi-class resecuritization trust is not substantially the same as the consolidated MBS debt. As a result, if a multi-class resecuritization trust is not consolidated, we account for the purchase and subsequent sale of such securities as the transfer of an investment security rather than the issuance or extinguishment of the related multi-class debt in accordance with the new accounting standard for the transfers of financial assets.

When we do not consolidate a multi-class resecuritization trust, we recognize in our consolidated financial statements both our investment in the trust and the mortgage loans of the Fannie Mae MBS trusts that we consolidate that underlie the multi-class resecuritization trust. Additionally, we recognize the unsecured corporate debt issued to third parties to fund the purchase of our investments in the multi-class resecuritization trusts as well as the debt issued to third parties of the MBS trusts we consolidate that underlie the multi-class resecuritization trusts. This results in the recognition of interest income from investments in multi-class resecuritization trusts and interest expense from the unsecured debt issued to third parties to fund the purchase of the investments in multi-class resecuritization trusts, as well as interest income from the mortgage loans and interest expense from the debt issued to third parties from the MBS trusts we consolidate that underlie the multi-class resecuritization trusts.

See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities," for additional information regarding the impact upon adoption.

*Portfolio Securitizations*

We evaluate a transfer of financial assets in a portfolio securitization transaction to an entity that is not consolidated to determine whether the transfer qualifies as a sale. If a portfolio securitization does not meet the criteria for sale treatment, the transferred assets remain in our consolidated balance sheets and we record a liability to the extent of any proceeds received in connection with such a transfer. Transfers of financial assets for which we surrender control of the transferred assets are recorded as sales.

When a transfer that qualifies as a sale is completed, we derecognize all assets transferred and recognize all assets obtained and liabilities incurred at fair value. The difference between the carrying basis of the assets transferred and the fair value of the proceeds from the sale is recorded as a component of "Investment gains (losses), net" in our consolidated statements of operations. Retained interests are primarily in the form of Fannie Mae MBS, REMIC certificates, guaranty assets and master servicing assets ("MSAs"). We separately describe the subsequent accounting, as well as how we determine fair value, for our retained interests in the "Investment in Securities," and "Guaranty Accounting" sections of this note.

We also enter into repurchase agreements, including dollar roll transactions, which we account for as secured borrowings. Refer to the "Securities Purchased under Agreements to Resell and Securities Sold under Agreements to Repurchase" section of this note for discussion of our accounting policies related to these transfers.

TREASURY-0510

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

***Cash and Cash Equivalents and Statements of Cash Flows***

Short-term investments that have a maturity at the date of acquisition of three months or less and are readily convertible to known amounts of cash are generally considered cash equivalents. We may pledge as collateral certain short-term investments classified as cash equivalents.

In the presentation of our consolidated statements of cash flows, we present cash flows from derivatives that do not contain financing elements and mortgage loans held for sale as operating activities. We present cash flows from federal funds sold and securities purchased under agreements to resell or similar arrangements as investing activities and cash flows from federal funds purchased and securities sold under agreements to repurchase as financing activities. We classify cash flows related to dollar roll transactions that do not meet the requirements to be accounted for as secured borrowings as purchases and sales of securities in investing activities. We classify cash flows from trading securities based on their nature and purpose. We classify cash flows from trading securities that we intend to hold for investment (the majority of our mortgage-related trading securities) as investing activities and cash flows from trading securities that we do not intend to hold for investment (primarily our non-mortgage-related securities) as operating activities.

Prior to the adoption of the new accounting standards on the transfers of financial assets and the consolidation of VIEs ("the new accounting standards"), we reflected the creation of Fannie Mae MBS through either the securitization of loans held for sale or advances to lenders as a non-cash activity in our consolidated statements of cash flows in the line items "Securitization-related transfers from mortgage loans held for sale to investments in securities" or "Transfers from advances to lenders to investments in securities," respectively. Cash inflows from the sale of a Fannie Mae MBS created through the securitization of loans held for sale were reflected in the consolidated statements of cash flows based on the balance sheet classification of the associated Fannie Mae MBS as either "Net change in trading securities, excluding non-cash transfers," or "Proceeds from sales of available-for-sale securities." Subsequent to the adoption of these new accounting standards, we continue to apply this presentation to unconsolidated trusts. For consolidated trusts, we classify cash flows related to mortgage loans held by our consolidated trusts as either investing activities (for principal repayments) or operating activities (for interest received from borrowers included as a component of our net loss). Cash flows related to debt securities issued by consolidated trusts are classified as either financing activities (for repayments of principal to certificateholders) or operating activities (for interest payments to certificateholders included as a component of our net loss). We distinguish between the payments and proceeds related to the debt of Fannie Mae and the debt of consolidated trusts, as applicable. We present our non-cash activities in the consolidated statements of cash flows at the associated unpaid principal balance.

During the fourth quarter of 2010, we identified certain servicer and consolidation related transactions that were not appropriately reflected in our condensed consolidated statements of cash flows for the three, six and nine month periods ended March 31, June 30, and September 30, 2010, respectively. As a result, our consolidated statement of cash flows for the year ended December 31, 2010 includes a $6.6 billion adjustment to increase net cash used in operating activities, included within "Other, net," a $7.0 billion adjustment to increase net cash provided by investing activities, primarily related to "Purchases of loans held for investment," and a $357 million adjustment to increase net cash used in financing activities. We have evaluated the effects of these misstatements, both quantitatively and qualitatively, on our three months ended March 31, 2010, six months ended June 30, 2010, and nine months ended September 30, 2010 condensed consolidated statements of cash flows and concluded that these prior periods were not materially misstated.

***Restricted Cash***

We and our servicers advance payments on delinquent loans to consolidated Fannie Mae MBS trusts. We recognize the cash advanced as "Restricted cash" in our consolidated balance sheets to the extent such amounts are due to, but have not yet been remitted to, the MBS certificateholders. In addition, when we or our

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

servicers collect and hold cash that is due to certain Fannie Mae MBS trusts in advance of our requirement to remit these amounts to the trusts, we recognize the collected cash amounts as "Restricted cash."

We also recognize "Restricted cash" as a result of restrictions related to certain consolidated partnership funds as well as for certain collateral arrangements.

### Securities Purchased under Agreements to Resell and Securities Sold under Agreements to Repurchase

When securities purchased under agreements to resell or securities sold under agreements to repurchase resulting from dollar roll transactions do not meet all of the conditions of a secured financing, we account for the transactions as purchases or sales, respectively. We treat securities purchased under agreements to resell and securities sold under agreements to repurchase as secured financing transactions when all of the conditions have been met. We record these transactions at the amounts at which the securities will be subsequently reacquired or resold, including accrued interest.

### Investments in Securities

#### Securities Classified as Available-for-Sale or Trading

We classify and account for our securities as either available-for-sale ("AFS") or trading. We measure AFS securities at fair value in our consolidated balance sheets, with unrealized gains and losses included in "Accumulated other comprehensive loss" ("AOCI"), net of applicable income taxes. We recognize realized gains and losses on AFS securities when securities are sold. We calculate the gains and losses using the specific identification method and record them in "Investment gains (losses), net" in our consolidated statements of operations. We measure trading securities at fair value in our consolidated balance sheets with unrealized and realized gains and losses included as a component of "Fair value losses, net" in our consolidated statements of operations. We include interest and dividends on securities, including amortization of the premium and discount at acquisition, in our consolidated statements of operations. When we receive multiple deliveries of securities on the same day that are backed by the same pools of loans, we calculate the specific cost of each security as the average price of the trades that delivered those securities. Currently, we do not have any securities classified as held-to-maturity, although we may elect to do so in the future.

We determine fair value using quoted market prices in active markets for identical assets when available. If quoted market prices in active markets for identical assets are not available, we use quoted market prices for similar securities that we adjust for observable or corroborated (*i.e.*, information purchased from third-party service providers) market information. In the absence of observable or corroborated market data, we use internally developed estimates, incorporating market-based assumptions when such information is available.

### Other-Than-Temporary Impairment of Debt Securities

On April 1, 2009, we adopted the FASB modified standard on the model for assessing other-than-temporary impairments, applicable to existing and new debt securities held by us as of April 1, 2009. Under this new standard, an other-than-temporary impairment is considered to have occurred when the fair value of a debt security is below its amortized cost basis and we intend to sell or it is more likely than not that we will be required to sell the security before recovery. In this case, we recognize in the consolidated statements of operations the entire difference between the amortized cost basis of the security and its fair value. An other-than-temporary impairment is also considered to have occurred if we do not expect to recover the entire amortized cost basis of a debt security even if we do not intend or it is not more likely than not we will be required to sell the security before recovery. In this case, we separate the difference between the amortized cost basis of the security and its fair value into the amount representing the credit loss, which we recognize in our consolidated statements of operations, and the amount related to all other factors, which we recognize in

TREASURY-0512

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

"Other comprehensive loss," net of applicable taxes. In determining whether a credit loss exists, we use our best estimate of cash flows expected to be collected from the debt security.

We consider guarantees, insurance contracts or other credit enhancements (such as collateral) in determining our best estimate of cash flows expected to be collected only if (1) such guarantees, insurance contracts or other credit enhancements provide for payments to be made solely to reimburse us for failure of the issuer to satisfy its required payment obligations, (2) such guarantees, insurance contracts or other credit enhancements are contractually attached to the security and (3) collection of the amounts receivable under these agreements is deemed probable. Guarantees, insurance contracts or other credit enhancements are considered contractually attached if they are part of and trade with the security upon transfer of the security to a third party.

In periods after we recognize an other-than-temporary impairment of debt securities, we use the prospective interest method to recognize interest income. Under the prospective interest method, we use the new cost basis and the cash flows expected to be collected from the security to calculate the effective yield.

As a result of adopting the FASB modified standard on the model for assessing other-than-temporary impairments, we recorded a cumulative-effect adjustment at April 1, 2009 of $8.5 billion on a pre-tax basis ($5.6 billion after tax) to reclassify the noncredit portion of previously recognized other-than-temporary impairments from "Accumulated deficit" to AOCI. We also reduced the "Accumulated deficit" and valuation allowance by $3.0 billion for the deferred tax asset related to the amounts previously recognized as other-than-temporary impairments in our consolidated statements of operations based upon the assertion of our intent and ability to hold certain of these securities until recovery.

Prior to April 1, 2009, we considered a debt security to be other-than-temporarily impaired if its estimated fair value was less than its amortized cost basis and we determined that it was probable that we would be unable to collect all of the contractual principal and interest payments or we did not intend to hold the security until it recovered to its previous carrying amount. In making an other-than-temporary impairment assessment, we considered many factors, including the severity and duration of the impairment, recent events specific to the issuer and/or the industry to which the issuer belongs, external credit ratings and recent downgrades, as well as our ability and intent to hold such securities until recovery.

We considered guarantees, insurance contracts or other credit enhancements (such as collateral) in determining whether it was probable that we would be unable to collect all amounts due according to the contractual terms of a debt security to the same extent that we currently consider them in estimating expected cash flows. When we determined that it was probable that we would not collect all of the contractual principal and interest amounts due or we determined that we did not have the ability or intent to hold the security until recovery of an unrealized loss, we identified the security as other-than-temporarily impaired. For all other securities in an unrealized loss position, we had the positive intent and ability to hold such securities until the earlier of full recovery or maturity.

When we determined an investment was other-than-temporarily impaired, we wrote down the cost basis of the investment to its fair value and included the loss in "Other-than-temporary-impairments" in our consolidated statements of operations. The fair value of the investment then became its new cost basis. We did not increase the investment's cost basis for subsequent recoveries in fair value, which were recorded in AOCI.

F-19

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Mortgage Loans*

*Loans Held for Investment*

When we acquire mortgage loans that we have the ability and the intent to hold for the foreseeable future or until maturity, we classify the loans as held for investment ("HFI"). When we consolidate a trust, we recognize the loans underlying the trust in our consolidated balance sheet. The trusts do not have the ability to sell mortgage loans and the use of such loans is limited exclusively to the settlement of obligations of the trusts. Therefore, mortgages acquired when we have the intent to securitize via trusts that are consolidated will generally be classified as HFI in our consolidated balance sheets both prior to and subsequent to their securitization. This is consistent with our intent and ability to hold the loans for the foreseeable future or until maturity.

We report HFI loans at their outstanding unpaid principal balance adjusted for any deferred and unamortized cost basis adjustments, including purchase premiums, discounts and other cost basis adjustments. We recognize interest income on HFI loans on an accrual basis using the interest method, unless we determine that the ultimate collection of contractual principal or interest payments in full is not reasonably assured.

Historically, mortgage loans held both by us and by consolidated trusts were reported collectively as "Mortgage loans held for investment." We now report loans held by consolidated trusts as "Mortgage loans held for investment of consolidated trusts" and those held directly by us as "Mortgage loans held for investment of Fannie Mae" in our consolidated balance sheets.

*Loans Held for Sale*

When we acquire mortgage loans that we intend to sell or securitize via trusts that are not consolidated, we classify the loans as held for sale ("HFS"). Prior to the adoption of the new accounting standards, we initially classified loans as HFS if they were product types that we actively securitized from our portfolio because we had the intent, at acquisition, to securitize the loans (either during the month in which the acquisition occurred or during the following month) via a trust that we did not consolidate and for which we sold all or a portion of the resulting securities. At month-end, we reclassified the loans acquired during the month from HFS to HFI, if we had not securitized or were not in the process of securitizing them because we had the intent to hold the loans for the foreseeable future or until maturity.

We report HFS loans at the lower of cost or fair value. Any excess of an HFS loan's cost over its fair value is recognized as a valuation allowance, with changes in the valuation allowance recognized as "Investment gains (losses), net" in our consolidated statements of operations. We recognize interest income on HFS loans on an accrual basis, unless we determine that the ultimate collection of contractual principal or interest payments in full is not reasonably assured. Purchase premiums, discounts and other cost basis adjustments on HFS loans are deferred upon loan acquisition, included in the cost basis of the loan, and not amortized. We determine any lower of cost or fair value adjustment on HFS loans on a pool basis by aggregating those loans based on similar risks and characteristics, such as product types and interest rates.

In the event that we reclassify HFS loans to HFI, we record the loans at lower of cost or fair value on the date of reclassification. We recognize any lower of cost or fair value adjustment recognized upon reclassification as a basis adjustment to the HFI loan.

*Nonaccrual Loans*

We discontinue accruing interest on single-family and multifamily loans when we believe collectibility of principal or interest is not reasonably assured, unless the loan is well secured and in the process of collection based upon an individual loan assessment. When a loan is placed on nonaccrual status, interest previously

F-20

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment. We recognize interest income for loans on non-accrual status when cash is received. If we have doubt regarding the ultimate collectibility of the remaining recorded investment in a nonaccrual loan, we apply any payment received to reduce principal to the extent necessary to eliminate such doubt. We return a loan to accrual status when we determine that the collectibility of principal and interest is reasonably assured.

*Restructured Loans*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a troubled debt restructuring ("TDR"). For single-family loans, we conclude that a concession has been granted to a borrower when we determine that the effective yield based on the restructured loan term is less than the effective yield prior to the modification. For multifamily loans, we consider other factors to determine if a concession has been granted to the borrower, such as whether the modified loan terms represent a market rate of return relative to the risk profile of the borrower. We measure impairment of a loan restructured in a TDR individually based on the excess of the recorded investment in the loan over the present value of the expected future cash inflows discounted at the loan's original effective interest rate. Costs incurred to effect a TDR are expensed as incurred.

A loan modification for reasons other than a borrower experiencing financial difficulties or that results in terms at least as favorable to us as the terms for comparable loans to other customers with similar credit risks who are not refinancing or restructuring a loan is not considered a TDR. We further evaluate such a loan modification to determine whether the modification is considered more than minor. If the modification is considered more than minor and the modified loan is not subject to the accounting requirements for acquired credit-impaired loans, we treat the modification as an extinguishment of the previously recorded loan and the recognition of a new loan. We recognize any unamortized basis adjustments on the previously recorded loan immediately in "Interest income" in our consolidated statements of operations. We account for a minor modification as a continuation of the previously recorded loan.

*Loans Purchased or Eligible to be Purchased from Trusts*

For our single-class securitization trusts that include a Fannie Mae guaranty, we have the option to purchase a loan from the trust after four or more consecutive monthly payments due under the loan are delinquent in whole or in part. With respect to single-family mortgage loans in trusts with issue dates on or after January 1, 2009, we also have the option to purchase a loan from the trust after the loan has been delinquent for at least one monthly payment, if the delinquency has not been fully cured on or before the next payment date (that is, 30 days delinquent), and it is determined that it is appropriate to execute loss mitigation activity that is not permissible while the loan is held in a trust. Fannie Mae, as guarantor or as issuer, may also purchase mortgage loans when other pre-defined contingencies have been met, such as when there is a material breach of a seller's representation and warranty. Under long-term standby commitments, we purchase credit-impaired loans from lenders when the loans subject to these commitments meet certain delinquency criteria. This arrangement also allows the lender to deliver qualified loans in exchange for our guaranteed Fannie Mae MBS.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from "Mortgage loans held for investment of consolidated trusts" to "Mortgage loans held for investment by Fannie Mae" and, upon settlement, we record an extinguishment of the corresponding portion of the debt of the consolidated trusts.

For unconsolidated trusts and long-term standby commitments, loans that are credit impaired at the time of acquisition are recorded at the lower of their acquisition cost (unpaid principal balance plus accrued interest) or fair value. A loan is considered credit impaired at acquisition when there is evidence of credit deterioration subsequent to the loan's origination and it is probable, at acquisition, that we will be unable to collect all

F-21

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

contractually required payments receivable (ignoring insignificant delays in contractual payments). We record each acquired loan that does not meet these criteria at its acquisition cost.

For unconsolidated trusts where we are considered the transferor, we recognize the loan in our consolidated balance sheets at fair value and record a corresponding liability to the unconsolidated trust when the contingency on our option to purchase the loan from the trust has been met and we regain effective control over the transferred loan.

We base our estimate of the fair value of delinquent loans purchased from unconsolidated trusts or long-term standby commitments upon an assessment of what a market participant would pay for the loan at the date of acquisition. We utilize indicative market prices from large, experienced dealers to estimate the initial fair value of delinquent loans purchased from unconsolidated trusts or long-term standby commitments. We consider acquired credit-impaired loans to be individually impaired at acquisition, and no valuation allowance is established or carried over. We record the excess of the loan's acquisition cost over its fair value as a charge-off against our "Reserve for guaranty losses" at acquisition. We recognize any subsequent decreases in estimated future cash flows to be collected subsequent to acquisition as impairment losses through our "Allowance for loan losses."

We place credit-impaired loans that we acquire from unconsolidated trusts or long-term standby commitments on nonaccrual status at acquisition in accordance with our nonaccrual policy. If we subsequently determine that the collectibility of principal and interest is reasonably assured, we return the loan to accrual status. We determine the initial accrual status of acquired loans that are not credit impaired in accordance with our nonaccrual policy. Accordingly, we place loans purchased from trusts under other contingent call options on accrual status at acquisition if they are current or if there has been only an insignificant delay in payment and there are no other facts and circumstances that would lead us to conclude that the collection of principal and interest is not reasonably assured.

When an acquired credit-impaired loan is returned to accrual status, the portion of the expected cash flows incorporating changes in the timing and amount that are associated with credit and prepayment events that exceeds the recorded investment in the loan is accreted into interest income over the expected remaining life of the loan. We prospectively recognize increases in future cash flows expected to be collected as interest income over the remaining expected life of the loan through a yield adjustment. If we subsequently refinance or restructure an acquired credit-impaired loan, other than through a TDR, the loan is not accounted for as a new loan but continues to be accounted for under the accounting standard for acquired credit-impaired loans.

*Allowance for Loan Losses and Reserve for Guaranty Losses*

The allowance for loan losses is a valuation allowance that reflects an estimate of incurred credit losses related to our recorded investment in both single-family and multifamily HFI loans. This population includes both HFI loans held by Fannie Mae and by consolidated Fannie Mae MBS trusts. The reserve for guaranty losses is a liability account in our consolidated balance sheets that reflects an estimate of incurred credit losses related to our guaranty to each unconsolidated Fannie Mae MBS trust that we will supplement amounts received by the Fannie Mae MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS and our agreements to purchase credit-impaired loans from lenders under the terms of our long-term standby commitments. As a result, the guaranty reserve considers not only the principal and interest due on the loan at the current balance sheet date, but also any additional interest payments due to the trust from the current balance sheet date until the point of loan acquisition or foreclosure. We recognize incurred losses by recording a charge to the "Provision for loan losses" or the "Provision for guaranty losses" in our consolidated statements of operations.

TREASURY-0516

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Single-Family Loans*

Credit losses related to groups of similar single-family HFI loans that are not individually impaired are recognized when (1) available information as of each balance sheet date indicates that it is probable a loss has occurred and (2) the amount of the loss can be reasonably estimated. We aggregate single-family loans (except for those that are deemed to be individually impaired), based on similar risk characteristics for purposes of estimating incurred credit losses and establish a collective single-family loss reserve using an econometric model that derives an overall loss reserve estimate given multiple factors which include but are not limited to: origination year; loan product type; mark-to-market loan-to-value ("LTV") ratio; and delinquency status. Once loans are aggregated, there typically is not a single, distinct event that would result in an individual loan or pool of loans being impaired. Accordingly, to determine an estimate of incurred credit losses, we base our allowance and reserve methodology on historical events and trends, such as loss severity, default rates, and recoveries from mortgage insurance contracts and other credit enhancements that provide loan level loss coverage and are either contractually attached to a loan or that were entered into contemporaneous with and in contemplation of a guaranty or loan purchase transaction. Our allowance calculation also incorporates a loss confirmation period (the anticipated time lag between a credit loss event and the confirmation of the credit loss resulting from that event) to ensure our allowance estimate captures credit losses that have been incurred as of the balance sheet date but have not been confirmed. In addition, management performs a review of the observable data used in its estimate to ensure it is representative of prevailing economic conditions and other events existing as of the balance sheet date.

We record charge-offs as a reduction to the allowance for loan losses or reserve for guaranty losses when losses are confirmed through the receipt of assets, such as cash in a preforeclosure sale or the underlying collateral in full satisfaction of the mortgage loan upon foreclosure. The excess of a loan's unpaid principal balance, accrued interest, and any applicable cost basis adjustments ("our total exposure") over the fair value of the assets received in full satisfaction of the loan is treated as a charge-off loss that is deducted from the allowance for loan losses or reserve for guaranty losses. Any excess of the fair value of the assets received in full satisfaction over our total exposure at charge-off is applied first to recover any forgone, yet contractually past due interest (for mortgage loans recognized in our consolidated balance sheets), and then to "Foreclosed property expense" in our consolidated statements of operations. We also apply estimated proceeds from primary mortgage insurance or other credit enhancements that provide loan level loss coverage and are either contractually attached to a loan or that were entered into contemporaneous with and in contemplation of a guaranty or loan purchase transaction as a recovery of our total exposure, up to the amount of loss recognized as a charge-off. We record proceeds from credit enhancements in excess of our total exposure in "Foreclosed property expense" in our consolidated statements of operations when received.

*Individually Impaired Single-Family Loans*

We consider a loan to be impaired when, based on current information, it is probable that we will not receive all amounts due, including interest, in accordance with the contractual terms of the loan agreement. When making our assessment as to whether a loan is impaired, we also take into account more than insignificant delays in payment and shortfalls in amount received. Determination of whether a delay in payment or shortfall in amount is more than insignificant requires management's judgment as to the facts and circumstances surrounding the loan.

Individually impaired single-family loans currently include those restructured in a TDR and acquired credit-impaired loans. Our measurement of impairment on an individually impaired loan follows the method that is most consistent with our expectations of recovery of our recorded investment in the loan. When a loan has been restructured, we measure impairment using a cash flow analysis discounted at the loan's original effective interest rate. If we expect to recover our recorded investment in an individually impaired loan

F-23

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

through probable foreclosure of the underlying collateral, we measure impairment based on the fair value of the collateral, reduced by estimated disposal costs on a discounted basis and adjusted for estimated proceeds from mortgage, flood, or hazard insurance or similar sources.

We use internal models to project cash flows used to assess impairment of individually impaired loans, including acquired credit-impaired loans. We generally update the market and loan characteristic inputs we use in these models monthly, using month-end data. Market inputs include information such as interest rates, volatility and spreads, while loan characteristic inputs include information such as mark-to-market LTV ratios and delinquency status. The loan characteristic inputs are key factors that affect the predicted rate of default for loans evaluated for impairment through our internal cash flow models. We evaluate the reasonableness of our models by comparing the results with actual performance and our assessment of current market conditions. In addition, we review our models at least annually for reasonableness and predictive ability in accordance with our corporate model review policy. Accordingly, we believe the projected cash flows generated by our models that we use to assess impairment appropriately reflect the expected future performance of the loans.

*Multifamily Loans*

We identify multifamily loans for evaluation for impairment through a credit risk classification process and individually assign them a risk rating. Based on this evaluation, we determine for loans that are not in homogeneous pools whether or not a loan is individually impaired. If we deem a multifamily loan to be individually impaired, we generally measure impairment on that loan based on the fair value of the underlying collateral less estimated costs to sell the property on a discounted basis. If we determine that an individual loan that was specifically evaluated for impairment is not individually impaired, we include the loan as part of a pool of loans with similar characteristics that are evaluated collectively for incurred losses.

We stratify multifamily loans into different risk rating categories based on the credit risk inherent in each individual loan. We categorize credit risk based on relevant observable data about a borrower's ability to pay, including reviews of current borrower financial information, operating statements on the underlying collateral, historical payment experience, collateral values when appropriate, and other related credit documentation. Multifamily loans that are categorized into pools based on their relative credit risk ratings are assigned certain default and severity factors representative of the credit risk inherent in each risk category. We apply these factors against our recorded investment in the loans, including recorded accrued interest associated with such loans, to determine an appropriate allowance. As part of our allowance process for multifamily loans, we also consider other factors based on observable data such as historical charge-off experience, loan size and trends in delinquency. In addition, we consider any loss sharing arrangements with our lenders.

***Advances to Lenders***

Advances to lenders represent payments of cash in exchange for the receipt of mortgage loans from lenders in a transfer that is accounted for as a secured lending arrangement. These transfers primarily occur when we provide early funding to lenders for loans that they will subsequently either sell to us or securitize into a Fannie Mae MBS that they will deliver to us. We individually negotiate early lender funding advances with our lender customers. Early lender funding advances have terms up to 60 days and earn a short-term market rate of interest. In other cases, the transfers are of loans that the lender has the unilateral ability to repurchase from us.

We report cash outflows from advances to lenders as an investing activity in our consolidated statements of cash flows. Settlements of the advances to lenders, other than through lender repurchases of loans, are not collected in cash, but rather in the receipt of either loans or Fannie Mae MBS. Accordingly, this activity is reflected as a non-cash transfer in our consolidated statements of cash flows. Currently, in our consolidated statements of cash flows, we include advances settled through receipt of securities in the line item entitled

F-24

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

"Transfers from advances to lenders to investments in securities" or, if the security is issued from a consolidated Fannie Mae MBS trust, in the line item entitled "Transfers from advances to lenders to loans held for investment of consolidated trusts."

*Acquired Property, Net*

"Acquired property, net" includes foreclosed property and any receivable outstanding on preforeclosure sales received in full satisfaction of a loan. We recognize foreclosed property upon the earlier of the loan foreclosure event or when we take physical possession of the property (i.e., through a deed-in-lieu of foreclosure transaction). We initially measure foreclosed property at its fair value less its estimated costs to sell. We treat any excess of our recorded investment in the loan over the fair value less estimated costs to sell the property as a charge-off to the "Allowance for loan losses." Any excess of the fair value less estimated costs to sell the property over our recorded investment in the loan is recognized first to recover any forgone, contractually due interest, then to "Foreclosed property expense" in our consolidated statements of operations.

Foreclosed properties that we intend to sell and are actively marketing and that are available for immediate sale in their current condition such that the sale is reasonably expected to take place within one year are classified as held for sale. We report these properties at the lower of their carrying amount or fair value less estimated selling costs, on a discounted basis if the sale is expected to occur beyond one year from the date of foreclosure. We do not depreciate these properties.

We determine the fair value of our foreclosed properties using third-party appraisals, when available. When third-party appraisals are not available, we estimate fair value based on factors such as prices for similar properties in similar geographical areas and/or assessment through observation of such properties. We recognize a loss for any subsequent write-down of the property to its fair value less its estimated costs to sell through a valuation allowance with an offsetting charge to "Foreclosed property expense" in our consolidated statements of operations. We recognize a recovery for any subsequent increase in fair value less estimated costs to sell up to the cumulative loss previously recognized through the valuation allowance. We recognize gains or losses on sales of foreclosed property through "Foreclosed property expense" in our consolidated statements of operations.

Properties that we do not intend to sell or that are not ready for immediate sale in their current condition are classified separately as held for use, are depreciated and are evaluated for impairment when circumstances indicate that the carrying amount of the property is no longer recoverable. Properties classified as held for use are recorded in "Other assets" in our consolidated balance sheets.

*Guaranty Accounting*

Our primary guaranty transactions result from mortgage loan securitizations in which we issue Fannie Mae MBS. The majority of our Fannie Mae MBS issuances fall within two broad categories: (1) lender swap transactions, where a lender delivers mortgage loans to us to deposit into a trust in exchange for our guaranteed Fannie Mae MBS backed by those mortgage loans and (2) portfolio securitizations, where we securitize loans that were previously included in our consolidated balance sheets, and create guaranteed Fannie Mae MBS backed by those loans. As guarantor, we guaranty to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. This obligation represents an obligation to stand ready to perform over the term of the guaranty. Therefore, our guaranty exposes us to credit losses on the loans underlying Fannie Mae MBS.

The majority of our guaranty obligations have historically arisen from lender swap transactions. In a lender swap transaction, we receive a monthly guaranty fee for our unconditional guaranty to the Fannie Mae MBS trust. The guaranty fee we receive varies depending on factors such as the risk profile of the securitized loans

F-25

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

and the level of credit risk we assume. In lieu of charging a higher guaranty fee for loans with greater credit risk, we may require that the lender pay an upfront fee to compensate us for assuming additional credit risk. We refer to this payment as a risk-based pricing adjustment. In addition, we may charge a lower guaranty fee if the lender assumes a portion of the credit risk through recourse or other risk-sharing arrangements. We refer to these arrangements as credit enhancements. We also adjust the monthly guaranty fee so that the pass-through coupon rates on Fannie Mae MBS are in more easily tradable increments of a whole or half percent by making an upfront payment to the lender ("buy-up") or receiving an upfront payment from the lender ("buy-down").

Upon adoption of the new accounting standards on the transfer of financial assets and the consolidation of VIE's on January 1, 2010, we consolidated most of the single-class securitization trusts that are issued under our guaranty accounting programs. As such, a significant portion of our guaranty-related assets and liabilities have been derecognized from our consolidated balance sheet.

For those trusts that are not consolidated, we initially recognize a liability for the fair value of our obligation to stand ready to perform over the term of the guaranty as a component of "Other liabilities" in our consolidated balance sheets. We also record an offsetting asset (a retained interest for portfolio securitizations) that represents the present value of cash flows expected to be received as compensation over the life of the guaranty as a component of "Other assets."

For lender swap transactions, we initially recognize our guaranty obligation at fair value using the transaction price, as a practical expedient, upon initial recognition. Specifically, we estimate the compensation that we would require to issue the same guaranty in a standalone arm's-length transaction with an unrelated party. Because the fair value of those guaranty obligations equals the fair value of the total compensation we receive, we do not recognize losses or record deferred profit in our consolidated financial statements at inception of our guaranty contracts. As such, all upfront cash received for buy-downs and risk-based price adjustments are included as a component of our guaranty obligation at inception.

For portfolio securitizations, we initially recognize our guaranty obligation at fair value using an estimate of a hypothetical transaction price that we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We recognize any difference between the fair value of the guaranty asset and the fair value of the guaranty obligation as a component of the gain or loss on the sale of mortgage-related assets and record the difference as "Investment gains (losses), net" in our consolidated statements of operations.

Subsequent to initial recognition, we account for the guaranty asset on lender swap transactions at amortized cost. As we collect monthly guaranty fees, we reduce guaranty assets to reflect cash payments received and recognize imputed interest income on guaranty assets as a component of "Guaranty fee income" under the prospective interest method. We reduce the corresponding guaranty obligation in proportion to the reduction in guaranty assets and recognize this reduction in our consolidated statements of operations as an additional component of "Guaranty fee income." We assess guaranty assets for other-than-temporary impairment based on changes in our estimate of the cash flows to be received. When we determine a guaranty asset is other-than-temporarily impaired, we write down the cost basis of the guaranty asset to its fair value and include the amount written-down in "Guaranty fee income" in our consolidated statements of operations. Any other-than-temporary impairment recorded on guaranty assets results in a proportionate reduction in the corresponding guaranty obligations. For portfolio securitizations, we subsequently account for the retained guarantee asset in the same manner as a trading security, with unrealized gains and losses included in "Guaranty fee income" in our consolidated statements of operations.

We record buy-ups in our consolidated balance sheets at fair value in "Other assets." We subsequently account for buy-ups in the same manner as a trading security.

TREASURY-0520

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We account for our guaranty related to a long term standby commitment in the same manner as our guaranty resulting from an unconsolidated lender swap transaction as described above.

In addition to our guaranty assets and obligations, we recognize a liability for estimable and probable losses for the credit risk we assume on loans underlying Fannie Mae MBS and long term standby commitments based on management's estimate of probable losses incurred on those loans as of each balance sheet date. We record this contingent liability in our consolidated balance sheets as "Reserve for guaranty losses."

### *Fannie Mae MBS included in "Investments in securities"*

When we own unconsolidated Fannie Mae MBS, we do not derecognize any components of the guaranty assets, guaranty obligations, reserve for guaranty losses, or any other outstanding recorded amounts associated with the guaranty transaction because our contractual obligation to the MBS trust remains in force until the trust is liquidated. We value Fannie Mae MBS based on their legal terms, which includes the Fannie Mae guaranty to the MBS trust, and continue to reflect the unamortized obligation to stand ready to perform over the term of our guaranty and any incurred credit losses in our "Other liabilities" and "Reserve for guaranty losses," respectively. We disclose the aggregate amount of Fannie Mae MBS held as "Investments in securities" in our consolidated balance sheets as well as the amount of our "Reserve for guaranty losses" and "Other liabilities" that relates to Fannie Mae MBS held as "Investments in securities." Upon subsequent sale of a Fannie Mae MBS, we continue to account for any outstanding recorded amounts associated with the guaranty transaction on the same basis of accounting as prior to the sale of Fannie Mae MBS, as no new assets were retained and no new liabilities have been assumed upon the subsequent sale.

### *Credit Enhancements*

Credit enhancements that we recognize separately as "Other assets" in our consolidated balance sheets are amortized in our consolidated statements of operations as "Other expenses." We amortize these assets at the greater of amounts calculated (1) commensurate with the observed decline in the unpaid principal balance of covered mortgage loans or (2) on a straight-line basis over a credit enhancement's contract term. We record recurring insurance premiums at the amount paid and amortize them over their contractual life.

### *Amortization of Cost Basis Adjustments*

We amortize cost basis adjustments, including premiums and discounts on mortgage loans and securities, as a yield adjustment using the interest method over the contractual or estimated life of the loan or security. We amortize these cost basis adjustments into interest income for mortgage securities and for loans we classify as HFI. We do not amortize cost basis adjustments for loans that we classify as HFS, but include them in the calculation of the gain or loss on the sale of those loans.

F-27

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays unamortized premiums, discounts, and other cost basis adjustments included in our consolidated balances sheets as of December 31, 2010 and 2009, that may result in net interest income in our consolidated statements of operations in future periods.

|  | As of December 31, | |
|---|---|---|
|  | **2010** | **2009** |
|  | (Dollars in millions) | |
| Of Fannie Mae: | | |
| Investments in securities: | | |
| Unamortized premiums and other cost basis adjustments, net | $    938 | $   1,185 |
| Other-than-temporary impairments[1] | (3,057) | (821) |
| Mortgage loans held-for-investment: | | |
| Unamortized discounts and other cost basis adjustments of loans in portfolio, net, excluding acquired credit-impaired loans and hedged mortgage assets[2] | (17,056) | (10,332) |
| Unamortized discount on acquired credit-impaired loans[3] | (3,240) | (11,467) |
| Unamortized premium on hedged mortgage assets[4] | 598 | 806 |
| Other assets[5] | (88) | (254) |
| Total | $(21,905) | $(20,883) |
| Of consolidated trusts: | | |
| Unamortized premiums, net in loans of consolidated trusts | $ 11,785 | |
| Unamortized premiums, net in debt of consolidated trusts | (16,803) | |
| Net unamortized premiums from consolidations | $ (5,018) | |

_____

[1] Represents the increase in expected cash flows since original impairment that we currently expect will be recorded as interest income in future periods. This amount is calculated as the excess of expected cash flows, discounted at the internal rate of return at acquisition, over the amortized cost basis of the security. To reduce costs associated with maintaining our internal model and decrease the operational risk, in the fourth quarter of 2010 we ceased to use our internally developed model and began using a third-party model as the source for cash flows used to assess other-than-temporary impairments on Alt-A and subprime private-label securities. This model change resulted in more favorable cash flow estimates that, based on estimates as of December 31, 2010, increased the amount that we will recognize prospectively as interest income over the remaining life of the securities by $2.5 billion.

[2] Includes the unamortized balance of the fair value discounts that were recorded upon acquisition of credit-impaired loans that have been subsequently modified as TDRs, which accretes into interest income for TDRs that are placed on accrual status.

[3] Represents the unamortized balance of the fair value discounts that were recorded upon acquisition and consolidation that may accrete into interest income for acquired credit-impaired loans that are placed on accrual status.

[4] Represents the net premium on mortgage assets designated for hedge accounting that are attributable to changes in interest rates and will be amortized through interest income over the life of the hedged assets.

[5] Represents the fair value discount related to unsecured HomeSaver Advance loans that will accrete into interest income based on the contractual terms of the loans for loans on accrual status.

We have elected to use the contractual payment terms to determine the amortization of cost basis adjustments on mortgage loans and mortgage securities initially recognized on or after January 1, 2010 in our consolidated balance sheets.

For substantially all mortgage loans and mortgage securities initially recorded on or before December 31, 2009, we use prepayment estimates in determining the periodic amortization of cost basis adjustments under the interest method using a constant effective yield. For those mortgage loans and mortgage securities for which we did not estimate prepayments, we used the contractual payment terms of the loan or security to

F-28

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

apply the interest method. When we anticipate prepayments for the application of the interest method to mortgage loans initially recognized before January 1, 2010, we aggregate individual mortgage loans based upon coupon rate, product type and origination year and consider Fannie Mae MBS to be aggregations of similar loans for the purpose of estimating prepayments. We also recalculate the constant effective yield each reporting period to reflect the actual payments and prepayments we have received to date and our new estimate of future prepayments. We then adjust our net investment in the mortgage loans and mortgage securities to the amount the investment would have been had we applied the recalculated constant effective yield since their acquisition, with a corresponding charge or credit to interest income.

We cease amortization of cost basis adjustments during periods in which we are not recognizing interest income on a loan because the collection of the principal and interest payments is not reasonably assured (that is, when the loan is placed on nonaccrual status).

*Other Investments*

We primarily account for unconsolidated investments in limited partnerships under the equity method of accounting. These investments include our LIHTC and other partnership investments. Under the equity method, we increase or decrease our investment for our share of the limited partnership's net income or loss reflected in "Losses from partnership investments" in our consolidated statements of operations. These investments are included as "Other assets" in our consolidated balance sheets. We periodically review our investments to determine if an other-than-temporary loss in value has occurred.

*Commitments to Purchase and Sell Mortgage Loans and Securities*

We enter into commitments to purchase and sell mortgage-backed securities and to purchase single-family and multifamily mortgage loans. Commitments to purchase or sell some mortgage-backed securities and to purchase single-family mortgage loans are generally accounted for as derivatives. Our commitments to purchase multifamily loans are not accounted for as derivatives because they do not meet the criteria for net settlement.

For those commitments that we account for as derivatives, we report them in our consolidated balance sheets at fair value in "Other assets" or "Other liabilities" and include changes in their fair value in "Fair value losses, net" in our consolidated statements of operations. When derivative purchase commitments settle, we include the fair value on the settlement date in the cost basis of the loan or unconsolidated security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases and sales of securities issued by our consolidated MBS trusts are treated as extinguishment or issuance of debt, respectively. For commitments to purchase and sell securities issued by our consolidated MBS trusts, we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses or in the cost basis of the debt issued, respectively.

Regular-way securities trades provide for delivery of securities within the time generally established by regulations or conventions in the market in which the trade occurs and are exempt from application of the derivative accounting literature. Commitments to purchase or sell securities that we account for on a trade-date basis are also exempt from the derivative accounting requirements. We record the purchase and sale of an existing security on its trade date when the commitment to purchase or sell the existing security settles within the period of time that is customary in the market in which those trades take place.

Additionally, contracts for the forward purchase or sale of when-issued and to-be-announced ("TBA") securities are exempt from the derivative accounting requirements if there is no other way to purchase or sell that security, delivery of that security and settlement will occur within the shortest period possible for that

F-29

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

type of security, and it is probable at inception and throughout the term of the individual contract that physical delivery of the security will occur. Since our commitments for the purchase of when-issued and TBA securities can be net settled and we do not document that physical settlement is probable, we account for all such commitments as derivatives.

Commitments to purchase securities that we do not account for as derivatives and do not require trade-date accounting are accounted for as forward contracts to purchase securities. We designate these commitments as AFS or trading at inception and account for them in a manner consistent with that category of securities.

### Derivative Instruments

We recognize all derivatives as either assets or liabilities in our consolidated balance sheets at their fair value on a trade date basis. We report derivatives in a gain position after offsetting by counterparty in "Other assets" and derivatives in a loss position after offsetting by counterparty in "Other liabilities" in our consolidated balance sheets.

We offset the carrying amounts of derivatives (other than commitments) that are in gain positions and loss positions with the same counterparty, as well as cash collateral receivables and payables associated with derivative positions in master netting arrangements. We offset these amounts because the derivative contracts have determinable amounts, we have the legal right to offset amounts with each counterparty, that right is enforceable by law, and we intend to offset the amounts to settle the contracts.

We determine fair value using quoted market prices in active markets when available. If quoted market prices are not available for particular derivatives, we use quoted market prices for similar derivatives that we adjust for directly observable or corroborated (i.e., information purchased from third-party service providers) market information. In the absence of observable or corroborated market data, we use internally-developed estimates, incorporating market-based assumptions wherever such information is available. For derivatives (other than commitments), we use a mid-market price when there is a spread between a bid and ask price.

We evaluate financial instruments that we purchase or issue and other financial and non-financial contracts for embedded derivatives. To identify embedded derivatives that we must account for separately, we determine if: (1) the economic characteristics of the embedded derivative are not clearly and closely related to the economic characteristics of the financial instrument or other contract; (2) the financial instrument or other contract (*i.e.*, the hybrid contract) itself is not already measured at fair value with changes in fair value included in earnings; and (3) a separate instrument with the same terms as the embedded derivative would meet the definition of a derivative. If the embedded derivative meets all three of these conditions we elect to carry the hybrid financial instrument in its entirety at fair value with changes in fair value recorded in earnings.

### Collateral

We enter into various transactions where we pledge and accept collateral, the most common of which are our derivative transactions. Required collateral levels vary depending on the credit rating and type of counterparty. We also pledge and receive collateral under our repurchase and reverse repurchase agreements. In order to reduce potential exposure to repurchase counterparties, a third-party custodian typically maintains the collateral and any margin. We monitor the fair value of the collateral received from our counterparties, and we may require additional collateral from those counterparties, as we deem appropriate. Collateral received under early funding agreements with lenders, whereby we advance funds to lenders prior to the settlement of a security commitment, must meet our standard underwriting guidelines for the purchase or guarantee of mortgage loans.

F-30

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Cash Collateral*

We record cash collateral accepted from a counterparty that we have the right to use as "Cash and cash equivalents" and cash collateral accepted from a counterparty that we do not have the right to use as "Restricted cash" in our consolidated balance sheets. We net our obligation to return cash collateral pledged to us against the fair value of derivatives in a gain position recorded in "Other assets" in our consolidated balance sheets as part of our counterparty netting calculation.

For derivative positions with the same counterparty under master netting arrangements where we pledge cash collateral, we remove it from "Cash and cash equivalents" and net the right to receive it against the fair value of derivatives in a loss position recorded in "Other liabilities" in our consolidated balance sheets as a part of our counterparty netting calculation.

The following table displays cash collateral accepted and pledged as of December 31, 2010 and 2009.

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (Dollars in millions) | |
| Cash collateral accepted[1] | $3,101 | $ 4,052 |
| Cash collateral pledged | $5,884 | $ 5,434 |
| Cash collateral pledged related to derivatives activities | 3,453 | 5,437 |
| Total cash collateral pledged | $9,337 | $10,871 |

[1] Includes restricted cash of $2.5 billion and $3.0 billion as of December 31, 2010 and 2009, respectively.

*Non-Cash Collateral*

We classify securities pledged to counterparties as either "Investments in securities" or "Cash and cash equivalents" in our consolidated balance sheets. Securities pledged to counterparties that have been consolidated with the underlying assets recognized as loans are included as "Mortgage loans" in our consolidated balance sheets. The following table displays non-cash collateral pledged and accepted as of December 31, 2010 and 2009.

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (Dollars in millions) | |
| Non-cash collateral pledged where the secured party has the right to sell or repledge: | | |
| Available-for-sale securities | $ — | $1,148 |
| Held-for-investment loans of consolidated trusts | 2,522 | 1,947 |
| Non-cash collateral accepted with the right to sell or repledge[1] | $7,500 | $ 67 |
| Non-cash collateral accepted without the right to sell or repledge | 6,744 | 6,285 |

[1] None of this collateral was sold or repledged as of December 31, 2010 and 2009.

Additionally, we provide early funding to lenders on a collateralized basis and account for the advances as secured lending arrangements. We recognized $7.2 billion and $5.4 billion funded to lenders in "Other assets" in our consolidated balance sheets as of December 31, 2010 and 2009, respectively.

Our liability to third-party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

TREASURY-0525

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

When securities sold under agreements to repurchase meet all of the conditions of a secured financing, we report the collateral of the transferred securities at fair value, excluding accrued interest. The fair value of these securities is classified in "Investments in securities" in our consolidated balance sheets. We had $49 million in repurchase agreements outstanding as of December 31, 2010. We had no such repurchase agreements outstanding as of December 31, 2009.

*Debt*

Our consolidated balance sheets contain debt of Fannie Mae as well as debt of consolidated trusts. We classify our outstanding debt as either short-term or long-term based on the initial contractual maturity. Prior to January 1, 2010, we reported debt issued both by us and by consolidated trusts collectively as either "Short-term debt" or "Long-term debt" in our consolidated balance sheets. Effective January 1, 2010, the debt of consolidated trusts is reported as either "Short-term debt of consolidated trusts" or "Long-term debt of consolidated trusts," and represents the amount of Fannie Mae MBS issued from such trusts and held by third-party certificateholders. Debt issued by us is reported as either "Short-term debt of Fannie Mae" or "Long-term debt of Fannie Mae," and represents debt that we issue to third parties to fund our general business activities. The debt of consolidated trusts is prepayable without penalty at any time. We report deferred items, including premiums, discounts and other cost basis adjustments, as adjustments to the related debt balances in our consolidated balance sheets. We remeasure the carrying amount, accrued interest and basis adjustments of debt denominated in a foreign currency into U.S. dollars using foreign exchange spot rates as of the balance sheet dates and report any associated gains or losses as "Debt foreign exchange gains (losses), net" which is a component of "Fair value losses, net" in our consolidated statements of operations.

We classify interest expense as either short-term or long-term based on the contractual maturity of the related debt. We recognize the amortization of premiums, discounts and other cost basis adjustments through interest expense using the effective interest method usually over the contractual term of the debt. Amortization of premiums, discounts and other cost basis adjustments begins at the time of debt issuance. We remeasure interest expense for debt denominated in a foreign currency into U.S. dollars using the daily spot rates. The difference in rates arising from the month-end spot exchange rate used to calculate the interest accruals and the daily spot rates used to record the interest expense is a foreign currency transaction gain or loss for the period and is recognized as "Debt foreign exchange gains (losses), net" which is a component of "Fair value losses, net" in our consolidated statements of operations.

When we purchase a Fannie Mae MBS issued from a consolidated single-class securitization trust, we extinguish the related debt of the consolidated trust as the MBS debt is no longer owed to a third-party. We record debt extinguishment gains or losses related to debt of consolidated trusts to the extent that the purchase price of the MBS does not equal the carrying value of the related consolidated MBS debt reported on our balance sheets (including unamortized premiums, discounts and other cost basis adjustments) at the time of purchase.

*Fees Received on the Structuring of Transactions*

We offer certain re-securitization services to customers in exchange for fees. Such services include, but are not limited to, the issuance, guarantee and administration of Fannie Mae REMIC, stripped mortgage-backed securities ("SMBS"), grantor trust, and Fannie Mae Mega® securities (collectively, the "Structured Securities"). We receive a one-time conversion fee upon issuance of a Structured Security that varies based on the value of securities issued and the transaction structure. The conversion fee compensates us for all services we provide in connection with the Structured Security, including services provided at and prior to security issuance and over the life of the Structured Securities. Except for Structured Securities where the underlying collateral is whole loans or private-label securities, we generally do not receive a guaranty fee as

F-32

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

compensation in connection with the issuance of a Structured Security, because the transferred mortgage-related securities have previously been guaranteed by us or another party.

We defer a portion of the fee received upon issuance of a Structured Security based on our estimate of the fair value of our future administration services. We amortize this portion of the fee on a straight-line basis over the expected life of the Structured Security. We recognize the excess of the total fee over the fair value of the future services in our consolidated statements of operations upon issuance of a Structured Security. However, when we acquire a portion of a Structured Security contemporaneous with our structuring of the transaction, we defer and amortize a portion of this upfront fee as an adjustment to the yield of the purchased security. We present fees received and costs incurred related to our structuring of securities in "Fee and other income" in our consolidated statements of operations.

### Income Taxes

We recognize deferred tax assets and liabilities for the difference in the basis of assets and liabilities for financial accounting and tax purposes. We measure deferred tax assets and liabilities using enacted tax rates that are expected to be applicable to the taxable income or deductions in the period(s) the assets are realized or the liabilities are settled. We adjust deferred tax assets and liabilities for the effects of changes in tax laws and rates on the date of enactment. We recognize investment and other tax credits through our effective tax rate calculation assuming that we will be able to realize the full benefit of the credits. We reduce our deferred tax asset by an allowance if, based on the weight of available positive and negative evidence, it is more likely than not that we will not realize some portion, or all, of the deferred tax asset.

We account for income tax uncertainty using a two-step approach whereby we recognize an income tax benefit if, based on the technical merits of a tax position, it is more likely than not (a probability of greater than 50%) that the tax position would be sustained upon examination by the taxing authority, which includes all related appeals and litigation. We then recognize a tax benefit equal to the largest amount of tax benefit that is greater than 50% likely to be realized upon settlement with the taxing authority, considering all information available at the reporting date. We recognize interest expense on unrecognized tax benefits as "Other expenses" in our consolidated statements of operations.

### Pension and Other Postretirement Benefits

We provide pension and postretirement benefits and account for these benefit costs on an accrual basis. We determine pension and postretirement benefit amounts recognized in our consolidated financial statements on an actuarial basis using several different assumptions. The two most significant assumptions used in the valuation are the discount rate and the long-term rate of return on assets. In determining our net periodic benefit cost, we apply a discount rate in the actuarial valuation of our pension and postretirement benefit obligations. In determining the discount rate as of each balance sheet date, we consider the current yields on high-quality, corporate fixed-income debt instruments with maturities corresponding to the expected duration of our benefit obligations. Additionally, the net periodic benefit cost recognized in our consolidated financial statements for our qualified pension plan is impacted by the long-term rate of return on plan assets. We base our assumption of the long-term rate of return on the current investment portfolio mix, actual long-term historical return information and the estimated future long-term investment returns for each class of assets. We measure plan assets and obligations as of the date of our consolidated financial statements. We recognize the over-funded or under-funded status of our benefit plans as a prepaid benefit cost (an asset) in "Other assets" or an accrued benefit cost (a liability) in "Other liabilities," respectively, in our consolidated balance sheets. We recognize actuarial gains and losses and prior service costs and credits when incurred as adjustments to the prepaid benefit cost or accrued benefit cost with a corresponding offset in other comprehensive income (loss).

TREASURY-0527

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Earnings (Loss) per Share*

Earnings (loss) per share ("EPS") is presented for both basic EPS and diluted EPS. We compute basic EPS by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the year. In addition to common shares outstanding, the computation of basic EPS includes instruments for which the holder has (or is deemed to have) the present rights as of the end of the reporting period to share in current period earnings (loss) with common stockholders (*i.e.,* participating securities and common shares that are currently issuable for little or no cost to the holder). We include in the denominator of our EPS computation the weighted-average shares of common stock that would be issued upon the full exercise of the warrant issued to Treasury. Diluted EPS is computed by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the year, plus the dilutive effect of common stock equivalents such as convertible securities, stock options and other performance awards. We exclude these common stock equivalents from the calculation of diluted EPS when the effect of inclusion, assessed individually, would be anti-dilutive.

*Other Comprehensive Income (Loss)*

Other comprehensive income (loss) is the change in equity, net of tax, resulting from transactions that we record directly to stockholders' equity. These transactions include: unrealized gains and losses on AFS securities and certain commitments whose underlying securities are classified as AFS; deferred hedging gains and losses from cash flow hedges; unrealized gains and losses on guaranty assets resulting from portfolio securitization transactions; buy-ups resulting from lender swap transactions; and change in prior service costs and credits and actuarial gains and losses associated with pension and postretirement benefits in other comprehensive income (loss).

As of December 31, 2010 and 2009, we recorded a valuation allowance for our deferred tax asset for the portion of the future tax benefit that we more likely than not will not utilize in the future. We established no valuation allowance for the deferred tax asset amount related to unrealized losses recorded through AOCI on our AFS securities. We believe this deferred tax amount is recoverable because we have the intent and ability to hold these securities until recovery of the unrealized loss amounts.

*Servicer and MBS Trust Receivable and Payable*

When a servicer advances payments to a consolidated MBS trust for delinquent loans, we record restricted cash and a corresponding liability to reimburse the servicer. When a delinquency advance is made to an unconsolidated trust, we record a receivable from the MBS trust, net of a valuation allowance, and a corresponding liability to reimburse the servicer. Servicers are reimbursed for amounts that they do not collect from the borrower at the earlier of our purchase of the loan out of the trust under our default call option or foreclosure.

For unconsolidated MBS trusts where we are considered the transferor, when the contingency on our option to purchase loans from the trust has been met and we regain effective control over the transferred loan, we recognize the loan in our consolidated balance sheets at fair value and record a corresponding liability to the unconsolidated MBS trust.

TREASURY-0528

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Fair Value Losses, Net*

The following table displays the composition of "Fair value losses, net" for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | **(Dollars in millions)** | | |
| Derivatives fair value losses, net ................................. | $(3,000) | $(6,350) | $(15,416) |
| Trading securities gains (losses), net ............................. | 2,692 | 3,744 | (7,040) |
| Hedged mortgage asset gains, net[1] ............................. | — | — | 2,154 |
| Debt foreign exchange gains (losses), net ......................... | (77) | (173) | 230 |
| Debt fair value gain (losses), net ................................. | 5 | (32) | (57) |
| Mortgage loans fair value losses, net ............................. | (131) | — | — |
| Fair value losses, net ....................................... | $ (511) | $(2,811) | $(20,129) |

---

[1] Represents adjustments to the carrying value of mortgage assets designated for hedge accounting that are attributable to changes in interest rates.

*Reclassifications*

To conform to our current period presentation, we have reclassified amounts reported in our consolidated financial statements.

In our consolidated balance sheet as of December 31, 2009, we reclassified $536 million from "Allowance for loan losses" to "Allowance for accrued interest receivable." Also, the following table displays the balance sheet line items that were reclassified to "Other assets" and "Other liabilities."

| | As of December 31, 2009 | |
|---|---|---|
| | **Before Reclassification** | **After Reclassification** |
| | **(Dollars in millions)** | |
| **Reclassified lines to:** | | |
| **Other assets:** | | |
| Advances to lenders ...................................... | $ 5,449 | $ |
| Derivative assets, at fair value ............................. | 1,474 | |
| Guaranty assets ......................................... | 8,356 | |
| Deferred tax assets, net................................... | 909 | |
| Partnership investments .................................. | 2,372 | |
| Other assets............................................ | 11,559 | 30,119 |
| Total other assets ..................................... | $30,119 | $30,119 |
| **Other liabilities:** | | |
| Derivatives liabilities, at fair value ......................... | $ 1,029 | $ |
| Guaranty obligations .................................... | 13,996 | |
| Partnership liabilities ................................... | 2,541 | |
| Other liabilities ........................................ | 7,020 | 24,586 |
| Total other liabilities................................... | $24,586 | $24,586 |

In our consolidated statements of operations, we reclassified $63.1 billion and $9.6 billion for 2009 from "Provision for credit losses," which is no longer presented, to "Provision for guaranty losses" and "Provision

F-35

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

for loan losses," respectively. For 2008, we reclassified $23.9 billion to "Provision for guaranty losses" and $4.0 billion to "Provision for loan losses."

In our consolidated statements of cash flows, we reclassified $27.5 billion and $15.3 billion from "Reimbursements to servicers for loan advances," which is no longer presented, to "Other, net," within "Cash flows provided by (used in) investing activities" for the years ended December 31, 2009 and 2008, respectively. Also, the following table displays the cash flows line items that we reclassified within "Cash flows (used in) provided by operating activities" for the years ended December 31, 2009 and 2008.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | |
| | Before Reclassification | After Reclassification | Before Reclassification | After Reclassification |
| | (Dollars in millions) | | | |
| **Reclassified lines to:** | | | | |
| **Amortization of cost basis adjustments:** | | | | |
| Amortization of investment cost basis adjustments . . . . . . . . . . . . . . . . | $ (687) | $ | $ (400) | $ |
| Amortization of debt cost basis adjustments . . . . . . . . . . . . . . . . . | 3,255 | | 8,589 | |
| Amortization of cost basis adjustments . . . . . . . . . . . . . . | $ 2,568 | $ 2,568 | $ 8,189 | $ 8,189 |
| **Valuation (gains) losses:** | | | | |
| Derivatives fair value adjustments . . . | $(1,105) | $ | $(1,239) | $ |
| Valuation losses . . . . . . . . . . . . . . . | 4,530 | 3,425 | 13,964 | 12,725 |
| Total valuation (gains) losses . . . . | $ 3,425 | $ 3,425 | $12,725 | $12,725 |
| **Other, net:** | | | | |
| Debt extinguishment losses, net . . . . . | $ 325 | $ | $ 222 | $ |
| Debt foreign currency transaction (gains) losses, net . . . . . . . . . . . . | 173 | | (230) | |
| Net change in: | | | | |
| Guaranty assets . . . . . . . . . . . . . . | (1,072) | | 2,089 | |
| Guaranty obligations . . . . . . . . . . | (903) | | (5,312) | |
| Other, net . . . . . . . . . . . . . . . . . . . | (550) | (2,027) | (2,458) | (5,689) |
| Total other, net . . . . . . . . . . . . . . | $(2,027) | $(2,027) | $(5,689) | $(5,689) |

**2. Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities**

Effective January 1, 2010, we prospectively adopted the new accounting standards on the transfer of financial assets and the consolidation of VIEs for all VIEs existing as of January 1, 2010 ("transition date"). The new accounting standards removed the scope exception for QSPEs and replaced the previous consolidation model with a qualitative model for determining the primary beneficiary of a VIE. Upon adoption of the new accounting standards, we consolidated the substantial majority of our single-class securitization trusts, which had significant impacts on our consolidated financial statements. The key financial statement impacts are summarized below.

The mortgage loans and debt reported in our consolidated balance sheet increased significantly at the transition date because we recognized the underlying assets and liabilities of the newly consolidated trusts. We recorded the trusts' mortgage loans and the debt held by third parties at their unpaid principal balance at the transition date. Prospectively, we recognized the interest income on the trusts' mortgage loans and interest

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

expense on the trusts' debt, resulting in an increase in the interest income and interest expense reported in our consolidated statements of operations compared to prior periods.

Another significant impact was the elimination of our guaranty accounting for the newly consolidated trusts. We derecognized the previously recorded guaranty-related assets and liabilities associated with the newly consolidated trusts from our consolidated balance sheets. We also eliminated our reserve for guaranty losses and recognized an allowance for loan losses for such trusts. In our consolidated statements of operations, we no longer recognize guaranty fee income for the newly consolidated trusts, as the revenue is now recorded as a component of loan interest income.

When we recognized the newly consolidated trusts' assets and liabilities at the transition date, we also derecognized our investments in these trusts, resulting in a decrease in our investments in MBS that are classified as trading and AFS securities. Instead of being recorded as an asset, our investments in Fannie Mae MBS reduce the debt reported in our consolidated balance sheets. Accordingly, the purchase and subsequent sale of MBS issued by consolidated trusts are accounted for in our consolidated financial statements as the extinguishment and issuance of the debt of consolidated trusts, respectively. Furthermore, under the new accounting standards, a transfer of mortgage loans from our portfolio to a trust will generally not qualify for sale treatment.

The new accounting standards do not change the economic risk to our business, specifically our exposure to liquidity, credit, and interest rate risks. We continue to securitize mortgage loans originated by lenders in the primary mortgage market into Fannie Mae MBS.

Refer to the "Principles of Consolidation" section in "Note 1, Summary of Significant Accounting Policies" for additional information.

### Summary of Transition Adjustments

The cumulative impact of our adoption of the new accounting standards was a decrease to our total deficit of $3.3 billion at the transition date. This amount includes:

- A net decrease in our accumulated deficit of $6.7 billion, primarily driven by the reversal of the guaranty assets and guaranty obligations related to the newly consolidated trusts; and

- A net increase in our accumulated other comprehensive loss of $3.4 billion primarily driven by the reversal of net unrealized gains related to our investments in Fannie Mae MBS classified as AFS.

Our transition adjustment is a result of the following changes to our accounting:

- *Net recognition of assets and liabilities of newly consolidated entities.*   At the transition date, trust assets and liabilities required to be consolidated were recognized in our consolidated balance sheet at their unpaid principal balance plus any accrued interest. An allowance for loan losses was established for the newly consolidated mortgage loans. The reserve for guaranty losses previously established for such loans was eliminated. Our investments in Fannie Mae MBS issued by the newly consolidated trusts were eliminated along with the related accrued interest receivable and unrealized gains or losses at the transition date.

- *Accounting for portfolio securitizations.*   At the transition date, we reclassified the majority of our HFS loans to HFI. Under the new accounting standards, the transfer of mortgage loans to a trust and the sale of the related securities in a portfolio securitization transaction will generally not qualify for sale treatment. As such, mortgage loans acquired with the intent to securitize will generally be classified as held for investment in our consolidated balance sheets both prior to and subsequent to their securitization.

- *Elimination of accounting for guarantees.*   At the transition date, a significant portion of our guaranty-related assets and liabilities were derecognized from our consolidated balance sheet. Upon consolidation

TREASURY-0531

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

of a trust, our guaranty activities represent intercompany activities that must be eliminated for purposes of our consolidated financial statements.

We also describe in this note the ongoing impacts of the new accounting standards on our consolidated statements of operations, as well as the changes we have made to our segment reporting as a result of our adoption of the new accounting standards. The substantial majority of the transition impact related to non-cash activity, which has not been included in our consolidated statement of cash flows.

**Balance Sheet Impact**

In accordance with the new accounting standards, effective on the transition date, we report the assets and liabilities of consolidated trusts separately from the assets and liabilities of Fannie Mae in our consolidated balance sheets. As such, we have reclassified prior period amounts to conform to our current period presentation. The following table presents the impact to our consolidated balance sheet at the transition date.

| | As of December 31, 2009 | Transition Impact | As of January 1, 2010 |
|---|---|---|---|
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  6,812 | $      (19) | $   6,793 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,070 | 45,583 | 48,653 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . | 53,684 | (316) | 53,368 |
| Investments in securities: | | | |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111,939 | (66,251) | 45,688 |
| Available-for-sale, at fair value . . . . . . . . . . . . . . . . . . . . . . . . | 237,728 | (122,328) | 115,400 |
| Total investments in securities . . . . . . . . . . . . . . . . . . . . . . . . | 349,667 | (188,579) | 161,088 |
| Mortgage loans: | | | |
| Loans held for sale, at lower of cost or fair value . . . . . . . . . . . | 18,462 | (18,115) | 347 |
| Loans held for investment, at amortized cost: | | | |
| Of Fannie Mae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 256,434 | 3,753 | 260,187 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129,590 | 2,595,321 | 2,724,911 |
| Total loans held for investment . . . . . . . . . . . . . . . . . . . . . . | 386,024 | 2,599,074 | 2,985,098 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . | (9,925) | (43,576) | (53,501) |
| Total loans held for investment, net of allowance . . . . . . | 376,099 | 2,555,498 | 2,931,597 |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . | 394,561 | 2,537,383 | 2,931,944 |
| Accrued interest receivable: | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,774 | (659) | 3,115 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 519 | 16,329 | 16,848 |
| Allowance for accrued interest receivable . . . . . . . . . . . . . . . | (536) | (6,989) | (7,525) |
| Total accrued interest receivable, net of allowance . . . . . . . . | 3,757 | 8,681 | 12,438 |
| Acquired property, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,142 | — | 9,142 |
| Servicer and MBS trust receivable. . . . . . . . . . . . . . . . . . . . . . . . | 18,329 | (17,143) | 1,186 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,119 | (8,496) | 21,623 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $869,141 | $2,377,094 | $3,246,235 |

F-38

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | As of December 31, 2009 | Transition Impact | As of January 1, 2010 |
|---|---|---|---|
| | (Dollars in millions) | | |
| **Liabilities and Equity (Deficit)** | | | |
| Liabilities: | | | |
| Accrued interest payable: | | | |
| Of Fannie Mae | $ 4,951 | $ 8 | $ 4,959 |
| Of consolidated trusts | 29 | 10,564 | 10,593 |
| Federal funds purchased and securities sold under agreements to repurchase | — | — | — |
| Short-term debt: | | | |
| Of Fannie Mae | 200,437 | — | 200,437 |
| Of consolidated trusts | — | 6,425 | 6,425 |
| Long-term debt: | | | |
| Of Fannie Mae | 567,950 | (205) | 567,745 |
| Of consolidated trusts | 6,167 | 2,442,280 | 2,448,447 |
| Reserve for guaranty losses | 54,430 | (54,103) | 327 |
| Servicer and MBS trust payable | 25,872 | (16,600) | 9,272 |
| Other liabilities | 24,586 | (14,573) | 10,013 |
| Total liabilities | 884,422 | 2,373,796 | 3,258,218 |
| Fannie Mae's stockholders' equity (deficit): | | | |
| Senior preferred stock | 60,900 | — | 60,900 |
| Preferred stock | 20,348 | — | 20,348 |
| Common stock | 664 | — | 664 |
| Additional paid-in capital | 2,083 | — | 2,083 |
| Accumulated deficit | (90,237) | 6,706 | (83,531) |
| Accumulated other comprehensive loss | (1,732) | (3,394) | (5,126) |
| Treasury stock | (7,398) | — | (7,398) |
| Total Fannie Mae stockholders' deficit | (15,372) | 3,312 | (12,060) |
| Noncontrolling interest | 91 | (14) | 77 |
| Total equity (deficit) | (15,281) | 3,298 | (11,983) |
| Total liabilities and equity (deficit) | $869,141 | $2,377,094 | $3,246,235 |

In the following sections, we describe the impacts to our consolidated balance sheet at the transition date in the context of the three categories of transition adjustments noted above.

### *Net Recognition of the Assets and Liabilities of Newly Consolidated Entities*

At the transition date, the majority of the net increase to both total assets and total liabilities resulted from the recognition of the assets and liabilities of newly consolidated trusts. This includes the impact of derecognizing our investments in Fannie Mae MBS issued from newly consolidated trusts. We describe the impacts to our consolidated balance sheet resulting from the recognition of the assets and liabilities of newly consolidated trusts below.

F-39

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Investments in Securities*

At the transition date, we derecognized $66.3 billion and $122.3 billion in investments in securities classified as trading and AFS, respectively. The net transition impact to our investments in securities was driven both by the derecognition of investments in Fannie Mae MBS issued by the newly consolidated trusts and the recognition of mortgage-related securities held by the newly consolidated trusts. We derecognized from our consolidated balance sheet investments in the Fannie Mae MBS issued by the newly consolidated trusts as these investments represent debt securities that are both debt of the consolidated trusts and investments in our portfolio and therefore represent intercompany activity. Such investments act to reduce the debt held by third parties in our consolidated balance sheets. We also derecognized the accrued interest receivable and net unrealized gains related to securities that we derecognized at transition.

Additionally, we recognized mortgage-related securities at transition in situations where trusts that were previously consolidated in our consolidated balance sheets deconsolidated under the new accounting standards. Upon deconsolidation of these trusts, we derecognized the collateral of the trusts (that is, mortgage loans) and recognized our investment in securities issued from the trusts in our consolidated balance sheet.

The table below presents the impact at the transition date to our investments in securities.

| | As of December 31, 2009 | Transition Impact | As of January 1, 2010 |
|---|---|---|---|
| | (Dollars in millions) | | |
| Mortgage-related securities: | | | |
| Fannie Mae .................................. | $229,169 | $(189,360) | $ 39,809 |
| Freddie Mac.................................. | 42,551 | — | 42,551 |
| Ginnie Mae .................................. | 1,354 | (21) | 1,333 |
| Alt-A private-label securities .................... | 15,505 | 533 | 16,038 |
| Subprime private-label securities.................. | 12,526 | (118) | 12,408 |
| CMBS........................................ | 22,528 | — | 22,528 |
| Mortgage revenue bonds ........................ | 13,446 | 21 | 13,467 |
| Other mortgage-related securities ................. | 3,706 | 366 | 4,072 |
| Total mortgage-related securities ................ | 340,785 | (188,579) | 152,206 |
| Total non-mortgage-related securities ............... | 8,882 | — | 8,882 |
| Total investments in securities ..................... | $349,667 | $(188,579) | $161,088 |

*Mortgage Loans*

At the transition date, the recognition of loans held by the newly consolidated trusts resulted in an increase in "Mortgage loans held for investment of consolidated trusts." Loans held by consolidated trusts are generally classified as HFI in our consolidated balance sheets. Prior to the transition date, we reported mortgage loans held both by us in our mortgage portfolio and those held by consolidated trusts collectively as "Mortgage loans held for investment" in our consolidated balance sheets. Effective at the transition date, we report loans held by us as "Mortgage loans held for investment of Fannie Mae" and loans held by consolidated trusts as "Mortgage loans held for investment of consolidated trusts." Prior period amounts have been reclassified to conform to our current period presentation.

The recognition of the mortgage loans held by newly consolidated trusts also resulted in an increase in "Accrued interest receivable of consolidated trusts." This increase was offset in part by an increase to "Allowance for accrued interest receivable," which represents estimated incurred losses on our accrued interest. Prior to the transition date, incurred losses on interest of unconsolidated trusts were reported as a

F-40

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

portion of our "Reserve for guaranty losses." Prior to the transition date, we reported the accrued interest receivable relating to loans held by consolidated trusts as a component of "Accrued interest receivable." Prior period amounts have been reclassified to conform to our current period presentation.

The table below presents the impact to the unpaid principal balance of our mortgage loans at the transition date.

| | As of December 31, 2009 | | Transition Impact | | As of January 1, 2010 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Of Fannie Mae | Of Consolidated Trusts | Of Fannie Mae | Of Consolidated Trusts | Of Fannie Mae | Of Consolidated Trusts |
| | (Dollars in millions) | | | | | |
| **Single-family:** | | | | | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . | $ 51,454 | $ 945 | $ — | $ 1 | $ 51,454 | $ 946 |
| Conventional: | | | | | | |
| Long-term fixed-rate . . . . . . . . . | 90,245 | 89,409 | (5,272) | 2,029,932 | 84,973 | 2,119,341 |
| Intermediate-term fixed-rate . . . . | 8,069 | 21,405 | (178) | 318,329 | 7,891 | 339,734 |
| Adjustable-rate . . . . . . . . . . . . . | 16,889 | 17,713 | (2) | 190,706 | 16,887 | 208,419 |
| Total single-family conventional . . . | 115,203 | 128,527 | (5,452) | 2,538,967 | 109,751 | 2,667,494 |
| Total single-family . . . . . . . . | $166,657 | $129,472 | $(5,452) | $2,538,968 | $161,205 | $2,668,440 |
| **Multifamily:** | | | | | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . | $ 585 | $ — | $ — | $ — | $ 585 | $ — |
| Conventional: | | | | | | |
| Long-term fixed-rate . . . . . . . . . | 4,937 | 790 | — | 3,752 | 4,937 | 4,542 |
| Intermediate-term fixed-rate . . . . | 81,456 | 10,304 | — | 35,672 | 81,456 | 45,976 |
| Adjustable-rate . . . . . . . . . . . . . | 21,535 | 807 | — | 5,603 | 21,535 | 6,410 |
| Total multifamily conventional . . . . | 107,928 | 11,901 | — | 45,027 | 107,928 | 56,928 |
| Total multifamily . . . . . . . . . | $108,513 | $ 11,901 | $ — | $ 45,027 | $108,513 | $ 56,928 |

*Allowance for Loan Losses and Reserve for Guaranty Losses*

We maintain an allowance for loan losses related to HFI loans reported in our consolidated balance sheets and a reserve for guaranty losses related to loans held by unconsolidated trusts. Upon recognition of the mortgage loans held by newly consolidated trusts at the transition date, we increased our "Allowance for loan losses" and decreased our "Reserve for guaranty losses." The overall decrease in the combined reserves represents a difference in the methodology used to estimate incurred losses for our allowance for loan losses versus our reserve for guaranty losses. Our guaranty reserve considers all contractually past due interest income including payments expected to be missed between the balance sheet date and the point of loan acquisition or foreclosure, however, for our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which only includes interest income accrued while the loan was on accrual status. We recognize the portion of the allowance related to principal as our "Allowance for loan losses" and the portion of the allowance related to accrued interest as our "Allowance for accrued interest receivable." We continue to record a reserve for guaranty losses related to loans in unconsolidated trusts and loans that we have guaranteed under long-term standby commitments, which require us to purchase loans from lenders if the loans meet certain delinquency criteria. See "Note 5, Allowance for Loan Losses and Reserve for Guaranty Losses" for additional information.

F-41

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Short-Term Debt and Long-Term Debt*

At the transition date, we recognized an increase of $6.4 billion in "Short-term debt of consolidated trusts" and $2.4 trillion in "Long-term debt of consolidated trusts." The debt of consolidated trusts represents the amount of Fannie Mae debt securities issued by such trusts and held by third-party certificateholders. We recognized an increase of $10.6 billion in "Accrued interest payable of consolidated trusts," which represents the interest expense accrued as of the transition date on the long-term debt of the newly consolidated trusts.

Prior to the transition date, we reported debt issued both by us and by consolidated trusts collectively as either "Short-term debt" or "Long-term debt." Effective at the transition date, we report debt issued by us as either "Short-term debt of Fannie Mae" or "Long-term debt of Fannie Mae." We report the debt of consolidated trusts as either "Short-term debt of consolidated trusts" or "Long-term debt of consolidated trusts." Prior period amounts have been reclassified to conform to our current period presentation.

*Servicer and MBS Trust Receivable and Payable*

At the transition date we recognized a net decrease of $17.1 billion in "Servicer and MBS trust receivable." Prior to our adoption of the new accounting standards, we recorded a receivable from unconsolidated trusts, net of a valuation allowance, when a delinquency advance was made to the trust. This receivable now represents intercompany activity that we eliminate for the purpose of our consolidated financial statements.

We also recognized a decrease of $16.6 billion in "Servicer and MBS trust payable," which consisted of two components. First, we have the option to purchase loans and foreclosed properties from the trust when certain contingencies have been met. At December 31, 2009, we recorded a payable to the trust for loans and foreclosed properties that had been purchased during the month of December. Second, prior to the consolidation of certain out of portfolio trusts, we recognized a loan in our consolidated balance sheets at fair value and recorded a corresponding liability to the unconsolidated trust when the contingency on our option to purchase loans from the trust had been met. These payables now represent intercompany activity that we eliminate for the purpose of our consolidated financial statements.

*Restricted Cash*

At the transition date, "Restricted cash" increased by $45.6 billion to record cash payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders that have been determined to be restricted for use.

*Federal Funds Sold and Securities Purchased Under Agreements to Resell or Similar Arrangements*

At the transition date, we recognized a decrease of $316 million in "Federal funds sold and securities purchased under agreements to resell or similar arrangements" relating to dollar roll transactions that utilized Fannie Mae MBS. As a result of the dollar roll transactions, we held investments in Fannie Mae MBS in our consolidated balance sheet as of December 31, 2009 that were issued from trusts that subsequently consolidated at the transition date. Similar to our treatment of Fannie Mae MBS classified as trading or AFS, we eliminated our secured financing receivable related to these dollar roll transactions and recharacterized the transfer of the Fannie Mae MBS as debt extinguishment in our consolidated financial statements.

**Accounting for Portfolio Securitizations**

At the transition date, we reclassified the majority of our HFS mortgage loans to HFI due to the change in our accounting for portfolio securitizations. Prior to our adoption of the new accounting standards, we classified mortgage loans acquired with the intent to securitize as HFS in our consolidated balance sheets as the majority of the transfers of mortgage loans under portfolio securitization transactions qualified as sales under the

TREASURY-0536

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

previous accounting standards. Under the new accounting standards, the transfer of mortgage loans through portfolio securitization transactions will generally not result in the derecognition of mortgage loans, thus we have classified the loans as HFI.

Certain mortgage loans continue to be classified as HFS in our consolidated balance sheets, consistent with our intent to securitize and transfer the mortgage loans to an MBS trust that we will not consolidate.

### Elimination of Accounting for Guarantees

At the transition date, we made adjustments relating to our accounting for guarantees and master servicing. We describe the impact of the new accounting standards on our accounting for guarantees and master servicing below.

#### Guaranty Accounting

We continue to guarantee to our MBS trusts that we will supplement amounts received by the trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS, regardless of their consolidation status. However, for consolidated trusts, our guarantee to the trust represents an intercompany activity that must be eliminated for purposes of our consolidated financial statements. Thus, upon consolidation of the trusts, we eliminated the related guaranty asset, guaranty obligation, buy-up, buy-down and risk-based price adjustments from our consolidated balance sheet. This transition adjustment is included in "Other assets" and "Other liabilities". We continue to record guaranty assets and guaranty obligations in our consolidated balance sheets relating to unconsolidated trusts.

#### Master Servicing

The transition adjustment to our "Other assets" and "Other liabilities" includes the derecognition of the portion of our master servicing asset and master servicing liability relating to newly consolidated trusts, which represents intercompany activity.

### Impact on Statements of Operations

Our adoption of the new accounting standards affects how certain income and expense items are reported in our consolidated statements of operations on an ongoing basis. We explain the key impacts below.

### Interest Income on Mortgage Loans

The interest income earned on mortgage loans held by the newly consolidated trusts is recorded in our consolidated statements of operations as loan interest income. This interest income was not recorded in our consolidated statements of operations prior to the transition date as the trusts were not consolidated.

Prior to our adoption of the new accounting standards, we reported interest income on mortgage loans held both by us and by consolidated trusts collectively as "Interest income on mortgage loans." Effective at the transition date, we report interest income on loans held by us as "Interest income on mortgage loans of Fannie Mae" and interest income on loans held by consolidated trusts as "Interest income on mortgage loans of consolidated trusts." Prior period amounts have been reclassified to conform to our current period presentation. "Interest income on mortgage loans of Fannie Mae" is not impacted by our adoption of the new accounting standards.

TREASURY-0537

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Interest Expense on Short-Term and Long-Term Debt*

The interest expense incurred on debt of newly consolidated trusts is recorded in our consolidated statements of operations as interest expense on short-term and long-term debt. This interest expense was not recorded in our consolidated statements of operations prior to the transition date as the trusts were not consolidated.

Prior to our adoption of the new accounting standards, we reported interest expense on debt issued both by us and by consolidated trusts as either "Interest expense on short-term debt" or "Interest expense on long-term debt." Effective at the transition date, we report interest expense as either "Interest expense on debt of Fannie Mae" or "Interest expense on debt of consolidated trusts." Prior period amounts have been reclassified to conform to our current period presentation. "Interest expense on debt of Fannie Mae" is not impacted by our adoption of the new accounting standards.

*Provision for Loan Losses and Provision for Guaranty Losses*

Since the majority of our MBS trusts were consolidated at the transition date, the provision for loan losses recorded in periods after the transition date reflects the increase in the mortgage loans reported in our consolidated balance sheets. The provision for guaranty losses recorded in periods after the transition date reflects the subsequent decrease in unconsolidated trusts. As our guaranty-related assets and liabilities pertaining to consolidated trusts were also eliminated, we no longer record amortization income or fair value adjustments related to these trusts. The guaranty fee income that continues to be recognized in our consolidated statements of operations relates to guarantees to unconsolidated trusts and other credit enhancements that we have provided.

*Debt Extinguishment Gains (Losses)*

Upon purchase of Fannie Mae MBS debt securities issued from a consolidated trust for our mortgage portfolio, we extinguish the related debt issued by the consolidated trust as we now own the debt securities instead of a third party. We record debt extinguishment gains or losses related to debt of consolidated trusts to the extent that the purchase price of the debt security does not equal the carrying value of the related consolidated debt reported in our consolidated balance sheet at the time of purchase.

*Trust Management Income*

As master servicer, issuer, and trustee for Fannie Mae MBS, we earn a fee that reflects interest earned on cash flows from the date of remittance of mortgage and other payments to us by the servicers until the date of distribution of these payments to the MBS certificateholders. Previously, we reported this compensation as "Trust management income" in our consolidated statements of operations. Upon adoption of the new accounting standards, we report the trust management income earned by consolidated trusts as a component of net interest income in our consolidated statements of operations. Trust management income earned by us relating to unconsolidated trusts is now reported as a component of "Fee and other income." Prior period amounts have been reclassified to conform to our current period presentation.

F-44

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Impact on Segment Reporting**

As a result of our adoption of the new accounting standards, we changed the presentation of segment financial information that is currently evaluated by management. With this change, the sum of the results for our three segments does not equal our consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments.

Our three reportable segments continue to be: Single-Family, Multifamily (formerly "HCD"), and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is measured based on the type of business activities it performs.

We have not restated prior period results nor have we presented current year results under the old presentation as we determined that it was impracticable to do so; therefore, our segment results reported in the current period are not comparable with prior periods.

We present our segment results in "Note 15, Segment Reporting."

**3.  Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be VIEs. The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests also include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. Our adoption of the new accounting standards on the transfers of financial assets and consolidation of VIEs resulted in the majority of our single-class securitization trusts being consolidated by us.

*Types of VIEs*

*Securitization Trusts*

Under our lender swap and portfolio securitization transactions, mortgage loans are transferred to a trust specifically for the purpose of issuing a single class of guaranteed securities that are collateralized by the underlying mortgage loans. The trust's permitted activities include receiving the transferred assets, issuing beneficial interests, establishing the guaranty and servicing the underlying mortgage loans. In our capacity as issuer, master servicer, trustee and guarantor, we earn fees for our obligations to each trust. Additionally, we may retain or purchase a portion of the securities issued by each trust. We have securitized mortgage loans since 1981.

In our structured securitization transactions, we earn fees for assisting lenders and dealers with the design and issuance of structured mortgage-related securities. The trusts created in these transactions have permitted activities that are similar to those for our lender swap and portfolio securitization transactions. The assets of these trusts may include mortgage-related securities and/or mortgage loans. The trusts created for Fannie Mae Mega securities issue single-class securities while the trusts created for REMIC, grantor trust and SMBS securities issue single-class and multi-class securities, the latter of which separate the cash flows from underlying assets into separately tradable interests. Our obligations and continued involvement in these trusts are similar to those described for lender swap and portfolio securitization transactions. We have securitized mortgage assets in structured transactions since 1986.

We also invest in mortgage-backed and asset-backed securities that have been issued via private-label trusts. These trusts are structured to provide investors with a beneficial interest in a pool of receivables or other financial assets, typically mortgage loans, credit card receivables, auto loans or student loans. The trusts act as

F-45

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

vehicles to allow loan originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. The originators of the financial assets or the underwriters of the transaction create the trusts and typically own the residual interest in the trusts' assets. Our involvement in these entities is typically limited to our recorded investment in the beneficial interests that we have purchased. We have invested in these vehicles since 1987.

*Limited Partnerships*

We have historically made equity investments in various limited partnerships that sponsor affordable housing projects utilizing the low-income housing tax credit pursuant to Section 42 of the Internal Revenue Code. The purpose of these investments is to increase the supply of affordable housing in the United States and to serve communities in need. In addition, our investments in LIHTC partnerships generate both tax credits and net operating losses that may reduce our federal income tax liability. Our LIHTC investments primarily represent limited partnership interests in entities that have been organized by a fund manager who acts as the general partner. These fund investments seek out equity investments in LIHTC operating partnerships that have been established to identify, develop and operate multifamily housing that is leased to qualifying residential tenants.

During 2009, we explored options to sell or otherwise transfer our LIHTC investments for value consistent with our mission. On February 18, 2010, FHFA informed us that after consultation with Treasury, we were not authorized to sell or transfer our LIHTC partnership interests. The carrying value of our LIHTC "Partnership investments" was reduced to zero in the consolidated financial statements as of December 31, 2009, as we no longer had both the intent and ability to sell or otherwise transfer our LIHTC investments for value.

We recognized $145 million, $5.9 billion and $795 million for the years ended December 31, 2010, 2009 and 2008, respectively, of other-than-temporary impairment losses related to our limited partnerships in "Losses from partnership investments" in our consolidated statements of operations. We no longer recognize net operating losses or impairment on our LIHTC investments, since the carrying value was reduced to zero.

As of December 31, 2010, we have an obligation to fund $280 million in capital contributions. This obligation has been recorded as a component of "Other liabilities" in our consolidated balance sheet. As a result of our current tax position, we did not make any LIHTC investments in 2010 other than pursuant to existing prior commitments. We are not currently recognizing the tax benefits associated with the tax credits and net operating losses in our consolidated financial statements.

**Consolidated VIEs**

Upon adoption of the new accounting standards, if an entity is a VIE, we consider whether our variable interest in that entity causes us to be the primary beneficiary. The primary beneficiary of the VIE is required to consolidate and account for the assets, liabilities and noncontrolling interests of the VIE in its consolidated financial statements. An enterprise is deemed to be the primary beneficiary when the enterprise has the power to direct the activities of the VIE that most significantly impact the entity's economic performance and exposure to benefits and/or losses could potentially be significant to the entity.

The following table displays the assets and liabilities of consolidated VIEs in our consolidated balance sheets as of December 31, 2010 and 2009. The difference between total assets of consolidated VIEs and total liabilities of consolidated VIEs is primarily due to our investment in the debt securities of consolidated VIEs.

TREASURY-0540

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In general, the investors in the obligations of consolidated VIEs have recourse only to the assets of those VIEs and do not have recourse to us, except where we provide a guaranty to the VIE.

| | As of December 31, | |
|---|---|---|
| | 2010[1] | 2009[1] |
| | (Dollars in millions) | |
| **Assets:** | | |
| Cash and cash equivalents | $ 348 | $ 2,092 |
| Restricted cash | 59,619 | — |
| Trading securities | 21 | 5,599 |
| Available-for-sale securities | 1,055 | 10,513 |
| Loans held for sale | 661 | 11,646 |
| Loans held for investment | 2,577,133 | 129,590 |
| Accrued interest receivable | 9,349 | 519 |
| Servicer and MBS trust receivable | 593 | 466 |
| Other assets[2] | — | 451 |
| Total assets of consolidated VIEs | $2,648,779 | $160,876 |
| **Liabilities:** | | |
| Accrued interest payable | $ 9,712 | $ 29 |
| Short-term debt | 5,359 | — |
| Long-term debt | 2,411,597 | 6,167 |
| Servicer and MBS trust payable | 562 | 850 |
| Other liabilities[3] | 331 | 385 |
| Total liabilities of consolidated VIEs | $2,427,561 | $ 7,431 |

---

[1] Includes VIEs created through lender swaps, private label wraps and portfolio securitization transactions.

[2] Includes partnership investments of $430 million and cash, cash equivalents and restricted cash of $21 million in limited partnerships as of December 31, 2009.

[3] Includes partnership liabilities of $385 million as of December 31, 2009.

The adoption of the new accounting standards resulted in significant changes in the consolidation status of VIEs. Refer to "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for additional information regarding the impact of transition.

In addition to the VIEs consolidated as a result of initially adopting the new accounting standards, we consolidated VIEs as of December 31, 2010 that were not consolidated as of December 31, 2009. These VIEs are Fannie Mae multi-class resecuritization trusts and were consolidated because we now hold in our portfolio a substantial portion of the certificates. As a result of consolidating these multi-class resecuritization trusts, which had combined total assets of $3.9 billion in unpaid principal balance as of December 31, 2010, we derecognized our investment in these trusts and recognized the assets and liabilities of the consolidated trusts at their fair value.

As of December 31, 2009, we consolidated VIEs that were no longer consolidated as of December 31, 2010, excluding the impact of adopting the new accounting standards. These VIEs were Fannie Mae multi-class resecuritization trusts and were deconsolidated because we no longer hold in our portfolio a substantial portion of the certificates. As a result of deconsolidating these multi-class resecuritization trusts, which had combined total assets of $855 million in unpaid principal balance as of December 31, 2009, we derecognized the assets and liabilities of the trusts and recognized at fair value our retained interests as securities in our consolidated balance sheet.

F-47

TREASURY-0541

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

For the years ended December 31, 2010 and 2009, we recognized a loss of $3 million and a gain of $171 million, respectively, upon deconsolidation of VIEs. We recognize these amounts as a component of "Investment gains (losses), net" in our consolidated statements of operations.

### *Unconsolidated VIEs*

We also have investments in VIEs that we do not consolidate because we are not deemed to be the primary beneficiary. These unconsolidated VIEs include securitization trusts, as well as other equity investments. The following table displays the total assets as of December 31, 2010 and 2009 of unconsolidated VIEs with which we are involved.

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (Dollars in millions) | |
| Mortgage-backed trusts | $ 732,368 | $3,044,516 |
| Asset-backed trusts | 363,721 | 484,703 |
| Limited partnership investments | 13,102 | 13,085 |
| Mortgage revenue bonds and other credit-enhanced bonds | 8,019 | 8,061 |
| Total assets of unconsolidated VIEs | $1,117,210 | $3,550,365 |

The following table displays the carrying amount and classification of the assets and liabilities as of December 31, 2010 and 2009 and the maximum exposure to loss as of December 31, 2010 related to our variable interests in unconsolidated VIEs with which we are involved.

|  | As of December 31, | | |
|---|---|---|---|
|  | 2010 | | 2009 |
|  | Carrying Amount | Maximum Exposure to Loss | Carrying Amount[1] |
|  | (Dollars in millions) | | |
| **Assets:** | | | |
| Available-for-sale securities[2] | $ 84,770 | $67,367 | $190,135 |
| Trading securities[2] | 29,342 | 27,627 | 91,222 |
| Guaranty assets | 246 | — | 8,195 |
| Partnership investments | 94 | 319 | 144 |
| Servicer and MBS trust receivable | 11 | 11 | 15,903 |
| Other assets | — | — | 1,320 |
| Total assets related to our interests in unconsolidated VIEs | $114,463 | $95,324 | $306,919 |
| **Liabilities:** | | | |
| Reserve for guaranty losses | $ 291 | $ — | $ 52,703 |
| Guaranty obligations | 469 | 21,318 | 13,504 |
| Partnership liabilities | 170 | — | 325 |
| Servicer and MBS trust payable | 13 | 2 | 20,371 |
| Other liabilities | — | — | 818 |
| Total liabilities related to our interest in unconsolidated VIEs | $ 943 | $21,320 | $ 87,721 |

---

[1] Includes VIEs created through lender swaps and portfolio securitization transactions. Our total maximum exposure to loss relating to unconsolidated VIEs was $2.6 trillion as of December 31, 2009.

[2] Contains securities exposed through consolidation which may also represent an interest in other unconsolidated VIEs.

F-48

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

*Transfers of Financial Assets*

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the years ended December 31, 2010, 2009 and 2008 the unpaid principal balance of portfolio securitizations was $120.0 billion, $216.1 billion and $41.1 billion, respectively.

Upon adoption of the new accounting standards, the majority of our portfolio securitization transactions do not qualify for sale treatment. As a result, our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts has been greatly reduced and is no longer material. We report the assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our consolidated balance sheets and in the consolidated VIEs table above.

To determine the fair value of our securities created via portfolio securitizations, we utilize several independent pricing services. The prices we receive from pricing services are typically based on information they obtain on current trading activity, but may be based on models where trading activity is not observed. We evaluate the reasonableness of fair value estimates obtained from pricing services through multiple means, including our internal price verification group which uses alternate forms of pricing information to validate the prices. Given that we do not base prices for the retained securities on internal models, but rather base them on observable market inputs obtained by our pricing services, we believe it would not be meaningful to provide sensitivities to changes in assumptions on the fair value of the retained securities.

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

|  | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS |
|---|---|---|
|  | (Dollars in millions) | |
| **As of December 31, 2010** | | |
| Unpaid principal balance | $ 63 | $ 15,771 |
| Fair value | 68 | 16,745 |
| Weighted-average coupon | 6.58% | 6.28% |
| Weighted-average loan age | 4.2 years | 4.4 years |
| Weighted-average maturity | 25.6 years | 22.0 years |
| **As of December 31, 2009** | | |
| Unpaid principal balance | $ 34,260 | $ 19,472 |
| Fair value | 35,455 | 20,224 |
| Weighted-average coupon | 5.62% | 6.82% |
| Weighted-average loan age | 2.9 years | 4.6 years |
| Weighted-average maturity | 24.2 years | 26.1 years |

For the years ended December 31, 2010, 2009 and 2008, the principal and interest received on retained interests was $3.5 billion, $9.7 billion and $7.9 billion, respectively.

TREASURY-0543

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. As noted above, our adoption of the new accounting standards resulted in a significant increase in mortgage loans held for investment and a decrease in loans held for sale on our consolidated balance sheets, as well as a decrease in the amount of loans securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that are delinquent as of December 31, 2010 and 2009.

|  | Unpaid Principal Balance | Principal Amount of Delinquent Loans |
|---|---|---|
|  | (Dollars in millions) | |
| **As of December 31, 2010** | | |
| Loans held for investment | | |
| Of Fannie Mae | $ 423,686 | $141,342 |
| Of consolidated trusts | 2,565,347 | 34,080 |
| Loans held for sale | 964 | 127 |
| Securitized loans | 2,147 | 78 |
| Total loans managed | $2,992,144 | $175,627 |
| **As of December 31, 2009** | | |
| Loans held for investment | $ 395,551 | $ 51,051 |
| Loans held for sale | 20,992 | 140 |
| Securitized loans | 187,922 | 5,161 |
| Total loans managed | $ 604,465 | $ 56,352 |

*Qualifying Sales of Portfolio Securitizations*

The gain or loss on a portfolio securitization transaction that qualifies as a sale depends, in part, on the carrying amount of the financial assets sold. Prior to January 1, 2010, we allocated the carrying amount of the financial assets sold between the assets sold and the interests retained, if any, based on their relative fair value at the date of sale. Further, we recognized our recourse obligations at their full fair value at the date of sale, which serves as a reduction of sale proceeds in the gain or loss calculation.

Beginning January 1, 2010, we recognize all assets obtained and all liabilities incurred in a portfolio securitization at fair value. We recorded a net gain on portfolio securitizations of $26 million, $1.0 billion and $49 million for the years ended December 31, 2010, 2009 and 2008, respectively. We recognize these amounts as a component of "Investment gains (losses), net" in our consolidated statements of operations. We recognized proceeds from the initial sale of securities from portfolio securitizations of $660 million, $85.7 billion and $30.1 billion for the years ended December 31, 2010, 2009 and 2008, respectively.

**4.   Mortgage Loans**

We own both single-family mortgage loans, which are secured by four or fewer residential dwelling units, and multifamily mortgage loans, which are secured by five or more residential dwelling units. We classify these loans as either HFI or HFS. We report HFI loans at the unpaid principal balance, net of unamortized premiums and discounts, other cost basis adjustments, and an allowance for loan losses. We report HFS loans at the lower of cost or fair value determined on a pooled basis, and record valuation changes in our consolidated statements of operations. Our prospective adoption on December 31, 2010 of a new accounting

F-50

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

standard on disclosures regarding the credit quality of financing receivables and the allowance for credit losses had a significant impact on the presentation and comparability of our loan and allowance related disclosures.

The following table displays our mortgage loans as of December 31, 2010 and 2009.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2010 | | | December 31, 2009[1] | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family . . . . . . . . . . . . . . . . . . . . | $328,824 | $2,490,623 | $2,819,447 | $166,657 | $129,472 | $296,129 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . | 95,157 | 75,393 | 170,550 | 108,513 | 11,901 | 120,414 |
| Total unpaid principal balance of mortgage loans . . . . . . . . . . . . . . . . | 423,981 | 2,566,016 | 2,989,997 | 275,170 | 141,373 | 416,543 |
| Unamortized premiums (discounts) and other cost basis adjustments, net . . . . . . | (16,470) | 11,786 | (4,684) | (11,196) | 28 | (11,168) |
| Lower of cost or fair value adjustments on loans held for sale . . . . . . . . . . . . . . | (28) | (9) | (37) | (729) | (160) | (889) |
| Allowance for loan losses for loans held for investment . . . . . . . . . . . . . . . . . . | (48,530) | (13,026) | (61,556) | (8,078) | (1,847) | (9,925) |
| Total mortgage loans . . . . . . . . . . . | $358,953 | $2,564,767 | $2,923,720 | $255,167 | $139,394 | $394,561 |

_____

[1]   Certain prior period amounts have been reclassified to conform to the current period presentation.

For the year ended December 31, 2010, we did not redesignate loans between HFI and HFS other than at the transition date. For the year ended December 31, 2009, we redesignated loans with a carrying value of $1.2 billion from HFS to HFI. We redesignated $8.5 billion of HFI loans to HFS for the year ended December 31, 2009.

The following table displays an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of December 31, 2010. For purposes of this table, each loan in our portfolio is included in only one segment and class category.

| | As of December 31, 2010[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-Family: | | | | | | | | |
| Primary[3] . . . . . | $47,048 | $18,055 | $ 93,302 | $158,405 | $2,299,080 | $2,457,485 | $139 | $110,758 |
| Government[4] . . . | 125 | 58 | 371 | 554 | 51,930 | 52,484 | 354 | — |
| Alt-A . . . . . . . . | 8,547 | 4,097 | 37,557 | 50,201 | 156,951 | 207,152 | 21 | 41,566 |
| Other[5] . . . . . . . | 3,785 | 1,831 | 15,290 | 20,906 | 84,473 | 105,379 | 80 | 17,022 |
| Total Single-Family . . . . | 59,505 | 24,041 | 146,520 | 230,066 | 2,592,434 | 2,822,500 | 594 | 169,346 |
| Multifamily[6] . . . . | 382 | NA | 1,132 | 1,514 | 171,000 | 172,514 | — | 1,012 |
| Total . . . . . . | $59,887 | $24,041 | $147,652 | $231,580 | $2,763,434 | $2,995,014 | $594 | $170,358 |

_____

[1]   Recorded investment consists of unpaid principal balance, net of unamortized premiums and discounts, other cost basis and fair value adjustments and accrued interest receivable on HFI loans, excluding loans for which we have elected the fair value option.

[2]   Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

F-51

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(3) Consists of mortgage loans that are not included in other loan classes.

(4) Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and included in the current column.

(5) Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

(6) Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

The recorded investment in loans over 90 days delinquent and accruing interest was $612 million as of December 31, 2009. The carrying value of all nonaccrual loans was $34.1 billion as of December 31, 2009.

### *Individually Impaired Loans*

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following table displays the total recorded investment, unpaid principal balance, related allowance, average recorded investment and interest income recognized as of December 31, 2010 for individually impaired loans, excluding loans for which we have elected the fair value option.

| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
|---|---|---|---|---|---|---|---|
| | As of December 31, 2010 | | | | | For the Year Ended December 31, 2010 | |
| | (Dollars in millions) | | | | | | |
| Individually impaired loans: | | | | | | | |
| With related allowance recorded | | | | | | | |
| Single-family | | | | | | | |
| Primary[3] . . . . . . . . . . . . . | $ 99,838 | $ 93,024 | $23,565 | $ 772 | $ 81,258 | $3,314 | $1,470 |
| Government[4] . . . . . . . . . . | 240 | 248 | 38 | 7 | 141 | 9 | — |
| Alt-A . . . . . . . . . . . . . . . . . | 30,932 | 28,253 | 9,592 | 368 | 25,361 | 897 | 407 |
| Other[5] . . . . . . . . . . . . . . . | 14,429 | 13,689 | 4,479 | 137 | 12,094 | 384 | 204 |
| Total single-family . . . . . . . | 145,439 | 135,214 | 37,674 | 1,284 | 118,854 | 4,604 | 2,081 |
| Multifamily . . . . . . . . . . . . . . | 2,372 | 2,371 | 556 | 23 | 1,496 | 202 | 10 |
| Total individually impaired loans with related allowance recorded . . . . . . . . . . . . . . | 147,811 | 137,585 | 38,230 | 1,307 | 120,350 | 4,806 | 2,091 |
| With no related allowance recorded[6] | | | | | | | |
| Single-family | | | | | | | |
| Primary[3] . . . . . . . . . . . . . | 10,586 | 7,237 | — | — | 7,860 | 336 | 55 |
| Government[4] . . . . . . . . . . | 19 | 13 | — | — | 11 | 8 | — |
| Alt-A . . . . . . . . . . . . . . . . . | 3,600 | 1,884 | — | — | 2,091 | 121 | 20 |
| Other[5] . . . . . . . . . . . . . . . | 879 | 512 | — | — | 589 | 36 | 7 |
| Total single-family . . . . . . . | 15,084 | 9,646 | — | — | 10,551 | 501 | 82 |
| Multifamily . . . . . . . . . . . . . . | 789 | 811 | — | — | 642 | 71 | 5 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . . | 15,873 | 10,457 | — | — | 11,193 | 572 | 87 |
| Total individually impaired loans[7] . . . . . . . . . . . . . . . . | $163,684 | $148,042 | $38,230 | $1,307 | $131,543 | $5,378 | $2,178 |

F-52

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

---

[1] Consists of unpaid principal balance, net of unamortized premiums and discounts, other cost basis and fair value adjustments and accrued interest receivable on HFI loans, excluding loans for which we have elected the fair value option.

[2] Total single-family interest income recognized of $5.1 billion consists of $3.9 billion of contractual interest and $1.3 billion of effective yield adjustments.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[5] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] The discounted cash flows, collateral value or fair value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

[7] Includes single-family loans restructured in a TDR with a recorded investment of $140.1 billion as of December 31, 2010. Includes multifamily loans restructured in a TDR with a recorded investment of $939 million as of December 31, 2010.

The following table displays the recorded investment and corresponding specific loss allowance as of December 31, 2009 for all impaired loans.

|  | As of December 31, 2009 | | |
|---|---|---|---|
|  | Recorded Investment | Allowance | Net Investment |
|  | (Dollars in millions) | | |
| Impaired loans:[1] |  |  |  |
| With valuation allowance | $27,050 | $5,995 | $21,055 |
| Without valuation allowance[2] | 8,420 | — | 8,420 |
| Total | $35,470 | $5,995 | $29,475 |

---

[1] Includes single-family loans restructured in a TDR with a recorded investment of $23.9 billion as of December 31, 2009. Includes multifamily loans restructured in a TDR with a recorded investment of $51 million as of December 31, 2009.

[2] The discounted cash flows, collateral value or fair value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

The average recorded investment in impaired loans was $13.3 billion and $4.8 billion for the years ended December 31, 2009 and 2008. Interest income recognized on impaired loans was $532 million and $251 million for the years ended December 31, 2009 and 2008, respectively.

TREASURY-0547

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Loans Acquired in a Transfer*

We acquired delinquent loans from unconsolidated trusts and long-term standby commitments with an unpaid principal balance plus accrued interest of $279 million, $36.4 billion and $4.5 billion for the years ended December 31, 2010, 2009 and 2008, respectively. The following table displays the outstanding balance and carrying amount of acquired credit-impaired loans as of December 31, 2010 and 2009, excluding loans that were modified as TDRs subsequent to their acquisition from MBS trusts.

| | As of December 31, | |
| --- | --- | --- |
| | **2010** | **2009** |
| | (Dollars in millions) | |
| Outstanding contractual balance | $8,519 | $24,106 |
| Carrying amount: | | |
| Loans on accrual status | 2,029 | 2,560 |
| Loans on nonaccrual status | 2,449 | 8,952 |
| Total carrying amount of loans | $4,478 | $11,512 |

The following table displays details on acquired credit-impaired loans at their acquisition dates for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Contractually required principal and interest payments at acquisition[1] | $321 | $39,197 | $5,034 |
| Nonaccretable difference | 154 | 9,234 | 783 |
| Cash flows expected to be collected at acquisition[1] | 167 | 29,963 | 4,251 |
| Accretable yield | 76 | 13,852 | 1,805 |
| Initial investment in acquired credit-impaired loans at acquisition | $ 91 | $16,111 | $2,446 |

---

[1] Contractually required principal and interest payments at acquisition and cash flows expected to be collected at acquisition are adjusted for the estimated timing and amount of prepayments.

The following table displays activity for the accretable yield of all outstanding acquired credit-impaired loans for the years ended December 31, 2010, 2009 and 2008. Accreted effective interest is shown for only those loans that we were still accounting for as acquired credit-impaired loans for the respective periods.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Beginning balance, January 1 | $10,117 | $ 1,559 | $ 2,252 |
| Additions | 76 | 13,852 | 1,805 |
| Accretion | (314) | (215) | (279) |
| Reductions[1] | (6,067) | (13,693) | (2,294) |
| Changes in estimated cash flows[2] | (1,163) | 8,729 | 420 |
| Reclassifications to nonaccretable difference[3] | (237) | (115) | (345) |
| Ending balance, December 31 | $ 2,412 | $ 10,117 | $ 1,559 |

---

[1] Reductions are the result of liquidations and loan modifications due to TDRs.

[2] Represents changes in expected cash flows due to changes in prepayment and other assumptions.

[3] Represents changes in expected cash flows due to changes in credit quality or credit assumptions.

F-54

TREASURY-0548

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays interest income recognized and the impact to the "Provision for loan losses" related to loans that are still being accounted for as acquired credit-impaired loans, as well as loans that have been subsequently modified as a TDR, for the years ended December 31, 2010, 2009 and 2008. The accretion of fair value discount reported in the table below relates primarily to credit-impaired loans that were acquired prior to the transition date. Subsequent to the transition date, our consolidated statements of operations no longer reflect the recognition of fair value losses on the majority of acquisitions of credit-impaired loans because the loans are already recorded in our consolidated balance sheets at the time of purchase.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Accretion of fair value discount[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,024 | $405 | $158 |
| Interest income on loans returned to accrual status or subsequently modified as TDRs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,148 | 214 | 476 |
| Total interest income recognized on acquired credit-impaired loans . . . . . . . . . . | $2,172 | $619 | $634 |
| Increase in "Provision for loan losses" subsequent to the acquisition of credit-impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 963 | $691 | $185 |

_____
[1]   Represents accretion of the fair value discount that was recorded on acquired credit-impaired loans.

## 5.   Allowance for Loan Losses and Reserve for Guaranty Losses

We maintain an allowance for loan losses for loans held for investment in our mortgage portfolio and loans backing Fannie Mae MBS issued from consolidated trusts and a reserve for guaranty losses related to loans backing Fannie Mae MBS issued from unconsolidated trusts and loans that we guaranteed under long-term standby commitments. We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. When calculating our reserve for guaranty losses, we consider all contractually past due interest income including payments expected to be missed between the balance sheet date and the point of loan acquisition or foreclosure. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes interest income only while the loan was on accrual status. Determining the adequacy of our allowance for loan losses and reserve for guaranty losses is complex and requires judgment about the effect of matters that are inherently uncertain.

Upon recognition of the mortgage loans held by newly consolidated trusts and the associated accrued interest receivable at the transition date of our adoption of the new accounting standards, we increased our "Allowance for loan losses" by $43.6 billion, increased our "Allowance for accrued interest receivable" by $7.0 billion and decreased our "Reserve for guaranty losses" by $54.1 billion. The net decrease of $3.5 billion reflects the difference in the methodology used to estimate incurred losses for our allowance for loan losses and accrued interest receivable versus our reserve for guaranty losses.

Although our loss models include extensive historical loan performance data, our loss reserve process is subject to risks and uncertainties, particularly in a rapidly changing credit environment. In response to these changes, our loss models were updated to reflect a change in our severity calculations to use mark-to-market LTV ratios rather than LTV ratios at origination, which we believe better reflects the current values of the loans, as well as our methodology for estimating the benefit of payments from lenders to make us whole for losses on loans due to a breach of representations and warranties.

Our prospective adoption on December 31, 2010 of a new accounting standard on disclosures regarding the credit quality of financing receivables and allowance for credit losses had a significant impact on the presentation of our loan and allowance related disclosures.

TREASURY-0549

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Allowance for Loan Losses*

The following table displays changes in both single-family and multifamily allowance for loan losses for the year ended December 31, 2010 and total allowance for loan losses for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2010** | | | **2009** | **2008** |
| | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | | |
| | (Dollars in millions) | | | | |
| Single-family allowance for loan losses: | | | | | |
| Beginning balance, January 1[(1)] . . . . . . . . . . . . . | $ 6,721 | $ 1,749 | $ 8,470 | | |
| Adoption of new accounting standards . . . . . . . . | — | 43,170 | 43,170 | | |
| Provision for loan losses . . . . . . . . . . . . . . . . . . | 12,923 | 11,592 | 24,515 | | |
| Charge-offs[(2)] . . . . . . . . . . . . . . . . . . . . . . . . | (15,438) | (7,026) | (22,464) | | |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,913 | 1,164 | 3,077 | | |
| Transfers[(3)] . . . . . . . . . . . . . . . . . . . . . . . . | 44,599 | (44,599) | — | | |
| Net reclassifications[(4)] . . . . . . . . . . . . . . . . . . | (3,341) | 6,553 | 3,212 | | |
| Ending balance, December 31 . . . . . . . . . . . . . . | $ 47,377 | $ 12,603 | $ 59,980 | | |
| Multifamily allowance for loan losses: | | | | | |
| Beginning balance, January 1[(1)] . . . . . . . . . . . . . | $ 1,357 | $ 98 | $ 1,455 | | |
| Adoption of new accounting standards . . . . . . . . | — | 406 | 406 | | |
| Provision for loan losses . . . . . . . . . . . . . . . . . . | 144 | 43 | 187 | | |
| Charge-offs[(2)] . . . . . . . . . . . . . . . . . . . . . . . . | (414) | — | (414) | | |
| Transfers[(3)] . . . . . . . . . . . . . . . . . . . . . . . . | 115 | (115) | — | | |
| Net reclassifications[(4)] . . . . . . . . . . . . . . . . . . | (49) | (9) | (58) | | |
| Ending balance, December 31 . . . . . . . . . . . . . . | $ 1,153 | $ 423 | $ 1,576 | | |
| Total allowance for loan losses: | | | | | |
| Beginning balance, January 1[(1)] . . . . . . . . . . . . . | $ 8,078 | $ 1,847 | $ 9,925 | $ 2,772 | $ 629 |
| Adoption of new accounting standards . . . . . . . . | — | 43,576 | 43,576 | | |
| Provision for loan losses . . . . . . . . . . . . . . . . . . | 13,067 | 11,635 | 24,702 | 9,569 | 4,022 |
| Charge-offs[(2)] . . . . . . . . . . . . . . . . . . . . . . . . | (15,852) | (7,026) | (22,878) | (2,245) | (1,987) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,913 | 1,164 | 3,077 | 214 | 190 |
| Transfers[(3)] . . . . . . . . . . . . . . . . . . . . . . . . . | 44,714 | (44,714) | — | — | — |
| Net reclassifications[(1)(4)] . . . . . . . . . . . . . . . . . | (3,390) | 6,544 | 3,154 | (385) | (82) |
| Ending balance, December 31[(1)(5)(6)] . . . . . . . . | $ 48,530 | $ 13,026 | $ 61,556 | $ 9,925 | $ 2,772 |

---

[(1)] Prior period amounts have been reclassified to conform to current year presentation. Current presentation excludes the allowance for accrued interest receivable from the beginning and ending balances.

[(2)] Total charge-offs includes accrued interest of $2.4 billion, $1.5 billion and $642 million for the years ended December 31, 2010, 2009 and 2008, respectively. Single-family charge-offs includes accrued interest of $2.3 billion for the year ended December 31, 2010. Multifamily charge-offs includes accrued interest of $64 million for the year ended December 31, 2010.

[(3)] Includes transfers from trusts for delinquent loan purchases.

F-56

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

[4]   Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowance for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

[5]   Total allowance for loan losses includes $385 million, $726 million and $150 million as of December 31, 2010, 2009 and 2008, respectively, for acquired credit-impaired loans.

[6]   Total single-family allowance for loan losses was $8.5 billion and $2.7 billion as of December 31, 2009 and 2008, respectively. Total multifamily allowance for loan losses was $1.4 billion and $74 million as of December 31, 2009 and 2008, respectively.

As of December 31, 2010, the allowance for accrued interest receivable for loans of Fannie Mae and loans of consolidated trusts was $3.0 billion and $439 million, respectively. The allowance for accrued interest receivable was $536 million as of December 31, 2009.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of December 31, 2010.

| | As of December 31, 2010 | | |
|---|---|---|---|
| | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | |
| Allowance for loan losses by segment: | | | |
| Individually impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . | $ 37,296 | $ 549 | $ 37,845 |
| Collectively reserved loans . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,306 | 1,020 | 23,326 |
| Acquired credit impaired loans . . . . . . . . . . . . . . . . . . . . . . . | 378 | 7 | 385 |
| Recorded investment in loans by segment:[1] | | | |
| Total loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,822,500 | $172,514 | $2,995,014 |
| Individually impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . . | 140,062 | 3,074 | 143,136 |
| Collectively reserved loans . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,677,640 | 169,332 | 2,846,972 |
| Acquired credit impaired loans . . . . . . . . . . . . . . . . . . . . . . . | 4,798 | 108 | 4,906 |

[1]   Consists of unpaid principal balance, net of unamortized premiums and discounts, other cost basis and fair value adjustments and accrued interest receivable on HFI loans, excluding loans for which we have elected the fair value option.

On December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, BAC Home Loans Servicing, LP, and Countrywide Home Loans, Inc., to address outstanding repurchase requests for residential mortgage loans with an unpaid principal balance of $3.9 billion delivered to us by affiliates of Countrywide Financial Corporation. Bank of America agreed, among other things, to a resolution amount of $1.5 billion, consisting of a cash payment of $1.3 billion and other payments recently made or to be made by them. We recognized $930 million as a recovery of charge-offs resulting in a reduction to "Provision for loan losses" and "Allowance for loan losses," $266 million as a reduction to "Foreclosed property expense" and $142 million as receipt of amounts receivable due to the rescission of mortgage insurance coverage included in "Other Assets."

The agreement substantially resolves or addresses outstanding repurchase requests on loans sold to us by Countrywide and permits us to bring claims for any additional breaches of our representations and warranties that are identified with respect to those loans. We continue to work with Bank of America to resolve repurchase requests that remain outstanding, including requests relating to loans delivered to us by Bank of America, N.A.

Our allowance for loan losses includes an estimate for the benefit of payments from lenders and servicers to make us whole for losses on loans due to a breach of selling or servicing representations and warranties.

F-57

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Historically, this estimate was based significantly on historical cash collections. In the fourth quarter of 2010, the following factors impacted this estimate:

- we revised our methodology to take into account trends in management actions taken before cash collections, which resulted in our allowance for loan losses being $1.1 billion higher than it would have been under the previous methodology; and

- agreements with seller/servicers that addressed their loan repurchase and other obligations to us impacted our expectation of future make-whole payments, resulting in a decrease in our allowance for loan losses of approximately $700 million.

In the three month period ended June 30, 2010, we identified that for a portion of our delinquent loans we had not estimated and recorded our obligation to reimburse servicers for advances they made on our behalf for preforeclosure property taxes and insurance. We previously recognized these expenses when we reimbursed servicers. We also did not record a receivable from borrowers for these payments or assess the collectibility of that receivable. As such, our allowance did not include an estimation of uncollectable amounts from those borrowers. We evaluated the effects of this misstatement, both quantitatively and qualitatively and concluded that the misstatement is not material to our 2010 loss or any prior consolidated financial statements.

The year ended December 31, 2010 includes an out-of-period adjustment of $1.1 billion to our consolidated statement of operations reflecting our assessment of the collectibility of the receivable from the borrowers.

*Reserve for Guaranty Losses*

The following table displays changes in the reserve for guaranty losses for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| Reserve for guaranty losses: | | | |
| Beginning balance, January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 54,430 | $ 21,830 | $ 2,693 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . . . . | (54,103) | — | — |
| Provision for guaranty losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 194 | 63,057 | 23,929 |
| Charge-offs[1][2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (203) | (31,142) | (4,986) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 685 | 194 |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 323 | $ 54,430 | $21,830 |

[1] Includes charges of $228 million and $333 million for the years ended December 31, 2009 and 2008, respectively, related to unsecured HomeSaver Advance loans. There were no charges related to unsecured HomeSaver Advance loans for the year ended December 31, 2010.

[2] Includes charges recorded at the date of acquisition of $180 million, $20.3 billion and $2.1 billion for the years ended December 31, 2010, 2009 and 2008, respectively, for acquired credit-impaired loans where the acquisition cost exceeded the fair value of the acquired loan.

F-58

TREASURY-0552

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Credit Quality Indicators*

The following table displays the total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by portfolio segment, class and credit quality indicators as of December 31, 2010. The single-family credit quality indicator is updated quarterly and the multifamily credit quality indicators are as of the origination date of each loan.

|  | As of December 31, 2010[1][2] | | |
|---|---|---|---|
|  | Primary[3] | Alt-A | Other[4] |
|  | (Dollars in millions) | | |
| **Single-family** | | | |
| Estimated mark-to-market LTV ratio:[5] | | | |
| Less than or equal to 80% | $1,561,202 | $ 79,305 | $ 29,854 |
| 80.01% to 90% | 376,414 | 27,472 | 13,394 |
| 90.01% to 100% | 217,193 | 24,392 | 12,935 |
| 100.01% to 110% | 112,376 | 18,022 | 11,400 |
| 110.01% to 120% | 62,283 | 12,718 | 8,967 |
| 120.01% to 125% | 21,729 | 5,083 | 3,733 |
| Greater than 125% | 106,288 | 40,160 | 25,096 |
| Total | $2,457,485 | $207,152 | $105,379 |

|  | As of December 31, 2010[1] |
|---|---|
|  | (Dollars in millions) |
| **Multifamily** | |
| Originating LTV ratio: | |
| Less than or equal to 70% | $ 96,844 |
| 70.01% to 80% | 71,560 |
| Greater than 80% | 4,110 |
| Total | $172,514 |
| Originating debt service coverage ratio: | |
| Less than or equal to 1.10% | $ 15,034 |
| 1.11% to 1.25% | 50,745 |
| Greater than 1.25% | 106,735 |
| Total | $172,514 |

---

[1] Recorded investment consists of unpaid principal balance, net of unamortized premiums and discounts, other cost basis and fair value adjustments and accrued interest receivable on HFI loans, excluding loans for which we have elected the fair value option.

[2] Excludes $52.5 billion of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

TREASURY-0553

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**6.  Investments in Securities**

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value losses, net" in our consolidated statements of operations. The following table displays our investments in trading securities and the cumulative amount of net losses recognized from holding these securities as of December 31, 2010 and 2009.

|  | As of December 31, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 7,398 | $ 74,750 |
| Freddie Mac | 1,326 | 15,082 |
| Ginnie Mae | 590 | 1 |
| Alt-A private-label securities | 1,683 | 1,355 |
| Subprime private-label securities | 1,581 | 1,780 |
| CMBS | 10,764 | 9,335 |
| Mortgage revenue bonds | 609 | 600 |
| Other mortgage-related securities | 152 | 154 |
| Total | 24,103 | 103,057 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 27,432 | 3 |
| Asset-backed securities | 5,321 | 8,515 |
| Corporate debt securities | — | 364 |
| Total | 32,753 | 8,882 |
| Total trading securities | $56,856 | $111,939 |
| Losses in trading securities held in our portfolio, net | $ 2,149 | $ 2,685 |

As of December 31, 2010, we held U.S. Treasury securities and money market funds with fair values of $4.0 billion and $2.3 billion, respectively, which we elected to classify as "Cash and cash equivalents" in our consolidated balance sheets.

TREASURY-0554

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays information about our net trading gains and losses for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (Dollars in millions) | | |
| Net trading gains (losses): | | | |
| Mortgage-related securities | $2,607 | $2,457 | $(4,297) |
| Non-mortgage-related securities | 85 | 1,287 | (2,743) |
| Total | $2,692 | $3,744 | $(7,040) |
| Net trading gains (losses) recorded in the year related to securities still held at year end: | | | |
| Mortgage-related securities | $2,485 | $1,974 | $(4,464) |
| Non-mortgage-related securities | 56 | 1,146 | (2,418) |
| Total | $2,541 | $3,120 | $(6,882) |

### Available-for-Sale Securities

We measure AFS securities at fair value with unrealized gains and losses recorded as a component of AOCI, net of tax, in our consolidated balance sheets. We record realized gains and losses from the sale of AFS securities in "Investment gains (losses), net" in our consolidated statements of operations.

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (Dollars in millions) | | |
| Gross realized gains | $ 566 | $ 4,521 | $ 4,022 |
| Gross realized losses | 293 | 3,080 | 3,635 |
| Total proceeds[1] | 7,207 | 226,664 | 130,991 |

---

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 3, Consolidations and Transfers of Financial Assets."

F-61

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of December 31, 2010 and 2009.

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . | $21,428 | $1,453 | $ (9) | $ (44) | $22,828 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . | 15,986 | 1,010 | — | — | 16,996 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . | 909 | 130 | — | — | 1,039 |
| Alt-A private-label securities . . . . . . . . . . . . . | 15,789 | 177 | (1,791) | (285) | 13,890 |
| Subprime private-label securities . . . . . . . . . . | 11,323 | 54 | (997) | (448) | 9,932 |
| CMBS[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,273 | 25 | — | (454) | 14,844 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . | 11,792 | 47 | (64) | (734) | 11,041 |
| Other mortgage-related securities . . . . . . . . . . | 4,098 | 106 | (44) | (338) | 3,822 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $96,598 | $3,002 | $(2,905) | $(2,303) | $94,392 |

| | As of December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . | $148,074 | $6,413 | $ (23) | $ (45) | $154,419 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . | 26,281 | 1,192 | — | (4) | 27,469 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . | 1,253 | 102 | — | (2) | 1,353 |
| Alt-A private-label securities . . . . . . . . . . . . . | 17,836 | 41 | (2,738) | (989) | 14,150 |
| Subprime private-label securities . . . . . . . . . . | 13,232 | 33 | (1,774) | (745) | 10,746 |
| CMBS[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,797 | — | — | (2,604) | 13,193 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . | 13,679 | 71 | (44) | (860) | 12,846 |
| Other mortgage-related securities . . . . . . . . . . | 4,225 | 29 | (235) | (467) | 3,552 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $240,377 | $7,881 | $(4,814) | $(5,716) | $237,728 |

[1] Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments recognized in our consolidated statements of operations.

[2] Represents the noncredit component of other-than-temporary impairment losses recorded in other comprehensive loss as well as cumulative changes in fair value for securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3] Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4] Amortized cost includes $848 million and $1.0 billion as of December 31, 2010 and 2009, respectively, of increase to the carrying amount from fair value hedge accounting in 2008.

TREASURY-0556

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of December 31, 2010 and 2009.

| | As of December 31, 2010 | | | |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (35) | $ 1,461 | $ (18) | $ 211 |
| Freddie Mac | — | 11 | — | 7 |
| Ginnie Mae | — | 1 | — | — |
| Alt-A private-label securities | (104) | 1,915 | (1,972) | 9,388 |
| Subprime private-label securities | (47) | 627 | (1,398) | 8,493 |
| CMBS | (15) | 1,774 | (439) | 10,396 |
| Mortgage revenue bonds | (206) | 5,009 | (592) | 3,129 |
| Other mortgage-related securities | (2) | 250 | (380) | 2,007 |
| Total | $(409) | $11,048 | $(4,799) | $33,631 |

| | As of December 31, 2009 | | | |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (36) | $ 1,461 | $ (32) | $ 544 |
| Freddie Mac | (2) | 85 | (2) | 164 |
| Ginnie Mae | (2) | 139 | — | 26 |
| Alt-A private-label securities | (2,439) | 7,018 | (1,288) | 6,929 |
| Subprime private-label securities | (998) | 4,595 | (1,521) | 5,860 |
| CMBS | — | — | (2,604) | 13,193 |
| Mortgage revenue bonds | (54) | 2,392 | (850) | 5,664 |
| Other mortgage-related securities | (96) | 536 | (606) | 2,739 |
| Total | $(3,627) | $16,226 | $(6,903) | $35,119 |

*Other-Than-Temporary Impairments*

We recognize the credit component of other-than-temporary impairments of our debt securities in our consolidated statements of operations and the noncredit component in "Other comprehensive loss" for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. $4.8 billion of the $5.2 billion of gross unrealized losses on AFS securities as of December 31, 2010 have existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of December 31, 2010 include unrealized losses on securities with other-than-temporary impairment in which a

F-63

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

portion of the impairment remains in AOCI. The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of December 31, 2010 that was 88% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our consolidated statements of operations for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (3) | $ (117) | $ (7) |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (327) | (3,956) | (4,820) |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (368) | (5,660) | (1,932) |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2) | (22) | (21) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (22) | (106) | (194) |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(722) | $(9,861) | $(6,974) |

For the year ended December 31, 2010, we recorded net other-than-temporary impairment of $722 million. The net other-than-temporary impairment charges recorded in 2010 were primarily driven by a net decline in forecasted home prices for certain geographic regions, which resulted in a decrease in the present value of our cash flow projections on Alt-A and subprime securities.

The following table displays activity for the years ended December 31, 2010 and 2009 related to the credit component recognized in earnings on debt securities held by us for which we recognized a portion of other-than-temporary impairment in AOCI.

| | For the Year Ended December 31, | |
|---|---|---|
| | **2010** | **2009** |
| | (Dollars in millions) | |
| Balance, January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,191 | $ — |
| Credit component of other-than-temporary impairment not reclassified to AOCI in conjunction with the cumulative effect transition adjustment . . . . . . . . . . . . . . . . . . . . . | — | 4,265 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 1,090 |
| Additions for credit losses on debt securities for which OTTI was previously recognized . . . | 693 | 3,118 |
| Reductions for securities no longer in portfolio at period end[1] . . . . . . . . . . . . . . . | (154) | — |
| Reductions for amortization resulting from increases in cash flows expected to be collected over the remaining life of the security . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (544) | (282) |
| Balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,215 | $8,191 |

[1] Includes securities sold, matured, called or consolidated to loans.

As of December 31, 2010, those debt securities with other-than-temporary impairment for which we recognized in our consolidated statement of operations only the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage

F-64

FANNIE MAE

(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. To reduce costs associated with maintaining our internal model and decrease the operational risk, in the fourth quarter of 2010, we ceased to use our internally developed model and began using a third-party model to project cash flow estimates on our private-label securities. Separate components of the third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We model securities assuming the benefit of those external financial guarantees that are deemed creditworthy. We have recorded other-than-temporary impairments for the year ended December 31, 2010 based on this analysis, with amounts related to credit loss recognized in our consolidated statements of operations. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Assumption of voluntary prepayment rates are also an input to the present value of expected losses.

| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
|---|---|---|---|---|---|
| | | | **As of December 31, 2010** | | |
| | | | | **Alt-A** | |
| | | | (Dollars in millions) | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $ 2,216 | $ 521 | $3,862 | $ 544 | $2,521 |
| Weighted average collateral default[1] . . . . . . | 40.5% | 38.8% | 11.2% | 34.9% | 19.5% |
| Weighted average collateral severities[2]. . . . . . | 61.9% | 46.6% | 43.4% | 45.0% | 38.0% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.0% | 6.1% | 8.5% | 8.3% | 10.6% |
| Average credit enhancement[4] . . . . . . . . . . . | 51.1% | 19.5% | 11.9% | 21.6% | 10.7% |
| **2005** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $ 206 | $1,401 | $1,297 | $ 585 | $2,578 |
| Weighted average collateral default[1] . . . . . . | 76.2% | 59.8% | 41.9% | 57.9% | 42.0% |
| Weighted average collateral severities[2]. . . . . . | 73.9% | 55.5% | 59.3% | 60.2% | 52.6% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.6% | 3.9% | 6.4% | 7.0% | 7.9% |
| Average credit enhancement[4] . . . . . . . . . . . | 63.5% | 30.0% | 2.4% | 19.5% | 7.1% |
| **2006** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $12,565 | $1,379 | $ 626 | $1,793 | $1,965 |
| Weighted average collateral default[1] . . . . . . | 78.9% | 73.8% | 45.9% | 61.8% | 34.4% |
| Weighted average collateral severities[2]. . . . . . | 74.1% | 62.0% | 64.1% | 64.6% | 49.5% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.7% | 3.2% | 5.8% | 6.2% | 9.3% |
| Average credit enhancement[4] . . . . . . . . . . . | 20.4% | 22.8% | 3.2% | 2.2% | 2.1% |

F-65

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | | | As of December 31, 2010 | | |
| | | | | Alt-A | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| 2007 & After: | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $ 656 | $ — | $ — | $ — | $ 129 |
| Weighted average collateral default[1] . . . . . . | 72.8% | N/A | N/A | N/A | 43.7% |
| Weighted average collateral severities[2] . . . . . . | 70.2% | N/A | N/A | N/A | 54.8% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.6% | N/A | N/A | N/A | 6.7% |
| Average credit enhancement[4] . . . . . . . . . . . | 34.5% | N/A | N/A | N/A | 25.3% |
| Total | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $15,643 | $3,301 | $5,785 | $2,922 | $7,193 |
| Weighted average collateral default[1] . . . . . . | 73.2% | 62.4% | 21.9% | 56.0% | 32.1% |
| Weighted average collateral severities[2] . . . . . . | 72.2% | 56.8% | 49.2% | 60.1% | 46.7% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.0% | 3.9% | 7.7% | 6.8% | 9.2% |
| Average credit enhancement[4] . . . . . . . . . . . | 25.9% | 25.3% | 8.9% | 9.3% | 7.4% |

[1] The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

[2] The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3] The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4] The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

For mortgage revenue bonds, where we cannot utilize credit-sensitized cash flows, we perform a qualitative and quantitative analysis to assess whether a bond is other-than-temporarily impaired. If a bond is deemed to be other-than-temporarily impaired, the projected contractual cash flows of the security are reduced by a default loss amount based on the security's lowest credit rating as provided by the major nationally recognized statistical rating organizations. The lower the security's credit rating, the larger the amount by which the contractual cash flows are reduced. These adjusted cash flows are then used in the present value calculation to determine the credit portion of the other-than-temporary impairment. While we have recognized other-than-temporary impairment on these bonds, we expect to realize no credit losses on the vast majority of our holdings due to the inherent financial strength of the issuers, or in some cases, the amount of external credit support from mortgage collateral or financial guarantees. The fair values of these bonds are likewise impacted by the low levels of market liquidity and greater expected yield, which has led to unrealized losses in the portfolio that we deem to be temporary.

Other mortgage-related securities include manufactured housing securities, some of which have been other-than-temporarily impaired in 2010. For manufactured housing securities, we utilize models that incorporate recent historical performance information and other relevant public data to run cash flows and assess for other-than-temporary impairment. Given the significant seasoning of these securities we expect that the future performance will be in line with how the securities are currently performing. We model securities assuming the benefit of those external financial guarantees that are deemed creditworthy. If we determined that securities were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or, if a loss was projected, that present value of expected cash flows was greater than the security's cost basis.

F-66

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We analyzed commercial mortgage-backed securities ("CMBS") using a CMBS loss forecast model that incorporates a loan level loss forecast. This forecast takes into account loan performance, loan status, loan attributes, structures, metropolitan area, property type and macroeconomic expectations. Given the current high level of credit enhancement and collateral loss expectations, no single bond is expected to experience a principal write-down or interest shortfall. Our CMBS loss forecast expectations may change as macroeconomic conditions and the commercial real estate market evolve. As of December 31, 2010, we had no other-than-temporary impairments in our holdings of CMBS as we projected the remaining subordination to be more than sufficient to absorb the level of projected losses. While downgrades have occurred in this sector, all of our holdings remained investment grade as of December 31, 2010.

### Maturity Information

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of December 31, 2010. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Amortized Cost | Total Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | | | (Dollars in millions) | | | | | |
| Fannie Mae | $21,428 | $22,828 | $ — | $ — | $ 2 | $ 2 | $ 3,876 | $ 4,103 | $17,550 | $18,723 |
| Freddie Mac | 15,986 | 16,996 | 5 | 5 | 37 | 39 | 1,571 | 1,683 | 14,373 | 15,269 |
| Ginnie Mae | 909 | 1,039 | — | — | — | — | 5 | 5 | 904 | 1,034 |
| Alt-A private-label securities | 15,789 | 13,890 | — | — | 1 | 1 | 294 | 296 | 15,494 | 13,593 |
| Subprime private-label securities | 11,323 | 9,932 | — | — | — | — | — | — | 11,323 | 9,932 |
| CMBS | 15,273 | 14,844 | 308 | 308 | 275 | 276 | 14,342 | 13,953 | 348 | 307 |
| Mortgage revenue bonds | 11,792 | 11,041 | 61 | 62 | 374 | 385 | 818 | 819 | 10,539 | 9,775 |
| Other mortgage-related securities | 4,098 | 3,822 | — | — | — | — | — | 16 | 4,098 | 3,806 |
| Total | $96,598 | $94,392 | $ 374 | $375 | $ 689 | $703 | $20,906 | $20,875 | $74,629 | $72,439 |
| Weighted average yield[(1)] | 4.32% | | 5.52% | | 5.55% | | 4.25% | | 4.32% | |

(1) Yields are determined by dividing interest income (including the amortization and accretion of premiums, discounts and other cost basis adjustments) by amortized cost balances as of year-end. Yields on tax exempt obligations have been computed on a tax equivalent basis.

### Accumulated Other Comprehensive Loss

The following table displays our accumulated other comprehensive loss by major categories as of December 31, 2010, 2009 and 2008.

| | As of December 31, | | |
|---|---|---|---|
| | 2010[(1)] | 2009 | 2008 |
| | (Dollars in millions) | | |
| Net unrealized gains (losses) on available-for-sale securities for which we have not recorded other-than-temporary impairment | $   304 | $ 1,337 | $(7,291) |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment | (1,736) | (3,059) | — |
| Other | (250) | (10) | (382) |
| Accumulated other comprehensive loss | $(1,682) | $(1,732) | $(7,673) |

(1) Includes a net increase of $3.4 billion from the adoption of the new accounting standards.

F-67

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**7.  Financial Guarantees and Master Servicing**

We generate revenue by absorbing the credit risk of mortgage loans in unconsolidated trusts in exchange for a guaranty fee. We also provide credit enhancements on taxable or tax-exempt mortgage revenue bonds issued by state and local governmental entities to finance multifamily housing for low- and moderate-income families. Additionally, we issue long-term standby commitments that require us to purchase loans from lenders if the loans meet certain delinquency criteria.

As a result of adopting the new accounting standards, we derecognized the previously recognized guaranty assets, guaranty obligations, MSAs, and master servicing liabilities ("MSLs") associated with the newly consolidated trusts from our consolidated balance sheets.

For our guarantees to unconsolidated trusts and other guaranty arrangements, we recognize a guaranty obligation for our obligation to stand ready to perform on these guarantees. For those guarantees recognized in our consolidated balance sheet, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $52.4 billion as of December 31, 2010. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our consolidated balance sheet was $12.6 billion as of December 31, 2010. In addition, we had exposure of $10.3 billion for other guarantees not recognized in our consolidated balance sheet as of December 31, 2010, which primarily represents the unpaid principal balance of loans underlying guarantees issued prior to the effective date of the current accounting standards on guaranty accounting. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our consolidated balance sheet was $3.9 billion as of December 31, 2010. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

As of December 31, 2009, our maximum potential exposure for guarantees recognized in our consolidated balance sheet was primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $2.5 trillion. The maximum amount we could recover through available credit enhancements and recourse with third parties for these guarantees was $113.4 billion. In addition, we had exposure of $135.7 billion for other guarantees not recognized in our consolidated balance sheet as of December 31, 2009. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our consolidated balance sheet was $13.6 billion as of December 31, 2009.

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the underlying mortgage loans of the related securities. Management also monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and the percentage of multifamily loans 60 days or more past due, of loans with certain higher risk characteristics, such as high mark-to-market loan-to-value ratios and low originating debt service coverage ratios. We use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to accurately reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

TREASURY-0562

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of December 31, 2010 and 2009.

| | As of December 31, 2010[1] | | | As of December 31, 2009[1] | | |
|---|---|---|---|---|---|---|
| | 30 days Delinquent | 60 days Delinquent | Seriously Delinquent[2] | 30 days Delinquent | 60 days Delinquent | Seriously Delinquent[2] |
| Percentage of single-family conventional guaranty book of business[3] . . . . . . . . . . . . . . . . | 2.19% | 0.89% | 5.37% | 2.38% | 1.15% | 6.68% |
| Percentage of single-family conventional loans[4] . . . . . . . . . | 2.32 | 0.87 | 4.48 | 2.46 | 1.07 | 5.38 |

| | As of December 31, 2010[1] | | As of December 31, 2009[1] | |
|---|---|---|---|---|
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2)(4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2)(4] |
| **Estimated mark-to-market loan-to-value ratio:** | | | | |
| Less than 100% . . . . . . . . . . . . . . . . | 84% | 2.62% | 86% | 3.36% |
| 100.01% to 110% . . . . . . . . . . . . . . . | 5 | 11.60 | 5 | 14.79 |
| 110.01% to 120% . . . . . . . . . . . . . . . | 3 | 14.74 | 3 | 18.55 |
| 120.01% to 125% . . . . . . . . . . . . . . . | 1 | 16.86 | 1 | 21.39 |
| Greater than 125% . . . . . . . . . . . . . . | 7 | 24.71 | 5 | 31.05 |
| **Geographical distribution:** | | | | |
| Arizona . . . . . . . . . . . . . . . . . . . . . . | 2 | 6.23 | 3 | 8.80 |
| California . . . . . . . . . . . . . . . . . . . . . | 18 | 3.89 | 17 | 5.73 |
| Florida . . . . . . . . . . . . . . . . . . . . . . . | 7 | 12.31 | 7 | 12.82 |
| Nevada . . . . . . . . . . . . . . . . . . . . . . . | 1 | 10.66 | 1 | 13.00 |
| Select Midwest states[5] . . . . . . . . . . . | 11 | 4.80 | 11 | 5.62 |
| All other states . . . . . . . . . . . . . . . . . | 61 | 3.46 | 61 | 4.11 |
| **Product distribution (not mutually exclusive):[6]** | | | | |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 13.87 | 9 | 15.63 |
| Subprime . . . . . . . . . . . . . . . . . . . . . | * | 28.20 | * | 30.68 |
| Negatively amortizing adjustable rate . . . | * | 9.02 | 1 | 10.29 |
| Interest only . . . . . . . . . . . . . . . . . . . | 6 | 17.85 | 7 | 20.17 |
| Investor property . . . . . . . . . . . . . . . . | 6 | 4.79 | 6 | 5.54 |
| Condo/Coop . . . . . . . . . . . . . . . . . . . | 9 | 5.37 | 9 | 5.99 |
| Original loan-to-value ratio >90%[7] . . . | 10 | 10.04 | 9 | 13.05 |
| FICO credit score <620[7] . . . . . . . . . . | 4 | 14.63 | 4 | 18.20 |
| Original loan-to-value ratio >90% and FICO credit score <620[7] . . . . . . . . | 1 | 21.41 | 1 | 27.96 |
| **Vintages:** | | | | |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 7.20 | 10 | 7.27 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 12.19 | 11 | 12.87 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 13.24 | 15 | 14.06 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 4.88 | 13 | 3.98 |
| All other vintages . . . . . . . . . . . . . . . | 62 | 1.73 | 51 | 2.19 |

---

* Represents less than 0.5% of the single-family conventional guaranty book of business.

[1] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted over 99% and 98% of our total single-family conventional guaranty book of business as of December 31, 2010 and 2009, respectively.

F-69

TREASURY-0563

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

[2] Consists of single-family conventional loans that were three months or more past due or in foreclosure as of December 31, 2010 and 2009.

[3] Calculated based on the aggregate unpaid principal balance of delinquent single-family conventional loans divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

[4] Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

[5] Consists of Illinois, Indiana, Michigan, and Ohio.

[6] Categories are not mutually exclusive. Loans with multiple product features are included in all applicable categories.

[7] Includes housing goals-oriented products such as MyCommunityMortgage® and Expanded Approval®.

| | As of December 31, 2010[1][2] | | As of December 31, 2009[1][2] | |
| --- | --- | --- | --- | --- |
| | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business. . . . . . . . | 0.21% | 0.71% | 0.28% | 0.63% |

| | As of December 31, 2010[1][2] | | As of December 31, 2009[1][2] | |
| --- | --- | --- | --- | --- |
| | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent |
| **Originating loan-to-value ratio:** | | | | |
| Greater than 80% . . . . . . . . . . . . . . . . . . . | 5% | 0.59% | 5% | 0.50% |
| Less than or equal to 80% . . . . . . . . . . . . . | 95 | 0.71 | 95 | 0.63 |
| **Originating debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 . . . . . . . . . . . . . | 9 | 0.27 | 10 | 0.17 |
| Greater than 1.10 . . . . . . . . . . . . . . . . . . . | 91 | 0.75 | 90 | 0.68 |
| **Acquisition loan size distribution:** | | | | |
| Less than or equal to $750,000 . . . . . . . . . | 2 | 1.61 | 3 | 1.27 |
| Greater than $750,000 and less than or equal to $3 million . . . . . . . . . . . . . . . . . . . . | 12 | 1.17 | 13 | 1.01 |
| Greater than $3 million and less than or equal to $5 million . . . . . . . . . . . . . . . . . | 9 | 0.88 | 9 | 1.08 |
| Greater than $5 million and less than or equal to $25 million . . . . . . . . . . . . . . . . | 42 | 0.88 | 41 | 0.60 |
| Greater than $25 million . . . . . . . . . . . . . . | 35 | 0.24 | 34 | 0.34 |
| **Maturing dates:** | | | | |
| Maturing in 2011 . . . . . . . . . . . . . . . . . . . . | 3 | 0.68 | 5 | 0.64 |
| Maturing in 2012 . . . . . . . . . . . . . . . . . . . . | 7 | 0.42 | 10 | 1.13 |
| Maturing in 2013 . . . . . . . . . . . . . . . . . . . . | 11 | 0.54 | 12 | 0.22 |
| Maturing in 2014 . . . . . . . . . . . . . . . . . . . . | 8 | 0.67 | 9 | 0.62 |
| Maturing in 2015 . . . . . . . . . . . . . . . . . . . . | 9 | 0.57 | | |

[1] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% our total multifamily guaranty book of business as of both December 31, 2010 and 2009, excluding loans that have been defeased. Defeasance is a pre-payment of a loan through substitution of collateral.

[2] Calculated based on the aggregate unpaid principal balance of delinquent multifamily loans divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3] Consists of multifamily loans that were 60 days or more past due as of December 31, 2010 and 2009.

F-70

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Guaranty Obligations*

The following table displays changes in our guaranty obligations recognized in "Other liabilities" in our consolidated balance sheets for the years ended December 31, 2010, 2009 and 2008. We derecognized the majority of our guaranty obligations and deferred profit from our consolidated balance sheet upon adoption of the new accounting standards.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | **(Dollars in millions)** | | |
| Beginning balance, January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 13,996 | $12,147 | $15,393 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (13,320) | — | — |
| Additions to guaranty obligations[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 225 | 7,577 | 7,279 |
| Amortization of guaranty obligations into guaranty fee income . . . . . . . . . . . . | (132) | (5,260) | (9,585) |
| Impact of consolidation activity[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (468) | (940) |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   769 | $13,996 | $12,147 |

[1] Represents the fair value of our contractual obligation at issuance of new guarantees.

[2] Represents the derecognition of guaranty obligations during the period due to consolidations excluding the impact of adopting the new accounting standards.

Deferred profit is a component of guaranty obligations in "Other liabilities" in our consolidated balance sheets and is included in the table above. Deferred profit had a carrying amount of $35 million and $1.6 billion as of December 31, 2010 and 2009, respectively. We recognized deferred profit amortization of $6 million, $830 million and $2.0 billion for the years ended December 31, 2010, 2009 and 2008, respectively.

*Guaranty Assets*

As guarantor at inception of a guaranty to an unconsolidated entity, we recognize a non-contingent liability for the fair value of our obligation to stand ready to perform over the term of the guaranty in the event that specified triggering events or conditions occur. We also record a guaranty asset that represents the present value of cash flows expected to be received as compensation over the life of the guaranty.

The following table displays changes in guaranty assets recognized in "Other assets" in our consolidated balance sheets for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | **(Dollars in millions)** | | |
| Beginning balance, January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 8,356 | $ 7,043 | $ 9,666 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (8,014) | — | — |
| Fair value of expected cash flows at issuance for new guaranteed Fannie Mae MBS issuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 182 | 4,135 | 3,938 |
| Net change in fair value of guaranty assets from portfolio securitizations. . . . . | (1) | 511 | (136) |
| Impact of amortization on guaranty contracts . . . . . . . . . . . . . . . . . . . . . . . | (59) | (2,719) | (2,767) |
| Other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7) | (347) | (3,270) |
| Impact of consolidation of MBS trusts[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (267) | (388) |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   457 | $ 8,356 | $ 7,043 |

[1] Represents the derecognition of guaranty assets during the period due to consolidations excluding the impact of adopting the new accounting standards.

F-71

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Fannie Mae MBS Included in Investments in Securities*

For Fannie Mae MBS included in "Investments in securities" in our consolidated balance sheets, we do not eliminate or extinguish the guaranty arrangement because it is a contractual arrangement with the unconsolidated MBS trusts. We determine the fair value of Fannie Mae MBS based on observable market prices because most Fannie Mae MBS are actively traded. Fannie Mae MBS receive high credit quality ratings primarily because of our guaranty. Absent our guaranty, Fannie Mae MBS would be subject to the credit risk on the underlying loans. We continue to recognize a guaranty obligation and a reserve for guaranty losses associated with these securities because we carry these securities in our consolidated financial statements as guaranteed Fannie Mae MBS. The fair value of the guaranty obligation, net of deferred profit, associated with Fannie Mae MBS included in "Investments in securities" approximates the fair value of the credit risk that exists on these Fannie Mae MBS absent our guaranty. The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.0 billion and $4.8 billion as of December 31, 2010 and 2009, respectively.

*Master Servicing*

We do not perform the day-to-day servicing of mortgage loans in a Fannie Mae MBS trust. We are compensated, however, for carrying out administrative functions for the trust and overseeing the primary servicer's performance of the day-to-day servicing of the trust's mortgage assets. For trusts that are not consolidated by us, this arrangement gives rise to either an MSA or an MSL. However, upon consolidation of the majority of our MBS trusts on January 1, 2010, we eliminated the majority of our MSA and MSL.

The following table displays the carrying value and fair value of our MSA for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2010** | **2009** | **2008** |
|  | (Dollars in millions) | | |
| Cost basis: |  |  |  |
| Beginning balance, January 1 | $ 196 | $ 764 | $1,171 |
| Adoption of new accounting standards | (195) | — | — |
| Additions | — | 56 | 302 |
| Amortization | — | (44) | (190) |
| Other-than-temporary impairments | — | (579) | (491) |
| Reductions for MBS trusts paid-off and impact of consolidation activity[1] | — | (1) | (28) |
| Ending balance, December 31 | 1 | 196 | 764 |
| Valuation allowance | 1 | 40 | 73 |
| Carrying value | $ — | $ 156 | $ 691 |
| Fair value, beginning of period | $ 179 | $ 855 | $1,808 |
| Fair value, end of period | $ — | $ 179 | $ 855 |

---

[1]   Excluding impact of adopting the new accounting standards.

The carrying value of our MSL, which approximates its fair value, was $25 million and $481 million as of December 31, 2010 and 2009, respectively.

Prior to January 1, 2010, we recognized servicing income, referred to as "Trust management income," in our consolidated statements of operations. Upon implementation of the new accounting standards, we report the

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

trust management income earned by consolidated trusts as a component of net interest income in our consolidated statements of operations. We recognized no servicing income for non-consolidated trusts in 2010. Trust management income of $40 million and $261 million relating to non-consolidated trusts for the years ended December 31, 2009 and 2008, respectively, has been reclassified as a component of "Fee and other income" in our consolidated statements of operations.

## 8. Acquired Property, Net

Acquired property, net consists of held-for-sale foreclosed property received in full satisfaction of a loan net of a valuation allowance for declines in the fair value of foreclosed properties after initial acquisition. We classify as held for sale those properties that we intend to sell and are actively marketed for sale. The following table displays the activity in acquired property and the related valuation allowance for the years ended December 31, 2010, 2009 and 2008.

| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
|---|---|---|---|
| | (Dollars in millions) | | |
| Balance, January 1, 2008 | $ 3,853 | $ (251) | $ 3,602 |
| Additions | 10,853 | (75) | 10,778 |
| Disposals | (6,666) | 664 | (6,002) |
| Write-downs, net of recoveries | — | (1,460) | (1,460) |
| Balance, December 31, 2008 | 8,040 | (1,122) | 6,918 |
| Additions | 14,165 | (79) | 14,086 |
| Disposals | (12,489) | 1,379 | (11,110) |
| Write-downs, net of recoveries | — | (752) | (752) |
| Balance, December 31, 2009 | 9,716 | (574) | 9,142 |
| Additions | 25,982 | (783) | 25,199 |
| Disposals | (17,644) | 1,407 | (16,237) |
| Write-downs, net of recoveries | — | (1,931) | (1,931) |
| Balance, December 31, 2010 | $ 18,054 | $(1,881) | $ 16,173 |

[1] Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

We classify as held for use those properties that we do not intend to sell or that are not ready for immediate sale in their current condition and are reflected in "Other assets" in our consolidated balance sheets. The following table displays the activity and carrying amount of acquired properties held for use for the years ended December 31, 2010, 2009 and 2008. The increase in held for use property is primarily from renting properties rather than actively marketing them.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| Beginning balance, January 1 | $ 44 | $ 11 | $107 |
| Transfers in from held for sale, net and additions | 977 | 45 | 1 |
| Transfers to held for sale, net | (64) | (11) | (93) |
| Depreciation and asset write-downs | (68) | (1) | (4) |
| Ending balance, December 31 | $889 | $ 44 | $ 11 |

F-73

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**9.   Short-Term Borrowings and Long-Term Debt**

Our short-term borrowings and long-term debt increased significantly due to our adoption of the new accounting standards on the transfers of financial assets and the consolidation of VIEs.

*Short-Term Borrowings*

Our short-term borrowings (borrowings with an original contractual maturity of one year or less) consist of both "Federal funds purchased and securities sold under agreements to repurchase" and "Short-term debt" in our consolidated balance sheets. The following table displays our outstanding short-term borrowings and weighted-average interest rates of these borrowings as of December 31, 2010 and 2009.

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2010** | | **2009** | |
| | **Outstanding** | **Weighted-Average Interest Rate[1]** | **Outstanding** | **Weighted-Average Interest Rate[1]** |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase.................... | $      52 | 2.20% | $      — | —% |
| Fixed-rate short-term debt: | | | | |
| Discount notes.............................. | $151,500 | 0.32% | $199,987 | 0.27% |
| Foreign exchange discount notes ................ | 384 | 2.43 | 300 | 1.50 |
| Other short-term debt ........................ | — | — | 100 | 0.53 |
| Total fixed-rate short-term debt................ | 151,884 | 0.32 | 200,387 | 0.27 |
| Floating-rate short-term debt[2] .................... | — | — | 50 | 0.02 |
| Total short-term debt of Fannie Mae.............. | 151,884 | 0.32 | 200,437 | 0.27 |
| Debt of consolidated trusts ...................... | 5,359 | 0.23 | — | — |
| Total short-term debt ........................ | $157,243 | 0.32% | $200,437 | 0.27% |

---

[1]   Includes the effects of discounts, premiums, and other cost basis adjustments.

[2]   Includes a portion of structured debt instruments that is reported at fair value.

Our federal funds purchased and securities sold under agreements to repurchase represent agreements to repurchase securities from banks with excess reserves on a particular day for a specified price, with repayment generally occurring on the following day. Our short-term debt includes discount notes and foreign exchange discount notes, as well as other short-term debt. Our discount notes are unsecured general obligations and have maturities ranging from overnight to 360 days from the date of issuance.

Additionally, we issue foreign exchange discount notes in the Euro money market enabling investors to hold short-term investments in different currencies. We have the ability to issue foreign exchange discount notes in maturities ranging from 5 to 360 days.

TREASURY-0568

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of December 31, 2010 and 2009.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | | **2009** | | |
| | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** |
| | | | **(Dollars in millions)** | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . | 2011 - 2030 | $ 300,344 | 3.20% | 2010 - 2030 | $279,945 | 4.10% |
| Medium-term notes . . . . . . . . . . . . | 2011 - 2020 | 199,266 | 2.13 | 2010 - 2019 | 171,207 | 2.97 |
| Foreign exchange notes and bonds . . . | 2017 - 2028 | 1,177 | 6.21 | 2010 - 2028 | 1,239 | 5.64 |
| Other long-term debt[2] . . . . . . . . . . | 2011 - 2040 | 44,893 | 5.64 | 2010 - 2039 | 62,783 | 5.80 |
| Total senior fixed . . . . . . . . . . . . | | 545,680 | 3.02 | | 515,174 | 3.94 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . . | 2011 - 2015 | 72,039 | 0.31 | 2010 - 2014 | 41,911 | 0.26 |
| Other long-term debt[2] . . . . . . . . . . | 2020 - 2037 | 386 | 4.92 | 2020 - 2037 | 1,041 | 4.12 |
| Total senior floating . . . . . . . . . . | | 72,425 | 0.34 | | 42,952 | 0.34 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[3] . . . . . . . . | 2011 - 2014 | 7,392 | 5.47 | 2011 - 2014 | 7,391 | 5.47 |
| Subordinated debentures . . . . . . . . . | 2019 | 2,663 | 9.91 | 2019 | 2,433 | 9.89 |
| Total subordinated fixed . . . . . . . . | | 10,055 | 6.65 | | 9,824 | 6.57 |
| Total long-term debt of Fannie Mae[4] . . . . . . . . . . . . . . . . . . . | | 628,160 | 2.77 | | 567,950 | 3.71 |
| Debt of consolidated trusts[2] . . . . . . | 2011 - 2051 | 2,411,597 | 4.59 | 2010 - 2039 | 6,167 | 5.63 |
| Total long-term debt . . . . . . . . . . | | $3,039,757 | 4.22% | | $574,117 | 3.73% |

[1] Includes the effects of discounts, premiums and other cost basis adjustments.

[2] Includes a portion of structured debt instruments that is reported at fair value.

[3] Consists of subordinated debt issued with an interest deferral feature.

[4] Reported amounts include a net discount and other cost basis adjustments of $12.4 billion and $15.6 billion as of December 31, 2010 and 2009, respectively.

Our long-term debt includes a variety of debt types. We issue both fixed and floating-rate medium-term notes with maturities greater than one year that are issued through dealer banks. We also offer Benchmark Notes and other bonds in large, regularly-scheduled issuances that provide increased efficiency, liquidity and tradability to the market. Additionally, we have issued notes and bonds denominated in several foreign currencies and are able to issue debt in numerous other currencies. We effectively convert all foreign currency-denominated transactions into U.S. dollars through the use of foreign currency swaps for the purpose of funding our mortgage assets.

Our other long-term debt includes callable and non-callable securities, which include all long-term non-Benchmark securities, such as zero-coupon bonds, fixed rate and other long-term securities, and are generally negotiated underwritings with one or more dealers or dealer banks.

TREASURY-0569

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Debt of Consolidated Trusts*

Debt of consolidated trusts represents our liability to third-party beneficial interest holders when we have included the assets of a corresponding trust in our consolidated balance sheets and we do not own all of the beneficial interests in the trust.

*Characteristics of Debt*

As of December 31, 2010 and 2009, the face amount of our debt securities of Fannie Mae was $792.6 billion and $784.0 billion, respectively. As of December 31, 2010 and 2009, we had zero-coupon debt with a face amount of $174.2 billion and $226.5 billion, respectively, which had an effective interest rate of 0.83% and 0.67%, respectively.

We issue callable debt instruments to manage the duration and prepayment risk of expected cash flows of the mortgage assets we own. Our outstanding debt as of December 31, 2010 and 2009 included $219.8 billion and $210.2 billion, respectively, of callable debt that could be redeemed in whole or in part at our option any time on or after a specified date.

The following table displays the amount of our long-term debt as of December 31, 2010 by year of maturity for each of the years 2011 through 2015 and thereafter. The first column assumes that we pay off this debt at maturity or on the call date if the call has been announced, while the second column assumes that we redeem our callable debt at the next available call date.

|  | Long-Term Debt by Year of Maturity | Assuming Callable Debt Redeemed at Next Available Call Date |
|---|---|---|
|  | (Dollars in millions) | |
| 2011 ......................................... | $   97,245 | $   297,703 |
| 2012 ......................................... | 150,913 | 146,091 |
| 2013 ......................................... | 122,278 | 65,677 |
| 2014 ......................................... | 71,705 | 45,553 |
| 2015 ......................................... | 66,741 | 18,282 |
| Thereafter ................................... | 119,278 | 54,854 |
| Total debt of Fannie Mae[1] ................... | 628,160 | 628,160 |
| Debt of consolidated trusts[2] ............... | 2,411,597 | 2,411,597 |
| Total long-term debt[3] ...................... | $3,039,757 | $3,039,757 |

_____

[1] Reported amount includes a net discount and other cost basis adjustments of $12.4 billion.

[2] Contractual maturity of debt of consolidated trusts is not a reliable indicator of expected maturity because borrowers of the underlying loans generally have the right to prepay their obligations at any time.

[3] Includes a portion of structured debt instruments that is reported at fair value.

The following table displays the amount of our debt of Fannie Mae that was called and repurchased and the associated weighted-average interest rates for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (Dollars in millions) | | |
| Debt called ....................................... | $289,770 | $166,777 | $158,988 |
| Weighted-average interest rate of debt called ...... | 3.1% | 4.2% | 5.3% |
| Debt repurchased................................... | $   1,333 | $   6,919 | $   13,214 |
| Weighted-average interest rate of debt repurchased ... | 3.3% | 4.3% | 4.8% |

F-76

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of both December 31, 2010 and 2009. We had no borrowings outstanding from these lines of credit as of December 31, 2010.

## 10.   Derivative Instruments and Hedging Activities

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. When deciding whether to use derivatives, we consider a number of factors, such as cost, efficiency, the effect on our liquidity, results of operations, and our overall interest rate risk management strategy. We choose to use derivatives when we believe they will provide greater relative value or more efficient execution of our strategy than debt securities. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of contracts that fall into four broad categories:

- *Interest rate swap contracts.*   An interest rate swap is a transaction between two parties in which each party agrees to exchange payments tied to different interest rates or indices for a specified period of time, generally based on a notional amount of principal. The types of interest rate swaps we use include pay-fixed swaps, receive-fixed swaps and basis swaps.

- *Interest rate option contracts.*   These contracts primarily include pay-fixed swaptions, receive-fixed swaptions, cancelable swaps and interest rate caps. A swaption is an option contract that allows us or a counterparty to enter into a pay-fixed or receive-fixed swap at some point in the future.

- *Foreign currency swaps.*   These swaps convert debt that we issue in foreign-denominated currencies into U.S. dollars. We enter into foreign currency swaps only to the extent that we issue foreign currency debt.

- *Futures.*   These are standardized exchange-traded contracts that either obligate a buyer to buy an asset at a predetermined date and price or a seller to sell an asset at a predetermined date and price. The types of futures contracts we enter into include Eurodollar, U.S. Treasury and swaps.

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We account for our derivatives pursuant to the accounting standards on derivative instruments, and recognize all derivatives as either assets or liabilities in our consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted at the counterparty level and are inclusive of cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our consolidated balance sheets. We record all derivative gains and losses, including accrued interest, in "Fair value losses, net" in our consolidated statements of operations.

TREASURY-0571

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments on a gross basis, before the application of master netting agreements, as of December 31, 2010 and 2009.

| | As of December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2010** | | | | **2009** | | | |
| | **Asset Derivatives** | | **Liability Derivatives** | | **Asset Derivatives** | | **Liability Derivatives** | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | | | (Dollars in millions) | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . . . . | $ 49,085 | $ 1,812 | $228,142 | $(14,115) | $ 68,099 | $ 1,422 | $314,501 | $(17,758) |
| Receive-fixed . . . . . . . . . . . . . . . . . . | 172,174 | 6,493 | 52,003 | (578) | 160,384 | 8,250 | 115,033 | (2,832) |
| Basis . . . . . . . . . . . . . . . . . . . . . . . . | 435 | 29 | 50 | — | 2,715 | 61 | 510 | (4) |
| Foreign currency . . . . . . . . . . . . . . . . | 1,274 | 164 | 286 | (51) | 727 | 107 | 810 | (49) |
| Swaptions: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . . . . . | 66,200 | 482 | 30,950 | (1,773) | 97,100 | 2,012 | 2,200 | (1) |
| Receive-fixed . . . . . . . . . . . . . . . . . . | 48,340 | 4,992 | 30,275 | (673) | 75,380 | 4,043 | — | — |
| Interest rate caps . . . . . . . . . . . . . . . . | 7,000 | 24 | — | — | 7,000 | 128 | — | — |
| Futures . . . . . . . . . . . . . . . . . . . . . . . | 220 | 3 | 25 | (1) | — | — | — | — |
| Other[1] . . . . . . . . . . . . . . . . . . . . . . . | 689 | 72 | — | — | 740 | 84 | 8 | — |
| Total gross risk management derivatives . . . . . . . . . . . . . . . . . | 345,417 | 14,071 | 341,731 | (17,191) | 412,145 | 16,107 | 433,062 | (20,644) |
| Collateral receivable (payable)[2] . . . . . | — | 3,452 | — | (604) | — | 5,437 | — | (1,023) |
| Accrued interest receivable (payable) . . | — | 1,288 | — | (1,805) | — | 2,596 | — | (2,813) |
| Total net risk management derivatives . . . . . . . . . . . . . . . . . | $345,417 | $18,811 | $341,731 | $(19,600) | $412,145 | $24,140 | $433,062 | $(24,480) |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans . . . . . . . . . . . . . . . . . . . | $ 2,880 | $ 19 | $ 4,435 | $ (105) | $ 273 | $ — | $ 4,453 | $ (66) |
| Forward contracts to purchase mortgage-related securities . . . . . . . | 19,535 | 123 | 27,697 | (468) | 3,403 | 7 | 23,287 | (283) |
| Forward contracts to sell mortgage-related securities . . . . . . . . . . . . . . | 40,761 | 811 | 24,562 | (169) | 83,299 | 1,141 | 7,232 | (14) |
| Total mortgage commitment derivatives . . . . . . . . . . . . . . . . . | $ 63,176 | $ 953 | $ 56,694 | $ (742) | $ 86,975 | $ 1,148 | $ 34,972 | $ (363) |
| Derivatives at fair value . . . . . . . . | $408,593 | $19,764 | $398,425 | $(20,342) | $499,120 | $25,288 | $468,034 | $(24,843) |

[1] Includes swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2] Collateral receivable represents cash collateral posted by us for derivatives in a loss position. Collateral payable represents cash collateral posted by counterparties to reduce our exposure for derivatives in a gain position.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from each of the major credit rating agencies. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we would be in

F-78

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

violation of these provisions, and the counterparties to the derivative instruments could request immediate payment or demand immediate collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of December 31, 2010 was $4.4 billion for which we posted collateral of $3.5 billion in the normal course of business. If the credit-risk-related contingency features underlying these agreements were triggered as of December 31, 2010, we would be required to post an additional $891 million of collateral to our counterparties.

The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2010 | 2009 | 2008 |
|  | (Dollars in millions) | | |
| Risk management derivatives: | | | |
| Swaps: | | | |
|   Pay-fixed | $(17,573) | $ 15,012 | $(64,764) |
|   Receive-fixed | 14,382 | (11,737) | 44,553 |
|   Basis | 17 | 96 | (102) |
|   Foreign currency[1] | 157 | 166 | (130) |
| Swaptions: | | | |
|   Pay-fixed | (2,026) | 453 | (666) |
|   Receive-fixed | 3,327 | (8,706) | 6,153 |
| Interest rate caps | (104) | 11 | (1) |
| Futures | 2 | — | — |
| Other[2] | 11 | 9 | (6) |
|   Total risk management derivatives fair value losses, net | (1,807) | (4,696) | (14,963) |
| Mortgage commitment derivatives fair value losses, net | (1,193) | (1,654) | (453) |
|   Total derivatives fair value losses, net | $ (3,000) | $ (6,350) | $(15,416) |

---

[1] Includes the effect of net contractual interest income of approximately $47 million, $38 million and $9 million for 2010, 2009 and 2008, respectively.

[2] Includes swap credit enhancements and mortgage insurance contracts.

TREASURY-0573

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Volume and Activity of our Derivatives*

*Risk Management Derivatives*

The following table displays, by derivative instrument type, our risk management derivative activity for the years ended December 31, 2010 and 2009.

| | For the Year Ended December 31, 2010 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Interest Rate Swaps | | | | Interest Rate Swaptions | | | | | |
| | Pay-Fixed | Receive-Fixed | Basis | Foreign Currency[1] | Pay-Fixed | Receive-Fixed | Interest Rate Caps | Futures | Other[2] | Total |
| | (Dollars in millions) | | | | | | | | | |
| Beginning notional balance . . . . . . . . . | $ 382,600 | $ 275,417 | $ 3,225 | $1,537 | $ 99,300 | $ 75,380 | $7,000 | $  — | $748 | $ 845,207 |
| Additions . . . . . . . . . | 212,214 | 250,417 | 55 | 636 | 51,700 | 51,025 | — | 598 | — | 566,645 |
| Terminations[3] . . . . . | (317,587) | (301,657) | (2,795) | (613) | (53,850) | (47,790) | — | (353) | (59) | (724,704) |
| Ending notional balance . . . . . . . . . | $ 277,227 | $ 224,177 | $  485 | $1,560 | $ 97,150 | $ 78,615 | $7,000 | $ 245 | $689 | $ 687,148 |

| | For the Year Ended December 31, 2009 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Interest Rate Swaps | | | | Interest Rate Swaptions | | | | | |
| | Pay-Fixed | Receive-Fixed | Basis | Foreign Currency[1] | Pay-Fixed | Receive-Fixed | Interest Rate Caps | Futures | Other[2] | Total |
| | (Dollars in millions) | | | | | | | | | |
| Beginning notional balance . . . . . . . . | $ 546,916 | $ 451,081 | $ 24,560 | $1,652 | $ 79,500 | $ 93,560 | $ 500 | $— | $827 | $1,198,596 |
| Additions  . . . . . . . | 297,379 | 279,854 | 2,765 | 577 | 32,825 | 19,175 | 6,500 | — | 13 | 639,088 |
| Terminations[3] . . . . | (461,695) | (455,518) | (24,100) | (692) | (13,025) | (37,355) | — | — | (92) | (992,477) |
| Ending notional balance . . . . . . . . | $ 382,600 | $ 275,417 | $ 3,225 | $1,537 | $ 99,300 | $ 75,380 | $7,000 | $— | $748 | $ 845,207 |

[1] Exchange rate adjustments to foreign currency swaps existing at both the beginning and the end of the period are included in terminations. Exchange rate adjustments to foreign currency swaps that are added or terminated during the period are reflected in the respective categories.

[2] Includes swap credit enhancements and mortgage insurance contracts.

[3] Includes matured, called, exercised, assigned and terminated amounts.

F-80

TREASURY-0574

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Mortgage Commitment Derivatives*

The following table displays, by commitment type, our mortgage commitment derivative activity for the years ended December 31, 2010 and 2009.

| | For the Year Ended December 31, | | | |
| | 2010 | | 2009 | |
| | Purchase Commitments | Sale Commitments | Purchase Commitments | Sale Commitments |
| | (Dollars in millions) | | | |
| Beginning of period notional balance . . . . . . . . | $ 31,416 | $ 90,531 | $ 35,004 | $ 36,232 |
| Mortgage related securities: | | | | |
| Open commitments . . . . . . . . . . . . . . . . . | 660,037 | 841,997 | 833,221 | 1,089,500 |
| Settled commitments . . . . . . . . . . . . . . . . | (639,495) | (867,205) | (832,279) | (1,035,201) |
| Loans: | | | | |
| Open commitments . . . . . . . . . . . . . . . . . | 90,043 | — | 114,054 | — |
| Settled commitments . . . . . . . . . . . . . . . . | (87,454) | — | (118,584) | — |
| End of period notional balance . . . . . . . . . . . | $ 54,547 | $ 65,323 | $ 31,416 | $ 90,531 |

**Derivative Counterparty Credit Exposure**

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

The table below displays our credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of December 31, 2010 and 2009.

| | As of December 31, 2010 | | | | |
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal | Other[2] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[3] . . . . . . . . . . . . . . . . . . . . | $ 350 | $ 325 | $ 675 | $ 75 | $ 750 |
| Less: Collateral held[4] . . . . . . . . . . . . . . . . . . . | 273 | 325 | 598 | — | 598 |
| Exposure net of collateral . . . . . . . . . . . . . . . . . | $ 77 | $ — | $ 77 | $ 75 | $ 152 |
| Additional information: | | | | | |
| Notional amount[5] . . . . . . . . . . . . . . . . . . . . . | $208,898 | $476,766 | $685,664 | $1,484 | $687,148 |
| Number of counterparties[5] . . . . . . . . . . . . . . . | 7 | 8 | 15 | | |

F-81

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | As of December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal | Other[2] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[3] . . . . . . . . . . . . . . . . . . . . . | $   658 | $   583 | $   1,241 | $ 84 | $   1,325 |
| Less: Collateral held[4] . . . . . . . . . . . . . . . . . . . . | 580 | 507 | 1,087 | — | 1,087 |
| Exposure net of collateral . . . . . . . . . . . . . . . . . . | $    78 | $    76 | $    154 | $ 84 | $    238 |
| Additional information: | | | | | |
| Notional amount[5] . . . . . . . . . . . . . . . . . . . . | $220,791 | $623,668 | $844,459 | $748 | $845,207 |
| Number of counterparties[5] . . . . . . . . . . . . . . | 7 | 9 | 16 | | |

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by Standard & Poor's and Moody's. The credit rating reflects the equivalent Standard & Poor's rating for any ratings based on Moody's scale.

[2] Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[3] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[4] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral. We posted cash collateral of $3.4 billion and $5.4 billion related to our counterparties' credit exposure to us as of December 31, 2010 and 2009, respectively.

[5] We had exposure to 3 and 6 interest rate and foreign currency derivative counterparties in a net gain position as of December 31, 2010 and 2009, respectively. Those interest rate and foreign currency derivatives had notional balances of $106.5 billion and $310.0 billion as of December 31, 2010 and 2009, respectively.

### Hedging Activities

In 2008, we began to employ fair value hedge accounting for some of our interest rate risk management activities by designating hedging relationships between certain of our interest rate derivatives and mortgage assets. We achieved hedge accounting by designating all or a fixed percentage of a pay-fixed receive variable interest rate swap as a hedge of the changes in the fair value attributable to the changes in LIBOR for a specific mortgage asset. Because we discontinued hedge accounting during 2008, we did not have any derivatives designated as hedges during 2010 or 2009.

For the year ended December 31, 2008, we recorded a $2.2 billion increase in the carrying value of the hedged assets before related amortization due to hedge accounting. This gain on the hedged assets was offset by fair value losses of $2.2 billion, which excluded valuation changes due to the passage of time, on the pay-fixed swaps designated as hedging instruments.

In addition, in 2008 we recorded a loss for the ineffective portion of our hedged assets of $94 million, which excluded a loss of $81 million that was not related to changes in the benchmark interest rate.

TREASURY-0576

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**11.   Income Taxes**

*Provision (Benefit) for Income Taxes*

We operate as a government-sponsored enterprise. We are subject to federal income tax, but we are exempt from state and local income taxes. The following table displays the components of our provision (benefit) for federal income taxes for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | (Dollars in millions) | | |
| Current income tax expense (benefit) .................................. | $(82) | $(999) | $   403 |
| Deferred income tax expense[1] ....................................... | — | 14 | 13,346 |
| Provision (benefit) for federal income taxes ............................. | $(82) | $(985) | $13,749 |

[1]   Amount excludes the income tax effect of items recognized directly in "Fannie Mae stockholders' equity (deficit)" where we did not establish a valuation allowance.

In January 2011, we received a refund of $1.1 billion from the IRS related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years.

The following table displays the difference between our effective tax rates and the statutory federal tax rates for the years ended December 31, 2010, 2009 and 2008, respectively.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| Statutory corporate tax rate ......................................... | 35.0% | 35.0% | 35.0% |
| Tax-exempt interest and dividends-received deductions ........................ | 1.3 | 0.3 | 0.5 |
| Equity investments in affordable housing projects........................... | 6.3 | 1.3 | 2.1 |
| Other ........................................................... | 0.1 | — | — |
| Valuation allowance ................................................ | (42.1) | (35.2) | (68.2) |
| Effective tax rate .................................................. | 0.6% | 1.4% | (30.6)% |

Our effective tax rate is the provision (benefit) for federal income taxes, excluding the tax effect of extraordinary items, expressed as a percentage of income or loss before federal income taxes. Our effective tax rates were different from the federal statutory rate of 35% for the years ended December 31, 2010, 2009 and 2008 due primarily to the increase to our valuation allowance for our net deferred tax assets that resulted in the recognition of $5.9 billion, $25.7 billion and $30.8 billion, respectively, in our provision for income taxes. In addition, our effective tax rate for the year ended December 31, 2010, was also impacted by the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS for our unrecognized tax benefits for the tax years 1999 through 2004. Our effective tax rates for the years ended December 31, 2010, 2009 and 2008 were impacted by the benefits of our holdings of tax-exempt investments, investments in housing projects eligible for the low-income housing tax credit and other equity investments that provide tax credits.

F-83

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Deferred Tax Assets and Liabilities*

The following table displays our deferred tax assets, deferred tax liabilities, and valuation allowance as of December 31, 2010 and 2009.

|  | As of December 31, | |
|---|---:|---:|
|  | **2010** | **2009** |
|  | **(Dollars in millions)** | |
| Deferred tax assets:[1] | | |
| Allowance for loan losses and basis in acquired property, net . . . . . . . . . . . . . . . . . . . | $ 27,063 | $ 23,615 |
| Mortgage and mortgage-related assets, including acquired credit-impaired loans . . . . . . | 10,825 | 10,547 |
| Debt and derivative instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,627 | 8,255 |
| Partnership credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,500 | 3,587 |
| Partnership and other equity investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,175 | 2,411 |
| Unrealized losses on AFS securities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 772 | 927 |
| Net operating loss and alternative minimum tax credit carryforwards. . . . . . . . . . . . . | 3,341 | 688 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,818 | 3,661 |
| Total deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 57,121 | 53,691 |
| Deferred tax liabilities: | | |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 | 45 |
| Total deferred tax liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 | 45 |
| Valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (56,314) | (52,737) |
| Net deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 754 | $ 909 |

---

[1] Certain prior year amounts have been reclassified to conform to the current year presentation.

We recognize deferred tax assets and liabilities for the future tax consequences related to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and for net operating loss and tax credit carryforwards. We recorded an increase in our valuation allowance in 2010 that resulted in the recognition of $5.9 billion in our provision for income taxes. This amount represented the tax effect associated with a portion of our pre-tax loss. The change in our 2010 valuation allowance also includes a $2.4 billion reduction primarily due to our adoption of the new accounting standards for amounts originally recognized in "Accumulated deficit." Our deferred tax assets, net of a valuation allowance, totaled $754 million and $909 million as of December 31, 2010 and 2009, respectively. We evaluate our deferred tax assets for recoverability using a consistent approach which considers the relative impact of both negative and positive evidence, including our historical profitability and projections of future taxable income. We are required to establish a valuation allowance for deferred tax assets and record a charge in our consolidated statements of operations or in "Fannie Mae stockholders' deficit" if we determine, based on available evidence at the time the determination is made, that it is more likely than not that some portion or all of the deferred tax assets will not be realized. In evaluating the need for a valuation allowance, we estimate future taxable income or loss based on management-approved business plans and ongoing tax planning strategies. This process involves significant management judgment about assumptions that are subject to change from period to period based on changes in tax laws or variances between our projected operating performance, our actual results and other factors.

We are in a cumulative book taxable loss position and have been for more than a three-year period. For purposes of establishing a deferred tax valuation allowance, this cumulative book taxable loss position is considered significant, objective evidence that we may not be able to realize some portion of our deferred tax

TREASURY-0578

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

assets in the future. Our cumulative book taxable loss position was caused by the negative impact on our results from the weak housing and credit market conditions that deteriorated dramatically during 2008 and continued through 2009 and 2010. These conditions caused an increase in our pre-tax loss, due in part to credit losses, and downward revisions to our projections of future results. Because of the volatile economic conditions, our projections of future credit losses are uncertain.

During 2008, we concluded that it was more likely than not that we would not generate sufficient future taxable income in the foreseeable future to realize all of our deferred tax assets. Our conclusion was based on our consideration of the relative weight of the available evidence, including the rapid deterioration of market conditions discussed above, the uncertainty of future market conditions on our results of operations, and significant uncertainty surrounding our future business model as a result of the placement of the company into conservatorship by FHFA. As a result, we recorded a valuation allowance on our net deferred tax asset for the portion of the future tax benefit that more likely than not will not be utilized in the future. We did not, however, establish a valuation allowance for the deferred tax asset amount that is related to unrealized losses recorded through AOCI for certain available-for-sale securities. We believe this deferred tax amount is recoverable because we have the intent and ability to hold these securities until recovery of the unrealized loss amounts. There have been no changes to our conclusion as of December 31, 2010.

As a result of adopting the new accounting standard for assessing other-than-temporary impairments, we recorded a cumulative-effect adjustment at April 1, 2009 of $8.5 billion on a pre-tax basis ($5.6 billion after tax) to reclassify the noncredit portion of previously recognized other-than-temporary impairments from "Accumulated deficit" to AOCI. We also reduced the "Accumulated deficit" and valuation allowance by $3.0 billion for the deferred tax asset related to the amounts previously recognized as other-than-temporary impairments in our consolidated statements of operations based upon the assertion of our intent and ability to hold certain AFS securities until recovery.

As of December 31, 2010, we had $11.3 billion of net operating loss carryforwards that expire in 2029 and 2030, $1.4 billion of capital loss carryforwards that expire in 2013 through 2015, $4.5 billion of partnership tax credit carryforwards that expire in various years through 2030, and $126 million of alternative minimum tax credit carryforwards that have an indefinite carryforward period.

### Unrecognized Tax Benefits

We had $864 million, $911 million, and $1.7 billion of unrecognized tax benefits as of December 31, 2010, 2009 and 2008, respectively. Of these amounts, we had $29 million as of December 31, 2009, which was resolved favorably in 2010 and reduced our effective tax rate in 2010. There are no unrecognized tax benefits as of December 31, 2010 that would reduce our effective tax rate in future periods. As of December 31, 2010 and 2009, we had accrued interest payable related to unrecognized tax benefits of $5 million and $41 million, respectively, and did not recognize any tax penalty payable. For the years ended December 31, 2010, 2009 and 2008, we had total interest expense related to unrecognized tax benefits of $2 million, $32 million and $223 million, respectively, and did not have any tax expense related to tax penalties.

During 2010, we and the IRS appeals division reached an agreement for all issues related to the tax years 1999 through 2004, which resulted in a $99 million reduction in our gross balance of unrecognized tax benefits for the tax years 1999 through 2004. Similarly, during 2009, we reached an agreement of $1.2 billion, net of tax credits, with the IRS on the audits of our 2005 and 2006 federal income tax returns. The decrease in our unrecognized tax benefits during the year ended December 31, 2009 is due to our settlement reached with the IRS regarding certain tax positions related to fair market value losses and the settlement of tax years 2005 through 2006. The decrease in our unrecognized tax benefits represents a temporary difference, and therefore does not result in a change to our effective tax rate, except to the extent of the reversal of a portion of the valuation allowance for deferred tax assets resulting from an agreement reached with the IRS for our

F-85

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

unrecognized tax benefits for the tax years 1999 through 2004. The IRS is currently examining our federal income tax returns for the tax years 2007 and 2008. We expect to reach a settlement agreement with the IRS for all issues related to the 2007 and 2008 tax years. As a result of this conclusion, it is reasonably possible that a $105 million reduction in our gross balance of unrecognized tax benefits may occur within the next 12 months for the 2007 and 2008 tax years.

The following table displays the changes in our unrecognized tax benefits for the years ended December 31, 2010, 2009 and 2008, respectively.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (Dollars in millions) | | |
| Unrecognized tax benefits as of January 1 | $911 | $ 1,745 | $  124 |
| Gross increases—tax positions in prior years | 83 | 38 | 49 |
| Gross decreases—tax positions in prior years | (31) | (1) | (6) |
| Gross increases—tax positions in current year | — | 761 | — |
| Settlements | (99) | (1,632) | 1,578 |
| Unrecognized tax benefits as of December 31[1] | $864 | $  911 | $1,745 |

---

[1] Amounts exclude tax credits of $804 million, $716 million and $456 million as of December 31, 2010, 2009 and 2008, respectively.

## 12.   Loss Per Share

The following table displays the computation of basic and diluted loss per share of common stock for the years ended December 31, 2010, 2009 and 2008.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (Dollars and shares in millions, except per share amounts) | | |
| Loss before extraordinary losses | $(14,018) | $(72,022) | $(58,319) |
| Extraordinary losses, net of tax effect | — | — | (409) |
| Net loss | (14,018) | (72,022) | (58,728) |
| Less: Net loss attributable to the noncontrolling interest | 4 | 53 | 21 |
| Net loss attributable to Fannie Mae | (14,014) | (71,969) | (58,707) |
| Preferred stock dividends and issuance costs at redemption | (7,704) | (2,474) | (1,069) |
| Net loss attributable to common stockholders-basic and diluted | $(21,718) | $(74,443) | $(59,776) |
| Weighted-average common shares outstanding-basic and diluted[1] | 5,694 | 5,680 | 2,487 |
| Basic and diluted loss per share: |  |  |  |
| Loss before extraordinary losses | $  (3.81) | $ (13.11) | $ (23.88) |
| Extraordinary losses, net of tax effect | — | — | (0.16) |
| Basic and diluted loss per share | $  (3.81) | $ (13.11) | $ (24.04) |

---

[1] Amounts include 4.6 billion for both the years ended December 31, 2010 and 2009 and 1.4 billion for the year ended December 31, 2008 of weighted-average shares of common stock, that would be issued upon the full exercise of the warrant issued to Treasury from the date the warrant was issued through December 31, 2010, 2009 and 2008, respectively.

F-86

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Weighted-average options and performance awards to purchase approximately 8 million, 14 million and 22 million shares of common stock were outstanding for the years ended December 31, 2010, 2009 and 2008, respectively, and were excluded from the computation of diluted EPS in the table above as they would have been anti-dilutive.

**13.   Stock-Based Compensation**

We have two stock-based compensation plans, the 1985 Employee Stock Purchase Plan and the Stock Compensation Plan of 2003. Under these plans, we previously offered various stock-based compensation programs where we provided employees an opportunity to purchase Fannie Mae common stock or periodically made stock awards to certain employees in the form of nonqualified stock options, performance share awards, restricted stock awards, restricted stock units or stock bonus awards. Under the senior preferred stock purchase agreement with Treasury, we may not issue Fannie Mae equity securities without the consent of Treasury, other than the senior preferred stock, the Treasury warrant, common stock issuable upon exercise of the warrant, or as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement. As such, we currently do not intend to grant equity compensation to employees under these plans.

In connection with our stock-based compensation plans for shares or awards issued prior to conservatorship, we recorded compensation expense of $39 million, $52 million and $97 million for 2010, 2009 and 2008, respectively.

*Stock-Based Compensation Plans*

The 1985 Employee Stock Purchase Plan (the "1985 Purchase Plan") provided employees an opportunity to purchase shares of Fannie Mae common stock at a discount to the fair market value of the stock during specified purchase periods. Our Board of Directors sets the terms and conditions of offerings under the 1985 Purchase Plan, including the number of available shares and the size of the discount. There were no offerings under the 1985 Purchase Plan in any year presented. The aggregate maximum number of shares of common stock available for employee purchase is 50 million. Since inception, we have made available 38,039,742 shares for purchase by employees under this plan.

The Stock Compensation Plan of 2003 (the "2003 Plan") is the successor to the Stock Compensation Plan of 1993 (the "1993 Plan"). The 2003 Plan enabled us to make stock awards in various forms and combinations, including stock options, stock appreciation rights, restricted stock, restricted stock units, performance share awards and stock bonus awards. The aggregate maximum number of shares of common stock available for award to employees and non-management directors under the 2003 Plan is 40 million. Including the effects of share cancellations, we have awarded 10,970,345 shares under this plan since its inception. The shares awarded under the 2003 Plan were authorized and unissued shares, treasury shares or shares purchased on the open market.

*Restricted Stock Program*

Under the 1993 and 2003 Plans, prior to conservatorship, employees could have received restricted stock awards ("RSAs") and, under the 2003 Plan, employees may have received restricted stock units ("RSUs"). The type of award employees received under the 2003 Plan generally depended upon years of service and age at the time of grant. Each RSU represented the right to receive a share of common stock at the time of vesting. As a result, RSUs are generally similar to restricted stock, except that RSUs do not confer voting rights on their holders. By contrast, holders of the RSAs do have voting rights. Vesting of the grants is based on continued employment. In general, grants vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Based on the fair value of our common stock on the respective

F-87

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

grant dates, the fair value of restricted stock that vested in 2010, 2009 and 2008 was $51 million, $83 million, and $103 million, respectively. The compensation expense related to restricted stock is based on the grant date fair value of our common stock. We recorded compensation expense for these restricted stock grants of $39 million, $52 million, and $97 million for 2010, 2009 and 2008, respectively.

The following table displays restricted stock activity for 2010, 2009 and 2008.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | Number of Shares | Weighted Average Fair Value at Grant Date | Number of Shares | Weighted Average Fair Value at Grant Date | Number of Shares | Weighted Average Fair Value at Grant Date |
| | (Shares in thousands) | | | | | |
| Nonvested as of January 1 . . . . . . . . . . | 2,873 | $39.53 | 5,934 | $41.19 | 4,375 | $57.67 |
| Granted . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 4,518 | 31.96 |
| Vested . . . . . . . . . . . . . . . . . . . . . . . | (1,199) | 42.58 | (1,858) | 44.78 | (1,768) | 58.25 |
| Forfeited . . . . . . . . . . . . . . . . . . . . . | (164) | 37.34 | (1,203) | 39.61 | (1,191) | 41.58 |
| Nonvested as of December 31 . . . . . . . | 1,510 | $37.34 | 2,873 | $39.53 | 5,934 | $41.19 |

The following table displays information related to unvested restricted stock as of December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (Dollars in millions) | | |
| Unrecognized compensation cost . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 19 | $ 56 | $ 148 |
| Expected weighted-average life of unvested restricted stock . . . . . . . | 1.0 years | 1.6 years | 2.4 years |

*Nonqualified Stock Options*

Under the 2003 Plan and prior to conservatorship, we could have granted stock options. Generally, these options may not be exercised until at least one year subsequent to the grant date, and the options expire ten years from the date of grant. Typically, options vest 25% per year beginning on the first anniversary of the date of grant. The exercise price of each option is equal to the fair market value of our common stock on the date we grant the option.

The following table displays nonqualified stock option activity for 2010, 2009 and 2008.

| | For the Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2010** | | | **2009** | | | **2008** | | |
| | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date |
| Beginning balance, January 1 . . . . . . | 8,759 | $72.39 | $23.60 | 12,293 | $72.12 | $23.62 | 17,031 | $71.90 | $23.49 |
| Forfeited and/or expired . . . . . . . . . . | (3,960) | 69.15 | 25.26 | (3,534) | 71.45 | 23.66 | (4,738) | 71.19 | 23.13 |
| Ending balance, December 31[1] . . . . | 4,799 | $75.07 | $23.01 | 8,759 | $72.39 | $23.60 | 12,293 | $72.12 | $23.62 |
| Options exercisable, December 31 . . . | 4,799 | $75.07 | $23.01 | 8,759 | $72.39 | $23.60 | 12,291 | $72.12 | $23.62 |

[1] All options outstanding are fully vested.

F-88

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**14.  Employee Retirement Benefits**

We sponsor both defined benefit plans and defined contribution plans for our employees, as well as a healthcare plan that provides certain health benefits for retired employees and their dependents. Net periodic benefit costs for defined benefit and healthcare plans, which are determined on an actuarial basis, and expenses for our defined contribution plans, are included in "Salaries and employee benefits expense" in our consolidated statements of operations. For the years ended December 31, 2010, 2009 and 2008, we recognized net periodic benefit costs for our defined benefit and healthcare plans and expenses for our defined contributions plans of $112 million, $131 million, and $95 million, respectively.

***Defined Benefit Pension Plans and Postretirement Health Care Plan***

Our defined benefit pension plans include qualified and nonqualified noncontributory plans. Pension plan benefits are based on years of credited service and a percentage of eligible compensation. In 2007, the defined benefit pension plans were amended to cease benefits accruals for employees that did not meet certain criteria to be grandfathered under the plan and to vest those employees in their frozen accruals.

We fund our qualified pension plan through employer contributions to a qualified irrevocable trust that is maintained for the sole benefit of plan participants and their beneficiaries. Contributions to our qualified pension plan are subject to a minimum funding requirement and a maximum funding limit under the Employee Retirement Income Security Act of 1974 ("ERISA") and IRS regulations.

Our nonqualified defined benefit pension plans consist of an Executive Pension Plan, Supplemental Pension Plan and the Supplemental Pension Plan of 2003, which is a bonus-based plan. These plans cover certain employees and supplement the benefits payable under the qualified pension plan. The Executive Pension Plan was frozen in 2009. Benefits under the Executive Pension Plan are paid through a rabbi trust.

The Supplemental Pension Plan provides retirement benefits to employees who participate in our qualified pension plan and do not receive a benefit from the Executive Pension Plan, and whose salary exceeds the statutory compensation cap applicable to the qualified plan or whose benefit is limited by the statutory benefit cap. Similarly, the Supplemental Pension Plan of 2003 provides additional benefits to our officers based on eligible incentive compensation, if any, received by an officer, but the amount of incentive compensation considered is limited to 50% of the officer's base salary. We pay benefits for our unfunded defined benefit Supplemental Pension Plans from our cash and cash equivalents.

We also sponsor a contributory postretirement Health Care Plan that covers substantially all regular full-time employees who meet the applicable age and service requirements. We subsidize premium costs for medical coverage for some employees who meet the age and service requirements. Employees hired after 2007 receive access to our retiree medical plan, when eligible, but they do not qualify for the subsidy. We accrue and pay the benefits for our unfunded postretirement Health Care Plan from our cash and cash equivalents.

TREASURY-0583

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays components of our net periodic benefit cost for our qualified and nonqualified pension plans and other postretirement plan for the years ended December 31, 2010, 2009 and 2008. The net periodic benefit cost for each period is calculated based on assumptions at the end of the prior year.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | 2009 | | 2008 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | | | |
| Service cost | $ 37 | $ 6 | $ 37 | $ 5 | $ 46 | $ 5 |
| Interest cost | 66 | 9 | 62 | 9 | 58 | 9 |
| Other | (51) | (2) | (22) | (2) | (59) | 1 |
| Net periodic benefit cost | $ 52 | $13 | $ 77 | $12 | $ 45 | $15 |

Prior service costs, which are changes in benefit obligations due to plan amendments, are amortized over the average remaining service period for active employees for our pension plans and prior to the full eligibility date for the other postretirement Health Care Plan.

The following table displays amounts recorded in AOCI that have not been recognized as a component of net periodic benefit cost for the years ended December 31, 2010 and 2009.

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2010 | | 2009 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | |
| Net actuarial loss | $218 | $ 42 | $162 | $ 39 |
| Net prior service cost (credit) | 6 | (56) | 7 | (61) |
| Net transition obligation | — | 4 | — | 5 |
| Pre-tax amount recorded in AOCI | $224 | $(10) | $169 | $(17) |
| After-tax amount recorded in AOCI[1] | $224 | $(10) | $169 | $(17) |

---

[1] During 2008, we established a valuation allowance for our deferred tax assets, which has resulted in the reversal of the tax benefit amounts recorded in AOCI for our pension and other postretirement plans. Refer to "Note 11, Income Taxes" for additional information.

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays the changes in the pre-tax amounts recognized in AOCI for the years ended December 31, 2010 and 2009.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2010** | | **2009** | |
| | **Pension Plans** | **Other Post-Retirement Plan** | **Pension Plans** | **Other Post-Retirement Plan** |
| | (Dollars in millions) | | | |
| **Actuarial (Gain) Loss** | | | | |
| Beginning balance, January 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $162 | $ 39 | $276 | $ 32 |
| Current year actuarial (gain) loss . . . . . . . . . . . . . . . . . . . . . . . . . | 64 | 4 | (92) | 8 |
| Actuarial gain due to curtailments . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (1) | — |
| Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (8) | (1) | (21) | (1) |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $218 | $ 42 | $162 | $ 39 |
| **Prior Service Cost (Credit)** | | | | |
| Beginning balance, January 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7 | $(61) | $ 10 | $(66) |
| Prior service credit due to curtailments . . . . . . . . . . . . . . . . . . . . . . | — | — | (1) | — |
| Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1) | 5 | (2) | 5 |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6 | $(56) | $ 7 | $(61) |

The following table displays pre-tax amounts in AOCI as of December 31, 2010 that are expected to be recognized as components of net periodic benefit cost in 2011.

| | As of December 31, 2010 | |
| --- | --- | --- |
| | **Pension Plans** | **Other Post-Retirement Plan** |
| | (Dollars in millions) | |
| Net actuarial loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $11 | $ 2 |
| Net prior service cost (credit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | (5) |
| Net transition obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1 |
| Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $12 | $(2) |

F-91

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays the status of our pension and other postretirement plans as of December 31, 2010 and 2009.

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2010 | | 2009 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of year............................ | $1,055 | $ 166 | $  959 | $ 151 |
| Service cost ................................................ | 37 | 6 | 37 | 5 |
| Interest cost ................................................ | 66 | 9 | 62 | 9 |
| Plan participants' contributions ................................ | — | 2 | — | 2 |
| Net actuarial loss............................................ | 130 | 4 | 29 | 8 |
| Curtailment gain ............................................ | — | — | (4) | — |
| Benefits paid............................................... | (31) | (7) | (28) | (9) |
| Benefit obligation at end of year .............................. | 1,257 | 180 | 1,055 | 166 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of year ..................... | 799 | — | 579 | — |
| Actual return on plan assets ................................... | 125 | — | 166 | — |
| Employer contributions ...................................... | 49 | 6 | 82 | 8 |
| Plan participants' contributions ................................ | — | 2 | — | 2 |
| Benefits paid............................................... | (31) | (8) | (28) | (10) |
| Fair value of plan assets at end of year ......................... | 942 | — | 799 | — |
| Funded status at end of year .................................. | $ (315) | $(180) | $ (256) | $(166) |
| **Amounts Recognized in our Consolidated Balance Sheets** | | | | |
| Accrued benefit cost ........................................ | $ (315) | $(180) | $ (256) | $(166) |
| Accumulated other comprehensive (income) loss ..................... | 224 | (10) | 169 | (17) |
| Net amount recognized ...................................... | $  (91) | $(190) | $  (87) | $(183) |

Actuarial gains or losses reflect annual changes in the amount of either the benefit obligation or the fair value of plan assets that result from the difference between actual experience and projected amounts or from changes in assumptions.

The following table displays the amount of the projected benefit obligation, accumulated benefit obligation and fair value of plan assets for our pension plans as of December 31, 2010 and 2009.

| | As of December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Projected benefit obligation ......................................... | $1,257 | $1,055 |
| Accumulated benefit obligation ....................................... | 1,111 | 926 |
| Fair value of plan assets ........................................... | 942 | 799 |

*Contributions*

Contributions to the qualified pension plan increase the plan assets while contributions to the unfunded plans are made to fund current period benefit payments or to fulfill annual funding requirements. We were not required to make minimum contributions to our qualified pension plan for each of the years in the three-year period ended December 31, 2010 since we met the minimum funding requirements as prescribed by ERISA.

F-92

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

However, we did make a discretionary contribution to our qualified pension plan of $42 million, $76 million and $80 million during 2010, 2009 and 2008, respectively.

During 2010, we contributed $42 million to our qualified pension plan, $7 million to our nonqualified pension plans and $6 million to our other postretirement benefit plan. During 2011, we anticipate contributing $56 million to our benefit plans, consisting of $41 million to our qualified pension plan, $7 million to our nonqualified pension plans and $8 million to our other postretirement plan.

The fair value of plan assets of our funded qualified pension plan was less than our accumulated benefit obligation by $5 million as of December 31, 2010 and greater than our accumulated benefit obligation by $14 million as of December 31, 2009. There were no plan assets returned to us as of February 24, 2011 and we do not expect any plan assets to be returned to us during the remainder of 2011.

*Assumptions*

Pension and other postretirement benefit amounts recognized in our consolidated financial statements are determined on an actuarial basis using several different assumptions that are measured as of December 31, 2010, 2009 and 2008. The following table displays the actuarial assumptions for our plans used in determining the net periodic benefit costs and the projected accumulated benefit obligations as of December 31, 2010, 2009 and 2008.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **Pension Benefits** | | | **Postretirement Benefits** | | |
| | **2010** | **2009** | **2008** | **2010** | **2009** | **2008** |
| **Weighted-average assumptions used to determine net periodic benefit costs:** | | | | | | |
| Discount rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.10% | 6.15% | 6.40% | 5.75% | 6.15% | 6.40% |
| Average rate of increase in future compensation . . . . . . . . . . . . . . . . | 4.00 | 4.00 | 5.00 | | | |
| Expected long-term weighted-average rate of return on plan assets . . . . | 7.50 | 7.50 | 7.50 | | | |
| **Weighted-average assumptions used to determine benefit obligation at year-end:** | | | | | | |
| Discount rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.65% | 6.10% | 6.15% | 5.40% | 5.75% | 6.15% |
| Average rate of increase in future compensation . . . . . . . . . . . . . . . . | 4.00 | 4.00 | 4.00 | | | |
| **Health care cost trend rate assumed for next year:** | | | | | | |
| Pre-65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | 8.00% | 8.00% | 8.00% |
| Post-65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | 8.00 | 8.00 | 8.00 |
| **Rate that cost trend rate gradually declines to and remains at:** . . . . | | | | 5.00 | 5.00 | 5.00 |
| Year that rate reaches the ultimate trend rate . . . . . . . . . . . . . . . . . . | | | | 2018 | 2018 | 2015 |

As of December 31, 2010, the effect of a 1% increase or decrease in the assumed health care cost trend rate would change the accumulated postretirement benefit obligation by $1 million.

We review our pension and other postretirement benefit plan assumptions on an annual basis. We calculate the net periodic benefit cost each year based on assumptions established at the end of the previous calendar year, unless we remeasure as a result of a curtailment. In determining our net periodic benefit costs, we assess the discount rate to be used in the annual actuarial valuation of our pension and other postretirement benefit obligations at year-end. We consider the current yields on high-quality, corporate fixed-income debt instruments with maturities corresponding to the expected duration of our benefit obligations and supported by cash flow matching analysis based on expected cash flows specific to the characteristics of our plan participants, such as age and gender. As of December 31, 2010, the discount rate used to determine our obligation decreased by 45 basis points for pension and 35 basis points for postretirement, reflecting a

F-93

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

corresponding rate decrease in corporate-fixed income debt instruments during 2010. We also assess the long-term rate of return on plan assets for our qualified pension plan. The return on asset assumption reflects our expectations for plan-level returns over a term of approximately seven to ten years. Given the longer-term nature of the assumption and a stable investment policy, it may or may not change from year to year. However, if longer-term market cycles or other economic developments impact the global investment environment, or asset allocation changes are made, we may adjust our assumption accordingly. The expected long-term weighted-average rate of return on plan assets for 2010 remained unchanged from the 2009 rate of 7.5%. Changes in assumptions used in determining pension and other postretirement benefit plan expense resulted in an increase in expense of $4 million for the years ended December 31, 2010 and a decrease in expense of $4 million and $15 million in our consolidated statements of operations for the years ended December 31, 2009 and 2008, respectively.

*Qualified Pension Plan Assets*

The following table displays our qualified pension plan assets by asset category at their fair value as of December 31, 2010 and 2009. The fair value of assets in Level 1 have been determined based on quoted prices of identical assets in active markets as of year end, while the fair value of assets in Level 2 have been determined based on the net asset value per share of the investments as of year end. None of the fair values for plan assets were determined by using significant unobservable inputs, or Level 3.

| | Fair Value Measurements as of December 31, | | | | | |
| | 2010 | | | 2009 | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Cash equivalents | $ — | $ 13 | $ 13 | $ — | $ 14 | $ 14 |
| Equity securities: | | | | | | |
| U.S. large-cap[1] | 329 | — | 329 | 408 | — | 408 |
| U.S. mid/small cap[2] | 83 | — | 83 | 116 | — | 116 |
| International[3] | — | 255 | 255 | — | 115 | 115 |
| Fixed income securities: | | | | | | |
| Investment grade credit[4] | — | 262 | 262 | — | 146 | 146 |
| Total plan assets at fair value | $412 | $530 | $942 | $524 | $275 | $799 |

---

[1] Consists of a publicly traded equity index fund that tracks the S&P 500.

[2] Consists of a publicly traded equity index fund that tracks all regularly traded U.S. stocks except those in the S&P 500.

[3] Consists of an international equity fund that tracks an index that consists of approximately 6,500 and 4,000 securities for 2010 and 2009, respectively, across over 40 countries. Japan has the largest share with 15% in 2010.

[4] Consists of a bond fund that tracks a broadly diversified investment grade index that consists of approximately 2,700 issuances of investment grade bonds from diverse industries. International markets represent 19% of the fund.

Our investment strategy is to diversify our plan assets in order to reduce our concentration risk, reflect the plan's profile over time, and maintain an asset allocation that allows us to meet current and future benefit obligations. The assets of the qualified pension plan consist primarily of exchange-listed stocks, held in broadly diversified index funds. We also invest in a broadly diversified indexed fixed income account. In addition, the plan holds liquid short-term investments that provide for monthly pension payments, plan

TREASURY-0588

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

expenses and, from time to time, may represent uninvested contributions or reallocation of plan assets. The target allocations for plan assets are from 70% to 80% for equity securities, 25% to 30% for fixed income securities and 0% to 5% for all other types of investments. The plan fiduciary periodically assesses our asset allocation to assure it is consistent with our plan objective.

*Expected Benefit Payments*

The following table displays the benefits we expect to pay in each of the next five years and in the aggregate for the subsequent five years for our pension plans and other postretirement plan and are based on the same assumptions used to measure our benefit obligation as of December 31, 2010.

| | | Expected Retirement Plan Benefit Payments | |
| | | Other Postretirement Benefits | |
| | Pension Benefits | Before Medicare Part D Subsidy | Medicare Part D Subsidy |
|---|---|---|---|
| | | (Dollars in millions) | |
| 2011 | $ 33 | $ 9 | $1 |
| 2012 | 36 | 9 | 1 |
| 2013 | 40 | 10 | 1 |
| 2014 | 44 | 11 | 1 |
| 2015 | 49 | 12 | 1 |
| 2016—2020 | 348 | 73 | 8 |

***Defined Contribution Plans***

*Retirement Savings Plan*

The Retirement Savings Plan is a defined contribution plan that includes a 401(k) before-tax feature, a regular after-tax feature and a Roth after-tax feature. Under the plan, eligible employees may allocate investment balances to a variety of investment options.

We match employee contributions in cash up to 6% of eligible compensation (base salary, overtime pay and eligible incentive compensation) for employees who are not active in our defined benefit pension plan and up to 3% of eligible compensation (base salary only) for employees who are active in our defined benefit pension plan. Matching contributions for employees who are not active in our defined benefit pension plan are 100% vested and matching contributions for employees who are active in our defined benefit pension plan are fully vested after five years of service.

All employees, with the exception of those who participated in the Executive Pension Plan, receive a 2% contribution regardless of employee contributions to this plan. Participants are fully vested in this 2% contribution after three years of service.

For the years ended December 31, 2010, 2009 and 2008, the maximum employee contribution as established by the IRS was $16,500, $16,500 and $15,500, respectively, with additional "catch- up" contributions permitted for participants aged 50 and older of $5,500, $5,500 and $5,000, respectively.

There was no option to invest directly in our common stock for the years ended December 31, 2010, 2009 and 2008. We recorded expense for this plan of $47 million, $42 million and $35 million for the years ended December 31, 2010, 2009 and 2008, respectively.

F-95

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Supplemental Retirement Savings Plan*

The Supplemental Retirement Savings Plan is an unfunded, nonqualified defined contribution plan. This plan supplements our Retirement Savings Plan to provide benefits to employees who are not grandfathered under our defined benefit pension plan and whose annual eligible earnings exceed the IRS annual limit on eligible compensation for 401(k) plans.

We credit to the plan 8% of a participant's eligible compensation that exceeds the IRS annual limit. Eligible compensation consists of base salary plus eligible incentive compensation earned, if any, up to a combined maximum of two times base salary. The 8% credit consists of (1) a 6% credit that vests immediately, and (2) a 2% credit that vests after three years of service.

For the years ended December 31, 2010, 2009 and 2008, we recognized expense related to this plan of less than $1 million in each year.

*Employee Stock Ownership Plan*

During 2010, our Employee Stock Ownership Plan ("ESOP") was terminated and amended to provide that all distributions are to be made in cash. In addition, all Fannie Mae Common Stock in the ESOP was sold as part of the plan termination. The assets of the ESOP will be distributed to participants following receipt of an IRS determination letter regarding the tax qualification status of the ESOP.

**15. Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. In October 2010, we began referring to our "HCD" business segment as our "Multifamily" business segment to better reflect the segment's focus on multifamily rental housing finance, especially affordable rentals, which is an increasingly important part of our company's mission. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs.

***Segment Reporting for 2010***

Our prospective adoption of the new accounting standards had a significant impact on the presentation and comparability of our consolidated financial statements due to the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. We continue to manage Fannie Mae based on the same three business segments. However, effective in 2010, we changed the presentation of segment financial information that is currently evaluated by management.

Under the current segment reporting, the sum of the results for our three business segments does not equal our consolidated statements of operations, as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our consolidated statements of operations.

While some line items in our segment results were not impacted by either the change from the new accounting standards or changes to our segment presentation, others were impacted significantly, which reduces the comparability of our segment results with prior years. We have neither restated prior year results nor presented current year results under the old presentation as we determined that it was impracticable to do so; therefore, our segment results reported in the current period are not comparable with prior years.

TREASURY-0590

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The section below provides a discussion of the three business segments and how each segment's financial information reconciles to our consolidated financial statements for those line items that were impacted significantly as a result of changes to our segment presentation.

*Single-Family*

Revenue drivers for Single-Family did not change under our current method of segment reporting. Revenue for our Single-Family business is from the guaranty fees the segment receives as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS, most of which are held within consolidated trusts, and on the single-family mortgage loans held in our mortgage portfolio. The primary source of profit for the Single-Family segment is the difference between the guaranty fees earned and the costs of providing the guaranty, including credit-related losses.

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations in order to reflect the activities and results of the Single-Family segment. The significant differences from the consolidated statements of operations are as follows:

- *Guaranty fee income*—Guaranty fee income reflects (1) the cash guaranty fees paid by MBS trusts to Single-Family, (2) the amortization of deferred cash fees (both the previously recorded deferred cash fees that were eliminated from our consolidated balance sheets at transition and deferred guaranty fees received subsequent to transition that are currently recognized in our consolidated financial statements through interest income), such as buy-ups, buy-downs, and risk-based pricing adjustments, and (3) the guaranty fees from the Capital Markets group on single-family loans in our mortgage portfolio. To reconcile to our consolidated statements of operations, we eliminate guaranty fees and the amortization of deferred cash fees related to consolidated trusts as they are now reflected as a component of interest income. However, such accounting continues to be reflected for the segment reporting presentation.

- *Net interest income (expense)*—Net interest expense within the Single-Family segment reflects interest expense to reimburse Capital Markets and consolidated trusts for contractual interest not received on mortgage loans, when interest income is no longer recognized in accordance with our nonaccrual accounting policy in our consolidated statements of operations. Net interest income (expense), also includes an allocated cost of capital charge among the three segments that is not included in net interest income in the consolidated statement of operations.

*Multifamily*

Revenue drivers for Multifamily did not change under our current method of segment reporting. The primary sources of revenue for our Multifamily business are (1) guaranty fees the segment receives as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS, most of which are held within consolidated trusts, (2) guaranty fees on the multifamily mortgage loans held in our mortgage portfolio, (3) transaction fees associated with the multifamily business and (4) bond credit enhancement fees. Investments in rental and for-sale housing generate revenue and losses from operations and the eventual sale of the assets. In the fourth quarter of 2009, we reduced the carrying value of our LIHTC investments to zero. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments. While the Multifamily guaranty business is similar to our Single-Family business, neither the economic return nor the nature of the credit risk is similar to that of Single-Family.

TREASURY-0591

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations in order to reflect the activities and results of the Multifamily segment. The significant differences from the consolidated statements of operations are as follows:

- *Guaranty fee income*—Guaranty fee income reflects the cash guaranty fees paid by MBS trusts to Multifamily and the guaranty fees from the Capital Markets group on multifamily loans in Fannie Mae's portfolio. To reconcile to our consolidated statements of operations, we eliminate guaranty fees related to consolidated trusts.

- *Income (losses) from partnership investments*—Income (losses) from partnership investments primarily reflect losses on investments in affordable rental and for-sale housing partnerships measured under the equity method of accounting. To reconcile to our consolidated statements of operations, we adjust the losses to reflect the consolidation of certain partnership investments.

*Capital Markets Group*

Revenue drivers for Capital Markets did not change under our current method of segment reporting. Our Capital Markets group generates most of its revenue from the difference, or spread, between the interest we earn on our mortgage assets and the interest we pay on the debt we issue to fund these assets. We refer to this spread as our net interest yield. Changes in the fair value of the derivative instruments and trading securities we hold impact the net income or loss reported by the Capital Markets group. The net income or loss reported by our Capital Markets group is also affected by the impairment of AFS securities.

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations in order to reflect the activities and results of the Capital Markets group. The significant differences from the consolidated statements of operations are as follows:

- *Net interest income*—Net interest income reflects the interest income on mortgage loans and securities owned by Fannie Mae and interest expense on funding debt issued by Fannie Mae, including accretion and amortization of any cost basis adjustments. To reconcile to our consolidated statements of operations, we adjust for the impact of consolidated trusts and intercompany eliminations as follows:

  - *Interest income:*  Interest income consists of interest on the segment's interest-earning assets, which differs from interest-earning assets in our consolidated balance sheets. We exclude loans and securities that underlie the consolidated trusts from our Capital Markets group balance sheets. The net interest income reported by the Capital Markets group excludes the interest income earned on assets held by consolidated trusts. As a result, we report interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income for reimbursement from Single-Family and Multifamily for the contractual interest due under the terms of our intracompany guaranty arrangement.

  - *Interest expense:*  Interest expense consists of contractual interest on the Capital Markets group's interest-bearing liabilities, including the accretion and amortization of any cost basis adjustments. It excludes interest expense on debt issued by consolidated trusts. Therefore, the interest expense recognized on the Capital Markets group income statement is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our consolidated balance sheets. Net interest expense also includes an allocated cost of capital charge among the three business segments that is not included in net interest income in our consolidated statements of operations.

- *Investment gains or losses, net*—Investment gains or losses, net reflects the gains and losses on securitizations and sales of available-for-sale securities from our portfolio. To reconcile to our

TREASURY-0592

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

consolidated statements of operations, we eliminate gains and losses on securities that have been consolidated to loans.

- *Fair value gains or losses, net*—Fair value gains or losses, net for the Capital Markets group includes derivative gains and losses, foreign exchange gains and losses, and the fair value gains and losses on certain debt securities in our portfolio. To reconcile to our consolidated statements of operations, we eliminate fair value gains or losses on Fannie Mae MBS that have been consolidated to loans.

- *Other expenses, net*—Debt extinguishment gains or losses recorded on the segment statements of operations relate exclusively to our funding debt, which is reported as "Debt of Fannie Mae" on our consolidated balance sheets. To reconcile to our consolidated statements of operations, we include debt extinguishment gains or losses related to consolidated trusts to arrive at our total recognized debt extinguishment gains or losses.

### *Segment Allocations and Results*

Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group.

With the adoption of the new accounting standards, we have prospectively revised the presentation of our results for these segments to better reflect how we operate and oversee these businesses.

TREASURY-0593

FANNIE MAE

(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table displays our segment results under our current segment reporting presentation for the year ended December 31, 2010.

| | For the Year Ended December 31, 2010 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest income (expense)[3] . . . . . | $ (5,386) | $   3 | $14,321 | $ 5,073 | $ 2,398 | $ 16,409 |
| Provision for loan losses . . . . . . . . . . . | (24,503) | (199) | — | — | — | (24,702) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . | (29,889) | (196) | 14,321 | 5,073 | 2,398 | (8,293) |
| Guaranty fee income (expense)[4] . . . . . | 7,206 | 791 | (1,440) | (4,525) | (1,830) | 202 |
| Investment gains (losses), net . . . . . . . | 9 | 6 | 4,047 | (418) | (3,298) | 346 |
| Net other-than-temporary impairments . . | — | — | (720) | (2) | — | (722) |
| Fair value gains (losses), net . . . . . . . . | — | — | 239 | (155) | (595) | (511) |
| Debt extinguishment losses, net . . . . . . | — | — | (459) | (109) | — | (568) |
| Losses from partnership investments . . . | — | (70) | — | — | (4) | (74) |
| Fee and other income (expense)[5] . . . . | 306 | 146 | 519 | (88) | (1) | 882 |
| Administrative expenses . . . . . . . . . . . | (1,628) | (384) | (585) | — | — | (2,597) |
| Benefit (provision) for guaranty losses . . | (237) | 43 | — | — | — | (194) |
| Foreclosed property expense . . . . . . . . | (1,680) | (38) | — | — | — | (1,718) |
| Other income (expenses) . . . . . . . . . . | (836) | (68) | 125 | — | (74) | (853) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | (26,749) | 230 | 16,047 | (224) | (3,404) | (14,100) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | 69 | (14) | 27 | — | — | 82 |
| Net income (loss) . . . . . . . . . . . . . | (26,680) | 216 | 16,074 | (224) | (3,404) | (14,018) |
| Less: Net loss attributable to noncontrolling interests . . . . . . . . | — | — | — | — | 4 | 4 |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . | $(26,680) | $ 216 | $16,074 | $  (224) | $(3,400) | $(14,014) |

[1] Column represents activity of consolidated trusts and it also includes the issuances and extinguishment of debt due to sales and purchases of our MBS.

[2] Column represents adjustments during the period used to reconcile segment results to consolidated results which include the elimination of intersegment transactions occurring between the three operating segments and our consolidated trusts.

[3] Includes cost of capital charge among our three business segments.

[4] The charge to Capital Markets represents an intracompany guaranty fee expense allocated to Capital Markets from Single-Family and Multifamily for absorbing the credit risk on mortgage loans held in our portfolio.

[5] Fee and other income for Single-Family and Multifamily segments include trust management income.

TREASURY-0594

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables display our segment results under our previous segment reporting presentation for the years ended December 31, 2009 and 2008.

| | For the Year Ended December 31, 2009 | | | |
|---|---|---|---|---|
| | Single-Family | Multifamily | Capital Markets | Total |
| | (Dollars in millions) | | | |
| Net interest income (expense)[1] . . . . . . . . . . . . . . . . . . . . . . | $ 428 | $ (193) | $14,275 | $ 14,510 |
| Guaranty fee income (expense)[2] . . . . . . . . . . . . . . . . . . . . . | 8,002 | 675 | (1,466) | 7,211 |
| Investment gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . | (2) | — | 1,460 | 1,458 |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . | — | — | (9,861) | (9,861) |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (2,811) | (2,811) |
| Debt extinguishment losses, net. . . . . . . . . . . . . . . . . . . . . . . | — | — | (325) | (325) |
| Losses from partnership investments . . . . . . . . . . . . . . . . . . . | — | (6,735) | — | (6,735) |
| Fee and other income[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 354 | 100 | 319 | 773 |
| Administrative expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,419) | (363) | (425) | (2,207) |
| Provision for credit losses. . . . . . . . . . . . . . . . . . . . . . . . . . . | (70,463) | (2,163) | — | (72,626) |
| Foreclosed property expense . . . . . . . . . . . . . . . . . . . . . . . . . | (857) | (53) | — | (910) |
| Other expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,216) | (38) | (230) | (1,484) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . | (65,173) | (8,770) | 936 | (73,007) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . | 1,375 | (311) | (79) | 985 |
| Net income (loss). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (63,798) | (9,081) | 857 | (72,022) |
| Less: Net loss attributable to noncontrolling interest . . . . . . . | — | 53 | — | 53 |
| Net income (loss) attributable to Fannie Mae. . . . . . . . . . . . . | $(63,798) | $(9,028) | $ 857 | $(71,969) |

[1] Includes cost of capital charge.

[2] The charge to Capital Markets represents an intercompany guaranty fee expense allocated to Capital Markets from Single-Family and Multifamily for absorbing the credit risk on mortgage loans held in our portfolio.

[3] Certain prior period amounts have been reclassified to conform to the current period presentation.

TREASURY-0595

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | For the Year Ended December 31, 2008 | | | |
| | Single-Family | Multifamily | Capital Markets | Total |
| | (Dollars in millions) | | | |
| Net interest income (expense) [1] | $ 461 | $ (343) | $ 8,664 | $ 8,782 |
| Guaranty fee income (expense)[2] | 8,390 | 633 | (1,402) | 7,621 |
| Investment losses, net | (72) | — | (174) | (246) |
| Net other-than-temporary impairments | — | — | (6,974) | (6,974) |
| Fair value losses, net | — | — | (20,129) | (20,129) |
| Debt extinguishment losses, net | — | — | (222) | (222) |
| Losses from partnership investments | — | (1,554) | — | (1,554) |
| Fee and other income [3] | 583 | 186 | 264 | 1,033 |
| Administrative expenses | (1,127) | (404) | (448) | (1,979) |
| Provision for credit losses | (27,881) | (70) | — | (27,951) |
| Foreclosed property expense | (1,844) | (14) | — | (1,858) |
| Other expenses | (823) | (133) | (137) | (1,093) |
| Loss before federal income taxes and extraordinary losses | (22,313) | (1,699) | (20,558) | (44,570) |
| Provision for federal income taxes | (4,788) | (511) | (8,450) | (13,749) |
| Loss before extraordinary losses | (27,101) | (2,210) | (29,008) | (58,319) |
| Extraordinary losses, net of tax effect | — | — | (409) | (409) |
| Net loss | (27,101) | (2,210) | (29,417) | (58,728) |
| Less: Net loss attributable to the noncontrolling interest | — | 21 | — | 21 |
| Net loss attributable to Fannie Mae | $(27,101) | $(2,189) | $(29,417) | $(58,707) |

[1] Includes cost of capital charge.

[2] The charge to Capital Markets represents an intercompany guaranty fee expense allocated to Capital Markets from Single-Family and Multifamily for absorbing the credit risk on mortgage loans held in our portfolio.

[3] Certain prior period amounts have been reclassified to conform to the current period presentation.

The following table displays total assets by segment as of December 31, 2010 and 2009.

| | As of December 31, | |
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Single-Family[1] | $ 14,843 | $ 19,991 |
| Multifamily[1] | 4,881 | 5,698 |
| Capital Markets | 873,052 | 843,452 |
| Consolidated trusts | 2,673,937 | — |
| Eliminations/adjustments[1] | (344,741) | — |
| Total assets | $3,221,972 | $869,141 |

[1] Beginning in 2010, the allowance for loan losses, allowance for accrued interest receivable and fair value losses previously recognized on acquired credit impaired loans are not treated as assets for Single-Family and Multifamily segment reporting purposes because these allowances and losses relate to loan assets that are held by the Capital Markets segment and consolidated trusts.

We operate our business solely in the United States and its territories, and accordingly, we generate no revenue from and have no assets in geographic locations other than the United States and its territories.

TREASURY-0596

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**16.   Equity (Deficit)**

*Common Stock*

Shares of common stock outstanding, net of shares held as treasury stock, totaled 1.1 billion as of both December 31, 2010 and 2009. In 2008, we received gross proceeds of $2.6 billion from the issuance of 94 million new shares of no par value common stock with a stated value of $0.5250 per share.

During the conservatorship, the rights and powers of shareholders are suspended. Accordingly, our common shareholders have no ability to elect directors or to vote on other matters during the conservatorship unless FHFA elects to delegate this authority to them. The senior preferred stock purchase agreement with Treasury prohibits the payment of dividends on common stock without the prior written consent of Treasury. The conservator also has eliminated common stock dividends. In addition, we issued a warrant to Treasury that provides Treasury with the right to purchase for a nominal price shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise, which would substantially dilute the ownership in Fannie Mae of our common stockholders at the time of exercise. Refer to "Senior Preferred Stock and Common Stock Warrant" section below.

F-103

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Preferred Stock*

The following table displays our senior preferred stock and preferred stock outstanding as of December 31, 2010 and 2009.

| Title | Issue Date | Issued and Outstanding as of December 31, | | | | Stated Value per share | Annual Dividend Rate as of December 31, 2010 | Redeemable on or After |
|---|---|---|---|---|---|---|---|---|
| | | 2010 | | 2009 | | | | |
| | | Shares | Amount | Shares | Amount | | | |
| | | (Dollars and shares in millions, except per share amounts) | | | | | | |
| **Senior Preferred Stock** | | | | | | | | |
| Series 2008-2 . . . . . . . . . . . | September 8, 2008 | 1 | $88,600 | 1 | $60,900 | $ 88,600[1] | 10.000%[2] | [3] |
| Total . . . . . . . . . . . . . . . . | | 1 | $88,600 | 1 | $60,900 | | | |
| **Preferred Stock** | | | | | | | | |
| Series D . . . . . . . . . . . | September 30, 1998 | 3 | $ 150 | 3 | $ 150 | $ 50 | 5.250% | September 30, 1999 |
| Series E . . . . . . . . . . . . . | April 15, 1999 | 3 | 150 | 3 | 150 | 50 | 5.100 | April 15, 2004 |
| Series F . . . . . . . . . . . . . | March 20, 2000 | 14 | 690 | 14 | 690 | 50 | 0.890[4] | March 31, 2002[5] |
| Series G . . . . . . . . . . . . | August 8, 2000 | 6 | 288 | 6 | 288 | 50 | 0.270[6] | September 30, 2002[5] |
| Series H . . . . . . . . . . . . . | April 6, 2001 | 8 | 400 | 8 | 400 | 50 | 5.810 | April 6, 2006 |
| Series I . . . . . . . . . . . . . . | October 28, 2002 | 6 | 300 | 6 | 300 | 50 | 5.375 | October 28, 2007 |
| Series L . . . . . . . . . . . . | April 29, 2003 | 7 | 345 | 7 | 345 | 50 | 5.125 | April 29, 2008 |
| Series M . . . . . . . . . . . . . | June 10, 2003 | 9 | 460 | 9 | 460 | 50 | 4.750 | June 10, 2008 |
| Series N . . . . . . . . . . . . | September 25, 2003 | 5 | 225 | 5 | 225 | 50 | 5.500 | September 25, 2008 |
| Series O . . . . . . . . . . . . . | December 30, 2004 | 50 | 2,500 | 50 | 2,500 | 50 | 7.000[7] | December 31, 2007 |
| Convertible | | | | | | | | |
| Series 2004-1[8] . . . . . . . . | December 30, 2004 | — | 2,492 | — | 2,492 | 100,000 | 5.375 | January 5, 2008 |
| Series P . . . . . . . . . . . . . . | September 28, 2007 | 40 | 1,000 | 40 | 1,000 | 25 | 4.500[9] | September 30, 2012 |
| Series Q . . . . . . . . . . . . . | October 4, 2007 | 15 | 375 | 15 | 375 | 25 | 6.750 | September 30, 2010 |
| Series R[10] . . . . . . . . . . . | November 21, 2007 | 21 | 530 | 21 | 530 | 25 | 7.625 | November 21, 2012 |
| Series S . . . . . . . . . . . . . | December 11, 2007 | 280 | 7,000 | 280 | 7,000 | 25 | 7.750[11] | December 31, 2010[12] |
| Mandatory | | | | | | | | |
| Convertible | | | | | | | | |
| Series 2008-1 . . . . . . . . . | May 14, 2008 | 21 | 1,074 | 24 | 1,218 | 50 | 8.750 | N/A |
| Series T[13] . . . . . . . . . . . | May 19, 2008 | 89 | 2,225 | 89 | 2,225 | 25 | 8.250 | May 20, 2013 |
| Total . . . . . . . . . . . . . . . | | 577 | $20,204 | 580 | $20,348 | | | |

[1] Initial Stated Value per share was $1,000. Based on our draws of funds under the Senior Preferred Stock Variable Liquidation Preference agreement with Treasury, the Stated Value per share on December 31, 2010 was $88,600.

[2] Rate effective September 9, 2008. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

[3] Any liquidation preference of our senior preferred stock in excess of $1.0 billion may be repaid through an issuance of common or preferred stock. The initial $1.0 billion investment may be repaid only in conjunction with termination of the senior preferred stock purchase agreement. The provisions for termination under the senior preferred stock purchase agreement are very restrictive and cannot occur while we are in conservatorship.

[4] Rate effective March 31, 2010. Variable dividend rate resets every two years at a per annum rate equal to the two-year Maturity U.S. Treasury Rate ("CMT") minus 0.16% with a cap of 11% per year. As of December 31, 2010, the annual dividend rate was 0.89%.

F-104

TREASURY-0598

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

[5] Represents initial call date. Redeemable every two years thereafter.

[6] Rate effective September 30, 2010. Variable dividend rate resets every two years at a per annum rate equal to the two-year CMT rate minus 0.18% with a cap of 11% per year. As of December 31, 2010, the annual dividend rate was 0.27%.

[7] Rate effective December 31, 2010. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 7.00% and 10-year CMT rate plus 2.375%. As of December 31, 2010, the annual dividend rate was 7.00%.

[8] Issued and outstanding shares were 24,922 both as of December 31, 2010 and 2009, respectively.

[9] Rate effective December 31, 2010. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 4.50% and 3-Month LIBOR plus 0.75%. As of December 31, 2010, the annual dividend rate was 4.50%.

[10] On November 21, 2007, we issued 20 million shares of preferred stock in the amount of $500 million. Subsequent to the initial issuance, we issued an additional 1.2 million shares in the amount of $30 million on December 14, 2007 under the same terms as the initial issuance.

[11] Rate effective December 31, 2010. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 7.75% and 3-Month LIBOR plus 4.23%. As of December 31, 2010, the annual dividend rate was 7.75%.

[12] Represents initial call date. Redeemable every five years thereafter.

[13] On May 19, 2008, we issued 80 million shares of preferred stock in the amount of $2.0 billion. Subsequent to the initial issuance, we issued an additional 8 million shares in the amount of $200 million on May 22, 2008 and one million shares in the amount of $25 million on June 4, 2008 under the same terms as the initial issuance.

As described under "Senior Preferred Stock and Common Stock Warrant" we issued senior preferred stock that ranks senior to all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company. During the conservatorship, the rights and powers of preferred stockholders (other than holders of senior preferred stock) are suspended. The senior preferred stock purchase agreement with Treasury also prohibits the payment of dividends on preferred stock (other than the senior preferred stock) without the prior written consent of Treasury. The conservator also has eliminated preferred stock dividends, other than dividends on the senior preferred stock.

Each series of our preferred stock has no par value, is non-participating, is non-voting and has a liquidation preference equal to the stated value per share. None of our preferred stock is convertible into or exchangeable for any of our other stock or obligations, with the exception of the Convertible Series 2004-1 and Non-cumulative Mandatory Convertible Series 2008-1.

Shares of the Convertible Series 2004-1 Preferred Stock are convertible at any time, at the option of the holders, into shares of Fannie Mae common stock at a conversion price of $94.31 per share of common stock (equivalent to a conversion rate of 1,060.3329 shares of common stock for each share of Series 2004-1 Preferred Stock). The conversion price is adjustable, as necessary, to maintain the stated conversion rate into common stock. Events which may trigger an adjustment to the conversion price include certain changes in our common stock dividend rate, subdivisions of our outstanding common stock into a greater number of shares, combinations of our outstanding common stock into a smaller number of shares and issuances of any shares by reclassification of our common stock. No such events have occurred.

Holders of preferred stock (other than the senior preferred stock are entitled to receive non-cumulative, quarterly dividends when, and if, declared by our Board of Directors, but have no right to require redemption of any shares of preferred stock. Payment of dividends on preferred stock (other than the senior preferred stock) is not mandatory, but has priority over payment of dividends on common stock, which are also declared by the Board of Directors. If dividends on the preferred stock are not paid or set aside for payment for a given dividend period, dividends may not be paid on our common stock for that period. For the year ended December 31, 2008, dividends declared on preferred stock (excluding the senior preferred stock) were $1.0 billion. There were no dividends declared or paid on preferred stock (other than the senior preferred stock) for the year ended December 31, 2010 or 2009.

TREASURY-0599

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

After a specified period, we have the option to redeem preferred stock (other than the senior preferred stock) at its redemption price plus the dividend (whether or not declared) for the then-current period accrued to, but excluding, the date of redemption. The redemption price is equal to the stated value for all issues of preferred stock except Series O, which has a redemption price of $50 to $52.50 depending on the year of redemption, Convertible Series 2004-1, which has a redemption price of $105,000 per share, and Mandatory Convertible Series 2008-1 which is not redeemable.

Our preferred stock is traded in the over-the-counter market.

*Issuance of Preferred Stock*

On May 14, 2008, we received gross proceeds of $2.6 billion from the issuance of 52 million shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, with a stated value of $50 per share. Each share has a liquidation preference equal to its stated value of $50 per share plus an amount equal to the dividend for the then-current quarterly dividend period. The Mandatory Convertible Series 2008-1 Preferred Stock is not redeemable by us. On May 13, 2011, the mandatory conversion date, each share of the Preferred Stock will automatically convert into between 1.5408 and 1.8182 shares of our common stock, subject to anti-dilution adjustments, depending on the average of the closing prices per share of our common stock for each of the 20 consecutive trading days ending on the third trading day prior to such date. At any time prior to the mandatory conversion date, holders may elect to convert each share of our Preferred Stock into a minimum of 1.5408 shares of common stock, subject to anti-dilution adjustments. The Mandatory Convertible Series 2008-1 shares are considered participating securities for purposes of calculating earnings per share.

On May 19, 2008, we received gross proceeds of $2.0 billion from the issuance of 80 million shares of 8.25% Non-Cumulative Preferred Stock, Series T, with a stated value of $25 per share. Subsequent to the initial issuance, we received gross proceeds of $200 million from the additional issuance of 8 million shares on May 22, 2008 and $25 million from the additional issuance of one million shares on June 4, 2008. Each share has a liquidation preference equal to its stated value of $25 per share plus accrued dividends for the then-current quarterly dividend period. The Series T Preferred Stock may be redeemed, at our option, on or after May 20, 2013. Pursuant to the covenants set forth in the senior preferred stock purchase agreement described below, we must obtain the prior written consent of Treasury in order to exercise our option to redeem the Series T Preferred Stock.

*Conversions of Preferred Stock to Common Stock*

For the year ended December 31, 2010, 2,867,318 shares of Mandatory Convertible Series 2008-1 were converted to 4,417,947 shares of common stock. For the year ended December 31, 2009, 17,335,866 shares of Mandatory Convertible Series 2008-1 were converted to 26,711,068 shares of common stock. Also 78 shares of Mandatory Convertible Series 2004-1 were converted to 82,705 shares of common stock. For the year ended December 31, 2008, 10,053,599 shares of Mandatory Convertible Series 2008-1 were converted to 15,490,568 shares of common stock.

*Senior Preferred Stock and Common Stock Warrant*

On September 8, 2008, we issued one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 ("senior preferred stock"), with an aggregate stated value and initial liquidation preference of $1.0 billion. On September 7, 2008, we issued a warrant to purchase common stock to Treasury. The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise. The senior preferred stock and the warrant were issued in consideration for the initial commitment from Treasury to provide up to $100.0 billion in cash to us under the terms set forth in the senior preferred stock purchase

F-106

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

agreement prior to subsequent amendments. We did not receive any cash proceeds as a result of issuing these shares or the warrant. We have assigned a value of $4.5 billion to Treasury's commitment, which has been recorded as a reduction to additional paid-in-capital and was partially offset by the aggregate fair value of the warrant. There was no impact to the total balance of stockholders' equity (deficit) as a result of the issuance as reported in our consolidated statement of changes in stockholders' equity (deficit).

*Variable Liquidation Preference Senior Preferred Stock, Series 2008-2*

Shares of the senior preferred stock have no par value and have a stated value and initial liquidation preference equal to $1,000 per share. The liquidation preference of the senior preferred stock is subject to adjustment. To the extent dividends are not paid in cash for any dividend period, the dividends will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts paid by Treasury to us pursuant to Treasury's funding commitment provided in the senior preferred stock purchase agreement and any quarterly commitment fee payable under the senior preferred stock purchase agreement that is not paid in cash to or waived by Treasury will be added to the liquidation preference of the senior preferred stock. As of February 24, 2011, we have received a total of $87.6 billion under Treasury's funding commitment and the Acting Director of FHFA has submitted a request for an additional $2.6 billion from Treasury to eliminate our net worth deficit as of December 31, 2010.

Holders of the senior preferred stock are entitled to receive when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at an annual rate of 10% per year based on the then-current liquidation preference of the senior preferred stock. As conservator and under our Charter, FHFA also has authority to declare dividends on the senior preferred stock. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends declared and paid on our senior preferred stock were $7.7 billion, $2.5 billion and $31 million for the years ended December 31, 2010, 2009 and 2008, respectively.

The senior preferred stock ranks prior to our common stock and all other outstanding series of our preferred stock as to both dividends and rights upon liquidation. We may not declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock without the prior written consent of Treasury. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock in full prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. However, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, to the extent we issue any shares of capital stock for cash at any time the senior preferred stock is outstanding (which requires Treasury's approval), we are required to use the net proceeds of the issuance to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in

F-107

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

part. If we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be considered redeemed as of the payment date.

*Common Stock Warrant*

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise. The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to Fannie Mae of: (a) a notice of exercise; (b) payment of the exercise price of $0.00001 per share; and (c) the warrant. If the market price of one share of common stock is greater than the exercise price, in lieu of exercising the warrant by payment of the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person. We recorded the aggregate fair value of the warrant of $3.5 billion as a component of additional paid-in-capital upon issuance of the warrant. If the warrant is exercised, the stated value of the common stock issued will be reclassified as "Common stock" in our consolidated balance sheet. As of February 24, 2011, Treasury had not exercised the warrant.

**Senior Preferred Stock Purchase Agreement with Treasury**

*Commitment Fee*

We were scheduled to begin paying Treasury a quarterly commitment fee beginning on March 31, 2011. On December 29, 2010, FHFA was notified by Treasury that Treasury was waiving the commitment fee for the first quarter of 2011 due to adverse conditions in the U.S. mortgage market and because Treasury believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate matters in the next calendar quarter. We may elect to pay the periodic commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock.

*Funding Commitment*

Treasury's funding commitment under the senior preferred stock purchase agreement is intended to ensure that we maintain a positive net worth. Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012. The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. The deficiency amount may be increased above the otherwise applicable amount upon our mutual written agreement with Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our conservator, may request that Treasury provide funds to us in such amount. The senior preferred stock purchase agreement also provides that, if we have a deficiency amount as of the date of completion of the liquidation of our assets, we may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum

F-108

TREASURY-0602

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

amount that may be funded under the agreement). Any amounts that we draw under the senior preferred stock purchase agreement will be added to the liquidation preference of the senior preferred stock. No additional shares of senior preferred stock are required to be issued under the senior preferred stock purchase agreement.

*Covenants*

The senior preferred stock purchase agreement, as amended, provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- Declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Fannie Mae equity securities (other than with respect to the senior preferred stock or warrant);

- Redeem, purchase, retire or otherwise acquire any Fannie Mae equity securities (other than the senior preferred stock or warrant);

- Sell or issue any Fannie Mae equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement);

- Terminate the conservatorship (other than in connection with a receivership);

- Sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with a liquidation of Fannie Mae by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage assets beginning in 2010;

- Incur indebtedness that would result in our aggregate indebtedness exceeding $1,080 billion through December 31, 2010. Beginning in 2011 and each year thereafter, our debt cap will equal 120% of the amount of mortgage assets we are allowed to hold on December 31 of the immediately preceding calendar year;

- Issue any subordinated debt;

- Enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- Engage in transactions with affiliates unless the transaction is (a) pursuant to the senior preferred stock purchase agreement, the senior preferred stock or the warrant, (b) upon arm's-length terms or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the senior preferred stock purchase agreement.

The agreement also provides that we may not own mortgage assets in excess of $810 billion as of December 31, 2010. We are also required to reduce our mortgage assets, beginning on December 31, 2010 and each year thereafter, to 90% of the amount of the mortgage assets we were allowed to hold as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion.

Under the agreement, the effect of changes in generally accepted accounting principles that occurred subsequent to the date of the agreement and that require us to recognize additional mortgage assets on our consolidated balance sheets were not considered for purposes of evaluating our compliance with the limitation on the amount of mortgage assets we may own. In addition, the definition of indebtedness in the agreement was revised to clarify that it also does not give effect to any change that may be made in respect of the FASB guidance on accounting for transfers of financial assets or any similar accounting standard.

TREASURY-0603

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In addition, the agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements with our named executive officers (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury. As of December 31, 2010, we were in compliance with the senior preferred stock purchase agreement covenants.

*Termination Provisions*

The senior preferred stock purchase agreement provides that Treasury's funding commitment will terminate under any the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount under the agreement. In addition, Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

*Waivers and Amendments*

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties. No waiver or amendment of the agreement, however, may decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

*Third-party Enforcement Rights*

If we default on payments with respect to our debt securities or guaranteed Fannie Mae MBS and Treasury fails to perform its obligations under its funding commitment, and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Fannie Mae MBS may file a claim for relief in the United States Court of Federal Claims. The relief, if granted, would require Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount available under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances would be treated for all purposes as a draw under the senior preferred stock purchase agreement that would increase the liquidation preference of the senior preferred stock.

**17.   Regulatory Capital Requirements**

In 2008, FHFA announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship, and that FHFA will not issue quarterly capital classifications during the conservatorship. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. FHFA has stated that it does not intend to report our critical capital, risk-based capital or subordinated debt levels during the conservatorship. As of December 31, 2010 and 2009, we had a minimum capital deficiency of $123.2 billion and $107.6 billion, respectively. Our minimum capital deficiency as of December 31, 2010 was determined based on guidance from FHFA, in which FHFA (1) directed us, for loans backing Fannie Mae MBS held by third parties, to continue reporting our minimum capital requirements based

TREASURY-0604

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

on 0.45% of the unpaid principal balance and critical capital based on 0.25% of the unpaid principal balance, notwithstanding our transition date adoption of the new accounting standards, and (2) issued a regulatory interpretation stating that our minimum capital requirements are not automatically affected by the new accounting standards. Additionally, our minimum capital deficiency excludes the funds provided to us by Treasury pursuant to the senior preferred stock purchase agreement, as the senior preferred stock does not qualify as core capital due to its cumulative dividend provisions.

Pursuant to the GSE Act, if our total assets are less than our total obligations (a net worth deficit) for a period of 60 days, FHFA is mandated by law to appoint a receiver for Fannie Mae. Treasury's funding commitment under the senior preferred stock purchase agreement is intended to ensure that we avoid a net worth deficit, in order to avoid this mandatory trigger of receivership. In order to avoid a net worth deficit, our conservator may request funds on our behalf from Treasury under the senior preferred stock purchase agreement.

FHFA has directed us, during the time we are under conservatorship, to focus on managing to a positive net worth. As of December 31, 2010 and 2009, we had a net worth deficit of $2.5 billion and $15.3 billion, respectively.

The following table displays our regulatory capital classification measures as of December 31, 2010 and 2009.

| | As of December 31, | |
| --- | --- | --- |
| | 2010 [1] | 2009 [1] |
| | (Dollars in millions) | |
| Core capital[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (89,516) | $ (74,540) |
| Statutory minimum capital requirement[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,676 | 33,057 |
| Deficit of core capital over statutory minimum capital requirement . . . . . . . . . . . . . . | $(123,192) | $(107,597) |
| Deficit of core capital percentage over statutory minimum capital requirement . . . . . . . | (366)% | (325)% |

[1] Amounts as of December 31, 2010 and 2009 represent estimates that have been submitted to FHFA. As noted above, FHFA is not issuing capital classifications during conservatorship.

[2] The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings (accumulated deficit). Core capital does not include: (a) accumulated other comprehensive income (loss) or (b) senior preferred stock.

[3] Generally, the sum of (a) 2.50% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director).

Our critical capital requirement is generally equal to the sum of: (1) 1.25% of on-balance sheet assets; (2) 0.25% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (3) 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances.

*Restrictions on Capital Distributions and Dividends*

Under the terms of the senior preferred stock purchase agreement, we are required to comply with certain restrictions and covenants. Set forth below are additional restrictions related to our capital requirements:

*Restrictions Under GSE Act.*   Under the GSE Act, FHFA has the authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, we must obtain the approval of the Director of FHFA for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized. The Director of FHFA, however, may permit us to repurchase shares if the

TREASURY-0605

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock. Our qualifying subordinated debt provides for the deferral of the payment of interest for up to five years if either: our core capital is below 125% of our critical capital requirement; or our core capital is below our statutory minimum capital requirement, and the U.S. Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 304(c) of the Charter Act to purchase our debt obligations. As of December 31, 2010 and 2009, our core capital was below 125% of our critical capital requirement; however, we have been directed by FHFA to continue paying principal and interest on our outstanding subordinated debt during the conservatorship and thereafter until directed otherwise, regardless of our existing capital levels.

Prior to conservatorship, we were subject to certain regulatory capital requirements, including minimum capital requirements, under the terms of various agreements and consent orders with OFHEO. We were in compliance with these regulatory capital requirements until they were suspended October 9, 2008 following our entry into conservatorship.

## 18.   Concentrations of Credit Risk

Concentrations of credit risk arise when a number of customers and counterparties engage in similar activities or have similar economic characteristics that make them susceptible to similar changes in industry conditions, which could affect their ability to meet their contractual obligations. Based on our assessment of business conditions that could impact our financial results, including those conditions arising through February 24, 2011, we have determined that concentrations of credit risk exist among single-family and multifamily borrowers (including geographic concentrations and loans with certain non-traditional features), mortgage insurers, mortgage servicers, financial guarantors, lenders with risk sharing, derivative counterparties and parties associated with our off-balance sheet transactions. Concentrations for each of these groups are discussed below.

### *Single-Family Loan Borrowers*

Regional economic conditions may affect a borrower's ability to repay his or her mortgage loan and the property value underlying the loan. Geographic concentrations increase the exposure of our portfolio to changes in credit risk. Single-family borrowers are primarily affected by home prices and interest rates. The geographic dispersion of our Single-Family business has been consistently diversified over both years ended December 31, 2010 and 2009, with our largest exposures in the Western region of the United States, which represented 27% of our single-family conventional guaranty book of business as of December 31, 2010. Except for California, where 18% and 17% of the gross unpaid principal balance of our conventional single-family mortgage loans held or securitized in Fannie Mae MBS as of December 31, 2010 and 2009, respectively, were located, no other significant concentrations existed in any state.

To manage credit risk and comply with legal requirements, we typically require primary mortgage insurance or other credit enhancements if the current LTV ratio (*i.e.*, the ratio of the unpaid principal balance of a loan to the current value of the property that serves as collateral) of a single-family conventional mortgage loan is greater than 80% when the loan is delivered to us. We may also require credit enhancements if the original LTV ratio of a single-family conventional mortgage loan is less than 80%.

F-112

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Multifamily Loan Borrowers*

Numerous factors affect a multifamily borrower's ability to repay his or her loan and the value of the property underlying the loan. The most significant factors affecting credit risk are rental vacancy rates and capitalization rates for the mortgaged property. Vacancy rates vary among geographic regions of the United States. The average mortgage amounts for multifamily loans are significantly larger than those for single-family borrowers and, therefore, individual defaults for multifamily borrowers can be more significant to us. However, these loans, while individually large, represent a small percentage of our total loan portfolio. Our multifamily geographic concentrations have been consistently diversified over both years ended December 31, 2010 and 2009, with our largest exposure in the Western region of the United States, which represented 34% of our multifamily guaranty book of business. Except for California and New York, no other significant concentrations existed in any states as of December 31, 2010 and 2009. As of December 31, 2010, 27% and 13% of the gross unpaid principal balance of our portfolio of multifamily mortgage loans held by us or securitized in Fannie Mae MBS was located in California and New York, respectively. As of December 31, 2009, 27% and 14% of the gross unpaid principal balance of our portfolio of multifamily mortgage loans held by us or securitized in Fannie Mae MBS was located in California and New York, respectively.

As part of our multifamily risk management activities, we perform detailed loan reviews that evaluate borrower and geographic concentrations, lender qualifications, counterparty risk, property performance and contract compliance. We generally require servicers to submit periodic property operating information and condition reviews, allowing us to monitor the performance of individual loans. We use this information to evaluate the credit quality of our portfolio, identify potential problem loans and initiate appropriate loss mitigation activities.

The following table displays the regional geographic concentration of single-family and multifamily loans in our mortgage portfolio and those loans held or securitized in Fannie Mae MBS as of December 31, 2010 and 2009.

| | Geographic Concentration[1] | | | |
| | Percentage of Conventional Single-Family Guaranty Book of Business[2] | | Percentage of Multifamily Guaranty Book of Business[3] | |
| | As of December 31, | | As of December 31, | |
| | **2010** | **2009** | **2010** | **2009** |
|---|---|---|---|---|
| Midwest | 15% | 16% | 8% | 9% |
| Northeast | 19 | 19 | 22 | 23 |
| Southeast | 24 | 24 | 20 | 19 |
| Southwest | 15 | 15 | 16 | 15 |
| West | 27 | 26 | 34 | 34 |
| Total | 100% | 100% | 100% | 100% |

[1] Midwest includes IL, IN, IA, MI, MN, NE, ND, OH, SD, WI; Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT, VI; Southeast includes AL, DC, FL, GA, KY, MD, NC, MS, SC, TN, VA, WV; Southwest includes AZ, AR, CO, KS, LA, MO, NM, OK, TX, UT; West include AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

[2] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted over 99% and 98% of our total single-family conventional guaranty book of business as of December 31, 2010 and 2009, respectively.

[3] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% and 98% of our total multifamily guaranty book of business as of December 31, 2010 and 2009, respectively.

TREASURY-0607

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Non-traditional Loans; Alt-A and Subprime Loans and Securities*

We own and guarantee loans with non-traditional features, such as interest-only loans and negative-amortizing loans. We also own and guarantee Alt-A and subprime mortgage loans and mortgage-related securities. An Alt-A mortgage loan generally refers to a mortgage loan that has been underwritten with reduced or alternative documentation than that required for a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans. In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features. We have classified private-label mortgage-related securities held in our investment portfolio as Alt-A if the securities were labeled as such when issued. A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans were typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans were originated by one of these specialty lenders or a subprime division of a large lender. We exclude loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We have classified private-label mortgage-related securities held in our investment portfolio as subprime if the securities were labeled as such when issued. We reduce our risk associated with some of these loans through credit enhancements, as described below under "Mortgage Insurers."

The following table displays the percentage of our conventional single-family guaranty book of business that consists of interest-only loans, negative-amortizing ARMs and loans with an estimated mark-to-market LTV ratios greater than 80% as of December 31, 2010 and 2009.

|  | Percentage of Single-Family Conventional Guaranty Book of Business As of December 31, | |
|---|---|---|
|  | **2010** | **2009** |
| Interest-only loans | 6% | 7% |
| Negative-amortizing ARMs | * | 1 |
| 80%+ mark-to-market LTV loans | 40 | 37 |

* Represents less than 0.5% of our single-family conventional guaranty book of business

F-114

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays information regarding our Alt-A and subprime mortgage loans and mortgage-related securities in our single-family mortgage credit book of business as of December 31, 2010 and 2009.

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2010** | | **2009** | |
| | **Unpaid Principal Balance** | **Percent of Book of Business**[1] | **Unpaid Principal Balance** | **Percent of Book of Business**[1] |
| | (Dollars in millions) | | | |
| Loans and Fannie Mae MBS: | | | | |
| Alt-A[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $213,597 | 7% | $251,111 | 8% |
| Subprime[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,266 | ** | 16,268 | ** |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $228,863 | 8% | $267,379 | 9% |
| Private-label securities: | | | | |
| Alt-A[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 22,283 | ** | $ 24,505 | ** |
| Subprime[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,410 | ** | 20,527 | ** |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 40,693 | 1% | $ 45,032 | 2% |

** Represent less than 1.0% of single-family mortgage credit book of business.

[1] Calculated based on total unpaid principal balance of our single-family mortgage credit book of business.

[2] Represents Alt-A mortgage loans held in our portfolio and Fannie Mae MBS backed by Alt-A mortgage loans.

[3] Represents subprime mortgage loans held in our portfolio and Fannie Mae MBS backed by subprime mortgage loans.

[4] Represents private-label mortgage-related securities backed by Alt-A mortgage loans.

[5] Represents private-label mortgage-related securities backed by subprime mortgage loans.

*Other Concentrations*

*Mortgage Seller/Servicers.* Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 77% of our single-family guaranty book of business as of December 31, 2010, compared to 80% as of December 31, 2009. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 70% of our multifamily guaranty book of business as of December 31, 2010, compared with 75% as of December 31, 2009.

If one of our principal mortgage seller/servicers fails to meet its obligations to us, it could increase our credit-related expenses and credit losses, result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth.

*Mortgage Insurers.* Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $95.9 billion on the single-family mortgage loans in our guaranty book of business as of December 31, 2010, which represented approximately 3% of our single-family guaranty book of business. Our primary and pool mortgage insurance coverage risk in force on single-family mortgage loans in our guaranty book of business represented $91.2 billion and $4.7 billion, respectively, as of December 31, 2010, compared with $99.6 billion and $6.9 billion, respectively, as of December 31, 2009. Eight mortgage insurance companies provided over 99% of our mortgage insurance as of both December 31, 2010 and 2009.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and financial condition of many mortgage insurers. The current

F-115

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are measured collectively for impairment. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of $1.2 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

We had outstanding receivables of $4.4 billion in "Other assets" in our consolidated balance sheet as of December 31, 2010 and $2.5 billion as of December 31, 2009 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $648 million as of December 31, 2010 and $301 million as of December 31, 2009 was due from our mortgage seller/servicers. We assessed the receivables for collectibility, and they are recorded net of a valuation allowance of $317 million as of December 31, 2010 and $51 million as of December 31, 2009 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of December 31, 2010 and 2009. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $6.4 billion for the year ended December 31, 2010 and $3.6 billion for the year ended December 31, 2009. We negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million and $668 million for the years ended December 31, 2010 and 2009, respectively, are included in our total insurance proceeds amount. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce future exposure to our mortgage insurers and were recorded as a reduction to our "Foreclosed property expense."

*Financial Guarantors.*   We were the beneficiary of financial guarantees totaling $8.8 billion and $9.6 billion as of December 31, 2010 and 2009, respectively, on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. In addition, we are the beneficiary of financial guarantees totaling $25.7 billion and $51.3 billion as of December 31, 2010 and 2009, respectively, obtained from Freddie Mac, the federal government, and its agencies. These financial guaranty contracts assure the collectibility of timely interest and ultimate principal payments on the guaranteed securities if the cash flows generated by the underlying collateral are not sufficient to fully support these payments.

If a financial guarantor fails to meet its obligations to us with respect to the securities for which we have obtained financial guarantees, it could reduce the fair value of our mortgage-related securities and result in financial losses to us, which could have a material adverse effect on our earnings, liquidity, financial condition and net worth. We model our securities assuming the benefit of those external financial guarantees that are deemed creditworthy.

*Lenders with Risk Sharing.*   We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $15.6 billion as of December 31, 2010 and $18.3 billion as of December 31, 2009. As of December 31, 2010, 56% of our

TREASURY-0610

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2009, 53% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $30.3 billion as of December 31, 2010 and $28.7 billion as of December 31, 2009. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three lenders. As of December 31, 2009, 51% of our maximum potential loss recovery on multifamily loans was from three lenders.

*Derivatives Counterparties.*   For information on credit risk associated with our derivatives transactions refer to "Note 10, Derivative Instruments and Hedging Activities."

*Parties Associated with Our Off-Balance Sheet Transactions.*   We enter into financial instrument transactions that create off-balance sheet credit risk in the normal course of our business. These transactions are designed to meet the financial needs of our customers, and manage our credit, market or liquidity risks.

We have entered into guarantees for which we have not recognized a guaranty obligation in our consolidated balance sheets relating to periods prior to 2003, the effective date of accounting pronouncements related to guaranty accounting. Our maximum potential exposure under these guarantees is $10.3 billion as of December 31, 2010 and $135.7 billion as of December 31, 2009. If we were required to make payments under these guarantees, we would pursue recovery through our right to the collateral backing the underlying loans, available credit enhancements and recourse with third parties that provide a maximum coverage of $3.9 billion as of December 31, 2010 and $13.6 billion as of December 31, 2009.

The following table displays the contractual amount of off-balance sheet financial instruments as of December 31, 2010 and 2009. Contractual or notional amounts do not necessarily represent the credit risk of the positions.

| | As of December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (Dollars in millions) | |
| Fannie Mae MBS and other guarantees[1] | $10,299 | $135,697 |
| Loan purchase commitments | 311 | 486 |

[1]   Represents maximum exposure on guarantees not reflected in our consolidated balance sheets.

## 19.   Fair Value

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

### Fair Value Measurement

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and expands disclosures around fair value measurements. This guidance applies whenever other accounting standards require or permit assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs. Effective March 31, 2010, we prospectively adopted a new accounting standard that requires enhanced fair value measurement disclosures.

F-117

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of December 31, 2010 and 2009. Specifically, total assets measured at fair value on a recurring basis and classified as Level 3 were $39.0 billion, or 1% of "Total assets," and $47.7 billion, or 5% of "Total assets," in our consolidated balance sheets as of December 31, 2010 and 2009, respectively.

| | Fair Value Measurements as of December 31, 2010 | | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| **Assets:** | | | | | |
| Cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,049 | $ 2,300 | $ — | $ — | $ 6,349 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,196 | 2,202 | — | 7,398 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,326 | — | — | 1,326 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 590 | — | — | 590 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . | — | 1,663 | 20 | — | 1,683 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . | — | — | 1,581 | — | 1,581 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10,764 | — | — | 10,764 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 609 | — | 609 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 152 | — | 152 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,432 | — | — | — | 27,432 |
| Asset-backed securities . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,309 | 12 | — | 5,321 |
| Total trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,432 | 24,848 | 4,576 | — | 56,856 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 22,714 | 114 | — | 22,828 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,993 | 3 | — | 16,996 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,039 | — | — | 1,039 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . | — | 6,841 | 7,049 | — | 13,890 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . | — | — | 9,932 | — | 9,932 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14,844 | — | — | 14,844 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . | — | 11 | 11,030 | — | 11,041 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16 | 3,806 | — | 3,822 |
| Total available-for-sale securities . . . . . . . . . . . . . . . . . . | — | 62,458 | 31,934 | — | 94,392 |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | — | 755 | 2,207 | — | 2,962 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 9,623 | 163 | — | 9,786 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,474 | — | — | 5,474 |
| Interest rate caps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 24 | — | — | 24 |
| Futures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | — | — | 3 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 72 | — | 72 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (15,175) | (15,175) |
| Mortgage commitment derivatives . . . . . . . . . . . . . . . . . . | — | 941 | 12 | — | 953 |
| Total other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 16,062 | 247 | (15,175) | 1,137 |
| Total assets at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . | $31,484 | $106,423 | $38,964 | $(15,175) | $161,696 |

F-118

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| **Liabilities:** | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed . . . . . . . . . . . . . . . . . . . . . . . . | $— | $ 472 | $  — | $  — | $  472 |
| Senior floating . . . . . . . . . . . . . . . . . . . . . | — | — | 421 | — | 421 |
| Total Fannie Mae . . . . . . . . . . . . . . . . . . . . | — | 472 | 421 | — | 893 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . | — | 1,644 | 627 | — | 2,271 |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . | — | 2,116 | 1,048 | — | 3,164 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,436 | 113 | — | 16,549 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,446 | — | — | 2,446 |
| Futures . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — | — | — | 1 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . | — | — | — | (18,023) | (18,023) |
| Mortgage commitment derivatives . . . . . . . . . . . . | — | 712 | 30 | — | 742 |
| Total other liabilities . . . . . . . . . . . . . . . . . . . | 1 | 19,594 | 143 | (18,023) | 1,715 |
| Total liabilities at fair value . . . . . . . . . . . . . . | $ 1 | $21,710 | $1,191 | $(18,023) | $  4,879 |

F-119

TREASURY-0613

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements as of December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| **Assets:** | | | | | |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | $— | $ 69,094 | $ 5,656 | $        — | $ 74,750 |
| Freddie Mac | — | 15,082 | — | — | 15,082 |
| Ginnie Mae | — | 1 | — | — | 1 |
| Alt-A private-label securities | — | 791 | 564 | — | 1,355 |
| Subprime private-label securities | — | — | 1,780 | — | 1,780 |
| CMBS | — | 9,335 | — | — | 9,335 |
| Mortgage revenue bonds | — | — | 600 | — | 600 |
| Other | — | — | 154 | — | 154 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 8,408 | 107 | — | 8,515 |
| Corporate debt securities | — | 364 | — | — | 364 |
| U.S. Treasury securities | 3 | — | — | — | 3 |
| Total trading securities | 3 | 103,075 | 8,861 | — | 111,939 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 153,823 | 596 | — | 154,419 |
| Freddie Mac | — | 27,442 | 27 | — | 27,469 |
| Ginnie Mae | — | 1,230 | 123 | — | 1,353 |
| Alt-A private-label securities | — | 5,838 | 8,312 | — | 14,150 |
| Subprime private-label securities | — | — | 10,746 | — | 10,746 |
| CMBS | — | 13,193 | — | — | 13,193 |
| Mortgage revenue bonds | — | 26 | 12,820 | — | 12,846 |
| Other | — | 22 | 3,530 | — | 3,552 |
| Total available-for-sale securities | — | 201,574 | 36,154 | — | 237,728 |
| Other assets: | | | | | |
| Derivative assets | — | 19,724 | 150 | (18,400) | 1,474 |
| Guaranty assets and buy-ups | — | — | 2,577 | — | 2,577 |
| Total other assets | — | 19,724 | 2,727 | (18,400) | 4,051 |
| Total assets at fair value | $ 3 | $324,373 | $47,742 | $(18,400) | $353,718 |
| **Liabilities:** | | | | | |
| Long-term debt | $— | $ 2,673 | $ 601 | $        — | $ 3,274 |
| Other liabilities: | | | | | |
| Derivative liabilities | — | 23,815 | 27 | (22,813) | 1,029 |
| Other liabilities | — | 270 | — | — | 270 |
| Total other liabilities | — | 24,085 | 27 | (22,813) | 1,299 |
| Total liabilities at fair value | $— | $ 26,758 | $ 628 | $(22,813) | $ 4,573 |

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

F-120

TREASURY-0614

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2010, 2009 and 2008. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recorded in our consolidated statements of operations for Level 3 assets and liabilities for the years ended December 31, 2010, 2009 and 2008. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period transferred.

| | | | Total Gains or (Losses) (Realized/Unrealized) | | | | | | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of December 31, 2010[2] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Balance, December 31, 2009 | Impact of New Accounting Standards | Included in Net Loss | Included in Other Comprehensive Loss | Purchases, Sales, Issuances, and Settlements, Net | Transfers Out of Level 3[1] | Transfers into Level 3[1] | Balance, December 31, 2010 | |
| | | | | (Dollars in millions) | | | | | |
| Trading securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . | $ 5,656 | $ (2) | $ (1) | $ — | $ (223) | $(5,551) | $2,323 | $ 2,202 | $ 13 |
| Freddie Mac . . . . . . . . . . | — | — | — | — | (1) | (3) | 4 | — | — |
| Alt-A private-label securities . . . . . . . . . . | 564 | 62 | 226 | — | (77) | (1,069) | 314 | 20 | 4 |
| Subprime private-label securities . . . . . . . . . . | 1,780 | — | 41 | — | (240) | — | — | 1,581 | 41 |
| Mortgage revenue bonds . . . | 600 | — | 67 | — | (58) | — | — | 609 | 66 |
| Other . . . . . . . . . . . . . . | 154 | — | 6 | — | (8) | — | — | 152 | 5 |
| Non-mortgage-related: | | | | | | | | | |
| Asset-backed securities . . . . | 107 | — | 1 | — | (62) | (47) | 13 | 12 | — |
| Total trading securities . . . . . . . | 8,861 | 60 | 340 | — | (669) | (6,670) | 2,654 | 4,576 | 129 |
| Available-for-sale securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . | 596 | (203) | (1) | 2 | 181 | (580) | 119 | 114 | — |
| Freddie Mac . . . . . . . . . . | 27 | — | — | (1) | (29) | — | 6 | 3 | — |
| Ginnie Mae . . . . . . . . . . | 123 | — | — | 2 | (125) | — | — | — | — |
| Alt-A private-label securities . . . . . . . . . . | 8,312 | 471 | (54) | 1,240 | (1,322) | (4,951) | 3,353 | 7,049 | — |
| Subprime private-label securities . . . . . . . . . . | 10,746 | (118) | (70) | 1,078 | (1,704) | — | — | 9,932 | — |
| Mortgage revenue bonds . . . | 12,820 | 21 | 11 | 82 | (1,902) | (2) | — | 11,030 | — |
| Other . . . . . . . . . . . . . . | 3,530 | 366 | (3) | 402 | (489) | — | — | 3,806 | — |
| Total available-for-sale securities . . . . . . . . . . . . . . | 36,154 | 537 | (117) | 2,805 | (5,390) | (5,533) | 3,478 | 31,934 | — |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . . | — | — | (29) | — | 2,188 | (11) | 59 | 2,207 | (29) |
| Guaranty assets and buy-ups. . . . | 2,577 | (2,568) | 1 | 1 | (11) | — | — | — | — |
| Net derivatives . . . . . . . . . . . | 123 | — | 61 | — | (74) | (1) | (5) | 104 | (33) |
| Long-term debt: | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | |
| Senior floating . . . . . . . . | (601) | — | 20 | — | 160 | — | — | (421) | 24 |
| Of consolidated trusts . . . . . . | — | (77) | 19 | — | (631) | 92 | (30) | (627) | 2 |
| Total long-term debt . . . . . . . . | $  (601) | $  (77) | $  39 | $  — | $  (471) | $  92 | $  (30) | $(1,048) | $ 26 |

F-121

TREASURY-0615

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2009 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total Gains or (Losses) (Realized/Unrealized) | | | | | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of December 31, 2009[2] |
| | Balance, January 1, 2009 | Included in Net Loss | Included in Other Comprehensive Loss | Purchases, Sales, Issuances, and Settlements, Net | Transfers in/out of Level 3, Net[3] | Balance, December 31, 2009 | |
| | | | | (Dollars in millions) | | | |
| Trading securities: | | | | | | | |
| Mortgage-related: | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . | $ 6,935 | $  278 | $  — | $(1,277) | $  (280) | $ 5,656 | $274 |
| Alt-A private-label securities . . . . . | 1,118 | 57 | — | (154) | (457) | 564 | (25) |
| Subprime private-label securities . . | 2,318 | (83) | — | (455) | — | 1,780 | (74) |
| Mortgage revenue bonds . . . . . . . | 695 | (75) | — | (20) | — | 600 | (75) |
| Other . . . . . . . . . . . . . . . . . . . . | 167 | (1) | — | (12) | — | 154 | (1) |
| Non-mortgage-related: | | | | | | | |
| Asset-backed securities . . . . . . . . | 1,475 | (38) | — | (108) | (1,222) | 107 | 2 |
| Corporate debt securities . . . . . . . | 57 | 3 | — | (116) | 56 | — | — |
| Total trading securities . . . . . . . . . . . | $12,765 | $  141 | $  — | $(2,142) | $(1,903) | $ 8,861 | $101 |
| Available-for-sale securities: | | | | | | | |
| Mortgage-related: | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . | $ 5,609 | $  (47) | $ 191 | $ (569) | $(4,588) | $  596 | $ — |
| Freddie Mac . . . . . . . . . . . . . . | 80 | 3 | (6) | (21) | (29) | 27 | — |
| Ginnie Mae . . . . . . . . . . . . . . . | 190 | — | 1 | (7) | (61) | 123 | — |
| Alt-A private-label securities . . . . . | 11,675 | (1,717) | 2,192 | (1,554) | (2,284) | 8,312 | — |
| Subprime private-label securities . . | 14,318 | (5,290) | 4,862 | (3,144) | — | 10,746 | — |
| Mortgage revenue bonds . . . . . . . | 12,456 | (16) | 1,349 | (969) | — | 12,820 | — |
| Other . . . . . . . . . . . . . . . . . . . . | 3,509 | (81) | 651 | (549) | — | 3,530 | — |
| Total available-for-sale securities . . . . . | $47,837 | $(7,148) | $9,240 | $(6,813) | $(6,962) | $36,154 | $ — |
| Guaranty assets and buy-ups . . . . . . . . | 1,083 | 466 | 243 | 785 | — | 2,577 | 783 |
| Net derivatives . . . . . . . . . . . . . . . . . | 310 | (42) | — | (48) | (97) | 123 | 3 |
| Long-term debt . . . . . . . . . . . . . . . . | (2,898) | (18) | — | 1,791 | 524 | (601) | (49) |

F-122

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | Trading Securities | Available-for-sale Securities | Net Derivatives | Guaranty Assets and Buy-ups | Long-Term Debt |
| | (Dollars in millions) | | | | |
| Beginning balance as of January 1, 2008 . . . . . . . | $18,508 | $20,920 | $ 161 | $1,568 | $(7,888) |
| Realized/unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,881) | (3,152) | 282 | (512) | (73) |
| Unrealized losses included in other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (4,136) | — | (342) | — |
| Purchases, sales, issuances, and settlements, net . . | (4,337) | (3,640) | (227) | 369 | 5,396 |
| Transfers in/out of Level 3, net[4] . . . . . . . . . . . . | 475 | 37,845 | 94 | — | (333) |
| Ending balance as of December 31, 2008 . . . . . . . | $12,765 | $47,837 | $ 310 | $1,083 | $(2,898) |
| Net unrealized gains (losses) included in net loss related to assets and liabilities still held as of December 31, 2008[2] . . . . . . . . . . . . . . . . . . . | $(1,293) | $    — | $ 159 | $  (26) | $  (18) |

---

[1] For the year ended December 31, 2010, the transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. For the year ended December 31, 2010, the transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A loans as well as Fannie Mae guaranteed mortgage-related securities. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

[2] Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

[3] For the year ended December 31, 2009, the net transfers to Level 2 from Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities, which include securities backed by jumbo conforming loans, and private-label mortgage-related securities backed by non-fixed rate Alt-A loans. Price transparency improved as a result of increased market activity, and we noted some convergence in prices obtained from third-party vendors. As a result, we determined that our fair value estimates for these securities did not rely on significant unobservable inputs.

[4] During the year ended December 31, 2008, transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A and subprime mortgage loans.

The following tables display unrealized gains and losses recorded in our consolidated statements of operations for the years ended December 31, 2010, 2009 and 2008 for assets and liabilities transferred into Level 3 and measured in our consolidated balance sheets at fair value on a recurring basis.

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Trading Securities | Available-For-Sale Securities | Loans of Consolidated Trusts | Net Derivatives | Long-Term Debt |
| | (Dollars in millions) | | | | |
| Realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . | $ 126 | $   (36) | $(33) | $(32) | $ (3) |
| Unrealized losses included in other comprehensive loss . . . . . . . . . . . . . . . . . . | — | (151) | — | — | — |
| Total gains (losses) . . . . . . . . . . . . . . . . . . . . | $ 126 | $ (187) | $(33) | $(32) | $ (3) |
| Amount of Level 3 transfers in . . . . . . . . . . . | $2,654 | $3,478 | $ 59 | $ (5) | $(30) |

F-123

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2009 | | | |
| | Trading Securities | Available-for-Sale Securities | Net Derivatives | Long-term Debt |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Realized and unrealized gains (losses) included in net loss . . . . | $    (6) | $    62 | $  (2) | $— |
| Unrealized gains included in other comprehensive loss . . . . . . . | — | 174 | — | — |
| Total gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    (6) | $  236 | $  (2) | $— |
| Amount of Level 3 transfers in . . . . . . . . . . . . . . . . . . . . . . | $1,136 | $7,877 | $107 | $— |

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2008 | | | |
| | Trading Securities | Available-for-Sale Securities | Net Derivatives | Long-term Debt |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Realized and unrealized gains (losses) included in net loss . . . . | $  (679) | $(2,014) | $18 | $  (35) |
| Unrealized losses included in other comprehensive loss . . . . . . | — | (2,261) | — | — |
| Total gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  (679) | $(4,275) | $18 | $  (35) |
| Amount of Level 3 transfers in . . . . . . . . . . . . . . . . . . . . . . | $10,189 | $55,621 | $18 | $(531) |

The following tables display realized and unrealized gains and losses included in our consolidated statements of operations for the years ended December 31, 2010, 2009 and 2008, for our Level 3 assets and liabilities measured in our consolidated balance sheets at fair value on a recurring basis.

| | For the Year Ended December 31, 2010 | | | | |
| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $319 | $416 | $(480) | $40 | $295 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 93 | $ — | $— | $ 93 |

| | For the Year Ended December 31, 2009 | | | | |
| | Interest Income Investments in Securities | Guaranty Fee Income | Fair Value Gain (Losses), net | Net Other-than-Temporary Impairments | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $545 | $466 | $94 | $(7,706) | $(6,601) |
| Net unrealized gains related to Level 3 assets and liabilities still held as of December 31, 2009 . . . . . | $ — | $783 | $55 | $ — | $ 838 |

TREASURY-0618

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | For the Year Ended December 31, 2008 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Interest Income Investment in Securities | Guaranty Fee Income | Investment Gains (Losses), Net | Fair Value Gains (Losses), net | Other than Temporary Impairments, net | Extraordinary Losses | Total |
| | (Dollars in millions) | | | | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . | $90 | $(915) | $448 | $(1,640) | $(3,260) | $(59) | $(5,336) |
| Net unrealized losses related to level 3 assets and liabilities still held as of December 31, 2008 . . . . . | $— | $ (26) | $ — | $(1,152) | $ — | $ — | $(1,178) |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a recurring basis, as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. These valuation techniques are also used to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasuries, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1. If quoted market prices in active markets for identical assets are not available, we use prices provided by up to four third-party pricing services that are calibrated to the quoted market prices in active markets for similar securities, and assets valued in this manner are classified as Level 2. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or discounted cash flow models that use inputs such as spread, prepayment speed, yield, and loss severity based on market assumptions where available. Such instruments are generally classified as Level 2. Where there is limited activity or less transparency around inputs to the valuation, securities are classified as Level 3.

*Mortgage Loans Held for Investment "HFI"*— The majority of HFI performing loans and nonperforming loans that are not individually impaired are reported in our consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. At the transition date, we recorded consolidated trusts' loans as HFI at their unpaid principal balance net of an allowance for loan losses. We elected the fair value option for certain loans containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinate trust structures, which are recorded in our consolidated balance sheets at fair value on a recurring basis.

Fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined from third-party pricing services and other observable market data as a base value, from which we add or subtract the fair value of the associated guaranty asset, guaranty obligation and master servicing arrangement. We classify these valuations primarily within Level 2 of the valuation hierarchy given that the market values of our Fannie Mae MBS are calibrated to the quoted market prices in active markets for similar securities. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3. Certain loans that do not qualify for Fannie Mae MBS securitization are valued using market-based data including, for example, credit spreads, severities and prepayment speeds for similar

F-125

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure.

Fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. We calculate the fair value of nonperforming loans based on assumptions about key factors, including loan performance, collateral value, foreclosure related expenses, disposition timeline, and mortgage insurance repayment. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we compute a market calibrated fair value. The bids on sample loans are obtained from multiple active market participants. Fair value for loans that are four or more months delinquent, in an open modification period, or in a closed modification and that have performed for nine or fewer months, is estimated directly from a model calibrated to these indicative bids. Fair value for loans that are one to three months delinquent is estimated by an interpolation method using three inputs: (1) the fair value estimate as a performing loan; (2) the fair value estimate as a nonperforming loan; and (3) the delinquency transition rate corresponding to the loan's current delinquency status.

Fair value of a portion of our single-family nonperforming loans is measured using the value of the underlying collateral. These valuations leverage our proprietary distressed home price model. The model assigns a value using comparable transaction data. In determining what comparables to use in the calculations, the model measures three key characteristics relative to the target property: (1) distance from target property, (2) time of the transaction and (3) comparability of the nondistressed value. A portion of the nonperforming loans that are impaired is measured at fair value in our consolidated balance sheets on a nonrecurring basis. These loans are classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

Fair value of multifamily nonperforming loans is determined by external third-party valuations when available. If third-party valuations are unavailable, we determine the value of the collateral based on a derived property value estimation method using current net operating income of the property and capitalization rates.

*Derivatives Assets and Liabilities (collectively "derivatives")*—Derivatives are recorded in our consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification. Certain highly complex structured derivatives use only a single external source of price information due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant assumptions, resulting in Level 3 classification. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2. Adjustments for market movement based on internal model results that cannot be corroborated by observable market data are classified as Level 3.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include

F-126

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further haircut of the present value for liquidity considerations. The haircut is based on market quotes from dealers.

The fair value of the guaranty assets include the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our consolidated balance sheets. While the fair value of the guaranty assets reflect all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

*Short-Term Debt and Long-Term Debt (collectively "debt")*—The majority of debt of Fannie Mae is recorded in our consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2. When third-party pricing is not available, we use a discounted cash flow approach based on a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Given that the derivatives considered in the valuations of these structured debt instruments are classified as Level 3, the valuations of the structured debt instruments result in a Level 3 classification.

At the transition date, we recognized consolidated trusts' debt held by third parties at their unpaid principal balance in our consolidated balance sheets. Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities." Certain consolidated MBS debt with embedded derivatives is recorded in our consolidated balance sheets at fair value on a recurring basis.

*Other Liabilities*—Represents dollar roll repurchase transactions that reflect prices for similar securities in the market. They are recorded in our consolidated balance sheets at fair value on a recurring basis. Fair value is based on observable market-based inputs, quoted market prices and actual transaction price levels adjusted for market movement, and these liabilities are typically classified as Level 2. Adjustments for market movement that require internal model results that cannot be corroborated by observable market data results in classification as Level 3.

*Nonrecurring Changes in Fair Value*

The following tables display assets and liabilities measured in our consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject

F-127

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

to fair value adjustments in certain circumstances (for example, when we evaluate for impairment), and the gains or losses recognized for these assets and liabilities for the years ended December 31, 2010, 2009 and 2008, as a result of fair value measurements.

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Assets:** | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $6,776 | $ 535 | $7,311[(1)(2)] | $ (91)[(2)] |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 38,150 | 38,150[(3)] | (2,244) |
| Of consolidated trusts | — | — | 1,294 | 1,294[(3)] | (235) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 1,836 | 1,836[(3)] | (481) |
| Acquired property, net: | | | | | |
| Single-family | — | — | 20,248 | 20,248[(4)] | (2,617) |
| Multifamily | — | — | 206 | 206[(4)] | (65) |
| Other assets | | | | | |
| Guaranty assets | — | — | 27 | 27 | (6) |
| Partnership investments | — | — | 107 | 107 | (145)[(6)] |
| Other assets | — | — | 597 | 597[(5)] | (43) |
| Total assets at fair value | $— | $6,776 | $63,000 | $69,776 | $(5,927) |

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements For the Year Ended December 31, 2009 | | | | For the Year Ended December 31, 2009 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | (Dollars in millions) | | | | |
| **Assets:** | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $22,238 | $ 3,557 | $25,795[1] | $(1,210) |
| Mortgage loans held for investment, at amortized cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 330 | 4,820 | 5,150[3] | (1,173) |
| Acquired property, net . . . . . . . . . . . . . . . . . . . . . . | — | — | 10,132 | 10,132[4] | (503) |
| Other assets: | | | | | |
| Guaranty assets . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 2,327 | 2,327 | (231) |
| Master servicing assets . . . . . . . . . . . . . . . . . . . | — | — | 147 | 147 | (546) |
| Partnership investments. . . . . . . . . . . . . . . . . . . | — | — | 212 | 212 | (5,943)[6] |
| Total assets at fair value . . . . . . . . . . . . . . . . . | $— | $22,568 | $21,195 | $43,763 | $(9,606) |
| **Liabilities:** | | | | | |
| Master servicing liabilities . . . . . . . . . . . . . . . . . | $— | $    — | $  254 | $  254 | $  (200) |
| Total liabilities at fair value. . . . . . . . . . . . . . . | $— | $    — | $  254 | $  254 | $  (200) |

TREASURY-0623

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements For the Year Ended December 31, 2008 | | | | For the Year Ended December 31, 2008 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $26,303 | $ 1,294 | $27,597[1] | $  (433) |
| Mortgage loans held for investment, at amortized cost | — | — | 1,838 | 1,838[3] | (107) |
| Acquired property, net | — | — | 9,624 | 9,624[4] | (1,533) |
| Other assets: | | | | | |
| Guaranty assets | — | — | 5,473 | 5,473 | (2,967) |
| Master servicing assets | — | — | 547 | 547 | (553) |
| Partnership investments | — | — | 4,877 | 4,877 | (764)[6] |
| Total assets at fair value | $— | $26,303 | $23,653 | $49,956 | $(6,357) |
| Liabilities: | | | | | |
| Master servicing liabilities | $— | $  — | $  22 | $  22 | $  (12) |
| Total liabilities at fair value | $— | $  — | $  22 | $  22 | $  (12) |

[1] Includes $7.1 billion, $15.1 billion, and $25.2 billion of mortgage loans held for sale that were sold, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of December 31, 2010, 2009, and 2008, respectively.

[2] Includes $7.1 billion of estimated fair value and $68 million in losses due to the adoption of the new accounting standards.

[3] Includes $3.4 billion, $1.1 billion and $157 million of mortgage loans held for investment that were redesignated to mortgage loans held for sale, liquidated or transferred to foreclosed properties as of December 31, 2010, 2009, and 2008, respectively.

[4] Includes $10.5 billion, $7.1 billion and $4.0 billion of acquired properties that were sold or transferred as of December 31, 2010, 2009 and 2008, respectively.

[5] Includes $22 million of other assets that were sold or transferred as of December 31, 2010.

[6] Represents impairment charges related to LIHTC partnerships and other equity investments in multifamily properties. We recognized other than temporary impairment losses of $16 million, $5.5 billion and $506 million related to LIHTC partnerships for the years ended December 31, 2010, 2009 and 2008, respectively.

The following is a description of the fair valuation techniques we use for assets and liabilities measured at fair value on a nonrecurring basis under the accounting standard for fair value measurements as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. We also use these valuation techniques to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Mortgage Loans Held for Sale "HFS"*—HFS loans are reported at the lower of cost or fair value in our consolidated balance sheets. At the transition date, we reclassified the majority of HFS loans to HFI, as the trusts do not have the ability to sell mortgage loans and use of such loans is limited exclusively to the settlement of obligations of the trust. The valuation methodology and inputs used in estimating the fair value

F-130

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

of HFS loans are described under "Mortgage Loans Held for Investment" and these loans are generally classified as Level 2. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3.

*Acquired Property, Net and Other Assets*—Acquired property, net mainly represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The fair value estimate is based on the best information available at the time of valuation. The hierarchy includes offers accepted, third-party interior appraisals, independent broker opinions, proprietary home price model values, and exterior broker price opinions. Estimated cost to sell is based upon historical sales cost at a geographic level.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated cost to sell. Foreclosed properties classified as held for use, included in other assets, are depreciated and are impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. Acquired property held for use is included in other assets in our consolidated balance sheets. The fair value of our single-family foreclosed properties on an ongoing basis is determined using the same information hierarchy used at the point of initial fair value. The fair value of our multifamily properties is derived using third-party valuations. When third-party valuations are not available, we estimate the fair value using current net operating income of the property and capitalization rates.

Acquired property is classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

*Master Servicing Assets and Liabilities*—Master servicing assets and liabilities are reported at the lower of cost or fair value in our consolidated balance sheets. We measure the fair value of master servicing assets and liabilities based on the present value of expected cash flows of the underlying mortgage assets using management's best estimates of certain key assumptions, which include prepayment speeds, forward yield curves, adequate compensation, and discount rates commensurate with the risks involved. Changes in anticipated prepayment speeds, in particular, result in fluctuations in the estimated fair values of our master servicing assets and liabilities. If actual prepayment experience differs from the anticipated rates used in our model, this may result in a material change in the fair value. Master servicing assets and liabilities are classified as Level 3.

*Partnership Investments*—Unconsolidated investments in limited partnerships are primarily accounted for under the equity method of accounting. During 2009, we reduced the carrying value of our LIHTC investments to zero. We previously determined the fair value of our LIHTC investments using internal models that estimated the present value of the expected future tax benefits (tax credits and tax deductions for net operating losses) expected to be generated from the properties underlying these investments. Our estimates were based on assumptions that other market participants would use in valuing these investments. The key assumptions used in our models, which required significant management judgment, included discount rates and projections related to the amount and timing of tax benefits. We compared our model results to independent third-party valuations to validate the reasonableness of our assumptions and valuation results. We also compared our model results to the limited number of observed market transactions and made adjustments to reflect differences between the risk profile of the observed market transactions and our LIHTC investments.

For our other equity method investments, we use a net present value approach to estimate the fair value. The key assumptions used in our approach, which require significant management judgment, include discount rates and projections related to the amount and timing of cash flows. Our equity investments in LIHTC limited

F-131

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

partnerships and other equity investments are classified as Level 3 because they trade in a market with limited observable transactions.

*Fair Value of Financial Instruments*

The following table displays the carrying value and estimated fair value of our financial instruments as of December 31, 2010 and 2009. The fair value of financial instruments we disclose, includes commitments to purchase multifamily mortgage and single-family mortgage loans, which are off-balance sheet financial instruments that we do not record in our consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | As of December 31, | | | |
| | **2010** | | **2009**[2] | |
| | **Carrying Value** | **Estimated Fair Value** | **Carrying Value** | **Estimated Fair Value** |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Financial assets: | | | | |
| Cash and cash equivalents[1] | $ 80,975 | $ 80,975 | $ 9,882 | $ 9,882 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 11,751 | 11,751 | 53,684 | 53,656 |
| Trading securities | 56,856 | 56,856 | 111,939 | 111,939 |
| Available-for-sale securities | 94,392 | 94,392 | 237,728 | 237,728 |
| Mortgage loans held for sale | 915 | 915 | 18,462 | 18,615 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | |
| Of Fannie Mae | 358,698 | 319,367 | 246,509 | 241,300 |
| Of consolidated trusts | 2,564,107 | 2,610,145 | 129,590 | 129,545 |
| Mortgage loans held for investment | 2,922,805 | 2,929,512 | 376,099 | 370,845 |
| Advances to lenders | 7,215 | 6,990 | 5,449 | 5,144 |
| Derivative assets at fair value | 1,137 | 1,137 | 1,474 | 1,474 |
| Guaranty assets and buy-ups | 458 | 814 | 9,520 | 14,624 |
| Total financial assets | $3,176,504 | $3,183,342 | $824,237 | $823,907 |
| Financial liabilities: | | | | |
| Federal funds purchased and securities sold under agreements to repurchase | $ 52 | $ 51 | $ — | $ — |
| Short-term debt: | | | | |
| Of Fannie Mae | 151,884 | 151,974 | 200,437 | 200,493 |
| Of consolidated trusts | 5,359 | 5,359 | — | — |
| Long-term debt: | | | | |
| Of Fannie Mae | 628,160 | 649,684 | 567,950 | 587,423 |
| Of consolidated trusts | 2,411,597 | 2,514,929 | 6,167 | 6,310 |
| Derivative liabilities at fair value | 1,715 | 1,715 | 1,029 | 1,029 |
| Guaranty obligations | 769 | 3,854 | 13,996 | 138,582 |
| Total financial liabilities | $3,199,536 | $3,327,566 | $789,579 | $933,837 |

---

[1] Includes restricted cash of $63.7 billion and $3.1 billion as of December 31, 2010 and 2009, respectively.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

F-132

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following are valuation techniques for items not subject to the fair value hierarchy either because they are not measured at fair value other than for the purpose of the above table or because they are only measured at fair value at inception.

*Financial Instruments for which fair value approximates carrying value*—We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions) and the majority of advances to lenders.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates the fair value due to the short-term nature of the specific instruments. Other instruments include loans for which the carrying value does not approximate fair value. These loans are valued using collateral values of similar loans as a proxy.

*Guaranty Obligations*—The fair value of all guaranty obligations ("GO"), measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. While the fair value of the GO reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our consolidated balance sheets as a result of consolidating VIEs. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the senior-subordinate trust structures we consolidated as a result of adopting the new consolidation accounting standard on January 1, 2010. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our consolidated statements of operations.

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of December 31, 2010 and 2009. For information about the related fair

F-133

FANNIE MAE

(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

value gains and losses associated with these instruments, refer to "Note 1, Summary of Significant Accounting Policies."

| | As of December 31, | | | |
| | 2010 | | | 2009 |
| | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] | Long-Term Debt of Fannie Mae |
| --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | |
| Fair value | $2,962 | $(893) | $(2,271) | $(3,274) |
| Unpaid principal balance | 3,456 | (829) | (2,572) | (3,181) |

[1] Includes nonaccrual loans with a fair value of $219 million and loans that are 90 or more days past due with a fair value of $369 million as of December 31, 2010.

[2] Includes interest-only debt instruments with no unpaid principal balance and a fair value of $151 million as of December 31, 2010.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value gains and losses, net" in our consolidated statements of operations for the years ended December 31, 2010, 2009 and 2008.

| | For the Year Ended December 31, | | | | | | | |
| | 2010 | | | 2009 | | 2008 | | |
| | Loans | Long-Term Debt | Total Losses | Long-Term Debt | Total Gains (Losses) | Short-Term Debt | Long-Term Debt | Total Gains (Losses) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | | | | | |
| Changes in instrument-specific credit risk | $ (58) | $(9) | $ (67) | $ 33 | $ 33 | $ 6 | $ 94 | $ 100 |
| Other changes in fair value | (73) | 14 | (59) | (64) | (64) | (6) | (151) | (157) |
| Fair value gains (losses), net | $(131) | $ 5 | $(126) | $(31) | $(31) | $— | $ (57) | $ (57) |

In determining the instrument-specific risk, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

## 20.   Commitments and Contingencies

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. Litigation claims and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. The following describes our material legal proceedings, investigations and other matters.

For certain legal actions and proceedings we have established a reserve against probable losses where we can reasonably estimate such losses or ranges of losses; based on our current knowledge and after consultation with counsel, we do not believe that such losses or ranges of losses will have a material adverse effect on our

F-134

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

financial condition. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued. For certain other legal actions or proceedings, we cannot reasonably estimate such losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, or where there may be novel or unsettled legal questions relevant to the proceedings. For these matters, we have not established a reserve. Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of any matter may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the lawsuits described below, we believe we have valid defenses to the claims in these lawsuits and intend to defend these lawsuits vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

_In re Fannie Mae Securities Litigation_

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case.

_2008 Class Action Lawsuits_

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—_In re Fannie Mae 2008 Securities Litigation_ and _In re 2008 Fannie Mae ERISA Litigation_. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings. On October 13, 2009, the Court entered an order allowing FHFA to intervene in—_In re Fannie Mae 2008 Securities Litigation_.

_In re Fannie Mae 2008 Securities Litigation_

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs purport to represent a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock. Lead plaintiffs seek various

F-135

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief.

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. These motions are fully briefed and remain pending. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims, which are now fully briefed and remain pending.

*Comprehensive Investment Services v. Mudd, et al.*

On May 13, 2009, Comprehensive Investment Services, Inc. filed an individual securities action against certain of our former officers and directors, and certain of our underwriters in the Southern District of Texas. Plaintiff alleges violations of Section 12(a)(2) of the Securities Act of 1933; violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violation of § 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. The complaint seeks various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*.

*Smith v. Fannie Mae, et al.*

On February 25, 2010, plaintiff Edward Smith filed an individual complaint against Fannie Mae and certain of its former officers as well as several underwriters in the U.S. District Court for the Southern District of California. Plaintiff alleges violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violation of § 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On March 26, 2010, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation*.

F-136

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Investigation by the Securities and Exchange Commission*

On September 26, 2008, we received notice of an ongoing investigation into Fannie Mae by the SEC regarding certain accounting and disclosure matters. On January 8, 2009, the SEC issued a formal order of investigation. We are cooperating with this investigation.

*Investigation by the Department of Justice*

On September 26, 2008, we received notice of an ongoing federal investigation by the U.S. Attorney for the Southern District of New York into certain accounting, disclosure and corporate governance matters. In connection with that investigation, Fannie Mae received a Grand Jury subpoena for documents. That subpoena was subsequently withdrawn. However, we were informed that the Department of Justice was continuing an investigation and on March 15, 2010, we received another Grand Jury subpoena for documents. We are cooperating with this investigation.

*Escrow Litigation*

*Casa Orlando Apartments, Ltd., et al. v. Federal National Mortgage Association (formerly known as Medlock Southwest Management Corp., et al. v. Federal National Mortgage Association)*

A complaint was filed against us in the U.S. District Court for the Eastern District of Texas (Texarkana Division) on June 2, 2004, in which plaintiffs purport to represent a class of multifamily borrowers whose mortgages are insured under Sections 221(d)(3), 236 and other sections of the National Housing Act and are held or serviced by us. The complaint identified as a proposed class low- and moderate-income apartment building developers who maintained uninvested escrow accounts with us or our servicer. Plaintiffs Casa Orlando Apartments, Ltd., Jasper Housing Development Company and the Porkolab Family Trust No. 1 allege that we violated fiduciary obligations that they contend we owed to borrowers with respect to certain escrow accounts and that we were unjustly enriched. In particular, plaintiffs contend that, starting in 1969, we misused these escrow funds and are therefore liable for any economic benefit we received from the use of these funds. The plaintiffs seek a return of any profits, with accrued interest, earned by us related to the escrow accounts at issue, as well as attorneys' fees and costs. Our motions to dismiss and for summary judgment with respect to the statute of limitations were denied. Plaintiffs filed an amended complaint on December 16, 2005. On July 13, 2009, the Court denied plaintiffs' motion for class certification. On October 14, 2010, the U.S. Court of Appeals for the Fifth Circuit affirmed the District Court's denial of class certification.

**Unconditional Purchase and Lease Commitments**

We have unconditional commitments related to the purchase of loans and mortgage-related securities. These include both on- and off-balance sheet commitments wherein a portion of these have been recorded as derivatives in our consolidated balance sheets. Unfunded lending represents off-balance sheet commitments for the unutilized portion of lending agreements entered into with multifamily borrowers.

We lease certain premises and equipment under agreements that expire at various dates through 2029. Some of these leases provide for payment by the lessee of property taxes, insurance premiums, cost of maintenance and other costs. Rental expenses for operating leases were $35 million, $62 million and $50 million for the years ended December 31, 2010, 2009 and 2008, respectively.

TREASURY-0631

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes by remaining maturity, non cancelable future commitments related to loan and mortgage purchases, unfunded lending, operating leases, and other agreements as of December 31, 2010.

| | As of December 31, 2010 | | | |
|---|---|---|---|---|
| | **Loans and Mortgage-Related Securities[1]** | **Unfunded Lending** | **Operating Leases** | **Other[2]** |
| | | (Dollars in millions) | | |
| 2011 | $54,837 | $ 72 | $ 40 | $34 |
| 2012 | 10 | 92 | 36 | 19 |
| 2013 | 11 | 42 | 25 | 10 |
| 2014 | — | — | 17 | 2 |
| 2015 | — | 3 | 14 | — |
| Thereafter | — | — | 26 | — |
| Total | $54,858 | $209 | $158 | $65 |

---

[1] Includes $54.5 billion, which have been accounted for as mortgage commitment derivatives.

[2] Includes purchase commitments for certain telecom services, computer software and services, and other agreements.

**21.   Selected Quarterly Financial Information (Unaudited)**

The condensed consolidated statements of operations for the quarterly periods in 2010 and 2009 are unaudited and in the opinion of management include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of our condensed consolidated statements of operations. The operating results for the interim periods are not necessarily indicative of the operating results to be expected for a full year or for other interim periods.

F-138

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | For the 2010 Quarter Ended | | | |
|---|---|---|---|---|
| | March 31 | June 30[1] | September 30 | December 31[2] |
| | (Dollars and shares in millions, except per share amounts) | | | |
| Interest income: | | | | |
| Trading securities | $    315 | $    330 | $    310 | $    296 |
| Available-for-sale securities | 1,473 | 1,389 | 1,313 | 1,115 |
| Mortgage loans: | | | | |
| Of Fannie Mae | 3,298 | 3,950 | 3,859 | 3,885 |
| Of consolidated trusts | 34,321 | 33,682 | 32,807 | 31,781 |
| Other | 39 | 41 | 31 | 35 |
| Total interest income | 39,446 | 39,392 | 38,320 | 37,112 |
| Interest expense: | | | | |
| Short-term debt: | | | | |
| Of Fannie Mae | 116 | 164 | 190 | 149 |
| Of consolidated trusts | 2 | 3 | 4 | 3 |
| Long-term debt: | | | | |
| Of Fannie Mae | 5,081 | 4,975 | 4,472 | 4,329 |
| Of consolidated trusts | 31,458 | 30,043 | 28,878 | 27,994 |
| Total interest expense | 36,657 | 35,185 | 33,544 | 32,475 |
| Net interest income | 2,789 | 4,207 | 4,776 | 4,637 |
| Provision for loan losses | (11,939) | (4,295) | (4,696) | (3,772) |
| Net interest income (loss) after provision for loan losses | (9,150) | (88) | 80 | 865 |
| Guaranty fee income | 54 | 52 | 51 | 45 |
| Investment gains, net | 166 | 23 | 82 | 75 |
| Other-than-temporary impairments | (186) | (48) | (366) | (94) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive loss | (50) | (89) | 40 | 71 |
| Net other-than-temporary impairments | (236) | (137) | (326) | (23) |
| Fair value gains (losses), net | (1,705) | 303 | 525 | 366 |
| Debt extinguishment losses, net | (124) | (159) | (214) | (71) |
| Income (losses) from partnership investments | (58) | (26) | 47 | (37) |
| Fee and other income | 179 | 242 | 253 | 208 |
| Non-interest income (loss) | (1,724) | 298 | 418 | 563 |
| Administrative expenses: | | | | |
| Salaries and employee benefits | 324 | 324 | 325 | 304 |
| Professional services | 194 | 260 | 305 | 183 |
| Occupancy expenses | 41 | 40 | 43 | 46 |
| Other administrative expenses | 46 | 46 | 57 | 59 |
| Total administrative expenses | 605 | 670 | 730 | 592 |
| Provision (benefit) for guaranty losses | (36) | 69 | 78 | 83 |
| Foreclosed property expense (income) | (19) | 487 | 787 | 463 |
| Other expenses | 172 | 198 | 243 | 240 |
| Total expenses | 722 | 1,424 | 1,838 | 1,378 |
| Income (loss) before federal income taxes | (11,596) | (1,214) | (1,340) | 50 |
| Provision (benefit) for federal income taxes | (67) | 9 | (9) | (15) |
| Net income (loss) | (11,529) | (1,223) | (1,331) | 65 |
| Less: Net (income) loss attributable to the noncontrolling interest | (1) | 5 | (8) | 8 |
| Net income (loss) attributable to Fannie Mae | (11,530) | (1,218) | (1,339) | 73 |
| Preferred stock dividends | (1,527) | (1,907) | (2,116) | (2,154) |
| Net loss attributable to common stockholders | $(13,057) | $(3,125) | $(3,455) | $(2,081) |
| Loss per share—Basic and Diluted | $   (2.29) | $   (0.55) | $   (0.61) | $   (0.37) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,692 | 5,694 | 5,695 | 5,696 |

---

[1] Includes out-of-period adjustment of $1.1 billion to provision for loan losses, reflecting our assessment of the collectibility of the receivable from the borrowers for preforeclosure property taxes and insurance.

[2] Includes settlement from Bank of America Inc. related to repurchase requests for residential mortgage loans of $1.3 billion.

F-139

TREASURY-0633

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | For the 2009 Quarter Ended | | | |
|---|---|---|---|---|
| | March 31 | June 30 | September 30 | December 31 |
| | (Dollars and shares in millions, except per share amounts) | | | |
| Interest income: | | | | |
| Trading securities | $   990 | $   923 | $   862 | $   1,084 |
| Available-for-sale securities | 3,721 | 3,307 | 3,475 | 3,115 |
| Mortgage loans: | | | | |
| Of Fannie Mae | 4,707 | 4,392 | 3,229 | 3,050 |
| Of consolidated trusts | 891 | 1,219 | 2,061 | 1,972 |
| Other | 127 | 139 | 48 | 43 |
| Total interest income | 10,436 | 9,980 | 9,675 | 9,264 |
| Interest expense: | | | | |
| Short-term debt: | | | | |
| Of Fannie Mae | 1,107 | 600 | 390 | 209 |
| Long-term debt: | | | | |
| Of Fannie Mae | 5,992 | 5,560 | 5,370 | 5,273 |
| Of consolidated trusts | 89 | 85 | 85 | 85 |
| Total interest expense | 7,188 | 6,245 | 5,845 | 5,567 |
| Net interest income | 3,248 | 3,735 | 3,830 | 3,697 |
| Provision for loan losses | (2,509) | (2,615) | (2,546) | (1,899) |
| Net interest income after provision for loan losses | 739 | 1,120 | 1,284 | 1,798 |
| Guaranty fee income | 1,752 | 1,659 | 1,923 | 1,877 |
| Investment gains (losses), net | 223 | (45) | 785 | 495 |
| Other-than-temporary impairments | (5,653) | (1,097) | (1,018) | (1,289) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive loss | — | 344 | 79 | (1,227) |
| Net other-than-temporary impairments | (5,653) | (753) | (939) | (2,516) |
| Fair value gains (losses), net | (1,460) | 823 | (1,536) | (638) |
| Debt extinguishment losses, net | (79) | (190) | (11) | (45) |
| Losses from partnership investments | (357) | (571) | (520) | (5,287) |
| Fee and other income | 192 | 197 | 194 | 190 |
| Non-interest income (loss) | (5,382) | 1,120 | (104) | (5,924) |
| Administrative expenses: | | | | |
| Salaries and employee benefits | 293 | 245 | 293 | 302 |
| Professional services | 143 | 180 | 178 | 183 |
| Occupancy expenses | 48 | 46 | 47 | 64 |
| Other administrative expenses | 39 | 39 | 44 | 63 |
| Total administrative expenses | 523 | 510 | 562 | 612 |
| Provision for guaranty losses | 17,825 | 15,610 | 19,350 | 10,272 |
| Foreclosed property expense (income) | 538 | 559 | 64 | (251) |
| Other expenses | 279 | 318 | 231 | 656 |
| Total expenses | 19,165 | 16,997 | 20,207 | 11,289 |
| Loss before federal income taxes and extraordinary losses | (23,808) | (14,757) | (19,027) | (15,415) |
| Provision (benefit) for federal income taxes | (623) | 23 | (143) | (242) |
| Net loss | (23,185) | (14,780) | (18,884) | (15,173) |
| Less: Net (income) loss attributable to the noncontrolling interest | 17 | 26 | 12 | (2) |
| Net loss attributable to Fannie Mae | (23,168) | (14,754) | (18,872) | (15,175) |
| Preferred stock dividends | (29) | (411) | (883) | (1,151) |
| Net loss attributable to common stockholders | $(23,197) | $(15,165) | $(19,755) | $(16,326) |
| Loss per share—Basic and Diluted | $   (4.09) | $   (2.67) | $   (3.47) | $   (2.87) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,666 | 5,681 | 5,685 | 5,687 |

F-140

Exhibit 31.1

# CERTIFICATION

## PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Michael J. Williams, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2010 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2011

/s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Exhibit 31.2

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, David C. Hisey, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2010 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2011

/s/   David C. Hisey
_____
David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION**

In connection with the Annual Report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association) for the year ended December 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/   Michael J. Williams
_____

Michael J. Williams
President and Chief Executive Officer

Dated: February 24, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Annual Report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association) for the year ended December 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David C. Hisey, Executive Vice President and Deputy Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/   David C. Hisey
_____

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer


Dated: February 24, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.



**FR005**

Table of Contents

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2010**

**Commission File Number: 000-53330**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | **McLean, Virginia 22102-3110** | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |
| | *(Address of principal executive offices, including zip code)* | | |

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

Voting Common Stock, no par value per share (OTC FMCC)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCI)
5% Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCKK)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCG)
5 % Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCH)
5 79% Non-Cumulative Preferred Stock, par value $ 00 per share (OTC: FMCCK)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCL)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCN)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCO)
5 8 % Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCO)
6% Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCP)
Variable Rate, Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCCJ)
5 7% Non-Cumulative Preferred Stock, par value $ 00 per share (OTC FMCKP)
Variable Rate, Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCCS)
6 42% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCCT)
5 9% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKO)
5 57% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKM)
5 66% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKN)
6 02% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKL)
6 55% Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKI)
Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, par value $ 00 per share (OTC FMCKJ)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 3 or Section 15(d) of the Act   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files)   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10 K   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company"  Rule 12 -2 of the Exchange Act
Large accelerated filer ☐   Accelerated filer ☒   Non-accelerated filer ☐ (Do not check if a smaller reporting company) ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12 -2 of the Exchange Act)   Yes ☐   No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the price at which the common equity was last sold on June 30, 2010 (the last business day of the registrant's most recent completed second fiscal quarter) was $266 2    on

As of February  , 20  , there were 649, 82,46  shares of the registrant's common stock outstanding

**DOCUMENTS INCORPORATED BY REFERENCE**  None

TREASURY-0640

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

# TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---:|
| Item | Business | 1 |
| Item   A. | Risk Factors | 38 |
| Item   B. | Unresolved Staff Comments | 62 |
| Item 2. | Properties | 62 |
| Item 3. | Legal Proceedings | 62 |
| Item 4. | Reserved | 62 |

**PART II**

| | | |
|---|---|---:|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity  Securities | 63 |
| Item 6. | Selected Financial Data | 6 5 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 66 |
| | Mortgage Market and Economic Conditions, and Outlook | 66 |
| | Consolidated Results of Operations | 69 |
| | Consolidated Balance Sheets Analysis | 89 |
| | Risk Management | 107 |
| | Liquidity and Capital Resources | 146 |
| | Fair Value Measurements and Analysis | 153 |
| | Off Balance Sheet Arrangements | 158 |
| | Contractual Obligations | 159 |
| | Critical Accounting Policies and Estimates | 160 |
| | Risk Management and Disclosure Commitments | 164 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 165 |
| Item 8. | Financial Statements and Supplementary Data | 171 |
| Item 9. | Changes in and Disagreements with Accountants on  Accounting and Financial Disclosure | 287 |
| Item 9A. | Controls and Procedures | 287 |
| Item 9B. | Other Information | 288 |

**PART III**

| | | |
|---|---|---:|
| Item   0. | Directors, Executive Officers and Corporate  Governance | 290 |
| Item 11. | Executive Compensation | 298 |
| Item   2. | Security Ownership of Certain Beneficial Owners  and Management and Related Stockholder Matters | 324 |
| Item   3. | Certain Relationships and Related Transactions,  and Director Independence | 326 |
| Item   4. | Principal Accounting Fees and Services | 330 |

**PART IV**

| | | |
|---|---|---:|
| Item 15. | Exhibits and Financial Statement Schedules | 332 |
| **SIGNATURES** | | 333 |
| **GLOSSARY** | | 334 |
| **EXHIBIT INDEX** | | E |

i                                                                *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0642

Table of Contents

## FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 172 |
| Freddie Mac Consolidated Statements of Operations | 174 |
| Freddie Mac Consolidated Balance Sheets | 175 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 176 |
| Freddie Mac Consolidated Statements of Cash Flows | 177 |
| Note 1: Summary of Significant Accounting Policies | 178 |
| Note 2: Change in Accounting Principles | 190 |
| Note 3: Conservatorship and Related Matters | 195 |
| Note 4: Variable Interest Entities | 201 |
| Note 5: Mortgage Loans and Loan Loss Reserves | 206 |
| Note 6: Individually Impaired and Non Performing Loans | 211 |
| Note 7: Real Estate Owned | 214 |
| Note 8: Investments in Securities | 215 |
| Note 9: Debt Securities and Subordinated Borrowings | 223 |
| Note 10: Financial Guarantees | 227 |
| Note   : Retained Interests in Mortgage Related Securitizations | 229 |
| Note 12: Derivatives | 231 |
| Note 13: Freddie Mac Stockholders' Equity (Deficit) | 235 |
| Note 14: Income Taxes | 239 |
| Note 15: Employee Benefits | 242 |
| Note 16: Noncontrolling Interests | 247 |
| Note 17: Segment Reporting | 248 |
| Note 18: Regulatory Capital | 255 |
| Note 19: Concentration of Credit and Other Risks | 257 |
| Note 20: Fair Value Disclosures | 265 |
| Note 2 : Legal Contingencies | 279 |
| Note 22: Earnings (Loss) Per Share | 283 |
| Note 23: Selected Financial Statement Line Items | 284 |
| Quarterly Selected Financial Data | 286 |

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0643

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART 1

*This Form 10 K includes forward looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward looking statements are made as of the date of this Form 10 K and we undertake no obligation to update any forward looking statement to reflect events or circumstances occurring after the date of this Form 10 K. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in "BUSINESS    Forward Looking Statements," and "RISK FACTORS" in this Form 10 K. Throughout this Form 10 K, we use certain acronyms and terms which are defined in the Glossary.*

## ITEM 1. BUSINESS

### Conservatorship

We continue to operate under the direction of FHFA as our Conservator  We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent  The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations

As our Conservator, FHFA succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets  FHFA, as Conservator, has directed and will continue to direct certain of our business activities and strategies  FHFA has delegated certain authority to our Board of Directors to oversee, and management to conduct, day to day operations  The directors serve on behalf of, and exercise authority as directed by, the Conservator.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist  Our future structure and role are currently being considered by the Obama Administration and Congress  We have no ability to predict the outcome of these deliberations  While we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term, there are likely to be significant changes beyond the near term that we expect to be decided by the Obama Administration and Congress.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions  The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations  The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

For more information, see "Executive Summary    *Long Term Financial Sustainability and Future Status.*"

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Based on our charter, public statements from Treasury and FHFA officials and guidance from our Conservator, we have a variety of different, and potentially competing, objectives  Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives  However, these changes to our business objectives and strategies may not contribute to our profitability  Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term  In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, may adversely impact our financial results, including our segment results. For example, our current business objectives reflect, in part, direction given to us by the Conservator  These efforts are expected to help homeowners and the mortgage market and may help to mitigate future credit losses  However, some of our activities are expected to have an adverse impact on our near  and long term financial results. The Conservator and Treasury also did not authorize us to engage in certain business activities and transactions, including the sale of certain assets, which we

<div align="center">1</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

believe may have had a beneficial impact on our results of operations or financial condition, if executed  Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds under the Purchase Agreement

In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed  Specifically, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship  The Acting Director stated that permitting us to engage in the development of new products is inconsistent with the goals of the conservatorship. This directive could have an adverse effect on our business and profitability in future periods

We had a net worth deficit of $401 million as of December 31, 2010, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million  As a result of draws under the Purchase Agreement, the agg egate liquidation preference of the senior preferred stock increased from $1.0 billion as of September 8, 2008 to $64.2 billion as of December 31, 2010  Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we may not be able to do so for the foreseeable future, if at all  The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash  The amounts we are obligated to pay in dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth  We expect to make additional draws under the Purchase Agreement in future periods

Our annual dividend obligation on the senior preferred stock, based on the current liquidation preference, is $6.4 billion, which is in excess of our annual historical earnings in all but one period  Continued cash payment of senior preferred dividends, combined with potentially substantial quarterly commitment fees payable to Treasury under the Purchase Agreement, will have an adverse impact on our future financial condition and net worth. The payment of dividends on our senior preferred stock in cash reduces our net worth  For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury.

For more information on our current business objectives, see "Executive Summary  *Our Primary Business Objectives."* For more information on the conservatorship and government support for our business see "Executive Summary  *Government Support for Our Business"* and "Conservatorship and Related Matters "

## Executive Summary

*You should read this Executive Summary in conjunction with our MD&A and consolidated financial statements and related notes for the year ended December 31, 2010.*

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments  During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures  Taken together, we believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure

### Summary of Financial Results

Our financial performance in 2010, including our net loss, continued to be impacted by the ongoing weakness in the economy, including the mortgage market  Our total comprehensive income (loss) was $1.2 billion and $282 million for the fourth quarter and full year of 2010, respectively, consisting of: (a) a net loss of $113 million and $14 0 billion, respectively, reflecting significant provisions for credit losses; and (b) $1.3 billion and $ 4 3 billion of changes in other comprehensive income (loss), respectively, primarily resulting from improved fair values on available for sale securities recorded in AOCI

Our total equity (deficit) was $(401) million at December 31, 2010 due to several contributing factors, including our dividend payments on our senior preferred stock, which exceeded total comprehensive income (loss) for the fourth quarter of 2010. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $500 million

2  *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During 2010, we paid cash dividends to Treasury of $5 7 billion on our senior preferred stock  We received cash proceeds of $12.5 billion from draws under Treasury's funding commitment during 2010. These draws were driven in large part by changes in accounting principles adopted on January 1, 2010, which resulted in a net decrease to total equity (deficit) of $11.7 billion. As a result of these draws from Treasury under the Purchase Agreement during 20 0, the aggregate liquidation preference of Treasury's senior preferred stock increased to $64.2 billion at December 3 , 20 0  See " *Changes in Accounting Standards Related to Accounting for Transfers of Financial Assets and Consolidation of VIEs*" for additional information related to our changes in accounting principles.

### Our Primary Business Objectives

Under conservatorship, we are focused on: (a) meeting the needs of the U S residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP, and our relief refinance mortgage initiative; (c) minimizing our credit losses; and (d) maintaining the credit quality of the loans we purchase and guarantee  These objectives reflect, in part, direction we have received from the Conservator  We also have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator  For more information, see "Conservatorship and Related Developments  *Impact of Conservatorship and Related Actions on Our Business*."

### Providing Mortgage Liquidity and Conforming Loan Availability

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year f xed-rate mortgage which represents the foundation of the mortgage market

- Our support provides lenders with a constant source of liquidity  We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed approximately 89% of the single family conforming mortgages originated during 20 0

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this provides market stability in difficult environments.

- We are an important counter cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years

During 2010, we guaranteed $384.6 billion in UPB of single family conforming mortgage loans representing 1 8 million families who purchased homes or refinanced their mortgages  Relief refinance mortgages with LTV ratios of 80% and above represented approximately 2% of our total single family credit guarantee portfolio purchases in 20 0  These mortgages comprised approximately 4% of our total single family credit guarantee portfolio at December 3 , 20 0

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae  Mortgage originators are generally able to offer homebuyers lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE guaranteed mortgage related securities  Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds  We estimate that prior to 2007 the average effective interest rates on conforming single family mortgage loans were about 30 basis points lower than on non conforming loans  Since 2007, there have been fewer sources of mortgage funds, and we estimate that interest rates on conforming loans, excluding conforming jumbo loans, have been lower than those on non conforming loans by as much as 184 basis points. In December 20 0, we estimate that borrowers were paying an average of 68 basis points less on these conforming loans than on non conforming loans  These estimates are based on data provided by HSH Associates, a third party provider of mortgage market data.

<div align="center">3</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Reducing Foreclosures and Keeping Families in Homes*

During the current housing crisis, we are focused on reducing the number of foreclosures and helping to keep families in their homes In addition to our participation in HAMP, we introduced several new initiatives to help eligible borrowers during this crisis, including our relief refinance mortgage initiative In 2010, we helped more than 275,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through our various workout programs, including HAMP. Table 1 presents our recent single family loan workout activities

**Table 1     Total Single Family Loan Workout Volumes**[1]

|  | or the Three Months nded | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 12/31/2010 | 09/30/2010 | 06/30/2010 (number of loans) | 03/31/2010 | 12/31/2009 |
| Loan mod f ca ons | 37,203 | 39,284 | 49,562 | 44,228 | 15,805 |
| Repaymen p ans | 7,964 | 7,030 | 7,455 | 8,761 | 8,129 |
| Fo bea ance ag eemen s[2] | 5,945 | 6,976 | 12,815 | 8,858 | 8,780 |
| S o sa es d deed–n-l eu ansac ons | 12,097 | 10,472 | 9,542 | 7,064 | 6,533 |
| To al s ngle-fam y loan wo kou s | 63,209 | 63,762 | 79,374 | 68,911 | 39,247 |

(1) Based on ac ons comple ed w h bo owe s fo loans w h no u s ngle-fam ly c ed gua an ee po fol o Excludes hose mod f ca on, epaymen , and fo bea ance ac v es fo wh ch e o owe ass a ed e eq ed p ocess,     e a co s ave o bee  adep e a e  , o effec ve, s c a so a s     e a pe od unde HAMP A so exc udes ce a n oan wo kou s whe e ou s ngle-fam ly cred /se v ce s have execu ed ag ee  e s    e e  o p o po ods, b   ese ave o been nco po a ed n o ce a n of ou ope a ona sys ems, due o de ays n p ocess ng These ca ego es a e no mu ua y exclus ve and a loan n one ca ego y may also be ncluded w h n ano he ca ego y n he same pe od

(2) Excludes loans w h long– e m fo bea ance unde a comple ed loan mod f ca on Many bo owe s comple e a sho -e m fo bea ance ag eemen befo e ano he loan wo ko  s p s ed co p e ed We only epo fo bea ance ac v y fo a s ngle loan once du ng each qua e ype od howeve , a s ng e oan ay be  c ded de sepa a e fo bea ance ag eemen s n sepa a e pe ods

We continue to execute a high volume of loan workouts Recent highlights include the following:

• We completed 275,256 single family loan workouts during 2010, including 170,277 loan modifications and 39,175 short sales and deed in lieu transactions

• Based on information provided by the MHA Program administrator, our servicers had completed 107,073 loan modifications under HAMP from the introduction of the initiative in 2009 through December 31, 2010 and, as of December 31, 2010, 22,352 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period)

In addition to these efforts, we continue to focus on assisting consumers through outreach and other efforts These efforts included: (a) meeting with borrowers nationwide in foreclosure prevention workshops; (b) launching the Borrower Help Network to provide distressed borrowers with free one-on-one counseling; (c) opening Borrower Help Centers in several cities nationwide to provide free counseling to distressed borrowers; and (d) in instances where foreclosure has occurred, allowing affected families who qualify to rent back their homes for a limited period of time We have also increased our efforts to directly assist our servicers by increasing our servicing staff and placing on-s te specialists at many of our mortgage servicer locations

For more information about HAMP, other loan workout programs, and our relief refinance mortgage initiative, and other options to help eligible borrowers, see "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Portfolio Management Activities MHA Program*" and "   *Loan Workout Activities.*"

*Minimizing Credit Losses*

To help minimize the credit losses related to our guarantee activities, we are focused on:

• pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we incur;

• managing foreclosure timelines;

• managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

• pursuing contractual remedies against originators, lenders, servicers, and credit enhancement providers, as appropriate.

We establish guidelines for our servicers and provide them with software tools to determine which loan workout solution would be expected to provide the best opportunity for minimizing our credit losses based on each borrower's qualifications For example, if a borrower qualifies for a loan modification, this often provides us a better opportunity to minimize credit losses than a foreclosure We rely on our servicers to pursue the best alternative available based on our guidelines and software tools

Our servicers pursue repayment plans and loan modifications for borrowers facing financial or other hardships since the level of recovery (if a loan reperforms) may often be much higher than with foreclosure or foreclosure alternatives In cases where this alternative is not possible or successful, a short sale transaction typically provides us with a comparable or higher level of recovery than what we would receive through property sales from our REO inventory In large part, the benefit of

4

*Freddie Mac*

TREASURY-0647

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

short sales arises from the avoidance of costs we would  otherwise incur to complete the foreclosure and dispose of the  property, including maintenance and other property expenses  associated with holding REO property, legal fees, commissions,  and other selling expenses of traditional real estate transactions. The foreclosure process is a lengthy one in many  jurisdictions with significant associated costs to complete,  including, in times of home value decline, foregone recovery we  might receive from an earlier sale  The nationwide average for  completion of a foreclosure (as measured from the date of the  last scheduled payment made by the borrower) on our  single family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 448 days for the  foreclosures we completed during 20  0 and varied widely among  jurisdictions. We expect that the growth in short sales will  continue, in part due to our recent initiatives, including  offering incentives to servicers to complete short sales instead of foreclosures as well as our implementation of HAFA

We have contractual arrangements with our seller/servicers under  which they agree to provide us with mortgage loans that have  been originated under specified underwriting standards. If we  subsequently discover that contractual standards were not  followed, we can exercise certain contractual remedies to mitigate our credit losses  These contractual remedies include  the ability to require the seller/servicer to repurchase the  loan at its current UPB or make us whole for any credit losses  realized with respect to the loan  As of December 3  , 20  0, the UPB of loans subject to repurchase requests issued to our  single family seller/servicers was approximately  $3 8 billion,  and approximately 34% of these requests were outstanding for more than four months since issuance of our  repurchase request  The actual amount we expect to collect on  these requests is significantly less than their UPB amounts  primarily because many of these requests are satisfied by  reimbursement of our realized losses by seller/servicers, or may be rescinded in the course of the  contractual appeals process  During 20  0 and 2009, we entered  into agreements with certain seller/servicers to release certain loans in their portfolio  from repurchase obligations in exchange for one time cash  payments  We may enter into similar agreements or seek other  remedies in the future  See "MD&A     RISK MANAGEMENT      Credit Risk     *Institutional Credit Risk    Mortgage Seller/Servicers* " for further information on our agreements with our seller/servicers

Historically, our credit loss exposure has also been partially  mitigated by mortgage insurance, which is a form of credit  enhancement  Primary mortgage insurance is required to be  purchased, at the borrower's expense, for certain mortgages  with higher LTV ratios  We received payments under primary and other mortgage insurance of $1 8  billion and  $952 million in the years ended December 31, 2010 and  2009, respectively, to help mitigate our credit losses

### Maintaining the Credit Quality of New Loan Purchases and Guarantees

We continue to focus on maintaining underwriting standards that  allow us to purchase and guarantee loans made to qualified  borrowers that we believe will provide management and guarantee  fee income, over the long term, that exceeds our anticipated  credit related and administrative expenses on the underlying loans.

As of December 31, 2010, more than one third of our  single family credit guarantee portfolio consisted of mortgage  loans originated in 2009 and 2010. The substantial majority of the single family mortgages  we purchased in 20  0 were 30-year and 15  year fixed rate mortgages  We believe the credit quality of the  single family loans we acquired in 2009 and 2010 (excluding  relief refinance mortgages) is better than that of loans we acquired from 2005 through 2008 as measured by original LTV  ratios, FICO scores, and income documentation standards. These  newer loans have also experienced significantly better serious  delinquency trends at this stage in their lifecycle than loans  acquired from 2006 through 2008. Early serious delinquency performance and home price declines  have historically been  indicators of long term credit performance

We believe the improvement in credit quality we are experiencing  is primarily the result of the combination of: (a) changes  in our underwriting guidelines implemented during 2009 and 2010;  (b) fewer purchases in 2009 and 2010 of loans with  higher risk characteristics; (c) changes in mortgage insurers' and lenders' underwriting practices; and (d) an  increase in the relative amount of refinance  mortgages versus new purchase mortgages we acquired in 2009 and 2010  Approximately 80% of our purchases for the single  family  credit guarantee portfolio in both 20  0 and 2009 were refinance mortgages  Refinance mortgages typically lower the  borrower's monthly mortgage payment, and thereby reduce the  risk that the borrower will default

Table 2 presents the composition, loan characteristics, and  serious delinquency rates of loans in our single family credit  guarantee portfolio, by year of origination at December 3  , 20  0

<div align="center">5</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 2**      **Single Family Credit Guarantee Portfolio Data by Year of Origination**

| Year of Or g nat on | At December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | % of Portfolio(1) | Average Credit Score(2) | Current LTV Ratio(3) | Serious Delinquency Rate(4) |
| 2010 | 18% | 755 | 70% | 0 05% |
| 2009 | 21 | 755 | 70 | 0 26 |
| 2008 | 9 | 728 | 86 | 4 89 |
| 2007 | 11 | 707 | 104 | 11 63 |
| 2006 | 9 | 712 | 104 | 10 46 |
| 2005 | 10 | 719 | 91 | 6 04 |
| 2004 and p o | 22 | 722 | 58 | 2 46 |
| o a | 100% | 733 | 78 | 3 84 |

(1) Based on  he UPB of  he s ngle-fam ly c ed   gua an ee po  fol o

(2) Based on FICO c ed   sco e of  he bo  owe  as of  he da e of  oan o  g na  on

(3) C    e    ake va  es a  es    a ed by adj s  g   e va e of  he p ope  y a o   g na  on based on changes  n  he ma ke  va ue of homes s nce o   g na  on

(4) See "MD&A   RISK MANAGEMENT    C ed t R sk    *Mortgage Credit Risk    Credit Performance*   Del nquenc es" fo  fu  he  nfo ma  on abou  ou  epo ed se  ous de  nquency  a es

During 20 0, the guarantee related revenue from the mortgage  loans originated in 2009 and 20 0 exceeded the credit related  and administrative expenses associated with these loans   Credit related expenses consist of our provision for credit  losses and REO operations expense  These new vintages are replacing the older vintages that have a higher composition of  mortgages with higher risk characteristics  We currently expect that, over time, this should positively impact the serious  delinquency rates and credit expenses of our single family  credit guarantee portfolio  See "Table 19    Segment Earnings Composition    Single Family Guarantee  Segment" for an analysis of the contribution to Segment  Earnings by loan origination year

***Single-Family Credit Guarantee Portfolio***

Since the beginning of 2008, on an aggregate basis, we recorded  provision for credit losses associated with single family loans  of approximately $62.3 billion, and an additional  $4.7 billion in losses on loans purchased from our PCs, net  of recoveries  The majority of these losses are associated with loans originated in 2005 through 2008  While loans we acquired  in 2005 through 2008 will give rise to additional credit losses that we have not yet provisioned for, we believe, as of  December 3 , 20 0, that we have reserved for or charged off  the majority of the total expected credit losses for these loans. Nevertheless, various factors, including continued high  unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our  current expectations

Table 3 provides certain credit statistics for our single family credit guarantee portfolio  The UPB of our  single family credit guarantee portfolio decreased 5% during 2010 to $1 81 trillion at December 31, 2010 from  $1.90 trillion at

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0649

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 3 , 2009  Liquidations have significantly exceeded  our new guarantee activity during 2010, which drove the decline  in UPB of this portfolio

**Table 3     Credit Statistics, Single Family Credit Guarantee  Portfolio**

| | As of | | | | |
|---|---|---|---|---|---|
| | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 | 12/31/2009 |
| Pay e  s a  s | | | | | |
| One  on  pas due | 2 07% | 2 11% | 2 02% | 1 89% | 2 24% |
| Two  o  s pas d e | 0 78% | 0 80% | 0 77% | 0 79% | 0 95% |
| Se ous y de nquen (1 | 3 84% | 3 80% | 3 96% | 4 13% | 3 98% |
| Non-pe fo m ng loans ( n mi ions)(2 | $115,478 | $112,746 | $111,758 | $110,079 | $ 98,689 |
| S ngle-fam ly loan loss ese ve ( n mi ions)(3 | $ 39,098 | $ 37,665 | $ 37,384 | $ 35,969 | $ 33,026 |
| REO nven o y( n n s) | 72,079 | 74,897 | 62,178 | 53,831 | 45,047 |
| REO asse s, ne ca y ng va ue ( n m  ons) | $  6,961 | $  7,420 | $  6,228 | $  5,411 | $  4,661 |

| | or the Three Months  nded | | | | |
|---|---|---|---|---|---|
| | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 | 12/31/2009 |
| | | | (in units, unless noted) | | |
| Se ous y de nquen  oan add ons( | 113,235 | 115,359 | 123,175 | 150,941 | 166,459 |
| Loan mod ca ons( | 37,203 | 39,284 | 49,562 | 44,228 | 15,805 |
| Fo ec osu es a  s ra o( | 0 73% | 0 75% | 0 61% | 0 64% | 0 57% |
| REO acqu s ons(6 | 23,771 | 39,053 | 34,662 | 29,412 | 24,749 |
| REO d spos on seve  y a o (7 | | | | | |
| Ca fo n a | 43 9% | 41 9% | 42 0% | 43 9% | 44 4% |
| F o da | 53 0% | 54 9% | 53 8% | 56 2% | 54 3% |
| A zona | 49 5% | 46 6% | 44 3% | 45 3% | 43 9% |
| Nevada | 53 1% | 51 6% | 49 4% | 50 7% | 50 4% |
| M ch gan | 49 7% | 49 2% | 47 2% | 47 6% | 48 9% |
| To a  US | 41 3% | 41 5% | 39 2% | 40 5% | 40 1% |
| S ngle-fam ly c ed  losses ( n mi ions)(6 | $  3,086 | $  4,216 | $  3,851 | $  2,907 | $  2,498 |

(1) See "MD&A    RISK MANAGEMENT    C ed t R sk    *Mortgage Credit Risk    Credit Performance*    Del nquenc es" fo  fu he  nfo ma on abou  ou  epo ed se ous de nquency  a es

(2) Cons s s of  he UPB of loans  n ou  s ngle-fam ly c ed  gua an ee po  fo o ha ve unde gone a TDR o  ha a e se ous y de nquen

(3) Cons s s of  he comb na on of (a) ou  allowance fo  loan losses on mo  gage loans held fo  nves men  and (b) ou   ese ve fo  gua an ee  osses assoc a ed w h non-consol da ed s ngle-fam ly mo  gage secu   za on  us s and o he  gua an ee comm men s

(4) Rep esen s  he numbe  of comple ed mod f ca ons unde  ag eemen  w h he bo  owe  du ng  he qua e   Exc udes fo bea ance ag eemen s,  epaymen  p ans, and  oans  n he  a   pe od unde  HAMP

(5) Rep ese  s  e a o of  e   be of  oa s  a e  eed  e fo ec osu e p ocess du ng  he  espec ve qua e  d v ded by  he numbe  of oans  n he po  fo o a  he end of  e qa e   Exc udes O he  Gua an ee T ansac ons and mo  gages cove ed unde   u  gua an ee comm men s

(6) Ou  REO acqu s  on vo ume  empo a  y s owed h he fou  h qua e  of 2010 due o de ays  n he fo ec osu e p ocess,  nc ud ng de ays  e a ed o conce ns abou  def c enc es n fo ec osu e documen a on p ac ces, and  educ ng ou  c ed   losses fo  he pe od

(7) Ca cu a ed as  he amoun of ou   osses  eco ded on d spos on  of REO p ope  es du ng  he  espec ve qua e  y pe od, exc d g  ose s bjec  o ep  c ase  eq es s  adde o o  se e /se ve s, d v ded by he avg ega e UPB of  he  e a ed oans  Exc udes  ecogn zed on d spos on d v he p ope  es  equa o he  a o  by w c  e UPB of  e oa s exceeds he amoun of sales p oceeds f om d spos on of he p ope  es  Exc udes sa es co      ss ons and o he  expenses, such as p ope  y ma n enance and cos s, as we  as  e a ed  ecove es f om c ed  enhancemen s, such as mo  gage  nsu ance

Our REO disposition severity ratio was impacted  in the fourth  quarter of 2010, particularly in the state of Florida,  by  temporary suspensions of REO sales by us and our  seller/servicers related to concerns about deficiencies in  foreclosure documentation practices  We believe that these suspensions caused our REO disposition severity ratio in Florida  to decline in the fourth quarter of 2010, as compared to the  third quarter of 20  0, while most other states experienced an  increase in this ratio for the same periods

As shown in Table 3 above, the number of seriously delinquent loan additions declined in each quarter of 2010  However, our single family credit guarantee portfolio continued  to experience a high level of serious delinquencies and  foreclosure starts, as compared to periods before 2009  The credit losses of our single family credit guarantee portfolio  increased in 2010, compared to 2009, due in part to the ongoing  weakness in the U S  economy  Other factors affecting credit losses during the year include:

- Losses associated with an increase in the volume of foreclosures  and foreclosure alternatives  These actions related to efforts  to resolve our significant inventory of seriously delinquent  loans. This inventory accumulated in prior periods, primarily  during 2009, due to the lengthening in the foreclosure and modification timelines caused by various suspensions of  foreclosure transfers, process requirements for the implementation of HAMP, and constraints in servicers' capabilities to process large volumes of problem loans  Due to  the length of time necessary for servicers either to complete  the foreclosure process or pursue foreclosure alternatives on  seriously delinquent loans still in our portfolio, we expect our credit losses will continue to rise even as the volume of new  serious delinquencies declines

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0650

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- The impact of certain loan groups within the single family credit guarantee portfolio, such as those underwritten with ce tain lower documentation standards and interest only loans, as well as other 2005 through 2008 vintage loans  These groups continue to be large contributors to our credit losses

- Continued declines in home prices in many geographic areas, based on our own index, which resulted in continued high loss severity ratios on our dispositions of REO inventory

Some of our loss mitigation activities create fluctuations in our delinquency statistics  For example, loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Performance*    Delinquencies" for further information about factors affecting our reported delinquency rates during 2010 and 2009.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions. While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on the funding commitment from Treasury will increase as necessary to eliminate any net worth deficits during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

On December 30, 20 0, we received $ 00 million in funding from Treasury under the Purchase Agreement relating to our net worth deficit as of September 30, 2010  The draws received during 20 0 increased the aggregate liquidation preference of the senior preferred stock to $64.2 billion at December 31, 2010 from $51.7 billion at December 31, 2009  To address our net worth deficit of $401 million as of December 31, 2010, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million. Upon funding of the draw request: (a) our aggregate funding received from Treasury under the Purchase Agreement will increase to $63.7 billion; and (b) the aggregate liquidation preference of the senior preferred stock owned by Treasury will increase from $64.2 billion to $64.7 billion and the corresponding annual cash dividend owed to Treasury will increase to $6.47 billion. We have paid cash dividends to Treasury of $10.0 billion to date, an amount equal to 16% of our aggregate draws under the Purchase Agreement  As of December 31, 2010, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period  As a result, we expect to make additional draws in future periods

Neither the U S  government nor any other agency or instrumentality of the U S  government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations

For more information on the Purchase Agreement, see "Conservatorship and Related Matters "

### Long-Term Financial Sustainability and Future Status

It is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term, although we may experience period to period variability in earnings and comprehensive income. As a result, there is uncertainty as to our long term financial sustainability.

We expect to request additional draws under the Purchase Agreement in future periods  Over time, our dividend obligation to Treasury will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could also contribute to future draws if the fee is not waived in the future. Treasury waived the fee for the first quarter of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment  The amount of the quarterly commitment fee has not yet been established and could be substantial.

In addition, continued high levels of unemployment, adverse changes in home prices, interest rates, mortgage security prices and spreads and other factors could lead to additional draws  For additional discussion of other factors that could result in additional draws, see "MD&A LIQUIDITY AND CAPITAL RESOURCES    Capital Resources."

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way

<div align="center">8</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term

### Changes in Accounting Standards Related to Accounting for Transfers of Financial Assets and Consolidation of VIEs

In June 2009, the FASB issued two new accounting standards that amended the guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs Effective January 1, 2010, we adopted these new accounting standards prospectively for all existing VIEs The adoption of these two standards had a significant impact on our consolidated financial statements and other financial disclosures beginning in the first quarter of 2010 As a result of our adoption of these standards, our consolidated balance sheets reflect the consolidation of our single family PC trusts and certain of our Other Guarantee Transactions. This consolidation resulted in an increase to our assets and liabilities of $1.5 trillion and a net decrease to total equity (deficit) as of January 1, 2010 of $11.7 billion.

Because our results of operations for the year ended December 31, 2010 (on both a GAAP and Segment Earnings basis) include the activities of the consolidated VIEs, they are not directly comparable with the results of operations for the years ended December 31, 2009 and 2008, which reflect the accounting policies in effect during that time (*i.e.*, when the majority of the securitization entities were accounted for off balance sheet)

See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for more information regarding the new accounting standards and the impact to our financial statements

### Consolidated Results    2010 versus 2009

Net loss was $14.0 billion and $21.6 billion for 2010 and 2009, respectively. Key highlights of our financial results for 20 0 include:

- Net interest income for 20 0 decreased slightly to $16.9 billion from $17.1 billion in 2009, mainly due to a decrease in the average balance of mo tgage related securities, partially offset by lower funding costs.

- Provision for credit losses for 20 0 decreased to $17.2 billion from $29.5 billion for 2009. The provision for credit losses in 2010 primarily reflects a substantial slowdown in the rate of growth of our non performing single family loans The provision for credit losses in 2009 reflected significant increases in non performing loans and serious delinquency rates in that period

- Non interest income (loss) was $(11.6) billion for 2010, compared to $(2.7) billion for 2009. This decline was primarily due to higher derivative losses, lower gains on investment securities, and a decrease in other income in 2010 Other income declined primarily due to a significant decrease in income recognized on our guarantee activities, which was substantially eliminated as a result of our adoption of the new accounting standards for consolidation of VIEs on January 1, 2010. These declines were partially offset by reduced impairments of available for sale securities in 20 0, compared to 2009

- Non interest expense declined to $2 9 billion in 2010, compared to $7.2 billion in 2009, primarily due to lower losses on loans purchased, which was substantially eliminated as a result of our adoption of the new accounting standards for consolidation of VIEs on January 1, 2010.

- Total comprehensive income (loss) was $282 million for 2010 compared to $(2.9) billion for 2009. Total comprehensive income for 20 0 reflects the net result of the $14.0 billion net loss for 2010, and an increase of $14.3 billion in AOCI primarily resulting from fair value improvements on available for sale securities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0652

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Our Business

We conduct business in the U.S. residential mortgage market and the global securities market under the direction of our Conservator, FHFA, and under regulatory supervision of FHFA, the SEC, HUD, and Treasury. The size of the U.S. residential mortgage market is affected by many factors, including changes in interest rates, home ownership rates, home prices, the supply of housing and lender preferences regarding credit risk and borrower preferences regarding mortgage debt  The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of mortgages meeting the requirements of our charter (which is affected by changes in the conforming loan limit by FHFA), our own preference for credit risk reflected in our purchase standards and the mortgage purchase and securitization activity of other financial institutions. We conduct our operations solely in the U.S. and its territories, and do not generate any revenue from or have assets in geographic locations outside of the U S and its territories

Our charter forms the framework for our business activities, the initiatives we bring to market and the services we provide to the nation's residential housing and mortgage industries  Our charter also determines the types of mortgage loans that we are permitted to purchase  Our statutory mission as defined in our charter is to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages for low and moderate income families, involving a reasonable economic return that may be less than the return earned on other activities); and

- promote access to mortgage credit throughout the U S (including central cities, rural areas, and other underserved areas).

Our charter does not permit us to originate mortgage loans or lend money directly to consumers in the primary mortgage market  We provide liquidity, stability and affordability to the U.S. housing market primarily by providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage related securities  We use mortgage securitization as an integral part of our activities  Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into guaranteed mortgage securities that are sold in global capital markets, generating proceeds that support future loan origination activity by lenders  The primary Freddie Mac guaranteed mortgage related security is the single class PC  We also aggregate and resecuritize mo tgage related securities that are issued by us, other GSEs, HFAs, or private (non agency) entities, and issue other single class and multiclass mortgage related securities to third party investors  We also enter into other guarantee commitments for multifamily mortgage loans, certain HFA bonds under the HFA initiative, and housing revenue bonds held by third parties.

Our charter limits our purchases of single family loans to the conforming loan market. The conforming loan market is defined by loans originated with UPBs at or below limits determined annually based on changes in FHFA's housing price index, a method established and maintained by FHFA for determining the national average single family home price  Since 2006, the base conforming loan limit for a one family residence has been set at $417,000 with higher limits in certain "high cost" areas  Higher limits also apply to two to four family residences  The conforming loan limits are 50% higher for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

Our charter generally prohibits us from purchasing first lien single family mortgages if the outstanding UPB of the mortgage at the time of our purchase exceeds 80% of the value of the property securing the mortgage unless we have one of the following credit protections:

- mortgage insurance from a mortgage insurer that we determine is qualified on the portion of the UPB of the mortgage that exceeds 80%;

- a seller's agreement to repurchase or replace any mortgage that has defaulted; or

- retention by the seller of at least a 0% participation interest in the mortgage

Under our charter, our mortgage purchase operations are confined, so far as practicable, to mortgages which we deem to be of such quality, type and class as to meet generally the purchase standards of other private institutional mortgage investors. This is a general marketability standard.

Our charter requirement for credit protection on mortgages with LTV ratios greater than 80% does not apply to multifamily mortgages or to mortgages that have the benefit of any guarantee, insurance or other obligation by the U S or any of its agencies or instrumentalities (*e.g.*, the FHA, the VA or the USDA Rural Development)

Until June 2011, as part of the MHA Program, we may purchase single family mortgages that refinance borrowers whose mortgages we currently own or guarantee without obtaining additional credit enhancement in excess of that already in

TREASURY-0653

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

place for any such loan, provided that the current LTV ratio of the loan at the time of refinance does not exceed 25% The relief refinance mortgage initiative is our implementation of this refinance program

We also focus on maintaining underwriting standards that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long term, that exceeds our anticipated credit related and administrative expenses on the underlying loans.

## Our Business Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs   Single family Guarantee, Investments, and Multifamily  Certain activities that are not part of a reportable segment are included in the All Other category

We evaluate segment performance and allocate resources based on a Segment Earnings approach. Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the financial performance of each segment and the company as a whole  For more information on our segments, including financial information, see "MD&A   CONSOLIDATED RESULTS OF OPERATIONS   Segment Earnings" and "NOTE 17: SEGMENT REPORTING."

### *Single-Family Guarantee Segment*

The Single family Guarantee segment reflects results from our single family credit guarantee activities  In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities  We guarantee the payment of principal and interest on the mortgage related security in exchange for management and guarantee fees

#### *Our Customers*

Our customers are predominantly lenders in the primary mortgage market that originate mortgages for homeowners  These lenders include mortgage banking companies, commercial banks, savings banks, community banks, credit unions, HFAs, and savings and loan associations.

We acquire a significant portion of our mortgages from several large lenders  These lenders are among the largest mortgage loan originators in the U S  Due to the mortgage and financial market crisis during 2008 and 2009, a number of larger mortgage originators failed or were acquired and, as a result, mortgage origination volume during 2010 was concentrated in a smaller number of institutions. See "RISK FACTORS   Competitive and Market Risks" for further information.  During 20 0, three mortgage lenders (Wells Fargo Bank, N.A., Bank of America, N.A. and Chase Home Finance LLC) each accounted for more than 10% of our single family mortgage purchase volume and collectively accounted for approximately 50% of our single family mortgage purchase volume  Our top ten lenders accounted for approximately 78% of our single family mortgage purchase volume during 20 0

#### *Our Competition*

Historically, our principal competitors have been Fannie Mae, Ginnie Mae and FHA, and other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers, and thrift institutions. Since 2008, most of our competitors, other than Fannie Mae and Ginnie Mae, have ceased their activities in the residential mortgage securitization business or severely curtailed these activities relative to their previous levels  We compete on the basis of price, products, the structure of our securities, and service.

Ginnie Mae, which has become a more significant competitor since 2008, guarantees the timely payment of principal and interest on mortgage related securities backed by federally insured or guaranteed loans, primarily those insured by FHA or guaranteed by VA  Ginnie Mae increased its share of the securitization market in 2010, in large part due to favorable pricing of loans insured by FHA, the increase in the FHA loan limit and the availability, through FHA, of a mortgage product for borrowers seeking greater than 80% financing who could not otherwise qualify for a conventional mortgage

The conservatorship, including direction provided to us by our Conservator, and the restrictions on our activities under the Purchase Agreement may affect our ability to compete in the business of securitizing mortgages. On a number of occasions, FHFA has directed us and Fannie Mae to confer and consider uniform approaches to particular issues and problems, and FHFA has in a few cases directed the two GSEs to adopt common approaches. For example, in January 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to work on a joint initiative, in coordination with HUD, to consider alternatives for future mortgage servicing structures and servicing compensation, including the possibility of reducing or eliminating the minimum servicing fee for performing loans, or other structures  FHFA has also directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop consistent requirements, policies and processes for, the servicing of non performing mortgages, and to discuss joint standards for the evaluation of the servicing performance of servicers  It is possible that FHFA could require us and Fannie Mae to take a common approach

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                          TREASURY-0654                           Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae

*Overview of the Mortgage Securitization Process*

Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into mortgage securities that are sold in global capital markets, generating proceeds that support future purchases from lenders   The following diagram illustrates how we support mortgage market liquidity when we create PCs through mortgage securitizations   These PCs can be sold to investors or held by us:



The U.S. residential mortgage market consists of a primary mortgage market that links homebuyers and lenders and a secondary mortgage market that links lenders and investors. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage related securities for investment and by issuing guaranteed mortgage related securities  In the Single family Guarantee segment, we purchase and securitize "single family mortgages," which are mortgages that are secured by one  to four family properties

In general, the securitization and Freddie Mac guarantee process works as follows:  ) a lender originates a mortgage loan to a borrower purchasing a home or refinancing an existing mortgage  loan, 2) we purchase the loan from the lender and place it with other mortgages that are "pooled" into a security that can be sold to investors, 3) the lender may then use the proceeds from the sale to originate another mortgage loan, 4) we provide a credit guarantee, for a fee (generally a  small portion of the interest collected on the mortgage loan), to those who invest in the security, 5) the borrower's monthly payment of mortgage principal and interest is passed  through to the investors in the security, and 6) if the borrower stops making monthly payments     because a  family member loses a job, for example     we step in  and make the applicable payments to investors in the security  In the event a borrower defaults on the mortgage, our servicer  works with the borrower to find a solution to help them stay in the home, if possible, through our many different workout  options, or we ultimately foreclose and sell the home

The terms of single family mortgages that we purchase or  guarantee allow borrowers to prepay these loans, thereby  allowing borrowers to refinance their loans when mortgage rates decline  Because of the nature of long term, fixed rate  mortgages, borrowers are protected against rising interest rates, but are able to take advantage of declining rates through  refinancing  When a borrower prepays a mortgage that we have  securitized, the outstanding balance of the security owned by

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0655

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investors is reduced by the amount of the prepayment  Unscheduled reductions in loan principal, regardless of whether they are voluntary or involuntary (*e.g.* foreclosure), result in prepayments of security balances. Consequently, the owners of our guaranteed securities are subject to prepayment risk on the related mortgage loans, which is principally that the investor will receive an unscheduled return of the principal, and therefore may not earn the rate of return originally expected on the investment

We guarantee these mortgage related securities in exchange for compensation, which consists primarily of a combination of management and guarantee fees paid on a monthly basis as a percentage of the UPB of the underlying loans and initial upfront payments referred to as delivery fees  We may also make upfront payments to buy up the monthly management and guarantee fee rate, or receive upfront payments to buy down the monthly management and guarantee fee rate  These fees are paid in conjunction with the formation of a PC to provide for a uniform coupon rate for the mortgage pool underlying the issued PC.

We enter into mortgage purchase volume commitments with many of our larger customers in order to have a supply of loans for our guarantee business  These commitments provide for the lenders to deliver us a specified dollar amount of mortgages during a specified period of time  Some commitments may also provide for the lender to deliver to us a minimum percentage of their total sales of conforming loans. The purchase and securitization of mortgage loans from customers under these longer term contracts have pricing schedules for our management and guarantee fees that are negotiated at the outset of the contract with initial terms that may range from one month to one year  We call these transactions "flow" activity and they represent the majority of our purchase volumes. The remainder of our purchases and securitizations of mortgage loans occurs in cash, or "bulk," transactions for which purchase prices and management and guarantee fees are negotiated on an individual transaction basis. Mortgage purchase volumes from individual customers can fluctuate significantly  If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, which may include the right to assess certain fees  Our mortgage purchase contracts contain no penalty or liquidated damages clauses based on our inability to take delivery of presented mortgage loans  However, if we were to fail to meet our contractual commitment, we could be deemed to be in breach of our contract and could be liable for damages in a lawsuit.

We seek to issue guarantees on our PCs with fee terms that we believe will, over the long term, provide management and guarantee fee income that exceeds our anticipated credit related and administrative expenses on the underlying loans  Our Single family Guarantee segment is responsible for determining prices of our guarantee and delivery fees based on our assessment of credit risk and loss mitigation related to s ng e-family loans, including single family loans underlying our guaranteed mortgage related securities  We vary our guarantee and delivery fee pricing for different mortgage products and mortgage or borrower underwriting characteristics  We implemented several increases in delivery fees that became effective in 2009 applicable to mortgages with certain higher risk loan characteristics. We announced additional delivery fee increases in the fourth quarter of 20 0 that become effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. Given the uncertainty of the housing market in 2009 and 2010, we entered into arrangements with certain existing customers at their renewal dates that allow us to change credit and pricing terms more quickly than in the past.

For information on how we account for our securitization activities, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES."

*Securitization Activities*

The types of mortgage related securities we issue and guarantee include the following:

- PCs;
- REMICs and Other Structured Securities; and
- Other Guarantee Transactions.

*PCs*

Our PCs are pass through securities that represent undivided beneficial interests in trusts that hold pools of mortgages we have purchased. Holding single family loans in the form of PCs rather than as unsecuritized loans gives us greater flexibility in managing the composition of our mortgage portfolio, as it is generally easier to purchase and sell PCs than unsecuritized mortgage loans, and allows more cost effective interest rate risk management  For our fixed rate PCs, we guarantee the timely payment of principal and interest  For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans  We also guarantee the full and final payment of principal for ARM PCs; however, we do not guarantee the timely payment of principal on ARM PCs  We issue most of

3                                                                 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our PCs in transactions in which our customers exchange mortgage loans for PCs  We refer to these transactions as guarantor swaps. The following diagram illustrates a guarantor swap transaction:

### Guarantor Swap



We also issue PCs in exchange for cash  The following diagram illustrates an exchange for cash in a "cash auction" of PCs:

### Cash Auction of PCs



Institutional and other fixed income investors, including pension funds, insurance companies, securities dealers, money managers, commercial banks and foreign central banks, purchase our PCs. Treasury and the Federal Reserve have also purchased mortgage-re ated securities issued by us, Fannie Mae and Ginnie Mae under their purchase programs. Treasury's purchase program ended in December 2009  The Federal Reserve s purchase program ended in March 2010.

PCs differ from U.S. Treasury securities and other fixed income investments in two ways. First, they can be prepaid at any time. Homeowners have the right to prepay their mortgage at any time (known as the prepayment option), and homeowner mortgage payments are passed through to the PC holder  Consequently, our securities implicitly have a call option that significantly reduces the average life of the security from the contractual loan maturity  As a result, our PCs generally provide a higher nominal yield than certain other fixed income products Second, PCs are not backed by the full faith and credit of the United States, as are U.S. Treasury securities.

In addition, we seek to support the liquidity of the market for our PCs through a variety of activities, including educating dealers and investors about the merits of PCs, and enhancing disclosures related to the collateral underlying our securities

*REMICs and Other Structured Securities*

We issue single class and multiclass securities. Single class securities involve the straight pass through of all of the cash flows of the underlying collateral to holders of the beneficial interests. Our principal multiclass securities qualify for tax treatment as REMICs  Multiclass securities divide all of the cash flows of the underlying mortgage related assets into two or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0657

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

more classes designed to meet the investment criteria and portfolio needs of different investors by creating classes of securities with varying maturities, payment priorities and coupons, each of which represents a beneficial ownership interest in a separate portion of the cash flows of the underlying collateral. Usually, the cash flows are divided to modify the relative exposure of different classes to interest rate risk, or to create various coupon structures. The simplest division of cash flows is into principal only and interest only classes Other securities we issue can involve the creation of sequential payment and planned or targeted amortization classes. In a sequential payment class structure, one or more classes receive all or a disproportionate percentage of the principal payments on the underlying mortgage assets for a period of time until that class or classes is retired, following which the principal payments are directed to other classes Planned or targeted amortization classes involve the creation of classes that have relatively more predictable amortization schedules across different prepayment scenarios, thus reducing prepayment risk, extension risk, or both.

Our REMICs and Other Structured Securities represent beneficial interests in pools of PCs and/or certain other types of mo tgage-re ated assets We create these securities primarily by using PCs or previously issued REMICs and Other Structured Securities as the underlying collateral Similar to our PCs, we guarantee the payment of principal and interest to the holders of tranches of our REMICs and Other Structured Securities We do not charge a management and guarantee fee for these securities if the underlying collateral is already guaranteed by us since no additional credit risk is introduced Because the collateral underlying nearly all of our single family REMICs and Other Structured Securities consists of other mortgage related securities that we guarantee, there are no concentrations of credit risk in any of the classes of these securities that are issued, and there are no economic residual interests in the related securitization trust The following diagram provides a general example of how we create REMICs and Other Structured Securities

### REMICs and Other Structured Securities



We issue many of our REMICs and Other Structured Securities in transactions in which securities dealers or investors sell us mortgage-related assets or we use our own mortgage related assets (*e.g.,* PCs and REMICs and Other Structured Securities) in exchange for the REMICs and Other Structured Securities Since the creation of REMICs and Other Structured Securities allows for setting differing terms for specific classes of investors, our issuance of these securities can expand the range of investors in our mortgage related securities to include those seeking specific security attributes For REMICs and Other Structured Securities that we issue to third parties, we typically receive a transaction, or resecuritization, fee This transaction fee is compensation for facilitating the transaction, as well as future administrative responsibilities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0658

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Guarantee Transactions*

We also issue mortgage related securities to third parties in exchange for non Freddie Mac mortgage related securities  We refer to these as Other Guarantee Transactions. The non Freddie Mac mortgage related securities are transferred to trusts that  were specifically created for the purpose of issuing securities, or certificates, in the Other Guarantee Transactions. The  following diagram illustrates an example of an Other Guarantee Transaction:

### Other Guarantee Transaction



Other Guarantee Transactions can generally be segregated into two different types  In one type, we purchase only senior tranches from a non Freddie Mac senior subordinated securitization, place the senior tranches into securitization  trusts, and issue Other Guarantee Transaction certificates guaranteeing the principal and interest payments on those  certificates. In this type of transaction, our credit risk is reduced by the credit protections from the related subordinated  tranches, which we neither purchase nor guarantee  In the second  type, we purchase single class pass through securities, place them in securitization trusts and issue Other Guarantee  Transaction certificates guaranteeing the principal and interest payments on those certificates  Our single family Other  Guarantee Transactions backed by single class pass through securities do not benefit from structural or other credit  enhancement protections

Although Other Guarantee Transactions generally have underlying  mortgage loans with varying risk characteristics, we do not  issue tranches that have concentrations of credit risk beyond  those embedded in the underlying assets, as all cash flows of  the underlying collateral are passed through to the holders of the securities and there are no economic residual interests in  the securitization trusts  Additionally, there may be other credit enhancements and structural features retained by the  seller, such as excess interest or overcollateralization, that  provide credit protection to our interests, and reduce the  likelihood that we will have to perform under our guarantee of  the senior tranches  In exchange for providing our guarantee, we may receive a management and guarantee fee or other  delivery  fees, if the underlying collateral is not already guaranteed by  us.

In 2010 and 2009, we entered into transactions under  Treasury's NIBP with HFAs, for the partial guarantee of certain single family and multifamily HFA bonds, which were Other  Guarantee Transactions with significant credit enhancement  provided by Treasury. The securities issued by us pursuant to the NIBP were purchased by Treasury. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" for further information

<div align="center">16</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For information about the amount of mortgage related securities we have issued, see "Table 34 — Freddie Mac Mortgage Related Securities." For information about the relative performance of mortgages underlying these securities, refer to our "MD&A — RISK MANAGEMENT — Credit Risk" section.

*PC Trust Documents*

We establish trusts for all of our issued PCs pursuant to our PC master trust agreement. In accordance with the terms of our PC trust documents, we have the option, and in some instances the requirement, to purchase specified mortgage loans from the trust. We purchase these mortgages at an amount equal to the current UPB, less any outstanding advances of principal on the mortgage that have been distributed to PC holders. From time to time, we reevaluate our delinquent loan purchase practices and alter them if circumstances warrant. Our practice is to purchase mortgages that are 20 days or more delinquent from pools underlying our PCs when:

- the mortgages have been modified;

- foreclosure sales occur;

- the mortgages are delinquent for 24 months; or

- the cost of guarantee payments to PC holders, including advances of interest at the PC coupon rate, exceeds the expected cost of holding the nonperforming loans

On February 10, 2010, we announced that we would purchase substantially all single family mortgage loans that are 120 days or more delinquent underlying our issued PCs. This change in practice was made based on a determination that the cost of guarantee payments to the security holders will exceed the cost of holding unsecuritized non performing loans on our consolidated balance sheets. The cost of holding unsecuritized non performing loans on our consolidated balance sheets was significantly affected by our January 1, 2010 adoption of amendments to certain accounting standards and changing economics pursuant to which the recognized cost of purchasing most delinquent loans from PC trusts was less than the recognized cost of continued guarantee payments to security holders. See "Executive Summary — *Changes in Accounting Standards Related to Accounting for Transfers of Financial Assets and Consolidation of VIEs*" for additional information.

In accordance with the terms of our PC trust documents, we are required to purchase a mortgage loan (or, in some cases, substitute a comparable mortgage loan) from a PC trust in the following situations:

- if a court of competent jurisdiction or a federal government agency, duly authorized to oversee or regulate our mortgage purchase business, determines that our purchase of the mortgage was unauthorized and a cure is not practicable without unreasonable effort or expense, or if such a court or government agency requires us to repurchase the mortgage;

- if a borrower exercises its option to convert the interest rate from an adjustable rate to a fixed rate on a convertible ARM; and

- in the case of balloon reset loans, shortly before the mortgage reaches its scheduled balloon reset date

*The To Be Announced Market*

Because our fixed rate PCs are homogeneous, issued in high volume and highly liquid, they trade on a "generic" basis by PC coupon rate, also referred to as trading in the TBA market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be delivered at a future date; however, the specific PCs that will be delivered to fulfill the trade obligation, and thus the specific characteristics of the mortgages underlying those PCs, are not known (*i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled. The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential mortgage financing, thereby helping us to accomplish our statutory mission. The Securities Industry and Financial Markets Association publishes guidelines pertaining to the types of mortgages that are eligible for TBA trades

*Underwriting Requirements and Quality Control Standards*

We use a process of delegated underwriting for the single family mortgages we purchase or securitize. In this process, our contracts with seller/servicers describe mortgage underwriting standards and the seller/servicers represent and warrant to us that the mortgages sold to us meet these standards. In our contracts with individual seller/servicers, we sometimes waive or modify selected underwriting standards. Through our delegated underwriting process, mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage. In lieu of a repurchase, we may agree to allow a seller/servicer to indemnify us against loss in the event of a default by the borrower or enter into some other remedy. During the year ended December 3 , 20 0, we reviewed a

Source  D RA HOM  OAN MORTGAG CORP, 10 K, ebruary 24, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

significant number of loans that defaulted in order to assess the sellers' compliance with our purchase contracts For more information on our seller/servicers' repurchase obligations, including recent performance under those obligations, see "MD&A RISK MANAGEMENT Credit Risk Institutional Credit Risk Mortgage Seller/Servicers "

The majority of our single family mortgage purchase volume is evaluated using automated underwriting software tools, either our tool (Loan Prospector), the seller/servicers' own tools, or Fannie Mae's tool The percentage of our single family mortgage purchase flow activity volume evaluated by the loan originator using Loan Prospector prior to being purchased by us was 39%, 45%, and 42% during 2010, 2009, and 2008, respectively Since 2008, we have added a number of additional credit standards for loans evaluated by other underwriting tools to improve the quality of loans we purchase that are evaluated using these other tools Consequently, we do not believe the use of a tool other than Loan Prospector significantly increases our loan performance risk.

As discussed above, our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests In addition, we employ other types of credit enhancements to further manage certain credit risk, including pool insurance, indemnification agreements, collateral pledged by lenders and subordinated security structures.

### *Loss Mitigation and Loan Workout Activities*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses Our single family loss mitigation strategy emphasizes early intervention in seriously delinquent mortgages and provides alternatives to foreclosure Other single family loss mitigation activities include providing our single family servicers with default management tools designed to help them manage non performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option Loan workouts are intended to reduce the number of seriously delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that we would likely incur in a REO sale

Our loan workouts include:

- Repayment plans, which are contractual plans to make up past due amounts. They mitigate our credit losses because they assist borrowers in returning to compliance with the original terms of their mortgages

- Loan modifications, which may involve changing the terms of the loan, or adding outstanding indebtedness, such as delinquent interest, to the UPB of the loan, or a combination of both We require our servicers to examine the borrower's capacity to make payments under the new terms by reviewing the borrower's qualifications, including income Loan modifications either: (a) result in a concession to the borrower, such as a reduction in interest rate; or (b) do not result in a concession to the borrower, such as those which add the past due amounts to the balance of the loan, extend the term or a combination of both Loan modifications that result in a concession to the borrower are situations in which we do not expect to recover the full original principal or interest due under the original loan terms Such modifications are accounted for as TDRs. During 2010, we granted principal forbearance but did not utilize principal forgiveness for our loan modifications

- Forbearance agreements, where reduced payments or no payments are required during a defined period They provide additional time for the borrower to return to compliance with the original terms of the mortgage or to implement another loan workout

- Short sales, in which the borrower, working with the servicer, sells the home and pays off part of the outstanding loan, accrued interest and other expenses from the sale proceeds, in satisfaction of the full amount of the loan

For more information regarding credit risk, see "MD&A RISK MANAGEMENT Credit Risk," "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES," and "NOTE 6: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS."

### *Investments Segment*

The Investments segment reflects results from our investment, funding and hedging activities In our Investments segment, we invest principally in mortgage assets funded by debt issuances and hedged using derivatives. We are not currently a substantial buyer or seller of mortgage assets, except for purchases of delinquent mortgages out of PC pools

### *Our Customers*

Our customers for our debt securities predominantly include insurance companies, money managers, central banks, depository institutions, and pension funds. Within the Investments segment, we buy securities through various market sources. We also invest in performing single family mortgage loans, a significant portion of which is from several large lenders, as discussed in "*Single Family Guarantee Segment Our Customers*."

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0661

Table of Contents

*Our Competition*

Historically, our principal competitors have been Fannie Mae and other financial institutions that invest in mortgage related securities and mortgage loans, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. The conservatorship, including direction provided to us by our Conservator, and the restrictions on our activities under the Purchase Agreement has affected and will continue to affect our ability to compete in the business of investing in mortgage related securities and mortgage loans

We compete for low cost debt funding with Fannie Mae, the FHLBs and other institutions  Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments

*Assets*

Historically, we have primarily been a buy and hold investor in mortgage related securities and single family mortgage loans  We may sell assets to reduce risk, provide liquidity, and improve our returns. However, due to limitations under the Purchase Agreement and those imposed by FHFA, our ability to acquire and sell mortgage assets is significantly constrained  For more information, see "Conservatorship and Re ated Matters" and "MD&A    CONSOLIDATED RESULTS OF OPERATIONS    Segment Earnings    *Segment Earnings Results Investments.*"

We may purchase assets for a variety of reasons, including to improve investment returns  We estimate our expected investment returns using an OAS approach, which is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve. In this approach, we consider potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as the prepayment option  Additionally, in this segment we maintain a cash and other investments portfolio, comprised primarily of cash and cash equivalents, non-mortgage-re ated securities, federal funds sold and securities purchased under agreements to resell, to help manage our liquidity needs

*Debt Financing*

We fund our investment activities by issuing short term and long term debt. The conservatorship, and the resulting support we receive from Treasury, has enabled us to access debt funding on terms sufficient for our needs  The support we received from the Federal Reserve through its debt purchase program, which was completed in March 2010, also contributed to our ability to access debt funding  While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available under the Purchase Agreement after 20 2  Additionally, the Purchase Agreement limits the amount of indebtedness we can incur

For more information, see "Conservatorship and Related Matters" and "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity."

*Risk Management*

Our Investments segment has responsibility for managing our interest rate risk and liquidity risk. Derivatives are an important part of our strategy to manage certain risks  We use derivatives primarily to: (a) regularly adjust or rebalance our funding mix in order to more closely match changes in the interest rate characteristics of our mortgage related assets; (b) hedge forecasted issuances of debt; (c) synthetically create callable and non callable funding; and (d) hedge foreign currency exposure  For more information regarding our use of derivatives, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "NOTE 12: DERIVATIVES." For information regarding our liquidity management, see "MD&A    LIQUIDITY AND CAPITAL RESOURCES."

*PC Support Activities*

Our PCs are an integral part of our mortgage purchase program  Our Single family Guarantee segment purchases many of our mortgages by issuing PCs in exchange for those mortgage loans in guarantor swap transactions. We also issue PCs backed by mortgage loans that we purchased for cash. Our competitiveness in purchasing single family mortgages from our seller/servicers, and thus the volume and profitability of new single family business, can be directly affected by the relative price performance of our PCs and comparable Fannie Mae securities  We seek to support the price performance of our PCs through a variety of strategies, including the purchase and sale of PCs and other agency securities, as well as through the issuance of REMICs and Other Structured Securities. Our purchases and sales of mo tgage related securities influence the relative supply and demand for these securities, and the issuance of REMICs and Other Structured Securities helps support the price performance of our PCs. Depending upon market conditions, including the relative prices, supply of and demand for PCs and comparable Fannie Mae securities, as well as other factors, there may be substantial variability in any period in the total amount of securities we purchase or sell, and in the success of our efforts to support the liquidity and price performance of our PCs  We may increase, reduce or discontinue these or other related activities at any time, which could

<div align="center">19</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

affect the liquidity of the market for PCs  For more  information, see "RISK FACTORS      Competitive and Market Risks      *Any decline in the price performance of or demand for our PCs could have an adverse effect on the  volume and profitability of our new single family guarantee business.*"

### Multifamily Segment

The Multifamily segment reflects results from our investments  and guarantee activities in multifamily mortgage loans and  securities  Our new purchases of multifamily mortgage loans are  primarily made for purposes of aggregation and then  securitization, which supports the availability of financing for multifamily properties  Our Multifamily segment does not issue  REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments   We also purchase non agency CMBS for investment; however we have  not purchased significant amounts of non agency CMBS for  investment since 2008

Prior to 2008, we principally purchased and held multifamily  loans for investment purposes  Beginning in 2008, we also began  purchasing certain multifamily mortgages for securitization  purposes. In 2010, we purchased $10.3 billion of loans as  part of our CME initiative and subsequently issued $6.4 billion of Other Guarantee Transaction certificates. Subject to market conditions, we expect to continue purchasing multifamily loans as part of our further expansion of the  multifamily securitization business in 2011. We may also sell multifamily loans from time to time

The multifamily property market is affected by general economic  factors, such as employment rates, construction cycles, and  re ative affordability of single family home prices, all of which influence the supply and demand for multifamily properties  and pricing for apartment rentals. Our multifamily loan volume  is largely sourced through established institutional channels  where we are generally providing post construction financing to larger apartment project operators with established performance  records. Our lending decisions are primarily based on an assessment of the property's ability to generate sufficient  operating cash flows to support payment of debt service  obligations as measured by the expected DSCR

Prior to 2010, our Multifamily segment also included investments  in LIHTC partnerships formed for the purpose of providing equity funding for affordable multifamily rental properties  In these  investments, we provided equity contributions to partnerships  designed to sponsor the development and ongoing operations for low  and moderate income multifamily apartments  We planned to realize a return on our investment through reductions in income tax expense that result from federal income tax credits and the  deductibility of operating losses generated by the partnerships. However, we no longer invest in these partnerships because we do  not expect to be able to use the underlying federal income tax credits or the operating losses generated from the partnerships  as a reduction to our taxable income because of our inability to  generate sufficient taxable income or to sell these interests to third parties. See "NOTE 4: VARIABLE INTEREST ENTITIES" for additional information.

### Our Customers

We acquire a significant portion of our multifamily mortgage  loans from several large seller/servicers  Our top three  multifamily lenders, CBRE Capital Markets, Inc., Wells Fargo Multifamily Capital and Berkadia Commercial Mortgage LLC,  each accounted for more than 10%, and collectively represented  approximately 44% of our multifamily purchase volume during 2010

We also enter into other guarantee commitments for multifamily  mortgage loans, HFA bonds, and housing revenue bonds held by third parties  By engaging in these activities, we provide  liquidity to this sector of the mortgage market

### Our Competition

Historically, our principal competitors have been Fannie Mae,  FHA, and other financial institutions that retain or securitize  multifamily mortgages, such as commercial and investment banks,  dealers, thrift institutions, and insurance companies. Since  2008, most of our competitors, other than Fannie Mae and FHA,  have ceased their activities in the multifamily mortgage  business or severely curtailed these activities relative to their previous levels  Some market participants began to  re enter the market on a limited basis in 20 0  We compete on the basis of price, products, structure and service.

### Underwriting Requirements and Quality Control Standards

For our purchase or guarantee of multifamily mortgage loans, we  rely significantly on pre purchase underwriting, which includes  third party appraisals and cash flow analysis. The underwriting  standards we provide to our seller/servicers focus on loan  quality measurement based, in part, on the LTV ratio and DSCR at origination  The DSCR is one indicator of future credit  performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured  property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more likely a multifamily  borrower will be able to continue servicing its mortgage  obligation. Our standards for multifamily loans specify maximum  original LTV ratio and minimum DSCR that vary based on the loan  characteristics, such as loan type (new acquisition or supplemental financing), loan term (intermediate or  longer term), and loan features (interest only or amortizing, fixed  or variable rate)  Since the beginning of 2009, our  multifamily loans are generally underwritten with

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0663

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

requirements for a maximum original LTV ratio of 80% and a DSCR of greater than 1.25. In certain circumstances, our standards for multifamily loans allow for certain types of loans to have an original LTV ratio over 80% and/or a DSCR of less than 1.25, typically where this will serve our mission and contribute to achieving our affordable housing goals. In cases where we commit to purchase or guarantee a permanent loan upon completion of construction or rehabilitation, we generally require additional credit enhancements, since underwriting for these loans typically requires estimates of future cash flows for calculating the DSCR that is expected after construction or rehabilitation is completed. We previously allowed delegated underwriting of multifamily loans in limited circumstances for approved lenders that deliver loans meeting targeted affordable housing goals criteria. Loans outside of certain criteria were subject to our underwriting review prior to closing and all loans we acquired with delegated underwriting were reviewed after closing for compliance with our underwriting guidelines. In addition, we required loss sharing or credit enhancement on loans we acquired with delegated underwriting. In the fourth quarter of 2009, we announced that we would discontinue such delegated underwriting, except for mortgages already in approved lenders' pipelines.

We generally require multifamily seller/servicers to service mortgage loans they have sold to us in order to mitigate potential losses. We do not oversee servicing on multifamily loans underlying our Other Guarantee Transactions as that task is performed by subordinated bondholders. For loans over $1 million and where we have servicing oversight, servicers must generally submit an annual assessment of the mortgaged property to us based on the servicer's analysis of financial and other information about the property. Because the activities of multifamily seller/servicers are an important part of our loss mitigation process, we rate their performance regularly and may conduct on site reviews of their servicing operations in an effort to confirm compliance with our standards.

For loans for which we oversee servicing, if a borrower is in distress, we may offer a workout option to the borrower. For example, we may modify the terms of a multifamily mortgage loan, which gives the borrower an opportunity to bring the loan current and retain ownership of the property. These arrangements are made with the expectation that we will recover our initial investment or minimize our losses. We do not enter into these arrangements in situations where we believe we would experience a loss in the future that is greater than or equal to the loss we would experience if we foreclosed on the property at the time of the agreement.

## Conservatorship and Related Matters

### Overview

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations.

On September 7, 2008, the then Secretary of the Treasury and the then Director of FHFA announced several actions taken by Treasury and FHFA regarding Freddie Mac and Fannie Mae. At that time, FHFA set forth the purpose and goals of the conservatorship as follows: "The purpose of appointing the Conservator is to preserve and conserve the company's assets and property and to put the company in a sound and solvent condition. The goals of the conservatorship are to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market." These actions included the following:

- placing us and Fannie Mae in conservatorship;

- the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock; and

- the establishment of a temporary secured lending credit facility that was available to us until December 31, 2009, which was effected through the execution of a lending agreement (this agreement expired on December 3, 2009)

We refer to the Purchase Agreement and the warrant as the "Treasury Agreements."

### Entry Into Conservatorship

Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets, and succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator delegated certain authority to the Board of Directors to oversee, and management to conduct, day to day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator. We describe the terms of the conservatorship and the powers of our Conservator in detail below under *"Supervision of our Business During Conservatorship"* and *"Powers of the Conservator."*

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0664

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

including whether we will continue to exist  While we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term, there are likely to be significant changes beyond the near term that we expect to be decided by the Obama Administration and Congress  Our future structure and role will be determined by the Obama Administration and Congress  We have no ability to predict the outcome of these deliberations  On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market. The report recommends winding down Freddie Mac and Fannie Mae  For more information, see "Executive Summary      *Long Term Financial Sustainability and Future Status.*"

We receive substantial support from Treasury and FHFA, as our Conservator and regulator, and are dependent upon their continued support in order to continue operating our business  Our ability to access funds from Treasury under the Purchase Agreement is critical to: (a) keeping us solvent; (b) allowing us to focus on our primary business objectives under conservatorship; and (c) avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

For a description of certain risks to our business relating to the conservatorship and Treasury Agreements, see "RISK FACTORS."

### Impact of Conservatorship and Related Actions on Our Business

We conduct our business under the direction of FHFA as our Conservator. While the conservatorship has benefited us through, for example, improved access to the debt markets because of the support we receive from Treasury, we are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Based on our charter, public statements from Treasury and FHFA officials and guidance from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;

- continuing to provide additional assistance to the struggling housing and mortgage markets;

- reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;

- returning to long term profitability; and

- protecting the interests of taxpayers

These objectives create conflicts in strategic and day to day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives  We regularly receive direction from our Conservator on how to pursue these objectives, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets  Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results or financial condition. Because we expect many of these objectives and related initiatives to result in significant costs, there is significant uncertainty as to the ultimate impact these initiatives will have on our future capital or liquidity needs  Certain of these objectives are expected to help homeowners and the mortgage market and may help to mitigate future credit losses  However, some of our initiatives are expected to have an adverse impact on our near   and long term financial results

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives, but may not contribute to profitability  Our efforts to help struggling homeowners and the mortgage market, in line with our mission, may help to mitigate credit losses, but in some cases may increase our expenses or require us to forego revenue opportunities in the near term  As a result, in some cases the objectives of reducing the need to draw funds from Treasury and returning to long term profitability will be subordinated as we provide this assistance. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets will have on our future capital or liquidity needs and we cannot estimate whether, and the extent to which, costs we incur in the near term as a result of these efforts, which for the most part we are not reimbursed for, will be offset by the prevention or reduction of potential future costs.

In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed  Specifically, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship  The Acting Director stated that permitting us to engage in new products is inconsistent with the goals of the conservatorship. This could limit our ability to return to profitability in future periods

<div align="center">22</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The conservatorship has also impacted our investment activity. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage related investments portfolio, except for purchases of delinquent mortgages out of  PC pools  FHFA also stated that, given the size of our current mortgage related investments portfolio and the potential volume  of delinquent mortgages to be purchased out of PC pools, it  expects that any net additions to our mortgage related  investments portfolio would be related to that activity

The Conservator and Treasury also did not authorize us to engage  in certain business activities and transactions, including the  sale of certain assets, some of which we believe may have had a  beneficial impact on our results of operations or financial  condition, if executed  Our inability to execute such transactions may adversely affect our profitability, and thus  contribute to our need to draw additional funds from Treasury. We believe that the support provided by Treasury pursuant to the  Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct  our normal business activities, although the costs of our debt  funding could vary.

Management is continuing its efforts to identify and evaluate  actions that could be taken to reduce the significant  uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors  Any actions we take will likely require approval  by FHFA and Treasury before they are implemented  In addition, FHFA, Treasury or Congress may have a different perspective than management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us  to implement any such actions.

These actions and objectives also create risks and uncertainties  that we discuss in "RISK FACTORS." For more information on the impact of conservatorship and our current  business objectives, see "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" and "Executive Summary    *Our Primary Business Objectives.*"

### Limits on Mortgage Related Investments Portfolio Under the Purchase  Agreement and by FHFA

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap  that decreases by  0% each year until the portfolio reaches $250 billion  As a result, the UPB of our mortgage related  investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as  of December 31, 2011

Table 4 presents the UPB of our mortgage related  investments portfolio, for purposes of the limit imposed by the  Purchase Agreement and FHFA regulation  We disclose our mortgage assets on this basis monthly under the caption  "Mortgage Related Investments Portfolio     Ending Balance" in our Monthly Volume Summary reports, which are available on our website and in current reports on Form 8 K  we file with the SEC

The UPB of our mortgage related investments portfolio declined  from December 31, 2009 to December 31, 2010, primarily  due to liquidations, partially offset by the purchase of $127.5 billion of seriously delinquent loans from PC trusts.

**Table 4     Mortgage Related Investments Portfolio(1)**

|  | | December 31, 2010 | December 31, 2009 |
|---|---|---|---|
|  | | (in millions) | |
| Inves men s segmen    Mo  gage  nves men s po  fol o | $ | 481,677 | $ 597,827 |
| S ngle-fam ly Gua an ee segmen    S ngle-fam ly unsecu    zed mo gage  oans(2 | | 69,766 | 10,743 |
| Mul  fam ly segmen    Mo  gage  nves men s po  fol o | | 145,431 | 146,702 |
| To a  mo  gage- e a ed  nves men s po   fo  o | $ | 696,874 | $ 755,272 |

(1) Based upon UPB and excludes mo  gage loans and mo  gage- ela ed sec   t es t ated,   t  ot yet sett ed

(2) Rep esen s unsecu    zed non-pe fo m ng s ngle-fam ly unsecu   zed loans fo  wh ch  he S ng e-fam  y Gua an ee segmen  s ac  ve y pu su ng a  p oblem loan wo kou

### Supervision of our Business During Conservatorship

We experienced a change in control when we were placed into  conservatorship on September 6, 2008. Under conservatorship, we have additional heightened supervision and direction from our regulator, FHFA, which is also acting as our Conservator. As Conservator, FHFA has succeeded to the powers of our Board of Directors and management, as well as the powers of  our stockholders. During the conservatorship, the Conservator delegated certain authority to the Board of Directors to  oversee, and management to conduct, day to  day operations so  that the company can continue to operate in the ordinary course of  business. The Conservator retains the authority to withdraw  or revise its delegations of authority at any time. The directors serve on behalf of, and exercise authority as directed  by, the Conservator.

Because the Conservator succeeded to the powers, including  voting rights, of our stockholders, who therefore do not  currently have voting rights of their own, we do not expect to  hold stockholders' meetings during the conservatorship, nor  will we prepare or provide proxy statements for the solicitation of proxies

TREASURY-0666

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Our Board of Directors and Management During Conservatorship

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to work with the Board of Directors and management to address and determine the strategic direction for the company

The Conservator instructed the Board of Directors that it should consult with and obtain the approval of the Conservator before taking action in the following areas:

- actions involving capital stock, dividends, the Purchase Agreement, increases in risk limits, material changes in accounting policy, and reasonably foreseeable material increases in operational risk;

- the creation of any subsidiary or affiliate or any substantial transaction between Freddie Mac and any of its subsidiaries or affiliates, except for transactions undertaken in the ordinary course (*e.g.*, the creation of a REMIC, REIT, or similar vehicle);

- matters that relate to conservatorship, such as, but not limited to, the initiation and material actions in connection with significant litigation addressing the actions or authority of the Conservator, repudiation of contracts, qualified financial contracts in dispute due to our conservatorship, and counterparties attempting to nullify or amend contracts due to our conservatorship;

- actions involving hiring, compensation and termination benefits of directors and officers at the executive vice president level and above (including, regardless of title, executive positions with the functions of Chief Operating Officer, Chief Financial Officer, General Counsel, Chief Business Officer, Chief Investment Officer, Treasurer, Chief Compliance Officer, Chief Risk Officer and Chief/General/Internal Auditor);

- actions involving the retention and termination of external auditors and law firms serving as consultants to the Board of Directors;

- settlements in excess of $50 million of litigation, claims, regulatory proceedings or tax related matters;

- any merger with or purchase or acquisition of a business involving consideration in excess of $50 million; and

- any action that in the reasonable business judgment of the Board of Directors at the time that the action is taken is likely to cause significant reputational risk.

### Government Support for Our Business During Conservatorship

We receive substantial support from Treasury and FHFA, as our Conservator and regulator, and are dependent upon their continued support in order to continue operating our business  This support includes our ability to access funds from Treasury under the Purchase Agreement Since being placed into conservatorship, we also received support from Treasury and the Federal Reserve under their programs to purchase mortgage related securities and, in the case of the Federal Reserve, debt securities. Treasury's program ended in December 2009 and the Federal Reserve's program ended in March 2010.

### Powers of the Conservator

Under the GSE Act, the conservatorship provisions applicable to Freddie Mac are based generally on federal banking law  As discussed below, FHFA has broad powers when acting as our conservator  For more information on the GSE Act, see "Regulation and Supervision "

#### *General Powers of the Conservator*

Upon its appointment, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets  The Conservator also succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party.

Under the GSE Act, the Conservator may take any actions it determines are necessary and appropriate to carry on our business, support public mission objectives, and preserve and conserve our assets and property. The Conservator's powers include the ability to transfer or sell any of our assets or liabilities (subject to certain limitations and post transfer notice provisions for transfers of qualified financial contracts, as defined below under "Special Powers of the Conservator  *Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts*") without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage related assets that have been transferred to a Freddie Mac securitization trust must be held for the beneficial owners of the trust and cannot be used to satisfy our general creditors

Under the GSE Act, in connection with any sale or disposition of our assets, the Conservator must conduct its operations to maximize the NPV return from the sale or disposition of such assets, to minimize the amount of any loss realized, and to ensure adequate competition and fair and consistent treatment of offerors. The Conservator is required to maintain a full accounting of the conservatorship and make its reports available upon request to stockholders and members of the public.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0667

Table of Contents

We remain liable for all of our obligations relating to our outstanding debt and mortgage related securities  FHFA has stated that our obligations will be paid in the normal course of business during the conservatorship.

*Special Powers of the Conservator*

*Disaffirmance and Repudiation of Contracts*

Under the GSE Act, the Conservator may disaffirm or repudiate contracts (subject to certain limitations for qualified financial contracts) that we entered into prior to its appointment as Conservator if it determines, in its sole discretion, that performance of the contract is burdensome and that disaffirmance or repudiation of the contract promotes the orderly administration of our affairs. The GSE Act requires FHFA to exercise its right to disaffirm or repudiate most contracts within a reasonable period of time after its appointment as Conservator. The Conservator has advised us that it has no intention of repudiating any guarantee obligation relating to Freddie Mac's mortgage related securities because it views repudiation as incompatible with the goals of the conservatorship. We can, and have continued to, enter into, perform and enforce contracts with third parties.

*Limitations on Enforcement of Contractual Rights by Counterparties*

The GSE Act provides that the Conservator may enforce most contracts entered into by us, notwithstanding any provision of the contract that provides for termination, default, acceleration, or exercise of rights upon the appointment of, or the exercise of rights or powers by, a conservator

*Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts*

Notwithstanding the Conservator's powers under the GSE Act described above, the Conservator must recognize legally enforceable or perfected security interests, except where such an interest is taken in contemplation of our insolvency or with the intent to hinder, delay or defraud us or our creditors. In addition, the GSE Act provides that no person will be stayed or prohibited from exercising specified rights in connection with qualified financial contracts, including termination or acceleration (other than solely by reason of, or incidental to, the appointment of the Conservator), rights of offset, and rights under any security agreement or arrangement or other credit enhancement relating to such contract  The term qualified financial contract means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement as determined by FHFA by regulation, resolution or order

*Avoidance of Fraudulent Transfers*

Under the GSE Act, the Conservator may avoid, or refuse to recognize, a transfer of any property interest of Freddie Mac or of any of our debtors, and also may avoid any obligation incurred by Freddie Mac or by any debtor of Freddie Mac, if the transfer or obligation was made: (a) within five years of September 6, 2008; and (b) with the intent to hinder, delay, or defraud Freddie Mac, FHFA, the Conservator or, in the case of a transfer in connection with a qualified financial contract, our creditors  To the extent a transfer is avoided, the Conservator may recover, for our benefit, the property or, by court order, the value of that property from the initial or subsequent transferee, other than certain transfers that were made for value, including satisfaction or security of a present or antecedent debt, and in good faith  These rights are superior to any rights of a trustee or any other party, other than a federal agency, under the U.S. bankruptcy code.

*Modification of Statutes of Limitations*

Under the GSE Act, notwithstanding any provision of any contract, the statute of limitations with regard to any action brought by the Conservator is: (a) for claims relating to a contract, the longer of six years or the applicable period under state law; and (b) for tort claims, the longer of three years or the applicable period under state law, in each case, from the later of September 6, 2008 or the date on which the cause of action accrues. In addition, notwithstanding the state law statute of limitation for tort claims, the Conservator may bring an action for any tort claim that arises from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to us, if the state's statute of limitations expired not more than five years before September 6, 2008

*Suspension of Legal Actions*

Under the GSE Act, in any judicial action or proceeding to which we are or become a party, the Conservator may request, and the applicable court must grant, a stay for a period not to exceed 45 days.

*Treatment of Breach of Contract Claims*

Under the GSE Act, any final and unappealable judgment for monetary damages against the Conservator for breach of an agreement executed or approved in writing by the Conservator will be paid as an administrative expense of the Conservator

<div style="text-align:center">25</div> *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0668

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Attachment of Assets and Other Injunctive Relief*

Under the GSE Act, the Conservator may seek to attach assets or obtain other injunctive relief without being required to show that any injury, loss or damage is irreparable and immediate

*Subpoena Power*

The GSE Act provides the Conservator, with the approval of the Director of FHFA, with subpoena power for purposes of carrying out any power, authority or duty with respect to Freddie Mac

### Treasury Agreements

The Reform Act granted Treasury temporary authority (through December 31, 2009) to purchase any obligations and other securities issued by Freddie Mac on such terms and conditions and in such amounts as Treasury may determine, upon mutual agreement between Treasury and Freddie Mac  Pursuant to this authority, Treasury entered into several agreements with us, as described below.

<u>Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant</u>

*Purchase Agreement*

On September 7, 2008, we, through FHFA, in its capacity as Conservator, and Treasury entered into the Purchase Agreement  The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009  Pursuant to the Purchase Agreement, on September 8, 2008 we issued to Treasury: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant. The terms of the senior preferred stock and warrant are summarized in separate sections below  We did not receive any cash proceeds from Treasury as a result of issuing the senior preferred stock or the warrant  However, deficits in our net worth have made it necessary for us to make substantial draws on Treasury's funding commitment under the Purchase Agreement  As a result, the aggregate liquidation preference of the senior preferred stock has increased from $1.0 billion as of September 8, 2008 to $64.2 billion at December 3 , 20  0 (this figure reflects the receipt of funds requested in the draw to address our net worth deficit as of September 30, 20  0)  Our dividend obligation on the senior preferred stock, based on that liquidation preference, is  $6.42 billion, which exceeds our annual earnings in all but one period

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the initial commitment from Treasury to provide up to $100 billion (subsequently increased to $200 billion) in funds to us  under the terms and conditions set forth in the Purchase Agreement  Under the Purchase Agreement, the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009)  In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

• If the year end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

• If the year end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws

In addition to the issuance of the senior preferred stock and warrant, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury  Under the Purchase Agreement, the fee is to be determined in an amount mutually agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years  We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock  Treasury may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U S  mortgage market  The fee was originally scheduled to commence on March 31, 2010, but was delayed until March 31, 2011 pursuant to an amendment to the Purchase Agreement  Treasury waived the fee for the first quarter of 2011, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment  Treasury stated that it would reevaluate whether the quarterly commitment fee should be set in the second quarter of 2011  Absent Treasury waiving the commitment fee in the second quarter of 2011, this quarterly commitment fee will begin accruing on April 1, 2011 and must be paid each quarter for as long as the Purchase Agreement is in effect  The amount of the fee has not yet been determined and could be substantial

TREASURY-0669

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                  Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Purchase Agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our GAAP balance sheet for the applicable fiscal quarter (referred to as the deficiency amount), provided that the aggregate amount funded under the Purchase Agreement may not exceed Treasury's commitment The Purchase Agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process The deficiency amount may be increased above the otherwise applicable amount upon our mutual written agreement with Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our Conservator, may request that Treasury provide funds to us in such amount. The Purchase Agreement also provides that, if we have a deficiency amount as of the date of completion of the liquidation of our assets, we may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement) Any amounts that we draw under the Purchase Agreement will be added to the liquidation preference of the senior preferred stock No additional shares of senior preferred stock are required to be issued under the Purchase Agreement As a result, the expiration on December 3 , 2009 of Treasury's temporary authority to purchase obligations and other securities issued by Freddie Mac did not affect Treasury's funding commitment under the Purchase Agreement

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we may not be able to do so for the foreseeable future, if at all. The amounts payable for dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth. The payment of dividends on our senior preferred stock in cash reduces our net worth For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. It is unlikely that, over the long term, we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury, although we may experience period to period variability in earnings and comprehensive income As a result, we expect to make additional draws in future periods.

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (a) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guarantee obligations); and (c) the funding by Treasury of the maximum amount of the commitment under the Purchase Agreement In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations

In the event of our default on payments with respect to our debt securities or Freddie Mac mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Freddie Mac mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

The Purchase Agreement has an indefinite term and can terminate only in limited circumstances, which do not include the end of the conservatorship The Purchase Agreement therefore could continue after the conservatorship ends

*Issuance of Senior Preferred Stock*

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation

<div align="center">27</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

preference of the senior preferred stock  As described below, we may make payments to reduce the liquidation preference of the  senior preferred stock in limited circumstances.

Treasury, as the holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of  Directors, cumulative quarterly cash dividends at the annual rate of  0% per year on the then current liquidation preference  of the senior preferred stock  Through December 31, 2010, we have paid cash dividends of $10.0 billion at the  direction of the Conservator  If at any time we fail to pay cash  dividends in a timely manner, then immediately following such  failure and for all dividend periods thereafter until  the  dividend period following the date on which we have paid in cash  full cumulative dividends (including any unpaid dividends added  to the liquidation preference), the dividend rate will be 12% per year

The senior preferred stock is senior to our common stock and all  other outstanding series of our preferred stock, as well as any  capital stock we issue in the future, as to both dividends and  rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire,  or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock  unless: (a) full cumulative dividends on the outstanding  senior preferred stock (including any unpaid dividends added to  the liquidation preference) have been declared and paid in cash;  and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described  in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible  Shares of the  senior preferred stock have no general or special voting rights,  other than those set forth in the certificate of designation for  the senior preferred stock or otherwise required by law  The consent of holders of at least two thirds of all outstanding shares of senior preferred stock is generally required to amend  the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with  the senior preferred stock

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of  senior preferred stock to the extent of: (a) accrued and unpaid dividends previously added to the liquidation preference  and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not  previously paid down. In addition, if we issue any shares of  capital stock for cash while the senior preferred stock is  outstanding, the net proceeds of the issuance must be used to  pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of  senior preferred stock may not be paid down below $1,000 per  share prior to the termination of Treasury's funding commitment  Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in  whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of  each outstanding share of senior preferred stock in full, the  shares will be deemed to have been redeemed as of the payment  date

*Issuance of Common Stock Warrant*

The warrant gives Treasury the right to purchase shares of our  common stock equal to 79.9% of the total number of shares of our  common stock outstanding on a fully diluted basis on the date of  exercise  The warrant may be exercised in whole or in part  at any time on or before September 7, 2028, by delivery to us  of: (a) a notice of exercise; (b) payment of the exercise price of $0 0000  per share; and (c) the warrant  If the market price of one share of our common stock is greater  than the exercise price, then, instead of paying the exercise  price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to  the formula specified in the warrant  Upon exercise of the warrant, Treasury may assign the right to receive the shares of  common stock issuable upon exercise to any other person

As of February 24, 2011, Treasury has not exercised the  warrant.

<u>*Covenants Under Treasury Agreements*</u>

The Purchase Agreement and warrant contain covenants that  significantly restrict our business activities. For example, as  a result of these covenants, we can no longer obtain additional  equity financing (other than pursuant to the Purchase Agreement)  and we are limited in the amount and type of debt financing we may obtain.

*Purchase Agreement Covenants*

The Purchase Agreement provides that, until the senior preferred  stock is repaid or redeemed in full, we may not, without the  prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any  other distribution with respect to any Freddie Mac equity  securities (other than with respect to the senior preferred  stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac  equity securities (other than the senior preferred stock or  warrant);

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0671

Table of Contents

- sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);

- terminate the conservatorship (other than in connection with a receivership);

- sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage related investments portfolio;

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement

These covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 3 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 3 of the immediately preceding calendar year, provided that we are not required to own less than $250 billion in mortgage assets. Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 20% of the amount of mortgage assets we are permitted to own on December 3 of the immediately preceding calendar year. The mortgage asset and indebtedness limitations are determined without giving effect to any change in the accounting standards related to transfers of financial assets and consolidation of VIEs or any similar accounting standard. Therefore, these limitations were not affected by our implementation of the changes to the accounting standards for transfers of financial assets and consolidation of VIEs, under which we consolidated our single family PC trusts and certain of our Other Guarantee Transactions in our financial statements as of January 1, 20 0.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

As of February 24, 20 , we believe we were in compliance with the covenants under the Purchase Agreement

*Warrant Covenants*

The warrant we issued to Treasury includes, among others, the following covenants: (a) we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights; (b) we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and (c) we must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant

As of February 24, 20 , we believe we were in compliance with the covenants under the warrant

### Effect of Conservatorship and Treasury Agreements on Existing Stockholders

The conservatorship, the Purchase Agreement and the senior preferred stock and warrant issued to Treasury have materially limited the rights of our common and preferred stockholders (other than Treasury as holder of the senior preferred stock) and had the following adverse effects on our common and preferred stockholders:

- the rights and powers of the stockholders are suspended during the conservatorship, and our common stockholders do not have the ability to elect directors or to vote on other matters;

- because we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0672

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed;

- the senior preferred stock ranks senior to the common stock and all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company;

- the Conservator has eliminated dividends on Freddie Mac common and preferred stock (other than dividends on the senior preferred stock) during conservatorship. In addition, the Purchase Agreement prohibits the payment of dividends on common or preferred stock (other than the senior preferred stock) without the prior written consent of Treasury; and

- the warrant provides Treasury with the right to purchase shares of our common stock equal to up to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise for a nominal price, thereby substantially diluting the ownership in Freddie Mac of our common stockholders at the time of exercise Until Treasury exercises its rights under the warrant, or its right to exercise the warrant expires on September 7, 2028 without having been exercised, the holders of our common stock continue to have the risk that, as a group, they will own no more than 20.1% of the total voting power of the company Under our charter, bylaws and applicable law, 20 1% is insufficient to control the outcome of any vote that is presented to the common stockholders Accordingly, existing common stockholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the time, if any, that the conservatorship ends.

As described above, the conservatorship and Treasury Agreements also impact our business in ways that indirectly affect our common and preferred stockholders. By their terms, the Purchase Agreement, senior preferred stock and warrant will continue to exist even if we are released from the conservatorship For a description of the risks to our business relating to the conservatorship and Treasury Agreements, see "RISK FACTORS."

## Regulation and Supervision

In addition to our oversight by FHFA as our Conservator, we are subject to regulation and oversight by FHFA under our charter and the GSE Act, which was modified substantially by the Reform Act We are also subject to certain regulation by other government agencies

### Federal Housing Finance Agency

FHFA is an independent agency of the federal government responsible for oversight of the operations of Freddie Mac, Fannie Mae and the FHLBs The Director of FHFA is appointed by the President and confirmed by the Senate for a five year term, removable only for cause In the discussion below, we refer to Freddie Mac and Fannie Mae as the "enterprises "

The Federal Housing Finance Oversight Board, or the Oversight Board, is responsible for advising the Director of FHFA with respect to overall strategies and policies The Oversight Board consists of the Director of FHFA as Chairperson, the Secretary of the Treasury, the Chair of the SEC and the Secretary of HUD.

Under the GSE Act, FHFA has safety and soundness authority that is comparable to, and in some respects, broader than that of the federal banking agencies The GSE Act also provides FHFA with powers that, even if we were not in conservatorship, include the authority to raise capital levels above statutory minimum levels, regulate the size and content of our mortgage related investments portfolio, and approve new mortgage products

FHFA is responsible for implementing the various provisions of the GSE Act that were added by the Reform Act In general, we remain subject to existing regulations, orders and determinations until new ones are issued or made

### Receivership

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship These include: (a) a substantial dissipation of assets or earnings due to unsafe or unsound practices; (b) the existence of an unsafe or unsound condition to transact business; (c) an inability to meet our obligations in the ordinary course of business; (d) a weakening of our condition due to unsafe or unsound practices or conditions; (e) critical undercapitalization; (f) the likelihood of losses that will deplete substantially all of our capital; or (g) by consent

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0673

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On July 9, 2010, FHFA published in the Federal Register a proposed rule to codify certain terms of conservatorship and receivership operations for Fannie Mae, Freddie Mac and the FHLBs  FHFA noted that among the key issues addressed in the proposed rule are the status and priority of claims and the relationships among various classes of creditors and equity holders under conservatorships or receiverships. The Acting Director of FHFA stated that publication of this rule for comment has no impact on the current conservatorship operations and is not a reflection of the condition of Freddie Mac, Fannie Mae, or the FHLBs.

### Capital Standards

FHFA has suspended capital classification of us during conservatorship in light of the Purchase Agreement  The existing statutory and FHFA directed regulatory capital requirements are not binding during the conservatorship  We continue to provide submissions to FHFA on both minimum and risk based capital. FHFA continues to publish relevant capital figures (minimum capital requirement, core capital, and GAAP net worth) but does not publish our critical capital, risk based capital or subordinated debt levels during conservatorship

On October 9, 2008, FHFA also announced that it will engage in rule making to revise our minimum capital and risk based capital requirements  The GSE Act provides that FHFA may increase minimum capital levels from the existing statutory percentages either by regulation or on a temporary basis by order  On February 8, 2010, FHFA issued a notice of proposed rulemaking setting forth procedures and standards for such a temporary increase in minimum capital levels  FHFA may also, by regulation or order, establish capital or reserve requirements with respect to any product or activity of an enterprise, as FHFA considers appropriate. In addition, under the GSE Act, FHFA must, by regulation, establish risk based capital requirements to ensure the enterprises operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in their operations and management. In developing the new risk based capital requirements, FHFA is not bound by the risk based capital standards in effect prior to the amendment of the GSE Act by the Reform Act

Our regulatory minimum capital is a leverage based measure that is generally calculated based on GAAP and reflects a 2 50% capital requirement for on balance sheet assets and 0 45% capital requirement for off balance sheet obligations  Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by our January 1, 2010 adoption of new accounting standards for transfers of financial assets and consolidation of VIEs. Specifically, upon adoption of these new accounting standards, FHFA directed us, for purposes of minimum capital, to continue reporting our PCs held by third parties and other aggregate off balance sheet obligations using a 0 45% capital requirement  Notwithstanding this guidance, FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities

For additional information, see "MD&A     LIQUIDITY AND CAPITAL RESOURCES     Capital Resources" and "NOTE 18: REGULATORY CAPITAL." Also, see "RISK FACTORS     Legal and Regulatory Risks" for more information

### New Products

The GSE Act requires the enterprises to obtain the approval of FHFA before initially offering any product, subject to certain exceptions  The GSE Act provides for a public comment process on requests for approval of new products  FHFA may temporarily approve a product without soliciting public comment if delay would be contrary to the public interest  FHFA may condition approval of a product on specific terms, conditions and limitations  The GSE Act also requires the enterprises to provide FHFA with written notice of any new activity that we or Fannie Mae consider not to be a product

On July 2, 2009, FHFA published an interim final rule on prior approval of new products, implementing the new product provisions for us and Fannie Mae in the GSE Act  The rule establishes a process for Freddie Mac and Fannie Mae to provide prior notice to the Director of FHFA of a new activity and, if applicable, to obtain prior approval from the Director if the new activity is determined to be a new product  On August 31, 2009, Freddie Mac and Fannie Mae filed joint public comments on the interim final rule with FHFA  FHFA has stated that permitting us to engage in new products is inconsistent with the goals of conservatorship and has instructed us not to submit such requests under the interim final rule  This could have an adverse effect on our business and profitability in future periods. We cannot currently predict when or if FHFA will permit us to engage in new products under the interim final rule, nor when the rule will be finalized

### Affordable Housing Goals

We are subject to annual affordable housing goals  In light of these housing goals, we may make adjustments to our mortgage loan sourcing and purchase strategies, which could further increase our credit losses  These strategies could include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions  Prior to 20 0, we at times relaxed some of our underwriting criteria to obtain goal qualifying mortgage loans and made additional investments in higher risk mortgage loan products that we believed were more likely to serve the borrowers targeted by the goals

<div align="center">3</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

If the Director of FHFA finds that we failed to meet a housing goal and that achievement of the housing goal was feasible, the GSE Act states that the Director may require the submission of a housing plan with respect to the housing goal for approval by the Director  The housing plan must describe the actions we would take to achieve the unmet goal in the future  FHFA has the authority to take actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by FHFA; or (b) fail to submit certain data relating to our mortgage purchases, information or reports as required by law  See "RISK FACTORS     Legal and Regulatory Risks."

*Affordable Housing Goals for 2010 and 2011*

Effective beginning calendar year 20 0, the Reform Act requires that FHFA establish, by regulation, four single family housing goals, one multifamily special affordable housing goal and requirements relating to multifamily housing for very low income families

On September 14, 2010, FHFA published in the Federal Register a final rule establishing new affordable housing goals for Freddie Mac and Fannie Mae for 2010 and 2011. The final rule was effective on October 14, 2010  The rule establishes four goals and one subgoal for single family owner occupied housing, one multifamily special affordable housing goal, and one multifamily special affordable housing subgoal  Three of the single family housing goals and the subgoal target purchase money mortgages for: (a) low income families; (b) very low income families; and/or (c) families that reside in low income areas  The single family housing goals also include one that targets refinancing mortgages for low income families. The multifamily special affordable housing goal targets multifamily rental housing affordable to low income families  The multifamily special affordable housing subgoal targets multifamily rental housing affordable to very low income families  In addition, the rule states that Freddie Mac and Fannie Mae must continue to report on their acquisition of mortgages involving low income units in small (5 to 50 unit) multifamily properties

Our housing goals for 2010 and 2011 are set forth in Table 5 below

**Table 5     Affordable Housing Goals for 2010 and 2011**

| | Goals for 2010 and 2011 |
|---|---|
| S ngle-fam ly pu chase money goals (benchma k levels) | |
| Low- ncome | 27% |
| Ve y ow- ncome | 8 % |
| Low- ncome a eas(1 | 24% |
| Low- ncome a eas subgoal | 13% |
| S ng e-fam y ef nance ow- ncome goa (benchma k eve ) | 21% |
| Mu fam y ow- ncome goa | 161,250  s |
| Mul fam ly ve y low- ncome subgoal | 21,000 un s |

(1) FHFA w ll annually se he benchma k level fo he low- ncome a eas goal based on he benchma k level fo he low- ncome a eas s goa , p s a adj s e  fac o
    eflec ng he add onal nc emen a sha e of mo gages fo mode a e- ncome fam es n des gna ed d sas e a eas n he  os ecen yea fo wh ch such da a s ava lable
    Fo 2010, FHFA se he bench a k eve fo he low- ncome a eas goal a 24%

The single family goals are expressed as a percentage of the total number of eligible mortgages underlying our total single family mortgage purchases. The multifamily goals are expressed in terms of minimum numbers of units financed.

With respect to the single family goals, the rule includes: (a) an assessment of performance as compared to the actual share of the market that meets the criteria for each goal; and (b) a benchmark level to measure performance  Where our performance on a single family goal falls short of the benchmark for a goal, we still could achieve the goal if our performance meets or exceeds the actual share of the market that meets the criteria for the goal for that year  For example, if the actual market share of mortgages to low income families relative to all mortgages originated to finance owner occupied single family properties is lower than the 27% benchmark rate, we would still satisfy this goal if we achieve that actual market percentage

The rule makes a number of changes to the previous counting methods for goals credit, including prohibiting housing goals credit for purchases of private label securities  However, the rule allows credit under the low income refinance goal for permanent MHA Program loan modifications. The rule also states that FHFA does not intend for the enterprises to undertake economically adverse or high risk activities in support of the goals, nor does it intend for the enterprises' state of conservatorship to be a justification for withdrawing support from these important market segments

In addition, as noted in the rule, FHFA expects to take future regulatory action to address the housing goals treatment of purchases of multifamily loans that aid the conversion of properties that have affordable rents to properties that have less affordable, market rate rents. FHFA also may solicit further comments on how the housing goals can further promote sustainable homeownership and how multifamily subordinate liens can be structured to benefit low income residents

We expect to report our performance with respect to the 20 0 affordable housing goals in March 2011. At this time, based on preliminary information, we believe we did not achieve certain of the goals for 2010  We and FHFA are in discussions concerning whether achievement of such goals was infeasible under the terms of the GSE Act, due to market and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0675

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

economic conditions and our financial condition  For more  information, see "EXECUTIVE COMPENSATION      Compensation Discussion and Analysis    *Executive Management Compensation Program    Determination of the  Performance Based Portion of 2010 Deferred Base Salary."*

We anticipate that the difficult market conditions and our financial condition will continue to affect our affordable  housing activities in 2011. See also "RISK FACTORS     Legal and Regulatory Risks." However, we view the purchase of mortgage loans that are eligible to  count toward our affordable housing goals to be a principal part of our mission and business and we are committed to facilitating  the financing of affordable housing for low  and moderate income families

*Duty to Serve Underserved Markets*

The GSE Act establishes a duty for Freddie Mac and Fannie Mae to  serve three underserved markets (manufactured housing,  affordable housing preservation and rural areas) by developing  loan products and flexible underwriting guidelines to facilitate  a secondary market for mortgages for very low , low  and moderate income families in those markets  Effective for 20  0, FHFA is required to establish a manner for annually: (a) evaluating whether and to what extent Freddie Mac and Fannie Mae have complied with the duty to serve underserved  markets; and (b) rating the extent of compliance

On June 7, 2010, FHFA published in the Federal Register a proposed rule regarding the duty of Freddie Mac and Fannie Mae  to serve the underserved markets  Comments were due on  July 22, 2010  We provided comments on the proposed rule to FHFA, but we cannot predict the contents of any final rule that FHFA may release, or the impact that the final rule will have on our business or operations.

*Affordable Housing Goals and Reported Results for 2009 and 2008*

Prior to 20  0, we were subject to affordable housing goals  related to mortgages for low  and moderate income families,  low income families living in low income areas, very low income  families and families living in defined underserved areas  These  goals were set as a percentage of the total number of dwelling units underlying our total mortgage purchases  The goal relating  to low income families living in low income areas and very low income families was referred to as the "special  affordable" housing goal. This special affordable housing goal also included a multifamily annual minimum dollar volume target of qualifying multifamily mortgage purchases  In addition, from 2005 to 2009, we were subject to three subgoals that were expressed as percentages of the total number of  mortgages we purchased that financed the purchase of  s ng e-family, owner occupied properties located in metropolitan areas

Our housing goals and results for 2009 and 2008 are set forth in  Table 6 below

**Table 6     Affordable Housing Goals and Reported Results for  2009 and 2008**[1]

| | | | | | | Year Ended December 31, | | |
| | | | | | 2009 | | 2008 | |
| | | | | | Goal | Results | Goal | Results |
|---|---|---|---|---|---|---|---|---|
| Hous ng goa s and ac ua  esu  s | | | | | | | | |
| Low- and mode a e- ncome goa [2] | | | | | | 43% | 44 7% | 56% | 51 5% |
| Unde se ved a eas goa [3] | | | | | | 32 | 26 8 | 39 | 37 7 |
| Spec al affo dable goa [2] | | | | | | 18 | 17 8 | 27 | 23 1 |
| Mul fam ly spec al affo dable volume  a ge  ( n b  ons)[4] | | | | | | $4 60 | $3 69 | $3 92 | $7 49 |
| Ho  e p  c ase s bgoa s and ac  a es  s | | | | | | | | | |
| Low- and mode a e- ncome subgoal[2] | | | | | | 40% | 48 4% | 47% | 39 3% |
| Unde se ved a eas subgoal[2] | | | | | | 30 | 27 9 | 34 | 30 3 |
| Spec al affo dable subgoal[2] | | | | | | 14 | 20 6 | 18 | 15 1 |

(1) An  nd v dual mo  gage may qual fy fo  mo e han one of  he goa s o  subgoa s  Each of  he goa  and subgoa  pe cen ages and each of ou  pe cen age  esu  s  s
    de e m ned  ndependen y and canno  be agg ega ed  o de e m ne a pe cen age of  o al pu chases  ha  qua  f es fo  hese goa s o  subgoa s
(2) These 2008 goals and subgoals we e de e m ned  o be  nfeas ble
(3) FHFA conc  ded  a ac  eve  en by  s of  s 2008 goa  was feas b e, bu  cha  eng ng  Acco d ng y, FHFA dec ded no  o  eq  e  s o s     a o s g p a
(4) These 2009 goals we e de e m ned  o be  nfeas ble
(5) FHFA conc uded  ha  ach eve  en by us of  hese 2009 goa s and s  goa s was feas  e,    dec ded  o  o  eq  e  s o s       a  hous ng p an

*Affordable Housing Allocations*

The GSE Act requires us to set aside in each fiscal year an  amount equal to 4.2 basis points for each dollar of the UPB  of total new business purchases, and allocate or transfer such  amount to: (a) HUD to fund a Housing Trust Fund  established and managed by HUD; and (b) a Capital Magnet Fund established and managed by Treasury. FHFA has the authority to suspend our allocation upon finding that the payment would contribute to our financial instability, cause us to be classified as undercapitalized or prevent us from successfully  completing a capital restoration plan  In November 2008, FHFA advised us that it has suspended the requirement to set aside or  allocate funds for the Housing Trust Fund and the Capital Magnet Fund until further notice

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0676

Powered by Morningstar® Document Research℠

Table of Contents

*Prudential Management and Operations Standards*

The GSE Act requires FHFA to establish prudential standards, by regulation or by guideline, for a broad range of operations of the enterprises. These standards must address internal controls, information systems, independence and adequacy of internal audit systems, management of interest rate risk exposure, management of market risk, liquidity and reserves, management of asset and investment portfolio growth, overall risk management processes, investments and asset acquisitions, management of credit and counterparty risk, and recordkeeping. FHFA may also establish any additional operational and management standards the Director of FHFA determines appropriate

*Portfolio Activities*

The GSE Act requires FHFA to establish, by regulation, criteria governing portfolio holdings to ensure the holdings are backed by sufficient capital and consistent with the enterprises' mission and safe and sound operations. In establishing these criteria, FHFA must consider the ability of the enterprises to provide a liquid secondary market through securitization activities, the portfolio holdings in relation to the mortgage market and the enterprises' compliance with the prudential management and operations standards prescribed by FHFA.

On December 28, 2010, FHFA issued a final rule adopting the portfolio holdings criteria established in the Purchase Agreement, as it may be amended from time to time, for so long as we remain subject to the Purchase Agreement

See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS     Impact of the Purchase Agreement and FHFA Regulation on the Mortgage Related Investments Portfolio" for additional information on restrictions to our portfolio activities

*Anti Predatory Lending*

Predatory lending practices are in direct opposition to our mission, our goals and our practices. We have instituted anti predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. These policies include processes related to the delivery, validation and certification of loans sold to us  In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options

*Subordinated Debt*

FHFA directed us to continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable  In addition, the requirements in the agreement we entered into with FHFA in September 2005 with respect to issuance, maintenance, and reporting and disclosure of Freddie Mac subordinated debt have been suspended during the term of conservatorship and thereafter until directed otherwise  See "NOTE  8:  REGULATORY CAPITAL Subordinated Debt Commitment" for more information regarding subordinated debt

### Department of Housing and Urban Development

HUD has regulatory authority over Freddie Mac with respect to fair lending  Our mortgage purchase activities are subject to federal anti discrimination laws. In addition, the GSE Act prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist in its fair lending investigations of primary market lenders with which we do business and requires us to undertake remedial actions against such lenders found to have engaged in discriminatory lending practices  In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the anti discrimination provisions of the GSE Act.

### Department of the Treasury

Treasury has significant rights and powers with respect to our company as a result of the Purchase Agreement  In addition, under our charter, the Secretary of the Treasury has approval authority over our issuances of notes, debentures and substantially identical types of unsecured debt obligations (including the interest rates and maturities of these securities), as well as new types of mortgage related securities issued subsequent to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989  The Secretary of the Treasury has performed this debt securities approval function by coordinating GSE debt offerings with Treasury funding activities. In addition, our charter authorizes Treasury to purchase Freddie Mac debt obligations not exceeding $2.25 billion in aggregate principal amount at any time.

The Reform Act granted the Secretary of the Treasury authority to purchase any obligations and securities issued by us and Fannie Mae until December 31, 2009 on such terms and conditions and in such amounts as the Secretary may determine,  provided that the Secretary determined the purchases were necessary to provide stability to the financial markets, prevent

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0677

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

disruptions in the availability of mortgage finance, and protect taxpayers See "Conservatorship and Related Matters *Treasury Agreements*."

### Securities and Exchange Commission

We are subject to the financial reporting requirements applicable to registrants under the Exchange Act, including the requirement to file with the SEC annual reports on Form 10 K, quarterly reports on Form  0 Q and current reports on Form 8 K. Although our common stock is required to be registered under the Exchange Act, we continue to be exempt from certain federal securities law requirements, including the following:

- Securities we issue or guarantee are "exempted securities" under the Securities Act and may be sold without registration under the Securities Act;

- We are excluded from the definitions of "government securities broker" and "government securities dealer" under the Exchange Act;

- The Trust Indenture Act of 1939 does not apply to securities issued by us; and

- We are exempt from the Investment Company Act of  940 and the Investment Advisers Act of 1940, as we are an "agency, authority or instrumentality" of the U.S. for purposes of such Acts.

### Legislative and Regulatory Developments

#### Dodd Frank Act

The Dodd Frank Act, which was signed into law on July 21,  2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset backed securitization, mortgage underwriting, and consumer financial protection The Dodd Frank Act will directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products We may also be affected by provisions of the Dodd Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties

At this time, it is difficult to assess fully the impact of the Dodd Frank Act on Freddie Mac and the financial services industry. Implementation of the Dodd Frank Act is being accomplished through numerous rulemakings, many of which are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete The Dodd Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes

Recently initiated rulemakings that may have an impact on Freddie Mac include the following:

- The Financial Stability Oversight Council has published a notice of proposed rulemaking inviting public comment on the criteria that will inform the Council's designation of nonbank financial companies as subject to enhanced supervision and prudential standards pursuant to the provisions of the Dodd Frank Act, as well as the Council's processes and procedures for such designation If Freddie Mac is so designated, it would be subject to Federal Reserve supervision and to prudential standards that may include risk based capital and leverage requirements, liquidity requirements, resolution plan and credit exposure reporting requirements, concentration limits, contingent capital requirements, enhanced public disclosures, short term debt limits, and overall risk management requirements, as well as other requirements and restrictions

- The U.S. Commodity Futures Trading Commission, or CFTC, and the SEC recently published a proposed rule regarding certain definitions in the Dodd Frank Act, including the definitions of "swap dealer" and "major swap participant." If Freddie Mac is deemed to be a major swap participant, FHFA, in consultation with the CFTC and the SEC, will be required to establish new rules with respect to our activities as a major swap participant regarding capital requirements, and margin requirements for certain derivatives transactions In addition, Freddie Mac would be required to register with the CFTC and to comply with certain business conduct standards and reporting requirements Even if we are not deemed a major swap participant, we could become subject to new rules related to clearing, trading, and reporting requirements for derivatives transactions.

We continue to review and assess the impact of these proposals For more information, see "RISK FACTORS   Legal and Regulatory Risks  *The Dodd Frank Act and related regulation may adversely affect our business activities and financial results*."

#### SEC Regulation on Disclosure for Asset Backed Securities

On January 20, 2011, the SEC adopted a rule requiring issuers of asset backed securities to disclose specified information concerning fulfilled and unfulfilled repurchase requests relating to the assets backing such securities, including certain historical information. This disclosure will first be required to be reported by February 14, 2012 (containing

Source   D RA HOM  OAN MORTGAG CORP, 10 K,  ebruary 24, 2011                    TREASURY-0678                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

information covering the three year period ended  December 31, 2011), with subsequent filings due each  quarter thereafter  While we are assessing the rule's impact on us, we currently believe compliance with the  disclosure requirements will likely present significant  operational challenges for us.

### Conforming Loan Limits

On September 30, 20  0, Congress temporarily extended the  current higher loan limits in certain high cost areas through  September 30, 2011  The higher loan limits in certain  high cost areas were set to expire on December 3 , 20  0  Actual conforming loan limits are established by FHFA for each county (or equivalent) and the loan limits for specific  high cost areas may be lower than the maximum amounts  For a  further discussion of conforming loan limits, see "Our  Business."

### Energy Loan Tax Assessment Programs

A number of states have enacted laws allowing localities to  create energy loan assessment programs for the purpose of  financing energy efficient home improvements  These programs are  typically denominated as Property Assessed Clean Energy, or  PACE, programs. While the specific terms may vary, these laws  generally treat the new energy assessments like property tax  assessments, which generally create a new lien to secure the assessment that is senior to any existing first mortgage lien  These laws could have a negative impact on Freddie Mac's  credit losses, to the extent a large number of borrowers obtain  this type of financing.

On July 6, 2010, FHFA announced that it had determined  that certain of these programs present significant safety and  soundness concerns that must be addressed by the GSEs. FHFA  directed Freddie Mac and Fannie Mae to waive the uniform  mortgage document prohibitions against senior liens for any  homeowner who obtained a PACE or PACE like loan with a first  priority lien before July 6, 2010 and, in addressing PACE programs with first liens, to undertake actions that protect  their safe and sound operation

On August 3 , 20  0, we released a new directive to our  seller/servicers in which we reinforced our long standing  requirement that mortgages sold to us must be and remain in the  first  lien position, while also providing guidance on our  requirements for refinancing loans that were originated with PACE obligations before July 6, 2010

We are subject to lawsuits relating to PACE programs  See  "NOTE 21: LEGAL CONTINGENCIES" for additional  information  Legislation has been introduced in the Senate and  the House of Representatives that would require Freddie Mac and  Fannie Mae to adopt standards that support PACE programs.

For more information regarding legislative and regulatory  developments that could impact our business, see "RISK  FACTORS     Legal and Regulatory Risks "

### Employees

At February 11, 2011, we had 5,231 full time and 78 part  time employees  Our principal offices are located  in McLean, Virginia.

### Available Information

#### SEC Reports

We file reports and other information with the SEC  In view  of the Conservator's succession to all of the voting power of  our stockholders, we do not expect to prepare or provide proxy  statements for the solicitation of proxies from stockholders  during the conservatorship. We make available free of charge  through our website at www freddiemac com our annual reports  on Form 10 K, quarterly reports on Form 10 Q, current reports  on Form 8 K, and all other SEC reports and amendments to those  reports as  soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. In addition,  materials  that we filed with the SEC are available for review and  copying  free of charge at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain  information on the operation of the Public Reference Room by  calling the SEC at    800 SEC 0330  The SEC also maintains an  internet site (www sec gov) that  contains reports, proxy and information statements, and other  information regarding companies that file electronically with  the  SEC.

We are providing our website addresses and the website  address of the SEC here or elsewhere in this annual report on  Form  0 K solely for your information  Information appearing on  our  website or on the SEC's website is not incorporated into  this annual report on Form 10 K

#### Information about Certain Securities Issuances by Freddie Mac

Pursuant to SEC regulations, public companies are required  to  disclose certain information when they incur a material direct  financial obligation or become directly or contingently liable  for a material obligation under an off balance sheet  arrangement  The disclosure must be made in a current report on  Form 8 K under Item 2 03 or, if the obligation is incurred in  connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0679

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Freddie Mac's securities offerings are exempted from SEC registration requirements  As a result, we are not required to  and do not file registration statements or prospectuses with the  SEC with respect to our securities offerings  To comply with the  disclosure requirements of Form 8 K relating to the incurrence of material financial obligations, we  report our incurrence of these types of obligations either in  offering circulars (or supplements thereto) that we post on our  website or in a current report on Form 8 K, in accordance with a "no action" letter we received from the SEC staff. In cases where the information is disclosed  in an offering circular posted on our website, the document will  be posted on our website within the same time period that a  prospectus for a non exempt securities offering would be  required to be filed with the SEC

The website address for disclosure about our debt securities is  www.freddiemac.com/debt. From this address, investors can access  the offering circular and related supplements for debt  securities offerings under Freddie Mac's global debt  facility, including pricing supplements for individual issuances of debt securities

Disclosure about our off balance sheet obligations pursuant to  some of the mortgage related securities we issue can be found at www.freddiemac.com/mbs. From this address, investors can access  information and documents about our mortgage related securities,  including offering circulars and related offering circular  supplements.

## Forward Looking Statements

We regularly communicate information concerning our business  activities to investors, the news media, securities analysts and  others as part of our normal operations  Some of these communications, including this Form 10 K, contain "forward looking statements," including  statements pertaining to the conservatorship, our current  expectations and objectives for our efforts under the MHA  Program and other programs to assist the U.S. residential mortgage market, future business plans, liquidity,  capital management, economic and market conditions and trends,  market share, the effect of legislative and regulatory developments,  implementation of new accounting standards, credit losses,  internal control remediation efforts, and results of operations  and financial condition on a GAAP, Segment Earnings, and fair  value basis  Forward looking statements are often accompanied by,  and identified with, terms such as "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," and similar phrases.  These statements are not historical facts, but rather represent  our expectations based on current information, plans, judgments,  assumptions, estimates, and projections. Forward looking  statements involve known and unknown risks and uncertainties, some of which are beyond our control  Actual  results may differ significantly from those described in or  implied by such forward looking statements due to various factors and  uncertainties, including those described in the "RISK  FACTORS" section of this Form  0 K and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama  Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the  conservatorship, the Purchase Agreement, the senior preferred  stock, and the warrant on our business, including our ability to  pay the dividend on the senior preferred stock;

- our ability to maintain adequate liquidity to fund our  operations, including following changes in any support provided  to us by Treasury or FHFA;

- changes in our charter or applicable legislative or regulatory  requirements, including any restructuring or reorganization in  the form of our company, including whether we will remain a  stockholder owned company or continue to exist and whether we  will be wound down or placed under receivership, regulations  under the GSE Act, the Reform Act, or the Dodd Frank Act,  changes to affordable housing goals regulation, reinstatement of  regulatory capital requirements, or the exercise or assertion of  additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services  industries, including changes caused by the Dodd Frank Act, or  any other legislative, regulatory, or judicial action at the  federal or state level;

- the extent to which borrowers participate in the MHA Program and  other initiatives designed to help in the housing recovery and  the impact of such programs on our credit losses, expenses, and  the size and composition of our mortgage related investments  portfolio;

- the impact of any deficiencies in foreclosure documentation  practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and  other operating systems or infrastructure, and those of our  vendors to process the complexity and volume of our transactions;

- changes in accounting or tax standards or in our accounting  policies or estimates, and our ability to effectively implement  any such changes in standards, policies, or estimates;

- changes in general regional, national, or international  economic, business, or market conditions and competitive  pressures, including changes in employment rates and interest  rates, and changes in the federal government's fiscal and  monetary policy;

- changes in the U S  residential mortgage market, including  changes in the rate of growth in total outstanding U S  residential mortgage debt, the size of the U S  residential  mortgage market, and home prices;

37                                                          *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products;

- our ability to recruit and retain executive officers and other key employees;

- our ability to effectively identify and manage credit, interest rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage to debt OAS;

- the potential impact on the market for our securities resulting from any future sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting requirements or investment standards for mortgage related products;

- investor preferences for mortgage loans and mortgage related and debt securities compared to other investments;

- borrower preferences for fixed rate mortgages or adjustable rate mortgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10 K, including in the "MD&A" section;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing

We undertake no obligation to update any forward looking statements we make to reflect events or circumstances occurring after the date of this Form 10 K

## ITEM 1A. RISK FACTORS

Before you invest in our securities, you should know that making such an investment involves risks, including the risks described be ow and in "BUSINESS," "MD&A," and elsewhere in this Form 10 K These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

### Conservatorship and Related Matters

***The future status and role of Freddie Mac could be materially adversely affected by legislative and regulatory action that alters the ownership, structure and mission of the company.***

Future legislation will likely materially affect the role of the company, our business model, our structure and future results of operations Some or all of our functions could be transferred to other institutions, and we could cease to exist as a stockholder owned company or at all If any of these events were to occur, our shares could further diminish in value, or

38                                                                                    *Freddie Mac*

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

cease to have any value, and there can be no assurance that our stockholders would receive any compensation for such loss in value

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends  winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the  market and ultimately wind down both institutions. The report  identifies a number of policy levers that could be used to wind  down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital  back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing  conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior  preferred stock purchase agreements  For more information, see  "BUSINESS Executive Summary    *Long Term Financial Sustainability and Future Status.*"

In addition to legislative actions, FHFA has expansive regulatory authority over us, and the manner in which FHFA will use its authority in the future is unclear  FHFA could take a number of regulatory actions that could materially adversely  affect our company, such as changing or reinstating our current capital requirements, which are not binding during  conservatorship.

***The conservatorship is indefinite in duration and the timing,  conditions and likelihood of our emerging from conservatorship  are uncertain. Even if the conservatorship is terminated, we  would remain subject to the Purchase Agreement, senior preferred  stock and warrant.***

FHFA has stated that there is no exact time frame as to when the conservatorship may end. Termination of the conservatorship (other than in connection with receivership) also requires  Treasury's consent under the Purchase Agreement  There can be no assurance as to when, and under what circumstances, Treasury would give such consent. There is also significant  uncertainty as to what changes may occur to our business structure during or following our conservatorship, including  whether we will continue to exist  It is possible that the conservatorship will end with us being placed into receivership

As discussed above, on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the  Administration's plan to reform the U.S. housing finance market  For more information, see  "BUSINESS    Executive Summary    *Long Term Financial Sustainability and Future Status.*"

In addition, Treasury has the ability to acquire almost 80% of our common stock for nominal consideration by exercising the  warrant we issued to it pursuant to the Purchase Agreement  Consequently, the company could effectively remain under the  control of the U S  government even if the conservatorship was ended and the voting rights of common stockholders restored  The warrant held by Treasury, the restrictions on our business contained in the Purchase Agreement and the senior status of the  senior preferred stock issued to Treasury under the Purchase Agreement, if the senior preferred stock has not been redeemed,  also could adversely affect our ability to attract new private  sector capital in the future should the company be in a position  to seek such capital. Moreover, our draws under Treasury's funding commitment, the senior preferred dividend obligation, and commitment fees paid to Treasury could permanently impair  our ability to build independent sources of capital

***We expect to make additional draws under the Purchase Agreement in  future periods, which will adversely affect our future results  of operations and financial condition.***

It is unlikely that we will generate net income or comprehensive  income in excess of our annual dividends payable to Treasury over the long term, which will lead us to require additional  draws under the Purchase Agreement  A variety of factors could lead us to make additional draws under the Purchase Agreement in the future, including:

- dividend obligations on the senior preferred stock, which are  cumulative and accrue at an annual rate of 10% (or 12% in any  quarter in which dividends are not paid in cash) until all  accrued dividends are paid in cash and which at their current  level exceed our annual historical earnings in all but one  period;

- future losses, driven by ongoing weak economic conditions, which  could cause, among other things, continued high provision for  credit losses, increased REO operations expense and additional  unrealized losses on the non agency mortgage related securities  we hold;

- required reductions in the size of our mortgage related  investments portfolio and other limitations on our investment  activities that reduce the earnings capacity of our investment  activities;

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0682

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- pursuit of public mission oriented objectives that could produce suboptimal financial returns, such as our efforts under the MHA Program, the continued use or expansion of foreclosure suspensions, and other foreclosure prevention efforts, including any future requirements to reduce the principal amount of loans;

- adverse changes in interest rates, the yield curve, implied volatility or mortgage to debt OAS, which could reduce net interest income and increase realized and unrealized mark to fair value losses recorded in earnings or AOCI;

- limitations in our access to the public debt markets, or increases in our debt funding costs;

- establishment of a valuation allowance for our remaining deferred tax asset;

- limitations on our ability to develop new products;

- changes in business practices and requirements resulting from legislative or regulatory developments;

- changes in accounting practices or standards; and

- the quarterly commitment fee we must pay to Treasury under the Purchase Agreement (Treasury has waived the fee for the first quarter of 2011) The amount of the fee has not yet been established and could be substantial. Treasury has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment

Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. Although additional draws under the Purchase Agreement will allow us to remain solvent and avoid mandatory receivership, they will also increase the liquidation preference of, and the dividends we owe on, the senior preferred stock Based on the aggregate liquidation preference of the senior preferred stock of $64.2 billion as of December 31, 2010, Treasury is entitled to annual cash dividends of $6.42 billion, which exceeds our annual historical earnings in all but one period Increases in the already substantial liquidation preference and senior preferred dividend obligation, along with limited flexibility to redeem the senior preferred stock, will adversely affect our results of operations and financial condition and add to the significant uncertainty regarding our long term financial sustainability.

***Our business objectives and strategies have in some cases been significantly altered since we were placed into conservatorship, and may continue to change, in ways that negatively affect our future financial condition and results of operations.***

FHFA, as Conservator, has directed the company to focus on managing to a positive stockholders' equity At the direction of the Conservator, we have made changes to certain business practices that are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives but may not contribute to our goal of managing to a positive stockholders' equity Some of these changes have increased our expenses or caused us to forego revenue opportunities For example, FHFA has directed that we implement various initiatives under the MHA Program We expect to incur significant costs associated with the implementation of these initiatives and we cannot currently estimate whether, or the extent to which, costs incurred in the near term from these initiatives may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives The Conservator and Treasury have also not authorized us to engage in certain business initiatives and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed Our inability to execute such initiatives and transactions may adversely affect our profitability Other agencies of the U S government, as well as Congress, also have an interest in the conduct of our business. We do not know what actions they may request us to take.

In view of the conservatorship and the reasons stated by FHFA for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non financial objectives Among other things, we could experience significant changes in the size, growth and characteristics of our guarantee and investment activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guarantee business Accordingly, our strategic and operational focus may not always be consistent with the generation of net income It is possible that we will make material changes to our capital strategy and to our accounting policies, methods, and estimates It is also possible that the company could be restructured and its statutory mission revised In addition, we may be directed to engage in initiatives that are operationally difficult or costly to implement

In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship The Acting Director stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage related investments portfolio, except for purchases of delinquent mortgages out of PC pools The Acting

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0683

Table of Contents

Director also stated that permitting us to engage in new products is inconsistent with the goals of the conservatorship. These restrictions could also adversely affect our financial results in future periods.

As our Conservator, FHFA possesses all of the powers of our stockholders, officers and directors. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day to day operations so that the company can continue to operate in the ordinary course of business. FHFA has the ability to withdraw or revise its delegations of authority and override actions of our Board of Directors at any time  The directors serve on behalf of, and exercise authority as directed by, the Conservator  In addition, FHFA has the power to take actions without our knowledge that could be material to investors and could significantly affect our financial performance

FHFA is also Conservator of Fannie Mae, our primary competitor, and FHFA's actions as Conservator of both companies could affect competition between us and Fannie Mae  On a number of occasions, FHFA has directed us and Fannie Mae to confer and consider uniform approaches to particular issues and problems, and FHFA has in a few cases directed the two GSEs to adopt common approaches  For example, in January 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to work on a joint initiative, in coordination with HUD, to consider alternatives for future mortgage servicing structures and servicing compensation, including the possibility of reducing or eliminating the minimum servicing fee for performing loans, or other structures  FHFA has also directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop consistent requirements, policies and processes for, the servicing of non performing mortgages, and to discuss joint standards for the evaluation of the servicing performance of servicers  We cannot predict the impact on our business of these actions or any similar actions FHFA may require us and Fannie Mae to take in the future  It is possible that FHFA could require us and Fannie Mae to take a common approach that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae

These changes and other factors could have material adverse effects on, among other things, our portfolio growth, net worth, credit losses, net interest income, guarantee fee income, net deferred tax assets, and loan loss reserves, and could have a material adverse effect on our future results of operations and financial condition  In light of the significant uncertainty surrounding these changes, there can be no assurances regarding when, or if, we will return to profitability

***We are subject to significant limitations on our business under the Purchase Agreement that could have a material adverse effect on our results of operations and financial condition.***

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limitations on the amount of indebtedness we may incur, the size of our mortgage related investments portfolio and the circumstances in which we may pay dividends, raise capital and pay down the liquidation preference on the senior preferred stock  In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any execut ve officers without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury  In deciding whether or not to consent to any request for approval it receives from us under the Purchase Agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. The limitations under the Purchase Agreement could have a material adverse effect on our future results of operations and financial condition

***Our regulator may, and in some cases must, place us into receivership, which would result in the liquidation of our assets and terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter; if we are liquidated, there may not be sufficient funds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock or make any distribution to the holders of our common stock.***

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship  These include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent  A receivership would terminate the conservatorship. The appointment of FHFA (or any other entity) as our receiver would terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter arising as a result of their status as

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0684

Table of Contents

stockholders or creditors, other than the potential ability to be paid upon our liquidation. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, there can be no assurance that there would be sufficient proceeds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock or make any distribution to the holders of our common stock. To the extent that we are placed in receivership and do not or cannot fulfill our guarantee to the holders of our mortgage related securities, such holders could become unsecured creditors of ours with respect to claims made under our guarantee Only after paying the secured and unsecured claims of the company, the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, which ranks senior to our common stock and all other series of preferred stock upon liquidation, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock The aggregate liquidation preference on the senior preferred stock owned by Treasury was $64.2 billion as of December 3 , 20 0 The liquidation preference will increase further if we make additional draws under the Purchase Agreement, if we do not pay dividends owed on the senior preferred stock in cash or if we do not pay the quarterly commitment fee to Treasury under the Purchase Agreement

### We have a variety of different, and potentially competing, objectives that may adversely affect our financial results and our ability to maintain positive net worth.

Based on our charter, public statements from Treasury and FHFA officials and guidance from our Conservator, we have a variety of different, and potentially competing, objectives These objectives include providing liquidity, stability and affordability in the mortgage market; continuing to provide additional assistance to the struggling housing and mortgage markets; reducing the need to draw funds from Treasury pursuant to the Purchase Agreement; returning to long term profitability; and protecting the interests of the taxpayers These objectives create conflicts in strategic and day to day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives Current portfolio investment and mortgage guarantee activities, liquidity support, and loan modification and foreclosure forbearance initiatives, including our efforts under the MHA Program, are intended to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives under conservatorship, but may negatively impact our financial results and net worth

### We have experienced significant management changes and internal reorganizations which could increase our control risks and have a material adverse effect on our ability to do business and our results of operations.

Since September 2008, we have had numerous changes in our senior management and governance structure, including FHFA becoming our Conservator, a reconstituted Board of Directors, three changes in our Chief Executive Officer, three changes in our Chief Financial Officer and a new Chief Operating Officer (who resigned in February 20  ) We have recently experienced several significant internal reorganizations The magnitude of these changes and the short time interval in which they have occurred, particularly during the ongoing housing and economic crisis, add to the risks of control failures, including a failure in the effective operation of our internal control over financial reporting or our disclosure controls and procedures Control failures could result in material adverse effects on our financial condition and results of operations

This turnover of key management positions could further harm our financial performance and results of operations Management attention may be diverted from regular business concerns by these and future reorganizations and the need to operate under the framework of conservatorship.

### The conservatorship and uncertainty concerning our future may have an adverse effect on the retention and recruitment of management and other valuable employees.

Our ability to recruit, retain, and engage management and other valuable employees with the necessary skills to conduct our business may be adversely affected by the conservatorship, the uncertainty regarding its duration, the potential for future legislative or regulatory actions that could significantly affect our existence and our role in the secondary mortgage market, and the negative publicity concerning the GSEs. The actions taken by Treasury and the Conservator to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of senior executives, management, and other valuable employees For example, we are subject to restrictions on the amount and type of compensation we may pay our executives under conservatorship The Conservator has also directed us to maintain individual salaries and wage rates for all employees at 20 0 levels for 20  (except in the case of promotions or significant changes in responsibilities). In addition, statutory and regulatory requirements restricting executive compensation at institutions that have received federal financial assistance, even if not expressly applicable to us, may be interpreted by FHFA or Treasury as limiting the compensation that we are able to provide to our executive officers and other employees Although we have established compensation programs designed to help retain key employees, we are not currently in a

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0685

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

position to offer employees financial incentives that are equity based and, as a result of this and other factors relating to the conservatorship that may affect our attractiveness as an employer, we may be at a competitive disadvantage compared to other potential employers  Uncertainty about the future of the GSEs affects all of our operations and heightens the risks related to retention of management and other valuable employees  A recovering economy is likely to put additional pressures on turnover in 2011, as other attractive opportunities may become available to people we want to retain  Accordingly, we may not be able to retain or replace executives or other employees with key skills, and may lose institutional knowledge, that could adversely affect our ability to conduct our business effectively  We may also face increased operational risk if key employees leave the company

***The conservatorship and investment by Treasury has had, and will continue to have, a material adverse effect on our common and preferred stockholders.***

Prior to our entry into conservatorship, the market price for our common stock declined substantially  After our entry into conservatorship, the market price of our common stock continued to decline (to less than $ per share for an extended period immediately following our entry into conservatorship, and again following the delisting of our common stock from the NYSE at the direction of FHFA) As a result, the investments of our common and preferred stockholders lost substantial value, which they may never recover  There is significant uncertainty as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist  Therefore, it is likely that our shares could further diminish in value, or cease to have any value.

The conservatorship and investment by Treasury has had, and will continue to have, other material adverse effects on our common and preferred stockholders, including the following:

- *No voting rights during conservatorship.*  The rights and powers of our stockholders are suspended during the conservatorship and our common stockholders do not have the ability to elect directors or to vote on other matters

- *No longer managed to maximize stockholder returns.*  Because we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns  In a letter to the Chairmen and Ranking Members of the Congressional Banking and Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed

- *Priority of Senior Preferred Stock.*  The senior preferred stock ranks senior to the common stock and all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company.

- *Dividends have been eliminated.*  The Conservator has eliminated dividends on Freddie Mac common and preferred stock (other than dividends on the senior preferred stock) during the conservatorship. In addition, under the terms of the Purchase Agreement, dividends may not be paid to common or preferred stockholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether or not we are in conservatorship

- *Warrant may substantially dilute investment of current stockholders.*  If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common stockholders will be substantially diluted. It is possible that stockholders, other than Treasury, will not own more than 20 1% of our total common stock for the duration of our existence. Under our charter, bylaws and applicable law, 20 1% is insufficient to control the outcome of any vote that is presented to the common stockholders  Accordingly, existing common stockholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the time, if any, that the conservatorship ends.

## Competitive and Market Risks

***Our investment activity is significantly limited under the Purchase Agreement and by FHFA, which will likely reduce our earnings from investment activities and result in greater reliance on our guarantee activities to generate revenue.***

We are subject to significant limitations on our investment activity, which will adversely affect the earnings capacity of our mo tgage related investments portfolio  These limitations include: (a) a requirement to reduce the size of our mortgage related investments portfolio; and (b) significant constraints on our ability to purchase or sell mortgage assets

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion  As a result, the UPB of our mortgage related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. Treasury has stated it does not expect us to be an active buyer to increase the size of our mortgage related investments portfolio, but also does not expect that active selling will be necessary to meet the required portfolio reduction targets  In addition, FHFA has stated that, given the size of our current mortgage related investments portfolio and

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the potential volume of delinquent mortgages to be purchased out of PC pools, it expects that any net additions to our mortgage related investments portfolio would be related to that activity  Therefore, our ability to take advantage of opportunities to purchase or sell mortgage assets at attractive prices has been, and likely will continue to be, limited  In addition, notwithstanding the expectations expressed by Treasury and FHFA regarding future selling activity, we can provide no assurance that the cap on our mortgage related investments portfolio will not, over time, force us to sell mortgage assets at unattractive prices, particularly given the potential in coming periods for continued high volumes of loan modifications and purchases of seriously delinquent loans, both of which result in the purchase of mortgage loans from our PCs for our mortgage-re ated investments portfolio

These limitations will reduce the earnings capacity of our mortgage related investments portfolio business and require us to place greater emphasis on our guarantee activities to generate revenue  However, under conservatorship, our ability to generate revenue through guarantee activities may be limited, as we may be required to adopt business practices that provide  support for the mortgage market in a manner that serves our public mission and other non financial objectives, but that may negatively impact our future financial results. The combination of the restrictions on our business activities under the Purchase Agreement and FHFA regulation, combined with our potential inability to generate sufficient revenue through our guarantee activities to offset the effects of those restrictions, may have an adverse effect on our results of operations and financial condition. There can be no assurance that the current profitability levels on our new single family business would be sufficient to attract new private sector capital in the future, should the company be in a position to seek such capital.

***We are subject to mortgage credit risks, including mortgage credit risk relating to off-balance sheet arrangements; increased credit costs related to these risks could adversely affect our financial condition and/or results of operations.***

Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee, exposing us to the risk of credit losses and credit related expenses  We are primarily exposed to mortgage credit risk with respect to the single family and multifamily loans that we hold on our consolidated balance sheets  We are also exposed to mortgage credit risk with respect to securities and guarantee arrangements that are not reflected as assets on our consolidated balance sheets  These relate primarily to: (a) Freddie Mac mo tgage related securities backed by multifamily loans; (b) certain single family Other Guarantee Transactions; and (c) other guarantee commitments, including long term standby commitments

Factors that affect the level of our mortgage credit risk include the credit profile of the borrower, home prices, the features of the mortgage loan, the type of property securing the mortgage, and local and regional economic conditions, including unemployment rates  We continue to face significant mortgage credit risk, and our credit losses will likely increase in the near term and remain significantly above historical levels for the foreseeable future due to the substantial number of mortgage loans in our single family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial backlog of seriously delinquent loans.

While mortgage interest rates remained low in 20 0, many borrowers may not have been able to refinance into lower interest mortgages due to substantial declines in home values, market uncertainty and continued high unemployment rates. Therefore, there can be no assurance that continued low mortgage interest rates or efforts to modify and refinance mortgages pursuant to the MHA Program will reduce our overall mortgage credit risk.

We also continue to have significant amounts of mortgage loans in our single family credit guarantee portfolio with certain characteristics, such as Alt A, interest only, option ARMs, loans with original LTV ratios greater than 90%, and loans where borrowers had FICO scores less than 620 at the time of origination, that expose us to greater credit risk than do other types of mortgage loans  See "Table 44   Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio" for more information

Beginning in 2008, the conforming loan limits were significantly increased for mortgages originated in certain "high cost" areas (the initial increases applied to loans originated after July 1, 2007)  Due to our relative lack of experience with these larger loans, purchases pursuant to the high cost conforming loan limits may also expose us to greater credit risks.

We also face the risk that multifamily borrowers will default if they are unable to refinance their loans at an affordable rate  This risk is particularly important with respect to multifamily loans because such loans generally have a balloon payment and typically have a shorter contractual term than single family mortgages  Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. This risk is significant given the state of the economy, lower levels of liquidity, property cash flows, and property market values. Of the $108.7 billion in UPB of loans in our multifamily mortgage portfolio as of December 3 , 20 0, approximately 2% and 4% will reach their maturity during 2011 and 2012, respectively.

44

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***We are exposed to significant credit risk related to the subprime, Alt-A and option ARM loans that back the non agency mortgage related securities we hold.***

Our investments in non agency mortgage related securities have included securities that are backed by subprime, Alt A and option ARM loans  Since 2007, mortgage loan delinquencies and credit losses in the U.S. mortgage market have substantially increased, particularly in the subprime, Alt A and option ARM sectors of the residential mortgage market  In addition, home prices declined significantly, after extended periods during which home prices appreciated  As a result, the fair value of these investments has declined significantly since  2007 and we have incurred substantial losses through other than temporary impairments  In addition, many of these  investments do not trade in a liquid secondary market and the size of our holdings relative to normal market activity is such  that, if we were to attempt to sell a significant quantity of these securities, the pricing in such markets could be  significantly disrupted and the price we ultimately realize may  be materially lower than the value at which we carry these investments on our consolidated balance sheets

We could experience additional GAAP losses due to other than temporary impairments on our investments in these  non agency mortgage related securities if, among other things: (a) interest rates change; (b) delinquency and loss rates on subprime, Alt A and option ARM loans increase; or (c) there is a further decline in actual or forecasted home prices  In addition, the  fair value of these investments may decline further due to additional ratings downgrades or market events  Any credit  enhancements covering these securities, including subordination,  may not prevent us from incurring losses. During 2010, we  continued to experience the depletion of credit enhancements on  selected securities backed by subprime first lien, option ARM and Alt A loans due to poor performance in the underlying collateral  See "MD&A    CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for information about the credit ratings for these securities and  the extent to which these securities have been downgraded

***Certain strategies to mitigate our losses as an investor in non agency  mortgage-related securities may adversely affect our relationships with some of our largest  seller/servicers.***

On July 12, 2010, FHFA, as Conservator of Freddie Mac and Fannie Mae, announced that it had issued subpoenas to various  entities seeking loan files and other transaction documents  related to non agency mortgage related securities in which the  two enterprises invested  FHFA stated that the documents will enable it to determine whether issuers of these securities and  others are liable to Freddie Mac and Fannie Mae for certain losses they have suffered on the securities  We are assisting FHFA in this effort

We also have joined an investor group that has delivered a  notice of non performance to Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as  BAC Home Loans Servicing, LP)  The notice related to the  possibility that certain mortgage pools backing certain mortgage related securities issued by Countrywide Financial and  related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or  warranties

These and other loss mitigation efforts may lead to disputes  with some of our largest seller/servicers and counterparties  that may result in litigation  The effectiveness of these loss mitigation efforts is highly uncertain and any potential  recoveries may take significant time to realize

***The credit losses we experience in future periods as a result of the  housing and economic crisis are likely to be larger, perhaps substantially larger, than our current loan loss  reserves.***

Our loan loss reserves, as reflected on our consolidated balance  sheets, do not reflect our estimate of the total of all future  credit losses inherent in our single family and multifamily  mortgage loans, including those underlying our financial  guarantees. Rather, pursuant to GAAP, our reserves only reflect probable losses we believe we have already incurred as of the  balance sheet date  Accordingly, although we believe that our credit losses may exceed the amounts we have already reserved  for loans currently identified as impaired, and that additional  credit losses will be incurred in the future due to the housing  and economic crisis, we are not permitted under GAAP to reflect  the potential impact of these future trends in our loan loss reserves  As a result of the depth and extent of the housing and  economic crisis, there is significant uncertainty regarding the full extent of future credit losses  Therefore, such credit  losses are likely to be larger, perhaps substantially larger, than  our current loan loss reserves  These additional credit losses we incur in future periods will adversely affect our  business, results of operations, financial condition, liquidity and net worth

***Further declines in U.S. home prices or other adverse changes in the  U.S. housing market could negatively impact our business and increase our losses.***

Throughout 2010, the U.S. housing market continued to  experience adverse trends, including continued price  depreciation, and continued high serious delinquency and default  rates  Home sales declined significantly following the  expiration of the federal homebuyer tax credit program in April 2010, which increased the supply of unsold homes and placed  further downward pressure on home prices. These conditions,  coupled with high continued unemployment, led to

<div align="center">45</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

increases in credit losses and continued high loan delinquencies and provisioning for loan losses, all of which have adversely affected our financial condition and results of operations  We expect that national home prices in 20    will likely be lower than in 2010, which could result in a continued high rate of serious delinquencies or defaults and a level of credit related  losses higher than our expectations when our guarantees were issued  It is possible that home price declines could be  significantly greater than we anticipate, or that a sustained  recovery in home prices would not begin until much later than we anticipate, which could result in higher losses due to  other than temporary impairments on our investments in non agency mortgage related securities than would otherwise be  recognized in earnings  Government programs designed to strengthen the U.S. housing market, such as the MHA Program, may fail to achieve expected results, and new programs  could be instituted that cause our credit losses to increase  For more information, see "MD&A     RISK MANAGEMENT     Credit Risk."

Our business volumes are closely tied to the rate of growth in  total outstanding U S  residential mortgage debt and the  size of the U S  residential mortgage market  Total residential mortgage debt declined approximately 2 3% in the  first nine months of 2010 compared to a decline of 1.9% in 2009. If total outstanding U S  residential mortgage debt were to  continue to decline, there could be fewer mortgage loans available for us to purchase, and we could face more competition  to purchase a smaller number of loans.

While major national multifamily market fundamentals (*i.e.*, vacancy rates and effective rents) improved during  20  0, there can be no assurance that this trend will continue.  Additionally, certain local markets continue to exhibit weak  fundamentals  We expect that our multifamily non performing assets may increase due to the continuation of the challenging  economic conditions particularly in certain geographical areas  Improvements in loan performance have historically lagged  improvements in broader economic and market trends during market  recoveries  As a result, we may continue to experience elevated  credit losses related to multifamily activities in the first  half of 2011, even if market conditions continue to improve  In addition, given the significant weakness currently being  experienced in the U S  economy, it is also possible that apartment fundamentals could deteriorate during 2011, which  could cause delinquencies and credit losses relating to our  multifamily activities to increase beyond our current  expectations

***Our refinance volumes could decline if interest rates rise, which  could cause our overall new issuance volumes to  decline.***

We continued to experience a high composition of refinance  mortgages in our purchase volume during 2010, due to continued  low interest rates and the impact of our relief refinance  mortgages  Interest rates have been at historically low levels  for an extended period of time, but have recently begun to increase  Overall originations of refinance mortgages, and our  purchases of them, will likely decrease if interest rates  continue to rise  Originations of refinance mortgages will also  likely decline after the Home Affordable Refinance Program expires in June 2011  It is possible that our overall issuance volumes could decline if our volumes of purchase money mortgages  do not increase to offset any such decrease in refinance mortgages  This could adversely affect the amount of revenue we  receive from our guarantee activities

***We depend on our institutional counterparties to provide services  that are critical to our business, and our results of operations  or financial condition may be adversely affected if one or more  of our institutional counterparties do not meet their  obligations to us.***

We face the risk that one or more of the institutional  counterparties that has entered into a business contract or  arrangement with us may fail to meet its obligations  We face similar risks with respect to contracts or arrangements we  benefit from indirectly or that we enter into on behalf of our securitization trusts. Our primary exposures to institutional  counterparty risk are with:

- mortgage seller/servicers;

- mortgage insurers;

- issuers, guarantors or third party providers of other credit  enhancements (including bond insurers);

- counterparties to short term lending and other  investment related agreements and cash equivalent transactions,  including such agreements and transactions we manage for our PC  trusts;

- derivative counterparties;

- hazard and title insurers;

- mortgage investors and originators; and

- document custodians and funds custodians.

Many of our counterparties provide several types of services to  us. In some cases, our business with institutional  counterparties is concentrated  A significant failure by a major institutional counterparty could harm our business and financial  results in a variety of ways and have a material adverse effect on our investments in mortgage loans, investments in securities,  our derivative portfolio or our credit guarantee activities  See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

46                                                                                           *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                      TREASURY-0689
Powered by Morningstar ® Document Research ℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Some of our counterparties may become subject to serious  liquidity problems affecting, either temporarily or permanently,  their businesses, which may adversely affect their ability to  meet their obligations to us  Challenging market conditions have  adversely affected and are expected to continue to adversely affect the liquidity and financial condition of a number of our  counterparties, including some seller/servicers, mortgage insurers and bond insurers. In the past few years, some of our  largest seller/servicers have experienced ratings downgrades and  liquidity constraints, and certain large lenders have failed  These challenging market conditions could also increase the  likelihood that we will have disputes with our counterparties concerning their obligations to us, especially with respect to  counterparties that have experienced financial strain and/or have large exposures to us  A default by a counterparty with significant obligations to us could adversely affect our ability  to conduct our operations efficiently and at cost effective rates, which in turn could adversely affect our results of  operations or our financial condition  See "MD&A     RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk*" for additional information regarding our credit risks to our counterparties and how we seek to manage them

***Our financial condition or results of operations may be adversely  affected if mortgage seller/servicers fail to repurchase loans  sold to us in breach of representations and warranties or fail  to honor any related indemnification or any recourse  obligations. We also face the risk that seller/servicers may  fail to perform their obligations to service loans in our  single-family and multifamily mortgage portfolios or that their servicing performance could decline.***

We require seller/servicers to make certain representations and  warranties regarding the loans they sell to us  If loans are  sold to us in breach of those representations and warranties, we  have the contractual right to require the seller/servicer to  repurchase those loans from us  In lieu of repurchase, we may agree to allow a seller/servicer to indemnify us against losses  on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages  Sometimes a seller/servicer sells us mortgages with recourse, meaning that the  seller/servicer agrees to repurchase any mortgage that is delinquent for more than a specified period (usually  120 days), regardless of whether there has been a breach of representations and warranties

Some of our seller/servicers have failed to fully perform their  repurchase obligations due to lack of financial capacity, while  others, including many of our larger seller/servicers, have not  fully performed their repurchase obligations in a timely manner  As of December 31, 2010 and December 31, 2009, the UPB of loans subject to repurchase requests issued to our  single family seller/servicers was approximately  $3.8 billion and $4.2 billion, respectively. Our contracts require that a seller/servicer repurchase a mortgage  within 30 days after we issue a repurchase request, unless the seller/servicer avails itself of an appeal process provided  for in our contracts, in which case the deadline for repurchase  is extended until we decide the appeal  As of December 3 , 20  0, approximately 34% of these repurchase requests were  outstanding more than four months since issuance of our repurchase request  The actual amount we collect on these  requests and others we may make in the future could be significantly less than their UPB amounts because we expect many  of these requests will be satisfied by reimbursement of our  realized losses by seller/servicers, instead of repurchase of  loans at their UPB, or may be rescinded in the course of the  contractual appeals process. Based on our historical loss experience and the fact that many of these loans are covered by  credit enhancement, we expect the actual credit losses  experienced by us should we fail to collect on these repurchase  requests would also be less than the UPB of the loans. We may  also enter into agreements with seller/servicers to resolve claims for repurchases. The amounts we receive under any such  agreements may be less than the losses we ultimately incur. Our credit losses may increase to the extent our seller/servicers do  not fully perform their repurchase obligations  Enforcing  repurchase obligations of seller/servicers who have the  financial capacity to perform those obligations could also  negatively impact our relationships with such customers and ability to retain market share

We also have exposure to seller/servicers with respect to  mortgage insurance  When a mortgage insurer rescinds coverage,  the seller/se vicer generally is in breach of representations  and warranties made to us when we purchased the affected  mortgage  Consequently, we may require the seller/servicer to repurchase the mortgage or to indemnify us for additional loss  The volume of rescissions of claims under mortgage insurance remains high.

If a servicer is unable to fulfill its repurchase or other  responsibilities, we may seek to recover the amounts that such  servicer owes us, such as by attempting to sell the applicable  mortgage servicing rights to a different servicer and applying  the proceeds to such owed amounts, or by contracting the servicing responsibilities to a different servicer and retaining  the net servicing fee  The ongoing weakness in the housing  market has negatively affected the market for mortgage servicing  rights, which increases the risk that we may be unable to sell  such rights or may not receive a sufficient price for them  Increased industry consolidation, bankruptcies of mortgage  bankers or bank failures may also make it more difficult for us to sell such rights, because there may not be sufficient  capacity in the market, particularly in the event of multiple  failures. This option may be difficult to accomplish with  respect to our larger seller/servicers, as it may be difficult  to transfer a large servicing portfolio  The financial stress on servicers and increased costs of servicing may lead to strategic  defaults (*i.e.*, defaults done deliberately as a financial  strategy, and not involuntarily) by servicers, which would also  require us to seek a successor servicer

<div align="center">47</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our seller/servicers have a significant role in servicing loans in our single family credit guarantee portfolio, which includes an active role in our loss mitigation efforts Therefore, a decline in their performance could impact the overall quality of our credit performance, which could adversely affect our financial condition or results of operations and have significant impacts on our ability to mitigate credit losses The risk of such a decline in performance remains high as servicers continue to face challenges in building capacity to process the large volumes of problem loans and as weak economic conditions continue to affect the liquidity and financial condition of many of our seller/servicers, including some of our largest seller/servicers Any efforts we take to attempt to improve our servicers' performance could adversely affect our relationships with such servicers, many of which also sell loans to us.

The inability to realize the anticipated benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases or default rates and severity that exceed our current projections could cause our losses to be significantly higher than those currently estimated

Our seller/servicers also have a significant role in servicing loans in our multifamily mortgage portfolio We are exposed to the risk that multifamily seller/servicers could come under financial pressure due to the current stressful economic environment, which could potentially cause degradation in the quality of servicing they provide or, in certain cases, reduce the likelihood that we could recover losses through lender repurchases or through recourse agreements or other credit enhancements, where applicable

See "MD&A   RISK MANAGEMENT   Credit Risk   *Institutional Credit Risk   Mortgage Seller/Servicers*" for additional information on our institutional credit risk related to our mortgage seller/servicers

### Our financial condition or results of operations may be adversely affected by the financial distress of our counterparties to derivatives, funding and other transactions.

We use derivatives for several purposes, including to rebalance our funding mix in order to more closely match changes in the interest rate characteristics of our mortgage related assets and to hedge forecasted issuances of debt The relative concentration of our derivative exposure among our primary derivative counterparties remains high This concentration increased in the last several years due to industry consolidation and the failure of certain counterparties, and could further increase One of our derivative counterparties accounted for greater than 0% of our net uncollateralized exposure, excluding commitments, at December 3 , 20 0 For a further discussion of our derivative counterparty exposure, see "MD&A   RISK MANAGEMENT   Credit Risk   *Institutional Credit Risk   Derivative Counterparties"* and "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS."

Some of our derivative and other capital markets counterparties have experienced various degrees of financial distress in the past few years, including liquidity constraints, credit downgrades and bankruptcy. Our financial condition and results of operations may be adversely affected by the financial distress of these derivative and other capital markets counterparties to the extent that they fail to meet their obligations to us For example, we may incur losses if collateral held by us cannot be liquidated at prices that are sufficient to recover the full amount of the loan or derivative exposure due us

In addition, our ability to engage in routine derivatives, funding and other transactions could be adversely affected by the actions of other financial institutions. Financial services institutions are interrelated as a result of trading, clearing, counterparty or other relationships As a result, defaults by, or even rumors or questions about, one or more financial services institutions, or the financial services industry generally, could lead to market wide disruptions in which it may be difficult for us to find acceptable counterparties for such transactions.

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. Thus, if our access to the derivative markets were disrupted, it may become more difficult or expensive to fund our business activities and achieve the funding mix we desire, which could adversely affect our business and results of operations.

### Our credit and other losses could increase if our mortgage or bond insurers become insolvent or fail to perform their obligations to us.

We are exposed to risk relating to the potential insolvency or non performance of mortgage insurers that insure single family mortgages we purchase or guarantee and bond insurers that insure bonds we hold as investment securities on our consolidated balance sheets The weakened financial condition and liquidity position of these counterparties increases the risk that these entities will fail to reimburse us for claims under insurance policies This risk could increase if home prices deteriorate further or if the economy worsens

As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. Thus, if any of our mortgage insurers that provide credit enhancement fails to fulfill its obligation, we could experience increased credit losses In addition, if a regulator determined that a mortgage insurer lacked sufficient capital to pay all claims when due, the regulator could take action that might impact the timing and amount of claim payments made to us. We independently assess the financial condition, including the claims paying resources, of

Source   D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0691

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

each of our mortgage insurers  Based on our analysis of the  financial condition of a mortgage insurer and pursuant to our  eligibility requirements for mortgage insurers, we could take  action against a mortgage insurer intended to protect our  interests that may impact the timing and amount of claims payments received from that insurer

In the event one or more of our bond insurers were to become  insolvent, it is likely that we would not collect all of our  claims from the affected insurer, and it would impact our ability to recover certain unrealized losses on our investments  in non agency mo tgage related securities  We expect to receive substantially  less than full payment of our claims from Financial Guaranty  Insurance Company, or FGIC, and Ambac Assurance Corporation, or  Ambac, due to adverse developments concerning these companies  We believe that, in addition to FGIC and Ambac, some of our other bond insurers lack sufficient ability to fully meet all of  their expected lifetime claims paying obligations to us as such  claims emerge  For more information on the developments  concerning FGIC and Ambac, see "MD&A     RISK MANAGEMENT     Credit Risk Institutional Credit Risk    Bond Insurers."

***If mortgage insurers were to further tighten their standards or  fall out of compliance with regulatory capital requirements, the  volume of high LTV ratio mortgages available for us to purchase  could be reduced, which could negatively affect our business and  make it more difficult for us to meet our affordable housing  goals. Mortgage insurance standards could constrain our ability  to increase our purchases of high LTV loans in the future,  should we want to do so.***

Our charter requires that single family mortgages with LTV  ratios above 80% at the time of purchase be covered by specified  credit enhancements or participation interests  Our purchases of  mortgages with LTV ratios above 80% (other than relief refinance  mortgages) have declined in recent years, in part because  mortgage insurers tightened their eligibility requirements  with  respect to the issuance of insurance on new mortgages with higher  LTV ratios  Recently, mortgage insurers have loosened some of  these requirements  However, if mortgage insurers  further restrict their eligibility requirements for high LTV ratio  loans, or if we are no longer willing or able to obtain  mortgage insurance from these counterparties, and we are not able  to avail ourselves of suitable alternative methods of  obtaining credit enhancement for these loans, we may be further  restricted in our ability to purchase or securitize loans with  LTV ratios over 80% at the time of purchase

If a mortgage insurance company were to fall out of compliance  with regulatory capital requirements and not obtain appropriate  waivers, it could become subject to regulatory actions that  restrict its ability to write new business in certain, or in  some cases all, states  At least one of our mortgage insurers has fallen out of compliance with regulatory capital  requirements, and others may do so in the future.

A mortgage insurer may attempt a corporate restructuring  designed to enable it to continue to write new business through  a new entity in the event the insurer falls out of compliance  with regulatory capital requirements  Several insurers have  completed such a restructuring  However, there can be no assurance that an insurer would be able to effect  such a  restructuring in the future, as the restructured entity would be  required to satisfy regulatory requirements as well as our own  conditions  These restructuring plans generally involve  contributing capital to a subsidiary or affiliate. This could result in less liquidity available to the  mortgage insurer to  pay claims on its existing book of business,  and an increased  risk that the mortgage insurer would not pay its claims in full  in the future

Where mortgage insurance or another charter acceptable credit  enhancement is not available, it may be more difficult for us to  purchase high LTV ratio (above 80%) loans that refinance  mortgages into more affordable loans  The unavailability of  suitable credit enhancement could also negatively impact our ability to pursue new business opportunities  relating to high  LTV ratio and other higher risk loans, should  we seek, or be directed, to pursue such business opportunities. This could also  impact our ability to meet our affordable housing goals, as  purchases of loans with high LTV ratios can contribute to our  performance under those goals

***The loss of business volume from key lenders could result in a  decline in our market share and revenues.***

Our business depends on our ability to acquire a steady flow of  mortgage loans  We purchase a significant percentage of our  single family mortgages from several large mortgage originators  During 2010 and 2009, approximately 78% and 74%, respectively,  of our guaranteed mortgage securities issuances originated from  purchase volume associated with our ten largest customers  During 20 0, three mortgage lenders (Wells Fargo Bank, N.A.,  Bank of America, N.A. and Chase Home Finance LLC) each accounted  for more than 10% of our  single family mortgage purchase volume and collectively accounted for approximately 50% of our  single family mortgage  purchase volume. Similarly, we acquire a significant portion of our multifamily mortgage loans from several large  lenders  We enter into mortgage purchase volume commitments  with many of our single family customers that provide for the  customers to deliver to us a specified dollar amount of mortgages  during a  specified period of time  Some commitments may also provide for  the lender to deliver to us a minimum percentage of their total  sales of conforming loans. There is a risk that we will not be  able to enter into a new commitment with a key customer that  will maintain mortgage purchase volume following the expiration  of the existing commitment  Since 2007, the mortgage industry  has consolidated significantly and a smaller number of large  lenders originate most single family mortgages  The

<div align="center">49</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loss of business from any one of our major lenders could adversely affect our market share and our revenues. Many of our seller/servicers also have tightened their lending criteria in recent years, which has reduced their loan volume, thus reducing the volume of loans available for us to purchase.

### Ongoing weak business and economic conditions in the U.S. and abroad may adversely affect our business and results of operations.

Our business and results of operations are significantly affected by general business and economic conditions, including conditions in the international markets for our investments or our mortgage related and debt securities  These conditions include employment rates, fluctuations in both debt and equity capital markets, the value of the U.S. dollar as compared to foreign currencies, the strength of the U S financial markets and national economy and the local economies in which we conduct business, and the economies of other countries that purchase our mortgage related and debt securities  There is significant uncertainty regarding the strength of the U S economic recovery  While the financial markets appear to have stabilized, there can be no assurance that this will continue  If the U S economy remains weak, we could experience continued high serious delinquencies and credit losses, which will adversely affect our results of operations and financial condition.

The mortgage credit markets have experienced very difficult conditions and volatility since 2007. This has resulted in a decrease in availability of corporate credit and liquidity within the mortgage industry, causing disruptions to normal operations of major mortgage originators, including some of our largest customers, and contributed to the insolvency, closure or acquisition of a number of major financial institutions. These conditions also resulted in significant volatility, wide credit spreads and a lack of price transparency and could contribute to further consolidation within the financial services industry. We continue to be subject to adverse effects on our financial condition and results of operations due to our activities involving securities, mortgages, derivatives and other mortgage commitments with our customers

### Competition from banking and non banking companies may harm our business.

Competition in the secondary mortgage market combined with a decline in the amount of residential mortgage debt outstanding may make it more difficult for us to purchase mortgages  Furthermore, competitive pricing pressures may make our products less attractive in the market and negatively impact our financial results  Increased competition from Fannie Mae and Ginnie Mae may alter our product mix, lower volumes and reduce revenues on new business  FHFA is also Conservator of Fannie Mae, our primary competitor, and FHFA's actions as Conservator of both companies could affect competition between us and Fannie Mae  Efforts we may make to increase the profitability of new single family guarantee business, such as by tightening credit standards or raising guarantee fees, could cause our market share to decrease and the volume of our s ng e-family guarantee business to decline  Historically, we also competed with other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. While many of these institutions have ceased or substantially reduced their activities in the secondary market since 2008, it is possible that these institutions will reenter the secondary market.

### Our business may be adversely affected by limited availability of financing and increased funding costs.

The amount, type and cost of our funding, including financing from other financial institutions and the capital markets, directly impacts our interest expense and results of operations  A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally, including:

- termination of, or future restrictions or other adverse changes with respect to, government support programs that may benefit us;

- reduced demand for our debt securities; and

- competition for debt funding from other debt issuers

Our ability to obtain funding in the public debt markets or by pledging mortgage related securities as collateral to other financial institutions could cease or change rapidly, and the cost of available funding could increase significantly due to changes in market confidence and other factors  For example, in the fall of 2008, we experienced significant deterioration in our access to the unsecured medium and long term debt markets, and were forced to rely on short term debt to fund our purchases of mortgage assets and refinance maturing debt and to rely on derivatives to synthetically create the substantive economic equivalent of various debt funding structures.

We follow certain liquidity management practices and procedures  However, in the event we were unable to obtain funding from the public debt markets, there can be no assurance that such practices and procedures would provide us with sufficient liquidity to meet ongoing cash obligations for an extended period

Since 2008, the ratings on the non agency mortgage related securities we hold backed by Alt A, subprime and option ARM loans have decreased, limiting their availability as a significant source of liquidity for us through sales or use as

<div align="center">50</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

collateral in secured lending transactions  In addition, adverse market conditions have negatively impacted our ability to enter into secured lending transactions using agency securities as collateral  These trends are likely to continue in the future

### Government Support

Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and our debt funding costs. Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The cost of our debt funding could increase if debt investors believe that the risk that we could be placed into receivership is increasing. In addition, under the Purchase Agreement, without the prior consent of Treasury, we may not increase our total indebtedness above a specified limit or become liable for any subordinated indebtedness

We do not currently have a liquidity backstop available to us (other than draws from Treasury under the Purchase Agreement and Treasury's ability to purchase up to $2.25 billion of our obligations under its permanent statutory authority) if we are unable to obtain funding from issuances of debt or other conventional sources  At present, we are not able to predict the likelihood that a liquidity backstop will be needed, or to identify the alternative sources of liquidity that might be available to us if needed, other than from Treasury as referenced above

### Demand for Debt Funding

The willingness of domestic and foreign investors to purchase and hold our debt securities can be influenced by many factors, including changes in the world economy, changes in foreign currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments  If investors were to divest their holdings or reduce their purchases of our debt securities, our funding costs could increase  The willingness of investors to purchase or hold our debt securities, and any changes to such willingness, may materially affect our liquidity, our business and results of operations

### Competition for Debt Funding

We compete for low cost debt funding with Fannie Mae, the FHLBs and other institutions  Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments  Increased competition for low cost debt funding may result in a higher cost to finance our business, which could negatively affect our financial results  An inability to issue debt securities at attractive rates in amounts sufficient to fund our business activities and meet our obligations could have an adverse effect on our liquidity, financial condition and results of operations  See "MD&A   LIQUIDITY AND CAPITAL RESOURCES   Liquidity    *Other Debt Securities*" for a description of our debt issuance programs.

Our funding costs may also be affected by changes in the amount of, and demand for, debt issued by Treasury.

### Line of Credit

We maintain a secured intraday line of credit to provide additional intraday liquidity to fund our activities through the Fedwire system. This line of credit requires us to post collateral to a third party. In certain circumstances, this secured counterparty may be able to repledge the collateral underlying our financing without our consent. In addition, because the secured intraday line of credit is uncommitted, we may not be able to continue to draw on it if and when needed

**Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single family guarantee business.**

Our PCs are an integral part of our mortgage purchase program  We purchase many mortgages by issuing PCs in exchange for them in guarantor swap transactions. We also issue PCs backed by mortgage loans that we purchased for cash  Our competitiveness in purchasing single family mortgages from our seller/servicers, and thus the volume and profitability of new single family business, can be directly affected by the relative price performance of our PCs and comparable Fannie Mae securities  Increasing demand for our PCs helps support the price performance of our PCs, which in turn helps us compete with Fannie Mae and others in purchasing mortgages

Our PCs typically trade at a discount to comparable Fannie Mae securities, which creates an incentive for customers to conduct a disproportionate share of their guarantor business with Fannie Mae. Various factors, including market conditions and the relative rates at which the underlying mortgages prepay, affect the price performance of our PCs  While we employ a variety of strategies to support the price performance of our PCs, any such strategies may fail or adversely affect our business  For example, we may attempt to compensate customers for the difference in price between our PCs and comparable

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0694

Table of Contents

Fannie Mae securities by reducing guarantee fees  However, this  could adversely affect the profitability of our single family  guarantee business

We may be unable to maintain a liquid and deep market for our  PCs, which could also adversely affect the price performance of  PCs. A significant reduction in the volume of mortgage loans  that we securitize could reduce the liquidity of our PCs

### A reduction in the credit ratings for our debt could adversely  affect our liquidity.

Nationally recognized statistical rating organizations play an  important role in determining, by means of the ratings they  assign to issuers and their debt, the availability and cost of debt  funding  We currently receive ratings from three nationally  recognized statistical rating organizations for our unsecured  borrowings  Our credit ratings are important to our liquidity  Actions by governmental entities or others, including changes in  government support for us, additional GAAP losses, additional  draws under the Purchase Agreement, a reduction in the credit  ratings of or outlook on the U.S. Government, and other factors  could adversely affect the credit ratings on our debt  A reduction  in our credit ratings could adversely affect our liquidity,  competitive position, or the supply or cost of debt financing  available to us  A reduction in our credit ratings could also trigger  additional collateral requirements under our  derivatives contracts  A significant increase in our borrowing  costs could cause us to sustain additional GAAP losses or impair  our liquidity by requiring us to seek other sources of  financing, which may be difficult to obtain.

### Mortgage fraud could result in significant financial losses and harm to  our reputation.

We rely on representations and warranties by seller/servicers  about the characteristics of the single family mortgage loans we  purchase and securitize, and we do not independently verify most  of the information that is provided to us before we purchase the  loan  This exposes us to the risk that one or more of the  parties involved in a transaction (such as the borrower, seller,  broker, appraiser, title agent, loan officer, lender or servicer)  will engage in fraud by misrepresenting facts about a  mortgage loan or a borrower  While we subsequently review a  sample of these loans to determine if such loans are in compliance  with our contractual standards, there can be no  assurance that this would detect or deter mortgage fraud, or  otherwise reduce our exposure to the risk of fraud  We are also  exposed to fraud by third parties in the mortgage servicing  function, particularly with respect to sales of REO properties and  other dispositions of non  performing assets. We may experience significant financial losses and reputational damage as a result of such fraud.

### The value of mortgage related securities guaranteed by us and held  as investments may decline if we were unable to perform under  our guarantee or if investor confidence in our ability to  perform under our guarantee were to diminish.

A portion of our investments in mortgage related securities are  securities guaranteed by us  Our valuation of these securities  is consistent with GAAP and the legal structure of the guarantee  transaction, which includes the Freddie Mac assets transferred  to the securitization trusts that serve as collateral for the mortgage  related securities issued by the trusts ( i.e.: (a) multifamily  PCs; (b) REMICs and Other Structured  Securities; and (c) certain Other Guarantee Transactions). The valuation of our  guaranteed mortgage securities necessarily  reflects investor confidence in our ability to perform under our  guarantee and the liquidity that our guarantee provides  If we  were unable to perform under our guarantee or if investor  confidence in our ability to perform under our guarantee were to  diminish, the value of our guaranteed securities may decline,  thereby reducing the value of the securities reported on our  consolidated balance sheets, which could have an adverse affect  on our financial condition and results of operations. This could  also adversely affect our ability to sell or otherwise use these  securities for liquidity purposes.

### Changes in interest rates could negatively impact our results of  operations, stockholders' equity (deficit) and fair value of net assets.

Our investment activities and credit guarantee activities expose  us to interest rate and other market risks. Changes in interest  rates, up or down, could adversely affect our net interest yield  Although the yield we earn on our assets and our funding  costs tend to move in the same direction in response to changes  in interest rates, either can rise or fall faster than the  other, causing our net interest yield to expand or compress  For example, due to the timing of maturities or rate reset dates on  variable rate instruments, when interest rates rise, our funding  costs may rise faster than the yield we earn on our assets. This  rate change could cause our net interest yield to compress until  the effect of the increase is fully reflected in asset yields  Changes in the slope of the yield curve could also reduce our  net interest yield

Our GAAP results can be significantly affected by changes in  interest rates, and adverse changes in interest rates could  increase our GAAP net loss or deficit in total equity (deficit)  materially  For example, changes in interest rates affect the  fair value of our derivatives portfolio  Since we generally record  changes in fair values of our derivatives in current  income, such changes could significantly impact our GAAP results. While  derivatives are an important aspect of our  management of interest rate risk, they generally increase the  volatility of reported net income (loss), because, while fair value  changes in derivatives affect net income, fair value  changes in several of the types of assets and liabilities being  hedged do not affect net

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011　　TREASURY-0695　　Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

income  Additionally, increases in interest rates could increase other than temporary impairments on our investments in non agency mortgage related securities

Changes in interest rates may also affect prepayment assumptions, thus potentially impacting the fair value of our assets, including our investments in mortgage related assets  When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate  An increased likelihood of prepayment on the mortgages underlying our mortgage related securities may adversely impact the value of these securities

Interest rates can fluctuate for a number of reasons, including changes in the fiscal and monetary policies of the federal government and its agencies, such as the Federal Reserve  Federal Reserve policies directly and indirectly influence the yield on our interest earning assets and the cost of our interest bearing liabilities  The availability of derivative financial instruments (such as options and interest rate and foreign currency swaps) from acceptable counterparties of the types and in the quantities needed could also affect our ability to effectively manage the risks related to our investment funding  Our strategies and efforts to manage our exposures to these risks may not be effective. In particular, various factors, including uncertainty concerning trends in home prices, have made it more difficult for us to estimate future prepayments. This could make it more difficult for us to manage prepayment risk, and could cause our hedging related losses to increase. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" for a description of the types of market risks to which we are exposed and how we seek to manage those risks.

### Changes in OAS could materially impact our fair value of net assets and affect future results of operations and stockholders' equity (deficit).

OAS is an estimate of the yield spread between a given security and an agency debt yield curve. This includes consideration of potential variability in the security's cash flows resulting from any options embedded in the security, such as prepayment options  The OAS between the mortgage and agency debt sectors can significantly affect the fair value of our net assets. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in the fair value of net assets arising from net fluctuations in OAS during that period  We do not attempt to hedge or actively manage the impact of changes in mortgage to debt OAS

Changes in market conditions, including changes in interest rates, may cause fluctuations in OAS. A widening of the OAS on a given asset, which typically causes a decline in the current fair value of that asset, may cause significant mark to fair value losses, and may adversely affect our financial results and stockholders' equity (deficit), but may increase the number of attractive investment opportunities in mortgage loans and mortgage related securities  Conversely, a narrowing or tightening of the OAS typically causes an increase in the current fair value of that asset, but may reduce the number of attractive investment opportunities in mortgage loans and mortgage related securities  Consequently, a tightening of the OAS may adversely affect our future financial results and stockholders' equity (deficit)  See "MD&A     FAIR VALUE MEASUREMENTS AND ANALYSIS     Discussion of Fair Value Results" for a more detailed description of the impacts of changes in mortgage to debt OAS

While wider spreads might create favorable investment opportunities, we are limited in our ability to take advantage of any such opportunities because, under the Purchase Agreement and FHFA regulation, the UPB of our mortgage related investments portfolio is subject to a cap that declines by 10% per year beginning in 2010 until it reaches $250 billion. FHFA has stated its expectation in the Acting Director's February 2, 20 0 letter that any net additions to our mortgage related investments portfolio would be related to purchasing delinquent mortgages out of PC pools

### We could experience significant reputational harm, which could affect the future of our company, if our efforts under the MHA Program, and other initiatives to support the U.S. residential mortgage market do not succeed.

We are focused on the MHA Program and other initiatives to support the U S residential mortgage market  If these initiatives do not achieve their desired results, or are otherwise perceived to have failed to achieve their objectives, we may experience damage to our reputation, which may impact the extent of future government support for our business and government decisions with respect to the future status and role of Freddie Mac.

### Negative publicity causing damage to our reputation could adversely affect our business prospects, financial results or net worth.

Reputation risk, or the risk to our financial results and net worth from negative public opinion, is inherent in our business. Negative public opinion could adversely affect our ability to keep and attract customers or otherwise impair our customer relationships, adversely affect our ability to obtain financing, impede our ability to hire and retain qualified personnel, hinder our business prospects or adversely impact the trading price of our securities  Perceptions regarding the practices of our competitors, our seller/servicers or the financial services and mortgage industries as a whole, particularly as they relate to the current economic downturn, may also adversely impact our reputation  Adverse reputation impacts on third parties with whom we have important relationships may impair market confidence or investor confidence in our business

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0696                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

operations as well In addition, negative publicity could expose us to adverse legal and regulatory consequences, including greater regulatory scrutiny or adverse regulatory or legislative changes, and could affect what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist These adverse consequences could result from perceptions concerning our activities and role in addressing the mortgage market crisis, the concerns about deficiencies in foreclosure documentation practices or our actual or alleged action or failure to act in any number of areas, including corporate governance, regulatory compliance, financial reporting and disclosure, purchases of products perceived to be predatory, safeguarding or using nonpublic personal information, or from actions taken by government regulators in response to our actual or alleged conduct

***The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition.***

The MHA Program and other loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses However, there can be no assurance that any of our loss mitigation strategies will be successful and that credit losses will not continue to escalate To the extent that borrowers participate in HAMP in large numbers, it is likely that the costs we incur related to loan modifications and other activities under HAMP will be substantial because we will bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee, and all servicer and borrower incentive fees We will not be reimbursed for these costs by Treasury.

FHFA has directed us to implement HAMP for troubled mortgages we own or guarantee. It is possible that Treasury could make changes to HAMP that, to the extent we were required to or elected to implement them, could make the program more costly to us, both in terms of credit expenses and the cost of implementing and operating the program We could also be required or elect to make changes to our implementation of our other loss mitigation activities that could make these activities more costly to us For example, we could be required to, or elect to, use principal reduction to achieve reduced payments for borrowers. This could further increase our losses, as we could bear the full costs of such reductions.

In June 2010, Treasury announced an initiative under which servicers will be required to consider an alternative modification approach that includes a possible reduction of principal for loans with LTV ratios over 115%. Mortgage investors will receive incentives based on the amount of reduced principal. In October 2010, Treasury provided guidance with respect to applying this alternative for borrowers who have already received permanent modifications or are in trial plans Holders of mortgages and mortgage related securities are not required to agree to a reduction of principal, but servicers must have a process for considering the approach We do not currently have plans to apply these changes to mortgages that we own or guarantee However, it is possible that FHFA might direct us to implement some or all of these changes Our credit losses could increase to the extent we apply these changes

A significant number of loans are in the trial period of HAMP Although the ultimate completion rate remains uncertain, a large number of loans have failed to complete the trial period or qualify for any of our other loan modification and loss mitigation programs. It is possible that, in the future, additional loans will fail to complete the trial period or qualify for these other programs For these loans, HAMP will have effectively delayed the foreclosure process and could increase our losses, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier, due to continued home price declines These delays in foreclosure could also cause our REO operations expense to increase, perhaps substantially.

Our seller/servicers have a key role in the success of our loss mitigation activities The continued increases in seriously delinquent loan volume, the ongoing weak conditions of the mortgage market during 2009 and 2010, and the number and variety of additions and changes to HAMP have placed a strain on the loss mitigation resources of many of our seller/servicers This has also increased the operational complexity of the servicing function, as well as the risk that errors will occur. A decline in the performance of seller/servicers in mitigation efforts could result in missed opportunities for successful loan modifications, an increase in our credit losses and damage to our reputation

Mortgage modifications on the scale of HAMP, particularly any new focus on principal reductions, have the potential to change borrower behavior and mortgage underwriting. This, coupled with the phenomenon of widespread underwater mortgages, could significantly affect borrower attitudes towards homeownership, the commitment of borrowers to making their mortgage payments, the way the market values residential mortgage assets, the way in which we conduct business and, ultimately, our financial results.

Depending on the type of loss mitigation activities we pursue, those activities could result in accelerating or slowing prepayments on our PCs and REMICs and Other Structured Securities, either of which could negatively affect the pricing of such securities.

We are devoting significant internal resources to the implementation of the various initiatives under the MHA Program, which has, and will continue to, increase our expenses The size and scope of our effort under the MHA Program may also limit our ability to pursue other business opportunities or corporate initiatives

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011 Powered by Morningstar® Document Research℠

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

Table of Contents

***Our relationships with our customers could be harmed by our actions as the compliance agent under HAMP, which could negatively affect our ability to purchase loans from them in the future.***

We are the compliance agent for certain foreclosure avoidance activities under HAMP by mortgage holders other than Freddie Mac or Fannie Mae  In this role, we conduct examinations and review servicer compliance with the published requirements for the program  It is unclear how servicers will perceive our actions as compliance agent  It is possible that this could impair our relationships with our seller/servicers, which could negatively affect our ability to purchase loans from them in the future

***We may experience further write downs and losses relating to our assets, including our investment securities, net deferred tax assets, REO properties or mortgage loans, that could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

We experienced significant losses and write downs relating to certain of our assets during 2008, 2009, and 2010, including significant declines in market value, impairments of our investment securities, market based write downs of REO properties, losses on non performing loans purchased out of PC pools, and impairments on other assets. The fair value of our assets may be further adversely affected by continued weakness in the economy, further deterioration in the housing and financial markets, additional ratings downgrades or other events.

We increased our valuation allowance for our net deferred tax assets by $8.3 billion during 2010. The future status and role of Freddie Mac could be affected by actions of the Conservator, and legislative and regulatory action that alters the ownership, structure and mission of the company. The uncertainty of these developments could materially affect our operations, which could in turn affect our ability or intent to hold investments until the recovery of any temporary unrealized losses  If future events significantly alter our current outlook, a valuation allowance may need to be established for the remaining deferred tax asset

Due to the ongoing weaknesses in the economy and in the housing and financial markets, we may experience additional write downs and losses relating to our assets, including those that are currently AAA rated, and the fair values of our assets may continue to decline. This could adversely affect our results of operations, financial condition, liquidity and net worth.

We could also incur losses related to our REO properties due to the occurrence of a major natural or other disaster, such as hurricanes in Florida or earthquakes in California.

***There may not be an active, liquid trading market for our equity securities.***

Our common stock and classes of preferred stock that previously were listed and traded on the NYSE were delisted from the NYSE  effect ve July 8, 2010, and now trade on the OTC market.  The market price of our common stock declined significantly between June 16, 2010, the date we announced our intention to delist these securities, and July 8, 2010, the first day the common stock traded exclusively on the OTC market, and may decline further. Trading volumes on the OTC market have been, and will likely continue to be, less than those on the NYSE, which would make it more difficult for investors to execute transactions in our securities and could make the prices of our securities decline or be more volatile

**Operational Risks**

***We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process.***

In the fall of 20 0, several large seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. These announcements have raised various concerns relating to foreclosure practices  The integrity of the foreclosure process is critical to our business, and our financial results could be adversely affected by deficiencies in the conduct of that process.

A number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in certain states in which they do business while they evaluated and addressed these issues  A number of these companies continue to address these issues, and certain of these suspensions remain in effect  In addition, a group consisting of state attorneys general and state bank and mortgage regulators in all 50 states and the District of Columbia is reviewing foreclosure practices  Some seller/servicers have announced issues relating to the improper execution of the documents used in foreclosure proceedings  In November 20 0, we terminated the eligibility of one law firm to serve as counsel in foreclosures of Freddie Mac mortgages, due to issues with respect to the firm's foreclosure practices. That firm had been responsible for handling a significant number of foreclosures for our servicers in Florida  It is possible that additional deficiencies in foreclosure practices will be identified, including relating to the foregoing

These issues and the related foreclosure suspensions could prolong the foreclosure process regionally or nationwide and could delay sales of our REO properties  The deficiencies in the conduct of the foreclosure process potentially affect the validity of a number of actions that have already been taken, including foreclosure transfers through which we acquired some of our REO properties and sales of some of our REO properties  It will take time for seller/servicers to complete their

5 5

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                                         Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

evaluations of these issues and implement remedial actions  It is possible that different procedures will need to be developed  and implemented for individual states because of differences in  applicable state laws. In addition, a number of parties involved  in residential real estate transactions as well as various federal, state and local regulatory authorities, may need to  agree to any remedial actions, which could further complicate  and delay the process of resolving these issues  These parties  potentially include seller/servicers, Freddie Mac, Fannie Mae,  FHFA, state or local authorities, mortgage insurers and title insurance companies. In many cases, the remedial actions will  require court approval. It is possible that courts in different states, as well as individual courts within the same state, may  come to different conclusions with respect to what remedial  actions are acceptable

Any delays in the foreclosure process could cause properties  awaiting foreclosure to deteriorate until we acquire ownership  of them through foreclosure  Such deterioration would increase  our expenses to repair and maintain the properties when we do  acquire them  Delays in selling REO properties could cause our  REO operations expense for current REO properties to increase  because those properties will stay in REO status for a longer period of time, which would increase the ongoing costs we incur  to maintain or protect them  In addition, our disposition  losses, which are a component of REO operations expense, could  increase to the extent home prices decline during this period of  delay and the prices we ultimately receive for the REO properties are less than the prices we could have received had  we acquired and sold them earlier

Concerns about the impact of deficient foreclosure practices on  title to REO properties may create additional uncertainty among  mortgage investors and potential home buyers about future trends  in home prices  Over the long term, concerns about foreclosure  practices may adversely affect trends in home prices regionally  or nationally, which could also adversely affect our financial  results  These concerns could increase both the uncertainty about the results of our models and the risk of errors in the  implementation, operation or use of our models, in part because  greater management judgment will need to be applied

Any delays in the foreclosure process could also create  fluctuations in our single family credit statistics, including  our credit loss statistics and reported serious delinquency rates. Our realization of credit losses, which consists of REO  operations income (expense) plus charge offs, net, could be delayed because we record charge offs at the time we take  ownership of a property through foreclosure  Delays in the  foreclosure process could reduce the rate at which delinquent  loans proceed to foreclosure, which could cause a temporary  decline in our REO acquisitions and the rate of growth of our REO inventory  This could also temporarily increase the number  of seriously delinquent loans that remain in our single family mortgage portfolio, which could result in higher reported  serious delinquency rates and a larger number of non performing  loans than would otherwise have been the case

It also is possible that mortgage insurance claims could be  denied if delays caused by servicers' deficient foreclosure  practices prevent servicers from completing foreclosures within  required timelines defined by mortgage insurers

We have incurred, and will continue to incur, expenses related  to deficiencies in foreclosure documentation practices and the  costs of remediating them, which may be significant. These costs  will include expenses to remediate issues relating to practices  of certain legal counsel that will increase our expenses in future periods  We may also incur costs if we become involved in  litigation or investigations relating to these issues  While we believe that our seller/servicers would be in violation of their  servicing contracts with us to the extent that they improperly  executed documents in foreclosure or bankruptcy proceedings, as  such contracts require that foreclosure proceedings be conducted  in accordance with applicable law, it may be difficult, expensive, and time consuming for us to enforce our contractual  rights  Our efforts to enforce our contractual rights may negatively impact our relationships with these seller/servicers,  some of which are among our largest sources of mortgage loans

We expect that remedying the document execution issues affecting  the foreclosure process and related developments will likely  place further strain on the resources of our seller/servicers,  possibly including seller/servicers where such issues have not  been identified to date  This could negatively affect their ability to service loans in our single family mortgage portfolio  or the quality of service they provide to us  Since our seller/servicers have an active role in our loss mitigation  efforts, this could impact the overall quality of our credit  performance and our ability to mitigate credit losses

Delays in the foreclosure process may also adversely affect the  values of, and our losses on, the non agency mortgage related  securities we hold  Foreclosure delays may increase the administrative expenses of the securitization trusts for the  non agency mortgage related securities, thereby reducing the amount of funds available for distribution to investors. In  addition, the subordinate classes of securities issued by the securitization trusts will continue to receive interest payments  while the defaulted loans remain in the trusts, rather than  absorbing the default losses. This may reduce the amount of funds available for the senior tranches we own  The prospect of  losses due to these impacts could adversely affect the market  value of non agency mortgage related securities we own

It has been difficult for us to determine the potential scope of  these issues, in part because we must rely on our  seller/servicers for much of the pertinent information and these  companies have not yet completed their assessments of these

<div align="center">5 6</div>

<div align="right">*Freddie Mac*</div>

Powered by Morningstar ® Document Research ℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

issues. Our evaluation of these issues, as well as the evaluations made by the seller/servicers, is complicated by the fact that state law governs the foreclosure process and, thus, the laws and regulations of a large number of different states must be examined

### Issues related to mortgages recorded through MERS could delay or disrupt foreclosure activities and have an adverse effect on our business.

The Mortgage Electronic Registration System, or the MERS® System, is an electronic registry that is widely used by seller/servicers, Freddie Mac, and other participants in the mortgage finance industry, to maintain records of beneficial ownership of mortgages. The MERS System is maintained by MERSCORP, Inc., a privately held company, the shareholders of which include a number of organizations in the mortgage industry, including Freddie Mac, Fannie Mae, and certain seller/servicers, mortgage insurance companies and title insurance companies.

Mortgage Electronic Registration Systems, Inc , or MERS, a wholly owned subsidiary of MERSCORP, Inc., has the ability to serve as a nominee for the owner of a mortgage loan and in that role become the mortgagee of record for the loan in local land records Freddie Mac seller/servicers may choose to use MERS as a nominee, and to initiate foreclosures in MERS' name Approximately 39% of the loans Freddie Mac owns or guarantees are registered in MERS' name; the beneficial ownership and the ownership of the servicing rights related to those loans are tracked in the MERS System.

MERS has been the subject of numerous lawsuits challenging foreclosures on mortgages for which MERS is mortgagee of record as nominee for the beneficial owner It is possible that adverse judicial decisions, regulatory proceedings or action, or legislative action related to MERS, could delay or disrupt foreclosure of mortgages that are registered on the MERS System Publicity concerning regulatory or judicial decisions, even if such decisions were not adverse, or MERS related concerns about the integrity of the assignment process, could adversely affect the mortgage industry and negatively impact public confidence in the foreclosure process, which could lead to legislative or regulatory action Because MERS often executes legal documents in connection with foreclosure proceedings, it is possible that investigations by governmental authorities and others into deficiencies in foreclosure practices may negatively impact MERS and the MERS System.

Federal or state legislation or regulatory action also could prevent us from using the MERS System for mortgages that we currently own, guarantee, and securitize and for mortgages acquired in the future, or could create additional requirements for the transfer of mortgages that could affect the process for and costs of acquiring, transferring, servicing, and foreclosing mortgages Such legislation or regulatory action could increase our costs or otherwise adversely affect our business For example, we could be required to transfer mortgages out of the MERS System. There is also uncertainty regarding the extent to which seller/servicers will choose to use the MERS System in the future.

Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process could pose legal, operational and reputational risks for us.

We cannot predict the impact that such events or actions may have on our business.

### Weaknesses in internal control over financial reporting and in disclosure controls could result in errors and inadequate disclosures, affect operating results and cause investors to lose confidence in our reported results.

We face continuing challenges because of deficiencies in our controls Control deficiencies could result in errors, and lead to inadequate or untimely disclosures, affect operating results and cause investors to lose confidence in our reported financial results For information about our ineffective disclosure controls and remaining material weakness in internal control over financial reporting, see "CONTROLS AND PROCEDURES."

There are a number of factors that may impede our efforts to establish and maintain effective disclosure controls and internal control over financial reporting, including: the nature of the conservatorship and our relationship with FHFA; the complexity of, and significant changes in, our business activities and related GAAP requirements; significant management changes and internal reorganizations in 2010; uncertainty regarding the sustainability of newly established controls; data quality or servicing related issues; and the uncertain impacts of the ongoing housing and credit market volatility on the results of our models, which are used for financial accounting and reporting purposes We cannot be certain that our efforts to improve and maintain our internal control over financial reporting will ultimately be successful

Effectively designed and operated internal control over financial reporting provides only reasonable assurance that material errors in our financial statements will be prevented or detected on a timely basis A failure to maintain effective internal control over financial reporting increases the risk of a material error in our reported financial results and delay in our financial reporting timeline Depending on the nature of a control failure and any required remediation, ineffective controls could have a material adverse effect on our business

Ineffective controls could also cause investors to lose confidence in our reported financial information, which may have an adverse effect on the trading price of our securities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0700

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties.***

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. We face risk associated with our use of models  First, there is inherently some uncertainty associated with model results  Second, we could fail to properly implement, operate or use our models  Either of these situations could adversely affect our financial statements and our ability to manage risks.

We use market based information as inputs to our models. However, it can take time for data providers to prepare information, and thus the most recent market information may not be available for the preparation of our financial statements  When market conditions change quickly and in unforeseen ways, there is an increased risk that the inputs reflected in our models are not representative of current market conditions

The severe deterioration of the housing and credit markets beginning several years ago and, more recently, the extended period of economic weakness and uncertainty has increased the risks associated with our use of models. Our models may not perform as well in situations for which there are few or no recent historical precedents  We have adjusted our models in response to recent events, but there remains some uncertainty about model results

Models are inherently imperfect predictors of actual results  Our models rely on various assumptions that may be incorrect, including that historical experience can be used to predict future results  It has been more difficult to predict the behaviors of the housing and credit capital markets and market participants over the past several years, due to, among other factors: (a) the uncertainty concerning trends in home prices; (b) the lack of historical evidence about the behavior of deeply underwater borrowers, the effect of an extended period of extremely low interest rates on prepayments, and the impact of widespread loan modification programs, including the potential for the extensive use of principal reductions; and (c) the impact of the concerns about deficiencies in foreclosure documentation practices and related delays in the foreclosure process.

We face the risk that we could fail to implement, operate or use our models properly  For example, the assumptions underlying a model could be invalid, or we could apply a model to events or products outside the model's intended use  We may fail to code a model correctly, or we could use incorrect data. The complexity and interconnectivity of our models create additional risk regarding the accuracy of model output  While we have processes and controls in place designed to mitigate these risks, there can be no assurances that such processes and controls will be successful.

Management often needs to exercise judgment to interpret or adjust modeled results to take into account new information or changes in conditions. The dramatic changes in the housing and credit capital markets in recent years have required frequent adjustments to our models and the application of greater management judgment in the interpretation and adjustment of the results produced by our models. This further increases both the uncertainty about model results and the risk of errors in the implementation, operation or use of the models

We face the risk that the valuations, risk metrics, amortization results, loan loss reserve estimations and security impairment charges produced by our internal models may be different from actual results, which could adversely affect our business results, cash flows, fair value of net assets, business prospects and future financial results. Changes in, or replacements of, any of our models or in any of the assumptions, judgments or estimates used in the models may cause the results generated by the model to be materially different from those generated by the prior model  The different results could cause a revision of previously reported financial condition or results of operations, depending on when the change to the model, assumption, judgment or estimate is implemented. Any such changes may also cause difficulties in comparisons of the financial condition or results of operations of prior or future periods

Due to increased uncertainty about model results, we also face increased risk that we could make poor business decisions in areas where model results are an important factor, including loan purchases, management and guarantee fee pricing and asset and liability management  Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective  See "MD&A CRITICAL ACCOUNTING POLICIES AND ESTIMATES" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK   Interest Rate Risk and Other Market Risks" for more information on our use of models

***Changes in our accounting policies, as well as estimates we make, could materially affect how we report our financial condition or results of operations.***

Our accounting policies are fundamental to understanding our financial condition and results of operations  Certain of our accounting policies, as well as estimates we make, are "critical," as they are both important to the presentation of our financial condition and results of operations and they require management to make particularly difficult, complex or subjective judgments and estimates, often regarding matters that are inherently uncertain  Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-0701

Table of Contents

impact on our consolidated financial statements  For a  description of our critical accounting policies, see  "MD&A      CRITICAL ACCOUNTING POLICIES AND ESTIMATES."

From time to time, the FASB and the SEC change the financial accounting and reporting standards that govern the preparation  of our financial statements  These changes are beyond our  control, can be difficult to predict and could materially impact  how we report our financial condition and results of operations  We could be required to apply a new or revised standard retrospectively, which may result in the revision of prior period financial statements by material amounts. The  implementation of new or revised accounting standards could  result in material adverse effects to our stockholders' equity (deficit) and result in or contribute to the need for  additional draws under the Purchase Agreement

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for more information

***A failure in our operational systems or infrastructure, or those  of third parties, could impair our liquidity, disrupt our  business, damage our reputation and cause losses.***

Shortcomings or failures in our internal processes, people or  systems could lead to impairment of our liquidity, financial  loss, errors in our financial statements, disruption of our  business, liability to customers, further legislative or  regulatory intervention or reputational damage  We experienced a number of operational problems in 20  0 related to inadequately  designed or improperly executed systems  Servicing and loss mitigation processes are currently under considerable stress,  which increases the risk that we may experience further  operational problems in the future  Corporate reorganizations, inability to retain key staff members, and our efforts to reduce  administrative expenses may increase the stress on existing processes

Our business is highly dependent on our ability to process a  large number of transactions on a daily basis and manage  and  analyze significant amounts of information, much of which is  provided by third parties. The transactions we process are  complex and are subject to various legal, accounting and  regulatory standards. The types of transactions we process and  the standards relating to those transactions can change rapidly in response to external events, such as the implementation of  government mandated programs and changes in market conditions Our financial, accounting, data processing or other operating  systems and facilities may fail to operate properly or become  disabled, adversely affecting our ability to process these  transactions. The information provided by third parties may be  incorrect, or we may fail to properly manage or analyze it  Our core systems and technical architecture include many legacy  systems and applications that lack scalability and flexibility, which increases the risk of system failure. The inability of our  systems to accommodate an increasing volume of transactions or  new types of transactions or products could constrain our  ability to pursue new business initiatives  We are investing  considerable resources in a long term project to improve our existing systems infrastructure. There can be no assurance that  we will be able to complete this project successfully, or that it will reduce our operational risk  In the past, we have had  difficulty in conducting similar large scale infrastructure  improvement projects

Our employees could act improperly for their own gain and cause  unexpected losses or reputational damage  While we have  processes and systems in place to prevent and detect fraud,  there can be no assurance that such processes and systems will  be successful.

We also face the risk of operational failure or termination of  any of the clearing agents, exchanges, clearinghouses or other  financial intermediaries we use to facilitate our securities and  derivatives transactions. Any such failure or termination could  adversely affect our ability to effect transactions, service our customers and manage our exposure to risk

Most of our key business activities are conducted in our  principal offices located in McLean, Virginia  Despite the  contingency plans and facilities we have in place, our ability to conduct business may be adversely impacted by a disruption in  the infrastructure that supports our business and the communities in which we are located  Potential disruptions may  include those involving electrical, communications, transportation or other services we use or that are provided to  us. If a disruption occurs and our employees are unable to  occupy our offices or communicate with or travel to other  locations, our ability to service and interact with our  customers or counterparties may suffer and we may not be able to successfully implement contingency plans that depend on  communication or travel

We are exposed to the risk that a catastrophic event, such as a  terrorist event or natural disaster, could result in a  significant business disruption and an inability to process  transactions through normal business processes. Any measures we  take to mitigate this risk may not be sufficient to respond to  the full range of catastrophic events that may occur

***We may not be able to protect the confidentiality of our  information.***

Our operations rely on the secure processing, storage and  transmission of confidential and other information in our  computer systems and networks. Our computer systems, software  and networks may be vulnerable to unauthorized access, computer  viruses or other malicious code and other events that could have  a security impact. If one or more of such events occur, this  potentially could jeopardize confidential and other information, including nonpublic personal information and

59                                                            *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

sensitive business data, processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our operations or the operations of our customers or counterparties, which could result in significant losses or reputational damage  We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured.

***We rely on third parties for certain important functions, including some that are critical to financial reporting, our mortgage-related investment activity and mortgage loan underwriting. Any failures by those vendors could disrupt our business operations.***

We outsource certain key functions to external parties, including: (a) processing functions for trade capture, market risk management analytics, and financial instrument valuation; (b) custody and recordkeeping for our mortgage related investments; (c) processing functions for mortgage loan underwriting and servicing; and (d) certain services we provide to Treasury in our role as program compliance agent under HAMP  We may enter into other key outsourcing relationships in the future  If one or more of these key external parties were not able to perform their functions for a period of time, at an acceptable service level, or for increased volumes, our business operations could be constrained, disrupted or otherwise negatively impacted  Our use of vendors also exposes us to the risk of a loss of intellectual property or of confidential information or other harm  We may also be exposed to reputational harm, to the extent vendors do not conduct their activities under appropriate ethical standards. Financial or operational difficulties of an outside vendor could also hurt our operations if those difficulties interfere with the vendor's ability to provide services to us

***Our risk management efforts may not effectively mitigate the risks we seek to manage.***

We could incur substantial losses and our business operations could be disrupted if we are unable to effectively identify, manage, monitor and mitigate operational risks, interest rate and other market risks and credit risks related to our business  Our risk management policies, procedures and techniques may not be sufficient to mitigate the risks we have identified or to appropriately identify additional risks to which we are subject  See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "MD&A   RISK MANAGEMENT" for a discussion of our approach to managing the risks we face.

## Legal and Regulatory Risks

***The Dodd Frank Act and related regulation may adversely affect our business activities and financial results.***

The Dodd Frank Wall Street Reform and Consumer Protection Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry and could affect us in substantial and unforeseeable ways and have an adverse effect on our business, results of operations, financial condition, liquidity and net worth  For example, the Dodd Frank Act and related future regulatory changes could impact the value of assets that we hold, require us to change certain of our business practices, impose significant additional costs on us, limit the products we offer, require us to increase our regulatory capital, or make it more difficult for us to retain and recruit management and other valuable employees  We will also face a more complicated regulatory environment due to the Dodd Frank Act and related future regulatory changes, which will increase compliance costs and could divert management attention or other resources  The Dodd Frank Act and related future regulatory changes will also significantly affect many aspects of the financial services industry and potentially change the business practices of our customers and counterparties; it is possible that any such changes could adversely affect our business and financial results.

Implementation of the Dodd Frank Act is being accomplished through numerous rulemakings, many of which are expected to be finalized in 2011  The final effects of the legislation will not be known with certainty until these rulemakings are complete  The Dodd Frank Act also mandates the preparation of studies of a wide range of issues, which could lead to additional legislative or regulatory changes  It could be difficult for us to comply with any future regulatory changes in a timely manner, due to the potential scope and number of such changes, which could limit our operations and expose us to liability

The long term impact of the Dodd Frank Act and related future regulatory changes on our business and the financial services industry will depend on a number of factors that are difficult to predict, including our ability to successfully implement any changes to our business, changes in consumer behavior and our competitors' and customers' responses to the Dodd Frank Act and related future regulatory changes

Examples of aspects of the Dodd Frank Act that may significantly affect us include the following:

- The new Financial Stability Oversight Council could designate Freddie Mac as a non bank financial company to be subject to supervision and regulation by the Federal Reserve  If this occurs, the Federal Reserve will have authority to examine Freddie Mac and we may be required to meet more stringent prudential standards than those applicable to

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

other non bank financial companies. New prudential standards  potentially could include capital requirements that are based on  standards applicable to insured depository institutions

- The Dodd Frank Act will have a significant impact on the  derivatives market, including by subjecting large derivatives  users, which may include Freddie Mac, to extensive new oversight  and regulation  These new regulatory standards could impose  significant additional costs on us relating to derivatives  transactions and it may become more difficult for us to enter  into desired hedging transactions with acceptable counterparties  on favorable terms

- The Dodd Frank Act will create new standards and requirements  related to asset backed securities, including requiring  securitizers and potentially originators to retain a portion of  the underlying loans' credit risk. Any such new standards and  requirements could weaken or remove incentives for financial  institutions to sell mortgage loans to us

- The Dodd Frank Act and related future regulatory changes could  negatively impact the volume of mortgage originations, and thus  adversely affect the number of mortgages available for us to  purchase.

- Under the Dodd Frank Act, new minimum mortgage underwriting  standards will be required for residential mortgages, including  a requirement that lenders make a reasonable and good faith  determination based on "verified and documented  information" that the consumer has a "reasonable ability to  repay" the mortgage  The Act requires regulators to establish a  class of qualified loans that will rece ve certain protections  from legal liability, such as the borrower's right to rescind  the loan and seek damages  Mortgage originators and assignees,  including Freddie Mac, may  be subject to increased legal risk  for loans that do not meet  these requirements

- Under the Dodd Frank Act, federal regulators, including FHFA,  are directed to promulgate regulations, to be applicable to  financial institutions, including Freddie Mac, that will  prohibit incentive based compensation structures that the  regulators determine encourage inappropriate risks by providing  excessive compensation or benefits or that could lead to  material financial loss. It is possible that any such  regulations will have an adverse effect on our ability to retain  and recruit management and other valuable employees, as we may  be at a competitive disadvantage as compared to other potential  employers not subject to these or similar regulations

For more information on the Dodd Frank Act, see "BUSINESS       Regulation and Supervision       *Legislative and Regulatory Developments*."

### Legislative or regulatory actions could adversely affect our business  activities and financial results.

In addition to possible GSE reform legislation and the Dodd  Frank Act discussed above, our business initiatives may be  directly adversely affected by other legislative and regulatory  actions at the federal, state and local levels  We could be  negatively affected by legislation or regulatory action that  changes the foreclosure process of any individual state  For  example, various states and local jurisdictions have implemented  mediation programs designed to bring servicers and borrowers  together to negotiate workout options  These actions could delay  the foreclosure process and increase our expenses, including by  potentially delaying the final resolution of delinquent mortgage  loans and the disposition of non performing assets  We could  also be affected by any legislative or regulatory changes to  existing bankruptcy laws or proceedings or foreclosure  processes, including any changes that would allow bankruptcy  judges to unilaterally change the terms of mortgage loans or  otherwise require principal reductions. Our business could also  be adversely affected by any modification, reduction or repeal  of the federal income tax deductibility of mortgage interest  payments.

Legislation or regulatory actions could indirectly adversely  affect us to the extent such legislation or actions affect the  activities of banks, savings institutions, insurance companies,  securities dealers and other regulated entities that constitute  a significant part of our customer base or counterparties, or  could indirectly affect us to the extent that they modify  industry practices  Legislative or regulatory provisions that  create or remove incentives for these entities to sell mortgage  loans to us, purchase our securities or enter into derivatives  or other transactions with us could have a material adverse  effect on our business results and financial condition.

The Basel Committee on Banking Supervision is in the process of  substantially revising capital guidelines for financial  institutions and has recently finalized portions of the so  called "Basel III" guidelines, which would set  new capital and  liquidity requirements for banks. Phase in of Basel III is  expected to take several years and there is  significant  uncertainty about how regulators might implement  these  guidelines or how the resulting regulations might impact us  For  example, it is possible that any new regulations on the  capital  treatment of mortgage servicing rights, risk based capital  requirements for credit risk, and liquidity treatment of  our  debt and guarantee obligations could adversely affect our  business results and financial condition.

### We may make certain changes to our business in an attempt to meet the  housing goals and subgoals set for us by FHFA that may increase our  losses.

We may make adjustments to our mortgage loan sourcing and  purchase strategies in an effort to meet our housing goals and  subgoals, including changes to our underwriting guidelines and  the expanded use of targeted initiatives to reach

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0704                                   Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underserved populations  For example, we may purchase loans that  offer lower expected returns on our investment and increase our  exposure to credit losses  Doing so could cause us to forgo  other purchase opportunities that we would expect to be more  profitable  If our current efforts to meet the goals and subgoals prove to be insufficient, we may need to take  additional steps that could further increase our losses  FHFA has not yet published a final rule with respect to our duty to  serve underserved markets  However, it is possible that we could  also make changes to our business in the future in response to this duty  If we do not meet our housing goals or duty to serve  requirements, and FHFA finds that the goals or requirements were feasible, we may become subject to a housing plan that could  require us to take additional steps that could have an adverse effect on our results of operations and financial condition

***We are involved in legal proceedings, governmental investigations and  IRS examinations that could result in the payment of substantial damages or otherwise harm our business.***

We are a party to various legal actions, including litigation in  the U.S. Tax Court as result of a dispute of certain tax matters  with the IRS related to our 1998 through 2005 federal income tax  returns. We are also subject to investigations by the SEC and the U S  Attorney's Office for the Eastern District of Virginia  In addition, certain of our current and former directors, officers and employees are involved in legal  proceedings for which they may be entitled to reimbursement by  us for costs and expenses of the proceedings  The defense of  these or any future claims or proceedings could divert  management's attention and resources from the needs of the  business  We may be required to establish reserves and to make substantial payments in the event of adverse judgments or  settlements of any such claims, investigations, proceedings or  examinations  Any legal proceeding, governmental investigation  or examination issue, even if resolved in our favor, could  result in negative publicity or cause us to incur significant legal and other expenses  Furthermore, developments in,  outcomes  of, impacts of, and costs, expenses, settlements and judgments related to these legal proceedings and governmental  investigations and examinations may differ from our expectations  and exceed any amounts for which we have reserved or require  adjustments to such reserves  We are also cooperating with other  investigations, such as the review being conducted by state attorneys general and state bank and mortgage regulators into  foreclosure practices  These proceedings could divert management's attention or other resources  See "LEGAL PROCEEDINGS" for information about our pending legal  proceedings and "NOTE 14: INCOME TAXES" for information about our litigation with the IRS relating to  potential additional income taxes and penalties for the 1998 to 2005 tax years and other tax  related matters

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None

## ITEM 2. PROPERTIES

Our principal offices consist of five office buildings in  McLean, Virginia  We own four of the office buildings, comprising approximately 1 3 million square feet  We occupy the fifth building, comprising approximately 200,000 square  feet, under a lease from a third party.

## ITEM 3. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings  arising from time to time in the ordinary course of business  See "NOTE 21: LEGAL CONTINGENCIES" for more  information regarding our involvement as a party to various  legal proceedings

## ITEM 4. RESERVED

62                                                                *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED
STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock, par value $0.00 per share, trades in the OTC market and is quoted on the OTC Bulletin Board under the ticker symbol "FMCC." As of February 11, 2011, there were 649,182,461 shares of our common stock outstanding.

On July 8, 2010, our common stock and 20 previously listed classes of preferred securities were delisted from the NYSE  We delisted such securities pursuant to a directive by the Conservator  The classes of preferred stock that were previously listed on the NYSE also now trade in the OTC market.

Table 7 sets forth the high and low prices of our common stock on the NYSE and the high and low bid information for our common stock on the OTC Bulletin Board for the indicated periods  The OTC Bulletin Board quotations reflect inter dealer prices, without retail mark up, mark down, or commission and may not necessarily represent actual transactions.

**Table 7    Quarterly Common Stock Information**

| | High | Low |
|---|---|---|
| **2010 Quarter Ended** | | |
| Decembe  31(1) | $ 0 50 | $0 29 |
| Sep embe  30(2 | 0 44 | 0 24 |
| J  e 30(3 | 1 68 | 0 40 |
| Ma c  31(3 | 1 52 | 1 12 |
| **2009 Quarter Ended(3)** | | |
| Decembe  31 | $1 86 | $1 02 |
| Sep embe  30 | 2 50 | 0 54 |
| J  e 30 | 1 05 | 0 53 |
| Ma ch 31 | 1 50 | 0 35 |

(1) Based on b d  nfo ma on fo ou  common s ock on  he OTC B  e n Boa d
(2) Based on  he p  ces of ou  common s ock on  he NYSE p  o  o July 8, 2010 and b d  nfo ma on fo  ou  common s ock on   e OTC B  e  Boa d o  a  daf e  J  y 8, 2010
(3) Based on  he p  ces of ou  co     on s ock on  he NYSE

**Holders**

As of February 11, 2011, we had 2,153 common stockholders of record

**Dividends and Dividend Restrictions**

We did not pay any cash dividends on our common stock during 2010 or 2009

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to the Conservatorship*

As Conservator, FHFA announced on September 7, 2008 that we would not pay any dividends on Freddie Mac's common stock or on any series of Freddie Mac's preferred stock (other than the senior preferred stock). FHFA has instructed our Board of Directors that it should consult with and obtain the approval of FHFA before taking actions involving dividends

*Restrictions Under the Purchase Agreement*

The Purchase Agreement prohibits us and any of our subsidiaries from declaring or paying any dividends on Freddie Mac equity securities (other than the senior preferred stock) without the prior written consent of Treasury.

*Restrictions Under the GSE Act*

Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet applicable capital requirements  Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition. If FHFA classifies us as undercapitalized, we are not permitted to make a capital distribution that would result in our being reclassified as significantly undercapitalized or critically undercapitalized  If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment; the Director may approve a capital distribution only if the Director determines that the distribution will enhance the ability of the company to meet required capital levels promptly, will contribute to the long term financial safety and soundness of the company or is otherwise in the public interest  Our capital requirements have been suspended during conservatorship

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0706

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Restrictions Under our Charter

Without regard to our capital classification, we must obtain prior written approval of FHFA to make any capital distribution that would decrease total capital to an amount less than the risk based capital level or that would decrease core capital to an amount less than the minimum capital level  As noted above, our capital requirements have been suspended during conservatorship.

### Restrictions Relating to Subordinated Debt

During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock. Our qualifying subordinated debt provides for the deferral of the payment of interest for up to five years if either: (a) our core capital is below 125% of our critical capital requirement; or (b) our core capital is below our statutory minimum capital requirement, and the Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 306(c) of our charter to purchase our debt obligations  FHFA has directed us to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable  As noted above, our capital requirements have been suspended during conservatorship

### Restrictions Relating to Preferred Stock

Payment of dividends on our common stock is also subject to the prior payment of dividends on our 24 series of preferred stock and one series of senior preferred stock, representing an aggregate of 464,170,000 shares and 1,000,000 shares, respectively, outstanding as of December 3 , 20 0  Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is subject to the prior payment of dividends on the senior preferred stock  On December 31, 2010, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of the Conservator  We did not declare or pay dividends on any other series of preferred stock outstanding in 2010.

### Recent Sales of Unregistered Securities

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms

No stock options were exercised during the three months ended December 31, 2010  However, restrictions lapsed on 23,137 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information

### Issuer Purchases of Equity Securities

We did not repurchase any of our common or preferred stock during the three months ended December 3 , 20 0  Additionally, we do not currently have any outstanding authorizations to repurchase common or preferred stock  Under the Purchase Agreement, we cannot repurchase our common or preferred stock without Treasury's prior consent, and we may only purchase or redeem the senior preferred stock in certain limited circumstances set forth in the Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock

### Transfer Agent and Registrar

Computershare Trust Company, N.A.
P O  Box 43078
Providence, RI 02940 3078
Telephone: 781 575 2879
http://www computershare com/investors

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0707

Table of Contents

## ITEM 6. SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the year ended December 3 , 20 0

| | At or for the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2007 | 2006 |
| | (dollars in millions, except share-related amounts) | | | | |
| **Statements of Operat ons Data** | | | | | |
| Ne n e es ncome | $ 16,856 | $ 17,073 | $ 6,796 | $ 3,099 | $ 3,412 |
| P ov s on fo c ed losses | (17,218) | (29,530) | (16,432) | (2,854) | (296) |
| Non-n e es ncome (loss) | (11,588) | (2,732) | (29,175) | (275) | 1,679 |
| Non-n e es expense | (2,932) | (7,195) | (5,753) | (5,959) | (2,513) |
| Ne ncome ( oss) a bu ab e o F edd e Mac | (14,025) | (21,553) | (50,119) | (3,094) | 2,327 |
| Ne ncome (loss) a bu able o common s ockholde s | (19,774) | (25,658) | (50,795) | (3,503) | 2,051 |
| Ea n ngs (loss) pe common sha e | | | | | |
| Bas c | (6 09) | (7 89) | (34 60) | (5 37) | 3 01 |
| D u ed | (6 09) | (7 89) | (34 60) | (5 37) | 3 00 |
| Cash d v dends pe common sha e | | | 0 50 | 1 75 | 1 91 |
| We gh ed ave age common sha es ou s and ng ( n o sa ds)[2] | | | | | |
| Bas c | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 | 680,856 |
| D u ed | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 | 682,664 |
| **Balance Sheets Data** | | | | | |
| Mo gage loans held-fo - nves men , a amo zed cos by consol da ed us (ne of allowance fo loan losses) | $ 1,646,172 | $ | $ | $ | $ |
| To a asse s | 2,261,780 | 841,784 | 850,963 | 794,368 | 804,910 |
| Deb secu es of conso da ed us s ed by d pa es | 1,528,648 | | | | |
| O he deb | 713,940 | 780,604 | 843,021 | 738,557 | 744,341 |
| A o he ab es | 19,593 | 56,808 | 38,576 | 28,906 | 33,139 |
| To al F edd e Mac s ockholde s' equ y (def c ) | (401) | 4,278 | (30,731) | 26,724 | 26,914 |
| **Port olio Balances[3** | | | | | |
| Mo gage-ela ed nves men s po fol o | $ 696,874 | $ 755,272 | $ 804,762 | $ 720,813 | $ 703,959 |
| To al F edd e Mac Mo gage-Rela ed Secu es[ | 1,712,918 | 1,854,813 | 1,807,553 | 1,701,207 | 1,470,481 |
| o a mo gage por o o[ | 2,164,859 | 2,250,539 | 2,207,476 | 2,102,676 | 1,826,720 |
| Non-pe fo m ng asse s[6] | 125,405 | 104,984 | 46,620 | 16,119 | 7,761 |
| **Ra ios** | | | | | |
| Re o ave age asse s[7], [12] | (0 6)% | (2 5)% | (6 1)% | (0 4)% | 0 3% |
| Non-pe fo m ng asse s ra o[8] | 6 4 | 5 2 | 2 4 | 0 9 | 0 5 |
| Re u n on common eq ty[9] [12] | N/A | N/A | N/A | (21 0) | 9 8 |
| D v dend payou o common s ock[10] | N/A | N/A | N/A | N/A | 63 9 |
| Eq ty to assets ra o[11], [12] | (0 2) | (1 6) | (0 2) | 3 4 | 3 3 |

(1)  See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" a d "NOTE 2 CHANGE IN ACCOUNTING PRINCIPLES" fo mo e nfo ma on ega d ng ou accoun ng po c es and adjus en s ade o p ev ous y epo ed esu s due o changes n accoun ng p nc ples

(2)  Inc udes he we gh ed ave age nu be of sha es du ng 2008, 2009 and 2010 ha a assoc a ed w h he wa an fo ou common s ock ss ed o T eas y as pa of he Pu chase Ag ee en Th s wa a s c ded bas c ea gs pe s a e, beca se s uncond onally exe c sable by he holde a a cos of $0 00001 pe s a e

(3)  Rep esen s he UPB and exc udes o gage oans and o gage- e a ed secu es aded, bu no ye sed Effec ve n Dece be 2007, we es ab shed us s fo t e adm n s on of cash er ances ece ved ela ed o he de y g assets of ou PCs a d REMICs a d O he St c ed Sec t es s ed As a es t, afte 2006, we epo o balance of ou mo gage po fol o o effec he pub c y-ava ab e secu y ba ances of F edd e Mac mo gage- ela ed secu es Fo 2006, we epo hese ba ances based on he UPB of he unde y ng mo gage oans We ef ec ed h s change as an ncrease n he UPB of ou mo gage- e a ed nves men s po fo o by $2 8 b on a Decembe 31, 2007

(4)  See "Tab e 34 F edd e Mac Mo gage-Re a ed Secu es" fo he compos on of h s l ne em

(5)  See "Table 16 Segmen Mo gage Po fol o Compos on" fo he compos on of ou o al mo gage por o o

(6)  See "Table 54 Non-Pe fo m ng Asse s" fo a desc p on of ou non-pe fo m ng asse s

(7)  Ra o compu ed as ne ncome ( oss) a bu ab e o F edd e Mac d v ded by he s mple ave age of he beg nn ng and end ng ba ances of o a asse s

(8)  Ra o compu ed as non-pe fo m ng asse s d v ded by he end ng UPB of ou o al mo gage po fol o, exclud ng non-F edd e Mac mo gage- ela ed secu es

(9)  Ra o compu ed as ne ncome (loss) a bu able o common s ockholde s d v ded by he s mple ave age of he beg nn ng and end ng balances of o al F edd e Mac s ockho de s' equ y (def c ), ne of p efe ed s ock (a edempt on va ue) Ra o s no p esen ed fo pe ods n wh ch he s mp e ave age of he beg nn ng and end ng ba ances of o a F edd e Mac s ockho de s' equ y (def c ) s ess han ze o

(10)  Ra o compu ed as common s ock d v dends dec a ed d v ded by ne ncome (loss) a bu able o common s ockholde s Ra o s no p esen ed fo pe ods n wh ch he ncome (loss) a bu able o common s ockholde s was a loss

(11)  Ra o compu ed as he s mple ave age of he beg nn ng and end ng ba ances of o a F edd e Mac s ockho de s' equ y (def c ) d v ded by he s mple ave age of he beg nn ng and end ng ba ances of o a asse s

(12)  To calcula e he s mple ave ages fo 2010, he beg nn ng ba ances of o a asse s, o a F edd e Mac s ockho de s' eq y, e of p efe ed s ock (a ede p o va ue), and o a F edd e Mac s ock o de s' equ y as of Jan a y 1, 2010 ba a ces c ded "NOTE 2 CHANGE IN ACCOUNTING PRINCIPLES Tab e 2 1 Impac of he Change n Accoun ng fo T ansfe s of F nanc al Asse s and Consol da on of Va able In e es En es on Ou Conso da ed Ba ance Shee " so ha bo h he beg nn ng and end ng ba ances ef ec changes n accoun ng p nc ples

65

*Freddie Mac*

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with "BUSINESS     Executive Summary" and our consolidated financial statements and related notes for the year ended December 31, 2010.*

### MORTGAGE MARKET AND ECONOMIC CONDITIONS, AND OUTLOOK

**Mortgage Market and Economic Conditions**

*Overview*

Mortgage and credit market conditions remained weak in 2010 due  primarily to a continued weak labor market  The pace of economic recovery increased slightly in the fourth quarter of 2010, with  the U.S. gross domestic product rising by 3.2% on an  annualized basis during the period, compared to 2.6% during the  third quarter of 2010, according to the Bureau of Economic  Analysis advance estimate. Unemployment was 9 4% in December 2010, down slightly compared to 9.9% at December 2009, based on  data from the U.S. Bureau of Labor Statistics.

Table 8 provides important indicators for the U.S.  residential mortgage market

**Table 8     Mortgage Market Indicators**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| Home sa e un s ( n  o  sa  ds)(1 | 5,229 | 5,531 | 5,398 |
| Home p  ce dep ec a  on(2 | (4 1)% | (2 4)% | (11 9)% |
| S ng e-fam  y o  g na  ons ( n b   ons)(3 | $ 1,570 | $ 1,815 | $ 1,500 |
| Ad us able- a e mo  gage sha e( | 10% | 7% | 13% |
| Ref nance sha e( | 73% | 68% | 50% |
| U S s ng e-fam  y mo  gage deb  ou s and ng ( n b   ons)6 | $10,612 | $10,861 | $11,072 |
| U S  mul  fam  y mo  gage deb  ou s and ng ( n b   ons)6 | $  847 | $  851 | $  841 |

(1) I c  des sa es of  ew a d ex s  g o es    e U S So  ce  Na  onal Assoc a  on of Real o s news  elease da ed Janua y 20, 2011 (sa es of ex s  ng ho  es) and U S Ce  s s B  ea   ews  elease da ed Ja   a y 26, 2011 (sa es of  ew homes)

(2) Ca cu a ed  n e na  y us ng es  ma es of changes  n s ng e-fam  y home p  ces by s a e, wh ch a e we gh ed us ng  he p ope  y values unde ly ng ou  s ng e-fam  y c ed  gua an ee po  fol o o ob an a na  onal  ndex  The dep ec a  on  a e fo  each yea  p esen ed  nco po a es p ope  y value  nfo ma  on on  oa  s p  c ased by bo   F edd e  Mac a d Fa   e Mae   o g  Decembe  31, 2010 and  he pe cen age change  w  be based o  ev s on based on  ew econ pu chase  nfo ma  on  O he  nd ces of  ho  e p  ces   ay have d ffe en  esu  s, as  hey a e de e m ned us ng d ffe en pools of mo  gage loans and ca cu a ed unde  d ffe en conven  ons han ou  own

(3) Sou ce  Ins de Mo  gage F nance es  ma es of o  g na  ons of s ng e-fam  y f s -and second   ens da ed Janua y 28, 2011

(4) Ad us able- a e mo  gage sha e of  he dolla  amoun  of  o al mo  gage appl ca  ons  Sou ce Mo  gage Banke s Assoc a  on's Mo  gage Appl ca  ons Su vey  Da a  eflec  annua  ave age of week y f gu es

(5) Ref nance sha e of  he numbe  of conven  onal mo  gage appl ca  ons  Sou ce Mo  gage Banke s Assoc a  on's Mo  gage App  ca  ons Su vey  Da a ef ec  annua  ave age of week y f gu es

(6) So  ce  Fede a  Rese ve F ow of F   ds Acco   s of  e U  ed S a es da ed Dece  be  9, 2010  T e o s and ng a  o s fo  2010 p esen ed above  eflec  balances as of Sep e  be  30, 2010, wh ch  s  he la es  nfo ma  on ava lable

**Single-Family Housing Market**

We believe the level of home sales in the U S  is a significant driver of the direction of home prices. Within the industry, existing home sales are important for assessing the rate at  which the mortgage market might absorb the inventory of listed,  but unsold, homes in the U.S. (including listed REO properties), while we believe new home sales can be an indicator of other  economic trends, such as the potential for growth in total U.S. mortgage debt outstanding  We believe that the end of the federal homebuyer tax credit program in April 20  0 contributed to a decline in home sales mid year, and the market slowly improved in the fourth quarter  New home sales fell 31 9% in May  2010 to a seasonally adjusted annual rate of 282,000, reflecting the fourth lowest level since the U.S. Census Bureau's  series began in 1963  New home sales recovered modestly in the second half of 2010, but ended the year at an annual rate of  329,000 in December  Because existing home sales are reported at  closing, typically a month or more after the contract is signed,  the full effect of the expiration of the federal homebuyer tax  credit program was not felt until July 2010, when existing home sales decreased by 27 0%, as compared to June 2010 sales  Sales  of existing homes rose 37 5% over the remainder of 20  0, to an annual rate of 5 3 million in December

We estimate that home prices decreased 4  % nationwide during 2010, as a slight increase in home prices during the first half of  2010 was more than offset by a decrease in home prices during  the second half of 2010, including a 1 4% decrease in the fourth  quarter of 2010  These estimates are based on our own index of  our single family credit guarantee portfolio  Other indices of  home prices may have different results, as they are determined using different pools of mortgage loans and calculated under  different conventions than our own  We believe home prices in the first half of the year were positively impacted by the  availability of the federal homebuyer tax credit, as well as  strong home sales in the spring and summer months of 2010, which  is consistent with historical trends.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-0709          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Serious delinquency rates on single family loans declined during 2010, but remain at historically high levels for all major product types. The MBA reported in its National Delinquency Survey that delinquency rates on all single family loans in their survey dipped to 8.6% as of December 31, 2010, down from the record 9 7% at year end 2009 Residential loan performance was generally better in areas with lower unemployment rates and where property prices have fallen slightly or not declined at all in the last two years In its survey, the MBA presents delinquency rates both for mortgages it classifies as subprime and for mortgages it classifies as prime conventional The delinquency rates of subprime mortgages are markedly higher than those of prime conventional loan products in the MBA survey; however, the delinquency experience in prime conventional mortgage loans during the last two years has been significantly worse than in any year since the 1930s.

Based on data from the Federal Reserve's Flow of Funds Accounts, there was a sustained and significant increase in single family mortgage debt outstanding from 2001 to 2006. This increase in mortgage debt was driven by increasing sales of new and existing single family homes during this same period. As reported by FHFA in its Conservator's Report on the Enterprises' Financial Condition, dated August 26, 2010, the market share of mortgage backed securities issued by the GSEs and Ginnie Mae declined significantly from 2001 to 2006 while the market share of non GSE securities peaked Non traditional mortgage types, such as interest only, Alt A, and option ARMs, also increased in market share during these years, which we believe introduced greater risk into the market We believe these shifts in market activity, in part, help explain the significant differentiation in delinquency performance of securitized non GSE and GSE mortgage loans as discussed below

We estimate that we owned or guaranteed approximately one fourth of the outstanding single family mortgages in the U S at December 3 , 20 0 At December 3 , 20 0, we held or guaranteed approximately 462,000 seriously delinquent single family loans, representing approximately one tenth of the seriously delinquent single family mortgages in the market as of December 31, 2010 We estimate that loans backing non GSE securities comprised approximately one tenth of the seriously delinquent single family mortgages in the U S and represented approximately one fourth of the seriously delinquent single family mortgages at December 3 , 20 0 As of December 3 , 20 0, we held non GSE securities with a UPB of $158.4 billion as investments.

### Concerns Regarding Deficiencies in Foreclosure Documentation Practices

In the fall of 20 0, several large seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. These announcements raised various concerns relating to foreclosure practices A number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in certain states in which they do business while they evaluated and addressed these issues A number of these companies continue to address these issues, and certain of these suspensions remain in effect We temporarily suspended certain foreclosure proceedings, and certain REO sales and eviction proceedings for REO properties for certain servicers during the fourth quarter of 20 0 while we evaluated the impact of these issues We resumed REO sales in November 20 0

In November 20 0, we terminated the eligibility of one law firm to serve as counsel in foreclosures of Freddie Mac mortgages, due to issues with respect to the firm's foreclosure practices. That firm had been responsible for handling a significant number of foreclosures for our servicers in Florida

We expect that these issues and the related foreclosure suspensions could prolong the foreclosure process in many states and may delay sales of our REO properties

On October 13, 2010, FHFA made public a four point policy framework detailing FHFA's plan to address these issues, including guidance for consistent remediation of identified foreclosure process deficiencies, and directed Freddie Mac and Fannie Mae to implement this plan

We have incurred, and will continue to incur, expenses related to these deficiencies in foreclosure documentation practices and the costs of remediating them, which may be significant For more information regarding how these deficiencies in foreclosure documentation practices could impact our business, see "RISK FACTORS Operational Risks *Our expenses could increase and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" and "RISK MANAGEMENT Credit Risk *Institutional Credit Risk Mortgage Seller/Servicers.*" Throughout this Form 10 K, we generally refer to these matters as the concerns about foreclosure documentation practices

Issues have also been raised with respect to the MERS System For more information, see "RISK FACTORS Operational Risks *Issues related to mortgages recorded through MERS could delay or disrupt foreclosure activities and have an adverse effect on our business* ."

### Multifamily Housing Market

Major national multifamily market fundamentals improved during 2010 with several consecutive quarters' apartment statistics reflecting positive trends. Vacancy rates, which had climbed to record levels in early 2010, improved, and effective

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0710                         Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

rents, the principal source of income for property owners,  stabilized and began to increase on a national basis. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash  flows generated by the underlying property  These improving fundamentals helped to stabilize property values in a number of  markets. However, the multifamily market continues to be  negatively impacted by high unemployment and ongoing weakness in the  economy  Since 2008, most of our competitors, other than Fannie Mae and FHA, ceased their activities in the multifamily  mortgage business or severely curtailed these activities  relative to their previous levels  However, some market participants began to re enter the market on a limited basis in  20  0

### Outlook

Forward looking statements involve known and unknown risks and  uncertainties, some of which are beyond our control  These  statements are not historical facts, but rather represent our  expectations based on current information, plans, judgments,  assumptions, estimates, and projections  Actual results may differ significantly from those described in or implied by such  forward looking statements due to various factors and uncertainties  For example, a number of factors could cause the  actual performance of the housing and mortgage markets and the  U.S. economy during 2011 to be significantly worse than we  expect, including adverse changes in consumer confidence,  national or international economic conditions and changes in the  federal government's fiscal policies  See "BUSINESS      Forward Looking Statements" for  additional information

### Overview

As in the past, we expect key macroeconomic drivers of the  economy      such as income growth, unemployment rate, and inflation      will affect the performance of the housing and mortgage markets in 2011. With the federal government's fiscal policy supporting aggregate demand for goods and services and a monetary policy that provides low  interest rates and ample liquidity to capital markets, we  believe the economic recovery will continue and gradually  accelerate during 2011, with the second half of 2011 exhibiting  stronger fundamentals than the early part of the year

### Single-Family Market

Below are four features that we believe will influence the 20      housing and mortgage markets. The likelihood that any or all of  these features will occur depends on a variety of factors,  including the pace of the economic recovery

- *Mortgage rates*      By November 2010, fixed rate  mortgage rates had declined to their lowest level since the  early 1950s. This allowed for the continuation of the refinance  boom that began in 2009  If the federal funds rate remains under  0 5% for most of 2011, relatively low mortgage rates should be a  feature of the 20      mortgage market

- *Home prices*      We believe those local markets that have relatively large inventories of for sale homes and REO  dispositions will continue to see home price declines in 20      We also believe that while certain markets may experience modest  home price increases in 2011, home prices for the U.S. as a  whole are likely to be lower than in 20  0

- *Homebuyer affordability*      The three primary factors that affect buyer affordability are: (a) mortgage  rates; (b) home prices; and (c) income  We believe buyer  affordability is higher than the past several years. We believe  that many first time buyers will be attracted to the housing  market in 2011, which should translate into more home  sales in 2011 than in 2010 and a slight increase in mortgage  debt outstanding.

- *Lower mortgage origination volume*      More home sales in 2011 would generally result in increased purchase money  originations, and that is expected to be a feature of 2011's  mortgage market  However, refinance activity is expected to  decline during 20      as a result of at least three factors: (a)  many borrowers have refinanced over the past  year or are  currently in the midst of refinancing, and hence  will have  little need to do so again in 2011; (b) MHA's Home Affordable  Refinance Program is scheduled to expire on June 30, 2011, which  is expected to further dampen refinance volume during the second  half of 2011;  and (c) we expect interest rates will move up  during 2011, reducing the financial incentive to refinance for  those  borrowers who have not done so already  As a result, we  believe the anticipated decline in refinance originations should  offset  the potential increase in purchase money originations,  which  should lead to lower total mortgage lending volume in 20

### Multifamily Market

While major multifamily market fundamentals improved on a  national basis during 2010, certain local markets continue to  exhibit weak fundamentals  We expect that our multifamily non  performing assets may increase due to the continuation of  challenging economic conditions, particularly in certain  geographical areas  Improvements in loan performance have  historically lagged improvements in broader economic and market  trends during market recoveries  As a result, we may continue to  experience elevated credit losses in the first half of 20     , even  if market conditions continue to improve

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                               TREASURY-0711

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes  Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our more significant accounting policies  and estimates applied in determining our reported results of operations

### Change in Accounting Principles

As discussed in "BUSINESS    Executive Summary," our adoption of two new accounting standards that amended the guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs had a  significant impact on our consolidated financial statements and other financial disclosures beginning in the first quarter of 20 0

The cumulative effect of these changes in accounting principles  was a net decrease of $11 7 billion to total equity (deficit) as of January 1, 2010, which included changes to the opening balances of retained earnings (accumulated deficit) and AOCI. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Consolidation and Equity Method of Accounting," "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES," "NOTE 4: VARIABLE INTEREST ENTITIES," and "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information regarding these changes

As these changes in accounting principles were applied  prospectively, our results of operations for the year ended December 3 , 20 0 (on both a GAAP and Segment Earnings basis), which reflect the consolidation of trusts that issue our  single family PCs and certain Other Guarantee Transactions, are not directly comparable with the results of operations for the  years ended December 31, 2009 and 2008, which reflect the accounting policies in effect during that time (*i.e.*, when the majority of the securitization entities were accounted  for off balance sheet)

**Table 9    Summary Consolidated Statements of Operations    GAAP Results[1]**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | (in millions) | | |
| Net interest income | $ 16,856 | $ 17,073 | $ 6,796 |
| Provision for credit losses | (17,218) | (29,530) | (16,432) |
| Net interest income (loss) after provision for credit losses | (362) | (12,457) | (9,636) |
| Non-interest income (loss) | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (164) | | |
| Gains (losses) on retirement of other debt | (219) | (568) | 209 |
| Gains (losses) on debt recorded at fair value | 580 | (404) | 406 |
| Derivative gains (losses) | (8,085) | (1,900) | (14,954) |
| Impairment of available-for-sale securities (2) | | | |
| Total other-than-temporary impairment of available-for-sale securities | (1,778) | (23,125) | (17,682) |
| Portion of other-than-temporary impairment recognized in AOCI | (2,530) | 11,928 | |
| Net impairment of available-for-sale securities recognized in earnings | (4,308) | (11,197) | (17,682) |
| Other gains (losses) on investment securities recognized in earnings | (1,252) | 5,965 | 1,501 |
| Other income | 1,860 | 5,372 | 1,345 |
| Total non-interest income (loss) | (11,588) | (2,732) | (29,175) |
| Non-interest expense | | | |
| Administrative expenses | (1,546) | (1,651) | (1,505) |
| REO operations expense | (673) | (307) | (1,097) |
| Other expenses | (713) | (5,237) | (3,151) |
| Total non-interest expense | (2,932) | (7,195) | (5,753) |
| Loss before income tax benefit (expense) | (14,882) | (22,384) | (44,564) |
| Income tax benefit (expense) | 856 | 830 | (5,552) |
| Net loss | (14,026) | (21,554) | (50,116) |
| Less Net (income) loss attributable to noncontrolling interest | 1 | 1 | (3) |
| Net loss attributable to Freddie Mac | $ (14,025) | $ (21,553) | $ (50,119) |

(1) See "NOTE 2  CHANGE IN ACCOUNTING PRINCIPLES" fo  nfo ma on ega d ng accoun ng changes mpac ng he cu en pe od
(2) We adop ed an amendmen  o he accoun ng s anda ds fo   ves  e s  deb a d equ y secu  es effec ve Ap  1, 2009  See "NOTE 2  CHANGE IN ACCOUNTING PRINCIPLES    O e C anges n Acco n ng P nc ples" fo add onal nfo ma on ega d ng he mpac of h s amendmen

### Net Interest Income

Table 10 summarizes our net interest income and net interest yield and provides an attribution of changes in annual results to changes in interest rates or changes in volumes of our interest earning assets and interest bearing liabilities  Average balance sheet information is presented because we believe end of period balances are not representative of activity throughout the periods presented  For most components of the average balances, a daily weighted average balance was calculated for the period  When daily weighted average balance information was not available, a simple monthly average balance was calculated

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0712

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by or limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 10    Average Balance, Net Interest Income and Rate/Volume Analysis**

| | Year nded December 31, | | | | | | | | |
| | 2010 | | | 2009 | | | 2008 | | |
| | Average Balance( )(2) | nterest ncome (Expense ( ) | Average Rate | Average Balance( )(2) | nterest ncome (Expense ( ) | Average Rate | Average Balance( )(2) | nterest ncome (Expense ( ) | Average Rate |
| | | | | (dollars in millions) | | | | | |
| nterest-earn ng assets | | | | | | | | | |
| Cash and cash equiva ents | $ 8,803 | $ 77 | 0 16% | $ 55,76 | $ 193 | 0 35% | $ 29,311 | $ 618 | 2 11% |
| Federa funds so d and securities purchased under agreements to resell | 6,739 | 79 | 0 17 | 28,52 | 8 | 0 17 | 23,018 | 23 | 1 8 |
| Mortgage-re ated secur t es | | | | | | | | | |
| Mortgage-re ated secur es(3 | 526,7 8 | 25,366 | 82 | 675,167 | 32,563 | 82 | 661 756 | 3 ,263 | 5 18 |
| xt ngu shment of PCs he d by redd e Mac | (213, 11 | (11,182 | (5 2 | — | — | — | — | — | — |
| Tota mortgage-re ated secur t es, net | 313,337 | 1 ,18 | 53 | 675,167 | 32,563 | 82 | 661 756 | 3 ,263 | 5 18 |
| Non-mortgage-re ated secur t es(3 | 27,995 | 191 | 0 68 | 16, 71 | 727 | 2 | 19,757 | 80 | 07 |
| Mortgage oans he d by conso idated trusts(4 ( | 1,722,387 | 86,698 | 5 03 | — | — | — | — | — | — |
| Unsecur t zed mortgage oans(4 (6 | 206,116 | 8,727 | 23 | 127, 29 | 6,815 | 5 35 | 93 6 9 | 5,369 | 5 73 |
| Tota nterest earn ng assets | $ 2,365,377 | $ 109 956 | 65 | $ 903,355 | $ 0,3 6 | 7 | $ 827, 91 | $ 1, 77 | 5 01 |
| Interest bear ng l ab l t es | | | | | | | | | |
| Debt secur t es of conso dated trusts nc ud ng PCs he d by redd e Mac | $ 1,738,330 | $ (86,398 | ( 97 | $ — | | — | $ — | | — |
| xt ngu shment of PCs he d by redd e Mac | (213, 11 | 11,182 | 5 2 | | | | | | |
| Tota debt secur t es of conso dated trusts he d by th rd part es | 1,52 ,919 | (75,216 | ( 93 | — | | — | | | |
| Other debt | | | | | | | | | |
| Short-term debt | 219,65 | (552 | (0 25 | 287,259 | (2,23 | (0 78 | 2 ,569 | (6,800 | (2 78 |
| ong-term debt(7 | 5 3,306 | (16,363 | (3 01 | 557,18 | (19 916 | (3 57 | 561,261 | (26,532 | ( 73 |
| Tota other debt | 762 960 | (16,915 | (2 22 | 8 , 3 | (22,150 | (2 62 | 805,830 | (33,332 | ( 1 |
| Total nterest bear ng l ab l t es | 2,287,879 | (92,131 | ( 03 | 8 , 3 | (22,150 | (2 62 | 805,830 | (33,332 | ( 1 |
| ncome (expense) related to der vat ves(8 | | (969 | (0 0 | | (1,123 | (0 13 | | (1,3 9 | (0 17 |
| mpact of net non nterest bear ng fund ng | 77, 98 | | 0 13 | 58,912 | | 0 17 | 21,661 | | 0 12 |
| Tota fund ng of nterest earn ng assets | $ 2,365,377 | $ (93,100 | (3 9 | $ 903,355 | $ (23,273 | (2 58 | $ 827, 91 | $ (3 ,681 | ( 19 |
| Net nterest ncome y eld | | $ 16,856 | 0 71 | | $ 17,073 | 1 89 | | $ 6,796 | 0 82 |

| | 2010 vs. 2009 Variance Due to | | | 2009 vs. 2008 Variance Due to | | |
| | Rate(9) | Volume(9) | Total Change | Rate(9) | Volume(9) | Total Change |
| | | | (in millions) | | | |
| nterest-earn ng assets | | | | | | |
| Cash and cash equiva ents | $ (83 | $ (33 | $ (116 | $ (7 0 | $ 315 | $ ( 25 |
| Federa funds so d and securities purchased under agreements to resell | (1 | 32 | 31 | ( 57 | 82 | (375 |
| Mortgage-re ated secur t es | | | | | | |
| Mortgage-re ated secur t es(3 | (50 | (7,1 7 | (7,197 | (2,38 | 68 | (1,700 |
| xt ngu shment of PCs he d by redd e Mac | — | (11,182 | (11,182 | — | — | — |
| Tota mortgage-re ated secur t es, net | (50 | (18,329 | (18,379 | (2,38 | 68 | (1,700 |
| Non-mortgage-re ated secur t es(3 | (850 | 31 | (536 | 6 | (1 2 | (77 |
| Mortgage oans he d by conso dated trusts(4 ( | — | 86,698 | 86,698 | — | — | — |
| Unsecur t zed mortgage oans(4 (6 | (1,6 1 | 3,553 | 1,912 | (381 | 1,827 | 1, 6 |
| Tota nterest earn ng assets | $ (2,625 | $ 72,235 | $ 69,610 | $ (3,897 | $ 2,766 | $ (1,131 |
| Interest bear ng l ab l t es | | | | | | |
| Debt secur t es of conso dated trusts nc ud ng PCs he d by redd e Mac | $ — | $ (86,398 | $ (86,398 | $ — | $ — | $ — |
| xt ngu shment of PCs he d by redd e Mac | — | 11,182 | 11,182 | | | |
| Tota debt secur t es of conso dated trusts he d by th rd part es | — | (75,216 | (75,216 | | | |
| Other debt | | | | | | |
| Short-term debt | 1,2 8 | 3 | 1,682 | 5,587 | (1,021 | 566 |
| ong-term debt(7 | 3,068 | 85 | 3,553 | 6, 2 | 192 | 66 6 |
| Tota other debt | ,316 | 9 9 | 5,235 | 12,011 | (829 | 11,182 |
| Total nterest bear ng l ab l t es | ,316 | (7 ,297 | (69,981 | 12,011 | (829 | 11,182 |
| ncome (expense) related to der vat ves(8 | 15 | — | 15 | 226 | — | 226 |
| Tota fund ng of nterest earn ng assets | $ , 70 | $ (7 ,297 | $ (69,827 | $ 12,237 | $ (829 | $ 11, 08 |
| Net nterest ncome | $ 1,8 5 | $ (2,062 | $ (217 | $ 8,3 0 | $ 1,937 | $ 10,277 |

(1)  Excludes mo gage loans and mo gage- ela ed secu es aded,    t ot yet sett ed

(2)  We calcula e ave age balances based on he amo zed cos

(3)  In e es ncome (expense) ncludes acc e on of he po on of mpa men cha ges ecogn zed n ea n ngs expec ed o be ecove ed

(4)  Non-pe fo m ng loans, whe e n e es ncome s gene ally ecogn zed when collec ed, a e ncluded n ave age balances

(5)  Loan fees, p ma y cons s ng of de ve y fees, ncluded n n e es ncome fo mo gage loans held by consol da ed us s we e $127 m ll on, $0 m ll on, and $0 m ll on fo 2010, 2009 and 2008, espec ve y

(6)  Loan fees, p ma y cons s ng of del ve y fees and mul fam ly p epaymen fees, ncluded n unsecu zed mo gage oan n e es ncome we e $130 m ll on, $78 m ll on, a d $102 m ll on fo 2010, 2009 and 2008, espec ve y

(7)  Inc udes cu en po on of ong- e m deb

(8)  Rep esen s changes n fa va ue of de va ves n cash f ow hedge e a onsh ps ha we p ev ous y defe ed n AOCI and have been ec ass f ed o ea n ngs as he assoc a ed hedged fo ecas ed ssuance of deb affec s ea n ngs 2008 a so nc udes he accrual of pe od c cash se lemen s of all de va ves n qual fy ng hedge accoun ng ela onsh ps

(9)  Ra e and vo ume changes a e ca cu a ed on he nd v dual f nanc al s a emen l ne em level Comb ned a e volume changes we e a loca ed o he nd v dual a e and volume change based on he e a ve s ze

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, ebruary 24, 2011

TREASURY-0713

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 11 summarizes components of our net interest income

**Table 11     Net Interest Income(1)**

| | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
| | (in millions) | | |
|---|---|---|---|
| Con ac ua a oun s of ne e es ncome(2 | $ 17,684 | $ 18,907 | $  9,001 |
| Amo za on ncome (expense), et (3 | | | |
| Acc e on o mpa men s on ava ab e-fo -sa e secu es( | 392 | 1,180 | 551 |
| Asse - e a ed amo za on expense, ne | | | |
| Mo gage oans he d by conso da ed us s | (712) | | |
| Unsecu ed mo gage loans | 311 | 233 | 52 |
| Mo gage- ela ed secu es | (272) | (1,345) | (311) |
| O he asse s | 36 | 30 | |
| Asse - e a ed amo za on expense, ne | (637) | (1,082) | (259) |
| Deb - e a ed amo za on expense, ne | | | |
| Deb secu es of conso da ed us s | 1,152 | | |
| O he long- e m deb secu es | (766) | (809) | (1,148) |
| Deb - ela ed amo za on expense, ne | 386 | (809) | (1,148) |
| To al amo za on ncome (expense), ne | 141 | (711) | (856) |
| Expense e a ed o de va ves( | (969) | (1,123) | (1,349) |
| Ne n e es ncome | 16,856 | 17,073 | 6,796 |
| P ov s on fo c ed losses | (17,218) | (29,530) | (16,432) |
| Ne n e es ncome (loss) af e p ov s on fo c ed losses | $   (362) | $(12,457) | $ (9,636) |

(1) Ou p ospec ve adop on of he changes n accoun ng s anda ds ela ed o ansfe s of f nanc al asse s and consol da on of VIEs s gn f can ly mpac ed he p esen a on of ou f nanc al esu s fo 2010 a e o f ac a es s fo 2010 a e o. p ev ou ly compa ab e o ou f nanc al esul s fo 2009 and 2008  Fo mo e nfo ma on, see "NOTE 2  CHANGE IN ACCOUNTING PRINCIPLES "

(2) Inc udes he eve sa of n e es nco e acc ued, ne of n e es ece ved on a cash bas s ela ed o mo gage loans ha a e o -acc a as s

(3) Rep esen s amo za on e a ed o p em ums, d scoun s, defe ed fees a d o e adj s e s o ca y g va e o f nanc al ns umen s, and he eclass f ca on of p ev ous y defe ed balances f om AOCI fo ce a n de va ves n cash flow hedge e a onsh ps e a ed o nd v dua deb ssuances and mo gage pu chase ansac ons

(4) The po on of he mpa men cha ges ecogn zed n ea n ngs expec ed o be ecove ed s ecogn zed as ne n e es ncome  Upon ou adop on of an amendmen o he accoun ng s anda ds fo nves s deb a d eq y sec es o Ap  1, 2009, p ev ously ecogn zed non-c ed - ela ed o he - han- empo a y mpa men s a e no longe acc e d n o ne n e es ncome

(5) Rep esen s changes n fa value of de va ves n cash f ow hedge e a onsh ps ha we p ev ous y defe ed n AOCI and have been ec ass f ed o ea n ngs as he assoc a ed hedged fo ecas ed ssuance of deb affec s ea n ngs  2008 a so nc udes he acc ual of pe od c cash se lemen s of all de va ves n qual fy ng hedge accoun ng ela onsh ps

Our adoption of the change to the accounting standards for transfers of financial assets and consolidation of VIEs, as discussed above, had the following impact on net interest income and net interest yield for the year ended December 3 , 2010, and will have similar effects on those items in future periods:

• we now include in net interest income both: (a) the interest income earned on the assets held in our consolidated single family trusts, comprised primarily of mortgage loans, restricted cash and cash equivalents and investments in securities purchased under agreements to resell (the average balance of such assets was $1.7 trillion for the year ended December 3 , 20 0); and (b) the interest expense related to the debt in the form of PCs and Other Guarantee Transactions issued by consolidated trusts that are held by third parties (the average balance of such debt was $1 5 trillion for the year ended December 31, 2010)  Prior to January 1, 2010, we reflected the earnings impact of these securitization activities as management and guarantee income, recorded within non interest income on our consolidated statements of operations, and as interest income on single family PCs and on certain Other Guarantee Transactions held for investment; and

• we reverse accrued but uncollected interest income recognized in prior periods on non performing loans, where the collection of principal and interest is not reasonably assured, and do not recognize any further interest income associated with these loans upon their placement on non accrual status except when cash payments are received  Interest income that we did not recognize, which we refer to as forgone interest income, and reversals of previously recognized interest income, net of cash received, related to non performing loans was $4.7 billion during 2010, compared to $349 million during 2009 on loans held at December 31, 2010 and 2009, respectively  The increase in forgone interest income and the reversal of interest income reduced our net interest yield for the year ended December 31, 2010, compared to the years ended December 31, 2009 and 2008, respectively  Prior to consolidation of these trusts, we did not reverse interest income on non performing loans for loans held by the trusts, and the forgone interest income on non performing loans of the trusts did not reduce net interest income or net interest yield, since it was accounted for through a charge to provision for credit losses

See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information

Net interest income decreased by $217 million during the year ended December 3 , 20 0, compared to the year ended December 31, 2009, due to: (a) a decrease in the average balance of mortgage related securities; and (b) higher interest

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0714

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

expense on seriously delinquent mortgage loans  These factors  were partially offset by: (a) lower funding costs; and  (b) the inclusion of amounts previously classified as management and guarantee income  Net interest yield declined  substantially during 2010 because the net interest yield of the assets held in our consolidated single family trusts was lower  than the net interest yield of PCs previously included in net  interest income and our balance of non performing mortgage loans  increased

During the year ended December 31, 2010, spreads on our  debt and our access to the debt markets remained favorable  relative to historical levels  For more information, see  "LIQUIDITY AND CAPITAL RESOURCES       Liquidity."

Net interest income and net interest yield during 2010 and 2009  also benefited, compared to prior years, from the funds we  received from Treasury under the Purchase Agreement. These funds are reinvested and increase net interest income while the costs  of such funds are not reflected in interest expense, but instead  are reflected as dividends paid on senior preferred stock

Net interest income and net interest yield increased  significantly during 2009 compared to 2008 primarily due to a  decrease in funding costs as a result of the replacement of some  higher cost short  and long term debt with new lower cost debt;  and an increase in the average balance of our investments in mortgage loans and mortgage related securities, including an  increase in our holdings of fixed rate assets  These items were partially offset by the impact of declining short term interest  rates on floating rate mortgage related and non mortgage related  securities

## Provision for Credit Losses

We maintain loan loss reserves at levels we deem adequate to  absorb probable incurred losses on mortgage loans held for  investment and loans underlying our financial guarantees  Increases in our loan loss reserves are generally  reflected in earnings through the provision for credit losses  As discussed in "Net Interest Income," our provision  for credit losses in 2010 was positively impacted by the changes  in accounting standards for transfers of financial assets and  consolidation of VIEs effective January 1, 2010, since we  no longer account for forgone interest income on non performing loans within our provision for credit losses  See  "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for  further information

Since the beginning of 2008, on an aggregate basis, we recorded  provision for credit losses associated with single family loans  of approximately $62.3 billion, and recorded an additional  $4.7 billion in losses on loans purchased from our PCs, net  of recoveries  The majority of these losses are associated with  loans originated in 2005 through 2008  While loans we acquired  in 2005 through 2008 will give rise to additional credit losses that we have not yet provisioned for, we believe, as of  December 3 , 20 0, that we have reserved for or charged off  the majority of the total expected credit losses for these  loans. Nevertheless, various factors, such as continued high  unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our  current expectations  See "Table 3      Credit Statistics, Single Family Credit Guarantee Portfolio" for  certain quarterly credit statistics for our single family credit  guarantee portfolio

Our provision for credit losses decreased to $17.2 billion  in 2010, compared to $29.5 billion in 2009, due to a  substantial slow down in the rate of growth in non performing  single family loans  Loss severity rates on our single family  mortgage loans increased only slightly in 2010, whereas severity  rates increased steadily throughout the first half of 2009  before moderating in the second half during 2010  The adverse effect of a  slight increase in loss severity rates during 2010 was  partially offset by higher recoveries from mortgage insurers and  repurchases by seller/servicers  We also experienced an increase in the number of single family loans subject to individual  impairment resulting from an increase in modifications  considered TDRs during 2010.

During the second quarter of 2010, we identified a backlog  related to the processing of certain loan workout activities  reported to us by our servicers, principally loan modifications  and short sales. This backlog resulted in erroneous loan data  within our loan reporting systems, thereby impacting our  financial accounting and reporting systems. The resulting error  impacted our provision for credit losses, allowance for loan  losses, and provision for income taxes and affected our  previously reported financial statements for the interim period  ended March 31, 2010, the interim 2009 periods, and the full  year ended December 31, 2009  The cumulative effect of this  error was recorded as a correction in the second quarter of 2010, which included a $1.0 billion pre tax cumulative  effect of this error associated with the year ended December 31,  2009  For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES       Basis of Presentation      *Out of Period Accounting Adjustment.*"

Our provision for credit losses exceeded the level of our  charge offs, net, by $4.3 billion during 2010, primarily as  a result of a continued increase in our non performing single  family loans  While the quarterly amount of our provision  for credit losses declined for all four consecutive quarters in 2010, our quarterly amount of charge offs, net of  recoveries  remained elevated  We believe the level of our charge offs  will continue to increase in 2011 as more of our single family  non performing loans are resolved  As of December 3 , 20  0, and 2009, the UPB of our single family non performing loans  was $115.5 billion and $98.7 billion, respectively, and the  UPB of multifamily non performing loans was $2.9 billion and  $1.6 billion, respectively. Although still increasing, the rate of  growth in the UPB of our  non performing loans slowed substantially during 2010. See  "RISK MANAGEMENT      Credit Risk      *Mortgage Credit Risk*" for further information on

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0715

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our single family credit guarantee portfolio, including credit performance, charge offs, and growth in the balance of our non performing assets.

In 20 0, we also experienced high volumes of loan modifications involving concessions to borrowers and consequently, a rise in the number of loans categorized as TDRs. Impairment analysis for TDRs requires giving recognition in the provision for credit losses to the excess of our recorded investment in the loan over the present value of the expected future cash flows This generally results in a higher allowance for loan losses than for loans that are not TDRs We expect the number of loan modifications to decline in 20   ; however, we expect the percentage of modifications that qualify as TDRs in 2011 will remain high, since the majority of our modifications are anticipated to include a significant reduction in the contractual interest rate, which represents a concession to the borrower

Our serious delinquencies have remained high due to the continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in building capacity to process large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans In an effort to help mitigate such risk, beginning in the fourth quarter of 2010, we are making significant investments in systems and personnel to help our seller/servicers manage their performance We believe this will help us to better realize the benefits of our loss mitigation plans, though it is too early to determine if this will be successful.

Our allowance for loan losses and amount of charge offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and our other loss mitigation efforts; (c) any governmental actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases See "RISK MANAGEMENT   Credit Risk   *Institutional Credit Risk*" for additional information on seller/servicer repurchase obligations

Our loan loss reserves associated with our multifamily mortgage portfolio were $828 million and $831 million as of December 31, 2010 and 2009, respectively. The multifamily market improved on a national basis in 2010, with several consecutive quarters of positive trends in vacancy rates and effective rents However, some geographic areas in which we have investments in multifamily mortgage loans, including the states of Nevada, Arizona, and Georgia, continue to exhibit weaker than average fundamentals

**Non-Interest Income (Loss)**

### *Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

Due to the change in accounting standards for consolidation of VIEs, beginning January 1, 2010, when we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trust We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value During 20 0, we extinguished debt securities of consolidated trusts with a UPB of $33.5 billion (representing our purchase of single family PCs with a corresponding UPB amount) and our losses on extinguishment of these debt securities of consolidated trusts were $164 million See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information

### *Gains (Losses) on Retirement of Other Debt*

We repurchase or call our outstanding other debt securities from time to time to help support the liquidity of the market for our other debt securities and to manage the mix of liabilities funding our assets. When we repurchase or call outstanding debt securities, or holders put outstanding debt securities to us, we recognize a gain or loss to the extent the amount paid to redeem the debt security differs from its carrying value See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for information regarding our accounting policies re ated to debt retirements

Gains (losses) on retirement of other debt were $(219) million, $(568) million, and $209 million during 2010, 2009, and 2008, respectively. We recognized fewer losses on debt retirement during 2010 compared to 2009 primarily due to decreased losses on calls and puts in 2010 compared to 2009 A tender offer for our subordinated debt also contributed to losses during 2009 During 2008, we recognized gains due to an increased level of call activity, primarily involving our debt with coupon levels that increase at predetermined intervals For more information, see "LIQUIDITY AND CAPITAL RESOURCES   Liquidity   *Other Debt Securities   Other Debt Retirement Activities*."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                     TREASURY-0716                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relates to changes in the fair value of our foreign currency denominated debt During 20 0, we recognized gains on debt recorded at fair value of $580 million primarily due to the U.S. dollar strengthening relative to the Euro During 2009 and 2008, we recognized gains (losses) on debt recorded at fair value of $(404) million and $406 million, respectively, primarily due to fluctuations in exchange rates of the U S dollar relative to the Euro We mitigate changes in the fair value of our foreign currency denominated debt by using foreign currency swaps and foreign currency denominated interest rate swaps.

### Derivative Gains (Losses)

Table 12 presents derivative gains (losses) reported in our consolidated statements of operations See "NOTE 12: DERIVATIVES Table 12.2 Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of operations At December 31, 2010 and 2009, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges Amounts deferred in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings While derivatives are an important aspect of our management of interest rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income

### Table 12    Derivative Gains (Losses)

| Derivatives not designated as hedging instruments under the accounting standards for derivatives and hedging | Derivative Gains (Losses) Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
| In e es - a e swaps | $ (7,679) | $ 13,611 | $(27,965) |
| Op on-based de va ves(1) | 4,843 | (10,686) | 17,080 |
| O he de va ves(2 | (755) | (882) | (2,774) |
| Acc ual of pe od c se lemen s(3 | (4,494) | (3,943) | (1,295) |
| o a | $(8,085) | $ (1,900) | $(14,954) |

(1) P a y nc udes pu chased ca and pu swap ons and pu chased n e es a e caps and f oo s

(2) I c des f es, fo eg c e cy swaps, co e s, swap gua an ee de va ves, and c ed de va ves Fo e gn-cu ency swaps a e def ed as swaps w c ne se e ens based on one leg calcula ed n a fo e gn-cu ency and he o he leg ca cu a ed n U S do a s Comm ens nc ude (a) ou comm en s pu chase a d se ves e s sec es a d (b) ou comm ens o pu chase and ex ngu sh o ssue deb sec es of o co so da ed s s

(3) Inc udes pu ed n e es on ze o-coupon swaps

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) swap and forward interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivatives portfolio

Our mix and volume of derivatives change period to period as we respond to changing interest rate environments We use receive and pay fixed interest rate swaps to adjust the interest rate characteristics of our debt funding in order to more closely match changes in the interest rate characteristics of our mortgage related assets A receive fixed swap results in our receipt of a fixed interest rate payment from our counterparty in exchange for a variable rate payment Conversely, a pay fixed swap requires us to make a fixed interest rate payment to our counterparty in exchange for a variable rate payment Receive fixed swaps increase in value and pay fixed swaps decrease in value when interest rates decrease (with the opposite being true when interest rates increase)

We use swaptions and other option based derivatives to adjust the interest rate characteristics of our debt in response to changes in the expected lives of our investments in mortgage related assets Purchased call and put swaptions, where we make premium payments, are options for us to enter into receive and pay fixed swaps, respectively Conversely, written call and put swaptions, where we receive premium payments, are options for our counterparty to enter into receive and pay fixed swaps, respectively. The fair values of both purchased and written call and put swaptions are sensitive to changes in interest rates and are also driven by the market's expectation of potential changes in future interest rates (referred to as "implied volatility") Purchased swaptions generally become more valuable as implied volatility increases and less valuable as implied volatility decreases Recognized losses on purchased options in any given period are limited to the premium paid to purchase the option plus any unrealized gains previously recorded Potential losses on written options are unlimited

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures For example, the combination of a series of short term debt issuances over a defined period and a pay fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long term fixed rate debt

Source   D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0717

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

instrument of comparable maturity. Similarly, the combination of non callable debt and a call swaption with the same maturity as the noncallable debt is the substantive economic equivalent of callable debt  Due to limits on our ability to issue long term  and callable debt in the second half of 2008 and the first few months of 2009, we pursued these strategies to an increased extent during those periods  However, the use of these derivatives may expose us to additional counterparty credit risk. For a discussion regarding our ability to issue debt, see  "LIQUIDITY AND CAPITAL RESOURCES     Liquidity     *Other Debt Securities*."

During 20  0, declining longer term swap interest rates resulted  in a loss on derivatives of $8.1 billion. Specifically, the decrease in longer term swap interest rates resulted in fair  value losses on our pay fixed swaps of $17.5 billion,  partially offset by fair value gains on our receive fixed swaps of $9 7 billion  We recognized fair value gains of $4 8 billion on our option based derivatives, resulting  from gains on our purchased call swaptions primarily due to the declines in forward interest rates during 2010

During 2009, the mix and volume of our derivative portfolio were  impacted by fluctuations in swap interest rates, resulting in a  loss on derivatives of $1.9 billion. Longer term swap  interest rates and implied volatility both increased during  2009  As a result of these factors, we recorded gains on our pay fixed swap positions, partially offset by losses on our  receive fixed swaps, resulting in a $13 6 billion net gain  We also recorded losses of $10 7 billion on option based  derivatives, primarily on our purchased call swaptions, as the  impact of the increasing forward swap interest rates more than  offset the impact of higher implied volatility

During 2008, we recognized a net derivative loss of  $15.0 billion primarily because swap interest rates  declined significantly in 2008  We had a loss of $28.0 billion for interest rate swaps that was partially offset by the gain of $17 1 billion related to our  option based derivatives as a result of a decrease in forward  swap interest rates combined with an increase in implied  volatility during 2008

### Investment Securities-Related Activities

Since January 1, 2010, as a result of our adoption of  amendments to the accounting standards for transfers of  financial assets and consolidation of VIEs, we no longer account  for the single family PCs and certain Other Guarantee  Transactions we hold as investments in securities  Instead, we now recognize the underlying mortgage loans on our consolidated  balance sheets through consolidation of the related trusts  Our adoption of these amendments resulted in a decrease in our  investments in securities of $286.5 billion on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information.

#### Impairments of Available For Sale Securities

We recorded net impairments of available for sale securities recognized in earnings of $4.3 billion, $11.2 billion, and $17.7 billion during 2010, 2009, and 2008, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities     *Mortgage Related Securities     Other Than Temporary Impairments on Available For Sale Mortgage Related Securities"* and "NOTE 8: INVESTMENTS IN SECURITIES" for information regarding the accounting  principles for investments in debt and equity securities and the other than temporary impairments recorded during 2010, 2009, and  2008. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for information on how other than temporary  impairments are recorded on our financial statements commencing  in the second quarter of 2009.

#### Other Gains (Losses) on Investment Securities Recognized in  Earnings

Other gains (losses) on investment securities recognized in  earnings primarily consists of gains (losses) on trading  securities  We recognized $(1.3) billion, $4.9 billion and $955 million related to gains (losses) on trading  securities during 2010, 2009, and 2008, respectively.

The fair value of our securities classified as trading was  approximately $60 3 billion at December 31, 2010  compared to approximately $222.3 billion at December 31, 2009. The decline in fair value was primarily  due to our adoption of amendments to the accounting standards  for transfers of financial assets and consolidation of VIEs on  January 1, 2010, pursuant to which we no longer account for  the single family PCs and certain Other Guarantee Transactions that we hold as investment securities as stated above

During 2010, the losses on trading securities was primarily due  to the movement of securities with unrealized gains towards  maturity, particularly interest only securities, partially offset by fair value gains on our non interest only securities  classified as trading primarily due to decreased interest rates

During 2009, we recognized net gains on trading securities of  $4.9 billion, compared to net gains of $955 million in  2008. The fair value of our securities classified as trading increased to $222 3 billion at December 31, 2009  compared to $190 4 billion at December 31, 2008,  primarily due to the increased balance of agency securities  The  increased balance in our investments in trading securities,  combined with a steepening yield curve and tightening OAS levels, contributed

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0718

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

$3 3 billion to the gains on these trading securities during 2009. In addition, we sold agency securities classified as trading with UPBs of approximately $148.7 billion, which generated realized gains of $ 7 billion

In 2008, we elected the fair value option for approximately $87 billion of securities and transferred the securities previously classified as available for sale to trading  The increase in the balance of the trading securities along with a decrease in interest rates resulted in significant gains on trading securities  Partially offsetting these gains were losses related to interest only securities classified as trading, primarily as a result of the decrease in interest rates, and the realization of $481 million of losses from the sale of certain agency securities prior to our entry into conservatorship during the third quarter of 2008 in an effort to meet the mandatory target capital surplus requirement then in effect

### Other Income

Table 13 summarizes the significant components of other income

**Table 13    Other Income**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
| O he  ncome (losses) | | | |
| Managemen  and gua an ee  ncome | $ 143 | $ 3,033 | $ 3,370 |
| Ga ns ( osses) on gua an ee asse | (61) | 3,299 | (7,091) |
| Income on gua an ee obl ga on | 135 | 3,479 | 4,826 |
| Ga ns (losses) on sale of mo  gage loans | 267 | 745 | 117 |
| Lowe -of-cos -o -fa  -value ad us men s on held-fo -sale mor gage  oans | | (679) | (30) |
| Ga ns (losses) on mo  gage loans  eco ded a  fa  value | (249) | (190) | (14) |
| Recove  es on loans  mpa  ed upon pu chase | 806 | 379 | 495 |
| Low- ncome hous ng  ax c ed  pa ne sh ps | | (4,155) | (453) |
| T us  managemen   ncome (expense) | | (761) | (70) |
| All o he | 819 | 222 | 195 |
| To a o he   ncome | $1,860 | $ 5,372 | $ 1,345 |

Other income includes items associated with our guarantee business activities on non consolidated trusts, including management and guarantee income, gains (losses) on guarantee asset, income on guarantee obligation, gains (losses) on sale of mortgage loans, and trust management income (expense)  Upon consolidation of our single family PC trusts and certain Other Guarantee Transactions commencing January 1, 2010, guarantee related items no longer have a material impact on our results and are therefore included in other income on our consolidated statements of operations  The management and guarantee income recognized during 20 0 was earned from our non consolidated securitization trusts and other mortgage credit guarantees which had an aggregate UPB of $44 0 billion as of December 3 , 20 0 compared to $1.87 trillion as of December 31, 2009  For additional information on the impact of consolidation of our single family PC trusts and certain Other Guarantee Transactions, see "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" AND "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS."

All other income increased to $819 million in 2010 from $222 million in 2009, primarily due to recognition of mortgage se vicing income related to reclaimed servicing rights associated with one of our former single family seller/servicers, and assessment of penalties and other fees on single family seller servicers, including penalties arising from failures to complete foreclosures within required time periods, and to a lesser extent, increased expectations of recoveries from certain legal claims

### Lower of Cost or Fair Value Adjustments on Held for Sale Mortgage Loans

We recognized lower of cost or fair value adjustments of $0 million, $(679) million, and $(30) million in 2010, 2009, and 2008, respectively  Due to the change in the accounting standard for consolidation of VIEs, which we adopted on January 1, 2010, all single family mortgage loans on our consolidated balance sheet were reclassified as held for investment  Consequently, beginning in 2010, we no longer record lower of cost or fair value adjustments on single family mortgage loans  During 2009, we transferred $10 6 billion of single family mortgage loans from held for sale to held for investment  Upon transfer, we evaluated the lower of cost or fair value for each individual loan  We recognized approximately $438 million of losses associated with these transfers during 2009, representing the unrealized losses of certain loans on the dates of transfer; however, we were not permitted to similarly recognize any unrealized gains on individual loans at the time of transfer  We did not transfer any mortgage loans between these categories during 2008.

### Recoveries on Loans Impaired upon Purchase

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses on loans purchased and provision for credit losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities  Recoveries occur when a non performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan  For

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0719

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are instead recognized as interest income over time as periodic payments are received

During 2010, 2009, and 2008, we recognized recoveries on loans impaired upon purchase of $806 million, $379 million and $495 million, respectively Our recoveries on loans impaired upon purchase increased in 2010, compared to 2009, due to a higher volume of short sales and foreclosure transfers, combined with improvements in home prices in certain geographical areas during 20 0 Recoveries on impaired loans decreased in 2009, compared to 2008, because a greater percentage of loans purchased from PCs were modified instead of being repaid in full or proceeding to foreclosure Modifications on seriously delinquent loans can delay the ultimate resolution of losses and consequently extend the timeframe for the recognition of our recoveries, if any, on loans impaired upon purchase Our recoveries on these loans may be volatile in the short term due to the effects of changes in home prices, among other factors

Commencing January , 20 0, we no longer recognize losses on loans purchased from PC pools related to our single family PC trusts and certain Other Guarantee Transactions due to adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs, as these loans are already recognized on our balance sheets Consequently, our recoveries on loans impaired upon purchase will decrease over time since we can only recognize recoveries on impaired loans purchased prior to January 1, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information about the impact of adoption of these amendments

### *Low Income Housing Tax Credit Partnerships*

We wrote down the carrying value of our LIHTC investments to zero in the fourth quarter of 2009, as we will not be able to realize any value either through reductions to our taxable income and related tax liabilities or through a sale to a third party. See "NOTE 14: INCOME TAXES" for information on the availability of unexpired tax credits

### Non-Interest Expense

Table 4 summarizes the components of non interest expense

### Table 14    Non Interest Expense

| | Year Ended December 31, | | |
| | 2010 | 2009 (in millions) | 2008 |
|---|---|---|---|
| Adm n s  a ve expenses | | | |
| Sala  es and employee benef s | $ 895 | $ 912 | $ 828 |
| P ofess onal se v ces | 246 | 310 | 262 |
| Occupancy expense | 64 | 68 | 67 |
| O he  adm n s  a ve expenses | 341 | 361 | 348 |
| To al adm n s  a ve expenses | 1,546 | 1,651 | 1,505 |
| REO ope a  ons expense | 673 | 307 | 1,097 |
| O he  expenses | 713 | 5,237 | 3,151 |
| To al non- n e es  expense | $2,932 | $ 7,195 | $5,753 |

### *Administrative Expenses*

Administrative expenses decreased in 2010 compared to 2009, in part due to our focus on cost reduction measures in 2010, particularly on professional services costs  Administrative expenses increased in 2009 compared to 2008, in part due to higher professional services costs to support corporate initiatives, including our efforts under MHA Programs, and higher legal fees

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0720

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### REO Operations Expense

The table below presents the components of our REO operations  expense for 2010, 2009, and 2008, and REO inventory and  disposition information

**Table 15     REO Operations Expense, REO Inventory and  Dispositions**

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | | (dollars in millions) | |
| REO ope a ons expense | | | |
| S ng e-fam y | | | |
| REO p ope y expenses[1] | $ 1,163 | $ 708 | $ 372 |
| D spos on (ga ns) losses,  e [2] | 102 | 749 | 682 |
| Change n hold ng pe od a owance[3] | 211 | (612) | 495 |
| Recove es[4] | (800) | (558) | (452) |
| To al s ngle-fam ly REO ope a ons expense | 676 | 287 | 1,097 |
| Mul fam ly REO ope a ons ( ncome) expense | (3) | 20 | |
| To al REO ope a ons expense | $ 673 | $ 307 | $ 1,097 |
| REO nven o y ( n p ope es), a Decembe 31 | | | |
| S ng e- am y | 72,079 | 45,047 | 29,340 |
| Mu fam y | 14 | 5 | 6 |
| o a | 72,093 | 45,052 | 29,346 |
| REO p ope y d spos ons ( n p ope es) | 101,215 | 69,406 | 35,579 |

(1) Cons s s of cos s ncu ed o ma n a n o p o ec a p ope y a e fo ec os e acq s o , s c as ega fees,  s  a ce,  axes, c ean ng and o he  ma n enance cha ges

(2) Rep esen s  e d ffe ence be ween e d spos on p oceeds, ne of se  g expe ses, a d e a va e of  e p ope y o  e da e of he fo ec osu e  ansfe  Exc udes hold ng pe od w  e-downs wh  e n REO nven o y

(3) Inc udes bo h he nc ease (dec ease) n he es ma ed fa  va ue of p ope es ha  e a n n nven o y a he end of he yea as we  as any educ ons assoc a ed w h  d spos ons d  g e yea

(4) Includes ecove es f om p ma y mo gage nsu ance, pool nsu ance and se  e /se v ce epu chases

Total REO operations expense was $673 million in 2010 as compared to $307 million in 2009 and $1.1 billion in 2008  The increase in 2010 was primarily due to higher property expenses associated with larger REO inventories  We currently expect REO property expenses to continue to increase due to expected continued high levels of REO acquisitions and inventory  in 2011. Net disposition losses declined in 2010, compared to the prior two years, as the pace of home value declines slowed  and sales proceeds were more closely aligned with acquisition  values of our REO inventory  We also experienced increases in recoveries associated with foreclosed loans during 20 0 and 2009, primarily due to the increases in those years in our REO acquisitions for which we had credit protection

Our REO acquisition volume temporarily slowed in the fourth  quarter of 2010 due to delays in the foreclosure process,  including delays related to concerns about deficiencies in  foreclosure documentation practices  For more information on how  this could adversely affect our REO operations (income) expense, see "RISK FACTORS     Operational Risks    *Our expenses could increase and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process.*"

### Other Expenses

Other expenses were $0.7 billion, $5.2 billion, and  $3.2 billion in 2010, 2009, and 2008, respectively. During  2009 and 2008, other expenses include significant losses on loans purchased. Our losses on loans purchased were  $25 million, $4.8 billion, and $1.6 billion in 2010, 2009, and 2008, respectively. When a loan underlying our PCs is seriously delinquent and modified, we generally exercise  our repurchase option and purchase the loan from the PC pool,  recording the loan as an unsecuritized mortgage loan,  held for investment  We record losses on loans purchased when the acquisition basis of a loan purchased from our  non consolidated securitization trusts exceeds the estimated  fair value of the loan on the date of purchase  Beginning January 1, 2010, our single family PC trusts are  consolidated as a result of the change in the accounting standard for consolidation of VIEs  As a result, we no longer record losses on loans purchased when we purchase loans from  these consolidated entities since the loans are already recorded  on our consolidated balance sheets  During 2010, losses on loans  purchased were associated solely with single family loans purchased pursuant to other guarantee commitments  See  *"Recoveries on Loans Impaired Upon Purchase"* for additional information about the impacts of these loans  on our financial results. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Impaired Loans" and "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information

Other expenses for 2008 also include a $1 1 billion  securities administrator loss on investment activity, which was  related to losses incurred on short term lending transactions with  Lehman Brothers Holdings, Inc., or Lehman, executed prior  to Lehman's bankruptcy in 2008. We had no securities administrator losses on investment activity during 2009 or 2010.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0721

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Income Tax Benefit (Expense)**

For 2010, 2009, and 2008, we reported income tax benefit (expense) of $0.9 billion, $0.8 billion, and $(5.6) billion, respectively, resulting in effective tax rates of 6%, 4%, and (12)%, respectively  Our effective tax rate differed from the federal statutory tax rate of 35% primarily due to the establishment of a valuation allowance against a portion of our net deferred tax assets  The income tax benefits recognized in 2010 and 2009 represent the current tax benefits associated with our ability to carry back net operating tax losses generated in 2009 and expected to be generated in 2010, as well as amounts related to the amortization of net deferred losses on pre 2008 closed cash flow hedges  See "NOTE 14: INCOME TAXES" for additional information

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Investments, Single family Guarantee, and Multifamily  Certain activities that are not part of a reportable segment are included in the All Other category

The Investments segment reflects results from our investment, funding and hedging activities  In our Investments segment, we invest principally in mortgage related securities and single family mortgage loans funded by other debt issuances and hedged using derivatives  Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses

The Single family Guarantee segment reflects results from our single family credit guarantee activities  In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities  We guarantee the payment of principal and interest on the mortgage related securities in exchange for management and guarantee fees  Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (*i.e.*, provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses

The Multifamily segment reflects results from our investments and guarantee activities in multifamily mortgage loans and securities  Our new purchases of multifamily mortgage loans are primarily made for purposes of aggregation and then securitization, which supports the availability of financing for multifamily properties. We also purchase non agency CMBS for investment; however we have not purchased significant amounts of non agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments  Segment Earnings for this segment include management and guarantee fee income and the interest earned on assets related to multifamily investment activities, net of allocated funding costs

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the performance of each segment and the company as a whole. This change in method, in conjunction with our implementation of changes in accounting standards relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings  Under the revised method, the financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss)  Beginning January 1, 2010, under the revised method, the sum of Segment Earnings for each segment and the All Other category will equal GAAP net income (loss) attributable to Freddie Mac

Segment Earnings for periods presented prior to 20  0 include the following items that are included in our GAAP basis earnings, but were deferred or excluded under the previous method for presenting Segment Earnings:

- Current period GAAP earnings impact of fair value accounting for investments, debt, and derivatives;

- Allocation of the valuation allowance established against our net deferred tax assets;

- Gains and losses on investment sales and debt retirements;

- Losses on loans purchased and related recoveries;

- Other than temporary impairment of securities recognized in earnings in excess of expected losses; and

- GAAP basis accretion income that may result from impairment adjustments.

Under the revised method of presenting Segment Earnings, the All Other category consists of material corporate level expenses that are: (a) non recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments  By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments represent the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods  Items included in the All Other category consist of: (a) the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward; and (b) in 2009, the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

write down of our LIHTC investments  Other items previously  recorded in the All Other category prior to the revision to our  method for presenting Segment Earnings have been allocated to  our three reportable segments

Effective January 1, 2010, we also made significant changes  to our GAAP consolidated statements of operations as a result of  our adoption of changes in accounting standards for transfers of  financial assets and the consolidation of VIEs. These changes  make it difficult to see the earnings impact of the business  activities conducted by our Investments, Single family Guarantee  and Multifamily segments  For example, much of the earnings impact of our securitization activity is now included within the  net interest income line of our GAAP consolidated statements of operations, whereas, prior to January 1, 2010, the earnings  impact of such activity was reflected in GAAP management and  guarantee income and other line items. As a result, in presenting Segment Earnings we make significant  reclassifications to certain line items in order to reflect a measure of net interest income on investments, and a measure of  management and guarantee income on guarantees, that is in line  with our internal measures of performance

We present Segment Earnings by: (a) reclassifying certain investment related activities and credit  guarantee related activities between various line items on our GAAP consolidated statements of operations; and  (b) allocating certain revenues and expenses, including  certain returns on assets and funding costs, and all  administrative expenses to our three reportable segments

As a result of these reclassifications and allocations, Segment  Earnings for our reportable segments differs significantly from,  and should not be used as a substitute for, net income (loss) as  determined in accordance with GAAP  Our definition of Segment Earnings may differ from similar measures used by other  companies  However, we believe that Segment Earnings provides us  with meaningful metrics to assess the financial performance of each segment and our company as a whole

We restated Segment Earnings for 2009 and 2008 to reflect the  changes in our method of measuring and assessing the performance  of our reportable segments described above  The restated Segment  Earnings for 2009 and 2008 do not include changes to the  guarantee asset, guarantee obligation or other items that were  eliminated or changed as a result of our implementation of the  amendments to the accounting standards for transfers of financial  assets and consolidation of VIEs adopted on  January 1, 2010, as this change was applied prospectively  consistent with our GAAP results. As a result, our Segment Earnings  results for 2010 are not directly comparable with the  results for 2009 and 2008. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information regarding  the consolidation of certain of our securitization trusts

See "NOTE 17: SEGMENT REPORTING" for further  information regarding our segments, including the descriptions  and activities of the segments and the reclassifications and  allocations used to present Segment Earnings

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 16 provides information about our various segment mortgage portfolios at December 3 , 20 0, 2009 and 2008  For a discussion of each segment's portfolios, see *Segment Earnings    Results.*

**Table 16     Segment Mortgage Portfolio Composition**[1]

| | December 31, 2010 | December 31, 2009 (in millions) | December 31, 2008 |
|---|---|---|---|
| **Segmen  por folios:** | | | |
| *Investments    Mortgage investments portfolio* | | | |
| S ngle-fam ly unsecu ized mo gage oans[2] | $     79,097 | $     44,135 | $     33,552 |
| F edd e Mac mo gage- ela ed secu es | 263,152 | 374,362 | 424,220 |
| Non-F edd e Mac mo gage- ela ed secu es | 139,428 | 179,330 | 203,829 |
| *Total Investments    Mortgage investments portfolio* | 481,677 | 597,827 | 661,601 |
| *Single-family Guarantee    Managed loan portfolio* | | | |
| S ngle-fam ly unsecu ized mo gage oans[3] | 69,766 | 10,743 | 5,203 |
| S ngle-fam ly F edd e Mac mo gage- ela ed secu es held by us | 261,508 | 372,666 | 422,463 |
| S ngle-fam ly F edd e Mac mo gage- ela ed secu es held by  h d pa es | 1,437,399 | 1,474,016 | 1,378,585 |
| S ngle-fam ly o he gua an ee comm en s[5] | 8,632 | 5,877 | 10,532 |
| *Total Single-family Guarantee    Managed loan portfolio* | 1,777,305 | 1,863,302 | 1,816,783 |
| *Multifamily    Guarantee portfolio:* | | | |
| Mul fam ly F edd e Mac mo gage- ela ed secu es held by us | 2,095 | 1,949 | 2,061 |
| Mul fam ly F edd e Mac mo gage- ela ed secu es held by  h d pa es | 11,916 | 6,182 | 4,445 |
| Mul fam ly o he gua an ee comm en s[5] | 10,038 | 9,192 | 9,152 |
| *Total Multifamily    Guarantee portfolio* | 24,049 | 17,323 | 15,658 |
| *Multifamily    Mortgage investments portfolio:* | | | |
| Mul fam ly nves men secu es po fol o | 59,548 | 62,764 | 65,237 |
| Mu fam y oan po fo o | 85,883 | 83,938 | 72,721 |
| *Total Multifamily    Mortgage investments portfolio* | 145,431 | 146,702 | 137,958 |
| *Total Multifamily portfolio* | 169,480 | 164,025 | 153,616 |
| Less F edd e Mac s ngle-fam ly and ce a n mul fam ly secu es[5] | (263,603) | (374,615) | (424,524) |
| **To a  mor gage por fo o** | $  2,164,859 | $  2,250,539 | $  2,207,476 |

(1) Based on UPB and excludes mo gage loans and mo gage- ela ed sec  t es t aded,   t ot yet sett ed

(2) Excludes unsecu ized non-pe fo m ng s ngle-fam ly loans fo  wh ch the S ng e-fam  y Gua an ee segmen  ac ve y pu su ng a p ob em oan wo kou  Howeve , he
       S ngle-fam ly Gua an ee segmen  con  nues  o ea n managemen  and gua an ee fees assoc a ed w  h unsecu  ized s ngle-fam ly loans  n he  Inves men s segmen

(3) Rep esen s unsecu  ized non-pe fo m ng s ngle-fam ly loans fo  wh ch  he S ng e-fam y Gua an ee segmen  ac ve y pu su ng a p oblem loan wo kou

(4) Rep esen s  he UPB of   o gage- e a ed asse s he d by  h d pa  es fo  wh ch we p ov de ou  gua an ee w  hou ou  secu  za on of  he a ed asse s

(5) F edd e Mac s ngle-fam ly mo gage- ela ed secu es held by us a e  ncluded  n bo h ou  Inves men s segmen 's mo gage  nves men s po fol o and ou  S ngle-fam ly
       G a a ee segmen 's managed loan po fol o, and ce a n F edd e Mac mul fam ly mo gage- ela ed secu es held by us a e  ncluded  n bo h  he mul fam ly nves men
       secu es po fol o and he  mul fam ly gua an ee po fol o  The efo e,  hese amoun s a e deduc ed  n o de  o econc le ou  o a mo gage po fol o

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0724

Table of Contents

*Segment Earnings    Results*

*Investments*

Table 17 presents the Segment Earnings of our Investments segment

**Table 17    Segment Earnings and Key Metrics     Investments**[1]

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | (dollars in millions) | | |
| Segmen Ea n ngs | | | |
| Ne n e es ncome | $   6,192 | $   8,090 | $   2,815 |
| Non- n e es ncome (loss) | | | |
| Ne mpa men s of ava lable-fo -sale secu es | (3,819) | (9,870) | (17,129) |
| De va ve ga ns (losses) | (1,859) | 4,695 | (12,845) |
| O he non- n e es ncome (loss) | (405) | 4,682 | 2,793 |
| To al non- n e es ncome (loss) | (6,083) | (493) | (27,181) |
| Non- n e es expense | | | |
| Adm n s a ve expenses | (455) | (515) | (486) |
| O he non- n e es expense | (18) | (33) | (1,117) |
| To al non- n e es expense | (473) | (548) | (1,603) |
| Segmen adj s e s[2] | 1,358 | | |
| Segmen Ea n ngs (loss) befo e ncome ax benef (expense) | 994 | 7,049 | (25,969) |
| Income ax benef (expense) | 259 | (572) | (2,047) |
| Less Ne ( ncome) loss - noncon oll ng n e es | (2) | (1) | (5) |
| Segmen Ea n ngs ( oss), ne of axes | $   1,251 | $   6,476 | $ (28,021) |
| Key me cs   Inves men s | | | |
| *Portfolio balances* | | | |
| Ave age balances of n e es -ea n ng assets[3]( | | | |
| Mo gage- ela ed secu es[6] | $465,048 | $600,562 | $ 584,146 |
| Non-mo gage- e a ed nves men s[7] | 123,537 | 100,759 | 72,087 |
| Unsecu zed s ngle-fam ly loans | 59,028 | 49,013 | 29,163 |
| To al ave age balances of n e es -ea n ng asse s | $ 647,613 | $750,334 | $685,396 |
| *Return* | | | |
| Ne n e es y ed   Segmen Ea n ngs bas s | 0 96% | 1 08% | 0 42% |

(1) Unde ou ev sed me hod of p esen ng Segmen Ea n ngs, Segmen   Ea n ngs fo he Inves men s segmen equa s GAAP ne ncome ( oss) a bu ab e o F edd e Mac fo he Inves men s segmen  Fo econc la ons of he Segmen Ea n ngs l ne ems o he compa able l ne ems n ou consol da ed f nanc al s a emen s p epa ed n acco dance w h GAAP, see "NOTE 17 SEGMENT REPORTING    Ta  e 17 2    Segmen Ea n ngs and Reconc a on o GAAP Resu s"

(2) Fo a desc p on of ou seg en adjus en s, see "NOTE 17 SEGMENT REPORTING   Seg e Ea n ngs   *Segment Adjustments.*"

(3) Based on UPB and exc udes o gage- e a ed secu es added,  t o tyet sett ed

(4) Exc udes non-pe fo m ng s ng e-fam y mo gage oans

(5) Fo secu es, we ca cu a e ave age ba ances based on he ave zed cos

(6) Inc udes ou nves men s n s ng e-fam y PCs and ce an O he G a a ee T a sac s, w c ave bee co so da ed de GAAP on ou conso da ed balance shee beg n g o Ja u y 1, 2010

(7) Inc udes he ave age ba ances of n e es -ea n ng cash and cash equ va en s, non- o gage- e a ed secu es, and fede a funds so d a d sec es p c ased de ag eemen s o esell

Segment Earnings for our Investments segment decreased by  $5.2 billion to $1.3 billion in 2010, compared to  $6.5 billion in 2009.

During 20 0, the UPB of the Investments segment mortgage  investments portfolio decreased by 19 4%, compared to a decrease of  9.6% during 2009  The UPB of the Investments segment mortgage  investments portfolio decreased from $598 billion at  December 3 , 2009 to $482 billion at December 31, 20 0

We held $302 9 billion of agency securities and $99 6 billion of non agency mortgage related securities as of December 3 , 20 0 compared to $440 0 billion of agency securities and $113 7 billion of non agency  mortgage related securities as of December 3 , 2009  The decline in UPB of agency securities is due mainly to liquidations, including prepayments and select sales.  Liquidations during 2010 increased substantially due to higher refinance activity, as mortgage rates hit record lows,  and increased purchases of seriously delinquent and modified loans  from the mortgage pools underlying both our PCs and other agency  securities  The decline in UPB of non agency mortgage related  securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated  loans and voluntary repayments of the underlying collateral, representing a partial return of our investments in these  securities. Purchase and sales activity in the Investments  segment was minimal in 2010. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for additional information regarding our mortgage related securities

Segment Earnings net interest income and net interest yield  decreased $1.9 billion and 12 basis points,  respectively, during 2010, compared to 2009. The primary driver underlying these decreases was a decrease in the average balance of

*Freddie Mac*

Source  D RA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage related securities, partially offset by a decrease in funding costs as a result of the replacement of higher cost long term debt at lower rates

Segment Earnings non interest loss increased $5.6 billion in 20 0, compared to 2009 Included in other non interest income (loss) are gains (losses) on trading securities of $(1.4) billion in 2010, compared to $4.8 billion in 2009. In 2010, the losses on trading securities was primarily due to the movement of securities with unrealized gains towards maturity, particularly interest only securities, partially offset by fair value gains on our non interest only securities classified as trading primarily due to decreased interest rates The net gains on trading securities during 2009 related primarily to tightening OAS levels

Impairments recorded in our Investments segment decreased by $6.1 billion during 2010, compared to 2009. Impairments for 2010 and 2009 are not comparable because the adoption of the amendment to the accounting standards for investments in debt and equity securities on April 1, 2009 significantly impacted both the identification and measurement of other than temporary impairments. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities    Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" for additional information on our impairments

We recorded derivative gains (losses) for this segment of $(1.9) billion in 2010, compared to $4.7 billion in 2009 While derivatives are an important aspect of our management of interest rate risk, they generally increase the volatility of reported Segment Earnings, because, while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings During 20 0, longer term swap interest rates declined, resulting in fair value losses on our pay fixed swaps that were partially offset by fair value gains on our receive fixed swaps and gains on our purchased call swaptions See "Non Interest Income (Loss)    *Derivative Gains (Losses)*" for additional information on our derivatives

The objectives set forth for us under our charter and conservatorship, restrictions set forth in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our Investments segment results For example, our mortgage related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. This will likely cause a corresponding reduction in our net interest income from these assets and therefore negatively affect our Investments segment results FHFA also stated its expectation that any net additions to our mortgage related investments portfolio would be related to purchasing seriously delinquent mortgages out of PC pools We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

For information on the impact of the requirement to reduce the mortgage related investments portfolio limit by 0% annually, see "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS    Impact of the Purchase Agreement and FHFA Regu at on on the Mo tgage-Re ated Investments Portfolio "

Segment Earnings for our Investments segment increased $34.5 billion in 2009 compared to 2008. Impairments recorded in our Investments segment decreased by $7.3 billion during 2009, compared to 2008. As noted above, impairments for 2009 and 2008 are not comparable because of the adoption of the amendment to the accounting standards for investments in debt and equity securities on April 1, 2009. We recorded derivative gains of $4.7 billion in 2009, primarily due to increases in longer term swap interest rates and implied volatility Segment Earnings non interest expense for 2008 includes a loss of $1 1 billion related to short term lending transactions with Lehman Segment Earnings net interest income increased $5 3 billion and Segment Earnings net interest yield increased 66 basis points to 108 basis points for 2009 compared to 2008. The increases in Segment Earnings net interest income and Segment Earnings net interest yield were primarily due to decreased funding costs due to the replacement of higher cost short and long term debt with lower cost debt issuances, and increases in the average balance of interest earning assets.

<div align="center">83</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single Family Guarantee*

Table 18 presents the Segment Earnings of our Single family Guarantee segment

**Table 18    Segment Earnings and Key Metrics    Single Family Guarantee(1)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (dollars in millions) | | |
| **Segment Earnings** | | | |
| Net interest income | $ 72 | $ 307 | $ 280 |
| Provision for credit losses | (18,785) | (29,102) | (16,325) |
| Non-interest income | | | |
| Management and guarantee income | 3,635 | 3,448 | 3,615 |
| Other non-interest income | 1,351 | 721 | 880 |
| Total non-interest income | 4,986 | 4,169 | 4,495 |
| Non-interest expense | | | |
| Administrative expenses | (879) | (915) | (826) |
| REO operations expense | (676) | (287) | (1,097) |
| Other non-interest expense | (629) | (4,888) | (1,730) |
| Total non-interest expense | (2,184) | (6,090) | (3,653) |
| Segment adjustments(2) | (953) | | |
| Segment Earnings (loss) before income tax benefit (expense) | (16,864) | (30,716) | (15,203) |
| Income tax benefit (expense) | 608 | 3,573 | (5,146) |
| Segment Earnings (loss), net of taxes | (16,256) | (27,143) | (20,349) |
| Reconciliation to GAAP net income (loss) | | | |
| Credit guarantee-related adjustments(3) | | 5,941 | (2,871) |
| Tax-related adjustments | | (2,080) | 1,005 |
| Total reconciling items, net of taxes | | 3,861 | (1,866) |
| Net income (loss) attributable to Freddie Mac | $ (16,256) | $ (23,282) | $ (22,215) |
| **Key metrics — Single-family Guarantee** | | | |
| *Balances and Growth (in billions, except rate)* | | | |
| Average securitized balance of single-family credit guarantee portfolio(4) | $ 1,728 | $ 1,799 | $ 1,771 |
| Issuance — Single-family credit guarantees(5) | $ 385 | $ 472 | $ 353 |
| Fixed-rate products — Percentage of single-family credit guarantees | 95% | 99% | 92% |
| Liquidation rate — Single-family credit guarantees(6) | 29% | 24% | 16% |
| *Management and Guarantee Fee Rate (in bps):* | | | |
| Contractual management and guarantee fees | 13.5 | 13.9 | 15.3 |
| Amortization of deferred delivery fees | 6.1 | 4.8 | 4.8 |
| Segment Earnings management and guarantee income | 19.6 | 18.7 | 20.1 |
| *Credit* | | | |
| Serious delinquency rate, at end of period | 3.84% | 3.98% | 1.83% |
| REO inventory, at end of period (number of units) | 72,079 | 45,047 | 29,340 |
| Single-family credit losses, in bps(7) | 76.2 | 42.7 | 20.9 |
| *Market:* | | | |
| Single-family mortgage debt outstanding (total US market, in billions)(8) | $ 10,612 | $ 10,861 | $ 11,072 |
| 30-year fixed mortgage rate(9) | 4.9% | 5.1% | 5.1% |

(1) Beginning January 1, 2010, under our revised period, Segment Earnings for the Single-family Guarantee segment equals GAAP net income (loss) attributable to Freddie Mac for the Single-family Guarantee segment. For reconciliation of Segment Earnings for the Single-family Guarantee segment in 2010, 2009 and 2008 and the Segment Earnings line items of the comparable line items to our consolidated financial statements prepared in accordance with GAAP, see "NOTE 17 SEGMENT REPORTING    Table 17.2    Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments see "NOTE 17 SEGMENT REPORTING    Segment Earnings    *Segment Adjustments."*

(3) Consists primarily of amortization and valuation of our single-family guarantee obligation and buy-down fees, which we excluded from Segment Earnings and cash compensation exchanged at the value of securitization, excluding any- paid buy-down fees, which we have realized in our earnings. These reconciling items existed in periods prior to 2010 as the amendment to the accounting standards for transfers of financial assets and consolidation of VIEs was applied prospectively on January 1, 2010

(4) Based on UPB

(5) Excludes Other Guarantee Transactions, and excludes purchases of interest-only mortgages with fixed interest rates

(6) Includes purchases of delinquent mortgages from our PC pools. See "NOTE 6 INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information

(7) Credit losses are equal to REO operations expense plus charge-offs, net of recoveries, associated with our single-family mortgage loans. Calculated as the amount of credit losses divided by the average balance of our single-family credit guarantee portfolio

(8) See Federal Reserve Flow of Funds Accounts of the United States of America dated December 30, 2010. The outstanding amount for 2010 reflects the balance as of September 30, 2010, which is the latest available information

(9) Based on Freddie Mac's Primary Mortgage Market Survey as of the week... eye year, weekly average commitment rate on a qualified borrower exclusive of any fees and points required by the lender. These commitments are applicable only to financing on conforming mortgages with LTV ratios as of 80%

During 2010, 2009 and 2008, Segment Earnings (loss) for our Single family Guarantee segment was $(16.3) billion, $(27.1) billion and $(20.3) billion, respectively. Segment Earnings (loss) improved in 2010, compared to 2009, primarily due to a decline in credit related expenses. Credit related expenses consist of our provision for credit losses and REO operations

*Freddie Mac*

Source    DRA HOM    OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0727

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

expense. The increase in Segment Earnings (loss) during 2009, as compared to 2008, was primarily due to higher Segment Earnings provision for credit losses and, to a lesser extent, higher losses on loans purchased.

Table 19 provides summary information about the composition of Segment Earnings (loss) for this segment in 2010 Segment Earnings management and guarantee income consists of contractual amounts due to us related to our management and guarantee fees as well as amortization of delivery fees

**Table 19    Segment Earnings Composition    Single Family Guarantee Segment**

|  | Year Ended December 31, 2010 | | | | |
|  | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) |
|  | Amount | Average Rate | Amount | Average Rate(3) |  |
|  | (dollars in millions, rates in bps) | | | | |
| Yea of orga on( |  |  |  |  |  |
| 2010 | $    418 | 23 8 | $    (109) | 6 2 | $    309 |
| 2009 | 837 | 19 3 | (367) | 8 4 | 470 |
| 2008 | 554 | 29 5 | (2,151) | 114 3 | (1,597) |
| 2007 | 493 | 21 2 | (7,170) | 307 2 | (6,677) |
| 2006 | 289 | 16 5 | (5,847) | 332 6 | (5,558) |
| 2005 | 313 | 15 8 | (2,644) | 132 8 | (2,331) |
| 2004 and p o | 731 | 16 3 | (1,173) | 26 1 | (442) |
| o a | $ 3,635 | 19 6 | $(19,461) | 104 7 | (15,826) |
| Adm n s a ve expenses |  |  |  |  | (879) |
| Ne n e s ncome |  |  |  |  | 72 |
| Income ax benef o h e non- n e es ncome and (expense),  e (6 |  |  |  |  | 377 |
| Segmen Ea n ngs ( oss), ne of axes |  |  |  |  | $  (16,256) |

(1) Includes amo za on of del ve y fees of $1 1 b ll on fo he yea ended Decembe 31, 2010
(2) Cons s s of he agg ega e of he Segmen Ea n ngs p ov s on fo c ed osses and Segmen Ea n ngs REO ope a ons expense
(3) Based on he ave age secu zed balance of he s ngle-fam ly c ed gua an ee po fol o H s o cal a es of ave age c ed expenses ay no be ep esen a ve of f e es ts
(4) Calcula ed as Segmen Ea n ngs managemen and gua an ee ncome ess c ed expenses
(5) Segmen Ea n ngs managemen and gua an ee ncome s p esen ed by yea of gua an ee o g na on, whe e as c ed expenses a e p esen ed based on yea of oan o g na on
(6) Inc udes seg en adjus en s

During 20 0, we raised our management and guarantee fee rates with certain of our seller/servicers; however, these increased rates are still lower than the average rates of the PCs that were liquidated during 20 0 We implemented delivery fee increases in 2009 for mortgages with certain combinations of LTV ratios and other higher risk loan characteristics, subject to certain maximum limits We currently believe the increase in management and guarantee fee rates we implemented in 2009 and 2010, when coupled with the higher credit quality of the mortgages within our new PC issuances in 2009 and 2010, will provide management and guarantee fee income, over the long term, that exceeds our anticipated credit related and administrative expenses associated with the underlying loans However, the increase in management and guarantee fees associated with 2009 and 2010 originated business will not be sufficient to offset the future expenses associated with our 2005 to 2008 PC issuances since the management and guarantee fees associated with those securities do not change Consequently, we expect to continue to report a net loss for the Single family Guarantee segment in 2011

Segment Earnings management and guarantee income increased slightly in 2010 compared to 2009, primarily due to an increase in the amortization of delivery fees Increased amortization of delivery fees in 2010, compared to 2009, reflects the impact of higher delivery fees associated with loans purchased in the last two years combined with higher prepayment rates on guaranteed mortgages in 20 0 as mortgage rates declined and refinancing activity increased Segment Earnings management and guarantee income was lower in 2009 than in 2008 primarily due to lower average fee rates in 2009

The UPB of the Single family Guarantee managed loan portfolio was $1 78 trillion at December 31, 2010 compared to $1.86 trillion at December 31, 2009 The decline in this portfolio was primarily attributable to liquidations of Freddie Mac mortgage related securities, partially offset by increased purchases of seriously delinquent mortgages out of PC pools The liquidation rate on our securitized single family credit guarantees increased to 29% for 2010, compared to 24% and 16% in 2009 and 2008, respectively.

Our single family mortgage purchases in 2010 decreased by 19% to $386.4 billion, as compared to $475.4 billion in 2009. Single family mortgage purchase volumes from individual customers can fluctuate significantly Our mortgage purchase volumes are impacted by several factors, including origination volumes, the price performance of our PCs, mortgage product and underwriting trends, competition, customer specific behavior, contract terms, and governmental initiatives concerning our business activities Origination volumes can be affected by government programs, such as the increase in refinance loan volume during 2010 and 2009 associated with our relief refinance initiative Ginnie Mae, which

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011              TREASURY-0729              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

has become a more significant competitor since 2008, guarantees the timely payment of principal and interest on mortgage related securities backed by federally insured or guaranteed loans, primarily those insured by FHA or guaranteed by VA  Ginnie Mae increased its share of the securitization market in 2010, in large part due to favorable pricing of loans insured by FHA, the  increase in the FHA loan limit and the availability, through FHA, of a mortgage product for borrowers seeking greater than  80% financing who could not otherwise qualify for a conventional mortgage

Refinance volumes continued to be high due to continued low  interest rates, and represented 80% of our single family  mortgage purchase volume during 20 0  Relief refinance mortgages  represented 28% of our single family mortgage purchase volume  during 20 0  We believe the combination of high refinance activity (excluding relief refinance mortgages), changes in  underwriting standards and fewer purchases of loans with higher risk characteristics resulted in overall improvement in  the credit quality associated with our single family mortgage  purchases in 2009 and 2010 as compared to purchases from 2005  through 2008 as measured by original LTV ratios, FICO credit scores, and income documentation standards.

During 2010, 2009 and 2008, our Segment Earnings provision for  credit losses for the Single family Guarantee segment was  $18.8 billion, $29.1 billion and $16.3 billion, respectively  Segment Earnings provision for credit losses decreased in 2010, compared to 2009, primarily due to a substantial slow down in the rate of growth in non performing  single family loans, as well as a less significant increase in  loss severity, but was partially offset by an increase in the number of single  family loans subject to individual impairment  resulting from an increase in modifications classified as TDRs during 2010  Our estimates of allowance for loan losses  associated with loans classified as TDRs generally result in an increase in the allowance for loan losses as compared to  non TDR loans evaluated on an aggregate basis  Our Segment Earnings provision for credit losses for the segment was higher in 2009,  compared to 2008, due to increased credit deterioration in our  single family credit guarantee portfolio, primarily related to loans with higher risk characteristics and loans originated in  2007 and 2006. Our Segment Earnings provision for loan losses is generally higher than that recorded under GAAP primarily due to  recognized provision associated with forgone interest income on non performing loans, which is not recognized under GAAP since  the loans are placed on non accrual status

The serious delinquency rate on our single family credit  guarantee portfolio decreased slightly to 3 84% as of  December 31, 2010 from 3 98% as of December 31, 2009 due to a higher volume of loan modifications and foreclosure  transfers, as well as a slowdown in new serious delinquencies  As of December 31, 2010, more than one third of our  single family credit guarantee portfolio is comprised of mortgage loans originated during 2009 and 2010  These new vintages reflect the combination of changes in underwriting  practices and other factors discussed in "BUSINESS      EXECUTIVE SUMMARY      Our Primary Business Objectives" and are replacing the older  vintages that have a higher composition of loans with higher risk characteristics  We currently expect that, over time, this should positively impact the serious delinquency rates and credit losses of our single family credit guarantee  portfolio  Although the volume of new serious delinquencies  declined in each quarter of 2010, our serious delinquency rate  remains high, reflecting continued stress in the housing and  labor markets.

Charge offs associated with single family loans increased to  $16.7 billion in 2010, compared to $9.7 billion in  2009 and $3.4 billion in 2008, primarily due to an increase  in the volume of foreclosure transfers and short sales  See  "RISK MANAGEMENT      Credit Risk *Mortgage Credit Risk*" for further information on our  single family credit guarantee portfolio, including credit  performance, charge offs, and growth in the balance of our non performing assets

Segment Earnings non interest income was $5 0 billion,  $4.2 billion, and $4.5 billion in 2010, 2009, and  2008, respectively  The increase in 2010, compared to 2009 was  primarily due to higher management and guarantee fees, discussed  above, and higher recoveries on loans impaired upon purchase. In 2010, increased recoveries on loans impaired upon purchase  resulted from a higher volume of short sales and foreclosure transfers, compared to 2009, combined with improvements in home  prices in certain geographical areas

Segment Earnings non interest expense was $2 2 billion,  $6.1 billion, and $3.7 billion in 2010, 2009 and 2008,  respectively  The decline in non interest expense in 20  0, compared to 2009, was primarily due to a decline in losses on  loans purchased that resulted from changes in accounting standards adopted on January 1, 2010. Single family  Guarantee REO operations expense increased during 20  0, compared to 2009, as a result of higher property expenses and holding  period write downs that were partially offset by lower  disposition losses and increased recoveries  Single family  Guarantee REO operations expense decreased during 2009,  compared to  2008, primarily due to stabilization of single family home prices in 2009, which mitigated holding period writedowns and  disposition losses  During 2010 and 2009, we experienced significant increases in REO activity in all regions of the  U.S., particularly in California, Florida, Nevada and Arizona. See "RISK MANAGEMENT      Credit Risk    *Mortgage Credit Risk    Portfolio Management Activities    Credit Performance*" for further information on serious delinquency rates and REO activity

<div align="center">86</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings income tax benefit was $608 million and $3.6 billion in 2010 and 2009, respectively. The income tax benefit in 20 0 primarily resulted from carrying back a portion of our expected current year tax loss to offset prior years' income  We exhausted our capacity for carrying back net operating losses for tax purposes during 2010

*Multifamily*

Table 20 presents the Segment Earnings of our Multifamily segment

**Table 20    Segment Earnings and Key Metrics    Multifamily**(1)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (dollars in millions) | | |
| Segmen  Ea n ngs | | | |
| Ne  n e es  ncome | $ 1,114 | $ 856 | $ 772 |
| P ov s on fo c ed  losses | (99) | (574) | (229) |
| Non- n e es  ncome (loss) | | | |
| Managemen  and gua an ee  ncome | 101 | 90 | 76 |
| Secu  y mpa men s | (96) | (137) | |
| De va ve ga ns (losses) | 6 | (27) | (3) |
| O he non- n e es  ncome (loss) | 237 | (462) | (517) |
| To al non- n e es  ncome (loss) | 248 | (536) | (444) |
| Non- n e es  expense | | | |
| Adm n s a ve expenses | (212) | (221) | (193) |
| REO ope a ons  ncome (expense) | 3 | (20) | |
| O he non- n e es  expense | (66) | (18) | (21) |
| To al non- n e es  expense | (275) | (259) | (214) |
| Segmen  adj s e s(2 | | | |
| Segmen  Ea n ngs (loss) befo e  ncome ax benef  (expense) | 988 | (513) | (115) |
| LIHTC pa  e s ps ax be ef | 585 | 594 | 589 |
| Income ax benef  (expense) | (611) | (594) | (532) |
| Less Ne  ( ncome) loss    noncon oll ng n e es | 3 | 2 | 2 |
| Segmen  Ea n ngs ( oss), ne  of axes | 965 | (511) | (56) |
| Reconc l a on o GAAP ne  ncome (loss) | | | |
| C ed  gua an ee- e a ed adj s e s(3 | | 7 | (2) |
| Fa  va ue- e a ed ad us en s | | (3,761) | |
| Tax- e a ed ad us men s | | 1,313 | 1 |
| To al  econc l ng  ems, ne  of axes | | (2,441) | (1) |
| Ne  ncome ( oss) a  bu ab e o F edd e Mac | $  965 | $ (2,952) | $  (57) |
| Key me cs  Mul fam ly | | | |
| *Balances and Growth:* | | | |
| Ave age balance of Mul fam ly loan po  fol o | $83,096 | $78,371 | $64,424 |
| Ave age balance of Mul fam ly gua an ee po  fol o | $21,756 | $16,188 | $ 14,118 |
| Ave age balance of Mul fam ly nves men  secu  es po  fol o | $61,332 | $63,797 | $65,513 |
| L qu da on a e  Mul fam ly loan po  fol o | 5 7% | 3 6% | 6 4% |
| G ow h a e | 8 6% | 14 6% | 27 9% |
| *Yield and Rate:* | | | |
| Ne  n e es y e d    Segmen  Ea n ngs bas s | 0 77% | 0 60% | 0 59% |
| Ave age Managemen  and gua an ee fee  a e, n  ps( | 50 1 | 53 3 | 50 5 |
| *Credit* | | | |
| De nquency a e( | 0 26% | 0 20% | 0 05% |
| Loa  oss ese ves,  bps | 75 3 | 82 1 | 31 3 |
| Loan oss ese ves a  pe od end | $  828 | $  831 | $  277 |
| C ed  osses,  ps(6 | 9 6 | 4 4 | 1 1 |

(1) Beg   g Ja  a y 1, 2010, de o   ev sed e  od, Segmen  Ea n ngs fo  he Mu  fam y segmen  equa s GAAP ne  ncome (loss) a   bu ab e o F edd e Mac fo   he Mul fam ly segmen  Fo  econc l a ons of Segmen  Ea n ngs fo  he Mu  fam y segmen  n 2010, 2009, and 2008 and he Segmen  Ea n ngs fo  he Mul fam ly segmen  compa able l ne  ems n ou  consol da ed f nanc al s a emen s p epa ed n acco dance w h GAAP, see "NOTE 17  SEGMENT REPORTING  Tab e 17 2  Segmen  Ea n ngs and Reconc l a on o GAAP Res  ts"

(2) Fo  a desc p on of ou  seg en ad us  en s see "NOTE 17  SEGMENT REPORTING    Seg e  Ea n ngs    *Segment Adjustments.*"

(3) Cons s s p ma ly of amo  za on and valua on ad us men s pe a n ng o he gua an ee asse  and gua an ee ob ga on, wh ch we e excluded f om Segmen  Ea n ngs n 2009 and 2008

(4) Rep esen s Mul fam ly Segmen  Ea n ngs    managemen  and gua an ee  ncome, exc ud ng p epaymen  and ce a n o he  fees, d v ded by he ave age ba ance of he mu  fam y gua an ee po  fo o, exc ud ng ce a n bonds unde  he NIBP

(5) See "RISK MANAGEMENT    C ed t R sk    *Mortgage Credit Risk    Credit Performance*    Del nquenc es" fo  nfo ma on on ou  epo  ed mul fam ly de nq ency a e

(6) C ed  osses a e equa  o REO ope a ons expenses p us cha ge-offs, ne of  ecove es, assoc a ed w h mul  fam ly mo  gage loans  Calcula ed as he amoun  of c ed  losses d v ded by he comb ned ave age balances of ou  mul  fam ly loan po  fol o and mul  fam ly gua an ee po  fol o

Segment Earnings (loss) for our Multifamily segment increased to  $965 million for 2010 compared to $(511) million for 2009  Segment Earnings (loss) improved in 2010 primarily due to  increased net interest income and lower provision for credit losses in 2010  Segment Earnings (loss) declined to $(511) million in 2009 from $(56) million in 2008,  primarily due to higher provision for credit losses and  recognition of security impairments in 2009.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0731

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0732

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

A primary contributor to the change in Multifamily Segment Earnings in 2010 is the treatment of our LIHTC investments  In  2009 and 2008, LIHTC partnership losses were recognized in the Multifamily Segment, negatively impacting Segment Earnings in those years  At December 3 , 2009, the LIHTC investments were written down to zero and resulted in a favorable variance  in 2010 Segment Earnings as partnership losses were no longer being recognized

Net interest income increased $258 million, or 30%, for  2010 compared to 2009, primarily attributable to lower funding  costs on allocated debt in 2010, which declined principally due  to the removal of the LIHTC investments from the Multifamily  segment in the fourth quarter of 2009  Net interest income was  also positively impacted by an increase in prepayment fees  driven by an increase in refinancing in 2010, as compared to 2009. As a result, net interest yield was 77 basis points in 2010, an improvement of 17 basis points from 2009. Net  interest income increased $84 million, or 11%, for 2009 compared to 2008, driven by a 22% increase in the average  balance of our multifamily loan portfolio and lower interest rates, which decreased our cost of funding.

Segment Earnings non interest income (loss) increased to  $248 million in 2010 compared to $(536) million in  2009, primarily attributable to the absence of LIHTC partnership losses in 2010  Multifamily Segment Earnings non interest income  (loss) also increased, although to a much lesser extent, due to higher gains recognized on the sale of loans through  securitization  We recognized $267 million in net gains on sales of $6.6 billion in UPB of multifamily loans during  the year ended December 3 , 20 0  These gains were  partially offset by $249 million in fair value losses recognized on mortgage loans held for sale reflecting market  volatility  Impairment on CMBS during 2010 and 2009 totaled $96 million and $137 million, respectively. There were  no impairments recognized for either GAAP or Segment Earnings on  available for sale CMBS during 2008.

Major national multifamily market fundamentals improved during  2010, with several consecutive quarters of positive trends in  vacancy rates and effective rents. Vacancy rates, which had climbed to record levels in early 20 0, improved and effective  rents, the principal source of income for property owners, stabilized and began to improve on a national basis. These  improving fundamentals helped to stabilize property values in a number of markets. However, the multifamily market continues to be negatively impacted by high unemployment and ongoing weakness in the economy  The multifamily mortgage market differs from the  residential single family market in several respects  The likelihood that a multifamily borrower will make scheduled  payments on its mortgage is based on the ability of the property  to generate sufficient cash flow to make those payments, and is generally affected by rent levels, vacancy rates and property  operating expenses  The multifamily market is affected by the balance between the supply of, and demand for, rental housing  (both multifamily and single family), which in turn is affected  by unemployment rates, the number of new units added to the  rental housing supply, rates of household formation and the  relative cost of owner occupied housing alternatives  However, some local markets continue to exhibit weaker than average  fundamentals, particularly in the states of Nevada, Arizona, and Georgia, which may increase our risk for future losses. For  further information on delinquencies, including geographical and other concentrations see "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment provision for credit losses decreased to  $99 million in 2010 from $574 million in 2009,  reflecting improved fundamentals, as discussed above. This decrease was partially offset by an increase in the amount  of loans identified as impaired and the specific reserve recorded in connection with those loans  The increase in Multifamily  segment provision for credit losses in 2009, as compared to 2008, reflected significant deterioration in multifamily market  fundamentals including higher vacancy rates and declines in  effective rental rates, which adversely affected our multifamily borrowers  For loans we identify as having deteriorating  underlying performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual property, using estimates of property value to determine if a  specific reserve is needed  Although we use the most recently available results of our multifamily borrowers to assess a  property's value, there is a significant lag in reporting as they prepare their results in the normal course of business.

The delinquency rate for loans in the multifamily mortgage  portfolio was 0 26% and 0 20% as of December 31, 2010 and  2009, respectively, and increased in 2010 due to weakness in  certain markets. Our multifamily delinquent loans as of December 31, 2010 are principally loans on properties located in Georgia and Texas  As of December 3 , 20 0, over one half of the multifamily loans, measured both in terms of  number of loans and on a UPB basis, that were two monthly  payments or more past due had credit enhancements that we  currently believe will mitigate our expected losses on those loans  The multifamily delinquency rate of credit enhanced loans  as of December 31, 2010 and 2009, was 0.85% and 1.03%, respectively, while the delinquency rate for non credit enhanced  loans was 0 12% and 0 07%, respectively  See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Performance*    Delinquencies" for further information about our reported delinquency rates

We account for multifamily mortgages as TDRs where the original  terms of the mortgage loan agreement are modified due to the  borrower's financial difficulties, and we have granted a concession  Accounting for TDRs requires recognition in the provision for credit losses for the excess of our recorded investment in the loan over the present value of the expected

<div align="center">88</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

future cash flows. This generally results in a higher allowance for loan losses than for loans that are not TDRs. In 2010, we experienced increased volumes of TDRs and REO acquisitions, compared to 2009. Refinance risk, which is the risk that a multifamily borrower with a maturing balloon mortgage will not be able to refinance and will instead default, is significant given the state of the economy, lower levels of liquidity, property cash flows, and property market values. This is also likely to lead to an increase in the volume of TDRs and REO acquisitions. REO and loss mitigation activities resulted in net charge offs of $103 million in 2010 In 2011, we expect our charge offs will continue to increase, driven by a higher level of REO acquisitions and loss mitigation activities, as we continue to work with borrowers to resolve troubled loans

The UPB of the total multifamily portfolio increased to $169.5 billion at December 31, 2010 from $164.0 billion at December 31, 2009, due to increased guarantees of securities issued during 2010 as part of our CME initiative as well as increased purchases of loans, which we expect to securitize in 2011. Subject to market conditions, we expect to continue to purchase loans and subsequently securitize these loans in 2011 under our CME initiative, which supports liquidity for the multifamily market.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our more significant accounting policies and estimates applied in determining our reported financial position

### Change in Accounting Principles

As a result of our adoption of two new accounting standards that amended the guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs, our consolidated balance sheets as of December 3 , 20 0 reflect the consolidation of our single family PC trusts and certain Other Guarantee Transactions The cumulative effect of these changes in accounting principles was an increase of $1.5 trillion to assets and liabilities, and a net decrease of $11.7 billion to total equity (deficit) as of January 1, 2010, which included changes to the opening balances of retained earnings (accumulated deficit) and AOCI This net decrease was driven principally by: (a) the elimination of unrealized gains resulting from the extinguishment of PCs held as investment securities upon consolidation of the PC trusts, representing the difference between the UPB of the loans underlying the PCs and the fair value of the PCs, including premiums, discounts, and other basis adjustments; (b) the elimination of the guarantee asset and guarantee obligation established for guarantees issued to securitization trusts we consolidated; and (c) the application of our non accrual policy to single family seriously delinquent mortgage loans consolidated as of January 1, 20 0

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Consolidation and Equity Method of Accounting," "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES," "NOTE 4: VARIABLE INTEREST ENTITIES," and "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information regarding these changes

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities      Non Mortgage Related Securities," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market We use these assets to help manage recurring cash flows and meet our other cash management needs We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System Securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities As discussed above, commencing January 1, 2010, we consolidated the assets of our single family PC trusts and certain Other Guarantee Transactions. These short term assets are comprised primarily of restricted cash and cash equivalents and investments in securities purchased under agreements to resell

Excluding amounts related to our consolidated VIEs, we held $37.0 billion and $64.7 billion of cash and cash equivalents, $1.4 billion and $0 billion of federal funds sold, and $15.8 billion and $7.0 billion of securities purchased under agreements to resell at December 31, 2010 and December 31, 2009, respectively The aggregate decrease in these assets is largely related to using such assets for debt calls and maturities, as well as purchases of delinquent mortgages from PC pools during 2010 In addition, excluding amounts related to our consolidated VIEs, we held on average $42.2 billion and $55.8 billion of cash and cash equivalents and $29.4 billion and $28.5 billion of federal funds sold and securities purchased under agreements to resell during the years ended December 31, 2010 and 2009, respectively

### Investments in Securities

Tables 21 and 22 provide detail regarding our investments in securities as of December 31, 2010, 2009, and 2008 Due to the accounting changes noted above, Tables 21 and 22 do not include our holdings of single family PCs and certain Other

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0734

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Guarantee Transactions as of December 31, 2010  For information on our holdings of such securities, see "Table 16    Segment Mortgage Portfolio Composition"

## Table 21    Investments in Available For Sale Securities

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $ (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | | 296 |
| Total available-for-sale mortgage-related securities | 247,523 | 8,188 | (23,077) | 232,634 |
| Total investments in available-for-sale securities | $ 247,523 | $ 8,188 | $(23,077) | $ 232,634 |
| December 31, 2009 | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 215,198 | $ 9,410 | $ (1,141) | $ 223,467 |
| Subprime | 56,821 | 2 | (21,102) | 35,721 |
| CMBS | 61,792 | 15 | (7,788) | 54,019 |
| Option ARM | 13,686 | 25 | (6,475) | 7,236 |
| Alt-A and other | 18,945 | 9 | (5,547) | 13,407 |
| Fannie Mae | 34,242 | 1,312 | (8) | 35,546 |
| Obligations of states and political subdivisions | 11,868 | 49 | (440) | 11,477 |
| Manufactured housing | 1,084 | 1 | (174) | 911 |
| Ginnie Mae | 320 | 27 | | 347 |
| Total available-for-sale mortgage-related securities | 413,956 | 10,850 | (42,675) | 382,131 |
| Available-for-sale non-mortgage-related securities | | | | |
| Asset-backed securities | 2,444 | 109 | | 2,553 |
| Total available-for-sale non-mortgage-related securities | 2,444 | 109 | | 2,553 |
| Total investments in available-for-sale securities | $ 416,400 | $10,959 | $(42,675) | $ 384,684 |
| December 31, 2008 | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 271,796 | $ 6,333 | $ (2,921) | $ 275,208 |
| Subprime | 71,399 | 13 | (19,145) | 52,267 |
| CMBS | 64,214 | 2 | (14,716) | 49,500 |
| Option ARM | 12,117 | | (4,739) | 7,378 |
| Alt-A and other | 20,032 | 11 | (6,787) | 13,256 |
| Fannie Mae | 40,255 | 674 | (88) | 40,841 |
| Obligations of states and political subdivisions | 12,874 | 3 | (2,349) | 10,528 |
| Manufactured housing | 917 | 9 | (183) | 743 |
| Ginnie Mae | 367 | 16 | | 383 |
| Total available-for-sale mortgage-related securities | 493,971 | 7,061 | (50,928) | 450,104 |
| Available-for-sale non-mortgage-related securities | | | | |
| Asset-backed securities | 8,788 | 6 | | 8,794 |
| Total available-for-sale non-mortgage-related securities | 8,788 | 6 | | 8,794 |
| Total investments in available-for-sale securities | $ 502,759 | $ 7,067 | $(50,928) | $458,898 |

(1) Gross unrealized losses at December 31, 2010 and 2009 include non-credit-related other-than-temporary impairments on available-for-sale securities recognized in AOCI and all periods presented include temporary unrealized losses

*Freddie Mac*

Source   DRA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0735

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22    Investments in Trading Securities**

| | December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | | (in millions) | |
| Mortgage-related securities | | | |
| Freddie Mac | $ 13,437 | $ 170,955 | $ 158,822 |
| Fannie Mae | 18,726 | 34,364 | 31,309 |
| Ginnie Mae | 172 | 185 | 198 |
| Other | 31 | 28 | 32 |
| To al mortgage-related securities | 32,366 | 205,532 | 190,361 |
| Non-mortgage-related securities | | | |
| Asset-backed securities | 44 | 1,492 | |
| Treasury bills | 17,289 | 14,787 | |
| Treasury notes | 10,122 | | |
| FDIC-guaranteed corporate medium-term notes | 441 | 439 | |
| Total non-mortgage-related securities | 27,896 | 16,718 | |
| Total fair value of investments in trading securities | $ 60,262 | $ 222,250 | $ 190,361 |

### *Non-Mortgage-Related Securities*

Our investments in non mortgage related securities provide an additional source of liquidity for us. We held investments in non-mortgage-related available for sale and trading securities of $27.9 billion and $19.3 billion as of December 31, 2010 and December 31, 2009, respectively Our holdings of non mortgage related securities at December 3 , 20 0 increased compared to December 3 , 2009 due to the acquisition of Treasury notes and additional Treasury bills to maintain required liquidity and contingency levels, partially offset by our sale of the majority of our non mortgage related asset backed securities in 20 0

We did not record a net impairment of available for sale securities recognized in earnings during 20 0 on our non mortgage related securities We recorded net impairments of $185 million for our non mortgage related securities during 2009, as we could not assert that we did not intend to, or will not be required to, sell these securities before a recovery of the unrealized losses. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information on how other than temporary impairments are recorded on our financial statements commencing in the second quarter of 2009

### *Mortgage-Related Securities*

We are primarily a buy and hold investor in mortgage related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions  We also invest in our own mortgage related securities  However, upon our adoption of amendments to the accounting standards for transfers of financial assets and consolidation of VIEs on January 1, 2010, we no longer account for single family PCs and certain Other Guarantee Transactions we purchase as investments in securities because we now recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts

Table 23 provides the UPB of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets  Due to the accounting changes noted above, Table 23 does not include our holdings of single family PCs and certain Other Guarantee Transactions as of December 31, 2010, but includes such securities as of December 31, 2009  For further information on our holdings of such securities, see "Table 6   Segment Mortgage Portfolio Composition "

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0736

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23     Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets**

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2009 | | |
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities (2 | | | | | | |
| Single-family | $ 79,955 | $ 8,118 | $ 88,073 | $294,958 | $ 77,708 | $372,666 |
| Multifamily | 339 | 1,756 | 2,095 | 277 | 1,672 | 1,949 |
| Total Freddie Mac mortgage-related securities | 80,294 | 9,874 | 90,168 | 295,235 | 79,380 | 374,615 |
| Non-Freddie Mac mortgage-related securities | | | | | | |
| Agency securities (3 | | | | | | |
| Fannie Mae | | | | | | |
| Single-family | 21,238 | 18,139 | 39,377 | 36,549 | 28,585 | 65,134 |
| Multifamily | 228 | 88 | 316 | 438 | 90 | 528 |
| Ginnie Mae | | | | | | |
| Single-family | 296 | 117 | 413 | 341 | 133 | 474 |
| Multifamily | 27 | | 27 | 35 | | 35 |
| Total agency securities | 21,789 | 18,344 | 40,133 | 37,363 | 28,808 | 66,171 |
| Non-agency mortgage-related securities | | | | | | |
| Single-family ( | | | | | | |
| Subprime | 363 | 53,855 | 54,218 | 395 | 61,179 | 61,574 |
| Option ARM | | 15,646 | 15,646 | | 17,687 | 17,687 |
| Alt-A and other | 2,405 | 16,438 | 18,843 | 2,845 | 18,594 | 21,439 |
| CMBS | 21,401 | 37,327 | 58,728 | 23,476 | 38,439 | 61,915 |
| Obligations of states and political subdivisions( | 9,851 | 26 | 9,877 | 11,812 | 42 | 11,854 |
| Manufactured housing | 930 | 150 | 1,080 | 1,034 | 167 | 1,201 |
| Total non-agency mortgage-related securities(6 | 34,950 | 123,442 | 158,392 | 39,562 | 136,108 | 175,670 |
| Total UPB of mortgage-related securities | 137,033 | 151,660 | 288,693 | 372,160 | 244,296 | 616,456 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (11,839) | | | (5,897) |
| Net unrealized gains (losses) on mortgage-related securities, pre-tax | | | (11,854) | | | (22,896) |
| Total carrying value of mortgage-related securities | | | $ 265,000 | | | $587,663 |

(1) Variable-rate mortgage-related securities include those which have contractual coupon rate, at a point in time, that vary, as yields associated with changes in the indexes change or as subject to change based on changes in the composition of the underlying collateral.

(2) For our Freddie Mac mortgage-related securities we are a subject to the credit risk associated with the mortgage loans underlying our securities. On January 1, 2010, we began prospectively recognizing on our consolidated balance sheets the mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions as held-for-investment mortgage loans, at amortized cost. We do not consolidate our securitization trusts since we are not deemed to be the primary beneficiary of such trusts. See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES Investees Securitization" for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equal to our non-agency mortgage-related securities AAA-rated equivalence.

(4) For information about how these securities are rated, see "Table 28 Ratings of Available-For-Sale Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 50% and 55% of these securities had a December 31, 2010 and 2009, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 23% and 26% of total non-agency mortgage-related securities held at December 31, 2010 and 2009, respectively, were AAA-rated as of those dates, based on the lowest rating available.

The total UPB of our investments in mortgage related securities on our consolidated balance sheets decreased from $616.5 billion at December 31, 2009 to $288.7 billion at December 31, 2010 primarily as a result of a decrease of $286.5 billion related to our adoption of the amendments to the accounting standards for the transfer of financial assets and the consolidation of VIEs on January 1, 2010.

Table 24 summarizes our mortgage related securities purchase activity for 2010, 2009, and 2008. The purchase activity for all years presented includes our purchase activity related to the single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Due to the consolidation changes noted above, effective January 1, 2010, purchases of single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

92

*Freddie Mac*

TREASURY-0737

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24    Total Mortgage Related Securities Purchase Activity**[1]

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (in millions) | | |
| Non-Freddie Mac mortgage-related securities purchased for securitization | | | |
| Ginnie Mae Certificates | $ 69 | $ 56 | $ 36 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 9,579 | 10,189 | 8,246 |
| Total Non-Freddie Mac mortgage-related securities purchased for securitization | 9,648 | 10,245 | 8,282 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities | | | |
| Agency securities | | | |
| *Fannie Mae:* | | | |
| Fixed-rate | | 43,298 | 49,534 |
| Variable-rate | 373 | 2,697 | 18,519 |
| Total Fannie Mae | 373 | 45,995 | 68,053 |
| *Ginnie Mae fixed-rate* | | 27 | 8 |
| *Total agency securities* | 373 | 46,022 | 68,061 |
| Non-agency mortgage-related securities | | | |
| *Single-family variable-rate* | | | 618 |
| *CMBS* | | | |
| Fixed-rate | | | 713 |
| Variable-rate | 40 | | 703 |
| Total CMBS | 40 | | 1,416 |
| *Obligations of states and political subdivisions, fixed-rate* | | 180 | 81 |
| *Total non-agency mortgage-related securities* | 40 | 180 | 2,115 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 413 | 46,202 | 70,176 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 10,061 | $ 56,447 | $ 78,458 |
| Freddie Mac mortgage-related securities repurchased | | | |
| *Single-family:* | | | |
| Fixed-rate | $40,462 | $ 176,974 | $ 192,701 |
| Variable-rate | 923 | 5,414 | 26,344 |
| *Multifamily* | | | |
| Fixed-rate | 271 | | 111 |
| Variable-rate | 111 | | |
| *Total Freddie Mac mortgage-related securities repurchased* | $41,767 | $182,388 | $219,156 |

(1) Based on UPB. Excludes mortgage-related securities added but not yet settled.

(2) Purchases in 2010 and 2009 include HFA bonds we acquired and securitized under NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" for further information on this component of the HFA Initiative.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At December 31, 2010, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $23.1 billion, compared to $42.7 billion at December 31, 2009. This improvement in unrealized losses reflects: (a) a decline in market interest rates; and (b) fair value gains related to the movement of securities with unrealized losses towards maturity. We believe the unrealized losses related to these securities at December 31, 2010 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage related securities. All securities in an unrealized loss position are evaluated to determine if the impairment is other than temporary. See "Total Equity (Deficit)" and "NOTE 8: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not

Source: DRAHOM LOAN MORTGAG CORP, 10-K, February 24, 2011                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0738

Table of Contents

identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt A securities. Tables 25 and 26 present information about our holdings of these securities

**Table 25    Non Agency Mortgage Related Securities Backed by Subprime First Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics[1]**

|  | As of | | | | |
|---|---|---|---|---|---|
|  | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 | 12/31/2009 |
|  |  |  | (dollars in millions) | | |
| UPB |  |  |  |  |  |
| Subprime first lien | $53,756 | $55,250 | $56,922 | $58,912 | $ 61,019 |
| Option ARM | 15,646 | 16,104 | 16,603 | 17,206 | 17,687 |
| Alt-A[2] | 15,917 | 16,406 | 16,909 | 17,476 | 17,998 |
| Gross unrealized losses, pre-tax [3] |  |  |  |  |  |
| Subprime first lien | $ 14,026 | $16,446 | $17,757 | $18,462 | $20,998 |
| Option ARM | 3,853 | 4,815 | 5,770 | 6,147 | 6,475 |
| Alt-A[2] | 2,096 | 2,542 | 3,335 | 3,539 | 4,032 |
| Present value of expected credit losses |  |  |  |  |  |
| Subprime first lien | $ 5,937 | $ 4,364 | $ 3,311 | $ 4,444 | $ 4,263 |
| Option ARM | 4,850 | 4,208 | 3,534 | 3,769 | 3,700 |
| Alt-A[2] | 2,469 | 2,101 | 1,653 | 1,635 | 1,845 |
| Collateral delinquency rate [4] |  |  |  |  |  |
| Subprime first lien | 45% | 45% | 46% | 49% | 49% |
| Option ARM | 44 | 44 | 45 | 46 | 45 |
| Alt-A[2] | 27 | 26 | 26 | 27 | 26 |
| Cumulative collateral loss [5] |  |  |  |  |  |
| Subprime first lien | 18% | 17% | 16% | 15% | 13% |
| Option ARM | 13 | 11 | 10 | 9 | 7 |
| Alt-A[2] | 6 | 6 | 5 | 5 | 4 |
| Average credit enhancement [6] |  |  |  |  |  |
| Subprime first lien | 25% | 25% | 26% | 28% | 29% |
| Option ARM | 12 | 12 | 13 | 15 | 16 |
| Alt-A[2] | 9 | 9 | 10 | 10 | 11 |

(1) See *"Ratings of Available-For-Sale Non-Agency Mortgage-Related Securities"* for additional information on our holdings of these securities

(2) Excludes non-agency mortgage-related securities backed by other loans, which change primarily comprised of securities backed by home equity lines of credit

(3) Represents the aggregate of the amount by which amortized cost, after the han-tempo-ary impairment, exceeds fair value measured at the end value over

(4) De ermined based on the number of loans that are two monthly payers or less or epast due at a determined set base using information on our holdings of man h-d-pay data at provide

(5) Based on the actual losses incurred on the collateral underlying these securities. Actual losses credit or these securities as whole data is significant any ess than the losses on the underlying collateral because a present en his ab e, as non-agency mortgage-related securities backed by subprime first lien, opto ARM, a d Al-A loans were serviced or credited at a certain place s, pa ca y h ough subordination

(6) Reflects the amount or excess as awe absolute sses n he securitization is successful before any losses are allocated or securities has we own. Percentage gene a y calcula ed based on the total UPB of a credit enhancement in the form of subordination of the securities divided by the total UPB of a of he tranches of collateral pools from which credit is supported aw for securi y as we own   Excludes credit enhancement provided by mono ne bond insurance

**Table 26    Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans[1]**

|  | Three Months ended | | | | |
|---|---|---|---|---|---|
|  | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 | 12/31/2009 |
|  |  |  | (in millions) | | |
| Net impairment of available-for-sale securities recognized in earnings |  |  |  |  |  |
| Subprime first lien and second liens | $ 1,207 | $ 213 | $ 17 | $ 332 | $ 515 |
| Option ARM | 668 | 577 | 48 | 102 | 15 |
| Alt-A and other | 372 | 296 | 333 | 19 | 51 |
| Principal repayments and cash shortfalls [2] |  |  |  |  |  |
| Subprime first lien and second liens |  |  |  |  |  |
| Principal repayments | $ 1,512 | $1,685 | $2,001 | $2,117 | $2,807 |
| Principal cash shortfalls | 6 | 8 | 12 | 13 | 14 |
| Option ARM |  |  |  |  |  |
| Principal repayments | $ 347 | $ 377 | $ 435 | $ 449 | $ 525 |
| Principal cash shortfalls | 111 | 122 | 80 | 32 | 2 |
| Alt-A and other |  |  |  |  |  |
| Principal repayments | $ 537 | $ 582 | $ 653 | $ 617 | $ 792 |
| Principal cash shortfalls | 62 | 56 | 67 | 22 | 21 |

(1) See *"Ratings of Available-For-Sale Non-Agency Mortgage-Related Securities"* for additional information on our holdings of these securities

(2) In addition on the conactual net expected net revenue monthly remittances of principal repayments from the recoveries of quidated oans and, on a esse extent, vo un a y repayments of the underlying collateral of these securities representing a peun of oun investment in these securities

Since the first quarter of 2008, we have not purchased any non agency mortgage related securities backed by subprime, option ARM, or Alt A loans. As discussed above, we recognized impairment on our holdings of such securities in 2010 and 2009, including during the three months ended December 31, 2010 and 2009  See "Table 27   Net Impairment on Available For Sale Mortgage Related Securities Recognized in Earnings" for more information

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0739

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0740

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We continue to pursue strategies to mitigate our losses as an investor in non agency mortgage related securities On July 12, 2010, FHFA, as Conservator of Freddie Mac and Fannie Mae, announced that it had issued subpoenas to various entities seeking loan files and other transaction documents related to non agency mortgage related securities in which the two enterprises invested FHFA stated that the documents will enable it to determine whether issuers of these securities and others are liable to Freddie Mac and Fannie Mae for certain losses they have suffered on the securities We are assisting FHFA in this effort In its announcement, FHFA noted that, before and during conservatorship, Freddie Mac and Fannie Mae sought to assess and enforce their rights as investors in non agency mortgage related securities, in an effort to recoup losses suffered in connection with their portfolios However, difficulty in obtaining the loan documents has presented a challenge to the companies' efforts There is no assurance as to how the various entities will respond to the subpoenas, or to what extent the information sought will result in loss recoveries

We also have joined an investor group that has delivered a notice of non performance to Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP) The notice related to the possibility that certain mortgage pools backing certain mortgage related securities issued by Countrywide Financial and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties

The effectiveness of these or any other loss mitigation efforts for these securities is highly uncertain and any potential recoveries may take significant time to realize These efforts could have a material impact on our estimate of future losses

For purposes of our impairment analysis, our estimate of the present value of expected future credit losses on our portfolio of non agency mortgage related securities increased to $14 3 billion at December 31, 2010 from $12.0 billion at September 30, 2010. This deterioration was due to an increase in estimated cumulative losses on the collateral underlying these securities and a reduction in the projected structural credit enhancement of the securities The increase in estimated cumulative losses resulted from declines in actual home prices, our expectation that home prices will be lower in 2011 compared to 2010 for the U S as a whole, as well as increasing interest rates, which affect the expected eve of voluntary prepayments and defaults on adjustable rate mortgages Increasing interest rates also reduce the expected benefits of credit enhancements by decreasing the excess interest available to the trust to absorb future collateral losses

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $705 million on impaired non agency mortgage-re ated securities, of which $598 million related to 2010 Many of the trusts that issued non agency mortgage related securities we hold were structured so that realized collateral losses in excess of credit enhancements are not passed on to investors until the investment matures We currently estimate that the future expected principal and interest shortfalls on non agency mortgage related securities we hold will be significantly less than the fair value declines experienced on these securities In addition, it is difficult to estimate the point at which credit enhancements will be exhausted During 20 0, we continued to experience the depletion of credit enhancements on selected securities backed by subprime first lien, option ARM, and Alt A loans due to poor performance of the underlying collateral

The investments in non agency mortgage related securities we hold backed by subprime first lien, option ARM, and Alt A loans we e structured to include credit enhancements, particularly through subordination. Bond insurance is an additional credit enhancement covering some of the non agency mo tgage related securities These credit enhancements are one of the primary reasons we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate For more information, see "RISK MANAGEMENT Credit Risk    *Institutional Credit Risk    Bond Insurers*."

The concerns about deficiencies in foreclosure documentation practices may also adversely affect the values of, and our losses on, non agency mortgage related securities we hold, including by causing further delays in foreclosure timelines

<div align="center">9 5</div>

<div align="right">*Freddie Mac*</div>

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*

Table 27 provides information about the mortgage related securities for which we recognized other than temporary impairments for the three months ended December 3 , 20 0 and 2009.

**Table 27    Net Impairment on Available For Sale Mortgage Related Securities Recognized in Earnings**

| | Three Months nded | | | |
| | December 31, 2010 | | December 31, 2009 | |
| | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings |
| | | (in millions) | | |
| Subp me | | | | |
| 2006 & 2007 f s l en | $ 31,315 | $        1,191 | $26,398 | $        499 |
| O e yea s   f s a d seco d ens(1 | 1,005 | 16 | 870 | 16 |
| To a subp e  f s and second ens(1 | 32,320 | 1,207 | 27,268 | 515 |
| Op on ARM | | | | |
| 2006 & 2007 | 11,142 | 585 | 2,516 | 15 |
| O he yea s | 2,156 | 83 | 167 | |
| To al op on ARM | 13,298 | 668 | 2,683 | 15 |
| A -A | | | | |
| 2006 & 2007 | 4,987 | 204 | 2,516 | 35 |
| O he yea s | 6,062 | 161 | 871 | 16 |
| To al Al -A | 11,049 | 365 | 3,387 | 51 |
| O he loans | 616 | 7 | 80 | |
| To a s bp e, op o ARM, Al -A a d o he loans | 57,283 | 2,247 | 33,418 | 581 |
| CMBS | 1,141 | 19 | 1,596 | 83 |
| Ma fac ed o s g | 312 | 4 | 142 | 3 |
| To a ava ab e-fo -sa e mo gage- e a ed secu es | $58,736 | $        2,270 | $ 35,156 | $        667 |

(1) Includes all second l ens

We recorded net impairment of available for sale mortgage related securities recognized in earnings of $2.3 billion and $4.3 billion during the three months and year ended December 31, 2010, respectively, as our estimate of the present value of expected future credit losses  on certain individual securities increased during the periods  Included in these net impairments are $2.2 billion and $4 2 billion of impairments related to securities backed by subprime, option ARM, and Alt A and other loans during the three months and year ended December 3 , 20 0, respectively

The credit performance of loans underlying our holdings of  non agency mortgage related securities has been declining for  several years. This decline has been particularly severe for  subprime, option ARM, and Alt A and other loans  Many of the same economic factors impacting the performance of our single family credit guarantee portfolio also  impact the performance of our investments in non agency  mo tgage-re ated securities  High unemployment, a large  inventory of seriously delinquent mortgage loans and unsold  homes, tight credit conditions, and weak consumer confidence contributed to poor performance during the three months and year  ended December 31, 2010  In addition, subprime, option ARM, and Alt A and other loans backing the securities we hold have  significantly greater concentrations in the states that are  undergoing the greatest economic stress, such as California,  Florida, Arizona, and Nevada. Loans in these states undergoing  economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to  be higher

We rely on monoline bond insurance, including secondary  coverage, to provide credit protection on some of our  investments in non agency mortgage related securities  We have  determined that there is substantial uncertainty surrounding  certain monoline bond insurers' ability to pay our future claims on expected credit losses related to our non agency  mortgage related security investments  This uncertainty  contributed to the impairments recognized in earnings during the  years ended December 31, 2010 and 2009  See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS      Bond Insurers" for additional information.

While it is reasonably possible that collateral losses on our  available for sale mortgage related securities where we have not  recorded an impairment earnings charge could exceed our credit  enhancement levels, we do not believe that those conditions were  likely at December 31, 2010  Based on our conclusion that we do  not intend to sell our remaining available for sale  mortgage related securities in an unrealized loss position and it is not more likely than not that we will be required to sell  these securities before a sufficient time to recover all  unrealized losses and our consideration of other available  information, we have concluded that the reduction in fair value  of these securities was temporary at December 3 , 2010 and as such has been recorded in AOCI

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During the three months and year ended December 31, 2009, we recorded net impairment of available for sale mortgage related securities recognized in earnings of $0.7 billion and $11.0 billion, respectively. The impairments recorded during the three months ended December 3 , 2009 related primarily to increases in expected future credit losses on our holdings of non agency mortgage related securities Of the impairments recorded during the year ended December 31, 2009, $6.9 billion were recognized in the first quarter, prior to our adoption of the amendment to the accounting standards related to investments in debt and equity securities, and included both credit and non credit related other than temporary impairments. For further information on our adoption of the amendment to the accounting standards for investments in debt and equity securities and how other than temporary impairments are recorded on our financial statements commencing in the second quarter of 2009, see "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES     Other Changes in Accounting Principles     *Change in the Impairment Model for Debt Securities.*" See "NOTE 8: INVESTMENTS IN SECURITIES" for additional information regarding the accounting principles for investments in debt and equity securities and the other than temporary impairments recorded during the years ended December 31, 2010, 2009, and 2008.

Our assessments concerning other than temporary impairment require significant judgment and the use of models, and are subject to potentially significant change due to the performance of the individual securities and mortgage market conditions  Depending on the structure of the individual mortgage related security and our estimate of collateral losses relative to the amount of credit support available for the senior tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security  Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities  Foreclosure processing suspensions can also affect our losses  For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the senior tranches we own  Given the extent of the housing and economic downturn over the past few years, it is difficult to estimate the future performance of mortgage loans and mortgage related securities with any assurance, and actual results could differ materially from our expectations  Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls  For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non agency mortgage related securities we hold, see "RISK FACTORS     Operational Risks     *Our expenses could increase and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process.*"

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Ratings of Available For Sale Non Agency Mortgage Related Securities*

Table 28 shows the ratings of available for sale non agency mortgage related securities backed by subprime, option ARM, Alt A and other loans, and CMBS held at December 31, 2010 based on their ratings as of December 31, 2010 as well as those held at December 31, 2009 based on their ratings as of December 3 , 2009 using the lowest rating available for each security

**Table 28    Ratings of Available For Sale Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans, and CMBS**

| Credit Ratings as o  December 31, 2010 | UPB | Percentage of UPB | Amortized Cost (dollars in millions) | Gross Unrealized Losses | Monoline Insurance Coverage(1) |
|---|---|---|---|---|---|
| Subp me loans | | | | | |
| AAA- a ed | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| O he nves men g ade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below nves men g ade(2 | 48,718 | 90 | 42,423 | (13,421) | 1,789 |
| o a | $ 54,210 | 100% | $ 47,916 | $ (14,056) | $ 2,269 |
| Op on ARM oans | | | | | |
| AAA- a ed | $ | % | $ | $ | $ |
| O he nves men g ade | 139 | 1 | 140 | (18) | 129 |
| Below nves men g ade(2 | 15,507 | 99 | 10,586 | (3,835) | 50 |
| o a | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| A -A and o he oans | | | | | |
| AAA- a ed | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| O he nves men g ade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below nves men g ade(2 | 14,789 | 78 | 11,495 | (2,002) | 2,443 |
| o a | $18,843 | 100% | $ 15,561 | $ (2,451) | $ 2,818 |
| CMBS | | | | | |
| AAA- a ed | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| O he nves men g ade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below nves men g ade(2 | 3,897 | 7 | 3,644 | (1,191) | 1,704 |
| o a | $58,681 | 100% | $58,455 | $ (1,919) | $ 3,401 |
| Credit Ratings as of December 31, 2009 | | | | | |
| Subp me loans | | | | | |
| AAA- a ed | $ 4,600 | 7% | $ 4,597 | $ (643) | $ 34 |
| O he nves men g ade | 6,248 | 10 | 6,247 | (1,562) | 625 |
| Below nves men g ade(2 | 50,716 | 83 | 45,977 | (18,897) | 1,895 |
| o a | $ 61,564 | 100% | $56,821 | $ (21,102) | $ 2,554 |
| Op on ARM oans | | | | | |
| AAA- a ed | $ | % | $ | $ | $ |
| O he nves men g ade | 350 | 2 | 345 | (152) | 166 |
| Below nves men g ade(2 | 17,337 | 98 | 13,341 | (6,323) | 163 |
| o a | $ 17,687 | 100% | $13,686 | $ (6,475) | $ 329 |
| A -A and o he oans | | | | | |
| AAA- a ed | $ 1,825 | 9% | $ 1,844 | $ (247) | $ 9 |
| O he nves men g ade | 4,829 | 23 | 4,834 | (1,051) | 530 |
| Below nves men g ade(2 | 14,785 | 68 | 12,267 | (4,249) | 2,752 |
| o a | $ 21,439 | 100% | $18,945 | $ (5,547) | $ 3,291 |
| CMBS | | | | | |
| AAA- a ed | $ 32,831 | 53% | $ 32,914 | $ (2,108) | $ 43 |
| O he nves men g ade | 26,233 | 42 | 26,167 | (4,661) | 1,658 |
| Below nves men g ade(2 | 2,813 | 5 | 2,711 | (1,019) | 1,701 |
| o a | $61,877 | 100% | $ 61,792 | $ (7,788) | $ 3,402 |

(1) Rep esen he amoun of UPB cove ed by mono ne nsu ance cove age Th s amoun does no ep esen he max mum amoun of osses we cou d ecove , as e monol ne nsu ance also cove s n e es

(2) I c des sec es w S&P c ed a gs be ow BBB- a d ce a n secu es ha a e no onge a ed

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet increased to $1.9 trillion as of December 31, 2010 from $138.8 billion as of December 31, 2009, primarily due to a change in the accounting for consolidation of VIEs discussed in "Change in Accounting Principles," which resulted in our consolidation of assets underlying approximately $1.8 trillion of our PCs and $21 billion of Other Guarantee Transactions as of January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information on the impact of these accounting changes, and "NOTE 5:

*Freddie Mac*

Source  D RA HOM  OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0744

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

MORTGAGE LOANS AND LOAN LOSS RESERVES" for characteristics and other information, including amounts and changes in our loan loss reserves, as well as a reconciliation of the UPB amounts of our mortgage loans to the amounts recorded on our consolidated balance sheets

The UPB of unsecuritized single family mortgage loans increased by $94.0 billion, to $148.9 billion at December 3 , 20 0 from $54.9 billion at December 31, 2009, primarily due to increased purchases of seriously delinquent and modified loans from the mortgage pools underlying our PCs. As guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools when they are significantly past due or when we determine that loss of the property is likely or default by the borrower is imminent due to borrower incapacity, death or other extraordinary circumstances that make future payments unlikely or impossible. This right to repurchase mortgages is known as our repurchase option, and we also exercise this option when we modify a mortgage See "NOTE 6: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for more information on our purchases of single family loans from PC pools

The UPB of multifamily mortgage loans increased to $85.9 billion at December 31, 2010 from $83.9 billion at December 31, 2009, due to increased purchases of loans that we expect to securitize through our CME initiative. Our multifamily loan sales in 2010 primarily consisted of sales through Other Guarantee Transactions. Subject to market conditions, we expect to increase sales of multifamily mortgage loans through our Other Guarantee Transactions which may reduce the outstanding UPB of our multifamily loan portfolio in future periods.

Table 29 summarizes our purchase and guarantee activity in mortgage loans for the years ended December 31, 2010, 2009, and 2008. Activity for the year ended December 3 , 20 0 consists of: (a) mortgage loans underlying consolidated single family PCs and certain Other Guarantee Transactions (regardless of whether such securities are held by us or third parties); (b) unsecuritized single family and multifamily mortgage loans; and (c) mortgage loans underlying our mortgage related financial guarantees which are not consolidated on our balance sheets Activity for the years ended December 31, 2009 and 2008 consists of: (a) mortgage loans underlying Freddie Mac mortgage related securities (regardless of whether such securities are held by us or third parties) which were not consolidated on our balance sheets prior to January 1, 2010; (b) unsecuritized single family and multifamily mortgage loans on our consolidated balance sheets; and (c) mortgage loans associated with other guarantee commitments

**Table 29    Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Year Ended December 31, | | | | | |
| | 2010 | | 2009 | | 2008 | |
| | Purchase Amount | % of Purchases | Purchase Amount | % of Purchases | Purchase Amount | % of Purchases |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (dollars in millions) | | | |
| Mo gage oan pu chases and gua an ee ssuances | | | | | | |
| S ng e-fam y | | | | | | |
| 30-yea o mo e amo z ng f xed- a e | $ 258,621 | 64% | $392,291 | 80% | $ 284,029 | 75% |
| 20-yea amo z ng f xed- a e | 23,852 | 6 | 11,895 | 2 | 7,303 | 2 |
| 15-yea amo z ng f xed- a e | 83,025 | 21 | 64,590 | 13 | 29,671 | 8 |
| Adj s ab e- a e[2] | 16,534 | 4 | 2,809 | 1 | 11,723 | 3 |
| In e es -only[3] | 909 | <1 | 845 | <1 | 24,063 | 6 |
| HFA bo ds | 2,469 | 1 | 802 | <1 | | |
| FHA/VA a d USDA R a Deve opmen ( | 968 | <1 | 2,118 | <1 | 796 | <1 |
| *Total single-family[5]* | 386,378 | 96% | 475,350 | 97% | 357,585 | 94% |
| Mu fam y[6] | 15,372 | 4 | 16,571 | 3 | 23,972 | 6 |
| *Total mortgage loan purchases and other guarantee commitment activity( )* | $ 401,750 | 100% | $ 491,921 | 100% | $ 381,557 | 100% |
| Pe cen age of mo gage pu chases and o he gua an ee comm men ac v y w h c ed enhancemen s[8] | | 9% | | 8% | | 21% |

(1) Based o UPB Exc des o gage oan added b o ye se ed Exc udes ne add on of se ous y de nquen oans and balloon/ ese mo gages pu chased ou of PC poo s Inc udes o he gua an ee comm men s assoc a ed w h mo gage loans See endno es (6) and (7) fo fu he nfo ma on

(2) I c des a o z g ARMs w 1-, 3-, 5-, 7- a d 10-yea n a f xed- a e pe ods We d d no pu chase any op on ARM oans du ng 2010, 2009, o 2008

(3) Rep esen s oans whe e ho bo owe pays n e es on y fo a pe od of me befo e he bo owe beg ns mak ng p nc pal pay en s Inc udes bo h f xed- a e and va able- a e n e es -only oans

(4) Exc des FHA/VA oa s a back O e G a ee T a sac o s

(5) I c des $23 9 o , $26 3 o , a d $2 6 b o of mo gage oans n excess of $417,000, wh ch a e elig b e as confo m ng umbo mo gages, fo he yea s ended Dece be 31, 2010, 2009, and 2008, espec ve y

(6) Includes $572 m ll on and $14 m ll on as of Dece be 31, 2010 and 2009, espec ve y, of u sec zed g a a ees of HFA o ds de e TCLFP See "NOTE 3 CONSERVATORSHIP AND RELATED MATTERS Hous ng F nance Agency In a ve" fo fu he nfo ma on on s componen of he Hous ng F nance Agency In a ve

(7) Includes ssuances of o he gua an ee comm men s on s ng e-fam y oans of $5 7 b on, $2 4 b on, and $1 6 b ll on and ssuances of o he gua an ee comm men s on mul fam ly loans of $1 7 b ll on, $0 5 b ll on, a d $4 4 b o d g eyea s e ded Dece be 31, 2010, 2009, a d 2008, espec ve y

(8) See "NOTE 5 MORTGAGE LOANS AND LOAN LOSS RESERVES C ed P o ec on and O e Fo s of C ed Enhancemen" fo fu he de a s on c ed enhancemen of mo gage loans n ou s ngle-fam ly c ed gua an ee po fol o

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                              Powered by Morningstar® Document Research℠

TREASURY-0745

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Second lien mortgages are another type of residential mortgage loan product with a higher risk of default; however, we do not purchase or hold significant amounts of these loans on our consolidated balance sheets  See "RISK  MANAGEMENT     Credit Risk     *Mortgage Credit Risk*" and "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS     Table 19.3     Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio" for information about mortgage loans in our single family credit guarantee portfolio that we believe have higher risk characteristics.

## Derivative Assets and Liabilities, Net

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity and expiration of the derivatives at their contractual maturity  We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets to derivative assets, net and derivative liabilities, net  See "NOTE 12: DERIVATIVES" for additional information regarding our derivatives

At December 3 , 20 0, the net fair value of our total derivative portfolio was $(1.1) billion, as compared to $(0 4) billion at December 3 , 2009. This decrease in the net fair value of our total derivative portfolio was primarily due to the decline in longer term swap interest rates  See "NOTE 12: DERIVATIVES     Table12.1     Derivative Assets and Liabilities at Fair Value" for our notional or contractual amounts and related fair values of our total derivative portfolio by product type at December 31, 2010 and 2009  Also see "CONSOLIDATED RESULTS OF OPERATIONS     Non Interest Income (Loss)     *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions

Table 30 shows the fair value for each derivative type and the maturity profile of our derivative positions as of December 31, 2010  A positive fair value in Table 30 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated  A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated  See "Table 4     Derivative Counterparty Credit Exposure" for additional information regarding derivative counterparty credit exposure   Table 30 also provides the weighted average fixed rate of our pay fixed and receive fixed swaps.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                TREASURY-0746                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 30     Derivative Fair Values and Maturities**

| | | | | December 31, 2010 | | |
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount(2) | Total Fair Value(3) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps | | | | | | |
| Receive-fixed | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| Weighted average fixed rate(4) | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forwards-swing swaps(5) | 22,412 | 371 | | 123 | (9) | 257 |
| Weighted average fixed rate(4) | | | | 3.47% | 1.88% | 4.19% |
| Total receive-fixed | 324,590 | 3,685 | 137 | 657 | 1,260 | 1,631 |
| Basis (floating to floating) | 2,375 | 4 | | | 4 | |
| Pay-fixed | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted average fixed rate | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forwards-swing swaps | 56,259 | (4,009) | | | | (4,009) |
| Weighted average fixed rate | | | | | | 4.54% |
| Total pay-fixed | 394,294 | (21,198) | (273) | (1,275) | (3,297) | (16,353) |
| Total interest-rate swaps | 721,259 | (17,509) | (136) | (618) | (2,033) | (14,722) |
| Option-based | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 114,110 | 8,391 | 2,793 | 2,684 | 1,428 | 1,486 |
| Written | 11,775 | (244) | (39) | (23) | (182) | |
| Put swaptions | | | | | | |
| Purchased | 59,975 | 1,404 | 144 | 451 | 226 | 583 |
| Written | 6,000 | (8) | (8) | | | |
| Other option-based derivatives(6) | 47,234 | 1,450 | (8) | | (1) | 1,459 |
| Total option-based | 239,094 | 10,993 | 2,882 | 3,112 | 1,471 | 3,528 |
| Futures | 212,383 | (167) | (167) | | | |
| Foreign-currency swaps | 2,021 | 172 | | 123 | 49 | |
| Commitments(7) | 14,292 | (20) | (20) | | | |
| Swap guarantee derivatives | 3,614 | (36) | | | (3) | (33) |
| Subtotal | 1,192,663 | (6,567) | $ 2,559 | $ 2,617 | $ (516) | $(11,227) |
| Credit derivatives | 12,833 | 7 | | | | |
| Subtotal | 1,205,496 | (6,560) | | | | |
| Derivative interest receivable (payable), net | | (820) | | | | |
| Trade/settlement receivable (payable), net | | 1 | | | | |
| Derivative collateral (held) posed, net | | 6,313 | | | | |
| Total | $ 1,205,496 | $ (1,066) | | | | |

(1) Fair values categorized based on the period from December 31, 2010 until the contractual maturity of the derivative were exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of the derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settlement receivable or (payable), net and derivative cash collateral (held) or posed, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that have a scheduled to begin on future dates ranging from less than one year to fifteen years.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Commitments include (a) our commitments to purchase and sell investments in securities and (b) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

101                                                                                          *Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 31 summarizes the changes in derivative fair values

**Table 31      Changes in Derivative Fair Values**

| | 2010(1) | 2009(1) |
|---|---|---|
| | (in millions) | |
| Beg      g ba a ce, a  Ja    a y 1   Ne asse  ( ab   y) | $(2,267) | $(3,827) |
| Ne  change  n | | |
|   Comm  men s(2 | (31) | 6 |
|   C ed  de  va ves | (8) | (23) |
|   Swap gua an ee de  va ves | (2) | (23) |
| O he  de  va ves (3 | | |
|   Changes  n fa  va ue | (3,508) | 2,762 |
|   Fa  va ue of new con  ac s en e ed n o du  ng   e pe  od | 444 | 3,148 |
|   Con  ac s  ea zed o  he w se se  ed du  ng he pe  od | (1,188) | (4,310) |
| End ng ba ance, a  Dece  31   Ne  asse  ( ab   y) | $(6,560) | $(2,267) |

(1) The va ue of de  ves on ou  conso  da ed ba ance shee s s  epo  ed as de  va  ve asse s, ne  and de  va  ve ab   es, ne , and nc udes de  va  es  ece vab e
  (paya  e)  et,  ade/se  e ece vab e (payab e), ne  and de  va  ve cash co  a e a (he d) pos ed, ne  Refe  o "Tab e 30   De  va  ve Fa  Va ues and Ma u  es" fo
  econc  a on of  a   value o  he amoun s p esen ed on ou  conso  da ed ba ance shee  as of December 31, 2010  Fa  va ue exc udes de  va  ve  ne es  ece vab e
  (payab e),  e of $(0 6) b  o   ade/se  e ece vab e (payab e), ne of $1 m  on, and de  va  ve cash co  a e a pos ed, ne of $2 5 b  on a  Decembe  31, 2009

(2) Comm  men s nclude (a) ou  comm  men s o pu chase and se  nves men s n secu  es and (b) ou  comm  men s o p  chase a d ex  g  o ss  ed deb  secu    es
  of o  conso  da ed  us s

(3) Inc  des fa  va  e  anges fo   n e es - a e swaps, op o  -based de  va ves, f  es, a d fo e g  -c   e cy swaps

(4) Cons s s p  ma ly of cash p em ums pa d o  ece ved on op ons

## REO, Net

As a result of borrower default on mortgage loans that we own,  or for which we have issued our financial guarantee, we acquire  properties, which are recorded as REO assets on our consolidated  balance sheets  The balance of our REO, net increased to $7.1 billion at December 31, 2010 from $4.7 billion at December 31, 2009. Temporary suspensions of foreclosure transfers of occupied homes during  portions of 2009, delays associated with the HAMP process and servicer  capacity constraints generally resulted in higher  balances of non performing loans in our single family credit guarantee portfolio in 20  0  Foreclosure activity increased  during 2010 as many of the non performing loans transitioned to REO  We experienced the highest volume of single  family REO acquisitions in 2010 in the states of Florida, California,  Illinois, Minnesota, Georgia and Arizona  We expect our REO inventory to continue to grow in 20      However, the pace of our REO acquisitions could slow due to further delays in the foreclosure process, including delays related to concerns about  deficiencies in foreclosure documentation practices  See "RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk     Credit Performance     *Non Performing Assets" for additional information about our REO activity

## Deferred Tax Assets, Net

We recognize deferred tax assets and liabilities based upon the  expected future tax consequences of existing temporary  differences between the financial reporting and the tax  reporting basis of assets and liabilities using enacted  statutory tax rates  We record valuation allowances to reduce our net deferred tax assets when it is more likely than not that  a tax benefit will not be realized  The realization of our net  deferred tax assets is dependent upon the generation of sufficient taxable income or,  with respect to the portion of our deferred tax assets related to our available for sale securities, upon our conclusion that we have the intent and  ability to hold such securities to the recovery of any temporary  unrealized losses  On a quarterly basis, we consider all evidence currently available,  both positive and negative, in  determining whether, based on the weight of that evidence, the net deferred tax assets will be realized or whether a valuation  allowance is necessary

Subsequent to the date of our entry into conservatorship, we  determined that it was more likely than not that a portion of  our net deferred tax assets would not be realized due to our  inability to generate sufficient taxable income and, therefore,  we recorded a valuation allowance  After evaluating all available evidence, including the events and developments  related to our conservatorship, volatility in the economy, and  re ated difficulty in forecasting future profit levels, we reached a  similar conclusion in all subsequent quarters,  including in the fourth quarter of 2010  We increased our valuation allowance by $8 3 billion in total during 2010  The $8.3 billion increase during 2010 was primarily  attributable to the creation of a net operating loss carryforward in 20  0 and other temporary differences generated during the year, as well as a $3.1 billion increase attributable to the adoption of the accounting standards for  transfers of financial assets and consolidation of VIEs. See  "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information on our adoption of these accounting  standards. Our total valuation allowance as of December 3  , 2010 was $33 4 billion  As of December 31, 2010, after  consideration of the valuation allowance, we had a net deferred  tax asset of $5.5 billion, primarily representing the tax  effect of unrealized losses on our available for sale  securities  We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because  of our conclusion that we have the intent and ability to hold  our available for sale securities until any temporary unrealized  losses are recovered  Our view of our ability to realize the net  deferred tax assets may change in future periods, particularly  if the mortgage and housing markets continue to decline

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

TREASURY-0748

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### IRS Examinations

The IRS completed its examinations of tax years 1998 to 2007  We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for the 1998 to 2005 tax years  We filed a petition with the U.S. Tax Court in October 2010 in response to the Statutory Notices. The principal matter of controversy involves questions  of timing and potential penalties regarding our tax accounting method for certain hedging transactions  The IRS responded to  our petition with the U S  Tax Court in December 2010  We currently believe adequate reserves have been provided for settlement on reasonable terms  For additional information, see  "NOTE 14: INCOME TAXES."

### Other Assets

Other assets consist of the guarantee asset related to  non consolidated trusts, other guarantee commitments, accounts  and other receivables, debt issuance costs, net, and other  miscellaneous assets  Upon consolidation of our single family  PCs and certain Other Guarantee Transactions, our guarantee asset does not have a material impact on our financial position  and is, therefore, included in other assets on our consolidated balance sheets  Our guarantee asset declined to  $541 million as of December 31, 2010 from $10.4 billion as of December 31, 2009 primarily because we no longer recognize a guarantee asset on PCs and  certain Other Guarantee Transactions issued by consolidated  securitization trusts. All other assets increased to $10 3 billion as of December 31, 2010 from  $4.9 billion as of December 31, 2009 primarily because  of servicer receivables in our securitization trusts that were  recorded on our consolidated balance sheets beginning  January 1, 2010 upon consolidation of our single family PCs and certain Other Guarantee Transactions. See "NOTE 2:  CHANGE IN ACCOUNTING PRINCIPLES" and "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information

### Total Debt, Net

Commencing January 1, 2010, we consolidated our  single family PCs and certain Other Guarantee Transactions in  our financial statements  Consequently, PCs and Other Guarantee  Transactions issued by our consolidated trusts and held by third  parties are recognized as debt securities of consolidated trusts  held by third parties on our consolidated balance sheets  Debt  securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial  interests in our consolidated trusts. The debt securities of our  consolidated trusts are prepayable without penalty at any time  Other debt consists of unsecured short term and long term debt  securities we issue to third parties to fund our business activities  It is classified as either short term or long  term  based on the contractual maturity of the debt instrument

Table 32 reconciles the par value of other debt and the UPB of debt securities of consolidated trusts held by third parties  to the amounts shown on our consolidated balance sheets

### Table 32    Reconciliation of the Par Value and UPB to Total Debt, Net

| | December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| To a  deb | | |
| O   e  deb | | |
| Pa   va ue | $   728,217 | $805,073 |
| Unamo   zed balance of d scoun s and p em ums[1] | (14,529) | (24,907) |
| Hedg ng- ela ed and o he  bas s adj  s   e  s[2] | 252 | 438 |
| S   o a | 713,940 | 780,604 |
| Deb  sec   es of conso da ed   ss  d by   d pa  es | | |
| UPB | 1,517,001 | |
| Unamo   zed balance of d scoun s and p em ums | 11,647 | |
| S   o a | 1,528,648 | |
| To a  de  , e | $2,242,588 | $780,604 |

(1) P  ma  ly  ep esen s unamo   zed d scoun s on ze o-coupon deb
(2) P  ma   y  ep esen s defe  a s  e a ed o deb  ns  umen s ha   we e n hedge accoun  ng  e a  onsh ps and changes  n  he fa   va ue a  bu ab e o  ns  umen -spec f c
  c ed   sk  e a ed o fo e gn-cu  ency-denom na ed deb

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-0749

Table of Contents

Table 33 summarizes our other short term debt

**Table 33      Other Short Term Debt**

| | 2010 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) | Weighted Average Effective Rate(4) | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $ 194,742 | 0.24% | $ 213,465 | 0.25% | $ 240,037 |
| Medium-term notes | 2,364 | 0.31 | 1,955 | 0.34 | 3,661 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 72 | 0.30 | |
| Other short-term debt | $ 197,106 | 0.25 | | | |

| | 2009 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) | Weighted Average Effective Rate(4) | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $ 227,611 | 0.26% | $ 261,020 | 0.70% | $ 340,307 |
| Medium-term notes | 10,560 | 0.69 | 19,372 | 1.10 | 34,737 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 33 | 0.29 | |
| Other short-term debt | $ 238,171 | 0.28 | | | |

| | 2008 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) | Weighted Average Effective Rate(4) | |
| | | | (dollars in millions) | | |
| Reference Bills® securities and discount notes | $ 310,026 | 1.67% | $ 261,361 | 2.65% | $ 310,026 |
| Medium-term notes | 19,676 | 2.61 | 11,758 | 2.74 | 19,676 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 519 | 2.86 | 3,500 |
| Other short-term debt | $ 329,702 | 1.73 | | | |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, of which $0.9 billion, $0.5 billion, and $0.6 billion of short-term debt represents fair value of debt securities with a fair value option elected at December 31, 2010, 2009, and 2008, respectively.

(2) Represents the approximate weighted average effective rate for each series of outstanding balance of the period, which includes the amortization of discounts or premiums and issuance costs.

(3) Represents par value, net of associated discounts, premiums and issuance costs. Issuance costs are reported in other assets on our consolidated balance sheets.

(4) Represents the approximate weighted average effective rate during the period, which includes the amortization of discounts or premiums and issuance costs.

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 34 presents the UPB for Freddie Mac issued mortgage related securities by the underlying mortgage product type. Balances as of December 31, 2010 are based on the UPB of the securities. Balances as of December 31, 2009 and 2008 are based on the UPB of the mortgage loans underlying our mortgage related financial guarantees, including those underlying our securities (regardless of whether such securities are held by us or third parties) which were issued by trusts that were not consolidated on our balance sheets prior to January 1, 2010.

**Table 34    Freddie Mac Mortgage Related Securities(1)**

| | December 31, 2010(2) | | | December 31, 2009(2) | December 31, 2008(2) |
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Total | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Single-family | | | | | |
| 30-year or more amortizing fixed-rate | $ 1,213,448 | $ | $ 1,213,448 | $ 1,318,053 | $ 1,213,361 |
| 20-year amortizing fixed-rate | 65,210 | | 65,210 | 57,705 | 63,587 |
| 15-year amortizing fixed-rate | 248,702 | | 248,702 | 241,721 | 243,704 |
| Adjustable-rate(3 | 61,269 | | 61,269 | 68,428 | 93,705 |
| Interest-only( | 79,835 | | 79,835 | 131,529 | 160,588 |
| FHA/VA and USDA Rural Development | 3,369 | | 3,369 | 1,343 | 1,428 |
| Total single-family | 1,671,833 | | 1,671,833 | 1,818,779 | 1,776,373 |
| Multifamily | | 4,603 | 4,603 | 5,085 | 5,677 |
| Total single-family and multifamily | 1,671,833 | 4,603 | 1,676,436 | 1,823,864 | 1,782,050 |
| Other Guarantee Transactions | | | | | |
| HFA bonds( | | | | | |
| Single-family | | 6,168 | 6,168 | 3,113 | |
| Multifamily | | 1,173 | 1,173 | 391 | |
| Total HFA bonds | | 7,341 | 7,341 | 3,504 | |
| All Other Guarantee Transactions | | | | | |
| Single-family(6 | 15,806 | 4,243 | 20,049 | 23,841 | 23,585 |
| Multifamily | | 8,235 | 8,235 | 2,655 | 829 |
| Total Other Guarantee Transactions | 15,806 | 12,478 | 28,284 | 26,496 | 24,414 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates(7 | | 857 | 857 | 949 | 1,089 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,687,639 | $ 25,279 | $ 1,712,918 | $ 1,854,813 | $ 1,807,553 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities(8) | (170,638) | | | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $ 1,517,001 | | | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled

(2) Excludes other guarantee commitments for mortgage assets held by third parties and certain types of cash loans for lenders when these loans meet certain delinquency criteria. Prior year amounts have been revised to conform to the current presentation

(3) Includes $13 billion, $14 billion, and $16 billion on UPB of option ARM mortgage loans at December 31, 2010, 2009, and 2008, respectively. See endnote (6) for additional information on option ARM loans as a subcomponent of our Other Guarantee Transactions

(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans

(5) Consists of bonds we acquired and securitized under our NIBP

(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $84 billion, $96 billion, and $108 billion on UPB of securities backed by option ARM mortgage loans at December 31, 2010, 2009, and December 31, 2008, respectively

(7) Backed by FHA/VA loans

(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that have a consolidated on our balance sheets and includes certain enhancement amounts associated with our security issued transactions that we have payable to holders of any mortgage-related security holders as of December 31, 2010. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 23 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

105

*Freddie Mac*

Source    DIRA  HOM  LOAN MORTGAG  CORP, 10 K,  February 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 35 provides additional details regarding our issued and guaranteed mortgage related securities

**Table 35    Freddie Mac Mortgage Related Securities by Class Type[1]**

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | | (in millions) | |
| *Held by Freddie Mac:* | | | |
| S ngle-Class | $ 157,752 | $ 255,171 | $ 293,597 |
| Mu  c ass | 105,851 | 119,444 | 130,927 |
| *Total held by Freddie Mac(2)* | 263,603 | 374,615 | 424,524 |
| *Held by third parties* | | | |
| S ngle-Class | 1,020,200 | 1,031,869 | 865,375 |
| Mu  c ass | 429,115 | 448,329 | 517,654 |
| *Total held by third parties* | 1,449,315 | 1,480,198 | 1,383,029 |
| **Total Fredd e Mac mortgage-related securi ies(2)** | $1,712,918 | $1,854,813 | $1,807,553 |

(1) Based on UPB of he secu es and exc udes mo gage- e a ed sec  es t aded,  t o yet set ed

(2) Beg nn ng Janua y 1, 2010, ncludes s ngle-fam ly s ng e-c ass and ce a n u  c ass secu  es he d by us, wh ch a e eco ded as ex ngu shmen s of deb secu  es of conso da ed  us s on ou conso da ed ba ance shee s  P o o 2010, a  F edd e Mac mo gage- e a ed secu  es he d by us we e accoun ed fo as nves men s n sec  es o o  conso da ed ba ance s ee s  See "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" fo a d sc ss o of o s gn f can accoun ng pol c es e a ed o ou nves men s n sec  es a s d sed sec  es s s

Table 36 presents issuances and extinguishments of the debt securities of our consolidated trusts during 2010 as well as the UPB of consolidated trusts held by third parties.

**Table 36    Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]**

| | Year nded December 31, 2010 |
|---|---|
| | (in millions) |
| Beg nn ng ba ance of deb secu  es of conso da ed  us s he d by   d pa es | $  1,564,093 |
| Issuances o h d pa  es of deb secu  es of conso da ed t sts | |
| Issuances based on unde y ng  o gage p oduc ype | |
| 30-yea  o mo e, amo  z ng f xed- a e | 255,101 |
| 20-yea amo  z ng f xed- a e | 24,293 |
| 15-yea amo  z ng f xed- a e | 78,316 |
| Adj s ab e-a e | 15,869 |
| In e es -only | 845 |
| FHA/VA | 1,429 |
| Deb sec  es of co so da ed  ss e a ed by s a  ss a ce | (15,725) |
| Ne ss a ces of deb sec  es of co so da ed  ss | 360,128 |
| Re ss ances of deb sec  es of conso da ed  ss p evo s y  ed y  y s(2 | 51,209 |
| To a ssuances o h d pa es of deb secu  es of conso da ed  us s | 411,337 |
| Ex  g s e s e(3 | (458,429) |
| End ng ba ance of deb secu  es of conso da ed  us s he d by h d pa  es | $  1,517,001 |

(1) Based o  UPB

(2) Rep ese  so  sa es of PCs a d ce a  O e G a a ee Ta sac o s p evo s y ed by s

(3) Rep esen s (a) UPB of ou pu c ases fo   d pa es of PCs a d O e G a a ee Ta sac o s ss ed by o  co so da ed  us s (b) p nc pa epay en s e a ed o PCs a d O e G a a ee Ta sac o s ss ed y o  co so da ed  ss a d (c) ce an  an e a oun s assoc a ed w ho  us secu y adm n s a on ha a e payab e o h d-pa y mo gage- e a ed secu y holde s as of Decembe  31, 2010

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non consolidated trusts and other mo tgage-re ated financial guarantees, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities  Upon consolidation of our single family PC trusts and certain Other Guarantee Transactions, the guarantee obligation and related reserve for guarantee losses do not have a material effect on our financial position and are, therefore, included in other liabilities on our consolidated balance sheets  Our guarantee obligation declined to $625 million as of December 31, 2010 from $12.5 billion as of December 31, 2009, primarily because we no longer recognize a guarantee obligation on PCs and certain Other Guarantee Transactions that are issued by consolidated trusts  Our reserve for guarantee losses decreased by $32 2 billion during 2010 to $235 million as of December 31, 2010, as a result of the consolidation of our single family PC trusts and certain Other Guarantee Transactions. Upon consolidation, reserves for credit losses related to mortgage loans held in consolidated securitization trusts are included in our allowance for loan losses  See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" and "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-0752          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total Equity (Deficit)**

Total equity (deficit) decreased from $4 4 billion at December 31, 2009 to $(401) million at December 3 , 20 0, reflecting: (a) a net loss of $14 0 billion for the year ended December 31, 2010; (b) the cumulative effect of changes in accounting principles of $(11.7) billion due to our adoption of amendments to the accounting standards for transfers of financial assets and consolidation of VIEs; and (c) payment of senior preferred stock dividends in an aggregate amount of $5.7 billion. These amounts were partially offset by: (a) a $13.6 billion decrease in unrealized losses in AOCI on our available for sale securities; (b) $12.5 billion received from Treasury during 2010 under the Purchase Agreement; and (c) a $0 7 billion decrease in unrealized losses in AOCI related to our closed cash flow hedge relationships

The balance of AOCI at December 31, 2010 was a net loss of approximately $12 0 billion, net of taxes, compared to a net loss of $23.6 billion, net of taxes, at December 31, 2009 The balance of AOCI was $26.3 billion at January 1, 2010, due to the impacts of the cumulative effect of changes in accounting principles Net unrealized losses in AOCI on our available for sale securities decreased by $13.6 billion during 2010 primarily attributable to fair value increases resulting from: (a) the impact of a decline in interest rates, primarily related to our agency securities; and (b) improved market conditions for our investments in non agency mortgage related securities Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $0 7 billion during 2010, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information on the cumulative effect of these changes in accounting principles.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" for additional information regarding these and other risks

Risk management is a critical aspect of our business. We manage risk through a framework whereby our executive management is responsible for independent risk evaluation. Within this framework, executive management monitors performance against our risk management strategies and established risk limits and reporting thresholds, identifies and assesses potential issues and provides oversight regarding changes in business processes and activities.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee We are exposed to mortgage credit risk on our total mo tgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage related security, or other guarantee commitment

#### *Institutional Credit Risk*

In recent periods, challenging market conditions adversely affected the liquidity and financial condition of our counterparties and this may continue in 20   Despite federal intervention, bank failures remained high in 2010 Our exposure to mortgage seller/servicers remained high in 20 0 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We also rely significantly on our seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a prudent and timely manner Our exposure to derivatives counterparties remains highly concentrated as compared to historical levels

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations Our investments in non Freddie Mac mortgage related securities include both agency and non agency securities However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for additional information on institutional credit risk associated with our investments in mortgage related securities, including higher risk components and impairment charges we recognized in 20 0 and 2009 related to these investments For information about institutional credit risk associated with our investments in non mortgage related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Non Mortgage-Re ated Securities" as well as "Cash and Other Investments Counterparties" below

We are working to enforce our rights as an investor with respect to the non agency mortgage related securities we hold, and are engaged in efforts to potentially mitigate losses on our investments in non agency mortgage related securities Our Conservator directed us to work with Fannie Mae to enforce investor rights in securitization trusts in which we both have

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0753

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

interests  We are also pursuing other loss mitigation strategies, in some cases in conjunction with other investors  The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize  See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities" for information on our investments in non agency mortgage related securities

Consolidation in the industry and any efforts we take to reduce  exposure to financially weakened counterparties could further  increase our exposure to individual counterparties  The failure of any of our primary counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

*Mortgage Seller/Servicers*

We acquire a significant portion of our single family mortgage purchase volume from several large lenders, or seller/servicers  Our top 0 single family seller/servicers provided approximately 78% of our single family purchase volume during  2010. Wells Fargo Bank, N.A., Bank of America, N.A., and Chase Home Finance LLC accounted for 27%, 12% and 10%,  respectively, of our single family mortgage purchase volume and were the only single family seller/servicers that comprised  0% or more of our purchase volume for 2010  During 2010, our top three multifamily lenders, CBRE Capital Markets, Inc., Wells Fargo Multifamily Capital and Berkadia Commercial  Mortgage LLC, accounted for 17%, 16%, and 11%, respectively, of our multifamily mortgage purchase volume  Our top  0 multifamily lenders represented an aggregate of approximately 84% of our multifamily purchase volume in 2010

Pursuant to their repurchase obligations, our seller/servicers  repurchase mortgages sold to us, whether we subsequently  securitized the loans or held them as unsecuritized loans on our consolidated balance sheets  In lieu of repurchase, we may  choose to allow a seller/servicer to indemnify us against losses on such mortgages or otherwise compensate us for the risk of  continuing to hold the mortgages  We are exposed to institutional credit risk arising from the potential insolvency  or non performance by our mortgage seller/servicers, including  non performance of their repurchase obligations arising from breaches of the representations and warranties made to us for  loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us  In some cases,  the ultimate amounts of recovery payments we received and may receive in the future from seller/servicers were and may be  significantly less than the amount of our estimates of potential  exposure to losses related to their obligations

Some of our seller/servicers have failed to fully perform their  repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner  The UPB of loans subject to repurchase requests issued to our  single family seller/servicers declined to approximately  $3 8 billion as of December 31, 2010 from  $4.2 billion as of December 31, 2009, primarily  because the volume of resolved requests exceeded our issuance of  new requests in 2010  Repurchase request resolution during 2010 benefitted from agreements with certain seller/servicers,  including the agreement with Bank of America discussed below  Our contracts require that a seller/servicer repurchase a  mortgage within 30 days after we issue a repurchase  request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the  deadline for repurchase is extended until we decide the appeal  As of December 3 , 20 0, approximately 34% of these  repurchase requests were outstanding for more than four months  since issuance of our repurchase request  The actual amount we expect to collect on these requests is significantly less than  their UPB amounts primarily because many of these requests are satisfied by reimbursement of our realized losses by  seller/servicers, or may be rescinded in the course of the  contractual appeal process. Based on our historical loss  experience and the fact that many of these loans are covered by  credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase  requests would also be less than the UPB of the loans. We may also enter into agreements with seller/servicers to resolve  claims for repurchases.

During the years ended December 31, 2010 and 2009, we  recovered amounts that covered losses with respect to  $6.4 billion and $4.3 billion, respectively, of UPB of loans associated with our repurchase requests, including amounts  associated with one time settlement agreements  Four of our larger single family seller/servicers collectively had  approximately 32% and 23% of their repurchase obligations  outstanding more than four months at December 31, 2010 and  December 31, 2009, respectively as measured by the UPB of  loans associated with our repurchase requests  In order to resolve outstanding repurchase requests on a more timely basis  with our single family seller/servicers in the future, we have  begun to require certain of our larger seller/servicers to commit to plans for completing repurchases, with financial  consequences or with stated remedies for non compliance, as part of the annual renewals of our contracts with them  It is too  early to tell if these provisions will help in resolving future repurchase requests or the impact they may have on the size or  timing of our credit losses  In the event of non performance by  a seller/servicer, we may also seek partial recovery of amounts  owed by the seller/servicer by transferring all or a portion of  the mortgage servicing rights of the seller/servicer to a different servicer  However, this option may be difficult to accomplish with respect to our larger seller/servicers, as it  may be challenging to transfer a large servicing portfolio

<div align="center">108</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations to us is a component of our allowance for loan losses as of December 31, 2010 and 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Allowance for Loan Losses and Reserve for Guarantee Losses" for further information  We believe we have adequately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at December 31, 2010 and December 31, 2009; however, our actual losses may exceed our estimates

GMAC Mortgage, LLC and Residential Funding Company, LLC (collectively, GMAC), indirect subsidiaries of Ally Financial Inc (formerly, GMAC Inc.), are seller/servicers that together serviced and subserviced for an affiliated entity approximately 3% of the single family loans in our single family credit guarantee portfolio as of December 3 , 20 0  In March 20 0, we entered into an agreement with GMAC under which they made a one time payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing requirements  The agreement did not have a material impact on our 20 0 consolidated statements of operations

On December 3 , 20 0, we entered into an agreement with Bank of America, N.A., and two of its affiliates, BAC Home Loans Servicing, LP and Countrywide Home Loans, Inc., to resolve currently outstanding and future claims for repurchases arising from the breach of representations and warranties on certain loans purchased by us from Countrywide Home Loans, Inc. and Countrywide Bank FSB. Under the terms of the agreement, we received a $1 28 billion cash payment in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the first regularly scheduled monthly payments were due on or before December 31, 2008. The UPB of the loans in this portfolio, as of December 31, 2010, was approximately $114 billion. The agreement applies only to certain claims for repurchase based on breaches of representations and warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank of America entities  The agreement did not have a material impact on our 20 0 consolidated statements of operations

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. TBW accounted for approximately 2% of our single family mortgage purchase volume activity for the year ended December 3, 2009  We have exposure to TBW with respect to its loan repurchase obligations  We also have exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac  TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac   Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion relates to current and projected repurchase obligations and approximately $440 million relates to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represents miscellaneous costs and expenses incurred in connection with the dissolution of TBW. On July 1, 2010, TBW filed a comprehensive final reconciliation report in the bankruptcy court indicating, among other things, that approximately $203 million in funds held in bank accounts maintained by TBW related to its servicing of Freddie Mac's loans and was potentially available to pay Freddie Mac's claims. These assets include certain funds on deposit with Colonial Bank. We have analyzed the report and, as necessary and appropriate, may revise the amount of our claim

No actions against Freddie Mac related to TBW have been initiated in bankruptcy court or elsewhere to recover assets  However, TBW and Bank of America, N.A., which is also a claimant in the TBW bankruptcy, have indicated that they wish to determine whether the bankruptcy estate of TBW has any potential rights to seek to recover assets transferred by TBW to Freddie Mac prior to bankruptcy. TBW has indicated to us that it may file an action to recover certain funds paid to us prior to the bankruptcy  At this time, we are unable to estimate our potential exposure, if any, to such claims. On or about May 14, 2010, certain underwriters of Lloyds of London brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers and directors. Freddie Mac has filed a proof of loss under the bonds, but we are unable to estimate our potential recovery, if any, thereunder  Discovery in the proceeding has been stayed at the request of the U S  Department of Justice, pending completion of a criminal trial involving the former chief executive officer of TBW  See "NOTE 21: LEGAL CONTINGENCIES" for additional information on our claim arising from TBW's bankruptcy.

Our seller/servicers also have an active role in our loan workout efforts, including under the MHA Program, and therefore we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans  A significant portion of our single family mortgage loans are serviced by several large seller/servicers  Our top five single family loan servicers, Wells Fargo Bank N.A., Bank of America N.A.,

TREASURY-0755

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 68% of our single family mortgage loans, the first three of which each serviced 0% or more of our single family mortgage loans, as of December 3 , 20 0 We are also indirectly exposed to the actions and financial capacity of servicers in their roles as trustee and issuer of private label mortgage related securities we hold

During the second half of 2010, a number of our single family servicers, including several of our largest, announced that they we e evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including some they service for us Some of these companies also announced they would temporarily suspend foreclosure proceedings in some or all states in which they do business while they assess these issues. A number of these companies continue to address these issues, and certain of these suspensions remain in effect See "RISK FACTORS    Operational Risks    *Our expenses could increase and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process"* For information on our problem loan workouts, see "*Mortgage Credit Risk    Portfolio Management Activities    Loan Workout Activities."* In addition, a group consisting of state attorneys general and state bank and mortgage regulators in all 50 states and the District of Columbia is reviewing foreclosure practices

As of December 31, 2010, our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 52% of our multifamily mortgage portfolio

We are exposed to the risk that multifamily seller/servicers could come under financial pressure due to the current stressful economic environment, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through lender repurchase or through recourse agreements or other credit enhancements, where applicable We continue to monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

### Mortgage Insurers

We have institutional credit risk relating to the potential insolvency of or non performance by mortgage insurers that insure single family mortgages we purchase or guarantee As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses

We attempt to manage this risk by establishing eligibility standards for mortgage insurers and by monitoring our exposure to individual mortgage insurers Our monitoring includes performing regular analysis of the estimated financial capacity of mortgage insurers under different adverse economic conditions In addition, state insurance authorities regulate mortgage insurers and we periodically meet with certain state authorities to discuss their views We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized statistical rating organizations, and we periodically review the methods used by such organizations None of our mortgage insurers has a rating higher than BBB. In evaluating the likelihood that an insurer will have the ability to pay our expected claims, we consider our own analysis of the insurer's financial capacity, any downgrades in the insurer's credit rating and various other factors.

Table 37 summarizes our exposure to mortgage insurers as of December 3 , 20 0 In the event that a mortgage insurer fails to perform, the outstanding coverage represents our maximum exposure to credit losses resulting from such failure

### Table 37    Mortgage Insurance by Counterparty

| Counterparty Name | Credit Rating(1) | Credit Rating Outlook(1) | As of December 31, 2010 | | |
| | | | Primary Insurance(2) | Pool Insurance(2) (in billions) | Coverage Outstanding(3) |
|---|---|---|---|---|---|
| Mo gage Gua an y Insu ance Co po a on (MGIC) | B+ | Nega ve | $ 52 5 | $ 33 7 | $ 13 9 |
| Rad a  G a a ty I c | B+ | Nega ve | 38 3 | 16 2 | 11 3 |
| Genwo h Mo gage Insu ance Co po a on | BB+ | Nega ve | 34 0 | 1 0 | 8 6 |
| U ed G a a y Res de  a I s a ce Co | BBB | S ab e | 29 0 | 0 4 | 7 1 |
| PMI Mo gage Insu ance Co | B | Pos ve | 27 3 | 2 4 | 6 9 |
| Repub c Mo gage Insu ance Company | BB+ | Nega ve | 23 1 | 2 5 | 5 8 |
| T ad G a a y I s a ce Co p ( | NR | NR | 10 2 | 1 3 | 2 5 |
| CMG Mo gage I s a ce Co | BBB | Nega ve | 2 7 | 0 1 | 0 7 |
| o a | | | $ 217 1 | $ 57 6 | $ 56 8 |

(1) La es a ng ava ab e as of Feb ua y 11, 2011 Rep esen he owe of S&P and Moody's c ed a ngs and ou ooks In h s ab e, he a ng and ou ook of he ega e y s sa ed e s of e S&P eq va e

(2) Rep ese s e a o of UPB a e d of e po fo o s ng e-fam ly c ed gua an ee po fol o cove ed by he espec ve s u ance ype

(3) Rep esen s he ema n ng agg ega e con ac ual m fo e mbu semen of losses unde pol c es of bo h p ma y and pool s a ce T esca o s a e based o o g oss cove age w hou ega d o ne ng of cove age ha may ex s he ex en an affec ed mo gage s cove ed unde bo h ypes of nsu ance

(4) Beg nn ng on June 1, 2009, T ad began pay ng va d c a ms 60% n cash and 40% n defe ed paymen obl ga ons

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0756

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We received proceeds of $1.8 billion and $952 million during the years ended December 31, 2010 and 2009, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans  We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.5 billion and $1.0 billion  as of December 31, 2010 and December 31, 2009,  respectively

During the year ended December 31, 2010, increases in default volumes and in the time between claim filing and receipt of payment resulted in an increase in our receivables for mortgage and pool insurance claims  Although the volume of rescissions of claims under mortgage insurance coverage temporarily declined mid year, the volume of rescissions returned to elevated levels by year end  When an insurer rescinds coverage, the seller/servicer generally is in breach of representations and warranties made to us when we purchased the affected mortgage  Consequently, we may require the seller/servicer to repurchase the mortgage or to indemnify us  for additional loss.

The UPB of single family loans covered by pool insurance declined approximately 25% during the year ended  December 31, 2010, primarily due to payoffs and other liquidation events. We did not purchase any pool insurance on single family loans during 2010 and 2009 and we do not expect to acquire any such policies for credit enhancement during 2011  We also reached the maximum limit of recovery on certain of these policies  As a result, losses we recognized on certain loans previously identified as credit enhanced increased during 2010, compared to prior years  We may reach aggregate loss limits on other pool insurance policies in the near term, which would  further increase our credit losses

Our pool insurance policies generally have coverage periods that range from ten to twelve years  In many cases, we entered into  these agreements to cover higher risk mortgage product types delivered to us through bulk transactions. As of December 31, 2010, pool insurance policies which will expire: (a) during 20    covered approximately $1.1 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such loans was approximately $373 million; and (b) between 2012 and 20 7 covered approximately $44 0 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such loans was approximately $1.0 billion. Any losses in excess of the contractual limit will be borne by us  We expect to generate claims sufficient to utilize the $  4 billion of loss coverage on policies which expire between 2011 and 2017  The remaining pool insurance policies, for which the remaining  contractual limit for reimbursement of losses was approximately $1.9 billion, expire after 2017. These figures include  coverage under our pool insurance policies with Triad, based on the stated coverage amounts under such policies  As noted below, we do not expect to receive full payment of our claims from  Triad.

Based upon currently available information, we believe that all  of our mortgage insurance counterparties will continue to pay  all claims as due in the normal course for the near term, except for claims obligations of Triad that were partially deferred  beginning June 1, 2009, under order of Triad's state regulator. In 2010, we approved Essent Guaranty, Inc., which acquired certain assets and infrastructure of Triad in December 2009, as a new mortgage insurer

### *Bond Insurers*

Most of the non agency mortgage related securities we hold rely  primarily on subordinated tranches to provide credit loss protection  Bond insurance, including primary and secondary  policies, is a credit enhancement covering some of the  non agency mo tgage related securities we hold  Primary policies are acquired by the securitization trust issuing the securities  we purchase while secondary policies are acquired by us  Bond insurance exposes us to the risks related to the bond  insurer's ability to satisfy claims.

Table 38 presents our coverage amounts of monoline bond insurance, including secondary coverage, for the non agency  mortgage-re ated securities we hold  In the event a monoline  bond insurer fails to perform, the coverage outstanding  represents our maximum exposure to loss related to such a failure

**Table 38    Monoline Bond Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | December 31, 2010 | |
|---|---|---|---|---|
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac[3] | NR | N/A | $        4 6 | 43% |
| FGIC[3] | NR | N/A | 2 0 | 19 |
| MBIA I  s  a ce Co p | B | Nega ve | 1 5 | 14 |
| Ass ed G a a  y M   c pa Co p (AGMC) | AA | Nega ve | 1 3 | 12 |
| Na ona Pub c F nance Gua an ee Co p (NPFGC) | BBB | Deve op ng | 1 2 | 11 |
| O he s | | | 0 1 | 1 |
| o a | | | $        10 7 | 100% |

(1) La es  a ngs ava ab e as of Feb ua y 11, 2011  Rep esen s e  owe of S&P and Moody's c ed   a ngs  In h s ab e,  he  a ng and ou ook of  he  ega  en y s
    s a ed  e  s of  e S&P eq  va e

(2) Rep esen s  he  ema n ng con ac ual l m  fo  e mbu semen of  osses,  c d gos   e es a do e  expe ses, o  non-agency mo gage- ela ed secu   es

(3) Ne  he  S&P no  Moody's p ov de c ed   a ngs fo  A  bac o  FGIC

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar® Document Research℠

TREASURY-0757

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In November 2009, the New York State Insurance Department ordered FGIC to restructure in order to improve its financial condition and to suspend paying any and all claims effective immediately On March 25, 2010, FGIC made an exchange offer to the holders of various residential mortgage backed securities insured by FGIC. The offer was terminated due to insufficient participation by security holders. On August 4, 2010, FGIC Corporation, the parent company of FGIC, announced that it had filed for bankruptcy We continue to monitor FGIC's efforts to restructure and assess the impact on our investments.

In March 2010, Ambac established a segregated account for certain Ambac insured securities, including those held by Freddie Mac, and consented to the rehabilitation of the segregated account requested by the Wisconsin Office of the Commissioner of Insurance. On March 24, 2010, a Wisconsin state circuit court issued an order for rehabilitation and an order for temporary injunctive relief regarding the segregated account Among other things, no claims arising under the segregated account will be paid, and policyholders are enjoined from taking certain actions until the plan of rehabilitation is approved by the circuit court. The plan of rehabilitation was filed with the circuit court by the Office of the Commissioner of Insurance on October 8, 2010, and approved on January 24, 2011. On November 8, 2010, Ambac Financial Group Inc, the parent company of Ambac, filed for bankruptcy We continue to monitor these developments and assess the impact on our investments

In accordance with our risk management policies we will continue to actively monitor the financial strength of our bond insurers We be eve that, in addition to FGIC and Ambac, some of their bond insurers lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us as such claims emerge In the event one or more of these bond insurers were to become insolvent, it is likely that we would not collect all of our claims from the affected insurer as they emerge, and it would impact our ability to recover certain unrealized losses on our mortgage related securities, which may result in further impairment losses on our investments in securities We considered the expected impact of the FGIC and Ambac developments, as well as our expectations regarding our other bond insurers' ability to meet their obligations, in making our impairment determinations at December 31, 2010 and 2009. See "NOTE 8: INVESTMENTS IN SECURITIES    Other Than Temporary Impairments on Available For Sale Securities" for additional information regarding impairment losses on securities covered by monoline bond insurers.

Table 39 shows the non agency mortgage related securities we hold that were covered by primary monoline bond insurance at December 3 , 2010 and December 31, 2009

**Table 39    Non Agency Mortgage Related Securities Covered by Primary Monoline Bond Insurance at December 31, 2010 and December 31, 2009**

| | Ambac | | FG C | | MB A nsurance Corp. | | AGMC( ) | | Other[2] | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] |
| | | | | | (in millions) | | | | | | | |
| **At December 31, 2010** | | | | | | | | | | | | |
| rst en subpr me | $ 676 | $ (207 | $ 92 | $ (322 | $ 12 | $ (1 | $ 27 | $ (99 | $ 3 | $ — | $ 2,0 2 | $ (629 |
| Second en subpr me | — | — | 227 | (12 | — | — | — | — | — | — | 227 | (12 |
| Opt on ARM | 50 | — | — | — | — | — | 129 | (16 | — | — | 179 | (16 |
| A t-A and other( | 1,150 | (186 | 832 | (93 | 25 | (29 | 3 0 | (82 | 71 | (1 | 2,818 | (391 |
| Manufactured housing | 97 | (11 | — | — | 15 | (15 | — | — | — | — | 251 | (26 |
| CMBS | 2,206 | (277 | — | — | — | — | — | — | 1,195 | (159 | 3, 01 | ( 36 |
| Obl gat ons of states and pol t cal subd v s ons | 19 | ( | — | — | 23 | (19 | 366 | (18 | 17 | (3 | 1,07 | (86 |
| ota | 4,598 | (725 | $ 2,021 | ( 29 | $ 825 | (64 | $ 1,262 | (215 | $ 1,286 | (163 | 9 992 | (1 96 |
| **At December 31, 2009** | | | | | | | | | | | | |
| rst en subpr me | $ 737 | $ (325 | $ 1,061 | ( 32 | $ 18 | $ (3 | $ 52 | $ (160 | $ 6 | $ — | $ 2,27 | $ (920 |
| Second en subpr me | — | — | 280 | (70 | — | — | — | — | — | — | 280 | (70 |
| Opt on ARM | 163 | ( 7 | — | — | — | — | 66 | (6 | — | — | 329 | (112 |
| A t-A and other( | 1,3 0 | (657 | 927 | ( 30 | 522 | (265 | 22 | (136 | 80 | (38 | 3,291 | (1,526 |
| Manufactured housing | 105 | (2 | — | — | 171 | (30 | — | — | — | — | 276 | (5 |
| CMBS | 2,206 | ( 95 | — | — | — | — | — | — | 1 196 | (307 | 3, 02 | (802 |
| Obl gat ons of states and pol t cal subd v s ons | 59 | (33 | 38 | (3 | 2 7 | (13 | 390 | (13 | 17 | (3 | 1,151 | (6 |
| ota | $ 5,010 | $ (1,581 | $ 2,306 | ( 935 | $ 958 | ( 311 | $ 1, 30 | ( 37 | $ 1 299 | (3 8 | $ 11,003 | (3,5 9 |

(1) Assu ed Gua an y Mun c pa Co p was fo e y known as F nanc a Sec y Assu a ce

(2) Rep esen s mono e nsu ance p ov ded by Synco a G a a tee I c , Rad a G o p, I c, a d CIFG Ho d gs L d, a d c des c a exposu es o bonds su ed by NPFGC, fo e y k ow as MBIA I s a ce Co p If o s, w c s as s day of MBIA I c , e pa e co pany of MBIA Insu ance Co p

(3) Rep esen s he amoun of UPB cove ed by mono e nsu ance cove age Th s amoun does no ep esen he max mum amoun of osses we co d ecove , as e monol ne nsu ance also cove s pa de es

(4) Rep esen s he a oun of g oss un ea zed osses a he espec ve epo ng da e on he secu es w h monol ne s a ce

(5) The ma o y of he AI -A a d o he loans cove ed by monol ne bond nsu a ce a secu es backed by home equ y nes of c ed

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0758

Table of Contents

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non performance of counterparties of non-mortgage-re ated investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short term in nature, which mitigates institutional credit risk for these instruments. To minimize counterparty risk of our on balance sheet assets, we access government programs and initiatives designed to support the economic environment in general and the credit and mortgage markets in particular For example, we have adjusted our policies and exposure measurement methodology to reflect the FDIC's added insurance coverage on principal and interest deposits up to $250,000. We also manage significant cash flow for the securitization trusts that are created in connection with our issuance of Freddie Mac mortgage related securities See "BUSINESS   Our Business   *Our Business Segments   Single Family Guarantee Segment   Securitization Activities*" and "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on these transactions associated with securitization trusts.

Table 40 summarizes our counterparty credit exposure for cash equivalents, federal funds sold and securities purchased under agreements to resell that are presented both on our consolidated balance sheets as well as those off balance sheet As of December 31, 2009, cash and other investment transactions that we entered into on behalf of our securitization trusts represented off balance sheet exposure

<div align="center">113</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 40      Counterparty Credit Exposure      Cash Equivalents,  Federal Funds Sold, and Securities Purchased Under Agreements to Resell(1)**

| | December 31, 2010 | | |
|---|---|---|---|
| Rating(2) | Number of Counterparties(3) | Contractual Amount(4) (dollars in millions) | Weighted Average Contractual Maturity (in days) |
| **On-balance sheet exposure:** | | | |
| _Un es  c ed_ | | | |
| _Cash equivalents, unrestricted(5)_ | | | |
| A-1 | 17 | $  15,270 | 5 |
| A-1 | 22 | 9,752 | 38 |
| _Federal funds sold, unrestricted_ | | | |
| A-1 | 1 | 1,100 | 3 |
| A-2 | 1 | 300 | 3 |
| _Securities purchased under agreements to resell, unrestricted_ | | | |
| A-1 | 1 | 5,500 | 22 |
| A-1 | 6 | 9,574 | 18 |
| A-2 | 1 | 700 | 3 |
| S    o a | 49 | 42,196 | 18 |
| _Res  c ed, he d by conso  da ed t   sts_ (6) | | | |
| _Cash equivalents, restricted( )_ | | | |
| A-1 | 6 | 6,250 | 1 |
| _Federal funds sold, restricted_ | | | |
| A-1 | 2 | 2,350 | 3 |
| _Securities purchased under agreements to resell, restricted_ | | | |
| A-1 | 1 | 10,000 | 27 |
| A-1 | 1 | 17,000 | 23 |
| S    o a | 10 | 35,600 | 19 |
| **Off-balance sheet exposure** | | | |
|    o a | 59 | $ 77,796 | 18 |

| | December 31, 2009 | | |
|---|---|---|---|
| Rating(2) | Number of Counterparties(3) | Contractual Amount(4) (dollars in millions) | Weighted Average Contractual Maturity (in days) |
| **On-balance sheet exposure:** | | | |
| _Cash equivalents(5)_ | | | |
| A-1 | 22 | $  30,153 | 3 |
| A-1 | 27 | 9,439 | 54 |
| _Securities purchased under agreements to resell_ | | | |
| A-1 | 1 | 7,000 | 25 |
| S    o a | 50 | 46,592 | 17 |
| **Off-balance sheet exposure:(6)** | | | |
| _Cash equivalents( )_ | | | |
| A-1 | 7 | 6,775 | 1 |
| _Securities purchased under agreements to resell_ | | | |
| A-1 | 1 | 7,500 | 26 |
| S    o a | 8 | 14,275 | 14 |
|    o a | 58 | $ 60,867 | 16 |

(1) Exc udes  c ed cash ba ances as we  as cash depos ed w  h  he Fede a  Rese ve Bank and o he  fede a  y-cha ed    s  o s

(2) Rep esen s  he  owe  of S&P and Moody's sho  - e  c ed a  gs of eac  pe od ed  owe ve ,    s ab e,  he a ng of  he  ega en  y s s a ed  n e ms of  he  S&P eq  va e t

(3) Based on legal en  es  Aff l a ed legal en    es a e  epo  ed sepa a ely

(4) Rep esen s  he pa  va ue o  ou s and ng p nc pa ba ance

(5) Cons s s of h gh y  qu d  nves men s  ha  have an o  g na  ma u  y of  he e mon hs o  ess  Exc udes $12 0 b   on and $25 1 b   on of cash depos  ed w  h  he Fede a  Rese ve Bank as of Dece  be  31, 2010 and 2009,  espec  ve y

(6) Rep esen s  he non-mo  gage- e a ed asse s managed by us on behalf of secu    za on  us s on of  em  ances fo  F edd e Mac mo  gage- ela ed  sec    s  D e to ou  Janua y 1, 2010 adop on of  he amendmen s  o accoun  ng s anda ds on accoun  ng fo  ansfe s of f nanc a  asse s and conso  da on of VIEs,  he asse s of s ngle-fam ly PCs we e co so  da ed o  o  ba a ces ee ,w  c  a sed a s gn f can  nc ease  n on-ba ance shee  es  c ed asse s and a co  espond ng  dec ease  n off-ba ance shee  es  c ed asse s as of Dece  be  31, 2010  These asse s   ay on y be used o se e  he ob  ga ons of  he  us s

(7) Cons s s of h gh y  qu d  nves men s  ha  have an o  g na    au  y of  he e  on hs o  ess  Exc udes $13 b   on and $8 2 b   on of cash depos  ed w  h  he Fede a  Rese ve Bank as of Dece  be  31, 2010 and 2009,  espec  ve y

_Derivative Counterparties_

We are exposed to institutional credit risk arising from the possibility that a derivative counterparty will not be able to  meet its contractual obligations  We are an active user of exchange traded products, such as Treasury and Eurodollar Futures,

_Freddie Mac_

Source  D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0760

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to reduce our overall exposure to derivative counterparties  Exchange traded derivatives do not measurably increase our  institutional credit risk because changes in the value of open  exchange traded contracts are settled daily through a financial  clearinghouse established by each exchange  OTC derivatives, however, expose us to institutional credit risk because  transactions are executed and settled directly between us and  the counterparty. When our net position with an OTC counterparty  subject to a master netting agreement has a market value above  zero at a given date (i.e., it is an asset reported as  derivative assets, net on our consolidated balance sheets), then  the counterparty could potentially be obligated to deliver cash, securities, or a combination of both having that market value  necessary to satisfy its obligation to us under the derivative

The Dodd Frank Act will require that, in the future, many types  of derivatives be centrally cleared and traded on exchanges or  comparable trading facilities. Pursuant to the Dodd Frank Act, the CFTC is in the process of determining the types of  derivatives that must be subject to this requirement  In addition, we continue to work with the Chicago Mercantile  Exchange and other parties to implement a central clearing  platform for interest rate derivatives and we executed two trades through this platform in the fourth quarter of 2010,  beginning on the first day it became operationally ready  We will be exposed to institutional credit risk with respect to the  Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to  clear and trade derivatives, and to the members of such clearing  organizations that execute and submit our transactions for  clearing

We seek to manage our exposure to institutional credit risk  related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring of our positions with each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress testing to evaluate potential exposure under possible  adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of  our OTC derivative counterparties to confirm that they continue  to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based  on quantitative and qualitative analysis, which we update and  monitor on a regular basis  We conduct additional reviews when  market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial  institutions and are experienced participants in the OTC  derivatives market  A large number of OTC derivative counterparties have credit ratings below AA   Our OTC  derivative counterparties that have credit ratings below AA  are required to post collateral if our net exposure to  them on derivative contracts exceeds $  million  See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our  primary derivative counterparties remains high. This  concentration increased in the last several years due to industry consolidation and the failure of certain  counterparties, and could further increase. Table 41 summarizes our exposure to our derivative counterparties, which  represents the net positive fair value of derivative contracts,  related accrued interest and collateral held by us from our  counterparties, after netting by counterparty as applicable  (i.e., net amounts due to us under derivative contracts).

<div align="center">115</div>

<div align="right"><em>Freddie Mac</em></div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 41     Derivative Counterparty Credit Exposure**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | **December 31, 2010** | | | |
| **Rat ng(1)** | **Number of Counterparties(2)** | **Notional or Contractual Amount(3)** | **Total Exposure at Fair Value(4)** | **Exposure, Net of Collateral(5)** | **Weighted Average Contractual Maturity (in years)** | **Collateral Posting Threshold(6)** |
| | | | (dollars in millions) | | | |
| AA | 3 | $   53,975 | $ | $ | 6 8 | $10 m  on o  ess |
| AA− | 4 | 270,694 | 1,668 | 29 | 6 4 | $10 m  on o  ess |
| A | 7 | 441,004 | 460 | 1 | 6 2 | $1 m  on o  ess |
| A | 3 | 177,277 | 16 | 2 | 5 2 | $1 m  on o  ess |
| S   o a (7 | 17 | 942,950 | 2,144 | 32 | 6 1 | |
| O he  de  va  ves(8) | | 244,640 | | | | |
| Comm  men s(9 | | 14,292 | 103 | 103 | | |
| Swap gua an ee de  va  ves | | 3,614 | | | | |
| To al de  va  ves(10) | | $1,205,496 | $   2,247 | $   135 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | **December 31, 2009** | | | |
| **Rat ng(1)** | **Number of Counterparties(2)** | **Notional or Contractual Amount(3)** | **Total Exposure at Fair Value(4)** | **Exposure, Net of Collateral(5)** | **Weighted Average Contractual Maturity (in years)** | **Collateral Posting Threshold(6)** |
| | | | (dollars in millions) | | | |
| AA+ | 1 | $    1,150 | $ | $ | 6 4 | $ |
| AA | 3 | 61,058 | | | 7 3 | $10 m  on o  ess |
| AA | 4 | 265,157 | 2,642 | 78 | 6 4 | $10 m  on o  ess |
| A | 7 | 440,749 | 61 | 31 | 6 0 | $1 m  on o  ess |
| A | 4 | 241,779 | 511 | 19 | 4 6 | $1 m  on o  ess |
| S   o a (7 | 19 | 1,009,893 | 3,214 | 128 | 5 9 | |
| O he  de  va  ves(8) | | 199,018 | | | | |
| Comm  men s(9 | | 13,872 | 81 | 81 | | |
| Swap gua an ee de  va  ves | | 3,521 | | | | |
| To al de  va  ves(10) | | $1,226,304 | $   3,295 | $   209 | | |

(1)   We use he  owe  of S&P and Moody's  a  ngs  o manage co a e a  equ  emen s  In h s  ab e, he  a ng of he  ega  e  y s sa d  e  s of  e S&P eq u  va e
(2)   Based on  ega  en  es  Aff  a ed  ega  en  es a e  epo  ed sepa a e y
(3)   No  ona  o  con ac ua  amoun s a e used  o ca cu a e he  pe od c se  emen  amoun s  o be  ece ved  o  pa d and gene a ly  do no  g ep esen ac ua  aoun s  o be  exchanged
(4)   Fo  eac  co  epa  y,  s a o   c  des de va  ves w  a e pos  ve fa  va  e ( eco ded as de  va  ve asse s,  e ),  nc ud ng he  e a ed acc ued  n e es  ece  vable/payable ( ne )  a d  ade/se  e fees
(5)   Ca cu a ed as To a  Exposu e a  Fa  Va ue  ess cash co a e a  he d as de e  ned  n he coun e pa  y  eve  Inc udes  a  oun s  e a ed o ou  pos ng of cash co la e al  n  excess of o   de  va  ve  ab l  y as de e m ned a  he coun e pa  y  eve
(6)   Coun e pa  es a e  equ  ed  o pos  co a e a  when he   expos  e exceeds a e ag eed-upon co la e al pos ng  h esholds  These  h esholds a e  yp cally based o   e  coun e pa  y's c ed  a ng and a e  nd v dually nego a ed
(7)   Cons s s of OTC de  va  e ag eemen s fo   n e es  - a e swaps,  op on-based de  va  ves (exc ud ng ce a n w  en op ons), fo e g -c  e cy swaps, a d p  c ased  n e es - a e caps
(8)   Cons s p ma  y of exchange- aded con ac s, ce a n w  en op ons, and ce a n ced  de va  ves  W  en op ons do no p ese  co  e pa  y c ed  expos  e, because we  ece ve a one- me up-f on p em um  n exchange fo  g v ng he holde  he  g o execu e a ce  a n  unde spec f ed  e ms, w c  a e ay p s s  a ab  y pos  on
(9)   Comm  men s  nclude  (a) ou  comm  men s o pu chase and se  nves men s  n secu  es  and (b) ou  comm  men s o p c ase a dex g s o sse de  secu  es of ou  conso  da ed  us s
(10)  The d ffe ence be ween  he expos  e, ne  of co a e a  co umn above and  he de va  ve asse s, ne  on ou  conso  da ed ba ance shee s p  ma  ly  ep esen s exchange- aded con ac s w ch a e se  ed da  y  o g a ce a  go se, a d s, do o p ese  co  e pa  y c ed  expos  e

Over time, our exposure to individual counterparties for OTC  interest rate swaps, option based derivatives, foreign currency  swaps, and purchased interest rate caps varies depending on  changes in fair values, which are affected by changes in  period end interest rates, the implied volatility of interest rates, foreign currency exchange rates, and the amount of  derivatives held  If all of our counterparties for these  derivatives defaulted simultaneously on December 31, 2010,  our uncollateralized exposure to these counterparties, or our  maximum loss for accounting purposes after applying netting  agreements and collateral, would have been approximately  $32 million  Our uncollateralized exposure as of December 31, 2009 was $128 million. One of our  counterparties, HSBC Bank USA, which was rated AA  as of February 11, 2011, accounted for greater than  0% of our net uncollateralized exposure to derivatives counterparties at  December 3 , 20 0

As indicated in Table 41, approximately 99% of our counterparty credit exposure for OTC interest rate swaps,  option based derivatives, foreign currency swaps, and purchased  interest rate caps was collateralized at December 3 , 20 0  The uncollateralized exposure to non AAA rated counterparties was primarily due to exposure amounts below the  applicable counterparty collateral posting threshold, as well as market movements during the time period between when a  derivative was marked to fair value and the date we received the  related collateral  Collateral is typically transferred within  one business day based on the values of the related derivatives

116

*Freddie Mac*

TREASURY-0763

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In the event of counterparty default, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost effective fashion  We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure  We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period  Our actual exposure could vary significantly from amounts forecasted by these tests

As indicated in Table 41, the total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $103 million and $81 million at December 31, 2010 and 2009, respectively  These commitments are uncollateralized  Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments  However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk management standards.

### Document Custodians

We use third party document custodians to provide loan document certification and custody services for some of the loans that we purchase and securitize  In many cases, our seller/servicer customers or their affiliates also serve as document custodians for us. Our ownership rights to the mortgage loans that we own or that back our PCs and REMICs and Other Structured Securities could be challenged if a seller/servicer intentionally or negligently pledges or sells the loans that we purchased or fails to obtain a release of prior liens on the loans that we purchased, which could result in financial losses to us. When a seller/servicer or one of its affiliates acts as a document custodian for us, the risk that our ownership interest in the loans may be adversely affected is increased, particularly in the event the seller/servicer were to become insolvent  We seek to mitigate these risks through legal and contractual arrangements with these custodians that identify our ownership interest, as well as by establishing qualifying standards for document custodians and requiring transfer of the documents to our possession or to an independent third party document custodian if we have concerns about the solvency or competency of the document custodian

### Mortgage Credit Risk

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage related security, or other guarantee commitment  Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economy  All mortgages that we purchase or guarantee have an inherent risk of default  To manage our mortgage credit risk in our single family credit guarantee and multifamily mortgage portfolios, we focus on three key areas: underwriting standards and quality control process; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements

Through our delegated underwriting process, single family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan  See "BUSINESS    Our Business" for information about our charter requirements for single family loans purchases, and "BUSINESS    Our Business Segments    Single Family Guarantee Segment    Underwriting Requirements and Quality Control Standards" for information about delegated underwriting and quality control monitoring  See "BUSINESS    Regulation and Supervision    Federal Housing Finance Agency Affordable Housing Goals" for a discussion of factors that may cause us to purchase loans that do not meet our normal standards.

We were significantly adversely affected by deteriorating conditions in the single family housing and mortgage markets during 2008 and 2009. In recent years, particularly 2005 to 2007, financial institutions significantly increased mortgage lending and securitization of certain higher risk mortgage loans, such as subprime, option ARM, interest only and Alt A, and these loans comprised a much larger proportion of origination and securitization issuance volumes during 2006 and 2007, and to a lesser extent in 2005, as compared to prior or subsequent years. During this time, we increased our participation in the market for these products through our purchases of non agency mortgage related securities and through our guarantee activities  Our expanded participation in these products was driven by a combination of competing objectives and pressures, including meeting our affordable housing goals, competition, the desire to maintain or increase market share, and generating returns for investors  The mortgage market has changed significantly since 2007  Financial institutions tightened their

<div align="center">117</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underwriting standards, which has significantly reduced the amount of subprime, option ARM, interest only and Alt A loans being originated

Conditions in the mortgage market continued to remain challenging during 20 0 All types of single family mortgage loans have been affected by the compounding pressures on household wealth caused by declines in home values that began in 2006 and the ongoing weak employment environment Our serious delinquency rates remained high in 2010, primarily due to economic factors which adversely affected borrowers Contributing to this increase were: (a) delays related to servicer processing capacity constraints; (b) delays associated with the HAMP trial period and related processes; and (c) delays in the foreclosure process, including those associated with deficiencies in foreclosure documentation practices, those imposed by third parties, and our own temporary suspensions of foreclosure transfers. Although the UPB of our single family non performing loans continued to increase during 2010, the number of loans that transitioned to serious delinquency gradually declined during the same period, though it remained high

### *Characteristics of the Single Family Credit Guarantee Portfolio*

The average UPB of loans in our single family credit guarantee portfolio was approximately $150,000 at both December 31, 2010 and December 31, 2009, respectively Table 42 provides additional characteristics of single family mortgage loans purchased during the years ended December 31, 2010, 2009, and 2008, and of our single family credit guarantee portfolio at December 31, 2010, 2009, and 2008

<div align="center">118</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 42     Characteristics of the Single Family Credit Guarantee Portfolio[1]**

| | Purchases During the Year ended December 31, | | | Portfolio[2] at December 31, | | |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| **Original LTV Ratio Range[3][4]** | | | | | | |
| 60% and below | 31% | 3 % | 2 % | 23% | 23% | 22% |
| Above 60% to 70% | 17 | 18 | 16 | 16 | 16 | 16 |
| Above 70% to 80% | 5 | 1 | 0 | 3 | 5 | 6 |
| Above 80% to 90% | — | 5 | 11 | 9 | 8 | 8 |
| Above 90% to 100% | 3 | 2 | 9 | 8 | 8 | 8 |
| Above 100% | — | — | — | 1 | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 67% | 66% | 71% | 71% | 71% | 72% |
| **Estimated Current LTV Ratio Range** | | | | | | |
| 60% and below | | | | 27% | 28% | 32% |
| Above 60% to 70% | | | | 12 | 12 | 13 |
| Above 70% to 80% | | | | 17 | 16 | 16 |
| Above 80% to 90% | | | | 16 | 16 | 16 |
| Above 90% to 100% | | | | 10 | 10 | 10 |
| Above 100% to 110% | | | | 6 | 6 | 5 |
| Above 110% to 120% | | | | 3 | | |
| Above 120% | | | | 8 | 8 | 5 |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | | | |
| Relief refinance mortgages[6] | | | | 78% | 85% | N A |
| All other mortgages | | | | 78% | 77% | N A |
| Total mortgages | | | | 78% | 77% | 72% |
| **Credit Score[3][7]** | | | | | | |
| 720 and above | 73% | 73% | 53% | 53% | 50% | 6% |
| 700 to 739 | 17 | 18 | 22 | 21 | 22 | 23 |
| 660 to 699 | 7 | 7 | 15 | 15 | 16 | 17 |
| 620 to 659 | 2 | 2 | 7 | 7 | 8 | 9 |
| Less than 620 | 1 | | | 3 | 3 | |
| Not available | — | — | — | 1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | | | | | | |
| Relief refinance mortgages[6] | | | | 715 | 738 | N A |
| All other mortgages | | | | 732 | 729 | N A |
| Total mortgages | | | | 733 | 730 | 725 |
| **Loan Purpose** | | | | | | |
| Purchase | 20% | 20% | 1% | 31% | 35% | 0% |
| Cash-out refinance | 21 | 26 | 31 | 29 | 30 | 30 |
| Other refinance[8] | 9 | 5 | 28 | 0 | 35 | 30 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached townhome[9] | 9 % | 9 % | 90% | 92% | 92% | 91% |
| Condo Co-op | 6 | 6 | 10 | 8 | 8 | 9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 93% | 93% | 89% | 91% | 91% | 91% |
| Second vacation home | | 5 | 6 | 5 | 5 | 5 |
| Investment | 3 | 2 | 5 | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Portfolio-based columns are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions which we hold in our balances of $2 billion as of December 31, 2010, 2009, and 2008, are excluded from our portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns in 2010 and 2009 exclude mortgage loans acquired under our relief refinance initiative. See "Table 47 — Single-Family Refinance Loan Volume" for further information on our LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owed to our guarantee by us are excluded from the LTV ratio calculation.

(5) Current market values are estimated by adjusting the estimated value of the property at origination based on changes in the market value of homes since origination. Estimated current LTV ratios change as our application of a price case activity, declines in our credit-enhanced portion of the loan and excludes any secondary financing by holders of the data.

(6) The ending balances of relief refinance mortgages composed approximately 7% and 2% of our single-family credit guarantee portfolio as of December 31, 2010 and 2009, respectively.

(7) Credit scores are based on FICO scores. Although we obtain an updated credit information on some loans, and borrowers after the origination of a mortgage, such as those borrowers seeking a modification, we generally rely on the credit score of the borrower at the origination of the mortgage.

(8) Other refinance transactions include (a) refinance mortgages with a "no cash-out" or the borrower and (b) refinance mortgages for which the delivery data a provided was not sufficient for us to determine whether the mortgage was a cash-out or a not cash-out refinance transaction.

(9) Includes manufactured housing and others within planned unit development communities.

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0766

Table of Contents

*Loan to Value Ratios*

An important safeguard against credit losses on mortgage loans in our single family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties As discussed in "BUSINESS    Our Business," our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests In addition, we employ other types of credit enhancements, including pool insurance, indemnification agreements, collateral pledged by lenders and subordinated security structures.

As shown in Table 42, the percentage of borrowers in our single family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 18% as of both December 31, 2010 and December 31, 2009 As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan If a borrower has an estimated current LTV ratio greater than   00%, the borrower is "underwater" and is more likely to default than other borrowers The serious delinquency rate for single family loans with estimated current LTV ratios greater than 100% was 14.9% and 14.8% as of December 31, 2010 and December 31 2009, respectively In addition, as of December 31, 2010 and 2009, for the loans in our single family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 721 and 719, respectively

*Credit Score*

Credit scores are a useful measure for assessing the credit quality of a borrower Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record FICO scores are the most commonly used credit scores today FICO scores are ranked on a scale of approximately 300 to 850 points Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores

*Loan Purpose*

Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. In a purchase transaction, the funds are used to acquire a property In a cash out refinance transaction, in addition to paying off existing mortgage liens, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower In other refinance transactions, the funds are used to pay off existing mortgage liens and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash out" or "rate and term" refinances The percentage of purchase transactions in our single family loan acquisition volume declined significantly in 2009 and remained at low levels during 20  0 Due to continued ower interest rates, we expect refinance activity to remain high in 2011, though it will likely decline from 2010 levels Historically, cash out refinancings have a higher risk of default than mortgages originated in no cash out, or rate and term, refinance transactions.

*Property Type*

Townhomes and detached single family houses are the predominant type of single family property Condominiums are a property type that historically experiences greater volatility in home prices than detached single family residences Condominium loans in our single family credit guarantee portfolio have a higher composition of first time homebuyers and homebuyers whose purpose is for investment, or a second home In practice, investors and second home borrowers often seek to finance the condominium purchase with loans having a higher original LTV ratio than other borrowers Approximately 4 % of the condominium loans within our single family credit guarantee portfolio are in California, Florida, and Illinois, which are among the states that have been most adversely affected by the economic recession and housing downturn. Condominium loans comprised 15% and 13% of our credit losses during the years ended December 31, 2010 and 2009, respectively, while these loans comprised 8% of our single family credit guarantee portfolio at both dates

*Occupancy Type*

Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property Mortgage loans on properties occupied by the borrower as a primary residence tend to have a lower credit risk than mortgages on investment properties or secondary residences

*Geographic Concentration*

Local economic conditions can affect borrowers' ability to repay loans and the value of the collateral underlying the loans Because our business involves purchasing mortgages from every geographic region in the U S , we maintain a geographically diverse single family credit guarantee portfolio While our single family credit guarantee portfolio's geographic distribution was relatively stable in recent years and remains broadly diversified across these regions, we were negatively impacted by overall home price declines in each region since 2006 Our credit losses continue to be greatest in those states that experienced significant decreases in property values since 2006, such as California, Florida, Nevada and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0767

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Arizona. See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information concerning the distribution of our single family credit guarantee portfolio by geographic region

### Attribute Combinations

Certain combinations of loan characteristics often can also indicate a higher degree of credit risk For example, single family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default We estimate that there were $11.8 billion and $12.7 billion at December 31, 2010 and December 31, 2009, respectively, of loans in our single family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination Certain mortgage product types, such as interest only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. In addition, some borrowers may use second liens at the time of purchase to reduce the LTV ratio on first lien mortgages, or may obtain second lien mortgages subsequently A borrower who obtains a second lien mortgage, either at the time of origination or subsequently, is more susceptible to declines in home prices, which would reduce the equity in their home to a lower level than if there were no second lien and increase the risk of delinquency on the first lien The practice of simultaneously obtaining first and second lien mortgages declined in 2009 and 2010, as compared to prior years. We obtain second lien information on loans we purchase only if the second lien mortgage was established at or before the time of origination of the first lien, and therefore we do not know about a second lien mortgage if the borrower obtains it after origination As of both December 31, 2010 and 2009, approximately 4% of loans in our single family credit guarantee portfolio had second lien financing at the time of origination of the first lien and we estimate that these loans comprised 19% and 21%, respectively, of our seriously delinquent loans, based on UPB.

### Single Family Mortgage Product Types

Product mix affects the credit risk profile of our total mortgage portfolio In general, 15 year amortizing fixed rate mo tgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mo tgages and the credit profiles of borrowers who seek and qualify for them In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed rate borrowers However, during the last two years, when interest rates have generally declined, our delinquency and default rates on adjustable rate and balloon/reset mortgage loans on a relative basis have been as high as, or higher than, fixed rate loans since these borrowers are also susceptible to declining housing and economic conditions and/or had other higher risk characteristics

The primary mortgage products in our single family credit guarantee portfolio are first lien, fixed rate mortgage loans During 2009 and 2010, a higher proportion of our single family mortgage purchases were fixed rate loans as compared to earlier periods, due to continued low interest rates for conforming mortgages, which increased refinancing activity by borrowers that desire fixed rate products Our non HAMP loan modifications generally result in new terms that include fixed interest rates after modification Increased non HAMP modification volume in recent periods therefore also contributed to the increase in the amount of fixed rate single family loans in our single family credit guarantee portfolio Our HAMP modifications generally result in reduced payments for a minimum of five years, after which time payments gradually increase to a rate consistent with the market rate at the time of modification

The following paragraphs provide information on the interest only, option ARM, and adjustable rate mortgage loans in our single family credit guarantee portfolio Interest only and option ARM loans have experienced significantly higher serious delinquency rates than other mortgage products.

### Interest Only Loans

Interest only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity At December 31, 2010 and December 31, 2009, interest only loans represented approximately 5% and 7%, respectively, of the UPB of our single family credit guarantee portfolio The UPB of interest only loans declined during 2010 primarily due to refinancing into other mortgage products, modifications of seriously delinquent loans to amortizing terms, and foreclosure events. We purchased $0.9 billion and $0 8 billion of these loans during the years ended December 31, 2010 and 2009, respectively As of September , 20 0, we no longer purchase interest only loans.

### Option ARM Loans

Most option ARM loans have initial periods during which the borrower has payment options until a specified date, when the terms are recast At both December 31, 2010 and 2009, option ARM loans represented approximately % of the UPB of our single family credit guarantee portfolio We did not purchase option ARM loans in our single family credit

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    **TREASURY-0768**                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee portfolio during 20 0 or 2009  For information on our  exposure to option ARM loans through our holdings of non agency  mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities."

*Adjustable Rate Mortgage Loans*

Table 43 presents information for single family mortgage loans in our single family credit guarantee portfolio, excluding  Other Guarantee Transactions, at December 31, 2010 that contain adjustable payment terms  The reported balances in the  table are aggregated by adjustable rate loan product type and categorized by year of the next scheduled contractual reset  date  At December 3 , 20 0, approximately 60% of these adjustable rate loans have interest rates that are scheduled to  reset in 2011 or 2012  The timing of the actual reset dates may  differ from those presented due to a number of factors,  including refinancing or exercising of other provisions within  the terms of the mortgage

**Table 43     Single Family Scheduled Adjustable Rate Resets by Year at December 31, 2010[1]**

|  | 2011 | 2012 | 2013 | 2014 (in millions) | 2015 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| ARMs amo  z ng | $28,022 | $ 7,418 | $ 3,827 | $2,758 | $ 11,946 | $ 6,594 | $ 60,565 |
| ARMs/ n e es -on y[2] | 25,261 | 18,802 | 10,681 | 5,021 | 3,681 | 8,365 | 71,811 |
| Balloon  ese s[3] | 1,190 | 334 | 95 | 16 | 12 | 1 | 1,648 |
| o a | $54,473 | $26,554 | $14,603 | $7,795 | $15,639 | $14,960 | $134,024 |

(1) Based on  he UPBs of  o  gage p oduc s ha  con a n ad us ab e- a e ese s p ov s ons  These  epo  ed ba ances a e  based on  he UPB of  he unde  y ng mo  gage oans and do no  ef ec  he pub  c y-ava ab e secu  y ba ances we use o  epo  he cos  pos  on of ou  PCs and REMICs and O he  St uc ed Sec u  t es Exc des mo  gage loans unde ly ng O he  Gua an ee T ansac ons s nce  ese  nfo ma on was no  ava lable  o s fo   ese oa s

(2) Ref ec s  he UPB of  n e es -on y oans ha   ese  and beg n amo   za on of p nc pal  n each of  he yea s shown

(3) Rep ese s  e po  o of UPBs  ha  a a e sc ed  ed o ese  du ng  he pe  od spec f ed above

*Conforming Jumbo Loans*

We purchased $23.9 billion and $26.3 billion of conforming jumbo loans during the years ended December 31,  2010 and 2009, respectively. The UPB of conforming jumbo loans in our single family credit guarantee portfolio as of  December 31, 2010 and December 31, 2009 was $37.8 billion and $26.6 billion, respectively. The average size of these loans was approximately $548,000 and  $546,000 at December 31, 2010 and December 31, 2009,  respectively

<u>*Other Categories of Single Family Mortgage Loans*</u>

While we classified certain loans as subprime or Alt A for purposes of the discussion below and elsewhere in this  Form 10 K, there is no universally accepted definition of subprime or  Alt A, and our classifications of such loans may differ from those used by  other companies  For example, some financial institutions may  use FICO credit scores to delineate certain residential  mortgages as subprime  In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure  relating to such loans in our single family credit guarantee  portfolio

*Subprime Loans*

Participants in the mortgage market may characterize  single family loans based upon their overall credit quality at  the time of origination, generally considering them to be prime or subprime  While we have not historically characterized the  loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have  guaranteed with characteristics that indicate a higher degree of credit risk (see  *"Higher Risk Loans in the Single Family Credit Guarantee Portfolio"* and "Table 52     Single Family Credit Guarantee Portfolio by Attribute Combinations" for further information)

We estimate that approximately $2.5 billion and $2.9 billion of security collateral underlying our Other  Guarantee Transactions at December 31, 2010 and 2009,  respectively, were identified as subprime based on information  provided to us when we entered into these transactions. In addition, as of December 31, 2010 and 2009, we also held  $1.5 billion and $1.6 billion, respectively, of certain securities backed by FHA/VA guaranteed loans within our Other  Guarantee Transactions that we previously reported as  subprime. In prior disclosures, we reported these FHA/VA loans as subprime because they were incorrectly identified as subprime  at that time

As of December 31, 2010 and 2009, we also held  $8.4 billion and $9.6 billion, respectively, of option ARM securities underlying our Other Guarantee Transactions. We have not identified these option ARM securities as either subprime or Alt A securities  However, these securities could currently be exhibiting similar credit performance to collateral identified  as subprime or Alt A

We also categorize our investments in non agency mortgage related securities as subprime if they were identified  as such based on information provided to us when we entered into these transactions  At December 31, 2010 and 2009, we held $54.2 billion and $61.6 billion, respectively, in UPB of non agency mortgage related securities backed by subprime  loans  These securities were structured to provide credit  enhancements, particularly through subordination, and 10% and   8% of these securities were investment grade at  December 31, 2010 and 2009, respectively  The credit performance of loans

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0769

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underlying these securities deteriorated significantly beginning  in 2008 and continued to deteriorate in 20  0  For more  information on our exposure to subprime mortgage loans through our investments in non agency mortgage related securities see  "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities "

*Alt A Loans*

Although there is no universally accepted definition of Alt A, many mortgage market participants classify single family loans with  credit characteristics that range between their prime and  subprime categories as Alt A because these loans have a combination of characteristics of  each category, may be underwritten with lower or alternative  income or asset documentation requirements compared to a full  documentation mortgage loan, or both. The UPB of Alt A loans in our single family credit guarantee portfolio declined to  $116.1 billion as of December 31, 2010 from $147.9 billion as of December 31, 2009. The UPB of our Alt A loans declined in 20  0 primarily due to refinancing into  other mortgage products, foreclosure transfers, and other  liquidation events  As of December 31, 2010, for Alt A loans in our single family credit guarantee portfolio, the average FICO credit score at origination was 7  9  Although Alt A mortgage loans comprised approximately 6% of our single family  credit guarantee portfolio as of December 3  , 20  0, these loans  represented approximately 37% of our credit losses during 20  0

We implemented several changes in our underwriting and  eligibility criteria in 2008 and 2009 to reduce our acquisition  of certain loans with higher risk characteristics, including Alt A loans. As a result, we did not purchase any new single family  Alt A mortgage loans in our single family credit guarantee portfolio during the year ended December 3  , 20  0, compared to  $0.5 billion of Alt A purchases for the year ended December 31, 2009  However, during the second quarter of 2010, we partially terminated  certain other guarantee commitments, which included $1.5 billion of UPB of Alt A mortgage loans, in order to permit these loans to be securitized  within a new PC issuance  There was no change to our Alt A exposure on these mortgages as a result of these transactions  Although we discontinued new purchases of mortgage loans with  ower documentation standards for assets or income beginning  March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these  mortgages in cases where the loan was either a part of our  relief refinance mortgage initiative or in another refinance mortgage initiative and the pre existing mortgage (including  Alt A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of  these programs and the original loan had been previously  identified as Alt A, such refinance loan may no longer be categorized or reported as an  Alt A mortgage in this Form  0 K and our other financial reports because the new refinance loan replacing the original loan would not be identified by the  servicer as an Alt A loan  As a result, our reported Alt A balances may be lower than would otherwise be the case had such  refinancing not occurred  From the time the product became  available in 2009 to December 31, 2010, we purchased  approximately $  0 2 billion of relief refinance mortgages  that were previously categorized as Alt A loans in our portfolio, including $7 0 billion during the year ended  December 3  , 20  0

We also hold investments in non agency mortgage related  securities backed by single family Alt A loans. At December 31, 2010 and 2009, we held investments of $18.8 billion and $21.4 billion, respectively, of non agency mortgage related securities backed by  Alt A and other mortgage loans and 22% and 31%, respectively, of these  securities were investment grade  The credit performance of loans underlying these securities deteriorated significantly beginning in 2008 and continued to deteriorate in 20  0  We categorize our investments in non agency mortgage related securities as Alt A if the securities were identified as such based on information provided  to us when we entered into these transactions  For more information on our exposure to Alt A mortgage loans through our investments in non agency  mo tgage related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities."

*Higher Risk Loans in the Single Family Credit Guarantee Portfolio*

Table 44 presents information about certain categories of single family mortgage loans within our single family credit  guarantee portfolio that we believe have certain higher risk  characteristics  These loans include categories based on product  type and borrower characteristics present at origination  The table includes a presentation of each higher risk category in  isolation  A single loan may fall within more than one category (for example, an interest only loan may also have an original  LTV ratio greater than 90%)  Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced  over the past few years

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0770

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 44      Certain Higher Risk(1) Categories in the Single Family Credit Guarantee Portfolio**

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV(2) | Percentage Modified(3) | Serious Delinquency Rate(4) |
| | | (dollars in billions) | | |
| Loans w h one o mo e spec f ed cha ac e s cs | $369 0 | 100% | 5 5% | 10 3% |
| Ca ego es ( nd v dual cha ac e s cs) | | | | |
| Al -A | 116 1 | 99% | 5 8% | 12 2% |
| In e es -only loans | 95 4 | 112% | 0 5% | 18 4% |
| Op on ARM loans | 9 4 | 115% | 3 1% | 21 2% |
| O g nal LTV a o g ea e han 90%( | 154 3 | 104% | 5 3% | 7 8% |
| Lowe o g nal FICO sco es (less han 620)( | 61 2 | 89% | 10 4% | 13 9% |

| | As of December 31, 2009 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV(2) | Percentage Modified(3) | Serious Delinquency Rate(4) |
| | | (dollars in billions) | | |
| Loans w h one o mo e spec f ed cha ac e s cs | $413 3 | 97% | 2 6% | 10 8% |
| Ca ego es ( nd v dual cha ac e s cs) | | | | |
| Al -A | 147 9 | 94% | 1 9% | 12 3% |
| In e es -only loans | 129 9 | 106% | 0 2% | 17 6% |
| Op on ARM loans | 10 8 | 111% | 1 4% | 17 9% |
| O g nal LTV a o g ea e han 90%( | 144 4 | 104% | 3 0% | 9 1% |
| Lowe o g nal FICO sco es (less han 620)( | 67 7 | 87% | 6 1% | 14 9% |

(1) Ca ego es a e no add ve and a s ng e oan may be nc uded n mul ple ca ego es f mo e han one cha ac e s cs assoc a ed w h he loan Loans w h a comb na on
   of ese cha ac e s cs w have an even h ghe sk of defau han hose w h an nd v dua cha ac e s c

(2) Based o f s e expos e o e p ope y a d exc des seconda y f nanc ng by h d pa es, f app cab e Fo ef nance mo gages, he o g nal LTV a o sa e
   based o h d-pa y app a sa s used n oan o g na on, whe eas new pu chase mo gages a e based on he p ope y sa es p ce

(3) Rep esen s he pe cen age of oans based on oan coun n ou s ng e-fam ly c ed gua an ee po fol o ha have been mod f ed unde ag ee en w h he bo owe ,
   nc ud ng hose w h no cha ges e e es a e o a y da e, whe e pas due a ouns a e added o he ou s and ng p nc pa ba ance of e oa Exc des
   oans unde y ng ce a n O he Gua an ee T ansac ons fo wh ch da a was no ava ab e

(4) See "Portfolio Management Activities  Credit Performance De nquency es" fo fu he nfo ma on abou ou epo ed se ous de nquency a es

(5) See e d es (4) a d (7) o "Ta e 42 Cha ac e s cs of he S ng e-Fam y C ed Gua an ee Po fo o" fo nfo ma on on ou ca cu a on of o g na LTV a os and
   use of FICO sco es, espec ve y

Loans with one or more of the above attributes comprised approximately 20% and 22% of our single family credit guarantee portfolio as of December 31, 2010 and 2009, respectively  The total UPB of loans in our single family credit guarantee portfolio with one or more of these characteristics declined approximately 11%, to $369.0 billion as of December 31, 2010 from $413 3 billion as of December 31, 2009. This decline was principally due to liquidations resulting from repayments, payoffs, refinancing activity and other principal curtailments as well as those resulting from foreclosure events  The serious delinquency rates associated with these loans decreased slightly to  0 3% as of December 3 , 2010 from 10 8% as of December 31, 2009

### Multifamily Mortgage Portfolio Diversification, Characteristics and Product Types

Portfolio diversification is an important aspect of our strategy to manage mortgage credit risk  We monitor a variety of mortgage loan characteristics which may affect the default experience on our overall mortgage portfolio, such as the LTV ratio, DSCR, geographic concentrations and loan duration  We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0771

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 45 provides attributes of our multifamily mortgage portfolio at December 31, 2010 and 2009

**Table 45     Multifamily Mortgage Portfolio     by Attribute**

| | UPB at December 31, | | Delinquency Rate[2] at December 31, | |
|---|---|---|---|---|
| | **2010** | **2009** | **2010** | **2009** |
| | (dollars in billions) | | | |
| **Original LTV Ratio[1]** | | | | |
| Be ow 75% | $ 72 0 | $ 65 0 | 0 08% | 0 07% |
| 75% o 80% | 29 9 | 29 5 | 0 24 | 0 15 |
| Above 80% | 6 8 | 6 8 | 2 30 | 1 63 |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |
| We gh ed ave age LTV a o a o g na on | 70% | 70% | | |
| | | | | |
| **Geographic Distribution** | | | | |
| Ca fo n a | $ 19 4 | $ 18 2 | 0 06% | % |
| Texas | 12 8 | 11 7 | 0 52 | 0 26 |
| New Yo k | 9 2 | 9 0 | | |
| F o da | 6 4 | 5 6 | 0 56 | 0 42 |
| V rg n a | 5 6 | 5 6 | | |
| Georg a | 5 5 | 5 3 | 0 98 | 0 65 |
| A o he S a es | 49 8 | 45 9 | 0 24 | 0 24 |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |
| | | | | |
| **Maturity Dates** | | | | |
| 2010 | N/A | $ 1 8 | N/A | 0 21% |
| 2011 | $ 2 3 | 3 5 | 0 97% | |
| 2012 | 4 1 | 4 4 | 0 82 | 0 14 |
| 2013 | 6 8 | 7 4 | | |
| 2014 | 8 5 | 8 8 | 0 02 | |
| Beyond 2014 | 87 0 | 75 4 | 0 26 | 0 25 |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |
| | | | | |
| **Year of Origination** | | | | |
| 2004 and p o | $ 15 9 | $ 19 4 | 0 31% | 0 08% |
| 2005 | 8 0 | 8 4 | | |
| 2006 | 11 7 | 12 0 | 0 25 | 0 16 |
| 2007 | 20 8 | 21 3 | 0 97 | 0 63 |
| 2008 | 23 0 | 23 9 | 0 03 | 0 13 |
| 2009 | 15 2 | 16 3 | | |
| 2010 | 14 1 | N/A | | N/A |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |
| | | | | |
| **Current Loan Size Distribution** | | | | |
| Above $25 m ll on | $ 39 7 | $ 36 9 | 0 07% | % |
| Above $5 m ll on o $25 m ll on | 59 7 | 55 3 | 0 38 | 0 32 |
| $5 m ll on and below | 9 3 | 9 1 | 0 37 | 0 25 |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |
| | | | | |
| **Legal Structure** | | | | |
| Unsecu zed loans | $ 85 9 | $ 83 9 | 0 11% | 0 08% |
| Non-consol da ed F edd e Mac mo gage- ela ed secu es | 13 1 | 8 2 | 1 30 | 1 61 |
| O he gua an ee comm men s | 9 7 | 9 2 | 0 23 | |
| o a | $108 7 | $ 101 3 | 0 26% | 0 20% |

(1) O g nal LTV a os a e calcula ed as he UPB of he mo gage, d v ded by e esse of he app a sed va e of e p ope y a he me of mo gage o g na on o he
 mo gage bo owe 's p c ase p ce Seco d es ow mo gages a e excluded f om he LTV a o calcula on
(2) See *"Portfolio Management   Credit Performance   Del nquenc es"* fo mo e nfo ma on abou ou de nquency a es

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms Multifamily loans may be interest only
or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time However, our multifamily loans are generally for
shorter terms than single family loans, and most have balloon maturities ranging from five to ten years Amortizing loans reduce our credit
exposure over time because the UPB declines with each mortgage payment Fixed rate loans may also create less risk for us because the borrower's
payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise as with a
variable rate mortgage is eliminated As of December 3 , 2010 and 2009, approximately 85% and 86%, respectively, of the multifamily loans on
our consolidated balance sheets had fixed interest rates while the remaining loans had variable rates

*Freddie Mac*

Source   D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0772

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We estimate that approximately 8% of loans in our multifamily mortgage portfolio had a current LTV ratio of greater than 00% as of December 3 , 20 0, and the estimated current average DSCR for these loans as of that date was 1.1, based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third party appraisals for a portion of the portfolio We periodically perform our own valuations or obtain third party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value

Because multifamily loans generally have a balloon payment and typically have a shorter contractual term than single family mortgages, the maturity date for a multifamily loan is also an important loan characteristic Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default

While we believe the underwriting practices we employ for our multifamily loan portfolio are prudent, the ongoing weak economic conditions in the U.S. negatively impacted many multifamily residential properties Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our underwriting standards versus those used by others in the industry. We monitor the financial performance of our multifamily borrowers and during 2010 we observed stabilization in measures such as the DSCR and estimated current LTV ratios for many of our properties To the extent multifamily loans reach maturity and a borrower with deterioration in cash flows and property market value requires refinancing of the property, we will work with the borrower to obtain principal repayment to reduce the refinanced balance to conform to our underwriting standards However, should a distressed borrower not have the financial capacity to do so, we may either experience higher default rates and credit losses, or need to provide continued financing ourselves at below market rates through a TDR. This refinancing risk for multifamily loans is greater for those loans with balloon provisions where the remaining UPB is due upon maturity. Of the $108.7 billion in UPB of our multifamily mortgage portfolio as of December 31, 2010, approximately 2% and 4% will reach their maturity during 2011 and 2012, respectively.

*Portfolio Management Activities*

The portfolio information below relates to our single family credit guarantee and multifamily mortgage portfolios, which exclude our holdings of non Freddie Mac mortgage related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities *Mortgage Related Securities*" for credit enhancement and other information about our investments in non Freddie Mac mo tgage-re ated securities

*Credit Enhancements*

Our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements

At December 31, 2010 and 2009, our credit enhanced mortgages represented 15% and 16%, respectively, of our single family credit guarantee portfolio and multifamily mortgage portfolio, on a combined basis, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant

We recognized recoveries of $3 4 billion and $2.1 billion in 2010 and 2009, respectively, under our primary and pool mortgage insurance policies and other credit enhancements as discussed below related to our single family credit guarantee portfolio In 20 0 and 2009, there was a significant decline in our credit enhancement coverage for new purchases compared to 2008, primarily as a result of the high refinance activity during these years Refinance loans typically have lower LTV ratios, which fall below the 80% charter threshold noted above In addition, we have been purchasing significant amounts of relief refinance mortgages These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans

Our ability and desire to expand or reduce the portion of our total mortgage portfolio covered by credit enhancements will depend on our evaluation of the credit quality of new business purchase opportunities, the risk profile of our portfolio and the future availability of effective credit enhancements at prices that permit an attractive return While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure to institutional credit risk As guarantor, we remain responsible for the payment of principal and interest if mortgage insurance or other credit

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

Table of Contents

enhancements do not provide full reimbursement for covered losses  Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recovery of credit losses

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single family credit guarantee portfolio and is typically provided on a loan level basis  Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage to a third party insurer. Most mortgage insurers increased premiums and tightened underwriting standards during 2009 and 2008. The amount of insurance we obtain on any mortgage depends on our requirements and our assessment of risk.

Generally, in order to file a claim under a primary mortgage insurance policy, the insured loan must be in default and the borrower's interest in the underlying property must have been extinguished, such as through a foreclosure action  The mortgage insurer has a prescribed period of time within which to process a claim and make a determination as to its validity and amount. Historically, it typically took two months from the time a claim was filed to receive a primary mortgage insurance payment; however, due to our insurers' performing greater diligence reviews on these claims to verify that the original underwriting of the loans by our seller/servicers was in accordance with their standards, the recovery timelines extended beginning in 2008 by several months and continued to extend in the last two years. As of December 31, 2010 and 2009, in connection with loans underlying our single family credit guarantee portfolio, excluding Other Guarantee Transactions, the maximum amount of losses we could recover under primary mortgage insurance, excluding reimbursement of expenses, was $52.9 billion and $58.2 billion, respectively

Other prevalent types of credit enhancements that we use are lender recourse (under which we may require a lender to repurchase a loan upon default) and indemnification agreements (under which we may require a lender to reimburse us for credit losses realized on mortgages), as well as pool insurance  Pool insurance provides insurance on a pool of loans up to a stated aggregate loss limit  In addition to a pool level loss coverage limit, some pool insurance contracts may have limits on coverage at the loan level  For pool insurance contracts that expire before the completion of the contractual term of the mortgage loan, we seek to ensure that the contracts cover the period of time during which we believe the mortgage loans are most likely to default  As of December 31, 2010 and 2009, in connection with loans underlying our single family credit guarantee portfolio, excluding Other Guarantee Transactions, the maximum amount of losses we could recover under lender recourse and indemnification agreements was $9.6 billion and $11.1 billion, respectively, and under pool insurance was $3.3 billion and $3.6 billion, respectively. In certain instances, the cumulative losses we have incurred as of December 3 , 20 0 combined with our expectations of potential future claims may exceed the maximum limit of loss allowed by the policy

In order to file a claim under a pool insurance policy, we generally must have finalized the primary mortgage claim, disposed of the foreclosed property, and quantified the net loss payable to us with respect to the insured loan to determine the amount due under the pool insurance policy  Certain pool insurance policies have specified loss deductibles that must be met before we are entitled to recover under the policy  Pool insurance proceeds are generally received five to six months after disposition of the underlying property  We have institutional credit risk relating to the potential insolvency or non performance of mortgage insurers that insure mortgages we purchase or guarantee  See *"Institutional Credit Risk Mortgage Insurers"* for further discussion about pool insurance coverage and our mortgage loan insurers.

Other forms of credit enhancements on our single family credit guarantee portfolio include government insurance or guarantees, collateral (including cash or high quality marketable securities) pledged by a lender, excess interest and subordinated security structures. At December 31, 2010 and 2009, respectively, the maximum amount of losses we could recover under other forms of credit enhancements in connection with loans in our single family credit guarantee portfolio, excluding Other Guarantee Transactions, was $0.2 billion and $0.3 billion.

At December 31, 2010 and 2009, the UPB of single family Other Guarantee Transactions with subordination coverage at origination was $4.1 billion and $4.5 billion, respectively, and the subordination coverage on these securities was $622 million and $784 million, respectively. However, at December 31, 2010 and 2009, the average serious delinquency rate on single family Other Guarantee Transactions with subordination coverage was 21 1% and 24 1%, respectively

We also use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds  Typically, we required credit enhancements on loans in situations where we delegated the underwriting process for the loan to the seller/servicer, which provides first loss coverage on the mortgage loan  We may also require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage  The total UPB of mortgage loans in our multifamily mortgage portfolio, excluding Other Guarantee Transactions, for which we have credit enhancement coverage was $ 3 0 billion and $11.0 billion as of December 31, 2010 and December 31, 2009, respectively, and we had maximum potential coverage as of such dates of $3 4 billion and $3 0 billion, respectively

<div align="center">127</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Additionally, Other Guarantee Transactions issued by our Multifamily segment include subordinated classes, that we do not  guarantee, that provide for credit loss protection to the senior  classes that we guarantee  Subordinated classes are allocated  credit losses prior to the senior classes  At December 3 , 2010 and 2009, the UPB of Multifamily Other Guarantee  Transactions with subordination coverage was $8.2 billion  and $2.6 billion, respectively, and the subordination  coverage on these securities was $1 0 billion  and  $0 3 billion, respectively

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage  products, we may charge upfront delivery fees above a base  management and guarantee fee, which are calculated based on  credit risk factors such as the mortgage product type, loan  purpose, LTV ratio and other loan or borrower characteristics  In 2009, we implemented certain increases in delivery fees for  certain mortgages deemed to be higher risk based on combinations of product type, property type, loan purpose, LTV ratio and/or borrower credit scores  We announced additional delivery fee increases in the fourth quarter of 20  0 that become effective  March 1, 2011 (or later, as outstanding contracts permit)  for loans with higher LTV ratios

We have also entered into credit derivatives on specified mortgage related assets that in most cases are intended to limit  our exposure to credit default losses  The fair value of these credit derivatives was not significant at December 31,  2010, or 2009. See "NOTE 12: DERIVATIVES" for further discussion.

*MHA Program*

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure  prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing  stability to the housing market. Through our participation  in this program, we help borrowers maintain home ownership  Some of  the key initiatives of this program are:

*Home Affordable Modification Program.*  HAMP commits U.S. government, Freddie Mac and Fannie Mae funds  to he p e igib e homeowners avoid foreclosures and keep their  homes through mortgage modifications, where possible  Under this  program, we offer loan modifications to financially struggling  homeowners with mortgages on their primary residences that  reduce the monthly principal and interest payments on their  mortgages  HAMP applies both to delinquent borrowers and to  those current borrowers at risk of imminent default  Other features of HAMP include the following:

- HAMP uses specified requirements for borrower eligibility  The program seeks to provide a uniform, consistent regime that all participating servicers must use in modifying loans held or  guaranteed by all types of investors: Freddie Mac, Fannie Mae,  banks and trusts backing non agency mortgage related securities

- Under HAMP, the goal is to reduce the borrowers' monthly mortgage payments to 31% of gross monthly income, which may be  achieved through a combination of methods, including interest  rate reductions, term extensions and principal forbearance  Although HAMP contemplates that some servicers will also make  use of principal reduction to achieve reduced payments for  borrowers, we only used forbearance in 2009 and 2010 and did not  use principal reduction in modifying our loans.

- Under HAMP, each modification must be preceded by a standardized NPV test to evaluate whether the NPV of the income that the mortgage holder will receive after the modification will equal  or exceed the NPV of the income that the holder would have  received had there been no modification  HAMP does not require a  modification if the NPV of the income that the mortgage holder  will receive after modification is less than the NPV of the  income the holder would have received had there been no  modification; however, Freddie Mac will permit such a modification in certain circumstances. Our practice in this  regard is intended to increase the number of modifications under the program; however, it may cause us to incur higher losses  than would otherwise be recognized under HAMP

- HAMP requires that each borrower complete a trial period during  which the borrower will make monthly payments based on the  estimated amount of the modification payments. Trial periods are  required for at least three months  After the final trial period  payment is received by our servicer and the borrower has  provided necessary documentation, the borrower and servicer will  enter into the modification

- Servicers will be paid a $1,000 incentive fee when they  originally modify a loan and an additional $500 incentive fee if  the loan was current when it entered the trial period  (*i.e.*, where default was imminent but had not yet  occurred)  In addition, servicers will receive up to $1,000 for any modification that reduces a borrower's monthly payment  by 6% or more, in each of the first three years after the modification, as long as the modified loan remains current

- Borrowers whose loans are modified through HAMP will accrue  monthly incentive payments that will be applied annually to  reduce up to $1,000 of their principal, per year, for five years, as long as they are making timely payments under the  modified loan terms

- HAMP applies to loans originated on or before January 1,  2009, and borrowers' requests for such modifications will  be considered until December 31, 2012

<center>128</center>

<center>*Freddie Mac*</center>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 46 presents the number of single family loans that completed or were in process of modification under HAMP as of December 3 , 20 0 and 2009.

**Table 46     Single Family Home Affordable Modification Program Volume(1)**

| | As of December 31, 2010 | | As of December 31, 2009 | |
|---|---|---|---|---|
| | Amount(2) | Number of Loans | Amount(2) | Number of Loans |
| | (dollars in millions) | | | |
| Comp e ed HAMP mod ca ons(3 | $23,635 | 107,073 | $ 3,127 | 13,927 |
| Loans n he HAMP a pe od | $ 4,905 | 22,352 | $28,151 | 129,380 |

(1) Based on nfo ma on epo ed by ou se v ce s o he MHA og am adm n s a o
(2) Fo oans n he HAMP a pe od, h s ef ec s he oan balance p o o mod f ca on Fo comple ed HAMP mod f ca ons, he amoun ep esen s he ba ance of oans af e mod f ca on de HAMP
(3) C mple ed HAMP mod f ca ons a e hose whe e he oan has ade he a a pe od pay en , has p ov ded he equ ed documen a on o he se v ce and he mod f ca on has become effec ve Amoun s p esen ed ep esen comp e ed HAMP mod f ca ons wh effec ve da es s nce ou mplemen a on of HAMP n 2009 h ough Decembe 31, 2010 and 2009, espec vely

As of December 31, 2010, the borrower's monthly payment was reduced on average by an estimated $566, which amounts to an average of $6,787 per year, and a total of $727 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification) Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years and borrowers whose payments were adjusted below current market levels will have their payment gradually increase after the fifth year to a rate consistent with the market rate at the time of modification  Since we repurchase loans modified under HAMP from our PC pools, we bear the costs of these payment reductions  Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 3 % of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 22,352 as of December 31, 2010 from 129,380 as of December 3 , 2009 A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and many of them either received permanent modifications or had their trial period plans cancelled in 2010  Significantly fewer new borrowers entered into HAMP trial period plans during 20 0  Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than did in 2010, since a large number of the delinquent borrowers that were eligible for the program already attempted or completed the trial period

Approximately 31% of our loans in the HAMP trial period as of December 3 , 20 0 had been in the trial period for more than the minimum duration of three months  Since the start of our HAMP effort, the trial period plans of more than 121,000 borrowers, or 48% of those starting the program, have been cancelled and the borrowers did not receive permanent HAMP modifications, primarily due to the failure to continue trial period payments, the failure to provide the income or other required documentation of the program, or the failure to meet the income requirements of the program. To address the documentation issues, guidelines for HAMP provide that, beginning with trial periods that became effective on or after June 1, 2010, borrowers must provide income documentation before entering into a HAMP trial period  The ultimate completion rate for HAMP modifications, which is the percentage of borrowers that successfully exit the trial period and receive final modifications, remains uncertain  When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities  For more information on our HAMP modifications, including redefault rates on these loans, see "*Loan Workout Activities.*"

In March 2010, Treasury expanded HAMP to include borrowers with FHA insured loans, including incentives comparable to the incentive structure of HAMP  In November 2010, we notified our seller/servicers that we will not pay any incentive fees for mortgages modified under HAMP that are insured by FHA.

During 2010, Treasury issued guidelines for the following enhancements to HAMP  We do not currently have plans to apply these changes to mortgages that we own or guarantee  However, it is possible that FHFA might direct us to implement some or all of these changes

• *Unemployed Homeowners*: In May 2010, Treasury announced a plan to provide temporary assistance for unemployed borrowers while they search for employment. Under this plan, certain borrowers may receive forbearance plans for a minimum of three months  At the end of the forbearance period or when the borrowers' financial situation changes, *e.g.*, they become employed, the borrowers must then be evaluated for a HAMP modification, including HAFA

• *Principal Reduction Approach and Incentives*: In June 2010, Treasury announced an initiative under which servicers will be required to consider an alternative modification approach including a possible reduction of principal for loans with LTV ratios over 115% Mortgage investors will receive incentives based on the amount of reduced principal  In October 2010, Treasury provided guidance with respect to applying this alternative for borrowers who have already

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0776

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

received permanent modifications or are in trial plans  Investors will not be required to agree to a reduction of principal, but servicers must have a process for considering the approach.

*Home Affordable Refinance Program.*  The Home Affordable Refinance Program gives eligible homeowners with loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed rate terms and is available until June 2011. Under the Home Affordable Refinance Program, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place

The relief refinance mortgage initiative, which we announced in March 2009, is our implementation of the Home Affordable Refinance Program  We have worked with FHFA to provide us the flexibility to implement this element of the MHA Program  The Home Affordable Refinance Program is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios below 80% to participate  On July 1, 2009, we announced that the current LTV ratio limit would be increased from 105% to 125%  We began purchasing mortgages that refinance such higher LTV ratio loans on October 1, 2009  We also increased the amount of closing costs that can be included in the new refinance mortgage to up to $5,000. Through our program, we offer this refinancing option only for qualifying mortgage loans that we hold or guarantee  We will continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements

The implementation of the relief refinance mortgage product will result in a higher volume of purchases and increased delivery fees from the new loans  However, the net effect of the refinance activity on our financial results is not expected to be significant

Table 47 below presents the composition of our purchases of refinanced single family loans during the years ended December 31, 2010 and 2009.

**Table 47     Single Family Refinance Loan Volume(1)**

| | Year Ended December 31, 2010 | | | Year ended December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans (dollars in millions) | Percent | Amount | Number of Loans (dollars in millions) | Percent |
| Re ef nance mo gages | | | | | | |
| Above 105% LTV Ra o | $ 3,977 | 16,667 | 1 1% | $   219 | 953 | 0 1% |
| 80%  o 105% LTV Ra o | 43,906 | 192,650 | 13 1 | 19,380 | 85,110 | 4 8 |
| Be ow 80% LTV Ra o | 57,766 | 323,851 | 22 0 | 15,119 | 83,155 | 4 7 |
| o a e ef ef nance mo gages | $105,649 | 533,168 | 36 2% | $ 34,718 | 169,218 | 9 6% |
| To al ef nance loan vo ume(2 | $303,060 | 1,470,786 | 100% | $379,035 | 1,757,500 | 100% |

(1) Cons s s of all s ngle-fam ly  ef nance mo gage loans  ha we  e  p c ased o  g a a eed d    g e pe od, exc d  g  hose assoc a ed w h o he  gua an ee
    comm  men s and O he  G a an ee T ansac ons
(2) Cons s s of  el ef  ef nance mo  gages and o he   ef nance  mor gages

Relief refinance mortgages comprised approximately 36% and  0% of our total refinance volume in 2010 and 2009, respectively  Re ef refinance mortgages with LTV ratios of 80% and above represented approximately  2% and 4% of our total single family credit guarantee portfolio purchases in 2010 and 2009, respectively  It is uncertain how relief refinance mortgages with LTV ratios of 80% and above will perform in the future, as only a short period of time has elapsed since these loans were originated  These mortgages comprised approximately 4% of our total single family credit guarantee portfolio at  December 3 , 20 0

*Home Affordable Foreclosure Alternatives Program.*  In May 2009, the Obama Administration announced HAFA, which is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a trial period or if they defaulted on their HAMP modification  HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure  HAFA took effect in April 20  0 and we began our implementation of this program in August 2010. Under HAFA, we will pay certain incentive fees to borrowers and servicers of mortgages that we own or guarantee that become the subject of HAFA short sales or deed- n- eu transactions  We will not receive reimbursement of these fees from Treasury. In December 2010, Treasury announced changes to HAFA intended to expand eligibility of borrowers and to eliminate the percentage cap on amounts payable to subordinate lienholders  We will work with FHFA to determine the extent to which we will implement such changes  We also allow for non HAFA short sale or deed in lieu transactions  We historically paid and may continue to pay incentive fees for non HAFA short sales and deed- n- eu transactions.

*Hardest Hit Fund.*  In 20  0, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. In August 2010, Treasury issued guidelines on how the MHA Program should operate in conjunction with these HFA programs. These HFA programs include, among others, unemployment assistance and mortgage reinstatement assistance

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                TREASURY-0777        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

programs. In October 2010, we issued instructions requiring servicers to accept assistance on behalf of borrowers under the HFAs' unemployment assistance and mortgage reinstatement assistance programs. The unemployment assistance programs are designed to assist unemployed or underemployed borrowers by paying all or a portion of their monthly mortgage payment for a period of time The mortgage reinstatement assistance programs are designed to bring delinquent borrowers to current status To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. As HFAs were in the process of implementing these programs during 20 0, we believe participation in these programs by our borrowers has been limited through December 31, 2010, and our delinquency statistics have not been significantly affected However, our delinquency reporting statistics may be impacted in 20   to the extent a significant number of borrowers rece ve assistance through these programs.

*Compliance Agent.* We are the compliance agent for Treasury for certain foreclosure avoidance activities under HAMP by mortgage holders other than Freddie Mac and Fannie Mae Among other duties, as the program compliance agent, we conduct examinations and review servicer compliance with the published requirements for the program Some of these examinations are on site, and others involve off site documentation reviews We report the results of our examination findings to Treasury. Based on the examinations, we may also provide Treasury with advice, guidance and lessons learned to improve operation of the program It is unclear how servicers will perceive our actions in this role It is possible that this could hurt our relationships with our seller/servicers, which could negatively affect our ability to purchase loans from them in the future.

### Expected Impact of the MHA Program on Freddie Mac

As previously discussed, HAMP, which is part of the MHA Program, is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties We believe our overall loss mitigation programs could reduce our ultimate credit losses over the long term However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives

We are devoting significant internal resources to the implementation and support of the various initiatives under the MHA Program, which has increased, and will continue to increase, our expenses It is likely that the costs we incur related to loan modifications and other activities under HAMP will be significant, to the extent that borrowers participate in this program in large numbers, for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we will bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentive fees and we will not receive a reimbursement of these costs from Treasury. We paid $241 million of servicer and borrower incentive fees in 2010, as compared to $11 million of such fees in 2009. We also have the potential to incur up to $8,000 of additional servicer incentive fees and borrower compensation fees per modification as long as the borrower remains current on a loan modified under HAMP As of December 31, 2010, we have also accrued $83 million for both initial fees and recurring incentive fees not yet due We also incur incentive fees to the servicer and borrower for short sales and deed- n- eu transactions under HAFA As of December 31, 2010, the incentive fees on these HAFA transactions were not significant

- Under HAMP, we typically provide concessions to borrowers, including interest rate reductions and forbearance of principal and interest on a portion of the UPB To the extent borrowers successfully obtain HAMP modifications, we will continue to experience high volumes of TDRs, similar to our experience during 2010.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the foreclosure process If home prices decline while these events take place, a delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier

- We expect that non GSE mortgages modified under HAMP will include mortgages backing our investments in non agency mortgage-re ated securities Such modifications reduce the monthly payments due from affected borrowers, and thus could reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement)

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0778

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Loan Workout Activities*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses  Our single family loss mitigation strategy emphasizes early intervention in seriously delinquent mortgages and provides alternatives to foreclosure  Other single family loss mitigation activities include providing our single family servicers with default management tools designed to help them manage non performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option  Loan workouts are intended to reduce the number of seriously delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale  See "BUSINESS      Our Business Segments    *Single Family Guarantee Segment    Loss Mitigation and Workout Activities*" for a general description of our loan workouts.

For multifamily loans, we monitor a variety of mortgage loan characteristics such as the LTV ratio, DSCR and geographic concentrations, among others, that help us assess the financial performance of the property and the borrower's ability to repay the loan  In certain cases, we may provide short term loan extensions of up to 12 months with no changes to the effective borrowing rate  During 20 0, we extended, modified, or restructured multifamily loans totaling $816 million in UPB, compared with $225 million in 2009. Multifamily loan modifications during 2010 included: (a) $71 million in UPB for short term loan extensions; and (b) $745 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. Although our loan modification activity for multifamily loans is increasing, and we expect it may continue to increase in the near term, the majority of our workout activities are for single family loans.

We are currently focusing our single family loan modification efforts on HAMP  If a borrower is not eligible for a HAMP modification, the borrower is considered for modification under our other loan modification programs  If the borrower is not eligible for any such programs, the loan is considered for other foreclosure alternatives, such as a short sale. In 2010, we helped more than 275,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 43,000 foreclosures

The UPB of loans in our single family credit guarantee portfolio for which we have completed a loan modification increased to $52 billion as of December 3 , 20 0 from $20 billion as of December 31, 2009. The estimated current LTV ratio for all modified loans in our single family credit guarantee portfolio was 116% and the serious delinquency rate on these loans was 19 1% as of December 31, 2010

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0779

Table of Contents

Table 48 presents volumes of single family workouts, serious delinquency, and foreclosures for the years ended 2010, 2009, and 2008.

**Table 48      Single Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes[1]**

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | | (dollars in millions) | | |
| **Home retention actions:** | | | | | | |
| Loan modifications[2] | | | | | | |
| with no change in terms[3] | 4,639 | $   799 | 5,866 | $  1,008 | 10,122 | $  1,524 |
| with extension of loan terms | 20,664 | 3,602 | 15,596 | 2,500 | 9,401 | 1,549 |
| with reduction of contractual interest rate | 48,749 | 10,838 | 2,375 | 562 | 15,465 | 3,315 |
| with a reduction and term extension | 65,937 | 14,439 | 38,540 | 8,043 | 96 | 18 |
| with a reduction, term extension and principal forbearance | 30,288 | 7,915 | 2,667 | 621 | | |
| Total loan modifications[6] | 170,277 | 37,593 | 65,044 | 12,734 | 35,084 | 6,406 |
| Repayment plans[4] | 31,210 | 4,523 | 33,725 | 4,711 | 42,062 | 5,768 |
| Forbearance agreements[5][6] | 34,594 | 7,156 | 14,628 | 2,848 | 4,192 | 518 |
| Total home retention actions | 236,081 | 49,272 | 113,397 | 20,293 | 81,338 | 12,692 |
| **Foreclosure alternatives:** | | | | | | |
| Short sales[7] | 38,773 | 9,109 | 18,890 | 4,481 | 5,333 | 1,208 |
| Deed-in-lieu transactions | 402 | 63 | 329 | 56 | 200 | 32 |
| Total foreclosure alternatives | 39,175 | 9,172 | 19,219 | 4,537 | 5,533 | 1,240 |
| **Total single-family loan workouts** | 275,256 | $58,444 | 132,616 | $24,830 | 86,871 | $13,932 |
| Delinquent loan additions | 502,710 | | 597,188 | | 340,094 | |
| Single-family foreclosures[8] | 142,877 | | 90,436 | | 53,371 | |
| Delinquencies, at period end | 462,439 | | 498,829 | | 231,426 | |

(1) Based on completed actions which borrowers for loans with no unpaid single-family loan balance are not reflected in the table. Excludes those modifications, repayments and forbearance activities for which the borrower has agreed to the required process, but has not yet been made permanent or in effect, or is no longer in the period under HAMP. Also excludes certain non-workout modifications for single-family loans. We have executed agreements with respect to properties, but this process has not been completed and or no change in our operational systems, due to delays in our processing. These categories are not mutually exclusive and a loan in one category may also be counted and or in another category in the same period (see endnote 6)

(2) Includes approximately 128,000, 4,000, and 2,000 TDRs during the years ended December 31, 2010, 2009 and 2008, respectively

(3) Under these modification types, past due amounts or as added to the principal balance and amortized based on the original modified loan terms

(4) Includes completed loan modifications under HAMP however, the number of such completed modifications differs from the amounts reported by the MHA Program administration partly due to differences in the timing of recognizing the completion of such modifications by us and the adoption of the terms.

(5) Represents the number of borrowers as reported by our servicer/servicers that have completed the full term of a repayment plan for past due amounts Excludes the number of borrowers as a receivable repayment plans due at December 31, 2010 and 2009, respectively

(6) Excludes loans with a long-term forbearance under a completed loan modification on Many borrowers complete a short-term forbearance agreement before a loan workout is completed On repeated activity as been revised to a new type of forbearance activity for a single loan once during each quarter type completed however, a single loan may be included under separate forbearance agreements for a single loan in the period if the borrower was not eligible for a single modification under Seee endnote 6)

(7) In 2010, we began to exclude third-party sales as a foreclosure action from our short sale results as Prior period amounts have been revised to conform to the current period presentation on See endnote 6 (8)

(8) Represents the number of our single-family loans that completed foreclosure transfers, including third-party sales as a foreclosure action on which the owner ship of the property has been transferred to us or a third-party as a result of the foreclosure process

We had significant increases in single family loan workout activity, particularly loan modifications and short sales during the year ended December 31, 2010 compared to the year ended December 31, 2009  Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance  Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used forbearance in 2009 and 2010 and did not use principal reduction in modifying our loans  In the second quarter of 2010, we implemented a temporary streamlined alternative loan modification process for single family borrowers who completed an existing trial period but did not qualify for a permanent modification under HAMP  We refer to this initiative as the HAMP backup modification and it was offered for modifications completed on or before December 1, 2010. This temporary non HAMP modification program was intended to minimize the need for additional documentation  We paid servicer incentive fees on our HAMP backup modifications that differed in amount from the incentive fees that are paid under HAMP  We did not offer borrower incentive fees under our HAMP backup modifications. We completed only a modest number of HAMP backup modifications in 2010. If the borrower was not eligible for this program, the borrower was considered for other workout activities, such as another type of non HAMP modification or a short sale

We completed 38,773 short sales during the year ended December 31, 2010, compared to 18,890 in the year ended December 31, 2009  We expect that the growth in short sales will continue, in part due to our implementation of HAFA effective August 1, 2010 and also due to incentives we provide to servicers to complete short sales instead of foreclosures

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

TREASURY-0780

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The number of modified loans in our single family credit guarantee portfolio has been increasing and such loans comprised approximately 2 1% and 0 9% of our single family credit guarantee portfolio as of December 31, 2010 and 2009, respectively Table 49 presents the reperformance rate of modified single family loans in each of the last five quarterly periods

**Table 49    Reperformance Rates[1] of Modified Single Family Loans**

| HAMP loan modi ications: | Quarter of oan Modification Completion[2] | | | | | |
|---|---|---|---|---|---|---|
| | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| me s nce mod f ca on− | | | | | | |
| 3 o 5 on hs | 93% | 94% | 95% | 94% | 96% | |
| 6 o 8 o s | | 91% | 93% | 93% | 93% | |
| 9 o 11 mon hs | | | 90% | 91% | 93% | |
| 12 o 14 mon hs | | | | 8 8% | 92% | |
| 15 o 17 mon hs | | | | | 91% | |
| 18 o 20 mon hs | | | | | | |

| Non-HAMP loan modi ications: | Quarter of oan Modification Completion[2] | | | | | |
|---|---|---|---|---|---|---|
| | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| me s nce mod f ca on− | | | | | | |
| 3 o 5 on hs | 93% | 93% | 94% | 90% | 8 8% | 73% |
| 6 o 8 o s | | 86% | 87% | 82% | 78% | 64% |
| 9 o 11 mon hs | | | 81% | 77% | 72% | 60% |
| 12 o 14 mon hs | | | | 75% | 69% | 58% |
| 15 o 17 mon hs | | | | | 67% | 57% |
| 18 o 20 mon hs | | | | | | 55% |

| Total (HAMP and non-HAMP): | Quarter of oan Modification Completion[2] | | | | | |
|---|---|---|---|---|---|---|
| | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| me s nce mod f ca on− | | | | | | |
| 3 o 5 on hs | 93% | 94% | 95% | 92% | 89% | 73% |
| 6 o 8 o s | | 90% | 92% | 8 8% | 79% | 64% |
| 9 o 11 mon hs | | | 8 8% | 85% | 74% | 60% |
| 12 o 14 mon hs | | | | 82% | 71% | 58% |
| 15 o 17 mon hs | | | | | 68% | 57% |
| 18 o 20 mon hs | | | | | | 55% |

(1) Rep ese s e pe ce age of oa s a a e c e o ess a e ee o y pay e s pas d e Exc des ose oa mod f ca on ac v es fo wh ch he bo owe as sta ted t e equ ed p ocess, bu he mod f ca on has no been ade p e a e , o effec ve, s c as oa s e a pe od de HAMP

(2) Loan mod fca ons a e ecogn zed as comple d n he qua e ly pe od n wh ch he se v ce has epo ed he mod fca on as effec ve and he ag eemen has been accepted y s, w c e an cases may be delayed by a backlog n se v ce p ocess ng of mod f ca ons

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss producing foreclosure alternative As of December 3 , 20 0, the redefault rate for all our single family loan modifications (including those under HAMP) completed during 2010, 2009, and 2008 was 8%, 38%, and 50%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last two years As of December 3 , 20 0, the redefault rate for loans modified under HAMP in 2010 and 2009 was approximately 7% and 11%, respectively These redefault rates may not be representative of the future performance of loans, including those modified under HAMP, as only a short period of time has elapsed since the modifications were effective We believe the redefault rate for loans modified in 2010 and 2009, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging

Our servicers have a key role in the success of our loan workout activities, including the HAMP process. The majority of our HAMP efforts have been primarily focused with our larger seller/servicers, which service the majority of our loans, and variations in their approaches may cause fluctuations in HAMP processing volumes. The significant increases in seriously delinquent loan volume and the challenging conditions of the mortgage market during 2009 and 2010 placed a strain on the loan workout resources of many of our mortgage servicers To the extent servicers do not complete loan modifications with eligible borrowers or are unable to facilitate the increasing volume of foreclosures, our credit losses could increase

In order to allow our mortgage servicers time to implement our more recent modification programs and provide additional relief to troubled borrowers, we implemented several temporary suspensions of all foreclosure transfers of occupied homes during certain periods of the last two years The MHA Program further restricts foreclosure while the borrower is being evaluated for HAMP and during the borrower's trial period We continued to pursue loss mitigation options with delinquent borrowers during these temporary suspension periods; however, we also continued to proceed with the initiation and other, pre closing steps in the foreclosure process

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-0781

Table of Contents

*Credit Performance*

Delinquencies

Unless otherwise noted, we report single family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our seller/servicers  For multifamily loans, we report delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure  Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, Multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable  As of December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts

Our single family and multifamily delinquency rates include all single family and multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on these securities by the U S  government  In 20 0, we began to include loans underlying Other Guarantee Transactions in both our multifamily and single family delinquency rates, which generally resulted in higher reported rates  Where applicable, prior period data throughout this report has been revised to conform with the current presentation

Some of our workout and other loss mitigation activities create fluctuations in our single family serious delinquency statistics  For example, loans that we report as delinquent before they enter the HAMP trial period continue to be reported as delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status  However, under many of our non HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate  In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting

Temporary actions to suspend foreclosure transfers of occupied homes, the longer foreclosure process timeframes of certain states, process requirements of HAMP, and general constraints on servicer capacity caused our single family serious delinquency rates to increase more rapidly in 2009 than they would have otherwise, as loans that would have completed a workout or been foreclosed upon have instead remained in a delinquent status  These factors also caused our single family delinquency rates to be higher in 20 0 than they otherwise would have been  Delays in the foreclosure process relating to the concerns about deficiencies in foreclosure practices could have a similar effect on our single family serious delinquency rates

Table 50 presents delinquency rates for our single family credit guarantee and multifamily mortgage portfolios

**Table 50      Delinquency Rates**

| | December 31, | | | | | |
| | 2010 | | 2009 | | 2008 | |
| | Percentage of Portfolio | Delinquency Rate(1) | Percentage of Portfolio | Delinquency Rate(1) | Percentage of Portfolio | Delinquency Rate(1) |
|---|---|---|---|---|---|---|
| S ng e-fam  y | | | | | | |
| Non-c ed  -enhanced | 85% | 3 01% | 84% | 3 02% | 82% | 1 27% |
| C ed  -enhanced | 15 | 8 27 | 16 | 8 68 | 18 | 4 27 |
| To al s ngle-fam ly c ed  gua an ee por o  o(2 | 100% | 3 84 | 100% | 3 98 | 100% | 1 83 |
| Mul  fam ly | | | | | | |
| Non-c ed  -enhanced | 80% | 0 12 | 87% | 0 07 | 87% | 0 02 |
| C ed  -enhanced | 20 | 0 85 | 13 | 1 03 | 13 | 0 21 |
| o a mu   am y mor gage por o o | 100% | 0 26 | 100% | 0 20 | 100% | 0 05 |

(1) In 2010, we began o nc ude oans unde  y ng O he  Gua an ee T ansac  ons n ou  epo ed de nquency  a es  P o pe  od de nquency  a es have been  ev sed o confo m o he cu en  yea  p esen a on

(2) As of Decembe  31, 2010 and Decembe  31, 2009, app ox  a e y 61 3% a d 49 2%, espec  ve y, of  e s ngle-fam ly loans  epo  ed as se  ously del nquen  we e n  t e p ocess of fo eclosu e

Serious delinquency rates of our single family credit guarantee portfolio declined slightly to 3 84% as of December 3 , 2010 from 3.98% as of December 31, 2009  Serious delinquency rates for interest only and option ARM products, which together represented approximately 6% of our total single family credit guarantee portfolio at December 3 , 2010, increased to 18.4% and 21.2% at December 31, 2010, respectively, compared with 17.6% and 17.9% at December 31, 2009,

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0782

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

respectively  Serious delinquency rates of single family 30 year, fixed rate amortizing loans, which is a more traditional  mortgage product, were 4% at both December 31, 2010, and  December 31, 2009  The slight improvement in the  single family serious delinquency rate during 2010 was primarily due to a higher volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies.  Although the volume of new serious delinquencies declined in  each quarter of 2010, our serious delinquency rate remains high,  reflecting continued stress in the housing and labor markets. In addition our serious delinquency rate has been negatively  impacted by the decline in the total number of loans of our single family credit guarantee portfolio during 2010, which is  the denominator used in our rate calculations

During 2010 and 2009, home prices in certain regions and states  improved modestly, but remained weak overall due to significant  inventories of unsold homes in every region of the U S  In some  geographical areas, particularly in certain states within the  West, Southeast and Northeast regions, the home price declines of the past three years combined with higher rates of  unemployment have resulted in persistently high serious delinquency rates  These increases in serious delinquency rates  have been more severe in Arizona, California, Florida, and Nevada. As of December 31, 2010, single family loans in California comprised 16% of our single family credit guarantee  portfolio; however, seriously delinquent loans in California comprised more than 20% of the seriously delinquent loans in our  single family credit guarantee portfolio, based on UPB. During 20 0, we also continued to experience higher serious delinquency  rates on single family loans originated between 2005 and 2008   We purchased significant amounts of loans with higher risk  characteristics in those years  In addition, those borrowers are  more susceptible to the declines in home prices since 2006 than  those homeowners that have built equity over time

Table 51 presents credit concentrations for certain loan groups  in our single family credit guarantee portfolio

**Table 51     Credit Concentrations in the Single Family Credit Guarantee  Portfolio**

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate | 2010 Credit Losses Alt-A | Non Alt-A |
|---|---|---|---|---|---|---|---|---|
| | | | (in billions) | | | | | (in billions) |
| **Geog aph cal d s  bu  on** | | | | | | | | |
| A  zona, Ca fo n a, F o  da, and Nevada | $47 | $    410 | $   457 | 91% | 3 3% | 7 1% | $3 7 | $   5 0 |
| A  o he  s a es | 69 | 1,283 | 1,352 | 73% | 1 9% | 3 0% | 1 5 | 3 9 |
| **Yea  of o  g na on** | | | | | | | | |
| 2010 | | 323 | 323 | 70% | | 0 1% | | |
| 2009 | | 391 | 391 | 70% | <0 1% | 0 3% | | 0 1 |
| 2008 | 10 | 149 | 159 | 86% | 2 2% | 4 9% | 0 2 | 0 8 |
| 2007 | 36 | 172 | 208 | 104% | 6 2% | 11 6% | 1 9 | 2 8 |
| 2006 | 31 | 125 | 156 | 104% | 5 8% | 10 5% | 1 9 | 2 3 |
| 2005 | 21 | 156 | 177 | 91% | 3 3% | 6 0% | 1 1 | 1 7 |
| All o he  yea s | 18 | 377 | 395 | 58% | 1 7% | 2 5% | 0 1 | 1 2 |

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate | 2009 Credit  osses Alt-A | Non Alt-A |
|---|---|---|---|---|---|---|---|---|
| | | | (in billions) | | | | | (in billions) |
| **Geog aph cal d s  bu  on** | | | | | | | | |
| A  zona, Ca fo n a, F o  da, and Nevada | $59 | $   421 | $   480 | 86% | 1 1% | 7 7% | $2 7 | $   2 4 |
| A  o he  s a es | 89 | 1,334 | 1,423 | 74% | 0 9% | 3 0% | 0 8 | 2 0 |
| **Yea  of o  g na on** | | | | | | | | |
| 2009 | | 438 | 438 | 70% | | 0 1% | | |
| 2008 | 13 | 214 | 227 | 82% | 0 3% | 3 4% | 0 1 | 0 3 |
| 2007 | 46 | 227 | 273 | 97% | 1 8% | 10 5% | 1 4 | 1 4 |
| 2006 | 40 | 167 | 207 | 98% | 1 9% | 9 4% | 1 6 | 1 2 |
| 2005 | 25 | 205 | 230 | 87% | 1 2% | 5 2% | 0 3 | 0 9 |
| All o he  yea s | 24 | 504 | 528 | 58% | 0 9% | 2 2% | 0 1 | 0 6 |

(1) See e  d  o e (5)  o "Tab e 42    Cha ac e  s cs of he S ng e-Fam  y C ed  Gua an ee Po  fol o" fo  nfo ma on on ou  calcula on of es ma ed c  e  LTV a os
(2) Rep ese  s  spec e  age of  oa s, based o  oa  co      o  s ngle-fam  y c ed  gua an ee po  fol o, ha  have been mod f ed unde  ag eemen  w h he bo  owe ,
ncud ng  hose wh  c a ges      e es a o a     y da e,    we e pas d  e a  oun s a added o he ou s and ng p nc pa ba ance of he loan

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011
TREASURY-0783
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 52 presents statistics for combinations of certain characteristics of the mortgages in our single family credit guarantee portfolio as of December 31, 2010 and 2009

**Table 52     Single Family Credit Guarantee Portfolio by Attribute Combinations**

| | December 31, 2010 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Current LTV Ratio(1) ≤ 80 | | | Current LTV Ratio(1) of 81 100 | | | Current LTV Ratio(1) > 100 | | | Current LTV Ratio(1) All loans | | |
| | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | | | | |
| FICO scores < 620 | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | %  | 6 2% | 8 6% | 0 8% | 2  % | 5  % | 0 9% | 26 4% | 27  % | 2 8% | 2 9% | 5  % |
| 5 year amortizing fixed rate | 0 2 | 7 | 4 6 | 0 | 3 0 | 8 | 0 | 4 | 22 2 | 0 2 | 8 | |
| ARMs adjustable rate(4) | 0 | 6 | 12 2 | 0 | 8 6 | 8 4 | 0 | 9 6 | 28 6 | 0 | 7 6 | 6 9 |
| interest only(5) | 0 | 0 | 7 6 | 0 | 0 4 | 2 3 | 0 | 2 | 39 9 | 0 2 | 0 9 | 33 3 |
| Other(6) | 0 | 2 6 | 3 7 | 0 | 2 6 | 8 | 0 | 6 0 | 13 2 | 0 | 3 | 6 |
| Total FICO scores < 620 | 4 | 4 9 | 7 6 | 0 9 | 2 | 1 3 | | 23 2 | 27 9 | 3 4 | 0 4 | 3 9 |
| FICO scores of 620 to 6 9 | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 2 4 | 3 6 | 2 | 7 | 7 3 | 9 8 | 8 | 18 | 20 | 9 | 8 3 | 0 3 |
| 5 year amortizing fixed rate | 0 6 | 0 9 | 2 6 | 0 | | 7 3 | 0 | 3 3 | 6 | 0 6 | 0 9 | 3 0 |
| ARMs adjustable rate(4) | 0 | 0 6 | 6 0 | 0 | 2 | 13 | 0 | 3 | 2 9 | 0 3 | | 3 6 |
| interest only(5) | 0 | 0 2 | 0 9 | 0 2 | 0 7 | 20 6 | 0 3 | | 3 6 | 0 | 0 9 | 29 2 |
| Other(6) | 0 | 0 | 2 6 | 0 | 0 | 4 | 0 | | 3 | 0 | 0 | 4 3 |
| Total FICO scores of 620 to 6 9 | 3 | 2 7 | 4 | 2 0 | 6 6 | 0 3 | 2 2 | 5 6 | 22 0 | 7 3 | 6 | 9 9 |
| FICO scores 660 | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 36 | 0 | 0 | 20 0 | 6 | 2 8 | 0 4 | 8 2 | 0 4 | 66 9 | 9 | 2 8 |
| 5 year amortizing fixed rate | 12 | 0 | 0 | 0 9 | 0 2 | 4 | 0 | 0 6 | 7 3 | 13 | 0 | 0 |
| ARMs adjustable rate(4) | 9 | 0 | 6 | 0 8 | 0 3 | 4 | 0 8 | 3 | 7 0 | 3 | 0 4 | 6 |
| interest only(5) | 0 | 0 | 3 7 | 2 | 0 3 | 0 3 | 2 8 | 0 6 | 23 1 | 4 7 | 0 4 | 6 |
| Other(6) | 0 | 0 | 2 | 0 | 0 3 | 2 0 | 0 | 0 4 | 3 | 0 | 0 | 7 |
| Total FICO scores 660 | 5 6 | 0 4 | 0 8 | 22 9 | 4 | 3 | 4 2 | 6 | 2 6 | 88 7 | 3 | 2 7 |
| Total FICO scores not available | 0 4 | 3 0 | 4 6 | 0 | 8 2 | 9 | 0 | 7 0 | 23 7 | 0 6 | 4 | 8 8 |
| All FICO scores | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 40 2 | 0 | 6 | 22 6 | 2 6 | 3 9 | 13 2 | 0 | 3 | 76 0 | 2 9 | 4 0 |
| 5 year amortizing fixed rate | 13 3 | 0 2 | 0 6 | 0 9 | 0 3 | 2 0 | 0 2 | | 8 8 | 4 4 | 0 2 | 0 8 |
| ARMs adjustable rate(4) | 2 | 0 4 | 2 4 | 0 | 0 8 | 7 0 | 0 9 | 2 0 | 8 7 | 4 0 | 0 8 | 6 7 |
| interest only(5) | 0 7 | 0 | 4 | 3 | 0 3 | 7 | 3 2 | 0 7 | 24 9 | 2 | 0 | 8 4 |
| Other(6) | 0 2 | 0 | 9 3 | 6 | 2 | 8 6 | 0 | | 7 3 | 0 4 | 2 | 8 6 |
| **Total Single Family Credit Guarantee Portfolio(7)** | 6  % | 0 7% | 4% | 2 9% | 2 4% | 4 3% | 7 6% | 8 9% | 4 9% | 00 0% | 2  % | 3 8% |
| **By Region(8)** | | | | | | | | | | | | |
| FICO scores < 620 | | | | | | | | | | | | |
| North Central | 0 2% | 4 7% | 7  % | 0 2% | 0 5% | 3 7% | 0 2% | 22 2% | 22  % | 0 6% | 0 9% | 3 0% |
| Northeast | 0 | 7 | 9 4 | 0 3 | 4 3 | 9 9 | 0 2 | 30 0 | 30 | 0 | 0 7 | 4 |
| Southeast | 0 2 | 4 9 | 8 4 | 0 2 | 0 9 | 1 | 0 3 | 2 4 | 3 9 | 0 7 | 0 7 | 6 4 |
| Southwest | 0 3 | 4 | 9 | 0 | 0 4 | 2 7 | 0 | 24 7 | 24 | 0 | 7 6 | 9 2 |
| West | 0 2 | 4 0 | 6 | 0 | 8 | 13 | 0 4 | 22 8 | 28 0 | 0 6 | 12 3 | 1 8 |
| Total FICO scores < 620 | 4 | 4 9 | 7 6 | 0 9 | 2 | 1 3 | | 23 2 | 27 9 | 3 4 | 0 4 | 3 9 |
| FICO scores of 620 to 6 9 | | | | | | | | | | | | |
| North Central | 0 6 | 2 7 | 4 3 | 0 4 | 6 4 | 9 6 | 0 4 | 4 5 | 6 6 | 4 | 6 6 | 8 9 |
| Northeast | 0 9 | 2 9 | 4 | 0 6 | 8 4 | 3 7 | 0 3 | 20 3 | 23 2 | 8 | 6 4 | 9 6 |
| Southeast | 0 | 2 8 | 3 | 0 4 | 6 0 | 0 0 | 0 6 | 3 7 | 2 | | 6 6 | 2 |
| Southwest | 0 6 | 2 6 | 3 4 | 0 3 | 6 | 6 | 0 8 | 1 2 | 1 3 | 0 | 4 | 6 |
| West | 0 | 2 | 3 | 0 3 | 6 | 9 6 | 0 8 | 6 7 | 23 7 | 6 | 8 | 2 7 |
| Total FICO scores of 620 to 6 9 | 3 | 2 7 | 4 | 2 0 | 6 6 | 0 3 | 2 2 | 5 6 | 22 0 | 7 3 | 6 | 9 9 |
| FICO scores 660 | | | | | | | | | | | | |
| North Central | 8 9 | 0 3 | 0 7 | 4 9 | 4 | 2 8 | 2 3 | 4 | 7 9 | 6 | 2 | 2 |
| Northeast | 5 0 | 0 4 | 0 | 6 | 2 | 4 4 | | 8 7 | 2 0 | 22 1 | | 2 |
| Southeast | 7 4 | 0 4 | 2 | 4 | 2 | 3 0 | 3 6 | 0 | 3 | 5 | 4 | 4 |
| Southwest | 7 3 | 0 4 | 0 7 | 2 9 | 3 | 2 3 | 0 3 | 3 | 6 8 | 0 5 | 0 7 | 2 |
| West | 3 0 | 0 3 | 0 6 | 4 | 2 | 2 7 | 6 | 7 8 | 13 8 | 24 9 | 2 | 3 9 |
| Total FICO scores 660 | 5 6 | 0 4 | 0 8 | 22 9 | 4 | 3 | 4 2 | 6 | 2 6 | 88 7 | 3 | 2 7 |
| Total FICO scores not available | 0 4 | 3 0 | 4 6 | 0 | 8 2 | 9 | 0 | 7 0 | 23 7 | 0 6 | 4 | 8 8 |
| All FICO scores | | | | | | | | | | | | |
| North Central | 9 6 | 0 6 | 2 | 6 | 2 3 | 3 9 | 3 0 | 8 | 0 5 | 18 2 | 2 0 | 3 |
| Northeast | 6 6 | 0 8 | 6 | 6 4 | 3 3 | 6 0 | 2 0 | 12 | 5 4 | 2 0 | 9 | 3 2 |
| Southeast | 8 2 | 0 9 | 9 | 4 7 | 2 2 | 4 3 | 4 | 7 4 | 7 8 | 7 4 | 2 4 | 6 |
| Southwest | 8 2 | 0 8 | 6 | 3 4 | 2 4 | 3 6 | 0 | 0 0 | 0 9 | 2 | | 2 |
| West | 3 9 | 0 4 | 0 9 | 8 | 6 | 3 4 | 7 6 | 9 4 | 1 | 27 3 | 2 7 | 4 7 |
| **Total Single Family Credit Guarantee Portfolio(7)** | 6  % | 0 7% | 4% | 2 9% | 2 4% | 4 3% | 7 6% | 8 9% | 4 9% | 00 0% | 2  % | 3 8% |

Source  FREDDIE MAC  LOAN MORTGAG  CORP, 10 K,  February 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0784

Table of Contents

**December 31, 2009**

| | Current TV Ratio[1] ≤ 80 | | | Current TV Ratio[1] > 81 100 | | | Current TV Ratio[1] > 100 | | | Current TV Ratio[1] All loans | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | | | | |
| **CO scores < 620** | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 2% | 4 0% | 9 % | 0 9% | 7 2% | 6 6% | 0 9% | 4 9% | 29 % | 3 0% | 7 % | 6 2% |
| 5 year amortizing fixed rate | 0 2 | 0 | 4 4 | 0 | 4 | 4 | 0 | 9 | 8 6 | 0 2 | 0 | 3 |
| ARMs adjustable rate[4] | 0 | 4 6 | 12 2 | 0 | 4 9 | 9 9 | 0 | 2 | 29 7 | 0 2 | 4 8 | 7 6 |
| interest only[5] | 0 | 0 2 | 7 9 | 0 | 0 2 | 27 | 0 | 0 8 | 44 2 | 0 2 | 0 | 3 |
| Other[6] | 0 | 2 3 | 3 9 | 0 | 8 | 7 | 0 | 2 | 9 | 0 | 2 2 | 4 |
| Total   CO scores < 620 | | 3 2 | 8 2 | 0 | 6 | 6 8 | | 12 8 | 29 7 | 3 6 | 6 0 | 4 9 |
| **CO scores of 620 to 6 9** | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 2 | 2 | 3 | 9 | 3 7 | 0 0 | 8 | 8 3 | 20 4 | 6 2 | 4 | 3 |
| 5 year amortizing fixed rate | 0 6 | 0 | 2 6 | 0 | 0 | 9 | 0 | 4 | 9 | 0 7 | 0 | 2 9 |
| ARMs adjustable rate[4] | 0 2 | 0 3 | 6 0 | 0 | 0 | 3 | 0 | 4 | 9 | 0 4 | 0 7 | 3 |
| interest only[5] | 0 | 0 | 9 | 0 | 0 3 | 21 3 | 0 4 | 0 | 38 1 | 0 6 | 0 4 | 29 7 |
| Other[6] | 0 | 0 9 | 2 3 | 0 | 0 8 | | 0 | 0 6 | 4 0 | 0 | 0 7 | 3 6 |
| Total   CO scores of 620 to 6 9 | 3 4 | 6 | 4 7 | 2 2 | 3 3 | 0 6 | 2 3 | 6 8 | 22 3 | 7 9 | 3 2 | 6 |
| **CO scores   660** | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 36 2 | 0 3 | 0 | 9 3 | 0 6 | 2 8 | 0 2 | 2 2 | 9 4 | 65 7 | 0 6 | 2 6 |
| 5 year amortizing fixed rate | 3 | 0 | 0 4 | 0 | 0 | 3 | 0 2 | 0 2 | 4 9 | 12 | 0 | 0 |
| ARMs adjustable rate[4] | 8 | 0 | 7 | 0 9 | 0 | 6 | 0 8 | 0 6 | 6 0 | 3 | 0 2 | 6 |
| interest only[5] | 2 | 0 | 3 4 | 8 | 0 | 9 6 | 3 | 0 3 | 2 2 | 6 | 0 2 | 5 7 |
| Other[6] | 0 | 0 4 | 2 0 | 0 | 0 2 | | 0 | 0 2 | 3 | 0 | 0 2 | |
| Total   CO scores   660 | 0 | 0 2 | 0 8 | 23 0 | 0 | 3 2 | 4 4 | 7 | 2 | 87 9 | 0 4 | 2 8 |
| Total of   CO scores not available | 0 4 | 9 | 4 8 | 0 | 3 8 | 4 | 0 | 8 2 | 28 9 | 0 6 | 2 | 7 |
| **All   CO scores** | | | | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 40 3 | 0 6 | 7 | 22 0 | 2 | 4 | 2 9 | 4 0 | 12 | 7 2 | 3 | 4 0 |
| 5 year amortizing fixed rate | 2 | 0 | 0 6 | 0 | 0 | 9 | 0 2 | 0 4 | 6 | 3 4 | 0 | 7 |
| ARMs adjustable rate[4] | 2 0 | 0 3 | 2 6 | 0 | 0 4 | 7 2 | 0 | 9 | 7 9 | 4 2 | 0 | 6 |
| interest only[5] | 3 | 0 | 4 2 | 2 0 | 0 | 2 | 3 6 | 0 3 | 26 4 | 6 9 | 0 2 | 7 6 |
| Other[6] | 0 | 2 | 0 5 | 0 | 2 2 | 0 2 | 0 | 2 0 | 8 6 | 0 3 | 2 3 | 0 |
| Total Single Family Credit Guarantee Portfolio[7] | 8% | 0.4% | 4% | 26.3% | 0% | 4.6% | 7.9% | 3 2% | 4 8% | 00.0% | 0.9% | 4 0% |
| **By Region[8]** | | | | | | | | | | | | |
| **CO scores <620** | | | | | | | | | | | | |
| North Central | 0 2% | 3 2% | 7 9% | 0 3% | 6  % | 4 8% | 0 2% | 12 8% | 23 6% | 0 7% | 6 8% | 4 2% |
| Northeast | 0 | 3 3 | 9 4 | 0 2 | 7 4 | 20 3 | 0 2 | 4 5 | 30 4 | 0 9 | 7 | 4 7 |
| Southeast | 0 3 | 3 3 | 9 | 0 2 | 6 8 | 8 0 | 0 3 | 2 4 | 33 6 | 0 8 | 6 3 | 7 0 |
| Southwest | 0 3 | 3 4 | 6 | 0 | 4 3 | 6 | 0 | 3 9 | 22 0 | 0 | 3 | 9 8 |
| West | 0 2 | 2 | 7 3 | 0 2 | 4 3 | 18 3 | 0 | 3 7 | 3  8 | 0 7 | 9 | 8 7 |
| Total   CO scores < 620 | | 3 2 | 8 2 | 0 | 6 | 6 8 | | 12 8 | 29 7 | 3 6 | 6 0 | 4 9 |
| **CO scores of 620 to 6 9** | | | | | | | | | | | | |
| North Central | 0 | | 4 | 0 | 3 4 | 9 6 | 0 | 6 9 | 6 5 | | 3 | 9 2 |
| Northeast | 0 | 0 | 0 | 0 | 3 7 | 12 3 | 0 4 | 7 7 | 21 3 | 9 | 2 9 | 8 9 |
| Southeast | 0 7 | 7 | | 0 4 | 3 2 | 3 | 0 6 | 6 4 | 26 0 | 7 | 3 3 | 12 2 |
| Southwest | 0 6 | 9 | 3 6 | 0 4 | 3 2 | 8 0 | 0 | 6 9 | 3 6 | | 2 8 | 8 |
| West | 0 6 | 2 | 4 3 | 0 4 | 2 3 | 12 | 0 7 | 6 7 | 27 | 7 | 3 3 | 3 9 |
| Total   CO scores of 620 to 6 9 | 3 4 | 6 | 4 7 | 2 2 | 3 3 | 0 6 | 2 3 | 6 8 | 22 3 | 7 9 | 3 2 | 6 |
| **CO scores   660** | | | | | | | | | | | | |
| North Central | 8 3 | 0 2 | 0 8 | | 0 | 2 7 | 2 7 | 6 | 7 0 | 6 | 0 4 | 2 |
| Northeast | 4 3 | 0 | 0 8 | 4 | 0 6 | 3 7 | 9 | 2 0 | 0 0 | 2 6 | 0 3 | 9 |
| Southeast | 7 8 | 0 2 | 2 | 4 | 0 | 3 6 | 3 4 | | 4 6 | 1 3 | 0 | 4 0 |
| Southwest | 6 8 | 0 2 | 0 7 | 3 2 | 0 | 2 0 | 0 6 | 4 | 4 9 | 0 6 | 0 3 | 3 |
| West | 13 3 | 0 | 0 7 | 2 | 0 3 | 3 9 | 8 | 9 | 5 6 | 2 3 | 0 | 4 2 |
| Total   CO scores   660 | 0 | 0 2 | 0 8 | 23 0 | 0 | 3 2 | 4 4 | 7 | 2 | 87 9 | 0 4 | 2 8 |
| Total of   CO scores not available | 0 4 | 9 | 4 8 | 0 | 3 8 | 4 | 0 | 8 2 | 28 9 | 0 6 | 2 | 7 |
| **All   CO scores** | | | | | | | | | | | | |
| North Central | 9 | 0 4 | 3 | 8 | | 3 9 | 3 4 | 3 2 | 9 8 | 18 3 | 0 | 3 2 |
| Northeast | 6 0 | 0 4 | | 6 2 | 2 | 4 | 2 4 | 3 9 | 13 | 24 6 | 0 8 | 6 |
| Southeast | 8 8 | 0 | 2 0 | 4 8 | | 2 | 4 3 | 3 | 7 8 | 7 9 | | 6 |
| Southwest | 7 7 | 0 6 | 3 | 3 8 | | 3 4 | 0 8 | 3 8 | 8 6 | 12 3 | 0 9 | 2 2 |
| West | 4 2 | 0 7 | | 2 | 0 6 | 0 | 0 | 7 0 | 2 9 | 7 8 | 0 9 | 3 |
| Total Single Family Credit Guarantee Portfolio[7] | 8% | 0.4% | 4% | 26.3% | 0% | 4.6% | 7.9% | 3 2% | 4 8% | 00.0% | 0.9% | 4 0% |

( )  The current  TV ratios are our estimates  See endnote ( )  to "Table  42
(2) Based on UPB of the single family credit guarantee portfolio
(3) See endnote (2)  to "Table  1    Credit Concentrations in the Single  family Credit Guarantee  Portfolio "
(4)  includes balloon resets and option ARM mortgage loans
(5 )  ncludes both fixed rate and and ustable rate  loans
(6  Consists of  A VA and USDA Rural  Development product types
(7  The total of a   CO scores category does not equal the inclusion of loans where   CO scores are not available in the respective totals for all loans  See endnote (7  to "Table 42  Character stics of the Single Family Credit Guarantee Portfolio
    for further information about our use of   CO scores
(8) Presentation with the following regional designation  West (AK  AZ  CA  G    D  MT  NV  OR   T  WA  Northeast (CT  D   DC MA  M   MD  N  J  NY PA  R  VT VA  WV  North Central (    N  A  M  MN  MO  O   SD  W
    Southeast (A      GA  K   MS  NC  PR  SC  TN  V   and Southwest (AR  CO  KS    A  MO  N   NM  OK  TX  WY

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0785

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents delinquency and default rate  information for our single family credit guarantee portfolio  based on year of origination

**Table 53     Single Family Credit Guarantee Portfolio by Year of Loan Origination**

| | | December 31, | | | | | | | |
| | 2010 | | | 2009 | | | 2008 | | |
| Year of Loan Origination | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | 18% | 0 05% | % | % | % | % | % | % | % |
| 2009 | 21 | 0 26 | 0 04 | 23 | 0 05 | | | | |
| 2008 | 9 | 4 89 | 1 26 | 12 | 3 38 | 0 37 | 15 | 0 56 | 0 02 |
| 2007 | 11 | 11 63 | 4 92 | 14 | 10 47 | 2 24 | 19 | 3 46 | 0 63 |
| 2006 | 9 | 10 46 | 5 00 | 11 | 9 35 | 2 70 | 15 | 3 50 | 1 14 |
| 2005 | 10 | 6 04 | 2 95 | 12 | 5 24 | 1 63 | 15 | 2 05 | 0 79 |
| 2004 and p  o | 22 | 2 46 | 0 88 | 28 | 2 20 | 0 69 | 36 | 1 08 | 0 48 |
| o a | 100% | 3 84% | | 100% | 3 98% | | 100% | 1 83% | |

(1) Calcula ed fo  each yea  of o  g na  on as  he numbe  of loans  ha  have p oceeded o fo ec osu e  ansfe  o  sho  sa e and  es  ed  a c ed  oss, exc  d g a y  s  bseq e  ecove  es du  ng  he pe  od f om o  g na  on  o Decembe  31, 2010, 2009, a d 2008,  espec  ve y, d v ded by  e  be of oa s  ou s ng e-fam  y  c ed  gua an ee po  fol o

At December 31, 2010, approximately 29% of our  single family credit guarantee portfolio consisted of mortgage  loans originated in 2008, 2007 or 2006, which experienced higher  serious delinquency rates in the earlier years of their terms as  compared to our historical experience  We attribute this to a number of factors, including: (a) the expansion of credit  terms under which loans were underwritten during these years;  (b) an increase in the origination and our purchase of interest only and Alt A  mortgage products in 2006 through 2008; and (c) an  environment of decreasing home sales and broadly declining home  prices in the period shortly following the loans' origination  Interest only and Alt A products have higher inherent credit risk than traditional  fixed rate mortgage products  Our single family credit  guarantee portfolio was positively affected by refinance activity in 2010 and 2009 as the UPB of loans originated for these years  comprised 39% of this portfolio as of December 31, 2010  Approximately 95% and 99% of the loans we purchased in our  single family credit guarantee portfolio in 2010 and 2009,  respectively, were amortizing fixed rate mortgage products

Our multifamily mortgage portfolio delinquency rate increased  during 2010, rising to 0.26% at December 31, 2010 from  0 20% at December 31, 2009, due to weakness in certain  markets. The delinquency rates for loans in our multifamily  mortgage portfolio are positively impacted to the extent we have  been successful in working with troubled borrowers to modify  their loans prior to their becoming delinquent or providing temporary relief through loan modifications  While major  multifamily market fundamentals improved on a national basis  during 2010, improvements in loan performance have historically  lagged improvements in broader economic and market trends during  market recoveries  As a result, we may continue to experience  elevated credit losses in the first half of 2011, even if market  conditions continue to improve  The majority of multifamily loans included in our multifamily mortgage portfolio delinquency  rates are credit enhanced loans for which we believe the credit enhancement will reduce our expected losses  Market fundamentals  for multifamily properties that we monitor in Nevada, Arizona,  and Georgia continued to be challenging during 20 0  For further  information regarding concentrations in our multifamily mortgage  portfolio, including regional geographic composition, see "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS."

Non Performing Assets

Non performing assets consist of single family and multifamily  loans that have undergone a TDR, single family seriously  delinquent loans, multifamily loans that are three or more  payments past due or in the process of foreclosure, and REO  assets, net. Non performing assets also include multifamily loans that are deemed impaired based on management judgment  We place non performing loans on non accrual status when we be  eve the collectability of interest and principal on a loan is not  reasonably assured, unless the loan is well secured and in the  process of collection  When a loan is placed on non accrual status, any interest income accrued but uncollected is reversed  Thereafter, interest income is recognized only upon receipt of cash payments  There were no loans three monthly payments or  more past due for which we continued to accrue interest during the year ended December 3 , 20 0

We classify TDRs as those loans in which we have modified the  loan and granted the borrower a concession  TDRs remain  categorized as non performing throughout the remaining life of  the loan regardless of whether the borrower makes payments which  return the loan to a current payment status after modification.

139

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0786

Table of Contents

Table 54 provides detail on non performing loans and REO assets on our consolidated balance sheets and non performing loans underlying our financial guarantees

### Table 54      Non-Performing Assets[1]

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2007 | 2006 |
| | (dollars in millions) | | | | |
| Non-pe fo m ng mo gage loans    on balance shee | | | | | |
| S ngle-fam y TDRs | | | | | |
| Repe fo m ng o ess han e mon h y paymen s pas due | $ 26,612 | $      711 | $      484 | $      282 | $      323 |
| Se ous y de nquen | 3,144 | 477 | 163 | 67 | 87 |
| Mu fam y TDRs | 911 | 229 | 150 | 167 | 216 |
| To a TDRs | 30,667 | 1,417 | 797 | 516 | 626 |
| O he s ng e-fam y non-pe fo m ng oans[2 3] | 84,272 | 12,106 | 5,590 | 5,842 | 3,335 |
| O he mu fam y non-pe fo m ng oans[ | 1,750 | 1,196 | 197 | 188 | 257 |
| To al non-pe fo m ng mo gage loans    on balance s ee | 116,689 | 14,719 | 6,584 | 6,546 | 4,218 |
| Non-pe fo m ng mo gage loans    off-balance shee | | | | | |
| S ng e-fam y oans[3] | 1,450 | 85,395 | 36,718 | 7,786 | 2,718 |
| Mul fam ly loans | 198 | 178 | 63 | 51 | 82 |
| To al non-pe fo m ng mo gage loans    off-balance shee | 1,648 | 85,573 | 36,781 | 7,837 | 2,800 |
| Rea es a e ow ed,  e | 7,068 | 4,692 | 3,255 | 1,736 | 743 |
| To al non-pe fo m ng asse s | $ 125,405 | $ 104,984 | $ 46,620 | $ 16,119 | $ 7,761 |
| Loan loss ese ves as a pe cen age of ou non-pe fo m ng mor gage oans | 33 7% | 33 8% | 36 0% | 19 6% | 8 8% |
| To al non-pe fo m ng asse s as a pe cen age of he o al mo gage po fo o, exclud ng non-F edd e Mac secu es | 6 4% | 5 2% | 2 4% | 0 9% | 0 5% |

(1) Mo gage oan a o n s a e based on UPB and REO, ne s based on ca y ng va ues

(2) Rep esen s oans ecogn zed by us on ou conso da ed ba ance s ee s,  c d g oa s p c ased f o  PC  s s d e o e bo w 's se ous del nquency

(3) The s gn f can ce ease n o he s ngle-fam y non-pe fo m ng oans    on ba ance shee  and s gn f can dec ease n he non-pe fo m ng s ng e-fam y mo gage oans off-balance shee f om Decembe 31, 2009 o Decembe 31, 2010 s p ma ly ela ed o he adop on of amendmen s of he accoun ng s anda ds fo  ansfe s of f nanc al assets a d conso da on of VIEs See "NOTE 2 CHANGE IN ACCOUNTING PRINCIPLES" fo fu he nfo ma on

(4) Of h s amoun , $1 6 b on and $1 1 b on we e secu en a Dece be 31, 2010 and 2009,  espec ve y

The amount of non performing assets increased to approximately $125.4 billion as of December 31, 2010, from $105.0 billion at December 31, 2009, primarily due to continued high transition of loans into serious delinquency, which led to higher volumes of loan modifications and, consequently, a rise in the number of loans categorized as TDRs Serious delinquencies have remained high due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in building capacity to service high volumes of problem loans The UPB of loans categorized as TDRs increased to $30 7 billion at December 31, 2010 from $1 4 billion as of December 31, 2009, largely due to a significant increase in loan modifications during 2010 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes Many of the TDRs during 2010 were loan modifications under HAMP, but an increasing number of our non HAMP modifications have similar changes in terms, excluding forbearance of principal amounts We expect the number of non HAMP modifications to continue to increase in 2011 We expect our non performing assets, including loans deemed to be TDRs, to increase in 2011.

Table 55 provides detail by region for REO activity. Our REO activity relates almost entirely to single family residential properties Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of

40

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

regional serious delinquency trends of our single family credit guarantee portfolio See "Table 52   Single Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates

**Table 55    REO Activity by Region**(1)

|  | December 31, | | |
|---|---|---|---|
|  | **2010** | **2009** | **2008** |
|  | (number of properties) | | |
| **REO Inventory** | | | |
| Beginning property inventory | 45,052 | 29,346 | 14,394 |
| Adjustment to beginning balance(2 | 1,340 | | |
| Properties acquired by region | | | |
| Northeast | 11,022 | 7,529 | 5,125 |
| Southeast | 35,409 | 19,255 | 10,725 |
| North Central | 29,550 | 19,946 | 13,678 |
| Southwest | 14,092 | 8,942 | 5,686 |
| West | 36,843 | 29,440 | 15,317 |
| Total properties acquired | 126,916 | 85,112 | 50,531 |
| Properties disposed by region | | | |
| Northeast | (8,490) | (5,663) | (3,846) |
| Southeast | (26,082) | (15,678) | (8,239) |
| North Central | (22,349) | (15,549) | (10,548) |
| Southwest | (11,044) | (7,142) | (5,155) |
| West | (33,250) | (25,374) | (7,791) |
| Total properties disposed | (101,215) | (69,406) | (35,579) |
| Ending property inventory | 72,093 | 45,052 | 29,346 |

(1) See endnote (8) to "Table 52   Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions

(2) Represents REO assets associated with previously non-consolidated mortgage issues recognized upon adoption of the amendments to the accounting standards for consolidation of VIEs on January 1, 2010

Our REO property inventory increased 60% during 2010 and 54% during 2009, in part due to increased levels of foreclosures associated with borrowers that did not qualify for or that did not successfully complete a modification or short sale  During  2009, we experienced a significant increase in the number of seriously delinquent loans in our single family credit guarantee portfolio  However, due to the effect of HAMP, our suspensions of foreclosure transfers and other programs, many of these loans  did not transition to REO until 2010 or have not yet transitioned to REO  We expect our REO acquisitions to continue to increase in 2011  However, the pace of our REO acquisitions  slowed during the fourth quarter of 2010 and could continue to  be affected by delays in the foreclosure process, including  delays related to concerns about deficiencies in foreclosure documentation practices  We temporarily suspended certain foreclosure proceedings, REO sales and eviction proceedings for our REO properties for certain servicers in the fourth quarter  of 2010 due to these concerns, but we resumed REO sales in November 20 0

As discussed in  *"Loan Workout Activities,"* we have implemented several initiatives designed to assist troubled  borrowers avoid foreclosure  We temporarily suspended foreclosure transfers in 2009 on owner occupied homes where the  borrower may be eligible to receive a loan modification under the MHA Program; however, for seriously delinquent borrowers, we continued with steps in the foreclosure process up to, but stopping short of, a foreclosure sale of the property  The MHA Program restricts foreclosure activities when a borrower is  being evaluated for HAMP and during a borrower's trial period. Our suspension or delay of foreclosure transfers and any  delay in foreclosures that might be imposed by regulatory or governmental agencies result in a temporary decline in REO  acquisitions and slow the rate of growth of our REO inventory  In July 2008, we also extended the period of time in which we  required seller/servicers to complete the foreclosure process on  our loans. This was done with respect to certain states where  the normal timeframe for foreclosure is relatively short, and  was intended to provide more time to evaluate the possibilities for a loan workout solution. Due to temporary suspensions and  other factors, the average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years  The nationwide average for completion of a foreclosure (as measured  from the date of the last scheduled payment made by the borrower) on our single family delinquent loans, excluding those  underlying our Other Guarantee Transactions, was 448 days and 370 days for foreclosures completed during 2010 and  2009, respectively

Our single family REO acquisitions during 2010 and 2009 were  most significant in the states of California, Florida, Arizona,  Michigan, Georgia, and Illinois  The West region represented approximately 29% of the new REO acquisitions during 2010, based  on the number of units, and the highest concentration in that region is in California  At December 31, 2010, our REO inventory in California comprised 11% of total REO property inventory, based on the number of properties  Although we have increased our resource capacity necessary to maintain and  dispose of the progressive increase in our REO acquisitions and  inventory over the last two years, we are limited in our  disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties  A portion of our REO properties are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may  reclaim the property; or (b) occupied and we have begun the

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0788

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

process of eviction  During the period when the borrower may  reclaim the property, or we are completing the eviction process,  we are not able to market the property  As of December 31, 2010, 2009 and 2008,  approximately 28%, 35% and 23%,  respectively, of our REO property inventory were not marketable due to the above conditions  For these and other reasons, the  average holding period of our REO property varies significantly in different geographical areas  As of December 3  , 20  0 and 2009, the percentage of our single family REO property  inventory that had been held for sale longer than one year was 3.4% and 1.6%, respectively.

Although the composition of interest only and  Alt A loans in our single  family credit guarantee portfolio, based on UPB,  was approximately 5% and 6%, respectively, at December 31, 2010, the percentage of our REO acquisitions in 2010 that had  been secured by either of these loan types represented  approximately 39% of our total REO acquisitions, based on loan  amount prior to acquisition.

We expanded our methods for REO sales during 2010, including the  expanded use of REO auctions and bulk sale transactions of  properties in certain geographical areas  In addition, in  certain locations we have offered REO properties for purchase by  Neighborhood Stabilization Program grant recipients prior to listing the properties for sale to the general public  For the  first 15 days following listing, we also offer most of our REO properties exclusively to Neighborhood Stabilization Program  grant recipients and purchasers who intend to occupy the  properties

### Loan Loss Reserves

We maintain mortgage related loan loss reserves at levels we  deem adequate to absorb probable incurred losses on mortgage  loans held for investment on our consolidated balance sheets and those underlying Freddie  Mac mortgage related securities and other guarantee commitments  Determining the loan loss reserves is complex and requires  significant management judgment about matters that involve a  high degree of subjectivity  See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES      Allowance for Loan Losses and Reserve for Guarantee Losses" and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING  POLICIES" for further information

Table 56 summarizes our loan loss reserves activity for held for investment mortgage loans recognized on our consolidated balance sheets and underlying Freddie Mac mortgage related securities and other  guarantee commitments, in total

**Table 56     Loan Loss Reserves Activity[1]**

|  | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 2010 | 2009 | 2008 | 2007 | 2006 |
|  | (dollars in millions) | | | | |
| To al loan loss  ese ves |  |  |  |  |  |
| Beg nn ng balance | $ 33,857 | $ 15,618 | $ 2,822 | $   619 | $ 548 |
| Ad us    en s o beg nn ng balance[2] | (186) |  |  |  |  |
| P ov s on fo  c ed  losses | 17,218 | 29,530 | 16,432 | 2,854 | 296 |
| C  a ge-offs, g oss[3] | (16,322) | (9,402) | (3,072) | (376) | (313) |
| Recove  es[3 | 3,363 | 2,088 | 779 | 239 | 166 |
| T a  sfe s,  e ( | 1,996 | (3,977) | (1,343) | (514) | (78) |
| End ng balance | $ 39,926 | $33,857 | $15,618 | $2,822 | $ 619 |
| Componen s of Loan Loss Rese ves |  |  |  |  |  |
| S ng e- am y | $ 39,098 | $ 33,026 | $ 15,341 | $ 2,760 | $ 592 |
| Mu  fam y | $   828 | $   831 | $   277 | $   62 | $   27 |
| To al loan loss  ese ve, as a pe cen age of  he o al mo  gage po  fol o, exclud ng non-F edd e Mac secu   es | 2 03% | 1 69% | 0 81% | 0 16% | 0 04% |

(1) Cons s s of  ese ves fo  oans held-fo - nves men  and  hose unde  y ng F edd e Mac mo  gage- e a ed secu   es and o he  gua an ee comm men s

(2) Rela es n ea o  he adop on of accoun ng s anda ds fo   ansfe s of f nanc a  asse s and conso  da on of VIEs  See "NOTE 2  CHANGE IN ACCOUNTING PRINCIPLES" fo  fu he  nfo ma on

(3) Cha ge-offs  ep esen  he a  oun of  he UPB of a  oan ha  has been d scha ged o  emove  he loan f om ou  consol da ed balance shee  due o e  he  fo ec osu e  ansfe  o a sho  sa e o  deed- n-l eu  ansac on Cha ge-offs exc ude $528     on, $280 m ll on, $377 m ll on, and $156 m ll on fo   he yea s ended Dece  be  31, 2010, 2009, 2008, a d 2007,  espec  ve y, e a ed o ce a n  oans pu chased unde  f nanc a  gua an ees and  ef ec ed w h n  osses on  oans pu chased on ou  consol da ed s a emen s of ope a ons  Recove  es of cha ge-offs  p ma ly  esul f om fo eclosu e al e na  ves and REO acqu s  ons on  oans whe e a sha e of defau   sk as  ee  assumed by mo  gage nsu e s, se v ce s o o he  h d pa  es  h ough c ed  enhancemen s

(4) Cons s p ma ly of (a) amoun s  ela ed o ag eemen s w h se e /se v ce s whe e  he  ansfe   ep esen s  ecove es  ece ved unde   hese ag eemen s o  compensa e us fo p ev ous y ncu ed and  ecogn zed  osses  (b) he  ansfe  of a p opo  onal amoun of  he  ecogn zed  ese ves fo  gua an ee  osses assoc a ed w h  oans pu chased f om non-consol da ed F edd e Mac mo  gage- ela ed secu   es and o he  gua an ee comm men s and (c) he  amoun s a  bu ab e o  ecap al za on of pas  due n e es  on mod f ed mo  gage  oans  See "Ins u ona C ed  R sk     Mo  gage Selle  Se v ce s" fo  mo e nfo ma on abou ou  ag eemen s w h ou  se e /se v ce s n 2010, c d  g GMAC Mo  gage, LLC, Ba k of A e ca, N A , a d ce a n  of he  aff l a es

See "CONSOLIDATED RESULTS OF OPERATIONS      Provision for Credit Losses," for a discussion of our  provision for credit losses

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0789

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Credit Loss Performance

Many loans that are seriously delinquent or in foreclosure result in credit losses. Table 57 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non consolidated mortgage related financial guarantees

**Table 57    Credit Loss Performance**

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | | (dollars in millions) | |
| **REO** | | | |
| REO a a ces, e | | | |
| S ng e- am y | $ 6,961 | $ 4,661 | $3,208 |
| Mu fam y | 107 | 31 | 47 |
| o a | $ 7,068 | $ 4,692 | $3,255 |
| REO ope a ons ( ncome) expense | | | |
| S ng e- am y | $ 676 | $ 287 | $ 1,097 |
| Mu fam y | (3) | 20 | |
| o a | $ 673 | $ 307 | $ 1,097 |
| Cha ge-offs | | | |
| S ng e-fam y | | | |
| C a ge-offs, g oss[1] ( nc ud ng $16 2 b on, $9 4 b on and $3 1 b ll on ela ng o loan loss ese ves, espec vely) | $16,746 | $ 9,661 | $3,441 |
| Recove es[2] | (3,362) | (2,088) | (779) |
| S ngle-fam ly, ne | 13,384 | 7,573 | 2,662 |
| Mul fam ly | | | |
| C a ge-offs, g oss[1] ( nclud ng $104 m ll on, $21 m ll on and $8 m ll on ela ng o loan loss ese ves, espec vely) | 104 | 21 | 8 |
| Recove es[2] | (1) | | |
| Mu fam y, ne | 103 | 21 | 8 |
| To al Cha ge-offs | | | |
| C a ge-offs, g oss[1] ( nc ud ng $16 3 b on, $9 4 b on and $3 1 b ll on ela ng o loan loss ese ves, espec vely) | 16,850 | 9,682 | 3,449 |
| Recove es[2] | (3,363) | (2,088) | (779) |
| To a Cha ge-offs, ne | $13,487 | $ 7,594 | $2,670 |
| C ed losses[3] | | | |
| S ng e-am y | $ 14,060 | $ 7,860 | $3,759 |
| Mu fam y | 100 | 41 | 8 |
| o a | $ 14,160 | $ 7,901 | $3,767 |
| To a ( n ps)[4] | 72 7 | 40 8 | 20 1 |

(1) Rep ese e a o o e UPB of a oa a as bee d scha ged n o de o emove he loan f om ou consol da ed ba ance shee s a he me of eso u on, ega d ess of when he mpac of he c ed loss was eco ded on ou consol da ed s a emen s of ope a ons h ough he p ov s on fo c ed losses o losses on loans pu chased Cha ge-offs p ma ly esul f om fo ec osu e ansfe s and sho sa es and a gene a y cacu a ed as he con ac ua ba ance of a oan a he da e s d scha ged less he es ma ed value n f nal d spos on o ac a e sa es a so sa e

(2) Recove es of cha ge-offs p ma ly esul f om fo eclosu e ansfe s and sho sa es on oans whe e a sha e of defau sk has been assu ed by o gage nsu e s, se v ce s, o he h d pa es n hough c ed enhancemen s

(3) Eq a o REO ope a o s expe se p s c a ge-offs, e Exc des fo egone n e es on non-pe fo m ng oans, wh ch educes ou ne n e es ncome bu s no ef ec ed n ou o a c ed losses In add on, exc udes o he va ue- elated c ed osses (a) ncu ed on ou nves men s n mo gage loans and mo gage- ela ed secu es and (b) ecogn zed n ou consol da ed s a emen s of ope a ons

(4) Ca c u ed as c ed osses d v ded by he ave age ba ance of ou o al mo gage po fol o, exclud ng non-F edd e Mac mo gage- ela ed secu es and ha po on of REMICs a d Ot e S c ed Sec es a e backed by G e Mae Ce f ca es

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge offs and REO expenses We record charge offs at the time we take ownership of a property through foreclosure, and any delays in the foreclosure process could reduce the rate at which seriously delinquent loans proceed to foreclosure, and would delay our recognition of charge offs We expect our credit losses to increase in 2011, as our short sale and REO acquisition volumes will likely remain high, because the level of seriously delinquent loans and pending foreclosures remains elevated and market conditions, such as home prices and the rate of home sales, continue to remain weak However, our realization of credit losses could be delayed due to the concerns about deficiencies in foreclosure documentation practices

As discussed in *"Loan Workout Activities,"* we implemented several suspensions in foreclosure transfers of owner occupied homes during certain periods of 2008 and 2009, and some servicers implemented suspensions in 2010, all of which affected our charge off and REO operations expenses Any suspension or delays of foreclosure transfers, including as a result

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0790

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of concerns about foreclosure documentation practices, and any  imposed delays in the foreclosure process by regulatory or  governmental agencies will cause a delay in our recognition of credit losses

Table 58 provides detail by region for charge offs  Regional charge off trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends

**Table 58     Single Family Charge offs and Recoveries by Region[1]**

| | Year Ended December 31, | | | | | | | | |
| | 2010 | | | 2009 | | | 2008 | | |
| | Charge offs, gross | Recoveries[2] | Charge offs, net | Charge offs, gross | Recoveries[2] (in millions) | Charge offs, net | Charge offs, gross | Recoveries[2] | Charge offs, net |
|---|---|---|---|---|---|---|---|---|---|
| No heas | $ 1,367 | $ (318) | $ 1,049 | $ 854 | $ (194) | $ 660 | $ 353 | $ (86) | $ 267 |
| So t east | 4,311 | (1,005) | 3,306 | 2,124 | (557) | 1,567 | 693 | (193) | 500 |
| No h Cen a | 2,638 | (694) | 1,944 | 1,502 | (393) | 1,109 | 689 | (191) | 498 |
| So t west | 761 | (288) | 473 | 484 | (169) | 315 | 234 | (82) | 152 |
| Wes | 7,669 | (1,057) | 6,612 | 4,697 | (775) | 3,922 | 1,472 | (227) | 1,245 |
| o a | $ 16,746 | $ (3,362) | $ 13,384 | $ 9,661 | $ (2,088) | $ 7,573 | $ 3,441 | $ (779) | $ 2,662 |

(1) See endno e (8)  o "Tab e 52   S ng e-Fam y C ed  Gua an ee Po fo o by A   bu e Comb na ons" fo a  desc p on of hese  eg ons
(2) Recove  es of cha ge-offs p ma  ly  esul f om fo eclosu e a e na  ves and fo ec osu e  ansfe s on one  whe e a sha e of  defau   sk has been assumed by mo  gage
     s  es, se v ce s o  o he   h d pa   es  h ough c ed  enhancemen s  Recove  es of cha ge-offs h ough c ed  enhancemen s a e l m ed n many  ns ances  o amoun s
     ess  a  e f  a  o   of c oss

Single family charge offs, gross, for 2010 increased to $16.7 billion compared to $9.7 billion for 2009, primarily due to an increase in the volume of foreclosure transfers and short sales and continued weakness of residential  real estate markets  The severity of charge offs increased slightly in 2010 due to overall declines in housing markets  resulting in higher per property losses, but was more stable  than we experienced in 2009  Our per property loss severity during 20 0 continued to be greatest in those states that  experienced significant increases in property values during 2000 through 2006, such as California, Florida, Nevada and Arizona.  California also accounted for 16% of loans in our single family credit guarantee portfolio as of December 3  , 20  0, and  comprised approximately 26% of our total credit losses in 2010   In addition, although Alt A loans comprised approximately 6% and 8% of our single family credit  guarantee portfolio as of December 31, 2010 and 2009,  respectively, these loans accounted for approximately 37% and  44% of our credit losses during 2010 and 2009, respectively  See "Table 3     Credit Statistics, Single Family Credit Guarantee Portfolio" for information on severity  rates, and see "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit  losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to  disclose the estimated increase in the NPV of future expected  credit losses for our single family credit guarantee portfolio  over a ten year period as the result of an immediate 5% decline  in home prices nationwide, followed by a stabilization period and return to the base case  Since the real estate market has  already experienced significant home price declines since 2006 and we experienced significant growth in actual credit losses  during 2009 and 2010, our portfolio's market value has been  less sensitive to additional 5% declines in home prices during  2010 for purposes of this analysis. As shown in the analysis  below, the NPV impact of expected credit losses resulting from a  5% home price shock declined significantly in the first half of  2010, primarily due to the impacts of a decline in interest rates and actual losses realized during that period. This  sensitivity analysis is hypothetical and may not be indicative  of our actual results. We do not use this analysis for determination of our reported results under GAAP  Our quarterly credit risk sensitivity estimates are as follows:

44

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 59     Single Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | | (dollars in millions) | | |
| At | | | | |
| December 31, 2010 | $ 9,926 | 54 9 bps | $ 9,053 | 50 0 bps |
| September 30, 2010 | $ 9,099 | 49 5 bps | $ 8,187 | 44 6 bps |
| June 30, 2010 | $ 8,327 | 44 5 bps | $ 7,445 | 39 8 bps |
| March 31, 2010 | $10,228 | 54 4 bps | $ 9,330 | 49 6 bps |
| December 31, 2009 | $12,646 | 67 4 bps | $11,462 | 61 1 bps |

(1) Assumes the none of the credit enhancement securing the covering our mortgage loans has any mortgage mpac on our credit losses

(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty defaults

(3) Based on the single-family credit guarantee portfolio, excluding REMICs and other structured securities backed by single-family Mac Cerficates

(4) Calculated as the ratio of NPV of net losses incurred losses to the single-family credit guarantee portfolio, defined in note (3) above

(5) Credit expo posures on the sens vy anaysis begnnngs as of March 31, 2010 dec dems, pa ecase as of March 31, 2010, we adjusted our models used s analysis s for both serious delinquency and loss severity projections The enhanced model educes our serious delinquency projections for loans that are at least one year of age based on the mortgage pool c type, bowe's credit score a do care history Ohe changes to the model included ncorpo ating recent delinquency expe ences o be efo fecase serious delinquency es for fixed coupon Al-A mortgages Severy assumptions for certain loans which educed documentation, regardless of whe the loan has a fixed or variable coupon, were ncreased based on our experience with these loans

### Interest Rate and Other Market Risks

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

### Operational Risks

Risk types have become increasingly inter related such that an operational breakdown, can result in a credit or market related event or loss Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud and failures of the technology used to support our business activities. Our risk of operational failure may be increased by vacancies or turnover in officer and key business unit positions and failed or inadequate internal controls. These operational risks may expose us to financial loss, interfere with our ability to sustain timely and reliable financial reporting, or result in other adverse consequences

Our business decision making, risk management and financial reporting are highly dependent on our use of models In recent periods, external market factors have contributed to increased risk associated with the use of these models We are taking certain actions to address our model oversight and governance process, including clarifying roles, aligning model resources and providing more transparency to management over model issues and changes.

Our primary business processing and financial accounting systems lack sufficient flexibility to handle all the complexities of, and changes in, our business transactions and related accounting policies and methods This requires us to rely more extensively on spreadsheets and other end user computing systems. These systems are likely to have a higher risk of operational failure and error than our primary systems, which are subject to our information technology general controls We believe we are mitigating this risk through active monitoring of, and improvements to, controls over the development and use of end user computing systems.

In order to manage the risk of inaccurate or unreliable valuations of our financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations For more information on the controls in our valuation process, see "FAIR VALUE MEASUREMENTS AND ANALYSIS    Fair Value Measurements    *Controls over Fair Value Measurement.*"

Announcements in the fall of 20 0 of deficiencies in foreclosure documentation by several large seller/servicers and designated counsel firms have raised various concerns relating to foreclosure practices The integrity of the foreclosure process is critical to our business, and our financial results could be adversely affected by deficiencies in the conduct of that process For further information about foreclosure documentation deficiencies and our other operational risks, see "RISK FACTORS    Operational Risks."

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting and our disclosure controls and procedures as of December 3 , 20 0 As of December 3 , 20 0, we had one material weakness which remained unremediated related to conservatorship, causing us to conclude that both our internal control over financial reporting and our disclosure controls and procedures were not effective as of December 3 , 20 0 Given the structural nature of this weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship In view of our mitigating activities related to the material weakness, we believe that our consolidated financial statements for the year ended December 3 , 20 0 have been prepared in conformity with GAAP For additional information on our disclosure controls and procedures and related material weakness in internal control over financial reporting, see "CONTROLS AND PROCEDURES."

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-0792

Table of Contents

# LIQUIDITY AND CAPITAL RESOURCES

**Liquidity**

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC pools.

We fund our cash requirements primarily by issuing short term and long term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

- borrowings against mortgage related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $12.5 billion in cash from Treasury pursuant to draws under the Purchase Agreement during 20 0.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We may require cash in order to fulfill our mortgage purchase commitments. Historically, we fulfilled our purchase commitments re ated to our mortgage purchase flow business primarily by swap transactions, whereby our customers exchanged mortgage loans for PCs, rather than through cash outlays. However, it is at the discretion of the seller, subject to limitations imposed by the contract governing the commitment, whether the purchase commitment is fulfilled through a swap transaction or with cash. We provide liquidity to our seller/servicers through our cash purchase program. Loans purchased through the cash purchase program are typically sold to investors through a cash auction of PCs, and, in the interim, are carried as mortgage loans on our consolidated balance sheets. See "OFF BALANCE SHEET ARRANGEMENTS" for additional information regarding our mortgage purchase commitments.

We make extensive use of the Fedwire system in our business activities. The Federal Reserve requires that we fully fund our account in the Fedwire system to the extent necessary to cover cash payments on our debt and mortgage related securities each day, before the Federal Reserve Bank of New York, acting as our fiscal agent, will initiate such payments. We routinely use an open line of credit with a third party, which provides intraday liquidity to fund our activities through the Fedwire system. This line of credit is an uncommitted intraday loan facility. As a result, while we expect to continue to use the facility, we may not be able to draw on it, if and when needed. This line of credit requires that we post collateral that, in certain circumstances, the secured party has the right to repledge to other third parties, including the Federal Reserve Bank. As of December 3 , 20 0, we pledged approximately $10.5 billion of securities to this secured party. See "NOTE 8: INVESTMENTS IN SECURITIES    Collateral Pledged" for further information.

Depending on market conditions and the mix of derivatives we employ in connection with our ongoing risk management activities, our derivative portfolio can be either a net source or a net use of cash. For example, depending on the prevailing interest rate environment, interest rate swap agreements could cause us either to make interest payments to counterparties or to receive interest payments from counterparties. Purchased options require us to pay a premium while written options allow us to receive a premium.

We are required to pledge collateral to third parties in connection with secured financing and daily trade activities. In accordance with contracts with certain derivative counterparties, we post collateral to those counterparties for derivatives in a net loss position, after netting by counterparty, above agreed upon posting thresholds. See "NOTE 8: INVESTMENTS IN SECURITIES    Collateral Pledged" for information about assets we pledge as collateral.

We are involved in various legal proceedings, including those discussed in "LEGAL PROCEEDINGS," which may result in a use of cash in order to settle claims or pay certain costs.

**Liquidity Management**

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short term investments that is intended to enable us to meet ongoing cash obligations for an extended period, without access to short and long term unsecured debt markets. We also actively manage the concentration

146                                                                                   *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of debt maturities and closely monitor our monthly maturity profile  Under these practices and policies, we maintain a  backup core reserve portfolio of liquid non mortgage securities  designed to provide additional liquidity in the event of a  liquidity crisis.

Our liquidity management policies provide for us to:

- maintain funds sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days, assuming no  access to the short or long term unsecured debt markets  At least 50% of such amount, which is based on the average daily  35 day cash liquidity needs of the preceding three months, must be held: (a) in U.S. Treasury securities with remaining  maturities of five years or less or other U S  government guaranteed securities with remaining  maturities of one year or less; or (b) as uninvested cash  at the Federal Reserve Bank of New York;

- maintain a portfolio of liquid, high quality marketable  non mortgage related securities with a market value of at least  $10 billion, exclusive of the 35 day cash requirement discussed above. The portfolio must consist of  securities with maturities greater than 35 days. The credit quality of these investments is monitored by our risk management  group on a daily basis;

- limit the proportion of debt maturing within the next year  We actively manage the composition of short and long term debt, as  well as our patterns of redemption of callable debt, to manage  the proportion of effective short term debt to reduce the risk  that we will be unable to refinance our debt as it comes  due; and

- maintain unencumbered collateral with a value greater than or  equal to the largest projected cash shortfall on any one day  over the following 365 calendar days, assuming no access to the  short  and long term unsecured debt markets. This is based on a  daily forecast of all existing contractual cash obligations over  the following 365 calendar days.

No more than an aggregate of $10 billion of market value  may be held in U.S. Treasury notes with remaining  maturities of between one and five years to satisfy the short  term liquidity requirements described above

We also continue to manage our debt issuances to remain in  compliance with the aggregate indebtedness limits set forth in  the Purchase Agreement

Throughout 2010, we complied with all liquidity requirements  under these policies  Furthermore, the majority of funds for  covering our short term cash liquidity needs are invested in  short term assets with a rating of A  /P  or AAA, as appropriate  In the event of a downgrade of a position, our credit governance policies require us to exit from the  position within a specified period

To facilitate cash management, we forecast cash outflows  These forecasts help us to manage our liabilities with respect to  asset purchases and runoff, when financial markets are not in crisis  For further information on our management of  interest rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices, our ability to maintain  sufficient liquidity, including by pledging mortgage related and  other securities as collateral to other financial institutions, could  cease or change rapidly and the cost of the available  funding could increase significantly due to changes in market confidence and other factors  For more information, see  "RISK FACTORS     Competitive and Market Risks   *Our business may be adversely affected by limited availability of financing and increased funding  costs.*"

### *Actions of Treasury, the Federal Reserve and FHFA*

Since our entry into conservatorship, Treasury, the Federal Reserve and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements  The  conservatorship, and the resulting support we received from  Treasury, enabled us to access debt funding on terms sufficient  for our needs  The support we received from the Federal Reserve  through its debt purchase program, which was completed in March 2010, also contributed to our ability to access debt funding

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits  in our net worth  The Purchase Agreement provides that the $200  billion maximum amount of the commitment from Treasury  will increase as necessary to accommodate any cumulative reduction  in our net worth during 2010, 2011, and 2012. If we do  not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012  will be $149.3 billion ($200 billion funding  commitment reduced by cumulative draws for net worth deficits  through December 3 , 2009)  In the event we have a capital  surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to  cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year end 2012 surplus is lower than the cumulative draws  needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for  2010 to 2012, then the amount of available funding is  $149.3 billion less the amount of those draws

<div align="center">147</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 20 2 Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at December 3 , 20 0, our aggregate funding received from Treasury under the Purchase Agreement will increase to $63 7 billion This aggregate funding amount does not include the initial $1 0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received

The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the UPB of total new business purchases, and allocate or transfer such amount to: (a) HUD to fund a Housing Trust Fund established and managed by HUD; and (b) a Capital Magnet Fund established and managed by Treasury. FHFA has the authority to suspend our allocation upon finding that the payment would contribute to our financial instability, cause us to be classified as undercapitalized or prevent us from successfully completing a capital restoration plan In November 2008, FHFA advised us that it had suspended the requirement to set aside or allocate funds for the Housing Trust Fund and the Capital Magnet Fund until further notice.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement Treasury waived the fee for the first quarter of 2011 The amount of the fee has not yet been established and could be substantial.

For more information on these actions, see "BUSINESS    Conservatorship and Related Matters" and "    Regulation and Supervision."

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at December 31, 2010 that FHFA will submit on our behalf, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6 42 billion to $6.47 billion, which exceeds our annual historical earnings in all but one period The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on December 3 , 20 0 at the direction of our Conservator. We have paid cash dividends to Treasury of $10.0 billion to date, an amount equal to 16% of our aggregate draws under the Purchase Agreement Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could also contribute to future draws if the fee is not waived in the future Treasury has waived the fee for the first quarter of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment

The payment of dividends on our senior preferred stock in cash reduces our net worth For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods Further draws will increase the liquidation preference of the and the dividends we owe on the senior preferred stock

### Other Debt Securities

We fund our business activities primarily through the issuance of short and long term debt Competition for funding can vary with economic, financial market, and regulatory environments. Historically, we have mainly competed for funds in the debt issuance markets with Fannie Mae and the FHLBs We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage our mix of liabilities funding our assets.

To fund our business activities, we depend on the continuing willingness of investors to purchase our debt securities Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and on our debt funding costs. In addition, any change in applicable legislative or regulatory exemptions, including those described in "BUSINESS    Regulation and Supervision," could adversely affect our access to some debt investors, thereby potentially increasing our debt funding costs.

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during 20 0, due largely to support from the U S government As a result, we were able to replace certain higher cost debt with lower cost

Source   D RA HOM   OAN MORTGAG CORP, 10 K,  ebruary 24, 2011

TREASURY-0795

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

debt  Our short term debt was 28% of outstanding other debt on  December 31, 2010, as compared to 31% and 30% at  December 31, 2009 and September 30, 20  0, respectively

Because of the debt limit under the Purchase Agreement, we may  be restricted in the amount of debt we are allowed to issue  to fund our operations  Under the Purchase Agreement, without the  prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness  exceeding   20% of the amount of mortgage assets we are allowed  to own on December 3  of the immediately preceding calendar year  Our debt cap under the Purchase Agreement was $1.08 trillion in 2010 and will be $972 billion in 2011. We also cannot become liable for any subordinated  indebtedness without the prior written consent of Treasury

As of December 3 , 20  0, we estimate that the par value of  our aggregate indebtedness for purposes of the debt limit  imposed by the Purchase Agreement totaled $728  2 billion, which was approximately $351  8 billion below the applicable  limit of $1.08 trillion. Under the Purchase Agreement, the amount of our "indebtedness" is determined based on  par value, without giving effect to any change in the accounting  standards related to transfers of financial assets and  consolidation of VIEs or any similar accounting standard.  Accordingly, our aggregate indebtedness for this purpose excludes debt securities of consolidated trusts held by third  parties  We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities     Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our website and in current reports on Form 8  K we file with the SEC

*Other Debt Issuance Activities*

Table 60 summarizes the par value of other debt securities  we issued, based on settlement dates, during 2010 and 2009.

**Table 60     Other Debt Security Issuances by Product, at Par Value**[1]

| | Year Ended December 31, | |
| | 2010 | 2009 |
| | (in millions) | |
| O he  sho  - e m deb | | |
| Refe ence B  s® sec    es a  d d sco   o es | $481,853 | $ 590,697 |
| Med um- e m no es    callable | 1,500 | 7,780 |
| Med um- e m no es    non-ca  ab e[2 | 1,364 | 11,886 |
| To al o he  sho  - e m deb | 484,717 | 610,363 |
| O he  long- e m deb | | |
| Med um- e m no es    ca  ab e[3 | 219,847 | 193,580 |
| Med um- e m no es    non-callable | 74,487 | 99,099 |
| U S  do a  Refe ence No es® secu   es    non-callable | 36,500 | 56,000 |
| To al o he  long- e m deb | 330,834 | 348,679 |
| To a  o he  deb  ssued | $ 815,551 | $ 959,042 |

(1)  Exc  des fede a  f  ds p  c ased a  d sec    es so d   de  ag eemen s  o  epu chase and  nes of c ed    A so exc udes deb  secu   es of conso da ed  us s he d by  h  d pa  es

(2)  Includes $1  4 b ll on and $536 m ll on of med um- e m  no es    non-ca  ab e  ssued fo   he yea s ended  Decembe  31, 2010 and 2009,  espec  ve y, wh ch we e accoun ed fo   as deb  exchanges

(3)  Includes $0 m ll on and $25 m ll on of med um- e m no es    ca  ab e  ssued fo   he yea s ended  Decembe  31, 2010 and 2009,  espec  ve y, wh ch we e accoun ed fo   as deb  exc  a ges

*Other Short Term Debt*

We fund our operating cash needs, in part, by issuing Reference Bills® securities and other discount notes, which are short term  instruments with maturities of one year or less that are sold on  a discounted basis, paying only principal at maturity. Our Reference Bills® securities program consists of large issues of short term debt  that we auction to dealers on a regular schedule  We issue discount notes with maturities ranging from one day to one year in response to investor demand and our cash needs  Short term  debt also includes certain medium term notes that have original maturities of one year or less

*Other Long Term Debt*

We issue debt with maturities greater than one year primarily  through our medium term notes program and our Reference  Notes® securities program

*Medium term Notes*

We issue a variety of fixed  and variable rate medium term notes, including callable and non callable fixed rate  securities, zero coupon securities and variable rate securities, with various maturities ranging up to 30 years  Medium  term notes with original maturities of one year or less are classified as short term debt  Medium term notes typically  contain call provisions, effective as early as three months or  as long as ten years after the securities are issued

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-0796

Table of Contents

*Reference Notes® Securities*

Reference Notes® securities are regularly issued, U.S. dollar denominated,  non callable fixed rate securities, which we generally issue  with original maturities ranging from two through ten years  We have also issued €Reference Notes® securities denominated in Euros, which remain outstanding, but did not issue any such securities in 2010 or 2009. We hedge our exposure to changes in foreign currency exchange rates by entering into swap transactions that convert foreign currency  denominated obligations to U S  dollar denominated obligations  See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK     Interest Rate Risk and Other Market  Risks *Sources of Interest Rate Risk and Other Market Risks"* for more information

The investor base for our debt is predominantly institutional.  From late 2008 through the first quarter of 20  0, the Federal  Reserve purchased substantial amounts of our debt securities  under its debt purchase program.

<u>Subordinated Debt</u>

During 2010 and 2009, we did not call or issue any Freddie  SUBS® securities  At both December 31, 2010 and 2009, the balance  of our subordinated debt outstanding was $0.7 billion. Our  subordinated debt in the form of Freddie  SUBS® securities is a component of our risk management and disclosure commitments with FHFA. See "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS" for a discussion of changes affecting our subordinated debt as a result of our placement in  conservatorship and the Purchase Agreement, and the Conservator's suspension of certain requirements relating  to our subordinated debt  Under the Purchase Agreement, we may  not issue subordinated debt without Treasury's consent.

<u>Other Debt Retirement Activities</u>

We repurchase or call our outstanding medium  and long debt  securities from time to time to help support the liquidity and  predictability of the market for our debt securities and to  manage our mix of liabilities funding our assets  When our debt  securities become seasoned or one time call options on our debt securities expire, they may become less liquid, which could  cause their price to decline  By repurchasing debt securities, we help preserve the liquidity of our debt securities and  improve their price performance, which helps to reduce our  funding costs over the long term  Our repurchase activities also  help us manage the funding mismatch, or duration gap, created by  changes in interest rates  For example, when interest rates decline, the expected lives of our investments in  mortgage related securities decrease, reducing the need for  long term debt  We use a number of different means to shorten  the effective weighted average lives of our outstanding debt  securities and thereby manage the duration gap, including retiring long term debt through repurchases or calls; changing  our debt funding mix between short and long term debt; or using derivative instruments, such as entering into receive fixed  swaps or terminating or assigning pay fixed swaps  From time to  time, we may also enter into transactions in which we exchange  newly issued debt securities for similar outstanding debt  securities held by investors. These transactions are accounted  for as debt exchanges

Table 61 provides the par value, based on settlement dates,  of other debt securities we repurchased, called, and exchanged  during 2010 and 2009.

**Table 61     Other Debt Security Repurchases, Calls, and  Exchanges**[1]

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| Rep  c ases of o  s a d  g €Refe e ce No es® secu    es | $     262 | $   5,814 |
| Repu chases of ou s and ng med um- e m no es | 5,301 | 35,795 |
| Rep  c ases of o  s a d  g F edd e SUBS® secu    es | | 3,875 |
| Calls of callable med um- e m no es | 256,256 | 198,940 |
| Exchanges of med um- e m no es | 1,364 | 551 |

(1) Exc  ded  deb  sec     es of co  so da ed   s  s   e d by      d pa   es

<u>Credit Ratings</u>

Our ability to access the capital markets and other sources of  funding, as well as our cost of funds, is highly dependent upon  our credit ratings. Table 62 indicates our credit ratings as of February 11, 2011.

<div align="center">150</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 62     Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | S&P | Moody's | Fitch |
| Sen o  ong- e m de   (1 | AAA | Aaa | AAA |
| Sho  - e m de   (2 | A-1 | -1 | F1 |
| S  o  d   a ed de   (3 | A | Aa2 | AA |
| P efe  ed s ock( | C | Ca | C/RR6 |

(1) Cons s s of med um- e m no es, U S  do a  Refe ence No es® secu   es and €Refe ence No es® secu    es
(2) Cons s s of Refe ence B  s® sec    es a d d sco    es
(3) Cons s s of F edd e SUBS® secu    es
(4) Does no  nc ude sen o  p efe ed s ock  ssued o T easu y

Effective September 7, 2008, we no longer had a "risk to the government" rating from S&P because of conservatorship. Moody's also provides a "Bank Financial Strength" rating that represents Moody's opinion of our intrinsic safety and soundness and, as such, excludes certain external credit risks and credit support elements. Our "Bank Financial Strength" rating from Moody's remained at "E+" as of February 11, 2011. A security rating is not a recommendation to buy, sell or hold securities  It may be subject to revision or withdrawal at any time by the assigning rating organization  Each rating should be evaluated  independently of any other rating

### *Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non Mortgage Related Securities*

Excluding amounts related to our consolidated VIEs, we held  $82.1 billion in the aggregate of cash and cash equivalents, federal funds sold, securities purchased under agreements to resell, and non mortgage related securities at December 31, 2010  These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market  At December 31, 2010, our non mortgage related securities primarily consisted of FDIC guaranteed corporate medium term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "    Investments in Securities    *Non Mortgage Related Securities.*"

### *Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage related securities, which consist of securities issued by us, Fannie Mae, Ginnie Mae, and other financial institutions. Historically, our mortgage loans and mortgage related securities have been a potential source of funding  A large majority of these assets is unencumbered  However, we are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

During 20  0, the market for non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans continued to be illiquid as investor demand for these assets remained low  We expect this illiquidity to continue in the near future. These market conditions, and the continued poor credit quality of the underlying assets, limit our ability to use these investments as a significant source of funds. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities*" for more information

### Cash Flows

Our cash and cash equivalents decreased approximately  $27.7 billion to $37.0 billion during 2010. The adoption of the new accounting standards on transfers of financial assets and the consolidation of VIEs effective January 1, 2010 impacted the presentation of our consolidated statements of cash flows. Cash flows provided by operating activities during 2010 were $9 8 billion, primarily driven by a decrease in net purchases of held for sale mortgages  Cash flows provided by investing activities during 2010 were $386.6 billion, primarily resulting from net proceeds received on a higher balance of held for investment mortgage loans as repayments of held for investment mortgage loans now include both unsecuritized and securitized loans. Cash flows used for financing activities for 2010 were $424 1 billion, largely attributable to repayments, net of proceeds from issuances, of debt securities of consolidated trusts held by third parties.

Our cash and cash equivalents increased approximately  $19.4 billion during 2009 to $64.7 billion at December 31, 2009. Cash flows provided by operating activities during 2009 were $1.3 billion, which primarily related to increased net interest income offset by a reduction in cash as a result of a net increase in our held for sale  mortgage loans  Cash flows provided by investing activities  during 2009 were $47.6 billion, primarily resulting from net proceeds related to sales and maturities of our available for sale securities, partially offset by a net increase in trading securities. Cash flows used for financing activities for 2009 were $29.5 billion, largely attributable to repayments of short term debt, partially offset by $36.9 billion received from Treasury under the Purchase Agreement

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0798

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our cash and cash equivalents increased $36.8 billion to $45.3 billion during 2008. Cash flows used for operating activities during 2008 were $10.1 billion, which primarily reflected a reduction in cash as a result of a net increase in held for sale mortgage loans  Cash flows used for investing activities during 2008 were $71.4 billion, primarily resulting from purchases of trading securities and available for sale securities, partially offset by proceeds from maturities of available for sale securities and sales of trading securities  Cash flows provided by financing activities in 2008 were $118 3 billion, largely attributable to proceeds from the issuance of debt securities, net of repayments

**Capital Resources**

Our entry into conservatorship resulted in significant changes to the assessment of our capital adequacy and our management of capital. On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement  FHFA continues to monitor our capital levels, but the existing statutory and FHFA directed regulatory capital requirements are not binding during conservatorship  We continue to provide submissions to FHFA on both minimum and risk based capital. See "NOTE 18:  REGULATORY CAPITAL" for our minimum capital requirement, core capital, and GAAP net worth results as of December 31, 20  0

Under the Purchase Agreement, Treasury made a commitment to provide us with funding, under certain conditions, to eliminate deficits in our net worth  The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets; a higher amount may be drawn if Treasury and Freddie Mac mutually agree that the draw should be increased  beyond the level by which liabilities exceed assets under GAAP  In each case, the amount of the draw cannot exceed the maximum  aggregate amount that may be funded under the Purchase Agreement

We are focusing our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long term profitability  Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change  Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves public policy and other non financial objectives  In this regard, we are focused on serving our mission, helping families keep their homes, and stabilizing the economy by playing a vital role in the Obama Administration's housing programs  However, these changes to our business objectives and strategies may conflict with maintaining positive GAAP equity  In addition, notwithstanding our failure to maintain required capital levels, FHFA directed us to continue to make interest and principal payments on our subordinated debt  For more information, see "BUSINESS    Regulation and Supervision   *Federal Housing Finance Agency Subordinated Debt.*"

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA  At December 3  , 20  0, our liabilities exceeded our assets under GAAP by $401 million  Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $500 million, which we expect to receive by March 31, 2011. See "BUSINESS    Regulation and Supervision   *Federal Housing Finance Agency    Receivership*" for additional information on mandatory receivership

We expect to make additional draws under the Purchase Agreement in future periods. The size and timing of such draws will be determined by a variety of factors that could adversely affect our net worth, including our dividend obligation on the senior preferred stock; how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other than temporary impairments of the non agency mortgage related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage to debt OAS, which could increase realized and unrealized mark to fair value losses recorded in earnings or AOCI; required reductions in the size of our mortgage related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; our inability to access the public debt markets on terms sufficient for our needs, absent continued support from Treasury; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or standards; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments

<div align="center">152</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will contribute to our future draw requirements under the Purchase Agreement with Treasury

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "Liquidity   *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS   Executive Summary *Long Term Financial Sustainability and Future Status*" and "RISK FACTORS."

## FAIR VALUE MEASUREMENTS AND ANALYSIS

### Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date  The accounting standards for fair value measurements and disclosures establish a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value based on the inputs a market participant would use at the measurement date  Observable inputs reflect market data obtained from independent sources  Unobservable inputs reflect assumptions based on the best information available under the circumstances  Unobservable inputs are used to measure fair value to the extent that observable inputs are not available, or in situations where there is little, if any, market activity for an asset or liability at the measurement date  We use valuation techniques that maximize the use of observable inputs, where available, and minimize the use of unobservable inputs.

The three levels of the fair value hierarchy under the accounting standards for fair value measurements and disclosures are described below:

- Level   :   Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities;

- Level 2:   Quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; inputs other than quoted market prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities; and

- Level 3:   Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair values.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgment regarding the observability of the related inputs  Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions  In applying our judgments, we review ranges of third party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive

Our Level 1 financial instruments consist of exchange traded derivatives, Treasury bills, and Treasury notes, where quoted prices exist for the exact instrument in an active market.

Our Level 2 instruments generally consist of high credit quality agency securities, CMBS, non mortgage related asset backed securities, FDIC guaranteed corporate medium term notes, interest rate swaps, option based derivatives, and foreign currency denominated debt  These instruments are generally valued through one of the following methods: (a) dealer or pricing service inputs with the value derived by comparison to recent transactions involving similar securities and adjusting for differences in prepayment or liquidity characteristics; or (b) modeled through an industry standard modeling technique that relies upon observable inputs such as discount rates and prepayment assumptions.

Our Level 3 assets primarily consist of non agency mortgage related securities  The non agency mo tgage related securities market continued to be illiquid during 2010, with low transaction volumes, wide credit spreads, and limited transparency  We value the non agency mortgage related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model  For a large majority of the securities we value using dealers and pricing services, we obtain at least three independent prices, which are non binding both to us and our counterparties  When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them  However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence  We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices  We make no adjustments to the individual prices we receive from third party pricing services or dealers for non agency mortgage-re ated securities

153                                                                                                   *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes See "*Controls over Fair Value Measurement*" for information on our validation processes

Our valuation process and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads and dispersion of prices on similar securities. As previously mentioned, the non agency mortgage related securities markets continued to be illiquid during 2010 We continue to utilize the prices on such securities provided to us by various pricing services and dealers and believe that the procedures executed by the pricing services and dealers, combined with our internal verification process, ensure that the prices used to develop our financial statements are in accordance with the guidance in the accounting standards for fair value measurements and disclosures.

We also consider credit risk in the valuation of our assets and liabilities with the credit risk of the counterparty considered in asset valuations and our own institutional credit risk considered in liability valuations See "*Consideration of Credit Risk in Our Valuation*" for more information

We periodically evaluate our valuation techniques and may change them to improve our fair value estimates, to accommodate market developments or to compensate for changes in data availability and reliability or other operational constraints We review a range of market quotes from pricing services or dealers and perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK  Interest Rate Risk and Other Market Risks" for a discussion of market risks and our interest rate sensitivity measures, PMVS and duration gap.

Table 63 below summarizes our assets and liabilities measured at fair value on a recurring basis at December 31, 20 0

**Table 63    Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | At December 31, | | | |
| | 2010 | | 2009 | |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
|---|---|---|---|---|
| **Asse s:** | | | | |
| Inves en s n secu es | | | | |
| Ava lable-fo -sale, a fa value | $232,634 | 30% | $384,684 | 37% |
| T ad g, a fa va e | 60,262 | 5 | 222,250 | 2 |
| Mo gage loans | | | | |
| He d-fo -sa e, a fa va ue | 6,413 | 100 | 2,799 | 100 |
| De ve ve asse s, e (1 | 143 | | 215 | 1 |
| O e asse s | | | | |
| G a a ee asse s, a fa va e | 541 | 100 | 10,444 | 100 |
| To a asse s ca ed a fa va ue on a ecu ng bas s(1 | $299,993 | 25 | $ 620,392 | 25 |
| **Liabili ies:** | | | | |
| Deb secu es eco ded a fa va ue | $  4,443 | % | $  8,918 | % |
| De ve va ab l es, e (1 | 1,209 | 3 | 589 | 3 |
| To al l ab l es ca ed a fa va ue on a ecu ng bas s(1 | $  5,652 | 2 | $  9,507 | 2 |

(1) Pe cen ages by level a e based on g oss fa value of de va ve asse s and de va ve ab es befo e coun e pa y ne ng, cash co a e a ne ng, ne ade/se e ece vable e payable and ne de va ve ne es ece vab e o payab e

### Changes in Level 3 Recurring Fair Value Measurements

At December 31, 2010 and 2009, we measured and recorded at fair value on a recurring basis $79.8 billion and $161.5 billion, respectively, or approximately 25% of total assets carried at fair value on a recurring basis at both dates, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting Our Level 3 assets at December 31, 2010 primarily consist of non agency mortgage related securities At December 3 , 2010 and 2009, we also measured and recorded at fair value on a recurring basis Level 3 liabilities of $0.8 billion and $0.6 billion, respectively, or 2% of total liabilities at both dates, carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting Our Level 3 liabilities consist of certain derivative contracts in which we are in a liability position

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third party pricing services In the fourth quarter of 2010 we determined that these market conditions stabilized to a degree that we believe indicates unobservable inputs are no longer significant to the fair values of these securities As a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2 The adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs resulted in the

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0801

Table of Contents

elimination of $28 8 billion in our Level 3 assets on January 1, 2010, including: (a) certain mortgage related securities issued by our consolidated trusts that are held by us; and (b) the guarantee asset for guarantees issued to our consolidated trusts In addition, we transferred $0 4 billion of other Level 3 assets to Level 2 during 2010, resulting from improved liquidity and availability of price quotes received from dealers and third party pricing services.

During 2009, our Level 3 assets increased by $48.1 billion primarily due to the transfer of CMBS securities from Level 2 to Level 3 given the continued weakness in the market for non agency CMBS, as evidenced by low transaction volumes and wide spreads, as investor demand for these assets remained limited As a result, we continued to observe significant variability in the quotes received from dealers and third party pricing services Consequently, we transferred $46.4 billion of Level 2 assets to Level 3 during 2009 These transfers were primarily within non agency CMBS in the first quarter of 2009 where inputs that are significant to their valuation became limited or unavailable, as previously discussed We recorded a gain of $4.4 billion, primarily in AOCI, on these transferred assets during 2009, which were included in our Level 3 reconciliation

See "NOTE 20: FAIR VALUE DISCLOSURES     Table 20 2     Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation For discussion of types and characteristics of mortgage loans underlying our mortgage-re ated securities, see "RISK MANAGEMENT     Credit Risk" and "Table 23     Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets "

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets

For our foreign currency denominated debt and certain other debt securities with the fair value option elected, we considered institutional credit risk as a component of the fair value determination The changes in fair value attributable to changes in instrument specific credit risk were primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest rate and foreign currency derivatives used to hedge the debt Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to instrument specific credit risk.

For multifamily held for sale loans with the fair value option elected, we consider the ability of the underlying property to generate sufficient cash flow to service the debt and the relative loan to property value in determining fair value Gains and losses attributable to changes in the credit risk of these held for sale mortgage loans were determined primarily from the changes in OAS level

We also consider credit risk when we evaluate the valuation of our derivative positions The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above See "RISK MANAGEMENT     Credit Risk     Institutional Credit Risk     Derivative Counterparties" for a discussion of our counterparty credit risk.

### Controls over Fair Value Measurement

We employ control processes to validate the techniques and models we use to determine fair value These processes are designed to ensure that fair value measurements are appropriate and reliable These control processes include review and approval of new transaction types, price verification and review of valuation judgments, methods, models, process controls and results. Groups within our Finance and Enterprise Risk Management divisions, independent of our trading and investing function, execute, validate, and review the valuation process Additionally, the Valuation & Finance Model Committee (Valuation Committee), which includes senior representation from business areas, and our Enterprise Risk Management and Finance divisions, participates in the review and validation process.

Our control process includes performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and uses independent analytics to determine if assigned fair values are reasonable. This review covers all categories of products with increased attention to higher risk/impact valuations. Validation processes are intended to ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services

TREASURY-0802

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                      Powered by Morningstar® Document Research℠

The information contained herein may be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Where applicable, prices are back tested by comparing the settlement prices to our fair value measurements Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices, based on market moves, and relative value and yield comparisons based on specific characteristics of securities To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and ultimately not use that price if we are not able to determine that the price is valid. The prices provided to us consider the existence of credit enhancements, including monoline insurance coverage and the current lack of liquidity in the marketplace. These processes are executed prior to the use of the prices in the financial statements

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee Inputs used by those models are regularly updated for changes in the underlying data, assumptions, valuation inputs, or market conditions.

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities See "NOTE 20: FAIR VALUE DISCLOSURES      Table 20.6      Consolidated Fair Value Balance Sheets" for our fair value balance sheets In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models See "RISK FACTORS," "RISK MANAGEMENT      Operational Risks" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK Interest Rate Risk and Other Market Risks" for information concerning the risks associated with these models

During 2010 and 2009, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES," "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 20: FAIR VALUE DISCLOSURES" for more information on fair values.

### Key Components of Changes in Fair Value of Net Assets

Our attribution of changes in the fair value of net assets relies on models, assumptions, and other measurement techniques that evolve over time The following are the key components of the attribution analysis:

#### Core Spread Income

Core spread income on our investments in mortgage loans and mortgage related securities is a fair value estimate of the net current period accrual of income from the spread between our mortgage related investments and our debt, calculated on an option adjusted basis. OAS is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve, after consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options

#### Changes in Mortgage To Debt OAS

The fair value of our net assets can be significantly affected from period to period by changes in the net OAS between the mortgage and agency debt sectors The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage to debt OAS because we generally hold a substantial portion of our mortgage assets for the long term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long term value of our investments in mortgage loans and mortgage related securities

#### Asset Liability Management Return

Asset liability management return represents the estimated net increase or decrease in the fair value of net assets resulting from net exposures related to the market risks we actively manage We do not hedge all of the interest rate risk that exists at the time a mortgage is purchased or that arises over its life. The market risks to which we are exposed as a result of our investment activities that we actively manage include duration and convexity risks, yield curve risk and volatility risk.

We seek to manage these risk exposures within prescribed limits as part of our overall investment strategy. Taking these risk positions and managing them within prudent limits is an integral part of our investment activity We expect that the net exposures related to market risks we actively manage will generate fair value returns, although those positions may result in a net increase or decrease in fair value for a given period See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK      Interest Rate Risk and Other Market Risks" for more information

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                             Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Core Management and Guarantee Fees, Net*

Core management and guarantee fees, net represents a fair value estimate of the annual income of our credit guarantee activities, based on current credit guarantee characteristics and market conditions. This estimate considers both contractual management and guarantee fees collected over the life of the credit guarantees and credit related delivery fees collected up front when pools are formed, and associated costs and obligations, which include default costs.

*Change in the Fair Value of Credit Guarantee Activities*

Change in the fair value of credit guarantee activities represents the estimated impact on the fair value of the credit guarantee business resulting from increases in the amount of such business we conduct plus the effect of changes in interest rates, projections of the future credit outlook and other market factors (*e.g.*, impact of the passage of time on cash flow discounting) Our estimated fair value of credit guarantee activities will change as credit conditions change

We generally do not hedge changes in the fair value of our existing credit guarantee activities, with two exceptions discussed below While periodic changes in the fair value of credit guarantee activities may have a significant impact on the fair value of net assets, we believe that changes in the fair value of our existing credit guarantee activities are not the best indication of long term fair value expectations because such changes do not reflect our expectation that, over time, replacement business will largely replenish management and guarantee fee income lost because of prepayments However, to the extent that projections of the future credit outlook reflected in the changes in fair value are realized, our fair value results may be affected

We hedge interest rate exposure related to net buy ups (up front payments we make that increase the management and guarantee fee that we will receive over the life of the pool) and float (expected gains or losses resulting from our mortgage security program remittance cycles) These value changes are excluded from our estimate of the changes in fair value of credit guarantee activities, so that it reflects only the impact of changes in interest rates and other market factors on the unhedged portion of the projected cash flows from the credit guarantee business. The fair value changes associated with net buy ups and float are considered in asset liability management return (described above) because they relate to hedged positions.

**Discussion of Fair Value Results**

Table 64 summarizes the change in the fair value of net assets for 2010 and 2009.

**Table 64    Summary of Change in the Fair Value of Net Assets**

|  | 2010 | 2009 |
|---|---|---|
|  | (in billions) | |
| Beg nn ng balance | $(62 5) | $(95 6) |
| Changes n fa va ue of ne asse s, befo e cap a ansac ons | (2 9) | 0 3 |
| Cap a ansac ons |  |  |
| D v de ds, s a e ep c ases a d ss a ces, e (1) | 6 8 | 32 8 |
| End ng balance | $(58 6) | $(62 5) |

(1) Inc udes he funds ece ved f o Treasu y of $12 5 b on and $36 9 b on fo 2010 and 2009, espec ve y, nde he Pu chase Ag ee en , wh ch nc eased he l qu da on p efe ence of ou sen o p efe ed s ock

Our consolidated fair value measurements are a component of our risk management procedures, as we use daily estimates of the changes in fair value to calculate our PMVS and duration gap measures The fair value of net assets as of December 31, 2010 was $(58.6) billion, compared to $(62.5) billion as of December 31, 2009. Our fair value results for the year ended December 31, 2010 included funds received from Treasury of $12.5 billion under the Purchase Agreement that increased the liquidation preference of our senior preferred stock, which was partially offset by the $5.7 billion of dividends paid to Treasury on our senior preferred stock. During 2010, the fair value of net assets, before capital transactions, decreased by 2.9 billion compared to a $0.3 billion increase during 2009.

During 2010, the decrease in the fair value of net assets, before capital transactions, was primarily due to: (a) an increase in the risk premium related to our single family loans as higher capital assumptions were applied reflecting the continued weak and uncertain credit environment; and (b) a change in the estimation of a risk premium embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans The decrease in fair value was partially offset by high estimated core spread income and an increase in the fair value of our investments in residential and commercial mortgage related securities driven by the tightening of OAS levels

During 2009, the increase in the fair value of net assets, before capital transactions was principally related to an increase in the fair value of our mortgage loans and our investments in mortgage related securities, resulting from higher core spread income and net tightening of mortgage to debt OAS. The increase in fair value was partially offset by an increase in the guarantee obligation related to the declining credit environment Included in the reduction of the fair value of

157                                                                          *Freddie Mac*

Source  D RA HOM  OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

net assets, before capital transactions, is $3.5 billion related to our partial valuation allowance against our net deferred tax assets recorded during 2009.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset The reverse is true when the OAS on a given asset tightens     current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates

## OFF BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction These off balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets

### Arrangements Related to Guarantee and Securitization Activities

Most of our off balance sheet arrangements relate to our business of guaranteeing mortgages and mortgage related securities, and related securitization activities We guarantee the payment of principal and interest on Freddie Mac mortgage related securities we issue As of December 3 , 20 0, our off balance sheet arrangements primarily related to: (a) Freddie Mac mortgage related securities backed by multifamily loans; and (b) certain single family Other Guarantee Transactions We also have off balance sheet arrangements related to other guarantee commitments, including long term standby commitments and liquidity guarantees

Our maximum potential off balance sheet exposure to credit losses relating to these securitization activities and other guarantee commitments is primarily represented by the UPB of the loans and securities underlying the non consolidated trusts and guarantees to third parties, which was $43.9 billion, $1.5 trillion and $1.4 trillion at December 31, 2010, 2009 and 2008, respectively Our off balance sheet arrangements related to securitization activity have been significantly reduced due to new accounting standards for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" and "NOTE 10: FINANCIAL GUARANTEES" for more information on our off balance sheet securitization arrangements

We provide long term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements These other guarantee commitments totaled $5.5 billion, $5.1 billion, and $10.6 billion of UPB at December 3 , 2010, 2009, and 2008, respectively. We also had other guarantee commitments outstanding with respect to multifamily housing revenue bonds of $9.7 billion, $9.2 billion, and $9.2 billion in UPB at December 31, 2010, 2009, and 2008, respectively. In addition, as of December 31, 2010, 2009, and 2008, we issued other guarantee commitments on HFA bonds under the TCLFP with UPB of $3.5 billion, $0.8 billion, and $0 billion respectively

As part of the guarantee arrangements pertaining to certain multifamily housing revenue bonds and securities backed by multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees," totaling $12.6 billion, $12.4 billion and $12.3 billion at December 31, 2010, 2009 and 2008, respectively. These guarantees require us to advance funds to third parties that enable them to repurchase tendered bonds or securities that are unable to be remarketed Any repurchased securities are pledged to us to secure funding until the securities are remarketed. We hold cash and cash equivalents in excess of these commitments to advance funds At December 31, 2010, 2009, and 2008, there were no liquidity guarantee advances outstanding. Advances under our liquidity guarantees would typically mature in 60 to 120 days. In addition, as part of the HFA initiative, we, together with Fannie Mae, provide liquidity guarantees for certain variable rate single family and multifamily housing revenue bonds, under which Freddie Mac generally is obligated to purchase 50% of any tendered bonds that cannot be remarketed within five business days.

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

### Other Agreements

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate on our balance sheets in accordance with the accounting standards on the consolidation of VIEs These VIEs relate primarily to our investment activity in mortgage related assets and non mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities See

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

"NOTE 4: VARIABLE INTEREST ENTITIES" for additional information related to our significant variable interests in these VIEs

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage related securities  Some of these commitments are accounted for as derivatives  Their fair values are reported as  either derivative assets, net or derivative liabilities, net on our consolidated balance sheets  We also have purchase commitments primarily related to mortgage purchase flow business, which we principally fulfill by issuing PCs in swap  transactions, and, to a lesser extent, commitments to purchase  or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated  balance sheets  These non derivative commitments totaled $220.7 billion, $325.9 billion and $216.5 billion  in notional value at December 31, 2010, 2009, and 2008,  respectively

## CONTRACTUAL OBLIGATIONS

Table 65 provides aggregated information about the listed categories of our contractual obligations as of  December 3 , 20  0  These contractual obligations affect our short  and long term liquidity and capital resource needs  The table includes information about undiscounted future cash payments due under these contractual obligations, aggregated by  type of contractual obligation, including the contractual  maturity profile of our debt securities (other than debt  securities of consolidated trusts held by third parties) and  other liabilities reported on our consolidated balance sheet and our operating leases at December 3 , 20  0  The timing of actual future payments may differ from those presented due to a number of factors, including discretionary debt repurchases. Our  contractual obligations include other purchase obligations that  are enforceable and legally binding  For purposes of this table,  purchase obligations are included through the termination date  specified in the respective agreement, even if the contract is renewable  Many of our purchase agreements for goods or services  include clauses that would allow us to cancel the agreement prior to the expiration of the contract within a specified  notice period; however, this table includes these obligations without regard to such termination clauses (unless we have  provided the counterparty with actual notice of our intention to  terminate the agreement)

In Table 65, the amounts of future interest payments on  debt securities outstanding at December 31, 2010 are based  on the contractual terms of our debt securities at that date  These amounts were determined using the key assumptions that:  (a) variable rate debt continues to accrue interest at the contractual rates in effect at December 3 , 20  0 until maturity; and (b) callable debt continues to accrue  interest until its contractual maturity. The amounts of future interest payments on debt securities presented do not reflect  certain factors that will change the amounts of interest payments on our debt securities after December 31, 2010,  such as: (a) changes in interest rates; (b) the call  or retirement of any debt securities; and (c) the issuance of new debt securities  Accordingly, the amounts presented in the table do not represent a forecast of our future cash interest payments or interest expense

Table 65 excludes certain obligations that significantly affect our short  and long term liquidity and capital resource  needs. These items, which are listed below, have generally been  excluded because the amount and timing of the related future  cash payments are uncertain.

- future payments related to debt securities of consolidated  trusts held by third parties, because the amount and timing  of such payments are generally contingent upon the occurrence of  future events and are therefore uncertain  These payments  generally include payments of principal and interest we make  to the holders of our guaranteed mortgage related securities in  the event a loan underlying a security becomes delinquent  We also purchase mortgages from pools underlying our PCs in certain  circumstances, including when loans are 120 days or more delinquent;

- any future cash payments associated with the liquidation  preference of the senior preferred stock, as well as the  quarterly commitment fee and the dividends on the senior  preferred stock because the timing and amount of any such future  cash payments are uncertain. As of December 3 , 20  0, the aggregate liquidation preference of the senior preferred stock  was $64.2 billion and our annual dividend obligation was $6.42 billion. See "BUSINESS      Conservatorship and Related Matters      Treasury Agreements" for additional information;

- future cash settlements on derivative agreements not yet  accrued, because the amount and timing of such payments are  dependent upon changes in the underlying financial instruments in  response to items such as changes in interest rates  and foreign exchange rates and are therefore uncertain;

- future dividends on the preferred stock we issued, because  dividends on these securities are non cumulative;

- the guarantee arrangements pertaining to multifamily housing  revenue bonds, where we provided commitments to advance funds, commonly referred to as "liquidity guarantees," because the  amount and timing of such payments are generally  contingent upon the occurrence of future events and are  therefore uncertain; and

- future contributions to our Pension Plan, as we have not yet  determined whether a contribution is required in 2011  See "NOTE 15: EMPLOYEE BENEFITS" for additional  information about contributions to our Pension Plan

159                                                                                           *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 65    Contractual Obligations by Year at December 31, 2010**

| | Total | 2011 | 2012 | 2013 (in millions) | 2014 | 2015 | Thereafter |
|---|---|---|---|---|---|---|---|
| Long-term debt (1) | $530,978 | $ 120,951 | $138,474 | $ 79,177 | $36,328 | $45,779 | $ 110,269 |
| Short-term debt (1) | 197,239 | 197,239 | | | | | |
| Interest payable (2) | 74,969 | 19,861 | 10,239 | 8,039 | 6,375 | 5,416 | 25,039 |
| Other liabilities reflected on our consolidated balance sheet | | | | | | | |
| Other contractual liabilities (3) | 948 | 737 | 15 | 14 | 10 | 9 | 163 |
| Purchase obligations | | | | | | | |
| PC cash commitments (6) | 14,513 | 14,513 | | | | | |
| Other purchase obligations | 478 | 406 | 46 | 12 | 6 | 3 | 5 |
| Operating lease obligations | 31 | 11 | 7 | 4 | 3 | 2 | 4 |
| Total specified contractual obligations | $819,156 | $353,718 | $148,781 | $87,246 | $42,722 | $ 51,209 | $135,480 |

(1) Represents par value of Cash and debt securities included in our balance sheet, including our accrual and any Exchanges of debt securities of consolidated issuer by third parties. For additional information, see "NOTE 9 DEBT SECURITIES AND SUBORDINATED BORROWINGS "

(2) Includes estimated future interest payments on our short-term and long-term debt securities as well as the accrual of periodic cash settlements of derivatives, netted by counterparty. Also includes accrued interest payable recorded on our balance sheet, which consists primarily of accrual of interest for PCs and certain Other Guarantee Transactions, and the accrual of interest on short-term and long-term debt

(3) Other contractual liabilities primarily represent future cash payments due under our obligations to make delayed equity contributions to LIHTC partnerships and payables on our consolidated balance sheet, established for the administration of cash remittances received and held for the underlying assets of Freddie Mac mortgage-related securities

(4) Accrued obligations related to our defined benefit plans, defined contribution plans, and executive deferred compensation plan are not included in the Total and 2011 columns. However, the timing of payments due under these obligations is uncertain. See "NOTE 15 EMPLOYEE BENEFITS" for additional information

(5) As of December 31, 2010, we have recorded tax liabilities for unrecognized tax benefits totaling $12 billion and a total net reserve of $248 million. These amounts have been excluded from the above table because we cannot reasonably estimate when these amounts may be settled. See "NOTE 14 INCOME TAXES" for additional information

(6) Purchase commitments represent our obligations to purchase mortgage loans and mortgage-related securities from third parties. The majority of purchase commitments are recorded as capital on a net accounted for as derivatives in accordance with the accounting standards for derivatives and hedging

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are "critical," as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) fair value measurements; (b) allowances for loan losses and reserve for guarantee losses; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

### Fair Value Measurements

Assets and liabilities within our consolidated financial statements measured at fair value include: (a) mortgage related and non mortgage related securities; (b) mortgage loans held for sale; (c) derivative instruments; (d) debt securities denominated in foreign currencies and certain other debt; and (e) REO. The measurement of fair value requires management to make judgments and assumptions. These judgments and assumptions may have a significant effect on our measurements of fair value, and the use of different judgments and assumptions, as well as changes in market conditions, could have a material effect on our consolidated statements of operations as well as our consolidated fair value balance sheets. For information regarding our fair value methods and assumptions, see "NOTE 20: FAIR VALUE DISCLOSURES."

The accounting standards for fair value measurements and disclosures also establish a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value based on the inputs a market participant would use at the measurement date. For certain categories of assets, the valuation technique relies on significant unobservable inputs. The process for determining fair value using unobservable inputs is generally more subjective and involves a high degree of management judgment and assumptions. See "FAIR VALUE MEASUREMENTS AND ANALYSIS" for additional information regarding fair value hierarchy and measurements

Fair value affects our statements of operations in the following ways:

- For certain financial instruments that are recorded in the consolidated balance sheets at fair value, changes in fair value are recognized in current period earnings. These include:

    mortgage related and non mortgage related securities classified as trading, which are recorded in other gains (losses) on investment securities recognized in earnings;

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0807

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivatives with no hedge designation, which are recorded in derivative gains (losses); and

debt securities recorded at fair value, which are recorded in gains (losses) on debt recorded at fair value

- For other financial instruments that are recorded in the consolidated balance sheets at fair value, changes in fair value are recognized, net of tax, in AOCI  These include:

  mortgage related and non mortgage related securities classified as available for sale  These unrealized gains and losses may affect earnings over time through amortization, sale or impairment recognition; and

  the effective portion of the changes in derivatives that were designated in cash flow hedge accounting relationships  The deferred gains and losses on closed cash flow hedges are reclassified from AOCI and recognized in earnings as the originally forecasted transactions affect earnings. If it is probable the originally forecasted transaction will not occur, the associated deferred gain or loss in AOCI is reclassified to earnings immediately

- Mortgage loans held for sale are reported at the lower of cost or fair value, except for loans for which we elected the fair value option  We elected the fair value option for multifamily mortgage loans held for sale purchased through our CME initiative  Changes in fair value are recognized in earnings in other income

- REO is initially recorded at fair value less estimated costs to sell and is subsequently carried at the lower of cost or fair value less estimated costs to sell  When a loan is transferred to REO, losses are charged off against the allowance for loan losses and any gains are recognized immediately in earnings  Subsequent declines in fair value are recognized in REO operations expense

## Allowance for Loan Losses and Reserve for Guarantee Losses

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses  The allowance for loan losses pertains to all single family and multifamily loans classified as held for investment on our consolidated balance sheets, whereas the reserve for guarantee losses relates to single family and multifamily loans underlying our non consolidated Freddie Mac mortgage related securities and other guarantee commitments  We use the same methodology to determine our allowance for loan losses and reserve for guarantee losses, as the relevant factors affecting credit risk are the same  Determining the adequacy of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant management judgment about matters that involve a high degree of subjectivity

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting standards for contingencies  Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting standards for receivables

### *Single Family Loan Loss Reserves*

Single family loans are aggregated into pools based on similar risk characteristics and measured collectively using a statistically based model that evaluates a variety of factors affecting collectibility  We consider the output of this model, together with other information such as expected future levels of loan modifications and expected repurchases of loans by seller/servicers as a result of their non compliance with our underwriting standards, and the effects of macroeconomic variables such as rates of unemployment and the effects of home price changes on borrower behavior

There is significant risk and uncertainty associated with our estimate of losses incurred on our single family loans  The process for determining the estimate is complex, and requires us to make judgments about matters that are difficult to predict, the most significant of which are the probability of default and estimated loss severity  To accomplish this, we evaluate many factors, including current LTV ratios, a loan's product type, and geographic location

Individually impaired single family loans include loans that have undergone a TDR and are measured for impairment as the excess of our recorded investment in the loan over the present value of the expected future cash flows  Our expectation of future cash flows incorporates many of the judgments indicated above

We identified an error in the application of this process in the second quarter of 2010 that impacted our provision for credit losses and allowance for loan losses  For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT POLICIES      Basis of Presentation *Out of Period Accounting Adjustment.*"

### *Multifamily Loan Loss Reserves*

To calculate loan loss reserves for the multifamily loan portfolio, we consider all available evidence including, but not limited to, operating cash flows from the underlying property as represented by its current DSCR, the fair value of collateral underlying the impaired loans, evaluation of the repayment prospects, the adequacy of third party credit enhancements, loss severity trends, rates of reperformance and other available economic data related to multifamily real estate, including apartment vacancy and rental rates. Individually impaired multifamily loans are measured for impairment based on the fair

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0808

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

value of the underlying collateral, as reduced by estimated disposition costs, as multifamily loans are generally collateral dependent and most multifamily loans are non recourse to the borrower Non recourse means generally that the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan

### Combined Loan Loss Reserves

The processes for establishing the single family and multifamily loan loss reserves rely on the use of models We regularly evaluate the underlying estimates and models we use when determining the loan loss reserves and update our assumptions to reflect our historical experience and current view of economic factors. Inputs used by those models are regularly updated for changes in the underlying data, assumptions, and market conditions However, there are significant risks associated with our use of models, especially in the current environment See "RISK FACTORS    *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties.*"

We believe the level of our loan loss reserves is reasonable based on internal reviews of the factors and methodologies used No single statistic or measurement determines the adequacy of the loan loss reserves Changes in one or more of the estimates or assumptions used to calculate the loan loss reserves could have a material impact on the loan loss reserves and provision for credit losses For example, the inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases, further declines in home prices, deterioration in the financial condition of our mortgage insurance counterparties, or delinquency rates that exceed our current projections could cause our losses on our single family loans to be significantly higher than those currently estimated

### Impairment Recognition on Investments in Securities

We recognize impairment losses on available for sale securities within our consolidated statements of operations as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary We prospectively adopted an amendment to the accounting standards for investments in debt and equity securities on April 1, 2009. This amendment changed the recognition, measurement and presentation of other than temporary impairment for debt securities See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES    Other Changes in Accounting Principles    *Change in the Impairment Model for Debt Securities*" for further information regarding the impact of this amendment on our consolidated financial statements

We conduct quarterly reviews to evaluate each available for sale security that has an unrealized loss for other than temporary impairment An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recogn ze only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized, net of tax, in AOCI The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security

The evaluation of whether unrealized losses on available for sale securities are other than temporary requires significant management judgments and assumptions and consideration of numerous factors We perform an evaluation on a security by security basis considering all available information The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment Important factors, judgments, and assumptions include, but are not limited to:

- whether we intend to sell the security and it is more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default and prepayment models. The modeling for CMBS employs third party models that require assumptions about the economic conditions in the areas surrounding each individual property;

- analysis of the performance of the underlying collateral relative to its credit enhancements using techniques that require assumptions about future loss severity, default, prepayment, and other borrower behavior Implicit in this analysis is information relevant to expected cash flows (such as collateral performance and characteristics);

<div style="text-align:center">162</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the length of time and extent to which the fair value of the security has been less than the book value and the expected recovery period; and

- the impact of changes in credit ratings (*i.e.*, rating agency downgrades)

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of operations as net impairment of available for sale securities recognized in earnings

See "NOTE 8: INVESTMENTS IN SECURITIES    Table 8 2    Available For Sale Securities in a Gross Unrealized Loss Position" for the length of time our available for sale securities have been in an unrealized loss position. Also see "NOTE 8: INVESTMENTS IN SECURITIES    Table 8.3    Significant Modeled Attributes for Certain Non Agency Mortgage Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in ce tain non agency mo tgage related securities would experience a cash shortfall. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for more information on impairment recognition on securities

We believe our judgments and assumptions used in our evaluation of other than temporary impairment are reasonable However, different judgments or assumptions could have resulted in materially different recognition of other than temporary impairment and changes in one or more of those judgments or assumptions could cause our realized losses to be significantly higher than those estimated

**Realizability of Deferred Tax Assets, Net**

We use the asset and liability method to account for income taxes pursuant to the accounting standards for income taxes Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, we determine whether a valuation allowance is necessary In so doing, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized

The consideration of this evidence requires significant estimates, assumptions, and judgments, particularly about our future financial condition and results of operations and our intent and ability to hold available for sale debt securities with temporary unrealized losses until recovery As discussed in "RISK FACTORS," the conservatorship and related matters fundamentally affecting our control, management, and operations are likely to affect our future financial condition and results of operations These events have resulted in a variety of uncertainties regarding our future operations, our business objectives and strategies, and our future profitability, the impact of which cannot be reliably forecasted at this time. As such, any changes in these estimates, assumptions or judgments may have a material effect on our financial position and results of operations.

We determined that, as of September 30, 2008, it was more likely than not that we would not realize the portion of our net deferred tax assets that is dependent upon the generation of future taxable income This determination was driven by recent events and the resulting uncertainties as of that date. Those conditions continued to exist as of December 3 , 20 0 As a result, we continue to maintain a valuation allowance against these net deferred tax assets at December 3 , 20 0 It is possible that, in future periods, the uncertainties regarding our future operations and profitability could be resolved such that it could become more likely than not that these net deferred tax assets would be realized due to the generation of sufficient taxable income If that were to occur, we would assess the need for a reduction of the valuation allowance, which could have a material effect on our financial position and results of operations in the period of the reduction

Also, we determined that a valuation allowance is not necessary for the portion of our net deferred tax assets that is dependent upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses These temporary unrealized losses have only impacted AOCI, not income from continuing operations or our taxable income, nor will they impact income from continuing operations or taxable income if they are held to maturity As such, the realization of this deferred tax asset is not dependent upon the generation of sufficient taxable income but rather on our intent and ability to hold these securities until recovery of these unrealized losses which may be at maturity. Our conclusion that these unrealized losses are temporary and that we have the intent and ability to hold these securities until recovery requires significant estimates, assumptions, and judgments, as described above in "Impairment Recognition on Investments in

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Securities." Any changes in these estimates, assumptions, or judgments in future periods may result in the recognition of an other than temporary impairment, which would result in some of this deferred tax asset not being realized and may have a material effect on our financial position and results of operations  For more information see "NOTE 14: INCOME TAXES."

**Accounting Changes and Recently Issued Accounting Pronouncements**

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for more information concerning our accounting policies and recently issued accounting pronouncements, including those that we have not yet adopted and that will likely affect our consolidated financial statements

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital  In September 2005, we entered into a written agreement with FHFA that updated these commitments and set forth a process for implementing them  A copy of the letters between us and FHFA dated September  , 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our website at www freddiemac com/investors/sec_filings/index html

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise  In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest rate risk and credit risk disclosures in our periodic public reports  For the year ended December 31, 2010, our duration gap averaged zero months, PMVS L averaged $338 million and PMVS YC averaged $23 million  Our 2010 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our website, www freddiemac com/investors/volsum and in current reports on Form 8 K we file with the SEC  For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT      Credit Risk      *Mortgage Credit Risk      Portfolio Management Activities      Credit Risk Sensitivity."* We are providing our website addresses solely for your information  Information appearing on our website is not incorporated into this Form 10 K

<div align="center">164</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

**Interest Rate Risk and Other Market Risks**

*Interest-Rate Risk Management Framework*

Our approach to managing interest rate risk is designed to be  disciplined and comprehensive  Our objective is to minimize our  interest rate risk exposure across a range of interest rate  scenarios  To do this, we analyze the interest rate sensitivity  of financial assets and liabilities at the instrument level on a daily basis and across a variety of interest rate scenarios. For  risk management purposes, the interest rate characteristics of each instrument are determined daily based on market prices and  internal models. The fair values of our assets, liabilities and  derivatives are primarily based on either third party prices, or  observable market based inputs. These fair values, whether  direct from third parties or derived from observable inputs, are  reviewed and validated by groups that are separate from our  trading and investing function. See "MD&A      FAIR VALUE MEASUREMENTS AND ANALYSIS      Fair Value Measurements      *Controls over Fair Value Measurement*."

Our interest rate risk framework includes interest rate risk  guidelines  Annually, our Board of Directors establishes certain  limits for risk measures, and if we exceed these limits we are  required to notify the Business and Risk Committee of the Board  of Directors as well as provide our expected course of action to  return below the limits  These limits encompass a range of  interest rate risks that include duration risk, convexity risk, volatility risk, and yield curve risk associated with our use of  various financial instruments, including derivatives. Also on an  annual basis, our Enterprise Risk Management division  establishes management limits and makes recommendations with  respect to the limits to be established by the Board of Directors  These limits are reviewed by our Enterprise Risk  Management Committee, which is responsible for reviewing performance as compared to the established limits  The  management limits are set at values below those set by our Board  of Directors, which is intended to allow us to follow a series of  predetermined actions in the event of a breach of the  management limits and helps ensure proper oversight to reduce the possibility of exceeding the limits set by our Board of  Directors

*Sources of Interest Rate Risk and Other Market Risks*

Our investments in mortgage loans and mortgage related  securities expose us to interest rate risk and other market  risks arising primarily from the uncertainty as to when  borrowers will pay the outstanding principal balance of mortgage  loans and mortgage related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our  receipt of cash flows related to our assets versus the timing of  payment of cash flows related to our liabilities used to fund  those assets  For the vast majority of our mortgage related  investments, the mortgage borrower has the option to make unscheduled payments of additional principal or to completely  pay off a mortgage loan at any time before its scheduled maturity date (without having to pay a prepayment penalty) or  make principal payments in accordance with their contractual  obligation  We use derivatives as an important part of our strategy to manage interest rate and prepayment risk  When  determining to use derivatives to mitigate our exposures, we consider a number of factors, including cost, efficiency,  exposure to counterparty risks, and our overall risk management  strategy  See "MD&A      RISK MANAGEMENT" for a discussion of our exposure to credit risks, our use of  derivatives, and operational risks of our business. See "RISK FACTORS" for a discussion of our market risk  exposure, including those related to derivatives, institutional counterparties, and other market risks.

Our credit guarantee activities also expose us to interest  rate risk because changes in interest rates can cause  fluctuations in  the fair value of our existing credit guarantees  We generally do not hedge these changes in fair value except  for interest rate exposure related to net buy ups and float  Float, which arises from timing differences between when  the borrower makes principal payments on the loan and the  reduction of the PC balance, can lead to significant interest  expense if the interest rate paid to a PC investor is higher than  the reinvestment rate earned by the securitization trusts on  payments received from mortgage borrowers and paid to us as  trust management income

The types of interest rate risk and other market risks to  which we are exposed are described below

<u>Duration Risk and Convexity Risk</u>

Duration is a measure of a financial instrument's price  sensitivity to changes in interest rates (expressed in  percentage terms)  For mortgage assets, we compute each  instrument's duration by applying a 50 basis point shock, both  upward and downward, to the LIBOR curve and evaluating the impact on the instrument's fair value  Convexity is a measure  of how much a financial instrument's duration changes as interest rates change  Similar to the duration calculation, we  compute each instrument's convexity by applying a 50 basis  point shock, both upward  and downward, to the LIBOR curve and evaluating the impact on  the duration  Currently, short term interest rates are historically  low and, at some points, the LIBOR curve is less than 50 basis  points. As a result, the 50 basis point shock to the LIBOR curve  described above is bounded by zero  Our convexity risk  primarily results from prepayment risk. We seek  to manage  duration risk and convexity risk through asset

<div align="center">165</div>

<div align="right">*Freddie Mac*</div>

TREASURY-0812

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

selection and structuring (that is, by identifying or structuring mortgage related securities with attractive prepayment and other characteristics), by issuing a broad range of both callable and non callable debt instruments, and by using interest rate derivatives and written options Managing the impact of duration risk and convexity risk is the principal focus of our daily market risk management activities. These risks are encompassed in our PMVS and duration gap risk measures, discussed in greater detail below We use prepayment models to determine the estimated duration and convexity of mortgage assets for our PMVS and duration gap measures When interest rates decline, mortgage asset prices tend to rise, but the rise is limited by the increased likelihood of prepayments, which exposes us to negative convexity Through the use of our models, we estimate on a weekly basis the negative convexity profile of our portfolio over a wide range of interest rates This process is designed to help us to identify the particular interest rate scenarios where the convexity of our portfolio appears to be most negative, and therefore the particular interest rate scenario where the interest rate price sensitivity of our financial instruments appears to be most acute. We use this information to develop hedging strategies that are customized to provide interest rate risk protection for the specific interest rate environment where we believe we are most exposed to negative convexity risk This strategy allows us to select hedging instruments that are expected to be most efficient for our portfolio, thereby reducing the overall cost of interest rate hedging activities

By managing our convexity profile over a wide range of interest rates, we are able to hedge prepayment risk for particular interest rate scenarios. As a result, the intensity and frequency of our ongoing risk management actions is relatively constant over a wide range of interest rate environments. Our approach to convexity risk management focuses our portfolio rebalancing activities for the specific interest rate scenario where market and interest rate volatility appear to be most pronounced. This approach to convexity risk reduces our ongoing rebalancing activity to a relatively low level compared to the overall daily trading volume of interest rate swaps and Treasury futures.

## Yield Curve Risk

Yield curve risk is the risk that non parallel shifts in the yield curve (such as a flattening or steepening) will adversely affect GAAP total equity (deficit) Because changes in the shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at different points along the yield curve, we evaluate our exposure to yield curve risk by examining potential reshaping scenarios at various points along the yield curve. Our yield curve risk under a specified yield curve scenario is reflected in our PMVS YC disclosure.

## Volatility Risk

Volatility risk is the risk that changes in the market's expectation of the magnitude of future variations in interest rates will adversely affect GAAP total equity (deficit) Volatility risk arises from the prepayment risk that is inherent in mortgages or mortgage related securities Volatility risk is the risk that the homeowner's prepayment option will gain or lose value as the expected volatility of future interest rates changes In general, as expected future interest rate volatility increases, the homeowner's prepayment option increases in value, thus negatively impacting the value of the mortgage security backed by the underlying mortgages We manage volatility risk by maintaining a portfolio of callable debt and option based interest rate derivatives that have relatively long option terms We actively manage and monitor our volatility risk exposure over a range of changing interest rate scenarios, however we do not eliminate our volatility risk exposure completely

## Basis Risk

Basis risk is the risk that interest rates in different market sectors will not move in tandem and will adversely affect GAAP total equity (deficit). This risk arises principally because we generally hedge mortgage related investments with debt securities. As principally a buy and hold investor, we do not actively manage the basis risk arising from funding mortgage related investments with our debt securities, also referred to as mortgage to debt OAS risk or spread risk See "MD&A     FAIR VALUE MEASUREMENTS AND ANALYSIS     Key Components of Changes in Fair Value of Net Assets     Changes in Mortgage To Debt OAS " for additional information. We also incur basis risk when we use LIBOR or Treasury based instruments in our risk management activities

## Model Risk

Proprietary models, including mortgage prepayment models, interest rate models, and mortgage default models, are an integral part of our investment framework. As market conditions change rapidly, as they have since 2007, the assumptions that we use in our models for our sensitivity analyses may not keep pace with these market changes. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair values of our net assets We actively manage our model risk by reviewing the performance of our models To improve the accuracy of our models, changes to the underlying assumptions or modeling techniques are made on a periodic basis Model development and model testing are reviewed and approved independently by our Enterprise Risk Management division Model performance is also reported regularly through a series of internal management committees See "RISK FACTORS     We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                TREASURY-0813

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties" for a discussion of the risks associated with our use of models  Given the importance of models to our  investment management practices, model changes undergo a rigorous model change review process  As a result, it is common  for model changes to take several months to complete  Given the time consuming nature of the model change review process, it is sometimes necessary for risk management purposes to make  adjustments to our interest rate risk statistics that reflect the expected impact of the pending model change  These  adjustments are included in our PMVS and duration gap disclosures.

*Foreign Currency Risk*

Foreign currency risk is the risk that fluctuations in currency  exchange rates (*e.g.*, Euros to the U.S. dollar) will  adversely affect GAAP total equity (deficit)  We are exposed to foreign currency risk because we have debt denominated in  currencies other than the U.S. dollar, our functional currency. We mitigate virtually all of our foreign currency risk by entering into swap transactions that effectively convert  foreign currency denominated obligations into U S  dollar denominated obligations

**Risk Management Strategy**

Although we cannot hedge all of our exposure to changes in  interest rates, this exposure is subject to established limits  and is monitored through our risk management process  We employ a risk management strategy that seeks to substantially match the  duration characteristics of our assets and liabilities. Through our asset and liability management process, we seek to mitigate  interest rate risk by issuing a wide variety of callable and non callable debt products  The prepayment option held by  mortgage borrowers drives the fair value of our mortgage assets  such that the combined fair value of our mortgage assets and  non callable debt will decline if interest rates move  significantly in either direction  We seek to mitigate much of our exposure to changes in interest rates by funding a  significant portion of our mortgage portfolio with callable  debt  When interest rates change, our option to redeem this debt  offsets a large portion of the fair value change driven by the  mortgage prepayment option  However, because the mortgage prepayment option is not fully hedged by callable debt, the  combined fair value of our mortgage assets and debt will be affected by changes in interest rates  It was more difficult for  us to implement this strategy at the end of 2008 and during the  first half of 2009, as our ability to issue callable debt and  other long term debt was limited due to the weakened market  conditions

To further reduce our exposure to changes in interest rates, we  hedge a significant portion of the remaining prepayment risk  with option based derivatives. These derivatives primarily consist of call swaptions, which tend to increase in value as  interest rates decline, and put swaptions, which tend to increase in value as interest rates increase  We also seek to manage interest rate risk by changing the effective interest  terms of the portfolio, primarily using interest rate swaps,  which we refer to as rebalancing

**Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk**

*PMVS and Duration Gap*

Our primary interest rate risk measures are PMVS and duration  gap  PMVS is the change in the market value of our net assets  and liabilities from an instantaneous 50 basis point shock  to interest rates and assumes no rebalancing actions are  undertaken. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel  movements in interest rates (PMVS Level or PMVS L) and the other to nonparallel movements (PMVS YC)  Our PMVS and duration gap estimates are determined using models  that involve our best judgment of interest rate and prepayment  assumptions  Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements

While PMVS and duration gap estimate our exposure to changes in  interest rates, they do not capture the potential impact of  certain other market risks, such as changes in volatility, basis, mortgage to debt OAS and foreign currency risk  The impact of these other market risks can be significant  Definitions of our primary interest rate risk measures follow:

• To estimate PMVS L, an instantaneous parallel 50 basis point shock is applied to the yield curve, as represented by the  US swap curve, holding all spreads to the swap curve constant.  This shock is applied to all financial instruments. The  resulting change in market value for the aggregate portfolio is computed for both the up rate and down rate shock and the change  in market value in the more adverse scenario of the up and down  rate shocks is the PMVS. Because this process uses a parallel,  or level, shock to interest rates, we refer to this measure as PMVS L

• To estimate sensitivity related to the shape of the yield curve,  a yield curve steepening and flattening of 25 basis points  is applied to all instruments. The resulting change in market  value for the aggregate portfolio is computed for both the  steepening and flattening yield curve scenarios  The more adverse yield curve scenario is then used to determine the  PMVS yield curve  Because this process uses a non parallel  shock to interest rates, we refer to this measure as  PMVS YC

<div align="center">167</div>

<div align="right">*Freddie Mac*</div>

TREASURY-0814

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- We calculate our exposure to changes in interest rates using effective duration  Effective duration measures the percentage change in price of financial instruments from a 1% change in interest rates  Financial instruments with positive duration increase in value as interest rates decline  Conversely, financial instruments with negative duration increase in value as interest rates rise

- Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets  For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month  A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. As a result, the change in the value of our assets from an instantaneous move in interest rates, either up or down, would be expected to be accompanied by an equal and offsetting change in the value of liabilities, thus leaving the fair value of equity unchanged  A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities which, from a net perspective, implies that the fair value of equity will increase in value when interest rates fall and decrease in value when interest rates rise  A negative duration gap indicates that the duration of our liabilities exceeds the duration of our assets which, from a net perspective, implies that the fair value of equity will increase in value when interest rates rise and decrease in value when interest rates fall  Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a  % change in interest rates

- Together, duration and convexity provide a measure of an instrument's overall price sensitivity to changes in interest rates  Freddie Mac utilizes the aggregate duration and convexity risk of all interest rate sensitive instruments on a daily basis to estimate the PMVS. The duration and convexity measures provide a convenient method for estimating the PMVS using the following formula:

PMVS =   [*Duration*] multiplied by [$\Delta$r] plus [0.5 multiplied by *Convexity*] multiplied by [$\Delta$r]$^2$

In the equation, $\Delta r$ represents the interest rate change expressed in percent  For example, a 50 basis point change will be expressed as 0 5%  The result of this formula is the percentage of sensitivity to the change in rate, which is expressed as:
PMVS = (0.5 Duration) + (0.125 Convexity)

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near term changes that we believe provide a meaningful measure of our interest rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure

The expected loss in portfolio market value is an estimate of the sensitivity to changes in interest rates of the fair value of all interest earning assets, interest bearing liabilities, and derivatives on a pre tax basis  When we calculate the expected loss in portfolio market value and duration gap, we also take into account the cash flows related to certain credit guarantee related items, including net buy ups and expected gains or losses due to net interest from float  In making these calculations, we do not consider the sensitivity to interest rate changes of the following assets and liabilities:

- *Credit guarantee activities.*  We do not consider the sensitivity of the fair value of credit guarantee activities to changes in interest rates except for the guarantee related items mentioned above (*i.e.*, net buy ups and float), because we believe the expected benefits from replacement business provide an adequate hedge against interest rate changes over time

- *Other assets with minimal interest rate sensitivity.*  We do not include other assets, primarily non financial instruments such as fixed assets and REO, because we estimate their impact on PMVS and duration gap to be minimal

### Limitations of Market Risk Measures

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates  Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio  These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest rate risk  As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

### PMVS Results

Table 66 provides duration gap, estimated point in time and minimum and maximum PMVS L and PMVS YC results, and an average of the daily values and standard deviation for the years ended December 31, 2010 and 2009  Table 66 also provides PMVS L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve  We do not hedge the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0815

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

entire prepayment risk exposure embedded in our mortgage assets  The interest rate sensitivity of a mortgage portfolio varies  across a wide range of interest rates  Therefore, the difference between PMVS at 50 basis points and 100 basis points  is non linear.  Accordingly, as shown in Table 66, the PMVS L results based on a 100 basis point shift in the LIBOR curve  are disproportionately higher at December 31, 2010, than the PMVS L results based on a 50 basis point shift in the LIBOR curve.

**Table 66     PMVS Results**

| | PMVS-YC | PMVS-L | |
|---|---|---|---|
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Ass   ng s  f s of   e LIBOR y e d c  ve | | | |
| Decembe  31, 2010 | $  35 | $588 | $1,884 |
| Decembe  31, 2009 | $  10 | $ 329 | $ 1,246 |

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | | | 2009 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Ave age | 0 0 | $  23 | $ 338 | 0 4 | $  74 | $  476 |
| M n mum | (0 7) | $ | $ | (0 5) | $ | $ |
| Max mum | 0 7 | $  83 | $ 668 | 1 8 | $ 219 | $1,127 |
| S anda d dev a  on | 0 3 | $  18 | $ 179 | 0 4 | $  52 | $  169 |

Derivatives have historically enabled us to keep our  interest rate risk exposure at consistently low levels in a wide  range of interest rate environments. Table 67 shows that the PMVS L risk levels for the periods presented would generally have been  higher if we had not used derivatives to manage our interest rate risk exposure

**Table 67     Derivative Impact on PMVS L (50 bps)**

| | Before Derivatives | After Derivatives | ffect of Derivatives |
|---|---|---|---|
| | | (in millions) | |
| At | | | |
| Decembe  31, 2010 | $ 3,614 | $  588 | $(3,026) |
| Decembe  31, 2009 | $ 3,507 | $  329 | $(3,178) |

*Duration Gap Results*

We actively measure and manage our duration gap exposure on a  daily basis  In addition to duration gap management, we also  measure and manage the price sensitivity of our portfolio to eleven different specific interest rate changes from three months to 30 years  The price sensitivity of an instrument to specific changes in interest rates is known as the  instrument's key rate duration risk. By managing our duration exposure both in aggregate through duration gap and to  specific changes in interest rates through key rate duration, we  expect to limit our exposure to interest rate changes for a wide range of interest rate yield curve scenarios  Our average  duration gap, rounded to the nearest month, for the months of December 2010 and 2009 was zero months in both periods  Our  average duration gap, rounded to the nearest month, during the  years ended December 31, 2010 and 2009 was zero months  in both periods.

The disclosure in our Monthly Volume Summary reports, which are available on our website at www freddiemac com and in current  reports on Form 8 K we file with the SEC, reflects the average of the daily  PMVS L, PMVS YC and duration gap estimates for a given reporting period (a month, quarter or year)

*Use of Derivatives and Interest-Rate Risk Management*

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non callable funding;

- regularly adjust or rebalance our funding mix in order to more  closely match changes in the interest rate characteristics of  our mortgage assets; and

- hedge foreign currency exposure (see  *"Sources of Interest Rate Risk and Other Market Risks      Foreign Currency Risk."*)

The derivatives we use to hedge interest rate and  foreign currency risk are common in the financial markets. We principally use the following types of derivatives:

- LIBOR  and Euribor based interest rate swaps;

- LIBOR  and Treasury based options (including swaptions);

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠
TREASURY-0816

Table of Contents

- LIBOR  and Treasury based exchange traded futures; and

- Foreign currency swaps

In addition to swaps, futures and purchased options, our  derivative positions include written options, swaptions, certain  commitments, swap guarantee derivatives, and credit derivatives

For more information, see "NOTE 12: DERIVATIVES "

### Derivative-Related Risks

Our use of derivatives exposes us to credit risk with respect to  our counterparties to derivative transactions  Through  counterparty selection, all derivative transactions are executed  in a manner that seeks to control and reduce counterparty credit  exposure  In order to attempt to minimize the potential replacement cost should a derivative counterparty fail, we  utilize derivative counterparty limits  These counterparty  limits, which include current exposure and potential exposure  in a stress scenario, are monitored by members of our Enterprise  Risk Management division, which is responsible for establishing  and monitoring credit and counterparty risk tolerances for our  business activities. See "MD&A     RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Derivative Counterparties*" for information on derivative counterparty credit risk.

Our use of derivatives also exposes us to derivative market  liquidity risk, which is the risk that we may not be able to  enter into or exit out of derivative transactions at a reasonable cost. A lack of sufficient capacity or liquidity in the derivatives  market could limit our risk management activities, increasing our exposure to interest rate risk  To help maintain continuous access to derivative markets, we use a  variety of products and transact with many different derivative  counterparties  In addition to OTC derivatives, we also use  exchange traded derivatives, asset securitization activities, callable debt, and short term debt to rebalance our portfolio

On an ongoing basis, we review the credit fundamentals of all of  our OTC derivative counterparties to confirm that they continue  to meet our internal standards. We assign internal ratings, credit  capital, and exposure limits to each counterparty based  on quantitative and qualitative analysis, which we update and  monitor on a regular basis  We conduct additional reviews when  market conditions dictate or certain events affecting an  individual counterparty occur.

The Dodd Frank Act will require that, in the future, many types  of derivatives be centrally cleared and traded on exchanges or  comparable trading facilities  See "MD&A     RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Derivative Counterparties*" for additional information on this  requirement and our use of a central clearing platform for  interest rate derivatives

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0817

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

171                                                                                              *Freddie Mac*

Source   D  RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Freddie Mac:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of equity (deficit), and of cash flows present fairly, in all material respects, the financial position of Freddie Mac, a stockholder owned government sponsored enterprise, and its subsidiaries at December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended December 3 , 20 0 in conformity with accounting principles generally accepted in the United States of America Also, in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to disclosure controls and procedures that do not provide adequate mechanisms for information known to the Federal Housing Finance Agency ("FHFA") that may have financial statement disclosure ramifications to be communicated to management, existed as of that date A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis The material weakness referred to above is described in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2010 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements. The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our audits (which were integrated audits in 2010 and 2009). We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects Our audits of the financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

We have also audited in accordance with the standards of the Public Company Accounting Oversight Board (United States) the supplemental consolidated fair value balance sheets of the Company as of December 31, 2010 and 2009. As discussed in "Note 20: Fair Value Disclosures", the supplemental consolidated fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the historical cost consolidated balance sheets and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America In addition, the supplemental consolidated fair value balance sheets do not purport to present the net realizable, liquidation, or market value of the Company as a whole Furthermore, amounts ultimately realized by the Company from the disposal of assets or amounts required to settle obligations may vary significantly from the fair values presented In our opinion, the supplemental consolidated fair value balance sheets referred to above present fairly, in all material respects, the information set forth therein as described in "Note 20: Fair Value Disclosures"

As explained in "Note 3: Conservatorship and Related Matters", in September 2008, the Company was placed into conservatorship by the FHFA. The U.S. Department of Treasury ("Treasury") has committed financial support to the Company and management continues to conduct business operations pursuant to the delegated authorities from FHFA during conservatorship. The Company is dependent upon the continued support of Treasury and FHFA.

As discussed in "Note 2: Change in Accounting Principles", the Company adopted as of January 1, 2010, amendments to the accounting guidance for transfers of financial assets and the consolidation of variable interest entities, which changed, among other things, how it evaluates securitization trusts for purposes of consolidation. Also, as discussed in "Note 2: Change in Accounting Principles" in 2009 the Company adopted an amendment to the accounting guidance for investments

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011           TREASURY-0819           Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in debt and equity securities which changed how it recognizes,  measures, and presents other than temporary impairment for debt  securities

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the  reliability of financial reporting and the preparation of  financial statements for external purposes in accordance with  generally accepted accounting principles A company's internal control over financial reporting includes those  policies and procedures that (i) pertain to the maintenance  of records that, in reasonable detail, accurately and fairly  reflect the transactions and dispositions of the assets of the  company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of  financial statements in accordance with generally accepted  accounting principles, and that receipts and expenditures of the  company are being made only in accordance with authorizations of  management and directors of the company; and (iii) provide  reasonable assurance regarding prevention or timely detection of  unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the  financial statements

Because of its inherent limitations, internal control over  financial reporting may not prevent or detect misstatements   Also, projections of any evaluation of effectiveness to future periods are subject to the  risk that controls may become  inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may  deteriorate

/s/ PricewaterhouseCoopers LLP
McLean, Virginia
February 24, 2011

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0820

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | *(in millions, except share-related amounts)* | | |
| **Interest income** | | | |
| Mo  gage loans | | | |
| He d by conso da ed  us s | $ 86,698 | $ | $ |
| Unsecu  zed | 8,727 | 6,815 | 5,369 |
| *Total mortgage loans* | 95,425 | 6,815 | 5,369 |
| Inves men s n secu   es | 14,375 | 33,290 | 35,067 |
| O he | 156 | 241 | 1,041 |
| *Total interest income* | 109,956 | 40,346 | 41,477 |
| *Interest expense* | | | |
| Deb secu   es of conso da ed  us s | (75,216) | | |
| O he  deb | (16,915) | (22,150) | (33,332) |
| *Total interest expense* | (92,131) | (22,150) | (33,332) |
| Expense  e a ed o de  va ves | (969) | (1,123) | (1,349) |
| *Net interest income* | 16,856 | 17,073 | 6,796 |
| P ov s on fo c ed  losses | (17,218) | (29,530) | (16,432) |
| *Net interest income (loss) after provision for credit losses* | (362) | (12,457) | (9,636) |
| *Non-interest income (loss)* | | | |
| Ga ns ( osses) on ex  ngu shmen  of deb secu   es of conso da ed  us s | (164) | | |
| Ga ns ( losses) on e   emen  of o he  deb | (219) | (568) | 209 |
| Ga ns ( osses) on deb  eco ded a fa  va ue | 580 | (404) | 406 |
| De  va ve ga ns (losses) | (8,085) | (1,900) | (14,954) |
| Impa men  of ava lable-fo -sale secu  es | | | |
| To al o he - han- empo a y mpa men  of ava lable-fo -sale secu   es | (1,778) | (23,125) | (17,682) |
| Po  on of o he - han- empo a y mpa men  ecogn zed n AOCI | (2,530) | 11,928 | |
| Ne  mpa men  of ava lable-fo -sale secu   es ecogn zed n ea n ngs | (4,308) | (11,197) | (17,682) |
| O he  ga ns (losses) on nves men secu   es ecogn zed n ea n ngs | (1,252) | 5,965 | 1,501 |
| O he  ncome (No e 23) | 1,860 | 5,372 | 1,345 |
| *Non-interest income (loss)* | (11,588) | (2,732) | (29,175) |
| *Non-interest expense* | | | |
| Sala  es and employee benef  s | (895) | (912) | (828) |
| P ofess onal se v ces | (246) | (310) | (262) |
| Occupancy expense | (64) | (68) | (67) |
| O he  adm n s  a ve expenses | (341) | (361) | (348) |
| To al adm n s a  ve expenses | (1,546) | (1,651) | (1,505) |
| Rea  es a e owned ope a  ons expense | (673) | (307) | (1,097) |
| O he  expenses (No e 23) | (713) | (5,237) | (3,151) |
| *Non-interest expense* | (2,932) | (7,195) | (5,753) |
| Loss befo e  ncome  ax benef   (expense) | (14,882) | (22,384) | (44,564) |
| Income  ax benef   (expense) | 856 | 830 | (5,552) |
| *Net loss* | (14,026) | (21,554) | (50,116) |
| *Less  Net (income) loss attributable to noncontrolling  interest* | 1 | 1 | (3) |
| *Net loss attributable to Freddie Mac* | (14,025) | (21,553) | (50,119) |
| P efe  ed s ock d v dends | (5,749) | (4,105) | (675) |
| Amoun  alloca ed  o pa  c pa ng secu   y op on holde s | | | (1) |
| *Net loss attributable to common stockholders* | $ (19,774) | $ (25,658) | $ (50,795) |
| Loss pe  common sha e | | | |
| Bas c | $ (6 09) | $ (7 89) | $ (34 60) |
| D  u ed | $ (6 09) | $ (7 89) | $ (34 60) |
| We gh ed ave age common sha es ou s and ng ( n  housands) | | | |
| Bas c | 3,249,369 | 3,253,836 | 1,468,062 |
| D  u ed | 3,249,369 | 3,253,836 | 1,468,062 |
| D v dends pe  common sha e | $ | $ | $     0 50 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

174

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cas   a d cas  eq  va e s (  c  des $1 a  Dece  be  31, 2010  e a ed o ou  conso  da ed VIEs) | $    37,012 | $  64,683 |
| Res   c ed cas  a d cas  eq  va e s (  c  des $7,514 a  Decembe  31, 2010 ela ed o ou  consol da ed VIEs) | 8,111 | 527 |
| Fede a  f  ds so d a d sec   es p c ased   de  ag ee e s o  ese  (  c udes $29,350 a  Dece  be  31, 2010  e a ed o o  consol da ed VIEs) | 46,524 | 7,000 |
| Investments in securities | | |
| Ava a e-fo -sa e, a  fa  va e (  c  des $817 a d $10,879,  espec  vely, pledged as colla e al  ha  may be  epledged) | 232,634 | 384,684 |
| T ad  g, a  fa  va  e | 60,262 | 222,250 |
| Total investments in securities | 292,896 | 606,934 |
| Mortgage loans | | |
| Held-fo - nves men , a  amo   zed cos | | |
| By conso  da ed  us s (ne  of a  owances fo   oan  osses of $11,644 a  Dece  be  31, 2010) | 1,646,172 | |
| Unsecu   zed (ne  of a  owances fo   oan  osses of $28,047 and $1,441,  espec  ve y) | 192,310 | 111,565 |
| To al held-fo - nves men  mo  gage loans, ne | 1,838,482 | 111,565 |
| He d-fo -sa e, a  owe -of-cos -o -fa  -va ue (  nc udes $6,413 a d $2,799 at fa   va  e,  espect ve y) | 6,413 | 16,305 |
| Total mortgage loans, net | 1,844,895 | 127,870 |
| Acc  ed  e es  ecce va e (  c  des $6,895 a  Decembe  31, 2010  e a ed o ou  consol da ed VIEs) | 8,713 | 3,376 |
| De  va  ve asse s,  e | 143 | 215 |
| Rea es a e ow ed,  e  (  c  des $118 a  Dece  be  31, 2010  e a ed o ou  conso  da ed VIEs) | 7,068 | 4,692 |
| Defe  ed tax assets,  et | 5,543 | 11,101 |
| O  e  asse s (No e 23) (  c  des $6,001 a  Decembe  31, 2010 ela ed o ou  consol da ed VIEs) | 10,875 | 15,386 |
| Total assets | $ 2,261,780 | $841,784 |
| **Liabilities and equity (deficit)** | | |
| Liabilities | | |
| Acc  ed  e es  payab e (  c  des $6,502 a  Dece  be  31, 2010 ela ed o ou  consol da ed VIEs) | $   10,286 | $    5,047 |
| Debt, net: | | |
| Deb  secu   es of conso  da ed  us s  ssued by   d pa  es | 1,528,648 | |
| Ot  e  de t (  c  des $4,443 a d $8,918 at fa   va  e,  espec  vely) | 713,940 | 780,604 |
| Total debt, net | 2,242,588 | 780,604 |
| De  va  ve l ab l   es, ne | 1,209 | 589 |
| O  e   ab    es (No e 23) (  nc  des $3,851 a  Decembe  31, 2010 ela ed o ou  consol da ed VIEs) | 8,098 | 51,172 |
| Total liabilities | 2,262,181 | 837,412 |
| Comm  men s and con  ngenc es (No es 1, 10, 12, a d 21) | | |
| Equity (deficit) | | |
| Freddie Mac stockholders' equity (deficit) | | |
| Sen o  p efe  ed s ock, a   edemp  on va ue | 64,200 | 51,700 |
| P efe  ed s ock, a   edemp  on va ue | 14,109 | 14,109 |
| Co    on s ock, $0 00 pa  va ue, 4,000,000,000 sha es a   o   zed, 725,863,886 s a es  ss ed a d 649,179,789 s a es a d 648,369,668 s a es o  ts ta d  g,  espect ve y | | |
| Add  onal pa d- n cap al | 7 | 57 |
| Re a ned ea  ngs (accumula ed def c  ) | (62,733) | (33,921) |
| AOCI, net of taxes, related to: | | |
| Ava ab e-fo -sa e sec    es (  c  des $10,740 a d $15,947,  espec  vely, ne  of  axes, of o he - han- empo a y  mpa  men s) | (9,678) | (20,616) |
| Cash flow hedge  ela  onsh ps | (2,239) | (2,905) |
| Def ned benef   p ans | (114) | (127) |
| Total AOCI, net of taxes | (12,031) | (23,648) |
| T eas  y  stock, at cost, 76,684,097 s a es a d 77,494,218 s a es,  espect ve y | (3,953) | (4,019) |
| Total Freddie Mac stockholders' equity (deficit) | (401) | 4,278 |
| Noncon  oll ng  n e es s | | 94 |
| Total equity (deficit) | (401) | 4,372 |
| Total liabilities and equity (deficit) | $ 2,261,780 | $841,784 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are otherwise limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0822

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **2008** | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
| | | | (in millions) | | | |
| *Senior preferred stock, at redemption value* | | | | | | |
| Balance, beginning of year | 1 | $ 51,700 | 1 | $ 1 ,800 | — | $ — |
| Senior preferred stock issuance | — | — | — | — | 1 | 1,000 |
| Increase in liquidation preference | — | 12,500 | — | 36,900 | — | 13,800 |
| Senior preferred stock, end of year | 1 | 6 ,200 | 1 | 51,700 | 1 | 1,800 |
| *Preferred stock, at redemption value* | | | | | | |
| Balance, beginning of year | 6 | 1 ,109 | 6 | 1 ,109 | 6 | 1 ,109 |
| Preferred stock, end of year | 6 | 1 ,109 | 6 | 1 ,109 | 6 | 1 ,109 |
| *Common stock, par value* | | | | | | |
| Balance, beginning of year | 726 | — | 726 | — | 726 | 152 |
| Adjustment to par value | — | — | — | — | — | (152 |
| Common stock, end of year | 726 | — | 726 | — | 726 | — |
| *Additional paid in capital* | | | | | | |
| Balance, beginning of year | | 57 | | 19 | | 871 |
| Stock-based compensation | | 2 | | 58 | | 7 |
| Income tax benefit from stock-based compensation | | 1 | | 7 | | (16 |
| Common stock issuances | | (67 | | (90 | | (66 |
| Noncontrolling interest purchase | | (31 | | — | | — |
| Adjustment to common stock par value | | — | | — | | 152 |
| Common stock warrant issuance | | — | | — | | 2,30 |
| Commitment from the U S Department of the Treasury | | — | | — | | (3,30 |
| Transfer from retained earnings (accumulated deficit) | | 23 | | 63 | | — |
| Additional paid-in capital, end of year | | 7 | | 57 | | 19 |
| *Retained earnings (accumulated deficit)* | | | | | | |
| Balance, beginning of year | | (33,921 | | (23,191 | | 26 909 |
| Cumulative effect of change in accounting principle | | (9,011 | | — | | 1,023 |
| Balance, beginning of year, as adjusted | | ( 2,932 | | (23,191 | | 27,932 |
| Cumulative effect of change in accounting principle | | — | | 1 996 | | — |
| Net loss attributable to Freddie Mac | | (1 ,025 | | (21,553 | | (50,119 |
| Senior preferred stock dividends declared | | (5,7 9 | | ( ,105 | | (172 |
| Preferred stock dividends declared | | — | | — | | (503 |
| Common stock dividends declared | | — | | — | | (323 |
| Div dends equivalent payments on exp red stock options | | ( | | (5 | | (6 |
| Transfer to add tional paid in capital | | (23 | | (63 | | — |
| Retained earnings (accumulated deficit), end of year | | (62,733 | | (33,921 | | (23,191 |
| *AOCI, net of taxes* | | | | | | |
| Balance, beginning of year | | (23,6 8 | | (32,357 | | (11,1 3 |
| Cumulative effect of change in accounting principle | | (2 690 | | — | | (850 |
| Balance, beginning of year, as adjusted | | (26,338 | | (32,357 | | (11,993 |
| Cumulative effect of change in accounting principle | | — | | (9 931 | | — |
| Changes in unrealized gains ( losses) related to available for sale securities, net of reclass cation adjustments | | 13,621 | | 17,825 | | (20,616 |
| Changes in unrealized gains ( losses) related to cash f ow hedge relationships, net of rec ass f cation adjustments | | 673 | | 773 | | 377 |
| Changes in de ned bene t plans | | 13 | | 2 | | (125 |
| AOCI, net of taxes, end of year | | (12,031 | | (23,6 8 | | (32,357 |
| *Treasury stock, at cost* | | | | | | |
| Balance, beginning of year | 77 | ( ,019 | 79 | ( ,111 | 80 | ( ,17 |
| Common stock issuances | | 66 | (2 | 92 | (1 | 63 |
| Treasury stock, end of year | 77 | (3,953 | 77 | ( ,019 | 79 | ( ,111 |
| *Noncontrolling interest* | | | | | | |
| Balance, beginning of year | | 9 | | 97 | | 181 |
| Cumulative effect of change in accounting principle | | (2 | | — | | — |
| Balance, beginning of year, as adjusted | | 92 | | 97 | | 181 |
| Net income ( oss) attributable to noncontrolling interest | | (1 | | (1 | | 3 |
| Noncontrolling interest purchase | | (89 | | — | | (82 |
| Div dends and other | | (2 | | (2 | | (5 |
| Noncontrolling interest, end of year | | — | | 9 | | 97 |
| *Total equity (deficit)* | | $ ( 01 | | $ ,372 | | $ (30,63 |
| *Comprehensive income (loss)* | | | | | | |
| Net loss | | $ (1 ,026 | | $ (21,55 | | $ (50,116 |
| Changes in other comprehens ve ncome ( oss), net of taxes, net of rec ass f cat on ad ustments | | 1 ,307 | | 18,6 0 | | (20,36 |
| Comprehens ve ncome ( oss) | | 281 | | (2,91 | | (70, 80 |
| ess Comprehens ve ( ncome) oss attr butab e to noncontro ng nterest | | 1 | | 1 | | (3 |
| *Total comprehensive income (loss) attributable to Freddie Mac* | | $ 282 | | $ (2,913 | | $ (70, 83 |

*The accompanying notes are an integral part of these consolidated financial statements.*

176

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0823

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
| **Cash flows from operating activities** | | | |
| Net loss | $ (14,026) | $ (21,554) | $ (50,116) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | |
| Derivative losses (gains) | 3,591 | (2,046) | 13,650 |
| Asset-related amortization of premiums, discounts, and basis adjustments | 326 | 163 | (493) |
| Debt-related amortization of premiums and discounts on certain debt securities and basis adjustments | 1,127 | 3,959 | 8,765 |
| Net discounts paid on retirement of other debt | (1,959) | (4,303) | (8,844) |
| Net premiums received from issuance of debt securities of consolidated trusts | 3,888 | | |
| Losses (gains) on extinguishment of debt securities of consolidated trusts and other debt | 383 | 568 | (209) |
| Provision for credit losses | 17,218 | 29,530 | 16,432 |
| Losses on investment activity | 5,542 | 5,356 | 16,108 |
| (Gains) losses on debt recorded at fair value | (580) | 404 | (406) |
| Deferred income tax expense (benefit) | (670) | (670) | 5,507 |
| Purchases of held-for-sale mortgages | (10,188) | (101,976) | (38,070) |
| Sales of mortgages acquired as held-for-sale | 5,627 | 88,094 | 24,578 |
| Repayments of mortgages acquired as held-for-sale | 21 | 3,050 | 896 |
| Change in: | | | |
| Accrued interest receivable | 832 | (1,193) | (554) |
| Accrued interest payable | (1,700) | (1,324) | (786) |
| Income taxes payable | 662 | 312 | (1,185) |
| Other, net | (233) | 2,918 | 4,568 |
| *Net cash provided by (used for) operating activities* | 9,861 | 1,288 | (10,159) |
| **Cash flows from investing activities** | | | |
| Purchases of trading securities | (54,550) | (250,411) | (200,613) |
| Proceeds from sales of trading securities | 17,771 | 153,093 | 94,764 |
| Proceeds from maturities of trading securities | 40,389 | 69,025 | 18,382 |
| Purchases of available-for-sale securities | (6,542) | (15,346) | (174,968) |
| Proceeds from sales of available-for-sale securities | 2,645 | 22,259 | 35,872 |
| Proceeds from maturities of available-for-sale securities | 44,398 | 86,702 | 193,573 |
| Purchases of held-to-maturity mortgages | (68,180) | (23,606) | (25,099) |
| Repayments of mortgages acquired as held-for-investment | 425,298 | 6,862 | 6,516 |
| Decrease (increase) in restricted cash | 7,399 | 426 | (857) |
| Net proceeds from (payments of) mortgage insurance and acquisitions and dispositions of real estate owned | 13,093 | (4,690) | (2,573) |
| Net (increase) decrease in federal funds sold and securities purchased under agreements to resell | (32,023) | 3,150 | (3,588) |
| Derivative premiums and terminations and swap collateral, net | (3,075) | 99 | (12,829) |
| Purchase of noncontrolling interests | (23) | | |
| *Net cash provided by (used for) investing activities* | 386,600 | 47,563 | (71,420) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 96,253 | | |
| Repayments of debt securities of consolidated trusts held by third parties | (461,084) | | |
| Proceeds from issuance of other debt | 1,115,097 | 1,333,859 | 1,435,678 |
| Repayments of other debt | (1,180,935) | (1,395,806) | (1,329,327) |
| Increase in liquidation preference of senior preferred stock | 12,500 | 36,900 | 13,800 |
| Repurchase of REIT preferred stock | (100) | | |
| Payment of cash dividends on senior preferred stock, preferred stock, and common stock | (5,749) | (4,105) | (998) |
| Excess tax benefits associated with share-based awards | 1 | 1 | 3 |
| Payment of low-income housing tax-credit partnership notes payable | (115) | (343) | (742) |
| Other, net | | | (83) |
| *Net cash (used for) provided by financing activities* | (424,132) | (29,494) | 118,331 |
| Net (decrease) increase in cash and cash equivalents | (27,671) | 19,357 | 36,752 |
| Cash and cash equivalents at beginning of year | 64,683 | 45,326 | 8,574 |
| *Cash and cash equivalents at end of year* | $ 37,012 | $ 64,683 | $ 45,326 |
| **Supplemental cash flow information** | | | |
| Cash paid (received) for: | | | |
| Debt interest | $ 95,468 | $ 25,169 | $ 35,664 |
| Net derivative interest carry and swap collateral interest | 4,305 | 2,274 | 953 |
| Income taxes | (848) | (472) | 1,230 |
| Non-cash investing and financing activities: | | | |
| Held-for-sale mortgages securitized and retained as trading and available-for-sale securities | 372 | 1,088 | |
| Underlying mortgage loans related to guaranand swap transactions | 324,004 | | |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 324,004 | | |
| Transfers from held-to-investment mortgages to held-for-sale mortgages | 196 | 435 | |
| Transfers from held-to-maturity mortgages to held-to-investment mortgages | | 10,336 | |
| Transfers from available-for-sale securities to trading securities | | | 87,281 |
| Issuance of senior preferred stock and warrant to purchase common stock to U.S. Department of the Treasury | | | 3,304 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0824

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0825

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS."

We are involved in the U.S. housing market by participating in the secondary mortgage market We do not participate directly in the primary mortgage market Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage related securities

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Single family Guarantee, Investments, and Multifamily Our Single family Guarantee segment reflects results from our single family credit guarantee activities In our Single family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third party investors and we also guarantee the payment of principal and interest on single family mortgage loans and mortgage related securities We also resecuritize mortgage related securities that are issued by us or Ginnie Mae as well as private (non agency) entities Our Investments segment reflects results from our investment, funding, and hedging activities In our Investments segment, we invest principally in mortgage related securities and single family mortgage loans These activities are funded by debt issuances We manage the interest rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investments and guarantee activities in multifamily mortgage loans and securities In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization, and CMBS for investment We also guarantee the payment of principal and interest on multifamily mortgage related securities and mortgages underlying multifamily housing revenue bonds See "NOTE 17: SEGMENT REPORTING" for additional information

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U S residential mo tgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP, and our relief refinance mortgage initiative; (c) minimizing our credit losses; and (d) maintaining the credit quality of the loans we purchase and guarantee

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and guidance from our Conservator. For information regarding these objectives see "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS     Business Objectives "

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary

## Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with GAAP and include our accounts as well as the accounts of other entities in which we have a controlling financial interest All intercompany balances and transactions have been eliminated

Our current accounting policies are described below For additional information regarding recently adopted accounting standards and other changes in accounting principles see "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES." We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation

We evaluate the materiality of identified errors in the financial statements using both an income statement, or "rollover," and a balance sheet, or "iron curtain," approach, based on relevant quantitative and qualitative factors. Net loss includes certain adjustments to correct immaterial errors related to previously reported periods

### *Out of Period Accounting Adjustment*

During the second quarter of 2010, we identified a backlog related to the processing of certain loan workout activities reported to us by our servicers, principally loan modifications and short sales. This backlog was the result of a significant increase in the volume of loan workouts executed by servicers beginning in 2009, which placed pressure on our existing loan processing capabilities Our loan accounting processing activities and our loan loss reserving process are dependent on accurate loan data from our loan reporting systems Our loan workout operational processes rely on manual reviews and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0826

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

approvals prior to modifying the corresponding loan data within our loan reporting systems. This backlog in processing loan modifications and short sales resulted in erroneous loan data within our loan reporting systems, thereby impacting our financial accounting and reporting systems. Prior to the second quarter of 2010, while we modified our loan loss reserving processes to consider potential processing lags in loan workout data, we failed to fully adjust for the impacts of the resulting erroneous loan data on our financial statements The resulting error impacted our provision for credit losses, allowance for loan losses, and provision for income taxes and affected our previously reported financial statements for the interim period ended March 31, 2010 and the interim 2009 periods and full year ended December 31, 2009 Based upon our evaluation during the second quarter of 20 0 of all relevant quantitative and qualitative factors related to this error, we concluded that this error was not material to our previously issued consolidated financial statements for any of the periods affected and was not material to our then estimated earnings for the full year ended December 3 , 20 0 or to the trend of earnings As a result, in accordance with the accounting standard related to accounting changes and correction of errors, we recorded the cumulative effect of this error as a correction in the second quarter of 2010 as an increase to our provision for credit losses The cumulative effect, net of taxes, of this error corrected in the second quarter of 20 0 was $1.2 billion, of which $0 9 billion related to the year ended December 31, 2009. Our updated analysis based on the impact of this error relative to full year actual results did not change our conclusion that it is not material to our actual earnings for the full year ended December 3 , 20 0 or to the trend of earnings

**Use of Estimates**

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period Management has made significant estimates in preparing the financial statements, including, but not limited to, valuing financial instruments and other assets and liabilities, establishing the allowance for loan losses and reserves for guarantee losses, assessing impairments and subsequent accretion of impairments on investments and assessing the realizability of net deferred tax assets Actual results could be different from these estimates

**Consolidation and Equity Method of Accounting**

The consolidated financial statements include our accounts and those of our subsidiaries. The equity and net earnings attributable to the noncontrolling interests in our consolidated subsidiaries are reported separately on our consolidated balance sheets as noncontrolling interest in total equity (deficit) and in the consolidated statements of operations as net income (loss) attributable to noncontrolling interest All material intercompany transactions have been eliminated in consolidation

For each entity with which we are involved, we determine whether the entity should be consolidated in our financial statements The consolidation assessment methodologies vary between a VIE and a non VIE A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the power, through voting rights or similar rights, to direct the activities of an entity that most significantly impact the entity's economic performance; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity s expected residual returns.

For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary An enterprise has a controlling financial interest in, and thus is the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact its economic performance; and (b) exposure to losses or benefits of the VIE that could potentially be significant to the VIE We perform ongoing assessments to determine if we are the primary beneficiary of the VIEs with which we are involved and, as such, conclusions may change over time

Historically, we were exempt from applying the accounting guidance applicable to consolidation of VIEs to the majority of our securitization trusts, as well as certain of our investment securities issued by third parties, because they had been designed to meet the definition of a QSPE Upon the effective date of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs, the concept of a QSPE and the related scope exception from the consolidation provisions applicable to VIEs were removed from GAAP; consequently, all of our securitization trusts, as well as our investment securities issued by third parties that had previously been QSPEs, became subject to a consolidation assessment. The results of our consolidation assessments on certain of these securitization trusts are explained in the paragraphs that follow

We use securitization trusts in our securities issuance process that are VIEs. We are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. See "NOTE 4: VARIABLE INTEREST ENTITIES" for more information. When we transfer assets into a VIE that we consolidate at the time of the transfer (or shortly thereafter), we recognize the assets and liabilities of the VIE at the amounts that they would have been recognized if

179                                                                                                                 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

they had not been transferred, and no gain or loss is recognized on these transfers  For all other VIEs that we consolidate, we  recognize the assets and liabilities of the VIE at fair value, and we recognize a gain or loss for the difference between:  (a) the fair value of the consideration paid and the fair value of any noncontrolling interests held by third parties; and  (b) the net amount, as measured on a fair value basis, of  the assets and liabilities consolidated

For entities that are not VIEs, the usual condition of a  controlling financial interest is ownership of a majority voting  interest in an entity  We use the equity method of accounting  for entities over which we have the ability to exercise  significant influence, but not control

### Securitization Activities through Issuances of Freddie Mac Mortgage Related  Securities

#### Overview

We securitize substantially all of the single family mortgages we purchase and issue mortgage related securities called PCs  that can be sold to investors or held by us. Guarantor swaps are  transactions where financial institutions exchange mortgage  loans for PCs backed by these mortgage loans. Multilender swaps are similar to guarantor swaps, except that formed PC pools  include loans that are contributed by more than one party  We issue PCs through various swap based exchanges significantly  more often than through cash based exchanges  We issue REMICs and Other Structured Securities in transactions in which  securities dealers or investors sell us mortgage related assets  in exchange for REMICs and Other Structured Securities. We also issue Other Guarantee Transactions to third parties in exchange  for non Freddie Mac mortgage related securities

#### PCs

Our PCs are pass through debt securities that represent  undivided beneficial interests in a pool of mortgages held by a  securitization trust  For our fixed rate PCs, we guarantee the timely payment of interest and principal  For our ARM PCs, we  guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans  We do not guarantee the timely payment of principal for ARM PCs; however, we  do guarantee the full and final payment of principal

Various types of fixed income investors purchase our PCs, including pension funds, insurance companies, securities  dealers, money managers, commercial banks and foreign central  banks. PCs differ from U.S. Treasury securities and certain  other fixed income investments in two primary ways. First, they  can be prepaid at any time because homeowners may pay off the  underlying mortgages at any time prior to a loan's maturity  Because homeowners have the right to prepay their mortgage, the securities implicitly have a call option that  significantly reduces the average life of the security as  compared to the contractual maturity of the underlying loans  Consequently, mortgage related securities generally provide a higher nominal yield than certain other fixed income products  Second, PCs are not backed by the full faith and credit of the  United States, as are U.S. Treasury securities. However, we  guarantee the payment of interest and principal on all of our  PCs, as discussed above.

In return for providing our guarantee of the payment of  principal and interest, we earn a management and guarantee fee  that is paid to us over the life of an issued PC, representing a  portion of the interest collected on the underlying loans

#### PC Trusts

Prior to January 1, 2010, our PC trusts met the definition  of QSPEs and were not consolidated. Effective January 1, 20  0, the concept of a QSPE was removed from GAAP and entities  previously considered QSPEs were required to be evaluated for  consolidation  Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our  single family PCs  Therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of  these trusts at their UPB, with accrued interest, allowance for  credit losses or other than temporary impairments recognized as appropriate, using the practical expedient permitted upon  adoption since we determined that calculation of carrying values was not practical  Other newly consolidated assets and  liabilities that either do not have a UPB or are required to be  carried at fair value were measured at fair value  As such, we have recognized on our consolidated balance sheets the mortgage  loans underlying our issued single family PCs as mortgage loans  held for investment by consolidated trusts, at amortized cost  We also recognized the corresponding single family PCs held by  third parties on our consolidated balance sheets as debt  securities of consolidated trusts held by third parties  After January 1, 2010, the assets and liabilities of trusts that  we consolidate are recorded at either their: (a) carrying  value if the underlying assets are contributed by us to the trust; or (b) fair value for those securitization trusts  established for our guarantor swap program, rather than their  UPB. Refer to "Mortgage Loans" and "Debt Securities Issued" below for further information on the  subsequent accounting treatment of these assets and liabilities, respectively

#### REMICs and Other Structured Securities

Our REMICs and Other Structured Securities use resecuritization  trusts that meet the definition of a VIE  REMICs and Other  Structured Securities represent beneficial interests in groups  of PCs and other types of mortgage related assets  We create these securities primarily by using PCs or previously issued  mortgage related securities as collateral  Similar to our

<div style="text-align:center">180</div>

<div style="text-align:right"><em>Freddie Mac</em></div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

PCs, we guarantee the payment of principal and interest to the holders of the tranches of our REMICs and Other Structured Securities However, for REMICs and Other Structured Securities where we have already guaranteed the underlying assets, there is no incremental credit risk assumed by us.

With respect to the resecuritization trusts used for REMICs and Other Structured Securities whose underlying assets are PCs, we do not have rights to receive benefits or obligations to absorb losses that could potentially be significant to the trusts because we have already provided a guarantee on the underlying assets Additionally, our involvement with these trusts does not provide any power that would enable us to direct the significant economic activities of these entities Although we may be exposed to prepayment risk through our ownership of the securities issued by these trusts, we do not have the ability through our involvement with the trust to impact the economic risks to which we are exposed. As a result, we have concluded that we are not the primary beneficiary of, and therefore do not consolidate, the resecuritization trusts used for REMICs and Other Structured Securities whose underlying assets are PCs unless we hold a substantial portion of the outstanding beneficial interests that have been issued by the trust and are therefore considered the primary beneficiary of the trust

We receive a transaction fee from third parties for issuing REMICs and Other Structured Securities in exchange for PCs or other mortgage-related assets We defer the portion of the transaction fee that is equal to the estimated value of our future administrative responsibilities for issued REMICs and Other Structured Securities These responsibilities include ongoing trustee services, administration of pass through amounts, paying agent services, tax reporting, and other required services We estimate the value of these future responsibilities based on quotes from third party vendors who perform each type of service and, where quotes are not available, based on our estimates of what those vendors would charge The remaining portion of the transaction fee relates to compensation earned in connection with structuring related services we rendered to third parties and is allocated between REMICs and Other Structured Securities we retain, if any, and the REMICs and Other Structured Securities acquired by third parties, based on the relative fair value of the securities The portion of the fee allocated to any REMICs and Other Structured Securities we retain is deferred as a carrying value adjustment and is amortized into interest income using the effective interest method over the contractual lives of these securities The fee allocated to REMICs and Other Structured Securities acquired by third parties is recognized immediately in earnings as other income

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage related securities that we issue to third parties in exchange for non Freddie Mac mortgage-re ated securities. Other Guarantee Transactions typically involve us purchasing either the senior tranches from a non Freddie Mac senior subordinated securitization or single class pass through securities, placing the acquired assets into a securitization trust, providing a guarantee of the principal and interest of the acquired assets and issuing securities backed by these assets To the extent that we are deemed to be the primary beneficiary of such a securitization trust, we recognize the mortgage loans underlying the Other Guarantee Transaction as mortgage loans held for investment, at amortized cost Correspondingly, we recognize the issued securities held by third parties as debt securities of consolidated trusts However, to the extent we are not deemed to be the primary beneficiary of such a securitization trust, we recognize a guarantee asset, to the extent a management and guarantee fee is charged, and we recognize a guarantee obligation at fair value We do not receive transaction fees, apart from our management and guarantee fee, for these transactions.

### Purchases and Sales of Freddie Mac Mortgage-Related Securities

#### PCs

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish the outstanding debt securities of the re ated consolidated trust We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to redeem the debt differs from carrying value, adjusted for any related purchase commitments accounted for as derivatives

When we sell PCs that have been previously issued by consolidated PC trusts, we recognize a liability to the third party beneficial interest holders of the related consolidated trust as debt securities of consolidated trusts held by third parties. That is, our sale of PCs issued by consolidated PC trusts is accounted for as the issuance of debt, not as the sale of investment securities

#### Single Class REMICs and Other Structured Securities

Our mortgage related securities that we classify as REMICs and Other Structured Securities may be single class or multiclass resecuritization transactions. In REMICs and Other Structured Securities that are single class securities, the collateral includes PCs and single class REMICs and Other Structured Securities We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts. Our single class REMICs and Other Structured Securities pass through all of the cash flows of the underlying PCs directly to the holders of the securities and are

<div align="center">181</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

deemed to be substantially the same as the underlying PCs  As a result, when we purchase single class REMICs and Other Structured Securities, we extinguish a pro rata portion of the  outstanding debt securities of the related PC trust on our  consolidated balance sheets

When we sell single class REMICs and Other Structured  Securities, we recognize a liability to the third party  beneficial interest holders of the related consolidated PC trust as debt securities of consolidated trusts held by third parties.  That is, our sale of single class REMICs and Other Structured Securities, is accounted for as the issuance of debt, not as the  sale of investment securities

*Multiclass REMICs and Other Structured Securities*

In multiclass REMICs and Other Structured Securities, the collateral includes PCs and REMICs and Other Structured  Securities  Generally, PCs serve as the primary type of collateral for these resecuritizations  We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts. In our multiclass REMICs and  Other Structured Securities, the cash flows of the underlying  PCs are divided (*e.g.*, stripped and/or time tranched). Due primarily to this division of cash flows, these  securities are not deemed to be substantially the same as the underlying PCs. As a result, when we purchase multiclass REMICs  and Other Structured Securities, we record these securities as investments in debt securities rather than as the extinguishment  of debt since we are investing in the debt securities of a  non consolidated entity  See "Investments in Securities" for further information regarding our  accounting for investments in multiclass REMICs and Other  Structured Securities  The purchase of these securities is  generally funded through the issuance of unsecured debt to third  parties

We recognize, as assets, both the investment in the multiclass  REMICs and Other Structured Securities and the mortgage loans  backing the PCs held by the trusts which underlie multiclass  REMICs and Other Structured Securities. Additionally, we recognize, as liabilities, the unsecured debt issued to third parties to fund the purchase of  the multiclass REMICs and Other  Structured Securities as well as the debt issued to third parties of the PC trusts we consolidate which underlie  multiclass REMICs and Other Structured Securities. This results  in recognition of interest income from both assets and interest  expense from both liabilities

When we sell multiclass REMICs and Other Structured Securities,  we account for the transfer in accordance with the accounting  standards for transfers of financial assets  To the extent the transfer of multiclass REMICs and Other Structured Securities  qualifies as a sale, we de recognize all assets sold and recognize all assets obtained and liabilities incurred  Any gain  (loss) on the sale of multiclass REMICs and Other Structured Securities is reflected in our consolidated statements of  operations as a component of other gains (losses) on investment  securities  To the extent the transfer of multiclass REMICs and  Other Structured Securities does not qualify as a sale, we  account for the transfer as a financing transaction and recognize a liability for the proceeds received from third  parties in the transfer

**Cash and Cash Equivalents**

Highly liquid investment securities that have an original  maturity of three months or less are accounted for as cash  equivalents. In addition, cash collateral that we have the right to use for general corporate purposes and that we obtain from  counterparties to derivative contracts is recorded as cash and cash equivalents. The vast majority of our cash and cash  equivalents balance is interest bearing in nature

**Restricted Cash and Cash Equivalents**

Cash collateral accepted from counterparties that we do not have  the right to use for general corporate purposes is recorded as  restricted cash in our consolidated balance sheets  Restricted cash includes cash remittances received on the underlying assets  of our consolidated trusts, which are deposited into a separate  custodial account. These cash remittances include both scheduled  and unscheduled principal and interest payments. These funds are segregated and are not commingled with our general operating funds. As securities administrator, we invest the cash held in the custodial account, pending distribution to our PC and REMICs  and Other Structured Securities holders, in short term  investments and are entitled to the interest income earned on  these short term investments, which is recorded as interest  income, other on our consolidated statements of operations  The funds are maintained in this separate custodial account until  they are remitted to the PC and REMICs and Other Structured Securities holders on their respective security payment dates

**Mortgage Loans**

Upon acquisition, we classify a loan as either held for sale or held for investment  Mortgage loans that we have the ability and intent to hold for the foreseeable future are classified as  held for investment  Historically, we classified mortgage loans  that we purchased to use as collateral for future PC and other mortgage related security issuances as held for sale because we intended to  securitize the loans in transactions that qualified for derecognition from our consolidated financial statements and did  not have the intent to hold these loans for the foreseeable  future  Effective January  , 20 0 we were required to  consolidate our single family PC trusts and certain Other  Guarantee Transactions, and, therefore, recognized the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0830

Table of Contents

loans underlying these issuances on our consolidated balance sheets  These consolidated entities do not have the ability to sell mortgage loans and generally are only permitted to hold such loans for the settlement of the corresponding obligations of these entities  As such, loans we acquire and which we intend to securitize using an entity we will consolidate will generally be classified as held for investment both prior to and subsequent to their securitization, in accordance with our intent and ability to hold such loans for the foreseeable future

Held for investment mortgage loans are reported in our consolidated balance sheets at their outstanding UPB, net of deferred fees and other cost basis adjustments (including unamortized premiums and discounts, delivery fees and other pricing adjustments)  These deferred items are amortized into interest income over the contractual lives of the loans using the effective interest method  We recognize interest income on an accrual basis except when we believe the collection of principal or interest is not probable  If the collection of principal and interest is not probable, we cease the accrual of interest income

Mortgage loans not classified as held for investment are classified as held for sale  Held for sale loans are reported at lower of cost or fair value on our consolidated balance sheets  Any excess of a held for sale loan's cost over its fair value is recognized as a valuation allowance in other income on our consolidated statement of operations, with changes in this valuation allowance also being recorded in other income  Premiums, discounts and other cost basis adjustments recognized upon  acquisition on single family loans classified as held for sale are deferred and not amortized  We have elected the fair value option for multifamily mortgage loans purchased through our CME initiative to reflect our strategy in this program  See "NOTE 20: FAIR VALUE DISCLOSURES    Fair Value Election  *Multifamily Held For Sale Mortgage Loans with Fair Value Option Elected*." Thus, these multifamily mortgage loans are measured at fair value on a recurring basis, with subsequent gains or losses related to sales or changes in fair value reported in other income in our consolidated statements of operations

Cash flows related to mortgage loans held by our consolidated trusts are classified as either investing activities (*e.g.*, principal repayments) or operating activities (*e.g.*, interest payments received from borrowers included within net income (loss))  In addition, cash flows related to purchases of mortgage loans held for sale are classified in operating activities  When mortgage loans held for sale are sold or securitized, proceeds from the sale or securitization and any related gain or loss are classified in operating activities

**Allowance for Loan Losses and Reserve for Guarantee Losses**

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses  The allowance for loan losses pertains to all single family and multifamily loans classified as held for investment on our consolidated balance sheets whereas the reserve for guarantee losses relates to single family and multifamily loans underlying our non consolidated Freddie Mac mortgage related securities and other guarantee commitments  Total held for investment mortgage loans, net are shown net of the allowance for loan losses on our consolidated balance sheets  The reserve for guarantee losses is included within other liabilities on our consolidated balance sheets  We recognize incurred losses by recording a charge to the provision for credit losses in our consolidated statements of operations  Determining the adequacy of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant judgment.

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting standards for contingencies  Accordingly, we maintain an allowance for loan losses on mortgage loans held for investment when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated  Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting standards for receivables

For both the single family and multifamily portfolios, we charge off (in full or in part) our recorded investment in a loan in the period it is determined that the loan (or a portion thereof) is uncollectible  This generally occurs at final disposition of the loan; however, it may occur prior to final disposition. For example, a charge off is recorded if a specific loss is realized upon the modification of a loan in a TDR

*Single-Family Loans*

We estimate loan loss reserves on homogeneous pools of single family loans using a statistically based model that evaluates a variety of factors  The homogeneous pools of single family mortgage loans are determined based on common underlying characteristics, including current LTV ratios and trends in home prices, loan product type and geographic region  In determining the loan loss reserves for single family loans at the balance sheet date, we evaluate factors including, but not limited to:

- current LTV ratios and historical trends in home prices;

- loan product type;

<div align="center">183</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- geographic location;

- delinquency history;

- delinquency status;

- loan age;

- sourcing channel;

- occupancy type;

- UPB at origination;

- actual and estimated rates of loss severity for similar loans;

- default experience;

- expected ability to partially mitigate losses through loan modification or other alternatives to foreclosure;

- expected proceeds from mortgage insurance contracts that are contractually attached to a loan or other credit enhancements that were entered into contemporaneous with and in contemplation of a guarantee or loan purchase transaction;

- expected repurchases of mortgage loans by sellers under their obligations to repurchase loans that are inconsistent with certain representations and warranties made at the time of sale;

- counterparty credit of mortgage insurers and seller/servicers;

- pre foreclosure real estate taxes and insurance;

- estimated selling costs should the underlying property ultimately be sold; and

- trends in the timing of foreclosures

Our loan loss reserves reflect our best current estimates of incurred losses Our loan loss reserve estimate includes projections related to strategic loss mitigation activities, including loan modifications for troubled borrowers, and projections of recoveries through repurchases by seller/servicers of defaulted loans due to failure to follow contractual underwriting requirements at the time of the loan origination At an individual loan level, our estimate also considers the effect of home price changes on borrower behavior and the impact of our loss mitigation actions, including our temporary suspensions of foreclosure transfers and our loan modification efforts We apply estimated proceeds from primary mortgage insurance that is contractually attached to a loan and other credit enhancements entered into contemporaneous with and in contemplation of a guarantee or loan purchase transaction as a recovery of our recorded investment in a charged off loan, up to the amount of loss recognized as a charge off Proceeds from credit enhancements received in excess of our recorded investment in charged off loans are recorded as a decrease to REO operations expense in our consolidated statements of operations when received

Our reserve estimate also reflects our best projection of delinquencies we believe are likely to occur as a result of loss events that have occurred through December 31, 2010 and December 3 , 2009, respectively However, the continued weakness in the national housing market, the uncertainty in other macroeconomic factors, and uncertainty of the success of modification efforts under HAMP and other loan workout programs, make forecasting of delinquency rates inherently imprecise The inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases, further declines in home prices, deterioration in the financial condition of our mortgage insurance counterparties, or delinquency rates that exceed our current projections would cause our losses to be significantly higher than those currently estimated

We validate and update the model and factors to capture changes in actual loss experience, as well as the effects of changes in underwriting practices and in our loss mitigation strategies We also consider macroeconomic and other factors that impact the quality of the loans underlying our portfolio including regional housing trends, applicable home price indices, unemployment and employment dislocation trends, consumer credit statistics and the extent of third party insurance We determine our loan loss reserves based on our assessment of these factors

### Multifamily Loans

We determine our loan loss reserves individually for multifamily loans identified as impaired Refer to "Impaired Loans" below for further discussion on individually impaired multifamily loans. The remaining multifamily loans are evaluated collectively for incurred losses based on all available evidence, including but not limited to, operating cash flows from the underlying property as represented by its current DSCR, evaluation of the repayment prospects, and the adequacy of third party credit enhancements In determining our loan loss reserve estimate, we utilize available economic data related to multifamily real estate, including apartment vacancy and rental rates, as well as estimates of loss severity and rates of reperformance

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0832

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Performing Loans**

We classify mortgage loans as non performing and place them on non accrual status when we believe collectibility of interest and principal is not reasonably assured, which generally occurs when a loan is three monthly payments past due, unless the loan is well secured and in the process of collection based upon an individual loan assessment. A loan is considered past due if a full payment of principal and interest is not received within one month of its due date. When a loan is placed on non accrual status, any interest income accrued but uncollected is reversed Thereafter, interest income is recognized only upon receipt of cash payments

A non accrual mortgage loan may be returned to accrual status when the collectibility of principal and interest is reasonably assured. Upon a loan's return to accrual status, amortization of any basis adjustments into interest income is resumed.

**Impaired Loans**

We consider a loan to be impaired when it is probable, based on current information, that we will not receive all amounts due (including both principal and interest), in accordance with the contractual terms of the original loan agreement This assessment is made taking into consideration any more than insignificant delays in the timing of our expected receipt of these amounts

*Single Family*

Individually impaired single family loans include loans that have undergone a TDR Impairment and interest income recognition are discussed separately in the paragraphs that follow. All other single family impaired loans are aggregated and measured collectively for impairment based on similar risk characteristics Collective impairment is measured as described above in the "Allowance for Loan Losses and Reserve for Guarantee Losses    Single Family Loans" section of this note If we determine that foreclosure on the underlying collateral is probable, we measure impairment based upon the fair value of the collateral, as reduced by estimated disposition costs and adjusted for estimated proceeds from insurance and similar sources.

*Multifamily*

Multifamily impaired loans include TDRs, loans three monthly payments or more past due, and loans that are deemed impaired based on management judgment Multifamily loans are measured individually for impairment based on the fair value of the underlying collateral, as reduced by estimated disposition costs, as the repayment of these loans is generally provided from the cash flows of the underlying collateral and any associated credit enhancement Except for cases of fraud and certain other types of borrower defaults, most multifamily loans are non recourse to the borrower so generally the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan Interest income recognition on non TDR multifamily impaired loans is subject to our non accrual policy as discussed in the Non Performing Loans section above

*Troubled Debt Restructurings*

Both single family and multifamily loans which experience a modification to their contractual terms which results in a concession being granted to a borrower experiencing financial difficulties are considered TDRs A concession is deemed granted if the borrower's effective borrowing rate under the terms of the contractual modification is less than the effective borrowing rate prior to the modification In addition, for multifamily loans, we also consider other qualitative factors in determining whether a concession is deemed granted, including whether the borrower's modified interest rate is consistent with that of a non troubled enterprise A concession typically includes one or more of the following being granted to the borrower: (a) a reduction in the contractual interest rate; (b) interest forbearance for a period of time that is not insignificant or forgiveness of accrued but uncollected interest amounts; and (c) a reduction in the principal amount of the loan For loans modified under the MHA Program, the TDR assessment is performed upon successful completion of the trial period at the date the contractual terms of the modified loan become effective

Impairment of a loan having undergone a TDR is measured as the excess of our recorded investment in the loan over the present value of the expected future cash flows, discounted at the loan's original effective interest rate for fixed rate loans or at the loan's effective interest rate prior to modification for adjustable rate loans Our expectation of future cash flows incorporates, among other items, an estimated probability of default which is based on a number of market factors as well as the characteristics of the loan, such as past due status. Subsequent to the modification date, interest income is recognized at the modified interest rate, subject to our non accrual policy as discussed in the Non Performing Loans section above, with all other changes in the present value of expected future cash flows being recognized as a component of the provision for credit losses in our consolidated statement of operations

<div align="center">185</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Investments in Securities**

Investments in securities consist primarily of mortgage related securities. We classify securities as "available for sale" or "trading " We currently have not classified any securities as "held to maturity," although we may elect to do so in the future  In addition, we  elected the fair value option for certain available for sale mortgage related securities, including investments in securities that: (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our  initial recorded investment; or (b) are not of high credit  quality at the acquisition date and are identified as within the  scope of the accounting standards for investments in beneficial  interests in securitized financial assets. Subsequent to our  election, these securities were classified as trading  securities. Securities classified as available for sale and trading are reported at fair value with changes in fair  value included in AOCI and other gains (losses) on investment  securities, respectively  See "NOTE 20: FAIR VALUE DISCLOSURES" for more information on how we determine the  fair value of securities

We record purchases and sales of securities that are  specifically exempt from the requirements of derivatives and  hedge accounting on a trade date basis. Securities underlying forward purchases and sales contracts that are not exempt from  the requirements of derivatives and hedge accounting are recorded on the expected settlement date with a corresponding  commitment recorded on the trade date

When we purchase REMICs and Other Structured Securities and  certain Other Guarantee Transactions that we have issued, we  account for these securities as investments in debt securities  as we are investing in the debt securities of a non  consolidated  entity  We consolidate the trusts that issue these securities when we hold substantially all of the outstanding beneficial  interests issued by the trusts  We recognize interest income on the securities and interest expense on the debt we issued  See "Securitization Activities through Issuances of Freddie Mac  Mo tgage-Re ated Securities    *Purchases and Sales of Freddie Mac Mortgage Related Securities*" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts

In connection with transfers of financial assets that qualified  as sales prior to the adoption of the amendments to accounting  standards on transfers of financial assets and the consolidation  of VIEs, we may have retained individual securities not  transferred to third parties upon the completion of a securitization transaction  These securities may have been  backed by mortgage related assets purchased from our customers, PCs, and REMICs and Other Structured Securities. The securities  we acquired in these transactions were classified as  available for sale or trading and are considered guaranteed investments  Therefore, the fair values of these securities reflect that they are  considered to be of high credit quality and the securities are  not subject to credit related impairments  They are subject to  the credit risk associated with the underlying collateral Therefore, our exposure to credit losses on collateral  underlying our retained securitization interests was recorded  within our reserve for guarantee losses.

For most of our investments in securities, interest income is  recognized using the effective interest method  Deferred items,  including premiums, discounts, and other basis adjustments, are  amortized into interest income over the contractual lives of the  securities

For certain investments in securities, interest income is  recognized using the prospective effective interest method  We  specifically apply this accounting to beneficial interests in  securitized financial assets that: (a) can contractually be  prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment; (b) are not of high credit quality at the acquisition date; or (c) have been  determined to be other than temporarily impaired  We recognize as interest income (over the life of these securities) the excess of all estimated cash flows attributable to these interests over their book value using the  effective interest method  We update our estimates of expected cash flows periodically and recognize changes in the calculated  effective interest rate on a prospective basis

We recognize impairment losses on available for sale securities  within our consolidated statements of operations as net  impairment of available for sale securities recognized in  earnings when we conclude that a decrease in the fair value of a  security is other than temporary  On April 1, 2009, we prospectively adopted an amendment to the accounting standards  for investments in debt and equity securities. This amendment changed the recognition, measurement, and presentation of  other than temporary impairment for debt securities

We conduct quarterly reviews to identify and evaluate each  available for sale security that has an unrealized loss for  other than temporary impairment  An unrealized loss exists when the current fair value of an individual security is less than  its amortized cost basis.

We recognize other than temporary impairment in earnings if one  of the following conditions exists: (a) we have the intent  to sell the security; (b) it is more likely than not that  we will be required to sell the security before recovery of its  unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security  If we do not intend to  sell the security and will not be required to sell the security  prior to recovery of its unrealized loss, we recognize only the  credit component of other than temporary impairment in earnings  and the amounts attributable to all other factors are recognized,

186                                                                                  *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

net of tax, in AOCI  The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security  The evaluation of whether unrealized losses on available for sale securities are other than temporary contemplates numerous factors  We perform an evaluation on a security by security basis considering all available information and our analysis is refined where the current fair value or other characteristics of the security warrant  The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment  See "NOTE 8: INVESTMENTS IN SECURITIES     Impairment Recognition on Investments in Securities" for a discussion of important factors we consider in our evaluation

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of operations as net impairment of available for sale securities recognized in earnings

We elected the fair value option for available for sale securities identified as within the scope of the accounting standards for investments in beneficial interests in securitized financial assets to better reflect the valuation changes that occur subsequent to impairment write downs recorded on these instruments  By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of operations in the period they occur, including increases in value  For additional information on our election of the fair value option, see "NOTE 20: FAIR VALUE DISCLOSURES."

Gains and losses on the sale of securities are included in other gains (losses) on investment securities recognized in earnings, including those gains (losses) reclassified into earnings from AOCI  We use the specific identification method for determining the cost basis of a security in computing the gain or loss

For securities classified as trading or available for sale and those securities where we elected the fair value option, we classify the cash flows as investing activities because we hold these securities for investment purposes  In cases where the transfer of available for sale securities represents a secured borrowing, we classify the related cash flows as financing activities

**Repurchase and Resale Agreements and Dollar Roll Transactions**

We enter into repurchase and resale agreements primarily as an investor or to finance certain of our security positions  Such transactions are accounted for as secured financings because the transferor does not relinquish control over the transferred assets.

We also engage in dollar roll transactions whereby we enter into an agreement to sell and subsequently repurchase (or purchase and subsequently resell) agency securities  When these transactions involve securities issued by consolidated entities, they are treated as issuances and extinguishments of debt  When these transactions involve securities issued by entities we do not consolidate, they are generally treated as purchases and sales as the security initially transferred is not required to be the same or substantially the same as the security subsequently returned

**Debt Securities Issued**

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt

As a result of the adoption of the amendments to the accounting standards on transfers of financial assets and the consolidation of VIEs, we consolidated our single family PC trusts and certain Other Guarantee Transactions in our financial statements commencing January 1, 2010. Consequently, PCs and Other Guarantee Transactions issued by the consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets  The debt securities of our consolidated trusts are prepayable without penalty at any time  Other debt represents short term and long term debt securities that we issue to third parties to fund our general business activities.

Both debt of our consolidated trusts and other debt, except for certain debt for which we elected the fair value option, are reported at amortized cost. Deferred items, including premiums, discounts, and hedging related basis adjustments are reported as a component of total debt, net  Issuance costs are reported as a component of other assets  These items are amortized and reported through interest expense using the effective interest method over the contractual life of the related indebtedness  Amortization of premiums, discounts, and issuance costs begins at the time of debt issuance  Amortization of hedging related basis adjustments is initiated upon the discontinuation of the related hedge relationship

We elected the fair value option on foreign currency denominated debt and certain other debt securities  The change in fair value for debt recorded at fair value is reported as gains (losses) on debt recorded at fair value in our consolidated statements of operations. Upfront costs and fees on foreign currency denominated debt are recognized in earnings as incurred

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0835

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

and not deferred  For additional information on our election of the fair value option, see "NOTE 20: FAIR VALUE DISCLOSURES."

When we purchase a PC or a REMIC and Other Structured Security  that is a single class security from a third party, we extinguish the debt of the related PC trusts and recognize a gain or loss related to the difference between the amount paid to redeem the debt security and its carrying value, adjusted for any related purchase commitments accounted for as derivatives,  in earnings as a component of gains (losses) on extinguishment of debt securities of consolidated trusts  Cash flows related to  debt securities issued by our consolidated trusts are classified as either financing activities (*e.g.*, repayment of principal to PC holders) or operating activities (*e.g.*, interest payments to PC holders included within net income (loss))  Other than interest paid, cash flows related to other  debt are classified as financing activities  Interest paid on other debt is classified as operating activities

When we repurchase or call outstanding other debt, we recognize  a gain or loss related to the difference between the amount paid to redeem the debt security and the carrying value in earnings  as a component of gains (losses) on retirement of other debt  Contemporaneous transfers of cash between us and a creditor in connection with the issuance of a new debt security and  satisfaction of an existing debt security are accounted for as either an extinguishment or a modification of an existing debt security  If the debt securities have substantially different terms, the transaction is accounted for as an extinguishment of the existing debt security  The issuance of a new debt security is recorded at fair value, fees paid to the creditor are expensed and fees paid to third parties are deferred and  amortized into interest expense over the life of the new debt  security using the effective interest method  If the terms of the existing debt security and the new debt security are not  substantially different, the transaction is accounted for as a modification of the existing debt  Fees paid to the creditor are  deferred and amortized over the life of the modified unsecured debt security using the effective interest method and fees paid to  third parties are expensed as incurred

## Derivatives

Derivatives are reported at their fair value on our consolidated  balance sheets  Derivatives in a net asset position, including  net derivative interest receivable or payable, are reported as  derivative assets, net  Similarly, derivatives in a net  liability position, including net derivative interest receivable or payable, are reported as derivative liabilities, net  We offset fair value amounts recognized for the right to reclaim  cash collateral or the obligation to return cash collateral  against fair value amounts recognized for derivative instruments  executed with the same counterparty under a master netting  agreement  Changes in fair value and interest accruals on  derivatives are recorded as derivative gains (losses) in our consolidated statements of operations

We evaluate whether financial instruments that we purchase or issue contain embedded derivatives  In accordance with an  amendment to derivatives and hedging accounting standards  regarding certain hybrid financial instruments, we elected to  measure newly acquired or issued financial instruments that  contain embedded derivatives at fair value, with changes in fair  value recorded in our consolidated statements of operations  At December 31, 2010, we did not have any embedded derivatives  that were bifurcated and accounted for as freestanding  derivatives

At December 31, 2010 and 2009, we did not have any  derivatives in hedge accounting relationships; however, there  are amounts recorded in AOCI related to discontinued cash flow  hedges which are recognized in earnings as the originally  forecasted transactions affect earnings  If it becomes probable the originally forecasted transaction will not occur, the  associated deferred gain or loss in AOCI would be reclassified  to earnings immediately

The changes in fair value of the derivatives in cash flow hedge  relationships are recorded as a separate component of AOCI to  the extent the hedge relationships are effective, and amounts  are reclassified to earnings as the forecasted transaction  affects earnings

In the consolidated statements of cash flows, cash flows related  to the acquisition and termination of derivatives, other than  forward commitments, are generally classified in investing  activities

## REO

REO is initially recorded at fair value less costs to sell and  is subsequently carried at the lower of cost or fair value less  costs to sell  When we acquire REO, losses arise when the carrying basis of the loan (including accrued interest) exceeds  the fair value of the foreclosed property, net of estimated costs to sell and expected recoveries through credit  enhancements  Losses are charged off against the allowance for  loan losses at the time of REO acquisition. REO gains arise and  are recognized immediately in earnings when the fair value of  the foreclosed property less costs to sell plus expected recoveries through credit enhancements exceeds the carrying  basis of the loan (including accrued interest)  Amounts we expect to receive from third party insurance or other credit  enhancements are recorded as receivables when REO is acquired  The receivable is adjusted when the actual claim is filed and is  reported as a component of other assets on our consolidated  balance sheets  Material development and improvement costs relating to REO are capitalized  Operating expenses specifically

<div align="center">188</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from the use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

identifiable with an REO property are included in REO operations income (expense); all other expenses are recognized within other administrative expenses in our consolidated statement of operations  Estimated declines in REO fair value that result from ongoing valuation of the properties are provided for and charged to REO operations income (expense) when identified  Any gains and losses from REO dispositions are included in REO operations income (expense)

## Income Taxes

We use the asset and liability method of accounting for income taxes under GAAP. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates as well as tax net operating loss and tax credit carryforwards  To the extent tax laws change, deferred tax assets and liabilities are adjusted, when necessary, in the period that the tax change is enacted  Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized  The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years, from current operations and from unrecognized tax benefits, and upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses  On a quarterly basis, our management determines whether a valuation allowance is necessary  In so doing, our management considers all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized  Our management determined that, as of December 31, 2010 and 2009, it was more likely than not that we would not realize the portion of our net deferred tax  assets that is dependent upon the generation of future taxable income. This determination was driven by events and the resulting uncertainties that existed as of December 3 , 2010 and 2009  For more information about the evidence that management considers and our determination of the need for a valuation allowance, see "NOTE 14: INCOME TAXES."

Regarding tax positions taken or expected to be taken (and any associated interest and penalties), we recognize a tax position so long as it is more likely than not that it will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position  We measure the tax position at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement  See "NOTE 14: INCOME TAXES" for additional information

Income tax benefit (expense) includes: (a) deferred tax benefit (expense), which represents the net change in the deferred tax asset or liability balance during the year plus any change in a valuation allowance; and (b) current tax benefit (expense), which represents the amount of tax currently payable to or receivable from a tax authority including any related interest and penalties plus amounts accrued for unrecognized tax benefits (also including any related interest and penalties)  Income tax benefit (expense) excludes the tax effects related to adjustments recorded to equity

## Earnings Per Common Share

Because we have participating securities, we use the "two class" method of computing earnings per common share  The "two class" method is an earnings allocation formula that determines earnings per share for common stock and participating securities based on dividends declared and participation rights in undistributed earnings. Our participating securities consist of: (a) vested and unvested options to purchase common stock; and (b) restricted stock units that earn dividend equivalents at the same rate when and as declared on common stock

Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period  The weighted average common shares outstanding for our basic earnings per share calculation includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost of $0 00001 per share  Diluted earnings per common share is determined using the weighted average number of common shares during the period, adjusted for the dilutive effect of common stock equivalents. Dilutive common stock equivalents reflect the assumed net issuance of additional common shares pursuant to certain of our stock based compensation plans that could potentially dilute earnings per common share

## Comprehensive Income

Comprehensive income is the change in equity, on a net of tax basis, resulting from transactions and other events and circumstances from non owner sources during a period  It includes all changes in equity during a period, except those resulting from investments by stockholders. We define comprehensive income as consisting of net income (loss) plus changes in: (a) the unrealized gains and losses on available for sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans

TREASURY-0837

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                        Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Recently Issued Accounting Standards, Not Yet Adopted Within These Consolidated Financial Statements**

*Accounting for Multiple-Deliverable Arrangements*

In October 2009, the FASB issued an amendment to the accounting standards on revenue recognition for multiple deliverable revenue arrangements  This amendment changes the criteria for separating consideration in multiple deliverable arrangements and establishes a selling price hierarchy for determining the selling price of a deliverable  It eliminates the residual method of allocation and requires that arrangement consideration be allocated at the inception of the arrangement to all deliverables using the relative selling price method  This amendment is effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010, with earlier adoption permitted  Our adoption of this amendment on January 1, 2011 is not expected to have a material impact on our consolidated financial statements in 2011.

## NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES

**Accounting for Transfers of Financial Assets and Consolidation of VIEs**

In June 2009, the FASB issued two new accounting standards that amended guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs. The guidance in these standards is effective for fiscal years beginning after November 15, 2009. The accounting standard for transfers of financial assets is applicable on a prospective basis to new transfers, while the accounting standard relating to consolidation of VIEs must be applied prospectively to all entities within its scope as of the date of adoption  Effective January 1, 2010, we prospectively adopted these new accounting standards.

We use securitization trusts in our securities issuance process. Prior to January 1, 2010, these trusts met the definition of QSPEs and were not subject to consolidation  Effective January 1, 2010, the concept of a QSPE was removed from GAAP and entities previously considered QSPEs were required to be evaluated for consolidation  Based on our consolidation evaluation, we determined that we are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. As a result, a large portion of our off balance sheet assets and liabilities prior to January 1, 2010 have been consolidated  Effective January 1, 2010, we consolidated these trusts and recognized the assets and liabilities at their UPB, with accrued interest, allowance for credit losses or other than temporary impairments recognized as appropriate, using the practical expedient permitted upon adoption since we determined that calculation of historical carrying values was not practical.  Other newly consolidated assets and liabilities that either do not have a UPB or are required to be carried at fair value were measured at fair value  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Consolidation and Equity Method of Accounting" for a discussion of our assessment to determine whether we are considered the primary beneficiary of a trust and thus need to consolidate it. As such, we recognized on our consolidated balance sheets the mortgage loans underlying our issued single family PCs and certain Other Guarantee Transactions as mortgage loans held for investment by consolidated trusts, at amortized cost  We also recognized the corresponding single family PCs and certain Other Guarantee Transactions held by third parties on our consolidated balance sheets as debt securities of consolidated trusts held by third parties. After January 1, 2010, new consolidations of trust assets and liabilities are recorded at either their: (a) carrying value if the underlying assets are contributed by us to the trust and consolidated at the time of transfer; or (b) fair value for the assets and liabilities that are consolidated under the securitization trusts established for our guarantor swap program, rather than their UPB.

In light of the consolidation of our single family PC trusts and certain Other Guarantee Transactions as discussed above, effective January 1, 20 0 we elected to change the amortization method for deferred items (*e.g.*, premiums, discounts, and other basis adjustments) related to mortgage loans and investments in securities  We made this change to align the amortization method for these assets with the amortization method for deferred items associated with the related liabilities  As a result of this change, deferred items are amortized into interest income using an effective interest method over the contractual lives of these assets instead of the estimated life that was used for periods prior to 2010  It was impracticable to retrospectively apply this change to prior periods, so we recognized this change as a cumulative effect adjustment to the opening balance of retained earnings (accumulated deficit), and future amortization of these deferred items will be recognized using this new method  The effect of the change in the amortization method for deferred items was immaterial to our consolidated financial statements in 2010

The cumulative effect of these changes in accounting principles was a net decrease of $11 7 billion to total equity (deficit) as of January 1, 2010, which includes changes to the opening balances of retained earnings (accumulated deficit) and AOCI. This net decrease was driven principally by: (a) the elimination of unrealized gains resulting from the extinguishment of PCs held as investment securities upon consolidation of the PC trusts, representing the difference between the UPB of the loans underlying the PC trusts and the fair value of the PCs, including premiums, discounts, and other basis adjustments; (b) the elimination of the guarantee asset and guarantee obligation established for guarantees issued to

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

TREASURY-0838

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securitization trusts we consolidated; and (c) the application of our non accrual policy to single family seriously delinquent mortgage loans consolidated as of January 1, 2010.

<div align="center">191</div>

*Freddie Mac*

TREASURY-0839

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Impacts on Consolidated Balance Sheets*

The effects of these changes are summarized in Table 2 1 below  Table 2 1 also illustrates the impact on our consolidated balance sheets of our adoption of these changes in accounting principles

**Table 2.1    Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet**

| | December 31, 2009(1) | Consolidation of VIEs | Reclassifications and Eliminations | January 1, 2010 |
|---|---|---|---|---|
| | | | (in millions) | |
| **Assets** | | | | |
| Cas  a d cas  eq  va e  s | $ 64,683 | $ | $         (1) | $  64,682 |
| Res  c ed cas  a d cas  equ va en s(2 | 527 | 14,982 | | 15,509 |
| Fede a  f ds so d a d sec   es p c ased  de ag ee  e s o rese (3 | 7,000 | 7,500 | | 14,500 |
| *Investments in securities (4)* | | | | |
| Ava lable-fo -sale, a  fa  value | 384,684 | | (128,452) | 256,232 |
| T ad g, a  fa  va e | 222,250 | | (158,089) | 64,161 |
| *Total investments in securities* | 606,934 | | (286,541) | 320,393 |
| *Mortgage loans* | | | | |
| Held-fo - nves men , a amo  zed cos | | 1,812,871 | (32,192) | 1,780,679 |
| Unsecu  zed, ne  of a owance fo  oan losses(7 | 111,565 | | 11,632 | 123,197 |
| To al held-fo - nves men mo gage loans, ne | 111,565 | 1,812,871 | (20,560) | 1,903,876 |
| He d-fo -sa e, a  owe -of-cos -o -fa -va ue(7 | 16,305 | | (13,506) | 2,799 |
| *Total mortgage loans, net* | 127,870 | 1,812,871 | (34,066) | 1,906,675 |
| Acc ed  e es  ece vab e(8) | 3,376 | 8,891 | (2,723) | 9,544 |
| De va  ve asse s,  e | 215 | | | 215 |
| Rea  es a e ow ed,  e | 4,692 | 147 | | 4,839 |
| Defe  ed tax assets,  et | 11,101 | | 1,445 | 12,546 |
| *Other assets* | | | | |
| G a a  tee asset, at fa   va ue(9 | 10,444 | | (10,024) | 420 |
| O he  (10) | 4,942 | 7,549 | (3,789) | 8,702 |
| *Total other assets* | 15,386 | 7,549 | (13,813) | 9,122 |
| *Total assets* | $841,784 | $1,851,940 | $    (335,699) | $2,358,025 |
| **L ab l  es and equ  y (def c )** | | | | |
| *Liabilities* | | | | |
| Acc ed  e es payable(11) | $  5,047 | $  8,630 | $     (1,446) | $   12,231 |
| *Debt, net:* | | | | |
| Deb  sec   es of co so da ed   ss e d by   d pa  es(12) | | 1,843,195 | (276,789) | 1,566,406 |
| O he  deb | 780,604 | | | 780,604 |
| *Total debt, net* | 780,604 | 1,843,195 | (276,789) | 2,347,010 |
| De va  ve l ab l  es, ne | 589 | | | 589 |
| *Other Liabilities:* | | | | |
| G a a  ee ob ga on(9 | 12,465 | | (11,823) | 642 |
| Rese ve fo  gua an ee losses on Pa   c pa on Ce   f ca es(6 | 32,416 | | (32,192) | 224 |
| O he | 6,291 | 115 | (1,746) | 4,660 |
| *Total other liabilities* | 51,172 | 115 | (45,761) | 5,526 |
| *Total liabilities* | 837,412 | 1,851,940 | (323,996) | 2,365,356 |
| Comm  men s and con  ngenc es | | | | |
| *Equity (deficit)* | | | | |
| *Freddie Mac stockholders' equity (deficit)* | | | | |
| Sen o  pefe  ed s ock, a  edemp on va ue | 51,700 | | | 51,700 |
| P efe  ed s ock, a  edemp on va ue | 14,109 | | | 14,109 |
| Common s ock, $0 00 pa  va ue | | | | |
| Add  onal pa d- n cap al | 57 | | | 57 |
| Re a ned ea n ngs (accumu a ed def c )(13) | (33,921) | | (9,011) | (42,932) |
| *AOCI, net of taxes, related to:* | | | | |
| Ava  ab e-fo -sa e secu  es(1 ) | (20,616) | | (2,683) | (23,299) |
| Cash flow hedge  ela  onsh ps | (2,905) | | (7) | (2,912) |
| Def ned benef  p ans | (127) | | | (127) |
| *Total AOCI, net of taxes* | (23,648) | | (2,690) | (26,338) |
| T eas  y stock, at cost | (4,019) | | | (4,019) |
| *Total Freddie Mac stockholders' equity (deficit)* | 4,278 | | (11,701) | (7,423) |
| Noncon  oll ng n e es | 94 | | (2) | 92 |
| *Total equity (deficit)* | 4,372 | | (11,703) | (7,331) |
| *Total liabilities and equity (deficit)* | $841,784 | $1,851,940 | $    (335,699) | $2,358,025 |

(1)  Ce a n Dece  be  31, 2009 a  oun s p esen ed n ou  conso da ed ba ance shee  w h n h s Fo m 10-K  eflec  eclass f ca ons n connec on w h he adop on of amendmen s o he accoun ng s anda ds fo   ansfe s of f nanc al asse s and consol da on of VIEs effec ve Ja  a y 1, 2010

(2)  We  ecogn ze he cash he d by  us s fo  ou  s ng e-fam  y PCs and ce  a n O  Gua an ee T ansac ons as es  c ed cas  and cash equ va en s on ou  conso da ed ba a ce shee s T s adj s e  ep ese a o s  a  ay o ybe sed o se e he ob ga ons of ou  conso da ed  us s

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0840

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011        TREASURY-0841        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(3) We recognize federal funds sold and securities purchased under agreements to resell held by our single-family PC trusts and certain Other Guarantee Transactions on our consolidated balance sheets. These adjustments represent a resale on a reporting basis to reduce the risk of loss on a portion of our consolidated assets.

(4) We no longer account for these single-family PCs and certain Other Guarantee Transactions that we hold as investments in securities because we consolidate the related trusts; therefore, we eliminated UPB amounts of approximately $123.8 billion and $150.1 billion on related investments in securities held by us across all classes of assets as of the consolidated trusts. Additionally, we eliminated $12.6 billion of basis adjustments (e.g., purchase discount) and changes in fair value, which adjust the carrying amount of these investments on our consolidated balance sheet. See also note 14, which discusses these amounts as moved from AOCI to income at adoption.

(5) On consolidation of our single-family PCs and certain Other Guarantee Transactions, we recognized $1.8 billion of mortgage loans held-for-investment contained in these consolidated trusts.

(6) We no longer established the asset related to guarantee losses on PCs and Other Guarantee Transactions accompanied by the asset and the allowance for loan losses against the mortgage loans held-for-investment. Also, we no longer recognize the asset and the allowance for loan losses as income. On consolidation of our single-family PCs and Other Guarantee Transactions, we eliminated the reclassified allowance for loan losses related to our mortgage loans held-for-investment. We continue to recognize the asset related to guarantee losses related to our guarantee commitments and guarantees issued to non-consolidated entities when those are probable.

(7) We reclassified all unsecuritized single-family mortgage loans held-for-investment having a carrying amount of $13.4 billion on held-for-investment to January 1, 2010, as these loans were held by us as securitized, or became a shelf of securitization or loans that we would consolidate. Additionally, we eliminated $1.8 billion of unsecuritized mortgage loans held-for-investment based on a status of loans that we previously purchased from single-family PC trusts upon consolidation that had not yet been purchased. We reclassified our previously acquired or recognized these loans as assets. Several previously recognized these loans became securitized of guarantee case these loans provided and to which effective recognition over time became as consolidated as assets as of our single-family mortgage loans. As of January 1, 2010, the held-for-sale loans arise in mortgage loans held-for-investment and $81 million on related loans held-for-sale as a result as of January 1, 2010, a held-for-sale loans are in family mortgage loans.

(8) The consolidation of VIEs includes $8.9 billion of accrued interest, which represents the aggregate amount of interest receivable on the mortgage loans held by these consolidated entities. Additionally, we eliminated $1.4 billion of interest receivable as it is securitized by these consolidated entities and by us as of December 31, 2009 (see endnote 4 above). We eliminated on consolidation, and $1.3 billion on related new financial application on our corporate non-accrual policy of these newly consolidated mortgage options.

(9) We eliminated the guarantee asset and guarantee obligations for guarantee fees issued on these loans as we have consolidated. We continue to recognize a guarantee asset and guarantee obligation for guarantee fees on these guarantee commitments and guarantees issued to non-consolidated entities.

(10) The consolidation of VIEs includes $5.1 billion of other receivables for services from payments received from the loans. These are serviced in order to be a fair value over by these loans to them eliminated on our reclassified as to as a required receipt to eliminated reclassified on consolidated balance sheets, of which of related cash receipts as the collection asset of first assets of first (see also note 7, above), a $0.6 billion on other receivables from us in our capacity as guarantor. We eliminated the $2.4 billion on aggregate amount of these consolidated interests in the proceeds received upon service, upon consolidation, the amount represents an incompany transaction on, $1.0 billion of other receivables for principal payments related to investments in securities issued by these consolidated entities and held by us as of December 31, 2009 (see endnote 4 above) have we eliminated on consolidation on, $353 million on guarantee fee-related credit enhancements which the consolidated VIEs, and $2 million of other receivables as asset related to LIHTC partnerships as we deconsolidated.

(11) The consolidation of VIEs includes $8.6 billion on accrued interest payable related to other debt securities issued by these consolidated securitizations on us. When we eliminated on consolidation on $1.4 billion of interest payable related to investment in securities issued by these consolidated entities and by us as of December 31, 2009 (see endnote 4 above).

(12) On consolidation of our single-family PCs and certain Other Guarantee Transactions, we recognized $1.8 billion of debt securities issued by these securitizations on us. We eliminated UPB amount of $273.9 billion of other securities as a whole of securities issued by us (see endnote 4 above) and $1.0 billion of principal repayments as we due to related loan payable to other securities issued by us to December 31, 2009.

(13) We recorded a decrease to retained earnings (accumulated deficit) at adoption principally by (a) the elimination on of unrealized gains resulting from the existing shift of PCs to the extent derivatives and securities exposed to change of PC loss, representing the difference between the UPB of the loans and the carrying value fair costs proceeds on consolidation and the fair value of the PCs, changes to prices, discounts, and other basis adjustments (b) the elimination of the guarantee asset and guarantee obligations established for guarantee fees on us to securities on consolidated at (c) the application on of our non-accrual policy to previously delinquent single-family mortgage loans consolidated as of January 1, 2010.

(14) We eliminated unrealized gains (net of deferred tax amounts) previously recorded in AOCI related to available-for-sale securities issued by securitizations on us that we have consolidated.

## Impacts on Consolidated Statements of Operations

Prospective adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of operations. These impacts are discussed below:

### Line Items No Longer Separately Presented:

Line items that are no longer separately presented on our consolidated statements of operations include:

- Management and guarantee income — we no longer recognize management and guarantee income on PCs and Other Guarantee Transactions issued by trusts that we have consolidated; rather, the portion of the interest collected on the underlying loans that represents our management and guarantee fee is recognized as part of interest income on mortgage loans. We continue to recognize management and guarantee income related to our other guarantee commitments and guarantees issued to non-consolidated entities in other income;

- Gains (losses) on guarantee asset and income on guarantee obligation — we no longer recognize a guarantee asset and a guarantee obligation for guarantees issued to trusts that we have consolidated; therefore, we also no longer recognize gains (losses) on guarantee asset and income on guarantee obligation for such trusts. However, we continue to recognize a guarantee asset and a guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities and the corresponding gains (losses) on guarantee asset and income on guarantee obligation, which are recorded in other income;

- Losses on loans purchased — we no longer recognize the acquisition of loans from PC trusts that we have consolidated as a purchase with an associated loss, as these loans are already reflected on our consolidated balance sheet. Instead, when we acquire a loan from these entities, we reclassify the loan from mortgage loans held for investment by consolidated trusts to unsecuritized mortgage loans held for investment and record the cash tendered as an extinguishment of the related PC debt within debt securities of consolidated trusts held by third parties.

Source: FREDDIE MAC, LOAN MORTGAGE CORP, 10-K, February 24, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0843

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We continue to recognize losses on loans purchased related to our other guarantee commitments and losses from purchases of loans from non consolidated entities in other expenses;

- Recoveries of loans impaired upon purchase    as these acquisitions of loans from PC trusts that we have consolidated are no longer treated as purchases for accounting purposes,  there will be no recoveries of such loans related to consolidated VIEs that require recognition in our consolidated statements of operations; and

- Trust management income    we no longer recognize trust management income from the single family PC trusts that we consolidate; rather, such amounts are now recognized in net interest income

See "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" for further information regarding line items that are no longer separately presented on our consolidated financial statements

*Line Items Significantly Impacted and Still Separately Presented:*

Line items that were significantly impacted and that continue to be separately presented on our consolidated statements of operations include:

- Interest income on mortgage loans    we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate, which includes the portion of interest that was historically recognized as management and guarantee income  Upfront credit related and other fees received in connection with such loans historically were treated as a component of the related guarantee obligation; prospectively, these fees are treated as basis adjustments to the loans to be amortized over their respective lives as a component of interest income on mortgage loans;

- Interest income on investments in securities    we no longer recognize interest income on our investments in the PCs and Other Guarantee Transactions issued by trusts that we consolidate, as we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate;

- Interest expense    we now recognize interest expense on PCs and Other Guarantee Transactions that were issued by trusts that we consolidate and are held by third parties; and

- Other gains (losses) on investments    we no longer recognize other gains (losses) on investments for single family PCs and certain Other Guarantee Transactions because those securities are no longer accounted for as investments by us as a result of our consolidation of the related trusts

*Newly Created Line Item:*

The following line item has been added to our consolidated statements of operations:

- Gains (losses) on extinguishment of debt securities of consolidated trusts    we record the purchase of PCs, REMICs and Other Structured Securities that are single class securities, and certain Other Guarantee Transactions as an extinguishment of outstanding debt with a gain or loss recorded to this line item  The gain or loss recognized is the difference between the amount paid to redeem the debt and its carrying value, adjusted for any related purchase commitments accounted for as derivatives. As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," REMICs and Other Structured Securities that are single class securities pass through all of the cash flows of the underlying PCs directly to the holders and are deemed to be substantially the same as the underlying PCs. We are not deemed to be the primary beneficiary for the related trusts and thus we do not consolidate them

**Impacts on Consolidated Statements of Cash Flows**

The adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of cash flows  At transition when we consolidated our single family PCs and certain Other Guarantee Transactions, there was significant non cash activity. Table 2.1 contains a summary of the impacts recorded when we adopted these changes in accounting principles  All of the activity in the columns titled "Consolidation of VIEs" and "Reclassifications and Eliminations" were non cash changes

**Other Changes in Accounting Principles**

***Scope Exception Related to Embedded Credit Derivatives***

In March 2010, the FASB issued an amendment to the accounting standards for derivatives and hedging to clarify the scope exception for embedded credit derivatives  The amendment provides that embedded credit derivatives created by the subordination of one financial instrument to another qualify for the scope exception and should not be subject to potential bifurcation and separate accounting  Other embedded credit derivative features are considered embedded derivatives and subject to potential bifurcation, provided that the overall contract is not a derivative in its entirety. This amendment was effective for fiscal quarters beginning after June 15, 2010 with early adoption permitted  Our adoption of this amendment beginning in the third quarter of 2010 did not have an impact to our consolidated financial statements

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0844

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Change in the Impairment Model for Debt Securities

On April 1, 2009, we prospectively adopted an amendment to the accounting standards for investments in debt and equity securities. This amendment changed the recognition, measurement, and presentation of other than temporary impairment for debt securities  To determine whether an other than temporary impairment exists, we assess whether we intend to sell or more likely than not will be required to sell the security prior to its anticipated recovery  The entire amount of other than temporary impairment related to securities which we intend to sell or for which it is more likely than not that we will be required to sell, is recognized in our consolidated statements of operations as net impairment on available for sale securities recognized in earnings  For securities that we do not intend to sell or for which it is not more likely than not that we will be required to sell, but for which we do not expect to recover the securities' amortized cost basis, the amount of other than temporary impairment is separated between amounts recorded in earnings or AOCI  Other than temporary impairment amounts related to credit loss are recognized in net impairment of available for sale securities recognized in earnings and the amounts attributable to all other factors are recorded to AOCI

As a result of the adoption, we recognized a cumulative effect adjustment, net of tax, of $15.0 billion to our opening balance of retained earnings (accumulated deficit) on April 1, 2009, with a corresponding adjustment of $(9.9) billion, to AOCI. The cumulative adjustment reclassifies the non credit component of previously recognized other than temporary impairments from retained earnings to AOCI  The difference between these adjustments of $5 1 billion primarily represents the release of the valuation allowance previously recorded against the deferred tax asset that is no longer required upon adoption of this amendment  See "NOTE 8: INVESTMENTS IN SECURITIES" for further disclosures regarding our investments in securities and other than temporary impairments

### The Fair Value Option for Financial Assets and Financial Liabilities

On January 1, 2008, we adopted the accounting standard related to the fair value option for financial assets and financial liabilities, which permits entities to choose to measure many financial instruments and certain other items at fair value that are not required to be measured at fair value  The effect of the first measurement to fair value was reported as a cumulative effect adjustment to the opening balance of retained earnings (accumulated deficit)  We elected the fair value option for foreign currency denominated debt and certain available for sale mortgage related securities, including investments in securities identified as within the scope of the accounting standards for investments in beneficial interests in securitized financial assets  Our election of the fair value option for the items discussed above was made in an effort to better reflect, in the financial statements, the economic offsets that exist related to items that were not previously recognized as changes in fair value through our consolidated statements of operations  As a result of the adoption, we recognized a $  0 billion after tax increase to our beginning retained earnings (accumulated deficit) at January 1, 2008, representing the effect of changing our measurement basis to fair value for the above items with the fair value option elected  During the third quarter of 2008, we elected the fair value option for certain multifamily held for sale mortgage loans  For additional information on the election of the fair value option, see "NOTE 20: FAIR VALUE DISCLOSURES."

### NOTE 3: CONSERVATORSHIP AND RELATED MATTERS

**Entry Into Conservatorship**

On September 6, 2008, the Director of FHFA placed us into conservatorship. On September 7, 2008, Treasury and FHFA announced several actions regarding Freddie Mac and Fannie Mae  These actions included the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

**Business Objectives**

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets  The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day to day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0845

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our business objectives and strategies have in some cases been  altered since we were placed into conservatorship, and may  continue to change  These changes to our business objectives and  strategies may not contribute to our profitability  Based on our charter, public statements from Treasury and FHFA officials and guidance from our Conservator, we have a variety of different,  and potentially competing, objectives, including:

- providing liquidity, stability and affordability in the mortgage  market;

- continuing to provide additional assistance to the struggling  housing and mortgage markets;

- reducing the need to draw funds from Treasury pursuant to the  Purchase Agreement;

- returning to long term profitability; and

- protecting the interests of taxpayers

In a letter to the Chairmen and Ranking Members of the Senate  Banking and House Financial Services Committees dated  February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets,  minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified  weaknesses in corporate operations and risk management, and  ensuring that sound corporate governance principles are  followed  The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking  actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new  products is inconsistent with the goals of the conservatorship

These objectives create conflicts in strategic and day to day  decision making that will likely lead to suboptimal outcomes for  one or more, or possibly all, of these objectives  We regularly receive direction from our Conservator on how to pursue our  objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage  markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions,  including the purchase or sale of certain assets, which we  believe may have had a beneficial impact on our results of  operations or financial condition, if executed  Our inability to  execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury  However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets  and to have adequate liquidity to conduct our normal business  activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our  Conservator have placed on Freddie Mac in addressing housing and  mortgage market conditions and our public mission, we may  be  required to take additional actions that could have a negative  impact on our business, operating results, or financial condition  The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage related investments portfolio, except for purchases  of seriously delinquent mortgages out of PC pools  We are also subject to limits on the amount of assets we can sell from our  mortgage related investments portfolio in any calendar month  without review and approval by FHFA and, if FHFA determines,Treasury.

Certain changes to our business objectives and strategies are  designed to provide support for the mortgage market in a manner  that serves our public mission and other non financial  objectives, but may not contribute to our profitability  Some of these changes increase our expenses, while others require us to forego revenue or other opportunities  In addition, the  objectives set forth for us under our charter and by our  Conservator, as well as the restrictions on our business under  the Purchase Agreement, have adversely impacted and may continue  to adversely impact our financial results, including our segment  results  For example, our efforts to help struggling homeowners  and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may  increase our expenses or require us to forgo revenue  opportunities in the near term  There is significant uncertainty as to the ultimate impact that our efforts to aid the housing  and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity  needs  We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program,  which has increased, and will continue to increase, our  expenses  We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA  Program efforts may be offset, if at all, by the prevention or  reduction of potential future costs of loan defaults and  foreclosures due to these initiatives

There is significant uncertainty as to whether or when we will  emerge from conservatorship, as it has no specified termination  date, and as to what changes may occur to our business structure  during or following our conservatorship, including whether we  will continue to exist  Our future structure and role will be  determined by the Obama Administration and Congress  We have no ability to predict the outcome of these deliberations

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in  a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends  winding

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0846

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors Our future draws are dictated by the terms of the Purchase Agreement Any actions we take will likely require approval by FHFA and Treasury before they are implemented FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

**Purchase Agreement**

*Overview*

The Conservator, acting on our behalf, entered into the Purchase Agreement on September 7, 2008 The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009 Under the December 2009 amendment to the Purchase Agreement, the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009) In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws

The Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us after any quarter in which we have a negative net worth (that is, our total liabilities exceed our total assets, as reflected on our GAAP balance sheet) In addition, the Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us if the Conservator determines, at any time, that it will be mandated by law to appoint a receiver for us unless we receive these funds from Treasury In exchange for Treasury's funding commitment, we issued to Treasury, as an aggregate initial commitment fee: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant We received no other consideration from Treasury for issuing the senior preferred stock or the warrant.

Under the terms of the Purchase Agreement, Treasury is entitled to a dividend of 10% per year, paid on a quarterly basis (which increases to 12% per year if not paid timely and in cash) on the aggregate liquidation preference of the senior preferred stock, consisting of the initial liquidation preference of $1 billion plus funds we receive from Treasury and any

<div align="center">197</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

dividends and commitment fees not paid in cash  To the extent we draw on Treasury's funding commitment, the liquidation preference of the senior preferred stock is increased by the  amount of funds we receive  The senior preferred stock is senior  in liquidation preference to our common stock and all other series of preferred stock

In addition to the issuance of the senior preferred stock and  warrant, we are required under the Purchase Agreement to pay a  quarterly commitment fee to Treasury  Under the Purchase Agreement, the fee is to be determined in an amount mutually  agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years  We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the  liquidation preference of the senior preferred stock  Treasury  may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the  U S  mortgage market  The fee was originally scheduled to commence on March 31, 2010, but was delayed until  March 31, 2011 pursuant to an amendment to the Purchase Agreement  Treasury waived the fee for the first quarter of 2011, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment  Treasury stated that it would reevaluate whether the quarterly commitment fee should be set in the second quarter of 2011  Absent Treasury waiving the commitment fee in the second quarter of 2011, this quarterly commitment fee will begin accruing on April 1, 2011 and must be paid each quarter for as long as  the Purchase Agreement is in effect  The amount of the fee has  not yet been determined and could be substantial

Under the Purchase Agreement, our ability to repay the  liquidation preference of the senior preferred stock is limited  and we may not be able to do so for the foreseeable future, if at all  The aggregate liquidation preference of the senior  preferred stock and our related dividend obligations will increase further if we receive additional draws under the  Purchase Agreement or if any dividends or quarterly commitment  fees payable under the Purchase Agreement are not paid in cash  The amounts payable for dividends on the senior preferred stock  are substantial and will have an adverse impact on our financial  position and net worth

The payment of dividends on our senior preferred stock in cash  reduces our net worth  For periods in which our earnings and  other changes in equity do not result in positive net worth, draws  under the Purchase Agreement effectively fund the cash  payment of senior preferred dividends to Treasury. It is unlikely that, over the long term, we will generate net income  or comprehensive income in excess of our annual dividends payable to Treasury, although we may experience period to period  variability in earnings and comprehensive income. As a result,  we expect to make additional draws in future periods.

While we are not aware of any current plans of our Conservator  to significantly change our business model or capital structure  in the near term, there are likely to be significant changes  beyond the near term that we expect to be decided by the Obama  Administration and Congress.

The Purchase Agreement includes significant restrictions on our  ability to manage our business, including limiting the amount of indebtedness we can incur and capping the size of our  mortgage related investments portfolio  While the senior  preferred stock is outstanding, we are prohibited from paying dividends (other than on the senior preferred stock) or issuing  equity securities without Treasury's consent.

The Purchase Agreement has an indefinite term and can terminate  only in limited circumstances, which do not include the end of  the conservatorship  The Purchase Agreement therefore could  continue after the conservatorship ends. Treasury has the right  to exercise the warrant, in whole or in part, at any time on or  before September 7, 2028

### Purchase Agreement Covenants

The Purchase Agreement provides that, until the senior preferred  stock is repaid or redeemed in full, we may not, without the  prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any  other distribution with respect to any Freddie Mac equity  securities (other than with respect to the senior preferred  stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac  equity securities (other than the senior preferred stock or  warrant);

- sell or issue any Freddie Mac equity securities (other than the  senior preferred stock, the warrant and the common stock  issuable upon exercise of the warrant and other than as required  by the terms of any binding agreement in effect on the date of  the Purchase Agreement);

- terminate the conservatorship (other than in connection with a  receivership);

- sell, transfer, lease or otherwise dispose of any assets, other  than dispositions for fair market value: (a) to a limited  life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of  business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash  equivalents for

198                                                                                                                                  *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                                       Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage related investments portfolio beginning in 2010;

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement

The covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with a UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 3 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 3 of the immediately preceding calendar year, provided that we are not required to own less than $250 billion in mortgage assets. Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 20% of the amount of mortgage assets we are permitted to own on December 3 of the immediately preceding calendar year The mortgage asset and indebtedness limitations are determined without giving effect to any change in the accounting standards related to transfers of financial assets and consolidation of VIEs or any similar accounting standard. Therefore, these limitations were not affected by our implementation of the changes to the accounting standards for transfers of financial assets and consolidation of VIEs, under which we consolidated our single family PCs and certain Other Guarantee Transactions in our financial statements as of January 1, 2010.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

We are required under the Purchase Agreement to provide annual reports on Form 10 K, quarterly reports on Form 0 Q and current reports on Form 8 K to Treasury in accordance with the time periods specified in the SEC's rules In addition, our designated representative (which, during the conservatorship, is the Conservator) is required to provide quarterly certifications to Treasury concerning compliance with the covenants contained in the Purchase Agreement and the accuracy of the representations made pursuant to the agreement We also are obligated to provide prompt notice to Treasury of the occurrence of specified events, such as the filing of a lawsuit that would reasonably be expected to have a material adverse effect

### Warrant Covenants

The warrant we issued to Treasury includes, among others, the following covenants: (a) our SEC filings under the Exchange Act will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder; (b) we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights; (c) we may not take any action that will result in an increase in the par value of our common stock; (d) we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and (e) we must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant

### Termination Provisions

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (a) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guarantee obligations); and (c) the funding by Treasury of the maximum amount of the commitment under the Purchase Agreement In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011                    TREASURY-0849                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Waivers and Amendments

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations

### Third party Enforcement Rights

In the event of our default on payments with respect to our debt securities or Freddie Mac mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Freddie Mac mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment  Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

### Impact of the Purchase Agreement and FHFA Regulation on the Mortgage Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion  As a result, the UPB of our mortgage related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 3 , 20    The UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $697 billion at December 31, 2010  The annual 10% reduction in the size of our mortgage related investments portfolio is calculated based on the maximum allowable size of the mortgage related investments portfolio, rather than the actual UPB of the mortgage related investments portfolio, as of December 3 of the preceding year  The limitation will be determined without giving effect to any change in the accounting standards related to transfers of financial assets and consolidation of VIEs or any similar accounting standard.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant developments during 2010 with respect to the support we receive from the government include the following:

- we received $12.5 billion in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficits in 2010, which increased the aggregate liquidation preference of the senior preferred stock to $64 2 billion as of December 3 , 20 0

- we paid dividends of $5.7 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator

To address our $401 million deficit in net worth as of December 31, 2010, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million  We expect to receive these funds by March 31, 2011. Upon funding of this draw request:

- the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $64.2 billion as of December 3 , 2010 to $64.7 billion; and

- the corresponding annual cash dividends payable to Treasury will increase to $6.47 billion, which exceeds our annual historical earnings in all but one period

To date, we have paid $10.0 billion in cash dividends on the senior preferred stock  Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long term  Treasury waived the fee for the first quarter of 2011  The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long term financial sustainability

See "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information on the terms of the conservatorship and the agreements described above

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0850

Table of Contents

**Housing Finance Agency Initiative**

On October 19, 2009, we entered into a Memorandum of Understanding with Treasury, FHFA, and Fannie Mae, which sets forth the terms under which Treasury and, as directed by FHFA, we and Fannie Mae, would provide assistance, through three separate initiatives, to state and local HFAs so that the HFAs can continue to meet their mission of providing affordable financing for both single family and multifamily housing. FHFA directed us and Fannie Mae to participate in the HFA initiative on a basis that is consistent with the goals of being commercially reasonable and safe and sound. Treasury's participation in these assistance initiatives does not affect the amount of funding that Treasury can provide to Freddie Mac under the terms of the Purchase Agreement

From October 19, 2009 to December 31, 2009, we, Treasury, Fannie Mae, and participating HFAs entered into definitive agreements setting forth the respective parties' obligations under this initiative The initiatives are as follows:

- *TCLFP* In December 2009, on a 50 50 pro rata basis, Freddie Mac and Fannie Mae agreed to provide $8.2 billion of credit and liquidity support, including outstanding interest at the date of the guarantee, for variable rate demand obligations, or VRDOs, previously issued by HFAs. This support was provided through the issuance of guarantees, which provide credit enhancement to the holders of such VRDOs and also create an obligation to provide funds to purchase any VRDOs that are put by their holders and are not remarketed Treasury provided a credit and liquidity backstop on the TCLFP. These guarantees, each of which expires on or before December 3 , 2012, replaced existing liquidity facilities from other providers

- *NIBP* In December 2009, on a 50 50 pro rata basis, Freddie Mac and Fannie Mae agreed to issue in total $15.3 billion of partially guaranteed pass through securities backed by new single family and certain new multifamily housing bonds issued by HFAs. Treasury purchased all of the pass through securities issued by Freddie Mac and Fannie Mae. This initiative provided financing for HFAs to issue new housing bonds.

Treasury will bear the initial losses of principal up to 35% of total principal for these two initiatives combined, and thereafter Freddie Mac and Fannie Mae each will be responsible only for losses of principal on the securities that it issues to the extent that such losses are in excess of 35% of all losses under both initiatives. Treasury will bear all losses of unpaid interest Under both initiatives, we and Fannie Mae were paid fees at the time bonds were securitized and also will be paid on-going fees

The third initiative under the HFA initiative is described below:

- *Multifamily Credit Enhancement Initiative.* Using existing housing bond credit enhancement products, Freddie Mac is providing a guarantee of new housing bonds issued by HFAs, which Treasury purchased from the HFAs. Treasury will not be responsible for a share of any losses incurred by us in this initiative.

**Related Parties as a Result of Conservatorship**

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U S government Except for the transactions with Treasury discussed above in "Government Support for our Business" and "Housing Finance Agency Initiative" as well as in "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us and the U S government during the year ended December 3 , 20 0 In addition, we are deemed related parties with Fannie Mae as both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have occurred in the normal course of business.

<div align="center">

**NOTE 4: VARIABLE INTEREST ENTITIES**

</div>

We use securitization trusts in our securities issuance process. Prior to January 1, 2010, these trusts met the definition of QSPEs and were not subject to consolidation Effective January 1, 2010, the concept of a QSPE was removed from GAAP and entities previously considered QSPEs were required to be evaluated for consolidation In addition, effective January 1, 2010, the approach for determining the primary beneficiary of a VIE based solely on economic variability was removed from GAAP in favor of a more qualitative approach that focuses on power and economic exposure Specifically, GAAP states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE GAAP requires ongoing assessments of whether an enterprise is the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES Consolidation and Equity Method of Accounting" for further information regarding the consolidation of certain VIEs

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions Therefore, effective January 1, 2010, we consolidated on our balance sheet the

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0851

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

assets and liabilities of these trusts at their UPB, with accrued interest, allowance for credit losses, or other than temporary impairments recognized as appropriate, using the practical expedient permitted upon adoption as we determined that calculation of carrying values was not practical  Other newly consolidated assets and liabilities that either do not have a UPB or are required to be carried at fair value were measured at fair value. After January 1, 2010, new consolidations of trust assets and liabilities are recorded at either their: (a) carrying value if the underlying assets are contributed by us to the trust and consolidated at the time of the transfer; or (b) fair value for the assets and liabilities that are consolidated under the securitization trusts established for our guarantor swap program, rather than their UPB.

In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed be ow

## VIEs for which We are the Primary Beneficiary

### PC Trusts

Our PC trusts issue pass through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed rate PCs, we guarantee the timely payment of interest and principal  For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs  In exchange for providing this guarantee, we may receive a management and guarantee fee and up front delivery fees We issue most of our PCs in transactions in which our customers exchange mortgage loans for PCs  We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs  The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor  For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities  We have the power to impact the activities related to this risk in our role as guarantor and master servicer

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses  See  "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information regarding our purchase of mortgage loans out of PC trusts  These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance  In addition, we determined that our guarantee to each PC trust to provide principal and interest payments exposes us to losses that could potentially be significant to the PC trusts  Accordingly, we concluded that we are the primary beneficiary of our single family PC trusts

At December 31, 2010, we were the primary beneficiary of, and therefore consolidated, PC trusts with assets totaling $1.7 trillion, as measured using the UPB of PCs we issued. The assets of each PC trust can be used only to settle obligations of that trust  In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement  We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES      Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third party credit enhancements related to our PC trusts

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage related securities that we issue to third parties in exchange for non Freddie Mac mortgage-re ated securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Securitization Activities through Issuances of Freddie Mac Mortgage-Re ated Securities" for information on the nature of Other Guarantee Transactions  The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements  As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $15.8 billion at December 31, 2010  For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0852

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Consolidated VIEs

Table 4.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets

### Table 4.1    Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| Cas a d cas eq va e s | $        1 | $ 4 |
| Res c ed cas a d cas eq va e s | 7,514 | |
| Fede a f ds so d a d sec es p c ased de ag ee e s o rese | 29,350 | |
| Mo gage loans held-fo - nves men by consol da ed us s | 1,646,172 | |
| Acc ued n e es ece vab e | 6,895 | |
| Rea es a e ow ed, e | 118 | |
| O he asse s | 6,001 | 16 |
| To al asse s of consol da ed VIEs | $ 1,696,051 | $ 20 |
| Acc ued n e es payab e | $    6,502 | $ |
| Deb secu es of conso da ed us s e d by d pa es | 1,528,648 | |
| O he ab es | 3,851 | 15 |
| To al l ab l es of consol da ed VIEs | $ 1,539,001 | $ 15 |

### VIEs for which We are not the Primary Beneficiary

Table 4.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of operations if that investment were to become worthless This amount does not include other than temporary impairments or other write downs that we previously recognized through earnings In instances where we provide financial guarantees to the VIEs, our maximum exposure represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0853

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 4.2     Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | | Mortgage-Related Security Trusts | | Unsecuritized | |
| | Asset-Backed Investment Trusts(1) | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | Multifamily Loans(3) | Other(1)(4) |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ | $ | $ | $ |
| Restricted cash and cash equivalents | | 52 | | 34 | 464 |
| *Investments in securities* | | | | | |
| Available-for-sale, at fair value | | 85,689 | 137,568 | | |
| Trading, at fair value | 44 | 13,437 | 18,914 | | |
| *Mortgage loans* | | | | | |
| Held-for-investment, unsecuritized | | | | 78,448 | |
| Held-for-sale | | | | 6,413 | |
| Accrued interest receivable | | 419 | 717 | 372 | 5 |
| Derivative assets, net | | | | | 2 |
| Other assets | | 277 | 6 | 23 | 381 |
| *Liabilities* | | | | | |
| Derivative liabilities, net | | (2) | | | (41) |
| Other liabilities | | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $ 29,368 | $ 1,036,975 | $138,330 | $25,875 |

(1) Four involvement with non-consolidated asset-backed investments, of Freddie Mac securitization and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying value of assets and no net of cash offset for certain classified as available-for-sale for our investments and our real estate recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family and multi-class REMICs and Other Structured Securities, Multifamily PCs, Multifamily Other Structured Securities, and for the Guarantee Transactions where we do no contain Our For our variable interests in Freddie Mac securities for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities, as we average guaranteed, which is our maximum to account or less description gains However, on maximum interests in single-family REMICs and Other Structured Securities we do not do no give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on UPB of our loans, as adjusted for our loan loss basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For the non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the notional amount or carrying basis of the guarantee for counterparty or borrower default, without consideration of possible recoveries under certain credit enhancement arrangements The maximum exposure disclosed above is not representative of our actual losses were a key to our, based on our historical loss experience and are consideration of any proceeds from related collateral or guarantees or credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information on available, where our continuing involvement is significant We do not include the assets of our non-consolidated VIEs related to single-family REMICs and Other Structured Securities as those assets are already consolidated on the underlying collateral of these issues on our consolidated balance sheets.

### Asset-Backed Investment Trusts

We invest in a variety of non-mortgage related, asset-backed investment trusts These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 8: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At December 31, 2010, we had investments in 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary Our investments in these asset-backed investment trusts were made in 2010 At December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES " Our investments in these trusts totaled $10.0 billion and $12.7 billion as of December 31, 2010 and 2009, respectively, and are included as cash and cash equivalents, available for sale securities or trading securities on our consolidated balance sheets At December 31, 2010 and 2009, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using

204

*Freddie Mac*

Source   FEDERAL HOME LOAN MORTGAGE CORP, 10 K, February 24, 2011

TREASURY-0854

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

PCs or previously issued REMICs and Other Structured Securities as collateral Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts

In Other Guarantee Transactions, non Freddie Mac mortgage related securities are used as collateral At December 3 , 20 0, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available for sale securities or trading securities on our consolidated balance sheets See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets

### *Non Freddie Mac Securities*

We invest in a variety of mortgage related securities issued by third parties, including non Freddie Mac agency securities, CMBS, other private label securities backed by various mortgage related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets See "NOTE 8: INVESTMENTS IN SECURITIES" for additional information regarding our non Freddie Mac securities

Our investments in these non Freddie Mac securities were made between 994 and 20 0 At December 3 , 20 0, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these non Freddie Mac mortgage related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES " At December 31, 2010 and 2009, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets

### **Unsecuritized Multifamily Loans**

We purchase from originators loans made to various multifamily real estate entities, and hold such loans for investment purposes or for securitization. While we primarily purchase such loans for investment purposes or for securitization, they also help us to fulfill our affordable housing goals These real estate entities are primarily single asset entities (typically partnerships or limited liability companies) established to acquire, construct, or rehabilitate residential properties, and subsequently to operate the properties as residential rental real estate The loans we acquire usually make up 80% or less of the value of the related underlying property at origination The remaining 20% of value is typically funded through equity contributions by the partners of the borrower entity In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third party lenders There were more than 7,000 unsecuritized loans in our mortgage related investments portfolio as of December 3 , 20 0

The UPB of our investments in these loans was $85.9 billion and $83.9 billion as of December 31, 2010 and 2009, respectively, and was included in unsecuritized held for investment mortgage loans, at amortized cost, and held for sale mortgage loans at fair value on our consolidated balance sheets At December 3 , 20 0, we were not the primary beneficiary of any such entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Mortgage Loans" and "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0855

Table of Contents

*Other*

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage related guarantees, and certain short term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We hold an equity investment in various LIHTC fund partnerships that invest in lower tier or project partnerships that are single asset entities In February 20 0, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 3 , 2009, as we will not be able to realize any value either through reductions to our taxable income and related tax liabilities or through a sale to a third party

- *Certain other mortgage related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered to their holders

- *Certain short term default and other guarantee commitments accounted for as derivatives:* Our involvements in these VIEs include our guarantee of the performance of interest rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities

At December 3 , 20 0, we were not the primary beneficiary of any such VIEs because our involvements in these VIEs are passive in nature and do not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance See Table 4 2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs Also see "NOTE 10: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage related guarantees and short term default and other guarantee commitments discussed above

## NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

Table 5.1 summarizes the types of loans on our consolidated balance sheets as of December 31, 2010 and 2009 For periods ending prior to January 1, 2010, the balances do not include mortgage loans underlying Freddie Mac mortgage related securities since these were not consolidated on our balance sheets at that time See "NOTE 4: VARIABLE INTEREST ENTITIES" for further information regarding the assets and liabilities, including mortgage loans, underlying our consolidated VIEs

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0856

Table of Contents

### Table 5.1    Mortgage Loans

| | December 31, 2010 | | | December 31, 2009 |
| | | eld by Consolidated | | |
| | Unsecuritized | Trusts | Total | Unsecuritized |
| | | | (in millions) | |
| S ng e-fam y (1 | | | | |
| F xed- a e | | | | |
| Amor z ng | $ 126,561 | $ 1,493,206 | $ 1,619,767 | $       49,033 |
| In e es -only | 4,161 | 19,616 | 23,777 | 425 |
| To al f xed- a e | 130,722 | 1,512,822 | 1,643,544 | 49,458 |
| Adj s ab e- a e | | | | |
| Amor z ng | 3,625 | 59,851 | 63,476 | 1,250 |
| In e es -only | 13,018 | 58,792 | 71,810 | 1,060 |
| To a ad us ab e- a e | 16,643 | 118,643 | 135,286 | 2,310 |
| O he Gua an ee T ansac ons backed by non-F edd e Mac secu es | | 15,580 | 15,580 | |
| FHA/VA and USDA Ru a Deve op en | 1,498 | 3,348 | 4,846 | 3,110 |
| o a s ng e- am y | 148,863 | 1,650,393 | 1,799,256 | 54,878 |
| Mu fam y(1 | | | | |
| F xed- a e | 72,679 | | 72,679 | 71,936 |
| Adj s ab e- a e | 13,201 | | 13,201 | 11,999 |
| USDA Ru a Deve opmen | 3 | | 3 | 3 |
| o a mu fam y | 85,883 | | 85,883 | 83,938 |
| To al UPB of mo gage loans | 234,746 | 1,650,393 | 1,885,139 | 138,816 |
| Defe ed fees, una o zed p e us, d scoun s and o he cos bas s adj s e s | (7,665) | 7,423 | (242) | (9,317) |
| Lowe of cos o fa va ue ad us men s on oans he d-fo -sa e(2 | (311) | | (311) | (188) |
| Allowance fo loan losses on mo gage loans held-fo nves men | (28,047) | (11,644) | (39,691) | (1,441) |
| To al mo gage loans, ne | $ 198,723 | $ 1,646,172 | $ 1,844,895 | $      127,870 |
| Mo gage oans, ne | | | | |
| Held-fo nves men | $ 192,310 | $ 1,646,172 | $ 1,838,482 | $      111,565 |
| He d-fo -sa e | 6,413 | | 6,413 | 16,305 |
| To al mo gage loans, ne | $ 198,723 | $ 1,646,172 | $ 1,844,895 | $      127,870 |

(1) Based on p nc pa ba ances and exc ud ng mo gage oans aded, t ot yet sett ed
(2) Inc udes fa va ue ad us men s assoc a ed w h mo gage oans fo wh ch we have made a fa value elec on

The decrease in mortgage loans held for sale and increase in mortgage loans held for investment from December 3 , 2009 to December 3 , 2010 is primarily due to a change in accounting for the consolidation of VIEs which resulted in our consolidation of assets underlying approximately $1.8 trillion of our PCs and $21 billion of certain Other Guarantee Transactions as of January 1, 2010. Upon adoption of the new accounting standards on January 1, 2010, we redesignated all single family loans that were held for sale as held for investment, which totaled $13.5 billion in UPB and resulted in the recognition of a lower of cost or fair value adjustment, which was recorded as an $80 million reduction in the beginning balance of retained earnings for 20 0 As of December 3 , 20 0, our mortgage loans held for sale consist solely of multifamily mortgage loans that we purchased for securitization. Prior to January 1, 2010, in addition to multifamily loans purchased for securitization, we also had investments in single family mortgage loans held for sale See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information

We purchased UPB of $380.7 billion of single family mortgage loans and $3.2 billion of multifamily loans that were classified as held for investment at purchase in the year ended December 31, 2010 As discussed above, prior to January 1, 2010 the majority of our single family loan purchases were classified as held for sale loans Our sales of mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 10: FINANCIAL GUARANTEES" for more information We did not sell any held for investment loans during the year ended December 3 , 20 0 We did not have significant reclassifications of mortgage loans into held for sale in the year ended December 3 , 2010. In 2009, for loans designated as held for sale for which we had not elected the fair value option, we evaluated the lower of cost or fair value for such loans each period by aggregating loans based on the mortgage product type Beginning in 20 0, we elected the fair value option for all of our held for sale loans During 2009, we recognized $679 million of lower of cost or fair value adjustments on our consolidated statement of operations related to held for sale mortgage loans

#### Credit Quality of Mortgage Loans

We evaluate the credit quality of single family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single family loans As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects

Source   D RA HOM   OAN MORTGAG CORP, 10 K,  ebruary 24, 2011

TREASURY-0857

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan  If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers  Table 5 2 presents information on the estimated current LTV ratios of single family loans held for investment on our consolidated balance sheets  Our current LTV ratio estimates are based on available data through December 3 , 20 0.

**Table 5.2    Recorded Investment of Held for Investment Mortgage Loans, by LTV Ratio**

| | As of December 31, 2010 | | | |
| | Estimated Current LTV Ratio[1] | | | |
| | < 80 | 81 – 100 | > 100[2] | Total |
| | (in millions) | | | |
|---|---|---|---|---|
| S ng e-fam y oans | | | | |
| 20 a d 30-yea o mo e, amo z ng f xed- a e | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-yea amo z ng f xed- a e | 233,422 | 16,432 | 2,523 | 252,377 |
| Adj s ab e- a e[3] | 34,252 | 13,273 | 9,149 | 56,674 |
| A -A,  e es-o y, a d op o  ARM[(] | 45,068 | 44,540 | 85,213 | 174,821 |
| o a s ng e-fam y oans | $1,017,624 | $468,098 | $ 313,273 | $1,798,995 |
| Mul fam ly loans | | | | 79,178 |
| To al eco ded nves men of held-fo -nves men loans | | | | $1,878,173 |

(1) The cu en LTV a os a e managemen es ma es, wh ch a e upda ed on a on y bas s  Cu en a ke va ues a e es a ed y adj s g e va e of e p ope y a o g na on based on changes n he ma ke value of homes n he same geog aph cal a ea s nce ha me  The va ue of a p ope y a o g na on s based on es a es p ce fo pu chase mo gages and h d-pa y app a sal fo ef nance mo gages  Es ma es of he cu en LTV a o nc ude he c ed -enhanced po on of he oan and exc ude any seconda y f nanc ng by h d pa es

(2) The se ous del nquency a e fo he o al of s ngle-fam ly mo gage loans w h es ma ed cu en LTV a os n excess of 100% was 14 9% as of Decembe 31, 2010

(3) Includes balloon/ ese mo gage loans and excludes op on ARMs

(4) We d sco ed p c ases of Al -A oans on Ma ch 1, 2009 (o a e , as cu s o e s' con ac s p em ed), and n ee s -on y oans effec ve Sep embe 1, 2010  Mod f ed oans w h n he Al -A ca ego y e a ns such, even hough he bo owe  ay have p ov ded full documen a on of asse s and ncome o comple e he mod f ca on  Mod f ed loans w h n he op on ARM ca ego y ema n as such even hough he mod f ed loan no longe p ov des fo op onal paymen p ov s ons

For information about the payment status of single family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 6: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS    Mortgages and Mortgage Related Securities "

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held for investment on our consolidated balance sheets  Prior to consolidation of certain of our securitization trusts, we also maintained a reserve for guarantee losses for mortgage loans held by these trusts  In 2010, our reserve for guarantee losses is associated with Freddie Mac mortgage related securities backed by multifamily loans, certain single family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk, and this reserve is included within other liabilities on our consolidated balance sheets

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales. This backlog in processing loan modifications and short sales resulted in erroneous loan data within our loan reporting systems, thereby impacting our financial accounting and reporting systems  The resulting error impacted our provision for credit losses and allowance for loan losses and affected our previously reported financial statements for the interim period ended March 31, 2010 and the interim 2009 periods and full year ended December 31, 2009  For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Basis of Presentation    *Out of Period Accounting Adjustment.*"

208                                                                              *Freddie Mac*

Source  D RA HOM  OAN MORTGAG CORP, 10 K, ebruary 24, 2011                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.3 summarizes loan loss reserve activity.

**Table 5.3    Detail of Loan Loss Reserves**

| | Year Ended December 31, | | | | | | |
| | 2010 | | | | 2009 | | |
| | Allowance for Loan Losses | | | | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total (in millions) | Allowance or Loan Losses | Reserve for Guarantee Losses | Total |
|---|---|---|---|---|---|---|---|
| *Single-family:* | | | | | | | |
| Beginning balance | $ 693 | $ | $ 32,333 | $ 33,026 | $ 454 | $14,887 | $ 15,341 |
| Adjustments to beginning balance(2) | | 32,006 | (32,192) | (186) | | | |
| Provision for credit losses | 7,532 | 9,540 | 47 | 17,119 | 524 | 28,432 | 28,956 |
| Charge-offs(3) | (12,856) | (3,351) | (11) | (16,218) | (507) | (8,874) | (9,381) |
| Recoveries(3) | 2,647 | 715 | | 3,362 | 222 | 1,866 | 2,088 |
| Transfers, net(( | 29,301 | (27,266) | (40) | 1,995 | | (3,978) | (3,978) |
| Ending balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $32,333 | $33,026 |
| *Multifamily* | | | | | | | |
| Beginning balance | $ 748 | $ | $ 83 | $ 831 | $ 236 | $ 41 | $ 277 |
| Provision for credit losses | 84 | | 15 | 99 | 533 | 41 | 574 |
| Charge-offs(3) | (103) | | (1) | (104) | (21) | | (21) |
| Recoveries(3) | 1 | | | 1 | | | |
| Transfers, net( | | | 1 | 1 | | 1 | 1 |
| Ending balance | $ 730 | $ | $ 98 | $ 828 | $ 748 | $ 83 | $ 831 |
| *Total* | | | | | | | |
| Beginning balance | $ 1,441 | $ | $ 32,416 | $33,857 | $ 690 | $14,928 | $ 15,618 |
| Adjustments to beginning balance(2) | | 32,006 | (32,192) | (186) | | | |
| Provision for credit losses | 7,616 | 9,540 | 62 | 17,218 | 1,057 | 28,473 | 29,530 |
| Charge-offs(3) | (12,959) | (3,351) | (12) | (16,322) | (528) | (8,874) | (9,402) |
| Recoveries(3) | 2,648 | 715 | | 3,363 | 222 | 1,866 | 2,088 |
| Transfers, net( | 29,301 | (27,266) | (39) | 1,996 | | (3,977) | (3,977) |
| Ending balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ 32,416 | $33,857 |

(1) All of these loans are collectively evaluated for impairment Beginning January 1, 2010, our reserve for guarantee losses is included in other liabilities See "NOTE 23 SELECTED FINANCIAL STATEMENT LINE ITEMS" for further information on

(2) Adjustments are as a result of the adoption of the accounting standards for transfers of financial assets and consolidation of VIEs See "NOTE 2 CHANGE IN ACCOUNTING PRINCIPLES" for further information

(3) Charge-offs represent the amount of the UPB of a loan that has been discharged or removed from our consolidated balance sheet due to foreclosure, or short sales (as disclosed under (3) above) in the years ended December 31, 2010 and 2009, respectively, related to certain loans purchased or refinanced guarantees and recorded as losses on loans purchased when the expenses on our consolidated statements of operations Recoveries of charge-offs primarily result from foreclosure sale of real estate owned and REO acquisitions on loans where a charge-off risk has been assumed by our guarantee insurers, servicers or other third parties through credit enhancements

(4) In February 2010, we also ceded a two-step process whereby substantially all single-family mortgage loans that are 120 days or more delinquent for our PC issues We purchased $127 5 billion on UPB of loans from PCs issued during 2010 As a result of these purchases, a reduction of our loan loss reserves were transferred from the allowance for loan losses ceded by consolidated issued reserve for guarantee losses to the allowance for loan losses securitized

(5) Consists primarily of (a) approximately $27 5 billion of reclassified single-family loss reserves during 2010 related to our purchases during the period of loans previously held by us (as discussed in (c)(d) above) (b) amounts related to agreements with sellers or servicers where we handle repossession escrows received under these agreements to compensate us for previously incurred and recognized losses (c) the transfer of a proportional amount of the recognized reserves for guarantee losses associated with whole loans purchased from non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments and (d) the amounts attributable to recapitalization of past due interest on modified mortgage loans See "NOTE 19 CONCENTRATIONS OF CREDIT AND OTHER RISKS Mortgage Seller/Servicers" for more information about recovery agreements with our seller/servicers 2010, including GMAC Mortgage, LLC, Bank of America, N A, and the transfer of our affiliates

For delinquent loans placed on non accrual status on our consolidated balance sheets, we reverse all past due interest In most cases, when we modify a non accrual loan, the past due interest on the original loan is recapitalized, or added to the principal of the new loan and reflected as a transfer into the reserve balance. Transfers, net in the table above, included $1 1 billion in 2010 associated with recapitalization of past due interest

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0859

Table of Contents

Table 5 4 presents our loan losses and our recorded investment  in mortgage loans by impairment evaluation methodology

**Table 5.4     Net Investment in Mortgage Loans**

| | December 31, 2010 | | | December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | | | (in millions) | | | |
| *Recorded investment* | | | | | | |
| Collec vely evalua ed | $ 1,762,490 | $ 76,541 | $ 1,839,031 | $ 20,885 | $ 79,664 | $100,549 |
| Ind v dua y eva ua ed | 36,505 | 2,637 | 39,142 | 11,036 | 1,421 | 12,457 |
| To al eco ded nves men | 1,798,995 | 79,178 | 1,878,173 | 31,921 | 81,085 | 113,006 |
| *Ending balance of the allowance* | | | | | | |
| Collec vely evalua ed | $ (30,477) | $ (382) | $ (30,859) | $ (550) | $ (512) | $ (1,062) |
| Ind v dua y eva ua ed | (8,484) | (348) | (8,832) | (143) | (236) | (379) |
| To al end ng balance of he allowance | (38,961) | (730) | (39,691) | (693) | (748) | (1,441) |
| Ne  nves men  n mo gage loans | $ 1,760,034 | $ 78,448 | $1,838,482 | $ 31,228 | $ 80,337 | $111,565 |

**Credit Protection and Other Forms of Credit Enhancement**

In connection with our mortgage loans, held for investment and  other mortgage related guarantees, we have credit protection in  the form of primary mortgage insurance, pool insurance, recourse  to lenders, and other forms of credit enhancements  Prior to  January 1, 2010, credit protection was viewed under GAAP as  part of the total consideration received for providing our  credit guarantee and was therefore included within our guarantee obligation and in other assets  A separate asset was recognized and subsequently amortized into earnings as other non  interest expense under the static effective yield method in the same  manner as our recognized guarantee obligation

Commencing January 1, 2010, credit protection, including  primary mortgage insurance, is no longer recognized as a  separate asset to the extent it is received in connection with a  consolidated guarantor swap and fully paid for by the lender; in  those situations, the economic effect of credit protection is included in our estimation of the allowance for loan losses  In  all other situations, credit protection continues to be  recognized as a separate asset and subsequently amortized into  earnings  At December 31, 2010 and 2009, respectively, we recorded $151 million and $597 million within other assets on our consolidated balance sheets for these credit  enhancements

Table 5.5 presents the UPB of loans in our consolidated balance  sheets and underlying our financial guarantees with credit  protection and the maximum amounts of potential loss recovery by  type of credit protection

**Table 5.5     Recourse and Other Forms of Credit  Protection**[1]

| | UPB at | | Maximum Coverage at | |
|---|---|---|---|---|
| | December 31, 2010 | December 31, 2009 | December 31, 2010 | December 31, 2009 |
| | | (in millions) | | |
| S ng e-fam ly | | | | |
| P ma y mo gage nsu ance | $    217,133 | $    239,339 | $    52,899 | $    58,226 |
| Lende  ecou se and ndemn f ca ons | 10,064 | 12,169 | 9,566 | 11,083 |
| Pool nsu ance | 37,868 | 50,721 | 3,299 | 3,649 |
| HFA ndemn f ca on(2 | 9,322 | 3,915 | 3,263 | 1,370 |
| Subo d na on(3 | 4,112 | 4,527 | 622 | 784 |
| O he  c ed  enhancemen s | 223 | 563 | 214 | 271 |
| o a | $    278,722 | $    311,234 | $    69,863 | $    75,383 |
| Mul fam ly | | | | |
| HFA ndemn f ca on(2 | $      1,551 | $         405 | $         543 | $         142 |
| Subo d na on(3 | 12,252 | 6,646 | 1,414 | 641 |
| O he  c ed  enhancemen s | 9,004 | 6,972 | 2,930 | 2,633 |
| o a | $      22,807 | $      14,023 | $      4,887 | $      3,416 |

(1) Inc udes he c ed  p o ec on assoc a ed w h unsecu  zed mo gage oans, oans he d by ou  conso da ed us s as we  as ou  non-conso da ed mo gage gua an ees   a d exc  des FHA/VA a d USDA oans  Excep fo  subo d na on cove age, hese a  oun s exc ude c ed  p o ec on assoc a ed w h $19 8 b  on and $20 8 b  on  n UPB of s ngle-fam ly loans unde ly ng O he  Gua an ee T ansac ons as of Decembe  31, 2010 and 2009,  espec vely, fo wh ch he  nfo ma on was no ava lable

(2) Rep esen s he amoun of po en a  e mbu semen of osses on sec  es we  ave g a a  eed  a a e backed by s a e a d oca HFA o ds,  de w c T eas y  bea s n a  osses on hese sec   es p o 35% of ose ss ed  de e HFA   a ve o  a comb ned bas s T easu y w  a so bea  osses of unpa d  n e es

(3) Rep esen s F edd e Mac  ssued mo  gage- e a ed secu   es w h s bo d na on p o ec on, exc d ng  ose backed by HFA bonds  A Dece  be  31, 2010 and 2009,  he ave age se  ous del nquency  a e on loans unde ly ng ou  s ngle-fam ly F edd e Mac  ssued mo  gage- e a ed secu   es w h subo d na on cove age was 21 1% and 24 1%,  espec  ve y

Primary mortgage insurance is the most prevalent type of credit  enhancement within our single family credit guarantee portfolio,  and is typically provided on a loan level basis  Pool insurance  contracts generally provide insurance on a group, or pool,  of mortgage loans up to a stated aggregate loss limit  As shown in the table above, the UPB of single family loans covered by pool  insurance declined during 2010, primarily due to loan payoffs and other liquidation events, which reduced

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0860

Table of Contents

the UPB of the mortgage loans covered by such policies  We also  reached the maximum limit of recovery on certain of these  contracts. As a result, losses we recognized during 20  0 increased on certain loans previously identified as credit enhanced

We also have credit protection for certain of the mortgage loans  on our consolidated balance sheets that are covered by insurance  or partial guarantees issued by federal agencies (such as FHA,  VA, and USDA). The total UPB of these loans was $4.8 billion and $3.1 billion as of December 3 , 2010 and 2009, respectively.

## NOTE 6: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS

### Individually Impaired Loans

Individually impaired single family loans include performing and  non performing TDRs, as well as loans acquired under our  financial guarantees with deteriorated credit quality  Individually impaired multifamily loans include TDRs, loans  three monthly payments or more past due, and loans that are impaired based on management judgment  For a discussion of our  significant accounting policies regarding impaired and non performing loans, which are applied consistently for all  single family classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

Total loan loss reserves consists of a specific valuation  allowance related to individually impaired mortgage loans, and a  general reserve for other probable incurred losses  Our recorded investment in individually impaired mortgage loans  and the  related specific valuation allowance are summarized in Table 6.1 by product class (for single family loans).

### Table 6.1    Individually Impaired Loans

| | Balance at December 31, 2010 | | | | For the Year Ended December 31, 2010 | |
|---|---|---|---|---|---|---|
| Single-family | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | (in millions) | | | |
| *With no specific allowance recorded*(1): | | | | | | |
| 20- and 30-year or more, amortizing fixed-rate | $ 8,462 | $ 3,721 | $ | $ 3,721 | $ 4,046 | $ 521 |
| 15-year amortizing fixed-rate | 119 | 50 | | 50 | 58 | 7 |
| Adjustable-rate(2) | 20 | 9 | | 9 | 12 | 1 |
| Alt-A, interest-only, and option ARM(3) | 2,525 | 1,098 | | 1,098 | 1,220 | 114 |
| Total with no specific allowance recorded | $ 11,126 | $ 4,878 | $ — | $ 4,878 | $ 5,336 | $ 643 |
| *With specific allowance recorded* | | | | | | |
| 20- and 30-year or more, amortizing fixed-rate | $25,504 | $24,502 | $(6,283) | $18,219 | $15,128 | $ 561 |
| 15-year amortizing fixed-rate | 229 | 198 | (17) | 181 | 175 | 10 |
| Adjustable-rate(2) | 168 | 153 | (23) | 130 | 114 | 5 |
| Alt-A, interest-only, and option ARM(3) | 7,035 | 6,774 | (2,161) | 4,613 | 3,753 | 116 |
| Total with specific allowance recorded | $32,936 | $31,627 | $(8,484) | $23,143 | $19,170 | $ 692 |
| *Combined single-family:* | | | | | | |
| 20- and 30-year or more, amortizing fixed-rate | $33,966 | $28,223 | $(6,283) | $ 21,940 | $19,174 | $ 1,082 |
| 15-year amortizing fixed-rate | 348 | 248 | (17) | 231 | 233 | 17 |
| Adjustable-rate(2) | 188 | 162 | (23) | 139 | 126 | 6 |
| Alt-A, interest-only, and option ARM(3) | 9,560 | 7,872 | (2,161) | 5,711 | 4,973 | 230 |
| Total single-family | 44,062 | 36,505 | (8,484) | 28,021 | 24,506 | 1,335 |
| Total multifamily | 2,661 | 2,637 | (348) | 2,289 | 2,959 | 107 |
| Total single-family and multifamily | $46,723 | $39,142 | $(8,832) | $ 30,310 | $27,465 | $ 1,442 |

(1) Individually impaired loans with no specific related valuation  allowance primarily represent mortgage loans purchased out of PC  pools and accounted for  in accordance
    with the accounting standards for loans and debt securities acquired  with  deteriorated credit  quality  that have no impairment,  or full  recovery of our investment.
(2) Includes balloon/ reset mortgage loans and excludes option ARMs
(3) See note (4) of "Table 5 2    Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio "

At December 31, 2009, we had a recorded investment of $12.5 billion of individually impaired loans. The average  recorded investment in individually impaired loans for 2009 and  2008 was approximately $10.7 billion and $7.1 billion,  respectively  At December 3 , 2009, the recorded investment in individually impaired loans requiring a specific allowance  was $2.6 billion, and the related allowance was  $379 million.

We recognized interest income on individually impaired loans of $818 million and $507 million for the years ended  December 31, 2009 and 2008  Interest income forgone on  individually impaired loans was approximately $784 million,  $276 million, and $69 million for the years ended December 31, 2010, 2009, and 2008, respectively.

### Mortgage Loan Performance

We do not accrue interest on loans three months or more past due

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0861

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any errors or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 6 2 presents the recorded investment of our single family and multifamily mortgage loans by payment status.

### Table 6.2    Payment Status of Mortgage Loans[1]

| | December 31, 2010 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20- and 30-year amortizing fixed-rate | $1,226,874 | $26,442 | $10,203 | $ 51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable-rate[2] | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[3] | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $34,737 | $ 14,041 | $ 84,305 | $1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are accounted for as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by empoyment and difference, or lags, in the reporting of this information or by our services. In addition, for multifamily borrowers that have entered into a forbearance agreement and subsequently meet the terms of the agreement the borrower's payment status is reflected as current, whereas single-family loans for which the borrower has been granted forbearance continue to reflect the past due status of the borrower, if applicable. As of December 31, 2010, approximately $0 1 billion of multifamily loans had been granted forbearance and were not included in delinquency status.
(2) Includes balloon/reset mortgage loans and excludes option ARMs
(3) See endnote (4) of "Table 5 2   Recorded Investment of He-for-Investment Mortgage Loans, by LTV Ratio"

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default Our practice is to purchase and effectively liquidate loans that are 120 days or more past due from PCs when: (a) the loans have been modified; (b) foreclosure sales occur; (c) the loans have been delinquent for 24 months; or (d) the cost of guarantee payments to PC holders, including advances of interest at the PC coupon rate, exceeds the expected cost of holding the non performing mortgage loans. On February 10, 2010, we announced that we would purchase substantially all single family mortgage loans that are 120 days or more delinquent from our PC trusts. This change in practice was made based on a determination that the cost of guarantee, or debt payments to the security holders, will exceed the cost of holding nonperforming loans on our consolidated balance sheets Due to our January 1, 2010 adoption of amendments to the accounting standards for transfers of financial assets and the consolidation of VIEs, the recognized cost of purchasing most delinquent loans from PC trusts will be less than the recognized cost of continued guarantee payments to security holders As of December 3 , 20 0, there were $5.2 billion in UPB of loans that were four monthly payments past due, and that met our repurchase criteria In certain cases we purchased and in others we expect to purchase, and thereby extinguish the related PC debt, at the scheduled PC debt payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or otherwise cure by receipt of payment by the borrower before such date

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held for investment by consolidated trusts to unsecuritized mortgage loans held for investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $127.5 billion and $10.8 billion of loans from PC trusts or associated with other guarantee commitments during the years ended December 31, 2010 and 2009, respectively. Beginning January 1, 2010, we no longer record losses on loans purchased when we purchase loans from PCs associated with consolidated trusts since these loans are already recorded on our consolidated balance sheets See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information We recognized losses on loans purchased of $25 million and $4.8 billion in 2010 and 2009, respectively, related to purchases of loans from PC trusts or associated with other guarantee commitments that are included within other expenses on our consolidated statements of operations

*Freddie Mac*

TREASURY-0862

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 6.3 summarizes the delinquency rates of mortgage loans within our single family credit guarantee and multifamily mortgage portfolios

**Table 6.3    Delinquency Rates(1)**

| Delinquencies | December 31, 2010 | December 31, 2009 |
|---|---|---|
| *Single-family:* | | |
| Non-credit-enhanced portfolio | | |
| Serious delinquency rate | 2 97% | 3 00% |
| Total number of serious delinquent loans | 296,397 | 305,840 |
| Credit-enhanced portfolio | | |
| Serious delinquency rate | 7 83% | 8 17% |
| Total number of serious delinquent loans | 144,116 | 168,903 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3 73% | 3 87% |
| Total number of serious delinquent loans | 440,513 | 474,743 |
| Other Guarantee Transactions (2 | | |
| Serious delinquency rate | 9 86% | 9 44% |
| Total number of serious delinquent loans | 21,926 | 24,086 |
| *Total single-family* | | |
| Serious delinquency rate | 3 84% | 3 98% |
| Total number of serious delinquent loans | 462,439 | 498,829 |
| *Multifamily (3* | | |
| Delinquency rate | 0 26% | 0 20% |
| UPB of delinquent loans (in millions) | $   288 | $   200 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement when the borrower are no counted as serious delinquent if the borrower is less than four monthly payments past due or deferred. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, the Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule than our other securities due to variances in payment cycle and remittance schedules. In addition, Multifamily loans are no counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance are considered delinquent. As of December 31, 2010, approximately $0 1 billion of multifamily loans had been granted forbearance and were no included in delinquency counts

(2) Other Guarantee Transactions are generally agency loans lying among counterparties with higher risk characteristics because Other Guarantee Transactions may provide new credit protections from losses due to delay in gains or damage, excess fees, over collateralization and other features

(3) Multifamily delinquency performance based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions Excludes mortgage loans whose contractual terms have been modified under an agreement when the borrower are as long as he borrower is less than two monthly payments due under he modified contractual terms

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program  Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan  (our relief refinance mortgage); (b) an initiative to modify mortgages for both homeowners who are in default and  those who are at risk of imminent default (HAMP); and  (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA)  As part of accomplishing these initiatives, we pay various incentives to servicers and borrowers  We will bear the full costs associated with these workout alternatives on mortgages that we own or  guarantee and will not receive a reimbursement for any component  from Treasury. These initiatives slowed the rate of growth in  single family REO assets on our consolidated balance sheets  during 2010 and 2009; however, the number and amount of individually impaired loans increased due to higher volumes of  TDRs  We can not currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA  Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives

**Loan Modifications**

We rely on our single family seller/servicers to contact borrowers who are in default or imminent default and to pursue  loan modifications, based on our guidelines and the  borrower's qualifications  When a borrower is considered  for a loan modification, our seller/servicers obtain information on income, assets, and other borrower obligations to determine  new loan terms  Under HAMP, the goal of a single family loan modification is to reduce the borrowers' monthly mortgage payments to a specified percentage of borrower's gross  monthly income (3 % for HAMP loans), which may be achieved through a combination of changes in the loans terms, including  interest rate reductions, term extensions and principal forbearance  Although HAMP contemplates that some servicers will  also make use of principal reduction to achieve reduced payments for borrowers, we have only used forbearance of principal and  have not used principal forgiveness in modifying our loans.

HAMP requires that each borrower complete a trial period during  which the borrower will make monthly payments based on the  estimated amount of the modification payments. Trial periods are  required for at least three months  After the final trial period  payment is received by our seller/servicer and the borrower has  provided necessary documentation, the borrower and servicer will  enter into the modification

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0863

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We pay a $ ,000 incentive fee to a seller/servicer when they modify a single family loan under HAMP and an additional $500 incentive fee if the loan was current when it entered the trial period (*i.e.*, where default was imminent but had not yet occurred)  In addition, our seller/servicers will receive up to $1,000 for any modification that reduces a borrower's monthly payment by 6% or more, in each of the first three years after the modification, as long as the modified loan remains current.

Borrowers whose loans are modified through HAMP accrue monthly incentive payments that will be applied annually to reduce up to $1,000 of their principal, per year, for five years, as long as they are making timely payments under the modified loan terms  HAMP applies to loans originated on or before January 1, 2009, and borrowers' requests for such modifications will be considered until December 31, 2012

Non HAMP modifications generally involve an extension of the term of the loan or a reduction of the interest rate, depending on the borrower's individual circumstances. All of our single family loan modifications during 2010 resulted in the modified loan containing a fixed interest rate or one that is fixed below market for five years and then gradually adjusts to a market rate (determined at the time of modification) and remains fixed at that new rate for the remaining term

## NOTE 7: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non performing single family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process  Upon acquiring single family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third party property management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," for a discussion of our significant accounting policies for REO

For the periods presented below, the weighted average holding period for our disposed properties was less than one year  Table 7.1 provides a summary of the change in the carrying value of our REO balances

**Table 7.1    REO**

| | REO, Gross | Valuation Allowance (in millions) | REO, Net |
|---|---|---|---|
| Ba ance, Dece be 31, 2008 | $ 4,216 | $ (961) | $ 3,255 |
| Add ons | 9,420 | (611) | 8,809 |
| D spos ons and valua on allowance assessmen | (8,511) | 1,139 | (7,372) |
| Ba ance, Decembe 31, 2009 | $ 5,125 | $ (433) | $ 4,692 |
| Ad us en s o beg nn ng balance(1) | 158 | (11) | 147 |
| Add ons | 13,211 | (1,016) | 12,195 |
| D spos ons and valua on allowance assessmen | (10,586) | 620 | (9,966) |
| Balance, Decembe 31, 2010 | $ 7,908 | $ (840) | $ 7,068 |

(1) Ad us men  o he beg nn ng ba ance  e a es o he adop on of new accoun ng s anda ds fo  ansfe s of f nanc a asse s and conso da on of VIEs  See "NOTE 2  CHANGE IN ACCOUNTING PRINCIPLES" fo  fu he  nfo ma on

The REO balance, net at December 31, 2010 and 2009 associated with single family properties was $7 0 billion and $4.7 billion, respectively, and the balance associated with multifamily properties was $107 million and $3 million, respectively  The West region represented approximately 29% and 35% of our REO additions in 2010 and 2009, respectively, based on the number of units, and the highest concentration in the West region is in California  At December 31, 2010, our REO inventory in California represented approximately   % of our total REO inventory based on the number of units. Our REO inventory consisted of 72,093 units and 45,052 units at December 31, 2010 and 2009, respectively

Our REO operations expenses included REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and insurance reimbursements and other credit enhancement recoveries  An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property  We recognized losses of $102 million and $749 million on REO dispositions during 2010 and 2009, respectively. We increased our valuation allowance for REO by $211 million for the year ended December 3 , 20 0 to account for declines in home prices during this period, and we reduced our valuation allowance for REO by $612 million for the year ended December 3 , 2009

In the second half of 20 0, several large seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. A number of our seller/servicers, including several of our largest, temporarily suspended foreclosure proceedings in certain states in which they do business

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0864

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

while they evaluated and addressed these issues  We temporarily suspended certain foreclosure proceedings, and certain REO sales  and eviction proceedings for REO properties for certain  servicers during the fourth quarter of 20  0 while we evaluated the impact of these issues  On October 13, 2010, FHFA made public a four point policy framework detailing FHFA's plan to address these issues, including guidance for consistent remediation of identified foreclosure process deficiencies, and  directed us to implement this plan  We resumed our REO sales in November 20  0

The method of accounting for cash flows associated with REO  acquisitions changed significantly with our adoption of  amendments to the accounting standards for transfers of  financial assets and consolidation of VIEs. In 2009,  the majority of our REO acquisitions resulted from cash payment for extinguishments of mortgage loans within PC pools at the time of  their conversion to REO  These cash outlays are included in net payments of mortgage insurance and acquisitions and dispositions  of REO in our consolidated statements of cash flows  Effective  January 1, 2010, REO property acquisitions resulted from  extinguishment of our mortgage loans held on our consolidated  balance sheets and are treated as non cash transfers. As a result, the amount of non cash acquisitions of REO properties  during the year ended December 31, 2010 and 2009 was $22.0 billion and $1.2 billion, respectively.

## NOTE 8: INVESTMENTS IN SECURITIES

Commencing with our adoption of two new accounting standards on  January 1, 2010, we changed the way we account for the  purchase and sale of the majority of our PCs and certain Other  Guarantee Transactions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a discussion of our significant accounting policies related to our investments in  securities

Table 8.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized  losses for available for sale securities by major security type

**Table 8.1    Available For Sale Securities**

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Mo  gage- ela ed secu   es | | | | |
| F  edd e Mac | $ 80,742 | $ 5,142 | $     (195) | $ 85,689 |
| Subp  me | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Op  on ARM | 10,726 | 16 | (3,853) | 6,889 |
| Al -A a  d o he | 15,561 | 58 | (2,451) | 13,168 |
| Fann e Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 9,885 | 31 | (539) | 9,377 |
| Ma  fac  ed  o s  g | 945 | 13 | (61) | 897 |
| G nn e Mae | 268 | 28 | | 296 |
| To al mo  gage- ela ed secu   es | 247,523 | 8,188 | (23,077) | 232,634 |
| To al ava lable-fo -sale secu   es | $247,523 | $8,188 | $(23,077) | $ 232,634 |
| | | | | |
| December 31, 2009 | | | | |
| Mo  gage- ela ed secu   es | | | | |
| F  edd e Mac | $215,198 | $ 9,410 | $   (1,141) | $ 223,467 |
| Subp  me | 56,821 | 2 | (21,102) | 35,721 |
| CMBS | 61,792 | 15 | (7,788) | 54,019 |
| Op  on ARM | 13,686 | 25 | (6,475) | 7,236 |
| Al -A a  d o he | 18,945 | 9 | (5,547) | 13,407 |
| Fann e Mae | 34,242 | 1,312 | (8) | 35,546 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 11,868 | 49 | (440) | 11,477 |
| Ma  fac  ed  o s  g | 1,084 | 1 | (174) | 911 |
| G nn e Mae | 320 | 27 | | 347 |
| To al mo  gage- ela ed secu   es | 413,956 | 10,850 | (42,675) | 382,131 |
| Non-mo  gage- ela ed secu   es | | | | |
| Asse -backed secu   es | 2,444 | 109 | | 2,553 |
| To al non-mo  gage- ela ed secu   es | 2,444 | 109 | | 2,553 |
| To al ava lable-fo -sale secu   es | $ 416,400 | $10,959 | $(42,675) | $384,684 |

(1) Includes non-c ed  - ela ed o he - han- empo a y  mpa  men s on ava lable-fo -sale secu   es  ecogn zed  n AOCI and  empo a y  un eal zed losses

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0865

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

Table 8 2 shows the fair value of available for sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months or 2 months or greater, including the non credit related portion of other temporary impairments which have been recognized in AOCI

**Table 8.2    Available For Sale Securities in a Gross Unrealized Loss Position**

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | | (in millions) | | | | | | |
| Mortgage related securities | | | | | | | | | | | | |
| Fredd e Mac | $ 2 494 | $ | $ (70 | $ (70 | $ 1 880 | $ | $ (12 | $ (12 | $ 4 374 | $ | $ (9 | $ (9 |
| Subprime | 6 | | | | 33 839 | ( 0 04 | (4 0 | ( 40 6 | 33 8 | ( 0 04 | (4 0 | ( 40 6 |
| CMBS | 29 0 | | ( 1 | ( 1 | 8 89 | (844 | ( 024 | (1 868 | 844 | (844 | ( 07 | ( 9 9 |
| Opt on ARM | 3 | ( | | | 6 838 | (3 744 | ( 08 | (3 8 2 | 6 84 | (3 7 | ( 08 | (3 8 3 |
| A t A and other | 2 | | (3 | (3 | 12 02 | ( 846 | (602 | (2 8 | 2 067 | ( 846 | (60 | (2 1 |
| annie Mae | | | | | 4 | | (3 | (3 | 68 | | (3 | (3 |
| Obligations o states and political subdivisions | 3 9 3 | | ( 63 | ( 63 | 3 02 | | (376 | (376 | 7 3 | | ( 39 | ( 39 |
| Manufactured hous ng | 8 | ( | | ( | 07 | (4 | (1 | (60 | 1 | (46 | (1 | (6 |
| Total mortgage related securities | 9 0 | | (2 | (287 | 67 399 | (16 20 | (6 268 | (22 788 | 76 909 | (16 22 | (6 | (23 077 |
| Total available or sale securities in a gross unrealized loss position | $ 9 0 | $ | $(2 | $(287 | $ 67 399 | $(16 20 | $(6 268 | $(22 788 | $ 76 909 | $(16 22 | $(6 | $(23 077 |

| December 31, 2009 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other Than Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | | (in millions) | | | | | | |
| Mortgage related securities | | | | | | | | | | | | |
| Fredd e Mac | $ 42 9 | $ | $ ( 2 | $ ( 2 | $ 068 | $ | $ ( 089 | $ ( 089 | $ 1 287 | $ | $ ( 4 | $ ( 4 |
| Subprime | 6 73 | (42 9 | (62 | ( 281 | 29 0 | (9 238 | (7 83 | (16 821 | 3 713 | (134 7 | (7 64 | (21 102 |
| CMBS | 3 80 | | ( 6 | ( 6 | 48 067 | ( 0 7 | (6 7 | (7 732 | 647 | ( 0 7 | (6 77 | (7 788 |
| Opt on ARM | 2 7 | (2 16 | (36 | (6 201 | 4 7 2 | ( 09 | (490 | (4 274 | 7 69 | ( 949 | ( 26 | (6 47 |
| A t A and other | 268 | (2 162 | (43 | (2 20 | 8 9 | (1 833 | ( 09 | (3 3 2 | 13 222 | (3 99 | ( 2 | ( 7 |
| annie Mae | 473 | | (2 | (2 | 24 | | ( 6 | ( 6 | 97 | | (8 | (8 |
| Obligations o states and political subdivisions | 949 | | ( 4 | ( 4 | 6 996 | | (426 | (426 | 7 94 | | (440 | (440 |
| Manufactured hous ng | 212 | ( 8 | | ( 8 | 68 | ( 7 | ( 9 | ( 6 | 897 | ( 9 | ( 9 | ( 74 |
| Ginnie Mae | | | | | 7 | | | | 7 | | | |
| Total mortgage related securities | 22 3 8 | (8 604 | (26 | (8 869 | 0 46 | (1 929 | ( 7 877 | (33 806 | 132 494 | (2 33 | (18 142 | (42 67 |
| Total available or sale securities in a gross unrealized loss position | $22 3 8 | $(8 604 | $(26 | $(8 869 | $ 0 46 | $(1 929 | $( 7 877 | $(33 806 | $132 494 | $(2 33 | $(18 142 | $(42 67 |

(1) Repesen s he pe- ax amoun of non-c ed - e a ed o he - han- empo a y mpa men s on ava lable-fo -sale secu es no expec ed o be so d wh ch a e ecogn zed n AOCI

(2) Repesen s he pe- ax amoun of empo a y mpa men s on ava lable-fo -sale secu es ecogn zed n AOCI

At December 31, 2010, total gross unrealized losses on available for sale securities were $23.1 billion, as noted in Table 8.2. The gross unrealized losses relate to 2,496 individual lots representing 2,403 separate securities, including securities with non credit related other than temporary impairments recognized in AOCI We routinely purchase multiple lots of individual securities at different times and at different costs We determine gross unrealized gains and gross unrealized losses by specifically identifying investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available for sale securities within our consolidated statements of operations as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary We prospectively adopted an amendment to the accounting standards for investments in debt and equity securities on April 1, 2009. This amendment changed the recognition, measurement and presentation of other than temporary impairment for debt securities See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES Other Changes in Accounting Principles *Change in the Impairment Model for Debt Securities*" for further information regarding the impact of this amendment on our consolidated financial statements

We conduct quarterly reviews to evaluate each available for sale security that has an unrealized loss for other than temporary impairment An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0866

Table of Contents

recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security  If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI  The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

Our net impairment of available for sale securities recognized in earnings on our consolidated statements of operations for the years ended December 31, 2010 and 2009, includes amounts related to certain securities where we have previously recognized other than temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non credit losses in AOCI and charged to earnings  In certain instances, we recognized credit losses in excess of unrealized losses in AOCI

The evaluation of whether unrealized losses on available for sale securities are other than temporary contemplates numerous factors  We perform an evaluation on a security by security basis considering all available information  The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment  Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default and prepayment models. The modeling for CMBS employs third party models that require assumptions about the economic conditions in the areas surrounding each individual property;

- analysis of the performance of the underlying collateral relative to its credit enhancements using techniques that require assumptions about future loss severity, default, prepayment, and other borrower behavior  Implicit in this analysis is information relevant to expected cash flows (such as collateral performance and characteristics);

- the length of time and extent to which the fair value of the security has been less than the book value and the expected recovery period; and

- the impact of changes in credit ratings (*i.e.*, rating agency downgrades)

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of operations as net impairment of available for sale securities recognized in earnings

See "Table 8 2    Available For Sale Securities in a Gross Unrealized Loss Position" for the length of time our available for sale securities have been in an unrealized loss position  Also see "Table 8 3    Significant Modeled Attributes for Certain Non Agency Mortgage Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non agency mo rtgage-related securities would experience a cash shortfall

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage related securities issued by Fannie Mae as investments in securities in accordance with the accounting standards on investments in debt and equity securities. In contrast, commencing January 1, 2010, our purchase of mortgage related securities that we issue (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage related security that we purchase  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for additional information  We hold these Freddie Mac and Fannie Mae securities that are in an unrealized loss position at least to recovery and typically to maturity  As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary

### Non Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans

We believe the unrealized losses on the non agency mortgage related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other than temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectibility of amounts that would be recovered from primary monoline insurers  In the case of monoline insurers, we also consider factors

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers  We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non performing loan populations

Table 8 3 presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain non agency mortgage related securities will experience a cash shortfall  Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated  The model uses projections of future home prices at the state level  Assumptions of voluntary prepayment rates derived from our proprietary prepayment models are also an input to the present value of expected losses and are discussed below

**Table 8.3    Significant Modeled Attributes for Certain Non Agency Mortgage Related Securities**

| | December 31, 2010 | | | Alt-A(1) | |
| | Subprime irst lien | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and p o | | | | | |
| UPB | $    1,354 | $    129 | $ 1,010 | $    583 | $ 2,385 |
| We gh ed ave age colla e al defa   s(2 | 35% | 38% | 8% | 50% | 26% |
| We gh ed ave age colla e al seve   es(3 | 56% | 53% | 46% | 52% | 39% |
| We gh ed ave age volun a y p epaymen   a es( | 4% | 6% | 9% | 2% | 4% |
| Ave age c ed  enhancemen ( | 41% | 20% | 14% | 19% | 16% |
| 2005 | | | | | |
| UPB | $    7,771 | $ 3,128 | $1,334 | $    936 | $ 4,335 |
| We gh ed ave age colla e al defa   s(2 | 55% | 53% | 24% | 58% | 45% |
| We gh ed ave age colla e al seve   es(3 | 66% | 63% | 53% | 57% | 49% |
| We gh ed ave age volun a y p epaymen   a es( | 1% | 8% | 6% | 1% | 3% |
| Ave age c ed  enhancemen ( | 54% | 18% | 6% | 28% | 7% |
| 2006 | | | | | |
| UPB | $   21,710 | $ 7,605 | $   620 | $ 1,283 | $ 1,342 |
| We gh ed ave age colla e al defa   s(2 | 65% | 66% | 39% | 66% | 57% |
| We gh ed ave age colla e al seve   es(3 | 70% | 69% | 60% | 63% | 56% |
| We gh ed ave age volun a y p epaymen   a es( | 5% | 6% | 4% | 2% | 3% |
| Ave age c ed  enhancemen ( | 19% | 7% | 9% | 1% | 4% |
| 2007 | | | | | |
| UPB | $   22,921 | $ 4,784 | $   171 | $ 1,522 | $    396 |
| We gh ed ave age colla e al defa   s(2 | 63% | 65% | 54% | 67% | 64% |
| We gh ed ave age colla e al seve   es(3 | 72% | 70% | 68% | 66% | 67% |
| We gh ed ave age volun a y p epaymen   a es( | 5% | 3% | 2% | 3% | 3% |
| Ave age c ed  enhancemen ( | 21% | 15% | 16% | 1% | 0% |
| To a | | | | | |
| UPB | $   53,756 | $ 15,646 | $3,135 | $ 4,324 | $ 8,458 |
| We gh ed ave age colla e al defa   s(2 | 62% | 63% | 23% | 62% | 42% |
| We gh ed ave age colla e al seve   es(3 | 70% | 69% | 56% | 62% | 50% |
| We gh ed ave age volun a y p epaymen   a es( | 4% | 5% | 6% | 2% | 3% |
| Ave age c ed  enhancemen ( | 25% | 12% | 10% | 9% | 9% |

(1) Excludes non-agency mo gage- ela ed secu  es backed by o he  loans, wh ch a e p ma ly comp sed of secu  es backed by home equ y l nes of c ed
(2) T e expec ed cu  u a ve defau   a e exp essed as a pe cen age of he cu en co a e a  UPB
(3) The expec ed ave age  oss g ven defau  ca cu a ed as he a o of cumu a ve oss ove cumu a ve defau  a e fo each secu  y
(4) T e secu  y's vo  un a y p epay e   a e exp ess d as he ave age of he mon h y vo un a y p epaymen a e we gh ed by he secu  y's ou s and ng UPB
(5) R ef ec s  e a oo of e c e a o  of e sec   es  a w  abso b osses n he secu  za on s u c u e befo e any osses a e a oca ed o secu  es ha we own
     Pe cen age gene a ly ca cu a ed based on he o a UPB of a c ed  enhancemen  n he fo m of subo d na on of he secu  y d v ded by he o a UPB of a  of he
     anches of colla e al pools f om wh c c ed  s ppo  s d aw  fo e secu  y  a we ow   Exc udes c ed  enhancemen  p ov ded by mono ne bond nsu ance

In evaluating the non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans for other than temporary impairment, we noted that the percentage of securities that were AAA rated and the percentage that were investment grade declined significantly since acquisition  While these ratings have declined, the ratings themselves are not determinative that a  loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security by security analyses provide a more consistent view of the ultimate collectibility of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same  ratings were not other than temporarily impaired  However, we carefully consider individual ratings, especially those below  investment grade, including changes since December 31, 2010

Our analysis is conducted on a quarterly basis and is subject to  change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available  While it is reasonably possible that, under certain

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0868

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

conditions, collateral losses on our remaining available for sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 3 , 20 0

In addition, we considered fair values at December 31, 2010, as well as any significant changes in fair value since December 3 , 20 0 to assess if they were indicative of potential future cash shortfalls. In this assessment, we put greater emphasis on categorical pricing information than on individual prices. We use multiple pricing services and dealers to price the majority of the non agency mortgage related securities we hold We observed significant dispersion in prices obtained from different sources However, we carefully consider individual and sustained price declines, placing greater weight when dispersion is lower and less weight when dispersion is higher Where dispersion is higher, other factors previously mentioned receive greater weight For further information, see "NOTE 20: FAIR VALUE DISCLOSURES."

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market We use external models to identify securities that have an increased risk of failing to make their contractual payments We then perform an analysis of the underlying collateral on a security by security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 3 , 20 0 We do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities

### Monoline Bond Insurance

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our non agency mortgage-re ated securities as well as our non mortgage related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary monoline bond insurer's ability to pay all future claims can give rise to recognition of other-than temporary impairment recognized in earnings See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS     Bond Insurers" for additional information.

### Other Than Temporary Impairments on Available for Sale Securities

Table 8.4 summarizes our net impairments of available for sale securities recognized in earnings by security type

### Table 8.4    Net Impairment of Available For Sale Securities Recognized in Earnings[1]

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings For the Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
| Mo gage- ela ed secu es | | | |
| Subp me | $(1,769) | $ (6,526) | $  (3,621) |
| Op on ARM | (1,395) | (1,726) | (7,602) |
| A  -A and o he | (1,020) | (2,572) | (5,253) |
| CMBS | (97) | (137) | |
| Obl ga ons of s a es and pol cal subd v s ons | | | (68) |
| Ma fac ed o s g | (27) | (51) | (90) |
| To a l o he - han- empo a y mpa men s on mo gage- ela ed secu es | (4,308) | (11,012) | (16,634) |
| Non-mo gage- ela ed secu es | | | |
| Asse -backed secu es | | (185) | (1,048) |
| To a l o he - han- empo a y mpa men s on non-mo gage- ela ed secu es | | (185) | (1,048) |
| To a l o he - han- empo a y mpa men s on ava lable-fo -sale secu es | $(4,308) | $(11,197) | $(17,682) |

(1) As a esu of he adop on of an amendmen o he accoun ng s a da ds fo ves es deb a d eq y sec es o Ap 11, 2009, ne mpa men of ava lable-fo sale secu es ecogn zed n ea n ngs fo he n ne mon hs ended Dece 31, 2009 (wh ch s nc uded n he yea ended Dece be 31, 2009) and he yea ended Decembe 31, 2010 nclude c ed - ela ed o he - han- empo a y mpa men s and o he - han- empo a y mpa men s on secu es wh ch we n end o sell o s mo e ke y han no ha we w be equ ed o se I con as, ne mpa men of ava lable-fo -sale secu es ecogn zed n ea n ngs fo he en o se ded Ma c 31, 2009 (wh ch s nc uded n he yea ended Dece be 31, 2009) and he yea ended Decembe 31, 2008 nc udes bo h c ed - e a ed and non-c ed - ela ed o he - han- empo a y mpa men s as well as o he - han- empo a y mpa men s on secu es fo wh ch we cou d no asse he pos ve n en and ab y o ho d un ecove y of he un ea zed osses

Source    D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-0869          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Net impairment of available for sale securities recognized in earnings includes other than temporary impairments of non mortgage related asset backed securities where we could not assert that we did not intend to sell these securities before a recovery of the unrealized losses  The decision to impair these asset backed securities is consistent with our consideration of these securities as a contingent source of liquidity  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Investments in Securities" for information regarding our policy on accretion of impairments

Table 8 5 presents a roll forward of the credit related other than temporary impairment component of the amortized cost related to available for sale securities: (a) that we have written down for other than temporary impairment; and (b) for which the credit component of the loss is recognized in earnings  The credit related other than temporary impairment component of the amortized cost represents the  difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and  the amortized cost basis of the security prior to considering credit losses  The beginning balance represents the  other than temporary impairment credit loss component related to available for sale securities for which other than temporary impairment occurred prior to January 1, 2010. Net impairment of available for sale securities recognized in earnings is presented as additions in  two components based upon whether the current period is:  (a) the first time the debt security was credit impaired; or (b) not the first time the debt security was  credit impaired  The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell  previously credit impaired available for sale securities  Additionally, the credit loss component is reduced if we receive cash flows in excess of what we expected to  receive over the remaining life of the credit impaired debt  security or the security matures or is fully written down.

### Table 8.5    Other Than Temporary Impairments Related to Credit Losses on Available For Sale Securities[1]

| | Year ended December 31, 2010 (in millions) |
|---|---|
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance, remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $    11,513 |
| Additions | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 120 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 4,188 |
| Reductions | |
| Amounts related to securities which we sold, were in off or matured | (650) |
| Amounts related to amortization of increases in cash flows expected to be collected that are recognized over the remaining life of the security | (293) |
| Ending balance, remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings[2] | $    14,878 |

(1) Excludes other-than-temporary impairments on securities we have no intent to sell or some likely hano no that we will be required to sell before recovery of the unrealized losses

(2) Excludes increases in cash flows expected to be collected that will be recognized in earnings over the remaining life of the security of $558 million, net of amortization

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0870

Table of Contents

**Realized Gains and Losses on Available For Sale Securities**

Table 8 6 below illustrates the gross realized gains and gross realized losses received from the sale of available for sale securities

**Table 8.6    Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | | (in millions) | |
| **Gross rea zed ga ns** | | | |
| Mo gage- ela ed secu es | | | |
| F edd e Mac | $ 27 | $ 879 | $423 |
| Fann e Mae | 54 | 2 | 67 |
| Obl ga ons of s a es and pol cal subd v s ons | 3 | 2 | 75 |
| To al mo gage- ela ed secu es g oss eal zed ga ns | 84 | 883 | 565 |
| Non-mo gage- ela ed secu es | | | |
| Asse -backed secu es | 10 | 313 | 1 |
| To al non-mo gage- ela ed secu es g oss eal zed ga ns | 10 | 313 | 1 |
| G oss eal zed ga ns | 94 | 1,196 | 566 |
| **Gross realized losses** | | | |
| Mo gage- ela ed secu es (1 | | | |
| F edd e Mac | (1) | (113) | (13) |
| Fann e Mae | | | (2) |
| Op on ARM | (6) | | |
| Obl ga ons of s a es and pol cal subd v s ons | | | (5) |
| To al mo gage- ela ed secu es g oss eal zed losses | (7) | (113) | (20) |
| G oss eal zed losses | (7) | (113) | (20) |
| Ne eal zed ga ns (losses) | $87 | $1,083 | $546 |

(1) These nd v dua sa es do no change ou conc us on ha we do no n end o sell ou ema n ng mo gage- ela ed secu es and s no mo e ke y han no ha we w
    be equ ed o se such secu es befo e a ecove y of he un ea zed osses

**Maturities and Weighted Average Yield of Available For SaleSecurities**

Table 8.7 summarizes, by major security type, the remaining contractual maturities and weighted average yield of available for sale securities

**Table 8.7    Maturities and Weighted Average Yield of Available For SaleSecurities(1)**

| December 31, 2010 | Amortized Cost | Fair Value | Weighted Average Yield(2) |
|---|---|---|---|
| | (dollars in millions) | | |
| Mo gage- ela ed secu es | | | |
| Due w h n 1 yea o ess | $     164 | $     167 | 6 13% |
| D e af e 1   o g 5 yea s | 998 | 1,047 | 5 18 |
| D e af e 5   o g 10 yea s | 7,761 | 8,127 | 5 04 |
| Due af e 10 yea s | 238,600 | 223,293 | 3 68 |
| To al mo gage- ela ed secu es | 247,523 | 232,634 | 3 73 |
| To al ava lable-fo -sale secu es | $  247,523 | $232,634 | 3 73 |

(1) Ma u y nfo ma on p ov ded s based on con ac ua ma u es, wh ch may no ep esen expec ed fe as ob ga ons unde y ng hese secu es ay be p epa d a any
    me w hou pena y

(2) The we gh ed ave age y e d s ca cu a ed based on a y e d fo each nd v dua o he d a Decembe 31, 2010  The nume a o fo he nd v dua o y e d cons s s of he
    s of (a) he yea -end n e es coupon a e u p ed by he yea -end UPB and (b) he annual zed amo za on ncome o expense calcula ed fo Decembe 2010
    (exclud ng he acc e on of non-c ed - ela ed o he - han- empo a y mpa men s and any ad us en s eco ded fo changes n he effec ve a e) The denom na o fo he
    nd v dua o y e d cons s s of he yea -end amo zed cos of he lo exclud ng effec s of o he - han- empo a y mpa men s on he UPB of mpa ed lo s

**AOCI Related to Available For Sale Securities**

Table 8 8 presents the changes in AOCI related to available for sale securities  The net unrealized holding gains (losses) represents the net fair value adjustments recorded on available for sale securities throughout the year, after the effects of our federal statutory tax rate of 35%  The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available for sale security or the recognition of an impairment loss

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-0871          Powered by Morningstar® Document Research℠

Table of Contents

**Table 8.8     AOCI Related to Available For Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | (in millions) | | |
| Beg nn ng balance | $(20,616) | $(28,510) | $ (7,040) |
| Ad us men  o n  ally apply  he adop on of amendmen s  o accoun ng s anda ds fo   ansfe s of f nanc a  asse s and  he | | | |
| conso  da  on of VIEs(1 | (2,683) | | |
| Ad us men  o n  a y app y  he adop on of an amendmen  o  e acco       g s a  da ds fo    ves  e s  deb a d eq  y | | | |
| secu   es(2 | | (9,931) | |
| Adjus   en  o n  a y app y  he accoun ng s anda ds on  he fa  va ue op on of f nanc a  asse s and  ab    es(3 | | | (854) |
| Ne  un ea zed hold ng ga ns (losses)( | 10,876 | 11,250 | (31,753) |
| Ne   eclass f ca  on ad us men  fo  ne  eal zed losses( (6 | 2,745 | 6,575 | 11,137 |
| End ng balance | $ (9,678) | $ (20,616) | $(28,510) |

(1) Ne  of  ax benef  of $1 4 b    on fo   he yea  ended Decembe  31, 2010
(2) Ne  of  ax benef  of $5 3 b    on fo   he yea  ended  Decembe  31, 2009
(3) Ne  of  ax benef  of $460 m    on fo   he yea  ended Decembe  31, 2008
(4) Ne  of  ax be  ef  (expe se) of $(5 9) b    o , $(6 1) b    on and $17 1 b    on fo   he yea s ended  Dece  be  31, 2010, 2009 and 2008,  espec  ve y
(5) Ne  of  ax be  ef  of $1 5 b    o , $3 5 b    o  a d $6 0 b    on fo   he yea s ended Decembe  31, 2010, 2009 and 2008,  espec  ve y
(6) Inc udes  he  eve sa  of p ev ous y  eco ded un ea  zed  osses  ha  have been  ecogn zed on ou  conso  da ed s a emen s of ope a  ons as  mpa  men  losses on ava lable-
fo  -sale secu   es of $2 8 b    o , $7 3 b    o  a d $11 5 b    o ,   e  of  axes, fo   yea s e ded Dece  be  31, 2010, 2009 a d 2008,  espec  ve y

## Trading Securities

Table 8.9 summarizes the estimated fair values by major  security type for trading securities

**Table 8.9     Trading Securities**

| | December 31, | |
|---|---|---|
| | 2010 | 2009 |
| | (in millions) | |
| Mo  gage- ela ed secu   es | | |
| F edd e Mac | $ 13,437 | $170,955 |
| Fann e Mae | 18,726 | 34,364 |
| G nn e Mae | 172 | 185 |
| O he | 31 | 28 |
| To al mo  gage- ela ed secu   es | 32,366 | 205,532 |
| Non-mo  gage- ela ed secu   es | | |
| Asse -backed secu   es | 44 | 1,492 |
| T easu y b  s | 17,289 | 14,787 |
| T eas  y  o es | 10,122 | |
| FDIC-gua an eed co po a e med um- e m no es | 441 | 439 |
| To al non-mo  gage- ela ed secu   es | 27,896 | 16,718 |
| To al fa  value of   ad ng secu   es | $ 60,262 | $222,250 |

For the years ended December 31, 2010, 2009 and 2008 we  recorded net unrealized gains (losses) on trading securities  held at December 3 , 2010, 2009 and 2008 of $(1.4) billion, $4.3 billion and $1.6 billion,  respectively

Total trading securities include $2.5 billion and $3.3 billion, respectively, of assets as defined by the  derivative and hedging accounting guidance regarding certain hybrid financial instruments as of December 31, 2010  and  2009. Gains (losses) on trading securities on our consolidated statements of operations include gains (losses) of  $(53) million and $96 million, respectively, related to these trading securities for the years ended December 31, 2010  and 2009

## Collateral Pledged

### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for  securities purchased under agreements to resell transactions and  most derivative instruments are subject to collateral posting  thresholds generally related to a counterparty's credit rating  We consider the types of securities being pledged to us as collateral when determining how much we lend related to  securities purchased under agreements to resell transactions Additionally, we subsequently and regularly review the market  values of these securities compared to amounts loaned to ensure  our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $2.2 billion and $3.1 billion at December 3 , 2010 and 2009, respectively  Although it is our practice not to repledge assets held as collateral, a portion of the collateral  may be repledged based on master agreements related to our  derivative instruments  At December 31, 2010 and 2009, we did not have collateral in the form of securities pledged to and held by us under these master agreements  Also at December 31, 2010 and 2009, we did not have securities pledged to us for securities purchased under agreements to  resell transactions that we had the right to repledge  From time  to time we may obtain pledges of collateral from certain  seller/servicers as additional

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

TREASURY-0872

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties

In addition, we hold cash and cash equivalents as collateral primarily in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at December 31, 2010 and 2009 was $550 million and $322 million, respectively.

### Collateral Pledged by Freddie Mac

We are required to pledge collateral for margin requirements with third party custodians in connection with secured financings and derivative transactions with some counterparties  The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating  As of December 3 , 20 0, we had one uncommitted intraday line of credit with a third party, which is secured, in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates delinquent overdrafts by the GSEs, in connection with our use of the Fedwire system  In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank  We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

Table 8 10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged

### Table 8.10    Collateral in the Form of Securities Pledged

|  | December 31, | |
|---|---|---|
|  | 2010 | 2009 |
|  | (in millions) | |
| Sec  es p edged w   e ab  y fo  e sec ed pa y o  epledge |  |  |
| Deb  sec   es of co  so da ed   s s e d by   d pa es(1) | $ 9,915 | $ |
| Ava lable-fo  -sale secu   es | 817 | 10,879 |
| Sec  es p edged w  o  e ab  y fo  e sec ed pa y o  epledge |  |  |
| Deb  sec   es of co  so da ed   s s e d by   d pa es(1) | 5 |  |
| Ava lable-fo  -sale secu   es |  | 302 |
| To al secu   es pledged | $10,737 | $ 11,181 |

(1) Co   e c  g Ja  a y 1, 2010,  ep ese  s PCs  e d by  s    ou  Inves men s segmen  mo  gage  nves men s po  fol o and p edged as co  a e a  As a  esu   of  he change   n accoun ng p  nc p es, h s a  oun s  eco ded as a  educ on o  deb  sec    es of conso da ed   s s e d by   d pa es on o  conso da ed balance shee s

### Securities Pledged with the Ability of the Secured Party to Repledge

At December 3 , 20 0, we pledged securities with the ability of the secured party to repledge of $10 7 billion,  of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party  as discussed above.

At December 3 , 2009, we pledged securities with the ability of the secured party to repledge of $10 9 billion,  of which $10.8 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party  as discussed above.

There were no borrowings against the line of credit at  December 31, 2010 or 2009  The remaining $0 2 billion  and $0 1 billion of collateral posted with the ability of the secured party to repledge at December 3 , 20 0 and 2009, respectively, was posted in connection with our futures transactions.

### Securities Pledged without the Ability of the Secured Party to Repledge

At December 31, 2010 and 2009, we pledged securities  without the ability of the secured party to repledge of  $5 million and $302 million, respectively, at a clearinghouse in connection with our futures transactions

### Collateral in the Form of Cash Pledged

At December 31, 2010, we pledged $8 5 billion of collateral in the form of cash and cash equivalents, all but  $40 million of which related to our derivative agreements as we had $9.4 billion of such derivatives in a net loss  position  At December 3 , 2009, we pledged $5.8 billion of collateral in the form of cash and cash  equivalents, of which $5.6 billion related to our  derivative agreements as we had $6 0 billion of such derivatives in a net loss position  The remaining  $40 million and $220 million was posted at clearinghouses in connection with our securities and other derivative transactions at December 31, 2010 and 2009,  respectively

### NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated  balance sheets as either debt securities of consolidated trusts held by third parties or other debt that we issue to fund our operations  Commencing with our adoption of two new accounting standards on January 1, 2010, the mortgage loans that are held by the consolidated securitization trusts are

223

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

recognized as mortgage loans held for investment by consolidated trusts and the beneficial interests issued by the consolidated securitization trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for additional information

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding  20% of the amount of mortgage assets we are allowed to own on December 3  of the immediately preceding calendar year  Our debt cap under the Purchase Agreement was $1 08 trillion in  2010 and will be $972 billion in 2011.

Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations  Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to any change in the accounting standards related to transfers of financial assets and consolidation of VIEs or any similar accounting standard  We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

As of December 3 , 20  0, we estimate that the par value of our aggregate indebtedness totaled $728 2 billion, which was approximately $351 8 billion below the applicable limit of $1 08 trillion  Our aggregate indebtedness is calculated  as the par value of: (a) total debt, net; less (b) debt securities of consolidated trusts held by third parties

In the tables that follow, the categories of short term debt (due within one year) and long term debt (due after one year) are based on the original contractual maturity of the debt instrument classified as other debt.

Table 9 1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets  Prior periods have been reclassified to conform to the current presentation

## Table 9.1    Total Debt, Net

| | Interest xpense for the Year Ended December 31, | | | Balance, Net at(1) | |
| | 2010 | 2009 | 2008 | December 31, 2010 | December 31, 2009 |
| | (in millions) | | | (in millions) | |
|---|---|---|---|---|---|
| O e deb | | | | | |
| Sho  - e m deb | $  552 | $ 2,234 | $ 6,800 | $      197,106 | $      238,171 |
| Long- e m deb | | | | | |
| Sen o  deb | 16,317 | 19,754 | 26,278 | 516,123 | 541,735 |
| S  o d ed de | 46 | 162 | 254 | 711 | 698 |
| To al long- e m deb | 16,363 | 19,916 | 26,532 | 516,834 | 542,433 |
| To al o h e deb | 16,915 | 22,150 | 33,332 | 713,940 | 780,604 |
| Deb secu  es of conso da ed us s ed by   d pa  es | 75,216 | | | 1,528,648 | |
| To a de , e | $ 92,131 | $ 22,150 | $ 33,332 | $   2,242,588 | $      780,604 |

(1) Rep ese s pa va  e, of assoc a ed dsco  s, p e     s a d edge- e a ed bas s adj s  en s, w   $0 9 b  on and $0 5 b  on, espec ve y, of o he sho - e m de t, a d $3 6 b    o a d $8 4 b o , espec ve y, of o e ong- e  deb  ha ep esen s he fa  va ue of debt secu  es w h he fa  va ue op on e ec ed a  Decembe  31, 2010 and 2009

During 2010 and 2009, we recognized fair value gains (losses) of  $581 million and $(405) million, respectively, on our foreign currency denominated debt, of which $461 million and $(209) million, respectively, are gains (losses) related to our net foreign currency translation

### Other Short Term Debt

As indicated in Table 9.2, a majority of other short term debt consisted of Reference Bills® securities and discount notes, paying only principal at maturity  Reference Bills® securities, discount notes, and medium term notes are unsecured  general corporate obligations  Certain medium term notes that have original maturities of one year or less are classified as  other short term debt

224

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 9 2 provides additional information related to our other short term debt  Prior periods have been reclassified to conform to the current presentation

**Table 9.2    Other Short Term Debt**

| | December 31, | | | | | |
| | 2010 | | | 2009 | | |
| | Par Value | Balance, Net[1] | ffective Rate[2] | Par Value | Balance, Net[1] | ffective Rate[2] |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Refe ence B s® sec es a d d sco o es | $194,875 | $194,742 | 0 24% | $ 227,732 | $ 227,611 | 0 26% |
| Med um- e m no es | 2,364 | 2,364 | 0 31 | 10,561 | 10,560 | 0 69 |
| O he sho - e m deb | $ 197,239 | $ 197,106 | 0 25 | $238,293 | $238,171 | 0 28 |

(1) Rep ese s pa va e of assoc a ed d sco s a d p e s
(2) Rep esen s he we gh ed ave age effec ve a ha emans co s a ove e fe of es e , w c c des e amo za on of d scoun s o p em ums and a s a ce cos s

**Federal Funds Purchased and Securities Sold Under Agreements to Repurchase**

Securities sold under agreements to repurchase are effectively collateralized borrowing transactions where we sell securities with an agreement to repurchase such securities. These agreements require the underlying securities to be delivered to the dealers who arranged the transactions  Federal funds purchased are unsecuritized borrowings from commercial banks that are members of the Federal Reserve System  At both December 31, 2010 and 2009, we had no balances in federal funds purchased and securities sold under agreements to repurchase.

**Other Long Term Debt**

Table 9 3 summarizes our other long term debt  Prior periods have been reclassified to conform to the current presentation

**Table 9.3    Other Long Term Debt**

| | Contractual Maturity[1] | December 31, | | | | | |
| | | 2010 | | | 2009 | | |
| | | Par Value | Balance, Net[2] | nterest Rates | Par Value | Balance, Net[2] | nterest Rates |
|---|---|---|---|---|---|---|---|
| | | (dollars in millions) | | | | | |
| O he long- e m deb | | | | | | | |
| O he sen o de t [3] | | | | | | | |
| F xed- a e | | | | | | | |
| Med um- e m no es ca ab e | 2011-2037 | $ 107,328 | $ 107,272 | 0 40%  6 50% | $ 154,545 | $ 154,417 | 1 00%  6 63% |
| Med um- e m no es non-ca ab e | 2011-2028 | 31,107 | 31,335 | 0 52%  13 25% | 15,071 | 15,255 | 1 00%  13 25% |
| U S do a Refe ence No es® sec es non-ca ab e | 2011-2032 | 239,497 | 239,486 | 0 38%  6 75% | 253,781 | 253,696 | 1 13%  7 00% |
| €Refe ence No es® sec es non-ca ab e | 2012-2014 | 2,021 | 2,131 | 4 38%  5 13% | 5,668 | 5,921 | 4 38%  5 75% |
| Va able- a e | | | | | | | |
| Med um- e m no es | 2011-2030 | 32,404 | 32,403 | Va ous | 24,084 | 24,081 | Va ous |
| Med um- e m no es non-callable | 2011-2026 | 91,332 | 91,346 | Va ous | 73,629 | 73,649 | Va ous |
| Ze o-coupon | | | | | | | |
| Med um- e m no es ca ab e | 2030-2040 | 12,191 | 2,971 | % | 23,388 | 4,444 | % |
| Med um- e m no es non-ca ab e[7] | 2011-2039 | 14,189 | 9,035 | % | 15,705 | 10,084 | % |
| Hedg ng- e a ed bas s ad us men s | | N/A | 144 | | N/A | 188 | |
| To al o he sen o deb | | 530,069 | 516,123 | | 565,871 | 541,735 | |
| O e s bo d a ed deb | | | | | | | |
| F xed- a e | 2011-2018 | 578 | 575 | 5 00%  8 25% | 578 | 575 | 5 00%  8 25% |
| Ze o-coupon[8] | 2019 | 331 | 136 | % | 331 | 123 | % |
| To a o he subo d na ed deb | | 909 | 711 | | 909 | 698 | |
| To a o he long- e m deb [9] | | $530,978 | $ 516,834 | | $ 566,780 | $ 542,433 | |

(1) Rep esen s con ac ua ma u es a Decembe 31, 2010
(2) Rep esen s pa va ue of ong-e m deb secu es and subo d na ed bo ow ngs, ne of assoc a ed d scoun s o p em ums and hedge- e a ed bas s adjus en s
(3) Fo deb de o a ed a c u e cy o e a e US do a, e o s and ng ba ance s based on e exc ange a e a Decembe 31, 2010 and 2009, espec ve y
(4) Includes callable F edd eNo es® secu es of $5 4 b on and $6 1 b on a Decembe 31, 2010 and 2009, espec ve y
(5) Includes callable F edd eNo es® secu es of $7 0 b on and $5 5 b on a Decembe 31, 2010 and 2009, espec ve y
(6) The effec ve a es fo ze o-coupon med um- e m no es callable anged f om 4 40%  7 25% a d 5 78%  7 25% at Decembe 31, 2010 and 2009, espec ve y
(7) The effec ve a es fo ze o-coupon med um- e m no es non-callable anged f om 0 52%  11 18% a d 0 56%  11 18% a Decembe 31, 2010 and 2009, espec vely
(8) The effec ve a e fo ze o-coupon subo d na ed deb was 10 51% a bo h Decembe 31, 2010 and 2009
(9) The effec ve a es fo he long-e m deb we e 2 78% and 3 41% a Dece be 31, 2010 and 2009, espec ve y  The effec ve a e ep esen s he we gh ed ave age effec ve a e ha a ans cons an ove he fe of he ns u en , wh ch nc udes he amo za on of d scoun s o p em ums and ssuance cos s and hedg ng- ela ed ass ad jus e s

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0875

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

A portion of our other long term debt is callable  Callable debt  gives us the option to redeem the debt security at par on one or  more specified call dates or at any time on or after a specified  call date

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties  represents our liability to third parties that hold beneficial  interests in our consolidated securitization trusts (*e.g.*, single family PC trusts and certain Other  Guarantee Transactions).

Table 9 4 summarizes the debt securities of our consolidated  trusts held by third parties based on underlying mortgage  product type.

**Table 9.4    Debt Securities of Our Consolidated Trusts Held by Third Parties**[1]

| | | December 31, 2010 | | |
| | Contractual Maturity[2] | UPB | Balance, Net | Interest Rates[2] |
| | | (dollars in millions) | | |
| Debt securities of consolidated trusts held by  third parties | | | | |
| Single-family | | | | |
| 30-year amortizing, fixed-rate | 2011-2048 | $1,110,943 | $1,118,994 | 1 60% - 16 25% |
| 20-year fixed-rate | 2012-2031 | 63,941 | 64,752 | 3 50% - 9 00% |
| 15-year fixed-rate | 2011-2026 | 227,269 | 229,510 | 2 50% - 10 50% |
| Adjustable-rate[3] | 2011-2047 | 50,904 | 51,351 | % - 10 05% |
| Interest-only[4] | 2026-2040 | 61,773 | 61,830 | 1 87% - 7 86% |
| FHA/VA | 2011-2040 | 2,171 | 2,211 | 1 60% - 15 00% |
| Total debt securities of consolidated trusts held by  third parties | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by  third parties are prepayable without penalty
(2) Based on contractual maturity and  yield rates as of debt securities of our consolidated  trusts held by  third parties
(3) The minimum interest rate of 0% reflects interest as on principal-only classes of Other  Guarantee Transactions
(4) Includes interest-only securities and interest-only mortgage loans have a low the borrower's option on y interest for a fixed period of time before the loan begins to  amortize
(5) The effective rate for debt securities of consolidated trusts held by  third parties was 4 57% at December 31, 2010  The effective rate represents the weighted average  effective rate, which includes the amortization of discounts or premiums

Table 9.5 summarizes the contractual maturities of other long term debt securities and debt securities of consolidated  trusts held by third parties at December 3 , 20 0

**Table 9.5    Contractual Maturity of Other Long Term Debt and Debt Securities  of Consolidated Trusts Held by Third Parties**

| Annual Maturities | Par Value[1][2] (in millions) |
| --- | --- |
| Other debt | |
| 2011 | $  120,951 |
| 2012 | 138,474 |
| 2013 | 79,177 |
| 2014 | 36,328 |
| 2015 | 45,779 |
| Thereafter | 110,269 |
| Debt securities of consolidated trusts held by  third parties[3] | 1,517,001 |
| Total | 2,047,979 |
| Net discounts, premiums,  hedge-related and other basis adjustments | (2,497) |
| Total debt securities of consolidated trusts held by  third parties and other long-term debt | $2,045,482 |

(1) Represents par value of our long-term  debt securities and subordinated borrowings and UPB of debt securities of our consolidated  trusts held by  third parties
(2) Par value denominated in a currency other than the U S dollar, are valued based on a change rate at December 31, 2010
(3) Contractual maturities of debt securities of consolidated trusts held by third parties may not represent expected maturity as they are prepayable at any  time without penalty
(4) Other bases adjustments represent changes in fair value related to our documents -specific credit risk related to the foreign-currency-denominated debt

**Lines of Credit**

At both December 31, 2010 and 2009, we had one secured,  uncommitted intraday line of credit with a third party totaling  $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday  activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by GSEs. No amounts  were drawn on this line of credit at December 3 , 20 0 or December 3 , 2009  We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and  when needed

*Freddie Mac*

Source   D RA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0876

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable

## NOTE 10: FINANCIAL GUARANTEES

We securitize substantially all of the single family mortgage loans we purchase and issue securities backed by such mortgages, which we guarantee  Beginning January 1, 2010, we no longer recognize a financial guarantee for such trusts as we recognize  both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets  See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information about changes in accounting affecting our securitized guarantees  Table 10 1 presents our maximum potential amount of future payments, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets

**Table 10.1     Financial Guarantees**

| | December 31, 2010 | | | December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities | $ 25,279 | $  202 | 41 | $1,854,813 | $11,949 | 43 |
| Other guarantee commitments | 18,670 | 427 | 38 | 15,069 | 516 | 40 |
| Derivative instruments | 37,578 | 301 | 35 | 30,362 | 76 | 33 |
| Servicing-related premium guarantees | 172 | | 5 | 193 | | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties to both owed a default, without consideration of possible recoveries under credit enhancement on a margin arrangement, such as collateral, and in the day-to-day management of our defaults, and of the amounts pledged  The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral and liquidation  In addition, the maximum exposure for our guaranty guarantees is not our liability exclusive of our default guarantees on the sale securities before, these amounts are not included when the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments

**Non-consolidated Freddie Mac Securities**

We issue three types of mortgage related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions  We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers  Commencing January 1, 2010, only our guarantees issued to non consolidated securitization trusts are accounted for in accordance with the accounting standards for guarantees (i.e., a guarantee asset and guarantee obligation are recognized)

At December 3 , 20 0 and 2009, there were  $1.4 trillion and $1.7 trillion, respectively, of securities we issued in resecuritization of our PCs and other previously issued REMICs and Other Structured Securities. The securities issued in these resecuritizations consist of single class and multiclass securities backed by PCs, REMICs, interest only strips, and principal only strips and do not increase our credit related exposure  As a result, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk  Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non consolidated securitization trusts  In addition to our guarantee obligation, we recognized a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0 2 billion and $32.4 billion at December 31, 2010 and 2009, respectively  For many of the loans underlying our non consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVE" for information about credit protections on loans we guarantee  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" for further information about our accounting for financial guarantees

During 2010 and 2009, we issued and guaranteed  $375.9 billion and $467.0 billion, respectively, in UPB of Freddie Mac mortgage related securities backed by single family mortgage loans (excluding those backed by HFA bonds)  In accordance with the changes in accounting standards for the consolidation of VIEs, we did not recognize a guarantee asset or a guarantee obligation for these single family securities  We also issued approximately $5.9 billion and $2.1 billion in UPB of Other Structured Securities and Other Guarantee Transactions backed by multifamily mortgage loans during 2010 and 2009, respectively, for which a guarantee asset and guarantee obligation were recognized  As explained above, the vast majority of our issued mortgage related securities are no longer accounted for in accordance with the accounting standards for guarantees (i.e., a guarantee asset and guarantee obligation are not recognized) as a result of the consolidation of certain

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                  TREASURY-0877                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use, omissions or damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of our securitization trusts commencing January 1, 2010.  See "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information on mortgage loans underlying our consolidated mortgage trusts

In connection with transfers of financial assets to non consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting standards for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust)  See "NOTE 11: RETAINED INTERESTS IN MORTGAGE RELATED SECURITIZATIONS" for further information on these retained interests

**Securitization Trusts**

Effective December 2007 we established securitization trusts for the administration of cash remittances received on the underlying assets of our PCs and REMICs and Other Structured Securities. As described in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES," we now recognize the cash held by our consolidated single family PC trusts and certain Other Guarantee Transactions as restricted cash and cash equivalents on our consolidated balance sheets  We receive fees as master servicer, issuer, trustee and administrator for our consolidated PCs and REMICs and Other Structured Securities, however, such amounts are now recorded within net interest income  These fees are derived from interest earned on principal and interest cash flows held in restricted cash and cash equivalents between the time funds are remitted to the trust by servicers and the date of distribution to our PCs and REMICs and Other Structured Securities holders  These fees are offset by interest expense we incur when a borrower prepays a mortgage, but the full amount of interest for the month is due to the PC investor  We recognized trust management income (expense) of $0 million, $(761) million, and $(70) million during 2010 (on our non consolidated trusts), 2009 (on all trusts), and 2008 (on all trusts), respectively, on our consolidated statements of operations

**Other Guarantee Commitments**

We provide long term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements  These other guarantee commitments totaled $5.5 billion and $5.1 billion of UPB at December 31, 2010 and 2009, respectively  We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.7 billion and $9.2 billion in UPB at December 31, 2010 and 2009, respectively. In addition, as of December 31, 2010 and 2009, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.5 billion and $0.8 billion, respectively

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees "  These guarantees require us to advance funds to enable others to repurchase any tendered tax exempt and related taxable bonds that are unable to be remarketed  Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed  We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments  No advances under these liquidity guarantees were outstanding at December 3 , 20 0 or 2009

**Derivative Instruments**

Derivative instruments include written options, written swaptions, interest rate swap guarantees, and short term default guarantee commitments accounted for as credit derivatives  See "NOTE 12: DERIVATIVES" for further discussion of these derivative guarantees

We guaranteed the performance of interest rate swap contracts in three circumstances. First, as part of a resecuritization transaction, we transferred certain swaps and related assets to a third party  We guaranteed that interest income generated from the assets would be sufficient to cover the required payments under the interest rate swap contracts  Second, we guaranteed that a borrower would perform under an interest rate swap contract linked to a borrower's adjustable rate mortgage  And third, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax exempt bonds, we guaranteed that the sponsor of the transaction would perform under the interest rate swap contract linked to the senior variable rate certificates that we issued

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans  If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets  To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the underlying mortgage loans

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Servicing Related Premium Guarantees**

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement  The liability associated with these agreements was not material at December 31, 2010 and 2009

**Other Indemnifications**

In connection with certain business transactions, we may provide  indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the  normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is  remote and there are no probable and estimable losses associated with these contracts  Therefore, we have not recorded any  liabilities related to these indemnifications on our  consolidated balance sheets at December 31, 2010 and 2009

## NOTE 11: RETAINED INTERESTS IN MORTGAGE RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment  to the accounting standards on consolidation of VIEs, we  consolidated our single family PC trusts and certain Other  Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our  single family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity  In addition, to the extent that we receive newly issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust  See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information regarding  the impacts of consolidation of our single family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non consolidated  trusts and third parties may continue to qualify as sales. In  connection with our transfers of financial assets that qualify  as sales, we may retain certain interests in the transferred  assets  Our retained interests are primarily beneficial interests issued by non consolidated securitization trusts  (*e.g.*, multifamily PCs and multiclass resecuritization  securities) These interests are included in investments in  securities on our consolidated balance sheets  In addition, our  guarantee asset recognized in connection with non consolidated securitization transactions also represents a retained interest  For more information about our retained interests in  mo tgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Investments in Securities " These transfers and our resulting retained  interests are not significant to our consolidated financial  statements in 2010

Our exposure to credit losses on the loans underlying our  retained securitization interests and our guarantee asset was  recorded within our reserve for guarantee losses on PCs and as a  component of our guarantee obligation, respectively  For information regarding our charge offs, and delinquencies on loans we have securitized, see "NOTE 5: MORTGAGE LOANS  AND LOAN LOSS RESERVES" and "NOTE 6: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS " Table 11 1 below presents the carrying values of our retained interests in securitization transactions as of December 31, 2009  Carrying values of our retained interests at December 31, 20  0 were not significant

### Table 11.1    Carrying Value of Retained Interests

| | December 31, 2009 |
|---|---|
| | (in millions) |
| Re a ned In e es s, mo  gage- ela ed secu    es | $    91,537 |
| Re a  ed I  e es s, g a a   ee asse | $    10,444 |

**Retained Interests, Mortgage Related Securities**

We estimate the fair value of retained interests in mortgage  related securities based on independent price quotes  obtained from third party pricing services or dealer provided  prices  The hypothetical sensitivity of the carrying value of  retained securitization interests is based on internal models adjusted where necessary to align with fair values

**Retained Interests, Guarantee Asset**

Our approach for estimating the fair value of the guarantee  asset at December 31, 2009 used third party market data as  practicable  For approximately 80% of the fair value of the  guarantee asset, which related to fixed rate loan products that  reflect current market rates, the valuation approach involved obtaining dealer quotes on proxy securities with collateral  similar to aggregated characteristics of our portfolio  This  effectively equated the guarantee asset with current, or  "spot", market values for excess servicing interest only  securities  We consider these securities to be comparable to the guarantee asset in that they represent  interest only cash flows and do not have matching principal only  securities. The remaining 20% of the fair value of the guarantee  asset related to underlying loan products for which comparable  market prices were not readily available  These amounts related specifically to ARM products, highly seasoned loans or fixed rate  loans with coupons that are not consistent with current market rates. This portion of the guarantee asset was  valued using an expected cash flow approach, including only  those cash flows expected to result from our contractual right  to receive management and

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee fees, with market input assumptions extracted from the  dealer quotes provided on the more liquid products, reduced by  an estimated liquidity discount.

The fair values at the time of securitization and subsequent  fair value measurements at the end of a period were primarily  estimated using third party information. Consequently, we derived the assumptions presented in Table 11.2 by determining those implied by our valuation estimates, with the IRRs adjusted where necessary to align our internal models with  estimated fair values determined using third party information  However, prepayment rates are presented based on our internal  models and were not similarly adjusted  For the portion of our guarantee asset that was valued by obtaining dealer quotes on  proxy securities, we derived the assumptions from the prices we  were provided Table 11.2 contains estimates of the key assumptions used to derive the fair value measurement that  related solely to our guarantee asset on financial guarantees of single family loans  These represent the average assumptions  used both at the end of the period as well as the valuation assumptions at guarantee issuance during the year presented on a  combined basis.

**Table 11.2    Key Assumptions Used in Measuring the Fair Value of Guarantee Asset[1]**

| Mean Valuation Assumptions | or the Year  nded December 31, | |
|---|---|---|
| | 2009 | 2008 |
| IRRs(/2 | 13 8% | 12 3% |
| P epaymen   a es(3 | 26 4% | 15 5% |
| We gh ed ave ave l ves (yea s) | 3 3 | 5 6 |

(1) Es    a es based so e y on va ua  ons on ou  gua an ee asse   assoc a ed w  h s ngle-fam ly loans, wh ch  ep esen  app ox ma e y 97% of he o a  gua an ee asse

(2) IRR assu  p ons ep esen  a UPB we g ed ave age of   ed scoun   a es nhe en  n n he fa  va ue of  he  ecogn zed gua an ee asse  We es   a ed  e IRRs  s  g a  model wh ch employs mu  p e n e es   a e scena  os ve sus a s ng e assump  on

(3) A  hough p epaymen   a es a e s  a e s mu a ed mon h y,  he assump  ons above  ep esen  annua  zed p epay  en   a es based on UPB

The objective of the sensitivity analysis below is to present  our estimate of the financial impact of an unfavorable change in  the input values associated with the determination of fair  values of these retained interests  We did not use these inputs  in determining fair value of our retained interests as our measurements were principally based on third party pricing  information  The weighted average assumptions within Table 11.3 represent our estimates of the assumed IRR and  prepayment rates implied by market pricing as of each period end  and were derived using our internal models  Since we did not use  these internal models for determining fair value in our reported  results under GAAP, this sensitivity analysis is hypothetical and would not be indicative of actual results, particularly due  to the change in accounting standards on January 1, 2010. In addition, the effect of a variation in a particular  assumption on the fair value of the retained interest was  estimated independently of changes in any other assumptions. Changes in one factor would have resulted in changes in another,  which would have affected the impact of the change

**Table 11.3    Sensitivity Analysis of Retained Interests**

| | As of December 31, 2009 |
|---|---|
| | (dollars in millions) |
| **Retained Interests, Mortgage-Related Securities** | |
| We gh ed ave age IRR assump  ons | 4 5% |
| Impac  on fa  value of 100 bps unfavo able change | $   (3,634) |
| Impac  on fa  value of 200 bps unfavo able change | $   (7,008) |
| We gh ed ave age p epaymen   a e assump  ons | 11 4% |
| Impac  on fa  value of 10% unfavo able change | $   (85) |
| Impac  on fa  value of 20% unfavo able change | $   (161) |
| **Retained Interests, Guarantee Asset (Single-Family Only)** | |
| We gh ed ave age IRR assump  ons | 8 5% |
| Impac  on fa  value of 100 bps unfavo able change | $   (382) |
| Impac  on fa  value of 200 bps unfavo able change | $   (714) |
| We gh ed ave age p epaymen   a e assump  ons | 20 1% |
| Impac  on fa  value of 10% unfavo able change | $   (517) |
| Impac  on fa  value of 20% unfavo able change | $   (995) |

We receive proceeds in securitizations accounted for as sales  for those securities sold to third parties  Subsequent to these  securitizations, we receive cash flows related to interest income and repayment of principal on the securities we retain  for investment  Regardless of whether our issued mortgage related security is sold to third parties or held by us  for investment, we are obligated to make cash payments to  acquire foreclosed properties and certain delinquent or impaired mortgages under our financial guarantees  Table 11 4 summarizes cash flows on retained interests related to securitizations accounted for as sales during 2009 and 2008.  Cash flows associated with our retained interests in 2010 were  not significant.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0880

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 11.4   Details of Cash Flows

| | For the Year Ended December 31, | |
|---|---|---|
| | 2009 | 2008 |
| | (in millions) | |
| Cash flows from | | |
| Proceeds from transfers of Freddie Mac securities that we accounted for as sales[1] | $118,445 | $36,885 |
| Cash flows received on the guarantee asset[2] | 2,922 | 2,871 |
| Principal and interest from retained securitization interests[3] | 21,377 | 20,411 |
| Purchases of delinquent or foreclosed loans and equity purchase of balloon mortgage[4] | (26,346) | (13,539) |

(1) On our consolidated statement of cash flows, this amount is included in investing activities as part of proceeds from sales of trading and available-for-sale securities

(2) Represents cash received from securities we receive in sales transactions and the cash remittances received on management and guarantee fees, which are recognized as a guarantee asset. On our consolidated statements of cash flows, the change in guarantee asset and the corresponding management and guarantee fee income are reflected as operating activities

(3) On our consolidated statement of cash flows, this amount includes interest income (loss) and the principal repayments that are included in investing activities as part of proceeds from maturities of available-for-sale securities

(4) On our consolidated statement of cash flows, this amount is included in investing activities as part of purchases of held-for-investment mortgages. Includes our acquisitions of REO in cases where a foreclosure sale occurred when a loan was owned by the securitization

In addition to the cash flow shown above, we are obligated under our guarantee to make up any shortfalls in principal and interest to the holders of our securities, including those shortfalls arising from losses incurred in our role as trustee for the master trust, which administers cash remittances from mortgages and makes payments to the security holders. See "NOTE 10: FINANCIAL GUARANTEES" for further information on these cash flows

### Gains and Losses on Transfers of PCs and REMICs and Other Structured Securities that are Accounted for as Sales

The gain or loss on a securitization that qualifies as a sale is determined, in part, based on the carrying amounts of the financial assets sold. The carrying amounts of the assets sold are allocated between those sold to third parties and those held as retained interests based on their relative fair value at the date of sale. We recognized net pre tax gains (losses) on transfers of mortgage loans, PCs and REMICs and Other Structured Securities that were accounted for as sales of approximately $1.5 billion and $151 million for the years ended December 31, 2009 and 2008, respectively. These transactions were not significant in 2010 due to the changes in the accounting standards for consolidation of PC trusts and certain Other Guarantee Transactions that became effective January 1, 2010.

## NOTE 12: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non callable funding;

- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest rate characteristics of our mortgage assets; and

- hedge foreign currency exposure

### Hedge Forecasted Debt Issuances

We typically commit to purchase mortgage investments on an opportunistic basis for a future settlement, typically ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest rate derivatives to economically hedge the interest rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued

### Create Synthetic Funding

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short term debt issuances over a defined period and a pay fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long term fixed rate debt instrument of comparable maturity. Similarly, the combination of non callable debt and a call swaption, or option to enter into a receive fixed interest rate swap, with the same maturity as the non callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### Adjust Funding Mix

We generally use interest rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take

Source   DFRA HOM   OAN MORTGAG CORP, 10 K, February 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0881

TREASURY-0882

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

rebalancing actions to keep our interest rate risk exposure within management set limits  In a declining interest rate environment, we typically enter into receive fixed interest rate swaps or purchase Treasury based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets  In a rising interest rate environment, we typically enter into pay fixed interest rate swaps or sell Treasury based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign Currency Exposure

We use foreign currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign currency denominated debt by entering into swap transactions that effectively convert foreign currency denominated obligations into U S dollar denominated obligations

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR and Euribor based interest rate swaps;

- LIBOR and Treasury based options (including swaptions);

- LIBOR and Treasury based exchange traded futures; and

- Foreign currency swaps

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive and pay fixed interest rate swaps, respectively  Written call and put options on mortgage related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position  We use these written options and swaptions to manage convexity risk over a wide range of interest rates  Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest rate futures and options on buy up and buy down commitments

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; and (b) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts  Most of these commitments are derivatives subject to the requirements of derivatives and hedging accounting

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest rate swaps used to mitigate interest rate risk, which are accounted for as swap guarantee derivatives

### Credit Derivatives

We entered into credit derivatives, including risk sharing agreements  Under these risk sharing agreements, default losses on specific mortgage loans delivered by sellers are compared to default losses on reference pools of mortgage loans with similar characteristics. Based upon the results of that comparison, we remit or receive payments based upon the default performance of the referenced pools of mortgage loans  In addition, we have entered into agreements whereby we assume credit risk for mortgage loans held by third parties in exchange for a monthly fee  We are obligated to purchase any of the mortgage loans that become four months payments past due.

In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event  The rights and obligations under these agreements have been assigned to the servicers  However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Derivatives."

<div align="center">232</div>

<div align="right">*Freddie Mac*</div>

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Derivative Assets and Liabilities at Fair Value**

Table 12 1 presents the location and fair value of derivatives reported in our consolidated balance sheets

**Table 12.1    Derivative Assets and Liabilities at Fair Value**

| | At December 31, 2010 | | | At December 31, 2009 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| To a  de  va  ve po  o | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting standards for derivatives and hedging(2* | | | | | | |
| I  es - a e swaps | | | | | | |
| Rece ve-f xed | $ 324,590 | $ 6,952 | $ (3,267) | $ 271,403 | $ 3,466 | $ (5,455) |
| Pay-f xed | 394,294 | 3,012 | (24,210) | 382,259 | 2,274 | (16,054) |
| Bas s (floa ng o floa ng) | 2,375 | 6 | (2) | 52,045 | 1 | (61) |
| To a  n es - a e swaps | 721,259 | 9,970 | (27,479) | 705,707 | 5,741 | (21,570) |
| Op on-based | | | | | | |
| Call swap ons | | | | | | |
| P  c ased | 114,110 | 8,391 | | 168,017 | 7,764 | |
| W  en | 11,775 | | (244) | 1,200 | | (19) |
| P  Swap o s | | | | | | |
| P  c ased | 59,975 | 1,404 | | 91,775 | 2,592 | |
| W  en | 6,000 | | (8) | | | |
| O he op on-based de  va ves(3 | 47,234 | 1,460 | (10) | 141,396 | 1,705 | (12) |
| To al op on-based | 239,094 | 11,255 | (262) | 402,388 | 12,061 | (31) |
| F  t  es | 212,383 | 3 | (170) | 80,949 | 5 | (89) |
| Fo e gn-cu  ency swaps | 2,021 | 172 | | 5,669 | 1,624 | |
| Comm  men s( | 14,292 | 103 | (123) | 13,872 | 81 | (70) |
| C ed  de  va ves | 12,833 | 12 | (5) | 14,198 | 26 | (11) |
| Swap gua an ee de  va ves | 3,614 | | (36) | 3,521 | | (34) |
| To al De  va ves no des gna ed as hedg ng ns  umen s | 1,205,496 | 21,515 | (28,075) | 1,226,304 | 19,538 | (21,805) |
| Ne  ng adj s me s( | | (21,372) | 26,866 | | (19,323) | 21,216 |
| To al de  va ve po  fol o, ne | $1,205,496 | $    143 | $ (1,209) | $1,226,304 | $    215 | $ (589) |

(1) The va ue of de  va ves on ou  conso  da ed ba ance shee s s  epo ed as de  va ve asse s, ne  and de  va ve ab  es,  et

(2) See "Use of De  va ves" fo add  ona  nfo ma on abou  he pu pose of en e ng n o de  va ves no  des gna ed as hedg ng ns  umen s and ou  ove all  sk managemen  s a eg es

(3) P  ma  y nc udes pu chased  n e  es  a e caps and f oo s

(4) Comm men s nc lude (a) ou  commen s o pu chase and se  nves men n secu  and (b) ou  commen s o p  c ase a dex  g s o  ss ed eb  sec  es of o  conso  da ed  us s

(5) Rep es  es o e pa y e  g, cas  co a e a  e  g, e  ade/se e ecce vab e o  payab e, and ne  de  va ve n e es  ece vable o  payable  The ne  cash colla e al posted a  d et ade/se  e ecce vab e we e $6 3 b  on and $1 m  on, espec  ve y, a  Decembe  31, 2010  The ne  cash co  a e a  pos ed and ne   ade/se  e payab e  we e $2 5 b  on and $1  on, espec ve y, a  Decembe  31, 2009  The ne  n e es  ecce vab e (payab e) of de  va ve asse s and de  va e l ab l es was app ox ma ely $(0 8) b  on and $(0 6) b  on a  Decembe  31, 2010 and 2009, espec ve y, wh ch was ma n y e a ed o  e es a e swaps a we  ave e e ed  o

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net  Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets, net at December 3 , 2010 and 2009 was $2.2 billion and $3.1 billion, respectively  Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities, net at December 31, 2010 and 2009 was $8.5 billion and $5.6 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long term senior unsecured debt securities from S&P or Moody's. In the event our credit ratings fall below certain specified rating triggers or are withdrawn by S&P or Moody's, the counterparties to the derivative instruments are entitled to full overnight collateralization on derivative instruments in net liability positions  The aggregate fair value of all derivative instruments with credit risk related contingent features that were in a liability position on December 31, 2010, was $9.3 billion for which we have posted collateral of $8 5 billion in the normal course of business  If the credit risk related contingent features underlying these agreements were triggered on December 3 , 20 0, we would be required to post an additional $0 8 billion of collateral to our counterparties

At December 31, 2010 and 2009, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable  See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties

*Freddie Mac*

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0884

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Gains and Losses on Derivatives

Table 12 2 presents the gains and losses on derivatives reported in our consolidated statements of operations

### Table 12.2    Gains and Losses on Derivatives[1]

| Derivatives in Cash Flow Hedging Relationships[3] | Amount o Gain or (Loss) Recognized in AOCI on Derivative (ffective Portion) Year Ended December 31, | | | Amount o Gain or (Loss) Reclassiied from AOCI into Earnings (ffective Portion) Year Ended December 31, | | | Amount of Gain or (Loss) Recognized in Other Income (ffnective Portion and Amount Excluded rom Effectiveness Testing [2] Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| | | | | | (in millions) | | | | |
| Pay-fxed nees ae swaps( | $     | $     | $  (564) | $     | $     | $  (92) | $     | $     | $  (16) |
| Fowadsae commens | | | 17 | | | | | | |
| Cosed cash fow hedges( | | | | (1,010) | (1,165) | (1,283) | | | |
| oa | $     | $     | $  (547) | $ (1,010) | $ (1,165) | $ (1,375) | $     | $     | $  (16) |

| Derivatives not designated as hedging instruments under the accounting standards for derivatives and hedging[7] | Derivative Gains (osses)[6] Year Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
| Iees - ae swaps | | | |
| Recee ve-fxed | | | |
| Foegn-cuency denomnaed | $   (119) | $     64 | $    489 |
| US dolla denomnaed | 9,825 | (13,337) | 29,732 |
| Toal ecee ve-fxed swaps | 9,706 | (13,273) | 30,221 |
| Pay-fxed | (17,450) | 27,078 | (58,295) |
| Bass (floang o floang) | 65 | (194) | 109 |
| Toa nees - ae swaps | (7,679) | 13,611 | (27,965) |
| Opon-based | | | |
| Call swapons | | | |
| Pcased | 6,548 | (10,566) | 17,242 |
| Wen | (199) | 248 | 14 |
| Pswap os | | | |
| Pcased | (1,621) | 323 | (1,095) |
| Wen | 82 | (321) | 156 |
| Ohe opon-based devaves[8] | 33 | (370) | 763 |
| Toal opon-based | 4,843 | (10,686) | 17,080 |
| Ftes | (210) | (300) | (2,074) |
| Foegn-cuency swaps[9] | (468) | 138 | (584) |
| Commens[10] | (85) | (708) | (112) |
| Ced devaves | 5 | (4) | 27 |
| Swap guaanee devaves | 3 | (20) | (4) |
| Ohe[11] | | 12 | (27) |
| Soa | (3,591) | 2,043 | (13,659) |
| Accual of peod cse lemens | | | |
| Recee ve-fxed nees ae swaps[12] | 6,381 | 5,817 | 1,928 |
| Pay-fxed nees ae swaps | (10,909) | (9,964) | (3,482) |
| Foegn-cuency swaps | 19 | 89 | 319 |
| Ohe | 15 | 115 | (60) |
| Toal accual of peod cse lemens | (4,494) | (3,943) | (1,295) |
| oa | $ (8,085) | $  (1,900) | $ (14,954) |

(1) ora dervaves na qua fying hedge accounng re at onshps, the accrua of per od c cash sett ements s recorded n net nterest ncome on our conso dated statements of operat ons or dervat ves not n
    qua fy ng hedge account ng re at onsh ps, the accrua of per od c cash sett ements s recorded n dervat ve ga ns ( osses) on our conso dated statements of operat ons

(2) Ga n or ( oss) ar ses when the fa r va ue change of a der vat ve does not exact y offset the fa r va ue change of the hedged tem attributab e to the hedged risk, and is a component of other ncome n our
    conso idated statements of operations No amounts have been exc uded from the assessment of effect veness

(3) Der vat ves that meet spec f c cr ter a may be accounted for as cash f ow hedges Changes n the fa r va ue of the effect ve port on of open qua fy ng cash flow hedges are recorded n AOC Net deferred ga ns
    and osses on c osed cash f ow hedges (i.e., where the der vat ve s e ther term nated or redes gnated) are a so nc uded n AOC unt the re ated forecasted transact on affects earn ngs or s determ ned to be
    probab e of not occurring

( ) In 2008, we ceased des gnat ng der vat ve pos t ons as cash f ow hedges assoc ated w th forecasted ssuances of debt n con unct on w th our entry nto conservatorsh p on September 6, 2008 As a resu t of our
    d scont nuance of th s hedge account ng strategy, we transferred the prev ous y deferred amount of $( 72) m on re ated to the fa r va ue changes of these hedges from open cash f ow hedges to c osed cash f ow
    hedges within AOC on September 6, 2008

(5) Amounts reported in AOC re ated to changes in the fair va ue of commitments to purchase securities that are designated as cash f ow hedges are recogn zed as bas s ad ustments to the re ated assets wh ch
    are amort zed n earn ngs as nterest ncome Amounts nked to interest payments on ong-term debt are recorded n other debt nterest expense and amounts not nked to interest payments on ong-term debt
    are recorded n expense re ated to der vat ves

(6) Ga ns ( osses) are reported as der vat ve ga ns ( osses) on our conso dated statements of operat ons

(7) See "Use of Der vat ves" for add t ona nformat on about the purpose of enter ng nto der vat ves not des gnated as hedging instruments and our overa risk management strategies

(8) Primari y nc udes purchased interest rate caps and f oors

(9) ore gn-currency swaps are def ned as swaps w th the net sett ements based on one eg ca cu ated n a fore gn-currency and the other eg ca cu ated in U S do ars

(10) Commitments nc ude (a) our commitments to purchase and se nvestments n secur t es and (b) our comm tments to purchase and ext ngu sh or ssue debt secur t es of our conso dated trusts

(11) Re ated to the bankruptcy of ehman Brothers Ho dings, nc , or ehman

(12) nc udes imputed interest on zero-coupon swaps

*Freddie Mac*

Source  D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0885

Table of Contents

**Hedge Designation of Derivatives**

At December 31, 2010 and 2009, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges  As shown in Table  2 3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $2.2 billion and $2.9 billion at December 31, 2010 and 2009, respectively, composed of deferred net losses on closed cash flow hedges  Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges  Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted issuances of debt impact earnings  Over the next 12 months, we estimate that approximately $516 million, net of taxes, of the $2 2 billion of cash flow hedging losses in AOCI at  December 3 , 20 0 will be reclassified into earnings  The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years  However, over 70% and 90% of AOCI relating to closed cash flow hedges at December 3 , 20 0, will be reclassified to earnings over the next five and ten years, respectively

During 2008 we designated cash flow hedge accounting relationships for certain commitments to sell mortgage related securities; however, we discontinued hedge accounting for these derivative instruments in December 2008  In addition, during  2008, we designated certain derivative positions as cash flow hedges of changes in cash flows associated with our forecasted issuances of debt, consistent with our risk management goals, in an effort to reduce interest rate risk related volatility in our consolidated statements of operations  In conjunction with our entry into conservatorship on September 6, 2008, we determined that we could no longer assert that the associated forecasted issuances of debt were probable of occurring and, as a result, we ceased designating derivative positions as cash flow hedges associated with forecasted issuances of debt. As a result of our discontinuance of this hedge accounting strategy, we transferred $27.6 billion in notional amount and $(488) million in fair value from open cash flow hedges to closed cash flow hedges on September 6, 2008

Table  2 3 presents the changes in AOCI related to derivatives designated as cash flow hedges  Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur  If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately  For further information on our net deferred tax asset valuation allowance see "NOTE 14: INCOME TAXES."

**Table 12.3    AOCI Related to Cash Flow Hedge Relationships**

| | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
| | | (in millions) | |
|---|---|---|---|
| Beg nn ng balance(1 | $ (2,905) | $ (3,678) | $ (4,059) |
| Cumu a ve effec of change n accoun ng p nc p e(2 | (7) | | 4 |
| Ne change n fa va ue ea ed o cash f ow hedg ng ac v es(3 | | | (522) |
| Ne eclass f ca ons of losses o ea n ngs( | 673 | 773 | 899 |
| End ng balance(1 | $(2,239) | $ (2,905) | $(3,678) |

(1) Rep esen s he effec ve po on of he fa va ue of open de va ve con ac s (i.e., e ea zed ga s a d osses) and ne defe ed ga ns and osses on c osed (i.e., e m na ed o edes gna ed) cash flow hedges
(2) Rep esen ad us en s o n a y app y new accoun ng s anda ds  Ne of ax benef of $4 on and $0 m ll on fo yea s ended Decembe 31, 2010 and 2008, espec ve y  We adop ed (a) amendmen s o he accoun ng s anda ds on ansfe s of f nanc a asse s and conso da on of VIEs, as we as a change n he amo za on me hod fo ce a n ea ed defe ed ems du ng 2010 and (b) he accoun ng s anda d on he fa va ue op on fo f nanc a asse s and f nanc a l ab l es du ng 2008
(3) Ne of ax benef of $0 m on, $0 m on, and $25 m on fo he yea s ended Decembe 31, 2010, 2009 and 2008, espec ve y
(4) Ne of ax benef of $337 on, $392 on, and $476 m on fo he yea s ended Decembe 31, 2010, 2009 and 2008, espec ve y

**NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)**

**Issuance of Senior Preferred Stock**

Pursuant to the Purchase Agreement described in "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS," we issued one million shares of senior preferred stock to Treasury on September 8, 2008. The senior preferred stock was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the Purchase Agreement

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share  The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock  In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K,  ebruary 24, 2011                                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

preference of the senior preferred stock  As described below, we may make payments to reduce the liquidation preference of the  senior preferred stock in limited circumstances.

Treasury, as the holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of  Directors, cumulative quarterly cash dividends at the annual rate of  0% per year on the then current liquidation preference of the senior preferred stock  Total dividends paid in cash during 2010, 2009, and 2008 at the direction of the Conservator were $5.7 billion, $4.1 billion, and $172 million, respectively  If at any time we fail to pay cash dividends in a timely manner, then immediately following  such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash  full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be  2% per year

The senior preferred stock ranks ahead of our common stock and  all other outstanding series of our preferred stock, as well as  any capital stock we issue in the future, as to both dividends  and rights upon liquidation. The senior preferred stock provides  that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire,  or make a liquidation payment with respect to, any Freddie Mac common stock or other securities ranking junior to the senior  preferred stock unless: (a) full cumulative dividends on the outstanding senior preferred stock (including any unpaid  dividends added to the liquidation preference) have been  declared and paid in cash; and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock  for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not  convertible  Shares of the senior preferred stock have no  general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or  otherwise required by law  The consent of holders of at least two thirds of all outstanding shares of senior preferred stock  is generally required to amend the terms of the senior preferred  stock or to create any class or series of stock that ranks prior  to or on parity with the senior preferred stock

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of  senior preferred stock to the extent of: (a) accrued and unpaid dividends previously added to the liquidation preference  and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not  previously paid down. In addition, if we issue any shares of  capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to  pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per  share prior to the termination of Treasury's funding commitment  Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in  whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of  each outstanding share of senior preferred stock in full, the  shares will be deemed to have been redeemed as of the payment  date

Table 13.1 provides a summary of our senior preferred stock  outstanding at December 31, 2010

## Table 13.1   Senior Preferred Stock

| | Draw Date | Shares Authorized | Shares Outstanding | Total Par Value | Initial Liquidation Preference Price per Share | Total Liquidation Preference(1) | Redeemable On or After(2) |
|---|---|---|---|---|---|---|---|
| | | | | (in millions, except initial liquidation preference price per share) | | | |
| *Senior preferred stock:(3)* | | | | | | | |
| 10% | Septe   e 8, 2008 | 1 00 | 1 00 | $ 1 00 | $        1,000 | $     1,000 | N/A |
| 10% | Nove  be 24, 2008 | | | | N/A | 13,800 | N/A |
| 10% | Ma c  31, 2009 | | | | N/A | 30,800 | N/A |
| 10% | J   e 30, 2009 | | | | N/A | 6,100 | N/A |
| 10% | J   e 30, 2010 | | | | N/A | 10,600 | N/A |
| 10% | Septembe  30, 2010 | | | | N/A | 1,800 | N/A |
| 10% | Decembe  30, 2010 | | | | N/A | 100 | N/A |
| To al, sen o  p efe  ed s ock | | 1 00 | 1 00 | $ 1 00 | | $  64,200 | |

(1)  A  oun s s a ed a  ede  p on va ue

(2)  In acco dance w h  he Pu chase Ag ee en , un   he sen o  p efe  ed s ock s epa d o  edee ed n fu , we  ay no , w o    e p o w e co se of T eas y, edee , p  c ase, e   o o he w se acqu e any F edd e Mac equ y secu   es (o he  han  he sen o  p efe  ed s ock o  wa an )

(3)  D v dends on  e sen o  p efe  ed s ock a e cu u a ve, and   e d v dend a e s 10% pe  yea  Howeve , f a  any  me we fa   o pay cash d v dends n a  me y manne , hen  mmed a ely follow ng such fa lu e and fo  all d v dend pe ods  he eaf e un   he d v dend pe od fo  ow ng  he da e on wh ch we have pa d n cash fu  cu  u a ve d v dends, he d v dend a e w   be 12% pe  yea

(4)  We d d no  ece ve any cash p oceeds f o  T easu y as a  esu  of ssu ng  he n  al l qu da on p efe ence

(5)  Rep esen s an nc ease n he  qu da on p efe ence of ou  sen o  p efe  ed s ock due o  he  ece p of funds f o  T easu y

We received $10.6 billion in June 2010, $1.8 billion in September 2010, and $100 million in December 2010  pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of  March 31, 2010, June 30, 2010, and September 30, 2010, respectively  In addition, we had a deficit in net worth of $401 million as of

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0887

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2010  See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS      Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth  The aggregate liquidation preference on the senior preferred stock owned by Treasury was $64.2 billion and $51.7 billion as of December 31, 2010 and December 31, 2009, respectively  See "NOTE 18: REGULATORY CAPITAL" for additional information

### Issuance of Common Stock Warrant

Pursuant to the Purchase Agreement described in "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS," on September 7, 2008, we, through FHFA, in its capacity as Conservator, issued a warrant to purchase common stock to Treasury. The warrant was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the terms set forth in the Purchase Agreement

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise  The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0 0000  per share; and (c) the warrant  If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to  the formula specified in the warrant  Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person

We account for the warrant in permanent equity  At issuance on September 7, 2008, we recognized the warrant at fair value,  and we do not recognize subsequent changes in fair value while the warrant remains classified in equity  We recorded an aggregate fair value of $2 3 billion for the warrant as a component of additional paid in capital  We derived the fair value of the warrant using a modified Black Scholes model  If the warrant is exercised, the stated value of the common stock issued will be reclassified to common  stock in our consolidated balance sheets. The warrant was determined to be in substance non voting common stock, because the warrant's exercise price of $0 0000  per share is considered non substantive (compared to the market price of our common stock). As a result, the warrant is included in the computation of basic and diluted earnings (loss) per share. The weighted average shares of common stock outstanding for the years ended December 31, 2010, 2009, and 2008, respectively, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

### Preferred Stock

Table 13.2 provides a summary of our preferred stock outstanding at December 3 , 20 0  We have the option to redeem our preferred stock on specified dates, at their redemption price plus dividends accrued through the redemption date  However, without the consent of Treasury, we are restricted from making payments to purchase or redeem preferred stock as well as paying any preferred dividends, other than dividends on the senior preferred stock  In addition, all 24 classes of preferred stock are perpetual and non cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to additional paid in capital

TREASURY-0888

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 13.2    Preferred Stock**

| | Issue Date | Shares Authorized | Shares Outstanding | Total Par Value | Redemption Price per Share | Total Outstanding Balance[1] | Redeemable On or After[2] | OTC Symbol[3] |
|---|---|---|---|---|---|---|---|---|
| | | (in millions, except redemption price per share) | | | | | | |
| *Preferred stock:* | | | | | | | | |
| 996 Var ab e rate[4] | Apr 126, 1996 | 5 00 | 5 00 | $  5 00 | $  50 00 | $  250 | June 30, 2001 | FMCC |
| 5 81% | October 27, 1997 | 3 00 | 3 00 | 3 00 | 50 00 | 150 | October 27, 1998 | ( |
| 5% | March 23, 1998 | 8 00 | 8 00 | 8 00 | 50 00 | 00 | March 31, 2003 | FMCKK |
| 1998 Var ab e rate[6] | September 23 and 29, 1998 | 0 | 0 | 0 | 50 00 | 220 | September 30, 2003 | FMCCG |
| 5 10% | September 23, 1998 | 8 00 | 8 00 | 8 00 | 50 00 | 00 | September 30, 2003 | FMCCH |
| 5 30% | October 28, 1998 | 00 | 00 | 00 | 50 00 | 200 | October 30, 2000 | ( |
| 5 10% | March 19, 1999 | 3 00 | 3 00 | 3 00 | 50 00 | 150 | March 31, 200 | ( |
| 5 79% | Ju y 21, 1999 | 5 00 | 5 00 | 5 00 | 50 00 | 250 | June 30, 2009 | FMCCK |
| 999 Var ab e rate[7] | November 5, 1999 | 5 75 | 5 75 | 5 75 | 50 00 | 287 | December 31, 200 | MCC |
| 2001 Var ab e rate[8] | January 26, 2001 | 6 50 | 6 50 | 6 50 | 50 00 | 325 | March 31, 2003 | FMCCM |
| 2001 Var ab e rate[9] | March 23, 2001 | 60 | 60 | 60 | 50 00 | 230 | March 31, 2003 | FMCCN |
| 5 81% | January 16, 2001 | 3 5 | 3 5 | 3 5 | 50 00 | 173 | March 31, 2011 | FMCCO |
| 6% | May 30, 2001 | 3 5 | 3 5 | 3 5 | 50 00 | 173 | June 30, 2006 | FMCCP |
| 2001 Var ab e rate[10] | May 30, 2001 | 02 | 02 | 02 | 50 00 | 201 | June 30, 2003 | FMCCJ |
| 5 70% | October 30, 2001 | 6 00 | 6 00 | 6 00 | 50 00 | 300 | December 31, 2006 | FMCKP |
| 5 81% | January 29, 2002 | 6 00 | 6 00 | 6 00 | 50 00 | 300 | March 31, 2007 | ( |
| 2006 Var ab e rate[11] | Ju y 17, 2006 | 15 00 | 15 00 | 15 00 | 50 00 | 750 | June 30, 2011 | FMCCS |
| 6 2% | Ju y 17, 2006 | 5 00 | 5 00 | 5 00 | 50 00 | 250 | June 30, 2011 | FMCC |
| 5 90% | October 16, 2006 | 20 00 | 20 00 | 20 00 | 25 00 | 500 | September 30, 2011 | FMC  O |
| 5 57% | January 16, 2007 | 00 | 00 | 00 | 25 00 | 1,100 | September 30, 2011 | FMCKM |
| 5 66% | Apr  16, 2007 | 20 00 | 20 00 | 20 00 | 25 00 | 500 | March 31, 2012 | FMCKN |
| 6 02% | Ju y 2 , 2007 | 20 00 | 20 00 | 20 00 | 25 00 | 500 | June 30, 2012 | FMC |
| 6 55% | September 28, 2007 | 20 00 | 20 00 | 20 00 | 25 00 | 500 | September 30, 2017 | FMC |
| 2007 F xed to  loat ng rate[12] | December  , 2007 | 2 0 00 | 2 0 00 | 2 0 00 | 25 00 | 6,000 | December 31, 2012 | FMCKJ |
| Tota , preferred stock | | 6  17 | 6  17 | $  6 17 | | $  1 ,109 | | |

(1)  A  ou n s s a ed a  ede  p on va ue

(2)  In acco dance w  h  he Pu chase Ag ee en , un   he seno  p efe ed s ock s epa d o edee ed n fu , we  ay no , w o   e p o   o  ve  co se  of T eas  y,
    edee  , p c ase, e e o  o he w se acqu e any F edd e Mac equ y secu  es (o he  han he sen o  p efe ed s ock w e an an )

(3)  P efe ed s ock  ades exc us ve y  h ough  he OTC  a ke un ess o he w se no ed

(4)  D v de d a e ese qua e ya d se qu a o es  of  ee-o  LIBOR p s 1% d v ded by 1 377, a d s capped a  9 00%

(5)  Issued  h ough p va e p ace  en

(6)  D v de d a e esqu a e ya d se qu a o es  of  ee-o   LIBOR p s 1% d v ded by 1 377, a d s capped a  7 50%

(7)  D v dend a e ese s on Janua y 1 eve y f ve yea s af e  Ja  a y 1, 2005  ased o  a f ve-yea  Co s a  Ma   y T easu y a e, and s capped a  11 00%  Op ona
    edemp on on Decembe  31, 2004 and on Decembe  31 eve y f ve yea s  he eaf e

(8)  D v dend a e ese s on Ap   1 eve y two yea s af e   Ap  1, 2003 based o   a  wo-yea  Co s a  Ma   y T eas  y a e p s 0 10%, a d s capped a  11 00%
    Op ona  edemp on on Ma ch 31, 2003 and on Ma 31 eve y  wo yea s  he eaf e

(9)  D v dend a e ese s on Ap   1 eve y yea  based on 12-mon h LIBOR m nus 0 20%, and s capped a  11 00%  Op ona  edemp on on o  Ma ch 31, 2003 a d o
    Ma ch 31 eve y yea   he eaf e

(10) D v de d a e ese so  Ju y1 eve y two yea s af e   Ju y 1, 2003  ased o   e  wo-yea  Co s a  Ma   y T eas  y a e p s 0 20%, a d s capped a  11 00%
    Op ona  edemp on o o  Ju e 30, 2003 a d o Ju e 30 eve y  wo yea s  he eaf e

(11) D v de d a e esqu a e ya d se qu a o es  of  ee-o  LIBOR p s 0 50% b   o ess a  4 00%

(12) D v de d a e esa a  a  f xed a e of 8 375% f o  Dece be  4, 2007  h ough Dece be  31, 2012  Fo  he pe od beg n ng on o af e  Janua y 1, 2013,
    d v dend a e esqu a e ya d se qu a o es  of ge of (a) es  of  ee-o  LIBOR p s 4 16% pe a    o  ( ) 7 875% pe  annum  Op onal
    edemp on on Decembe  31, 2012, and on Decembe  31 eve y f ve yea s  he eaf e

## Stock Based Compensation

Following the implementation of the conservatorship in September  2008, we suspended the operation of our ESPP, and are no longer  making grants under our 2004 Employee Plan or our Directors' Plan  We collectively refer to the 2004 Employee Plan and the 1995 Employee Plan as the Employee Plans  Under the Purchase Agreement, we cannot issue any new options, rights to  purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms  Prior to conservatorship, we made  grants under three stock based compensation plans:

- *ESPP:* At December 31, 2010, the maximum number  of shares of common stock authorized for grant to employees in  accordance with the ESPP totaled 6.8 million shares and approximately  5 8 million shares remained available for  grant

- *2004 Employee Plan:* At December 3 , 20 0, the maximum number of shares of common stock authorized for grant to  employees in accordance with the 2004 Employee Plan totaled  30.9 million shares and approximately 26.0 million  shares remained available for grant

- *Directors' Plan:* At December 3 , 20 0, the maximum number of shares of common stock authorized for grant to  members of our Board of Directors in accordance with the Directors' Plan totaled 2 4 million shares and approximately 1 6 million shares remained available for grant

We did not repurchase or issue any of our common shares or  non cumulative preferred stock during 2010 and 2009, except for  issuances of treasury stock as reported on our consolidated  statements of equity (deficit) relating to stock based

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

compensation granted prior to conservatorship  Common stock  delivered under these stock based compensation plans consist of  treasury stock or shares acquired in market transactions on  behalf of the participants. During 2010, restrictions lapsed on  1,293,937 restricted stock units and 209,435 restricted stock units were forfeited  At December 31, 2010, 1,380,124 restricted stock units  remained outstanding  In addition, there were 41,160 shares of restricted stock outstanding at both December 31, 2010  and 2009  During 2010, no stock options were exercised and 591,390 stock options were forfeited or expired  At December 31, 2010, 3,182,452 stock options were  outstanding.

During the years ended December 31, 2010 and 2009, we  recognized $24 million and $57 million, respectively,  of compensation expense related to stock based compensation on  our consolidated statements of operations

**Dividends Declared During 2010**

No common dividends were declared in 2010  During 2010, we  paid  dividends of $5.7 billion in cash on the senior preferred  stock at the direction of our Conservator  We did not declare or pay dividends on any other series of Freddie Mac preferred stock  outstanding during 2010.

On March 30, 2010, our REIT subsidiaries paid preferred  stock dividends for one quarter, consistent with approval from  Treasury and direction from FHFA  No other preferred or common stock dividends were paid by the REITs during the year ended  December 3 , 20 0  See "NOTE 16: NONCONTROLLING  INTERESTS" for more information.

**Delisting of Common Stock and Preferred Stock from NYSE**

On July 8, 2010, we delisted our common and 20  previously listed classes of preferred securities from the NYSE  pursuant to a directive by FHFA, our Conservator

Our common stock and the classes of preferred stock that were  previously listed on the NYSE are traded exclusively in the OTC  market. Shares of our common stock now trade under the ticker  symbol FMCC. We expect that our common stock and the previously  listed classes of preferred stock will continue to trade in the OTC market so long as market makers demonstrate an interest in  trading the common and preferred stock.

### NOTE 14: INCOME TAXES

**Income Tax Benefit (Expense)**

We are exempt from state and local income taxes  Table   4    presents the components of our income tax benefit (expense) for  2010, 2009, and 2008

**Table 14.1     Federal Income Tax Benefit (Expense)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| | | (in millions) | |
| Cu  en  ncome  ax benef  (expense) | $ 186 | $ 160 | $   (45) |
| Defe  ed  ncome  ax benef  (expense) | 670 | 670 | (5,507) |
| To al  ncome  ax benef  (expense) (1) | $856 | $830 | $(5,552) |

(1) Does  o   ef ec  (a)  he defe  ed  ax effec s of un eal zed (ga ns) losses on ava lable-fo -sale secu  es,  he  ax effec s of ne  (ga ns)  osses  ea ed o  he effec ve  po  on of de va ves des gna ed n cash flow hedge  e a onsh ps, and  he  ax effec s of ce a n changes n ou  def ned benef  p ans wh ch a e  epo ed as pa  of AOCI; (b)  e a n s ock-based compensa on  ax effec s  epo ed as pa  of add  ona  pa d-n cap a  and (c)  he  ax effec  of  he cumu a ve  ax effec of change n accoun ng p  nc ples

A reconciliation between our federal statutory income tax rate  and our effective tax rate for 2010, 2009, and 2008 is presented  in Table 14.2.

**Table 14.2     Reconciliation of Statutory to Effective Tax Rate**

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2010** | | **2009** | | **2008** | |
| | Amount | Percent | Amount | Percent | Amount | Percent |
| | | | (dollars in millions) | | | |
| S a u o y co po a e  ax  a e | $ 5,209 | 35 0% | $ 7,834 | 35 0% | $ 15,597 | 35 0% |
| Tax-exemp  n e es | 213 | 1 4 | 252 | 1 1 | 266 | 0 6 |
| Tax c ed  s | 585 | 3 9 | 594 | 2 7 | 589 | 1 3 |
| Un ecogn zed  ax benef  s and  e a ed n e es es /con ngency  ese ves | (12) | (0 1) | (12) | (0 1) | 167 | 0 4 |
| Valua on allowance | (5,155) | (34 6) | (7,860) | (35 1) | (22,172) | (49 8) |
| O he | 16 | 0 1 | 22 | 0 1 | 1 | |
| Effec ve  ax  a e | $  856 | 5 7% | $  830 | 3 7% | $ (5,552) | (12 5)% |

In 2010, 2009, and 2008, our effective tax rate differs from  the  statutory tax rate of 35% primarily due to the establishment of  a valuation allowance against a portion of our net deferred tax  assets  Those income tax benefits recognized in 2010 and 2009  represent the current tax benefits associated with our ability to carry back net operating tax losses

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                     TREASURY-0890                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by or resulting from the negligence of such user. There is no guarantee of future results.

Table of Contents

generated in 2009 and expected to be generated in 20 0, as well as amounts related to the amortization of net deferred losses on pre 2008 closed cash flow hedges

**Deferred Tax Assets, Net**

The sources and tax effects of temporary differences that give rise to significant portions of deferred tax assets and liabilities for the years ended December 31, 2010 and 2009 are presented in Table 4 3

**Table 14.3    Deferred Tax Assets, Net**

| | 2010 | 2009 |
|---|---|---|
| | (in millions) | |
| Defe ed ax asse s | | |
| Defe ed fees | $  1,561 | $  1,613 |
| Bas s d ffe ences e a ed o de va ve ns umen s | 5,014 | 4,473 |
| C ed ela ed ems and ese ve fo loan losses | 17,850 | 16,296 |
| Bas s d ffe ences e a ed o asse s he d fo nves men | | 1,361 |
| Un eal zed (ga ns) losses ela ed o ava lable-fo -sale secu es | 5,211 | 11,101 |
| LIHTC and AMT c ed ca yfo wa d | 2,360 | 1,598 |
| Ne ope a ng oss ca yfo wa d, ne of un ecogn zed ax benef s | 12,122 | |
| O he e s, ne | 268 | 67 |
| To a defe ed ax asse s | 44,386 | 36,509 |
| Defe ed ax l ab l es | | |
| Bas s d ffe ences e a ed o asse s he d fo nves men | (5,270) | |
| Bas s d ffe ences e a ed o deb | (192) | (300) |
| To al defe ed ax l ab l y | (5,462) | (300) |
| Va ua on a owance(1 | (33,381) | (25,108) |
| Defe ed tax assets, et | $  5,543 | $  11,101 |

(1) The valua on allowance as of Decembe 31, 2010 ncludes $3 1 b on e a ed o he adop on of he accoun ng s anda ds fo ansfe s of f nanc a asse s and conso da on of VIEs See "NOTE 2 CHANGE IN ACCOUNTING PRINCIPLES" fo add onal nfo ma on

We use the asset and liability method to account for income taxes in accordance with the accounting standards for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, the net deferred tax assets will be realized or whether the valuation allowance should be adjusted.

Events since our entry into conservatorship, including those described in "NOTE 3: CONSERVATORSHIP AND RELATEDMATTERS," fundamentally affect our control, management, and operations and are likely to affect our future financial condition and results of operations These events have resulted in a variety of uncertainties regarding our future operations, our business objectives and strategies, and our future profitability, the impact of which cannot be reliably forecasted at this time In evaluating our need for a valuation allowance, we considered all of the events and evidence discussed above, in addition to: (a) our three year cumulative loss position; (b) our carryback and carryforward availability; (c) our difficulty in predicting unsettled circumstances; and (d) our conclusion that we have the intent and ability to hold our available for sale securities to the recovery of any temporary unrealized losses

Subsequent to the date of our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance After evaluating all available evidence, including the events and developments related to our conservatorship, volatility in the economy, and re ated difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including in the fourth quarter of 2010 We increased our valuation allowance by $8.3 billion in total during 2010. The $8.3 billion increase during 2010 was primarily attributable to the creation of a net operating loss carryforward in 20 0 and other temporary differences generated during the year, as well as a $3.1 billion increase attributable to the adoption of the accounting standards for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for additional information on our adoption of these accounting standards. Our total valuation allowance as of December 3 , 2010 was $33 4 billion As of December 31, 2010, after consideration of the valuation allowance, we had a net deferred tax asset of $5.5 billion primarily representing the tax effect of unrealized losses on our available for sale securities We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our conclusion that we have the intent and ability to hold our available for

240                                                                 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sale securities until any temporary unrealized losses are  recovered  Our view of our ability to realize the net deferred tax asset may change in future periods, particularly if the  mortgage and housing markets continue to decline

In 2009, we generated a net operating loss that we carried back  to offset our 2007 income tax liability, resulting in an AMT liability for 2007 after the carryback claim was applied. In 20  0, we are estimating a net operating loss that we anticipate  carrying back to partially offset our 2008 regular and AMT liability  AMT credits generated from the 2007 and 2008 AMT liability totaling $36 million will not expire  As a result of the carryback claim to offset our 2007 income tax liability, approximately $533 million of our LIHTC generated in 2007  were limited  Additionally, we have unused tax credits of $603 million, $602 million, and $585 million from  2008, 2009, and 2010, respectively, that will be carried forward into future years because we were in an AMT position  These LIHTC totaling $2 3 billion that are available for use in  the future will begin to expire in 2027

As of December 3  , 20  0, we have a net operating loss  carryforward of $34 7 billion that will expire in 2030

**Unrecognized Tax Benefits**

**Table 14.4    Unrecognized Tax Benefits**

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Ba a ce a Ja  a y 1 | $  805 | $636 | $637 |
| Changes based on  ax pos  ons n p  o  yea s | 372 | (34) | (29) |
| C anges based on  ax pos  ons n c  en  yea s | 48 | 203 | 102 |
| Dec eases n un ecogn zed  ax benef  s due o se  e  en s w h  ax ng au ho  es | (5) |  | (74) |
| Balance a  Decembe  31 | $1,220 | $805 | $636 |

At December 3  , 20  0, we had total unrecognized tax  benefits, exclusive of interest, of $1.2 billion. This  amount relates to tax positions for which ultimate deductibility is highly certain, but for which there  is uncertainty as to the  timing of such deductibility. If favorably resolved, $1 2 billion of unrecognized tax benefits would have a  positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets  created by the uncertain tax positions. This favorable impact  would be offset by a $332 million tax expense related to the establishment of a valuation allowance against credits and  net operating losses that have been carried forward  A valuation allowance has not currently been recorded against this amount  because a portion of the unrecognized tax benefits was used as a  source of taxable income in our realization assessment of our  net deferred tax assets

We continue to recognize interest and penalties, if any, in  income tax expense  Total accrued interest receivable was approximately $245 million at December 31, 2010, unchanged from December 31, 2009  Amounts included in total  accrued interest relate to: (a) unrecognized tax benefits; (b) pending claims with the IRS for open tax years;  (c) the tax benefit related to the settlement for tax years  1985 to 1997; and (d) the impact of payments made to the IRS in prior years in anticipation  of potential tax  deficiencies  Of the $245 million of accrued interest  receivable as of December 31, 2010 and 2009, approximately  $248 million and $233 million of accrued interest  payable, respectively, is allocable to unrecognized tax benefits. We recognized $0 million, $0 million, and $160 million of  interest income (expense) in 2010, 2009, and 2008, respectively  We have accrued no amounts for penalties during 2010, 2009 or 2008.

The period for assessment under the statute of limitations for  federal income tax purposes is open on corporate income tax  returns filed for tax years 1998 to 2009. Tax years 1985 to 1997 were before the U S  Tax Court  In June 2008, we reached agreement with the IRS on a settlement regarding the tax treatment of the customer relationship intangible asset  recognized upon our transition from non taxable to taxable  status in 1985. As a result of this agreement, we re measured  the tax benefit from this uncertain tax position and recognized  $171 million of tax benefit and interest income in the second quarter of 2008. This settlement, which was approved by the  Joint Committee on Taxation of Congress, resolves the last matter to be decided by the U S  Tax Court for these tax years  Those matters not resolved by settlement agreement in the  case, including the favorable financing intangible asset decided  favorably by the Court in 2006, are no longer subject to appeal  Therefore, the tax years 1985 through 1997 are now effectively settled

The IRS completed its examinations of tax years 1998 to 2007  We received Statutory Notices from the IRS assessing  $3 0 billion of additional income taxes and penalties for the  1998 to 2005 tax years  We filed a petition with the U.S. Tax  Court in October 2010 in response to the Statutory Notices. The principal matter of controversy involves questions  of timing and potential penalties regarding our tax accounting method for certain hedging transactions  The IRS responded to  our petition with the U S  Tax Court in December 2010  We continue to seek resolution of the controversy by settlement  It is reasonably possible that the hedge accounting method issue  will be resolved within the next 12 months  We believe adequate reserves have been provided for settlement on  reasonable terms  However, changes could occur in the gross balance of unrecognized tax benefits within the next  12 months that could have a material impact on income tax  expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of  the amount currently reserved  We have no information that would enable us to estimate such impact at this time

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0892

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Tax Status of REITs**

On September 19, 2008, FHFA, as Conservator, advised us of FHFA's determination that no further common or preferred stock dividends should be paid by our REIT subsidiaries. FHFA specifically directed us, as the controlling stockholder of both REIT subsidiaries and the boards of directors of both companies, not to declare or pay any dividends on the preferred stock of the REITs until FHFA directed otherwise However, at our request and with Treasury's consent, FHFA directed us and the boards of directors of our REIT subsidiaries to: (a) declare and pay dividends for one quarter on the preferred shares of our REIT subsidiaries during each of the fourth quarter of 2009 and the first quarter of 2010; and (b) take all steps necessary to effect the elimination of the REITs by merger in a timely and expeditious manner  The business decision to eliminate the REITs was made to achieve increased flexibility in the management of the assets of our REIT subsidiaries and to simplify our business operations.

During the second quarter of 2010, each of our two REIT subsidiaries was eliminated via a merger transaction, which resulted in no gain or loss recognized on our consolidated statement of operations  This resulted in the elimination of the noncontrolling interest from our consolidated balance sheets as of June 30, 20 0

For a discussion of our significant accounting policies related to income taxes, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Income Taxes."

## NOTE 15: EMPLOYEE BENEFITS

**Defined Benefit Plans**

We maintain a tax qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees  Pension Plan benefits are based on an employee's years of service and highest average compensation, up to legal plan limits, over any consecutive 36 months of employment  Our Pension Plan assets are invested in various combinations of equity, fixed income, and other types of investments  In addition to our Pension Plan, we maintain a nonqualified, unfunded defined benefit pension plan for our officers, as part of our Supplemental Executive Retirement Plan, or SERP  The related retirement benefits for our SERP are paid from our general assets  Our qualified and nonqualified defined benefit pension plans are collectively referred to as defined benefit pension plans.

We maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who rendered at least 0 years of service (five years of service if the employee was eligible to retire prior to March 1, 2007) and who, upon separation or termination, immediately elected to commence benefits under the Pension Plan in the form of an annuity. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our defined benefit pension plans are collectively referred to as the defined benefit plans

We accrue the estimated cost of retiree benefits as employees render the services necessary to earn their pension and postretirement health benefits  Our pension and postretirement health care costs related to these defined benefit plans for 2010, 2009, and 2008 presented in the following tables were calculated using assumptions as of December 31, 2009, 2008, and 2007, respectively. The funded status of our defined benefit plans for 2010 and 2009 presented in the following tables was calculated using assumptions as of December 31, 2010 and 2009, respectively

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0893

Table of Contents

Table 15.1 shows the changes in our benefit obligations and fair value of plan assets using December 31 as the valuation measurement date for amounts recognized on our consolidated balance sheets

**Table 15.1     Obligation and Funded Status of our Defined Benefit Plans**

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| | (in millions) | | | |
| Change in benefit obligation | | | | |
| Benefit obligation on January 1 | $629 | $581 | $155 | $133 |
| Service cost | 32 | 32 | 7 | 7 |
| Interest cost | 37 | 34 | 9 | 8 |
| Net actuarial loss (gain) | 46 | (3) | 7 | 9 |
| Benefits paid | (15) | (15) | (2) | (2) |
| Plan amendments | (4) | | | |
| Benefit obligation on December 31 | 725 | 629 | 176 | 155 |
| Change in plan assets | | | | |
| Fair value of plan assets on January 1 | 579 | 446 | | |
| Actual return on plan assets | 92 | 68 | | |
| Employee contributions | 37 | 80 | | |
| Benefits paid | (15) | (15) | | |
| Fair value of plan assets on December 31 | 693 | 579 | | |
| Funded status at December 31 | $ (32) | $ (50) | $(176) | $(155) |
| Amounts recognized on our consolidated balance sheets at December 31 | | | | |
| Other assets | $ 30 | $ 12 | $ | $ |
| Other liabilities | (62) | (62) | (176) | (155) |
| AOCI, net of taxes, related to defined benefit plans [1] | | | | |
| Net actuarial loss | $ 105 | $ 123 | $ 11 | $ 3 |
| Prior service cost (credit) | (2) | 1 | | |
| Total AOCI, net of taxes | $ 103 | $ 124 | $ 11 | $ 3 |

(1) Includes the effect of the establishment of a valuation allowance against our net deferred tax assets

The accumulated benefit obligation for all defined benefit pension plans was $591 million and $507 million at December 31, 2010 and 2009, respectively. The accumulated benefit obligation represents the actuarial present value of future expected benefits attributed to employee service rendered before the measurement date and based on employee service and compensation prior to that date

Table 15.2 provides additional information for our defined benefit pension plans  The aggregate accumulated benefit obligation and fair value of plan assets are disclosed as of December 31, 2010 and 2009, respectively, with the projected benefit obligation included for illustrative purposes. The projected benefit obligation is the actuarial present value of all benefits, based on our defined benefit pension plans' benefit formula, attributed to service already provided and based on assumptions of future salary increases.

**Table 15.2     Additional Information for Defined Benefit Pension Plans**

| | 2010 | | | 2009 | | |
|---|---|---|---|---|---|---|
| | Pension Plan | SERP | Total | Pension Plan | SERP | Total |
| | (in millions) | | | | | |
| Projected benefit obligation | $ 663 | $ 62 | $725 | $ 567 | $ 62 | $629 |
| Fair value of plan assets | $ 693 | $ | $ 693 | $ 579 | $ | $ 579 |
| Accumulated benefit obligation | 541 | 50 | 591 | 460 | 47 | 507 |
| Fair value of plan assets over (under) accumulated benefit obligation | $ 152 | $(50) | $ 102 | $ 119 | $(47) | $ 72 |

The measurement of our benefit obligations includes assumptions about the rate of future compensation increases included in Table 15.3.

**Table 15.3     Weighted Average Assumptions Used to Determine Projected and Accumulated Benefit Obligations**

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | December 31, 2010 | December 31, 2009 | December 31, 2010 | December 31, 2009 |
| Discount rate | 5 65% | 6 00% | 5 65% | 6 00% |
| Rate of future compensation increase | 5 10% to 6 50% | 5 10% to 6 50% | | |

243

*Freddie Mac*

Source   DRA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Table 15 4 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the years ended December 31, 2010, 2009, and 2008. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of operations

**Table 15.4     Net Periodic Benefit Cost Detail**

| | Pension Benefits | | | Postretirement Health Benefits | | |
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Ne pe od c benef cos de a l | | | | | | |
| Se v ce cos | $ 32 | $ 32 | $ 35 | $ 7 | $ 7 | $ 9 |
| In e es cos on benef obl ga on | 37 | 34 | 33 | 9 | 8 | 8 |
| Expec ed e o p a asse s | (40) | (33) | (41) | | | |
| Recogn ze d ne loss | 10 | 14 | 2 | | | |
| Recogn ze d p o se v ce c ed | | | | (1) | (1) | (1) |
| Ne pe od c benef cos | $ 39 | $ 47 | $ 29 | $ 15 | $ 14 | $ 16 |

Table 15 5 presents the changes in AOCI related to our defined benefit plans recorded to AOCI throughout the year, after the effects of our federal statutory tax rate of 35% As of December 31, 2010 and 2009, a portion of the valuation allowance established against the net deferred tax asset related to our defined benefit plans was recorded to AOCI in the amounts of $24 million and $28 million, respectively. See "NOTE 14: INCOME TAXES" for further information on our deferred tax assets valuation allowance The estimated net actuarial loss and prior service credit for our defined benefit plans that will be amortized from AOCI into net periodic benefit cost in 2011 is $(5) million and $1 million, respectively These amounts reflect the impact of the valuation allowance against our net deferred tax assets

**Table 15.5     AOCI Related to Defined Benefit Plans**

| | Year nded December 31, | |
| | 2010 | 2009 |
| | (in millions) | |
|---|---|---|
| Beg nn ng balance | $(127) | $(169) |
| Amoun s ecogn zed n AOCI (1 | | |
| Recogn zed ne ga n | | 29 |
| Recogn zed p o se v ce c ed | 4 | |
| Ne eclass f ca on adj s es (1 (2 | | |
| Recogn zed ne loss | 10 | 14 |
| Recogn zed p o se v ce c ed | (1) | (1) |
| End ng balance(1) | $(114) | $(127) |

(1) Inc udes he effec of he es ab sh en of a va ua on a owance aga ns ou ne defe ed ax asse s
(2) Rep ese a o s bseq e y ecog zed as adj s e s o he comp ehens ve ncome as hose amoun s a e ecogn zed as componen s of ne pe od c benef cos

Table 15.6 includes the assumptions used in the measurement of our net periodic benefit cost

**Table 15.6     Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost**

| | Pension Benefits | | | Postretirement Health Benefits | | |
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|---|
| D scoun a e | 6 00% | 6 00% | 6 25% | 6 00% | 6 00% | 6 25% |
| Ra e of fu u e compensa on nc ease | 5 10% o 6 50% | 5 10% o 6 50% | 5 10% o 6 50% | | | |
| Expec ed ong- e m a e of e u n on p an asse s | 7 25% | 7 50% | 7 50% | | | |

For the 20 0 and 2009 benefit obligations, we determined the discount rate using a yield curve consisting of spot interest rates at half year increments for each of the next 30 years, developed with pricing and yield information from high quality bonds. The future benefit plan cash flows were then matched to the appropriate spot rates and discounted back to the measurement date Finally, a single equivalent discount rate was calculated that, when applied to the same cash flows, results in the same present value of the cash flows as of the measurement date

The expected long term rate of return on plan assets was estimated using a portfolio return calculator model The model considered the historical returns and the future expectations of returns for each asset class in our defined benefit plans in conjunction with our target investment allocation to arrive at the expected rate of return The resulting expected long term rate of return is selected based on the median projected return generated net of expenses using a weighted average of the major categories of assets as described in Table 15.8.

244

*Freddie Mac*

TREASURY-0895

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The assumed health care cost trend rates used in measuring the accumulated postretirement benefit obligation as of December 3 , 20 0 are 8 70% for pre age 65 employees and 8.90% for post age 65 employees in 2011, gradually declining to an ultimate rate of 4 5% in 2029 and remaining at that level thereafter

Table 15 7 sets forth the effect on the accumulated postretirement benefit obligation for health care benefits as of December 31, 2010, and the effect on the service cost and interest cost components of the net periodic postretirement health benefit cost that would result from a 1% increase or decrease in the assumed health care cost trend rate

**Table 15.7     Selected Data Regarding our Retiree Medical Plan**

|  | 1% Increase | 1% Decrease |
|---|---|---|
|  | (in millions) | |
| Effec on he accumula ed pos e emen benef obl ga on fo hea h ca e benef s | $ 35 | $ (28) |
| Effec on he se v ce and n e es cos co ponen s of he ne pe od c pos e emen heal h benef cos | 4 | (3) |

**Plan Assets**

The Pension Plan's retirement investment committee has fiduciary responsibility for establishing and overseeing the investment policies and objectives of our Pension Plan and they review the appropriateness of our Pension Plan's investment strategy on an ongoing basis Prior to 2009, our Pension Plan investment committee employed a total return investment approach whereby a diversified blend of equities and fixed income investments was used to maximize the long term return of plan assets for a prudent level of risk. In 2009, the investment committee changed the Pension Plan asset allocation strategy to a liability driven investment philosophy designed to better match assets with estimated liabilities The target allocations were 40% equity securities, 40% fixed income securities, and 20% asset allocation funds in 2010 and 2009. Investment risk is measured and monitored on an ongoing basis through quarterly investment portfolio and liability reviews and periodic asset and liability studies. Due to the level of risk associated with certain investment securities, it is at least reasonably possible that changes in their values will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits However, the Pension Plan asset allocation is designed to be well diversified to limit exposure to significant concentrations of risk. Notably, the asset allocation includes a liability driven fixed income strategy, which decreases the net risk exposure to interest rates from combined assets and liabilities For example, if long term interest rates increase, both plan assets and liabilities would be expected to decrease While diversified, our Pension Plan is also exposed to equity market risk, credit risk, and currency risk, but expects to be compensated for taking these risks over the long term

Our Pension Plan assets did not include any direct ownership of our securities at December 31, 2010 and 2009

*Plan Assets Subject to Fair Value Hierarchy*

We categorized our pension plan assets that are measured at fair value within the fair value hierarchy of the accounting standards for fair value measurements and disclosures based on the valuation techniques used to derive the fair value Certain other assets in our pension plan assets, such as cash and cash equivalents, are recorded at their carrying amounts which approximate fair value These are presented as a reconciling item below

Table 15.8 sets forth our Pension Plan assets at December 3 , 20 0 by asset category See "NOTE 20: FAIR VALUE DISCLOSURES" for additional information about the fair value hierarchy

**Table 15.8     Pension Plan Assets Measured at Fair Value by Asset Category**

| | Plan Assets at December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2010 | | | | 2009 | | | |
| | Quoted Prices in Active Markets for dentical Assets ( evel 1) | Significant Other Observable nputs ( evel 2 | Significant Unobservable nputs ( evel 3 | Total | Quoted Prices in Active Markets for dentical Assets ( evel 1 | Significant Other Observable nputs ( evel 2 | Significant Unobservable nputs ( evel 3 | Total |
| | | | (in millions) | | | | | |
| **Asset Category:** | | | | | | | | |
| quity | | | | | | | | |
| U S arge-cap | $ — | $ 1 6 | $ — | $ 1 6 | $ — | $ 120 | $ — | $ 120 |
| U S sma mid cap | 8 1 | — | — | 8 1 | 63 | — | — | 63 |
| nternat ona qu ty | — | 6 | — | 6 | — | 6 | — | 6 |
| F xed ncome | | | | | | | | |
| Government Corporate onds | — | 9 | — | 9 | — | 0 | — | 0 |
| Synthet c F xed ncome | — | 260 | — | 260 | — | 180 | — | 180 |
| Other Types of nvestments | | | | | | | | |
| Asset A ocation Funds | — | 130 | — | 130 | — | 110 | — | 110 |
| Subtota | $ 8 1 | 610 | $ — | 69 | $ 63 | 51 | $ — | 577 |
| Cash and Cash quiva ents | | | | 2 | | | | 2 |
| ota | | | | $ 693 | | | | $ 579 |

For U.S. small/mid cap equity securities that are measured using individual price quotes available on nationally recognized exchanges, we classify these investments as Level 1 under the fair value hierarchy since they represent unadjusted

245

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011    TREASURY-0896    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

quoted prices in active markets that we have the ability to access on the measurement date  Our other Pension Plan assets  are measured using net asset values and are classified as Level 2  The net asset value is calculated by aggregating the fair value of the assets held by the fund as of the measurement date divided by the number of ownership units in the  fund and represents our exit price

_Valuation Methods and Assumptions for Pension Plan Assets Subject to the  Fair Value Hierarchy_

Our Pension Plan assets are invested in various combinations of  equity, fixed income, and other types of investments. Equity  investments are diversified across U.S. and non U.S companies with small and large capitalizations  Fixed income securities  include corporate bonds of companies from diversified industries, mortgage backed securities, and U.S. treasury  securities  The following is a description of the major asset categories and the significant investment strategies for the  investment funds in which our Pension Plan's assets  are invested, and that are subject to the fair value hierarchy:

_Equity_

- _U.S. Large Cap:_ Investments in this category consist of an S&P 500 equity index fund, measured at the net asset  value of the fund shares held by the Pension Plan

- _U.S. Small/Mid Cap:_ Investments in this category include separately managed portfolios that invest in  stocks of small  and mid capitalization U.S. companies, which are measured at the closing price reported on  nationally recognized exchanges

- _International Equity:_ Investments in this category include commingled as well as mutual fund products.  These strategies invest in stocks of companies located in developed and emerging market countries, whether traded on  U S  or international exchanges  These investments are measured at the net asset value of fund shares held by the  Pension Plan

_Fixed Income_

- _Government/Corporate Bonds:_ Investments in this category consist of a passively managed bond fund  constructed to correspond to the characteristics of the Barclays Capital Government/Credit index  These investments are measured  at the net asset value of fund shares held by the Pension Plan

- _Synthetic Fixed Income:_ Investments in this category include commingled funds of fixed income and derivative  instruments designed to provide protection against interest rate  exposure arising from expected liability payments  These  investments are measured at the net asset value of fund shares held by the Pension Plan

_Other Types of Investments_

- _Asset Allocation Funds:_ This category comprises commingled funds and mutual funds that invest in  multiple asset classes, including U.S. and international equities, bonds and real estate assets. These investments are  measured at the net asset value of fund shares held by the Pension Plan

**Cash Flows Related to Defined Benefit Plans**

Our general practice is to contribute to our Pension Plan an  amount equal to at least the minimum required contribution, if  any, but no more than the maximum amount deductible for federal  income tax purposes each year  During 2010, we made a  contribution to our Pension Plan of $33 million  We made a contribution to our Pension Plan of $74 million during 2009  in an effort to fully fund the Pension Plan's projected  benefit obligation  We have not yet determined whether a contribution to our Pension Plan is required in 2011

In addition to the Pension Plan contributions noted above, we  paid $4 million during 2010 and $6 million during 2009  in benefits under our SERP. Allocations under our SERP, as well as our Retiree Health Plan, are in the form of benefit payments,  as these plans are unfunded.

Table 15.9 sets forth estimated future benefit payments  expected to be paid for our defined benefit plans  The expected  benefits are based on the same assumptions used to measure our  benefit obligation at December 3 , 20  0

**Table 15.9    Estimated Future Benefit Payments**

|  | Pension Benefits | | Postretirement Health Bene its | |
| --- | --- | --- | --- | --- |
|  | (in millions) | | | |
| 2011 | $ | 15 | $ | 4 |
| 2012 |  | 16 |  | 4 |
| 2013 |  | 18 |  | 5 |
| 2014 |  | 20 |  | 5 |
| 2015 |  | 23 |  | 6 |
| Yea s 2016-2020 |  | 157 |  | 40 |

_Freddie Mac_

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Defined Contribution Plans**

Our Thrift/401(k) Savings Plan, or Savings Plan, is a tax qualified defined contribution pension plan offered to all eligible employees Employees are permitted to contribute from   % to 25% of their eligible compensation to the Savings Plan, subject to limits set by the Internal Revenue Code We match employees' contributions up to 6% of their eligible compensation per year, with such matching contributions being made each pay period; the percentage matched depends upon the employee's length of service Employee contributions and our matching contributions are immediately vested We also have discretionary authority to make additional contributions to our Savings Plan that are allocated to each eligible employee, based on the employee's eligible compensation Employees become vested in our discretionary contributions ratably over such employee's first five years of service, after which time employees are fully vested in their discretionary contribution accounts In addition to our Savings Plan, we maintain a non qualified defined contribution plan for our officers, designed to make up for benefits lost due to limitations on eligible compensation imposed by the Internal Revenue Code, and to make up for deferrals of eligible compensation under both our Executive Deferred Compensation Plan and our Mandatory Executive Deferred Base Salary Plan We incurred costs of $41 million, $40 million, and $33 million for the years ended December 31, 2010, 2009, and 2008, respectively, related to these plans. These expenses were included in salaries and employee benefits on our consolidated statements of operations

**Executive Deferred Compensation Plan and Mandatory Executive Deferred Base Salary Plan**

Our Executive Deferred Compensation Plan is an unfunded, non qualified plan that allows officers to elect to defer substantially all or a portion of their corporate wide annual cash bonus and up to 80% of their eligible annual salary for any number of years specified by the employee In December 20 0, we advised participants in the Executive Deferred Compensation Plan that the company is suspending deferrals of pay under this Plan during calendar year 2011 and that it will review future deferral options during the fourth quarter of 2011

In December 2009, we adopted, with the approval of FHFA and in consultation with Treasury, the Mandatory Executive Deferred Base Salary Plan covering compensation of our officers at the level of senior vice president and above. This plan is unfunded and is effective beginning in 2009 and is part of a compensation design for senior executives that we believe will remain in place throughout the conservatorship Part of this design requires that a portion of a senior executive's base salary be mandatorily deferred until the following year The Mandatory Executive Deferred Base Salary Plan is a mechanism by which these deferrals and the corresponding cash distributions are made. Our SERP has also been amended to generally include compensation deferred under the Mandatory Executive Deferred Base Salary Plan.

Distributions under these two deferred compensation plans are paid from our general assets We record a liability equal to the accumulated deferred salary, cash bonus, and accrued interest, as applicable, net of any related distributions made to plan participants.

## NOTE 16: NONCONTROLLING INTERESTS

The equity and net earnings attributable to the noncontrolling interests in consolidated subsidiaries for prior periods were reported on our consolidated balance sheets as noncontrolling interest and on our consolidated statements of operations as net (income) loss attributable to noncontrolling interest There was no material AOCI associated with the noncontrolling interests recorded on our consolidated balance sheets The majority of the balances in these accounts related to our two majority owned REITs. For a discussion of our significant accounting policies regarding our basis of accounting and our determination of controlling and noncontrolling interests, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

In February 1997, we formed two majority owned REIT subsidiaries funded through the issuance of common stock (99.9% of which was held by us) and a total of $4.0 billion of perpetual, step down preferred stock originally issued to third party investors. We repurchased most of the preferred stock held by third parties during 2007 and 2008 and as of December 31, 2009 we held approximately 84% of the issued preferred shares.

On September 19, 2008, FHFA, as Conservator, advised us of FHFA's determination that no further common or preferred stock dividends should be paid by our REIT subsidiaries. FHFA specifically directed us, as the controlling stockholder of both REIT subsidiaries and the boards of directors of both companies, not to declare or pay any dividends on the preferred stock of the REITs until FHFA directs otherwise However, at our request and with Treasury's consent, FHFA directed us and the boards of directors of our REIT subsidiaries to: (a) declare and pay dividends for one quarter on the preferred shares of our REIT subsidiaries during each of the fourth quarter of 2009 and the first quarter of 2010; and (b) take all steps necessary to effect the elimination of the REITs by merger in a timely and expeditious manner The business decision to eliminate the REITs was made to achieve increased flexibility in the management of the assets of our REIT subsidiaries and to simplify our business operations.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0898

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During 2010, each of our two REIT subsidiaries was eliminated via a merger transaction, which resulted in no gain or loss recognized on our consolidated statements of operations  This resulted in the elimination of the noncontrolling interest from our consolidated balance sheets

## NOTE 17: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship  Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the financial performance of each segment and the company as a whole  Under the revised method, the financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss)  This change in method, in conjunction with our implementation of changes in accounting standards relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings

We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of operations; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments  These reclassifications and allocations are described below in "Segment Earnings "

We do not consider our assets by segment when evaluating segment performance or allocating resources  We conduct our operations solely in the U S  and its territories  Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

### Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs      Investments, Single family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category  As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category  Under our revised method for presenting Segment Earnings, the All Other category consists of material corporate level expenses that are: (a) non recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments  By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments represent the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods  Items included in the All Other category consist of: (a) the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward; and (b) in 2009, the write down of our LIHTC investments. Other items previously recorded in the All Other category prior to the revision to our method for presenting Segment Earnings have been allocated to our three reportable segments

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0899

Table of Contents

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and cash management activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consists primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• Non-agency rated securities/securities, excluding CMBS<br><br>• Debt issuances<br><br>• Asset and liability management returns<br><br>• Guarantee buy-ups/buy-downs, net of executory gains/losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-Family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-Family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In a process we package and securitize mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on our mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consists primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (i.e., provision for credit losses), administrative expenses, allocated funding costs, and a do our share of the float benefit expenses. | • Management and guarantee fees or PCs, and guarantees earned by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for securities performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment and guarantee activities in multifamily mortgage loans and securities. Our new purchases of multifamily mortgage loans are primarily made for purposes of aggregation and securitization, which we support through our ability of financing for multifamily type operations. We also purchase CMBS for investment, however, we have not purchased a significant amount of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities it does issue other Structured Securities, or Guarantee Transactions, and do engage in our commitments. Segment Earnings for this segment also include management and guarantee fee income and the interest earned on assets related to multifamily investment activities, net of allocated funding costs. | • Multifamily mortgage loans and associated securitization activities<br><br>• Investments in CMBS<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Provided for the guarantee commitments on multifamily mortgage loans |
| All Other | The All Other category consists of corporate-level expenses that are material and non-recurring in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br><br>• Tax services, as applicable<br><br>• Legal services, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward |

## Segment Earnings

Beginning January 1, 2010, under the revised method of presenting Segment Earnings, the sum of Segment Earnings for each segment and the All Other category will equal GAAP net income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 17.2 — Segment Earnings and Reconciliation to GAAP Results."

TREASURY-0900

Source  DRA HOM  OAN MORTGAGE CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-0901          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings presented include the following items that are included in our GAAP basis earnings, but were deferred or excluded under the previous method for presenting Segment Earnings:

- Current period GAAP earnings impact of fair value accounting for investments, debt and derivatives;

- Allocation of the valuation allowance established against our net deferred tax assets;

- Gains and losses on investment sales and debt retirements;

- Losses on loans purchased and related recoveries;

- Other than temporary impairment of securities recognized in earnings in excess of expected losses; and

- GAAP basis accretion income that may result from impairment adjustments.

We restated Segment Earnings for the years ended December 3 , 2009 and 2008 to reflect the changes in our method of evaluating the performance of our reportable segments described above  These revisions significantly impacted the prior period reported results for the Investments segment and, to a lesser extent, the Single family Guarantee segment, because the revised method includes fair value adjustments, gains and losses on investment sales, loans purchased from PC pools and debt retirements that are included in GAAP based earnings, but that had previously been excluded from or deferred in Segment Earnings. These revisions did not have a significant impact on the prior period results for the Multifamily segment

The restated Segment Earnings for the years ended December 31, 2009 and 2008 do not include changes to the guarantee asset, guarantee obligation or other items that were eliminated or changed as a result of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs adopted on January 1, 2010, as these changes were applied prospectively consistent with our GAAP financial results. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" for further information regarding the consolidation of certain of our securitization trusts.

Many of the reclassifications, adjustments and allocations described below relate to the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs  These amendments require us to consolidate our single family PC trusts and certain Other Guarantee Transactions, which makes it difficult to view the results of the three operating segments from a GAAP perspective  For example, as a result of the amendments, the net guarantee fee earned on mortgage loans held by our consolidated trusts is included in net interest income on our GAAP consolidated statements of operations  Previously, we separately recorded the guarantee fee on our GAAP consolidated statements of operations as a component of non interest income  Through the reclassifications described below, we move the net guarantee fees earned on mortgage loans into Segment Earnings management and guarantee income

### Investment Activity-Related Reclassifications

In preparing certain line items within Segment Earnings, we make various reclassifications to earnings determined under GAAP related to our investment activities, including those described below  Through these reclassifications, we move certain items into or out of net interest income so that, on a Segment Earnings basis, net interest income reflects how we measure the effective interest on securities held in our mortgage investments portfolio and our cash and other investments portfolio

We use derivatives extensively in our investment activity  The reclassifications described below allow us to reflect, in Segment Earnings net interest income, the costs associated with this use of derivatives.

- The accrual of periodic cash settlements of all derivatives is reclassified in Segment Earnings from derivative gains (losses) into net interest income to fully reflect the periodic cost associated with the protection provided by these contracts

- Up front cash paid or received upon the purchase or writing of swaptions and other option contracts is reclassified in Segment Earnings prospectively on a straight line basis from derivative gains (losses) into net interest income over the contractual life of the instrument to fully reflect the periodic cost associated with the protection provided by these contracts

Amortization related to certain items is not relevant to how we measure the economic yield earned on the securities held in our investments portfolio  Therefore, as described below, we reclassify these items in Segment Earnings from net interest income to non interest income

- Amortization related to derivative commitment basis adjustments associated with mortgage related and non mortgage related securities is reclassified in Segment Earnings from net interest income to non interest income

- Amortization related to accretion of other than temporary impairments on non mortgage related securities held in our cash and other investments portfolio is reclassified in Segment Earnings from net interest income to non interest income

- Amortization related to premiums and discounts associated with PCs and Other Guarantee Transactions issued by our consolidated trusts that we previously held and subsequently transferred to third parties is reclassified in Segment

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Earnings from net interest income to non interest income  The  amortization is related to deferred gains (losses) on transfers  of these securities

### Credit Guarantee Activity-Related Reclassifications

In preparing certain line items within Segment Earnings, we make  various reclassifications to earnings determined under GAAP related to our credit guarantee activities, including those  described below  All credit guarantee related income and costs are included in Segment Earnings management and guarantee income

- Net guarantee fee is reclassified in Segment Earnings from net  interest income to management and guarantee income

- Implied management and guarantee fee related to unsecuritized  mortgage loans held in the mortgage investments portfolio is  reclassified in Segment Earnings from net interest income to  management and guarantee income

- The portion of the amount reversed for accrued but uncollected  interest upon placing loans on a non accrual status that relates  to guarantee fees is reclassified in Segment Earnings from net  interest income to management and guarantee income  The remaining portion of the allowance for lost interest is reclassified in Segment Earnings from net interest income to  provision for credit losses. Under GAAP basis earnings and Segment Earnings, the guarantee fee is not accrued on loans  three monthly payments or more past due

### Segment Adjustments

In presenting Segment Earnings net interest income and  management and guarantee income, we make adjustments to better  reflect how management measures and assesses the performance  of each segment and the company as a whole  These adjustments  relate to amounts that are no longer reflected in net income (loss)  as determined in accordance with GAAP as a result of the  adoption of new accounting standards for the transfers of financial assets and the consolidation of VIEs. These  adjustments are reversed through the segment adjustments line  item within Segment Earnings, so that Segment Earnings (loss)  for each segment will equal GAAP net income (loss) attributable  to Freddie Mac for each segment beginning January 1, 2010  Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the  Investments segment to include the amortization of cash premiums  and discounts and buy up and buy down fees on the consolidated  Freddie Mac mortgage related securities we purchase as  investments  As of December 31, 2010, the unamortized  balance of such premiums and discounts and buy up and buy down  fees was $2.4 billion. These adjustments are necessary to reflect the economic yield realized on investments in  consolidated Freddie Mac mortgage related securities purchased at a premium or discount or with buy up or buy down fees. We include an offsetting amount in the segment adjustments line within Segment Earnings

- We adjust our Segment Earnings management and guarantee income  for the Single family Guarantee segment to include the  amortization of delivery fees recorded in periods prior to  January 1, 2010. As of December 31, 2010, the unamortized  balance of such fees was $2.9 billion. We consider such fees to  be part of the effective rate of the  guarantee fee on guaranteed  mortgage loans  This adjustment is necessary in order to better reflect the realization of revenue  associated with guarantee contracts over the life of the  underlying loan  We include an offsetting amount in the segment  adjustments line within Segment Earnings

### Segment Allocations

The results of each reportable segment include directly  attributable revenues and expenses  Administrative expenses that  are not directly attributable to a segment are allocated to our  segments using various methodologies, depending on the nature of  the  expense (i.e., semi direct versus indirect)  Net interest income for each segment includes allocated debt  funding  costs related to certain assets of each segment  These  allocations, however, do not include the effects of dividends  paid on our senior preferred stock  The tax credits generated by  the LIHTC partnerships and any valuation allowance on these tax  credits are allocated to the Multifamily segment  The deferred  tax asset valuation allowance associated with previously recognized income tax credits carried forward is allocated  to  the "All Other" category  All remaining taxes are calculated  based on a 35% federal statutory rate as applied to  pre tax Segment Earnings

<div align="center">251</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 17.1 presents Segment Earnings by segment.

**Table 17.1      Summary of Segment Earnings(1)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | | (in millions) | |
| Seg en Ea n ngs ( oss), ne of axes | | | |
| Inves men s | $  1,251 | $  6,476 | $ (28,021) |
| S ngle-fam ly Gua an ee | (16,256) | (27,143) | (20,349) |
| Mu  fam y | 965 | (511) | (56) |
| All O he | 15 | (4,240) | 174 |
| To a Segmen Ea n ngs ( oss), ne of axes | (14,025) | (25,418) | (48,252) |
| Reconc l a on o GAAP ne ncome (loss) a  bu able o F edd e Mac | | | |
| C ed  gua an ee- e a ed adj  s e s(2 | | 5,948 | (2,873) |
| Tax- e a ed ad us men s | | (2,083) | 1,006 |
| To al econc l ng  ems, ne of axes | | 3,865 | (1,867) |
| Ne  ncome ( oss) a  bu ab e o F edd e Mac | $ (14,025) | $ (21,553) | $ (50,119) |

(1) Beg    g Ja  a y 1, 2010,  de o  ev sed  e od,  e sum of Segmen Ea n ngs fo each segmen  and  he All O he  ca ego y equals GAAP ne  ncome (loss)  a  b  ab e o F edd e Mac

(2) Cons s p  ma ly of amo  za on and valua  on ad us men s e a ed o  he gua an ee asse  and gua an ee ob ga  on wh ch a e excluded f om Segmen Ea n ngs and cash  compensa on exc a ged a  e   e of sec   za o , exc  d g b y- p a d buy-down fees, wh ch s a  o  zed n o ea n ngs  These econc l ng  ems ex s  n pe ods  p o  o 2010 as  he amendmen  o  he accoun ng s anda ds fo  ansfe s of f nanc al asse s and conso  da on of VIEs was app ed p ospec  ve y on Ja   a y 1, 2010

252

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 17.2 presents detailed financial information by financial statement line item for our reportable segments and All Other

### Table 17.2    Segment Earnings and Reconciliation to GAAP Results

| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses | Other Non Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non Interest Expense | Segment Adjustments[2] | LIHTC Partnership Tax Credit | Income Tax Benefit (Expense) | Net Income (Loss | Less: Net (Income) Loss Noncontrolling Interests | Net Income (Loss) Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | |
| investments | $ 6 92 | $ | $ | $ (3 819 | $ (18 9 | $ (40 | $ ( | $ | $ (18 | $ 13 8 | $ | $ 2 9 | $ 1 2 3 | $ (2 | $ 1 2 1 |
| Single amily Guarantee | 72 | (18 78 | 3 63 | | 6 | 1 3 1 | (879 | (676 | (629 | (9 3 | | 608 | (16 2 6 | | (16 2 6 |
| Multi amily | 4 | (99 | 0 | (96 | | 237 | (212 | 3 | (66 | | 8 | (6 | 962 | 3 | 96 |
| All Other | | | | | | | | | | | | 1 | 1 | | 1 |
| Total Segment Earnings (loss net o taxes | 7 378 | (18 88 | 3 736 | (3 91 | (18 3 | 1 183 | ( 46 | (673 | (7 3 | 40 | 8 | 27 | ( 4 026 | | (14 02 |
| Reconciliation to consolidated statements o operations | | | | | | | | | | | | | | | |
| Reclassi ications[3] | 8 120 | 666 | (2 640 | (393 | (6 232 | ( 21 | | | | | | | | | |
| Segment ad ustments[2] | 1 3 8 | | (9 3 | | | | | | | (40 | | | | | |
| Total reconciling item | 9 478 | 666 | (3 93 | (393 | (6 232 | ( 21 | | | | (40 | | | | | |
| Total per consolidated statements o operations | $ 16 8 6 | $ (17 218 | $ 43 | $ ( 308 | $ (8 08 | $ 662 | $ 46 | $ (673 | $ (7 3 | $ | $ 8 | $ 27 | $ ( 4 026 | $ | $ (14 02 |

(1) Managemen and gua an ee income o al pe consol da ed s a emen s of ope a ons s nc uded n o he income on ou GAAP consol da ed s a emen s of ope a ons

(2) See "Segmen Ea n ngs *Segment Adjustments*" fo add onal nfo ma on ega d ng hese adj s e s

(3) See "Segmen Ea n ngs *Investment Activity-Related Reclassifications*" a d " *Credit Guarantee Activity-Related Reclassifications*" fo nfo ma on ega d ng hese eclass f ca ons

253                                      *Freddie Mac*

Source   D RA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0905

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Non Interest Income (Loss)** | | | | **Non Interest Expense** | | | **Income Tax Provision** | | | **Less: Net** | | |
| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non Interest Expense | LIHTC Partnerships Tax Credit | Income Tax Benefit (Expense) | Net Income (Loss) | (Income) Loss Noncontrolling Interests | Net Income (Loss) Freddie Mac |
| | | | | | | | | (in millions) | | | | | | |
| Investments | $ 8 090 | $ | | $ | (9 870 | $ 4 69 | $ 682 | $ | (1 | $ | (33 | $ | (72 | $ 6 477 | $ | ( | $ 6 477 |
| Single family Guarantee | 307 | (29 102 | 3 8 | | (9 | 72 | | (9 | (287 | ( 888 | | 3 73 | (27 143 | ( | (27 143 |
| Multi family | 8 6 | | ( 74 | 90 | ( 37 | (27 | | (221 | (20 | (18 | 94 | ( 94 | ( 13 | 2 | ( |
| All Other | | | | | | (3 6 3 | | | | ( 09 | | (478 | (4 240 | | (4 240 |
| Total Segment Earnings (loss) net of taxes | 9 2 3 | (29 676 | 3 38 | ( 0 007 | 4 668 | 1 288 | | ( 6 | (307 | ( 0 8 | 94 | 929 | (2 419 | | (2 18 |
| Reconciliation to consolidated statements of operations | | | | | | | | | | | | | | |
| Credit guarantee related adjustments[2] | 21 | 6 | (94 | | | 7 0 | | | | ( 89 | | | 9 8 | | 9 8 |
| Reclassifications[3] | 7 799 | 40 | 440 | ( 90 | (6 68 | ( 0 | | | | | | 390 | (2 083 | | (2 083 |
| Tax related adjustments | | | | | | | | | | (2 083 | | (2 083 | | |
| Total reconciling items | 7 820 | 46 | ( 0 | ( 90 | (6 68 | 6 044 | | | | ( 89 | | ( 693 | 3 86 | | 3 86 |
| Total per consolidated statements of operations | $ 7073 | $ (29 30 | $ 3 033 | $ ( 97 | $ ( 900 | $ 7 332 | $ ( 6 | $ (307 | $ ( 237 | 94 | $ 236 | $ (21 | $ | $ (21 3 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Non Interest Income (Loss)** | | | | **Non Interest Expense** | | | **Income Tax Provision** | | | **Less: Net** | | |
| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non Interest Expense | LIHTC Partnerships Tax Credit | Income Tax Benefit (Expense) | Net Income (Loss) | (Income) Loss Noncontrolling Interests | Net Income (Loss) Freddie Mac |
| | | | | | | | | (in millions) | | | | | | |
| Investments | $ 2 81 | $ | | $ | (7 29 | $ (128 | $ 2 793 | $ | ( 7 | $ | (33 | $ | (2 047 | $ (28 016 | $ | ( | $ (28 021 |
| Single family Guarantee | 280 | (16 32 | 3 61 | | | (3 | 880 | (826 | ( 097 | 730 | | 46 | (20 349 | | (20 349 |
| Multi family | 772 | (229 | 76 | | (3 | ( 7 | ( 93 | | (21 | 89 | ( 32 | ( 8 | 2 | ( 6 |
| All Other | | | | | | | (1 0 | ( 097 | (2 868 | 89 | (7 1 | (48 249 | (3 | ( 8 2 2 |
| Total Segment Earnings (loss) net of taxes | 3 867 | (16 4 | 3 69 | ( 7 29 | (128 8 | 3 1 6 | | | | | | | | |
| Reconciliation to consolidated statements of operations | | | | | | | | | | | | | | |
| Credit guarantee related adjustments[2] | 3 | 21 | (6 4 | | ( | ( 989 | | | | (283 | | | (2 873 | | (2 873 |
| Reclassifications[3] | 2 926 | 0 | 293 | ( 3 | (2 09 | ( 076 | | | | | 404 | | 006 | | 006 |
| Tax related adjustments | | | | | | | | | | 006 | | 006 | | |
| Total reconciling items | 2 929 | 122 | (321 | ( 3 | (2 06 | (3 06 | | | | (283 | | 4 0 | ( 867 | | 867 |
| Total per consolidated statements of operations | $ 6 796 | $ (16 432 | $ 3 370 | $ (17 682 | $ ( 49 4 | $ 9 | $ (1 0 | $ ( 097 | $ (3 1 1 | 89 | $ 6 4 | $ ( 0 6 | $ (3 | $ ( 0 9 |

(1) Management and guarantee income of all personal consolidated statements of operations is included in the net income of our GAAP consolidated statements of operations.

(2) Consists primarily of amortization and valuation adjustments in earnings for guarantee obligation and guarantee asset that are excluded from Segment Earnings and cash compensation exchanged at the time of securitization, excluding buy-down fees, which is amortized into earnings. These economic earnings items existing in periods prior to 2010 as the amendment to the accounting standards for transfers of financial assets and consolidation of VIEs was applied prospectively on January 1, 2010.

(3) See "Segment Earnings — *Investment Activity-Related Reclassifications*" and " *Credit Guarantee Activity-Related Reclassifications*" for information regarding these reclassifications.

254

*Freddie Mac*

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 18: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement  Concurrent with this announcement, FHFA classified us as undercapitalized as of June 30, 2008 based on discretionary authority provided by statute  FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA directed regulatory capital requirements are not binding during conservatorship  We continue to provide our submissions to FHFA on both minimum and risk based capital.

Our regulatory minimum capital is a leverage based measure that is generally calculated based on GAAP and reflects a 2 50% capital requirement for on balance sheet assets and 0 45% capital requirement for off balance sheet obligations  Based upon our adoption of amendments to the accounting standards for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single family  PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments  Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement.  Notwithstanding this guidance, FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On February 8, 2010, FHFA issued a notice of proposed rulemaking setting forth procedures and standards for such a temporary increase in minimum capital levels

Our regulatory capital standards in effect prior to our entry into conservatorship on September 6, 2008 are described be ow

### Regulatory Capital Standards

The GSE Act established minimum, critical and risk based capital standards for us.

Prior to our entry into conservatorship, those standards determined the amounts of core capital and total capital that we were to maintain to meet regulatory capital requirements  Core capital consisted of the par value of outstanding common stock  (common stock issued less common stock held in treasury), the par value of outstanding non cumulative, perpetual preferred stock, additional paid in capital and retained earnings (accumulated deficit), as determined in accordance with GAAP  Total capital included core capital and general reserves for mortgage and foreclosure losses and any other amounts available to absorb losses that FHFA included by regulation

#### *Minimum Capital*

The minimum capital standard required us to hold an amount of core capital that was generally equal to the sum of 2 50% of agg egate on-balance sheet assets and approximately 0 45% of the sum of our PCs held by third parties and other aggregate off balance sheet obligations  As discussed below, in 2004 FHFA implemented a framework for monitoring our capital adequacy, which included a mandatory target capital surplus over the minimum capital requirement

#### *Critical Capital*

The critical capital standard required us to hold an amount of core capital that was generally equal to the sum of 1 25% of agg egate on-balance sheet assets and approximately 0 25% of the sum of our PCs held by third parties and other aggregate off balance sheet obligations

#### *Risk Based Capital*

The risk based capital standard required the application of a stress test to determine the amount of total capital that we were to hold to absorb projected losses resulting from adverse interest rate and credit risk conditions specified by the GSE  Act prior to enactment of the Reform Act and added 30% additional capital to provide for management and operations  risk. The adverse interest rate conditions prescribed by the GSE  Act included an "up rate scenario" in which   0 year Treasury yields rise by as much as 75% and a "down rate  scenario" in which they fall by as much as 50%. The credit risk component of the stress tests simulated the performance of our mortgage portfolio based on loss rates for a benchmark region  The criteria for the benchmark region were intended to capture the credit loss experience of the region that exper enced the highest historical rates of default and severity of mortgage losses for two consecutive origination years

### Classification

Prior to FHFA's suspension of our capital classifications in October 2008, FHFA assessed our capital adequacy not less than quarterly.

To be classified as "adequately capitalized," we must meet both the risk based and minimum capital standards. If we fail to meet the risk based capital standard, we cannot be classified higher than "undercapitalized " If we fail to meet the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0907

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

undercapitalized " If we fail to meet the critical capital standard, we must be classified as "critically undercapitalized " In addition, FHFA has discretion to reduce our capital classification by one level if FHFA determines in writing that: (a) we are engaged in conduct that could result in a rapid depletion of core or total capital, the value of collateral pledged as security has decreased significantly, or the value of the property subject to mortgages held or securitized by us has decreased significantly; (b) we are in an unsafe or unsound condition; or (c) we are engaging in unsafe or unsound practices.

If we were classified as adequately capitalized, we generally could pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior FHFA approval so long as the payment would not decrease total capital to an amount less than our risk based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement. However, during conservatorship, the Conservator has instructed our Board of Directors that it should consult with and obtain the approval of the Conservator before taking any actions involving capital stock and dividends. In addition, while the senior preferred stock is outstanding, we are prohibited from paying dividends (other than on the senior preferred stock) or issuing equity securities without Treasury's consent.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would reduce our core capital to an amount less than our minimum capital requirement We also would be required to submit a capital restoration plan for FHFA approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would reduce our core capital to less than the critical capital level We would otherwise be able to make a capital distribution only if FHFA determined that the distribution would: (a) enhance our ability to meet the risk based capital standard and the minimum capital standard promptly; (b) contribute to our long term financial safety and soundness; or (c) otherwise be in the public interest Also under this classification, FHFA could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk We also would be required to submit a capital restoration plan for FHFA approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, FHFA would have the authority to appoint a conservator or receiver for us

In addition, without regard for our capital classification, under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition Also without regard to our capital classification, under Freddie Mac's charter, we must obtain prior written approval of FHFA to make any capital distribution that would decrease total capital to an amount less than the risk based capital level or that would decrease core capital to an amount less than the minimum capital eve

## Performance Against Regulatory Capital Standards

Table 18.1 summarizes our minimum capital requirements and deficits and net worth

### Table 18.1    Net Worth and Minimum Capital

| | December 31, 2010 | | December 31, 2009 |
|---|---|---|---|
| | (in millions) | | |
| GAAP et wo h(1 | $ (401) | $ | 4,372 |
| Co e cap al (def c )(2 (3 | $ (52,570) | $ | (23,774) |
| Less M n mum cap al equ emen (2 | 25,987 | | 28,352 |
| M n mum cap al su pus (def c )(2 | $ (78,557) | $ | (52,126) |

(1) Ne wo h (def c ) ep esen s he d ffe ence be ween ou asse s and ab es unde GAAP

(2) Co e cap al and m n mum cap al f gu es fo Decembe 31, 2010 a e a es FHFA s he au ho a ve sou ce fo ou egula o y cap al

(3) Co e cap a exc udes ce a n componen s of GAAP o a equ y (def c ) (i.e., AOCI, q da o p efe e ce of e sen o p efe ed s ock and non-con oll ng n e es s) as t ese ems do no mee he s a u o y def n on of co e cap al

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long term profitability The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days FHFA notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date FHFA

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination

At December 3 , 20 0, our liabilities exceeded our assets under GAAP by $401 million. As such, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $500 million, which we expect to receive by March 31, 2011. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at December 3 , 20 0, our aggregate funding received from Treasury under the Purchase Agreement will increase to $63 7 billion  This aggregate  funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received  As a result of the additional $500 million draw request, the aggregate liquidation  preference of the senior preferred stock will increase from $64.2 billion as of December 31, 2010 to $64.7 billion. We paid a quarterly dividend of $1.3 billion, $1.3 billion, $1.6 billion, and $1.6 billion on the senior preferred stock in cash on  March 31, 2010, June 30, 2010, September 30,  2010, and December 31, 2010, respectively, at the direction of the Conservator

### Subordinated Debt Commitment

In October 2000, we announced our adoption of a series of  commitments designed to enhance market discipline, liquidity and  capital  In September 2005, we entered into a written agreement  with FHFA that updated those commitments and set forth a process for implementing them  Under the terms of this agreement, we committed to issue qualifying subordinated debt for public  secondary market trading and rated by no fewer than two nationally recognized statistical rating organizations in a  quantity such that the sum of total capital plus the outstanding  balance of qualifying subordinated debt will equal or exceed the  sum of 0.45% of our PCs, Other Structured Securities, and Other  Guarantee Transactions outstanding and 4% of our on balance sheet assets at the end of each quarter  Qualifying subordinated  debt is defined as subordinated debt that contains a deferral of interest payments for up to five years if: (a) our core  capital falls below 125% of our critical capital requirement; or  (b) our core capital falls below our minimum capital  requirement and pursuant to our request, the Secretary of the  Treasury exercises discretionary authority to purchase our obligations under Section 306(c) of our charter  Qualifying subordinated debt will be discounted  for the purposes of this commitment as it approaches maturity with one fifth of the outstanding amount excluded each year  during the instrument's last five years before maturity. When the remaining maturity is less than one year, the  instrument is entirely excluded  FHFA, as Conservator of Freddie Mac, has suspended the requirements in the September 2005  agreement with respect to issuance, maintenance and reporting  and disclosure of Freddie Mac subordinated debt during the term of conservatorship and thereafter until directed otherwise

### Regulatory Capital Monitoring Framework

In a letter dated January 28, 2004, FHFA created a framework for monitoring our capital  The letter directed that  we maintain a 30% mandatory target capital surplus over our  minimum capital requirement, subject to certain conditions and  variations; that we submit weekly reports concerning our capital levels; and that we obtain prior approval of certain capital  transactions. The mandatory target capital surplus was subsequently reduced to 20%

FHFA, as Conservator of Freddie Mac, has announced that the  mandatory target capital surplus will not be binding during the  term of conservatorship.

## NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS

### Mortgages and Mortgage Related Securities

Our business activity is to participate in and support the  residential mortgage market in the United States, which we  pursue by both issuing guaranteed mortgage securities and  investing in mortgage loans and mortgage related securities

Table 19.1 summarizes the concentration by year of origination and geographical area of the approximately  $1.8 trillion and $1.9 trillion UPB of our single family credit guarantee portfolio as of December 3 , 2010 and 2009, respectively. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," "NOTE 5: MORTGAGE LOANS AND LOAN LOSS RESERVES," and "NOTE 8: INVESTMENTS IN SECURITIES" for more information about credit risk  associated with loans and mortgage related securities that we  hold.

257                                                                                         *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 19.1     Concentration of Credit Risk     Single Family Credit Guarantee Portfolio**

| | December 31, 2010 | | December 31, 2009 | | Percent of Credit Losses(1) Year ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | December 31, 2010 | December 31, 2009 |
| Year of Origination | | | | | | |
| 2010 | 18% | 0 1% | % | % | % | % |
| 2009 | 21 | 0 3 | 23 | 0 1 | | |
| 2008 | 9 | 4 9 | 12 | 3 4 | 7 | 5 |
| 2007 | 11 | 11 6 | 14 | 10 5 | 34 | 36 |
| 2006 | 9 | 10 5 | 11 | 9 4 | 30 | 35 |
| 2005 | 10 | 6 0 | 12 | 5 2 | 20 | 15 |
| 2004 and prior | 22 | 2 5 | 28 | 2 2 | 9 | 9 |
| Total | 100% | 3 8% | 100% | 4 0% | 100% | 100% |
| By Region | | | | | | |
| West | 27% | 4 7% | 27% | 5 3% | 48% | 53% |
| Northeast | 25 | 3 2 | 25 | 3 0 | 8 | 8 |
| North Central | 18 | 3 1 | 18 | 3 2 | 15 | 15 |
| Southeast | 18 | 5 6 | 18 | 5 6 | 25 | 20 |
| Southwest | 12 | 2 1 | 12 | 2 2 | 4 | 4 |
| Total | 100% | 3 8% | 100% | 4 0% | 100% | 100% |
| State | | | | | | |
| California | 16% | 4 9% | 15% | 5 8% | 26% | 32% |
| Florida | 6 | 10 5 | 6 | 10 3 | 19 | 15 |
| Arizona | 3 | 6 1 | 3 | 7 3 | 11 | 11 |
| Nevada | 1 | 11 9 | 1 | 11 4 | 6 | 6 |
| Michigan | 3 | 3 0 | 3 | 3 7 | 5 | 6 |
| Illinois | 5 | 4 6 | 5 | 4 4 | 5 | 3 |
| Georgia | 3 | 4 1 | 3 | 4 4 | 3 | 3 |
| All other | 63 | N/A | 64 | N/A | 25 | 24 |
| Total | 100% | 3 8% | 100% | 4 0% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of operations

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, excluding our other guarantee commitments

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and our guarantee commitments may be reported on a different schedule due to varying remittance cycles

(4) Region designation   West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY)

We primarily invest in and securitize single family mortgage loans  However, we also invest in and guarantee multifamily mortgage loans, which totaled $108.7 billion and $101.3 billion in UPB as of December 31, 2010 and 2009, respectively

Table 19 2 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes  Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination  The table includes a presentation of each category in isolation  A single loan may fall within more than one category (for example, a non credit enhanced loan may also have an original LTV ratio greater than 80%)

Source   DRA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0910

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 19.2     Concentration of Credit Risk     Multifamily Mortgage Portfolio**

| | December 31, 2010 | | December 31, 2009 | |
| --- | --- | --- | --- | --- |
| | UPB | Delinquency Rate(1) | UPB | Delinquency Rate(1) |
| | | (dollars in billions) | | |
| **By State** | | | | |
| Ca fo n a | $ 19 4 | 0 06% | $ 18 2 | % |
| Texas | 12 8 | 0 52 | 11 7 | 0 26 |
| New Yo k | 9 2 | | 9 0 | |
| F o da | 6 4 | 0 56 | 5 6 | 0 42 |
| V rg n a | 5 6 | | 5 6 | |
| Georg a | 5 5 | 0 98 | 5 3 | 0 65 |
| A o he s a es | 49 8 | 0 24 | 45 9 | 0 24 |
| o a | $108 7 | 0 26% | $101 3 | 0 20% |
| | | | | |
| **By Reg on(2** | | | | |
| Wes | $ 28 4 | 0 07% | $ 26 5 | 0 10% |
| No h Cen a | 9 7 | 0 30 | 9 0 | 0 19 |
| No heas | 31 0 | | 29 5 | |
| So t east | 19 2 | 0 59 | 17 4 | 0 52 |
| So t west | 20 4 | 0 61 | 18 9 | 0 35 |
| o a | $108 7 | 0 26% | $101 3 | 0 20% |
| | | | | |
| **By Ca ego y(3** | | | | |
| O g nal LTV a o > 80% | $ 6 8 | 2 30% | $ 6 8 | 1 63% |
| O g nal DSCR below 1 10 | $ 3 3 | 1 22% | $ 3 5 | 1 78% |
| Non-c ed enhanced loans | $ 87 5 | 0 12% | $ 87 6 | 0 07% |

(1) Based on he UPB of mul fam ly mo gages wo mon hly paymen s o mo e del nquen o n fo eclosu e
(2) See endno e (4) o "Tab e 19 1    Concen a on of C ed R sk    S ng e-fam y C ed  Gua an ee Po fol o" fo a desc p on of hese eg ons
(3) These ca ego es a e no mua  y exc us ve and a oan n one ca ego y may also be ncluded w  h n ano he

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property  A borrower's equity in a property decreases as the LTV ratio increases  Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage  The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation  Credit enhancement reduces our exposure to a potential credit loss  As of December 3 , 20 0, over one half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than  00% was approximately 8% and our estimate of the current average  DSCR for these loans was 1 1 as of December 31, 2010  We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1 0 was 7% as of December 31, 2010, and the average current LTV ratio of these loans was  08%  Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement  Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third party appraisals  for a portion of the portfolio  We periodically perform our own valuations or obtain third party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value  Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs

**Credit Performance of Certain Higher Risk Single Family Loan Categories**

There are several residential loan products that are designed to offer borrowers greater choices in their payment terms  For example, interest only mortgages allow the borrower to pay only interest for a fixed period of time before the loan begins to amortize  Option ARM loans permit a variety of repayment options, which include minimum, interest only, fully amortizing 30-year and fully amortizing 15 year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance  We

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011
TREASURY-0911
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

have not purchased option ARM loans in 2010 or 2009, and beginning September 1, 2010, we no longer purchase interest only loans

Participants in the mortgage market often characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both However, there is no universally accepted definition of subprime or Alt A Although we discontinued new purchases of mortgage loans with ower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either a part of our relief refinance mortgage initiative or in another refinance mortgage initiative and the pre existing mortgage (including Alt A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as Alt A in Table 19.3 because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt A loan As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred For non agency mortgage related securities that are backed by Alt A loans, we categorize securities as Alt A if the securities were identified as such based on information provided to us when we entered into these transactions

Although we do not categorize single family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores The industry has viewed those borrowers with credit scores below 620 based on the FICO scores scale as having a higher risk of delinquency

Presented below is a summary of the serious delinquency rates of certain higher risk categories of single family loans in our single family credit guarantee portfolio During 2010 and 2009, a significant percentage of our charge offs and REO acquisition activity was associated with these loan groups The table includes a presentation of each higher risk category in isolation A single loan may fall within more than one category (for example, an interest only loan may also have an original LTV ratio greater than 90%) Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics

### Table 19.3    Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio[1]

| | As of December 31, | | | |
| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
| | 2010 | 2009 | 2010 | 2009 |
|---|---|---|---|---|
| In e es -only loans | 5% | 7% | 18 4% | 17 6% |
| Op on ARM loans | 1% | 1% | 21 2% | 17 9% |
| Al -A[2] | 6% | 8% | 12 2% | 12 3% |
| O g nal LTV a o g ea e han 90%[3] oans | 9% | 8% | 7 8% | 9 1% |
| Lowe o g nal FICO sco es (less han 620) | 3% | 4% | 13 9% | 14 9% |

(1) Based o UPB

(2) Al -A oans may no nc ude hose oans ha we ep ev ous y c ass f ed as A -A and ha have been ef nanced as e he a e ef ef nance mo gage o n ano he ef nance mo gage n a ve

(3) Based o o f s e expos e o ep op y I c des ec ed -enhanced po on of he oan and exc udes any seconda y f nanc ng by h d pa es

The percentage of borrowers in our single family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 18% at both December 31, 2010 and 2009. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers The serious delinquency rate for single family loans with estimated current LTV ratios greater than 100% was 14 9% and 14 8% as of December 31, 2010 and 2009, respectively

We categorize our investments in non agency mortgage related securities as subprime, option ARM, or Alt A if the securities were identified as such based on information provided to us when we entered into these transactions We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt A securities. See "NOTE 8: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0912

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Seller/Servicers**

We acquire a significant portion of our single family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us a specified dollar amount of mortgages during a specified period of time  Our top  0 single family seller/servicers provided approximately 78% of our  single family purchase volume during the year ended December 31, 2010. Wells Fargo Bank, N.A., Bank of America, N.A., and Chase Home Finance LLC accounted  for 27%, 12% and 10% of our single family mortgage purchase volume and were the only single family seller/servicers that  comprised 10% or more of our purchase volume during the year ended December 3 , 20 0  We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders

We are exposed to institutional credit risk arising from the  potential insolvency or non performance by our seller/servicers  of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the  representations and warranties they made when they sold the mortgages to us; (b) failure to comply with our servicing  requirements; or (c) failure to honor their recourse and  indemnification obligations to us  As of December 3 , 20 0 and 2009, the UPB of loans subject to our repurchase requests  issued to our single family seller/servicers was approximately $3.8 billion and $4.2 billion, and approximately 34%  and 20% of these requests, respectively, were outstanding for more than four months since issuance of our repurchase request.  Our contracts require that a seller/servicer repurchase a  mortgage within 30 days after we issue a repurchase request, unless the seller/servicer avails itself of an appeals  process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal  During the years ended December 31, 2010 and 2009, we  recovered amounts that covered losses with respect to  $6.4 billion and $4.3 billion, respectively, of UPB on loans associated with our repurchase requests, including amounts associated with one time settlement agreements

GMAC Mortgage, LLC and Residential Funding  Company, LLC (collectively GMAC), indirect subsidiaries of Ally Financial Inc  (formerly, GMAC Inc.), are seller/servicers that together serviced and subserviced for an  affiliated entity approximately 3% of the single family loans in  our single family credit guarantee portfolio as of December 3 , 20 0  In March 20  0, we entered into an  agreement with GMAC, under which they made a one time payment to us for the partial release of repurchase obligations relating to  loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase  obligations for loans sold to us by GMAC after January 1,  2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing  requirements  The agreement did not have a material impact on our 20  0 consolidated statements of operations

On December 3 , 20  0, we entered into an agreement with  Bank of America, N.A., and two of its affiliates, BAC Home  Loans Servicing, LP and Countrywide Home Loans, Inc., to resolve currently outstanding and future claims for  repurchases arising from the breach of representations and warranties on certain loans purchased by us from Countrywide  Home Loans, Inc. and Countrywide Bank FSB. Under the terms  of the agreement, we received a $1 28 billion cash payment  in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the  first regularly scheduled monthly payments were due on or before December 31, 2008. The UPB of the loans in this portfolio,  as of December 31, 2010, was approximately $114 billion. The agreement applies only to certain claims  for repurchase based on breaches of representations and  warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank  of America entities  The agreement did not have a material  impact on our 20  0 consolidated statements of operations

On August 24, 2009, one of our single family  seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations  We have exposure to TBW with respect to its loan repurchase obligations  We also have exposure with respect to certain borrower funds that TBW held  for the benefit of Freddie Mac  TBW received and processed such  funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts,  primarily  at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac  Colonial Bank was placed into  receivership by the FDIC in August 2009

On or about June 14, 2010, we filed a proof of claim in the  TBW bankruptcy aggregating $1.78 billion. Of this  amount, approximately $1.15 billion relates to current and projected repurchase obligations and approximately  $440 million relates to funds deposited with Colonial Bank or with the FDIC as its receiver, which are attributable to  mortgage loans owned or guaranteed by us and previously serviced  by TBW. The remaining $190 million represents miscellaneous  costs and expenses incurred in connection with the dissolution  of TBW. On July 1, 2010, TBW filed a comprehensive final reconciliation report in the bankruptcy court indicating, among  other things, that approximately $203 million in funds held in bank accounts maintained by TBW related to its servicing of Freddie Mac's loans and was potentially available to pay Freddie Mac's claims. These assets include certain funds on deposit with Colonial Bank. We have analyzed the report and, as necessary and appropriate, may revise the amount of our claim

<center>261</center>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In a related matter, both TBW and Bank of America, N.A., which is also a claimant in the TBW bankruptcy, have sought discovery against Freddie Mac  While no actions against Freddie  Mac related to TBW have been initiated in bankruptcy court or  elsewhere to recover assets, TBW and Bank of America, N.A. have indicated that they wish to determine whether the  bankruptcy estate of TBW has any potential rights to seek to recover assets transferred by TBW to Freddie Mac prior to  bankruptcy. TBW has indicated to us that it may file an action to recover certain funds paid to us prior to the bankruptcy. At this time, we are unable to estimate our potential exposure, if  any, to such claims. See "NOTE 21: LEGAL CONTINGENCIES" for additional information on our claims  arising from TBW's bankruptcy.

In some cases, the ultimate amounts of recovery payments we  received and may receive in the future from seller/servicers  were and may be significantly less than the amount of our  estimates of potential exposure to losses related to their  obligations  Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations to  us is a component of our allowance for loan losses as of  December 3  , 2010 and 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Allowance for  Loan Losses and Reserve for Guarantee Losses" for further  information  We believe we have adequately provided for these  exposures, based upon our estimates of incurred losses, in our loan loss reserves at December 31, 2010 and 2009; however,  our actual losses may exceed our estimates

Our seller/servicers have an active role in our loss mitigation  efforts, including under the MHA Program, and therefore we also  have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated  benefits of our loss mitigation plans  A significant portion of our single family mortgage loans are serviced by several large  seller/servicers  Our top five single family loan servicers,  Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A.,  together serviced approximately 68% of our single family  mortgage loans, the first three of which each serviced   0% or  more of our single family mortgage loans, as of December 3  , 20  0

During the second half of 2010, a number of our  seller/servicers, including several of our largest ones,  temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers  announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation  and  execution of certain documents used in foreclosure proceedings,  including affidavits. See "NOTE 7: REAL ESTATE OWNED" for additional information.

As of December 31, 2010 our top four multifamily  servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our  multifamily mortgage portfolio and together serviced approximately 52% of our multifamily mortgage portfolio

We are exposed to the risk that multifamily seller/servicers could come under financial pressure due to the current stressful  economic environment, which could potentially cause degradation  in the quality of servicing they provide to us or, in certain  cases, reduce the likelihood that we could recover losses through lender repurchase or through recourse agreements or  other credit enhancements, where applicable  We continue to monitor the status of all our multifamily seller/servicers in  accordance with our counterparty credit risk management  framework.

## Mortgage Insurers

We have institutional credit risk relating to the potential  insolvency of or non performance by mortgage insurers that  insure single family mortgages we purchase or guarantee  For our exposure to mortgage insurers, we evaluate the recovery from  insurance policies for mortgage loans that we hold for investment as well as loans underlying our non consolidated Freddie  Mac mortgage related securities and covered by other guarantee commitments as part of the estimate of our loan loss  reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Allowance for Loan Losses and Reserve for Guarantee Losses" for additional information  As of December 31, 2010, these insurers provided coverage, with maximum loss limits of $56.8 billion, for  $274.7 billion of UPB in connection with our single family  credit guarantee portfolio  Our top six mortgage insurer  counterparties, Mortgage Guaranty Insurance Corporation (or  MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, PMI Mortgage Insurance Co , United Guaranty  Residential Insurance Co  and Republic Mortgage  Insurance Co. each accounted for more than 10% and  collectively represented approximately 95% of our overall mortgage insurance coverage at December 3  , 20  0  All our mortgage insurance counterparties are rated BBB or below as of  December 31, 2010, based on the lower of the S&P or  Moody's rating scales and stated in terms of the S&P  equivalent

During 2010, increases in default volumes and in the time period  between claim filing and receipt of payment resulted in an  increase of our receivables for mortgage and pool insurance  claims  Although the volume of rescissions of claims under  mortgage insurance coverage temporarily declined mid year, the volume of rescissions returned to elevated levels by year end   When an insurer rescinds coverage, the seller/servicer generally is in breach of representations and warranties made to us when  we purchased the affected mortgage  Consequently, we may require the seller/servicer to repurchase the mortgage or to indemnify  us for additional loss.

262

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In 20  0, we reached the maximum limit of recovery under certain  pool insurance policies  As a result, losses we recognized in 20  0 increased on certain loans previously identified as credit  enhanced  We may reach aggregate loss limits on other pool  insurance policies in the near term, which would further increase our credit losses

We received proceeds of $1.8 billion and $952 million during the years ended December 31, 2010 and 2009,  respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans  We had outstanding receivables from mortgage insurers of $2.3 billion and $1.7 billion as of December 31,  2010 and 2009, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.5 billion and $1.0 billion as December 31, 2010 and 2009,  respectively  Based upon currently available information, we believe that all of our mortgage insurance counterparties will  continue to pay all claims as due in the normal course for the near term, except for claims obligations of Triad Guaranty  Insurance Corporation (or Triad) that were partially deferred  beginning June 1, 2009, under order of Triad's state regulator. In 2010, we approved Essent Guaranty, Inc., which acquired certain assets and infrastructure of Triad in December 2009, as a new mortgage insurer.

**Bond Insurers**

Bond insurance, including primary and secondary policies, is a  credit enhancement covering certain of our investments in  non agency mortgage related securities  Primary policies are  acquired by the securitization trust issuing securities we  purchase, while secondary policies are acquired by us. At December 31, 2010, we had coverage, including secondary  policies, on non agency mortgage related securities totaling $10.7 billion of UPB. At December 31, 2010, the top  five of our bond insurers, Ambac Assurance Corporation, Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp. (or  AGMC), and National Public Finance Guarantee Corp. or (NPFGC), each accounted for more than 10% of our overall bond  insurance coverage and collectively represented approximately  99% of our total coverage

In November 2009, the New York State Insurance Department ordered FGIC to restructure in order to improve its financial  condition and to suspend paying any and all claims effective  immediately  On March 25, 2010, FGIC made an exchange offer to the holders of various residential mortgage backed securities insured by FGIC  The offer was ultimately terminated due to  insufficient participation by security holders. On August 4, 2010, FGIC Corporation, the parent company of  FGIC, announced that it had filed for bankruptcy. We continue to monitor FGIC's efforts to restructure and assess the impact  on our investments

In March 2010, Ambac established a segregated account for  certain Ambac insured securities, including those held by  Freddie Mac, and consented to the rehabilitation of the  segregated account requested by the Wisconsin Office of the  Commissioner of Insurance. On March 24, 2010, a Wisconsin state circuit court issued an order for rehabilitation and an  order for temporary injunctive relief regarding the segregated account  Among other things, no claims arising under the  segregated account will be paid, and policyholders are enjoined  from taking certain actions until the plan of rehabilitation  is approved by the circuit court. The plan of rehabilitation was  filed with the circuit court by the Office of the Commissioner of Insurance on October 8, 2010, and approved on  January 24, 2011. On November 8, 2010, Ambac Financial Group Inc, the parent company of Ambac, filed for bankruptcy.

We believe that, in addition to FGIC and Ambac, some of our other bond insurers lack sufficient ability to fully meet all of  the r expected lifetime claims paying obligations to us as such  claims emerge

We evaluate the recovery from primary monoline bond insurance  policies as part of our impairment analysis for our investments  in securities  If a monoline bond insurer fails to meet its  obligations on our investments in securities, then the fair  values of our securities would further decline, which could have a material adverse effect on our results and financial  condition  We recognized other than temporary impairment losses during 2009 and 20  0 related to investments in mortgage related  securities covered by bond insurance as a result of our  uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities  See  "NOTE 8: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities  covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk from the potential  insolvency or non performance of counterparties of  non-mortgage-re ated investment agreements and cash equivalent  transactions, including those entered into on behalf of our  securitization trusts. These financial instruments are investment grade at the time of purchase and primarily  short term in nature, which mitigates institutional credit risk  for these instruments.

During 2008, we recognized $1  1 billion of losses on  investment activity associated with our role as securities  administrator for our securitization trusts on unsecured loans  made to Lehman on the trusts' behalf  These short term loans were due to mature on September 15, 2008, the date Lehman filed for bankruptcy; however, Lehman failed to repay  these

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0915

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loans and the accrued interest. The loss incurred in 2008 associated with this transaction is included in other expenses on our consolidated statements of operations  See "NOTE 21: LEGAL CONTINGENCIES" for further information on this claim.

As of December 31, 2010 and 2009, there were $91.6 billion and $94.7 billion, respectively, of cash and other non mortgage assets invested with institutional counterparties or the Federal Reserve Bank  As of December 31, 2010, these primarily included: (a) $31.3 billion of cash equivalents invested in 45 counterparties that had short term credit ratings of A   or above on the S&P or equivalent scale; (b) $3.4 billion of federal funds sold with three counterparties that had  short term S&P ratings of A   or above; (c) $0 3 billion of federal funds sold with one counterparty that had a short term S&P rating of A 2; (d) $42.1 billion of securities purchased under agreements to resell with nine counterparties that had short term S&P ratings of A   or above; (e) $0.7 billion of securities purchased under  agreements to resell with one counterparty that had short term S&P rating of A 2; and (f) $ 3 3 billion of cash deposited with the Federal  Reserve Bank  The December 31, 2009 counterparty credit exposure includes amounts on our consolidated balance sheet as  well as those off balance sheet that we entered into on behalf of our securitization trusts that were not consolidated

## Derivative Portfolio

On an ongoing basis, we review the credit fundamentals of all of  our OTC derivative counterparties to confirm that they continue  to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based  on quantitative and qualitative analysis, which we update and monitor on a regular basis  We conduct additional reviews when  market conditions dictate or certain events affecting an individual counterparty occur.

### *Derivative Counterparties*

Our use of derivatives exposes us to counterparty credit risk,  which arises from the possibility that the derivative  counterparty will not be able to meet its contractual obligations  Exchange traded derivatives, such as futures  contracts, do not measurably increase our counterparty credit risk because changes in the value of open exchange traded  contracts are settled daily through a financial clearinghouse  established by each exchange  OTC derivatives, however, expose  us to counterparty credit risk because transactions are executed  and settled between us and our counterparty. Our use of OTC interest rate swaps, option based derivatives and  foreign currency swaps is subject to rigorous internal credit  and legal reviews  All our OTC derivatives counterparties are  major financial institutions and are experienced participants in  the OTC derivatives market.

### *Master Netting and Collateral Agreements*

We use master netting and collateral agreements to reduce our  credit risk exposure to our active OTC derivative counterparties  for interest rate swaps, option based derivatives and  foreign currency swaps  Master netting agreements provide for  the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single  counterparty in the event of default. On a daily basis, the  market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit  exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted   Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the  applicable threshold  Bilateral collateral agreements are in  place for the majority of our counterparties  Collateral posting thresholds are tied to a counterparty's credit rating  Derivative  exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price  quotes. Collateral is typically transferred within one business  day based on the values of the related derivatives  This time  lag in posting collateral can affect our net uncollateralized  exposure to derivative counterparties

Collateral posted by a derivative counterparty is typically in  the form of cash, although U.S. Treasury securities, Freddie Mac  mortgage-related securities, or our debt securities may also be  posted  In the event a counterparty defaults on its obligations  under the derivatives agreement and the default is not remedied  in the manner prescribed in the agreement, we have the right  under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non  cash collateral, to sell  the collateral and transfer the proceeds to us

Our uncollateralized exposure to counterparties for OTC  interest rate swaps, option based derivatives, foreign currency  swaps, and purchased interest rate caps, after applying netting  agreements and collateral, was $32 million and $128 million at  December 31, 2010 and 2009, respectively  In the event that all  of our counterparties for these derivatives were to have  defaulted simultaneously on  December 31, 2010, our maximum loss for accounting purposes  would have been approximately $32 million  One of our  counterparties, HSBC Bank USA, which was rated AA  as of  February 11, 2011, accounted for greater than 10% of our  net uncollateralized exposure to derivatives counterparties at December 3 , 20  0

The total exposure on our OTC forward purchase and sale  commitments, which are treated as derivatives, was $103 million  and $81 million at December 3 , 20  0 and 2009, respectively   These commitments are uncollateralized  Because the typical  maturity of our forward purchase and sale commitments is less  than 60 days and they are generally  settled through a clearinghouse, we do not require master  netting and collateral agreements for the counterparties of these

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011                    TREASURY-0916                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

commitments  However, we monitor the credit fundamentals of the  counterparties to our forward purchase and sale commitments on  an ongoing basis to ensure that they continue to meet our  internal risk  management standards.

## NOTE 20: FAIR VALUE DISCLOSURES

**Fair Value Hierarchy**

The accounting standards for fair value measurements and  disclosures establishes a fair value hierarchy that prioritizes  the inputs to valuation techniques used to measure fair value  Fair value represents the price that would be received to sell  an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date  Observable inputs reflect market data obtained from independent sources. Unobservable inputs reflect assumptions based on the  best information available under the circumstances  We use valuation techniques that maximize the use of observable inputs,  where available, and minimize the use of unobservable inputs

The three levels of the fair value hierarchy are described below:

- Level   :   Quoted prices (unadjusted) in active markets that are accessible  at the measurement date for identical assets or liabilities;

- Level 2:   Quoted prices for similar assets and liabilities in active  markets; quoted prices for identical or similar assets and  liabilities in markets that are not active; inputs other than  quoted market prices that are observable for the asset or  liability; and inputs that are derived principally from or  corroborated by observable market data for substantially the  full term of the assets; and

- Level 3:   Unobservable inputs for the asset or liability that are  supported by little or no market activity and that are  significant to the fair values.

Assets and liabilities are classified in their entirety within  the fair value hierarchy based on the lowest level input that is  significant to the fair value measurement  Table 20 1 sets forth by level within the fair value hierarchy assets and  liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at December 31,  2010 and 2009.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0917

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 20.1    Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
| **Assets:** | | | | | |
| Investments in securities | | | | | |
| Available-for-sale, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | $ | $ 83,652 | $ 2,037 | $ | $ 85,689 |
| Subprime | | | 33,861 | | 33,861 |
| CMBS | | 54,972 | 3,115 | | 58,087 |
| Option ARM | | | 6,889 | | 6,889 |
| Alt-A and other | | 13 | 13,155 | | 13,168 |
| Fannie Mae | | 24,158 | 212 | | 24,370 |
| Obligations of states and political subdivisions | | | 9,377 | | 9,377 |
| Manufactured housing | | | 897 | | 897 |
| Ginnie Mae | | 280 | 16 | | 296 |
| Total available-for-sale securities, at fair value | | 163,075 | 69,559 | | 232,634 |
| Trading, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | | 11,138 | 2,299 | | 13,437 |
| Fannie Mae | | 17,872 | 854 | | 18,726 |
| Ginnie Mae | | 145 | 27 | | 172 |
| Other | | 11 | 20 | | 31 |
| Total mortgage-related securities | | 29,166 | 3,200 | | 32,366 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 44 | | | 44 |
| Treasury bills | 17,289 | | | | 17,289 |
| Treasury notes | 10,122 | | | | 10,122 |
| FDIC-guaranteed corporate medium-term notes | | 441 | | | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | | | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | | 292,896 |
| Mortgage loans | | | | | |
| Held-for-sale, at fair value | | | 6,413 | | 6,413 |
| Derivative assets, net | | | | | |
| Interest-rate swaps | | 9,921 | 49 | | 9,970 |
| Option-based derivatives | | 11,255 | | | 11,255 |
| Other | 3 | 266 | 21 | | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | | 21,515 |
| Netting adjustments(1) | | | | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets | | | | | |
| Guarantee asset, at fair value | | | 541 | | 541 |
| Total assets carried at fair value on a recurring basis | $ 27,414 | $ 214,168 | $ 79,783 | $ (21,372) | $ 299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ | $ 4,443 | $ | $ | $ 4,443 |
| Derivative liabilities, net | | | | | |
| Interest-rate swaps | | 26,856 | 623 | | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | | 262 |
| Other | 170 | 28 | 136 | | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | | 28,075 |
| Netting adjustments(1) | | | | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $ (26,866) | $ 5,652 |

*Freddie Mac*

Source   FREDDIE MAC, FEDERAL HOME LOAN MORTGAGE CORP, 10 K, February 24, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0918

Table of Contents

|  | Fair Value at December 31, 2009 | | | | |
|---|---|---|---|---|---|
|  | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
|  | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities | | | | | |
| Available-for-sale, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | $ | $ 202,660 | $ 20,807 | $ | $ 223,467 |
| Subprime | | | 35,721 | | 35,721 |
| CMBS | | | 54,019 | | 54,019 |
| Option ARM | | | 7,236 | | 7,236 |
| Alt-A and other | | 16 | 13,391 | | 13,407 |
| Fannie Mae | | 35,208 | 338 | | 35,546 |
| Obligations of states and political subdivisions | | | 11,477 | | 11,477 |
| Manufactured housing | | | 911 | | 911 |
| Ginnie Mae | | 343 | 4 | | 347 |
| Total mortgage-related securities | | 238,227 | 143,904 | | 382,131 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 2,553 | | | 2,553 |
| Total available-for-sale securities, at fair value | | 240,780 | 143,904 | | 384,684 |
| Trading, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | | 168,150 | 2,805 | | 170,955 |
| Fannie Mae | | 33,021 | 1,343 | | 34,364 |
| Ginnie Mae | | 158 | 27 | | 185 |
| Other | | | 28 | | 28 |
| Total mortgage-related securities | | 201,329 | 4,203 | | 205,532 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 1,492 | | | 1,492 |
| Treasury Bills | 14,787 | | | | 14,787 |
| FDIC-guaranteed corporate medium-term notes | | 439 | | | 439 |
| Total non-mortgage-related securities | 14,787 | 1,931 | | | 16,718 |
| Total trading securities, at fair value | 14,787 | 203,260 | 4,203 | | 222,250 |
| Total investments in securities | 14,787 | 444,040 | 148,107 | | 606,934 |
| Mortgage Loans | | | | | |
| Held-for-sale, at fair value | | | 2,799 | | 2,799 |
| Derivative assets, net | 5 | 19,409 | 124 | (19,323) | 215 |
| Other assets | | | | | |
| Guarantee asset, at fair value | | | 10,444 | | 10,444 |
| **Total assets carried at fair value on a recurring basis** | $ 14,792 | $ 463,449 | $ 161,474 | $ (19,323) | $ 620,392 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ | $ 8,918 | $ | $ | $ 8,918 |
| Derivative liabilities, net | 89 | 21,162 | 554 | (21,216) | 589 |
| **Total liabilities carried at fair value on a recurring basis** | $ 89 | $ 30,080 | $ 554 | $ (21,216) | $ 9,507 |

(1) Represents counterparty netting, cash collateral netting, and/or net trade/settlement receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settlement receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net cash collateral posted and net trade/settlement receivable were $2.5 billion and $1 million, respectively, at December 31, 2009. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(0.8) billion and $(0.6) billion at December 31, 2010 and 2009, respectively, which has many traded or settled swaps as we have credit for.

### Recurring Fair Value Changes

For the year ended December 31, 2010, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non agency mortgage related securities. Level 3 measurements consist of assets and liabilities that are supported by little or no market activity where observable inputs generally are not available. The fair value of these assets and liabilities is measured using significant inputs that are considered unobservable. Unobservable inputs reflect assumptions based on the best information available under the circumstances. We use valuation techniques that maximize the use of observable inputs, where available, and minimize the use of unobservable inputs. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

*Freddie Mac*

Source   FREDDIE MAC HOME LOAN MORTGAGE CORP, 10 K, February 24, 2011
TREASURY-0919
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third party pricing services  In the fourth quarter of 2010 we  determined that these market conditions stabilized to a degree  that we believe indicates that unobservable inputs are no longer significant to the fair values of these securities and, as a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2  The adoption of the amendments to  the accounting standards for transfers of financial assets and  consolidation of VIEs resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 20 0, including: ( ) certain mortgage related securities  issued by our consolidated trusts that are held by us; and (2) the guarantee asset for guarantees issued to our  consolidated trusts. In addition, we transferred $0 4 billion of other Level 3 assets to Level 2  during 2010, resulting from improved liquidity and availability  of price quotes received from dealers and third party pricing services

During 2009, our Level 3 assets increased by $48.1 billion primarily due to the transfer of CMBS  securities from Level 2 to Level 3 given the continued weakness in the market for non agency CMBS, as evidenced by low  transaction volumes and wide spreads, as investor demand for these assets remained limited  As a result, we continued to  observe significant variability in the quotes received from dealers and third party pricing services  We concluded that the prices on these securities received from pricing services and  dealers were reflective of significant unobservable inputs. Consequently, we transferred $46 4 billion of Level 2  assets to Level 3 during 2009

Table 20 2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair  value using significant unobservable inputs (Level 3)

**Table 20.2    Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, December 3 , 2009 | Cumulative effect of change in accounting principle[1] | Balance, January , 20 0 | Included in earnings[2X )(4X5) | Included in other comprehensive income[2X ) | Total | Purchases, issuances sales and settlements, net[6] | Net transfers in and/or out of Level 3( ) | Balance, December 3 , 20 0 | Unrealized gains (losses) still held[8] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *For The Year Ended December 3 , 20 0* | | | | | |
| | | | | | *Realized and unrealized gains (losses)* | | | | | |
| | | | | | *(in millions)* | | | | | |
| investments in securities | | | | | | | | | | |
| Available or sale at air value | | | | | | | | | | |
| Mortgage re ated secur t es | | | | | | | | | | |
| redd e Mac | $ 20 807 | $ (18 77 | $ 2 032 | $ | $ | $ | $ | $ | $ 2 037 | $ |
| Subprime | 3  721 | | 3  721 | (  769 | 7 046 | 277 | (7  37 | | 33 861 | (  769 |
| CMBS | 4 0 9 | | 4 0 9 | | 369 | 369 | | (  1 273 | 3 11 | |
| Opt on ARM | 7 236 | | 7 236 | (  402 | 2 611 | 209 | (1  6 | | 6 889 | (139 |
| A t A and other | 13 391 | | 13 391 | (  020 | 3 128 | 2 108 | (2 3 | | 13 1 | (  020 |
| annie Mac | 3 38 | | 3 38 | | | | (  39 | 13 | 212 | |
| Obligations o  states and political subdivisions | 477 | | 477 | 4 | (123 | (  9 | (  98 | | 9 377 | |
| Manufactured hous ng | 9 | | 9 | (27 | 26 | 99 | (  3 | | 897 | (27 |
| Ginnie Mac | 4 | | 4 | | ( | ( | | 18 | 6 | |
| Total available  or sale mortgage related securities | 43 904 | (18 77 | 12 129 | (4 2 4 | 3  6 | 8 947 | (13 27 | (1 2 2 | 69  9 | (4 2 |
| Trad ng  at fa r va ue | | | | | | | | | | |
| Mortgage re ated secur t es | | | | | | | | | | |
| redd e Mac | 2 80 | ( | 2 800 | (777 | | (777 | 6  9 | (383 | 2 299 | (799 |
| annie Mac | 1 3  3 | | 1 3  3 | (449 | | (449 | (38 | (2 | 8 | (449 |
| Ginnie Mac | 27 | | 27 | | | | ( | | 27 | |
| Other | 2 8 | ( | 27 | ( | | ( | 4 | (2 | 20 | ( |
| Total trading mortgage related securities | 203 | (6 | 4  97 | (1 226 | | (1 226 | 6 6 | (387 | 3 200 | (1 2 8 |
| Mortgage loans | | | | | | | | | | |
| Held  or sale at  alue | 2 799 | | 2 799 | ( | | ( | 3 61 | | 6 4 3 | (308 |
| Net derivatives[9] | (430 | | (430 | ( 4 | | ( 4 | ( 20 | | (69 | (6 9 |
| Other assets | | | | | | | | | | |
| Guarantee asset[10] | 0 444 | ( 0 024 | 420 | (24 | | (24 | 4 | | 4 | (24 |

268                                                                                                   *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0920

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, January 1, 2009 | Realized and unrealized gains (losses) | | | Purchases, issuances, sales and settlements, net(6) | Net transfers in and/or out of evel 3(7) | Balance, December 31, 2009 | Unrealized gains (losses) still held(8) |
|---|---|---|---|---|---|---|---|---|
| | | ncluded in earnings(2)(3)(4)(5) | ncluded in other comprehensive income(2)(3) | Total | | | | |
| | | | (in millions) | | | | | |
| nvestments in securities | | | | | | | | |
| Available or sale at air value | | | | | | | | |
| Mortgage re ated securit es | | | | | | | | |
| redd e Mac | $ 18 320 | $ (2 | $ 1 833 | $ 1 831 | $ 1 03 | $ (379 | $ 20 807 | $ |
| Subprime | 2 266 | (6 26 | 2 9 8 | (3 68 | ( 2 977 | | 3 721 | (6 26 |
| CMBS | 2 861 | ( 37 | 6 940 | 6 803 | (2 28 | 46 639 | 4 0 9 | ( 37 |
| Opt on ARM | 7 378 | ( 726 | 3 4 6 | 690 | (1 832 | | 7 236 | ( 726 |
| Alt A and other | 13 236 | (2 72 | 6 30 | 3 8 | (3 404 | | 13 391 | (2 72 |
| annie Mae | 396 | | 6 | 6 | (42 | (22 | 33 8 | |
| Obligations o states and political subdivisions | 10 28 | 2 | 1 9 | 9 7 | ( 008 | | 477 | |
| Manufactured hous ng | 743 | ( 1 | 336 | 28 | ( 7 | | 9 | ( 1 |
| Ginnie Mae | 12 | | | | (2 | (6 | 4 | |
| Total mortgage related securities | 0 740 | ( 0 2 | 23 7 | 12 62 | (20 631 | 6 233 | 43 904 | ( 0 2 |
| Non mortgage related securities | | | | | | | | |
| Asset backed securities | | (7 | 8 | | ( | | | |
| Total available or sale at air value | 0 740 | ( 0 9 | 23 82 | 12 63 | (20 632 | 6 233 | 43 904 | ( 0 2 |
| Trad ng at air va ue | | | | | | | | |
| Mortgage re ated securit es | | | | | | | | |
| redd e Mac | 1 7 | 97 | | 97 | (90 | 349 | 2 80 | 962 |
| annie Mae | 82 | 4 | | 4 | 87 | 60 | 1 3 3 | 4 |
| Ginnie Mae | 4 | 2 | | 2 | (2 | 2 | 13 | 27 |
| Other | 29 | ( | | ( | (3 | 3 | 28 | |
| Total mortgage related securities | 2 200 | 486 | | 486 | 92 | 2 | 203 | 478 |
| Non mortgage related securities | | | | | | | | |
| D C guaranteed corporate med um term notes | | | | | 2 0 | (2 0 | | |
| Tota trad ng securit es at a r va ue | 2 200 | 486 | | 486 | 3 2 | 7 | 203 | 478 |
| Mortgage loans | | | | | | | | |
| Held on sale at air value | 40 | (81 | | (81 | 2 479 | | 2 799 | (96 |
| Net derivatives(9 | 00 | (388 | | (388 | ( 47 | | (430 | (404 |
| Other assets | | | | | | | | |
| Guarantee asset 0 | 4 847 | 298 | | 298 | 299 | | 0 444 | 298 |

(1) Rep esen s ad us en on a y app y he accoun ng s anda ds on accoun ng fo ansfe s of f nanc a asse s and conso da on of VIEs
(2) Changes n fa r value fo ava lable-fo -sale nves men s a e eco ded n AOCI, wh le ga ns and losses f om sales a e eco ded n o he ga ns (losses) on nves men s on ou conso da ed s a emen s of ope a ons Fo mo gage- elated secu es c ass f ed as ad ng, he ea zed and un ea zed ga ns (losses) a e eco ded n o he ga ns ( osses) on nves men s on ou conso da ed s a emen s of ope a ons
(3) Changes n fa r va ue of de va ves a e eco ded n o he ga ns (losses) on ou conso da ed s a emen s of ope a ons fo hose no des gna ed as accoun ng edges, a d AOCI, fo ose acco n ed fo as a cas f ow edge o e ex en edge s effec ve
(4) Changes n fa r va ue of he gua an ee asse a e eco ded n o he ncome on ou conso da ed s a emen s of ope a ons
(5) Fo held-fo -sale mo gage loans w h fa value op on elec ed, ga ns (losses) on fa value changes and sale of mo gage loans a e eco ded n o he ncome on ou conso da ed s a emen s of ope a ons
(6) Fo non-agency mo gage- ela ed secu es, p ma ly ep esen s p nc pal epaymen s
(7) T ansfe n and/o o of Leve 3 d ng e pe od s d ac osed as f he ansfe occu ed a he beg nn ng of he pe od
(8) Rep esen s he a oun of o a ga ns o osses fo he pe od, ncuded n ea n ngs, a bu ab e o he change n un ea zed ga ns (losses) ela ed o asse s and l ab l es class f ed as Leve 3 ha we es ll he d a Dece b r 31, 2010 and 2009, espec ve y Inc uded n hese a oun s a e c ed - e a ed o he - han- empo a y mpa men s eco ded on ava lable-fo -sale secu es
(9) Ne de va ves nc ude de va ve asse s and de va ve l ab l es p o o coun e pa y ne ng, cash colla e al ne ng, ne ade/se e ec e vab e o payab e and ne de va ve ne es ece vable o payable
(10) We es ma e ha all amoun s eco ded fo un eal zed ga ns and osses on ou gua an ee asse a e o hose a oun s s n pos on Cash ece ved on ou gua an ee asse s p esen ed as se e ens n he s d p of The a oun s f ec ed as nc uded n ea n ngs ep esen he pe od of fa va ue changes of ou g a a ee asse

## Non-recurring Fair Value Changes

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non recurring These assets include REO, net, impaired held for investment multifamily mortgage loans, and single family held for sale mortgage loans These fair value measurements usually result from the write down of individual assets to current fair value amounts due to impairments.

For a discussion related to our fair value measurement of single family held for sale mortgage loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy   *Mortgage Loans, Held for Sale*." As of January 1, 2010, we reclassified single family loans that were historically classified as held for sale to unsecuritized mortgage loans held for investment Therefore, these loans were not subject to fair value measurements after this date See "NOTE 2:  CHANGE IN ACCOUNTING PRINCIPLES" for additional information.

The fair value of impaired multifamily held for investment mortgage loans is generally based on the value of the underlying property Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy   *Mortgage Loans, Held for Investment*" for additional details

REO is initially measured at its fair value less costs to sell   In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy   *REO, Net*'" for additional details

269                                                                                                  *Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K,  ebruary 24, 2011

TREASURY-0921

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 20 3 presents assets measured and reported at fair value on a non recurring basis in our consolidated balance  sheets by level within the fair value hierarchy at December 31, 2010 and 2009, respectively

**Table 20.3     Assets Measured at Fair Value on a Non Recurring Basis**

| | Fair Value at December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for  dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | Total Gains ( osses)(5) |
| | | | (in millions) | | |
| **Assets measured at fa r value on a non-recurr ng bas s:** | | | | | |
| Mo  gage loans (1 | | | | | |
|   Held-fo - nves men | $ | $ | $   1,560 | $ 1,560 | $    (183) |
| REO,  e (2 | | | 5,606 | 5,606 | (290) |
| **Total assets measured at fair value on a non-recurring basis** | $ | $ | $   7,166 | $ 7,166 | $    (473) |

| | Fair Value at December 31, 2009 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for  dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | Total Gains ( osses)(5) |
| | | | (in millions) | | |
| **Assets measured at fa r value on a non-recurr ng bas s:** | | | | | |
| Mo  gage loans (1 | | | | | |
|   Held-fo - nves men | $ | $ | $     894 | $   894 | $    (231) |
| He d-fo -sa e | | | 13,393 | 13,393 | (64) |
| REO,  e (2 | | | 1,532 | 1,532 | 607 |
| LIHTC pa  e s  p eq  y  nves men s(3 | | | | | (3,669) |
| Acco   s a do  e  ece vab es,  e ( | | | | | (109) |
| **Total assets measured at fair value on a non-recurring basis** | $ | $ | $ 15,819 | $15,819 | $ (3,466) |

(1) Rep esen s ca  y ng va ue and  e a ed w  e-downs of  oans fo  w  c  adj s e  s a e based o   e fa  va ea o  s  T ese  oans  nclude held-fo -sale mo  gage loans   w e e  e  fa  va  e s below cos and  mpa ed mul  fam ly mo  gage loans, ha  a  class f ed as held-fo - nves men and have a  ela ed valua on  o  owance

(2) Rep esen s he fa  va ue and  e a ed  osses of fo ec osed p ope  es  a  wee  e ea ed a fa  va es bseq e   o  e  n  al class f ca on as REO,  he  T he ca  y ng a   o  of REO,  e was w  e  dow  o fa  va e of $5 6 b  on,  ess  e ma ed cos s o sell of $406 m ll on (o  app ox ma ely $5 2 b  on) a  Decembe  31, 2010   The ca  y ng a  o   of REO,  e was w  e  dow  o fa  va e of $1 5 b  on,  ess es ma ed cos s o se  of $106 m ll on (o  app ox ma ely $1 4 b ll on) a  Decembe  31, 2009

(3) Rep esen s he ca  y ng va ue and  e a ed w  e-downs of  mpa ed LIHTC pa  ne sh p equ  y  nves men s fo  wh ch adj s  e s a e based o   e fa  va ea o  s

(4) Rep esen s he ca  y ng va ue and  e a ed w  e-downs of  mpa ed LIHTC pa  ne sh p conso da ed  nves men s fo  wh ch adj s  en s a e based on fa  va  e  amoun s

(5) Rep esen s he  o a  ga ns ( osses) eco ded on  ems measu ed a  fa  va ue on a non- ecu  ng bas s as of Decembe  31, 2010 and 2009,  espec ve y

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held for sale mortgage loans,  foreign currency denominated debt, and certain other debt

*Certain Available-for-Sale Securities with Fair Value Option Elected*

We elected the fair value option for certain available for sale mortgage related securities to better reflect the natural offset  these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election  In addition, upon adoption of the accounting standards for the fair value option, we elected this option for available for sale  securities within the scope of the accounting standards for investments in beneficial interests in securitized financial  assets to better reflect any valuation changes that would occur  subsequent to impairment write downs previously recorded on these instruments  By electing the fair value option for these  instruments, we reflect valuation changes through our consolidated statements of operations in the period they occur,  including any increases in value.

For mortgage related securities and investments in securities  that were selected for the fair value option and subsequently  classified as trading securities, the change in fair value is  recorded in other gains (losses) on investment securities  recognized in earnings in our consolidated statements of operations. See "NOTE 8: INVESTMENTS IN  SECURITIES" for additional information regarding the net  unrealized gains (losses) on trading securities, which include  gains (losses) for other items that are not selected for the  fair value option  Related interest income continues to be reported as interest income in our consolidated statements of  operations. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Investments in Securities"  for additional information about the measurement and recognition  of interest income on investments in securities

*Debt Securities with Fair Value Option Elected*

We elected the fair value option for foreign currency denominated debt and certain other debt securities  In the case  of foreign currency denominated debt, we have entered into  derivative transactions that effectively convert these  instruments to U S  dollar denominated floating rate instruments  The fair value changes on these derivatives were  recorded in derivative

270

*Freddie Mac*

TREASURY-0922

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from the use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

gains (losses) in our consolidated statements of operations  We elected the fair value option on these debt instruments to  better reflect the economic offset that naturally results from the debt due to changes in interest rates  We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation

The changes in fair value of debt securities with the fair value  option elected were $580 million and $(404) million for the years ended December 31, 2010 and 2009, respectively, which were recorded in gains (losses) on debt  recorded at fair value in our consolidated statements of operations  The changes in fair value related to fluctuations in  exchange rates and interest rates were $583 million and  $(204) million for the years ended December 3 , 20  0 and 2009, respectively. The remaining changes in the fair value of $(3) million and $(200) million were attributable  to changes in the instrument specific credit risk for the years  ended December 31, 2010 and 2009, respectively

The change in fair value attributable to changes in  instrument specific credit risk was primarily determined by  comparing the total change in fair value of the debt to the total change in fair value of the interest rate and  foreign currency derivatives used to hedge the debt  Any difference in the fair value change of the debt compared to the  fair value change in the derivatives is attributed to  instrument specific credit risk.

The difference between the aggregate fair value and aggregate  UPB for long term debt securities with fair value option elected  was $108 million and $249 million at December 31, 20  0 and 2009, respectively  Related interest expense continues to be reported as interest expense in our consolidated statements of operations  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Debt Securities  Issued" for additional information about the measurement  and recognition of interest expense on debt securities issued

### Multifamily Held For Sale Mortgage Loans with Fair Value Option  Elected

We elected the fair value option for multifamily mortgage loans that were purchased through our CME initiative. Through this  channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall  strategy to expand our multifamily business, it differs from our traditional buy and hold strategy with respect to multifamily loans held for investment  Therefore, these multifamily mortgage loans were classified as held for sale mortgage loans in our consolidated balance sheets  to reflect our intent to sell in the future

We recorded $(1) million and $(81) million from the change in fair value in gains (losses) in other income in our  consolidated statements of operations for the years ended  December 31, 2010 and 2009, respectively  The fair value changes that were attributable to changes in the instrument specific credit risk were $18 million and  $24 million for the years ended December 31, 2010 and  2009, respectively. The gains and losses attributable to changes in instrument specific credit risk were determined primarily  from the changes in OAS level

The difference between the aggregate fair value and the  aggregate UPB for multifamily held for sale loans with the fair  value option elected was $(311) million and $(97) million at December 31, 2010 and 2009,  respectively  Related interest income continues to be reported as interest income in our consolidated statements of operations  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Mortgage Loans" for additional information about the measurement and recognition of interest  income on our mortgage loans

### Valuation Methods and Assumptions Subject to Fair Value Hierarchy

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair  value hierarchy based on the valuation process used to derive  the fair value and our judgment regarding the observability of  the related inputs

### Investments in Securities

#### Agency Securities

Fixed rate agency securities are valued based on  dealer published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay  ups for specified collateral  The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or  same day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement  date. The carry adjustment uses our internal prepayment and interest rate models  A pay up is added to the base TBA price for characteristics that are  observed to be trading at a premium versus TBAs; this currently includes seasoning and low loan balance attributes  Haircuts are  applied to a small subset of positions that are less liquid and  are observed to trade at a discount relative to TBAs; this  includes securities that are not eligible for delivery into TBA trades.

Adjustable rate agency securities are valued based on the median  of prices from multiple pricing services. The key valuation  drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months to next  coupon reset, coupled with prevailing market conditions, namely  interest rates

Because fixed rate and adjustable rate agency securities are  generally liquid and contain observable pricing in the market,  they generally are classified as Level 2

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0923

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Multiclass structures are valued using a variety of methods, depending on the product type The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates Other tranche types that are more challenging to price are valued using the median prices from multiple dealers These include structured interest only, structured principal only, inverse floaters, and inverse interest only structures Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer priced tranche If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value There is also a subset of positions for which prices are published on a daily basis; these include trust interest only and trust principal only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable

### Commercial Mortgage Backed Securities

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities The weighted average coupon and weighted average life of the collateral underlying our CMBS investments were 5.7% and 4.3 years, respectively, as of December 3 , 20 0 Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified in Level 2

### Subprime, Option ARM, and Alt A and Other (Mortgage Related)

These private label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible The market for non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified in Level 3

Table 20 4 below presents the fair value of subprime, option ARM, and Alt A and other investments we held by origination year

### Table 20.4    Fair Value of Subprime, Option ARM, and Alt A and Other Investments by Origination Year

| Year of Origination | | Fair Value at December 31, 2010 |
| --- | --- | --- |
| | | (in millions) |
| 2004 and p  o | $ | 4,998 |
| 2005 | | 13,126 |
| 2006 | | 19,333 |
| 2007 | | 16,461 |
| 2008 and beyond | | |
| o a | $ | 53,918 |

### Obligations of States and Political Subdivisions

These include housing revenue and municipal bonds, and are valued by taking the median prices from multiple pricing services Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross collateralization features, and tax exempt features coupled with municipal bond rates, credit ratings, and spread levels These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

### Manufactured Housing

Securities backed by loans on manufactured housing properties are dealer priced and we arrive at the fair value by taking the median of multiple dealer prices Some of the key valuation drivers include the collateral's performance and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-0924

vintage  These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the  market due to low levels of liquidity.

### Asset Backed Securities (Non Mortgage Related)

These private label non mortgage related securities are  dealer priced  Some of the key valuation drivers include the  discount margin, subordination level, and prepayment speed,  coupled with interest rates  They are classified as Level 2  because of their liquidity and tight pricing ranges

### Treasury Bills and Treasury Notes

Treasury bills and Treasury notes are classified as Level 1  in the fair value hierarchy since they are actively traded and  price quotes are widely available at the measurement date for  the exact security we are valuing

### FDIC Guaranteed Corporate Medium Term Notes

Since these securities carry the FDIC guarantee, they are  considered to have no credit risk. They are valued based on  yield analysis. They are classified as Level 2 because of their  high liquidity and tight pricing ranges.

### Mortgage Loans, Held for Sale

Mortgage loans, held for sale represent multifamily mortgage  loans at December 3 , 20  0 with the fair value option  elected  Thus, all held for sale mortgage loans are measured at  fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based  on market prices obtained from a third party pricing service  provider for similar actively traded mortgages, adjusted for  differences in loan characteristics and contractual terms. The  pricing service aggregates observable price points from two  markets: agency and non agency. The agency market consists  of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the  non agency market generally consists of secondary market trades  between banks and other financial institutions of loans that  were originated and initially held in portfolio by these  institutions. The pricing service blends the observable price  data obtained from these two distinct markets into a final  composite price based on the expected probability that a given  loan will trade in one of these two markets  This estimated  probability is largely a function of the loan's credit quality, as  determined by its current LTV ratio and DSCR. The result of  this blending technique is that lower credit quality  loans receive a lower percentage of agency price weighting and  higher credit quality loans receive a higher percentage of  agency price weighting

Given the relative illiquidity in the marketplace for  multifamily mortgage loans and differences in contractual terms,  these loans are classified as Level 3 in the fair value  hierarchy.

On January 1, 2010, we reclassified single family loans that  were historically classified as held for sale to  unsecuritized mortgage loans held for investment  Therefore, these loans are reported at amortized cost and are no  longer subject to the fair value hierarchy at December 31, 2010  Prior to January 1, 2010, these loans were recorded at the  lower of cost or fair value on our consolidated balance sheets  and were measured at fair value on a non recurring basis  See "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy    *Mortgage Loans"* for additional information regarding the valuation techniques we use  for our single family mortgage loans

### Mortgage Loans, Held for Investment

Mortgage loans, held for investment measured at fair value on a  non recurring basis represent impaired multifamily mortgage  loans, which are not measured at fair value on an ongoing basis  but have been written down to fair value due to impairment  The  valuation technique we use to measure the fair value of impaired  multifamily mortgage loans, held for investment is based on the  value of the underlying property and may include assessment of  third party appraisals, environmental, and engineering reports  that we compare with relevant market performance to arrive at a  fair value  Our valuation technique incorporates one or more of  the following methods: income capitalization, discounted cash  flow, sales comparables, and replacement cost  We consider the  physical condition of the property, rent levels, and other  market drivers, including input from sales brokers and the  property manager  We classify impaired multifamily mortgage  loans, held for investment as Level 3 in the fair value  hierarchy as their valuation includes significant unobservable  inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest rate swaps,  option based derivatives, futures, and forward purchase and sale  commitments that we account for as derivatives. The carrying  value of our derivatives on our consolidated balance sheets is  equal to their fair value, including net derivative interest  receivable or payable, trade/settle receivable or payable and is  net of cash collateral held or posted, where allowable by a  master netting agreement  Derivatives in a net unrealized gain  position are reported as derivative assets, net. Similarly,  derivatives in a net unrealized loss position are reported as  derivative liabilities, net

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011             TREASURY-0925

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Interest Rate Swaps and Option Based Derivatives*

The fair values of interest rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy

Option based derivatives include call and put swaptions and other option based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer supplied interest rate volatility grids as inputs to our option pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap Derivatives with embedded American options are valued using dealer provided pricing grids The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy Other option based derivatives include exchange traded options that are valued by exchange published daily closing prices Therefore, exchange traded options are classified as Level under the fair value hierarchy Other option based derivatives also include purchased interest rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy

As of December 31, 2010, the fair value of our interest rate swaps, before counterparty and cash collateral netting adjustments, was $(17.5) billion. The fair value of option based derivatives, before counterparty and cash collateral netting adjustments, was $11.0 billion on December 3 , 20 0, with a remaining weighted average life of 4.46 years. Table 20.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest rate swaps and option based derivatives and the maturity profile of our derivative positions It also provides the weighted average fixed rates of our pay fixed and receive fixed swaps

**Table 20.5     Fair Values and Maturities for Interest Rate Swaps and Option-Based Derivatives**

| | | | December 31, 2010 | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| I e es - a e swaps | | | | | | |
| Rece ve-f xed | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| We gh ed ave age f xed a e(3 | | | 1 54% | 1 12% | 2 39% | 3 66% |
| Fo wa d-s a ng swaps( | 22,412 | 371 | | 123 | (9) | 257 |
| We gh ed ave age f xed a e(3 | | | | 3 47% | 1 88% | 4 19% |
| Bas s (floa ng o floa ng) | 2,375 | 4 | | | 4 | |
| Pay-f xed | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| We gh ed-ave age f xed a e(3 | | | 3 11% | 2 21% | 3 04% | 4 02% |
| Fo wa d-s a ng swaps( | 56,259 | (4,009) | | | | (4,009) |
| We gh ed-ave age f xed a e(3 | | | | | | 4 54% |
| To a n e es - a e swaps | $ 721,259 | $(17,509) | $ (136) | $ (618) | $ (2,033) | $(14,722) |
| Op on-based de va ves | | | | | | |
| Call swap ons | $ 125,885 | $ 8,147 | $ 2,754 | $ 2,661 | $ 1,246 | $ 1,486 |
| P swap o s | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| O he op on-based de va ve( | 47,234 | 1,450 | (8) | | (1) | 1,459 |
| To al op on-based | $ 239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fa value s ca ego zed based on he pe od f om Dece  31, 2010 un  he con ac ua  a u  y of he de va ves
(2) Rep ese s fa  va  e fo  eac  ype of swap, pe  o  o coun e pa  y ne ng, cas  co a e a ne  ng, ne  ade/se  e o  payab e, and ne  de va  ve ne  ee s  ecce vab e o  payab e adj s  e s
(3) Rep esen s he no  ona  we gh ed ave age a e fo  he f xed eg of  e swaps
(4) Rep esen s n e es - a e swap ag ee  en s ha  e schedu ed o beg n on fu u e da es  ang ng f om  ess han one yea  o f f een yea s
(5) P  ma  y nc udes pu chased  n e es  a e caps and f oo s

274

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange traded futures, foreign currency swaps, certain forward purchase and sale commitments, and credit derivatives  The fair value of exchange traded futures is based on end of day closing prices obtained from third party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy     *Mortgage Loans.*"

Credit derivatives primarily include purchased credit default swaps and certain short term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third party dealer credit default spreads at the measurement date  We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation  Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above. See "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Leve  3

**REO, Net**

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months  We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy

**Debt Securities Recorded at Fair Value**

We elected the fair value option for foreign currency denominated debt instruments and certain other debt securities  See "Fair Value Election     *Debt Securities with Fair Value Option Elected"* for additional information  We determine the fair value of these instruments by obtaining multiple quotes from dealers  Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy

**Derivative Liabilities, Net**

See discussion under *"Derivative Assets, Net"* above

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in Table 20 6 present our estimates of the fair value of our financial assets and liabilities at December 3 , 20 0 and 2009. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting standards for fair value measurements and disclosures and the accounting standards for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole  Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

During the second quarter of 2010 our fair value results as presented in our consolidated fair value balance sheets were affected by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans  For more information concerning our approach to valuation related to our mortgage loans, see "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy     *Mortgage Loans."*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0927

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 20.6    Consolidated Fair Value Balance Sheets**

| | December 31, 2010 | | December 31, 2009 | |
|---|---|---|---|---|
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 37 0 | $ 37 0 | $ 64 7 | $ 64 7 |
| Restricted cash and cash equivalents | 8 1 | 8 1 | 0 5 | 0 5 |
| Federal funds sold and securities purchased under agreements to resell | 46 5 | 46 5 | 7 0 | 7 0 |
| *Investments in securities* | | | | |
| Available-for-sale, at fair value | 232 6 | 232 6 | 384 7 | 384 7 |
| Trading, at fair value | 60 3 | 60 3 | 222 2 | 222 2 |
| *Total investments in securities* | 292 9 | 292 9 | 606 9 | 606 9 |
| *Mortgage loans* | | | | |
| Mortgage loans held by consolidated trusts | 1,646 2 | 1,667 5 | | |
| Unsecuritized mortgage loans | 198 7 | 191 5 | 127 9 | 119 9 |
| *Total mortgage loans* | 1,844 9 | 1,859 0 | 127 9 | 119 9 |
| Derivative assets, net | 0 1 | 0 1 | 0 2 | 0 2 |
| Other assets | 32 3 | 37 2 | 34 6 | 37 2 |
| To al assets | $2,261 8 | $2,280 8 | $ 841 8 | $ 836 4 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts issued by third parties | $1,528 7 | $1,589 5 | $ | $ |
| Other debt | 713 9 | 729 7 | 780 6 | 795 4 |
| *Total debt, net* | 2,242 6 | 2,319 2 | 780 6 | 795 4 |
| Derivative liabilities, net | 1 2 | 1 2 | 0 6 | 0 6 |
| Other liabilities | 18 4 | 19 0 | 56 2 | 102 9 |
| Total liabilities | 2,262 2 | 2,339 4 | 837 4 | 898 9 |
| **Net assets** | | | | |
| *Net assets attributable to Freddie Mac* | | | | |
| Senior preferred stockholder | 64 2 | 64 2 | 51 7 | 51 7 |
| Preferred stockholders | 14 1 | 0 3 | 14 1 | 0 5 |
| Common stockholders | (78 7) | (123 1) | (61 5) | (114 7) |
| *Total net assets attributable to Freddie Mac* | (0 4) | (58 6) | 4 3 | (62 5) |
| Noncontrolling interests | | | 0 1 | |
| Total net assets | (0 4) | (58 6) | 4 4 | (62 5) |
| Total liabilities and net assets | $2,261 8 | $2,280 8 | $ 841 8 | $ 836 4 |

(1) Equals the amount reported on our GAAP consolidated balance sheets

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented As new markets are developed, our assumed principal exit market may change The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting standards for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets We believe these items do not have a significant impact on our overall fair value results Other non financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets

*Freddie Mac*

Source   D RA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0928

Table of Contents

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception

### Cash and Cash Equivalents

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties Given that these assets are short term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold Given that these assets are short term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value

### Mortgage Loans

Single family mortgage loans are not subject to the fair value hierarchy since they are classified as held for investment and recorded at amortized cost Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral dependent

#### Single Family Loans

We determine the fair value of single family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single family loans for which a contractual modification has been completed Our estimate of fair value is based on comparisons to actively traded mortgage related securities with similar characteristics We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties  See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy     *Investments in Securities*."

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-re ated securities Our approach for estimating the fair value of the implied management and guarantee fee at December 31, 2010 used third party market data as practicable  The valuation approach for the majority of implied management and guarantee fee that relates to fixed rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single family credit guarantee portfolio  The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available  These amounts relate specifically to ARM products, highly seasoned loans, or fixed rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees

The implied management and guarantee fee for single family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation  We use entry pricing information for all guaranteed loans that would qualify for purchase under current underwriting guidelines  (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation)

For single family mortgage loans for which a contractual modification has been completed, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

<div align="center">277</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily Loans*

For a discussion of the techniques used to determine the fair value of held for sale, and both impaired and non impaired held for investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy *Mortgage Loans, Held for Investment*" and "*Mortgage Loans, Held for Sale,*" respectively

### Other Assets

Our other assets are not financial instruments required to be valued at fair value under the accounting standards for disclosures about the fair value of financial instruments, such as property and equipment  For most of these non financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets  Certain non financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets  This treatment is applied to deferred items such as deferred debt issuance costs

We adjust the GAAP basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders  To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets  In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets  If the adjusted deferred taxes are a net liability, this amount is included in other liabilities

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets  On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets  Rather, the mechanism by which we consider the loan's non accrual status is through our internally modeled credit cost component of the loan's fair value. As a result, there is a difference between the accrued interest receivable GAAP basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging related basis adjustments

For fair value balance sheet purposes, we use the dealer published quotes for a base TBA security, adjusted for the carry and pay up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes  See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy *Investment in Securities  Agency Securities*" for additional information regarding the valuation techniques we use

Other debt includes both non callable and callable debt, as well as short term zero coupon discount notes  The fair value of the short term zero coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers, reliable third party pricing service providers or direct market observations  We elected the fair value option for foreign currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets  See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy *Debt Securities Recorded at Fair Value*" for additional information

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities, the reserve for guarantee losses on non consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities  We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities  The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans  Single Family Loans" section

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets  As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market based approach incorporating quoted dealer prices

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders, the fair value attributable to preferred stockholders and the fair value of noncontrolling interests

### Noncontrolling Interests in Consolidated Subsidiaries

Noncontrolling interests in consolidated subsidiaries primarily represented preferred stock interests that third parties held in our two majority owned REIT subsidiaries at December 31, 2009  The fair value of the third party noncontrolling interests in these REITs on our consolidated fair value balance sheets at December 31, 2009 was based on Freddie Mac's preferred stock quotes  During the second quarter of 2010, the two REITs were eliminated via a merger transaction  As a result, there was no preferred stock of the REITs held by third party stockholders at December 3 , 20 0  For more information, see "NOTE 16: NONCONTROLLING INTERESTS."

## NOTE 21: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment related litigation and other legal proceedings incidental to our business  We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures  From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us  In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories  In addition, we are sometimes sued in connection with the origination or servicing of mortgages  These suits typically involve claims alleging wrongful actions of seller/servicers  Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction  In accordance with the accounting standards for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated

### Putative Securities Class Action Lawsuits

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007.  The plaintiff alleges that the defendants violated federal securities laws by making "false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry." On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel  On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider trading allegations against only Patricia Cook  The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator  On April 6, 2009, defendants filed a motion to dismiss the second amended complaint, which motion remains pending

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiff claims that defendants made false and misleading statements about Freddie

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0931

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Mac's business that artificially inflated the price of Freddie Mac's common stock, and seeks unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008 Freddie Mac filed a motion to dismiss the complaint on February 24, 2010, which motion remains pending

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition, or results of operations

### Shareholder Demand Letters

In late 2007 and early 2008, the Board of Directors received three letters from purported shareholders of Freddie Mac, which together contain allegations of corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management, alleged false and misleading financial disclosures, and the alleged sale of stock based on material non public information by certain current and former officers and directors of Freddie Mac Collectively, the letters demanded that the board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages and unjust enrichment from board members, senior officers, Freddie Mac's outside auditors, and other parties who allegedly aided or abetted the improper conduct, and implement corporate governance initiatives to ensure that the alleged problems do not recur Prior to the conservatorship, the Board of Directors formed a Special Litigation Committee, or SLC, to investigate the purported shareholders' allegations, and engaged counsel for that purpose Pursuant to the conservatorship, FHFA, as the Conservator, has succeeded to the powers of the Board of Directors, including the power to conduct investigations such as the one conducted by the SLC of the prior Board of Directors The counsel engaged by the former SLC is continuing the investigation pursuant to instructions from FHFA As described below, each of these purported shareholders subsequently filed lawsuits against Freddie Mac.

### Shareholder Derivative Lawsuits

On July 24, 2008 and August 15, 2008, purported shareholders, The Adams Family Trust, Kevin Tashjian and the Louisiana Municipal Police Employees Retirement System, or LMPERS, filed two derivative lawsuits in the U.S. District Court for the Eastern District of Virginia against certain current and former officers and directors of Freddie Mac, with Freddie Mac named as a nominal defendant in the actions On October 15, 2008, the U.S. District Court for the Eastern District of Virginia consolidated these two cases Previously, on March 10, 2008, a purported shareholder, Robert Bassman, had filed a similar shareholder derivative lawsuit in the U.S. District Court for the Southern District of New York, which was subsequently transferred to the Eastern District of Virginia and then, on December 12, 2008, consolidated with the cases filed by The Adams Family Trust, Kevin Tashjian, and LMPERS. While no consolidated complaint has yet been filed, the complaints collectively assert claims for breach of fiduciary duty, negligence, violations of federal securities laws, violations of the Sarbanes Oxley Act of 2002 and unjust enrichment. Those claims are based on allegations that defendants failed to implement and/or maintain sufficient risk management and other controls; failed to adequately reserve for uncollectible loans and other risks of loss; and made false and misleading statements regarding the company's exposure to the subprime market, the strength of the company's risk management and internal controls, and the company's underwriting standards in response to alleged abuses in the subprime market. The plaintiffs also allege that certain of the defendants breached their fiduciary duties and unjustly enriched themselves through their salaries, bonuses, benefits and other compensation, and sale of stock based on material non public information. The complaints seek unspecified damages, equitable relief, the imposition of a constructive trust for the proceeds of alleged insider stock sales, an accounting, restitution, disgorgement, declaratory relief, an order requiring reform and improvement of corporate governance, punitive damages, costs, interest, and attorneys', accountants' and experts' fees

After FHFA successfully intervened in these consolidated actions in its capacity as Conservator, it filed a motion to substitute for plaintiffs. On July 27, 2009, the District Court entered an order granting FHFA's motion, and on August 20, 2009, the plaintiffs filed an appeal of that order. On October 29, 2009, FHFA filed a motion to dismiss the appeal for lack of appellate jurisdiction, which motion remains pending. On November 16, 2009, the District Court issued an order granting the parties' consent motion to stay all proceedings, including the deadlines for the defendants to answer or otherwise respond to the complaints, which stay was extended by the District Court until February 1, 2011. On February 1, 2011, FHFA filed a status report with the District Court requesting that it extend the stay until March 2, 2011. The District Court granted this request on February 16, 2011.

On June 6, 2008, a purported shareholder, the Esther Sadowsky Testamentary Trust, filed a shareholder derivative complaint in the U.S. District Court for the Southern District of New York against certain former officers and current and former directors of Freddie Mac Plaintiff asserts claims for alleged breach of fiduciary duty and declaratory and injunctive relief, based on allegations that defendants caused the company to violate its charter by engaging in "unsafe, unsound and improper speculation in high risk mortgages to boost near term profits, report growth in the company's mo tgage-re ated

<div align="center">280</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investments portfolio and guarantee business, and take market share away from its primary competitor, Fannie Mae " Among other things, plaintiff seeks an accounting, an order requiring that defendants remit all salary and compensation received during the periods they allegedly breached their duties, and an award of pre judgment and post judgment interest, attorneys' fees, expert fees and consulting fees, and other costs and expenses On November 13, 2008, FHFA filed a motion to substitute for the Esther Sadowsky Testamentary Trust. On February 26, 2009, Robert Bassman filed a motion with the District Court to intervene or, in the alternative, to appear as amicus curiae. On May 6, 2009, the District Court granted FHFA's motion to substitute and denied Bassman's motion to intervene. On June 4, 2009, the Esther Sadowsky Testamentary Trust filed a notice of appeal of the May 6 order granting FHFA's substitution motion. On September 17, 2009, Bassman filed a notice of appeal of the May 6 order denying his motion to intervene or appear as amicus curiae. On March 10, 2010, the U.S. Court of Appeals for the Second Circuit granted FHFA's motion to dismiss the appeal of the Esther Sadowsky Testamentary Trust and dismissed that appeal on April 12, 2010 due to lack of jurisdiction. On October 28, 2010, the District Court granted FHFA's motion to extend the stay through February 1, 2011. On February 1, 2011, FHFA filed a status report with the District Court requesting that it extend the stay until March 2, 2011. The District Court granted this request on February 2, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations

## Energy Lien Litigation

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper

Similar complaints have been filed by other parties On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss the lawsuits brought in the Northern District of California and the Northern District of Florida; responses to the other complaints are not yet required On December 23, 2010, the Northern District of California granted the parties' joint stipulation dismissing as defendants the individual officers of Freddie Mac and Fannie Mae from the State of California and County of Sonoma matters On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations

## Government Investigations and Inquiries

On September 26, 2008, Freddie Mac received a federal grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York. The subpoena sought documents relating to accounting, disclosure, and corporate governance matters for the period beginning January 1, 2007. Subsequently, we were informed that the subpoena was withdrawn, and that an investigation is being conducted by the U S Attorney's Office for the Eastern District of Virginia On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an

<div align="center">281</div>

<div align="right"><em>Freddie Mac</em></div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation Freddie Mac is cooperating fully in these matters

Freddie Mac has been informed by Donald J Bisenius, Executive Vice President  Single Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation  The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he intends to make such a submission.

## Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non cumulative, non convertible, perpetual fixed rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering  Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel  The case is currently dormant and we believe plaintiff may have abandoned it

By letter dated October  7, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of 8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleges that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with an offering by Freddie Mac of $6 billion of 8 375% Fixed to Floating Rate Non Cumulative  Perpetual Preferred Stock Series Z that commenced on November 29, 2007. The complaint further alleges that certain defendants and others made additional false statements following the offering  The complaint names as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants  The defendants moved to dismiss the amended consolidated complaint on April 28, 2010  On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead  On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting the underwriter defendants and Cook. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel  Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel  At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations

<div align="center">282</div>

*Freddie Mac*

TREASURY-0934

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities") Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2 1 billion On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years On January 25, 2011, Lehman filed its first amended plan and disclosure statement The plan and disclosure statement are subject to court approval

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion relates to current and projected repurchase obligations and about $440 million relates to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represents miscellaneous costs and expenses incurred in connection with the dissolution of TBW. On July 1, 2010, TBW filed a comprehensive final reconciliation report in the bankruptcy court indicating, among other things, that approximately $203 million in funds held in bank accounts maintained by TBW related to its servicing of Freddie Mac's loans and was potentially available to pay Freddie Mac's claims. We have analyzed the report and, as necessary and appropriate, may revise the amount of our claim

Both TBW and Bank of America, N.A., which is also a claimant in the TBW bankruptcy, have sought discovery against Freddie Mac While no actions against Freddie Mac related to TBW have been initiated in bankruptcy court or elsewhere to recover assets, TBW and Bank of America, N.A. have indicated that they wish to determine whether the bankruptcy estate of TBW has any potential rights to seek to recover assets transferred by TBW to Freddie Mac prior to bankruptcy. TBW has also indicated to us that it may file an action to recover certain monies paid to us prior to the bankruptcy At this time, we are unable to estimate our potential exposure, if any, to such claims.

On or about May 14, 2010, certain underwriters of Lloyds of London brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers and directors Several excess insurers on the bonds thereafter filed similar claims in that action Freddie Mac has filed a proof of loss under the bonds, but we are unable to estimate our potential recovery, if any, thereunder Discovery in the proceeding has been stayed at the request of the U S Department of Justice, pending completion of a criminal trial involving the former chief executive officer of TBW

For more information, see "NOTE 19: CONCENTRATION OF CREDIT AND OTHER RISKS  Seller/Servicers."

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court in October 2010 in response to the Statutory Notices The IRS responded to our petition with the U S Tax Court in December 20 0 We continue to seek resolution of the controversy by settlement For information on this matter, see "NOTE 14: INCOME TAXES."

<div align="center">

**NOTE 22: EARNINGS (LOSS) PER SHARE**

</div>

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting standards for earnings per share, we use the "two class" method of computing earnings per share Basic earnings per common share are computed by dividing net loss attributable to common stockholders by weighted average common shares outstanding basic for the period. The weighted average common shares outstanding basic during the years ended December 3 , 20 0 and 2009 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding diluted for the period, which considers the effect of dilutive common equivalent shares outstanding For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect Such items are excluded from the

<div align="center">283</div>

<div align="right">*Freddie Mac*</div>

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0935

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

weighted average common shares outstanding    basic  For a discussion of our significant accounting policies  regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Earnings Per Common Share."

### Table 22.1    Loss Per Common Share    Basic and Diluted

| | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
| | (dollars in millions, except per share amounts) | | |
|---|---|---|---|
| Ne  oss a  bu ab e  o F edd e Mac | $  (14,025) | $  (21,553) | $  (50,119) |
| P efe ed s ock d v dends[1] | (5,749) | (4,105) | (675) |
| Amoun  alloca ed  o pa  c pa  ng secu  y op  on holde s | | | (1) |
| Ne  loss a  bu able  o common s ockholde s | $  (19,774) | $  (25,658) | $  (50,795) |
| We gh ed ave age common sha es ou s and ng    bas c ( n   o sa ds)[2] | 3,249,369 | 3,253,836 | 1,468,062 |
| D lu ve po en al common sha es ( n  housands) | | | |
| We gh ed ave age common sha es ou s and ng    d lu ed (    o sa ds) | 3,249,369 | 3,253,836 | 1,468,062 |
| An  d lu ve po en al common sha es excluded f om  he compu a on of d lu ve po en al common sha es ( n housands) | 5,290 | 7,541 | 10,611 |
| Bas c loss pe  common sha e | $  (6 09) | $  (7 89) | $  (34 60) |
| D lu ed loss pe  common sha e | $  (6 09) | $  (7 89) | $  (34 60) |

(1) Co s s e  w    e cove a y of   e P  c ase Ag ee e  , we pa d d v de ds o  o  se o  p efe ed s ock, b  d d  o  dec a e d v dends on any o he  se es of p efe ed s ock ou s and ng s  bseq en  o en e ng conse va o s p

(2) Inc udes  he we gh ed ave age numbe  of sha es du ng 2010 and 2009  espec ve y  ha  a e assoc a ed w h  he wa an  fo o  common s ock ssued o T easu y  as pa  of  e P  c ase Ag ee en  Th s wa an s nc uded n sha es ou s and ng  bas c s nce   s uncond  ona y exe c sable by  he holde  a  a m n mal cos  of $0 00001 pe s a e

## NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS

As discussed in "NOTE 2: CHANGE IN ACCOUNTING  PRINCIPLES," we adopted amendments to the accounting  standards for transfers of financial assets and consolidation of VIEs effective January 1, 2010  As a result of this change in accounting principles, certain line items on our consolidated statements of operations, consolidated balance sheets, and  consolidated statements of cash flows are no longer material to our 2010 consolidated results of operations, financial position,  and cash flows.

As this change in accounting principles was applied  prospectively, the results of operations for the year ended December 3  , 20 0 reflect the consolidation of our single family PC trusts and certain Other Guarantee Transactions  while the results of operations for the years ended December 3  , 2009 and 2008 reflect the accounting policies  in effect at that time,  i.e., these securitization entities were accounted for off balance sheet  Table 23 1 highlights the significant line items that are no longer  disclosed separately on our consolidated statements of operations

### Table 23.1    Line Items No Longer Disclosed Separately  on our Consolidated Statements of Operations

| | For The Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
| | (in millions) | | |
|---|---|---|---|
| O he   ncome | | | |
| Managemen  and gua an ee  ncome | $  143 | $ 3,033 | $ 3,370 |
| Ga ns ( osses) on gua an ee asse | (61) | 3,299 | (7,091) |
| Income on gua an ee obl ga on | 135 | 3,479 | 4,826 |
| Ga ns (losses) on sale of mo  gage loans | 267 | 745 | 117 |
| Lowe -of-cos -o -fa  value ad us men s on held-fo -sale mor gage  oans | | (679) | (30) |
| Ga ns (losses) on mo  gage loans  eco ded a  fa  value | (249) | (190) | (14) |
| Recove es on loans  mpa  ed upon pu chase | 806 | 379 | 495 |
| Low- ncome hous ng  ax c ed   pa ne sh ps | | (4,155) | (453) |
| T us  managemen  ncome (expense) | | (761) | (70) |
| All o he | 819 | 222 | 195 |
| To al o he   ncome pe  consol da ed s a emen s of ope a  ons | $1,860 | $ 5,372 | $ 1,345 |
| O he  expenses | | | |
| Losses on  oans pu chased | $   25 | $ 4,754 | $ 1,634 |
| Secu  es adm n s a o  loss on nves men  ac  v y[1] | | | 1,082 |
| All o he | 688 | 483 | 435 |
| To al o he  expenses pe  consol da ed s a emen s of ope a  ons | $  713 | $ 5,237 | $ 3,151 |

(1) Rep esen s  osses we  ecogn zed  n 2008 on  nves men s made by  s   Le  a  o be a f of o  sec    za o    s s  See "NOTE 19  CONCENTRATION OF CREDIT AND OTHER RISKS" fo  add  onal  nfo ma on

284

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 23 2 highlights the significant line items that are no longer disclosed separately on our consolidated balance sheets

**Table 23.2    Line Items No Longer Disclosed Separately on our Consolidated Balance Sheets**

|  | December 31, 2010 | December 31, 2009 |
|---|---|---|
|  | (in millions) | |
| Other assets | | |
| Guarantee asset | $ 541 | $ 10,444 |
| All other (1) | 10,334 | 4,942 |
| Total other assets per consolidated balance sheets | $ 10,875 | $ 15,386 |
| Other liabilities | | |
| Guarantee obligation | $ 625 | $ 12,465 |
| Reserve for guarantee losses | 235 | 32,416 |
| All other (2) | 7,238 | 6,291 |
| Total other liabilities per consolidated balance sheets | $ 8,098 | $ 51,172 |

(1) Includes accounts and other receivables of $8 7 b on and $2 8 b on a Decembe 31, 2010 and 2009, espec vely
(2) Includes se v ce advanced n e s payab e and ce a no he se v ce l ab l es of $4 5 b ll on and $0 b ll on a Decembe 31, 2010 and 2009, espec ve y Inc udes acco s payab e a d acc ed expe ses of $1 8 b o a d $5 6 b on a Dece be 31, 2010 and 2009, espec vely

Table 23 3 highlights the significant line items that are no longer disclosed separately on our consolidated statements of cash flows.

**Table 23.3    Line Items No Longer Disclosed Separately on our Consolidated Statements of Cash Flows**

|  | For The Year Ended December 31, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (in millions) | | |
| Adjustments to reconcile net loss to net cash from operating activities | | | |
| Low-income housing tax credit partnerships | $ — | $ 4,155 | $ 453 |
| Losses on loans purchased | 25 | 4,754 | 1,634 |
| Change in | | | |
| Due to PCs and REMICs and Other Structured Securities trusts | 14 | 250 | (623) |
| Guarantee asset, at fair value | (121) | (5,597) | 4,744 |
| Guarantee obligation | (17) | (183) | (1,470) |
| Other, net | (134) | (461) | (170) |
| Total other, net | $(233) | $ 2,918 | $4,568 |

**END OF CONSOLIDATED FINANCIAL STATEMENTS AND ACCOMPANYING NOTES**

285                                                                                     *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## QUARTERLY SELECTED FINANCIAL DATA

| | 2010 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 4,125 | $ 4,136 | $ 4,279 | $ 4,316 | $ 16,856 |
| Provision for credit losses | (5,396) | (5,029) | (3,727) | (3,066) | (17,218) |
| Non-interest income (loss) | (4,854) | (3,627) | (2,646) | (461) | (11,588) |
| Non-interest expense | (667) | (479) | (828) | (958) | (2,932) |
| Income tax benefit (expense) | 103 | 286 | 411 | 56 | 856 |
| Net (income) loss attributable to noncontrolling interests | 1 | | | | 1 |
| Net loss attributable to Freddie Mac | $(6,688) | $(4,713) | $(2,511) | $ (113) | $(14,025) |
| Net loss attributable to common stockholders | $(7,980) | $(6,009) | $(4,069) | $(1,716) | $(19,774) |
| Loss per common share(1) | | | | | |
| Basic | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |
| Diluted | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |

| | 2009 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 3,859 | $ 4,255 | $ 4,462 | $ 4,497 | $ 17,073 |
| Provision for credit losses | (8,915) | (5,665) | (7,973) | (6,977) | (29,530) |
| Non-interest income (loss) | (3,088) | 3,215 | (1,082) | (1,777) | (2,732) |
| Non-interest expense | (2,768) | (1,688) | (965) | (1,774) | (7,195) |
| Income tax benefit (expense) | 937 | 184 | 149 | (440) | 830 |
| Net (income) loss attributable to noncontrolling interests | | 1 | 1 | (1) | 1 |
| Net loss attributable to Freddie Mac | $(9,975) | $ 302 | $(5,408) | $(6,472) | $ (21,553) |
| Net loss attributable to common stockholders | $(10,353) | $ (840) | $ (6,701) | $(7,764) | $(25,658) |
| Loss per common share(1) | | | | | |
| Basic | $ (3.18) | $ (0.26) | $ (2.06) | $ (2.39) | $ (7.89) |
| Diluted | $ (3.18) | $ (0.26) | $ (2.06) | $ (2.39) | $ (7.89) |

(1) Earnings (loss) per common share is computed independently for each of the quarters presented. Therefore, the sum of weighted average common shares used and ng when calculating earnings (loss) per share, is of efo quaes ay o equa e full-year amount. Earnings (loss) per common share amounts may not recalculate because of s g ea os s ab e de o o d g

286                                                      *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# ITEM 9. CHANGES IN AND DISAGREEMENTS WITH
## ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

# ITEM 9A. CONTROLS AND PROCEDURES

## Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation,  controls and procedures designed to ensure that the information  we are required to disclose in reports that we file or submit  under the Exchange Act is recorded, processed, summarized and  reported within the time periods specified by the SEC rules and  forms and that such information is accumulated and communicated  to senior management, as appropriate, to allow timely decisions  regarding required disclosure  In designing our disclosure  controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can  provide only reasonable assurance of achieving the desired  control objectives, and we must apply judgment in implementing  possible controls and procedures

Management, including the company's Chief Executive Officer and  Chief Financial Officer, conducted an evaluation of the  effectiveness of our disclosure controls and procedures as of  December 3 , 20  0  As a result of management's evaluation, our  Chief Executive Officer and Chief Financial Officer concluded that  our disclosure controls and procedures were not effective as of  December 3 , 20  0, at a reasonable  eve  of assurance, because  our disclosure controls and  procedures did not adequately ensure  the accumulation and  communication to management of information  known to FHFA that is needed to meet our disclosure obligations  under the federal  securities laws  We have not been able to update  our disclosure controls and procedures to provide reasonable  assurance that  information known by FHFA on an ongoing basis is  communicated from FHFA to Freddie Mac's management in a manner  that allows for timely decisions regarding our required disclosure  Based on discussions with FHFA and the structural nature of this  continuing weakness, it is likely that we will not remediate  this  weakness in our disclosure controls and procedures while we are  under conservatorship  As noted below, we also consider this  situation to be a continuing material weakness in our internal  control over financial reporting

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining  adequate internal control over financial reporting, as such term  is defined in Exchange Act Rule  3a   5(f)  Internal control over  financial reporting is a process designed  by, or under the  supervision of, our Chief Executive Officer and Chief Financial  Officer and effected by the Board of Directors,  management and  other personnel to provide reasonable assurance regarding the  reliability of our financial reporting and the  preparation of  financial statements for external purposes in  accordance with GAAP

Because of its inherent limitations, internal control over  financial reporting cannot provide absolute assurance of  preventing or detecting all misstatements. It is a process that  involves human diligence and compliance and is, therefore,  subject to lapses in judgment and breakdowns resulting from human  error  It also can be circumvented by collusion or  improper  override. Because of its limitations, there is a risk  that internal  control over financial reporting may not prevent  or detect on a  timely basis errors or fraud that could cause a  material  misstatement of the financial statements

We assessed the effectiveness of our internal control over  financial reporting as of December 31, 2010  In making our  assessment, we used the criteria set forth by the Committee of  Sponsoring Organizations of the Treadway Commission, or COSO, in  *Internal Control      Integrated Framework*  A material weakness  is a deficiency, or a combination of deficiencies, in internal  control over financial reporting, such  that there is a reasonable  possibility that a material  misstatement of the company's annual  or interim financial statements will not be prevented or detected  on a timely basis by a company's internal controls. Based on our  assessment,  we identified a material weakness related to our  inability to  update our disclosure controls and procedures in a  manner that  adequately ensures the accumulation and communication  to  management of information known to FHFA that is needed to meet  our disclosure obligations under the federal securities laws,  including disclosures affecting our consolidated financial  statements

We have been under conservatorship of FHFA since September 6,  2008  FHFA is an independent agency that currently functions as  both our Conservator and our regulator with respect to our  safety, soundness and mission. Because we are in conservatorship,  some of the information that we may need to meet our disclosure  obligations may be solely within the  knowledge of FHFA  As our  Conservator, FHFA has the power to take actions without our  knowledge that could be material to  investors and could  significantly affect our financial  performance  Although we and  FHFA have attempted to design and implement disclosure policies  and procedures that would account  for the conservatorship and  accomplish the same objectives as disclosure controls and  procedures for a typical reporting  company, there are inherent  structural limitations on our ability to  design, implement, test  or operate effective  disclosure controls and procedures under the  current  circumstances. As our Conservator and regulator,  FHFA is  limited in its ability to design and implement a complete set of  disclosure controls and procedures relating to us, particularly  with respect to current reporting pursuant to Form 8 K. Similarly,  as a regulated entity,

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0939

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible  For example, FHFA may formulate certain intentions with respect to the conduct of our business that, if known to management,  would require consideration for disclosure or reflection in our financial statements, but that FHFA, for regulatory reasons, may  be constrained from communicating to management  As a result, we did not maintain effective controls and procedures designed to  ensure complete and accurate disclosure as required by GAAP as of December 3 , 20 0

Because of this material weakness, we have concluded that our  internal control over financial reporting was not effective as  of December 3 , 2010 based on the COSO criteria  PricewaterhouseCoopers LLP, an independent registered public accounting firm, audited the effectiveness of our internal control over financial reporting as of  December 3 , 20 0 and also determined that our internal  control over financial reporting was not effective  PricewaterhouseCoopers LLP's report appears in  "FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA   Repo t of Independent Registered Public Accounting Firm "

**Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting**

As described under "Management's Report on Internal Control Over Financial Reporting," we have not remediated  the material weakness related to our disclosure controls and procedures as of December 31, 2010  Given the structural  nature of this weakness, we believe it is likely that we will not remediate this material weakness while we are under  conservatorship  However, both we and FHFA have continued to engage  n activities and employ procedures and practices  intended to permit accumulation and communication to management  of information needed to meet our disclosure obligations under  the federal securities laws  These include the following:

- FHFA has established the Office of Conservator Affairs, which is intended to facilitate operation of the company with the  oversight of the Conservator

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing  We also provide drafts of externa press releases, statements and speeches to FHFA personnel for their review and comment prior to release

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this annual report on Form 10 K, and engage in discussions regarding issues associated with the  information contained in those filings  Prior to filing this  annual report on Form 10 K, FHFA provided us with a written acknowledgement that it had reviewed  the annual report on Form 10 K, was not aware of any material misstatements or omissions in the  annual report on Form 10 K, and had no objection to our filing the annual report on  Form 10 K

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by  phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters,  including accounting, capital markets management, external  communications and legal matters

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures

In view of our mitigating activities related to the material  weakness, we believe that our consolidated financial statements  for the year ended December 31, 2010, have been prepared in  conformity with GAAP

**Changes in Internal Control Over Financial Reporting During the Quarter  Ended December 31, 2010**

We evaluated the changes in our internal control over financial  reporting that occurred during the quarter ended  December 31, 2010 and concluded that there were no matters that materially affected, or are reasonably likely to materially  affect, our internal control over financial reporting  Subsequent to year end, Bruce M  Witherell resigned from  his position and responsibilities as our Chief Operating Officer  effect ve February 9, 2011.

## ITEM 9B. OTHER INFORMATION

**Election of Directors**

Upon the appointment of FHFA as our Conservator on September 6, 2008, the Conservator immediately succeeded to  all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets, including, without limitation, the right of holders of our common stock to vote with respect to the  election of directors and any other matter for which stockholder approval is required or deemed advisable

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0940

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On February 17, 2011, the Conservator executed a written consent re electing each of the then current directors as members of our Board of Directors, effective as of that date  The individuals elected by the Conservator for another term as directors are listed below

Linda B. Bammann
Carolyn H. Byrd
Robert R  Glauber
Charles E. Haldeman, Jr.
Laurence E. Hirsch
John A. Koskinen
Christopher S. Lynch
Nicolas P. Retsinas
Clayton S  Rose
Eugene B. Shanks, Jr.
Anthony A. Williams

The terms of the directors elected under the February 17, 2011 consent will continue until the date of the next annual meeting of stockholders or the Conservator next elects directors by written consent, whichever occurs first.

## 2011 Target Compensation for Named Executive Officers

The table below sets forth the approved 2011 Semi Monthly Base Salary, Deferred Base Salary, Target Incentive Opportunity, and Total Direct Compensation (as those terms are defined in our Executive Compensation Plan) for each officer who is a Named Executive Officer for the year ended December 3 , 20 0  With the approval of FHFA in consultation with Treasury, we approved the 2011 target compensation for Messrs. Haldeman, Kari, Bostrom, and Federico (each of whom was also a Named Executive Officer for the year ended December 3 , 2009) on February 22, 2011 and approved the 2011 target compensation for Mr. Bisenius on January 18, 2011.

**Table 68    2011 Target Compensation for Named Executive Officers**

| | | 2011 Target Total Direct Compensation | | | |
|---|---|---|---|---|---|
| **Named Executive Officer** | **Title** | **Semi-Monthly Base Salary** | **Deferred Base Salary** | **Target Incentive Opportunity** | **Target Total Direct Compensation** |
| C a es E Ha de a , J | CEO | $ 900,000 | $ 3,100,000 | $ 2,000,000 | $ 6,000,000 |
| Ross J Ka | CFO | 675,000 | 1,658,333 | 1,166,667 | 3,500,000 |
| Robe  E Bos om | EVP  Ge e a Co  se & Co po a e Sec e a y | 500,000 | 1,333,333 | 916,667 | 2,750,000 |
| Pe e J Fede co | EVP  I ves  e s & Cap a Ma ke s a d T eas e | 400,000 | 1,340,000 | 870,000 | 2,610,000 |
| Do a d J B se  s | EVP  S ng e-Fam y C ed  Gua an ee | 400,000 | 1,100,000 | 750,000 | 2,250,000 |

## Departure of Named Executive Officer

Mr  Bisenius has notified us that he plans to leave Freddie Mac effective April 1, 2011  He will continue to perform his duties as Executive Vice President    Single Family Credit Guarantee until that date

289                                                           *Freddie Mac*

TREASURY-0941

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

**Background**

On September 6, 2008, the Director of FHFA appointed FHFA as our Conservator. Upon its appointment as Conservator, FHFA immediately succeeded to, among other things, the right of holders of our common stock to vote with respect to the election of directors. As a result, stockholders no longer have the ability to recommend director nominees or vote for the election of our directors  Accordingly, we will not solicit proxies, distribute a proxy statement to stockholders, or hold an annual meeting of stockholders in 2011. Instead, the Conservator has e ected directors by a written consent in lieu of an annual meeting, as it did in 2009 and 2010.

**Directors**

On November 24, 2008, the Conservator reconstituted our Board of Directors and delegated certain powers to the Board while reserving certain powers of approval to itself  See "Authority of the Board and Board Committees." The Conservator determined that the Board is to have a non-execut ve Chairman, and is to consist of a minimum of nine and not more than 13 directors, with the Chief Executive Officer being the only corporate officer serving as a member of the Board

The Conservator executed a written consent, effective February 17, 2011, electing all of the then current directors to another term as our directors  The terms of those directors will end: (a) on the date of the next annual meeting of our stockholders; or (b) when the Conservator next e ects directors by written consent, whichever occurs first.

Our Board seeks candidates for director who have achieved a high level of stature, success, and respect in their principal occupations. Each of our current directors was selected as a candidate because of his or her character, judgment, experience, and expertise  The qualifications of candidates also were evaluated in light of the requirement in our charter, as amended  by the Reform Act, that our Board must at all times have at least one individual from the homebuilding, mortgage lending and real estate industries, and at least one person from an organization representing consumer or community interests or one person who has demonstrated a career commitment to the provision of housing for low income households. Consistent with the examination guidance for corporate governance issued by FHFA, the factors considered also include the knowledge directors would have, as a group, in the areas of business, finance, accounting, risk management, public policy, mortgage lending, real estate, low income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to our safe and sound operation  Additionally, in accordance with the guidance issued by FHFA, we considered whether a candidate's other commitments, including the number of other board memberships held by the candidate, would permit the candidate to devote sufficient time to the candidate's duties and responsibilities as a director  See "Certain Relationships and Related Transactions, and Director Independence    Board Diversity" for additional information concerning the Board's consideration of diversity in identifying director nominees and candidates

The following is a brief discussion of: the age and length of Board service of each director; each director's experience, qualifications, attributes, and/or skills that led to his or her selection as a director; and other biographical information about our directors, as of February 15, 2011:

- Linda B. Bammann joined the Board in December 2008. She is 54 years old  She is an experienced finance executive with in depth knowledge of risk management gained from her previous employment and board memberships. Ms. Bammann's risk management experience enables her to contribute significantly to the Board's oversight of our enterprise risk management

  Ms. Bammann was Executive Vice President, Deputy Chief Risk Officer for JPMorgan Chase & Co  from July 2004 until her retirement in January 2005. Prior to that, Ms. Bammann held several positions with Bank One  Corporation beginning in 2000, including Executive V ce President and Chief Risk Management Officer from 2001 until Bank One's acquisition by JPMorgan Chase & Co. in July 2004  Ms. Bammann also was a member of Bank One's executive planning group. From 1992 to 2000, Ms. Bammann was a Managing Director with UBS Warburg LLC and predecessor firms. Ms. Bammann was a board member of the Risk Management Association, and chairperson of the Loan Syndications and Trading Association. Ms. Bammann currently is a director of Manulife Financial Corporation, where she is a member of the Risk Committee and the Management Resources and Compensation Committee, and of The Manufacturers Life Insurance Company, a subsidiary of Manulife Financial Corporation.

- Carolyn H  Byrd joined the Board in December 2008  She is 62 years old  She is an experienced finance executive who has held a variety of leadership positions. She also has significant public company audit committee experience  Ms. Byrd's internal audit and public company audit committee experience enables her to support the Board's oversight of our internal control over financial reporting and compliance matters

  Ms. Byrd has been Chairman and Chief Executive Officer of GlobalTech Financial, LLC, a financial services company she founded, since 2000. From 1997 to 2000, Ms. Byrd was President of Coca Cola Financial Corporation

TREASURY-0942

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

From 1977 to 1997, Ms. Byrd held a variety of domestic and international positions with The Coca Cola Company, including Chief of Internal Audits and Director of the Corporate Auditing Department  She is currently a director of AFC Enterprises, Inc., where she is the Chair of the Audit Committee and a member of the People Services (Compensation) Committee and of Regions Financial Corporation, where she is a member of the Audit Committee and the Risk Committee  Ms. Byrd is a former member of the board of directors and audit committee member of Circuit City Stores, Inc  and RARE Hospitality International, Inc , and she also served on the board of directors of St. Paul Travelers Companies, Inc.

- Robert R  Glauber joined the Board in 2006  He is  71 years old  Mr  Glauber is an experienced finance executive who has held several leadership positions in the private and public sectors and has academic experience focusing on financial matters  Mr  Glauber's extensive experience in the public, private and academic sectors,  including his experience as chairman of boards of directors of  other public companies, enables him to provide the Board with  valuable guidance on financial and regulatory matters

Mr. Glauber is a Lecturer at Harvard's Kennedy School of Government and was a visiting professor at the Harvard Law  School  Previously, he served as Chairman and Chief Executive  Officer of the National Association of Securities Dealers, (now the Financial Industry Regulatory Authority, Inc.), the private sector regulator of U S  securities firms, from  September 200  to September 2006, after becoming NASD's CEO in November 2000  Prior to becoming an officer at NASD, he was a  Lecturer at the Kennedy School from 1992 until 2000, Under Secretary of the Treasury for Finance from 1989 to 1992 and,  prior to that, a Professor of Finance at the Harvard Business School for 25 years. In 1987 88, Mr  Glauber served as Executive Director of the Task Force ("Brady Commission") appointed by President Reagan to report on the October 1987 stock market break. He has served on  the boards of the Federal Reserve Bank of Boston, a number of Dreyfus mutual funds, the Investment Company Institute, Quadra  Realty Trust, and as president of the Boston Economic Club. Mr. Glauber currently is a director of Moody's Corporation, where he is a member of the Audit Committee and the Governance and Compensation Committee; Chairman of  XL Group plc (an insurance company), where he is a  member of the Nominating, Governance and External Affairs Committee and the Risk and Finance Committee; Chairman of  Northeast Bancorp, where he is the Chairman of the Corporate Governance Committee, a member of the Risk Committee, and a  member of the Loan Investment Committee of Northeast Bank, a subsidiary of Northeast Bancorp; and Vice Chairman of the International Financial Reporting Standards Foundation  He has been a Senior Advisor at Peter J  Solomon Co , an investment bank, since November 2006.

- Charles E. Haldeman, Jr. joined the Board in August 2009, upon the commencement of his employment as Chief Executive  Officer of Freddie Mac. He is 62 years old. He is an  experienced finance executive and leader of finance and  investment organizations  Mr  Haldeman's experience as a leader of financial organizations enables him to provide  valuable business and operating perspectives to the Board

Prior to joining Freddie Mac, Mr  Haldeman served as  Chairman of Putnam Investment Management, LLC, the  investment advisor for the Putnam Funds, from July 2008 though June 2009  He joined Putnam Investments in 2002 as Senior  Managing Director and Co Head of the investment division, was appointed President and Chief  Executive Officer in November 2003, and served in that capacity  until June 2008. He was a member of Putnam Funds' Board of Trustees from 2004 until July 2009, and was named President of  the Putnam Funds in 2007  He served as a member of Putnam  Investments' Board of Trustees from November 2003 until June 2009, where he served as a member of the audit committee  Prior to joining Putnam, Mr  Haldeman served as Chief Executive Officer of Delaware Investments from 2000 to 2002, and as chairman from 2001 to 2002  He was the President and Chief  Operating Officer of United Asset Management Corporation from 1998 to 1999. Mr. Haldeman served as chairman of Dartmouth  College's Board of Trustees from 2007 until 2010

- Laurence E  Hirsch joined the Board in December 2008  He is  65 years old  He is an experienced finance executive who has held leadership positions in the homebuilding, real estate and investment industries  Mr  Hirsch's experience in the homebuilding and real estate industries allows him to provide to the Board valuable business experience and an  understanding of customer relationships and the homebuilding industry.

Mr. Hirsch has been Chairman of Highlander Partners, L.P., a private equity firm, since April 2004  Mr  Hirsch was Chief Executive Officer of Centex Corporation, a large homebuilder, from 1988 until his retirement  in March 2004 and its Chairman from 1991 until March 2004  Mr  Hirsch is the Chairman of Eagle Materials Inc., where he is also Chairman of the Executive Committee  Mr  Hirsch is a director of A H Belo Corporation, where he is a member of the Audit Committee, the  Compensation Committee, and the Nominating and Corporate Governance Committee, and formerly served on the board of  directors of Belo Corp., its parent company. In addition, Mr. Hirsch is Chairman of the Center for European Policy  Analysis in Washington, D.C.

291                                                                                                                          *Freddie Mac*

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- John A  Koskinen joined the Board in September 2008  He is  71 years old  He brings over thirty five years of  executive, board and government experience to the Board  He has  managed a wide range of companies and divisions engaged in a  variety of activities including mortgage securitization and investment, real estate development and management, hotel and  resort operations, home building, and insurance. Mr. Koskinen's broad based public and private sector  experience provides leadership and operating experience to the  Board. His business restructuring experience enables him to  provide valuable guidance to the Board regarding the management  of our business operations while in conservatorship

  Mr. Koskinen was initially appointed as Non Executive  Chairman of Freddie Mac in September 2008 and served in that  role for all of 2010. Previously, Mr. Koskinen was President of  the United States Soccer Foundation for four years,  deputy mayor and city administrator of Washington, D.C. from 2000 to 2003, assistant to the president and chair of the  President's Council on Year 2000 Conversion from 1998 to 2000, and deputy director  for management of the Office of  Management and Budget from 1994 to 1997. Prior to his government service, Mr  Koskinen worked as a senior executive of The  Palmieri Company, including serving as President and Chief Executive Officer, participating in the  restructuring of a large, troubled enterprises including Penn Central, the  Teamsters Pension Fund, Levitt and Sons, Inc. and Mutual  Benefit. Mr. Koskinen also is a director of The AES Corporation, where he is a member of the Financial Audit Committee, the Compensation Committee, and the Technology  Advisory Council, and American Capital, Ltd., where he is a member of the Audit and Compliance Committee

- Christopher S  Lynch joined the Board in December 2008  He is 53 years old  He is an experienced senior accounting  executive who served as the lead audit signing partner and  account executive for several large financial institutions with  mortgage lending businesses  He also has significant public company audit committee experience and risk management  experience  Mr  Lynch's extensive experience in finance, accounting and risk management enables him to provide  valuable guidance to the Board on complex accounting and risk  management issues, including in his role as chairman of our  audit committee

  Mr. Lynch is an independent consultant providing a variety  of services to financial intermediaries, including risk  management, strategy, governance, financial and regulatory  reporting and troubled asset management  Prior to retiring from  KPMG LLP in May 2007, Mr. Lynch held a variety of leadership  positions at KPMG, including National Partner in  Charge      Financial Services, the U.S. firm's largest industry division. Mr. Lynch chaired KPMG's Americas Financial Services Leadership team, was a member of the  Global Financial Services Leadership and the U.S. Industries Leadership teams and led the  Banking & Finance practice. Mr. Lynch also served as a partner in KPMG's Department of Professional  Practice and as a Practice Fellow at the Financial Accounting  Standards Board. Mr. Lynch was the lead and audit signing partner for  some of KPMG's largest financial services clients  Mr  Lynch  also is a director of American International Group, Inc , where he is the Chair of the Audit Committee and  a member of the Finance and Risk Management Committee

- Nicolas P  Retsinas joined the Board in 2007  He is 64 years old  He is an experienced leader in the  governmental and educational sectors, with in depth knowledge of the mortgage lending and real estate  industries  He also has  represented consumer and community interests and has  demonstrated a career commitment to the provision of housing for  low income households  Mr  Retsinas' public, private and academic experience, including his service on the boards of  several not for profit organizations, enables him to bring to the  Board broad knowledge and understanding of housing and  consumer and community issues.

  Mr  Retsinas is a senior lecturer in Real Estate at the  Harvard Business School and is Director Emeritus of Harvard  University's Joint Center for Housing Studies, where he  served as Director from 1998 to 2010  He is also a lecturer in  Housing Studies at the Graduate School of Design  Prior to his  Harvard appointment, Mr. Retsinas served as Assistant Secretary  for Housing      Federal Housing Commissioner at the United  States Department of Housing and Urban Development from 1993 to 1998 and as Director of the Office of Thrift Supervision from 1996 to 1997. He served on the Board of the  Federal Deposit Insurance Corporation from 1996 to 1997, the Federal Housing Finance Board from 1993 to 1998 and the  Neighborhood Reinvestment Corporation from 1993 to 1998.  Mr  Retsinas serves on the Board of Trustees for the National  Housing Endowment and for Enterprise Community Partners  and  on the Board of Directors of the Center for Responsible  Lending

- Clayton S  Rose joined the Board in October 20  0  He is  52 years old  He is a finance executive with leadership  experience in finance and investment organizations and with  academic experience focused on financial services and managerial  ethics  Mr  Rose's leadership, operating and academic  experience enables him to provide the Board with valuable  guidance regarding business execution, corporate finance and capital markets.

  Mr  Rose is Professor of Management Practice at the  Harvard Business School, and has been a member of its faculty  since July  2007  He was awarded a PhD in sociology (with distinction) from  the University of Pennsylvania in the

<div align="center">292</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

same year  He was an adjunct professor at the Stern School of Business at New York University from 2002 to 2004, and at the Graduate School of Business at Columbia University from 2002 to 2006. In 2001, Mr. Rose served as Vice Chairman and Chief Operating Officer of JP Morgan, the investment bank of J.P. Morgan Chase & Co. Previously, he worked at J P  Morgan & Co  Incorporated from 1981 to 2000, where, among other positions, he was head of the Global Investment Banking and the Global Equities Divisions  and served as a member of the firm's executive committee  Mr Rose is a member of the board of directors of XL Group plc, where he is a member of the Nominating, Governance and External Affairs Committee and the Risk and  Finance Committee  He is a trustee of the Howard Hughes Medical Institute and the National Opinion Research Center at the University of Chicago, and is a director of Public/Private  Ventures  From November 2007 to March 2010, he served as Chairman of the board of managers of Highbridge Capital  Management, an alternative investment management firm owned by JPMorgan Chase & Co  Mr  Rose previously served as a member of the boards of directors of Mercantile Bankshares Corporation from September 2003 to April 2007 and of Lexicon  Pharmaceuticals, Inc  from September 2003 through October 2007

- Eugene B  Shanks, Jr  joined the Board in December 2008  He is 63 years old  He is an experienced finance  executive with leadership and risk management expertise  Mr. Shanks' leadership and risk management experience enables him to provide the Board with valuable guidance on risk management issues and our strategic direction

Mr. Shanks is a Trustee of Vanderbilt University and a consultant to the board of directors of ACE Limited, a member of  the Advisory Board of the Stanford Institute for Economic Policy Research, a director of NewPower Holdings, Inc , and a  founding director at The Posse Foundation  From November 2007 until August 2008, Mr. Shanks was a senior consultant to Trinsum Group, Incorporated, a strategic consulting and asset management company. From 1997 until its sale in 2002, Mr. Shanks was President and Chief Executive Officer of NetRisk, Inc., a risk management software and advisory  services company he founded. From 1973 to 1978 and from 1980 to 1995, Mr. Shanks held a variety of positions with Bankers  Trust New York Corporation, including head of Global Markets from 1986 to 1992 and President and Director from 1992 to 1995. From 1978 to 1980, he was Treasurer of Commerce Union  Bank in Nashville, Tennessee

- Anthony A  Williams joined the Board in December 2008  He is 59 years old  He is an experienced leader of state and  local governments, with extensive knowledge concerning real estate and housing for low income individuals  He also has  significant experience in financial matters and is an experienced academic focusing on public management issues  Mr Williams' leadership and operating experience in the public sector allows him to provide a unique perspective on  state and local housing issues.

Mr  Williams is the William H  Bloomberg Lecturer in Public Management at Harvard's Kennedy School of Government  Since January 2010, he has served as Executive Director of the Government Practice at The Corporate Executive  Board Company. Since May 2009, Mr. Williams has been affiliated with Arent Fox LLP, a law firm. Prior to this, Mr  Williams served as the Chief Executive Officer of Primum Public Realty Trust, beginning in January 2007. Mr. Williams served as the Mayor of Washington, D.C. from 1999 to January 2007, and as its Chief Financial Officer from 1995 to 1998. In 2005, Mr. Williams served as Vice Chair of the Metropolitan Washington Council of Governments, and  in 2004, Mr  Williams served as President of the National League of Cities. From 1993 to 1995, Mr. Williams was the first Chief Financial Officer for the U.S. Department of  Agriculture. From 1991 to 1993, Mr. Williams was the Deputy State Comptroller of Connecticut. From 1989 to 1991,  Mr  Williams was the Executive Director of the Community Development Agency of St. Louis, Missouri. From 1988 to 1989, Mr. Williams was an Assistant Director with the Boston Redevelopment Authority where he led the Department of  Neighborhood Housing and Development, one of the  Authority's four primary divisions. Mr. Williams is a director of Meruelo Maddox Properties, Inc , where he is a  member of the Audit Committee and the Nominating and Corporate  Governance Committee  Mr Williams is also a member of the Board of Trustees of the Calvert Sage Fund and of each fund  comprising the Calvert Multiple Funds.

## Authority of the Board and Board Committees

The directors serve on behalf of, and exercise authority as  directed by, the Conservator  The Conservator has delegated to the Board and its committees authority to function in accordance  with the duties and authorities set forth in applicable  statutes, regulations and regulatory examination and policy guidance, and our Bylaws and Board committee charters, as such  duties or authorities may be modified by the Conservator. The Conservator has instructed the Board that it should consult with  and obtain the approval of the Conservator before taking action in the following areas:

- actions involving capital stock, dividends, the Purchase  Agreement between us and Treasury, increases in risk limits, material changes in accounting policy, and reasonably foreseeable material increases in operational risk;

<center>293</center>

<div align="right"><em>Freddie Mac</em></div>

<center>TREASURY-0945</center>

Source   D  RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- creation of any subsidiary or affiliate or any substantial transaction between us and any of our subsidiaries or affiliates, except for transactions undertaken in the ordinary course (*e.g.*, the creation of a trust, REMIC, REIT, or similar vehicle);

- matters that relate to conservatorship, such as, but not limited to, the initiation of, and material actions in connection with, significant litigation addressing the actions or authority of the Conservator, repudiation of contracts, qualified financial contracts in dispute due to our conservatorship, and counterparties attempting to nullify or amend contracts due to our conservatorship;

- actions involving hiring, compensation, and termination benefits of directors and officers at the executive vice president level and above (including, regardless of title, executive positions with the functions of chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general/internal auditor);

- actions involving the retention and termination of external auditors and law firms serving as consultants to the Board;

- settlements in excess of $50 million of litigation, claims, regulatory proceedings, or tax related matters;

- any merger with or purchase or acquisition of a business involving consideration in excess of $50 million; and

- any action that, in the reasonable business judgment of the Board at the time that the action is taken, is likely to cause significant reputation risk.

The Board has five standing committees: Audit; Business and Risk; Compensation; Executive; and Nominating and Governance. All standing committees other than the Executive Committee meet regularly  The membership of each committee is shown in the table below

**Table 69     Board of Directors Committee Membership**

| Director | Audit | Business and Risk | Compensation | Executive | Nominating and Governance |
|---|---|---|---|---|---|
| L  Bammann | | C | √ | | |
| C  By d | √ | | | | √ |
| R  G a  e | √ | | | √ | C |
| C  Haldeman | | | | √ | |
| L  H  sc | | √ | | | √ |
| J  Kosk  e | | | | C | |
| C  Ly  c | C | | √ | √ | |
| N  Rets  as | | √ | | | √ |
| C  Rose | | √ | √ | | |
| E  S  a  ks | | √ | C | √ | |
| A  W ll ams | √ | | | | √ |

√   Membe of  he Comm ee
C   Cha  man of  he Comm ee

The charters reflecting the duties of the committees have been  adopted by the Board and approved by the Conservator  All of the charters of the standing committees are available on our website  at www freddiemac com/governance/bd_committees html

Our Board has an independent Non Executive Chairman, whose responsibilities include presiding over meetings of the Board, regularly scheduled executive sessions of the non employee directors, and executive sessions including only the independent directors that occur at least once annually if any of the non employee directors are not independent  Mr  Koskinen  was initially appointed to the position of Non Executive Chairman by the Conservator in September 2008 and served in that  role for all of 20  0

**Communications with Directors**

Interested parties wishing to communicate any concerns or  questions about Freddie Mac to the Non Executive Chairman of the  Board or to our non employee directors as a group may do so by  U.S. mail, addressed to the Corporate Secretary, Freddie Mac, Mail Stop 200, 8200 Jones Branch Drive, McLean, VA 22102 3110  Communications may be addressed to a specific director or  directors or to groups of directors, such as the independent or non employee directors

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0946

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Executive Officers**

As of February 15, 2011, our executive officers are as follows:

| Name | Age | Year of Affiliation | Position |
|---|---|---|---|
| C a es E Ha de a , J | 62 | 2009 | Ch ef Execu ve Off ce |
| Ross J Ka | 52 | 2009 | Execu ve V ce P es den   Ch ef F nanc al Off ce |
| Do ad J B se s | 52 | 1992 | Execu ve V ce P es den   S ng e Fam y C ed  G a a ee |
| Robe E Bos om | 58 | 2006 | Exec ve V ce P es den   Ge e a Co se & Co po a e Sec e a y |
| Pe e J Fede co | 44 | 1988 | Exec ve V ce P es de   I ves e s & Cap a Ma ke s a d T eas e |
| M c ae C May | 52 | 1983 | Execu ve V ce P es den   Mu fam y |
| A o y N Re z | 47 | 2010 | Execu ve V ce P es den   S ngle Fam ly Po fol o Managemen |
| Raymond G Romano | 49 | 2004 | Execu ve V ce P es den   Ch ef C ed t Off ce |
| Je y We ss | 52 | 2003 | Execu ve V ce P es den   Ch ef Adm n s a ve Off ce & Ch ef Compl ance Off ce |
| Pa ge H W sdom | 49 | 2008 | Exec ve V ce P es den   C ef En e p se R sk O ce |
| T o y F Kenny | 49 | 2007 | Sen o V ce P es den   Gene a Aud o |
| Robe D Ma oux | 43 | 2002 | Sen o V ce P es den   Co po a e Con o e & P nc pal Accoun ng Off ce |
| Holl s S McLoughl n | 60 | 2004 | Sen o V ce P es den   Ex e na Re a ons |
| Pa E M gs | 60 | 2005 | Sen o V ce P es den   S ngle Fam ly Sou c ng |
| Josep A Ross | 57 | 2005 | Ope a ons & Technology |

The following is a brief biographical description of each executive officer who is not also a member of the Board

Ross J Kari was appointed Executive Vice President  Chief Financial Officer in October 2009. Mr. Kari joined us from Fifth Third Bancorp, a financial services firm, where he served as Executive Vice President and Chief Financial Officer beginning in November 2008 Previously, he served as Executive Vice President and Chief Financial Officer of Safeco Corporation, an insurance firm, from June 2006 to October 2008 Prior to that, Mr Kari served as Executive Vice President and Chief Operating Officer of the Federal Home Loan Bank of San Francisco, a government sponsored enterprise and part of the Federal Home Loan Bank System, from February 2002 to June 2006. Mr. Kari is a member of the board of directors of KKR Financial Holdings LLC where he is the Chairman of the Audit Committee

Donald J Bisenius was appointed Executive Vice President  Single Family Credit Guarantee in May 2009 Prior to holding his current position, he served as Senior Vice President  Single Family Credit Guarantee from May 2008 until May 2009 and Senior Vice President Credit Policy and Portfolio Management from November 2003 until April 2008 From October 200 until October 2003 Mr. Bisenius was Senior Vice President  Credit Risk Management Prior to that, he served in a number of positions since joining us in January 1992. Before his service with us, Mr. Bisenius served in a variety of positions with the Federal Housing Finance Board and the Federal Home Loan Bank Board in Washington, DC.

Robert E Bostrom was appointed Executive Vice President  General Counsel & Corporate Secretary in February 2006. Prior to joining us, Mr Bostrom was the managing partner of the New York office of Winston & Strawn LLP, a member of that firm's executive committee and head of its financial institutions practice Mr Bostrom originally joined Winston & Strawn in 1990. From 1992 until 1996, Mr. Bostrom served as Executive Vice President of Legal, Regulatory and Compliance and General Counsel of National Westminster Bancorp.

Peter J Federico was appointed Executive Vice President  Investments & Capital Markets and Treasurer in October 2010. In this position, Mr Federico is responsible for managing all of our mortgage investment activities for the mortgage related investments portfolio He also manages our short and long term debt issuance program Prior to this, Mr Federico served as our Senior Vice President  Investments & Capital Markets and Treasurer from May 2009 until October 2010. From December 2008 until May 2009, he served as Treasurer and Senior Vice President Treasury & Liability Management, a position in which he was responsible for managing our debt and equity funding, as well as our Liquidity & Contingency Portfolio of non mortgage investments From March 2006 to December 2008, Mr Federico served as Senior Vice President  Asset & Liability Management, managing the interest rate risks associated with our mortgage investment and guarantee businesses. In that position, he also was responsible for the management of our Liquidity and Contingency Portfolio He was named Vice President, Asset & Liability Management in 2000 Mr Federico joined us in 1988

Michael C May was appointed Executive Vice President  Multifamily in October 2010 Prior to this he served as our Senior Vice President  Multifamily beginning in August 2005 Prior to that appointment, Mr May served as our Senior Vice President, Operations from February 2005 until August 2005. He also served as Senior Vice President, Mortgage Sourcing, Operations & Funding from November 2003 to February 2005. Prior to that, Mr May held the positions of Senior Vice President, Single Family Operations from July 2002 through October 2003 and Senior Vice President, Project Enterprise from January 200 to July 2002. Mr. May also held various additional positions since joining us in 1983.

Anthony Renzi joined us as Executive Vice President  Single Family Portfolio Management in April 20 0 In this position, Mr. Renzi is responsible for our loss management in the single family credit portfolio and oversees our loss mitigation activities He also manages our relationships with servicers and the implementation of our foreclosure avoidance efforts Prior to joining us, Mr Renzi served as chief operating officer of GMAC Residential Capital and president of GMAC Mortgage Corporation since 2008, and managed their operational and financial activities From 2006 to 2008, he was chief

Source  D RA HOM  OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0947

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

operating officer of the Residential Finance Group, where he led  servicing operations, risk management, and strategic sourcing.  Prior to that, Mr  Renzi held several executive positions at GMAC Mortgage including executive vice president, senior vice  president of client branded solutions, vice president of loan administration and senior loan counselor

Raymond G  Romano was appointed Executive Vice President     Chief Credit Officer in April 2009  Prior to this appointment, he served as our Senior Vice President     Chief Credit Officer from December 2008  until March 2009 and as acting Chief Credit Officer from September 2008 until December 2008  Before being appointed Chief  Credit Officer, Mr  Romano served as Senior Vice President     Credit Risk Oversight, a position he held since March 2004  Prior to that, Mr  Romano served as Senior Vice President and Chief Credit Risk Officer and held other executive positions at different major financial  institutions, including North American Mortgage Company in  Tampa, Dime Savings Bank of NY, and with Citicorp's Investment Bank.

Jerry Weiss was appointed Executive Vice President     Chief Administrative Officer & Chief Compliance Officer in  August 2010.  In this role, Mr. Weiss is responsible for managing the Human Resources and External Relations functions  and leads the Compliance, Regulatory Affairs, and Mission organizations  He also serves as Chief Compliance Officer  Prior to that he served as our Senior Vice President Compliance, Regulatory Affairs and Mission, and Chief Compliance  Officer from April 2009 until July 2010.  Mr. Weiss served as Senior Vice President     Compliance and Regulatory  Affairs and Chief Compliance Officer from April 2008 until April 2009.  Prior to this appointment, Mr. Weiss served as our Senior Vice President and Chief Compliance Officer since joining  us in October 2003  Prior to joining us, Mr  Weiss worked from 1990 at Merrill Lynch Investment Managers, most recently as  First Vice President and Global Head of Compliance  From 1982 to 1990, Mr. Weiss was with a national law practice in Washington, D C , where he specialized in securities  regulation and corporate finance matters

Paige H  Wisdom was appointed Executive Vice President     Chief Enterprise Risk Officer in October  2010  Prior to this she served as our Senior Vice President     Chief Enterprise Risk Officer from April 2010 until October 2010  Prior to this appointment, she served  as the Senior Vice President     Business Unit Chief Financial Officer from January 2008 through March 2010. From  August 2004 until December 2007, Ms. Wisdom served as a Business Unit Chief Financial Officer at Bank of America for key  businesses including Global Business and Financial Services; Business, Lending, and Global Technology; and Service and Fulfillment.  Prior to joining Bank of America, Ms. Wisdom served at Bank One Corporation/JP Morgan from June 2000 until July 2004, most recently as the Chief Financial Officer, Corporate Bank. Prior to that she served in leadership positions with increasing responsibilities at UBS/Warburg Dillon Read, Citibank Salomon Smith Barney, and Swiss Bank Corporation/SBC Warburg Dillon Read

Timothy F. Kenny was appointed Senior Vice President     General Auditor in July 2008  Prior to  this appointment, Mr. Kenny served as Vice President and Interim General Auditor starting in May 2008  Before that, he  served as our Vice President, Assistant General Auditor from September 2007 to May 2008  From 2001 to 2007, Mr  Kenny was a Managing Director with BearingPoint, Inc  (formerly  KPMG Consulting, Inc ) where he directed a large team of  financial professionals on a variety of financial risk  management consulting projects with Ginnie Mae, the Federal Housing Administration, private sector mortgage bankers and  other federal credit agencies  He was appointed a member of the BearingPoint, Inc  401(k) Plan Committee in 2004 and served as a member until his resignation  in 2007  He joined KPMG LLP, the predecessor organization to KPMG Consulting, in 1986, was promoted to a KPMG Audit  Partner in 1997, and served in that position until the separation of KPMG Consulting from KPMG LLP in February  200

Robert D  Mailloux was appointed Senior Vice President     Corporate Controller & Principal  Accounting Officer in April 20  0  Prior to holding his current position, Mr  Mailloux served as our Vice President     Acting Corporate Controller beginning in October 2008  Prior to that appointment, he served as Vice President     Corporate and Multifamily Business Segment  Controller, from May 2008 until October 2008, and as Vice President     Corporate Financial Accounting from September 2004 until May 2008  Before that, Mr  Mailloux  held the position of Director     Corporate Reporting and Analysis from March 2002 until September 2004  Before joining us, Mr. Mailloux served for 12 years at a leading accounting firm, where he managed a variety of large  audit and consulting engagements in the financial services and  real estate industries

Hollis S  McLoughlin was appointed Senior Vice President     External Relations in September 2008  Prior to that he served as Senior Vice President     External Relations and Chief of Staff from April 2008 until  September 2008  Prior to this appointment, Mr  McLoughlin  served as our Senior Vice President, External Relations starting in January 2006  He also served as Senior Vice President and  Chief of Staff from April 2004 to January 2006. During the  period from 1998 until 2004, Mr. McLoughlin was Chief  Operating Officer of two private equity backed operating companies  Before that, he was one of the founding partners of  Darby Overseas, a private equity partnership based in  Washington, D.C. He also has been a senior executive at  Purolator Courier, an overnight delivery company, and a privately held transportation company  Mr  McLoughlin served from 1989 through 1992 as assistant secretary of the  Treasury under President George Bush, where

<div align="center">296</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

he was responsible for the coordination of all policy and management of several key internal functions  He served as chief of staff to Sen. Nicholas Brady, R N.J., in 1982 and to Rep. Millicent Fenwick, R N.J., from 1975 to 1979.

Paul E  Mullings was appointed Senior Vice President   Single Family Sourcing in July 2005.  Before joining us, Mr. Mullings was Senior Vice President of JPMorgan Chase and Mortgage Finance Manager and Fair Lending  Executive at Chase Home Finance  Prior to joining Chase Home Finance in 1997, Mr. Mullings was President and Chief Executive Officer of Mortgage Electronic Registration  Systems, Inc. Mr. Mullings was also President and Chief Executive Officer of the residential mortgage division of  First Interstate Bank, Los Angeles  Prior to First Interstate, he held a series of senior management positions with increasing  responsibilities at Glendale Federal Bank, Glendale, California

Joseph A  Rossi was appointed Senior Vice President   Operations & Technology in June 20 0  Prior to that he served as our Senior Vice President   Business Transformation Office, beginning  in January 2010  Prior to that, he served as our Senior Vice President   Operations beginning in February 2008 and as our Senior Vice President   Technology Services beginning in April 2007  Mr  Rossi joined us in March 2005 as our Senior Vice President   Investment Capital Market Operations  Before joining us, Mr  Rossi served in  leadership positions at Mellon Bank, JP MorganChase and Citibank in New York where he developed a significant portfolio of experience in all aspects of global securities clearance, custody, fund administration, and accounting.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the directors and executive  officers of a reporting company and persons who own more than   0% of a registered class of such company's equity securities to file reports of ownership and changes in ownership  with the SEC. Based solely on a review of such reports, we believe that during 20 0 all of our directors and executive  officers complied with such reporting obligations, except that as a result of an administrative error, one Form 4 reporting the vesting of a Restricted Stock Unit grant for  Anurag Saksena, a former executive officer, was filed one day  ate

### Codes of Conduct

We have separate codes of conduct applicable to all employees and to Board members that outline the principles, policies, and  laws governing their activities. Upon joining us or our Board, all employees and directors, respectively, are required to sign  acknowledgements that they have read the applicable code and agree to abide by it  In addition, all employees and directors  must respond to an annual questionnaire concerning code compliance  The employee code also serves as the code of ethics  for senior executives and financial officers required by the  Sarbanes Oxley Act and SEC regulations  Copies of our employee  and director codes of conduct are available, and any amendments  or waivers that would be required to be disclosed are posted, on  our website at www freddiemac com

### Audit Committee Financial Expert

We have a standing Audit Committee that satisfies the "audit committee" definition under Section 3(a)(58)(A) of the Exchange Act and the requirements of Ru e  0A-3 under the Exchange Act  Although our stock was delisted from the NYSE in July 2010, certain of the corporate governance requirements of the NYSE Listed Company Manual, including those  relating to audit committees, continue to apply to us because they are incorporated by reference in the FHFA corporate governance regulations  Our Audit Committee satisfies the "audit committee" definition under Sections 303A 06 and 303A 07 of the NYSE Listed Company  Manual  The current members of the Audit Committee are Carolyn H. Byrd, Robert R  Glauber, Christopher S. Lynch and Anthony A. Williams, all of whom the Board determined in February 2011 are independent  within the meaning of Ru e  0A-3 under the Exchange Act and Section 303A 02 of the NYSE  Listed Company Manual.

Mr  Lynch has been a member of the Audit Committee since December 2008 and currently is its chairman. The Board  determined in February 2011 that Mr. Lynch meets the definition of an "audit committee financial expert"  under SEC regulations.

<div align="center">297</div>

*Freddie Mac*

TREASURY-0949

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 11. EXECUTIVE COMPENSATION

### Executive Summary

Our critical role in providing liquidity and stability to the U.S. housing and mortgage markets while in conservatorship requires us to attract, motivate and retain talented executives who can lead the company despite our uncertain future. To assist us in achieving these priorities, in December 2009 our Board adopted (and FHFA approved, in consultation with Treasury) a new executive compensation program

The performance based incentives under the program, which represent a significant amount of total compensation for our executives, are funded primarily based on our performance against objectives that are established by the Board, reviewed and approved by FHFA, and reflect our priorities during conservatorship The funding level also takes into account other relevant factors beyond performance against these objectives

For 20  0, the performance based elements of compensation were determined by evaluating performance against a balanced set of objectives in four areas: mission, financial execution, accounting and controls, and our business infrastructure. The evaluation was initially conducted by management and then reviewed and approved by the Compensation Committee Following the evaluation of performance, the Compensation Committee then considered whether any other relevant internal or external factors should be taken into account in establishing the funding  eve

The following table shows the approved funding level for each component of performance based compensation under the program A detailed discussion is contained in the "Compensation Discussion and Analysis" about the company's performance against the objectives applicable to each component of performance based compensation as well as other factors considered by the Compensation Committee in determining the performance based compensation funding levels

**Table 70     Assessment of 2010 Performance**

|  | 2010 De erred Base Salary (Performance Based Element) | Target Incentive Opportunity | |
|---|---|---|---|
|  |  | 2010 First Installment | 2009 Second  nstallment |
| **Fund ng Level Percent** | 88% | 95% | 95% |

### Compensation Discussion and Analysis

This section contains information regarding our compensation programs and policies applicable to the following individuals, who were determined to be our Named Executive Officers for the year ended December 31, 2010 under SEC rules

- Charles E. Haldeman, Jr., Chief Executive Officer

- Ross J Kari, Executive Vice President    Chief Financial Officer

- Robert E Bostrom, Executive Vice President    General Counsel & Corporate Secretary

- Peter J Federico, Executive Vice President    Investments & Capital Markets and Treasurer

- Donald J Bisenius, Executive Vice President    Single Family Credit Guarantee

See "Other Information    Departure of Named Executive Officer" for information concerning Mr Bisenius' plan to leave Freddie Mac, effective April 1, 2011.

### *Executive Management Compensation Program*

#### *Overview of Program Structure*

The Executive Management Compensation Program covers the compensation of Freddie Mac executives in the following positions, each a "Covered Officer":

- Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer;

- All Executive Vice Presidents; and

- All Senior Vice Presidents

Each Named Executive Officer is a Covered Officer

Prior to its approval in December 2009, our senior management and Compensation Committee worked closely with FHFA over the course of several months to develop and refine the Executive Compensation Program's overall structure under the terms of our conservatorship. The program is a result of collaboration and compromise with FHFA that reflects the principles established by Treasury's executive compensation guidelines for companies receiving federal assistance Specifically, the Executive Compensation Program was designed to align executive pay with achievement of our mission of providing liquidity, stability, and affordability to a troubled mortgage market and with certain financial, infrastructure development and other corporate performance objectives established annually by our Board and approved by FHFA. These objectives reflect our responsibilities both under our charter and in conservatorship as determined by the Conservator The

298                                                                                      *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Executive Compensation Program establishes strict recapture provisions that protect our interests as well as those of taxpayers The Executive Compensation Program has also been designed to position us to retain critical executives and attract new executive talent as we continue to support the nation's housing recovery amidst the uncertainties regarding our future

One key element of the Executive Compensation Program that differs from Treasury's executive compensation guidelines is that all compensation is delivered exclusively in cash We cannot provide equity based compensation to our employees under the terms of the Purchase Agreement with Treasury, unless such grants are approved by Treasury. In addition, uncertainty regarding our future status makes our stock ineffective as a vehicle for delivering incentive compensation

Participation in the Executive Compensation Program is contingent upon a Covered Officer agreeing to be bound by the terms of a recapture arrangement that has been approved by both the Compensation Committee and FHFA A further discussion of the recapture arrangement is set forth below in "Other Executive Compensation Considerations    Recapture Policy "

Finally, although the Compensation Committee takes the lead role in considering and recommending executive compensation, the following circumstances limit the Compensation Committee's authority during conservatorship:

- When FHFA was appointed as our Conservator in September 2008, it assumed all of the rights, titles, powers, and privileges of the company and its stockholders, directors and management, including the authority to set executive compensation Under the terms of the Purchase Agreement, FHFA is required to consult with Treasury on compensation matters for our executive officers

- Our directors serve on behalf of FHFA and exercise their authority as directed by FHFA More information about the role of our directors is provided above in "Directors, Executive Officers, and Corporate Governance    Authority of the Board and Board Committees."

- FHFA has directed that our Board consult with and obtain FHFA's approval before taking any action involving compensation or termination benefits for any officer at the level of executive vice president and above and, regardless of title, executives who hold positions with the functions of chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general internal auditor

- FHFA retains the authority not only to approve both the terms and amount of any compensation prior to payment to any of our execut ve officers, but also to modify any existing compensation arrangements

Elements of Compensation and Total Direct Compensation

Under the Executive Compensation Program, a Covered Officer's target total direct compensation consists of three elements    Semi Monthly Base Salary, Deferred Base Salary, and a Target Incentive Opportunity. The Target TDC is established for each annual performance cycle Under the Executive Compensation Program, two thirds of a Covered Officer's Target TDC will consist of the sum of the Semi Monthly and Deferred Base Salaries, and one third will consist of the Target Incentive Opportunity More information on the three elements of the Target TDC is provided below

- Semi Monthly Base Salary is paid in cash on a semi monthly basis and provides a fixed level of compensation designed to fairly compensate each Named Executive Officer for the responsibility level of his position Semi Monthly Base Salary cannot exceed $500,000 per year, except for the CEO and CFO, or other exceptions as approved from time to time by FHFA For any Covered Officer other than the CEO and CFO whose Semi Monthly Base Salary was greater than $500,000 immediately prior to the adoption of the Executive Compensation Program in December 2009, that Covered Officer's Semi Monthly Base Salary was reduced to $500,000 effective January 1, 2010.

- Deferred Base Salary is earned during one year but not paid until the following year Deferred Base Salary is provided in two portions: a fixed portion, which provides certainty as to amount and is not subject to increase or decrease on the basis of corporate performance, and a performance based portion, which is subject to adjustment to provide incentives to the Covered Officers to achieve specific corporate performance measures Payment of both portions is deferred until the following year as described in the next paragraph, which aligns the executives' interests with long term performance and provides an incentive for executive retention

  For Deferred Base Salary earned in 2010 and subsequent years, 50% (the fixed portion) will be earned during each quarter and paid in a fixed amount on the last business day of the corresponding quarter of the following calendar year The remaining 50% (the performance based portion) will be earned and paid on the same timetable as the fixed portion, but the Executive Compensation Program permits the amount actually paid to range from 0% to 25% based on the performance based Deferred Base Salary funding level determined by the Compensation Committee with the approval of FHFA Individual differentiation is not provided for under the Executive

<div align="center">299</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Compensation Program for performance based Deferred Base Salary  and therefore each Covered Officer's payment is equal to  his or her target multiplied by the funding level  While the Executive Compensation Program allows for an approved funding  level greater than  00%, it is the current intention of the Compensation Committee not to approve a funding level in excess  of  00% while the company is in conservatorship.

- The Target Incentive Opportunity ("TIO") is a performance based, long term incentive award that is designed to  provide incentives to the Covered Officers to achieve specific corporate performance measures  Each Covered Officer's target award is equal to one third of his or her annual Target TDC. The award is granted annually and earned over a two  year  period based on the considerations discussed below  Half of each award is earned in the year granted, with the other half earned  in the following year  Payment may range from 0% to  50% of target, as determined by the Compensation Committee with the  approval of FHFA, and will occur no later than March 15 of the year following the year to which the annual performance  measures are applicable  Individual differentiation is provided  for under the Executive Compensation Program for TIO payments  based on an assessment of division  and/or individual performance as determined by the Chief Executive Officer or, in the case of the Chief Executive Officer, the Board of Directors

While the Executive Compensation Program allows for a Covered  Officer to receive a TIO payment greater than  00% of the target, it is the current intention of the Compensation  Committee not to approve payments to the Chief Executive Officer  or Chief Financial Officer that are in excess of  00% of their individual targets while the company is in conservatorship.

Except in the limited circumstances described below (see "Potential Payments Upon Termination of Employment or Change in Control"), we will pay installments of TIO and Deferred Base Salary awards  only if the Named Executive Officer is employed by Freddie Mac  on the scheduled payment date

The Executive Compensation Program is effective for as long as  Freddie Mac remains in conservatorship. The provisions of the  Executive Compensation Program may be amended by the  Compensation Committee, if approved by FHFA after consulting with  Treasury.

The following diagram depicts potential total direct  compensation, including the three elements of compensation,  under the Executive Compensation Program, using a covered  officer with a $3,000,000 Target TDC for 2010 as an example



### Performance Measures for the Performance Based Elements of Compensation

The performance measures for the performance based portion of  Deferred Base Salary, the first installment of the 2010 TIO  grant, and the second installment of the 2009 TIO grant, together with a  description of the assessment of actual  performance against such measures, are presented below in "  Determination of the Performance Based Portion  of 2010 Deferred Base Salary" and "   Determination of Actual Target Incentive Opportunity " These performance measures, which were developed by management, the Compensation Committee, and FHFA,  we e chosen because we believe they reflect our priorities under  conservatorship. They also require the participation and support  of employees throughout the company

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0952

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Determination of 2010 and 2011 Target TDC for Named Executive Officers

#### Role of Compensation Consultants

As part of the annual process to determine the Target TDC for each of the Named Executive Officers, the Compensation Committee receives guidance from an independent compensation consultant that is selected by the Compensation Committee without any recommendation by management  In addition to the annual process to determine the Target TDC, the compensation consultant provides guidance during the course of the year on executive compensation matters and can be engaged, as needed, by either the Compensation Committee or the full Board on special projects

From August 2009 to May 2010, the Compensation Committee retained Steven Hall & Partners as its consultant. In May 2010, the Compensation Committee determined it would be appropriate to end its relationship with Steven Hall & Partners after it became aware that Steven Hall & Partners' potential engagement with another client might give the appearance of a conflict of interest

In September 20 0, the Compensation Committee retained Meridian Compensation Partners, LLC as its consultant.

Steven Hall & Partners and Meridian Compensation Partners, LLC have not provided the Compensation Committee with any non executive compensation consulting services, nor has either firm provided any services to our management

#### Gathering Comparative Market Compensation Data

As part of its process to establish each Named Executive Officer's Target TDC under the Executive Compensation Program, the Compensation Committee reviewed the compensation of executives in comparable positions at companies that are either in a similar line of business or are otherwise comparable for purposes of recruiting and retaining individuals with the requisite skills and capabilities  We refer to this group of companies as the Comparator Group  In September 2009, the Committee reviewed and discussed the composition of the Comparator Group with its compensation consultant at the time, Steven Hall & Partners, and determined that the following companies be included in the Comparator Group for 20 0:

| | | |
|---|---|---|
| Allstate | Hartford Financial Services Group | Prudential Financial |
| American Express | JPMorgan Chase* | State Street |
| Bank of America* | MasterCard | SunTrust Banks |
| Bank of New York Mellon | MetLife | U.S. Bancorp |
| BlackRock | Northern Trust | Visa |
| Citigroup* | PNC Financial Services Group | Wells Fargo* |
| Fannie Mae | | |

* Compensa on da a o be used f om hese d ve s f ed bank ng f ms s aken only f om he mo gage o eal es a e d v s ons

In October 20 0, the Committee reviewed and discussed the composition of the Comparator Group with its current compensation consultant, Meridian Compensation Partners, LLC, and determined that the 19 companies that comprised the 20 0 Comparator Group continue to reflect the relevant labor market for us and our executive talent  Accordingly, the 2011 Comparator Group is comprised of the same 19 companies as the 2010 Comparator Group

In the event there is insufficient data from the Comparator Group for any of the Named Executive Officer positions, or if the Committee's compensation consultant believes that additional data sources would strengthen the analysis of competitive market compensation levels, the Compensation Committee can use alternative survey sources to make these assessments. For 2010, the alternative survey sources used by the Compensation Committee were compensation surveys published by human resources consulting firms Aon Hewitt, Towers Watson, and McLagan, an Aon Hewitt consulting company. For 2011, the alternative survey source used by the Compensation Committee was a compensation survey published by McLagan  In order to preserve confidentiality and encourage continuing participation, these consulting firms do not attribute the data in their surveys to the companies that participate in their surveys

#### Establishing Target TDC

In establishing Target TDC levels for our Named Executive Officers, the Compensation Committee used as a guideline the market median, or 50th percentile, of the total direct compensation, consisting of base salary, annual incentive, and long term incentive awards, paid to comparable positions at Comparator Group companies or in the alternative survey sources  While the market median was used as the guideline for Target TDC, the Compensation Committee had the authority to establish Target TDC above or below such level as it deemed appropriate, for each Named Executive Officer  Additional factors considered by the Compensation Committee were the executive officer's past performance and the criticality of the officer's role

In establishing the Named Executive Officers' 2010 Target TDC, the Compensation Committee reviewed 2009 data from the Comparator Group and alternative survey sources. Specifically, for the positions of Chief Executive Officer, Chief Financial Officer, Executive Vice President    General Counsel & Corporate Secretary, the Compensation Committee, at the recommendation of Steven Hall & Partners, reviewed competitive market compensation data from the Comparator Group and

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0953

Table of Contents

surveys published by Aon Hewitt and Towers Watson. For the positions of Executive Vice President     Investments & Capital Markets and Treasurer and Executive Vice President     Single Family Credit Guarantee, the Compensation Committee reviewed competitive market data from a survey published by McLagan, because no reasonable match was available in the Comparator Group

With respect to 2010 Target TDC for the Named Executive Officers, the Compensation Committee, working with Steven Hall & Partners, either developed recommendations or reviewed recommendations presented by senior management and its compensation consultant (Aon Hewitt)

In December 2009, the Compensation Committee applied the criteria described above to set 2010 Target TDC for the Named Executive Officers, which were reviewed and approved by FHFA, in consultation with Treasury.

The table below sets forth the approved 2010 Semi Monthly Base Salary, Deferred Base Salary, TIO, and Target TDC for our Named Executive Officers These amounts represent compensation targets, not the actual amount of compensation paid for performance during 2010 Information about the amounts actually paid during or with respect to performance during 2010 to these executives is set forth below in the Summary Compensation Table.

**Table 71     2010 Semi Monthly Base Salary, Deferred Base Salary, Target Incentive Opportunity, and Target TDC**

| | | 2010 Target TDC | | | |
|---|---|---|---|---|---|
| Named Executive Officer | Title | Semi-Monthly Base Salary | Deferred Base Salary | Target Incentive Opportunity | Target TDC |
| C  a  es E  Ha de  a , J | CEO | $ 900,000 | $ 3,100,000 | $ 2,000,000 | $ 6,000,000 |
| Ross J  Ka | EVP  CFO | 675,000 | 1,658,333 | 1,166,667 | 3,500,000 |
| Robe  E  Bos om | EVP | 500,000 | 1,360,000 | 930,000 | 2,790,000 |
| Pe e  J  Fede co | EVP  I ves  e  s & Cap  a  Ma ke s a d T eas  e | 400,000 | 1,340,000 | 870,000 | 2,610,000 |
| Do  a J  B se  s | EVP  S ng e Fa    y C d  Gua an ee | 400,000 | 1,100,000 | 750,000 | 2,250,000 |

In establishing the Named Executive Officer's 2011 Target TDC, the Compensation Committee reviewed 20 0 data from the Comparator Group and one alternative survey source Specifically, for the positions of CEO, CFO and Executive Vice President     General Counsel & Corporate Secretary, the Compensation Committee, at the recommendation of Meridian Compensation Partners, LLC, reviewed competitive market compensation data from the Comparator Group For the positions of Executive Vice President     Investments & Capital Markets and Treasurer and Executive Vice President     Single Family Credit Guarantee, the Compensation Committee at the recommendation of Meridian Compensation Partners, LLC, reviewed competitive market data from a survey published by McLagan, because no reasonable match was available in the Comparator Group

With respect to 2011 Target TDC for the Named Executive Officers, the Compensation Committee, working with Meridian Compensation Partners, LLC, reviewed recommendations presented by senior management

The Compensation Committee's authority was limited to setting 2011 Target TDC at a level that was either the same as or lower than each Named Executive Officer's 20 0 Target TDC, based on the December 16, 2010 directive from FHFA that the company maintain individual salaries and wage rates at 2010 levels for 2011, absent a promotion or a significant change in responsibilities. In February 2011, the Compensation Committee applied the compensation criteria described above to set 2011 Target TDC for the Named Executive Officers, which were reviewed and approved by FHFA, in consultation with Treasury.

The 2011 Target TDC and each of the other elements of compensation remains unchanged for all Named Executive Officers other than Mr. Bostrom. Mr. Bostrom's Target TDC was reduced by $40,000 to $2,750,000 to bring it more in line with the 50th percentile of the 20 0 competitive market data His semi monthly base salary remains at $500,000, but his Deferred Base Salary and TIO have been reduced to $1,333,333 and $916,667, respectively. See "Other Information     2011 Target Compensation for Named Executive Officers" for additional information

*Determination of the Performance Based Portion of 2010 Deferred Base Salary*

Over the course of 20 0, the Compensation Committee received updates from management on our achievement against the performance objectives used to determine the funding level for the performance based portion of Deferred Base Salary In the fourth quarter of 2010, management presented the Compensation Committee with a final achievement assessment against the performance objectives and concluded that we would achieve most, but not all, of the performance objectives

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0954

Table of Contents

The table below presents the performance measures and management's assessment of our achievement against those performance measures

**Table 72    Achievement of Performance Measures for the Performance Based Portion of Deferred Base Salary**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission**<br>• Suppo  he Obama Adm n s a on's Mak ng Home Affo dable P og am<br>• Mee  2010 affo dab e goa s and subgoa s ( f feas b e, as de e  ned by FHFA); a d<br>• Co p ee  eb do of e Mak g Home Affo dable  Compl ance  f c t on | 35% | • Mod f ed ove  160,000 mo  gages  n suppo  of MHA, s gn f can  y exceed ng  he a ge  ange of 70,000  120,000  Howeve , he p ma  y se v ce s epo  ng had on y con ac ed 45% of ob  ga ed pa  es fo  occup ed p ope  es on wh ch  he  oans we e 60 o  o e days de nquen , be ow  he a ge of 75% o  o e<br>• Based on p el m na y  nfo ma  on, we bel eve we d no  ach eve  he 2010 S ngle- fam ly Low-Income A eas Pu chase goal and he  ela ed Low-Income A eas sub- goa , and we a so be eve we may no  have ach eved  he 2010 Mu  fam y Low- Income goa  We a d scuss ng w h FHFA whe he  hese goa s we e  nfeas b e  de  e e s of e GSE Ac d e o  a ke a do e fac o s  See "Ta  e 5  Affo dable Hous ng Goals fo  2010 and 2011" fo  mo e  nfo ma on abou  hese goa s<br>• Comp e ed bu dou of MHA-Comp ance func on |
| **F nanc al Execu on**<br>Mee  a ge s fo<br>• Seg e  Ea  gs<br>• Ret  o Assets (ROA) o  ew s ngle-fam ly and mul fam ly p c ases;<br>• Unde w  ng qua  y on new s ng e- fam y and mu  fam y p u chases<br>• Op o -Adj s ed Sp ead (OAS) o  ew vest  e t s p c ases;<br>• Re a ned po fo o ba ance<br>• Co se va o of asse s; a d<br>• Eff c ency/adm n s a ve expenses | 35% | • S ngle-fam ly segmen  loss of $16 3 b  on fo  2010 was w  h n  he a ge  ange  Mul fam ly segmen  ea n ngs of $1 0 b ll on fo  2010 exceeded  he a ge<br>• Inves men  segmen  ea n ngs of $1 3 b  on we e be ow a ge due o he nc us on  n ea n ngs of ma k-o-ma ke (MTM) losses w  o  o f se g MTM ga s  eco ded  AOCI, w  c s esec o of e a a ce se e  a  c  des MTM  c a ges o AFS sec  es<br>• We exceeded  e objec ves e a ed o e u n on asse s (ROA) fo  s ng e-fam  y and  mul fam ly p u chases  2010 s ngle-fam ly ROA benef ed f om  mp oved PC p ce  pe fo a ced  g ef s a fo  e yea , wh ch educed  he compensa on we  p ov ded o cus ome s fo  he d ffe ence  n p ce be ween ou  PCs and compa ab e  Fann e Mae secu  es  2010 Mu  fam y ROA benef ed f om ga ns on  sec  za o ac v y de o CME n a ve<br>• Fo  e dew  g q a yo  ew p c ases<br>  S g e-Fa   y  The es  a ed defau  os fo  he wo s qu n e of new  p  c ases was 11 bps, s gn f can  y ess  han  he a ge of 40 o 50  ps  M  t fa   y  The we gh ed ave age DSCR fo  he  owes  10% of new y  p  c ased mul fam ly conven onal loans, based on o  g na  on DSCR, was  1 25x  e deb pay e , w  c ac eved  e a ge of 1 23x o g ea e<br>• T e OAS o  ew p c ases fo  e  nves men  po fol o was below a ge due o  ansac ons en e ed n o o p ove secu  y pe fo mance  We would have ach eved  e OAS a ge  ad ese a sac o s ee  exc eded<br>• T e yea -end  npa d p nc pa ba ance of f e a ned po fo o was $697 b  on,  well below  he $810 b ll on  m p esc  bed n  he Sen o  P efe ed S ock Pu chase  Ag eemen<br>• W h ega d o conse va on of assets<br>  D aws f om T easu y of $13 0 b  on fo  2010, wh ch  nc ude  he  $500  o d aw eq e a FHFA w  s b  o  T eas y o e  a e o  et wo h def c a  Decembe  31, 2010, we e w h n  he a ge  ange  2010 c ed  osses of $14 2 b  o  we e j s  de  e owe d of  he a ge  a ge  See "RISK MANAGEMENT  Po fo o Manage en  Ac v es  C ed t Loss Pe fo mance" fo  mo e  nfo ma on and  Net accoun ng sav ngs on fo eclosu e d e na ves ove  he es ma ed cos s had  t e  oans gone o REO of $1 6 b  on exceeded  he h gh end of  e a ge  a ge of $1 0 o $1 5 b  on<br>• We me  he obec ve of l m ng 2010 adm n s a ve expenses, exc ud ng non- ec  g e ss c as e cos s assoc a ed w h spec a po  c y and hous ng  a ves s c as  e MHA p og a , o  o mo e  han $1 509 b ll on  2010  ad  n s a ve expenses  easu ed on h s bas s o aled $1 4 b ll on |
| **Account ng and Controls**<br>• Exec e 2010  e a ad  pa ;<br>• Comple e he mplemen a on of accoun ng s anda ds e a ng  o a sfe s of f nac a assess a d  consol da on of va able n e es en es  e t t es; a d<br>• Comp e e Sa banes-Ox ey Sec on 404  wo k o s ppo  e 2009 f a c a  yea  c f ca on | 10% | • S ccessf  y exec ted  e a  a  te a ad t p a<br>• Imp emen ed new accoun ng s anda ds e a ng o  ansfe s of f nanc a  asse s and  consol da on of va ab e n e es en es<br>• Successfu y co p e ed wo k necessa y o suppo  ce f ca on unde  Sec on 404  of he Sa banes-Ox ey Ac fo  he 2009 f nanc a  yea |
| **Bus ness Infrastructure**<br>• Comp e e he 2010 e emen s of ou  s ess f ast ct e a | 20% | • Ach eved m es ones fo  n ne of  he 10 b s ness  nf as  c e wo ks ea s and  ev sed he  me ab e fo  one of  he mul fam ly nf as  uc u e wo ks eams |

For certain of the performance measures, we have chosen not to  disclose the specific target or both the target and actual  results because we believe such disclosure would cause us  competitive harm, as the disclosures would provide our  competitors and customers with proprietary information on how we  determine our pricing for the mortgages we purchase or

303

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0956

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee For these performance measures, management and the Compensation Committee considered the likelihood of achievement when recommending and approving the target or target range Each target was set at a level determined to be realistic and achievable, taking into account our priorities during conservatorship, including providing liquidity, stability and affordability in a period of tremendous uncertainty in the mortgage markets, as well as the general economic outlook Management and the Compensation Committee considered a number of factors with respect to each of the Financial Execution performance measures for which the target is not otherwise disclosed in Table 72. These factors included, but were not limited to, the following:

- Segment Earnings:

  Single Family: Historical single family segment earnings, delinquency rates, estimated default costs, loan modifications under HAMP, and the impact of adopting accounting standards related to transfers of financial assets and consolidation of variable interest entities

  Multifamily: Historical multifamily segment earnings, delinquency rates, projected volume, and anticipated LIHTC losses.

  Investment: Historical investment segment earnings, interest rate trends, the liquidity of the assets in the investment portfolio, and the balance limit on our retained portfolio

- Return on Assets: Historical new purchase ROA, the competitive market, estimated default costs, guarantee fees, and security performance related costs

- Option Adjusted Spread on New Investment Purchases: Historical OAS, the impacts of the Federal Reserve's mortgage security purchase program and the balance limit on our retained portfolio

- Conservation of Assets:

  Senior Preferred Draws: In addition to the factors considered for Segment Earnings, we also considered the impact of anticipated credit related expenses, economic conditions and home prices

  Realized Credit Losses: Anticipated charge offs and REO operations expense

After reviewing and discussing management's final performance assessment against the performance measures, the Compensation Committee concurred with management's assessment The Compensation Committee then identified and discussed additional factors that it believed should be taken into consideration in determining the appropriate funding level for the performance based portion of Deferred Base Salary These included:

- The continued enhancement of the Enterprise Risk Management organization, which strengthens risk management across the company, provides for a better framework for risk management and improves our work process;

- Management's identification of opportunities to improve the processing of foreclosure alternative transactions, specifically loan modifications and short sales;

- Our increased focus and accelerated progress with respect to diversity and inclusion; and

- Internal control and operational deficiencies identified by management and FHFA during 20 0 related to both the Multifamily and Information Technology divisions

After considering our achievement against the performance objectives as well as the additional factors, which had the overall effect of lowering the funding level, the Compensation Committee developed a preliminary recommended funding level for the performance based portion of Deferred Base Salary of approximately 88% The Compensation Committee's preliminary recommendation was submitted to FHFA for review Following this review, management informed the Compensation Committee that there were no material changes to the assessment that was presented during the fourth quarter of 2010 and this funding level was then formally approved by the Compensation Committee and FHFA

The following chart compares the target and actual amounts of 2010 Deferred Base Salary for each Named Executive Officer The actual amount earned is scheduled to be paid in equal quarterly installments on the last business day of each calendar quarter of 2011.

**Table 73     2010 Deferred Base Salary**

| Named Executive Officer | Target 2010 De erred Base Salary | | | Actual 2010 Deferred Base Salary | | |
| | ixed Portion | Performance Based Portion | Total Target Deferred Base Salary | ixed Portion | Performance Based Portion | Total Actual Deferred Base Salary |
|---|---|---|---|---|---|---|
| M  Haldeman | $1,550,000 | $1,550,000 | 3,100,000 | $1,550,000 | $1,362,450 | $2,912,450 |
| M  Ka | 829,166 | 829,166 | 1,658,333 | 829,167 | 728,838 | 1,558,005 |
| M  Bos om | 680,000 | 680,000 | 1,360,000 | 680,000 | 597,720 | 1,277,720 |
| M  Fede  co | 670,000 | 670,000 | 1,340,000 | 670,000 | 588,930 | 1,258,930 |
| M  B se  s | 550,000 | 550,000 | 1,100,000 | 550,000 | 483,450 | 1,033,450 |

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0957

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In order to receive the Deferred Base Salary that was earned during 2010, the Covered Officer must be employed by us on the payment date, subject to certain exceptions  If a Covered Officer is involuntarily terminated, any unpaid Deferred Base Salary will be forfeited unless the Compensation Committee recommends that the Covered Officer receive either all or a portion of the unpaid Deferred Base Salary and the Compensation Committee's recommendation is approved by FHFA after consulting with Treasury, as appropriate. Further, if a Covered Officer voluntarily terminates employment, any unpaid Deferred Base Salary will be forfeited. Accordingly, Mr. Bisenius will forfeit the second, third and fourth quarterly installments of his Deferred Base Salary if he leaves the company as planned on April 1, 2011.

*Determination of Actual Target Incentive Opportunity*

Over the course of 20 0, the Compensation Committee received updates from management on our achievement against the performance objectives used to determine the funding level for the two TIO installments  In the fourth quarter of 2010, management presented the Compensation Committee with a final achievement assessment against the performance objectives used in determining the funding level for the two installments for which payment is based on performance during 2010.

For the first installment of the 2010 TIO, management concluded that we would achieve most, but not all, of the performance objectives  The table below presents the performance measures and management's assessment of our achievement against those performance measures for the first installment of the 20 0 TIO.

**Table 74     Achievement of Performance Measures for First Installment of 2010 Target Incentive Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission** Same as for the performance based element of Deferred Base Salary. | 35% | Same as for the performance based element of Deferred Base Salary. |
| **Financial Execution** Achieve the Financial Execution objectives related to 20 0 new purchases and conservation of assets for the performance based element of Deferred Base Salary | 20% | As discussed further in "Table 72     Achievement of Performance Measures for the Performance     Based Portion of Deferred Base Salary", we achieved the 2010 new purchases and conservation of assets objectives |
| **Accounting and Controls** Strengthen the control environment and submit a plan to the Audit Committee to assure more efficient and effective processes are in place to maintain Sarbanes Oxley compliance | 20% | Controls environment strengthened, but less than expected  Of the four significant deficiencies scheduled for remediation during 2010: • One was fully remediated; • Two had their scopes expanded and target remediation dates extended into 2011; and • One did not meet its target remediation date |
| **Business Infrastructure** • Complete the 20 0 elements of our business infrastructure plan; and • Operate the existing technology and operations infrastructure in an efficient fashion, while maintaining service and quality standards. | 25% | Achieved milestones for nine of the 10 business infrastructure workstreams: • Revised the timetable for one of the multifamily infrastructure workstreams; and • Based on performance indicators for key applications and processes, our business infrastructure operated efficiently and service and quality standards were met |

After reviewing and discussing management's final performance assessment against the specific performance measures, the Compensation Committee concurred with management's assessment  The Compensation Committee then identified and discussed one additional factor that it believed should be taken into consideration in determining the appropriate funding level for the first installment of the 2010 TIO. The additional factor considered by the Committee was the overall upgrade in the talent and capability in senior level roles and how this improvement strengthens our position for the future  After considering both our achievement against the performance objectives as well as the additional factor, which had the overall effect of increasing the funding level, the Compensation Committee developed a preliminary recommended funding level for the 20 0 TIO first installment of approximately 95%. The Compensation Committee's preliminary recommendation was submitted to FHFA for review  Following this review, management informed the Committee that there were no material changes to the assessment that was presented during the fourth quarter of 2010 and this funding level was then formally approved by the Compensation Committee and FHFA

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-0958

Table of Contents

For the second installment of the 2009 TIO, management concluded that we would fully achieve the performance objectives  The table below presents the performance measures and management's assessment of our achievement against those performance measures for the second installment of the 2009 TIO

**Table 75      Achievement of Performance Measures for Second Installment of 2009 Target Incentive Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Accounting and Controls** <br> Remediation of MRAs that are scheduled to be remediated in 2010 and avoidance of any significant repeat MRAs in 2010 | 25% | • Completed the necessary steps with respect to all four MRAs scheduled to be remediated <br> • No repeat MRAs were identified in 20 0 |
| **Business Infrastructure** <br> Same as for the performance based element of Deferred Base Salary | 75% | Same as for the performance based element of Deferred Base  Salary. |

After reviewing and discussing management's final performance assessment against the specified performance measures, the Compensation Committee concurred with management's assessment  The Compensation Committee did not identify any additional factors that should be taken into consideration in determining the appropriate funding level for the second installment of the 2009 TIO  After considering our achievement against the specified performance objectives, the Compensation Committee developed a preliminary recommended funding level for the second installment of the 2009 TIO of approximately 95%. The Compensation Committee's preliminary recommendation was submitted to FHFA for review  Following this review, management informed the Compensation Committee that there were no material changes to the assessment that was presented during the fourth quarter of 2010 and this funding level was then formally approved by the Compensation Committee and FHFA

For both the 2009 and 2010 TIO installments, the Compensation Committee concurred with the CEO's recommendation that each of the Named Executive Officers (other than Mr  Haldeman) receive a payment equal to the Compensation Committee's approved funding level  While individual differentiation is provided for under the terms of the Executive Compensation  Program, there is no requirement that this discretion be exercised  The decision not to vary individual payments was made  based on the following factors:

• During 20 0, all of the Covered Officers who remained employed  with us at year end had either substantially achieved or exceeded the objectives established for them at the start of the year, which are described below; and

• The recommendation reinforces to the entire Covered Officer group the need for highly coordinated, cross functional  collaboration

The Compensation Committee reviewed and approved the CEO's recommendation  After consultation with the other non management members of the Board and consideration of Mr  Haldeman's performance, the Compensation Committee also approved payments to Mr  Haldeman in amounts equal to the approved funding level for the two Target Incentive Opportunity installments.

FHFA then approved the recommended payment to each Named Executive Officer

The following chart summarizes the TIO applicable to performance  during 2010 for each of the Named Executive Officers under the Executive Compensation Program and the amount of the 20 0 TIO  that was approved by the Compensation Committee and FHFA and paid on February 18, 2011.

**Table 76      2010 Target Incentive Opportunity**

| Named Executive Officer | 2010 First Installment | | 2009 Second  nstallment | |
|---|---|---|---|---|
| | Target | Actual | Target | Actual |
| M  Haldeman | $1,000,000 | $ 947,000 | $395,834 | $ 375,250 |
| M  Ka | 583,334 | 552,417 | 130,502 | 123,716 |
| M  Bos om | 465,000 | 440,355 | 465,000 | 440,820 |
| M  Fede  co | 435,000 | 411,945 | 419,079 | 397,287 |
| M  B se  s | 375,000 | 355,125 | 359,691 | 340,987 |

The 2009 second installment amounts for Messrs. Haldeman  and Kari reflect a pro ration of their annual TIO based on their  respective dates of hire during 2009.

*2010 Target TDC Compared to 2010 Actual TDC*

The following table shows 2010 Target TDC compared to the approved 2010 actual TDC for each of the Named Executive  Officers. The amounts displayed in both the "Total Target" and "Total Actual" columns include the sum of Semi

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0959

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Monthly Base Salary, Deferred Base Salary and those amounts associated with the first installment of the 2010 TIO and the second installment of the 2009 TIO payments.

**Table 77    2010 Target TDC Compared to the Approved 2010 Actual TDC**

| Named Executive Officer | 2010 Semi-Monthly Base Salary | 2010 Deferred Base Salary | | Target Incentive Opportunity (2010 1st Installment and 2009 2nd Installment) | | Total[1] | |
|---|---|---|---|---|---|---|---|
| | | Target | Actual | Target | Actual | Target | Actual |
| M  Haldeman | $  900,000 | $  3,100,000 | $2,912,450 | $1,395,834 | $1,322,250 | $5,395,834 | $  5,134,700 |
| M  Ka | 675,000 | 1,658,333 | 1,558,005 | 713,836 | 676,133 | 3,047,169 | 2,909,138 |
| M  Bos om | 500,000 | 1,360,000 | 1,277,720 | 930,000 | 881,175 | 2,790,000 | 2,658,895 |
| M  Fede co | 400,000 | 1,340,000 | 1,258,930 | 854,079 | 809,232 | 2,594,079 | 2,468,162 |
| M  B se   s | 400,000 | 1,100,000 | 1,033,450[2] | 734,691 | 696,112 | 2,234,691 | 2,129,562 |

(1) The  ab e does no   nc ude  he second  ns a  men  of each Named Execu  ve Off ce 's 2010 Ta ge  Incen  ve Oppo un  y ha   s sc ed   ed o be pa d     Ma c  2012
(2) M  B se   s w  fo fe   e seco,   d a d fo     qua e  y ns a  men s of h s Defe  ed Base Sa a y f he  eaves  he company as p anned on Ap    1, 2011

**Named Executive Officer Individual Performance Objectives**

The chart below describes the individual performance measures for our Named Executive Officers, as well as their level of achievement against those performance measures  The majority of these individual performance measures were either one of the corporate performance measures or supported achievement of one of the corporate performance measures  Achievement against the corporate performance measures is discussed in "Determination of the Performance Based Portion of Deferred Base Salary and Determination of Actual Target Incentive Opportunity for Named Executive Officers "

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Individual Performance Measures | Assessment of Performance |
|---|---|
| *Mr. Haldeman*<br>• Lead the executive office of objectives included in the corporate scorecard<br>• Enhance human capital initiatives related to diversity and inclusion and management continuity; and<br>• Foster a risk aware culture throughout the company, including incorporating risk-adjusted measures in management decision making and the assessment of business performance | In 2010, Mr. Haldeman continued as a strong leader who shaped and was able to manage a management continuity through a time of change at departures of top executives. He also had a Human Resources, Technology and Risk functions continue. He led in an capital initiatives to create an atmosphere of openness and access by all of our employees, including the creation of a new division the Office of Diversity and Inclusion. He suggested the risk-management discipline across the company, providing a better framework for risk management and improving our overall risk management processes. |
| *Mr. Kari*<br>• Complete a finance- and business initiatives to achieve the desired variables<br>• Identify opportunities or the exceed the Financial Executive on and Mission goals in the corporate scorecard<br>• Complete activities necessary to certify compliance with the Sarbanes-Oxley Section 404<br>• Timely implement accounting standards dealing in transfers of financial assets and consolidation of variable interests; and<br>• Identify and execute on opportunities to reduce corporate expenses | Mr. Kari successfully executed several key projects which also brought about multiple successful improvements in the Finance division. He achieved the finance- and business initiatives to achieve the desired variables, led the timely implementation of accounting standards dealing in transfers of financial assets and consolidation of variable interests, and managed the activities necessary to certify compliance with the Sarbanes-Oxley Section 404. Mr. Kari was also instrumental in coordinating activities between various divisions in order to resolve business issues and identify opportunities or the exceed corporate scorecard objectives. He demonstrated effective leadership as he designed, communicated, and implemented a significant change in organization. |
| *Mr. Bostrom*<br>• Manage high profile, complex litigation and corporate investigations<br>• Coordinate our compliance with new SEC disclosure requirements related to Board governance and compensation matters<br>• Provide effective legal advice and support to business units in the execution of the 2010 transaction goals and business plans, including the Making Home Affordable Program<br>• Manage the company's response to a high volume of significant corporate new year enacted regulations, regulatory orders and guidance, including the financial services reform legislation and<br>• Establish a comprehensive scope type program among a range of litigation-related risks | Mr. Bostrom's technical proficiency and experience allowed us to manage demanding and complex legal issues. In particular, he managed complex litigation and governmental and corporate investigations and performed additional activities as needed by the current environment, including significant business transactions. He advised on numerous significant corporate and state legal matters, provided advice on conservatorship operations and business transactions, and provided advice on a new and significant regulatory matters. The Legal division also acquired an end-to-end scope type solution that he will clearly create efficiencies in litigation activities. |
| *Mr. Federico*<br>• Support and provide the quality and stability in the mortgage market by<br>  Satisfying the portfolio size requirements prescribed in the Senior Preferred Stock Purchase Agreement, and,<br>  Actively managing Optional Adjusted Spread and management of new purchases;<br>• Maximize the effectiveness of funding and quality management activities<br>• Enhance and retain a competitive Investments and Capital Markets division and<br>• Improve the flexibility, transparency and effectiveness of investment-related models | Mr. Federico was successful in building a strong and corroborative relationship with the company and who continue to value and helped him in a continued and implemented on of a significant degree of meet the applicable objectives in the corporate scorecard and provide the liquidity and stability in the mortgage market. He also worked with our regulator to develop and implement a more comprehensive and stringent set of quality measures and metrics. During 2010, a number are asks were managed within the pre-determined limits, all open Markets Requiring Attention were remediated and according to the approved schedules, and a model enhancement were implemented as planned. |
| *Mr. Bisenius*<br>• Lead achievement of the applicable objectives in the corporate scorecard related to our credit profile of the new business<br>• Manage credit losses on the existing mortgage portfolio<br>• Complete the applicable objectives in the 2010 corporate scorecard related to risk management activities and<br>• Meet the 2010 affordable housing goals and subgoals applicable to new single-family purchases | Under Mr. Bisenius' leadership, during 2010 the single-family guarantee business achieved or exceeded all of the corporate scorecard objectives appropriate to the new purchases of single-family mortgages while maintaining strong credit quality. He also effectively managed credit losses on existing mortgages and achieved all of his advisor's business initiatives as our credit plan deliverables. With respect to the affordable housing goals, based on preliminary information, we expect that all of the single-family goals will be achieved with the exception of one goal and several affordable subgoal. |

**Written Agreements Relating to Employment of CEO and CFO**

We have entered into: (a) a Memorandum Agreement; and (b) a recapture agreement with each of Messrs. Haldeman and Kari in connection with their employment as our executive officers. Copies of the Memorandum Agreement and the recapture agreement regarding Messrs. Haldeman and Kari were filed as Exhibits 10.1 and 10.2, respectively, to our Current

TREASURY-0961

Source DRA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Reports on Form 8 K filed on July 21 and September 24, 2009 with respect to each executive's employment with us  We have also entered into indemnification agreements with certain of our  current directors and executive officers, each, an indemnitee, including Messrs. Haldeman and Kari  A copy of the general form of indemnification agreement is filed as Exhibit 10 2  to our Form 8 K filed on December 23, 2008

The indemnification agreements provide that we will indemnify  the indemnitee to the fullest extent permitted by our Bylaws and  Virginia law  This obligation includes, subject to certain terms and conditions, indemnification against all liabilities and  expenses (including attorneys' fees) actually and reasonably incurred by the indemnitee in connection with any  threatened or pending action, suit or proceeding, except such  liabilities and expenses as are incurred because of the  indemnitee's willful misconduct or knowing violation of criminal law. The indemnification agreements provide that if requested by the indemnitee, we will advance expenses, subject  to repayment by the indemnitee of any funds advanced if it is ultimately determined that the indemnitee is not entitled to  indemnification  The rights to indemnification under the  indemnification agreements are not exclusive of any other right  the indemnitee may have under any statute, agreement or  otherwise  Our obligations under the indemnification agreements will continue after the indemnitee is no longer a director or  officer of the company with respect to any possible claims based on the fact that the indemnitee was a director or officer, and  the indemnification agreements will remain in effect in the  event the conservatorship is terminated. The indemnification  agreements also provide that indemnification for actions  instituted by FHFA will be governed by the standards set forth  in FHFA's Notice of Proposed Rulemaking published in the Federal Register on November  4, 2008, proposing an amendment to FHFA's interim final golden parachute  payments regulation to address prohibited and permissible indemnification  payments. In January 2009, FHFA issued final regulations relating to golden parachute payments  Under those final  regulations, FHFA may limit golden parachute payments, and the  regulations set forth factors to be considered by the Director  of FHFA in acting upon his authority to limit these payments. A proposed rule was published by FHFA in June 2009 that has not  yet been adopted in final form  In general, this proposal would  g ve FHFA the authority to prohibit indemnification payments in cases involving administrative proceedings before FHFA or civil actions initiated by FHFA

The compensation provisions of each executive's Memorandum  Agreement, in combination with provisions of the Executive  Compensation Program, are summarized separately below  Additional information about the components of executive  compensation is discussed above in " *Elements of Compensation and Total Direct Compensation.*"

Mr  Haldeman's compensation is as follows:

- A Semi Monthly Base Salary of $900,000 per year;

- Deferred Base Salary in the amount of $3 1 million for each  of 2009 and 2010, payable as described above; and

- A Target Incentive Opportunity in the amount of $2.0 million for each of 2009 and 2010, payable as  described above

Mr. Kari's compensation is as follows:

- A Semi Monthly Base Salary of no less than $675,000 per year;

- Deferred Base Salary of $1,658,333 for each of 2009 and 2010,  payable as described above;

- A Target Incentive Opportunity of $1,166,667 for each of 2009 and 2010, payable as described above; and

- A cash sign on award of $1,950,000 in recognition of the annual  incentive opportunity and unvested equity that Mr. Kari  forfeited by leaving his previous employer. This award was paid  in installments during Mr. Kari's first year of employment with us (25% in October 2009, 25% in April 2010, and 50% in October 2010)  A portion of each installment is subject to repayment in the event that, prior to the first anniversary of an installment payment date, Mr. Kari terminates his  employment with us for any reason or we terminate his employment for cause (as defined in the Memorandum Agreement)

Their Memorandum Agreements provide that Messrs  Haldeman  and Kari will receive the following additional forms of  compensation during their employment with us:

- The opportunity to participate in all employee benefit plans  offered to our senior executive officers, including our SERP, pursuant to the terms of these plans  For a description of these  plans see "Compensation Tables" below; and

- If we terminate the employment of Mr  Haldeman or Mr  Kari for any reason other than cause (as defined in the Memorandum  Agreement), he wi  be e igib e to receive termination benefits pursuant to the terms of any  then applicable severance plan or policy, subject to the approval of FHFA  Executive Compensation Program participants,  including Messrs. Haldeman and Kari, are not currently  entitled to a guaranteed level of severance benefits upon any  type of termination event other than death or disability  For additional information on compensation and benefits payable in  the event of a termination of employment, see "Potential  Payments Upon Termination of Employment or Change in Control" be ow

We have also entered into recapture and restrictive covenant  agreements with each of the executives  The recapture  requirements included in these agreements, and the similar  recapture requirements applicable to all other Covered Officers

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0962

Table of Contents

under the Recapture Policy, are described below under "Recapture Policy " The non competition and non solicitation provisions included in the restrictive covenant agreement are described in "Potential Payments Upon Termination of Employment or Change in Control "

**Other Executive Compensation Considerations**

*Perquisites*

    We believe that perquisites should be a minimal part of the compensation package for our Named Executive Officers  We provide certain perquisites because we believe there is a business related benefit, including that the perquisites assist in attracting and retaining executive talent Shortly after being placed in conservatorship, and following a thorough review of competitive market practices, we eliminated a number of perquisites we previously offered and determined that only certain perquisites are appropriate  Accordingly, only the following perquisites were provided to the Named Executive Officers during 2010:

- *Personal Financial Planning.*  Reimbursement for assistance with personal financial planning, tax planning, and/or estate planning, up to an annual maximum benefit that varies by position; and

- *Relocation Benefits.*  Under our relocation program, we provide assistance in finding a new home and selling an existing home, which may involve the purchase of the Named Executive Officer's existing home  We also pay the cost of packing and transporting household goods, provide temporary lodging, reimburse certain travel expenses, and provide a one time payment to cover miscellaneous expenses

    Although available, none of the Named Executive Officers received either of the following perquisites during 20 0: (a) reimbursement of up to $700 of expenses associated with a comprehensive annual physical exam that are not otherwise covered by the Named Executive Officer's medical insurance; and (b) reimbursement of business related spousal travel expenses

    Total annual perquisites for any Named Executive Officer cannot exceed $25,000 without FHFA approval and none of the perquisites include a gross up for taxes due on the perquisite itself

*Supplemental Executive Retirement Plan*

    Our Named Executive Officers are eligible to participate in our Supplemental Executive Retirement Plan, or "SERP " The SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under our Pension Plan and Thrift/401(k) Savings Plan if those plans: (a) were not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" amounts deferred under our Executive Deferred Compensation Plan and the Mandatory Executive Deferred Base Salary Plan  Effective January 1, 2010, the SERP was amended at the direction of FHFA to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi Monthly Base Salary  A copy of the amendment to the SERP is filed as Exhibit  0 3 to the Form 8 K filed on December 24, 2009.

    We provide a SERP because it helps us to remain competitive with the companies with which we compete for talent and thereby assists in attracting and retaining executive talent  For additional information regarding this benefit see "Compensation Tables" below

*Recapture Policy*

    The Recapture Policy provides that certain compensation paid under the Executive Compensation Program will be subject to recapture if any of the following events occur subsequent to the date that the Named Executive Officer agreed to the terms of the Recapture Policy

- *Payment Based on Materially Inaccurate Information*    If the Named Executive Officer obtains a bonus or incentive payment based on materially inaccurate financial statements or performance metrics

- *Termination for Cause*    If the Named Executive Officer's employment is terminated for cause, as defined in the Recapture Policy

- *Subsequent Determination of Cause*    If, within two years of the termination of the Named Executive Officer's employment, the Board makes a determination in good faith that circumstances existed at the time of the Named Executive Officer's termination that would have justified a termination for cause and that actions taken by the Named Executive Officer resulted in material business or reputational harm to us.

The additional event listed below is applicable only to Messrs. Haldeman and Kari.

- *Accounting Restatement Resulting from the Executive's Misconduct*    If misconduct by the CEO and/or the CFO necessitates the preparation of an accounting restatement due to material non compliance with financial reporting requirements

<div align="center">3 0</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

If any of these triggering events occur, the Board will determine whether more compensation was paid to the Named Executive Officer than would otherwise have been paid had we been aware of the triggering event or events at the time the compensation was paid or awarded. If such a determination is made, the following elements of compensation will be subject to recapture: (a) Deferred Base Salary; (b) Target Incentive Opportunity; (c) any equity awards that vest after the adoption of the Executive Compensation Program; and (d) any termination benefits paid Only compensation paid up to two years prior to the triggering event or the date of termination or compensation paid at the time of termination, as applicable, will be subject to recapture  Additionally, the occurrence of a triggering event may result in cancellation of any future payment obligations and/or any outstanding equity awards.

The amount of compensation recaptured will be determined by the Board, subject to the guidelines described above  Additional details are included in the Recapture Policy, which was filed as Exhibit  0 4 to our Current Report on Form 8 K filed on December 3 , 2009  For the triggering event applicable only to Messrs. Haldeman and Kari, the compensation subject to recapture will be determined in accordance with Section 304 of the Sarbanes Oxley Act

### Stock Ownership and Hedging Policies

In November 2008, FHFA approved the suspension of our stock ownership guidelines because we had ceased paying our executives  stock based compensation  Also, the Purchase Agreement prohibits us from issuing any shares of our equity securities without the  prior written consent of Treasury. The suspension of stock ownership requirements is expected to continue through the  conservatorship and until we resume granting stock based compensation

All employees, including our Named Executive Officers, are prohibited from purchasing and selling derivative securities  related to our equity securities, including warrants, puts and calls, or from dealing in any derivative securities other than  pursuant to our stock based benefit plans. All directors and employees (including the Named Executive Officers) are  prohibited from transacting in options (other than options granted by us) or other hedging instruments as specified in our  Insider Trading Policy  In addition, all directors and employees (including our Named Executive Officers) are prohibited from  holding our securities in a margin account or pledging our securities as collateral for a loan

### Section 162(m) Limits on the Tax Deductibility of Our Compensation Expenses

Section 162(m) of the Internal Revenue Code imposes a $  million limit on  the amount that a company may annually deduct for compensation to its CEO and certain other Named Executive Officers, unless,  among other things, the compensation is "performance based," as defined in section 162(m). Given the conservatorship and the desire to maintain flexibility  to promote our corporate goals, awards of retention and deferred pay, and long term incentive awards for 2010 performance are not  structured to qualify as performance based compensation under section 162(m).

### Compensation Committee Interlocks and Insider Participation

None of the members of the Board of Directors who served on the  Compensation Committee during fiscal year 20  0 were our officers  or employees or had any relationship with us that would be  required to be disclosed by us under Item 407(e)(4) of Regulation S K

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0964

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Compensation Committee Report

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis with management and, based on such review and discussion, has recommended to the Board that the Compensation Discussion and Analysis be included in this Annual Report on Form 10 K

This report is respectfully submitted by the members of the Compensation Committee of the Board

> Eugene B. Shanks, Jr., Chairman
> Linda B. Bammann
> Christopher S. Lynch
> Clayton S  Rose

### Compensation and Risk

Our management conducted an assessment of our compensation plans and programs that were in place during 2010 and that were applicable to employees at all levels, including the Executive Compensation Program in which our executives participate  The purpose of the assessment was to determine whether the design and operation of our compensation plans create incentives for employees to take inappropriate risks that are reasonably likely to have a material adverse effect on us  The assessment was conducted by members of our enterprise risk management and human resources teams, as well as by Aon Hewitt, management's compensation consultant

The review included an evaluation of the mix of fixed and variable compensation; eligibility for participation in incentive programs, the process by which target compensation levels are established, the process for establishing performance objectives and for evaluating performance against those objectives, the methodology used to allocate the incentive funding among divisions, departments, and individual employees (including maximum individual payout levels); and the involvement of the Compensation Committee and FHFA in the compensation process  An evaluation was also made of the linkage between corporate and divisional performance objectives

The assessment was discussed with the Compensation Committee in December 20  0  Management's conclusion, with which the Compensation Committee concurred, is that our compensation  policies and practices do not create risks that are reasonably  likely to have a material adverse effect on us  In reaching this conclusion, management considered a number of factors, including  the following:

- Our compensation programs are designed to provide an appropriate mix of both fixed and variable compensation;

- The variable elements of compensation provide an appropriate mix of annual and multi year incentives based on our current state and objectives;

- We utilize a balanced set of financial and operational objectives for both the annual and multi year incentive plans that are focused on four key aspects of our operations: (a) mission; (b) financial and risk; (c) business infrastructure; and (d) accounting and controls;

- Payouts under the annual and multi year incentive plans are not formulaic in nature and the Compensation Committee has the discretion to adjust the funding levels based on any factor or factors it determines to be relevant, which mitigates the risk that employees will place an inappropriate focus on achievement of any single objective;

- The Compensation Committee's oversight of our compensation plans and programs and, during conservatorship, FHFA's role in structuring and overseeing our compensation plans and programs; and

- Our adoption of a compensation recapture policy applicable to all senior officers that enables us to recoup certain elements of previously paid compensation upon the occurrence of specified events, including payment based on materially inaccurate financial information.

<center>312</center>

<center>*Freddie Mac*</center>

---

<center>TREASURY-0965</center>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Compensation Tables

The following tables set forth compensation information for our Named Executive Officers: our Chief Executive Officer, our Chief Financial Officer, and our three other most highly compensated executive officers who were serving as executive officers as of December 3 , 20 0.

### Table 78    Summary Compensation Table    2010

| Name | Year | Salary Paid during Year ) | Salary Deferred(2) | Bonus(3) | Stock Awards(4) | Option Awards(4) | Non Equity ncentive Plan Compensation(5) | Change in Pension Value and Nonqualified Deferred Compensation Earnings(6) | All Other Compensation(7) | Total |
|------|------|------|------|------|------|------|------|------|------|------|
| **Charles E. Haldeman, Jr.** Ch ef Execut ve Off cer | 2010 | $900,000 | $1,550,000 | $ — | $ — | $ — | $ 2,68 ,700 | $ 21 ,60 | $ 10 ,37 | $5, 553 |
| | 2009 | 356,250 | 1,277,083 | | | | 395,833 | — | 56 , 89 | 2,085,655 |
| **Ross J. Kari** EVP  Ch e F nanc al O  cer | 2010 | 675,000 | 829,167 | 1, 62,500 | — | — | 1, 0 ,971 | 69,7 2 | 391,276 | ,832,656 |
| | 2009 | 151,010 | 370 999 | 87,500 | | | 130,502 | — | 69 290 | 1,209,301 |
| **Robert  . Bostrom** VP — Genera  Counse  & Corporate Secretary | 2010 | 500,000 | 680,000 | — | — | — | 1, 78,895 | 1 8,151 | 97,232 | 2,90 ,278 |
| | 2009 | 600,000 | 1,260,000 | 05,000 | — | — | 663,750 | 1 ,53 | 12 ,103 | 3,197,387 |
| | 2008 | 600,000 | — | 180,000 | 1,650,030 | — | — | 105,907 | 106 69 | 2,6 2,631 |
| **Peter J.  ederico** VP  nvestments & Cap ta Markets and Treasurer | 2010 | 00,000 | 670,000 | — | — | — | 1,398,162 | 2 9,1 7 | 97,8 6 | 2,815,155 |
| | 2009 | 381,629 | 1,29 ,685 | 05,000 | — | — | 838, 38 | 85,525 | 121,522 | 3,126,799 |
| **Donald J. Bisenius** VP — Sing e Fami y Credit Guarantee | 2010 | 00,000 | 550,000 | — | — | — | 1,179,562 | 230,069 | 92,052 | 2, 51,683 |

(1) The amoun s shown fo  2010 and 2009  ep esen  Sem -Mon h y Base  Sa a y unde   he Execu ve Compensa on P og am as desc ibed n "Compensa on D scuss on a d A a ys s   Exec  ve Managemen  Compensa on P og am" and, fo  2008, base sala y.

(2) The amoun s shown  ep esen  he f xed po  on of Defe ed Base Sa a y ea ned unde  he e s of he Execu ve Co pensa on P og am  The f xed po  on of he 2010 Defe ed Base Sa a y ea ned du ng each ca enda  qua  e  n 2010 w  be pa d n cash o  cha as b s ess day of  eco espo d g qua  e   2011, p ov ded  he Na ed Execu ve Off cer s  e p oyed by us on such pay e  date o   e eve s r off ce d es, n ce ain o  ce and sab l y n 2011  The ema n ng po  on of he 2010 Defe ed Base Sa a y s epo ed n "Non-Equ y Incen ve P an Compensa on" because   s pe fo mance-based and he amoun  has  pa d s va ab e M B sen us w  fo  e seco d,  da d fo  qua e y na u e o Defe ed Base Sa a y f he eaves he company as p anned on Ap  1, 2011.

A oun s shown as 2009 Defe ed Base Sa a y we e ea ned du ng eac ca enda qua e n 2009 and pa d n cas on  e as bus ness day of he co espond ng qua  e  n 2010

(3) The a  oun s shown fo  M  Ka  ep esen  he po  on of  he cash s gn-on bonus pa d n 2009 and 2010, wh ch he  ece ved n  ecogn on of he fo fe ed annual  ncen ve oppo un y and  ves ed equ y a  s p evo se p oye   See "CD&A  W en Ag eemen s Re a ng o Emp oymen of CEO and CFO"  The amoun s shown n 2009 fo  Mess s Bos o  and Fede co  ep esen  he second and h rd se v ce-based ns a men paymen s unde  he on awa ds g a ed   2008 T e amoun shown n 2008 fo  M  Bos om  ep esen s he f  s se v ce-based ns a  en pay en  unde  he  on awa d g an ed n 2008

(4) The amoun  epo ed fo  s ock awa ds s he agg ega e g an da e fa  va ue of es  ced s ock  n  awa ds g an ed d  ng  e yea  nd ca ed, compu ed n acco dance w  FASB Acco  g S anda ds Cod f ca on Top c 718 ("Compensa on  S ock Compensa on"), excep  ha  he amoun  epo ed does no  ef ec es ma ed fo fe u es  Wh e g an s of RSUs nc ude  he  gh o  ece ve d v dend equ va en s, d v dends on ou  co  on s ock have been s spe ded d  g co se va o s p by o de of he Conse va o

S ock op  ons g an ed p o o  Janua y 1, 2006 a so nc ude d v dend equ va en  gh s on each sha e unde  y ng he op on  Paymen of acc ued d v dend va en s on s ock op ons ves ed as of Decembe  31, 2004 occu s as op ons a e exe c sed  exp  e unexe c sed  Of he Na ed Execu ve Off ce s, on y M  Fede co  ece ved cash pay en s d  ng 2010 (16,726) and 2009 ($13,274) fo d v dend equ va en s assoc a ed w  op on s ha exp  ed unexe c sed  D v dend equ va en s on s ock op ons ves ed af e  Dece be  31, 2004 we e pa d a he same  me ha d v dends we e dec a ed and pa d on ou  common s ock

(5) The 2010 amoun s epo ed ef ec  he po  on of he 2010 and 2009 Ta ge  Incen ve Oppo un  es ha we e ea ned fo  2010 a d pa d o  Fe  ua y 18, 2011 a d  e  pe fo mance-based po  on of he 2010 Defe ed Base Sa a y ea ned du ng each ca enda  qua  e  n 2010 wh ch s schedu ed o be pa d on he as   s ess day of he  co espond ng qua  e  n 2011  See "CD&A   Execu ve Managemen  Compensa on P og am   Pe fo mance Measu es fo  he Pe fo mance-Based E emen s of Compensa on"  As no ed above, M B sen us w  fo  e seco d,  da d fo  qua e y na u e a men s of h s Defe ed Base Sa a y f he eaves he company as p anned on Ap  1, 2011

The 2009 amoun s epo ed ef ec  he po  on of he 2009 Ta ge  Incen ve Oppo un y ha  was ea ned fo  2009 and pa d on Ma ch 12, 2010  The 2009 a  oun s  epo ed fo  Mess s Bos o  and Fede co a so nc ude  he f na , pe fo mance-based po  ons of  he Sep embe  2008  e en on awa ds of $315,000 eac , pa d on Ma ch 15, 2010

(6) Excep  fo  he defe ed compensa on amoun s desc bed n  he  as  pa ag aph of h s no e, he a  oun s epo ed n h s co umn  ef ec on y he ac ua  n ease n he p ese  va ue of eac  Na ed Execu ve Off ce 's acc ued benef  s unde ou  Pens on P an and he Pens on SERP Benef  de  e ned us ng he  me pe ods and assump ons app ed n ou  conso da ed f nanc a s a e en s fo  he yea s ended Dece  31, 2008, 2009, and 2010, espec ve y

W  h excep  o of Mess s Bos o , Fede co, a d B se u, n one of he  a  oun s epo ed n h s co umn  ef ec a Na ed Execu ve Off ce s ea n ng on  ece ve because s c a o  sa e o ye ves ed T ea o  s epo ed do o nc ude va ues assoc a ed w h he e med ca benef s, wh ch a e gene ally ava lable on he same e ms o all employees  Defe ed Base Sa a y unde he Execu ve Compensa on P og am s a no cons de ed compensa on el g ble fo  defe al n acco dance w h he EDCP  The Execu ve Compensa on P og am does no p ov de fo n e es on Defe ed Base Sa a y

Fo  2009, he a  oun s  epo ed n h s co un fo  M  Fede co nc ude above-ma ke ea n ngs ($126) on h s accu u a ed ba ances n he EDCP as of Dece be  31, 2009

*Freddie Mac*

Source  D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0966

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(7) Amoun s ef ec ( ) bas c and mac ng con bu ons we made o ou ax-qua f ed Th f 401(k) Sav gs P a ( ) acc a s we ade p s a o e Th f 401(k) SERP Benef ( ) F exDo a s (desc bed be ow) and ( v) pe qu s es and o he pe sona benef s ece ved These amoun s fo 2010 a e as follows

| | Thrift/401(k) Savings Plan Contributions | Thrift/401(k) SERP Benefit Accruals | Total Flex Dollars | Perquisites |
|---|---|---|---|---|
| M Haldeman | $ | $ 22,500 | $ 19,035 | $ 62,839 |
| M Ka | | | 14,792 | 376,484 |
| M Bos om | 18,689 | 64,375 | 14,168 | |
| M Fede co | 22,364 | 53,700 | 21,782 | |
| M B se s | 22,364 | 53,700 | 15,988 | |

Employe con bu ons o he Th f 401(k) Sav ngs Plan a e ava lable on he same e ems o all of ou employees We ma ch up o he f s 6% of el g ble compensa on a 100% of he emp oyee's con bu ons, w h he pe cen age ma ched dependen upon he employee's leng h of se v ce Employee con bu ons and ou ma ch ng con bu ons a e nves ed n acco dance w h he employee's nves men e ec ons and a e rimmed a e y ves ed In add on, on a d sc e ona y bas s, we may make an add onal con bu on o he Th f 401(k) Sav ngs P an, efe ed o as "bas c con b on," ha s alloca ed on behalf of each el g ble employee, based on a s a ed pe cen age of each employee's el g ble compensa on When we make a bas c con bu on, occu s af e he end of he ca enda yea o wh ch e a es The fo u a o e co b o s 2% of pay p o e Soc a Secu y wage base, w c was $106,800 fo 2010, a d 4% of pay a ove e Soc a Secu y wage base Bas c con bu ons we e app oved and pos ed o e p oyees' accoun s n 2008, 2009, and 2010 Bas c con bu ons ece ved on o af e Janua y 1, 2008 a e s ject to a g aded ves ng schedu e such ha e p oyees w ss an f ve yea s of se v ce a e no f y ves ed n a bas c con bu on con bu on da e, bu ey beco e ves ed a e a e of 20% pe yea ove e f s f ve yea s of se v ce

Fo add onal nfo ma on ega d ng he Th f 401(k) SERP Benef , see "Non-q a f ed Defe ed Compensa on" below Amoun s fo he Th f 401(k) Sav ngs Plan con bu ons and Th f 401(k) SERP Be ef acc as a e p ese ed w o e g a d o ves g a s us To be e g b e fo he po on of he Th f 401(k) SERP Be ef a bu ab e o ma ch ng con bu ons, he Named Execu ve Off ce mus con bu e he max mum amoun pe m ed de e e s of he Th f 401(k) Sav ngs Plan on a p e-ax bas s houghou he en e pe od of he yea n wh ch he Named Execu ve Off ce s el g ble o ake such con bu ons M Ha de an con bu ed he max mum amoun o he Th f/401(k) Sav ngs Plan p o o comple ng he one yea se v ce equ emen needed o be el g ble fo Th /401(k) SERP Benef acc uals n 2010 M Ka d d no con bu e e eq ed a o a d s was no el g ble fo Th f 401(k) SERP Benef acc ua s n 2010

F exDo a s a e p ov ded unde ou F ex b e Benef s P an and a e gene ally ava lable o all employees o offse cos s ela ed o med cal, den al and v s on cove age, g oup e m fe s a ce, acc de a dea a d pe so a oss s a e, a d vaca on pu c ase F exDo a s can be used o offse e cos of o e e efts a da y sed FlexDolla s a e payable as axable ncome

Pe qu s es a e valued a he agg ega e nc emen al cos o s D g e yea s epo ed, e agg ega e va e of pe qu s es ece ved by all Named Execu ve Off ce s o e a Mess s Ha de a a d Ka was ess a $10,000 1 acco da ce w SEC es, a o s s ow de "A O e Compensa on" do no nclude pe qu s es o pe sona benef s fo a Na ed Execu ve Off ce ha n he agg ega e, a oun o ess han $10,000

The amoun shown n he "Pe qu s es" co umn fo M Haldeman cons s s en ely of eloca on expenses pa d as pa of he eloca on benef we ag eed o p ov de o we we h ed h The a oun shown n he "Pe qu s es" column fo M Ka cons s of (a) eloca on expe ses of $369,484 pa d as pa of e eloca on benef we ag eed o p ov de when we h ed h m and (b) f nanc a p ann ng se v ces As pa of ou s and a d execu ve eloca on p og am, we pu chased M Ka 's fo me home a a p ce equa o he ave age of wo ndependen app a sa s, wh e he p ce a wh ch home ul ma ely sold was s gn f can ly ower because of a dec ne n he home's va ue be ween ou p c ase a d t e s a e SEC es eq t at we c de t s d ffe ence as f scal yea 2010 compensa on

We ca cu a ed he nc emen a cos o us of p ov d ng each of M Haldeman's and M Ka 's eloca on expe ses ased o ac a cos a s, e o a o of expe ses c ed by s p ov d g e be ef

The amoun s shown n "All O he Compensa on" fo 2009 fo Mess s Ha de an and Ka have been es a ed o nc ude paymen s fo e oca on se v ces ($9,644 and $10,152, espec ve y) ncu ed a e n 2009 and nadve en y exc uded f om amoun s p ev ously epo ed

### Grants of Plan Based Awards    2010

The following table contains information concerning grants of plan based awards to each of the Named Executive Officers during 20 0 We are prohibited from issuing equity securities, without Treasury's consent, under the terms of the Purchase Agreement Accordingly, no stock awards were granted during 2010 For a description of the performance and other measures used to determine payouts, see "CD&A Executive Management Compensation Program Elements of Compensation and Total Direct Compensation Deferred Base Salary," "Target Incentive Opportunity," "Performance Measures for the Performance Based Elements of Compensation," "Determination of the Performance Based Portion of 20 0 Deferred Base Salary," and "Determination of Actual Target Incentive Opportunity "

3 4                                                                                                                *Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 79     Grants of Plan Based Awards     2010**

| Name | Award | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1) | | |
|---|---|---|---|---|
| | | Threshold | Target | Maximum |
| M Haldeman | Ta ge Incen ve Oppo un y | $ | $ 2,000,000 | $ 3,000,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 1,550,000 | 1,937,500 |
| | **Total** | | 3,550,000 | 4,937,500 |
| M Ka | Ta ge Incen ve Oppo un y | | 1,166,667 | 1,750,001 |
| | Pe fo mance-Based Defe ed Base Sala y | | 829,166 | 1,036,458 |
| | **Total** | | 1,995,833 | 2,786,459 |
| M Bos om | Ta ge Incen ve Oppo un y | | 930,000 | 1,395,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 680,000 | 850,000 |
| | **Total** | | 1,610,000 | 2,245,000 |
| M Fede co | Ta ge Incen ve Oppo un y | | 870,000 | 1,305,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 670,000 | 837,500 |
| | **Total** | | 1,540,000 | 2,142,500 |
| M B se s | Ta ge Incen ve Oppo un y | | 750,000 | 1,125,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 550,000 | 687,500 |
| | **Total** | | 1,300,000 | 1,812,500 |

(1) The amoun s epo ed ef ec he Ta ge Incen ve Oppo un y and he pe fo mance-based po on of he Defe ed Base Sa a y g an ed n 2010 The Ta ge Incen ve Oppo un y ac ua y ea ned can ange f om 0% of a ge ( epo ed n he Th eshold column) up o a max mum of 150% of a ge ( epo ed n he Max mum column) The pe fo mance-based po on of he Defe ed Base Sa a y ac ua y ea ned can ange f om 0% of a ge ( epo ed n he Th eshold column) up o a max mum of 125% of a ge ( epo ed n he Max mum co umn) Howeve , wh e he Execu ve Compensa on P og am allows fo an app oved fund ng eve g ea e han 100%, s he c e e o of e Compensa on Comm ee no o app ove a fund ng eve in excess of 100% wh le he company s n conse va o sh p Ac ual amoun s ea ned a e epo ed n he "Non-Equ y Incen ve P an Compensa on" column of "Tab e 78    Summa y Compensa on Table    2010 "

The 2010 Ta ge Incen ve Oppo un y s schedu ed o be pa d n wo ns a en s, he f s of wh ch occu ed on Fe a y 18, 2011, a d e seco d of w c s sc ed ed o occu no a e han Ma ch 15, 2012 The pe fo ance-based po on of he 2010 Defe ed Base Sa a y s payab e n equa qua e y ns a men s on he as s ess day of eac q a n 2011

M B se s w fo e a f e payo s of s non-equ y ncen ve p an awa ds f he eaves he co pany as p anned on Ap 1, 2011

315

*Freddie Mac*

Source    D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0968

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Outstanding Equity Awards at Fiscal Year End   2010*

The following table shows outstanding equity awards held by the Named Executive Officers as of December 3 , 20 0

**Table 80     Outstanding Equity Awards at Fiscal Year End    2010**

| Name | Award Type( ) | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (# | Number of Securities Underlying Unexercised Options Unexercisable (# | Option xercise Price ($)(2) | Option Expiration Date | Number of Shares or nits of Stock That ave Not Vested (# | Market Value of Shares or nits of Stock That ave Not Vested ($)(4) |
|---|---|---|---|---|---|---|---|---|
| | | | | | **Option Awards(3)** | | **Stock Awards(3)** | |
| M  Haldeman | | | | | $ | | | $ |
| M  Ka | | | | | | | | |
| M  Bos om | SO | 06 05 06 | 11,950 | 0 | $ 60 45 | 06 04 16 | | |
| | RSU | 03/29/07 | | | | | 3,762 | 1,147 |
| | RSU | 03/07/08 | | | | | 31,044 | 9,469 |
| M  Fede co | SO | 03 02 01 | 1,870 | 0 | $67 85 | 03 01 11 | | |
| | SO | 03 01 02 | 2,870 | 0 | $ 64 35 | 02/29/12 | | |
| | SO | 03 13 03 | 4,000 | 0 | $ 52 65 | 03 12 13 | | |
| | SO | 04 01 04 | 3,590 | 0 | $ 59 51 | 03 31 14 | | |
| | SO | 06 04 04 | 2,330 | 0 | $58 92 | 06 03 14 | | |
| | SO | 04 11 05 | 4,730 | 0 | $ 62 79 | 04 10 15 | | |
| | RSU | 03/29/07 | | | | | 4,573 | 1,395 |
| | RSU | 03/07/08 | | | | | 30,413 | 9,276 |
| M  B se  s | SO | 03 02 01 | 4,720 | 0 | $67 85 | 03 01 11 | | |
| | SO | 03 01 02 | 5,480 | 0 | $ 64 35 | 02/29/12 | | |
| | SO | 11/26/03 | 4,700 | 0 | $ 54 30 | 11/25/13 | | |
| | SO | 08/09/04 | 4,500 | 0 | $ 64 36 | 08/08/14 | | |
| | SO | 04 11 05 | 4,420 | 0 | $ 62 79 | 04 10 15 | | |
| | RSU | 03/29/07 | | | | | 1,513 | 461 |
| | RSU | 03/07/08 | | | | | 11,451 | 3,493 |

(1) The  ows abe ed "SO" nd ca e s ock op ons and he  ows abe ed "RSU" nd ca e  s  c ed s ock un s

(2) Cons e n  w  h  he  ems of ou  2004 Emp oyee P an, he op on exe c se p ce was se a a pr ce equa o he fa  ket va ue of ou common s ock on he g an da e

(3) A o s epo ed    s ab e fo  RSUs ep ese e  ves ed po on of awa ds, wh e amoun s epo ed n h s ab e fo  op ons ep esen he unexe c sed po on of awa ds Excep fo  ose awa ds c ed   e wob s be ow, e op o a d s ock awa ds ves ed  e ab e ves  fo  equa a a  ns allmen s beg nn ng on he ann ve sa y of he g an da e

• A po o of RSUs g a ed o Ma c 7, 2008 ves    ee a  a sa  e s (33%, 33%, a d 34%) beg    g o  e ann ve sa y of e g an da e  T e ou s and ng po on of hese awa ds co s s ed of 4,326 RSUs fo  M  Bos o a d 2,423 RSUs fo  M  Fede co a d

• S ock op o s g a ed o Ma c  2, 2001, Ma c  1, 2002, Ma c  13, 2003, a d J  e 4, 2004 vested at a ate of 25% o  eac  of t e seco d, t  d, fo  t , a d f f h ann ve sa es of he g an da e

• S ock op  ons g an ed on Nove  be  26, 2003 ves ed a a a e of 25% annua  beg nn ng on Ma ch 6, 2005

• S ock op o s g a ed o A g s 9, 2004 ves ed a a a e of 25% beg    g o  e f s a  ve sa y of e g a  da e, a d 25% o  Ap  1, 2006, Ap  1, 2007, a d Ap  1, 2008

(4) Ma ke va ue s ca c a ed by    p y ng  e n  be  of RSUs held by each Named Execu ve Off ce on Decembe 31, 2010 by he clos ng p ce of ou common s ock on Decembe 31, 2010 ($0 305), e as  ad ng day of  e yea

For information on alternative settlement provisions of RSU and stock option grants in the event of certain terminations, see "Table 84   Potential Payments Upon Termination of Employment or Change in Control as of December 3 , 20 0" below

### *Option Exercises and Stock Vested    2010*

The following table sets forth information concerning value realized upon the vesting of RSUs during 2010 by each of the Named Executive Officers  No Named Executive Officer exercised options in 2010

**Table 81     Option Exercises and Stock Vested    2010**

| Name | Number of Shares Acquired on Vesting (#)(1) | Value Realized on Vesting ($)(2) |
|---|---|---|
| | **Stock Awards** | |
| M  Haldeman | 0 | $        0 |
| M  Ka | 0 | |
| M  Bos om | 27,067 | 33,105 |
| M  Fede co | 23,821 | 29,278 |
| M  B se  s | 8,226 | 10,107 |

(1) A o  s epo ed efec  e  be of RSUs  a ves ed d   g 2010 p  o o ou  w hhold ng of sha es o s sfy appl cable taxes

(2) Amoun s epo ed a e ca cu a ed by mu  p y ng he numbe  of RSUs  a ves ed d   g 2010 by e fa  ke va ue of o  common s ock on he da e of ves ng

### *Pension Benefits    2010*

The following table shows the actuarial present value of the accumulated retirement benefits payable to each of the Named Executive Officers under our Pension Plan and the Pension SERP Benefit (the component of the SERP that relates to the Pension Plan), computed as of December 31, 2010  A summary of the material terms of each plan follows the table, including information on early retirement

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-0969

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0970

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 82     Pension Benefits     2010**

| Name | Plan Name | Number of Years Credited Service (# (1) | Present Value o Accumulated Benefit ($)(2) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| M  Haldeman | Pens on Plan | 1 3 | $        31,368 | $      0 |
|  | Pens on SERP |  |  |  |
|  | Benef | 1 3 | 183,092 | 0 |
| M  Ka | Pens on Plan | 1 2 | 16,534 | 0 |
|  | Pens on SERP |  |  |  |
|  | Benef | 1 2 | 53,208 | 0 |
| M  Bos  om | Pens on Plan | 5 | 93,001 | 0 |
|  | Pens on SERP |  |  |  |
|  | Benef | 5 | 442,874 | 0 |
| M  Fede  co | Pens on Plan | 22 3 | 258,217 | 0 |
|  | Pens on SERP |  |  |  |
|  | Benef | 22 3 | 807,256 | 0 |
| M  B se  s | Pens on Plan | 19 | 331,982 | 0 |
|  | Pens on SERP |  |  |  |
|  | Benef | 19 | 651,339 | 0 |

(1) Amoun s epo ed ep esen  he c ed ed yea s of se v ce fo  each Named Execu ve Off ce as of Decembe  31, 2010, unde   he Pens on P an and  he Pens on SERP Benef , espec ve y

(2) A o   s epo ed ef ec   e p ese  va e, exp essed as a   p um as of Decembe  31, 2010, of each Named Execu ve Off ce 's benef s unde  he Pens on Plan and  e Pens on SERP Benef , espec ve y A  um s ep ese ed e ca cu a ed us ng  e assu p ons app ed n NOTE 11  he conso da ed f nanc al s a emen s  c ded  s A  a Repo on Fo m 10-K and  he no mal e emen age of 65 spec f ed n  he Pens on Plan As of Decembe  31, 2010,  he commencemen age o  de e  ne  on h y accr ued benef and p esen va ue fo  he Pens on Plan was changed f om no mal e emen age of 65  o  he ea es un educed e emen da e ( f appl cable) Fo  benef s ea ned h ough Decembe  31, 2010,  he Pens on P an p o des an un educed ea y e emen benef a  he ea  e of  (a) age 62 and 15 yea s of se v ce a d (b) age 65 T e Pe s o SERP Be ef  does  o p ov de an ea y  e emen benef ,  he efo e age 65 s  he assumed commencemen da e  Mess s Fede co a d B se   s a ee  g be fo  un educed Pens on P an benef s a  age 62 fo  benef s ea ned p o  o Decembe  31, 2010 M  Fede co's change n pens on value f om Decembe  31, 2009 o Decembe  31, 2010 eflec s an  nc ease n va ue of $52,726 o  e a change n me hodo ogy o nc  de  e va e of un educed benef s ava ab e a  age 62 n  he Pens on P an Fo Mess s Ha de an and Ka  , ea o s ssow  c dea o s, fa y,  w c  e Named Execu ve Off ce as a e no ye  ves ed Pens on P an and Pe s o SERP Be ef s do o  ves        e pa c pa  a a s f ve yea s of ves ng se v ce, a wh ch  me  he pa c pa  ves s f y

## Pension Plan

The Pension Plan is a tax qualified, defined benefit pension  plan that we maintain, covering substantially all employees who  have attained age 2  and completed one year of service with us  Pension Plan benefits are based on an employee's years of service and compensation, up to limits imposed by law. Specifically, the normal retirement benefit under the Pension Plan for service after December 31, 1988 is a monthly payment commencing at age 65 calculated as follows:

- 1% of the participant's highest average monthly compensation for the 36 consecutive month period during which  the participant's compensation was the highest;

- multiplied by the participant's full and partial years of credited service under the Pension Plan

For purposes of the Pension Plan, compensation includes the  non deferred base salary paid to each employee (which includes  Semi Monthly Base Salary under our Executive Compensation Program), as well as overtime pay, shift differentials, non deferred bonuses paid under our corporate wide annual bonus program or pursuant to a functional incentive plan (excluding  the value of any stock options or cash equivalents), commissions and salary reductions under the Thrift/401(k) Savings Plan and the Flexible Benefits Plan, and qualified transportation benefits under Internal Revenue Code Section  32(f)(4)  Compensation does not include, among other things, supplemental  compensation plans providing temporary pay, deferrals under the Executive Compensation Program, or amounts paid after  termination of employment other than amounts included in a final paycheck.

Notwithstanding the lump sum nature of the disclosure in the  preceding table, lump sum payments are not permitted under the  Pension Plan if the present value of the accrued benefit would  equal or exceed $25,000  The normal form of benefit under the  Pension Plan is an annuity providing monthly payments for the  life of the participant (and a survivor annuity for the  participant's spouse if applicable). Optional forms of benefit payment are available  A benefit with an actuarial present value equal to or less than $5,000 may only be paid as a  lump sum.

Participants under the Pension Plan who terminate employment  before age 55 with at least five years of service are  considered "terminated vested" participants. Such participants may commence their benefit under the Pension Plan  as early as age 55  The benefit is equal to the vested portion of the participant's accrued benefit, reduced by 1/180th for each of the first 60 months, and by 1/360th for  each of the next 60 months, by which the commencement of such benefits precedes age 65.

An early retirement benefit is available to a participant who  terminates employment on or after age 55 with at least five  years of service  For service before January 1, 2011, this early retirement benefit is reduced by 3% for each year  (prorated monthly for partial years) by which the commencement of such benefits precedes the earlier of: (a) the  participant's attainment of age 65; or (b) the participant's attainment of age 62 or later with at least 15 years of service  For service after December 31, 2010, the reduction is 5% for each year  (prorated monthly for partial years) by which the commencement of benefits precedes the participant's  attainment of age 65. For participants with service prior to January 1, 2011 and after December 31, 2010, the reductions are separately  calculated, and the early retirement benefit is the sum of the two calculations  Death benefits are available provided the participant completed at least five years of service prior to  death

*Freddie Mac*

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0971

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0972

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Supplemental Executive Retirement Plan     Pension SERP Benefit**

The Pension SERP Benefit component of the SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under the Pension Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" Deferred Base Salary and amounts deferred under our Executive Deferred Compensation Plan For example, the Pension Plan is only permitted under the Internal Revenue Code to consider the first $245,000 of an employee's compensation during 20 0 for the purpose of determining the participant's compensation based normal retirement benefit Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi Monthly Base Salary We believe the Pension SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group.

The Pension SERP Benefit is calculated as the participant's accrued annual benefit payable at age 65 (or current age, if greater) under the Pension Plan without application of the limits described in the preceding paragraph, less the participant's actual accrued benefit under the Pension Plan The Pension SERP Benefit is vested for each participant to the same extent that the participant is vested in the corresponding benefit under the Pension Plan

To be eligible for the Pension SERP Benefit for any year, the Named Executive Officer must be eligible to participate in the Pension Plan

Pension SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum after separation from service and are payable 90 days after the end of the calendar year in which separation occurs. Subject to plan limitations and restrictions under Internal Revenue Code Section 409A, employees may elect that this portion of the Pension SERP Benefit be paid upon separation in the form of a single life annuity at age 65 or in reasonably equal annual installments over five, 10 or 15 years (including interest) Under IRS rules, distributions to so called "key employees" (as defined by the IRS in regulations concerning Internal Revenue Code Section 409A) on account of separation from service may not commence earlier than six months from the key employee's separation from service Payments under the SERP will be delayed if necessary to meet this requirement In the case of death, the Pension SERP Benefit is distributed as a lump sum within 90 days of such event.

Pension SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of a single life annuity commencing at age 65 In the case of retirement, the vested pre 2005 Pension SERP Benefit is combined with the vested pre 2005 Thrift/401(k) SERP Benefit and is paid out in the form of a single life annuity payable at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that payment form would yield a longer period of payment) In the case of death, the vested pre 2005 Pension SERP Benefit is paid in the form of a lump sum within 90 days of such event.

**Non qualified Deferred Compensation**

*Executive Deferred Compensation Plan*

The EDCP allows the Named Executive Officers to defer receipt of a portion of their annual salary and cash bonus (and to defer settlement of RSUs granted between 2002 and 2007). The EDCP is a non qualified plan and is unfunded (benefits are paid from our general assets). Pursuant to the plan, deferrals may be made for a period of whole years as elected by the employee, but in no event past termination of employment Deferred amounts are credited with interest, which is currently the prime rate as reported by the Wall Street Journal as of the first business day of the applicable calendar year, plus 1%. When employees make deferral elections for a particular year, they also specify the form in which the deferral will be distributed after the expiration of the election The available selections are lump sum or reasonably equal installments over five, 10, or 15 years. A six month delay in commencement of distributions on account of separation from service applies to key employees, in accordance with Internal Revenue Code Section 409A Hardship withdrawals are permitted in certain limited circumstances

On October 8, 2008, we amended the EDCP to permit participants to make a one time election by October 3 , 2008 to change the timing and form of the distribution of their existing non equity balances in the EDCP Messrs Federico and Bisenius elected new in service distributions scheduled to be paid in three installments in March 2009, December 2009, and May 20 0 None of the other Named Executive Officers have made deferrals under the EDCP In December 2010, we advised participants in the EDCP that we are suspending deferrals of pay under the EDCP during calendar year 2011, and that we will review future deferral options during the fourth quarter of 2011

*Supplemental Executive Retirement Plan     Thrift/401(k) SERP Benefit*

The Thrift/401(k) SERP Benefit component of the SERP is an unfunded, nonqualified defined contribution plan designed to provide participants with the full amount of benefits that they would have been entitled to under the Thrift/401(k) Savings Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under

<div align="center">318</div>

<div align="right">*Freddie Mac*</div>

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the Internal Revenue Code; and (b) did not exclude from compensation Deferred Base Salary and amounts deferred under our EDCP For example, in 20 0 under the Internal Revenue Code, only the first $245,000 of an employee's compensation is considered when determining our percentage based matching contribution and the basic contribution for any participant in the Thrift/401(k) Savings Plan. Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi Monthly Base Salary We believe the Thrift/401(k) SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group.

The Thrift/401(k) SERP Benefit equals the amount of the employer matching contributions and basic contribution for each Named Executive Officer that would have been made to the Thrift/401(k) Savings Plan during the year, based upon the participant's eligible compensation, without application of the above limits, less the amount of the matching contributions and basic contribution actually made to the Thrift/401(k) Savings Plan during the year Participants are credited with earnings or losses in their Thrift/401(k) SERP Benefit accounts based upon each participant's individual direction of the investment of such notional amounts among the virtual investment funds available under the SERP. Such investment options are based upon and mirror the performance of the investment options available under the Thrift/401(k) Savings Plan As of December 31, 20 0, there were 20 investment options in which participants' notional amounts could be deemed invested

To be eligible for the Thrift/401(k) SERP Benefit, the Named Executive Officer must be eligible for matching contributions and basic contributions under the Thrift/401(k) Savings Plan for part of the year In addition, to be eligible for the portion of the Thrift/401(k) SERP Benefit attributable to employer matching contributions, the Named Executive Officer must contribute the maximum amount permitted under the terms of the Thrift/401(k) Savings Plan on a pre tax basis throughout the entire portion of the year in which the Named Executive Officer is eligible to make such contributions. That portion of the Thrift/401(k) SERP Benefit is vested when accrued, while the accrual relating to the basic contribution paid prior to 2008 is subject to five year cliff vesting, and the accrual relating to the basic contribution paid in 2008 and later years is subject to five year graded vesting of 20% per year The Thrift/401(k) SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum payable 90 days after the end of the calendar year in which separation from service occurs A six month delay in commencement of distributions on account of separation from service applies to key employees, in accordance with Internal Revenue Code Section 409A If the Named Executive Officer dies, the vested Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of death

Thrift/401(k) SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of three reasonably equal annual installments, starting in the first quarter of the calendar year following the year in which the separation from service occurs In the case of retirement, the vested pre 2005 Thrift/401(k) SERP Benefit is combined with the vested pre 2005 Pension SERP Benefit and is payable in the form of a single life annuity at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that this payment form would yield a longer period of payment) In the case of death, the vested pre 2005 Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of such event.

319                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, ebruary 24, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table shows the contributions, earnings, withdrawals and distributions, and accumulated balances under the Thrift/401(k) SERP Benefit for each Named Executive Officer and the EDCP for Messrs Federico and Bisenius (the only participating Named Executive Officers) as of December 31, 2010

**Table 83    Non Qualified Deferred Compensation**

| Name | Executive Contributions in Last FY ($)(1) | reddie Mac Accruals in Last FY ($)(2) | Aggregate Earnings in Last FY ($)(3) | Aggregate Withdrawals/ Distributions ($)(4) | Aggregate Balance at Last FYE ($)(5) |
|---|---|---|---|---|---|
| M Haldeman | | | | | |
|   T ft/401(k) SERP Benef | $  0 | $  22,500 | $  4 | $  0 | $  22,504 |
|   EDCP | 0 | 0 | 0 | 0 | 0 |
| M Ka | | | | | |
|   T ft/401(k) SERP Benef | 0 | 0 | 0 | 0 | 0 |
|   EDCP | 0 | 0 | 0 | 0 | 0 |
| M Bos om | | | | | |
|   T ft/401(k) SERP Benef | 0 | 64,375 | 16,812 | 0 | 291,582 |
|   EDCP | 0 | 0 | 0 | 0 | 0 |
| M Fede co | | | | | |
|   T ft/401(k) SERP Benef | 0 | 53,700 | (1,517) | 0 | 400,728 |
|   EDCP | 0 | 0 | 1,453 | 114,435 | 0 |
| M B se s | | | | | |
|   T ft/401(k) SERP Benef | 0 | 53,700 | 60,754 | 0 | 551,106 |
|   EDCP | 0 | 0 | 6,032 | 474,966 | 0 |

(1) The SERP does no allow fo employee con bu ons

(2) A o s epo ed efe co acc as de he T f 401(k) SERP Benef du ng 2010 These a ouns a e a so epo ed n he "All O he Compensa on" column n "Tab e 78  Summa y Compensa on Table  2010"

(3) A ouns epo ed ep esen he o a ne s and ea n ngs c ed ed o each Na ed Execu ve Off ce unde he Th f 401(k) SERP Be ef ta d t e EDCP du ng 2010 The c ed ed ne s a e fo defe a s de e EDCP fo 2010 was 4 25% T e ea e no above-ma e ea n ngs eflec ed n he column "Change n Pens on Value and Nonqual f ed Defe ed Compensa on Ea n ngs" n "Tab e 78  Su  y Compensa on Table  2010" fo Mess s Fede co a d B se s sce e EDCP e es a e was no above 120% of he long- e m fede al a e fo 2010

(4) Mess s Fede co a d B se s ece ved d s b o s Ma ch 2009, Dece be 2009, and May 2010 unde he new n-se vce d s o sc ed e d sc ssed e "Non-qual f ed Defe ed Compensa on  Execu ve Defe ed Compensa on Plan" sec on

(5) A ouns epo ed efe c he accu u a ed ba ances unde he Th f 401(k) SERP Benef fo each Na ed Execu ve Off ce and, fo Mess s Fede co a d B se s, accu u a ed ba ances unde t e EDCP U de t he Th f 401(k) SERP Benef , ma ch ng con bu on acc ua s ves mmed a e y, whe eas he bas c con bu on acc ua s e a ng o he bas c con bu on pa d o o 2008 a e safe-co ff ves ng of 100% a he end of f ve yea s and he acc ua s e a ng o he bas c co b o pa d 2008 a d a e yea s a e s bjec o f ve-yea g aded ves ng of 20% pe yea The agg ega e balances e above c a a e f y ves ed Howeve , based on e A g s 10, 2009 a d Oc o e 12, 2009 epo ts, espec ve y, Mess s Ha de an and Ka have no ece ved a bas c con bu on acc ua s me Fo a mo e de a led d scuss on of he ma ch ng con bu on acc ua s and bas c con bu on acc ua s, see "Suppe en a Execu ve Re e en Pa  Th f 401(k) SERP Benef " above

The follow ng 2009 Th f 401(k) SERP Benef acc ua a ouns w e e epo ed n he coun "All O he Compensa on" n he 2009 Summa y Compensa on Table as compensa on fo each Named Execu ve Off ce fo whom such acc ua s w e e made and epo ed du ng 2009, as fo ows (a) M Ha de an $0 ( ) M Ka $0; (c) M Bos o $92,500 a d (d) M Fede co $77,880 Based o M Ha de a a d M Ka 's e da e, ey w e no e g be fo Th f 401(k) SERP Be ef acc ua s See A en den No 2 o ou Fo m 10-K f ed o Ap 12, 2010 I add o , M B se s ad a Th f 401(k) SERP Be ef acc ua a o of $66,813 fo 2009, a o g s was no epo ed n he Summa y Compensa on Tab e because he was no a Named Execu ve Off ce fo 2009 In he 2008 Summa y Compensa on Tab e, he Th f 401(k) SERP Benef acc ua a ouns w e e epo ed n he coun n "All O he Compensa on" fo only one Named Execu ve Off ce fo whom such acc ua s w e e made and epo ed du ng 2008, as fo ows M Bos o $78,600 See A en den No 1 o ou Fo m 10-K f ed on Ap 30, 2009 In add o , M Fede co ad a Th f 401(k) SERP Be ef acc ua a o of $79,520 fo 2008, a d M B se s ad a Th f 401(k) SERP Benef acc ua a oun of $43,032 fo 2008, a t o g t ose we e no epo ed n he Summa y Compensa on Tab e because hey we e no Named Execu ve Off ce s fo 2008

## Potential Payments Upon Termination of Employment or Change-in-Control

We have entered into certain agreements and maintain certain plans that call for us to pay compensation to our Named Executive Officers in the event of a termination of employment with us  The compensation and benefits potentially payable to each Named Executive Officer if the officer had terminated his employment under various circumstances as of December 31, 2010 are described in the discussion and reported in the table below  For more information, see "Employment and Separation Agreements" below  FHFA reviewed the terms of the employment agreements for Messrs. Haldeman and Kari and approved the termination benefits set forth therein  The actual payment of such termination benefits is subject to FHFA review and approval.

We are not obligated to provide any additional compensation to our Named Executive Officers in connection with a change in control

Each of our Named Executive Officers is subject to a restrictive covenant agreement with us  Each agreement provides that the Named Executive Officer will not seek employment with one of our competitors for a specified period immediately following termination of employment, regardless of whether the executive's employment is terminated by the executive, by us, or by mutual agreement. The specified period is 24 months for Messrs. Haldeman and Kari and 12 months for Messrs. Bostrom, Federico, and Bisenius. During the 12 month period immediately following termination, each executive also agrees not to: (a) solicit or recruit any of our managerial employees; (b) compete against us in any of our business activities; or (c) make disparaging remarks about us. The agreement also provides for confidentiality of information that constitutes trade secrets or proprietary or other confidential information

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0975

Table of Contents

As of December 31, 2010, Messrs. Bostrom, Federico, and Bisenius had vested in their benefits under the Thrift/401(k) SERP Benefit and the Pension SERP Benefit, while Messrs Haldeman and Kari had not. The amounts presented in Table 84 do not include vested RSU or stock option awards, vested balances in the Thrift/401(k) SERP Benefit or vested benefits in the Pension SERP Benefit as of December 31, 2010, because such vesting was not in connection with a termination or change in control Amounts shown in the tables also do not include certain items available to all employees generally upon a termination event

For RSUs, the value shown in the tables is calculated on a grant by grant basis by multiplying the number of unvested RSUs by the closing price of our common stock on December 31, 2010 No value is included in the tables for stock options because the exercise prices for all such options held by Named Executive Officers are substantially higher than the closing price of our common stock on December 3, 20 0

### Potential Payments to Current Named Executive Officers

The Executive Compensation Program addresses the treatment of Semi Monthly Base Salary, Deferred Base Salary, and the Target Incentive Opportunity upon various termination events In order to be eligible to receive any portion of a Target Incentive Opportunity installment payment, a Covered Officer must have been employed for a minimum of four whole calendar months during the performance year to which the award applies.

Additionally, none of the Covered Officers are guaranteed termination benefits upon any type of termination event other than death or disability and the actual payment of a termination benefit is subject to FHFA review and approval at the time of payment. The discussion that follows describes the termination benefits, if any, provided upon various types of termination events

- *Death.* Any earned but unpaid Deferred Base Salary or Target Incentive Opportunity installments will be paid as soon as administratively possible in the event of death If, at the time of death, the funding level has not been determined, the award will remain outstanding until such determination is made Payment will occur as soon as administratively possible following the determination of the funding level

- *Disability.* Treatment upon a Long Term Disability (as defined in the Executive Compensation Program) is the same as upon death, except that payment of any Deferred Base Salary will occur in accordance with the approved payment schedule and not as soon as administratively possible following termination of employment

- *Retirement.* Treatment upon an eligible Retirement (as defined in the Executive Compensation Program) is the same as upon Long Term Disability, except that only a pro rata portion of a Target Incentive Opportunity installment payment will occur based on the number of whole months worked in the performance year during which the officer retires No information is provided in Table 84 with respect to a termination of employment on account of a retirement because none of the Named Executive Officers was retirement eligible under the Executive Compensation Program as of December 3, 20 0

- *Voluntary or For Cause.* The Named Executive Officers are not entitled to any termination benefits in the event of a voluntary termination or a termination for cause and all earned but unpaid Deferred Base Salary and the unpaid portion of any outstanding Target Incentive Opportunity awards are forfeited

- *Involuntary Termination Without Cause.* The Named Executive Officers are not entitled to any termination benefits in the event of an involuntary termination without cause unless the Compensation Committee recommends that the Named Executive Officer receive termination benefits and the Committee's recommendation is approved by FHFA after consulting with Treasury, as appropriate. In determining whether to recommend payment of termination benefits and the amount of such benefits, the Compensation Committee will take into account one or more factors that it determines are relevant, including:

  - The facts and circumstances associated with the termination;

  - The performance and contributions of the Named Executive Officer during his or her tenure with us;

  - The amount of earned but unpaid Deferred Base Salary as of the date of termination; and

  - Our need to provide reasonable and competitive termination benefits in order to attract and retain high caliber executives during conservatorship.

The following table describes the potential payments as of December 3, 20 0 upon termination of the Named Executive Officers employed as of that date that results from death or disability. There are no payments or benefits payable upon termination of employment for other reasons or upon a change in control Additionally, Semi Monthly Base Salary is only payable through the date of death or a termination resulting from disability. The amounts presented in this table do not include vested RSU or stock option awards, vested balances in the Thrift/401(k) SERP Benefit, or vested benefits in the Pension SERP Benefit as of December 31, 2010, because such vesting was not in connection with a termination or change

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0976

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in control  Amounts shown in the tables also do not include  certain items available to all employees generally upon a  termination event  Additional information is provided in the  footnotes following the table

**Table 84     Potential Payments Upon Termination of Employment or  Change-in-Control as of December 31, 2010**

|  | Death | Disability |
|---|---|---|
| **Charles E. Haldeman, Jr.** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 2,912,450 | $ 2,912,450 |
| Incen ve Oppo un y(2 | 1,322,250 | 1,322,250 |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 183,092 |
| o a | $ 4,234,700 | $ 4,417,792 |
| **Ross J. Kari** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,558,005 | $ 1,558,005 |
| Incen ve Oppo un y(2 | 676,133 | 676,133 |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 53,208 |
| o a | $ 2,234,138 | $2,287,346 |
| **Robert E. Bostrom** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,277,720 | $ 1,277,720 |
| Incen ve Oppo un y(2 | 881,175 | 881,175 |
| Eq ty Awa ds( | 10,616 | 10,616 |
| o a | $ 2,169,511 | $ 2,169,511 |
| **Peter J. Federico** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,258,930 | $ 1,258,930 |
| Incen ve Oppo un y(2 | 809,232 | 809,232 |
| Eq ty Awa ds( | 10,671 | 10,671 |
| o a | $2,078,833 | $2,078,833 |
| **Donald J. Bisenius** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,033,450 | $ 1,033,450 |
| Incen ve Oppo un y(2 | 696,112 | 696,112 |
| Eq ty Awa ds( | 3,954 | 3,954 |
| o a | $ 1,733,516 | $ 1,733,516 |

(1) T e a o n  epo ed as Defe ed Base Sa a y s eq a o any ea ed   pa d Defe ed Base Sa a y, adj s ed o efec  e app oved fund ng eve
(2) T e a o  epo ed de I ce ve Oppo    y s eq a o e f s ns allmen assoc a ed w h he 2010 Ta ge Incen ve Oppo un y and he second ns a men  assoc a ed w h he 2009 Ta ge I ce ve Oppo    y Bo a o s ave bee adj s ed o efec  he app oved fund ng eve
(3) The amoun  epo ed unde Non-Qua f ed Pens on ef ec s he non-ves ed Pens on SERP Benef as of Dece be 31, 2010 U de  e e s of e SERP, a pa c pa co  es o acc s e se ve wh e d sab ed (as def ned n he SERP)
(4) The amoun  epo ed unde Equ y Awa ds ef ec s he mmed a e ves ng of he Named Execu ve Of ce 's ou s and ng RSU g an s n he even of dea h o d sab y Dea a so es s n he  ed a e se e en of he ou s and ng RSUs, wh a D sab  y es s n con nued ves ng of a g an s n acco dance w h he  ves  g sc ed e o  o ed  e awa d ag eemen as f e mina on had no occu ed The va ues shown we e ca cu a ed by  u p y ng he nu be of RSUs ha w con nue o ves by he c os ng p ce of ou common s ock on Dece be 31, 2010 ($ 305),  e as  ad ng day of  e yea

***Alternative Settlement Provisions for Equity Awards in the Event of Certain Terminations***

*RSUs*

The RSUs awarded to our employees, including our Named Executive  Officers, contain alternative settlement provisions in the event of certain terminations, as follows:

- ***Death.***  Immediate vesting and settlement  occurs in the event of death

- ***Disability and Retirement.***  In the event of disability, normal retirement, or a retirement other than a  normal retirement (all as defined in the 2004 Employee Plan), RSUs will vest immediately and will be settled in accordance  with the vesting schedule outlined in the award agreement as if termination had not occurred  This treatment is subject to the  executive's signing an agreement containing certain restrictive covenants to protect our business interests  Violation of any of the covenants results in the forfeiture of unsettled shares and the requirement to repay any after tax gain  realized from the settlement of shares within 12 months of  the forfeiture event

- ***Involuntary Termination Without Cause.***  In the event of an involuntary termination other than for cause, the Compensation Committee may, contingent on approval from FHFA, provide for RSUs to vest immediately and settle in accordance with the vesting schedule outlined in the award agreement as if termination had not  occurred. Under

<div align="center">322</div>

<div align="right">*Freddie Mac*</div>

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

interim guidance provided by FHFA, this provision is limited to awards scheduled to vest within 12 months of the executive's termination date

- **All Other Terminations.**  If the Named Executive Officer's employment is terminated for any reason other than those described above, all RSUs unvested as of the date of termination are forfeited

*Stock Options*

The stock options granted to our employees, including our Named Executive Officers, all of which were exercisable as of December 31, 2010, include alternative settlement provisions in the event of certain terminations which are similar to the provisions for RSUs, with the following modifications:

- **Death.**  The stock options remain exercisable for three years after the date of termination in the event of death

- **Disability.**  The stock options remain exercisable for the full balance of their term in the event of disability.

- **Retirement.**  In the event of retirement, as defined in the 2004 Employee Plan, stock options will remain exercisable for the full balance of their term, subject to the executive's signing an agreement containing the same restrictive covenants as described above for RSUs.

- **All Other Terminations.**  If the individual's employment is terminated for any reason other than those described above, the stock options remain exercisable for 90 days following termination

**Employment and Separation Agreements**

*Messrs. Haldeman and Kari*

The various agreements entered into in connection with the employment of Messrs. Haldeman and Kari are summarized above  See " Written Agreements Relating to Employment of CEO and CFO."

*Mr. Bostrom*

We have no continuing obligations under the letter agreement entered into with Mr. Bostrom in January 2006. The final installment of 3,000 shares pursuant to his sign on RSU award, as set forth in his letter agreement, vested on March 3, 2010.

The agreement pertaining to Mr Bostrom was filed as an exhibit to our Form  0 K/A filed on April 30, 2009

*Mr. Federico*

We do not have an employment agreement with Mr Federico

*Mr. Bisenius*

We do not have an employment agreement with Mr Bisenius

**Director Compensation**

After we entered conservatorship, FHFA approved compensation for Board members in the form of cash retainers only, paid on a quarterly basis  Under the terms of the Purchase Agreement, without Treasury's consent, we are prohibited from making stock grants to directors while this agreement remains in effect  We do not maintain any pension or retirement plans for directors  Non employee directors are reimbursed for reasonable out of pocket costs for attending each meeting of the Board or a  Board committee of which they are a member

The reasons for this shift toward compensation delivered entirely in cash were similar, in the case of director compensation, to some of those described above regarding the structural change in executive compensation (see "Overview   Executive Management Compensation Program Overview of Program Structure")  However, the considerations underlying director and executive compensation differed in one key respect  There is no provision in the director compensation program for pay that varies depending on business results. While such incentive compensation is deemed appropriate to give management strong incentives to devise and execute business plans and achieve positive financial results, it is viewed in the case of directors as inconsistent with their oversight role

Board compensation levels during conservatorship are shown in the table below

**Table 85     Board Compensation     2010 Non Employee Director Compensation Levels**

| Board Service | |
|---|---|
| Cash Compensa on | |
| Ann  a  Re a ne | $ 160,000 |
| Annua  Re a ne  fo  Non-Execu ve Cha  man | 290,000 |
| **Comm  ee Serv ce** (Cas ) | |
| Annua  Re a ne  fo  Aud   Comm  ee Cha | $ 25,000 |
| Annua  Re a ne  fo  Bus ness and R sk Co      ee Cha | 15,000 |
| Annua  Re a ne  fo  Comm  ee Cha  s (o he  han Aud  o  B s  ess a d R sk) | 10,000 |
| Annual Re a ne  fo  Aud   Comm  ee Membe s | 10,000 |

323                                                                 *Freddie Mac*

TREASURY-0978

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table summarizes the 20 0 compensation provided to  all persons who served as non employee directors during 20 0

**Table 86     2010 Director Compensation**

| Name | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings(4) | All Other Compensation(5) | Total |
|------|---|---|---|---|---|---|
| B  Alexande (1 | $  43,750 | $ | $ | $ | $  10,000 | $ 53,750 |
| R  G aube (2 (3 | 180,000 | | | | 10,000 | 190,000 |
| N  Re s  as(2 | 160,000 | | | | 4,500 | 164,500 |
| L  Bammann | 173,750 | | | | 2,500 | 176,250 |
| C  By d | 170,000 | | | | | 170,000 |
| L  H  sc | 160,000 | | | | 10,000 | 170,000 |
| J  Kosk  e | 290,000 | | | | 10,000 | 300,000 |
| C  Ly  c | 185,000 | | | | | 185,000 |
| C  Rose(1 | 34,348 | | | | | 34,348 |
| E  S  a ks, J | 170,000 | | | | 10,000 | 180,000 |
| A  W ll ams | 167,500 | | | | | 167,500 |

(1) The amoun  ep esen s pa  a  annua  compensa on fo  pe od se ved du ng 2010  Ms  A exande  chose no  o s and fo  e-elec on o  he Boa d n Ma ch 2010 and
    M  Rose jo ed he Boa d n Oc obe  2010  Because  he  e m na  on of he  se v ce as d ec o d d no  esu  f om dea h, d sab  y o  e emen , Ms  A exande
    fo fe ted 5,043   vested RSUs upon he  e m na on of se v ce

(2) A  Decembe  31, 2010, he agg ega e numbe  of common sha es   de y  g  e o s a d  g RSU awa ds  a  a o  ves ed a d  we e held by each non-employee
    d ec o  was as follows  M  G a e    2,970 s a es; a d M  Rets  as    2,970 s a es

(3) A  Decembe  31, 2010, he agg ega e numbe  of common sha es  unde  y ng ou s and ng op  on awa ds, exe c sab e and  unexe c sab e, he d by each non-emp oyee
    d ec o  was as fo ows  M  G a e    1,822 s a es

(4) We do no  have any pens on o  e  emen p ans fo ou  non-employee d ec o s

(5) In 2010,  he F edd e Mac Founda  on p ov ded a do a -fo -do a  ma ch  o e g b e o gan za  ons and ns  u ons, up  o an agg ega e amoun  of $10,000 pe d ec o  pe
    calenda  yea  Ma ch ng con  bu ons made o cha  es des gna ed by he  non-employee d  ec o s we e as follows  Ms  Alexande , $10,000; Ms Ba    , $2,500;
    M  G a e , $10,000; M  Kosk  e , $10,000; M  Rets  as, $4,500; M  H  sc , $10,000; a d M  S a ks, J  , $10,000

*Indemnification.*  We have also made arrangements to indemnify our directors against certain  liabilities which are similar to the terms on
which our executive officers are indemnified  For a description of such  terms, see "    Written Agreements Relating to Employment of CEO and
CFO."

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

### Security Ownership

Our only class of voting stock is our common stock. The  following table shows the beneficial ownership of our common  stock as of
February 15, 2011 by our current directors, our Named Executive Officers, all of our directors and executive  officers as a group, and holders of
more than 5% of our common stock  Beneficial ownership is determined in accordance with SEC  rules for computing the number of shares of
common stock beneficially owned by a person and the percentage ownership of  that person. As of February 15, 2011, each director and Named
Executive Officer, and all of our

TREASURY-0980

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

directors and executive officers as a group, owned less than 1% of our outstanding common stock  The information presented below  is based on information provided to us by the individuals or  entities specified in the table

**Table 87     Stock Ownership by Directors, Executive Officers, and Greater Than 5% Holders As of February 15, 2011**

| Name | Position | Common Stock Beneficially Owned Excluding Stock Options(1) | Stock Options Exercisable Within 60 Days of February 15, 2011 | Total Common Stock Beneficially Owned(1) |
|---|---|---|---|---|
| Linda B  Bammann | Director | 0 | 0 | 0 |
| Carolyn H  Byrd | Director | 0 | 0 | 0 |
| Robert R  Glauber | Director | 5,533(2 | 1,822 | 7,355 |
| Laurence E H sc | Director | 0 | 0 | 0 |
| John A  Koskinen | Director | 0 | 0 | 0 |
| C  sopher S  Ly c | Director | 0 | 0 | 0 |
| N co as P  Re s nas | Director | 7,791(3 | 0 | 7,791 |
| Cayo  S  Rose | Director | 0 | 0 | 0 |
| E  ge e B  S a ks, J | Director | 0 | 0 | 0 |
| An hony A  W ll ams | Director | 0 | 0 | 0 |
| C  a es E  Ha de a , J | Chief Executive Officer | 0 | 0 | 0 |
| Ross J  Ka | EVP   Chief Financial Officer | 0 | 0 | 0 |
| Robe  E  Bos om | EVP   General Counsel & Corporate Secretary | 66,095( | 11,950 | 78,045 |
| Pe e  J  Fede co | EVP   Investments & Capital Markets and Treasurer | 60,014( | 19,390 | 79,404 |
| Do a d J B se s | EVP   Single Family Credit Guarantee | 23,952(6 | 23,820 | 47,772 |
| *All directors and executive officers as a group  (25 persons)* | | 430,947(7 | 180,690 | 611,637 |

| 5% Holder | Common Stock Beneficially Owned | Percent of Class |
|---|---|---|
| U S  Depa  e  of  e T eas y<br>1500 Pennsylvania Avenue, NW<br>Was  g o , D C  20220 | Va ab e(8) | 79 9% |

(1)  Includes shares of s ock benef c a y owned as of Feb a y 15, 2011  A so   c  des RSUs ves  g w   60 days of Fe   a y 15, 2011  A RSU  ep ese  s a
    cond  onal con ac ual  gh  o ece ve one sha e of ou  common s ock a a spec f ed f  e da e  See "Exec  ve Compensa on   Compensa on D scuss on and
    Analys s" above fo  mo e nfo ma on
(2)  I c  des 5,322 RSUs a d 211 d v de  qu va e  s  RSUs
(3)  I c  des 3,896 RSUs a d 106 d v de  qu va e s o  RSUs
(4)  I c  des 21,447 RSUs
(5)  I c  des 20,991 RSUs
(6)  I c  des 7,238 RSUs
(7)  I c  des 131,675 RSUs a d 317 d v de  qu va e s o  RSUs
(8)  I  Sep e  2008, we ss ed to T eas  y a wa a t to p c ase, fo  one one-  housand h of a cen  ($0 00001) pe  sha e, sha es of ou  common s ock equa  o 79 9%
    of  he o a  numbe  of sha es of ou  co   on s ock ou s and ng on a fu y d  u ed bas s a  he  me he wa an  s exe c sed  The wa  an may be exe c sed n whole o n
    pa  a y e   Sep e  7, 2028  As of  e da e of  s f  g, T eas y as o exe c sed  e wa a   The  nfo ma on above assumes T easu y benef c ally
    owns no o he  sha es of ou  common s ock

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides information about our common stock  that may be issued upon the exercise of options, warrants, and  rights under our existing equity compensation plans at  December 31, 2010. Our stockholders have approved the ESPP, the 2004 Employee Plan, the 1995 Employee Plan, and the Directors' Plan  We suspended the operation of these plans following our entry into conservatorship and are no longer granting awards under such plans.

**Table 88     Common Stock**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants, and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensa on p ans app oved by s ockho de s | 4,603,736(1 | $   42 68(2 | 33,395,665(3 |
| Equity compensa on p ans no  app oved by s ockho de s | None | N/A | None |

(1)  I c  des 1,421,284 es  cted stock   ts a d s a es of  es  c ed s ock ss ed  de  e D ec o s' P a ,  e 1995  Employee Plan, and  he 2004 Employee Plan
(2)  Fo  p  pose of ca c  a  g s ao  ,  e s c eds ock    s a d s a es of  es  c ed s ock a e ass g ed a va  e of ze o
(3)  I c  des 25,962,031 s a es, 5,845,739 s a es, a d 1,587,895 s a es ava a  fo  ss a ce  de   e 2004 E p oyee P an,  e ESPP, and   e D ec o s' P an,
    espec ve y  No sha es a e ava  ab e fo  ssuance unde   he 1995 Employee Plan

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0981

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

**Policy Governing Related Person Transactions**

The Board has adopted a written policy governing the approval of related person transactions. This policy sets forth procedures for the review and approval or ratification of transactions involving related persons, which consist of any person who is, or was at any time since the beginning of our last completed fiscal year, a director, a director nominee, an executive officer, or an immediate family member of any of the foregoing persons.

Under authority delegated by the Board, the Executive Vice President General Counsel & Corporate Secretary, or the General Counsel, and the Nominating and Governance Committee (or its Chair under certain circumstances), each, an Authorized Approver, are responsible for applying the Related Person Transactions Policy. Transactions covered by the Related Person Transactions Policy consist of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships, in which: (a) the aggregate amount involved exceeded or is expected to exceed $ 20,000; (b) we were or are expected to be a participant; and (c) any related person had or will have a direct or indirect material interest The Related Person Transactions Policy includes a list of categories of transactions identified by the Board as having no significant potential for an actual conflict of interest or the appearance of a conflict or improper benefit to a related person, and thus not subject to review

Our Legal Division assesses whether any proposed transaction involving a related person is covered by the Related Person Transactions Policy If so, the transaction is reviewed by the appropriate Authorized Approver In consultation with the Chair of the Nominating and Governance Committee, the General Counsel may refer any proposed transaction to the Nominating and Governance Committee for review and approval.

If possible, approval of a related person transaction is obtained prior to the effectiveness or consummation of the transaction. If advance approval of a related person transaction by the appropriate Authorized Approver is not feasible or otherwise not obtained, then the transaction is considered promptly by the appropriate Authorized Approver to determine whether ratification is warranted

In determining whether to approve or ratify a related person transaction covered by the Related Person Transactions Policy, the appropriate Authorized Approver reviews and considers all relevant information which may include: (a) the nature of the related person's interest in the transaction; (b) the approximate total dollar value of, and extent of the related person's interest in, the transaction; (c) whether the transaction was or would be undertaken in the ordinary course of our business; (d) whether the transaction is proposed to be, or was, entered into on terms no less favorable to us than terms that could have been reached with an unrelated third party; and (e) the purpose, and potential benefits to us, of the transaction.

**Corporate Governance Guidelines**

In March 2010, the Board adopted our amended Corporate Governance Guidelines, which are available on our website at www freddiemac com/governance/pdf/gov_guidelines pdf

**Director Independence**

The non employee members of the Board evaluated the independence, as defined in both Sections 4 and 5 of our Guidelines and in Section 303A 02 of the NYSE Listed Company Manual, of the members of our Board who have served in 2011, each of whom also served on our Board in 2010, and Barbara T. Alexander, who served on our Board until March 20 0 In connection with that evaluation, the non employee members of the Board determined that all current members of our Board (other than Charles E. Haldeman, Jr., our CEO) and Ms Alexander were independent during their service in 20 0 and 2011. Mr. Haldeman is not considered an independent director because he is our CEO

The non employee members of the Board also concluded that all current members of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee are independent within the meaning of both Sections 4 and 5 of our Guidelines and Section 303A 02 of the NYSE Listed Company Manual The non employee members of the Board also determined that all current members of the Audit Committee are independent within the meaning of Ru e 0A-3 promulgated under the Exchange Act, and Section 303A 06 of the NYSE Listed Company Manual.

In determining the independence of each Board member, the non employee members of the Board reviewed the following categories or types of relationships, in addition to those specifically addressed by the standards contained in Section 5 of our Guidelines, to determine whether those relationships, either individually or when aggregated with other relationships, would constitute a material relationship between the Director and us that would impair a Director's judgment as a member of the Board or create the perception or appearance of such an impairment:

- *Board Memberships With For Profit Business Partners.* Mses. Alexander, Bammann, and Byrd and Messrs. Glauber, Lynch, Retsinas, and Rose serve as directors, and Mr. Shanks serves as a consultant to the board of directors, of other companies that engage or have engaged in business with us resulting in payments between us and such companies during the past three fiscal years. After considering the nature and extent of the specific relationship between each of

Source D RA HOM OAN MORTGAG CORP, 10 K, ebruary 24, 2011

TREASURY-0982

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

those companies and us, and the fact that these Board members are directors of these other companies rather than employees, the non employee members of the Board concluded that those business relationships did not constitute material relationships between any of the Directors and us that would impair their independence as our Directors

- *Board Memberships With Charitable Organizations To Which We Have Made Contributions.* Messrs. Koskinen, Retsinas, and Williams or their immediate family members serve or served as board members or trustees of charitable organizations that have received monetary contributions from us, the Freddie Mac Foundation or contributions by our executive officers within the last three fiscal years In each case, the total annual amount contributed was below the applicable threshold in our Guidelines that would require a specific determination that the Board member is independent in spite of the contribution The non employee members of the Board considered the contributions and the nature of the organizations and concluded that those relationships with charitable organizations did not constitute material relationships between any of the Directors and us that would impair their independence as our Directors

- *Board Members Who Are Executive Officers Or Employees Of Business Partners.* Mr. Williams was appointed as Executive Director of the Government Practice at The Corporate Executive Board Company in January 2010. CEB provides best practices research and analysis and executive education to corporations through memberships in various subject matter interest groups organized and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the development of CEB's state and local government service strategy and its existing federal government service offerings; and promoting future CEB services. In 2008, 2009, 2010 and 2011 year to date, we paid CEB $664,200, $362,100, $515,700 and $347,300, respectively, for memberships in certain of CEB's subject matter interest groups Currently, we are a member of 11 CEB groups, and in 2008, 2009 and 2010 we were a member of 23, 11 and 12 groups, respectively. The annual amounts of our payments to CEB in 2008 and 2009 were substantially below 2% of CEB's annual revenues for the applicable years and the 2010 and 2011 payments are substantially less than 2% of CEB's 2009 revenues (the latest year for which CEB revenue is publicly available). Therefore, under our Guidelines, those annual payments do not preclude the non employee members of the Board from concluding that Mr. Williams is independent. The non employee members of the Board considered those payments and the nature and extent of the relationship between us and CEB and concluded that this business relationship did not constitute a material relationship between Mr Williams and us that would impair Mr. Williams' independence as our Director

- *Financial Relationships with For Profit Business Partners.* Since 2005, Ms. Bammann has owned stock of JPMorgan Chase & Co., or JPMorgan In the aggregate, this stock represents a material portion of her net worth JPMorgan conducts significant business with Freddie Mac, including, among other things, as a single family and multifamily seller/servicer, as an underwriter of our debt and mortgage securities and as a capital markets counterparty. In order to eliminate any potential conflict of interest that might arise as a result of this stock ownership, Ms. Bammann has agreed to recuse herself from discussing and acting upon any matters that are to be considered by the full Board or any of the committees of which she is a member (including the Business and Risk Committee, which she chairs), and that relate directly to JPMorgan, and that therefore might affect the value of her JPMorgan stock The Audit Committee Chairman, in consultation with the Non Executive Chairman, will address any questions that may arise regarding whether recusal from a particular discussion or action is appropriate

In evaluating Ms Bammann's independence in light of her ownership of JPMorgan stock, the non employee members of the Board considered the nature and extent of Freddie Mac's business relationship with JPMorgan, actions previously undertaken by the Board through the Business and Risk Committee relating to JPMorgan and any potential impact that her stock ownership might have on her independent judgment as a Freddie Mac director, taking into account the recusal arrangement The non employee members of the Board concluded that Ms Bammann's recusal arrangement concerning JPMorgan would address any actual or potential conflicts of interest that might arise with respect to her ownership of JPMorgan stock Accordingly, the non employee members concluded that Ms. Bammann's ownership of JPMorgan stock does not constitute a material relationship between her and Freddie Mac that would impair her independence as a Freddie Mac Director

Mr Rose receives an annuity from JPMorgan in connection with his retirement from that firm in 2001. The amount of Mr. Rose's annuity is fixed and does not depend in any way on JPMorgan's revenues or profits In evaluating the impact of Mr Rose's annuity from JPMorgan on his independence, the non employee members of the Board considered the structure of the annuity, the amount of the annuity as a percentage of Mr Rose's annual adjusted gross income, and Freddie Mac's business relationship with JPMorgan. The non-emp oyee members of the Board were also informed that Mr Rose had agreed to recuse himself from discussing or acting upon any matter to be considered by our Board that could threaten the viability of JPMorgan The non employee members of the Board concluded that Mr Rose's JPMorgan annuity does not constitute a material relationship between him and Freddie Mac that would impair his independence as a Freddie Mac Director

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0983

Table of Contents

### Board Diversity

The Board identifies Director nominees or candidates when the Conservator has requested that the Board identify candidates for the Conservator to consider for election by written consent and when there is a vacancy on the Board, at which time the Board may exercise the authority delegated to it by the Conservator to fill such vacancies, subject to review by the Conservator

Our charter provides that our Board must at all times have at least one person from the homebuilding, mortgage lending, and rea estate industries, and at least one person from an organization representing community or consumer interests or one person who has demonstrated a career commitment to the provision of housing for low income households In addition, the examination guidance for corporate governance issued by FHFA provides that in identifying individuals for nomination for election to the Board, the Board should consider the knowledge of such individuals, as a group, in the areas of business, finance, accounting, risk management, public policy, mortgage lending, real estate, low income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to our safe and sound operation

In addition, our Guidelines explain that we seek to have a diversity of talent on the Board and that candidates are selected, in part, for their experience and expertise The Guidelines also explain that when identifying director nominees, the Nominating and Governance Committee considers, among other factors, our needs, the talents and skills then available on the Board, and, with respect to incumbent directors, their continued involvement in business and professional activities relevant to us, the skills and experience that should be represented on the Board, the availability of other individuals with desirable skills to join the Board, and the desire to maintain a diverse Board.

FHFA has also adopted a final rule regarding minority and women inclusion that became effective on January 28, 2011. The final rule implements section 1116 of HERA and requires us to, among other things, promote diversity and the inclusion of women, minorities, and individuals with disabilities in all activities, including in the election of directors

The Board does not currently have, but is developing, a formal policy with regard to the consideration of diversity in identifying director nominees and candidates, as required by these regulations

### Board Leadership Structure and Role in Risk Oversight

The positions of Chief Executive Officer and Non Executive Chairman of the Board are held by different individuals. This leadership structure was established by the Conservator when it appointed separate individuals to hold those two positions in September 2008 The examination guidance for corporate governance issued by FHFA provides that once separated, the functions of the Chief Executive Officer and the Non Executive Chairman of the Board should remain separated until such time as the Director of FHFA determines otherwise

The responsibility for risk oversight is shared by two committees of the Board, the Business and Risk Committee and the Audit Committee The Business and Risk Committee is responsible for assisting the Board in the oversight, on an enterprise wide basis, of our risk management framework, including management of credit risk (including counterparty risk), market risk (including interest rate and liquidity risk), model risk, operational risk, strategic risk, and reputation risk. The risk oversight responsibilities of the Audit Committee include reviewing: (a) management's guidelines and policies governing the processes for assessing and managing our risks; and (b) our major financial risk exposures (including but not limited to market, credit, and operational risks) and the steps management has taken to monitor and control such exposures

The Business and Risk Committee and the Audit Committee generally meet in joint session at least quarterly to carry out their respective risk oversight responsibilities on behalf of the Board The membership of those two committees collectively consists of all members of the Board except Messrs. Koskinen and Haldeman, who generally also attend the joint sessions Copies of the Charters of the Audit Committee and the Business and Risk Committee are available on our website at http://www.freddiemac.com/governance/bd_committees html

The Chief Enterprise Risk Officer reports regularly to the joint meetings of the Business and Risk Committee and the Audit Committee In addition, the Chief Credit Officer reports regularly to the Business and Risk Committee. The Chief Enterprise Risk Officer and the Chief Credit Officer also report to the full Board as appropriate

For a discussion of the Compensation Committee's conclusion that our compensation policies and practices do not create risks that are reasonably likely to have a material adverse effect on us, see "Executive Compensation   Compensation and Risk."

### Transactions with 5% Shareholders

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U S government Except for the transactions with Treasury discussed in "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS   Government Support for our Business" and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS   Housing Finance Agency Initiative" as well as in "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS,"

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0984

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us and the U S government since the beginning of 20 0

FHFA, as conservator, approved the Purchase Agreement and our administrative role in the MHA Program and the Memorandum of Understanding with Treasury, FHFA, and Fannie Mae (see "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS      Housing Finance Agency Initiative")  The remaining transactions described in the sections referenced  above did not require review and approval under any of our policies and procedures relating to transactions with related persons.

In addition, we are deemed related parties with Fannie Mae as  both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have  occurred in the normal course of business.

**Transactions with Institutions Related to Directors**

In the ordinary course of business, we were a party during 2010,  and expect to continue to be a party during 2011, to certain business transactions with institutions affiliated with members  of our Board  Management believes that the terms and conditions of the transactions were no more and no less favorable to us  than the terms of similar transactions with unaffiliated institutions to which we are, or expect to be, a party The only such transaction that is required to be  disclosed under SEC  rules is described below

Mr  Williams joined our Board in December 2008  In January of 20 0, he was appointed Executive Director of the Government  Practice at CEB. CEB provides best practices research and  analysis and executive education to corporations through  memberships in various subject matter interest groups organized  and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the development  of CEB's state and local government  service strategy and its existing federal government service  offerings; and promoting future CEB services. We purchased  memberships in certain membership groups, and paid CEB $515,700  and $347,300 for those memberships, in 2010 and 2011  year to date, respectively

This transaction was not required to be reviewed, approved or  ratified under our Related Person Transactions Policy because  the Board concluded that our business relationship with CEB did  not constitute a material relationship between Mr  Williams and us that would impair Mr. Williams' independence as our director

**Transactions with Institutions Related to Executive Officers**

Mr  Renzi joined us in April 20 0 as our Executive Vice President      Single Family Portfolio Management  Prior  to that, he served as the Chief Operating Officer of GMAC  Residential Capital and as President of GMAC Mortgage  Corporation  That employment ended in March 2010

GMAC Residential Capital, LLC, GMAC Mortgage Corporation, GMAC  Mortgage, LLC, and Residential Funding Company, LLC are all affiliated entities, and are now reorganized as subsidiaries of  Ally Financial Inc., or Ally.

GMAC Mortgage, LLC, is a seller/servicer that sold  mortgages to Freddie Mac with an aggregate unpaid principal  balance of approximately $15.7 billion in 2010, and mortgages  with an aggregate unpaid principal balance of  approximately $2.9 billion through February 10, 2011.

GMAC Mortgage, LLC and Residential Funding Company, LLC  (indirect subsidiaries of Ally) are seller/servicers that  together serviced and subserviced for an affiliated entity  approximately 3% of the single family loans in our single family  credit guarantee portfolio as of December 3 , 20 0  In 2011, these entities continue to service and subservice our  single family loans in our single family credit guarantee  portfolio, and we expect that selling and servicing relationship  to continue for full year 2011

In addition, in March 20 0, we entered into an agreement with  GMAC Mortgage, LLC and Residential Funding Company, LLC under  which they made a one time payment to us for the partial release  of repurchase obligations relating to loans sold to us prior to  January 1, 2009. The partial release does not affect any of  GMAC's potential repurchase obligations for loans sold to  us by GMAC after January 1, 2009.

Mr  Renzi's relationship with these entities included the  following:

- Mr  Renzi's 2010 performance metrics for his role as Chief  Operating Officer at GMAC Residential Capital, upon which  his 2010 year end performance assessment would have been  based, included maintaining superior servicing performance in  its relationship with each of Freddie Mac, Fannie Mae, and HUD.  Because Mr  Renzi left that employment in March 20 0 (prior to  his affiliation with us), he did not receive any bonus payments based on this performance metric

- At the time Mr  Renzi joined us, he was entitled to payments  from Ally consisting of unpaid deferred stock units  granted during his employment  At that time, the remaining  payments had an aggregate grant date value of

TREASURY-0985

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

approximately $860,000  The aggregate amount actually paid may  be either higher or lower based on Ally's value  Payments are scheduled to be made in cash semi monthly and will continue  through March 2015.

- Mr. Renzi also had outstanding RSUs when he left his  employment  The RSUs vested on December 31, 2010 with a  value at vesting of approximately $46,478. The vesting of the RSUs was based solely on the passage of time and was not related  to any performance metric relating to Mr  Renzi, Freddie Mac or Ally

In order to eliminate any potential conflict of interest,  Mr  Renzi, in his capacity as an employee of Freddie Mac,  has been, and will continue to be, recused from any transactions with or decisions relating to Ally or its affiliates through such time that he has received his last payment from Ally and its affiliates  Specifically, Mr  Renzi has been recused from serving as the final decision maker, and from influencing  final decisions, relating to: (a) any and all aspects of Freddie Mac's relationship with Ally or its affiliates pertaining to both performing and non performing loan servicing; (b) any other business transactions with Ally or its  affiliates or their status as a counterparty with us; or (c) reviews of Ally or its affiliates by our MHA   Compliance function under the Financial Agency  Agreement with Treasury

Mr  Renzi's relationship with Ally and its affiliates  was not required to be reviewed, approved or ratified under our  Related Person Transactions Policy because Mr. Renzi, in his capacity as an employee, is recused from any involvement in  transactions with or decisions relating to Ally and its affiliates for the period that he is receiving payments on  unpaid stock units. For this reason, Mr. Renzi does not  have a material interest in our relationship with Ally or its  affiliates

### Conservatorship Agreements

Treasury, FHFA, and the Board of Governors of the Federal Reserve System have taken a number of actions to support us  during conservatorship, including entering into the Purchase  Agreement, described in this Form 10 K  See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS    Purchase Agreement" and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS    Government Support for our Business," "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS    Related Parties as a Result of Conservatorship."

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

### Description of Fees

The following is a description of fees billed to us by  PricewaterhouseCoopers LLP, our independent public accountants, during 2010 and 2009.

**Table 89      Auditor Fees(1)**

| | 2010 | 2009 |
|---|---|---|
| A  d t Fees(2 | $29,484,646 | $ 42,913,079 |
| A  d  -Re a ed Fees(3 | 18,000 | 18,000 |
| Tax Fees( | 3,050,000 | 4,295,000 |
| All O he  Fees( | 148,805 | |
| o a | $ 32,701,451 | $47,226,079 |

(1) These fees  ep esen a  oun s b  ed w h n he des gna ed yea  a d   c  de e       sa  e  expe ses of $436,051 a d $1,295,736 fo  2010 and 2009,  espec ve y

(2) A d  fees   e de fees a d expe ses b  ed by P  cewa e houseCoope s n connec on w h he SAS 100 qua e ly ev ews of ou  n e m f nanc al nfo ma on and he  aud  of ou  annua  conso da ed f nanc a s a e en s  The aud   fees b  ed du ng 2010 nc ude fees and expenses  e a ed o  he 2009 ($8,839,260) a d 2010 ($20,645,386) a d ts  I  add t o  to  he amoun s shown above, app ox ma e y $8 1 m  on of fees and  e mbu sable expenses w ll be b lled n 2011 fo  he 2010 a d t  The aud  fees b  ed du ng 2009 nc ude fees and expe ses  e a ed to t e 2008 ($14,318,278) a d 2009 ($28,594,801) a d ts  A  d t fees of $95,542 a d $81,300 n 2010 a d 2009,  espec ve y, e a ed o  e F edd e Mac Fo  da o  a exc  ded beca se  ese fees a e  c  eda d pa d sepa a e y  y  e F edd e Mac Fo  da o

(3) The 2010 and 2009 aud  - ela ed fees  esul ed f om ou  Compe o  subsc p on ($18,000)  enewa s

(4) Tax fees n 2010 nc ude fees fo  p ov d ng non-aud   ax compl ance se v ces  ela ng to  he p epa a on of 2009  ax  e u ns, p epa a on of qua e  y es   ed ax  ca cu a ons and o he  se v ces  ela ng  o mp ov ng F edd e Mac's annual  ax comp ance p ocess ($3,000,000), as we  as p ocess documen a on se v ces and ax  accoun ng me hod change se v ces ($50,000)  The  ax fees b  ed n 2009 cove ed se v ces  e a ed  o  e p epa a on of 2008  ax  e  ns, p epa a on of qua e y  es ma ed  ax ca cu a ons and o he  se v ces  e a ed o  mp ov ng F edd e Mac's annual  ax compl ance p ocess ($3,500,000), as we  as p ocess documen a on se v ces a d tax accoun  ng me hod change se v ce ($295,000)  Add  ona y, $500,000 of he 2010  ax fees we e b  ed n 2009 upon execu on of he non-aud   ax compl ance se v ces engagemen  le e

(5) A  o he fees fo  2010 ($148,805)  esu ed f o   fees and expenses b lled by P  cewa e houseCoope s fo  he pe fo mance of adv so y se v ces  ela ed o managemen 's  e organ za on of ou  F nance D v s on

### Approval of Independent Auditor Services and Fees

As provided in its charter, the Audit Committee appoints, subject to FHFA approval, our independent public accounting firm and reviews the scope of the annual audit and pre approves,  subject (as required) to FHFA approval, all audit and non audit services permitted under applicable law to be performed by the  independent public accounting firm

The Sarbanes Oxley Act and related rules adopted by the SEC  require that all services provided to companies subject to the  reporting requirements of the Exchange Act by their independent auditors be pre approved by their audit committee or by  authorized members of the committee, with certain exceptions  The Audit Committee's charter requires that the Audit

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                 Powered by Morningstar® Document Research℠
The information contained herein may be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0986

Table of Contents

Committee pre approve any audit services, and any non audit services permitted under applicable law, to be performed by our independent auditors (or to designate one or more members of the Audit Committee to pre approve such services and report such pre approval to the Audit Committee)

Audit services that are within the scope of an auditor's engagement approved by the Audit Committee prior to the performance of those services are deemed pre approved and do not require separate pre approval Audit services not within the scope of an Audit Committee approved engagement, as well as permissible non audit services, must be separately pre approved by the Audit Committee

When the Audit Committee pre approves a service, the Audit Committee typically sets a dollar limit for such service Management endeavors to obtain pre approval of the Audit Committee, or of the Chairman of the Audit Committee (when the Chairman for the Audit Committee has been delegated such authority), before it incurs fees exceeding the dollar limit If the Chairman of the Audit Committee approves the increase, the Chairman will report such approval at the Audit Committee's next scheduled meeting

The pre approval procedure is administered by our senior financial management, which reports throughout the year to the Audit Committee The Audit Committee pre approved all audit, audit related, tax, and other services performed in 2009 and 20 0

<div align="center">33</div>

*Freddie Mac*

---

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)  Documents filed as part of this report:

  (1)    Consolidated Financial Statements

    The consolidated financial statements required to be filed in  this annual report on Form   0 K are included in Part II, Item 8

  (2)    Financial Statement Schedules

    None

  (3)    Exhibits

    An Exhibit Index has been filed as part of this annual report on  Form   0 K beginning on page E    and is incorporated herein by reference

TREASURY-0988

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

Federal Home Loan Mortgage Corporation

By:   /s/  Charles E. Haldeman, Jr.
            Charles E. Haldeman, Jr.
            Chief Executive Officer

Date: February 24, 2011

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated

| Signature | | Date |
|---|---|---|
| /s/  John A  Kosk nen<br>John A  Kosk nen | No -Exec t ve C a    a  of  e Boa d | February 24, 20 |
| /s/  Cha  es E  Ha deman, J<br>Cha  es E  Ha deman, J | Ch ef Execu  ve Off ce<br>(P  nc pa  Execu  ve Off ce ) | February 24, 20 |
| /s/  Ross J  Ka<br>Ross J  Ka | Execu  ve V ce P es den    Ch ef F nanc a  Off ce<br>(P  nc pal F nanc al Off ce ) | February 24, 20 |
| /s/  Robert D  Ma   o x<br>Robe t D  Ma   o x | Se   o  V ce P es de t   Co po ate Co t o e  d<br>P  nc pa  Accoun ng Off ce  (P  nc pa  Accoun ng Off ce ) | February 24, 20 |
| /s/  L nda B  Bammann*<br>L  da B  Ba    a | D  ec o | February 24, 20 |
| /s/  Ca o yn H  Byrd*<br>Ca o y  H  Byrd | D  ec o | February 24, 20 |
| /s/  Robert R  G auber*<br>Robe t R  G aube | D  ec o | February 24, 20 |
| /s/  Lau ence E  H  sch*<br>La   ce E H  sc | D  ec o | February 24, 20 |
| /s/  Chr stopher S  Lynch*<br>Ch stophe  S  Lynch | D  ec o | February 24, 20 |
| /s/  N co as P  Rets nas*<br>N colas P  Re s  as | D  ec o | February 24, 20 |
| /s/  C ayton S  Rose*<br>C ay o  S  Rose | D  ec o | February 24, 20 |
| /s/  Eugene B  Shanks, Jr *<br>Eugene B  Shanks, Jr | D  ec o | February 24, 20 |
| /s/  Anthony A  W   ams*<br>Anthony A  W   a  s | D  ec o | February 24, 20 |

*By: /s/  Ross J  Kari
        Ross J  Kari
        Attorney in Fact

333                                                                                      *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

# GLOSSARY

The Glossary includes acronyms and defined terms that are used throughout this Form 10 K

**1995 Employee Plan**     1995 Stock Compensation Plan, as amended

**2004 Employee Plan**     2004 Stock Compensation Plan, as amended and restated June 6, 2008

**Agency securities**     Generally refers to mortgage related securities issued by the GSEs or government agencies

**Alt A loan**     Although there is no universally accepted definition of Alt A, many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both  In determining our Alt A exposure on loans underlying our single family credit guarantee portfolio, we classified mortgage loans as Alt A if the lender that delivers them to us classified the loans as Alt A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt A  In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as an Alt A mortgage in this Form  0 K and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt A loan  As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred  For non agency mortgage related securities that are backed by Alt A loans, we categorize our investments in non agency mortgage related securities as Alt A if the securities were identified as such based on information provided to us when we entered into these transactions

**AMT**     Alternative Minimum Tax

**AOCI**     Accumulated other comprehensive income (loss), net of taxes

**ARM**     Adjustable rate mortgage     A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Board**     Board of Directors

**BPS**     Basis points     One one hundredth of 1%  This term is commonly used to quote the yields of debt instruments or movements in interest rates

**Cash and other investments portfolio**     Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non mo tgage related securities

**CD&A**     Compensation Discussion and Analysis

**CEB**     The Corporate Executive Board Company

**CEO**     Chief Executive Officer

**CFO**     Chief Financial Officer

**Charter**     The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS**     Commercial mortgage backed security     A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one to four family residential real estate  Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties  Military housing revenue bonds are included as CMBS within investments related disclosures. We have not identified CMBS as either subprime or Alt A securities

**CME**     Freddie Mac Capital Markets Execution_Sm_     A multifamily mortgage initiative in which we purchase loans pre designated for securitization through an Other Guarantee Transaction.

**Conforming loan/Conforming jumbo loan/Conforming loan limit**     A conventional single family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single family mortgage loans we are permitted by law to purchase or securitize

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0990

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The conforming loan limit is determined annually based on  changes in FHFA's housing price index  Any decreases in the housing price index are accumulated and used to offset any  future increases in the housing price index so that conforming  loan limits do not decrease from year to year  Since 2006, the base conforming loan limit for a one  family residence has been  set at $417,000 with higher limits in certain  "high cost" areas

Beginning in 2008, the conforming loan limits were increased for  mortgages originated in certain "high cost" areas  above the conforming loan limits. In addition, conforming loan limits for certain high  cost areas were increased temporarily  (up to $729,250 for a one  family residence). Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB  exceeding $417,000 as conforming jumbo loans

**Conservator**    The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac

**Convexity**    A measure of how much a financial  instrument's duration changes as interest rates change

**Core spread income**    Refers to a fair value estimate of the net current period accrual of income from the  spread between mortgage related investments and debt, calculated on an option  adjusted basis.

**Covered Officer**    Those executives in the following positions, each of whom are compensated pursuant to  the Executive Management Compensation Program: (a) Chief Executive Officer; (b) Chief Operating Officer; (c) Chief Financial Officer; (d) all Executive Vice Presidents; and (e) all Senior Vice Presidents  Each of the Named Executive Officers is a Covered Officer

**Credit enhancement**    Any number of different financial arrangements that are designed to reduce credit risk  by partially or fully compensating an investor in the event of certain financial losses  Examples of credit enhancements  include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees

**Credit losses**    Consists of charge offs, net of recoveries, and REO operations income (expense)

**Deed in lieu of foreclosure**    An alternative to foreclosure in which the borrower voluntarily conveys title to  the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower)  in full satisfaction of the mortgage indebtedness

**Delinquency**    A failure to make timely payments of principal or interest on a mortgage loan  For single family  mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans,  we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process  of foreclosure

**Derivative**    A financial instrument whose value depends upon the characteristics and value of an underlying  financial asset or index, such as a security or commodity price,  interest or currency rates, or other financial indices

**Directors' Plan**    1995 Directors' Stock Compensation Plan, as amended  and restated

**Dodd Frank Act**    Dodd Frank Wall Street Reform and Consumer Protection Act

**DSCR**    Debt Service Coverage Ratio    An indicator of future credit performance for multifamily loans  The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured  property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more likely a multifamily  borrower will be able to continue servicing its mortgage  obligation

**Duration**    The weighted average maturity of a  financial instrument's cash flows. Duration is used as a  measure of a financial instrument's price sensitivity to changes in interest rates

**Duration gap**    A measure of the difference between the estimated durations of our interest rate sensitive  assets and liabilities  We present the duration gap of our financial instruments in units expressed as months. A duration  gap of zero implies that the change in value of our interest  rate sensitive assets from an instantaneous change in interest  rates would be expected to be accompanied by an equal and  offsetting change in the value of our debt and derivatives, thus  leaving the net fair value of equity unchanged

**EDCP**    Executive Deferred Compensation Plan

**Effective rent**    The average rent paid by the tenant over the term of a lease  Does not include discounts for  concessions, or premiums, such as for non standard lease terms

335                                                                                               *Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ESPP**   Employee Stock Purchase Plan

**Euribor**   Euro Interbank Offered Rate

**EVP**   Executive Vice President

**Exchange Act**   Securities and Exchange Act of 1934, as amended

**Executive Compensation Program**   Executive Management Compensation Program, as amended and restated

**Fannie Mae**   Federal National Mortgage Association

**FASB**   Financial Accounting Standards Board

**FDIC**   Federal Deposit Insurance Corporation

**Federal Reserve**   Board of Governors of the Federal Reserve System

**FHA**   Federal Housing Administration

**FHFA**   Federal Housing Finance Agency   FHFA is an independent agency of the U S  government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the  FHLBs.

**FHLB**   Federal Home Loan Bank

**FICO score**   A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used  credit scores today  FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a  lower likelihood of credit default

**Fixed rate mortgage**   Refers to a mortgage originated at a specific rate of interest that remains constant  over the life of the loan

**Foreclosure alternative**   A workout option pursued when a home retention action is not successful or not  possible  A foreclosure alternative is either a short sale or deed in lieu of foreclosure

**Foreclosure transfer**   Refers to our completion of a transaction provided for by the foreclosure laws of the  applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and  title to the property is transferred to us or to a third party  State foreclosure laws commonly refer to such transactions as  foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or  all of the mortgage debt

**Freddie Mac mortgage related securities**   Securities we issue and guarantee, including PCs, REMICs and  Other Structured Securities, and Other Guarantee Transactions.

**GAAP**   Generally accepted accounting principles

**Ginnie Mae**   Government National Mortgage Association

**GSE Act**   The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the  Reform Act

**GSEs**   Government sponsored enterprises   Refers to certain legal entities created  by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee**   The fee that we receive for guaranteeing the payment of principal and interest to mortgage  security investors.

**Guidelines**   Corporate Governance Guidelines, as revised

**HAFA**   Home Affordable Foreclosures Alternative program   In 2009, the Treasury Department introduced  the HAFA program to provide an option for HAMP eligible homeowners who are unable to keep their homes  The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010

**HAMP**   Home Affordable Modification Program   Refers to the effort under the MHA Program  whereby the U S  government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and  keep their homes through mortgage modifications

**HERA**   The Housing and Economic Recovery Act of 2008

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0992

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**HFA**   State or local Housing Finance Agency

**HUD**   U.S. Department of Housing and Urban Development   Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs  Under the Reform Act, FHFA now has general regulato y authority over us, though HUD still has authority over Freddie Mac with respect to fair lending

**Implied volatility**   A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates  A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options based derivatives, while an increase in implied volatility generally has the opposite effect

**Interest only loan**   A mortgage loan that allows the borrower to pay only interest (either fixed rate or adjustable rate) for a fixed period of time before principal amortization payments are required to begin  After the end of the interest only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan

**IRS**   Internal Revenue Service

**LIBOR**   London Interbank Offered Rate

**LIHTC partnerships**   Low income housing tax credit partnerships   Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses

**Liquidation preference**   Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $ 0 billion  The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement  In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock  We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio**   Loan to value ratio   The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage  Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high  compared to loans with lower LTV ratios  We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien)

**MBA**   Mortgage Bankers Association of America

**MD&A**   Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program**   Making Home Affordable Program   Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009  The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes: (a) the Home Affordable Refinance Program, which gives eligible homeowners with loans owned or guaranteed by Freddie Mac or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments; and (b) HAMP.

**Monolines**   Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**Mortgage assets**   Refers to both mortgage loans and the mortgage related securities we hold in our mortgage related investments portfolio

**Mortgage related investments portfolio**   Our investment portfolio, which consists principally of mortgage related securities and single family and multifamily mortgage loans  Our mortgage related investments portfolio under the Purchase Agreement is determined without giving effect to any change in accounting standards related to transfers of financial assets and consolidation of VIEs or any similar accounting standard. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0993

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage to debt OAS**    The net OAS between the mortgage and agency debt sectors  This is an important  factor in determining the expected level of net interest yield on a new mortgage asset  Higher mortgage to debt OAS means that  a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund  the purchase of the asset and, therefore, a higher net interest  yield  Mo tgage to debt OAS tends to be higher when there is  weak demand for mortgage assets and lower when there is strong  demand for mortgage assets

**MRA**    Matter requiring attention

**Multifamily mortgage**    A mortgage loan secured by a property with five or more residential rental units

**Multifamily mortgage portfolio**    Consists of multifamily mortgage loans held by us on our consolidated  balance sheets as well as those underlying non consolidated Freddie Mac mortgage related securities, and other guarantee  commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative

**NASD**    National Association of Securities Dealers

**Net worth**    The amount by which our total assets exceed our total liabilities as reflected on our  consolidated balance sheets prepared in conformity with GAAP

**NIBP**    New Issue Bond Program

**NPV**    Net present value

**NYSE**    New York Stock Exchange

**OAS**    Option adjusted spread    An estimate of the incremental yield spread between a particular  financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes  consideration of potential variability in the instrument's cash flows resulting from any options embedded in the  instrument, such as prepayment options.

**Option ARM loan**    Mortgage loans that permit a variety of repayment options, including minimum, interest only,  fully amortizing 30-year and fully amortizing 15 year payments  The minimum payment alternative for option ARM loans  allows the borrower to make monthly payments that may be less than the interest accrued for the period  The unpaid interest,  known as negative amortization, is added to the principal  balance of the loan, which increases the outstanding loan balance  For our non agency mortgage related securities that are  backed by option ARM loans, we categorize securities as option  ARM if the securities were identified as such based on  information provided to us when we entered into these transactions  We have not identified option ARM securities as either subprime or Alt A securities

**OTC**    Over the counter

**Other guarantee commitments**    Mortgage related assets held by third parties for which we provide our guarantee  without our securitization of the related assets

**Other Guarantee Transactions**    Transactions in which third parties transfer non Freddie Mac mortgage related  securities to trusts specifically created for the purpose of issuing mortgage related securities, or certificates, in the  Other Guarantee Transactions.

**PCs**    Participation Certificates    Securities that we issue as part of a securitization  transaction  Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust  and issue PCs from that trust. The PCs are generally transferred  to the seller of the mortgage loans in consideration of the  loans or are sold to third party investors if we purchased the  mortgage loans for cash

**Pension Plan**    Employees' Pension Plan

**Pension SERP Benefit**    The component of the SERP that relates to the Pension Plan

**Primary mortgage market**    The market where lenders originate mortgage loans and lend funds to borrowers  We do not lend money directly to homeowners, and do not participate  in this market.

**PMVS**    Portfolio Market Value Sensitivity    Our primary interest rate risk  measurement  PMVS measures are estimates of the amount of average potential pre tax loss in the market value of our net  assets due to parallel (PMVS L) and non parallel (PMVS YC) changes in LIBOR

338                                                                 *Freddie Mac*

Table of Contents

**Purchase Agreement / Senior Preferred Stock Purchase Agreement**    An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009

**QSPE**    Qualifying Special Purpose Entity    A term used within the former accounting standards on transfers and servicing of financial assets to describe a particular trust or other legal vehicle that was demonstrably distinct from the transferor, had significantly limited permitted activities and could only hold certain types of assets, such as passive financial assets. Prior to January 1, 2010, the securitization trusts that were used for the administration of cash remittances received on the underlying assets of our PCs and REMICs and Other Structured Securities were QSPEs and, as such, they were not consolidated.

**Recorded Investment**    The dollar amount of a loan or security recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write downs of the investment  For mortgage loans, direct write downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase

**Reform Act**    The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**REIT**    Real estate investment trust    To maintain REIT status under the Internal Revenue Code, a REIT must distribute 90% of its taxable earnings to shareholders annually  During the second quarter of 2010, our majority owned REIT subsidiaries were eliminated via a merger transaction.

**Related Persons Transaction Policy**    Written policy governing the approval of related person transactions

**Relief refinance mortgage**    A single family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesm initiative  This initiative is our implementation of the Home Affordable Refinance Program for our loans  Although the Home Affordable Refinance Program is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios below 80% to participate

**REMIC**    Real Estate Mortgage Investment Conduit    A type of multiclass mortgage related security that divides the cash flows (principal and interest) of the underlying mortgage related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**)    Single and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage related assets  REMICs and Other Structured Securities that are single class securities pass through the cash flows (principal and interest) on the underlying mortgage related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs

**REO**    Real estate owned    Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure

**ROA**    Return on assets

**RSU**    Restricted stock unit

**S&P**    Standard & Poor's

**SD**    Significant deficiencies

**SEC**    Securities and Exchange Commission

**Secondary mortgage market**    A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage related securities  We participate in the secondary mortgage market by purchasing mortgage loans and mortgage related securities for investment and by issuing guaranteed mortgage related securities, principally PCs

**Senior preferred stock**    The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-0995

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Seriously delinquent**    Single family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers

**SERP**    Supplemental Executive Retirement Plan

**Short sale**    Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness

**Single family credit guarantee portfolio**    Consists of unsecuritized single family loans, single family loans held by consolidated trusts, and single family loans underlying non consolidated Other Guarantee Transactions and covered by other guarantee commitments  Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative

**Single family mortgage**    A mortgage loan secured by a property containing four or fewer residential dwelling units

**Spread**    The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips**    Mortgage pass through securities created by separating the principal and interest payments on a pool of mortgage loans  A principal only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages  An interest only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime**    Participants in the mortgage market may characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime  Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime  The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income  While we have not historically characterized the loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk  Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain securities collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into  We also categorize our investments in non agency mo tgage-re ated securities as subprime if they were identified as such based on information provided to us when we entered into these transactions

**SVP**    Senior Vice President

**Swaption**    An option contract to enter into an interest rate swap  In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date

**TBA**    To be announced

**TCLFP**    Temporary Credit and Liquidity Facility Program

**TDC**    Total direct compensation

**TDR**    Troubled debt restructuring    A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties

**Thrift/401(k) SERP Benefit**    The component of the SERP that relates to the Thrift/401(k) Savings Plan.

**TIO**    Target Incentive Opportunity

**Total comprehensive income (loss)**    Consists of net income (loss) plus changes in: (a) the unrealized gains and losses on available for sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans

**Total mortgage portfolio**    Includes mortgage loans and mortgage related securities held on our consolidated balance sheets as well as the balances of our non consolidated issued and guaranteed single class and multiclass securities, and other mortgage related financial guarantees issued to third parties

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-0996

Table of Contents

**Treasury**    U.S. Department of the Treasury

**UPB**    Unpaid principal balance

**USDA**    U S  Department of Agriculture

**VA**    U.S. Department of Veteran Affairs

**VIE**    Variable Interest Entity    A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to rece ve the entity's expected residual returns

**Warrant**    Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase  Agreement  The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of  shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise

**Workout, or loan workout**    A workout is either: (a) a home retention action, which is either a loan  modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale  or a deed in lieu of foreclosure

**Yield curve**    A graphical display of the relationship between yields and maturity dates for bonds of the  same credit quality  The slope of the yield curve is an important factor in determining the level of net interest yield  on a new mortgage asset, both initially and over time  For example, if a mortgage asset is purchased when the yield curve  is inverted, with short term rates higher than long term rates,  our net interest yield on the asset will tend to be lower initially and then increase over time  Likewise, if a mortgage  asset is purchased when the yield curve is steep, with short term rates lower than long term rates, our net interest  yield on the asset will tend to be higher initially and then  decrease over time

34

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# EXHIBIT INDEX

**Exhibi  No.**

3.1   Federal Home Loan Mortgage Corporation Act ( 2 U S C  §1451 et seq.), as amended through July 21, 2010  (incorporated by reference to Exhibit 3   to the Registrant's Quarterly Report on Form  0 Q for the quarterly period ended June 30, 2010, as filed on August 9, 2010)

3.2   Bylaws of the Federal Home Loan Mortgage Corporation, as amended  and restated July   , 20  0 (incorporated by reference to Exhibit 3   to the Registrant's Current Report on Form 8 K as filed on June 7, 2010)

4.1   Eighth Amended and Restated Certificate of Designation, Powers,  Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock (no par value per share) dated September 10, 2008 (incorporated by reference to Exhibit 4   to the Registrant's Current Report on Form 8 K as filed on September 11, 2008)

4.2   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non  Cumulative Preferred Stock (par value $1.00 per share), dated April 23, 1996 (incorporated by reference to Exhibit 4 2 to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4 3   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.81% Non Cumulative Preferred Stock  (par value $1.00 per share), dated October 27, 1997 (incorporated by reference to Exhibit 4 3 to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4 4   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5% Non Cumulative Preferred Stock (par  value $1.00 per share), dated March 23, 1998 (incorporated by reference to Exhibit 4 4 to the Registrant's Registration Statement on Form 10 as filed on July 18,  2008)

4.5   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.1% Non Cumulative Preferred Stock (par  value $1.00 per share), dated September 23, 1998 (incorporated by reference to Exhibit 4 5 to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4.6   Amended and Restated Certificate of Creation, Designation,  Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non  Cumulative Preferred Stock (par value $1 00 per share), dated September 29, 1998 (incorporated by reference  to Exhibit 4 6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)

4.7   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.3% Non Cumulative Preferred Stock (par  value $1.00 per share), dated October 28, 1998  (incorporated by reference to Exhibit 4 7 to the Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4.8   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.1% Non Cumulative Preferred Stock (par  value $1.00 per share), dated March 19, 1999 (incorporated by reference to Exhibit 4 8 to the Registrant's Registration Statement on Form 10 as filed on July 18,  2008)

4.9   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.79% Non Cumulative Preferred Stock  (par value $1.00 per share), dated July 21, 1999  (incorporated by reference to Exhibit 4 9 to the Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4 10   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated November 5, 1999 (incorporated by reference to Exhibit  0 to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4.11   Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated January 26, 2001 (incorporated by reference to Exhibit 4   to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

4.12   Certificate of Creation, Designation, Powers,  Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 2001 (incorporated by reference to Exhibit 4  2 to the  Registrant's Registration Statement on Form  0 as filed on July 18, 2008)

E                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Exhibi No.**

4 13    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.81% Non Cumulative Preferred Stock  (par value $1.00 per share), dated March 23, 2001  (incorporated by reference to Exhibit 4   3 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4 14    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated May 30, 2001  (incorporated by reference to Exhibit   4   4 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.15    Certificate of Creation, Designation, Powers,  Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 6% Non Cumulative Preferred Stock (par  value $1.00 per share), dated May 30, 2001 (incorporated by reference to Exhibit 4   5 to the Registrant's Registration Statement on Form 10 as filed on July 18,  2008)

4.16    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.7% Non Cumulative Preferred Stock (par  value $1 00 per share), dated October 30, 2001  (incorporated by reference to Exhibit 4   6 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.17    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.81% Non Cumulative Preferred Stock  (par value $1.00 per share), dated January 29, 2002  (incorporated by reference to Exhibit 4   7 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.18    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Rate, Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 17, 2006 (incorporated by reference to Exhibit 4   8 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.19    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 6 42% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated July 17, 2006  (incorporated by reference to Exhibit 4   9 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4 20    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5 9% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated October 16, 2006  (incorporated by reference to Exhibit 4 20 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.21    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.57% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated January 16, 2007  (incorporated by reference to Exhibit 4 2   to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.22    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 5.66% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated April 16, 2007  (incorporated by reference to Exhibit 4 22 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4 23    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 6 02% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated July 24, 2007  (incorporated by reference to Exhibit 4 23 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4 24    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of 6.55% Non Cumulative Perpetual Preferred  Stock (par value $1.00 per share), dated September 28, 2007  (incorporated by reference to Exhibit 4 24 to the  Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

4.25    Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Fixed to Floating Rate Non Cumulative  Perpetual Preferred Stock (par value $1 00 per share), dated December 4, 2007 (incorporated by reference to  Exhibit 4 25 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)

E 2                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Exhibit No.**

| | |
|---|---|
| 4.26 | Certificate of Creation, Designation, Powers, Preferences,  Rights, Privileges, Qualifications, Limitations, Restrictions,  Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (par value $1.00 per share), dated  September 7, 2008 (incorporated by reference to  Exhibit 4 2 to the Registrant's Current Report on Form 8 K as filed on September 11, 2008) |
| 4.27 | Federal Home Loan Mortgage Corporation Global Debt Facility  Agreement, dated February 24, 2010 (incorporated by  reference to Exhibit 4  to the Registrant's Quarterly Report on Form   0 Q for the quarterly period ended March 31, 2010, as filed on May 5, 2010) |
| 0.1 | Federal Home Loan Mortgage Corporation 2004 Stock Compensation  Plan (as amended and restated as of June 6, 2008) (incorporated by reference to Exhibit   0   to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0.2 | First Amendment to the Federal Home Loan Mortgage Corporation  2004 Stock Compensation Plan (incorporated by reference to Exhibit   0 2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0 3 | Second Amendment to the Federal Home Loan Mortgage Corporation  2004 Stock Compensation Plan (incorporated by reference to Exhibit   0 4 to the Registrant's Quarterly Report on Form   0 Q for the quarterly period ended June 30, 2009, as filed on August 7, 2009)† |
| 0 4 | Form of Nonqualified Stock Option Agreement for executive  officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4,  2005 but prior to January 1, 2006 (incorporated by  reference to Exhibit   0 3 to the Registrant's Registration Statement on Form 10 as filed on July 18,  2008)† |
| 0.5 | Form of Nonqualified Stock Option Agreement for executive  officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after January 1,  2006 (incorporated by reference to Exhibit   0 4 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0.6 | Form of Restricted Stock Units Agreement for executive officers  under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4, 2005  (incorporated by reference to Exhibit   0 5 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0.7 | Form of Restricted Stock Units Agreement for executive officers  under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for supplemental bonus awards on March 7,  2008 (incorporated by reference to Exhibit   0 6 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0.8 | Form of Performance Restricted Stock Units Agreement for executive  officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on  March 29, 2007 (incorporated by reference to  Exhibit   0 7 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0.9 | Form of Performance Restricted Stock Units Agreement for executive  officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on  March 7, 2008 (incorporated by reference to Exhibit   0 8 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0 10 | Federal Home Loan Mortgage Corporation Global Amendment to  Affected Stock Options under Nonqualified Stock Option Agreements and Separate Dividend Equivalent Rights, effective  December 3  , 2005 (incorporated by reference to Exhibit   0 9 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0.11 | Federal Home Loan Mortgage Corporation Amendment to Restricted  Stock Units Agreements and Performance Restricted Stock Units Agreements, dated December 3  , 2008 (incorporated by  reference to Exhibit   0  0 to the Registrant's Annual Report on Form   0 K for the fiscal year ended December 31, 2008, as filed on  March 11, 2009)† |
| 0.12 | Federal Home Loan Mortgage Corporation 1995 Stock Compensation  Plan (incorporated by reference to Exhibit   0  0 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0 13 | First Amendment to the Federal Home Loan Mortgage Corporation  1995 Stock Compensation Plan (incorporated by reference to Exhibit   0     to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0 14 | Second Amendment to the Federal Home Loan Mortgage Corporation  1995 Stock Compensation Plan (incorporated by reference to Exhibit   0   2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |

E-3                                                                                              *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Exhibit No.

0.15   Third Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 0 3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)†

0.16   Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 0 4 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0.17   Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 0 5 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0.18   Federal Home Loan Mortgage Corporation Employee Stock Purchase Plan (as amended and restated as of January 1, 2005) (incorporated by reference to Exhibit 0 6 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0.19   Federal Home Loan Mortgage Corporation 995 Directors' Stock Compensation Plan (as amended and restated June 8, 2007) (incorporated by reference to Exhibit 0 7 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0 20   Form of Nonqualified Stock Option Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 0 20 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0.21   Form of Restricted Stock Units Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 0 23 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0.22   Form of Restricted Stock Units Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards since 2006 (incorporated by reference to Exhibit 0 24 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0 23   Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 0 25 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0 24   First Amendment to the Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 0 27 to the Registrant's Annual Report on Form 0 K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)†

0.25   Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 0 28 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)†

0.26   First Amendment to the Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January , 2008) (incorporated by reference to Exhibit 10 6 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended September 30, 2008, as filed on November 14, 2008)†

0.27   2009 Officer Short Term Incentive Program (incorporated by reference to Exhibit 0 30 to the Registrant's Annual Report on Form 0 K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)†

0.28   2009 Long Term Incentive Award Program, as amended (incorporated by reference to Exhibit 0 5 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended June 30, 2009, as filed on August 7, 2009)†

0.29   Forms of award agreements under 2009 Long Term Incentive Award Program (incorporated by reference to Exhibit 0 6 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended June 30, 2009, as filed on August 7, 2009)†

0 30   20 0 Vice President and Non Officer Long Term Incentive Award Program (incorporated by reference to Exhibit 0 3 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended June 30, 2009, as filed on August 9, 2010)†

0 31   Officer Severance Policy, dated January 24, 2011†

0 32   Federal Home Loan Mortgage Corporation Severance Plan (as restated and amended effective January 1, 1997) (incorporated by reference to Exhibit 0 3 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

0 33   First Amendment to the Federal Home Loan Mortgage Corporation Severance Plan (incorporated by reference to Exhibit 0 32 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)†

<div align="center">E-4</div>

<div align="right">*Freddie Mac*</div>

Source  D RA HOM  OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-1001

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibi  No.

| 0 34 | Federal Home Loan Mortgage Corporation Supplemental Executive  Retirement Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit   0 33 to the Registrant's Registration  Statement on Form   0 as filed on July 18, 2008)† |
|---|---|
| 0.35 | First Amendment to the Federal Home Loan Mortgage Corporation  Supplemental Executive Retirement Plan (As Amended and Restated January 1, 2008) (incorporated by reference to Exhibit   0 38 to the Registrant's Annual Report on Form   0 K for the fiscal year ended December 31, 2009, as filed on  February 24, 2010)† |
| 0.36 | Federal Home Loan Mortgage Corporation Long Term Disability Plan (incorporated by reference to Exhibit   0 34 to the Registrant's Registration Statement on Form   0 as filed on July 18, 2008)† |
| 0 37 | First Amendment to the Federal Home Loan Mortgage Corporation Long Term Disability Plan (incorporated by reference to Exhibit   0 35 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0 38 | Second Amendment to the Federal Home Loan Mortgage Corporation  Long Term Disability Plan (incorporated by reference to Exhibit   0 36 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0.39 | FHFA Conservatorship Retention Program, Executive Vice President and Senior Vice President, Parameters Document, September 2008 (incorporated by reference to Exhibit   0 4 to the Registrant's Quarterly Report on Form   0 Q for the quarterly period ended September 30, 2008, as filed on  November 14, 2008)† |
| 0 40 | Form of cash retention award for executive officers for awards  in September 2008 (incorporated by reference to Exhibit 10 7 to the Registrant's Quarterly Report on Form   0 Q for the quarterly period ended September 30, 2008, as filed  on November 14, 2008)† |
| 0 41 | Executive Management Compensation Program (as amended and  restated as of October    , 20 0) (incorporated by reference to Exhibit   0  to the Registrant's Current Report on Form 8 K, as filed on October 13, 2010)† |
| 0 42 | Federal Home Loan Mortgage Corporation Mandatory Executive  Deferred Base Salary Plan, Effective as of January 1, 2009 (incorporated by reference to Exhibit   0 45 to the Registrant's Annual Report on Form   0 K for the fiscal year ended December 31, 2009, as filed on  February 24, 2010)† |
| 0 43 | Executive Management Compensation Recapture Policy (incorporated  by reference to Exhibit   0 4 to the Registrant's Current Report on Form 8 K, as filed on December 24, 2009)† |
| 0 44 | Memorandum Agreement, dated July 20, 2009, between Freddie Mac and Charles E  Haldeman, Jr  (incorporated by reference to Exhibit   0  to the Registrant's Current Report on Form 8 K, as filed on July 21, 2009)† |
| 0.45 | Recapture Agreement, dated July 2 , 2009, between Freddie Mac and Charles E  Haldeman, Jr  (incorporated by reference to Exhibit   2 to the Registrant's Current Report on Form 8 K, as filed on July 21, 2009)† |
| 0.46 | Restrictive Covenant and Confidentiality Agreement, dated July 21, 2009, between Freddie Mac and Charles E.  Haldeman, Jr. (incorporated by reference to Exhibit   0 7 to the Registrant's Quarterly Report on Form   0 Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |
| 0 47 | Memorandum Agreement, dated September 24, 2009, between  Freddie Mac and Ross J  Kari (incorporated by reference to Exhibit   0    to the Registrant's Current Report on Form 8 K, as filed on September 24, 2009)† |
| 0 48 | Recapture Agreement, dated September 24, 2009, between Freddie Mac and Ross J  Kari (incorporated by reference to Exhibit   2 to the Registrant's Current Report on Form 8 K, as filed on September 24, 2009)† |
| 0.49 | Restrictive Covenant and Confidentiality Agreement, dated  September 24, 2009, between Freddie Mac and Ross J  Kari (incorporated by reference to Exhibit   0 9 to the  Registrant's Quarterly Report on Form   0 Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |
| 0.50 | Letter Agreement dated January 24, 2006 between Freddie Mac  and Robert E  Bostrom (incorporated by reference to Exhibit   0 7  to the Registrant's Annual Report on Form 10 K/A, as filed on April 30, 2009)† |
| 0.51 | Form of Restrictive Covenant and Confidentiality Agreement  between Freddie Mac and Robert E  Bostrom (incorporated by reference to Exhibit   0  0 to the Registrant's Quarterly Report on Form    0 Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |
| 0.52 | _Restrictive Covenant and Confidentiality Agreement, dated March 1, 2006, between  Freddie Mac and Peter J  Federico†_ |
| 0.53 | _Restrictive Covenant and Confidentiality Agreement, dated March 11, 2001, between  Freddie Mac and Donald J. Bisenius†_ |

E 5                                                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| Exhibit No. | |
|---|---|
| 0.54 | Description of non employee director compensation (incorporated by reference to Exhibit 0 to the Registrant's Current Report on Form 8 K as filed on December 23, 2008)† |
| 0.55 | PC Master Trust Agreement dated November 29, 2010 |
| 0.56 | Form of Indemnification Agreement between the Federal Home Loan Mortgage Corporation and executive officers and outside Directors (incorporated by reference to Exhibit 0 2 to the Registrant's Current Report on Form 8 K as filed on December 23, 2008)† |
| 0.57 | Consent of Defendant Federal Home Loan Mortgage Corporation with the Securities and Exchange Commission, dated September 18, 2007 (incorporated by reference to Exhibit 0 65 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 0.58 | Letters, dated September 1, 2005, setting forth an agreement between Freddie Mac and FHFA (incorporated by reference to Exhibit 10 67 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 0.59 | Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 0 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended September 30, 2008, as filed on November 14, 2008) |
| 0.60 | Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 0 6 to the Registrant's Quarterly Report on Form 0 Q for the period ended March 31, 2009, as filed on May 12, 2009) |
| 0.61 | Second Amendment dated as of December 24, 2009, to the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 0 to the Registrant's Current Report on Form 8 K, as filed on December 29, 2009) |
| 0.62 | Warrant to Purchase Common Stock, dated September 7, 2008 (incorporated by reference to Exhibit 0 2 to the Registrant's Current Report on Form 8 K as filed on September 11, 2008) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 24 | Powers of Attorney |
| 3 .1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 3a 4(a) |
| 3 .2 | Certification of Executive Vice President Chief Financial Officer pursuant to Securities Exchange Act Rule 3a 4(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |

\* The SEC f e numbe fo he Reg s an 's Reg s a on S a e en on Fo 10, Annua Repo s on Fo m 10-K, Qua e y Repo s on orm 10-Q a d C e Repo s o Fo m 8-K s 000-53330

† Th s exh b s a managemen con ac o compensa o y plan o a angemen

E 6                                                                                                                    *Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K, ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.31



CORPORATE POLICY

**Subject:** Severance   Officers

**Policy Number:** 3 254.1

**Control Point:** Director Employee Relations

**Approval Authority:** SVP Human Resources

**Signature:** Keith Green [Signature on original kept by Legal]

---

### Summary of this Policy

This policy sets forth the eligibility requirements and amount of *Severance Pay* available to *Eligible Officers*  Defined terms are italicized  Please see Appendix A for definitions  Further details can be found in Freddie Mac's Severance Plan <u>Summary Plan Description</u>.

### I. Under what circumstances is *Severance Pay* provided?

Freddie Mac provides *Severance Pay* to a *Severance Eligible Officer* pursuant to the terms of this Policy In addition, in the event an employee becomes a *Severance Eligible Officer* as a result of a *Reduction in Force*, Freddie Mac also provides *Notice Pay*, even if the *Severance Eligible Officer* does not sign an agreement and release of claims

A *Severance Eligible Officer's* employment is terminated as of the *Separation Date*  Such former officer's eligibility to receive any benefit from or to continue participation in other plans maintained by the company is governed by the terms and provisions of those plans.

In addition, the provision of *Severance Pay* to a *Severance Eligible Officer* is subject to the approval of Freddie Mac's regulator

### II. What procedures are followed to determine severance eligibility?

Business area management will submit to their respective Human Resources Business Partner ("HRBP") for review any proposed termination of employment (including any proposed voluntary separation that could result in *Severance Pay*) or proposed offer of *Comparable Employment* prior to discussing the same with the impacted officer  The Director of Employee Relations in the Human Resources Division determines whether the employee is a *Severance Eligible Officer*, and interprets and applies this policy.

Employee Relations, after consulting with the HRBP, the Legal Division, and possibly business area management, also determines whether a job position to be offered to an *Eligible Officer* is *Comparable Employment*. *Eligible Officers* will be evaluated for *Comparable Employment*, if at all, based on criteria including (but not limited to) their historical performance ratings and management's assessment of relative skills

After Employee Relations determines that the employee is a *Severance Eligible Officer*, business area management provides *Notice* to the *Severance Eligible Officer*  Business area management will give *Notice* in advance of the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 **CORPORATE POLICY**

We make home possible®

*Separation Date,* if at all, to the extent that advance notification is consistent with business circumstances or required by law

Business area management, after consulting with the HRBP, also establishes the *Separation Date* of a *Severance Eligible Officer.*

### III. What is required for a *Severance Eligible Officer* to receive *Severance Pay*?

As a condition of receiving *Severance Pay,* a *Severance Eligible Officer* must sign an agreement and release of claims  Freddie Mac has exclusive discretion to determine what terms will be included within the agreement and release of claims  Among other things, the agreement and release of claims may contain provisions related to the following:

- • Full release of claims
- • Non participation in claims against Freddie Mac
- • Notice of receipt of subpoenas
- • Treatment of confidential information
- • Non competition
- • Non solicitation of Freddie Mac employees
- • Notice of future employment
- • Return of Freddie Mac property
- • Non disparagement
- • Obligation to reasonably cooperate
- • Damages in the event of breach
- • Preclusion and/or restriction from future Freddie Mac employment

Business area management may require an *Eligible Officer* to provide services to Freddie Mac up to and including the *Separation Date* as a condition of receiving *Severance Pay* .

If a *Severance Eligible Officer* does not receive two weeks of advance *Notice* of his/her *Separation Date* from Freddie Mac, and does not execute an agreement and release of claims proffered by the company, then the officer will receive *Pay in Lieu of Notice* for the two week period following the date of *Notice,* and will receive no *Severance Pay* .

### IV. How long is the *Severance Period* of a *Severance Eligible Officer*?

The *Severance Period* of a *Severance Eligible Officer* is as specified in the Restrictive Covenant and Confidentiality Agreement between the  *Severance Eligible Officer* and Freddie Mac  If the *Severance Eligible Officer* is entitled to receive *Notice Pay,* then his/her *Severance Period* shall be the *Severance Period* specified in the Restrictive Covenant and Confidentiality Agreement , minus the number of days of  *Notice Pay* he/she is entitled to receive  In no event will a *Severance Eligible Officer* receive less than four weeks of *Severance Pay* in addition to *Notice Pay.*

Policy 3 254.1 dated January 24, 2011                                                                          2

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

**V. How does a *Severance Eligible Officer* receive his/her *Severance Pay*?**

A *Severance Eligible Officer* has the option of receiving his/her *Severance Pay* in periodic payments over the specified *Severance Period* coinciding with Freddie Mac's standard payroll procedures  Alternatively, the *Severance Eligible Officer* may receive his/her *Severance Pay* in a *Lump Sum*  If the *Severance Eligible Officer* elects periodic payments, he/she may be eligible to continue his/her participation in certain benefits plans at a reduced cost, in accordance with the terms of those plans

If a former officer receiving *Severance Pay* dies before receiving his/her entire *Severance Pay*, then Freddie Mac will pay the balance to the former employee's estate or personal representative

**VI. When does a *Severance Eligible Officer* have to elect *Lump Sum* or Periodic Payments?**

A *Severance Eligible Officer* must elect whether to receive his/her *Severance Pay* in a *Lump Sum* or in periodic payments by the date he/she signs the required agreement and release of claims  Failure to make an election upon execution of the agreement and release of claims will result in the *Severance Eligible Officer* receiving his/her *Severance Pay* in a *Lump Sum*.

**VII. When does *Severance Pay* begin?**

*Severance Pay* will be paid in accordance with the company's standard payroll practices, and will begin within 30 days after 1) the company's receipt of the *Severance Eligible Officer's* properly executed agreement and release of claims, 2) if applicable, expiration of the revocation period specified in the agreement and release of claims, and (3) (applicable only to *Specified Employees*) six months has elapsed since the *Separation Date*.

If the consideration period noted in the agreement and release of claims extends beyond the *Separation Date* and the company has not received the *Severance Eligible Officer's* properly executed agreement and release of claims as of the *Separation Date*, the company will place the *Severance Eligible Officer* on unpaid Leave of Absence until ( ) receipt of the properly signed agreement and release of claims or (2) the end of the consideration period (whichever comes first).

Failure by a *Severance Eligible Officer* to submit a properly executed agreement and release of claims within the time period specified in such agreement will result in the proffered agreement and release of claims being withdrawn by the company

**VIII. What happens to *Severance Pay* if the employee becomes re employed by Freddie Mac or renders services to Freddie Mac as a vendor or contract worker during the Severance Period?**

If a former officer receiving *Severance Pay* is re employed by Freddie Mac before the end of the *Severance Period*, or renders services to Freddie Mac as a vendor or contract worker during the Severance Period, the former officer will forfeit any remaining unpaid *Severance Pay*  If the former officer received his/her *Severance Pay* as a *Lump Sum*, and becomes re employed by Freddie Mac or renders services to Freddie Mac as a vendor or contract worker before the end of what would have been the *Severance Period*, Freddie Mac reserves the right to require that some or all of the *Severance Pay* be repaid as a condition of re employment or rendering services to Freddie Mac as a contract worker or vendor

Policy 3 254.1 dated January 24, 2011                                                                                                                3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



CORPORATE POLICY

## IX. Restriction on *Specified Employees*.

If a *Severance Eligible Officer* is a *Specified Employee*, then he/she will not begin receiving his/her *Severance Pay* until six (6) months following his/her *Separation Date*, consistent with Treas  Reg  § 1 409A 3(g)(2), or any successor thereto  If the  *Severance Eligible Officer* elected to receive his/her *Severance Pay* in periodic payments within the required election period, then he/she shall receive six months of  *Severance Pay* in a *Lump Sum* upon the expiration of the six  month wait period, and then will receive the balance of his/her  *Severance Pay* in periodic payments according to the company's standard payroll procedures

## X. Where can officers find additional information about Freddie Mac's severance plan?

Officers may find additional information about the company's severance plan in Freddie Mac's Severance Plan  Summary Plan Description.

## XI. Reservation of Rights

Freddie Mac reserves the right to amend or terminate this Policy or any of its provisions at any time for any reason in its sole discretion without giving rise to legal liability  Nothing in this Policy is intended nor shall be interpreted to create a contract of employment or alter the at will employment relationship that otherwise may exist between Freddie Mac and such employee, or otherwise limit the discretion of either Freddie Mac or such employee to terminate the employment relationship at any time for any reason

**Effective Date:** January 24, 2011

☐ **New**
☒ **Replaces** Policy 3 254.1 dated July 16, 2010
☒ Reviewed by Legal or Determined that No Legal Review Necessary

## Appendix A Definitions

### Comparable Employment

Comparable Employment will be assessed on a case by case basis  Exact criteria the company will use include each of the following, all of which must be met for the position to be deemed comparable

- The content of the job to which the employee may be assigned  To be comparable, the new position must require substantially the same skill set and technical knowledge

- The commuting distance associated with the new position  To be comparable, the new position must not increase the commuting distance for the employee by more than 50 miles each way, or increase the commuting distance for the employee such that the total commuting distance exceeds 90 miles each way

- To be comparable, the employee's base salary must not decrease by more than 10%

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-1007                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 **CORPORATE POLICY**

**Eligible Officer**

An employee who is appointed by Freddie Mac as an officer of the company

**Gross Misconduct**

The occurrence or existence of any of the following:

- Recurrent or flagrant insubordination related to core job duties and responsibilities;

- Stealing property belonging to Freddie Mac, another employee, or other theft in connection with employment;

- Committing fraud, including computer fraud;

- Willfully destroying property;

- Inflicting bodily harm on another employee, threatening another employee with a weapon, or conviction (including any plea of *nolo contendere*) of a crime;

- Committing harassment or retaliation;

- Engaging in discriminatory behavior or retaliation;

- Engaging in dishonesty, including failure to cooperate fully, promptly and truthfully in an investigation or failure to keep an investigation appropriately confidential;

- Recurring or habitual tardiness or absenteeism which has resulted in a written reprimand;

- Intentionally disclosing or intentionally misusing Confidential Information (as that term is defined in Freddie Mac policy, Code of Conduct, or applicable restrictive covenant and/or confidentiality agreement between the employee and Freddie Mac);

- Negligently disclosing or negligently misusing Confidential Information (as that term is defined in Freddie Mac policy, Code of Conduct, or applicable restrictive covenant and/or confidentiality agreement between the employee and Freddie Mac) resulting in a significant adverse impact on Freddie Mac or on the business of Freddie Mac; or

- A material breach of any provision of any written policy of Freddie Mac required by law or established to maintain compliance with applicable legal or regulatory requirements

**Loss of Confidence**

Determination by senior executive management in its sole discretion that it no longer maintains a high level of confidence in an *Eligible Officer's* decisions, judgment and/or conduct

**Lump Sum**

The payment to a *Severance Eligible Officer* of the entire amount of *Severance Pay* in the form of a single payment, minus lawful deductions (rather than periodic payments over the span of the *Severance Period*).

**Notice**

Oral or written communication from business area management or an HRBP to a *Severance Eligible Officer* about the termination of the officer's employment, *Separation Date*, terms of the proffered agreement and release of claims, and

Policy 3  254.1 dated January 24, 2011                                                                 5

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 **CORPORATE POLICY**

expectations concerning his/her continued provision of services to Freddie Mac during the period between the Notice and the *Separation Date*.

**Notice Pay**

The dollar amount of pay based on the number of days of continued pay required by applicable federal and/or state law upon triggering events, such as group layoffs that occur within a legally defined period of time  Laws that would trigger *Notice Pay* include, but are not limited to, the federal Worker Adjustment and Retraining Notification ("WARN") Act

**Pay in Lieu of Notice**

If a *Severance Eligible Officer* does not receive two weeks of advance *Notice* of his/her *Separation Date* from Freddie Mac, and does not execute an agreement and release of claims proffered by the company, then the employee will receive pay for the two week period following the date of *Notice*, and will receive no *Severance Pay*.

**Position Elimination**

Loss of job due to: (a) company reorganization or job abolishment; or (b) a skills gap, i e , the duties of an employee's position have changed recently and so significantly that the employee is no longer qualified to perform the redesigned job

**Reduction in Force**

An elimination of a certain minimum number of jobs that occurs within a defined time period and triggers a requirement to pay *Notice Pay*. Laws that would require *Notice Pay* include (but are not limited to) the federal WARN Act

**Senior Executive Officer**

An employee who is appointed by Freddie Mac to be employed in the position of Senior Vice President or above of the company

**Separation Date**

The last date on which a *Severance Eligible Officer* is considered an active employee with Freddie Mac; also known as the Termination Date

**Severance Eligible Officer**

An *Eligible Officer* whose position is eliminated due to a *Position Elimination*, *Reduction in Force*, or *Loss of Confidence*.

An *Eligible Officer* is not a *Severance Eligible Officer* if such employee:

- at the time of *Notice* is classified as a temporary employee pursuant to Policy 3 221, Worker Classifications (as may be amended, replaced or redesignated from time to time);

- is terminated for engaging in *Gross Misconduct*;

- is regularly scheduled to work fewer than twenty (20) hours per week as of his/her receipt of *Notice;*

- is on "Leave of Absence" status as defined in Policy 3 236, Other Excused Absences (as may be amended, replaced or redesignated from time to time) for thirty (30) or more calendar days as of his/her receipt of *Notice* unless otherwise provided by law;

Policy 3 254.1 dated January 24, 2011                                                                                                        6

TREASURY-1009

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 **CORPORATE POLICY**

- fails to provide services to Freddie Mac in accordance with the *Notice*;

- resigned employment as a result of a new assignment or reporting relationship;

- received a written offer of employment from a Successor, which is an entity that acquires (through consolidation, reorganization, transfer, sublease, assignment or otherwise) all or substantially all of the business or assets of any business unit of Freddie Mac, or an entity that contracts with Freddie Mac to perform activities of the business unit in which the employee is assigned contemporaneous with the commencement of the contractual relationship; or

- received a written offer of *Comparable Employment* from Freddie Mac

In addition, an *Eligible Officer* who serves as a Senior Executive Officer is not a *Severance Eligible Officer* unless the company's regulator approves payment of severance pay, and the amount thereof, to such Senior Executive Officer at the time of termination

**Severance Pay**

The dollar amount that will be paid to a *Severance Eligible Officer* pursuant to the terms of this Policy. *Severance Pay* is equal to the *Severance Eligible Officer's* base salary (not including items such as overtime, bonus, retention payments, and/or commissions) as of the *Separation Date* that would normally be paid over the length of time designated as the *Severance Period*, minus lawful deductions. Alternatively, *Severance Pay* may be paid in the form of a *Lump Sum*.

**Severance Period**

The length of the *Severance Period* is as specified in the Restrictive Covenant and Confidentiality Agreement between the *Severance Eligible Officer* and the company. The *Severance Period* begins the day following the *Separation Date*.

**Specified Employee**

A *Severance Eligible Officer* who is identified by Freddie Mac in its sole discretion as of the *Separation Date* as a "specified employee" as defined in Treas Reg. § 1.409A 1(i), or any successor thereto, and whose *Severance Pay* is determined by Freddie Mac to be subject to section 409A of the Internal Revenue Code

Policy 3 254.1 dated January 24, 2011                                                                                                    7

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.52**

## RESTRICTIVE COVENANT AND CONFIDENTIALITY AGREEMENT

In exchange for the mutual promises and consideration set forth below, this Restrictive Covenant and Confidentiality Agreement ("Agreement") is entered into by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company") and Peter Federico ("Executive"), effective as of March 1, 2006.

### I. Definitions

The following terms shall have the meanings indicated when used in this Agreement.

A. *Competitor*: The following entities, and their respective parents, successors, subsidiaries, and affiliates are competitors: (i) Fannie Mae (ii) all Federal Home Loan Banks (including the Office of Finance); and (iii) such other entities to which Executive and the Company may agree in writing from time to time.

B. *Confidential Information*: Information or materials in written, oral, magnetic, digital, computer, photographic, optical, electronic, or other form, whether now existing or developed or created during the period of Executive's employment with Freddie Mac, that constitutes trade secrets and/or proprietary or confidential information. This information includes, but is not limited to: (i) all information marked Proprietary or Confidential; (ii) information concerning the components, capabilities, and attributes of Freddie Mac's business plans, methods, and strategies; (iii) information relating to tactics, plans, or strategies concerning shareholders, investors, pricing, investment, marketing, sales, trading, funding, hedging, modeling, sales and risk management; (iv) financial or tax information and analyses, including but not limited to, information concerning Freddie Mac's capital structure and tax or financial planning; (v) confidential information about Freddie Mac's customers, borrowers, employees, or others; (vi) pricing and quoting information, policies, procedures, and practices; (vii) confidential customer lists; (viii) proprietary algorithms; (ix) confidential contract terms; (x) confidential information concerning Freddie Mac's policies, procedures, and practices or the way in which Freddie Mac does business; (xi) proprietary or confidential data bases, including their structure and content; (xii) proprietary Freddie Mac business software, including its design, specifications and documentation; (xiii) information about Freddie Mac products, programs, and services which has not yet been made public; (xiv) confidential information about Freddie Mac's dealings with third parties, including dealers, customers, vendors, and regulators; and/or (xv) confidential information belonging to third parties to which Executive received access in connection with Executive's employment with Freddie Mac. Confidential Information does not include general skills, experience, or knowledge acquired in connection with Executive's employment with Freddie Mac that otherwise are generally known to the public or within the industry or trade in which Freddie Mac operates.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Restrictive Covenant and Confidentiality Agreement for Peter Federico
Page 2 of 6

## II.  Non-Competition

Executive recognizes that as a result of Executive's employment with Freddie Mac, Executive has access to and knowledge of critically sensitive Confidential Information, the improper disclosure or use of which would result in grave competitive harm to Freddie Mac. Therefore, Executive agrees that during Executive's employment with Freddie Mac, and for the twelve (12) months immediately following termination of Executive's employment for any reason, Executive will not consider offers of employment from, seek or accept employment with, or otherwise directly or indirectly provide professional services to any Competitor. Executive acknowledges and agrees that this covenant has unique, substantial and immeasurable value to Freddie Mac, that Executive has sufficient skills to provide a livelihood for Executive while this covenant remains in force, and that this covenant will not interfere with Executive's ability to work consistent with Executive's experience, training and education. This non competition covenant applies regardless of whether Executive's employment is terminated by Executive, by Freddie Mac, or by a joint decision.

If Executive is a licensed lawyer, this non competition covenant shall be interpreted in a manner consistent with any rule applicable to a legal licensed professional in the jurisdiction(s) of Executive's licensure or registration that concerns the Executive's employment as counsel with, or provisions of legal services to, a Competitor.

## III.  Non-Solicitation and Non-Recruitment

During Executive's employment with Freddie Mac and for a period of twelve (12) months after Executive's termination date, Executive will not solicit or recruit, attempt to solicit or recruit or assist another in soliciting or recruiting any Freddie Mac managerial employee (including manager level, Director level, or officer level employee) with whom Executive worked, or any employee whom Executive directly or indirectly supervised at Freddie Mac, to leave the employee's employment with Freddie Mac for purposes of employment or for the rendering of professional services. This prohibition against solicitation does not apply if Freddie Mac has notified the employee being solicited that his/her employment with the Company will be terminated pursuant to a corporate reorganization or reduction in force.

If Executive is a licensed lawyer, this non solicitation covenant shall be interpreted in a manner consistent with any rule applicable to a licensed legal professional in the jurisdiction(s) of Executive's licensure or registration.

## IV.  Treatment of Confidential Information

A.  *Non Disclosure*. Executive recognizes that Freddie Mac is engaged in an extremely competitive business and that, in the course of performing Executive's job duties, Executive will have access to and gain knowledge about Confidential Information. Executive further recognizes the importance of carefully protecting this Confidential Information in order for Freddie Mac to compete successfully. Therefore, Executive agrees

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Restrictive Covenant and Confidentiality Agreement for Peter Federico
Page 3 of 6

that Executive will neither divulge Confidential Information to any persons, including to other Freddie Mac employees who do not have a Freddie Mac business related need to know, nor make use of the Confidential Information for the Executive's own benefit or for the benefit of anyone else other than Freddie Mac. Executive further agrees to take all reasonable precautions to prevent the disclosure of Confidential Information to unauthorized persons or entities, and to comply with all Company policies, procedures, and instructions regarding the treatment of such information.

B.  *Return of Materials*. Executive agrees that upon termination of Executive's employment with Freddie Mac for any reason whatsoever, Executive will deliver to Executive's immediate supervisor all tangible materials embodying Confidential Information, including, but not limited to, any documentation, records, listings, notes, files, data, sketches, memoranda, models, accounts, reference materials, samples, machine readable media, computer disks, tapes, and equipment which in any way relate to Confidential Information, whether developed by Executive or not. Executive further agrees not to retain any copies of any materials embodying Confidential Information.

C.  *Post Termination Obligations*. Executive agrees that after the termination of Executive's employment for any reason, Executive will not use in any way whatsoever, nor disclose any Confidential Information learned or obtained in connection with Executive's employment with Freddie Mac without first obtaining the written permission of the Vice President of Human Capital Management. Executive further agrees that, in order to assure the continued confidentiality of the Confidential Information, Freddie Mac may correspond with Executive's future employers to advise them generally of Executive's exposure to and knowledge of Confidential Information, and Executive's obligations and responsibilities regarding the Confidential Information. Executive understands and agrees that any such contact may include a request for assurance and confirmation from such employer(s) that Executive will not disclose Confidential Information to such employer(s), nor will such employer(s) permit any use whatsoever of the Confidential Information. To enable Freddie Mac to monitor compliance with the obligations imposed by this Agreement, Executive further agrees to inform in writing Freddie Mac's Executive Vice President of Human Resources of the identity of Executive's subsequent employer(s) and Executive's prospective job title and responsibilities prior to beginning employment. Executive agrees that this notice requirement shall remain in effect for twelve (12) months following the termination of Executive's Freddie Mac employment.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Restrictive Covenant and Confidentiality Agreement for Peter Federico
Page 4 of 6

D. *Ability to Enforce Agreement and Assist Government Investigations*. Nothing in this Agreement prohibits or otherwise restricts you from: (1) making any disclosure of information required by law; (2) assisting any regulatory or law enforcement agency or legislative body to the extent you maintain a legal right to do so notwithstanding this Agreement; (3) filing, testifying, participating in or otherwise assisting in a proceeding relating to the alleged violation of any federal, state, or local law, regulation, or rule, to the extent you maintain a legal right to do so notwithstanding this Agreement; or (4) filing, testifying, participating in or otherwise assisting the Securities and Exchange Commission or any other proper authority in a proceeding relating to allegations of fraud.

## V. Consideration Given to Executive

In exchange for Executive agreeing to be bound by this Agreement, Freddie Mac agrees to provide Executive with the following consideration, each of which itself is adequate for Executive's agreement to be bound by the provisions of this Agreement:

A. *Long Term Incentive Grant*. Executive will receive a 2006 long term incentive grant pursuant to the terms that the Compensation and Human Resources Committee of the Freddie Mac Board of Directors approved on or about March 3, 2006; and/or

B. *Employment*. Executive will be employed by Freddie Mac as Senior Vice President; and

*Additional Consideration*. If Executive currently is subject to another Restrictive Covenant and Confidentiality Agreement that provides for any additional consideration in the event of termination, this Agreement shall not negate such additional form of consideration.

## VI. Reservation of Rights

Executive agrees that nothing in this Agreement constitutes a contract or commitment by Freddie Mac to continue Executive's employment in any job position for any period of time, nor does anything in this Agreement limit in any way Freddie Mac's right to terminate Executive's employment at any time for any reason.

## VII. Previous Agreements

Except as otherwise stated herein, this Agreement supercedes all previous agreements between Executive and Freddie Mac which bear the title of "Confidentiality and Restrictive Covenant Agreement," and/or "Restrictive Covenant and Confidentiality Agreement."

## VIII. Enforcement

A. Executive acknowledges that Executive may be subject to discipline, up to and including termination of employment, for Executive's breach or threat of breach of any

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Restrictive Covenant and Confidentiality Agreement for Peter Federico
Page 5 of 6

provision of this Agreement.

B.   Executive agrees that irreparable injury will result to Freddie Mac's business interests in the event of breach or threatened breach of this Agreement, the full extent of Freddie Mac's damages will be impossible to ascertain, and monetary damages will not be an adequate remedy for Freddie Mac. Therefore, Executive agrees that in the event of a breach or threat of breach of any provision(s) of this Agreement, Freddie Mac, in addition to any other relief available, shall be entitled to temporary, preliminary, and permanent equitable relief to restrain any such breach or threat of breach by Executive and all persons acting for and/or in concert with Executive, without the necessity of posting bond or security, which Executive expressly waives.

C.   Executive agrees that each of Executive's obligations specified in this Agreement is a separate and independent covenant, and that all of Executive's obligations set forth herein shall survive any termination, for any reason, of Executive's Freddie Mac employment. To the extent that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, that provision shall be limited and enforced to the extent permitted by applicable law. Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid under applicable law, the validity of the remaining obligations will not be affected thereby and only the unenforceable or invalid obligation will be deemed not to be a part of this Agreement.

D.   This Agreement is governed by, and will be construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its or any other jurisdiction's conflict of law provisions. Executive agrees that any action related to or arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Virginia, and Executive hereby irrevocably consents to personal jurisdiction and venue in such court and to service of process by United States Mail or express courier service in any such action.

E.   If any dispute(s) arise(s) between Freddie Mac and Executive with respect to any matter which is the subject of this Agreement, the prevailing party in such dispute(s) shall be entitled to recover from the other party all of its costs and expenses, including its reasonable attorneys' fees.

**Executive has been advised to discuss all aspects of this Agreement with Executive's private attorney. Executive acknowledges that Executive has carefully read and understands the terms and provisions of this Agreement and that they are reasonable. Executive signs this Agreement voluntarily and accepts all obligations contained in this Agreement in exchange for the consideration to be given to Executive as outlined above, which Executive acknowledges is adequate and satisfactory, and which Executive further acknowledges Freddie Mac is not otherwise obligated to provide to Executive. Neither Freddie Mac nor its agents, representatives, Executives, officers or employees have made any representations to Executive concerning the terms or effects of this Agreement, other than those contained in this Agreement.**

Source   D RA HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

TREASURY-1015

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Restrictive Covenant and Confidentiality Agreement for Peter Federico
Page 6 of 6

By:   /s/ Peter J. Federico _____          Date:  March 17, 2006 _____

   Peter Federico

By:   /s/ Paul George _____          Date:  March 24, 2006 _____

   Paul George
   Executive Vice President   Human Resources

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          TREASURY-1016          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.53

## RESTRICTIVE COVENANT AND CONFIDENTIALITY AGREEMENT

In exchange for the mutual promises and consideration set forth below, this Restrictive Covenant and Confidentiality Agreement ("Agreement") is entered into by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company") and Donald J. Bisenius ("Executive"), effective as of this 11th day of March, 2001.

### I. Definitions

The following terms shall have the meanings indicated when used in this Agreement.

A. *Competitor*: The following entities, and their respective parents, successors, subsidiaries, and affiliates are competitors: (i) Fannie Mae (ii) all Federal Home Loan Banks (including the Office of Finance); and (iii) such other entities to which Executive and the Company may agree in writing from time to time.

B. *Confidential Information*: Information or materials in written, oral, magnetic, digital, computer, photographic, optical, electronic, or other form, whether now existing or developed or created during the period of Executive's employment with Freddie Mac, that constitutes trade secrets and/or proprietary or confidential information. This information includes, but is not limited to: (i) all information marked Proprietary or Confidential; (ii) information concerning the components, capabilities, and attributes of Freddie Mac's business plans, methods, and strategies; (iii) information relating to tactics, plans, or strategies concerning shareholders, investors, pricing, investment, marketing, sales, trading, funding, hedging, modeling, sales and risk management; (iv) financial or tax information and analyses, including but not limited to, information concerning Freddie Mac's capital structure and tax or financial planning; (v) confidential information about Freddie Mac's customers, borrowers, employees, or others; (vi) pricing and quoting information, policies, procedures, and practices; (vii) confidential customer lists; (viii) proprietary algorithms; (ix) confidential contract terms; (x) confidential information concerning Freddie Mac's policies, procedures, and practices or the way in which Freddie Mac does business; (xi) proprietary or confidential data bases, including their structure and content; (xii) proprietary Freddie Mac business software, including its design, specifications and documentation; (xiii) information about Freddie Mac products, programs, and services which has not yet been made public; (xiv) confidential information about Freddie Mac's dealings with third parties, including dealers, customers, vendors, and regulators; and/or (xv) confidential information belonging to third parties to which Executive received access in connection with Executive's employment with Freddie Mac. Confidential Information does not include general skills, experience, or knowledge acquired in connection with Executive's employment with Freddie Mac that otherwise are generally known to the public or within the industry or trade in which Freddie Mac operates.

C. *Severance*: Cash compensation paid pursuant to Freddie Mac's Severance Policy.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

2

D. *Severance Policy*: Freddie Mac Policy 3 254.1 (Severance    Officers), or any subsequent and superceding severance policy.

## II. Non-Competition

Executive recognizes that as a result of Executive's employment with Freddie Mac, Executive has access to and knowledge of critically sensitive Confidential Information, the improper disclosure or use of which would result in grave competitive harm to Freddie Mac. Therefore, Executive agrees that neither during Executive's employment with Freddie Mac, nor for the twelve (12) months immediately following termination of Executive's employment for any reason, will Executive consider offers of employment from, seek or accept employment with, or otherwise directly or indirectly provide professional services to any Competitor. Executive acknowledges and agrees that this covenant has unique, substantial and immeasurable value to Freddie Mac, that Executive has sufficient assets and skills to provide a livelihood for Executive while this covenant remains in force, and that this covenant will not interfere with Executive's ability to work consistent with Executive's experience, training and education. This non competition covenant applies regardless of whether Executive's employment is terminated by Executive, by Freddie Mac, or by a joint decision.

## III. Non-Solicitation

During Executive's employment with Freddie Mac and for a period of twelve (12) months after Executive's termination date, Executive will not solicit, attempt to solicit or assist another in soliciting any Freddie Mac managerial employee (including manager level, Executive level, or officer level employee) with whom Executive worked, or any employee whom Executive directly or indirectly supervised at Freddie Mac, to leave the employee's employment with Freddie Mac for purposes of employment or for the rendering of professional services. This prohibition against solicitation does not apply if Freddie Mac has notified the employee being solicited that his/her employment with the Company will be terminated pursuant to a corporate reorganization or reduction in force.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3

### IV.  Treatment of Confidential Information

A.  *Non Disclosure*. Executive recognizes that Freddie Mac is engaged in an extremely competitive business and  that, in the course of performing Executive's job duties,  Executive will have access to and gain knowledge about  Confidential Information. Executive further recognizes the  importance of carefully protecting this Confidential Information  in order for Freddie Mac to compete successfully. Therefore, Executive agrees that Executive will neither divulge  Confidential Information to any persons, including to other Freddie Mac employees who do not have a Freddie Mac  business related need to know, nor make use of the Confidential Information for the Executive's own benefit or for the  benefit of anyone else other than Freddie Mac. Executive further agrees to take all reasonable precautions to prevent the  disclosure of Confidential Information to unauthorized persons  or entities, and to comply with all Company policies,  procedures, and instructions regarding the treatment of such  information.

B.  *Return of Materials*. Executive agrees that upon termination of Executive's  employment with Freddie Mac  for any reason whatsoever, Executive will deliver to Executive's immediate supervisor all tangible materials  embodying Confidential Information, including, but not limited to, any documentation, records, listings, notes, files, data,  sketches, memoranda, models, accounts, reference materials, samples, machine readable media, computer disks, tapes, and  equipment which in any way relate to Confidential Information,  whether developed by Executive or not. Executive further agrees  not to retain any copies of any materials embodying Confidential  Information.

C.  *Post Termination Obligations*. Executive agrees that after the termination of Executive's employment  for any reason, Executive will not use in any way whatsoever, nor disclose any Confidential Information learned or obtained in  connection with Executive's employment with Freddie Mac without first obtaining the written permission of the Senior  Vice President of Human Resources of Freddie Mac. Executive  further agrees that, in order to assure the continued  confidentiality of the Confidential Information, Freddie Mac may  correspond with Executive's future employers to advise them  generally of Executive's exposure to and knowledge of Confidential Information, and Executive's obligations and  responsibilities regarding the Confidential Information. Executive understands and agrees that any such contact may  include a request for assurance and confirmation from such employer(s) that Executive will not disclose Confidential  Information to such employer(s), nor will such employer(s)  permit any use whatsoever of the Confidential Information. To  enable Freddie Mac to monitor compliance with the obligations  imposed by this Agreement, Executive further agrees to inform in  writing Freddie Mac's Senior Vice President of Human Resources of the identity of Executive's subsequent employer(s) and Executive's prospective job title and  responsibilities prior to beginning employment**.** Executive agrees that this notice requirement shall remain in effect for  twelve (12) months following the termination of Executive's Freddie Mac employment.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

4

### V.  Consideration Given to Executive

In exchange for agreeing to be employed by Freddie Mac on the terms, conditions, and restrictions stated in this Agreement, Freddie Mac will provide the Executive with the following consideration, each of which itself is adequate consideration for Executive's agreement to be bound by the provisions of this Agreement:

A.  *Twelve Month s Severance.* Executive acknowledges that under Freddie Mac's Severance Policy, Executive may be eligible to receive Severance upon termination of employment, the duration of which is within the discretion of Freddie Mac. In exchange for Executive agreeing to be bound by this Agreement, Freddie Mac agrees to provide Executive with Severance pursuant to the Severance Policy for a period of twelve (12) months following termination, provided the circumstances of the Executive's termination qualify for Severance under the Severance Policy. In the event that at the time of termination, Executive occupies a position that is an "Executive Officer" of Freddie Mac as Freddie Mac interprets that term to be defined in Section 1303(7) of the Federal Housing Enterprise Financial Safety and Soundness Act of 1992 and related administrative guidance, then Executive acknowledges that receipt of the twelve (12) months severance under this paragraph is contingent upon any legally required approval from the Office of Federal Housing Enterprise Oversight ("OFHEO"). If such approval is not received, then Executive will not be eligible for Severance. The twelve (12) month Severance guarantee provided by this Paragraph V(A) is in place of, and not in addition to, Severance to which Executive would otherwise be entitled under any other agreement between Executive and Freddie Mac.

B.  *Long Term Incentive Grant.* In exchange for Executive agreeing to be bound by this Agreement, Freddie Mac further agrees to provide Executive with a long term incentive grant as approved by the Human Resources Committee of the Freddie Mac Board of Directors on March 2, 2001. Executive's failure to execute and return this Agreement to Freddie Mac on or before March 30, 2001, will result in Executive's ineligibility for such long term incentive grant otherwise provided pursuant to this Paragraph V(B).

### VI.  Reservation of Rights

Executive agrees that nothing in this Agreement constitutes a contract or commitment by Freddie Mac to continue Executive's employment in any job position for any period of time, nor does anything in this Agreement limit in any way Freddie Mac's right to terminate Executive's employment at any time for any reason.

### VII.  Enforcement

A.  Executive acknowledges that Executive may be subject to discipline, up to and including termination of employment, for Executive's breach or threat of breach of any provision of this Agreement.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

5

B.  Executive agrees that irreparable injury will result to Freddie Mac's business interests in the event of breach or threatened breach of this Agreement, the full extent of Freddie Mac's damages will be impossible to ascertain, and monetary damages will not be an adequate remedy for Freddie Mac. Therefore, Executive agrees that in the event of a breach or threat of breach of any provision(s) of this Agreement, Freddie Mac, in addition to any other relief available, shall be entitled to temporary, preliminary, and permanent equitable relief to restrain any such breach or threat of breach by Executive and all persons acting for and/or in concert with Executive, without the necessity of posting bond or security, which Executive expressly waives.

C.  Executive agrees that each of Executive's obligations specified in this Agreement is a separate and independent covenant, and that all of Executive's obligations set forth herein shall survive any termination, for any reason, of Executive's Freddie Mac employment. To the extent that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, that provision shall be limited and enforced to the extent permitted by applicable law. Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid under applicable law, the validity of the remaining obligations will not be affected thereby and only the unenforceable or invalid obligation will be deemed not to be a part of this Agreement.

D.  This Agreement is governed by, and will be construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its or any other jurisdiction's conflict of law provisions. Executive agrees that any action related to or arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Virginia, and Executive hereby irrevocably consents to personal jurisdiction and venue in such court and to service of process by United States Mail or express courier service in any such action.

E.  If any dispute(s) arise(s) between Freddie Mac and Executive with respect to any matter which is the subject of this Agreement, the prevailing party in such dispute(s) shall be entitled to recover from the other party all of its costs and expenses, including its reasonable attorneys' fees.

**VIII.  Prior Restrictive Covenant, Non-Competition, Non-Solicitation Agreements**

Except as provided in Paragraph V(A), this Agreement does not supercede and prior agreement(s) between Executive and Freddie Mac. To the extent that any prior agreement(s) between Executive and Freddie Mac contain provisions regarding any of the subject matters discussed herein, the provisions that are more restrictive of Executive prevail.

**Executive has been advised to discuss all aspects of this Agreement with Executive's private attorney. Executive acknowledges that Executive has carefully read and understands the terms and provisions of this Agreement and that they are reasonable. Executive signs this Agreement voluntarily and accepts all obligations contained in this Agreement in exchange for the consideration to be given to Executive as outlined above, which Executive acknowledges is adequate and satisfactory, and which Executive further acknowledges Freddie Mac is not otherwise obligated to provide to Executive. Neither Freddie Mac nor its agents, representatives, directors, officers or employees have made any representations to**

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

6

**Executive concerning the terms or effects of this Agreement, other than those contained in this Agreement.**

By:     /s/  Donald J. Bisenius
[name of employee]


Freddie Mac

By:     /s/  Paul T. Peterson

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                TREASURY-1022                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.55**

<div align="center">

**Freddie Mac**

**PC MASTER TRUST AGREEMENT**

</div>

**THIS PC MASTER TRUST AGREEMENT** is entered into as of November 29, 2010, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the PCs offered from time to time pursuant to Freddie Mac's Offering Circular referred to herein

<div align="center">

**WHEREAS:**

</div>

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the Freddie Mac Act and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein; and

(b) Freddie Mac may from time to time (i) purchase Mortgages, in accordance with the applicable provisions of the Freddie Mac Act, (ii) as Depositor, transfer and deposit such Mortgages into various trust funds that are established pursuant to this Agreement and that are referred to herein as "PC Pools," (iii) as Trustee, create and issue hereunder, on behalf of the related PC Pool, PCs representing undivided beneficial ownership interests in the assets of that PC Pool and otherwise act as trustee for each such PC Pool, (iv) as Guarantor, guarantee the payment of interest and principal for the benefit of the Holders of such PCs and (v) as Administrator, administer the affairs of each such PC Pool.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained in this Agreement, the parties to this Agreement, do hereby declare and establish this Agreement and do hereby undertake and otherwise agree as follows with respect to the transfer of the Mortgages to various PC Pools, the issuance of the PCs and the establishment of the rights and obligations of the parties

<div align="center">

**Definitions**

</div>

The following terms used in this Agreement have the respective meanings set forth below

*Accrual Period:* As to any PC and any Payment Date, (i) the calendar month preceding the month of the Payment Date for Gold PCs or (ii) the second calendar month preceding the month of the Payment Date for ARM PCs

*Administrator:* Freddie Mac, in its corporate capacity, as administrator of the PC Pools created under this Agreement

*Agreement:* This PC Master Trust Agreement, dated as of November 29, 2010, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the various PCs, as originally executed, or as modified, amended or supplemented in accordance with the provisions set forth herein  Unless the context requires otherwise, the term "Agreement" shall be deemed to include any applicable Pool Supplement entered into pursuant to Section   0  of this Agreement

*ARM:* An adjustable rate Mortgage

<div align="center">

1

</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* A PC with a Payment Delay of 75 days and which is backed by ARMs. ARM PCs include Deferred Interest PCs.

*Book Entry Rules:* The provisions from time to time in effect, currently contained in Title 24, Part 81, Subpart H of the Code of Federal Regulations, setting forth the terms and conditions under which Freddie Mac may issue securities on the book entry system of the Federal Reserve Banks and authorizing a Federal Reserve Bank to act as its agent in connection with such securities

*Business Day:* A day other than (i) a Saturday or Sunday and (ii) a day when the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is closed or, as to any Holder, a day when the Federal Reserve Bank that maintains the Holder's account is closed

*Conventional Mortgage:* A Mortgage that is not guaranteed or insured by the United States or any agency or instrumentality of the United States

*Custodial Account:* As defined in Section 3 05(e) of this Agreement

*Deferred Interest:* The amount by which the interest due on a Mortgage exceeds the borrower's monthly payment, which amount is added to the unpaid principal balance of the Mortgage

*Deferred Interest PC:* A PC representing an undivided beneficial ownership interest in a PC Pool that includes Mortgages providing for negative amortization

*Depositor:* Freddie Mac, in its corporate capacity, as depositor of Mortgages into the PC Pools created under this Agreement

*Eligible Investments:* Any one or more of the following obligations, securities or holdings maturing on or before the Payment Date applicable to the funds so invested:

(i) obligations of, or obligations guaranteed as to the full and timely payment of principal and interest by, the United States;

(ii) obligations of any agency or instrumentality of the United States (other than Freddie Mac) or taxable debt obligations of any state or local government (or political subdivision thereof) that have a long term rating or a short term rating, as applicable, from S&P, Moody's or Fitch in any case in one of its two highest rating categories for long term securities or in its highest ratings category for short term securities;

(iii) time deposits of any depository institution or trust company domiciled in the Cayman Islands or Nassau and affiliated with a financial institution that is a member of the Federal Reserve System, provided that the short term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short term securities;

(iv) federal funds, certificates of deposit, time deposits and bankers' acceptances with a fixed maturity of no more than 365 days of any depository institution or trust company, provided that the short term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short term securities;

(v) commercial paper with a fixed maturity of no more than 270 days, of any corporation that is rated by S&P, Moody's or Fitch in its highest short term ratings category;

2

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    TREASURY-1024                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi) debt securities that have a long term rating or a short term rating, as applicable, from S&P, Moody's or Fitch, in any case in one of its two highest ratings categories for long term securities or in its highest ratings category for short term securities;

(vii) money market funds that are registered under the Investment Company Act of 1940, as amended, are entitled, pursuant to Rule 2a 7 of the Securities and Exchange Commission, or any successor to that rule, to hold themselves out to investors as money market funds, and are rated by S&P, Moody's or Fitch in one of its two highest ratings categories for money market funds;

(viii) asset backed commercial paper that is rated by S&P, Moody's or Fitch in its highest short term ratings category;

(ix) repurchase agreements on obligations that are either specified in any of clauses (i), (ii), (iv), (v), (vi) or (viii) above or are mortgage backed securities insured or guaranteed by an entity that is an agency or instrumentality of the United States; provided that the counterparty to the repurchase agreement is an entity whose short term debt securities are rated by S&P, Moody's or Fitch in its highest ratings category for short term securities; and

(x) any other investment without options that is approved by Freddie Mac and is within the two highest ratings categories of the applicable rating agency for long term securities or the highest ratings category of the applicable rating agency for short term securities

The rating requirement will be satisfied if the relevant security, issue or fund at the time of purchase receives at least the minimum stated rating from at least one of S&P, Moody's or Fitch. The rating requirement will not be satisfied by a rating that is the minimum rating followed by a minus sign or by a rating lower than Aa2 from Moody's

*Event of Default:* As defined in Section 5 01 of this Agreement

*FHA/VA Mortgage:* A Mortgage insured by the Federal Housing Administration or by the Department of Agriculture Rural Development (formerly the Rural Housing Service) or guaranteed by the Department of Veterans Affairs or the Department of Housing and Urban Development

*Final Payment Date:* As to any PC, the first day of the latest month in which the related Pool Factor will be reduced to zero  The Administrator publishes the Final Payment Date upon formation of the related PC Pool

*Fitch:* Fitch, Inc., also known as Fitch Ratings, or any successor thereto.

*Freddie Mac:* The Federal Home Loan Mortgage Corporation, a corporation created pursuant to the Freddie Mac Act for the purpose of establishing and supporting a secondary market in residential mortgages  Unless the context requires otherwise, the term "Freddie Mac" shall be deemed to refer to Freddie Mac acting in one or more of its corporate capacities, as specified or as provided in context, and not in its capacity as Trustee

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. §§1451 1459.

*Gold PC:* A PC with a Payment Delay of 45 days and which is backed by fixed rate Mortgages

*Guarantor:* Freddie Mac, in its corporate capacity, as guarantor of the PCs issued by each PC Pool.

3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* Freddie Mac's Single Family Seller/Servicer Guide, as supplemented and amended from time to time, in which Freddie Mac sets forth its mortgage purchase standards, credit, appraisal and underwriting guidelines and servicing policies.

*Holder:* With respect to any PC Pool, any entity that appears on the records of a Federal Reserve Bank as a holder of the related PCs

*Monthly Reporting Period:* The period during which servicers report Mortgage payments to the Administrator, generally consisting of the calendar month preceding the related Payment Date for Gold PCs and the second calendar month preceding the related Payment Date for ARM PCs, which period the Administrator has the right to change as provided in Section 3 05(d) of this Agreement; *provided, however*, that with respect to prepayments on PCs issued before September 1, 1995, the Monthly Reporting Period generally is from the 16$^{t}$ of a month through the 15$^{t}$ of the next month

*Moody's:* Moody's Investors Service, Inc , or any successor thereto

*Mortgage:* A mortgage loan or a participation interest in a mortgage loan that is secured by a first or second lien on a one to four family dwelling and that has been purchased by the Depositor and transferred by the Depositor to the Trustee for inclusion in the related PC Pool  With respect to each PC Pool, the Mortgages to be included therein shall be identified on the books and records of the Depositor and the Administrator

*Mortgage Coupon:* The per annum fixed or adjustable interest rate of a Mortgage

*MultiLender Swap Program:* A program under which Freddie Mac purchases Mortgages from one or more sellers in exchange for PCs representing undivided beneficial ownership interests in a PC Pool consisting of Mortgages that may or may not be those delivered by the seller(s)

*Negative Amortization Factor:* With respect to PCs backed by Mortgages providing for negative amortization, a truncated eight digit decimal number that reflects the amount of Deferred Interest added to the principal balances of the related Mortgages in the preceding month

*Offering Circular:* Freddie Mac's Mortgage Participation Certificates Offering Circular dated November 29, 2010, as amended and supplemented by any Supplements issued from time to time, or any successor thereto, as it may be amended and supplemented from time to time

*Payment Date:* The 15th of each month or, if the 15th is not a Business Day, the next Business Day.

*Payment Delay:* The delay between the first day of the Accrual Period for a PC and the related Payment Date

*PC:* With respect to each PC Pool, a Mortgage Participation Certificate issued pursuant to this Agreement, representing a beneficial ownership interest in such PC Pool  The term "PC'' includes a Gold PC or an ARM PC unless the context requires otherwise

*PC Coupon:* The per annum fixed or adjustable rate of a PC calculated as described in the Offering Circular or the applicable Pool Supplement, computed on the basis of a 360 day year of twelve 30 day months

*PC Issue Date:* With respect to each PC Pool, the date specified in the related Pool Supplement or, if not specified therein, the date on which Freddie Mac issues a PC in exchange for the Mortgages delivered by a dealer or other customer

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research$^{SM}$

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Pool:* With respect to each PC, the corpus of the related trust fund created by this Agreement, consisting of (i) the related Mortgages and all proceeds thereof, (ii) amounts on deposit in the Custodial Account, to the extent allocable to such PC Pool, (iii) the right to receive payments under the related guarantee and (iv) any other assets specified in the related Pool Supplement, excluding any investment earnings on any of the assets of that PC Pool  With respect to each PC Pool, and unless expressly stated otherwise, the provisions of this Agreement will be interpreted as referring only to the Mortgages included in that PC Pool, the PCs issued by that PC Pool and the Holders of those PCs.

*Person:* Any legal person, including any individual, corporation, partnership, limited liability company, financial institution, joint venture, association, joint stock company, trust, unincorporated organization or governmental unit or political subdivision of any governmental unit.

*Pool Factor:* With respect to each PC Pool, a truncated eight digit decimal calculated for each month by the Administrator which, when multiplied by the original principal balance of the related PCs, will equal their remaining principal amount  The Pool Factor for any month reflects the remaining principal amount after the payment to be made on the Payment Date in the same month for Gold PCs or in the following month for ARM PCs

*Pool Supplement:* Any physical or electronic document or record (which may be a supplement to the Offering Circular or any other supplemental document prepared by Freddie Mac for the related PCs), which, together herewith, evidences the establishment of a PC Pool and modifies, amends or supplements the provisions hereof in any respect whatsoever  The Pool Supplement for a particular PC Pool shall be binding and effective upon formation of the related PC Pool and issuance of the related PCs, whether or not such Pool Supplement is executed, delivered or published by Freddie Mac

*Purchase Documents:* The mortgage purchase agreements between Freddie Mac and its Mortgage sellers and servicers, which are the contracts that govern the purchase and servicing of Mortgages and which include, among other things, the Guide and any negotiated modifications, amendments or supplements to the Guide

*Record Date:* As to any Payment Date, the close of business on the last day of (i) the preceding month for Gold PCs or (ii) the second preceding month for ARM PCs.

*S&P:* Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., or any successor thereto.

*Trustee:* Freddie Mac, in its capacity as trustee of each PC Pool formed under this Agreement, and its successors and assigns, which will have the trustee responsibilities specified in this Agreement, as amended or supplemented from time to time

*Trustee Event of Default:* As defined in Section 6 06 of this Agreement

5

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# ARTICLE I

## Conveyance of Mortgages; Creation of PC Pools

**Section 1.01. Declaration of Trust; Transfer of Mortgages.** The Depositor, by delivering any Mortgages pursuant to this Agreement, unconditionally, absolutely and irrevocably hereby transfers, assigns, sets over and otherwise conveys to the Trustee, on behalf of the related Holders, all of the Depositor's right, title and interest in and to such Mortgages, including all payments of principal and interest thereon received after the month in which the PC Issue Date occurs  Once Mortgages have been identified as being part of a related PC Pool for which at least one PC has been issued, they shall remain in that PC Pool unless removed in a manner consistent with this Agreement  Concurrently with the Depositor's transferring, assigning, setting over and otherwise conveying the Mortgages to the Trustee for a PC Pool, the Trustee hereby accepts the Mortgages so conveyed and acknowledges that it holds the entire corpus of each PC Pool in trust for the exclusive benefit of the related Holders and shall deliver to, or on the order of, the Depositor, the PCs issued by such PC Pool  The Administrator agrees to administer the related PC Pool and such PCs in accordance with the terms of this Agreement  On the related PC Issue Date and upon payment to the Depositor for any such PC by a Holder, such Holder shall, by virtue thereof, acknowledge, accept and agree to be bound by all of the terms and conditions of this Agreement

A Pool Supplement shall evidence the establishment of a particular PC Pool and shall relate to specific PCs representing the entire beneficial ownership interests in such PC Pool  If for any reason the creation of a Pool Supplement is delayed, Freddie Mac shall create one as soon as practicable, and such delay shall not affect the validity and existence of the PC Pool or the related PCs  With respect to each PC Pool, the collective terms hereof and of the related Pool Supplement shall govern the issuance and administration of the PCs related to such PC Pool, and all matters related thereto, and shall have no applicability to any other PC Pool or PCs  As applied to each PC Pool, the collective terms hereof and of the related Pool Supplement shall constitute an agreement as if the collective terms of those instruments were set forth in a single instrument  In the event of a conflict between the terms hereof and the terms of a Pool Supplement for a PC Pool, the terms of the Pool Supplement shall control with respect to that PC Pool  A Pool Supplement is not considered an amendment to this Agreement requiring approval pursuant to Section 7 05

**Section 1.02. Identity of the Mortgages; Substitution and Repurchase.**

(a) In consideration for the transfer of the related Mortgages by the Depositor to a PC Pool, the Depositor (i) shall receive the PCs issued by such PC Pool and (ii) may retain such PCs or transfer them to the related Mortgage seller or otherwise, as the Depositor deems appropriate

(b) After the PC Issue Date but prior to the first Payment Date, the Depositor may, in accordance with its customary mortgage purchase and pooling procedures, adjust the amount and identity of the Mortgages to be transferred to a PC Pool, the PC Coupon and/or the original unpaid principal balance of the PCs and the Mortgages in the PC Pool, provided that any changes to the characteristics of the PCs shall be evidenced by an amendment or supplement to the related Pool Supplement

(c) Except as provided in this Section 1 02 or in Section 1 03, once the Depositor has transferred a Mortgage to a particular PC Pool, such Mortgage may not be transferred out of such PC Pool, except (x) if a mortgage insurer exercises an option under an insurance contract to purchase such Mortgage or (y) in the case of repurchase by the Guarantor, the Administrator or the related Mortgage seller or servicer, under the following circumstances:

(i) The Guarantor may repurchase from the related PC Pool a Mortgage in connection with a guarantee payment under Section 3 09(a)(ii)

6

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(ii) The Administrator may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if a repurchase is necessary or advisable (A) to maintain servicing of the Mortgage in accordance with the provisions of the Guide, or (B) to maintain the status of the PC Pool as a grantor trust for federal income tax purposes

(iii) The Guarantor may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if (A) such Mortgage is 120 or more days delinquent, or (B) the Guarantor determines, on the basis of information from the related borrower or servicer, that loss of ownership of the property securing a Mortgage is likely or default is imminent due to borrower incapacity, death or hardship or other extraordinary circumstances that make future payments on such Mortgage unlikely or impossible.

(iv) The Guarantor may repurchase from the related PC Pool a Mortgage if a bankruptcy court approves a plan that materially affects the terms of the Mortgage or authorizes a transfer or substitution of the underlying property

(v) The Administrator may require or permit a Mortgage seller or servicer to repurchase from the related PC Pool any Mortgage or (within six months of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if there is (A) a material breach of warranty by the Mortgage seller or servicer, (B) a material defect in documentation as to such Mortgage or (C) a failure by a seller or servicer to comply with any requirements or terms set forth in the Guide and, if applicable, other Purchase Documents

(vi) The Administrator shall repurchase from the related PC Pool any Mortgage or (within two years of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if (A) a court of competent jurisdiction or a federal government agency duly authorized to oversee or regulate Freddie Mac's mortgage purchase business determines that Freddie Mac's purchase of such Mortgage was unauthorized and Freddie Mac determines that a cure is not practicable without unreasonable effort or expense or (B) such court or government agency requires repurchase of such Mortgage

(vii) To the extent a PC Pool includes convertible ARMs or Balloon/Reset Mortgages (each, as defined in the Offering Circular), the Administrator shall repurchase from the related PC Pool or require or allow the Mortgage seller or servicer to repurchase such Mortgages (a) when the borrower exercises its option to convert the related interest rate from an adjustable rate to a fixed rate, in the case of a convertible ARM; and (b) shortly before such Mortgage reaches its scheduled balloon repayment date, in the case of a Balloon/Reset Mortgage

(d) The purchase price of a Mortgage repurchased by a Mortgage seller or servicer shall be equal to the then unpaid principal balance of such Mortgage, less any principal on such Mortgage that the Mortgage seller or servicer advanced to the Depositor or the Administrator  The purchase price of a Mortgage repurchased by the Administrator or the Guarantor under this Agreement shall be equal to the then unpaid principal balance of such Mortgage, less any outstanding advances of principal on such Mortgage that the Administrator, on behalf of the Trustee, distributed to Holders. The Administrator, on behalf of the Trustee, agrees to release any Mortgage from the PC Pool upon payment of the applicable purchase price

(e) In determining whether a Mortgage shall be repurchased from the related PC Pool as described in this Section 1 02, the Guarantor and the Administrator may consider such factors as they deem appropriate, including the reduction of administrative costs (in the case of the Administrator) or possible exposure as Guarantor under its guarantee (in the case of the Guarantor)

7

TREASURY-1029

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.03. Post Settlement Purchase Adjustments**

(a) The Administrator shall make any post settlement purchase adjustments necessary to reflect the actual aggregate unpaid principal balance of the related Mortgages or other Mortgage characteristics as of the date of their purchase by the Depositor or their delivery to the Trustee in exchange for PCs, as the case may be.

(b) Post settlement adjustments may be made in such manner as the Administrator deems appropriate, but shall not adversely affect any Holder's rights to monthly payments of interest at the PC Coupon, any Holder's pro rata share of principal or any Holder's rights under the Guarantor's guarantees. Any reduction in the principal balance of the Mortgages held by a PC Pool shall be reflected by the Administrator as a corresponding reduction in the principal balance of the related PCs with a corresponding principal payment to the related Holders, on a pro rata basis

**Section 1.04. Custody of Mortgage Documents.**  With respect to each PC Pool, the Administrator, a custodian acting as its agent (which may be a third party or a trust or custody department of the related seller or servicer), or the originator or seller of the Mortgage may hold the related Mortgage documents, including Mortgage notes and participation certificates evidencing the Trustee's legal ownership interest in the Mortgages  The Administrator may adopt and modify its policies and procedures for the custody of Mortgage documents at any time, provided such modifications are prudent and do not materially and adversely affect the Holders' interests

**Section 1.05. Interests Held or Acquired by Freddie Mac.**  Freddie Mac shall have the right to purchase and hold for its own account any PCs. Subject to Section 7 06, PCs held or acquired by Freddie Mac from time to time and PCs held by other Holders shall have equal and proportionate benefits, without preference, priority or distinction  In the event that Freddie Mac retains any interest in a Mortgage, the remaining interest in which is part of a PC Pool, Freddie Mac's interest in such Mortgage shall rank equally with that of the related PC Pool, without preference, priority or distinction  No Holder shall have any priority over any other Holder

**Section 1.06. Intended Characterization.**  It is intended that the conveyance, transfer, assignment and setting over of the Mortgages by the Depositor to the Trustee pursuant to this Agreement be a true, absolute and unconditional sale of the related Mortgages by the Depositor to the Trustee, and not a pledge of the Mortgages to secure a debt or other obligation of the Depositor, and that the Holders of the related PCs shall be the beneficial owners of such Mortgages  Notwithstanding this express intention, however, if the Mortgages are determined by a court of competent jurisdiction or other competent authority to be the property of the Depositor, then it is intended that: (a) this Agreement be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code; (b) the conveyances provided for in Section 1 01 shall be deemed to be (1) a grant by the Depositor to the Trustee on behalf of the related Holders of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the related Mortgages, any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Custodial Account and allocable to such Mortgages, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee on behalf of the related Holders of any security interest in any and all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clause ( ); and (c) notifications to Persons holding such property, and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee on behalf of the related Holders, for the purpose of perfecting such security interest under applicable law

8

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.07. Encumbrances.** Except as may otherwise be provided expressly in this Agreement, neither Freddie Mac nor the Trustee shall directly or indirectly, assign, sell, dispose of or transfer all or any portion of or interest in any PC Pool, or permit all or any portion of any PC Pool to be subject to any lien, claim, mortgage, security interest, pledge or other encumbrance of any other Person  This Section shall not be construed as a limitation on Freddie Mac's rights with respect to PCs held by it in its corporate capacity

## ARTICLE II

### Administration and Servicing of the Mortgages

**Section 2.01. The Administrator as Primary Servicer.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages and administer, on behalf of the Trustee, in accordance with the provisions of the Guide and this Agreement, including management of any property acquired through foreclosure or otherwise, all for the benefit of the related Holders  The Administrator shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration that the Administrator deems necessary or desirable. The Administrator shall seek from the Trustee, as representative of the related Holders, any consents or approvals relating to the control, management and servicing of the Mortgages included in any PC Pool and that are required hereunder

**Section 2.02. Servicing Responsibilities.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages in a manner consistent with prudent servicing standards and in substantially the same manner as the Administrator services or supervises the servicing of unsold mortgages of the same type in its portfolio  In performing its servicing responsibilities hereunder, the Administrator may engage servicers, subservicers and other independent contractors or agents  The Administrator may discharge its responsibility to supervise servicing of the Mortgages by monitoring servicers' performance on a reporting and exception basis  Except as provided in Articles V and VI and Sections 7 05 and 7 06 of this Agreement, Freddie Mac, as Administrator shall not be subject to the control of the Holders in the discharge of its responsibilities pursuant to this Article  Except with regard to its guarantee obligations pursuant to Section 3 09 with respect to a PC Pool, the Administrator shall have no liability to any related Holder for the Administrator's actions or omissions in discharging its responsibilities under this Article II other than for any direct damage resulting from its failure to exercise that degree of ordinary care it exercises in the conduct and management of its own affairs  In no event shall the Administrator have any liability for consequential damages

**Section 2.03. Realization Upon Defaulted Mortgages.** With respect to each PC Pool, unless the Administrator deems that another course of action (e g , charge off) would be in the best economic interest of the Holders, the Administrator (or its authorized designee or representative) shall, as soon as practicable, foreclose upon (or otherwise comparably convert the ownership of) any real property securing a Mortgage which comes into and continues in default and as to which no satisfactory arrangements can be made for collection of delinquent payments  In connection with such foreclosure or conversion, the Administrator (or its authorized designee or representative) shall follow such practices or procedures as it deems necessary or advisable and consistent with general mortgage servicing standards.

**Section 2.04. Automatic Acceleration and Assumptions.**

(a) With respect to each PC Pool, to the extent provided in the Guide, the Administrator shall enforce the terms of each applicable Mortgage that gives the mortgagee the right to demand full payment of the unpaid principal balance of the Mortgage upon sale or transfer of the property securing the Mortgage regardless of the creditworthiness of the transferee (a right of "automatic acceleration''), subject to applicable state and federal law and the Administrator's then current servicing policies

9

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and that is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) With respect to each PC Pool, the Administrator shall permit the assumption by a new mortgagor of an FHA/VA Mortgage upon the sale or transfer of the underlying property, as required by applicable regulations. Any such assumption shall be in accordance with applicable regulations, policies, procedures and credit requirements and shall not result in loss or impairment of any insurance or guaranty.

**Section 2.05. Prepayment Penalties.** Unless otherwise provided in the Pool Supplement for a PC Pool, the related Holders shall not be entitled to receive any prepayment penalties, assumption fees or other fees charged on the Mortgages included in such PC Pool, and either the related servicer or the Administrator shall retain such amounts.

**Section 2.06. Mortgage Insurance and Guarantees.**

(a) With respect to each PC Pool, if a Conventional Mortgage is insured by a mortgage insurer and the mortgage insurance policy is an asset of such PC Pool, the related Holders acknowledge that the insurer shall have no obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives regarding the mortgagee's rights, benefits and obligations under the related insurance contract

(b) With respect to each PC Pool, each FHA/VA Mortgage shall have in full force and effect a certificate or other satisfactory evidence of insurance or guaranty, as the case may be, as may be issued by the applicable government agency from time to time  None of these agencies has any obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives with regard to the rights, benefits and obligations of the mortgagee under the contract of insurance or guaranty relating to each FHA/VA Mortgage included in such PC Pool

<div align="center">

## ARTICLE III

### Distributions to Holders; Guarantees

</div>

**Section 3.01. Monthly Reporting Period.** For purposes of this Agreement with respect to any PC Pool, any payment or any event with respect to any Mortgage included in such PC Pool that is reported to the Administrator by the related servicer as having been made or having occurred within a Monthly Reporting Period shall be deemed to have been received by the Administrator or to have in fact occurred within such Monthly Reporting Period used by the Administrator for such purposes. Payments reported by servicers include all principal and interest payments made by a borrower, insurance proceeds, liquidation proceeds and repurchase proceeds. Events reported by servicers include foreclosure sales, payments of insurance claims and payments of guarantee claims

**Section 3.02. Holder's Undivided Beneficial Ownership Interest.**  With respect to each PC Pool, the Holder of a PC on the Record Date shall be the owner of record of a pro rata undivided beneficial ownership interest in the remaining principal balance of the Mortgages in the related PC Pool as of such date and shall be entitled to interest at the PC Coupon on such pro rata undivided beneficial ownership interest, in each case on the related Payment Date  Such pro rata undivided beneficial ownership interest shall change accordingly if any Mortgage is added to or removed from such PC Pool in accordance with this Agreement  A Holder's pro rata undivided beneficial ownership interest in the Mortgages included in a PC Pool is calculated by dividing the original unpaid principal balance of the Holder's PC by the original unpaid principal balance of all the Mortgages in the related PC Pool

**Section 3.03. Distributions of Principal.**  With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of principal collections with respect to the Mortgages in such PC Pool, including, if applicable, each Holder's pro rata share of the aggregate amount of any Deferred Interest that has been

<div align="center">0</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to the principal balance of the related Mortgages; *provided, however*, that with respect to guarantee payments, the Guarantor's obligations herein shall be subject to its subrogation rights pursuant to Section 3.10. The Administrator may retain from any prepayment or delinquent principal payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee  For Mortgages purchased by the Depositor in exchange for PCs under its MultiLender Swap Program, the Depositor shall retain principal payments made on such Mortgages in the amount of any difference between the aggregate unpaid principal balance of the Mortgages as of delivery by the seller and the aggregate unpaid principal balance as of the PC Issue Date, and the Depositor shall purchase additional Mortgages with such principal payments; such additional Mortgages may or may not be included in the related PC Pool represented by the PCs received by the seller

**Section 3.04. Distributions of Interest.**  With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of interest collections with respect to the Mortgages included in such PC Pool, at a rate equal to the PC Coupon (excluding, if applicable, each Holder's pro rata share of any Deferred Interest that has been added to the principal balance of the related Mortgages)  Interest shall accrue during the applicable Accrual Periods  The Administrator may retain from any delinquent interest payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee  With respect to each PC Pool, a partial month's interest retained by Freddie Mac or remitted to the related Holders with respect to prepayments shall constitute an adjustment to the fee payable to the Administrator and the Guarantor pursuant to Section 3 08(a) for such PC Pool

**Section 3.05. Payments.**

(a) With respect to each PC Pool, distributions of principal and interest on the related PCs shall begin in the month after issuance for Gold PCs and in the second month after issuance for ARM PCs. The Administrator, on behalf of the Trustee, shall calculate, or cause to be calculated, for each PC the distribution amount for the current calendar month

(b) On or before each Payment Date, the Administrator, on behalf of the Trustee, shall instruct the Federal Reserve Banks to credit payments on PCs from the Custodial Account to the appropriate Holders' accounts  The related PC Pool's payment obligations shall be met upon transmittal of the Administrator's payment order to the Federal Reserve Banks provided sufficient funds are then on deposit in the Custodial Account  A Holder shall receive the payment of principal, if applicable, and interest on each Payment Date on each PC held by such Holder as of the related Record Date

(c) The Administrator relies on servicers' reports of mortgage activity to prepare the Pool Factors  There may be delays or errors in processing mortgage information, such as a servicer's failure to file an accurate or timely report of its collections of principal or its having filed a report that cannot be processed  In these situations the Administrator's calculation of scheduled principal to be made on Gold PCs may not reflect actual payments on the related Mortgages  The Administrator shall account for and reconcile any differences as soon as practicable.

(d) The Administrator reserves the right to change the period during which a servicer may hold funds prior to payment to the Administrator, as well as the period for which servicers report payments to the Administrator, including adjustments to the Monthly Reporting Period  Either change may change the time at which prepayments are distributed to Holders. Any such change, however, shall not impair Holders' rights to payments as otherwise provided in this Section.

(e) The Administrator shall maintain one or more accounts (together, the "Custodial Account"), segregated from the general funds of Freddie Mac, in its corporate capacity, for the deposit of collections of

TREASURY-1033

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

principal (including full and partial principal prepayments) and interest received from or advanced by the servicers in respect of the Mortgages  Mortgage collections in respect of the PC Pools established by Freddie Mac under this Agreement or trust funds established by Freddie Mac pursuant to any other trust agreements may be commingled in the Custodial Account, provided that the Administrator keeps, or causes to be kept, separate records of funds with respect to each such PC Pool and other trust fund  Collections due to Freddie Mac, in its corporate capacity as owner of mortgages held in its portfolio, may also be commingled in the Custodial Account, provided that the Administrator shall withdraw such amounts for remittance to Freddie Mac on a monthly basis. Funds on deposit in the Custodial Account may be invested by the Administrator in Eligible Investments  Investment earnings on deposits in the Custodial Account shall be for the benefit of the Administrator, and any losses on such investments shall be paid by the Administrator. On each Payment Date, amounts on deposit in the Custodial Account shall be withdrawn upon the order of the Administrator, on behalf of the Trustee, for the purpose of making distributions to the related Holders, in accordance with this Agreement

### Section 3.06. Pool Factors.

(a) The Administrator, on behalf of the Trustee, shall calculate and make payments to Holders on each Payment Date based on the monthly Pool Factors (including Negative Amortization Factors) until such time as the Administrator determines that a more accurate and practicable method for calculating such payments is available and implements that method  Pursuant to Section 7 05(e), the Administrator may modify the Pool Factor methodology from time to time, without the consent of Holders  With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall do the following:

(i) The Administrator shall publish or cause to be published for each month a Pool Factor with respect to each PC Pool  Beginning in the month after formation of a PC Pool, Pool Factors shall be published on or about the fifth Business Day of the month, which Pool Factors may reflect prepayments reported to the Administrator after the end of the related Monthly Reporting Period and before the publication of the applicable Pool Factors  However, the Administrator may, in its own discretion, publish Pool Factors on any other Business Day. The Pool Factor for the month in which the PC Pool is established is   00000000 and need not be published

(ii) The Administrator shall distribute principal each month to a Holder of a Gold PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the Gold PC by the difference between its Pool Factors for the preceding and current months.

(iii) The Administrator shall distribute principal each month to a Holder of an ARM PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the ARM PC by the difference between its Pool Factors for the two preceding months

(iv) The Administrator shall distribute interest each month in arrears to a Holder (assuming no Deferred Interest) in an amount equal to 1/12th of the applicable PC Coupon multiplied by such Holder's pro rata share of principal, calculated by multiplying the original principal balance of such Holder's PC by the preceding month's Pool Factor for Gold PCs or by the second preceding month's Pool Factor for ARM PCs

(v) For any month that Deferred Interest has accrued on a Deferred Interest PC, the Administrator shall distribute principal (if any is due) to a Holder in an amount equal to such Holder's pro rata share of principal, calculated by (A) subtracting the preceding month's Pool Factor from the second preceding month's Pool Factor, (B) adding to the difference the Negative Amortization Factor for the preceding month and (C) multiplying the resulting sum by the original PC principal balance  The interest payment on the Deferred Interest PC in that month shall be (i) 1/12th of the PC Coupon

12

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

multiplied by (ii) the original principal balance of the Holder's PC multiplied by (iii) the preceding month's Pool Factor minus the preceding month's Negative Amortization Factor

(b) With respect to each PC Pool, a Pool Factor shall reflect prepayments reported for the applicable Monthly Reporting Period  The Administrator, on behalf of the Trustee, may also, in its discretion, reflect in a Pool Factor any prepayments reported after the end of the applicable Monthly Reporting Period  To the extent a given Pool Factor (adjusted as necessary for payments made pursuant to the Guarantor's guarantee of timely payment of scheduled principal on Gold PCs) does not reflect the actual unpaid principal balance of the related Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable

(c) In the case of a PC Pool that is comprised of ARMs, a Pool Factor shall be based upon the unpaid principal balance of the related Mortgages that servicers report to the Administrator for the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. The Administrator, on behalf of the Trustee, may also, in its discretion, include as part of the aggregate principal payment in any month any prepayments received after the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published  To the extent a given Pool Factor does not reflect the actual aggregate unpaid principal balance of the Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable.

(d) The Pool Factor method for a PC Pool may affect the timing of receipt of payments by related Holders but shall not affect the Guarantor's guarantee with respect to such PC Pool, as set forth in Section 3 09  The Guarantor's guarantee shall not be affected by the implementation of any different method for calculating and paying principal and interest for any PC Pool, as permitted by this Section 3.06.

### Section 3.07. Servicing Fees; Retained Interest.

(a) To the extent provided by contractual arrangement with the Administrator, with respect to each PC Pool, the related servicer of each Mortgage included in such PC Pool shall be entitled to retain each month, as a servicing fee, any interest payable by the borrower on a Mortgage that exceeds the servicer's required remittance with respect to such Mortgage  Each servicer is required to pay all expenses incurred by it in connection with its servicing activities and shall not be entitled to reimbursement for those expenses, except as provided in Section 3 08(c)  If a servicer advances any principal and/or interest on a Mortgage to the Administrator prior to the receipt of such funds from the borrower, the servicer may retain (i) from prepayments or collections of delinquent principal on such Mortgage any payments of principal so advanced, or (ii) from collections of delinquent interest on such Mortgage any payments of interest so advanced  To the extent permitted by its servicing agreement, the servicer is entitled to retain as additional compensation certain incidental fees related to Mortgages it services

(b) With respect to a PC Pool, pursuant to the related Purchase Documents, a seller may retain each month as extra compensation a fixed amount of interest on a Mortgage included in such PC Pool  In such event, the related servicer shall retain each month as a servicing fee the excess of any interest payable by the borrower on such Mortgage (less the seller's retained interest amount) over the servicer's required remittance with respect to such Mortgage

### Section 3.08. Administration Fee; Guarantee Fee.

(a) Subject to any adjustments required by Section 3 04, with respect to any PC Pool, the Administrator and the Guarantor shall be entitled to receive from monthly interest payments on each related Mortgage a fee (to be allocated between the Administrator and the Guarantor as they may agree) equal to the excess of any interest received by the Administrator from the servicer over the amount of interest payable to the related Holders;  *provided, however,* that the aggregate fee amount shall be automatically adjusted with respect to each PC Pool to the extent a Pool Factor does not reflect the unpaid principal

3

TREASURY-1035

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

balance of the Mortgages  Any such adjustment shall equal the difference between (i) interest at the applicable PC Coupon computed on the aggregate unpaid principal balance of the Mortgages for such month based on monthly principal payments actually received by the Administrator and (ii) interest at the applicable PC Coupon computed on the remaining balance of the Mortgages included in the PC Pool derived from the Pool Factor  The Administrator shall (i) withdraw the aggregate fee amount from the Custodial Account prior to distributions to the related Holders, (ii) retain its portion of the fee for the Administrator's own account and (iii) remit the remaining portion of the fee to the Guarantor as the guarantee fee  In addition, the Administrator is entitled to retain as additional compensation certain incidental fees on the Mortgages as provided in Section 2 05 and certain investment earnings as provided in Section 3 05(e)

(b) The Depositor shall pay all expenses incurred in connection with the transfer of the Mortgages, the establishment and administration of each PC Pool and the issuance of the PCs  Any amounts (including attorney's fees) expended by the Trustee or the Administrator (or the servicers on the Administrator's behalf) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages, shall be expenses to be borne pro rata by the Administrator and the Holders in accordance with their interests in each Mortgage  The Administrator, on behalf of the Trustee, may retain an amount sufficient to pay the portion of such expenses borne pro rata by the Depositor and the Holders from payments otherwise due to Holders, which may affect the timing of receipt of payments by Holders but shall not affect the Guarantor's obligations under Section 3 09

(c) The Administrator shall reimburse a servicer for any amount (including attorney's fees) it expends (on the Administrator's behalf and with its approval) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages  Such expenses shall be reimbursable to the servicer from the assets of the related PC Pool, to the extent provided in the Guide

(d) Any fees and expenses described above shall not affect the Guarantor's guarantee with respect to any PC Pool, as set forth in Section 3 09

**Section 3.09. Guarantees.**

(a) With respect to each PC Pool, the Guarantor guarantees to the Trustee and to each Holder of a PC:

(i) the timely payment of interest at the applicable PC Coupon;

(ii) the full and final payment of principal on the underlying Mortgages on or before the Payment Date that falls (A) in the month of its Final Payment Date, for Gold PCs, or (B) in the month after its Final Payment Date, for ARM PCs; and

(iii) for Gold PCs only, the timely payment of scheduled principal on the underlying Mortgages

In the case of Deferred Interest PCs, the Guarantor's guarantee of principal includes, and its guarantee of interest excludes, any Deferred Interest added to the principal balances of the related Mortgages  The Guarantor shall make payments of any guaranteed amounts by transfer to the Custodial Account for distribution to the related Holders, in accordance with Sections 3 03 and 3 04  The guarantees pursuant to this Section will inure to the benefit of each PC Pool and its related Holders, and shall be enforceable by the Trustee of that PC Pool and by such Holders, as provided in Article V of this Agreement

(b) The Guarantor shall compute guaranteed scheduled monthly principal payments on any Gold PC, subject to any applicable adjustments, in accordance with procedures adopted by the Guarantor from time to time  With respect to each PC Pool, any payment the Guarantor makes to the Administrator, on behalf

4

Source  D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of the Trustee, on account of the Guarantor's guarantee of scheduled principal payments shall be considered to be a payment of principal for purposes of calculating the Pool Factor for such PC Pool and the Holder's pro rata share of the remaining unpaid principal balance of the related Mortgages

(c) The Guarantor's guarantees shall continue to be effective or shall be reinstated (i) in the event that any principal or interest payment made to a Holder is for any reason returned by the Holder pursuant to an order, decree or judgment of any court of competent jurisdiction that the Holder was not entitled to retain such payment pursuant to this Agreement and (ii) notwithstanding any provision hereof permitting fees, expenses, indemnities or other amounts to be paid from the assets of any PC Pool

**Section 3.10. Subrogation.** With respect to each PC Pool, the Guarantor shall be subrogated to all the rights, interests, remedies, powers and privileges of each related Holder in respect of any Mortgage included in such PC Pool on which it has made guarantee payments of principal and/or interest to the extent of such payments. Nothing in this Section shall impair the Guarantor's right to receive distributions in its capacity as Holder, if it is a Holder of any PCs.

**Section 3.11. Termination Upon Final Payment.** Each PC Pool is irrevocable and will terminate only in accordance with the terms of this Agreement Except as provided in Sections 3.05(e), 6.06 and 7.01, with respect to each PC Pool, Freddie Mac's and the Trustee's obligations and responsibilities under this Agreement shall terminate as to a PC Pool and its Holders upon (i) the full payment to such Holders of all principal and interest due to the Holders based on the Pool Factors or by reason of the Guarantor's guarantees or (ii) the payment to the Holder of all amounts held by Freddie Mac and the Trustee, respectively, and required to be paid hereunder; *provided, however,* that in no event shall any PC Pool created hereby continue beyond the expiration of 2 years from the death of the survivor of the descendants of Joseph P Kennedy, the late ambassador of the United States to the Court of St James's, living on the date hereof

**Section 3.12. Effect of Final Payment Date.** The actual final payment on a PC may occur prior to the Payment Date specified in Section 3 09(a)(ii) due to prepayments of principal, including prepayments made in connection with the repurchase of any Mortgage from the related PC Pool

**Section 3.13. Payment Error Corrections.** In the event of a principal or interest payment error, the Administrator, in its sole discretion, may effect corrections by the adjustment of payments to be made on future Payment Dates or in such other manner as it deems appropriate

## ARTICLE IV

## PCs

**Section 4.01. Form and Denominations.** With respect to each PC Pool, the principal balances, PC Coupons and other characteristics of the PCs to be issued shall be specified in the related Pool Supplement  Delivery of the PCs of a PC Pool shall constitute the issuance of the PCs for that PC Pool  PCs shall be issued, held and transferable only on the book entry system of the Federal Reserve Banks in minimum original principal amounts of $1,000 and additional increments of $1  PCs shall at all times remain on deposit with a Federal Reserve Bank in accordance with the provisions of the Book Entry Rules  A Federal Reserve Bank will maintain a book entry recordkeeping system for all transactions in PCs with respect to Holders

**Section 4.02. Transfer of PCs.** PCs may be transferred only in minimum original principal amounts of $1,000 and additional increments of $1. PCs may not be transferred if, as a result of the transfer, the

15

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or the new Holder would have on deposit in its account PCs of the same issue with an original principal amount of less than $1,000. The transfer, exchange or pledge of PCs shall be governed by the fiscal agency agreement between Freddie Mac and a Federal Reserve Bank, the Book Entry Rules and such other procedures as shall be agreed upon from time to time by Freddie Mac and a Federal Reserve Bank  A Federal Reserve Bank shall act only upon the instructions of the Holder in recording transfers of a PC  A charge may be made for any transfer of a PC and shall be made for any tax or other governmental charge imposed in connection with a transfer of a PC  Freddie Mac hereby assigns to the Trustee Freddie Mac's rights under each fiscal agency agreement with respect to PCs issued by any PC Pool.

   **Section 4.03. Record Date.**  The Record Date for each Payment Date shall be the close of business on the last day of the preceding month for Gold PCs and the second preceding month for ARM PCs  A Holder of a PC on the books and records of a Federal Reserve Bank on the Record Date shall be entitled to payment of principal and interest on the related Payment Date  A transfer of a PC made on or before the Record Date in a month shall be recognized as effective as of the first day of such month.

<div align="center">

**ARTICLE V**

**Remedies**

</div>

   **Section 5.01. Events of Default.**  With respect to each PC Pool, an "Event of Default'' means any one of the following events:

   (a) Default by the Guarantor or the Administrator in the payment of interest or principal to the related Holders as and when the same shall become due and payable as provided in this Agreement, and the continuance of such default for a period of 30 days

   (b) Failure by the Guarantor or the Administrator to observe or perform any other covenants of this Agreement relating to their respective obligations, and the continuance of such failure for a period of 60 days after the date of receipt by such party of written notice of such failure and a demand for remedy by the affected Holders representing not less than 65 percent of the remaining principal balance of any affected PC Pool

   (c) The entry by any court having jurisdiction over the Guarantor or the Administrator of a decree or order for relief in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of its property, or for the winding up or liquidation of its affairs, if such decree or order remains unstayed and in effect for a period of 60 consecutive days.

   (d) Commencement by the Guarantor or the Administrator of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent by the Guarantor or the Administrator to the entry of an order for relief in an involuntary case under any such law, or its consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of their respective properties, or any general assignment made by the Guarantor or the Administrator for the benefit of creditors, or failure by the Guarantor or the Administrator generally to pay their debts as they become due

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over the Guarantor or the Administrator, whether or not such party consents to such appointment, shall not constitute an Event of Default.

<div align="center">16</div>

TREASURY-1038

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 5.02. Remedies.**

(a) If an Event of Default occurs and is continuing with respect to a PC Pool, the Holders of PCs representing a majority of the remaining principal balance of such PC Pool may, by written notice to Freddie Mac, remove Freddie Mac as Administrator and nominate its successor under this Agreement with respect to such PC Pool  The nominee shall be deemed appointed as Freddie Mac's successor as Administrator unless Freddie Mac objects within 10 days after such nomination  Upon such objection:

(i) The Administrator may petition any court of competent jurisdiction for the appointment of its successor; or

(ii) Any bona fide Holder that has been a Holder for at least six months may, on behalf of such Holder and all others similarly situated, petition any such court for appointment of the Administrator's successor.

(b) If a successor Administrator is appointed, the Administrator shall submit to its successor a complete written report and accounting of the Mortgages in the affected PC Pool and shall take all other steps necessary or desirable to transfer its interest in and administration of such PC Pool to its successor

(c) Subject to the Freddie Mac Act, a successor may take any action with respect to the Mortgages as may be reasonable and appropriate in the circumstances  Prior to the designation of a successor, the Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool may waive any past or current Event of Default

(d) Appointment of a successor shall not relieve Freddie Mac, in its capacity as Guarantor, of its guarantee obligations as set forth in this Agreement

**Section 5.03. Limitation on Suits by Holders.**

(a) With respect to any PC Pool, except as provided in Section 5 02, no Holder shall have any right to institute any action or proceeding at law or in equity or in bankruptcy or otherwise or seek any other remedy whatsoever against Freddie Mac or the Trustee with respect to this Agreement or the related PCs or Mortgages, unless:

(i) Such Holder previously has given the Trustee written notice of an Event of Default and the continuance thereof;

(ii) The Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool have made a written request to the Trustee to institute an action or proceeding in its own name and have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred;

(iii) The Trustee has failed to institute any such action or proceeding for 60 days after its receipt of the written notice, request and offer of indemnity described above; and

(iv) The Trustee has not received from such Holders any direction inconsistent with the written request described above during the 60 day period

(b) No Holder shall have any right under this Agreement to prejudice the rights of any other Holder, to obtain or seek preference or priority over any other Holder or to enforce any right under this Agreement, except for the ratable and common benefit of all Holders of PCs representing interests in any affected PC Poo

17

TREASURY-1039

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) For the protection and enforcement of the provisions of this Section, Freddie Mac, the Trustee and each and every Holder shall be entitled to such relief as can be given either at law or in equity  Notwithstanding the foregoing, no Holder's right to receive payment (or to institute suit to enforce payment) of principal and interest as provided herein on or after the due date of such payment shall be impaired or affected without the consent of the Holder

# ARTICLE VI

## Trustee

**Section 6.01. Duties of Trustee.**

(a) If an Event of Default has occurred and is continuing with respect to a PC Pool, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement and no implied covenants or obligations shall be read into this Agreement against the Trustee

(c) The Trustee and its directors, officers, employees and agents may not be protected from liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of their respective duties or by reason of reckless disregard of obligations and duties under this Agreement, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any action taken, or not taken, by the Trustee in good faith pursuant to this Agreement or for errors in judgment; and

(iii) the Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default, unless the Trustee obtains actual knowledge or written notice of such default or Event of Default  In the absence of such actual knowledge or notice, the Trustee may conclusively assume that there is no default or Event of Default

(d) Every provision of this Agreement shall be subject to the provisions of this Section and Section 6 02

(e) The Trustee shall not be liable for indebtedness evidenced by or arising under this Agreement, including principal of or interest on the PCs, or interest on any money received by it except as the Trustee may agree in writing

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law or the terms of this Agreement

(g) No provision of this Agreement shall require the Trustee to expend, advance or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

18

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(h) The Trustee may, but shall not be obligated to, undertake any legal action that it deems necessary or desirable in the interest of Holders  The Trustee may be reimbursed for the legal expenses and costs of such action from the assets of the related PC Pool

**Section 6.02. Certain Matters Affecting the Trustee.**

(a) The Trustee, and any director, officer, employee or agent of the Trustee may rely in good faith on any certificate, opinion or other document of any kind which, prima facie, is properly executed and submitted by any appropriate Person respecting any matters arising hereunder. The Trustee may rely on any such documents believed by it to be genuine and to have been signed or presented by the proper Person and on their face conforming to the requirements of this Agreement  The Trustee need not investigate any fact or matter stated in such documents

(b) Before the Trustee acts or refrains from acting, it may require an officer's certificate or an opinion of counsel, which shall not be at the expense of the Trustee  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or opinion of counsel  The right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty and the Trustee shall not be answerable for other than its willful misfeasance, bad faith or gross negligence in the performance of such act

(c) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, that the Trustee's conduct does not constitute willful misfeasance, bad faith or gross negligence  In no event shall the Trustee have any liability for consequential damages

(e) The Trustee may consult with and rely on the advice of counsel, accountants and other advisors and shall not be liable for errors in judgment or for anything it does or does not do in good faith if it so relies  Any opinion of counsel with respect to legal matters relating to this Agreement and the PCs shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with any opinion of such counsel.

(f) Any fees, expenses and indemnities payable from the assets of any PC Pool to Freddie Mac, in its capacity as Trustee, in the performance of its duties and obligations hereunder shall not affect Freddie Mac's guarantee with respect to that PC Pool, as set forth in Section 3 09

**Section 6.03. Trustee's Disclaimer.** The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Agreement, the assets of the PC Pool or the PCs

**Section 6.04. Trustee May Own PCs.** Subject to Section 7 06, the Trustee in its individual or any other capacity may become the owner or pledgee of PCs with the same rights as it would have if it were not the Trustee

**Section 6.05. Indemnity.** Each PC Pool shall indemnify the Trustee and the Trustee's employees, directors, officers and agents, as provided in this Agreement, against any and all claims, losses, liabilities or expenses (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties under this Agreement (to the extent not previously reimbursed above), including, without limitation, the execution and filing of any federal or state tax returns and information returns and being the mortgagee of record with respect to the related Mortgages  The Trustee shall notify the Administrator promptly of any claim for which it may seek indemnity. Failure by the Trustee to so

19

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notify the Administrator shall not relieve the related PC Pool of its obligations hereunder  A PC Pool shall not be required to reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misfeasance, bad faith or gross negligence.

The Trustee's rights pursuant to this Section shall survive the discharge of this Agreement.

**Section 6.06. Replacement of Trustee.** The Trustee may resign at any time  Any successor Trustee shall resign if it ceases to be eligible in accordance with the provisions of Section 6 09  In either case, the resignation of the Trustee shall become effective, and the resigning Trustee shall be discharged from its obligations with respect to the PC Pools created under this Agreement by giving 90 days' written notice of the resignation to the Depositor, the Guarantor and the Administrator and upon the effectiveness of an appointment of a successor Trustee, which may be as of a date prior to the end of the 90 day period  Upon receiving such notice of resignation, the Depositor shall promptly appoint one or more successor Trustees by written instrument, one copy of which is delivered to the resigning Trustee and one copy of which is delivered to the successor Trustee  The successor Trustee need not be the same Person for all PC Pools  If no successor Trustee has been appointed for a PC Pool, or one that has been appointed has not accepted the appointment within 90 days after giving such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee

Prior to an Event of Default, or if an Event of Default has occurred and has been cured with respect to a PC Pool, Freddie Mac cannot be removed as Trustee with respect to that PC Pool  If an Event of Default has occurred and is continuing while Freddie Mac is the Trustee, at the direction of Holders of PCs representing a majority of the remaining principal balance of such PC Pool, Freddie Mac shall resign or be removed as Trustee, and to the extent permitted by law, all of the rights and obligations of the Trustee with respect to the related PC Pool only, will be terminated by notifying the Trustee in writing  Holders of PCs representing a majority of the remaining principal balance of the PC Pool will then be authorized to name and appoint one or more successor Trustees  Notwithstanding the termination of the Trustee, its liability under this Agreement and arising prior to such termination shall survive such termination.

If a successor Trustee is serving as the Trustee, the following events are "Trustee Events of Default" with respect to a PC Pool:

(i) the Trustee fails to comply with Section 6.09;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting

If at any time a Trustee Event of Default has occurred and is continuing, the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) may, and if directed by Holders of PCs representing a majority of the remaining principal balance of such PC Pool, shall, remove the Trustee as to such PC pool and appoint a successor Trustee by written instrument, one copy of which shall be delivered to the Trustee so removed and one copy of which shall be delivered to the successor Trustee, and the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) shall give written notice of the successor Trustee to the Holders affected by the succession  Notwithstanding the termination of the Trustee, its liability under this Agreement arising prior to such termination will survive such termination.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Depositor shall promptly appoint a successor Trustee that satisfies the eligibility requirements of Section 6.09.

20

TREASURY-1042

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The retiring Trustee agrees to cooperate with the Depositor and any successor Trustee in effecting the termination of the retiring Trustee's responsibilities and rights hereunder and shall promptly provide such successor Trustee all documents and records reasonably requested by it to enable it to assume the Trustee's functions hereunder.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Depositor, the Guarantor and the Administrator Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Agreement with respect to such PC Pool  The successor Trustee shall mail a notice of its succession to the related Holders  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Depositor may petition any court of competent jurisdiction for the appointment of a successor Trustee

**Section 6.07. Successor Trustee By Merger.** If a successor Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.09.

**Section 6.08. Appointment of Co Trustee or Separate Trustee.**

(a) Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of a PC Pool may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co trustee or co trustees, or separate trustee or separate trustees, of all or any part of such PC Pool and to vest in such Person or Persons, in such capacity and for the benefit of the related Holders, such title to such PC Pool, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable  No co trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6 09 and no notice to the related Holders of the appointment of any co trustee or separate trustee shall be required under Section 6 06 hereof

(b) With respect to each PC Pool, every separate trustee and co trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co trustee jointly (it being understood that such separate trustee or co trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the related PC Pool or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co trustee, but solely at the direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

21

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co trustee

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co trustees, as effectively as if given to each of them  Every instrument appointing any separate trustee or co trustee shall refer to this Agreement and the conditions of this Article VI  Each separate trustee and co trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee  Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co trustee may at any time constitute the Trustee, its agent or attorney in fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name  If any separate trustee or co trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee

**Section 6.09. Eligibility; Disqualification.**  Freddie Mac is eligible to act as the Trustee and is initially the Trustee for the PC Pools created under this Agreement  Any successor to Freddie Mac (i) at the time of its appointment as Trustee, must be reasonably acceptable to Freddie Mac and (ii) must be organized as a corporation or association doing business under the laws of the United States or any State thereof, be authorized under such laws to exercise corporate trust powers, have combined capital and surplus of at least $50,000,000 and be subject to supervision or examination by federal or state financial regulatory authorities  If any successor Trustee shall cease to satisfy the eligibility requirements set forth in (ii) above, that successor Trustee shall resign immediately in the manner and with the effect specified in Section 6 06

## ARTICLE VII

### Miscellaneous Provisions

**Section 7.01. Annual Statements.**  Within a reasonable time after the end of each calendar year, the Administrator (or its agent) shall furnish to each Holder on any Record Date during such year information that the Administrator deems necessary or desirable to enable Holders and beneficial owners of PCs to prepare their United States federal income tax returns, if applicable

**Section 7.02. Limitations on Liability.**  Neither Freddie Mac, in its corporate capacity, nor any of its directors, officers, employees, authorized designees, representatives or agents ("related persons'') shall be liable to Holders for any action taken, or not taken, by them or by a servicer in good faith pursuant to this Agreement or for errors in judgment  This provision shall not protect Freddie Mac or any related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under this Agreement  In no event shall Freddie Mac or any related person be liable for any consequential damages  Freddie Mac and any related person may rely in good faith on any document or other communication of any kind properly executed and submitted by any Person with respect to any matter arising under this Agreement  Freddie Mac has no obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service or supervise the servicing of the Mortgages in accordance with this Agreement and which in its opinion may involve any expense or liability for Freddie Mac. Freddie Mac may, in its discretion, undertake or participate in any action it deems necessary or

22

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

desirable with respect to any Mortgage, this Agreement, the PCs or the rights and duties of the parties hereto and the interests of the Holders hereunder  In such event, the legal expenses and costs of such action and any resulting liability shall be expenses for the protection, preservation and maintenance of the Mortgages borne pro rata by Freddie Mac and Holders as provided in Section 3 08(b)

**Section 7.03. Limitation on Rights of Holders.**  The death or incapacity of any Person having an interest in a PC shall not terminate this Agreement or any PC Pool  Such death or incapacity shall not entitle the legal representatives or heirs of such Person, or any Holder for such Person, to claim an accounting, take any action or bring any proceeding in any court for a partition or winding up of the related PC Pool, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them

**Section 7.04. Control by Holders.**  With respect to any PC Pool, except as otherwise provided in Articles V and VI and Sections 7 05 and 7 06, no Holder shall have any right to vote or to otherwise control in any manner the operation and management of the Mortgages included in such PC Pool, or the obligations of the parties hereto  This Agreement shall not be construed so as to make the Holders from time to time partners or members of an association  Holders shall not be liable to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof

**Section 7.05. Amendment.**

(a) Freddie Mac and the Trustee may amend this Agreement (including any related Pool Supplement) from time to time without the consent of any Holders to (i) cure any ambiguity or correct or supplement any provision in this Agreement,  *provided, however,* that any such amendment shall not have a material adverse effect on any Holder; (ii) maintain the classification of any PC Pool as a grantor trust for federal income tax purposes; or (iii) avoid the imposition of any state or federal tax on a PC Pool; it being understood that any amendment permitting the repurchase of a Mortgage by Freddie Mac due to a delinquency of less than 120 days, other than in the circumstances described in Section 1.02(c)(iii), may not be adopted under this clause (a).

(b) Except as provided in Section 7 05(c), Freddie Mac and the Trustee may amend this Agreement as to any PC Pool, with the consent of Holders representing not less than a majority of the remaining principal balance of the affected PC Pool

(c) Freddie Mac and the Trustee may not amend this Agreement, without the consent of a Holder, if such amendment would impair or affect the right of such Holder to receive payment of principal and interest on or after the due date of such payment or to institute suit for the enforcement of any such payment on or after such date

(d) To the extent that any provisions of this Agreement differ from the provisions of any Freddie Mac Mortgage Participation Certificates Agreement or PC Master Trust Agreement dated prior to the date of this Agreement, this Agreement shall be deemed to amend such provisions of the prior agreement, but only to the extent that Freddie Mac, under the terms of such prior agreement, could have effected such change as an amendment of such prior agreement without the consent of Holders of PCs thereunder; *provided, however,* that the trust declarations and related provisions set forth in Section 7 05(d) of the PC Master Trust Agreement dated as of December 3  , 2007 are hereby reaffirmed with respect to each PC Pool created before December 3  , 2007

(e) Notwithstanding any other provision of this Section, (i) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to reflect any modification in the Administrator's methodology of calculating payments to Holders, including any modifications described in Section 3.05(d) and Section 3.06(a) and the manner in which it distributes prepayments to Holders, (ii) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to cure any inconsistency between this

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Agreement and the provisions of the Guide and (iii) the Depositor (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend any Pool Supplement to make the adjustments described in Section 1 02(b) to the characteristics of the Mortgages to be transferred to a PC Pool or to the related PCs

**Section 7.06. Voting Rights.**

If Freddie Mac is acting as Administrator or Trustee and an Event of Default has occurred and is continuing, any PCs held by Freddie Mac for its own account shall be disregarded and deemed not to be outstanding for purposes of exercising the remedies set forth in Section 5 02 and the second paragraph of Section 6.06.

**Section 7.07. Persons Deemed Owners.** With respect to each PC Pool, Freddie Mac, the Trustee, the Administrator and a Federal Reserve Bank (or any agent of any of them) may deem and treat the related Holder(s) as the absolute owner(s) of a PC and the undivided beneficial ownership interests in the Mortgages included in the related PC Pool for the purpose of receiving payments and for all other purposes, and none of Freddie Mac, the Trustee, the Administrator or a Federal Reserve Bank (nor any agent of any of them) shall be affected by any notice to the contrary  All payments made to a Holder, or upon such Holder's order, shall be valid, and, to the extent of the payment, shall satisfy and discharge the related PC Pool's payment obligations with respect to the Holder's PC  None of Freddie Mac, the Trustee, the Administrator or any Federal Reserve Bank shall have any direct obligation to any beneficial owner unless it is also the Holder of a PC

**Section 7.08. Governing Law.** THIS AGREEMENT AND THE PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO PCs, SHALL BE GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED HEREBY, THE LOCAL LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 7.09. Grantor Trust Status.** No provision in this Agreement shall be construed to grant Freddie Mac, the Trustee or any other Person authority to act in any manner which would cause a PC Pool not to be treated as a grantor trust for federal income tax purposes

**Section 7.10. Payments Due on Non Business Days.** If the date fixed for any payment on any PC is a day that is not a Business Day, then such payment shall be made on the next succeeding Business Day, with the same force and effect as though made on the date fixed for such payment, and no interest shall accrue for the period after such date

**Section 7.11. Successors.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, including any successor by operation of law, and permitted assigns.

**Section 7.12. Headings.** The headings in this Agreement are for convenience only and shall not affect the construction of this Agreement

**Section 7.13. Notice and Demand.**

(a) Any notice, demand or other communication required or permitted under this Agreement to be given to or served upon any Holder may be given or served (i) in writing by deposit in the United States mail, postage prepaid, and addressed to such Holder as such Holder's name and address may appear on the books and records of a Federal Reserve Bank or (ii) by transmission to such Holder through the communication system of the Federal Reserve Banks  Any notice, demand or other communication to or or

24

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                                           Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

upon a Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission

(b) Any notice, demand or other communication which is required or permitted to be given to or served under this Agreement may be given in writing addressed as follows (i) in the case of Freddie Mac in its corporate capacity, to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President     General Counsel and Secretary and (ii) in the case of the Trustee, to: Freddie Mac (as Trustee), 8200 Jones Branch Drive, McLean, Virginia 22  02, Attention: Executive Vice President     General Counsel and Secretary

(c) Any notice, demand or other communication to or upon Freddie Mac or the Trustee shall be deemed to have been sufficiently given or made only upon its actual receipt of the writing

25

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

THE SALE OF A PC AND RECEIPT AND ACCEPTANCE OF A PC BY OR ON BEHALF OF A HOLDER, WITHOUT ANY SIGNATURE OR FURTHER MANIFESTATION OF ASSENT, SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER AND ALL OTHERS HAVING A BENEFICIAL INTEREST IN SUCH PC OF ALL THE TERMS AND PROVISIONS OF THIS AGREEMENT (INCLUDING THE RELATED POOL SUPPLEMENT) AND THE AGREEMENT OF FREDDIE MAC, SUCH HOLDER AND SUCH OTHERS THAT THOSE TERMS AND PROVISIONS SHALL BE BINDING, OPERATIVE AND EFFECTIVE.

<div align="center">

FEDERAL HOME LOAN MORTGAGE CORPORATION, in its

corporate capacity and as Trustee


/s/     Mark D. Hanson_____

Authorized Signatory

</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2007 | 2006 |
| | (dollars in millions) | | | | |
| Net Income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $(14,882) | $(22,384) | $(44,564) | $ (5,989) | $ 2,340 |
| Add | | | | | |
| Low-income housing tax credit partnerships | | 4,155 | 453 | 469 | 407 |
| Total interest expense | 92,131 | 22,150 | 33,332 | 38,482 | 37,270 |
| Interest factor on rental expenses | 5 | 7 | 8 | 7 | 6 |
| Earnings (loss), as adjusted | $ 77,254 | $ 3,928 | $ (10,771) | $ 32,969 | $ 40,023 |
| Fixed charges | | | | | |
| Total interest expense | $ 92,131 | $ 22,150 | $ 33,332 | $ 38,482 | $ 37,270 |
| Interest factor on rental expenses | 5 | 7 | 8 | 7 | 6 |
| Capitalized interest | | | | | |
| Total fixed charges | $ 92,136 | $ 22,157 | $ 33,340 | $ 38,489 | $ 37,276 |
| Senior preferred stock and preferred stock dividends[1] | 5,749 | 4,105 | 675 | 398 | 270 |
| Total fixed charges including preferred stock dividends | $ 97,885 | $ 26,262 | $ 34,015 | $ 38,887 | $ 37,546 |
| Ratio of earnings to fixed charges[2] | | | | | 1.07 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] | | | | | 1.07 |

(1) Senior preferred stock and preferred stock dividends depresent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using the effective tax rate, whenever there is an income or a provision, for the relevant periods

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For earnings to equal 1.00, earnings (loss), as adjusted must increase by $14.9 billion, $18.2 billion, $44.1 billion and $5.5 billion for the years ended December 31, 2010, 2009, 2008, and 2007, respectively

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For earnings to equal 1.00, earnings (loss), as adjusted must increase by $20.6 billion, $22.3 billion, $44.8 billion and $5.9 billion for the years ended December 31, 2010, 2009, 2008, and 2007, respectively

Source: FANNIE MAE / FEDERAL NATIONAL MORTGAGE CORP, 10-K, February 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1049

**Exhibit 24**

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

    KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

    IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 31, 2011.

    /s/ John A. Koskinen

    John A. Koskinen

TREASURY-1050

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 29, 2011.

/s/ Linda B. Bammann

Linda B. Bammann

---

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Carolyn H. Byrd

Carolyn H. Byrd

TREASURY-1052

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Robert R  Glauber

Robert R  Glauber

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Laurence E. Hirsch

Laurence E. Hirsch

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Christopher S. Lynch

Christopher S. Lynch

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Nicolas P. Retsinas

Nicolas P. Retsinas

TREASURY-1056

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 28, 2011.

/s/ Clayton S. Rose

Clayton S  Rose

---

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 5, 2011.

/s/ Eugene B. Shanks, Jr.

Eugene B. Shanks, Jr.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10 K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Robert E. Bostrom and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U S  Securities and Exchange Commission in connection with the Annual Report on Form 10 K for the year ended December 31, 2010 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of January 30, 2011.

/s/ Anthony A. Williams

Anthony A. Williams

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Annual Report on Form 0 K for the year ended December 3 , 20 0 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3 Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4 The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 3a 5(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: February 24, 2011

/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Annual Report on Form  0 K for the year ended December 3 , 20  0 of the Federal Home  Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue  statement of a material fact or omit to state a material fact  necessary to make the statements made, in light of the circumstances under which such statements were made, not  misleading with respect to the period covered by this report;

3  Based on my knowledge, the financial statements, and other  financial information included in this report, fairly present in  all material respects the financial condition, results of  operations and cash flows of the registrant as of, and for, the  periods presented in this report;

4  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining  disclosure controls and procedures (as defined in Exchange Act Rules  3a  5(e) and 15d 15(e)) and internal control over financial reporting (as defined in  Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such  disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the  registrant, including its consolidated subsidiaries, is made  known to us by others within those entities, particularly during  the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or  caused such internal control over financial reporting to be  designed under our supervision, to provide reasonable assurance  regarding the reliability of financial reporting and the  preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure  controls and procedures and presented in this report our  conclusions about the effectiveness of the disclosure controls  and procedures, as of the end of the period covered by this  report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during  the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual  report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over  financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of  internal control over financial reporting, to the registrant's auditors and the audit committee of  the registrant's board of directors (or persons performing the  equivalent functions):

   a. All significant deficiencies and material weaknesses in the  design or operation of internal control over financial reporting  which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or  other employees who have a significant role in the  registrant's internal control over financial reporting

Date: February 24, 2011

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President     Chief Financial Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,   ebruary 24, 2011          TREASURY-1061          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES OXLEY ACT OF 2002**

In connection with the Annual Report on Form   0 K for the year ended December 3  , 20  0 of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to  Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section  3(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of operations of the Company.

Date: February 24, 2011

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTI Tl FRTAO**

**NP CUP FOR RA S8 P .U1 . UE1 RTAO S350,**

**F U EOF1 RED BY UE1 RTAO 906 A1  RHE UFCBFOEU AXLEY F 1 R AI  2002**

In connection with the Annual Report on Form  0 K for the year ended December 3  , 20  0 of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Ross J  Kari, Executive  V ce President     Chief Financial Officer of the  Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of  Section  3(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: February 24, 2011

/s/  Ross J. Kari
Ross J. Kari
Executive Vice President      Chief Financial Officer

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K,  ebruary 24, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**DEPARTMENT OF THE TREASURY**
WASHINGTON

UNDER SECRETARY

March 31, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in my letter to you dated December 29, 2010, I communicated to you our waiver, for the first quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the second quarter of CY 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

☑      **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2011

OR

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from      to

Commission File No.: 0-50231

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of March 31, 2011, there were 1,119,602,427 shares of common stock of the registrant outstanding.

# TABLE OF CONTENTS

**Part I—Financial Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Item 1.    Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

          Condensed Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

          Condensed Consolidated Statements of Operations and Comprehensive Loss . . . . . . . . . . . . .   85

          Condensed Consolidated Statements of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86

              Note 1—Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . . .   87

              Note 2—Consolidations and Transfers of Financial Assets . . . . . . . . . . . . . . . . . . . . . .   94

              Note 3—Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97

              Note 4—Allowance for Loan Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102

              Note 5—Investments in Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   105

              Note 6—Financial Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   112

              Note 7—Acquired Property, Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   116

              Note 8—Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . .   116

              Note 9—Derivative Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   118

              Note 10—Segment Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   122

              Note 11—Regulatory Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   124

              Note 12—Concentration of Credit Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   124

              Note 13—Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   126

              Note 14—Commitments and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   141

Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations . . .   1

          Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

          Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

          Legislative and Regulatory Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

          Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

          Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

          Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

          Consolidated Balance Sheet Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

          Supplemental Non-GAAP Information—Fair Value Balance Sheets . . . . . . . . . . . . . . . . . . .   42

          Liquidity and Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

          Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

          Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

          Impact of Future Adoption of New Accounting Pronouncements . . . . . . . . . . . . . . . . . . . .   81

          Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

Item 3.    Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . . . . . .   145

Item 4.    Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   145

TREASURY-1066

**PART II—Other Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   148

Item 1.      Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   148

Item 1A.   Risk Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   148

Item 2.      Unregistered Sales of Equity Securities and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . .   151

Item 3.      Defaults Upon Senior Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153

Item 4.      [Removed and reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153

Item 5.      Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153

Item 6.      Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153

TREASURY-1067

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Quarter of 2011 | 5 |
| 2 | Single-Family Serious Delinquency Rates by Year of Acquisition | 7 |
| 3 | Credit Profile of Single-Family Conventional Loans Acquired | 8 |
| 4 | Credit Statistics, Single-Family Guaranty Book of Business | 10 |
| 5 | Level 3 Recurring Financial Assets at Fair Value | 16 |
| 6 | Summary of Condensed Consolidated Results of Operations | 17 |
| 7 | Analysis of Net Interest Income and Yield | 18 |
| 8 | Rate/Volume Analysis of Changes in Net Interest Income | 19 |
| 9 | Fair Value Gains (Losses), Net | 20 |
| 10 | Total Loss Reserves | 22 |
| 11 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 23 |
| 12 | Nonperforming Single-Family and Multifamily Loans | 25 |
| 13 | Credit Loss Performance Metrics | 26 |
| 14 | Single-Family Credit Loss Sensitivity | 27 |
| 15 | Single-Family Business Results | 29 |
| 16 | Multifamily Business Results | 31 |
| 17 | Capital Markets Group Results | 33 |
| 18 | Capital Markets Group's Mortgage Portfolio Activity | 35 |
| 19 | Capital Markets Group's Mortgage Portfolio Composition | 36 |
| 20 | Summary of Condensed Consolidated Balance Sheets | 37 |
| 21 | Summary of Mortgage-Related Securities at Fair Value | 38 |
| 22 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities | 39 |
| 23 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) | 40 |
| 24 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net | 42 |
| 25 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 43 |
| 26 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 45 |
| 27 | Activity in Debt of Fannie Mae | 48 |
| 28 | Outstanding Short-Term Borrowings and Long-Term Debt | 50 |
| 29 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 51 |
| 30 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year | 52 |
| 31 | Cash and Other Investments Portfolio | 52 |
| 32 | Fannie Mae Credit Ratings | 53 |
| 33 | Composition of Mortgage Credit Book of Business | 56 |
| 34 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business | 59 |

iii

| Table | Description | Page |
|-------|-------------|------|
| 35 | Delinquency Status of Single-Family Conventional Loans | 64 |
| 36 | Serious Delinquency Rates | 65 |
| 37 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis | 66 |
| 38 | Statistics on Single-Family Loan Workouts | 67 |
| 39 | Loan Modification Profile | 68 |
| 40 | Single-Family Foreclosed Properties | 69 |
| 41 | Single-Family Acquired Property Concentration Analysis | 70 |
| 42 | Multifamily Serious Delinquency Rates | 72 |
| 43 | Multifamily Concentration Analysis | 72 |
| 44 | Multifamily Foreclosed Properties | 73 |
| 45 | Mortgage Insurance Coverage | 75 |
| 46 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 80 |
| 47 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 80 |

iv

## PART I—FINANCIAL INFORMATION

**Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K") in "Business—Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2010 Form 10-K.*

*This report contains forward-looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report. Our actual results may differ materially from those reflected in these forward-looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2010 Form 10-K.*

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans or lend money directly to consumers in the primary mortgage market. Our most significant activities are securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities, which we refer to as Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities for our mortgage portfolio. We use the term "acquire" in this report to refer both to our securitization activity and our purchase activity.

We obtain funds to purchase mortgage-related assets for our mortgage portfolio by issuing a variety of debt securities in the domestic and international capital markets. We also make other investments that increase the supply of affordable housing.

We are a corporation chartered by the U.S. Congress. Our conservator is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

1

## EXECUTIVE SUMMARY

### Summary of Our Financial Performance for the First Quarter of 2011

Our financial results for the first quarter of 2011 reflect continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment, underemployment and the prolonged decline in home prices.

*Comprehensive loss.* Our total comprehensive loss for the first quarter of 2011 was $6.3 billion, consisting of a net loss of $6.5 billion and other comprehensive income of $181 million. In comparison, we recognized a total comprehensive loss of $435 million in the fourth quarter of 2010, consisting of net income of $65 million and other comprehensive loss of $500 million, and a total comprehensive loss of $10.2 billion in the first quarter of 2010, consisting of a net loss of $11.5 billion and other comprehensive income of $1.4 billion.

The change from net income in the fourth quarter of 2010 to net loss in the first quarter of 2011 was primarily due to a $6.7 billion increase in credit-related expenses. Credit-related expenses consist of the provision for loan losses, the provision for guaranty losses and foreclosed property expense. Our higher provision for loan losses during the period was primarily driven by an increase in our total loss reserves due to: (1) a decline in home prices and increase in initial charge-off severity during the period, (2) the number of loans that entered a trial modification period during the quarter, (3) a decline in future expected home prices and (4) loans continuing to remain delinquent for an extended period of time. In addition, the fourth quarter of 2010 reflects a $1.2 billion reduction to credit-related expenses resulting from the resolution of outstanding repurchase requests with Bank of America, N.A. and its affiliates.

The $5.1 billion decrease in our net loss in the first quarter of 2011 compared with the first quarter of 2010 was due primarily to a $2.2 billion increase in net interest income, driven by lower interest expense on debt; $289 million in net fair value gains in the first quarter of 2011 compared with $1.7 billion in net fair value losses in the first quarter of 2010, primarily due to fair value gains on derivatives and trading securities; and an $842 million decrease in credit-related expenses, due to a decrease in our provision for loan losses. Other comprehensive income in the first quarter of 2010 was primarily driven by a reduction in our unrealized loss due to significantly improved fair value of available-for-sale securities.

*Net worth.* Our net worth deficit of $8.4 billion as of March 31, 2011 reflects the recognition of our total comprehensive loss of $6.3 billion and our payment to Treasury of $2.2 billion in senior preferred stock dividends during the first quarter of 2011. In May 2011, the Acting Director of FHFA submitted a request to Treasury on our behalf for $8.5 billion to eliminate our net worth deficit.

In the first quarter of 2011, we received $2.6 billion in funds from Treasury to eliminate our net worth deficit as of December 31, 2010. Upon receipt of the additional funds requested to eliminate our net worth deficit as of March 31, 2011, the aggregate liquidation preference on the senior preferred stock will be $99.7 billion, which will require an annualized dividend payment of $10.0 billion. This amount exceeds our reported annual net income for each year since our inception. Through March 31, 2011, we have paid an aggregate of $12.4 billion to Treasury in dividends on the senior preferred stock.

*Total loss reserves.* Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $72.1 billion as of March 31, 2011 from $66.3 billion as of December 31, 2010. Our total loss reserve coverage to total nonperforming loans was 34.66% as of March 31, 2011, compared with 30.85% as of December 31, 2010. The continued stress on a broad segment of borrowers from persistent high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past several quarters. Further, the shift in our nonperforming loan balance from loans in our collective reserve to loans that are individually impaired has caused our coverage ratio to increase.

TREASURY-1071

**Providing Liquidity, Our Strong New Book of Business and Expected Losses on Single-Family Loans We Acquired before 2009 (Our "Legacy" Book of Business)**

In the first quarter of 2011, we continued our work to provide liquidity to the mortgage market, grow the strong new book of business we have acquired since January 1, 2009, shortly after we entered into conservatorship, and minimize our losses from delinquent loans.

- From January 1, 2009 to March 31, 2011, we acquired approximately 6,595,000 single-family conventional loans, excluding delinquent loans we purchased from our MBS trusts, and we acquired multifamily loans secured by multifamily properties with approximately 761,000 units.

- The single-family loans we have acquired since the beginning of 2009, which we refer to in this discussion as our "new single-family book of business," have a strong overall credit profile and are performing well. We expect these loans will be profitable over their lifetime, by which we mean they will generate more fee income than credit losses and administrative costs, as we discuss below in "Building a Strong New Single-Family Book of Business—Expected Profitability of Our Single-Family Acquisitions." For further information, see "Table 2: Single-Family Serious Delinquency Rates by Year of Acquisition" and "Table 3: Credit Profile of Single-Family Conventional Loans Acquired."

- The vast majority of our realized credit losses in 2009, 2010 and the first quarter of 2011 were attributable to single-family loans that we purchased or guaranteed from 2005 through 2008. While these loans will give rise to additional credit losses that we will realize when the loans are charged-off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we estimate that we have reserved for the substantial majority of the remaining losses on these loans. Even though we believe a substantial majority of the credit losses we have yet to realize on these loans has already been reflected in our results of operations as credit-related expenses, we expect that our credit-related expenses will be higher in 2011 than in 2010 as weakness in the housing and mortgage markets continues. We are taking a number of actions to reduce our credit losses, which we discuss in our 2010 Form 10-K in "Business—Executive Summary—Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" and in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

*Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations*

We present a number of estimates and expectations in this executive summary regarding the profitability of single-family loans we have acquired, our single-family credit losses and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of these amounts, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of home price changes, changes in interest rates, unemployment, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, other macro-economic variables, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our real-estate owned ("REO") inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, or many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

*Providing Mortgage Market Liquidity*

We support liquidity and stability in the secondary mortgage market, serving as a stable source of funds for purchases of homes and multifamily rental housing and for refinancing existing mortgages. We provide this financing through the activities of our three complementary businesses: our Single-Family business ("Single-Family"), our Multifamily Mortgage business ("Multifamily") and our Capital Markets group. Our Single-

TREASURY-1072

Family and Multifamily businesses work with our lender customers, who deliver mortgage loans that we purchase and securitize into Fannie Mae MBS. Our Capital Markets group manages our investment activity in mortgage-related assets, funding investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. The Capital Markets group also works with lender customers to provide funds to the mortgage market through short-term financing and other activities, making short-term use of our balance sheet. These financing activities include whole loan conduit transactions, early funding transactions, Real Estate Mortgage Investment Conduit ("REMIC") and other structured securitization activities, and dollar rolls, which we describe in more detail in our 2010 Form 10-K in "Business—Business Segments—Capital Markets Group."

In the first quarter of 2011, we purchased or guaranteed approximately $189 billion in loans, measured by unpaid principal balance, which includes approximately $20 billion in delinquent loans we purchased from our single-family MBS trusts. Excluding delinquent loans purchased from our MBS trusts, our purchases and guarantees enabled our lender customers to finance approximately 759,000 single-family conventional loans and multifamily loans secured by multifamily properties with approximately 83,000 units.

We remained the largest single issuer of mortgage-related securities in the secondary market, with an estimated market share of new single-family mortgage-related securities issuances of 48.6% during the first quarter of 2011. In comparison, our estimated market share of new single-family mortgage-related securities issuances was 49.0% in the fourth quarter of 2010 and 40.8% in the first quarter of 2010. If the Federal Housing Administration ("FHA") continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher loan-to-value ("LTV") ratios, our market share could be adversely impacted if the market shifts away from refinance activity, which is likely to occur when interest rates rise. We remain a constant source of liquidity in the multifamily market. Currently, we own or guarantee approximately one-fifth of the outstanding debt on multifamily properties.

### Building a Strong New Single-Family Book of Business

Our new single-family book of business has a strong overall credit profile and is performing well. In this section, we discuss our expectations for these loans and their performance to date.

#### Expected Profitability of Our Single-Family Acquisitions

While it is too early to know how loans in our new single-family book of business will ultimately perform, given their strong credit risk profile, low levels of payment delinquencies shortly after acquisition, and low serious delinquency rates, we expect that, over their lifetime, these loans will be profitable. Table 1 provides information about whether we expect loans we acquired in 1991 through the first quarter of 2011 to be profitable, and the percentage of our single-family guaranty book of business represented by these loans as of March 31, 2011. The expectations reflected in Table 1 are based on the credit risk profile of the loans we have acquired, which we discuss in more detail in "Table 3: Credit Profile of Single-Family Conventional Loans Acquired" and in "Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business." These expectations are also based on numerous other assumptions, including our expectations regarding home price declines set forth below in "Outlook." As shown in Table 1, we expect loans we have acquired in 2009, 2010 and the first quarter of 2011 to be profitable. If future macroeconomic conditions turn out to be significantly more adverse than our expectations, these loans could become unprofitable. For example, we believe that these loans would become unprofitable if home prices declined more than 15% from their March 2011 levels over the next five years based on our home price index, which would be an approximately 34% decline from their peak in the third quarter of 2006.

TREASURY-1073

**Table 1:   Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Quarter of 2011**



As Table 1 shows, the key years in which we acquired loans that we expect will be unprofitable are 2005 through 2008. The vast majority of our realized credit losses since the beginning of 2009 were attributable to these loans. Although loans we acquired in 2004 were originated under more conservative acquisition policies than loans we acquired from 2005 through 2008, our 2004 acquisitions were made during a time when home prices were rapidly increasing, and their performance has suffered from the subsequent decline in home prices, which continued in the first quarter of 2011. We currently expect these loans to perform close to break-even, but changes in home prices, other economic conditions or borrower behavior could change our expectation regarding whether these loans will be profitable.

Loans we have acquired since the beginning of 2009 comprised 45% of our single-family guaranty book of business as of March 31, 2011. Our 2005 to 2008 acquisitions are becoming a smaller percentage of our guaranty book of business, having decreased from 39% of our guaranty book of business as of December 31, 2010 to 36% as of March 31, 2011.

5

*Serious Delinquency Rates by Year of Acquisition*

In our experience, an early predictor of the ultimate performance of loans is the rate at which the loans become seriously delinquent within a short period of time after acquisition. Loans we acquired in 2009 and 2010 have experienced historically low levels of delinquencies shortly after their acquisition. Table 2 shows, for single-family loans we acquired in each year from 2001 to 2010, the percentage that were seriously delinquent (three or more months past due or in the foreclosure process) as of the end of the first quarter following the acquisition year. Loans we acquired in 2011 are not included in this table because they were originated so recently that they could not yet have become seriously delinquent. As Table 2 shows, the percentage of our 2009 acquisitions that were seriously delinquent as of the end of the first quarter following their acquisition year was more than seven times lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. For loans originated in 2010, this percentage was more than nine times lower than the average comparable rate for loans acquired in 2005 through 2008. Table 2 also shows serious delinquency rates for each year's acquisitions as of March 31, 2011. Except for the most recent acquisition years, whose serious delinquency rates are likely lower than they will be after the loans have aged, Table 2 shows that the current serious delinquency rate generally tracks the trend of the serious delinquency rate as of the end of the first quarter following the year of acquisition. Below the table we provide information about the economic environment in which the loans were acquired, specifically home price appreciation and unemployment levels.

6

**Table 2:   Single-Family Serious Delinquency Rates by Year of Acquisition**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011  YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Home Price Appreciation[1] | 6.3% | 7.5% | 7.6% | 10.7% | 11.5% | 2.7% | (4.1)% | (10.3)% | (3.7)% | (3.7)% | (1.8)% |
| Unemployment rate[2] | 4.7% | 5.8% | 6.0% | 5.5% | 5.1% | 4.6% | 4.6% | 5.8% | 9.3% | 9.6% | 8.9% |

---

  *  For 2010, the serious delinquency rate as of March 31, 2011 is the same as the serious delinquency rate as of the end of the first quarter following the acquisition year.

[1]  Based on Fannie Mae's Home Price Index (HPI), which measures average price changes based on repeat sales on the same properties. For 2011, the data show an initial estimate based on purchase transactions in Fannie-Freddie acquisition and public deed data available through the end of March 2011, supplemented by preliminary data that became available in April 2011. Previously reported data has been revised to reflect additional available historical data. Including subsequently available data may lead to materially different results.

[2]  Based on the average national unemployment rates for each month reported in the labor force statistics current population survey (CPS), Bureau of Labor Statistics.

_Credit Profile of Our Single-Family Acquisitions_

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized, on average and as discussed below, by higher LTV ratios and lower FICO credit scores than loans we have acquired since January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only

7

payment features. As a result of the sharp declines in home prices, 34% of the loans that we acquired from 2005 through 2008 had mark-to-market LTV ratios that were greater than 100% as of March 31, 2011, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. This percentage is higher when second lien loans secured by the same properties that secure our loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. We are taking a number of actions to reduce our credit losses. We discuss these actions and our strategy in our 2010 Form 10-K in "Business—Executive Summary—Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" and in "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market dynamics, we reduced our acquisitions of loans with higher-risk attributes. Compared with the loans we acquired in 2005 through 2008, the loans we have acquired since January 1, 2009 have had better overall credit risk profiles at the time we acquired them and their early performance has been strong. Our experience has been that loans with characteristics such as lower original LTV ratios (that is, more equity held by the borrowers in the underlying properties), higher FICO credit scores and more stable payments will perform better than loans with risk characteristics such as higher original LTV ratios, lower FICO credit scores, Alt-A underwriting and payments that may adjust over the term of the loan. Table 3 shows improvements in the credit risk profile of single-family loans we have acquired since January 1, 2009 compared to loans we acquired from 2005 through 2008.

**Table 3:   Credit Profile of Single-Family Conventional Loans Acquired[1]**

| | Acquisitions from 2009 through the first quarter of 2011 | Acquisitions from 2005 through 2008 |
|---|---|---|
| Weighted average loan-to-value ratio at origination . . . . . | 68% | 73% |
| Weighted average FICO credit score at origination . . . . . | 762 | 722 |
| Fully amortizing, fixed-rate loans . . . . . . . . . . . . . . . . . . | 95% | 86% |
| Alt-A loans[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 14% |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 12% |
| Original loan-to-value ratio > 90% . . . . . . . . . . . . . . . . | 5% | 11% |
| FICO credit score < 620 . . . . . . . . . . . . . . . . . . . . . . . . | * | 5% |

*    Represent less than 0.5% of the total acquisitions.

[1]  Loans that meet more than one category are included in each applicable category.

[2]  Newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinance of existing loans.

Improvements in the credit risk profile of our acquisitions since the beginning of 2009 over acquisitions in prior years reflect changes that we made to our pricing and eligibility standards, as well as changes that mortgage insurers made to their eligibility standards. We discuss these changes in our 2010 Form 10-K in "Business—Executive Summary—Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses—Credit Profile of Our Single-Family Acquisitions." In addition, FHA's role as the lower-cost option for some consumers for loans with higher LTV ratios has also reduced our acquisitions of these types of loans. The credit risk profile of our acquisitions since the beginning of 2009 has been influenced further by its significant percentage of refinanced loans. Refinanced loans generally perform better than purchase money loans, as the borrower has demonstrated a desire to maintain homeownership. As we discuss in "Outlook" below, we expect fewer refinancings in 2011 than in 2010.

In 2010 and 2011 our acquisitions of refinanced loans included a significant number of loans under our Refi Plus™ initiative. Under Refi Plus we acquire refinancings of performing Fannie Mae loans that have current LTV ratios up to 125% and, in some cases, lower FICO credit scores than we generally require. Refi Plus

loans reduce the borrowers' monthly payments or are otherwise more sustainable than the borrowers' old loans. Our acquisitions under Refi Plus include our acquisitions under the Home Affordable Refinance Program ("HARP"), which was established by the Administration to help borrowers who may be unable to refinance the mortgage loan on their primary residence due to a decline in home values. The LTV ratios at origination for our 2010 and 2011 acquisitions are higher than for our 2009 acquisitions, primarily due to our acquisition of Refi Plus loans. The percentage of loans with LTV ratios at origination greater than 90% has increased from 4% for 2009 acquisitions to 7% for 2010 acquisitions and 8% for acquisitions in the first quarter of 2011.

Despite the increases in LTV ratios at origination associated with Refi Plus, the overall credit profile of our 2010 and 2011 acquisitions remains significantly stronger than the credit profile of our 2005 through 2008 acquisitions. Whether the loans we acquire in the future exhibit an overall credit profile similar to our acquisitions since the beginning of 2009 will depend on a number of factors, including our future eligibility standards and those of mortgage insurers, the percentage of loan originations representing refinancings, our future objectives, government policy, and market and competitive conditions.

### Expected Losses on Our Legacy Book of Business

The single-family credit losses we realized from January 1, 2009 through March 31, 2011, combined with the amounts we have reserved for single-family credit losses as of March 31, 2011, as described below, total approximately $120 billion. The vast majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we estimate that we have reserved for the substantial majority of the remaining losses on these loans. Even though we believe a substantial majority of the credit losses we have yet to realize on these loans has already been reflected in our results of operations as credit-related expenses, we expect that our credit-related expenses will be higher in 2011 than in 2010 as weakness in the housing and mortgage markets continues. We also expect that future defaults on our legacy book of business and the resulting charge-offs will occur over a period of years. In addition, given the large current and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory is reduced to pre-2008 levels.

We show how we calculate our realized credit losses in "Table 13: Credit Loss Performance Metrics." Our reserves for credit losses described in this discussion consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, please see "Table 10: Total Loss Reserves."

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." The majority of the fair value losses were recorded prior to our adoption in 2010 of new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. Prior to our adoption of the new standards, upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses to the extent that the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our condensed consolidated balance sheets and have effectively been recognized in our condensed consolidated statements of operations and comprehensive loss through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future.

TREASURY-1078

**Credit Performance**

Table 4 presents information for each of the last five quarters about the credit performance of mortgage loans in our single-family guaranty book of business and actions taken by our servicers with borrowers to resolve existing or potential delinquent loan payments. We refer to these actions as "workouts." The workout information in Table 4 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

**Table 4: Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2011 | 2010 | | | | |
|---|---|---|---|---|---|---|
| | Q1 | Full Year | Q4 | Q3 | Q2 | Q1 |
| | | | (Dollars in millions) | | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate[2] . . . . . . . . . . . . | 4.27% | 4.48% | 4.48% | 4.56% | 4.99% | 5.47% |
| Nonperforming loans[3] . . . . . . . . . . . . . . | $206,098 | $ 212,858 | $212,858 | $212,305 | $217,216 | $222,892 |
| Foreclosed property inventory: | | | | | | |
| Number of properties. . . . . . . . . . . . . . | 153,224 | 162,489 | 162,489 | 166,787 | 129,310 | 109,989 |
| Carrying value . . . . . . . . . . . . . . . . . . | $ 14,086 | $ 14,955 | $ 14,955 | $ 16,394 | $ 13,043 | $ 11,423 |
| Combined loss reserves[4] . . . . . . . . . . . | $ 66,240 | $ 60,163 | $ 60,163 | $ 58,451 | $ 59,087 | $ 58,900 |
| Total loss reserves[5] . . . . . . . . . . . . . . . . | $ 70,466 | $ 64,469 | $ 64,469 | $ 63,105 | $ 64,877 | $ 66,479 |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions[6]. . . . . . . . . . . . . . . . . . . . | 53,549 | 262,078 | 45,962 | 85,349 | 68,838 | 61,929 |
| Dispositions . . . . . . . . . . . . . . . . . . . . . | (62,814) | (185,744) | (50,260) | (47,872) | (49,517) | (38,095) |
| Credit-related expenses[7]. . . . . . . . . . . . . | $ 11,106 | $ 26,420 | $ 4,064 | $ 5,559 | $ 4,871 | $ 11,926 |
| Credit losses[8] . . . . . . . . . . . . . . . . . . . | $ 5,604 | $ 23,133 | $ 3,111 | $ 8,037 | $ 6,923 | $ 5,062 |
| Loan workout activity (number of loans): | | | | | | |
| Home retention loan workouts[9]. . . . . . . | 60,959 | 440,276 | 89,691 | 113,367 | 132,192 | 105,026 |
| Preforeclosure sales and deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . . . . . . . . | 17,120 | 75,391 | 15,632 | 20,918 | 21,515 | 17,326 |
| Total loan workouts . . . . . . . . . . . . . . . . | 78,079 | 515,667 | 105,323 | 134,285 | 153,707 | 122,352 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[10]. . . . . . . . . . . . . . . . . . . . . | 25.01% | 37.30% | 30.47% | 37.86% | 41.18% | 31.59% |

[1] Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

[2] Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

[3] Represents the total amount of nonperforming loans that are on accrual status, including troubled debt restructurings and HomeSaver Advance (HSA) first-lien loans. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. HSA first-lien loans are unsecured personal loans in the amount of past due payments used to bring mortgage loans current. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

[4] Consists of the allowance for loan losses for loans recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments.

10

For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

[5] Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[6] Includes acquisitions through deeds-in-lieu of foreclosure.

[7] Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense (income).

[8] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

[9] Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 38: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

[10] Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Housing and Mortgage Market and Economic Conditions**

During the first quarter of 2011, the United States economic recovery continued at a very slow pace. The U.S. gross domestic product, or GDP, rose by 1.8% on an annualized basis during the quarter, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 478,000 jobs in the first quarter as a result of employment growth in the private sector. According to the U.S. Bureau of Labor Statistics, as of March 2011, over the past 12 months there has been an increase of 1.3 million non-farm jobs. The unemployment rate was 8.8% in March 2011, compared with 9.0% in January 2011, based on data from the U.S. Bureau of Labor Statistics. Employment will likely need to post sustained improvement for an extended period to have a positive impact on housing.

Housing activity remained weak during the first quarter of 2011. Although home sales during the quarter increased modestly from the fourth quarter's levels, sales of foreclosed homes and short sales ("distressed sales") represented an outsized portion of the market. Distressed sales accounted for 40% of existing home sales in March 2011, up from 35% in March 2010, according to the National Association of REALTORS®. In the face of competition from distressed sales, sales of new homes remained very low.

The overall mortgage market serious delinquency rate has trended down since peaking in the fourth quarter of 2009 but has remained historically high, with an estimated four million loans seriously delinquent (90 days or more past due or in the foreclosure process) as of December 31, 2010, based on the Mortgage Bankers Association National Delinquency Survey. In March, the supply of single-family homes as measured by the inventory/sales ratio remained above long-term average levels. Properties that are vacant and held off the market, combined with the portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices.

We estimate that home prices on a national basis declined by 1.8% in the first quarter of 2011 and have declined by 22.5% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available. The decline in home prices has left many homeowners with "negative equity" in their mortgages, which means their principal mortgage balance exceeds the current market value of their home. According to CoreLogic, approximately 11 million, or 23%, of all residential properties with mortgages were in a negative equity position in the fourth quarter of 2010. This increases the risk that borrowers might walk away from their mortgage obligations, causing the loans to become delinquent and proceed to foreclosure.

TREASURY-1080

During the first quarter of 2011, the multifamily sector continued to improve due to increased rental demand and improving job growth. Based on preliminary third-party data, we estimate that the national multifamily vacancy rate on average fell by 25 basis points during the first quarter of 2011 to 7.0%, after having held steady in the fourth quarter of 2010. In addition, it appears that asking rents increased in the first quarter of 2011 by an estimated 50 basis points on a national basis. As indicated by data from Axiometrics, Inc., multifamily concession rates, the rental discount rate as a percentage of asking rents, declined during the first quarter of the year to 4.64% as of February 2011, after having increased during the fourth quarter of 2010 to end the year at 5.07%. The increase in rental demand is also reflected in an estimated increase of 44,000 units in the number of occupied rental units during the first three months of 2011, according to preliminary data from REIS, Inc. National multifamily fundamentals, which generally include factors such as effective rents, vacancy rates, supply and demand, job growth, and demographic trends, continued to improve in the first quarter. However, certain local markets and properties continue to exhibit weak fundamentals.

**Outlook**

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in 2011. The high level of delinquent mortgage loans will result in the foreclosure of troubled loans, which is likely to add to the excess housing inventory. Home sales are unlikely to rise before the unemployment rate improves further. In addition, servicer foreclosure process deficiencies and their consequences have created uncertainty for potential home buyers, because foreclosed homes account for a substantial part of the existing home market. Thus, widespread concerns about foreclosure process deficiencies could suppress home sales in the near term and interfere with the housing recovery.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011. Despite signs of multifamily sector improvement at the national level, we expect multifamily charge-offs in 2011 to remain commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

We expect the pace of our loan acquisitions for the remainder of 2011 will be significantly lower than in 2010 and the first quarter of 2011, primarily because we expect fewer refinancings as a result of increasing mortgage rates and, to a lesser extent, the high number of mortgages that have already refinanced to low rates in recent years. To the extent our acquisitions decline, we will receive fewer risk-based fees, which are charged at loan acquisition and recognized over time; as a result, our future revenues will be negatively impacted. We estimate that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately one-third, from an estimated $1.5 trillion to an estimated $1.0 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.1 trillion to approximately $413 billion. Refinancings comprised approximately 82% of our single-family business volume in the first quarter of 2011, compared with 78% for all of 2010.

*Home Price Declines.*   We expect that home prices on a national basis will decline further, with greater declines in some geographic areas than others, before stabilizing in late 2011. We now expect that the peak-to-trough home price decline on a national basis will range between 22% and 29%, as compared with our expectation at the time we filed our 2010 Form 10-K that the peak-to-trough home price decline on a national basis would range between 21% and 26%. These estimates are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. These estimates also contain significant inherent uncertainty in the current market environment regarding a variety of critical assumptions we make when formulating these estimates, including the effect of actions the federal government has taken and may take with respect to housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our 22% to 29% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas the S&P/Case-Shiller index weights expectations based on property value, causing home price declines on higher priced homes to have a greater effect on the overall result; and (2) our estimates attempt to exclude sales of foreclosed homes because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values, whereas the S&P/Case-Shiller index includes foreclosed homes sales. The S&P/Case-Shiller comparison numbers are calculated using our models and assumptions, but modified to account for weighting based on property value and the impact of foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not modified to account for this data pool difference. We are working on enhancing our home price estimates to identify and exclude a greater portion of foreclosed home sales. When we begin reporting these enhanced home price estimates, we expect that some period to period comparisons of home prices may differ from those determined using our current estimates.

*Credit-Related Expenses and Credit Losses.*   We expect that our credit-related expenses and our credit losses will be higher in 2011 than in 2010. We describe our credit loss outlook above under "Providing Liquidity, Our Strong New Book of Business and Expected Losses on Single-Family Loans We Acquired before 2009—Expected Losses on Our Legacy Book of Business."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. We do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. As a result of these factors, there is significant uncertainty about our long-term financial sustainability.

In addition, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. On February 11, 2011 Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. Please see "Legislation and GSE Reform" in this report and in our 2010 Form 10-K for a discussion of recent legislative reform of the financial services industry, and proposals for GSE reform, that could affect our business and "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

### GSE Reform

As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), on February 11, 2011, Treasury and HUD released their report to Congress on ending the conservatorships of Fannie Mae and Freddie Mac and reforming the housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

13

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10-Q.

We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac. In both the House of Representatives and the Senate, legislation has been introduced that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership. As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of their existing and ongoing liabilities.

In the House of Representatives, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee has also approved several specific bills relating to GSE operations, including the following: (1) suspending current compensation packages and applying a government pay scale for GSE employees; (2) requiring the GSEs to increase guarantee fees; (3) subjecting GSE loans to the risk retention standards in the Dodd-Frank Act; (4) requiring a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement; (5) requiring Treasury to pre-approve all GSE debt issuances; (6) repealing the GSEs' affordable housing goals; and (7) prohibiting FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions.

We expect additional legislation relating to the GSEs to be introduced and considered by Congress in 2011. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

In sum, there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Please see "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

**Proposed Rules Implementing the Dodd-Frank Act**

Below we describe some rules that have been proposed by various government agencies to implement provisions of the Dodd-Frank Act. We are currently evaluating these proposed rules and how they may impact our business and the housing finance industry.

TREASURY-1083

*Risk Retention.* On March 29, 2011, the Office of the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, the U.S. Securities and Exchange Commission, FHFA and HUD issued a joint proposed rule implementing the risk retention requirements established by the Dodd-Frank Act. Under the proposed rule, securitizers would be required to retain at least 5% of the credit risk with respect to the assets they securitize. The proposed rule offers several options for compliance by parties with assets to securitize, one of which is to have either Fannie Mae or Freddie Mac securitize the assets. As long as Fannie Mae or Freddie Mac (1) fully guarantees the assets, thereby taking on 100% of their credit risk, and (2) is in conservatorship or receivership at the time the assets are securitized, no further retention of credit risk is required. Certain mortgage loans meeting the definition of a "Qualified Residential Mortgage" are exempt from the requirements of the rule. Only mortgage loans that are first lien mortgages on primary residences with loan-to-value ratios not exceeding 80% (75% for refinancings and 70% for cash-out refinancings) and that meet certain other underwriting requirements, would meet the definition of "Qualified Residential Mortgage" under the proposal.

*Ability to Repay.* On April 19, 2011, the Federal Reserve Board issued a proposed rule pursuant to the Dodd-Frank Act that, among others things, requires creditors to determine a borrower's "ability to repay" a mortgage loan under Regulation Z, which implements the Truth in Lending Act. If a creditor fails to comply, a borrower may be able to offset amounts owed as part of a foreclosure or recoup monetary damages. The proposed rule offers several options for complying with the ability to repay requirement, including making loans that meet certain terms and characteristics (so-called "qualified mortgages"), which may provide creditors with special protection from liability. As proposed, a loan is generally a qualified mortgage if, among other things, the borrower's income and assets are verified, the loan term does not exceed 30 years, the loan is fully amortizing with no negative amortization, interest-only or balloon features, and the loan is underwritten at the maximum interest rate applicable in the first five years of the loan, taking into account all mortgage-related obligations.

*Derivatives.* On April 12, 2011, the Federal Reserve Board, the Federal Deposit Insurance Corporation, FHFA, the Farm Credit Administration and the Office of the Comptroller of the Currency proposed rules under the Dodd-Frank Act governing margin and capital requirements applicable to entities that are subject to their oversight. On April 28, 2011, the Commodity Futures Trading Commission proposed rules under the Dodd-Frank Act governing margin requirements for swap dealers and major swap participants engaging in derivative trades that are not submitted for clearing to a derivatives clearing organization ("uncleared trades"). These proposed rules would require that, for all uncleared trades, we collect from our counterparties and provide to our counterparties collateral in excess of the amounts we have historically collected or provided, regardless of whether we are deemed to be a major swap participant.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" of this report and in our 2010 Form 10-K.

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of

reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Total Loss Reserves

- Other-Than-Temporary Impairment of Investment Securities

See "MD&A—Critical Accounting Policies and Estimates" in our 2010 Form 10-K for a detailed discussion of these critical accounting policies and estimates. We provide below information about our Level 3 assets and liabilities as of March 31, 2011 as compared with December 31, 2010.

## Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 13, Fair Value."

### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage- and asset-backed securities and residual interests, certain mortgage loans, certain acquired property, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 5 presents a comparison, by balance sheet category, of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring asset") that were classified as Level 3 as of March 31, 2011 and December 31, 2010. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

**Table 5:   Level 3 Recurring Financial Assets at Fair Value**

| | As of | |
|---|---|---|
| **Balance Sheet Category** | **March 31, 2011** | **December 31, 2010** |
| | (Dollars in millions) | |
| Trading securities | $  3,981 | $   4,576 |
| Available-for-sale securities | 31,762 | 31,934 |
| Mortgage loans | 2,221 | 2,207 |
| Other assets | 239 | 247 |
| Level 3 recurring assets | $ 38,203 | $ 38,964 |
| Total assets | $3,227,042 | $3,221,972 |
| Total recurring assets measured at fair value | $ 155,996 | $ 161,696 |
| Level 3 recurring assets as a percentage of total assets | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value | 24% | 24% |
| Total recurring assets measured at fair value as a percentage of total assets | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring

16

assets totaled $42.7 billion during the quarter ended March 31, 2011 and $63.0 billion during the year ended December 31, 2010.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.1 billion as of March 31, 2011 and $1.0 billion as of December 31, 2010, and other liabilities with a fair value of $121 million as of March 31, 2011 and $143 million as of December 31, 2010.

## CONSOLIDATED RESULTS OF OPERATIONS

In this section we discuss our condensed consolidated results of operations for the periods indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 6 summarizes our condensed consolidated results of operations for the periods indicated.

**Table 6:   Summary of Condensed Consolidated Results of Operations**

|  | For the Three Months Ended March 31, | | |
|  | 2011 | 2010 | Variance |
| --- | ---: | ---: | ---: |
|  | (Dollars in millions) | | |
| Net interest income | $  4,960 | $  2,789 | $2,171 |
| Fee and other income | 237 | 233 | 4 |
| **Net revenues** | **$  5,197** | **$  3,022** | **$2,175** |
| Investment gains, net | 75 | 166 | (91) |
| Net other-than-temporary impairments | (44) | (236) | 192 |
| Fair value gains (losses), net | 289 | (1,705) | 1,994 |
| Administrative expenses | (605) | (605) | — |
| Credit-related expenses[1] | (11,042) | (11,884) | 842 |
| Other non-interest expenses[2] | (339) | (354) | 15 |
| Loss before federal income taxes | (6,469) | (11,596) | 5,127 |
| Benefit (provision) for federal income taxes | (2) | 67 | (69) |
| **Net loss** | **(6,471)** | **(11,529)** | **5,058** |
| Less: Net income attributable to the noncontrolling interest | — | (1) | 1 |
| **Net loss attributable to Fannie Mae** | **$  (6,471)** | **$(11,530)** | **$5,059** |

[1]   Consists of provision for loan losses, reserve for guaranty losses, and foreclosed property income (expense).

[2]   Consists of debt extinguishment losses, net and other expenses.

### Net Interest Income

Table 7 presents an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we used a daily weighted average of amortized cost. When daily average balance information was not available, such as for mortgage loans, we used monthly averages. Table 8 presents the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities. In the fourth quarter of 2010, we changed the presentation to distinguish the change in net interest income of Fannie Mae from the change in net interest income of consolidated trusts. We have revised the presentation of results for prior periods to conform to the current period presentation.

17

**Table 7:   Analysis of Net Interest Income and Yield**

| | For the Three Months Ended March 31, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| **Interest-earning assets:** | | | | | | |
| Mortgage loans of Fannie Mae[1] . . . . | $ 405,820 | $ 3,725 | 3.67% | $ 276,346 | $ 3,298 | 4.77% |
| Mortgage loans of consolidated trusts[1] . . . . . . . . . . . . . . . . . . . | 2,598,508 | 31,865 | 4.91 | 2,713,611 | 34,321 | 5.06 |
| Total mortgage loans . . . . . . . . . . | 3,004,328 | 35,590 | 4.74 | 2,989,957 | 37,619 | 5.03 |
| Mortgage-related securities . . . . . . . . | 334,057 | 4,245 | 5.08 | 435,754 | 5,550 | 5.09 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . | (214,370) | (2,793) | 5.21 | (286,701) | (3,799) | 5.30 |
| Total mortgage-related securities, net . . . . . . . . . . . . . . . . . . . . | 119,687 | 1,452 | 4.85 | 149,053 | 1,751 | 4.70 |
| Non-mortgage securities[2] . . . . . . . . . | 79,719 | 45 | 0.23 | 66,860 | 37 | 0.22 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . | 13,743 | 7 | 0.20 | 40,061 | 21 | 0.21 |
| Advances to lenders . . . . . . . . . . . . | 4,089 | 21 | 2.05 | 2,512 | 18 | 2.87 |
| Total interest-earning assets . . . . . . . . . | $3,221,566 | $37,115 | 4.61% | $3,248,443 | $39,446 | 4.86% |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt[3] . . . . . . . . . . . . . . | $ 138,848 | $  104 | 0.30% | $ 185,042 | $  116 | 0.25% |
| Long-term debt . . . . . . . . . . . . . . . | 631,917 | 4,196 | 2.66 | 564,875 | 5,081 | 3.60 |
| Total short-term and long-term funding debt . . . . . . . . . . . . . . | 770,765 | 4,300 | 2.23 | 749,917 | 5,197 | 2.77 |
| Debt securities of consolidated trusts . . | 2,652,024 | 30,648 | 4.62 | 2,758,387 | 35,259 | 5.11 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . | (214,370) | (2,793) | 5.21 | (286,701) | (3,799) | 5.30 |
| Total debt securities of consolidated trusts held by third parties . . . . . . | 2,437,654 | 27,855 | 4.57 | 2,471,686 | 31,460 | 5.09 |
| Total interest-bearing liabilities . . . . . . . | $3,208,419 | $32,155 | 4.01% | $3,221,603 | $36,657 | 4.55% |
| Impact of net non-interest bearing funding . . . . . . . . . . . . . . . . . . . . | $  13,147 | | 0.02% | $  26,840 | | 0.03% |
| Net interest income/net interest yield . . . | | $ 4,960 | 0.62% | | $ 2,789 | 0.34% |
| Net interest income/net interest yield of consolidated trusts[4] . . . . . . . . . . . . | | $ 1,217 | 0.19% | | $  (938) | (0.14)% |
| **Selected benchmark interest rates at end of period:[5]** | | | | | | |
| 3-month LIBOR . . . . . . . . . . . . . . . | | | 0.30% | | | 0.29% |
| 2-year swap interest rate . . . . . . . . . . | | | 1.00 | | | 1.19 |
| 5-year swap interest rate . . . . . . . . . . | | | 2.47 | | | 2.73 |
| 30-year Fannie Mae MBS par coupon rate . . . . . . . . . . . . . . . . . . . . . | | | 4.30 | | | 4.51 |

[1]  Interest income includes interest income on acquired credit-impaired loans of $486 million and $587 million for the three months ended March 31, 2011 and 2010, respectively. These amounts include accretion income of $231 million and $266 million for the three months ended March 31, 2011 and 2010, respectively, relating to a portion of the fair value losses recorded upon the acquisition of the loans. Average balance includes loans on nonaccrual status, for which interest income is recognized when collected.

[2]  Includes cash equivalents.

[3]  Includes federal funds purchased and securities sold under agreements to repurchase.

[4]  Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

[5]  Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg.

18

**Table 8:   Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended March 31, 2011 vs. 2010 | | |
| | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate |
| | (Dollars in millions) | | |
| Interest income: | | | |
| Mortgage loans of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  427 | $ 1,306 | $  (879) |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,456) | (1,430) | (1,026) |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,029) | (124) | (1,905) |
| Mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,305) | (1,292) | (13) |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . . | 1,006 | 943 | 63 |
| Total mortgage-related securities, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (299) | (349) | 50 |
| Non-mortgage securities[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 7 | 1 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (14) | (13) | (1) |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 9 | (6) |
| Total interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,331) | (470) | (1,861) |
| Interest expense: | | | |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) | (32) | 20 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (885) | 554 | (1,439) |
| Total short-term and long-term funding debt . . . . . . . . . . . . . . . . . . . . . . . . . . | (897) | 522 | (1,419) |
| Debt securities of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,611) | (1,322) | (3,289) |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . . | 1,006 | 943 | 63 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . | (3,605) | (379) | (3,226) |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,502) | 143 | (4,645) |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,171 | $  (613) | $ 2,784 |

---

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

[2]   Includes cash equivalents.

Net interest income increased in the first quarter of 2011, as compared with the first quarter of 2010, due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities. The primary drivers of this change were:

- a reduction in the interest expense on debt of consolidated trusts as we purchased the majority of delinquent loans from our MBS trusts after the first quarter of 2010;

- lower interest expense on funding debt as lower borrowing rates allowed us to replace higher-cost debt with lower-cost debt;

- a decrease in volume of our mortgage securities, as we continue to manage our portfolio requirements; and

- lower yields on mortgage loans as new business acquisitions continue to replace higher-yielding loans with loans issued at lower mortgage rates. The reduction in interest income on loans from lower yields was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans on our condensed consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures.

For the first quarter of 2011, interest income that we did not recognize for nonaccrual mortgage loans, net of recoveries, was $1.6 billion, which resulted in a 20 basis point reduction in net interest yield, compared with $2.7 billion for the first quarter of 2010, which resulted in a 33 basis point reduction in net interest yield. Of

TREASURY-1088

the $1.6 billion of interest income that we did not recognize for nonaccrual mortgage loans for the first quarter of 2011, $1.4 billion was related to the unsecuritized mortgage loans that we owned during the period. Of the $2.7 billion of interest income that we did not recognize for nonaccrual mortgage loans for the first quarter of 2010, $566 million was related to the unsecuritized mortgage loans that we own.

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

**Fair Value Gains (Losses), Net**

Table 9 presents the components of our fair value gains and losses.

**Table 9:   Fair Value Gains (Losses), Net**

|  | For the Three Months Ended March 31, | |
| --- | --- | --- |
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Risk management derivatives fair value gains (losses) attributable to: | | |
|    Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . | $(635) | $  (835) |
|    Net change in fair value during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 751 | (1,326) |
|       Total risk management derivatives fair value gains (losses), net . . . . . . . . . . . . . . . . . | 116 | (2,161) |
| Mortgage commitment derivatives fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . | 23 | (601) |
| Total derivatives fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 139 | (2,762) |
| Trading securities gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 225 | 1,058 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (75) | (1) |
|      Fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 289 | $(1,705) |
|  | **2011** | **2010** |
| 5-year swap interest rate: | | |
|    As of January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.18% | 2.98% |
|    As of March 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.47 | 2.73 |

*Risk Management Derivatives Fair Value Gains (Losses), Net*

We supplement our issuance of debt securities with derivative instruments to further reduce duration and prepayment risks. We recorded risk management derivative fair value gains in the first quarter of 2011 primarily as a result of an increase in the fair value of our pay-fixed derivatives due to an increase in swap interest rates during the first quarter of 2011, which was partially offset by fair value losses due to time decay on our purchased options.

We recorded risk management derivative losses in the first quarter of 2010 as a result of: (1) a decrease in implied interest rate volatility, which reduced the fair value of our purchased options; (2) a decrease in the fair value of our pay-fixed derivatives due to a decline in swap interest rates; and (3) time decay on our purchased options.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three months ended March 31, 2011 and 2010 in "Note 9, Derivative Instruments."

*Mortgage Commitment Derivatives Fair Value Gains (Losses), Net*

Commitments to purchase or sell some mortgage-related securities and to purchase single-family mortgage loans are generally accounted for as derivatives. For open mortgage commitment derivatives, we include

TREASURY-1089

changes in their fair value in our condensed consolidated statements of operations and comprehensive loss. When derivative purchase commitments settle, we include the fair value of the commitment on the settlement date in the cost basis of the loan or security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases of securities issued by our consolidated MBS trusts are treated as extinguishments of debt; we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses. Sales of securities issued by our consolidated MBS trusts are treated as issuances of consolidated debt; we recognize the fair value of the commitment on the settlement date as a component of debt in the cost basis of the debt issued.

We recognized gains on our mortgage commitments in the first quarter of 2011 primarily due to gains on commitments to sell mortgage-related securities as a result of a decrease in prices as interest rates increased during the commitment period.

We recognized losses on our mortgage commitments in the first quarter of 2010 primarily due to losses on commitments to sell mortgage-related securities as a result of an increase in prices as interest rates decreased during the commitment period.

### *Trading Securities Gains (Losses), Net*

The gains from our trading securities in the first quarter of 2011 and 2010 were primarily driven by the narrowing of credit spreads on commercial mortgage-backed securities ("CMBS"); gains in the first quarter of 2010 were also driven by a decrease in interest rates.

## Credit-Related Expenses

We refer to our provision for loan losses and the provision for guaranty losses collectively as our "provision for credit losses." Credit-related expenses consist of our provision for credit losses and foreclosed property expense.

### *Provision for Credit Losses*

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business as of each balance sheet date. We establish our loss reserves through the provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs, which results in an increase to our loss reserves.

Table 10 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future. We estimate that approximately two-thirds of this amount, as of March 31, 2011, represents credit losses we expect to realize in the future and approximately one-third will eventually be recovered through our condensed consolidated statements of operations and comprehensive loss, primarily as net interest income if the loan cures or as foreclosed property income if the sale of the collateral exceeds the recorded investment in the credit-impaired loan. How much of these fair value losses we expect to realize as credit losses depends primarily on home prices and loss severity. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

TREASURY-1090

**Table 10:   Total Loss Reserves**

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Allowance for loan losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $67,557 | $61,556 |
| Reserve for guaranty losses[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 257 | 323 |
| Combined loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67,814 | 61,879 |
| Allowance for accrued interest receivable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,930 | 3,414 |
| Allowance for preforeclosure property taxes and insurance receivable[2]. . . . . . . . | 1,356 | 958 |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,100 | 66,251 |
| Fair value losses previously recognized on acquired credit impaired loans[3]. . . . . . | 18,457 | 19,171 |
| Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $90,557 | $85,422 |

[1]   Amount included in "Other liabilities" in our condensed consolidated balance sheets.

[2]   Amount included in "Other assets" in our condensed consolidated balance sheets.

[3]   Represents the fair value losses on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets.

We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. We summarize the changes in our combined loss reserves in Table 11.

TREASURY-1091

**Table 11:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended March 31, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | | | (Dollars in millions) | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $48,530 | $13,026 | $61,556 | $  8,078 | $  1,847 | $  9,925 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Provision for loan losses . . . . . . . . . . | 7,159 | 3,428 | 10,587 | 6,271 | 5,668 | 11,939 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . . | (5,705) | (448) | (6,153) | (1,705) | (3,455) | (5,160) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 530 | 952 | 1,482 | 97 | 277 | 374 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . | 3,207 | (3,207) | — | 13,855 | (13,855) | — |
| Net reclassifications[3] . . . . . . . . . . . . | (13) | 98 | 85 | (921) | 836 | (85) |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $53,708 | $13,849 | $67,557 | $ 25,675 | $ 34,894 | $ 60,569 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $   323 | $   — | $   323 | $ 54,430 | $   — | $ 54,430 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | — | (54,103) |
| Benefit for guaranty losses . . . . . . . . . . | (33) | — | (33) | (36) | — | (36) |
| Charge-offs . . . . . . . . . . . . . . . . . . . . | (35) | — | (35) | (61) | — | (61) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 2 | — | 2 | 3 | — | 3 |
| Ending balance . . . . . . . . . . . . . . . . . | $   257 | $   — | $   257 | $   233 | $   — | $   233 |
| Combined loss reserves: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $48,853 | $13,026 | $61,879 | $ 62,508 | $  1,847 | $ 64,355 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | 43,576 | (10,527) |
| Total provision for credit losses . . . . . . | 7,126 | 3,428 | 10,554 | 6,235 | 5,668 | 11,903 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . . | (5,740) | (448) | (6,188) | (1,766) | (3,455) | (5,221) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 532 | 952 | 1,484 | 100 | 277 | 377 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . | 3,207 | (3,207) | — | 13,855 | (13,855) | — |
| Net reclassifications[3] . . . . . . . . . . . . | (13) | 98 | 85 | (921) | 836 | (85) |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $53,965 | $13,849 | $67,814 | $ 25,908 | $ 34,894 | $ 60,802 |

| | As of | |
| | March 31, 2011 | December 31, 2010 |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $66,240 | $60,163 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,574 | 1,716 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $67,814 | $61,879 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.29% | 2.10% |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.83 | 0.91 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.20% | 2.03% |
| Total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32.60 | 28.81 |

TREASURY-1092

---

(1) Includes accrued interest of $386 million and $579 million for the three months ended March 31, 2011 and 2010, respectively.

(2) Includes transfers from trusts for delinquent loan purchases.

(3) Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

(4) Includes $412 million and $903 million as of March 31, 2011 and 2010, respectively, for acquired credit-impaired loans.

The continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past several quarters. Our total loss reserves increased in the first quarter of 2011 due to: (1) a decline in home prices and increase in initial charge-off severity during the period, (2) the number of loans that entered a trial modification period during the quarter, (3) a decline in future expected home prices and (4) loans continuing to remain delinquent for an extended period of time. Our provision for credit losses decreased in the first quarter of 2011 compared with the first quarter of 2010, primarily because our total loss reserves increased less in the first quarter of 2011 than in the first quarter of 2010.

Because of the substantial volume of loan modifications we completed and the number of loans that entered a trial modification period in 2010 and the first quarter of 2011, more than half of our total loss reserves is attributable to individual impairment rather than the collective reserve for loan losses. Individual impairment for a troubled debt restructuring ("TDR") is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The model includes forward-looking assumptions using multiple scenarios of the future economic environment, including interest rates and home prices. Based on the structure of the modifications, in particular the size of the concession granted, and the performance of modified loans combined with the forward-looking assumptions used in our model, the allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve. Further, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure the impairment based on the fair value of the collateral. The loss reserve for a greater portion of individually impaired loans was based on the fair value of the underlying collateral as of March 31, 2011 than as of March 31, 2010.

Additionally, while delinquency rates on loans in our single-family guaranty book of business have decreased, borrowers' inability or unwillingness to make their mortgage payments, along with delays in foreclosures, continue to cause loans to remain seriously delinquent for an extended period of time as shown in "Table 35: Delinquency Status of Single-Family Conventional Loans."

For additional discussion of our loan workout activities, delinquent loans and concentrations, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Problem Loan Management." For a discussion of our charge-offs, see "Credit Loss Performance Metrics."

Our balance of nonperforming single-family loans remained high as of March 31, 2011 due to both high levels of delinquencies and an increase in TDRs. When a TDR is executed, the loan status becomes current, but the loan will continue to be classified as a nonperforming loan as the loan is not performing in accordance with the original terms. The composition of our nonperforming loans is shown in Table 12. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

24

**Table 12:   Nonperforming Single-Family and Multifamily Loans**

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans | $141,623 | $152,756 |
| Troubled debt restructurings on accrual status[1] | 66,342 | 61,907 |
| Total on-balance sheet nonperforming loans | 207,965 | 214,663 |
| Off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts[2] | 83 | 89 |
| Total nonperforming loans | $208,048 | $214,752 |
| Accruing on-balance sheet loans past due 90 days or more[3] | $    850 | $    896 |

| | For the Three Months Ended March 31, 2011 | For The Year Ended December 31, 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Interest related to on-balance sheet nonperforming loans: | | |
| Interest income forgone[4] | $2,827 | $8,185 |
| Interest income recognized for the period[5] | 1,388 | 7,995 |

[1]   Includes HomeSaver Advance first-lien loans on accrual status.

[2]   Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet. Includes HomeSaver Advance first-lien loans.

[3]   Recorded investment in loans as of the end of each period that are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans where we have recourse against the seller in the event of a default.

[4]   Represents the amount of interest income that would have been recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[5]   Represents interest income recognized during the period based on stated coupon rate for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while loan was performing and cash payments received on nonaccrual loans.

### *Foreclosed Property Expense (Income)*

The shift to foreclosed property expense during the first quarter of 2011 from foreclosed property income during the first quarter of 2010 was primarily due to higher REO inventory as of March 31, 2011 compared with March 31, 2010 and an increase in valuation adjustments that reduced the value of our REO inventory. The foreclosed property income in the first quarter of 2010 was primarily due to the recognition of $562 million in fees from the cancellation and restructuring of some of our mortgage insurance coverage; there were no such fees recognized in the first quarter of 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce our future exposure to our mortgage insurers.

### *Credit Loss Performance Metrics*

Our credit-related expenses should be considered in conjunction with our credit loss performance. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with the acquisition of credit-impaired loans. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from

TREASURY-1094

deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans from credit losses.

Historically, management viewed our credit loss performance metrics, which include our historical credit losses and our credit loss ratio, as indicators of the effectiveness of our credit risk management strategies. As our credit losses are now at such high levels, management has shifted focus to our loss mitigation strategies and the reduction of our total credit losses and away from the credit loss ratio to measure performance. However, we believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. They also provide a consistent treatment of credit losses for on- and off-balance sheet loans. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods. Table 13 details the components of our credit loss performance metrics as well as our average single-family and multifamily default rate and initial charge-off severity rate.

**Table 13:   Credit Loss Performance Metrics**

| | For the Three Months Ended March 31, | | | |
| | 2011 | | 2010 | |
| | Amount | Ratio[1] | Amount | Ratio[1] |
| | (Dollars in millions) | | | |
| Charge-offs, net of recoveries[2] | $4,704 | 61.2 bp | $4,844 | 62.9 bp |
| Foreclosed property (income) expense[2] | 488 | 6.4 | (19) | (0.2) |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans | 5,192 | 67.6 | 4,825 | 62.7 |
| Less: Fair value losses resulting from acquired credit-impaired loans | (31) | (0.4) | (58) | (0.8) |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense | 525 | 6.9 | 380 | 4.9 |
| Credit losses and credit loss ratio | $5,686 | 74.1 bp | $5,147 | 66.8 bp |
| Credit losses attributable to: | | | | |
| Single-family | $5,604 | | $5,062 | |
| Multifamily | 82 | | 85 | |
| Total | $5,686 | | $5,147 | |
| Average single-family default rate | | 0.44% | | 0.46% |
| Average single-family initial charge-off severity rate[3] | | 35.93% | | 35.40% |
| Average multifamily default rate | | 0.12% | | 0.09% |
| Average multifamily initial charge-off severity rate[3] | | 36.85% | | 40.25% |

[1] Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period.

[2] In the first quarter of 2011, expenses relating to preforeclosure taxes and insurance were recorded as charge-offs. These expenses were recorded as foreclosed property expense in the first quarter of 2010. The impact of including these costs in charge-offs for the first quarter of 2011 was 5.7 basis points.

[3] Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from preforeclosure sales.

The increase in our credit losses is primarily due to an increase in foreclosed property expense. During the first quarter of 2010, we recognized $562 million of fees from the cancellation and restructuring of some of our mortgage insurance as a reduction to foreclosed property expense; no such fees were received in the first quarter of 2011. In addition, while defaults remain high, defaults in the first quarter of 2011 were lower than

TREASURY-1095

they would have been due to delays caused by the servicer foreclosure process deficiencies and the resulting foreclosure pause.

Our 2009, 2010 and first quarter of 2011 vintages accounted for approximately 1% of our single-family credit losses for the first quarter of 2011. Typically, credit losses on mortgage loans do not peak until the third through fifth years following origination. We provide more detailed credit performance information, including serious delinquency rates by geographic region, statistics on nonperforming loans and foreclosure activity in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Although other provisions of the September 2005 agreement were suspended in March 2009 by FHFA until further notice, this disclosure requirement was not suspended. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 14 compares the credit loss sensitivities for the periods indicated for first lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

**Table 14:   Single-Family Credit Loss Sensitivity[1]**

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Gross single-family credit loss sensitivity | $  26,774 | $   25,937 |
| Less: Projected credit risk sharing proceeds | (2,581) | (2,771) |
| Net single-family credit loss sensitivity | $  24,193 | $   23,166 |
| Outstanding single-family whole loans and Fannie Mae MBS | $2,815,575 | $2,782,512 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS | 0.86% | 0.83% |

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of both March 31, 2011 and December 31, 2010. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

TREASURY-1096

**Financial Impact of the Making Home Affordable Program on Fannie Mae**

*Home Affordable Refinance Program*

Because we already own or guarantee the original mortgages that we refinance under HARP, our expenses under that program consist mostly of limited administrative costs.

*Home Affordable Modification Program*

We incurred impairments related to loans that had entered a trial modification under the Home Affordable Modification Program ("HAMP") of $2.7 billion during the first quarter of 2011 compared with $7.6 billion during the first quarter of 2010. These include impairments on loans that entered into a trial modification under the program but that have not yet received, or that have been determined to be ineligible for, a permanent modification under the program. These impairments have been included in the calculation of our provision for loan losses in our condensed consolidated results of operations and comprehensive loss. The impairments do not include the reduction in our collective loss reserves which occurred as a result of beginning to individually assess the loan for impairment upon entering a trial modification. Please see "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae" in our 2010 Form 10-K for a detailed discussion on these impairments.

We paid or accrued incentive fees for servicers of $80 million during the first quarter of 2011 compared with $68 million during the first quarter of 2010. These fees were related to loans modified under HAMP, which we recorded as part of "Other expenses." Borrower incentive payments are included in the calculation of our allowance for loan losses for individually impaired loans. Additionally, our expenses under HAMP also include administrative costs.

*Overall Impact of the Making Home Affordable Program*

Because of the unprecedented nature of the circumstances that led to the Making Home Affordable Program, we cannot quantify what the impact would have been on Fannie Mae if the Making Home Affordable Program had not been introduced. We do not know how many loans we would have modified under alternative programs, what the terms or costs of those modifications would have been, how many foreclosures would have resulted nationwide, and at what pace, or the impact on housing prices if the program had not been put in place. As a result, the amounts we discuss above are not intended to measure how much the program is costing us in comparison to what it would have cost us if we did not have the program at all.

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations. We describe the management reporting and allocation process used to generate our segment results in our 2010 Form 10-K in "Notes to Consolidated Financial Statements—Note 15, Segment Reporting." We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. When we begin operating under a functional structure, we may change some of our management reporting and how we report our business segment results.

In this section, we summarize our segment results for the first quarters of 2011 and 2010 in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations." See "Note 10, Segment Reporting" of this report for a reconciliation of our segment results to our condensed consolidated results.

TREASURY-1097

*Single-Family Business Results*

Table 15 summarizes the financial results of our Single-Family business for the periods indicated. The primary sources of revenue for our Single-Family business are guaranty fee income and fee and other income. Expenses primarily include credit-related expenses, net interest expense and administrative expenses.

**Table 15:   Single-Family Business Results**

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | Variance |
| | (Dollars in millions) | | |
| **Statement of operations data:**[1] | | | |
| Net interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    (898) | $   (1,945) | $1,047 |
| Guaranty fee income[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,871 | 1,768 | 103 |
| Credit-related expenses[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (11,106) | (11,926) | 820 |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (586) | (513) | (73) |
| Loss before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . | (10,719) | (12,616) | 1,897 |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . | (2) | 51 | (53) |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (10,721) | $ (12,565) | $1,844 |
| **Other key performance data:** | | | |
| Single-family effective guaranty fee rate (in basis points)[5] . . . . . . . . . | 26.0 | 24.4 | |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26.1 | 26.9 | |
| Average single-family guaranty book of business[7] . . . . . . . . . . . . . . . | $2,881,300 | $2,893,988 | |
| Single-family Fannie Mae MBS issues[8] . . . . . . . . . . . . . . . . . . . . . . | $ 166,673 | $ 124,358 | |

[1] Certain prior period amounts have been reclassified to conform to the current period presentation.

[2] Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[3] Consists of the provision for loan losses, provision for guaranty losses and foreclosed property income or expense.

[4] Consists of investment gains and losses, fee and other income, administrative expenses and other expenses.

[5] Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

[6] Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[7] Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[8] Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period. The three months ended March 31, 2010 includes Housing Finance Agency (HFA) new issue bond program issuances of $3.1 billion. There were no HFA new issue bond program issuances in 2011.

*Net Interest Expense*

Net interest expense for the Single-Family business segment includes: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; (3) cash payments received on loans that have been placed on nonaccrual status; and (4) an allocated cost of capital charge among our three business segments. Net interest expense decreased in the first quarter of 2011 compared with the first quarter of 2010 primarily due to a significant decrease in interest

TREASURY-1098

income not recognized for loans on nonaccrual status because of a decline in the number of loans on nonaccrual status.

*Guaranty Fee Income*

Guaranty fee income increased in the first quarter of 2011 compared with the first quarter of 2010 due to an increase in the amortization of risk-based pricing adjustments.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. There were fewer new mortgage originations due to weakness in the housing market and an increase in liquidations due to the high level of foreclosures. Our estimated market share of new single-family mortgage-related securities issuances, which is based on publicly available data and excludes previously securitized mortgages, remained high at 48.6% for the first quarter of 2011.

*Credit-Related Expenses*

Single-family credit-related expenses decreased in the first quarter of 2011 compared with the first quarter of 2010, primarily because our total single-family loss reserves increased less in the first quarter of 2011 compared with the first quarter of 2010.

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses."

**Multifamily Business Results**

Table 16 summarizes the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses and other items that impact income or loss primarily include credit-related expenses, administrative expenses and net operating losses from our partnership investments.

TREASURY-1099

**Table 16:   Multifamily Business Results**

| | For the Three Months Ended March 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **Variance** |
| | (Dollars in millions) | | |
| **Statement of operations data:** | | | |
| Guaranty fee income[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    209 | $    194 | $  15 |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58 | 35 | 23 |
| Losses from partnership investments[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) | (58) | 46 |
| Credit-related income[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64 | 42 | 22 |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (67) | (101) | 34 |
| Income before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 252 | 112 | 140 |
| Provision for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5) | (13) | 8 |
| Net income attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    247 | $    99 | $148 |
| **Other key performance data:** | | | |
| Multifamily effective guaranty fee rate (in basis points)[5] . . . . . . . . . . . . . . . . . . . . . | 44.0 | 41.8 | |
| Credit loss performance ratio (in basis points)[6] . . . . . . . . . . . . . . . . . . . . . . . . . | 17.3 | 18.3 | |
| Average multifamily guaranty book of business[7] . . . . . . . . . . . . . . . . . . . . . . . . . | $190,012 | $185,703 | |
| Multifamily new business volumes[8] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,024 | 4,162 | |
| Multifamily units financed from new business volumes[9] . . . . . . . . . . . . . . . . . . . . . | 83,000 | 61,000 | |
| Fannie Mae multifamily MBS issuances[10] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,581 | 4,073 | |
| Fannie Mae multifamily structured securities issuances (issued by Capital Markets group)[11] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,400 | 1,821 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[12] . . . . . . . . . . . . . . . . . . . . | 230 | 205 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio[13] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 114,375 | 117,709 | |

| | As of | |
|---|---|---|
| | **March 31, 2011** | **December 31, 2010** |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.64% | 0.71% |
| Percentage of guaranty book of business with credit enhancement . . . . . . . . . . . . . . . . . . . . | 90 | 89 |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[14] . . . . . . . . . . . . . | 20.5 | 20.1 |
| Fannie Mae multifamily MBS outstanding[15] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $83,145 | $77,251 |

---

[1]  Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[2]  Losses from partnership investments is included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

[3]  Consists of the benefit for loan losses, benefit for guaranty losses and foreclosed property expense.

[4]  Consists of net interest income or expense, investment gains, other income or expenses, and administrative expenses.

[5]  Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6]  Calculated based on the annualized credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

[7]  Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

31

[8] Reflects unpaid principal balance of Fannie Mae MBS issued (excluding portfolio securitizations) and loans purchased during the period. The three months ended March 31, 2010 includes $1.0 billion of HFA new issue bond program issuances. There were no HFA new issue bond program issuances for the three months ended March 31, 2011.

[9] Excludes HFA new issue bond program.

[10] Reflects unpaid principal balance of Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS volumes, (b) $3.5 billion of Fannie Mae portfolio securitization transactions and (c) $119 million of conversion of adjustable rate loans to fixed rate loans and DMBS securities to MBS securities for the three months ended March 31, 2011. There were no Fannie Mae portfolio securitizations transactions or conversions of adjustable rate loans to fixed rate loans and DMBS securities to MBS securities for the three months ended March 31, 2010.

[11] Reflects original unpaid principal balance of out-of-portfolio structured securities issuances by our Capital Markets Group.

[12] Interest expense estimate based on allocated duration matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

[13] Based on unpaid principal balance.

[14] Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information as of March 31, 2011 is through December 31, 2010 and is based on the Federal Reserve's March 2011 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Information as of December 31, 2010 is through September 30, 2010.

[15] Includes $23.4 billion and $19.9 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheet, as of March 31, 2011 and December 31, 2010, respectively; and $1.4 billion of bonds issued by HFAs as of both March 31, 2011 and December 31, 2010.

*Guaranty Fee Income*

Multifamily guaranty fee income increased in the first quarter of 2011 compared with the first quarter of 2010 primarily due to higher fees charged on new acquisitions in recent years. New acquisitions with higher guaranty fees have become an increasingly large part of our book of business.

*Credit-Related Income*

Multifamily credit-related income increased in the first quarter of 2011 compared with the first quarter of 2010 primarily due to a modest decrease in the allowance for loan losses as the multifamily sector continued to show improvement.

Multifamily credit losses were relatively flat period over period at $82 million in the first quarter of 2011 compared with $85 million in the first quarter of 2010. While national multifamily market fundamentals improved during the first quarter of 2011, certain local markets and properties continue to exhibit weak fundamentals. As a result, we may continue to experience losses commensurate with 2010 levels for the remainder of 2011 despite generally improving market fundamentals.

**Capital Markets Group Results**

Table 17 summarizes the financial results of our Capital Markets group for the periods indicated. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion on the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion on the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments" in this report and "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" and "Notes to Consolidated Financial Statements—Note 10, Derivative Instruments and Hedging Activities" in our 2010 Form 10-K. The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other-than-temporary impairment and administrative expenses.

32

**Table 17:   Capital Markets Group Results**

|  | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2011 | 2010 | Variance |
|  | (Dollars in millions) | | |
| **Statement of operations data:** | | | |
| Net interest income[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,710 | $ 3,057 | $  653 |
| Investment gains, net[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 870 | 792 | 78 |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (44) | (236) | 192 |
| Fair value gains (losses), net[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 218 | (1,186) | 1,404 |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75 | 104 | (29) |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (553) | (423) | (130) |
| Income before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,276 | 2,108 | 2,168 |
| Benefit for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 29 | (24) |
| Net income attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $4,281 | $ 2,137 | $2,144 |

[1] Includes $2.0 billion and $795 million of contractual interest, excluding recoveries, on nonaccrual loans received from the Single-Family segment for the three months ended March 31, 2011 and 2010, respectively. Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts.

[2] We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[3] Fair value gains or losses on trading securities include the trading securities that we own, regardless of whether the trust has been consolidated.

[4] Includes allocated guaranty fee expense, debt extinguishment gains or losses, net, administrative expenses, and other income or expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

*Net Interest Income*

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our mortgage portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income reimbursements that the group receives, primarily from Single-Family, for the contractual interest due. The interest expense recognized on the Capital Markets group's statement of operations is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our condensed consolidated balance sheets. Net interest expense also includes a cost of capital charge allocated among the three business segments.

The Capital Markets group's net interest income increased in the first quarter of 2011 compared with the first quarter of 2010 primarily due to a decline in funding costs as we replaced higher cost debt with lower cost debt. This increase of net interest income was partially offset by a decline in interest income from our mortgage portfolio. Although our mortgage portfolio loan balance increased, the reduction of our mortgage securities balance and increase in the balance of nonperforming loans, mainly loans modified in a TDR and our purchases of delinquent loans from MBS trusts, caused the yield on our portfolio and our interest income to decline. The reimbursements of contractual interest due on nonaccrual loans, from the Single-Family business, were a significant portion of the Capital Markets group's interest income during the first quarter of 2011. However, the increase in these reimbursements was offset by the decline in interest income on our mortgage-related securities because our securities portfolio balance has declined.

Additionally, Capital Markets' net interest income and net interest yield increased in the first quarter of 2011 and 2010 as a result of funds we received from Treasury under the senior preferred stock purchase agreement

33

because the cash received was used to reduce our debt and the cost of these funds is included in dividends rather than interest expense.

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value gains (losses), net" and is shown in "Table 9: Fair Value Gains (Losses), Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $635 million in the first quarter of 2011 compared with an $835 million decrease in the first quarter of 2010.

### Net Other-Than-Temporary Impairments

The net other-than-temporary impairments recognized by the Capital Markets group is generally consistent with the amount reported in our condensed consolidated results of operations. See "Note 5, Investments in Securities" for information on our other-than-temporary impairments by major security type and primary drivers for other-than-temporary impairments recorded in the first quarter of 2011.

### Fair Value Gains (Losses), Net

The derivative gains and losses that are reported for the Capital Markets group are consistent with the same gains and losses reported in our condensed consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations—Fair Value Gains (Losses), Net."

The gains on our trading securities for the segment during the first quarter of 2011 were attributable to a narrowing of spreads on CMBS, partially offset by losses on agency MBS due to an increase in interest rates during the period.

The gains on our trading securities for the segment during the first quarter of 2010 were attributable to a narrowing of spreads on CMBS and decreases in interest rates during the period.

### The Capital Markets Group's Mortgage Portfolio

The Capital Markets group's mortgage portfolio consists of mortgage-related securities and mortgage loans that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheets. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

We are restricted by our senior preferred stock purchase agreement with Treasury in the amount of mortgage assets that we may own. Beginning on each December 31 and thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $810 billion as of December 31, 2010 and will be reduced to $729 billion as of December 31, 2011. As of March 31, 2011, we owned $757.6 billion in mortgage assets, compared with $788.8 billion as of December 31, 2010.

Table 18 summarizes our Capital Markets group's mortgage portfolio activity for the periods indicated.

34

**Table 18:   Capital Markets Group's Mortgage Portfolio Activity[1]**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (Dollars in millions) | |
| **Total Capital Markets mortgage portfolio, beginning balance as of January 1** | $788,771 | $772,728 |
| **Mortgage loans:** | | |
| Beginning balance as of January 1 | 427,074 | 281,162 |
| Purchases | 38,074 | 70,561 |
| Securitizations[2] | (23,983) | (14,254) |
| Liquidations[3] | (19,309) | (7,192) |
| Mortgage loans, ending balance as of March 31 | 421,856 | 330,277 |
| **Mortgage securities:** | | |
| Beginning balance as of January 1 | $361,697 | $491,566 |
| Purchases[4] | 5,090 | 29,186 |
| Securitizations[2] | 23,983 | 14,254 |
| Sales | (35,426) | (79,784) |
| Liquidations[3] | (19,582) | (20,690) |
| Mortgage securities, ending balance as of March 31 | 335,762 | 434,532 |
| **Total Capital Markets mortgage portfolio, ending balance as of March 31** | $757,618 | $764,809 |

[1]   Based on unpaid principal balance.

[2]   Includes portfolio securitization transactions that do not qualify for sale treatment under the accounting standards on the transfers of financial assets.

[3]   Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[4]   Includes purchases of Fannie Mae MBS issued by consolidated trusts.

Table 19 shows the composition of the Capital Markets group's mortgage portfolio as of March 31, 2011 and December 31, 2010.

TREASURY-1104

**Table 19:   Capital Markets Group's Mortgage Portfolio Composition**[1]

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| **Capital Markets group's mortgage loans:** | | |
| Single-family loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 51,348 | $ 51,783 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 239,723 | 237,096 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,721 | 11,446 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,496 | 31,526 |
| Total single-family conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 279,940 | 280,068 |
| **Total single-family loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 331,288 | 331,851 |
| Multifamily loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 413 | 431 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,180 | 4,413 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67,375 | 71,010 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,600 | 19,369 |
| Total multifamily conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 90,155 | 94,792 |
| **Total multifamily loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 90,568 | 95,223 |
| **Total Capital Markets group's mortgage loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 421,856 | 427,074 |
| **Capital Markets group's mortgage-related securities:** | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 238,330 | 260,429 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,659 | 17,332 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,170 | 1,425 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,590 | 22,283 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,653 | 18,038 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,844 | 25,052 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,008 | 12,525 |
| Other mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,508 | 4,613 |
| **Total Capital Markets group's mortgage-related securities**[2] . . . . . . . . . . . . . . . . . . . | 335,762 | 361,697 |
| **Total Capital Markets group's mortgage portfolio** . . . . . . . . . . . . . . . . . . . . . . . . . . | $757,618 | $788,771 |

---

[1]   Based on unpaid principal balance.

[2]   The fair value of these mortgage-related securities was $339.8 billion and $365.8 billion as of March 31, 2011 and December 31, 2010, respectively.

The Capital Markets group's mortgage portfolio decreased from December 31, 2010 to March 31, 2011 primarily due to sales and liquidations, partially offset by purchases of delinquent loans from MBS trusts. We expect our mortgage portfolio to continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury.

We purchased approximately 113,000 delinquent loans with an unpaid principal balance of approximately $20 billion from our single-family MBS trusts in the first quarter of 2011. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $231.3 billion as of March 31, 2011. This population includes loans that have been modified and have been classified as TDRs as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors

TREASURY-1105

including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. As of March 31, 2011, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $6.8 billion. In April 2011, we purchased approximately 32,000 delinquent loans with an unpaid principal balance of $5.7 billion from our single-family MBS trusts.

## CONSOLIDATED BALANCE SHEET ANALYSIS

The section below provides a discussion of our condensed consolidated balance sheets as of the dates indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 20 presents a summary of our condensed consolidated balance sheets as of March 31, 2011 and December 31, 2010.

**Table 20:   Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
| --- | --- | --- | --- |
| | March 31, 2011 | December 31, 2010 | Variance |
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . . . . | $  46,081 | $   29,048 | $ 17,033 |
| Restricted cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,730 | 63,678 | (26,948) |
| Investments in securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 146,648 | 151,248 | (4,600) |
| Mortgage loans | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 402,711 | 407,482 | (4,771) |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,614,903 | 2,577,794 | 37,109 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (67,557) | (61,556) | (6,001) |
| Mortgage loans, net of allowance for loan losses . . . . . . . . . . . . . . . . . . . . | 2,950,057 | 2,923,720 | 26,337 |
| Other assets[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47,526 | 54,278 | (6,752) |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,227,042 | $3,221,972 | $  5,070 |
| **Liabilities and equity (deficit)** | | | |
| Debt | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 761,187 | $ 780,044 | $(18,857) |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,447,589 | 2,416,956 | 30,633 |
| Other liabilities[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,684 | 27,489 | (805) |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,235,460 | 3,224,489 | 10,971 |
| Senior preferred stock. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91,200 | 88,600 | 2,600 |
| Other equity (deficit)[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (99,618) | (91,117) | (8,501) |
| Total stockholders' equity (deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (8,418) | (2,517) | (5,901) |
| **Total liabilities and stockholders' deficit** . . . . . . . . . . . . . . . . . . . . . . . . | $3,227,042 | $3,221,972 | $  5,070 |

[1]   Includes $33.5 billion as of March 31, 2011 and $32.8 billion as of December 31, 2010 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 31: Cash and Other Investments Portfolio."

[2]   Consists of accrued interest receivable, net; acquired property, net; and other assets.

[3]   Consists of accrued interest payable, federal funds purchased and securities sold under agreements to repurchase, and other liabilities.

[4]   Consists of preferred stock, common stock, additional paid-in capital, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

37

**Cash and Other Investments Portfolio**

Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements are included in our cash and other investments portfolio. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

**Restricted Cash**

Restricted cash primarily includes cash payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders. Our restricted cash decreased in the first quarter of 2011 primarily due to a decline in the volume of refinance activity as interest rates increased, resulting in a decrease in unscheduled payments received.

**Investments in Mortgage-Related Securities**

Our investments in mortgage-related securities are classified in our condensed consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value gains (losses), net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive loss. Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss. See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of March 31, 2011. Table 21 presents the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of March 31, 2011 and December 31, 2010.

**Table 21: Summary of Mortgage-Related Securities at Fair Value**

| | As of | |
| --- | --- | --- |
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 27,774 | $ 30,226 |
| Freddie Mac | 16,557 | 18,322 |
| Ginnie Mae | 1,315 | 1,629 |
| Alt-A private-label securities | 15,350 | 15,573 |
| Subprime private-label securities | 11,207 | 11,513 |
| CMBS | 25,867 | 25,608 |
| Mortgage revenue bonds | 11,148 | 11,650 |
| Other mortgage-related securities | 3,947 | 3,974 |
| Total | $113,165 | $118,495 |

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $39.6 billion as of March 31, 2011, of which $32.0 billion was rated below investment grade. Table 22

38

presents the fair value of our investments in Alt-A and subprime private-label securities and an analysis of the cumulative losses on these investments as of March 31, 2011. As of March 31, 2011, we had realized actual cumulative principal shortfalls of approximately 3% of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements.

**Table 22:   Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of March 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
| | (Dollars in millions) | | | | |
| Trading securities:[4] | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . | $ 2,991 | $ 1,658 | $ (1,287) | $   (124) | $(1,163) |
| Subprime private-label securities . . . . . . . . . . | 2,724 | 1,547 | (1,176) | (268) | (908) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,715 | $ 3,205 | $ (2,463) | $   (392) | $(2,071) |
| Available-for-sale securities: | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . | $18,599 | $13,692 | $ (5,107) | $(1,645) | $(3,462) |
| Subprime private-label securities[5] . . . . . . . . . | 15,298 | 9,660 | (5,678) | (1,449) | (4,229) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,897 | $23,352 | $(10,785) | $(3,094) | $(7,691) |
| Grand Total . . . . . . . . . . . . . . . . . . . . . . . . | $39,612 | $26,557 | $(13,248) | $(3,486) | $(9,762) |

[1]   Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2]   Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3]   For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in earnings.

[4]   Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

[5]   Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

Table 23 presents the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of March 31, 2011. Based on the stressed condition of some of our financial guarantors, we believe some of these counterparties will not fully meet their obligation to us in the future. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

**Table 23:** **Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | | | | As of March 31, 2011 | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | | | Monyline Financial Guaranteed Amount[6] |
| | Trading | Available-for-Sale | Wraps[1] | ≥ 60 Days Delinquent[2][3] | Average Loss Severity[3][4] | Average Credit Enhancement[3][5] | |
| | | | | (Dollars in millions) | | | |
| **Private-label mortgage-related securities backed by:**[7] | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | $    — | $    511 | $    — | 33.1% | 64.5% | 18.2% | $    — |
| 2005 . . . . . . . . . . . . . . . | — | 1,375 | — | 45.0 | 57.4 | 43.0 | 268 |
| 2006 . . . . . . . . . . . . . . . | — | 1,335 | — | 46.5 | 65.8 | 32.3 | 144 |
| 2007 . . . . . . . . . . . . . . . | 2,078 | — | — | 45.9 | 61.7 | 59.5 | 752 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | — | 6,704 | — | 10.2 | 46.8 | 12.4 | 13 |
| 2005 . . . . . . . . . . . . . . . | 90 | 4,347 | 129 | 24.4 | 57.0 | 6.6 | — |
| 2006 . . . . . . . . . . . . . . . | 67 | 4,201 | — | 30.6 | 59.8 | 1.8 | — |
| 2007 . . . . . . . . . . . . . . . | 756 | — | 194 | 44.4 | 67.2 | 30.2 | 314 |
| 2008[8] . . . . . . . . . . . . | — | 126 | — | — | — | — | — |
| Total Alt-A mortgage loans: . . . . . . . . . . . . . . | 2,991 | 18,599 | 323 | | | | 1,491 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior[9] . . . . . . | — | 2,159 | 652 | 24.8 | 70.4 | 60.4 | 674 |
| 2005[8] . . . . . . . . . . . . | — | 197 | 1,440 | 44.6 | 73.9 | 58.1 | 229 |
| 2006 . . . . . . . . . . . . . . . | — | 12,303 | — | 49.7 | 78.0 | 19.6 | 52 |
| 2007 . . . . . . . . . . . . . . . | 2,724 | 639 | 5,728 | 50.2 | 76.1 | 23.6 | 182 |
| Total subprime mortgage loans: . . . . . . . . . . . . . . | 2,724 | 15,298 | 7,820 | | | | 1,137 |
| Total Alt-A and subprime mortgage loans: . . . . . . . | $5,715 | $33,897 | $8,143 | | | | $2,628 |

[1] Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

[2] Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from March 2011 remittances for February 2011 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3] The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4] Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from March 2011 remittances for February 2011 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5] Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee.

[6] Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

TREASURY-1109

[7]   Vintages are based on series date and not loan origination date.

[8]   The unpaid principal balance includes private-label REMIC securities that have been resecuritized totaling $126 million for the 2008 vintage of other Alt-A loans and $20 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

[9]   Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

## Mortgage Loans

The increase in mortgage loans, net of an allowance for loan losses in the first quarter of 2011 was primarily driven by securitization activity from our lender swap and portfolio securitization programs, partially offset by scheduled principal paydowns and prepayments. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

## Debt Instruments

Debt of Fannie Mae is the primary means of funding our mortgage investments. Debt of consolidated trusts represents our liability to third-party beneficial interest holders when we have included the assets of a corresponding trust in our condensed consolidated balance sheets. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt as of March 31, 2011 and 2010 in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

The increase in debt of consolidated trusts in the first quarter of 2011 was primarily driven by sales of Fannie Mae MBS, which are accounted for as reissuances of debt of consolidated trusts in our condensed consolidated balance sheets, since the MBS certificates are transferred from our ownership to a third party.

## Derivative Instruments

We supplement our issuance of debt with interest rate related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. We aggregate, by derivative counterparty, the net fair value gain or loss, less any cash collateral paid or received, and report these amounts in our condensed consolidated balance sheets as either assets or liabilities.

Our derivative assets and liabilities consist of these risk management derivatives and our mortgage commitments. We refer to the difference between the derivative assets and derivative liabilities recorded in our condensed consolidated balance sheets as our net derivative asset or liability. We present, by derivative instrument type, the estimated fair value of derivatives recorded in our condensed consolidated balance sheets and the related outstanding notional amounts as of March 31, 2011 and December 31, 2010 in "Note 9, Derivative Instruments." Table 24 provides an analysis of the factors driving the change from December 31, 2010 to March 31, 2011 in the estimated fair value of our net derivative liability related to our risk management derivatives recorded in our condensed consolidated balance sheets.

41

**Table 24:   Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net**

|  | For the Three Months Ended March 31, 2011 |
|---|---|
|  | (Dollars in millions) |
| Net risk management derivative liability as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . | $(789) |
| Effect of cash payments: |  |
| Fair value at inception of contracts entered into during the period[1] . . . . . . . . . . . . . . . . . . | 58 |
| Fair value at date of termination of contracts settled during the period[2] . . . . . . . . . . . . . . . | 308 |
| Net collateral received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (705) |
| Periodic net cash contractual interest payments[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 391 |
| Total cash payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| Statement of operations impact of recognized amounts: |  |
| Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . . . . | (635) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 751 |
| Risk management derivatives fair value gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 116 |
| Net risk management derivative liability as of March 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . | $(621) |

---

[1] Cash receipts from sale of derivative option contracts increase the derivative liability recorded in our condensed consolidated balance sheets. Cash payments made to purchase derivative option contracts (purchased option premiums) increase the derivative asset recorded in our condensed consolidated balance sheets.

[2] Cash payments made to terminate derivative contracts reduce the derivative liability recorded in our condensed consolidated balance sheets. Primarily represents cash paid (received) upon termination of derivative contracts.

[3] Interest is accrued on interest rate swap contracts based on the contractual terms. Accrued interest income increases our derivative asset and accrued interest expense increases our derivative liability. The offsetting interest income and expense are included as components of derivatives fair value gains (losses), net in our condensed consolidated statements of operations and comprehensive loss. Net periodic interest receipts reduce the derivative asset and net periodic interest payments reduce the derivative liability. Also includes cash paid (received) on other derivatives contracts.

For additional information on our derivative instruments, see "Consolidated Results of Operations—Fair Value Gains (Losses), Net," "Risk Management—Market Risk Management, Including Interest Rate Risk Management" and "Note 9, Derivative Instruments."

### Stockholders' Deficit

Our net deficit increased in the first quarter of 2011. See Table 25 in "Supplemental Non-GAAP Information—Fair Value Balance Sheets" for details of the change in our net deficit.

### SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 25 summarizes changes in our stockholders' deficit reported in our GAAP condensed consolidated balance sheets and in the fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the three months ended March 31, 2011. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 13, Fair Value."

TREASURY-1111

**Table 25:   Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

| | For the Three Months Ended March 31, 2011 |
| --- | --- |
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2010[1] ............................ | $   (2,599) |
| Total comprehensive loss ....................................................... | (6,290) |
| Capital transactions:[2] | |
| Funds received from Treasury under the senior preferred stock purchase agreement ........... | 2,600 |
| Senior preferred stock dividends................................................ | (2,216) |
| Capital transactions, net ....................................................... | 384 |
| Other ..................................................................... | 6 |
| Fannie Mae stockholders' deficit as of March 31, 2011[1] ............................... | $   (8,499) |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2010............................. | $(120,294) |
| Capital transactions, net ....................................................... | 384 |
| Change in estimated fair value of net assets, excluding capital transactions................... | (11,231) |
| Decrease in estimated fair value of net assets, net ...................................... | (10,847) |
| Estimated fair value of net assets as of March 31, 2011 ................................ | $(131,141) |

[1]   Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total deficit" amount reported in our condensed consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' equity (deficit)" and "Noncontrolling interests" reported in our condensed consolidated balance sheets.

[2]   Represents capital transactions, which are reported in our condensed consolidated financial statements.

The $11.2 billion decrease in the fair value of our net assets, excluding capital transactions, during the first quarter of 2011 was attributable to:

- A net decrease in the fair value due to credit-related items principally related to declining actual and expected home prices as well as a decrease in the estimated rate of prepayments, which increased the expected life of the guaranty book of business and increased expected credit losses. This net decrease due to credit-related items was partially offset by

- An increase in the fair value of the net portfolio attributable to the positive impact of the spread between mortgage assets and associated debt and derivatives.

### Cautionary Language Relating to Supplemental Non-GAAP Financial Measures

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

43

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not intend to have another party assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We present our non-GAAP fair value balance sheets in Table 26 below.

TREASURY-1113

**Table 26:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of March 31, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . | $  56,561 | $       — | $  56,561 | $  80,975 | $       — | $  80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . | 26,250 | — | 26,250 | 11,751 | — | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . | 57,035 | — | 57,035 | 56,856 | — | 56,856 |
| Available-for-sale securities . . . . . . . . . . . . . . . . | 89,613 | — | 89,613 | 94,392 | — | 94,392 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale . . . . . . . . . . . . | 1,414 | 44 | 1,458 | 915 | — | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | 348,644 | (35,472) | 313,172 | 358,698 | (39,331) | 319,367 |
| Of consolidated trusts . . . . . . . . . . . . . . . | 2,599,999 | 18,737[2] | 2,618,736[3] | 2,564,107 | 46,038[2] | 2,610,145[3] |
| Total mortgage loans . . . . . . . . . . . . . . . . . . | 2,950,057 | (16,691) | 2,933,366[4] | 2,923,720 | 6,707 | 2,930,427[4] |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . | 3,091 | (151) | 2,940[5][6] | 7,215 | (225) | 6,990[5][6] |
| Derivative assets at fair value . . . . . . . . . . . . . . | 279 | — | 279[5][6] | 1,137 | — | 1,137[5][6] |
| Guaranty assets and buy-ups, net . . . . . . . . . . . | 459 | 440 | 899[5][6] | 458 | 356 | 814[5][6] |
| Total financial assets . . . . . . . . . . . . . . . . | 3,183,345 | (16,402) | 3,166,943[7] | 3,176,504 | 6,838 | 3,183,342[7] |
| Credit enhancements . . . . . . . . . . . . . . . . . . . . | 471 | 3,406 | 3,877[5][6] | 479 | 3,286 | 3,765[5][6] |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . | 43,226 | (240) | 42,986[5][6] | 44,989 | (261) | 44,728[5][6] |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . | $3,227,042 | $ (13,236) | $3,213,806 | $3,221,972 | $   9,863 | $3,231,835 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | $      25 | $       — | $      25 | $      52 | $      (1) | $      51 |
| Short-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . | 147,092 | 41 | 147,133 | 151,884 | 90 | 151,974 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . | 5,156 | — | 5,156 | 5,359 | — | 5,359 |
| Long-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . | 614,095[8] | 19,055 | 633,150 | 628,160[8] | 21,524 | 649,684 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . | 2,442,433[8] | 88,041[2] | 2,530,474 | 2,411,597[8] | 103,332[2] | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . . | 941 | — | 941[9][10] | 1,715 | — | 1,715[9][10] |
| Guaranty obligations . . . . . . . . . . . . . . . . . . . . | 760 | 2,667 | 3,427[9][10] | 769 | 3,085 | 3,854[9][10] |
| Total financial liabilities . . . . . . . . . . . . . . . | 3,210,502 | 109,804 | 3,320,306[7] | 3,199,536 | 128,030 | 3,327,566[7] |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . | 24,958 | (398) | 24,560[9][10] | 24,953 | (472) | 24,481[9][10] |
| Total liabilities . . . . . . . . . . . . . . . . . . . . | 3,235,460 | 109,406 | 3,344,866 | 3,224,489 | 127,558 | 3,352,047 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[11] . . . . . . . . . . . . . . . . . . . . | 91,200 | — | 91,200 | 88,600 | — | 88,600 |
| Preferred . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,204 | (18,987) | 1,217 | 20,204 | (19,829) | 375 |
| Common . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (119,903) | (103,655) | (223,558) | (111,403) | (97,866) | (209,269) |
| **Total Fannie Mae stockholders' deficit/non-GAAP fair value of net assets** . . . . . . . . . | $   (8,499) | $(122,642) | $ (131,141) | $  (2,599) | $(117,695) | $ (120,294) |
| Noncontrolling interests . . . . . . . . . . . . . . . . . . | 81 | — | 81 | 82 | — | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . | (8,418) | (122,642) | (131,060) | (2,517) | (117,695) | (120,212) |
| Total liabilities and equity (deficit) . . . . . . . . | $3,227,042 | $ (13,236) | $3,213,806 | $3,221,972 | $   9,863 | $3,231,835 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]   Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2]   Fair value exceeds carrying value of consolidated loans and consolidated debt as a significant portion of these were consolidated at unpaid principal balance as of January 1, 2010, upon adoption of accounting standards on transfers of financial assets and consolidation of VIEs. Also impacting the difference between fair value and carrying value of the consolidated loans is the credit component included in consolidated loans, which has no corresponding impact on the consolidated debt.

TREASURY-1114

[3]    Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheet of $3.0 billion as of both March 31, 2011 and December 31, 2010.

[4]    Performing loans had both a fair value and an unpaid principal balance of $2.8 trillion as of March 31, 2011 compared with a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2010. Nonperforming loans, which include loans that are delinquent by one or more payments, had a fair value of $143.4 billion and an unpaid principal balance of $254.4 billion as of March 31, 2011 compared with a fair value of $168.5 billion and an unpaid principal balance of $287.4 billion as of December 31, 2010. See "Note 13, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[5]    The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

[6]    "Other assets" include the following GAAP condensed consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP condensed consolidated balance sheets totaled $26.6 billion and $27.5 billion as of March 31, 2011 and December 31, 2010, respectively. "Other assets" in our GAAP condensed consolidated balance sheets include the following: (a) Advances to Lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $4.3 billion and $9.3 billion as of March 31, 2011 and December 31, 2010, respectively.

[7]    We determined the estimated fair value of these financial instruments in accordance with the fair value accounting standard as described in "Note 13, Fair Value."

[8]    Includes certain long-term debt instruments that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $3.1 billion and $3.2 billion as of March 31, 2011 and December 31, 2010, respectively.

[9]    The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

[10]    "Other liabilities" include the Accrued interest payable in our GAAP condensed consolidated balance sheets. The carrying value of this item in our GAAP condensed consolidated balance sheets totaled $13.8 billion as of both March 31, 2011 and December 31, 2010. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP condensed consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP condensed consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $1.7 billion and $2.5 billion as of March 31, 2011 and December 31, 2010, respectively.

[11]    The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

---

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements and maintaining sufficient capacity to meet these needs.

Our Treasury group is responsible for implementing our liquidity and contingency planning strategies. We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt. While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury arrangements, we believe that our liquidity contingency planning may be difficult or impossible to execute for a company of our size in our circumstances. See "Risk Factors" in our 2010 Form 10-K for a description of the risks associated with our contingency planning.

Our liquidity position could be adversely affected by many causes, both internal and external to our business, including: actions taken by the conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; an unexpected systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a downgrade in the credit ratings of our senior unsecured debt or the U.S. government's debt from the major

TREASURY-1115

ratings organizations; a significant further decline in our net worth; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status.

### Debt Funding

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

<u>Fannie Mae Debt Funding Activity</u>

Table 27 summarizes the activity in the debt of Fannie Mae for the periods indicated. This activity includes federal funds purchased and securities sold under agreements to repurchase but excludes the debt of consolidated trusts as well as intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

TREASURY-1116

**Table 27:   Activity in Debt of Fannie Mae**

| | For the Three Months Ended March 31, | |
| | 2011 | 2010[2] |
| --- | --- | --- |
| | (Dollars in millions) | |
| **Issued during the period:** | | |
| Short-term: | | |
| Amount | $ 88,201 | $138,480 |
| Weighted-average interest rate | 0.15% | 0.23% |
| Long-term: | | |
| Amount | $ 51,737 | $101,964 |
| Weighted-average interest rate | 2.13% | 2.28% |
| Total issued: | | |
| Amount | $139,938 | $240,444 |
| Weighted-average interest rate | 0.88% | 1.09% |
| **Paid off during the period:[1]** | | |
| Short-term: | | |
| Amount | $ 93,031 | $130,866 |
| Weighted-average interest rate | 0.26% | 0.23% |
| Long-term: | | |
| Amount | $ 66,857 | $ 95,163 |
| Weighted-average interest rate | 2.82% | 3.30% |
| Total paid off: | | |
| Amount | $159,888 | $226,029 |
| Weighted-average interest rate | 1.33% | 1.53% |

[1] Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases.

[2] For the three months ended March 31, 2010, we revised the weighted-average interest rate on short-term issued and total issued debt primarily to reflect weighting based on transaction level data.

Debt funding activity in the first quarter of 2011 was lower compared with the first quarter of 2010 primarily because we decreased our redemptions of callable debt and had a lower amount of outstanding debt that matured in the first quarter of 2011, which reduced the amount of debt we needed to issue. In addition, our funding needs decreased because of a decrease in purchases of delinquent loans from MBS trusts. During the first half of 2010, we purchased a significant amount of loans from MBS trusts that were four or more consecutive monthly payments delinquent.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform."

In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" in this report and in our 2010 Form 10-K for a discussion of the risks we face relating to (1) the uncertain future of our

48

company; (2) our reliance on the issuance of debt securities to obtain funds for our operations; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae consists of federal funds purchased and securities sold under agreements to repurchase and short-term and long-term debt, excluding debt of consolidated trusts.

As of March 31, 2011, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt remained constant at 19% compared with December 31, 2010. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.69% as of March 31, 2011 from 2.77% as of December 31, 2010.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Our debt cap under the senior preferred stock purchase agreement was reduced to $972 billion in 2011. As of March 31, 2011, our aggregate indebtedness totaled $774.0 billion, which was $198.0 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt cap reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

Table 28 provides information as of March 31, 2011 and December 31, 2010 on our outstanding short-term and long-term debt based on its original contractual terms.

49

**Table 28:   Outstanding Short-Term Borrowings and Long-Term Debt[1]**

| | | As of | | | | |
|---|---|---|---|---|---|---|
| | | March 31, 2011 | | | December 31, 2010 | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| | | | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . | — | $       25 | 0.01% | — | $       52 | 2.20% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . | — | $  146,751 | 0.26% | — | $  151,500 | 0.32% |
| Foreign exchange discount notes . . . . . . | — | 341 | 2.51 | — | 384 | 2.43 |
| Total short-term debt of Fannie Mae[2] . . . . . | | 147,092 | 0.27 | | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . | — | 5,156 | 0.22 | — | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . | | $  152,248 | 0.27% | | $  157,243 | 0.32% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . | 2011 - 2030 | $  291,851 | 3.14% | 2011 - 2030 | $  300,344 | 3.20% |
| Medium-term notes . . . . . . . . . . . . . . . | 2011 - 2021 | 190,950 | 2.00 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . . . . | 2017 - 2028 | 1,204 | 6.07 | 2017 - 2028 | 1,177 | 6.21 |
| Other long-term debt[3] . . . . . . . . . . . . | 2011 - 2040 | 47,630 | 5.64 | 2011 - 2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . . . | | 531,635 | 2.96 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . . . . . | 2011 - 2016 | 74,454 | 0.30 | 2011 - 2015 | 72,039 | 0.31 |
| Other long-term debt[3] . . . . . . . . . . . . | 2020 - 2037 | 389 | 5.27 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . . . . | | 74,843 | 0.32 | | 72,425 | 0.34 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[4] . . . . . . . . . | 2012 - 2014 | 4,893 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . . . | 2019 | 2,724 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed-rate . . . . . . . | | 7,617 | 6.80 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[5] . . . . . . | | 614,095 | 2.69 | | 628,160 | 2.77 |
| Debt of consolidated trusts[3] . . . . . . . . . | 2011 - 2051 | 2,442,433 | 4.61 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . . . . . . . . | | $3,056,528 | 4.23% | | $3,039,757 | 4.22% |
| Outstanding callable debt of Fannie Mae[6]. . . | | $  204,664 | 2.50% | | $  219,804 | 2.53% |

[1]  Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments and debt of consolidated trusts, totaled $772.6 billion and $792.6 billion as of March 31, 2011 and December 31, 2010, respectively.

[2]  Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $67 million and $128 million as of March 31, 2011 and December 31, 2010, respectively.

[3]  Includes a portion of structured debt instruments that is reported at fair value.

[4]  Consists of subordinated debt with an interest deferral feature.

[5]  Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $87.5 billion and $95.4 billion as of March 31, 2011 and December 31, 2010, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $11.4 billion and $12.4 billion as of March 31,

2011 and December 31, 2010, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $625.5 billion and $640.5 billion as of March 31, 2011 and December 31, 2010, respectively.

(6) Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 29 presents the maturity profile, as of March 31, 2011, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, decreased as a percentage of our total outstanding debt, excluding debt of consolidated trusts and federal funds purchased and securities sold under agreements to repurchase, to 31% as of March 31, 2011, compared with 32% as of December 31, 2010. The weighted-average maturity of our outstanding debt that is maturing within one year was 98 days as of March 31, 2011, compared with 116 days as of December 31, 2010.

**Table 29:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year[(1)]**



(1)   Includes unamortized discounts, premiums and other cost basis adjustments of $103 million as of March 31, 2011. Excludes debt of consolidated trusts maturing within one year of $9.6 billion and federal funds purchased and securities sold under agreements to repurchase of $25 million as of March 31, 2011.

Table 30 presents the maturity profile, as of March 31, 2011, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 58 months as of both March 31, 2011 and December 31, 2010.

51

**Table 30:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year[1]**



[1]  Includes unamortized discounts, premiums and other cost basis adjustments of $11.4 billion as of March 31, 2011. Excludes debt of consolidated trusts of $2.4 trillion as of March 31, 2011.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities. We also intend to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock.

### Cash and Other Investments Portfolio

Table 31 provides information on the composition of our cash and other investments portfolio for the periods indicated.

**Table 31:   Cash and Other Investments Portfolio**

|  | As of | |
|---|---|---|
|  | March 31, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Cash and cash equivalents | $19,831 | $17,297 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 26,250 | 11,751 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities[1] | 29,383 | 27,432 |
| Asset-backed securities[2] | 4,100 | 5,321 |
| Total non-mortgage-related securities | 33,483 | 32,753 |
| Total cash and other investments | $79,564 | $61,801 |

[1]  Excludes $3.1 billion and $4.0 billion of U.S. Treasury securities which are a component of cash equivalents as of March 31, 2011 and December 31, 2010, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[2]  Includes securities primarily backed by credit cards loans, student loans and automobile loans.

Our cash and other investments portfolio increased from December 31, 2010 to March 31, 2011 primarily due to a decrease in the weighted-average maturity of our outstanding debt in the first quarter of 2011, which resulted in an increase in the amount of cash and highly liquid non-mortgage securities we were required to hold pursuant to our liquidity risk management policy.

TREASURY-1121

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, are highly dependent on our credit ratings from the major ratings organizations. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions.

While there have been no changes in our credit ratings from December 31, 2010 to May 2, 2011, on April 20, 2011, Standard & Poor's revised its outlook on the debt issues of Fannie Mae to negative from stable. This action followed Standard & Poor's revision to the outlook of the U.S. government's long-term credit rating to negative from stable. Standard & Poor's noted that the ratings on Fannie Mae and other government-related entities are constrained by the long-term sovereign rating on the U.S. government and noted that it will not raise the outlooks or ratings on these entities above the U.S. government as long as the ratings and outlook on the U.S. remain unchanged. Standard & Poor's also stated that if it were to lower its ratings on the U.S. government, it would likely lower the ratings on the debt of Fannie Mae and other government-related entities.

Table 32 presents the credit ratings issued by the three major credit rating agencies as of May 2, 2011.

**Table 32:   Fannie Mae Credit Ratings**

| | As of May 2, 2011 | | |
| --- | --- | --- | --- |
| | Standard & Poor's | Moody's | Fitch |
| Long-term senior debt . . . . . . . . . . | AAA | Aaa | AAA |
| Short-term senior debt . . . . . . . . . . | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt . . . . . | A | Aa2 | AA- |
| Preferred stock . . . . . . . . . . . . . . . | C | Ca | C/RR6 |
| Bank financial strength rating . . . . . | — | E+ | — |
| Outlook . . . . . . . . . . . . . . . . . . . . | Negative | Stable | Stable |
| | (for Long Term Senior Debt and Qualifying Subordinated Debt) | (for all ratings) | (for AAA rated Long Term Issuer Default Rating) |

*Cash Flows*

*Three Months Ended March 31, 2011.*   Cash and cash equivalents of $19.8 billion as of March 31, 2011 increased by $2.5 billion from December 31, 2010 driven by net cash inflows provided by operating activities of $2.6 billion. Net cash generated from investing activities totaled $123.8 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash used in financing activities of $123.9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt.

*Three Months Ended March 31, 2010.*   Cash and cash equivalents of $30.5 billion as of March 31, 2010 increased by $23.7 billion from December 31, 2009. Net cash generated from investing activities totaled $108.7 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were partially offset by net cash outflows used in operating activities of $30.9 billion resulting primarily from purchases of trading securities. The net cash used in financing activities of $54.2 billion was primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

## Capital Management

*Regulatory Capital*

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. We report our minimum capital requirement, core capital and GAAP net worth in our periodic reports on Form 10-Q and Form 10-K, and FHFA also reports them on its website. FHFA is not reporting on our critical capital, risk-

53

based capital or subordinated debt levels during the conservatorship. For information on our minimum capital requirements see "Note 11, Regulatory Capital Requirements."

*Senior Preferred Stock Purchase Agreement*

As a result of the covenants under the senior preferred stock purchase agreement and Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding, we no longer have access to equity funding except through draws under the senior preferred stock purchase agreement.

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $90.2 billion from Treasury pursuant to the senior preferred stock purchase agreement as of March 31, 2011. In May 2011, the Acting Director of FHFA submitted a request for $8.5 billion from Treasury under the senior preferred stock purchase agreement to eliminate our net worth deficit as of March 31, 2011, and requested receipt of those funds on or prior to June 30, 2011. Upon receipt of the requested funds, the aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, will equal $99.7 billion.

We continue to expect to have a net worth deficit in future periods and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement. Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

As consideration for Treasury's funding commitment, we issued one million shares of senior preferred stock and a warrant to purchase shares of our common stock to Treasury. A quarterly commitment fee was scheduled to be set by Treasury beginning on March 31, 2011. This commitment fee was waived by Treasury for the first quarter of 2011. On March 31, 2011, FHFA was notified by Treasury that it was waiving the commitment fee for the second quarter of 2011 due to the continued fragility of the U.S. mortgage market and because Treasury believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the next quarter under the senior preferred stock purchase agreement.

*Dividends*

Holders of the senior preferred stock are entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Treasury is the current holder of our senior preferred stock. As conservator and under our charter, FHFA has authority to declare and approve dividends on the senior preferred stock. If at any time we do not pay cash dividends on the senior preferred stock when they are due, then immediately following the period we did not pay dividends and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends on the senior preferred stock that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock.

Our first quarter dividend of $2.2 billion was declared by the conservator and paid by us on March 31, 2011. Upon receipt of additional funds from Treasury in June 2011, which FHFA requested on our behalf in May 2011, the annualized dividend on the senior preferred stock will be $10.0 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the

TREASURY-1123

conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

## OFF-BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $56.7 billion as of March 31, 2011 and $56.9 billion as of December 31, 2010.

Under the temporary credit and liquidity facilities program in which we provide assistance to housing finance agencies ("HFAs") and in which Treasury has purchased participation interests, our outstanding commitments totaled $3.5 billion as of March 31, 2011 and $3.7 billion as of December 31, 2010. Our total outstanding liquidity commitments to advance funds for securities backed by multifamily housing revenue bonds totaled $17.7 billion as of March 31, 2011 and $17.8 billion as of December 31, 2010. As of both March 31, 2011 and December 31, 2010, there were no liquidity guarantee advances outstanding. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2010 Form 10-K.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to manage these risks and mitigate our losses by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" and "Risk Factors." We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2010 Form 10-K and "Risk Factors" in our 2010 Form 10-K.

### Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Continuing adverse market conditions have resulted in significant exposure to mortgage and institutional counterparty credit risk. The metrics used to measure credit risk are generated using internal models. Our internal models require numerous assumptions and there are inherent limitations in any methodology used to estimate macro-economic factors such as home prices, unemployment and interest rates and their impact on borrower behavior. When market conditions change rapidly and dramatically, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risks associated with our use of models.

### *Mortgage Credit Risk Management*

Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our

TREASURY-1124

mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty.

### *Mortgage Credit Book of Business*

Table 33 displays the composition of our entire mortgage credit book of business as of the periods indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of both March 31, 2011 and December 31, 2010.

The total mortgage credit book of business is not impacted by our repurchase of delinquent loans as this activity is a reclassification from loans of consolidated trusts to loans of Fannie Mae.

**Table 33:   Composition of Mortgage Credit Book of Business[1]**

| | As of March 31, 2011 | | | | | |
| | Single-Family | | Multifamily | | Total | |
| | Conventional[2] | Government[3] | Conventional[2] | Government[3] | Conventional[2] | Government[3] |
| | | | (Dollars in millions) | | | |
|---|---|---|---|---|---|---|
| Mortgage assets: | | | | | | |
| Mortgage loans[4] . . . . . . | $2,799,337 | $52,516 | $171,425 | $  453 | $2,970,762 | $52,969 |
| Fannie Mae MBS[5][7] . . . | 6,177 | 1,543 | — | 2 | 6,177 | 1,545 |
| Agency mortgage-related securities[5][6] . . . . . . . | 15,616 | 1,186 | — | 32 | 15,616 | 1,218 |
| Mortgage revenue bonds[5] . . . . . . . . . . | 2,140 | 1,077 | 7,192 | 1,599 | 9,332 | 2,676 |
| Other mortgage-related securities[5] . . . . . . . . | 42,475 | 1,629 | 24,844 | 15 | 67,319 | 1,644 |
| Total mortgage assets . . . . . | 2,865,745 | 57,951 | 203,461 | 2,101 | 3,069,206 | 60,052 |
| Unconsolidated Fannie Mae MBS[5][7] . . . . . . . . . . . | 1,814 | 16,985 | 37 | 1,791 | 1,851 | 18,776 |
| Other credit guarantees[8] . . . | 16,191 | 2,949 | 16,536 | 380 | 32,727 | 3,329 |
| Mortgage credit book of business . . . . . . . . . . | $2,883,750 | $77,885 | $220,034 | $4,272 | $3,103,784 | $82,157 |
| Guaranty book of business . . . . . . . . . . . | $2,823,519 | $73,993 | $187,998 | $2,626 | $3,011,517 | $76,619 |

TREASURY-1125

| | As of December 31, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Single-Family | | Multifamily | | Total | |
| Mortgage assets: | Conventional[2] | Government[3] | Conventional[2] | Government[3] | Conventional[2] | Government[3] |
| | | | (Dollars in millions) | | | |
| Mortgage loans[4] . . . . . | $2,766,870 | $52,577 | $170,074 | $  476 | $2,936,944 | $53,053 |
| Fannie Mae MBS[5][7] . . . | 5,961 | 1,586 | — | 2 | 5,961 | 1,588 |
| Agency mortgage-related securities[5][6] . . . . . . . | 17,291 | 1,506 | — | 24 | 17,291 | 1,530 |
| Mortgage revenue bonds[5] . . . . . . . . . . | 2,197 | 1,190 | 7,449 | 1,689 | 9,646 | 2,879 |
| Other mortgage-related securities[5] . . . . . . . . | 43,634 | 1,657 | 25,052 | 15 | 68,686 | 1,672 |
| Total mortgage assets . . . . . | 2,835,953 | 58,516 | 202,575 | 2,206 | 3,038,528 | 60,722 |
| Unconsolidated Fannie Mae MBS[5][7] . . . . . . . . . . . . | 2,230 | 17,238 | 37 | 1,818 | 2,267 | 19,056 |
| Other credit guarantees[8] . . . | 15,529 | 3,096 | 16,601 | 393 | 32,130 | 3,489 |
| Mortgage credit book of business . . . . . . . . . . | $2,853,712 | $78,850 | $219,213 | $4,417 | $3,072,925 | $83,267 |
| Guaranty book of business . . . . . . . . . . | $2,790,590 | $74,497 | $186,712 | $2,689 | $2,977,302 | $77,186 |

[1]  Based on unpaid principal balance.

[2]  Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured by the U.S. government or any of its agencies.

[3]  Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[4]  Includes unscheduled borrower principal payments.

[5]  Excludes unscheduled borrower principal payments.

[6]  Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

[7]  The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[8]  Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies and underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies, which we discuss in detail below, may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our single-family guaranty book of business for which we have access to detailed loan-level information, which

TREASURY-1126

constituted over 99% of our single-family conventional guaranty book of business as of both March 31, 2011 and December 31, 2010. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

*Single-Family Acquisition and Servicing Policies and Underwriting and Servicing Standards*

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions.

For additional discussion of our acquisition policy, underwriting standards and use of mortgage insurance as a form of credit enhancement see "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in our 2010 Form 10-K. For a discussion of our aggregate mortgage insurance coverage as of March 31, 2011 and December 31, 2010, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Insurers."

*Single-Family Portfolio Diversification and Monitoring*

Diversification within our single-family mortgage credit book of business by product type, loan characteristics and geography is an important factor that influences credit quality and performance and may reduce our credit risk. We monitor various loan attributes, in conjunction with housing market and economic conditions, to determine if our pricing and our eligibility and underwriting criteria accurately reflect the risk associated with loans we acquire or guarantee. In some cases we may decide to significantly reduce our participation in riskier loan product categories. We also review the payment performance of loans in order to help identify potential problem loans early in the delinquency cycle and to guide the development of our loss mitigation strategies.

TREASURY-1127

Table 34 presents our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

**Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business[1]**

| | Percent of Single-Family Conventional Business Volume[2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| --- | --- | --- | --- | --- |
| | **2011** | **2010** | **March 31, 2011** | **December 31, 2010** |
| | (Dollars in millions) | | | |
| **Original LTV ratio:[5]** | | | | |
| <= 60% . . . . . . . . . . . . . . . . . | 30% | 30% | 24% | 24% |
| 60.01% to 70% . . . . . . . . . . . . | 16 | 16 | 16 | 16 |
| 70.01% to 80% . . . . . . . . . . . . | 38 | 37 | 42 | 41 |
| 80.01% to 90%[6] . . . . . . . . . . . | 8 | 9 | 9 | 9 |
| 90.01% to 100%[6] . . . . . . . . . . | 6 | 6 | 8 | 9 |
| Greater than 100%[6] . . . . . . . . | 2 | 2 | 1 | 1 |
| Total . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . . . . . | 69% | 69% | 71% | 71% |
| Average loan amount . . . . . . . . . . . | $213,710 | $224,719 | $156,557 | $155,531 |
| **Estimated mark-to-market LTV ratio:[7]** | | | | |
| <= 60% . . . . . . . . . . . . . . . . | | | 27% | 28% |
| 60.01% to 70% . . . . . . . . . . . . | | | 12 | 13 |
| 70.01% to 80% . . . . . . . . . . . . | | | 17 | 19 |
| 80.01% to 90% . . . . . . . . . . . . | | | 16 | 15 |
| 90.01% to 100% . . . . . . . . . . . . | | | 10 | 9 |
| Greater than 100% . . . . . . . . . . | | | 18 | 16 |
| Total . . . . . . . . . . . . . . . . . | | | 100% | 100% |
| Weighted average . . . . . . . . . . | | | 79% | 77% |
| **Product type:** | | | | |
| **Fixed-rate:[8]** | | | | |
| Long-term . . . . . . . . . . . . . . | 68% | 72% | 74% | 74% |
| Intermediate-term . . . . . . . . . . | 25 | 20 | 14 | 14 |
| Interest-only . . . . . . . . . . . . | * | * | 2 | 2 |
| Total fixed-rate . . . . . . . . . | 93 | 92 | 90 | 90 |
| **Adjustable-rate:** | | | | |
| Interest-only . . . . . . . . . . . . | 1 | 2 | 3 | 4 |
| Other ARMs . . . . . . . . . . . . | 6 | 6 | 7 | 6 |
| Total adjustable-rate . . . . . . | 7 | 8 | 10 | 10 |
| Total . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| **Number of property units:** | | | | |
| 1 unit . . . . . . . . . . . . . . . . . . | 98% | 98% | 97% | 97% |
| 2-4 units . . . . . . . . . . . . . . . . | 2 | 2 | 3 | 3 |
| Total . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |

59

| | Percent of Single-Family Conventional Business Volume[2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
|---|---|---|---|---|
| | **2011** | **2010** | **March 31, 2011** | **December 31, 2010** |
| | (Dollars in millions) | | | |
| **Property type:** | | | | |
| Single-family homes . . . . . . . . . | 91% | 90% | 91% | 91% |
| Condo/Co-op. . . . . . . . . . . . . . . | 9 | 10 | 9 | 9 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| **Occupancy type:** | | | | |
| Primary residence . . . . . . . . . . . | 89% | 90% | 89% | 90% |
| Second/vacation home . . . . . . . . | 5 | 5 | 5 | 4 |
| Investor . . . . . . . . . . . . . . . . . . | 6 | 5 | 6 | 6 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| **FICO credit score:** | | | | |
| < 620 . . . . . . . . . . . . . . . . . . . | *% | 1% | 3% | 4% |
| 620 to < 660 . . . . . . . . . . . . . . | 2 | 2 | 7 | 7 |
| 660 to < 700 . . . . . . . . . . . . . . | 7 | 8 | 14 | 15 |
| 700 to < 740 . . . . . . . . . . . . . . | 17 | 18 | 21 | 21 |
| >= 740 . . . . . . . . . . . . . . . . . . . | 74 | 71 | 55 | 53 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . . . . | 762 | 758 | 736 | 735 |
| **Loan purpose:** | | | | |
| Purchase . . . . . . . . . . . . . . . . . . | 18% | 22% | 32% | 33% |
| Cash-out refinance . . . . . . . . . . . | 19 | 20 | 29 | 29 |
| Other refinance . . . . . . . . . . . . . | 63 | 58 | 39 | 38 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| **Geographic concentration:**[9] | | | | |
| Midwest . . . . . . . . . . . . . . . . . . | 15% | 15% | 15% | 15% |
| Northeast . . . . . . . . . . . . . . . . . | 20 | 21 | 19 | 19 |
| Southeast . . . . . . . . . . . . . . . . . | 20 | 18 | 24 | 24 |
| Southwest . . . . . . . . . . . . . . . . . | 15 | 14 | 15 | 15 |
| West. . . . . . . . . . . . . . . . . . . . . | 30 | 32 | 27 | 27 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% |
| **Origination year:** | | | | |
| <= 2001 . . . . . . . . . . . . . . . . . | | | 2% | 2% |
| 2002. . . . . . . . . . . . . . . . . . . . . | | | 3 | 3 |
| 2003. . . . . . . . . . . . . . . . . . . . . | | | 10 | 11 |
| 2004. . . . . . . . . . . . . . . . . . . . . | | | 6 | 7 |
| 2005. . . . . . . . . . . . . . . . . . . . . | | | 8 | 9 |
| 2006. . . . . . . . . . . . . . . . . . . . . | | | 8 | 8 |
| 2007. . . . . . . . . . . . . . . . . . . . . | | | 11 | 12 |
| 2008. . . . . . . . . . . . . . . . . . . . . | | | 8 | 9 |
| 2009. . . . . . . . . . . . . . . . . . . . . | | | 20 | 21 |
| 2010. . . . . . . . . . . . . . . . . . . . . | | | 21 | 18 |
| 2011. . . . . . . . . . . . . . . . . . . . . | | | 3 | — |
| Total . . . . . . . . . . . . . . . . . . . | | | 100% | 100% |

---

*  Represents less than 0.5% of single-family conventional business volume or book of business.

[1]  We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.5% of our single-family conventional guaranty book of business as of both March 31, 2011 and December 31, 2010. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

60

(2) Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-Family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we securitize into Fannie Mae MBS.

(3) Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

(4) Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented approximately 4.3% of our single-family conventional guaranty book of business as of March 31, 2011 and 3.9% as of December 31, 2010. See "Business—Our Charter and Regulation of Our Activities—Charter Act-Loan Standards" in our 2010 Form 10-K for additional information on loan limits.

(5) The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

(6) We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have a LTV ratio over 80%.

(7) The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

(8) Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

(9) Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

## Credit Profile Summary

We continue to see the positive effects of actions we took beginning in 2008 to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. The single-family loans we purchased or guaranteed in the first quarter of 2011 have a strong credit profile with a weighted average original LTV ratio of 69%, a weighted average FICO credit score of 762, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to lower acquisition volume and the relatively high volume of Refi Plus loans (including HARP), the LTV ratios at origination for our 2011 acquisitions to date are higher than for our 2009 and 2010 acquisitions.

Whether our acquisitions throughout 2011 will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. FHA's role as the lower-cost option for some consumers, or in some cases the only option, for loans with higher LTV ratios reduced our acquisition of these types of loans. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

The credit profile of our acquisitions in the first quarter of 2011 was further influenced by a significant percentage of our acquisitions representing refinanced loans, which generally have a strong credit profile because refinancing indicates the borrower's ability to make their mortgage payment and desire to maintain homeownership. Refinancings represented 82% of our single-family acquisitions in the first quarter of 2011. While refinanced loans have historically tended to perform better than loans used for initial home purchase, Refi Plus loans may not ultimately perform as strongly as traditional refinanced loans because these loans, which relate to non-delinquent Fannie Mae mortgages that were refinanced, may have original LTV ratios as high as 125% and, in some cases, lower FICO credit scores than we generally require. In the first quarter of 2011, our regulator granted our request for an extension of our ability to acquire loans under Refi Plus with LTV ratios greater than 80% and up to 125% for loans originated through June 2012. Approximately 17% of our single-family conventional business volume for the first quarter of 2010 consisted of loans with LTV ratios higher than 80% at the time of purchase. For the first quarter of 2011, these loans accounted for 16% of our single-family business volume.

61

The prolonged and severe decline in home prices has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 79% as of March 31, 2011, and 77% as of December 31, 2010. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 18% as of March 31, 2011, and 16% as of December 31, 2010. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

Our exposure, as discussed in this paragraph, to Alt-A and subprime loans included in our single-family conventional guaranty book of business does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time. We are also not currently acquiring newly originated subprime loans. We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender. We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $203.7 billion as of March 31, 2011, represented approximately 7.2% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of $6.3 billion as of March 31, 2011, represented approximately 0.2% of our single-family conventional guaranty book of business. See "Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for information on our single-family book of business.

The outstanding unpaid principal balance of our jumbo-conforming and high-balance loans was $122.4 billion, or 4.3% of our single-family conventional guaranty book of business, as of March 31, 2011 and $109.7 billion, or 3.9% of our single-family conventional guaranty book of business, as of December 31, 2010. Jumbo-conforming and high-balance loans refer to high-balance loans we acquired pursuant to the Economic Stimulus Act of 2008, the 2008 Reform Act and the American Recovery and Reinvestment Act of 2009, which increased our conforming loan limits in certain high-cost areas above our standard conforming loan limit. These increases are currently in effect for mortgages originated through September 30, 2011 and will expire at that time, unless Congress acts to extend them. The standard conforming loan limit for a one-unit property was $417,000 in 2011 and 2010. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" in our 2010 Form 10-K for additional information on our loan limits.

The outstanding unpaid principal balance of reverse mortgage whole loans included in our mortgage portfolio was $50.9 billion as of March 31, 2011 and $50.8 billion as of December 31, 2010. Our reverse-mortgage portfolio could increase over time, as each month the scheduled and unscheduled payments, interest, mortgage insurance premium, servicing fee, and default-related costs accrue to increase the unpaid principal balance. The majority of these loans are home equity conversion mortgages insured by the federal government through the FHA. Because home equity conversion mortgages are insured by the federal government, we believe that we have limited exposure to losses on these loans. In December 2010, we communicated to our lenders that we are exiting the reverse mortgage business and will no longer acquire newly originated home equity conversion mortgages.

TREASURY-1131

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to reduce the severity of the losses we incur. If a borrower does not make required payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. We refer to actions taken by servicers with borrowers to resolve existing or potential delinquent loan payments as "workouts." Our loan workouts reflect our various types of home retention strategies and foreclosure alternatives.

Our home retention solutions are intended to help borrowers stay in their homes and include loan modifications, repayment plans and forbearances. Because we believe that reducing delays and implementing solutions that can be executed in a timely manner and early in the delinquency increases the likelihood that our problem loan management strategies will be successful in avoiding a default or minimizing severity, it is important for our servicers to work with borrowers to complete these solutions as early in their delinquency as feasible. If the servicer cannot provide a viable home retention solution for a problem loan, the servicer will seek to offer foreclosure alternatives, primarily preforeclosure sales and deeds-in-lieu of foreclosure. These alternatives reduce the severity of our loss resulting from a borrower's default while permitting the borrower to avoid going through a foreclosure. However, the existence of a second lien may limit our ability to provide borrowers with loan workout options, including those that are part of our foreclosure prevention efforts. We occasionally execute third-party sales, where we sell the property to a third party immediately prior to entering the foreclosure process. When appropriate, we seek to move to foreclosure expeditiously.

Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. We seek to improve the servicing of our delinquent loans through a variety of means, including improving our communications with and training of our servicers, increasing the number of our personnel who manage our servicers, directing servicers to contact borrowers at an earlier stage of delinquency and improve their telephone communications with borrowers, and holding our servicers accountable for following our requirements. We continue to work with some of our servicers to test and implement "high-touch" servicing protocols designed for managing higher-risk loans, which include lower ratios of loans per servicer employee, beginning borrower outreach strategies earlier in the delinquency cycle and establishing a single point of resolution for distressed borrowers.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. We generally define single-family problem loans as loans that have been identified as being at imminent risk of payment default; early stage delinquent loans that are either 30 days or 60 days past due; and seriously delinquent loans, which are loans that are three or more monthly payments past due or in the foreclosure process. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the periods indicated.

**Table 35:   Delinquency Status of Single-Family Conventional Loans**

| | As of | | |
| --- | --- | --- | --- |
| | March 31, 2011 | December 31, 2010 | March 31, 2010 |
| As of period end: | | | |
| Delinquency status: | | | |
| 30 to 59 days delinquent .......................................... | 1.93% | 2.32% | 2.09% |
| 60 to 89 days delinquent .......................................... | 0.70 | 0.87 | 0.90 |
| Seriously delinquent .............................................. | 4.27 | 4.48 | 5.47 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days ............................................. | 71% | 67% | 62% |

Early Stage Delinquency

The prolonged and severe decline in home prices, coupled with continued high unemployment, caused an overall increase in the number of early stage delinquencies—loans that are delinquent but less than three monthly payments past due—over the past several years. However, the number of early stage delinquencies has decreased as of March 31, 2011 compared with December 31, 2010.

Serious Delinquency

The number of loans at risk of becoming seriously delinquent has diminished in 2011 as early stage delinquencies have decreased. As of March 31, 2011, the percentage and number of our single-family conventional loans that were seriously delinquent decreased, as compared with December 31, 2010, and has decreased every month since February 2010. The decrease in our serious delinquency rate in 2010 and the first quarter of 2011 was primarily the result of home retention solutions, mainly loan modifications, and foreclosure alternatives completed, combined with foreclosures when a viable solution was not available. The volume of loans impacted by these actions continues to exceed the number of loans becoming seriously delinquent, thereby decreasing our percentage of seriously delinquent loans. The decrease is also attributable to our acquisition of loans with stronger credit profiles in 2010 and the first quarter of 2011.

We expect serious delinquency rates will continue to be affected in the future by changes in economic factors such as home prices, unemployment rates and household wealth, and by the extent to which borrowers with modified loans again become delinquent in their payments.

We continue to work with our servicers to reduce delays in determining and executing the appropriate workout solution. However, the continued negative conditions in the current economic environment, such as the sustained weakness in the housing market and high unemployment, have continued to adversely affect the serious delinquency rates across our single-family conventional guaranty book of business and the serious delinquency rate remains elevated. Additionally, the period of time that loans are seriously delinquent continues to remain extended.

Table 36 provides a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the periods indicated for single-family conventional loans in our single-family guaranty book of business.

TREASURY-1133

**Table 36:   Serious Delinquency Rates**

| | March 31, 2011 | | December 31, 2010 | | March 31, 2010 | |
|---|---|---|---|---|---|---|
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest.................. | 15% | 3.99% | 15% | 4.16% | 16% | 4.96% |
| Northeast.................. | 19 | 4.30 | 19 | 4.38 | 19 | 4.74 |
| Southeast.................. | 24 | 6.08 | 24 | 6.15 | 24 | 7.22 |
| Southwest ................ | 15 | 2.73 | 15 | 3.05 | 15 | 4.17 |
| West ..................... | 27 | 3.61 | 27 | 4.06 | 26 | 5.55 |
| Total single-family conventional loans ....... | 100% | 4.27% | 100% | 4.48% | 100% | 5.47% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced ............ | 15% | 10.13% | 15% | 10.60% | 17% | 13.29% |
| Non-credit enhanced ......... | 85 | 3.26 | 85 | 3.40 | 83 | 3.90 |
| Total single-family conventional loans ....... | 100% | 4.27% | 100% | 4.48% | 100% | 5.47% |

[1]   See footnote 9 to "Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans, subprime loans and loans with higher mark-to-market LTVs, and our 2006 and 2007 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. States in the Midwest have experienced prolonged economic weakness and California, Florida, Arizona and Nevada have experienced the most significant declines in home prices coupled with unemployment rates that remain high.

TREASURY-1134

Table 37 presents the conventional serious delinquency rates and other financial information for our single-family loans with some of these higher-risk characteristics as of the periods indicated. The reported categories are not mutually exclusive. See "Consolidated Results of Operations—Credit-Related Expenses—Credit Loss Performance Metrics" for information on the portion of our credit losses attributable to Alt-A loans and certain other higher-risk loan categories.

**Table 37:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | As of | | | | | | | | | | | |
| | March 31, 2011 | | | | December 31, 2010 | | | | March 31, 2010 | | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | | | | |
| States: | | | | | | | | | | | | |
| Arizona . . . . . . $ | 70,055 | 2% | 5.16% | 110% | $ 71,052 | 2% | 6.23% | 105% | $ 74,831 | 3% | 8.76% | 103% |
| California . . . . . | 518,569 | 19 | 3.35 | 78 | 507,598 | 18 | 3.89 | 76 | 492,294 | 17 | 5.72 | 77 |
| Florida . . . . . . . | 182,943 | 7 | 12.40 | 110 | 184,101 | 7 | 12.31 | 107 | 192,724 | 7 | 13.27 | 103 |
| Nevada . . . . . . . | 30,856 | 1 | 9.40 | 133 | 31,661 | 1 | 10.66 | 128 | 34,166 | 1 | 13.95 | 130 |
| Select Midwest states[2] . . . . . | 294,182 | 10 | 4.62 | 82 | 292,734 | 11 | 4.80 | 80 | 302,017 | 11 | 5.65 | 80 |
| All other states . . | 1,718,421 | 61 | 3.34 | 73 | 1,695,615 | 61 | 3.46 | 71 | 1,701,543 | 61 | 4.19 | 70 |
| Product type: | | | | | | | | | | | | |
| Alt-A . . . . . . . . | 203,709 | 7 | 13.45 | 100 | 211,770 | 8 | 13.87 | 96 | 238,325 | 9 | 16.22 | 94 |
| Subprime . . . . . | 6,328 | * | 27.47 | 108 | 6,499 | * | 28.20 | 103 | 7,179 | * | 31.47 | 100 |
| Vintages: | | | | | | | | | | | | |
| 2006 . . . . . . . . | 218,938 | 8 | 12.12 | 109 | 232,009 | 8 | 12.19 | 104 | 277,752 | 10 | 13.42 | 100 |
| 2007 . . . . . . . . | 315,420 | 11 | 13.08 | 109 | 334,110 | 12 | 13.24 | 104 | 401,782 | 14 | 14.85 | 99 |
| All other vintages . . . . . | 2,280,667 | 81 | 2.50 | 72 | 2,216,642 | 80 | 2.62 | 70 | 2,118,041 | 76 | 3.12 | 68 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | | |
| Greater than 100%[1] . . . . | 499,432 | 18 | 15.72 | 130 | 435,991 | 16 | 17.70 | 130 | 439,327 | 16 | 21.79 | 129 |
| Select combined risk characteristics: | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 . . . . . . . | 20,656 | 1 | 20.20 | 113 | 21,205 | 1 | 21.41 | 109 | 23,395 | 1 | 26.94 | 106 |

\* Percentage is less than 0.5%.

[1] Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2] Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

The efforts of our mortgage servicers are critical in keeping people in their homes, preventing foreclosures and providing homeowner assistance. We continue to work with our servicers to implement our foreclosure prevention initiatives effectively and to find ways to enhance our workout protocols and their workflow processes. Additionally, partnering with our servicers, civic and community leaders and housing industry partners, we have launched a series of nationwide Mortgage Help Centers to accelerate the response time for struggling borrowers with loans owned by us. As of March 31, 2011, we have established six Mortgage Help Centers which completed approximately 800 home retention plans in the first quarter of 2011.

66

Our approach to workouts continues to address the large number of borrowers facing long-term, rather than short-term, financial hardships due to prolonged economic stress and high levels of unemployment. Accordingly, the vast majority of loan modifications we completed during the first quarter of 2011 were, as in recent periods, concentrated on lowering or deferring the borrowers' monthly mortgage payments for a predetermined period of time to allow borrowers to work through their hardships.

In addition, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. Our servicers work with a borrower to sell their home prior to foreclosure in a preforeclosure sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure. Further, in cooperation with several Multiple Listing Services ("MLS") across the nation, we developed the Short Sale Assistance Desk ("Assistance Desk") to assist real estate professionals in handling post-offer short sale issues that may relate to servicer responsiveness, the existence of a second lien, or issues involving mortgage insurance. The Assistance Desk leverages the relationship between the participating MLSs and their members to collect and submit information to us using a dedicated submission form on the MLS website. Complementing this streamlined service, the participating MLS provides us with data to help improve valuations and make quicker decisions regarding short sale requests. The Assistance Desk is meant to serve as a catalyst for progress towards a resolution for the homeowner.

Table 38 provides statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

**Table 38:   Statistics on Single-Family Loan Workouts**

| | For the Three Months Ended March 31, 2011 | | For The Year Ended December 31, 2010 | | For the Three Months Ended March 31, 2010 | |
|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | | | (Dollars in millions) | | | |
| Home retention strategies: | | | | | | |
| Modifications . . . . . . . . . . . . . . . . . . . . . . . | $10,668 | 51,043 | $ 82,826 | 403,506 | $19,005 | 93,756 |
| Repayment plans and forbearances completed  . . | 1,374 | 9,916 | 4,385 | 31,579 | 1,137 | 8,682 |
| HomeSaver Advance first-lien loans. . . . . . . . . . | — | — | 688 | 5,191 | 178 | 2,588 |
| | $12,042 | 60,959 | $ 87,899 | 440,276 | $20,320 | 105,026 |
| Foreclosure alternatives: | | | | | | |
| Preforeclosure sales . . . . . . . . . . . . . . . . . . . . . | $ 3,415 | 15,344 | $ 15,899 | 69,634 | $ 3,817 | 16,457 |
| Deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . | 318 | 1,776 | 1,053 | 5,757 | 158 | 869 |
| | $ 3,733 | 17,120 | $ 16,952 | 75,391 | $ 3,975 | 17,326 |
| Total loan workouts. . . . . . . . . . . . . . . . . . . . . . | $15,775 | 78,079 | $104,851 | 515,667 | $24,295 | 122,352 |
| Loan workouts as a percentage of single-family guaranty book of business[1] . . . . . . . . . . . . . . | 2.18% | 1.73% | 3.66% | 2.87% | 3.38% | 2.68% |

[1]   Calculated based on annualized loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

The volume of workouts completed in the first quarter of 2011 decreased compared with the first quarter of 2010, in part because we began to require that certain non-HAMP modifications go through a trial period, which lowered the number of modifications that became permanent. The number of foreclosure alternatives we agreed to during the first quarter of 2011 remains high as these are favorable solutions for a growing number of borrowers. We expect the volume of our foreclosure alternatives to remain high throughout the remainder of 2011.

TREASURY-1136

During the first quarter of 2011, approximately two-thirds of our loan modifications were completed under HAMP. During the first quarter of 2011, we initiated approximately 31,000 trial modifications under HAMP compared with 92,000 during the first quarter of 2010. We also initiated other types of loan modifications, repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

Table 39 displays the profile of loan modifications (HAMP and non-HAMP) provided to borrowers for the three months ended March 31, 2011 and the year ended December 31, 2010.

**Table 39:   Loan Modification Profile**

| | For the Three Months Ended March 31, 2011 | For The Year Ended December 31, 2010 |
|---|---|---|
| Term extension, interest rate reduction, or combination of both[1] . . . . . . . . . . | 96% | 93% |
| Initial reduction in monthly payment[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94 | 91 |
| Estimated mark-to-market LTV ratio > 100% . . . . . . . . . . . . . . . . . . . . . . . . | 64 | 53 |
| Troubled debt restructurings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 97 | 94 |

[1]   Reported statistics for term extension, interest rate reduction or the combination include subprime adjustable-rate mortgage loans that have been modified to a fixed-rate loan.

[2]   These modification statistics do not include subprime adjustable-rate mortgage loans that were modified to a fixed-rate loan and were current at the time of the modification.

A significant portion of our modifications pertain to loans with a mark-to-market LTV ratio greater than 100% because these borrowers are typically unable to refinance their mortgages or sell their homes for a price that allows them to pay off their mortgage obligation as their mortgages are greater than the value of their homes. Additionally, the serious delinquency rate for these loans tends to be significantly higher than the overall average serious delinquency rate. As of March 31, 2011, the serious delinquency rate for loans with a mark-to-market LTV ratio greater than 100% was 16%, compared with our overall average single-family serious delinquency rate of 4.27%.

Approximately 65% of loans modified during the first quarter of 2010 were current or had paid off as of one year following the loan modification date. In comparison, 39% of loans modified during the first quarter of 2009 were current or had paid off as of one year following the loan modification date. There is significant uncertainty regarding the ultimate long term success of our current modification efforts because of the economic and financial pressures on borrowers. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations. FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets.

As we have focused our efforts on distressed borrowers who are experiencing current economic hardship, the short-term performance of our workouts may not be indicative of long-term performance. We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and home prices.

*REO Management*

Foreclosure and REO activity affect the level of credit losses. Table 40 compares our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

**Table 40:   Single-Family Foreclosed Properties**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| Single-family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . | 162,489 | 86,155 |
| Acquisitions by geographic area:[2] | | |
| Midwest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,285 | 15,095 |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,004 | 3,590 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,976 | 17,748 |
| Southwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,666 | 12,882 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,618 | 12,614 |
| Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53,549 | 61,929 |
| Dispositions of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (62,814) | (38,095) |
| End of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . . . . | 153,224 | 109,989 |
| Carrying value of single-family foreclosed properties (dollars in millions)[3] . . . . . . . . . . . . | $ 14,086 | $ 11,423 |
| Single-family foreclosure rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.19% | 1.36% |

[1]   Includes acquisitions through deeds-in-lieu of foreclosure.

[2]   See footnote 9 to "Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]   Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

[4]   Estimated based on the annualized total number of properties acquired through foreclosure as a percentage of the total number of loans in our single-family conventional guaranty book of business as of the end of each respective period.

The continued weak economy, as well as high unemployment rates, continue to result in an increase in the percentage of our mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Additionally, the prolonged decline in home prices on a national basis has significantly reduced the values of our single-family REO. Our foreclosure rates remain high. However, foreclosure levels were lower than what they otherwise would have been in the first quarter of 2011 due to the delays caused by servicer foreclosure process deficiencies and the resulting foreclosure pause. Additionally, foreclosure levels during 2010 were affected by our directive to servicers to delay foreclosure sales until the loan servicer verifies that the borrower is ineligible for a HAMP modification and that all other home retention and foreclosure prevention alternatives have been exhausted.

The percentage of our properties that we are unable to market for sale remains high. The most common reasons for our inability to market properties for sale are: (1) properties are within the period during which state law allows the former mortgagor and second lien holders to redeem the property (states which allow this are known as "redemption states"); (2) properties are still occupied by the person or personal property and the eviction process is not yet complete ("occupied status"); or (3) properties are being repaired. As we are unable to market a higher portion of our inventory, it slows the pace at which we can dispose of our properties and increases our foreclosed property expense related to costs associated with ensuring that the property is vacant and maintaining the property. For example, as of March 31, 2011, approximately 25% compared with 27% as of December 31, 2010, of our properties that we were unable to market for sale were in redemption status, which lengthens the time a property is in our REO inventory by an average of three to six months.

69

Additionally, as of March 31, 2011, approximately 39% compared with 40% as of December 31, 2010, of our properties that we were unable to market for sale were in occupied status, which lengthens the time a property is in our REO inventory by an average of one to three months.

As shown in Table 41 we have experienced a disproportionate share of foreclosures in certain states as compared with their share of our guaranty book of business. This is primarily because these states have had significant home price depreciation or weak economies, and in the case of California and Florida specifically, a significant number of Alt-A loans.

**Table 41:   Single-Family Acquired Property Concentration Analysis**

| | As of | | For the Three Months Ended | |
| | **March 31, 2011** | **December 31, 2010** | **March 31, 2011** | **March 31, 2010** |
| | **Percentage of Book Outstanding**[1] | **Percentage of Book Outstanding**[1] | **Percentage of Properties Acquired by Foreclosure**[2] | **Percentage of Properties Acquired by Foreclosure**[2] |
| States: | | | | |
| Arizona, California, Florida, and Nevada . . | 29% | 28% | 39% | 36% |
| Illinois, Indiana, Michigan, and Ohio. . . . . | 10 | 11 | 17 | 19 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Calculated based on the number of properties acquired through foreclosure during the period divided by the total number of properties acquired through foreclosure.

We continue to work with our servicers to manage our foreclosure timelines and although we have expanded our loan workout initiatives to help borrowers stay in their homes, our foreclosure levels for the first quarter of 2011 remain high as a result of the continued adverse impact that the weak economy and high unemployment have had on the financial condition of borrowers. Although the foreclosure pause has negatively affected our foreclosure timelines and reduced the number of new REO acquisitions, we cannot yet predict the full impact of the pause.

### Multifamily Mortgage Credit Risk Management

The credit risk profile of our multifamily mortgage credit book of business is influenced by: the structure of the financing; the type and location of the property; the condition and value of the property; the financial strength of the borrower and lender; market and sub-market trends and growth; and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

While our multifamily mortgage credit book of business includes all of our multifamily mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae multifamily mortgage-related securities held in our portfolio for which we do not provide a guaranty. Our multifamily guaranty book of business consists of: multifamily mortgage loans held in our mortgage portfolio; Fannie Mae MBS held in our portfolio or by third parties; and other credit enhancements that we provide on mortgage assets.

The credit statistics reported below, unless otherwise noted, pertain only to a specific portion of our multifamily guaranty book of business for which we have access to detailed loan-level information. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information. The portion of our multifamily guaranty book of business for which we have detailed loan level-information, excluding loans that have been defeased, constituted 99% of our total multifamily guaranty book as of both March 31, 2011 and December 31, 2010.

70

See "Risk Factors" in our 2010 Form 10-K for a discussion of the risk due to our reliance on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business.

*Multifamily Acquisition Policy and Underwriting Standards*

Our Multifamily business, in conjunction with our Enterprise Risk Management division, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the Delegated Underwriting and Servicing ("DUS") program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented 84% of our multifamily guaranty book of business as of March 31, 2011 and December 31, 2010.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing. Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Other lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration and credit enhancement arrangements is an important factor that influences credit quality and performance and helps reduce our credit risk.

The weighted average original LTV ratio for our multifamily guaranty book of business was 66% as of March 31, 2011 and 67% as of December 31, 2010. The percentage of our multifamily guaranty book of business with an original LTV ratio greater than 80% was 5% as of both March 31, 2011 and December 31, 2010. We present the current risk profile of our multifamily guaranty book of business in "Note 6, Financial Guarantees."

We monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the investment at the loan, property and portfolio level. We closely track the physical condition of the property, the relevant local market and economic conditions that may signal changing risk or return profiles and other risk factors. For example, we closely monitor the rental payment trends and vacancy levels in local markets to identify loans that merit closer attention or loss mitigation actions. We are managing our exposure to refinancing risk for multifamily loans maturing in the next several years. We have a team that proactively manages upcoming loan maturities to minimize losses on maturing loans. This team assists lenders and borrowers with timely and appropriate refinancing of maturing loans with the goal of reducing defaults and foreclosures related to loans maturing in the near term. For our investments in multifamily loans, the primary asset management responsibilities are performed by our DUS and other multifamily lenders. We periodically evaluate the performance of our third-party service providers for compliance with our asset management criteria.

*Problem Loan Management and Foreclosure Prevention*

Unfavorable economic conditions have caused our multifamily serious delinquency rate and the level of defaults to remain elevated. Since delinquency rates are a lagging indicator, even if the market shows some improvement, we expect to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

71

*Problem Loan Statistics*

Table 42 provides a comparison of our multifamily serious delinquency rates for loans with and without credit enhancement in our multifamily guaranty book of business. We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

**Table 42:   Multifamily Serious Delinquency Rates**

| | As of | | | | | |
| | March 31, 2011 | | December 31, 2010 | | March 31, 2010 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| Multifamily loans: | | | | | | |
| Credit enhanced . . . . . . . . | 90% | 0.59% | 89% | 0.67% | 89% | 0.69% |
| Non-credit enhanced . . . . . | 10 | 1.05 | 11 | 1.01 | 11 | 1.56 |
| Total multifamily loans . . . . . . . . . . . . | 100% | 0.64% | 100% | 0.71% | 100% | 0.79% |

The multifamily serious delinquency rate decreased as of March 31, 2011 compared with both December 31, 2010 and March 31, 2010 as national multifamily market fundamentals continue to improve. Table 43 provides a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders and loans acquired through non-DUS lenders.

**Table 43:   Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Three Months Ended March 31, | |
| | March 31, 2011 | | December 31, 2010 | | March 31, 2010 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2011 | 2010 |
|---|---|---|---|---|---|---|---|---|
| DUS small balance loans[1] . . . . . . . . . . | 8% | 0.68% | 8% | 0.55% | 8% | 0.47% | 8% | 12% |
| DUS non small balance loans[2] . . . . . . . | 70 | 0.48 | 70 | 0.56 | 68 | 0.56 | 70 | 72 |
| Non-DUS small balance loans[1] . . . . . . . | 10 | 1.41 | 10 | 1.47 | 11 | 1.41 | 15 | 11 |
| Non-DUS non small balance loans[2] . . . . | 12 | 0.88 | 12 | 0.97 | 13 | 1.62 | 7 | 5 |

[1] Loans with original unpaid principal balances less than or equal to $3 million except in high cost markets where they are loans with original unpaid principal balances less than or equal to $5 million.

[2] Loans with original unpaid principal balances greater than $3 million except in high cost markets where they are loans with original unpaid principal balances greater than $5 million.

The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that align our interest with those of the borrowers and lenders. Smaller balance non-DUS loans continue to represent a disproportionate share of delinquencies but they are generally covered by loss sharing arrangements, which limit the credit losses incurred by us.

In addition, Arizona, Florida, Georgia, and Ohio, have a disproportionate share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for 39% of multifamily serious delinquencies but only 10% of the multifamily guaranty book of business.

TREASURY-1141

*REO Management*

Foreclosure and REO activity affect the level of credit losses. Table 44 compares our held for sale multifamily REO balances for the periods indicated.

**Table 44:   Multifamily Foreclosed Properties**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) | 222 | 73 |
| Total properties acquired through foreclosure | 50 | 47 |
| Disposition of REO | (37) | (13) |
| End of period inventory of multifamily foreclosed properties (REO) | 235 | 107 |
| Carrying value of multifamily foreclosed properties (dollars in millions) | $576 | $319 |

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals improved in 2011.

### Institutional Counterparty Credit Risk Management

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2010 Form 10-K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers and from document custodians.

*Mortgage Seller/Servicers*

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 76% of our single-family guaranty book of business as of March 31, 2011, compared to 77% as of December 31, 2010. Our largest mortgage servicer is Bank of America which, together with its affiliates, serviced approximately 25% of our single-family guaranty book of business as of March 31, 2011, compared with 26% as of December 31, 2010. In addition, we had two other mortgage servicers, JPMorgan Chase & Co. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of March 31, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of both March 31, 2011 and December 31, 2010. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively.

During the first quarter of 2011, our primary mortgage servicer counterparties have generally continued to meet their obligations to us. The large number of delinquent loans on their books of business may negatively affect the ability of these counterparties to continue to meet their obligations to us in the future.

TREASURY-1142

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." During the first quarter of 2011, the number of our repurchase requests remained high. The aggregate unpaid principal balance of loans repurchased by our seller/servicers pursuant to their contractual obligations was approximately $1.6 billion, compared to $1.8 billion during the first quarter of 2010. In addition, as of March 31, 2011, we had $8.6 billion in outstanding repurchase requests related to loans that had been reviewed for potential breaches of contractual obligations, compared to $5.0 billion as of December 31, 2010. As of March 31, 2011, approximately 58% of our total outstanding repurchase requests had been made to one of our seller/servicers, compared to 41% as of December 31, 2010. As of March 31, 2011, 20% of our outstanding repurchase requests had been outstanding for more than 120 days from either the original loan repurchase request date or, for lenders remitting after the REO is disposed, the date of our final loss determination, compared to 30% as of December 31, 2010.

The amount of our outstanding repurchase requests provided above is based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than this amount. In addition, amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests; however, as the volume of repurchase requests increases, the risk increases that affected seller/servicers will not be willing or able to meet the terms of their repurchase obligations and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. If a significant seller/servicer counterparty, or a number of seller/servicer counterparties, fails to fulfill its repurchase obligations to us, it could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. We expect that the amount of our outstanding repurchase requests could remain high in 2011.

We are exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" in our 2010 Form 10-K for additional discussion on risks of mortgage fraud to which we are exposed.

*Mortgage Insurers*

We use several types of credit enhancement to manage our single-family mortgage credit risk, including primary and pool mortgage insurance coverage. Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $94.8 billion on the single-family mortgage loans in our guaranty book of business as of March 31, 2011, which represented approximately 3% of our single-family guaranty book of business as of March 31, 2011. Primary mortgage insurance represented $90.2 billion of this total, and pool mortgage insurance was $4.6 billion. We had total mortgage insurance coverage risk in force of $95.9 billion on the single-family mortgage loans in our guaranty book of business as of December 31, 2010, which represented approximately 3% of our single-family guaranty book of business as of December 31, 2010. Primary mortgage insurance represented $91.2 billion of this total, and pool mortgage insurance was $4.7 billion of this total.

TREASURY-1143

Table 45 presents our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business by mortgage insurer for our top eight mortgage insurer counterparties as of March 31, 2011. These mortgage insurers provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of March 31, 2011.

**Table 45:   Mortgage Insurance Coverage**

| | As of March 31, 2011 | | |
| --- | --- | --- | --- |
| | Maximum Coverage[2] | | |
| Counterparty:[1] | Primary | Pool | Total |
| | (Dollars in millions) | | |
| Mortgage Guaranty Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $21,073 | $1,781 | $22,854 |
| Radian Guaranty, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,956 | 339 | 15,295 |
| Genworth Mortgage Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,080 | 76 | 14,156 |
| United Guaranty Residential Insurance Company . . . . . . . . . . . . . . . . . . . . . . | 13,779 | 172 | 13,951 |
| PMI Mortgage Insurance Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,901 | 289 | 12,190 |
| Republic Mortgage Insurance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,317 | 1,206 | 10,523 |
| Triad Guaranty Insurance Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,877 | 779 | 3,656 |
| CMG Mortgage Insurance Company[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,940 | — | 1,940 |

[1]   Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[2]   Maximum coverage refers to the aggregate dollar amount of insurance coverage (*i.e.*, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[3]   CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. A number of our mortgage insurers have received waivers from their regulators regarding state-imposed risk-to-capital limits. Without these waivers, these mortgage insurers would not be able to continue to write new business in accordance with state regulatory requirements, should they fall below their regulatory capital requirements. In anticipation that a waiver may not be granted or continued by their regulator, at least one of our mortgage insurers arranged for another mortgage insurer subsidiary or affiliate to write new business on its behalf. The parent companies of several of our largest mortgage insurer counterparties raised capital, which may improve their ability to meet state-imposed risk-to-capital limits and their ability to continue paying our claims in full as they come due, to the extent that the capital raised by the parent companies is contributed to their respective mortgage insurance entities. Though we are unable to determine how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits, at this time we continue to receive payments on our claims as they come due, except where deferred payment terms have been established.

Our mortgage insurer counterparties have increased the number of mortgage loans for which they have rescinded coverage. In those cases where mortgage insurance was obtained and the mortgage insurer has rescinded coverage, we generally require the seller/servicer to repurchase the loan or indemnify us against loss.

In 2010, some mortgage insurers disclosed that they entered into agreements with lenders whereby they agreed to waive certain rights to investigate claims for some of the lenders' insured loans in return for some compensation against loss. Although these agreements do not affect our rights to demand repurchase in the event of violations of lender representations and warranties, these agreements are likely to result in fewer mortgage insurance rescissions for certain groups of loans. Fewer rescissions may result in Fannie Mae devoting more resources to an independent review process to determine whether loans subject to these agreements have underlying origination defects.

75

In April 2011, we issued an announcement which prohibited servicers from entering into any agreement that modifies the terms of an approved mortgage insurance master policy on loans delivered to us. We also required servicers to disclose any such agreements with mortgage insurers to us. With respect to our mortgage insurance counterparties, changes to the substance of their master policies have required our prior approval since 2005. In October 2010, we required our top mortgage insurers to notify us promptly of any agreement that affects their investigative or rescission rights. In April 2011, we further clarified and amended our mortgage insurer requirements to prohibit any agreement that has the effect of modifying a master policy, including any investigative or rescission rights, absent our approval. By taking these steps, we hope to mitigate the risk of loss for loans that would have resulted in mortgage insurance rescission, and—as a result—a lender repurchase, for loan defects that we may not have otherwise uncovered in our independent review process.

Besides evaluating their condition to assess whether we have incurred probable losses in connection with our coverage, we also evaluate these counterparties individually to determine whether or under what conditions they will remain eligible to insure new mortgages sold to us. Except for Triad Guaranty Insurance Corporation, as of May 6, 2011, our private mortgage insurer counterparties remain qualified to conduct business with us.

As of March 31, 2011, our allowance for loan losses of $67.6 billion, allowance for accrued interest receivable of $2.9 billion and reserve for guaranty losses of $257 million incorporated an estimated recovery amount of approximately $16.5 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.4 billion as of March 31, 2011 and an adjustment of approximately $975 million which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of approximately $1.2 billion, which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $4.1 billion as of March 31, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $650 million as of March 31, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the receivables for collectibility, and they were recorded net of a valuation allowance of $271 million as of March 31, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.6 billion for the first quarter of 2011 and $6.4 billion for the year ended December 31, 2010.

*Financial Guarantors*

We were the beneficiary of financial guarantees totaling $8.6 billion as of March 31, 2011 and $8.8 billion as of December 31, 2010 on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $23.9 billion as of March 31, 2011 and $25.7 billion as of December 31, 2010.

76

With the exception of Ambac Assurance Corporation, none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. However, based on the stressed financial condition of our financial guarantor counterparties, we believe that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future. We model our securities assuming the benefit of those external financial guarantees from guarantors that we determine are creditworthy. For additional discussions of our model methodology and key inputs used to estimate other-than-temporary impairment see "Note 5, Investments in Securities."

### Lenders with Risk Sharing

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $14.8 billion as of March 31, 2011 and $15.6 billion as of December 31, 2010. As of March 31, 2011, 55% of our maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $30.7 billion as of March 31, 2011 and $30.3 billion as of December 31, 2010. As of both March 31, 2011 and December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of Standard & Poor's, Moody's and Fitch ratings) was 46% as of both March 31, 2011 and December 31, 2010. The percentage of these recourse obligations to lender counterparties rated below investment grade was 23% as of both March 31, 2011 and December 31, 2010. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 31% as of both March 31, 2011 and December 31, 2010. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. As of March 31, 2011, approximately 54% of the unpaid principal balance of loans in our guaranty book of business was serviced by our DUS lenders, which are institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. To ensure the level of risk associated with these lenders remains within our standards, we actively monitor their financial condition.

### Custodial Depository Institutions

A total of $47.9 billion in deposits for single-family payments were received and held by 287 institutions in the month of March 2011 and a total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010. Of these total deposits, 93% as of March 31, 2011 and 92% as of December 31, 2010 were held by institutions rated as investment grade by Standard & Poor's, Moody's and Fitch. Our ten largest custodial depository institutions held 93% of these deposits as of both March 31, 2011 and December 31, 2010.

### Issuers of Investments Held in our Cash and Other Investments Portfolio

Our cash and other investments portfolio primarily consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and

asset-backed securities. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio. Our counterparty risk is primarily with financial institutions and Treasury.

Our cash and other investments portfolio, which totaled $79.6 billion as of March 31, 2011, included $32.5 billion of U.S. Treasury securities and $10.8 billion of unsecured positions. All of our unsecured positions were short-term deposits with financial institutions that had short-term credit ratings of A-1, P-1, F1 (or its equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively. As of December 31, 2010, our cash and other investments portfolio totaled $61.8 billion and included $31.5 billion of U.S. Treasury securities and $10.3 billion of unsecured positions. All of our unsecured positions were short-term deposits with financial institutions which had short-term credit ratings of A-1, P-1, F1 (or equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively.

### Derivatives Counterparties

Our derivative credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. Derivatives in a gain position are included in our condensed consolidated balance sheets in "Other assets." We manage our exposure to derivatives counterparties by requiring collateral in specified instances.

Our net credit exposure on derivatives contracts decreased to $104 million as of March 31, 2011, from $152 million as of December 31, 2010. We had outstanding interest rate and foreign currency derivative transactions with 15 counterparties as of March 31, 2011 and December 31, 2010. Derivatives transactions with nine of our counterparties accounted for approximately 91% of our total outstanding notional amount as of March 31, 2011, with each of these counterparties accounting for between approximately 5% and 16% of the total outstanding notional amount. In addition to the 15 counterparties with whom we had outstanding notional amounts as of March 31, 2011, we had a master netting agreement with one more counterparty with whom we may enter into interest rate derivative or foreign currency derivative transactions in the future.

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of March 31, 2011 and December 31, 2010. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risks to our business posed by interest rate risk and a discussion of the risks to our business as a result of the increasing concentration of our derivatives counterparties.

### Market Risk Management, Including Interest Rate Risk Management

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management" in our 2010 Form 10-K.

### Measurement of Interest Rate Risk

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current

78

mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

### *Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve*

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

### *Duration Gap*

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summaries, which are available on our website and announced in a press release.

The sensitivity measures presented in Table 46, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

In addition, Table 46 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended March 31, 2011.

**Table 46:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve[1]**

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in billions) | |
| Rate level shock: | | |
| -100 basis points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(0.2) | $(0.8) |
| -50 basis points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (0.2) |
| +50 basis points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.1) | (0.2) |
| +100 basis points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.3) | (0.5) |
| Rate slope shock: | | |
| -25 basis points (flattening) . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (0.1) |
| +25 basis points (steepening) . . . . . . . . . . . . . . . . . . . . . . . . . | — | 0.1 |

| | For the Three Months Ended March 31, 2011 | | |
|---|---|---|---|
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | $0.1 | $0.2 |
| Minimum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.4) | — | 0.1 |
| Maximum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.8 | 0.2 | 0.4 |
| Standard deviation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.2 | — | 0.1 |

[1]   Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuance, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 47 shows an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

**Table 47:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | (Dollars in billions) | | |
| As of March 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1.3) | $(0.1) | $1.2 |
| As of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(0.9) | $(0.2) | $0.7 |

*Other Interest Rate Risk Information*

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

In "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk—Other Interest Rate Risk Information" in our 2010 Form 10-K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments. As of March 31, 2011, these sensitivities were relatively unchanged as compared with December 31, 2010. The fair value of our trading financial instruments and our other financial instruments as of March 31, 2011 and December 31, 2010 can be found in "Note 13, Fair Value."

*Liquidity Risk Management*

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

## IMPACT OF FUTURE ADOPTION OF NEW ACCOUNTING PRONOUNCEMENTS

We identify and discuss the expected impact on our condensed consolidated financial statements of recently issued accounting pronouncements in "Note 1, Summary of Significant Accounting Policies."

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 ("Exchange Act"). In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that loans in our new single-family book of business will be profitable over their lifetime;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we have reserved for the substantial majority of the remaining losses;

- Our expectation that, if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted if the market shifts away from refinance activity, which is likely to occur when interest rates rise;

- Our belief that loans we have acquired since 2009 would become unprofitable if home prices declined by more than 15% from their March 2011 levels over the next five years based on our home price index;

- Our expectations regarding whether loans we acquired in specific years will be profitable or unprofitable, or perform close to break-even;

- The possibility that changes in home prices, other economic conditions or borrower behavior could change our expectations regarding whether loans we acquired in 2004 will be profitable;

- Our expectation that defaults on loans we acquired from 2005 through 2008 and the resulting charge-offs will occur over a period of years;

- Our expectation that it will take years before our REO inventory is reduced to pre-2008 levels;

- Our expectation that we will realize as credit losses an estimated two-thirds of the fair value losses on loans purchased out of MBS trusts that are reflected in our condensed consolidated balance sheets, and recover the remaining one-third through our condensed consolidated results of operations, depending primarily on changes in home prices and loss severity;

- Our expectation that employment will likely need to post sustained improvement for an extended period to have a positive impact on housing;

- Our expectation that weakness in the housing and mortgage markets will continue in 2011;

- Our expectation that home sales are unlikely to increase until the unemployment rate improves further;

81

- Our expectation that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011;

- Our expectation that multifamily charge-offs in 2011 will remain commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectation that the pace of our loan acquisitions for the remainder of 2011 will be significantly lower than in 2010 and the first quarter of 2011 because we expect increasing mortgage rates and, to a lesser extent, the high number of mortgages that have already refinanced to low rates in recent years will lead to fewer refinancings;

- Our expectation that our future revenues will be negatively impacted to the extent our acquisitions decline and we receive fewer risk-based fees;

- Our estimation that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately one-third, from an estimated $1.5 trillion to an estimated $1.0 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.1 trillion to approximately $413 billion;

- Our expectation that home prices on a national basis will decline further, with greater declines in some geographic areas than others, before stabilizing in late 2011;

- Our expectation that the peak-to-trough home price decline on a national basis will range between 22% and 29%, as compared with our expectation at the time we filed our 2010 Form 10-K that the peak-to-trough home price decline on a national basis would range between 21% and 26%;

- Our expectation that our credit-related expenses and our credit losses will be higher in 2011 than in 2010;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac;

- Our expectation that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of their existing and ongoing liabilities;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, servicer capacity, and other constraints, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that our mortgage portfolio will continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury;

- Our expectation that the current market premium portion of our current estimate of fair value will not impact future Treasury draws, which is based on our intention not to have another party assume the credit risk inherent in our book of business;

- Our expectation that our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirements of the senior preferred stock purchase agreement;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

82

- Our expectation that serious delinquency rates will continue to be affected in the future by changes in economic factors such as home prices, unemployment rates and household wealth, and by the extent to which borrowers with modified loans again become delinquent in their payments;

- Our expectation that the volume of our foreclosure alternatives will remain high throughout the remainder of 2011;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and home prices;

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers could remain high in 2011;

- The possibility that, in light of agreements by mortgage insurers with lenders to waive certain rights to investigate claims, fewer rescissions of mortgage insurance may result in our devoting more resources to an independent review process to determine whether there are underlying origination defects in loans subject to these agreements;

- Our belief that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future;

- Our expectation that we will continue to need funding from Treasury to avoid triggering FHFA's obligation to place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations for a period of 60 days after the filing deadline for our Form 10-K or Form 10-Q with the SEC;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding; and

- Our expectation that the pause in foreclosures as a result of servicer foreclosure process deficiencies will likely continue to result in longer foreclosure timelines and higher credit-related expenses.

Forward-looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; deficiencies in servicer and law firm foreclosure processes and the consequences of those deficiencies; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2010 Form 10-K, as well as the factors described in "Executive Summary—Providing Liquidity, Our Strong New Book of Business and Our Expected Losses on our Legacy Book of Loans Acquired before 2009—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2010 Form 10-K and in this report. Our forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statement because of new information, future events or otherwise, except as required under the federal securities laws.

83

## Item 1.   Financial Statements

### FANNIE MAE
### (In conservatorship)

### Condensed Consolidated Balance Sheets—(Unaudited)
(Dollars in millions, except share amounts)

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| **ASSETS** | | |
| Cash and cash equivalents (includes $717 and $348, respectively, related to consolidated trusts) | $ 19,831 | $ 17,297 |
| Restricted cash (includes $33,405 and $59,619, respectively, related to consolidated trusts) | 36,730 | 63,678 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 26,250 | 11,751 |
| Investments in securities: | | |
| Trading, at fair value (includes $21 as of both periods related to consolidated trusts) | 57,035 | 56,856 |
| Available-for-sale, at fair value (includes $1,678 and $1,055, respectively, related to consolidated trusts) | 89,613 | 94,392 |
| Total investments in securities | 146,648 | 151,248 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $1,055 and $661, respectively, related to consolidated trusts) | 1,414 | 915 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae | 402,352 | 407,228 |
| Of consolidated trusts (includes $2,969 and $2,962, respectively, at fair value and loans pledged as collateral that may be sold or repledged of $2,241 and $2,522, respectively) | 2,613,848 | 2,577,133 |
| Total loans held for investment | 3,016,200 | 2,984,361 |
| Allowance for loan losses | (67,557) | (61,556) |
| Total loans held for investment, net of allowance | 2,948,643 | 2,922,805 |
| Total mortgage loans | 2,950,057 | 2,923,720 |
| Accrued interest receivable, net (includes $8,918 and $8,910, respectively, related to consolidated trusts) | 11,303 | 11,279 |
| Acquired property, net | 15,264 | 16,173 |
| Other assets (includes $242 and $593, respectively, related to consolidated trusts) | 20,959 | 26,826 |
| Total assets | $3,227,042 | $3,221,972 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,673 and $9,712, respectively, related to consolidated trusts) | $ 13,828 | $ 13,764 |
| Federal funds purchased and securities sold under agreements to repurchase | 25 | 52 |
| Debt: | | |
| Of Fannie Mae (includes $884 and $893, respectively, at fair value) | 761,187 | 780,044 |
| Of consolidated trusts (includes $2,193 and $2,271, respectively, at fair value) | 2,447,589 | 2,416,956 |
| Other liabilities (includes $713 and $893, respectively, related to consolidated trusts) | 12,831 | 13,673 |
| Total liabilities | 3,235,460 | 3,224,489 |
| Commitments and contingencies (Note 14) | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding | 91,200 | 88,600 |
| Preferred stock, 700,000,000 shares are authorized—576,868,039 and 576,868,139 shares issued and outstanding, respectively | 20,204 | 20,204 |
| Common stock, no par value, no maximum authorization—1,270,092,862 and 1,270,092,708 shares issued, respectively; 1,119,073,956 and 1,118,504,194 shares outstanding, respectively | 667 | 667 |
| Accumulated deficit | (111,669) | (102,986) |
| Accumulated other comprehensive loss | (1,501) | (1,682) |
| Treasury stock, at cost, 151,018,906 and 151,588,514 shares, respectively | (7,400) | (7,402) |
| Total Fannie Mae stockholders' deficit | (8,499) | (2,599) |
| Noncontrolling interest | 81 | 82 |
| Total deficit | (8,418) | (2,517) |
| Total liabilities and equity (deficit) | $3,227,042 | $3,221,972 |

See Notes to Condensed Consolidated Financial Statements

TREASURY-1153

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Operations and Comprehensive Loss—(Unaudited)**

(Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| Interest income: | | |
| Trading securities | $ 284 | $ 315 |
| Available-for-sale securities | 1,213 | 1,473 |
| Mortgage loans (includes $31,865 and $34,321, respectively, related to consolidated trusts) | 35,590 | 37,619 |
| Other | 28 | 39 |
| Total interest income | 37,115 | 39,446 |
| Interest expense: | | |
| Short-term debt (includes $3 and $2, respectively, related to consolidated trusts) | 107 | 118 |
| Long-term debt (includes $27,852 and $31,458, respectively, related to consolidated trusts) | 32,048 | 36,539 |
| Total interest expense | 32,155 | 36,657 |
| Net interest income | 4,960 | 2,789 |
| Provision for loan losses | (10,587) | (11,939) |
| Net interest loss after provision for loan losses | (5,627) | (9,150) |
| Investment gains, net | 75 | 166 |
| Other-than-temporary impairments | (57) | (186) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | 13 | (50) |
| Net other-than-temporary impairments | (44) | (236) |
| Fair value gains (losses), net | 289 | (1,705) |
| Debt extinguishment gains (losses), net | 13 | (124) |
| Fee and other income | 237 | 233 |
| Non-interest income (loss) | 570 | (1,666) |
| Administrative expenses: | | |
| Salaries and employee benefits | 320 | 324 |
| Professional services | 189 | 194 |
| Occupancy expenses | 42 | 41 |
| Other administrative expenses | 54 | 46 |
| Total administrative expenses | 605 | 605 |
| Benefit for guaranty losses | (33) | (36) |
| Foreclosed property expense (income) | 488 | (19) |
| Other expenses | 352 | 230 |
| Total expenses | 1,412 | 780 |
| Loss before federal income taxes | (6,469) | (11,596) |
| Provision (benefit) for federal income taxes | 2 | (67) |
| Net loss | (6,471) | (11,529) |
| Other comprehensive income: | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | 179 | 1,370 |
| Other | 2 | 2 |
| Total other comprehensive income | 181 | 1,372 |
| Total comprehensive loss | (6,290) | (10,157) |
| Less: Comprehensive income attributable to the noncontrolling interest | — | (1) |
| Total comprehensive loss attributable to Fannie Mae | $ (6,290) | $(10,158) |
| Net loss | $ (6,471) | $(11,529) |
| Less: Net income attributable to the noncontrolling interest | — | (1) |
| Net loss attributable to Fannie Mae | (6,471) | (11,530) |
| Preferred stock dividends | (2,216) | (1,527) |
| Net loss attributable to common stockholders | $ (8,687) | $(13,057) |
| Loss per share—Basic and Diluted | $ (1.52) | $ (2.29) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,698 | 5,692 |

See Notes to Condensed Consolidated Financial Statements

85

**FANNIE MAE**
**(In conservatorship)**

**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
(Dollars in millions)

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| **Net cash provided by (used in) operating activities** | $ 2,566 | $ (30,885) |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (185) | (6,695) |
| Proceeds from maturities of trading securities held for investment | 522 | 805 |
| Proceeds from sales of trading securities held for investment | 409 | 15,068 |
| Purchases of available-for-sale securities | (44) | (107) |
| Proceeds from maturities of available-for-sale securities | 3,851 | 4,120 |
| Proceeds from sales of available-for-sale securities | 498 | 4,428 |
| Purchases of loans held for investment | (15,745) | (12,725) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 5,381 | 3,920 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 121,533 | 108,903 |
| Net change in restricted cash | 26,948 | 3,174 |
| Advances to lenders | (15,646) | (10,338) |
| Proceeds from disposition of acquired property and preforeclosure sales | 10,979 | 7,678 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | (14,499) | (9,135) |
| Other, net | (163) | (382) |
| Net cash provided by investing activities | 123,839 | 108,714 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 163,776 | 293,013 |
| Payments to redeem debt of Fannie Mae | (183,073) | (277,495) |
| Proceeds from issuance of debt of consolidated trusts | 72,567 | 88,750 |
| Payments to redeem debt of consolidated trusts | (177,551) | (172,385) |
| Payments of cash dividends on senior preferred stock to Treasury | (2,216) | (1,527) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 2,600 | 15,300 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | 26 | 180 |
| Net cash used in financing activities | (123,871) | (54,164) |
| **Net increase in cash and cash equivalents** | 2,534 | 23,665 |
| Cash and cash equivalents at beginning of period | 17,297 | 6,812 |
| Cash and cash equivalents at end of period | $ 19,831 | $ 30,477 |
| **Cash paid during the period for interest** | $ 32,689 | $ 36,788 |

See Notes to Condensed Consolidated Financial Statements

86

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

## 1. Summary of Significant Accounting Policies

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE") and subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship; (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock; and (3) Treasury's agreement to establish a temporary secured lending credit facility that was available to us and the other GSEs regulated by FHFA under identical terms until December 31, 2009.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

We were directed by FHFA to voluntarily delist our common stock and each listed series of our preferred stock from the New York Stock Exchange and the Chicago Stock Exchange. The last trading day for the listed securities on the New York Stock Exchange and the Chicago Stock Exchange was July 7, 2010, and since July 8, 2010, the securities have been traded on the over-the-counter market.

As of May 6, 2011, the conservator has advised us that it has not disaffirmed or repudiated any contracts we entered into prior to its appointment as conservator. The GSE Act requires FHFA to exercise its right to disaffirm or repudiate most contracts within a reasonable period of time after its appointment as conservator. FHFA's proposed rule on conservatorship and receivership operations, published on July 9, 2010, defines "reasonable period" as a period of 18 months following the appointment of a conservator or receiver. This proposed rule has not been finalized.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of May 6, 2011, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the

TREASURY-1156

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near-term.

### Impact of U.S. Government Support

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. Government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. We have received a total of $90.2 billion as of March 31, 2011 under Treasury's funding commitment and the Acting Director of FHFA has submitted a request for an additional $8.5 billion from Treasury to eliminate our net worth deficit as of March 31, 2011. The aggregate liquidation preference of the senior preferred stock was $91.2 billion as of March 31, 2011 and will increase to $99.7 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of March 31, 2011.

Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

As consideration for Treasury's funding commitment, we issued one million shares of senior preferred stock and a warrant to purchase shares of our common stock to Treasury. A quarterly commitment fee was scheduled to be set by Treasury beginning on March 31, 2011. This commitment fee was waived by Treasury for the first quarter of 2011. On March 31, 2011, FHFA was notified by Treasury that it was waiving the commitment fee for the second quarter of 2011 due to the continued fragility of the U.S. mortgage market and because Treasury believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the next quarter under the senior preferred stock purchase agreement.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

88

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, or our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

*Basis of Presentation*

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included. Results for the three months ended March 31, 2011 may not necessarily be indicative of the results for the year ending December 31, 2011. The unaudited interim condensed consolidated financial statements as of March 31, 2011 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K"), filed with the SEC on February 24, 2011.

*Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and the Treasury are deemed related parties. As of March 31, 2011, Treasury held an investment in our senior preferred stock with a liquidation preference of $91.2 billion. Our administrative expenses were reduced by $35 million in the first quarter of 2011 due to accrual and receipt of reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for the Home Affordable Modification Program ("HAMP") and other initiatives under the Making Home Affordable Program.

During the three months ended March 31, 2011, we received a refund of $1.1 billion from the IRS, a bureau of Treasury, related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years.

Under a temporary credit and liquidity facilities ("TCLF") program, we had $3.5 billion and $3.7 billion outstanding, which includes principal and interest, of three-year standby credit and liquidity support as of March 31, 2011 and December 31, 2010, respectively. Treasury has purchased participating interests in these temporary credit and liquidity facilities. Under a new issue bond ("NIB") program, we had $7.6 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of March 31, 2011 and December 31, 2010. Treasury bears the initial

89

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

loss of principal under the TCLF program and the NIB program up to 35% of the total principal on a combined program-wide basis.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of March 31, 2011 and December 31, 2010, we held Freddie Mac mortgage-related securities with a fair value of $16.6 billion and $18.3 billion, respectively, and accrued interest receivable of $83 million and $93 million, respectively. We recognized interest income on Freddie Mac mortgage-related securities held by us of $188 million and $335 million for the three months ended March 31, 2011 and 2010, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

*Use of Estimates*

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

*Principles of Consolidation*

Our condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. The typical condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. A controlling financial interest may also exist in entities through arrangements that do not involve voting interests, such as a variable interest entity ("VIE").

*Cash and Cash Equivalents and Statements of Cash Flows*

During 2010, we identified certain servicer and consolidation related transactions that were not appropriately reflected in our condensed consolidated statements of cash flows for the three months ended March 31, 2010. As a result, our condensed consolidated statement of cash flows for the three months ended March 31, 2010 includes a $2.0 billion adjustment to decrease net cash used in operating activities, a $3.5 billion adjustment to decrease net cash provided by investing activities, primarily related to "Proceeds from sales of available-for-sale securities," "Purchases of loans held for investment," "Proceeds from repayments of loans held for investment of consolidated trusts" and "Other, net" and a $1.5 billion adjustment to decrease net cash used in financing activities, primarily related to "Proceeds from issuance of long-term debt of consolidated trusts." We have evaluated the effects of these misstatements, both quantitatively and qualitatively, on our previously reported condensed consolidated statements of cash flows for the three months ended March 31, 2010 and concluded that this prior period was not materially misstated.

90

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Collateral*

*Cash Collateral*

The following table displays cash collateral accepted and pledged as of March 31, 2011 and December 31, 2010.

| | As of | |
|---|---|---|
| | **March 31, 2011** | **December 31, 2010** |
| | **(Dollars in millions)** | |
| Cash collateral accepted[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,056 | $3,101 |
| Cash collateral pledged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,049 | $5,884 |
| Cash collateral pledged related to derivatives activities . . . . . . . . . | 2,849 | 3,453 |
| Total cash collateral pledged . . . . . . . . . . . . . . . . . . . . . . . . . | $8,898 | $9,337 |

[1] Includes restricted cash of $2.4 billion and $2.5 billion as of March 31, 2011 and December 31, 2010, respectively.

*Non-Cash Collateral*

The following table displays non-cash collateral pledged and accepted as of March 31, 2011 and December 31, 2010.

| | As of | |
|---|---|---|
| | **March 31, 2011** | **December 31, 2010** |
| | **(Dollars in millions)** | |
| Non-cash collateral pledged where the secured party has the right to sell or repledge: | | |
| Held-for-investment loans of consolidated trusts . . . . . . . . . . . | $ 2,241 | $2,522 |
| Non-cash collateral accepted with the right to sell or repledge[1] . . | $20,000 | $7,500 |
| Non-cash collateral accepted without the right to sell or repledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,249 | 6,744 |

[1] None of this collateral was sold or repledged as of March 31, 2011 and December 31, 2010.

Additionally, we provide early funding to lenders on a collateralized basis and account for the advances as secured lending arrangements in "Other assets" in our condensed consolidated balance sheets. These amounts totaled $3.1 billion at March 31, 2011 and $7.2 billion at December 31, 2010.

Our liability to third-party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

When securities sold under agreements to repurchase meet all of the conditions of a secured financing, we report the collateral of the transferred securities at fair value, excluding accrued interest. The fair value of these securities is classified in "Investments in securities" in our condensed consolidated balance sheets. We had no repurchase agreements outstanding as of March 31, 2011 and $49 million in repurchase agreements outstanding as of December 31, 2010.

91

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Fair Value Gains (Losses), Net*

The following table displays the composition of "Fair value gains (losses), net" for the three months ended March 31, 2011 and 2010.

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | (Dollars in millions) | |
| Derivatives fair value gains (losses), net | $139 | $(2,762) |
| Trading securities gains, net | 225 | 1,058 |
| Other, net | (75) | (1) |
| Fair value gains (losses), net | $289 | $(1,705) |

*Reclassifications*

To conform to our current period presentation, we have reclassified and condensed certain amounts reported in our condensed consolidated financial statements. The following table displays the line items that were reclassified and condensed in our condensed consolidated balance sheet as of December 31, 2010.

|  | As of December 31, 2010 | |
|---|---|---|
|  | Before Reclassification | After Reclassification |
|  | (Dollars in millions) | |
| **Reclassified lines to:** | | |
| **Assets:** | | |
| Servicer and MBS trust receivable | $     951 | $ |
| Other assets | 25,875 | 26,826 |
| **Liabilities:** | | |
| Short-term debt: | | |
| Of Fannie Mae | 151,884 | |
| Of consolidated trusts | 5,359 | |
| Long-term debt: | | |
| Of Fannie Mae | 628,160 | |
| Of consolidated trusts | 2,411,597 | |
| Debt: | | |
| Of Fannie Mae | | 780,044 |
| Of consolidated trusts | | 2,416,956 |
| Reserve for guaranty losses | 323 | |
| Service and MBS trust payable | 2,950 | |
| Other liabilities | 10,400 | 13,673 |

92

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table represents the line items that we reclassified and condensed in our condensed consolidated statements of operations and comprehensive loss for the three months ended March 31, 2010.

| | Before Reclassification | After Reclassification |
|---|---|---|
| | (Dollars in millions) | |
| **Reclassified lines to:** | | |
| Interest expense: | | |
| Short-term debt: | | |
| Of Fannie Mae | $ 116 | $ |
| Of consolidated trusts | 2 | |
| Long-term debt: | | |
| Of Fannie Mae | 5,081 | |
| Of consolidated trusts | 31,458 | |
| Short-term debt (includes $2 related to consolidated trusts) | | 118 |
| Long-term debt (includes $31,458 related to consolidated trusts) | | 36,539 |
| Guaranty fee income | 54 | |
| Fee and other income | 179 | 233 |
| Losses from partnership investments | 58 | |
| Other expenses | 172 | 230 |

In our condensed consolidated statements of cash flows for the three months ended March 31, 2010, we reclassified the following amounts within "Cash flows used in financing activities" to conform to our current period presentation: $192.4 billion from "Proceeds from issuance of short-term debt of Fannie Mae" and $100.6 billion from "Proceeds from issuance of long-term debt of Fannie Mae" to "Proceeds from issuance of debt of Fannie Mae," $185.2 billion from "Payments to redeem short-term debt of Fannie Mae" and $92.4 billion from "Payments to redeem long-term debt of Fannie Mae" to "Payments to redeem debt of Fannie Mae," $3.3 billion from "Proceeds from issuance of short-term debt of consolidated trusts" and $83.7 billion from "Proceeds from issuance of long-term debt of consolidated trusts" to "Proceeds from issuance of debt of consolidated trusts" and $9.5 billion from "Payments to redeem short-term debt of consolidated trusts" and $162.6 billion from "Payments to redeem long-term debt of consolidated trusts" to "Payments to redeem debt of consolidated trusts."

*New Accounting Pronouncements*

In April 2011, the Financial Accounting Standards Board ("FASB") issued a new standard that clarifies when a loan restructuring is considered a troubled debt restructuring ("TDR"). Specifically, the new standard amends existing guidance to clarify how to determine when a borrower is experiencing financial difficulty, when a concession is granted by a creditor, and when a delay in payment is considered insignificant.

The new standard is effective for the first interim or annual period beginning on or after June 15, 2011 and should be applied retrospectively to the beginning of the annual period of adoption. We will adopt this new guidance effective for the period ending September 30, 2011 and are currently assessing the impact that the new standard may have on our condensed consolidated financial statements.

93

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**2.  Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be VIEs. The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts.

As of March 31, 2011, we consolidated certain Fannie Mae multi-class resecuritization trusts that were not consolidated as of December 31, 2010 because we now hold in our portfolio a substantial portion of the certificates. As a result of consolidating these multi-class resecuritization trusts, which had combined total assets of $1.3 billion in unpaid principal balance as of March 31, 2011, we derecognized our investment in these trusts and recognized the assets and liabilities of the consolidated trusts at their fair value.

We deconsolidate Fannie Mae multi-class resecuritization trusts when we no longer hold in our portfolio a substantial portion of the certificates, derecognizing the assets and liabilities of the trusts and recognizing at fair value our retained interests as securities in our condensed consolidated balance sheet. As of March 31, 2011, there was no change in the consolidation status of Fannie Mae multi-class resecuritization trusts that were consolidated as of December 31, 2010.

*Unconsolidated VIEs*

We also have interests in VIEs that we do not consolidate because we are not deemed to be the primary beneficiary. These unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of March 31, 2011 and December 31, 2010, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

| | As of March 31, 2011 | | |
| --- | --- | --- | --- |
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] . . . . . . . . . . . . . . . . . . . . | $ 80,570 | $      — | $      — |
| Trading securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,472 | 4,100 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 257 | — | 95 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 719 | — | 152 |
| **Net carrying amount** . . . . . . . . . . . . . . . . . . . . . . . . . . . | $103,580 | $  4,100 | $  (57) |
| **Maximum exposure to loss[1]** . . . . . . . . . . . . . . . . . . . . . | $107,416 | $  4,100 | $  336 |
| **Total assets of unconsolidated VIEs[1]** . . . . . . . . . . . . . . | $666,298 | $343,868 | $13,001 |

TREASURY-1163

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

|  | As of December 31, 2010[2] | | |
|---|---|---|---|
|  | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
|  | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] | $ 84,770 | $ — | $ — |
| Trading securities[1] | 24,021 | 5,321 | — |
| Other assets | 257 | — | 94 |
| Other liabilities | 773 | — | 170 |
| **Net carrying amount** | $108,275 | $ 5,321 | $ (76) |
| **Maximum exposure to loss[1]** | $111,004 | $ 5,321 | $ 319 |
| **Total assets of unconsolidated VIEs[1]** | $740,387 | $363,721 | $13,102 |

[1] Contains securities exposed through consolidation which may also represent an interest in other unconsolidated VIEs.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the three months ended March 31, 2011 and 2010, the unpaid principal balance of portfolio securitizations was $29.3 billion and $17.8 billion, respectively.

The majority of our portfolio securitization transactions do not qualify for sale treatment. As a result, our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material. We report the assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets.

The following table displays some key characteristics of the REMIC and Stripped Mortgage-Backed Securities retained in unconsolidated portfolio securitization trusts.

|  | As of | |
|---|---|---|
|  | March 31, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Unpaid principal balance | $ 14,448 | $ 15,771 |
| Fair value | 15,238 | 16,745 |
| Weighted-average coupon | 6.18% | 6.28% |
| Weighted-average loan age | 4.7 years | 4.4 years |
| Weighted-average maturity | 21.0 years | 22.0 years |

95

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For the three months ended March 31, 2011 and 2010, the principal and interest received on retained interests was $750 million and $836 million, respectively.

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that are delinquent as of March 31, 2011 and December 31, 2010.

| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
|---|---|---|
| | (Dollars in millions) | |
| **As of March 31, 2011** | | |
| Loans held for investment | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 418,770 | $136,489 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,603,491 | 27,972 |
| Loans held for sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,470 | 116 |
| Securitized loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,108 | 24 |
| Total loans managed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,025,839 | $164,601 |
| **As of December 31, 2010** | | |
| Loans held for investment | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 423,686 | $141,342 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,565,347 | 34,080 |
| Loans held for sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 964 | 127 |
| Securitized loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,147 | 78 |
| Total loans managed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,992,144 | $175,627 |

[1] Represents the unpaid principal balance of loans held for investment and loans held for sale for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest.

*Qualifying Sales of Portfolio Securitizations*

We recognize assets obtained and liabilities incurred in a portfolio securitization at fair value. Proceeds from the initial sale of securities from portfolio securitizations were $108 million and $249 million for the three months ended March 31, 2011 and 2010, respectively. For the three months ended March 31, 2010, proceeds from the initial sale of securities were reduced by $1.3 billion from the amount previously disclosed, primarily related to deconsolidated REMICs that should have been presented as proceeds from issuance of long-term debt of consolidated trusts.

TREASURY-1165

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### 3.   Mortgage Loans

The following table displays our mortgage loans as of March 31, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2011 | | | December 31, 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family . . . . . . . . . . . . . . . . . . | $328,656 | $2,523,197 | $2,851,853 | $328,824 | $2,490,623 | $2,819,447 |
| Multifamily . . . . . . . . . . . . . . . . . . . | 90,517 | 81,361 | 171,878 | 95,157 | 75,393 | 170,550 |
| Total unpaid principal balance of mortgage loans . . . . . . . . . . . . . . | 419,173 | 2,604,558 | 3,023,731 | 423,981 | 2,566,016 | 2,989,997 |
| Cost basis and fair value adjustments, net . . . . . . . . . . . . . . . . . . . . . . . . . | (16,462) | 10,345 | (6,117) | (16,498) | 11,777 | (4,721) |
| Allowance for loan losses for loans held for investment . . . . . . . . . . . . . . . . | (53,708) | (13,849) | (67,557) | (48,530) | (13,026) | (61,556) |
| Total mortgage loans . . . . . . . . . . | $349,003 | $2,601,054 | $2,950,057 | $358,953 | $2,564,767 | $2,923,720 |

During the three months ended March 31, 2011, we redesignated loans with a carrying value of $561 million from held for investment ("HFI") to held for sale ("HFS").

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of March 31, 2011 and December 31, 2010. For purposes of this table, each loan in our portfolio is included in only one segment and class category.

| | As of March 31, 2011[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] . . . . . | $39,980 | $14,949 | $ 89,650 | $144,579 | $2,356,321 | $2,500,900 | $128 | $104,375 |
| Government[4] . . . | 96 | 48 | 320 | 464 | 51,486 | 51,950 | 320 | — |
| Alt-A . . . . . . . . | 7,670 | 3,598 | 34,761 | 46,029 | 153,035 | 199,064 | 16 | 38,335 |
| Other[5] . . . . . . . | 3,514 | 1,624 | 14,241 | 19,379 | 81,837 | 101,216 | 105 | 15,670 |
| Total single-family . . . . | 51,260 | 20,219 | 138,972 | 210,451 | 2,642,679 | 2,853,130 | 569 | 158,380 |
| Multifamily[6] . . . . | 322 | NA | 1,094 | 1,416 | 172,385 | 173,801 | — | 1,047 |
| Total . . . . . . | $51,582 | $20,219 | $140,066 | $211,867 | $2,815,064 | $3,026,931 | $569 | $159,427 |

TREASURY-1166

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of December 31, 2010[1] | | | |
| | | | | (Dollars in millions) | | | | |
| Single-family: | | | | | | | | |
| Primary[3] . . . . . | $47,048 | $18,055 | $ 93,302 | $158,405 | $2,299,080 | $2,457,485 | $139 | $110,758 |
| Government[4] . . . | 125 | 58 | 371 | 554 | 51,930 | 52,484 | 354 | — |
| Alt-A . . . . . . . . | 8,547 | 4,097 | 37,557 | 50,201 | 156,951 | 207,152 | 21 | 41,566 |
| Other[5] . . . . . . . | 3,785 | 1,831 | 15,290 | 20,906 | 84,473 | 105,379 | 80 | 17,022 |
| Total single-family . . . . | 59,505 | 24,041 | 146,520 | 230,066 | 2,592,434 | 2,822,500 | 594 | 169,346 |
| Multifamily[6] . . . . | 382 | NA | 1,132 | 1,514 | 171,000 | 172,514 | — | 1,012 |
| Total . . . . . | $59,887 | $24,041 | $147,652 | $231,580 | $2,763,434 | $2,995,014 | $594 | $170,358 |

[1] Recorded investment consists of (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and included in the current column.

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

The following table displays the total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by portfolio segment, class and credit quality indicators as of March 31, 2011 and December 31, 2010. The single-family credit quality indicator is updated quarterly and the multifamily credit quality indicators are as of the origination date of each loan.

| | March 31, 2011[1][2] | | | December 31, 2010[1][2] | | |
|---|---|---|---|---|---|---|
| | Primary[3] | Alt-A | Other[4] | Primary[3] | Alt-A | Other[4] |
| | As of | | | | | |
| | (Dollars in millions) | | | | | |
| **Single-family** | | | | | | |
| Estimated mark-to-market LTV ratio:[5] | | | | | | |
| Less than or equal to 80% . . . . . . . . . | $1,491,411 | $ 70,592 | $ 26,614 | $1,561,202 | $ 79,305 | $ 29,854 |
| 80.01% to 90% . . . . . . . . . . . . . . . | 426,344 | 25,620 | 11,794 | 376,414 | 27,472 | 13,394 |
| 90.01% to 100% . . . . . . . . . . . . . . | 237,697 | 23,487 | 11,817 | 217,193 | 24,392 | 12,935 |
| 100.01% to 110% . . . . . . . . . . . . . . | 129,197 | 18,260 | 10,893 | 112,376 | 18,022 | 11,400 |
| 110.01% to 120% . . . . . . . . . . . . . | 71,237 | 13,471 | 9,043 | 62,283 | 12,718 | 8,967 |
| 120.01% to 125% . . . . . . . . . . . . . | 24,542 | 5,295 | 3,817 | 21,729 | 5,083 | 3,733 |
| Greater than 125% . . . . . . . . . . . . . | 120,472 | 42,339 | 27,238 | 106,288 | 40,160 | 25,096 |
| Total . . . . . . . . . . . . . . . . . . . . . | $2,500,900 | $199,064 | $101,216 | $2,457,485 | $207,152 | $105,379 |

98

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

|  | As of | |
|---|---|---|
|  | March 31, 2011[1] | December 31, 2010[1] |
|  | (Dollars in millions) | |
| **Multifamily** | | |
| Original LTV ratio: | | |
| Less than or equal to 70% | $ 98,355 | $ 96,844 |
| 70.01% to 80% | 71,087 | 71,560 |
| Greater than 80% | 4,359 | 4,110 |
| Total | $173,801 | $172,514 |
| Original debt service coverage ratio: | | |
| Less than or equal to 1.10% | $ 14,287 | $ 15,034 |
| 1.11% to 1.25% | 51,765 | 50,745 |
| Greater than 1.25% | 107,749 | 106,735 |
| Total | $173,801 | $172,514 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Excludes $52.0 billion and $52.5 billion as of March 31, 2011 and December 31, 2010, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

99

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Individually Impaired Loans*

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following tables display the total recorded investment, unpaid principal balance, related allowance and average recorded investment as of March 31, 2011 and December 31, 2010 and interest income recognized for the three months ended March 31, 2011 and 2010 for individually impaired loans.

| | As of March 31, 2011 | | | | | For the Three Months Ended March 31, 2011 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
| | *(Dollars in millions)* | | | | | | |
| Individually impaired loans: | | | | | | | |
| With related allowance recorded: | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . | $104,608 | $ 97,149 | $26,095 | $ 737 | $ 95,087 | $ 904 | $ 41 |
| Government[4] . . . . . . . . . . | 218 | 217 | 45 | 7 | 232 | 3 | — |
| Alt-A . . . . . . . . . . . . . . . . | 31,987 | 28,881 | 10,352 | 334 | 28,567 | 242 | 2 |
| Other[5] . . . . . . . . . . . . . . . | 14,956 | 14,089 | 4,872 | 125 | 13,889 | 106 | 6 |
| Total single-family . . . . . . . | 151,769 | 140,336 | 41,364 | 1,203 | 137,775 | 1,255 | 49 |
| Multifamily . . . . . . . . . . . . . . | 2,035 | 2,033 | 494 | 20 | 2,202 | 25 | 1 |
| Total individually impaired loans with related allowance recorded . . . . . . . . . . . . . . | 153,804 | 142,369 | 41,858 | 1,223 | 139,977 | 1,280 | 50 |
| With no related allowance recorded:[6] | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . | 11,255 | 7,041 | — | — | 7,139 | 108 | 57 |
| Government[4] . . . . . . . . . . | 19 | 11 | — | — | 12 | 1 | — |
| Alt-A . . . . . . . . . . . . . . . . | 4,062 | 1,841 | — | — | 1,863 | 33 | 19 |
| Other[5] . . . . . . . . . . . . . . . | 1,013 | 515 | — | — | 513 | 8 | 4 |
| Total single-family . . . . . . . | 16,349 | 9,408 | — | — | 9,527 | 150 | 80 |
| Multifamily . . . . . . . . . . . . . . | 710 | 696 | — | — | 754 | 15 | 3 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . . | 17,059 | 10,104 | — | — | 10,281 | 165 | 83 |
| Total individually impaired loans[7] . . . . . . . . . . . . . . . . | $170,863 | $152,473 | $41,858 | $1,223 | $150,258 | $1,445 | $133 |

100

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of December 31, 2010 | | | | | For the Three Months Ended March 31, 2010 | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | | |
| Individually impaired loans: | | | | | | | |
| With related allowance recorded: | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . | $ 99,838 | $ 93,024 | $23,565 | $ 772 | $ 81,258 | $1,198 | $210 |
| Government[4] . . . . . . . . . . | 240 | 248 | 38 | 7 | 141 | 1 | — |
| Alt-A . . . . . . . . . . . . . . . . | 30,932 | 28,253 | 9,592 | 368 | 25,361 | 408 | 58 |
| Other[5] . . . . . . . . . . . . . . . | 14,429 | 13,689 | 4,479 | 137 | 12,094 | 173 | 35 |
| Total single-family . . . . . . . | 145,439 | 135,214 | 37,674 | 1,284 | 118,854 | 1,780 | 303 |
| Multifamily . . . . . . . . . . . . . | 2,372 | 2,371 | 556 | 23 | 1,496 | 56 | 1 |
| Total individually impaired loans with related allowance recorded . . . . . . . . . . . . . | 147,811 | 137,585 | 38,230 | 1,307 | 120,350 | 1,836 | 304 |
| With no related allowance recorded:[6] | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . | 10,586 | 7,237 | — | — | 7,860 | 209 | 18 |
| Government[4] . . . . . . . . . . | 19 | 13 | — | — | 11 | 2 | — |
| Alt-A . . . . . . . . . . . . . . . . | 3,600 | 1,884 | — | — | 2,091 | 88 | 9 |
| Other[5] . . . . . . . . . . . . . . . | 879 | 512 | — | — | 589 | 24 | 2 |
| Total single-family . . . . . . . | 15,084 | 9,646 | — | — | 10,551 | 323 | 29 |
| Multifamily . . . . . . . . . . . . . | 789 | 811 | — | — | 642 | 18 | — |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . | 15,873 | 10,457 | — | — | 11,193 | 341 | 29 |
| Total individually impaired loans[7] . . . . . . . . . . . . . . . . | $163,684 | $148,042 | $38,230 | $1,307 | $131,543 | $2,177 | $333 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Total single-family interest income recognized of $1.4 billion consists of $1.1 billion of contractual interest and $352 million of effective yield adjustments for the three months ended March 31, 2011. Total single-family interest income recognized of $2.1 billion consists of $1.8 billion of contractual interest and $275 million of effective yield adjustments for the three months ended March 31, 2010.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[5] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

[7] Includes single-family loans restructured in a TDR with a recorded investment of $145.4 billion and $140.1 billion as of March 31, 2011 and December 31, 2010, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $916 million and $939 million as of March 31, 2011 and December 31, 2010, respectively.

101

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Loans Acquired in a Transfer*

We acquired delinquent loans from unconsolidated trusts and long-term standby commitments with an unpaid principal balance plus accrued interest of $48 million and $85 million for the three months ended March 31, 2011 and 2010, respectively. The following table displays the outstanding balance, carrying amount and accretable yield of acquired credit-impaired loans as of March 31, 2011 and December 31, 2010, excluding loans that were modified as TDRs subsequent to their acquisition from MBS trusts.

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Outstanding contractual balance | $7,231 | $8,519 |
| Carrying amount: | | |
| Loans on accrual status | $1,960 | $2,029 |
| Loans on nonaccrual status | 2,020 | 2,449 |
| Total carrying amount of loans | $3,980 | $4,478 |
| Accretable yield | $2,125 | $2,412 |

The following table displays interest income recognized and the impact to the "Provision for credit losses" related to loans that are still being accounted for as acquired credit-impaired loans, as well as loans that have been subsequently modified as a TDR, for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Accretion of fair value discount[1] | $231 | $266 |
| Interest income on loans returned to accrual status or subsequently modified as TDRs | 255 | 321 |
| Total interest income recognized on acquired credit-impaired loans | $486 | $587 |
| Increase in "Provision for loan losses" subsequent to the acquisition of credit-impaired loans | $238 | $564 |

_____

[1] Represents accretion of the fair value discount that was recorded on acquired credit-impaired loans.

**4.   Allowance for Loan Losses**

We maintain an allowance for loan losses for loans held for investment in our mortgage portfolio and loans backing Fannie Mae MBS issued from consolidated trusts. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes interest income only while the loan was on accrual status. The allowance for loan losses is calculated based on our estimate of incurred losses as of the balance sheet date. Determining the adequacy of our allowance for loan losses is complex and requires judgment about the effect of matters that are inherently uncertain.

TREASURY-1171

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Allowance for Loan Losses*

The following table displays changes in both single-family and multifamily allowance for loan losses for the three months ended March 31, 2011 and total allowance for loan losses for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
|---|---|---|---|---|---|---|
| | | (Dollars in millions) | | | | |
| **Single-family allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . . | $47,377 | $12,603 | $59,980 | | | |
| Provision for loan losses . . . . . . . | 7,243 | 3,369 | 10,612 | | | |
| Charge-offs[1] . . . . . . . . . . . . . . | (5,623) | (448) | (6,071) | | | |
| Recoveries . . . . . . . . . . . . . . . . . | 530 | 952 | 1,482 | | | |
| Transfers[2] . . . . . . . . . . . . . . . . | 3,162 | (3,162) | — | | | |
| Net reclassifications[3] . . . . . . . . | (18) | 99 | 81 | | | |
| Ending balance . . . . . . . . . . . . . | $52,671 | $13,413 | $66,084 | | | |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . . | $ 1,153 | $    423 | $ 1,576 | | | |
| Provision (benefit) for loan losses . . . . . . . . . . . . . . . . . . . | (84) | 59 | (25) | | | |
| Charge-offs[1] . . . . . . . . . . . . . . | (82) | — | (82) | | | |
| Transfers[2] . . . . . . . . . . . . . . . . | 45 | (45) | — | | | |
| Net reclassifications[3] . . . . . . . . | 5 | (1) | 4 | | | |
| Ending balance . . . . . . . . . . . . . | $ 1,037 | $    436 | $ 1,473 | | | |
| **Total allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . . | $48,530 | $13,026 | $61,556 | $ 8,078 | $  1,847 | $ 9,925 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Total provision for loan losses . . . | 7,159 | 3,428 | 10,587 | 6,271 | 5,668 | 11,939 |
| Charge-offs[1] . . . . . . . . . . . . . . | (5,705) | (448) | (6,153) | (1,705) | (3,455) | (5,160) |
| Recoveries . . . . . . . . . . . . . . . . . | 530 | 952 | 1,482 | 97 | 277 | 374 |
| Transfers[2] . . . . . . . . . . . . . . . . | 3,207 | (3,207) | — | 13,855 | (13,855) | — |
| Net reclassifications[3] . . . . . . . . | (13) | 98 | 85 | (921) | 836 | (85) |
| Ending balance[4][5] . . . . . . . . . . | $53,708 | $13,849 | $67,557 | $25,675 | $ 34,894 | $60,569 |

[1] Total charge-offs include accrued interest of $386 million and $579 million for the three months ended March 31, 2011 and 2010, respectively. Single-family charge-offs include accrued interest of $377 million for the three months ended March 31, 2011. Multifamily charge-offs include accrued interest of $9 million for the three months ended March 31, 2011.

[2] Includes transfers from trusts for delinquent loan purchases.

TREASURY-1172

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[3]   Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowance for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

[4]   Total allowance for loan losses includes $412 million and $903 million as of March 31, 2011 and 2010, respectively, for acquired credit-impaired loans.

[5]   Total single-family allowance for loan losses was $58.8 billion as of March 31, 2010. Total multifamily allowance for loan losses was $1.8 billion as of March 31, 2010.

As of March 31, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2.6 billion and for loans of consolidated trusts was $340 million. As of December 31, 2010, the allowance for accrued interest receivable for loans of Fannie Mae was $3.0 billion and for loans of consolidated trusts was $439 million.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of March 31, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | **March 31, 2011** | | | **December 31, 2010** | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| **Allowance for loan losses by segment:** | | | | | | |
| Individually impaired loans . . . . . . . . . . . | $ 40,957 | $ 489 | $ 41,446 | $ 37,296 | $ 549 | $ 37,845 |
| Collectively reserved loans . . . . . . . . . . . | 24,720 | 979 | 25,699 | 22,306 | 1,020 | 23,326 |
| Acquired credit-impaired loans . . . . . | 407 | 5 | 412 | 378 | 7 | 385 |
| Total allowance for loan losses . . . . . . | $ 66,084 | $ 1,473 | $ 67,557 | $ 59,980 | $ 1,576 | $ 61,556 |
| **Recorded investment in loans by segment:**[1] | | | | | | |
| Individually impaired loans . . . . . . . . . . . | $ 145,376 | $ 2,721 | $ 148,097 | $ 140,062 | $ 3,074 | $ 143,136 |
| Collectively reserved loans . . . . . . . . . . . | 2,703,386 | 171,003 | 2,874,389 | 2,677,640 | 169,332 | 2,846,972 |
| Acquired credit-impaired loans . . . . . | 4,368 | 77 | 4,445 | 4,798 | 108 | 4,906 |
| Total recorded investment in loans . . . . . . . . . | $2,853,130 | $173,801 | $3,026,931 | $2,822,500 | $172,514 | $2,995,014 |

[1]   Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

104

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**5.   Investments in Securities**

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss. The following table displays our investments in trading securities and the cumulative amount of net losses recognized from holding these securities as of March 31, 2011 and December 31, 2010.

| | As of | |
| --- | --- | --- |
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 7,131 | $ 7,398 |
| Freddie Mac | 1,201 | 1,326 |
| Ginnie Mae | 311 | 590 |
| Alt-A private-label securities | 1,658 | 1,683 |
| Subprime private-label securities | 1,547 | 1,581 |
| CMBS | 10,943 | 10,764 |
| Mortgage revenue bonds | 606 | 609 |
| Other mortgage-related securities | 155 | 152 |
| Total | 23,552 | 24,103 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 29,383 | 27,432 |
| Asset-backed securities | 4,100 | 5,321 |
| Total | 33,483 | 32,753 |
| Total trading securities | $57,035 | $56,856 |
| Losses in trading securities held in our portfolio, net | $ 1,912 | $ 2,149 |

The following table displays information about our net trading gains and losses for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Net trading gains (losses): | | |
| Mortgage-related securities | $229 | $1,006 |
| Non-mortgage-related securities | (4) | 52 |
| Total | $225 | $1,058 |
| Net trading gains (losses) recorded in the period related to securities still held at period end: | | |
| Mortgage-related securities | $222 | $ 900 |
| Non-mortgage-related securities | (5) | 48 |
| Total | $217 | $ 948 |

TREASURY-1174

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Available-for-Sale Securities*

We measure AFS securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| | (Dollars in millions) | |
| Gross realized gains | $ 60 | $ 265 |
| Gross realized losses | 6 | 120 |
| Total proceeds[1] | 390 | 4,179 |

---

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets." For the three months ended March 31, 2010, proceeds were reduced by $419 million from what was previously disclosed, primarily related to deconsolidated REMICs that should have been presented as proceeds from issuance of long-term debt of consolidated trusts.

The following tables display the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of March 31, 2011 and December 31, 2010.

| | As of March 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **Total Amortized Cost**[1] | **Gross Unrealized Gains** | **Gross Unrealized Losses - OTTI**[2] | **Gross Unrealized Losses - Other**[3] | **Total Fair Value** |
| | (Dollars in millions) | | | | |
| Fannie Mae | $19,426 | $1,267 | $ (7) | $ (43) | $20,643 |
| Freddie Mac | 14,435 | 921 | — | — | 15,356 |
| Ginnie Mae | 873 | 131 | — | — | 1,004 |
| Alt-A private-label securities | 15,337 | 187 | (1,634) | (198) | 13,692 |
| Subprime private-label securities | 11,109 | 42 | (1,102) | (389) | 9,660 |
| CMBS[4] | 15,097 | 66 | — | (239) | 14,924 |
| Mortgage revenue bonds | 11,273 | 49 | (78) | (702) | 10,542 |
| Other mortgage-related securities | 3,997 | 122 | (31) | (296) | 3,792 |
| Total | $91,547 | $2,785 | $(2,852) | $(1,867) | $89,613 |

106

TREASURY-1175

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $21,428 | $1,453 | $    (9) | $    (44) | $22,828 |
| Freddie Mac | 15,986 | 1,010 | — | — | 16,996 |
| Ginnie Mae | 909 | 130 | — | — | 1,039 |
| Alt-A private-label securities | 15,789 | 177 | (1,791) | (285) | 13,890 |
| Subprime private-label securities | 11,323 | 54 | (997) | (448) | 9,932 |
| CMBS[4] | 15,273 | 25 | — | (454) | 14,844 |
| Mortgage revenue bonds | 11,792 | 47 | (64) | (734) | 11,041 |
| Other mortgage-related securities | 4,098 | 106 | (44) | (338) | 3,822 |
| Total | $96,598 | $3,002 | $(2,905) | $(2,303) | $94,392 |

[1]  Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments recognized in our condensed consolidated statements of operations and comprehensive loss.

[2]  Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value for securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3]  Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4]  Amortized cost includes $807 million and $848 million as of March 31, 2011 and December 31, 2010, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following tables display additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of March 31, 2011 and December 31, 2010.

| | As of March 31, 2011 | | | |
|---|---|---|---|---|
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (34) | $ 1,160 | $   (16) | $   199 |
| Alt-A private-label securities | (97) | 1,946 | (1,735) | 8,256 |
| Subprime private-label securities | (46) | 704 | (1,445) | 8,237 |
| CMBS | (31) | 4,124 | (208) | 6,286 |
| Mortgage revenue bonds | (195) | 4,174 | (585) | 3,019 |
| Other mortgage-related securities | (8) | 345 | (319) | 1,871 |
| Total | $(411) | $12,453 | $(4,308) | $27,868 |

107

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | As of December 31, 2010 | | | |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
|---|---|---|---|---|
| Fannie Mae | $ (35) | $ 1,461 | $ (18) | $ 211 |
| Alt-A private-label securities | (104) | 1,915 | (1,972) | 9,388 |
| Subprime private-label securities | (47) | 627 | (1,398) | 8,493 |
| CMBS | (15) | 1,774 | (439) | 10,396 |
| Mortgage revenue bonds | (206) | 5,009 | (592) | 3,129 |
| Other mortgage-related securities | (2) | 262 | (380) | 2,014 |
| Total | $(409) | $11,048 | $(4,799) | $33,631 |

*Other-Than-Temporary Impairments*

We recognize the credit component of other-than-temporary impairments of our debt securities in our condensed consolidated statements of operations and comprehensive loss and the noncredit component in "Other comprehensive income" for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. $4.3 billion of the $4.7 billion of gross unrealized losses on AFS securities as of March 31, 2011 have existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of March 31, 2011 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of March 31, 2011 that was 87% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover a portion or the majority of these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive loss for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
| | 2011 | 2010 |
| | (Dollars in millions) | |
|---|---|---|
| Alt-A private-label securities | $37 | $ 37 |
| Subprime private-label securities | — | 184 |
| Other | 7 | 15 |
| Net other-than-temporary impairments | $44 | $236 |

108

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For the three months ended March 31, 2011, we recorded net other-than-temporary impairment of $44 million. The net other-than-temporary impairment charges recorded in the three month period ended March 31, 2011 were primarily driven by an increase in collateral delinquencies on certain Alt-A private-label securities, which resulted in a decrease in the present value of our cash flow projections on these Alt-A private-label securities.

The following table displays activity related to the unrealized credit component on debt securities held by us recognized in earnings for the three months ended March 31, 2011 and 2010. A related unrealized non-credit component has been recognized in "Accumulated other comprehensive loss."

| | For the Three Months Ended March 31, | |
| | 2011 | 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Balance January 1, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,215 | $8,191 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 6 |
| Additions for credit losses on debt securities for which OTTI was previously recognized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | 230 |
| Reductions for securities no longer in portfolio at period end . . . . . . . . . . . . . . . . . . . | — | (51) |
| Reductions for amortization resulting from increases in cash flows expected to be collected over the remaining life of the securities . . . . . . . . . . . . . . . . . . . . . . . . | (219) | (167) |
| Balance March 31, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,040 | $8,209 |

As of March 31, 2011, those debt securities with other-than-temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive loss only the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We model securities assuming the benefit of those external financial guarantees that we determined are creditworthy. We have recorded other-than-temporary impairments for the three months ended March 31, 2011 based on this analysis, with amounts related to credit loss recognized in our condensed consolidated statements of operations and comprehensive loss. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

109

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

| | | | As of March 31, 2011 | | |
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $ 2,159 | $ 511 | $3,726 | $ 532 | $2,446 |
| Weighted average collateral default[1] . . . . . . | 40.9% | 36.7% | 12.0% | 34.7% | 17.3% |
| Weighted average collateral severities[2]. . . . . | 60.7% | 45.8% | 42.9% | 44.7% | 35.8% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.1% | 6.0% | 8.6% | 8.2% | 11.1% |
| Average credit enhancement[4] . . . . . . . . . . . | 51.3% | 18.2% | 12.0% | 21.8% | 10.7% |
| **2005** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $ 197 | $1,375 | $1,261 | $ 570 | $2,516 |
| Weighted average collateral default[1] . . . . . . | 76.1% | 57.3% | 42.7% | 58.5% | 41.8% |
| Weighted average collateral severities[2]. . . . . | 73.0% | 54.3% | 58.6% | 59.5% | 50.5% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.7% | 3.9% | 6.6% | 6.9% | 7.8% |
| Average credit enhancement[4] . . . . . . . . . . . | 64.3% | 29.2% | 2.0% | 19.3% | 6.5% |
| **2006** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $12,303 | $1,335 | $ 602 | $1,733 | $1,866 |
| Weighted average collateral default[1] . . . . . . | 78.7% | 72.6% | 44.3% | 61.5% | 37.0% |
| Weighted average collateral severities[2]. . . . . | 73.3% | 60.8% | 62.8% | 62.6% | 48.1% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.7% | 3.2% | 6.1% | 6.9% | 9.3% |
| Average credit enhancement[4] . . . . . . . . . . . | 19.7% | 21.5% | 2.4% | 1.6% | 1.8% |
| **2007 & After:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $ 639 | $ — | $ — | $ — | $ 126 |
| Weighted average collateral default[1] . . . . . . | 74.4% | N/A | N/A | N/A | 44.8% |
| Weighted average collateral severities[2]. . . . . | 69.9% | N/A | N/A | N/A | 54.3% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.6% | N/A | N/A | N/A | 6.7% |
| Average credit enhancement[4] . . . . . . . . . . . | 34.4% | N/A | N/A | N/A | 25.7% |
| **Total** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $15,298 | $3,221 | $5,589 | $2,835 | $6,954 |
| Weighted average collateral default[1] . . . . . . | 73.1% | 60.4% | 22.4% | 55.8% | 31.9% |
| Weighted average collateral severities[2]. . . . . | 71.4% | 55.7% | 48.6% | 58.6% | 44.7% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.1% | 3.9% | 7.9% | 7.1% | 9.4% |
| Average credit enhancement[4] . . . . . . . . . . . | 25.3% | 24.3% | 8.7% | 9.0% | 7.0% |

---

[1] The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

TREASURY-1179

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[2]  The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3]  The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4]  The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of March 31, 2011. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Amortized Cost | Total Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | | | (Dollars in millions) | | | | | |
| Fannie Mae | $19,426 | $20,643 | $— | $— | $ 1 | $ 1 | $ 3,576 | $ 3,774 | $15,849 | $16,868 |
| Freddie Mac | 14,435 | 15,356 | 4 | 4 | 32 | 33 | 1,492 | 1,595 | 12,907 | 13,724 |
| Ginnie Mae | 873 | 1,004 | — | — | — | — | 5 | 6 | 868 | 998 |
| Alt-A private-label securities | 15,337 | 13,692 | — | — | 1 | 1 | 279 | 281 | 15,057 | 13,410 |
| Subprime private-label securities | 11,109 | 9,660 | — | — | — | — | — | — | 11,109 | 9,660 |
| CMBS | 15,097 | 14,924 | — | — | 1,990 | 1,989 | 12,472 | 12,328 | 635 | 607 |
| Mortgage revenue bonds | 11,273 | 10,542 | 55 | 55 | 370 | 380 | 771 | 772 | 10,077 | 9,335 |
| Other mortgage-related securities | 3,997 | 3,792 | — | — | — | — | — | 16 | 3,997 | 3,776 |
| Total | $91,547 | $89,613 | $59 | $59 | $2,394 | $2,404 | $18,595 | $18,772 | $70,499 | $68,378 |

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of March 31, 2011 and December 31, 2010.

| | As of | |
|---|---|---|
| | March 31, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment | $ 446 | $ 304 |
| Net unrealized gains (losses) on available-for-sale securities for which we have recorded other-than-temporary impairment | (1,703) | (1,736) |
| Other | (244) | (250) |
| Accumulated other comprehensive loss | $(1,501) | $(1,682) |

111

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the activity in other comprehensive income, net of tax, by major categories for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (Dollars in millions) | |
| Comprehensive loss: | | |
| Net loss | $(6,471) | $(11,529) |
| Other comprehensive income (loss), net of tax: | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $87 and $710, respectively) | 161 | 1,318 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $13 and $81, respectively) | 32 | 155 |
| Reclassification adjustment for gains included in net loss (net of tax of $8 and $56, respectively) | (14) | (103) |
| Other | 2 | 2 |
| Other comprehensive income | 181 | 1,372 |
| Total comprehensive loss | $(6,290) | $(10,157) |

## 6.  Financial Guarantees

For our guarantees to unconsolidated trusts and other guaranty arrangements, we recognize a guaranty obligation for our obligation to stand ready to perform on these guarantees. For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $52.5 billion and $52.4 billion as of March 31, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $12.4 billion and $12.6 billion as of March 31, 2011 and December 31, 2010, respectively. In addition, we had exposure of $10.1 billion and $10.3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of March 31, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $3.8 billion and $3.9 billion as of March 31, 2011 and December 31, 2010, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $1.9 billion and $2.0 billion as of March 31, 2011 and December 31, 2010, respectively.

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities. Management also monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and the percentage of multifamily loans 60 days or more past due, of loans that also have higher risk characteristics, such as high mark-to-market loan-to-value ratios and low original debt service coverage ratios. We use this information, in conjunction with

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to accurately reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of March 31, 2011 and December 31, 2010.

| | As of March 31, 2011[1] | | | As of December 31, 2010[1] | | |
|---|---|---|---|---|---|---|
| | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] |
| Percentage of single-family conventional guaranty book of business[3] . . . . . . . . . . . . . . . . . | 1.83% | 0.73% | 5.05% | 2.19% | 0.89% | 5.37% |
| Percentage of single-family conventional loans[4] . . . . . . . . . | 1.93 | 0.70 | 4.27 | 2.32 | 0.87 | 4.48 |

| | As of March 31, 2011[1] | | As of December 31, 2010[1] | |
|---|---|---|---|---|
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2)(4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2)(4] |
| **Estimated mark-to-market loan-to-value ratio:** | | | | |
| Less than 100% . . . . . . . . . . . . . . . . . | 82% | 2.36% | 84% | 2.62% |
| 100.01% to 110% . . . . . . . . . . . . . . | 6 | 9.79 | 5 | 11.60 |
| 110.01% to 120% . . . . . . . . . . . . . . | 3 | 13.08 | 3 | 14.74 |
| 120.01% to 125% . . . . . . . . . . . . . . | 1 | 14.69 | 1 | 16.86 |
| Greater than 125% . . . . . . . . . . . . . . | 8 | 22.45 | 7 | 24.71 |
| **Geographical distribution:** | | | | |
| Arizona . . . . . . . . . . . . . . . . . . . . . . . | 2 | 5.16 | 2 | 6.23 |
| California . . . . . . . . . . . . . . . . . . . . . . | 19 | 3.35 | 18 | 3.89 |
| Florida . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 12.40 | 7 | 12.31 |
| Nevada . . . . . . . . . . . . . . . . . . . . . . . | 1 | 9.40 | 1 | 10.66 |
| Select Midwest states[5] . . . . . . . . . . . | 10 | 4.62 | 11 | 4.80 |
| All other states . . . . . . . . . . . . . . . . . . | 61 | 3.34 | 61 | 3.46 |
| **Product distribution (not mutually exclusive):[6]** | | | | |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 13.45 | 8 | 13.87 |
| Subprime . . . . . . . . . . . . . . . . . . . . . . | * | 27.47 | * | 28.20 |
| Negatively amortizing adjustable rate. . . | * | 8.57 | * | 9.02 |
| Interest only . . . . . . . . . . . . . . . . . . . . | 5 | 17.10 | 6 | 17.85 |
| Investor property . . . . . . . . . . . . . . . . . | 6 | 4.67 | 6 | 4.79 |
| Condo/Coop . . . . . . . . . . . . . . . . . . . . | 9 | 5.15 | 9 | 5.37 |
| Original loan-to-value ratio >90%[7] . . . | 9 | 9.40 | 10 | 10.04 |
| FICO credit score <620[7] . . . . . . . . . . | 3 | 14.05 | 4 | 14.63 |
| Original loan-to-value ratio >90% and FICO credit score <620[7] . . . . . . . . | 1 | 20.20 | 1 | 21.41 |

113

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of March 31, 2011[1] | | As of December 31, 2010[1] | |
|---|---|---|---|---|
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| **Vintages:** | | | | |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 7.17 | 9 | 7.20 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 12.12 | 8 | 12.19 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 13.08 | 12 | 13.24 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 5.10 | 9 | 4.88 |
| All other vintages . . . . . . . . . . . . . . . . | 65 | 1.64 | 62 | 1.73 |

* Represents less than 0.5% of the single-family conventional guaranty book of business.

[1] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted over 99% of our total single-family conventional guaranty book of business as of both March 31, 2011 and December 31, 2010.

[2] Consists of single-family conventional loans that were three months or more past due or in foreclosure, as of the periods indicated.

[3] Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

[4] Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

[5] Consists of Illinois, Indiana, Michigan, and Ohio.

[6] Categories are not mutually exclusive. Loans with multiple product features are included in all applicable categories.

[7] Includes housing goals-oriented products such as MyCommunityMortgage® and Expanded Approval®.

114

TREASURY-1183

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of March 31, 2011[1][2] | | As of December 31, 2010[1][2] | |
|---|---|---|---|---|
| | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business......... | 0.16% | 0.64% | 0.21% | 0.71% |

| | As of March 31, 2011[1][2] | | As of December 31, 2010[1][2] | |
|---|---|---|---|---|
| | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% . . . . . . . . . . . . . . . | 5% | 0.60% | 5% | 0.59% |
| Less than or equal to 80% . . . . . . . . . . | 95 | 0.64 | 95 | 0.71 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 . . . . . . . . . . | 9 | 0.20 | 9 | 0.27 |
| Greater than 1.10 . . . . . . . . . . . . . . | 91 | 0.68 | 91 | 0.75 |
| **Acquisition loan size distribution:** | | | | |
| Less than or equal to $750,000 . . . . . . . | 2 | 1.59 | 2 | 1.61 |
| Greater than $750,000 and less than or equal to $3 million . . . . . . . . . . . . . | 12 | 1.22 | 12 | 1.17 |
| Greater than $3 million and less than or equal to $5 million . . . . . . . . . . . | 9 | 0.84 | 9 | 0.88 |
| Greater than $5 million and less than or equal to $25 million . . . . . . . . . . . | 42 | 0.76 | 42 | 0.88 |
| Greater than $25 million . . . . . . . . . . . . | 35 | 0.18 | 35 | 0.24 |
| **Maturing dates:** | | | | |
| Maturing in 2011 . . . . . . . . . . . . . . . . | 3 | 1.10 | 3 | 0.68 |
| Maturing in 2012 . . . . . . . . . . . . . . . . | 7 | 0.43 | 7 | 0.42 |
| Maturing in 2013 . . . . . . . . . . . . . . . . | 10 | 0.46 | 11 | 0.54 |
| Maturing in 2014 . . . . . . . . . . . . . . . . | 8 | 0.52 | 8 | 0.67 |
| Maturing in 2015 . . . . . . . . . . . . . . . . | 9 | 0.70 | 9 | 0.57 |

[1] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% of our total multifamily guaranty book of business as of both March 31, 2011 and December 31, 2010, respectively, excluding loans that have been defeased. Defeasance is a pre-payment of a loan through substitution of collateral.

[2] Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3] Consists of multifamily loans that were 60 days or more past due as of the periods indicated.

115

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

## 7. Acquired Property, Net

Acquired property, net consists of held-for-sale foreclosed property received in full satisfaction of a loan net of a valuation allowance for declines in the fair value of foreclosed properties after initial acquisition. We classify as held for sale those properties that we intend to sell and are actively marketed for sale. The following table displays the activity in acquired property and the related valuation allowance for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, 2011 | | | For the Three Months Ended March 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Beginning balance, January 1 . . . . . | $18,054 | $(1,881) | $16,173 | $ 9,716 | $(574) | $ 9,142 |
| Additions . . . . . . . . . . . . . . . . . . . | 4,889 | (129) | 4,760 | 6,762 | (52) | 6,710 |
| Disposals . . . . . . . . . . . . . . . . . . . | (6,015) | 730 | (5,285) | (3,425) | 206 | (3,219) |
| Write-downs, net of recoveries . . . . | — | (384) | (384) | — | (264) | (264) |
| Ending balance, March 31 . . . . . . . . | $16,928 | $(1,664) | $15,264 | $13,053 | $(684) | $12,369 |

[1]   Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

## 8. Short-Term Borrowings and Long-Term Debt

### Short-Term Borrowings

The following table displays our outstanding short-term borrowings (borrowing with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of March 31, 2011 and December 31, 2010.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2011 | | December 31, 2010 | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . | $     25 | 0.01% | $     52 | 2.20% |
| Fixed-rate short-term debt: | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $146,751 | 0.26% | $151,500 | 0.32% |
| Foreign exchange discount notes . . . . . . . . . . . . . . . . . | 341 | 2.51 | 384 | 2.43 |
| Total short-term debt of Fannie Mae . . . . . . . . . . . | 147,092 | 0.27 | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . | 5,156 | 0.22 | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . . . . . . . | $152,248 | 0.27% | $157,243 | 0.32% |

[1]   Includes the effects of discounts, premiums, and other cost basis adjustments.

116

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of March 31, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2011 | | | December 31, 2010 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate[1] | Maturities | Outstanding | Weighted-Average Interest Rate[1] |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . | 2011 - 2030 | $ 291,851 | 3.14% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes . . . . . . . . . . . . . | 2011 - 2021 | 190,950 | 2.00 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . | 2017 - 2028 | 1,204 | 6.07 | 2017 - 2028 | 1,177 | 6.21 |
| Other long-term debt[2] . . . . . . . . . . | 2011 - 2040 | 47,630 | 5.64 | 2011 - 2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . | | 531,635 | 2.96 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . . . | 2011 - 2016 | 74,454 | 0.30 | 2011 - 2015 | 72,039 | 0.31 |
| Other long-term debt[2] . . . . . . . . . . | 2020 - 2037 | 389 | 5.27 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . | | 74,843 | 0.32 | | 72,425 | 0.34 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[3] . . . . . . . | 2012 - 2014 | 4,893 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . | 2019 | 2,724 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed . . . . . . . | | 7,617 | 6.80 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[4] . . . . . . . . . . . . . . . . . . . . | | 614,095 | 2.69 | | 628,160 | 2.77 |
| Debt of consolidated trusts[2] . . . . . . . | 2011 - 2051 | 2,442,433 | 4.61 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . | | $3,056,528 | 4.23% | | $3,039,757 | 4.22% |

[1]  Includes the effects of discounts, premiums and other cost basis adjustments.

[2]  Includes a portion of structured debt instruments that is reported at fair value.

[3]  Consists of subordinated debt issued with an interest deferral feature.

[4]  Reported amounts include a net discount and other cost basis adjustments of $11.4 billion and $12.4 billion as of March 31, 2011 and December 31, 2010, respectively.

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of both March 31, 2011 and December 31, 2010. We had no borrowings outstanding from these lines of credit as of March 31, 2011.

117

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### 9.  Derivative Instruments

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps, interest rate options, foreign currency swaps and futures.

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets. We record all derivative gains and losses, including accrued interest, in "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss.

*Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of March 31, 2011 and December 31, 2010.

| | As of March 31, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . . | $ 72,172 | $  2,074 | $198,078 | $(10,764) | $ 49,085 | $  1,812 | $228,142 | $(14,115) |
| Receive-fixed . . . . . . . . . . . . . . . | 150,481 | 5,180 | 64,296 | (868) | 172,174 | 6,493 | 52,003 | (578) |
| Basis . . . . . . . . . . . . . . . . . . . . . . | 415 | 43 | 1,150 | (3) | 435 | 29 | 50 | — |
| Foreign currency . . . . . . . . . . . . . | 1,223 | 161 | 372 | (45) | 1,274 | 164 | 286 | (51) |
| Swaptions: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . . | 73,750 | 737 | 58,300 | (1,844) | 66,200 | 482 | 30,950 | (1,773) |
| Receive-fixed . . . . . . . . . . . . . . . | 54,244 | 4,074 | 58,300 | (849) | 48,340 | 4,992 | 30,275 | (673) |
| Interest rate caps . . . . . . . . . . . . . | 7,000 | 20 | — | — | 7,000 | 24 | — | — |
| Other[1] . . . . . . . . . . . . . . . . . . . . . . | 1,047 | 80 | 100 | (1) | 909 | 75 | 25 | (1) |
| Total gross risk management derivatives . . . . . . . . . . . . . . . . | 360,528 | 12,369 | 380,596 | (14,374) | 345,417 | 14,071 | 341,731 | (17,191) |
| Accrued interest receivable (payable) . . | — | 1,221 | — | (1,981) | — | 1,288 | — | (1,805) |
| Netting adjustment[2] . . . . . . . . . . . . | — | (13,478) | — | 15,622 | — | (15,175) | — | 18,023 |
| Total net risk management derivatives . . . . . . . . . . . . . . . . | $360,528 | $     112 | $380,596 | $    (733) | $345,417 | $     184 | $341,731 | $    (973) |

118

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of March 31, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | | | (Dollars in millions) | | | | |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans.............. | $ 2,017 | $ 9 | $ 1,075 | $ (4) | $ 2,880 | $ 19 | $ 4,435 | $ (105) |
| Forward contracts to purchase mortgage-related securities ....... | 20,310 | 111 | 12,828 | (60) | 19,535 | 123 | 27,697 | (468) |
| Forward contracts to sell mortgage-related securities ............. | 13,149 | 47 | 25,959 | (144) | 40,761 | 811 | 24,562 | (169) |
| Total mortgage commitment derivatives............... | $ 35,476 | $ 167 | $ 39,862 | $ (208) | $ 63,176 | $ 953 | $ 56,694 | $ (742) |
| Derivatives at fair value ........ | $396,004 | $ 279 | $420,458 | $ (941) | $408,593 | $ 1,137 | $398,425 | $ (1,715) |

[1]  Includes futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2]  The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral receivable and payable. Cash collateral receivable was $2.8 billion and $3.5 billion as of March 31, 2011 and December 31, 2010, respectively. Cash collateral payable was $704 million and $604 million as of March 31, 2011 and December 31, 2010, respectively.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from each of the major credit rating agencies. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we would be in violation of these provisions, and the counterparties to the derivative instruments could request immediate payment or demand immediate collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of March 31, 2011 was $3.6 billion for which we posted collateral of $2.8 billion in the normal course of business. If the credit-risk-related contingency features underlying these agreements were triggered as of March 31, 2011, we would be required to post an additional $734 million of collateral to our counterparties.

119

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| | (Dollars in millions) | |
| Risk management derivatives: | | |
| Swaps: | | |
| Pay-fixed | $ 602 | $(5,879) |
| Receive-fixed | (256) | 4,669 |
| Basis | 19 | 9 |
| Foreign currency | 30 | (3) |
| Swaptions: | | |
| Pay-fixed | (55) | (934) |
| Receive-fixed | (233) | 27 |
| Interest rate caps | (4) | (56) |
| Other[1] | 13 | 6 |
| Total risk management derivatives fair value gains (losses), net | 116 | (2,161) |
| Mortgage commitment derivatives fair value gains (losses), net | 23 | (601) |
| Total derivatives fair value gains (losses), net | $ 139 | $(2,762) |

---

[1]   Includes futures, swap credit enhancements and mortgage insurance contracts.

***Derivative Counterparty Credit Exposure***

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

TREASURY-1189

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The table below displays our credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of March 31, 2011 and December 31, 2010.

| | As of March 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Credit Rating[1] | | Subtotal[2] | Other[3] | Total |
| | AA+/AA/AA- | A+/A | | | |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $  77 | $  651 | $  728 | $  77 | $  805 |
| Less: Collateral held[5] | 55 | 646 | 701 | — | 701 |
| Exposure net of collateral | $  22 | $  5 | $  27 | $  77 | $  104 |
| Additional information: | | | | | |
| Notional amount | $209,395 | $529,732 | $739,127 | $1,997 | $741,124 |
| Number of counterparties | 7 | 8 | 15 | | |

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Credit Rating[1] | | Subtotal[2] | Other[3] | Total |
| | AA+/AA/AA- | A+/A | | | |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $  350 | $  325 | $  675 | $  75 | $  750 |
| Less: Collateral held[5] | 273 | 325 | 598 | — | 598 |
| Exposure net of collateral | $  77 | $  — | $  77 | $  75 | $  152 |
| Additional information: | | | | | |
| Notional amount | $208,898 | $476,766 | $685,664 | $1,484 | $687,148 |
| Number of counterparties | 7 | 8 | 15 | | |

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by Standard & Poor's and Moody's. The credit rating reflects the equivalent Standard & Poor's rating for any ratings based on Moody's scale.

[2] We had exposure to 4 and 3 interest rate and foreign currency derivative counterparties in a net gain position as of March 31, 2011 and December 31, 2010, respectively. Those interest rate and foreign currency derivatives had notional balances of $125.1 billion and $106.5 billion as of March 31, 2011 and December 31, 2010, respectively.

[3] Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[4] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[5] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral. We posted cash collateral of $2.8 billion and $3.4 billion related to our counterparties' credit exposure to us as of March 31, 2011 and December 31, 2010, respectively.

TREASURY-1190

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**10.   Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. When we begin operating under a functional structure, we may change some of our management reporting and how we report our business segment results.

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive loss, as we separate the activity related to our consolidated trusts from the results generated by our three segments. Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group. We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated statements of operations.

The following tables display our segment results for the three months ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/Adjustments[2] | Total Results |
| | | | | (Dollars in millions) | | |
| Net interest income (expense) . . . . . . . | $ (898) | $ (9) | $3,710 | $ 1,574 | $ 583[3] | $ 4,960 |
| Benefit (provision) for loan losses . . . . | (10,612) | 25 | — | — | — | (10,587) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . | (11,510) | 16 | 3,710 | 1,574 | 583 | (5,627) |
| Guaranty fee income (expense) . . . . . . | 1,871 | 209 | (399) | (1,110)[4] | (521)[4] | 50[4] |
| Investment gains (losses), net . . . . . . . | 1 | 4 | 870 | (26) | (774)[5] | 75 |
| Net other-than-temporary impairments . . | — | — | (44) | — | — | (44) |
| Fair value gains (losses), net . . . . . . . . | — | — | 218 | (33) | 104[6] | 289 |
| Debt extinguishment gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . | — | — | (24) | 37 | — | 13 |
| Losses from partnership investments . . . | — | (12) | — | — | — | (12)[7] |
| Fee and other income (expense) . . . . . . | 147 | 58 | 75 | (92) | (1) | 187 |
| Administrative expenses . . . . . . . . . . . | (416) | (68) | (121) | — | — | (605) |
| Benefit (provision) for guaranty losses . . | (6) | 39 | — | — | — | 33 |
| Foreclosed property expense . . . . . . . . | (488) | — | — | — | — | (488) |
| Other income (expenses) . . . . . . . . . . | (318) | 6 | (9) | — | (19) | (340) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | (10,719) | 252 | 4,276 | 350 | (628) | (6,469) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | (2) | (5) | 5 | — | — | (2) |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(10,721) | $247 | $4,281 | $ 350 | $(628) | $ (6,471) |

122

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Three Months Ended March 31, 2010 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest income (expense) . . . . . . . | $ (1,945) | $   4 | $ 3,057 | $ 1,239 | $ 434[3] | $  2,789 |
| Benefit (provision) for loan losses . . . . | (11,945) | 6 | | | | (11,939) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . | (13,890) | 10 | 3,057 | 1,239 | 434 | (9,150) |
| Guaranty fee income (expense) . . . . . . | 1,768 | 194 | (279) | (1,197)[4] | (432)[4] | 54[4] |
| Investment gains (losses), net . . . . . . . | 2 | — | 792 | (155) | (473)[5] | 166 |
| Net other-than-temporary impairments . . | — | — | (236) | — | — | (236) |
| Fair value losses, net . . . . . . . . . . . . . | — | — | (1,186) | (35) | (484)[6] | (1,705) |
| Debt extinguishment losses, net . . . . . . | — | — | (55) | (69) | — | (124) |
| Losses from partnership investments . . . | — | (58) | — | — | — | (58)[7] |
| Fee and other income (expense) . . . . . . | 47 | 35 | 104 | (7) | — | 179 |
| Administrative expenses . . . . . . . . . . . | (390) | (99) | (116) | — | — | (605) |
| Benefit (provision) for guaranty losses . . | (11) | 47 | — | — | — | 36 |
| Foreclosed property income (expense) . . | 30 | (11) | — | — | — | 19 |
| Other income (expenses) . . . . . . . . . . | (172) | (6) | 27 | — | (21) | (172) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . | (12,616) | 112 | 2,108 | (224) | (976) | (11,596) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . | 51 | (13) | 29 | — | — | 67 |
| Net income (loss) . . . . . . . . . . . . . | (12,565) | 99 | 2,137 | (224) | (976) | (11,529) |
| Less: Net income attributable to noncontrolling interests . . . . . . . . | — | — | — | — | (1)[8] | (1) |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(12,565) | $  99 | $ 2,137 | $   (224) | $(977) | $(11,530) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets.

[2] Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our condensed consolidated results.

[3] Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4] Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[5] Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6] Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7] Losses from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

[8] Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets.

123

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

## 11. Regulatory Capital Requirements

FHFA has announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship, and that FHFA will not issue quarterly capital classifications during the conservatorship. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels.

The following table displays our regulatory capital classification measures as of March 31, 2011 and December 31, 2010.

| | As of | |
|---|---|---|
| | March 31, 2011[1] | December 31, 2010[1] |
| | (Dollars in millions) | |
| Core capital[2] | $ (98,199) | $ (89,516) |
| Statutory minimum capital requirement[3] | 32,530 | 33,676 |
| Deficit of core capital over statutory minimum capital requirement | $(130,729) | $(123,192) |
| Deficit of core capital percentage over statutory minimum capital requirement | (402)% | (366)% |

---

[1] Amounts as of March 31, 2011 and December 31, 2010 represent estimates that have been submitted to FHFA.

[2] The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings (accumulated deficit). Core capital does not include: (a) accumulated other comprehensive income (loss) or (b) senior preferred stock.

[3] Generally, the sum of (a) 2.50% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director).

## 12. Concentration of Credit Risk

*Mortgage Seller/Servicers.* Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 76% of our single-family guaranty book of business as of March 31, 2011, compared with 77% as of December 31, 2010. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 69% of our multifamily guaranty book of business as of March 31, 2011, compared with 70% as of December 31, 2010.

If one of our principal mortgage seller/servicers fails to meet its obligations to us, it could increase our credit-related expenses and credit losses, result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth.

*Mortgage Insurers.* Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $94.8 billion on the single-family mortgage loans in our guaranty book of business as of March 31, 2011, which represented approximately 3% of our single-family guaranty book of business. Our primary and pool mortgage insurance coverage risk in force on single-family mortgage loans in our guaranty book of business represented $90.2 billion and $4.6 billion, respectively, as of March 31, 2011, compared with $91.2 billion and

124

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

$4.7 billion, respectively, as of December 31, 2010. Eight mortgage insurance companies provided over 99% of our mortgage insurance as of both March 31, 2011 and December 31, 2010.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and financial condition of many mortgage insurers. The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

As of March 31, 2011, our allowance for loan losses of $67.6 billion, allowance for accrued interest receivable of $2.9 billion and reserve for guaranty losses of $257 million incorporated an estimated recovery amount of approximately $16.5 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.4 billion as of March 31, 2011 and an adjustment of approximately $975 million which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

We had outstanding receivables of $4.1 billion in "Other assets" in our condensed consolidated balance sheet as of March 31, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $650 million as of March 31, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the receivables for collectibility, and they are recorded net of a valuation allowance of $271 million as of March 31, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of March 31, 2011 and December 31, 2010. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.6 billion for the three months ended March 31, 2011 and $6.4 billion for the year ended December 31, 2010. We negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million for the year ended December 31, 2010 are included in our total insurance proceeds amount; there were no such cash fees received in the three months ended March 31, 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce future exposure to our mortgage insurers and were recorded as a reduction to our "Foreclosed property expense (income)."

*Financial Guarantors.*   We were the beneficiary of financial guarantees totaling $8.6 billion and $8.8 billion as of March 31, 2011 and December 31, 2010, respectively, on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. In addition, we are the beneficiary of financial guarantees totaling $23.9 billion and $25.7 billion as of March 31, 2011 and December 31, 2010, respectively, obtained from Freddie Mac, the federal government, and its agencies. These financial guaranty contracts assure the collectibility of timely interest and ultimate principal payments on the guaranteed securities if the cash flows generated by the underlying collateral are not sufficient to fully support these payments.

If a financial guarantor fails to meet its obligations to us with respect to the securities for which we have obtained financial guarantees, it could reduce the fair value of our mortgage-related securities and result in financial losses to us, which could have a material adverse effect on our earnings, liquidity, financial condition

125

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

and net worth. We model the fair value of our securities assuming the benefit of those external financial guarantees that we determine are creditworthy.

*Lenders with Risk Sharing.* We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $14.8 billion as of March 31, 2011 and $15.6 billion as of December 31, 2010. As of March 31, 2011, 55% of our maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $30.7 billion as of March 31, 2011 and $30.3 billion as of December 31, 2010. As of both March 31, 2011 and December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three lenders.

## 13.  Fair Value

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

### Fair Value Measurement

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and expands disclosures around fair value measurements. This guidance applies whenever other accounting standards require or permit assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

TREASURY-1195

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of March 31, 2011 and December 31, 2010. Specifically, total assets measured at fair value on a recurring basis and classified as Level 3 were $38.2 billion, or 1% of "Total assets," and $39.0 billion, or 1% of "Total assets," in our condensed consolidated balance sheets as of March 31, 2011 and December 31, 2010, respectively.

| | Fair Value Measurements as of March 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 3,150 | $ 2,950 | $ — | $ — | $ 6,100 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 5,480 | 1,651 | — | 7,131 |
| Freddie Mac | — | 1,201 | — | — | 1,201 |
| Ginnie Mae | — | 311 | — | — | 311 |
| Alt-A private-label securities | — | 1,638 | 20 | — | 1,658 |
| Subprime private-label securities | — | — | 1,547 | — | 1,547 |
| CMBS | — | 10,943 | — | — | 10,943 |
| Mortgage revenue bonds | — | — | 606 | — | 606 |
| Other | — | — | 155 | — | 155 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 29,383 | — | — | — | 29,383 |
| Asset-backed securities | — | 4,098 | 2 | — | 4,100 |
| Total trading securities | 29,383 | 23,671 | 3,981 | — | 57,035 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 20,097 | 546 | — | 20,643 |
| Freddie Mac | — | 15,344 | 12 | — | 15,356 |
| Ginnie Mae | — | 1,004 | — | — | 1,004 |
| Alt-A private-label securities | — | 6,456 | 7,236 | — | 13,692 |
| Subprime private-label securities | — | — | 9,660 | — | 9,660 |
| CMBS | — | 14,924 | — | — | 14,924 |
| Mortgage revenue bonds | — | 10 | 10,532 | — | 10,542 |
| Other | — | 16 | 3,776 | — | 3,792 |
| Total available-for-sale securities | — | 57,851 | 31,762 | — | 89,613 |
| Mortgage loans of consolidated trusts | — | 748 | 2,221 | — | 2,969 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 8,523 | 156 | — | 8,679 |
| Swaptions | — | 4,811 | — | — | 4,811 |
| Interest rate caps | — | 20 | — | — | 20 |
| Other | 3 | — | 77 | — | 80 |
| Netting adjustment | — | — | — | (13,478) | (13,478) |
| Mortgage commitment derivatives | — | 161 | 6 | — | 167 |
| Total other assets | 3 | 13,515 | 239 | (13,478) | 279 |
| Total assets at fair value | $32,536 | $98,735 | $38,203 | $(13,478) | $155,996 |

127

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of March 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed . . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $    461 | $    — | $    — | $    461 |
| Senior floating . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 423 | — | 423 |
| Total of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | — | 461 | 423 | — | 884 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . | — | 1,526 | 667 | — | 2,193 |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . | — | 1,987 | 1,090 | — | 3,077 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 13,560 | 101 | — | 13,661 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,693 | — | — | 2,693 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — | — | — | 1 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (15,622) | (15,622) |
| Mortgage commitment derivatives . . . . . . . . . . . . . . | — | 188 | 20 | — | 208 |
| Total other liabilities . . . . . . . . . . . . . . . . . . . . . . | 1 | 16,441 | 121 | (15,622) | 941 |
| Total liabilities at fair value . . . . . . . . . . . . . . . . . | $  1 | $18,428 | $1,211 | $(15,622) | $  4,018 |

TREASURY-1197

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,049 | $ 2,300 | $ — | $ — | $ 6,349 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,196 | 2,202 | — | 7,398 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,326 | — | — | 1,326 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 590 | — | — | 590 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . | — | 1,663 | 20 | — | 1,683 |
| Subprime private-label securities . . . . . . . . . . . . . . . | — | — | 1,581 | — | 1,581 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10,764 | — | — | 10,764 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . | — | — | 609 | — | 609 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 152 | — | 152 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities . . . . . . . . . . . . . . . . . . . . . . | 27,432 | — | — | — | 27,432 |
| Asset-backed securities . . . . . . . . . . . . . . . . . . . . . . | — | 5,309 | 12 | — | 5,321 |
| Total trading securities . . . . . . . . . . . . . . . . . . . . . . | 27,432 | 24,848 | 4,576 | — | 56,856 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 22,714 | 114 | — | 22,828 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,993 | 3 | — | 16,996 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,039 | — | — | 1,039 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . | — | 6,841 | 7,049 | — | 13,890 |
| Subprime private-label securities . . . . . . . . . . . . . . . | — | — | 9,932 | — | 9,932 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14,844 | — | — | 14,844 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . | — | 11 | 11,030 | — | 11,041 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16 | 3,806 | — | 3,822 |
| Total available-for-sale securities . . . . . . . . . . . . . . . . | — | 62,458 | 31,934 | — | 94,392 |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . | — | 755 | 2,207 | — | 2,962 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 9,623 | 163 | — | 9,786 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,474 | — | — | 5,474 |
| Interest rate caps . . . . . . . . . . . . . . . . . . . . . . . . . | — | 24 | — | — | 24 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 72 | — | 75 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (15,175) | (15,175) |
| Mortgage commitment derivatives . . . . . . . . . . . . . . . . | — | 941 | 12 | — | 953 |
| Total other assets . . . . . . . . . . . . . . . . . . . . . . . | 3 | 16,062 | 247 | (15,175) | 1,137 |
| Total assets at fair value . . . . . . . . . . . . . . . . . . . . | $31,484 | $106,423 | $38,964 | $(15,175) | $161,696 |

129

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $— | $   472 | $    — | $    — | $   472 |
| Senior floating | — | — | 421 | — | 421 |
| Total of Fannie Mae | — | 472 | 421 | — | 893 |
| Of consolidated trusts | — | 1,644 | 627 | — | 2,271 |
| Total long-term debt | — | 2,116 | 1,048 | — | 3,164 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 16,436 | 113 | — | 16,549 |
| Swaptions | — | 2,446 | — | — | 2,446 |
| Other | 1 | — | — | — | 1 |
| Netting adjustment | — | — | — | (18,023) | (18,023) |
| Mortgage commitment derivatives | — | 712 | 30 | — | 742 |
| Total other liabilities | 1 | 19,594 | 143 | (18,023) | 1,715 |
| Total liabilities at fair value | $ 1 | $21,710 | $1,191 | $(18,023) | $  4,879 |

---

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

[2] Cash equivalents is comprised of U.S. Treasuries that are classified as Level 1 and money market funds that are classified as Level 2.

130

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three months ended March 31, 2011 and 2010. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive loss for Level 3 assets and liabilities for the three months ended March 31, 2011 and 2010. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period.

| | | | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Three Months Ended March 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Balance, December 31, 2010 | Included in Net Loss | Total Gains or (Losses) (Realized/Unrealized) Included in Other Comprehensive Income | Purchases[3] | Sales[3] | Settlements[4] | Transfers Out of Level 3[1] | Transfers into Level 3[1] | Balance, March 31, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of March 31, 2011[2] |
| | | | | | (Dollars in millions) | | | | | |
| Trading securities: | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | |
| Fannie Mae . . . . . . . . . | $ 2,202 | $(13) | $ — | $ — | $(15) | $ (132) | $(391) | $ — | $ 1,651 | $(10) |
| Alt-A private-label securities . . . . . . . . | 20 | — | — | — | — | — | — | — | 20 | — |
| Subprime private-label securities . . . . . . . . | 1,581 | 11 | — | — | — | (45) | — | — | 1,547 | 11 |
| Mortgage revenue bonds . . . . . . . . . . | 609 | — | — | — | — | (3) | — | — | 606 | 3 |
| Other . . . . . . . . . . . | 152 | 4 | — | — | — | (1) | — | — | 155 | 4 |
| Non-mortgage-related: | | | | | | | | | | |
| Asset-backed securities . . | 12 | — | — | — | — | (3) | (9) | 2 | 2 | — |
| Total trading securities . . . . . | 4,576 | 2 | — | — | (15) | (184) | (400) | 2 | 3,981 | 8 |
| Available-for-sale securities: | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | |
| Fannie Mae . . . . . . . . . | 114 | — | 4 | 416 | (15) | (2) | (101) | 130 | 546 | — |
| Freddie Mac . . . . . . . . | 3 | — | — | — | — | — | — | 9 | 12 | — |
| Alt-A private-label securities . . . . . . . . | 7,049 | (2) | 104 | — | — | (258) | (317) | 660 | 7,236 | — |
| Subprime private-label securities . . . . . . . . | 9,932 | 130 | (58) | — | — | (344) | — | — | 9,660 | — |
| Mortgage revenue bonds . . . . . . . . . . | 11,030 | (2) | 21 | — | (42) | (475) | — | — | 10,532 | — |
| Other . . . . . . . . . . . | 3,806 | 1 | 71 | — | — | (102) | — | — | 3,776 | — |
| Total available-for-sale securities . . . . . . . . . . . . | 31,934 | 127 | 142 | 416 | (57) | (1,181) | (418) | 799 | 31,762 | — |
| Mortgage loans of consolidated trusts . . . . . | 2,207 | 11 | — | 15 | — | (79) | (6) | 73 | 2,221 | 11 |
| Net derivatives . . . . . . . . . | 104 | 14 | — | — | — | — | — | — | 118 | 5 |
| Long-term debt: | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | |
| Senior floating . . . . . . . | (421) | (22) | — | — | — | 20 | — | — | (423) | (22) |
| Of consolidated trusts . . . . | (627) | (35) | — | — | — | 22 | 22 | (49) | (667) | (35) |
| Total long-term debt . . . . . . | $(1,048) | $(57) | $ — | $ — | $— | $ 42 | $ 22 | $(49) | $(1,090) | $(57) |

TREASURY-1200

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Balance, December 31, 2009 | Impact of New Accounting Standards | Included in Net Loss | Included in Other Comprehensive Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers Out of Level 3[1] | Transfers into Level 3[1] | Balance, March 31, 2010 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of March 31, 2010[2] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . . | $ 5,656 | $ (2) | $ 38 | $ — | $ (131) | $(1,490) | $ 5 | $ 4,076 | $ 43 |
| Alt-A private-label securities . . | 564 | 62 | 23 | — | (36) | (490) | 30 | 153 | — |
| Subprime private-label securities . . . . . . . . . . . | 1,780 | — | (26) | — | (71) | — | — | 1,683 | (26) |
| Mortgage revenue bonds . . . . . | 600 | — | 50 | — | (39) | — | — | 611 | 47 |
| Other . . . . . . . . . . . . . . . . | 154 | — | 5 | — | (1) | — | — | 158 | 5 |
| Non-mortgage-related: | | | | | | | | | |
| Asset-backed securities . . . . . . | 107 | — | (1) | — | (36) | (40) | 13 | 43 | 1 |
| Total trading securities . . . . . . . . | 8,861 | 60 | 89 | — | (314) | (2,020) | 48 | 6,724 | 70 |
| Available-for-sale securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . . | 596 | (203) | (2) | 1 | 167 | (344) | 2 | 217 | — |
| Freddie Mac . . . . . . . . . . . . | 27 | — | — | — | (3) | — | 6 | 30 | — |
| Ginnie Mae . . . . . . . . . . . . | 123 | — | — | — | — | — | — | 123 | — |
| Alt-A private-label securities . . | 8,312 | 471 | (4) | 267 | (312) | (1,011) | 794 | 8,517 | — |
| Subprime private-label securities . . . . . . . . . . . | 10,746 | (118) | (88) | 463 | (492) | — | — | 10,511 | — |
| Mortgage revenue bonds . . . . . | 12,820 | 21 | (1) | 233 | (514) | — | — | 12,559 | — |
| Other . . . . . . . . . . . . . . . . | 3,530 | 366 | (5) | 110 | (128) | — | — | 3,873 | — |
| Total available-for-sale securities . . . | 36,154 | 537 | (100) | 1,074 | (1,282) | (1,355) | 802 | 35,830 | — |
| Guaranty assets and buy-ups . . . . . | 2,577 | (2,568) | — | — | 2 | — | — | 11 | 1 |
| Net derivatives . . . . . . . . . . . . . . | 123 | — | 35 | — | (18) | — | — | 140 | (2) |
| Long-term debt: | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | |
| Senior floating . . . . . . . . . . | (601) | — | 14 | — | 5 | — | — | (582) | 15 |
| Of consolidated trusts . . . . . . . . | — | (77) | (1) | — | — | — | 9 | (2) | (71) | — |
| Total long-term debt . . . . . . . . . . | $ (601) | $ (77) | $ 13 | $ — | $ 5 | $ 9 | $ (2) | $ (653) | $ 15 |

---

[1]  Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. The transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A loans as well as Fannie Mae guaranteed mortgage-related securities. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

[2]  Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

[3]  Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitized trusts.

[4]  Issuances and settlements include activity related to the consolidation and deconsolidation of liabilities of securitized trusts.

TREASURY-1201

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive loss for the three months ended March 31, 2011 and 2010, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | For the Three Months Ended March 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary Impairments | Other | Total |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $135 | $(24) | $(17) | $ 3 | $ 97 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of March 31, 2011 . . . . . . . . . | $ — | $(33) | $ — | $— | $(33) |

| | For the Three Months Ended March 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary Impairments | Other | Total |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $111 | $133 | $(212) | $5 | $37 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of March 31, 2010 . . . . . . . . . | $ — | $ 83 | $ — | $1 | $84 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a recurring basis, as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. These valuation techniques are also used to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasuries, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1. If quoted market prices in active markets for identical assets are not available, we use prices provided by up to four third-party pricing services that are calibrated to the quoted market prices in active markets for similar securities, and assets valued in this manner are classified as Level 2. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or discounted cash flow models that use inputs such as spread, prepayment speed, yield, and loss severity based on market assumptions where available. Such instruments are generally classified as Level 2. Where there is limited activity or less transparency around inputs to the valuation, securities are classified as Level 3.

*Mortgage Loans Held for Investment "HFI"*—The majority of HFI performing loans and nonperforming loans that are not individually impaired are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We elected the fair value option for certain loans containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinate trust structures, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

133

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined from third-party pricing services and other observable market data as a base value, from which we add or subtract the fair value of the associated guaranty asset, guaranty obligation and master servicing arrangement. We classify these valuations primarily within Level 2 of the valuation hierarchy given that the market values of our Fannie Mae MBS are calibrated to the quoted market prices in active markets for similar securities. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3. Certain loans that do not qualify for Fannie Mae MBS securitization are valued using market-based data including, for example, credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure.

Fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. We calculate the fair value of nonperforming loans based on assumptions about key factors, including loan performance, collateral value, foreclosure related expenses, disposition timeline, and mortgage insurance repayment. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we compute a market calibrated fair value. The bids on sample loans are obtained from multiple active market participants. Fair value for loans that are four or more months delinquent, in an open modification period, or in a closed modification and that have performed for nine or fewer months, is estimated directly from a model calibrated to these indicative bids. Fair value for loans that are one to three months delinquent is estimated by an interpolation method using three inputs: (1) the fair value estimate as a performing loan; (2) the fair value estimate as a nonperforming loan; and (3) the delinquency transition rate corresponding to the loan's current delinquency status.

Fair value of a portion of our single-family nonperforming loans is measured using the value of the underlying collateral. These valuations leverage our proprietary distressed home price model. The model assigns a value using comparable transaction data. In determining what comparables to use in the calculations, the model measures three key characteristics relative to the target property: (1) distance from target property, (2) time of the transaction and (3) comparability of the nondistressed value. A portion of the nonperforming loans that are impaired is measured at fair value in our condensed consolidated balance sheets on a nonrecurring basis. These loans are classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

Fair value of multifamily nonperforming loans is determined by external third-party valuations when available. If third-party valuations are unavailable, we determine the value of the collateral based on a derived property value estimation method using current net operating income of the property and capitalization rates.

*Derivatives Assets and Liabilities (collectively "derivatives")*—Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification. Certain highly complex structured derivatives use only a single external source of price information due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as

134

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

well as significant assumptions, resulting in Level 3 classification. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2. Adjustments for market movement based on internal model results that cannot be corroborated by observable market data are classified as Level 3.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further haircut of the present value for liquidity considerations. This discount is based on market quotes from dealers.

The fair value of the guaranty assets include the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets. While the fair value of the guaranty assets reflect all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

*Debt*—The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2. When third-party pricing is not available, we use a discounted cash flow approach based on a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Given that the derivatives considered in the valuations of these structured debt instruments are classified as Level 3, the valuations of the structured debt instruments result in a Level 3 classification.

Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities." Certain consolidated MBS debt

135

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

*Nonrecurring Changes in Fair Value*

The following tables display assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment), and the gains or losses recognized for these assets and liabilities for the three months ended March 31, 2011 and 2010 as a result of fair value measurements.

| | Fair Value Measurements For the Three Months Ended March 31, 2011 | | | | For the Three Months Ended March 31, 2011 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $89 | $   131 | $   220 | $    (5) |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 27,265 | 27,265[(3)] | (1,014) |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . | — | — | 633 | 633[(3)] | (80) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 1,028 | 1,028[(3)] | (80) |
| Acquired property, net: | | | | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 12,114 | 12,114[(4)] | (811) |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 93 | 93[(4)] | (16) |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 1,402 | 1,402 | (30) |
| Total assets at fair value . . . . . . . . . . . . . . . . . . | $— | $89 | $42,666 | $42,755 | $(2,036) |

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements For the Three Months Ended March 31, 2010 | | | | For the Three Months Ended March 31, 2010 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Gains (Losses) |
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $6,690 | $    473 | $ 7,163[1][2] | $  (69)[2] |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 3,621 | 3,621[3] | 109 |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 1,089 | 1,089[3] | (91) |
| Acquired property, net: | | | | | |
| Single-family | — | — | 5,827 | 5,827[4] | (332) |
| Multifamily | — | — | 73 | 73[4] | (15) |
| Other Assets: | | | | | |
| Guaranty assets | — | — | 18 | 18 | (3) |
| Partnership investments | — | — | 69 | 69 | (63) |
| Total assets at fair value | $— | $6,690 | $11,170 | $17,860 | $(464) |

---

[1]   Includes $7.1 billion of mortgage loans held for sale that were sold, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of March 31, 2010.

[2]   Includes $7.1 billion of estimated fair value and $68 million in losses due to the adoption of the new accounting standards.

[3]   Includes $1.3 billion and $161 million of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of March 31, 2011 and 2010, respectively.

[4]   Includes $4.1 billion and $1.6 billion of acquired properties that were sold or transferred as of March 31, 2011 and 2010, respectively.

The following is a description of the fair valuation techniques we use for assets and liabilities measured at fair value on a nonrecurring basis under the accounting standard for fair value measurements as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. We also use these valuation techniques to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Mortgage Loans Held for Sale "HFS"*—HFS loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are described under "Mortgage Loans Held for Investment" and these loans are classified as Level 2 to the extent that significant inputs are observable. To the extent that significant inputs are unobservable or determined by extrapolation of observable points, the loans are classified within Level 3.

*Acquired Property, Net and Other Assets*—Acquired property, net mainly represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in

137

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

our condensed consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The fair value estimate is based on the best information available at the time of valuation. The hierarchy includes offers accepted, third-party interior appraisals, independent broker opinions, proprietary home price model values and exterior broker price opinions. Estimated cost to sell is based upon historical sales cost at a geographic level.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in other assets, are depreciated and are impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. Acquired property held for use is included in other assets in our condensed consolidated balance sheets. The fair value of our single-family foreclosed properties on an ongoing basis is determined using the same information hierarchy used at the point of initial fair value. The fair value of our multifamily properties is derived using third-party valuations. When third-party valuations are not available, we estimate the fair value using current net operating income of the property and capitalization rates.

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

*Fair Value of Financial Instruments*

The following table displays the carrying value and estimated fair value of our financial instruments as of March 31, 2011 and December 31, 2010. The fair value of financial instruments we disclose, includes commitments to purchase multifamily and single-family mortgage loans, which are off-balance sheet financial instruments that we do not record in our condensed consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial

TREASURY-1207

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2011 | | December 31, 2010 | |
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Financial assets:** | | | | |
| Cash and cash equivalents[1] | $ 56,561 | $ 56,561 | $ 80,975 | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 26,250 | 26,250 | 11,751 | 11,751 |
| Trading securities | 57,035 | 57,035 | 56,856 | 56,856 |
| Available-for-sale securities | 89,613 | 89,613 | 94,392 | 94,392 |
| Mortgage loans held for sale | 1,414 | 1,458 | 915 | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | |
| Of Fannie Mae | 348,644 | 313,172 | 358,698 | 319,367 |
| Of consolidated trusts | 2,599,999 | 2,618,736 | 2,564,107 | 2,610,145 |
| Mortgage loans held for investment | 2,948,643 | 2,931,908 | 2,922,805 | 2,929,512 |
| Advances to lenders | 3,091 | 2,940 | 7,215 | 6,990 |
| Derivative assets at fair value | 279 | 279 | 1,137 | 1,137 |
| Guaranty assets and buy-ups | 459 | 899 | 458 | 814 |
| Total financial assets | $3,183,345 | $3,166,943 | $3,176,504 | $3,183,342 |
| **Financial liabilities:** | | | | |
| Federal funds purchased and securities sold under agreements to repurchase | $ 25 | $ 25 | $ 52 | $ 51 |
| Short-term debt: | | | | |
| Of Fannie Mae | 147,092 | 147,133 | 151,884 | 151,974 |
| Of consolidated trusts | 5,156 | 5,156 | 5,359 | 5,359 |
| Long-term debt: | | | | |
| Of Fannie Mae | 614,095 | 633,150 | 628,160 | 649,684 |
| Of consolidated trusts | 2,442,433 | 2,530,474 | 2,411,597 | 2,514,929 |
| Derivative liabilities at fair value | 941 | 941 | 1,715 | 1,715 |
| Guaranty obligations | 760 | 3,427 | 769 | 3,854 |
| Total financial liabilities | $3,210,502 | $3,320,306 | $3,199,536 | $3,327,566 |

[1] Includes restricted cash of $36.7 billion and $63.7 billion as of March 31, 2011 and December 31, 2010, respectively.

The following are valuation techniques for items not subject to the fair value hierarchy either because they are not measured at fair value other than for the purpose of the above table or because they are only measured at fair value at inception.

*Financial Instruments for which fair value approximates carrying value*—We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions) and the majority of advances to lenders.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates the fair value due to the short-term nature of the specific instruments. Other instruments include loans for which the

139

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

carrying value does not approximate fair value. These loans are valued using collateral values of similar loans as a proxy.

*Guaranty Obligations*—The fair value of all guaranty obligations ("GO"), measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. While the fair value of the GO reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our condensed consolidated balance sheets as a result of consolidating VIEs. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of March 31, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | **March 31, 2011** | | | **December 31, 2010** | | |
| | **Loans of Consolidated Trusts**[1] | **Long-Term Debt of Fannie Mae** | **Long-Term Debt of Consolidated Trusts**[2] | **Loans of Consolidated Trusts**[1] | **Long-Term Debt of Fannie Mae** | **Long-Term Debt of Consolidated Trusts**[2] |
| | **(Dollars in millions)** | | | | | |
| Fair value . . . . . . . . . . . . . . . . | $2,969 | $884 | $2,193 | $2,962 | $893 | $2,271 |
| Unpaid principal balance . . . . . . | 3,472 | 809 | 2,506 | 3,456 | 829 | 2,572 |

140

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

---

(1) Includes nonaccrual loans with a fair value of $242 million and $219 million as of March 31, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of March 31, 2011 is $216 million. Includes loans that are 90 days past due with a fair value of $365 million and $369 million as of March 31, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of March 31, 2011 is $253 million.

(2) Includes interest-only debt instruments with no unpaid principal balance and a fair value of $140 million and $151 million as of March 31, 2011 and December 31, 2010, respectively.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss for the periods ended March 31, 2011 and 2010.

| | For the Three Months Ended March 31, | | | |
| | 2011 | | | 2010 |
| | Loans | Long-Term Debt | Total Gains (Losses) | Long-Term Debt |
| | (Dollars in millions) | | | |
| Changes in instrument-specific credit risk | $(217) | $(4) | $(221) | $ 3 |
| Other changes in fair value | 65 | 33 | 98 | (27) |
| Fair value gains (losses), net | $(152) | $29 | $(123) | $(24) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

## 14.   Commitments and Contingencies

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. Litigation claims and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. The following describes our material legal proceedings, investigations and other matters.

For certain legal actions and proceedings we have established a reserve for probable losses where we can reasonably estimate such losses or ranges of losses. Based on our current knowledge and after consultation with counsel, we do not believe that such losses or ranges of losses will have a material adverse effect on our financial condition. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued. For certain other legal actions or proceedings, we cannot reasonably estimate such losses or ranges of losses, particularly for proceedings that are in their early stages of

TREASURY-1210

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

development, where plaintiffs seek substantial or indeterminate damages, or where there may be novel or unsettled legal questions relevant to the proceedings. For these matters, we have not established a reserve. Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the lawsuits described below, we believe we have valid defenses to the claims in these lawsuits and intend to defend these lawsuits vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

### In re Fannie Mae Securities Litigation

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case.

### 2008 Class Action Lawsuits

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—*In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings. On October 13, 2009, the Court entered an order allowing FHFA to intervene in *In re Fannie Mae 2008 Securities Litigation*.

### In re Fannie Mae 2008 Securities Litigation

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs purport to represent a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief.

142

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010. Defendants' motions for reconsideration were denied on April 11, 2011.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims, which are now fully briefed and remain pending.

*Comprehensive Investment Services v. Mudd, et al.*

On May 13, 2009, Comprehensive Investment Services, Inc. filed an individual securities action against certain of our former officers and directors, and certain of our underwriters in the Southern District of Texas. Plaintiff alleges violations of Section 12(a)(2) of the Securities Act of 1933; violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violation of § 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. The complaint seeks various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*.

*Smith v. Fannie Mae, et al.*

This action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters and is pending in the Southern District of New York where it is coordinated with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on April 19, 2011, which alleges, in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock, violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of § 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages.

143

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Investigation by the Securities and Exchange Commission*

On September 26, 2008, we received notice of an ongoing investigation into Fannie Mae by the SEC regarding certain accounting and disclosure matters. On January 8, 2009, the SEC issued a formal order of investigation. We are cooperating with this investigation.

*Investigation by the Department of Justice*

On September 26, 2008, we received notice of an ongoing federal investigation by the U.S. Attorney for the Southern District of New York into certain accounting, disclosure and corporate governance matters. In connection with that investigation, Fannie Mae received a Grand Jury subpoena for documents. That subpoena was subsequently withdrawn. However, we were informed that the Department of Justice was continuing an investigation and on March 15, 2010, we received another Grand Jury subpoena for documents. We are cooperating with this investigation.

144

### Item 3.   Quantitative and Qualitative Disclosures about Market Risk

Information about market risk is set forth in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management."

### Item 4.   Controls and Procedures

**Overview**

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

### Evaluation of Disclosure Controls and Procedures

*Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"). Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Deputy Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Deputy Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of March 31, 2011, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Deputy Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2011 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of March 31, 2011 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of March 31, 2011 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship.

### Description of Material Weakness

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

145

Management has determined that we continued to have the following material weakness as of March 31, 2011 and as of the date of filing this report:

- *Disclosure Controls and Procedures.*   We have been under the conservatorship of FHFA since September 6, 2008. Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

  Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of March 31, 2011 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Mitigating Actions Relating to Material Weakness**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10-Q for the quarter ended March 31, 2011 ("First Quarter 2011 Form 10-Q"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our First Quarter 2011 Form 10-Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the First Quarter 2011 Form 10-Q, and it was not aware of any material misstatements or omissions in the First Quarter 2011 Form 10-Q and had no objection to our filing the First Quarter 2011 Form 10-Q.

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

146

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, liquidity, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

**Changes in Internal Control over Financial Reporting**

Management is required to evaluate, with the participation of our Chief Executive Officer and Deputy Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. There have been no changes in our internal control over financial reporting since December 31, 2010 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

147

# PART II—OTHER INFORMATION

## Item 1.   Legal Proceedings

The information in this item supplements information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2010 Form 10-K. We also provide information regarding material legal proceedings in "Note 14, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can reasonably be estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our condensed consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described or incorporated by reference in this item or in our 2010 Form 10-K. We have recorded a reserve for legal claims related to those matters for which we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

## Item 1A.   Risk Factors

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2010 Form 10-K. This section supplements and updates that discussion and, for a complete understanding of the subject, you should read both together. Please also refer to "MD&A—Risk Management" in this report and in our 2010 Form 10-K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. However, these are not the only risks we face. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial. The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth and could cause our actual results to differ materially from our past results or the results contemplated by the forward-looking statements contained in this report.

***The future of our company is uncertain.***

There is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

On February 11, 2011, Treasury and HUD released a report to Congress on ending the conservatorships of the GSEs and reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report also addresses three options for a reformed housing finance system. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the

148

importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

In April 2011, in the House of Representatives, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee approved several bills relating to GSE operations. We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "MD&A—Legislative and Regulatory Developments—GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation may be insufficient to cover our obligations or aggregate liquidation preference on our preferred stock, or provide any proceeds to common shareholders.***

FHFA has an obligation to place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations for a period of 60 days after the filing deadline for our Form 10-K or Form 10-Q with the SEC. Because of the credit-related expenses we expect to incur on our legacy book of business and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid triggering FHFA's obligation. Although Treasury committed to providing us funds in accordance with the terms of the senior preferred stock purchase agreement, Treasury may not be able to make funds available to us within the required 60 days if providing the funds would cause the government to exceed its authorized debt ceiling. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the 2008 Reform Act (together, the "GSE Act"). Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

In the event of a liquidation of our assets, only after payment of the secured and unsecured claims against the company (including repaying all outstanding debt obligations), the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock.

TREASURY-1218

*A decrease in the credit ratings on our senior unsecured debt would likely have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements.*

Our borrowing costs and our access to the debt capital markets depend in large part on the high credit ratings on our senior unsecured debt. Credit ratings on our debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt. While there have been no changes in our credit ratings from December 31, 2010 to May 2, 2011, on April 20, 2011, Standard & Poor's revised its outlook on the debt issues of Fannie Mae to negative from stable. This action followed Standard & Poor's revision to the outlook of the U.S. government's long-term credit rating to negative from stable. Standard & Poor's noted that the ratings on Fannie Mae and other government-related entities are constrained by the long-term sovereign rating on the U.S. government and noted that it will not raise the outlooks or ratings on these entities above the U.S. government as long as the ratings and outlook on the U.S. remain unchanged. Standard & Poor's also stated that if it were to lower its ratings on the U.S. government, it would likely lower the ratings on the debt of Fannie Mae and other government-related entities. A reduction in our credit ratings would likely increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. It may also reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

*Deficiencies in servicer and law firm foreclosure processes and the resulting foreclosure pause may cause higher credit losses and credit-related expenses.*

A number of our single-family mortgage servicers temporarily halted foreclosures in the fall of 2010 in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process. This foreclosure pause could expand to additional servicers and states, and possibly to all or substantially all of our loans in the foreclosure process. Some servicers have lifted the foreclosure pause in some jurisdictions, while continuing the pause in others.

Although we cannot predict the ultimate impact of this foreclosure pause on our business at this time, we believe the pause has resulted in longer foreclosure timelines and higher credit-related expenses and will likely continue to do so. The foreclosure pause could negatively affect housing market conditions and delay the recovery of the housing market. This foreclosure pause may also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities.

The foreclosure process deficiencies have generated significant concern and are currently being reviewed by various government agencies and the attorneys general of all fifty states. Foreclosure process deficiencies could lead to expensive or time-consuming new regulation, such as new rules applicable to the foreclosure process recently issued by courts in some states. On April 13, 2011, federal banking regulators announced enforcement actions against fourteen mortgage servicers and their parent bank holding companies to address deficiencies and weaknesses identified in the regulators' review of the servicers' foreclosure processing. The enforcement actions require the servicers to correct deficiencies and make improvements in their servicing and foreclosure practices. The actions also require each servicer to hire an independent firm to conduct a comprehensive review of foreclosure actions pending during 2009 and 2010 to identify and provide remediation to borrowers who suffered financial injury as a result of wrongful foreclosures or other foreclosure process deficiencies.

The failure of our servicers or a law firm to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us. Depending on the duration and extent of the foreclosure pause and the foreclosure process deficiencies, and the responses to them, these matters could have a material adverse effect on our business.

150

***Challenges to the MERS® System could pose counterparty, operational, reputational and legal risks for us.***

MERSCORP, Inc. is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc., can serve as a nominee for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP, Inc.

Several legal challenges have been made disputing MERS's legal standing to initiate foreclosures and/or act as nominee in local land records. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions. In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. On April 13, 2011, federal banking regulators and FHFA announced that they were taking enforcement action against MERS to address significant weaknesses in, among other things, oversight, management supervision and corporate governance at MERS that were uncovered as part of the regulators' review of mortgage servicers' foreclosure processing. Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational, reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to MERS or the impact on our business, results of operations and financial condition.

### Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds

**Recent Sales of Unregistered Securities**

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Plans"). During the quarter ended March 31, 2011, 73,094 restricted stock units vested, as a result of which 48,419 shares of common stock were issued, and 24,675 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting. All of these restricted stock units were granted prior to our entering into conservatorship. Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders. All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae.

During the quarter ended March 31, 2011, 154 shares of common stock were issued upon conversion of 100 shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, at the option of

TREASURY-1220

the holders pursuant to the terms of the preferred stock. All series of preferred stock, other than the senior preferred stock, were issued prior to September 7, 2008.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act of 1933 with respect to our securities offerings.

**Information about Certain Securities Issuances by Fannie Mae**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this report.

**Our Purchases of Equity Securities**

The following table shows shares of our common stock we repurchased during the first quarter of 2011.

| Period | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2011** | | | | |
| January 1-31 . . . . . . . . . . . . . . . . . . . . . . | 294 | $0.52 | — | — |
| February 1-28 . . . . . . . . . . . . . . . . . . . . . | 23 | 0.59 | — | — |
| March 1-31 . . . . . . . . . . . . . . . . . . . . . . . | 1 | 0.55 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 318 | | | |

TREASURY-1221

_____

(1) Consists of shares of common stock reacquired from employees to pay an aggregate of $167,443 in withholding taxes due upon the vesting of previously issued restricted stock. Does not include 100 shares of 8.75% Non-Cumulative Mandatory Convertible Series 2008-1 Preferred Stock received from holders upon conversion of those shares into 154 shares of common stock.

(2) We no longer have any publicly announced share repurchase programs under which we could purchase our common stock.

**Dividend Restrictions**

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock.

*Restrictions under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

**Item 3.   Defaults Upon Senior Securities**

None.

**Item 4.   [Removed and reserved]**

**Item 5.   Other Information**

None.

**Item 6.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

TREASURY-1222

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By: /s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: May 6, 2011

By: /s/   David C. Hisey

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Date: May 6, 2011

154

## INDEX TO EXHIBITS

| Item | Description |
|------|-------------|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 4.1 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series D (Incorporated by reference to Exhibit 4.1 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.2 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series E (Incorporated by reference to Exhibit 4.2 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.3 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series F (Incorporated by reference to Exhibit 4.3 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.4 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series G (Incorporated by reference to Exhibit 4.4 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.5 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series H (Incorporated by reference to Exhibit 4.5 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.6 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series I (Incorporated by reference to Exhibit 4.6 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.7 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series L (Incorporated by reference to Exhibit 4.7 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.8 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series M (Incorporated by reference to Exhibit 4.8 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.9 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series N (Incorporated by reference to Exhibit 4.9 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.10 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Convertible Preferred Stock, Series 2004-1 (Incorporated by reference to Exhibit 4.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.11 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series O (Incorporated by reference to Exhibit 4.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.12 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series P (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed September 28, 2007.) |
| 4.13 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series Q (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 5, 2007.) |
| 4.14 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series R (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed November 21, 2007.) |
| 4.15 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series S (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 11, 2007.) |
| 4.16 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 14, 2008.) |
| 4.17 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series T (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 19, 2008.) |

E-1

| Item | Description |
|------|-------------|
| 4.18 | Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Incorporated by reference to Exhibit 4.2 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.) |
| 4.19 | Warrant to Purchase Common Stock, dated September 7, 2008 (Incorporated by reference to Exhibit 4.3 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.) |
| 4.20 | Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 2008.) |
| 4.21 | Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.) |
| 4.22 | Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.) |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Deputy Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Deputy Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |

* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

TREASURY-1225

Exhibit 31.1

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Michael J. Williams, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: May 6, 2011

TREASURY-1226

Exhibit 31.2

CERTIFICATION

PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, David C. Hisey, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   David C. Hisey

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Date: May 6, 2011

**Exhibit 32.1**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/   Michael J. Williams
_____
Michael J. Williams
President and Chief Executive Officer


Dated: May 6, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David C. Hisey, Executive Vice President and Deputy Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/   David C. Hisey
_____

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Dated: May 6, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.



FR006

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended March 31, 2011**

**or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from          to**

**Commission File Number: 000 53330**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | |
|---|---|
| **Federally chartered corporation** | **52-0904874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8200 Jones Branch Drive, McLean, Virginia** | **22102 3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(703) 903-2000**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 3 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, eve y Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☐ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non accelerated filer, or a smaller reporting company  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 2b 2 of the Exchange Act

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ |
| Non accelerated filer (Do no check f a smalle epo ng company) ☐ | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 2b 2 of the Exchange Act).  ☐ Yes ☒ No

As of April 22, 2011, there were 649,688,423 shares of the registrant's common stock outstanding.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item | Financial Statements | 91 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
|  | Executive Summary | 1 |
|  | Selected Financial Data | 12 |
|  | Consolidated Results of Operations | 3 |
|  | Consolidated Balance Sheets Analysis | 29 |
|  | Risk Management | 43 |
|  | Liquidity and Capital Resources | 73 |
|  | Fair Value Measurements and Analysis | 78 |
|  | Off Balance Sheet Arrangements | 80 |
|  | Critical Accounting Policies and Estimates | 81 |
|  | Forward Looking Statements | 81 |
|  | Risk Management and Disclosure Commitments | 83 |
|  | Legislative and Regulatory Matters | 83 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 87 |
| Item 4 | Controls and Procedures | 89 |
| **PART II** | **OTHER INFORMATION** | |
| Item | Legal Proceedings | 166 |
| Item A | Risk Factors | 166 |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | 167 |
| Item 6 | Exhibits | 167 |
| **SIGNATURES** |  | 168 |
| **GLOSSARY** |  | 169 |
| **EXHIBIT INDEX** |  | E |

i                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011
TREASURY-1232
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## MD&A TABLE REFERENCE

| Table | Descrip ion | Page |
|---|---|---|
| | Selected Financial Data | 12 |
| 1 | Total Single Family Loan Workout Volumes | 3 |
| 2 | Single Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage Related Investments Po tfolio | 11 |
| 5 | Summary Consolidated Statements of Income and Comprehensive Income | 3 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 4 |
| 7 | Derivative Gains (Losses) | 16 |
| 8 | Other Income | 17 |
| 9 | Non Interest Expense | 18 |
| 0 | REO Operations Expense, REO Inventory, and REO Dispositions | 18 |
| 11 | Segment Mortgage Portfolio Composition | 21 |
| 12 | Segment Earnings and Key Metrics     Investments | 22 |
| 3 | Segment Earnings and Key Metrics     Single Family Guarantee | 24 |
| 4 | Segment Earnings Composition     Single Family Guarantee Segment | 25 |
| 15 | Segment Earnings and Key Metrics     Multifamily | 27 |
| 16 | Investments in Securities | 30 |
| 17 | Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets | 3 |
| 18 | Total Mortgage Related Securities Purchase Activity | 32 |
| 19 | Non Agency Mortgage Related Securities Backed by Subprime First Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics | 33 |
| 20 | Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans | 33 |
| 21 | Net Impairment on Available For Sale Mortgage Related Securities Recognized in Earnings | 34 |
| 22 | Ratings of Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans, and CMBS | 36 |
| 23 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 37 |
| 24 | Derivative Fair Values and Maturities | 39 |
| 25 | Changes in Derivative Fair Values | 40 |
| 26 | Freddie Mac Mortgage Related Securities | 42 |
| 27 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 43 |
| 28 | Mortgage Insurance by Counterparty | 47 |
| 29 | Monoline Bond Insurance by Counterparty | 48 |
| 30 | Derivative Counterparty Credit Exposure | 50 |
| 3 | Characteristics of the Single Family Credit Guarantee Portfolio | 53 |
| 32 | Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio | 5 6 |
| 33 | Multifamily Mortgage Portfolio     by Attribute | 57 |
| 34 | Single Family Home Affordable Modification Program Volume | 5 9 |
| 35 | Single Family Refinance Loan Volume | 60 |
| 36 | Single Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes | 62 |
| 37 | Reperformance Rates of Modified Single Family Loans | 63 |
| 38 | Delinquency Rates | 64 |
| 39 | Credit Concentrations in the Single Family Credit Guarantee Portfolio | 6 5 |
| 40 | Single Family Credit Guarantee Portfolio by Attribute Combinations | 6 6 |
| 4 | Single Family Credit Guarantee Portfolio by Year of Loan Origination | 68 |
| 42 | Non Performing Assets | 6 9 |
| 43 | REO Activity by Region | 70 |
| 44 | Credit Loss Performance | 71 |
| 45 | Single Family Credit Loss Sensitivity | 72 |
| 46 | Other Debt Security Issuances by Product, at Par Value | 75 |
| 47 | Other Debt Security Repurchases, Calls, and Exchanges | 76 |
| 48 | Freddie Mac Credit Ratings | 76 |
| 49 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 78 |
| 50 | Summary of Change in the Fair Value of Net Assets | 80 |
| 51 | PMVS Results | 88 |
| 52 | Derivative Impact on PMVS L (50 bps) | 88 |

ii                                                                *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 92 |
| Freddie Mac Consolidated Balance Sheets | 93 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 94 |
| Freddie Mac Consolidated Statements of Cash Flows | 95 |
| Note 1: Summary of Significant Accounting Policies | 96 |
| Note 2: Conservatorship and Related Matters | 97 |
| Note 3: Variable Interest Entities | 00 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 105 |
| Note 5: Individually Impaired and Non Performing Loans | 109 |
| Note 6: Real Estate Owned | 112 |
| Note 7: Investments in Securities | 113 |
| Note 8: Debt Securities and Subordinated Borrowings | 121 |
| Note 9: Financial Guarantees | 123 |
| Note 0: Retained Interests in Mortgage Related Securitizations | 125 |
| Note 11: Derivatives | 125 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 129 |
| Note 3: Income Taxes | 30 |
| Note 4: Employee Benefits | 131 |
| Note 5: Segment Reporting | 131 |
| Note 16: Regulatory Capital | 135 |
| Note 17: Concentration of Credit and Other Risks | 136 |
| Note 18: Fair Value Disclosures | 43 |
| Note 9: Legal Contingencies | 159 |
| Note 20: Earnings (Loss) Per Share | 164 |
| Note 2 : Selected Financial Statement Line Items | 165 |

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1234

## PART I   FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day to day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS   Conservatorship and Related Matters" in our Annual Report on Form 10 K for the year ended December 31, 2010, or 2010 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10 Q includes forward looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward looking statements are made as of the date of this Form 10 Q and we undertake no obligation to update any forward looking statement to reflect events or circumstances after the date of this Form 10 Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A   FORWARD LOOKING STATEMENTS," and "RISK FACTORS" in this Form 10 Q and in the comparably captioned sections of our 2010 Annual Report; and (b) the "BUSINESS" section of our 2010 Annual Report.*

*Throughout this Form 10 Q, we use certain acronyms and terms which are defined in the Glossary.*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three months ended March 31, 2011, included in "FINANCIAL STATEMENTS," and our 2010 Annual Report.*

## EXECUTIVE SUMMARY

**Overview**

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures Taken together, we believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure

**Summary of Financial Results**

Our financial performance in the first quarter of 2011 improved compared to the first quarter of 20 0, even though we continued to be impacted by the ongoing weakness in the economy, including the mortgage market  Our total comprehensive income (loss) was $2.7 billion and $(1.9) billion for the first quarters of 2011 and 2010, respectively, consisting of: (a) a net income (loss) of $676 million and $(6.7) billion, respectively, reflecting reductions in both derivative losses and provision for credit losses in the first quarter of 2011 compared to the first quarter of 2010; and (b) $2.1 billion and $4.8 billion of changes in AOCI, respectively, primarily resulting from improved fair values on available for sale securities

Our total equity was $1.2 billion at March 31, 2011 reflecting total comprehensive income of $2 7 billion during the first quarter of 2011, partially offset by our dividend payment of $1.6 billion on our senior preferred stock on March 31, 2011. As a result of our positive net worth at March 31, 2011, FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement

Also contributing to total equity was cash proceeds received of $500 million from a draw under Treasury's funding commitment on March 31, 2011, related to our deficit in net worth at December 31, 2010  As a result of this draw from Treasury under the Purchase Agreement, the aggregate liquidation preference of Treasury's senior preferred stock increased to $64.7 billion at March 31, 2011.

TREASURY-1235

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 04, 2011                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Our Primary Business Objectives**

Under conservatorship, we are focused on: (a) meeting the needs of the U S residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency  Our business objectives reflect, in part, direction we have received from the Conservator  We also have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator  For more information, see "BUSINESS    Conservatorship and Related Matters   *Impact of Conservatorship and Related Actions on Our Business*" in our 2010 Annual Report

*Providing Mortgage Liquidity and Conforming Loan Availability*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

•  Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year f xed-rate mortgage which represents the foundation of the mortgage market

•  Our support provides lenders with a constant source of liquidity  We estimate that we, Fannie Mae, and Ginnie Mae collectively continued to guarantee more than 90% of the single family conforming mortgages originated during the first quarter of 2011.

•  Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards  We believe this provides our customers with confidence to continue lending in diff cult environments

•  We are an important counter cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years

During the first quarter of 2011, we guaranteed $95.7 billion in UPB of single family conforming mortgage loans representing more than 430,000 borrowers who purchased homes or refinanced their mortgages  Relief refinance mortgages with LTV ratios of 80% and above represented approximately 5% of our total single family credit guarantee portfolio purchases in the first quarter of 2011.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae  Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE guaranteed mortgage related securities  Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds  We estimate that prior to 2007 the average effective interest rates on conforming single family mortgage loans were about 30 basis points lower than on non conforming loans  Since 2007, there have been fewer sources of mortgage funds, and we estimate that interest rates on conforming loans, excluding conforming jumbo loans, have been lower than those on non conforming loans by as much as 184 basis points  In March 20  , we estimate that borrowers were paying an average of 61 basis points less on these conforming loans than on non conforming loans  These estimates are based on data provided by HSH Associates, a third party provider of mortgage market data.

*Reducing Foreclosures and Keeping Families in Homes*

We are focused on reducing the number of foreclosures and helping to keep families in their homes  In addition to our participation in HAMP, we introduced several new initiatives during the housing crisis to help eligible borrowers, including our relief refinance mortgage initiative, which is our implementation of HARP  In the first quarter of 2011, we helped more than 62,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout programs. In March 2011, FHFA announced it had extended HARP to June 30, 20 2 for qualifying borrowers  Table 1 presents our recent single family loan workout activities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 1    Total Single Family Loan Workout Volumes(1)**

| | 03/31/2011 | 12/31/2010 | or the Three Months nded 09/30/2010 | 06/30/2010 | 03/31/2010 |
|---|---|---|---|---|---|
| | | | (number of loans) | | |
| Loan mod f ca ons | 35,158 | 37,203 | 39,284 | 49,562 | 44,228 |
| Repaymen p ans | 9,099 | 7,964 | 7,030 | 7,455 | 8,761 |
| Fo bea ance ag eemen s(2 | 7,678 | 5,945 | 6,976 | 12,815 | 8,858 |
| S o sa es a d deed- n-l eu  ansac ons | 10,706 | 12,097 | 10,472 | 9,542 | 7,064 |
| To al s ngle-fam ly loan wo kou s | 62,641 | 63,209 | 63,762 | 79,374 | 68,911 |

(1) Based on ac  ons comple ed w h bo owe s fo loans w h n ou  s ngle-fam ly ced  gua an ee po fol o  Excludes  hose mod f ca on,  epaymen , and fo bea ance
    ac v es fo wh ch  e o owe ass a  ed e  ed ep ocess,    ea o s  ave o bee  ade pe  a e ,  o effec ve, s c as oa s     e  a pe od unde
    HAMP  A so exc udes ce  a n oan wo kou s whe  ou  s ngle-fam ly selle /se v ce s have execu ed ag ee  en s n  ec  en o po e pe  ods, b  ese  ave no
    been  nco po a ed n o ce a n of ou  ope a ona sys ems, due  o de ays n p ocess ng  These a  ay a s  exclus ve and a  nan  s  one ca ego y may also
    be  c  ded w    ano he  ca ego y n  he same pe  od
(2) Excludes loans w h  long- e m fo bea ance unde  a comp e  ed loan mod f ca  on  Many bo  owe s comple e a sho  - e m fo bea ance ag eemen befo e ano he  loan
    wo ko   s  p s ed o co  p e ed  We only  epo  fo bea ance ac  v y fo  a s ngle loan once du  ng each qua  e  y pe  od  howeve , a s ng e oan  ay be  nc uded
    unde  sepa a e fo bea ance ag eemen s n sepa a e  pe  ods

We continue to execute a high volume of loan workouts  Highlights of these efforts include the following:

- We completed 62,641 single family loan workouts during the  first quarter of 2011, including 35,158 loan modifications  and 10,706 short sales and deed in  lieu transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 119,690 loan modifications  under HAMP from the introduction of the initiative in 2009  through March 31, 2011 and, as of March 31, 2011, 19,897 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under  the trial period)

In addition to these efforts, we continue to focus on assisting  consumers through outreach and other efforts  These efforts included: (a) meeting with borrowers nationwide in  foreclosure prevention workshops; (b) operating a Borrower  Help Network to provide distressed borrowers with free one-on-one counseling; and (c) in instances where foreclosure  has  occurred, allowing affected families who qualify to rent back their homes for a limited period of time  In recent periods, we  also increased our efforts to directly assist our servicers by  increasing our servicing staff.

For more information about HAMP, other loan workout programs,  and our relief refinance mortgage initiative, and other options  to help eligible borrowers, see "RISK MANAGEMENT      Credit Risk      *Mortgage Credit Risk    Portfolio Management Activities      MHA Program*" and "  *Loan Workout Activities.*"

*Minimizing Credit Losses*

We establish guidelines for our servicers to follow and provide  them default management tools to use, in part, in determining  which type of loan workout would be expected to provide the best  opportunity for minimizing our credit losses  We require our single family seller/servicers to first evaluate problem loans  for possible modification under HAMP before considering other  workout alternatives  If a borrower is not eligible for a modification under HAMP, our seller/servicers pursue other  workout options before considering foreclosure

To help minimize the credit losses related to our guarantee  activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure  alternatives, in an effort to reduce the severity of losses we  incur;

- managing foreclosure timelines to the extent possible, given  elongated state timelines;

- managing our inventory of foreclosed properties to reduce costs  and maximize proceeds; and

- pursuing contractual remedies against originators, lenders,  servicers, and insurers, as appropriate.

We have contractual arrangements with our seller/servicers under  which they agree to provide us with mortgage loans that have  been originated under specified underwriting standards  If we  subsequently discover that contractual standards were not  followed, we can exercise certain contractual remedies to mitigate  our credit losses  These contractual remedies include  requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized  with respect to the loan. As of March 31, 2011, the UPB of loans  subject to repurchase requests issued to our single family  seller/servicers was approximately $3 4 billion, and  approximately 38% of these requests were outstanding for more  than four months since issuance of our initial repurchase  request  The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily  because many of these requests will likely be satisfied by  reimbursement of our realized losses by seller/servicers, or may  be rescinded in the course of the contractual appeals process  During 20  0, we entered into agreements with certain of our seller/servicers to release specified loans in

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

their portfolios from certain repurchase obligations in exchange for one time cash payments  We may enter into similar agreements  or seek other remedies in the future  See "RISK MANAGEMENT     Credit Risk      *Institutional Credit Risk     Mortgage Seller/Servicers*" for further information on our agreements with our seller/servicers

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary  mo tgage insurance is required to be purchased, at the  borrower's expense, for certain mortgages with higher LTV ratios  We received payments under primary and other mortgage insurance of $587 million and $294 million in the  first quarter of 2011 and 2010, respectively, which helped to mitigate our credit losses

In February 2011, FHFA directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop, consistent requirements, policies and processes for the  servicing of non performing loans  This directive was designed  to create greater consistency in servicing practices and to  build on the best practices of each of the GSEs. Pursuant to  this directive, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie  Mae, which are designed to help servicers do a better job of engaging with homeowners and to bring greater accountability to  the servicing industry  The aligned requirements include earlier and more frequent communication with borrowers, consistent  requirements for collecting documents from borrowers, consistent  timelines for responding to borrowers, a consistent approach to  modifications, and consistent timelines for processing  foreclosures  This initiative will result in the alignment of the processes for both HAMP and non HAMP workout solutions, and  will be implemented over the course of 20     We believe this effort will result in certain changes in our non HAMP loan  modification processes which may temporarily result in delays in  these activities while the changes are implemented by us and our  servicers  Servicers will also be subject to incentives and  sanctions with respect to performance under these standards.  Ultimately, we expect this effort will help streamline loss  mitigation processes for servicers and delinquent borrowers, give servicers consistent guidance to help improve their  servicing performance, and lay the foundation for industry  benchmarks for responsible servicing that will benefit the  housing finance system, servicers and consumers.

### *Maintaining the Credit Quality of New Loan Purchases and  Guarantees*

We continue to focus on maintaining underwriting standards that  allow us to purchase and guarantee loans made to qualified  borrowers that we believe will provide management and guarantee  fee income, over the long term, that exceeds our anticipated  credit related and administrative expenses on such loans

As of March 31, 2011, more than 40% of our single family  credit guarantee portfolio consisted of mortgage loans  originated after 2008 Loans in our single family credit  guarantee portfolio originated after 2008 have experienced  better serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008

We believe the credit quality of the single family loans we have  acquired in the first quarter of 2011 (excluding relief refinance mortgages, which represented approximately 30% of our  single family purchase volume during the quarter) is  significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and income documentation standards. The substantial majority of the single family mortgages we purchased in the first quarter of 20     were 30-year and 15 year fixed rate mortgages  Approximately 85% of our single family loan purchases in the first quarter of 2011 were refinance  mortgages  Relief refinance mortgages with LTV ratios of 80% and above (which we refer to as HARP loans), may not perform as well  as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans

Table 2 presents the composition, loan characteristics, and  serious delinquency rates of loans in our single family credit  guarantee portfolio, by year of origination at March 31, 2011.

<div align="center">4</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 2      Single Family Credit Guarantee Portfolio Data by Year of Origination**[1]

| | At March 31, 2011 | | | | |
|---|---|---|---|---|---|
| | % of Portfolio | Average Credit Score[2] | Original LTV Ratio | Current LTV Ratio[3] | Serious Delinquency Rate[4] |
| **Year of Origination** | | | | | |
| 2011 | 2% | 752 | 70% | 68% | % |
| 2010 | 20 | 755 | 70 | 70 | 0 07 |
| 2009 | 21 | 755 | 68 | 71 | 0 31 |
| 2008 | 8 | 727 | 74 | 88 | 4 91 |
| 2007 | 11 | 707 | 77 | 107 | 11 26 |
| 2006 | 8 | 711 | 75 | 106 | 10 34 |
| 2005 | 9 | 718 | 73 | 92 | 6 05 |
| 2004 and prior | 21 | 721 | 71 | 59 | 2 47 |
| Total | 100% | 734 | 71 | 78 | 3 63 |

(1) Based on the single-family credit guarantee portfolio, which totaled $1,815 billion at March 31, 2011, and excludes self-financed mortgage loans
(2) Based on FICO credit scores of the borrower as of the date of loan origination and may not be indicative of the borrower's credit worthiness at March 31, 2011
(3) We use an average value based upon adjusted average of property values and the ope yan origination based on changes in the market value of homes since origination
(4) See "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk   Credit Performance*   Delinquencies" for further information about our exposure to serious delinquency rates

During the first quarter of 20  , the guarantee related revenue from the mortgage guarantees issued after 2008 exceeded the credit related and administrative expenses associated with these guarantees  Credit related expenses consist of our provision for credit losses and REO operations expense  Mortgages originated after 2008 represent an increasingly large proportion of our single family credit guarantee portfolio, as the amount of older vintages in the portfolio, which have a higher composition of loans with higher risk characteristics, continues to decline due to liquidations, which include payoffs, repayments, refinancing activity, and foreclosures  We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit related expenses of our single family credit guarantee portfolio  However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity  See "Table 14   Segment Earnings Composition   Single Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year

### Strengthening Our Infrastructure and Improving Overall Efficiency

We are working with our Conservator to both enhance the value of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. As such, we are investing considerable resources in an effort to improve our existing systems infrastructure. This long term project will likely take several years to fully implement and focuses on making significant improvements to our systems infrastructure in order to: (a) improve risk management; (b) enhance the service we provide to our customers; and (c) improve operational efficiency  At the end of this effort, we expect to have an infrastructure in place that is more efficient, flexible and well controlled which will assist us in our continued efforts to focus on reducing administrative expenses and other cost reduction measures

We continue to actively monitor our general and administrative expenses, while also continuing to focus on retaining key talent  During the full year of 2010, we reduced our administrative expenses by $88 million, despite increasing the number of employees in our non performing asset management group  Our general and administrative expenses continued to decline in the first quarter of 2011

### Single Family Credit Guarantee Portfolio

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single family loans of approximately $64.3 billion, and have recorded an additional $4.6 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008  While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus have not been provisioned for, we believe, as of March 31, 2011, that we have reserved for or charged off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations

Source   DRA HOM  OAN MORTGAG  CORP, 10 Q, May 04, 2011

TREASURY-1239

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of our single family credit guarantee portfolio increased slightly during the first quarter of 2011 to $1,815 billion at March 31, 2011 from $1,809 billion at December 31, 2010, since new loan purchase and guarantee activity exceeded the amount of liquidations. Table 3 provides certain credit statistics for our single family credit guarantee portfolio

### Table 3    Credit Statistics, Single Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 |
| Pay e s a s | | | | | |
| One on pas due | 1 75% | 2 07% | 2 11% | 2 02% | 1 89% |
| Two o s pas d e | 0 65% | 0 78% | 0 80% | 0 77% | 0 79% |
| Se ous y de nquen (1 | 3 63% | 3 84% | 3 80% | 3 96% | 4 13% |
| Non-pe fo m ng loans ( n mi ions)(2 | $115,083 | $115,478 | $112,746 | $111,758 | $110,079 |
| S ngle-fam ly loan loss ese ve ( n mi ions)(3 | $38,558 | $ 39,098 | $ 37,665 | $ 37,384 | $ 35,969 |
| REO nven o y ( n p ope es) | 65,159 | 72,079 | 74,897 | 62,178 | 53,831 |
| REO asse s, ne ca y ng va ue ( n m ons) | $  6,261 | $  6,961 | $  7,420 | $  6,228 | $  5,411 |

| | or the Three Months nded | | | | |
|---|---|---|---|---|---|
| | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 |
| | (in units, unless noted) | | | | |
| Se ous y de nquen oan add ons(1 | 97,646 | 113,235 | 115,359 | 123,175 | 150,941 |
| Loan mod ca ons( | 35,158 | 37,203 | 39,284 | 49,562 | 44,228 |
| Fo ec osu e s a s ra o( | 0 58% | 0 73% | 0 75% | 0 61% | 0 64% |
| REO acqu s ons | 24,707 | 23,771 | 39,053 | 34,662 | 29,412 |
| REO d spos on seve y a o (7 | | | | | |
| Ca fo n a | 44 5% | 43 9% | 41 9% | 42 0% | 43 9% |
| F o da | 54 8% | 53 0% | 54 9% | 53 8% | 56 2% |
| A zona | 50 8% | 49 5% | 46 6% | 44 3% | 45 3% |
| Nevada | 53 1% | 53 1% | 51 6% | 49 4% | 50 7% |
| M ch gan | 48 3% | 49 7% | 49 2% | 47 2% | 47 6% |
| To a U S | 43 0% | 41 3% | 41 5% | 39 2% | 40 5% |
| S ng e-fam y c ed osses ( n m ons) | $  3,226 | $  3,086 | $  4,216 | $  3,851 | $  2,907 |

(1) See "RISK MANAGEMENT   C ed t R sk   *Mortgage Credit Risk   Credit Performance   Delinquencies*" fo f e nfo ma on abou ou epo ed se ous de q e cy a es

(2) Cons s s of he UPB of loans n ou s ngle-fam ly c ed gua an ee po fo o ha have unde gone a TDR o ha a e se ous y de nquen

(3) Cons s s of he comb na on of (a) ou allowance fo loan losses on mo gage loans held fo nves men and (b) ou ese ve fo gua an ee osses assoc a ed w h non-consol da ed s ngle-fam ly mo gage secu za on us s and o he gua an ee comm men s

(4) Rep esen s he numbe of comple ed mod f ca ons unde ag eemen w h he bo owe du ng he qua e Exc udes to deo ba ance ag ee en s, epay en p ans, and oans n he a pe od unde HAMP

(5) Rep ese s e a o of e be of oa s a e eed c ed gua an ee po fo o a he end of eq a e Exc des O e G a an ee T a sac o s and mo gages cove ed unde o he gua an ee comm men s

(6) Ou REO acqu s on vo ume empo a y s owed n he fou h q a e of 2010 and f s q a e of 2011 d e o de ays n e fo ec osu e p ocess, nc ud ng de ays e a ed o conce ns abou def c enc es n fo ec osu e docume a on p ac ces, wh ch educed ou c ed osses fo hese pe ods

(7) Ca cu a ed as he amoun of ou osses eco ded on d spos on of REO p ope es ove a epo ted vequa e y pe od, exc d g oss s bjec o ep c ase eq es s ade o o se e /se v ces, d v ded by he agg ega e UPB of he e a ed loans The amoun of losses ecogn zed on d spos on of he p ope es equa o e a o by w c e UPB of e oa s exceeds he amoun of sales p oceeds f om d spos on of he p ope es Exc udes sa es comm ss ons and o he expenses, s c as p ope y ma n enance and cos s, as we as app cab e ecove es f om c ed enhancemen s, such as mo gage nsu ance

The number of new serious delinquencies (*i.e.*, seriously delinquent loan additions) declined in each of the last five quarters; however, our single family credit guarantee portfolio continued to experience a high level of serious delinquencies and foreclosures in the first quarter of 2011 as compared to periods before 2009 Our servicers generally resumed foreclosures and we fully resumed marketing and sales of REO properties during the first quarter of 2011, which led to a high REO disposition volume during the quarter Our REO inventory (measured in properties) declined in each of the last two quarters. The UPB of our non performing loans also declined in the first quarter of 2011. This was the first decline in non performing loans since the first half of 2006 However, the credit losses from our single family credit guarantee portfolio we e higher in the first quarter of 2011 than the first quarter of 2010, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives These actions relate to our continued efforts to resolve our significant inventory of seriously delinquent loans. This inventory accumulated in prior periods due to the lengthening in the foreclosure and modification timelines caused by various suspensions of foreclosure transfers, process requirements for HAMP, and constraints in servicers' capabilities to process large volumes of problem loans Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans still in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                     TREASURY-1240

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Continued negative impact of certain loan groups within the single family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses

- Continued decline in national home prices, based on our own index, which resulted in continued high loss severity ratios on our dispositions of REO inventory

We believe our REO disposition severity ratio was impacted in the fourth quarter of 2010 and, to a lesser extent in the first quarter of 2011, particularly in the state of Florida, by temporary suspensions of REO sales by us and our seller/servicers in the latter part of 20 0 related to concerns about deficiencies in foreclosure documentation practices  See "Mortgage Market and Economic Conditions    Concerns Regarding Deficiencies in Foreclosure Documentation Practices" for further information

Some of our loss mitigation activities create fluctuations in our delinquency statistics  For example, single family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Performance    Delinquencies*" for further information about factors affecting our reported delinquency rates

## Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator

On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our net worth deficit as of December 31, 2010. This draw increased the aggregate liquidation preference of the senior preferred stock to $64.7 billion at March 31, 2011 from $64.2 billion at December 31, 2010. At March 31, 2011, our assets exceeded our liabilities under GAAP by $1 2 billion; therefore FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement

We pay cash dividends to Treasury at an annual rate of 10%. We have paid cash dividends to Treasury of $11.6 billion life to date, an amount equal to  8% of our aggregate draws under the Purchase Agreement. As of March 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock of $6.5 billion exceeded our annual historical earnings in all but one period  As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Neither the U S government nor any other agency or instrumentality of the U S government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations

For more information on conservatorship and the Purchase Agreement, see "BUSINESS    Conservatorship and Related Matters" in our 20 0 Annual Report

## Consolidated Financial Results

Net income (loss) was $0.7 billion and $(6.7) billion for the first quarters of 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the first quarter of 2011 increased slightly to $4.5 billion from $4.1 billion in the first quarter of 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage related securities and mortgage loans

TREASURY-1241

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Provision for credit losses for the first quarter of 2011 decreased to $2.0 billion, compared to $5.4 billion for the first quarter of 2010 The provision for credit losses in the first quarter of 2011 primarily reflects a decline in the number of delinquent loan inflows, and a decline in the rate at which seriously delinquent loans ultimately transition to a loss event The provision for credit losses in the first quarter of 20 0 reflected increases in non performing loans and serious delinquency rates in that period

- Non interest income (loss) was $(1 3) billion for the first quarter of 2011, compared to $(4.9) billion for the first quarter of 2010. This improvement was primarily due to significantly lower losses on derivatives in the first quarter of 2011, compared to the first quarter of 2010, attributable to the impact of a slight increase in interest rates during the first quarter of 2011 as compared to a decline in interest rates during the first quarter of 2010 The decline in derivative losses was partially offset by higher impairments on mortgage-re ated securities recognized in earnings in the first quarter of 2011 compared to the first quarter of 2010

- Non interest expense was $0 7 billion in both the first quarter of 2011 and the first quarter of 2010, and reflects increased REO operations expense partially offset by a decline in administrative expenses in the 2011 period, compared to the 20 0 period

- Total comprehensive income (loss) was $2 7 billion for the first quarter of 2011 compared to $(1.9) billion for the first quarter of 2010. Total comprehensive income for the first quarter of 2011 reflects the net result of the $0 7 billion of net income, and $2.1 billion of changes in AOCI primarily resulting from improved fair values on available for sale securities

## Mortgage Market and Economic Conditions

### Overview

The housing market recovery experienced continued challenges during the first quarter of 2011 due primarily to weak housing demand. The U.S. real gross domestic product rose by 1.8% on an annualized basis during the period, compared to 3.1% during the fourth quarter of 2010, according to the Bureau of Economic Analysis estimates. Unemployment was 8.8% in March 2011, improving from 9 4% in December 2010, based on data from the U.S. Bureau of Labor Statistics.

### Single-Family Housing Market

We believe the level of home sales in the U S is a significant driver of the direction of home prices Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties) We believe new home sales can be an indicator of certain economic trends, such as the potential for growth in total U S mortgage debt outstanding Sales of existing homes in the first quarter of 2011 averaged 5 14 million (at a seasonally adjusted annual rate), an improvement of 8% from an average seasonally adjusted annual rate of 4 75 million in the fourth quarter of 2010 New home sales in the first quarter of 2011 averaged 0.29 million homes (at a seasonally adjusted annual rate) declining approximately 2% from an average seasonally adjusted annual rate of 0 30 million homes in the fourth quarter of 20 0

We estimate that home prices declined 2 8% nationwide during the first quarter of 2011. This estimate is based on our own index of mortgage loans in our single family credit guarantee portfolio Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the first quarter of 2011, though certain states and metropolitan areas continue to exhibit weaker than average fundamentals This improvement continues a trend of several consecutive quarters of favorable movements in key indicators such as vacancy rates and effective rents. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. Improving fundamentals and perceived optimism about demand for multifamily housing have helped improve property values in most markets. However, rising interest rates may cause property owners to increase the returns they expect on their multifamily property investments. In turn, this could reduce multifamily property values, which could make it more difficult to refinance multifamily properties when the balloon payment becomes due

### Concerns Regarding Deficiencies in Foreclosure Documentation Practices

In the fall of 20 0, several large single family seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. As a result, a number of our

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in the latter part of 2010 in certain states in which they do business, and we temporarily suspended certain REO sales until November 2010  During the first quarter of 2011, we fully resumed marketing and sales of REO properties  While the larger servicers have generally resumed foreclosure proceedings, the rate at which they are completing foreclosures is slower than prior to the suspensions. These issues have caused delays in the foreclosure process in many states and temporarily slowed the pace of our REO acquisitions  We expect the pace of our REO acquisitions to increase in the remainder of 2011, in part due to the resumption of foreclosure activity by servicers  We generally refer to these issues as the concerns about foreclosure documentation practices. See "MD&A     MORTGAGE MARKET AND ECONOMIC CONDITIONS, AND OUTLOOK     Mortgage Market and Economic Conditions     *Concerns Regarding Deficiencies in Foreclosure Documentation Practices*" in our 2010 Annual Report for further information

### Consent Orders with Servicers Regarding Foreclosure and Loss Mitigation Practices

On April 13, 2011, the Comptroller of the Currency, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with fourteen large servicers regarding their foreclosure and loss mitigation practices  These institutions service the majority of the single family mortgages we own or guarantee  The consent orders require the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS® System, and communications with borrowers. We will not be able to assess the impact of these actions on our business until the servicers submit their comprehensive action plans  It is possible that these plans will result in changes to these companies' mortgage servicing practices that could adversely affect our business.

### Mortgage Market and Business Outlook

Forward looking statements involve known and unknown risks and uncertainties, some of which are beyond our control  These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections  Actual results may differ significantly from those described in or implied by such forward looking statements due to various factors and uncertainties  For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U S  economy during the remainder of 2011 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies  See "FORWARD LOOKING STATEMENTS" for additional information

### Overview

As in the past, we expect key macroeconomic drivers of the economy     such as income growth, unemployment rate, and inflation     will affect the performance of the housing and mortgage markets in 2011  The economy is expected to generate new jobs and rising incomes, contributing to a gradual recovery in housing activity and declines in delinquency rates  However, several developments may adversely affect the prospects for a housing recovery  The current and expected increases in oil prices raise concerns about the overall economic recovery and housing markets as higher oil prices reduce consumers' cash for other spending  We also expect rates on fixed rate mortgages to be slightly higher in the second half of 2011, as stronger GDP growth and further labor market improvements generate higher demand for credit and consumer spending. Lastly, many large financial institutions experienced temporary delays in the foreclosure process late in 20 0, and we be eve the resumption of foreclosures will result in increased distressed sales of REO properties in 2011

Our expectation for home prices, based on our own index, is that national average home prices will continue to decline over the near term before a long term recovery in housing begins, due to, among other factors: (a) our expectation for a sustained volume of distressed sales, which include short sales and sales by financial institutions of their REO properties; and (b) the likelihood that unemployment rates will remain high

### Single-Family

We expect our credit losses will likely increase in the near term and, for 2011, remain significantly above historical levels. This is in part due to the substantial number of mortgage loans in our single family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial backlog of seriously delinquent loans  For the near term, we also expect:

- loss severity rates to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;

<div align="center">9</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

TREASURY-1243

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- REO operations expense to continue to increase, as single family REO acquisition volume and property inventory continues to be high;

- non performing assets, which include loans deemed TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines, which may result in a continued high loan loss reserve balance in the near term and increases in charge offs in future periods

### *Multifamily*

We expect that the continuation of challenging economic conditions, including elevated unemployment in certain states in which we have substantial investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, may negatively impact our mortgage portfolio performance and may lead to additional non performing assets Improvements in loan performance historically lag improvements in broader economic and market trends during market recoveries. As a result, we may continue to experience elevated credit losses in the remainder of 2011 and delinquency rates may increase despite improving fundamentals. In addition, as more market participants re emerged in the multifamily market during the first quarter of 2011, increased competition from other institutional investors may negatively impact our future purchase volumes as well as the pricing and credit quality of newly originated loans for the remainder of 2011

### *Long-Term Financial Sustainability*

We expect to request additional draws under the Purchase Agreement in future periods Over time, our dividend obligation to Treasury will increasingly drive future draws Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury waived the fee for the first and second quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment The amount of the quarterly commitment fee has not yet been established and could be substantial. As a result of these factors, there is uncertainty as to our long term financial sustainability

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, adverse changes in interest rates, mortgage security prices, spreads and other factors could lead to additional draws For discussion of other factors that could result in additional draws, see "LIQUIDITY AND CAPITAL RESOURCES     Capital Resources "

There is also significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist While we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term, there are likely to be significant changes beyond the near term that we expect to be decided by the Obama Administration and Congress. Our future structure and role will be determined by the Obama Administration and Congress We have no ability to predict the outcome of these deliberations As discussed below in "Legislative and Regulatory Developments," on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market.

### Limits on Mortgage Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion As a result, the UPB of our mortgage related investments portfolio could not exceed $8 0 billion as of December 31, 2010 and may not exceed $729 billion as of December 3 , 20 FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage related investments portfolio, except for purchases of delinquent mortgages out of PC pools

Table 4 presents the UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation We disclose our mortgage assets on this basis monthly under the caption "Mortgage Related Investments Portfolio     Ending Balance" in our Monthly Volume Summary reports, which are available on our web site at www freddiemac com and in current reports on Form 8 K we file with the SEC

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                    TREASURY-1244                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We are providing our web site addresses here and elsewhere in this Form  0 Q solely for your information  Information appearing on our web site is not incorporated into this Form 10 Q

The UPB of our mortgage related investments portfolio declined  from December 31, 2010 to March 31, 2011, primarily due to liquidations, partially offset by the purchase of $14.6 billion of seriously delinquent loans from PC trusts.

**Table 4    Mortgage Related Investments Portfolio(1)**

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Inves men s segmen    Mo gage nves men s po fol o | $  477,446 | $   481,677 |
| S ngle-fam ly Gua an ee segmen    S ngle-fam ly unsecu   zed mo gage  oans(2 | 67,882 | 69,766 |
| Mul fam ly segmen    Mo gage nves men s po fol o | 146,710 | 145,431 |
| To a mo gage- e a ed nves men s po fo o | $  692,038 | $   696,874 |

(1) Based on UPB and excludes mo gage loans and mo gage- ela ed sec   t es t aded,    t ot yet sett ed
(2) Rep esen s unsecu   zed non-pe fo m ng s ngle-fam ly loans  managed by  he S ngle-fam ly Gua an ee segmen

**Legislative and Regulatory Developments**

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including  options for structuring the government's long term role in  a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends  winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae  in the market and ultimately wind down both institutions. The  report states that these efforts must be undertaken at a  deliberate pace, which takes into account the impact that these  changes will have on borrowers and the housing market

The report states that the government is committed to ensuring  that Freddie Mac and Fannie Mae have sufficient capital to  perform under any guarantees issued now or in the future and the  ability to meet any of its debt obligations, and further  states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac  and Fannie Mae to honor their obligations  The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described  in the Administration's plan.

The report identifies a number of policy levers that could be  used to wind down Freddie Mac and Fannie Mae, shrink the  government's footprint in housing finance, and help bring  private capital back to the mortgage market, including  increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down  Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements

These recommendations, if implemented, would have a material  impact on our business volumes, market share, results of  operations and financial condition  We cannot predict the extent to which these recommendations will be implemented or when any  actions to implement them may be taken  However, we are not aware of any current plans of our Conservator to significantly  change our business model or capital structure in the near term

See "LEGISLATIVE AND REGULATORY MATTERS" for information on recent developments in GSE reform legislation and  recently initiated rulemakings under the Dodd Frank Act.

11 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SELECTED FINANCIAL DATA[(1)]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three months ended March 31, 2011.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (dollars in millions, except share-related amounts) | |
| **Statements of Income and Comprehensive Income Data** | | |
| Net interest income | $ 4,540 | $ 4,125 |
| Provision for credit losses | (1,989) | (5,396) |
| Non-interest income (loss) | (1,252) | (4,854) |
| Non-interest expense | (697) | (667) |
| Net income (loss) attributable to Freddie Mac | 676 | (6,688) |
| Total comprehensive income (loss) attributable to Freddie Mac | 2,740 | (1,880) |
| Net loss attributable to common stockholders | (929) | (7,980) |
| Earnings (loss) per common share | | |
|   Basic | (0.29) | (2.45) |
|   Diluted | (0.29) | (2.45) |
| Cash dividends per common share | — | — |
| Weighted average common shares outstanding (in thousands) [(2)] | | |
|   Basic | 3,246,985 | 3,251,295 |
|   Diluted | 3,246,985 | 3,251,295 |

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowance for loan losses) | $ 1,644,609 | $ 1,646,172 |
| Total assets | 2,244,916 | 2,261,780 |
| Debt securities of consolidated trusts held by third parties | 1,510,426 | 1,528,648 |
| Other debt | 715,572 | 713,940 |
| All other liabilities | 17,681 | 19,593 |
| Total Freddie Mac stockholders' equity (deficit) | 1,237 | (401) |
| **Portfolio Balances**[(3)] | | |
| Mortgage-related investments portfolio | $ 692,038 | $ 696,874 |
| Total Freddie Mac Mortgage-Related Securities[(4)] | 1,689,978 | 1,712,918 |
|   Total mortgage portfolio[(5)] | 2,143,472 | 2,164,859 |
| Non-performing assets[(6)] | 124,438 | 125,405 |

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| **Ratios**[(7)] | | |
| Return on average assets[(8)(11)] | 0.1% | (1.1)% |
| Non-performing assets ratio[(9)] | 6.4 | 5.9 |
| Equity to assets ratio[(10)(11)] | 0.0 | (0.4) |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for more information regarding our accounting policies.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. These warrants are included in basic and diluted shares of the first quarter of 2011 and 2010, because issuance of common stock is currently unconditional and exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 26 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Segment Mortgage Portfolio Composition" for the composition of our total mortgage portfolio.

(6) See "Table 42 — Non-Performing Assets" for a description of our non-performing assets.

(7) The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value), is less than zero for all periods presented. The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as annualized net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

(11) To calculate the simple average ratios for the three months ended March 31, 2010, we began with balances of assets, and total Freddie Mac stockholders' equity as of January 1, 2010 balances included in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES — Table 2.1 — Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet" in our 2010 Annual Report, so that our beginning and ending balances reflect changes in accounting principles.

*Freddie Mac*

Source: FREDDIE MAC, 10-Q, May 04, 2011

TREASURY-1246

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes  Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our more significant accounting policies  and estimates applied in determining our reported results of  operations

**Table 5     Summary Consolidated Statements of Income and  Comprehensive Income**

|  | Three Months  nded March 31, | |
|---|---|---|
|  | 2011 | 2010 |
|  | (in millions) | |
| Ne  n e es  ncome | $ 4,540 | $ 4,125 |
| P ov s on fo  c ed  losses | (1,989) | (5,396) |
| Ne  n e es  ncome (loss) af e  p ov s on fo  c ed  losses | 2,551 | (1,271) |
| Non- n e es  ncome (loss) | | |
| Ga ns ( osses) on ex  ngu shmen  of deb  secu  es of conso  da ed  us s | 223 | (98) |
| Ga ns (losses) on e  emen  of o he  deb | 12 | (38) |
| Ga ns ( osses) on deb  eco ded a  fa  va ue | (81) | 347 |
| De  va  ve ga ns (losses) | (427) | (4,685) |
| Impa  men  of ava lable-fo -sale secu  es | | |
| To al o he - han- empo a y  mpa  men  of ava lable-fo -sale secu  es | (1,054) | (417) |
| Po  on of o he - han- empo a y  mpa  men  ecogn zed  n AOCI | (139) | (93) |
| Ne  mpa  men  of ava lable-fo -sale secu  es  ecogn zed  n ea n ngs | (1,193) | (510) |
| O he  ga ns (losses) on  nves men  secu  es  ecogn zed  n ea n ngs | (120) | (416) |
| O he   ncome | 334 | 546 |
| To al non- n e es  ncome (loss) | (1,252) | (4,854) |
| Non- n e es  expense | | |
| Adm n s a  ve expenses | (361) | (405) |
| REO ope a  ons expense | (257) | (159) |
| O he  expenses | (79) | (103) |
| To al non- n e es  expense | (697) | (667) |
| Income (loss) befo e  ncome  ax benef | 602 | (6,792) |
| Income  ax benef | 74 | 103 |
| Ne  ncome (loss) | 676 | (6,689) |
| O he  comp ehens ve  ncome (loss), ne  of  axes and  eclass f ca  on ad us men s | | |
| Changes  n un ea  zed ga ns ( osses)  e a ed  o ava lable-fo -sale secu  es | 1,941 | 4,646 |
| Changes  n un ea  zed ga ns ( osses)  e a ed  o cash f ow hedge  ela  onsh ps | 132 | 172 |
| Changes  n def ned benef  p ans | (9) | (10) |
| To al o he  comp ehens ve  ncome (loss), ne  of  axes and  eclass f ca  on ad us men s | 2,064 | 4,808 |
| Comp ehens ve  ncome (loss) | 2,740 | (1,881) |
| Less  Comp ehens ve ( ncome) loss a  bu able  o noncon  oll ng  n e es | — | 1 |
| To al comp ehens ve  ncome (loss) a  bu able  o F edd e Mac | $ 2,740 | $ (1,880) |

3                                           *Freddie Mac*

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Net Interest Income**

Table 6 presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities

**Table 6    Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended March 31, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-earning assets** | | | | | | |
| Cash and cash equivalents | $ 37,561 | $ 16 | 0.17% | $ 66,973 | $ 17 | 0.10% |
| Federal funds sold and securities purchased under agreements to resell | 47,861 | 18 | 0.15 | 51,645 | 16 | 0.12 |
| Mortgage-related securities | | | | | | |
|  Mortgage-related securities(3) | 456,972 | 5,316 | 4.65 | 593,512 | 7,279 | 4.91 |
|  Extinguishment of PCs held by Freddie Mac | (167,528) | (2,063) | (4.93) | (256,951) | (3,441) | (5.36) |
|  Total mortgage-related securities, net | 289,444 | 3,253 | 4.50 | 336,561 | 3,838 | 4.56 |
| Non-mortgage-related securities(3) | 29,309 | 30 | 0.41 | 20,189 | 61 | 1.21 |
| Mortgage loans held by consolidated trusts(4) | 1,650,567 | 20,064 | 4.86 | 1,787,327 | 22,732 | 5.09 |
| Unsecuritized mortgage loans(4) | 240,557 | 2,334 | 3.88 | 159,780 | 1,961 | 4.91 |
|  Total interest-earning assets | $2,295,299 | $ 25,715 | 4.48 | $2,422,475 | $ 28,625 | 4.73 |
| **Interest-bearing liabilities** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,665,608 | $(19,466) | (4.67) | $ 1,801,525 | $(23,084) | (5.13) |
| Extinguishment of PCs held by Freddie Mac | (167,528) | 2,063 | 4.93 | (256,951) | 3,441 | 5.36 |
|  Total debt securities of consolidated trusts held by third parties | 1,498,080 | (17,403) | (4.65) | 1,544,574 | (19,643) | (5.09) |
| Other debt | | | | | | |
|  Short-term debt | 194,822 | (115) | (0.24) | 242,938 | (141) | (0.23) |
|  Long-term debt(5) | 518,034 | (3,450) | (2.66) | 556,907 | (4,458) | (3.20) |
|  Total other debt | 712,856 | (3,565) | (2.00) | 799,845 | (4,599) | (2.30) |
|  Total interest-bearing liabilities | 2,210,936 | (20,968) | (3.79) | 2,344,419 | (24,242) | (4.14) |
| Income (expense) related to derivatives(6) | | (207) | (0.04) | | (258) | (0.04) |
| Impact of net non-interest-bearing funding | 84,363 | | 0.14 | 78,056 | | 0.13 |
| Total funding of interest-earning assets | $2,295,299 | $ (21,175) | (3.69) | $2,422,475 | $ (24,500) | (4.05) |
| Net interest income/yield | | $ 4,540 | 0.79 | | $ 4,125 | 0.68 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled

(2) We calculate average balances based on amortized cost

(3) Interest income (expense) includes accretion of the portion of impairment changes recognized in earnings expected to be recovered

(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances

(5) Includes current portion of long-term debt

(6) Represents changes in fair value of derivatives in cash flow hedge relationships as well as previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings

Net interest income and net interest yield increased by $415 million and 11 basis points, respectively, during the three months ended March 31, 2011, compared to the three months ended March 31, 2010, due to: (a) lower funding costs from the replacement of debt at lower rates; and (b) the impact of a change in practice announced in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts, as the average funding rate of the other debt used to purchase such loans from PC trusts is significantly less than the average funding rate of the debt securities of consolidated trusts held by third parties. These factors were partially offset by the reduction in the average balance of higher yielding mortgage related assets due to continued liquidations and limited purchase activity.

Interest income that we did not recognize, which we refer to as foregone interest income, and reversals of previously recognized interest income, net of cash received, related to non performing loans was $1.0 billion during the three months ended March 31, 2011, compared to $1.1 billion during the three months ended March 31, 2010

During the three months ended March 31, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels For more information, see "LIQUIDITY AND CAPITAL RESOURCES      Liquidity."

**Provision for Credit Losses**

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single family loans of approximately $64.3 billion, and have recorded an additional $4.6 billion in losses on loans

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 Q, May 04, 2011                    TREASURY-1248                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purchased from our PCs, net of recoveries  The majority of these  losses are associated with loans originated in 2005 through  2008  While loans originated in 2005 through 2008 will give rise  to additional credit losses that have not yet been incurred, and  thus have not been provisioned for, we believe, as of March 31, 2011, that we have reserved for or charged off  the majority of the total expected credit losses for these  loans. Nevertheless, various factors, such as continued high  unemployment rates or further declines in home prices, could  require us to provide for losses on these loans beyond our current expectations  See "Table 3     Credit Statistics, Single Family Credit Guarantee Portfolio" for  certain quarterly credit statistics for our single family credit  guarantee portfolio

Our provision for credit losses decreased to $2 0 billion  in the first quarter of 2011, compared to $5.4 billion  in the first quarter of 2010, due to a decline in the number  of delinquent loan inflows, and a decline in the rate at which  seriously delinquent loans ultimately transition to a loss event  While the quarterly amount of our provision for credit  losses declined for the last several consecutive quarters, our  quarterly amount of charge offs, net of recoveries remained elevated  We believe the level of our charge offs will continue to remain high  in 20    due to the large number of single family non performing loans  that will likely be resolved during the  year. As of March 31, 2011 and December 31, 2010, the UPB of our single family non performing loans was  $115.1 billion and $115.5 billion, respectively; these amounts  include $32.2 billion and $26.6 billion, respectively, of single family TDRs that are reperforming,  or less than three months past due. As of March 31, 2011 and December 31, 2010, the UPB of multifamily non performing  loans was $3.0 billion and $2.9 billion, respectively.  Although still at historically high levels, the UPB of our single family non performing loans declined slightly during the  first quarter of 2011. See "RISK MANAGEMENT     Credit Risk    Mortgage Credit Risk" for further information on our single family credit  guarantee portfolio, including credit performance, charge offs, and growth in the balance of our non performing assets

In the first quarter of 20   , we also continued to experience  high volumes of loan modifications involving concessions to  borrowers, which are considered TDRs. Impairment analysis for TDRs requires  giving recognition in the provision for credit  losses to the excess of our recorded investment in the loan over the present value of the expected future cash flows  This  generally results in a higher allowance for loan losses for TDRs than for loans that are not TDRs  We expect the percentage of modifications  that qualify as TDRs in 2011 will remain high,  since the majority of our modifications are anticipated to  include a significant reduction in the contractual interest  rate, which represents a concession to the borrower

The total number of seriously delinquent loans declined during  the first quarter of 2011, but has remained high due to the  continued weakness in home prices, persistently high  unemployment, extended foreclosure timelines and foreclosure  suspensions in many states, and challenges faced by servicers  processing large volumes of problem loans  Our seller/servicers  have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance  could  result in a failure to realize the anticipated benefits of our  loss mitigation plans. In an effort to help mitigate such risk,  we began making significant investments in systems and personnel  in the last months of 20 0 to help our seller/servicers manage  their performance  We believe this will help us to better realize  the benefits of our loss mitigation plans, though it is too early to determine if this will be successful

Our provision (benefit) for credit losses associated with our  multifamily mortgage portfolio was $(60) million and  $29 million for the first quarters of 2011 and 2010,  respectively  Our loan loss reserve associated with our multifamily  mortgage portfolio was $747 million and $828 million as of March 31, 2011 and December 3 , 20 0,  respectively  The decrease in the reserves was driven by positive  market trends in vacancy rates and effective rents reflected over the past several consecutive  quarters, as well as stabilizing or improved property values and  improved borrower credit profiles  However, some states in which  we have substantial investments in multifamily mortgage loans,  including Nevada, Arizona, and Georgia, continue to exhibit weaker than average fundamentals

**Non-Interest Income (Loss)**

### Gains (Losses) on Extinguishment of Debt Securities of Consolidated  Trusts

When we purchase PCs that have been issued by consolidated PC  trusts, we extinguish a pro rata portion of the outstanding debt  securities of the related consolidated trust  We recognize a gain  (loss) on extinguishment of the debt securities to the  extent the amount paid to extinguish the debt security differs from its carrying value  For the three months ended  March 31, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $24.8 billion  and  $2 1 billion, respectively (representing our purchase of  single family PCs with a corresponding UPB amount), and our  gains (losses) on extinguishment of these debt securities of  consolidated trusts were $223 million and $(98) million, respectively. The gains in the first quarter of 2011  were due to the repurchases of our debt securities at a  discount resulting from an increase in interest rates during the period. See "Table 18     Total Mo tgage Related Securities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Purchase Activity" for additional information regarding purchases of PCs, including those issued by consolidated PC trusts.

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $ 2 million and $(38) million during the three months ended March 31, 2011 and 2010, respectively  We recognized gains on debt retirements in the first quarter of 2011 primarily due  to the repurchase of other debt securities at a discount. We also recognized fewer losses on debt calls and puts in the first  quarter of 2011 compared to the first quarter of 2010 due to a decreased level of debt call activity in the first quarter of  2011.

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relates to changes in the fair value of our foreign currency denominated  debt  For the three months ended March 31, 2011, we recognized losses on debt recorded at fair value of  $81 million primarily due to the U.S. dollar weakening relative to the Euro  For the three months ended March 3 , 20 0, we recognized gains on debt recorded at fair value of  $347 million primarily due to the U S  dollar strengthening relative to the Euro  We mitigate changes in the fair value of our foreign currency denominated debt by using foreign currency  swaps and foreign currency denominated interest rate swaps

### Derivative Gains (Losses)

Table 7 presents derivative gains (losses) reported in our  consolidated statements of income and comprehensive income  See "NOTE 11: DERIVATIVES    Table11.2    Gains and Losses on Derivatives" for  information about gains and losses related to specific  categories of derivatives  Changes in fair value and interest  accruals on derivatives not in hedge accounting relationships  are recorded as derivative gains (losses) in our consolidated  statements of income and comprehensive income  At March  31, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts  recorded in AOCI related to discontinued cash flow hedges  Amounts recorded in AOCI associated with these closed cash flow  hedges are reclassified to earnings when the forecasted  transactions affect earnings  If it is probable that the forecasted transaction will not occur, then the deferred gain or  loss associated with the forecasted transaction is reclassified into earnings immediately

While derivatives are an important aspect of our management of  interest rate risk, they generally increase the volatility of  reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the  types of assets and liabilities being hedged do not affect net income

**Table 7    Derivative Gains (Losses)**

| | Derivative Gains (Losses) | |
| | Three Months  nded March 31, | |
| | 2011 | 2010 |
| --- | --- | --- |
| | (in millions) | |
| In e  es - a e swaps | $ 1,723 | $ (2,334) |
| Op on-based de  va  ves[1] | (807) | (582) |
| O he  de  va  ves[2] | (94) | (420) |
| Acc ual of pe  od c se  lemen s[3 | (1,249) | (1,349) |
|  o a | $ (427) | $ (4,685) |

(1) P    a   y  nc udes pu chased ca  and pu  swap  ons and  pu chased  n  e es   a e caps and f oo s

(2) I c de f    es, fo e g c  e cy swaps, co        e  s, swap gua an ee de  va  ves, and c ed  de  va  ves  Fo e gn-cu  ency swaps a e def  ed as swaps    w c  ne  se  e  e  s based on one leg calcula ed  n a fo e gn-cu  ency and he o he  leg ca cu a ed  n U S  do  a s  Comm men s nc ude  (a) ou  comm men s o pu chase and se  nves  en s n secu  es  (b) ou  comm men s o pu chase mo  gage loans and (c) ou  comm men s o pu chase and ex  ngu sh o  ssue deb  secu   es of o  co so da ed    s s

(3) Inc udes  pu ed n e es  on ze o-coupon swaps

Gains (losses) on derivatives not accounted for in hedge  accounting relationships are principally driven by changes in:  (a) swap and forward interest rates and implied volatility;  and (b) the mix and volume of derivatives in our  derivatives portfolio

During the three months ended March 31, 2011, we recognized  losses on derivatives of $0 4 billion primarily due to  $1.2 billion of losses related to the accrual of periodic  settlements on interest rate swaps as we continued to be in a  net pay fixed swap position during the first quarter of 2011, partially offset by the improvement in derivative fair values as  interest rates increased  As a result, we recognized fair value  gains of $4.0 billion on our pay fixed swaps, partially  offset by fair value losses on our receive fixed swaps of $2 2 billion  We recognized fair value losses of $0.8 billion on our

Source  D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

TREASURY-1250

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

option based derivatives, resulting from losses on our purchased call swaptions primarily due to the increase in forward interest rates during the three months ended March 31, 2011.

During the three months ended March 31, 2010, the fair value of our derivative portfolio was impacted by a decline in swap interest rates and implied volatility, resulting in a loss on derivatives of $4 7 billion As a result of these factors, we recorded losses of $4 7 billion on our pay fixed swaps, partially offset by gains on our receive fixed swap positions of $2 4 billion We also recorded losses of $1.0 billion on our purchased put swaptions.

### Investment Securities-Related Activities

#### Impairments of Available For Sale Securities

We recorded net impairments of available for sale securities recognized in earnings of $1.2 billion and $510 million during the three months ended March 31, 2011 and 2010, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities *Mortgage Related Securities     Other Than Temporary Impairments on Available For Sale Mortgage Related Securities"* and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other than temporary impairments recorded during the three months ended March 31, 2011 and 2010.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities We recognized $(200) million and $(417) million related to gains (losses) on trading securities during the three months ended March 31, 2011 and 2010, respectively

During the three months ended March 31, 2011 and 2010, the losses on trading securities were primarily due to the movement of securities with unrealized gains towards maturity During the three months ended March 31, 2011, these losses were partially offset by gains due to tightening of OAS levels on agency securities, and during the three months ended March 31, 2010, these losses were partially offset by fair value gains on our non interest only securities classified as trading primarily due to decreased interest rates

### Other Income

Table 8 summarizes the significant components of other income

**Table 8     Other Income**

| | Three Months nded March 31, | |
| | 2011 | 2010 |
| | (in millions) | |
| O he ncome (losses) | | |
| Gua an ee- ela ed ncome | $ 54 | $ 59 |
| Ga ns (losses) on sale of mo gage loans | 95 | 95 |
| Ga ns (losses) on mo gage loans eco ded a fa value | (33) | 21 |
| Recove es on loans mpa ed upon pu chase | 125 | 169 |
| All o he | 93 | 202 |
| To a o he ncome | $ 334 | $ 546 |

Other income declined during the first quarter of 2011, compared to the first quarter of 20 0, primarily due to lower recoveries on loans impaired upon purchase, a decline in all other income during the first quarter of 2011, and the shift to net losses on mortgage loans recorded at fair value in the first quarter of 2011.

During the first quarters of 2011 and 2010, we recognized recoveries on loans impaired upon purchase of $125 million and $169 million, respectively Our recoveries on loans impaired upon purchase declined in the first quarter of 2011, compared to the first quarter of 2010, due to a lower volume of foreclosure transfers associated with loans impaired upon purchase.

We principally recognize recoveries on impaired loans purchased prior to January 1, 2010, due to a change in accounting guidance effective on that date Consequently, our recoveries on loans impaired upon purchase will generally decline over time

All other income declined to $93 million in the first quarter of 2011 from $202 million in the first quarter of 20 0 All other income was higher in the first quarter of 2010 primarily due to reduced expectations of losses from certain legal claims that were previously recognized

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                                       Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1251

Table of Contents

**Non-Interest Expense**

Table 9 summarizes the components of non interest expense

**Table 9    Non Interest Expense**

|  | Three Months ended March 31, | |
| --- | --- | --- |
|  | **2011** | **2010** |
|  | (in millions) | |
| Adm n s a ve expenses(1 |  |  |
| Sala es and employee benef s | $ 207 | $ 234 |
| P ofess onal se v ces | 56 | 81 |
| Occupancy expense | 15 | 16 |
| O he adm n s a ve expenses | 83 | 74 |
| To al adm n s a ve expenses | 361 | 405 |
| REO ope a ons expense | 257 | 159 |
| O he expenses | 79 | 103 |
| To al non- n e es expense | $ 697 | $ 667 |

(1) In he f s qua e of 2011, we ec ass f ed ce a n expenses f om o he expenses o p ofess onal se v ces expense P o pe od amoun s have been eclass f ed o
    confo m o he cu en p esen a on

*Administrative Expenses*

Administrative expenses decreased in the first quarter of 2011 compared to the first quarter of 2010, due in part to our ongoing focus on cost reduction measures, particularly with regard to salaries and employee benefits and professional services costs  Administrative expenses declined during 2010 and we expect these expenses will continue to decline for the full year of 2011 when compared to 2010

*REO Operations Expense*

The table below presents the components of our REO operations expense for the first quarters of 2011 and 2010, and REO inventory and disposition information.

**Table 10    REO Operations Expense, REO Inventory, and REO Dispositions**

|  | Three Months ended March 31, | |
| --- | --- | --- |
|  | **2011** | **2010** |
|  | (dollars in millions) | |
| REO ope a ons expense |  |  |
| S ng e-fam y |  |  |
| REO p ope y expenses(1 | $ 308 | $ 232 |
| D spos on (ga ns) losses, e (2 (3 | 126 | 13 |
| Change n hold ng pe od allowance, d spos ons | (155) | (67) |
| Change n hold ng pe od allowance, nven o y( | 151 | 137 |
| Recove es( | (173) | (159) |
| To al s ngle-fam ly REO ope a ons expense | 257 | 156 |
| Mul fam ly REO ope a ons ( ncome) expense |  | 3 |
| To al REO ope a ons expense | $ 257 | $ 159 |
| REO nven o y ( n p ope es), a Ma ch 31 |  |  |
| S ng e- am y | 65,159 | 53,831 |
| Mu fam y | 15 | 8 |
| o a | 65,174 | 53,839 |
| REO p ope y d spos ons ( n p ope es) | 31,628 | 21,969 |

(1) Cons s s of cos s ncu ed o acqu e, a n a n o p o ec a p ope y af e s acqu ed a fo ec os e a sfe , s c as ega fees, s a ce, axes, a d c ea g
    and o he ma n enance cha ges
(2) Rep esen s e d ffe ence be ween e d spos on p oceeds, ne of se g expe ses, a d e fa va e of p ope y o e da e of he fo ec osu e a ansfe
(3) In he f s qua e of 2011, we ec ass f ed expenses e a ed o he d spos on of REO unde y ng O he Gua an ee T ansac ons f om REO p ope y expense o
    d spos on (ga ns) osses, ne  P o pe ods have been ev sed o confo m o he p esen a on
(4) Rep esen s he ( n c ease) dec ease n he es a ed fa va ue of p ope es ha we e n nven o y du ng he pe od
(5) Includes ecove es f om p ma y mo gage nsu ance, pool nsu ance and se e /se v ce epu chases

Total REO operations expense was $257 million in the first quarter of 2011 as compared to $159 million in the first quarter of 2010. This increase was primarily due to higher property expenses associated with larger REO inventories and higher disposition losses. Net disposition losses increased in the first quarter of 2011, compared to the first quarter of 2010, as we completed a higher volume of property dispositions in 2011 and home prices declined on a national basis. We

*Freddie Mac*

Source  D RA HOM  OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

currently expect REO property expenses to continue to increase  due to expected continued high levels of REO acquisitions and  inventory in the remainder of 2011

The pace of our REO acquisitions was slowed by delays in the  foreclosure process arising from concerns about foreclosure  documentation practices, particularly in states that require a  judicial foreclosure process. The acquisition slowdown, coupled  with high disposition levels, led to an approximate  0% reduction in REO property inventory from December 31, 2010  to March 3 , 20    We expect the pace of our REO acquisitions to increase in the remainder of 2011 in part due to  the resumption of foreclosure activity by servicers  For more  information on how concerns about foreclosure documentation  practices could adversely affect our REO operations (income)  expense, see "RISK FACTORS Operational Risks   *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by  deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report  See "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk   Credit Performance   Non Performing Assets*" for additional information about our REO activity

## Other Expenses

Other expenses primarily consist of losses on loans purchased  and other miscellaneous expenses  Our losses on loans purchased  we e $4 million during the first quarter of 2011 compared to $17  million during the first quarter of 2010. Losses on  delinquent and modified loans purchased from mortgage pools  within our non consolidated securitization trusts occur when the  acquisition basis of the purchased loan exceeds the estimated fair value of the loan on the date of purchase

## Income Tax Benefit

For the three months ended March 31, 2011 and 2010, we  reported an income tax benefit of $74 million and $  03 million, respectively  See "NOTE 13: INCOME TAXES" for additional information.

## Total Comprehensive Income (Loss)

Our total comprehensive income (loss) was $2.7 billion and  $(1.9) billion for the first quarters of 2011 and 2010,  respectively, consisting of: (a) a net income (loss) of $676  million and $(6.7) billion, respectively; and  (b) $2.1 billion and $4.8 billion of changes in  AOCI, respectively, primarily resulting from improved fair  values on available for sale securities  See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Total Equity (Deficit)" for additional information regarding changes in AOCI

## Segment Earnings

Our operations consist of three reportable segments, which are  based on the type of business activities each performs     Investments, Single family Guarantee, and Multifamily  Certain activities that are not part of a reportable segment are  included in the All Other category

The Investments segment reflects results from our investment,  funding and hedging activities  In our Investments segment, we  invest principally in mortgage related securities and  single family performing mortgage loans funded by other debt  issuances and hedged using derivatives  Segment Earnings for  this segment consist primarily of the returns on these  investments, less the related funding, hedging, and administrative expenses

The Single family Guarantee segment reflects results from our  single family credit guarantee activities  In our Single family  Guarantee segment, we purchase single family mortgage loans  originated by our seller/servicers in the primary mortgage  market. In most instances, we use the mortgage securitization  process to package the purchased mortgage loans into guaranteed  mortgage related securities  We guarantee the payment of  principal and interest on the mortgage related securities in  exchange for management and guarantee fees  Segment Earnings for  this segment consist primarily of management and guarantee fee  revenues, including amortization of upfront fees, less the  related credit costs (*i.e.*, provision for credit losses),  administrative expenses, allocated funding costs, and amounts  related to net float benefits or expenses

The Multifamily segment reflects results from our investment and  guarantee activities in multifamily mortgage loans and  securities  We purchase multifamily mortgage loans primarily for  purposes of aggregation and then securitization  Although we hold  CMBS that we purchased for investment, we have not purchased  significant amounts of non agency CMBS for investment  since 2008  The Multifamily segment does not issue REMIC  securities but does issue Other Structured Securities, Other  Guarantee Transactions, and other guarantee commitments  Segment  Earnings for this segment primarily includes management and  guarantee fee income and the interest earned on assets related  to multifamily investment activities, net of allocated funding  costs  The Multifamily segment reflects the impact of changes in  fair value

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                                          TREASURY-1253                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of CMBS and held for sale loans associated only with factors other than changes in interest rates, such as credit and liquidity.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss) and GAAP total comprehensive income (loss)  The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac  Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments  By recording these types of activities to the All Other category, we be eve the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments, and a measure of management and guarantee income on guarantees, that is in line with our internal measures of performance  We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP  Our definition of Segment Earnings may differ from similar measures used by other companies  However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole

See "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

<div align="center">20</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 11 provides information about our various segment mortgage portfolios at March 31, 2011 and December 31, 2010. For a discussion of each segment's portfolios, see *"Segment Earnings      Results."*

## Table 11      Segment Mortgage Portfolio Composition[1]

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segmen  por folios:** | | |
| *Investments      Mortgage investments portfolio* | | |
| S ngle-fam ly unsecu    zed mo  gage  oans[2] | $   88,301 | $   79,097 |
| F edd e Mac mo  gage- ela ed secu   es | 256,283 | 263,152 |
| Non-agency mo  gage- ela ed secu   es | 94,592 | 99,639 |
| Non-F edd e Mac agency mo  gage- ela ed secu   es | 38,270 | 39,789 |
| *Total Investments      Mortgage investments portfolio* | 477,446 | 481,677 |
| *Single-family Guarantee      Managed loan portfolio* [3] | | |
| S ngle-fam ly unsecu    zed mo  gage  oans[2] | 67,882 | 69,766 |
| S ngle-fam ly F edd e Mac mo  gage- ela ed secu   es held by us | 256,283 | 261,508 |
| S ngle-fam ly F edd e Mac mo  gage- ela ed secu   es held by  h d pa   es | 1,416,882 | 1,437,399 |
| S ngle-fam ly o he  gua an ee comm men[4] | 9,990 | 8,632 |
| *Total Single-family Guarantee      Managed loan portfolio* | 1,751,037 | 1,777,305 |
| *Multifamily      Guarantee portfolio* [3] | | |
| Mul  fam ly F edd e Mac mo  gage- ela ed secu   es held by us | 2,197 | 2,095 |
| Mul  fam ly F edd e Mac mo  gage- ela ed secu   es held by  h d pa   es | 14,615 | 11,916 |
| Mul  fam ly o he  gua an ee comm men[4] | 9,947 | 10,038 |
| *Total Multifamily      Guarantee portfolio* | 26,759 | 24,049 |
| *Multifamily      Mortgage investments portfolio* [3] | | |
| Mul  fam ly nves men  secu   es po  fol o | 62,558 | 59,548 |
| Mu  fam  y  oan po  fo  o | 84,152 | 85,883 |
| *Total Multifamily      Mortgage investments portfolio* | 146,710 | 145,431 |
| *Total Multifamily portfolio* | 173,469 | 169,480 |
| *Less F edd e Mac s ngle-fam ly and mul  fam ly secu   es[6]* | (258,480) | (263,603) |
| **To a  mor gage por fo  o** | $ 2,143,472 | $  2,164,859 |

(1) Based on UPB and excludes mo  gage loans and mo  gage- ela ed sec   t es  t aded,   t ot yet sett ed

(2) Excludes unsecu    zed non-pe fo m ng s ngle-fam ly loans  managed by  he S ng e-fam  y Gua an ee segmen  Howeve ,  he S ngle-fam ly Gua an ee segmen  con nues
o ea n managemen  and gua an ee fees assoc a ed w h unsecu    zed s ngle-fam ly loans  n he Inves men s segmen

(3) The balances of  he mo  gage- ela ed secu   es  n hese po  fo os a e based o    e UPB of  e sec   y, w e eas  e balances of ou  s ngle-fam ly c ed   gua an ee and
mu  fam  y mo  gage po  fos p esen ed n  h s  epo  a e based on  he UPB of  he mo  gage  oans  unde  yng  he e a ed secu  y  The d ffe ences  n  he  oan and
secu   y ba ances  esu  f o   he  m ng of em  ances o secu   y ho de s, wh ch  s yp ca  y 45 o  75 days a e  he mo  gage paymen  cycle of f xed- a e a d ARM
PCs,  espec  ve y

(4) Rep esen s unsecu    zed non-pe fo m ng s ngle-fam ly loans managed by  he S ngle-fam ly Gua an ee segmen

(5) Rep esen s  he UPB of o  gage- e a ed asse s he d by  h d pa   es fo  wh ch we p ov de ou  gua an ee w hou  ou  secu   za on of  he e a ed asse s

(6) F edd e Mac s ngle-fam ly mo  gage- ela ed secu   es held by us a e  ncluded  n bo h ou  Inves men s segmen  's mo  gage  nves men s po  fol o and ou  S ngle-fam ly
G a a  ee segmen  's managed loan po  fol o, and F edd e Mac mul  fam ly mo  gage- ela ed secu   es held by us a e  ncluded  n bo h  he mul  fam  ly  nves men
secu   es po  fol o and  he mul  fam ly gua an ee po  fol o  The efo  e,  hese amoun s a e  deduc ed  n o de   o  econc le  o ou   o al mo  gage po  fol o

21

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Segment Earnings Results

#### Investments

Table 12 presents the Segment Earnings of our Investments segment

**Table 12    Segment Earnings and Key Metrics    Investments[1]**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (dollars in millions) | |
| Segment Earnings | | |
| Net interest income | $ 1,653 | $ 1,311 |
| Non-interest income (loss) | | |
| Net impairment of available-for-sale securities | (1,029) | (376) |
| Derivative gains (losses) | 1,103 | (2,702) |
| Other non-interest income (loss) | 236 | (22) |
| Total non-interest income (loss) | 310 | (3,100) |
| Non-interest expense | | |
| Administrative expenses | (95) | (122) |
| Other non-interest expense | — | (7) |
| Total non-interest expense | (95) | (129) |
| Segment adjustments[2] | 203 | 510 |
| Segment Earnings (loss) before income tax benefit | 2,071 | (1,408) |
| Income tax benefit | 66 | 97 |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | 2,137 | (1,311) |
| Less Net (income) loss noncontrolling interest | — | (2) |
| Segment Earnings (loss), net of taxes | 2,137 | (1,313) |
| Total other comprehensive income, net of taxes | 1,126 | 3,120 |
| Total comprehensive income | $ 3,263 | $ 1,807 |
| Key metrics Investments | | |
| Portfolio balances | | |
| Average balances of interest-earning assets [3][4] | | |
| Mortgage-related securities[6] | $ 399,113 | $530,865 |
| Non-mortgage-related investments[7] | 114,732 | 138,806 |
| Unsecuritized single-family loans | 85,515 | 43,559 |
| Total average balances of interest-earning assets | $599,360 | $ 713,230 |
| Return | | |
| Net interest yield Segment Earnings basis (annualized) | 1 10% | 0 74% |

(1) For reconciliations of the Segment Earnings line items to our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15 SEGMENT REPORTING Table 15 2 Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments, see "NOTE 15 SEGMENT REPORTING Segment Earnings"

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled

(4) Excludes non-performing single-family PCs and certain Other Guarantee Transactions, which have been consolidated onto GAAP on our consolidated balance sheet beginning go January 1, 2010

(5) We calculate average balances based on amortized cost

(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated onto GAAP on our consolidated balance sheet beginning go January 1, 2010

(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related investments, and federal funds sold and deposits placed under agreements to resell

Our total comprehensive income for our Investments segment was $3.3 billion and $1.8 billion for the three months ended March 31, 2011 and 2010, respectively, consisting of: (a) Segment Earnings (loss) of $2.1 billion and $(1.3) billion, respectively; and (b) $1.1 billion and $3.1 billion of changes in AOCI, respectively

The UPB of the Investments segment mortgage investments portfolio declined by 3.5% on an annualized basis from $482 billion at December 31, 2010 to $477 billion at March 31, 2011, compared to a decline of 30.5% on an annualized basis from December 31, 2009 to March 31, 20 0

We held $294.6 billion of agency securities and $94 6 billion of non agency mortgage related securities as of March 31, 2011 compared to $302.9 billion of agency securities and $99 6 billion of non agency mortgage related securities as of December 31, 2010 The decline in UPB of agency securities is due mainly to liquidations, including prepayments and select sales The decline in UPB of non agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities See "CONSOLIDATED BALANCE SHEETS ANALYSIS Investments in Securities" for additional information regarding our mortgage related securities

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1256

Table of Contents

Segment Earnings net interest income and net interest yield  increased $342 million and 36 basis points,  respectively, during the three months ended March 31, 2011, compared to the three months ended March 31, 2010  The  primary driver was lower funding costs, primarily due to the replacement of debt at lower rates  These lower funding costs  were partially offset by the reduction in the average balance of  higher yielding mortgage related assets, due to continued  liquidations.

Segment Earnings non interest income (loss) increased by  $3 4 billion to $310 million during the three months  ended March 31, 2011, compared to $(3 1) billion during the three months ended March 31, 2010  Non interest  income for the three months ended March 31, 2011 was primarily attributable to derivative gains, partially offset by  net impairments of available for sale securities  Non interest  loss for the three months ended March 31, 2010 was  primarily driven by derivative losses and net impairments of  available for sale securities

Impairments recorded in our Investments segment increased by  $653 million during the three months ended March 31,  2011, compared to the three months ended March 31, 2010  See "CONSOLIDATED BALANCE SHEETS ANALYSIS      Investments in Securities  *Mortgage Related Securities     Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" for additional information on our impairments.

We recorded derivative gains (losses) for this segment of $1.1 billion in the three months ended March 31, 2011,  compared to $(2.7) billion in the three months ended March 31, 2010. While derivatives are an important aspect  of our management of interest rate risk, they generally increase the volatility of reported Segment Earnings, because,  while fair  value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being  hedged do not affect Segment Earnings  During the three months  ended March 31, 2011, longer term swap interest rates increased, resulting in fair value gains on our pay fixed swaps  that were partially offset by fair value losses on our receive fixed swaps and purchased call swaptions  During the  three months ended March 31, 2010, longer term swap  interest rates decreased, resulting in losses on our pay fixed  interest rate swaps partially offset by fair value gains on our  receive fixed swaps  See "Non Interest Income (Loss)      *Derivative Gains (Losses)*" for additional information on our derivatives

Our Investments segment's change in AOCI for the three months ended March 31, 2011 was $1.1 billion compared  to $3 1 billion for the three months ended March 31, 20 0  Net unrealized losses in AOCI on our available for sale  securities decreased by $1 0 billion during the three months ended March 31, 2011, primarily attributable to the  recognition in earnings of other than temporary impairments on  our non agency mortgage related securities  Net unrealized  losses in AOCI on our available for sale securities decreased by  $3 0 billion during the three months ended March 31, 2010,  primarily attributable to fair value gains related to the  movement of securities with unrealized losses towards maturity

The objectives set forth for us under our charter and  conservatorship, restrictions set forth in the Purchase  Agreement and restrictions imposed by FHFA have negatively  impacted, and will continue to negatively impact, our  Investments segment results  For example, our mortgage-re ated investments portfolio is subject to a cap that decreases  by 10%  each year until the portfolio reaches $250 billion. This  will likely cause a corresponding reduction in our net interest  income from these assets and therefore negatively affect our  Investments segment results  FHFA also stated its expectation  that any net additions to our mortgage related investments  portfolio would be related to purchasing seriously delinquent mortgages out of PC pools  We are also subject to limits on  the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so  determines, Treasury.

For information on the impact of the requirement to reduce the  mortgage related investments portfolio limit by  0% annually,  see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS     Impact of the Purchase Agreement and FHFA Regu at on on the Mo tgage-Re ated Investments Portfolio "

23                                                                                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single Family Guarantee*

Table 13 presents the Segment Earnings of our Single family Guarantee segment

**Table 13    Segment Earnings and Key Metrics    Single Family Guarantee[1]**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (dollars in millions) | |
| Segment Earnings | | |
| Net interest income | $    100 | $    59 |
| Provision for credit losses | (2,284) | (6,041) |
| Non-interest income | | |
|   Management and guarantee income | 870 | 848 |
|   Other non-interest income | 211 | 210 |
|     Total non-interest income | 1,081 | 1,058 |
| Non-interest expense | | |
|   Administrative expenses | (215) | (229) |
|   REO operations expense | (257) | (156) |
|   Other non-interest expense | (66) | (79) |
|     Total non-interest expense | (538) | (464) |
| Segment adjustments[2] | (185) | (213) |
| Segment Earnings (loss) before income tax benefit (expense) | (1,826) | (5,601) |
| Income tax benefit | 6 | 5 |
| Segment Earnings (loss), net of taxes | $ (1,820) | $ (5,596) |
| Total other comprehensive income (loss), net of taxes | (4) | (4) |
| Total comprehensive loss | $ (1,824) | $ (5,600) |
| Key metrics Single-family Guarantee | | |
| *Balances and Growth (in billions, except rate)* | | |
| Average balance of single-family credit guarantee portfolio | $ 1,819 | $ 1,874 |
| Issuance Single-family credit guarantees[3] | $    96 | $    94 |
| Fixed-rate products Percentage of purchases( | 94% | 98% |
| Liquidation rate Single-family credit guarantees (annualized)( | 28% | 35% |
| *Management and Guarantee Fee Rate (in bps, annualized)* | | |
| Contractual management and guarantee fees | 13.6 | 13.3 |
| Amortization of delivery fees | 5.5 | 4.8 |
| Segment Earnings management and guarantee income | 19.1 | 18.1 |
| *Credit* | | |
| Serious delinquency rate, at end of period | 3.63% | 4.13% |
| REO inventory, at end of period (number of properties) | 65,159 | 53,831 |
| Single-family credit losses, in bps (annualized)[6] | 71.0 | 62.3 |
| *Market:* | | |
| Single-family mortgage debt outstanding (total US market, in billions)[7] | $ 10,070 | $ 10,226 |
| 30-year fixed mortgage rate[8] | 4.9% | 5.1% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15 SEGMENT REPORTING    Table 15.2    Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments, see "NOTE 15 SEGMENT REPORTING    Segment Earnings"

(3) Based on UPB

(4) Excludes Other Guarantee Transactions, and includes purchases of interest-only mortgages with fixed interest rates

(5) Includes purchases of delinquent loans for PCs Offer February 10, 2010, we allocated a we would degree purchase sub annually all 120 days or more delinquent mortgages from our PC pools See "NOTE 5 INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information

(6) Credit losses are equal to REO operations expenses plus charge-offs, net of recoveries, associated with single-family mortgage loans Calculated as the amount of credit losses divided by the sum of the average balance of our single-family credit guarantee portfolio

(7) Source Federal Reserve Flow of Funds Accounts of the United States as of March 10, 2011 The outstanding amount for March 31, 2011 reflects the balance as of December 31, 2010, which is the latest available information

(8) Based on Freddie Mac's Primary Mortgage Market Survey as of the last week in reporting period, which represents a national average mortgage commitment rate to a qualified borrower excluding fees and points required by the lender The commitment rate applies only to conforming mortgages with LTV as of 80%

*Financial Results*

For the first quarters of 2011 and 2010, total comprehensive (loss) for our Single family Guarantee segment, which is comprised almost entirely of Segment Earnings (loss), was $(1.8) billion and $(5.6) billion, respectively. Segment Earnings (loss) improved in the first quarter of 2011, compared to the first quarter of 2010, primarily due to a decline in provision for credit losses, partially offset by an increase in REO operations expense

Segment Earnings management and guarantee income consists of contractual amounts due to us related to our management and guarantee fees as well as amortization of delivery fees

24

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings management and guarantee income increased slightly in the first quarter of 2011 compared to the first quarter of 2010, primarily due to an increase in the amortization of delivery fees. Increased amortization of delivery fees reflects the impact of higher delivery fees associated with loans purchased after 2008 combined with continued high prepayment rates on guaranteed mortgages in the first quarter of 2011 as mortgage rates remained low and refinancing activity remained high.

During the first quarters of 2011 and 2010, our Segment Earnings provision for credit losses for the Single family Guarantee segment was $2.3 billion and $6.0 billion, respectively. Segment Earnings provision for credit losses decreased in the first quarter of 2011, compared to the first quarter of 2010, primarily due to a decline in the number of delinquent loan inflows, and a decline in the rate at which delinquent loans ultimately transition to a loss event.

Table 14 provides summary information about the composition of Segment Earnings (loss) for this segment in the first quarter of 2011.

**Table 14    Segment Earnings Composition — Single Family Guarantee Segment**

| | | Three Months Ended March 31, 2011 | | | | |
|---|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | | |
| | Amount | Average Rate | Amount | Average Rate(3) | | Net Amount(4) |
| | | | (dollars in millions, rates in bps) | | | |
| Year of origination( | | | | | | |
| 2011 | $ 26 | 15.0 | $ (3) | 3.2 | $ | 23 |
| 2010 | 184 | 20.6 | (54) | 5.8 | | 130 |
| 2009 | 170 | 18.5 | (50) | 5.3 | | 120 |
| 2008 | 110 | 24.6 | (211) | 57.0 | | (101) |
| 2007 | 101 | 18.8 | (884) | 180.3 | | (783) |
| 2006 | 59 | 17.0 | (763) | 208.3 | | (704) |
| 2005 | 66 | 16.6 | (403) | 96.6 | | (337) |
| 2004 and prior | 154 | 18.4 | (173) | 18.8 | | (19) |
| Total | $ 870 | 19.1 | $(2,541) | 55.9 | | (1,671) |
| Administrative expenses | | | | | | (215) |
| Net interest income | | | | | | 100 |
| Income tax benefit and other non-interest income and (expense), net(6) | | | | | | (34) |
| Segment Earnings (loss), net of taxes | | | | | | $ (1,820) |

(1) Includes amortization of delivery fees of $252 million for the three months ended March 31, 2011.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense.
(3) Based on the average securitized balance of the single-family credit guarantee portfolio. Historical average credit expenses may not be representative of future.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.
(6) Includes segment adjustments.

We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our anticipated credit related and administrative expenses associated with the underlying loans. However, our management and guarantee fee rates associated with guarantee issuances in 2005 through 2008 have not been adequate to provide related income to cover the credit and administrative expenses associated with such loans. We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances. Consequently, we expect to continue reporting net losses for the Single family Guarantee segment at least through 2011.

*Key Metrics*

The UPB of the Single family Guarantee managed loan portfolio was $1.75 trillion at March 31, 2011 compared to $1.78 trillion at December 31, 2010. The slight decline in this portfolio was primarily attributable to liquidations of Freddie Mac mortgage related securities, which are due to high levels of refinancing, and our repurchases of delinquent loans from PC pools during the first quarter of 2011. The annualized liquidation rate on our securitized single family credit guarantees was 28.1% for the first quarter of 2011, compared to 34.7% in the first quarter of 2010.

Refinance volumes continued to be high due to continued low interest rates, and represented 85% of our single family mortgage purchase volume during the first quarter of 2011. Relief refinance mortgages represented approximately 30% and 24% of our single family mortgage purchase volume during the first quarters of 2011 and 2010, respectively. Due to increasing interest rates and improving economic conditions we believe that, overall and as a percentage of our

Source   DRA HOM OAN MORTGAG CORP, 10 Q, May 04, 2011                                                 TREASURY-1259                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purchase volume, refinance loan volume should decline substantially, and mortgages originated for home purchases should increase during the remainder of 2011

The serious delinquency rate on our single family credit guarantee portfolio decreased slightly to 3 63% as of March 31, 2011 from 3.84% as of December 3 , 20 0 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies As of March 31, 2011, more than 40% of our single family credit guarantee portfolio is comprised of mortgage loans originated after 2008 These new vintages reflect a combination of changes in underwriting practices and a higher composition of fixed rate and refinanced mortgage products, and represent an increasingly large proportion of our single family credit guarantee portfolio The proportion of the portfolio represented by older vintages, which have a higher composition of loans with higher risk characteristics, continues to decline principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as those resulting from foreclosure events and foreclosure alternatives We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit related expenses of our single family credit guarantee portfolio However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity Although the volume of new serious delinquencies declined in each of the last five quarters, our serious delinquency rate remains high, reflecting continued stress in the housing and labor markets.

Single family credit losses as a percentage of the average balance of the single family credit guarantee portfolio, increased to 71 basis points in the first quarter of 2011, compared to 62 basis points in the first quarter of 2010. Charge offs, excluding recoveries, associated with single family loans increased to $3.7 billion in the first quarter of 2011, compared to $3.4 billion in the first quarter of 2010, primarily due to a decline in home prices and increased short sale activity during the first quarter of 2011, partially offset by a lower volume of foreclosure transfers, as compared to the first quarter of 2010 See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk*" for further information on our single family credit guarantee portfolio, including credit performance, charge offs, and growth in the balance of our non performing assets

<div align="center">26</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

*Multifamily*

Table 15 presents the Segment Earnings of our Multifamily segment

**Table 15      Segment Earnings and Key Metrics      Multifamily(1)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (dollars in millions) | |
| Segment Earnings | | |
| Net interest income | $ 279 | $ 238 |
| Benefit (provision) for credit losses | 60 | (29) |
| Non-interest income | | |
| Management and guarantee income | 28 | 24 |
| Security impairments | (135) | (55) |
| Derivative gains (losses) | 2 | 5 |
| Other non-interest income | 187 | 108 |
| Total non-interest income | 82 | 82 |
| Non-interest expense | | |
| Administrative expenses | (51) | (54) |
| REO operations expense | | (3) |
| Other non-interest expense | (13) | (17) |
| Total non-interest expense | (64) | (74) |
| Segment Earnings before income tax benefit | 357 | 217 |
| Income tax benefit | 2 | 1 |
| Segment Earnings, net of taxes, including noncontrolling interest | 359 | 218 |
| Less Net (income) loss  noncontrolling interest | | 3 |
| Segment Earnings, net of taxes | 359 | 221 |
| Total other comprehensive income, net of taxes | 942 | 1,692 |
| Total comprehensive income | $ 1,301 | $ 1,913 |
| Key metrics  Multifamily | | |
| *Balances and Growth:* | | |
| Average balance of Multifamily loan portfolio | $85,779 | $83,456 |
| Average balance of Multifamily guarantee portfolio | $ 25,312 | $ 18,179 |
| Average balance of Multifamily investments securities portfolio | $62,842 | $ 62,501 |
| Liquidation rate  Multifamily loan portfolio (annualized) | 5 8% | 2.5% |
| Growth rate (annualized) | 3 6% | 8 2% |
| *Yield and Rate:* | | |
| Net interest yield  Segment Earnings basis (annualized) | 0 75% | 0 65% |
| Average Management and guarantee fee rate, in bps (annualized)(2 | 46 8 | 52 8 |
| *Credit* | | |
| Delinquency rate(3 | 0 36% | 0 22% |
| Loan loss reserves at period end | $ 747 | $ 842 |
| Loan loss reserves, bps | 67 4 | 81 5 |
| Credit losses, bps (annualized)( | 4 2 | 8 2 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15  SEGMENT REPORTING  Table 15 2  Segment Earnings and Reconciliation to GAAP Results "

(2) Represents Multifamily Segment Earnings  management and guarantee income, excluding prepayment and certain other fees, divided by the  sum of  the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain modifications related to NIBP

(3) See "RISK MANAGEMENT  Credit Risk  *Mortgage Credit Risk  Credit Performance  Delinquencies*" for information on our reported multifamily delinquency rate

(4) Credit losses are equal to REO operations expenses plus charge-offs, net of recoveries, associated with multifamily mortgage loans Calculated as the amount of credit losses divided by the sum of the combined average balances of our multifamily non portfolio and multifamily guarantee portfolio

Our total comprehensive income (loss) for our Multifamily segment was $1.3 billion and $1.9 billion for the first quarters of 2011 and 2010, respectively, consisting of: (a) Segment Earnings of $0 4 billion and $0.2 billion, respectively; and (b) $0.9 billion and $1.7 billion of changes in AOCI, respectively, primarily resulting from improved fair values related to credit risk on available for sale securities

Segment Earnings for our Multifamily segment increased to  $359 million for the first quarter of 2011 compared to $221 million for the first quarter of 2010, primarily due to increased net interest income and a recognized benefit for credit losses in the first quarter of 2011. We currently expect to generate positive Segment Earnings in the Multifamily segment  in 2011.

Net interest income increased $41 million, or 17%, for the  first quarter of 2011 compared to the first quarter of 2010,  primarily attributable to growth in the multifamily loan portfolio with higher interest rates relative to allocated  funding costs in the first quarter of 2011.

Source   FEDERAL HOME LOAN MORTGAGE CORP, 10 Q, May 04, 2011

TREASURY-1261

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings non interest income for the Multifamily segment was unchanged in the first quarter of 2011 compared to the first quarter of 2010  Within Segment Earnings non interest income, we experienced higher security impairments on CMBS that were offset primarily by fair value gains on mortgage loans during the first quarter of 2011, compared to the first quarter of 2010. CMBS impairments during the first quarters of 2011 and 2010 totaled $135 million and $55 million, respectively. We recognized $83 million in gain on sales of $3.4 billion in UPB of multifamily loans during the first quarter of 2011, compared to $107 million of gain on sales of $1.8 billion in UPB of multifamily loans during the first quarter of 2010. Gains on sales of multifamily loans in the multifamily segment are presented net of changes in fair value due to changes in interest rates

Multifamily market fundamentals, including vacancy rates and effective rents, continued to improve nationally and in most states and metropolitan areas during the first quarter of 2011  These improving fundamentals continued to help stabilize property values in a number of markets. While multifamily market fundamentals reflect positive trends for much of the nation, certain states in which we have substantial investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average fundamentals and elevated unemployment and may negatively impact our mortgage portfolio performance and may lead to additional non performing assets. For further information on delinquencies, including geographical and other concentrations, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment recognized a benefit for credit losses of $60 million in the first quarter of 2011 compared to a provision for credit losses of $29 million in the first quarter of 2010  Our loan loss reserve associated with our multifamily mortgage portfolio was $747 million and $828 million as of March 31, 2011 and December 3 , 20 0, respectively  The decrease in our loan loss reserve in the first quarter of 2011 was driven by positive trends in vacancy rates and effective rents reflected over the past several consecutive quarters, as well as stabilizing or improved property values and improved borrower credit profiles  For loans where we identified deteriorating collateral performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual loan, using estimates of property value, to determine if a specific loan loss reserve is needed  Although we use the most recently available results of our multifamily borrowers to assess a property's value, there may be a significant lag in reporting as they prepare their results in the normal course of business.

The delinquency rate for loans in the multifamily mortgage portfolio was 0.36% and 0.26% as of March 31, 2011 and December 31, 2010, respectively. As of March 31, 2011, our delinquent multifamily loans are concentrated in Georgia and Texas  Loans in these two states represented approximately 7% of the loans in our multifamily mortgage portfolio and approximately 37% of our multifamily delinquent loans, both on a UPB basis, as of March 31, 2011. As of March 31, 2011, approximately one half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two or more monthly payments past due had credit enhancements that we currently believe will reduce our expected losses on those loans  The multifamily delinquency rate of credit enhanced loans as of March 31, 2011 and December 31, 2010, was 0.75% and 0 85%, respectively, while the delinquency rate for non credit enhanced loans was 0.25% and 0.12%, respectively  See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Performance    Delinquencies*" for further information about our reported multifamily delinquency rates, including factors that can positively impact such rates.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios decreased from 8.2 basis points in the first quarter of 2010 to 4.2 basis points in the first quarter of 2011, driven by decreased charge offs and REO operations expense for the first quarter of 2011  Charge offs, excluding recoveries, associated with multifamily loans declined to $12 million in the first quarter of 2011, compared to $18 million in the first quarter of 2010, due to a lower number of foreclosures in the 2011 period  Although our charge offs were low for the first quarter of 2011, we expect that our charge offs will increase in the remainder of 2011

The UPB of the total multifamily portfolio increased to $173.5 billion at March 31, 2011 from $169.5 billion at December 31, 2010, due primarily to increased guarantees of securities issued during the first quarter of 2011 as part of our CME securitization program as well as the transfer of certain housing revenue bonds to the Multifamily Segment that were previously managed by the Investments segment  We issued $3.0 billion and $3 2 billion of Freddie Mac mortgage related securities and other guarantee commitments related to multifamily mortgage loans in the first quarters of 2011 and 2010, respectively. Increased competition in certain markets has exerted and may continue to exert downward pressure on pricing and credit for new activity in the remainder of 2011, and could negatively impact our future purchase volumes. Our primary multifamily business strategy in 2011 is to purchase loans and subsequently securitize them under our CME securitization program, which supports liquidity for the multifamily market and affordability for multifamily rental housing.

28

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our more significant accounting policies and estimates applied in determining our reported financial position

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities      *Non Mortgage Related Securities,*" are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market We use these assets to help manage recurring cash flows and meet our other cash management needs We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System Securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities The short term assets related to our consolidated VIEs are comprised primarily of restricted cash and cash equivalents and investments in securities purchased under agreements to resell These short term assets related to our consolidated VIEs decreased by $19.9 billion from December 31, 2010 to March 31, 2011, primarily due to a relative decline in refinancing activities as a result of the increase in mortgage rates during the period

Excluding amounts related to our consolidated VIEs, we held $34.3 billion and $37.0 billion of cash and cash equivalents, $5.8 billion and $1 4 billion of federal funds sold, and $20.5 billion and $15.8 billion of securities purchased under agreements to resell at March 31, 2011 and December 31, 2010, respectively The aggregate increase in these assets is largely related to an increase in forecasted debt redemptions In addition, excluding amounts related to our consolidated VIEs, we held on average $32.0 billion of cash and cash equivalents and $28.6 billion of federal funds sold and securities purchased under agreements to resell during the three months ended March 31, 2011.

### Investments in Securities

Table 16 provides detail regarding our investments in securities as of March 31, 2011 and December 31, 2010. Table 16 does not include our holdings of single family PCs and certain Other Guarantee Transactions. For information on our holdings of such securities, see "Table 11      Segment Mortgage Portfolio Composition "

Source   D RA  HOM   OAN MORTGAG   CORP, 10 Q, May 04, 2011                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16    Investments in Securities**

| | | March 31, 2011 | | December 31, 2010 |
|---|---|---|---|---|
| | | | (in millions) | |
| Investments in securities | | | | |
| Available-for-sale | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac[1] | $ | 85,744 | $ | 85,689 |
| Subprime | | 33,344 | | 33,861 |
| CMBS | | 57,944 | | 58,087 |
| Option ARM | | 6,989 | | 6,889 |
| Alt-A and other | | 12,937 | | 13,168 |
| Fannie Mae | | 22,844 | | 24,370 |
| Obligations of states and political subdivisions | | 8,875 | | 9,377 |
| Manufactured housing | | 878 | | 897 |
| Ginnie Mae | | 283 | | 296 |
| Total available-for-sale mortgage-related securities | | 229,838 | | 232,634 |
| Total investments in available-for-sale securities | | 229,838 | | 232,634 |
| Trading | | | | |
| Trading mortgage-related securities | | | | |
| Freddie Mac[1] | | 15,951 | | 13,437 |
| Fannie Mae | | 18,586 | | 18,726 |
| Ginnie Mae | | 167 | | 172 |
| Other | | 26 | | 31 |
| Total trading mortgage-related securities | | 34,730 | | 32,366 |
| Trading non-mortgage-related securities | | | | |
| Asset-backed securities | | 94 | | 44 |
| Treasury bills | | 9,397 | | 17,289 |
| Treasury notes | | 16,123 | | 10,122 |
| FDIC-guaranteed corporate medium-term notes | | 1,009 | | 441 |
| Total trading non-mortgage-related securities | | 26,623 | | 27,896 |
| Total investments in trading securities | | 61,353 | | 60,262 |
| Total investments in securities | $ | 291,191 | $ | 292,896 |

(1) For information on the types of instruments that are included, see "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Investments in Securities" in our 2010 Annual Report.

### Non-Mortgage-Related Securities

Our investments in non-mortgage related securities provide an additional source of liquidity for us. We held investments in non-mortgage-related securities of $26.6 billion and $27.9 billion as of March 31, 2011 and December 31, 2010, respectively. Our holdings of non-mortgage-related securities at March 31, 2011 decreased slightly compared to December 31, 2010 while continuing to meet required liquidity and contingency levels.

We did not hold any available-for-sale non-mortgage related securities during the three months ended March 31, 2011 and did not record a net impairment of available-for-sale securities recognized in earnings during the three months ended March 31, 2010 on our non-mortgage related securities.

### Mortgage-Related Securities

We are primarily a buy and hold investor in mortgage related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage related securities. However, single family PCs and certain Other Guarantee Transactions we purchase are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

Table 17 provides the UPB of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets. Table 17 does not include our holdings of single family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11    Segment Mortgage Portfolio Composition."

*Freddie Mac*

Source   FREDDIE MAC  HOME LOAN MORTGAGE CORP, 10 Q, May 04, 2011                    TREASURY-1264                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17     Characteristics of Mortgage Related Securities on Our  Consolidated Balance Sheets**

| | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities (2) | | | | | | |
| Single-family | $ 81,067 | $ 9,018 | $ 90,085 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 503 | 1,694 | 2,197 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 81,570 | 10,712 | 92,282 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities | | | | | | |
| Agency securities (3) | | | | | | |
| Fannie Mae | | | | | | |
| Single-family | 20,732 | 17,140 | 37,872 | 21,238 | 18,139 | 39,377 |
| Multifamily | 163 | 87 | 250 | 228 | 88 | 316 |
| Ginnie Mae | | | | | | |
| Single-family | 284 | 114 | 398 | 296 | 117 | 413 |
| Multifamily | 27 | | 27 | 27 | | 27 |
| Total agency securities | 21,206 | 17,341 | 38,547 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities | | | | | | |
| Single-family ( | | | | | | |
| Subprime | 351 | 52,492 | 52,843 | 363 | 53,855 | 54,218 |
| Option ARM | | 15,232 | 15,232 | | 15,646 | 15,646 |
| Alt-A and other | 2,333 | 15,977 | 18,310 | 2,405 | 16,438 | 18,843 |
| CMBS | 21,002 | 36,857 | 57,859 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions( | 9,359 | 24 | 9,383 | 9,851 | 26 | 9,877 |
| Manufactured housing | 904 | 145 | 1,049 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities(6) | 33,949 | 120,727 | 154,676 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $136,725 | $148,780 | 285,505 | $137,033 | $ 151,660 | 288,693 |
| Premiums, discounts, deferred fees, premiums of UPB and other basis adjustments | | | (11,959) | | | (11,839) |
| Net unrealized losses on mortgage-related securities, pre-tax | | | (8,978) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $264,568 | | | $ 265,000 |

(1) Variable-rate mortgage-related securities include those with a coupon rate that, prior to contractual maturity, is subject to change based on changes in the composition of the underlying collateral.

(2) We are a subco ho ed to the risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, amortized cost. We do not consolidate our securitization trusts since we are not deemed to be the primary beneficiary of such trusts. See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our Investments in Securities" in our 2010 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equal to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 50% of these securities held at both March 31, 2011 and December 31, 2010 were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for mortgage non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 22% and 23% of total non-agency mortgage-related securities held at March 31, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The total UPB of our investments in mortgage related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $285.5 billion at March 31, 2011 primarily as a result of liquidations exceeding our purchase activity during the three months ended March 31, 2011.

Table 18 summarizes our mortgage related securities purchase activity for the three months ended March 31, 2011 and 2010. The purchase activity includes single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

3

*Freddie Mac*

Source   DRA HOM  OAN MORTGAG  CORP, 10 Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.