**Table of Contents**

**Table 18 — Total Mortgage-Related Securities Purchase Activity(1)**

| | Three Months Ended March 31, | |
| | 2011 | 2010 |
| --- | --- | --- |
| | (in millions) | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | |
| Ginnie Mae Certificates | $    16 | $    13 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions(2) | 2,879 | 5,621 |
| Total Non-Freddie Mac mortgage-related securities purchased for resecuritization | 2,895 | 5,634 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | |
| Agency securities: | | |
| *Fannie Mae:* | | |
| Fixed-rate | 1,019 | — |
| Variable-rate | 168 | 47 |
| *Total agency securities* | 1,187 | 47 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 1,187 | 47 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 4,082 | $5,681 |
| Freddie Mac mortgage-related securities purchased: | | |
| *Single-family:* | | |
| Fixed-rate | $36,679 | $4,840 |
| Variable-rate | 2,542 | 203 |
| *Multifamily:* | | |
| Fixed-rate | 25 | 25 |
| Variable-rate | — | 31 |
| *Total Freddie Mac mortgage-related securities purchased* | $39,246 | $ 5,099 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.
(2) Purchases for the three months ended March 31, 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our 2010 Annual Report for further information on this component of the HFA Initiative.

We did not purchase any non-agency mortgage-related securities during the first quarters of 2011 or 2010, other than purchases for resecuritization as Other Guarantee Transactions.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At March 31, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.2 billion, compared to $23.1 billion at December 31, 2010. This improvement in unrealized losses was primarily due to an increase in fair value on non-agency mortgage-related securities, as spreads tightened on CMBS, coupled with fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at March 31, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk.*"

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Tables 19 and 20 present information about our holdings of these securities. Since the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1266                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans.

### Table 19 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]

| | As of | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 |
| | (dollars in millions) | | | | |
| UPB: | | | | | |
| Subprime first lien | $ 52,403 | $53,756 | $55,250 | $56,922 | $58,912 |
| Option ARM | 15,232 | 15,646 | 16,104 | 16,603 | 17,206 |
| Alt-A[2] | 15,487 | 15,917 | 16,406 | 16,909 | 17,476 |
| Gross unrealized losses, pre-tax:[3] | | | | | |
| Subprime first lien | $ 12,481 | $ 14,026 | $16,446 | $17,757 | $18,462 |
| Option ARM | 3,170 | 3,853 | 4,815 | 5,770 | 6,147 |
| Alt-A[2] | 1,941 | 2,096 | 2,542 | 3,335 | 3,539 |
| Present value of expected credit losses: | | | | | |
| Subprime first lien | $ 6,612 | $ 5,937 | $ 4,364 | $ 3,311 | $ 4,444 |
| Option ARM | 4,993 | 4,850 | 4,208 | 3,534 | 3,769 |
| Alt-A[2] | 2,401 | 2,469 | 2,101 | 1,653 | 1,635 |
| Collateral delinquency rate:[4] | | | | | |
| Subprime first lien | 44% | 45% | 45% | 46% | 49% |
| Option ARM | 44 | 44 | 44 | 45 | 46 |
| Alt-A[2] | 26 | 27 | 26 | 26 | 27 |
| Cumulative collateral loss:[5] | | | | | |
| Subprime first lien | 19% | 18% | 17% | 16% | 15% |
| Option ARM | 14 | 13 | 11 | 10 | 9 |
| Alt-A[2] | 7 | 6 | 6 | 5 | 5 |
| Average credit enhancement:[6] | | | | | |
| Subprime first lien | 24% | 25% | 25% | 26% | 28% |
| Option ARM | 11 | 12 | 12 | 13 | 15 |
| Alt-A[2] | 8 | 9 | 9 | 10 | 10 |

(1) See "Ratings of Non-Agency Mortgage-Related Securities" for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(3) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(4) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(5) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime first lien, option ARM, and Alt-A were structured to include credit enhancements, particularly through subordination and other structural enhancements.

(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by monoline bond insurance, overcollateralization and other forms of credit enhancement.

### Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans[1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 | 03/31/2010 |
| | (in millions) | | | | |
| Net impairment of available-for-sale securities recognized in earnings: | | | | | |
| Subprime — first and second liens | $ 734 | $ 1,207 | $ 213 | $ 17 | $ 332 |
| Option ARM | 281 | 668 | 577 | 48 | 102 |
| Alt-A and other | 40 | 372 | 296 | 333 | 19 |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime — first and second liens: | | | | | |
| Principal repayments | $1,361 | $ 1,512 | $1,685 | $2,001 | $2,117 |
| Principal cash shortfalls | 14 | 6 | 8 | 12 | 13 |
| Option ARM: | | | | | |
| Principal repayments | $ 315 | $ 347 | $ 377 | $ 435 | $ 449 |
| Principal cash shortfalls | 100 | 111 | 122 | 80 | 32 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 452 | $ 537 | $ 582 | $ 653 | $ 617 |
| Principal cash shortfalls | 81 | 62 | 56 | 67 | 22 |

(1) See "Ratings of Non-Agency Mortgage-Related Securities" for additional information about these securities.

(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1267                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As discussed below, we recognized impairment in earnings on our holdings of such securities during the three months ended March 31, 2011 and 2010. See "Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings" for more information.

For purposes of our impairment analysis, our estimate of the present value of expected future credit losses on our portfolio of non-agency mortgage-related securities increased to $15.2 billion at March 31, 2011 from $14.3 billion at December 31, 2010. All of this amount has been reflected in our net impairment of available-for-sale securities recognized in earnings in this and prior periods. The increase in our estimate of the present value of expected future credit losses resulted primarily from our expectation of slower prepayments, and to a lesser extent from deteriorating delinquency data on the underlying loans, decreases in actual and forward home prices, and higher forward interest rates.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $903 million on impaired non-agency mortgage-related securities, of which $199 million related to the three months ended March 31, 2011. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reasons we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted. During the three months ended March 31, 2011, we continued to experience the depletion of structural credit enhancements on selected securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers.*"

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

Table 21 provides information about the mortgage-related securities for which we recognized other-than-temporary impairments for the three months ended March 31, 2011 and 2010.

**Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | | Three Months Ended | | | |
| | March 31, 2011 | | | March 31, 2010 | |
| | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings |
| | | (in millions) | | | |
| Subprime: | | | | | |
| 2006 & 2007 first lien | $ 34,370 | $ | 712 | $19,084 | $ | 317 |
| Other years — first and second liens[1] | 1,089 | | 22 | 643 | | 15 |
| Total subprime — first and second liens[1] | 35,459 | | 734 | 19,727 | | 332 |
| Option ARM: | | | | | |
| 2006 & 2007 | 9,929 | | 232 | 7,251 | | 88 |
| Other years | 2,170 | | 49 | 223 | | 14 |
| Total option ARM | 12,099 | | 281 | 7,474 | | 102 |
| Alt-A: | | | | | |
| 2006 & 2007 | 2,416 | | 15 | 1,625 | | 9 |
| Other years | 3,728 | | 23 | 292 | | 2 |
| Total Alt-A | 6,144 | | 38 | 1,917 | | 11 |
| Other loans | 520 | | 2 | 491 | | 8 |
| Total subprime, option ARM, Alt-A and other loans | 54,222 | | 1,055 | 29,609 | | 453 |
| CMBS | 1,404 | | 135 | 1,629 | | 55 |
| Manufactured housing | 314 | | 3 | 83 | | 2 |
| Total available-for-sale mortgage-related securities | $ 55,940 | $ | 1,193 | $ 31,321 | $ | 510 |

(1) Includes all second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $1.2 billion and $510 million during the three months ended March 31, 2011 and 2010, respectively, as our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. Included in these net

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

impairments are $1.1 billion and $453 million of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three months ended March 31, 2011 and 2010, respectively.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence, which contributed to poor performance during the three months ended March 31, 2011 and 2010. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain monoline bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three months ended March 31, 2011 and 2010. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at March 31, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at March 31, 2011 and as such has been recorded in AOCI.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change due to changes in the performance of the individual securities and in mortgage market conditions. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report.

*Ratings of Non-Agency Mortgage-Related Securities*

Table 22 shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at March 31, 2011 based on their ratings as of March 31, 2011 as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

TREASURY-1269

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of March 31, 2011 | UPB | Percentage of UPB | Amortized Cost (dollars in millions) | Gross Unrealized Losses | Monoline Insurance Coverage(1) |
|---|---|---|---|---|---|
| Subprime loans: | | | | | |
| AAA-rated | $ 1,433 | 3% | $ 1,433 | $ (97) | $ 23 |
| Other investment grade | 3,069 | 6 | 3,069 | (367) | 400 |
| Below investment grade(2) | 48,341 | 91 | 41,328 | (12,029) | 1,779 |
| Total | $ 52,843 | 100% | $ 45,830 | $ (12,493) | $ 2,202 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 116 | 1 | 116 | (13) | 116 |
| Below investment grade(2) | 15,116 | 99 | 10,018 | (3,157) | 48 |
| Total | $ 15,232 | 100% | $ 10,134 | $ (3,170) | $ 164 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 769 | 4% | $ 773 | $ (43) | $ 7 |
| Other investment grade | 2,198 | 12 | 2,217 | (268) | 353 |
| Below investment grade(2) | 15,343 | 84 | 12,105 | (1,904) | 2,365 |
| Total | $ 18,310 | 100% | $ 15,095 | $ (2,215) | $ 2,725 |
| CMBS: | | | | | |
| AAA-rated | $ 27,331 | 47% | $ 27,386 | $ (27) | $ 42 |
| Other investment grade | 26,525 | 46 | 26,496 | (468) | 1,654 |
| Below investment grade(2) | 4,003 | 7 | 3,577 | (998) | 1,702 |
| Total | $ 57,859 | 100% | $ 57,459 | $ (1,493) | $ 3,398 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 29,533 | 21% | $ 29,592 | $ (167) | $ 72 |
| Other investment grade | 31,908 | 22 | 31,898 | (1,116) | 2,523 |
| Below investment grade(2) | 82,803 | 57 | 67,028 | (18,088) | 5,894 |
| Total | $ 144,244 | 100% | $128,518 | $ (19,371) | $ 8,489 |
| Total investments in mortgage-related securities | $ 285,505 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

| Credit Ratings as of December 31, 2010 | UPB | Percentage of UPB | Amortized Cost (dollars in millions) | Gross Unrealized Losses | Monoline Insurance Coverage(1) |
|---|---|---|---|---|---|
| Subprime loans: | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade(2) | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $ (14,056) | $ 2,269 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade(2) | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade(2) | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $ 2,818 |
| CMBS: | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade(2) | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $ 3,401 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade(2) | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $ 147,435 | 100% | $ 132,670 | $ (22,279) | $ 8,667 |
| Total investments in mortgage-related securities | $ 288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by monoline bond insurance coverage. This amount does not represent the maximum amount of losses we could recover, as the monoline insurance also covers interest.

(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1270

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet increased to $1,888 billion as of March 31, 2011 from $1,885 billion as of December 31, 2010. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased by $7.3 billion, to $156.2 billion at March 31, 2011 from $148.9 billion at December 31, 2010, primarily due to our purchases of seriously delinquent and modified loans from the mortgage pools underlying our PCs. As guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools when they are significantly past due or when we determine that loss of the property is likely or default by the borrower is imminent due to borrower incapacity, death or other extraordinary circumstances that make future payments unlikely or impossible. This right to repurchase mortgages is known as our repurchase option, and we also exercise this option when we modify a mortgage. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our purchases of single-family loans from PC pools.

The UPB of unsecuritized multifamily mortgage loans was $84.2 billion at March 31, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in the first quarters of 2011 and 2010 primarily consisted of purchases of loans intended for securitization and sales through Other Guarantee Transactions as part of our CME securitization program. We expect to continue to purchase and subsequently securitize multifamily loans in 2011 under our CME securitization program, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy in 2011.

Table 23 summarizes our purchase and guarantee activity in mortgage loans for the three months ended March 31, 2011 and 2010. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs and certain Other Guarantee Transactions (regardless of whether such securities are held by us or third parties); (b) unsecuritized single-family and multifamily mortgage loans; and (c) mortgage loans underlying our mortgage-related financial guarantees which are not consolidated on our balance sheets.

**Table 23 — Mortgage Loan Purchase and Other Guarantee Commitment Activity(1)**

| | Three Months Ended March 31, | | | |
| | 2011 | | 2010 | |
| | Purchase Amount | % of Purchases | Purchase Amount | % of Purchases |
| | | (dollars in millions) | | |
| Mortgage loan purchases and guarantee issuances: | | | | |
| Single-family: | | | | |
| 30-year or more amortizing fixed-rate | $62,898 | 62% | $ 65,614 | 72% |
| 20-year amortizing fixed-rate | 6,715 | 7 | 3,358 | 4 |
| 15-year amortizing fixed-rate | 22,110 | 22 | 15,114 | 17 |
| Adjustable-rate(2) | 5,741 | 6 | 1,858 | 2 |
| Interest-only(3) | — | — | 321 | <1 |
| FHA/VA and other governmental | 87 | <1 | 2,783 | 3 |
| _Total single-family(4)_ | 97,551 | 97% | 89,048 | 98% |
| Multifamily | 3,049 | 3 | 2,113 | 2 |
| _Total mortgage loan purchases and other guarantee commitment activity(5)_ | $ 100,600 | 100% | $ 91,161 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements(6) | 7% | | 13% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes net additions of seriously delinquent loans and balloon/reset mortgages purchased out of PC pools. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the first quarter of 2011 or 2010.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $7.3 billion and $5.9 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the three months ended March 31, 2011 and 2010, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $1.8 billion and $2.8 billion and issuances of other guarantee commitments on multifamily loans of $0.2 billion and $0.6 billion during the three months ended March 31, 2011 and 2010, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in the first quarter of 2010.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our single-family credit guarantee portfolio.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1271

Table of Contents

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets to derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

At March 31, 2011, the net fair value of our total derivative portfolio was $(0.7) billion, as compared to $(1.1) billion at December 31, 2010. The increase in the net fair value of our total derivative portfolio was primarily due to increasing longer-term swap interest rates. See "NOTE 11: DERIVATIVES — Table 11.1 — Derivative Assets and Liabilities at Fair Value" for our notional or contractual amounts and related fair values of our total derivative portfolio by product type at March 31, 2011 and December 31, 2010. Also see "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

Table 24 shows the fair value for each derivative type and the maturity profile of our derivative positions as of March 31, 2011. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated. See "Table 30 — Derivative Counterparty Credit Exposure" for additional information regarding derivative counterparty credit exposure. Table 24 also provides the weighted average fixed rate of our pay-fixed and receive-fixed swaps.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24 — Derivative Fair Values and Maturities**

| | | | March 31, 2011 | | | |
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount(2) | Total Fair Value(3) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 230,197 | $ 432 | $ 185 | $ 262 | $ 272 | $ (287) |
| Weighted average fixed rate(4) | | | 1.36% | 1.18% | 2.42% | 3.68% |
| Forward-starting swaps(5) | 19,596 | 141 | — | 8 | (1) | 134 |
| Weighted average fixed rate(4) | | | — | 1.37% | 1.57% | 4.50% |
| Total receive-fixed | 249,793 | 573 | 185 | 270 | 271 | (153) |
| Basis (floating to floating) | 3,375 | 3 | — | — | — | 3 |
| Pay-fixed: | | | | | | |
| Swaps | 299,011 | (13,473) | (178) | (1,144) | (2,761) | (9,390) |
| Weighted average fixed rate(4) | | | 3.21% | 2.44% | 3.24% | 4.07% |
| Forward-starting swaps(5) | 31,004 | (2,682) | — | — | — | (2,682) |
| Weighted average fixed rate(4) | | | — | — | — | 4.96% |
| Total pay-fixed | 330,015 | (16,155) | (178) | (1,144) | (2,761) | (12,072) |
| Total interest-rate swaps | 583,183 | (15,579) | 7 | (874) | (2,487) | (12,225) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 104,850 | 7,172 | 3,319 | 1,127 | 1,340 | 1,386 |
| Written | 23,775 | (566) | (4) | (415) | (147) | — |
| Put swaptions | | | | | | |
| Purchased | 60,475 | 1,819 | 56 | 615 | 462 | 686 |
| Written | 6,000 | (1) | (1) | — | — | — |
| Other option-based derivatives(6) | 44,884 | 1,388 | (4) | — | — | 1,392 |
| Total option-based | 239,984 | 9,812 | 3,366 | 1,327 | 1,655 | 3,464 |
| Futures | 157,197 | (97) | (97) | — | — | — |
| Foreign-currency swaps | 2,138 | 281 | 8 8 | 193 | — | — |
| Commitments(7) | 15,877 | — | — | — | — | — |
| Swap guarantee derivatives | 3,731 | (36) | — | (1) | (1) | (34) |
| Subtotal | 1,002,110 | (5,619) | $3,364 | $ 645 | $ (833) | $ (8,795) |
| Credit derivatives | 11,664 | 2 | | | | |
| Subtotal | 1,013,774 | (5,617) | | | | |
| Derivative interest receivable (payable), net | | (1,596) | | | | |
| Trade/settle receivable (payable), net | | 3 | | | | |
| Derivative collateral (held) posted, net | | 6,518 | | | | |
| Total | $ 1,013,774 | $ (692) | | | | |

(1) Fair value is categorized based on the period from March 31, 2011 until the contractual maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(6) Primarily includes purchased interest rate caps and floors.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1273

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 25 summarizes the changes in derivative fair values.

**Table 25 — Changes in Derivative Fair Values**

| | Three Months Ended March 31,[1] | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $(6,560) | $(2,267) |
| Net change in: | | |
|    Commitments[2] | 20 | 10 |
|    Credit derivatives | (5) | (2) |
|    Swap guarantee derivatives | — | (1) |
| Other derivatives:[3] | | |
|    Changes in fair value | 986 | (3,302) |
|    Fair value of new contracts entered into during the period[4] | 233 | 56 |
|    Contracts realized or otherwise settled during the period | (291) | 380 |
| Ending balance, at December 31 — Net asset (liability) | $(5,617) | $(5,126) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable (payable), net, trade/settle receivable (payable), net and derivative cash collateral (held) posted, net. Refer to "Table 24 — Derivative Fair Values and Maturities" for reconciliation of fair value to the amounts presented on our consolidated balance sheets as of March 31, 2011. Fair value excludes derivative interest receivable or (payable), net of $(1.5) billion, trade/settle receivable or (payable), net of $3 million, and derivative cash collateral posted, net of $5.7 billion at March 31, 2010.

(2) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

**REO, Net**

As a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee, we acquire properties which are recorded as REO assets on our consolidated balance sheets. The balance of our REO, net, declined to $6.4 billion at March 31, 2011 from $7.1 billion at December 31, 2010. The pace of our REO acquisitions temporarily slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices. These delays in foreclosures continued in the first quarter of 2011, particularly in states that require a judicial foreclosure process. While foreclosure proceedings generally resumed during the first quarter of 2011, the rate of foreclosure completion is slower than prior to the suspensions. We expect our REO inventory to grow in the remainder of 2011. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Performance — Non-Performing Assets*" for additional information about our REO activity.

**Deferred Tax Assets, Net**

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in all subsequent quarters, including in the first quarter of 2011. Our valuation allowance decreased by $91 million during the first quarter of 2011 to $33.3 billion, primarily due to the reversal of temporary differences during the period. As of March 31, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $4.5 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

*IRS Examinations*

The IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. We currently believe adequate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1274                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Other Assets**

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $8.1 billion as of March 31, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in servicer receivables resulting from lower loan liquidations on mortgage loans held by consolidated trusts. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

<div align="center">41</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 26 presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type based on the UPB of the securities.

**Table 26 — Freddie Mac Mortgage-Related Securities**[1][2]

| | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $ 1,192,471 | $     — | $ 1,192,471 | $1,213,448 | $     — | $1,213,448 |
| 20-year amortizing fixed-rate | 67,076 | — | 67,076 | 65,210 | — | 65,210 |
| 15-year amortizing fixed-rate | 249,148 | — | 249,148 | 248,702 | — | 248,702 |
| Adjustable-rate[3] | 62,160 | — | 62,160 | 61,269 | — | 61,269 |
| Interest-only[4] | 72,630 | — | 72,630 | 79,835 | — | 79,835 |
| FHA/VA and other governmental | 3,570 | — | 3,570 | 3,369 | — | 3,369 |
| *Total single-family* | 1,647,055 | — | 1,647,055 | 1,671,833 | — | 1,671,833 |
| Multifamily | — | 4,560 | 4,560 | — | 4,603 | 4,603 |
| *Total single-family and multifamily* | 1,647,055 | 4,560 | 1,651,615 | 1,671,833 | 4,603 | 1,676,436 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds[5] | | | | | | |
| Single-family | — | 6,152 | 6,152 | — | 6,168 | 6,168 |
| Multifamily | — | 1,146 | 1,146 | — | 1,173 | 1,173 |
| Total HFA bonds | — | 7,298 | 7,298 | — | 7,341 | 7,341 |
| Other: | | | | | | |
| Single-family[6] | 14,979 | 4,146 | 19,125 | 15,806 | 4,243 | 20,049 |
| Multifamily | — | 11,107 | 11,107 | — | 8,235 | 8,235 |
| Total Other Guarantee Transactions | 14,979 | 15,253 | 30,232 | 15,806 | 12,478 | 28,284 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[7] | — | 833 | 833 | — | 857 | 857 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,662,034 | $   27,944 | $1,689,978 | $1,687,639 | $   25,279 | $1,712,918 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[8] | (164,185) | | | (170,638) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $1,497,849 | | | $ 1,517,001 | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled.

(2) Excludes other guarantee commitments for mortgage assets held by third parties that require us to purchase loans from lenders when these loans meet certain delinquency criteria.

(3) Includes $1.2 billion and $1.3 billion in UPB of option ARM mortgage loans as of March 31, 2011 and December 31, 2010, respectively. See endnote (6) for additional information on option ARM loans that back our Other Guarantee Transactions.

(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(5) Consists of bonds we acquired and resecuritized under the NIBP.

(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $8.2 billion and $8.4 billion in UPB of securities backed by option ARM mortgage loans at March 31, 2011 and December 31, 2010, respectively.

(7) Backed by FHA/VA loans.

(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1276

Table of Contents

Table 27 presents issuances and extinguishments of the debt securities of our consolidated trusts during the three months ended March 31, 2011 and 2010 as well as the UPB of consolidated trusts held by third parties.

## Table 27 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $ 1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | |
| Issuances based on underlying mortgage product type: | | |
| 30-year or more amortizing fixed-rate | 61,791 | 68,424 |
| 20-year amortizing fixed-rate | 6,243 | 2,873 |
| 15-year amortizing fixed-rate | 19,866 | 13,207 |
| Adjustable-rate | 5,646 | 1,770 |
| Interest-only | 152 | 284 |
| FHA/VA | 160 | 1,074 |
| Debt securities of consolidated trusts retained by us at issuance | (6,345) | (2,310) |
| Net issuances of debt securities of consolidated trusts | 87,513 | 85,322 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 24,576 | 7,911 |
| Total issuances to third parties of debt securities of consolidated trusts | 112,089 | 93,233 |
| Extinguishments, net[3] | (131,241) | (114,264) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,497,849 | $1,543,062 |

(1) Based on UPB.
(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.
(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of March 31, 2011 and 2010.

## Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $7.5 billion as of March 31, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in servicer liabilities during the first quarter of 2011. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

## Total Equity (Deficit)

Total equity (deficit) increased from $(401) million at December 31, 2010 to $1.2 billion at March 31, 2011, reflecting: (a) a $1.9 billion decrease in unrealized losses recorded in AOCI on our available-for-sale securities; (b) net income of $676 million for the three months ended March 31, 2011; (c) $500 million received from Treasury during the first quarter of 2011 under the Purchase Agreement; and (d) a $132 million decrease in unrealized losses recorded in AOCI related to our closed cash flow hedge relationships. These amounts were partially offset by the payment of senior preferred stock dividends in an aggregate amount of $1.6 billion.

The balance of AOCI at March 31, 2011 was a net loss of approximately $10.0 billion, net of taxes, compared to a net loss of $12.0 billion, net of taxes, at December 31, 2010. Net unrealized losses in AOCI on our available-for-sale securities decreased by $1.9 billion during the first quarter of 2011, primarily due to an increase in prices on non-agency mortgage-related securities, as spreads tightened on CMBS, coupled with fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $132 million during the first quarter of 2011, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2010 Annual Report and in this Form 10-Q for additional information regarding these and other risks.

*Freddie Mac*

TREASURY-1277

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk.  Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will  fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage  we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage  assets or have guaranteed mortgages in connection with the  issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

### *Institutional Credit Risk*

In recent periods, challenging market conditions adversely  affected the liquidity and financial condition of our  counterparties and this trend has continued in 2011. The concentration of our exposure to our counterparties has  increased in recent periods due to industry consolidation and counterparty failures. In addition, previously highly-rated  mortgage insurers have been downgraded in prior periods due to  their weakened financial condition. As a result, we continue to face challenges in reducing our risk concentrations with  counterparties.

Our exposure to mortgage seller/servicers remained high in 2010  and the three months ended March 31, 2011 with respect to  their repurchase obligations arising from breaches of  representations and warranties made to us for loans they  underwrote and sold to us. We rely significantly on our seller/servicers to perform loan workout activities as well as  foreclosures on loans that they service for us. Our credit  losses could increase to the extent that our seller/servicers do  not fully perform these obligations in a prudent and timely  manner. Our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

Our investments in securities expose us to institutional credit  risk to the extent that servicers, issuers, guarantors, or third  parties providing credit enhancements become insolvent or do not  perform their obligations. Our investments in non-Freddie Mac  mortgage-related securities include both agency and non-agency  securities. However, agency securities have historically  presented minimal institutional credit risk due to the guarantee provided by those institutions. See "CONSOLIDATED BALANCE  SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our  investments in mortgage-related securities, including  higher-risk components and impairment charges we recognized in the three months ended March 31, 2011 and 2010 related to  these investments. For information about institutional credit risk associated with our investments in non-mortgage-related  securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments  Counterparties" below.

We are working to enforce our rights as an investor with respect  to the non-agency mortgage-related securities we hold, and are  engaged in efforts to potentially mitigate losses on our  investments in non-agency mortgage-related securities. Our  Conservator directed us to work with Fannie Mae to enforce  investor rights in securitization trusts in which we both have  interests. We are also pursuing other loss mitigation strategies, in some cases in conjunction with other investors.  The effectiveness of our efforts is highly uncertain and any  potential recoveries may take significant time to realize. See  "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information on our investments in non-agency mortgage-related securities.

Consolidation in the industry and any efforts we take to reduce  exposure to financially weakened counterparties could further  increase our exposure to individual counterparties. The failure  of any of our primary counterparties to meet their obligations  to us could have a material adverse effect on our results of  operations, financial condition, and our ability to conduct  future business.

### <u>Mortgage Seller/Servicers</u>

We acquire a significant portion of our single-family mortgage  purchase volume from several large lenders, or seller/servicers.  Our top 10 single-family seller/servicers provided approximately 85% of our single-family purchase volume during  the three months ended March 31, 2011. Wells Fargo Bank, N.A.,  Chase Home Finance LLC, Bank of  America, N.A. and U.S. Bank, N.A. accounted for 30%, 13%,  12%, and 11% respectively, of our single-family mortgage  purchase volume and were the only single-family seller/servicers  that comprised 10% or more of our purchase volume for the  three months ended March 31, 2011. For the three months ended  March 31, 2011, our top three multifamily lenders, CBRE Capital  Markets, Inc., Berkadia Commercial  Mortgage LLC and Holliday, Fenoglio Fowler, L.P., accounted for 26%, 14%, and 13%, respectively, of our multifamily purchase  volume. Our top 10 multifamily lenders  represented an aggregate of approximately 90% of our multifamily  purchase volume for the three months ended March 31, 2011.

44

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages. In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. In some cases, the ultimate amounts of recovery payments we received and may receive in the future from seller/servicers were and may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations.

Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. The UPB of loans subject to repurchase requests issued to our single-family seller/servicers declined to approximately $3.4 billion as of March 31, 2011 from $3.8 billion as of December 31, 2010, primarily because resolved requests of $3.2 billion exceeded our issuance of $2.8 billion of new requests for the three months ended March 31, 2011. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. As of March 31, 2011 and December 31, 2010, approximately 38% and 34%, respectively, of these repurchase requests were outstanding for more than four months since issuance of our initial repurchase request, as measured by the UPB of the loans subject to the requests. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily because many of these requests will likely be satisfied by reimbursement of our realized losses by seller/servicers, or may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests would also be less than the UPB of the loans. As of March 31, 2011, a significant portion of the repurchase requests outstanding more than four months relates to requests made because the mortgage insurer rescinded the mortgage insurance on the loan or denied the mortgage insurance claim. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated or we fail to collect on these repurchase requests.

During the three months ended March 31, 2011, we recovered amounts that covered losses with respect to $1.2 billion of UPB of loans associated with our repurchase requests. Four of our largest single-family seller/servicers collectively had approximately 40% and 32% of their repurchase obligations outstanding more than four months at March 31, 2011 and December 31, 2010, respectively, as measured by the UPB of loans associated with our repurchase requests. In order to resolve outstanding repurchase requests on a more timely basis with our single-family seller/servicers in the future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases, with financial consequences or with stated remedies for non-compliance, as part of the annual renewals of our contracts with them. While these provisions are in place for certain of our seller/servicers, it is too early to tell if these provisions will help in resolving future repurchase requests in a more timely manner or the impact they may have on the size or timing of our credit losses. We may also enter into agreements with seller/servicers to resolve claims for outstanding or future repurchases.

Our estimate of probable incurred losses for exposures to seller/servicer repurchase obligations is considered in our allowance for loan losses as of March 31, 2011 and December 31, 2010; however, our actual losses may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information.

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We have exposure to TBW with respect to its loan repurchase obligations. We also have exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion relates to current and projected repurchase obligations and approximately $440 million relates to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represents miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans. On July 1, 2010, TBW filed a comprehensive final reconciliation report in the bankruptcy court indicating, among

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                          TREASURY-1279                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

other things, that approximately $203 million in funds held in bank accounts maintained by TBW related to its servicing of Freddie Mac's loans and was potentially available to pay Freddie Mac's claims. These assets include certain funds on deposit with Colonial Bank. We have analyzed the report and, as necessary and appropriate, may revise the amount of our claim.

We estimate that our loss exposure to TBW at March 31, 2011, excluding potential claims by Ocala Funding, LLC discussed below, was approximately $690 million. This estimated exposure has been previously recognized by us through March 31, 2011. However, our ultimate losses could exceed this estimate.

No actions against Freddie Mac related to TBW or Ocala Funding, LLC, which is a wholly-owned subsidiary of TBW, have been initiated in bankruptcy court or elsewhere to recover assets. However, we understand that Ocala or its creditors may file an action to recover certain funds paid to, and loans acquired by, us prior to the TBW bankruptcy. Based on court filings and other information, we understand that Ocala or its creditors may assert fraudulent transfer and possibly other claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. Ocala may also make claims against us asserting ownership of a large number of loans that we purchased from TBW. We are unable to estimate our loss exposure related to any claim against us concerning such loans.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery in the proceeding has been stayed at the request of the U.S. Department of Justice, pending completion of a criminal trial involving the former chairman and chief executive officer of TBW. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on our claim arising from TBW's bankruptcy.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program, and therefore we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of March 31, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14%, and 12%, respectively, of our single-family mortgage loans, as of March 31, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results. For more information on developments in mortgage servicing, see "Operational Risks."

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report. For information on our problem loan workouts, see "*Mortgage Credit Risk — Portfolio Management Activities — Loan Workout Activities.*"

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, indemnify us for losses resulting from any breach, or pay damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio.

TREASURY-1280

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As of March 31, 2011, our top four multifamily servicers,  Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our  multifamily mortgage portfolio and together serviced approximately 52% of our multifamily mortgage portfolio.

Similarly, in our multifamily business, we are exposed to the  risk that multifamily seller/servicers could come under  financial pressure due to the current stressful economic  environment, which could potentially cause degradation in the  quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through  recourse agreements or other credit enhancements, where  applicable. We continue to monitor the status of all our  multifamily seller/servicers in accordance with our counterparty  credit risk management framework.

### *Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that  insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal  and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that  provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

Table 28 summarizes our exposure to mortgage insurers as of  March 31, 2011. In the event that a mortgage insurer fails  to perform, the coverage outstanding represents our maximum  exposure to credit losses resulting from such failure.

### Table 28 — Mortgage Insurance by Counterparty

| | | | As of March 31, 2011 | | |
| Counterparty Name | Credit Rating(1) | Credit Rating Outlook(1) | Primary Insurance(2) | Pool Insurance(2) (in billions) | Coverage Outstanding(3) |
|---|---|---|---|---|---|
| Mortgage Guaranty Insurance Corporation (MGIC) | B+ | Negative | $    51.7 | $    32.3 | $    13.7 |
| Radian Guaranty Inc. | B+ | Negative | 38.0 | 15.5 | 11.2 |
| Genworth Mortgage Insurance Corporation | BB+ | Negative | 33.2 | 0.9 | 8.5 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.7 | 0.3 | 7.0 |
| PMI Mortgage Insurance Co. | B | Positive | 26.9 | 2.4 | 6.7 |
| Republic Mortgage Insurance Company | BB+ | Negative | 22.5 | 2.4 | 5.6 |
| Triad Guaranty Insurance Corp.(4) | NR | NR | 9.8 | 1.0 | 2.4 |
| CMG Mortgage Insurance Co. | BBB | Negative | 2.8 | 0.1 | 0.7 |
| Total | | | $   213.6 | $    54.9 | $    55.8 |

(1) Latest rating available as of April 22, 2011. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our  single-family credit guarantee portfolio covered by the  respective insurance type.

(3) Represents the remaining aggregate contractual limit for  reimbursement of losses under policies of both primary and pool  insurance. These amounts are based on our gross coverage without regard to coverage that may exist to the extent an  affected mortgage is covered under both types of insurance.

(4) Beginning on June 1, 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations.

We believe that our pool insurance policies with MGIC provide us  with the right to obtain recoveries for losses up to the  aggregate limit indicated in Table 28. However, based on information we received from MGIC, we understand that MGIC may  challenge our future claims under those policies if the claims  reach an aggregate loss limit that is approximately  $0.5 billion lower than the coverage outstanding amount set forth in Table 28.

We received proceeds of $587 million and $294 million during the three months ended March 31, 2011 and 2010,  respectively, from our primary and pool mortgage insurance  policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.5 billion at both March 31,  2011 and December 31, 2010.

The UPB of single-family loans covered by pool insurance  declined approximately 4% during the three months ended  March 31, 2011, primarily due to payoffs and other  liquidation events. We did not purchase pool insurance on  single-family loans during the quarter ended March 31, 2011. In recent periods we also reached the maximum limit of  recovery on certain of these policies.

Based upon currently available information, we believe that all  of our mortgage insurance counterparties have the capacity  to pay all claims as due in the normal course for the near term,  except for claims obligations of Triad that were partially  deferred beginning June 1, 2009, under order of Triad's state regulator. To date, Triad's regulator has not allowed Triad to begin paying its deferred payment  obligations, and it is uncertain when or if Triad will be permitted to do so.

We believe at least one of our largest servicers entered into  arrangements with two of our mortgage insurance counterparties  for settlement of future rescission activity for certain  mortgage loans. Under such agreements, servicers pay  and/or indemnify mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1281                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could result in negative financial impacts on our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. It is unclear how widespread this type of agreement between our servicers and mortgage insurers may become or how many loans it may impact.

### Bond Insurers

Most of the non-agency mortgage-related securities we hold rely primarily on subordinated tranches to provide credit loss protection. Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Table 29 presents our coverage amounts of monoline bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a monoline bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

### Table 29 — Monoline Bond Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | March 31, 2011 | |
|---|---|---|---|---|
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | NR | N/A | $ 4.4 | 43% |
| Financial Guaranty Insurance Company (FGIC)[3] | NR | N/A | 2.0 | 19 |
| MBIA Insurance Corp. | B– | Negative | 1.4 | 14 |
| Assured Guaranty Municipal Corp. | AA– | Negative | 1.2 | 12 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.2 | 11 |
| Syncora Guarantee Inc.[3] | NR | N/A | 0.1 | 1 |
| Total | | | $ 10.3 | 100% |

(1) Latest ratings available as of April 22, 2011. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.

(3) Neither S&P nor Moody's provide credit ratings for Ambac, FGIC, or Syncora Guarantee Inc., since these companies continue to operate under regulatory supervision.

We continue to actively monitor the financial strength of our bond insurers in accordance with our risk management policies. We expect to receive substantially less than full payment of our claims from FGIC and Ambac due to adverse developments concerning these companies. FGIC and Ambac are currently not paying any claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of these bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted, which may result in further impairment losses to be recognized on our investments in securities. We considered our expectations regarding our bond insurers' ability to meet their obligations, including those of Ambac and FGIC, in making our impairment determinations at March 31, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of March 31, 2011 and December 31, 2010, there were $78.3 billion and $91.6 billion, respectively, of cash and other non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1282

Table of Contents

mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of March 31, 2011, these included:

- $30.1 billion of cash equivalents invested in 46 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $4.5 billion of federal funds sold with three counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $16.7 billion of securities purchased under agreements to resell with seven counterparties that had short-term S&P ratings of A-1 or above;

- $15.3 billion of securities purchased under agreements to resell with seven counterparties that had short-term S&P ratings of A-2; and

- $9.6 billion of cash deposited with the Federal Reserve Bank.

### *Derivative Counterparties*

We are exposed to institutional credit risk arising from the possibility that a derivative counterparty will not be able to meet its contractual obligations. We are an active user of exchange-traded products, such as Treasury and Eurodollar futures, to reduce our overall exposure to derivative counterparties. Exchange-traded derivatives do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled directly between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at a given date (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities, or a combination of both having that market value necessary to satisfy its net obligation to us under the derivatives (subject to a threshold).

The Dodd-Frank Act will require that, in the future, many types of derivatives be centrally cleared and traded on exchanges or comparable trading facilities. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "LEGISLATIVE AND REGULATORY MATTERS — Dodd-Frank Act" for more information. In addition, we continue to work with the Chicago Mercantile Exchange and other parties to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring of our positions with each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. A large number of OTC derivative counterparties have credit ratings below AA–. We require such counterparties to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. Table 30 summarizes our exposure to our derivative counterparties, which represents the net positive fair

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1283                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts).

**Table 30 — Derivative Counterparty Credit Exposure**

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | *(dollars in millions)* | | | |
| AA | 3 | $ 50,259 | $ — | $ — | 6.1 | $10 million or less |
| AA− | 4 | 236,106 | 1,671 | 15 | 6.2 | $10 million or less |
| A+ | 7 | 362,192 | 18 | 1 | 5.8 | $1 million or less |
| A | 3 | 159,669 | 15 | 1 | 5.7 | $1 million or less |
| Subtotal[7] | 17 | 808,226 | 1,704 | 17 | 5.9 | |
| Other derivatives[8] | | 185,940 | — | — | | |
| Commitments[9] | | 15,877 | 32 | 32 | | |
| Swap guarantee derivatives | | 3,731 | — | — | | |
| Total derivatives[10] | | $ 1,013,774 | $ 1,736 | $ 49 | | |

*(March 31, 2011)*

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | *(dollars in millions)* | | | |
| AA | 3 | $ 53,975 | $ — | $ — | 6.8 | $10 million or less |
| AA− | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal[7] | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Other derivatives[8] | | 244,640 | — | — | | |
| Commitments[9] | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | 3,614 | — | — | | |
| Total derivatives[10] | | $1,205,496 | $ 2,247 | $ 135 | | |

*(December 31, 2010)*

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.

(2) Based on legal entities. Affiliated legal entities are reported separately.

(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.

(4) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net) and trade/settle fees.

(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level.

(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.

(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.

(8) Consists primarily of exchange-traded contracts, certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

(9) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(10) The difference between the exposure, net of collateral column above and derivative assets, net on our consolidated balance sheets primarily represents exchange-traded contracts which are settled daily through a clearinghouse, and thus, do not present counterparty credit exposure.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on March 31, 2011, our uncollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $17 million. Our uncollateralized exposure as of December 31, 2010 was $32 million. One of our counterparties, HSBC Bank USA, which was rated AA− as of April 22, 2011, accounted for greater than 10% of our net uncollateralized exposure to derivatives counterparties at March 31, 2011.

As indicated in Table 30, approximately 99% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at March 31, 2011. The uncollateralized exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1284

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the date we received the related collateral. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

As indicated in Table 30, the total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $32 million and $103 million at March 31, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### Mortgage Credit Risk

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and general economic conditions. All mortgages that we purchase or guarantee have an inherent risk of default.

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Requirements and Quality Control Standards*" in our 2010 Annual Report for information about our charter requirements for single-family loans purchases, delegated underwriting, and our quality control monitoring.

Conditions in the mortgage market continued to remain challenging during the first quarter of 2011. All single-family mortgage loans, especially those originated between 2005 and 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in the first quarter of 2011, primarily due to economic factors which adversely affected borrowers. Also contributing to high serious delinquency rates were: (a) delays related to servicer processing capacity constraints; (b) delays associated with the HAMP trial period and related processes; and (c) delays in the foreclosure process, including those associated with deficiencies in foreclosure documentation practices, and other delays imposed by third parties. These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. While still at historically high levels, the UPB of our single-family non-performing loans declined during the first quarter of 2011, and the number of loans that transitioned to serious delinquency declined.

### Characteristics of the Single-Family Credit Guarantee Portfolio

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at March 31, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in the first quarter of 2011 increased by 10% to $97.6 billion, as compared to $89.0 billion in the first quarter of 2010. The substantial majority of the single-family mortgages we purchased in the first quarter of 2011 were 30-year and 15-year fixed-rate mortgages. Approximately 85% of our purchases for the single-family credit guarantee portfolio in the first quarter of 2011 were refinance mortgages.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1285

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 19% and 18% as of March 31, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 13.7% and 14.9% as of March 31, 2011 and December 31, 2010, respectively. In addition, as of March 31, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 723 and 721, respectively.

A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of March 31, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 31 provides additional characteristics of single-family mortgage loans purchased during the three months ended March 31, 2011 and 2010, and of our single-family credit guarantee portfolio at March 31, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 31 — Characteristics of the Single-Family Credit Guarantee Portfolio[1]**

| | Purchases During the Three Months Ended March 31, | | Portfolio[2] at | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | March 31, 2011 | December 31, 2010 |
| **Original LTV Ratio Range**[3][4] | | | | |
| 60% and below | 33% | 32% | 23% | 23% |
| Above 60% to 70% | 18 | 17 | 16 | 16 |
| Above 70% to 80% | 42 | 45 | 43 | 43 |
| Above 80% to 90% | 4 | 4 | 9 | 9 |
| Above 90% to 100% | 3 | 2 | 8 | 8 |
| Above 100% | — | — | 1 | 1 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 66% | 67% | 71% | 71% |
| **Estimated Current LTV Ratio Range**[5] | | | | |
| 60% and below | | | 26% | 27% |
| Above 60% to 70% | | | 12 | 12 |
| Above 70% to 80% | | | 18 | 17 |
| Above 80% to 90% | | | 15 | 16 |
| Above 90% to 100% | | | 10 | 10 |
| Above 100% to 110% | | | 6 | 6 |
| Above 110% to 120% | | | 4 | 4 |
| Above 120% | | | 9 | 8 |
| Total | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | |
| Relief refinance mortgages[6] | | | 78% | 78% |
| All other mortgages | | | 78% | 78% |
| Total mortgages | | | 78% | 78% |
| **Credit Score**[3][7] | | | | |
| 740 and above | 74% | 70% | 53% | 53% |
| 700 to 739 | 18 | 19 | 21 | 21 |
| 660 to 699 | 7 | 8 | 15 | 15 |
| 620 to 659 | 1 | 2 | 7 | 7 |
| Less than 620 | — | 1 | 3 | 3 |
| Not available | — | — | 1 | 1 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | |
| Relief refinance mortgages[6] | 745 | 742 | 745 | 745 |
| All other mortgages | 758 | 754 | 733 | 732 |
| Total mortgages | 754 | 751 | 734 | 733 |
| **Loan Purpose** | | | | |
| Purchase | 15% | 21% | 30% | 31% |
| Cash-out refinance | 19 | 23 | 28 | 29 |
| Other refinance[8] | 66 | 56 | 42 | 40 |
| Total | 100% | 100% | 100% | 100% |
| **Property Type** | | | | |
| Detached/townhome[9] | 94% | 94% | 92% | 92% |
| Condo/Co-op | 6 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | |
| Primary residence | 92% | 92% | 91% | 91% |
| Second/vacation home | 4 | 4 | 5 | 5 |
| Investment | 4 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at both March 31, 2011 and December 31, 2010, are excluded from portfolio balance data since these securities are backed by non- Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 35 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien mortgage reduces the borrower's equity in the home, and therefore, can increase the risk of default.

(5) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) The ending balances of relief refinance mortgages comprised approximately 9% and 7% of our single-family credit guarantee portfolio as of March 31, 2011 and December 31, 2010, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities.

*Freddie Mac*

TREASURY-1287

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Attribute Combinations*

Certain combinations of loan characteristics often can also indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.6 billion and $11.8 billion at March 31, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, such as interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default.

*Single-Family Mortgage Product Types*

The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than other mortgage products.

*Interest-Only Loans*

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity. At both March 31, 2011 and December 31, 2010, interest-only loans represented approximately 5% of the UPB of our single-family credit guarantee portfolio. Beginning September 1, 2010, we no longer purchase interest-only loans. We purchased $0.3 billion of these loans during the first quarter of 2010.

*Option ARM Loans*

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both March 31, 2011 and December 31, 2010, option ARM loans represented approximately 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $8.2 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at March 31, 2011 and December 31, 2010, respectively. We have not identified these option ARM securities as either subprime or Alt-A securities. These option ARM securities could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

*Conforming Jumbo Loans*

We purchased $7.3 billion and $5.9 billion of conforming jumbo loans during the first quarters of 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of March 31, 2011 and December 31, 2010 was $42.8 billion and $37.8 billion, respectively. The average size of these loans was approximately $549,000 and $548,000 at March 31, 2011 and December 31, 2010, respectively. Our purchases of conforming jumbo loans will likely decline beginning in the fourth quarter of 2011 if the temporary increase in limits on the size of loans we may purchase expires as scheduled on September 30, 2011. See "LEGISLATIVE AND REGULATORY MATTERS" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO credit scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1288                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Subprime Loans*

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *"Higher Risk Loans in the Single-Family Credit Guarantee Portfolio"* and "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information).

We estimate that approximately $2.5 billion of security collateral underlying our Other Guarantee Transactions at both March 31, 2011 and December 31, 2010, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At March 31, 2011 and December 31, 2010, we held $52.8 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities are structured to provide credit enhancements, and 9% and 10% of these securities were investment grade at March 31, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the first quarter of 2011. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

*Alt-A Loans*

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $109.2 billion as of March 31, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in the first quarter of 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of March 31, 2011, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO credit score at origination was 719. Although Alt-A mortgage loans comprised approximately 6% of our single-family credit guarantee portfolio as of March 31, 2011, these loans represented approximately 31% of our credit losses during the first quarter of 2011. During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. As of March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during the first quarter of 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the product became available in 2009 to March 31, 2011, we purchased approximately $12.1 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $1.9 billion during the first quarter of 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At March 31, 2011 and December 31, 2010, we held investments of $18.3 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 16% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the first quarter of 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1289                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

*Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio*

Table 32 presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 32 — Certain Higher-Risk[1] Categories in the Single-Family Credit Guarantee Portfolio**

| | As of March 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $ 363.2 | 102% | 6.0% | 9.7% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 109.2 | 101% | 6.6% | 11.9% |
| Interest-only[6] | 88.4 | 115% | 0.6% | 17.9% |
| Option ARM[7] | 9.2 | 116% | 3.2% | 21.5% |
| Original LTV ratio greater than 90%[8][9] | 160.0 | 105% | 5.6% | 7.1% |
| Lower original FICO scores (less than 620)[8] | 59.8 | 90% | 11.4% | 13.0% |

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99% | 5.7% | 12.2% |
| Interest-only[6] | 95.4 | 112% | 0.5% | 18.4% |
| Option ARM[7] | 9.4 | 115% | 3.1% | 21.2% |
| Original LTV ratio greater than 90%[8][9] | 154.3 | 104% | 5.3% | 7.8% |
| Lower original FICO scores (less than 620)[8] | 61.2 | 89% | 10.4% | 13.9% |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) Based on our first lien exposure on the property and excludes secondary financing by third parties, if applicable. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default. For refinance mortgages, the original LTV ratios are based on third-party appraisals used in loan origination, whereas new purchase mortgages are based on the lower of an appraisal or property sales price.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "*Portfolio Management Activities — Credit Performance* — Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain as such following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain as such following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 31 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our use of FICO scores, respectively.

(9) Includes approximately $45 billion and $37 billion at March 31, 2011 and December 31, 2010, respectively, of mortgages associated with our relief refinance initiative which allow for LTV ratios up to 125%.

Loans with one or more of the above attributes comprised approximately 20% of our single-family credit guarantee portfolio as of both March 31, 2011 and December 31, 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 2%, to $363.2 billion as of March 31, 2011 from $368.8 billion as of December 31, 2010. This decline was principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as those resulting from foreclosure events and foreclosure alternatives. The serious delinquency rates associated with these loans declined to 9.7% as of March 31, 2011 from 10.3% as of December 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1290

Table of Contents

*Multifamily Mortgage Portfolio Diversification, Characteristics and Product Types*

Portfolio diversification is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics which may affect the default experience on our overall mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan duration. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for information about geographic concentrations and original DSCR of loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

Table 33 provides certain attributes of our multifamily mortgage portfolio at March 31, 2011 and December 31, 2010.

**Table 33 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB at December 31, | | Delinquency Rate[2] at | |
|---|---|---|---|---|
| | March 31, 2011 | December 31, 2010 | March 31, 2011 | December 31, 2010 |
| **Original LTV Ratio[1]** | *(dollars in billions)* | | | |
| Below 75% | $ 73.2 | $ 72.0 | 0.21% | 0.08% |
| 75% to 80% | 29.9 | 29.9 | 0.24 | 0.24 |
| Above 80% | 6.7 | 6.8 | 2.56 | 2.30 |
| Total | $ 109.8 | $ 108.7 | 0.36% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| | | | | |
| **Maturity Dates** | | | | |
| 2011 | $ 1.7 | $ 2.3 | 1.32% | 0.97% |
| 2012 | 4.0 | 4.1 | 1.11 | 0.82 |
| 2013 | 6.7 | 6.8 | 0.94 | — |
| 2014 | 8.4 | 8.5 | 0.05 | 0.02 |
| 2015 | 11.9 | 12.0 | 0.09 | 0.09 |
| Beyond 2015 | 77.1 | 75.0 | 0.33 | 0.29 |
| Total | $ 109.8 | $ 108.7 | 0.36% | 0.26% |
| | | | | |
| **Year of Acquisition or Guarantee[3]** | | | | |
| 2004 and prior | $ 15.2 | $ 15.9 | 0.34% | 0.31% |
| 2005 | 7.8 | 8.0 | — | — |
| 2006 | 11.5 | 11.7 | 0.62 | 0.25 |
| 2007 | 20.8 | 20.8 | 0.95 | 0.97 |
| 2008 | 22.9 | 23.0 | 0.34 | 0.03 |
| 2009 | 15.0 | 15.2 | — | — |
| 2010 | 13.6 | 14.1 | — | — |
| 2011 | 3.0 | N/A | — | N/A |
| Total | $ 109.8 | $ 108.7 | 0.36% | 0.26% |
| | | | | |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 39.8 | $ 39.7 | 0.23% | 0.07% |
| Above $5 million to $25 million | 60.7 | 59.7 | 0.44 | 0.38 |
| $5 million and below | 9.3 | 9.3 | 0.43 | 0.37 |
| Total | $ 109.8 | $ 108.7 | 0.36% | 0.26% |
| | | | | |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 84.2 | $ 85.9 | 0.24% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 16.0 | 13.1 | 1.07 | 1.30 |
| Other guarantee commitments | 9.6 | 9.7 | 0.23 | 0.23 |
| Total | $ 109.8 | $ 108.7 | 0.36% | 0.26% |

(1) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrowers' equity in the property and, therefore, can increase the risk of default.

(2) See "*Credit Performance* — Delinquencies" for more information about our delinquency rates.

(3) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. As of March 31, 2011 and

57

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2010, approximately 84% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable-rates.

We estimate that approximately 8% of loans in our multifamily mortgage portfolio had a current LTV ratio of greater than 100% as of March 31, 2011, and the estimated current average DSCR for these loans as of that date was 1.2, based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to assess a property's value, there may be a significant lag in reporting as they prepare their results in the normal course of business.

Because multifamily loans generally have a balloon payment and typically have a shorter contractual term than single-family mortgages, the maturity date for a multifamily loan is an important loan characteristic. Borrowers may be less able to refinance their obligations during periods of rising interest rates or if the underlying fundamentals of the property deteriorate, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

*Portfolio Management Activities*

The portfolio information below relates to our single-family credit guarantee and multifamily mortgage portfolios, which exclude our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

*Credit Enhancements*

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At both March 31, 2011 and December 31, 2010, our credit-enhanced mortgages represented 15% of our single-family credit guarantee portfolio and multifamily mortgage portfolio, on a combined basis, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We had recoveries associated with charged-off loans of $0.7 billion and $0.6 billion in the first quarter of 2011 and 2010, respectively, under our primary and pool mortgage insurance policies and other credit enhancements related to our single-family credit guarantee portfolio. In the first quarter of 2011 and in the full year of 2010, the credit enhancement coverage for new purchases was lower than in periods before 2010, primarily as a result of the high refinance activity during the first quarter of 2011 and the full year of 2010. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to fall below the 80% charter threshold noted above. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of March 31, 2011 and December 31, 2010.

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio and other loan or borrower characteristics. We announced delivery fee increases in the fourth

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1292

Table of Contents

quarter of 2010 that became effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. These increased fees do not apply to relief refinance mortgages with settlement dates on or after July 1, 2011.

*MHA Program*

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include:

*Home Affordable Modification Program.* HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the principal and interest payments on their mortgages. HAMP applies both to delinquent borrowers and to those current borrowers at risk of imminent default. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risks — Portfolio Management Activities — MHA Program*" in our 2010 Annual Report for further information on HAMP.

Table 34 presents the number of single-family loans that completed modification or were in trial periods under HAMP as of March 31, 2011 and December 31, 2010.

**Table 34 — Single-Family Home Affordable Modification Program Volume**[1]

| | As of March 31, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications[3] | $26,409 | 119,690 | $23,635 | 107,073 |
| Loans in the HAMP trial period | $ 4,327 | 19,897 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.

(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through March 31, 2011 and December 31, 2010, respectively.

As of March 31, 2011, the borrower's monthly payment was reduced on average by an estimated $566, which amounts to an average of $6,792 per year, and a total of $813 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years and borrowers whose payments were adjusted below current market levels will have their payment gradually increase after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 19,897 as of March 31, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and significantly fewer new borrowers entered into HAMP trial period plans after 2009. Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than did in 2010, since a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For more information on our HAMP modifications, including redefault rates on these loans, see "*Loan Workout Activities.*"

*Home Affordable Refinance Program.* HARP gives eligible homeowners with loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place.

The relief refinance initiative is our implementation of HARP. HARP is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios below 80% to participate. HARP loans may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Through our relief refinance initiative, we offer this refinancing option only for qualifying mortgage loans that we hold or

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1293                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The implementation of the relief refinance mortgage product has resulted in a higher volume of purchases and increased delivery fees from the new loans than we would expect in the absence of the program. However, we believe the net effect of the refinance activity on our financial results has not been significant.

Table 35 below presents the composition of our purchases of refinanced single-family loans during the three months ended March 31, 2011 and 2010.

**Table 35 — Single-Family Refinance Loan Volume[1]**

|  | Three Months Ended March 31, 2011 | | | Three Months Ended March 31, 2010 | | |
|  | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
|  | | | (dollars in millions) | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $ 2,527 | 10,747 | 2.8% | $ 608 | 2,508 | 0.8% |
| 80% to 105% LTV ratio | 12,006 | 54,974 | 14.1 | 10,355 | 44,459 | 13.8 |
| Below 80% LTV ratio | 14,573 | 87,025 | 22.3 | 10,816 | 60,640 | 18.8 |
| Total relief refinance mortgages | $ 29,106 | 152,746 | 39.2% | $21,779 | 107,607 | 33.4% |
| Total refinance loan volume[2] | $81,757 | 390,008 | 100% | $68,014 | 321,886 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.

(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 39% and 33% of our total refinance volume in the first quarter of 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios of 80% and above represented approximately 15% and 12% of our total single-family credit guarantee portfolio purchases in the first quarter of 2011 and 2010, respectively. Relief refinance mortgages comprised approximately 9% and 7% of our total single-family credit guarantee portfolio at March 31, 2011 and December 31, 2010, respectively.

*Home Affordable Foreclosure Alternatives Program.* HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and we began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during the first quarter of 2011.

*Hardest Hit Fund.* In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. We believe participation in these programs by our borrowers has been limited through March 31, 2011, and our delinquency statistics have not been significantly affected.

*Impact of the MHA Program on Freddie Mac*

As previously discussed, HAMP is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. We believe our overall loss mitigation programs, including efforts outside of the MHA Program, could reduce our ultimate credit losses over the long term. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

The costs we incur related to loan modifications and other activities under HAMP have been, and will likely continue to be, significant for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentive fees and we will not receive a reimbursement of these costs from Treasury. We paid $60 million of servicer and borrower incentive fees in the first quarter of 2011, as compared to $24 million of such fees in the first quarter of 2010. We also have the potential to incur additional servicer incentive fees and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1294

Table of Contents

borrower incentive fees as long as the borrower remains current on a loan modified under HAMP. As of March 31, 2011, we accrued $81 million for both initial fees and recurring incentive fees not yet due.

- Under HAMP, we typically provide concessions to borrowers, including interest rate reductions and forbearance of principal and interest on a portion of the UPB. To the extent borrowers successfully obtain HAMP modifications, we will continue to experience high volumes of TDRs, similar to our experience during 2010 and the first quarter of 2011.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the foreclosure process. If home prices decline while these events take place, a delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

- Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

*Loan Workout Activities*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. The majority of our workout activities are for single-family loans. Our single-family loss mitigation strategy emphasizes early intervention in seriously delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of seriously delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Workout Activities*" in our 2010 Annual Report for a general description of our loan workouts.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop, consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. Pursuant to this directive, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae, which are designed to help servicers do a better job of engaging with homeowners and to bring greater accountability to the servicing industry. The aligned requirements include earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications, and consistent timelines for processing foreclosures. This initiative will result in the alignment of the processes for both HAMP and non-HAMP workout solutions, and will be implemented over the course of 2011. We believe this effort will result in certain changes in our non-HAMP loan modification processes which may temporarily result in delays in these activities while the changes are implemented by us and our servicers. Servicers will also be subject to incentives and sanctions with respect to performance under these standards.

For multifamily loans, we monitor a variety of mortgage loan characteristics such as the LTV ratio, DSCR and geographic location, among others, that help us assess the financial performance of the property and the borrower's ability to repay the loan. In certain cases, we may provide short-term loan extensions of up to 12 months with no changes to the effective borrowing rate. We do not modify or extend loans in situations where we believe we would experience a loss in the future that is greater than or equal to the loss we would experience if we foreclosed on the property at the time of the agreement. During the first quarter of 2011, we extended and modified multifamily loans totaling $13 million in UPB, compared with $99 million in the first quarter of 2010. Multifamily loan modifications during the first quarter of 2011 included: (a) $1 million in UPB for short-term loan extensions; and (b) $12 million in UPB for loan modifications. None of our multifamily modified loans, including those classified as TDRs, were delinquent at March 31, 2011. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1295          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of its delinquency status. At March 31, 2011, we had $897 million of multifamily loan UPB classified as TDRs on our consolidated balance sheets, all of which were performing.

We require our single-family seller/servicers to first evaluate problem loans for possible modification under HAMP. If a borrower is not eligible for a modification under HAMP, the borrower is considered for modification under our other loan modification programs. If the borrower is not eligible for any such programs, the loan is considered for other workout options. In the first quarter of 2011, we helped more than 62,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 31,000 foreclosures.

Table 36 presents volumes of single-family workouts, serious delinquency, and foreclosures for the three months ended March 31, 2011 and 2010.

### Table 36 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes[1]

| | Three Months Ended March 31, | | | |
| | 2011 | | 2010 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | (dollars in millions) | | |
| Home retention actions: | | | | |
| Loan modifications[2] | | | | |
| with no change in terms[3] | 1,265 | $    219 | 737 | $    116 |
| with extension of loan terms | 5,280 | 961 | 3,961 | 657 |
| with reduction of contractual interest rate | 9,365 | 2,134 | 13,914 | 3,043 |
| with rate reduction and term extension | 13,603 | 3,033 | 16,199 | 3,573 |
| with rate reduction, term extension and principal forbearance | 5,645 | 1,505 | 9,417 | 2,464 |
| Total loan modifications[4] | 35,158 | 7,852 | 44,228 | 9,853 |
| Repayment plans[5] | 9,099 | 1,286 | 8,761 | 1,268 |
| Forbearance agreements[6] | 7,678 | 1,526 | 8,858 | 1,856 |
| Total home retention actions: | 51,935 | 10,664 | 61,847 | 12,977 |
| Foreclosure alternatives: | | | | |
| Short sale | 10,621 | 2,488 | 6,957 | 1,609 |
| Deed-in-lieu transactions | 85 | 15 | 107 | 15 |
| Total foreclosure alternatives | 10,706 | 2,503 | 7,064 | 1,624 |
| Total single-family loan workouts | 62,641 | $13,167 | 68,911 | $ 14,601 |
| Delinquent loan additions | 97,464 | | 150,941 | |
| Single-family foreclosures[7] | 31,087 | | 32,301 | |
| Delinquent loans, at period end | 436,314 | | 516,219 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).
(2) Includes approximately 27,000 TDRs in both the three months ended March 31, 2011 and 2010.
(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.
(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.
(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 20,592 and 21,358 borrowers as of March 31, 2011 and 2010, respectively.
(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before a loan workout is pursued or completed. Our reported activity has been revised such that we only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.
(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, and increases in short sales during the three months ended March 31, 2011, compared to the three months ended March 31, 2010. Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used forbearance in the first quarter of 2011 and did not use principal reduction in modifying our loans. We bear the costs of these activities, including the cost of any monthly payment reductions. We also completed 10,621 short sales during the three months ended March 31, 2011, compared to 6,957 in the three months ended March 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          TREASURY-1296          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $58 billion as of March 31, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio has been increasing and such loans comprised approximately 2.4% and 2.1% of our single-family credit guarantee portfolio as of March 31, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 118% and the serious delinquency rate on these loans was 17% as of March 31, 2011. Table 37 presents the reperformance rate of modified single-family loans in each of the last seven quarterly periods.

### Table 37 — Reperformance Rates[1] of Modified Single-Family Loans

| | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|
| HAMP loan modifications: | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | |
| 3 to 5 months | 94% | 93% | 94% | 95% | 94% | 96% | — |
| 6 to 8 months | | 92% | 91% | 93% | 93% | 93% | — |
| 9 to 11 months | | | 89% | 90% | 91% | 93% | — |
| 12 to 14 months | | | | 89% | 88% | 92% | — |
| 15 to 17 months | | | | | 87% | 91% | — |
| 18 to 20 months | | | | | | 88% | — |
| 21 to 23 months | | | | | | | — |

| | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|
| Non-HAMP loan modifications: | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | |
| 3 to 5 months | 94% | 93% | 93% | 94% | 90% | 88% | 73% |
| 6 to 8 months | | 90% | 86% | 87% | 82% | 78% | 64% |
| 9 to 11 months | | | 83% | 81% | 77% | 72% | 60% |
| 12 to 14 months | | | | 79% | 75% | 69% | 58% |
| 15 to 17 months | | | | | 74% | 67% | 57% |
| 18 to 20 months | | | | | | 67% | 55% |
| 21 to 23 months | | | | | | | 56% |

| | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|
| Total (HAMP and non-HAMP): | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | |
| 3 to 5 months | 94% | 93% | 94% | 95% | 92% | 89% | 73% |
| 6 to 8 months | | 91% | 90% | 92% | 88% | 79% | 64% |
| 9 to 11 months | | | 88% | 88% | 85% | 74% | 60% |
| 12 to 14 months | | | | 87% | 82% | 71% | 58% |
| 15 to 17 months | | | | | 81% | 68% | 57% |
| 18 to 20 months | | | | | | 68% | 55% |
| 21 to 23 months | | | | | | | 56% |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes those loan modification activities for which the borrower has started the required process, but the modification has not been made permanent, or effective, such as loans in the trial period under HAMP.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of March 31, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during 2010, 2009, and 2008 was 11%, 37%, and 49%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of March 31, 2011, the redefault rate for loans modified under HAMP in 2010 and 2009 was approximately 10% and 13%, respectively. These redefault rates may not be representative of the future performance of loans, including those modified under HAMP. We believe the redefault rate for loans modified in 2010, 2009, and 2008, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

### *Credit Performance*

### *Delinquencies*

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our seller/servicers. For multifamily loans, we report delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, multifamily loans

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1297

Table of Contents

are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement. Single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower.

Our single-family and multifamily delinquency rates include all single-family and multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on these securities by the U.S. government.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under many of our non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, and general constraints on servicer capacity caused our single-family serious delinquency rates to be higher in the first quarter of 2011 than they otherwise would have been. Delays in the foreclosure process relating to the concerns about deficiencies in foreclosure practices also have a similar effect on our single-family serious delinquency rates.

Table 38 presents delinquency rates for our single-family credit guarantee and multifamily mortgage portfolios.

**Table 38 — Delinquency Rates**

|  | March 31, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
|  | Percentage of Portfolio | Delinquency Rate | Percentage of Portfolio | Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced | 85% | 2.85% | 85% | 3.01% |
| Credit-enhanced | 15 | 7.87 | 15 | 8.27 |
| Total single-family credit guarantee portfolio(1) | 100% | 3.63 | 100% | 3.84 |
| Multifamily: | | | | |
| Non-credit-enhanced | 78% | 0.25% | 80% | 0.12% |
| Credit-enhanced | 22 | 0.75 | 20 | 0.85 |
| Total multifamily mortgage portfolio | 100% | 0.36 | 100% | 0.26 |

(1) As of March 31, 2011 and December 31, 2010, approximately 65% and 61%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined slightly to 3.63% as of March 31, 2011 from 3.84% as of December 31, 2010. Serious delinquency rates for interest-only and option ARM products, which together represented approximately 6% of our total single-family credit guarantee portfolio at March 31, 2011, were 17.9% and 21.5%, respectively, at March 31, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, which is a more traditional mortgage product, were approximately 3.8% and 4.0% at March 31, 2011, and December 31, 2010, respectively. The slight improvement in the single-family serious delinquency rate during the first quarter of 2011 was primarily due to a continued high volume of loan modifications, significant volumes of foreclosure transfers, and a slowdown in new serious delinquencies. Although the volume of new serious delinquencies declined in each of the past five quarters, our serious delinquency rate remains high, reflecting continued stress in the housing and labor markets.

In certain states within the West, Southeast and Northeast regions, our single-family serious delinquency rates have remained persistently high. As of March 31, 2011, single-family loans in California and Florida comprised 16% and 6%, respectively, of our single-family credit guarantee portfolio; however, seriously delinquent loans in these states comprised approximately 18% and 19%, respectively, of the seriously delinquent loans in our single-family credit guarantee portfolio, based on UPB. During the first quarter of 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    TREASURY-1298                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

Table 39 presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | Alt-A UPB | Non Alt-A UPB (in billions) | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate | Three Months Ended March 31, 2011 Credit Losses Alt-A (in billions) | Non Alt-A |
|---|---|---|---|---|---|---|---|---|
| | | | | **As of March 31, 2011** | | | | |
| Geographical distribution: | | | | | | | | |
| Arizona, California, Florida, and Nevada | $ 45 | $ 415 | $ 460 | 91% | 3.7% | 6.7% | $0.7 | $ 1.2 |
| All other states | 64 | 1,291 | 1,355 | 74 | 2.1 | 2.8 | 0.3 | 1.0 |
| Year of origination: | | | | | | | | |
| 2011 | — | 44 | 44 | 68 | — | — | — | — |
| 2010 | — | 369 | 369 | 70 | <0.1 | 0.1 | — | — |
| 2009 | <1 | 376 | 376 | 71 | 0.1 | 0.3 | — | — |
| 2008 | 9 | 139 | 148 | 88 | 2.8 | 4.9 | — | 0.2 |
| 2007 | 34 | 162 | 196 | 107 | 7.4 | 11.3 | 0.4 | 0.8 |
| 2006 | 29 | 117 | 146 | 106 | 6.8 | 10.3 | 0.4 | 0.6 |
| 2005 | 20 | 147 | 167 | 92 | 3.8 | 6.1 | 0.2 | 0.4 |
| 2004 and prior | 17 | 352 | 369 | 59 | 1.9 | 2.5 | — | 0.2 |

| | Alt-A UPB | Non Alt-A UPB (in billions) | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate | Three Months Ended March 31, 2010 Credit Losses Alt-A (in billions) | Non Alt-A |
|---|---|---|---|---|---|---|---|---|
| | | | | **As of March 31, 2010** | | | | |
| Geographical distribution: | | | | | | | | |
| Arizona, California, Florida, and Nevada | $ 57 | $ 418 | $ 475 | 89% | 1.7% | 8.0% | $0.9 | $ 0.9 |
| All other states | 83 | 1,322 | 1,405 | 73 | 1.1 | 3.1 | 0.3 | 0.8 |
| Year of origination: | | | | | | | | |
| 2010 | — | 48 | 48 | 69 | — | — | — | — |
| 2009 | <1 | 462 | 462 | 69 | — | 0.1 | — | — |
| 2008 | 12 | 199 | 211 | 83 | 0.7 | 3.9 | — | 0.1 |
| 2007 | 43 | 212 | 255 | 99 | 2.8 | 11.2 | 0.4 | 0.5 |
| 2006 | 38 | 155 | 193 | 99 | 2.8 | 10.0 | 0.5 | 0.4 |
| 2005 | 25 | 192 | 217 | 88 | 1.6 | 5.7 | 0.3 | 0.4 |
| 2004 and prior | 22 | 472 | 494 | 57 | 1.0 | 2.3 | — | 0.3 |

(1) See endnote (5) to "Table 31 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2) Represents the percentage of loans, based on loan count in our single-family credit guarantee portfolio, that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 40 presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of March 31, 2011 and December 31, 2010.

## Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations

| | Current LTV Ratio[1] ≤ 80 | | Current LTV Ratio[1] of 81-100 | | Current LTV Ratio[1] > 100 | | Current LTV Ratio[1] All Loans | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 1.0% | 8.0% | 0.8% | 13.7% | 1.0% | 25.1% | 2.8% | 14.0% | 14.2% |
| 15- year amortizing fixed rate | 0.2 | 4.3 | <0.1 | 11.0 | <0.1 | 19.7 | 0.2 | 1.9 | 4.8 |
| ARMs/adjustable rate[4] | 0.1 | 12.0 | <0.1 | 17.6 | <0.1 | 26.8 | 0.1 | 8.3 | 16.4 |
| Interest-only[5] | <0.1 | 16.2 | <0.1 | 24.0 | 0.1 | 38.0 | 0.1 | 1.4 | 32.0 |
| Other[6] | <0.1 | 3.1 | 0.1 | 6.7 | <0.1 | 11.7 | 0.1 | 3.4 | 4.8 |
| Total FICO scores < 620 | 1.3 | 7.1 | 0.9 | 13.9 | 1.1 | 25.6 | 3.3 | 11.4 | 13.0 |
| FICO scores of 620 to 659 | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 2.3 | 5.0 | 1.6 | 9.1 | 1.8 | 19.0 | 5.7 | 9.3 | 9.8 |
| 15- year amortizing fixed rate | 0.5 | 2.5 | 0.1 | 7.0 | <0.1 | 15.9 | 0.6 | 1.0 | 2.9 |
| ARMs/adjustable rate[4] | 0.1 | 5.7 | 0.1 | 12.7 | 0.1 | 24.9 | 0.3 | 1.5 | 13.2 |
| Interest-only[5] | <0.1 | 10.6 | 0.1 | 19.8 | 0.4 | 34.1 | 0.5 | 1.2 | 28.3 |
| Other[6] | <0.1 | 2.1 | <0.1 | 4.9 | <0.1 | 4.9 | <0.1 | 1.1 | 3.9 |
| Total FICO scores of 620 to 659 | 2.9 | 4.3 | 1.9 | 9.5 | 2.3 | 20.4 | 7.1 | 7.3 | 9.4 |
| FICO scores ≥ 660 | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 36.4 | 1.0 | 19.8 | 2.5 | 11.1 | 9.6 | 67.3 | 2.1 | 2.7 |
| 15- year amortizing fixed rate | 12.7 | 0.4 | 0.9 | 1.4 | 0.1 | 6.6 | 13.7 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.0 | 1.4 | 0.8 | 5.1 | 0.8 | 16.1 | 3.6 | 0.4 | 5.3 |
| Interest-only[5] | 0.6 | 3.6 | 1.0 | 9.9 | 2.7 | 22.0 | 4.3 | 0.5 | 16.4 |
| Other[6] | <0.1 | 1.9 | <0.1 | 1.6 | 0.1 | 1.4 | 0.1 | 0.4 | 1.6 |
| Total FICO scores ≥ 660 | 51.7 | 0.8 | 22.5 | 2.8 | 14.8 | 11.6 | 89.0 | 1.5 | 2.6 |
| Total of FICO scores not available | 0.3 | 4.6 | 0.1 | 11.2 | 0.2 | 22.5 | 0.6 | 4.5 | 8.8 |
| All FICO scores | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 39.7 | 1.5 | 22.3 | 3.6 | 14.0 | 12.0 | 76.0 | 3.3 | 3.8 |
| 15- year amortizing fixed rate | 13.5 | 0.6 | 0.9 | 1.9 | 0.2 | 8.0 | 14.6 | 0.2 | 0.7 |
| ARMs/adjustable rate[4] | 2.2 | 2.2 | 0.9 | 6.5 | 1.0 | 17.7 | 4.1 | 0.8 | 6.3 |
| Interest-only[5] | 0.6 | 4.3 | 1.2 | 11.2 | 3.1 | 23.7 | 4.9 | 0.6 | 17.9 |
| Other[6] | 0.2 | 8.7 | 0.1 | 7.9 | 0.1 | 7.1 | 0.4 | 5.7 | 8.1 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.2% | 1.3% | 25.4% | 3.9% | 18.4% | 13.7% | 100.0% | 2.4% | 3.6% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 12.3% | 0.2% | 20.7% | 0.6% | 11.7% | 12.1% |
| Northeast | 0.4 | 9.1 | 0.3 | 18.7 | 0.2 | 28.6 | 0.9 | 11.8 | 14.0 |
| Southeast | 0.2 | 7.8 | 0.2 | 14.3 | 0.3 | 30.1 | 0.7 | 11.7 | 15.7 |
| Southwest | 0.3 | 5.4 | 0.1 | 11.4 | 0.1 | 21.4 | 0.5 | 8.2 | 8.3 |
| West | 0.2 | 4.9 | 0.1 | 11.5 | 0.3 | 24.3 | 0.6 | 13.6 | 14.0 |
| Total FICO scores < 620 | 1.3 | 7.1 | 0.9 | 13.9 | 1.1 | 25.6 | 3.3 | 11.4 | 13.0 |
| FICO scores of 620 to 659 | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.4 | 8.6 | 0.5 | 15.3 | 1.4 | 7.3 | 8.3 |
| Northeast | 1.0 | 5.3 | 0.5 | 13.2 | 0.3 | 22.3 | 1.8 | 7.2 | 9.4 |
| Southeast | 0.5 | 5.1 | 0.4 | 9.4 | 0.6 | 24.5 | 1.5 | 7.4 | 11.9 |
| Southwest | 0.5 | 3.2 | 0.3 | 7.6 | 0.1 | 14.1 | 0.9 | 5.0 | 5.2 |
| West | 0.4 | 3.3 | 0.3 | 8.3 | 0.8 | 21.2 | 1.5 | 9.6 | 11.5 |
| Total FICO scores of 620 to 659 | 2.9 | 4.3 | 1.9 | 9.5 | 2.3 | 20.4 | 7.1 | 7.3 | 9.4 |
| FICO scores ≥ 660 | | | | | | | | | |
| North Central | 8.7 | 0.7 | 4.9 | 2.4 | 2.6 | 7.4 | 16.2 | 1.3 | 2.0 |
| Northeast | 15.2 | 0.9 | 5.4 | 4.3 | 1.6 | 11.9 | 22.2 | 1.3 | 2.1 |
| Southeast | 7.2 | 1.1 | 4.1 | 2.8 | 3.7 | 14.7 | 15.0 | 1.6 | 4.1 |
| Southwest | 7.5 | 0.6 | 2.7 | 2.2 | 0.3 | 6.1 | 10.5 | 0.8 | 1.1 |
| West | 13.1 | 0.5 | 5.4 | 2.3 | 6.6 | 12.0 | 25.1 | 2.3 | 3.4 |
| Total FICO scores ≥ 660 | 51.7 | 0.8 | 22.5 | 2.8 | 14.8 | 11.6 | 89.0 | 1.5 | 2.6 |
| Total of FICO scores not available | 0.3 | 4.6 | 0.1 | 11.2 | 0.2 | 22.5 | 0.6 | 4.5 | 8.8 |
| All FICO scores | | | | | | | | | |
| North Central | 9.4 | 1.1 | 5.5 | 3.4 | 3.3 | 9.6 | 18.2 | 2.2 | 2.9 |
| Northeast | 16.6 | 1.5 | 6.2 | 5.8 | 2.2 | 15.1 | 25.0 | 2.2 | 3.1 |
| Southeast | 8.0 | 1.8 | 4.6 | 4.0 | 4.7 | 17.3 | 17.3 | 2.7 | 6.4 |
| Southwest | 8.4 | 1.1 | 3.2 | 3.4 | 0.5 | 9.8 | 12.1 | 1.6 | 1.9 |
| West | 13.8 | 0.8 | 5.9 | 2.9 | 7.7 | 13.5 | 27.4 | 3.1 | 4.2 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.2% | 1.3% | 25.4% | 3.9% | 18.4% | 13.7% | 100.0% | 2.4% | 3.6% |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1300

Table of Contents

| | Current LTV Ratio(1) ≤ 80 | | Current LTV Ratio(1) of 81-100 | | Current LTV Ratio(1) > 100 | | Current LTV Ratio(1) All Loans | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| *FICO scores < 620:* | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15-year amortizing fixed rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate(4) | 0.1 | 12.2 | <0.1 | 18.4 | <0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest-only(5) | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.9 | 0.2 | 0.9 | 33.3 |
| Other(6) | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| *FICO scores of 620 to 659:* | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15-year amortizing fixed rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 16.6 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate(4) | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest-only(5) | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other(6) | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 4.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| *FICO scores ≥ 660:* | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15-year amortizing fixed rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate(4) | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest-only(5) | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other(6) | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| Total of FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| *All FICO scores:* | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 40.2 | 1.4 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15-year amortizing fixed rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate(4) | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 6.7 |
| Interest-only(5) | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other(6) | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total Single-family Credit Guarantee Portfolio(7) | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region:** | | | | | | | | | |
| *FICO scores <620:* | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| *FICO scores of 620 to 659:* | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.6 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| *FICO scores ≥ 660:* | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.4 | 4.1 | 1.5 | 12.0 | 22.1 | 1.1 | 2.2 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| Total of FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| *All FICO scores:* | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.5 | 10.9 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total Single-family Credit Guarantee Portfolio(7) | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 31 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio."

(4) Includes balloon/resets and option ARM mortgage loans.

(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 31 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC,MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL,IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                             Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 41 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) |
| 2011 | 2% | —% | —% | —% | —% | —% |
| 2010 | 20 | 0.07 | 0.01 | 18 | 0.05 | — |
| 2009 | 21 | 0.31 | 0.06 | 21 | 0.26 | 0.04 |
| 2008 | 8 | 4.91 | 1.49 | 9 | 4.89 | 1.26 |
| 2007 | 11 | 11.26 | 5.56 | 11 | 11.63 | 4.92 |
| 2006 | 8 | 10.34 | 5.50 | 9 | 10.46 | 5.00 |
| 2005 | 9 | 6.05 | 3.24 | 10 | 6.04 | 2.95 |
| 2004 and prior(2) | 21 | 2.47 | 0.92 | 22 | 2.46 | 0.88 |
| Total | 100% | 3.63% | | 100% | 3.84% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to March 31, 2011 and December 31, 2010, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

(2) The foreclosure and short sale rate for "2004 and prior" represents the rate associated with loans originated from 2000 to 2004.

At March 31, 2011, approximately 36% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated during these years experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute these serious delinquency trends to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of decreasing home sales and broadly declining home prices in the period shortly following the loan's origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

Our single-family credit guarantee portfolio was positively affected by refinance activity after 2008, and the UPB of loans originated after 2008 comprised more than 40% of this portfolio as of March 31, 2011. Approximately 94% of the loans we purchased in our single-family credit guarantee portfolio during the three months ended March 31, 2011 were amortizing fixed-rate mortgage products.

Our multifamily mortgage portfolio delinquency rate increased to 0.36% at March 31, 2011 from 0.26% at December 31, 2010. Our multifamily credit-enhanced loans collectively have a higher average delinquency rate than our non-credit enhanced loans. As of March 31, 2011, approximately one-half of our multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will reduce our expected losses on those loans. Multifamily delinquency rates may increase in the remainder of 2011. For more information, see "CONSOLIDATED RESULTS OF OPERATIONS — Segment Earnings — *Segment Earnings-Results — Multifamily*."

The delinquency rates for loans in our multifamily mortgage portfolio are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to their becoming delinquent or providing temporary relief through loan modifications, including short-term extensions. Multifamily loan modifications, including short-term loan extensions, totaled $13 million in UPB during the first quarter of 2011. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement. As of both March 31, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loan UPB, representing 10 basis points of our multifamily mortgage portfolio, had been granted forbearance and were not included in the delinquency rate statistics. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                   TREASURY-1302                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due during the three months ended March 31, 2011.

We classify TDRs as those loans we modified and granted the borrower a concession. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification.

Table 42 provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

## Table 42 — Non-Performing Assets[1]

| | March 31, 2011 | December 31, 2010 | March 31, 2010 |
|---|---|---|---|
| | | (dollars in millions) | |
| Non-performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming, or less than three monthly payments past due | $ 32,205 | $ 26,612 | $ 8,493 |
| Seriously delinquent | 3,325 | 3,144 | 1,560 |
| Multifamily TDRs[2] | 897 | 911 | 233 |
| Total TDRs | 36,427 | 30,667 | 10,286 |
| Other single-family non-performing loans[3] | 78,182 | 84,272 | 98,139 |
| Other multifamily non-performing loans[4] | 1,874 | 1,750 | 1,352 |
| Total non-performing mortgage loans — on balance sheet | 116,483 | 116,689 | 109,777 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,371 | 1,450 | 1,887 |
| Multifamily loans | 208 | 198 | 138 |
| Total non-performing mortgage loans — off-balance sheet | 1,579 | 1,648 | 2,025 |
| Real estate owned, net | 6,376 | 7,068 | 5,468 |
| Total non-performing assets | $124,438 | $ 125,405 | $117,270 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 33.3% | 33.7% | 32.9% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.4% | 6.4% | 5.9% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of March 31, 2011, all multifamily loans classified as TDRs were performing.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans purchased from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.6 billion, and $1.2 billion of UPB were performing at March 31, 2011, December 31, 2010, and March 31, 2010, respectively.

The amount of non-performing assets declined to $124.4 billion as of March 31, 2011, from $125.4 billion at December 31, 2010, primarily due to a decline in the rate at which loans transitioned into serious delinquency. Although declining, our serious delinquency rate has remained high due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in processing large volumes of problem loans. The UPB of loans categorized as TDRs increased to $36.4 billion at March 31, 2011 from $30.7 billion at December 31, 2010, largely due to continued high volume of loan modifications during the first quarter of 2011 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes. TDRs during the first quarter of 2011 include HAMP and non-HAMP loan modifications, as many of our non-HAMP modifications have changes in terms similar to those of HAMP modifications, excluding forbearance of principal amounts. In recent periods, our non-HAMP modifications comprised a greater portion of our loan modification volume and the volume of HAMP modifications declined. We expect this trend to continue in the remainder of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels during 2011.

Table 43 provides detail by region for REO activity. Our REO activity relates almost entirely to single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                              TREASURY-1303                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

**Table 43 — REO Activity by Region**[1]

| | Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (number of properties) | |
| **REO Inventory** | | |
| Beginning property inventory | 72,093 | 45,052 |
| Adjustment to beginning balance[2] | — | 1,340 |
| Properties acquired by region: | | |
|    Northeast | 1,485 | 2,644 |
|    Southeast | 4,734 | 8,034 |
|    North Central | 6,375 | 7,199 |
|    Southwest | 3,113 | 3,090 |
|    West | 9,002 | 8,449 |
|      Total properties acquired | 24,709 | 29,416 |
| Properties disposed by region: | | |
|    Northeast | (2,661) | (1,912) |
|    Southeast | (9,214) | (5,262) |
|    North Central | (7,292) | (4,897) |
|    Southwest | (3,480) | (2,332) |
|    West | (8,981) | (7,566) |
|      Total properties disposed | (31,628) | (21,969) |
| Ending property inventory | 65,174 | 53,839 |

(1) See endnote (8) to "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

Our REO property inventory declined 10% from December 31, 2010 to March 31, 2011, primarily due to a decrease in the level of foreclosures caused by temporary delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, combined with continued strong levels of REO disposition activity during the period. We have a large number of highly aged seriously delinquent loans in our single-family credit guarantee portfolio, due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, our suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

We expect the pace of our REO acquisitions to increase in the remainder of 2011, in part due to the resumption of foreclosure activity by servicers following the temporary suspensions over concerns about documentation practices, as well as the transition of many seriously delinquent loans to REO. In the remainder of 2011, the pace of our REO acquisitions could continue to be slowed by delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices. Due to temporary suspensions and other factors, the average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years. The nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 456 days and 417 days for foreclosures completed during the first quarters of 2011 and 2010, respectively.

Our single-family REO acquisitions during the first quarter of 2011 were most significant in the states of California, Michigan, Arizona, Georgia, and Florida. The West region represented approximately 36% of the new REO acquisitions during the three months ended March 31, 2011, based on the number of properties, and the highest concentration in that region is in California. At March 31, 2011, our REO inventory in California comprised 12% of total REO property inventory, based on the number of properties.

Although we have increased the resources devoted to maintaining and disposing of our REO inventory in recent periods, we are limited in our disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. A portion of our REO properties are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have begun the process of eviction. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of March 31, 2011 and December 31, 2010, approximately 33% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Primarily for these reasons, the average holding

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1304

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

period of our REO property increased in recent periods and varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our REO dispositions during the first quarter of 2011 and 2010 was 191 days and 152 days, respectively. As of March 31, 2011 and December 31, 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 4.7% and 3.4%, respectively.

Although the composition of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 5% and 6%, respectively, at March 31, 2011, the percentage of our REO acquisitions in the three months ended March 31, 2011 that had been secured by either of these loan types represented approximately 34% of our total REO acquisitions, based on loan amount prior to acquisition.

*Credit Loss Performance*

Many loans that are seriously delinquent or in foreclosure result in credit losses. Table 44 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 44 — Credit Loss Performance**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (dollars in millions) | |
| REO | | |
| REO balances, net: | | |
| Single-family | $ 6,261 | $ 5,411 |
| Multifamily | 115 | 57 |
| Total | $ 6,376 | $ 5,468 |
| REO operations (income) expense: | | |
| Single-family | $ 257 | $ 156 |
| Multifamily | — | 3 |
| Total | $ 257 | $ 159 |
| Charge-offs | | |
| Single-family: | | |
| Charge-offs, gross[1] (including $3.5 billion and $3.3 billion relating to loan loss reserves, respectively) | $3,653 | $3,367 |
| Recoveries[2] | (684) | (616) |
| Single-family, net | $2,969 | $2,751 |
| Multifamily: | | |
| Charge-offs, gross[1] (including $12 million and $18 million relating to loan loss reserves, respectively) | $ 12 | $ 18 |
| Recoveries[2] | — | — |
| Multifamily, net | $ 12 | $ 18 |
| Total Charge-offs: | | |
| Charge-offs, gross[1] (including $3.6 billion and $3.3 billion relating to loan loss reserves, respectively) | $3,665 | $3,385 |
| Recoveries [2] | (684) | (616) |
| Total Charge-offs, net | $2,981 | $2,769 |
| Credit losses[3] | | |
| Single-family | $ 3,226 | $ 2,907 |
| Multifamily | 12 | 21 |
| Total | $3,238 | $2,928 |
| Total (in bps)[4] | 67.4 | 59.5 |

(1) Represent the amount of the UPB of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the contractual balance of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Equal to REO operations expense plus charge-offs, net. Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.

(4) Calculated as credit losses divided by the average balance of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We record charge-offs at the time we take ownership of a property through foreclosure,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1305                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

and any delays in the foreclosure process could reduce the rate at which seriously delinquent loans proceed to foreclosure, and would delay our recognition of charge-offs. We expect our credit losses to increase in the remainder of 2011, as our short sale and REO acquisition volumes will likely remain high, because the level of seriously delinquent loans and pending foreclosures remains elevated and market conditions, such as home prices and the rate of home sales, continue to remain weak. Suspensions and delays of foreclosure transfers, including as a result of concerns about foreclosure documentation practices, and imposed delays in the foreclosure process by regulatory or governmental agencies have caused delays in our recognition of credit losses and may continue to do so in the future.

Single-family charge-offs, gross, for the three months ended March 31, 2011 increased to $3.7 billion compared to $3.4 billion for the three months ended March 31, 2010, primarily due to the continued high volume of foreclosure transfers and short sales and continued weakness in residential real estate markets. The loss severity we recognized for our charge-offs increased slightly in the first quarter of 2011, as compared to the fourth quarter of 2010, due to overall declines in housing markets. Our per-property loss severity during the three months ended March 31, 2011 continued to be greatest in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada and Arizona. California also accounted for 16% of loans in our single-family credit guarantee portfolio as of March 31, 2011, and comprised approximately 31% of our total credit losses in the three months ended March 31, 2011. In addition, although Alt-A loans comprised approximately 6% and 7% of our single-family credit guarantee portfolio as of March 31, 2011 and March 31, 2010, respectively, these loans accounted for approximately 31% and 42% of our credit losses for the three months ended March 31, 2011 and 2010, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on severity rates, and see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. Our quarterly credit risk sensitivity estimates are as follows:

**Table 45 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| At: | | (dollars in millions) | | |
| March 31, 2011 | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $ 9,926 | 54.9 bps | $ 9,053 | 50.0 bps |
| September 30, 2010 | $ 9,099 | 49.5 bps | $8,187 | 44.6 bps |
| June 30, 2010 | $ 8,327 | 44.5 bps | $ 7,445 | 39.8 bps |
| March 31, 2010 | $10,228 | 54.4 bps | $ 9,330 | 49.6 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

FHFA has directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and servicing compensation. The mortgage servicing model could be changing significantly in the near or mid-term. As a result, we may need to significantly change our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so.

FHFA has also directed us and Fannie Mae to develop, wherever feasible, consistent requirements, policies and processes for the servicing of non-performing mortgages, and to discuss joint standards for the evaluation of the servicing performance of servicers. See "Credit Risks — *Mortgage Credit Risk — Portfolio Management Activities — Loan Workout*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                 TREASURY-1306                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Activities*" for more information. In addition, a group consisting of state attorneys general and state bank and mortgage regulators is in discussions with a number of large seller/servicers concerning a global settlement of certain issues related to mortgage servicing practices. It has been reported that this settlement could include additional changes to mortgage servicing practices. On April 13, 2011, federal regulators entered into consent orders with fourteen large servicers, under which the servicers will submit comprehensive action plans regarding their foreclosure and loss mitigation practices. It is possible that these plans will result in changes to these companies' mortgage servicing practices or other developments that could adversely affect our business or financial condition.

Our risks related to employee retention are high and likely to increase in coming months. A number of important officers have left the company in 2011, including our Chief Operating Officer and our Executive Vice President — Single Family Credit Guarantee. In addition, our Executive Vice President — Investments and Capital Markets and Treasurer has informed us that he will resign effective May 15, 2011. Disruptive levels of turnover could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

Management, including the company's Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of March 31, 2011. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC pools. For more information on our liquidity needs and liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2010 Annual Report.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $500 million in cash from Treasury pursuant to a draw under the Purchase Agreement during the first quarter of 2011.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. Under these practices and policies, we maintain a backup core reserve portfolio of liquid non-mortgage securities designed to provide additional liquidity in the event of a liquidity crisis. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

Throughout the first quarter of 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs are invested in short-term assets with a rating of A-1/P-1 or AAA or are issued by a counterparty with that rating. In the event of a downgrade of a position or a counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our business may be adversely affected by limited availability of financing and increased funding costs*" in our 2010 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. Our aggregate funding received from Treasury under the Purchase Agreement is $63.7 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. In addition, we are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below.

For more information on these actions, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2010 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

Our annual cash dividend obligation to Treasury on the senior preferred stock as of March 31, 2011 is $6.5 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on March 31, 2011 at the direction of our Conservator. We have paid cash dividends to Treasury of $11.6 billion life to date, an amount equal to 18% of our aggregate draws under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly

74

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                 Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury has waived the fee for the first and second quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three months ended March 31, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 27% of outstanding other debt on March 31, 2011, as compared to 28% at December 31, 2010.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $972 billion in 2011. As of March 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $729.1 billion, which was approximately $242.9 billion below the debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

#### Other Debt Issuance Activities

Table 46 summarizes the par value of other debt securities we issued, based on settlement dates, during the three months ended March 31, 2011 and 2010.

#### Table 46 — Other Debt Security Issuances by Product, at Par Value[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| Other short-term debt: | | |
| Reference Bills® securities and discount notes | $103,846 | $ 153,603 |
| Medium-term notes — non-callable[2] | 200 | 500 |
| Total other short-term debt | 104,046 | 154,103 |
| Other long-term debt: | | |
| Medium-term notes — callable | 37,801 | 63,721 |
| Medium-term notes — non-callable | 29,175 | 27,242 |
| U.S. dollar Reference Notes® securities — non-callable | 10,000 | 10,500 |
| Total other long-term debt | 76,976 | 101,463 |
| Total other debt issued | $ 181,022 | $ 255,566 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $200 million and $500 million of medium-term notes — non-callable issued for the three months ended March 31, 2011 and 2010, respectively, which were accounted for as debt exchanges.

#### Other Debt Retirement Activities

We repurchase, call, or exchange our outstanding medium- and long-debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1309

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 47 provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three months ended March 31, 2011 and 2010.

## Table 47 — Other Debt Security Repurchases, Calls, and Exchanges(1)

| | Three Months Ended March 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (in millions) | |
| Repurchases of outstanding €Reference Notes® securities | $ — | $ 70 |
| Repurchases of outstanding medium-term notes | 2,738 | — |
| Calls of callable medium-term notes | 39,835 | 57,174 |
| Exchanges of medium-term notes | 200 | 500 |

(1) Excludes debt securities of consolidated trusts held by third parties.

### Credit Ratings

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. Table 48 indicates our credit ratings as of April 22, 2011.

## Table 48 — Freddie Mac Credit Ratings

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | **S&P** | **Moody's** | **Fitch** |
| Senior long-term debt(1) | AAA | Aaa | AAA |
| Short-term debt(2) | A-1+ | P-1 | F1+ |
| Subordinated debt(3) | A | Aa2 | AA– |
| Preferred stock(4) | C | Ca | C/RR6 |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

On April 20, 2011, S&P revised the outlook on our senior long-term debt and subordinated debt ratings to negative from stable. This change followed S&P's revision of the outlook on the long-term 'AAA' sovereign credit rating on the United States to negative from stable on April 18, 2011. An S&P rating outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years). An outlook is not necessarily a precursor of a rating change. A rating outlook of "negative" means that a rating may be lowered. For information about the potential impact of a reduction in our credit ratings, see "RISK FACTORS" in our 2010 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities

Excluding amounts related to our consolidated VIEs, we held $87.2 billion in the aggregate of cash and cash equivalents, federal funds sold, securities purchased under agreements to resell, and non-mortgage-related securities at March 31, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At March 31, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — Non-Mortgage-Related Securities."

### Mortgage Loans and Mortgage-Related Securities

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our ability to use our holdings of CMBS as a significant source of liquidity is limited. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1310

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities"* for more information

## Cash Flows

Our cash and cash equivalents decreased approximately $2.7 billion to $34.3 billion during the three months ended March 31, 2011. Cash flows provided by operating activities during the three months ended March 31, 2011 were $3.9 billion, primarily driven by an increase in net interest income and net sales of multifamily held-for-sale mortgages. Cash flows provided by investing activities during the three months ended March 31, 2011 were $96.5 billion, primarily resulting from net proceeds received on single-family held-for-investment mortgage loan repayments, an increase in sales of trading securities, and fewer purchases of federal funds sold and securities purchased under agreements to resell. Cash flows used for financing activities during the three months ended March 31, 2011 were $103.1 billion, largely attributable to an increase in net repayments of debt securities of consolidated trusts held by third parties and a decrease in net issuance of all other debt.

Our cash and cash equivalents decreased approximately $9.2 billion to $55.4 billion during the three months ended March 31, 2010. Cash flows provided by operating activities during the three months ended March 31, 2010 were $2.1 billion, which primarily reflected a net decrease in our held-for-sale mortgage loans. Cash flows provided by investing activities during the three months ended March 31, 2010 were $60.6 billion, primarily resulting from net proceeds received on held-for-investment mortgage loans. Cash flows used for financing activities for the three months ended March 31, 2010 were $71.9 billion, largely attributable to repayments of debt securities of consolidated trusts held by third parties, net of proceeds from the issuance of debt securities of consolidated trusts held by third parties.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At March 31, 2011, our assets exceeded our liabilities under GAAP by $1.2 billion; therefore FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership"* in our 2010 Annual Report for additional information on mandatory receivership.

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests under the Purchase Agreement with Treasury.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair-value losses recorded in earnings or AOCI; required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; adverse changes to our funding costs and limited availability of financing; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or guidance; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission-related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock,"* "BUSINESS — Executive Summary — *Long-Term Financial Sustainability and Future Status"* and "RISK FACTORS" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1311

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2010 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 fair value measurements (*i.e.*, valued using significant inputs that are unobservable) primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. The market for non-agency mortgage-related securities continued to be illiquid during the first quarter of 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain at least three independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of the processes they use to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Fair Value Measurements — *Controls over Fair Value Measurement*" in our 2010 Annual Report for information on our validation processes.

Table 49 below summarizes our assets and liabilities measured at fair value on a recurring basis at March 31, 2011 and December 31, 2010.

**Table 49 — Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | March 31, 2011 | | December 31, 2010 | |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| --- | --- | --- | --- | --- |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $229,838 | 30% | $232,634 | 30% |
| Trading, at fair value | 61,353 | 6 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 5,304 | 100 | 6,413 | 100 |
| Derivative assets, net(1) | 58 | — | 143 | — |
| Other assets: | | | | |
| Guarantee assets, at fair value | 597 | 100 | 541 | 100 |
| Total assets carried at fair value on a recurring basis(1) | $ 297,150 | 25 | $299,993 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $  3,960 | —% | $  4,443 | —% |
| Derivative liabilities, net(1) | 750 | 4 | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis(1) | $  4,710 | 3 | $  5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

78                                                                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### Changes in Level 3 Recurring Fair Value Measurements

At March 31, 2011 and December 31, 2010, we measured and recorded at fair value on a recurring basis $77.8 billion and $79.8 billion, respectively, or approximately 25% of total assets carried at fair value on a recurring basis at both dates, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at March 31, 2011 primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. At March 31, 2011 and December 31, 2010, we also measured and recorded at fair value on a recurring basis Level 3 derivative liabilities of $0.8 billion at both dates, or 3% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, respectively, before the impact of counterparty and cash collateral netting.

During the three months ended March 31, 2011, the fair value of our Level 3 assets decreased by $2.0 billion, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, we had a net transfer into Level 3 assets of $0.1 billion resulting from a change in valuation method due to a lack of relevant price quotes from dealers and third-party pricing services.

See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "RISK MANAGEMENT — Credit Risk" and "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 18: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "RISK FACTORS," "RISK MANAGEMENT — Operational Risks" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for information concerning the risks associated with these models.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 18 FAIR VALUE DISCLOSURES" in this Form 10-Q for more information on fair values.

TREASURY-1313

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Discussion of Fair Value Results*

Table 50 summarizes the change in the fair value of net assets for the first quarter of 2011 and 2010.

### Table 50 — Summary of Change in the Fair Value of Net Assets

| | Three Months Ended March 31, | |
| | 2011 | 2010 |
|---|---|---|
| | (in billions) | |
| Beginning balance | $(58.6) | $ (62.5) |
| Changes in fair value of net assets, before capital transactions | 3.3 | 4.2 |
| Capital transactions: | | |
| Dividends and share issuances, net(1) | (1.1) | (1.3) |
| Ending balance | $ (56.4) | $ (59.6) |

(1) Includes the funds received from Treasury of $0.5 billion and $0 billion for the three months ended 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the first quarter of 2011, the fair value of net assets, before capital transactions, increased by $3.3 billion, compared to a $4.2 billion increase during the first quarter of 2010. The increase in the fair value of net assets, before capital transactions, was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by tightening of OAS levels of agency mortgage-related securities and CMBS. The increase in fair value was partially offset by an increase in the risk premium related to our single-family loans due to the continued weak credit environment and tightening of OAS levels on other debt related to agency mortgage-related securities.

During the first quarter of 2010, the increase in the fair value of net assets, before capital transactions, was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by the tightening of CMBS OAS levels. The fair value of net assets was also positively impacted by an increase in prepayment speeds on our PC debt securities. The increase in fair value was partially offset by an increase in the risk premium related to our single-family loans in the continued weak credit environment.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Securitization Activities and Other Guarantee Commitments

We have off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities. As of March 31, 2011, our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities which was $47.9 billion and $43.9 billion at March 31, 2011 and December 31, 2010, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced due to new accounting guidance for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report and "NOTE 9: FINANCIAL GUARANTEES" in this Form 10-Q for more information on our off-balance sheet securitization arrangements.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1314

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

**Other Agreements**

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate on our balance sheets in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $182.5 billion, and $220.7 billion in notional value at March 31, 2011 and December 31, 2010, respectively.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2010 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" sections of this Form 10-Q and our 2010 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama Administration, Congress, and our management may take;

TREASURY-1315

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Obama Administration's plan to reform the housing finance system, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the extent to which borrowers participate in the MHA Program and other initiatives designed to help in the housing recovery and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit and retain executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

82                                         *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage-related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting requirements or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages or adjustable-rate motgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q and in our 2010 Annual Report;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports. For the three months ended March 31, 2011, our duration gap averaged zero months, PMVS-L averaged $448 million and PMVS-YC averaged $21 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Portfolio Management Activities — Credit Risk Sensitivity.*"

## LEGISLATIVE AND REGULATORY MATTERS

### Obama Administration Report on Reforming the U.S. Housing Finance Market

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

## Legislation Related to Reforming Freddie Mac and Fannie Mae

Several bills have been introduced and approved by the Capital Markets and Government Sponsored Enterprises Subcommittee of the House Financial Services Committee. These include bills that would require advance Treasury approval and notice to Congress for all debt issuances by the enterprises; require FHFA to direct the enterprises to increase guarantee fees; repeal our affordable housing goals; prohibit the enterprises from initially offering new products during conservatorship or receivership; accelerate reductions in the enterprises' mortgage-related investments portfolios; require that Freddie Mac and Fannie Mae mortgages be treated the same as other mortgages for purposes of the risk retention requirements in the Dodd-Frank Act; grant the FHFA Inspector General direct access to enterprise records and employees; and place all Freddie Mac and Fannie Mae employees on the federal government pay scale. These bills have been referred to the House Financial Services Committee.

Bills have also been introduced in the U.S. House of Representatives and the U.S. Senate that would end the conservatorships of Freddie Mac and Fannie Mae. Under these bills, 24 months after the date of enactment, the Director of FHFA would be required to determine the financial viability of each enterprise, based on standards for the appointment of a receiver for an enterprise under the GSE Act. If an enterprise were determined not to be financially viable, FHFA would immediately be appointed as receiver. If an enterprise were determined to be financially viable, the enterprise's charter would be revoked after an additional three-year period and the enterprise would be wound down over a subsequent ten-year period. These bills also include provisions that, among other things, would repeal our affordable housing goals, accelerate reductions in our mortgage-related investments portfolio, require FHFA to direct the enterprises to increase guarantee fees, revise conforming loan limits and prohibit any reduction in the dividend rate on our senior preferred stock. It is unclear whether or when these bills will be considered.

Enactment of any of the bills discussed above could have an adverse effect on our financial results and operations as well our ability to retain and recruit management and other valuable employees. We cannot predict whether or when any GSE-related legislation will be enacted.

## Dodd-Frank Act

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act will directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

At this time, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry. Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which

84

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Recently initiated rulemakings that may have an impact on Freddie Mac include the following:

- FHFA and four other agencies (collectively referred to below as the "Prudential Regulators") jointly have proposed regulations that would establish margin and capital requirements for swap dealers, major swap participants, security-based swap dealers, and major security-based swap participants (collectively referred to below as the "Swap Entities"). The proposed regulations would require Swap Entities regulated by the Prudential Regulators to collect minimum amounts of initial margin and variation margin from counterparties to non-cleared swaps and non-cleared security-based swaps. Separately, the CFTC has proposed regulations that would establish margin requirements for swap dealers and major swap participants for which there is no Prudential Regulator. Freddie Mac would likely be subject to increased margin requirements under the Prudential Regulators' proposed regulations and would likely be required to post or collect initial margin and variation margin to or from counterparties under either of the proposed regulations. The proposed margin requirements are substantially greater than the requirements for cleared swaps, and would apply to new non-cleared swaps or security-based swaps entered into after the proposed regulations' effective dates, substantially increasing the cost of using non-cleared swaps.

- FHFA and five other federal regulators jointly have proposed regulations that generally would require sponsors of securitizations to retain an unhedged economic interest in no less than 5% of the credit risk of the securitized assets, unless an exemption is available. While indicating that Freddie Mac is not exempt from the requirements, the regulators have proposed that the guarantee provided by Freddie Mac will satisfy the risk retention requirements with respect to a securitization transaction, so long as: (a) we fully guarantee the timely payment of principal and interest on all asset-backed security interests issued in the securitization transaction; and (b) we are operating under the conservatorship or receivership of FHFA, with capital support from the United States. If the rules are adopted as proposed, there would not likely be any significant impact on our current business with respect to the majority of our mortgage-related securities, although implementation of the proposed rules may have a significant impact on certain of our securitizations. If final regulations vary from the proposed regulations, it is possible that new requirements related to the retention of credit risk could have a substantial impact on our business.

- The Federal Reserve has published a notice of proposed rulemaking amending Regulation Z, which implements the Truth in Lending Act. The proposal sets forth four options to comply with the Dodd-Frank Act's requirement that creditors determine a borrower's ability to repay a mortgage prior to making a loan. One option is the origination of a "qualified mortgage," which would provide special protection from liability for creditors. The proposal solicits comments on the definition of a "qualified mortgage," which specifies various underwriting criteria necessary to obtain this designation. Authority for this rulemaking will transfer to the Consumer Financial Protection Bureau on July 21, 2011 and it is not clear what requirements might be included in a final rule. We are assessing the potential impact of the proposal on us.

- The Federal Reserve and the FDIC have jointly proposed regulations to implement the Dodd-Frank Act provisions that require submission and regular periodic updating of resolution plans and credit exposure reports from covered entities, including certain bank holding companies, certain foreign banking organizations, and non-bank financial companies determined to be subject to Federal Reserve supervision. We would be subject to these proposed regulations if the Financial Stability Oversight Council designates us as a non-bank financial company subject to supervision and regulation by the Federal Reserve. The proposed regulations would require covered entities to report periodically to financial regulators on their plans for rapid and orderly resolution in the event of material financial distress or failure, as well as to report periodically on their credit exposures to other large financial companies. If an entity's plans fail to satisfy applicable requirements, the Federal Reserve and FDIC would be able to jointly impose penalties, including heightened capital and liquidity requirements, restrictions on activities and, ultimately (and in consultation with the Financial Stability Oversight Council), divestiture of certain assets or operations.

We continue to review and assess the impact of these proposals. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Conforming Loan Limits

On September 30, 2010, Congress temporarily extended the current higher loan limits in certain high-cost areas through September 30, 2011. Actual conforming loan limits are established by FHFA for each county (or equivalent) and the loan limits for specific high-cost areas may be lower than the maximum amounts. The report that the Obama Administration delivered to Congress on February 11, 2011 recommends that Congress allow the temporary increase in loan limits to expire as scheduled on September 30, 2011. If Congress allows the temporary high-cost area loan limits to expire, the permanent high-cost area loan limits set out in the Reform Act will apply. Certain of the bills discussed above in "Legislation Related to Reforming Freddie Mac and Fannie Mae" would also terminate the permanent high-cost area loan limits entirely.

## Affordable Housing Goals for 2010

In March 2011, we reported to FHFA that we achieved our single-family and multifamily affordable housing goals for 2010, except that we did not achieve the benchmark levels for the single-family low-income areas goal and the related low-income areas subgoal.

We still could achieve the 2010 single-family low-income areas goal and the related low-income areas subgoal if our performance meets or exceeds the actual share of the market that meets the criteria for the applicable goal for 2010. We expect that the relevant market data for 2010 will be released in September 2011. FHFA will ultimately make the determination as to whether we achieved compliance with the housing goals.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for more information on our exposure to interest-rate and other market risks, including our use of derivatives as part of our efforts to manage certain of these risks.

*PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

Short-term interest rates are historically low, and, at some points on the LIBOR curve, are less than 50 basis points. As a result, the 50 basis point shift to the LIBOR curve described above is bounded by zero.

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six-month duration and liabilities with a five-month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets approximates the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity resulting from a 1% change in interest rates.

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis and mortgage-to-debt OAS, as well as foreign-currency risk.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

*Duration Gap and PMVS Results*

Table 51 provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three months ended March 31, 2011 and 2010. Table 51 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Accordingly, as shown in Table 51, the PMVS-L results based on a 100 basis point shift in the LIBOR curve are disproportionately higher at March 31, 2011, than the PMVS-L results based on a 50 basis point shift in the LIBOR curve.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1321

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 51 — PMVS Results**

| | PMVS-YC | PMVS-L | |
| --- | --- | --- | --- |
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| March 31, 2011 | $ 9 | $ 329 | $ 1,290 |
| December 31, 2010 | $ 35 | $588 | $1,884 |

| | Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.3) | $ 21 | $ 448 | 0.0 | $ 19 | $ 476 |
| Minimum | (1.0) | $ — | $ 280 | (0.7) | $ 1 | $ 331 |
| Maximum | 0.4 | $ 51 | $ 721 | 0.7 | $ 61 | $ 668 |
| Standard deviation | 0.3 | $ 13 | $ 101 | 0.3 | $ 16 | $ 81 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 52 shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

**Table 52 — Derivative Impact on PMVS-L (50 bps)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
| --- | --- | --- | --- |
| | | (in millions) | |
| At: | | | |
| March 31, 2011 | $ 3,851 | $ 329 | $(3,522) |
| December 31, 2010 | $ 3,614 | $ 588 | $(3,026) |

The disclosure in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          TREASURY-1322          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms and that such information is accumulated and communicated to senior management, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of March 31, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continued weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship. As noted below, we also consider this situation to be a continuing material weakness in our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting During the Quarter Ended March 31, 2011**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. During the first quarter, Bruce M. Witherell resigned from his position and responsibilities as our Chief Operating Officer effective February 9, 2011 and Donald J. Bisenius resigned from his position and responsibilities as Executive Vice President — Single Family Credit Guarantee effective April 1, 2011. Subsequent to March 31, 2011, we reorganized the management structure, eliminating the position of Chief Operating Officer, and were informed by Peter J. Federico, Executive Vice President — Investments and Capital Markets and Treasurer, that he will resign from his position effective May 15, 2011.

**Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting**

We have not remediated the material weakness in internal control over financial reporting related to our disclosure controls and procedures as of March 31, 2011. Given the structural nature of this continued weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservator Affairs, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

TREASURY-1323

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures.

In view of our mitigating actions related to the material weakness, we believe that our interim consolidated financial statements for the quarter ended March 31, 2011 have been prepared in conformity with GAAP.

TREASURY-1324

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 1. FINANCIAL STATEMENTS

91                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Table of Contents**

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| | (in millions, except share-related amounts) | |
| *Interest income* | | |
| Mortgage loans: | | |
| Held by consolidated trusts | $ 20,064 | $ 22,732 |
| Unsecuritized | 2,334 | 1,961 |
| *Total mortgage loans* | 22,398 | 24,693 |
| Investments in securities | 3,283 | 3,899 |
| Other | 34 | 33 |
| *Total interest income* | 25,715 | 28,625 |
| *Interest expense* | | |
| Debt securities of consolidated trusts | (17,403) | (19,643) |
| Other debt | (3,565) | (4,599) |
| *Total interest expense* | (20,968) | (24,242) |
| Expense related to derivatives | (207) | (258) |
| *Net interest income* | 4,540 | 4,125 |
| Provision for credit losses | (1,989) | (5,396) |
| *Net interest income (loss) after provision for credit losses* | 2,551 | (1,271) |
| *Non-interest income (loss)* | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | 223 | (98) |
| Gains (losses) on retirement of other debt | 12 | (38) |
| Gains (losses) on debt recorded at fair value | (81) | 347 |
| Derivative gains (losses) | (427) | (4,685) |
| Impairment of available-for-sale securities: | | |
| Total other-than-temporary impairment of available-for-sale securities | (1,054) | (417) |
| Portion of other-than-temporary impairment recognized in AOCI | (139) | (93) |
| *Net impairment of available-for-sale securities recognized in earnings* | (1,193) | (510) |
| Other gains (losses) on investment securities recognized in earnings | (120) | (416) |
| Other income | 334 | 546 |
| *Non-interest income (loss)* | (1,252) | (4,854) |
| *Non-interest expense* | | |
| Salaries and employee benefits | (207) | (234) |
| Professional services | (56) | (81) |
| Occupancy expense | (15) | (16) |
| Other administrative expenses | (83) | (74) |
| *Total administrative expenses* | (361) | (405) |
| Real estate owned operations expense | (257) | (159) |
| Other expenses | (79) | (103) |
| *Non-interest expense* | (697) | (667) |
| Income (loss) before income tax benefit | 602 | (6,792) |
| Income tax benefit | 74 | 103 |
| *Net income (loss)* | 676 | (6,689) |
| Other comprehensive income (loss), net of taxes and reclassification adjustments: | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,941 | 4,646 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 132 | 172 |
| Changes in defined benefit plans | (9) | (10) |
| *Total other comprehensive income (loss), net of taxes and reclassification adjustments* | 2,064 | 4,808 |
| Comprehensive income (loss) | 2,740 | (1,881) |
| Less: Comprehensive (income) loss attributable to noncontrolling interest | — | 1 |
| *Total comprehensive income (loss) attributable to Freddie Mac* | $ 2,740 | $ (1,880) |
| *Net income (loss)* | $ 676 | $ (6,689) |
| Less: Net (income) loss attributable to noncontrolling interest | — | 1 |
| *Net income (loss) attributable to Freddie Mac* | 676 | (6,688) |
| Preferred stock dividends | (1,605) | (1,292) |
| *Net loss attributable to common stockholders* | $ (929) | $ (7,980) |
| Loss per common share: | | |
| Basic | $ (0.29) | $ (2.45) |
| Diluted | $ (0.29) | $ (2.45) |
| Weighted average common shares outstanding (in thousands): | | |
| Basic | 3,246,985 | 3,251,295 |
| Diluted | 3,246,985 | 3,251,295 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1326

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1327

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Table of Contents**

# FREDDIE MAC
## CONSOLIDATED BALANCE SHEETS
### (UNAUDITED)

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $1, respectively, related to our consolidated VIEs) | $ 34,298 | $ 37,012 |
| Restricted cash and cash equivalents (includes $5,497 and $7,514, respectively, related to our consolidated VIEs) | 6,184 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $11,500 and $29,350, respectively, related to our consolidated VIEs) | 37,792 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $298 and $817, respectively, pledged as collateral that may be repledged) | 229,838 | 232,634 |
| Trading, at fair value | 61,353 | 60,262 |
| Total investments in securities | 291,191 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $9,517 and $11,644, respectively) | 1,644,609 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $29,571 and $28,047, respectively) | 197,883 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,842,492 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $5,304 and $6,413 at fair value, respectively) | 5,304 | 6,413 |
| *Total mortgage loans, net* | 1,847,796 | 1,844,895 |
| Accrued interest receivable (includes $6,801 and $6,895, respectively, related to our consolidated VIEs) | 8,660 | 8,713 |
| Derivative assets, net | 58 | 143 |
| Real estate owned, net (includes $112 and $118, respectively, related to our consolidated VIEs) | 6,376 | 7,068 |
| Deferred tax assets, net | 4,498 | 5,543 |
| Other assets (Note 21) (includes $2,675 and $6,001, respectively, related to our consolidated VIEs) | 8,063 | 10,875 |
| *Total assets* | $ 2,244,916 | $ 2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $6,345 and $6,502, respectively, related to our consolidated VIEs) | $ 9,392 | $ 10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,510,426 | 1,528,648 |
| Other debt (includes $3,960 and $4,443 at fair value, respectively) | 715,572 | 713,940 |
| *Total debt, net* | 2,225,998 | 2,242,588 |
| Derivative liabilities, net | 750 | 1,209 |
| Other liabilities (Note 21) (includes $3,757 and $3,851, respectively, related to our consolidated VIEs) | 7,539 | 8,098 |
| *Total liabilities* | 2,243,679 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 19) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 64,700 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,686,194 shares and 649,179,789 shares outstanding, respectively | — | — |
| Additional paid-in capital | — | 7 |
| Retained earnings (accumulated deficit) | (63,693) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $9,978 and $10,740, respectively, net of taxes, of other-than-temporary impairments) | (7,737) | (9,678) |
| Cash flow hedge relationships | (2,107) | (2,239) |
| Defined benefit plans | (123) | (114) |
| Total AOCI, net of taxes | (9,967) | (12,031) |
| Treasury stock, at cost, 76,177,692 shares and 76,684,097 shares, respectively | (3,912) | (3,953) |
| *Total equity (deficit)* | 1,237 | (401) |
| *Total liabilities and equity (deficit)* | $ 2,244,916 | $ 2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## FREDDIE MAC
### CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
### (UNAUDITED)

| | Shares Outstanding | | | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred Stock | Preferred Stock | Common Stock | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
| | | | | | | (in millions) | | | | | | |
| **Balance as of December 31, 2009** | 1 | 464 | 649 | $ 51,700 | $ 14,109 | $ — | $ 57 | (33,921) | $ (23,648) | $ (4,019) | $ 94 | $ 4,372 |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | (9,011) | (2,690) | — | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | (6,688) | — | — | (1) | (6,689) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 4,808 | — | — | 4,808 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (6,688) | 4,808 | — | (1) | (1,881) |
| Stock-based compensation | — | — | — | — | — | — | 9 | — | — | — | — | 9 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (62) | — | — | 59 | — | (3) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (23) | — | — | — | — | (23) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 18 | (18) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,292) | — | — | — | (1,292) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at March 31, 2010** | 1 | 464 | 649 | $ 51,700 | $ 14,109 | $ — | $ — | $ (50,933) | $ (21,530) | $ (3,960) | $ 89 | $ (10,525) |
| | | | | | | | | | | | | |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $ 64,200 | $ 14,109 | $ — | $ 7 | (62,733) | $ (12,031) | $ (3,953) | $ — | $ (401) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | 676 | — | — | — | 676 |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 2,064 | — | — | 2,064 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | 676 | 2,064 | — | — | 2,740 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 6 | — | — | — | — | 6 |
| Common stock issuances | — | — | 1 | — | — | — | (41) | — | — | 41 | — | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,605) | — | — | — | (1,605) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| **Ending balance at March 31, 2011** | 1 | 464 | 650 | $ 64,700 | $ 14,109 | $ — | $ — | $ (63,693) | $ (9,967) | $ (3,912) | $ — | $ 1,237 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1329

**Table of Contents**

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net income (loss) | $ 676 | $ (6,689) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Derivative (gains) losses | (822) | 3,337 |
| Asset related amortization — premiums, discounts, and basis adjustments | 250 | (97) |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (190) | 592 |
| Net discounts paid on retirements of other debt | (251) | (442) |
| Net premiums received from issuance of debt securities of consolidated trusts | 1,214 | 550 |
| (Gains) losses on extinguishment of debt securities of consolidated trusts and other debt | (235) | 136 |
| Provision for credit losses | 1,989 | 5,396 |
| Losses on investment activity | 1,250 | 810 |
| Losses (gains) on debt recorded at fair value | 81 | (347) |
| Deferred income tax benefit | (65) | (87) |
| Purchases of held-for-sale mortgages | (2,164) | (1,004) |
| Sales of mortgages acquired as held-for-sale | 3,028 | 1,407 |
| Repayments of mortgages acquired as held-for-sale | 13 | 7 |
| Change in: | | |
| Accrued interest receivable | 53 | 76 |
| Accrued interest payable | (850) | (1,419) |
| Income taxes payable | (8) | 182 |
| Other, net | (48) | (346) |
| *Net cash provided by operating activities* | 3,921 | 2,062 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (18,899) | (18,071) |
| Proceeds from sales of trading securities | 12,746 | 26 |
| Proceeds from maturities of trading securities | 4,609 | 7,385 |
| Purchases of available-for-sale securities | (5,868) | (328) |
| Proceeds from sales of available-for-sale securities | 958 | 49 |
| Proceeds from maturities of available-for-sale securities | 9,540 | 10,821 |
| Purchases of held-for-investment mortgages | (11,180) | (12,861) |
| Repayments of mortgages acquired as held-for-investment | 90,717 | 79,893 |
| Decrease in restricted cash | 1,927 | 5,721 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 3,413 | 2,634 |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 8,732 | (10,991) |
| Derivative premiums and terminations and swap collateral, net | (155) | (3,662) |
| Purchase of noncontrolling interest | — | (23) |
| *Net cash provided by investing activities* | 96,540 | 60,593 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 27,152 | 19,690 |
| Repayments of debt securities of consolidated trusts held by third parties | (130,729) | (116,600) |
| Proceeds from issuance of other debt | 264,444 | 329,379 |
| Repayments of other debt | (262,924) | (303,037) |
| Increase in liquidation preference of senior preferred stock | 500 | — |
| Payment of cash dividends on senior preferred stock, preferred stock, and common stock | (1,605) | (1,292) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (14) | (34) |
| *Net cash used for financing activities* | (103,175) | (71,893) |
| Net decrease in cash and cash equivalents | (2,714) | (9,238) |
| Cash and cash equivalents at beginning of period | 37,012 | 64,683 |
| *Cash and cash equivalents at end of period* | $ 34,298 | $ 55,445 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 22,479 | $ 25,405 |
| Net derivative interest carry and swap collateral interest | 472 | 524 |
| Income taxes | (1) | (198) |
| Non-cash investing and financing activities: | | |
| Held-for-sale mortgages securitized and retained as trading securities | 214 | 351 |
| Underlying mortgage loans related to guarantor swap transactions | 85,035 | 75,093 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 85,035 | 75,093 |
| Transfers from held-for-investment mortgages to held-for-sale mortgages | — | 196 |

*The accompanying notes are an integral part of these consolidated financial statements.*

95

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1330

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our Annual Report on our Form 10-K for the year ended December 31, 2010, or our 2010 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third-party investors and we also guarantee the payment of principal and interest on single-family mortgage loans and mortgage-related securities. We also resecuritize mortgage-related securities that are issued by us or Ginnie Mae as well as private (non-agency) entities. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans. These activities are funded by debt issuances. We manage the interest-rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investments and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization. We also guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. See "NOTE 15: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency.

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary.

For additional information regarding our significant accounting policies, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2010 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    TREASURY-1331                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the first quarter. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ending December 31, 2011 or to the trend of earnings. The cumulative effect, net of taxes, of the errors corrected in the first quarter of 2011 was $111 million.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

## Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements

### *Reconsideration of Effective Control for Repurchase Agreements*

In April 2011, the FASB issued an amendment to the accounting guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. As a result of this amendment, we expect that most repurchase agreements will not qualify for derecognition from the transferor's financial statements. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

### *A Creditor's Determination of Whether a Restructuring is a TDR*

In April 2011, the FASB issued an amendment to the accounting guidance for receivables to clarify when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR. The amendment is effective for interim and annual periods beginning on or after June 15, 2011 and applies retrospectively to restructurings occurring on or after the beginning of the fiscal year of adoption, with early adoption permitted. We are evaluating the impact of this amendment on our consolidated financial statements.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

## Business Objectives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our

97                                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

profitability. Based on our charter, public statements from Treasury and FHFA officials and other guidance from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;

- continuing to provide additional assistance to the struggling housing and mortgage markets;

- reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;

- returning to long-term profitability; and

- protecting the interests of taxpayers.

In a letter to the Chairmen and Ranking Members of the Senate Banking and House Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new products is inconsistent with the goals of the conservatorship.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages out of PC pools. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue or other opportunities. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Our future structure and role will be determined by the Obama Administration and Congress. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors. Our future draws are dictated by the terms of the Purchase Agreement. Any actions we take will likely require approval by FHFA and possibly Treasury before they are implemented. FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

### Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $692.0 billion at March 31, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we receive from the government include the following:

- On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at December 31, 2010, which increased the aggregate liquidation preference of the senior preferred stock to $64.7 billion as of March 31, 2011.

- On March 31, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

At March 31, 2011, our assets exceeded our liabilities under GAAP by $1.2 billion; therefore FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement. As of March 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock of $6.5 billion exceeded our annual historical earnings in all but one period.

*Freddie Mac*

TREASURY-1334

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Life to date, we have paid $11.6 billion in cash dividends on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for the first and second quarters of 2011. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 3: CONSERVATORSHIP AND RELATED DEVELOPMENTS," "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation. For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. The accounting guidance related to the consolidation of VIEs states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE. We perform ongoing assessments of whether we are the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2010 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

### VIEs for which We are the Primary Beneficiary

#### Single-family PC Trusts

Our PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information regarding our purchase of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments exposes us to losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At both March 31, 2011 and December 31, 2010, we were the primary beneficiary of, and therefore consolidated, PC trusts with assets totaling $1.7 trillion, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $15.0 billion and $15.8 billion at March 31, 2011 and December 31, 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

### Consolidated VIEs

Table 3.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

### Table 3.1 — Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | March 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | | (in millions) | | |
| Cash and cash equivalents | $ | 1 | $ | 1 |
| Restricted cash and cash equivalents | | 5,497 | | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | | 11,500 | | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | | 1,644,609 | | 1,646,172 |
| Accrued interest receivable | | 6,801 | | 6,895 |
| Real estate owned, net | | 112 | | 118 |
| Other assets | | 2,675 | | 6,001 |
| Total assets of consolidated VIEs | $ | 1,671,195 | $ | 1,696,051 |
| Accrued interest payable | $ | 6,345 | $ | 6,502 |
| Debt securities of consolidated trusts held by third parties | | 1,510,426 | | 1,528,648 |
| Other liabilities | | 3,757 | | 3,851 |
| Total liabilities of consolidated VIEs | $ | 1,520,528 | $ | 1,539,001 |

### VIEs for which We are not the Primary Beneficiary

Table 3.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of income and comprehensive income if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. In instances where we provide financial guarantees to the VIEs, our maximum exposure represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements.

*Freddie Mac*

TREASURY-1336

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| --- | --- | --- | --- | --- | --- |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| **March 31, 2011** | | | | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 8,167 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 79 | 483 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,744 | 135,219 | — | — |
| Trading, at fair value | 94 | 15,951 | 18,766 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 77,992 | — |
| Held-for-sale | — | — | — | 5,304 | — |
| Accrued interest receivable | — | 520 | 493 | 364 | 6 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 307 | 5 | 290 | 369 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (444) | (4) | (80) | (1,007) |
| **Maximum Exposure to Loss** | $ 8,261 | $ 29,076 | $ 170,488 | $ 84,029 | $ 11,320 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 149,626 | $ 32,443 | $ 1,011,495 | $129,786 | $25,546 |

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| --- | --- | --- | --- | --- | --- |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| **December 31, 2010** | | | | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,689 | 137,568 | — | — |
| Trading, at fair value | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 78,448 | — |
| Held-for-sale | — | — | — | 6,413 | — |
| Accrued interest receivable | — | 419 | 717 | 372 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $29,368 | $ 1,036,975 | $138,330 | $25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation including possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

### Asset-Backed Investment Trusts

We invest in a variety of non-mortgage-related, asset-backed investment trusts. These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1337

TREASURY-1338

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At March 31, 2011 and December 31, 2010, we had investments in 25 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of March 31, 2011 were made in 2010 and 2011. At both March 31, 2011 and December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. Our investments in these trusts totaled $8.3 billion and $10.0 billion as of March 31, 2011 and December 31, 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both March 31, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

In Other Guarantee Transactions, non-Freddie Mac mortgage-related securities are used as collateral. At both March 31, 2011 and December 31, 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non-Freddie Mac Securities

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at March 31, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. At December 31, 2010, we were not the primary beneficiary of any non-Freddie Mac securities trusts; however, during the first quarter of 2011, we became the primary beneficiary of one CMBS trust that was not material. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Report. At both March 31, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

### Unsecuritized Multifamily Loans

We purchase loans made to various multifamily real estate entities from originators. While we primarily purchase such loans for securitization, and to a lesser extent, investment purposes, they also help us to fulfill our affordable housing goals. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually make up 80% or less of the value of the related underlying property at origination. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders. There were more than 7,000 unsecuritized multifamily loans in our mortgage-related investments portfolio as of both March 31, 2011 and December 31, 2010.

The UPB of our investments in these loans was $84.2 billion and $85.9 billion as of March 31, 2011 and December 31, 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of multifamily real estate entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At March 31, 2011 and December 31, 2010, the amount of loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

### Other

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We hold an equity investment in various LIHTC fund partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- *Certain other mortgage-related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives:* Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At both March 31, 2011 and December 31, 2010, we were the primary beneficiary of two and three, respectively credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1340                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Table 4.1 summarizes the types of loans on our consolidated balance sheets as of March 31, 2011 and December 31, 2010.

### Table 4.1 — Mortgage Loans

| | March 31, 2011 | | | December 31, 2010 | | |
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Single-family:(1) | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 134,074 | $1,495,949 | $ 1,630,023 | $ 126,561 | $1,493,206 | $ 1,619,767 |
| Interest-only | 3,819 | 18,181 | 22,000 | 4,161 | 19,616 | 23,777 |
| Total fixed-rate | 137,893 | 1,514,130 | 1,652,023 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
| Amortizing | 4,127 | 61,221 | 65,348 | 3,625 | 59,851 | 63,476 |
| Interest-only | 12,931 | 53,577 | 66,508 | 13,018 | 58,792 | 71,810 |
| Total adjustable-rate | 17,058 | 114,798 | 131,856 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 14,769 | 14,769 | — | 15,580 | 15,580 |
| FHA/VA and other governmental | 1,232 | 3,557 | 4,789 | 1,498 | 3,348 | 4,846 |
| Total single-family | 156,183 | 1,647,254 | 1,803,437 | 148,863 | 1,650,393 | 1,799,256 |
| Multifamily(1): | | | | | | |
| Fixed-rate | 70,648 | — | 70,648 | 72,679 | — | 72,679 |
| Adjustable-rate | 13,501 | — | 13,501 | 13,201 | — | 13,201 |
| Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 84,152 | — | 84,152 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans | 240,335 | 1,647,254 | 1,887,589 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (7,382) | 6,872 | (510) | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale(2) | (195) | — | (195) | (311) | — | (311) |
| Allowance for loan losses on mortgage loans held-for-investment | (29,571) | (9,517) | (39,088) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net | $ 203,187 | $ 1,644,609 | $ 1,847,796 | $ 198,723 | $ 1,646,172 | $1,844,895 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $ 197,883 | $ 1,644,609 | $ 1,842,492 | $ 192,310 | $ 1,646,172 | $1,838,482 |
| Held-for-sale | 5,304 | — | 5,304 | 6,413 | — | 6,413 |
| Total mortgage loans, net | $ 203,187 | $ 1,644,609 | $ 1,847,796 | $ 198,723 | $ 1,646,172 | $1,844,895 |

(1) Based on principal balances and excluding mortgage loans traded, but not yet settled.
(2) Includes fair value adjustments associated with mortgage loans for which we have made a fair value election.

We purchased UPB of $95.7 billion of single-family mortgage loans and $0.7 billion of multifamily loans that were classified as held-for-investment at purchase in the three months ended March 31, 2011. Our sales of mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell any held-for-investment loans during the three months ended March 31, 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in the three months ended March 31, 2011.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

combined balances of the first and second mortgages. As of March 31, 2011 and December 31, 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 4.2 presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period.

**Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio**

| | As of March 31, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio(1) | | | | Estimated Current LTV Ratio(1) | | | |
| | <= 80 | 81 – 100 | > 100(2) | Total | <= 80 | 81 – 100 | > 100(2) | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(3) | $ 699,571 | $ 391,550 | $ 230,171 | $ 1,321,292 | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-year amortizing fixed-rate | 238,986 | 16,600 | 2,716 | 258,302 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate(3)(4) | 36,633 | 12,985 | 9,426 | 59,044 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM(5) | 40,500 | 39,308 | 84,469 | 164,277 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans | $1,015,690 | $460,443 | $326,782 | 1,802,915 | $1,017,624 | $468,098 | $ 313,273 | 1,798,995 |
| Multifamily loans | | | | 78,665 | | | | 79,178 |
| Total recorded investment of held-for-investment loans | | | | $1,881,580 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 13.7% and 14.9% as of March 31, 2011 and December 31, 2010, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales. For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Basis of Presentation — *Out-of-Period Accounting Adjustment*" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.3 summarizes loan loss reserve activity.

**Table 4.3 — Detail of Loan Loss Reserves**

| | Three Months Ended March 31, | | | | | | | |
| | 2011 | | | | 2010 | | | |
| | Allowance for Loan Losses | | Reserve for Guarantee Losses(1) | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses(1) | Total |
| | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $ — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance(2) | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 407 | 1,631 | 11 | 2,049 | 2,158 | 3,212 | (3) | 5,367 |
| Charge-offs(3) | (3,304) | (242) | (1) | (3,547) | (1,273) | (1,975) | (2) | (3,250) |
| Recoveries(3) | 664 | 20 | — | 684 | 266 | 350 | — | 616 |
| Transfers, net(4)(5) | 3,814 | (3,536) | (4) | 274 | 12,247 | (11,835) | (16) | 396 |
| Ending balance | $ 28,898 | $ 9,517 | $ 143 | $38,558 | $ 14,091 | $ 21,758 | $ 120 | $35,969 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $ 730 | $ — | $ 98 | $ 828 | $ 748 | $ — | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (45) | — | (15) | (60) | 51 | — | (22) | 29 |
| Charge-offs(3) | (12) | — | — | (12) | (18) | — | — | (18) |
| Recoveries(3) | — | — | — | — | — | — | — | — |
| Transfers, net(5) | — | — | (9) | (9) | — | — | — | — |
| Ending balance | $ 673 | $ — | $ 74 | $ 747 | $ 781 | $ — | $ 61 | $ 842 |
| *Total:* | | | | | | | | |
| Beginning balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ — | $ 32,416 | $33,857 |
| Adjustments to beginning balance(2) | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 362 | 1,631 | (4) | 1,989 | 2,209 | 3,212 | (25) | 5,396 |
| Charge-offs(3) | (3,316) | (242) | (1) | (3,559) | (1,291) | (1,975) | (2) | (3,268) |
| Recoveries(3) | 664 | 20 | — | 684 | 266 | 350 | — | 616 |
| Transfers, net(4)(5) | 3,814 | (3,536) | (13) | 265 | 12,247 | (11,835) | (16) | 396 |
| Ending balance | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 | $ 14,872 | $ 21,758 | $ 181 | $ 36,811 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.02% | | | | 1.85% |

(1) All of these loans are collectively evaluated for impairments. Beginning January 1, 2010, our reserve for guarantee losses is included in other liabilities. See "NOTE 23: SELECTED FINANCIAL STATEMENT LINE ITEMS" in our 2010 Annual Report for further information.

(2) Adjustments relate to the adoption of the accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

(3) Charge-offs represent the amount of the UPB of a loan that has been discharged to remove the loan from our consolidated balance sheet due to either foreclosure transfers or short sales. Charge-offs exclude $106 million and $117 million for the three months ended March 31, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers or other third parties through credit enhancements.

(4) In February 2010, we announced that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. We purchased $14.6 billion and $56.6 billion in UPB of loans from PC trusts during the three months ended March 31, 2011 and 2010, respectively. As a result of these purchases, related amounts of our loan loss reserves were transferred from the allowance for loan losses — held by consolidated trusts and the reserve for guarantee losses into the allowance for loan losses — unsecuritized.

(5) Consist primarily of: (a) approximately $3.5 billion and $12.1 billion of reclassified single-family reserves during the three months ended March 31, 2011 and 2010, respectively, related to our purchases during the period of loans previously held by consolidated trusts (as discussed in endnote (4) above); (b) amounts related to agreements with seller/servicers where the transfer represents recoveries received under these agreements to compensate us for previously incurred and recognized losses; (c) the transfer of a proportional amount of the recognized reserves for guarantee losses associated with loans purchased from non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments; and (d) net amounts attributable to recapitalization of past due interest on modified mortgage loans.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.4 presents our loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

### Table 4.4 — Net Investment in Mortgage Loans

| | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | (in millions) | | | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $ 1,761,214 | $ 75,923 | $ 1,837,137 | $ 1,762,490 | $ 76,541 | $ 1,839,031 |
| Individually evaluated | 41,701 | 2,742 | 44,443 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,802,915 | 78,665 | 1,881,580 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance:* | | | | | | |
| Collectively evaluated | (28,348) | (346) | (28,694) | (30,477) | (382) | (30,859) |
| Individually evaluated | (10,067) | (327) | (10,394) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,415) | (673) | (39,088) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $ 1,764,500 | $ 77,992 | $ 1,842,492 | $ 1,760,034 | $ 78,448 | $ 1,838,482 |

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

Table 4.5 presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

### Table 4.5 — Recourse and Other Forms of Credit Protection[1]

| | UPB at | | Maximum Coverage at | |
|---|---|---|---|---|
| | March 31, 2011 | December 31, 2010 | March 31, 2011 | December 31, 2010 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 213,593 | $ 217,133 | $ 52,066 | $ 52,899 |
| Lender recourse and indemnifications | 9,777 | 10,064 | 9,361 | 9,566 |
| Pool insurance | 36,248 | 37,868 | 3,187 | 3,299 |
| HFA indemnification[2] | 9,096 | 9,322 | 3,184 | 3,263 |
| Subordination[3] | 3,800 | 3,889 | 473 | 493 |
| Other credit enhancements[3] | 130 | 223 | 114 | 118 |
| Total | $ 272,644 | $ 278,499 | $ 68,385 | $ 69,638 |
| Multifamily: | | | | |
| HFA indemnification[2] | $ 1,521 | $ 1,551 | $ 532 | $ 543 |
| Subordination[3] | 15,091 | 12,252 | 1,875 | 1,414 |
| Other credit enhancements | 8,937 | 9,004 | 2,713 | 2,930 |
| Total | $ 25,549 | $ 22,807 | $ 5,120 | $ 4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $18.9 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of March 31, 2011 and December 31, 2010, respectively, for which the information was not available.

(2) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.

(3) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. As of March 31, 2011, amounts exclude mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the first quarter of 2011. We also reached the maximum limit of recovery on certain of these contracts.

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.8 billion as of both March 31, 2011 and December 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          TREASURY-1344          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

### Individually Impaired Loans

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in Table 5.1 by product class (for single-family loans).

### Table 5.1 — Individually Impaired Loans

| | Balance at March 31, 2011 | | | | Balance at December 31, 2010 | | | | For the Three Months Ended March 31, 2011 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | | | (in millions) | | | | | |
| Single-family — | | | | | | | | | | |
| *With no specific allowance recorded(1):* | | | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 8,050 | $ 3,547 | $ — | $ 3,547 | $ 8,462 | $ 3,721 | $ — | $ 3,721 | $ 3,585 | $ 92 |
| 15-year amortizing fixed-rate(2) | 109 | 44 | — | 44 | 119 | 50 | — | 50 | 45 | 2 |
| Adjustable rate(3) | 18 | 8 | — | 8 | 20 | 9 | — | 9 | 8 | — |
| Alt-A, interest-only, and option ARM(4) | 2,344 | 1,020 | — | 1,020 | 2,525 | 1,098 | — | 1,098 | 1,037 | 21 |
| Total with no specific allowance recorded | $ 10,521 | $ 4,619 | $ — | $ 4,619 | $ 11,126 | $ 4,878 | $ — | $ 4,878 | $ 4,675 | $ 115 |
| *With specific allowance recorded:* | | | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 29,920 | $ 28,870 | $ (7,494) | 21,376 | $ 25,504 | $ 24,502 | $ (6,283) | 18,219 | $ 27,638 | $ 176 |
| 15-year amortizing fixed-rate(2) | 228 | 197 | (18) | 179 | 229 | 198 | (17) | 181 | 178 | 3 |
| Adjustable rate(3) | 154 | 139 | (23) | 116 | 168 | 153 | (23) | 130 | 122 | 1 |
| Alt-A, interest-only, and option ARM(4) | 8,165 | 7,876 | (2,532) | 5,344 | 7,035 | 6,774 | (2,161) | 4,613 | 7,406 | 33 |
| Total with specific allowance recorded | $ 38,467 | $ 37,082 | $ (10,067) | $ 27,015 | $ 32,936 | $ 31,627 | $ (8,484) | $ 23,143 | $ 35,344 | $ 213 |
| *Combined single-family:* | | | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 37,970 | $ 32,417 | $ (7,494) | 24,923 | $ 33,966 | $ 28,223 | $ (6,283) | 21,940 | $ 31,223 | $ 268 |
| 15-year amortizing fixed-rate(2) | 337 | 241 | (18) | 223 | 348 | 248 | (17) | 231 | 223 | 5 |
| Adjustable rate(3) | 172 | 147 | (23) | 124 | 188 | 162 | (23) | 139 | 130 | 1 |
| Alt-A, interest-only, and option ARM(4) | 10,509 | 8,896 | (2,532) | 6,364 | 9,560 | 7,872 | (2,161) | 5,711 | 8,443 | 54 |
| Total single-family | 48,988 | 41,701 | (10,067) | 31,634 | 44,062 | 36,505 | (8,484) | 28,021 | 40,019 | 328 |
| Total multifamily | 2,771 | 2,742 | (327) | 2,415 | 2,661 | 2,637 | (348) | 2,289 | 2,745 | 34 |
| Total single-family and multifamily | $ 51,759 | $ 44,443 | $ (10,394) | $ 34,049 | $ 46,723 | $ 39,142 | $ (8,832) | $ 30,310 | $ 42,764 | $ 362 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (4) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

The average recorded investment in individually impaired loans for the three months ended March 31, 2010 was approximately $17.7 billion. We recognized interest income on individually impaired loans of $231 million for the three months ended March 31, 2010. Interest income foregone on individually impaired loans was approximately $365 million and $192 million for the three months ended March 31, 2011 and 2010, respectively.

### Mortgage Loan Performance

We do not accrue interest on loans three months or more past due.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1345                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.2 presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans**[1]

| | March 31, 2011 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Single-family —** | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,241,751 | $22,396 | $ 8,622 | $      48,523 | $ 1,321,292 | $ 48,431 |
| 15-year amortizing fixed-rate[2] | 254,955 | 1,426 | 393 | 1,528 | 258,302 | 1,523 |
| Adjustable rate[3] | 55,917 | 721 | 284 | 2,122 | 59,044 | 2,118 |
| Alt-A, interest-only, and option ARM[4] | 130,159 | 5,018 | 2,650 | 26,450 | 164,277 | 26,417 |
| Total single-family | 1,682,782 | 29,561 | 11,949 | 78,623 | 1,802,915 | 78,489 |
| Total multifamily | 78,455 | 11 | 27 | 172 | 78,665 | 1,918 |
| Total single-family and multifamily | $ 1,761,237 | $29,572 | $11,976 | $      78,795 | $1,881,580 | $ 80,407 |

| | December 31, 2010 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Single-family —** | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,226,874 | $26,442 | $10,203 | $      51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate[2] | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable rate[3] | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[4] | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $34,737 | $14,041 | $      84,305 | $1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers. In addition, if a multifamily borrower has entered into a forbearance agreement and is abiding by the terms of the agreement the borrower's payment status is reflected as current, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both March 31, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (4) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Our practice is to purchase and effectively liquidate loans that are 120 days or more past due from PCs when: (a) the loans have been modified; (b) foreclosure sales occur; (c) the loans have been delinquent for 24 months; or (d) the cost of guarantee payments to PC holders, including advances of interest at the PC coupon rate, exceeds the expected cost of holding the non-performing mortgage loans. On February 10, 2010, we announced that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. This change in practice was made based on a determination that the cost of guarantee, or debt payments to the security holders, would exceed the cost of holding nonperforming loans on our consolidated balance sheets. As of March 31, 2011, there were $3.1 billion in UPB of loans that were four monthly payments past due, and that met our repurchase criteria. Generally, we purchase these delinquent loans, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $14.6 billion and $56.6 billion in UPB of loans from PC trusts or associated with other guarantee commitments during the three months ended March 31, 2011 and 2010, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.3 summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquency Rates[1]

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Delinquencies: | | |
| *Single-family:* | | |
| Non-credit-enhanced portfolio | | |
|    Serious delinquency rate | 2.81% | 2.97% |
|    Total number of seriously delinquent loans | 281,127 | 296,397 |
| Credit-enhanced portfolio | | |
|    Serious delinquency rate | 7.40% | 7.83% |
|    Total number of seriously delinquent loans | 133,268 | 144,116 |
|     Total portfolio, excluding Other Guarantee Transactions | | |
|      Serious delinquency rate | 3.51% | 3.73% |
|      Total number of seriously delinquent loans | 414,395 | 440,513 |
| Other Guarantee Transactions:[2] | | |
|    Serious delinquency rate | 10.23% | 9.86% |
|    Total number of seriously delinquent loans | 21,919 | 21,926 |
| Total single-family: | | |
|    Serious delinquency rate | 3.63% | 3.84% |
|    Total number of seriously delinquent loans | 436,314 | 462,439 |
| *Multifamily:*[3] | | |
|    Delinquency rate | 0.36% | 0.26% |
|    UPB of delinquent loans (in millions) | $ 399 | $ 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both March 31, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA). As part of accomplishing these initiatives, we pay various incentives to servicers and borrowers. We will bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and will not receive a reimbursement for any component from Treasury. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop, consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. Pursuant to this directive, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae, which are designed to help servicers do a better job of engaging with homeowners and to bring greater accountability to the servicing industry. The aligned requirements include earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications and consistent timelines for processing foreclosures. This initiative will result in the alignment of the processes for both HAMP and non-HAMP workout solutions, and will be implemented over the course of 2011. Servicers will also be subject to incentives and sanctions with respect to performance under these standards.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 6: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for a discussion of our significant accounting policies for REO.

For the periods presented below, the weighted average holding period for our disposed properties was less than one year. Table 6.1 provides a summary of the change in the carrying value of our REO balances.

### Table 6.1 — REO

| | Three Months Ended March 31, | | | | | |
| | 2011 | | | 2010 | | |
| | REO, Gross | Valuation Allowance | REO, Net | REO, Gross | Valuation Allowance | REO, Net |
| | (in millions) | | | | | |
|---|---|---|---|---|---|---|
| Beginning balance | $ 7,908 | $ (840) | $ 7,068 | $ 5,125 | $ (433) | $ 4,692 |
| Adjustment to beginning balance(1) | — | — | — | 158 | (11) | 147 |
| Additions | 2,453 | (182) | 2,271 | 3,082 | (244) | 2,838 |
| Change in holding period allowance, inventory | — | (125) | (125) | — | (107) | (107) |
| Dispositions | (3,212) | 374 | (2,838) | (2,323) | 221 | (2,102) |
| Ending balance | $ 7,149 | $ (773) | $ 6,376 | $ 6,042 | $ (574) | $ 5,468 |

(1) Adjustment to the beginning balance relates to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report, for further information.

The REO balance, net at March 31, 2011 and December 31, 2010 associated with single-family properties was $6.3 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $115 million and $107 million, respectively. The West region represented approximately 36% and 29% of our single-family REO additions during the three months ended March 31, 2011 and 2010, respectively, based on the number of properties, and the highest concentration in the West region is in California. At March 31, 2011, our single-family REO inventory in California represented approximately 12% of our total REO inventory based on the number of properties. Our single-family REO inventory consisted of 65,159 properties and 72,079 properties at March 31, 2011 and December 31, 2010, respectively.

Our REO operations expenses included REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and insurance reimbursements and other credit enhancement recoveries. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. We recognized losses of $126 million and $13 million on single-family REO dispositions during the three months ended March 31, 2011 and 2010, respectively. We increased our valuation allowance for the properties in our inventory of single-family REO by $151 million and $137 million for the three months ended March 31, 2011 and 2010 to account for declines in home prices during these periods.

REO property acquisitions result from extinguishment of our mortgage loans held on our consolidated balance sheets and are treated as non-cash transfers. As a result, the amount of non-cash acquisitions of REO properties during the three months ended March 31, 2011 and 2010 was $4.1 billion and $5.1 billion, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 7: INVESTMENTS IN SECURITIES

Table 7.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At March 31, 2011 and December 31, 2010, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| March 31, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 81,133 | $ 4,804 | $     (193) | $ 85,744 |
| Subprime | 45,829 | 8 | (12,493) | 33,344 |
| CMBS | 57,457 | 1,980 | (1,493) | 57,944 |
| Option ARM | 10,134 | 25 | (3,170) | 6,989 |
| Alt-A and other | 15,092 | 60 | (2,215) | 12,937 |
| Fannie Mae | 21,541 | 1,305 | (2) | 22,844 |
| Obligations of states and political subdivisions | 9,384 | 26 | (535) | 8,875 |
| Manufactured housing | 914 | 15 | (51) | 878 |
| Ginnie Mae | 257 | 26 | — | 283 |
| Total available-for-sale securities | $ 241,741 | $ 8,249 | $ (20,152) | $229,838 |

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $     (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $8,188 | $(23,077) | $ 232,634 |

(1) Includes non-credit-related other-than-temporary impairments on available-for-sale securities recognized in AOCI and temporary unrealized losses.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1349

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

Table 7.2 shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| March 31, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,813 | $ — | $ (68) | $ (68) | $ 1,829 | $ — | $ (125) | $ (125) | $ 4,642 | $ — | $ (193) | $ (193) |
| Subprime | 9 | (1) | — | (1) | 33,190 | (9,988) | (2,504) | (12,492) | 33,199 | (9,989) | (2,504) | (12,493) |
| CMBS | 1,046 | — | (24) | (24) | 4,946 | (655) | (814) | (1,469) | 5,992 | (655) | (838) | (1,493) |
| Option ARM | 2 | (1) | — | (1) | 6,820 | (3,045) | (124) | (3,169) | 6,822 | (3,046) | (124) | (3,170) |
| Alt-A and other | 535 | (24) | (5) | (29) | 11,123 | (1,606) | (580) | (2,186) | 11,658 | (1,630) | (585) | (2,215) |
| Fannie Mae | 22 | — | — | — | 15 | — | (2) | (2) | 37 | — | (2) | (2) |
| Obligations of states and political subdivisions | 3,909 | — | (181) | (181) | 3,133 | — | (354) | (354) | 7,042 | — | (535) | (535) |
| Manufactured housing | 22 | (1) | — | (1) | 459 | (31) | (19) | (50) | 481 | (32) | (19) | (51) |
| Total available-for-sale securities in a gross unrealized loss position | $ 8,358 | $ (27) | $ (278) | $ (305) | $ 61,515 | $ (15,325) | $ (4,522) | $ (19,847) | $ 69,873 | $ (15,352) | $ (4,800) | $ (20,152) |

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,494 | $ — | $ (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (844) | (1,024) | (1,868) | 11,844 | (844) | (1,075) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | (3) | (3) | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $ 9,510 | $ (2) | $ (287) | $ (289) | $ 67,399 | $ (16,520) | $ (6,268) | $ (22,788) | $ 76,909 | $ (16,522) | $ (6,555) | $ (23,077) |

(1) Represents the pre-tax amount of non-credit-related other-than-temporary impairments on available-for-sale securities not expected to be sold which are recognized in AOCI.

(2) Represents the pre-tax amount of temporary impairments on available-for-sale securities recognized in AOCI.

At March 31, 2011, total gross unrealized losses on available-for-sale securities were $20.2 billion. The gross unrealized losses relate to 2,452 individual lots representing 2,357 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically identifying investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which

114

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1350

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the three months ended March 31, 2011 and 2010, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The evaluation of whether unrealized losses on available-for-sale securities are other-than-temporary contemplates numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issue (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectibility of amounts that would be recovered from primary monoline insurers. In the case of monoline insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security

TREASURY-1351

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

prices, and credit default swap levels traded on the insurers.  We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics.  We also consider the differences between the loan level characteristics of the performing and non-performing loan populations.

Table 7.3 presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall.  Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions of voluntary prepayment rates are also an input to the present value of expected losses and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities**

| | | | | Alt-A(1) | |
| | | | | March 31, 2011 | |
| | Subprime first lien | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and prior: | | | | | |
| UPB | $ 1,312 | $ 126 | $ 972 | $ 566 | $ 2,338 |
| Weighted average collateral defaults(2) | 38% | 38% | 8% | 46% | 26% |
| Weighted average collateral severities(3) | 56% | 53% | 47% | 53% | 40% |
| Weighted average voluntary prepayment rates(4) | 6% | 7% | 10% | 7% | 8% |
| Average credit enhancement(5) | 41% | 19% | 14% | 19% | 15% |
| 2005: | | | | | |
| UPB | $ 7,367 | $ 3,070 | $ 1,300 | $ 909 | $ 4,229 |
| Weighted average collateral defaults(2) | 57% | 55% | 24% | 55% | 43% |
| Weighted average collateral severities(3) | 66% | 63% | 53% | 58% | 49% |
| Weighted average voluntary prepayment rates(4) | 4% | 6% | 8% | 6% | 8% |
| Average credit enhancement(5) | 52% | 17% | 5% | 27% | 7% |
| 2006: | | | | | |
| UPB | $ 21,216 | $ 7,381 | $ 603 | $ 1,242 | $ 1,303 |
| Weighted average collateral defaults(2) | 67% | 70% | 39% | 64% | 54% |
| Weighted average collateral severities(3) | 70% | 70% | 60% | 64% | 57% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 8% | 7% | 8% |
| Average credit enhancement(5) | 18% | 6% | 8% | 0% | 2% |
| 2007: | | | | | |
| UPB | $ 22,508 | $ 4,655 | $ 168 | $ 1,482 | $ 375 |
| Weighted average collateral defaults(2) | 64% | 67% | 55% | 65% | 61% |
| Weighted average collateral severities(3) | 71% | 71% | 68% | 66% | 68% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 7% | 7% | 8% |
| Average credit enhancement(5) | 19% | 14% | 15% | (3)% | 0% |
| Total: | | | | | |
| UPB | $ 52,403 | $ 15,232 | $3,043 | $ 4,199 | $ 8,245 |
| Weighted average collateral defaults(2) | 64% | 66% | 24% | 60% | 41% |
| Weighted average collateral severities(3) | 70% | 69% | 57% | 62% | 50% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 9% | 7% | 8% |
| Average credit enhancement(5) | 24% | 11% | 9% | 8% | 8% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(3) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default rate for each security.
(4) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(5) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by monoline bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectibility of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same ratings were not other-than-temporarily impaired. However, we carefully consider individual ratings, especially those below investment grade, including changes since March 31, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Our analysis is conducted on a quarterly basis and is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2011.

In addition, we considered fair values at March 31, 2011, as well as any significant changes in fair value since March 31, 2011 to assess if they were indicative of potential future cash shortfalls. In this assessment, we put greater emphasis on categorical pricing information than on individual prices. We use multiple pricing services and dealers to price the majority of the non-agency mortgage-related securities we hold. We observed significant dispersion in prices obtained from different sources. However, we carefully consider individual and sustained price declines, placing greater weight when dispersion is lower and less weight when dispersion is higher. Where dispersion is higher, other factors previously mentioned receive greater weight. For further information, see "NOTE 18: FAIR VALUE DISCLOSURES."

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2011. We do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Monoline Bond Insurance

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary monoline bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

Table 7.4 summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings for the Three Months Ended | |
|---|---|---|
| | March 31, 2011 | March 31, 2010 |
| | (in millions) | |
| Available-for-sale securities: | | |
| Subprime | $ (734) | $ (332) |
| Option ARM | (281) | (102) |
| Alt-A and other | (40) | (19) |
| CMBS | (135) | (55) |
| Manufactured housing | (3) | (2) |
| Total other-than-temporary impairments on available-for-sale securities | $ (1,193) | $ (510) |

Table 7.5 presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash

117                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1353                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced if we receive cash flows in excess of what we expected to receive over the remaining life of the credit-impaired debt security or the security matures or is fully written down.

### Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities[1]

| | Three Months Ended March 31, 2011 |
| --- | --- |
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $     14,878 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 20 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 1,173 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured | (199) |
| Amounts related to amortization resulting from increases in cash flows expected to be collected that are recognized over the remaining life of the security | (30) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings[2] | $     15,842 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

(2) Excludes increases in cash flows expected to be collected that will be recognized in earnings over the remaining life of the security of $642 million, net of amortization.

### Realized Gains and Losses on Available-For-Sale Securities

Table 7.6 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

### Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| **Gross realized gains** | | |
| Mortgage-related securities: | | |
| Freddie Mac | $     77 | $     — |
| Obligations of states and political subdivisions | 1 | 1 |
| Total mortgage-related securities gross realized gains | 78 | 1 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 2 | — |
| Total non-mortgage-related securities gross realized gains | 2 | — |
| Gross realized gains | 80 | 1 |
| **Gross realized losses** | | |
| Gross realized losses | — | — |
| Net realized gains (losses) | $     80 | $     1 |

118

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Maturities of Available-For-Sale Securities**

Table 7.7 summarizes the remaining contractual maturities of available-for-sale securities.

**Table 7.7 — Maturities of Available-For-Sale Securities[1]**

| March 31, 2011 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $ 99 | $ 100 |
| Due after 1 through 5 years | 1,230 | 1,288 |
| Due after 5 through 10 years | 6,869 | 7,196 |
| Due after 10 years | 233,543 | 221,254 |
| Total available-for-sale securities | $ 241,741 | $229,838 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

**AOCI Related to Available-For-Sale Securities**

Table 7.8 presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance | $(9,678) | $ (20,616) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[1] | — | (2,683) |
| Net unrealized holding gains[2] | 1,216 | 4,315 |
| Net reclassification adjustment for net realized losses[3][4] | 725 | 331 |
| Ending balance | $(7,737) | $(18,653) |

(1) Net of tax benefit of $1.4 billion for the three months ended March 31, 2010.
(2) Net of tax expense of $655 million and $2.3 billion for the three months ended March 31, 2011 and 2010, respectively.
(3) Net of tax benefit of $390 million and $178 million for the three months ended March 31, 2011 and 2010, respectively.
(4) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $775 million and $332 million, net of taxes, for the three months ended March 31, 2011 and 2010, respectively.

**Trading Securities**

Table 7.9 summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | March 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $ 15,951 | $ 13,487 |
| Fannie Mae | 18,586 | 18,726 |
| Ginnie Mae | 167 | 172 |
| Other | 26 | 31 |
| Total mortgage-related securities | 34,730 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 94 | 44 |
| Treasury bills | 9,397 | 17,289 |
| Treasury notes | 16,123 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 1,009 | 441 |
| Total non-mortgage-related securities | 26,623 | 27,896 |
| Total fair value of trading securities | $ 61,353 | $ 60,262 |

For the three months ended March 31, 2011 and 2010 we recorded net unrealized losses on trading securities held at March 31, 2011 and 2010 of $0.2 billion and $0.4 billion, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1355                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Total trading securities include $2.3 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of March 31, 2011 and December 31, 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include losses of $41 million and $35 million, respectively, related to these hybrid financial securities for the three months ended March 31, 2011 and 2010.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned to ensure our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $1.7 billion and $2.2 billion at March 31, 2011 and December 31, 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At March 31, 2011 and December 31, 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at March 31, 2011 and December 31, 2010, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties.

In addition, we hold cash and cash equivalents as collateral primarily in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at March 31, 2011 and December 31, 2010 was $607 million and $550 million, respectively.

*Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of March 31, 2011, we had one uncommitted intraday line of credit with a third party, which is secured, in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates delinquent overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line-of-credit agreement upon demand by the counterparty.

Table 7.10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

**Table 7.10 — Collateral in the Form of Securities Pledged**

|  | March 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties(1) | $ 10,402 | $ 9,915 |
| Available-for-sale securities | 298 | 817 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties(1) | 15 | 5 |
| Total securities pledged | $ 10,715 | $ 10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

*Securities Pledged with the Ability of the Secured Party to Repledge*

At March 31, 2011, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.6 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at March 31, 2011 or December 31, 2010. The remaining $0.1 billion and $0.2 billion of collateral posted with the ability of the secured party to repledge at March 31, 2011 and December 31, 2010, respectively, was posted in connection with our futures transactions.

*Securities Pledged without the Ability of the Secured Party to Repledge*

At March 31, 2011 and December 31, 2010, we pledged securities without the ability of the secured party to repledge of $15 million and $5 million, respectively, at a clearinghouse in connection with our futures transactions.

*Collateral in the Form of Cash Pledged*

At March 31, 2011, we pledged $8.3 billion of collateral in the form of cash and cash equivalents, all but $75 million of which related to our derivative agreements as we had $8.8 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.4 billion of such derivatives in a net loss position. The remaining $75 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at March 31, 2011 and December 31, 2010, respectively.

### NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt that we issue to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $972 billion in 2011. As of March 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $729.1 billion, which was approximately $242.9 billion below the debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In the tables that follow, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instrument classified as other debt.

Table 8.1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

### Table 8.1 — Total Debt, Net

| | Interest Expense for the Three Months Ended March 31, | | Balance, Net(1) | |
| | 2011 | 2010 | March 31, 2011 | December 31, 2010 |
| | (in millions) | | (in millions) | |
|---|---|---|---|---|
| Other debt: | | | | |
| Short-term debt | $ 115 | $ 141 | $ 196,625 | $ 197,106 |
| Long-term debt: | | | | |
| Senior debt | 3,438 | 4,446 | 518,590 | 516,123 |
| Subordinated debt | 12 | 12 | 357 | 711 |
| Total long-term debt | 3,450 | 4,458 | 518,947 | 516,834 |
| Total other debt | 3,565 | 4,599 | 715,572 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 17,403 | 19,643 | 1,510,426 | 1,528,648 |
| Total debt, net | $20,968 | $24,242 | $ 2,225,998 | $ 2,242,588 |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, with $0.5 billion and $0.9 billion, respectively, of other short-term debt, and $3.5 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at March 31, 2011 and December 31, 2010.

121

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1357

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For the three months ended March 31, 2011 and 2010, we recognized fair value gains (losses) of $(81) million and $346 million, respectively, on our foreign-currency denominated debt, of which $(117) million and $321 million, respectively, are gains (losses) related to our net foreign-currency translation.

**Other Debt**

Table 8.2 summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either March 31, 2011 or December 31, 2010.

**Table 8.2 — Other Debt**

| | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net(1) | Weighted Average Effective Rate(2) | Par Value | Balance, Net(1) | Weighted Average Effective Rate(2) |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $ 196,237 | $ 196,126 | 0.22% | $194,875 | $ 194,742 | 0.24% |
| Medium-term notes | 499 | 499 | 0.15 | 2,364 | 2,364 | 0.31 |
| Total other short-term debt | 196,736 | 196,625 | 0.22 | 197,239 | 197,106 | 0.25 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2011 | 84,678 | 84,678 | 2.02% | 120,951 | 120,959 | 2.13% |
| 2012 | 139,578 | 139,529 | 1.71 | 138,474 | 138,418 | 1.79 |
| 2013 | 102,582 | 102,304 | 2.11 | 79,177 | 78,886 | 2.64 |
| 2014 | 49,703 | 49,511 | 2.91 | 36,328 | 36,142 | 3.46 |
| 2015 | 42,027 | 42,000 | 2.97 | 45,779 | 45,752 | 2.99 |
| Thereafter | 113,756 | 100,925 | 4.66 | 110,269 | 96,677 | 4.77 |
| Total other long-term debt(3) | 532,324 | 518,947 | 2.63 | 530,978 | 516,834 | 2.78 |
| Total other debt | $ 729,060 | $ 715,572 | | $728,217 | $ 713,940 | |

(1) Represents par value, net of associated discounts, premiums, and hedging-related adjustments.

(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs and hedging-related basis adjustments.

(3) Balance, net for other long-term debt includes callable debt of $139.6 billion and $142.6 billion at March 31, 2011 and December 31, 2010, respectively.

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (i.e., single-family PC trusts and certain Other Guarantee Transactions).

Table 8.3 summarizes the debt securities of our consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.3 — Debt Securities of Our Consolidated Trusts Held by Third Parties(1)**

| | March 31, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity(2) | UPB | Balance, Net | Weighted Average Coupon(2) | Contractual Maturity(2) | UPB | Balance, Net | Weighted Average Coupon(2) |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2011 - 2048 | $ 1,091,679 | $ 1,100,404 | 5.00% | 2011-2048 | $1,110,943 | $ 1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2031 | 65,613 | 66,426 | 4.70 | 2012-2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2011 - 2026 | 229,797 | 232,209 | 4.33 | 2011-2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2011 - 2047 | 51,842 | 52,346 | 3.55 | 2011-2047 | 50,904 | 51,351 | 3.69 |
| Interest-only(3) | 2026 - 2041 | 56,662 | 56,749 | 5.23 | 2026-2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2011 - 2041 | 2,256 | 2,292 | 5.73 | 2011-2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties(4) | | $1,497,849 | $1,510,426 | | | $ 1,517,001 | $ 1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.

(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.

(3) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.

(4) The effective rate for debt securities of consolidated trusts held by third parties was 4.62% and 4.57% as of March 31, 2011 and December 31, 2010, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1358                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Lines of Credit**

At both March 31, 2011 and December 31, 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by GSEs. No amounts were drawn on this line of credit at March 31, 2011 or December 31, 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

### NOTE 9: FINANCIAL GUARANTEES

We securitize substantially all of the single-family mortgage loans we purchase and issue securities backed by such mortgages, which we guarantee. During the three months ended March 31, 2011 and 2010, we issued and guaranteed $93.9 billion and $87.6 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds). Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. Table 9.1 presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

**Table 9.1 — Financial Guarantees**

| | March 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, terms in years) | | | |
| Non-consolidated Freddie Mac securities | $27,944 | $ 227 | 40 | $ 25,279 | $ 202 | 41 |
| Other guarantee commitments | 19,936 | 429 | 38 | 18,670 | 427 | 38 |
| Derivative instruments | 46,557 | 612 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees | 162 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

**Non-consolidated Freddie Mac Securities**

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

At both March 31, 2011 and December 31, 2010, there were $1.4 trillion of securities we issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips and do not increase our credit-related exposure. As a result, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognized a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both March 31, 2011 and December 31,

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2010. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVE" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information about our accounting for financial guarantees.

During the three months ended March 31, 2011 and 2010, we issued approximately $2.9 billion and $1.5 billion, respectively, in UPB of Other Guarantee Transactions backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized. As of March 31, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $11.1 billion and $11.3 billion, respectively.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (e.g., a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

## Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. These other guarantee commitments totaled $7.0 billion and $5.5 billion of UPB at March 31, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion and $9.7 billion in UPB at March 31, 2011 and December 31, 2010, respectively. In addition, as of March 31, 2011 and December 31, 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.3 billion and $3.5 billion, respectively. As of March 31, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $10.0 billion and $8.6 billion, respectively.

## Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's adjustable-rate mortgage. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

## Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at March 31, 2011 and December 31, 2010.

## Other Indemnifications and Guarantees

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (e.g., those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no probable and estimable losses associated with these contracts. Therefore, we have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at March 31, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at March 31, 2011 and December 31, 2010.

## NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (e.g., the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. In addition, to the extent that we receive newly-issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (e.g., multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report. These transfers and our resulting retained interests are not significant to our consolidated financial statements in the first quarters of 2011 and 2010.

## NOTE 11: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

We typically commit to purchase mortgage investments on an opportunistic basis for a future settlement, typically ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

125                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Adjust Funding Mix

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign-Currency Exposure

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are derivatives subject to the requirements of derivatives and hedge accounting.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

<div align="center">126</div> *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2010 Annual Report.

**Derivative Assets and Liabilities at Fair Value**

Table 11.1 presents the location and fair value of derivatives reported in our consolidated balance sheets.

**Table 11.1 — Derivative Assets and Liabilities at Fair Value**

| | At March 31, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
| | | Assets(1) | Liabilities(1) | | Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| Total derivative portfolio | | | | | | |
| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging(2) | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $ 249,793 | $ 3,122 | $ (2,549) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-fixed | 330,015 | 2,202 | (18,357) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 3,375 | 5 | (2) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 583,183 | 5,329 | (20,908) | 721,259 | 9,970 | (27,479) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 104,850 | 7,172 | — | 114,110 | 8,391 | — |
| Written | 23,775 | — | (566) | 11,775 | — | (244) |
| Put Swaptions | | | | | | |
| Purchased | 60,475 | 1,819 | — | 59,975 | 1,404 | — |
| Written | 6,000 | 1 | (1) | 6,000 | — | (8) |
| Other option-based derivatives(3) | 44,884 | 1,394 | (6) | 47,234 | 1,460 | (10) |
| Total option-based | 239,984 | 10,385 | (573) | 239,094 | 11,255 | (262) |
| Futures | 157,197 | 3 | (100) | 212,383 | 3 | (170) |
| Foreign-currency swaps | 2,138 | 281 | — | 2,021 | 172 | — |
| Commitments(4) | 15,877 | 32 | (32) | 14,292 | 103 | (123) |
| Credit derivatives | 11,664 | 7 | (5) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,731 | — | (36) | 3,614 | — | (36) |
| Total Derivatives not designated as hedging instruments | 1,013,774 | 16,037 | (21,654) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments(5) | | (15,979) | 20,904 | | (21,372) | 26,866 |
| Total derivative portfolio, net | $1,013,774 | $    58 | $    (750) | $1,205,496 | $    143 | $  (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(3) Primarily includes purchased interest rate caps and floors.

(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $6.5 billion and $3 million, respectively, at March 31, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.6) billion and $(0.8) billion at March 31, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets, net at March 31, 2011 and December 31, 2010 was $1.7 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities, net at March 31, 2011 and December 31, 2010 was $8.2 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. In the event our credit ratings fall below certain specified rating triggers or are withdrawn by S&P or Moody's, the counterparties to the derivative instruments are entitled to full overnight collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on March 31, 2011, was $8.8 billion for which we have posted collateral of $8.2 billion in the normal course of business. If the credit-risk-related contingent features underlying these agreements were triggered on March 31, 2011, we would be required to post an additional $0.6 billion of collateral to our counterparties.

TREASURY-1363

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At March 31, 2011 and December 31, 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

**Gains and Losses on Derivatives**

Table 11.2 presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

**Table 11.2 — Gains and Losses on Derivatives**

| Derivatives in Cash Flow Hedging Relationships[1] | Amount of Gain or (Loss) Recognized in AOCI on Derivative (Effective Portion) | | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | Amount of Gain or (Loss) Recognized in AOCI on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| | | | (in millions) | | | |
| Closed cash flow hedges[2] | $ — | $ — | $ (197) | $ (259) | $ — | $ — |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[4] | Derivative Gains (Losses)[3] Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Interest-rate swaps: | | |
| Receive-fixed | | |
| Foreign-currency denominated | $ (37) | $ (8) |
| U.S. dollar denominated | (2,204) | 2,383 |
| Total receive-fixed swaps | (2,241) | 2,375 |
| Pay-fixed | 3,963 | (4,747) |
| Basis (floating to floating) | 1 | 38 |
| Total interest-rate swaps | 1,723 | (2,334) |
| Option based: | | |
| Call swaptions | | |
| Purchased | (684) | 500 |
| Written | 38 | 59 |
| Put swaptions | | |
| Purchased | (122) | (974) |
| Written | 7 | (5) |
| Other option-based derivatives[5] | (46) | (162) |
| Total option-based | (807) | (582) |
| Futures | (41) | (54) |
| Foreign-currency swaps[6] | 109 | (331) |
| Commitments[7] | (164) | (35) |
| Credit derivatives | 1 | — |
| Swap guarantee derivatives | 1 | — |
| Subtotal | 822 | (3,336) |
| Accrual of periodic settlements:[8] | | |
| Receive-fixed interest rate swaps[9] | 1,246 | 1,532 |
| Pay-fixed interest rate swaps | (2,504) | (2,884) |
| Foreign-currency swaps | 4 | 7 |
| Other | 5 | (4) |
| Total accrual of periodic settlements | (1,249) | (1,349) |
| Total | $ (427) | $ (4,685) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(3) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(4) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(5) Primarily includes purchased interest rate caps and floors.

(6) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1364

Table of Contents

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

## Hedge Designation of Derivatives

At March 31, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in Table 11.3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $2.1 billion and $2.7 billion at March 31, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $488 million, net of taxes, of the $2.1 billion of cash flow hedge losses in AOCI at March 31, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at March 31, 2011, will be reclassified to earnings over the next five and ten years, respectively.

Table 11.3 presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately. For further information on our net deferred tax asset valuation allowance see "NOTE 13: INCOME TAXES."

## Table 11.3 — AOCI Related to Cash Flow Hedge Relationships

| | Three Months Ended March 31, | |
| | 2011 | 2010 |
| --- | --- | --- |
| | (in millions) | |
| Beginning balance[1] | $(2,239) | $(2,905) |
| Cumulative effect of change in accounting principle[2] | — | (7) |
| Net reclassifications of losses to earnings[3] | 132 | 172 |
| Ending balance[1] | $(2,107) | $(2,740) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.

(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the three months ended March 31, 2010.

(3) Net of tax benefit of $65 million and $87 million for the three months ended March 31, 2011 and 2010, respectively.

## NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

### Senior Preferred Stock

We received $500 million in March 2011 pursuant to a draw request that FHFA submitted to Treasury on our behalf to address the deficit in our net worth as of December 31, 2010. At March 31, 2011, our assets exceeded our liabilities under GAAP by $1.2 billion; therefore FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $64.7 billion and $64.2 billion as of March 31, 2011 and December 31, 2010, respectively. See "NOTE 16: REGULATORY CAPITAL" for additional information.

### Stock Repurchase and Issuance Programs

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the three months ended March 31, 2011, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During the three months ended March 31, 2011, restrictions lapsed on 792,372 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          TREASURY-1365          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Dividends Declared During 2011**

No common dividends were declared in 2011. On March 31, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the three months ended March 31, 2011.

### NOTE 13: INCOME TAXES

**Income Tax Benefit**

For the three months ended March 31, 2011 and 2010, we reported an income tax benefit of $74 million and $103 million, respectively, resulting in effective tax rates of (12.3)% and 1.5%, respectively. These income tax benefits represent primarily the tax benefit recognized related to the amortization of net deferred losses on pre-2008 closed cash flow hedges. For the three months ended March 31, 2011 and 2010, our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including the first quarter of 2011. Our valuation allowance decreased by $91 million to $33.3 billion in the three months ended March 31, 2011, primarily due to the reversal of temporary differences during the period. As of March 31, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $4.5 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of March 31, 2011, we had net operating loss and LIHTC carryforwards that will expire over multiple years ending in 2031 and alternative minimum tax credit carryforwards that will not expire.

**Unrecognized Tax Benefits**

At March 31, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.2 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $332 million tax expense related to the establishment of a valuation allowance against credits and net operating losses that have been carried forward. A valuation allowance has not currently been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. There has been no material change during the quarter in total accrued interest payable allocable to unrecognized tax benefits.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2009. The IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. We

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1366                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

continue to seek resolution of the controversy by settlement. It is reasonably possible that the hedge accounting method issue will be resolved within the next 12 months. We believe adequate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits within the next 12 months that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. We have no information that would enable us to estimate such impact at this time.

## NOTE 14: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. We also maintain a nonqualified, unfunded defined benefit pension plan for our officers as part of our Supplemental Executive Retirement Plan (we refer to this plan and the Pension Plan as our Defined Benefit Pension Plans). We maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who rendered at least 10 years of service (five years of service if the employee was eligible to retire prior to March 1, 2007) and who, upon separation or termination, immediately elected to commence benefits under the Pension Plan in the form of an annuity. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our Defined Benefit Pension Plans are collectively referred to as the Defined Benefit Plans.

Table 14.1 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the three months ended March 31, 2011 and 2010. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income and comprehensive income.

### Table 14.1 — Net Periodic Benefit Cost Detail

| | Three Months Ended March 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Pension Benefits** | | |
| Service cost | $ 9 | $ 8 |
| Interest cost on benefit obligation | 10 | 9 |
| Expected return on plan assets | (12) | (10) |
| Recognized net actuarial loss | 1 | 3 |
| Net periodic benefit cost | $ 8 | $ 10 |
| **Postretirement Health Care Benefits** | | |
| Service cost | $ 2 | $ 2 |
| Interest cost on benefit obligation | 2 | 2 |
| Net periodic benefit cost | $ 4 | $ 4 |

### Cash Flows Related to Defined Benefit Plans

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. We have not yet determined whether a contribution to our Pension Plan is required in 2011.

## NOTE 15: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss) and GAAP total comprehensive income (loss).

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) non-recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset / liability management returns<br><br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (*i.e.*, provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment and guarantee activities in multifamily mortgage loans and securities. We purchase multifamily mortgage loans primarily for purposes of aggregation and then securitization. Although we hold CMBS that we purchased for investment, we have not purchased significant amounts of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment primarily includes management and guarantee fee income and the interest earned on assets related to multifamily investment activities, net of allocated funding costs. The Multifamily segment reflects the impact of changes in the fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as credit and liquidity. | • Multifamily mortgage loans and associated securitization activities<br><br>• Investments in CMBS and multifamily housing revenue bonds<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily mortgage loans<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of corporate-level expenses that are material and infrequent in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br><br>• Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

*Freddie Mac*

TREASURY-1368

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1369

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Segment Earnings

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of March 31, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.5 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of March 31, 2011, the unamortized balance of such fees was $2.7 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

Table 15.1 presents Segment Earnings by segment.

## Table 15.1 — Summary of Segment Earnings and Total Comprehensive Income (Loss)[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| Segment Earnings (loss), net of taxes: | | |
| Investments | $ 2,137 | $ (1,313) |
| Single-family Guarantee | (1,820) | (5,596) |
| Multifamily | 359 | 221 |
| Total Segment Earnings (loss), net of taxes | 676 | (6,688) |
| Net income (loss) attributable to Freddie Mac | $ 676 | $(6,688) |
| Total comprehensive income (loss) of segments: | | |
| Investments | $ 3,263 | $ 1,807 |
| Single-family Guarantee | (1,824) | (5,600) |
| Multifamily | 1,301 | 1,913 |
| Total comprehensive income (loss) of segments | 2,740 | (1,880) |
| Total comprehensive income (loss) attributable to Freddie Mac | $ 2,740 | $ (1,880) |

(1) The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1370

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.2 presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 15.2 — Segment Earnings and Reconciliation to GAAP Results

### Three Months Ended March 31, 2011

(in millions)

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non-Interest Expense | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $ 1,653 | $ — | $ | $ (1,029) | $ 1,103 | $ 236 | $ (95) | $ | $ | $ 203 | 66 | $ 2,137 | $ — | $ 2,137 | $ 1,126 | $ 3,263 |
| Single-family Guarantee | 100 | (2,284) | 870 | — | — | 211 | (215) | (257) | (66) | (185) | 6 | (1,820) | — | (1,820) | (4) | (1,824) |
| Multifamily | 279 | 60 | 28 | (135) | 2 | 187 | (51) | — | (13) | | 2 | 359 | — | 359 | 942 | 1,301 |
| Total Segment Earnings (loss), net of taxes | 2,032 | (2,224) | 898 | (1,164) | 1,105 | 634 | (361) | (257) | (79) | 18 | 74 | 676 | — | 676 | 2,064 | 2,740 |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassification[3] | 2,305 | 235 | (675) | (29) | (1,532) | (304) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 203 | — | (185) | — | — | — | — | — | — | (18) | — | — | — | — | — | — |
| Total reconciling items | 2,508 | 235 | (860) | (29) | (1,532) | (304) | — | — | — | (18) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,540 | $ (1,989) | $ 38 | $ (1,193) | $ (427) | $ 330 | $ (361) | $ (257) | $ (79) | $ — | $ 74 | $ 676 | $ — | $ 676 | $ 2,064 | $ 2,740 |

### Three Months Ended March 31, 2010

(in millions)

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non-Interest Expense | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $ 1,311 | $ — | $ | $ (376) | $ (2,702) | $ (22) | $ (122) | $ | $ (7) | $ 510 | 97 | $ (1,311) | $ (2) | $ (1,313) | $ 3,120 | $ 1,807 |
| Single-family Guarantee | 59 | (6,041) | 848 | — | — | 210 | (229) | (156) | (79) | (213) | 5 | (5,596) | — | (5,596) | (4) | (5,600) |
| Multifamily | 238 | (29) | 24 | (55) | 5 | 108 | (54) | (3) | (17) | — | 1 | 218 | 3 | 221 | 1,692 | 1,913 |
| Total Segment Earnings (loss), net of taxes | 1,608 | (6,070) | 872 | (431) | (2,697) | 296 | (405) | (159) | (103) | 297 | 103 | (6,689) | 1 | (6,688) | 4,808 | (1,880) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassification[3] | 2,007 | 674 | (624) | (79) | (1,988) | 10 | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 510 | — | (213) | — | — | — | — | — | — | (297) | — | — | — | — | — | — |
| Total reconciling items | 2,517 | 674 | (837) | (79) | (1,988) | 10 | — | — | — | (297) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,125 | $ (5,396) | $ 35 | $ (510) | $ (4,685) | $ 306 | $ (405) | $ (159) | $ (103) | $ — | $ 103 | $ (6,689) | $ 1 | $ (6,688) | $ 4,808 | $ (1,880) |

(1) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(2) See "Segment Earnings" for additional information regarding these adjustments.

(3) See "NOTE 17: SEGMENT REPORTING — Segment Earnings — Investment Activity-Related Reclassifications" and "— Credit Guarantee Activity-Related Reclassifications" in our 2010 Annual Report for information regarding these reclassifications.

134

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table 15.3 presents total comprehensive income (loss) by segment.

**Table 15.3 — Total Comprehensive Income (Loss) of Segments[1]**

| | Net Income (Loss) — Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income, Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
|---|---|---|---|---|---|---|
| | | | Three Months Ended March 31, 2011 | | | |
| | | | Total Changes in AOCI, Net of Reclassification Adjustments | | | |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,137 | $ 999 | $ 131 | $ (4) | $ 1,126 | $ 3,263 |
| Single-family Guarantee | (1,820) | — | — | (4) | (4) | (1,824) |
| Multifamily | 359 | 942 | 1 | (1) | 942 | 1,301 |
| Total per consolidated statements of income and comprehensive income | $ 676 | $ 1,941 | $ 132 | $ (9) | $ 2,064 | $ 2,740 |
| | | | Three Months Ended March 31, 2010 | | | |
| | | | Total Changes in AOCI, Net of Reclassification Adjustments | | | |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,313) | $ 2,952 | $ 172 | $ (4) | $ 3,120 | $ 1,807 |
| Single-family Guarantee | (5,596) | — | — | (4) | (4) | (5,600) |
| Multifamily | 221 | 1,694 | — | (2) | 1,692 | 1,913 |
| Total per consolidated statements of income and comprehensive income | $ (6,688) | $ 4,646 | $ 172 | $ (10) | $ 4,808 | $ (1,880) |

(1) The sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

## NOTE 16: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submissions to FHFA on both minimum and risk-based capital.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. Table 16.1 summarizes our minimum capital requirements and deficits and net worth.

Table of Contents

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011     TREASURY-1372     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 16.1 — Net Worth and Minimum Capital

|  | March 31, 2011 | | December 31, 2010 |
|---|---|---|---|
|  | (in millions) | | |
| GAAP net worth(1) | $ 1,237 | $ | (401) |
| Core capital (deficit)(2)(3) | $ (53,496) | $ | (52,570) |
| Less: Minimum capital requirement(2) | 25,865 | | 25,987 |
| Minimum capital surplus (deficit)(2) | $ (79,361) | $ | (78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for March 31, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI, liquidation preference of the senior preferred stock and non-controlling interests) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long-term profitability. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination.

At March 31, 2011, our assets exceeded our liabilities under GAAP by $1.2 billion; therefore FHFA will not submit a draw request on our behalf to Treasury under the Purchase Agreement. As of March 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock of $6.5 billion exceeded our annual historical earnings in all but one period. At March 31, 2011, our aggregate funding received from Treasury under the Purchase Agreement was $63.7 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. The aggregate liquidation preference of the senior preferred stock was $64.7 billion at March 31, 2011. We paid a quarterly dividend of $1.6 billion on the senior preferred stock in cash on March 31, 2011 at the direction of the Conservator.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single-family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

Table 17.1 summarizes the concentration by year of origination and geographical area of the approximately $1.8 trillion UPB of our single-family credit guarantee portfolio at both March 31, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

136                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 17.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio

| | March 31, 2011 | | December 31, 2010 | | Percent of Credit Losses[1] Three Months Ended | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | March 31, 2011 | March 31, 2010 |
|---|---|---|---|---|---|---|
| **Year of Origination** | | | | | | |
| 2011 | 2% | —% | N/A | N/A | —% | N/A |
| 2010 | 20 | 0.1 | 18% | 0.1% | — | —% |
| 2009 | 21 | 0.3 | 21 | 0.3 | 1 | — |
| 2008 | 8 | 4.9 | 9 | 4.9 | 8 | 5 |
| 2007 | 11 | 11.3 | 11 | 11.6 | 36 | 33 |
| 2006 | 8 | 10.3 | 9 | 10.5 | 29 | 30 |
| 2005 | 9 | 6.1 | 10 | 6.0 | 18 | 22 |
| 2004 and prior | 21 | 2.5 | 22 | 2.5 | 8 | 10 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |
| **By Region[4]** | | | | | | |
| West | 27% | 4.2% | 27% | 4.7% | 56% | 46% |
| Northeast | 25 | 3.1 | 25 | 3.2 | 7 | 8 |
| North Central | 18 | 2.9 | 18 | 3.1 | 15 | 17 |
| Southeast | 18 | 5.4 | 18 | 5.6 | 18 | 25 |
| Southwest | 12 | 1.9 | 12 | 2.1 | 4 | 4 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |
| **State[5]** | | | | | | |
| California | 16% | 4.2% | 16% | 4.9% | 31% | 26% |
| Florida | 6 | 10.5 | 6 | 10.5 | 12 | 19 |
| Illinois | 5 | 4.5 | 5 | 4.6 | 4 | 5 |
| Georgia | 3 | 3.8 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.7 | 3 | 3.0 | 5 | 6 |
| Arizona | 3 | 5.2 | 3 | 6.1 | 13 | 11 |
| Nevada | 1 | 11.4 | 1 | 11.9 | 5 | 5 |
| All other | 63 | N/A | 63 | N/A | 26 | 25 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the three months ended March 31, 2011. Our top seven states based on the highest percentage of UPB as of March 31, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (5%), New Jersey (4%), and Virginia (4%), and comprised 45% of our single-family credit guarantee portfolio as of March 31, 2011.

#### Credit Performance of Certain Higher Risk Single-Family Loan Categories

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in Table 17.2 because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1374

Powered by Morningstar® Document Research℠

Table of Contents

credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. During the three months ended March 31, 2011, a significant percentage of our charge-offs and REO acquisition activity was associated with these loan groups. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

|  | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|  | March 31, 2011 | December 31, 2010 | March 31, 2011 | December 31, 2010 |
|---|---|---|---|---|
| Interest-only | 5% | 5% | 17.9% | 18.4% |
| Option ARM | 1% | 1% | 21.5% | 21.2% |
| Alt-A[2] | 6% | 6% | 11.9% | 12.2% |
| Original LTV ratio greater than 90%[3] | 9% | 9% | 7.1% | 7.8% |
| Lower original FICO scores (less than 620) | 3% | 3% | 13.0% | 13.9% |

(1) Based on UPB.

(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.

(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 18% at both March 31, 2011 and December 31, 2010. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 13.7% and 14.9% as of March 31, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

**Multifamily Mortgage Portfolio**

Table 17.3 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1375

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | March 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | UPB | Delinquency Rate[1] | UPB | Delinquency Rate[1] |
| | | (dollars in billions) | | |
| **By State** | | | | |
| California | $ 19.4 | 0.06% | $ 19.4 | 0.06% |
| Texas | 13.1 | 0.64 | 12.8 | 0.52 |
| New York | 9.4 | — | 9.2 | — |
| Florida | 6.6 | 0.68 | 6.4 | 0.56 |
| Virginia | 5.6 | — | 5.6 | — |
| Georgia | 5.6 | 1.16 | 5.5 | 0.98 |
| All other states | 50.1 | 0.39 | 49.8 | 0.24 |
| Total | $109.8 | 0.36% | $108.7 | 0.26% |
| **By Region**[2] | | | | |
| Northeast | $ 31.3 | 0.21% | $ 31.0 | —% |
| West | 28.6 | 0.17 | 28.4 | 0.07 |
| Southwest | 20.8 | 0.68 | 20.4 | 0.61 |
| Southeast | 19.6 | 0.62 | 19.2 | 0.59 |
| North Central | 9.5 | 0.25 | 9.7 | 0.30 |
| Total | $109.8 | 0.36% | $108.7 | 0.26% |
| **By Category**[3] | | | | |
| Original LTV ratio > 80% | $ 6.7 | 2.56% | $ 6.8 | 2.30% |
| Original DSCR below 1.10 | $ 3.2 | 1.55% | $ 3.3 | 1.22% |
| Non-credit enhanced loans | $ 85.8 | 0.25% | $ 87.5 | 0.12% |

(1) Based on the UPB of multifamily mortgages two monthly payments  or more delinquent or in foreclosure.

(2) See endnote (4) to "Table 17.1 — Concentration of Credit Risk — Single-family Credit  Guarantee Portfolio" for a description of these regions.

(3) These categories are not mutually exclusive and a loan in one  category may also be included within another.

One indicator of risk for mortgage loans in our multifamily  mortgage portfolio is the amount of a borrower's equity in  the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the  outstanding mortgage. The DSCR is another indicator of future  credit performance. The DSCR estimates a multifamily  borrower's ability to service its mortgage obligation using  the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more  likely a multifamily borrower will be able to continue servicing its mortgage obligation. Our multifamily mortgage portfolio  includes certain loans for which we have credit enhancement.  Credit enhancement reduces our exposure to a potential credit  loss. As of March 31, 2011, approximately one-half of the multifamily loans, measured both in terms of number of loans and  on a UPB basis, that were two monthly payments or more past due  had credit enhancements that we currently believe will mitigate  our expected losses on those loans.

We estimate that the percentage of loans in our multifamily  mortgage portfolio with a current LTV ratio of greater than 100% was approximately 8% at both March 31, 2011 and  December 31, 2010, and our estimate of the current average  DSCR for these loans was 1.2 and 1.1 as of March 31, 2011 and December 31, 2010, respectively. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 7% at both March 31, 2011  and December 31, 2010, and the average current LTV ratio of these loans was 106% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income  information for these properties and our assessments of market  conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates  of property value, for which we may use changes in tax  assessments, market vacancy rates, rent growth and comparable  property sales in local areas as well as third-party appraisals  for a portion of the portfolio. We periodically perform our own  valuations or obtain third-party appraisals in cases where a  significant deterioration in a borrower's financial condition has occurred, the borrower has applied for  refinancing, or in certain other circumstances where we deem it  appropriate to reassess the property value. Our internal estimates of property valuation are derived using techniques  that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage  purchase volume from several large seller/servicers with whom we  have entered into mortgage purchase volume commitments that  provide for the lenders to deliver us a specified dollar amount  of mortgages during a specified period of time. Our top 10  single-family seller/servicers provided approximately 85% of our  single-family purchase volume during the three months ended March 31, 2011. Wells Fargo

139

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Bank, N.A., Chase Home Finance LLC, Bank of America, N.A. and U.S. Bank, N.A. accounted for 30%, 13%, 12% and 11%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the three months ended March 31, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; (b) failure to comply with our servicing requirements; or (c) failure to honor their recourse and indemnification obligations to us. As of March 31, 2011 and December 31, 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $3.4 billion and $3.8 billion, and approximately 38% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. During the three months ended March 31, 2011, we recovered amounts that covered losses with respect to $1.2 billion of UPB on loans associated with our repurchase requests.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We have exposure to TBW with respect to its loan repurchase obligations. We also have exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

No actions against Freddie Mac related to TBW or Ocala Funding, LLC, which is a wholly-owned subsidiary of TBW, have been initiated in bankruptcy court or elsewhere to recover assets. However, we understand that Ocala or its creditors may file an action to recover certain funds paid to, and losses acquired by, us prior to the bankruptcy. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on our claims arising from TBW's bankruptcy and Ocala's potential claims.

In some cases, the ultimate amounts of recovery payments we received and may receive in the future from seller/servicers were and may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of March 31, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information. We believe we have adequately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the MHA Program, and therefore we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of March 31, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14% and 12%, respectively, of our single-family mortgage loans, as of March 31, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers have generally resumed

TREASURY-1377

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 7: REAL ESTATE OWNED" in our 2010 Annual Report for additional information.

As of March 31, 2011 our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 52% of our multifamily mortgage portfolio.

Similarly, in our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure due to the current stressful economic environment, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. We continue to monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for additional information. As of March 31, 2011, these insurers provided coverage, with maximum loss limits of $55.8 billion, for $268.5 billion of UPB in connection with our single-family credit guarantee portfolio. Our top six mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, PMI Mortgage Insurance Co., United Guaranty Residential Insurance Co. and Republic Mortgage Insurance Co. each accounted for more than 10% and collectively represented approximately 94% of our overall mortgage insurance coverage at March 31, 2011. All our mortgage insurance counterparties are rated BBB or below as of March 31, 2011, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $0.6 billion and $0.3 billion during the three months ended March 31, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $2.3 billion at both March 31, 2011 and December 31, 2010. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.5 billion at both March 31, 2011 and December 31, 2010. Based upon currently available information, we believe that all of our mortgage insurance counterparties have the capacity to pay all claims as due in the normal course for the near term, except for claims obligations of Triad Guaranty Insurance Corporation (or Triad) that were partially deferred beginning June 1, 2009, under order of Triad's state regulator.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the investments in non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing securities we purchase, while secondary policies are acquired by us. At March 31, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $10.3 billion of UPB. At March 31, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the recovery from primary monoline bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. If a monoline bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2010 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of March 31, 2011 and December 31, 2010, there were $78.3 billion and $91.6 billion, respectively, of cash and other non-mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of March 31, 2011, these included:

- $30.1 billion of cash equivalents invested in 46 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $4.5 billion of federal funds sold with three counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $16.7 billion of securities purchased under agreements to resell with seven counterparties that had short-term S&P ratings of A-1 or above;

- $15.3 billion of securities purchased under agreements to resell with seven counterparties that had short-term S&P ratings of A-2; and

- $9.6 billion of cash deposited with the Federal Reserve Bank.

## Derivative Portfolio

### Derivative Counterparties

Our use of derivatives exposes us to institutional credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $17 million and $32 million at March 31, 2011 and December 31, 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on March 31, 2011, our maximum loss for accounting purposes would have been approximately $17 million. One of our counterparties, HSBC Bank USA, which was rated AA– as of April 22, 2011, accounted for greater than 10% of our net uncollateralized exposure to derivatives counterparties at March 31, 2011.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $32 million and $103 million at March 31, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 18: FAIR VALUE DISCLOSURES

**Fair Value Hierarchy**

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. Table 18.1 sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at March 31, 2011 and December 31, 2010.

143                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,848 | $ 1,896 | $ — | $ 85,744 |
| Subprime | — | — | 33,344 | — | 33,344 |
| CMBS | — | 54,851 | 3,093 | — | 57,944 |
| Option ARM | — | — | 6,989 | — | 6,989 |
| Alt-A and other | — | 13 | 12,924 | — | 12,937 |
| Fannie Mae | — | 22,649 | 195 | — | 22,844 |
| Obligations of states and political subdivisions | — | — | 8,875 | — | 8,875 |
| Manufactured housing | — | — | 878 | — | 878 |
| Ginnie Mae | — | 268 | 15 | — | 283 |
| Total available-for-sale securities, at fair value | — | 161,629 | 68,209 | — | 229,838 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 13,254 | 2,697 | — | 15,951 |
| Fannie Mae | — | 17,715 | 871 | — | 18,586 |
| Ginnie Mae | — | 141 | 26 | — | 167 |
| Other | — | 7 | 19 | — | 26 |
| Total mortgage-related securities | — | 31,117 | 3,613 | — | 34,730 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 94 | — | — | 94 |
| Treasury bills | 9,397 | — | — | — | 9,397 |
| Treasury notes | 16,123 | — | — | — | 16,123 |
| FDIC-guaranteed corporate medium-term notes | — | 1,009 | — | — | 1,009 |
| Total non-mortgage-related securities | 25,520 | 1,103 | — | — | 26,623 |
| Total trading securities, at fair value | 25,520 | 32,220 | 3,613 | — | 61,353 |
| Total investments in securities | 25,520 | 193,849 | 71,822 | — | 291,191 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 5,304 | — | 5,304 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 5,302 | 27 | — | 5,329 |
| Option-based derivatives | — | 10,385 | — | — | 10,385 |
| Other | 3 | 310 | 10 | — | 323 |
| Subtotal, before netting adjustments | 3 | 15,997 | 37 | — | 16,037 |
| Netting adjustments(1) | — | — | — | (15,979) | (15,979) |
| Total derivative assets, net | 3 | 15,997 | 37 | (15,979) | 58 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 597 | — | 597 |
| Total assets carried at fair value on a recurring basis | $ 25,523 | $ 209,846 | $ 77,760 | $ (15,979) | $ 297,150 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,960 | $ — | $ — | $ 3,960 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 20,162 | 746 | — | 20,908 |
| Option-based derivatives | 4 | 567 | 2 | — | 573 |
| Other | 100 | 27 | 46 | — | 173 |
| Subtotal, before netting adjustments | 104 | 20,756 | 794 | — | 21,654 |
| Netting adjustments(1) | — | — | — | (20,904) | (20,904) |
| Total derivative liabilities, net | 104 | 20,756 | 794 | (20,904) | 750 |
| Total liabilities carried at fair value on a recurring basis | $ 104 | $ 24,716 | $ 794 | $ (20,904) | $ 4,710 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1381

Table of Contents

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $    — | $  83,652 | $   2,037 | $    — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments(1) | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| Total assets carried at fair value on a recurring basis | $  27,414 | $ 214,168 | $  79,783 | $  (21,372) | $299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $    — | $   4,443 | $    — | $    — | $  4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments(1) | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $   178 | $  31,579 | $   761 | $  (26,866) | $  5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $6.5 billion and $3 million, respectively, at March 31, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.6) billion and $(0.8) billion at March 31, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

145

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1382

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Recurring Fair Value Changes**

For the three months ended March 31, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities and multifamily held-for-sale loans. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three months ended March 31, 2011, the fair value of our Level 3 assets decreased by $2.0 billion, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, we had a net transfer into Level 3 assets of $0.1 billion during the first quarter of 2011, resulting from a change in valuation method due to a lack of relevant price quotes from dealers and third-party pricing services.

During the three months ended March 31, 2010, our Level 3 assets decreased by $27.6 billion primarily due to the adoption of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. These accounting changes resulted in the elimination of $28.8 billion of our Level 3 assets on January 1, 2010, including the elimination of certain mortgage-related securities issued by our consolidated trusts that are held by us and the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.3 billion of Level 3 assets to Level 2 during the three months ended March 31, 2010 resulting from improved liquidity and availability in the price quotes received from dealers and third-party pricing services.

Table 18.2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

**TREASURY-1383**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | | | Three Months Ended March 31, 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Realized and unrealized gains (losses) | | | | | | | | | |
| | Balance, January 1, 2011 | Included in earnings[1][2][3][4] | Included in other comprehensive income | Total | Purchases | Issuances (in millions) | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, March 31, 2011 | Unrealized gains (losses) still held[7] |
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $  2,037 | $        — | $        — | $    — | $    — | $    — | $    — | $        (40) | $     (101) | $  1,896 | $        — |
| Subprime | 33,861 | (734) | 1,569 | 835 | — | | — | (1,352) | — | 33,344 | (734) |
| CMBS | 3,115 | — | (23) | (23) | — | | — | 1 | | 3,093 | |
| Option ARM | 6,889 | (281) | 692 | 411 | — | | — | (311) | — | 6,989 | (281) |
| Alt-A and other | 13,155 | (40) | 238 | 198 | — | | — | (429) | — | 12,924 | (40) |
| Fannie Mae | 212 | — | 1 | 1 | — | | — | (13) | (5) | 195 | — |
| Obligations of states and political subdivisions | 9,377 | 1 | (1) | — | | | (37) | (465) | — | 8,875 | |
| Manufactured housing | 897 | (3) | 12 | 9 | — | | — | (28) | — | 878 | (3) |
| Ginnie Mae | 16 | — | | — | | | — | (1) | | 15 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,057) | 2,488 | 1,431 | — | | (37) | (2,638) | (106) | 68,209 | (1,058) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | 62 | — | 62 | 230 | | (31) | (49) | 186 | 2,697 | 62 |
| Fannie Mae | 854 | 11 | — | 11 | — | | — | (6) | 12 | 871 | 11 |
| Ginnie Mae | 27 | — | — | — | — | | — | (1) | — | 26 | — |
| Other | 20 | — | — | — | — | | — | (1) | — | 19 | — |
| Total trading mortgage-related securities | 3,200 | 73 | — | 73 | 230 | | (31) | (57) | 198 | 3,613 | 73 |
| Mortgage Loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 62 | — | 62 | 2,164 | — | (3,322) | (13) | — | 5,304 | (25) |
| Net derivatives[8] | (691) | (127) | — | (127) | — | (13) | — | 74 | — | (757) | (120) |
| Other assets: | | | | | | | | | | | |
| Guarantee asset[9] | 541 | (1) | — | (1) | — | 68 | — | (11) | — | 597 | (1) |

147

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle(10) | Balance, January 1, 2010 | Three Months Ended March 31, 2010 | | | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, March 31, 2010 | Unrealized gains (losses) still held(7) |
| | | | | Realized and unrealized gains (losses) | | | | | | |
| | | | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1)(2) | Total | | | | |
| | | | | (in millions) | | | | | | |
| Investments in securities: | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | $  20,807 | $  (18,775) | $  2,032 | $  — | $  (12) | $  (12) | $  (9) | $  — | $  2,011 | $  — |
| Subprime | 35,721 | — | 35,721 | (332) | 2,550 | 2,218 | (2,104) | — | 35,835 | (332) |
| CMBS | 54,019 | — | 54,019 | (55) | 3,057 | 3,002 | (530) | — | 56,491 | (55) |
| Option ARM | 7,236 | — | 7,236 | (102) | 323 | 221 | (432) | — | 7,025 | (102) |
| Alt-A and other | 13,391 | — | 13,391 | (19) | 619 | 600 | (608) | — | 13,383 | (19) |
| Fannie Mae | 338 | — | 338 | — | (2) | (2) | (17) | — | 319 | — |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 1 | 114 | 115 | (488) | — | 11,104 | — |
| Manufactured housing | 911 | — | 911 | (2) | 22 | 20 | (30) | — | 901 | (2) |
| Ginnie Mae | 4 | — | 4 | — | — | — | (1) | — | 3 | — |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (509) | 6,671 | 6,162 | (4,219) | — | 127,072 | (510) |
| Trading, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (297) | — | (297) | 579 | (261) | 2,821 | (302) |
| Fannie Mae | 1,343 | — | 1,343 | (150) | — | (150) | (11) | — | 1,182 | (150) |
| Ginnie Mae | 27 | — | 27 | 1 | — | 1 | — | — | 28 | 1 |
| Other | 28 | (1) | 27 | — | — | — | (2) | — | 25 | — |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (446) | — | (446) | 566 | (261) | 4,056 | (451) |
| Mortgage loans: | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | 97 | — | 97 | (690) | — | 2,206 | (28) |
| Net derivatives(8) | (430) | — | (430) | 364 | — | 364 | 30 | 1 | (35) | 255 |
| Other assets | | | | | | | | | | |
| Guarantee asset(9) | 10,444 | (10,024) | 420 | (3) | — | (3) | 65 | — | 482 | (3) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at March 31, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable or net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

148

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

Table 18.3 presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at March 31, 2011 and December 31, 2010, respectively.

**Table 18.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at March 31, 2011 | | | | Fair Value at December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | (in millions) | | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment | $ — | $ — | $ 1,643 | $1,643 | $ — | $ — | $ 1,560 | $1,560 |
| REO, net[2] | — | — | 5,634 | 5,634 | — | — | 5,606 | 5,606 |
| Total assets measured at fair value on a non-recurring basis | $ — | $ — | $ 7,277 | $7,277 | $ — | $ — | $ 7,166 | $7,166 |

| | Total Gains (Losses) Three Months Ended March 31,[3] | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Assets measured at fair value on a non-recurring basis:** | | |
| Mortgage loans:[1] | | |
| Held-for-investment | $ 11 | $ (31) |
| REO, net[2] | (135) | (117) |
| Total gains (losses) | $ (124) | $ (148) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $410 million (or approximately $5.2 billion) at March 31, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of March 31, 2011 and 2010, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          TREASURY-1386          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $(81) million and $347 million for the three months ended March 31, 2011 and 2010, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(72) million and $337 million for the three months ended March 31, 2011 and 2010, respectively. The remaining changes in the fair value of $(9) million and $10 million were attributable to changes in the instrument-specific credit risk for the three months ended March 31, 2011 and 2010, respectively.

The change in fair value attributable to changes in instrument-specific credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to instrument-specific credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $73 million and $108 million at March 31, 2011 and December 31, 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2010 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased through our CME securitization program. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our traditional buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $62 million and $97 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the three months ended March 31, 2011 and 2010, respectively. The fair value changes that were attributable to changes in the instrument-specific credit risk were $85 million and $45 million for the three months ended March 31, 2011 and 2010, respectively. The gains and losses attributable to changes in instrument specific credit risk were determined primarily from the changes in OAS level.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $(195) million and $(311) million at March 31, 2011 and December 31, 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

**Valuation Methods and Assumptions Subject to Fair Value Hierarchy**

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

*Investments in Securities*

*Agency Securities*

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floaters, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

*Commercial Mortgage-Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both March 31, 2011 and December 31, 2010. The weighted-average life of the collateral underlying our CMBS investments was 4.1 years and 4.3 years, respectively, as of March 31, 2011 and December 31, 2010. Many of these securities have significant

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1388                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified in Level 2.

### Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified in Level 3.

Table 18.4 below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 18.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| | Fair Value at | |
|---|---|---|
| Year of Origination | March 31, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $    4,918 | $    4,998 |
| 2005 | 12,767 | 13,126 |
| 2006 | 19,121 | 19,333 |
| 2007 | 16,464 | 16,461 |
| 2008 and beyond | — | — |
| Total | $   53,270 | $   53,918 |

### Obligations of States and Political Subdivisions

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

### Manufactured Housing

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

### Asset-Backed Securities (Non-Mortgage-Related)

These private-label non-mortgage-related securities are dealer-priced. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

### Treasury Bills and Treasury Notes

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

### FDIC-Guaranteed Corporate Medium-Term Notes

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

### Mortgage Loans, Held-for-Sale

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1389                    Powered by Morningstar® Document Research℠

Table of Contents

market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

### Mortgage Loans, Held-for-Investment

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

### Interest-Rate Swaps and Option-Based Derivatives

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Table 18.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from the use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

average fixed rates of our pay-fixed and receive-fixed swaps. As of March 31, 2011 and December 31, 2010 our option-based derivatives had a remaining weighted-average life of 4.6 years and 4.5 years, respectively.

**Table 18.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives**

| | March 31, 2011 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $    230,197 | $    432 | $    185 | $    262 | $    272 | $    (287) |
| Weighted average fixed rate(3) | | | 1.36% | 1.18% | 2.42% | 3.68% |
| Forward-starting swaps(4) | 19,596 | 141 | — | 8 | (1) | 134 |
| Weighted average fixed rate(3) | | | | 1.37% | 1.57% | 4.50% |
| Basis (floating to floating) | 3,375 | 3 | — | — | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 299,011 | (13,473) | (178) | (1,144) | (2,761) | (9,390) |
| Weighted-average fixed rate(3) | | | 3.21% | 2.44% | 3.24% | 4.07% |
| Forward-starting swaps(4) | 31,004 | (2,682) | — | — | — | (2,682) |
| Weighted-average fixed rate(3) | | | | | | 4.96% |
| Total interest-rate swaps | $    583,183 | $(15,579) | $    7 | $    (874) | $    (2,487) | $(12,225) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $    128,625 | $    6,606 | $    3,315 | $    712 | $    1,193 | $    1,386 |
| Put swaptions | 66,475 | 1,818 | 55 | 615 | 462 | 686 |
| Other option-based derivatives(5) | 44,884 | 1,388 | (4) | — | — | 1,392 |
| Total option-based | $    239,984 | $    9,812 | $    3,366 | $    1,327 | $    1,655 | $    3,464 |

| | December 31, 2010 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $    302,178 | $    3,314 | $    137 | $    534 | $    1,269 | $    1,374 |
| Weighted average fixed rate(3) | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps(4) | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted average fixed rate(3) | | | — | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | — | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted-average fixed rate(3) | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps(4) | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted-average fixed rate(3) | | | | | | 4.54% |
| Total interest-rate swaps | $    721,259 | $(17,509) | $    (136) | $    (618) | $    (2,033) | $(14,722) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $    125,885 | $    8,147 | $    2,754 | $    2,661 | $    1,246 | $    1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives(5) | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $    239,094 | $    10,993 | $    2,882 | $    3,112 | $    1,471 | $    3,528 |

(1) Fair value is categorized based on the period from March 31, 2011 and December 31, 2010, respectively, until the contractual maturity of the derivatives.

(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.

(3) Represents the notional weighted average rate for the fixed leg of the swaps.

(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(5) Primarily includes purchased interest rate caps and floors.

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1391                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

### Other Assets, Guarantee Asset

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

### REO, Net

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected"* for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Consolidated Fair Value Balance Sheets

The supplemental consolidated fair value balance sheets in Table 18.6 present our estimates of the fair value of our financial assets and liabilities at March 31, 2011 and December 31, 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

155                                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.6 — Consolidated Fair Value Balance Sheets**

| | March 31, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 34.3 | $ 34.3 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents | 6.2 | 6.2 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell | 37.8 | 37.8 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value | 229.8 | 229.8 | 232.6 | 232.6 |
| Trading, at fair value | 61.4 | 61.4 | 60.3 | 60.3 |
| *Total investments in securities* | 291.2 | 291.2 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts | 1,644.6 | 1,659.0 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans | 203.2 | 194.1 | 198.7 | 191.5 |
| *Total mortgage loans* | 1,847.8 | 1,853.1 | 1,844.9 | 1,859.0 |
| Derivative assets, net | 0.1 | 0.1 | 0.1 | 0.1 |
| Other assets | 27.5 | 32.6 | 32.3 | 37.2 |
| Total assets | $2,244.9 | $2,255.3 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties | $ 1,510.4 | $ 1,564.0 | $1,528.7 | $1,589.5 |
| Other debt | 715.6 | 729.3 | 713.9 | 729.7 |
| *Total debt, net* | 2,226.0 | 2,293.3 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net | 0.8 | 0.8 | 1.2 | 1.2 |
| Other liabilities | 16.9 | 17.6 | 18.4 | 19.0 |
| Total liabilities | 2,243.7 | 2,311.7 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders | 64.7 | 64.7 | 64.2 | 64.2 |
| Preferred stockholders | 14.1 | 0.9 | 14.1 | 0.3 |
| Common stockholders | (77.6) | (122.0) | (78.7) | (123.1) |
| Total net assets | 1.2 | (56.4) | (0.4) | (58.6) |
| *Total liabilities and net assets* | $2,244.9 | $2,255.3 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

## Limitations

   Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

   The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

   We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    TREASURY-1393                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### Cash and Cash Equivalents

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### Mortgage Loans

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

<u>Single-Family Loans</u>

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities*."

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fee at March 31, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fee that relates to fixed-rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single-family credit guarantee portfolio. The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available. These amounts relate specifically to ARM products, highly seasoned loans, or fixed-rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use entry-pricing information for all guaranteed loans that would qualify for purchase under current underwriting guidelines (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

<div align="center">157</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1394                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For single-family mortgage loans for which a contractual modification has been completed, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

*Multifamily Loans*

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" and "*— Mortgage Loans, Held-for-Sale,*" respectively.

### Other Assets

Our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, the mechanism by which we consider the loan's non-accrual status is through our internally modeled credit cost component of the loan's fair value. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investment in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers, reliable third-party pricing service providers or direct market observations. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Liabilities*

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

*Net Assets Attributable to Senior Preferred Stockholders*

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

*Net Assets Attributable to Preferred Stockholders*

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

*Net Assets Attributable to Common Stockholders*

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders, the fair value attributable to preferred stockholders.

## NOTE 19: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making "false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry." On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On

<div style="text-align:center">159</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed a motion to dismiss the second amended complaint, which motion remains pending.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiff claims that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seeks unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint within 60 days.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition, or results of operations.

## Shareholder Demand Letters

In late 2007 and early 2008, the Board of Directors received three letters from purported shareholders of Freddie Mac, which together contain allegations of corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management, alleged false and misleading financial disclosures, and the alleged sale of stock based on material non-public information by certain current and former officers and directors of Freddie Mac. Collectively, the letters demanded that the board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages and unjust enrichment from board members, senior officers, Freddie Mac's outside auditors, and other parties who allegedly aided or abetted the improper conduct, and implement corporate governance initiatives to ensure that the alleged problems do not recur. Prior to the conservatorship, the Board of Directors formed a Special Litigation Committee, or SLC, to investigate the purported shareholders' allegations, and engaged counsel for that purpose. Pursuant to the conservatorship, FHFA, as the Conservator, has succeeded to the powers of the Board of Directors, including the power to conduct investigations such as the one conducted by the SLC of the prior Board of Directors. The counsel engaged by the former SLC continued the investigation pursuant to instructions from FHFA. As described below, each of these purported shareholders subsequently filed lawsuits against Freddie Mac.

On February 25, 2011, the counsel engaged by the former SLC submitted a report to the Conservator, in which the counsel concluded, among other things, that it "uncovered no evidence sufficient to demonstrate that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with the Company's acceptance and management of credit risk from 2004 through 2007."

## Shareholder Derivative Lawsuits

On July 24, 2008 and August 15, 2008, purported shareholders, The Adams Family Trust, Kevin Tashjian and the Louisiana Municipal Police Employees Retirement System, or LMPERS, filed two derivative lawsuits in the U.S. District Court for the Eastern District of Virginia against certain current and former officers and directors of Freddie Mac, with Freddie Mac named as a nominal defendant in the actions. On October 15, 2008, the U.S. District Court for the Eastern District of Virginia consolidated these two cases. Previously, on March 10, 2008, a purported shareholder, Robert Bassman, had filed a similar shareholder derivative lawsuit in the U.S. District Court for the Southern District of New York, which was subsequently transferred to the Eastern District of Virginia and then, on December 12, 2008, consolidated with the cases filed by The Adams Family Trust, Kevin Tashjian, and LMPERS. While no consolidated complaint has yet been filed, the complaints collectively assert claims for breach of fiduciary duty, negligence, violations of federal securities laws, violations of the Sarbanes-Oxley Act of 2002 and unjust enrichment. Those claims are based on allegations that defendants failed to implement and/or maintain sufficient risk management and other controls; failed to adequately reserve for uncollectible loans and other risks of loss; and made false and misleading statements regarding the company's exposure to the subprime market, the strength of the company's risk management and internal controls, and the company's underwriting standards in response to alleged abuses in the subprime market. The plaintiffs also allege that certain of the defendants breached their fiduciary duties and unjustly enriched themselves through their salaries, bonuses, benefits and other compensation, and sale of stock based on material non-public information. The complaints seek unspecified damages, equitable relief, the imposition of a constructive trust for the proceeds of alleged insider stock sales,

TREASURY-1397

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

an accounting, restitution, disgorgement, declaratory relief, an order requiring reform and improvement of corporate governance, punitive damages, costs, interest, and attorneys', accountants' and experts' fees.

After FHFA successfully intervened in these consolidated actions in its capacity as Conservator, it filed a motion to substitute for plaintiffs. On July 27, 2009, the District Court entered an order granting FHFA's motion, and on August 20, 2009, the plaintiffs filed an appeal of that order. On October 29, 2009, FHFA filed a motion to dismiss the appeal for lack of appellate jurisdiction, which motion remains pending. On November 16, 2009, the District Court issued an order granting the parties' consent motion to stay all proceedings, including the deadlines for the defendants to answer or otherwise respond to the complaints, which stay was ultimately extended by the District Court until March 2, 2011. Following the February 25, 2011 SLC counsel report, FHFA filed its status report on March 2, 2011, stating that it intended to file a motion for voluntary dismissal without prejudice, which it did on March 16, 2011. On April 21, 2011, the District Court granted FHFA's motion for voluntary dismissal.

On June 6, 2008, a purported shareholder, the Esther Sadowsky Testamentary Trust, filed a shareholder derivative complaint in the U.S. District Court for the Southern District of New York against certain former officers and current and former directors of Freddie Mac. Plaintiff asserts claims for alleged breach of fiduciary duty and declaratory and injunctive relief, based on allegations that defendants caused the company to violate its charter by engaging in "unsafe, unsound and improper speculation in high risk mortgages to boost near term profits, report growth in the company's mortgage-related investments portfolio and guarantee business, and take market share away from its primary competitor, Fannie Mae." Among other things, plaintiff seeks an accounting, an order requiring that defendants remit all salary and compensation received during the periods they allegedly breached their duties, and an award of pre-judgment and post-judgment interest, attorneys' fees, expert fees and consulting fees, and other costs and expenses. On November 13, 2008, FHFA filed a motion to substitute for the Esther Sadowsky Testamentary Trust. On February 26, 2009, Robert Bassman filed a motion with the District Court to intervene or, in the alternative, to appear as amicus curiae. On May 6, 2009, the District Court granted FHFA's substitution motion and denied Bassman's motion to intervene. The District Court subsequently stayed the case through March 2, 2011. On June 4, 2009, the Esther Sadowsky Testamentary Trust filed a notice of appeal of the May 6 order granting FHFA's substitution motion. On September 17, 2009, Bassman filed a notice of appeal of the May 6 order denying his motion to intervene or appear as amicus curiae. On March 10, 2010, the U.S. Court of Appeals for the Second Circuit granted FHFA's motion to dismiss the appeal of the Esther Sadowsky Testamentary Trust and dismissed that appeal on April 12, 2010 due to lack of jurisdiction. On March 4, 2011, the Second Circuit affirmed the District Court's decision denying Bassman's motion to intervene and dismissed Bassman's motion to appeal due to lack of jurisdiction. The Second Circuit issued its mandate to the District Court on April 11, 2011. Following the February 25, 2011 SLC counsel report, FHFA filed its status report with the District Court on March 2, 2011, stating that it intended to file a motion for voluntary dismissal without prejudice, which it did on March 16, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants

161                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations.

## Government Investigations and Inquiries

On September 26, 2008, Freddie Mac received a federal grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York. The subpoena sought documents relating to accounting, disclosure, and corporate governance matters for the period beginning January 1, 2007. Subsequently, we were informed that the subpoena was withdrawn, and that an investigation is being conducted by the U.S. Attorney's Office for the Eastern District of Virginia. On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees. Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation. Freddie Mac is cooperating fully in these matters.

Freddie Mac was informed by Donald J. Bisenius, former Executive Vice President — Single Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation. The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr. Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008.

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he has made such a submission.

## Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets*. The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleges that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with an offering by Freddie Mac of $6 billion of

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1399

Table of Contents

8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock Series Z that commenced on November 29, 2007. The complaint further alleges that certain defendants and others made additional false statements following the offering. The complaint names as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants. The defendants moved to dismiss the amended consolidated complaint on April 28, 2010. On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead. On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. On January 25, 2011, Lehman filed its first amended plan and disclosure statement. The plan and disclosure statement are subject to court approval.

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion relates to current and projected repurchase obligations and about $440 million relates to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represents miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer. On July 1, 2010, TBW filed a comprehensive final reconciliation report in the bankruptcy court indicating, among other things, that approximately $203 million in funds held in bank accounts maintained by TBW related to its servicing of Freddie Mac's loans and was potentially available to pay Freddie Mac's claims. We have analyzed the report and, as necessary and appropriate, may revise the amount of our claim.

We estimate that our loss exposure to TBW at March 31, 2011, excluding potential claims by Ocala Funding, LLC discussed below, was approximately $690 million. This estimated exposure has been previously recognized by us through March 31, 2011. However, our ultimate losses could exceed this estimate.

No actions against Freddie Mac related to TBW or Ocala Funding, LLC, which is a wholly-owned subsidiary of TBW, have been initiated in bankruptcy court or elsewhere to recover assets. However, we understand that Ocala or its creditors may file an action to recover certain funds paid to, and loans acquired by, us prior to the TBW bankruptcy. Based on court filings and other information, we understand that Ocala or its creditors may assert fraudulent transfer and possible other claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. Ocala may also make claims against us asserting ownership of a large number of loans that we purchased from TBW. We are unable to estimate our loss exposure related to any claim against us concerning such loans.

<div style="text-align:center">163</div>

<div style="text-align:right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery in the proceeding has been stayed at the request of the U.S. Department of Justice, pending completion of a criminal trial involving the former chairman and chief executive officer of TBW.

For more information, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers."

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. We continue to seek resolution of the controversy by settlement. For information on this matter, see "NOTE 13: INCOME TAXES."

## NOTE 20: EARNINGS (LOSS) PER SHARE

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing net income attributable to common stockholders by weighted average common shares outstanding — basic for the period. The weighted average common shares outstanding — basic during the three months ended March 31, 2011 and 2010 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic. For a discussion of our significant accounting policies regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2010 Annual Report.

### Table 20.1 — Loss Per Common Share — Basic and Diluted

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2011 | | 2010 | |
| | (dollars in millions, except per share amounts) | | | |
| Net income (loss) attributable to Freddie Mac | $ | 676 | $ | (6,688) |
| Preferred stock dividends[1] | | (1,605) | | (1,292) |
| Net loss attributable to common stockholders | $ | (929) | $ | (7,980) |
| Weighted average common shares outstanding — basic (in thousands)[2] | | 3,246,985 | | 3,251,295 |
| Dilutive potential common shares (in thousands) | | — | | — |
| Weighted average common shares outstanding — diluted (in thousands) | | 3,246,985 | | 3,251,295 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | | 4,257 | | 6,277 |
| Basic loss per common share | $ | (0.29) | $ | (2.45) |
| Diluted loss per common share | $ | (0.29) | $ | (2.45) |

(1) Consistent with the covenants of the Purchase Agreement, we paid dividends on our senior preferred stock, but did not declare dividends on any other series of preferred stock outstanding subsequent to entering conservatorship.

(2) Includes the weighted average number of shares during the three months ended March 31, 2011 and 2010 that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in shares outstanding — basic, since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share.

TREASURY-1401

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS

Table 21.1 below presents the major components of other assets and other liabilities on our consolidated balance sheets.

**Table 21.1 — Other Assets and Other Liabilities on Consolidated Balance Sheets**

|  | March 31, 2011 | | December 31, 2010 |
| --- | ---: | --- | ---: |
|  | (in millions) | | |
| Other assets: | | | |
| Guarantee asset | $ 597 | $ | 541 |
| Accounts and other receivables | 5,933 | | 8,734 |
| All other | 1,533 | | 1,600 |
| Total other assets | $ 8,063 | $ | 10,875 |
| Other liabilities: | | | |
| Guarantee obligation | $ 656 | $ | 625 |
| Servicer liabilities | 4,079 | | 4,456 |
| Accounts payable and accrued expenses | 1,662 | | 1,760 |
| All other | 1,142 | | 1,257 |
| Total other liabilities | $ 7,539 | $ | 8,098 |

165                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

PART II OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 19: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" section in our 2010 Annual Report, which describe various risks and uncertainties to which we are or may become subject, and is supplemented by the discussion below. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

***Issues related to mortgages recorded through the MERS System could delay or disrupt foreclosure activities and have an adverse effect on our business.***

The Mortgage Electronic Registration System, or the MERS® System, is an electronic registry that is widely used by seller/servicers, Freddie Mac, and other participants in the mortgage finance industry to maintain records of beneficial ownership of mortgages. The MERS System is maintained by MERSCORP, Inc., a privately held company, the shareholders of which include a number of organizations in the mortgage industry, including Freddie Mac, Fannie Mae, and certain seller/servicers, mortgage insurance companies and title insurance companies.

Mortgage Electronic Registration Systems, Inc., or MERS, a wholly-owned subsidiary of MERSCORP, Inc., has the ability to serve as a nominee for the owner of a mortgage loan and in that role become the mortgagee of record for the loan in local land records. Freddie Mac seller/servicers may choose to use MERS as a nominee. Approximately 39% of the loans Freddie Mac owns or guarantees were registered in MERS' name as of March 31, 2011; the beneficial ownership and the ownership of the servicing rights related to those loans are tracked in the MERS System.

In the past, Freddie Mac servicers have had the option of initiating foreclosure in MERS' name. However, on March 8, 2011, MERS proposed changes to its membership rules, whereby MERS would no longer permit foreclosures to be initiated in its name. On March 23, 2011, we informed our servicers that they no longer may initiate foreclosure in MERS' name for those mortgages registered with MERS that are referred to foreclosure on or after April 1, 2011. Henceforth, foreclosure of mortgages owned or guaranteed by us for which MERS serves as nominee will be accomplished by MERS assigning the record ownership of the mortgage to the servicer, which will initiate foreclosure in its own name. Many of our servicers were following this procedure before the March 23 announcement.

MERS has also been the subject of numerous lawsuits challenging foreclosures on mortgages for which MERS is mortgagee of record as nominee for the beneficial owner. It is possible that adverse judicial decisions, regulatory proceedings or action, or legislative action related to MERS, could delay or disrupt foreclosure of mortgages that are registered on the MERS System. Publicity concerning regulatory or judicial decisions, even if such decisions were not adverse, or MERS-related concerns about the integrity of the assignment process, could adversely affect the mortgage industry and negatively impact public confidence in the foreclosure process, which could lead to legislative or regulatory action. Because MERS often executes legal documents in connection with foreclosure proceedings, it is possible that investigations by governmental authorities and others into deficiencies in foreclosure practices may negatively impact MERS and the MERS System.

Federal or state legislation or regulatory action could prevent us from using the MERS System for mortgages that we currently own, guarantee and securitize, and for mortgages acquired in the future, or could create additional requirements for the transfer of mortgages that could affect the process for and costs of acquiring, transferring, servicing, and foreclosing mortgages. Such legislation or regulatory action could increase our costs or otherwise adversely affect our business. For example, we could be required to transfer mortgages out of the MERS System. There is also uncertainty regarding the extent to which seller/servicers will choose to use the MERS System in the future.

Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process could pose legal, operational and reputational risks for us. We cannot predict the impact that such events or actions may have on our business. On April 13, 2011, the Comptroller of the Currency, the Federal Reserve, the FDIC, the Office of Thrift Supervision and FHFA entered into a consent order with MERS and MERSCORP, Inc. that requires MERS and MERSCORP, Inc. to, among other things, create and submit plans to ensure that MERS and MERSCORP, Inc. are: (a) operated in a safe and sound manner and have adequate financial strength and staff; (b) improve communications with MERSCORP, Inc. shareholders and members; (c) intensify the monitoring of and

166                                                                 *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

response to litigation; and (d) establish processes to ensure data quality and strengthen certain aspects of corporate governance.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of and ceased making grants under equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended March 31, 2011. However, restrictions lapsed on 792,372 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2010 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

## ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                      TREASURY-1404                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
       Charles E. Haldeman, Jr.
       Chief Executive Officer

Date: May 4, 2011

By: /s/  Ross J. Kari
       Ross J. Kari
       Executive Vice President — Chief Financial Officer
       (Principal Financial Officer)

Date: May 4, 2011

168           *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# GLOSSARY

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**BPS** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**CME securitization program** — Freddie Mac Capital Markets Executionsm — A multifamily mortgage securitization program in which we purchase loans pre-designated for securitization through an Other Guarantee Transaction.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas.

Beginning in 2008, the conforming loan limits were increased for mortgages originated in certain "high-cost" areas above the conforming loan limits. In addition, conforming loan limits for certain high-cost areas were increased temporarily (up to $729,250 for a one-family residence). Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding $417,000 as conforming jumbo loans.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

<div align="center">169</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs, net of recoveries, and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — The weighted average maturity of a financial instrument's cash flows. Duration is used as a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent paid by the tenant over the term of a lease. Does not include discounts for concessions, or premiums, such as for non-standard lease terms.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1407

Table of Contents

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers with loans guaranteed by us or Fannie Mae refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. The relief refinance initiative is our implementation of HARP for our loans.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1408                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

$1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Monolines** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth** — The amount by which our total assets exceed our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OFHEO** — Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    TREASURY-1409                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan or security recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesm initiative. This initiative is our implementation of HARP for our loans. Although HARP is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios below 80% to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total comprehensive income (loss)** — Consists of net income (loss) plus changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

TREASURY-1411

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

175                                   *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

# EXHIBIT INDEX

**Exhibit No.**

| | |
|---|---|
| 4.1 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated February 25, 2011 |
| 10.1 | Officer Severance Policy, dated January 24, 2011 (incorporated by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, as filed on February 24, 2011) |
| 10.2 | Officer Severance Policy, dated April 11, 2011 |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |

E-1                                                                              *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 4.1

## FEDERAL HOME LOAN MORTGAGE CORPORATION

### GLOBAL DEBT FACILITY AGREEMENT

**AGREEMENT**, dated as of February 25, 2011, among the Federal Home Loan Mortgage Corporation  (**"Freddie Mac"**) and Holders of Debt Securities (each as hereinafter defined).

Whereas:

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the laws of the United States (Title III of the Emergency Home Finance Act of 1970, as amended (the **"Freddie Mac Act"**)) and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein;

(b) Pursuant to Section 306(a) of the Freddie Mac Act, Freddie Mac is authorized, upon such terms and conditions as it may prescribe, to borrow, to pay interest or other return, and to issue notes, bonds or other obligations or securities; and

(c) To provide funds to permit Freddie Mac to engage in activities consistent with its statutory purposes, Freddie Mac has established a Global Debt Facility (the **"Facility"**) and authorized the issuance, from time to time, pursuant to this Agreement, of unsecured general obligations of Freddie Mac or, if so provided in the applicable Supplemental Agreement (as hereinafter defined), secured obligations of Freddie Mac  (**"Debt Securities"**).

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained, it is hereby agreed that the following terms and conditions of this Agreement (including, as to each issue of the Debt Securities, the applicable Supplemental Agreement) shall govern the Debt Securities and the rights and obligations of Freddie Mac and Holders with respect to the Debt Securities.

### ARTICLE I

#### Definitions

Whenever used in this Agreement, the following words and phrases shall have the following meanings, unless the context otherwise requires.

*Additional Debt Securities:*  Debt Securities issued by Freddie Mac with the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

*Agreement:* This Global Debt Facility Agreement dated as of February 25, 2011, as it may be amended or supplemented from time to time, and successors thereto pursuant to which Freddie Mac issues the Debt Securities.

*Amortizing Debt Securities:*  Debt Securities on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement.

*Beneficial Owner:*  The entity or individual that beneficially owns a Debt Security.

*Bonds:*  Callable or non-callable Debt Securities with maturities of more than ten years.

*Book-Entry Rules:*  The Department of Housing and Urban Development  regulations (24 C.F.R. Part 81, Subpart H) applicable to the Fed Book-Entry Debt Securities and such procedures as to which Freddie Mac and the FRBNY may agree.

TREASURY-1414

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is not guarantee of future results.

*Business Day:* (i) With respect to Fed Book-Entry Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which the FRBNY is closed, (d) as to any Holder of a Fed Book-Entry Debt Security, a day on which the Federal Reserve Bank that maintains the Holder's account is closed, or (e) a day on which Freddie Mac's offices are closed; and (ii) with respect to Registered Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions are closed in (1) the City of New York or (2) if the Specified Payment Currency is other than U.S. dollars or euros, the Principal Financial Center of the country of such Specified Payment Currency, (d) if the Specified Payment Currency is euros, a day on which the TARGET2 system is not open for settlements, or a day on which payments in euros cannot be settled in the international interbank market as determined by the Global Agent, (e) for any required payment, a day on which banking institutions are closed in the place of payment, or (f) a day on which Freddie Mac's offices are closed.

*Calculation Agent:* Freddie Mac or a bank or broker-dealer designated by Freddie Mac in the applicable Supplemental Agreement as the entity responsible for determining the interest rate on a Variable Rate Debt Security.

*Calculation Date:* In each year, each of those days in the calendar year that are specified in the applicable Supplemental Agreement as being the scheduled Interest Payment Dates regardless, for this purpose, of whether any such date is in fact an Interest Payment Date and, for the avoidance of doubt, a "Calculation Date" may occur prior to the Issue Date or after the last Principal Payment Date.

*Callable Reference Notes:* U.S. dollar denominated, callable Reference Securities with maturities of more than one year.

*Cap:* A maximum interest rate at which interest may accrue on a Variable Rate Debt Security during any Interest Reset Period.

*Citibank — London:* Citibank, N.A., London office, the Global Agent for Registered Debt Securities.

*Citigroup — Frankfurt:* Citigroup Global Markets Deutschland AG & Co. KGaA, the Registrar for Registered Debt Securities.

*Clearstream, Luxembourg:* Clearstream Banking, société anonyme, which holds securities for its participants and facilitates the clearance and settlement of securities transactions between its participants through electronic book-entry changes in accounts of its participants.

*CMS Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMS Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(N).

*CMT Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMT Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(M).

*Code:* The Internal Revenue Code of 1986, as amended.

*Common Depositary:* The common depositary for Euroclear, Clearstream, Luxembourg and/or any other applicable clearing system, which will hold Other Registered Debt Securities on behalf of Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system.

*Currency Exchange Bank:* The currency exchange bank specified in the applicable Supplemental Agreement that will convert any amounts paid by Freddie Mac in a Specified Payment Currency on DTC Registered Debt Securities to U.S. Holders into U.S. dollars.

2

TREASURY-1415

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*CUSIP Number:* A unique nine-character designation assigned to each Debt Security by the CUSIP Service Bureau and used to identify each issuance of Debt Securities on the records of the Federal Reserve Banks or DTC, as applicable.

*Day Rate:* The arithmetic mean for each day in a Seven-Day Period as determined by the Calculation Agent in accordance with Section 2.07(i)(P)(2).

*Dealers:* Firms that engage in the business of dealing or trading in debt securities as agents, brokers or principals.

*Debt Securities:* Unsecured subordinated or unsubordinated notes, bonds and other debt securities issued from time to time by Freddie Mac under the Facility, or if so provided in the applicable Supplemental Agreement, secured obligation issued from time to time by Freddie Mac under the Facility.

*Deleverage Factor:* A Multiplier of less than one by which an applicable Index is multiplied.

*Depository:* DTC or any successor.

*Deposits:* Deposits commencing on the applicable Reset Date.

*Designated EURIBOR Reuters Page:* The display on Reuters Page EURIBOR01, or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated EUR-LIBOR Reuters Page:* The display on Reuters Page LIBOR01 or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated Reuters Page:* The display on Reuters Page LIBOR01 (or where the Index Currency is Australian dollars, Swiss francs or Yen, Page LIBOR02) or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying British Bankers' Association interest settlement rates for Deposits in the Index Currency.

*Determination Date:* The date as of which the rate of interest applicable to an Interest Reset Period is determined.

*Determination Period:* The period from, and including, one Calculation Date to, but excluding, the next Calculation Date.

*DTC:* The Depository Trust Company, a limited-purpose trust company, which holds securities for DTC participants and facilitates the clearance and settlement of transactions between DTC participants through electronic book-entry changes in accounts of DTC participants.

*DTC Registered Debt Securities:* Registered Debt Securities registered in the name of a nominee of DTC, which will clear and settle through the system operated by DTC.

EC: The European Community.

*EMU:* European Economic and Monetary Union; the convergence of key features of the economies of certain participating European countries, including the adoption of a common monetary unit called the euro.

*EMU Event:* As defined in Section 7.01(b).

*EURIBOR:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(J).

3

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EURIBOR Determination Date:* The second TARGET2 Business Day preceding the applicable Reset Date, unless EURIBOR is determined in accordance with Section 2.07(i)(J)(3), in which case it means the applicable Reset Date.

*EUR-LIBOR:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(I).

*EUR-LIBOR Determination Date:* The second TARGET2 Business Day preceding the applicable Reset Date.

*Euroclear:* Euroclear System, a depositary that holds securities for its participants and clears and settles transactions between its participants through simultaneous electronic book-entry delivery against payment.

*Euro Representative Amount:* A principal amount of not less than the equivalent of U.S. $1,000,000 in euros that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Euro-Zone:* The region consisting of member states of the European Union that adopt the single currency in accordance with the Treaty.

*Event of Default:* As defined in Section 7.01(a).

*Extendible Variable Rate Securities:* Variable Rate Debt Securities, the maturity of which may be extended at a Beneficial Owner's option effective as of certain specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods.

*Facility:* The Global Debt Facility described in the Offering Circular dated February 25, 2011 under which Freddie Mac issues the Debt Securities.

*Fed Book-Entry Debt Securities:* U.S. dollar denominated Debt Securities issued and maintained in book-entry form on the Fed Book-Entry System.

*Fed Book-Entry System:* The book-entry system of the Federal Reserve Banks which provides book-entry holding and settlement for U.S. dollar denominated securities issued by the U.S. Government, certain of its agencies, instrumentalities, government-sponsored enterprises and international organizations of which the United States is a member.

*Federal Funds Rate (Daily):* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(O).

*Federal Funds Rate (Daily) Determination Date:* The applicable Reset Date; provided, however, that if the Reset Date is not a Business Day, then the Federal Funds Rate (Daily) Determination Date means the Business Day immediately following the applicable Reset Date.

*Federal Funds Rate (Weekly Average):* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(P).

*Federal Reserve:* The Board of Governors of the Federal Reserve System.

*Federal Reserve Bank:* Each U.S. Federal Reserve Bank that maintains Debt Securities in book-entry form.

*Federal Reserve Banks:* Collectively, the Federal Reserve Banks.

*Fiscal Agency Agreement:* The Uniform Fiscal Agency Agreement between Freddie Mac and the FRBNY.

*Fiscal Agent:* The FRBNY is fiscal agent for Fed Book-Entry Debt Securities.

4

TREASURY-1417

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Fixed Principal Repayment Amount:* An amount equal to 100% of the principal amount of a Debt Security, payable on the applicable Maturity Date or earlier date of redemption or repayment or a specified amount above or below such principal amount, as provided in the applicable Supplemental Agreement.

*Fixed Rate Debt Securities:* Debt Securities that bear interest at a single fixed rate.

*Fixed/Variable Rate Debt Securities:* Debt Securities that bear interest at a single fixed rate during one or more specified periods and at a variable rate determined by reference to one or more Indices, or otherwise, during one or more other periods. As to any such fixed rate period, the provisions of this Agreement relating to Fixed Rate Debt Securities shall apply, and, as to any such variable rate period, the provisions of this Agreement relating to Variable Rate Debt Securities shall apply.

*Floor:* A minimum interest rate at which interest may accrue on a Debt Security during any Interest Reset Period.

*Freddie Mac:* Federal Home Loan Mortgage Corporation, a stockholder-owned company chartered by Congress pursuant to the Freddie Mac Act.

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. § 1451-1459.

*FRBNY:* The Federal Reserve Bank of New York.

*Global Agency Agreement:* The agreement between Freddie Mac, the Global Agent and the Registrar.

*Global Agent:* The entity selected by Freddie Mac to act as its fiscal, transfer and paying agent for Registered Debt Securities.

*H.15(519):* The weekly statistical release entitled "Statistical Release H.15(519), Selected Interest Rates" as published by the Federal Reserve, or any successor publication of the Federal Reserve available on its website at http://www.federalreserve.gov/releases/h15/or any successor site.

*H.15 Daily Update:* The daily update of H.15(519), available on the website of the Federal Reserve at http://www.federalreserve.gov/releases/h15/update, or any successor site or publication.

*Holder:* In the case of Fed Book-Entry Debt Securities, the entity whose name appears on the book-entry records of a Federal Reserve Bank as Holder; in the case of Registered Debt Securities in global registered form, the depository, or its nominee, in whose name the Registered Debt Securities are registered on behalf of a related clearing system; and, in the case of Registered Debt Securities in definitive registered form, the person or entity in whose name such Debt Securities are registered in the Register.

*Holding Institutions:* Entities eligible to maintain book-entry accounts with a Federal Reserve Bank.

*Index:* LIBOR, EUR-LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds (Weekly Average) or other specified interest rate, exchange rate or other index, as the case may be.

*Index Currency:* The currency or currency unit specified in the applicable Supplemental Agreement with respect to which an Index will be calculated for a Variable Rate Debt Security; provided, however, that if euros are substituted for such currency or currency unit, the Index Currency will be euros and, with respect to LIBOR, the determination provisions for EUR-LIBOR will apply to such Debt

5

TREASURY-1418

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Securities upon such substitution. If no such currency or currency unit is specified in the applicable Supplemental Agreement, the Index Currency will be U.S. dollars.

*Index Maturity:* The period with respect to which an Index will be calculated for a Variable Rate Debt Security that is specified in the applicable Supplemental Agreement.

*Interest Component:* Each future interest payment, or portion thereof, due on or prior to the Maturity Date, or if the Debt Security is subject to redemption or repayment prior to the Maturity Date, the first date on which such Debt Security is subject to redemption or repayment.

*Interest Payment Date:* The date or dates on which interest on Debt Securities will be payable in arrears.

*Interest Payment Period:* Unless otherwise provided in the applicable Supplemental Agreement, the period beginning on (and including) the Issue Date or the most recent Interest Payment Date, as the case may be, and ending on (but excluding) the earlier of the next Interest Payment Date or the Principal Payment Date.

*Interest Reset Period:* The period beginning on the applicable Reset Date and ending on the calendar day preceding the next Reset Date.

*Issue Date:* The date on which Freddie Mac wires an issue of Debt Securities to Holders or other date specified in the applicable Supplemental Agreement.

*Leverage Factor:* A Multiplier of greater than one by which an applicable Index is multiplied.

*LIBOR:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(H).

*LIBOR Determination Date:* The second London Banking Day preceding the applicable Reset Date unless the Index Currency is Sterling, in which case it means the applicable Reset Date.

*London Banking Day:* Any day on which commercial banks are open for business (including dealings in foreign exchange and deposits in the Index Currency) in London.

*Maturity Date:* The date, one day or longer from the Issue Date, on which a Debt Security will mature unless extended, redeemed or repaid prior thereto.

*Mortgage Linked Amortizing Debt Securities:* Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage-related assets, as described in the related Supplemental Agreement.

*Multiplier:* A constant or variable number (which may be greater than or less than one) to be multiplied by the relevant Index for a Variable Rate Debt Security.

*Non-U.S. Currency*: Specified Currency other than U.S. dollars.

*Notes:* Callable or non-callable Debt Securities with maturities of more than one day.

*New York Banking Day:* Any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions in the City of New York are required or permitted by law or executive order to close, or (d) a day on which the FRBNY is closed.

*Offering Circular:* The Freddie Mac Global Debt Facility Offering Circular dated February 25, 2011 (including any related Offering Circular Supplement) and successors thereto.

*OID Determination Date:* The last day of the last accrual period ending prior to the date of the meeting of Holders (or, for consents not at a meeting, prior to a date established by Freddie Mac). The

6

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

TREASURY-1419

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

accrual period will be the same as the accrual period used by Freddie Mac to determine its deduction for accrued original issue discount under section 163 (e) of the Code.

*Other Registered Debt Securities:* Registered Debt Securities that are not DTC Registered Debt Securities, that are deposited with a Common Depositary and that will clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system other than DTC.

*Pricing Supplement:* A supplement to the Offering Circular that describes the specific terms, of, and provides pricing information and other information for, an issue of Debt Securities or which otherwise amends, modifies or supplements the terms of the Offering Circular.

*Prime Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(K).

*Prime Rate Determination Date:* The New York Banking Day preceding the applicable Reset Date.

*Principal Component:* The principal payment plus any interest payments that are either due after the date specified in, or are specified as ineligible for stripping in, the applicable Supplemental Agreement.

*Principal Financial Center:* The capital city of the country of the Specified Payment Currency, or solely with respect to the calculation of LIBOR, the Index Currency, as the case may be, as specified in the applicable Supplemental Agreement except that with respect to U.S. dollars, Sterling, Yen, the euro and Swiss francs, the Principal Financial Center shall be the City of New York, London, Tokyo, Brussels and Zurich, respectively.

*Principal Payment Date:* The Maturity Date, or the earlier date of redemption or repayment, if any (whether such redemption or repayment is in whole or in part).

*Range Accrual Debt Securities:* Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

*Record Date:* As to Registered Debt Securities, the fifteenth calendar day preceding an Interest Payment Date. Interest on a Registered Debt Security will be paid to the Holder of such Registered Debt Security as of the close of business on the Record Date.

*Reference Bonds:* U.S. dollar denominated, non-callable Reference Securities with maturities of more than ten years.

*Reference Notes:* U.S. dollar denominated, non-callable Reference Securities with maturities of more than one year.

*Reference Securities:* Scheduled U.S. dollar denominated issues of Debt Securities in large principal amounts, which may be either Callable Reference Notes, Reference Bonds or Reference Notes.

*Register:* A register of the Holders of Registered Debt Securities maintained by the Registrar.

*Registered Debt Securities:* Debt Securities issued and maintained in global registered or definitive registered form on the books and records of the Registrar.

*Registrar:* The entity selected by Freddie Mac to maintain the Register.

*Representative Amount:* A principal amount of not less than U.S. $1,000,000 (or, if the Index Currency is other than U.S. dollars, a principal amount not less than the equivalent in the Index Currency)

7

TREASURY-1420

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                  Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Reset Date:* The date on which a new rate of interest on a Debt Security becomes effective.

*Reuters:* Reuters Group PLC or any successor service.

*Reuters USAUCTION10 Page:* The display designated as "USAUCTION10" (or any successor page) provided by Reuters.

*Reuters USAUCTION11 Page:* The display designated as "USAUCTION11" (or any successor page) provided by Reuters.

*Reuters US PRIME1 Page:* The display designated as page "USPRIME1" (or any successor page) provided by Reuters.

*Seven-Day Period:* As defined in Section 2.07(i)(P)(1).

*Specified Currency:* The currency or currency unit in which a Debt Security may be denominated and in which payments of principal of and interest on a Debt Security may be made.

*Specified Interest Currency:* The Specified Currency provided for the payment of interest on Debt Securities.

*Specified Payment Currency:* The term to which the Specified Interest Currency and Specified Principal Currency are referred collectively.

*Specified Principal Currency:* The Specified Currency provided for the payment of principal on Debt Securities.

*Spread:* A constant or variable percentage or number to be added to or subtracted from the relevant Index for a Variable Rate Debt Security.

*Step Debt Securities:* Debt Securities that bear interest at different fixed rates during different specified periods.

*Sterling:* British pounds sterling.

*Supplemental Agreement:* An agreement which, as to the related issuance of Debt Securities, supplements the other provisions of this Agreement and identifies and establishes the particular offering of Debt Securities issued in respect thereof. A Supplemental Agreement may be documented by a supplement to this Agreement, a Pricing Supplement, a confirmation or a terms sheet. A Supplemental Agreement may, as to any particular issuance of Debt Securities, modify, amend or supplement the provisions of this Agreement in any respect whatsoever. A Supplemental Agreement shall be effective and binding as of its publication, whether or not executed by Freddie Mac.

*TARGET2:* The Trans-European Automated Real-Time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

*TARGET2 Business Day:* A day on which the TARGET2 system or its successor is operating.

*Targeted Registered Debt Securities:* Debt Securities "targeted to foreign markets" under Treasury Department regulations and offered or sold solely to persons outside the United States or its territories or possessions.

*Treaty:* The treaty establishing the EC, as amended by the treaty on European Union.

*Treasury Auction:* The most recent auction of Treasury Bills prior to a given Reset Date.

8

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Treasury Bills:* Direct obligations of the United States.

*Treasury Department:* United States Department of the Treasury.

*Treasury Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(L).

*Treasury Rate Determination Date:* The day of the week in which the Reset Date falls on which Treasury Bills would normally be auctioned or, if no auction is held for a particular week, the first Business Day of that week. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that the auction may be held on the preceding Friday; provided, however, that if an auction is held on the Friday of the week preceding the Reset Date, the Treasury Rate Determination Date will be that preceding Friday; and provided, further, that if the Treasury Rate Determination Date would otherwise fall on the Reset Date, that Reset Date will be postponed to the next succeeding Business Day.

*Variable Principal Repayment Amount:* The principal amount determined by reference to one or more Indices or otherwise, payable on the applicable Maturity Date or date of redemption or repayment of a Debt Security, as specified in the applicable Supplemental Agreement.

*Variable Rate Debt Securities:* Debt Securities that bear interest at a variable rate, and reset periodically, determined by reference to one or more Indices or otherwise. The formula for a variable rate may include a Spread.

*Yen:* Japanese yen.

*Zero Coupon Debt Securities:* Debt Securities that do not bear interest and are issued at a discount to their principal amount.

<div align="center">

**ARTICLE II**

**Authorization; Certain Terms**

</div>

**Section 2.01. Authorization.**

Debt Securities shall be issued by Freddie Mac in accordance with the authority vested in Freddie Mac by Section 306(a) of the Freddie Mac Act. The indebtedness represented by the Debt Securities shall be unsecured general obligations of Freddie Mac, or, if so provided in the applicable Supplemental Agreement, secured obligations of Freddie Mac. Debt Securities shall be offered from time to time by Freddie Mac in an unlimited amount and shall be known by the designation given them, and have the Maturity Dates stated, in the applicable Supplemental Agreement. Freddie Mac, in its discretion and at any time, may offer Additional Debt Securities having the same terms and conditions as Debt Securities previously offered. The Debt Securities may be issued as Reference Securities, which includes Callable Reference Notes, Reference Notes and Reference Bonds, or may be issued as any other Debt Securities, denominated in U.S. dollars or other currencies, with maturities of one day or longer and may be in the form of Notes or Bonds or otherwise. Issuances may consist of new issues of Debt Securities or reopenings of an existing issue of Debt Securities.

**Section 2.02. Other Debt Securities Issued Hereunder.**

Freddie Mac may from time to time create and issue Debt Securities hereunder which contain terms and conditions not specified in this Agreement. Such Debt Securities shall be governed by the applicable Supplemental Agreement and, to the extent that the terms of this Agreement are not inconsistent with Freddie Mac's intent in creating and issuing such Debt Securities, by the terms of this Agreement. Such

<div align="center">9</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Debt Securities shall be secured or unsecured obligations of Freddie Mac. If the Debt Securities are secured obligations of Freddie Mac, the provisions of Article V hereof shall apply to such Debt Securities.

**Section 2.03. Specified Currencies and Specified Payment Currencies.**

(a) Each Debt Security shall be denominated and payable in such Specified Currency as determined by Freddie Mac. Fed Book-Entry Debt Securities will be denominated and payable in U.S. dollars only.

(b) Except under the circumstances provided in Section 2.03(c)(i) and (ii) and Article VI hereof, Freddie Mac shall make payments of any interest on Debt Securities in the Specified Interest Currency and shall make payments of the principal of Debt Securities in the Specified Principal Currency. The Specified Currency for the payment of interest and principal with respect to any Debt Security shall be set forth in the applicable Supplemental Agreement.

(c) European Economic and Monetary Union and Unavailability.

(i) *European Economic and Monetary Union.* The Treaty contemplated that EMU would occur in three stages. On January 1, 1999 the third and final stage of the EMU commenced with the irrevocable fixing of the exchange rates of the currencies of the initial 11 participating member states for interbank transfers in a single currency, the **"euro"**. Complete replacement of member currencies was completed in 2002. As of the date of this Agreement, the participating member states in the EMU are Austria, Belgium, Cyprus, Estonia, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Malta, The Netherlands, Portugal, Slovakia, Slovenia and Spain.

(ii) *Unavailability.* Except as set forth below, if the principal of, premium, if any, or interest on, any Debt Security is payable in a Specified Currency other than U.S. dollars and such Specified Currency is not available to Freddie Mac for making required payments due to the imposition of exchange controls, its replacement or disuse or other circumstances beyond the control of Freddie Mac, then Freddie Mac shall be entitled to satisfy its obligations to Holders of the Debt Securities by making such payments in U.S. dollars on the basis of the noon U.S. dollar buying rate in New York City for cable transfers for such Specified Currency published by the FRBNY on the date of such payment, or, if such currency exchange rate is not available on such date, as of the most recent prior practicable date. Notwithstanding the provisions of the preceding sentence, if euros have replaced such Specified Currency as described under Section 2.03(c)(i) above, Freddie Mac may, at its option (or shall, if so required by applicable law) without the consent of the Holders of such Debt Securities effect the payment of principal of, premium, if any, or interest on, any Debt Security denominated in such Specified Currency in euros in lieu of such Specified Currency, in conformity with legally applicable measures taken pursuant to, or by virtue of the Treaty or other applicable legal or regulatory requirements.

**Section 2.04. Minimum Denominations.**

The Debt Securities shall be issued and maintained in the minimum denominations of U.S. $1,000 and additional increments of U.S. $1,000 for U.S. dollar denominated Debt Securities, unless otherwise provided in the applicable Supplemental Agreement and as may be allowed or required from time to time by the relevant regulatory authority or any laws or regulations applicable to the relevant Specified Currency. In the case of Zero Coupon Debt Securities, denominations will be expressed in terms of the principal amount payable on the Maturity Date.

**Section 2.05. Maturity.**

(a) Each Debt Security shall mature on its Maturity Date, as provided in the applicable Supplemental Agreement, unless redeemed at the option of Freddie Mac or repaid at the option of the Holder

10

TREASURY-1423

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

prior thereto in accordance with the provisions described under Section 2.06. Debt Securities may be issued with minimum or maximum maturities or variable maturities allowed or required from time to time by the relevant regulatory or stock exchange authority or clearing systems or any laws or regulations applicable to the Specified Currency.

(b) If so provided in the applicable Supplemental Agreement, certain Debt Securities may have provision permitting their Beneficial Owner to elect to extend the initial Maturity Date specified in such Supplemental Agreement, or any later date to which the maturity of such Debt Securities has been extended, on specified dates. However, the maturity of such Debt Securities may not be extended beyond the final Maturity Date specified in the Supplemental Agreement.

(b) The principal amount payable on the Maturity Date of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

**Section 2.06. Optional Redemption and Optional Repayment.**

(a) The Supplemental Agreement for any particular issue of Debt Securities shall provide whether such Debt Securities may be redeemed at Freddie Mac's option or repayable at the Holder's option, in whole or in part, prior to their Maturity Date. If so provided in the applicable Supplemental Agreement, an issue of Debt Securities shall be subject to redemption at the option of Freddie Mac, or repayable at the option of the Holders, in whole or in part, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time. The redemption or repayment price for such Debt Securities (or such part of such Debt Securities as is redeemed or repaid) shall be an amount provided in, or determined in a manner provided in, the applicable Supplemental Agreement, together with accrued and unpaid interest to the date fixed for redemption or repayment.

(b) Unless otherwise provided in the applicable Supplemental Agreement, notice of optional redemption shall be given to Holders of the related Debt Securities not less than 5 Business Days nor more than 60 calendar days prior to the date of redemption in the manner provided in Section 8.07.

(c) In the case of a partial redemption of an issue of Fed Book-Entry Debt Securities by Freddie Mac, such Fed Book-Entry Debt Securities shall be redeemed pro rata. In the case of a partial redemption of an issue of Registered Debt Securities by Freddie Mac, one or more of such Registered Debt Securities shall be reduced by the Global Agent in the amount of such redemption, subject to the principal amount of such Registered Debt Securities after redemption remaining in an authorized denomination. The effect of any partial redemption of an issue of Registered Debt Securities on the Beneficial Owners of such Registered Debt Securities will depend on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner owns its interest.

(d) If so provided in the applicable Supplemental Agreement, certain Debt Securities shall be repayable, in whole or in part, by Freddie Mac at the option of the relevant Holders thereof or otherwise, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time, upon terms and procedures provided in the applicable Supplemental Agreement. Unless otherwise provided in the applicable Supplemental Agreement, in the case of a Registered Debt Security, to exercise such option, the Holder shall deposit with the Global Agent (i) such Registered Debt Security; and (ii) a duly completed notice of optional repayment in the form obtainable from the Global Agent, in each case not more than the number of days nor less than the number of days specified in the applicable Supplemental Agreement prior to the date fixed for repayment. Unless otherwise specified in the applicable Supplemental Agreement, no such Registered Debt Security (or notice of repayment) so deposited may be withdrawn without the prior consent of Freddie Mac or the Global Agent. Unless

11

TREASURY-1424

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

otherwise provided in the applicable Supplemental Agreement, in the case of a Fed Book-Entry Debt Security, if the Beneficial Owner wishes to exercise such option, then the Beneficial Owner shall give notice thereof to Freddie Mac through the relevant Holding Institution as provided in the applicable Supplemental Agreement.

(e) The principal amount payable upon redemption or repayment of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

### Section 2.07. Payment Terms of the Debt Securities.

(a) Debt Securities shall bear interest at one or more fixed rates or variable rates or may not bear interest. If so provided in the applicable Supplemental Agreement, Debt Securities may be separated by a Holder into one or more Interest Components and Principal Components. The Offering Circular or the applicable Supplemental Agreement for such Debt Securities shall specify the procedure for stripping such Debt Securities into such Interest and Principal Components.

(b) The applicable Supplemental Agreement shall specify the frequency with which interest, if any, is payable on the related Debt Securities. Interest on Debt Securities shall be payable in arrears on the Interest Payment Dates specified in the applicable Supplemental Agreement and on each Principal Payment Date.

(c) Each issue of interest-bearing Debt Securities shall bear interest during each Interest Payment Period. No interest on the principal of any Debt Security will accrue on or after the Principal Payment Date on which such principal is repaid.

(d) The determination by the Calculation Agent of the interest rate on, or any Index in relation to, a Variable Rate Debt Security and the determination of any payment on any Debt Security (or any interim calculation in the determination of any such interest rate, index or payment) shall, absent manifest error, be final and binding on all parties. If a principal or interest payment error occurs, Freddie Mac may correct it by adjusting payments to be made on later Interest Payment Dates or Principal Payment Dates (as appropriate) or in any other manner Freddie Mac considers appropriate. If the source of an Index changes in format, but the Calculation Agent determines that the Index source continues to disclose the information necessary to determine the related interest rate substantially as required, the Calculation Agent will amend the procedure for obtaining information from that source to reflect the changed format. All Index values used to determine principal or interest payments are subject to correction within 30 days from the applicable payment. The source of a corrected value must be the same source from which the original value was obtained. A correction might result in an adjustment on a later date to the amount paid to the Holder.

(e) Payments on Debt Securities shall be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a Specified Payment Currency other than U.S. dollars, to the nearest smallest transferable unit (with one-half cent or unit being rounded upwards).

(f) In the event that any jurisdiction imposes any withholding or other tax on any payment made by Freddie Mac (or our agent or any other person potentially required to withhold) with respect to a Debt Security, Freddie Mac (or our agent or such other person) will deduct the amount required to be withheld from such payment, and Freddie Mac (or our agent or such other person) will not be required to pay additional interest or other amounts, or redeem or repay the Debt Securities prior to the applicable Maturity Date, as a result.

(g) *Fixed Rate Debt Securities*

12

TREASURY-1425

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Fixed Rate Debt Securities shall bear interest at a single fixed interest rate. The applicable Supplemental Agreement shall specify the fixed interest rate per annum on a Fixed Rate Debt Security. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Fixed Rate Debt Security shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(h) *Step Debt Securities*

Step Debt Securities shall bear interest from their Issue Date to a specified date at their initial fixed interest rate and from that date to their Maturity Date at one or more different fixed interest rates that shall be prescribed as of the Issue Date. A Step Debt Security will have one or more step periods. The applicable Supplemental Agreement shall specify the fixed interest rate per annum payable on Step Debt Securities for each related period from issuance to maturity. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Step Debt Security shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(i) *Variable Rate Debt Securities*

(A) Variable Rate Debt Securities shall bear interest at a variable rate determined on the basis of a direct or an inverse relationship to one or more specified Indices or otherwise, (x) plus or minus a Spread, if any, or (y) multiplied by one or more Leverage or Deleverage Factors, if any, as specified in the applicable Supplemental Agreement. Variable Rate Debt Securities also may bear interest in any other manner described in the applicable Supplemental Agreement.

(B) Variable Rate Debt Securities may have a Cap and/or a Floor.

(C) The applicable Supplemental Agreement shall specify the accrual method (i.e., the day count convention) for calculating interest or any relevant accrual factor on the related Variable Rate Debt Securities. The accrual method may incorporate one or more of the following defined terms:

"**Actual/360**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 360 days.

"**Actual/365 (fixed)**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 365 days, regardless of whether accrual or payment occurs during a calendar leap year.

"**Actual/Actual**" shall mean, unless otherwise indicated in the applicable Supplemental Agreement, that interest or any other relevant accrual factor shall be calculated on the basis of (x) the actual number of days elapsed in the Interest Payment Period divided by 365, or (y) if any portion of the Interest Payment Period falls in a calendar leap year, (A) the actual number of days in that portion divided by 366 plus (B) the actual number of days in the remaining portion divided by 365. If so indicated in the applicable Supplemental Agreement, "Actual/Actual" shall mean interest or any other relevant accrual factor shall be calculated in accordance with the definition of "Actual/ Actual" adopted by the International Securities Market Association (**"Actual/Actual (ISMA)"**), which means a calculation on the basis of the following:

(1) where the number of days in the relevant Interest Payment Period is equal to or shorter than the Determination Period during which such Interest Payment Period ends, the number of days in such Interest Payment Period divided by the product of (A) the number of days in such Determination Period and (B) the number of Interest Payment Dates that would occur in one calendar year; or

(2) where the Interest Payment Period is longer than the Determination Period during which the Interest Payment Period ends, the sum of (A) the number of days in such Interest Payment Period falling in the Determination Period in which the Interest Payment Period begins divided

13

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year; and (B) the number of days in such Interest Payment Period falling in the next Determination Period divided by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year.

(D) The applicable Supplemental Agreement shall specify the frequency with which the rate of interest on the related Variable Rate Debt Securities shall reset. The applicable Supplemental Agreement also shall specify the Reset Date. If the interest rate will reset within an Interest Payment Period, then the interest rate in effect on the sixth Business Day preceding an Interest Payment Date will be the interest rate for the remainder of that Interest Payment Period and the first day of each Interest Payment Period also will be a Reset Date. Variable Rate Debt Securities may bear interest prior to the initial Reset Date at an initial interest rate, if any, specified in the applicable Supplemental Agreement. If so, then the first day of the first Interest Payment Period will not be a Reset Date. The rate of interest applicable to each Interest Reset Period shall be determined as provided below or in the applicable Supplemental Agreement.

Except for a Variable Rate Debt Security as to which the rate of interest thereon is determined by reference to LIBOR, EUR-LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds Rate (Weekly Average) or as otherwise set forth in the applicable Supplemental Agreement, the Determination Date for a Variable Rate Debt Security means the second Business Day preceding the Reset Date applicable to an Interest Reset Period.

(E) If the rate of interest on a Variable Rate Debt Security is subject to adjustment within an Interest Payment Period, accrued interest shall be calculated by multiplying the principal amount of such Variable Rate Debt Security by an accrued interest factor. Unless otherwise specified in the applicable Supplemental Agreement, this accrued interest factor shall be computed by adding the interest factor calculated for each Interest Reset Period in such Interest Payment Period and rounding the sum to nine decimal places. The interest factor for each such Interest Reset Period shall be computed by (1) multiplying the number of days in the Interest Reset Period by the interest rate (expressed as a decimal) applicable to such Interest Reset Period; and (2) dividing the product by the number of days in the year referred to in the accrual method specified in the applicable Supplemental Agreement.

(F) If and so long as an issue of Variable Rate Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and such stock exchange so requires, the Calculation Agent shall cause the interest rate for the applicable Interest Reset Period and the amount of interest on the minimum denomination in respect of such issue that would accrue through the last day of such Interest Reset Period, as well as the last day of such Interest Reset Period, to be provided to such stock exchange as soon as practicable, but in no event later than the applicable Reset Date.

(G) For each issue of Variable Rate Debt Securities, the Calculation Agent shall also cause the interest rate for the applicable Interest Reset Period and the amount of interest accrued on the minimum denomination specified for such issue to be made available to Holders as soon as practicable after its determination but in no event later than two Business Days thereafter. Such interest amounts so made available may subsequently be amended (or appropriate alternative arrangements made by way of adjustment) without notice in the event of an extension or shortening of the Interest Reset Period.

14

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(H) If the applicable Supplemental Agreement specifies LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in the Index Currency having the Index Maturity that appears on the Designated Reuters Page at 11:00 a.m. (London time) on such LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on such LIBOR Determination Date and in a Representative Amount. If at least two quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in the applicable Principal Financial Center selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in the Index Currency for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. in the Principal Financial Center on such LIBOR Determination Date and in a Representative Amount. If at least two such quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, LIBOR shall be LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, shall be the rate for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on the most recent London Banking Day preceding the related LIBOR Determination Date for which such rate shall have been displayed on the Designated Reuters Page with respect to Deposits commencing on the second London Banking Day following such date (or, if the Index Currency is Sterling, commencing on such date).

(I) If the applicable Supplemental Agreement specifies EUR-LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**EUR-LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EUR-LIBOR Reuters Page at 11:00 a.m. (London time) on the related EUR-LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on such EUR-LIBOR Determination

15

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Date and in a Euro Representative Amount. If at least two quotations are provided, EUR-LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in London selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in euros for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. (London time) on such EUR-LIBOR Determination Date and in a Euro Representative Amount. If at least two such quotations are provided, EUR-LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, EUR-LIBOR shall be EUR-LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, will be the rate for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on the most recent TARGET Business Day preceding the EUR-LIBOR Determination Date for which such rate was displayed on the Designated EUR-LIBOR Reuters Page for deposits starting on the second TARGET Business Day following such date.

(J) If the applicable Supplemental Agreement specifies EURIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Statement):

"**EURIBOR**" shall mean, with respect to a Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EURIBOR Reuters Page at 11:00 a.m., Brussels time, on the relevant EURIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, then the Calculation Agent will request the principal offices of four major banks in the Euro-Zone selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the Euro-Zone interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. Brussels time on such EURIBOR Determination Date and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the rates quoted by major banks in the Euro-Zone, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent), at approximately 11:00 a.m., Brussels time, on the EURIBOR Determination Date for loans in euros to leading European banks for a period of time corresponding to the Index Maturity and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations; and

(4) if fewer than two quotations are provided as requested in clause (3) above, EURIBOR will be EURIBOR as determined for the immediately preceding Reset Date or, in the case of the first Reset Date, the interest rate payable for the new Interest Reset Period will be the initial interest rate.

16

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(K) If the applicable Supplemental Agreement specifies the Prime Rate as the applicable Index for determining the rate of interest for the related Variable Rate Debt Securities, the following provisions shall apply:

The **"Prime Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Prime Rate Determination Date, as published in H.15(519) Daily Update opposite the caption "Bank prime loan";

(2) if the rate is not published by 5:00 p.m., New York City time, on the Reset Date pursuant to clause (1), the rate for the Prime Rate Determination Date as published in H.15(519) opposite the caption "Bank prime loan";

(3) if the rate is not published in either H.15(519) or the H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the Prime Rate will be the arithmetic mean, determined by the Calculation Agent, of the rates (after eliminating certain rates, as described below in this clause (3)) that appear, at 11:00 a.m., New York City time, on the Prime Rate Determination Date, on Reuters USPRIME1 Page as the U.S. dollar prime rate or base lending rate of each bank appearing on that page; provided, that at least three rates appear. In determining the arithmetic mean:

    (i) if 20 or more rates appear, the highest five rates (or in the event of equality, five of the highest) and the lowest five rates (or in the event of equality, five of the lowest) will be eliminated,

    (ii) if fewer than 20 but 10 or more rates appear, the highest two rates (or in the event of equality, two of the highest) and the lowest two rates (or in the event of equality, two of the lowest) will be eliminated, or

    (iii) if fewer than 10 but five or more rates appear, the highest rate (or in the event of equality, one of the highest) and the lowest rate (or in the event of equality, one of the lowest) will be eliminated;

(4) if fewer than three rates so appear on Reuters USPRIME1 Page pursuant to clause (3) above, then the Calculation Agent will request five major banks in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such banks' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest));

(5) if fewer than three quotations are so provided pursuant to clause (4) above, the Calculation Agent will request five banks or trust companies organized and doing business under the laws of the United States or any state, each having total equity capital of at least U.S. $500,000,000 and being subject to supervision or examination by federal or state authority, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent), to provide a quotation of such banks' or trust companies' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. In making such selection, the Calculation Agent will include each bank, if any, that provided a quotation as requested in clause (4) above and exclude each bank that failed to

17

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

provide a quotation as requested in clause (4). If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

(6) if fewer than three quotations are so provided pursuant to clause (5) above, then the Prime Rate will be the Prime Rate determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the Prime Rate will be the rate calculated pursuant to clause (1) or (2) for the most recent New York Banking Day preceding the Reset Date for which such rate was published in H.15(519) or H.15 Daily Update.

(L) If the applicable Supplemental Agreement specifies the Treasury Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Treasury Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Treasury Determination Date of Treasury Bills having the Index Maturity, as published in H.15 Daily Update under the caption "U.S. government securities/Treasury bills/(secondary market)";

(2) if the rate described in clause (1) above does not appear in H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the rate for the Treasury Rate Determination Date of Treasury Bills having the Index Maturity, as published in the H.15 (519), or other recognized electronic source used for the purpose of displaying that rate under the caption "U.S. government securities/Treasury bills(secondary market)";

(3) if the rate described in clause (2) above is not so published by 3.00 p.m., New York City time, on the Reset Date, then the rate from Treasury Auction of Treasury Bills having the Index Maturity, as that rate appears under the caption "INVEST RATE" on the display on Reuters USAUCTION10 Page or Reuters USAUCTION11 Page;

(4) if the rate described in clause (3) above is not published by 5:00 p.m., New York City time, on the Reset Date, then the auction average rate for Treasury Bills having the Index Maturity obtained from the applicable Treasury Auction as announced by the Treasury Department in the form of a press release under the heading "Investment Rate" by 5:00 p.m. on such Reset Date;

(5) if the rate describe in clause (4) above is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, then auction average rate obtained from the Treasury Auction of the applicable Treasury Bills, as otherwise announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date as determined by the Calculation Agent;

(6) if such rate described in clause (5) is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading primary United States government securities dealers in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such dealers' secondary market bid yields, as of 3:00 p.m. on the Reset Date, for Treasury Bills with a remaining maturity closest to the Index Maturity (or, in the event that the remaining maturities are equally close, the longer remaining maturity). If at least three quotations are provided, then the Treasury Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

18

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(7) if fewer than three quotations are so provided pursuant to clause (6) above, then the Treasury Rate for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the auction average rate for Treasury Bills having the Index Maturity from the most recent auction of Treasury Bills prior to the Reset Date for which such rate was announced by the Treasury Department in the form of a press release under the heading "Investment Rate."

The rate (including the auction average rate) for Treasury Bills and the secondary market bid yield for Treasury Bills will be obtained and expressed as a bond equivalent on the basis of a year of 365 or 366 days, as applicable (or, if not so expressed, will be converted by the Calculation Agent to such a bond equivalent yield).

(M) If the applicable Supplemental Agreement specifies the CMT Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMT Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) for any CMT Determination Date, the daily rate for the Index Maturity that appears on page "FRBCMT" on Reuters (or any other page that replaces the FRBCMT page on that service or any successor service) under the heading "...Treasury Constant Maturities. Federal Reserve Board Release H.15...Mondays Approximately 3:45 p.m.";

(2) if the applicable rate described in clause (1) is not displayed on Reuters page FRBCMT at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate for the Index Maturity applicable for the CMT Determination Date as published in H.15 (519);

(3) if the CMT Rate is not determined pursuant to clause (1) and the applicable rate described in clause (2) does not appear in H.15 (519) at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate, or other U.S. Treasury rate, applicable to an Index Maturity with reference to the CMT Determination Date, that:

    (i) is published by the Federal Reserve or the Treasury Department; and

    (ii) Freddie Mac has determined to be comparable to the applicable rate formerly displayed on Reuters page 7051 and published in H.15 (519);

(4) if the CMT Rate is not determined pursuant to clause (1) or (2) and the rate described in clause (3) above does not appear at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities with an original maturity of approximately the Index Maturity and a remaining term to maturity of no more than one year shorter than the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest. If two U.S. Treasury securities with an original maturity longer than the Index Maturity have remaining terms to maturity that are equally close to the Index Maturity, Freddie Mac will obtain quotations for the U.S. Treasury security with the shorter remaining term to maturity;

19

TREASURY-1432

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(5) if the CMT Rate is not determined pursuant to clause (1), (2) or (3) and fewer than five but more than two primary dealers are quoting offered rates as described in clause (4), then the CMT Rate for the CMT Determination Date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded;

(6) if the CMT Rate is not determined pursuant to clause (1), (2), (3) or (4) and two or fewer primary dealers are quoting offered rates as described in clause (5), then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities having an original maturity longer than the Index Maturity and a remaining term to maturity closest to the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation, or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest;

(7) if the CMT Rate is not determined pursuant to clauses (1) through (6) above and fewer than five but more than two primary dealers are quoting offered rates as described in clause (6), then the CMT Rate for the CMT Determination date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded; and

(8) if the Calculation Agent obtains fewer than three quotations of the kind described in clause (6), the CMT Rate in effect for the new Interest Reset Period will be the CMT Rate in effect for the prior Interest Rate Period, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(N) If the applicable Supplemental Agreement specifies the CMS Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMS Rate"** means, with respect to any Reset Date:

(1) the most recent rate for U.S. dollar swap transactions for the applicable Index Currency and applicable Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, expressed as a percentage, which appears on the Reuters page "ISDAFIX1" (or such other page that may replace that page on that service or a successor service) at 11:00 a.m., New York City time, on the applicable CMS Determination Date;

(2) if the most recent CMS Rate as described in clause (1) above was first available prior to ten calendar days before the applicable CMS Determination Date, then the CMS Rate will be determined by the Calculation Agent on the basis of the mid-market semi-annual swap rate quotations provided by the five leading swaps dealers in the New York City interbank market (which may include Dealers and their affiliates), and for this purpose, "mid-market semi-annual swap rate" means the arithmetic mean of the bid and offered rate quotations for the semi-annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating United States dollars denominated interest rate swap transaction with the applicable Index Currency and Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, commencing on the Reset Date for the relevant Interest Period, and for a relevant representative amount in the relevant market at the relevant time, with an acknowledged dealer of good credit in the swap market, where the floating leg, calculated on an Actual/360 day count basis, is equivalent to USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc.) with a designated

20

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

maturity of three months. The Calculation Agent will request the principal New York City office of each of the five leading swaps dealers selected by the Calculation Agent to provide a quotation of its rate. If at least five quotations are provided, the rate for that CMS Determination Date will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest);

(3) if two, three or four (and not five) of such swaps dealers are quoting as described in clause (2) above, then the CMS Rate will be based on the arithmetic mean of the bid prices obtained and neither the highest nor lowest of such quotations will be eliminated; and

(4) if fewer than two rate quotations are provided, then the CMS Rate for the Reset Date will be the CMS Rate in effect on the preceding Reset Date, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(O) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Daily) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Daily)"** means, with respect to any Reset Date:

(1) the rate for the Business Day preceding the Federal Funds Rate (Daily) Determination Date for U.S. dollar federal funds, as published in the latest H.15 Daily Update opposite the caption "Federal funds (effective)";

(2) if the rate specified in clause (1) is not published by 5:00 p.m., New York City Time, on the Federal Funds Rate (Daily) Determination Date, the Federal Funds Rate (Daily) will be the rate for that Fed Funds Rate (Daily) Determination Date as published in the H.15 Daily Update, or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)";

(3) if the rate specified in clause (2) is not published by 5:00 p.m., New York City time, on the Federal Funds Rate Determination Date, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's effective rate for transactions in overnight federal funds arranged by the broker settling on the Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest));

(4) if fewer than two quotations are so provided pursuant to clause (3) above, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rates for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m., New York City time, on the Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are

21

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(5) if fewer than two quotations are so provided pursuant to clause (4) above, then the Federal Funds Rate (Daily) as of such Federal Funds Rate (Daily) Determination Date will be the Federal Funds Rate (Daily) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Rate Period will be the initial interest rate.

(P) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Weekly Average) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Weekly Average)"** means, with respect to any Reset Date:

(1) the most recent rate published in the latest H.15(519) available by 5:00 p.m., New York City time, on the Reset Date, opposite the caption "Federal funds (effective)" and under the caption "Week Ending" for the Friday immediately preceding the Reset Date. (As described in the footnotes to the H.15(519), the rate shown for the week ending on a Friday preceding a Reset Date actually will be the rate for the week ending on (and including) the Wednesday preceding the Reset Date (the **"Seven-Day Period"**));

(2) if a rate is not so published pursuant to clause (1) above, then the Federal Funds Rate (Weekly Average) will be the arithmetic mean determined by the Calculation Agent of the rate, determined in the manner described in subclauses (y) and (z) below (as applicable), for each day in the Seven-Day Period (each a **"Day Rate"**); provided, that the Calculation Agent determines a Day Rate for each day in the Seven-Day Period:

(y) The Day Rate for a Business Day will be the rate that is published, by 5:00 p.m., New York City time, on the Reset Date, in the H.15 Daily Update or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)" for that Business Day. If a rate for that Business Day does not appear on H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rate for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m. on that Business Day. If at least two quotations are provided, then the Day Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(z) The Day Rate for a day other than a Business Day will be the rate for the preceding Business Day, whether or not the Business Day falls within the relevant Seven-Day Period, determined in accordance with the provisions of subclause (y) above; and

(3) if the Day Rate for each day in the Seven-Day Period is not so determined pursuant to either clause (1) or (2) above, then the Federal Funds Rate (Weekly Average) as of such Reset Date will be the Federal Funds Rate (Weekly Average) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

22

TREASURY-1435

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(j) *Fixed/Variable Rate Debt Securities*

Fixed/Variable Rate Debt Securities shall bear interest at a single fixed rate for one or more specified periods and at a rate determined by reference to one or more Indices, or otherwise, for one or more other specified periods. Fixed/Variable Rate Debt Securities also may bear interest at a rate that Freddie Mac may elect to convert from a fixed rate to a variable rate or from a variable rate to a fixed rate, if so provided in the applicable Supplemental Agreement.

If Freddie Mac may convert the interest rate on a Fixed/Variable Rate Debt Security from a fixed rate to a variable rate, or from a variable rate to a fixed rate, accrued interest for each Interest Payment Period may be calculated using an accrued interest factor in the manner described in Section 2.07(i)(E).

(k) *Zero Coupon Debt Securities*

Zero Coupon Debt Securities shall not bear interest.

(l) *Amortizing Debt Securities*

Amortizing Debt Securities are those on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement. Amortizing Debt Securities may bear interest at fixed or variable rates.

(m) *Debt Securities with Variable Principal Repayment Amounts*

Variable Principal Repayment Amount Debt Securities are those on which the amount of principal payable is determined with reference to an Index specified in the related Supplemental Agreement.

(n) *Mortgage Linked Amortizing Debt Securities*

Mortgage Linked Amortizing Debt Securities are Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage-related assets, as described in the related Supplemental Agreement. Mortgage Linked Amortizing Debt Securities may bear interest at fixed or variable rates.

(o) *Range Accrual Debt Securities*

Range Accrual Debt Securities are Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

(p) *Extendible Variable Rate Debt Securities*

Extendible Variable Rate Debt Securities' are Variable Rate Debt Securities, the maturity of which may be extended at a Beneficial Owner's option effective as of specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods, as described in the related Supplemental Agreement.

**Section 2.08. Business Day Convention.**

Unless otherwise specified in the applicable Supplemental Agreement, in any case in which an Interest Payment Date or Principal Payment Date is not a Business Day, payment of any interest on or the principal of the Debt Securities shall not be made on such date but shall be made on the next Business Day with the same force and effect as if made on such Interest Payment Date or Principal Payment Date, as the case may be. Unless otherwise provided in the applicable Supplemental Agreement, no interest on such payment shall accrue for the period from and after such Interest Payment Date or Principal Payment Date, as the case may be, to the actual date of such payment.

23

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 2.09. Targeted Registered Issues.**

Any Debt Securities that are Targeted Registered Debt Securities shall be considered to be "targeted to foreign markets" as provided under Treasury Department regulations.

**Section 2.10. Reopened Issues and Repurchases.**

Freddie Mac reserves the right, in its discretion and at any time, to offer additional Debt Securities which have the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred or been scheduled so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

Freddie Mac reserves the right, in its discretion and at any time, to purchase Debt Securities or otherwise acquire (either for cash or in exchange for securities) some or all of an issue of Debt Securities at any price or prices in the open market or otherwise. Such Debt Securities may be held, resold or canceled by Freddie Mac.

<div align="center">

**ARTICLE III**

**Form; Clearance and Settlement Procedures**

</div>

**Section 3.01. Form of Fed Book-Entry Debt Securities.**

(a) *General*

Fed Book-Entry Debt Securities shall be issued and maintained only on the Fed Book-Entry System. Fed Book-Entry Debt Securities shall not be exchangeable for definitive Debt Securities. The Book-Entry Rules are applicable to Fed Book-Entry Debt Securities.

(b) *Title*

Fed Book-Entry Debt Securities shall be held of record only by Holding Institutions. Such entities whose names appear on the book-entry records of a Federal Reserve Bank as the entities to whose accounts Fed Book-Entry Debt Securities have been deposited shall be the Holders of such Fed Book-Entry Debt Securities. The rights of the Beneficial Owner of a Fed Book-Entry Debt Security with respect to Freddie Mac and the Federal Reserve Banks may be exercised only through the Holder of the Fed Book-Entry Debt Security. Freddie Mac and the Federal Reserve Banks shall have no direct obligation to a Beneficial Owner of a Fed Book-Entry Debt Security that is not also the Holder of the Fed Book-Entry Debt Security. The Federal Reserve Banks shall act only upon the instructions of the Holder in recording transfers of a Debt Security maintained on the Fed Book-Entry System. Freddie Mac and the Federal Reserve Banks may treat the Holders as the absolute owners of Fed Book-Entry Debt Securities for the purpose of making payments in respect thereof and for all other purposes, whether or not such Fed Book-Entry Debt Securities shall be overdue and notwithstanding any notice to the contrary.

The Holders and each other financial intermediary holding such Fed Book-Entry Debt Securities directly or indirectly on behalf of the Beneficial Owners shall have the responsibility of remitting payments for the accounts of their customers. All payments on Fed Book-Entry Debt Securities shall be subject to any applicable law or regulation.

(c) *Fiscal Agent*

The FRBNY shall be the Fiscal Agent for Fed Book-Entry Debt Securities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1437

In acting under the Fiscal Agency Agreement, the FRBNY shall act solely as Fiscal Agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Fed Book-Entry Debt Security.

### Section 3.02. Form of Registered Debt Securities.

(a) *General*

As specified in the applicable Supplemental Agreement, Registered Debt Securities shall be deposited with (i) a custodian for, and registered in the name of a nominee of, DTC, or (ii) a Common Depositary, and registered in the name of such Common Depositary or a nominee of such Common Depositary.

(b) *Title*

The person in whose name a Registered Debt Security is registered in the Register shall be the Holder of such Registered Debt Security. Beneficial interests in a Registered Debt Security shall be represented, and transfers thereof shall be effected, only through book-entry accounts of financial institutions acting on behalf of the Beneficial Owners of such Registered Debt Security, as a direct or indirect participant in the applicable clearing system for such Registered Debt Security.

Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of Registered Debt Securities for the purpose of making payments and for all other purposes, whether or not such Registered Debt Securities shall be overdue and notwithstanding any notice to the contrary. Owners of beneficial interests in a Registered Debt Security shall not be considered by Freddie Mac, the Global Agent or the Registrar as the owner or Holder of such Registered Debt Security and, except as provided in Section 4.02(a), shall not be entitled to have Debt Securities registered in their names and shall not receive or be entitled to receive definitive Debt Securities. Any Beneficial Owner shall rely on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner holds its interest, to exercise any rights of a Holder of such Registered Debt Securities.

Payments by DTC participants to Beneficial Owners of DTC Registered Debt Securities held through DTC participants shall be the responsibility of such participants. Payments with respect to Other Registered Debt Securities held through Euroclear, Clearstream, Luxembourg or any other applicable clearing system shall be credited to Euroclear participants, Clearstream, Luxembourg participants or participants of any other applicable clearing system in accordance with the relevant system's rules and procedures.

(c) *Global Agent*

In acting under the Global Agency Agreement, the Global Agent acts solely as a fiscal agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Registered Debt Security, except that any moneys held by the Global Agent for payment on a Registered Debt Security shall be held in trust for the Holder as provided in the Global Agency Agreement.

(d) *Registrar*

In acting under the Global Agency Agreement, the Registrar does not assume any obligation or relationship of agency or trust for, or with, any Holder of a Registered Debt Security.

### Section 3.03. Clearance and Settlement Procedures.

(a) *General*

25

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Unless otherwise provided in the applicable Supplemental Agreement:

(i) Most Debt Securities denominated and payable in U.S. dollars and distributed within the United States shall clear and settle through the Fed Book-Entry System.

(ii) Most Debt Securities denominated and payable in U.S. dollars and distributed simultaneously within and outside of the United States, including all Reference Securities, shall clear and settle, within the United States, through the Fed Book-Entry System and, outside of the United States, through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(iii) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed solely within the United States shall clear and settle through the system operated by DTC.

(iv) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed simultaneously within and outside of the United States shall clear and settle through the systems operated by DTC, Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(v) Debt Securities, irrespective of the Specified Currency in which such Debt Securities are denominated or payable, distributed solely outside of the United States shall clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system or, in certain cases, DTC.

(b) *Primary Distribution*

(i) *General.* On initial issue, Debt Securities shall be credited through one or more of the systems specified below or any other system specified in the applicable Supplemental Agreement.

(ii) *Federal Reserve Banks.* Fed Book-Entry Debt Securities shall be issued and settled through the Fed-Book-Entry System in same-day funds and shall be held by designated Holding Institutions. After initial issue, all Fed Book-Entry Debt Securities shall continue to be held by such Holding Institutions in the Fed Book-Entry System unless arrangements are made for the transfer thereof to another Holding Institution. Fed Book-Entry Debt Securities shall not be exchangeable for definitive Debt Securities.

(iii) *DTC.* DTC participants acting on behalf of investors holding DTC Registered Debt Securities through DTC shall follow the delivery practices applicable to securities eligible for DTC's Same-Day Funds Settlement System. DTC Registered Debt Securities shall be credited to DTC participants' securities accounts following confirmation of receipt of payment to Freddie Mac on the relevant Issue Date.

(iv) *Euroclear and Clearstream, Luxembourg.* Investors holding Other Registered Debt Securities through Euroclear, Clearstream, Luxembourg or such other clearing system shall follow the settlement procedures applicable to conventional Eurobonds in registered form. Such Other Registered Debt Securities shall be credited to Euroclear, Clearstream, Luxembourg or such other clearing system participants' securities accounts either on the relevant Issue Date or on the settlement day following the relevant Issue Date against payment in same-day funds (for value on the relevant Issue Date).

(c) *Secondary Market Transfers*

26

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(i) *Fed Book-Entry Debt Securities.*  Transfers of Fed Book-Entry Debt Securities shall take place only in book-entry form on the Fed Book-Entry System. Such transfers shall occur between Holding Institutions in accordance with the rules of the Fed Book-Entry System.

(ii) *Registered Debt Securities.*  Transfers of beneficial interests in Registered Debt Securities within the various systems that may be clearing and settling interests therein shall be made in accordance with the usual rules and operating procedures of the relevant system applicable to the Specified Currency in which such Registered Debt Securities are denominated or payable and the nature of the transfer.

(iii) Freddie Mac shall not bear responsibility for the performance by any system or the performance of the system's respective direct or indirect participants or accountholders of the respective obligations of such participants or account holders under the rules and procedures governing such system's operations.

<div align="center">

ARTICLE IV

**Payments, Exchange for Definitive Debt Securities**

</div>

**Section 4.01. Payments.**

(a) *Payments on Fed Book-Entry Debt Securities*

Payments of principal of and any interest on Fed Book-Entry Debt Securities shall be made in U.S. dollars (except as otherwise provided in the applicable Supplemental Agreement) on the applicable payment dates to Holders thereof as of the end of the Business Day preceding each such payment date. Payments on Fed Book-Entry Debt Securities shall be made by credit of the payment amount to the Holders' accounts at the relevant Federal Reserve Bank. All payments to or upon the order of a Holder shall be valid and effective to discharge the liability of Freddie Mac and the Fiscal Agent in respect of the related Fed Book-Entry Debt Securities.

(b) *Payments on Registered Debt Securities*

(i) Payments in respect of Registered Debt Securities shall be made in immediately available funds to DTC, Euroclear, Clearstream, Luxembourg or any other applicable clearing system, or their respective nominees, as the case may be, as the Holders thereof. Except as provided in Section 2.03(c) and Article VII hereof, such payments shall be made in the Specified Payment Currency. All payments to or upon the order of the Holder of a Registered Debt Security shall be valid and effective to discharge the liability of Freddie Mac in respect of such Registered Debt Security. Ownership positions within each system shall be determined in accordance with the normal conventions observed by such system. Freddie Mac, the Global Agent and the Registrar shall not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Registered Debt Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(ii) Interest on a Registered Debt Security shall be paid on the applicable Interest Payment Date. Such interest payment shall be made to the Holder of such Registered Debt Security as of the close of business on the related Record Date. The first payment of interest on any Registered Debt Security originally issued between a Record Date and the related Interest Payment Date shall be made on the Interest Payment Date following the next Record Date to the Holder on such next Record Date. The principal of each Registered Debt Security, together with accrued and unpaid interest thereon, shall be paid to the Holder thereof against presentation and surrender of such Registered Debt Security.

<div align="center">27</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) All payments on Registered Debt Securities are subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or other similar restrictions, payments in respect of the related Registered Debt Securities shall be made at the office of any paying agent in the United States.

**Section 4.02. Exchange for Definitive Debt Securities.**

In the event that Freddie Mac issues definitive Debt Securities in exchange for Registered Debt Securities issued in global form, such definitive Debt Securities shall have terms identical to the Registered Debt Securities for which they were exchanged except as described below.

(a) *Issuance of Definitive Debt Securities*

Unless otherwise provided in the applicable Supplemental Agreement, beneficial interests in Registered Debt Securities issued in global form shall be subject to exchange for definitive Debt Securities only if such exchange is permitted by applicable law and (i) in the case of a DTC Registered Debt Security, DTC notifies Freddie Mac that it is no longer willing or able to discharge properly its responsibilities as depositary with respect to such DTC Registered Debt Security, or ceases to be a "clearing agency" registered under the Securities Exchange Act of 1934 (if so required), or is at any time no longer eligible to act as such, and in each case Freddie Mac is unable to locate a successor within 90 calendar days of receiving notice of such ineligibility on the part of DTC; (ii) in the case of any Other Registered Debt Security, if all of the systems through which it is cleared or settled are closed for business for a continuous period of 14 calendar days (other than by reason of holidays, statutory or otherwise) or are permanently closed for business or have announced an intention permanently to cease business and in any such situations Freddie Mac is unable to locate a single successor within 90 calendar days of such closure; (iii) a Holder has instituted a judicial proceeding in a court to enforce its rights under such Registered Debt Security and such Holder has been advised by counsel that in connection with such proceeding it is necessary for such Holder to obtain possession of definitive Debt Securities; (iv) Freddie Mac (at its discretion), upon the request of a Holder and at such Holder's expense, elects to issue definitive Debt Securities; or (v) Freddie Mac (at its discretion) elects to issue definitive Debt Securities. In such circumstances, Freddie Mac shall cause sufficient definitive Debt Securities to be executed and delivered as soon as practicable (and in any event within 45 calendar days of Freddie Mac's receiving notice of the occurrence of such circumstances) to the Global Agent or its agent for completion, authentication and delivery to the relevant registered holders of such definitive Debt Securities. A person having an interest in a DTC Registered Debt Security or Other Registered Debt Security issued in global form shall provide Freddie Mac or the Global Agent with a written order containing instructions and such other information as Freddie Mac or the Global Agent may require to complete, execute and deliver such definitive Debt Securities in authorized denominations.

(b) *Title*

The person in whose name a definitive Debt Security is registered in the Register shall be the **"Holder"** of such definitive Debt Security. Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of definitive Debt Securities for the purpose of making payments and for all other purposes, whether or not such definitive Debt Securities shall be overdue and notwithstanding any notice to the contrary.

(c) *Payments*

Interest on a definitive Debt Security shall be paid on the applicable Interest Payment Date. Such interest payments shall be made by check mailed to the Holder thereof at the close of business on the Record Date preceding such Interest Payment Date at such Holder's address appearing in the Register. The principal of each definitive Debt Security, together with accrued and unpaid interest thereon, shall be

28

TREASURY-1441

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

due on the Principal Payment Date (subject to the right of the Holder thereof on the related Record Date to receive interest due on an Interest Payment Date that is on or prior to such Principal Payment Date) and shall be paid against presentation and surrender of such definitive Debt Security at the offices of the Global Agent or other paying agent. Payments on the Principal Payment Date shall be made by check provided at the appropriate office of the Global Agent or other paying agent or mailed by the Global Agent to the Holder of such definitive Debt Security. U.S. dollar checks shall be drawn on a bank in the United States. Checks in a Specified Payment Currency other than U.S. dollars shall be drawn on a bank office located outside the United States.

Notwithstanding the provisions described in the preceding paragraph relating to payments by check, the Holder of an aggregate principal amount of at least $10,000,000 of an issue of Debt Securities of which definitive Debt Securities form a part (or, in the case of a definitive Debt Security denominated in a Specified Currency other than U.S. dollars, the Specified Currency equivalent of at least $10,000,000) may elect to receive payments thereon by wire transfer of immediately available funds in the Specified Payment Currency to an account in such Specified Payment Currency with a bank designated by such Holder that is acceptable to Freddie Mac; provided, that such bank has appropriate facilities therefor and accepts such transfer and such transfer is permitted by any applicable law or regulation and will not subject Freddie Mac to any liability, requirement or unacceptable charge. In order for such Holder to receive such payments, the relevant paying agent (including the Global Agent) must receive at its office from such Holder (i) in the case of payments on an Interest Payment Date, a written request therefor not later than the close of business on the related Record Date; or (ii) in the case of payments on the Principal Payment Date, a written request therefor not later than the close of business on the date 15 days prior to such Principal Payment Date and the related definitive Debt Security not later than two Business Days prior to such Principal Payment Date. Such written request must be delivered to the relevant paying agent (including the Global Agent) by mail, by hand delivery or by tested or authenticated telex. Any such request shall remain in effect until the relevant paying agent receives written notice to the contrary.

All payments on definitive Debt Securities shall be subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or similar restrictions, payments in respect of the related definitive Debt Securities may be made at the office of any paying agent in the United States.

(d) *Partial Redemption*

Definitive Debt Securities subject to redemption in part by Freddie Mac shall be selected by the Global Agent by lot or in such other manner as the Global Agent deems fair and appropriate, subject to the requirement that the principal amount of each outstanding definitive Debt Security after such redemption is in an authorized denomination.

(e) *Transfer and Exchange*

Definitive Debt Securities shall be presented for registration of transfer or exchange (with the form of transfer included thereon properly endorsed, or accompanied by a written instrument of transfer, with such evidence of due authorization and guaranty of signature as may be required by the Registrar, duly executed) at the office of the Registrar or any other transfer agent upon payment of any taxes and other governmental charges and other amounts, but without payment of any service charge to the Registrar or such transfer agent for such transfer or exchange. A transfer or exchange shall not be effective unless, and until, recorded in the Register.

A transfer or exchange of a definitive Debt Security shall be effected upon satisfying the Registrar with regard to the documents and identity of the person making the request and subject to such reasonable regulations as Freddie Mac may from time to time agree with the Registrar. Such documents may include

29

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

forms prescribed by U.S. tax authorities to establish the applicability of, or the exemption from, withholding or other taxes regarding the transferee Holder. Definitive Debt Securities may be transferred or exchanged in whole or in part only in the authorized denominations of the DTC Registered Debt Securities or Other Registered Debt Securities issued in global form for which they were exchanged. In the case of a transfer of a definitive Debt Security in part, a new definitive Debt Security in respect of the balance not transferred shall be issued to the transferor. In addition, replacement of mutilated, destroyed, stolen or lost definitive Debt Securities also is subject to the conditions discussed above with respect to transfers and exchanges generally. Each new definitive Debt Security to be issued upon transfer of such a definitive Debt Security, as well as the definitive Debt Security issued in respect of the balance not transferred, shall be mailed to such address as may be specified in the form or instrument of transfer at the risk of the Holder entitled thereto in accordance with the customary procedures of the Registrar.

## ARTICLE V

### Secured Debt Securities

If so provided in the applicable Supplemental Agreement, the indebtedness represented by certain Debt Securities shall be secured obligations of Freddie Mac. In such event, the description of the security interest and the terms of the grant of the security interest shall be set forth in the applicable Supplemental Agreement.

## ARTICLE VI

### Currency Conversions

**Section 6.01. Currency Conversions for DTC Registered Debt Securities.**

(a) In the case of DTC Registered Debt Securities whose Specified Payment Currency is other than U.S. dollars, the Currency Exchange Bank specified in the applicable Supplemental Agreement, for Holders of such DTC Registered Debt Securities, shall convert any amounts paid by Freddie Mac in such Specified Payment Currency into U.S. dollars, unless such Holders elect to receive payments in such Specified Payment Currency as hereinafter described. Freddie Mac shall have no responsibility for the conversion of the Specified Payment Currency for such DTC Registered Debt Securities into U.S. dollars.

(b) The U.S. dollar amount to be received by a Holder of a DTC Registered Debt Security in respect of which payments are to be converted from the Specified Payment Currency into U.S. dollars shall be determined by the Currency Exchange Bank in the morning of the day that would be considered the date for "spot" settlement of the Specified Payment Currency on the applicable payment date in accordance with market convention (generally two New York business days prior to such payment date) at the market rate determined by the Currency Exchange Bank to accomplish the conversion on such payment date of the aggregate amount of the Specified Payment Currency payable in respect of DTC Registered Debt Securities scheduled to receive payments converted into U.S. dollars. All currency exchange costs shall be borne by the Holders of such DTC Registered Debt Securities (and, accordingly, by the related Beneficial Owners) by deductions from such payments. In the event all or any portion of a Specified Payment Currency is not convertible into U.S. dollars, Holders of such DTC Registered Debt Securities shall receive payment in the Specified Payment Currency.

(c) A Holder of a DTC Registered Debt Security to be paid in a Specified Payment Currency other than U.S. dollars shall have the option to receive payments of the principal of and any interest on such DTC Registered Debt Security in the Specified Payment Currency by notifying DTC no later than the third New York business day after the related Record Date, in the case of payments on an Interest

30

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Payment Date, or the date 12 days prior to the Principal Payment Date, in the case of payments on the Principal Payment Date.

<div align="center">

**ARTICLE VII**

**Events of Default and Remedies**

</div>

**Section 7.01. Events of Default.**

(a) An "**Event of Default**" with respect to a specific issue of Debt Securities shall consist of (i) any failure by Freddie Mac to pay to Holders of such Debt Securities any required payment that continues unremedied for 30 days; (ii) any failure by Freddie Mac to perform in any material respect any other covenant or agreement in this Agreement, which failure continues unremedied for 60 days after the giving of notice of such failure to Freddie Mac by the Holders of not less than 25% of the outstanding principal amount (or notional principal amount) of such Debt Securities; (iii) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of Freddie Mac in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appoint a receiver, liquidator, assignee, custodian, or sequestrator (or other similar official) of Freddie Mac or for all or substantially all of its property, or order the winding up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (iv) Freddie Mac shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, or sequestrator (or other similar official) of Freddie Mac or any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due.

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over Freddie Mac, whether or not Freddie Mac consents to such appointment, will not constitute an Event of Default. Any payment made in U.S. dollars or in euros as provided under Section 2.03(c)(ii) shall not constitute an Event of Default.

(b) Any event associated with EMU (an "**EMU Event**") shall not give rise to an Event of Default. An EMU Event may include, without limitation, each (and any combination) of (i) the fixing of exchange rates between the currency of a member state of the European Union and euros or between the currencies of member states of the European Union; (ii) the introduction of euros as lawful currency in a member state of the European Union; or (iii) the disappearance or replacement of a relevant rate option or other price source for the national currency of any member state of the European Union, or the failure of the agreed sponsor (or a successor sponsor) to publish or display a relevant rate, index, price, page or screen.

**Section 7.02. Rights Upon Event of Default.**

(a) As long as an Event of Default under this Agreement remains unremedied, Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities to which such Event of Default relates may, by written notice to Freddie Mac, declare such Debt Securities due and payable and accelerate the maturity of such Debt Securities. Upon such acceleration, the principal amount of such Debt Securities and the interest accrued thereon shall be due and payable.

(b) No Holder has any right under this Agreement to institute any action or proceeding at law or in equity or in bankruptcy or otherwise, or for the appointment of a receiver or trustee, or for any other remedy, unless (i) such Holder previously has given to Freddie Mac written notice of an Event of Default

<div align="center">31</div>

<div align="center">TREASURY-1444</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                                                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

and of the continuance thereof; (ii) the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities to which such Event of Default relates have given written notice to Freddie Mac of such Event of Default; and (iii) such Event of Default continues uncured for a period of 60 days following such notice. No Holder of an issue of Debt Securities has any right in any manner whatsoever by virtue of or by availing itself of any provision of this Agreement to affect, disturb or prejudice the rights of any other such Holder, or to obtain or seek to obtain preference or priority over any other such Holder or to enforce any right under this Agreement, except in the manner provided in this Agreement and for the ratable and common benefit of all such Holders.

(c) Prior to or after the institution of any action or proceeding relating to an issue of Debt Securities, the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of such Debt Securities may waive an Event of Default, whether or not it has resulted in a declaration of an acceleration of the maturity of such Debt Securities, and may rescind and annul any previously declared acceleration.

(d) Whenever in this Agreement it is provided that the Holders of a specified percentage in outstanding principal amount (or notional principal amount) of an issue of Debt Securities may take any action (including the making of any demand or request, or the giving of any authorization, notice, consent or waiver), the fact that at the time of taking any such action the Holders of such specified percentage have joined therein may be evidenced by a writing, or any number of writings of similar tenor, executed by Holders in person, or by an agent or proxy appointed in writing.

## ARTICLE VIII

### Miscellaneous Provisions

#### Section 8.01. Limitations on Liability of Freddie Mac and Others.

Neither Freddie Mac nor any of its directors, officers, employees or agents shall be under any liability to the Holders or Beneficial Owners for any action taken, or not taken, by them in good faith under this Agreement or for errors in judgment. This provision will not protect Freddie Mac or any other related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence or by reason of reckless disregard of obligations and duties under this Agreement. Freddie Mac and such related persons shall have no liability of whatever nature for special, indirect or consequential damages, lost profits or business, or any other liability or claim (other than for direct damages), even if reasonably foreseeable or Freddie Mac has been advised of the possibility of such loss, damage, liability or claim.

In performing its responsibilities under this Agreement, Freddie Mac may employ agents or independent contractors. Except upon an Event of Default (as defined herein), Freddie Mac shall not be subject to the control of Holders in any manner in the discharge of its responsibilities pursuant to this Agreement.

Freddie Mac shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under this Agreement and which in its opinion may involve it in any expense or liability. However, Freddie Mac may in its discretion undertake any such legal action which it may deem necessary or desirable in the interests of the Holders. In such event, the legal expenses and costs of such action shall be expenses and costs of Freddie Mac.

32

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 8.02. Binding Effect of this Agreement.**

(a) By receiving and accepting a Debt Security, each Holder, financial intermediary and Beneficial Owner of such Debt Security unconditionally agrees, without any signature or further manifestation of assent, to be bound by the terms and conditions of this Agreement, as supplemented, modified or amended pursuant to its terms.

(b) This Agreement shall be binding upon and inure to the benefit of any successor to Freddie Mac.

**Section 8.03. Replacement.**

Any Registered Debt Security in definitive form that becomes mutilated, destroyed, stolen or lost shall be replaced by Freddie Mac at the expense of the Holder upon delivery to the Global Agent of evidence of the destruction, theft or loss thereof, and an indemnity satisfactory to Freddie Mac and the Global Agent. Upon the issuance of any substituted Registered Debt Security, Freddie Mac or the Global Agent may require the payment by the Holder of a sum sufficient to cover any taxes and expenses connected therewith.

**Section 8.04. Conditions to Payment, Transfer or Exchange.**

Freddie Mac, its agent or any other person potentially required to withhold with respect to payments on a Debt Security shall have the right to require a Holder of a Debt Security, as a condition to payment of principal of or interest on such Debt Security, or as a condition to transfer or exchange of such Debt Security, to present at such place as Freddie Mac, its agent or such other person shall designate a certificate in such form as Freddie Mac, its agent or such other person may from time to time prescribe, to enable Freddie Mac, its agent or such other person to determine its duties and liabilities with respect to (i) any taxes, assessments or governmental charges which Freddie Mac, any Federal Reserve Bank, the Global Agent or such other person, as the case may be, may be required to deduct or withhold from payments in respect of such Debt Security under any present or future law of the United States or jurisdiction therein or any regulation or interpretation of any taxing authority thereof; and (ii) any reporting or other requirements under such laws, regulations or interpretations. Freddie Mac, its agent or such other person shall be entitled to determine its duties and liabilities with respect to such deduction, withholding, reporting or other requirements on the basis of information contained in such certificate or, if no certificate shall be presented, on the basis of any presumption created by any such law, regulation or interpretation, and shall be entitled to act in accordance with such determination.

**Section 8.05. Amendment.**

(a) Freddie Mac may modify, amend or supplement this Agreement and the terms of an issue of Debt Securities, without the consent of the Holders or Beneficial Owners, (i) to cure any ambiguity, or to correct or supplement any defective provision or to make any other provision with respect to matters or questions arising under this Agreement or the terms of any Debt Security that are not inconsistent with any other provision of this Agreement or the Debt Security; (ii) to add to the covenants of Freddie Mac for the benefit of the Holders or surrender any right or power conferred upon Freddie Mac; (iii) to evidence the succession of another entity to Freddie Mac and its assumption of the covenants of Freddie Mac; (iv) to conform the terms of an issue of Debt Securities or cure any ambiguity or discrepancy resulting from any changes in the Book-Entry Rules or any regulation or document that are applicable to book-entry securities of Freddie Mac; (v) to increase the amount of an issue of Debt Securities as contemplated under Section 2.07; or (vi) in any other manner that Freddie Mac may determine and that will not adversely affect in any material respect the interests of Holders or Beneficial Owners at the time of such modification, amendment or supplement.

33

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) In addition, either (i) with the written consent of the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities affected thereby, excluding any such Debt Securities owned by Freddie Mac; or (ii) by the adoption of a resolution at a meeting of Holders at which a quorum is present, by the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities represented at such meeting, excluding any such Debt Securities owned by Freddie Mac, Freddie Mac may from time to time and at any time modify, amend or supplement the terms of an issue of Debt Securities for the purpose of adding any provisions to or changing in any manner or eliminating any provisions of such Debt Securities or modifying in any manner the rights of the Holders; provided, however, that no such modification, amendment or supplement may, without the written consent or affirmative vote of each Holder of a Debt Security; (A) change the Maturity Date or any Interest Payment Date of such Debt Security; (B) materially modify the redemption or repayment provisions, if any, relating to the redemption or repayment price of, or any redemption or repayment date or period for, such Debt Security; (C) reduce the principal amount of, delay the principal payment of, or materially modify the rate of interest or the calculation of the rate of interest on, such Debt Security; (D) in the case of Registered Debt Securities only, change the Specified Payment Currency of such Registered Debt Security; or (E) reduce the percentage of Holders whose consent or affirmative vote is necessary to modify, amend or supplement the terms of the relevant issue of Debt Securities. A quorum at any meeting of Holders called to adopt a resolution shall be Holders entitled to vote a majority of the then aggregate outstanding principal amount or notional principal amount of an issue of such Debt Securities called to such meeting and, at any reconvened meeting adjourned for lack of a quorum, 25% of the then aggregate outstanding principal amount or notional principal amount of such issue of Debt Securities, in both cases excluding any such Debt Securities owned by Freddie Mac. It shall not be necessary for the Holders to approve the particular form of any proposed amendment, but it shall be sufficient if such consent or resolution approves the substance of such change. If any modification, amendment or supplement of the terms of an issue of Debt Securities that have been separated into Interest and Principal Components requires the consent of Holders, only the Holders of the Principal Components will be entitled to give or withhold that consent. Holders of Interest Components will have no right to give or withhold such consent.

(c) The "principal amount," for purposes of the preceding paragraph, for a Debt Security that is a Zero Coupon Debt Security or for a Debt Security issued at an "issue price" of 80% or less of its principal amount will be equal to (i) the issue price of such Debt Security; plus (ii) the original issue discount that has accrued from the Issue Date of such Debt Security to the OID Determination Date; minus (iii) any amount considered as part of the "stated redemption price at maturity" of such Debt Security that has been paid from the Issue Date of such Debt Security to the OID Determination Date.

The "principal amount," for purposes of the second preceding paragraph, of a Debt Security whose Specified Principal Currency is other than U.S. dollars will be the U.S. dollar equivalent, determined on the Issue Date, of the principal amount (or, in the case of the Debt Securities referred to in the preceding paragraph, the amount determined in accordance with the provisions described in such preceding paragraph) of such Debt Security. The "principal amount" of a Debt Security with principal determined by reference to an Index will be described in the applicable Supplemental Agreement.

(d) Freddie Mac may establish a record date for the determination of Holders entitled to vote at any meeting of Holders of Debt Securities, to grant any consent in respect of Debt Securities and to notice with respect to any such meeting or consent.

(e) Any instrument given by or on behalf of any Holder of a Debt Security in connection with any consent to any such modification, amendment or supplement shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Debt Security or any Debt Security issued,

<center>34</center>

<center>TREASURY-1447</center>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

directly or indirectly, in exchange or substitution therefor, irrespective of whether or not notation in regard thereto is made thereon. Any modification, amendment or supplement of this Agreement or of the terms of Debt Securities shall be conclusive and binding on all Holders of Debt Securities affected thereby, whether or not they have given such consent or were present at any meeting (unless by the terms of this Agreement a written consent or an affirmative vote of such Holders is required), and whether or not notation of such modification, amendment or supplement is made upon the Debt Securities.

**Section 8.06. Securities Acquired by Freddie Mac.**

Freddie Mac may, from time to time, repurchase or otherwise acquire (either for cash or in exchange for newly-issued Debt Securities) all or a portion of any issue of Debt Securities. Any Debt Securities owned by Freddie Mac shall have an equal and proportionate benefit under the provisions of this Agreement, without preference, priority or distinction as among such Debt Securities, except that in determining whether the Holders of the required percentage of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities have given any required demand, authorization, notice, consent or waiver under this Agreement, any Debt Securities owned by Freddie Mac or any person directly or indirectly controlling or controlled by or under direct or indirect common control with Freddie Mac shall be disregarded and deemed not to be outstanding for the purpose of such determination.

**Section 8.07. Notice.**

(a) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon any Holder may be given or served in writing by deposit thereof, postage prepaid, in the mail, addressed to such Holder as such Holder's name and address may appear in the records of Freddie Mac, a Federal Reserve Bank or the Registrar, as the case may be, or, in the case of a Holder of a Fed Book-Entry Debt Security, by transmission to such Holder through the communication system linking the Federal Reserve Banks, or, in the case of a Holder of a Debt Security maintained on DTC, by transmission to such Holder through the DTC communication system. Such notice, demand or other communication to or upon any Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission.

(b) If and so long as an issue of Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, notices with respect to such issue of Debt Securities also shall be published in a newspaper of general circulation in Luxembourg (which is expected to be *Luxemburger Wort*) or on the website of the Luxembourg Stock Exchange (http://www.bourse.lu) or, if such publication is not practical, elsewhere in Europe, if the rules of that exchange so require. Notice by publication shall be deemed to have been given on the date of publication or, if published more than once, on the date of first publication.

(c) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon Freddie Mac shall be given in writing addressed (until another address is published by Freddie Mac) as follows: Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, Virginia 22102 Attention: General Counsel and Secretary. Such notice, demand or other communication to or upon Freddie Mac shall be deemed to have been sufficiently given or made only upon actual receipt of the writing by Freddie Mac.

**Section 8.08. Governing Law.**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE HOLDERS AND FREDDIE MAC WITH RESPECT TO THE DEBT SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS

35

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED THEREBY, THE LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 8.09. Headings.**

The Article, Section and Subsection headings are for convenience only and shall not affect the construction of this Agreement.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

36

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Exhibit 10.2**



## CORPORATE POLICY

**Subject:** Severance - Officers

**Policy Number:** 3-254.1

**Control Point:** Director-Employee Relations

**Approval Authority:** SVP-Human Resources

**Signature:** Keith Green [Signature on original kept by Legal]

---

### Summary of this Policy

This policy sets forth the eligibility requirements and amount of *Severance Pay* available to *Eligible Officers*. Defined terms are italicized. Please see Appendix A for definitions. Further details can be found in Freddie Mac's Severance Plan <u>Summary Plan Description</u>.

### I. Under what circumstances is *Severance Pay* provided?

Freddie Mac provides *Severance Pay* to a *Severance Eligible Officer* pursuant to the terms of this Policy In addition, in the event an employee becomes a *Severance Eligible Officer* as a result of a *Reduction in Force*, Freddie Mac also provides *Notice Pay*, even if the *Severance Eligible Officer* does not sign an agreement and release of claims.

A *Severance Eligible Officer's* employment is terminated as of the *Separation Date*. Such former officer's eligibility to receive any benefit from or to continue participation in other plans maintained by the company is governed by the terms and provisions of those plans.

In addition, the provision of *Severance Pay* to a *Severance Eligible Officer* is subject to the approval of Freddie Mac's regulator.

### II. What procedures are followed to determine severance eligibility?

Business-area management will submit to their respective Human Resources Business Partner ("HRBP") for review any proposed termination of employment (including any proposed voluntary separation that could result in *Severance Pay*) or proposed offer of *Comparable Employment* prior to discussing the same with the impacted officer. The Director of Employee Relations in the Human Resources Division determines whether the employee is a *Severance Eligible Officer*, and interprets and applies this policy.

Employee Relations, after consulting with the HRBP, the Legal Division, and possibly business-area management, also determines whether a job position to be offered to an *Eligible Officer* is *Comparable Employment*. *Eligible Officers* will be evaluated for *Comparable Employment*, if at all, based on criteria including (but not limited to) their historical performance ratings and management's assessment of relative skills.

After Employee Relations determines that the employee is a *Severance Eligible Officer*, business-area management provides *Notice* to the *Severance Eligible Officer*. Business-area management will give *Notice* in advance of the

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

*Separation Date,* if at all, to the extent that advance notification is consistent with business circumstances or required by law.

Business-area management, after consulting with the HRBP, also establishes the *Separation Date* of a *Severance Eligible Officer.*

### III. What is required for a *Severance Eligible Officer* to receive *Severance Pay*?

As a condition of receiving *Severance Pay,* a *Severance Eligible Officer* must sign an agreement and release of claims. Freddie Mac has exclusive discretion to determine what terms will be included within the agreement and release of claims. Among other things, the agreement and release of claims may contain provisions related to the following:

- Full release of claims
- Non-participation in claims against Freddie Mac
- Notice of receipt of subpoenas
- Treatment of confidential information
- Non-competition
- Non-solicitation of Freddie Mac employees
- Notice of future employment
- Return of Freddie Mac property
- Non-disparagement
- Obligation to reasonably cooperate
- Damages in the event of breach
- Preclusion and/or restriction from future Freddie Mac employment

Business-area management may require an *Eligible Officer* to provide services to Freddie Mac up to and including the *Separation Date* as a condition of receiving *Severance Pay* .

If a *Severance Eligible Officer* does not receive two-weeks of advance *Notice* of his/her *Separation Date* from Freddie Mac, and does not execute an agreement and release of claims proffered by the company, then the officer will receive *Pay in Lieu of Notice* for the two-week period following the date of *Notice,* and will receive no *Severance Pay* .

### IV. How long is the *Severance Period* of a *Severance Eligible Officer*?

The *Severance Period* of a *Severance Eligible Officer* is as specified in the Restrictive Covenant and Confidentiality Agreement between the *Severance Eligible Officer* and Freddie Mac. If the *Severance Eligible Officer* is entitled to receive *Notice Pay,* then his/her *Severance Period* shall be the *Severance Period* specified in the Restrictive Covenant and Confidentiality Agreement , minus the number of days of *Notice Pay* he/she is entitled to receive. In no event will a *Severance Eligible Officer* receive less than four weeks of *Severance Pay* in addition to *Notice Pay.*

### V. How does a *Severance Eligible Officer* receive his/her *Severance Pay*?

A *Severance Eligible Officer* has the option of receiving his/her *Severance Pay* in periodic payments over the specified *Severance Period* coinciding with Freddie Mac's standard payroll procedures. Alternatively, the *Severance Eligible Officer* may receive his/her *Severance Pay* in a *Lump Sum.* If the *Severance Eligible Officer* elects periodic payments,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1451

 CORPORATE POLICY

he/she may be eligible to continue his/her participation in certain benefits plans at a reduced cost, in accordance with the terms of those plans.

If a former officer receiving *Severance Pay* dies before receiving his/her entire *Severance Pay*, then Freddie Mac will pay the balance to the former employee's estate or personal representative.

### VI. When does a *Severance Eligible Officer* have to elect *Lump Sum* or Periodic Payments?

A *Severance Eligible Officer* must elect whether to receive his/her *Severance Pay* in a *Lump Sum* or in periodic payments by the date he/she signs the required agreement and release of claims. Failure to make an election upon execution of the agreement and release of claims will result in the *Severance Eligible Officer* receiving his/her *Severance Pay* in a *Lump Sum*.

### VII. When does *Severance Pay* begin?

*Severance Pay* will be paid in accordance with the company's standard payroll practices, and will begin within 3J days after 1) the company's receipt of the *Severance Eligible Officer's* properly executed agreement and release of claims, 2) if applicable, expiration of the revocation period specified in the agreement and release of claims, and (3) (applicable only to *Specified Employees*) six months has elapsed since the *Separation Date*.

If the consideration period noted in the agreement and release of claims extends beyond the *Separation Date* and the company has not received the *Severance Eligible Officer's* properly executed agreement and release of claims as of the *Separation Date*, the company will place the *Severance Eligible Officer* on unpaid Leave of Absence until (1) receipt of the properly signed agreement and release of claims or (2) the end of the consideration period (whichever comes first).

Failure by a *Severance Eligible Officer* to submit a properly executed agreement and release of claims within the time period specified in such agreement will result in the proffered agreement and release of claims being withdrawn by the company.

### VIII. What happens to *Severance Pay* if the employee becomes re-employed by Freddie Mac or renders services to Freddie Mac as a vendor or contract worker during the Severance Period?

If a former officer receiving *Severance Pay* is re-employed by Freddie Mac before the end of the *Severance Period*, or renders services to Freddie Mac as a vendor or contract worker during the Severance Period, the former officer will forfeit any remaining unpaid *Severance Pay*. If the former officer received his/her *Severance Pay* as a *Lump Sum*, and becomes re-employed by Freddie Mac or renders services to Freddie Mac as a vendor or contract worker before the end of what would have been the *Severance Period*, Freddie Mac reserves the right to require that some or all of the *Severance Pay* be repaid as a condition of re-employment or rendering services to Freddie Mac as a contract worker or vendor.

### IX. Restriction on *Specified Employees*.

If a *Severance Eligible Officer* is a *Specified Employee*, then he/she will not begin receiving his/her *Severance Pay* until six (0) months following his/her *Separation Date*, consistent with Treas. Reg. 6 1.4J§A-3(g)(2), or any successor thereto. If the *Severance Eligible Officer* elected to receive his/her *Severance Pay* in periodic payments within the required election period, then he/she shall receive six months of *Severance Pay* in a *Lump Sum* upon the expiration of the six-

TREASURY-1452

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

month wait period, and then will receive the balance of his/her *Severance Pay* in periodic payments according to the company's standard payroll procedures.

**X. Where can officers find additional information about Freddie Mac's severance plan?**

Officers may find additional information about the company's severance plan in Freddie Mac's Severance Plan  Summary Plan Description .

**XI. Reservation of Rights**

Freddie Mac reserves the right to amend or terminate this Policy or any of its provisions at any time for any reason in its sole discretion without giving rise to legal liability. Nothing in this Policy is intended nor shall be interpreted to create a contract of employment or alter the at-will employment relationship that otherwise may exist between Freddie Mac and such employee, or otherwise limit the discretion of either Freddie Mac or such employee to terminate the employment relationship at any time for any reason.

**Effective Date:** April 11, 2J11

☐ **New**

☒ **Replaces** Policy 3-254.1 dated 9anuary 24, 2J11

☒ Reviewed by Legal or Determined that No Legal Review Necessary

Policy 3-254.1 dated April 11, 2J11                                                                                                              4

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

## Appendix A Definitions

**Comparable Employment**

Comparable Employment will be assessed on a case-by-case basis. Exact criteria the company will use include each of the following, all of which must be met for the position to be deemed comparable.

- The content of the job to which the employee may be assigned. To be comparable, the new position must require substantially the same skill set and technical knowledge.

- The commuting distance associated with the new position. To be comparable, the new position must not increase the commuting distance for the employee by more than 5J miles each way, or increase the commuting distance for the employee such that the total commuting distance exceeds §J miles each way.

- To be comparable, the employee's base salary must not decrease by more than 1J%.

**Eligible Officer**

An employee who is appointed by Freddie Mac as an officer of the company.

**Gross Misconduct**

The occurrence or existence of any of the following:

- Recurrent or flagrant insubordination related to core job duties and responsibilities;

- Stealing property belonging to Freddie Mac, another employee, or other theft in connection with employment;

- Committing fraud, including computer fraud;

- Willfully destroying property;

- Inflicting bodily harm on another employee, threatening another employee with a weapon, or conviction (including any plea of *nolo contendere*) of a crime;

- Committing harassment or retaliation;

- Engaging in discriminatory behavior or retaliation;

- Engaging in dishonesty, including failure to cooperate fully, promptly and truthfully in an investigation or failure to keep an investigation appropriately confidential;

- Recurring or habitual tardiness or absenteeism which has resulted in a written reprimand;

- Intentionally disclosing or intentionally misusing Confidential Information (as that term is defined in Freddie Mac policy, Code of Conduct, or applicable restrictive covenant and/or confidentiality agreement between the employee and Freddie Mac);

- Negligently disclosing or negligently misusing Confidential Information (as that term is defined in Freddie Mac policy, Code of Conduct, or applicable restrictive covenant and/or confidentiality agreement between the employee and Freddie Mac) resulting in a significant adverse impact on Freddie Mac or on the business of Freddie Mac; or

Policy 3-254.1 dated April 11, 2J11                                                                5

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

- A material breach of any provision of any written policy of Freddie Mac required by law or established to maintain compliance with applicable legal or regulatory requirements.

**Loss of Confidence**

Termination of employment based on a determination by senior executive management in its sole discretion that it no longer maintains a high level of confidence in an *Eligible Officer's* decisions, judgment and/or conduct, or any other performance-related reason.

**Lump Sum**

The payment to a *Severance Eligible Officer* of the entire amount of *Severance Pay* in the form of a single payment, minus lawful deductions (rather than periodic payments over the span of the *Severance Period*).

**Notice**

Oral or written communication from business-area management or an HRBP to a *Severance Eligible Officer* about the termination of the officer's employment, *Separation Date*, terms of the proffered agreement and release of claims, and expectations concerning his/her continued provision of services to Freddie Mac during the period between the Notice and the *Separation Date*.

**Notice Pay**

The dollar amount of pay based on the number of days of continued pay required by applicable federal and/or state law upon triggering events, such as group layoffs that occur within a legally defined period of time. Laws that would trigger *Notice Pay* include, but are not limited to, the federal Worker Adjustment and Retraining Notification ("WARN") Act.

**Pay in Lieu of Notice**

If a *Severance Eligible Officer* does not receive two-weeks of advance *Notice* of his/her *Separation Date* from Freddie Mac, and does not execute an agreement and release of claims proffered by the company, then the employee will receive pay for the two-week period following the date of *Notice*, and will receive no *Severance Pay*.

**Position Elimination**

Loss of job due to: (a) company reorganization or job abolishment; or (b) a skills gap, i.e., the business or leadership attributes required for successful performance of an employee's position have changed recently and so significantly that the employee is no longer qualified to perform the job.

**Reduction in Force**

An elimination of a certain minimum number of jobs that occurs within a defined time-period and triggers a requirement to pay *Notice Pay*. Laws that would require *Notice Pay* include (but are not limited to) the federal WARN Act.

**Senior Executive Officer**

An employee who is appointed by Freddie Mac to be employed in the position of Senior Vice President or above of the company.

**Separation Date**

The last date on which a *Severance Eligible Officer* is considered an active employee with Freddie Mac; also known as the Termination Date.

Policy 3-254.1 dated April 11, 2J11                                                              0

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

 CORPORATE POLICY

**Severance Eligible Officer**

An *Eligible Officer* whose position is eliminated due to a *Position Elimination*, *Reduction in Force*, or *Loss of Confidence*.

An *Eligible Officer* is not a *Severance Eligible Officer* if such employee:

- at the time of *Notice* is classified as a temporary employee pursuant to Policy 3-221, Worker Classifications (as may be amended, replaced or redesignated from time to time);

- is terminated for engaging in *Gross Misconduct*;

- is regularly scheduled to work fewer than twenty (2J) hours per week as of his/her receipt of *Notice*;

- is on "Leave of Absence" status as defined in Policy 3-230, Other Excused Absences (as may be amended, replaced or redesignated from time to time) for thirty (3J) or more calendar days as of his/her receipt of *Notice* unless otherwise provided by law;

- fails to provide services to Freddie Mac in accordance with the *Notice*;

- resigned employment as a result of a new assignment or reporting relationship;

- received a written offer of employment from a Successor, which is an entity that acquires (through consolidation, reorganization, transfer, sublease, assignment or otherwise) all or substantially all of the business or assets of any business unit of Freddie Mac, or an entity that contracts with Freddie Mac to perform activities of the business unit in which the employee is assigned contemporaneous with the commencement of the contractual relationship; or

- received a written offer of *Comparable Employment* from Freddie Mac.

In addition, an *Eligible Officer* who serves as a Senior Executive Officer is not a *Severance Eligible Officer* unless the company's regulator approves payment of severance pay, and the amount thereof, to such Senior Executive Officer at the time of termination.

**Severance Pay**

The dollar amount that will be paid to a *Severance Eligible Officer* pursuant to the terms of this Policy. *Severance Pay* is equal to the *Severance Eligible Officer's* base salary (not including items such as overtime, bonus, retention payments, and/or commissions) as of the *Separation Date* that would normally be paid over the length of time designated as the *Severance Period*, minus lawful deductions. Alternatively, *Severance Pay* may be paid in the form of a *Lump Sum*.

**Severance Period**

The length of the *Severance Period* is as specified in the Restrictive Covenant and Confidentiality Agreement between the *Severance Eligible Officer* and the company. The *Severance Period* begins the day following the *Separation Date*.

**Specified Employee**

A *Severance Eligible Officer* who is identified by Freddie Mac in its sole discretion as of the *Separation Date* as a "specified employee" as defined in Treas. Reg. 6 1.4J §A-1(i), or any successor thereto, and whose *Severance Pay* is determined by Freddie Mac to be subject to section 4J §A of the Internal Revenue Code.

Policy 3-254.1 dated April 11, 2J11                                                                                                  7

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 12.1**

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Three Months Ended March 31, | | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2010 | 2009 | 2008 | 2007 | 2006 |
| | | | (dollars in millions) | | | | |
| Net Income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ 602 | $ (6,792) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) | $ 2,340 |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships | — | — | — | 4,155 | 453 | 469 | 407 |
| Total interest expense | 20,968 | 24,242 | 92,131 | 22,150 | 33,332 | 38,482 | 37,270 |
| Interest factor in rental expenses | 1 | 2 | 5 | 7 | 8 | 7 | 6 |
| Earnings (loss), as adjusted | $ 21,571 | $ 17,452 | $ 77,254 | $ 3,928 | $ (10,771) | $ 32,969 | $ 40,023 |
| Fixed charges: | | | | | | | |
| Total interest expense | $20,968 | $24,242 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 | $37,270 |
| Interest factor in rental expenses | 1 | 2 | 5 | 7 | 8 | 7 | 6 |
| Capitalized interest | — | — | — | — | — | — | — |
| Total fixed charges | $20,969 | $24,244 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 | $37,276 |
| Senior preferred stock and preferred stock dividends[1] | 1,605 | 1,292 | 5,749 | 4,105 | 675 | 398 | 270 |
| Total fixed charges including preferred stock dividends | $22,574 | $25,536 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 | $37,546 |
| Ratio of earnings to fixed charges[2] | 1.03 | — | — | — | — | — | 1.07 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] | — | — | — | — | — | — | 1.07 |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $6.8 billion, $14.9 billion, $18.2 billion, $44.1 billion and $5.5 billion for the three months ended March 31, 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.0 billion, $8.1 billion, $20.6 billion, $22.3 billion, $44.8 billion and $5.9 billion for the three months ended March 31, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

## CERTIFICATION

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 4, 2011

/s/ Charles E. Haldeman, Jr.
_____
Charles E. Haldeman, Jr.
Chief Executive Officer

**TREASURY-1458**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 4, 2011

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 4, 2011

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-1460

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTI Tl FRTAO**

**NP CUP F OR RA S8 P .U1 . UE1 RTAO S350,**

**F U EOF 1 RED BY UE1 RTAO 906 A I  RHE UFCBFOEU-AXLEY F 1 R AI  2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of operations of the Company.

Date: May 4, 2011

/s/  Ross J. Kari
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 04, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

June 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in my letter to you dated March 31, 2011, I communicated to you our waiver, for the second quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the third quarter of CY 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-Q

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2011**

**OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File No.: 0-50231**

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑      No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑      No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☑      Non-accelerated filer ☐      Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐      No ☑

As of June 30, 2011, there were 1,158,237,382 shares of common stock of the registrant outstanding.

**TABLE OF CONTENTS**

**Part I—Financial Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Item 1.  Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93

Condensed Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93

Condensed Consolidated Statements of Operations and Comprehensive Loss . . . . . . . . . . . . .  94

Condensed Consolidated Statements of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . .  95

Note 1—Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . .  96

Note 2—Consolidations and Transfers of Financial Assets . . . . . . . . . . . . . . . . . . . . . 103

Note 3—Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Note 4—Allowance for Loan Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Note 5—Investments in Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Note 6—Financial Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Note 7—Acquired Property, Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Note 8—Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . 128

Note 9—Derivative Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Note 10—Segment Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Note 11—Regulatory Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Note 12—Concentration of Credit Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Note 13—Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Note 14—Commitments and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations . . .   1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Legislative and Regulatory Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

Consolidated Balance Sheet Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

Supplemental Non-GAAP Information—Fair Value Balance Sheets . . . . . . . . . . . . . . . . . . . .  51

Liquidity and Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Impact of Future Adoption of New Accounting Pronouncements . . . . . . . . . . . . . . . . . . . .  89

Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

Item 3.  Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . 162

Item 4.  Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

**PART II—Other Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Item 1.  Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Item 1A.  Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds . . . . . . . . . . . . . . . . 170

Item 3.  Defaults Upon Senior Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Item 4.  [Removed and reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Item 5.  Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Item 6.  Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

i

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Draw and Dividend Payments.................................................. | 4 |
| 2 | Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Half of 2011 ............................................................................. | 6 |
| 3 | Single-Family Serious Delinquency Rates by Year of Acquisition ........................ | 8 |
| 4 | Credit Profile of Single-Family Conventional Loans Acquired ........................... | 9 |
| 5 | Credit Statistics, Single-Family Guaranty Book of Business............................ | 12 |
| 6 | Level 3 Recurring Financial Assets at Fair Value .................................... | 21 |
| 7 | Summary of Condensed Consolidated Results of Operations ........................... | 22 |
| 8 | Analysis of Net Interest Income and Yield .......................................... | 23 |
| 9 | Rate/Volume Analysis of Changes in Net Interest Income .............................. | 25 |
| 10 | Fair Value Gains (Losses), Net .................................................... | 27 |
| 11 | Total Loss Reserves .............................................................. | 29 |
| 12 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)....... | 30 |
| 13 | Nonperforming Single-Family and Multifamily Loans .................................. | 33 |
| 14 | Credit Loss Performance Metrics .................................................. | 35 |
| 15 | Single-Family Credit Loss Sensitivity .............................................. | 36 |
| 16 | Single-Family Business Results ................................................... | 38 |
| 17 | Multifamily Business Results ..................................................... | 40 |
| 18 | Capital Markets Group Results .................................................... | 42 |
| 19 | Capital Markets Group's Mortgage Portfolio Activity ................................. | 44 |
| 20 | Capital Markets Group's Mortgage Portfolio Composition .............................. | 45 |
| 21 | Summary of Condensed Consolidated Balance Sheets ................................. | 46 |
| 22 | Summary of Mortgage-Related Securities at Fair Value ................................ | 47 |
| 23 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities......... | 48 |
| 24 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) ...................................................... | 49 |
| 25 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net ............. | 51 |
| 26 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) .......................................... | 52 |
| 27 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets ....................... | 54 |
| 28 | Activity in Debt of Fannie Mae ................................................... | 57 |
| 29 | Outstanding Short-Term Borrowings and Long-Term Debt.............................. | 59 |
| 30 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year ............. | 60 |
| 31 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year ........ | 61 |
| 32 | Cash and Other Investments Portfolio .............................................. | 61 |
| 33 | Fannie Mae Credit Ratings........................................................ | 62 |
| 34 | Composition of Mortgage Credit Book of Business ................................... | 65 |

TREASURY-1465

| Table | Description | Page |
|-------|-------------|------|
| 35 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business | 68 |
| 36 | Delinquency Status of Single-Family Conventional Loans | 72 |
| 37 | Single-Family Serious Delinquency Rates | 73 |
| 38 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis | 74 |
| 39 | Statistics on Single-Family Loan Workouts | 75 |
| 40 | Single-Family Loan Modification Profile | 76 |
| 41 | Single-Family Foreclosed Properties | 77 |
| 42 | Single-Family Acquired Property Concentration Analysis | 78 |
| 43 | Multifamily Serious Delinquency Rates | 80 |
| 44 | Multifamily Concentration Analysis | 80 |
| 45 | Multifamily Foreclosed Properties | 81 |
| 46 | Mortgage Insurance Coverage | 83 |
| 47 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 88 |
| 48 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 89 |

iii

## PART I—FINANCIAL INFORMATION

**Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K") in "Business—Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2010 Form 10-K.*

*This report contains forward-looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report. Our actual results may differ materially from those reflected in these forward-looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2010 Form 10-K.*

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans or lend money directly to consumers in the primary mortgage market. Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities that we guarantee, which we refer to as Fannie Mae MBS. We also purchase mortgage loans and mortgage-related securities for our mortgage portfolio. We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets.

We are a corporation chartered by the U.S. Congress. Our conservator is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

TREASURY-1467

**EXECUTIVE SUMMARY**

In the first half of 2011, we continued our work to provide liquidity and support to the mortgage market, grow the strong new book of business we have been acquiring since January 1, 2009, and minimize our losses from delinquent loans.

**Providing Liquidity and Support to the Mortgage Market**

*Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of funds for purchases of homes and multifamily rental housing, as well as for refinancing existing mortgages. We provided nearly $2 trillion in liquidity to the mortgage market from January 1, 2009 through June 30, 2011 through our purchases and guarantees of mortgage loans, which enabled over 7 million borrowers to purchase homes or refinance loans and financed nearly 857,000 units of multifamily housing.

- We are a consistent market presence as we continue to provide liquidity to the mortgage market even when other sources of capital have exited the market, as evidenced by the events of the last few years. We estimate that we, Freddie Mac and Ginnie Mae have collectively guaranteed more than 80% of the single-family mortgages originated in the United States since January 1, 2009.

- We have strengthened our lending standards to support sustainable homeownership. Our support enables borrowers to have access to a variety of conforming mortgage products, including long-term, fixed-rate mortgages, such as the prepayable 30-year fixed-rate mortgage that protects homeowners from interest rate swings.

- We helped more than 874,000 homeowners struggling to pay their mortgages work out their loans from January 1, 2009 through June 30, 2011, which helped to support neighborhoods, home prices and the housing market.

- We support affordability in the multifamily rental market. The vast majority of the multifamily units we financed during 2009 and 2010 were affordable to families earning at or below the median income in their area.

- Borrowers typically pay a lower interest rate on loans purchased or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae. Mortgage originators are generally able to offer borrowers lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in our 2010 Form 10-K in "Business—Business Segments—Capital Markets."

*2011 Acquisitions and Market Share*

In the first half of 2011, we purchased or guaranteed approximately $306 billion in loans, measured by unpaid principal balance, which includes approximately $36 billion in delinquent loans we purchased from our single-family MBS trusts. Excluding delinquent loans purchased from our MBS trusts, our purchases and guarantees during the first half of 2011 enabled our lender customers to finance approximately 1,238,000 single-family conventional loans and loans secured by multifamily properties with approximately 179,000 units. We use the term "acquire" in this report to refer to both our purchases and our guarantees of mortgage loans.

We remained the largest single issuer of mortgage-related securities in the secondary market during the second quarter of 2011, with an estimated market share of new single-family mortgage-related securities issuances of 43.2%. In comparison, our estimated market share of new single-family mortgage-related securities issuances was 48.6% in the first quarter of 2011 and 39.1% in the second quarter of 2010.

2

TREASURY-1468

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately one-fifth of the outstanding debt on multifamily properties as of March 31, 2011 (the latest date for which information was available).

### Summary of Our Financial Performance for the Second Quarter and First Half of 2011

Our financial results for the second quarter and the first half of 2011 reflect the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment, underemployment and the prolonged decline in home prices since their peak in the third quarter of 2006. Credit-related expenses continue to be the primary driver of our net losses for each period presented. Our credit-related expenses vary from period to period primarily based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender counterparties.

#### *Comprehensive Loss*

Our net loss and total comprehensive loss for the second quarter of 2011 were both $2.9 billion. In comparison, we recognized a total comprehensive loss of $6.3 billion in the first quarter of 2011, consisting of a net loss of $6.5 billion and other comprehensive income of $181 million. We recognized total comprehensive income of $447 million in the second quarter of 2010, consisting of a net loss of $1.2 billion and other comprehensive income of $1.7 billion (primarily driven by a reduction in our unrealized losses due to significantly improved fair value of available-for-sale securities).

Our total comprehensive loss for the first half of 2011 was $9.2 billion, consisting of a net loss of $9.4 billion and other comprehensive income of $183 million. In comparison, we recognized a total comprehensive loss of $9.7 billion in the first half of 2010, consisting of a net loss of $12.8 billion and other comprehensive income of $3.0 billion (primarily driven by a reduction in our unrealized losses due to significantly improved fair value of available-for-sale securities).

*Second Quarter 2011 vs. First Quarter 2011.*   The $3.6 billion decrease in our net loss was primarily due to a $5.0 billion decrease in our credit-related expenses driven by the deterioration in home prices in the first quarter of 2011, which was not present in the second quarter of 2011, and higher amounts received from lenders related to our outstanding repurchase requests. This was partially offset by net fair value losses of $1.6 billion in the second quarter of 2011 driven by losses on our risk management derivatives due to a decline in swap interest rates during the period, compared with net fair value gains of $289 million in the first quarter of 2011.

*Second Quarter 2011 vs. Second Quarter 2010.*   The $1.7 billion increase in our net loss was primarily due to a $1.2 billion increase in credit-related expenses and $1.6 billion in net fair value losses in the second quarter of 2011 driven by losses on our risk management derivatives due to a decline in swap interest rates during the period, compared with $303 million in net fair value gains in the second quarter of 2010. These were partially offset by a $765 million increase in net interest income. The increase in credit-related expenses was primarily driven by an increase in the number of modified loans that are subject to individual impairment, a decrease in home prices on a national basis and the longer period of time that loans continue to remain delinquent, partially offset by higher amounts received from lenders related to our outstanding repurchase requests.

*First Half of 2011 vs. First Half of 2010.*   The $3.4 billion decrease in our net loss was primarily due to a $2.9 billion increase in our net interest income driven by lower funding costs, partially offset by a $366 million increase in our credit-related expenses.

See "Consolidated Results of Operations" for more information on our results.

#### *Net Worth*

Our net worth deficit of $5.1 billion as of June 30, 2011 reflects the recognition of our total comprehensive loss of $2.9 billion and our payment to Treasury of $2.3 billion in senior preferred stock dividends during the

3

second quarter of 2011. The Acting Director of FHFA will submit a request to Treasury on our behalf for $5.1 billion to eliminate our net worth deficit.

In the second quarter of 2011, we received $8.5 billion in funds from Treasury to eliminate our net worth deficit as of March 31, 2011. Upon receipt of the additional funds requested to eliminate our net worth deficit as of June 30, 2011, the aggregate liquidation preference on the senior preferred stock will be $104.8 billion, which will require an annualized dividend payment of $10.5 billion. This amount exceeds our reported annual net income for each year since our inception. Through June 30, 2011, we have paid an aggregate of $14.7 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our Treasury draw and senior preferred stock dividend payments to Treasury since entering conservatorship on September 6, 2008.

**Table 1:   Treasury Draw and Dividend Payments**

| | **2008** | **2009** | **2010** | **2011 to date (first half)** | **Cumulative Total** |
|---|---|---|---|---|---|
| | | | | (Dollars in billions) | |
| Senior preferred stock dividends[1] ........................ | $  — | $ 2.5 | $ 7.7 | $ 4.5 | $ 14.7 |
| Treasury draw[2][3] ................................ | 15.2 | 60.0 | 15.0 | 13.6 | 103.8 |
| Cumulative percentage of senior preferred stock dividends to Treasury draw ............................... | 0.2% | 3.3% | 11.3% | 14.2% | 14.2% |

[1]   Represents total quarterly cash dividends paid to Treasury, during the periods presented, based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

[2]   Represents the total draws required and requested from Treasury based on our quarterly net worth deficits for the periods presented. Draw requests were funded in the quarter following each quarterly net worth deficit.

[3]   Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

### Total Loss Reserves

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $74.8 billion as of June 30, 2011 from $72.1 billion as of March 31, 2011 and $66.3 billion as of December 31, 2010. Our total loss reserve coverage to total nonperforming loans was 36.91% as of June 30, 2011, compared with 34.66% as of March 31, 2011 and 30.85% as of December 31, 2010. The continued stress on a broad segment of borrowers from persistent high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past few years. Further, the shift in our nonperforming loan balance from loans in our collective reserve to loans that are individually impaired has caused our coverage ratio to increase.

### Our Strong New Book of Business and Expected Losses on Our Legacy Book of Business

We refer to the single-family loans we have acquired since the beginning of 2009 as our "new single-family book of business" and the single-family loans we acquired prior to 2009 as our "legacy book of business." In this section, we discuss our expectations regarding the profitability of our new single-family book of business, as well as the performance and credit profile of these loans to date. We also discuss our expectations regarding losses on the loans in our legacy book of business.

### Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations

We present a number of estimates and expectations in this executive summary regarding the profitability of single-family loans we have acquired, our single-family credit losses and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of these amounts, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of home price changes, changes in

4

interest rates, unemployment, other macroeconomic variables, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our real-estate owned ("REO") inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, and many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

### Building a Strong New Single-Family Book of Business

#### *Expected Profitability of Our Single-Family Acquisitions*

Our new single-family book of business has a strong overall credit profile and is performing well. While it is too early to know how loans in our new single-family book of business will ultimately perform, given their strong credit risk profile, low levels of payment delinquencies shortly after acquisition, and low serious delinquency rates, we expect that, over their lifetime, these loans will be profitable, by which we mean they will generate more fee income than credit losses and administrative costs. Table 2 provides information about whether we expect loans we acquired in 1991 through the first half of 2011 to be profitable, and the percentage of our single-family guaranty book of business represented by these loans as of June 30, 2011. The expectations reflected in Table 2 are based on the credit risk profile of the loans we have acquired, which we discuss in more detail in "Table 4: Credit Profile of Single-Family Conventional Loans Acquired" and in "Table 35: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business." These expectations are also based on numerous other assumptions, including our expectations regarding home price declines set forth in "Outlook" and other macroeconomic factors. As shown in Table 2, we expect loans we have acquired in 2009, 2010 and the first half of 2011 to be profitable over their lifetime. If future macroeconomic conditions turn out to be significantly more adverse than our expectations, these loans could become unprofitable. For example, we believe that these loans would become unprofitable if home prices declined more than 10% from their June 2011 levels over the next five years based on our home price index.

5

**Table 2:   Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Half of 2011**



As Table 2 shows, the years in which we acquired single-family loans that we expect will be unprofitable are 2004 through 2008. The vast majority of our realized credit losses since the beginning of 2009 were attributable to loans we acquired in 2005 through 2008. Although the 2004 vintage has been profitable to date, we currently believe that this vintage will not be profitable over its lifetime. While we previously believed the 2004 vintage would perform close to break-even, our expectation for long-term home price growth has worsened, which has changed our expectation of future borrower behavior regarding these loans. We expect the 2005 through 2008 vintages to be significantly more unprofitable than the 2004 vintage. The loans we acquired in 2004 were originated under more conservative acquisition policies than loans we acquired from 2005 through 2008; however, because our 2004 acquisitions were made during a time when home prices were rapidly increasing, their performance is expected to suffer from the significant decline in home prices since 2006. The ultimate long-term performance and profitability of the 2004 vintage will depend on many factors, including changes in home prices, other economic conditions and borrower behavior.

Loans we have acquired since the beginning of 2009 comprised 47% of our single-family guaranty book of business as of June 30, 2011. Our 2005 to 2008 acquisitions are becoming a smaller percentage of our single-

6

family guaranty book of business, having decreased from 39% of our single-family guaranty book of business as of December 31, 2010 to 34% as of June 30, 2011. Our 2004 acquisitions constituted 5% of our single-family guaranty book of business as of June 30, 2011.

*Serious Delinquency Rates by Year of Acquisition*

In our experience, an early predictor of the ultimate performance of loans is the rate at which the loans become seriously delinquent (three or more months past due or in the foreclosure process) within a short period of time after acquisition. Loans we acquired in 2009 and 2010 have experienced historically low levels of delinquencies shortly after their acquisition. Table 3 shows, for single-family loans we acquired in each year from 2001 to 2010, the percentage that were seriously delinquent as of the end of the second quarter following the acquisition year. Loans we acquired in 2011 are not included in this table because they were originated so recently that many of them could not yet have become seriously delinquent. As Table 3 shows, the percentage of our 2009 acquisitions that were seriously delinquent as of the end of the second quarter following their acquisition year was approximately eight times lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. For loans originated in 2010, this percentage was approximately ten times lower than the average comparable rate for loans acquired in 2005 through 2008. Table 3 also shows serious delinquency rates for each year's acquisitions as of June 30, 2011. Except for the 2008 and more recent acquisition years, whose serious delinquency rates are likely lower than they will be after the loans have aged, Table 3 shows that the current serious delinquency rate generally tracks the trend of the serious delinquency rate as of the end of the second quarter following the year of acquisition. Below the table we provide information about the economic environment in which the loans were acquired, specifically home price appreciation and unemployment levels.

TREASURY-1473

**Table 3:   Single-Family Serious Delinquency Rates by Year of Acquisition**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011  YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Home Price Appreciation[1] | 6.3% | 7.5% | 7.6% | 10.7% | 11.5% | 2.7% | (4.1)% | (10.4)% | (3.7)% | (4.0)% | (0.3)% |
| Unemployment rate[2] | 4.7% | 5.8% | 6.0% | 5.5% | 5.1% | 4.6% | 4.6% | 5.8% | 9.3% | 9.6% | 9.0% |

---

\* For 2010, the serious delinquency rate as of June 30, 2011 is the same as the serious delinquency rate as of the end of the second quarter following the acquisition year.

[1] Based on Fannie Mae's Home Price Index (HPI), which measures average price changes based on repeat sales on the same properties. For 2011, the data show an initial estimate based on purchase transactions in Fannie-Freddie acquisition and public deed data available through the end of June 2011, supplemented by preliminary data available for July 2011. Previously reported data has been revised to reflect additional available historical data. Including subsequently available data may lead to materially different results.

[2] Based on the average national unemployment rates for each month reported in the labor force statistics current population survey (CPS), Bureau of Labor Statistics.

## Credit Profile of Our Single-Family Acquisitions

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized, on average and as discussed below, by higher loan-to-value ("LTV") ratios and lower FICO credit scores than loans we have acquired since

TREASURY-1474

January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only payment features. As a result of the sharp declines in home prices, 33% of the loans that we acquired from 2005 through 2008 had mark-to-market LTV ratios that were greater than 100% as of June 30, 2011, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. This percentage is higher when second lien loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. We are taking a number of actions to reduce our credit losses. We discuss these actions and our strategy in "Our Strategies and Actions to Reduce Credit Losses on Loans in our Legacy Book of Business" and "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in this report and in "Business— Executive Summary—Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" in our 2010 Form 10-K.

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market dynamics, we reduced our acquisitions of loans with higher-risk attributes. Compared with the loans we acquired in 2005 through 2008, the loans we have acquired since January 1, 2009 have had better overall credit risk profiles at the time we acquired them and their early performance has been strong. Our experience has been that loans with characteristics such as lower original LTV ratios (that is, more equity held by the borrowers in the underlying properties), higher FICO credit scores and more stable payments will perform better than loans with risk characteristics such as higher original LTV ratios, lower FICO credit scores, Alt-A underwriting and payments that may adjust over the term of the loan.

Table 4 shows the credit risk profile of the single-family loans we have acquired since January 1, 2009 compared to the loans we acquired from 2005 through 2008.

**Table 4:   Credit Profile of Single-Family Conventional Loans Acquired[1]**

| | Acquisitions from 2009 through the first half of 2011 | Acquisitions from 2005 through 2008 |
|---|---|---|
| Weighted average loan-to-value ratio at origination . . . . . . . . . . . . | 68% | 73% |
| Weighted average FICO credit score at origination . . . . . . . . . . . . . | 761 | 722 |
| Fully amortizing, fixed-rate loans . . . . . . . . . . . . . . . . . . . . . . . . . | 95% | 86% |
| Alt-A loans[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 14% |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 12% |
| Original loan-to-value ratio > 90% . . . . . . . . . . . . . . . . . . . . . . . . | 6% | 11% |
| FICO credit score < 620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | * | 5% |

*   Represents less than 0.5% of the total acquisitions.

[1]   Loans that meet more than one category are included in each applicable category.

[2]   Newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinance of existing loans.

Improvements in the credit risk profile of our acquisitions since the beginning of 2009 over acquisitions in prior years reflect changes that we made to our pricing and eligibility standards, as well as changes that mortgage insurers made to their eligibility standards. We discuss these changes in our 2010 Form 10-K in "Business—Executive Summary—Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses—Credit Profile of Our Single-Family Acquisitions." In addition, the Federal Housing Administration's ("FHA") role as the lower-cost option for some consumers for loans with higher LTV ratios reduced our acquisitions of these types of loans after 2008. The credit risk profile of our acquisitions since the beginning of 2009 has been influenced further by its significant percentage of refinanced loans. Refinanced loans generally have better credit profiles than purchase money loans. As we discuss in "Outlook" below, we expect fewer refinancings in 2011 and 2012 than in 2010.

9

In 2010 and 2011 our acquisitions of refinanced loans included a significant number of loans under our Refi Plus™ initiative. Refi Plus loans constituted approximately 27% of our total single-family acquisitions in the first half of 2011 and approximately 23% of total single-family acquisitions in all of 2010. Under Refi Plus we acquire refinancings of performing Fannie Mae loans that have current LTV ratios up to 125% and, in some cases, lower FICO credit scores than we generally require. Refi Plus loans reduce the borrowers' monthly payments or are otherwise more sustainable than the borrowers' old loans. Our acquisitions under Refi Plus include our acquisitions under the Home Affordable Refinance Program ("HARP"), which was established by the Administration to help borrowers who may be unable to refinance the mortgage loan on their primary residence due to a decline in home values. The LTV ratios at origination for our 2010 and 2011 acquisitions are higher than for our 2009 acquisitions, primarily due to our acquisition of Refi Plus loans. The percentage of loans with LTV ratios at origination greater than 90% has increased from 4% for 2009 acquisitions to 7% for 2010 acquisitions and 10% for acquisitions in the first half of 2011.

Despite the increases in LTV ratios at origination associated with Refi Plus, the overall credit profile of our 2010 and 2011 acquisitions remains significantly stronger than the credit profile of our 2005 through 2008 acquisitions. Whether the loans we acquire in the future exhibit an overall credit profile similar to our acquisitions since the beginning of 2009 will depend on a number of factors, including our future eligibility standards and those of mortgage insurers, the percentage of loan originations representing refinancings, our future objectives, government policy, and market and competitive conditions.

### Expected Losses on Our Legacy Book of Business

The single-family credit losses we realized from January 1, 2009 through June 30, 2011, combined with the amounts we have reserved for single-family credit losses as of June 30, 2011, as described below, total approximately $130 billion. The vast majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we estimate that we have reserved for the substantial majority of the remaining losses on these loans. Even though we believe a substantial majority of the credit losses we have yet to realize on these loans has already been reflected in our results of operations as credit-related expenses, we expect that our credit-related expenses will be higher in 2011 than in 2010 as weakness in the housing and mortgage markets continues. We also expect that future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years. In addition, given the large current and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory is reduced to pre-2008 levels.

We show how we calculate our realized credit losses in "Table 14: Credit Loss Performance Metrics." Our reserves for credit losses described in this discussion consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, please see "Table 11: Total Loss Reserves."

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." The majority of the fair value losses were recorded prior to our adoption in 2010 of new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. Prior to our adoption of the new standards, upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses to the extent that the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our condensed consolidated balance sheets and have effectively been recognized in our condensed consolidated statements of operations and

comprehensive loss through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future.

**Our Strategies and Actions to Reduce Credit Losses on Loans in Our Legacy Book of Business**

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Reducing defaults;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Pursuing foreclosure alternatives to reduce the severity of the losses we incur;

- Managing our REO inventory to reduce costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders and providers of credit enhancement.

Pursuing home retention solutions, such as loan modifications, is a key aspect of our strategy to reduce defaults. We have completed over 603,000 loan modifications since January 1, 2009. Although the high number of modifications we have completed in recent periods has contributed to our credit-related expenses, we believe that, if these modifications are successful in reducing foreclosures and keeping borrowers in their homes, they may benefit the housing market and may help reduce our long-term credit losses from what they otherwise would have been if we had foreclosed on the loans. The ultimate long-term success of our current modification efforts is uncertain and will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. See "Risk Management—Credit Risk Management— Single-Family Mortgage Credit Risk Management—Problem Loan Management—Loan Workout Metrics" for a description of our modification and other home retention efforts. For a description of the impact of modifications on our credit-related expenses, see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

Improving servicing standards is another key aspect of our strategy to reduce defaults. As described in "New Servicing Standards for Delinquent Loans," in June 2011, we issued new servicing standards for delinquent loans pursuant to FHFA's Servicing Alignment Initiative.

For more information on the strategies and actions we are taking to minimize our credit losses, see "Business—Executive Summary—Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" in our 2010 Form 10-K and "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in our 2010 Form 10-K and in this report.

**New Servicing Standards for Delinquent Loans**

Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. In June, we issued new standards for mortgage servicers regarding the management of delinquent loans, default prevention and foreclosure time frames under FHFA's Servicing Alignment Initiative. The Servicing Alignment Initiative is a FHFA-directed effort to establish consistent policies and processes for the servicing of delinquent loans owned or guaranteed by Fannie Mae and Freddie Mac.

These new servicing standards require servicers to take a more consistent approach to borrower communications, loan modifications and other workouts, and, when necessary, foreclosures. The new servicing standards are designed to:

- achieve earlier, more frequent and more effective contact with borrowers, including creating a uniform standard for communicating with borrowers;

- set clear timelines for the foreclosure process; and

11

- improve servicer performance by providing monetary incentives to servicers that exceed specified performance benchmarks for loan workouts and by imposing fees on servicers that fail to meet specified loan workout benchmarks or that fail to meet foreclosure timelines.

Servicers are required to implement the new servicing standards related to the management of delinquent loans and default prevention by no later than October 1, 2011. The new standards relating to foreclosure time frames were effective as of January 1, 2011.

We believe these new servicing standards will increase servicers' effectiveness in reaching borrowers, bring greater consistency and clarity to servicer communications with borrowers, and increase the likelihood that servicers will contact borrowers early in the default management process, which is one of the most important factors in reaching a resolution that avoids foreclosure. In addition, in cases where a foreclosure cannot be avoided, we believe these standards will bring greater consistency, fairness and efficiency to the foreclosure process.

## Credit Performance

Table 5 presents information for each of the last six quarters about the credit performance of mortgage loans in our single-family guaranty book of business and actions taken by our servicers with borrowers to resolve existing or potential delinquent loan payments. We refer to these actions as "workouts." The workout information in Table 5 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

**Table 5:   Credit Statistics, Single-Family Guaranty Book of Business**[1]

| | 2011 | | | 2010 | | | | |
| | Q2 YTD | Q2 | Q1 | Full Year | Q4 | Q3 | Q2 | Q1 |
| | | | | (Dollars in millions) | | | | |
| As of the end of each period: | | | | | | | | |
| Serious delinquency rate[2] . . . . | 4.08% | 4.08% | 4.27% | 4.48% | 4.48% | 4.56% | 4.99% | 5.47% |
| Nonperforming loans[3] . . . . . . | $ 200,793 | $200,793 | $206,098 | $ 212,858 | $212,858 | $212,305 | $217,216 | $222,892 |
| Foreclosed property inventory: | | | | | | | | |
| Number of properties . . . . . . | 135,719 | 135,719 | 153,224 | 162,489 | 162,489 | 166,787 | 129,310 | 109,989 |
| Carrying value . . . . . . . . . . | $ 12,480 | $ 12,480 | $ 14,086 | $ 14,955 | $ 14,955 | $ 16,394 | $ 13,043 | $ 11,423 |
| Combined loss reserves[4] . . . . . | $ 68,887 | $ 68,887 | $ 66,240 | $ 60,163 | $ 60,163 | $ 58,451 | $ 59,087 | $ 58,900 |
| Total loss reserves[5] . . . . . . . . | $ 73,116 | $ 73,116 | $ 70,466 | $ 64,469 | $ 64,469 | $ 63,105 | $ 64,877 | $ 66,479 |
| During the period: | | | | | | | | |
| Foreclosed property (number of properties): | | | | | | | | |
| Acquisitions[6] . . . . . . . . . . | 107,246 | 53,697 | 53,549 | 262,078 | 45,962 | 85,349 | 68,838 | 61,929 |
| Dispositions . . . . . . . . . . . . | (134,016) | (71,202) | (62,814) | (185,744) | (50,260) | (47,872) | (49,517) | (38,095) |
| Credit-related expenses[7] . . . . . | $ 17,039 | $ 5,933 | $ 11,106 | $ 26,420 | $ 4,064 | $ 5,559 | $ 4,871 | $ 11,926 |
| Credit losses[8] . . . . . . . . . . . | $ 9,414 | $ 3,810 | $ 5,604 | $ 23,133 | $ 3,111 | $ 8,037 | $ 6,923 | $ 5,062 |
| Loan workout activity (number of loans): | | | | | | | | |
| Home retention loan workouts[9] . . . . . . . . . . . . | 119,978 | 59,019 | 60,959 | 440,276 | 89,691 | 113,367 | 132,192 | 105,026 |
| Preforeclosure sales and deeds-in-lieu of foreclosure . . . | 38,296 | 21,176 | 17,120 | 75,391 | 15,632 | 20,918 | 21,515 | 17,326 |
| Total loan workouts . . . . . . . . | 158,274 | 80,195 | 78,079 | 515,667 | 105,323 | 134,285 | 153,707 | 122,352 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[10] . . . . . . . . . . . . | 25.37% | 25.71% | 25.01% | 37.30% | 30.47% | 37.86% | 41.18% | 31.59% |

---

[1]   Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we

provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

(2) Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

(3) Represents the total amount of nonperforming loans including troubled debt restructurings and HomeSaver Advance (HSA) first-lien loans. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. HSA first-lien loans are unsecured personal loans in the amount of past due payments used to bring mortgage loans current. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

(4) Consists of the allowance for loan losses for loans recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

(5) Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

(6) Includes acquisitions through deeds-in-lieu of foreclosure.

(7) Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense (income).

(8) Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

(9) Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 39: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

(10) Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

Our single-family serious delinquency rate has decreased each month since February 2010. This decrease is primarily the result of home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans have become an increasingly larger portion of our single-family guaranty book of business, resulting in fewer loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since February 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Foreclosure Delays and Changes in the Foreclosure Environment," continuing issues in the servicer foreclosure process, changes in state foreclosure laws, and new court rules and proceedings have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, and the extent to which borrowers with modified loans continue to make timely payments.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Foreclosure Delays and Changes in the Foreclosure Environment**

As described in our 2010 Form 10-K, in the fall of 2010, a number of our single-family mortgage servicers temporarily halted foreclosures in some or all states after discovering deficiencies in their processes and the

13

processes of their service providers relating to the execution of affidavits in connection with the foreclosure process. Although servicers have indicated that they have generally lifted their broad, formal foreclosure pauses, the processing of foreclosures continues to be delayed or halted in many states.

A number of states have changed their foreclosure laws or implemented new court rules or proceedings in response to the servicer foreclosure process deficiencies. These actions have halted or significantly delayed the processing of foreclosures in those states. In addition, servicers continue to process foreclosures at a slow pace, as they work to update their procedures to respond to the recent changes in foreclosure laws and court rules, as well as to remediate the deficiencies in their foreclosure procedures.

The changing foreclosure environment has significantly lengthened the time it takes to foreclose on a mortgage loan in many states, which has increased our credit-related expenses and negatively affected our single-family serious delinquency rates. In addition, our single-family foreclosure rate has decreased from 1.45% for the first half of 2010 to 1.20% for the first half of 2011. We believe these changes in the foreclosure environment will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses. Moreover, we believe these changes in the foreclosure environment will delay the recovery of the housing market because it will take longer to clear the housing market's supply of distressed homes. Distressed homes typically sell at a discount to non-distressed homes and therefore negatively affect overall home prices. See "Risk Factors" for further information about the potential impact of the foreclosure process deficiencies and resulting changes in the foreclosure environment on our business, results of operations, financial condition and net worth.

### Housing and Mortgage Market and Economic Conditions

During the second quarter of 2011, the United States economic recovery continued at a very slow pace. The inflation-adjusted U.S. gross domestic product, or GDP, rose by 1.3% on an annualized basis during the quarter, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 260,000 jobs in the second quarter as a result of employment growth in the private sector. According to the U.S. Bureau of Labor Statistics, as of June 2011, over the past 12 months there has been an increase of 1.2 million non-farm jobs. The unemployment rate was 9.2% in June 2011, compared with 8.8% in March 2011, based on data from the U.S. Bureau of Labor Statistics. Employment will likely need to post sustained improvement for an extended period to have a positive impact on housing.

Existing home sales remained weak during the second quarter of 2011, averaging below first quarter levels. Sales of foreclosed homes and short sales ("distressed sales") continued to represent an outsized portion of the market. Distressed sales accounted for 30% of existing home sales in June 2011, down from 32% in June 2010, according to the National Association of REALTORS®. While new home sales during the second quarter of 2011 were higher than first quarter levels, these sales remained at historically low levels.

The overall mortgage market serious delinquency rate has trended down since peaking in the fourth quarter of 2009 but has remained historically high at 8.1% as of March 31, 2011, according to the Mortgage Bankers Association National Delinquency Survey. While the supply of new single-family homes as measured by the inventory/sales ratio declined to its long-term average level in June, the inventory/sales ratio for existing single-family homes remained above average. Properties that are vacant and held off the market, combined with the portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices.

We estimate that home prices on a national basis increased by 1.8% in the second quarter of 2011 and have declined by 21.6% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available. The decline in home prices has left many homeowners with "negative equity" in their mortgages, which means their principal mortgage balance exceeds the current market value of their home. According to CoreLogic, approximately 11 million, or 23%, of all residential properties with mortgages were in a negative equity position in the first quarter of 2011. This increases the risk that borrowers might walk away from their mortgage obligations, causing the loans to become delinquent and proceed to foreclosure.

14

During the second quarter of 2011, national multifamily market fundamentals, which include factors such as effective rents and vacancy rates, continued to improve. Based on preliminary third-party data, we estimate that the national multifamily vacancy rate fell to 6.8% in the second quarter of 2011, after having fallen to 7.0% in the first quarter of 2011. In addition, we estimate that asking rents increased in the second quarter of 2011 by nearly 50 basis points on a national basis. As indicated by data from Axiometrics, Inc., multifamily concession rates, the rental discount rate as a percentage of asking rents, declined during the second quarter to -3.5% as of June 2011. The increase in rental demand was also reflected in an estimated increase of 33,000 units in the net number of occupied rental units during the second quarter of 2011, according to preliminary data from REIS, Inc. Although national multifamily market fundamentals continued to improve, certain local markets and properties continued to underperform compared to the rest of the country due to localized underlying economic conditions.

**Credit Ratings**

While there have been no changes in our credit ratings from December 31, 2010 to August 2, 2011, on July 15, 2011, Standard & Poor's ("S&P") placed our long-term and short-term debt ratings on "CreditWatch with negative implications," following a similar action on the debt ratings of the U.S. government. A rating being placed on CreditWatch indicates a substantial likelihood of a ratings action by S&P within the next 90 days or is a response to events presenting significant uncertainty to the creditworthiness of an issuer. On July 14, 2011, S&P stated that it may lower the long-term debt rating of the U.S. in the next three months if it concludes that Congress and the Administration have not achieved a credible solution to the rising U.S. government debt burden and are not likely to achieve one in the foreseeable future.

On July 13, 2011, Moody's placed both the U.S. government's rating and our long-term debt ratings on review for possible downgrade. Following the raising of the U.S. government's statutory debt limit on August 2, 2011, Moody's confirmed both the U.S. government's rating and our long-term debt ratings, and removed the designation that these ratings were under review for possible downgrade. However, Moody's revised the rating outlook for both the U.S. government's rating and our long-term debt ratings to negative. In assigning the negative outlook to the U.S. government's rating, Moody's indicated there would be a risk of a downgrade if (1) there is a weakening in fiscal discipline in the coming year; (2) further fiscal consolidation measures are not adopted in 2013; (3) the economic outlook deteriorates significantly; or (4) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected.

S&P, Moody's and Fitch Ratings ("Fitch") have all indicated that they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities if they were to lower their ratings on the U.S. government.

We currently cannot predict whether one or more of these ratings agencies will downgrade our debt ratings in the future, or how long our ratings will remain subject to review for a possible downgrade by S&P.

Our credit ratings and ratings outlook are included in "Liquidity and Capital Management—Liquidity Management—Credit Ratings." See "Risk Factors" for a discussion of the risks to our business relating to a decrease in our credit ratings.

**Outlook**

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in the second half of 2011. The high level of delinquent mortgage loans ultimately will result in the foreclosure of troubled loans, which is likely to add to the excess housing inventory. Home sales are unlikely to rise before the unemployment rate improves further.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011. Despite signs of multifamily sector improvement at the national level, we expect multifamily charge-offs in 2011 to remain commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

TREASURY-1481

We expect the pace of our loan acquisitions for the remainder of 2011 and for 2012 will be lower than in 2010, primarily because we expect fewer refinancings as a result of the high number of mortgages that have already refinanced to low rates in recent years and the anticipated rise in mortgage rates. Our loan acquisitions also could be negatively affected by the decrease in our maximum loan limit in the fourth quarter of 2011. In addition, if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted. As our acquisitions decline, our future revenues will be negatively impacted.

We estimate that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately 30%, from an estimated $1.5 trillion to an estimated $1.1 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.0 trillion to approximately $573 billion. Refinancings comprised approximately 77% of our single-family business volume in the first half of 2011, compared with 78% for all of 2010.

*Home Price Declines.*   We expect that home prices on a national basis will decline further, with greater declines in some geographic areas than others, before stabilizing in 2012. We currently expect that the peak-to-trough home price decline on a national basis will range between 23% and 29%. These estimates are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. These estimates also contain significant inherent uncertainty in the current market environment regarding a variety of critical assumptions we make when formulating these estimates, including the effect of actions the federal government has taken and may take with respect to housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our 23% to 29% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas the S&P/Case-Shiller index weights expectations based on property value, causing home price declines on higher priced homes to have a greater effect on the overall result; and (2) our estimates attempt to exclude sales of foreclosed homes because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values, whereas the S&P/Case-Shiller index includes foreclosed homes sales. We calculate the S&P/Case-Shiller comparison numbers by modifying our internal home price estimates to account for weighting based on property value and the impact of foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not modified to account for this data pool difference. We are working on enhancing our home price estimates to identify and exclude a greater portion of foreclosed home sales. When we begin reporting these enhanced home price estimates, we expect that some period to period comparisons of home prices may differ from those determined using our current estimates.

*Credit-Related Expenses and Credit Losses.*   We expect that our credit-related expenses and our credit losses will be higher in 2011 than in 2010. We describe our credit loss outlook above under "Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Expected Losses on Our Legacy Book of Business."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting

16

dividend payments are substantial. We do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. We expect to request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock. We expect that, over time, our dividend obligation to Treasury will constitute an increasing portion of our future draws under the senior preferred stock purchase agreement. As a result of these factors, there is significant uncertainty about our long-term financial sustainability.

In addition, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. On February 11, 2011 Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. See "Legislative and Regulatory Developments" in this report and "Legislation and GSE Reform" in our 2010 Form 10-K for discussions of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" in this report for a discussion of the risks to our business relating to the uncertain future of our company.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

### GSE Reform

As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), on February 11, 2011, Treasury and HUD released their report to Congress on ending the conservatorships of Fannie Mae and Freddie Mac and reforming the housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10-Q.

17

We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. For example, legislation has been introduced in both the House of Representatives and the Senate that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership. As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and ongoing liabilities.

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered in the House of Representatives that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury have over the enterprises. The Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd-Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre-approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non-mission critical assets;

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act.

We expect additional legislation relating to the GSEs to be introduced and considered by Congress in 2011. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

In sum, there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. See "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company. Also see "Risk Factors" in our 2010 Form 10-K for a discussion of how the uncertain future of

18

our company may adversely affect our ability to retain and recruit well-qualified employees, including senior management.

**Final Rule Regarding Conservatorship and Receivership Operations**

On June 20, 2011, FHFA issued a final rule establishing a framework for conservatorship and receivership operations for the GSEs. The final rule, which became effective on July 20, 2011, establishes procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. For example, the final rule clarifies that:

- the powers of the conservator or receiver include continuing the missions of a regulated entity and ensuring that the operations of the regulated entity foster liquid, efficient, competitive and resilient national housing finance markets;

- the conservator or receiver may disaffirm or repudiate any contract or lease to which the regulated entity is a party for up to 18 months following the appointment of a conservator or receiver;

- a regulated entity is prohibited from making capital distributions while in conservatorship unless authorized by the Director of FHFA; and

- claims by current or former shareholders (including securities litigation claims) would receive the lowest priority in a receivership, behind: (1) administrative expenses of the receiver (or an immediately preceding conservator), (2) other general or senior liabilities of the regulated entity, and (3) obligations subordinated to those of general creditors.

The final rule also provides that FHFA, as conservator, will not pay securities litigation claims against a regulated entity during conservatorship, unless the Director of FHFA determines it is in the interest of the conservatorship.

The final rule is part of FHFA's implementation of the powers provided by the 2008 Reform Act, and does not seek to anticipate or predict future conservatorships or receiverships.

**Proposed Rule Regarding Prudential Management and Operations Standards**

On June 20, 2011, FHFA issued a proposed rule establishing prudential standards relating to the management and operations of Fannie Mae, Freddie Mac and the Federal Home Loan Banks in the following ten areas: (1) internal controls and information systems; (2) independence and adequacy of internal audit systems; (3) management of market risk exposure; (4) management of market risk—measurement systems, risk limits, stress testing, and monitoring and reporting; (5) adequacy and maintenance of liquidity and reserves; (6) management of asset and investment portfolio growth; (7) investments and acquisitions of assets; (8) overall risk management processes; (9) management of credit and counterparty risk; and (10) maintenance of adequate records. These standards are proposed to be adopted as guidelines, which the Director of FHFA may modify, revoke or add to at any time by order. The proposed rule provides that FHFA may take specified remedial actions if a regulated entity fails to meet one or more of the standards, such as requiring the entity to submit a corrective plan or increasing its capital requirements. FHFA issued the proposed rule pursuant to the requirements of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the 2008 Reform Act (together, the "GSE Act").

For additional information on legislative and regulatory matters affecting us, refer to "Business—Legislation and GSE Reform" and "Business—Our Charter and Regulation of Our Activities" in our 2010 Form 10-K, and "MD&A—Legislative and Regulatory Developments—Proposed Rules Implementing the Dodd-Frank Act" in our quarterly report for the quarter ended March 31, 2011 ("First Quarter 2011 Form 10-Q").

19

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" of this report and in our 2010 Form 10-K.

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Total Loss Reserves

- Other-Than-Temporary Impairment of Investment Securities

See "MD&A—Critical Accounting Policies and Estimates" in our 2010 Form 10-K for a detailed discussion of these critical accounting policies and estimates. We provide below information about our Level 3 assets and liabilities as of June 30, 2011 as compared with December 31, 2010. We also describe any significant changes in the judgments and assumptions we made during the first half of 2011 in applying our critical accounting policies and significant changes to critical estimates.

### Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 13, Fair Value."

#### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage- and asset-backed securities and residual interests, certain mortgage loans, certain acquired property, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 6 presents a comparison, by balance sheet category, of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring asset") that were classified as Level 3 as of June 30, 2011 and December 31, 2010. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

TREASURY-1486

**Table 6:   Level 3 Recurring Financial Assets at Fair Value**

| | As of | |
|---|---|---|
| **Balance Sheet Category** | **June 30, 2011** | **December 31, 2010** |
| | (Dollars in millions) | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   4,034 | $   4,576 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,379 | 31,934 |
| Mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,365 | 2,207 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 210 | 247 |
| Level 3 recurring assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  36,988 | $  38,964 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,196,112 | $3,221,972 |
| Total recurring assets measured at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  154,275 | $  161,696 |
| Level 3 recurring assets as a percentage of total assets . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value . . . . . | 24% | 24% |
| Total recurring assets measured at fair value as a percentage of total assets . . . . . . . . . . . . . | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $51.2 billion during the quarter ended June 30, 2011 and $63.0 billion during the year ended December 31, 2010.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.0 billion as of both June 30, 2011 and December 31, 2010, and other liabilities with a fair value of $131 million as of June 30, 2011 and $143 million as of December 31, 2010.

**Total Loss Reserves**

Our total loss reserves consist of the following components:

- Allowance for loan losses;

- Allowance for accrued interest receivable;

- Reserve for guaranty losses; and

- Allowance for preforeclosure property tax and insurance receivable.

These components can be further divided into single-family portions, which collectively make up our single-family loss reserves, and multifamily portions, which collectively make up our multifamily loss reserves.

In the second quarter of 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans which contributed to an increase to our allowance for loan losses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the second quarter of 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency as a driver of foreclosures in order to reflect changes to the foreclosure environment. This update resulted in an increase to our reserve for guaranty losses included within "Other liabilities" of approximately $700 million.

21

## CONSOLIDATED RESULTS OF OPERATIONS

In this section we discuss our condensed consolidated results of operations for the periods indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 7 summarizes our condensed consolidated results of operations for the periods indicated.

**Table 7:   Summary of Condensed Consolidated Results of Operations**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | Variance | 2011 | 2010 | Variance |
| | (Dollars in millions) | | | | | |
| Net interest income . . . . . . . . . . . . . . . . . . . . . | $ 4,972 | $ 4,207 | $   765 | $  9,932 | $  6,996 | $2,936 |
| Fee and other income . . . . . . . . . . . . . . . . . . | 265 | 294 | (29) | 502 | 527 | (25) |
| **Net revenues** . . . . . . . . . . . . . . . . . . . . . . . . . | **$ 5,237** | **$ 4,501** | **$   736** | **$ 10,434** | **$  7,523** | **$2,911** |
| Investment gains, net . . . . . . . . . . . . . . . . . . . . | 171 | 23 | 148 | 246 | 189 | 57 |
| Net other-than-temporary impairments . . . . . . . . | (56) | (137) | 81 | (100) | (373) | 273 |
| Fair value (losses) gains, net . . . . . . . . . . . . . . | (1,634) | 303 | (1,937) | (1,345) | (1,402) | 57 |
| Administrative expenses . . . . . . . . . . . . . . . . . . | (569) | (670) | 101 | (1,174) | (1,275) | 101 |
| Credit-related expenses[1] . . . . . . . . . . . . . . . . | (6,059) | (4,851) | (1,208) | (17,101) | (16,735) | (366) |
| Other non-interest expenses[2] . . . . . . . . . . . . . | (75) | (383) | 308 | (414) | (737) | 323 |
| Loss before federal income taxes . . . . . . . . . . . | (2,985) | (1,214) | (1,771) | (9,454) | (12,810) | 3,356 |
| Benefit (provision) for federal income taxes . . . . | 93 | (9) | 102 | 91 | 58 | 33 |
| **Net loss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **(2,892)** | **(1,223)** | **(1,669)** | **(9,363)** | **(12,752)** | **3,389** |
| Less: Net (income) loss attributable to the noncontrolling interest . . . . . . . . . . . . . . . . . | (1) | 5 | (6) | (1) | 4 | (5) |
| **Net loss attributable to Fannie Mae** . . . . . . . . | **$(2,893)** | **$(1,218)** | **$(1,675)** | **$ (9,364)** | **$(12,748)** | **$3,384** |
| Total comprehensive (loss) income attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | $(2,891) | $   452 | $(3,343) | $ (9,181) | $ (9,706) | $   525 |

[1]  Consists of provision for loan losses, provision for guaranty losses, and foreclosed property expense (income).

[2]  Consists of debt extinguishment losses, net and other expenses.

## Net Interest Income

Table 8 presents an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we used a daily weighted average of amortized cost. When daily average balance information was not available, such as for mortgage loans, we used monthly averages. Table 9 presents the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities. In the fourth quarter of 2010, we changed the presentation to distinguish the change in net interest income of Fannie Mae from the change in net interest income of consolidated trusts. We have revised the presentation of results for prior periods to conform to the current period presentation.

**Table 8:   Analysis of Net Interest Income and Yield**

| | For the Three Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | | | (Dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-earning assets:** | | | | | | |
| Mortgage loans of Fannie Mae[1] . . . . . . . . . . | $ 394,687 | $ 3,720 | 3.77% | $ 366,321 | $ 3,950 | 4.31% |
| Mortgage loans of consolidated trusts[1] . . . . . . . | 2,614,392 | 31,613 | 4.84 | 2,620,167 | 33,682 | 5.14 |
| Total mortgage loans. . . . . . . . . . . . . . . . . | 3,009,079 | 35,333 | 4.70 | 2,986,488 | 37,632 | 5.04 |
| Mortgage-related securities . . . . . . . . . . . . . . | 319,395 | 4,029 | 5.05 | 395,600 | 5,040 | 5.10 |
| Elimination of Fannie Mae MBS held in portfolio . . | (204,465) | (2,643) | 5.17 | (256,163) | (3,387) | 5.29 |
| Total mortgage-related securities, net . . . . . . . | 114,930 | 1,386 | 4.82 | 139,437 | 1,653 | 4.74 |
| Non-mortgage securities[2] . . . . . . . . . . . . . . . | 76,829 | 30 | 0.15 | 111,294 | 66 | 0.23 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . | 21,833 | 6 | 0.11 | 47,571 | 23 | 0.19 |
| Advances to lenders . . . . . . . . . . . . . . . . . . | 3,144 | 19 | 2.39 | 2,673 | 18 | 2.66 |
| Total interest-earning assets . . . . . . . . . . . . . . | $3,225,815 | $36,774 | 4.56% | $3,287,463 | $39,392 | 4.79% |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt[3] . . . . . . . . . . . . . . . . . . . . | $ 162,071 | $      79 | 0.19% | $ 234,474 | $     164 | 0.28% |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . | 589,269 | 3,802 | 2.58 | 579,190 | 4,975 | 3.44 |
| Total short-term and long-term funding debt . . | 751,340 | 3,881 | 2.07 | 813,664 | 5,139 | 2.53 |
| Debt securities of consolidated trusts . . . . . . . . . | 2,657,571 | 30,564 | 4.60 | 2,693,538 | 33,433 | 4.96 |
| Elimination of Fannie Mae MBS held in portfolio . . | (204,465) | (2,643) | 5.17 | (256,163) | (3,387) | 5.29 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . | 2,453,106 | 27,921 | 4.55 | 2,437,375 | 30,046 | 4.93 |
| Total interest-bearing liabilities . . . . . . . . . . . . | $3,204,446 | $31,802 | 3.97% | $3,251,039 | $35,185 | 4.33% |
| Impact of net non-interest bearing funding . . . . . . . | $   21,369 | | 0.03% | $   36,424 | | 0.05% |
| Net interest income/net interest yield . . . . . . . . . | | $ 4,972 | 0.62% | | $ 4,207 | 0.51% |
| Net interest income/net interest yield of consolidated trusts[4] . . . . . . . . . . . . . . . . . . | | $ 1,049 | 0.16% | | $   249 | 0.04% |

TREASURY-1489

| | For the Six Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | | | (Dollars in millions) | | | |
|---|---|---|---|---|---|---|
| **Interest-earning assets:** | | | | | | |
| Mortgage loans of Fannie Mae[1] .... | $ 399,898 | $ 7,445 | 3.72% | $ 322,926 | $ 7,248 | 4.49% |
| Mortgage loans of consolidated trusts[1] .................... | 2,605,087 | 63,478 | 4.87 | 2,664,917 | 68,003 | 5.10 |
| Total mortgage loans ........... | 3,004,985 | 70,923 | 4.72 | 2,987,843 | 75,251 | 5.04 |
| Mortgage-related securities......... | 326,727 | 8,274 | 5.06 | 415,393 | 10,590 | 5.10 |
| Elimination of Fannie Mae MBS held in portfolio ................. | (209,418) | (5,436) | 5.19 | (271,432) | (7,186) | 5.29 |
| Total mortgage-related securities, net ..................... | 117,309 | 2,838 | 4.84 | 143,961 | 3,404 | 4.73 |
| Non-mortgage securities[2] ......... | 78,266 | 75 | 0.19 | 89,200 | 103 | 0.23 |
| Federal funds sold and securities purchased under agreements under resell or similar arrangements ..... | 17,810 | 13 | 0.15 | 43,838 | 44 | 0.20 |
| Advances to lenders ............. | 3,614 | 40 | 2.20 | 2,593 | 36 | 2.76 |
| Total interest-earning assets ......... | $3,221,984 | $73,889 | 4.59% | $3,267,435 | $78,838 | 4.83% |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt[3] ............. | $ 150,523 | $ 183 | 0.24% | $ 209,894 | $ 280 | 0.27% |
| Long-term debt................. | 610,594 | 7,998 | 2.62 | 572,033 | 10,056 | 3.52 |
| Total short-term and long-term funding debt ................ | 761,117 | 8,181 | 2.15 | 781,927 | 10,336 | 2.64 |
| Debt securities of consolidated trusts .. | 2,653,872 | 61,212 | 4.61 | 2,725,177 | 68,692 | 5.04 |
| Elimination of Fannie Mae MBS held in portfolio ................. | (209,418) | (5,436) | 5.19 | (271,432) | (7,186) | 5.29 |
| Total debt securities of consolidated trusts held by third parties...... | 2,444,454 | 55,776 | 4.56 | 2,453,745 | 61,506 | 5.01 |
| Total interest-bearing liabilities ....... | $3,205,571 | $63,957 | 3.99% | $3,235,672 | $71,842 | 4.44% |
| Impact of net non-interest bearing funding ...................... | $ 16,413 | | 0.02% | $ 31,763 | | 0.04% |
| Net interest income/net interest yield ... | | $ 9,932 | 0.62% | | $ 6,996 | 0.43% |
| Net interest income/net interest yield of consolidated trusts[4] ............. | | $ 2,266 | 0.17% | | $ (689) | (0.05)% |

| | As of June 30, | |
| Selected benchmark interest rates[5] | 2011 | 2010 |
|---|---|---|
| 3-month LIBOR .................................................... | 0.25% | 0.53% |
| 2-year swap interest rate ............................................. | 0.70 | 0.97 |
| 5-year swap interest rate ............................................. | 2.03 | 2.06 |
| 30-year Fannie Mae MBS par coupon rate................................. | 4.02 | 3.75 |

---

[1]  Interest income includes interest income on acquired credit-impaired loans of $515 million and $586 million for the three months ended June 30, 2011 and 2010, respectively, and $1.0 billion and $1.2 billion for the six months ended June 30, 2011 and 2010, respectively. These amounts include accretion income of $250 million and $288 million for the three months ended June 30, 2011 and 2010, respectively, and $481 million and $554 million for the six months ended June 30, 2011 and 2010, respectively, relating to a portion of the fair value losses recorded upon the acquisition

24

of the loans. Average balance includes loans on nonaccrual status, for which interest income is recognized when collected.

[2]   Includes cash equivalents.

[3]   Includes federal funds purchased and securities sold under agreements to repurchase.

[4]   Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

[5]   Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg.

**Table 9:   Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended June 30, 2011 vs. 2010 | | | For the Six Months Ended June 30, 2011 vs. 2010 | | |
|---|---|---|---|---|---|---|
| | Total Variance | Variance Due to:[1] | | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate | | Volume | Rate |
| | | (Dollars in millions) | | | | |
| Interest income: | | | | | | |
| Mortgage loans of Fannie Mae . . . . . . . . . . . . . . . . | $  (230) | $ 291 | $  (521) | $   197 | $ 1,556 | $(1,359) |
| Mortgage loans of consolidated trusts . . . . . . . . . . . | (2,069) | (74) | (1,995) | (4,525) | (1,504) | (3,021) |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . | (2,299) | 217 | (2,516) | (4,328) | 52 | (4,380) |
| Mortgage-related securities . . . . . . . . . . . . . . . . . . . | (1,011) | (962) | (49) | (2,316) | (2,246) | (70) |
| Elimination of Fannie Mae MBS held in portfolio . . . | 744 | 670 | 74 | 1,750 | 1,612 | 138 |
| Total mortgage-related securities, net . . . . . . . . . | (267) | (292) | 25 | (566) | (634) | 68 |
| Non-mortgage securities[2] . . . . . . . . . . . . . . . . . . . . | (36) | (17) | (19) | (28) | (12) | (16) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . | (17) | (9) | (8) | (31) | (21) | (10) |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 3 | (2) | 4 | 12 | (8) |
| Total interest income . . . . . . . . . . . . . . . . . . . . . . . . | (2,618) | (98) | (2,520) | (4,949) | (603) | (4,346) |
| Interest expense: | | | | | | |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (85) | (43) | (42) | (97) | (74) | (23) |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,173) | 85 | (1,258) | (2,058) | 642 | (2,700) |
| Total short-term and long-term funding debt . . . . . | (1,258) | 42 | (1,300) | (2,155) | 568 | (2,723) |
| Debt securities of consolidated trusts . . . . . . . . . . . . | (2,869) | (441) | (2,428) | (7,480) | (1,761) | (5,719) |
| Elimination of Fannie Mae MBS held in portfolio . . . | 744 | 670 | 74 | 1,750 | 1,612 | 138 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,125) | 229 | (2,354) | (5,730) | (149) | (5,581) |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . . . | (3,383) | 271 | (3,654) | (7,885) | 419 | (8,304) |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . | $   765 | $(369) | $ 1,134 | $ 2,936 | $(1,022) | $ 3,958 |

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

[2]   Includes cash equivalents.

Net interest income increased in the second quarter and first half of 2011, as compared with the second quarter and first half of 2010, due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities. The primary drivers of this change were:

- a reduction in the interest expense on debt of consolidated trusts as we have purchased a significant amount of delinquent loans from our MBS trusts since the first quarter of 2010;

- lower interest expense on funding debt due to lower borrowing rates which allowed us to replace higher-cost debt with lower-cost debt;

TREASURY-1491

- lower interest income on mortgage securities due to a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements; and

- lower yields on mortgage loans as new business acquisitions continue to replace higher-yielding loans with loans issued at lower mortgage rates. The reduction in interest income on loans due to lower yields was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans on our condensed consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures.

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in both the second quarter and first half of 2011 and 2010 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

For the second quarter of 2011, interest income that we did not recognize for nonaccrual mortgage loans, net of recoveries, was $1.4 billion, which resulted in a 17 basis point reduction in net interest yield, compared with $2.2 billion for the second quarter of 2010, which resulted in a 27 basis point reduction in net interest yield. Of the $1.4 billion of interest income that we did not recognize for nonaccrual mortgage loans for the second quarter of 2011, $1.2 billion was related to the unsecuritized mortgage loans that we owned during the period. Of the $2.2 billion of interest income that we did not recognize for nonaccrual mortgage loans for the second quarter of 2010, $1.2 billion was related to the unsecuritized mortgage loans that we owned.

For the first half of 2011, interest income that we did not recognize for nonaccrual mortgage loans, net of recoveries, was $3.0 billion, which resulted in a 18 basis point reduction in net interest yield, compared with $4.9 billion for the first half of 2010, which resulted in a 30 basis point reduction in net interest yield. Of the $3.0 billion of interest income that we did not recognize for nonaccrual mortgage loans for the first half of 2011, $2.5 billion was related to the unsecuritized mortgage loans that we owned during the period. Of the $4.9 billion of interest income that we did not recognize for nonaccrual mortgage loans for the first half of 2010, $1.8 billion was related to the unsecuritized mortgage loans that we owned.

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

**Fair Value Gains (Losses), Net**

Table 10 presents the components of our fair value gains and losses.

**Table 10:   Fair Value Gains (Losses), Net**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Risk management derivatives fair value gains (losses) attributable to: | | | | |
| Net contractual interest expense accruals on interest rate swaps . . . . | $  (658) | $(756) | $(1,293) | $(1,591) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . | (958) | 936 | (207) | (390) |
| Total risk management derivatives fair value gains (losses), net . . | (1,616) | 180 | (1,500) | (1,981) |
| Mortgage commitment derivatives fair value losses, net . . . . . . . . . . . | (61) | (577) | (38) | (1,178) |
| Total derivatives fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . | (1,677) | (397) | (1,538) | (3,159) |
| Trading securities gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 135 | 640 | 360 | 1,698 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (92) | 60 | (167) | 59 |
| Fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,634) | $ 303 | $(1,345) | $(1,402) |

| | | | **2011** | **2010** |
|---|---|---|---|---|
| 5-year swap interest rate: | | | | |
| As of January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.18% | 2.98% |
| As of March 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.47 | 2.73 |
| As of June 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.03 | 2.06 |

### Risk Management Derivatives Fair Value Gains (Losses), Net

We supplement our issuance of debt securities with derivative instruments to further reduce duration and prepayment risks. We recorded risk management derivative fair value losses in the second quarter and first half of 2011 primarily as a result of a decrease in the fair value of our pay-fixed derivatives due to a decline in swap interest rates during the period.

We recorded risk management derivative gains in the second quarter of 2010 primarily as a result of changes in implied interest rate volatility, partially offset by time decay on our purchased options.

We recorded risk management derivative losses in the first half of 2010 as a result of: (1) time decay on our purchased options; (2) a decrease in the fair value of our pay-fixed derivatives due to a decline in swap interest rates; and (3) a decrease in implied interest rate volatility, which reduced the fair value of our purchased options.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three and six months ended June 30, 2011 and 2010 in "Note 9, Derivative Instruments."

### Mortgage Commitment Derivatives Fair Value Gains (Losses), Net

Commitments to purchase or sell some mortgage-related securities and to purchase single-family mortgage loans are generally accounted for as derivatives. For open mortgage commitment derivatives, we include changes in their fair value in our condensed consolidated statements of operations and comprehensive loss. When derivative purchase commitments settle, we include the fair value of the commitment on the settlement date in the cost basis of the loan or security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases of securities issued by our consolidated MBS trusts are treated as extinguishments of debt; we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses. Sales of securities issued by our consolidated MBS trusts are treated as issuances of

27

consolidated debt; we recognize the fair value of the commitment on the settlement date as a component of debt in the cost basis of the debt issued.

We recognized losses on our mortgage commitments in the second quarter and first half of both 2011 and 2010 primarily due to losses on commitments to sell mortgage-related securities as a result of a decline in interest rates during the commitment period.

### Trading Securities Gains (Losses), Net

The gains from our trading securities in the second quarter of 2011 were primarily driven by a decrease in interest rates. The gains from our trading securities in the first half of 2011 were primarily driven by the narrowing of credit spreads on commercial mortgage-backed securities ("CMBS").

The gains from our trading securities in the second quarter and first half of 2010 were primarily driven by a decrease in interest rates and narrowing of credit spreads.

### Credit-Related Expenses

We refer to our provision for loan losses and the provision for guaranty losses collectively as our "provision for credit losses." Credit-related expenses consist of our provision for credit losses and foreclosed property expense.

### Provision for Credit Losses

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business as of each balance sheet date. We establish our loss reserves through the provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs, which results in an increase to our loss reserves.

Table 11 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future. We estimate that approximately two-thirds of this amount, as of June 30, 2011, represents credit losses we expect to realize in the future and approximately one-third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

TREASURY-1494

**Table 11:   Total Loss Reserves**

| | As of | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $69,506 | $61,556 |
| Reserve for guaranty losses[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 960 | 323 |
| Combined loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70,466 | 61,879 |
| Allowance for accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,024 | 3,414 |
| Allowance for preforeclosure property taxes and insurance receivable[2] . . . . . . . . . . | 1,267 | 958 |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74,757 | 66,251 |
| Fair value losses previously recognized on acquired credit impaired loans[3] . . . . . . . . | 17,693 | 19,171 |
| Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $92,450 | $85,422 |

[1]   Amount included in "Other liabilities" in our condensed consolidated balance sheets.

[2]   Amount included in "Other assets" in our condensed consolidated balance sheets.

[3]   Represents the fair value losses on loans purchased out of MBS trusts reflected in our condensed consolidated balance sheets.

We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. We summarize the changes in our combined loss reserves in Table 12.

29

**Table 12:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | | | (Dollars in millions) | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $53,708 | $13,849 | $67,557 | $25,675 | $ 34,894 | $60,569 |
| Provision for loan losses . . . . . . . . . . . | 3,040 | 2,762 | 5,802 | 2,593 | 1,702 | 4,295 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . . . | (5,460) | (758) | (6,218) | (4,446) | (1,947) | (6,393) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 1,819 | 550 | 2,369 | 65 | 291 | 356 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . . | 2,762 | (2,762) | — | 22,620 | (22,620) | — |
| Net reclassifications[3] . . . . . . . . . . . . . | 97 | (101) | (4) | (3,663) | 5,418 | 1,755 |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $55,966 | $13,540 | $69,506 | $42,844 | $ 17,738 | $60,582 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $ 257 | $ — | $ 257 | $ 233 | $ — | $ 233 |
| Provision for guaranty losses . . . . . . . . . | 735 | — | 735 | 69 | — | 69 |
| Charge-offs . . . . . . . . . . . . . . . . . . . . . | (33) | — | (33) | (56) | — | (56) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 1 | — | 1 | — | — | — |
| Ending balance . . . . . . . . . . . . . . . . . . | $ 960 | $ — | $ 960 | $ 246 | $ — | $ 246 |
| Combined loss reserves: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $53,965 | $13,849 | $67,814 | $25,908 | $ 34,894 | $60,802 |
| Total provision for credit losses . . . . . . . | 3,775 | 2,762 | 6,537 | 2,662 | 1,702 | 4,364 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . . . | (5,493) | (758) | (6,251) | (4,502) | (1,947) | (6,449) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . | 1,820 | 550 | 2,370 | 65 | 291 | 356 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . . | 2,762 | (2,762) | — | 22,620 | (22,620) | — |
| Net reclassifications[3] . . . . . . . . . . . . . | 97 | (101) | (4) | (3,663) | 5,418 | 1,755 |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $56,926 | $13,540 | $70,466 | $43,090 | $ 17,738 | $60,828 |

TREASURY-1496

| | For the Six Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . | $ 48,530 | $13,026 | $ 61,556 | $ 8,078 | $ 1,847 | $ 9,925 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Provision for loan losses . . . . . . . . . . | 10,199 | 6,190 | 16,389 | 8,864 | 7,370 | 16,234 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . | (11,165) | (1,206) | (12,371) | (6,151) | (5,402) | (11,553) |
| Recoveries. . . . . . . . . . . . . . . . . . . . | 2,349 | 1,502 | 3,851 | 162 | 568 | 730 |
| Transfers[2] . . . . . . . . . . . . . . . . . . | 5,969 | (5,969) | — | 36,475 | (36,475) | — |
| Net reclassifications[3] . . . . . . . . . . . | 84 | (3) | 81 | (4,584) | 6,254 | 1,670 |
| Ending balance[4] . . . . . . . . . . . . . . . | $ 55,966 | $13,540 | $ 69,506 | $ 42,844 | $ 17,738 | $ 60,582 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . | $ 323 | $ — | $ 323 | $ 54,430 | $ — | $ 54,430 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | — | (54,103) |
| Provision for guaranty losses . . . . . . . | 702 | — | 702 | 33 | — | 33 |
| Charge-offs . . . . . . . . . . . . . . . . . . . | (68) | — | (68) | (117) | — | (117) |
| Recoveries. . . . . . . . . . . . . . . . . . . . | 3 | — | 3 | 3 | — | 3 |
| Ending balance . . . . . . . . . . . . . . . . | $ 960 | $ — | $ 960 | $ 246 | $ — | $ 246 |
| Combined loss reserves: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . | $ 48,853 | $13,026 | $ 61,879 | $ 62,508 | $ 1,847 | $ 64,355 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | 43,576 | (10,527) |
| Total provision for credit losses . . . . . | 10,901 | 6,190 | 17,091 | 8,897 | 7,370 | 16,267 |
| Charge-offs[1] . . . . . . . . . . . . . . . . . | (11,233) | (1,206) | (12,439) | (6,268) | (5,402) | (11,670) |
| Recoveries. . . . . . . . . . . . . . . . . . . . | 2,352 | 1,502 | 3,854 | 165 | 568 | 733 |
| Transfers[2] . . . . . . . . . . . . . . . . . . | 5,969 | (5,969) | — | 36,475 | (36,475) | — |
| Net reclassifications[3] . . . . . . . . . . . | 84 | (3) | 81 | (4,584) | 6,254 | 1,670 |
| Ending balance[4] . . . . . . . . . . . . . . . | $ 56,926 | $13,540 | $ 70,466 | $ 43,090 | $ 17,738 | $ 60,828 |

| | As of | |
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $68,887 | $60,163 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,579 | 1,716 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $70,466 | $61,879 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.40% | 2.10% |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.82 | 0.91 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.30% | 2.03% |
| Total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34.79 | 28.81 |

TREASURY-1497

<sup>(1)</sup>  Includes accrued interest of $438 million and $611 million for the three months ended June 30, 2011 and 2010, respectively, and $824 million and $1.2 billion for the six months ended June 30, 2011 and 2010, respectively.

<sup>(2)</sup>  Includes transfers from trusts for delinquent loan purchases.

<sup>(3)</sup>  Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

<sup>(4)</sup>  Includes $414 million and $637 million as of June 30, 2011 and 2010, respectively, for acquired credit-impaired loans.

The continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past few years. Our provision for credit losses continues to be the primary driver of our net losses for each period presented. The amount of provision for credit losses varies from period to period based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender counterparties.

Our provision for credit losses increased in the second quarter of 2011 compared with the second quarter of 2010 as our loss reserves grew in the second quarter of 2011 while our loss reserves were relatively flat in the second quarter of 2010. The increase in our loan loss reserves in the second quarter 2011 was driven by:

- an increase in the number of modified loans that are subject to individual impairment;

- a decrease in home prices, on a national basis, since the second quarter of 2010; and

- an increase in the number of days loans are remaining delinquent.

Our provision for credit losses and loss reserves during these periods has also been positively and negatively impacted by other factors. Additional factors that impacted our provision for credit losses in the second quarter of 2011 include:

- Our provision for credit losses benefited from higher amounts received from lenders related to our outstanding repurchase requests. In addition, we revised our estimate for amounts due to us related to outstanding repurchase requests to incorporate additional loan-level attributes which resulted in a decrease in our provision for credit losses and foreclosed property expense of $1.5 billion.

- We updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency as a driver of foreclosures in order to reflect changes to the foreclosure environment. This update resulted in an increase to our reserve for guaranty losses of approximately $700 million.

- We updated our loan loss models to incorporate more recent data on prepayments of modified loans. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. This update contributed to an increase to our allowance for loan losses of approximately $1.5 billion.

Factors that impacted our provision for credit losses in the second quarter of 2010 include:

- We recognized an out-of-period adjustment of $1.1 billion related to an additional provision for losses on preforeclosure property taxes and insurance receivables.

- We updated our allowance for loan loss model to reflect a change in our cohort structure for our severity calculations to use mark-to-market LTV ratios rather than LTV ratios at origination. The update resulted in a decrease in the allowance for loan losses of approximately $1.6 billion.

Our provision for credit losses increased in the first half of 2011 compared with the first half of 2010 due to the reasons described above as well as higher loss severity rates and deterioration of future expected home prices, which drove additional impairment on loans that we have individually impaired.

Because of the substantial volume of loan modifications we completed and the number of loans that entered a trial modification period in 2010 and the first half of 2011, approximately two-thirds of our total loss reserves are attributable to individual impairment rather than the collective reserve for loan losses. Individual

32

impairment for a troubled debt restructuring ("TDR") is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The model includes forward-looking assumptions using multiple scenarios of the future economic environment, including interest rates and home prices. Based on the structure of the modifications, in particular the size of the concession granted, and the performance of modified loans combined with the forward-looking assumptions used in our model, the allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve. Further, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure the impairment based on the fair value of the collateral. The loss reserve for a greater portion of our population of individually impaired loans was based on the fair value of the underlying collateral as of June 30, 2011 than as of June 30, 2010.

Additionally, while delinquency rates on loans in our single-family guaranty book of business have decreased, borrowers' inability or unwillingness to make their mortgage payments, along with delays in foreclosures, continue to cause loans to remain seriously delinquent for an extended period of time as shown in "Table 36: Delinquency Status of Single-Family Conventional Loans."

For additional discussion of our loan workout activities, delinquent loans and concentrations, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Problem Loan Management." For a discussion of our charge-offs, see "Credit Loss Performance Metrics."

Our balance of nonperforming single-family loans remained high as of June 30, 2011 due to both high levels of delinquencies and an increase in TDRs. When a TDR is executed, the loan status becomes current, but the loan will continue to be classified as a nonperforming loan as the loan is not performing in accordance with the original terms. The composition of our nonperforming loans is shown in Table 13. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

**Table 13:  Nonperforming Single-Family and Multifamily Loans**

|  | As of | |
|---|---|---|
|  | June 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans | $133,885 | $152,756 |
| Troubled debt restructurings on accrual status[1] | 68,525 | 61,907 |
| Total on-balance sheet nonperforming loans | 202,410 | 214,663 |
| Off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts[2] | 142 | 89 |
| Total nonperforming loans | $202,552 | $214,752 |
| Accruing on-balance sheet loans past due 90 days or more[3] | $    758 | $    896 |

|  | For the Six Months Ended June 30, 2011 | For the Year Ended December 31, 2010 |
|---|---|---|
|  | (Dollars in millions) | |
| Interest related to on-balance sheet nonperforming loans: | | |
| Interest income forgone[4] | $4,555 | $8,185 |
| Interest income recognized for the period[5] | 2,990 | 7,995 |

[1]  Includes HomeSaver Advance first-lien loans on accrual status.

[2]  Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

33

(3) Recorded investment in loans as of the end of each period that are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans where we have recourse against the seller in the event of a default.

(4) Represents the amount of interest income that would have been recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

(5) Represents interest income recognized during the period for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while loan was performing and cash payments received on nonaccrual loans.

### Foreclosed Property Expense (Income)

Foreclosed property expense and income are displayed in Table 14. The shift from foreclosed property expense in the second quarter of 2010 to foreclosed property income in the second quarter of 2011, and the decline in foreclosed property expense in the first half of 2011 compared with the first half of 2010, was primarily due to an increase in estimated amounts due to or received by us for outstanding repurchase requests. These amounts were recognized in our provision for credit losses and foreclosed property expense and income. The foreclosed property expense in the 2010 periods reflected the recognition of cash fees of $211 million in the second quarter of 2010 and $773 million in the first half of 2010 from the cancellation and restructuring of some of our mortgage insurance coverage; there were no such fees recognized in the second quarter and first half of 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce our future exposure to our mortgage insurers.

### Credit Loss Performance Metrics

Our credit-related expenses should be considered in conjunction with our credit loss performance. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with the acquisition of credit-impaired loans. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans from credit losses.

Historically, management viewed our credit loss performance metrics, which include our historical credit losses and our credit loss ratio, as indicators of the effectiveness of our credit risk management strategies. As our credit losses are now at such high levels, management has shifted focus to our loss mitigation strategies and the reduction of our total credit losses and away from the credit loss ratio to measure performance. However, we believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. They also provide a consistent treatment of credit losses for on- and off-balance sheet loans. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods. Table 14 details the components of our credit loss performance metrics as well as our average single-family and multifamily default rate and initial charge-off severity rate.

TREASURY-1500

**Table 14:   Credit Loss Performance Metrics**

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1][2] |
| | | | | (Dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Charge-offs, net of recoveries . . . . . . | $3,881 | 50.4 bp | $6,093 | 79.7 bp | $8,585 | 55.9 bp | $10,937 | 71.2 bp |
| Foreclosed property expense (income) . . . . . . . . . . . . . . . . . . . | (478) | (6.2) | 487 | 6.4 | 10 | 0.1 | 468 | 3.1 |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans . . . . . . . . . . | 3,403 | 44.2 | 6,580 | 86.1 | 8,595 | 56.0 | 11,405 | 74.3 |
| Less: Fair value losses resulting from acquired credit-impaired loans. . . . | (31) | (0.4) | (47) | (0.6) | (62) | (0.4) | (105) | (0.7) |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense . . . . . . . . . . . . . . . . . . . . | 560 | 7.3 | 512 | 6.7 | 1,085 | 7.1 | 892 | 5.8 |
| Credit losses and credit loss ratio . . . | $3,932 | 51.1 bp | $7,045 | 92.2 bp | $9,618 | 62.7 bp | $12,192 | 79.4 bp |
| Credit losses attributable to: | | | | | | | | |
| Single-family . . . . . . . . . . . . . . | $3,810 | | $6,923 | | $9,414 | | $11,985 | |
| Multifamily. . . . . . . . . . . . . . . . | 122 | | 122 | | 204 | | 207 | |
| Total . . . . . . . . . . . . . . . . . . . | $3,932 | | $7,045 | | $9,618 | | $12,192 | |
| Average single-family default rate . . . | | 0.46% | | 0.53% | | 0.90% | | 0.99% |
| Average single-family initial charge-off severity rate[3] . . . . . . . . . . . | | 34.47% | | 34.30% | | 35.29% | | 34.80% |
| Average multifamily default rate . . . . | | 0.17% | | 0.14% | | 0.29% | | 0.24% |
| Average multifamily initial charge-off severity rate[3] . . . . . . . . . . . | | 35.82% | | 38.74% | | 36.23% | | 39.34% |

[1]   Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period.

[2]   Beginning in the second quarter of 2010, expenses relating to preforeclosure taxes and insurance were recorded as charge-offs. These expenses were recorded as foreclosed property expense in the first quarter of 2010. The impact of including these costs in charge-offs was 3.0 basis points for the six months ended June 30, 2010.

[3]   Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from preforeclosure sales.

The decrease in our credit losses in the second quarter and first half of 2011 compared with both the second quarter and first half of 2010 was primarily due to an increase in estimated amounts due to or received by us related to outstanding repurchase requests. While defaults remain high, defaults in the second quarter and first half of 2011 were lower than they would have been due to delays in the foreclosure process. See "Executive Summary—Foreclosure Delays and Changes in the Foreclosure Environment" for information regarding the current foreclosure environment.

Our 2009, 2010 and 2011 vintages accounted for approximately 2% of our single-family credit losses for the second quarter and first half of 2011. Typically, credit losses on mortgage loans do not peak until later years in the loan cycle following origination. We provide more detailed credit performance information, including serious delinquency rates by geographic region, statistics on nonperforming loans and foreclosure activity in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected

TREASURY-1501

credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Although other provisions of the September 2005 agreement were suspended in March 2009 by FHFA until further notice, this disclosure requirement was not suspended. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 15 compares the credit loss sensitivities for the periods indicated for first lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

**Table 15:   Single-Family Credit Loss Sensitivity**[1]

| | As of | |
|---|---|---|
| | **June 30, 2011** | **December 31, 2010** |
| | **(Dollars in millions)** | |
| Gross single-family credit loss sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    29,383 | $    25,937 |
| Less: Projected credit risk sharing proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,547) | (2,771) |
| Net single-family credit loss sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    26,836 | $    23,166 |
| Outstanding single-family whole loans and Fannie Mae MBS . . . . . . . . . . . . . . . . . . . . . . . | $2,795,230 | $2,782,512 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.96% | 0.83% |

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of both June 30, 2011 and December 31, 2010, respectively. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

**Financial Impact of the Making Home Affordable Program on Fannie Mae**

*Home Affordable Refinance Program*

Because we already own or guarantee the original mortgages that we refinance under HARP, our expenses under that program consist mostly of limited administrative costs.

*Home Affordable Modification Program*

We incurred impairments related to loans that had entered a trial modification under the Home Affordable Modification Program ("HAMP") of $2.6 billion during the second quarter of 2011 compared with $2.2 billion during the second quarter of 2010. We incurred impairments related to loans that had entered a trial modification under HAMP of $5.2 billion during the first half of 2011, compared with $9.8 billion during the first half of 2010. These include impairments on loans that entered into a trial modification under the program but that have not yet received, or that have been determined to be ineligible for, a permanent modification

TREASURY-1502

under the program. These impairments have been included in the calculation of our provision for loan losses in our condensed consolidated results of operations and comprehensive loss. The impairments do not include the reduction in our collective loss reserves which occurred as a result of beginning to individually assess the loan for impairment upon entering a trial modification. Please see "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae" in our 2010 Form 10-K for a more detailed discussion on these impairments.

We paid or accrued HAMP incentive fees for servicers of $88 million during the second quarter of 2011 compared with $115 million during the second quarter of 2010. We paid or accrued HAMP incentive fees for servicers of $168 million during the first half of 2011, compared with $183 million during the first half of 2010. These fees were related to loans modified under HAMP, which we recorded as part of "Other expenses." Borrower incentive payments are included in the calculation of our allowance for loan losses for individually impaired loans. Additionally, our expenses under HAMP also include administrative costs.

### Overall Impact of the Making Home Affordable Program

Because of the unprecedented nature of the circumstances that led to the Making Home Affordable Program, we cannot quantify what the impact would have been on Fannie Mae if the Making Home Affordable Program had not been introduced. We do not know how many loans we would have modified under alternative programs, what the terms or costs of those modifications would have been, how many foreclosures would have resulted nationwide, and at what pace, or the impact on housing prices if the program had not been put in place. As a result, the amounts we discuss above are not intended to measure how much the program is costing us in comparison to what it would have cost us if we did not have the program at all.

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations. We describe the management reporting and allocation process used to generate our segment results in our 2010 Form 10-K in "Notes to Consolidated Financial Statements—Note 15, Segment Reporting." We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

In this section, we summarize our segment results for the second quarter and first half of 2011 and 2010 in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations." See "Note 10, Segment Reporting" of this report for a reconciliation of our segment results to our condensed consolidated results.

TREASURY-1503

*Single-Family Business Results*

Table 16 summarizes the financial results of our Single-Family business for the periods indicated. The primary sources of revenue for our Single-Family business are guaranty fee income and fee and other income. Expenses primarily include credit-related expenses, net interest expense and administrative expenses.

**Table 16:   Single-Family Business Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2011** | **2010** | **Variance** | **2011** | **2010** | **Variance** |
| | | | (Dollars in millions) | | | |
| **Statement of operations data:** | | | | | | |
| Net interest expense . . . . . . . . . . . . . . . . | $ (680) | $ (1,385) | $ 705 | $ (1,578) | $ (3,330) | $1,752 |
| Guaranty fee income[1] . . . . . . . . . . . . . . . | 1,880 | 1,795 | 85 | 3,751 | 3,563 | 188 |
| Credit-related expenses[2] . . . . . . . . . . . . | (5,933) | (4,871) | (1,062) | (17,039) | (16,797) | (242) |
| Other expenses[3] . . . . . . . . . . . . . . . . . . . | (372) | (608) | 236 | (958) | (1,121) | 163 |
| Loss before federal income taxes . . . . . . . . | (5,105) | (5,069) | (36) | (15,824) | (17,685) | 1,861 |
| Benefit for federal income taxes . . . . . . . . | 109 | 1 | 108 | 107 | 52 | 55 |
| Net loss attributable to Fannie Mae . . . . . . | $ (4,996) | $ (5,068) | $ 72 | $ (15,717) | $ (17,633) | $1,916 |
| **Other key performance data:** | | | | | | |
| Single-family effective guaranty fee rate (in basis points)[4] . . . . . . . . . . . . . . . . . . . . | 26.1 | 25.0 | | 26.1 | 24.7 | |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[5] . . | 31.6 | 27.3 | | 28.0 | 27.1 | |
| Average single-family guaranty book of business[6] . . . . . . . . . . . . . . . . . . . . . . . | $2,886,509 | $2,871,208 | | $2,879,369 | $2,884,767 | |
| Single-family Fannie Mae MBS issues[7] . . | $ 102,654 | $ 111,457 | | $ 269,327 | $ 235,814 | |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[2]   Consists of the provision for loan losses, provision for guaranty losses and foreclosed property expense (income).

[3]   Consists of investment gains and losses, fair value losses, fee and other income, administrative expenses and other expenses.

[4]   Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

[5]   Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[6]   Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[7]   Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period. Includes Housing Finance Agency (HFA) new issue bond program issuances of $3.1 billion for the first half of 2010. There were no HFA new issue bond program issuances in 2011 or the second quarter of 2010.

TREASURY-1504

*Net Interest Expense*

Net interest expense for the Single-Family business segment primarily consists of: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) cash payments received on loans that have been placed on nonaccrual status.

Net interest expense decreased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010 primarily due to a significant decrease in interest income not recognized for loans on nonaccrual status because of a decline in the total number of loans on nonaccrual status. This decline is due to the high number of loan workouts and foreclosures since the second quarter of 2010.

*Guaranty Fee Income*

Guaranty fee income increased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010 due to an increase in the amortization of risk based pricing adjustments, reflecting the impact of higher risk based pricing associated with our more recent acquisition vintages.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding primarily due to the continued high level of foreclosures. Our estimated market share of new single-family mortgage-related securities issuances, which is based on publicly available data and excludes previously securitized mortgages, remained high at 43.2% for the second quarter and 46.4% for the first half of 2011.

*Credit-Related Expenses*

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide a discussion of our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

**Multifamily Business Results**

Table 17 summarizes the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses and other items that impact income or loss primarily include credit-related expenses, administrative expenses and net operating losses from our partnership investments.

TREASURY-1505

**Table 17:   Multifamily Business Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | Variance | 2011 | 2010 | Variance |
| | | | (Dollars in millions) | | | |
| **Statement of operations data:** | | | | | | |
| Guaranty fee income[1] . . . . . . . . . . . . . . . . . . . . | $  216 | $  195 | $  21 | $  425 | $  389 | $  36 |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . | 57 | 28 | 29 | 115 | 63 | 52 |
| Gains (losses) from partnership investments[2] . . . . | 34 | (22) | 56 | 22 | (80) | 102 |
| Credit-related income (expense)[3] . . . . . . . . . . . . | (126) | 20 | (146) | (62) | 62 | (124) |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . | (38) | (100) | 62 | (105) | (201) | 96 |
| Income before federal income taxes . . . . . . . . . . . | 143 | 121 | 22 | 395 | 233 | 162 |
| Provision for federal income taxes . . . . . . . . . . . . | (56) | (2) | (54) | (61) | (15) | (46) |
| Net income attributable to Fannie Mae . . . . . . . . . | $  87 | $  119 | $ (32) | $  334 | $  218 | $ 116 |
| **Other key performance data:** | | | | | | |
| Multifamily effective guaranty fee rate (in basis points)[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45.2 | 41.9 | | 44.6 | 41.9 | |
| Credit loss performance ratio (in basis points)[6] . . . | 25.5 | 26.2 | | 21.4 | 22.3 | |
| Average multifamily guaranty book of business[7] . . | $191,039 | $186,105 | | $190,493 | $185,841 | |
| Multifamily new business volumes[8] . . . . . . . . . . | 5,439 | 2,709 | | 10,463 | 6,871 | |
| Multifamily units financed from new business volumes[9] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96,000 | 54,000 | | 179,000 | 115,000 | |
| Fannie Mae multifamily MBS issuances[10] . . . . . . | $  8,129 | $  2,727 | | $ 16,710 | $  6,801 | |
| Fannie Mae multifamily structured securities issuances (issued by Capital Markets group)[11] . . | 1,622 | 772 | | 3,022 | 2,593 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[12] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 222 | 197 | | 452 | 402 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio[13] . . . . . . . . . . . . . . . . . . . . . . . . . . | 112,208 | 116,521 | | 113,272 | 117,115 | |

| | As of | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.46% | 0.71% |
| Percentage of guaranty book of business with credit enhancement . . . . . . . . . . . . . . . . . . . . . . | 90 | 89 |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[14] . . . . . . . . . . . . . . . | 20.7 | 20.5 |
| Fannie Mae multifamily MBS outstanding[15] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $89,098 | $77,251 |

[1] Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[2] Gains (losses) from partnership investments is included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

[3] Consists of the benefit (provision) for loan losses, benefit for guaranty losses and foreclosed property expense.

[4] Consists of net interest income or expense, investment gains (losses), other income or expenses, and administrative expenses.

[5] Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6] Calculated based on the annualized credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

40

(7) Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

(8) Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period. Includes $1.0 billion of HFA new issue bond program issuances for the first half of 2010. There were no HFA new issue bond program issuances in 2011 or the second quarter of 2010.

(9) Excludes HFA new issue bond program.

(10) Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS volumes, (b) $2.8 billion and $6.3 billion of Fannie Mae portfolio securitization transactions for the second quarter and first half of 2011, and (c) $119 million of conversions of adjustable-rate loans to fixed-rate loans and DMBS securities to MBS securities for the first half of 2011. There were no conversions of adjustable-rate loans to fixed-rate loans and DMBS securities to MBS securities for the second quarter of 2011. There were $256 million of new MBS issuances as a result of converting adjustable rate loans to fixed rate loans in the second quarter and first half of 2010. There were no Fannie Mae multifamily portfolio securitizations transactions for the second quarter or first half of 2010.

(11) Reflects original unpaid principal balance of out-of-portfolio multifamily structured securities issuances by our Capital Markets Group.

(12) Interest expense estimate based on allocated duration-matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

(13) Based on unpaid principal balance.

(14) Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information as of June 30, 2011 is through March 31, 2011 and is based on the Federal Reserve's June 2011 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Prior period amount may have been changed to reflect revised historical data from the Federal Reserve.

(15) Includes $25.2 billion and $19.9 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheets, as of June 30, 2011 and December 31, 2010, respectively; and $1.4 billion of bonds issued by HFAs as of both June 30, 2011 and December 31, 2010.

*Guaranty Fee Income*

Multifamily guaranty fee income increased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010 primarily due to higher fees charged on new acquisitions in recent years. New acquisitions with higher guaranty fees have become an increasingly large part of our multifamily guaranty book of business.

*Credit-Related Income (Expense)*

Multifamily credit-related expenses in the second quarter and first half of 2011 were due to credit losses, combined with a stable allowance in the second quarter of 2011, as national improvement in the multifamily market was offset by weakness in certain local markets. In comparison, multifamily credit-related income in the second quarter and first half of 2010 was due to a decrease in the allowance for loan losses as a result of stabilization in cap rates, the use of more current property level financial data, and an improvement in multifamily market fundamentals relative to previously depressed levels.

Multifamily credit losses were $122 million for both the second quarter of 2011 and 2010, and $204 million for the first half of 2011 compared with $207 million for the first half of 2010.

*Gains (Losses) from Partnership Investments*

Losses from partnership investments in the second quarter and first half of 2010 shifted to gains in the second quarter and first half of 2011 as properties experienced improved operating performance due to stronger national multifamily market fundamentals.

41

*Provision for Federal Income Taxes*

In the second quarter of 2011, we reached an effective settlement of issues with the Internal Revenue Service relating to tax years 2007 and 2008, which reduced our total corporate tax liability. However, the reduction in our tax liability also reduced the low-income housing tax credits we were able to use, resulting in a provision for federal income taxes for the Multifamily segment in the second quarter and first half of 2011.

### Capital Markets Group Results

Table 18 summarizes the financial results of our Capital Markets group for the periods indicated. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion on the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion on the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments" in this report and "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" and "Notes to Consolidated Financial Statements—Note 10, Derivative Instruments and Hedging Activities" in our 2010 Form 10-K. The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other-than-temporary impairment and administrative expenses.

**Table 18:   Capital Markets Group Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2011** | **2010** | **Variance** | **2011** | **2010** | **Variance** |
| | | | (Dollars in millions) | | | |
| **Statement of operations data:** | | | | | | |
| Net interest income[1] . . . . . . . . . . . . . . . . . . . . . . . . | $ 3,867 | $3,549 | $    318 | $ 7,577 | $6,606 | $ 971 |
| Investment gains, net[2] . . . . . . . . . . . . . . . . . . . . . . . | 918 | 779 | 139 | 1,788 | 1,571 | 217 |
| Net other-than-temporary impairments . . . . . . . . . . . . . | (55) | (137) | 82 | (99) | (373) | 274 |
| Fair value gains (losses), net[3] . . . . . . . . . . . . . . . . . . | (1,507) | 631 | (2,138) | (1,289) | (555) | (734) |
| Fee and other income. . . . . . . . . . . . . . . . . . . . . . . . . . | 109 | 136 | (27) | 184 | 240 | (56) |
| Other expenses[4]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (560) | (538) | (22) | (1,113) | (961) | (152) |
| Income before federal income taxes. . . . . . . . . . . . . . . | 2,772 | 4,420 | (1,648) | 7,048 | 6,528 | 520 |
| Benefit (provision) for federal income taxes . . . . . . . . . | 40 | (8) | 48 | 45 | 21 | 24 |
| Net income attributable to Fannie Mae. . . . . . . . . . . . . | $ 2,812 | $4,412 | $(1,600) | $ 7,093 | $6,549 | $ 544 |

[1] Includes contractual interest, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $1.5 billion for the second quarter of both 2011 and 2010. Includes contractual interest, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $3.5 billion for the first half of 2011 compared with $2.3 billion for the first half of 2010. Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts.

[2] We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[3] Fair value gains or losses on trading securities include the trading securities that we own, regardless of whether the trust has been consolidated.

[4] Includes allocated guaranty fee expense, debt extinguishment gains or losses, net, administrative expenses, and other income or expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

*Net Interest Income*

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our mortgage portfolio, when interest income is

TREASURY-1508

no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income reimbursements that the group receives, primarily from Single-Family, for the contractual interest due. The interest expense recognized on the Capital Markets group's statement of operations is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our condensed consolidated balance sheets. Net interest expense also includes a cost of capital charge allocated among the three business segments.

The Capital Markets group's net interest income increased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010, primarily due to a decline in funding costs as we replaced higher cost debt with lower cost debt. This increase in net interest income due to lower funding costs was partially offset by a decline in interest income from our mortgage portfolio. The reduction of our mortgage securities balance and high balance of nonperforming loans, mainly loans modified in a TDR, and our purchases of delinquent loans from MBS trusts, caused the yield on our portfolio and our interest income to decline. The reimbursements of contractual interest due on nonaccrual loans, from the Single-Family business, were a significant portion of the Capital Markets group's interest income during the second quarter and first half of 2011. However, the increase in these reimbursements was offset by the decline in interest income on our mortgage-related securities because our securities portfolio balance has declined.

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in both the second quarter and first half of 2011 and 2010 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value gains (losses), net" and is shown in "Table 10: Fair Value Gains (Losses), Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $658 million for the second quarter of 2011 compared with a decrease of $756 million for the second quarter of 2010, and would have decreased $1.3 billion for the first half of 2011 compared with a decrease of $1.6 billion for the first half of 2010.

*Net Other-Than-Temporary Impairments*

The net other-than-temporary impairments recognized by the Capital Markets group is generally consistent with the amount reported in our condensed consolidated results of operations. See "Note 5, Investments in Securities" for information on our other-than-temporary impairments by major security type and primary drivers for other-than-temporary impairments recorded in the second quarter and first half of 2011.

*Fair Value Gains (Losses), Net*

The derivative gains and losses that are reported for the Capital Markets group are consistent with the derivative gains and losses reported in our condensed consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations—Fair Value Gains (Losses), Net."

The gains from our trading securities in the second quarter of 2011 were primarily driven by an improvement in fair values of CMBS and agency MBS due to a decline in interest rates partially offset by losses on private-label securities due to a widening of credit spreads. The gains on our trading securities in the first half of 2011 were primarily driven by the narrowing of credit spreads on CMBS.

The gains from our trading securities in the second quarter and first half of 2010 were primarily driven by a decrease in interest rates and narrowing of credit spreads.

43

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage-related securities and mortgage loans that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheets. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

We are restricted by our senior preferred stock purchase agreement with Treasury in the amount of mortgage assets that we may own. Beginning on each December 31 and thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $810 billion as of December 31, 2010 and will be reduced to $729 billion as of December 31, 2011. As of June 30, 2011, we owned $731.8 billion in mortgage assets, compared with $788.8 billion as of December 31, 2010.

Table 19 summarizes our Capital Markets group's mortgage portfolio activity for the periods indicated.

**Table 19:   Capital Markets Group's Mortgage Portfolio Activity[1]**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| **Mortgage loans:** | | | | |
| Beginning balance | $421,856 | $330,277 | $427,074 | $ 281,162 |
| Purchases | 28,290 | 130,028 | 66,364 | 200,589 |
| Securitizations[2] | (22,559) | (13,912) | (46,542) | (28,166) |
| Liquidations[3] | (22,170) | (20,208) | (41,479) | (27,400) |
| Mortgage loans, ending balance | 405,417 | 426,185 | 405,417 | 426,185 |
| **Mortgage securities:** | | | | |
| Beginning balance | $335,762 | $434,532 | $361,697 | $ 491,566 |
| Purchases[4] | 4,533 | 4,678 | 9,623 | 33,864 |
| Securitizations[2] | 22,559 | 13,912 | 46,542 | 28,166 |
| Sales | (21,635) | (35,604) | (57,061) | (115,388) |
| Liquidations[3] | (14,835) | (25,903) | (34,417) | (46,593) |
| Mortgage securities, ending balance | 326,384 | 391,615 | 326,384 | 391,615 |
| **Total Capital Markets mortgage portfolio** | $731,801 | $817,800 | $731,801 | $ 817,800 |

---

[1] Based on unpaid principal balance.

[2] Includes portfolio securitization transactions that do not qualify for sale treatment under the accounting standards on the transfers of financial assets.

[3] Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[4] Includes purchases of Fannie Mae MBS issued by consolidated trusts.

Purchases of mortgage loans decreased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010 because we purchased fewer loans that were four or more months delinquent from MBS trusts in the second quarter and first half of 2011. We began to significantly increase our purchases of delinquent loans in 2010 and during the first half of 2010, we purchased the substantial majority of our delinquent loan population, which included $127 billion of loans that were four or more months delinquent as of December 31, 2009.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors

44

including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We purchased approximately 204,000 delinquent loans with an unpaid principal balance of approximately $36 billion from our single-family MBS trusts in the first half of 2011. As of June 30, 2011, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $6.1 billion. In July 2011, we purchased approximately 29,000 delinquent loans with an unpaid principal balance of $5.1 billion from our single-family MBS trusts.

Securitizations increased in the second quarter and first half of 2011 compared with the second quarter and first half of 2010 primarily due to the securitization of $9.3 billion of existing reverse mortgage whole loans from the Capital Markets group's portfolio in the second quarter of 2011. We held these reverse mortgage securities in our Capital Markets group's portfolio as of June 30, 2011.

Table 20 shows the composition of the Capital Markets group's mortgage portfolio as of June 30, 2011 and December 31, 2010.

**Table 20:   Capital Markets Group's Mortgage Portfolio Composition**[1]

| | As of | |
| --- | --- | --- |
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| **Capital Markets group's mortgage loans:** | | |
| Single-family loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 41,849 | $ 51,783 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 241,766 | 237,096 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,474 | 11,446 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,832 | 31,526 |
| Total single-family conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 278,072 | 280,068 |
| **Total single-family loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 319,921 | 331,851 |
| Multifamily loans | | |
| Government insured or guaranteed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 396 | 431 |
| Conventional: | | |
| Long-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,890 | 4,413 |
| Intermediate-term, fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64,248 | 71,010 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,962 | 19,369 |
| Total multifamily conventional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85,100 | 94,792 |
| **Total multifamily loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85,496 | 95,223 |
| **Total Capital Markets group's mortgage loans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 405,417 | 427,074 |
| **Capital Markets group's mortgage-related securities:** | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 231,541 | 260,429 |
| Freddie Mac. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,952 | 17,332 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,126 | 1,425 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,936 | 22,283 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,277 | 18,038 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,500 | 25,052 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,658 | 12,525 |
| Other mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,394 | 4,613 |
| **Total Capital Markets group's mortgage-related securities**[2] . . . . . . . . . . . . . . . . . . . . | 326,384 | 361,697 |
| **Total Capital Markets group's mortgage portfolio** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $731,801 | $788,771 |

TREASURY-1511

---

[1]   Based on unpaid principal balance.

[2]   The fair value of these mortgage-related securities was $332.2 billion and $365.8 billion as of June 30, 2011 and December 31, 2010, respectively.

The Capital Markets group's mortgage portfolio decreased from December 31, 2010 to June 30, 2011 primarily due to liquidations and sales, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $230.8 billion as of June 30, 2011. This population includes loans that have been modified and have been classified as TDRs as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements. We expect our mortgage portfolio to continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury.

## CONSOLIDATED BALANCE SHEET ANALYSIS

The section below provides a discussion of our condensed consolidated balance sheets as of the dates indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 21 presents a summary of our condensed consolidated balance sheets as of June 30, 2011 and December 31, 2010.

**Table 21:   Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
| --- | --- | --- | --- |
| | June 30, 2011 | December 31, 2010 | Variance |
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements | $   33,774 | $   29,048 | $   4,726 |
| Restricted cash | 37,579 | 63,678 | (26,099) |
| Investments in securities[1] | 148,523 | 151,248 | (2,725) |
| Mortgage loans | | | |
| Of Fannie Mae | 386,722 | 407,482 | (20,760) |
| Of consolidated trusts | 2,610,613 | 2,577,794 | 32,819 |
| Allowance for loan losses | (69,506) | (61,556) | (7,950) |
| Mortgage loans, net of allowance for loan losses | 2,927,829 | 2,923,720 | 4,109 |
| Other assets[2] | 48,407 | 54,278 | (5,871) |
| Total assets | $3,196,112 | $3,221,972 | $(25,860) |
| **Liabilities and equity (deficit)** | | | |
| Debt | | | |
| Of Fannie Mae | $   724,799 | $   780,044 | $(55,245) |
| Of consolidated trusts | 2,450,046 | 2,416,956 | 33,090 |
| Other liabilities[3] | 26,354 | 27,489 | (1,135) |
| Total liabilities | 3,201,199 | 3,224,489 | (23,290) |
| Senior preferred stock | 99,700 | 88,600 | 11,100 |
| Other equity (deficit)[4] | (104,787) | (91,117) | (13,670) |
| Total stockholders' equity (deficit) | (5,087) | (2,517) | (2,570) |
| **Total liabilities and stockholders' deficit** | $3,196,112 | $3,221,972 | $(25,860) |

TREASURY-1512

---

[1] Includes $38.1 billion as of June 30, 2011 and $32.8 billion as of December 31, 2010 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 32: Cash and Other Investments Portfolio."

[2] Consists of accrued interest receivable, net; acquired property, net; and other assets.

[3] Consists of accrued interest payable, federal funds purchased and securities sold under agreements to repurchase, and other liabilities.

[4] Consists of preferred stock, common stock, additional paid-in capital, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

## Cash and Other Investments Portfolio

Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements are included in our cash and other investments portfolio. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

## Restricted Cash

Restricted cash primarily includes cash payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders. Our restricted cash decreased in the first half of 2011 primarily due to a decline in the volume of refinance activity, resulting in a decrease in unscheduled payments received.

## Investments in Mortgage-Related Securities

Our investments in mortgage-related securities are classified in our condensed consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value gains (losses), net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive loss. Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss. See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of June 30, 2011. Table 22 presents the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of June 30, 2011 and December 31, 2010.

**Table 22:   Summary of Mortgage-Related Securities at Fair Value**

| | As of | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 27,408 | $ 30,226 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,927 | 18,322 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,267 | 1,629 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,670 | 15,573 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,368 | 11,513 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,821 | 25,608 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,089 | 11,650 |
| Other mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,875 | 3,974 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $110,425 | $118,495 |

47

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $38.6 billion as of June 30, 2011, of which $31.8 billion was rated below investment grade. Table 23 presents the fair value of our investments in Alt-A and subprime private-label securities and an analysis of the cumulative losses on these investments as of June 30, 2011. As of June 30, 2011, we had realized actual cumulative principal shortfalls of approximately 4% of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements.

**Table 23:   Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of June 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
| | | | (Dollars in millions) | | |
| Trading securities:[4] | | | | | |
|    Alt-A private-label securities . . . . . . . . . . . . . . | $ 2,891 | $ 1,568 | $ (1,278) | $  (115) | $(1,163) |
|    Subprime private-label securities . . . . . . . . . . . | 2,675 | 1,459 | (1,216) | (308) | (908) |
|    Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,566 | $ 3,027 | $ (2,494) | $  (423) | $(2,071) |
| Available-for-sale securities: | | | | | |
|    Alt-A private-label securities . . . . . . . . . . . . . . | $18,045 | $13,102 | $ (5,234) | $(1,811) | $(3,423) |
|    Subprime private-label securities[5] . . . . . . . . . | 14,965 | 8,909 | (6,095) | (1,996) | (4,099) |
|    Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,010 | $22,011 | $(11,329) | $(3,807) | $(7,522) |
| Grand Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $38,576 | $25,038 | $(13,823) | $(4,230) | $(9,593) |

[1]  Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2]  Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3]  For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in earnings.

[4]  Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

[5]  Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

Table 24 presents the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of June 30, 2011. Based on the stressed condition of some of our financial guarantors, we believe some of these counterparties will not fully meet their obligation to us in the future. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Financial Guarantors" for additional

TREASURY-1514

information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

**Table 24:  Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | | | | As of June 30, 2011 | | | |
|---|---|---|---|---|---|---|---|
| | **Unpaid Principal Balance** | | | | | | **Monoline Financial Guaranteed Amount[6]** |
| | **Trading** | **Available-for-Sale** | **Wraps[1]** | **≥ 60 Days Delinquent[2][3]** | **Average Loss Severity[3][4]** | **Average Credit Enhancement[3][5]** | |
| | | | | (Dollars in millions) | | | |
| **Private-label mortgage-related securities backed by:[7]** | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | $    — | $   498 | $    — | 31.9% | 48.6% | 17.3% | $    — |
| 2005 . . . . . . . . . . . . . . . | — | 1,349 | — | 45.1 | 57.8 | 42.2 | 262 |
| 2006 . . . . . . . . . . . . . . . | — | 1,289 | — | 47.2 | 64.2 | 31.9 | 130 |
| 2007 . . . . . . . . . . . . . . . | 2,010 | — | — | 45.5 | 65.8 | 58.3 | 716 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | — | 6,508 | — | 10.3 | 58.8 | 12.4 | 13 |
| 2005 . . . . . . . . . . . . . . . | 87 | 4,236 | 123 | 23.7 | 58.3 | 6.1 | — |
| 2006 . . . . . . . . . . . . . . . | 66 | 4,043 | — | 29.6 | 59.0 | 1.1 | — |
| 2007 . . . . . . . . . . . . . . . | 728 | — | 188 | 42.8 | 66.5 | 28.6 | 298 |
| 2008[8] . . . . . . . . . . . . | — | 122 | — | — | — | — | — |
| Total Alt-A mortgage loans: . . . . . . . . . . . . . . . | 2,891 | 18,045 | 311 | | | | 1,419 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior[9] . . . . . . | — | 2,109 | 631 | 24.1 | 75.3 | 60.6 | 661 |
| 2005[8] . . . . . . . . . . . . | — | 188 | 1,378 | 42.5 | 77.2 | 58.2 | 228 |
| 2006 . . . . . . . . . . . . . . . | — | 12,044 | — | 47.9 | 77.6 | 18.6 | 52 |
| 2007 . . . . . . . . . . . . . . . | 2,675 | 624 | 5,631 | 48.7 | 76.0 | 22.9 | 180 |
| Total subprime mortgage loans: . . . . . . . . . . . . . . . | 2,675 | 14,965 | 7,640 | | | | 1,121 |
| Total Alt-A and subprime mortgage loans: . . . . . . . | $5,566 | $33,010 | $7,951 | | | | $2,540 |

---

[1]  Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

[2]  Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from June 2011 remittances for May 2011 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3]  The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4]  Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from June 2011 remittances for May 2011 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5]  Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to

49

securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee.

[6] Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

[7] Vintages are based on series date and not loan origination date.

[8] The unpaid principal balance includes private-label REMIC securities that have been resecuritized totaling $122 million for the 2008 vintage of other Alt-A loans and $17 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

[9] Includes a wrap transaction that has been partially consolidated on our balance sheet, which effectively resulted in a portion of the underlying structure of the transaction being accounted for and reported as available-for-sale securities.

## Mortgage Loans

The increase in mortgage loans, net of an allowance for loan losses, in the first half of 2011 was primarily driven by securitization activity from our lender swap and portfolio securitization programs, partially offset by scheduled principal paydowns and prepayments. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

## Debt Instruments

Debt of Fannie Mae is the primary means of funding our mortgage investments. Debt of consolidated trusts represents our liability to third-party beneficial interest holders when we have included the assets of a corresponding trust in our condensed consolidated balance sheets. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt as of June 30, 2011 and 2010 in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

The increase in debt of consolidated trusts in the first half of 2011 was primarily driven by the sale of Fannie Mae MBS, which are accounted for as reissuances of debt of consolidated trusts in our condensed consolidated balance sheets, since the MBS certificates are transferred from our ownership to a third party.

## Derivative Instruments

We supplement our issuance of debt with interest rate related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. We aggregate, by derivative counterparty, the net fair value gain or loss, less any cash collateral paid or received, and report these amounts in our condensed consolidated balance sheets as either assets or liabilities.

Our derivative assets and liabilities consist of these risk management derivatives and our mortgage commitments. We refer to the difference between the derivative assets and derivative liabilities recorded in our condensed consolidated balance sheets as our net derivative asset or liability. We present, by derivative instrument type, the estimated fair value of derivatives recorded in our condensed consolidated balance sheets and the related outstanding notional amounts as of June 30, 2011 and December 31, 2010 in "Note 9, Derivative Instruments." Table 25 provides an analysis of the factors driving the change from December 31, 2010 to June 30, 2011 in the estimated fair value of our net derivative liability related to our risk management derivatives recorded in our condensed consolidated balance sheets.

TREASURY-1516

**Table 25:   Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net**

| | For the Six Months Ended June 30, 2011 |
|---|---|
| | (Dollars in millions) |
| Net risk management derivative liability as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . | $   (789) |
| Effect of cash payments: | |
| Fair value at inception of contracts entered into during the period[1] . . . . . . . . . . . . . . . . . . | 62 |
| Fair value at date of termination of contracts settled during the period[2] . . . . . . . . . . . . . . . | 1,265 |
| Net collateral received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (92) |
| Periodic net cash contractual interest payments[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,213 |
| Total cash payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,448 |
| Statement of operations impact of recognized amounts: | |
| Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . . . . | (1,293) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (207) |
| Risk management derivatives fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,500) |
| Net risk management derivative asset as of June 30, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   159 |

---

[1]  Cash receipts from sale of derivative option contracts increase the derivative liability recorded in our condensed consolidated balance sheets. Cash payments made to purchase derivative option contracts (purchased option premiums) increase the derivative asset recorded in our condensed consolidated balance sheets.

[2]  Cash payments made to terminate derivative contracts reduce the derivative liability recorded in our condensed consolidated balance sheets. Primarily represents cash paid (received) upon termination of derivative contracts.

[3]  Interest is accrued on interest rate swap contracts based on the contractual terms. Accrued interest income increases our derivative asset and accrued interest expense increases our derivative liability. The offsetting interest income and expense are included as components of derivatives fair value gains (losses), net in our condensed consolidated statements of operations and comprehensive loss. Net periodic interest receipts reduce the derivative asset and net periodic interest payments reduce the derivative liability. Also includes cash paid (received) on other derivatives contracts.

For additional information on our derivative instruments, see "Consolidated Results of Operations—Fair Value Gains (Losses), Net," "Risk Management—Market Risk Management, Including Interest Rate Risk Management" and "Note 9, Derivative Instruments."

### Stockholders' Deficit

Our net deficit increased as of June 30, 2011 compared with December 31, 2010. See Table 26 in "Supplemental Non-GAAP Information—Fair Value Balance Sheets" for details of the change in our net deficit.

---

## SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 26 summarizes changes in our stockholders' deficit reported in our GAAP condensed consolidated balance sheets and in the fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the six months ended June 30, 2011. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 13, Fair Value."

51

**Table 26:   Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

| | For the Six Months Ended June 30, 2011 |
| --- | --- |
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2010[1] | $  (2,599) |
| Total comprehensive loss | (9,180) |
| Capital transactions:[2] | |
| Funds received from Treasury under the senior preferred stock purchase agreement | 11,100 |
| Senior preferred stock dividends | (4,497) |
| Capital transactions, net | 6,603 |
| Other | 8 |
| Fannie Mae stockholders' deficit as of June 30, 2011[1] | $  (5,168) |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2010 | $(120,294) |
| Capital transactions, net | 6,603 |
| Change in estimated fair value of net assets, excluding capital transactions | (14,319) |
| Decrease in estimated fair value of net assets, net | (7,716) |
| Estimated fair value of net assets as of June 30, 2011 | $(128,010) |

[1]   Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total deficit" amount reported in our condensed consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' deficit" and "Noncontrolling interests" reported in our condensed consolidated balance sheets.

[2]   Represents capital transactions, which are reported in our condensed consolidated financial statements.

The $14.3 billion decrease in the fair value of our net assets, excluding capital transactions, during the first half of 2011 was attributable to:

- A net decrease in the fair value due to credit-related items principally related to declining actual and expected home prices as well as a decrease in the estimated rate of prepayments, which increased the expected life of the guaranty book of business and increased expected credit losses. This net decrease due to credit-related items was partially offset by

- An increase in the fair value of the net portfolio attributable to the positive impact of the spread between mortgage assets and associated debt and derivatives.

### Cautionary Language Relating to Supplemental Non-GAAP Financial Measures

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

TREASURY-1518

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not intend to have another party assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We present our non-GAAP fair value balance sheets in Table 27 below.

53

**Table 27:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of June 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $  51,853 | $      — | $  51,853 | $  80,975 | $      — | $  80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . | 19,500 | — | 19,500 | 11,751 | — | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . . | 61,907 | — | 61,907 | 56,856 | — | 56,856 |
| Available-for-sale securities. . . . . . . . . . . . . . | 86,616 | — | 86,616 | 94,392 | — | 94,392 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale . . . . . . . . . . . | 439 | — | 439 | 915 | — | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae. . . . . . . . . . . . . . . . . . . | 330,390 | (30,847) | 299,543 | 358,698 | (39,331) | 319,367 |
| Of consolidated trusts . . . . . . . . . . . . . . | 2,597,000 | 42,555[2] | 2,639,555[3] | 2,564,107 | 46,038[2] | 2,610,145[3] |
| Total mortgage loans . . . . . . . . . . . . . . . . | 2,927,829 | 11,708 | 2,939,537[4] | 2,923,720 | 6,707 | 2,930,427[4] |
| Advances to lenders . . . . . . . . . . . . . . . . . . | 3,829 | (188) | 3,641[5][6] | 7,215 | (225) | 6,990[5][6] |
| Derivative assets at fair value . . . . . . . . . . . . | 668 | — | 668[5][6] | 1,137 | — | 1,137[5][6] |
| Guaranty assets and buy-ups, net . . . . . . . . . . | 483 | 446 | 929[5][6] | 458 | 356 | 814[5][6] |
| Total financial assets . . . . . . . . . . . . . . | 3,152,685 | 11,966 | 3,164,651[7] | 3,176,504 | 6,838 | 3,183,342[7] |
| Credit enhancements . . . . . . . . . . . . . . . . . . | 471 | 2,958 | 3,429[5][6] | 479 | 3,286 | 3,765[5][6] |
| Other assets. . . . . . . . . . . . . . . . . . . . . . . . . | 42,956 | (267) | 42,689[5][6] | 44,989 | (261) | 44,728[5][6] |
| Total assets. . . . . . . . . . . . . . . . . . . . . | $3,196,112 | $  14,657 | $3,210,769 | $3,221,972 | $  9,863 | $3,231,835 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase. . . . . . . . . . . . . . | $      — | $      — | $      — | $      52 | $      (1) | $      51 |
| Short-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | 162,005 | 36 | 162,041 | 151,884 | 90 | 151,974 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 5,193 | 1 | 5,194 | 5,359 | — | 5,359 |
| Long-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | 562,794[8] | 22,604 | 585,398 | 628,160[8] | 21,524 | 649,684 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 2,444,853[8] | 113,038[2] | 2,557,891 | 2,411,597[8] | 103,332[2] | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . | 592 | — | 592[9][10] | 1,715 | — | 1,715[9][10] |
| Guaranty obligations . . . . . . . . . . . . . . . . . . | 778 | 2,922 | 3,700[9][10] | 769 | 3,085 | 3,854[9][10] |
| Total financial liabilities . . . . . . . . . . . . . | 3,176,215 | 138,601 | 3,314,816[7] | 3,199,536 | 128,030 | 3,327,566[7] |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . | 24,984 | (1,102) | 23,882[9][10] | 24,953 | (472) | 24,481[9][10] |
| Total liabilities . . . . . . . . . . . . . . . . . . . . | 3,201,199 | 137,499 | 3,338,698 | 3,224,489 | 127,558 | 3,352,047 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[11] . . . . . . . . . . . . . . . . . . | 99,700 | — | 99,700 | 88,600 | — | 88,600 |
| Preferred . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,130 | (17,593) | 1,537 | 20,204 | (19,829) | 375 |
| Common. . . . . . . . . . . . . . . . . . . . . . . . . . . | (123,998) | (105,249) | (229,247) | (111,403) | (97,866) | (209,269) |
| **Total Fannie Mae stockholders' deficit/non-GAAP fair value of net assets** . . . . . . . . | $  (5,168) | $(122,842) | $ (128,010) | $  (2,599) | $(117,695) | $ (120,294) |
| Noncontrolling interests . . . . . . . . . . . . . . . | 81 | — | 81 | 82 | — | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . | (5,087) | (122,842) | (127,929) | (2,517) | (117,695) | (120,212) |
| Total liabilities and equity (deficit) . . . . . . . . | $3,196,112 | $  14,657 | $3,210,769 | $3,221,972 | $  9,863 | $3,231,835 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]   Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2]   Fair value exceeds carrying value of consolidated loans and consolidated debt as a significant portion of these were consolidated at unpaid principal balance as of January 1, 2010, upon adoption of accounting standards on transfers of financial assets and

TREASURY-1520

consolidation of variable interest entities ("VIEs"). Also impacting the difference between fair value and carrying value of the consolidated loans is the credit component included in consolidated loans, which has no corresponding impact on the consolidated debt.

[3]   Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $3.1 billion and $3.0 billion as of June 30, 2011 and December 31, 2010, respectively.

[4]   Performing loans had both a fair value and an unpaid principal balance of $2.8 trillion as of June 30, 2011 compared with a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2010. Nonperforming loans, which include loans that are delinquent by one or more payments, had a fair value of $139.7 billion and an unpaid principal balance of $247.3 billion as of June 30, 2011 compared with a fair value of $168.5 billion and an unpaid principal balance of $287.4 billion as of December 31, 2010. See "Note 13, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[5]   The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

[6]   "Other assets" include the following GAAP condensed consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP condensed consolidated balance sheets totaled $24.3 billion and $27.5 billion as of June 30, 2011 and December 31, 2010, respectively. "Other assets" in our GAAP condensed consolidated balance sheets include the following: (a) Advances to Lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $5.5 billion and $9.3 billion as of June 30, 2011 and December 31, 2010, respectively.

[7]   We determined the estimated fair value of these financial instruments in accordance with the fair value accounting standard as described in "Note 13, Fair Value."

[8]   Includes certain long-term debt instruments that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $4.1 billion and $3.2 billion as of June 30, 2011 and December 31, 2010, respectively.

[9]   The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

[10]   "Other liabilities" include Accrued interest payable in our GAAP condensed consolidated balance sheets. The carrying value of this item in our GAAP condensed consolidated balance sheets totaled $13.3 billion and $13.8 billion as of June 30, 2011 and December 31, 2010, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP condensed consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP condensed consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $1.4 billion and $2.5 billion as of June 30, 2011 and December 31, 2010, respectively.

[11]   The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements and maintaining sufficient capacity to meet these needs.

Our Treasury group is responsible for implementing our liquidity and contingency planning strategies. We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt. While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury arrangements, we believe that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances. See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning" in our 2010 Form 10-K for a discussion of our liquidity contingency plans. Also see "Risk Factors" in this report for a description of the risks associated with our liquidity contingency planning.

Our liquidity position could be adversely affected by many causes, both internal and external to our business, including: actions taken by the conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; a U.S. government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U.S. government's debt from any of the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a significant further decline in our net worth; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status.

### Debt Funding

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

#### Fannie Mae Debt Funding Activity

Table 28 summarizes the activity in the debt of Fannie Mae for the periods indicated. This activity includes federal funds purchased and securities sold under agreements to repurchase but excludes the debt of consolidated trusts as well as intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

TREASURY-1522

**Table 28:   Activity in Debt of Fannie Mae**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010[2]** | **2011** | **2010[2]** |
| | | (Dollars in millions) | | |
| **Issued during the period:** | | | | |
| Short-term: | | | | |
|    Amount | $140,051 | $148,451 | $228,252 | $286,931 |
|    Weighted-average interest rate | 0.12% | 0.29% | 0.13% | 0.26% |
| Long-term: | | | | |
|    Amount | $ 29,687 | $100,890 | $ 81,424 | $202,854 |
|    Weighted-average interest rate | 2.38% | 2.39% | 2.22% | 2.34% |
| Total issued: | | | | |
|    Amount | $169,738 | $249,341 | $309,676 | $489,785 |
|    Weighted-average interest rate | 0.51% | 1.12% | 0.68% | 1.11% |
| **Paid off during the period:** [1] | | | | |
| Short-term: | | | | |
|    Amount | $125,171 | $100,141 | $218,202 | $231,007 |
|    Weighted-average interest rate | 0.22% | 0.21% | 0.24% | 0.22% |
| Long-term: | | | | |
|    Amount | $ 82,721 | $ 88,439 | $149,578 | $183,602 |
|    Weighted-average interest rate | 2.82% | 3.33% | 2.82% | 3.32% |
| Total paid off: | | | | |
|    Amount | $207,892 | $188,580 | $367,780 | $414,609 |
|    Weighted-average interest rate | 1.26% | 1.68% | 1.29% | 1.59% |

[1]  Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases.

[2]  For the three and six months ended June 30, 2010, we revised the weighted-average interest rate on short-term issued and total issued debt primarily to reflect weighting based on transaction level data.

Debt funding activity in the second quarter and first half of 2011 decreased compared with the second quarter and first half of 2010 primarily due to lower funding needs as a result of (1) a reduction in the size of our mortgage portfolio pursuant to the requirements of the senior preferred stock purchase agreement, and (2) a decrease in our purchases of delinquent loans from MBS trusts. We began to significantly increase our purchases of delinquent loans in 2010, and during the first half of 2010 we purchased the substantial majority of our delinquent loan population. Additionally, our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform."

In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of our debt funding also could be materially adversely affected by a change or perceived change in the

TREASURY-1523

creditworthiness of the U.S. government. See "Credit Ratings" below for a discussion of potential rating agency actions on our debt securities that likely would result from a downgrade in the U.S. government's debt ratings. A downgrade in our credit ratings likely would reduce demand for our debt securities and increase our borrowing costs.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae consists of federal funds purchased and securities sold under agreements to repurchase and short-term and long-term debt, excluding debt of consolidated trusts.

As of June 30, 2011, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt increased to 22% from 19% as of December 31, 2010. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.68% as of June 30, 2011 from 2.77% as of December 31, 2010.

Pursuant to the terms of the senior preferred stock purchase agreement, our outstanding debt limit is 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Our debt limit under the senior preferred stock purchase agreement was reduced to $972 billion in 2011. As of June 30, 2011, our aggregate indebtedness totaled $735.7 billion, which was $236.3 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

Table 29 provides information as of June 30, 2011 and December 31, 2010 on our outstanding short-term and long-term debt based on its original contractual terms.

TREASURY-1524

**Table 29:   Outstanding Short-Term Borrowings and Long-Term Debt[1]**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011 | | | December 31, 2010 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| | | | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . | — | $ — | —% | — | $ 52 | 2.20% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . | — | $ 161,689 | 0.16% | — | $ 151,500 | 0.32% |
| Foreign exchange discount notes . . . . . . | — | 316 | 2.30 | — | 384 | 2.43 |
| Total short-term debt of Fannie Mae[2] . . . . . | | 162,005 | 0.17 | | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . | — | 5,193 | 0.17 | — | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . | | $ 167,198 | 0.17% | | $ 157,243 | 0.32% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . . | 2011 - 2030 | $ 273,366 | 3.00% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes . . . . . . . . . . . . . . . | 2011 - 2021 | 164,043 | 2.15 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . . . . | 2017 - 2028 | 1,223 | 5.98 | 2017 - 2028 | 1,177 | 6.21 |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . | 2011 - 2040 | 45,568 | 5.63 | 2011 - 2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . . . . | | 484,200 | 2.97 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . . . . . | 2011 - 2016 | 70,546 | 0.25 | 2011 - 2015 | 72,039 | 0.31 |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . | 2020 - 2037 | 368 | 5.84 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . . . . . | | 70,914 | 0.28 | | 72,425 | 0.34 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[4] . . . . . . . . . | 2012 - 2014 | 4,893 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . . . | 2019 | 2,787 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed-rate . . . . . . . | | 7,680 | 6.83 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[5] . . . . . | | 562,794 | 2.68 | | 628,160 | 2.77 |
| Debt of consolidated trusts[3] . . . . . . . . . | 2011 - 2051 | 2,444,853 | 4.54 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . . . . . . . . | | $3,007,647 | 4.20% | | $3,039,757 | 4.22% |
| Outstanding callable debt of Fannie Mae[6] . . . | | $ 170,133 | 2.74% | | $ 219,804 | 2.53% |

[1]  Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments and debt of consolidated trusts, totaled $734.5 billion and $792.6 billion as of June 30, 2011 and December 31, 2010, respectively.

[2]  Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $67 million and $128 million as of June 30, 2011 and December 31, 2010, respectively.

[3]  Includes a portion of structured debt instruments that is reported at fair value.

[4]  Consists of subordinated debt with an interest deferral feature.

[5]  Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $78.9 billion and $95.4 billion as of June 30, 2011 and December 31, 2010, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $9.7 billion and $12.4 billion as of June 30,

59

2011 and December 31, 2010, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $572.4 billion and $640.5 billion as of June 30, 2011 and December 31, 2010, respectively.

(6) Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 30 presents the maturity profile, as of June 30, 2011, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, increased as a percentage of our total outstanding debt, excluding debt of consolidated trusts and federal funds purchased and securities sold under agreements to repurchase, to 33% as of June 30, 2011, compared with 32% as of December 31, 2010. The weighted-average maturity of our outstanding debt that is maturing within one year was 119 days as of June 30, 2011, compared with 116 days as of December 31, 2010.

**Table 30:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year(1)**



(1)   Includes unamortized discounts, premiums and other cost basis adjustments of $115 million as of June 30, 2011. Excludes debt of consolidated trusts maturing within one year of $9.0 billion as of June 30, 2011.

Table 31 presents the maturity profile, as of June 30, 2011, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 57 months as of June 30, 2011 compared with approximately 58 months as of December 31, 2010.

TREASURY-1526

**Table 31:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year**[1]



[1]   Includes unamortized discounts, premiums and other cost basis adjustments of $9.7 billion as of June 30, 2011. Excludes debt of consolidated trusts of $2.4 trillion as of June 30, 2011.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities. We also intend to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock.

### Cash and Other Investments Portfolio

Table 32 provides information on the composition of our cash and other investments portfolio for the periods indicated.

**Table 32:   Cash and Other Investments Portfolio**

|  | As of | |
|---|---|---|
|  | June 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Cash and cash equivalents | $14,274 | $17,297 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 19,500 | 11,751 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities[1] | 34,856 | 27,432 |
| Asset-backed securities[2] | 3,242 | 5,321 |
| Total non-mortgage-related securities | 38,098 | 32,753 |
| Total cash and other investments | $71,872 | $61,801 |

[1]   Excludes $2.0 billion and $4.0 billion of U.S. Treasury securities which are a component of cash equivalents as of June 30, 2011 and December 31, 2010, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[2]   Includes securities primarily backed by credit cards loans, student loans and automobile loans.

Our cash and other investments portfolio increased from December 31, 2010 to June 30, 2011. We have more outstanding debt maturing in the third quarter of 2011 compared with our outstanding debt that matured in the first quarter of 2011, which resulted in an increase in the amount of cash and highly liquid non-mortgage securities we were required to hold pursuant to our liquidity risk management policy.

61

TREASURY-1527

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, are highly dependent on our credit ratings from the major ratings organizations. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions.

While there have been no changes in our credit ratings from December 31, 2010 to August 2, 2011, on July 15, 2011, S&P placed our long-term and short-term debt ratings on "CreditWatch with negative implications," following a similar action on the debt ratings of the U.S. government. A rating being placed on CreditWatch indicates a substantial likelihood of a ratings action by S&P within the next 90 days or is a response to events presenting significant uncertainty to the creditworthiness of an issuer. S&P noted that it placed our long-term and short-term debt on CreditWatch with negative implications due to our direct reliance on the U.S. government. On July 14, 2011, S&P stated that it may lower the long-term debt rating of the U.S. in the next three months if it concludes that Congress and the Administration have not achieved a credible solution to the rising U.S. government debt burden and are not likely to achieve one in the foreseeable future.

On July 13, 2011, Moody's placed both the U.S. government's rating and our long-term debt ratings on review for possible downgrade. Following the raising of the U.S. government's statutory debt limit on August 2, 2011, Moody's confirmed both the U.S. government's rating and our long-term debt ratings, and removed the designation that these ratings were under review for possible downgrade. However, Moody's revised the rating outlook for both the U.S. government's rating and our long-term debt ratings to negative. In assigning the negative outlook to the U.S. government's rating, Moody's indicated there would be a risk of a downgrade if (1) there is a weakening in fiscal discipline in the coming year; (2) further fiscal consolidation measures are not adopted in 2013; (3) the economic outlook deteriorates significantly; or (4) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected.

S&P, Moody's and Fitch have all indicated that they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities if they were to lower their ratings on the U.S. government.

We currently cannot predict whether one or more of these ratings agencies will downgrade our debt ratings in the future, or how long our ratings will remain subject to review for a possible downgrade by S&P. See "Risk Factors" for a discussion of the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements.

Table 33 presents the credit ratings issued by the three major credit rating agencies as of August 2, 2011.

**Table 33:   Fannie Mae Credit Ratings**

| | As of August 2, 2011 | | |
| --- | --- | --- | --- |
| | **S&P** | **Moody's** | **Fitch** |
| Long-term senior debt . . . . . | AAA | Aaa | AAA |
| Short-term senior debt . . . . . | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt . . | A | Aa2 | AA- |
| Preferred stock . . . . . . . . . . | C | Ca | C/RR6 |
| Bank financial strength rating . . . . . . . . . . . . . . . | — | E+ | — |
| Outlook . . . . . . . . . . . . . . . | CreditWatch Negative (for Senior Debt) Negative (for Qualifying Subordinated Debt) | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Stable (for AAA rated Long Term Issuer Default Rating) |

TREASURY-1528

*Cash Flows*

*Six Months Ended June 30, 2011.*   Cash and cash equivalents of $14.3 billion as of June 30, 2011 decreased by $3.0 billion from December 31, 2010. Net cash generated from investing activities totaled $236.2 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash outflows used in operating activities of $2.1 billion and net cash used in financing activities of $237.1 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

*Six Months Ended June 30, 2010.*   Cash and cash equivalents of $27.8 billion as of June 30, 2010 increased by $21.0 billion from December 31, 2009. Net cash generated from investing activities totaled $251.0 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were partially offset by net cash outflows used in operating activities of $47.1 billion resulting primarily from purchases of trading securities. The net cash used in financing activities of $182.8 billion was primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

## Capital Management

### Regulatory Capital

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. We report our minimum capital requirement, core capital and GAAP net worth in our periodic reports on Form 10-Q and Form 10-K, and FHFA also reports them on its website. FHFA is not reporting on our critical capital, risk-based capital or subordinated debt levels during the conservatorship. For information on our minimum capital requirements see "Note 11, Regulatory Capital Requirements."

### Senior Preferred Stock Purchase Agreement

As a result of the covenants under the senior preferred stock purchase agreement, Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding and the uncertainty regarding our future, we effectively no longer have access to equity funding except through draws under the senior preferred stock purchase agreement.

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $98.7 billion from Treasury pursuant to the senior preferred stock purchase agreement as of June 30, 2011. The Acting Director of FHFA will submit a request for $5.1 billion from Treasury under the senior preferred stock purchase agreement to eliminate our net worth deficit as of June 30, 2011, and request the receipt of those funds on or prior to September 30, 2011. Upon receipt of the requested funds, the aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, will equal $104.8 billion.

We continue to expect to have a net worth deficit in future periods and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement. Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth

TREASURY-1529

as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for the first, second and third quarters of 2011 due to the continued fragility of the U.S. mortgage market and to Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the fourth quarter of 2011.

### Dividends

Holders of the senior preferred stock are entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Treasury is the current holder of our senior preferred stock. As conservator and under our charter, FHFA has authority to declare and approve dividends on the senior preferred stock. If at any time we do not pay cash dividends on the senior preferred stock when they are due, then immediately following the period we did not pay dividends and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends on the senior preferred stock that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock.

Our second quarter dividend of $2.3 billion was declared by the conservator and paid by us on June 30, 2011. Upon receipt of additional funds from Treasury in September 2011, which FHFA will request on our behalf, the annualized dividend on the senior preferred stock will be $10.5 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

## OFF-BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $57.4 billion as of June 30, 2011 and $56.9 billion as of December 31, 2010.

Under the temporary credit and liquidity facilities program in which we provide assistance to housing finance agencies ("HFAs") and in which Treasury has purchased participation interests, our outstanding commitments totaled $3.5 billion as of June 30, 2011 and $3.7 billion as of December 31, 2010. Our total outstanding liquidity commitments to advance funds for securities backed by multifamily housing revenue bonds totaled $17.6 billion as of June 30, 2011 and $17.8 billion as of December 31, 2010. As of both June 30, 2011 and December 31, 2010, there were no liquidity guarantee advances outstanding. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2010 Form 10-K.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to manage these risks and mitigate our losses by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" and "Risk Factors." We are also subject to a number of other risks that could

64

adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2010 Form 10-K and "Risk Factors" in our 2010 Form 10-K and in this report.

## Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Continuing adverse market conditions have resulted in significant exposure to mortgage and institutional counterparty credit risk. The metrics used to measure credit risk are generated using internal models. Our internal models require numerous assumptions and there are inherent limitations in any methodology used to estimate macroeconomic factors such as home prices, unemployment and interest rates and their impact on borrower behavior. When market conditions change rapidly and dramatically, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risks associated with our use of models.

### *Mortgage Credit Risk Management*

Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty.

#### Mortgage Credit Book of Business

Table 34 displays the composition of our entire mortgage credit book of business as of the periods indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of both June 30, 2011 and December 31, 2010.

**Table 34:   Composition of Mortgage Credit Book of Business[1]**

| | As of June 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | | | (Dollars in millions) | | | |
| Mortgage loans and Fannie Mae MBS[2] | $2,855,481 | $174,602 | $3,030,083 | $2,846,462 | $172,407 | $3,018,869 |
| Other credit guarantees[3] | 20,025 | 16,853 | 36,878 | 18,625 | 16,994 | 35,619 |
| Guaranty book of business | $2,875,506 | $191,455 | $3,066,961 | $2,865,087 | $189,401 | $3,054,488 |
| Agency mortgage-related securities[4] | 16,046 | 33 | 16,079 | 18,797 | 24 | 18,821 |
| Other mortgage-related securities | 45,989 | 33,139 | 79,128 | 48,678 | 34,205 | 82,883 |
| Mortgage credit book of business | $2,937,541 | $224,627 | $3,162,168 | $2,932,562 | $223,630 | $3,156,192 |
| **Guaranty Book of Business Detail:** | | | | | | |
| Conventional Guaranty Book of Business[5] | $2,801,371 | $188,868 | $2,990,239 | $2,790,590 | $186,712 | $2,977,302 |
| Government Guaranty Book of Business[6] | $ 74,135 | $ 2,587 | $ 76,722 | $ 74,497 | $ 2,689 | $ 77,186 |

[1]   Based on unpaid principal balance. Prior period amounts have been reclassified to conform to the current period presentation.

TREASURY-1531

(2)   The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(3)   Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

(4)   Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

(5)   Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

(6)   Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of both our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of June 30, 2011 and December 31, 2010. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies and underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies, which we discuss below, may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

### Single-Family Acquisition and Servicing Policies and Underwriting and Servicing Standards

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions.

TREASURY-1532

Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. In the second quarter of 2011, we issued new standards for mortgage servicers regarding the management of delinquent loans, default prevention and foreclosure time frames under FHFA's directive to align GSE policies for servicing delinquent mortgages. The new standards, reinforced by new incentives and compensatory fees, require servicers to take a more consistent approach for homeowner communications, loan modifications and other workouts, and, when necessary, foreclosures. The new standards are designed to: (1) achieve effective contact with the borrower, including creating a uniform standard for communicating with the homeowner, determining reasons for delinquency and assessing their ability to pay, and educating homeowners on the availability of foreclosure prevention options; (2) set clear timelines and establish clear and consistent policies in the foreclosure process; and (3) provide incentives to servicers to complete loan workouts earlier in the homeowner's delinquency and charge servicers compensatory fees when they fail to have the proper contact with the borrower. We believe these standards will bring greater consistency, clarity, fairness and efficiency to the process, help improve servicer performance, and hold servicers accountable for their effectiveness in assisting homeowners.

In addition to these new standards, we have taken other steps to improve the performance of our servicers including: (1) updating our Servicing Guide, which should improve our servicers' ability to understand and comply with our requirements and allow them to complete workouts earlier in the delinquency process, thereby avoiding foreclosure; and (2) implementing a servicer performance management system designed to measure and evaluate mortgage servicers' performance in helping homeowners avoid foreclosure.

For discussion of our acquisition policy, underwriting standards, and use of mortgage insurance as a form of credit enhancement, see "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in our 2010 Form 10-K. For a discussion of our aggregate mortgage insurance coverage as of June 30, 2011 and December 31, 2010, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Insurers."

*Single-Family Portfolio Diversification and Monitoring*

Diversification within our single-family mortgage credit book of business by product type, loan characteristics and geography is an important factor that influences credit quality and performance and may reduce our credit risk. We monitor various loan attributes, in conjunction with housing market and economic conditions, to determine if our pricing and our eligibility and underwriting criteria accurately reflect the risk associated with loans we acquire or guarantee. In some cases we may decide to significantly reduce our participation in riskier loan product categories. We also review the payment performance of loans in order to help identify potential problem loans early in the delinquency cycle and to guide the development of our loss mitigation strategies.

Table 35 presents our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

67

**Table 35:   Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business**[1]

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | June 30, 2011 | December 31, 2010 |
| | | | (Dollars in millions) | | | |
| **Original LTV ratio:**[5] | | | | | | |
| <= 60% . . . . . . . . . . . . . . . | 28% | 27% | 29% | 29% | 24% | 24% |
| 60.01% to 70% . . . . . . . . . . . . . | 14 | 15 | 15 | 15 | 16 | 16 |
| 70.01% to 80% . . . . . . . . . . . . . | 37 | 40 | 37 | 38 | 41 | 41 |
| 80.01% to 90%[6] . . . . . . . . . . . | 10 | 10 | 9 | 10 | 9 | 9 |
| 90.01% to 100%[6] . . . . . . . . . . . | 8 | 6 | 7 | 6 | 9 | 9 |
| Greater than 100%[6] . . . . . . . . | 3 | 2 | 3 | 2 | 1 | 1 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . . . . | 71% | 70% | 69% | 69% | 71% | 71% |
| Average loan amount . . . . . . . . . . | $194,598 | $216,042 | $206,313 | $220,411 | $156,294 | $155,531 |
| **Estimated mark-to-market LTV ratio:**[7] | | | | | | |
| <= 60% . . . . . . . . . . . . . . . . | | | | | 27% | 28% |
| 60.01% to 70% . . . . . . . . . . . . . | | | | | 13 | 13 |
| 70.01% to 80% . . . . . . . . . . . . . | | | | | 19 | 19 |
| 80.01% to 90% . . . . . . . . . . . . . | | | | | 15 | 15 |
| 90.01% to 100% . . . . . . . . . . . . | | | | | 9 | 9 |
| Greater than 100% . . . . . . . . . . . | | | | | 17 | 16 |
| Total . . . . . . . . . . . . . . . . . . . | | | | | 100% | 100% |
| Weighted average . . . . . . . . . | | | | | 78% | 77% |
| **Product type:** | | | | | | |
| **Fixed-rate:**[8] | | | | | | |
| Long-term . . . . . . . . . . . . . . | 70% | 72% | 69% | 72% | 73% | 74% |
| Intermediate-term . . . . . . . . . | 22 | 20 | 24 | 20 | 14 | 14 |
| Interest-only . . . . . . . . . . . . . | * | * | * | * | 2 | 2 |
| Total fixed-rate . . . . . . . . . | 92 | 92 | 93 | 92 | 89 | 90 |
| **Adjustable-rate:** | | | | | | |
| Interest-only . . . . . . . . . . . . . | 1 | 2 | 1 | 2 | 3 | 4 |
| Other ARMs . . . . . . . . . . . . . | 7 | 6 | 6 | 6 | 8 | 6 |
| Total adjustable-rate . . . . . . | 8 | 8 | 7 | 8 | 11 | 10 |
| Total . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Number of property units:** | | | | | | |
| 1 unit . . . . . . . . . . . . . . . . . . . | 97% | 98% | 97% | 98% | 97% | 97% |
| 2-4 units . . . . . . . . . . . . . . . . . | 3 | 2 | 3 | 2 | 3 | 3 |
| Total . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |

68

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | June 30, 2011 | December 31, 2010 |
| | | | | (Dollars in millions) | | |
| **Property type:** | | | | | | |
| Single-family homes . . . . . . . . . . . . . . . . . | 90% | 90% | 90% | 90% | 91% | 91% |
| Condo/Co-op . . . . . . . . . . . . . . . . . . . . . | 10 | 10 | 10 | 10 | 9 | 9 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy type:** | | | | | | |
| Primary residence . . . . . . . . . . . . . . . . . | 85% | 90% | 88% | 90% | 89% | 90% |
| Second/vacation home . . . . . . . . . . . . . . | 6 | 5 | 5 | 5 | 5 | 4 |
| Investor . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 5 | 7 | 5 | 6 | 6 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **FICO credit score:** | | | | | | |
| < 620 . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 1% | *% | 1% | 3% | 4% |
| 620 to < 660 . . . . . . . . . . . . . . . . . . | 3 | 2 | 2 | 2 | 7 | 7 |
| 660 to < 700 . . . . . . . . . . . . . . . . . . | 9 | 8 | 8 | 8 | 14 | 15 |
| 700 to < 740 . . . . . . . . . . . . . . . . . . | 18 | 17 | 17 | 17 | 21 | 21 |
| >= 740 . . . . . . . . . . . . . . . . . . . . . . . . | 69 | 72 | 73 | 72 | 55 | 53 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . . . . . . . . . . . . | 756 | 758 | 760 | 758 | 737 | 735 |
| **Loan purpose:** | | | | | | |
| Purchase . . . . . . . . . . . . . . . . . . . . . . . . | 31% | 31% | 23% | 26% | 32% | 33% |
| Cash-out refinance . . . . . . . . . . . . . . . . . | 16 | 19 | 18 | 20 | 28 | 29 |
| Other refinance . . . . . . . . . . . . . . . . . . . | 53 | 50 | 59 | 54 | 40 | 38 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Geographic concentration:**[9] | | | | | | |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . | 14% | 14% | 15% | 15% | 15% | 15% |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . | 20 | 20 | 20 | 20 | 19 | 19 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . | 20 | 19 | 20 | 19 | 24 | 24 |
| Southwest . . . . . . . . . . . . . . . . . . . . . . . | 16 | 15 | 15 | 14 | 15 | 15 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | 32 | 30 | 32 | 27 | 27 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| **Origination year:** | | | | | | |
| <= 2001 . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 2% | 2% |
| 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 3 | 3 |
| 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 10 | 11 |
| 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 6 | 7 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 8 | 9 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 7 | 8 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 11 | 12 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 8 | 9 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 19 | 21 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 20 | 18 |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 6 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 100% | 100% |

---

\*   Represents less than 0.5% of single-family conventional business volume or book of business.

[1]   We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien
      mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.5% of our single-

69

family conventional guaranty book of business as of both June 30, 2011 and December 31, 2010. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

(2)  Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-Family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we securitize into Fannie Mae MBS.

(3)  Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

(4)  Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented approximately 4.5% of our single-family conventional guaranty book of business as of June 30, 2011 and 3.9% as of December 31, 2010. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" in our 2010 Form 10-K for additional information on loan limits.

(5)  The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

(6)  We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have a LTV ratio over 80%.

(7)  The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

(8)  Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

(9)  Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

_Credit Profile Summary_

We continue to see the positive effects of actions we took beginning in 2008 to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. The single-family loans we purchased or guaranteed in the first half of 2011 have a strong credit profile with a weighted average original LTV ratio of 69%, a weighted average FICO credit score of 760, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to lower acquisition volume and the relatively high volume of Refi Plus loans (including HARP loans), the LTV ratios at origination for our 2011 acquisitions to date are higher than for our 2009 and 2010 acquisitions.

Whether our future acquisitions will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. In addition, FHA's role as the lower-cost option for some consumers for loans with higher LTV ratios has reduced our acquisitions of these types of loans since 2008. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

The credit profile of our acquisitions in the first half of 2011 was further influenced by our acquisitions of refinanced loans. Refinanced loans, which includes Refi Plus loans, comprised 77% of our single-family acquisitions in the first half of 2011. Refinanced loans generally have a strong credit profile because refinancing indicates borrowers' ability to make their mortgage payment and desire to maintain homeownership but Refi Plus loans, which may have original LTV ratios as high as 125% and in some cases lower FICO credit scores than we generally require, may not ultimately perform as well as traditional refinanced loans. Refi Plus, however, offers expanded refinance opportunities for eligible Fannie Mae borrowers that may help prevent future delinquencies and defaults. In the first quarter of 2011, our regulator granted our request for an extension of our ability to acquire loans under Refi Plus with LTV ratios greater than 80% and up to 125% for loans originated through June 2012. Approximately 18% of our single-family conventional business volume for the first half of 2010 consisted of loans with LTV ratios higher than 80% at

70

the time of purchase. For the first half of 2011, these loans accounted for 19% of our single-family business volume.

The prolonged and severe decline in home prices has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 78% as of June 30, 2011, and 77% as of December 31, 2010. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 17% as of June 30, 2011, and 16% as of December 31, 2010. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

*Alt-A and Subprime Loans*

Our exposure to Alt-A and subprime loans included in our single-family conventional guaranty book of business, as defined in this section, does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time. We are also not currently acquiring newly originated subprime loans. We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender. We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $195.3 billion as of June 30, 2011, represented approximately 7.0% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of $6.2 billion as of June 30, 2011, represented approximately 0.2% of our single-family conventional guaranty book of business. See "Table 35: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for additional information on our single-family book of business.

*Jumbo-Conforming and High-Balance Loans*

The outstanding unpaid principal balance of our jumbo-conforming and high-balance loans was $126.4 billion, or 4.5% of our single-family conventional guaranty book of business, as of June 30, 2011 and $109.7 billion, or 3.9% of our single-family conventional guaranty book of business, as of December 31, 2010. The standard conforming loan limit for a one-unit property was $417,000 in 2011 and 2010 (higher in some areas). Our loan limits are currently higher in specified high-cost areas, reaching as high as $729,750 for one-unit properties. Unless Congress acts to extend current law, our loan limits for loans originated after September 30, 2011 will decrease in such specified high-cost areas to an amount not to exceed $625,500 for one-unit properties. Unlike FHA, which will not be subject to lower loan limits for refinancing its existing jumbo and high-balance loans, our revised loan limits would apply to the refinancing of our existing jumbo-conforming and high-balance loans. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" in our 2010 Form 10-K for additional information on our loan limits.

TREASURY-1537

*Reverse Mortgages*

The outstanding unpaid principal balance of reverse mortgage whole loans and Fannie Mae MBS backed by reverse mortgage loans in our guaranty book of business was $50.9 billion as of June 30, 2011 and $50.8 billion as of December 31, 2010. The balance of our reverse-mortgage loans could increase over time, as each month the scheduled and unscheduled payments, interest, mortgage insurance premium, servicing fee, and default-related costs accrue to increase the unpaid principal balance. The majority of these loans are home equity conversion mortgages insured by the federal government through the FHA. Because home equity conversion mortgages are insured by the federal government, we believe that we have limited exposure to losses on these loans. In December 2010, we communicated to our lenders that we are exiting the reverse mortgage business and will no longer acquire newly originated home equity conversion mortgages.

Problem Loan Management

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur. If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. We refer to actions taken by servicers with borrowers to resolve existing or potential delinquent loan payments as "workouts." Our loan workouts reflect our various types of home retention strategies, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including preforeclosure sales and deeds-in-lieu of foreclosure. When appropriate, we seek to move to foreclosure expeditiously.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. We generally define single-family problem loans as loans that have been identified as being at imminent risk of payment default; early stage delinquent loans that are either 30 days or 60 days past due; and seriously delinquent loans, which are loans that are three or more monthly payments past due or in the foreclosure process. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the periods indicated.

**Table 36:   Delinquency Status of Single-Family Conventional Loans**

| | As of | | |
| --- | --- | --- | --- |
| | June 30, 2011 | December 31, 2010 | June 30, 2010 |
| As of period end: | | | |
| Delinquency status: | | | |
| 30 to 59 days delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.13% | 2.32% | 2.32% |
| 60 to 89 days delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.72 | 0.87 | 0.90 |
| Seriously delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.08 | 4.48 | 4.99 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 73% | 67% | 66% |

The number of loans at risk of becoming seriously delinquent has diminished in 2011 as early stage delinquencies have decreased. As of June 30, 2011, the percentage and number of our single-family conventional loans that were seriously delinquent decreased, as compared with December 31, 2010, and has

72

decreased every month since February 2010. The decrease in our serious delinquency rate in 2010 and the first half of 2011 was primarily the result of home retention solutions, as well as foreclosure alternatives and foreclosures completed. The volume of loans impacted by these actions continues to exceed the number of loans becoming seriously delinquent, thereby decreasing our percentage of seriously delinquent loans. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans have become an increasingly larger portion of our conventional single-family guaranty book of business, resulting in fewer loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased since February 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Executive Summary—Foreclosure Delays and Changes in the Foreclosure Environment," continuing issues in the servicer foreclosure process, changes in state foreclosure laws, and new court rules and proceedings have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, and the extent to which borrowers with modified loans continue to make timely payments.

Table 37 provides a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the periods indicated for single-family conventional loans in our single-family guaranty book of business.

**Table 37:   Single-Family Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | **June 30, 2011** | | **December 31, 2010** | | **June 30, 2010** | |
| | **Percentage of Book Outstanding** | **Serious Delinquency Rate** | **Percentage of Book Outstanding** | **Serious Delinquency Rate** | **Percentage of Book Outstanding** | **Serious Delinquency Rate** |
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest. . . . . . . . . . . . . . . . . | 15% | 3.89% | 15% | 4.16% | 16% | 4.52% |
| Northeast . . . . . . . . . . . . . . . . | 19 | 4.31 | 19 | 4.38 | 19 | 4.43 |
| Southeast . . . . . . . . . . . . . . . . | 24 | 5.92 | 24 | 6.15 | 24 | 6.67 |
| Southwest  . . . . . . . . . . . . . . . | 15 | 2.43 | 15 | 3.05 | 15 | 3.67 |
| West . . . . . . . . . . . . . . . . . . . | 27 | 3.25 | 27 | 4.06 | 26 | 4.96 |
| Total single-family conventional loans . . . . . . . | 100% | 4.08% | 100% | 4.48% | 100% | 4.99% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . . | 14% | 9.72% | 15% | 10.60% | 16% | 11.68% |
| Non-credit enhanced . . . . . . . . . | 86 | 3.14 | 85 | 3.40 | 84 | 3.74 |
| Total single-family conventional loans . . . . . . . | 100% | 4.08% | 100% | 4.48% | 100% | 4.99% |

---

[1]   See footnote 9 to "Table 35: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans, subprime loans and loans with higher mark-to-market LTVs, and our 2006 and 2007 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. Some states in the Midwest have experienced prolonged economic weakness and California, Florida, Arizona and Nevada have experienced the most significant declines in home prices coupled with unemployment rates that remain high.

73

Table 38 presents the serious delinquency rates and other financial information for our single-family conventional loans with some of these higher-risk characteristics as of the periods indicated. The reported categories are not mutually exclusive.

**Table 38:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | As of | | | | | | | | | | | |
| | June 30, 2011 | | | | December 31, 2010 | | | | June 30, 2010 | | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | | | | |
| States: | | | | | | | | | | | | |
| Arizona . . . . . . $ | 68,634 | 2% | 4.19% | 109% $ | 71,052 | 2% | 6.23% | 105% $ | 73,402 | 3% | 7.48% | 100% |
| California . . . . . | 516,760 | 19 | 2.94 | 78 | 507,598 | 18 | 3.89 | 76 | 496,731 | 17 | 4.99 | 75 |
| Florida . . . . . . | 180,681 | 6 | 12.19 | 107 | 184,101 | 7 | 12.31 | 107 | 189,569 | 7 | 12.60 | 102 |
| Nevada . . . . . . . | 29,763 | 1 | 7.88 | 134 | 31,661 | 1 | 10.66 | 128 | 33,345 | 1 | 12.83 | 129 |
| Select Midwest states[2] . . . . . | 290,612 | 10 | 4.54 | 82 | 292,734 | 11 | 4.80 | 80 | 298,607 | 11 | 5.17 | 78 |
| All other states . . | 1,707,490 | 62 | 3.24 | 72 | 1,695,615 | 61 | 3.46 | 71 | 1,694,015 | 61 | 3.82 | 68 |
| Product type: | | | | | | | | | | | | |
| Alt-A . . . . . . . . | 195,284 | 7 | 13.04 | 100 | 211,770 | 8 | 13.87 | 96 | 227,206 | 8 | 15.17 | 93 |
| Subprime . . . . . | 6,152 | * | 25.86 | 109 | 6,499 | * | 28.20 | 103 | 6,922 | * | 29.96 | 99 |
| Vintages: | | | | | | | | | | | | |
| 2006 . . . . . . . . | 207,140 | 7 | 11.90 | 109 | 232,009 | 8 | 12.19 | 104 | 262,925 | 9 | 12.52 | 99 |
| 2007 . . . . . . . . | 298,856 | 11 | 12.75 | 109 | 334,110 | 12 | 13.24 | 104 | 380,220 | 14 | 13.79 | 99 |
| All other vintages . . . . . | 2,287,944 | 82 | 2.42 | 71 | 2,216,642 | 80 | 2.62 | 70 | 2,142,524 | 77 | 2.88 | 67 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | | |
| Greater than 100%[1] . . . . . | 472,549 | 17 | 15.13 | 132 | 435,991 | 16 | 17.70 | 130 | 399,133 | 14 | 20.57 | 130 |
| Select combined risk characteristics: | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 . . . . . . . | 20,063 | 1 | 19.36 | 113 | 21,205 | 1 | 21.41 | 109 | 22,655 | 1 | 24.28 | 105 |

\* Percentage is less than 0.5%.

[1] Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2] Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

The efforts of our mortgage servicers are critical in keeping people in their homes, preventing foreclosures and providing homeowner assistance. We continue to work with our servicers to implement our foreclosure prevention initiatives effectively and to find ways to enhance our workout protocols and their workflow processes. Partnering with our servicers, civic and community leaders and housing industry partners, we have launched a series of nationwide Mortgage Help Centers to accelerate the response time for struggling borrowers with loans owned by us. As of June 30, 2011, we have established nine Mortgage Help Centers which completed nearly 2,300 home retention plans in the first half of 2011. Additionally, we currently offer up to twelve months forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure.

TREASURY-1540

Our approach to workouts continues to focus on the large number of borrowers facing both long-term and short-term financial hardships. Accordingly, the vast majority of loan modifications we completed during the first half of 2011 were, as in recent periods, concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships.

In addition, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. Our servicers work with a borrower to sell their home prior to foreclosure in a preforeclosure sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure. Further, in cooperation with several Multiple Listing Services across the nation, we developed the Short Sale Assistance Desk to assist real estate professionals in handling post-offer short sale issues that may relate to servicer responsiveness, the existence of a second lien, or issues involving mortgage insurance.

Table 39 provides statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

**Table 39:   Statistics on Single-Family Loan Workouts**

| | For the Six Months Ended June 30, 2011 | | For the Year Ended December 31, 2010 | | For the Six Months Ended June 30, 2010 | |
|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | | | (Dollars in millions) | | | |
| Home retention strategies: | | | | | | |
| Modifications . . . . . . . . . . . . . . . . . . . . . . . . . | $20,909 | 101,379 | $ 82,826 | 403,506 | $44,383 | 215,449 |
| Repayment plans and forbearances completed  . . | 2,598 | 18,599 | 4,385 | 31,579 | 2,372 | 17,398 |
| HomeSaver Advance first-lien loans. . . . . . . . . . | — | — | 688 | 5,191 | 515 | 4,371 |
| | 23,507 | 119,978 | 87,899 | 440,276 | 47,270 | 237,218 |
| Foreclosure alternatives: | | | | | | |
| Preforeclosure sales . . . . . . . . . . . . . . . . . . . . . | 7,587 | 34,047 | 15,899 | 69,634 | 8,387 | 36,534 |
| Deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . | 768 | 4,249 | 1,053 | 5,757 | 424 | 2,307 |
| | 8,355 | 38,296 | 16,952 | 75,391 | 8,811 | 38,841 |
| Total loan workouts. . . . . . . . . . . . . . . . . . . . . . . | $31,862 | 158,274 | $104,851 | 515,667 | $56,081 | 276,059 |
| Loan workouts as a percentage of single-family guaranty book of business[1] . . . . . . . . . . . . . . . | 2.22% | 1.77% | 3.66% | 2.87% | 3.91% | 3.05% |

[1]   Calculated based on annualized loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

The volume of workouts completed in the first half of 2011 decreased compared with the first half of 2010, primarily because we began to require that non-HAMP modifications go through a trial period, which initially lowers the number of modifications that can become permanent in any particular period. The number of foreclosure alternatives we agreed to during the first half of 2011 remains high as these are favorable solutions for a growing number of borrowers. We expect the volume of our foreclosure alternatives to remain high throughout the remainder of 2011.

During the first half of 2011, we initiated approximately 104,000 trial modifications, including HAMP and non-HAMP, compared with 117,000 trial modifications during the first half of 2010. We also initiated other types of workouts, such as repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

TREASURY-1541

Table 40 displays the profile of loan modifications (HAMP and non-HAMP) provided to borrowers during the first half of 2011, the first and second quarters of 2011 and during 2010.

**Table 40:   Single-Family Loan Modification Profile**

| | 2011 | | | Full Year |
|---|---|---|---|---|
| | YTD | Q2 | Q1 | 2010 |
| Term extension, interest rate reduction, or combination of both[1] . . . . . . . . . . . . . . . . . . | 97% | 99% | 96% | 93% |
| Initial reduction in monthly payment[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95 | 97 | 94 | 91 |
| Estimated mark-to-market LTV ratio > 100% . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 63 | 62 | 64 | 53 |
| Troubled debt restructurings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 98 | 98 | 97 | 94 |

[1]   Reported statistics for term extension, interest rate reduction or the combination include subprime adjustable-rate mortgage loans that have been modified to a fixed-rate loan.

[2]   These modification statistics do not include subprime adjustable-rate mortgage loans that were modified to a fixed-rate loan and were current at the time of the modification.

A significant portion of our modifications pertains to loans with a mark-to-market LTV ratio greater than 100% because these borrowers are typically unable to refinance their mortgages or sell their homes for a price that allows them to pay off their mortgage obligation as their mortgages are greater than the value of their homes. Additionally, the serious delinquency rate for these loans tends to be significantly higher than the overall average serious delinquency rate. As of June 30, 2011, the serious delinquency rate for loans with a mark-to-market LTV ratio greater than 100% was 15%, compared with our overall average single-family serious delinquency rate of 4.08%.

Approximately 68% of loans modified during the first half of 2010 were current or had paid off as of one year following the loan modification date. In comparison, 44% of loans modified during the first half of 2009 were current or had paid off as of one year following the loan modification date. There is significant uncertainty regarding the ultimate long term success of our current modification efforts and we believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations. FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets.

_REO Management_

Foreclosure and REO activity affect the level of credit losses. Table 41 compares our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

TREASURY-1542

**Table 41:   Single-Family Foreclosed Properties**

| | For the Six Months Ended June 30, | |
|---|---|---|
| | **2011** | **2010** |
| Single-family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . . | 162,489 | 86,155 |
| Acquisitions by geographic area:[2] | | |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,769 | 30,619 |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,786 | 7,497 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,549 | 39,593 |
| Southwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,950 | 26,660 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,192 | 26,398 |
| Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107,246 | 130,767 |
| Dispositions of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (134,016) | (87,612) |
| End of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . . . . . | 135,719 | 129,310 |
| Carrying value of single-family foreclosed properties (dollars in millions)[3] . . . . . . . . . . . . . | $ 12,480 | $ 13,043 |
| Single-family foreclosure rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.20% | 1.45% |

[1]   Includes acquisitions through deeds-in-lieu of foreclosure.

[2]   See footnote 9 to "Table 35: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]   Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

[4]   Estimated based on the annualized total number of properties acquired through foreclosure as a percentage of the total number of loans in our single-family conventional guaranty book of business as of the end of each respective period.

The continued weak economy, as well as high unemployment rates, continue to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure, which has resulted in a higher inventory of REO properties as of June 30, 2011 compared with June 30, 2010. Our foreclosure rates remain high; however, foreclosure levels were lower than what they otherwise would have been during the first half of 2011 due to delays in the processing of foreclosures caused by continuing foreclosure process issues, changes in state foreclosure laws, and new court rules and proceedings. Additionally, foreclosure levels during 2010 were affected by our directive to servicers to delay foreclosure sales until the loan servicer verifies that the borrower is ineligible for a HAMP modification and that all other home retention and foreclosure prevention alternatives have been exhausted. The delay in potential foreclosures, as well as an increase in the number of dispositions of REO properties, has resulted in a decrease in the ending inventory of foreclosed properties since December 31, 2010.

The carrying value of our single-family foreclosed properties declined as of June 30, 2011 compared with June 30, 2010 due to a decline in home prices on a national basis, which significantly reduced the values of our single-family REO, partially offset by an increase in the number of REO properties.

The percentage of our properties that we are unable to market for sale remains high. The most common reasons for our inability to market properties for sale are: (1) properties are within the period during which state law allows the former mortgagor and second lien holders to redeem the property (states which allow this are known as "redemption states"); (2) properties are still occupied by the person or personal property and the eviction process is not yet complete ("occupied status"); or (3) properties are being repaired. As we are unable to market a higher portion of our inventory, it slows the pace at which we can dispose of our properties and increases our foreclosed property expense related to costs associated with ensuring that the property is vacant and maintaining the property. For example, as of June 30, 2011, approximately 28% of our properties that we were unable to market for sale were in redemption status, which lengthens the time a property is in our REO inventory by an average of two to six months. Additionally, as of June 30, 2011, approximately 34% of our

TREASURY-1543

properties that we were unable to market for sale were in occupied status, which lengthens the time a property is in our REO inventory by an average of one to three months.

As shown in Table 42 we have experienced a disproportionate share of foreclosures in certain states as compared with their share of our guaranty book of business. This is primarily because these states have had significant home price depreciation or weak economies, and in the case of California and Florida specifically, a significant number of Alt-A loans.

**Table 42:   Single-Family Acquired Property Concentration Analysis**

| | As of | | For the Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2011 | December 31, 2010 | June 30, 2011 | June 30, 2010 |
| | Percentage of Book Outstanding[1] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Properties Acquired by Foreclosure[2] |
| States: | | | | |
| Arizona, California, Florida, and Nevada . . . | 28% | 28% | 38% | 36% |
| Illinois, Indiana, Michigan, and Ohio  . . . . . | 10 | 11 | 15 | 19 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Calculated based on the number of properties acquired through foreclosure during the period divided by the total number of properties acquired through foreclosure.

### *Multifamily Mortgage Credit Risk Management*

The credit risk profile of our multifamily mortgage credit book of business is influenced by: the structure of the financing; the type and location of the property; the condition and value of the property; the financial strength of the borrower and lender; market and sub-market trends and growth; and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

While our multifamily mortgage credit book of business includes all of our multifamily mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae multifamily mortgage-related securities held in our portfolio for which we do not provide a guaranty. Our multifamily guaranty book of business consists of: multifamily mortgage loans held in our mortgage portfolio; Fannie Mae MBS held in our portfolio or by third parties; and other credit enhancements that we provide on mortgage assets.

### *Multifamily Acquisition Policy and Underwriting Standards*

Our Multifamily business, in conjunction with our Enterprise Risk Management division, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the Delegated Underwriting and Servicing, or DUS®, program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented 85% of our multifamily guaranty book of business as of June 30, 2011 compared with 84% as of December 31, 2010.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing.

TREASURY-1544

Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Other lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

_Multifamily Portfolio Diversification and Monitoring_

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration and credit enhancement arrangement is an important factor that influences credit quality and performance and helps reduce our credit risk.

The weighted average original LTV ratio for our multifamily guaranty book of business was 66% as of June 30, 2011 and 67% as of December 31, 2010. The percentage of our multifamily guaranty book of business with an original LTV ratio greater than 80% was 5% as of both June 30, 2011 and December 31, 2010. We present the current risk profile of our multifamily guaranty book of business in "Note 6, Financial Guarantees."

We monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the investment at the loan, property and portfolio level. We closely track the physical condition of the property, the relevant local market and economic conditions that may signal changing risk or return profiles and other risk factors. For example, we closely monitor the rental payment trends and vacancy levels in local markets to identify loans that merit closer attention or loss mitigation actions. We are managing our exposure to refinancing risk for multifamily loans maturing in the next several years. We have a team that proactively manages upcoming loan maturities to minimize losses on maturing loans. This team assists lenders and borrowers with timely and appropriate refinancing of maturing loans with the goal of reducing defaults and foreclosures related to loans maturing in the near term. For our investments in multifamily loans, the primary asset management responsibilities are performed by our DUS and other multifamily lenders. We periodically evaluate the performance of our third-party service providers for compliance with our asset management criteria.

_Problem Loan Management and Foreclosure Prevention_

The number of multifamily loans at risk of becoming seriously delinquent has decreased in 2011, as early-stage delinquencies have decreased. Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

_Problem Loan Statistics_

Table 43 provides a comparison of our multifamily serious delinquency rates for loans with and without credit enhancement in our multifamily guaranty book of business. We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

TREASURY-1545

**Table 43:   Multifamily Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011 | | December 31, 2010 | | June 30, 2010 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Multifamily loans: | | | | | | |
| Credit enhanced . . . . . . . . | 90% | 0.43% | 89% | 0.67% | 89% | 0.70% |
| Non-credit enhanced . . . . . | 10 | 0.80 | 11 | 1.01 | 11 | 1.62 |
| Total multifamily loans. . | 100% | 0.46% | 100% | 0.71% | 100% | 0.80% |

The multifamily serious delinquency rate decreased as of June 30, 2011 compared with both December 31, 2010 and June 30, 2010 as national multifamily market fundamentals continued to improve. Table 44 provides a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders and loans acquired through non-DUS lenders.

**Table 44:   Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2011 | | December 31, 2010 | | June 30, 2010 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2011 | 2010 |
| DUS small balance loans[1] . . . . . . . . . | 8% | 0.50% | 8% | 0.55% | 8% | 0.42% | 6% | 8% |
| DUS non small balance loans[2] . . . . . . . | 71 | 0.31 | 70 | 0.56 | 68 | 0.62 | 76 | 81 |
| Non-DUS small balance loans[1] . . . . . . . | 9 | 1.36 | 10 | 1.47 | 11 | 1.40 | 12 | 8 |
| Non-DUS non small balance loans[2] . . . . | 12 | 0.65 | 12 | 0.97 | 13 | 1.52 | 6 | 3 |

[1]   Loans with original unpaid principal balances less than or equal to $3 million as well as loans in high cost markets with original unpaid principal balances less than or equal to $5 million.

[2]   Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that align our interest with those of the borrowers and lenders. Smaller balance non-DUS loans continue to represent a disproportionate share of delinquencies but they are generally covered by loss sharing arrangements, which limit the credit losses incurred by us.

In addition, Florida and Ohio have a disproportionate share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for 24% of multifamily serious delinquencies but only 6% of the multifamily guaranty book of business as of June 30, 2011.

*REO Management*

Foreclosure and REO activity affect the level of credit losses. Table 45 compares our held for sale multifamily REO balances for the periods indicated.

TREASURY-1546

**Table 45:   Multifamily Foreclosed Properties**

| | For the Six Months Ended June 30, | |
| --- | ---: | ---: |
| | 2011 | 2010 |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . . . . . . . . . . . . . | 222 | 73 |
|    Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 | 107 |
|    Disposition of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (87) | (27) |
| End of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 259 | 153 |
| Carrying value of multifamily foreclosed properties (dollars in millions) . . . . . . . . . . . . . . . . . . . . . . . . | $555 | $436 |

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals have continued to improve in 2011.

### *Institutional Counterparty Credit Risk Management*

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2010 Form 10-K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers and from document custodians.

#### *Mortgage Seller/Servicers*

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 76% of our single-family guaranty book of business as of June 30, 2011, compared to 77% as of December 31, 2010. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 25% of our single-family guaranty book of business as of June 30, 2011, compared with 26% as of December 31, 2010. In addition, we had two other mortgage servicers, JPMorgan Chase & Co. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of June 30, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of both June 30, 2011 and December 31, 2010. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively. During the first half of 2011, our primary mortgage servicer counterparties have generally continued to meet their obligations to us.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." The number of our repurchase requests remained high during the first half of 2011. The aggregate unpaid principal balance of loans repurchased by our seller/servicers pursuant to their contractual obligations was approximately $4.5 billion in the first half of 2011, compared with $3.2 billion during the first half of 2010. In addition, as of June 30, 2011, we had $9.6 billion in

TREASURY-1547

outstanding repurchase requests related to loans that had been reviewed for potential breaches of contractual obligations, compared with $5.0 billion as of December 31, 2010. As of June 30, 2011, approximately 52% of our total outstanding repurchase requests had been made to one of our seller/servicers, compared with 41% as of December 31, 2010. As of June 30, 2011, 23% of our outstanding repurchase requests had been outstanding for more than 120 days from either the original loan repurchase request date or, for lenders remitting after the REO is disposed, the date of our final loss determination, compared with 30% as of December 31, 2010.

The amount of our outstanding repurchase requests provided above is based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than this amount. In addition, amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

In June 2011, we issued an announcement that (1) reminded lenders of their existing obligations with respect to mortgage insurance; (2) required lenders to report to us mortgage insurance rescissions, mortgage insurer-initiated cancellations, and claim denials; (3) confirmed our repurchase policies with respect to these actions; (4) temporarily extended from 30 to 90 days our timeframe within which lenders must repurchase loans and provided an appeal process; (5) required that all outstanding mortgage insurance-related repurchase demands as of April 30, 2011 be satisfactorily resolved by September 30, 2011; (6) reiterated our process for the redelivery of certain repurchased loans; and (7) reiterated our remedies if a lender fails to meet our repurchase requirements.

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests; however, as the volume of repurchase requests increases, the risk increases that affected seller/servicers will not be willing or able to meet the terms of their repurchase obligations and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. If a significant seller/servicer counterparty, or a number of seller/servicer counterparties, fails to fulfill its repurchase obligations to us, it could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. We expect that the amount of our outstanding repurchase requests will remain high in 2011.

We are exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" in our 2010 Form 10-K for additional discussion on risks of mortgage fraud to which we are exposed.

### *Mortgage Insurers*

Table 46 presents our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of June 30, 2011 and December 31, 2010. The table includes our top eight mortgage insurer counterparties that provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of both June 30, 2011 and December 31, 2010.

TREASURY-1548

**Table 46:   Mortgage Insurance Coverage**

| Counterparty:[1] | Maximum Coverage[2] | | | | Unpaid Principal Balance Covered By Insurance[3] | |
| | As of June 30, 2011 | | | As of December 31, 2010 | As of June 30, 2011 | As of December 31, 2010 |
| | Primary | Pool | Total | Total | Total | Total |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation . . . . . . . | $20,672 | $1,683 | $22,355 | $23,277 | $ 97,189 | $101,823 |
| Radian Guaranty, Inc.  . . . . . . . . . . . . . . . . . . . . . | 14,724 | 327 | 15,051 | 15,370 | 62,484 | 64,042 |
| Genworth Mortgage Insurance Corporation . . . . . . | 13,811 | 70 | 13,881 | 14,331 | 55,800 | 57,845 |
| United Guaranty Residential Insurance Company . . | 13,688 | 181 | 13,869 | 14,044 | 57,617 | 58,416 |
| PMI Mortgage Insurance Co. . . . . . . . . . . . . . . . | 11,628 | 284 | 11,912 | 12,359 | 51,437 | 53,768 |
| Republic Mortgage Insurance Company . . . . . . . . | 9,045 | 952 | 9,997 | 10,566 | 43,249 | 46,660 |
| Triad Guaranty Insurance Corporation . . . . . . . . . . | 2,759 | 740 | 3,499 | 3,809 | 15,328 | 16,974 |
| CMG Mortgage Insurance Company[4] . . . . . . . . . | 1,932 | — | 1,932 | 1,938 | 8,155 | 8,174 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 337 | — | 337 | 209 | 1,724 | 1,140 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $88,596 | $4,237 | $92,833 | $95,903 | $392,983 | $408,842 |
| Total as a percentage of single-family guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . | | | 3% | 3% | 14% | 14% |

_____

[1] Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[2] Maximum coverage refers to the aggregate dollar amount of insurance coverage (*i.e.*, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[3] Represents the unpaid principal balance of single-family loans in our guaranty book of business covered under the applicable mortgage insurance policies (*i.e.*, "insurance in force").

[4] CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

See "Risk Management—Credit Risk Management—Institutional Counterparty Risk Management—Mortgage Insurers" in our 2010 Form 10-K for a discussion on the credit ratings of our mortgage insurers.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. However, at this time we generally continue to receive payments on our claims as they come due, with the exception of claims obligations of Triad Guaranty Insurance Corporation, which have been partially deferred since June 1, 2009 pursuant to an order from its regulator.

During 2010 and the first half of 2011, a number of our mortgage insurers received waivers from their regulators regarding state-imposed risk-to-capital limits. Without these waivers, these mortgage insurers would not be able to continue to write new business in accordance with state regulatory requirements, should they fall below their regulatory capital requirements. In anticipation that a waiver may not be granted or continued by their regulator, several of our mortgage insurers arranged for another mortgage insurer subsidiary or affiliate to write new business on its behalf. In 2010, the parent companies of several of our largest mortgage insurer counterparties raised capital, which may improve their ability to meet state-imposed risk-to-capital limits and their ability to continue paying our claims in full as they come due, to the extent that the capital raised by the parent companies is contributed to their respective mortgage insurance entities. We are unable to determine how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits.

Our mortgage insurer counterparties have increased the number of mortgage loans for which they have rescinded coverage. In those cases where mortgage insurance was obtained and the mortgage insurer has

83

rescinded coverage, we generally require the seller/servicer to repurchase the loan or indemnify us against loss.

In 2010, some mortgage insurers disclosed that they entered into agreements with lenders whereby they agreed to waive certain rights to investigate claims for some of the lenders' insured loans in return for some compensation against loss. Although these agreements do not affect our rights to demand repurchase in the event of violations of lender representations and warranties, these agreements are likely to result in fewer mortgage insurance rescissions for certain groups of loans.

As a result, in April 2011, we issued an announcement which prohibited servicers from entering into any agreement that modifies the terms of an approved mortgage insurance master policy on loans delivered to us. We also required servicers to disclose any such agreements with mortgage insurers to us. With respect to our mortgage insurance counterparties, changes to the substance of their master policies have required our prior approval since 2005. In October 2010, we required our top mortgage insurers to notify us promptly of any agreement that affects their investigative or rescission rights. In April 2011, we further clarified and amended our mortgage insurer requirements to prohibit any agreement that has the effect of modifying a master policy, including any investigative or rescission rights, absent our approval. By taking these steps, we hope to mitigate the risk of loss for loans that would have resulted in mortgage insurance rescission, and—as a result—a lender repurchase, for loan defects that we may not have otherwise uncovered in our independent review process.

We evaluate the financial condition of our mortgage insurer counterparties to assess whether we have incurred probable losses in connection with our coverage. We also evaluate these counterparties individually to determine whether or under what conditions they will remain eligible to insure new mortgages sold to us.

On July 29, 2011, we notified Republic Mortgage Insurance Corporation ("RMIC") that, effective immediately, both RMIC and its affiliate, Republic Mortgage Insurance Company of North Carolina ("RMIC-NC"), are suspended nationwide as approved mortgage insurers as provided by our qualified mortgage insurer approval requirements, as well as per the terms of RMIC-NC's limited approval. RMIC had previously obtained a temporary waiver of the state-imposed risk-to-capital limits from its domiciliary regulator, the North Carolina Department of Insurance ("NC DOI"). On July 28, 2011, RMIC's parent company, Old Republic International, Corp., announced that NC DOI had extended their waiver, but that it was due to expire on August 31, 2011. It is our understanding that the expiration of this waiver would result in NC DOI prohibiting RMIC from writing any new mortgage insurance policies in North Carolina on or after September 1, 2011. Except for Triad Guaranty Insurance Corporation, RMIC and RMIC-NC, as of August 4, 2011, our private mortgage insurer counterparties remain qualified to conduct business with us.

As of June 30, 2011, our allowance for loan losses of $69.5 billion, allowance for accrued interest receivable of $3.0 billion and reserve for guaranty losses of $960 million incorporated an estimated recovery amount of approximately $15.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $16.5 billion as of June 30, 2011 and an adjustment of approximately $1.1 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of approximately $1.2 billion, which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $4.4 billion as of both June 30, 2011 and December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $534 million as of June 30, 2011 and

84

$648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they were recorded net of a valuation allowance of $253 million as of June 30, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.5 billion for the second quarter of 2011, $3.1 billion for the first half of 2011 and $6.4 billion for the year ended December 31, 2010.

### Financial Guarantors

We were the beneficiary of financial guarantees totaling $8.3 billion as of June 30, 2011 and $8.8 billion as of December 31, 2010 on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. We are also the beneficiary of financial guarantees issued by Freddie Mac, the federal government and its agencies included in securities that totaled $31.8 billion as of June 30, 2011 and $25.7 billion as of December 31, 2010.

With the exception of Ambac Assurance Corporation, none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. However, based on the stressed financial condition of our financial guarantor counterparties, we believe that one or more of our other financial guarantor counterparties may not be able to fully meet their obligations to us in the future. We model our securities assuming the benefit of those external financial guarantees from guarantors that we determine are creditworthy. For additional discussions of our model methodology and key inputs used to estimate other-than-temporary impairment see "Note 5, Investments in Securities."

### Lenders with Risk Sharing

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $14.3 billion as of June 30, 2011 and $15.6 billion as of December 31, 2010. As of both June 30, 2011 and December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $31.1 billion as of June 30, 2011 and $30.3 billion as of December 31, 2010. As of June 30, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three lenders. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 48% as of June 30, 2011 and 46% as of December 31, 2010. The percentage of these recourse obligations to lender counterparties rated below investment grade was 23% as of both June 30, 2011 and December 31, 2010. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 29% as of June 30, 2011 and 31% as of December 31, 2010. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. As of June 30, 2011, approximately 54% of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders were from institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade

85

credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. We actively monitor the financial condition of these lenders to ensure the level of risk remains within our standards.

*Custodial Depository Institutions*

A total of $42.7 billion in deposits for single-family payments were received and held by 287 institutions in the month of June 2011 and a total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010. Of these total deposits, 93% as of June 30, 2011 and 92% as of December 31, 2010 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our ten largest custodial depository institutions held 93% of these deposits as of both June 30, 2011 and December 31, 2010.

*Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio primarily consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset-backed securities. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio. Our counterparty risk is primarily with financial institutions and Treasury.

Our cash and other investments portfolio, which totaled $71.9 billion as of June 30, 2011, included $36.9 billion of U.S. Treasury securities and $5.2 billion of unsecured positions. As of December 31, 2010, our cash and other investments portfolio totaled $61.8 billion and included $31.5 billion of U.S. Treasury securities and $10.3 billion of unsecured positions. As of both June 30, 2011 and December 31, 2010, all of our unsecured positions were short-term deposits with financial institutions which had short-term credit ratings of A-1, P-1, F1 (or equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively.

*Derivatives Counterparties*

Our derivative credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. Derivatives in a gain position are included in our condensed consolidated balance sheets in "Other assets." Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better by the major ratings organizations. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

Our net credit exposure on derivatives contracts decreased to $132 million as of June 30, 2011, from $152 million as of December 31, 2010. We had outstanding interest rate and foreign currency derivative transactions with 15 counterparties as of June 30, 2011 and December 31, 2010. Derivatives transactions with nine of our counterparties accounted for approximately 91% of our total outstanding notional amount as of June 30, 2011, with each of these counterparties accounting for between approximately 5% and 15% of the total outstanding notional amount. In addition to the 15 counterparties with whom we had outstanding notional amounts and master netting agreements as of June 30, 2011, we had a master netting agreement with one more counterparty with whom we may enter into interest rate derivative or foreign currency derivative transactions in the future.

We expect that, under the Dodd-Frank Act, we will be required in the future to submit certain interest rate swaps for clearing to a derivatives clearing organization. In anticipation of those requirements, we have cleared a small number of new interest rate swap transactions with the Chicago Mercantile Exchange, Inc. ("CME"), a derivatives clearing organization. As a result, we are exposed to the institutional credit risk of CME and its members that execute and submit our transactions for clearing. Our institutional credit risk

86

exposure to the CME or other comparable exchanges or trading facilities, as well as their members, is likely to increase in the future.

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of June 30, 2011 and December 31, 2010, as well as a discussion of our collateral requirements under our derivatives contracts. See "Risk Factors" for a discussion of the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts. Also see "Risk Factors" in our 2010 Form 10-K for a discussion of the risks to our business posed by interest rate risk and a discussion of the risks to our business as a result of the concentration of our institutional counterparties.

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management" in our 2010 Form 10-K.

*Measurement of Interest Rate Risk*

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

*Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve*

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

• A 50 basis point shift in interest rates.

• A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

*Duration Gap*

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are

matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summaries, which are available on our website and announced in a press release.

The sensitivity measures presented in Table 47, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

In addition, Table 47 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended June 30, 2011.

**Table 47:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve**[1]

| | As of | |
| --- | --- | --- |
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in billions) | |
| Rate level shock: | | |
| -100 basis points | $(0.4) | $(0.8) |
| -50 basis points | (0.1) | (0.2) |
| +50 basis points | (0.1) | (0.2) |
| +100 basis points | (0.3) | (0.5) |
| Rate slope shock: | | |
| -25 basis points (flattening) | (0.1) | (0.1) |
| +25 basis points (steepening) | 0.1 | 0.1 |

| | For the Three Months Ended June 30, 2011 | | |
| --- | --- | --- | --- |
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | 0.3 | $0.1 | $0.1 |
| Minimum | — | — | — |
| Maximum | 0.7 | 0.2 | 0.3 |
| Standard deviation | 0.2 | — | 0.1 |

[1] Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuance, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 48 shows an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

88

**Table 48:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
|  | (Dollars in billions) | | |
| As of June 30, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1.6) | $(0.1) | $1.5 |
| As of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(0.9) | $(0.2) | $0.7 |

*Other Interest Rate Risk Information*

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

In "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk—Other Interest Rate Risk Information" in our 2010 Form 10-K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments. As of June 30, 2011, these sensitivities were relatively unchanged as compared with December 31, 2010. The fair value of our trading financial instruments and our other financial instruments as of June 30, 2011 and December 31, 2010 can be found in "Note 13, Fair Value."

**Liquidity Risk Management**

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

## IMPACT OF FUTURE ADOPTION OF NEW ACCOUNTING PRONOUNCEMENTS

We identify and discuss the expected impact on our condensed consolidated financial statements of recently issued accounting pronouncements in "Note 1, Summary of Significant Accounting Policies."

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 ("Exchange Act"). In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that loans in our new single-family book of business will be profitable over their lifetime;

- Our belief that loans we have acquired since 2009 would become unprofitable if home prices declined by more than 10% from their June 2011 levels over the next five years based on our home price index;

- Our expectations regarding whether loans we acquired in specific years will be profitable or unprofitable;

- Our expectations regarding the performance and profitability of loans we acquired in 2004 and the factors that will impact the performance and profitability of these loans;

- Our expectation that our 2005 through 2008 vintages will be significantly more unprofitable than our 2004 vintage;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our

TREASURY-1555

acceptance of a short sale or deed-in-lieu of foreclosure), we have reserved for the substantial majority of the remaining losses on these loans;

- Our expectation that future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years;

- Our expectation that it will take years before our REO inventory is reduced to pre-2008 levels;

- Our expectation that we will realize as credit losses an estimated two-thirds of the fair value losses on loans purchased out of MBS trusts that are reflected in our condensed consolidated balance sheets, and recover the remaining one-third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that, if our loan modifications are successful in reducing foreclosures and keeping borrowers in their homes, they may benefit the housing market and may help reduce our long-term credit losses from what they otherwise would have been if we had foreclosed on the loans;

- Our belief that the new servicing standards we issued in June 2011 will increase servicers' effectiveness in reaching borrowers, bring greater consistency and clarity to servicer communications with borrowers, and increase the likelihood that servicers will contact borrowers early in the default management process, as well as bring greater consistency, fairness and efficiency to the foreclosure process;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, and the extent to which borrowers with modified loans continue to make timely payments;

- Our belief that foreclosure delays resulting from changes in the foreclosure environment will continue to negatively impact our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and will delay the recovery of the housing market;

- Our expectation that employment will likely need to post sustained improvement for an extended period to have a positive impact on housing;

- Our expectation that weakness in the housing and mortgage markets will continue in the second half of 2011;

- Our expectation that home sales are unlikely to increase until the unemployment rate improves further;

- Our expectation that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011;

- Our expectation that multifamily charge-offs in 2011 will remain commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectation that the pace of our loan acquisitions for the remainder of 2011 and for 2012 will be lower than in 2010;

- Our expectation that there will be fewer refinancings in 2011 and 2012 than in 2010;

- Our belief that our loan acquisitions could be negatively affected by the decrease in our maximum loan limit in the fourth quarter of 2011;

- Our expectation that, if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted;

- Our expectation that our future revenues will be negatively impacted to the extent our acquisitions decline;

- Our estimation that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately 30%, from an estimated $1.5 trillion to an estimated $1.1 trillion, and

90

that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.0 trillion to approximately $573 billion;

- Our expectation that home prices on a national basis will decline further, with greater declines in some geographic areas than others, before stabilizing in 2012;

- Our expectation that the peak-to-trough home price decline on a national basis will range between 23% and 29%;

- Our expectation that our credit-related expenses and our credit losses will be higher in 2011 than in 2010;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that the Acting Director of FHFA will submit a request to Treasury on our behalf for $5.1 billion to eliminate our net worth deficit as of June 30, 2011;

- Our expectation that we will request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that, over time, our dividend obligation to Treasury will constitute an increasing portion of our future draws under the senior preferred stock purchase agreement;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, or our operations, or that involve our liquidation or dissolution;

- Our belief that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and ongoing liabilities;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that our mortgage portfolio will continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury;

- Our expectation that the current market premium portion of our current estimate of fair value will not impact future Treasury draws, which is based on our intention not to have another party assume the credit risk inherent in our book of business;

- Our expectation that our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirements of the senior preferred stock purchase agreement;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our expectation that the volume of our foreclosure alternatives will remain high throughout the remainder of 2011;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

91

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high in 2011;

- Our belief that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future;

- Our expectation that we will be required to submit certain interest rate swaps for clearing to a derivatives clearing organization in the future and that our institutional credit risk exposure to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities and their members is likely to increase in the future;

- Our expectation that we will continue to need funding from Treasury to avoid triggering FHFA's obligation to place us into receivership;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding; and

- Our expectation of an increase in our TDR population as a result of implementing a new Financial Accounting Standards Board ("FASB") standard.

Forward-looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; a decrease in our credit ratings; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; deficiencies in servicer foreclosure processes and the consequences of those deficiencies; guidance by the FASB; operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2010 Form 10-K, as well as the factors described in "Executive Summary—Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2010 Form 10-K and in this report. Our forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statement because of new information, future events or otherwise, except as required under the federal securities laws.

TREASURY-1558

**Item 1.   Financial Statements**

# FANNIE MAE
## (In conservatorship)

### Condensed Consolidated Balance Sheets—(Unaudited)
(Dollars in millions, except share amounts)

|  | As of | |
|---|---|---|
|  | June 30, 2011 | December 31, 2010 |
| **ASSETS** | | |
| Cash and cash equivalents (includes $3 and $348, respectively, related to consolidated trusts) | $ 14,274 | $ 17,297 |
| Restricted cash (includes $33,136 and $59,619, respectively, related to consolidated trusts) | 37,579 | 63,678 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 19,500 | 11,751 |
| Investments in securities: | | |
| Trading, at fair value (includes $21 as of both periods related to consolidated trusts) | 61,907 | 56,856 |
| Available-for-sale, at fair value (includes $1,590 and $1,055, respectively, related to consolidated trusts) | 86,616 | 94,392 |
| Total investments in securities | 148,523 | 151,248 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $73 and $661, respectively, related to consolidated trusts) | 439 | 915 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae | 386,356 | 407,228 |
| Of consolidated trusts (includes $3,084 and $2,962, respectively, at fair value and loans pledged as collateral that may be sold or repledged of $460 and $2,522, respectively) | 2,610,540 | 2,577,133 |
| Total loans held for investment | 2,996,896 | 2,984,361 |
| Allowance for loan losses | (69,506) | (61,556) |
| Total loans held for investment, net of allowance | 2,927,390 | 2,922,805 |
| Total mortgage loans | 2,927,829 | 2,923,720 |
| Accrued interest receivable, net (includes $8,683 and $8,910, respectively, related to consolidated trusts) | 10,681 | 11,279 |
| Acquired property, net | 13,592 | 16,173 |
| Other assets (includes $59 and $593, respectively, related to consolidated trusts) | 24,134 | 26,826 |
| Total assets | $3,196,112 | $3,221,972 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,584 and $9,712, respectively, related to consolidated trusts) | $ 13,289 | $ 13,764 |
| Federal funds purchased and securities sold under agreements to repurchase | — | 52 |
| Debt: | | |
| Of Fannie Mae (includes $862 and $893, respectively, at fair value) | 724,799 | 780,044 |
| Of consolidated trusts (includes $3,273 and $2,271, respectively, at fair value) | 2,450,046 | 2,416,956 |
| Other liabilities (includes $707 and $893, respectively, related to consolidated trusts) | 13,065 | 13,673 |
| Total liabilities | 3,201,199 | 3,224,489 |
| Commitments and contingencies (Note 14) | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding | 99,700 | 88,600 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 and 576,868,139 shares issued and outstanding, respectively | 19,130 | 20,204 |
| Common stock, no par value, no maximum authorization—1,308,762,703 and 1,270,092,708 shares issued, respectively; 1,157,750,434 and 1,118,504,194 shares outstanding, respectively | 687 | 667 |
| Accumulated deficit | (115,784) | (102,986) |
| Accumulated other comprehensive loss | (1,499) | (1,682) |
| Treasury stock, at cost, 151,012,269 and 151,588,514 shares, respectively | (7,402) | (7,402) |
| Total Fannie Mae stockholders' deficit | (5,168) | (2,599) |
| Noncontrolling interest | 81 | 82 |
| Total deficit | (5,087) | (2,517) |
| Total liabilities and equity (deficit) | $3,196,112 | $3,221,972 |

See Notes to Condensed Consolidated Financial Statements

TREASURY-1559

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Operations and Comprehensive Loss—(Unaudited)**

(Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Interest income:** | | | | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 264 | $ 330 | $ 548 | $ 645 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . | 1,152 | 1,389 | 2,365 | 2,862 |
| Mortgage loans (includes $31,613 and $33,682, respectively, for the three months ended and $63,478 and $68,003, respectively, for the six months ended related to consolidated trusts) . . . . . . . . . . . . . . | 35,333 | 37,632 | 70,923 | 75,251 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 | 41 | 53 | 80 |
| Total interest income . . . . . . . . . . . . . . . . . . . | 36,774 | 39,392 | 73,889 | 78,838 |
| **Interest expense:** | | | | |
| Short-term debt (includes $2 and $3, respectively, for the three months ended and $5 for the six months ended, for both periods, related to consolidated trusts) . . . . . . . . . . . | 81 | 167 | 188 | 285 |
| Long-term debt (includes $27,919 and $30,043, respectively, for the three months ended and $55,771 and $61,501, respectively, for the six months ended related to consolidated trusts) . . . . . . . . . . . . . . | 31,721 | 35,018 | 63,769 | 71,557 |
| Total interest expense . . . . . . . . . . . . . . . . . . . | 31,802 | 35,185 | 63,957 | 71,842 |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . | 4,972 | 4,207 | 9,932 | 6,996 |
| Provision for loan losses . . . . . . . . . . . . . . . . . . . . . . | (5,802) | (4,295) | (16,389) | (16,234) |
| Net interest loss after provision for loan losses . . . . . . . . . . . . . . | (830) | (88) | (6,457) | (9,238) |
| Investment gains, net . . . . . . . . . . . . . . . . . . . . . . . . | 171 | 23 | 246 | 189 |
| Other-than-temporary impairments . . . . . . . . . . . . . . . . . | (28) | (48) | (85) | (234) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income . . . . . . . . . . . . . . | (28) | (89) | (15) | (139) |
| Net other-than-temporary impairments . . . . . . . . . . . . . . | (56) | (137) | (100) | (373) |
| Fair value gains (losses), net . . . . . . . . . . . . . . . . . . . | (1,634) | 303 | (1,345) | (1,402) |
| Debt extinguishment losses, net . . . . . . . . . . . . . . . . . | (43) | (159) | (30) | (283) |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . . . | 265 | 294 | 502 | 527 |
| Non-interest income (loss) . . . . . . . . . . . . . . . . | (1,297) | 324 | (727) | (1,342) |
| **Administrative expenses:** | | | | |
| Salaries and employee benefits . . . . . . . . . . . . . . . . . . | 310 | 324 | 630 | 648 |
| Professional services . . . . . . . . . . . . . . . . . . . . . . . | 169 | 260 | 358 | 454 |
| Occupancy expenses . . . . . . . . . . . . . . . . . . . . . . . | 43 | 40 | 85 | 81 |
| Other administrative expenses . . . . . . . . . . . . . . . . . . | 47 | 46 | 101 | 92 |
| Total administrative expenses . . . . . . . . . . . . . . | 569 | 670 | 1,174 | 1,275 |
| Provision for guaranty losses . . . . . . . . . . . . . . . . . . . | 735 | 69 | 702 | 33 |
| Foreclosed property expense (income) . . . . . . . . . . . . . . | (478) | 487 | 10 | 468 |
| Other expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | 224 | 384 | 454 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . | 858 | 1,450 | 2,270 | 2,230 |
| Loss before federal income taxes . . . . . . . . . . . . . . . . | (2,985) | (1,214) | (9,454) | (12,810) |
| Provision (benefit) for federal income taxes . . . . . . . . . . . | (93) | 9 | (91) | (58) |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,892) | (1,223) | (9,363) | (12,752) |
| **Other comprehensive (loss) income:** | | | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes . . . . . . . . . . . . . . | (1) | 1,667 | 178 | 3,037 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3 | 5 | 5 |
| Total other comprehensive income . . . . . . . . . . . . . . | 2 | 1,670 | 183 | 3,042 |
| Total comprehensive (loss) income . . . . . . . . . . . . . . . . | (2,890) | 447 | (9,180) | (9,710) |
| Less: Comprehensive (income) loss attributable to the noncontrolling interest . . . . . . . | (1) | 5 | (1) | 4 |
| Total comprehensive (loss) income attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(2,891) | $ 452 | $ (9,181) | $ (9,706) |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(2,892) | $(1,223) | $ (9,363) | $(12,752) |
| Less: Net (income) loss attributable to the noncontrolling interest . . . . . . . . . . . . . . | (1) | 5 | (1) | 4 |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . | (2,893) | (1,218) | (9,364) | (12,748) |
| Preferred stock dividends . . . . . . . . . . . . . . . . . . . . . | (2,282) | (1,907) | (4,498) | (3,434) |
| Net loss attributable to common stockholders . . . . . . . . . . | $(5,175) | $(3,125) | $(13,862) | $(16,182) |
| Loss per share—Basic and Diluted . . . . . . . . . . . . . . . . | $ (0.90) | $ (0.55) | $ (2.43) | $ (2.84) |
| Weighted-average common shares outstanding—Basic and Diluted . . . . . . . . . . . . . . . . | 5,730 | 5,694 | 5,714 | 5,693 |

See Notes to Condensed Consolidated Financial Statements

94

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
(Dollars in millions)

|  | For the Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2011 | 2010 |
| **Net cash used in operating activities** | $ (2,095) | $ (47,133) |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (545) | (7,887) |
| Proceeds from maturities and paydowns of trading securities held for investment | 1,051 | 1,398 |
| Proceeds from sales of trading securities held for investment | 516 | 20,442 |
| Purchases of available-for-sale securities | (44) | (142) |
| Proceeds from maturities and paydowns of available-for-sale securities | 6,933 | 9,022 |
| Proceeds from sales of available-for-sale securities | 1,850 | 5,949 |
| Purchases of loans held for investment | (26,000) | (25,743) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 11,722 | 9,188 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 226,210 | 219,380 |
| Net change in restricted cash | 26,099 | 9,798 |
| Advances to lenders | (27,990) | (23,131) |
| Proceeds from disposition of acquired property and preforeclosure sales | 24,142 | 17,693 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | (7,749) | 15,618 |
| Other, net | (33) | (627) |
| Net cash provided by investing activities | 236,162 | 250,958 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 345,028 | 592,508 |
| Payments to redeem debt of Fannie Mae | (401,125) | (519,120) |
| Proceeds from issuance of debt of consolidated trusts | 117,760 | 135,809 |
| Payments to redeem debt of consolidated trusts | (305,465) | (412,359) |
| Payments of cash dividends on senior preferred stock to Treasury | (4,497) | (3,436) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 11,100 | 23,700 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | — | 142 |
| Other, net | 109 | (37) |
| Net cash used in financing activities | (237,090) | (182,793) |
| **Net (decrease) increase in cash and cash equivalents** | (3,023) | 21,032 |
| Cash and cash equivalents at beginning of period | 17,297 | 6,812 |
| Cash and cash equivalents at end of period | $ 14,274 | $ 27,844 |
| **Cash paid during the period for interest** | $ 65,710 | $ 73,272 |

See Notes to Condensed Consolidated Financial Statements

95

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

## 1.  Summary of Significant Accounting Policies

### Organization

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE") and subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

### Conservatorship

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship; (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock; and (3) Treasury's agreement to establish a temporary secured lending credit facility that was available to us and the other GSEs regulated by FHFA under identical terms until December 31, 2009.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

We were directed by FHFA to voluntarily delist our common stock and each listed series of our preferred stock from the New York Stock Exchange and the Chicago Stock Exchange. The last trading day for the listed securities on the New York Stock Exchange and the Chicago Stock Exchange was July 7, 2010, and since July 8, 2010, the securities have been traded on the over-the-counter market.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of August 4, 2011, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

On June 20, 2011, FHFA issued a final rule establishing a framework for conservatorship and receivership operations for the GSEs. The final rule, which became effective on July 20, 2011, establishes procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. The final rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred

96

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near-term.

*Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. We have received a total of $98.7 billion as of June 30, 2011 under Treasury's funding commitment and the Acting Director of FHFA will submit a request for an additional $5.1 billion from Treasury to eliminate our net worth deficit as of June 30, 2011. The aggregate liquidation preference of the senior preferred stock was $99.7 billion as of June 30, 2011 and will increase to $104.8 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of June 30, 2011.

Treasury's maximum funding commitment to us prior to a December 2009 amendment of the senior preferred stock purchase agreement was $200 billion. The amendment to the agreement stipulates that the cap on Treasury's funding commitment to us under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits as of December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion ($200 billion less $75.2 billion cumulatively drawn through March 31, 2010) less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for the first, second and third quarters of 2011 due to the continued fragility of the U.S. mortgage market and because Treasury believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the fourth quarter of 2011.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In

TREASURY-1563

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

addition, due to our reliance on the U.S. government's support, our access to debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, or our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

*Basis of Presentation*

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included. Results for the three and six months ended June 30, 2011 may not necessarily be indicative of the results for the year ending December 31, 2011. The unaudited interim condensed consolidated financial statements as of and for the three and six months ended June 30, 2011 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K"), filed with the SEC on February 24, 2011.

*Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and the Treasury are deemed related parties. As of June 30, 2011, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $99.7 billion. Our administrative expenses were reduced by $25 million and $60 million for the three and six months ended June 30, 2011, respectively, due to accrual and receipt of reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for the Home Affordable Modification Program ("HAMP") and other initiatives under the Making Home Affordable Program.

During the six months ended June 30, 2011, we received a refund of $1.1 billion from the Internal Revenue Service ("IRS"), a bureau of Treasury, related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years. In addition, in June 2011, we effectively settled our 2007 and 2008 tax years with the IRS and as a result, we have recognized an income tax benefit of $90 million in our condensed consolidated statements of operations and comprehensive loss for the three and six months ended June 30, 2011.

Under a temporary credit and liquidity facilities ("TCLF") program, we had $3.5 billion and $3.7 billion outstanding, which include principal and interest, of three-year standby credit and liquidity support as of June 30, 2011 and December 31, 2010, respectively. Treasury has purchased participating interests in these

98

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

temporary credit and liquidity facilities. Under a new issue bond ("NIB") program, we had $7.6 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of both June 30, 2011 and December 31, 2010. Treasury bears the initial loss of principal under the TCLF program and the NIB program up to 35% of the total principal on a combined program-wide basis.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of June 30, 2011 and December 31, 2010, we held Freddie Mac mortgage-related securities with a fair value of $15.9 billion and $18.3 billion, respectively, and accrued interest receivable of $77 million and $93 million, respectively. We recognized interest income on Freddie Mac mortgage-related securities held by us of $172 million and $277 million for the three months ended June 30, 2011 and 2010, respectively, and $360 million and $612 million for the six months ended June 30, 2011 and 2010, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

*Use of Estimates*

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

In the three months ended June 30, 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans which contributed to an increase to our allowance for loan losses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the three months ended June 30, 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency as a driver of foreclosures in order to reflect changes to the foreclosure environment. This update resulted in an increase to our reserve for guaranty losses included within "Other liabilities" of approximately $700 million.

In addition, in the three months ended June 30, 2011, we revised our estimate for amounts due to us related to outstanding repurchase requests to incorporate additional loan-level attributes which resulted in a decrease in our provision for loan losses and foreclosed property expense of $1.5 billion.

*Principles of Consolidation*

Our condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. The typical condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. A controlling financial interest may also exist in entities through arrangements that do not involve voting interests, such as a variable interest entity ("VIE").

99

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Cash and Cash Equivalents and Statements of Cash Flows*

During 2010, we identified certain servicer and consolidation related transactions that were not appropriately reflected in our condensed consolidated statements of cash flows for the six months ended June 30, 2010. As a result, our condensed consolidated statement of cash flows for the six months ended June 30, 2010 includes a $2.5 billion adjustment to decrease net cash used in operating activities, a $4.6 billion adjustment to decrease net cash provided by investing activities, primarily related to "Proceeds from sales of available-for-sale securities," "Purchases of loans held for investment," and "Proceeds from repayments of loans held for investment of consolidated trusts" and a $2.1 billion adjustment to decrease net cash used in financing activities, primarily related to "Proceeds from issuance of long-term debt of consolidated trusts." We evaluated the effects of these misstatements, both quantitatively and qualitatively, on our previously reported condensed consolidated statements of cash flows for the six months ended June 30, 2010 and concluded that this prior period was not materially misstated.

*Collateral*

*Cash Collateral*

The following table displays cash collateral accepted and pledged as of June 30, 2011 and December 31, 2010.

|  | As of | |
|---|---|---|
|  | June 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Cash collateral accepted[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,671 | $3,101 |
| Cash collateral pledged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,599 | $5,884 |
| Cash collateral pledged related to derivatives activities . . . . . . . . . | 2,907 | 3,453 |
| Total cash collateral pledged . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,506 | $9,337 |

[1] Includes restricted cash of $2.5 billion as of both June 30, 2011 and December 31, 2010.

*Non-Cash Collateral*

The following table displays non-cash collateral pledged and accepted as of June 30, 2011 and December 31, 2010.

|  | As of | |
|---|---|---|
|  | June 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Non-cash collateral pledged where the secured party has the right to sell or repledge: | | |
| Held-for-investment loans of consolidated trusts . . . . . . . . . . . . . | $   460 | $2,522 |
| Non-cash collateral accepted with the right to sell or repledge[1] . . . | $17,011 | $7,500 |
| Non-cash collateral accepted without the right to sell or repledge . . | 8,587 | 6,744 |

[1] None of this collateral was sold or repledged as of June 30, 2011 and December 31, 2010.

Additionally, we provide early funding to lenders on a collateralized basis and account for the advances as secured lending arrangements in "Other assets" in our condensed consolidated balance sheets. These amounts totaled $3.8 billion as of June 30, 2011 and $7.2 billion at December 31, 2010.

Our liability to third-party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

100

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

When securities sold under agreements to repurchase meet all of the conditions of a secured financing, we report the collateral of the transferred securities at fair value, excluding accrued interest. The fair value of these securities is classified in "Investments in securities" in our condensed consolidated balance sheets. We had no repurchase agreements outstanding as of June 30, 2011 and $49 million in repurchase agreements outstanding as of December 31, 2010.

### *Fair Value Gains (Losses), Net*

The following table displays the composition of "Fair value gains (losses), net" for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Derivatives fair value losses, net | $(1,677) | $(397) | $(1,538) | $(3,159) |
| Trading securities gains, net | 135 | 640 | 360 | 1,698 |
| Other, net | (92) | 60 | (167) | 59 |
| Fair value gains (losses), net | $(1,634) | $ 303 | $(1,345) | $(1,402) |

### *Reclassifications*

To conform to our current period presentation, we have reclassified and condensed certain amounts reported in our condensed consolidated financial statements. The following table displays the line items that were reclassified and condensed in our condensed consolidated balance sheet as of December 31, 2010.

| | As of December 31, 2010 | |
|---|---|---|
| | **Before Reclassification** | **After Reclassification** |
| | (Dollars in millions) | |
| **Reclassified lines to:** | | |
| **Assets:** | | |
| Servicer and MBS trust receivable | $ 951 | $ |
| Other assets | 25,875 | 26,826 |
| **Liabilities:** | | |
| Short-term debt: | | |
| Of Fannie Mae | 151,884 | |
| Of consolidated trusts | 5,359 | |
| Long-term debt: | | |
| Of Fannie Mae | 628,160 | |
| Of consolidated trusts | 2,411,597 | |
| Debt: | | |
| Of Fannie Mae | | 780,044 |
| Of consolidated trusts | | 2,416,956 |
| Reserve for guaranty losses | 323 | |
| Servicer and MBS trust payable | 2,950 | |
| Other liabilities | 10,400 | 13,673 |

101

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The following table represents the line items that we reclassified and condensed in our condensed consolidated statements of operations and comprehensive loss for the three and six months ended June 30, 2010.

| | For the Three Months Ended June 30, 2010 | | For the Six Months Ended June 30, 2010 | |
| --- | --- | --- | --- | --- |
| | Before Reclassification | After Reclassification | Before Reclassification | After Reclassification |
| | (Dollars in millions) | | | |
| **Reclassified lines to:** | | | | |
| Interest Income: | | | | |
| Mortgage loans: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . | $ 3,950 | $ | $ 7,248 | $ |
| Of consolidated trusts . . . . . . . . . . . | 33,682 | | 68,003 | |
| Mortgage loans (includes $33,682 and $68,003, respectively, related to consolidated trusts) . . . . . . . . . . . . . . | | 37,632 | | 75,251 |
| Interest expense: | | | | |
| Short-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . | 164 | | 280 | |
| Of consolidated trusts . . . . . . . . . . . | 3 | | 5 | |
| Long-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . | 4,975 | | 10,056 | |
| Of consolidated trusts . . . . . . . . . . . | 30,043 | | 61,501 | |
| Short-term debt (includes $3 and $5, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . | | 167 | | 285 |
| Long-term debt (includes $30,043 and $61,501, respectively, related to consolidated trusts) . . . . . . . . . . . . . . | | 35,018 | | 71,557 |
| Guaranty fee income . . . . . . . . . . . . . . . . . | 52 | | 106 | |
| Fee and other income . . . . . . . . . . . . . . . . | 242 | 294 | 421 | 527 |
| Losses from partnership investments . . . . . | 26 | | 84 | |
| Other expenses . . . . . . . . . . . . . . . . . . . . . | 198 | 224 | 370 | 454 |

In our condensed consolidated statements of cash flows for the six months ended June 30, 2010, we reclassified the following amounts within "Cash flows used in financing activities" to conform to our current period presentation: $394.7 billion from "Proceeds from issuance of short-term debt of Fannie Mae" and $197.8 billion from "Proceeds from issuance of long-term debt of Fannie Mae" to "Proceeds from issuance of debt of Fannie Mae," $339.4 billion from "Payments to redeem short-term debt of Fannie Mae" and $180.1 billion from "Payments to redeem long-term debt of Fannie Mae" to "Payments to redeem debt of Fannie Mae," $5.9 billion from "Proceeds from issuance of short-term debt of consolidated trusts" and $128.1 billion from "Proceeds from issuance of long-term debt of consolidated trusts" to "Proceeds from issuance of debt of consolidated trusts," $18.1 billion from "Payments to redeem short-term debt of consolidated trusts" and $394.2 billion from "Payments to redeem long-term debt of consolidated trusts" to "Payments to redeem debt of consolidated trusts" and $37 million from "Proceeds from issuance of debt of Fannie Mae" to "Other, net."

TREASURY-1568

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*New Accounting Pronouncements*

In April 2011, the Financial Accounting Standards Board ("FASB") issued a new standard that clarifies when a loan restructuring is considered a troubled debt restructuring ("TDR"). Specifically, the new standard amends existing guidance to clarify how to determine when a borrower is experiencing financial difficulty, when a concession is granted by a creditor, and when a delay in payment is considered insignificant.

The new standard is effective for the first interim or annual period beginning on or after June 15, 2011 and should be applied retrospectively to the beginning of the annual period of adoption. We will adopt this new guidance effective for the period ending September 30, 2011. As a result of implementing the new standard, we expect an increase in our TDR population such that we estimate that we will recognize approximately $200 million of additional impairment expense in our condensed consolidated statements of operations and comprehensive loss upon initial adoption.

**2.   Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be VIEs. The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts.

As of June 30, 2011, we consolidated certain Fannie Mae securities that were not consolidated as of December 31, 2010 because we now hold in our portfolio a substantial portion of the certificates. As a result of consolidating these securities, which had combined total assets of $2.3 billion in unpaid principal balance as of June 30, 2011, we derecognized our investment in these trusts and recognized the assets and liabilities of the consolidated trusts at their fair value.

As of December 31, 2010, we consolidated VIEs that were no longer consolidated as of June 30, 2011. These VIEs were Fannie Mae securitization trusts and were deconsolidated because we no longer hold in our portfolio a substantial portion of the certificates. As a result of deconsolidating these trusts, which had combined total assets of $31 million in unpaid principal balance as of December 31, 2010, we derecognized the assets and liabilities of the trusts and recognized at fair value our retained interests as securities in our condensed consolidated balance sheet.

*Unconsolidated VIEs*

We also have interests in VIEs that we do not consolidate because we are not deemed to be the primary beneficiary. These unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

involvement with unconsolidated VIEs as of June 30, 2011 and December 31, 2010, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

| | As of June 30, 2011 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] . . . . . . . . . . . . . . . . . . . | $ 77,612 | $ — | $ — |
| Trading securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,739 | 3,242 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 274 | — | 125 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,318 | — | 152 |
| **Net carrying amount** . . . . . . . . . . . . . . . . . . . . . . . . . | $100,307 | $ 3,242 | $ (27) |
| **Maximum exposure to loss[1]** . . . . . . . . . . . . . . . . . . . | $106,010 | $ 3,242 | $ 363 |
| **Total assets of unconsolidated VIEs[1]** . . . . . . . . . . . . . . . | $651,368 | $328,570 | $13,237 |

| | As of December 31, 2010[2] | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] . . . . . . . . . . . . . . . . . . . | $ 84,770 | $ — | $ — |
| Trading securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,021 | 5,321 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 257 | — | 94 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 773 | — | 170 |
| **Net carrying amount** . . . . . . . . . . . . . . . . . . . . . . . . . | $108,275 | $ 5,321 | $ (76) |
| **Maximum exposure to loss[1]** . . . . . . . . . . . . . . . . . . . | $111,004 | $ 5,321 | $ 319 |
| **Total assets of unconsolidated VIEs[1]** . . . . . . . . . . . . . . . | $740,387 | $363,721 | $13,102 |

_____
[1] Contains securities exposed through consolidation which may also represent an interest in other unconsolidated VIEs.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the three months ended June 30, 2011 and 2010, the unpaid principal balance of portfolio securitizations was

104

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

$27.3 billion and $15.1 billion, respectively. For the six months ended June 30, 2011 and 2010, the unpaid principal balance of portfolio securitizations was $56.6 billion and $32.9 billion, respectively.

The majority of our portfolio securitization transactions do not qualify for sale treatment. As a result, our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material. We report the assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets.

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

| | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS |
|---|---|---|
| | (Dollars in millions) | |
| **As of June 30, 2011** | | |
| Unpaid principal balance | $    654 | $    14,053 |
| Fair value | 713 | 15,071 |
| Weighted-average coupon | 6.23% | 6.05% |
| Weighted-average loan age | 4.9 years | 4.7 years |
| Weighted-average maturity | 24.0 years | 20.0 years |
| **As of December 31, 2010** | | |
| Unpaid principal balance | $    63 | $    15,771 |
| Fair value | 68 | 16,745 |
| Weighted-average coupon | 6.58% | 6.28% |
| Weighted-average loan age | 4.2 years | 4.4 years |
| Weighted-average maturity | 25.6 years | 22.0 years |

For the three months ended June 30, 2011 and 2010, the principal and interest received on retained interests was $715 million and $887 million, respectively. For the six months ended June 30, 2011 and 2010, the principal and interest received on retained interests was $1.5 billion and $1.7 billion, respectively.

TREASURY-1571

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that are delinquent as of June 30, 2011 and December 31, 2010.

| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
|---|---|---|
| | (Dollars in millions) | |
| **As of June 30, 2011** | | |
| Loans held for investment | | |
| Of Fannie Mae | $ 402,742 | $129,773 |
| Of consolidated trusts | 2,598,027 | 26,028 |
| Loans held for sale | 483 | 59 |
| Securitized loans | 2,168 | 63 |
| Total loans managed | $3,003,420 | $155,923 |
| **As of December 31, 2010** | | |
| Loans held for investment | | |
| Of Fannie Mae | $ 423,686 | $141,342 |
| Of consolidated trusts | 2,565,347 | 34,080 |
| Loans held for sale | 964 | 127 |
| Securitized loans | 2,147 | 78 |
| Total loans managed | $2,992,144 | $175,627 |

[1] Represents the unpaid principal balance of loans held for investment and loans held for sale for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest.

*Qualifying Sales of Portfolio Securitizations*

We recognize assets obtained and liabilities incurred in a portfolio securitization at fair value. Proceeds from the initial sale of securities from portfolio securitizations were $513 million and $126 million for the three months ended June 30, 2011 and 2010, respectively. Proceeds from the initial sale of securities from portfolio securitizations were $621 million and $375 million for the six months ended June 30, 2011 and 2010, respectively. For the three and six months ended June 30, 2010, proceeds from the initial sale of securities were reduced by $338 million and $1.6 billion, respectively, from the amount previously disclosed, primarily related to deconsolidated REMICs that should have been presented as proceeds from issuance of long-term debt of consolidated trusts.

TREASURY-1572

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

### 3. Mortgage Loans

The following table displays our mortgage loans as of June 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011 | | | December 31, 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family . . . . . . . . . . . . . . . . | $317,690 | $2,510,772 | $2,828,462 | $328,824 | $2,490,623 | $2,819,447 |
| Multifamily. . . . . . . . . . . . . . . . . . | 85,461 | 87,329 | 172,790 | 95,157 | 75,393 | 170,550 |
| Total unpaid principal balance of mortgage loans . . . . . . . . . . . . . | 403,151 | 2,598,101 | 3,001,252 | 423,981 | 2,566,016 | 2,989,997 |
| Cost basis and fair value adjustments, net . . . . . . . . . . . . . . . . . . . . . | (16,428) | 12,511 | (3,917) | (16,498) | 11,777 | (4,721) |
| Allowance for loan losses for loans held for investment . . . . . . . . . . . | (55,966) | (13,540) | (69,506) | (48,530) | (13,026) | (61,556) |
| Total mortgage loans . . . . . . . . | $330,757 | $2,597,072 | $2,927,829 | $358,953 | $2,564,767 | $2,923,720 |

During the three months ended June 30, 2011, we did not redesignate any loans from held for investment ("HFI") to held for sale ("HFS"). During the six months ended June 30, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS.

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of June 30, 2011 and December 31, 2010. For purposes of this table, each loan in our portfolio is included in only one segment and class category.

| | As of June 30, 2011[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] . . . . . | $43,387 | $15,120 | $ 85,242 | $143,749 | $2,348,882 | $2,492,631 | $115 | $100,192 |
| Government[4] . . . | 107 | 47 | 303 | 457 | 51,490 | 51,947 | 303 | — |
| Alt-A . . . . . . . . | 7,660 | 3,372 | 32,183 | 43,215 | 147,541 | 190,756 | 19 | 35,531 |
| Other[5] . . . . . . . | 3,641 | 1,543 | 12,972 | 18,156 | 78,726 | 96,882 | 99 | 14,317 |
| Total single-family . . . . | 54,795 | 20,082 | 130,700 | 205,577 | 2,626,639 | 2,832,216 | 536 | 150,040 |
| Multifamily[6] . . . . | 228 | NA | 849 | 1,077 | 173,721 | 174,798 | — | 801 |
| Total . . . . . . | $55,023 | $20,082 | $131,549 | $206,654 | $2,800,360 | $3,007,014 | $536 | $150,841 |

TREASURY-1573

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | |
| **Single-family:** | | | | | | | | |
| Primary[3] . . . . . | $47,048 | $18,055 | $ 93,302 | $158,405 | $2,299,080 | $2,457,485 | $139 | $110,758 |
| Government[4] . . | 125 | 58 | 371 | 554 | 51,930 | 52,484 | 354 | — |
| Alt-A. . . . . . . | 8,547 | 4,097 | 37,557 | 50,201 | 156,951 | 207,152 | 21 | 41,566 |
| Other[5] . . . . . . | 3,785 | 1,831 | 15,290 | 20,906 | 84,473 | 105,379 | 80 | 17,022 |
| Total single-family . . . . | 59,505 | 24,041 | 146,520 | 230,066 | 2,592,434 | 2,822,500 | 594 | 169,346 |
| Multifamily[6] . . . . | 382 | NA | 1,132 | 1,514 | 171,000 | 172,514 | — | 1,012 |
| Total . . . . . | $59,887 | $24,041 | $147,652 | $231,580 | $2,763,434 | $2,995,014 | $594 | $170,358 |

As of December 31, 2010[1]

[1] Recorded investment consists of (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column.

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

The following table displays the total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by portfolio segment, class and credit quality indicators as of June 30, 2011 and December 31, 2010. The single-family credit quality indicator is updated quarterly and the multifamily credit quality indicators are as of the origination date of each loan.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011[1][2] | | | December 31, 2010[1][2] | | |
| | Primary[3] | Alt-A | Other[4] | Primary[3] | Alt-A | Other[4] |
| | (Dollars in millions) | | | | | |
| **Single-family** | | | | | | |
| Estimated mark-to-market LTV ratio:[5] | | | | | | |
| Less than or equal to 80% . . . . . . . . . . | $1,548,616 | $ 69,375 | $26,745 | $1,561,202 | $ 79,305 | $ 29,854 |
| 80.01% to 90% . . . . . . . . . . . . . . . | 383,654 | 23,555 | 10,883 | 376,414 | 27,472 | 13,394 |
| 90.01% to 100% . . . . . . . . . . . . . . | 224,680 | 21,415 | 10,740 | 217,193 | 24,392 | 12,935 |
| 100.01% to 110% . . . . . . . . . . . . . . | 120,482 | 17,107 | 9,941 | 112,376 | 18,022 | 11,400 |
| 110.01% to 120% . . . . . . . . . . . . . . | 68,729 | 12,948 | 8,535 | 62,283 | 12,718 | 8,967 |
| 120.01% to 125% . . . . . . . . . . . . . . | 24,031 | 5,184 | 3,615 | 21,729 | 5,083 | 3,733 |
| Greater than 125% . . . . . . . . . . . . . . | 122,439 | 41,172 | 26,423 | 106,288 | 40,160 | 25,096 |
| Total . . . . . . . . . . . . . . . . . . . . . | $2,492,631 | $190,756 | $96,882 | $2,457,485 | $207,152 | $105,379 |

TREASURY-1574

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of | |
|---|---|---|
| | June 30, 2011[1] | December 31, 2010[1] |
| | (Dollars in millions) | |
| **Multifamily** | | |
| Original LTV ratio: | | |
| Less than or equal to 70% | $ 99,064 | $ 96,844 |
| 70.01% to 80% | 71,187 | 71,560 |
| Greater than 80% | 4,547 | 4,110 |
| Total | $174,798 | $172,514 |
| Original debt service coverage ratio: | | |
| Less than or equal to 1.10% | $ 14,097 | $ 15,034 |
| 1.11% to 1.25% | 51,556 | 50,745 |
| Greater than 1.25% | 109,145 | 106,735 |
| Total | $174,798 | $172,514 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Excludes $51.9 billion and $52.5 billion as of June 30, 2011 and December 31, 2010, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

TREASURY-1575

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### Individually Impaired Loans

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following tables display the total recorded investment, unpaid principal balance, related allowance and average recorded investment as of June 30, 2011 and December 31, 2010 and interest income recognized for the three and six months ended June 30, 2011 and 2010 for individually impaired loans.

| | As of June 30, 2011 | | | | For the Three Months Ended June 30, 2011 | | | For the Six Months Ended June 30, 2011 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
| | | | | | (Dollars in millions) | | | | | |
| Individually impaired loans: | | | | | | | | | | |
| With related allowance recorded: | | | | | | | | | | |
| Single-family: | | | | | | | | | | |
| Primary[3] . . . . . | $106,911 | $ 99,339 | $28,217 | $ 690 | $ 97,984 | $ 911 | $326 | $ 97,723 | $1,815 | $367 |
| Government[4] . . . | 233 | 229 | 47 | 6 | 274 | 3 | — | 265 | 6 | — |
| Alt-A . . . . . . . | 32,053 | 28,920 | 10,817 | 296 | 28,862 | 239 | 96 | 29,213 | 481 | 98 |
| Other[5] . . . . . . | 15,206 | 14,327 | 5,131 | 111 | 14,158 | 106 | 41 | 14,108 | 212 | 47 |
| Total single-family . . . . | 154,403 | 142,815 | 44,212 | 1,103 | 141,278 | 1,259 | 463 | 141,309 | 2,514 | 512 |
| Multifamily . . . . . | 2,076 | 2,076 | 523 | 21 | 2,055 | 23 | 2 | 2,135 | 48 | 3 |
| Total individually impaired loans with related allowance recorded . . . . . . | 156,479 | 144,891 | 44,735 | 1,124 | 143,333 | 1,282 | 465 | 143,444 | 2,562 | 515 |
| With no related allowance recorded:[6] | | | | | | | | | | |
| Single-family: | | | | | | | | | | |
| Primary[3] . . . . . | 11,959 | 8,127 | — | — | 7,399 | 144 | 31 | 5,695 | 252 | 88 |
| Government[4] . . . | 18 | 6 | — | — | 15 | 3 | — | 11 | 4 | — |
| Alt-A . . . . . . . | 4,252 | 2,212 | — | — | 1,959 | 53 | 7 | 1,331 | 86 | 26 |
| Other[5] . . . . . . | 1,053 | 591 | — | — | 541 | 13 | 3 | 385 | 21 | 7 |
| Total single-family . . . . | 17,282 | 10,936 | — | — | 9,914 | 213 | 41 | 7,422 | 363 | 121 |
| Multifamily . . . . . | 688 | 676 | — | — | 686 | 10 | 2 | 711 | 25 | 5 |
| Total individually impaired loans with no related allowance recorded . . . . . . | 17,970 | 11,612 | — | — | 10,600 | 223 | 43 | 8,133 | 388 | 126 |
| Total individually impaired loans[7] . . . | $174,449 | $156,503 | $44,735 | $1,124 | $153,933 | $1,505 | $508 | $151,577 | $2,950 | $641 |

110

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment |
|---|---|---|---|---|---|
| | | As of December 31, 2010 | | | |
| | | | (Dollars in millions) | | |
| Individually impaired loans: | | | | | |
| With related allowance recorded: | | | | | |
| Single-family: | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . . | $ 99,838 | $ 93,024 | $23,565 | $ 772 | $ 81,258 |
| Government[4] . . . . . . . . . . . . . | 240 | 248 | 38 | 7 | 141 |
| Alt-A . . . . . . . . . . . . . . . . . . . . | 30,932 | 28,253 | 9,592 | 368 | 25,361 |
| Other[5] . . . . . . . . . . . . . . . . . . | 14,429 | 13,689 | 4,479 | 137 | 12,094 |
| Total single-family . . . . . . . . | 145,439 | 135,214 | 37,674 | 1,284 | 118,854 |
| Multifamily . . . . . . . . . . . . . . . . | 2,372 | 2,371 | 556 | 23 | 1,496 |
| Total individually impaired loans with related allowance recorded . . | 147,811 | 137,585 | 38,230 | 1,307 | 120,350 |
| With no related allowance recorded:[6] | | | | | |
| Single-family: | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . . | 10,586 | 7,237 | — | — | 7,860 |
| Government[4] . . . . . . . . . . . . . | 19 | 13 | — | — | 11 |
| Alt-A . . . . . . . . . . . . . . . . . . . . | 3,600 | 1,884 | — | — | 2,091 |
| Other[5] . . . . . . . . . . . . . . . . . . | 879 | 512 | — | — | 589 |
| Total single-family . . . . . . . . | 15,084 | 9,646 | — | — | 10,551 |
| Multifamily . . . . . . . . . . . . . . . . | 789 | 811 | — | — | 642 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . . . . . | 15,873 | 10,457 | — | — | 11,193 |
| Total individually impaired loans[7] . . . | $163,684 | $148,042 | $38,230 | $1,307 | $131,543 |

---

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Total single-family interest income recognized of $1.5 billion for the three months ended June 30, 2011 consists of $1.1 billion of contractual interest and $383 million of effective yield adjustments. Total single-family interest income recognized of $2.9 billion for the six months ended June 30, 2011 consists of $2.1 billion of contractual interest and $735 million of effective yield adjustments.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[5] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

[7] Includes single-family loans restructured in a TDR with a recorded investment of $149.8 billion and $140.1 billion as of June 30, 2011 and December 31, 2010, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $993 million and $939 million as of June 30, 2011 and December 31, 2010, respectively.

111

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

Interest income recognized on impaired loans was $455 million for the three months ended June 30, 2010 and $2.6 billion for the six months ended June 30, 2010. Interest income recognized on a cash basis on impaired loans was $558 million for the three months ended June 30, 2010 and $891 million for the six months ended June 30, 2010.

*Loans Acquired in a Transfer*

We acquired delinquent loans from unconsolidated trusts and long-term standby commitments with an unpaid principal balance plus accrued interest of $48 million and $75 million for the three months ended June 30, 2011 and 2010, respectively, and $96 million and $160 million for the six months ended June 30, 2011 and 2010, respectively. The following table displays the outstanding balance, carrying amount and accretable yield of acquired credit-impaired loans as of June 30, 2011 and December 31, 2010, excluding loans that were modified as TDRs subsequent to their acquisition from MBS trusts.

| | As of | |
| --- | --- | --- |
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Outstanding contractual balance | $6,351 | $8,519 |
| Carrying amount: | | |
|     Loans on accrual status | $1,836 | $2,029 |
|     Loans on nonaccrual status | 1,696 | 2,449 |
| Total carrying amount of loans | $3,532 | $4,478 |
| Accretable yield | $1,965 | $2,412 |

The following table displays interest income recognized and the impact to the "Provision for credit losses" related to loans that are still being accounted for as acquired credit-impaired loans, as well as loans that have been subsequently modified as a TDR, for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Accretion of fair value discount[1] | $250 | $ 288 | $ 481 | $ 554 |
| Interest income on loans returned to accrual status or subsequently modified as TDRs | 265 | 298 | 520 | 619 |
| Total interest income recognized on acquired credit-impaired loans | $515 | $ 586 | $1,001 | $1,173 |
| Increase (Decrease) in "Provision for loan losses" subsequent to the acquisition of credit-impaired loans | $721 | $(120) | $ 959 | $ 444 |

_____
[1] Represents accretion of the fair value discount that was recorded on acquired credit-impaired loans.

## 4. Allowance for Loan Losses

We maintain an allowance for loan losses for HFI loans in our mortgage portfolio and loans backing Fannie Mae MBS issued from consolidated trusts. When calculating our allowance for loan losses, we consider only our net recorded investment in the loan at the balance sheet date, which includes interest income only while

112

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

the loan was on accrual status. The allowance for loan losses is calculated based on our estimate of incurred losses as of the balance sheet date. Determining the adequacy of our allowance for loan losses is complex and requires judgment about the effect of matters that are inherently uncertain.

*Allowance for Loan Losses*

The following table displays changes in both single-family and multifamily allowance for loan losses for the three and six months ended June 30, 2011 and total allowance for loan losses for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . | $52,671 | $13,413 | $66,084 | | | |
| Provision for loan losses . . . . . . . . | 2,954 | 2,723 | 5,677 | | | |
| Charge-offs[1] . . . . . . . . . . . . . . . . | (5,341) | (758) | (6,099) | | | |
| Recoveries . . . . . . . . . . . . . . . . . . | 1,819 | 550 | 2,369 | | | |
| Transfers[2] . . . . . . . . . . . . . . . . . . | 2,750 | (2,750) | — | | | |
| Net reclassifications[3] . . . . . . . . . . | 96 | (100) | (4) | | | |
| Ending balance . . . . . . . . . . . . . . . | $54,949 | $13,078 | $68,027 | | | |
| Multifamily allowance for loan losses: . . . . . . . . . . . . . . . . . . . . . . | | | | | | |
| Beginning balance . . . . . . . . . . . . . | $ 1,037 | $ 436 | $ 1,473 | | | |
| Provision for loan losses . . . . . . . . | 86 | 39 | 125 | | | |
| Charge-offs[1] . . . . . . . . . . . . . . . . | (119) | — | (119) | | | |
| Transfers[2] . . . . . . . . . . . . . . . . . . | 12 | (12) | — | | | |
| Net reclassifications[3] . . . . . . . . . . | 1 | (1) | — | | | |
| Ending balance . . . . . . . . . . . . . . . | $ 1,017 | $ 462 | $ 1,479 | | | |
| Total allowance for loan losses: . . . . . . | | | | | | |
| Beginning balance . . . . . . . . . . . . . | $53,708 | $13,849 | $67,557 | $25,675 | $ 34,894 | $60,569 |
| Total provision for loan losses . . . . . | 3,040 | 2,762 | 5,802 | 2,593 | 1,702 | 4,295 |
| Charge-offs[1] . . . . . . . . . . . . . . . . | (5,460) | (758) | (6,218) | (4,446) | (1,947) | (6,393) |
| Recoveries . . . . . . . . . . . . . . . . . . | 1,819 | 550 | 2,369 | 65 | 291 | 356 |
| Transfers[2] . . . . . . . . . . . . . . . . . . | 2,762 | (2,762) | — | 22,620 | (22,620) | — |
| Net reclassifications[3] . . . . . . . . . . | 97 | (101) | (4) | (3,663) | 5,418 | 1,755 |
| Ending balance[4][5] . . . . . . . . . . . . | $55,966 | $13,540 | $69,506 | $42,844 | $ 17,738 | $60,582 |

TREASURY-1579

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Six Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | | **2010** | | |
| | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** |
| | (Dollars in millions) | | | | | |
| Single-family allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . | $ 47,377 | $12,603 | $ 59,980 | | | |
| Provision for loan losses . . . . . | 10,197 | 6,092 | 16,289 | | | |
| Charge-offs[1] . . . . . . . . . . . . | (10,964) | (1,206) | (12,170) | | | |
| Recoveries . . . . . . . . . . . . . . | 2,349 | 1,502 | 3,851 | | | |
| Transfers[2] . . . . . . . . . . . . . . | 5,912 | (5,912) | — | | | |
| Net reclassifications[3] . . . . . . . | 78 | (1) | 77 | | | |
| Ending balance . . . . . . . . . . . | $ 54,949 | $13,078 | $ 68,027 | | | |
| Multifamily allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . | $ 1,153 | $ 423 | $ 1,576 | | | |
| Provision for loan losses . . . . . | 2 | 98 | 100 | | | |
| Charge-offs[1] . . . . . . . . . . . . | (201) | — | (201) | | | |
| Transfers[2] . . . . . . . . . . . . . . | 57 | (57) | — | | | |
| Net reclassifications[3] . . . . . . . | 6 | (2) | 4 | | | |
| Ending balance . . . . . . . . . . . | $ 1,017 | $ 462 | $ 1,479 | | | |
| Total allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . | $ 48,530 | $13,026 | $ 61,556 | $ 8,078 | $ 1,847 | $ 9,925 |
| Adoption of new accounting standards . . . . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Total provision for loan losses . . . . . . . . . . . . . . . . . | 10,199 | 6,190 | 16,389 | 8,864 | 7,370 | 16,234 |
| Charge-offs[1] . . . . . . . . . . . . | (11,165) | (1,206) | (12,371) | (6,151) | (5,402) | (11,553) |
| Recoveries . . . . . . . . . . . . . . | 2,349 | 1,502 | 3,851 | 162 | 568 | 730 |
| Transfers[2] . . . . . . . . . . . . . . | 5,969 | (5,969) | — | 36,475 | (36,475) | — |
| Net reclassifications[3] . . . . . . . | 84 | (3) | 81 | (4,584) | 6,254 | 1,670 |
| Ending balance[4][5] . . . . . . . . | $ 55,966 | $13,540 | $ 69,506 | $42,844 | $ 17,738 | $ 60,582 |

[1] Total charge-offs include accrued interest of $438 million and $611 million for the three months ended June 30, 2011 and 2010, respectively and $824 million and $1.2 billion for the six months ended June 30, 2011 and 2010, respectively. Single-family charge-offs include accrued interest of $423 million and $800 million for the three and six months ended June 30, 2011, respectively. Multifamily charge-offs include accrued interest of $15 million and $24 million for the three and six months ended June 30, 2011, respectively.

[2] Includes transfers from trusts for delinquent loan purchases.

[3] Represents reclassification of amounts recorded in provision for loan losses and charge-offs that relate to allowance for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers.

[4] Total allowance for loan losses includes $414 million and $637 million as of June 30, 2011 and 2010, respectively, for acquired credit-impaired loans.

114

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[5] Total single-family allowance for loan losses was $59.0 billion as of June 30, 2010. Total multifamily allowance for loan losses was $1.6 billion as of June 30, 2010.

As of June 30, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2.6 billion and for loans of consolidated trusts was $442 million. As of December 31, 2010, the allowance for accrued interest receivable for loans of Fannie Mae was $3.0 billion and for loans of consolidated trusts was $439 million.

In the three month period ended June 30, 2010, we identified that for a portion of our delinquent loans we had not estimated and recorded our obligation to reimburse servicers for advances they made on our behalf for preforeclosure property taxes and insurance. We previously recognized these expenses when we reimbursed servicers. We also did not record a receivable from borrowers for these payments or assess the collectibility of the receivable. As such, we did not record an allowance for estimated uncollectable amounts. To correct the above misstatement, we recorded an out-of-period adjustment of $1.1 billion to "Provision for loan losses" in our condensed consolidated statements of operations for the three and six month periods ended June 30, 2010, reflecting our assessment of the collectibility of the receivable from the borrowers. We evaluated the effects of this misstatement, both quantitatively and qualitatively, on our three and six month periods ended June 30, 2010 and prior consolidated financial statements and concluded that no prior periods are materially misstated.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of June 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011 | | | December 31, 2010 | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans . . | $ 43,803 | $ 518 | $ 44,321 | $ 37,296 | $ 549 | $ 37,845 |
| Collectively reserved loans. . . | 23,815 | 956 | 24,771 | 22,306 | 1,020 | 23,326 |
| Acquired credit-impaired loans . . . . . . . . . . . . . . . | 409 | 5 | 414 | 378 | 7 | 385 |
| Total allowance for loan losses . . . . . . . . . . . . | $ 68,027 | $ 1,479 | $ 69,506 | $ 59,980 | $ 1,576 | $ 61,556 |
| Recorded investment in loans by segment:[1] | | | | | | |
| Individually impaired loans . . | $ 149,813 | $ 2,770 | $ 152,583 | $ 140,062 | $ 3,074 | $ 143,136 |
| Collectively reserved loans. . . | 2,678,465 | 171,961 | 2,850,426 | 2,677,640 | 169,332 | 2,846,972 |
| Acquired credit-impaired loans . . . . . . . . . . . . . . . | 3,938 | 67 | 4,005 | 4,798 | 108 | 4,906 |
| Total recorded investment in loans. . . . . . . . . . . . | $2,832,216 | $174,798 | $3,007,014 | $2,822,500 | $172,514 | $2,995,014 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

TREASURY-1581

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

## 5.   Investments in Securities

### *Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss. The following table displays our investments in trading securities and the cumulative amount of net losses recognized from holding these securities as of June 30, 2011 and December 31, 2010.

| | As of | |
| --- | --- | --- |
| | June 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 7,343 | $ 7,398 |
| Freddie Mac | 1,392 | 1,326 |
| Ginnie Mae | 301 | 590 |
| Alt-A private-label securities | 1,568 | 1,683 |
| Subprime private-label securities | 1,459 | 1,581 |
| CMBS | 10,976 | 10,764 |
| Mortgage revenue bonds | 616 | 609 |
| Other mortgage-related securities | 154 | 152 |
| Total | 23,809 | 24,103 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 34,856 | 27,432 |
| Asset-backed securities | 3,242 | 5,321 |
| Total | 38,098 | 32,753 |
| Total trading securities | $61,907 | $56,856 |
| Losses in trading securities held in our portfolio, net | $ 1,758 | $ 2,149 |

The following table displays information about our net trading gains and losses for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Net trading gains: | | | | |
| Mortgage-related securities | $131 | $612 | $360 | $1,618 |
| Non-mortgage-related securities | 4 | 28 | — | 80 |
| Total | $135 | $640 | $360 | $1,698 |
| Net trading gains recorded in the period related to securities still held at period end: | | | | |
| Mortgage-related securities | $131 | $567 | $354 | $1,499 |
| Non-mortgage-related securities | 7 | 24 | 8 | 70 |
| Total | $138 | $591 | $362 | $1,569 |

116

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Available-for-Sale Securities*

We measure AFS securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three and six months ended June 30, 2011 and 2010.

|  | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (Dollars in millions) | | | |
| Gross realized gains | $ 73 | $  83 | $ 133 | $  348 |
| Gross realized losses | 47 | 59 | 53 | 179 |
| Total proceeds[1] | 839 | 1,395 | 1,229 | 5,574 |

---

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets." For the three and six months ended June 30, 2010, proceeds were reduced by $455 million and $874 million, respectively, from what was previously disclosed, primarily related to deconsolidated REMICs that should have been presented as proceeds from issuance of long-term debt of consolidated trusts.

The following tables display the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of June 30, 2011 and December 31, 2010.

|  | As of June 30, 2011 | | | | |
|---|---|---|---|---|---|
|  | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
|  | (Dollars in millions) | | | | |
| Fannie Mae | $18,717 | $1,379 | $    (28) | $     (3) | $20,065 |
| Freddie Mac | 13,564 | 971 | — | — | 14,535 |
| Ginnie Mae | 838 | 128 | — | — | 966 |
| Alt-A private-label securities | 14,913 | 173 | (1,783) | (201) | 13,102 |
| Subprime private-label securities | 10,905 | 9 | (1,563) | (442) | 8,909 |
| CMBS[4] | 14,802 | 144 | — | (101) | 14,845 |
| Mortgage revenue bonds | 10,931 | 78 | (55) | (481) | 10,473 |
| Other mortgage-related securities | 3,887 | 118 | (18) | (266) | 3,721 |
| Total | $88,557 | $3,000 | $(3,447) | $(1,494) | $86,616 |

117

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $21,428 | $1,453 | $ (9) | $ (44) | $22,828 |
| Freddie Mac | 15,986 | 1,010 | — | — | 16,996 |
| Ginnie Mae | 909 | 130 | — | — | 1,039 |
| Alt-A private-label securities | 15,789 | 177 | (1,791) | (285) | 13,890 |
| Subprime private-label securities | 11,323 | 54 | (997) | (448) | 9,932 |
| CMBS[4] | 15,273 | 25 | — | (454) | 14,844 |
| Mortgage revenue bonds | 11,792 | 47 | (64) | (734) | 11,041 |
| Other mortgage-related securities | 4,098 | 106 | (44) | (338) | 3,822 |
| Total | $96,598 | $3,002 | $(2,905) | $(2,303) | $94,392 |

[1] Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments recognized in our condensed consolidated statements of operations and comprehensive loss.

[2] Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value for securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3] Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4] Amortized cost includes $763 million and $848 million as of June 30, 2011 and December 31, 2010, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following tables display additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of June 30, 2011 and December 31, 2010.

| | As of June 30, 2011 | | | |
|---|---|---|---|---|
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (18) | $ 942 | $ (13) | $ 191 |
| Alt-A private-label securities | (102) | 1,724 | (1,882) | 7,821 |
| Subprime private-label securities | (120) | 888 | (1,885) | 7,707 |
| CMBS | (8) | 2,792 | (93) | 3,092 |
| Mortgage revenue bonds | (78) | 2,434 | (458) | 3,006 |
| Other mortgage-related securities | (10) | 398 | (274) | 1,849 |
| Total | $(336) | $9,178 | $(4,605) | $23,666 |

118

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

|  | As of December 31, 2010 | | | |
|---|---|---|---|---|
|  | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
|  | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
|  | (Dollars in millions) | | | |
| Fannie Mae | $ (35) | $ 1,461 | $ (18) | $ 211 |
| Alt-A private-label securities | (104) | 1,915 | (1,972) | 9,388 |
| Subprime private-label securities | (47) | 627 | (1,398) | 8,493 |
| CMBS | (15) | 1,774 | (439) | 10,396 |
| Mortgage revenue bonds | (206) | 5,009 | (592) | 3,129 |
| Other mortgage-related securities | (2) | 262 | (380) | 2,014 |
| Total | $(409) | $11,048 | $(4,799) | $33,631 |

*Other-Than-Temporary Impairments*

We recognize the credit component of other-than-temporary impairments of our debt securities in our condensed consolidated statements of operations and comprehensive loss and the noncredit component in "Other comprehensive income" for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. $4.6 billion of the $4.9 billion of gross unrealized losses on AFS securities as of June 30, 2011 have existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of June 30, 2011 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of June 30, 2011 that was 84% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover a portion or the majority of these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive loss for the three and six months ended June 30, 2011 and 2010.

|  | For the Three Months Ended June 30,[1] | | For the Six Months Ended June 30,[1] | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (Dollars in millions) | | | |
| Alt-A private-label securities | $53 | $120 | $ 91 | $157 |
| Subprime private-label securities | — | 10 | — | 194 |
| Other | 3 | 7 | 9 | 22 |
| Net other-than-temporary impairments | $56 | $137 | $100 | $373 |

---

[1] Certain prior period amounts have been reclassified to conform to the current period presentation.

119

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For the three and six months ended June 30, 2011, we recorded net other-than-temporary impairment of $56 million and $100 million, respectively. The net other-than-temporary impairment charges recorded in the three month period ended June 30, 2011 were primarily driven by an increase in collateral losses on certain Alt-A private-label securities, which resulted in a decrease in the present value of our cash flow projections on these Alt-A private-label securities.

The following table displays activity related to the unrealized credit component on debt securities held by us recognized in earnings for the three and six months ended June 30, 2011 and 2010. A related unrealized non-credit component has been recognized in "Accumulated other comprehensive loss."

|  | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2011 | 2010 | 2011 | 2010 |
|  | (Dollars in millions) | | | |
| Balance, beginning of period | $8,040 | $8,209 | $8,215 | $8,191 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | — | 9 | 8 | 15 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 56 | 128 | 92 | 358 |
| Reductions for securities no longer in portfolio at period end | — | (1) | — | (52) |
| Reductions for amortization resulting from increases in cash flows expected to be collected over the remaining life of the securities | (220) | (164) | (439) | (331) |
| Balance, end of period | $7,876 | $8,181 | $7,876 | $8,181 |

As of June 30, 2011, those debt securities with other-than-temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive loss only the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We model securities assuming the benefit of those external financial guarantees that we determined are creditworthy. We have recorded other-than-temporary impairments for the three and six months ended June 30, 2011 based on this analysis, with amounts related to credit loss recognized in our condensed consolidated statements of operations and comprehensive loss. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

120

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

| | | | As of June 30, 2011 | | |
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| Vintage Year | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $ 2,109 | $ 498 | $3,614 | $ 516 | $2,379 |
| Weighted average collateral default[1] . . . . . . . | 37.9% | 38.5% | 11.4% | 32.9% | 15.8% |
| Weighted average collateral severities[2] . . . . . . | 58.5% | 50.6% | 45.5% | 39.9% | 35.6% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.4% | 9.9% | 9.9% | 8.2% | 9.9% |
| Average credit enhancement[4] . . . . . . . . . . . | 51.2% | 17.3% | 12.0% | 22.1% | 10.6% |
| **2005** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $ 188 | $1,348 | $1,231 | $ 553 | $2,452 |
| Weighted average collateral default[1] . . . . . . . | 73.3% | 59.3% | 40.7% | 55.7% | 39.2% |
| Weighted average collateral severities[2] . . . . . . | 70.8% | 58.6% | 60.2% | 56.3% | 46.1% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.3% | 5.4% | 7.3% | 6.6% | 7.8% |
| Average credit enhancement[4] . . . . . . . . . . . | 64.9% | 28.2% | 1.8% | 18.6% | 5.9% |
| **2006** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $12,044 | $1,289 | $ 585 | $1,672 | $1,786 |
| Weighted average collateral default[1] . . . . . . . | 77.8% | 74.6% | 41.7% | 59.0% | 32.7% |
| Weighted average collateral severities[2] . . . . . . | 71.2% | 61.8% | 64.0% | 57.8% | 49.2% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.2% | 2.8% | 6.8% | 5.9% | 8.3% |
| Average credit enhancement[4] . . . . . . . . . . . | 18.8% | 21.8% | 1.2% | 0.9% | 1.2% |
| **2007 & After:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $ 624 | $ — | $ — | $ — | $ 122 |
| Weighted average collateral default[1] . . . . . . . | 79.5% | N/A | N/A | N/A | 43.5% |
| Weighted average collateral severities[2] . . . . . . | 66.9% | N/A | N/A | N/A | 55.7% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.9% | N/A | N/A | N/A | 6.9% |
| Average credit enhancement[4] . . . . . . . . . . . | 34.1% | N/A | N/A | N/A | 26.1% |
| **Total** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . | $14,965 | $3,135 | $5,430 | $2,741 | $6,739 |
| Weighted average collateral default[1] . . . . . . . | 72.2% | 62.3% | 21.3% | 53.4% | 29.3% |
| Weighted average collateral severities[2] . . . . . . | 69.3% | 58.6% | 50.8% | 54.1% | 43.4% |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.8% | 5.0% | 9.0% | 6.5% | 8.7% |
| Average credit enhancement[4] . . . . . . . . . . . | 24.6% | 23.8% | 8.6% | 8.5% | 6.7% |

[1] The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

121

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

(2) The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

(3) The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

(4) The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

### Maturity Information

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of June 30, 2011. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | | | As of June 30, 2011 | | | | | |
| | Total Amortized Cost | Total Fair Value | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
| | | | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | | |
| Fannie Mae | $18,717 | $20,065 | $— | $— | $ 1 | $ 1 | $ 3,363 | $ 3,570 | $15,353 | $16,494 |
| Freddie Mac | 13,564 | 14,535 | 2 | 2 | 36 | 39 | 1,404 | 1,516 | 12,122 | 12,978 |
| Ginnie Mae | 838 | 966 | — | — | — | — | 5 | 6 | 833 | 960 |
| Alt-A private-label securities | 14,913 | 13,102 | — | — | 1 | 1 | 264 | 268 | 14,648 | 12,833 |
| Subprime private-label securities | 10,905 | 8,909 | — | — | — | — | — | — | 10,905 | 8,909 |
| CMBS | 14,802 | 14,845 | — | — | 3,631 | 3,693 | 10,560 | 10,556 | 611 | 596 |
| Mortgage revenue bonds | 10,931 | 10,473 | 58 | 58 | 364 | 374 | 756 | 765 | 9,753 | 9,276 |
| Other mortgage-related securities | 3,887 | 3,721 | — | — | — | — | — | 14 | 3,887 | 3,707 |
| Total | $88,557 | $86,616 | $60 | $60 | $4,033 | $4,108 | $16,352 | $16,695 | $68,112 | $65,753 |

### Accumulated Other Comprehensive Loss

The following table displays our accumulated other comprehensive loss by major categories as of June 30, 2011 and December 31, 2010.

| | As of | |
| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment, net of tax | $ 862 | $ 304 |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment, net of tax | (2,123) | (1,736) |
| Other | (238) | (250) |
| Accumulated other comprehensive loss | $(1,499) | $(1,682) |

122

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The following table displays the activity in other comprehensive income, net of tax, by major categories for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Comprehensive income (loss): | | | | |
| Net loss | $(2,892) | $(1,223) | $(9,363) | $(12,752) |
| Other comprehensive income, net of tax: | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax benefit of $19 and tax of $799, respectively, for the three months ended and net of tax of $68 and $1,509 respectively, for the six months ended) | (34) | 1,484 | 127 | 2,802 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $15 and $45, respectively, for the three months ended and $28 and $126, respectively, for the six months ended) | 40 | 92 | 72 | 247 |
| Reclassification adjustment for (gains) losses included in net loss (net of tax of $3 and tax benefit of $50, respectively for the three months ended and net of tax of $11 and $6, respectively, for the six months ended) | (7) | 91 | (21) | (12) |
| Other | 3 | 3 | 5 | 5 |
| Other comprehensive income | 2 | 1,670 | 183 | 3,042 |
| Total comprehensive income (loss) | $(2,890) | $   447 | $(9,180) | $ (9,710) |

## 6.  Financial Guarantees

For our guarantees to unconsolidated trusts and other guaranty arrangements, we recognize a guaranty obligation for our obligation to stand ready to perform on these guarantees. For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $54.1 billion and $52.4 billion as of June 30, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $12.2 billion and $12.6 billion as of June 30, 2011 and December 31, 2010, respectively. In addition, we had exposure of $9.9 billion and $10.3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of June 30, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $3.7 billion and $3.9 billion as of June 30, 2011 and December 31, 2010, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.1 billion and $2.0 billion as of June 30, 2011 and December 31, 2010, respectively.

TREASURY-1589

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities. Management also monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and the percentage of multifamily loans 60 days or more past due, of loans that also have higher risk characteristics, such as high mark-to-market loan-to-value ratios and low original debt service coverage ratios. We use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to accurately reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of June 30, 2011 and December 31, 2010.

| | As of June 30, 2011[1] | | | As of December 31, 2010[1] | | |
|---|---|---|---|---|---|---|
| | **30 Days Delinquent** | **60 Days Delinquent** | **Seriously Delinquent[2]** | **30 Days Delinquent** | **60 Days Delinquent** | **Seriously Delinquent[2]** |
| Percentage of single-family conventional guaranty book of business[3] . . . . . . . . . . . . . . . . . | 1.98% | 0.73% | 4.79% | 2.19% | 0.89% | 5.37% |
| Percentage of single-family conventional loans[4] . . . . . . . . . . | 2.13 | 0.72 | 4.08 | 2.32 | 0.87 | 4.48 |

124

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of June 30, 2011[1] | | As of December 31, 2010[1] | |
|---|---|---|---|---|
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| **Estimated mark-to-market loan-to-value ratio:** | | | | |
| Less than 100% . . . . . . . . . . . . . . . . | 83% | 2.34% | 84% | 2.62% |
| 100.01% to 110% . . . . . . . . . . . . . . . | 5 | 9.76 | 5 | 11.60 |
| 110.01% to 120% . . . . . . . . . . . . . . . | 3 | 12.55 | 3 | 14.74 |
| 120.01% to 125% . . . . . . . . . . . . . . . | 1 | 14.08 | 1 | 16.86 |
| Greater than 125% . . . . . . . . . . . . . . | 8 | 20.73 | 7 | 24.71 |
| **Geographical distribution:** | | | | |
| Arizona . . . . . . . . . . . . . . . . . . . . . . . | 2 | 4.19 | 2 | 6.23 |
| California . . . . . . . . . . . . . . . . . . . . . . | 19 | 2.94 | 18 | 3.89 |
| Florida . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 12.19 | 7 | 12.31 |
| Nevada . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 7.88 | 1 | 10.66 |
| Select Midwest states[5] . . . . . . . . . . . | 10 | 4.54 | 11 | 4.80 |
| All other states . . . . . . . . . . . . . . . . . . | 62 | 3.24 | 61 | 3.46 |
| **Product distribution (not mutually exclusive):[6]** | | | | |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 13.04 | 8 | 13.87 |
| Subprime . . . . . . . . . . . . . . . . . . . . . . | * | 25.86 | * | 28.20 |
| Negatively amortizing adjustable rate . . . | * | 7.97 | * | 9.02 |
| Interest only . . . . . . . . . . . . . . . . . . . . | 5 | 16.28 | 6 | 17.85 |
| Investor property . . . . . . . . . . . . . . . . . | 6 | 4.47 | 6 | 4.79 |
| Condo/Coop . . . . . . . . . . . . . . . . . . . . | 9 | 4.90 | 9 | 5.37 |
| Original loan-to-value ratio >90%[7] . . . | 10 | 8.82 | 10 | 10.04 |
| FICO credit score <620[7] . . . . . . . . . | 3 | 13.65 | 4 | 14.63 |
| Original loan-to-value ratio >90% and FICO credit score <620[7] . . . . . . . . | 1 | 19.36 | 1 | 21.41 |
| **Vintages:** | | | | |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 7.06 | 9 | 7.20 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 11.90 | 8 | 12.19 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 12.75 | 12 | 13.24 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 5.17 | 9 | 4.88 |
| All other vintages . . . . . . . . . . . . . . . . | 66 | 1.59 | 62 | 1.73 |

* Represents less than 0.5% of the single-family conventional guaranty book of business.

[1] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted over 99% of our total single-family conventional guaranty book of business as of both June 30, 2011 and December 31, 2010.

[2] Consists of single-family conventional loans that were three months or more past due or in the foreclosure process, as of the periods indicated.

125

TREASURY-1591

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[3]  Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

[4]  Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

[5]  Consists of Illinois, Indiana, Michigan, and Ohio.

[6]  Categories are not mutually exclusive. Loans with multiple product features are included in all applicable categories.

[7]  Includes housing goals-oriented products such as MyCommunityMortgage® and Expanded Approval®.

|  | As of June 30, 2011[1][2] | | As of December 31, 2010[1][2] | |
| --- | --- | --- | --- | --- |
|  | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.14% | 0.46% | 0.21% | 0.71% |

|  | As of June 30, 2011[1][2] | | As of December 31, 2010[1][2] | |
| --- | --- | --- | --- | --- |
|  | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% . . . . . . . . . . . . . . . . | 5% | 0.50% | 5% | 0.59% |
| Less than or equal to 80% . . . . . . . . . . | 95 | 0.46 | 95 | 0.71 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 . . . . . . . . . . | 9 | 0.10 | 9 | 0.27 |
| Greater than 1.10 . . . . . . . . . . . . . . . . | 91 | 0.50 | 91 | 0.75 |
| **Acquisition loan size distribution:** | | | | |
| Less than or equal to $750,000 . . . . . . . . | 2 | 1.35 | 2 | 1.61 |
| Greater than $750,000 and less than or equal to $3 million . . . . . . . . . . . . . . | 12 | 1.09 | 12 | 1.17 |
| Greater than $3 million and less than or equal to $5 million . . . . . . . . . . . . . . | 9 | 0.76 | 9 | 0.88 |
| Greater than $5 million and less than or equal to $25 million . . . . . . . . . . . . . | 42 | 0.49 | 42 | 0.88 |
| Greater than $25 million . . . . . . . . . . . . | 35 | 0.09 | 35 | 0.24 |
| **Maturing dates:** | | | | |
| Maturing in 2011 . . . . . . . . . . . . . . . . . | 1 | 2.33 | 3 | 0.68 |
| Maturing in 2012 . . . . . . . . . . . . . . . . . | 6 | 0.27 | 7 | 0.42 |
| Maturing in 2013 . . . . . . . . . . . . . . . . . | 10 | 0.39 | 11 | 0.54 |
| Maturing in 2014 . . . . . . . . . . . . . . . . . | 8 | 0.13 | 8 | 0.67 |
| Maturing in 2015 . . . . . . . . . . . . . . . . . | 9 | 0.59 | 9 | 0.57 |

[1]  Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% of our total multifamily guaranty book of business as of both June 30, 2011 and December 31, 2010, respectively, excluding loans that have been defeased. Defeasance is a pre-payment of a loan through substitution of collateral.

[2]  Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3]  Consists of multifamily loans that were 60 days or more past due as of the periods indicated.

126

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

## 7.  Acquired Property, Net

Acquired property, net consists of held for sale foreclosed property received in full satisfaction of a loan net of a valuation allowance for declines in the fair value of foreclosed properties after initial acquisition. We classify as held for sale those properties that we intend to sell and are actively marketed for sale. The following table displays the activity in acquired property and the related valuation allowance for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, 2011 | | | For the Six Months Ended June 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Balance as of beginning of period . . . . . . . | $16,928 | $(1,664) | $15,264 | $ 18,054 | $(1,881) | $ 16,173 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . | 4,998 | (149) | 4,849 | 9,887 | (278) | 9,609 |
| Disposals . . . . . . . . . . . . . . . . . . . . . . . | (7,011) | 788 | (6,223) | (13,026) | 1,518 | (11,508) |
| Write-downs, net of recoveries . . . . . . . . . | — | (298) | (298) | — | (682) | (682) |
| Balance as of end of period . . . . . . . . . . | $14,915 | $(1,323) | $13,592 | $ 14,915 | $(1,323) | $ 13,592 |

| | For the Three Months Ended June 30, 2010 | | | For the Six Months Ended June 30, 2010 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Balance as of beginning of period . . . . . . . | $13,053 | $  (684) | $12,369 | $ 9,716 | $  (574) | $ 9,142 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . | 6,828 | (238) | 6,590 | 13,590 | (290) | 13,300 |
| Disposals . . . . . . . . . . . . . . . . . . . . . . . | (4,740) | 319 | (4,421) | (8,165) | 525 | (7,640) |
| Write-downs, net of recoveries . . . . . . . . . | — | (517) | (517) | — | (781) | (781) |
| Balance as of end of period . . . . . . . . . . | $15,141 | $(1,120) | $14,021 | $15,141 | $(1,120) | $14,021 |

[1]  Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

127

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

### 8.  Short-Term Borrowings and Long-Term Debt

*Short-Term Borrowings*

The following table displays our outstanding short-term borrowings (borrowing with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of June 30, 2011 and December 31, 2010.

| | As of | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2011 | | December 31, 2010 | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase............................ | $    — | —% | $    52 | 2.20% |
| Fixed-rate short-term debt: | | | | |
| Discount notes............................... | $161,689 | 0.16% | $151,500 | 0.32% |
| Foreign exchange discount notes ................. | 316 | 2.30 | 384 | 2.43 |
| Total short-term debt of Fannie Mae ............. | 162,005 | 0.17 | 151,884 | 0.32 |
| Debt of consolidated trusts ...................... | 5,193 | 0.17 | 5,359 | 0.23 |
| Total short-term debt ......................... | $167,198 | 0.17% | $157,243 | 0.32% |

_____

[1]  Includes the effects of discounts, premiums, and other cost basis adjustments.

128

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of June 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2011 | | | December 31, 2010 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate[1] | Maturities | Outstanding | Weighted-Average Interest Rate[1] |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds.... | 2011 - 2030 | $ 273,366 | 3.00% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes.......... | 2011 - 2021 | 164,043 | 2.15 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds.................. | 2017 - 2028 | 1,223 | 5.98 | 2017 - 2028 | 1,177 | 6.21 |
| Other[2] .................. | 2011 - 2040 | 45,568 | 5.63 | 2011  - 2040 | 44,893 | 5.64 |
| Total senior fixed ........ | | 484,200 | 2.97 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes.......... | 2011 - 2016 | 70,546 | 0.25 | 2011 - 2015 | 72,039 | 0.31 |
| Other[2] .................. | 2020 - 2037 | 368 | 5.84 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating ....... | | 70,914 | 0.28 | | 72,425 | 0.34 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[3] .... | 2012 - 2014 | 4,893 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures ...... | 2019 | 2,787 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed.... | | 7,680 | 6.83 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[4] .................. | | 562,794 | 2.68 | | 628,160 | 2.77 |
| Debt of consolidated trusts[2] .... | 2011 - 2051 | 2,444,853 | 4.54 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt ....... | | $3,007,647 | 4.20% | | $3,039,757 | 4.22% |

[1]  Includes the effects of discounts, premiums and other cost basis adjustments.

[2]  Includes a portion of structured debt instruments that is reported at fair value.

[3]  Consists of subordinated debt issued with an interest deferral feature.

[4]  Reported amounts include a net discount and other cost basis adjustments of $9.7 billion and $12.4 billion as of June 30, 2011 and December 31, 2010, respectively.

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of both June 30, 2011 and December 31, 2010. We had no borrowings outstanding from these lines of credit as of June 30, 2011.

TREASURY-1595

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

## 9. Derivative Instruments

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps, interest rate options, foreign currency swaps and futures.

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets. We record all derivative gains and losses, including accrued interest, in "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss.

### *Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of June 30, 2011 and December 31, 2010.

| | As of June 30, 2011 | | | | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . | $ 38,027 | $    878 | $167,057 | $ (9,711) | $ 49,085 | $  1,812 | $228,142 | $(14,115) |
| Receive-fixed . . . . . . . . . . | 149,566 | 4,989 | 11,585 | (95) | 172,174 | 6,493 | 52,003 | (578) |
| Basis . . . . . . . . . . . . . . . . | 902 | 44 | 1,650 | (2) | 435 | 29 | 50 | — |
| Foreign currency . . . . . . . . | 1,241 | 191 | 297 | (47) | 1,274 | 164 | 286 | (51) |
| Swaptions: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . | 71,150 | 471 | 56,050 | (1,088) | 66,200 | 482 | 30,950 | (1,773) |
| Receive-fixed . . . . . . . . . . | 47,120 | 3,657 | 56,050 | (1,352) | 48,340 | 4,992 | 30,275 | (673) |
| Interest rate caps . . . . . . . . . . . | 7,000 | 6 | — | — | 7,000 | 24 | — | — |
| Other[1] . . . . . . . . . . . . . . . . . | 689 | 56 | 637 | (3) | 909 | 75 | 25 | (1) |
| Total gross risk management derivatives . . . . . . . . . . . . | 315,695 | 10,292 | 293,326 | (12,298) | 345,417 | 14,071 | 341,731 | (17,191) |
| Accrued interest receivable (payable) . . . . . . . . . . . . . | — | 798 | — | (1,392) | — | 1,288 | — | (1,805) |
| Netting adjustment[2] . . . . . . . . | — | (10,586) | — | 13,345 | — | (15,175) | — | 18,023 |
| Total net risk management derivatives . . . . . . . . . . . | $315,695 | $    504 | $293,326 | $   (345) | $345,417 | $    184 | $341,731 | $   (973) |

TREASURY-1596

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | As of June 30, 2011 | | | | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | | | (Dollars in millions) | | | | |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans . . . . . . | $ 2,388 | $ 5 | $ 3,178 | $ (19) | $ 2,880 | $ 19 | $ 4,435 | $ (105) |
| Forward contracts to purchase mortgage-related securities . . | 8,866 | 75 | 18,991 | (111) | 19,535 | 123 | 27,697 | (468) |
| Forward contracts to sell mortgage-related securities . . | 17,095 | 84 | 15,679 | (117) | 40,761 | 811 | 24,562 | (169) |
| Total mortgage commitment derivatives. . . . . . . . . . . | $ 28,349 | $ 164 | $ 37,848 | $ (247) | $ 63,176 | $ 953 | $ 56,694 | $ (742) |
| Derivatives at fair value . . . . | $344,044 | $ 668 | $331,174 | $ (592) | $408,593 | $ 1,137 | $398,425 | $ (1,715) |

---

[1] Includes futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2] The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral receivable and payable. Cash collateral receivable was $2.9 billion and $3.5 billion as of June 30, 2011 and December 31, 2010, respectively. Cash collateral payable was $149 million and $604 million as of June 30, 2011 and December 31, 2010, respectively.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from Standard & Poor's ("S&P"), Moody's Investors Services, Inc. ("Moody's") or Fitch Ratings ("Fitch"). If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we would be in violation of these provisions, and the counterparties to the derivative instruments could request immediate payment or demand immediate collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of June 30, 2011 was $3.1 billion for which we posted collateral of $2.9 billion in the normal course of business. Had the credit-risk-related contingency features underlying these agreements been triggered as of June 30, 2011, we would have been required to post an additional $200 million of collateral to our counterparties.

TREASURY-1597

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Risk management derivatives: | | | | |
| Swaps: | | | | |
| Pay-fixed | $(5,474) | $(10,898) | $(4,872) | $(16,777) |
| Receive-fixed | 2,784 | 7,847 | 2,528 | 12,516 |
| Basis | 10 | 21 | 29 | 30 |
| Foreign currency | 53 | (8) | 83 | (11) |
| Swaptions: | | | | |
| Pay-fixed | 327 | (425) | 272 | (1,359) |
| Receive-fixed | 733 | 3,655 | 500 | 3,682 |
| Interest rate caps | (14) | (43) | (18) | (99) |
| Other[1] | (35) | 31 | (22) | 37 |
| Total risk management derivatives fair value gains (losses), net | (1,616) | 180 | (1,500) | (1,981) |
| Mortgage commitment derivatives fair value losses, net | (61) | (577) | (38) | (1,178) |
| Total derivatives fair value losses, net | $(1,677) | $ (397) | $(1,538) | $ (3,159) |

[1]   Includes futures, swap credit enhancements and mortgage insurance contracts.

### Derivative Counterparty Credit Exposure

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better by S&P, Moody's or Fitch. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

132

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The table below displays our credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of June 30, 2011 and December 31, 2010.

|  | As of June 30, 2011 | | | | |
|  | Credit Rating[1] | | | | |
|  | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
|  | (Dollars in millions) | | | | |
| Credit loss exposure[4] . . . . . . . . . . . . . . . . . | $ 103 | $ 336 | $ 439 | $ 56 | $ 495 |
| Less: Collateral held[5] . . . . . . . . . . . . . . . . . | 76 | 287 | 363 | — | 363 |
| Exposure net of collateral . . . . . . . . . . . . . . . | $ 27 | $ 49 | $ 76 | $ 56 | $ 132 |
| Additional information: | | | | | |
| Notional amount . . . . . . . . . . . . . . . . . . . . . | $167,459 | $439,345 | $606,804 | $2,217 | $609,021 |
| Number of counterparties . . . . . . . . . . . . . . | 7 | 8 | 15 | | |

|  | As of December 31, 2010 | | | | |
|  | Credit Rating[1] | | | | |
|  | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
|  | (Dollars in millions) | | | | |
| Credit loss exposure[4] . . . . . . . . . . . . . . . . . | $ 350 | $ 325 | $ 675 | $ 75 | $ 750 |
| Less: Collateral held[5] . . . . . . . . . . . . . . . . . | 273 | 325 | 598 | — | 598 |
| Exposure net of collateral . . . . . . . . . . . . . . . | $ 77 | $ — | $ 77 | $ 75 | $ 152 |
| Additional information: | | | | | |
| Notional amount . . . . . . . . . . . . . . . . . . . . . | $208,898 | $476,766 | $685,664 | $1,484 | $687,148 |
| Number of counterparties . . . . . . . . . . . . . . | 7 | 8 | 15 | | |

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's. The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2] We had exposure to 3 interest rate and foreign currency derivative counterparties in a net gain position as of both June 30, 2011 and December 31, 2010. Those interest rate and foreign currency derivatives had notional balances of $154.9 billion and $106.5 billion as of June 30, 2011 and December 31, 2010, respectively.

[3] Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[4] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[5] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral.

**10.   Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

133

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive loss, as we separate the activity related to our consolidated trusts from the results generated by our three segments. Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group. We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to net loss in our condensed consolidated statements of operations and comprehensive loss.

The following tables display our segment results for the three and six months ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, 2011 | | | | | |
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest income (expense) . . . . . . . . | $ (680) | $ (11) | $ 3,867 | $ 1,314 | $ 482[3] | $ 4,972 |
| Provision for loan losses . . . . . . . . . . . . . | (5,677) | (125) | — | — | — | (5,802) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . . . | (6,357) | (136) | 3,867 | 1,314 | 482 | (830) |
| Guaranty fee income (expense) . . . . . . . . | 1,880 | 216 | (391) | (1,116)[4] | (539)[4] | 50[4] |
| Investment gains (losses), net . . . . . . . . . . | (6) | 1 | 918 | (143) | (599)[5] | 171 |
| Net other-than-temporary impairments . . . | — | — | (55) | (1) | — | (56) |
| Fair value losses, net . . . . . . . . . . . . . . . . | (3) | — | (1,507) | (72) | (52)[6] | (1,634) |
| Debt extinguishment gains (losses), net . . . | — | — | (55) | 12 | — | (43) |
| Gains from partnership investments . . . . . | — | 34 | — | — | 1 | 35[7] |
| Fee and other income (expenses) . . . . . . . | 114 | 57 | 109 | (63) | (2) | 215 |
| Administrative expenses . . . . . . . . . . . . . | (400) | (64) | (105) | — | — | (569) |
| Benefit (provision) for guaranty losses . . . | (737) | 2 | — | — | — | (735) |
| Foreclosed property income (expense) . . . . | 481 | (3) | — | — | — | 478 |
| Other income (expenses) . . . . . . . . . . . . . | (77) | 36 | (9) | — | (17) | (67) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | (5,105) | 143 | 2,772 | (69) | (726) | (2,985) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | 109 | (56) | 40 | — | — | 93 |
| Net income (loss) . . . . . . . . . . . . . . . . . | (4,996) | 87 | 2,812 | (69) | (726) | (2,892) |
| Net income attributable to noncontrolling interest . . . . . . . . . . . | — | — | — | — | (1)[8] | (1) |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . | $(4,996) | $ 87 | $ 2,812 | $ (69) | $(727) | $(2,893) |

TREASURY-1600

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Six Months Ended June 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest income (expense) . . . . . . . | $ (1,578) | $ (20) | $ 7,577 | $ 2,888 | $ 1,065[3] | $ 9,932 |
| Provision for loan losses . . . . . . . . . . . | (16,289) | (100) | — | — | — | (16,389) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . | (17,867) | (120) | 7,577 | 2,888 | 1,065 | (6,457) |
| Guaranty fee income (expense) . . . . . . | 3,751 | 425 | (790) | (2,226)[4] | (1,060)[4] | 100[4] |
| Investment gains (losses), net . . . . . . . | (5) | 5 | 1,788 | (169) | (1,373)[5] | 246 |
| Net other-than-temporary impairments . . | — | — | (99) | (1) | — | (100) |
| Fair value losses, net . . . . . . . . . . . . . | (3) | — | (1,289) | (105) | 52[6] | (1,345) |
| Debt extinguishment gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (79) | 49 | — | (30) |
| Gains from partnership investments . . . | — | 22 | — | — | 1 | 23[7] |
| Fee and other income (expense) . . . . . . | 261 | 115 | 184 | (155) | (3) | 402 |
| Administrative expenses . . . . . . . . . . . | (816) | (132) | (226) | — | — | (1,174) |
| Benefit (provision) for guaranty losses . . | (743) | 41 | — | — | — | (702) |
| Foreclosed property expense . . . . . . . . | (7) | (3) | — | — | — | (10) |
| Other income (expenses) . . . . . . . . . . | (395) | 42 | (18) | — | (36) | (407) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | (15,824) | 395 | 7,048 | 281 | (1,354) | (9,454) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | 107 | (61) | 45 | — | — | 91 |
| Net income (loss) . . . . . . . . . . . . . | (15,717) | 334 | 7,093 | 281 | (1,354) | (9,363) |
| Net income attributable to noncontrolling interest . . . . . . . . . | — | — | — | — | (1)[8] | (1) |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(15,717) | $ 334 | $ 7,093 | $ 281 | $(1,355) | $ (9,364) |

TREASURY-1601

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | For the Three Months Ended June 30, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest income (expense) . . . . . . . . | $(1,385) | $ 5 | $3,549 | $ 1,282 | $ 756[3] | $ 4,207 |
| Benefit (provision) for loan losses . . . . . . | (4,319) | 24 | — | — | — | (4,295) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . . . | (5,704) | 29 | 3,549 | 1,282 | 756 | (88) |
| Guaranty fee income (expense) . . . . . . . . | 1,795 | 195 | (360) | (1,130)[4] | (448)[4] | 52[4] |
| Investment gains (losses), net . . . . . . . . . | 2 | (1) | 779 | (28) | (729)[5] | 23 |
| Net other-than-temporary impairments . . . | — | — | (137) | — | — | (137) |
| Fair value gains, net . . . . . . . . . . . . . . . | — | — | 631 | 11 | (339)[6] | 303 |
| Debt extinguishment losses, net. . . . . . . . | — | — | (128) | (31) | — | (159) |
| Losses from partnership investments . . . . | — | (22) | — | — | (4) | (26)[7] |
| Fee and other income (expense) . . . . . . . | 85 | 28 | 136 | (7) | — | 242 |
| Administrative expenses . . . . . . . . . . . . | (436) | (93) | (141) | — | — | (670) |
| Benefit (provision) for guaranty losses . . . | (73) | 4 | — | — | — | (69) |
| Foreclosed property expense . . . . . . . . . | (479) | (8) | — | — | — | (487) |
| Other income (expenses) . . . . . . . . . . . . | (259) | (11) | 91 | — | (19) | (198) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . | (5,069) | 121 | 4,420 | 97 | (783) | (1,214) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . | 1 | (2) | (8) | — | — | (9) |
| Net income (loss) . . . . . . . . . . . . . . . | (5,068) | 119 | 4,412 | 97 | (783) | (1,223) |
| Less: Net loss attributable to noncontrolling interests . . . . . . . . . | — | — | — | — | 5[8] | 5 |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . . | $(5,068) | $119 | $4,412 | $ 97 | $(778) | $(1,218) |

136

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | For the Six Months Ended June 30, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | | | | (Dollars in millions) | | |
| Net interest income (expense) . . . . . . . | $ (3,330) | $ 9 | $6,606 | $ 2,521 | $ 1,190[3] | $ 6,996 |
| Benefit (provision) for loan losses . . . . | (16,264) | 30 | — | — | — | (16,234) |
| Net interest income (expense) after provision for loan losses . . . . . . . . . | (19,594) | 39 | 6,606 | 2,521 | 1,190 | (9,238) |
| Guaranty fee income (expense) . . . . . . | 3,563 | 389 | (639) | (2,327)[4] | (880)[4] | 106[4] |
| Investment gains (losses), net . . . . . . . | 4 | (1) | 1,571 | (183) | (1,202)[5] | 189 |
| Net other-than-temporary impairments . . | — | — | (373) | — | — | (373) |
| Fair value losses, net . . . . . . . . . . . . | — | — | (555) | (24) | (823)[6] | (1,402) |
| Debt extinguishment losses, net . . . . . . | — | — | (183) | (100) | — | (283) |
| Losses from partnership investments . . . | — | (80) | — | — | (4) | (84)[7] |
| Fee and other income (expense) . . . . . . | 132 | 63 | 240 | (14) | — | 421 |
| Administrative expenses . . . . . . . . . . | (826) | (192) | (257) | — | — | (1,275) |
| Benefit (provision) for guaranty losses . . | (84) | 51 | — | — | — | (33) |
| Foreclosed property expense . . . . . . . . | (449) | (19) | — | — | — | (468) |
| Other income (expenses) . . . . . . . . . . | (431) | (17) | 118 | — | (40) | (370) |
| Income (loss) before federal income taxes . . . . . . . . . . . . . . . . . . . . . . | (17,685) | 233 | 6,528 | (127) | (1,759) | (12,810) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . | 52 | (15) | 21 | — | — | 58 |
| Net income (loss) . . . . . . . . . . . . . | (17,633) | 218 | 6,549 | (127) | (1,759) | (12,752) |
| Less: Net loss attributable to noncontrolling interests . . . . . . . . | — | — | — | — | 4[8] | 4 |
| Net income (loss) attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(17,633) | $ 218 | $6,549 | $ (127) | $(1,755) | $(12,748) |

[1]  Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets.

[2]  Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our condensed consolidated results.

[3]  Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4]  Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[5]  Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6]  Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7]  Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

137

TREASURY-1603

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[8] Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets.

## 11. Regulatory Capital Requirements

FHFA has announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship, and that FHFA will not issue quarterly capital classifications during the conservatorship. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels.

The following table displays our regulatory capital classification measures as of June 30, 2011 and December 31, 2010.

| | As of | |
| --- | --- | --- |
| | June 30, 2011[1] | December 31, 2010[1] |
| | (Dollars in millions) | |
| Core capital[2] | $(103,368) | $ (89,516) |
| Statutory minimum capital requirement[3] | 31,720 | 33,676 |
| Deficit of core capital over statutory minimum capital requirement | $(135,088) | $(123,192) |
| Deficit of core capital percentage over statutory minimum capital requirement | (426)% | (366)% |

[1] Amounts as of June 30, 2011 and December 31, 2010 represent estimates that have been submitted to FHFA.

[2] The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings (accumulated deficit). Core capital does not include: (a) accumulated other comprehensive income (loss) or (b) senior preferred stock.

[3] Generally, the sum of (a) 2.50% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director).

## 12. Concentration of Credit Risk

*Mortgage Seller/Servicers.*   Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 76% of our single-family guaranty book of business as of June 30, 2011, compared with 77% as of December 31, 2010. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 68% of our multifamily guaranty book of business as of June 30, 2011, compared with 70% as of December 31, 2010.

If one of our principal mortgage seller/servicers fails to meet its obligations to us, it could increase our credit-related expenses and credit losses, result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth.

*Mortgage Insurers.*   Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $92.8 billion on the single-family mortgage loans in our guaranty book of business as of June 30, 2011, which represented approximately 3% of our single-family guaranty book of business. Our primary and pool mortgage insurance coverage risk in force on single-family mortgage loans in our guaranty book of business represented $88.6 billion and $4.2 billion, respectively, as of June 30, 2011, compared with $91.2 billion and $4.7 billion,

138

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

respectively, as of December 31, 2010. Eight mortgage insurance companies provided over 99% of our mortgage insurance as of both June 30, 2011 and December 31, 2010.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and financial condition of many mortgage insurers. Additionally, because FHA continues to be a lower-cost option for some consumers with higher LTV ratios, new business volumes for many private mortgage insurers have been impacted and this could also adversely affect the financial results and financial condition of those insurers. The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

As of June 30, 2011, our allowance for loan losses of $69.5 billion, allowance for accrued interest receivable of $3.0 billion and reserve for guaranty losses of $960 million incorporated an estimated recovery amount of approximately $15.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $16.5 billion as of June 30, 2011 and an adjustment of approximately $1.1 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

We had outstanding receivables of $4.4 billion in "Other assets" in our condensed consolidated balance sheet as of both June 30, 2011 and December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $534 million as of June 30, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they are recorded net of a valuation allowance of $253 million as of June 30, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having a duration of approximately three to six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of June 30, 2011 and December 31, 2010.

We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.5 billion and $3.1 billion for the three and six months ended June 30, 2011, respectively, and $6.4 billion for the year ended December 31, 2010. We negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million for the year ended December 31, 2010 are included in our total insurance proceeds amount; there were no such cash fees received in the six months ended June 30, 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce future exposure to our mortgage insurers and were recorded as a reduction to our "Foreclosed property expense (income)."

*Financial Guarantors.*   We were the beneficiary of financial guarantees totaling $8.3 billion and $8.8 billion as of June 30, 2011 and December 31, 2010, respectively, on securities held in our investment portfolio or on securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The securities covered by these guarantees consist primarily of private-label mortgage-related securities and mortgage revenue bonds. We are also the beneficiary of financial guarantees issued by Freddie Mac, the federal government and its agencies included in securities that totaled $31.8 billion as of June 30, 2011 and $25.7 billion as of December 31, 2010.

139

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

If a financial guarantor fails to meet its obligations to us with respect to the securities for which we have obtained financial guarantees, it could reduce the fair value of our mortgage-related securities and result in financial losses to us, which could have a material adverse effect on our earnings, liquidity, financial condition and net worth. We model the fair value of our securities assuming the benefit of those external financial guarantees that we determine are creditworthy.

*Lenders with Risk Sharing.*   We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $14.3 billion as of June 30, 2011 and $15.6 billion as of December 31, 2010. As of both June 30, 2011 and December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on multifamily loans was $31.1 billion as of June 30, 2011 and $30.3 billion as of December 31, 2010. As of June 30, 2011 and December 31, 2010, 40% and 41%, respectively, of our maximum potential loss recovery on multifamily loans was from three lenders.

**13.   Fair Value**

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

**Fair Value Measurement**

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and expands disclosures around fair value measurements. This guidance applies whenever other accounting standards require or permit assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

140

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of June 30, 2011 and December 31, 2010. Specifically, total assets measured at fair value on a recurring basis and classified as Level 3 were $37.0 billion, or 1% of "Total assets," and $39.0 billion, or 1% of "Total assets," in our condensed consolidated balance sheets as of June 30, 2011 and December 31, 2010, respectively.

| | Fair Value Measurements as of June 30, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,000 | $ — | $ — | $ — | $ 2,000 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,664 | 1,679 | — | 7,343 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,392 | — | — | 1,392 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 301 | — | — | 301 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . | — | 1,442 | 126 | — | 1,568 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . | — | — | 1,459 | — | 1,459 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10,976 | — | — | 10,976 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . | — | — | 616 | — | 616 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 154 | — | 154 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities . . . . . . . . . . . . . . . . . . . . . . | 34,856 | — | | — | 34,856 |
| Asset-backed securities . . . . . . . . . . . . . . . . . . . . . . | — | 3,242 | — | — | 3,242 |
| Total trading securities . . . . . . . . . . . . . . . . . . . . . . . . | 34,856 | 23,017 | 4,034 | — | 61,907 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 19,430 | 635 | — | 20,065 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14,523 | 12 | — | 14,535 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 966 | — | — | 966 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . | — | 6,450 | 6,652 | — | 13,102 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . | — | — | 8,909 | — | 8,909 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14,845 | — | — | 14,845 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . | — | 9 | 10,464 | — | 10,473 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14 | 3,707 | — | 3,721 |
| Total available-for-sale securities . . . . . . . . . . . . . . . . . . . | — | 56,237 | 30,379 | — | 86,616 |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . . | — | 719 | 2,365 | — | 3,084 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 6,752 | 148 | — | 6,900 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 4,128 | — | — | 4,128 |
| Interest rate caps . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 6 | — | — | 6 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 56 | — | 56 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (10,586) | (10,586) |
| Mortgage commitment derivatives . . . . . . . . . . . . . . . . . . . | — | 158 | 6 | — | 164 |
| Total other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 11,044 | 210 | (10,586) | 668 |
| Total assets at fair value . . . . . . . . . . . . . . . . . . . . . . . . | $36,856 | $91,017 | $36,988 | $(10,586) | $154,275 |

141

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of June 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| **Liabilities:** | | | | | |
| **Long-term debt:** | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $— | $ 460 | $ — | $ — | $ 460 |
| Senior floating | — | — | 402 | — | 402 |
| Total of Fannie Mae | — | 460 | 402 | — | 862 |
| Of consolidated trusts | — | 2,627 | 646 | — | 3,273 |
| Total long-term debt | — | 3,087 | 1,048 | — | 4,135 |
| **Other liabilities:** | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 11,146 | 101 | — | 11,247 |
| Swaptions | — | 2,440 | — | — | 2,440 |
| Other | 3 | — | — | — | 3 |
| Netting adjustment | — | — | — | (13,345) | (13,345) |
| Mortgage commitment derivatives | — | 217 | 30 | — | 247 |
| Total other liabilities | 3 | 13,803 | 131 | (13,345) | 592 |
| Total liabilities at fair value | $ 3 | $16,890 | $1,179 | $(13,345) | $ 4,727 |

142

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| **Assets:** | | | | | |
| Cash equivalents[2] . . . . . . . . . . . . . . . . . . . . . . . | $ 4,049 | $ 2,300 | $ — | $ — | $ 6,349 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,196 | 2,202 | — | 7,398 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,326 | — | — | 1,326 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | — | 590 | — | — | 590 |
| Alt-A private-label securities . . . . . . . . . . . . . | — | 1,663 | 20 | — | 1,683 |
| Subprime private-label securities . . . . . . . . . . . | — | — | 1,581 | — | 1,581 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10,764 | — | — | 10,764 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . | — | — | 609 | — | 609 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 152 | — | 152 |
| Non-mortgage-related securities: . . . . . . . . . . . . | | | | | |
| U.S. Treasury securities . . . . . . . . . . . . . . . . | 27,432 | — | — | — | 27,432 |
| Asset-backed securities . . . . . . . . . . . . . . . . . | — | 5,309 | 12 | — | 5,321 |
| Total trading securities . . . . . . . . . . . . . . . . . | 27,432 | 24,848 | 4,576 | — | 56,856 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: . . . . . . . . . . . . . . . | | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | — | 22,714 | 114 | — | 22,828 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,993 | 3 | — | 16,996 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,039 | — | — | 1,039 |
| Alt-A private-label securities . . . . . . . . . . . . . | — | 6,841 | 7,049 | — | 13,890 |
| Subprime private-label securities . . . . . . . . . . . | — | — | 9,932 | — | 9,932 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 14,844 | — | — | 14,844 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . | — | 11 | 11,030 | — | 11,041 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16 | 3,806 | — | 3,822 |
| Total available-for-sale securities . . . . . . . . . . . . | — | 62,458 | 31,934 | — | 94,392 |
| Mortgage loans of consolidated trusts . . . . . . . . . . . | — | 755 | 2,207 | — | 2,962 |
| Other assets: . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 9,623 | 163 | — | 9,786 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,474 | — | — | 5,474 |
| Interest rate caps . . . . . . . . . . . . . . . . . . . . . . | — | 24 | — | — | 24 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 72 | — | 75 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . | — | — | — | (15,175) | (15,175) |
| Mortgage commitment derivatives . . . . . . . . . . . . | — | 941 | 12 | — | 953 |
| Total other assets . . . . . . . . . . . . . . . . . . . . . . . | 3 | 16,062 | 247 | (15,175) | 1,137 |
| Total assets at fair value . . . . . . . . . . . . . . . . | $31,484 | $106,423 | $38,964 | $(15,175) | $161,696 |

143

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $    472 | $    — | $    — | $    472 |
| Senior floating . . . . . . . . . . . . . . . . . . . . . | — | — | 421 | — | 421 |
| Total of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | — | 472 | 421 | — | 893 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | — | 1,644 | 627 | — | 2,271 |
| Total long-term debt. . . . . . . . . . . . . . . . . . . . . . | — | 2,116 | 1,048 | — | 3,164 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,436 | 113 | — | 16,549 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,446 | — | — | 2,446 |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — | — | — | 1 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . | — | — | — | (18,023) | (18,023) |
| Mortgage commitment derivatives . . . . . . . . . . . | — | 712 | 30 | — | 742 |
| Total other liabilities . . . . . . . . . . . . . . . . . . . . . | 1 | 19,594 | 143 | (18,023) | 1,715 |
| Total liabilities at fair value . . . . . . . . . . . . . . . | $ 1 | $21,710 | $1,191 | $(18,023) | $  4,879 |

---

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

[2] Cash equivalents is comprised of U.S. Treasuries that are classified as Level 1 and money market funds that are classified as Level 2.

144

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three and six months ended June 30, 2011 and 2010. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive loss for Level 3 assets and liabilities for the three and six months ended June 30, 2011 and 2010. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period.

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Three Months Ended June 30, 2011

| | Balance, April 1, 2011 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Included in Other Comprehensive Income | Purchases(1) | Sales(1) | Issuances(2) | Settlements(2) | Transfers out of Level 3(3) | Transfers into Level 3(3) | Balance, June 30, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2011(4) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | | | |
| **Trading securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . | $ 1,651 | $  1 | $  — | $124 | $ — | $ — | $ (97) | $  — | $ — | $ 1,679 | $  2 |
| Alt-A private-label securities . . | 20 | 1 | — | — | — | — | (1) | — | 106 | 126 | 2 |
| Subprime private-label securities . . . . . . . . . . | 1,547 | (41) | — | — | — | — | (47) | — | — | 1,459 | (41) |
| Mortgage revenue bonds . . . . | 606 | 21 | — | — | — | — | (11) | — | — | 616 | 21 |
| Other . . . . . . . . . . . . . . . . | 155 | 1 | — | — | — | — | (2) | — | — | 154 | 1 |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities . . . . . | 2 | — | — | — | — | — | (2) | — | — | — | — |
| Total trading securities . . . . . . . | 3,981 | (17) | — | 124 | — | — | (160) | — | 106 | 4,034 | (15) |
| **Available-for-sale securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . | 546 | — | 8 | 473 | (24) | — | — | (368) | — | 635 | — |
| Freddie Mac . . . . . . . . . . . | 12 | — | — | — | — | — | — | — | — | 12 | — |
| Alt-A private-label securities . . | 7,236 | 3 | (26) | — | — | — | (217) | (747) | 403 | 6,652 | — |
| Subprime private-label securities . . . . . . . . . . | 9,660 | 130 | (547) | — | — | — | (334) | — | — | 8,909 | — |
| Mortgage revenue bonds . . . . | 10,532 | (1) | 273 | — | (64) | — | (276) | — | — | 10,464 | — |
| Other . . . . . . . . . . . . . . . . | 3,776 | 2 | 40 | — | — | — | (111) | — | — | 3,707 | — |
| Total available-for-sale securities . . | 31,762 | 134 | (252) | 473 | (88) | — | (938) | (1,115) | 403 | 30,379 | — |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . | 2,221 | 19 | — | 42 | — | — | (71) | (31) | 185 | 2,365 | 19 |
| Net derivatives . . . . . . . . . . . . | 118 | (9) | — | — | — | (1) | (29) | — | — | 79 | (26) |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating . . . . . . . . . | (423) | 8 | — | — | — | — | 13 | — | — | (402) | 8 |
| Of consolidated trusts . . . . . . . | (667) | 6 | — | — | — | (40) | 26 | 55 | (26) | (646) | 6 |
| Total long-term debt . . . . . . . . . | $(1,090) | $ 14 | $  — | $  — | $ — | $(40) | $ 39 | $ 55 | $(26) | $(1,048) | $ 14 |

TREASURY-1611

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Six Months Ended June 30, 2011

| | Balance, December 31, 2010 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Included in Other Comprehensive Income | Purchases[1] | Sales[1] | Issuances[2] | Settlements[2] | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, June 30, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2011[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae . . . . . . . | $ 2,202 | $(12) | $ — | $124 | $ (15) | $ — | $ (229) | $ (391) | $ — | $ 1,679 | $ (6) |
| Alt-A private-label securities . . . . . . . | 20 | 1 | — | — | — | — | (1) | — | 106 | 126 | 1 |
| Subprime private-label securities . . . . . . . | 1,581 | (30) | — | — | — | — | (92) | — | — | 1,459 | (30) |
| Mortgage revenue bonds . . . . . . . . . | 609 | 21 | — | — | — | — | (14) | — | — | 616 | 24 |
| Other . . . . . . . . . . . | 152 | 5 | — | — | — | — | (3) | — | — | 154 | 5 |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities . . . . . . . | 12 | — | — | — | — | — | (5) | (9) | 2 | — | — |
| Total trading securities . . . | 4,576 | (15) | — | 124 | (15) | — | (344) | (400) | 108 | 4,034 | (6) |
| Available-for-sale securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae . . . . . . . | 114 | — | 12 | 889 | (39) | — | (2) | (469) | 130 | 635 | — |
| Freddie Mac . . . . . . | 3 | — | — | — | — | — | — | — | 9 | 12 | — |
| Alt-A private-label securities . . . . . . . | 7,049 | 1 | 78 | — | — | — | (475) | (1,064) | 1,063 | 6,652 | — |
| Subprime private-label securities . . . . . . . | 9,932 | 260 | (605) | — | — | — | (678) | — | — | 8,909 | — |
| Mortgage revenue bonds . . . . . . . . . | 11,030 | (3) | 294 | — | (106) | — | (751) | — | — | 10,464 | — |
| Other . . . . . . . . . . . | 3,806 | 3 | 111 | — | — | — | (213) | — | — | 3,707 | — |
| Total available-for-sale securities . . . . . . . . . . | 31,934 | 261 | (110) | 889 | (145) | — | (2,119) | (1,533) | 1,202 | 30,379 | — |
| Mortgage loans of consolidated trusts . . . . | 2,207 | 30 | — | 57 | — | — | (150) | (37) | 258 | 2,365 | 30 |
| Net derivatives . . . . . . . . | 104 | 5 | — | — | — | (1) | (29) | — | — | 79 | (16) |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating . . . . . | (421) | (14) | — | — | — | — | 33 | — | — | (402) | (14) |
| Of consolidated trusts . . | (627) | (29) | — | — | — | (40) | 48 | 77 | (75) | (646) | (28) |
| Total long-term debt . . . . . | $(1,048) | $(43) | $ — | $ — | $ — | $(40) | $ 81 | $ 77 | $ (75) | $(1,048) | $(42) |

146

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Balance, April 1, 2010 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Included in Other Comprehensive Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, June 30, 2010 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2010[4] |
|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | |
| Mortgage-related: | | | | | | | | |
| Fannie Mae | $ 4,076 | $(34) | $ — | $ (111) | $(3,873) | $ — | $ 58 | $(2) |
| Freddie Mac | — | — | — | — | — | 4 | 4 | — |
| Alt-A private-label securities | 153 | 9 | — | (12) | (99) | 68 | 119 | 4 |
| Subprime private-label securities | 1,683 | 26 | — | (64) | — | — | 1,645 | 25 |
| Mortgage revenue bonds | 611 | 49 | — | (10) | — | — | 650 | 49 |
| Other | 158 | 3 | — | (1) | — | — | 160 | 3 |
| Non-mortgage-related: | | | | | | | | |
| Asset-backed securities | 43 | 1 | — | (13) | (7) | — | 24 | 1 |
| Total trading securities | 6,724 | 54 | — | (211) | (3,979) | 72 | 2,660 | 80 |
| Available-for-sale securities: | | | | | | | | |
| Mortgage-related: | | | | | | | | |
| Fannie Mae | 217 | 1 | 3 | (85) | (119) | 36 | 53 | — |
| Freddie Mac | 30 | — | (1) | (8) | — | — | 21 | — |
| Ginnie Mae | 123 | — | 3 | (1) | — | — | 125 | — |
| Alt-A private-label securities | 8,517 | 23 | 467 | (363) | (1,245) | 378 | 7,777 | — |
| Subprime private-label securities | 10,511 | 78 | 122 | (456) | — | — | 10,255 | — |
| Mortgage revenue bonds | 12,559 | — | 270 | (401) | — | — | 12,428 | — |
| Other | 3,873 | (1) | 144 | (126) | — | — | 3,890 | — |
| Total available-for-sale securities | 35,830 | 101 | 1,008 | (1,440) | (1,364) | 414 | 34,549 | — |
| Net derivatives | 140 | 132 | — | (41) | — | (5) | 226 | 97 |
| Guaranty assets and buy-ups | 11 | 3 | 1 | — | — | — | 15 | 2 |
| Long-term debt: | | | | | | | | |
| Of Fannie Mae: | | | | | | | | |
| Senior floating | (582) | (3) | — | — | — | — | (585) | (3) |
| Of consolidated trusts | (71) | 8 | — | (38) | 2 | (6) | (105) | 8 |
| Total long-term debt | $ (653) | $ 5 | $ — | $ (38) | $ 2 | $ (6) | $ (690) | $ 5 |

TREASURY-1613

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Balance, December 31, 2009 | Impact of New Accounting Standards | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Total Gains or (Losses) (Realized/Unrealized) Included in Other Comprehensive Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, June 30, 2010 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2010[4] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . | $ 5,656 | $ (2) | $ 4 | $ — | $ (242) | $(5,363) | $ 5 | $ 58 | $ (2) |
| Freddie Mac . . . . . . . . . . . . | — | — | — | — | — | — | 4 | 4 | — |
| Alt-A private-label securities . . . | 564 | 62 | 32 | — | (48) | (589) | 98 | 119 | 10 |
| Subprime private-label securities . . . . . . . . . . . . | 1,780 | — | — | — | (135) | — | — | 1,645 | — |
| Mortgage revenue bonds . . . . . | 600 | — | 99 | — | (49) | — | — | 650 | 96 |
| Other . . . . . . . . . . . . . . . . | 154 | — | 8 | — | (2) | — | — | 160 | 8 |
| Non-mortgage-related: | | | | | | | | | |
| Asset-backed securities . . . . . . | 107 | — | — | — | (49) | (47) | 13 | 24 | 2 |
| Total trading securities . . . . . . . . | 8,861 | 60 | 143 | — | (525) | (5,999) | 120 | 2,660 | 114 |
| Available-for-sale securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . | 596 | (203) | (1) | 4 | 82 | (463) | 38 | 53 | — |
| Freddie Mac . . . . . . . . . . . . | 27 | — | — | (1) | (11) | — | 6 | 21 | — |
| Ginnie Mae . . . . . . . . . . . . | 123 | — | — | 3 | (1) | — | — | 125 | — |
| Alt-A private-label securities . . . | 8,312 | 471 | 19 | 734 | (675) | (2,256) | 1,172 | 7,777 | — |
| Subprime private-label securities . . . . . . . . . . . . | 10,746 | (118) | (10) | 585 | (948) | — | — | 10,255 | — |
| Mortgage revenue bonds . . . . . | 12,820 | 21 | (1) | 503 | (915) | — | — | 12,428 | — |
| Other . . . . . . . . . . . . . . . . | 3,530 | 366 | (6) | 254 | (254) | — | — | 3,890 | — |
| Total available-for-sale securities . . . | 36,154 | 537 | 1 | 2,082 | (2,722) | (2,719) | 1,216 | 34,549 | — |
| Net derivatives . . . . . . . . . . . . . | 123 | — | 167 | — | (59) | — | (5) | 226 | 89 |
| Guaranty assets and buy-ups . . . . . . | 2,577 | (2,568) | 3 | 1 | 2 | — | — | 15 | 4 |
| Long-term debt: | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | |
| Senior floating . . . . . . . . . . | (601) | — | 11 | — | 5 | — | — | (585) | 12 |
| Of consolidated trusts . . . . . . . | — | (77) | 7 | — | (38) | 11 | (8) | (105) | 6 |
| Total long-term debt . . . . . . . . . . | $ (601) | $ (77) | $ 18 | $ — | $ (33) | $ 11 | $ (8) | $ (690) | $ 18 |

[1]  Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitized trusts.

[2]  Issuances and settlements include activity related to the consolidation and deconsolidation of liabilities of securitized trusts.

[3]  Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. Transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A loans. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

[4]  Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

148

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive loss for the three and six months ended June 30, 2011 and 2010, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | | | **For the Three Months Ended June 30, 2011** | | |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss | $135 | $ 8 | $(6) | $ 4 | $141 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of June 30, 2011 | $  (1) | $(7) | $— | $— | $  (8) |

| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | | | **For the Six Months Ended June 30, 2011** | | |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss | $270 | $(16) | $(23) | $ 7 | $238 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of June 30, 2011 | $  (1) | $(33) | $ — | $— | $ (34) |

| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary-Impairments | Other | Total |
|---|---|---|---|---|---|
| | | | **For the Three Months Ended June 30, 2010** | | |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss | $101 | $192 | $ (7) | $9 | $295 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of June 30, 2010 | $ — | $182 | $— | $2 | $184 |

| | Interest Income | Fair Value Gains (Losses), net | Net Other-than-Temporary-Impairments | Other | Total |
|---|---|---|---|---|---|
| | | | **For the Six Months Ended June 30, 2010** | | |
| | | (Dollars in millions) | | | |
| Total realized and unrealized gains (losses) included in net loss | $212 | $325 | $(219) | $14 | $332 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of June 30, 2010 | $ — | $221 | $ — | $ 4 | $225 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a recurring basis, as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. These valuation techniques are also used to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

149

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasuries, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1. If quoted market prices in active markets for identical assets are not available, we use prices provided by up to four third-party pricing services that are calibrated to the quoted market prices in active markets for similar securities, and assets valued in this manner are classified as Level 2. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or discounted cash flow models that use inputs such as spread, prepayment speed, yield, and loss severity based on market assumptions where available. Such instruments are generally classified as Level 2. Where there is limited activity or less transparency around inputs to the valuation, securities are classified as Level 3.

*Mortgage Loans Held for Investment*—The majority of HFI performing loans and nonperforming loans that are not individually impaired are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We elected the fair value option for certain loans containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinate trust structures, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

Fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined from third-party pricing services and other observable market data as a base value, from which we add or subtract the fair value of the associated guaranty asset, guaranty obligation and master servicing arrangement. We classify these valuations primarily within Level 2 of the valuation hierarchy given that the market values of our Fannie Mae MBS are calibrated to the quoted market prices in active markets for similar securities. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3. Certain loans that do not qualify for Fannie Mae MBS securitization are valued using market-based data including, for example, credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure.

Fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. We calculate the fair value of nonperforming loans based on assumptions about key factors, including loan performance, collateral value, foreclosure related expenses, disposition timeline, and mortgage insurance repayment. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we compute a market calibrated fair value. The bids on sample loans are obtained from multiple active market participants. Fair value for loans that are four or more months delinquent, in an open modification period, or in a closed modification and that have performed for nine or fewer months, is estimated directly from a model calibrated to these indicative bids. Fair value for loans that are one to three months delinquent is estimated by an interpolation method using three inputs: (1) the fair value estimate as a performing loan; (2) the fair value estimate as a nonperforming loan; and (3) the delinquency transition rate corresponding to the loan's current delinquency status.

Fair value of a portion of our single-family nonperforming loans is measured using the value of the underlying collateral. These valuations leverage our proprietary distressed home price model. The model assigns a value using comparable transaction data. In determining what comparables to use in the calculations, the model measures three key characteristics relative to the target property: (1) distance from target property, (2) time of

150

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

the transaction and (3) comparability of the nondistressed value. A portion of the nonperforming loans that are impaired is measured at fair value in our condensed consolidated balance sheets on a nonrecurring basis. These loans are classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

Fair value of multifamily nonperforming loans is determined by external third-party valuations when available. If third-party valuations are unavailable, we determine the value of the collateral based on a derived property value estimation method using current net operating income of the property and capitalization rates.

*Derivatives Assets and Liabilities (collectively "derivatives")*—Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification. Certain highly complex structured derivatives use only a single external source of price information due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant assumptions, resulting in Level 3 classification. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2. Adjustments for market movement based on internal model results that cannot be corroborated by observable market data are classified as Level 3.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further haircut of the present value for liquidity considerations. This discount is based on market quotes from dealers.

The fair value of the guaranty assets includes the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets. While the fair value of the guaranty assets reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

*Debt*—The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain

151

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2. When third-party pricing is not available, we use a discounted cash flow approach based on a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Given that the derivatives considered in the valuations of these structured debt instruments are classified as Level 3, the valuations of the structured debt instruments result in a Level 3 classification.

Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities." Certain consolidated MBS debt with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

TREASURY-1618

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Nonrecurring Changes in Fair Value*

The following tables display assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment), and the gains or losses recognized for these assets and liabilities for the three and six months ended June 30, 2011 and 2010 as a result of fair value measurements.

| | Fair Value Measurements For the Six Months Ended June 30, 2011 | | | | For the Three Months Ended June 30, 2011 | For the Six Months Ended June 30, 2011 |
|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses | Total Losses |
| | (Dollars in millions) | | | | | |
| Assets: | | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value . . . . . . . . . . . . . . . . . . . . . . . | $— | $ 2 | $  204 | $  206[1] | $  (8) | $   (13) |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | — | — | 32,970 | 32,970[2] | (66) | (1,080) |
| Of consolidated trusts . . . . . . . . . . . . . . . . | — | — | 749 | 749[2] | (18) | (98) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | — | — | 1,365 | 1,365[2] | (28) | (108) |
| Acquired property, net: | | | | | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . | — | — | 14,806 | 14,806[3] | (701) | (1,512) |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . | — | — | 227 | 227[3] | (33) | (49) |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . | — | — | 877 | 877[5] | (35) | (65) |
| Total assets at fair value . . . . . . . . . . . . . . | $— | $ 2 | $51,198 | $51,200 | $(889) | $(2,925) |

TREASURY-1619

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

| | Fair Value Measurements For the Six Months Ended June 30, 2010 | | | | For the Three Months Ended June 30, 2010 | For the Six Months Ended June 30, 2010 |
|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses | Total Losses |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $6,869 | $ 540 | $ 7,409[(1)(4)] | $ (21) | $ (90)[(4)] |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae | — | — | 14,733 | 14,733[(2)] | (917) | (808) |
| Of consolidated trusts | — | — | 348 | 348[(2)] | (103) | (103) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae | — | — | 1,730 | 1,730[(2)] | (146) | (237) |
| Acquired property, net: | | | | | | |
| Single-family | — | — | 9,995 | 9,995[(3)] | (672) | (1,004) |
| Multifamily | — | — | 133 | 133[(3)] | (17) | (32) |
| Other Assets: | | | | | | |
| Guaranty assets | — | — | 24 | 24 | (1) | (4) |
| Partnership investments | — | — | 85 | 85 | (26) | (89) |
| Total assets at fair value | $— | $6,869 | $27,588 | $34,457 | $(1,903) | $(2,367) |

(1) Includes $56 million and $7.1 billion of mortgage loans held for sale that were sold, deconsolidated, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of June 30, 2011 and 2010, respectively.

(2) Includes $3.6 billion and $508 million of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of June 30, 2011 and 2010, respectively.

(3) Includes $8.4 billion and $4.0 billion of acquired properties that were sold or transferred as of June 30, 2011 and 2010, respectively.

(4) Includes $7.1 billion of estimated fair value and $68 million in losses due to the adoption of the new accounting standards.

(5) Includes $144 million of other assets that were sold or transferred as of June 30, 2011.

The following is a description of the fair valuation techniques we use for assets and liabilities measured at fair value on a nonrecurring basis under the accounting standard for fair value measurements as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. We also use these valuation techniques to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Mortgage Loans Held for Sale*—Loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are described under "Mortgage Loans Held for Investment" and these loans are classified as Level 2 to the extent that significant inputs are observable. To the extent that significant inputs are unobservable or determined by extrapolation of observable points, the loans are classified within Level 3.

154

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Acquired Property, Net and Other Assets*—Acquired property, net mainly represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our condensed consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The fair value estimate is based on the best information available at the time of valuation. The hierarchy includes offers accepted, third-party interior appraisals, independent broker opinions, proprietary home price model values and exterior broker price opinions. Estimated cost to sell is based upon historical sales cost at a geographic level.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in other assets, are depreciated and are impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. Acquired property held for use is included in other assets in our condensed consolidated balance sheets. The fair value of our single-family foreclosed properties on an ongoing basis is determined using the same information hierarchy used at the point of initial fair value. The fair value of our multifamily properties is derived using third-party valuations. When third-party valuations are not available, we estimate the fair value using current net operating income of the property and capitalization rates.

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

**Fair Value of Financial Instruments**

The following table displays the carrying value and estimated fair value of our financial instruments as of June 30, 2011 and December 31, 2010. The fair value of financial instruments we disclose, includes commitments to purchase multifamily and single-family mortgage loans, which are off-balance sheet financial instruments that we do not record in our condensed consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial

155

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | As of | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2011 | | December 31, 2010 | |
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Financial assets:** | | | | |
| Cash and cash equivalents[1] . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 51,853 | $ 51,853 | $ 80,975 | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . . . | 19,500 | 19,500 | 11,751 | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61,907 | 61,907 | 56,856 | 56,856 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . | 86,616 | 86,616 | 94,392 | 94,392 |
| Mortgage loans held for sale . . . . . . . . . . . . . . . . . . . . . . . | 439 | 439 | 915 | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 330,390 | 299,543 | 358,698 | 319,367 |
| Of consolidated trusts. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,597,000 | 2,639,555 | 2,564,107 | 2,610,145 |
| Mortgage loans held for investment. . . . . . . . . . . . . . . . . . . . | 2,927,390 | 2,939,098 | 2,922,805 | 2,929,512 |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,829 | 3,641 | 7,215 | 6,990 |
| Derivative assets at fair value . . . . . . . . . . . . . . . . . . . . . . . . | 668 | 668 | 1,137 | 1,137 |
| Guaranty assets and buy-ups. . . . . . . . . . . . . . . . . . . . . . . . | 483 | 929 | 458 | 814 |
| Total financial assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,152,685 | $3,164,651 | $3,176,504 | $3,183,342 |
| **Financial liabilities:** | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ — | $ 52 | $ 51 |
| Short-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 162,005 | 162,041 | 151,884 | 151,974 |
| Of consolidated trusts. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,193 | 5,194 | 5,359 | 5,359 |
| Long-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 562,794 | 585,398 | 628,160 | 649,684 |
| Of consolidated trusts. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,444,853 | 2,557,891 | 2,411,597 | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . . . . . . . . . . . . | 592 | 592 | 1,715 | 1,715 |
| Guaranty obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 778 | 3,700 | 769 | 3,854 |
| Total financial liabilities . . . . . . . . . . . . . . . . . . . . . . . . | $3,176,215 | $3,314,816 | $3,199,536 | $3,327,566 |

_____
[1] Includes restricted cash of $37.6 billion and $63.7 billion as of June 30, 2011 and December 31, 2010, respectively.

The following are valuation techniques for items not subject to the fair value hierarchy either because they are not measured at fair value other than for the purpose of the above table or because they are only measured at fair value at inception.

*Financial Instruments for which fair value approximates carrying value*—We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions) and the majority of advances to lenders.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates the fair value due to the short-term nature of the specific instruments. Other instruments include loans for which the

156

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

carrying value does not approximate fair value. These loans are valued using collateral values of similar loans as a proxy.

*Guaranty Obligations*—The fair value of all guaranty obligations ("GO"), measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. While the fair value of the GO reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our condensed consolidated balance sheets as a result of consolidating VIEs. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of June 30, 2011 and December 31, 2010.

| | As of | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | June 30, 2011 | | | December 31, 2010 | | |
| | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] |
| | (Dollars in millions) | | | | | |
| Fair value . . . . . . . . . . . . . . . . . . . . . . . . . | $3,084 | $862 | $3,273 | $2,962 | $893 | $2,271 |
| Unpaid principal balance . . . . . . . . . . . . . . | 3,612 | 796 | 3,450 | 3,456 | 829 | 2,572 |

---

[1] Includes nonaccrual loans with a fair value of $222 million and $219 million as of June 30, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of June 30, 2011 is $216 million. Includes loans that are 90 days past due with a fair value of $367 million and

157

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

$369 million as of June 30, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of June 30, 2011 is $247 million.

(2)  Includes interest-only debt instruments with no unpaid principal balance and a fair value of $136 million and $151 million as of June 30, 2011 and December 31, 2010, respectively.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value gains (losses), net" in our condensed consolidated statements of operations and comprehensive loss for the periods ended June 30, 2011 and 2010.

| | For the Three Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2011 | | | 2010 |
| | Loans | Long-Term Debt | Total Gains | Long-Term Debt |
| | (Dollars in millions) | | | |
| Changes in instrument-specific credit risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  6 | $  8 | $  14 | $  5 |
| Other changes in fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76 | (26) | 50 | 1 |
| Fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  82 | $(18) | $  64 | $  6 |

| | For the Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2011 | | | 2010 |
| | Loans | Long-Term Debt | Total Gains (Losses) | Long-Term Debt |
| | (Dollars in millions) | | | |
| Changes in instrument-specific credit risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(211) | $  4 | $(207) | $  8 |
| Other changes in fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 141 | 7 | 148 | (26) |
| Fair value gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  (70) | $  11 | $  (59) | $(18) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

## 14.  Commitments and Contingencies

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. Litigation claims and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. The following describes our material legal proceedings, investigations and other matters.

TREASURY-1624

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For certain legal actions and proceedings we have established a reserve for probable losses where we can reasonably estimate such losses or ranges of losses. Based on our current knowledge and after consultation with counsel, we do not believe that such losses or ranges of losses will have a material adverse effect on our financial condition. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued. For certain other legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we cannot reasonably estimate such losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, or where there may be novel or unsettled legal questions relevant to the proceedings. For these matters, we have not established a reserve. Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the lawsuits described below, we believe we have valid defenses to the claims in these lawsuits and intend to defend these lawsuits vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

*In re Fannie Mae Securities Litigation*

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case.

*2008 Class Action Lawsuits*

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—*In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings.

*In re Fannie Mae 2008 Securities Litigation*

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege

159

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. On July 28, 2011 lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October 13, 2009, the Court entered an order allowing FHFA to intervene.

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010. Defendants' motions for reconsideration were denied on April 11, 2011.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims, which are now fully briefed and remain pending.

*Comprehensive Investment Services v. Mudd, et al.*

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of § 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. Defendants moved to dismiss the amended complaint on July 11, 2011.

*Smith v. Fannie Mae, et al.*

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed

TREASURY-1626

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

an amended complaint on April 19, 2011, which alleges violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of § 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. Defendants moved to dismiss the complaint on July 11, 2011.

*Alenick v. Merrill Lynch, et al.*

On May 12, 2011, Zeke Alenick filed an individual securities action against one of our former officers, certain of our underwriters, and an employee of one of our underwriters in New York State Court. Plaintiff alleges common law fraud, recklessness, negligence, and violations of § 349 of the New York General Business Law in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. The complaint seeks various forms of relief, including damages, punitive damages, and rescission. On June 13, 2011, the case was removed to the United States District Court for the Southern District of New York and accepted as related to *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On July 18 and 25, 2011, Alenick filed motions to dismiss voluntarily all defendants. The court granted those motions on July 25 and 28, 2011, and closed the case.

*Investigation by the Securities and Exchange Commission*

On September 26, 2008, we received notice of an ongoing investigation into Fannie Mae by the SEC regarding certain accounting and disclosure matters. On January 8, 2009, the SEC issued a formal order of investigation. We are cooperating with this investigation.

*Investigation by the Department of Justice*

On September 26, 2008, we received notice of an ongoing federal investigation by the U.S. Attorney for the Southern District of New York into certain accounting, disclosure and corporate governance matters. In connection with that investigation, Fannie Mae received a Grand Jury subpoena for documents. That subpoena was subsequently withdrawn. However, we were informed that the Department of Justice was continuing an investigation and on March 15, 2010, we received another Grand Jury subpoena for documents. We are cooperating with this investigation.

TREASURY-1627

**Item 3.   Quantitative and Qualitative Disclosures about Market Risk**

Information about market risk is set forth in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management."

**Item 4.   Controls and Procedures**

**Overview**

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

**Evaluation of Disclosure Controls and Procedures**

*Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"). Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of June 30, 2011, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of June 30, 2011 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of June 30, 2011 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of June 30, 2011 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

TREASURY-1628

Management has determined that we continued to have the following material weakness as of June 30, 2011 and as of the date of filing this report:

- *Disclosure Controls and Procedures.*   We have been under the conservatorship of FHFA since September 6, 2008. Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

  Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of June 30, 2011 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Mitigating Actions Relating to Material Weakness**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10-Q for the quarter ended June 30, 2011 ("Second Quarter 2011 Form 10-Q"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our Second Quarter 2011 Form 10-Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the Second Quarter 2011 Form 10-Q, and it was not aware of any material misstatements or omissions in the Second Quarter 2011 Form 10-Q and had no objection to our filing the Second Quarter 2011 Form 10-Q.

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

TREASURY-1629

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, liquidity, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

## Changes in Internal Control over Financial Reporting

### Overview

Management is required to evaluate, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe changes in our internal control over financial reporting since March 31, 2011 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Changes in Management

During the third quarter of 2011, Susan R. McFarland became our new Chief Financial Officer, succeeding David C. Hisey as our principal financial officer. Mr. Hisey, our Deputy Chief Financial Officer, continues to serve as our principal accounting officer. In addition, John Nichols, who had previously been our interim Chief Risk Officer, was appointed our Chief Risk Officer in the third quarter of 2011. During the second quarter of 2011, Karen R. Pallotta, Executive Vice President—Single-Family Mortgage Business, left the company.

164

# PART II—OTHER INFORMATION

## Item 1.   Legal Proceedings

The information in this item supplements information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2010 Form 10-K and First Quarter 2011 Form 10-Q. We also provide information regarding material legal proceedings in "Note 14, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can reasonably be estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our condensed consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described or incorporated by reference in this item or in our 2010 Form 10-K or First Quarter 2011 Form 10-Q. We have recorded a reserve for legal claims related to those matters for which we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

## Item 1A.   Risk Factors

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2010 Form 10-K. This section supplements and updates that discussion and, for a complete understanding of the subject, you should read both together. Please also refer to "MD&A—Risk Management" in this report and in our 2010 Form 10-K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. However, these are not the only risks we face. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial.

### *The future of our company is uncertain.*

There is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

On February 11, 2011, Treasury and HUD released a report to Congress on ending the conservatorships of the GSEs and reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report also addresses three options for a reformed housing finance system. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

TREASURY-1631

The Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee has approved numerous bills that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury have over the enterprises. In addition, several bills have been introduced in the Senate and House of Representatives that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "MD&A—Legislative and Regulatory Developments—GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation will likely be insufficient to repay the aggregate liquidation preference on our preferred stock or to provide any proceeds to common shareholders.***

FHFA has an obligation to place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations for a period of 60 days after the filing deadline for our Form 10-K or Form 10-Q with the SEC. Because of the credit-related expenses we expect to incur on our legacy book of business and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid triggering FHFA's obligation. Although Treasury committed to providing us funds in accordance with the terms of the senior preferred stock purchase agreement, Treasury may not provide these funds to us within the required 60 days if it has exhausted its borrowing authority or if there is a government shutdown. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the GSE Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

In the event of a liquidation of our assets, only after payment of the administrative expenses of the receiver and immediately preceding conservator, the secured and unsecured claims against the company (including repaying all outstanding debt obligations), and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock.

TREASURY-1632

***Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.***

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business, the future of our business (including future profitability, future structure, regulatory actions and GSE status) and the creditworthiness of the U.S. government could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 and the first half of 2011 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets, including the Federal Reserve's purchases of our debt and MBS. As a result, we believe that our status as a GSE and continued federal government support of our business is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. There can be no assurance that the government will continue to support us or that our current level of access to debt funding will continue. In addition, due to our reliance on the U.S. government's support, our access to debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our obligations, it likely would interfere with the operation of our business and have a material adverse effect on our liquidity, results of operations, financial condition and net worth.

***Our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis.***

We believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis. If we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be significantly impaired. In this event, our alternative sources of liquidity—consisting of our cash and other investments portfolio and the unencumbered mortgage assets in our mortgage portfolio—may not be sufficient to meet our liquidity needs.

We believe that the amount of mortgage-related assets that we could successfully borrow against or sell in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Due to the large size of our portfolio of mortgage assets, current market conditions and the significant amount of distressed assets in our mortgage portfolio, there likely would be insufficient market demand for large amounts of these assets over a prolonged period of time, which would limit our ability to borrow against or sell these assets.

To the extent that we are able to obtain funding by pledging or selling mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount could result in proceeds significantly lower than the current market value of these securities and could thereby reduce the amount of financing we obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

TREASURY-1633

*A decrease in the credit ratings on our senior unsecured debt would likely have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements.*

Our borrowing costs and our access to the debt capital markets depend in large part on the high credit ratings on our senior unsecured debt. Credit ratings on our debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt.

While there have been no changes in our credit ratings from December 31, 2010 to August 2, 2011, on July 15, 2011, S&P placed our long-term and short-term debt ratings on "CreditWatch with negative implications," following a similar action on the debt ratings of the U.S. government. A rating being placed on CreditWatch indicates a substantial likelihood of a ratings action by S&P within the next 90 days or is a response to events presenting significant uncertainty to the creditworthiness of an issuer. S&P noted that it placed our long-term and short-term debt on CreditWatch with negative implications due to our direct reliance on the U.S. government. On July 14, 2011, S&P stated that it may lower the long-term debt rating of the U.S. in the next three months if it concludes that Congress and the Administration have not achieved a credible solution to the rising U.S. government debt burden and are not likely to achieve one in the foreseeable future.

On July 13, 2011, Moody's placed both the U.S. government's rating and our long-term debt ratings on review for possible downgrade. Following the raising of the U.S. government's statutory debt limit on August 2, 2011, Moody's confirmed both the U.S. government's rating and our long-term debt ratings, and removed the designation that these ratings were under review for possible downgrade. However, Moody's revised the rating outlook for both the U.S. government's rating and our long-term debt ratings to negative. In assigning the negative outlook to the U.S. government's rating, Moody's indicated there would be a risk of a downgrade if (1) there is a weakening in fiscal discipline in the coming year; (2) further fiscal consolidation measures are not adopted in 2013; (3) the economic outlook deteriorates significantly; or (4) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected.

S&P, Moody's and Fitch have all indicated that they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities if they were to lower their ratings on the U.S. government.

We currently cannot predict whether one or more of these rating agencies will downgrade our debt ratings in the future, or how long our ratings will remain subject to review for a possible downgrade by S&P. A reduction in our credit ratings would likely increase our borrowing costs, limit our access to the debt capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. It may also reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

*Deficiencies in servicer foreclosure processes and the resulting changes in the foreclosure environment could have a material adverse effect on our business, results of operations, financial condition and net worth.*

A number of our single-family mortgage servicers temporarily halted foreclosures in the fall of 2010 in some or all states after discovering deficiencies in their processes and the processes of their service providers relating to the execution of affidavits in connection with the foreclosure process. Although servicers have indicated that they have generally lifted their broad, formal foreclosure pauses, the processing of foreclosures continues to be delayed or halted in many states due to continuing issues in the servicer foreclosure process, as well as recent changes in state foreclosure laws and new court rules and proceedings. In addition, court budget cuts in Florida and other states could further delay the processing of foreclosures.

TREASURY-1634

These changes in the foreclosure environment have negatively affected our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and we expect they will continue to do so. We believe these changes also will delay the recovery of the housing market. These changes could also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities. In addition, the failure of our servicers or their service providers to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us. The servicer foreclosure process deficiencies have generated significant concern and are currently being reviewed by various government agencies and the various state attorneys general, which could lead to additional new laws, regulation or rules that negatively affect our ability to foreclose expeditiously or increase our costs.

***Challenges to the MERS® System could pose counterparty, operational, reputational and legal risks for us.***

MERSCORP, Inc. is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc. ("MERSCORP"), can serve as a nominee for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP, Inc.

Several legal challenges have been made disputing MERS's legal standing to initiate foreclosures and/or act as nominee in local land records. These challenges seek judicial relief ranging from money damages to the voiding of completed foreclosures in which MERS appeared in the chain of title. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions. These challenges also could result in court decisions that void our completed foreclosures in certain jurisdictions, which would require that we re-foreclose on the affected properties, thereby increasing our costs and lengthening the time it takes for us to foreclose on and dispose of the properties.

In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. On April 13, 2011, federal banking regulators and FHFA announced that they were taking enforcement action against MERS and MERSCORP to address significant weaknesses in, among other things, oversight, management supervision and corporate governance at MERS and MERSCORP that were uncovered as part of the regulators' review of mortgage servicers' foreclosure processing. Failures by MERS or MERSCORP to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational, reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to, or the enforcement action against, MERS and MERSCORP or the impact on our business, results of operations and financial condition.

***A failure in our operational systems or infrastructure, or those of third parties, could materially adversely affect our business, impair our liquidity, cause financial losses and harm our reputation.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial statement reliability, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, liability to customers, financial losses and damage to our reputation. For example, our business is highly dependent on our ability to manage and

169

process, on a daily basis, an extremely large number of transactions, many of which are highly complex, across numerous and diverse markets and in an environment in which we must make frequent changes to our core processes in response to changing external conditions. These transactions are subject to various legal, accounting and regulatory standards. Our financial, accounting, data processing or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. In addition, we rely on information provided by third parties in processing many of our transactions, and that information may be incorrect or we may fail to properly manage or analyze it.

We rely upon business processes that are highly dependent on people, legacy technology and the use of numerous complex systems and models to manage our business and produce books and records upon which our financial statements are prepared. This reliance increases the risk that we may be exposed to financial, reputational or other losses as a result of inadequately designed internal processes or systems, or failed execution of our systems. While we continue to enhance our technology, operational controls and organizational structure in order to reduce our operational risk, these actions may not be effective to manage these risks and may create additional operational risk as we execute these enhancements. In addition, as our use of third-party service providers for some of our business functions increases, we increasingly face the risk of an operational failure with respect to these third parties.

We also face the risk of operational failure, termination or capacity constraints of any of the clearing agents, exchanges, clearinghouses or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure, termination or constraint could adversely affect our ability to effect transactions or manage our exposure to risk, and could have a significant adverse impact on our business, liquidity, financial condition, net worth and results of operations.

Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Our computer systems, software and networks may be vulnerable to breaches, unauthorized access, misuse, computer viruses or other malicious code and other events that could have a security impact. If one or more of such events occur, this potentially could jeopardize our or our customers' or counterparties' confidential and other information processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our, our customers', our counterparties' or third parties' operations, which could result in significant losses, reputational damage, litigation, regulatory fines or penalties, or adversely affect our business, financial condition or results of operations. In addition, we may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures arising from operational and security risks.

In addition, we have experienced, and expect we may continue to experience, substantial changes in management, employees and our business structure and practices since the conservatorship began. These changes could increase our operational risk and result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, our systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions and reputational damage.

## Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds

**Recent Sales of Unregistered Securities**

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the

TREASURY-1636

"Plans"). During the quarter ended June 30, 2011, 692 restricted stock units vested, as a result of which 471 shares of common stock were issued, and 221 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting. All of these restricted stock units were granted prior to our entering into conservatorship. Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders. All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae.

From April 1, 2011 through May 12, 2011, 2,271,392 shares of common stock were issued upon conversion of 1,474,170 shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, at the option of the holders pursuant to the terms of the preferred stock. On May 13, 2011, 36,398,449 shares of common stock were issued upon the mandatory conversion of all remaining outstanding shares (20,018,947 shares) of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, in accordance with its terms. All series of preferred stock, other than the senior preferred stock, were issued prior to September 7, 2008.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act of 1933 with respect to our securities offerings.

**Information about Certain Securities Issuances by Fannie Mae**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this report.

TREASURY-1637

**Our Purchases of Equity Securities**

The following table shows shares of our common stock we repurchased during the second quarter of 2011.

| Period | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2011** | | | | |
| April 1-30 . . . . . . . . . . . . . . . . . . . . . . . | 1 | $0.39 | — | — |
| May 1-31. . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0.45 | — | — |
| June 1-30. . . . . . . . . . . . . . . . . . . . . . . | — | 0.37 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . | 3 | | | |

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of $1,394 in withholding taxes due upon the vesting of previously issued restricted stock. Does not include 21,493,117 shares of 8.75% Non-Cumulative Mandatory Convertible Series 2008-1 Preferred Stock received from holders upon conversion of those shares into 38,669,841 shares of common stock.

[2] We do not have any publicly announced share repurchase programs under which we could purchase our common stock.

**Dividend Restrictions**

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock. In addition, FHFA's regulations relating to conservatorship and receivership operations, which became effective July 20, 2011, prohibit us from paying any dividends while in conservatorship unless authorized by the Director of FHFA. The Acting Director of FHFA directs us to make dividend payments on the senior preferred stock on a quarterly basis.

*Restrictions under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

TREASURY-1638

**Item 3.   Defaults Upon Senior Securities**

None.

**Item 4.   [Removed and reserved]**

**Item 5.   Other Information**

None.

**Item 6.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

173

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By: /s/   Michael J. Williams
      Michael J. Williams
      President and Chief Executive Officer

Date: August 5, 2011

By: /s/   David C. Hisey
      David C. Hisey
      Executive Vice President and
      Deputy Chief Financial Officer

Date: August 5, 2011

174

## INDEX TO EXHIBITS

| Item | Description |
|------|-------------|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |

* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

Exhibit 31.1

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Michael J. Williams, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Michael J. Williams
Michael J. Williams
President and Chief Executive Officer

Date: August 5, 2011

Exhibit 31.2

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Susan R. McFarland, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Susan R. McFarland
_____

Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: August 5, 2011

**Exhibit 32.1**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended June 30, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer


Date: August 5, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended June 30, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Susan R. McFarland, Executive Vice President and Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/   Susan R. McFarland

Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: August 5, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.



**FR007**

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended cune 30, 2011**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from          to**

**Commission File Number: 000-53330**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Ma8**

| | |
|---|---|
| **Federally 8hartered 8orporation** | **52-09047J4** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **7200 cones Bran8h Drive, M8Lean, Virginia** | **22102-3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(J03) 903-2000**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                 Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  ☐ Yes ☒ No

As of July 22, 2011, there were 649,709,893 shares of the registrant's common stock outstanding.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1647

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 101 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Executive Summary | 1 |
| | Selected Financial Data | 12 |
| | Consolidated Results of Operations | 13 |
| | Consolidated Balance Sheets Analysis | 32 |
| | Risk Management | 48 |
| | Liquidity and Capital Resources | 81 |
| | Fair Value Measurements and Analysis | 87 |
| | Off-Balance Sheet Arrangements | 89 |
| | Critical Accounting Policies and Estimates | 90 |
| | Forward-Looking Statements | 90 |
| | Risk Management and Disclosure Commitments | 92 |
| | Legislative and Regulatory Matters | 93 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 97 |
| Item 4. | Controls and Procedures | 99 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 185 |
| Item 1A. | Risk Factors | 185 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 187 |
| Item 6. | Exhibits | 187 |
| **SIGNATURES** | | 188 |
| **GLOSSARY** | | 189 |
| **EXHIBIT INDEX** | | E-1 |

i                                                         *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## MD&A TABLE REFERENCE

| Table | Des8ription | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 4 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Income and Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 17 |
| 8 | Other Income | 18 |
| 9 | Non-Interest Expense | 19 |
| 10 | REO Operations Expense (Income), REO Inventory, and REO Dispositions | 19 |
| 11 | Segment Mortgage Portfolio Composition | 22 |
| 12 | Segment Earnings and Key Metrics — Investments | 23 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 26 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 28 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 30 |
| 16 | Investments in Securities | 33 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 34 |
| 18 | Total Mortgage-Related Securities Purchase Activity | 35 |
| 19 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 36 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 37 |
| 21 | Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 38 |
| 22 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 40 |
| 23 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 41 |
| 24 | Derivative Fair Values and Maturities | 43 |
| 25 | Changes in Derivative Fair Values | 44 |
| 26 | Freddie Mac Mortgage-Related Securities | 46 |
| 27 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 47 |
| 28 | Changes in Total Equity (Deficit) | 47 |
| 29 | Mortgage Insurance by Counterparty | 53 |
| 30 | Monoline Bond Insurance by Counterparty | 54 |
| 31 | Derivative Counterparty Credit Exposure | 56 |
| 32 | Characteristics of the Single-Family Credit Guarantee Portfolio | 59 |
| 33 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 62 |
| 34 | Single-Family Home Affordable Modification Program Volume | 64 |
| 35 | Single-Family Refinance Loan Volume | 65 |
| 36 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes | 67 |
| 37 | Reperformance Rates of Modified Single-Family Loans | 68 |
| 38 | Single-Family Serious Delinquency Rates | 69 |
| 39 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 71 |
| 40 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 72 |
| 41 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 74 |
| 42 | Multifamily Mortgage Portfolio — by Attribute | 75 |
| 43 | Non-Performing Assets | 77 |
| 44 | REO Activity by Region | 78 |
| 45 | Credit Loss Performance | 79 |
| 46 | Single-Family Credit Loss Sensitivity | 80 |
| 47 | Other Debt Security Issuances by Product, at Par Value | 84 |
| 48 | Other Debt Security Repurchases, Calls, and Exchanges | 84 |
| 49 | Freddie Mac Credit Ratings | 85 |
| 50 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 87 |
| 51 | Summary of Change in the Fair Value of Net Assets | 89 |
| 52 | PMVS Results | 98 |
| 53 | Derivative Impact on PMVS-L (50 bps) | 98 |

ii

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 102 |
| Freddie Mac Consolidated Balance Sheets | 103 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 104 |
| Freddie Mac Consolidated Statements of Cash Flows | 105 |
| Note 1: Summary of Significant Accounting Policies | 106 |
| Note 2: Conservatorship and Related Matters | 107 |
| Note 3: Variable Interest Entities | 110 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 116 |
| Note 5: Individually Impaired and Non-Performing Loans | 120 |
| Note 6: Real Estate Owned | 124 |
| Note 7: Investments in Securities | 125 |
| Note 8: Debt Securities and Subordinated Borrowings | 134 |
| Note 9: Financial Guarantees | 136 |
| Note 10: Retained Interests in Mortgage-Related Securitizations | 138 |
| Note 11: Derivatives | 138 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 142 |
| Note 13: Income Taxes | 143 |
| Note 14: Employee Benefits | 144 |
| Note 15: Segment Reporting | 145 |
| Note 16: Regulatory Capital | 151 |
| Note 17: Concentration of Credit and Other Risks | 152 |
| Note 18: Fair Value Disclosures | 159 |
| Note 19: Legal Contingencies | 177 |
| Note 20: Earnings (Loss) Per Share | 183 |
| Note 21: Selected Financial Statement Line Items | 184 |

iii                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2010, or 2010 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS," and "RISK FACTORS" in this Form 10-Q and in the comparably captioned sections of our 2010 Annual Report and our Quarterly Report on Form 10-Q for the first ; uarter of 2011Yand (b) the "BUSINESS" section of our 2010 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms which are defined in the Glossary.*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*/ ou should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and six months ended qune 30, 2011 included in "FINANCIAL STATEMENTS," and our 2010 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure.

### *Summary of Financial Results*

Our financial performance in the second quarter of 2011 was impacted by the ongoing weakness in the economy, including the mortgage market. Our total comprehensive income (loss) was $(1.1) billion and $(430) million for the second quarters of 2011 and 2010, respectively, consisting of: (a) $(2.1) billion and $(4.7) billion of net income (loss), respectively; and (b) $1.0 billion and $4.3 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(1.5) billion at June 30, 2011, resulting from several contributing factors including our dividend payment of $1.6 billion on our senior preferred stock on June 30, 2011 and our total comprehensive income (loss) of $(1.1) billion for the second quarter of 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $1.5 billion. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $66.2 billion.

### Our Primary Business Obje8tives

Under conservatorship, we are focused on: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency. Our business objectives reflect, in part, direction we have received from the Conservator. We also have a variety of different, and potentially competing,

<div align="center">1</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2010 Annual Report.

### *Providing Mortgage Liquidity and Conforming Loan Availability*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the second quarter of 2011.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years.

During the three and six months ended June 30, 2011, we guaranteed $62.2 billion and $157.9 billion in UPB of single-family conforming mortgage loans, respectively, representing more than 275,000 and 709,000 borrowers, respectively, who purchased homes or refinanced their mortgages.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that prior to 2007 the average effective interest rates on conforming single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, we estimate that interest rates on conforming loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In June 2011, we estimate that borrowers were paying an average of 48 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

### *Reducing Foreclosures and Keeping Families in Homes*

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure, including our relief refinance mortgage initiative, which is our implementation of HARP. In the first half of 2011, we helped more than 116,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout initiatives. Table 1 presents our recent single-family loan workout activities.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

| | For the Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| | (number of loans) | | | | |
| Loan modifications | 31,049 | 35,158 | 37,203 | 39,284 | 49,562 |
| Repayment plans | 7,981 | 9,099 | 7,964 | 7,030 | 7,455 |
| Forbearance agreements[2] | 3,709 | 7,678 | 5,945 | 6,976 | 12,815 |
| Short sales and deed-in-lieu transactions | 11,038 | 10,706 | 12,097 | 10,472 | 9,542 |
| Total single-family loan workouts | 53,777 | 62,641 | 63,209 | 63,762 | 79,374 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

TREASURY-1652

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We continue to execute a high volume of loan workouts. Highlights of these efforts include the following:

- We completed 53,777 single-family loan workouts during the second quarter of 2011, including 31,049 loan modifications and 11,038 short sales and deed-in-lieu transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 134,282 loan modifications under HAMP from the introduction of the initiative in 2009 through June 30, 2011 and, as of June 30, 2011, 16,106 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period).

We continue to directly assist troubled borrowers through outreach and other efforts. In addition, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. This servicing alignment initiative will result in consistent processes for both HAMP and non-HAMP workout solutions, and will be implemented over the course of 2011 and into 2012. As part of this initiative, we will implement a new non-HAMP loan modification process that, similar to the HAMP process, will require borrowers to complete a three month trial period. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure. For information on changes to mortgage servicing and foreclosure practices that could adversely affect our business, see "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

For more information about HAMP, other loan workout programs, our relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — MHA Program*" and "*— Single-Family Loan Workouts.*"

### *Minimizing Credit Losses*

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We have contractual arrangements with our seller/servicers under which they agree to provide us with mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. As of June 30, 2011, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $3.1 billion, and approximately 43% of these requests were outstanding for more than four months since issuance of our initial repurchase request. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily because many of these requests will likely be satisfied by reimbursement of our realized losses by seller/servicers, or may be rescinded in the course of the contractual appeals process. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Mortgage Seller/Servicers*" for further information on our agreements with our seller/servicers.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, at the borrower's expense, for certain mortgages with higher LTV ratios. We received payments under primary and other mortgage insurance of $0.7 billion and $1.3 billion in the three and six months ended June 30, 2011, respectively, which helped to mitigate our credit losses. We believe that in addition to Triad Guaranty Insurance Corp., or Triad (as discussed below), certain of our other mortgage insurance counterparties

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1653                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge. However, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties, except for Triad, have the capacity to pay all claims as they become due in the normal course for the near term.

### Maintaining the Credit Quality of New Loan Purchases and Guarantees

We continue to focus on maintaining credit policies, including our underwriting guidelines, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

As of June 30, 2011 and December 31, 2010, approximately 46% and 39%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008. Loans in our single-family credit guarantee portfolio originated after 2008 have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

The credit quality of the single-family loans we acquired in the first half of 2011 (excluding relief refinance mortgages, which represented approximately 28% of our single family purchase volume during the first half of 2011) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 is primarily the result of the combination of: (a) changes in our credit policies, including changes in our underwriting guidelines; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Approximately 93% of our single-family purchase volume in the first half of 2011 consisted of fixed-rate amortizing mortgages. Approximately 70% and 79% of our single-family purchase volume in the three and six months ended June 30, 2011, respectively, was refinance mortgages, including approximately 26% and 28%, respectively, that were relief refinance mortgages, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Approximately 14% of our single-family purchase volume in the first half of 2011 was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010, respectively.

Table 2 presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at June 30, 2011.

### Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination(1)

| | At cune 30, 2011 | | | | | |
| Year of Origination | % of Portfolio | Average Credit SSore(2)(3) | Original LTV Ratio(3) | Current LTV Ratio(3)(4) | Current LTV Ratio x100% | Serious Delinquen8y Rate(3)(5) |
|---|---|---|---|---|---|---|
| 2011 | 6% | 751 | 71% | 70% | 5% | 0.01% |
| 2010 | 20 | 755 | 70 | 71 | 5 | 0.12 |
| 2009 | 20 | 755 | 68 | 72 | 5 | 0.34 |
| 2008 | 8 | 727 | 74 | 90 | 32 | 4.94 |
| 2007 | 10 | 706 | 77 | 110 | 58 | 11.04 |
| 2006 | 8 | 711 | 75 | 109 | 54 | 10.28 |
| 2005 | 9 | 717 | 73 | 95 | 36 | 6.01 |
| 2004 and prior | 19 | 721 | 71 | 60 | 9 | 2.49 |
| Total | 100% | 734 | 71 | 79 | 20 | 3.50 |

(1) Based on the single-family credit guarantee portfolio, which totaled $1,805 billion at June 30, 2011, and includes relief refinance mortgage loans.

(2) Based on FICO credit score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at June 30, 2011. Excludes $11 billion in UPB of loans where the FICO scores at origination were not available at June 30, 2011.

(3) Calculated based on the loans remaining in the portfolio as of June 30, 2011, rather than all loans originally guaranteed by us and originated in the respective year.

(4) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination.

(5) See "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies" for further information about our reported serious delinquency rates.

Mortgages originated after 2008 represent an increasingly large proportion of our single-family credit guarantee portfolio, as the amount of older vintages in the portfolio, which have a higher composition of loans with higher-risk

TREASURY-1654

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

characteristics, continues to decline due to liquidations, which include payoffs, repayments, refinancing activity, and foreclosures. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity. See "Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year.

### Strengthening Our Infrastructure and Improving Overall Efficiency

We are working with our Conservator to both enhance the value of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. As such, we are investing considerable resources in an effort to improve our existing systems infrastructure. This effort will likely take several years to fully implement and focuses on making significant improvements to our systems infrastructure in order to: (a) comply with FHFA- and regulatory-mandated initiatives; (b) improve risk management; (c) enhance the service we provide to our customers; and (d) improve operational efficiency. At the end of this effort, we expect to have an infrastructure in place that is more efficient, flexible and well-controlled, which will assist us in our continued efforts to serve the mortgage market and reduce administrative expenses and other costs.

We continue to actively monitor our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined in the first half of 2011 compared to the first half of 2010.

### Single-Family Credit Guarantee Portfolio

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs, and REO operations income (expense), net of recoveries, and our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $66.9 billion, and have recorded an additional $4.5 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus have not been provisioned for, we believe that, as of June 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of our single-family credit guarantee portfolio declined slightly during the first half of 2011, since the amount of liquidations exceeded new loan purchase and guarantee activity. Table 3 provides certain credit statistics for our single-family credit guarantee portfolio.

## Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| Payment status — | | | | | |
| One month past due | 1.92% | 1.75% | 2.07% | 2.11% | 2.02% |
| Two months past due | 0.67% | 0.65% | 0.78% | 0.80% | 0.77% |
| Seriously delinquent[1] | 3.50% | 3.63% | 3.84% | 3.80% | 3.96% |
| Non-performing loans (in millions)[2] | $114,819 | $115,083 | $115,478 | $112,746 | $111,758 |
| Single-family loan loss reserve (in millions)[3] | $ 38,390 | $ 38,558 | $ 39,098 | $ 37,665 | $ 37,384 |
| REO inventory (in properties) | 60,599 | 65,159 | 72,079 | 74,897 | 62,178 |
| REO assets, net carrying value (in millions) | $ 5,834 | $ 6,261 | $ 6,961 | $ 7,420 | $ 6,228 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 87,813 | 97,646 | 113,235 | 115,359 | 123,175 |
| Loan modifications[4] | 31,049 | 35,158 | 37,203 | 39,284 | 49,562 |
| Foreclosure starts ratio[5] | 0.55% | 0.58% | 0.73% | 0.75% | 0.61% |
| REO acquisitions | 24,788 | 24,707 | 23,771 | 39,053 | 34,662 |
| REO disposition severity ratio:[6] | | | | | |
| California | 44.9% | 44.5% | 43.9% | 41.9% | 42.0% |
| Arizona | 51.3% | 50.8% | 49.5% | 46.6% | 44.3% |
| Florida | 52.7% | 54.8% | 53.0% | 54.9% | 53.8% |
| Nevada | 55.4% | 53.1% | 53.1% | 51.6% | 49.4% |
| Michigan | 48.5% | 48.3% | 49.7% | 49.2% | 47.2% |
| Total U.S. | 41.7% | 43.0% | 41.3% | 41.5% | 39.2% |
| Single-family credit losses (in millions) | $ 3,106 | $ 3,226 | $ 3,086 | $ 4,216 | $ 3,851 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of June 30, 2011 and December 31, 2010, approximately $36.2 billion and $26.6 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of completed modifications under agreement with the borrower during the quarter. Excludes forbearance agreements, repayment plans, and loans in the trial period under HAMP.

(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.

(6) Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

The number of seriously delinquent loan additions has continued to decline; however, our single-family credit guarantee portfolio continued to experience a high level of serious delinquencies and foreclosures in the first half of 2011 as compared to our historical experience. Several factors, including delays in foreclosure due to concerns about the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of June 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 72% and 66%, respectively. The UPB of our non-performing loans declined in the first half of 2011. However, the credit losses and loan loss reserve associated with our single-family credit guarantee portfolio remained elevated in the first half of 2011, due in part to:

• Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to our continued efforts to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

6

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
TREASURY-1656
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative declines in national home prices during the last five years, based on our own index, which resulted in continued high REO disposition severity ratios on our dispositions of REO inventory.

Our REO inventory (measured in number of properties) declined in each of the last three quarters due to an increase in the volume of REO dispositions and temporary slowdowns in REO acquisition volume. Dispositions of REO increased 26% in the first half of 2011 compared to the first half of 2010, based on the number of properties sold. We believe our single-family REO acquisition volume and single-family credit losses beginning in the fourth quarter of 2010 have been less than they otherwise would have been due to delays in the single-family foreclosure process. See "Mortgage Market and Economic Conditions — *Delays in the Foreclosure Process for Single-Family Mortgages*" for further information.

## Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion. FHFA will request that we receive these funds by September 30, 2011. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $66.2 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $6.6 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through June 30, 2011, we paid aggregate cash dividends to Treasury of $13.2 billion, an amount equal to 21% of our aggregate draws received under the Purchase Agreement. As of June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. This could adversely affect our liquidity and the supply and cost of debt financing available to us. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Credit Ratings.*"

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For information on conservatorship, the Purchase Agreement, and the impact of credit ratings, see "BUSINESS — Conservatorship and Related Matters" in our 2010 Annual Report and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our li;uidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" and "*— If Treasury is unable to provide us with funding re;uested under the Purchase Agreement to address a deficit in our net worth, FHFA could be re;uired to place us into receivership.*"

<div align="center">7</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Consolidated Finan8ial Results**

Net loss was $(2.1) billion and $(4.7) billion for the second quarters of 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the second quarter of 2011 increased to $4.6 billion from $4.1 billion in the second quarter of 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage-related securities.

- Provision for credit losses for the second quarter of 2011 decreased to $2.5 billion, compared to $5.0 billion for the second quarter of 2010. The provision for credit losses in the second quarter of 2011 primarily reflects a decline in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the second quarter of 2010 reflected a higher volume of seriously delinquent loan additions and loan modifications that were classified as TDRs.

- Non-interest income (loss) was $(3.9) billion for the second quarter of 2011, compared to $(3.6) billion for the second quarter of 2010 largely due to derivative losses in both periods.

- Non-interest expense was $546 million and $479 million in the second quarters of 2011 and 2010, respectively, and reflects increased REO operations expense, partially offset by a decline in administrative expenses in the second quarter of 2011, compared to the second quarter of 2010.

- Total comprehensive income (loss) was $(1.1) billion for the second quarter of 2011 compared to $(430) million for the second quarter of 2010. Total comprehensive income (loss) for the second quarter of 2011 reflects the $(2.1) billion net loss, partially offset by the $1.0 billion total other comprehensive income, primarily resulting from improved fair values on available-for-sale securities.

**Mortgage Market and E8onomi8 Conditions**

*Overview*

The housing market experienced continued challenges during the second quarter of 2011 due primarily to continued weakness in the employment market and a large number of distressed property sales. The U.S. real gross domestic product rose by 1.3% on an annualized basis during the second quarter of 2011, compared to 0.4% during the first quarter of 2011, according to the Bureau of Economic Analysis estimates. The national unemployment rate rose to 9.2% in June 2011, compared to 8.8% in March 2011, based on data from the U.S. Bureau of Labor Statistics.

*Single-Family Housing Market*

We believe the overall number of potential home buyers in the market combined with the volume of homes offered for sale will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties). Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U.S. mortgage debt outstanding. Sales of existing homes in the second quarter of 2011 averaged 4.86 million (at a seasonally adjusted annual rate), a decline of 5% from an average seasonally adjusted annual rate of 5.14 million in the first quarter of 2011. New home sales in the second quarter of 2011 averaged 315,000 homes (at a seasonally adjusted annual rate) increasing approximately 5% from an average seasonally adjusted annual rate of approximately 300,000 homes in the first quarter of 2011.

We estimate that home prices (on a non-seasonally adjusted basis) decreased 0.2% nationwide during the first half of 2011, which includes a 2.1% increase in the second quarter of 2011. Seasonal factors typically result in stronger house-price appreciation during the second quarter. We estimate that seasonally adjusted home prices were approximately flat during the second quarter. These estimates are based on our own index of mortgage loans in our single-family credit guarantee portfolio. Other indexes of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

*Multifamily Housing Market*

Multifamily market fundamentals continued to improve on a national level during the second quarter of 2011. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism about demand for multifamily housing have helped improve property

TREASURY-1658

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

values in most markets. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more complete economic recovery.

### Delays in the Foreclosure Process for Single-Family Mortgages

In the fall of 2010, several large single-family seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. As a result, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in the latter part of 2010 in certain states in which they do business, and we temporarily suspended certain REO sales in November 2010. During the first quarter of 2011, we fully resumed marketing and sales of REO properties. While the larger servicers generally resumed foreclosure proceedings in the first quarter of 2011, we have continued to experience significant delays in the foreclosure process for single-family mortgages in the second quarter of 2011, as compared to before these issues arose, particularly in states that require a judicial foreclosure process. More recently, regulatory developments impacting mortgage servicing and foreclosure practices have contributed to these delays. These delays have caused the volume of our single-family REO acquisitions in the first half of 2011 to be less than it otherwise would have been. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. We generally refer to these issues as the concerns about the foreclosure process. For information on recent regulatory developments affecting foreclosures, see "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2011 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets in the remainder of 2011. The economy is expected to continue to generate new jobs and rising incomes, which will help in continuing the gradual recovery in housing activity. However, the weak payroll employment growth during the second quarter and accompanying rise in the unemployment rate weakens near-term demand for housing. Further, consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely be more cautious in home buying. We also expect rates on fixed-rate single-family mortgages to be slightly higher in the second half of 2011, as stronger GDP growth and labor market improvements generate higher demand for credit and mitigate deflationary pressures. Lastly, many large financial institutions experienced temporary delays in the foreclosure process for single-family loans late in 2010 and early in 2011. To the extent a large inventory of loans completes the foreclosure process, such an increase in REO inventory could have a negative impact on the housing market.

Our expectation for home prices, based on our own index, is that national average home prices will continue to remain volatile and will likely decline over the near term before a long-term recovery in housing begins, due to, among other factors: (a) our expectation for a sustained volume of distressed sales, which include short sales and sales by financial institutions of their REO properties; and (b) the likelihood that unemployment rates will remain high.

### Single-Family

We expect our credit losses will likely remain elevated in the second half of 2011. This is in part due to the substantial number of mortgage loans in our single-family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

• REO disposition severity ratios to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;

• non-performing assets, which include loans deemed TDRs, to continue to remain high;

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1659                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the volume of loan workouts to remain high; and
- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines, which may result in a continued high loan loss reserve balance in the near term and increases in charge-offs in future periods.

### Multifamily

The most recent data available continues to reflect improving national apartment fundamentals, including vacancy rates and effective rents. However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many nonperforming loans, and loans that we believe are at risk of default, in these states. Our delinquency rates have historically been a lagging indicator and, as a result, we expect to continue to experience delinquencies in the remainder of 2011, consistent with our experience in the first half of 2011.

In addition, as more market participants re-emerged in the multifamily market during the first half of 2011, increased competition from other institutional investors could negatively impact our future purchase volumes as well as the pricing and credit quality of newly originated loans for the remainder of 2011.

### Long-Term Financial Sustainability

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury waived the fee for the first three quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial. As a result of these factors, there is uncertainty as to our long-term financial sustainability.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, adverse changes in interest rates, mortgage security prices, spreads and other factors could lead to additional draws. For discussion of other factors that could result in additional draws, see "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources."

There is also significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. As discussed below in "Legislative and Regulatory Developments," on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market.

### Limits on Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets.

Table 4 presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1660                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 4 — Mortgage-Related Investments Portfolio**[1]

| | cune 30, 2011 | | De8ember 31, 2010 |
|---|---|---|---|
| | | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 477,196 | $ | 481,677 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 64,744 | | 69,766 |
| Multifamily segment — Mortgage investments portfolio | 143,093 | | 145,431 |
| Total mortgage-related investments portfolio | $ 685,033 | $ | 696,874 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment.

The UPB of our mortgage-related investments portfolio declined from December 31, 2010 to June 30, 2011, primarily due to liquidations, partially offset by the purchase of $25.2 billion of seriously delinquent loans from PC trusts.

Our mortgage-related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 35% of the UPB of the portfolio at June 30, 2011. Our mortgage-related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single-family mortgage loans, which we purchased from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 22% of the UPB of the portfolio at June 30, 2011.

We disclose our mortgage assets on the basis used to determine the cap under the caption "Mortgage-Related Investments Portfolio — Ending Balance" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

We are providing our web site addresses here and elsewhere in this Form 10-Q solely for your information. Information appearing on our web site is not incorporated into this Form 10-Q.

**Legislative and Regulatory Developments**

A number of bills have been introduced in Congress that would bring about changes in Freddie Mac and Fannie Mae's business model. In addition, on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

See "LEGISLATIVE AND REGULATORY MATTERS" for information on the Obama Administration's February 2011 report, recent developments in GSE reform legislation, recently initiated rulemakings under the Dodd-Frank Act, and other regulatory developments.

TREASURY-1661

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SELECTED FINANCIAL DATA(1)

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and six months ended June 30, 2011.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Income and Comprehensive Income Data** | | | | |
| Net interest income | $ 4,561 | $ 4,136 | $ 9,101 | $ 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| Non-interest income (loss) | (3,857) | (3,627) | (5,109) | (8,481) |
| Non-interest expense | (546) | (479) | (1,243) | (1,146) |
| Net loss attributable to Freddie Mac | (2,139) | (4,713) | (1,463) | (11,401) |
| Total comprehensive income (loss) attributable to Freddie Mac | (1,100) | (430) | 1,640 | (2,310) |
| Net loss attributable to common stockholders | (3,756) | (6,009) | (4,685) | (13,989) |
| Loss per common share: | | | | |
| Basic | (1.16) | (1.85) | (1.44) | (4.30) |
| Diluted | (1.16) | (1.85) | (1.44) | (4.30) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands):(2) | | | | |
| Basic | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Diluted | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,634,773 | $ 1,646,172 |
| Total assets | 2,195,795 | 2,261,780 |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other debt | 681,087 | 713,940 |
| All other liabilities | 17,150 | 19,593 |
| Total stockholders' equity (deficit) | (1,478) | (401) |
| **Portfolio Balances(3)** | | |
| Mortgage-related investments portfolio | $ 685,033 | $ 696,874 |
| Total Freddie Mac Mortgage-Related Securities(4) | 1,681,985 | 1,712,918 |
| Total mortgage portfolio(5) | 2,128,659 | 2,164,859 |
| Non-performing assets(6) | 123,861 | 125,405 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Ratios(7)** | | | | |
| Return on average assets(8)(11) | (0.4)% | (0.8)% | (0.1)% | (1.0)% |
| Non-performing assets ratio(9) | 6.4 | 6.0 | 6.4 | 6.0 |
| Equity to assets ratio(10)(11) | 0.0 | (0.3) | 0.0 | (0.2) |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for information regarding our accounting policies.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 26 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Segment Mortgage Portfolio Composition" for the composition of our total mortgage portfolio.

(6) See "Table 43 — Non-Performing Assets" for a description of our non-performing assets.

(7) The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value), is less than zero for all periods presented. The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as annualized net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

(11) To calculate the simple averages for the six months ended June 30, 2010, the beginning balances of total assets, and total Freddie Mac stockholders' equity are based on the January 1, 2010 balances included in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES — Table 2.1 — Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet" in our 2010 Annual Report, so that both the beginning and ending balances reflect changes in accounting principles.

*Freddie Mac*

TREASURY-1662

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

**Table 5 — Summary Consolidated Statements of In8ome and Comprehensive In8ome**

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Net interest income | $ 4,561 | $ 4,136 | $ 9,101 | $ 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| Net interest income (loss) after provision for credit losses | 2,032 | (893) | 4,583 | (2,164) |
| Non-interest income (loss): | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (125) | 4 | 98 | (94) |
| Gains (losses) on retirement of other debt | 3 | (141) | 15 | (179) |
| Gains (losses) on debt recorded at fair value | (37) | 544 | (118) | 891 |
| Derivative gains (losses) | (3,807) | (3,838) | (4,234) | (8,523) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (230) | (114) | (1,284) | (531) |
| Portion of other-than-temporary impairment recognized in AOCI | (122) | (314) | (261) | (407) |
| Net impairment of available-for-sale securities recognized in earnings | (352) | (428) | (1,545) | (938) |
| Other gains (losses) on investment securities recognized in earnings | 209 | (257) | 89 | (673) |
| Other income | 252 | 489 | 586 | 1,035 |
| Total non-interest income (loss) | (3,857) | (3,627) | (5,109) | (8,481) |
| Non-interest expense: | | | | |
| Administrative expenses | (384) | (404) | (745) | (809) |
| REO operations (expense) income | (27) | 40 | (284) | (119) |
| Other expenses | (135) | (115) | (214) | (218) |
| Total non-interest expense | (546) | (479) | (1,243) | (1,146) |
| Loss before income tax benefit | (2,371) | (4,999) | (1,769) | (11,791) |
| Income tax benefit | 232 | 286 | 306 | 389 |
| Net loss | (2,139) | (4,713) | (1,463) | (11,402) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 4,097 | 2,844 | 8,743 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 184 | 267 | 356 |
| Changes in defined benefit plans | 1 | 2 | (8) | (8) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,039 | 4,283 | 3,103 | 9,091 |
| Comprehensive income (loss) | (1,100) | (430) | 1,640 | (2,311) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |

### Net Interest In8ome

Table 6 presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table / — Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $ 33,660 | $ 10 | 0.12% | $ 45,879 | $ 18 | 0.15% |
| Federal funds sold and securities purchased under agreements to resell | 32,227 | 8 | 0.09 | 37,238 | 16 | 0.18 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 450,575 | 5,215 | 4.63 | 540,380 | 6,432 | 4.76 |
| Extinguishment of PCs held by Freddie Mac | (166,318) | (1,966) | (4.73) | (220,350) | (2,913) | (5.29) |
| Total mortgage-related securities, net | 284,257 | 3,249 | 4.57 | 320,030 | 3,519 | 4.40 |
| Non-mortgage-related securities(3) | 26,078 | 26 | 0.39 | 32,571 | 55 | 0.67 |
| Mortgage loans held by consolidated trusts(4) | 1,643,680 | 19,782 | 4.81 | 1,729,618 | 22,114 | 5.11 |
| Unsecuritized mortgage loans(4) | 242,471 | 2,274 | 3.75 | 212,919 | 2,179 | 4.09 |
| Total interest-earning assets | $ 2,262,373 | $ 25,349 | 4.48 | $2,378,255 | $ 27,901 | 4.69 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,656,150 | $ (19,222) | (4.64) | $ 1,739,519 | $ (21,961) | (5.05) |
| Extinguishment of PCs held by Freddie Mac | (166,318) | 1,966 | 4.73 | (220,350) | 2,913 | 5.29 |
| Total debt securities of consolidated trusts held by third parties | 1,489,832 | (17,261) | (4.63) | 1,519,169 | (19,048) | (5.02) |
| Other debt: | | | | | | |
| Short-term debt | 194,153 | (95) | (0.19) | 226,624 | (137) | (0.24) |
| Long-term debt(5) | 500,587 | (3,238) | (2.59) | 561,353 | (4,331) | (3.08) |
| Total other debt | 694,740 | (3,333) | (1.92) | 787,977 | (4,468) | (2.27) |
| Total interest-bearing liabilities | 2,184,572 | (20,594) | (3.77) | 2,307,146 | (23,516) | (4.08) |
| Income (expense) related to derivatives(6) | — | (194) | (0.03) | — | (249) | (0.04) |
| Impact of net non-interest-bearing funding | 77,801 | | 0.13 | 71,109 | | 0.13 |
| Total funding of interest-earning assets | $ 2,262,373 | $(20,788) | (3.67) | $2,378,255 | $(23,765) | (3.99) |
| Net interest income/yield | | $ 4,561 | 0.81 | | $ 4,136 | 0.70 |

| | Six Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $ 35,611 | $ 26 | 0.14% | $ 56,426 | $ 35 | 0.12% |
| Federal funds sold and securities purchased under agreements to resell | 40,044 | 26 | 0.13 | 44,441 | 32 | 0.14 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 453,773 | 10,531 | 4.64 | 566,946 | 13,711 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,923) | (4,029) | (4.83) | (238,651) | (6,354) | (5.32) |
| Total mortgage-related securities, net | 286,850 | 6,502 | 4.53 | 328,295 | 7,357 | 4.48 |
| Non-mortgage-related securities(3) | 27,694 | 56 | 0.40 | 26,380 | 116 | 0.88 |
| Mortgage loans held by consolidated trusts(4) | 1,647,123 | 39,846 | 4.84 | 1,758,473 | 44,846 | 5.10 |
| Unsecuritized mortgage loans(4) | 241,514 | 4,608 | 3.82 | 186,350 | 4,140 | 4.44 |
| Total interest-earning assets | $2,278,836 | $ 51,064 | 4.48 | $ 2,400,365 | $ 56,526 | 4.71 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,660,879 | $(38,693) | (4.66) | $ 1,770,522 | $ (45,045) | (5.09) |
| Extinguishment of PCs held by Freddie Mac | (166,923) | 4,029 | 4.83 | (238,651) | 6,354 | 5.32 |
| Total debt securities of consolidated trusts held by third parties | 1,493,956 | (34,664) | (4.64) | 1,531,871 | (38,691) | (5.05) |
| Other debt: | | | | | | |
| Short-term debt | 194,488 | (210) | (0.21) | 234,781 | (278) | (0.24) |
| Long-term debt(5) | 509,310 | (6,688) | (2.63) | 559,130 | (8,789) | (3.14) |
| Total other debt | 703,798 | (6,898) | (1.96) | 793,911 | (9,067) | (2.28) |
| Total interest-bearing liabilities | 2,197,754 | (41,562) | (3.78) | 2,325,782 | (47,758) | (4.11) |
| Income (expense) related to derivatives(6) | — | (401) | (0.04) | — | (507) | (0.04) |
| Impact of net non-interest-bearing funding | 81,082 | | 0.14 | 74,583 | | 0.13 |
| Total funding of interest-earning assets | $2,278,836 | $ (41,963) | (3.68) | $ 2,400,365 | $(48,265) | (4.02) |
| Net interest income/yield | | $ 9,101 | 0.80 | | $ 8,261 | 0.69 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings expected to be recovered.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

14

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011     TREASURY-1664     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Net interest income increased $425 million and $840 million during the three and six months ended June 30, 2011, respectively, compared to the three and six months ended June 30, 2010. Net interest yield increased 11 basis points during both the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010. The primary driver underlying the increases was lower funding costs from the replacement of debt at lower rates. In addition, the increases in net interest income and net interest yield for the six months ended June 30, 2011 compared to the six months ended June 30, 2010 were partially driven by the impact of a change in practice announced in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts, as the average funding rate of the other debt used to purchase such loans from PC trusts is significantly less than the average funding rate of the debt securities of consolidated trusts held by third parties. These factors were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Interest income that we did not recognize related to non-performing loans, which we refer to as foregone interest income, includes interest income not recognized due to interest rate concessions granted on certain modified loans. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $1.0 billion and $2.0 billion during the three and six months ended June 30, 2011, respectively, compared to $1.3 billion and $2.4 billion during the three and six months ended June 30, 2010, respectively, primarily due to the decreased volume of non-performing loans on nonaccrual status.

During the three and six months ended June 30, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Provision for Credit Losses**

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $66.9 billion, and have recorded an additional $4.5 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of June 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses was $2.5 billion for the second quarter of 2011 compared to $5.0 billion for the second quarter of 2010, and was $4.5 billion in the first half of 2011 compared to $10.4 billion in the first half of 2010. The decrease in the provision for credit losses in the second quarter and first half of 2011 primarily reflects a decline in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the second quarter and first half of 2010 reflected a higher volume of seriously delinquent loan additions and loan modifications that were classified as TDRs.

During the three and six months ended June 30, 2011, our charge-offs for single-family loans exceeded the amount of our provision for credit losses. We believe the level of our charge-offs will continue to remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. As of June 30, 2011 and December 31, 2010, the UPB of our single-family non-performing loans was $114.8 billion and $115.5 billion, respectively. These amounts include $36.2 billion and $26.6 billion, respectively, of single-family TDRs that are reperforming, or less than three months past due. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

We continued to experience a high volume of loan modifications involving concessions to borrowers, which are considered TDRs, during the first half of 2011, but the volume of such modifications was less than the volume in the first half of 2010. Impairment analysis for TDRs requires giving recognition in the provision for credit losses to the excess of our recorded investment in the loan over the present value of the expected future cash flows. This generally results in a higher allowance for loan losses for loan modifications that are TDRs than for loan modifications that are not TDRs. We expect the percentage of modifications that qualify as TDRs in 2011 will remain high, primarily since the majority of our modifications are anticipated to include a significant reduction in the contractual interest rate, which represents a concession to the borrower. In addition, the FASB issued an amendment to the accounting guidance for receivables to clarify when a restructuring such as a loan modification is considered a TDR, which will become effective in the third

<div align="center">15</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.          Powered by Morningstar® Document Research℠

quarter of 2011. As a result of this amendment, the population of loan modifications we account for and disclose as TDRs will likely increase.

The total number of seriously delinquent loans declined approximately 10% during the first half of 2011, but has remained high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. In an effort to help mitigate such risk, we made significant investments in systems and personnel in the last months of 2010 to help our seller/servicers manage their loss mitigation efforts. In addition, we believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure.

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(13) million and $119 million for the second quarters of 2011 and 2010, respectively, and was $(73) million in the first half of 2011 compared to $148 million in the first half of 2010. Our loan loss reserves associated with our multifamily mortgage portfolio were $705 million and $828 million as of June 30, 2011 and December 31, 2010, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by positive market trends in vacancy rates and effective rents reflected over the past several consecutive quarters, as well as stabilizing or improved property values. However, some states in which we have substantial investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average fundamentals.

**Non-Interest In8ome (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trust. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. For the three months ended June 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $22.2 billion and $0.4 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(125) million and $4 million, respectively. The losses during the second quarter of 2011 were primarily due to the repurchase of our debt securities at larger net premiums driven by the decrease in interest rates during the period. For the six months ended June 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $47.0 billion and $2.5 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $98 million and $(94) million, respectively. The decreased volume of the extinguishment of debt securities in the 2010 periods was due to a change in practice announced in February 2010 that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. As a result, the increased purchases of delinquent loans limited our capacity to repurchase debt securities into our mortgage-related investments portfolio due to limits on the portfolio under the Purchase Agreement and FHFA regulation. The gains for the six months ended June 30, 2011 were due to the repurchases of our debt securities at a net discount during the first quarter of 2011 driven by an increase in interest rates during the first quarter of 2011. See "Table 18 — Total Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

*Gains (Losses) on Retirement of Other Debt*

Gains (losses) on retirement of other debt were $3 million and $(141) million during the three months ended June 30, 2011 and 2010, respectively. Gains (losses) on retirement of other debt were $15 million and $(179) million during the six months ended June 30, 2011 and 2010, respectively. We recognized gains on debt retirements for the second quarter and first half of 2011, compared to losses for the second quarter and first half of 2010, driven by a decrease in the related write-off of unamortized net discounts on the retired other debt during the second quarter and the first half of 2011.

*Gains (Losses) on Debt Recorded at Fair Value*

Gains (losses) on debt recorded at fair value primarily relates to changes in the fair value of our foreign-currency denominated debt. For the three and six months ended June 30, 2011, we recognized losses on debt recorded at fair value

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of $37 million and $118 million, respectively, primarily due to the U.S. dollar weakening relative to the Euro. For the three and six months ended June 30, 2010, we recognized gains on debt recorded at fair value of $544 million and $891 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

### *Derivative Gains (Losses)*

Table 7 presents derivative gains (losses) reported in our consolidated statements of income and comprehensive income. See "NOTE 11: DERIVATIVES — Table11.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income. At June 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our management of interest-rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income.

### Table J — Derivative Gains (Losses)

| | Derivative Gains (Losses) | | | |
| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Interest-rate swaps | $(3,749) | $ (7,938) | $ (2,026) | $(10,272) |
| Option-based derivatives[1] | 1,602 | 5,864 | 795 | 5,282 |
| Other derivatives[2] | (308) | (553) | (402) | (973) |
| Accrual of periodic settlements[3] | (1,352) | (1,211) | (2,601) | (2,560) |
| Total | $(3,807) | $(3,838) | $(4,234) | $ (8,523) |

(1) Primarily includes purchased call and put swaptions and purchased interest rate caps and floors.

(2) Includes futures, foreign currency swaps, commitments, swap guarantee derivatives, and credit derivatives. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars. Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) swap and forward interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivatives portfolio.

During the three and six months ended June 30, 2011, we recognized losses on derivatives of $3.8 billion and $4.2 billion, respectively, primarily due to declines in interest rates in the second quarter. Specifically, during the three and six months ended June 30, 2011, we recognized fair value losses on our pay-fixed swap positions of $7.3 billion and $3.3 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $3.6 billion and $1.3 billion, respectively. We also recognized fair value gains of $1.6 billion and $0.8 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during these periods. Additionally, we recognized losses related to the accrual of periodic settlements during the three and six months ended June 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

During the three and six months ended June 30, 2010, the yield curve flattened, with declining longer-term swap interest rates, resulting in a loss on derivatives of $3.8 billion and $8.5 billion, respectively. Also contributing to these losses was a decline in implied volatility on our options portfolio during the six months ended June 30, 2010. Specifically, for the three and six months ended June 30, 2010, the decrease in longer-term swap interest rates resulted in fair value losses on our pay-fixed swaps of $18.6 billion and $23.4 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $10.7 billion and $13.0 billion, respectively. We recognized fair value gains for the three and six months ended June 30, 2010 of $5.9 billion and $5.3 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions primarily due to the declines in interest rates during these periods.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Investment Securities-Related Activities

#### Impairments of Available-For-Sale Securities

We recorded net impairments of available-for-sale securities recognized in earnings, which was related to non-agency mortgage-related securities, of $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, compared to $428 million and $938 million during the three and six months ended June 30, 2010, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities"* and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three and six months ended June 30, 2011 and 2010.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. We recognized $274 million and $74 million related to gains (losses) on trading securities during the three and six months ended June 30, 2011, respectively, compared to $(277) million and $(694) million related to gains (losses) on trading securities during the three and six months ended June 30, 2010, respectively.

During the three and six months ended June 30, 2011 the gains on trading securities were primarily due to a decline in interest rates coupled with a tightening of OAS levels on agency securities.

During the three and six months ended June 30, 2010, the losses on trading securities were primarily due to the movement of securities with unrealized gains towards maturity, partially offset by fair value gains due to a decline in interest rates.

### Other Income

Table 8 summarizes the significant components of other income.

### Table 7 — Other In8ome

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (in millions) | | | |
| Other income: | | | | |
| Guarantee-related income | $    81 | $    60 | $ 135 | $    119 |
| Gains on sale of mortgage loans | 161 | 121 | 256 | 216 |
| Gains on mortgage loans recorded at fair value | 136 | 5 | 103 | 26 |
| Recoveries on loans impaired upon purchase | 132 | 227 | 257 | 396 |
| All other | (258) | 76 | (165) | 278 |
| Total other income | $  252 | $  489 | $ 586 | $1,035 |

Other income declined during the three and six months ended June 30, 2011, compared to the same periods in 2010, primarily due to certain prior period accounting errors not material to our financial statements recorded in the second quarter of 2011 partially offset by increased gains on mortgage loans recorded at fair value.

During the second quarter of 2011, our largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other income in 2011 by approximately $293 million.

During the second quarters of 2011 and 2010, recoveries on loans impaired upon purchase were $132 million and $227 million, respectively, and were $257 million in the first half of 2011, compared to $396 million in the first half of 2010. The declines in the 2011 periods were due to a lower volume of foreclosure transfers associated with loans impaired upon purchase. We principally recognize recoveries on impaired loans purchased prior to January 1, 2010, due to a change in accounting guidance effective on that date. Consequently, our recoveries on loans impaired upon purchase will generally decline over time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Non-Interest Expense**

Table 9 summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (in millions) | | |
| Administrative expenses(1): | | | | |
| Salaries and employee benefits | $ 219 | $ 230 | $ 426 | $ 464 |
| Professional services | 64 | 67 | 120 | 148 |
| Occupancy expense | 15 | 15 | 30 | 31 |
| Other administrative expense | 86 | 92 | 169 | 166 |
| Total administrative expenses | 384 | 404 | 745 | 809 |
| REO operations expense (income) | 27 | (40) | 284 | 119 |
| Other expenses | 135 | 115 | 214 | 218 |
| Total non-interest expense | $ 546 | $ 479 | $1,243 | $1,146 |

(1) Commencing in the first quarter of 2011, we reclassified certain expenses from other expenses to professional services expense. Prior period amounts have been reclassified to conform to the current presentation.

*Administrative Expenses*

Administrative expenses decreased for the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010, due in part to our ongoing focus on cost reduction measures, particularly with regard to salaries and employee benefits and professional services costs. We expect our administrative expenses will decline for the full year of 2011 when compared to 2010.

*REO Operations Expense (Income)*

The table below presents the components of our REO operations expense (income), and REO inventory and disposition information.

**Table 10 — REO Operations Expense (Income), REO Inventory, and REO Dispositions**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (dollars in millions) | | |
| REO operations expense (income): | | | | |
| Single-family: | | | | |
| REO property expenses(1) | $ 300 | $ 252 | $ 608 | $ 484 |
| Disposition (gains) losses, net(2)(3) | 56 | (39) | 182 | (26) |
| Change in holding period allowance, dispositions | (129) | (60) | (284) | (127) |
| Change in holding period allowance, inventory(4) | 5 | (20) | 156 | 117 |
| Recoveries(5) | (197) | (174) | (370) | (333) |
| Total single-family REO operations expense (income) | 35 | (41) | 292 | 115 |
| Multifamily REO operations expense (income) | (8) | 1 | (8) | 4 |
| Total REO operations expense (income) | $ 27 | $ (40) | $ 284 | $ 119 |
| REO inventory (in properties), at June 30: | | | | |
| Single-family | 60,599 | 62,178 | 60,599 | 62,178 |
| Multifamily | 19 | 12 | 19 | 12 |
| Total | 60,618 | 62,190 | 60,618 | 62,190 |
| REO property dispositions (in properties) | 29,355 | 26,316 | 60,983 | 48,285 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) We have reclassified expenses related to the disposition of REO underlying Other Guarantee Transactions from REO property expense to disposition (gains) losses, net. Prior periods have been revised to conform to the current presentation.
(4) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(5) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense (income) was $27 million for the second quarter of 2011, as compared to $(40) million during the second quarter of 2010 and was $284 million in the first half of 2011 compared to $119 million for the first half of 2010. These increases were primarily due to higher single-family property expenses in the 2011 periods. We recorded net disposition losses during the 2011 periods as we completed a higher volume of property dispositions and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1669                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

home prices remained weak. We recorded net disposition gains during the 2010 periods due to the relative stabilization in national home prices in the first half of 2010 that included slight improvements in many geographic areas. We expect REO property expenses to continue to remain high in the remainder of 2011 due to expected continued high levels of single-family REO acquisitions and inventory.

In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process, including deficiencies in foreclosure documentation practices, particularly in states that require a judicial foreclosure process. The acquisition slowdown, coupled with high disposition levels, led to an approximate 16% reduction in REO property inventory from December 31, 2010 to June 30, 2011. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. For more information on how concerns about foreclosure documentation practices could adversely affect our REO operations expense (income), see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report. See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Other Expenses

Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses. Other expenses were lower in the first half of 2011 compared to the first half of 2010, primarily due to lower losses on purchases of impaired loans, which were partially offset by increased expenses associated with transfers and terminations of mortgage servicing in the first half of 2011.

### Income Tax Benefit

For the three months ended June 30, 2011 and 2010, we reported an income tax benefit of $232 million and $286 million, respectively. For the six months ended June 30, 2011 and 2010 we reported an income tax benefit of $306 million and $389 million, respectively. See "NOTE 13: INCOME TAXES" for additional information.

### Total Comprehensive Income (Loss)

Our total comprehensive income (loss) was $(1.1) billion and $(430) million for the three months ended June 30, 2011 and 2010, respectively, consisting of: (a) a net income (loss) of $(2.1) billion and $(4.7) billion, respectively; and (b) $1.0 billion and $4.3 billion of total other comprehensive income (loss), respectively.

Our total comprehensive income (loss) was $1.6 billion and $(2.3) billion for the six months ended June 30, 2011 and 2010, respectively, consisting of: (a) a net income (loss) of $(1.5) billion and $(11.4) billion, respectively; and (b) $3.1 billion and $9.1 billion of total other comprehensive income (loss), respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss).

### Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (*i.e.*, provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1670                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans for investment, we have not purchased significant amounts of these loans for investment since 2010. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. Although we hold CMBS that we purchased for investment, we have not purchased significant amounts of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the related credit costs (*i.e.* provision (benefit) for credit losses), and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss). The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments, and a measure of management and guarantee income on guarantees, that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1671

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 11 provides information about our various segment mortgage portfolios at June 30, 2011 and December 31, 2010. For a discussion of each segment's portfolios, see *"Segment Earnings — Results."*

**Table 11 — Segment Mortgage Portfolio Composition**[1]

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segment portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $   93,404 | $   79,097 |
| Freddie Mac mortgage-related securities | 256,190 | 263,152 |
| Non-agency mortgage-related securities | 91,735 | 99,639 |
| Non-Freddie Mac agency mortgage-related securities | 35,867 | 39,789 |
| *Total Investments — Mortgage investments portfolio* | 477,196 | 481,677 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 64,744 | 69,766 |
| Single-family Freddie Mac mortgage-related securities held by us | 256,190 | 261,508 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,405,372 | 1,437,399 |
| Single-family other guarantee commitments[5] | 10,442 | 8,632 |
| *Total Single-family Guarantee — Managed loan portfolio* | 1,736,748 | 1,777,305 |
| *Multifamily — Guarantee portfolio:*[3] | | |
| Multifamily Freddie Mac mortgage-related securities held by us | 2,578 | 2,095 |
| Multifamily Freddie Mac mortgage-related securities held by third parties | 17,845 | 11,916 |
| Multifamily other guarantee commitments[5] | 9,967 | 10,038 |
| *Total Multifamily — Guarantee portfolio* | 30,390 | 24,049 |
| *Multifamily — Mortgage investments portfolio:*[3] | | |
| Multifamily investment securities portfolio | 61,291 | 59,548 |
| Multifamily loan portfolio | 81,802 | 85,883 |
| *Total Multifamily — Mortgage investments portfolio* | 143,093 | 145,431 |
| *Total Multifamily portfolio* | 173,483 | 169,480 |
| Less: Freddie Mac single-family and multifamily securities[6] | (258,768) | (263,603) |
| **Total mortgage portfolio** | $2,128,659 | $ 2,164,859 |
| **Credit risk portfolios:**[3] | | |
| *Single-family credit guarantee portfolio:* | | |
| Single-family mortgage loans, on-balance sheet | $ 1,793,769 | $  1,799,256 |
| Non-consolidated Freddie Mac mortgage-related securities | 11,034 | 11,268 |
| Other guarantee commitments | 10,442 | 8,632 |
| Less: HFA-related guarantees[8] | (9,057) | (9,322) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (852) | (857) |
| *Total single-family credit guarantee portfolio:* | $1,805,336 | $ 1,808,977 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $   81,802 | $    85,883 |
| Non-consolidated Freddie Mac mortgage-related securities | 20,422 | 14,011 |
| Other guarantee commitments | 9,967 | 10,038 |
| Less: HFA-related guarantees[8] | (1,468) | (1,551) |
| *Total multifamily mortgage portfolio:* | $  110,723 | $  108,381 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(2) Excludes unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment.

(3) The balances of the mortgage-related securities in these portfolios are based on the UPB of the security, whereas the balances of our single-family credit guarantee and multifamily mortgage portfolios presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.

(4) Represents unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment.

(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.

(7) Represents the UPB of loans for which we present characteristics, delinquency data, and other statistics in this report. See "GLOSSARY" for further description.

(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on these by the U.S. government.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1672          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### *Segment Earnings — Results*

*Investments*

Table 12 presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and z ey Metri8s — Investments**[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 1,826 | $ 1,509 | $ 3,479 | $ 2,820 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities | (139) | (327) | (1,168) | (703) |
| Derivative gains (losses) | (2,156) | (2,193) | (1,053) | (4,895) |
| Other non-interest income (loss) | 243 | 294 | 479 | 272 |
| Total non-interest income (loss) | (2,052) | (2,226) | (1,742) | (5,326) |
| Non-interest expense: | | | | |
| Administrative expenses | (101) | (111) | (196) | (233) |
| Other non-interest expense | (1) | (6) | (1) | (13) |
| Total non-interest expense | (102) | (117) | (197) | (246) |
| Segment adjustments[2] | 126 | 294 | 329 | 804 |
| Segment Earnings (loss) before income tax benefit | (202) | (540) | 1,869 | (1,948) |
| Income tax benefit | 212 | 129 | 278 | 226 |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | 10 | (411) | 2,147 | (1,722) |
| Less: Net (income) loss — noncontrolling interest | — | — | — | (2) |
| Segment Earnings (loss), net of taxes | 10 | (411) | 2,147 | (1,724) |
| Total other comprehensive income, net of taxes | 633 | 3,614 | 1,759 | 6,734 |
| Total comprehensive income | $ 643 | $ 3,203 | $ 3,906 | $ 5,010 |
| Key metrics — Investments: | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets:[3][4][5] | | | | |
| Mortgage-related securities[6] | $ 393,361 | $478,043 | $396,238 | $504,454 |
| Non-mortgage-related investments[7] | 91,965 | 115,688 | 103,348 | 127,247 |
| Unsecuritized single-family loans | 92,339 | 53,183 | 88,927 | 48,371 |
| Total average balances of interest-earning assets | $577,665 | $646,914 | $588,513 | $680,072 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.26% | 0.93% | 1.18% | 0.83% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."
(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) Includes non-performing single-family mortgage loans.
(5) We calculate average balances based on amortized cost.
(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.
(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

Our total comprehensive income for our Investments segment was $643 million and $3.9 billion for the three and six months ended June 30, 2011, respectively, consisting of: (a) Segment Earnings of $10 million and $2.1 billion, respectively; and (b) $633 million and $1.8 billion of total other comprehensive income, respectively.

Our total comprehensive income for our Investments segment was $3.2 billion and $5.0 billion for the three and six months ended June 30, 2010, respectively, consisting of: (a) Segment Earnings (loss) of $(411) million and $(1.7) billion, respectively; and (b) $3.6 billion and $6.7 billion of total other comprehensive income, respectively.

During the three and six months ended June 30, 2011, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 0.2% and 1.9%, respectively, compared to a decrease at an annualized rate of 21.2% and 25.0% for the three and six months ended June 30, 2010, respectively. The larger decrease in our Investments segment mortgage investments portfolio during the three and six months ended June 30, 2010 was primarily due to a higher volume of purchases of delinquent and modified loans from the mortgage pools underlying both our PCs and other agency securities. We announced a change in practice in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts. As a result, the increased purchases of delinquent loans limited our capacity to purchase investments into our mortgage-related investments portfolio due to limits on the portfolio under the Purchase Agreement and FHFA regulation. We report the loans that formerly collateralized our PCs in the Single-family Guarantee segment. The UPB of

23

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1673                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the Investments segment mortgage investments portfolio declined to $477.2 billion at June 30, 2011 from $481.7 billion at December 31, 2010.

We held $292.1 billion of agency securities and $91.7 billion of non-agency mortgage-related securities as of June 30, 2011 compared to $302.9 billion of agency securities and $99.6 billion of non-agency mortgage-related securities as of December 31, 2010. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income increased $317 million and $659 million, and Segment Earnings net interest yield increased 33 basis points and 35 basis points during the three and six months ended June 30, 2011, respectively, compared to the three and six months ended June 30, 2010. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations.

Segment Earnings non-interest income (loss) was $(2.1) billion for the three months ended June 30, 2011 compared to $(2.2) billion for the three months ended June 30, 2010. This decrease in non-interest loss was primarily attributable to increased gains on trading securities and decreased impairments of available-for-sale securities during the three months ended June 30, 2011, compared to the three months ended June 30, 2010. Segment Earnings non-interest income (loss) was $(1.7) billion for the six months ended June 30, 2011 compared to $(5.3) billion for the six months ended June 30, 2010. This decrease in non-interest loss was mainly due to decreased derivative losses and increased gains on trading securities, partially offset by increased impairments of available-for-sale securities during the six months ended June 30, 2011, compared to the six months ended June 30, 2010.

Impairments recorded in our Investments segment decreased by $188 million during the three months ended June 30, 2011, compared to the three months ended June 30, 2010, and increased by $465 million during the six months ended June 30, 2011, compared to the six months ended June 30, 2010. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded derivative gains (losses) for this segment of $(2.2) billion and $(1.1) billion during the three and six months ended June 30, 2011, respectively, compared to $(2.2) billion and $(4.9) billion during the three and six months ended June 30, 2010. While derivatives are an important aspect of our management of interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During the three and six months ended June 30, 2011 and the three and six months ended June 30, 2010, longer-term swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps that were partially offset by fair value gains on our receive-fixed swaps and purchased call swaptions. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Our Investments segment's total other comprehensive income was $633 million and $1.8 billion for the three and six months ended June 30, 2011, respectively, compared to $3.6 billion and $6.7 billion during the three and six months ended June 30, 2010, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by $498 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, primarily attributable to fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity, the impact of declining interest rates on our agency securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening of OAS levels on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our available-for-sale securities decreased by $3.4 billion and $6.4 billion during the three and six months ended June 30, 2010, respectively, primarily attributable to fair value gains related to the movement of securities with unrealized losses towards maturity and a net decrease in interest rates.

The objectives set forth for us under our charter and conservatorship, restrictions set forth in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our Investments segment results. For example, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. This will likely cause a corresponding reduction in our net interest income from these assets and therefore negatively affect our Investments segment results. FHFA also stated that we will not be a

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1674

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

substantial buyer of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

For information on the impact of the requirement to reduce the mortgage-related investments portfolio limit by 10% annually, see "NOTE 2: CONSERVATORSHIP AND RELATEDMATTERS — Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio."

<div align="center">25</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single-Family Guarantee*

Table 13 presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and z ey Metri8s — Single-Family Guarantee[1]**

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (dollars in millions) | | |
| **Segment Earnings:** | | | | |
| Net interest income (expense) | $ (30) | $ 51 | $ 70 | $ 110 |
| Provision for credit losses | (2,886) | (5,294) | (5,170) | (11,335) |
| Non-interest income: | | | | |
| Management and guarantee income | 848 | 865 | 1,718 | 1,713 |
| Other non-interest income | 208 | 268 | 419 | 478 |
| Total non-interest income | 1,056 | 1,133 | 2,137 | 2,191 |
| Non-interest expense: | | | | |
| Administrative expenses | (228) | (242) | (443) | (471) |
| REO operations (expense) income | (35) | 41 | (292) | (115) |
| Other non-interest expense | (106) | (90) | (172) | (169) |
| Total non-interest expense | (369) | (291) | (907) | (755) |
| Segment adjustments[2] | (143) | (208) | (328) | (421) |
| Segment Earnings (loss) before income tax (expense) benefit | (2,372) | (4,609) | (4,198) | (10,210) |
| Income tax (expense) benefit | (14) | 104 | (8) | 109 |
| Segment Earnings (loss), net of taxes | (2,386) | (4,505) | (4,206) | (10,101) |
| Total other comprehensive income (loss), net of taxes | 1 | 1 | (3) | (3) |
| Total comprehensive income (loss) | $ (2,385) | $ (4,504) | $ (4,209) | $ (10,104) |
| **Key metrics — Single-family Guarantee:** | | | | |
| *Balances and Growth (in billions, except rate):* | | | | |
| Average balance of single-family credit guarantee portfolio | $ 1,816 | $ 1,877 | $ 1,817 | $ 1,880 |
| Issuance — Single-family credit guarantees[3] | $ 62 | $ 76 | $ 158 | $ 170 |
| Fixed-rate products — Percentage of purchases[4] | 90.3% | 94.2% | 92.6% | 96.0% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 17.4% | 21.7% | 22.7% | 27.8% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
| Contractual management and guarantee fees | 13.7 | 13.5 | 13.6 | 13.4 |
| Amortization of delivery fees | 5.0 | 4.9 | 5.3 | 4.8 |
| Segment Earnings management and guarantee income | 18.7 | 18.4 | 18.9 | 18.2 |
| *Credit:* | | | | |
| Serious delinquency rate, at end of period | 3.50% | 3.96% | 3.50% | 3.96% |
| REO inventory, at end of period (number of properties) | 60,599 | 62,178 | 60,599 | 62,178 |
| Single-family credit losses, in bps (annualized)[6] | 68.4 | 82.4 | 69.7 | 72.2 |
| *Market:* | | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 9,970 | $ 10,150 | $ 9,970 | $ 10,150 |
| 30-year fixed mortgage rate[8] | 4.5% | 4.6% | 4.5% | 4.6% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."

(3) Based on UPB.

(4) Excludes Other Guarantee Transactions.

(5) Includes our purchases of delinquent loans from PCs. On February 10, 2010, we announced that we would begin purchasing substantially all 120 days or more delinquent mortgages from our PC trusts. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information.

(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated June 9, 2011. The outstanding amount for June 30, 2011 reflects the balance as of March 31, 2011, which is the latest available information.

(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

*Financial Results*

For the three and six months ended June 30, 2011, Segment Earnings (loss) for our Single-family Guarantee segment was $(2.4) billion and $(4.2) billion, respectively, compared to $(4.5) billion and $(10.1) billion for the three and six months ended June 30, 2010, respectively. Segment Earnings (loss) for our Single-family segment improved for the three and six months ended June 30, 2011, as compared to the corresponding 2010 periods primarily due to a decline in provision for credit losses.

During the three and six months ended June 30, 2011, our provision for credit losses for the Single-family Guarantee segment was $2.9 billion and $5.2 billion, respectively, compared to $5.3 billion and $11.3 billion during the three and six

TREASURY-1676

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

months ended June 30, 2010, respectively. Segment Earnings provision for credit losses decreased in the three and six months ended June 30, 2011, as compared to the corresponding periods in 2010, primarily due to a decline in the rate at which delinquent loans transition into serious delinquency.

Segment Earnings management and guarantee income consists of contractual amounts due to us related to our management and guarantee fees as well as amortization of delivery fees. Segment Earnings management and guarantee income increased slightly in the six months ended June 30, 2011, as compared to the first half of 2010, primarily due to an increase in the amortization of delivery fees. Increased amortization of delivery fees reflects the impact of higher delivery fees associated with loans purchased after 2008 combined with continued high prepayment rates on guaranteed mortgages in the first half of 2011 as mortgage rates remained low and refinancing activity remained high. This increase was partially offset by a decline in contractual management and guarantee income due to lower average balances of the single-family credit guarantee portfolio during the first half of 2011. Segment Earnings management and guarantee income decreased approximately 2% in the three months ended June 30, 2011, as compared to the second quarter of 2010, primarily due to lower average balances of the single-family credit guarantee portfolio.

<div align="center">27</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 14 provides summary information about the composition of Segment Earnings (loss) for this segment in the three and six months ended June 30, 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended June 30, 2011 | | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination[5]: | | | | | | |
| 2011 | $    65 | 18.9 | $    (12) | 4.5 | $    53 | |
| 2010 | 185 | 21.1 | (60) | 6.6 | 125 | |
| 2009 | 152 | 17.0 | (64) | 6.9 | 88 | |
| 2008 | 93 | 22.2 | (202) | 57.7 | (109) | |
| 2007 | 95 | 18.7 | (1,010) | 216.5 | (915) | |
| 2006 | 56 | 17.0 | (729) | 209.4 | (673) | |
| 2005 | 62 | 16.4 | (491) | 122.7 | (429) | |
| 2004 and prior | 140 | 17.6 | (353) | 40.2 | (213) | |
| Total | $  848 | 18.7 | $(2,921) | 64.4 | $  (2,073) | |
| Administrative expenses | | | | | (228) | |
| Net interest income (expense) | | | | | (30) | |
| Other non-interest income and expenses, net | | | | | (55) | |
| Segment Earnings (loss), net of taxes | | | | | $  (2,386) | |

| | Six Months Ended June 30, 2011 | | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination[5]: | | | | | | |
| 2011 | $    91 | 17.6 | $    (15) | 4.1 | $    76 | |
| 2010 | 369 | 20.9 | (114) | 6.2 | 255 | |
| 2009 | 322 | 17.8 | (114) | 6.1 | 208 | |
| 2008 | 203 | 23.5 | (413) | 57.3 | (210) | |
| 2007 | 196 | 18.8 | (1,894) | 198.0 | (1,698) | |
| 2006 | 115 | 17.0 | (1,492) | 208.8 | (1,377) | |
| 2005 | 128 | 16.5 | (894) | 109.4 | (766) | |
| 2004 and prior | 294 | 18.0 | (526) | 29.2 | (232) | |
| Total | $ 1,718 | 18.9 | $(5,462) | 60.2 | $  (3,744) | |
| Administrative expenses | | | | | (443) | |
| Net interest income | | | | | 70 | |
| Other non-interest income and expenses, net | | | | | (89) | |
| Segment Earnings (loss), net of taxes | | | | | $  (4,206) | |

(1) Includes amortization of delivery fees of $224 and $476 million for the three and six months ended June 30, 2011, respectively.

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results.

(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(4) Calculated as Segment Earnings management and guarantee income less credit expenses.

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

During the first half of 2011, the guarantee-related revenue from mortgage guarantees we issued after 2008 exceeded the credit-related and administrative expenses associated with these guarantees. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. However, our management and guarantee fee rates associated with guarantee issuances in 2005 through 2008 have not been adequate to provide income to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in those years. We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                                                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the future expenses associated with our 2005 to 2008 guarantee issuances. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment at least through 2011.

*Key Metrics*

The UPB of the Single-family Guarantee managed loan portfolio declined to $1.7 trillion at June 30, 2011 from $1.8 trillion at December 31, 2010. The decline in UPB of the Single-family Guarantee managed loan portfolio during 2011 reflects that the amount of liquidations has exceeded new loan purchase and guarantee activity, which we believe is due in part, to declines in the amount of single-family mortgage debt outstanding in the market. During the three and six months ended June 30, 2011 our annualized liquidation rate on our securitized single-family credit guarantees was 17% and 23%, respectively.

Refinance volumes continued to be high due to continued low interest rates, and, based on UPB, represented 70% and 79% of our single-family mortgage purchase volume during the three and six months ended June 30, 2011, respectively, compared to 71% and 75% of our single-family mortgage purchase volume during the three and six months ended June 30, 2010, respectively. Relief refinance mortgages comprised approximately 40% and 34% of our total refinance volume during the six months ended June 30, 2011 and 2010, respectively, based on number of loans. Relief refinance mortgages with LTV ratios above 80% represented approximately 14% and 12% of our single-family mortgage purchase volume during the six months ended June 30, 2011 and 2010, respectively, based on UPB.

The serious delinquency rate on our single-family credit guarantee portfolio declined to 3.50% as of June 30, 2011 from 3.84% as of December 31, 2010 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. Although the volume of new serious delinquencies has continued to decline, our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets. As of June 30, 2011 and December 31, 2010, approximately 46% and 39%, respectively, of our single-family credit guarantee portfolio is comprised of mortgage loans originated after 2008. Excluding relief refinance mortgages, these new vintages reflect a combination of changes in underwriting practices and improved borrower and loan characteristics, and represent an increasingly large proportion of our single-family credit guarantee portfolio. The proportion of the portfolio represented by 2005 through 2008 vintages, which have a higher composition of loans with higher-risk characteristics, continues to decline principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as liquidations resulting from foreclosure events and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity. Relief refinance mortgages with LTV ratios above 80% may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees was 68.4 basis points in the second quarter of 2011, compared to 82.4 basis points for the second quarter of 2010, and was 69.7 basis points for the first half of 2011, compared to 72.2 basis points for the first half of 2010. Charge-offs, net of recoveries, associated with the single-family loans declined to $3.1 billion in the second quarter of 2011, from $3.9 billion for the second quarter of 2010. Charge-offs, net of recoveries, were $6.0 billion and $6.6 billion in the first half of 2011 and 2010, respectively. Our net charge-offs in the three and six months ended June 30, 2011 remained elevated, but reflect suppression of activity due to delays in foreclosures caused by concerns about the foreclosure process. We believe that the level of our charge-offs will remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

<div align="center">29</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily*

Table 15 presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and z ey Metri8s — Multifamily(1)**

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (dollars in millions) | | |
| Segment Earnings: | | | | |
| Net interest income | $ 304 | $ 278 | $ 583 | $ 516 |
| (Provision) benefit for credit losses | 13 | (119) | 73 | (148) |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 30 | 25 | 58 | 49 |
| Net impairment of available-for-sale securities | (182) | (17) | (317) | (72) |
| Derivative gains (losses) | 2 | (1) | 4 | 4 |
| Other non-interest income | 111 | 55 | 298 | 163 |
| Total non-interest income (loss) | (39) | 62 | 43 | 144 |
| Non-interest expense: | | | | |
| Administrative expenses | (55) | (51) | (106) | (105) |
| REO operations income (expense) | 8 | (1) | 8 | (4) |
| Other non-interest expense | (28) | (19) | (41) | (36) |
| Total non-interest expense | (75) | (71) | (139) | (145) |
| Segment Earnings before income tax benefit | 203 | 150 | 560 | 367 |
| Income tax benefit (expense) | (3) | — | (1) | 1 |
| Segment Earnings, net of taxes, including noncontrolling interest | 200 | 150 | 559 | 368 |
| Less: Net (income) loss — noncontrolling interest | — | — | — | 3 |
| Segment Earnings, net of taxes | 200 | 150 | 559 | 371 |
| Total other comprehensive income, net of taxes | 405 | 668 | 1,347 | 2,360 |
| Total comprehensive income | $ 605 | $ 818 | $ 1,906 | $ 2,731 |
| Key metrics — Multifamily: | | | | |
| *Balances and Growth:* | | | | |
| Average balance of Multifamily loan portfolio | $83,718 | $82,107 | $84,749 | $82,782 |
| Average balance of Multifamily guarantee portfolio | $ 29,014 | $21,723 | $ 27,163 | $ 20,594 |
| Average balance of Multifamily investment securities portfolio | $ 61,909 | $ 62,017 | $ 62,376 | $ 62,259 |
| Liquidation rate — Multifamily loan portfolio (annualized) | 10.1% | 4.8% | 7.9% | 3.6% |
| Growth rate (annualized) | 4.6% | 4.9% | 4.1% | 6.6% |
| */ ield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.83% | 0.77% | 0.79% | 0.71% |
| Average Management and guarantee fee rate, in bps (annualized)(2) | 43.0 | 49.6 | 44.7 | 51.1 |
| *Credit:* | | | | |
| Delinquency rate, at period end(3) | 0.31% | 0.22% | 0.31% | 0.22% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 705 | $ 935 | $ 705 | $ 935 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 62.8 | 89.4 | 62.8 | 89.4 |
| Credit losses, in bps (annualized)(4) | 7.6 | 10.3 | 5.9 | 9.2 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio, and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Our total comprehensive income for our Multifamily segment was $605 million and $1.9 billion for the three and six months ended June 30, 2011 respectively, consisting of: (a) Segment Earnings of $200 million and $559 million, respectively; and (b) $405 million and $1.3 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values related to credit risk on available-for-sale CMBS.

Our total comprehensive income for our Multifamily segment was $818 million and $2.7 billion for the three and six months ended June 30, 2010, respectively, consisting of: (a) Segment Earnings of $150 million and $371 million, respectively; and (b) $668 million and $2.4 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values related to credit risk on available-for-sale CMBS.

Segment Earnings for our Multifamily segment increased to $200 million for the second quarter of 2011 from $150 million for the second quarter of 2010 and increased to $559 million for the first half of 2011 from $371 million for the first half of 2010. These increases were primarily due to lower provision for credit losses and higher other non-interest income, partially offset by higher net impairments on available-for-sale securities in the three and six months ended

30

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

June 30, 2011, compared to the same periods in 2010. We currently expect to generate positive Segment Earnings in the Multifamily segment in the remainder of 2011.

Segment Earnings net interest income increased to $304 million in the second quarter of 2011 from $278 million in the second quarter of 2010, and was $583 million and $516 million in the first half of 2011 and 2010, respectively. These increases were primarily attributable to growth in the average balance of the multifamily loan portfolio and higher interest income relative to allocated funding costs in the first half of 2011.

Segment Earnings non-interest income (loss) was $(39) million and $62 million for the three months ended June 30, 2011 and 2010, respectively, and was $43 million and $144 million for the six months ended June 30, 2011 and 2010, respectively. Within Segment Earnings non-interest income, we experienced higher security impairments on CMBS that were offset primarily by fair value gains on mortgage loans during the first half of 2011, compared to the first half of 2010. CMBS impairments during the first half of 2011 and 2010 totaled $317 million and $72 million, respectively. During the second quarter of 2011, we sold two of the five impaired CMBS bonds, which had generated a majority of our Segment Earnings net impairments of available-for-sale securities recognized during the first half of 2011. We have the intent to sell the three other impaired CMBS bonds in the second half of 2011 subject to market conditions. We also recognized $240 million in gains on sales of $7.7 billion in UPB of multifamily loans during the first half of 2011, compared to $205 million of gains on sales of $4.2 billion in UPB of multifamily loans during the first half of 2010. Gains on sales of multifamily loans in the multifamily segment are presented net of changes in fair value due to changes in interest rates.

The most recent data available continues to reflect improving national apartment fundamentals, including vacancy rates and effective rents. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more complete economic recovery. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many nonperforming loans, and loans that we believe are at risk of default, in these states. Our delinquency rates have historically been a lagging indicator and, as a result, we expect to continue to experience delinquencies in the remainder of 2011, consistent with our experience in the first half of 2011. For further information on delinquencies, including geographical and other concentrations, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment recognized a provision (benefit) for credit losses of $(13) million and $(73) million for the three and six months ended June 30, 2011 compared to a provision for credit losses of $119 million and $148 million, for the three and six months ended June 30, 2010, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $705 million and $828 million as of June 30, 2011 and December 31, 2010, respectively. The decline in our loan loss reserves in the first half of 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values. For loans where we identified deteriorating collateral performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual loan, using estimates of property value, to determine if a specific loan loss reserve is needed. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they prepare their results in the normal course of business.

The delinquency rate for loans in the multifamily mortgage portfolio was 0.31% and 0.26% as of June 30, 2011 and December 31, 2010, respectively. As of June 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two or more monthly payments past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. The multifamily delinquency rate of credit-enhanced loans as of June 30, 2011 and December 31, 2010, was 0.70% and 0.85%, respectively, while the delinquency rate for non-credit-enhanced loans was 0.19% and 0.12%, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates, including factors that can positively impact such rates.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios declined from 10.3 basis points in the second quarter of 2010 to 7.6 basis points in the second quarter of 2011, driven by an improvement in REO operations income (expense) for the second quarter of 2011. Charge-offs, excluding recoveries, associated with multifamily loans increased to $29 million in the second quarter of 2011, compared to $27 million in the second quarter of 2010, due to an increase in the number of foreclosures in the 2011 period. Charge-offs, excluding recoveries, were $41 million and $45 million in the first half of 2011 and 2010, respectively. We currently expect that our charge-offs and credit losses in the full-year of 2011 will be consistent with the amount realized in 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                         Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of the total multifamily portfolio increased to $173.5 billion at June 30, 2011 from $169.5 billion at December 31, 2010, due primarily to increased guarantees of non-consolidated securities issued during the first half of 2011 as well as the transfer in the first quarter of 2011 of certain housing revenue bonds to the Multifamily Segment that were previously managed by the Investments segment. We issued $7.0 billion and $5.6 billion UPB of Freddie Mac mortgage-related securities and other guarantee commitments related to multifamily mortgage loans in the first half of 2011 and 2010, respectively. Increased competition in certain markets has exerted and may continue to exert downward pressure on pricing and credit for new activity in the remainder of 2011, and could negatively impact our future purchase volumes. Our primary multifamily business strategy in 2011 is to purchase loans and subsequently securitize them, which supports liquidity for the multifamily market and affordability for multifamily rental housing.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Se8urities Pur8hased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents and investments in securities purchased under agreements to resell. These short-term assets decreased by $21.1 billion from December 31, 2010 to June 30, 2011, primarily due to a relative decline in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $17.5 billion and $37.0 billion of cash and cash equivalents, $7.3 billion and $1.4 billion of federal funds sold, and $12.4 billion and $15.8 billion of securities purchased under agreements to resell at June 30, 2011 and December 31, 2010, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $29.8 billion and $30.9 billion of cash and cash equivalents and $21.6 billion and $25.1 billion of federal funds sold and securities purchased under agreements to resell during the three and six months ended June 30, 2011.

Recently we changed the composition of our portfolio of liquid assets given the recent market concerns about the potential for a downgrade in the credit ratings of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

### Investments in Se8urities

Table 16 provides detail regarding our investments in securities as of June 30, 2011 and December 31, 2010. Table 16 does not include our holdings of single-family PCs and certain Other Guarantee Transactions. For information on our holdings of such securities, see "Table 11 — Segment Mortgage Portfolio Composition."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 1/  — Investments in Se8urities

| | Fair Value | |
|---|---|---|
| | cune 30, 2011 | De8ember 31, 2010 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $  85,221 | $    85,689 |
| Subprime | 30,491 | 33,861 |
| CMBS | 57,647 | 58,087 |
| Option ARM | 6,591 | 6,889 |
| Alt-A and other | 12,209 | 13,168 |
| Fannie Mae | 21,011 | 24,370 |
| Obligations of states and political subdivisions | 8,560 | 9,377 |
| Manufactured housing | 844 | 897 |
| Ginnie Mae | 275 | 296 |
| Total available-for-sale mortgage-related securities | 222,849 | 232,634 |
| Total investments in available-for-sale securities | 222,849 | 232,634 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 16,997 | 13,437 |
| Fannie Mae | 17,982 | 18,726 |
| Ginnie Mae | 165 | 172 |
| Other | 82 | 31 |
| Total trading mortgage-related securities | 35,226 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 164 | 44 |
| Treasury bills | 250 | 17,289 |
| Treasury notes | 17,497 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 1,627 | 441 |
| Total trading non-mortgage-related securities | 19,538 | 27,896 |
| Total investments in trading securities | 54,764 | 60,262 |
| Total investments in securities | $ 277,613 | $   292,896 |

(1) For information on the types of instruments that are included,  see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report.

### Non-Mortgage-Related Securities

Our investments in non-mortgage-related securities provide an  additional source of liquidity for us. We held investments in non-mortgage-related securities classified as trading of $19.5 billion and $27.9 billion as of June 30, 2011 and December 31, 2010, respectively. While balances may fluctuate from period to period, we continue to meet  required liquidity and contingency levels.

### Mortgage-Related Securities

We are primarily a buy-and-hold investor in mortgage-related securities, which consist of  securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other  Guarantee Transactions we purchase are not  accounted for as investments in securities because we recognize  the underlying mortgage loans on our consolidated balance sheets  through consolidation of the related trusts.

Table 17 provides the UPB of our investments in mortgage-related securities classified as available-for-sale or  trading on our consolidated balance sheets. Table 17 does not include our holdings of single-family PCs and certain Other  Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Segment Mortgage Portfolio Composition."

33

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011           Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table 1J — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| **Freddie Mac mortgage-related securities:(2)** | | | | | | |
| Single-family | $ 79,194 | $ 9,014 | $ 88,208 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 780 | 1,798 | 2,578 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 79,974 | 10,812 | 90,786 | 80,294 | 9,874 | 90,168 |
| **Non-Freddie Mac mortgage-related securities:** | | | | | | |
| Agency securities:(3) | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 19,838 | 15,645 | 35,483 | 21,238 | 18,139 | 39,377 |
| Multifamily | 70 | 77 | 147 | 228 | 88 | 316 |
| Ginnie Mae: | | | | | | |
| Single-family | 273 | 111 | 384 | 296 | 117 | 413 |
| Multifamily | 27 | — | 27 | 27 | — | 27 |
| Total agency securities | 20,208 | 15,833 | 36,041 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:(4) | | | | | | |
| Subprime | 344 | 51,147 | 51,491 | 363 | 53,855 | 54,218 |
| Option ARM | — | 14,778 | 14,778 | — | 15,646 | 15,646 |
| Alt-A and other | 2,260 | 15,502 | 17,762 | 2,405 | 16,438 | 18,843 |
| CMBS | 20,574 | 35,817 | 56,391 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions(5) | 8,809 | 24 | 8,833 | 9,851 | 26 | 9,877 |
| Manufactured housing | 879 | 140 | 1,019 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities(6) | 32,866 | 117,408 | 150,274 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $133,048 | $144,053 | 277,101 | $137,033 | $151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (11,696) | | | (11,839) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (7,330) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $258,075 | | | $ 265,000 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 49% and 50% of these securities held at June 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 22% and 23% of total non-agency mortgage-related securities held at June 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $277.1 billion at June 30, 2011 primarily as a result of liquidations exceeding our purchase activity during the six months ended June 30, 2011.

Table 18 summarizes our mortgage-related securities purchase activity for the three and six months ended June 30, 2011 and 2010. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

34

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1684

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**Table 17 — Total Mortgage-Related Se8urities Pur8hase A8tivity**[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $ 56 | $ — | $ 72 | $ 13 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 3,633 | 2,063 | 6,512 | 7,684 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 3,689 | 2,063 | 6,584 | 7,697 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | 2,181 | — | 3,200 | — |
| Variable-rate | 60 | 117 | 228 | 164 |
| *Total agency securities* | 2,241 | 117 | 3,428 | 164 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | 14 | — | 14 | — |
| Variable-rate | 46 | — | 46 | — |
| *Total non-agency mortgage-related securities* | 60 | — | 60 | — |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 2,301 | 117 | 3,488 | 164 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 5,990 | $2,180 | $ 10,072 | $ 7,861 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $ 24,304 | $1,205 | $60,983 | $ 6,045 |
| Variable-rate | 462 | — | 3,004 | 203 |
| *Multifamily:* | | | | |
| Fixed-rate | 26 | 160 | 51 | 185 |
| Variable-rate | 65 | 10 | 65 | 41 |
| *Total Freddie Mac mortgage-related securities purchased* | $24,857 | $1,375 | $ 64,103 | $ 6,474 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.

(2) Purchases for the six months ended June 30, 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our 2010 Annual Report for further information on this component of the HFA Initiative.

During the three and six months ended June 30, 2011, we engaged in mortgage-related security transactions in which we entered into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities. We engaged in these transactions primarily to support the market and pricing of our PC securities. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in the first half of 2011 reflected in Table 18 above is attributed primarily to these transactions.

### Unrealized Losses on Available-For-Sale Mortgage-Related Securities

At June 30, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.5 billion, compared to $23.1 billion at December 31, 2010. The improvement in unrealized losses was primarily due to fair value gains on non-agency mortgage-related securities related to the movement of these securities with unrealized losses towards maturity and the impact of a decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at June 30, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

### Higher-Risk Components of Our Investments in Mortgage-Related Securities

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

TREASURY-1685

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk.*"

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. Tables 19 and 20 present information about our holdings of these securities.

**Table 19 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

|  | As of | | | | |
|---|---|---|---|---|---|
|  | 0/ @0Q2011 | 03Q1Q2011 | 12Q1Q2010 | 09Q0Q2010 | 0/ @0Q2010 |
|  | (dollars in millions) | | | | |
| UPB: |  |  |  |  |  |
|   Subprime first lien | $ 51,070 | $ 52,403 | $53,756 | $55,250 | $56,922 |
|   Option ARM | 14,778 | 15,232 | 15,646 | 16,104 | 16,603 |
|   Alt-A[2] | 15,059 | 15,487 | 15,917 | 16,406 | 16,909 |
| Gross unrealized losses, pre-tax:[3] |  |  |  |  |  |
|   Subprime first lien | $ 13,764 | $ 12,481 | $ 14,026 | $16,446 | $ 17,757 |
|   Option ARM | 3,099 | 3,170 | 3,853 | 4,815 | 5,770 |
|   Alt-A[2] | 2,171 | 1,941 | 2,096 | 2,542 | 3,335 |
| Present value of expected credit losses: |  |  |  |  |  |
|   Subprime first lien | $ 6,487 | $ 6,612 | $ 5,937 | $ 4,364 | $ 3,311 |
|   Option ARM | 4,767 | 4,993 | 4,850 | 4,208 | 3,534 |
|   Alt-A[2] | 2,310 | 2,401 | 2,469 | 2,101 | 1,653 |
| Collateral delinquency rate:[4] |  |  |  |  |  |
|   Subprime first lien | 42% | 44% | 45% | 45% | 46% |
|   Option ARM | 44 | 44 | 44 | 44 | 45 |
|   Alt-A[2] | 26 | 26 | 27 | 26 | 26 |
| Cumulative collateral loss:[5] |  |  |  |  |  |
|   Subprime first lien | 20% | 19% | 18% | 17% | 16% |
|   Option ARM | 15 | 14 | 13 | 11 | 10 |
|   Alt-A[2] | 7 | 7 | 6 | 6 | 5 |
| Average credit enhancement:[6] |  |  |  |  |  |
|   Subprime first lien | 23% | 24% | 25% | 25% | 26% |
|   Option ARM | 10 | 11 | 12 | 12 | 13 |
|   Alt-A[2] | 8 | 8 | 9 | 9 | 10 |

(1) See *"Ratings of Non-Agency Mortgage-Related Securities"* for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(3) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(4) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(5) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by monoline bond insurance, overcollateralization and other forms of credit enhancement.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 20 — Non-Agen8y Mortgage-Related Se8urities Ba8ked by Subprime, Option ARM, Alt-A and Other Loans[1]**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 0/ @0@2011 | 03@1@2011 | 12@1@2010 | 09@0@2010 | 0/ @0@2010 |
| | | | (in millions) | | |
| Net impairment of available-for-sale securities recognized in earnings: | | | | | |
| Subprime — first and second liens | $ 70 | $ 734 | $ 1,207 | $ 213 | $ 17 |
| Option ARM | 65 | 281 | 668 | 577 | 48 |
| Alt-A and other | 32 | 40 | 372 | 296 | 333 |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime — first and second liens: | | | | | |
| Principal repayments | $ 1,341 | $ 1,361 | $ 1,512 | $1,685 | $2,001 |
| Principal cash shortfalls | 10 | 14 | 6 | 8 | 12 |
| Option ARM: | | | | | |
| Principal repayments | $ 331 | $ 315 | $ 347 | $ 377 | $ 435 |
| Principal cash shortfalls | 123 | 100 | 111 | 122 | 80 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 464 | $ 452 | $ 537 | $ 582 | $ 653 |
| Principal cash shortfalls | 84 | 81 | 62 | 56 | 67 |

(1) See *"Ratings of Non-Agency Mortgage-Related Securities"* for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

As discussed below, we recognized impairment in earnings on our holdings of such securities during the three and six months ended June 30, 2011 and 2010. See "Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings" for more information.

For purposes of our impairment analysis, our estimate of the present value of expected future credit losses on our portfolio of non-agency mortgage-related securities decreased to $14.4 billion at June 30, 2011 from $15.2 billion at March 31, 2011. All of this amount has been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decrease in our estimate of the present value of expected future credit losses resulted primarily from decreasing interest rates in the second quarter of 2011, offset by a decline in forecasted home prices on a seasonally adjusted basis.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.1 billion on impaired non-agency mortgage-related securities, of which $229 million and $428 million related to the three and six months ended June 30, 2011. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three and six months ended June 30, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers.*"

*Freddie Mac*

TREASURY-1687

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

Table 21 provides information about the mortgage-related securities for which we recognized other-than-temporary impairments for the three months ended June 30, 2011 and 2010.

**Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Se8urities Re8ogni>ed in Earnings**

| | | Three Months Ended cune 30, | | |
| | 2011 | | 2010 | |
| | UPB | Net Impairment of Available-For-Sale Se8urities Re8ogni>ed in Earnings | UPB | Net Impairment of Available-For-Sale Se8urities Re8ogni>ed in Earnings |
|---|---|---|---|---|
| | | (in millions) | | |
| Subprime: | | | | |
| 2006 & 2007 first lien | $ 11,909 | $ 67 | $ 606 | $ 15 |
| Other years — first and second liens(1) | 298 | 3 | 234 | 2 |
| Total subprime — first and second liens(1) | 12,207 | 70 | 840 | 17 |
| Option ARM: | | | | |
| 2006 & 2007 | 5,867 | 43 | 1,940 | 34 |
| Other years | 1,235 | 22 | 260 | 14 |
| Total option ARM | 7,102 | 65 | 2,200 | 48 |
| Alt-A: | | | | |
| 2006 & 2007 | 1,494 | 16 | 2,860 | 37 |
| Other years | 2,126 | 15 | 152 | 2 |
| Total Alt-A | 3,620 | 31 | 3,012 | 39 |
| Other loans | 80 | 1 | 2,419 | 294 |
| Total subprime, option ARM, Alt-A and other loans | 23,009 | 167 | 8,471 | 398 |
| CMBS | 918 | 183 | 900 | 17 |
| Manufactured housing | 205 | 2 | 424 | 13 |
| Total available-for-sale mortgage-related securities | $24,132 | $ 352 | $9,795 | $ 428 |

(1) Includes all second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, compared to $428 million and $938 million during the three and six months ended June 30, 2010, as our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. These impairments include $167 million and $1.2 billion of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and six months ended June 30, 2011, respectively, compared to $398 million and $851 million during the three and six months ended June 30, 2010. In addition, during the three months ended June 30, 2011, these impairments include recognition of the unrealized fair value losses related to three investments in CMBS of $154 million as an impairment charge in earnings, as we have the intent to sell these securities. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at June 30, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at June 30, 2011 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence, all of which have contributed to poor performance during the three and six months ended June 30, 2011 and 2010. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1688          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

surrounding certain monoline bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three and six months ended June 30, 2011 and 2010. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change due to changes in the performance of the individual securities and in mortgage market conditions. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process"* in our 2010 Annual Report.

*Ratings of Non-Agency Mortgage-Related Securities*

Table 22 shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at June 30, 2011 based on their ratings as of June 30, 2011 as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

<div align="center">39</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of June 30, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Monoline Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Subprime loans: | | | | | |
| AAA-rated | $ 1,284 | 2% | $ 1,284 | $ (106) | $ 23 |
| Other investment grade | 2,934 | 6 | 2,934 | (395) | 394 |
| Below investment grade(2) | 47,273 | 92 | 40,013 | (13,271) | 1,727 |
| Total | $ 51,491 | 100% | $ 44,231 | $(13,772) | $ 2,144 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 100 | 1 | 100 | (12) | 100 |
| Below investment grade(2) | 14,678 | 99 | 9,561 | (3,087) | 45 |
| Total | $ 14,778 | 100% | $ 9,661 | $ (3,099) | $ 145 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 482 | 3% | $ 483 | $ (25) | $ 7 |
| Other investment grade | 2,300 | 13 | 2,323 | (306) | 337 |
| Below investment grade(2) | 14,980 | 84 | 11,744 | (2,056) | 2,274 |
| Total | $ 17,762 | 100% | $ 14,550 | $ (2,387) | $ 2,618 |
| CMBS: | | | | | |
| AAA-rated | $ 26,407 | 47% | $ 26,455 | $ (29) | $ 42 |
| Other investment grade | 26,524 | 47 | 26,496 | (421) | 1,652 |
| Below investment grade(2) | 3,460 | 6 | 2,990 | (266) | 1,701 |
| Total | $ 56,391 | 100% | $ 55,941 | $ (716) | $ 3,395 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 28,173 | 20% | $ 28,222 | $ (160) | $ 72 |
| Other investment grade | 31,858 | 23 | 31,853 | (1,134) | 2,483 |
| Below investment grade(2) | 80,391 | 57 | 64,308 | (18,680) | 5,747 |
| Total | $ 140,422 | 100% | $124,383 | $(19,974) | $ 8,302 |
| Total investments in mortgage-related securities | $ 277,101 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | | 51% | | | |

| Credit Ratings as of December 31, 2010 | | | | | |
|---|---|---|---|---|---|
| Subprime loans: | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade(2) | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $(14,056) | $ 2,269 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade(2) | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade(2) | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $ 2,818 |
| CMBS: | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade(2) | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $ 3,401 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade(2) | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $ 147,435 | 100% | $132,670 | $(22,279) | $ 8,667 |
| Total investments in mortgage-related securities | $288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | | 51% | | | |

(1) Represents the amount of UPB covered by monoline bond insurance coverage. This amount does not represent the maximum amount of losses we could recover, as the monoline insurance also covers interest.

(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

40

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past performance is no guarantee of future results.

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet declined to $1,876 billion as of June 30, 2011 from $1,885 billion as of December 31, 2010. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased by $9.2 billion, to $158.1 billion at June 30, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued purchases of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded investment of these loans, approximately $74.6 billion, or 4.2%, of the single-family mortgage loans on our consolidated balance sheet as of June 30, 2011 were seriously delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. The majority of these seriously delinquent loans are unsecuritized, and were purchased by us from our PC trusts. As guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our purchases of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $81.8 billion at June 30, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in the three and six months ended June 30, 2011 primarily consisted of purchases of loans intended for securitization and sales of loans through Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy.

Table 23 summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 23 — Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
| | | | | (dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate | $40,345 | 60% | $53,661 | 67% | $103,243 | 61% | $119,275 | 70% |
| 20-year amortizing fixed-rate | 3,315 | 5 | 3,871 | 5 | 10,030 | 6 | 7,229 | 4 |
| 15-year amortizing fixed-rate | 13,001 | 19 | 14,737 | 18 | 35,111 | 21 | 29,851 | 18 |
| Adjustable-rate[2] | 6,125 | 9 | 3,925 | 5 | 11,866 | 7 | 5,783 | 3 |
| Interest-only[3] | — | — | 499 | 1 | — | — | 820 | <1 |
| FHA/VA and other governmental | 117 | <1 | 349 | <1 | 204 | <1 | 3,132 | 2 |
| Total single-family[5] | 62,903 | 93 | 77,042 | 96 | 160,454 | 95 | 166,090 | 97 |
| Multifamily | 4,512 | 7 | 2,954 | 4 | 7,561 | 5 | 5,067 | 3 |
| Total mortgage loan purchases and other guarantee commitment activity[4] | $67,415 | 100% | $79,996 | 100% | $168,015 | 100% | $171,157 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] | | 9% | | 8% | | 8% | | 11% |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes additions of seriously delinquent loans and balloon/reset mortgages purchased out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the first half of 2011 or 2010.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $13.3 billion and $11.0 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the six months ended June 30, 2011 and 2010, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $2.5 billion and $3.1 billion and issuances of other guarantee commitments on multifamily loans of $0.4 billion and $0.9 billion during the six months ended June 30, 2011 and 2010, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in 2010.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our single-family credit guarantee portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1692          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We also classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

Table 24 shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions as of June 30, 2011. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

TREASURY-1693

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24 — Derivative Fair Values and Maturities**

| | | | cune 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | | | | Fair Value(1) | | |
| | Notional or Contra8tual Amount(2) | Total Fair Value(3) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In E8ess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 199,851 | $ 2,260 | $ 151 | $ 590 | $ 931 | $ 588 |
| Weighted average fixed rate(4) | | | 1.31% | 1.22% | 2.21% | 3.60% |
| Forward-starting swaps(5) | 15,907 | 440 | — | — | (1) | 441 |
| Weighted average fixed rate(4) | | | — | 0.59% | 1.09% | 4.51% |
| Total receive-fixed | 215,758 | 2,700 | 151 | 590 | 930 | 1,029 |
| Basis (floating to floating) | 3,275 | 4 | — | 1 | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 302,831 | (18,263) | (136) | (1,261) | (4,880) | (11,986) |
| Weighted average fixed rate(4) | | | 2.90% | 1.68% | 3.28% | 4.07% |
| Forward-starting swaps(5) | 19,039 | (2,489) | — | — | — | (2,489) |
| Weighted average fixed rate(4) | | | — | — | — | 5.37% |
| Total pay-fixed | 321,870 | (20,752) | (136) | (1,261) | (4,880) | (14,475) |
| Total interest-rate swaps | 540,903 | (18,048) | 15 | (670) | (3,947) | (13,446) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 103,825 | 8,260 | 4,084 | 2,001 | 816 | 1,359 |
| Written | 23,025 | (780) | (18) | (694) | (68) | — |
| Put swaptions | | | | | | |
| Purchased | 73,475 | 1,714 | 117 | 427 | 484 | 686 |
| Written | 6,000 | — | — | — | — | — |
| Other option-based derivatives(6) | 41,861 | 1,514 | 5 | — | — | 1,509 |
| Total option-based | 248,186 | 10,708 | 4,188 | 1,734 | 1,232 | 3,554 |
| Futures | 105,169 | (46) | (46) | — | — | — |
| Foreign-currency swaps | 2,184 | 327 | 101 | 226 | — | — |
| Commitments(7) | 34,361 | 55 | 55 | — | — | — |
| Swap guarantee derivatives | 3,733 | (36) | — | (1) | (1) | (34) |
| Subtotal | 934,536 | (7,040) | $ 4,313 | $ 1,289 | $ (2,716) | $ (9,926) |
| Credit derivatives | 11,383 | (2) | | | | |
| Subtotal | 945,919 | (7,042) | | | | |
| Derivative interest receivable (payable), net | | (1,347) | | | | |
| Trade/settle receivable (payable), net | | 6 | | | | |
| Derivative collateral (held) posted, net | | 8,221 | | | | |
| Total | $ 945,919 | $ (162) | | | | |

(1) Fair value is categorized based on the period from June 30, 2011 until the contractual maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(6) Primarily includes purchased interest rate caps and floors.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

At June 30, 2011, the net fair value of our total derivative portfolio was $(0.2) billion, as compared to $(1.1) billion at December 31, 2010. During the six months ended June 30, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by declines in interest rates. See "NOTE 11: DERIVATIVES — Table 11.1 — Derivative Assets and Liabilities at Fair Value" for our notional or contractual amounts and related fair values of our total derivative portfolio by product type at June 30, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1694

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 25 summarizes the changes in derivative fair values.

## Table 25 — Changes in Derivative Fair Values

|  | SikMonths Ended cume 30,(1) | |
| --- | --- | --- |
|  | 2011 | 2010 |
|  | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $(6,560) | $(2,267) |
| Net change in: | | |
| Commitments(2) | 75 | (1) |
| Credit derivatives | (9) | (4) |
| Swap guarantee derivatives | — | (1) |
| Other derivatives:(3) | | |
| Changes in fair value | (1,213) | (5,816) |
| Fair value of new contracts entered into during the period(4) | 576 | (324) |
| Contracts realized or otherwise settled during the period | 89 | 99 |
| Ending balance, at June 30 — Net asset (liability) | $(7,042) | $(8,314) |

(1) Refer to "Table 24 — Derivative Fair Values and Maturities" for reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2011. At June 30, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(791) million, trade/settle receivable or (payable), net of $17 million, and derivative cash collateral posted, net of $8.4 billion.

(2) Our commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

As a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee, we acquire properties which are recorded as REO assets on our consolidated balance sheets. The balance of our REO, net, declined to $5.9 billion at June 30, 2011 from $7.1 billion at December 31, 2010. In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process. These delays in foreclosures continued in the first half of 2011, particularly in states that require a judicial foreclosure process. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. However, we expect our REO inventory to remain at elevated levels, as we have a large inventory of significantly delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. To the extent a large inventory of loans completes the foreclosure process, such an increase in REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred TaKAssets, Net

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in all subsequent quarters, including in the second quarter of 2011. Our valuation allowance increased by $658 million during the six months ended June 30, 2011 to $33.9 billion, primarily attributable to an increase in temporary differences during the period. As of June 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

## IRS Examinations

Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court

44

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We currently believe adequate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

**Other Assets**

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $8.4 billion as of June 30, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in servicer receivables resulting from lower loan liquidations on mortgage loans held by consolidated trusts. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

TREASURY-1696

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 26 presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type based on the UPB of the securities.

**Table 2/ — Freddie Ma8 Mortgage-Related Se8urities[1][2]**

| | cune 30, 2011 | | | De8ember 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $1,182,288 | $ — | $1,182,288 | $1,213,448 | $ — | $1,213,448 |
| 20-year amortizing fixed-rate | 67,525 | — | 67,525 | 65,210 | — | 65,210 |
| 15-year amortizing fixed-rate | 251,030 | — | 251,030 | 248,702 | — | 248,702 |
| Adjustable-rate[3] | 64,367 | — | 64,367 | 61,269 | — | 61,269 |
| Interest-only[4] | 67,593 | — | 67,593 | 79,835 | — | 79,835 |
| FHA/VA and other governmental | 3,486 | — | 3,486 | 3,369 | — | 3,369 |
| *Total single-family* | 1,636,289 | — | 1,636,289 | 1,671,833 | — | 1,671,833 |
| Multifamily | — | 4,611 | 4,611 | — | 4,603 | 4,603 |
| *Total single-family and multifamily* | 1,636,289 | 4,611 | 1,640,900 | 1,671,833 | 4,603 | 1,676,436 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds[5] | | | | | | |
| Single-family | — | 6,144 | 6,144 | — | 6,168 | 6,168 |
| Multifamily | — | 1,093 | 1,093 | — | 1,173 | 1,173 |
| Total HFA bonds | — | 7,237 | 7,237 | — | 7,341 | 7,341 |
| Other: | | | | | | |
| Single-family[6] | 14,240 | 4,038 | 18,278 | 15,806 | 4,243 | 20,049 |
| Multifamily | — | 14,718 | 14,718 | — | 8,235 | 8,235 |
| Total Other Guarantee Transactions | 14,240 | 18,756 | 32,996 | 15,806 | 12,478 | 28,284 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[7] | — | 852 | 852 | — | 857 | 857 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,650,529 | $ 31,456 | $1,681,985 | $1,687,639 | $ 25,279 | $1,712,918 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[8] | (166,113) | | | (170,638) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $ 1,484,416 | | | $ 1,517,001 | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled.

(2) Excludes other guarantee commitments for mortgage assets held by third parties that require us to purchase loans from lenders when these loans meet certain delinquency criteria.

(3) Includes $1.2 billion and $1.3 billion in UPB of option ARM mortgage loans as of June 30, 2011 and December 31, 2010, respectively. See endnote (6) for additional information on option ARM loans that back our Other Guarantee Transactions.

(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(5) Consists of bonds we acquired and resecuritized under the NIBP.

(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $7.9 billion and $8.4 billion in UPB of securities backed by option ARM mortgage loans at June 30, 2011 and December 31, 2010, respectively.

(7) Backed by FHA/VA loans.

(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust securities, based on UPB, was approximately 92% at both June 30, 2011 and December 31, 2010. Because mortgage interest rates remained relatively low in the first half of 2011, the majority of newly issued Freddie Mac single-family mortgage-related securities in 2011 were backed by refinance mortgages. During the first half of 2011, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 4.4%, on an annualized basis, as our new issuances have not been sufficient to replace the liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $14.7 billion as of June 30, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1697

Table of Contents

Table 27 presents issuances and extinguishments of debt securities of our consolidated trusts held by third parties during the three and six months ended June 30, 2011 and 2010.

**Table 2J — Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,497,849 | $1,543,062 | $1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate | 36,517 | 53,603 | 98,308 | 122,027 |
| 20-year amortizing fixed-rate | 3,147 | 4,006 | 9,390 | 6,879 |
| 15-year amortizing fixed-rate | 15,648 | 14,170 | 35,514 | 27,377 |
| Adjustable-rate | 6,216 | 3,835 | 11,862 | 5,605 |
| Interest-only | — | 473 | 152 | 757 |
| FHA/VA | — | 1 | 160 | 1,075 |
| Debt securities of consolidated trusts retained by us at issuance | (313) | (481) | (6,658) | (2,791) |
| Net issuances of debt securities of consolidated trusts | 61,215 | 75,607 | 148,728 | 160,929 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 11,977 | 8,449 | 36,553 | 16,360 |
| Total issuances to third parties of debt securities of consolidated trusts | 73,192 | 84,056 | 185,281 | 177,289 |
| Extinguishments, net[3] | (86,625) | (90,169) | (217,866) | (204,433) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,484,416 | $1,536,949 | $1,484,416 | $1,536,949 |

(1) Based on UPB.

(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.

(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of June 30, 2011 and 2010.

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $7.2 billion as of June 30, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in servicer liabilities and accounts payable and accrued expenses during the first half of 2011. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Equity (Deficit)**

Table 28 presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 27 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Six Months Ended |
| --- | --- | --- | --- | --- | --- | --- |
| | 6/30/11 | 03/31/11 | 12/31/10 | 09/30/10 | 6/30/10 | 6/30/11 |
| | (in millions) | | | | | |
| Beginning balance | $ 1,237 | $ (401) | $ (58) | $(1,738) | $(10,525) | $ (401) |
| Net income (loss) | (2,139) | 676 | (113) | (2,511) | (4,713) | (1,463) |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 1,941 | 1,097 | 3,781 | 4,097 | 2,844 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 132 | 153 | 164 | 184 | 267 |
| Changes in defined benefit plans | 1 | (9) | 19 | 2 | 2 | (8) |
| Total comprehensive income (loss) | (1,100) | 2,740 | 1,156 | 1,436 | (430) | 1,640 |
| Capital draw funded by Treasury | — | 500 | 100 | 1,800 | 10,600 | 500 |
| Senior preferred stock dividends declared | (1,617) | (1,605) | (1,603) | (1,561) | (1,293) | (3,222) |
| Other | 2 | 3 | 4 | 5 | (90) | 5 |
| Total equity (deficit) / Net worth | $ (1,478) | $ 1,237 | $ (401) | $ (58) | $ (1,738) | $ (1,478) |
| Aggregate draws under the Purchase Agreement[1] | $ 63,700 | $63,700 | $63,200 | $ 63,100 | $ 61,300 | $ 63,700 |
| Aggregate senior preferred stock dividends paid to Treasury in cash | $13,248 | $11,631 | $10,026 | $ 8,423 | $ 6,862 | $13,248 |
| Percentage of dividends paid to Treasury in cash to aggregate draws | 21% | 18% | 16% | 13% | 11% | 21% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was required.

Net unrealized losses in AOCI on our available-for-sale securities decreased by $0.9 billion and $2.8 billion during the three and six months ended June 30, 2011, respectively, primarily due to fair value gains related to the movement of

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1698

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

non-agency mortgage-related securities with unrealized losses towards maturity and the impact of a decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $135 million and $267 million during the three and six months ended June 30, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

<div align="center">

### RISz MANAGEMENT

</div>

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2010 Annual Report, our Quarterly Report on Form 10-Q for the first quarter of 2011, and in this Form 10-Q for additional information regarding these and other risks.

## Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

### *Institutional Credit Risk*

In recent periods, challenging market conditions adversely affected the liquidity and financial condition of our counterparties. The concentration of our exposure to our counterparties has increased in recent periods due to industry consolidation and counterparty failures. In addition, previously highly-rated mortgage insurers have been downgraded in prior periods due to their weakened financial condition. As a result, we continue to face challenges in reducing our risk concentrations with counterparties. Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties. The failure of any of our primary counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

Our exposure to mortgage seller/servicers remained high during the six months ended June 30, 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a prudent and timely manner.

Our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

### <u>Non-Agency Mortgage-Related Security Issuers</u>

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

<div align="center">48</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict whether and to what extent challenges will be made to the settlement or the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The court has directed that any objections to the settlement be filed no later than August 30, 2011. FHFA, after considering input from us and others, will determine whether or not to object to the proposed settlement.

On July 27, 2011, FHFA announced that it, as conservator of Freddie Mac and Fannie Mae, has filed a lawsuit in the federal district court for the Southern District of New York against UBS Americas, Inc., and related defendants alleging violations of federal securities laws in the sale of residential private-label mortgage-related securities to Freddie Mac and Fannie Mae. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in UBS securities.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and six months ended June 30, 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

### *Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 85% of our single-family purchase volume during the six months ended June 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., Bank of America, N.A. and U.S. Bank, N.A. accounted for 29%, 14%, 11%, and 10% respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume for the six months ended June 30, 2011. For the six months ended June 30, 2011, our top two multifamily lenders, CBRE Capital Markets, Inc., and Berkadia Commercial Mortgage LLC accounted for 21% and 13%, respectively, of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 85% of our multifamily purchase volume for the six months ended June 30, 2011. In July 2011, FHFA informed us that it expects us, going forward, to have in our agreements with sellers the ability to change base guarantee fees upon 90 days notice to sellers, if directed to do so by FHFA.

We have contractual arrangements with our seller/servicers under which they agree to provide us with mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. In addition, we may enter into agreements with certain of our seller/servicers to release specified loans in their servicing portfolios from certain repurchase obligations in exchange for one-time cash payments or seek other remedies with our seller/servicers in the future.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification

<div align="center">49</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages. In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. If a seller/servicer does not satisfy its repurchase or indemnification obligations with respect to a loan, we will be subject to the full range of credit risks posed by the loan if the loan fails to perform, including the risk that a mortgage insurer may deny or rescind coverage on the loan (if the loan is insured) and the risk that we will incur credit losses on the loan through the workout or foreclosure process.

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. The UPB of loans subject to repurchase requests issued to our single-family seller/servicers declined to approximately $3.1 billion as of June 30, 2011 from $3.8 billion as of December 31, 2010, primarily because resolved requests of $6.1 billion exceeded our issuance of $5.4 billion of new requests for the six months ended June 30, 2011. As measured by UPB, approximately 43% and 34% of the repurchase requests outstanding at June 30, 2011 and December 31, 2010, respectively, were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount because many of these requests are likely to be satisfied by reimbursement of our realized losses by seller/servicers, or rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests to also be less than the UPB of the loans. As of June 30, 2011, a significant portion of the repurchase requests outstanding more than four months relates to requests made because the mortgage insurer rescinded the mortgage insurance on the loan or denied the mortgage insurance claim. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During the six months ended June 30, 2011, we recovered amounts that covered losses with respect to $2.4 billion of UPB of loans subject to our repurchase requests. At June 30, 2011 and December 31, 2010, four of our largest single-family seller/servicers collectively had approximately 47% and 32%, respectively, of their repurchase obligations outstanding for more than four months since issuance of our initial repurchase request, as measured by the UPB of loans associated with our repurchase requests. During 2010, we entered into agreements with certain of our seller/servicers to release specified loans in their servicing portfolios from certain repurchase obligations in exchange for one-time cash payments.

In order to resolve outstanding repurchase requests on a more timely basis with our single-family seller/servicers in the future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases, with financial consequences or with stated remedies for non-compliance, as part of the annual renewals of our contracts with them. While these provisions are in place for certain of our seller/servicers, it is too early to tell if these provisions will help in resolving future repurchase requests in a more timely manner or the impact they may have on the size or timing of our credit losses. In addition, we will implement a new monitoring process for our seller/servicers in the third quarter of 2011, which is intended to allow us to better evaluate our servicers and remediate issues concerning performance. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate.

Our estimate of probable incurred losses for exposures to seller/servicer repurchase obligations is considered in our allowance for loan losses as of June 30, 2011 and December 31, 2010; however, our actual losses may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information.

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

TREASURY-1701

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

With the approval of FHFA, as Conservator, we entered into a proposed settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the Bankruptcy Court for the Middle District of Florida on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW, indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. We are also entitled to approximately $203 million on deposit in certain TBW bank accounts relating to our mortgage loans, $150 million of which we received on June 21, 2011 from the FDIC as receiver of Colonial Bank. We are required to assign ownership rights of certain escrow accounts associated with the serviced loans to TBW and certain of its creditors. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. We estimate that during the third quarter of 2011, we will recognize approximately a $0.2 billion gain, representing the difference between the amounts that we assign, or pay, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At June 30, 2011, we estimate our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements to their net realizable value through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of June 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14%, and 12%, respectively, of our single-family mortgage loans, as of June 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally

<div align="center">51</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process"* in our 2010 Annual Report.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. During the first half of 2011, there have been several regulatory developments that have affected and will continue to significantly impact our single-family mortgage servicers. For more information on regulatory and other developments in mortgage servicing, and how these developments may impact our business, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, indemnify us for losses resulting from any breach, or pay damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio.

As of June 30, 2011, our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

### *Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

Table 29 summarizes our exposure to mortgage insurers as of June 30, 2011. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. As of June 30, 2011, most of the coverage outstanding from mortgage insurance shown in Table 29 is attributed to primary policies rather than pool insurance policies.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 29 — Mortgage Insuran8e by Counterparty**

| Counterparty Name | Credit Rating(1) | Credit Rating Outlook(1) | As of cune 30, 2011 | | |
| --- | --- | --- | --- | --- | --- |
| | | | Primary Insuran8e(2) | Pool Insuran8e(2) (in billions) | Coverage Outstanding(3) |
| Mortgage Guaranty Insurance Corporation (MGIC) | B+ | Negative | $  50.9 | $  31.0 | $  13.4 |
| Radian Guaranty Inc. | B+ | Negative | 37.5 | 12.4 | 11.0 |
| Genworth Mortgage Insurance Corporation | BB− | Negative | 32.4 | 0.9 | 8.3 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.5 | 0.3 | 7.0 |
| PMI Mortgage Insurance Co. (PMI) | CCC− | Negative | 26.3 | 2.3 | 6.6 |
| Republic Mortgage Insurance Company (RMIC) | B+ | Negative | 21.8 | 2.2 | 5.5 |
| Triad Guaranty Insurance Corp.(4) | Not rated | N/A | 9.4 | 1.0 | 2.3 |
| CMG Mortgage Insurance Co. | BBB | Negative | 2.9 | 0.1 | 0.7 |
| Total | | | $ 209.7 | $  50.2 | $  54.8 |

(1) Except for PMI and RMIC, latest rating available as of July 22, 2011. PMI's and RMIC's credit rating and credit rating outlook reflect a S&P action on August 4, 2011 and August 1, 2011, respectively. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to extent of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) Beginning on June 1, 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations.

We received proceeds of $1.3 billion and $0.7 billion during the six months ended June 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.4 billion and $1.5 billion as of June 30, 2011 and December 31, 2010, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 11% during the six months ended June 30, 2011, primarily due to payoffs and other liquidation events. We did not purchase pool insurance on single-family loans during the six months ended June 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these policies.

Based on information we received from MGIC, we understand that MGIC may challenge our future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in Table 29. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.5 billion lower than the coverage outstanding amount set forth in Table 29. We expect this difference to increase but not to exceed approximately $0.7 billion.

Four of our mortgage insurers, including RMIC and PMI, have exceeded risk to capital ratios required by their state insurance regulators, and others may exceed regulatory limits in the future. Most, but not all, states have issued waivers to allow the companies to continue writing new business in their states, and Freddie Mac has, in certain circumstances, approved limited purpose affiliates to allow the companies to continue writing business in those states that have not issued waivers. Some of those state regulatory waivers are nearing their expiration dates.

On July 28, 2011, RMIC announced that its waiver of minimum state regulatory capital requirements will expire on August 31, 2011, and that it has not yet obtained necessary approvals to move production of new business to a separately capitalized subsidiary. RMIC stated that it is probable that its new business production will cease, at least temporarily, prior to August 31, 2011. RMIC also stated that, absent approval to underwrite new production through a separately capitalized subsidiary, it is most likely that RMIC's existing book of business would be placed into run off operating mode. We notified RMIC that they were suspended as an approved insurer for Freddie Mac loans effective August 1, 2011.

We evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties have the capacity to pay all claims as they become due in the normal course for the near term, except for claims obligations of Triad that were partially deferred beginning June 1, 2009, under order of Triad's state regulator. To date, Triad's regulatorhas not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so, which would result in the loss of a significant portion of the coverage provided by Triad and indicated in Table 29 above. In addition, we believe that certain of our other mortgage insurance counterparties may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1704

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We believe at least one of our largest servicers entered into arrangements with two of our mortgage insurance counterparties for settlement of future rescission activity for certain mortgage loans. Under such agreements, servicers pay and/or indemnify mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could result in negative financial impacts on our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. It is unclear how widespread this type of agreement between our servicers and mortgage insurers may become or how many loans it may impact.

### Bond Insurers

Most of the non-agency mortgage-related securities we hold rely primarily on subordinated tranches to provide credit loss protection. Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Table 30 presents our coverage amounts of monoline bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a monoline bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

### Table 30 — Monoline Bond Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | June 30, 2011 | |
|---|---|---|---|---|
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not rated | N/A | $   4.4 | 43% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not rated | N/A | 1.9 | 19 |
| MBIA Insurance Corp. | B | Negative | 1.4 | 14 |
| Assured Guaranty Municipal Corp. | AA+ | Stable | 1.2 | 12 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.1 | 11 |
| Syncora Guarantee Inc.[3] | Not rated | N/A | 0.1 | 1 |
| Total | | | $   10.1 | 100% |

(1) Latest ratings available as of July 22, 2011. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.

(3) Neither S&P nor Moody's provide credit ratings for Ambac, FGIC, or Syncora Guarantee Inc., since these companies operate under regulatory supervision at June 30, 2011.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. We expect to receive substantially less than full payment of our claims from FGIC and Ambac due to adverse developments concerning these companies, both of which are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of these bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted, which may result in further impairment losses to be recognized on our investments in securities. We considered our expectations regarding our bond insurers' ability to meet their obligations, including those of Ambac and FGIC, in making our impairment determinations at June 30, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of June 30, 2011 and December 31, 2010, there were $53.4 billion and $91.6 billion, respectively, of cash and other non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1705                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of June 30, 2011, these included:

- $14.4 billion of cash equivalents invested in 32 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $6.0 billion of federal funds sold with four counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $7.1 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-1 or above;

- $19.2 billion of securities purchased under agreements to resell with eight counterparties that had short-term S&P ratings of A-2; and

- $4.9 billion of cash deposited with the Federal Reserve Bank.

*Derivative Counterparties*

We are exposed to institutional credit risk arising from the possibility that a derivative counterparty will not be able to meet its contractual obligations. We are an active user of exchange-traded products, such as Treasury and Eurodollar futures, to reduce our overall exposure to derivative counterparties. Exchange-traded derivatives do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled directly between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at a given date (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities, or a combination of both having that market value necessary to satisfy its net obligation to us under the derivatives (subject to a threshold).

The Dodd-Frank Act will require that, in the future, many types of derivatives be centrally cleared and traded on exchanges or comparable trading facilities. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "LEGISLATIVE AND REGULATORY MATTERS — Dodd-Frank Act" for more information. In addition, we continue to work with the Chicago Mercantile Exchange and other parties to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring and internal analysis of our positions with, and credit rating of, each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. A large number of OTC derivative counterparties have credit ratings below AA–. We require such counterparties to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. Table 31 summarizes our exposure to our derivative counterparties, which represents the net

5 5                                                                                                                              *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (i.e., net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. At June 30, 2011, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2011, which includes both cash collateral held and posted by us, net.

**Table 31 — Derivative Counterparty Credit Exposure**

| | | | | | As of June 30, 2011 |
|---|---|---|---|---|---|
| Rating(1) | Number of Counterparties(2) | Notional or Contractual Amount(3) | Total Exposure at Fair Value(4) (dollars in millions) | Exposure, Net of Collateral(5) | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold(6) |
| AA | 3 | $ 54,831 | $ — | $ — | 5.8 | $10 million or less |
| AA− | 4 | 227,820 | 1,634 | 60 | 6.0 | $10 million or less |
| A+ | 7 | 395,803 | 101 | 40 | 5.3 | $1 million or less |
| A | 3 | 98,758 | 15 | 13 | 6.0 | $1 million or less |
| Subtotal(7) | 17 | 777,212 | 1,750 | 113 | 5.6 | |
| Other derivatives(8) | | 130,613 | — | — | | |
| Commitments(9) | | 34,361 | 121 | 121 | | |
| Swap guarantee derivatives | | 3,733 | — | — | | |
| Total derivatives(10) | | $ 945,919 | $ 1,871 | $ 234 | | |

| | | | | | As of December 31, 2010 |
|---|---|---|---|---|---|
| Rating(1) | Number of Counterparties(2) | Notional or Contractual Amount(3) | Total Exposure at Fair Value(4) (dollars in millions) | Exposure, Net of Collateral(5) | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold(6) |
| AA | 3 | $ 53,975 | $ — | $ — | 6.8 | $10 million or less |
| AA− | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal(7) | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Other derivatives(8) | | 244,640 | — | — | | |
| Commitments(9) | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | 3,614 | — | — | | |
| Total derivatives(10) | | $1,205,496 | $ 2,247 | $ 135 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.
(4) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net) and trade/settle fees.
(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level.
(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.
(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.
(8) Consists primarily of exchange-traded contracts, certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.
(9) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(10) The difference between the exposure, net of collateral column above and derivative assets, net on our consolidated balance sheets primarily represents exchange-traded contracts which are settled daily through a clearinghouse, and thus, do not present counterparty credit exposure.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on June 30, 2011, our uncollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $113 million. Our uncollateralized exposure as of December 31, 2010 was $32 million. Four counterparties each accounted for greater than 10% and collectively accounted for 94% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at June 30, 2011. These

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1707                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

counterparties were Barclays Bank PLC, Deutsche Bank, A.G., UBS A.G., and Goldman Sachs Bank USA, all of which were rated A or higher as of July 22, 2011.

As indicated in Table 31, approximately 94% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at June 30, 2011. The uncollateralized exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

As indicated in Table 31, the total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $121 million and $103 million at June 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### *Mortgage Credit Risk*

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and general economic conditions. All mortgages that we purchase or guarantee have an inherent risk of default.

#### *Single-Family Mortgage Credit Risk*

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. Despite the improvements in underwriting standards and borrower and loan credit characteristics in the past two years, our single-family quality control sampling and review continues to find loans with underwriting deficiencies. We meet with our seller/servicers that have higher than average rates of loans with deficiencies from our sampling to help ensure they make changes appropriate to their underwriting process. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Re; uirements and Quality Control Standards*" in our 2010 Annual Report for information about our charter requirements for single-family loans purchases, delegated underwriting, and our quality control monitoring.

Conditions in the mortgage market continued to remain challenging during the six months ended June 30, 2011. All single-family mortgage loans, especially those originated between 2005 and 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in the first half of 2011 compared to historical levels, primarily due to economic factors which adversely affected borrowers. Also contributing to high serious delinquency rates were: (a) delays related to servicer processing capacity constraints; (b) delays associated with the modification process; and (c) delays caused by concerns about the foreclosure process and other delays imposed by third parties. These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. While still at historically high levels, the UPB of our single-family non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1708                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

performing loans declined during the six months ended June 30, 2011, and the number of loans that transitioned to serious delinquency also declined.

### Characteristics of the Single-Family Credit Guarantee Portfolio

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at June 30, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in the second quarter of 2011 decreased by 18% to $62.9 billion, as compared to $77.0 billion in the second quarter of 2010. Approximately 90% of the single-family mortgages we purchased in the second quarter of 2011 were fixed-rate amortizing mortgages, based on UPB. Approximately 70% and 79% of the single-family mortgages we purchased in the three and six months ended June 30, 2011 were refinance mortgages, including approximately 26% and 28%, respectively, that were relief refinance mortgages, based on UPB.

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers. The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% as of June 30, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of June 30, 2011 and December 31, 2010, respectively. Due to declines in home prices since 2006, we estimate that, as of June 30, 2011, approximately 46% of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of that date had current LTV ratios greater than 100%. In addition, as of June 30, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 721, respectively.

A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of June 30, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 32 provides additional characteristics of single-family mortgage loans purchased during the three and six months ended June 30, 2011 and 2010, and of our single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010.

<div align="center">58</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                          Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 32 — Chara8teristi8s of the Single-Family Credit Guarantee Portfolio[1]**

| | Pur8hases During the Three Months Ended 8une 30, | | Pur8hases During the Si8Months Ended 8une 30, | | Portfolio[2] at | |
|---|---|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** | **8une 30, 2011** | **De8ember 31, 2010** |
| **Original LTV Ratio Range**[3][4] | | | | | | |
| 60% and below | 29% | 28% | 31% | 30% | 23% | 23% |
| Above 60% to 70% | 16 | 16 | 17 | 16 | 16 | 16 |
| Above 70% to 80% | 46 | 48 | 44 | 46 | 43 | 43 |
| Above 80% to 90% | 5 | 5 | 5 | 5 | 9 | 9 |
| Above 90% to 100% | 4 | 3 | 3 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 68% | 68% | 67% | 68% | 71% | 71% |
| **Estimated Current LTV Ratio Range**[5] | | | | | | |
| 60% and below | | | | | 25% | 27% |
| Above 60% to 70% | | | | | 12 | 12 |
| Above 70% to 80% | | | | | 17 | 17 |
| Above 80% to 90% | | | | | 16 | 16 |
| Above 90% to 100% | | | | | 10 | 10 |
| Above 100% to 110% | | | | | 7 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 9 | 8 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages[6] | | | | | 79% | 78% |
| All other mortgages | | | | | 79% | 78% |
| Total mortgages | | | | | 79% | 78% |
| **Credit S8ore**[3][7] | | | | | | |
| 740 and above | 71% | 68% | 73% | 69% | 54% | 53% |
| 700 to 739 | 19 | 20 | 18 | 19 | 21 | 21 |
| 660 to 699 | 8 | 9 | 7 | 9 | 14 | 15 |
| 620 to 659 | 2 | 2 | 2 | 2 | 7 | 7 |
| Less than 620 | <1 | 1 | <1 | 1 | 3 | 3 |
| Not available | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages[6] | 738 | 741 | 742 | 742 | 744 | 745 |
| All other mortgages | 755 | 752 | 757 | 753 | 733 | 732 |
| Total mortgages | 751 | 749 | 753 | 750 | 734 | 733 |
| **Loan Purpose** | | | | | | |
| Purchase | 30% | 29% | 21% | 25% | 30% | 31% |
| Cash-out refinance | 19 | 23 | 19 | 23 | 28 | 29 |
| Other refinance[8] | 51 | 48 | 60 | 52 | 42 | 40 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome[9] | 93% | 93% | 94% | 93% | 92% | 92% |
| Condo/Co-op | 7 | 7 | 6 | 7 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **O88upan8y Type** | | | | | | |
| Primary residence | 89% | 91% | 91% | 92% | 91% | 91% |
| Second/vacation home | 5 | 5 | 4 | 5 | 5 | 5 |
| Investment | 6 | 4 | 5 | 3 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at both June 30, 2011 and December 31, 2010, are excluded from portfolio balance data since these securities are backed by non- Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 35 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) The ending balances of relief refinance mortgages comprised approximately 10% and 7% of our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased in the six months ended June 30, 2011 and 2010 was $206 million and $179 million, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1710          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Attribute Combinations*

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.5 billion and $11.8 billion at June 30, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default.

*Single-Family Mortgage Product Types*

The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity. At both June 30, 2011 and December 31, 2010, interest-only loans represented approximately 5% of the UPB of our single-family credit guarantee portfolio. We discontinued purchasing interest-only loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both June 30, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.9 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at June 30, 2011 and December 31, 2010, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $13.3 billion and $11.0 billion of conforming jumbo loans during the six months ended June 30, 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010 was $46.7 billion and $37.8 billion, respectively. The average size of these loans was approximately $548,000 at both June 30, 2011 and December 31, 2010. Our purchases of conforming jumbo loans will likely decline beginning in the fourth quarter of 2011 if the temporary increase in limits on the size of loans we may purchase expires as scheduled on September 30, 2011. See "LEGISLATIVE AND REGULATORY MATTERS" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO credit scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *"Higher Risk Loans in the Single-Family Credit Guarantee Portfolio"* and "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information).

We estimate that approximately $2.4 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at June 30, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At June 30, 2011 and December 31, 2010, we held $51.5 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 8% and 10% of these securities were investment grade at June 30, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the six months ended June 30, 2011. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $104.0 billion as of June 30, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in the first half of 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of June 30, 2011, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO credit score at origination was 719. Although Alt-A mortgage loans comprised approximately 6% of our single-family credit guarantee portfolio as of June 30, 2011, these loans represented approximately 29% and 30% of our credit losses during the three and six months ended June 30, 2011, respectively. During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. Commencing March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during the six months ended June 30, 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the product became available in 2009 to June 30, 2011, we purchased approximately $13.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $3.2 billion during the six months ended June 30, 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At June 30, 2011 and December 31, 2010, we held investments of $17.8 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 16% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the six months ended June 30, 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1712

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

   Table 33 presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 33 — Certain Higher-Risk[1] Categories in the Single-Family Credit Guarantee Portfolio**

| | As of cune 30, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Per&entage Modified[3] | Serious Delinquen&y Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $ 356.4 | 104% | 6.5% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 104.0 | 104 | 7.4 | 11.7 |
| Interest-only[6] | 82.1 | 117 | 0.4 | 17.7 |
| Option ARM[7] | 9.0 | 118 | 3.4 | 21.6 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 112.5 | 108 | 7.4 | 8.3 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 50.3 | 104 | 0.1 | 0.9 |
| Lower original FICO scores (less than 620)[8] | 58.5 | 92 | 12.2 | 12.5 |

| | As of De&ember 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Per&entage Modified[3] | Serious Delinquen&y Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99 | 5.7 | 12.2 |
| Interest-only[6] | 95.4 | 112 | 0.5 | 18.4 |
| Option ARM[7] | 9.4 | 115 | 3.1 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 117.8 | 105 | 6.3 | 9.1 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 36.5 | 101 | 0.1 | 0.7 |
| Lower original FICO scores (less than 620)[8] | 61.2 | 89 | 10.4 | 13.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) Based on our first lien exposure on the property and excludes secondary financing by third parties, if applicable. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default. For refinance mortgages, the original LTV ratios are based on third-party appraisals used in loan origination, whereas new purchase mortgages are based on the lower of an appraisal or property sales price.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain as such following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain as such following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and use of FICO scores, respectively.

   Loans with one or more of the above attributes comprised approximately 20% of our single-family credit guarantee portfolio as of both June 30, 2011 and December 31, 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 3%, to $356.4 billion as of June 30, 2011 from $368.8 billion as of December 31, 2010. This decline was principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in the first half of 2011. The serious delinquency rates associated with these loans declined to 9.3% as of June 30, 2011 from 10.3% as of December 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1713                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Credit Enhancements

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At June 30, 2011 and December 31, 2010, our credit-enhanced mortgages represented 14% and 15%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

We had recoveries associated with charged-off single-family loans of $1.5 billion and $1.4 billion during the six months ended June 30, 2011 and 2010, respectively, under our primary and pool mortgage insurance policies and other credit enhancements. During the six months ended June 30, 2011, the credit enhancement coverage for new purchases was lower than in periods before 2009, primarily as a result of the high refinance activity during the first half of 2011. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have a LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010.

### Other Credit Risk Management Activities

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio and other loan or borrower characteristics. We announced delivery fee increases in the fourth quarter of 2010 that became effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. These increased fees do not apply to relief refinance mortgages with settlement dates on or after July 1, 2011.

### MHA Program

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include:

#### Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP applies both to delinquent borrowers and to current borrowers at risk of imminent default. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risks — Portfolio Management Activities — MHA Program*" in our 2010 Annual Report for further information on HAMP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1714

Table of Contents

Table 34 presents the number of single-family loans that completed modification or were in trial periods under HAMP as of June 30, 2011 and December 31, 2010.

**Table 34 — Single-Family Home Affordable Modifi8ation Program Volume**(1)

| | As of cune 30, 2011 | | As of De8ember 31, 2010 | |
|---|---|---|---|---|
| | Amount(2) | Number of Loans | Amount(2) | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications(3) | $29,662 | 134,282 | $23,635 | 107,073 |
| Loans in the HAMP trial period | $ 3,460 | 16,106 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.

(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through June 30, 2011 and December 31, 2010, respectively.

As of June 30, 2011, the borrower's monthly payment was reduced on average by an estimated $563, which amounts to an average of $6,756 per year, and a total of $907 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose payments were adjusted below current market levels will have their payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 16,106 as of June 30, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and significantly fewer new borrowers entered into HAMP trial period plans after 2009. Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than 2010, since a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For more information on our HAMP modifications, including redefault rates on these loans, see "*Single-Family Loan Workouts*."

Home Affordable Refinance Program

HARP gives eligible homeowners with loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place.

The relief refinance initiative is our implementation of HARP. HARP is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios of 80% and below to participate. HARP loans may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Through our relief refinance initiative, we offer this refinancing option only for qualifying mortgage loans that we hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The implementation of the relief refinance mortgage product has resulted in a higher volume of purchases and increased delivery fees from the new loans than we would expect in the absence of the program. However, we believe the net effect of the refinance activity on our financial results has not been significant.

TREASURY-1715

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 35 below presents the composition of our purchases of refinanced single-family loans during the six months ended June 30, 2011 and 2010.

**Table 35 — Single-Family Refinan8e Loan Volume**[1]

| | SiKMonths Ended cune 30, 2011 | | | SiKMonths Ended cune 30, 2010 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Per8ent | Amount | Number of Loans | Per8ent |
| | | | (dollars in millions) | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $ 4,638 | 20,072 | 3.3% | $ 1,376 | 5,736 | 1.0% |
| Above 80% to 105% LTV ratio | 18,431 | 85,328 | 14.1 | 18,998 | 81,913 | 13.8 |
| 80% and below LTV ratio | 22,269 | 137,053 | 22.7 | 19,749 | 110,627 | 18.7 |
| Total relief refinance mortgages | $ 45,338 | 242,453 | 40.1% | $ 40,123 | 198,276 | 33.5% |
| Total refinance loan volume[2] | $125,399 | 604,493 | 100% | $122,377 | 591,936 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.

(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 40% and 34%, based on the number of loans, of our total refinance volume during the six months ended June 30, 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios above 80% represented approximately 14% and 12% of our total single-family credit guarantee portfolio purchases, based on UPB, during the six months ended June 30, 2011 and 2010, respectively. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010, respectively.

Home Affordable Foreclosure Alternatives Program

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and ends on December 31, 2012. We began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during the first half of 2011.

Hardest Hit Fund

In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. Based on information provided to us by our seller/servicers, we believe participation in these programs by our borrowers has been limited through June 30, 2011.

*Impact of the MHA Program on Freddie Mac*

As previously discussed, HAMP is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. We believe our overall loss mitigation programs, including efforts outside of the MHA Program, could reduce our ultimate credit losses over the long term. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

The costs we incur related to loan modifications and other activities under HAMP have been, and will likely continue to be, significant for the following reasons:

• Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentive fees and we will not receive a reimbursement of these costs from Treasury. We paid $113 million of servicer and borrower incentive fees during the six months ended June 30, 2011, as compared to $85 million of such fees during the six months ended June 30, 2010. We also have the potential to incur additional servicer incentive fees and borrower incentive fees as long as the borrower remains current on a loan

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1716

Powered by Morningstar® Document Research℠

Table of Contents

modified under HAMP. As of June 30, 2011, we accrued $116 million for both initial fees and recurring incentive fees not yet due.

- Under HAMP, we typically provide concessions to borrowers, including interest rate reductions and forbearance of principal. To the extent borrowers successfully obtain HAMP modifications, we will continue to experience high volumes of TDRs, similar to our experience during 2010 and the six months ended June 30, 2011.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process. If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

- Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

*Single-Family Loan Workouts*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention in seriously delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of seriously delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Workout Activities*" in our 2010 Annual Report for a general description of our loan workouts.

We require our single-family seller/servicers to first evaluate problem loans for possible reinstatement, a repayment plan, or a forbearance agreement before considering a modification under HAMP. If a borrower is not eligible for a modification under HAMP, the borrower is considered for modification under our other loan modification programs. If the borrower is not eligible for any such programs, the loan is considered for other workout options. During the six months ended June 30, 2011, we helped more than 116,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 61,000 foreclosures.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 36 presents volumes of single-family workouts, serious delinquency, and foreclosures for the three and six months ended June 30, 2011 and 2010.

**Table 3/ — Single-Family Loan Workouts, Serious Delinquen8y, and Fore8losure Volumes**[1]

| | Three Months Ended cune 30, | | | | Si6Months Ended cune 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Number of Loans | Loan Balan8es | Number of Loans | Loan Balan8es | Number of Loans | Loan Balan8es | Number of Loans | Loan Balan8es |
|---|---|---|---|---|---|---|---|---|
| | | | | (dollars in millions) | | | | |
| **Home retention actions:** | | | | | | | | |
| Loan modifications[2] | | | | | | | | |
| with no change in terms[3] | 1,058 | $  190 | 1,212 | $  205 | 2,323 | $  409 | 1,949 | $  321 |
| with extension of loan terms | 4,528 | 836 | 5,494 | 940 | 9,808 | 1,797 | 9,455 | 1,597 |
| with reduction of contractual interest rate | 8,720 | 1,942 | 14,261 | 3,202 | 18,085 | 4,076 | 28,175 | 6,244 |
| with rate reduction and term extension | 11,061 | 2,461 | 19,511 | 4,273 | 24,664 | 5,494 | 35,710 | 7,846 |
| with rate reduction, term extension and principal forbearance | 5,682 | 1,520 | 9,084 | 2,373 | 11,327 | 3,025 | 18,501 | 4,838 |
| Total loan modifications[4] | 31,049 | 6,949 | 49,562 | 10,993 | 66,207 | 14,801 | 93,790 | 20,846 |
| Repayment plans[5] | 7,981 | 1,157 | 7,455 | 1,090 | 17,080 | 2,443 | 16,216 | 2,358 |
| Forbearance agreements[6] | 3,709 | 703 | 12,815 | 2,695 | 11,387 | 2,229 | 21,673 | 4,551 |
| Total home retention actions: | 42,739 | 8,809 | 69,832 | 14,778 | 94,674 | 19,473 | 131,679 | 27,755 |
| Foreclosure alternatives: | | | | | | | | |
| Short sale | 10,894 | 2,515 | 9,450 | 2,240 | 21,515 | 5,003 | 16,407 | 3,849 |
| Deed-in-lieu transactions | 144 | 25 | 92 | 15 | 229 | 40 | 199 | 31 |
| Total foreclosure alternatives | 11,038 | 2,540 | 9,542 | 2,255 | 21,744 | 5,043 | 16,606 | 3,880 |
| Total single-family loan workouts | 53,777 | $11,349 | 79,374 | $ 17,033 | 116,418 | $24,516 | 148,285 | $ 31,635 |
| Delinquent loan additions | 87,813 | | 123,175 | | 185,459 | | 274,116 | |
| Single-family foreclosures[7] | 30,139 | | 37,718 | | 61,226 | | 70,019 | |
| Delinquent loans, at period end | 417,457 | | 492,500 | | 417,457 | | 492,500 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).

(2) Includes approximately 24,000 and 40,000 TDRs during the three months ended June 30, 2011 and 2010, respectively, and approximately 51,000 and 67,000 TDRs during the six months ended June 30, 2011 and 2010, respectively.

(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 20,342 and 22,323 borrowers as of June 30, 2011 and 2010, respectively.

(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before a loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, and increases in short sales during the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010, respectively. Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used forbearance in the first half of 2011 and did not use principal reduction in modifying our loans. We bear the costs of these activities, including the cost of any monthly payment reductions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $63 billion as of June 30, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio has been increasing and such loans comprised approximately 2.6% and 2.1% of our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 121% and the serious delinquency rate on these loans was 16% as of June 30, 2011. Table 37 presents the reperformance rate of modified single-family loans in each of the last eight quarterly periods.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1718                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

### Table 3J — Reperforman8e Rates[(1)] of Modified Single-Family Loans

| HAMP loan modifi8ations: | Quarter of Loan Modifi8ation Completion[(2)] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 95% | 94% | 93% | 94% | 95% | 94% | 96% | — |
| 6 to 8 months | | 92 | 92 | 91 | 93 | 93 | 93 | — |
| 9 to 11 months | | | 90 | 89 | 90 | 90 | 92 | — |
| 12 to 14 months | | | | 87 | 88 | 88 | 91 | — |
| 15 to 17 months | | | | | 86 | 86 | 89 | — |
| 18 to 20 months | | | | | | 85 | 87 | — |
| 21 to 23 months | | | | | | | 85 | — |
| 24 to 26 months | | | | | | | | — |

| Non-HAMP loan modifi8ations: | Quarter of Loan Modifi8ation Completion[(2)] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 93% | 94% | 93% | 93% | 94% | 90% | 8 8% | 73% |
| 6 to 8 months | | 89 | 90 | 86 | 87 | 82 | 78 | 64 |
| 9 to 11 months | | | 85 | 82 | 80 | 75 | 71 | 58 |
| 12 to 14 months | | | | 78 | 77 | 69 | 66 | 55 |
| 15 to 17 months | | | | | 74 | 66 | 61 | 51 |
| 18 to 20 months | | | | | | 64 | 59 | 48 |
| 21 to 23 months | | | | | | | 57 | 47 |
| 24 to 26 months | | | | | | | | 46 |

| Total (HAMP and non-HAMP): | Quarter of Loan Modifi8ation Completion[(2)] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 95% | 94% | 93% | 94% | 95% | 92% | 89% | 73% |
| 6 to 8 months | | 90 | 91 | 90 | 92 | 8 8 | 79 | 64 |
| 9 to 11 months | | | 8 8 | 87 | 8 8 | 84 | 72 | 58 |
| 12 to 14 months | | | | 8 5 | 86 | 80 | 67 | 55 |
| 15 to 17 months | | | | | 84 | 78 | 62 | 51 |
| 18 to 20 months | | | | | | 76 | 61 | 48 |
| 21 to 23 months | | | | | | | 59 | 47 |
| 24 to 26 months | | | | | | | | 46 |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes those loan modification activities for which the borrower has started the required process, but the modification has not been made permanent, or effective, such as loans in the trial period under HAMP.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications. In the second quarter of 2011, we revised the calculation of reperformance rates to better account for remodified loans, or those where a borrower has received a second modification. The revised calculation reflects the status of each modification separately. In the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of June 30, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during 2010, 2009, and 2008 was 14%, 46%, and 65%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of June 30, 2011, the redefault rate for loans modified under HAMP in 2010 and 2009 was approximately 12% and 15%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in 2010, 2009, and 2008, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. These standards will provide for earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications, and consistent timelines for processing foreclosures. These standards will result in the alignment of our processes for both HAMP and non-HAMP workouts, and will be implemented over the course of 2011 and into 2012.

*Freddie Mac*

TREASURY-1719

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Under these new servicing standards, servicers will be subject to incentives and compensatory fee assessments with respect to servicer performance. These incentives will likely result in our payment of increased fees to our seller/servicers, but these fees will be at least partially mitigated by compensatory fees paid to us by our servicers that do not perform as required.

We anticipate implementing the new non-HAMP modification initiative beginning in the fourth quarter of 2011. This initiative will require a three month trial period for our new non-HAMP modifications. Consequently, we expect to experience a temporary decline in completed modification volume, as many borrowers will be in the process of completing the trial period of this non-HAMP modification initiative. This new modification program is expected to result in a higher volume of modifications where we partially forbear principal until the borrower sells the home or refinances or pays off the mortgage. In addition, the new modification initiative will allow for a change of contractual interest rates to a current market rate whereas, our previous initiative allowed for reduction of contractual interest rates to as low as 2%.

*Delin; uencies*

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our seller/servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. Single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on these securities by the U.S. government.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under many of our non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications have impacted our reported serious delinquency rate. As discussed above in "Single-Family Loan Workouts," we anticipate implementing a new non-HAMP loan modification initiative that will include a trial period comparable to that of our HAMP modification initiative. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, and general constraints on servicer capacity caused loans to remain in seriously delinquent status for longer periods than prior to 2008, before such actions and delays arose. This has caused our single-family serious delinquency rates to be higher in recent periods than they otherwise would have been. Delays in foreclosure relating to the concerns about the foreclosure process have also had a similar effect on our single-family serious delinquency rates. As of June 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 72% and 66%, respectively.

Table 38 presents delinquency rates for our single-family credit guarantee portfolio.

**Table 37 — Single-Family Serious Delinquen8y Rates**

| | As of cune 30, 2011 | | As of De&mber 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Per8entage of Portfolio | Serious Delinquen8y Rate | Per8entage of Portfolio | Serious Delinquen8y Rate |
| Single-family: | | | | |
| Non-credit-enhanced | 86% | 2.75% | 85% | 3.01% |
| Credit-enhanced | 14 | 7.67 | 15 | 8.27 |
| Total single-family credit guarantee portfolio(1) | 100% | 3.50 | 100% | 3.84 |

(1) As of June 30, 2011 and December 31, 2010, approximately 67% and 61%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

69                                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Serious delinquency rates of our single-family credit guarantee portfolio declined slightly to 3.50% as of June 30, 2011 from 3.84% as of December 31, 2010. Serious delinquency rates for interest-only and option ARM products, which together represented approximately 5% of our total single-family credit guarantee portfolio at June 30, 2011, were 17.7% and 21.6%, respectively, at June 30, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, which is a more traditional mortgage product, were approximately 3.7% and 4.0% at June 30, 2011, and December 31, 2010, respectively. The slight improvement in the single-family serious delinquency rate during the second quarter of 2011 was primarily due to a continued high volume of loan modifications, significant volumes of foreclosure transfers, and a slowdown in new serious delinquencies. Although the volume of new serious delinquencies declined in each of the past several quarters, our serious delinquency rate remains high, reflecting continued stress in the housing and labor markets.

In certain states our single-family serious delinquency rates have remained persistently high. As of June 30, 2011, single-family loans in Arizona, California, Florida, and Nevada comprised 26% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.3%. During the six months ended June 30, 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

<div align="center">70</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 39 presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 39 — Credit Con8entrations in the Single-Family Credit Guarantee Portfolio**

| | As of cune 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Per8entage Modified(2) | Serious Delinquen8y Rate |
| | | (in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 43 | $   416 | $   459 | 92% | 4.1% | 6.3% |
| All other states | 61 | 1,285 | 1,346 | 75 | 2.2 | 2.7 |
| Year of origination: | | | | | | |
| 2011 | — | 105 | 105 | 70 | — | <0.1 |
| 2010 | — | 361 | 361 | 71 | <0.1 | 0.1 |
| 2009 | <1 | 366 | 366 | 72 | 0.1 | 0.3 |
| 2008 | 9 | 131 | 140 | 90 | 3.4 | 4.9 |
| 2007 | 32 | 154 | 186 | 110 | 8.5 | 11.0 |
| 2006 | 28 | 111 | 139 | 109 | 7.7 | 10.3 |
| 2005 | 19 | 140 | 159 | 95 | 4.2 | 6.0 |
| 2004 and prior | 16 | 333 | 349 | 60 | 2.1 | 2.5 |

| | As of cune 30, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Per8entage Modified(2) | Serious Delinquen8y Rate |
| | | (in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 53 | $   421 | $   474 | 82% | 2.3% | 7.6% |
| All other states | 80 | 1,316 | 1,396 | 70 | 1.4 | 3.0 |
| Year of origination: | | | | | | |
| 2010 | — | 122 | 122 | 68 | — | <0.1 |
| 2009 | <1 | 452 | 452 | 66 | <0.1 | 0.1 |
| 2008 | 11 | 188 | 199 | 79 | 1.2 | 4.1 |
| 2007 | 41 | 200 | 241 | 95 | 4.1 | 11.0 |
| 2006 | 36 | 146 | 182 | 95 | 3.8 | 9.9 |
| 2005 | 24 | 183 | 207 | 83 | 2.1 | 5.7 |
| 2004 and prior | 21 | 446 | 467 | 54 | 1.2 | 2.3 |

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | (in millions) | |
| **Credit Losses** | | | | |
| Geographical distribution: | | | | |
| Arizona, California, Florida, and Nevada | $1,967 | $2,445 | $ 3,951 | $ 4,192 |
| All other states | 1,139 | 1,406 | 2,381 | 2,566 |
| Year of origination: | | | | |
| 2011 | — | — | — | — |
| 2010 | — | — | — | — |
| 2009 | 35 | 9 | 67 | 14 |
| 2008 | 233 | 232 | 484 | 389 |
| 2007 | 1,139 | 1,325 | 2,315 | 2,277 |
| 2006 | 899 | 1,189 | 1,830 | 2,053 |
| 2005 | 534 | 767 | 1,104 | 1,419 |
| 2004 and prior | 266 | 329 | 532 | 606 |

(1) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.
(2) Represents the percentage of loans, based on loan count in our single-family credit guarantee portfolio, that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

71

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011       TREASURY-1722       Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 40 presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010.

## Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations

| | As of June 30, 2011 | | | | | | | | |
| | Current LTV Ratio[1] < 70 | | Current LTV Ratio[1] of 71-100 | | Current LTV Ratio[1] x 100 | | Current LTV Ratio[1] All Loans | | |
| | Percentage of Portfolio[2] | Serious Delinquency[2] Rate | Percentage of Portfolio[2] | Serious Delinquency[2] Rate | Percentage of Portfolio[2] | Serious Delinquency[2] Rate | Percentage of Portfolio[1] | Percentage Modified[3] | Serious Delinquency[1] Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 0.9% | 7.6% | 0.8% | 12.6% | 1.0% | 23.3% | 2.7% | 15.1% | 13.6% |
| 15-year amortizing fixed rate | 0.2 | 4.2 | <0.1 | 10.7 | <0.1 | 18.2 | 0.2 | 1.9 | 4.8 |
| ARMs/adjustable rate[4] | 0.1 | 11.2 | <0.1 | 16.9 | <0.1 | 25.3 | 0.1 | 8.9 | 15.7 |
| Interest-only[5] | <0.1 | 16.2 | <0.1 | 22.6 | 0.1 | 36.6 | 0.1 | 0.7 | 31.3 |
| Other[6] | <0.1 | 3.1 | <0.1 | 7.4 | 0.1 | 11.6 | 0.1 | 3.7 | 4.9 |
| Total FICO scores < 620 | 1.2 | 6.7 | 0.8 | 12.8 | 1.2 | 23.8 | 3.2 | 12.2 | 12.5 |
| FICO scores of 620 to 659 | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 2.0 | 4.8 | 1.6 | 8.3 | 2.0 | 17.6 | 5.6 | 10.1 | 9.5 |
| 15-year amortizing fixed rate | 0.6 | 2.5 | <0.1 | 6.4 | <0.1 | 14.2 | 0.6 | 1.0 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.4 | 0.1 | 11.8 | 0.1 | 24.0 | 0.3 | 1.5 | 12.9 |
| Interest-only[5] | <0.1 | 10.1 | 0.1 | 18.7 | 0.3 | 32.6 | 0.4 | 0.7 | 27.5 |
| Other[6] | <0.1 | 2.0 | <0.1 | 4.8 | <0.1 | 4.9 | <0.1 | 1.2 | 3.9 |
| Total FICO scores of 620 to 659 | 2.7 | 4.1 | 1.8 | 8.7 | 2.4 | 18.9 | 6.9 | 8.0 | 9.1 |
| FICO scores ≥ 660 | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 34.6 | 0.9 | 20.8 | 2.2 | 12.3 | 8.9 | 67.7 | 2.4 | 2.6 |
| 15-year amortizing fixed rate | 12.6 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 13.8 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.0 | 1.3 | 0.9 | 4.6 | 0.8 | 15.4 | 3.7 | 0.4 | 5.1 |
| Interest-only[5] | 0.5 | 3.4 | 0.9 | 9.2 | 2.6 | 21.3 | 4.4 | 0.3 | 16.2 |
| Other[6] | <0.1 | 1.7 | <0.1 | 1.5 | 0.1 | 1.4 | 0.1 | 0.4 | 1.4 |
| Total FICO scores ≥ 660 | 49.7 | 0.7 | 23.6 | 2.5 | 16.0 | 10.7 | 89.3 | 1.7 | 2.5 |
| FICO scores not available | 0.3 | 4.2 | 0.2 | 11.1 | 0.1 | 20.2 | 0.6 | 4.9 | 8.5 |
| All FICO scores | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 37.8 | 1.4 | 23.2 | 3.2 | 15.3 | 11.1 | 76.3 | 3.6 | 3.7 |
| 15-year amortizing fixed rate | 13.3 | 0.6 | 1.1 | 1.6 | 0.2 | 7.2 | 14.6 | 0.2 | 0.7 |
| ARMs/adjustable rate[4] | 2.2 | 2.0 | 1.0 | 5.9 | 1.0 | 17.0 | 4.2 | 0.8 | 6.0 |
| Interest-only[5] | 0.5 | 4.2 | 1.0 | 10.5 | 3.0 | 22.9 | 4.5 | 0.4 | 17.7 |
| Other[6] | 0.1 | 7.7 | 0.1 | 8.5 | 0.2 | 6.5 | 0.4 | 6.1 | 7.5 |
| Total Single-family Credit Guarantee Portfolio[7] | 53.9% | 1.2% | 26.4% | 3.4% | 19.7% | 12.7% | 100.0% | 2.6% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.0% | 0.2% | 11.4% | 0.2% | 19.4% | 0.6% | 12.4% | 11.7% |
| Northeast | 0.4 | 8.7 | 0.2 | 17.5 | 0.3 | 27.1 | 0.9 | 12.8 | 13.7 |
| Southeast | 0.2 | 7.4 | 0.2 | 13.2 | 0.3 | 28.7 | 0.7 | 12.6 | 15.2 |
| Southwest | 0.2 | 5.1 | 0.1 | 10.1 | 0.1 | 19.1 | 0.4 | 8.7 | 7.8 |
| West | 0.2 | 4.7 | 0.1 | 10.3 | 0.3 | 21.5 | 0.6 | 14.7 | 12.8 |
| Total FICO scores < 620 | 1.2 | 6.7 | 0.8 | 12.8 | 1.2 | 23.8 | 3.2 | 12.2 | 12.5 |
| FICO scores of 620 to 659 | | | | | | | | | |
| North Central | 0.4 | 3.7 | 0.4 | 7.9 | 0.5 | 14.3 | 1.3 | 7.8 | 8.1 |
| Northeast | 0.9 | 5.1 | 0.5 | 12.0 | 0.4 | 21.6 | 1.8 | 7.9 | 9.3 |
| Southeast | 0.5 | 4.9 | 0.3 | 9.6 | 0.6 | 23.5 | 1.4 | 8.1 | 11.7 |
| Southwest | 0.5 | 3.0 | 0.3 | 6.6 | 0.1 | 12.3 | 0.9 | 5.3 | 4.9 |
| West | 0.4 | 3.1 | 0.3 | 7.2 | 0.8 | 18.9 | 1.5 | 10.6 | 10.4 |
| Total FICO scores of 620 to 659 | 2.7 | 4.1 | 1.8 | 8.7 | 2.4 | 18.9 | 6.9 | 8.0 | 9.1 |
| FICO scores ≥ 660 | | | | | | | | | |
| North Central | 8.1 | 0.6 | 5.0 | 2.1 | 3.0 | 6.8 | 16.1 | 1.4 | 1.9 |
| Northeast | 14.7 | 0.9 | 5.8 | 3.7 | 1.9 | 11.6 | 22.4 | 1.4 | 2.1 |
| Southeast | 7.0 | 1.1 | 4.1 | 2.7 | 3.8 | 14.1 | 14.9 | 1.8 | 4.1 |
| Southwest | 7.1 | 0.6 | 3.0 | 1.8 | 0.4 | 5.7 | 10.5 | 0.8 | 1.1 |
| West | 12.8 | 0.5 | 5.7 | 1.9 | 6.9 | 10.9 | 25.4 | 2.6 | 3.2 |
| Total FICO scores ≥ 660 | 49.7 | 0.7 | 23.6 | 2.5 | 16.0 | 10.7 | 89.3 | 1.7 | 2.5 |
| FICO scores not available | 0.3 | 4.2 | 0.2 | 11.1 | 0.1 | 20.2 | 0.6 | 4.9 | 8.5 |
| All FICO scores | | | | | | | | | |
| North Central | 8.7 | 1.0 | 5.6 | 3.0 | 3.8 | 8.8 | 18.1 | 2.4 | 2.8 |
| Northeast | 16.1 | 1.5 | 6.5 | 5.0 | 2.5 | 14.5 | 25.1 | 2.4 | 3.1 |
| Southeast | 7.7 | 1.7 | 4.7 | 3.8 | 4.8 | 16.5 | 17.2 | 3.0 | 5.4 |
| Southwest | 7.9 | 1.0 | 3.5 | 2.8 | 0.6 | 8.6 | 12.0 | 1.7 | 1.8 |
| West | 13.5 | 0.7 | 6.1 | 2.4 | 8.0 | 12.2 | 27.6 | 3.4 | 3.8 |
| Total Single-family Credit Guarantee Portfolio[7] | 53.9% | 1.2% | 26.4% | 3.4% | 19.7% | 12.7% | 100.0% | 2.6% | 3.5% |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1723

| | Current LTV Ratio(1) ≤ 70 | | Current LTV Ratio(1) of 71-100 | | Current LTV Ratio(1) x 100 | | Current LTV Ratio(1) All Loans | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15- year amortizing fixed rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate(4) | 0.1 | 12.2 | <0.1 | 18.4 | <0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest-only(5) | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.0 | 0.2 | 0.9 | 33.3 |
| Other(6) | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15- year amortizing fixed rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 14.6 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate(4) | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest-only(5) | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other(6) | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 4.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores ≥ 660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15- year amortizing fixed rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate(4) | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest-only(5) | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other(6) | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 40.2 | 1.6 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15- year amortizing fixed rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate(4) | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 8.7 |
| Interest-only(5) | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other(6) | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total Single-family Credit Guarantee Portfolio(7) | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region(8)** | | | | | | | | | |
| FICO scores <620: | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.6 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores ≥ 660: | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.6 | 4.4 | 1.5 | 12.0 | 22.1 | 1.1 | 2.1 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.4 | 9.0 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total Single-family Credit Guarantee Portfolio(7) | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.
(2) Based on UPB of the single-family credit guarantee portfolio.
(3) See endnote (2) to "Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio."
(4) Includes balloon/resets and option ARM mortgage loans.
(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.
(6) Consist of FHA/VA and other government guaranteed mortgages.
(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.
(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC,MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

73

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 41 presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 41 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of June 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| Year of Loan Origination | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) |
| 2011 | 6% | 0.01% | —% | —% | —% | —% |
| 2010 | 20 | 0.12 | 0.01 | 18 | 0.05 | — |
| 2009 | 20 | 0.34 | 0.09 | 21 | 0.26 | 0.04 |
| 2008 | 8 | 4.94 | 1.72 | 9 | 4.89 | 1.26 |
| 2007 | 10 | 11.04 | 6.19 | 11 | 11.63 | 4.92 |
| 2006 | 8 | 10.28 | 5.99 | 9 | 10.46 | 5.00 |
| 2005 | 9 | 6.01 | 3.51 | 10 | 6.04 | 2.95 |
| 2004 and prior(2) | 19 | 2.49 | 0.96 | 22 | 2.46 | 0.88 |
| Total | 100% | 3.50% | | 100% | 3.84% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to June 30, 2011 and December 31, 2010, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

(2) The foreclosure and short sale rate for "2004 and prior" represents the rate associated with loans originated from 2000 to 2004.

At June 30, 2011, approximately 35% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated during these years experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of decreasing home sales and broadly declining home prices in the period shortly following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

The UPB of loans originated after 2008 comprised 46% of our portfolio as of June 30, 2011. Approximately 93% of the loans we purchased in our single-family credit guarantee portfolio during the six months ended June 30, 2011 were amortizing fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and geographical areas, is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan duration. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011            TREASURY-1725            Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 42 provides certain attributes of our multifamily mortgage portfolio at June 30, 2011 and December 31, 2010.

**Table 42 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB(1) at | | Delinquen8y Rate(2) at | |
|---|---|---|---|---|
| | cune 30, 2011 | De8ember 31, 2010 | cune 30, 2011 | De8ember 31, 2010 |
| Original LTV Ratio(3) | (dollars in billions) | | | |
| Below 75% | $ 74.7 | $ 72.0 | 0.19% | 0.08% |
| 75% to 80% | 29.5 | 29.8 | 0.15 | 0.24 |
| Above 80% | 6.5 | 6.6 | 2.45 | 2.30 |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| | | | | |
| Maturity Dates | | | | |
| 2011 | $ 1.0 | $ 2.3 | 2.65% | 0.97% |
| 2012 | 3.8 | 4.1 | 0.20 | 0.82 |
| 2013 | 6.3 | 6.8 | 0.98 | — |
| 2014 | 8.2 | 8.5 | 0.03 | 0.02 |
| 2015 | 11.7 | 12.0 | 0.14 | 0.09 |
| Beyond 2015 | 79.7 | 74.7 | 0.29 | 0.29 |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |
| | | | | |
| Year of A8quisition or Guarantee(4) | | | | |
| 2004 and prior | $ 14.4 | $ 15.9 | 0.33% | 0.31% |
| 2005 | 7.6 | 7.9 | — | — |
| 2006 | 11.1 | 11.6 | 0.33 | 0.25 |
| 2007 | 20.5 | 20.8 | 0.92 | 0.97 |
| 2008 | 22.1 | 23.0 | 0.33 | 0.03 |
| 2009 | 14.7 | 15.2 | — | — |
| 2010 | 13.1 | 14.0 | — | — |
| 2011 | 7.2 | N/A | — | N/A |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |
| | | | | |
| Current Loan Si8e Distribution | | | | |
| Above $25 million | $ 39.9 | $ 39.6 | 0.22% | 0.07% |
| Above $5 million to $25 million | 61.4 | 59.4 | 0.34 | 0.38 |
| $5 million and below | 9.4 | 9.4 | 0.50 | 0.37 |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |
| | | | | |
| Legal Stru8ure | | | | |
| Unsecuritized loans | $81.8 | $ 85.9 | 0.18% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 19.3 | 12.8 | 0.89 | 1.30 |
| Other guarantee commitments | 9.6 | 9.7 | 0.23 | 0.23 |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |
| Credit Enhan8ement | | | | |
| Credit-enhanced | $ 27.2 | $ 20.9 | 0.70% | 0.85% |
| Non-credit-enhanced | 83.5 | 87.5 | 0.19 | 0.12 |
| Total | $110.7 | $ 108.4 | 0.31% | 0.26% |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) See *"Delin; uencies"* below for more information about our multifamily delinquency rates.

(3) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(4) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. As of June 30, 2011 and December 31, 2010, approximately 83% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable-rates.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1726

Because most multifamily loans require a significant lump sum payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for lenders. Although property values have increased in recent quarters, in some instances they are still well below the highs of a few years ago and are lower than when the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. As of June 30, 2011, approximately 90% of UPB in our multifamily mortgage portfolio matures in 2014 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications and extensions of loans are performed in an effort to minimize our losses and maximize our returns. During the first half of 2011, we extended and modified unsecuritized multifamily loans totaling $170 million in UPB, compared with $301 million during the six months ended June 30, 2010. Multifamily unsecuritized loan modifications during the first half of 2011 included: (a) $32 million in UPB for short-term loan extensions; and (b) $138 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At June 30, 2011, we had $988 million of multifamily loan UPB classified as TDRs on our consolidated balance sheets, all of which were current.

*Delin; uencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loan UPB had been granted forbearance and were not included in the delinquency rate statistics. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many loans in these states that are non-performing, or we believe are at risk of default. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our multifamily mortgage portfolio delinquency rate increased to 0.31% at June 30, 2011 from 0.26% at December 31, 2010. Our delinquency rate for credit-enhanced loans was 0.70% and 0.85% at June 30, 2011 and December 31, 2010, respectively, and for non-credit-enhanced loans was 0.19% and 0.12% at June 30, 2011 and December 31, 2010, respectively. As of June 30, 2011, more than one-half of our multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of June 30, 2011 and December 31, 2010.

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due or if the loan is in the process of foreclosure during the three and six months ended June 30, 2011.

We classify TDRs as those loans we modified and granted the borrower a concession. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 43 provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 43 — Non-Performing Assets**[1]

| | June 30, 2011 | As of December 31, 2010 | June 30, 2010 |
|---|---|---|---|
| | | (dollars in millions) | |
| Non-performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming, or less than three monthly payments past due | $ 36,243 | $ 26,612 | $ 15,470 |
| Seriously delinquent | 3,884 | 3,144 | 1,836 |
| Multifamily TDRs[2] | 988 | 911 | 351 |
| Total TDRs | 41,115 | 30,667 | 17,657 |
| Other single-family non-performing loans[3] | 73,397 | 84,272 | 92,788 |
| Other multifamily non-performing loans[4] | 1,901 | 1,750 | 1,451 |
| Total non-performing mortgage loans — on balance sheet | 116,413 | 116,689 | 111,896 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,295 | 1,450 | 1,664 |
| Multifamily loans | 221 | 198 | 157 |
| Total non-performing mortgage loans — off-balance sheet | 1,516 | 1,648 | 1,821 |
| Real estate owned, net | 5,932 | 7,068 | 6,298 |
| Total non-performing assets | $123,861 | $ 125,405 | $ 120,015 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 33.2% | 33.7% | 33.7% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.4% | 6.4% | 6.0% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of June 30, 2011, all multifamily loans classified as TDRs were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans purchased from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.6 billion, and $1.4 billion of UPB were current at June 30, 2011, December 31, 2010, and June 30, 2010, respectively.

The amount of non-performing assets declined to $123.9 billion as of June 30, 2011, from $125.4 billion at December 31, 2010, primarily due to a decline in the rate at which loans transitioned into serious delinquency. Although declining, our serious delinquency rate has remained high compared to historical levels due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in processing large volumes of problem loans. The UPB of loans categorized as TDRs increased to $41.1 billion at June 30, 2011 from $30.7 billion at December 31, 2010, largely due to a continued high volume of loan modifications during the six months ended June 30, 2011 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes. TDRs during the second quarter of 2011 include HAMP and non-HAMP loan modifications. In recent periods, our non-HAMP modifications comprised a greater portion of our loan modification volume and the volume of HAMP modifications declined. We expect this trend to continue in the remainder of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels during the remainder of 2011.

Table 44 provides detail by region for REO activity. Our REO activity relates almost entirely to single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1728

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

## Table 44 — REO A8tivity by Region[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (number of properties) | | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 65,174 | 53,839 | 72,093 | 45,052 |
| Adjustment to beginning balance[2] | — | — | — | 1,340 |
| Properties acquired by region: | | | | |
| Northeast | 1,921 | 3,086 | 3,406 | 5,730 |
| Southeast | 5,131 | 9,594 | 9,865 | 17,628 |
| North Central | 6,405 | 8,119 | 12,780 | 15,318 |
| Southwest | 3,388 | 3,601 | 6,501 | 6,691 |
| West | 7,954 | 10,267 | 16,956 | 18,716 |
| Total properties acquired | 24,799 | 34,667 | 49,508 | 64,083 |
| Properties disposed by region: | | | | |
| Northeast | (2,427) | (2,230) | (5,088) | (4,142) |
| Southeast | (7,540) | (6,874) | (16,754) | (12,136) |
| North Central | (6,801) | (5,938) | (14,093) | (10,835) |
| Southwest | (3,539) | (2,812) | (7,019) | (5,144) |
| West | (9,048) | (8,462) | (18,029) | (16,028) |
| Total properties disposed | (29,355) | (26,316) | (60,983) | (48,285) |
| Ending property inventory | 60,618 | 62,190 | 60,618 | 62,190 |

(1) See endnote (8) to "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

Our REO property inventory declined 16% from December 31, 2010 to June 30, 2011, primarily due to a decline in the volume of single-family foreclosures caused by temporary delays in the foreclosure process, including delays related to concerns about the foreclosure process, combined with continued strong levels of REO disposition activity during the period. Due to temporary suspensions, delays and other factors, the average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years. The nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 498 days and 451 days for foreclosures completed during the three months ended June 30, 2011 and 2010, respectively.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process in the remainder of 2011. However, we expect the volume of our REO acquisitions will likely remain elevated, in part due to the resumption earlier in the year of foreclosure activity by servicers following the temporary suspensions over concerns about documentation practices. We have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. This inventory of seriously delinquent loans arose due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, temporary suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Our single-family REO acquisitions during the six months ended June 30, 2011 were most significant in the states of California, Michigan, Arizona, Georgia, and Florida. The state with the most properties in our REO inventory is California. At June 30, 2011, our REO inventory in California comprised 13% of total REO property inventory, based on the number of properties.

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. This generally extends our holding period for up to three additional months. As of June 30, 2011 and December 31, 2010, approximately 33% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the holding period to increase. Primarily for these reasons,

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1729

the average holding period of our REO property increased in recent periods, though it varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our REO dispositions during the six months ended June 30, 2011 and 2010 was 193 days and 151 days, respectively. As of June 30, 2011 and December 31, 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.3% and 3.4%, respectively. We continue to actively market these properties through our established initiatives. All of these factors have resulted in an increase in the aging of our inventory.

The composition of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 5% and 6%, respectively, at June 30, 2011 and was 9% on a combined basis. The percentage of our REO acquisitions in the six months ended June 30, 2011 that had been secured by either of these loan types represented approximately 32% of our total REO acquisitions, based on loan amount prior to acquisition.

*Credit Loss Performance*

Many loans that are seriously delinquent or in foreclosure result in credit losses. Table 45 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 45 — Credit Loss Performan8e**

| | Three Months Ended cune 30, | | SikMonths Ended cune 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| REO | | | | |
| REO balances, net: | | | | |
| Single-family | $5,834 | $6,228 | $ 5,834 | $ 6,228 |
| Multifamily | 98 | 70 | 98 | 70 |
| Total | $ 5,932 | $6,298 | $ 5,932 | $ 6,298 |
| REO operations (income) expense: | | | | |
| Single-family | $ 35 | $ (41) | $ 292 | $ 115 |
| Multifamily | (8) | 1 | (8) | 4 |
| Total | $ 27 | $ (40) | $ 284 | $ 119 |
| Charge-offs | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.8 billion, $4.5 billion, $7.3 billion, and $7.8 billion relating to loan loss reserves, respectively) | $3,871 | $4,664 | $ 7,524 | $ 8,031 |
| Recoveries[2] | (800) | (772) | (1,484) | (1,388) |
| Single-family, net | $ 3,071 | $3,892 | $ 6,040 | $ 6,643 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $29 million, $27 million, $41 million, and $45 million relating to loan loss reserves, respectively) | $ 29 | $ 27 | $ 41 | $ 45 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 29 | $ 27 | $ 41 | $ 45 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.8 billion, $4.5 billion, $7.4 billion, and $7.8 billion relating to loan loss reserves, respectively) | $ 3,900 | $ 4,691 | $ 7,565 | $ 8,076 |
| Recoveries [2] | (800) | (772) | (1,484) | (1,388) |
| Total Charge-offs, net | $ 3,100 | $3,919 | $ 6,081 | $ 6,688 |
| Credit losses[3] | | | | |
| Single-family | $ 3,106 | $3,851 | $ 6,332 | $ 6,758 |
| Multifamily | 21 | 28 | 33 | 49 |
| Total | $ 3,127 | $3,879 | $ 6,365 | $ 6,807 |
| Total (in bps)[4] | 64.9 | 78.6 | 66.0 | 68.9 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

79 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We record charge-offs at the time we take ownership of a property through foreclosure. We expect our credit losses to remain elevated in the remainder of 2011, as our short sale and REO acquisition volumes will likely remain high, due to high levels of seriously delinquent loans and pending foreclosures, and because market conditions, such as home prices and the rate of home sales, continue to remain weak. Suspensions and delays of foreclosure transfers, including as a result of concerns about the foreclosure process, and imposed delays by regulatory or governmental agencies have caused delays in the timing of our recognition of credit losses and may continue to do so in the future.

Single-family charge-offs, gross, for the three and six months ended June 30, 2011 were $3.9 billion and $7.5 billion, respectively, compared to $4.7 billion and $8.0 billion for the three and six months ended June 30, 2010, respectively. Our charge-offs in the three and six months ended June 30, 2011 remained elevated, but reflects suppression of activity due to delays in the foreclosure process. We believe that the level of our charge-offs will remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. Our credit losses during the three months ended June 30, 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada and Arizona. California accounted for 16% of loans in our single-family credit guarantee portfolio as of June 30, 2011, and comprised approximately 32% of our total credit losses in both the three and six months ended June 30, 2011. In addition, although Alt-A loans comprised approximately 6% of our single-family credit guarantee portfolio at both June 30, 2011 and December 31, 2010, respectively, these loans accounted for approximately 29% and 30% of our credit losses for the three and six months ended June 30, 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. As shown in Table 46 below, our quarterly credit risk sensitivity estimates have increased in recent periods primarily due to declines in home prices during the last year.

**Table 4/ — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements(1) | | After Receipt of Credit Enhancements(2) | |
| | NPV(3) | NPV Ratio(4) | NPV(3) | NPV Ratio(4) |
|---|---|---|---|---|
| | | (dollars in millions) | | |
| At: | | | | |
| June 30, 2011 | $10,203 | 56.5 bps | $ 9,417 | 52.2 bps |
| March 31, 2011 | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $ 9,926 | 54.9 bps | $ 9,053 | 50.0 bps |
| September 30, 2010 | $ 9,099 | 49.5 bps | $8,187 | 44.6 bps |
| June 30, 2010 | $ 8,327 | 44.5 bps | $ 7,445 | 39.8 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We may face increased operational risk due to the requirement that we and Fannie Mae align certain single-family mortgage servicing practices for non-performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. The large scope of change required by this alignment will require significant management effort and attention. See "Credit Risk — *Mortgage Credit Risk — Single-family Mortgage*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1731          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Credit Risk — Single-Family Loan Workouts"* for more information. There also have been a number of other regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. The servicing model for single-family mortgages may face further significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices" for more information.

Our risks related to employee retention are high. We have experienced elevated levels of voluntary turnover, and expect this to be the case for the remainder of 2011 as the public debate regarding the future role of the GSEs continues. This has led to concerns about staffing inadequacies and management depth. A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President — Single-Family Credit Guarantee, our Executive Vice President — Investments and Capital Markets and Treasurer, our Executive Vice President — Multifamily, our Senior Vice President — Operations & Technology, and our Executive Vice President — General Counsel & Corporate Secretary. In addition, our Executive Vice President — Chief Credit Officer will be leaving the company in October 2011. Because we maintain succession plans for our senior management positions, we have been able to fill most of these senior management positions quickly, or have eliminated them through reorganizations. However, disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions, and we merged our Credit Management division into our Enterprise Risk Management division. Over time, we expect these changes will improve our overall risk profile. However, in the near term, these changes could increase our operational risk.

Management, including the company's Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of June 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC trusts. For more information on our liquidity needs and liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2010 Annual Report.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth, however, no cash was received from Treasury during the second quarter of 2011 due to our positive net worth at March 31, 2011.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

TREASURY-1732

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. This could adversely affect our liquidity, and the supply and cost of debt financing available to us. For more information, see *"Other Debt Securities — Credit Ratings."*

Recently we changed the composition of our portfolio of liquid assets by decreasing our holdings of short-term Treasury securities and money funds and increasing our holdings of cash and overnight investments given the recent market concerns about the potential for a downgrade in the credit rating of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our li;uidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government."*

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. In the second quarter of 2011, we revised our liquidity management practices and policies such that they no longer require us to maintain a back-up core portfolio of liquid non-mortgage-related securities with a market value of $10 billion. This requirement was no longer deemed to be necessary due to improvements in our ability to forecast cash flows. Our remaining liquidity management policies remain in effect, including the requirement to maintain sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Li;uidity Management*" in our 2010 Annual Report.

Throughout the second quarter of 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs are invested in short-term assets with a rating of A-1/P-1 or AAA or are issued by a counterparty with that rating. In the event of a downgrade of a position or a counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our business may be adversely affected by limited availability of financing and increased funding costs"* in our 2010 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount

<div align="center">82</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at June 30, 2011, our aggregate funding received from Treasury under the Purchase Agreement will increase to $65.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. In addition, we are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below.

For more information on these actions, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2010 Annual Report and "RISK FACTORS" in this Form 10-Q.

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on June 30, 2011 at the direction of our Conservator. Through June 30, 2011, we paid aggregate cash dividends to Treasury of $13.2 billion, an amount equal to 21% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury has waived the fee for the first three quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and six months ended June 30, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 28% of outstanding other debt at both June 30, 2011 and December 31, 2010 as compared to 27% at March 31, 2011.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $972 billion in 2011. As of June 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $695.2 billion, which was approximately $276.8 billion below the debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1734                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

*Other Debt Issuance Activities*

Table 47 summarizes the par value of other debt securities we issued, based on settlement dates, during the three and six months ended June 30, 2011 and 2010.

**Table 4J — Other Debt Se8urity Issuan8es by Produ8t, at Par Value**[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $ 104,200 | $ 103,331 | $ 208,046 | $256,934 |
| Medium-term notes — non-callable[2] | 250 | 565 | 450 | 1,065 |
| Total other short-term debt | 104,450 | 103,896 | 208,496 | 257,999 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 33,246 | 62,975 | 71,047 | 126,696 |
| Medium-term notes — non-callable | 18,482 | 23,958 | 47,657 | 51,200 |
| U.S. dollar Reference Notes® securities — non-callable | 8,000 | 7,000 | 18,000 | 17,500 |
| Total other long-term debt | 59,728 | 93,933 | 136,704 | 195,396 |
| Total other debt issued | $164,178 | $197,829 | $ 345,200 | $453,395 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $250 million and $565 million of medium-term notes — non-callable issued for the three months ended June 30, 2011 and 2010, respectively, which were accounted for as debt exchanges. For the six months ended June 30, 2011 and 2010, there were $0.5 billion and $1.1 billion accounted for as debt exchanges, respectively.

*Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

Table 48 provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and six months ended June 30, 2011 and 2010.

**Table 47 — Other Debt Se8urity Repur8hases, Calls, and EK8hanges**[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Repurchases of outstanding €Reference Notes® securities | $ — | $ 192 | $ — | $ 262 |
| Repurchases of outstanding medium-term notes | 1,030 | 4,054 | 3,768 | 4,054 |
| Calls of callable medium-term notes | 45,697 | 81,560 | 85,532 | 138,734 |
| Exchanges of medium-term notes | 250 | 565 | 450 | 1,065 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. Table 49 indicates our credit ratings as of August 8, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1735

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 49 — Freddie Ma8 Credit Ratings**

| | Nationally Re8ogni˃ed Statisti8al Rating Organi˃ation | | |
|---|---|---|---|
| | **S&P** | **Moody's** | **Fit8h** |
| Senior long-term debt(1) | AA+/Negative | Aaa/Negative | AAA |
| Short-term debt(2) | A-1+ | P-1 | F1+ |
| Subordinated debt(3) | A/Negative | Aa2/Negative | AA– |
| Preferred stock(4) | C | Ca | C/RR6 |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

Earlier this year, given concerns that the U.S. government's statutory debt limit would not be raised in a timely manner as well as uncertainty about achievement of a credible deficit reduction solution, certain major credit rating agencies took actions on the U.S. government's credit ratings. Due to the support we receive from Treasury, these rating agencies also took corresponding actions on certain of our credit ratings. On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in further rating actions on our debt ratings and the ratings of the U.S. government.

- On July 15, 2011, S&P placed our senior long-term debt and short-term debt on CreditWatch with negative implications. This action followed S&P's placement of the long-term and short-term credit ratings of the United States on CreditWatch with negative implications on July 14, 2011. S&P subsequently lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+" on August 5, 2011. S&P removed both the short- and long-term ratings of the U.S. government from CreditWatch negative and assigned a negative outlook to the long-term credit rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

- On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the rating. Our debt ratings, as well as the long-term credit rating of the U.S. government, had previously been placed on review for possible downgrade on July 13, 2011.

For information about the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our li; uidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government.*"

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### *Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities*

Excluding amounts related to our consolidated VIEs, we held $56.7 billion in the aggregate of cash and cash equivalents, federal funds sold, securities purchased under agreements to resell, and non-mortgage-related securities at June 30, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At June 30, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities.*"

### *Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1736                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for more information

## Cash Flows

Our cash and cash equivalents decreased approximately $19.5 billion to $17.5 billion during the six months ended June 30, 2011. Cash flows provided by operating activities during the six months ended June 30, 2011 were $7.8 billion, primarily driven by net interest income and net sales of multifamily held-for-sale mortgage loans. Cash flows provided by investing activities during the six months ended June 30, 2011 were $181.8 billion, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the six months ended June 30, 2011 were $209.1 billion, largely attributable to net repayments of debt securities of consolidated trusts held by third parties.

Our cash and cash equivalents decreased approximately $15.0 billion to $49.7 billion during the six months ended June 30, 2010. Cash flows provided by operating activities during the six months ended June 30, 2010 were $6.6 billion, primarily driven by net interest income and net sales of multifamily held-for-sale mortgage loans. Cash flows provided by investing activities during the six months ended June 30, 2010 were $133.9 billion, primarily resulting from net proceeds received on held-for-investment mortgage loans as we had more repayments of held-for-investment mortgage loans compared to purchases. Cash flows used for financing activities for the six months ended June 30, 2010 were $155.5 billion, largely attributable to repayments of debt securities of consolidated trusts held by third parties, net of proceeds from the issuance of debt securities of consolidated trusts held by third parties.

## Capital Resour8es

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2010 Annual Report for additional information on mandatory receivership. See also "RISK FACTORS — *If Treasury is unable to provide us with funding re; uested under the Purchase Agreement to address a deficit in our net worth, FHFA could be re; uired to place us into receivership.*"

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests under the Purchase Agreement with Treasury.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair-value losses recorded in earnings or AOCI; required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; adverse changes to our funding costs and limited availability of financing; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or guidance; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission-related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock,*" "BUSINESS — Executive Summary — *Long-Term Financial Sustainability and Future Status*" and "RISK FACTORS" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FAIR VALUE MEASUREMENTS AND ANALYSIS

## Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2010 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgments regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary due to changes in market conditions. In making our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 fair value measurements (*i.e.*, valued using significant inputs that are unobservable) primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. The market for non-agency mortgage-related securities continued to be illiquid during the second quarter of 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of the processes they use to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Fair Value Measurements — *Controls over Fair Value Measurement*" in our 2010 Annual Report for information on our validation processes.

Table 50 below summarizes our assets and liabilities measured at fair value on a recurring basis at June 30, 2011 and December 31, 2010.

## Table 50 — Summary of Assets and Liabilities at Fair Value on a Re8urring Basis

| | cune 30, 2011 | | De8ember 31, 2010 | |
|---|---|---|---|---|
| | Total GAAP Re8urring Fair Value | Per8entage in Level 3 | Total GAAP Re8urring Fair Value | Per8entage in Level 3 |
| | | (dollars in millions) | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $ 222,849 | 29% | $232,634 | 30% |
| Trading, at fair value | 54,764 | 6 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 4,463 | 100 | 6,413 | 100 |
| Derivative assets, net[1] | 246 | — | 143 | — |
| Other assets: | | | | |
| Guarantee assets, at fair value | 667 | 100 | 541 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $282,989 | 24 | $299,993 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 3,998 | —% | $ 4,443 | —% |
| Derivative liabilities, net[1] | 408 | 2 | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis[1] | $ 4,406 | 1 | $ 5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1738

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Changes in Level 3 Recurring Fair Value Measurements

At June 30, 2011 and December 31, 2010, we measured and recorded at fair value on a recurring basis $72.8 billion and $79.8 billion, respectively, or approximately 24% and 25% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at June 30, 2011 primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. At June 30, 2011 and December 31, 2010, we also measured and recorded at fair value on a recurring basis Level 3 derivative liabilities of $0.4 billion and $0.8 billion, or 1% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting.

During the three and six months ended June 30, 2011, the fair value of our Level 3 assets decreased by $5.0 billion and $7.0 billion, respectively, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, the fair value of our investments in non-agency mortgage-related securities also decreased from the widening of OAS levels on these securities during the second quarter of 2011. During the three and six months ended June 30, 2011, we had a net transfer into Level 3 assets of $12 million and $160 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "RISK MANAGEMENT — Credit Risk" and "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 18: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in this Form 10-Q and our 2010 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2010 Annual Report for information concerning the risks associated with these models.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 18: FAIR VALUE DISCLOSURES" in this Form 10-Q for more information on fair values.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1739                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Discussion of Fair Value Results

Table 51 summarizes the change in the fair value of net assets for the six months ended June 30, 2011 and 2010.

**Table 51 — Summary of Change in the Fair Value of Net Assets**

|  | Six Months Ended June 30, | |
|---|---|---|
|  | **2011** | **2010** |
|  | (in billions) | |
| Beginning balance | $(58.6) | $(62.5) |
| Changes in fair value of net assets, before capital transactions | (1.7) | 8.2 |
| Capital transactions: | | |
| Dividends and share issuances, net(1) | (2.7) | 8.0 |
| Ending balance | $ (63.0) | $(46.3) |

(1) Includes the funds received from Treasury of $0.5 billion and $10.6 billion for the six months ended June 30, 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the six months ended June 30, 2011, the fair value of net assets, before capital transactions, decreased by $1.7 billion, compared to an $8.2 billion increase during the six months ended June 30, 2010. The decrease in the fair value of net assets, before capital transactions, was primarily due to a decrease in the fair value of our single-family loans due to a decline in forecasted home prices (on a seasonally adjusted basis) and a continued weak credit environment, as well as a decrease in the fair value of our investments in mortgage-related securities from the widening of OAS levels on our non-agency securities. The decrease in fair value was partially offset by an increase in fair value from a tightening of OAS levels on our agency and CMBS securities and high core spread income.

During the six months ended June 30, 2010, the increase in the fair value of net assets, before capital transactions, was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by the tightening of the OAS levels of agency mortgage-related securities and CMBS. The fair value of net assets was also positively impacted by higher than previously expected home prices (on a seasonally adjusted basis) and an increase in prepayment speeds on our PC debt securities. The increase in fair value was partially offset by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a decrease in our fair value measurement of mortgage loans, as well as an increase in the risk premium related to our single-family loans in the continued weak credit environment.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

### OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Se8uriti>ation A8tivities and Other Guarantee Commitments

We have off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities. As of June 30, 2011, our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $51.9 billion and $43.9 billion at June 30, 2011 and December 31, 2010, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we

TREASURY-1740

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report and "NOTE 9: FINANCIAL GUARANTEES" in this Form 10-Q for more information on our off-balance sheet securitization arrangements.

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

**Other Agreements**

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate on our balance sheets in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $241.7 billion, and $220.7 billion in notional value at June 30, 2011 and December 31, 2010, respectively.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2010 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOz ING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program and other programs to assist the U.S. residential mortgage market, the servicing alignment initiative, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS"

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sections of this Form 10-Q, our 2010 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2011, and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Obama Administration's plan to reform the housing finance system, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the extent to which borrowers participate in the MHA Program, modification efforts under the servicing alignment initiative, and other initiatives designed to help in the housing recovery and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit and retain executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

<div align="center">91</div>

<div align="right">*Freddie Mac*</div>

<div align="center">TREASURY-1742</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage-related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages or adjustable-rate mortgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q, in our 2010 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2011;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISz MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports. For the six months ended June 30, 2011, our duration gap averaged zero months, PMVS-L averaged $433 million and PMVS-YC averaged $23 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity.*"

92 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# LEGISLATIVE AND REGULATORY MATTERS

**Obama Administration Report on Reforming the U.S. Housing Finan&e Market**

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

**Legislation Related to Reforming Freddie Ma8 and Fannie Mae**

Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae. In the Senate, a comprehensive bill on the future state of Freddie Mac and Fannie Mae was introduced in March, but has yet to be scheduled for consideration. Under this bill, 24 months after the date of enactment, the Director of FHFA would be required to determine the financial viability of each company, based on standards for the appointment of a receiver for an enterprise under the GSE Act. If Freddie Mac or Fannie Mae were determined not to be financially viable, FHFA would immediately be appointed as receiver. If Freddie Mac or Fannie Mae were determined to be financially viable, the company's charter would be revoked after an additional three-year period and the company would be wound down over a subsequent ten-year period.

In the House, Congress continues to debate the approach to the long-term future of housing finance including the role of Freddie Mac and Fannie Mae. Several bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae while other bills take a more targeted approach that would impact the companies' operations.

The comprehensive bills include the House companion to the Senate bill, as well as two additional bills that were introduced in the second quarter of 2011. One bill would wind down and place Freddie Mac and Fannie Mae into receivership no later than one year after the time when FHFA has chartered five or more newly created, privately capitalized, federally chartered entities. Freddie Mac and Fannie Mae's role in the secondary market would be replaced by these entities which would, as secondary mortgage market participants, purchase conventional mortgage loans, issue mortgage-related securities, and sell the mortgage-related securities in the capital markets. The other bill would require the Secretary of the Treasury, in consultation with FHFA, to develop a plan to wind down Freddie Mac and Fannie Mae within 36 months and establish a Federal Secondary Market Facility for Residential Mortgages. The Facility would operate as a government instrumentality of the federal government but without capital stock.

In addition, the House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises approved a number of bills affecting Freddie Mac and Fannie Mae's operations that, among other things, would require advance approval by the Secretary of the Treasury and notice to Congress for all debt issuances by the companies; require FHFA to direct the companies to increase guarantee fees; repeal our affordable housing goals; prohibit the companies from initially offering new products during conservatorship or receivership; accelerate reductions in our mortgage-related investments portfolio; require that Freddie Mac and Fannie Mae mortgages be treated the same as other mortgages for

<div style="text-align: center;">93</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

Table of Contents

purposes of risk retention requirements in the Dodd-Frank Act; grant the FHFA Inspector General direct access to our records and employees; place all Freddie Mac and Fannie Mae employees on the federal government pay scale; authorize FHFA, as receiver, to revoke the charters of Freddie Mac and Fannie Mae; prevent the Department of the Treasury from lowering the dividend payment under the Purchase Agreement; abolish the Affordable Housing Trust Fund, the Capital Magnet Fund, and the HOPE Reserve Fund; require disposition of non-mission critical assets; apply the Freedom of Information Act to Freddie Mac and Fannie Mae; and set a cap on the funds received under the Purchase Agreement.

We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however, we cannot predict whether or when any such legislation will be enacted. Some of the bills discussed above, if enacted, would materially affect the role of the company, our business model and our structure, and could have an adverse effect on our financial results and operations as well as our ability to retain and recruit management and other valuable employees. Under several of the bills, our charter would be revoked and/or we would be wound down or placed into receivership. Such legislation could impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and ongoing liabilities by the U.S. government. A number of the other bills would adversely affect our ability to conduct business under our current business model, including by subjecting us to new requirements that could increase costs, reduce revenues and limit or prohibit current business activities.

### Dodd-Frank A8t

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has and will directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

At this time, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry. Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Developments since the first quarter of 2011 with respect to rulemakings that may have a significant impact on Freddie Mac include actions taken by the CFTC and SEC to defer most Dodd-Frank Act requirements regulating swaps and security-based swaps that would otherwise have gone into effect on July 16, 2011.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2010 Annual Report.

### Conforming Loan Limits

On September 30, 2010, Congress temporarily extended the current higher loan limits in certain high-cost areas through September 30, 2011. Actual conforming loan limits are established by FHFA for each county (or equivalent) and the loan limits for specific high-cost areas may be lower than the maximum amounts. The report that the Obama Administration delivered to Congress on February 11, 2011 recommends that Congress allow the temporary increase in loan limits to expire as scheduled on September 30, 2011. If Congress allows the temporary high-cost area loan limits to expire, the permanent high-cost area loan limits set out in the Reform Act will apply. Certain of the bills discussed above in "Legislation Related to Reforming Freddie Mac and Fannie Mae" would also terminate the permanent high-cost area loan limits entirely. Legislation has been introduced that would extend the current temporary loan limits.

### Prudential Management and Operations Standards

On June 20, 2011, FHFA published a proposed rule that would establish prudential standards, in the form of guidelines, relating to the management and operations of Freddie Mac, Fannie Mae, and the FHLBs (the "Standards"). This proposed rule implements the Housing and Economic Recovery Act amendments to the GSE Act. The proposed Standards address a number of business, controls, and risk management areas. The Standards specify the possible consequences for any entity that fails to meet any of the Standards or otherwise fails to comply (including submission of a

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1745                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

corrective plan, limits on asset growth, increases in capital, limits on dividends and stock redemptions or repurchases, a minimum level of retained earnings or any other action that the FHFA Director determines will contribute to bringing the entity into compliance with the Standards). In addition, a failure to meet any Standard also may constitute an unsafe or unsound practice, which may form the basis for FHFA initiating an administrative enforcement action. Because FHFA proposes to adopt the Standards as guidelines, as authorized by the Housing and Economic Recovery Act, FHFA may modify, revoke or add to the Standards at any time by order.

**Conservatorship and Re&eivership Rule**

On June 20, 2011, FHFA published a final rule that addresses conservatorship and receivership operations of Freddie Mac, Fannie Mae and the FHLBs. The final rule establishes a framework to be used by FHFA when acting as conservator or receiver, supplementing and clarifying statutory authorities. Among other provisions, the final rule indicates that FHFA will not permit payment of securities litigation claims during conservatorship and that claims by current or former shareholders arising as a result of their status as shareholders would receive the lowest priority of claim in receivership. In addition, the final rule indicates that administrative expenses of the conservatorship will also be deemed to be administrative expenses of a subsequent receivership and that capital distributions may not be made during conservatorship, except as specified in the final rule.

**Developments Con8erning Single-Family Servi8ing Pra8ti8es**

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below. These developments have caused delays in the foreclosure process for single-family mortgages, which have caused the volume of our single-family REO acquisitions to be less than it otherwise would have been. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. The regulatory developments and changes include the following:

- On April 13, 2011, the OCC, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with 14 large servicers regarding their foreclosure and loss mitigation practices. These institutions service the majority of the single-family mortgages we own or guarantee. The consent orders require the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and communications with borrowers. We will not be able to assess the impact of these actions on our business until the servicers' comprehensive action plans are publicly available.

- On June 30, 2011, the OCC issued Supervisory Guidance regarding the OCC's expectations for the oversight and management of mortgage foreclosure activities by national banks. The Supervisory Guidance contains several elements from the consent orders with the 14 major servicers that will now be applied to all national banks. In the Supervisory Guidance, the OCC directs all national banks to conduct a self-assessment of foreclosure management practices by September 30, 2011. Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing guidelines contained in the consent orders. During Congressional testimony on July 7, 2011, an OCC official indicated that there is an active interagency effort under way to develop comprehensive, nationally applicable mortgage servicing standards, and that this effort involves federal bank regulatory agencies, HUD and FHFA.

- A group consisting of state attorneys general and state bank and mortgage regulators is in discussions with a number of large seller/servicers concerning a global settlement of certain issues related to mortgage servicing practices. It has been reported that this settlement could include changes to mortgage servicing practices.

- On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed by Freddie Mac and Fannie Mae. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts.*" FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1746

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

servicing compensation. The development of further alternatives could impact our ability to conduct current initiatives.

- On July 21, 2011, new MERS membership rules with respect to the foreclosure of mortgages registered on the MERS System were adopted. Subject to certain limited exceptions, these rules require the assignment of a mortgage out of MERS' name prior to the initiation of foreclosure or certain other legal proceedings. This may further extend Freddie Mac's foreclosure timelines.

For more information on operational risks related to these developments in mortgage servicing, see "RISK MANAGEMENT — Operational Risks."

<div align="center">96</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARz ETRISz

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for more information on our exposure to interest-rate and other market risks, including our use of derivatives as part of our efforts to manage certain of these risks.

*PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. We do not actively manage overall basis risk, also referred to as mortgage-to-debt OAS risk or spread risk, arising from funding mortgage-related assets with our debt securities. Recently our agency-to-swap basis risk exposure has increased due to the increased use of floating rate debt. Agency-to-swap basis risk impacts the debt component of our mortgage-to-debt OAS risk. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six-month duration and liabilities with a five-month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets approximates the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity resulting from a 1% change in interest rates.

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it is more difficult to measure and manage the interest rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding foreclosures, loan modification, and the volatility and impact of home price movements on mortgage durations. Mis-estimation of prepayments could result in hedging-related losses.

*Duration Gap and PMVS Results*

Table 52 provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three and six months ended June 30, 2011 and 2010. Table 52 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve.

97

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Accordingly, as shown in Table 52, the PMVS-L results based on a 100 basis point shift in the LIBOR curve are disproportionately higher at June 30, 2011, than the PMVS-L results based on a 50 basis point shift in the LIBOR curve.

**Table 52 — PMVS Results**

| | PMVS-YC | PMVS-L | |
| --- | --- | --- | --- |
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| June 30, 2011 | $ 35 | $ 434 | $ 1,607 |
| December 31, 2010 | $ 35 | $588 | $1,884 |

| | Three Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | 0.1 | $ 25 | $ 419 | 0.0 | $ 23 | $ 415 |
| Minimum | (0.2) | $ 4 | $ 288 | (0.6) | $ — | $ 156 |
| Maximum | 0.6 | $ 58 | $ 558 | 0.5 | $ 64 | $ 606 |
| Standard deviation | 0.2 | $ 13 | $ 62 | 0.2 | $ 16 | $ 92 |

| | Six Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $ 23 | $ 433 | 0.0 | $ 21 | $ 445 |
| Minimum | (1.0) | $ — | $ 280 | (0.7) | $ — | $ 156 |
| Maximum | 0.6 | $ 58 | $ 721 | 0.7 | $ 64 | $ 668 |
| Standard deviation | 0.3 | $ 13 | $ 84 | 0.3 | $ 16 | $ 92 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 53 shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

**Table 53 — Derivative Impact on PMVS-L (50 bps)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
| --- | --- | --- | --- |
| | | (in millions) | |
| At: | | | |
| June 30, 2011 | $3,688 | $ 434 | $(3,254) |
| December 31, 2010 | $ 3,614 | $ 588 | $ (3,026) |

The disclosure in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1749

Table of Contents

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Dis8losure Controls and Pro8edures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms and that such information is accumulated and communicated to senior management, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of June 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continued weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship. As noted below, we also consider this situation to be a continuing material weakness in our internal control over financial reporting.

**Changes in Internal Control Over Finan8ial Reporting During the Quarter Ended cune 30, 2011**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended June 30, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A number of senior officers have left the company since March 31, 2011, including Donald J. Bisenius, Executive Vice President — Single-Family Credit Guarantee, Peter J. Federico, Executive Vice President — Investments and Capital Markets and Treasurer, Michael C. May, Executive Vice President — Multifamily, Joseph A. Rossi, Senior Vice President — Operations & Technology, and Robert E. Bostrom, Executive Vice President — General Counsel & Corporate Secretary. In addition, Raymond G. Romano, Executive Vice President — Chief Credit Officer will be leaving the company in October 2011. Because we maintain succession plans for our senior management positions, we have been able to fill many of these senior management positions quickly, or have eliminated them through reorganizations. However, disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions, and we merged our Credit Management division into our Enterprise Risk Management division. Over time, we expect these changes will improve our overall risk profile. However, in the near term, these changes could increase our operational risk.

**Mitigating A8tions Related to the Material Weakness in Internal Control Over Finan8ial Reporting**

We have not remediated the material weakness in internal control over financial reporting related to our disclosure controls and procedures as of June 30, 2011. Given the structural nature of this continued weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

• FHFA has established the Office of Conservator Affairs, which is intended to facilitate operation of the company with the oversight of the Conservator.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1750

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures.

In view of our mitigating actions related to the material weakness, we believe that our interim consolidated financial statements for the quarter ended June 30, 2011 have been prepared in conformity with GAAP.

<div align="center">100</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 1. FINANCIAL STATEMENTS

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | *(in millions, except share-related amounts)* | | | |
| **Interest income** | | | | |
| Mortgage loans: | | | | |
| Held by consolidated trusts | $ 19,782 | $ 22,114 | $ 39,846 | $ 44,846 |
| Unsecuritized | 2,274 | 2,179 | 4,608 | 4,140 |
| *Total mortgage loans* | 22,056 | 24,293 | 44,454 | 48,986 |
| Investments in securities | 3,275 | 3,574 | 6,558 | 7,473 |
| Other | 18 | 34 | 52 | 67 |
| *Total interest income* | 25,349 | 27,901 | 51,064 | 56,526 |
| **Interest expense** | | | | |
| Debt securities of consolidated trusts | (17,261) | (19,048) | (34,664) | (38,691) |
| Other debt | (3,333) | (4,468) | (6,898) | (9,067) |
| *Total interest expense* | (20,594) | (23,516) | (41,562) | (47,758) |
| Expense related to derivatives | (194) | (249) | (401) | (507) |
| **Net interest income** | 4,561 | 4,136 | 9,101 | 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| **Net interest income (loss) after provision for credit losses** | 2,032 | (893) | 4,583 | (2,164) |
| **Non-interest income (loss)** | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (125) | 4 | 98 | (94) |
| Gains (losses) on retirement of other debt | 3 | (141) | 15 | (179) |
| Gains (losses) on debt recorded at fair value | (37) | 544 | (118) | 891 |
| Derivative gains (losses) | (3,807) | (3,838) | (4,234) | (8,523) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (230) | (114) | (1,284) | (531) |
| Portion of other-than-temporary impairment recognized in AOCI | (122) | (314) | (261) | (407) |
| Net impairment of available-for-sale securities recognized in earnings | (352) | (428) | (1,545) | (938) |
| Other gains (losses) on investment securities recognized in earnings | 209 | (257) | 89 | (673) |
| Other income | 252 | 489 | 586 | 1,035 |
| **Non-interest income (loss)** | (3,857) | (3,627) | (5,109) | (8,481) |
| **Non-interest expense** | | | | |
| Salaries and employee benefits | (219) | (230) | (426) | (464) |
| Professional services | (64) | (67) | (120) | (148) |
| Occupancy expense | (15) | (15) | (30) | (31) |
| Other administrative expenses | (86) | (92) | (169) | (166) |
| Total administrative expenses | (384) | (404) | (745) | (809) |
| Real estate owned operations (expense) income | (27) | 40 | (284) | (119) |
| Other expenses | (135) | (115) | (214) | (218) |
| **Non-interest expense** | (546) | (479) | (1,243) | (1,146) |
| Loss before income tax benefit | (2,371) | (4,999) | (1,769) | (11,791) |
| Income tax benefit | 232 | 286 | 306 | 389 |
| **Net loss** | (2,139) | (4,713) | (1,463) | (11,402) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 4,097 | 2,844 | 8,743 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 184 | 267 | 356 |
| Changes in defined benefit plans | 1 | 2 | (8) | (8) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,039 | 4,283 | 3,103 | 9,091 |
| Comprehensive income (loss) | (1,100) | (430) | 1,640 | (2,311) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| **Total comprehensive income (loss) attributable to Freddie Mac** | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |
| **Net loss** | $ (2,139) | $ (4,713) | $ (1,463) | $ (11,402) |
| Less: Net loss attributable to noncontrolling interest | — | — | — | 1 |
| *Net loss attributable to Freddie Mac* | (2,139) | (4,713) | (1,463) | (11,401) |
| Preferred stock dividends | (1,617) | (1,296) | (3,222) | (2,588) |
| *Net loss attributable to common stockholders* | $ (3,756) | $ (6,009) | $ (4,685) | $ (13,989) |
| Loss per common share: | | | | |
| Basic | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |
| Diluted | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |
| Weighted average common shares outstanding (in thousands): | | | | |
| Basic | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Diluted | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |

*The accompanying notes are an integral part of these consolidated financial statements.*

102

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1754

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past performance is no guarantee of future results.

# FREDDIE MAC
# CONSOLIDATED BALANCE SHEETS
# (UNAUDITED)

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $1, respectively, related to our consolidated VIEs) | $ 17,488 | $ 37,012 |
| Restricted cash and cash equivalents (includes $1,850 and $7,514, respectively, related to our consolidated VIEs) | 2,333 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $13,950 and $29,350, respectively, related to our consolidated VIEs) | 33,609 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $244 and $817, respectively, pledged as collateral that may be repledged) | 222,849 | 232,634 |
| Trading, at fair value | 54,764 | 60,262 |
| Total investments in securities | 277,613 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $8,948 and $11,644, respectively) | 1,634,773 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $29,919 and $28,047, respectively) | 198,568 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,833,341 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $4,463 and $6,413 at fair value, respectively) | 4,463 | 6,413 |
| Total mortgage loans, net | 1,837,804 | 1,844,895 |
| Accrued interest receivable (includes $6,704 and $6,895, respectively, related to our consolidated VIEs) | 8,523 | 8,713 |
| Derivative assets, net | 246 | 143 |
| Real estate owned, net (includes $83 and $118, respectively, related to our consolidated VIEs) | 5,932 | 7,068 |
| Deferred tax assets, net | 3,866 | 5,543 |
| Other assets (Note 21) (includes $3,252 and $6,001, respectively, related to our consolidated VIEs) | 8,381 | 10,875 |
| Total assets | $2,195,795 | $ 2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $6,241 and $6,502, respectively, related to our consolidated VIEs) | $ 9,542 | $ 10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other debt (includes $3,998 and $4,443 at fair value, respectively) | 681,087 | 713,940 |
| Total debt, net | 2,180,123 | 2,242,588 |
| Derivative liabilities, net | 408 | 1,209 |
| Other liabilities (Note 21) (includes $3,821 and $3,851, respectively, related to our consolidated VIEs) | 7,200 | 8,098 |
| Total liabilities | 2,197,273 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 19) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 64,700 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,706,712 shares and 649,179,789 shares outstanding, respectively | — | — |
| Additional paid-in capital | 1 | 7 |
| Retained earnings (accumulated deficit) | (67,449) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,195 and $10,740, respectively, net of taxes, of other-than-temporary impairments) | (6,834) | (9,678) |
| Cash flow hedge relationships | (1,972) | (2,239) |
| Defined benefit plans | (122) | (114) |
| Total AOCI, net of taxes | (8,928) | (12,031) |
| Treasury stock, at cost, 76,157,174 shares and 76,684,097 shares, respectively | (3,911) | (3,953) |
| Total equity (deficit) | (1,478) | (401) |
| Total liabilities and equity (deficit) | $2,195,795 | $ 2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

TREASURY-1755

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)**
**(UNAUDITED)**

| | Shares Outstanding | | | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred Stock | Preferred Stock | Common Stock | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
| | | | | | | (in millions) | | | | | | |
| **Balance as of December 31, 2009** | 1 | 464 | 649 | $ 51,700 | $ 14,109 | $ — | $ 57 | $ (33,921) | $ (23,648) | $ (4,019) | $ 94 | $ 4,372 |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | (9,011) | (2,690) | — | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| Comprehensive income (loss): | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (11,401) | — | — | (1) | (11,402) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 9,091 | — | — | 9,091 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (11,401) | 9,091 | — | (1) | (2,311) |
| Increase in liquidation preference | — | — | — | 10,600 | — | — | — | — | — | — | — | 10,600 |
| Stock-based compensation | — | — | — | — | — | — | 15 | — | — | — | — | 15 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (65) | — | — | 64 | — | (1) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (31) | — | — | — | (89) | (120) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 23 | (23) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (2,585) | — | — | — | (2,585) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (4) | — | — | — | (4) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at June 30, 2010** | 1 | 464 | 649 | $ 62,300 | $ 14,109 | $ — | $ — | $ (56,945) | $ (17,247) | $ (3,955) | $ — | $ (1,738) |
| | | | | | | | | | | | | |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $ 64,200 | $ 14,109 | $ — | $ 7 | $ (62,733) | $ (12,031) | $ (3,953) | $ — | $ (401) |
| Comprehensive income (loss): | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (1,463) | — | — | — | (1,463) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 3,103 | — | — | 3,103 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (1,463) | 3,103 | — | — | 1,640 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 7 | — | — | — | — | 7 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (42) | — | — | 42 | — | 1 |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (3,222) | — | — | — | (3,222) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| **Ending balance at June 30, 2011** | 1 | 464 | 650 | $ 64,700 | $ 14,109 | $ — | $ 1 | $ (67,449) | $ (8,928) | $ (3,911) | $ — | $ (1,478) |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1756

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net loss | $ (1,463) | $ (11,402) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Derivative losses | 1,632 | 5,963 |
| Asset related amortization — premiums, discounts, and basis adjustments | 595 | (48) |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (311) | 1,099 |
| Net discounts paid on retirements of other debt | (469) | (1,041) |
| Net premiums received from issuance of debt securities of consolidated trusts | 1,927 | 1,225 |
| (Gains) losses on extinguishment of debt securities of consolidated trusts and other debt | (113) | 273 |
| Provision for credit losses | 4,518 | 10,425 |
| Losses on investment activity | 1,096 | 1,369 |
| Losses (gains) on debt recorded at fair value | 118 | (891) |
| Deferred income tax benefit | 15 | (268) |
| Purchases of held-for-sale mortgage loans | (5,298) | (2,795) |
| Sales of mortgage loans acquired as held-for-sale | 6,998 | 3,629 |
| Repayments of mortgage loans acquired as held-for-sale | 22 | 11 |
| Change in: | | |
| Accrued interest receivable | 190 | 279 |
| Accrued interest payable | (618) | (887) |
| Income taxes payable | (319) | 70 |
| Other, net | (726) | (348) |
| *Net cash provided by operating activities* | 7,794 | 6,663 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (28,705) | (28,153) |
| Proceeds from sales of trading securities | 24,076 | 4,231 |
| Proceeds from maturities of trading securities | 10,122 | 21,477 |
| Purchases of available-for-sale securities | (7,687) | (626) |
| Proceeds from sales of available-for-sale securities | 2,107 | 606 |
| Proceeds from maturities of available-for-sale securities | 17,965 | 23,542 |
| Purchases of held-for-investment mortgage loans | (17,610) | (25,200) |
| Repayments of mortgage loans acquired as held-for-investment | 159,045 | 156,865 |
| Decrease in restricted cash | 5,778 | 8,714 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 6,782 | 5,654 |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 12,915 | (27,568) |
| Derivative premiums and terminations and swap collateral, net | (2,965) | (5,646) |
| Purchase of noncontrolling interest | — | (23) |
| *Net cash provided by investing activities* | 181,823 | 133,873 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 43,997 | 38,756 |
| Repayments of debt securities of consolidated trusts held by third parties | (217,330) | (206,991) |
| Proceeds from issuance of other debt | 521,779 | 602,116 |
| Repayments of other debt | (554,835) | (597,356) |
| Increase in liquidation preference of senior preferred stock | 500 | 10,600 |
| Payment of cash dividends on senior preferred stock | (3,222) | (2,585) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (31) | (83) |
| *Net cash used for financing activities* | (209,141) | (155,542) |
| Net decrease in cash and cash equivalents | (19,524) | (15,006) |
| Cash and cash equivalents at beginning of period | 37,012 | 64,683 |
| *Cash and cash equivalents at end of period* | $ 17,488 | $ 49,677 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 43,449 | $ 48,738 |
| Net derivative interest carry and swap collateral interest | 2,074 | 2,412 |
| Income taxes | (1) | (191) |
| Non-cash investing and financing activities: | | |
| Held-for-sale mortgage loans securitized and retained as trading securities | 448 | 371 |
| Underlying mortgage loans related to guarantor swap transactions | 143,324 | 142,146 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 143,324 | 142,146 |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | — | 196 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1757

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our Annual Report on our Form 10-K for the year ended December 31, 2010, or our 2010 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third-party investors and we also guarantee the payment of principal and interest on single-family mortgage loans and mortgage-related securities. We also resecuritize mortgage-related securities that are issued by us or Ginnie Mae as well as private (non-agency) entities. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans. These activities are funded by debt issuances. We manage the interest-rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investments (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization. We also guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. See "NOTE 15: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout programs; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency.

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary.

For additional information regarding our significant accounting policies, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2010 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the three and six months ended June 30, 2011. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ending December 31, 2011 or to the trend of earnings. The cumulative effect, net of taxes, of the errors corrected during the three and six months ended June 30, 2011 was $189 million and $28 million, respectively.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

## Re8ently Issued A88ounting Guidan8e, Not Yet Adopted Within These Consolidated Finan8ial Statements

### Fair Value Measurement

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted for public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

### Reconsideration of Effective Control for Repurchase Agreements

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

### A Creditor's Determination of Whether a Restructuring is a TDR

In April 2011, the FASB issued an amendment to the accounting guidance for receivables to clarify when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR. The amendment is effective for interim and annual periods beginning on or after June 15, 2011 and applies retrospectively to restructurings occurring on or after the beginning of the fiscal year of adoption, with early adoption permitted. We are evaluating the impact of this amendment on our consolidated financial statements; however, we expect that the population of loan restructurings we account for and disclose as TDRs will increase.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Business Obje8tives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1759

Table of Contents

conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. Based on our charter, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

• providing liquidity, stability and affordability in the mortgage market;

• continuing to provide additional assistance to the struggling housing and mortgage markets;

• reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;

• returning to long-term profitability; and

• protecting the interests of taxpayers.

In a letter to the Chairmen and Ranking Members of the Senate Banking and House Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new products is inconsistent with the goals of the conservatorship.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages from PC trusts. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue or other opportunities. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Our future structure and role will be determined by the Obama Administration and Congress. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors. Our future draws are dictated by the terms of the Purchase Agreement. Any actions we take will likely require approval by FHFA and possibly Treasury before they are implemented. FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

### Impa8t of the Pur8hase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $685.0 billion at June 30, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

<div align="center">109</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Significant recent developments with respect to the support we receive from the government include the following:

• On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at December 31, 2010, which increased the aggregate liquidation preference of the senior preferred stock to $64.7 billion as of March 31, 2011. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011.

• On both March 31, 2011 and June 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period.

Through June 30, 2011, we paid $13.2 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for the first three quarters of 2011. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 3: CONSERVATORSHIP AND RELATED DEVELOPMENTS," "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation. For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. The accounting guidance related to the consolidation of VIEs states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary, of a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE. We perform ongoing assessments of whether we are the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2010 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

### VIEs for whi8h We are the Primary Benefi8iary

#### Single-family PC Trusts

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage

<div align="center">110</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED LOANS AND NON-PERFORMING LOANS" for further information regarding our purchase of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At June 30, 2011 and December 31, 2010, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $14.2 billion and $15.8 billion at June 30, 2011 and December 31, 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

### Consolidated VIEs

Table 3.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

### Table 3.1 — Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 1 |
| Restricted cash and cash equivalents | 1,850 | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | 13,950 | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | 1,634,773 | 1,646,172 |
| Accrued interest receivable | 6,704 | 6,895 |
| Real estate owned, net | 83 | 118 |
| Other assets | 3,252 | 6,001 |
| Total assets of consolidated VIEs | $ 1,660,613 | $ 1,696,051 |
| Accrued interest payable | $ 6,241 | $ 6,502 |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other liabilities | 3,821 | 3,851 |
| Total liabilities of consolidated VIEs | $ 1,509,098 | $ 1,539,001 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1763          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**VIEs for whi8h We are not the Primary Benefi8iary**

Table 3.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of income and comprehensive income if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

<div align="center">112</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | | (in millions) | | |
| **June 30, 2011** | | | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 4,355 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 35 | 288 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,221 | 129,068 | — | — |
| Trading, at fair value | 164 | 16,997 | 18,216 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 76,759 | — |
| Held-for-sale | — | — | — | 4,463 | — |
| Accrued interest receivable | — | 519 | 462 | 345 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 358 | 3 | 193 | 411 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (40) |
| Other liabilities | — | (524) | (1) | (36) | (832) |
| **Maximum Exposure to Loss** | $ 4,519 | $ 32,568 | $ 163,800 | $ 81,795 | $ 11,344 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 51,779 | $ 36,610 | $ 1,023,005 | $ 131,227 | $ 25,264 |

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | | (in millions) | | |
| **December 31, 2010** | | | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,689 | 137,568 | — | — |
| Trading, at fair value | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 78,448 | — |
| Held-for-sale | — | — | — | 6,413 | — |
| Accrued interest receivable | — | 419 | 717 | 372 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $ 29,368 | $ 1,036,975 | $ 138,330 | $ 25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts, and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

### Asset-Backed Investment Trusts

We invest in a variety of non-mortgage-related, asset-backed investment trusts. These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1765

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At June 30, 2011 and December 31, 2010, we had investments in 15 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of June 30, 2011 were made in 2010 and 2011. At both June 30, 2011 and December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. Our investments in these trusts totaled $4.5 billion and $10.0 billion as of June 30, 2011 and December 31, 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both June 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both June 30, 2011 and December 31, 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non-Freddie Mac Securities

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at June 30, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. At both June 30, 2011 and December 31, 2010, we were not the primary beneficiary of any non-Freddie Mac securities trusts. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. At both June 30, 2011 and December 31, 2010, we did not guarantee any obligations of these

<div align="center">114</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

### Unsecuritized Multifamily Loans

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually make up 80% or less of the value of the related underlying property at origination. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders. We held more than 7,000 unsecuritized multifamily loans at both June 30, 2011 and December 31, 2010.

The UPB of our investments in these loans was $81.8 billion and $85.9 billion as of June 30, 2011 and December 31, 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At June 30, 2011 and December 31, 2010, the amount of loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

### Other

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We hold equity investments in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- *Certain other mortgage-related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives:* Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At June 30, 2011 and December 31, 2010, we were the primary beneficiary of two and three, respectively, credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        TREASURY-1767        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES**

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Table 4.1 summarizes the types of loans on our consolidated balance sheets as of June 30, 2011 and December 31, 2010.

## Table 4.1 — Mortgage Loans

| | cune 30, 2011 | | | De&ember 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Unse&uriti≻ed | Held by Consolidated Trusts | Total | Unse&uriti≻ed | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family:(1) | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 137,684 | $1,488,199 | $1,625,883 | $ 126,561 | $1,493,206 | $ 1,619,767 |
| Interest-only | 3,512 | 16,986 | 20,498 | 4,161 | 19,616 | 23,777 |
| Total fixed-rate | 141,196 | 1,505,185 | 1,646,381 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,844 | 62,945 | 66,789 | 3,625 | 59,851 | 63,476 |
| Interest-only | 11,789 | 49,925 | 61,714 | 13,018 | 58,792 | 71,810 |
| Total adjustable-rate | 15,633 | 112,870 | 128,503 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 14,090 | 14,090 | — | 15,580 | 15,580 |
| FHA/VA and other governmental | 1,319 | 3,476 | 4,795 | 1,498 | 3,348 | 4,846 |
| Total single-family | 158,148 | 1,635,621 | 1,793,769 | 148,863 | 1,650,393 | 1,799,256 |
| Multifamily(1): | | | | | | |
| Fixed-rate | 68,155 | — | 68,155 | 72,679 | — | 72,679 |
| Adjustable-rate | 13,644 | — | 13,644 | 13,201 | — | 13,201 |
| Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 81,802 | — | 81,802 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans | 239,950 | 1,635,621 | 1,875,571 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (7,045) | 8,100 | 1,055 | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale(2) | 45 | — | 45 | (311) | — | (311) |
| Allowance for loan losses on mortgage loans held-for-investment | (29,919) | (8,948) | (38,867) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net | $ 203,031 | $1,634,773 | $1,837,804 | $ 198,723 | $1,646,172 | $1,844,895 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $ 198,568 | $1,634,773 | $1,833,341 | $ 192,310 | $1,646,172 | $1,838,482 |
| Held-for-sale | 4,463 | — | 4,463 | 6,413 | — | 6,413 |
| Total mortgage loans, net | $ 203,031 | $1,634,773 | $1,837,804 | $ 198,723 | $1,646,172 | $1,844,895 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Includes fair value adjustments associated with mortgage loans for which we have made a fair value election.

We purchased UPB of $62.2 billion of single-family mortgage loans and $0.9 billion of multifamily loans that were classified as held-for-investment at purchase in the three months ended June 30, 2011. We purchased UPB of $158.0 billion of single-family mortgage loans and $1.7 billion of multifamily loans that were classified as held-for-investment at purchase in the six months ended June 30, 2011. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell any held-for-investment loans during the three and six months ended June 30, 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in the three and six months ended June 30, 2011.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1768

Table of Contents

more likely to default than other borrowers. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of June 30, 2011 and December 31, 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 4.2 presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period.

**Table 4.2 — Re8orded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio**

| | As of cune 30, 2011 | | | | As of De8ember 31, 2010 | | | |
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 70 | 71 – 100 | x 100[2] | Total | <= 70 | 71 – 100 | x 100[2] | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $ 662,541 | $ 406,083 | $ 252,386 | $ 1,321,010 | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-year amortizing fixed-rate | 235,387 | 19,103 | 3,010 | 257,500 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3][4] | 37,507 | 13,614 | 9,792 | 60,913 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] | 35,719 | 34,957 | 84,714 | 155,390 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans | $ 971,154 | $473,757 | $ 349,902 | $1,794,813 | $1,017,624 | $468,098 | $ 313,273 | 1,798,995 |
| Multifamily loans | | | | 77,395 | | | | 79,178 |
| Total recorded investment of held-for-investment loans | | | | $1,872,208 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.6% and 14.9% as of June 30, 2011 and December 31, 2010, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

**Allowan8e for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales, which impacted our allowance for loan losses. For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Basis of Presentation — *Out-of-Period Accounting Adjustment*" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1769

Table of Contents

Table 4.3 summarizes loan loss reserve activity.

**Table 4.3 — Detail of Loan Loss Reserves**

Three Months Ended June 30,

| | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses[1] | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses[1] | Total |
| | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 28,898 | $ 9,517 | $ 143 | $ 38,558 | $ 14,091 | $ 21,758 | $ 120 | $ 35,969 |
| Provision for credit losses | 318 | 2,203 | 21 | 2,542 | 2,364 | 2,533 | 13 | 4,910 |
| Charge-offs[3] | (3,570) | (195) | (3) | (3,768) | (3,969) | (548) | (3) | (4,520) |
| Recoveries[3] | 773 | 27 | — | 800 | 700 | 72 | — | 772 |
| Transfers, net[4][5] | 2,864 | (2,604) | (2) | 258 | 9,601 | (9,339) | (9) | 253 |
| Ending balance | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 | $ 22,787 | $ 14,476 | $ 121 | $ 37,384 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $ 673 | $ — | $ 74 | $ 747 | $ 781 | $ — | $ 61 | $ 842 |
| Provision (benefit) for credit losses | (8) | — | (5) | (13) | 125 | — | (6) | 119 |
| Charge-offs[3] | (29) | — | — | (29) | (27) | — | — | (27) |
| Transfers, net[5] | — | — | — | — | — | — | 1 | 1 |
| Ending balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| *Total:* | | | | | | | | |
| Beginning balance | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 | $ 14,872 | $ 21,758 | $ 181 | $ 36,811 |
| Provision for credit losses | 310 | 2,203 | 16 | 2,529 | 2,489 | 2,533 | 7 | 5,029 |
| Charge-offs[3] | (3,599) | (195) | (3) | (3,797) | (3,996) | (548) | (3) | (4,547) |
| Recoveries[3] | 773 | 27 | — | 800 | 700 | 72 | — | 772 |
| Transfers, net[4][5] | 2,864 | (2,604) | (2) | 258 | 9,601 | (9,339) | (8) | 254 |
| Ending balance | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 | $ 23,666 | $ 14,476 | $ 177 | $ 38,319 |

Six Months Ended June 30,

| | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses[1] | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses[1] | Total |
| | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $ — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance[2] | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 725 | 3,834 | 32 | 4,591 | 4,522 | 5,745 | 10 | 10,277 |
| Charge-offs[3] | (6,874) | (437) | (4) | (7,315) | (5,242) | (2,523) | (5) | (7,770) |
| Recoveries[3] | 1,437 | 47 | — | 1,484 | 966 | 422 | — | 1,388 |
| Transfers, net[4][5] | 6,678 | (6,140) | (6) | 532 | 21,848 | (21,174) | (25) | 649 |
| Ending balance | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 | $ 22,787 | $ 14,476 | $ 121 | $ 37,384 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $ 730 | $ — | $ 98 | $ 828 | $ 748 | $ — | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (53) | — | (20) | (73) | 176 | — | (28) | 148 |
| Charge-offs[3] | (41) | — | — | (41) | (45) | — | — | (45) |
| Transfers, net[5] | — | — | (9) | (9) | — | — | 1 | 1 |
| Ending balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| *Total:* | | | | | | | | |
| Beginning balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ — | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance[2] | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 672 | 3,834 | 12 | 4,518 | 4,698 | 5,745 | (5) | 10,425 |
| Charge-offs[3] | (6,915) | (437) | (4) | (7,356) | (5,287) | (2,523) | (5) | (7,815) |
| Recoveries[3] | 1,437 | 47 | — | 1,484 | 966 | 422 | — | 1,388 |
| Transfers, net[4][5] | 6,678 | (6,140) | (15) | 523 | 21,848 | (21,174) | (24) | 650 |
| Ending balance | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 | $ 23,666 | $ 14,476 | $ 177 | $ 38,319 |
| Total loan loss reserves as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.01% | | | | 1.91% |

(1)  All of these loans are collectively evaluated for impairments.  Beginning January 1, 2010, our reserve for guarantee losses  is included in other liabilities.

(2)  Adjustments relate to the adoption of the accounting guidance  for transfers of financial assets and consolidation of VIEs. See  "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

(3)  Charge-offs represent the carrying amount of a loan that has  been discharged to remove the loan from our consolidated balance  sheet due to either foreclosure transfers or short sales.  Charge-offs exclude $103 million and $144 million for the three months ended June 30, 2011 and 2010,  respectively, related to certain single-family loans purchased  under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements  of income and comprehensive income. Charge-offs exclude  $209 million and $261 million for the six months ended June 30, 2011 and 2010, respectively, related to certain single-family loans purchased under financial guarantees and  recorded as losses on loans purchased within other expenses on  our consolidated statements of income and comprehensive income.  Recoveries of charge-offs primarily result from foreclosure  transfers and short sales on loans where a share of default risk  has been assumed by mortgage insurers, servicers or other third parties through credit enhancements.

(4)  In February 2010, we announced that we would purchase  substantially all single-family mortgage loans that are  120 days or more delinquent from our PC trusts. We purchased $10.6 billion and $40.2 billion in UPB of loans from PC trusts during the three months ended June 30, 2011 and 2010, respectively. We purchased $25.2 billion and $96.8 billion in UPB of loans from PC trusts during the six months ended June 30, 2011 and 2010, respectively. As a result of these purchases, related amounts of our loan loss  reserves were transferred from the allowance for loan losses — held by consolidated trusts and the reserve for guarantee losses into the allowance for loan losses — unsecuritized.

(5)  Consist primarily of: (a) approximately $2.6 billion and $9.3 billion during the three months ended June 30, 2011 and 2010, respectively, of reclassified single-family  reserves related to our purchases during the periods of loans  previously held by consolidated trusts (as discussed in endnote (4) above); (b) amounts related to agreements  with seller/servicers where the transfer represents recoveries  received under these agreements to compensate us for previously  incurred and recognized losses; (c) the transfer of a proportional amount of the recognized reserves for guarantee  losses associated with loans purchased from non-consolidated  Freddie Mac mortgage-related securities and other guarantee commitments; and (d) net amounts attributable to  recapitalization of past due interest on modified mortgage loans.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1770          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.4 presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

### Table 4.4 — Net Investment in Mortgage Loans

| | cune 30, 2011 | | | De8ember 31, 2010 | | |
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $ 1,749,021 | $ 74,535 | $1,823,556 | $ 1,762,490 | $ 76,541 | $ 1,839,031 |
| Individually evaluated | 45,792 | 2,860 | 48,652 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,794,813 | 77,395 | 1,872,208 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (26,979) | (330) | (27,309) | (30,477) | (382) | (30,859) |
| Individually evaluated | (11,252) | (306) | (11,558) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,231) | (636) | (38,867) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $1,756,582 | $ 76,759 | $1,833,341 | $ 1,760,034 | $ 78,448 | $1,838,482 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.1% and 12.7% of the recorded investment in such loans at June 30, 2011 and December 31, 2010, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% and 0.7% of the recorded investment in such loans as of June 30, 2011 and December 31, 2010, respectively.

### Credit Prote8tion and Other Forms of Credit Enhan8ement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

Table 4.5 presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

### Table 4.5 — Re8ourse and Other Forms of Credit Prote8tion[1]

| | UPB at | | Ma8imum Coverage[2] at | |
| | cune 30, 2011 | De8ember 31, 2010 | cune 30, 2011 | De8ember 31, 2010 |
|---|---|---|---|---|
| | | (in millions) | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 209,758 | $    217,133 | $   51,209 | $    52,899 |
| Lender recourse and indemnifications | 9,280 | 10,064 | 8,885 | 9,566 |
| Pool insurance | 33,592 | 37,868 | 3,008 | 3,299 |
| HFA indemnification[3] | 9,057 | 9,322 | 3,170 | 3,263 |
| Subordination[4] | 3,677 | 3,889 | 724 | 825 |
| Other credit enhancements[4] | 131 | 223 | 111 | 118 |
| Total | $ 265,495 | $  278,499 | $   67,107 | $    69,970 |
| Multifamily: | | | | |
| HFA indemnification[3] | $   1,468 | $     1,551 | $      514 | $       543 |
| Subordination[4] | 18,762 | 12,252 | 2,537 | 1,414 |
| Other credit enhancements | 8,795 | 9,004 | 2,704 | 2,930 |
| Total | $  29,025 | $   22,807 | $    5,755 | $     4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $18.1 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of June 30, 2011 and December 31, 2010, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued by Freddie Mac and Fannie Mae under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.

(4) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1771

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any errors, omissions or delays, or for any actions taken in reliance on information contained herein. Past financial performance is no guarantee of future results.

Table of Contents

on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the first half of 2011. In recent periods, we also reached the maximum limit of recovery on certain of these contracts.

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.8 billion as of both June 30, 2011 and December 31, 2010.

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

**Individually Impaired Loans**

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in Table 5.1 by product class (for single-family loans).

**Table 5.1 — Individually Impaired Loans**

| | Balan8e at cune 30, 2011 | | | | For the Three Months Ended cune 30, 2011 | | For the Si\Months Ended cune 30, 2011 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | UPB | Re8orded Investment | Asso8iated Allowan8e | Net Investment | Average Re8orded Investment | Interest In8ome Re8ogni=ed | Average Re8orded Investment | Interest In8ome Re8ogni=ed |
| | | | | (in millions) | | | | |
| Single-family — | | | | | | | | |
| *With no specific allowance recorded*(1): | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 7,710 | $ 3,414 | $ — | $ 3,414 | $ 3,449 | $ 85 | $ 3,503 | $ 177 |
| 15-year amortizing fixed-rate(2) | 104 | 42 | — | 42 | 43 | 2 | 45 | 4 |
| Adjustable rate(3) | 15 | 7 | — | 7 | 7 | — | 7 | — |
| Alt-A, interest-only, and option ARM(4) | 2,218 | 970 | — | 970 | 986 | 19 | 1,007 | 40 |
| Total with no specific allowance recorded | $ 10,047 | $ 4,433 | $ — | $ 4,433 | $ 4,485 | $ 106 | $ 4,562 | $ 221 |
| *With specific allowance recorded:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $33,447 | $32,382 | $ (8,446) | $23,936 | $ 31,404 | $ 141 | $29,591 | $ 317 |
| 15-year amortizing fixed-rate(2) | 196 | 168 | (13) | $ 155 | 156 | 2 | 155 | 5 |
| Adjustable rate(3) | 133 | 119 | (18) | $ 101 | 105 | 1 | 102 | 2 |
| Alt-A, interest-only, and option ARM(4) | 8,983 | 8,690 | (2,775) | $ 5,915 | 8,279 | 21 | 7,777 | 54 |
| Total with specific allowance recorded | $42,759 | $ 41,359 | $(11,252) | $ 30,107 | $39,944 | $ 165 | $37,625 | $ 378 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 41,157 | $35,796 | $ (8,446) | $27,350 | $34,853 | $ 226 | $ 33,094 | $ 494 |
| 15-year amortizing fixed-rate(2) | 300 | 210 | (13) | 197 | 199 | 4 | 200 | 9 |
| Adjustable rate(3) | 148 | 126 | (18) | 108 | 112 | 1 | 109 | 2 |
| Alt-A, interest-only, and option ARM(4) | 11,201 | 9,660 | (2,775) | 6,885 | 9,265 | 40 | 8,784 | 94 |
| Total single-family | 52,806 | 45,792 | (11,252) | 34,540 | 44,429 | 271 | 42,187 | 599 |
| Total multifamily | 2,889 | 2,860 | (306) | 2,554 | 2,864 | 38 | 3,013 | 72 |
| Total single-family and multifamily | $55,695 | $48,652 | $(11,558) | $ 37,094 | $47,293 | $ 309 | $ 45,200 | $ 671 |

120

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | UPB | Recorded Investment | Associated Allowance | Net Investment |
|---|---|---|---|---|
| | | | (in millions) | |
| Single-family — | | | | |
| *With no specific allowance recorded[1]:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 8,462 | $ 3,721 | $ — | $ 3,721 |
| 15-year amortizing fixed-rate[2] | 119 | 50 | — | 50 |
| Adjustable rate[3] | 20 | 9 | — | 9 |
| Alt-A, interest-only, and option ARM[4] | 2,525 | 1,098 | — | 1,098 |
| Total with no specific allowance recorded | $ 11,126 | $ 4,878 | $ — | $ 4,878 |
| *With specific allowance recorded:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 25,504 | $ 24,502 | $ (6,283) | $ 18,219 |
| 15-year amortizing fixed-rate[2] | 229 | 198 | (17) | 181 |
| Adjustable rate[3] | 168 | 153 | (23) | 130 |
| Alt-A, interest-only, and option ARM[4] | 7,035 | 6,774 | (2,161) | 4,613 |
| Total with specific allowance recorded | $ 32,936 | $ 31,627 | $ (8,484) | $ 23,143 |
| *Combined single-family:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 33,966 | $ 28,223 | $ (6,283) | $ 21,940 |
| 15-year amortizing fixed-rate[2] | 348 | 248 | (17) | 231 |
| Adjustable rate[3] | 188 | 162 | (23) | 139 |
| Alt-A, interest-only, and option ARM[4] | 9,560 | 7,872 | (2,161) | 5,711 |
| Total single-family | 44,062 | 36,505 | (8,484) | 28,021 |
| Total multifamily | 2,661 | 2,637 | (348) | 2,289 |
| Total single-family and multifamily | $ 46,723 | $ 39,142 | $ (8,832) | $ 30,310 |

(1) Individually impaired loans with no related specific valuation allowance primarily represent mortgage loans purchased from PC trusts and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

The average recorded investment in individually impaired loans for the three and six months ended June 30, 2010 was approximately $24.8 billion and $21.6 billion, respectively. We recognized interest income on individually impaired loans of $291 million and $522 million for the three and six months ended June 30, 2010, respectively. Interest income foregone on individually impaired loans was approximately $328 million and $147 million for the three months ended June 30, 2011 and 2010, respectively. Interest income foregone on individually impaired loans was approximately $693 million and $339 million for the six months ended June 30, 2011 and 2010, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1773

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Mortgage Loan Performan8e

We do not accrue interest on loans three months or more past due.

Table 5.2 presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

### Table 5.2 — Payment Status of Mortgage Loans[1]

| | cune 30, 2011 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Fore8losure | Total | Non-a88rual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,241,359 | $24,456 | $ 8,784 | $ 46,411 | $ 1,321,010 | $ 46,298 |
| 15-year amortizing fixed-rate[2] | 254,164 | 1,509 | 391 | 1,436 | 257,500 | 1,431 |
| Adjustable rate[3] | 57,885 | 755 | 275 | 1,998 | 60,913 | 1,993 |
| Alt-A, interest-only, and option ARM[4] | 123,169 | 4,995 | 2,443 | 24,783 | 155,390 | 24,744 |
| Total single-family | 1,676,577 | 31,715 | 11,893 | 74,628 | 1,794,813 | 74,466 |
| Total multifamily | 77,217 | 34 | 12 | 132 | 77,395 | 1,945 |
| Total single-family and multifamily | $ 1,753,794 | $ 31,749 | $ 11,905 | $ 74,760 | $1,872,208 | $ 76,411 |

| | De8ember 31, 2010 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Fore8losure | Total | Non-a88rual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,226,874 | $26,442 | $ 10,203 | $ 51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate[2] | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable rate[3] | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[4] | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $34,737 | $ 14,041 | $ 84,305 | $1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers. In addition, if a multifamily borrower has entered into a forbearance agreement and is abiding by the terms of the agreement the borrower's payment status is reflected as current, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally results in our purchase of loans from PC trusts when the loans have been delinquent for four months or more. As of June 30, 2011, there were $2.9 billion in UPB of loans that were four monthly payments past due, and that met our repurchase criteria. Generally, we purchase these delinquent loans, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $10.6 billion and $40.2 billion in UPB of loans from PC trusts during the three months ended June 30, 2011 and 2010, respectively. We purchased $25.2 billion and $96.8 billion in UPB of loans from PC trusts during the six months ended June 30, 2011 and 2010, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1774

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.3 summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquen8y Rates[1]

| | cune 30, 2011 | De8ember 31, 2010 |
|---|---|---|
| Delinquencies: | | |
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
|   Serious delinquency rate | 2.71% | 2.97% |
|   Total number of seriously delinquent loans | 270,065 | 296,397 |
| Credit-enhanced portfolio: | | |
|   Serious delinquency rate | 7.23% | 7.83% |
|   Total number of seriously delinquent loans | 126,415 | 144,116 |
|   Total portfolio, excluding Other Guarantee Transactions | | |
|     Serious delinquency rate | 3.38% | 3.73% |
|     Total number of seriously delinquent loans | 396,480 | 440,513 |
| Other Guarantee Transactions:[2] | | |
|   Serious delinquency rate | 10.14% | 9.86% |
|   Total number of seriously delinquent loans | 20,977 | 21,926 |
| Total single-family: | | |
|   Serious delinquency rate | 3.50% | 3.84% |
|   Total number of seriously delinquent loans | 417,457 | 462,439 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
|   Delinquency rate | 0.19% | 0.12% |
|   UPB of delinquent loans (in millions) | $ 156 | $ 106 |
| Credit-enhance portfolio: | | |
|   Delinquency rate | 0.70% | 0.85% |
|   UPB of delinquent loans (in millions) | $ 192 | $ 182 |
| Total Multifamily: | | |
|   Delinquency rate | 0.31% | 0.26% |
|   UPB of delinquent loans (in millions) | $ 348 | $ 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA). As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We will bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and will not receive a reimbursement for any component from Treasury. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop, consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. Pursuant to this directive, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae, which are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. The aligned requirements include earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications and consistent timelines for processing foreclosures. This initiative will result in the alignment of the processes for both HAMP and non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

HAMP workout solutions, and will be implemented over the course of 2011 and into 2012. Servicers will also be subject to incentives and compensatory fee assessments with respect to performance under these standards.

### NOTE / : REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for a discussion of our significant accounting policies for REO.

Table 6.1 provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in Table 6.1, the weighted average holding period for our disposed properties was less than one year.

### Table / .1 — REO

|  | Three Months Ended cune 30, | | | | | |
|  | 2011 | | | 2010 | | |
|  | REO, Gross | Valuation Allowan&e | REO, Net | REO, Gross | Valuation Allowan&e | REO, Net |
|  | (in millions) | | | | | |
| Beginning balance | $ 7,149 | $ (773) | $ 6,376 | $ 6,042 | $ (574) | $ 5,468 |
| Additions | 2,408 | (163) | 2,245 | 3,561 | (253) | 3,308 |
| Change in holding period allowance, inventory | — | 5 | 5 | — | 21 | 21 |
| Dispositions | (3,024) | 330 | (2,694) | (2,748) | 249 | (2,499) |
| Ending balance | $ 6,533 | $ (601) | $ 5,932 | $ 6,855 | $ (557) | $ 6,298 |

|  | SiKMonths Ended cune 30, | | | | | |
|  | 2011 | | | 2010 | | |
|  | REO, Gross | Valuation Allowan&e | REO, Net | REO, Gross | Valuation Allowan&e | REO, Net |
|  | (in millions) | | | | | |
| Beginning balance | $ 7,908 | $ (840) | $ 7,068 | $ 5,125 | $ (433) | $ 4,692 |
| Adjustment to beginning balance[1] | — | — | — | 158 | (11) | 147 |
| Additions | 4,861 | (345) | 4,516 | 6,643 | (497) | 6,146 |
| Change in holding period allowance, inventory | — | (120) | (120) | — | (86) | (86) |
| Dispositions | (6,236) | 704 | (5,532) | (5,071) | 470 | (4,601) |
| Ending balance | $ 6,533 | $ (601) | $ 5,932 | $ 6,855 | $ (557) | $ 6,298 |

(1) Adjustment to the beginning balance relates to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

The REO balance, net at June 30, 2011 and December 31, 2010 associated with single-family properties was $5.8 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $98 million and $107 million, respectively. The West region represented approximately 32% and 30% of our single-family REO additions during the three months ended June 30, 2011 and 2010, respectively, based on the number of properties, and the state with the most REO properties in the West region is California. At June 30, 2011, our single-family REO inventory in California represented approximately 13% of our total REO inventory based on the number of properties. Our single-family REO inventory consisted of 60,599 properties and 72,079 properties at June 30, 2011 and December 31, 2010, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process, including delays related to concerns about the foreclosure process. These delays in foreclosures continued in the first half of 2011, particularly in states that require a judicial foreclosure process. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for additional information about delays in single-family foreclosures.

Our REO operations expenses includes REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and insurance reimbursements and other credit enhancement recoveries. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized a loss of $56 million and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1776

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

a gain of $39 million on single-family REO dispositions during the three months ended June 30, 2011 and 2010, respectively, and recognized a loss of $182 million and a gain of $26 million on single-family REO dispositions during the six months ended June 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our single-family inventory REO by $5 million and decreased our valuation allowance for properties in our single-family inventory REO by $20 million in the three months ended June 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our single-family inventory REO by $156 million and $117 million in the six months ended June 30, 2011 and 2010, respectively.

REO property acquisitions result from extinguishment of our mortgage loans held on our consolidated balance sheets and are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the six months ended June 30, 2011 and 2010 was $8.2 billion and $11.2 billion, respectively.

## NOTE J: INVESTMENTS IN SECURITIES

Table 7.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At June 30, 2011 and December 31, 2010, all available-for-sale securities are mortgage-related securities.

## Table J.1 — Available-For-Sale Securities

| June 30, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 79,417 | $ 5,919 | $    (115) | $ 85,221 |
| Subprime | 44,231 | 32 | (13,772) | 30,491 |
| CMBS | 55,881 | 2,482 | (716) | 57,647 |
| Option ARM | 9,661 | 29 | (3,099) | 6,591 |
| Alt-A and other | 14,546 | 50 | (2,387) | 12,209 |
| Fannie Mae | 19,675 | 1,338 | (2) | 21,011 |
| Obligations of states and political subdivisions | 8,825 | 50 | (315) | 8,560 |
| Manufactured housing | 880 | 15 | (51) | 844 |
| Ginnie Mae | 248 | 27 | — | 275 |
| Total available-for-sale securities | $233,364 | $ 9,942 | $(20,457) | $222,849 |

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $    (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $ 8,188 | $(23,077) | $ 232,634 |

(1) Includes non-credit-related other-than-temporary impairments on available-for-sale securities recognized in AOCI and temporary unrealized losses.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Se8urities in a Gross Unreali>ed Loss Position**

Table 7.2 shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table J.2 — Available-For-Sale Se8urities in a Gross Unreali>ed Loss Position**

| cune 30, 2011 | Less than 12 Months Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | 12 Months or Greater Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Total Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,488 | $ — | $ — | (29) | $ (29) | $ 1,877 | $ — | $ (86) | $ (86) | $ 4,365 | $ — | $ (115) | $ (115) |
| Subprime | 9 | (1) | — | (1) | 30,337 | (10,982) | (2,789) | (13,771) | 30,346 | (10,983) | (2,789) | (13,772) |
| CMBS | 409 | — | (14) | (14) | 4,384 | — | (702) | (702) | 4,793 | — | (716) | (716) |
| Option ARM | 19 | (2) | — | (2) | 6,438 | (2,974) | (123) | (3,097) | 6,457 | (2,976) | (123) | (3,099) |
| Alt-A and other | 882 | (48) | (3) | (51) | 10,317 | (1,641) | (695) | (2,336) | 11,199 | (1,689) | (698) | (2,387) |
| Fannie Mae | 12 | — | — | — | 14 | — | (2) | (2) | 26 | — | (2) | (2) |
| Obligations of states and political subdivisions | 2,855 | — | (81) | (81) | 2,974 | — | (234) | (234) | 5,829 | — | (315) | (315) |
| Manufactured housing | 38 | (1) | — | (1) | 452 | (36) | — | (36) | 490 | (37) | — | (37) |
| Total available-for-sale securities in a gross unrealized loss position | $ 6,712 | $ (52) | $ (127) | $ (179) | $ 56,793 | $ (15,633) | $ (4,645) | $ (20,278) | $ 63,505 | $ (15,685) | $ (4,772) | $ (20,457) |

| De8ember 31, 2010 | Less than 12 Months Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | 12 Months or Greater Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | Total Fair Value | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,494 | $ — | $ — | (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (844) | (1,024) | (1,868) | 11,844 | (844) | (1,075) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | (3) | (3) | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $ 9,510 | $ (2) | $ (287) | $ (289) | $ 67,399 | $ (16,520) | $ (6,268) | $ (22,788) | $ 76,909 | $ (16,522) | $ (6,555) | $ (23,077) |

(1) Represents the pre-tax amount of non-credit-related other-than-temporary impairments on available-for-sale securities not expected to be sold which are recognized in AOCI.

(2) Represents the pre-tax amount of temporary impairments on available-for-sale securities recognized in AOCI.

At June 30, 2011, total gross unrealized losses on available-for-sale securities were $20.5 billion. The gross unrealized losses relate to 2,202 individual lots representing 2,121 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Re8ognition on Investments in Se8urities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
TREASURY-1778
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the three and six months ended June 30, 2011 and 2010, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary involves the evaluation of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectibility of amounts that would be recovered from primary monoline insurers. In the case of monoline insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1779

Table of Contents

prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations.

Table 7.3 presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions of voluntary prepayment rates are also an input to the present value of expected cash flows and are discussed below.

**Table J.3 — Signifi8ant Modeled Attributes for Certain Non-Agen8y Mortgage-Related Se8urities**

| | Subprime first lien | Option ARM | Fi8ed Rate | Alt-A(1) Variable Rate | Hybrid Rate |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Issuan8e Date** | | | | | |
| **2004 and prior:** | | | | | |
| UPB | $ 1,279 | $ 123 | $ 940 | $ 548 | $ 2,287 |
| Weighted average collateral defaults(2) | 37% | 37% | 8% | 44% | 26% |
| Weighted average collateral severities(3) | 57% | 54% | 48% | 51% | 41% |
| Weighted average voluntary prepayment rates(4) | 6% | 7% | 10% | 7% | 8% |
| Average credit enhancement(5) | 41% | 17% | 14% | 18% | 15% |
| **2005:** | | | | | |
| UPB | $ 6,979 | $ 3,009 | $1,269 | $ 886 | $ 4,124 |
| Weighted average collateral defaults(2) | 56% | 54% | 25% | 52% | 40% |
| Weighted average collateral severities(3) | 67% | 63% | 54% | 58% | 49% |
| Weighted average voluntary prepayment rates(4) | 4% | 6% | 9% | 7% | 8% |
| Average credit enhancement(5) | 52% | 15% | 5% | 27% | 6% |
| **2006:** | | | | | |
| UPB | $ 20,720 | $ 7,120 | $ 586 | $ 1,203 | $ 1,253 |
| Weighted average collateral defaults(2) | 65% | 68% | 40% | 63% | 53% |
| Weighted average collateral severities(3) | 71% | 70% | 61% | 64% | 57% |
| Weighted average voluntary prepayment rates(4) | 7% | 6% | 10% | 8% | 8% |
| Average credit enhancement(5) | 17% | 5% | 8% | 0% | 2% |
| **2007:** | | | | | |
| UPB | $ 22,092 | $ 4,526 | $ 165 | $ 1,440 | $ 358 |
| Weighted average collateral defaults(2) | 63% | 66% | 56% | 64% | 63% |
| Weighted average collateral severities(3) | 72% | 71% | 68% | 67% | 68% |
| Weighted average voluntary prepayment rates(4) | 7% | 7% | 8% | 8% | 8% |
| Average credit enhancement(5) | 18% | 13% | 14% | (4)% | 0% |
| **Total:** | | | | | |
| UPB | $ 51,070 | $ 14,778 | $2,960 | $ 4,077 | $ 8,022 |
| Weighted average collateral defaults(2) | 62% | 64% | 25% | 58% | 39% |
| Weighted average collateral severities(3) | 71% | 69% | 57% | 63% | 51% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 9% | 8% | 8% |
| Average credit enhancement(5) | 23% | 10% | 9% | 7% | 8% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(3) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default rate for each security.
(4) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(5) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by monoline bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectibility of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same ratings were not other-than-temporarily impaired. However, we carefully consider individual ratings, especially those below investment grade, including changes since June 30, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2011.

In addition, we considered fair values at June 30, 2011, as well as any significant changes in fair value since June 30, 2011 to assess if they were indicative of potential future cash shortfalls. In this assessment, we put greater emphasis on categorical pricing information than on individual prices. We use multiple pricing services and dealers to price the majority of the non-agency mortgage-related securities we hold. We observed significant dispersion in prices obtained from different sources. However, we carefully consider individual and sustained price declines, placing greater weight when dispersion is lower and less weight when dispersion is higher. Where dispersion is higher, other factors previously mentioned receive greater weight. For further information, see "NOTE 18: FAIR VALUE DISCLOSURES."

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. During the second quarter of 2011, we recognized the unrealized fair value losses related to three investments in CMBS of $154 million as an impairment charge in earnings because we have the intent to sell these securities. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2011. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Monoline Bond Insuran8e

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary monoline bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Se8urities

Table 7.4 summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table J.4 — Net Impairment of Available-For-Sale Se8urities Re8ogni>ed in Earnings

| | Net Impairment of Available-For-Sale Se8urities Re8ogni>ed in Earnings | | | |
| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Available-for-sale securities: | | | | |
| Subprime | $ (70) | $ (17) | $ (804) | $ (349) |
| Option ARM | (65) | (48) | (346) | (150) |
| Alt-A and other | (32) | (333) | (72) | (352) |
| CMBS(1) | (183) | (17) | (318) | (72) |
| Manufactured housing | (2) | (13) | (5) | (15) |
| Total other-than-temporary impairments on available-for-sale securities | $ (352) | $ (428) | $(1,545) | $(938) |

(1) Includes $154 million of other-than-temporary impairments recognized in earnings for the three and six months ended June 30, 2011 as we have the intent to sell the related security before recovery of its amortized cost basis.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1781                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 7.5 presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced if we receive cash flows in excess of what we expected to receive over the remaining life of the credit-impaired debt security or the security matures or is fully written down.

### Table J.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Se8urities[1]

| | SiKMonths Ended cune 30, 2011 |
| --- | --- |
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $ 14,878 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 49 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 1,342 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured | (558) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis. | (161) |
| Amounts related to amortization resulting from increases in cash flows expected to be collected that are recognized over the remaining life of the security | (60) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $ 15,490 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Realized Gains and Losses on Sales of Available-For-Sale Securities**

Table 7.6 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

**Table J./ — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| **Gross realized gains** | | | | |
| Mortgage-related securities: | | | | |
| Freddie Mac | $ — | $ 26 | $ 77 | $ 26 |
| Fannie Mae | 14 | — | 14 | — |
| Obligations of states and political subdivisions | 3 | — | 4 | 1 |
| Total mortgage-related securities gross realized gains | 17 | 26 | 95 | 27 |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | (2) | — | — | — |
| Total non-mortgage-related securities gross realized gains | (2) | — | — | — |
| Gross realized gains | 15 | 26 | 95 | 27 |
| **Gross realized losses** | | | | |
| Mortgage-related securities:(1) | | | | |
| CMBS | (80) | — | (80) | — |
| Option ARM | — | (6) | — | (6) |
| Total mortgage-related securities gross realized losses | (80) | (6) | (80) | (6) |
| Gross realized losses | (80) | (6) | (80) | (6) |
| Net realized gains (losses) | $ (65) | $ 20 | $ 15 | $ 21 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

**Maturities of Available-For-Sale Securities**

Table 7.7 summarizes the remaining contractual maturities of available-for-sale securities.

**Table J.J — Maturities of Available-For-Sale Securities(1)**

| June 30, 2011 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $ 41 | $ 41 |
| Due after 1 through 5 years | 1,167 | 1,226 |
| Due after 5 through 10 years | 6,385 | 6,741 |
| Due after 10 years | 225,771 | 214,841 |
| Total available-for-sale securities | $ 233,364 | $222,849 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

**AOCI Related to Available-For-Sale Securities**

Table 7.8 presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

131                                                                                              *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table J.7 — AOCI Related to Available-For-Sale Se8urities**

| | SiKMonths Ended cune 30, | |
| | 2011 | 2010 |
|---|---|---|
| | (in millions) | |
| Beginning balance | $(9,678) | $ (20,616) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[1] | — | (2,683) |
| Net unrealized holding gains[2] | 1,849 | 8,146 |
| Net reclassification adjustment for net realized losses[3][4] | 995 | 597 |
| Ending balance | $(6,834) | $(14,556) |

(1) Net of tax benefit of $1.4 billion for the six months ended June 30, 2010.
(2) Net of tax expense of $1.0 billion and $4.4 billion for the six months ended June 30, 2011 and 2010, respectively.
(3) Net of tax benefit of $536 million and $321 million for the six months ended June 30, 2011 and 2010, respectively.
(4) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.0 billion and $609 million, net of taxes, for the six months ended June 30, 2011 and 2010, respectively.

**Trading Se8urities**

Table 7.9 summarizes the estimated fair values by major security type for trading securities.

**Table J.9 — Trading Se8urities**

| | cune 30, 2011 | De8ember 31, 2010 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $ 16,997 | $ 13,437 |
| Fannie Mae | 17,982 | 18,726 |
| Ginnie Mae | 165 | 172 |
| Other | 82 | 31 |
| Total mortgage-related securities | 35,226 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 164 | 44 |
| Treasury bills | 250 | 17,289 |
| Treasury notes | 17,497 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 1,627 | 441 |
| Total non-mortgage-related securities | 19,538 | 27,896 |
| Total fair value of trading securities | $ 54,764 | $ 60,262 |

For the three months ended June 30, 2011 and 2010, we recorded net unrealized gains (losses) on trading securities held at June 30, 2011 and 2010 of $229 million and $(272) million, respectively. For the six months ended June 30, 2011 and 2010, we recorded net unrealized gains (losses) on trading securities held at June 30, 2011 and 2010 of $10 million and $(689) million, respectively.

Total trading securities include $2.2 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of June 30, 2011 and December 31, 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $11 million and $(30) million, respectively, related to these hybrid financial securities for the three and six months ended June 30, 2011. Gains (losses) on trading securities include gains of $36 million and $1 million related to these trading securities for the three and six months ended June 30, 2010, respectively.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to ensure our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $1.7 billion and $2.2 billion at June 30, 2011 and December 31, 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At June 30, 2011 and December 31, 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at June 30, 2011 and December 31, 2010, we did not have securities pledged to us for securities

132

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. These pledges may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at June 30, 2011 and December 31, 2010 was $368 million and $550 million, respectively.

### *Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of June 30, 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

Table 7.10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table J.10 — Collateral in the Form of Se8urities Pledged

| | June 30, 2011 | | December 31, 2010 |
|---|---|---|---|
| | (in millions) | | |
| Securities pledged with the ability for the secured party to repledge: | | | |
| Debt securities of consolidated trusts held by third parties[1] | $ 10,345 | $ | 9,915 |
| Available-for-sale securities | 244 | | 817 |
| Securities pledged without the ability for the secured party to repledge: | | | |
| Debt securities of consolidated trusts held by third parties[1] | 139 | | 5 |
| Total securities pledged | $ 10,728 | $ | 10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

### Securities Pledged with the Ability of the Secured Party to Repledge

At June 30, 2011, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at June 30, 2011 or December 31, 2010. The remaining $0.1 billion and $0.2 billion of collateral posted with the ability of the secured party to repledge at June 30, 2011 and December 31, 2010, respectively, was posted in connection with our margin account related to futures transactions.

### Securities Pledged without the Ability of the Secured Party to Repledge

At June 30, 2011 and December 31, 2010, we pledged securities without the ability of the secured party to repledge of $139 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

### Collateral in the Form of Cash Pledged

At June 30, 2011, we pledged $10.0 billion of collateral in the form of cash and cash equivalents, all but $109 million of which related to our derivative agreements as we had $10.1 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.3 billion of such derivatives in a net loss position. The remaining $109 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at June 30, 2011 and December 31, 2010, respectively.

<div style="text-align:center">133</div>

<div style="text-align:right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 7: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $972 billion in 2011. As of June 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $695.2 billion, which was approximately $276.8 billion below the debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In Tables 8.1 and 8.2, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

Table 8.1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

### Table 7.1 — Total Debt, Net

| | Interest Expense for the | | | | Balance, Net(1) | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | June 30, 2011 | December 31, 2010 |
| | (in millions) | | | | (in millions) | |
| Other debt: | | | | | | |
| Short-term debt | $ 95 | $ 137 | $ 210 | $ 278 | $ 189,092 | $ 197,106 |
| Long-term debt: | | | | | | |
| Senior debt | 3,232 | 4,320 | 6,670 | 8,766 | 491,634 | 516,123 |
| Subordinated debt | 6 | 11 | 18 | 23 | 361 | 711 |
| Total long-term debt | 3,238 | 4,331 | 6,688 | 8,789 | 491,995 | 516,834 |
| Total other debt | 3,333 | 4,468 | 6,898 | 9,067 | 681,087 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 17,261 | 19,048 | 34,664 | 38,691 | 1,499,036 | 1,528,648 |
| Total debt, net | $20,594 | $23,516 | $41,562 | $47,758 | $2,180,123 | $ 2,242,588 |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, with $0.7 billion and $0.9 billion, respectively, of other short-term debt, and $3.2 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at June 30, 2011 and December 31, 2010.

For the three and six months ended June 30, 2011, we recognized fair value gains (losses) of $(37) million and $(118) million, respectively, on our foreign-currency denominated debt, of which $(46) million and $(163) million, respectively, are gains (losses) related to our net foreign-currency translation.

*Freddie Mac*

TREASURY-1786

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Other Debt**

Table 8.2 summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either June 30, 2011 or December 31, 2010.

**Table 7.2 — Other Debt**

| | cune 30, 2011 | | | De8ember 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balan8e, Net[1] | Weighted Average Effe8tive Rate[2] | Par Value | Balan8e, Net[1] | Weighted Average Effe8tive Rate[2] |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $188,411 | $ 188,343 | 0.16% | $194,875 | $ 194,742 | 0.24% |
| Medium-term notes | 749 | 749 | 0.14 | 2,364 | 2,364 | 0.31 |
| Total other short-term debt | 189,160 | 189,092 | 0.16 | 197,239 | 197,106 | 0.25 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2011 | 45,522 | 45,519 | 1.62% | 120,951 | 120,959 | 2.13% |
| 2012 | 132,695 | 132,653 | 1.75 | 138,474 | 138,418 | 1.79 |
| 2013 | 112,310 | 112,061 | 1.83 | 79,177 | 78,886 | 2.64 |
| 2014 | 60,997 | 60,816 | 2.57 | 36,328 | 36,142 | 3.46 |
| 2015 | 37,680 | 37,653 | 2.96 | 45,779 | 45,752 | 2.99 |
| Thereafter | 116,855 | 103,293 | 4.49 | 110,269 | 96,677 | 4.77 |
| Total other long-term debt[3] | 506,059 | 491,995 | 2.53 | 530,978 | 516,834 | 2.78 |
| Total other debt | $695,219 | $ 681,087 | | $728,217 | $ 713,940 | |

(1) Represents par value, net of associated discounts, premiums, and hedging-related adjustments.

(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs and hedging-related basis adjustments.

(3) Balance, net for other long-term debt includes callable debt of $124.5 billion and $142.6 billion at June 30, 2011 and December 31, 2010, respectively.

**Debt Se8urities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

Table 8.3 summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 7.3 — Debt Se8urities of Consolidated Trusts Held by Third Parties[1]**

| | cune 30, 2011 | | | | De8ember 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contra8tual Maturity[2] | UPB | Balan8e, Net | Weighted Average Coupon[2] | Contra8tual Maturity[2] | UPB | Balan8e, Net | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2011 - 2048 | $ 1,074,301 | $1,084,346 | 5.00% | 2011-2048 | $1,110,943 | $ 1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2031 | 65,988 | 66,885 | 4.67 | 2012-2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2011 - 2026 | 234,548 | 237,480 | 4.29 | 2011-2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2011 - 2047 | 54,715 | 55,338 | 3.43 | 2011-2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[3] | 2026 - 2041 | 52,669 | 52,757 | 5.15 | 2026-2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2011 - 2041 | 2,195 | 2,230 | 5.71 | 2011-2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties[4] | | $1,484,416 | $1,499,036 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.

(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.

(3) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.

(4) The effective rate for debt securities of consolidated trusts held by third parties was 4.57% as of both June 30, 2011 and December 31, 2010, respectively.

**Lines of Credit**

At both June 30, 2011 and December 31, 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at June 30, 2011 or

135

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1787

Table of Contents

December 31, 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

## NOTE 9: FINANCIAL GUARANTEES

We securitize substantially all of the single-family mortgage loans we purchase and issue securities backed by such mortgage loans, which we guarantee. During the six months ended June 30, 2011 and 2010, we issued and guaranteed $155.5 billion and $163.7 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds). Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. Table 9.1 presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

**Table 9.1 — Financial Guarantees**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, terms in years) | | | |
| Non-consolidated Freddie Mac securities(2) | $31,456 | $ 264 | 40 | $ 25,279 | $ 202 | 41 |
| Other guarantee commitments(3) | 20,409 | 431 | 38 | 18,670 | 427 | 38 |
| Derivative instruments | 41,729 | 820 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees | 147 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

(2) As of June 30, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $11.0 billion and $11.3 billion, respectively. The remaining balances relate to multifamily mortgage loans.

(3) As of June 30, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $10.4 billion and $8.6 billion, respectively. The remaining balances relate to multifamily mortgage loans.

**Non-consolidated Freddie Mac Securities**

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

At June 30, 2011 and December 31, 2010, there were $1.5 trillion and $1.4 trillion, respectively, of securities we issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips and do not increase our credit-related exposure. As a result, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both June 30, 2011 and December 31, 2010, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information about our accounting for financial guarantees.

During the three and six months ended June 30, 2011 we issued approximately $3.8 billion and $6.7 billion, respectively, compared to $2.2 billion and $3.7 billion for the three and six months ended June 30, 2010, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized. During the six months ended June 30, 2010, we also issued $4.1 billion in UPB of non-consolidated Other Guarantee Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

## Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three and six months ended June 30, 2011, we issued and guaranteed $0.7 billion and $2.5 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $7.5 billion and $5.5 billion of UPB at June 30, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion and $9.7 billion in UPB at June 30, 2011 and December 31, 2010, respectively. In addition, as of June 30, 2011 and December 31, 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.3 billion and $3.5 billion, respectively.

## Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's adjustable-rate mortgage. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

## Servi8ing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at June 30, 2011 and December 31, 2010.

## Other Indemnifi8ations

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no probable and estimable losses associated with these contracts. Therefore, we have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at June 30, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1789

Table of Contents

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at June 30, 2011 and December 31, 2010.

## NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. In addition, to the extent that we receive newly-issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report. These transfers and our resulting retained interests are not significant to our consolidated financial statements in the first half of 2011 and 2010.

## NOTE 11: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1790

Table of Contents

to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### *Foreign-Currency Exposure*

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;
- LIBOR- and Treasury-based options (including swaptions);
- LIBOR- and Treasury-based exchange-traded futures; and
- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### *Written Options and Swaptions*

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### *Commitments*

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### *Swap Guarantee Derivatives*

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### *Credit Derivatives*

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2010 Annual Report.

<div align="center">139</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Derivative Assets and Liabilities at Fair Value**

Table 11.1 presents the location and fair value of derivatives reported in our consolidated balance sheets.

**Table 11.1 — Derivative Assets and Liabilities at Fair Value**

| | At June 30, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*(2) | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $215,758 | $ 3,971 | $ (1,271) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-fixed | 321,870 | 716 | (21,468) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 3,275 | 5 | (1) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 540,903 | 4,692 | (22,740) | 721,259 | 9,970 | (27,479) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 103,825 | 8,260 | — | 114,110 | 8,391 | — |
| Written | 23,025 | — | (780) | 11,775 | — | (244) |
| Put swaptions | | | | | | |
| Purchased | 73,475 | 1,714 | — | 59,975 | 1,404 | — |
| Written | 6,000 | — | — | 6,000 | — | (8) |
| Other option-based derivatives(3) | 41,861 | 1,515 | (1) | 47,234 | 1,460 | (10) |
| Total option-based | 248,186 | 11,489 | (781) | 239,094 | 11,255 | (262) |
| Futures | 105,169 | 4 | (50) | 212,383 | 3 | (170) |
| Foreign-currency swaps | 2,184 | 327 | — | 2,021 | 172 | — |
| Commitments(4) | 34,361 | 121 | (66) | 14,292 | 103 | (123) |
| Credit derivatives | 11,383 | 2 | (4) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,733 | — | (36) | 3,614 | — | (36) |
| Total Derivatives not designated as hedging instruments | 945,919 | 16,635 | (23,677) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments(5) | | (16,389) | 23,269 | | (21,372) | 26,866 |
| Total derivative portfolio, net | $ 945,919 | $ 246 | $ (408) | $1,205,496 | $ 143 | $ (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(3) Primarily includes purchased interest rate caps and floors.

(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $8.2 billion and $6 million, respectively, at June 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at June 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at June 30, 2011 and December 31, 2010 was $1.7 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at June 30, 2011 and December 31, 2010 was $9.9 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. In the event our credit ratings fall below certain specified rating triggers or are withdrawn by S&P or Moody's, the counterparties to the derivative instruments are entitled to full overnight collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on June 30, 2011, was $10.1 billion for which we have posted collateral of $9.9 billion in the normal course of business. If the credit-risk-related contingent features underlying these agreements were triggered on June 30, 2011, we would be required to post an additional $0.2 billion of collateral to our counterparties.

At June 30, 2011 and December 31, 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Gains and Losses on Derivatives**

Table 11.2 presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

**Table 11.2 — Gains and Losses on Derivatives**

| | | Three Months Ended cune 30, | | | | | |
|---|---|---|---|---|---|---|---|
| | Amount of Gain or (Loss) Re8ogni≈ed in AOCI on Derivatives (Effe8tive Portion) | | Amount of Gain or (Loss) Re8lassified from AOCI into Earnings (Effe8tive Portion) | | Amount of Gain or (Loss) Re8ogni≈ed in Other In8ome (Ineffe8tive Portion and Amount Ex8luded from Effe8tiveness Testing) | | |
| Derivatives in Cash Flow Hedging Relationships(1) | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 | |
| | | | (in millions) | | | | |
| Closed cash flow hedges(2) | $ — | $ — | $ (201) | $ (277) | $ — | $ — | |

| | | SiKMonths Ended cune 30, | | | | | |
|---|---|---|---|---|---|---|---|
| | Amount of Gain or (Loss) Re8ogni≈ed in AOCI on Derivatives (Effe8tive Portion) | | Amount of Gain or (Losses) Re8lassified from AOCI into Earnings (Effe8tive Portion) | | Amount of Gain or (Loss) Re8ogni≈ed in Other In8ome (Ineffe8tive Portion and Amount Ex8luded from Effe8tiveness Testing) | | |
| Derivatives in Cash Flow Hedging Relationships(1) | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 | |
| | | | (in millions) | | | | |
| Closed cash flow hedges(2) | $ — | $ — | $ (398) | $ (536) | $ — | $ — | |

| | Derivative Gains (Losses)(3) | | | |
|---|---|---|---|---|
| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
| Derivatives not designated as hedging instruments under the a88ounting guidan8e for derivatives and hedging(4) | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated | $ (3) | $ (57) | $ (40) | $ (65) |
| U.S. dollar denominated | 3,561 | 10,716 | 1,357 | 13,099 |
| Total receive-fixed swaps | 3,558 | 10,659 | 1,317 | 13,034 |
| Pay-fixed | (7,307) | (18,633) | (3,344) | (23,380) |
| Basis (floating to floating) | — | 36 | 1 | 74 |
| Total interest-rate swaps | (3,749) | (7,938) | (2,026) | (10,272) |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased | 2,026 | 6,531 | 1,342 | 7,031 |
| Written | (196) | (336) | (158) | (277) |
| Put swaptions | | | | |
| Purchased | (355) | (813) | (477) | (1,787) |
| Written | — | 84 | 7 | 79 |
| Other option-based derivatives(5) | 127 | 398 | 81 | 236 |
| Total option-based | 1,602 | 5,864 | 795 | 5,282 |
| Futures | (99) | 42 | (140) | (12) |
| Foreign-currency swaps(6) | 47 | (484) | 156 | (815) |
| Commitments(7) | (257) | (114) | (421) | (149) |
| Credit derivatives | — | 2 | 1 | 2 |
| Swap guarantee derivatives | 1 | — | 1 | 1 |
| Subtotal | (2,455) | (2,627) | (1,633) | (5,963) |
| Accrual of periodic settlements:(8) | | | | |
| Receive-fixed interest rate swaps(9) | 1,066 | 1,688 | 2,312 | 3,220 |
| Pay-fixed interest rate swaps | (2,428) | (2,906) | (4,932) | (5,790) |
| Foreign-currency swaps | 6 | 5 | 10 | 12 |
| Other | 4 | 2 | 9 | (2) |
| Total accrual of periodic settlements | (1,352) | (1,211) | (2,601) | (2,560) |
| Total | $ (3,807) | $ (3,838) | $(4,234) | $ (8,523) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (*i.e.*, where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recorded in other debt interest expense and amounts linked to interest payments on long-term debt are recorded in expense related to derivatives.

(3) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(4) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(5) Primarily includes purchased interest rate caps and floors.

(6) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1794

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## Hedge Designation of Derivatives

At June 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in Table 11.3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $2.0 billion and $2.6 billion at June 30, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $461 million, net of taxes, of the $2.0 billion of cash flow hedge losses in AOCI at June 30, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at June 30, 2011, will be reclassified to earnings over the next five and ten years, respectively.

Table 11.3 presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

## Table 11.3 — AOCI Related to Cash Flow Hedge Relationships

|  | Six Months Ended June 30, | |
|  | 2011 | 2010 |
|  | (in millions) | |
| Beginning balance(1) | $(2,239) | $(2,905) |
| Cumulative effect of change in accounting principle(2) | — | (7) |
| Net reclassifications of losses to earnings(3) | 267 | 356 |
| Ending balance(1) | $(1,972) | $(2,556) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the six months ended June 30, 2010.
(3) Net of tax benefit of $131 million and $180 million for the six months ended June 30, 2011 and 2010, respectively.

## NOTE 12: FREDDIE MAC STOCz HOLDERS' EQUITY (DEFICIT)

### Senior Preferred Sto8k

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion. We received $500 million in March 2011 pursuant to a draw request that FHFA submitted to Treasury on our behalf to address the deficit in our net worth as of December 31, 2010. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $64.7 billion and $64.2 billion as of June 30, 2011 and December 31, 2010, respectively. See "NOTE 16: REGULATORY CAPITAL" for additional information.

### Sto8k Repur8hase and Issuan8e Programs

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the six months ended June 30, 2011, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock. During the six months ended June 30, 2011, restrictions lapsed on 823,605 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1795

Table of Contents

**Dividends De8lared During 2011**

No common dividends were declared in 2011. On both March 31, 2011 and June 30 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the six months ended June 30, 2011.

## NOTE 13: INCOME TAXES

**In8ome TaKBenefit**

For the three months ended June 30, 2011 and 2010, we reported an income tax benefit of $232 million and $286 million, respectively, resulting in effective tax rates of 9.8% and 5.7%, respectively. For the six months ended June 30, 2011 and 2010, we reported an income tax benefit of $306 million and $389 million, respectively, representing effective tax rates of 17.3% and 3.3%, respectively. For the three and six months ended June 30, 2011 and 2010, our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred TaKAssets, Net**

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including the second quarter of 2011. Our valuation allowance increased by $658 million to $33.9 billion in the six months ended June 30, 2011, primarily attributable to an increase in temporary differences during the period. As of June 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of June 30, 2011, we had net operating loss and LIHTC carryforwards that will expire over multiple years beginning in 2027 and ending in 2031 and alternative minimum tax credit carryforwards that will not expire.

**Unre8ogni>ed TaKBenefits**

At June 30, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.2 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $186 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not currently been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. There has been no material change during the quarter in total accrued interest payable allocable to unrecognized tax benefits.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2009. Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1796

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We continue to seek resolution of the controversy by settlement. It is reasonably possible that the hedge accounting method issue will be resolved within the next 12 months. We believe adequate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits within the next 12 months that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. We have no information that would enable us to estimate such impact at this time.

## NOTE 14: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. We also maintain a nonqualified, unfunded defined benefit pension plan for our officers as part of our SERP (we refer to this plan and the Pension Plan as our Defined Benefit Pension Plans). We also maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who meet certain minimum service and other eligibility requirements. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our Defined Benefit Pension Plans are collectively referred to as the Defined Benefit Plans.

In June 2011, we amended our Defined Benefit Pension Plans. Under those amendments, eligibility for the pension benefit under our Defined Benefit Pension Plans will be limited to eligible employees hired on or before December 31, 2011. The amendments are effective January 1, 2012.

Table 14.1 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the three and six months ended June 30, 2011 and 2010. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income and comprehensive income.

### Table 14.1 — Net Periodi8 Benefit Cost Detail

| | Three Months Ended cune 30, 2011 | | | | SiKMonths Ended cune 30, 2011 | | |
| | 2011 | | 2010 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| **Pension Benefits** | | | | | | | |
| Service cost | $ | 8 | $ | 8 | $ 17 | | $ 16 |
| Interest cost on benefit obligation | | 10 | | 10 | 20 | | 19 |
| Expected return on plan assets | | (12) | | (10) | (24) | | (20) |
| Recognized net actuarial loss | | 2 | | 2 | 3 | | 5 |
| Net periodic benefit cost | $ | 8 | $ | 10 | $ 16 | | $ 20 |
| **Postretirement Health Care Benefits** | | | | | | | |
| Service cost | $ | 1 | $ | 1 | $ 3 | | $ 3 |
| Interest cost on benefit obligation | | 3 | | 2 | 5 | | 4 |
| Net periodic benefit cost | $ | 4 | $ | 3 | $ 8 | | $ 7 |

### Cash Flows Related to Defined Benefit Plans

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. A contribution to our Pension Plan is not required in calendar year 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 15: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss).

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

### Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) non-recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

TREASURY-1798

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset / liability management returns<br><br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (*i.e.*, provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans that we purchased for investment, we have not purchased significant amounts of these loans for investment since 2010. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. Although we hold CMBS that we purchased for investment, we have not purchased significant amounts of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the related credit costs (*i.e.* provision (benefit) for credit losses), and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in the fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily mortgage loans<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of corporate-level expenses that are material and infrequent in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br><br>• Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

TREASURY-1799

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Segment Earnings

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of June 30, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.6 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of June 30, 2011, the unamortized balance of such fees was $2.6 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

Table 15.1 presents Segment Earnings by segment.

## Table 15.1 — Summary of Segment Earnings and Total Comprehensive In8ome (Loss)[1]

| | Three Months Ended cune 30, | | SiKMonths Ended cune 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Segment Earnings (loss), net of taxes: | | | | |
| Investments | $ 10 | $ (411) | $ 2,147 | $ (1,724) |
| Single-family Guarantee | (2,386) | (4,505) | (4,206) | (10,101) |
| Multifamily | 200 | 150 | 559 | 371 |
| All Other | 37 | 53 | 37 | 53 |
| Total Segment Earnings (loss), net of taxes | (2,139) | (4,713) | (1,463) | (11,401) |
| Net income (loss) attributable to Freddie Mac | $ (2,139) | $(4,713) | $(1,463) | $(11,401) |
| Total comprehensive income (loss) of segments: | | | | |
| Investments | $ 643 | $ 3,203 | $ 3,906 | $ 5,010 |
| Single-family Guarantee | (2,385) | (4,504) | (4,209) | (10,104) |
| Multifamily | 605 | 818 | 1,906 | 2,731 |
| All Other | 37 | 53 | 37 | 53 |
| Total comprehensive income (loss) of segments | (1,100) | (430) | 1,640 | (2,310) |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |

(1) The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1800

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.2 presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 15.2 — Segment Earnings and Re8on8iliation to GAAP Results

**Three Months Ended June 30, 2011**

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments(2) | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – NonControlling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 1,826 | $ — | $ — | $ (139) | $ (2,156) | $ 243 | $ (101) | $ — | $ (1) | $ 126 | $ 212 | $ 10 | $ — | $ 10 | $ (2,386) | $ (2,385) |
| Single-family Guarantee | (30) | (2,886) | 848 | — | — | 208 | (228) | (35) | (106) | (143) | (14) | (2,386) | — | (2,386) | 1 | (2,385) |
| Multifamily | 304 | 13 | 30 | (182) | 2 | 111 | (55) | • | (28) | — | (3) | 200 | — | 200 | 405 | 605 |
| All Other | — | — | — | — | — | — | — | — | — | — | — | 37 | — | 37 | — | 37 |
| Total Segment Earnings (loss), net of taxes | 2,100 | (2,873) | 878 | (321) | (2,154) | 562 | (384) | (27) | (135) | (17) | 232 | (2,139) | — | (2,139) | 1,039 | (1,100) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications(3) | 2,335 | 344 | (694) | (31) | (1,653) | (301) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments(2) | 126 | — | (143) | — | — | — | — | — | — | 17 | — | — | — | — | — | — |
| Total reconciling items | 2,461 | 344 | (837) | (31) | (1,653) | (301) | — | — | — | 17 | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,561 | $ (2,529) | $ 41 | $ (352) | $ (3,807) | $ 261 | $ (384) | $ (27) | $ (135) | $ — | $ 232 | $ (2,139) | $ — | (2,139) | 1,039 | (1,100) |

**Si8 Months Ended June 30, 2011**

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments(2) | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – NonControlling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 3,479 | $ — | $ — | $ (1,168) | $ (1,053) | $ 479 | $ (196) | $ — | $ (1) | $ 329 | $ 278 | $ 2,147 | $ — | $ 2,147 | $ 1,759 | $ 3,906 |
| Single-family Guarantee | 70 | (5,170) | 1,718 | — | — | 419 | (443) | (292) | (172) | (328) | (8) | (4,206) | — | (4,206) | (3) | (4,209) |
| Multifamily | 583 | 73 | 58 | (317) | 4 | 298 | (106) | • | (41) | — | (1) | 559 | — | 559 | 1,347 | 1,906 |
| All Other | — | — | — | — | — | — | — | — | — | — | — | 37 | — | 37 | — | 37 |
| Total Segment Earnings (loss), net of taxes | 4,132 | (5,097) | 1,776 | (1,485) | (1,049) | 1,196 | (745) | (284) | (214) | 1 | 306 | (1,463) | — | (1,463) | 3,103 | 1,640 |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications(3) | 4,640 | 579 | (1,369) | (60) | (3,185) | (605) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments(2) | 329 | — | (328) | — | — | — | — | — | — | (1) | — | — | — | — | — | — |
| Total reconciling items | 4,969 | 579 | (1,697) | (60) | (3,185) | (605) | — | — | — | (1) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 9,101 | $ (4,518) | $ 79 | $ (1,545) | $ (4,234) | $ 591 | $ (745) | $ (284) | $ (214) | $ — | $ 306 | $ (1,463) | $ — | (1,463) | 3,103 | 1,640 |

148

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1801

Table of Contents

**Three Months Ended June 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Non-Interest Income (Loss) | | | | Non-Interest Expense | | | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – NonControlling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
| | | | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | | | | | |
| Investments | $ 1,509 | $ — | $ — | $ (327) | $ (2,193) | $ 294 | $ (111) | $ — | $ (6) | $ 294 | $ 129 | $ (411) | $ — | $ (411) | 3,614 | $ 3,203 |
| Single-family Guarantee | 51 | (5,294) | 865 | (17) | (1) | 268 | (242) | (1) | (19) | (208) | 104 | (4,505) | — | (4,505) | 1 | (4,504) |
| Multifamily | 278 | (119) | 25 | (17) | (1) | 55 | (51) | — | (19) | — | — | 150 | — | 150 | 668 | 818 |
| All Other | — | — | — | — | — | — | — | — | — | — | 53 | 53 | — | 53 | — | 53 |
| Total Segment Earnings (loss), net of taxes | 1,838 | (5,413) | 890 | (344) | (2,194) | 617 | (404) | 40 | (115) | 86 | 286 | (4,713) | — | (4,713) | 4,283 | (430) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[3] | 2,004 | 384 | (645) | (84) | (1,644) | (15) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 294 | — | (208) | — | — | — | — | — | — | (86) | — | — | — | — | — | — |
| Total reconciling items | 2,298 | 384 | (853) | (84) | (1,644) | (15) | — | — | — | (86) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,136 | $ (5,029) | $ 37 | $ (428) | $ (3,838) | $ 602 | $ (404) | $ 40 | $ (115) | $ — | $ 286 | $ (4,713) | $ — | $ (4,713) | $ 4,283 | $ (430) |

**Six Months Ended June 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Non-Interest Income (Loss) | | | | Non-Interest Expense | | | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – NonControlling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
| | | | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | | | | | |
| Investments | $ 2,820 | $ — | $ — | $ (703) | $ (4,895) | $ 272 | $ (233) | $ — | $ (13) | $ 804 | $ 226 | $ (1,722) | $ (2) | $ (1,724) | 6,734 | 5,010 |
| Single-family Guarantee | 110 | (11,335) | 1,713 | (72) | 4 | 478 | (471) | (4) | (169) | (421) | 109 | (10,101) | — | (10,101) | (3) | (10,104) |
| Multifamily | 516 | (148) | 49 | (72) | 4 | 163 | (105) | (4) | (36) | — | 1 | 368 | 3 | 371 | 2,360 | 2,731 |
| All Other | — | — | — | — | — | — | — | — | — | — | 53 | 53 | — | 53 | — | 53 |
| Total Segment Earnings (loss), net of taxes | 3,446 | (11,483) | 1,762 | (775) | (4,891) | 913 | (809) | (119) | (218) | 383 | 389 | (11,402) | 1 | (11,401) | 9,091 | (2,310) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[3] | 4,011 | 1,058 | (1,269) | (163) | (3,632) | (5) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 804 | — | (421) | — | — | — | — | — | — | (383) | — | — | — | — | — | — |
| Total reconciling items | 4,815 | 1,058 | (1,690) | (163) | (3,632) | (5) | — | — | — | (383) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 8,261 | $ (10,425) | $ 72 | $ (938) | $ (8,523) | $ 908 | $ (809) | $ (119) | $ (218) | $ — | $ 389 | $ (11,402) | $ 1 | $ (11,401) | $ 9,091 | $ (2,310) |

(1) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(2) See "Segment Earnings" for additional information regarding these adjustments.

(3) See "NOTE 17: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" in our 2010 Annual Report for information regarding these reclassifications.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1802

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.3 presents total comprehensive income (loss) by segment.

**Table 15.3 — Total Comprehensive Income (Loss) of Segments(1)**

**Three Months Ended June 30, 2011**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 10 | $ 498 | $ 135 | $ — | $ 633 | $ 643 |
| Single-family Guarantee | (2,386) | — | — | 1 | 1 | (2,385) |
| Multifamily | 200 | 405 | — | — | 405 | 605 |
| All Other | 37 | — | — | — | — | 37 |
| Total per consolidated statements of income and comprehensive income | $ (2,139) | $ 903 | $ 135 | $ 1 | $ 1,039 | $ (1,100) |

**Six Months Ended June 30, 2011**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,147 | $ 1,497 | $ 266 | $ (4) | $ 1,759 | $ 3,906 |
| Single-family Guarantee | (4,206) | — | — | (3) | (3) | (4,209) |
| Multifamily | 559 | 1,347 | 1 | (1) | 1,347 | 1,906 |
| All Other | 37 | — | — | — | — | 37 |
| Total per consolidated statements of income and comprehensive income | $ (1,463) | $ 2,844 | $ 267 | $ (8) | $ 3,103 | $ 1,640 |

**Three Months Ended June 30, 2010**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (411) | $ 3,429 | $ 184 | $ 1 | $ 3,614 | $ 3,203 |
| Single-family Guarantee | (4,505) | — | — | 1 | 1 | (4,504) |
| Multifamily | 150 | 668 | — | — | 668 | 818 |
| All Other | 53 | — | — | — | — | 53 |
| Total per consolidated statements of income and comprehensive income | $ (4,713) | $ 4,097 | $ 184 | $ 2 | $ 4,283 | $ (430) |

**Six Months Ended June 30, 2010**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,724) | $ 6,381 | $ 356 | $ (3) | $ 6,734 | $ 5,010 |
| Single-family Guarantee | (10,101) | — | — | (3) | (3) | (10,104) |
| Multifamily | 371 | 2,362 | — | (2) | 2,360 | 2,731 |
| All Other | 53 | — | — | — | — | 53 |
| Total per consolidated statements of income and comprehensive income | $ (11,401) | $ 8,743 | $ 356 | $ (8) | $ 9,091 | $ (2,310) |

(1) The sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1803

**Table of Contents**

## NOTE 1/ : REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. Table 16.1 summarizes our minimum capital requirements and deficits and net worth.

## Table 1/ .1 — Net Worth and Minimum Capital

|  | cune 30, 2011 | | De&ember 31, 2010 | |
| --- | --- | --- | --- | --- |
|  | | (in millions) | | |
| GAAP net worth[1] | $ | (1,478) | $ | (401) |
| Core capital (deficit)[2][3] | $ | (57,250) | $ | (52,570) |
| Less: Minimum capital requirement[2] | | 24,901 | | 25,987 |
| Minimum capital surplus (deficit)[2] | $ | (82,151) | $ | (78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for June 30, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI and liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused on our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long-term profitability. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $65.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $1.5 billion draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $64.7 billion at June 30, 2011 to $66.2 billion. We paid quarterly dividends of $1.6 billion on the senior preferred stock in cash on both March 31, 2011 and June 30, 2011 at the direction of the Conservator. Following funding of the draw request related to

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1804

Table of Contents

our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period.

### NOTE 1J: CONCENTRATION OF CREDIT AND OTHER RISz S

**Single-family Credit Guarantee Portfolio**

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

Table 17.1 summarizes the concentration by year of origination and geographical area of the approximately $1.8 trillion UPB of our single-family credit guarantee portfolio at both June 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 1J.1 — Con8entration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | cune 30, 2011 | | De8ember 31, 2010 | | Per8ent of Credit Losses(1) Si6Months Ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | Per8entage of Portfolio(2) | Serious Delinquen8y Rate(3) | Per8entage of Portfolio(2) | Serious Delinquen8y Rate(3) | cune 30, 2011 | cune 30, 2010 |
| **Year of Origination** | | | | | | |
| 2011 | 6% | <0.1% | N/A | N/A | —% | N/A |
| 2010 | 20 | 0.1 | 18% | 0.1% | — | —% |
| 2009 | 20 | 0.3 | 21 | 0.3 | 1 | — |
| 2008 | 8 | 4.9 | 9 | 4.9 | 8 | 6 |
| 2007 | 10 | 11.0 | 11 | 11.6 | 37 | 34 |
| 2006 | 8 | 10.3 | 9 | 10.5 | 29 | 30 |
| 2005 | 9 | 6.0 | 10 | 6.0 | 17 | 21 |
| 2004 and prior | 19 | 2.5 | 22 | 2.5 | 8 | 9 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **Region(4)** | | | | | | |
| West | 28% | 3.8% | 27% | 4.7% | 56% | 47% |
| Northeast | 25 | 3.1 | 25 | 3.2 | 7 | 8 |
| North Central | 18 | 2.8 | 18 | 3.1 | 15 | 16 |
| Southeast | 17 | 5.4 | 18 | 5.6 | 18 | 25 |
| Southwest | 12 | 1.8 | 12 | 2.1 | 4 | 4 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **State(5)** | | | | | | |
| California | 16% | 3.8% | 16% | 4.9% | 32% | 26% |
| Florida | 6 | 10.6 | 6 | 10.5 | 12 | 19 |
| Illinois | 5 | 4.5 | 5 | 4.6 | 4 | 5 |
| Georgia | 3 | 3.6 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.4 | 3 | 3.0 | 5 | 6 |
| Arizona | 3 | 4.6 | 3 | 6.1 | 12 | 11 |
| Nevada | 1 | 10.6 | 1 | 11.9 | 6 | 5 |
| All other | 63 | N/A | 63 | N/A | 25 | 25 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the six months ended June 30, 2011. Our top seven states based on the highest percentage of UPB as of June 30, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (5%), New Jersey (4%), and Virginia (4%), and comprised 45% of our single-family credit guarantee portfolio as of June 30, 2011.

**Credit Performan8e of Certain Higher Risk Single-Family Loan Categories**

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1805          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in Table 17.2 because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

### Table 1J.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
| --- | --- | --- | --- | --- |
| | June 30, 2011 | December 31, 2010 | June 30, 2011 | December 31, 2010 |
| Interest-only | 5% | 5% | 17.7% | 18.4% |
| Option ARM | <1 | 1 | 21.6 | 21.2 |
| Alt-A[2] | 6 | 6 | 11.7 | 12.2 |
| Original LTV ratio greater than 90%[3] | 9 | 9 | 6.8 | 7.8 |
| Lower original FICO scores (less than 620) | 3 | 3 | 12.5 | 13.9 |

(1) Based on UPB.

(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.

(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% at June 30, 2011 and December 31, 2010, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of June 30, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

### Multifamily Mortgage Portfolio

Table 17.3 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1806

Table of Contents

**Table 1J.3 — Con8entration of Credit Risk — Multifamily Mortgage Portfolio**

| | cune 30, 2011 | | De8ember 31, 2010 | |
|---|---|---|---|---|
| | UPB(1) | Delinquen8y Rate(2) | UPB(1) | Delinquen8y Rate(2) |
| | | (dollars in billions) | | |
| **State** | | | | |
| California | $ 19.2 | 0.04% | $ 19.3 | 0.06% |
| Texas | 13.1 | 0.78 | 12.7 | 0.52 |
| New York | 9.3 | — | 9.2 | — |
| Florida | 6.8 | 0.42 | 6.4 | 0.56 |
| Virginia | 5.8 | — | 5.6 | — |
| Georgia | 5.6 | 1.09 | 5.5 | 0.98 |
| All other states | 50.9 | 0.29 | 49.7 | 0.24 |
| Total | $110.7 | 0.31% | $108.4 | 0.26% |
| | | | | |
| **Region**(3) | | | | |
| Northeast | $ 31.6 | 0.22% | $ 31.1 | —% |
| West | 28.5 | 0.06 | 28.3 | 0.07 |
| Southwest | 21.0 | 0.69 | 20.2 | 0.61 |
| Southeast | 20.0 | 0.51 | 19.2 | 0.59 |
| North Central | 9.6 | 0.12 | 9.6 | 0.30 |
| Total | $110.7 | 0.31% | $108.4 | 0.26% |
| | | | | |
| **Category**(4) | | | | |
| Original LTV ratio greater than 80% | $ 6.5 | 2.45% | $ 6.6 | 2.30% |
| Original DSCR below 1.10 | 3.0 | 2.05 | 3.2 | 1.22 |
| Non-credit enhanced loans | 83.5 | 0.19 | 87.5 | 0.12 |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.
(2) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.
(3) See endnote (4) to "Table 17.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.
(4) These categories are not mutually exclusive and a loan in one category may also be included within another.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement significantly reduces our exposure to a potential credit loss. As of June 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 8% at both June 30, 2011 and December 31, 2010, and our estimate of the current average DSCR for these loans was 1.2 and 1.1 as of June 30, 2011 and December 31, 2010, respectively. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 6% and 7% at June 30, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 101% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

TREASURY-1807

Table of Contents

**Seller/Servi8ers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us a specified dollar amount of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 85% of our single-family purchase volume during the six months ended June 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., Bank of America, N.A. and U.S. Bank, N.A. accounted for 29%, 14%, 11% and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the six months ended June 30, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of June 30, 2011 and December 31, 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $3.1 billion and $3.8 billion, and approximately 43% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests. During the three and six months ended June 30, 2011, respectively, we recovered amounts that covered losses with respect to $1.2 billion and $2.4 billion of UPB on loans subject to our repurchase requests.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011. We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and Ocala's potential claims.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict whether and to what extent challenges will be made to the settlement or the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this

<div align="center">155</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The court has directed that any objections to the settlement be filed no later than August 30, 2011. FHFA, after considering input from us and others, will determine whether or not to object to the proposed settlement.

The ultimate amounts of recovery payments we received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of June 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information. We believe we have adequately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at June 30, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of June 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14% and 12%, respectively, of our single-family mortgage loans, as of June 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 7: REAL ESTATE OWNED" in our 2010 Annual Report for additional information.

As of June 30, 2011 our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for additional information. As of June 30, 2011, these insurers provided coverage, with maximum loss limits of $54.8 billion, for $259.9 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top six mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co. (or PMI), and Republic Mortgage Insurance Co. (or RMIC) each accounted for more than 10% and collectively represented approximately 95% of our overall mortgage insurance coverage at June 30, 2011. All our mortgage insurance counterparties are rated BBB or below as of July 22, 2011, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

156                                                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                            Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We received proceeds of $1.3 billion and $0.7 billion during the six months ended June 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $2.1 billion and $2.3 billion as of June 30, 2011 and December 31, 2010, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.4 billion and $1.5 billion as of June 30, 2011 and December 31, 2010, respectively. Four of our mortgage insurers, including RMIC and PMI, have exceeded regulatory risk to capital ratios required by their state insurance regulators, and others may exceed regulatory limits in the future. Most, but not all, states have issued waivers to allow the companies to continue writing new business in their states, and Freddie Mac has, in certain circumstances, approved limited purpose affiliates to allow the companies to continue writing business in those states that have not issued waivers. Some of those state waivers are nearing their expiration dates.

On July 28, 2011, RMIC announced that its waiver of minimum state regulatory capital requirements will expire on August 31, 2011, and that it has not yet obtained necessary approvals to move production of new business to a separately capitalized subsidiary. RMIC stated that it is probable that its new business production will cease, at least temporarily, prior to August 31, 2011. RMIC also stated that, absent approval to underwrite new production through a separately capitalized subsidiary, it is most likely that RMIC's existing book of business would be placed into run off operating mode. We notified RMIC that they were suspended as an approved insurer for Freddie Mac loans effective August 1, 2011.

We evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties have the capacity to pay all claims as they become due in the normal course for the near term, except for claims obligations of Triad Guaranty Insurance Corporation (or Triad) that were partially deferred beginning June 1, 2009, under order of Triad's state regulator. However, we believe that certain of our other mortgage insurance counterparties may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At June 30, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $10.1 billion of UPB. At June 30, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the recovery from primary monoline bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. If a monoline bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2010 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of June 30, 2011 and December 31, 2010, there were $53.4 billion and $91.6 billion, respectively, of cash and other non-

*Freddie Mac*

TREASURY-1810

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of June 30, 2011, these included:

- $14.4 billion of cash equivalents invested in 32 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $6.0 billion of federal funds sold with four counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $7.1 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-1 or above;

- $19.2 billion of securities purchased under agreements to resell with eight counterparties that had short-term S&P ratings of A-2; and

- $4.9 billion of cash deposited with the Federal Reserve Bank.

**Derivative Portfolio**

*Derivative Counterparties*

Our use of derivatives exposes us to institutional credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

*Master Netting and Collateral Agreements*

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $113 million and $32 million at June 30, 2011 and December 31, 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on June 30, 2011, our maximum loss for accounting purposes would have been approximately $113 million. Four counterparties each accounted for greater than 10% and collectively accounted for 94% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at June 30,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1811

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2011. These counterparties were Barclays Bank PLC, Deutsche Bank, A.G., UBS A.G., and Goldman Sachs Bank USA, all of which were rated A or higher as of July 22, 2011.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $121 million and $103 million at June 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 17: FAIR VALUE DISCLOSURES

**Fair Value Hierar8hy**

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. Table 18.1 sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at June 30, 2011 and December 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 17.1 — Assets and Liabilities Measured at Fair Value on a Re8urring Basis**

| | Quoted Pri8es in A8tive Markets for Identi8al Assets (Level 1) | Signifi8ant Other Observable Inputs (Level 2) | Signifi8ant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $   — | $ 83,238 | $ 1,983 | $   — | $ 85,221 |
| Subprime | — | — | 30,491 | — | 30,491 |
| CMBS | — | 54,440 | 3,207 | — | 57,647 |
| Option ARM | — | — | 6,591 | — | 6,591 |
| Alt-A and other | — | 12 | 12,197 | — | 12,209 |
| Fannie Mae | — | 20,824 | 187 | — | 21,011 |
| Obligations of states and political subdivisions | — | — | 8,560 | — | 8,560 |
| Manufactured housing | — | — | 844 | — | 844 |
| Ginnie Mae | — | 261 | 14 | — | 275 |
| Total available-for-sale securities, at fair value | — | 158,775 | 64,074 | — | 222,849 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,375 | 2,622 | — | 16,997 |
| Fannie Mae | — | 17,139 | 843 | — | 17,982 |
| Ginnie Mae | — | 139 | 26 | — | 165 |
| Other | — | 64 | 18 | — | 82 |
| Total mortgage-related securities | — | 31,717 | 3,509 | — | 35,226 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 164 | — | — | 164 |
| Treasury bills | 250 | — | — | — | 250 |
| Treasury notes | 17,497 | — | — | — | 17,497 |
| FDIC-guaranteed corporate medium-term notes | — | 1,627 | — | — | 1,627 |
| Total non-mortgage-related securities | 17,747 | 1,791 | — | — | 19,538 |
| Total trading securities, at fair value | 17,747 | 33,508 | 3,509 | — | 54,764 |
| Total investments in securities | 17,747 | 192,283 | 67,583 | — | 277,613 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 4,463 | — | 4,463 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 4,646 | 46 | — | 4,692 |
| Option-based derivatives | 5 | 11,484 | — | — | 11,489 |
| Other | 4 | 444 | 6 | — | 454 |
| Subtotal, before netting adjustments | 9 | 16,574 | 52 | — | 16,635 |
| Netting adjustments(1) | — | — | — | (16,389) | (16,389) |
| Total derivative assets, net | 9 | 16,574 | 52 | (16,389) | 246 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 667 | — | 667 |
| Total assets carried at fair value on a recurring basis | $ 17,756 | $ 208,857 | $ 72,765 | $ (16,389) | $282,989 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $   — | $ 3,998 | $   — | $   — | $ 3,998 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 22,423 | 317 | — | 22,740 |
| Option-based derivatives | — | 780 | 1 | — | 781 |
| Other | 50 | 53 | 53 | — | 156 |
| Subtotal, before netting adjustments | 50 | 23,256 | 371 | — | 23,677 |
| Netting adjustments(1) | — | — | — | (23,269) | (23,269) |
| Total derivative liabilities, net | 50 | 23,256 | 371 | (23,269) | 408 |
| Total liabilities carried at fair value on a recurring basis | $ 50 | $ 27,254 | $ 371 | $ (23,269) | $ 4,406 |

160

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,652 | $ 2,037 | $ — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments(1) | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| Total assets carried at fair value on a recurring basis | $ 27,414 | $ 214,168 | $ 79,783 | $ (21,372) | $ 299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 4,443 | $ — | $ — | $ 4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments(1) | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $ (26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $8.2 billion and $6 million, respectively, at June 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at June 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1814          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Re8urring Fair Value Changes**

For the three and six months ended June 30, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities and multifamily held-for-sale loans. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three and six months ended June 30, 2011, the fair value of our Level 3 assets decreased by $5.0 billion and $7.0 billion, respectively, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, the fair value of our investments in non-agency mortgage-related securities also decreased from the widening of OAS levels on these securities during the second quarter of 2011. During the three and six months ended June 30, 2011, we had a net transfer into Level 3 assets of $12 million and $160 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

In the second quarter of 2010, our Level 3 assets decreased by $1.0 billion, mainly attributable to monthly remittances of principal repayments from the underlying collateral. For the six months ended June 30, 2010, our Level 3 assets decreased by $28.5 billion primarily due to the adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. These accounting changes resulted in the elimination of $28.8 billion of our Level 3 assets on January 1, 2010, including the elimination of certain mortgage-related securities issued by our consolidated trusts that are held by us and the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.3 billion of Level 3 assets to Level 2 during the six months ended June 30, 2010, resulting from improved liquidity and availability of the price quotes received from dealers and third-party pricing services.

Table 18.2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

TREASURY-1815

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, Mar 31, 2011 | Three Months Ended June 30, 2011 | | | Purchases | Issuances | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(7) | Balance, June 30, 2011 | Unrealized gains (losses) still held(2) |
| | | Realized and unrealized gains (losses) | | | | | | | | | |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income | Total | | (in millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 1,896 | $ — | $ 40 | $ 40 | $ 8 | $ — | $ — | $ (27) | $ 66 | $ 1,983 | $ — |
| Subprime | 33,344 | (70) | (1,255) | (1,325) | — | — | — | (1,528) | — | 30,491 | (70) |
| CMBS | 3,093 | — | 136 | 136 | — | — | — | (22) | — | 3,207 | — |
| Option ARM | 6,989 | (65) | 76 | 11 | — | — | — | (409) | — | 6,591 | (65) |
| Alt-A and other | 12,924 | (32) | (182) | (214) | — | — | — | (513) | — | 12,197 | (32) |
| Fannie Mae | 195 | — | — | — | — | — | — | (8) | — | 187 | — |
| Obligations of states and political subdivisions | 8,875 | 3 | 244 | 247 | — | — | (158) | (404) | — | 8,560 | — |
| Manufactured housing | 878 | (2) | (1) | (3) | — | — | — | (31) | — | 844 | (2) |
| Ginnie Mae | 15 | — | — | — | — | — | — | (1) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 68,209 | (166) | (942) | (1,108) | 8 | — | (158) | (2,943) | 66 | 64,074 | (169) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,697 | (65) | — | (65) | 90 | — | — | (46) | (54) | 2,622 | (65) |
| Fannie Mae | 871 | (17) | — | (17) | — | — | — | (11) | — | 843 | (17) |
| Ginnie Mae | 26 | — | — | — | — | — | — | — | — | 26 | — |
| Other | 19 | (1) | — | (1) | — | — | — | — | — | 18 | (1) |
| Total trading mortgage-related securities | 3,613 | (83) | — | (83) | 90 | — | — | (57) | (54) | 3,509 | (83) |
| Mortgage Loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 5,304 | 298 | — | 298 | 3,270 | — | (4,400) | (9) | — | 4,463 | 94 |
| Net derivatives(8) | (757) | 522 | — | 522 | — | (9) | — | (77) | 2 | (319) | 407 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset(9) | 597 | 6 | — | 6 | — | 77 | — | (13) | — | 667 | 6 |

163

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issuances (in millions) | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(7) | Balance, June 30, 2011 | Unrealized gains (losses) still held(6) |
|  |  | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income | Total |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments in securities: |  |  |  |  |  |  |  |  |  |  |  |
| Available-for-sale, at fair value: |  |  |  |  |  |  |  |  |  |  |  |
| Mortgage-related securities: |  |  |  |  |  |  |  |  |  |  |  |
| Freddie Mac | $ 2,037 | $ — | $ 39 | $ 39 | $ 17 | $ — | $ — | $ (78) | $ (32) | $ 1,983 | $ — |
| Subprime | 33,861 | (804) | 315 | (489) | — | — | — | (2,881) | — | 30,491 | (804) |
| CMBS | 3,115 | — | 112 | 112 | — | — | — | (20) | — | 3,207 | — |
| Option ARM | 6,889 | (346) | 768 | 422 | — | — | — | (720) | — | 6,591 | (346) |
| Alt-A and other | 13,155 | (72) | 56 | (16) | — | — | — | (942) | — | 12,197 | (72) |
| Fannie Mae | 212 | — | 2 | 2 | — | — | — | (22) | (5) | 187 | — |
| Obligations of states and political subdivisions | 9,377 | 4 | 242 | 246 | 1 | — | (195) | (869) | — | 8,560 | — |
| Manufactured housing | 897 | (5) | 11 | 6 | — | — | — | (59) | — | 844 | (5) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (2) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,223) | 1,545 | 322 | 18 | — | (195) | (5,593) | (37) | 64,074 | (1,227) |
| Trading, at fair value: |  |  |  |  |  |  |  |  |  |  |  |
| Mortgage-related securities: |  |  |  |  |  |  |  |  |  |  |  |
| Freddie Mac | 2,299 | (3) | — | (3) | 266 | — | (31) | (95) | 186 | 2,622 | (3) |
| Fannie Mae | 854 | (5) | — | (5) | — | — | — | (17) | 11 | 843 | (5) |
| Ginnie Mae | 27 | — | — | — | — | — | — | (1) | — | 26 | — |
| Other | 20 | (1) | — | (1) | — | — | — | (1) | — | 18 | (1) |
| Total trading mortgage-related securities | 3,200 | (9) | — | (9) | 266 | — | (31) | (114) | 197 | 3,509 | (9) |
| Mortgage Loans: |  |  |  |  |  |  |  |  |  |  |  |
| Held-for-sale, at fair value | 6,413 | 359 | — | 359 | 5,434 | — | (7,721) | (22) | — | 4,463 | 81 |
| Net derivatives(8) | (691) | 395 | — | 395 | — | (23) | — | (2) | 2 | (319) | 293 |
| Other assets: |  |  |  |  |  |  |  |  |  |  |  |
| Guarantee asset(9) | 541 | 5 | — | 5 | — | 145 | — | (24) | — | 667 | 5 |

164

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, March 31, 2010 | Realized and unrealized gains (losses) | | | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(7) | Balance, June 30, 2010 | Unrealized gains (losses) still held(3) |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1)(2) | Total | | | | |
| | | | (in millions) | | | | | |
| Investments in securities: | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | $ 2,011 | $ — | $ 29 | $ 29 | $ (10) | $ 69 | $ 2,099 | $ — |
| Subprime | 35,835 | (17) | 715 | 698 | (1,979) | — | 34,554 | (17) |
| CMBS | 56,491 | (17) | 2,604 | 2,587 | (949) | — | 58,129 | (17) |
| Option ARM | 7,025 | (54) | 374 | 320 | (448) | — | 6,897 | (48) |
| Alt-A and other | 13,383 | (333) | 545 | 212 | (637) | — | 12,958 | (333) |
| Fannie Mae | 319 | — | — | — | (30) | — | 289 | — |
| Obligations of states and political subdivisions | 11,104 | — | 98 | 98 | (459) | — | 10,743 | — |
| Manufactured housing | 901 | (13) | 32 | 19 | (28) | — | 892 | (13) |
| Ginnie Mae | 3 | — | — | — | — | — | 3 | — |
| Total available-for-sale mortgage-related securities | 127,072 | (434) | 4,397 | 3,963 | (4,540) | 69 | 126,564 | (428) |
| Trading, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | 2,821 | (328) | — | (328) | 590 | (42) | 3,041 | (328) |
| Fannie Mae | 1,182 | (248) | — | (248) | (14) | (2) | 918 | (248) |
| Ginnie Mae | 28 | — | — | — | — | — | 28 | — |
| Other | 25 | (2) | — | (2) | — | — | 23 | (2) |
| Total trading mortgage-related securities | 4,056 | (578) | — | (578) | 576 | (44) | 4,010 | (578) |
| Mortgage loans: | | | | | | | | |
| Held-for-sale, at fair value | 2,206 | 126 | — | 126 | (676) | — | 1,656 | 2 |
| Net derivatives(8) | (35) | 310 | — | 310 | (76) | — | 199 | 222 |
| Other assets: | | | | | | | | |
| Guarantee asset(9) | 482 | (4) | — | (4) | 7 | — | 485 | (4) |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1818

Table of Contents

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle(10) | Balance, January 1, 2010 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1)(2) | Total | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2010 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Six Months Ended June 30, 2010 | | | | | |
| | | | | | Realized and unrealized gains (losses) | | | | | |
| | | | | | (in millions) | | | | | |
| Investments in securities: | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $ (18,775) | $ 2,032 | $ — | $ 16 | $ 16 | $ (53) | $ 104 | $ 2,099 | $ — |
| Subprime | 35,721 | — | 35,721 | (349) | 3,265 | 2,916 | (4,083) | — | 34,554 | (349) |
| CMBS | 54,019 | — | 54,019 | (72) | 5,660 | 5,588 | (1,478) | — | 58,129 | (72) |
| Option ARM | 7,236 | — | 7,236 | (156) | 696 | 540 | (879) | — | 6,897 | (150) |
| Alt-A and other | 13,391 | — | 13,391 | (352) | 1,164 | 812 | (1,245) | — | 12,958 | (352) |
| Fannie Mae | 338 | — | 338 | — | (1) | (1) | (48) | — | 289 | — |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 1 | 212 | 213 | (947) | — | 10,743 | — |
| Manufactured housing | 911 | — | 911 | (15) | 54 | 39 | (58) | — | 892 | (15) |
| Ginnie Mae | 4 | — | 4 | — | — | — | (1) | — | 3 | — |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (943) | 11,066 | 10,123 | (8,792) | 104 | 126,564 | (938) |
| Trading, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (627) | — | (627) | 1,151 | (283) | 3,041 | (631) |
| Fannie Mae | 1,343 | — | 1,343 | (398) | — | (398) | (25) | (2) | 918 | (398) |
| Ginnie Mae | 27 | — | 27 | 1 | — | 1 | — | — | 28 | 1 |
| Other | 28 | (1) | 27 | (2) | — | (2) | (2) | — | 23 | (2) |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,026) | — | (1,026) | 1,124 | (285) | 4,010 | (1,030) |
| Mortgage loans: | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | 223 | — | 223 | (1,366) | — | 1,656 | 2 |
| Net derivatives(8) | (430) | — | (430) | 675 | — | 675 | (46) | — | 199 | 417 |
| Other assets: | | | | | | | | | | |
| Guarantee asset(9) | 10,444 | (10,024) | 420 | (8) | — | (8) | 73 | — | 485 | (8) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at June 30, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

166

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1819

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

Table 18.3 presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at June 30, 2011 and December 31, 2010, respectively.

**Table 17.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at June 30, 2011 | | | | Fair Value at December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | | (in millions) | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:(1) | | | | | | | | |
| Held-for-investment | $ — | $ — | $ 1,716 | $ 1,716 | $ — | $ — | $ 1,560 | $ 1,560 |
| REO, net(2) | — | — | 3,484 | 3,484 | — | — | 5,606 | 5,606 |
| Total assets measured at fair value on a non-recurring basis | $ — | $ — | $ 5,200 | $ 5,200 | $ — | $ — | $ 7,166 | $ 7,166 |

| | Total Gains (Losses)(3) | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | |
| Mortgage loans:(1) | | | | |
| Held-for-investment | $ (4) | $ (109) | $ 5 | $ (132) |
| REO, net(2) | (24) | (7) | (90) | (58) |
| Total gains (losses) | $ (28) | $ (116) | $ (85) | $ (190) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $3.5 billion, less estimated costs to sell of $246 million (or approximately $3.3 billion) at June 30, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of June 30, 2011 and 2010, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
TREASURY-1820
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $(37) million and $(118) million for the three and six months ended June 30, 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(44) million and $(116) million for the three and six months ended June 30, 2011, respectively. The remaining changes in the fair value of $7 million and $(2) million were attributable to changes in credit risk for the three and six months ended June 30, 2011, respectively.

The changes in fair value of debt securities with the fair value option elected were $544 million and $891 million for the three and six months ended June 30, 2010, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $539 million and $877 million for the three and six months ended June 30, 2010, respectively. The remaining changes in the fair value of $5 million and $14 million were attributable to changes in credit risk for the three and six months ended June 30, 2010, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $65 million and $108 million at June 30, 2011 and December 31, 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2010 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our traditional buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $298 million and $359 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the three and six months ended June 30, 2011, respectively. We recorded fair value changes of $126 million and $223 million in other income in our consolidated statements of income and comprehensive income for the three and six months ended

<div align="center">168</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

June 30, 2010, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other non-credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $45 million and $(311) million at June 30, 2011 and December 31, 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

## Valuation Methods and Assumptions Subje8t to Fair Value Hierar8hy

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

### Investments in Securities

#### Agency Securities

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floaters, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1822

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Commercial Mortgage-Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both June 30, 2011 and December 31, 2010. The weighted-average life of the collateral underlying our CMBS investments was 4.0 years and 4.3 years, respectively, as of June 30, 2011 and December 31, 2010. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified in Level 2.

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified in Level 3.

Table 18.4 below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 17.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $ 4,702 | $ 4,998 |
| 2005 | 11,860 | 13,126 |
| 2006 | 17,681 | 19,333 |
| 2007 | 15,048 | 16,461 |
| 2008 and beyond | — | — |
| Total | $ 49,291 | $ 53,918 |

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are dealer-priced. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                             Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Mortgage Loans, Held-for-Sale

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

### Mortgage Loans, Held-for-Investment

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

#### Interest-Rate Swaps and Option-Based Derivatives

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based

<div align="center">171</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Table 18.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of June 30, 2011 and December 31, 2010 our option-based derivatives had a remaining weighted-average life of 4.2 years and 4.5 years, respectively.

**Table 17.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives**

| | | | June 30, 2011 | | | |
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 199,851 | $ 2,260 | $ 151 | $ 590 | $ 931 | $ 588 |
| Weighted average fixed rate[3] | | | 1.31% | 1.22% | 2.21% | 3.60% |
| Forward-starting swaps[4] | 15,907 | 440 | — | 0.59% | (1) | 441 |
| Weighted average fixed rate[3] | | | | 0.59% | 1.09% | 4.51% |
| Basis (floating to floating) | 3,275 | 4 | — | 1 | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 302,831 | (18,263) | (136) | (1,261) | (4,880) | (11,986) |
| Weighted-average fixed rate[3] | | | 2.90% | 1.68% | 3.28% | 4.07% |
| Forward-starting swaps[4] | 19,039 | (2,489) | — | — | — | (2,489) |
| Weighted-average fixed rate[3] | | | | | | 5.37% |
| Total interest-rate swaps | $ 540,903 | $(18,048) | $ 15 | $ (670) | $ (3,947) | $(13,446) |
| Option-based derivatives: | | | | | | |
| Call swaptions | 126,850 | 7,480 | 4,066 | 1,307 | 748 | 1,359 |
| Put swaptions | 79,475 | 1,714 | 117 | 427 | 484 | 686 |
| Other option-based derivatives[5] | 41,861 | 1,514 | 5 | — | — | 1,509 |
| Total option-based | $ 248,186 | $ 10,708 | $ 4,188 | $ 1,734 | $ 1,232 | $ 3,554 |

| | | | December 31, 2010 | | | |
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| Weighted average fixed rate[3] | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps[4] | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted average fixed rate[3] | | | — | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | — | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted-average fixed rate[3] | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps[4] | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted-average fixed rate[3] | | | | | | 4.54% |
| Total interest-rate swaps | $ 721,259 | $ (17,509) | $ (136) | $ (618) | $ (2,033) | $(14,722) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 125,885 | $ 8,147 | $ 2,754 | $ 2,661 | $ 1,246 | $ 1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives[5] | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $ 239,094 | $ 10,993 | $ 2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fair value is categorized based on the period from June 30, 2011 and December 31, 2010, respectively, until the contractual maturity of the derivatives.

(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.

(3) Represents the notional weighted average rate for the fixed leg of the swaps.

(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(5) Primarily includes purchased interest rate caps and floors.

172

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

**REO, Net**

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

**Debt Securities Recorded at Fair Value**

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected"* for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

**Derivative Liabilities, Net**

See discussion under *"Derivative Assets, Net"* above.

**Consolidated Fair Value Balan8e Sheets**

The supplemental consolidated fair value balance sheets in Table 18.6 present our estimates of the fair value of our financial assets and liabilities at June 30, 2011 and December 31, 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1826

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

During the second quarter of 2010 our fair value results as presented in our consolidated fair value balance sheets were affected by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a decrease in our fair value measurement of mortgage loans. For more information concerning our approach to valuation related to our mortgage loans, see "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

## Table 17./ — Consolidated Fair Value Balan8e Sheets

| | cune 30, 2011 | | De8ember 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 17.5 | $ 17.5 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents | 2.3 | 2.3 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell | 33.6 | 33.6 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value | 222.8 | 222.8 | 232.6 | 232.6 |
| Trading, at fair value | 54.8 | 54.8 | 60.3 | 60.3 |
| Total investments in securities | 277.6 | 277.6 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts | 1,634.8 | 1,665.8 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans | 203.0 | 195.4 | 198.7 | 191.5 |
| Total mortgage loans | 1,837.8 | 1,861.2 | 1,844.9 | 1,859.0 |
| Derivative assets, net | 0.2 | 0.2 | 0.1 | 0.1 |
| Other assets | 26.8 | 27.1 | 32.3 | 37.2 |
| Total assets | $2,195.8 | $ 2,219.5 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties | $ 1,499.0 | $1,568.8 | $1,528.7 | $1,589.5 |
| Other debt | 681.1 | 696.9 | 713.9 | 729.7 |
| Total debt, net | 2,180.1 | 2,265.7 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net | 0.4 | 0.4 | 1.2 | 1.2 |
| Other liabilities | 16.8 | 16.4 | 18.4 | 19.0 |
| Total liabilities | 2,197.3 | 2,282.5 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders | 64.7 | 64.7 | 64.2 | 64.2 |
| Preferred stockholders | 14.1 | 1.4 | 14.1 | 0.3 |
| Common stockholders | (80.3) | (129.1) | (78.7) | (123.1) |
| Total net assets | (1.5) | (63.0) | (0.4) | (58.6) |
| Total liabilities and net assets | $2,195.8 | $ 2,219.5 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1827

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

### Valuation Methods and Assumptions Not Subje8t to Fair Value Hierar8hy

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### *Cash and Cash Equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### *Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### *Mortgage Loans*

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

#### <u>Single-Family Loans</u>

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities*."

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fee at June 30, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fee that relates to fixed-rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single-family credit guarantee portfolio. The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available. These amounts relate specifically to ARM products, highly seasoned loans, or fixed-rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our

<div align="center">175</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

guarantee obligation. We use entry-pricing information for all guaranteed loans that would qualify for purchase under current underwriting guidelines (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For single-family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

*Multifamily Loans*

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" and "*— Mortgage Loans, Held-for-Sale,*" respectively.

**Other Assets**

Our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

**Total Debt, Net**

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investment in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally

TREASURY-1829

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on market prices obtained from broker/dealers, reliable third-party pricing service providers or direct market observations. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders.

## NOTE 19: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

### Putative Se8urities Class A8tion Lawsuits

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed a motion to dismiss the second amended complaint, which motion remains pending.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiff claims that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seeks unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition, or results of operations.

## Shareholder Demand Letters

In late 2007 and early 2008, the Board of Directors received three letters from purported shareholders of Freddie Mac, which together contain allegations of corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management, alleged false and misleading financial disclosures, and the alleged sale of stock based on material non-public information by certain current and former officers and directors of Freddie Mac. Collectively, the letters demanded that the board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages and unjust enrichment from board members, senior officers, Freddie Mac's outside auditors, and other parties who allegedly aided or abetted the improper conduct, and implement corporate governance initiatives to ensure that the alleged problems do not recur. Prior to the conservatorship, the Board of Directors formed a Special Litigation Committee, or SLC, to investigate the purported shareholders' allegations, and engaged counsel for that purpose. Pursuant to the conservatorship, FHFA, as the Conservator, has succeeded to the powers of the Board of Directors, including the power to conduct investigations such as the one conducted by the SLC of the prior Board of Directors. The counsel engaged by the former SLC continued the investigation pursuant to instructions from FHFA. As described below, each of these purported shareholders subsequently filed lawsuits against Freddie Mac.

On February 25, 2011, the counsel engaged by the former SLC submitted a report to the Conservator, in which the counsel concluded, among other things, that it "uncovered no evidence sufficient to demonstrate that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with the Company's acceptance and management of credit risk from 2004 through 2007."

## Shareholder Derivative Lawsuits

On July 24, 2008 and August 15, 2008, purported shareholders, The Adams Family Trust, Kevin Tashjian and the Louisiana Municipal Police Employees Retirement System, or LMPERS, filed two derivative lawsuits in the U.S. District Court for the Eastern District of Virginia against certain current and former officers and directors of Freddie Mac, with Freddie Mac named as a nominal defendant in the actions. On October 15, 2008, the U.S. District Court for the Eastern District of Virginia consolidated these two cases. Previously, on March 10, 2008, a purported shareholder, Robert Bassman, had filed a similar shareholder derivative lawsuit in the U.S. District Court for the Southern District of New York, which was subsequently transferred to the Eastern District of Virginia and then, on December 12, 2008, consolidated with the cases filed by The Adams Family Trust, Kevin Tashjian, and LMPERS. While no consolidated complaint has been filed, the complaints collectively assert claims for breach of fiduciary duty, negligence, violations of federal securities laws, violations of the Sarbanes-Oxley Act of 2002 and unjust enrichment. Those claims are based on allegations that defendants failed to implement and/or maintain sufficient risk management and other controls; failed to adequately reserve for uncollectible loans and other risks of loss; and made false and misleading statements regarding the company's exposure to the subprime market, the strength of the company's risk management and internal controls, and the

<div align="center">178</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

company's underwriting standards in response to alleged abuses in the subprime market. The plaintiffs also allege that certain of the defendants breached their fiduciary duties and unjustly enriched themselves through their salaries, bonuses, benefits and other compensation, and sale of stock based on material non-public information. The complaints seek unspecified damages, equitable relief, the imposition of a constructive trust for the proceeds of alleged insider stock sales, an accounting, restitution, disgorgement, declaratory relief, an order requiring reform and improvement of corporate governance, punitive damages, costs, interest, and attorneys', accountants' and experts' fees.

After FHFA successfully intervened in these consolidated actions in its capacity as Conservator, it filed a motion to substitute for plaintiffs. On July 27, 2009, the District Court entered an order granting FHFA's motion, and on August 20, 2009, the plaintiffs filed an appeal of that order. On March 16, 2011, FHFA filed with the District Court a motion for voluntary dismissal without prejudice. On April 21, 2011, the District Court granted FHFA's motion for voluntary dismissal. On May 5, 2011, the Court of Appeals for the Fourth Circuit affirmed the District Court's ruling allowing FHFA to substitute for plaintiffs.

On June 6, 2008, a purported shareholder, the Esther Sadowsky Testamentary Trust, filed a shareholder derivative complaint in the U.S. District Court for the Southern District of New York against certain former officers and current and former directors of Freddie Mac. Plaintiff asserts claims for alleged breach of fiduciary duty and declaratory and injunctive relief, based on allegations that defendants caused the company to violate its charter by engaging in "unsafe, unsound and improper speculation in high risk mortgages to boost near term profits, report growth in the company's mortgage-related investments portfolio and guarantee business, and take market share away from its primary competitor, Fannie Mae." Among other things, plaintiff seeks an accounting, an order requiring that defendants remit all salary and compensation received during the periods they allegedly breached their duties, and an award of pre-judgment and post-judgment interest, attorneys' fees, expert fees and consulting fees, and other costs and expenses. On November 13, 2008, FHFA filed a motion to substitute for the Esther Sadowsky Testamentary Trust. On February 26, 2009, Robert Bassman filed a motion with the District Court to intervene or, in the alternative, to appear as amicus curiae. On May 6, 2009, the District Court granted FHFA's motion to substitute and denied Bassman's motion to intervene. The District Court subsequently stayed the case through March 2, 2011. On June 4, 2009, the Esther Sadowsky Testamentary Trust filed a notice of appeal of the May 6 order granting FHFA's substitution motion. On September 17, 2009, Bassman filed a notice of appeal of the May 6 order denying his motion to intervene or appear as amicus curiae. On March 10, 2010, the U.S. Court of Appeals for the Second Circuit granted FHFA's motion to dismiss the appeal of the Esther Sadowsky Testamentary Trust and dismissed that appeal on April 12, 2010 due to lack of jurisdiction. On March 4, 2011, the Second Circuit affirmed the District Court's decision denying Bassman's motion to intervene and dismissed Bassman's motion to appeal due to lack of jurisdiction. The Second Circuit issued its mandate to the District Court on April 11, 2011. Following the February 25, 2011 SLC counsel report, FHFA filed its status report with the District Court on March 2, 2011, stating that it intended to file a motion for voluntary dismissal without prejudice, which it did on March 16, 2011. On May 31, 2011, the District Court granted FHFA's motion to dismiss the case without prejudice.

## Energy Lien Litigation

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants

<div align="center">179</div>

<div align="right"><em>Freddie Mac</em></div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations.

## Government Investigations and Inquiries

On September 26, 2008, Freddie Mac received a federal grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York. The subpoena sought documents relating to accounting, disclosure, and corporate governance matters for the period beginning January 1, 2007. Subsequently, we were informed that the subpoena was withdrawn, and that an investigation was being conducted by the U.S. Attorney's Office for the Eastern District of Virginia. On June 1, 2011, the Federal Bureau of Investigation office assisting the investigation advised Freddie Mac's outside counsel that the investigation had been concluded.

On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees. Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation. Freddie Mac is cooperating fully in these matters.

Freddie Mac was informed by Donald J. Bisenius, former Executive Vice President — Single-Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation. The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr. Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008.

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he has made such a submission.

## Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *qacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, qP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., q.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint

<div align="center">180</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

alleges that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with an offering by Freddie Mac of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock Series Z that commenced on November 29, 2007. The complaint further alleges that certain defendants and others made additional false statements following the offering. The complaint names as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants. The defendants moved to dismiss the amended consolidated complaint on April 28, 2010. On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead. On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston v. Goldman, Sachs & Co*. The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's Series Z preferred stock offering that commenced on November 29, 2007. Freddie Mac is not named as a defendant in this lawsuit.

### Lehman Bankrupt8y

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. On January 25, 2011, Lehman filed its first amended plan and disclosure statement. Lehman filed its second amended joint plan and disclosure statement on June 29, 2011. The plan and disclosure statement are subject to court approval.

### Taylor, Bean & Whitaker Bankrupt8y

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that

181

*Freddie Mac*

TREASURY-1834

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. We are also entitled to approximately $203 million on deposit in certain TBW bank accounts relating to our mortgage loans, $150 million of which we received on June 21, 2011 from the FDIC as receiver of Colonial Bank. We are required to assign ownership rights of certain escrow accounts associated with the serviced loans to TBW and certain of its creditors. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. We estimate that during the third quarter of 2011, we will recognize approximately a $0.2 billion gain, representing the difference between the amounts we assign, or pay, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At June 30, 2011, we estimate our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements to their net realizable value through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

### IRS Litigation

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We continue to seek resolution of the controversy by settlement. We believe adequate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 13: INCOME TAXES."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 20: EARNINGS (LOSS) PER SHARE

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing net loss attributable to common stockholders by weighted average common shares outstanding — basic for the period. The weighted average common shares outstanding — basic during the three and six months ended June 30, 2011 and 2010 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic. For a discussion of our significant accounting policies regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2010 Annual Report.

### Table 20.1 — Loss Per Common Share — Basi8 and Diluted

| | Three Months Ended cune 30, | | | | SiKMonths Ended cune 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | (dollars in millions, e8êpt per share amounts) | | | | | | | |
| Net loss attributable to Freddie Mac | $ | (2,139) | $ | (4,713) | $ | (1,463) | $ | (11,401) |
| Preferred stock dividends[1] | | (1,617) | | (1,296) | | (3,222) | | (2,588) |
| Net loss attributable to common stockholders | $ | (3,756) | $ | (6,009) | $ | (4,685) | $ | (13,989) |
| Weighted average common shares outstanding — basic (in thousands)[2] | | 3,244,967 | | 3,249,198 | | 3,245,970 | | 3,250,241 |
| Dilutive potential common shares (in thousands) | | — | | — | | — | | — |
| Weighted average common shares outstanding — diluted (in thousands) | | 3,244,967 | | 3,249,198 | | 3,245,970 | | 3,250,241 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | | 3,229 | | 5,020 | | 3,808 | | 5,729 |
| Basic loss per common share | $ | (1.16) | $ | (1.85) | $ | (1.44) | $ | (4.30) |
| Diluted loss per common share | $ | (1.16) | $ | (1.85) | $ | (1.44) | $ | (4.30) |

(1) Consistent with the covenants of the Purchase Agreement, we paid dividends on our senior preferred stock, but did not declare dividends on any other series of preferred stock outstanding subsequent to entering conservatorship.

(2) Includes the weighted average number of shares during the period that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in shares outstanding — basic, since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS

Table 21.1 below presents the major components of other assets and other liabilities on our consolidated balance sheets.

**Table 21.1 — Other Assets and Other Liabilities on Consolidated Balance Sheets**

|  | cune 30, 2011 | | De&ember 31, 2010 |
|---|---|---|---|
|  | (in millions) | | |
| Other assets: | | | |
| Guarantee asset | $ 667 | $ | 541 |
| Accounts and other receivables | 6,268 | | 8,734 |
| All other | 1,446 | | 1,600 |
| Total other assets | $ 8,381 | $ | 10,875 |
| Other liabilities: | | | |
| Guarantee obligation | $ 733 | $ | 625 |
| Servicer liabilities | 4,045 | | 4,456 |
| Accounts payable and accrued expenses | 1,257 | | 1,760 |
| All other | 1,165 | | 1,257 |
| Total other liabilities | $ 7,200 | $ | 8,098 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1837

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART II OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 19: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

**ITEM 1A. RISz FACTORS**

This Form 10-Q should be read together with the "RISK FACTORS" sections in our Form 10-Q for the quarter ended March 31, 2011 and our 2010 Annual Report, which describe various risks and uncertainties to which we are or may become subject, and is supplemented by the discussion below. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

***A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government.***

Nationally recognized statistical rating organizations play an important role in determining, by means of the ratings they assign to issuers and their debt, the availability and cost of funding. We currently receive ratings from three nationally recognized statistical rating organizations for our unsecured borrowings. These ratings are largely based on the support we receive from Treasury, and therefore are influenced by the credit ratings of the U.S. government.

Our credit ratings are important to our liquidity. Actions by governmental entities or others, including changes in government support for us, additional GAAP losses, additional draws under the Purchase Agreement, a downgrade in the credit ratings of or outlook on the U.S. government, and other factors could adversely affect our debt credit ratings. Any downgrade in the credit ratings of the U.S. government would be expected to be followed or accompanied by a downgrade in our credit ratings. Such actions could lead to major disruptions in the mortgage market and to our business due to lower liquidity, higher borrowing costs, lower asset values and higher credit losses, and could cause us to experience much greater net losses and net worth deficits. The full range and extent of the adverse effects to our business that would result from any such ratings downgrades and market disruptions cannot be predicted with certainty. However, we expect that they would: (i) adversely affect our liquidity and cause us to limit or suspend new business activities that entail outlays of cash; (ii) make new issuances of debt significantly more costly, and potentially prohibitively expensive as well as adversely affect the supply of debt financing available to us; (iii) reduce the value of our guarantee to investors and adversely affect our ability to issue our guaranteed mortgage-related securities; (iv) reduce the value of Treasury and agency mortgage securities we hold; (v) increase the cost of mortgage financing for borrowers, thereby reducing the supply of mortgages available to us to purchase; (vi) adversely affect home prices, reducing the value of our REO and likely leading to additional borrower defaults on mortgage loans we guarantee; and (vii) trigger additional collateral requirements under our derivatives contracts.

Earlier this year, given concerns that the U.S. government's statutory debt limit would not be raised in a timely manner as well as uncertainty about achievement of a credible deficit reduction solution, certain major credit rating agencies took actions on the U.S. government's credit ratings. Due to the support we receive from Treasury, these rating agencies also took corresponding actions on certain of our credit ratings. On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in further rating actions on our debt ratings and the ratings of the U.S. government.

On July 15, 2011, S&P placed our senior long-term debt and short-term debt on CreditWatch with negative implications given our direct reliance on the U.S. government. This action followed S&P's placement of the long-term and short-term credit ratings of the United States on CreditWatch with negative implications on July 14, 2011. S&P subsequently lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+" on August 5, 2011. S&P removed both the short- and long-term ratings of the U.S. government from CreditWatch negative and assigned a negative outlook to the long-term credit rating. By assigning a negative outlook to the U.S. government's long-term credit rating, S&P indicated that the long-term rating could be lowered within the next two years if: (a) there are less reductions in spending than agreed to; (b) interest rates are higher; or (c) new fiscal pressures during the period result in a higher general government debt trajectory than currently assumed in its base case. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

185                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the rating. By assigning a negative outlook to the government's long-term credit rating, Moody's indicated that there would be a risk of downgrade if: (a) there is a weakening in fiscal discipline in the coming year; (b) further fiscal consolidation measures are not adopted in 2013; (c) the economic outlook deteriorates significantly; or (d) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected.

On August 2, 2011, Fitch noted that it expects to conclude its scheduled review of the U.S. government's credit rating by the end of August 2011. Fitch had indicated in July 2011, that following resolution of the debt ceiling situation, the ratings of financial institutions that are directly underpinned by support from the U.S. government, such as Freddie Mac, would ultimately be aligned with whatever Fitch determines the U.S. government rating to be, either remaining at the current AAA–level or potentially a lower rating level.

### *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.*

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 calendar days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

### *We could incur significant credit losses and credit-related expenses in the event of a major natural disaster or other catastrophic event in geographic areas in which portions of our total mortgage portfolio are concentrated.*

We own or guarantee mortgage loans throughout the United States. The occurrence of a major natural or environmental disaster (such as an earthquake, hurricane, tsunami, or widespread damage caused to the environment by commercial entities), terrorist attack, pandemic, or similar catastrophic event in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a catastrophic event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A catastrophic event that either damaged or destroyed residential real estate underlying mortgage loans we own or guarantee or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans we own or guarantee could increase our serious delinquency rates and average loan loss severity in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. While we attempt to maintain a geographically diverse portfolio, there can be no assurance that a catastrophic event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses. We may not have insurance coverage for some of these catastrophic events. In some cases, we may be prohibited by state law from requiring such insurance as a condition to our purchasing or guaranteeing loans.

TREASURY-1839

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Re8ent Sales of Unregistered Se8urities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of and ceased making grants under equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended June 30, 2011. However, restrictions lapsed on 31,233 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information.

**Dividend Restri8tions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2010 Annual Report.

**Information about Certain Se8urities Issuan8es by Freddie Ma8**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

### ITEM /. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1840

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
       Charles E. Haldeman, Jr.
       Chief Executive Officer

Date: August 8, 2011

By: /s/  Ross J. Kari
       Ross J. Kari
       Executive Vice President — Chief Financial Officer
       (Principal Financial Officer)

Date: August 8, 2011

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Table of Contents**

## GLOSSARY

**Agen8y se8urities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**BPS** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas.

Beginning in 2008, the conforming loan limits were increased for mortgages originated in certain "high-cost" areas above the conforming loan limits. In addition, conforming loan limits for certain high-cost areas were increased temporarily (up to $729,250 for a one-family residence). Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding $417,000 as conforming jumbo loans.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Conve8ity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread in8ome** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

189                                                                                                            *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense), net of recoveries.

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — The weighted average maturity of a financial instrument's cash flows. Duration is used as a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

TREASURY-1843

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Fore8losure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Ma8 mortgage-related se8urities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE A8t** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers with loans guaranteed by us or Fannie Mae refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios from 80% up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. The relief refinance initiative is our implementation of HARP for our loans, under which we also allow borrowers with LTV ratios of 80% and below to participate.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Liquidation preferen8e** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Monoline bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (defi8it)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve ( *e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OCC** — Office of the Comptroller of the Currency

**OFHEO** — Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee 8ommitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transa8tions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Pur8hase Agreement 6Senior Preferred Sto8k Pur8hase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Re8orded Investment** — The dollar amount of a loan or security recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase.

**Reform A8t** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinan8e mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesₘ initiative. This initiative is our implementation of HARP for our loans. Although HARP is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Stru8tured Se8urities** (or in the case of Multifamily securities, **Other Stru8tured Se8urities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**SEC** — Securities and Exchange Commission

**Se8ondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred sto8k** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**SERP** — Supplemental Executive Retirement Plan

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness.

**Single-family 8redit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total 8omprehensive in8ome (loss)** — Consists of net income (loss) plus the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1847

Table of Contents

**Total other 8omprehensive in8ome (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield 8urve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

<div align="center">195</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1 | Bylaws of the Federal Home Loan Mortgage Corporation, as amended and restated June 3, 2011 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K as filed on June 7, 2011) |
| 10.1 | Officer Severance Policy, dated April 11, 2011 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011) |
| 10.2 | PC Master Trust Agreement dated June 20, 2011 |
| 10.3 | Second Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as Amended and Restated January 1, 2008) (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K as filed on June 28, 2011) |
| 10.4 | Executive Management Compensation Program (as amended and restated as of June 2, 2011) |
| 10.5 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.5**

Freddie Mac

PC MASTER TRUST AGREEMENT

**THIS PC MASTER TRUST AGREEMENT** is entered into as of Nvne nb2nb992, 0 and a1 ony greddie F aMin its Mrcorate McaM0 as p ecositor2 Dd1 inistrator and Avarantor2greddie F aMin its McaM0 as Grvstee2and tue Tolders of tue Hl s offered fro1 ti1 e to ti1 e cvrsvant to greddie F aMs Cfferiny l irMhar referred to uerein'

**WHEREAS:**

C1. greddie F aMis a Mcrcoration dvl0 oryani(ed and e)istiny vnder and , 0 zirtve of tue greddie F aMDM and uas fvlhhMrcorate cox er and avtuorit0 to enter into tuis Dyree1 ent and to vndertave tue o, hiyations vndertawen , 0 it uereinkand

C. greddie F aMl a0 fro1 ti1 e to ti1 e C. cvrMase F ortyayes2in aMordanMd x itu tue acchiM, he crozisions of tue greddie F aMDM2C. as p ecositor2 transfer and decosit svMd F ortyayes into zariovs trvst fvnds tuat are esta, hisued cvrsvant to tuis Dyree1 ent and tuat are referred to uerein as ; Hl Hoob2' Gii. as Grvstee2Mcate and issve uerevnder2on , eualf of tue rehated Hl Hoob2Hl s recresentiny vndizided , enefiMahox nersuic interests in tue assets of tuat Hl Hoohand otuerx ise aMas trvstee for eaMd svMd Hl Hoob2Q. as Avarantor2yvarantee tue ca01 ent of interest and crinMcahfor tue , enefit of tue Tolders of svMd Hl s and C. as Dd1 inistrator2ad1 inister tue affairs of eaMd svMd Hl Hooh'

**NOW, THEREFORE** 2in Mnsideration of tue cre1 ises and 1 vtvahMzenants Mntained in tuis Dyree1 ent2tue carties to tuis Dyree1 ent2do uere, 0 deMMare and esta, hisu tuis Dyree1 ent and do uere, 0 vndertave and otuerx ise ayree as fohtox s x itu resceMd to tue transfer of tue F ortyayes to zariovs Hl Hoohs2 tue issvanMd of tue Hl s and tue esta, hisu1 ent of tue riyuts and o, hiyations of tue carties'

**Definitions**

Gue fohtox iny ter1 s vsed in tuis Dyree1 ent uaze tue resceMdze1 eaninys set fortu , ehox '

*Accrual Period:* Ds to an0 Hl and an0 Ha01 ent p ate2C0. tue Mdhendar 1 ontu creMddiny tue 1 ontu of tue Ha01 ent p ate for Aohd Hl s or Gi. tue seMMnd Mdhendar 1 ontu creMddiny tue 1 ontu of tue Ha01 ent p ate for D" F Hl s'

*Administrator:* greddie F aMin its Mrcorate McaM02as ad1 inistrator of tue Hl Hoohs Mcated vnder tuis Dyree1 ent'

*Agreement:* Guis Hl F aster Grvst Dyree1 ent2dated as of Nvne nb2nb992, 0 and a1 ony greddie F aMin its Mrcorate McaM0 as p ecositor2 Dd1 inistrator and Avarantor2greddie F aMin its McaM0 as Grvstee2and tue Tolders of tue zariovs Hl s2as oriyinaHf0 e) eMrted2or as 1 odified2a1 ended or svccte1 ented in aMordanMd x itu tue crozisions set fortu uerein' Rnhess tue Mnte) t reUvires otuerx ise2tue ter1 ; Dyree1 ent" sualh, e dee1 ed to inMhvde an0 acchiM, he Hoohqvccte1 ent entered into cvrsvant to qeMMion 9'b9 of tuis Dyree1 ent'

*ARM:* Dn adSvsta, he rate F ortyaye'

9

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* D Hl  x itu a Ha01 ent p eha0 of j 7 da0s and x uiMl is , aMed , 0 D" F s' D" F  Hl s inMvde p eferred 5nterest Hl s'

*Book-Entry Rules:* Gue crozisions fro1  ti1 e to ti1 e in effeM2Mrrentl0 Mntained in Gitle nl 2Hart 492qv, cart T of tue l ode of gederah" eyvhations2 settiny fortu tue ter1 s and Mnditions vnder x uiMl greddie F aMl a0 issve seMrities on tue , oow8entr0 s0ste1  of tue gederah" eserze - anws and avtuori(iny a gederah" eserze - anwto aMas its ayent in MnneMfion x itu svMl seMrities'

*Business Day:* D da0 otuer tuan G). a qatvrda0 or qvnda0 and Gi. a da0 x uen tue gederah" eserze - anwof Bex  YorwGr otuer ayent aMiny as greddie F aMs fisMhayent. is Mbosed or2as to an0 Tohder2a da0 x uen tue gederah" eserze - anwtuat 1 aintains tue TohderPs aMovnt is Mbosed'

*Conventional Mortgage:* D F ortyaye tuat is not yvranteed or insvred , 0 tue Rnited qtates or an0 ayenM0 or instrv1 entahit0 of tue Rnited qtates'

*Custodial Account:* Ds defined in qeMfion 3'b7Q). of tuis Dyree1 ent'

*Deferred Interest:* Gue a1 ovnt , 0 x uiMl tue interest dve on a F ortyaye e) Meds tue , orrox erPs 1 ontul0 ca01 ent2x uiMl a1 ovnt is added to tue vncaid crinMcah, ahanMd of tue F ortyaye'

*Deferred Interest PC:* D Hl  recresentiny an vndizided , enefiMahox nersuic interest in a Hl  Hoohtuat inMvdes F ortyayes crozidiny for neyatize a1 orti(ation'

*Depositor:* greddie F aM2in its Mrcorate McaM02as decositor of F ortyayes into tue Hl  Hoohs Meated vnder tuis Dyree1 ent'

*Eligible Investments:* Dn0 one or 1 ore of tue foHtox iny o, hiyations2seMrities or uohdinys 1 atvriny on or , efore tue Ha01 ent p ate acchiM, he to tue fvnds so inzested:

Gi. o, hiyations of2or o, hiyations yvaranteed as to tue fvlhand ti1 el0 ca01 ent of crinMcahand interest , 02tue Rnited qtatesk

Gii. o, hiyations of an0 ayenM0 or instrv1 entahit0 of tue Rnited qtates Gtuer tuan greddie F aM or ta) a, he de, t o, hiyations of an0 state or hoMhyozern1 ent Gor cohitiMhsv, dizision tuereof. tuat uaze a hony8ter1  ratiny or a suort8ter1  ratiny2as acchiM, he2fro1  q&H2F ood0PB or gitMl in an0 Mse in one of its tx o uiyuest ratiny Mteyories for hony8ter1  seMrities or in its uiyuest ratinys Mteyor0 for suort8ter1  seMritiesk

Giii. ti1 e decosits of an0 decositor0 institvtion or trvst Ml1 can0 do1 iMhed in tue l a01 an 5hands or Bassav and affiliated x itu a finanMahinstitvtion tuat is a l el1 , er of tue gederah" eserze q0ste1 2crozided tuat tue suort8ter1  seMrities of tue decositor0 institvtion or trvst Ml1 can0 are rated , 0 q&H2F ood0PB or gitMl in tue uiyuest acchiM, he ratinys Mteyor0 for suort8ter1  seMritiesk

Giz. federahfvnds2MrtifiMates of decosit2ti1 e decosits and , anwersPaMMctanMs x itu a fi)ed 1 atvrit0 of no 1 ore tuan 367 da0s of an0 decositor0 institvtion or trvst Ml1 can02crozided tuat suort8ter1  seMrities of tue decositor0 institvtion or trvst Ml1 can0 are rated , 0 q&H2F ood0PB or gitMl in tue uiyuest acchiM, he ratinys Mteyor0 for suort8ter1  seMritiesk

Gz. Ml1 erMahcacer x itu a fi)ed 1 atvrit0 of no 1 ore tuan nj b da0s2of an0 Mrcoration tuat is rated , 0 q&H2F ood0PB or gitMl in its uiyuest suort8 ter1  ratinys Mteyor0k

m

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Qi. de, t seMrities tuat uaze a bony8ter1 ratiny or a suort8ter1 ratiny2as accliM, le2fro1 q&H2F ood0Ps or gitM2in an0 Mase in one of its tx o uiyuest ratinys Mteyories for bony8ter1 seMrities or in its uiyuest ratinys Mteyor0 for suort8ter1 seMritiesk

Qii. 1 one0 1 arwet fvnds tuat are reyistered vnder tue 1nzest1 ent l o1 can0 DM of 9E1 b2as a1 ended2are entitled2cvrsvant to " vle ma§ of tue qeMrities and V) Manye l o1 1 ission2or an0 svMMassor to tuat rvle2to uold tue1 seizes ovt to inzestors as 1 one0 1 arwet fvnds2and are rated , 0 q&H2F ood0Ps or gitM in one of its tx o uiyuest ratinys Mteyories for 1 one0 1 arwet fvndsk

Qiii. asset8, aMed M0 1 1 erManhacacer tuat is rated , 0 q&H2F ood0Ps or gitM in its uiyuest suort8ter1 ratinys Mteyor0k

Qi). recvrMase ayree1 ents on o, liyations tuat are eituer sceMified in an0 of Mavses Q.2Qi.2Qz.2Q.2Qi. or Qiii. a, oze or are 1 ortyaye8, aMed seMrities insvred or yvaranteed , 0 an entit0 tuat is an ayenM0 or instrv1 entalit0 of tue Rnited qtateskcrozided tuat tue Mvntercart0 to tue recvrMase ayree1 ent is an entit0 x uose suort8ter1 de, t seMrities are rated , 0 q&H2F ood0Ps or gitM in its uiyuest ratinys Mteyor0 for suort8ter1 seMritieskand

Q. an0 otuer inzest1 ent x ituovt octions tuat is accrozed , 0 greddie F aMand is x ituin tue tx o uiyuest ratinys Mteyories of tue accliM, le ratiny ayenM0 for bony8ter1 seMrities or tue uiyuest ratinys Mteyor0 of tue accliM, le ratiny ayenM0 for suort8ter1 seMrities'

Gue ratiny reUvire1 ent x ilh, e satisfied if tue rehezant seMrit02issve or fvnd at tue ti1 e of cvrMase reMizes at least tue 1 ini1 v1 stated ratiny fro1 at least one of q&H2F ood0Ps or gitM' Gue ratiny reUvire1 ent x ilhnot , e satisfied , 0 a ratiny tuat is tue 1 ini1 v1 ratiny folPox ed , 0 a 1 invs siyn or , 0 a ratiny hox er tuan Damfro1 F ood0Ps'

*Event of Default:* Ds defined in qeMion 7'b9 of tuis Dyree1 ent'

*FHA/VA Mortgage:* D F ortyaye insvred , 0 tue gederahTovsiny Dd1 inistration or , 0 tue p ecart1 ent of DyriMltvre " vrahp ezeloc1 ent G0or1 erl0 tue " vrahTovsiny qerziM. or yvaranteed , 0 tue p ecart1 ent of Leterans Dffairs or tue p ecart1 ent of Tovsiny and Rr, an p ezeloc1 ent'

*Final Payment Date:* Ds to an0 H1 2tue first da0 of tue latest 1 ontu in x uiM tue related HoohgaMor x ilh, e redvMed to ( ero' Gue Gue Dd1 inistrator cv, lisues tue ginahHu01 ent p ate vcon for1 ation of tue related H1 Hooh'

*Fitch:* gitM25nM2also wnox n as gitM " atinys2or an0 svMMassor tuereto'

*Freddie Mac:* Gue gederahTo1 e § oan F ortyaye l orcoration2a Morcoration Meated cvrsvant to tue greddie F aMDM for tue cvrcose of esta, lisuiny and svccortiny a seMondar0 1 arwet in residential1 ortyayes' Rnhess tue Monte) t reUvires otuerx ise2tue ter1 ; greddie F aM1 sualh, e dee1 ed to refer to greddie F aM aMany in one or 1 ore of its Morcorate McaMities2as sceMified or as crozided in Monte) t2and not in its McaM0 as Grvstee'

*Freddie Mac Act:* Githe 555 of tue V1 eryenM0 To1 e ginanM DM0 of 9Ej b2as a1 ended29mR'q'1 ' / / 9I 7989I 7E'

*Gold PC:* D H1 x itu a Ha01 ent p elin0 of I 7 da0s and x uiM is , aMed , 0 fi) ed8rate F ortyayes'

*Guarantor:* greddie F aM2in its Morcorate McaMit02as yvarantor of tue H1 s issved , 0 eaM1 H1 Hooh'

3

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* greddie F aMs qinylte8ga1 il0 qelterYyerzi Mr Avide2as svccte1 ented and a1 ended fro1 ti1 e to ti1 e2in x uiM greddie F aMsets fortu its 1 ortyaye cvrMase standards2Medit2accraisahand vnderx ritiny yvidelines and serziMhy coliMes'

*Holder:* J itu resceM to an0 H1 Hool2an0 entit0 tuat accears on tue reMrds of a gederah" eserze - anwas a uolder of tue related H1 s'

*Monthly Reporting Period:* Gue ceriod dvriny x uiM serziMrs recort F ortyaye ca01 ents to tue Dd1 inistrator2yeneralH0 Mnsistiny of tue Mlendar 1 ontu creMdiny tue related Ha01 ent p ate for Aold H1 s and tue seMnd Mlendar 1 ontu creMdiny tue related Ha01 ent p ate for D" F H1 s2x uiM ceriod tue Dd1 inistrator uas tue riyut to Manye as crozided in qeMsion 3'b7Gl. of tuis Dyree1 entk *provided, however*2tuat x itu resceM to creca01 ents on H1 s issved , efore qecte1 , er 929EE72tue F ontul0 " ecortiny Heriod yeneralH0 is fro1 tue 96 <sup>tu</sup> of a 1 ontu turovyu tue 97<sup>tu</sup> of tue ne) t 1 ontu'

*Moody's:* F ood0Ps 5nzestors qerzi M25nM2or an0 svMassor tuereto'

*Mortgage:* D 1 ortyaye loan or a cartiMcation interest in a 1 ortyaye loan tuat is seMred , 0 a first or seMnd lien on a one8to8fovr fa1 il0 dx elliny and tuat uas , een cvrMased , 0 tue p ecositor and transferred , 0 tue p ecositor to tue Grvstee for inMsion in tue related H1 Hooli J itu resceM to eaM H1 Hool2tue F ortyayes to , e inMded tuerein sualh, e identified on tue , oows and reMrds of tue p ecositor and tue Dd1 inistrator'

*Mortgage Coupon:* Gue cer annv1 fij ed or adSvsta, he interest rate of a F ortyaye'

*MultiLender Swap Program:* D croyra1 vnder x uiM greddie F aMcvrMases F ortyayes fro1 one or 1 ore sellers in e) Manye for H1 s recresentiny vndizided , enefiMahox nersuic interests in a H1 HoohMnsistiny of F ortyayes tuat 1 a0 or 1 a0 not , e tuose delizered , 0 tue sellerG. '

*Negative Amortization Factor:* J itu resceM to H1 s , aMred , 0 F ortyayes crozidiny for neyatize 1 orti(ation2a trvnMted eiyut8liyit deMl ahnv1 , er tuat refteMs tue a1 ovnt of p eferred 5nterest added to tue crinMah, ahanMs of tue related F ortyayes in tue creMdiny 1 ontu'

*Offering Circular:* greddie F aMs F ortyaye HartiMcation 1  certifiMtes Cfferiny 1 irMhar dated N1ne nb2nb992as a1 ended and svccte1 ented , 0 an0 qvcche1 ents issved fro1 ti1 e to ti1 e2or an0 Massor tuereto2as it 1 a0 , e a1 ended and svccte1 ented fro1 ti1 e to ti1 e'

*Payment Date:* Gue 97tu of eaM 1 ontu or2if tue 97tu is not a - vsiness p a02tue ne) t - vsiness p a0'

*Payment Delay:* Gue deha0 , etx een tue first da0 of tue DMrvahHeriod for a H1 and tue related Ha01 ent p ate'

*PC:* J itu resceM to eaM H1 Hool2a F ortyaye HartiMcation 1 certifiMte issved cvrrsvant to tuis Dyree1 ent2recresentiny a , enefiMahox nersuic interest in svMaM H1 Hooli Gue ter1 ; H1 PPinMdes a Aold H1 or an D" F H1 vnless tue Mnte)t reUvires otuerx ise'

*PC Coupon:* Gue cer annv1 fij ed or adSvsta, he rate of a H1 MhMhhated as desMifi, ed in tue Cfferiny 1 irMhar or tue accliM, he Hoohqvcche1 ent2M01 cvted on tue , asis of a 36b8da0 0ear of tx elze 3b&da0 1 ontus'

*PC Issue Date:* J itu resceM to eaM H1 Hool2tue date sceMfied in tue related Hoohqvcche1 ent or2if not sceMfied tuerein2tue date on x uiM greddie F aM issves a H1 in e) Manye for tue F ortyayes delizered , 0 a dealer or otuer Msto1 er'

1

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Pool:* J̌ itu rescěMto eaM̌ Hł 2tue Mʳcvs of tue relħted trvst fvnd Meated , 0 tuis Dyree1 ent2M̌nsistiny of Ǧ. tue relħted F ortyayes and aľhcroMeds tuereof2Ǧi. a1 ovnts on decosit in tue 1 vstodiahDM̌ovnt2to tue e) tent aľhoM̌, ľe to svM̌ Hł Hool2Ǧii. tue riyut to reM̌ize ca01 ents vnder tue relħted yvarantee and Ǧz. an0 otuer assets sceM̌fied in tue relħted Hoohqvcche1 ent2e) M̌vdiny an0 inzest1 ent earninys on an0 of tue assets of tuat Hł Hool J̌ itu rescěMto eaM̌ Hł Hool2and vnless e) cress10 stated otuerx ise2tue crozisions of tuis Dyree1 ent x iľh, e intercreted as referriny onł0 to tue F ortyayes inM̌vded in tuat Hł Hool2 tue Hł s issved , 0 tuat Hł Hoohand tue Tolders of tuose Hł s'

*Person:* Dn0 ľeyahcerson2inM̌vdiny an0 indizidvaľ2M̌rcoration2cartnersuic2ħi1 ited ħia, iľit0 M̌01 can02finanM̌ahinstitvtion2Sint zentvre2assoM̌ation2 Sint stoM̌vM̌01 can02trvst2vninM̌rcorated oryani(ation or yozern1 entahvnit or cohitiM̌hsv, dizision of an0 yozern1 entahvnit'

*Pool Factor:* J̌ itu rescěMto eaM̌ Hł Hool2a trvnM̌ted eiyut&liyit deM̌1 ahM̌HM̌hted for eaM̌ 1 ontu , 0 tue Dd1 inistrator x uiM̌2x uen 1 vľticlied , 0 tue oriyinahcrinM̌cah, ahnnM̌ of tue relħted Hł s2x iľheUvahtueiŕreŕaininy·crinM̌cah·a1 ovnt' Gue HoohgaM̌or for an0 1 ontu refleM̌s tue reŕaininy crinM̌cah a1 ovnt after tue ca01 ent to , e 1 ade on tue Ha01 ent p ate in tue sa1 e 1 ontu for Aohd Hł s or in tue foľhox iny 1 ontu for D" F Hł s'

*Pool Supplement:* Dn0 cu0siM̌hor eleM̌roniM̌loM̌1 ent or reM̌rd Gt uiM̌ 1 a0 , e a svcche1 ent to tue Cfferiny 1 irM̌har or an0 otuer svcche1 entah doM̌1 ent crecared , 0 greddie F aM̌for tue relħted Hł s.2x uiM̌2toyetuer uerex itu2ezidenM̌s tue esta, ħisu1 ent of a Hł Hoohand 1 odifies2a1 ends or svcche1 ents tue crozisions uereof in an0 resceM̌x uatsoezer' Gue Hoohqvcche1 ent for a cartiM̌har Hł Hoohsuaľh, e , indiny and effeM̌ize vcon for1 ation of tue relħted Hł Hoohand issvanM̌ of tue relħted Hł s2x uetuer or not svM̌ Hoohqvcche1 ent is e) eM̌ted2deľizered or cv, ħisued , 0 greddie F aM̌

*Purchase Documents:* Gue 1 ortyaye cvrM̌ase ayree1 ents , etx een greddie F aM̌and its F ortyaye selľers and serziM̌rs2x uiM̌ are tue MntraM̌s tuat yozern tue cvrM̌ase and serziM̌iny of F ortyayes and x uiM̌ inM̌vde2a1 ony otuer tuinys2tue Avide and an0 neyotiated 1 odifiM̌ions2a1 end1 ents or svcche1 ents to tue Avide'

*Record Date:* Ds to an0 Ha01 ent p ate2tue M̌ose of , vsiness on tue ħast da0 of Ǧ. tue creM̌diny 1 ontu for Aohd Hł s or Ǧi. tue seM̌nd creM̌diny 1 ontu for D" F Hł s'

*S&P:* qtandard & HoorP̌s " atinys qerziM̌s2a dizision of Gue F M̌rax 8Tiľh1 o1 canies25nM̌2or an0 svM̌essor tuereto'

*Trustee:* greddie F aM̌in its M̌caM̌t0 as trvstee of eaM̌ Hł Hoohfor1 ed vnder tuis Dyree1 ent2and its svM̌4ssors and assiyns2x uiM̌ x iľhuaze tue trvstee resconsi, iłities sceM̌fied in tuis Dyree1 ent2as a1 ended or svcche1 ented fro1 ti1 e to ti1 e'

*Trustee Event of Default:* Ds defined in qeM̌ion 6'b6 of tuis Dyree1 ent'

7

# ARTICLE I

## Conveyance of Mortgages; Creation of PC Pools

**Section 1.01. Declaration of Trust; Transfer of Mortgages.** Gue p ecositor2, 0 delizeriny an0 F ortyayes cvrsvant to tuis Dyree1 ent2vnMnditionalH02 a, solvtel0 and irrezoM, l0 uere, 0 transfers2assiyns2sets ozer and otuerx ise Mnze0s to tue Grvstee2on , eualf of tue relhted Tohlders2alhof tue p ecositorPs riyut2tithe and interest in and to svMd F ortyayes2inMvdiny alhca01 ents of crinMcahand interest tuereon reMized after tue 1 ontu in x uiMd tue Hl 5ssve p ate oMvIrs' CnMd F ortyayes uaze , een identified as , einy cart of a rehted Hl Hoohfor x uiMd at least one Hl uas , een issved2tue0 sualhre1 ain in tuat Hl Hooh vnhrss re1 ozed in a 1 anner Mnsistent x itu tuis Dyree1 ent' 1 onMrrentl0 x itu tue p ecositorPs transferriny2assiyniny2settiny ozer and otuerx ise Mnze0iny tue F ortyayes to tue Grvstee for a Hl Hool2tue Grvstee uere, 0 aMdcts tue F ortyayes so Mnze0ed and aMnox hedyes tuat it uolds tue entire Mrcvs of eaMd Hl Hoohin trvst for tue e) Mvsize , enefit of tue rehted Tohlders and sualhdelizer to2or on tue order of2tue p ecositor2tue Hl s issved , 0 svMd Hl Hooh' Gue Dd1 inistrator ayrees to ad1 inister tue rehted Hl Hoohand svMd Hl s in aMdordanMd x itu tue ter1 s of tuis Dyree1 ent' Cn tue rehted Hl 5ssve p ate and vcon ca01 ent to tue p ecositor for an0 svMd Hl , 0 a Tohder2svMd Tohder sualh2, 0 zirtve tuereof2aMnox hedye2aMdct and ayree to , e , ovnd , 0 alhof tue ter1 s and Mnditions of tuis Dyree1 ent'

D Hoohqvcche1 ent sualhezidenMd tue esta, hisu1 ent of a cartiMhar Hl Hoohand sualhrehte to sceMdri MH1 s recresentiny tue entire , enefiMdhox nersuic interests in svMd Hl Hooh' 5f for an0 reason tue Mreation of a Hoohqvcche1 ent is dehn0ed2greddie F aMsualhMeate one as soon as craMd5M, le2and svMd dehn0 sualhnot affeMd tue zahidit0 and e) istenMd of tue Hl Hoohor tue rehted Hl s' J itu resceMd to eaMd Hl Hool2tue MdteMize ter1 s uereof and of tue rehted Hooh qvcche1 ent sualhyozern tue issvanMd and ad1 inistration of tue Hl s rehted to svMd Hl Hool2and alh1 atters rehted tuereto2and sualhuaze no accliM, ilit0 to an0 otuer Hl Hoohor Hl s' Ds acchied to eaMd Hl Hool2tue MdteMize ter1 s uereof and of tue rehted Hoohqvcche1 ent sualhMnstitvte an ayree1 ent as if tue MdteMize ter1 s of tuose instrv1 ents x ere set fortu in a sinyhe instrv1 ent' 5n tue ezent of a Mnfhi M, etx een tue ter1 s uereof and tue ter1 s of a Hoohqvcche1 ent for a Hl Hool2tue ter1 s of tue Hoohqvcche1 ent sualhMntrohx itu resceMd to tuat Hl Hooh' D Hoohqvcche1 ent is not Mnsidered an a1 end1 ent to tuis Dyree1 ent reUviriny accrozahcvrsvant to qeMion j 'b7'

**Section 1.05. Identity of the Mortgages; Substitution and Re2urchase.**

G., 5n Mnsideration for tue transfer of tue rehted F ortyayes , 0 tue p ecositor to a Hl Hool2tue p ecositor G., sualhreMize tue Hl s issved , 0 svMd Hl Hooh and Gi. 1 a0 retain svMd Hl s or transfer tue1 to tue rehted F ortyaye sehter or otuerx ise2as tue p ecositor dee1 s accrocriate'

Q., Dfter tue Hl 5ssve p ate , vt crior to tue first Ha01 ent p ate2tue p ecositor 1 a02in aMdordanMd x itu its Msto1 ar0 1 ortyaye cvrMase and coohiny croMdvres2adSvst tue a1 ovnt and identit0 of tue F ortyayes to , e transferred to a Hl Hool2tue Hl 1 ovcon andWir tue oriyinahvncaid crinMcah, ahanMd of tue Hl s and tue F ortyayes in tue Hl Hool2crozided tuat an0 Manyes to tue MdaraMeristiMd of tue Hl s sualh, e ezidenMd , 0 an a1 end1 ent or svcche1 ent to tue rehted Hoohqvcche1 ent'

OMd V) Mdct as crozided in tuis qeMion 9'bmor in qeMion 9'b32onMd tue p ecositor uas transferred a F ortyaye to a cartiMhar Hl Hool2svMd F ortyaye 1 a0 not , e transferred ovt of svMd Hl Hool2e) Mdct Q.; if a 1 ortyaye insvrer e) erMses an oction vnder an insvranMd MntraMd to cvrMase svMd F ortyaye or Qii. in tue Mse of recvrMase , 0 tue Avarantor2tue Dd1 inistrator or tue rehted F ortyaye sehter or serzi Mr2vnder tue fohhox iny MrM1 1 stanMs:

G., Gue Avarantor 1 a0 recvrMase fro1 tue rehted Hl Hooha F ortyaye in Mnne Mion x itu a yvarantee ca01 ent vnder qeMion 3'bEG.Gi. '

6

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Gi. Gue Dd1 inistrator 1 a0 recvrMase fro1  tue relnted HI  Hool2or reUvire or cer1 it a F ortyaye selter or serziMr to recvrMase2an0 F ortyaye if a recvrMase is neMssar0 or adzisa, le GD. to 1 aintain serziMny of tue F ortyaye in aMordanM x itu tue crozisions of tue Avide2or G . to 1 aintain tue statvs of tue HI  Hoohas a yrantor trvst for federahinM1 e ta) cvrcoses'

Gii. Gue Avarantor 1 a0 recvrMase fro1  tue relnted HI  Hool2or reUvire or cer1 it a F ortyaye selter or serziMr to recvrMase2an0 F ortyaye if GD. svMd F ortyaye is 9nb or 1 ore da0s delinUvent2or G . tue Avarantor deter1 ines2on tue , asis of infor1 ation fro1  tue relnted , orrox er or serziMr2tuat bss of ox nersuic of tue crocert0 seMrriny a F ortyaye is livel0 or defavlt is i1 1 inent dve to , orrox er inMcaM02deatu or uardsuic or otuer e) traordinar0 MrM1 stanMs tuat 1 awe fvtvre ca01 ents on svMd F ortyaye vnlivel0 or i1 cossi, le'

Gz. Gue Avarantor 1 a0 recvrMase fro1  tue relnted HI  Hooha F ortyaye if a , anwrvctM0 Mdvrt accrozes a chn tuat 1 aterialH0 affeMs tue ter1 s of tue F ortyaye or avtuori(es a transfer or sv, stitvtion of tue vnderf0iiny crocert0'

G2. Gue Dd1 inistrator 1 a0 reUvire or cer1 it a F ortyaye selter or serziMr to recvrMase fro1  tue relnted HI  Hoohan0 F ortyaye or Gt ituin si) 1 ontus of tue issvanM of tue relnted HI s. sv, stitvte for an0 F ortyaye a F ortyaye of M1 cara, le t0ce2vncaid crinMcah, ahnnM2re1 aininy ter1  and 0iehl2if tuere is GD. a 1 ateriah, reaM of x arrant0 , 0 tue F ortyaye selter or serziMr2G . a 1 ateriahdefeM in doM1 entation as to svMd F ortyaye or G . a failvre , 0 a selter or serziMr to M1 cl0 x itu an0 reUvire1 ents or ter1 s set fortu in tue Avide and2if accliM, le2otuer HvrMase p oM1 ents'

G2i. Gue Dd1 inistrator sualhrecvrMase fro1  tue relnted HI  Hoohan0 F ortyaye or Gt ituin tx o 0ears of tue issvanM of tue relnted HI s. sv, stitvte for an0 F ortyaye a F ortyaye of M1 cara, le t0ce2vncaid crinMcah, ahnnM2re1 aininy ter1  and 0iehl2if tuere. 0. a Mdvrt of M1 cetent SrrisdiMion or a federah yozern1 ent ayenM0 dvl0 avtuori(ed to ozersee or reyvhte greddie F aMs 1 ortyaye cvrMase , vsiness deter1 ines tuat greddie F aMs cvrMase of svMd F ortyaye x as vnavtuori(ed and greddie F aMeter1 ines tuat a Mre is not craMM, le x ituovt vnreasona, le effort or e) cense or G . svMd Mdvrt or yozern1 ent ayenM0 reUvires recvrMase of svMd F ortyaye'

G2ii. Go tue e) tent a HI  HoohinMvdes Mdnzerti, le D" F s or - alhoonWeset F ortyayes GaaM2as defined in tue Cfferiny 1 irMhar.2tue Dd1 inistrator sualh recvrMase fro1  tue relnted HI s. Hoohor reUvire or alhox  tue F ortyaye selter or serziMr to recvrMase svMd F ortyayes Gx. x uen tue , orrox er e) erMses its oction to Mdnzert tue relnted interest rate fro1  an adSvsta, le rate to a fi) ed rate2in tue Mse of a Mdnzerti, le D" F kand Q. suortl0 , efore svMd F ortyaye reaMes its sMedvlted , alhoon reca01 ent date2in tue Mse of a - alhoonWeset F ortyaye'

G3. Gue cvrMase criM of a F ortyaye recvrMased , 0 a F ortyaye selter or serziMr sualh, e eUvahto tue tuen vncaid crinMcah, ahnnM of svMd F ortyaye2 less an0 crinMcahon svMd F ortyaye tuat tue F ortyaye selter or serziMr adzanMd to tue p ecositor or tue Dd1 inistrator' Gue cvrMase criM of a F ortyaye recvrMased , 0 tue Dd1 inistrator or tue Avarantor vnder tuis Dyree1 ent sualh, e eUvahto tue tuen vncaid crinMcah, ahnnM of svMd F ortyaye2less an0 ovtstanding adzanMs of crinMcahon svMd F ortyaye tuat tue Dd1 inistrator2on , eualf of tue Grvstee2distri, vted to Tolders' Gue Dd1 inistrator2on , eualf of tue Grvstee2ayrees to release an0 F ortyaye fro1  tue HI  Hoohvcon ca01 ent of tue accliM, le cvrMase criM'

G4. 5n deter1 ininy x uetuer a F ortyaye sualh, e recvrMased fro1  tue relnted HI  Hoohas desM, ed in tuis qeMion 9'bn2tue Avarantor and tue Dd1 inistrator 1 a0 Mdnsider svMd faMors as tue0 dee1  accrocriate2inMlvdiny tue redvMion of ad1 inistratize Msts Gn tue Mse of tue Dd1 inistrator. or cossi, le e) cosvre as Avarantor vnder its yvarantee Gn tue Mse of tue Avarantor. '

j

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.0p. Post-Settle-ent Purchase Adust-ents**

Q. Gue Dd1 inistrator sualh1 awe an0 costSettle1 ent cvrMase adSvst1 ents neMssar0 to refleMtue aMvahayyreyate vncaid crinMcah, ahanM of tue rehated F ortyayes or ouer F ortyaye MaraMeristiM as of tue date of tueir cvrMase , 0 tue p ecositor or tueir delizer0 to tue Grvstee in e)Manye for Hl s2as tue Mse 1 a0 , e'

Q. Host8settle1 ent adSvst1 ents 1 a0 , e 1 ade in svMa 1 anner as tue Dd1 inistrator dee1 s accrocriate2, vt sualhnot adzersel0 affeMan0 TolderB's riyuts to 1 ontul0 ca01 ents of interest at tue Hl 1 ovcon2an0 TolderB's cro rata suare of crinMcahor an0 TolderB's riyuts vnder tue AvarantorB's yvarantees' Dn0 redvMion in tue crinMcah, ahanM of tue F ortyayes uehd , 0 a Hl Hoohsualh, e refleMed , 0 tue Dd1 inistrator as a Mrrescondiny redvMion in tue crinMcah , ahanM of tue rehated Hl s x itu a Mrrescondiny crinMcahca01 ent to tue rehated Tolders2on a cro rata , asis'

**Section 1.0j. Custody of Mortgage Docu-ents.** J itu resceMto eaM Hl Hool2tue Dd1 inistrator2a Mstodian aMiny as its ayent Gt uiMd 1 a0 , e a tuird cart0 or a trvst or Mstod0 decart1 ent of tue rehated selfer or serziMr.2or tue oriyinator or selfer of tue F ortyaye 1 a0 uohd tue rehated F ortyaye doM1 ents2 inMviiny F ortyaye notes and cartiMcation MrtifiMtes eziden Mny tue GrvsteeB's leyahox nersuic interest in tue F ortyayes' Gue Dd1 inistrator 1 a0 adoct and 1 odif0 its coliMes and croMdvres for tue Mstod0 of F ortyaye doM1 ents at an0 ti1 e2crozided svMd 1 odifiMtions are crvdent and do not 1 ateriahH0 and adzersel0 affeMtue TolderstPinterests'

**Section 1.04. Interests Held or Acquired by Freddie Mac.** greddie F aMsualhuaze tue riyut to cvrMase and uohd for its ox n aMMvnt an0 Hl s' qv, SeM to qeMion j 'b62Hl s uehd or aMMvired , 0 greddie F aMfro1 ti1 e to ti1 e and Hl s uehd , 0 otuer Tolders sualh eUvahand crocortionate , enefits2x ituovt creferenM2criorit0 or distinMion' 5n tue ezent tuat greddie F aMretains an0 interest in a F ortyaye2tue re1 aininy interest in x uiMd is cart of a Hl Hool2greddie F aMs interest in svMd F ortyaye sualhranweUvaHO x itu tuat of tue rehated Hl Hool2x ituovt creferenM2criorit0 or distinMion' Bo Tolder sualhuaze an0 criorit0 ozer an0 otuer Tolder'

**Section 1.06. Intended Characterization.** 5t is intended tuat tue Mnze0anM2transfer2assiyn1 ent and settiny ozer of tue F ortyayes , 0 tue p ecositor to tue Grvstee cvrsvant to tuis Dyree1 ent , e a trve2a, solvte and vnMnditionahsale of tue rehated F ortyayes , 0 tue p ecositor to tue Grvstee2and not a cledye of tue F ortyayes to seMre a de, t or otuer o, liyation of tue p ecositor2and tuat tue Tolders of tue rehated Hl s sualh, e tue , enefiMahox ners of svMd F ortyayes' Botx itustandiny tuis e)cress intention2uox ezer2if tue F ortyayes are deter1 ined , 0 a Mvrt of Ml cetent SrisdiMion or otuer Md1 cetent avtuorit0 to , e tue crocert0 of tue p ecositor2tuen it is intended tuat: Q. tuis Dyree1 ent , e dee1 ed to , e a seMrit0 ayree1 ent x ituin tue 1 eaniny of DrtiMes 4 and E of tue Rnifor1 1 o1 1 erMahM odeQ. tue Mnze0anMs crozided for in qeMion 9'b9 sualh, e dee1 ed to , e G9. a yrant , 0 tue p ecositor to tue Grvstee on , eualf of tue rehated Tolders of a seMrit0 interest in alhof tue p ecositorB's riyut GmMvdiny tue cox er to Mnze0 tithe tuereto.2tithe and interest2x uetuer nox ox ned or uereafter aMMvired2in and to tue rehated F ortyayes2an0 and alhyenerahintanyi, hes Mnsistiny of2arisiny fro1 or rehatiny to an0 of tue foreyoiny2and alhcroMeds of tue Mnzersion2zolvntar0 or inzolvntar02of tue foreyoiny into Msu2instrv1 ents2seMrities or otuer crocert02inMvdiny x ituovt hi1 itation alha1 ovnts fro1 ti1 e to ti1 e uehd or inzested in tue 1 vstodiahDMMvnt and alhoM, he to svM F ortyayes2x uetuer in tue for1 of Msu2instrv1 ents2seMrities or otuer crocert0 and Gn an assiyn1 ent , 0 tue p ecositor to tue Grvstee on , eualf of tue rehated Tolders of an0 seMrit0 interest in an0 alhof tue p ecositorB's riyut GmMvdiny tue cox er to Mnze0 tithe tuereto.2tithe and interest2x uetuer nox ox ned or uereafter aMMvired2in and to tue crocert0 desMi, ed in tue foreyoiny Mavse G9.kand Qd notifiMations to Hersons uohdiny svMd crocert02and aMMnox hedy1 ents2reMdicts or Mnfir1 ations fro1 Hersons uohdiny svMd crocert02sualh, e dee1 ed notifiMations to2or aMMnox hedy1 ents2reMdicts or Mnfir1 ations fro1 2finanMahinter1 ediaries2, ailees or ayents Gas aCchiMd, he. of tue Grvstee on , eualf of tue rehated Tolders2for tue cvrcose of cerfeMiny svMd seMrit0 interest vnder acchiMd, he hax '

4

**Section 1.07. Encu- brances.** V)Mct as 1 a0 otuerx ise , e crozided e) cressl0 in tuis Dyree1 ent2neituer greddie F aMnor tue Grvstee sualhdireM0 or indireM02assiyn2selH2disclose or or transfer alhor an0 cortion of or interest in an0 HI Hool2or cer1 it alhor an0 cortion of an0 HI Hoohto , e sv, SeM to an0 lien2Mail 21 ortyaye2seMrit0 interest2chedye or otuer enM1 , ranM of an0 otuer Herson' Guis qeMsion sualhnot , e Mnstrved as a hi1 itation on greddie F aMs riyuts x itu resceM to HI s ueld , 0 it in its Mrcorate McaM0'

## ARTICLE II

### Ad- istration and Servicing of the Mortgages

**Section 5.01. The Ad- istrator as Pri- ary Servicer.** J itu resceM to eaM HI Hool2tue Dd1 inistrator sualhserziM or svcerzise serziMny of tue related F ortyayes and ad1 inister2on , eualhof tue Grvstee2in aMrdanM x itu tue crozisions of tue Avide and tuis Dyree1 ent2inMvdiny 1 anaye1 ent of an0 crocert0 aMvired turovyu foreMosvre or otuerx ise2alhfor tue , enefit of tue related Tolders' Gue Dd1 inistrator sualhuaze fvlhcox er and avtuorit0 to do or Mvse to , e done an0 and alhtuinys in MnneMion x itu svM serziMny and ad1 inistration tuat tue Dd1 inistrator dee1 s neMssar0 or desira, le' Gue Dd1 inistrator sualhseewfro1 tue Grvstee2as recresentatize of tue related Tolders2an0 Mnsents or accrozals relatiny to tue Mntrol21 anaye1 ent and serziMny of tue F ortyayes inMvded in an0 HI Hoohand tuat are reUvired uerevnder'

**Section 5.05. Servicing Res2onsibilities.** J itu resceM to eaM HI Hool2tue Dd1 inistrator sualhserziM or svcerzise serziMny of tue related F ortyayes in a 1 anner Mnsistent x itu crvdent serziMny standards and in sv, stantialH0 tue sa1 e 1 anner as tue Dd1 inistrator serziMs or svcerzises tue serziMny of vnsoM 1 ortyayes of tue sa1 e t0ce in its cortfolio' 5n cerfor1 iny its serziMny resconsi, ilities uerevnder2tue Dd1 inistrator 1 a0 enyaye serziMrs2sv, serziMrs and otuer indecendent Mntra Mors or ayents' Gue Dd1 inistrator 1 a0 disMaryve its resconsi, ilit0 to svcerzise serziMny of tue F ortyayes , 0 1 onitoriny serziMrsP cerfor1 anM on a recvriny and e) Mction , asis' V) Mct as crozided in DrtiMles L and L5and qeMsions j 'b7 and j 'b6 of tuis Dyree1 ent2greddie F aMas Dd1 inistrator sualhnot , e sv, SeM to tue Mntrohof tue Tolders in tue disMaryve of its resconsi, ilities cvrsvant to tuis DrtiMe' V) Mct x itu reyard to its yvarantee o, liyations cvrsvant to qeMsion 3'bE x itu resceM to a HI Hool2tue Dd1 inistrator sualhuaze no hia, ilit0 to an0 related Tolder for tue Dd1 inistratorB aMions or o1 issions in disMaryiny its resconsi, ilities vnder tuis DrtiMe 55otuer tuan for an0 direM da1 aye resvltiny fro1 its failvre to e) erMse tuat deyree of ordinar0 Mare it e) erMses in tue MndvM and 1 anaye1 ent of its ox n affairs' 5n no ezent sualhtue Dd1 inistrator uaze an0 hia, ilit0 for MnseUventiahda1 ayes'

**Section 5.0p. Realization U2on Defaulted Mortgages.** J itu resceM to eaM HI Hool2vnless tue Dd1 inistrator dee1 s tuat anotuer Mvrse of aMion Q'y'2 Marye8off. x ovld , e in tue , est eMno1 iMinterest of tue Tolders2tue Dd1 inistrator Qr its avtuori(ed desiynee or recresentatize. sualh2as soon as craMM, le2 foreMose vcon Qr otuerx ise M1 cara, l0 Mnzert tue ox nersuic of. an0 reahcrocert0 seMriny a F ortyaye x uiM M1 es into and Mntinves in defavh and as to x uiM no satisfaMor0 arranye1 ents Mn , e 1 ade for MdiMation of delinUvent ca01 ents' 5n MnneMion x itu svM foreMosvre or Mnzersion2tue Dd1 inistrator Qr its avtuori(ed desiynee or recresentatize. sualhfolhox svM craMM es or croMdvres as it dee1 s neMssar0 or adzisa, le and Mnsistent x itu yenerah1 ortyaye serziMny standards'

**Section 5.0j . Auto- atic Acceleration and Assu- 2tions.**

Q. J itu resceM to eaM HI Hool2to tue e) tent crozided in tue Avide2tue Dd1 inistrator sualhenforM tue ter1 s of eaM accliM, le F ortyaye tuat yizes tue 1 ortyayee tue riyut to de1 and fvlhca01 ent of tue vncaid crinMcah, ahanM of tue F ortyaye vcon sale or transfer of tue crocert0 seMriny tue F ortyaye reyardless of tue Meditx ortuiness of tue transferee Qt riyut of ; avto1 atiMaMMderationP2.2sv, SeM to accliM, le state and federahhx and tue Dd1 inistratorB tuen8Mrrent serziMny coliMes'

E

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Q. J itu resceMto eaMd Hl Hool2tue Dd1 inistrator suaheer1 it tue assv1 ction , 0 a nex 1 ortyayor of an gTDWD F ortyaye vcon tue sale or transfer of tue vnderl0iny crocert02as reUvired , 0 accliM, he reyvhations' Dn0 svMd assv1 ction sualh, e in aMordanM x itu accliM, he reyvhations2coliMes2croMdvres and Medit reUvire1 ents and sualhnot resvlt in hoss or i1 cair1 ent of an0 insvranMd or yvarant0'

**Section 5.04. Pre2ay- ent Penalties.** Rnless otuerx ise crozided in tue Hoohqvccle1 ent for a Hl Hool2tue rehted Tohders sualhnot , e entitled to reMize an0 creca01 ent cenalties2assv1 ction fees or otuer fees Maryed on tue F ortyayes inMded in svMd Hl Hool2and eituer tue rehted serziMr or tue Dd1 inistrator sualhretain svMd a1 ovnts'

**Section 5.06. Mortgage Insurance and Guarantees.**

Q. J itu resceMto eaMd Hl Hool2if a l onzentionahF ortyaye is insved , 0 a l ortyaye insvrer and tue l ortyaye insvranMd coliM0 is an asset of svMd Hl Hool2tue rehted Tohders aMnox hedye tuat tue insvrer sualhuaze no o, hiyation to reMoyni( e or deahx itu an0 Herson otuer tuan tue Dd1 inistrator2tue Grvstee2 or tueir resceMize avtuori( ed desiynees or recresentatizes reyardiny tue l ortyayeeP3 riyuts2, enefits and o, hiyations vnder tue rehted insvranMd MntraM'

Q. J itu resceMto eaMd Hl Hool2eaMd gTDWD F ortyaye sualhuaze in fvlhforMd and effeMa MrtifiMte or otuer satisfaMor0 ezidenMd of insvranMd or yvarant02as tue Mise 1 a0 , e2as 1 a0 , e issved , 0 tue accliM, he yozern1 ent ayenM0 fro1 ti1 e to ti1 e' Bone of tuese ayenMes uas an0 o, hiyation to reMoyni( e or deahx itu an0 Herson otuer tuan tue Dd1 inistrator2tue Grvstee2or tueir resceMize avtuori( ed desiynees or recresentatizes x itu reyard to tue riyuts2, enefits and o, hiyations of tue l ortyayee vnder tue MntraM of insvranMd or yvarant0 rehtiny to eaMd gTDWD F ortyaye inMded in svMd Hl Hool'

## ARTICLE III

### Distributions to Holders; Guarantees

**Section p.01. Monthly Re2orting Period.** gor cvrcoses of tuis Dyree1 ent x itu resceMto an0 Hl Hool2an0 ca01 ent or an0 ezent x itu resceMto an0 F ortyaye inMded in svMd Hl Hoohtuat is recorted to tue Dd1 inistrator , 0 tue rehted serziMr as uaziny , een 1 ade or uaziny oMMrred x ituin a F ontuh0 " ecortiny Heriod sualh, e dee1 ed to uaze , een reMized , 0 tue Dd1 inistrator or to uaze in faMoMMrred x ituin svMd F ontuh0 " ecortiny Heriod vsed , 0 tue Dd1 inistrator for svMd cvrcoses' Ha01 ents recorted , 0 serziMrs inMde alhcrinMdahand interest ca01 ents 1 ade , 0 a , orrox er2insvranMd croMeds2 liUvidation croMeds and recvrMase croMeds' Vzents recorted , 0 serziMrs inMde foreMosvre sales2ca01 ents of insvranMd Mhi1 s and ca01 ents of yvarantee Mhi1 s'

**Section p.05. Holder's Undivided Beneficial Ownershi2 Interest.** J itu resceMto eaMd Hl Hool2tue Tohder of a Hl on tue " eMord p ate sualh, e tue ox ner of reMord of a cro rata vndizided , enefiMahox nersuic interest in tue re1 aininy crinMdah, ahnM0 of tue F ortyayes in tue rehted Hl Hoohas of svMd date and sualh, e entitled to interest at tue Hl l ovcon on svMd cro rata vndizided , enefiMahox nersuic interest2in eaMd Mise on tue rehted Ha01 ent p ate' qvMd cro rata vndizided , enefiMahox nersuic interest sualhManye aMordinyl0 if an0 F ortyaye is added to or re1 ozed fro1 svMd Hl Hoohin aMordanM x itu tuis Dyree1 ent' D Tohder's cro rata vndizided , enefiMahox nersuic interest in tue F ortyayes inMded in a Hl Hoohis MMMhnted , 0 dizidiny tue oriyinahvncaid crinMdah, ahnM0 of tue Tohder's Hl , 0 tue oriyinahvncaid crinMdah, ahnM0 of alhtue F ortyayes in tue rehted Hl Hool'

**Section p.0p. Distributions of Princi2al.** J itu resceMto eaMd Hl Hool2tue Dd1 inistrator2on , eualf of tue Grvstee2sualhx itudrax fro1 tue 1 vstodiah DMMvnt and sualhdistri, vte to eaMd rehted Tohder its cro rata suare of crinMdah2MMheMions x itu resceMto tue F ortyayes in svMd Hl Hool2inMdiny2if accliM, he2eaMd Tohder's cro rata suare of tue ayyreyate a1 ovnt of an0 p eferred 5nterest tuat uas , een

9b

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1859

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to tue crinMcah, ahnnM of tue rehted F ortyayesk *provided, however* 2tuat x itu resceM to yvarantee ca01 ents2tue AvarantorB o, hiyations uerein sualh, e sv, SeM to its sv, royation riyuts cvrsvant to qeMion 3'9b' Gue Dd1 inistrator 1 a0 retain fro1 an0 creca01 ent or delinUvent crinMcahca01 ent on an0 F ortyaye2for rei1 , vrse1 ent to tue Avarantor2an0 a1 ovnt not creziovsl0 reMized x itu resceM to svMaF F ortyaye , vt caid , 0 tue Avarantor to tue rehted Tohders vnder its yvarantee' gor F ortyayes cvrMased , 0 tue p ecositor in e) Manye for Hl s vnder its F vlti§ender qx ac Hroyra1 2tue p ecositor sualhretain crinMcahca01 ents 1 ade on svMaF F ortyayes in tue a1 ovnt of an0 differenM , etx een tue ayyreyate vncaid crinMcah, ahnnM of tue F ortyayes as of delizer0 , 0 tue seHer and tue ayyreyate vncaid crinMcah, ahnnM as of tue Hl 5ssve p ate2and tue p ecositor sualhcvrMase additionahF ortyayes x itu svMaF crinMcah ca01 entsksvMl additionahF ortyayes 1 a0 or 1 a0 not , e inMvded in tue rehted Hl Hoohrecresented , 0 tue Hl s reMized , 0 tue seHer'

**Section p.0j . Distributions of Interest.** J itu resceM to eaMl Hl Hool2tue Dd1 inistrator2on , eualh' of tue Grvstee2sualhx itudrax fro1 tue l vstodiah DMMovnt and sualhdistri, vte to eaMl rehted Tohder its cro rata suare of interest MlHeMions x itu resceM to tue F ortyayes inMvded in svMl Hl Hool2at a rate eUvahto tue Hl 1 ovcon Q)Mvdiny2if acchiM, he2eaMl TohderB cro rata suare of an0 p eferred 5nterest tuat uas , een added to tue crinMcah, ahnnM of tue rehted F ortyayes.' 5nterest sualhaMMve dvriny tue acchiM, he DMMvahHeriods' Gue Dd1 inistrator 1 a0 retain fro1 an0 delinUvent interest ca01 ent on an0 F ortyaye2for rei1 , vrse1 ent to tue Avarantor2an0 a1 ovnt not creziovsl0 reMized x itu resceM to svMaF F ortyaye , vt caid , 0 tue Avarantor to tue rehted Tohders vnder its yvarantee' J itu resceM to eaMl Hl Hool2a cartiah1 ontuB interest retained , 0 greddie F aMbr rei1 itted to tue rehted Tohders x itu resceM to creca01 ents sualhMonstitvte an adSvst1 ent to tue fee ca0a, he to tue Dd1 inistrator and tue Avarantor cvrsvant to qeMion 3'b4Q. for svMl Hl Hooli'

**Section p.04. Pay- ents.**

Q. J itu resceM to eaMl Hl Hool2distri, vtions of crinMcahand interest on tue rehted Hl s sualh, eyin in tue 1 ontu after issvanM for Aohd Hl s and in tue seMond 1 ontu after issvanM for D" F Hl s' Gue Dd1 inistrator2on , eualh' of tue Grvstee2sualhMlMvhate2or Mvse to , e MlMvhated2for eaMl Hl tue distri, vtion a1 ovnt for tue Mrrent Mlendar 1 ontu'

Q. Cn or , efore eaMl Ha01 ent p ate2tue Dd1 inistrator2on , eualh' of tue Grvstee2sualhinstrvM tue gederah" eserze - anws to Medit ca01 ents on Hl s fro1 tue l vstodiahDMMovnt to tue accrocriate TohdersPaMMovnts' Gue rehted Hl HoolB ca01 ent o, hiyations sualh, e 1 et vcon trans1 ittahof tue Dd1 inistratorB ca01 ent order to tue gederah" eserze - anws crozided svffiMent fvnds are tuen on decosit in tue l vstodiahDMMovnt' D Tohder sualhreMize tue ca01 ent of crinMcah2if acchiM, he2and interest on eaMl Ha01 ent p ate on eaMl Hl ueld , 0 svMl Tohder as of tue rehted " eMord p ate'

QM Gue Dd1 inistrator relies on serziMrsPrecorts of 1 ortyaye aMMizit0 to crecare tue HoohgaMors' Guere 1 a0 , e delin0s or errors in croMissiny 1 ortyaye infor1 ation2svM as a serziMrB failvre to file an aMMvrate or ti1 el0 recort of its MlHeMions of crinMcahor its uaziny filed a recort tuat Mnnot , e croMssed' 5n tuese sitvations tue Dd1 inistratorB MlMvhation of sMvedvhed crinMcahto , e 1 ade on Aohd Hl s 1 a0 not refleMaMvahca01 ents on tue rehted F ortyayes' Gue Dd1 inistrator sualhaMMvnt for and reMonMMe an0 differenMs as soon as craMMM, he'

QM Gue Dd1 inistrator reserzes tue riyut to Manye tue ceriod dvriny x uiM a serziMr 1 a0 uohd fvnds crior to ca01 ent to tue Dd1 inistrator2as x elhas tue ceriod for x uiM serziMrs recort ca01 ents to tue Dd1 inistrator2inMvdiny adSvst1 ents to tue F ontul0 " ecortiny Heriod' Vituer Manye 1 a0 Manye tue ti1 e at x uiM creca01 ents are distri, vted to Tohders' Dn0 svMl Manye2uox ezer2sualhnot i1 cair TohdersPriyuts to ca01 ents as otuerx ise crozided in tuis qeMion'

Q. Gue Dd1 inistrator sualh1 aintain one or 1 ore aMMovnts Goyetuer2tue ; l vstodiahDMMovnt".2seyreyated fro1 tue yenerahfvnds of greddie F aMMin its Mrcorate MeaMM02for tue decosit of MlHeMions of

99

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

crinMcahOnMvdiny fvIhand cartiahcrinMcahcreca01 ents. and interest reMized fro1 or adzanMd , 0 tue serziMrs in resceMof of tue F ortyayes' F ortyaye MitheMions in resceMof tue HI Hoohs esta, Iisued , 0 greddie F aMvnder tuis Dyree1 ent or trvst fvnds esta, Iisued , 0 greddie F aMcvrsvant to an0 otuer trvst ayree1 ents 1 a0 , e M1 1 inyIed in tue 1 vstodiahDMMovnt2crozided tuat tue Dd1 inistrator weecs2or Mavses to , e vect2securate reMrds of fvnds x itu resceM to eaM svMd HI Hoohand otuer trvst fvnd'1 olteMions dve to greddie F aM2in its Mrcorate McaM0 as ox ner of 1 ortyayes ueId in its cortfolio21 a0 also , e M1 1 inyIed in tue 1 vstodiahDMMovnt2crozided tuat tue Dd1 inistrator sualhx itudrax svM a1 ovnts for re1 ittanM to greddie F aMon a 1 ontul0 , asis' gvnds on decosit in tue 1 vstodiahDMMovnt 1 a0 , e inzested , 0 tue Dd1 inistrator in Vhiyi, he 5nzest1 ents' 5nzest1 ent earninys on decosits in tue 1 vstodiahDMMovnt sualh, e for tue , enefit of tue Dd1 inistrator2and an0 losses on svMd inzest1 ents sualh, e caid , 0 tue Dd1 inistrator' Cn eaMd Ha01 ent p ate2a1 ovnts on decosit in tue 1 vstodiahDMMovnt sualh, e x itudrax n vcon tue order of tue Dd1 inistrator2on , eualh of tue Grvstee2for tue cvrcose of 1 awiny distri, vtions to tue reInted Tohders2in aMordanM x itu tuis Dyree1 ent'

## Section p.06. Pool Factors.

Q. Gue Dd1 inistrator2on , eualh of tue Grvstee2sualhMihMhate and 1 ave ca01 ents to Tohders on eaMd Ha01 ent p ate , ased on tue 1 ontul0 HoohgaMors OnMvdiny Beyatize D1 orti(ation gaMors. vntihsvM ti1 e as tue Dd1 inistrator deter1 ines tuat a 1 ore aMMrate and craMfiM, he 1 etuod for MihMhatiny svM ca01 ents is azaih, he and i1 cle1 ents tuat 1 etuod' Hvrsvant to qeMion j 'b7Q.2tue Dd1 inistrator 1 a0 1 odif0 tue HoohgaMor 1 etuodoloy0 fro1 ti1 e to ti1 e2 x ituovt tue Monsent of Tohders' J itu resceMto eaMd HI Hool2tue Dd1 inistrator2on , eualh of tue Grvstee2sualhdo tue folhox iny:

Q. Gue Dd1 inistrator sualhcv, hisu or Mavse to , e cv, hisued for eaMd 1 ontu a HoohgaMor x itu resceMto eaMd HI Hool' - eyinniny in tue 1 ontu after for1 ation of a HI Hool2HoohgaMors sualh, e cv, hisued on or a, ovt tue fiftu - vsiness p a0 of tue 1 ontu2x uiM HoohgaMors 1 a0 reffeMcreca01 ents recorted to tue Dd1 inistrator after tue end of tue reInted F ontul0 " ecortiny Heriod and , efore tue cv, hiMtion of tue acchiM, he HoohgaMors' Tox ezer2tue Dd1 inistrator 1 a02in its ox n disMetion2cv, hisu HoohgaMors on an0 otuer - vsiness p a0' Gue HoohgaMor for tue 1 ontu in x uiM tue HI Hoohis esta, Iisued is 9'bbbbbbbb and need not , e cv, hisued'

Qi. Gue Dd1 inistrator sualhdistri, vte crinMcaheaMd 1 ontu to a Tohder of a Aohd HI in an a1 ovnt eUvahto svM TohderB cro rata suare of svM crinMcal2MihMhated , 0 1 vhticl0iny tue oriyinahcrinMcah, ahanM of tue Aohd HI , 0 tue differenM , etx een its HoohgaMors for tue creMdiny and Mrrent 1 ontus'

Qii. Gue Dd1 inistrator sualhdistri, vte crinMcaheaMd 1 ontu to a Tohder of an D" F HI in an a1 ovnt eUvahto svM TohderB cro rata suare of svM crinMcal2MihMhated , 0 1 vhticl0iny tue oriyinahcrinMcah, ahanM of tue D" F HI , 0 tue differenM , etx een its HoohgaMors for tue tx o creMdiny 1 ontus'

Qz. Gue Dd1 inistrator sualhdistri, vte interest eaMd 1 ontu in arrears to a Tohder Qassv1 iny no p eferred 5nterest. in an a1 ovnt eUvahto 9Mntu of tue acchiM, he HI 1 ovcon 1 vhtichied , 0 svM TohderB cro rata suare of crinMcal2MihMhated , 0 1 vhticl0iny tue oriyinahcrinMcah, ahanM of svM TohderB HI , 0 tue creMdiny 1 ontuB HoohgaMor for Aohd HI s or , 0 tue seMnd creMdiny 1 ontuB HoohgaMor for D" F HI s'

Q. gor an0 1 ontu tuat p eferred 5nterest uas aMMved on a p eferred 5nterest HI 2tue Dd1 inistrator sualhdistri, vte crinMcahOf an0 is dve. to a Tohder in an a1 ovnt eUvahto svM TohderB cro rata suare of crinMcal2MihMhated , 0 OD. sv, traMiny tue creMdiny 1 ontuB HoohgaMor fro1 tue seMnd creMdiny 1 ontuB HoohgaMor2O . addiny to tue differenM tue Beyatize D1 orti(ation gaMor for tue creMdiny 1 ontu and O . 1 vhticl0iny tue resvhtiny sv1 , 0 tue oriyinahHI crinMcah, ahanM' Gue interest ca01 ent on tue p eferred 5nterest HI in tuat 1 ontu sualh, e O. 9Mntu of tue HI 1 ovcon

9m

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

1 vltiched , 0 Oii. tue oriyinahcrinМcah, ahnnМ of tue TohderЮ Hl  1 vltiched , 0 Oii. tue creМdiny 1 ontuЮ HoohgaМor 1 invs tue creМdiny 1 ontuЮ Beyatize D1 orti(ation gaМor'

Q. J itu resceМto eaМl Hl  Hool2a HoohgaМor suahrefteМd creca01 ents recorted for tue accliМ, le F ontul0 '' ecortiny Heriod' Gue Dd1 inistrator2on , eualrf of tue Grvstee21 a0 also2n its disМetion2refteМd in a HoohgaМor an0 creca01 ents recorted after tue end of tue accliМ, le F ontul0 '' ecortiny Heriod' Go tue e) tent a yizen HoohgaМor GldSysted as neМssar0 for ca01 ents 1 ade cvrsvant to tue AvarantorЮ yvarantee of ti1 el0 ca01 ent of sМedvled crinМcahon Aohd Hl s. does not refteМ tue aМvahvncaid crinМcah, ahnnМ of tue rehated F ortyayes2tue Dd1 inistrator suahhaМ6vnt for an0 differenМ , 0 adSystiny sv, seUvent HoohgaМors as soon as craМfiМ, le'

QМ5n tue Мase of a Hl  Hoohtuat is Мd1 crised of D'' F s2a HoohgaМor suahh, e , ased vcon tue vncaid crinМcah, ahnnМ of tue rehated F ortyayes tuat serziМrs recort to tue Dd1 inistrator for tue F ontul0 '' ecortiny Heriod tuat ended in tue seМnd 1 ontu creМdiny tue 1 ontu in x uiМ tue HoohgaМor is cv, lisued' Gue Dd1 inistrator2on , eualrf of tue Grvstee21 a0 also2n its disМetion2inМvde as cart of tue ayyreyate crinМcahca01 ent in an0 1 ontu an0 creca01 ents reМized after tue F ontul0 '' ecortiny Heriod tuat ended in tue seМnd 1 ontu creМdiny tue 1 ontu in x uiМ tue HoohgaМor is cv, lisued' Go tue e) tent a yizen HoohgaМor does not refteМ tue aМvahayyreyate vncaid crinМcah, ahnnМ of tue F ortyayes2tue Dd1 inistrator suahhaМ6vnt for an0 differenМ , 0 adSystiny sv, seUvent HoohgaМors as soon as craМfiМ, le'

Ql. Gue HoohgaМor 1 etuod for a Hl  Hooh1 a0 affeМ tue ti1 iny of reМict of ca01 ents , 0 rehated Tohders , vt suahhnot affeМ tue AvarantorЮ yvarantee x itu resceМ to svМl Hl  Hool2as set fortu in qeМion 3'bE' Gue AvarantorЮ yvarantee suahhnot , e affeМed , 0 tue i1 cle1 entation of an0 different 1 etuod for МdlМhtiny and ca0iny crinМcahand interest for an0 Hl  Hool2as cer1 itted , 0 tuis qeМion 3'b6'

### Section p.07. Servicing Fees; Retained Interest.

Ql. Go tue e) tent crozided , 0 МontractМvaharranye1 ent x itu tue Dd1 inistrator2x itu resceМto eaМl Hl  Hool2tue rehated serziМr of eaМl F ortyaye inМvded in svМl Hl  Hoohsuahh, e entitled to retain eaМl 1 ontu2as a serziМny fee2an0 interest ca0a, le , 0 tue , orrox er on a F ortyaye tuat e) Мeds tue serziМrЮ reUvired re1 ittanМ x itu resceМto svМl F ortyaye' VaМl serziМr is reUvired to ca0 alhe) censes inМrred , 0 it in МonneМion x itu its serziМny aМtizities and suahhnot , e entitled to rei1 , vrse1 ent for tuose e) censes2e) ММct as crozided in qeМion 3'b4ОМ' 5f a serziМr adzanМs an0 crinМcahand Мr interest on a F ortyaye to tue Dd1 inistrator crior to tue reМict of tue fvnds fro1  tue , orrox er2tue serziМr 1 a0 retain Ql. fro1  creca01 ents or МohheМions of delinUvent crinМcahon svМl F ortyaye an0 ca01 ents of crinМcahso adzanМd2or Qli. fro1  МohheМions of delinUvent interest on svМl F ortyaye an0 ca01 ents of interest so adzanМd' Go tue e) tent cer1 itted , 0 its serziМny ayree1 ent2tue serziМr is entitled to retain as additionahМl1 censation Мrtain inМidentahfees rehated to F ortyayes it serziМs'

Q. J itu resceМto a Hl  Hool2cvrsvant to tue rehated HvrМase p oМ1 ents2a selter 1 a0 retain eaМl 1 ontu as e) tra М1 censation a fi) ed a1 ovnt of interest on a F ortyaye inМvded in svМl Hl  Hooh' 5n svМl ezent2tue rehated serziМr suahretain eaМl 1 ontu as a serziМny fee tue e) Мss of an0 interest ca0a, le , 0 tue , orrox er on svМl F ortyaye Оess tue selterЮ retained interest a1 ovnt. ozer tue serziМrЮ reUvired re1 ittanМ x itu resceМto svМl F ortyaye'

### Section p.08. Ad- inistration Fee; Guarantee Fee.

Ql. qv, SeМl to an0 adSyst1 ents reUvired , 0 qeМion 3'bI2x itu resceМto an0 Hl  Hool2tue Dd1 inistrator and tue Avarantor suahh, e entitled to reМize fro1  1 ontul0 interest ca01 ents on eaМl rehated F ortyaye a fee Оo , e alhoМted , etx een tue Dd1 inistrator and tue Avarantor as tue0 1 a0 ayree. eUvahto tue e) Мss of an0 interest reМized , 0 tue Dd1 inistrator fro1  tue serziМr ozer tue a1 ovnt of interest ca0a, le to tue rehated Tohdersk *provided, however,* tuat tue ayyreyate fee a1 ovnt suahh, e avto1 atiМllу0 adSysted x itu resceМto eaМl Hl  Hoohto tue e) tent a HoohgaМor does not refteМ tue vncaid crinМcah

93

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

, ahnnM at tue F ortayes' Dn0 svM adSvst1 ent sualheUvahtue differenM , etx een Qi. interest at tue acchiM, he Hl 1 ovcon Mol cvted on tue ayyreyate vncaid crinMcah, ahnnM at tue F ortayes for svM 1 ontu , ased on 1 ontul0 crinMcahca01 ents aMvaH0 reMized , 0 tue Dd1 inistrator and Qii. interest at tue acchiM, he Hl 1 ovcon Mol cvted on tue re1 aininy , ahnnM at tue F ortayes inMvded in tue Hl Hoohderized fro1 tue HoohgaMor' Gue Dd1 inistrator sualh Q. x itudrax tue ayyreyate fee a1 ovnt fro1 tue 1 vstodiahDMvvnt crior to distri, vtions to tue rehated Tohders2Qi. retain its cortion of tue fee for tue Dd1 inistratorP3 ox n aMvnt and Qii. re1 it tue re1 aininy cortion of tue fee to tue Avarantor as tue yvarantee fee' 5n addition2tue Dd1 inistrator is entihed to retain as additionalM1 censation Mrtain inMdentahfees on tue F ortayes as crozided in qeMion nib7 and Mrtain inzest1 ent earninys as crozided in qeMion 3'b7Q. '

Q. Gue p ecositor sualhca0 alhe) censes inMrrred in MonneMion x itu tue transfer of tue F ortayes2tue esta, hisu1 ent and ad1 inistration of eaM Hl Hooh and tue issvanM of tue Hl s' Dn0 a1 ovnts GnMvdiny attorne0P3 fees. e) cended , 0 tue Grvstee or tue Dd1 inistrator Qor tue serziMrs on tue Dd1 inistratorP3 , eualf. for tue croteMion2creserzation or 1 aintenanM of tue F ortayes2or of tue reahcrocert0 seMriny tue F ortayes2or of crocert0 reMized in hiUvidation of or reahi(ation vcon tue F ortayes2sualh, e e) censes to , e , orne cro rata , 0 tue Dd1 inistrator and tue Tohders in aMordanM x itu tueir interests in eaM F ortaye' Gue Dd1 inistrator2on , eualf of tue Grvstee21 a0 retain an a1 ovnt svffiMent to ca0 tue cortion of svM e) censes , orne cro rata , 0 tue p ecositor and tue Tohders fro1 ca01 ents otuerx ise dve to Tohders2x uiM 1 a0 affeMtue ti1 iny of reMict of ca01 ents , 0 Tohders , vt sualhnot affeMtue AvarantorP3 o, hiyations vnder qeMion 3'bE'

0M Gue Dd1 inistrator sualhrei1 , vrse a serziMr for an0 a1 ovnt GnMvdiny attorne0P3 fees. it e) cends Qon tue Dd1 inistratorP3 , eualf and x itu its accrozah for tue croteMion2creserzation or 1 aintenanM of tue F ortayes2or of tue reahcrocert0 seMriny tue F ortayes2or of crocert0 reMized in hiUvidation of or reahi(ation vcon tue F ortayes' qvM e) censes sualh, e rei1 , vrsa, he to tue serziMr fro1 tue assets of tue rehated Hl Hool2to tue e) tent crozided in tue Avide'

Q1. Dn0 fees and e) censes desMi, ed a, oze sualhnot affeMtue AvarantorP3 yvarantee x itu resceMto an0 Hl Hool2as set fortu in qeMion 3'bE'

**Section p.09. Guarantees.**

Q. J itu resceMto eaM Hl Hool2tue Avarantor yvarantees to tue Grvstee and to eaM Tohder of a Hl :

Qi. tue ti1 el0 ca01 ent of interest at tue acchiM, he Hl 1 ovconk

Qii. tue fvthand finahca01 ent of crinMcahon tue vnderl0iny F ortayes on or , efore tue Ha01 ent p ate tuat fahs QD. in tue 1 ontu of its ginahHa01 ent p ate2for Aohd Hl s2or Q . in tue 1 ontu after its ginahHa01 ent p ate2for D" F Hl skand

Qiii. for Aohd Hl s onl02tue ti1 el0 ca01 ent of sMedvhed crinMcahon tue vnderl0iny F ortayes'

5n tue Mase of p eferred 5nterest Hl s2tue AvarantorP3 yvarantee of crinMcahinMvdes2and its yvarantee of interest e) Mvdes2an0 p eferred 5nterest added to tue crinMcah, ahnnMs of tue rehated F ortayes' Gue Avarantor sualh1 awe ca01 ents of an0 yvaranteed a1 ovnts , 0 transfer to tue 1 vstodiahDMvvnt for distri, vtion to tue rehated Tohders2in aMordanM x itu qeMions 3'b3 and 3'b1 ' Gue yvarantees cvrsvant to tuis qeMion x ilhinvre to tue , enefit of eaM Hl Hooh and its rehated Tohders2and sualh, e enforMa, he , 0 tue Grvstee of tuat Hl Hoohand , 0 svM Tohders2as crozided in DrtiMe L of tuis Dyree1 ent'

Q. Gue Avarantor sualhM01 cvte yvaranteed sMedvhed 1 ontul0 crinMcahca01 ents on an0 Aohd Hl 2sv, SeMto an0 acchiM, he adSvst1 ents2in aMordanM x itu croMdvres adocted , 0 tue Avarantor fro1 ti1 e to ti1 e' J itu resceMto eaM Hl Hool2an0 ca01 ent tue Avarantor 1 awes to tue Dd1 inistrator2on , eualf

9I

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of tue Grvstee2on aMovnt of tue AvarantorB yvarantee of sMedvled crinMcahca01 ents sualh, e Mnsidered to , e a ca01 ent of crinMcahfor cvrcoses of MMMntiny tue HoohgaMor for svMl Hl Hoohand tue TolderB cro rata suare of tue re1 aininy vncaid crinMcah, ahanM of tue rehated F ortyayes'

OM Gue AvarantorB yvarantees sualhMontinve to , e effeMize or sualh, e reinstated Q. in tue ezent tuat an0 crinMcahor interest ca01 ent 1 ade to a Tolder is for an0 reason retvrned , 0 tue Tolder cvrsvant to an order2deMee or Svdy1 ent of an0 Mvrt of M1 cetent SvrisdiMion tuat tue Tolder x as not entitled to retain svMl ca01 ent cvrsvant to tuis Dyree1 ent and Gi. notx itustandiny an0 crozision uereof cer1 ittiny fees2e) censes2inde1 nities or otuer a1 ovnts to , e caid fro1 tue assets of an0 Hl Hoohi

**Section p.10. Subrogation.** J itu resceMt to eaMl Hl Hool2tue Avarantor sualh, e sv, royated to alhtue riyuts2interests2re1 edies2cox ers and crizileyes of eaMl rehated Tolder in resceMt of an0 F ortyaye inMvded in svMl Hl Hoohon x uiMl it uas 1 ade yvarantee ca01 ents of crinMcahandWr interest to tue e) tent of svMl ca01 ents' Botuiny in tuis qeMion sualhi1 cair tue AvarantorB riyut to reMize distri, vtions in its McanM0 as Tolder2if it is a Tolder of an0 Hl s'

**Section p.11. Ter- ination U2on Final Pay- ent.** VaMl Hl Hoohis irrezoM, le and x ilhter1 inate onl0 in aMordanM x itu tue ter1 s of tuis Dyree1 ent' V) Mct as crozided in qeMions 3'b7Q.26'b6 and j 'b92x itu resceMt to eaMl Hl Hool2greddie F aM and tue GrvsteeB o, liyations and resconsi, ilities vnder tuis Dyree1 ent sualhter1 inate as to a Hl Hoohand its Tolders vcon Q. tue fvlhca01 ent to svMl Tolders of alhcrinMcahand interest dve to tue Tolders , ased on tue HoohgaMors or , 0 reason of tue AvarantorB yvarantees or Gi. tue ca01 ent to tue Tolder of alha1 ovnts uehd , 0 greddie F aM and tue Grvstee2 resceMize102and relvired to , e caid uerevnderk *provided, however*2tuat in no ezent sualhan0 Hl HoohMeated uere, 0 Montinve , e0ond tue e) ciration of m9 0ears fro1 tue deatu of tue svrzizor of tue desMndants of Nsecu Hl Kenned02tue hate a1 , assador of tue Rnited qtates to tue l ovrt of qt' Ni1 esB2Iziny on tue date uereof'

**Section p.15. Effect of Final Pay- ent Date.** Gue aMvahfinahca01 ent on a Hl 1 a0 oMMr crior to tue Ha01 ent p ate sceMified in qeMion 3'bEQ.Gi. dve to creca01 ents of crinMcal2inMvdiny creca01 ents 1 ade in MonneMon x itu tue recvrMase of an0 F ortyaye fro1 tue rehated Hl Hoohi

**Section p.1p. Pay- ent Error Corrections.** 5n tue ezent of a crinMcahor interest ca01 ent error2tue Dd1 inistrator2in its sole disMetion21 a0 effeM MorreMions , 0 tue adSyst1 ent of ca01 ents to , e 1 ade on fvtvre Ha01 ent p ates or in svMl otuer 1 anner as it dee1 s accrocriate'

## ARTICLE IV

### PCs

**Section j.01. For-  and Deno-  inations.** J itu resceMto eaMl Hl Hool2tue crinMcah, ahanMs2Hl 1 ovcons and otuer MaraMeristiM of tue Hl s to , e issved sualh, e sceMified in tue rehated Hoohqvcche1 ent' p elizer0 of tue Hl s of a Hl Hoohsualh, Monstitvte tue issvanM of tue Hl s for tuat Hl Hooli Hl s sualh , e issved2uehd and transfera, le onl0 on tue , oow8vntr0 s0ste1 of tue gederah'' eserze - anws in 1 ini1 v1 oriyinahcrinMcaha1 ovnts of $92bbb and additionah inMe1 ents of $9' Hl s sualhat alhti1 es re1 ain on decosit x itu a gederah'' eserze - anwin aMordanM x itu tue crozisions of tue - oow8vntr0 '' vles' D gederah '' eserze - anwx ilh1 aintain a , oow8vntr0 reMordweeciny s0ste1 for alhtransaMions in Hl s x itu resceMt to Tolders'

**Section j.05. Transfer of PCs.** Hl s 1 a0 , e transferred onl0 in 1 ini1 v1 oriyinahcrinMcaha1 ovnts of $92bbb and additionahinMe1 ents of $9' Hl s 1 a0 not , e transferred if2as a resvlt of tue transfer2tue

97

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or tue nex Tolder x ovld uaze on deposit in its aMdvnt Hl s of tue sal e issve x itu an oriyinahcrinMcaha1 ovnt of less tuan $92bbb'Gue transfer2 e)Manye or cledye of Hl s sualh, e yozerned , 0 tue fisMhayenM0 ayree1 ent , etx een greddie F aMind a gederah" eserze - anv2tue - oow8Vntr0 " vles and svMi otuer croMdvres as sualh, e agreed vcon fro1 ti1 e to ti1 e , 0 greddie F aMind a gederah" eserze - anw' D gederah" eserze - anwsualhaMonl0 vcon tue instrvMsons of tue Tolder in reMordiny transfers of a Hl ' D Marye 1 a0 , e 1 ade for an0 transfer of a Hl and sualh, e 1 ade for an0 ta) or otuer yozern1 entah Marye i1 cosed in MonneMsion x itu a transfer of a Hl ' greddie F aMuere, 0 assiyns to tue Grvstee greddie F aMs riyuts vnder eaMd fisMhayenM0 ayree1 ent x itu resceMto Hl s issved , 0 an0 Hl Hooli

**Section j .0p. Record Date.** Gue " eMord p ate for eaMd Ha01 ent p ate sualh, e tue Mbse of , vsiness on tue hast da0 of tue creMdiny 1 ontu for Aohd Hl s and tue seMnd creMdiny 1 ontu for D" F Hl s' D Tohder of a Hl on tue , oows and reMords of a gederah" eserze - anwon tue " eMord p ate sualh, e entihed to ca01 ent of crinMcahand interest on tue rehted Ha01 ent p ate' D transfer of a Hl 1 ade on or , efore tue " eMord p ate in a 1 ontu sualh, e reMoyni(ed as effeMize as of tue first da0 of svMd 1 ontu'

## ARTICLE V

## Re- edies

**Section 4.01. Events of Default.** J itu resceMd to eaMd Hl Hooh2an ; Vzent of p efavltHP1 eans an0 one of tue folhox iny ezents:

Qi. p efavlt , 0 tue Avarantor or tue Dd1 inistrator in tue ca01 ent of interest or crinMcahto tue rehted Tolders as and x uen tue sa1 e sualh, eMd1 e dve and ca0a, he as crozided in tuis Dyree1 ent2and tue Montinvan M of svMd defavlt for a ceriod of 3b da0s'

Q. gailvre , 0 tue Avarantor or tue Dd1 inistrator to o, serze or cerfor1 an0 otuer Mzenants of tuis Dyree1 ent rehtiny to tueir resceMize o, hyations2and tue Montinvan M of svMd failvre for a ceriod of 6b da0s after tue date of reMict , 0 svMd cart0 of x ritten notiMd of svMd failvre and a de1 and for re1 ed0 , 0 tue affeMed Tolders recresentiny not less tuan 67 cerMnt of tue re1 aininy crinMcah, ahanMd of an0 affeMed Hl Hooli

0M Gue entr0 , 0 an0 Mdvrt uaziny SvrisdiMion ozer tue Avarantor or tue Dd1 inistrator of a deMee or order for relief in an inzolvntar0 Mse vnder an0 acchiM, he , anwrvctM2insolzenM0 or otuer si1 ihr hax nox or uereafter in effeM2or for tue accoint1 ent of a reMizer2hiUvidator2assiynee2Mstodian or seUvestrator Q0r otuer si1 ihr offiMah of tue Avarantor or tue Dd1 inistrator or for an0 sv, stantiahcart of its crocert02or for tue x indiny vc or hiUvidation of its affairs2if svMd deMee or order re1 ains vnsta0ed and in effeMd for a ceriod of 6b MonseMtize da0s'

Qi. l o1 1 enM1 ent , 0 tue Avarantor or tue Dd1 inistrator of a zolvntar0 Mse vnder an0 acchiM, he , anwrvctM2insolzenM0 or otuer si1 ihr hax nox or uereafter in effeM2or Monsent , 0 tue Avarantor or tue Dd1 inistrator to tue entr0 of an order for relief in an inzolvntar0 Mse vnder an0 svMd hax 2or its Monsent to tue accoint1 ent of or tawiny cossession , 0 a reMizer2hiUvidator2assiynee2trvstee2Mstodian or seUvestrator Q0r otuer si1 ihr offiMah of tue Avarantor or tue Dd1 inistrator or for an0 sv, stantiahcart of tueir resceMize crocerties2or an0 yenerahassiyn1 ent 1 ade , 0 tue Avarantor or tue Dd1 inistrator for tue , enefit of Meditors2or failvre , 0 tue Avarantor or tue Dd1 inistrator yenerah0 to ca0 tueir de, ts as tue0 , eM1 e dve'

Gue accoint1 ent of a Monservator Q0r otuer si1 ihr offiMah , 0 a reyvhtor uaziny SvrisdiMion ozer tue Avarantor or tue Dd1 inistrator2x uetuer or not svMd cart0 Monsents to svMd accoint1 ent2sualhnot Monstitvte an Vzent of p efavlt'

96

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.